**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| GERALDO IGLESIAS, | ) | Case No. 19 C 6508 |
| | ) | |
| | ) | Hon. Virginia M. Kendall, |
| *Plaintiff*, | ) | District Judge |
| | ) | |
| *v.* | ) | Hon. Maria Valdez, |
| | ) | Magistrate Judge |
| REYNALDO GUEVARA, JOANN | ) | **JURY TRIAL DEMANDED** |
| HALVORSEN as SPECIAL | ) | |
| REPRESENTATIVE for ERNEST | ) | |
| HALVORSEN, STEVE GAWRYS, | ) | |
| ANTHONY RICCIO, ROBERT BIEBEL, | ) | |
| and the CITY OF CHICAGO, | ) | |
| | ) | |
| *Defendants*. | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, GERALDO IGLESIAS, by his attorneys LOEVY &

LOEVY, and complaining of Defendants REYNALDO GUEVARA, JOANN HALVORSEN as

SPECIAL REPRESENTATIVE for ERNEST HALVORSEN, STEVE GAWRYS, ANTHONY

RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO, states as follows:

### INTRODUCTION

1.      Plaintiff Geraldo Iglesias was wrongly convicted of the 1993 shooting death of

Monica Roman and spent 16 years in prison for a crime that he did not commit.

2.      Plaintiff had nothing to do with this shooting, and he has always maintained his

innocence.

3.      Not one piece of physical evidence connected Plaintiff to the Roman murder, and

he had no motive to commit the crime.

4.      Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence created by notorious Chicago Police Detective Reynaldo Guevara and the other Defendants.

5.      That false evidence included fabricated identifications from two eyewitnesses and manufactured testimony from a jailhouse informant named Francisco Vicente.

6.      Defendants arrested Vicente, who was facing decades of prison time, when they forced him to give statements implicating Plaintiff and four other men in crimes they had not committed. In a span of less than two months, Vicente claimed that all of these men, Plaintiff included, had spontaneously confessed to him that they were guilty of the murders that Defendants framed them for. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

7.      In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants also suppressed evidence that would have shown Plaintiff was innocent, as well as evidence that could have been used to undermine the testimony of the State's witnesses, including the testimony of Defendants themselves.

8.      Defendants' misconduct resulting in Plaintiff's wrongful conviction was just part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and the other Defendants. Indeed, Plaintiff is one of nineteen men exonerated after being convicted on murder charges resulting from corrupt homicide investigations conducted by Defendant Guevara and his fellow Area 5 detectives and supervisors.

9.      In court proceedings after Plaintiff's wrongful conviction, Defendant Guevara has pleaded his Fifth Amendment right not to incriminate himself in response to questions about

his misconduct as a police officer, and specifically about his misconduct during the investigation of the Roman murder.

10.     In 2017, Cook County Judge James Obbish found that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

11.     Shortly thereafter, after a new investigation, Plaintiff's conviction was vacated and all charges against him were dropped. More than 25 years after his terrible ordeal began, Plaintiff was finally exonerated.

12.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

14.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In addition, many if not all of the Defendants reside in this judicial district.

## PARTIES

16.     Plaintiff Geraldo Iglesias spent 16 years wrongly incarcerated for a murder that he did not commit.

17.     At all times relevant to the events described in this Complaint, Defendants Reynaldo Guevara, Steve Gawrys, Anthony Riccio, and other unknown law enforcement officers, as well as deceased officer Ernest Halvorsen were police officers in the Chicago Police Department. The collective "Defendants" includes Mr. Halvorsen.

18.     JoAnn Halvorsen, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

19.     At all times relevant to the events described in this Complaint, Defendant Robert Biebel and other unknown law enforcement officers supervised the officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

20.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Roman murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

21.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

22.     On June 7, 1993, Jesus Gonzalez, Jose Coronell, Daniel Sanchez, Hugo Rodriguez, Monica Roman, and Marcelle "Marci" Cordero were driving around their Logan Square neighborhood, running a variety of errands.

23.     Gonzalez was driving the car. Coronell, Sanchez, and Rodriguez were sitting in the back seat. Cordero and Roman were sharing the front passenger seat.

24.     At or about 4:00 pm, the group dropped Cordero off at her home, located at 2135 North Sawyer Avenue, and they parked in an alley near that address while Cordero brought out her baby niece for her friends to meet.

25.     As Cordero went back inside and Gonzalez began driving again north on Sawyer, an individual on the street shouted "King love!" and fired five shots from behind Gonzalez's vehicle.

26.     The shooter immediately ran south, away from the car, and turned into an alley.

27.     As soon as the shooting began, all occupants of Gonzalez's car ducked for cover as Gonzalez tried to speed away.

28.     Two of the shots hit Roman.

29.     Gonzalez drove to a nearby gas station on Fullerton and called the police.

30.     Monica Roman was transported to the hospital, where she died later that night.

### The Initial Police Investigation

31.     Officers responding to the scene tracked down several potential witnesses, all of whom related similar accounts: that a single shooter with a black hoodie over his head had shot at the vehicle before running away.

32.     The witnesses at the scene consistently described the shooter as someone in all black, between 5'7" to 5'9", who ran south after firing shots at the vehicle.

33.     Rosendo Ochoa, Cordero's cousin, was living with her at 2135 North Sawyer at the time. He was at a top-floor window during the incident.

34.     From that vantage point, the shooter was extremely far away from Ochoa, below him, and obstructed by trees.

35.     Ochoa told police that he saw a male dressed in all black with a sweatshirt hood over his head, standing behind a tree across the street, in front of the large apartment building at 2148 North Sawyer.

36.     Ochoa claimed to have watched that man fire shots at the car, then run southbound briefly before turning into an alley.

37.     Ochoa provided a description of the shooter, saying that he was a male Hispanic, 17 to 19 years old, between 5'5" and 5'7" tall, weighing between 135 and 140 pounds, clean shaven, and wearing black pants and a black hooded sweatshirt.

38.     Ochoa could not provide additional descriptive information.

39.     Meanwhile, the four surviving passengers in the targeted car were largely unable to provide helpful information to the first investigating officers.

40.     They were unable to provide helpful information because they had ducked to take cover and were in a crowded vehicle going northbound as the shooter fired from the south.

41.     Neither Gonzalez nor Sanchez caught a glimpse of the shooter.

42.     Coronell and Rodriguez both claimed to have seen the shooter run into an alley as their car sped away, but the only description they could give of the shooter was that he was wearing black.

43.     As discussed below, Plaintiff did not fit the witness descriptions of the perpetrator.

**Defendants Conjure an Investigative Lead Out of Thin Air**

44.     For two weeks after the crime, given what witnesses had seen and the way the crime occurred, the police generated no suspects and had no solid leads.

45.     Almost none of the eyewitnesses had gotten a look at the shooter's face, and even those who had said the person's face had been occluded by the hood of his sweatshirt throughout the crime.

46.     Plus, the shooting had happened extremely quickly, followed immediately by the offender's swift escape from the scene through alleyways.

47.     Nonetheless, on or about June 21, 1993, Defendant Guevara and Mr. Halvorsen picked up the investigation and immediately solved the crime.

48.     Defendant Guevara claimed that he had received a tip from a confidential informant who was a member of the Imperial Gangsters street gang. That informant allegedly told Guevara that members of the gang were talking about "Snake" killing a girl in a car on Sawyer and Palmer. Defendant Guevara reported that "Snake" was the nickname of Plaintiff, and so he acquired a Polaroid photo of Plaintiff.

49.     This story was entirely fabricated by Defendant Guevara.

50.     Defendant Guevara made up the confidential informant. Indeed, when asked about it under oath he has asserted his Fifth Amended right against self-incrimination.

51.     Defendant Guevara settled on Plaintiff as his suspect first, and he set about framing him for Roman's murder.

52.     At all times, it was obvious that Plaintiff could not have been the person who committed the crime because he did not match the profile of the shooter. Plaintiff was of a

different complexion, a different height, and he had facial hair, contrary to the description of all eyewitnesses.

53. In addition, there was no reason to suspect that Plaintiff had a motive to commit Roman's murder (or any other crime). At the time of the investigation at issue in this case, Plaintiff was attending classes to get his G.E.D., and he was working in the YMCA's gang prevention program, cleaning up graffiti and trying to keep kids away from gangs. He had a newborn son whom he was working hard to care for. Plaintiff was not the violent gang member that the police were looking for.

54. Nevertheless, after Defendant Guevara settled on Plaintiff as a suspect, the remainder of Defendants' investigation was spent manufacturing evidence to frame Plaintiff for the crime.

**Defendants Fabricate An Identification from Ochoa**

55. On or about June 22, 1993, more than two weeks after the shooting, Defendant Guevara and Mr. Halvorsen met with Ochoa and showed him a photo array.

56. Ochoa viewed photographs that Defendants showed him, and he purportedly identified Plaintiff as the man who shot Roman.

57. Ochoa's identification of Plaintiff was fabricated by Defendants, and it would not have occurred but for their use of unduly suggestive identification procedures to get him to select their suspect.

58. Ochoa's identification of Plaintiff was contrary to the original, limited description of the shooter that he had provided to police.

59. In addition, Ochoa's identification of Plaintiff was impossible given Ochoa's vantage point during the crime, the shooter's dress, and the passage of time between the crime and Defendants' identification procedure.

60.     Nonetheless, based on their photo identification procedure with Ochoa, Defendants arrested Plaintiff on or about June 23, and they transported Plaintiff to Area Five.

### Defendants Fabricate An Identification from Rodriguez

61.     Defendants also brought other witnesses in the investigation to Area Five, including Hugo Rodriguez, Jose Coronell, and Daniel Sanchez, who had been riding in the car with Roman.

62.     None of the witnesses could provide any additional information to the Defendants. But Defendants would not take no for an answer.

63.     They focused on Rodriguez, who had been riding in the back of the car at the time of the crime.

64.     Despite the fact that they had Plaintiff in custody and could have shown him to Rodriguez in a live lineup, Defendants showed Rodriguez photos, just as they had with Ochoa.

65.     Again, Defendants reported falsely that Rodriguez had identified Plaintiff as the shooter.

66.     Rodriguez's identification of Plaintiff was fabricated by Defendants, and it would not have occurred but for their use of unduly suggestive identification procedures to get him to select their suspect.

67.     Rodriguez's identification of Plaintiff was contrary to the fact that he initially had been unable to provide any contemporaneous description of the shooter other than to say he was wearing black.

68.     In addition, Rodriguez's identification of Plaintiff was impossible given that the shooter was behind him, he was in a moving car, his view was obstructed, and he was ducking down at the time of the shooting.

**Defendants' Reported Live Lineup Procedures**

69.     Defendants reported that they placed Plaintiff in two live lineup procedures after their photo identification procedures with Ochoa and Rodriguez.

70.     These live lineups were unduly suggestive and were conducted solely to cement Defendants' fabricated photo identifications.

71.     The result of these live lineup procedures were a forgone conclusion given that Defendants had showed both Ochoa and Rodriguez pictures of Plaintiff shortly before they viewed Plaintiff in the live lineups.

72.     Defendants falsely reported that both Ochoa and Rodriguez identified Plaintiff in legitimate live lineup procedure.

73.     In fact, Defendants never conducted legitimate lineup procedures with Ochoa or Rodriguez.

**Defendants' Fabricate A Jailhouse Confession**

74.     Despite fabricating eyewitness identifications in order to frame Plaintiff for the Roman murder, Defendants thought they needed additional evidence to obtain a conviction.

75.     To address the evidentiary holes in their case, Defendants fabricated a jailhouse confession. They created false evidence that Plaintiff had confessed to the Roman shooting to a man named Francisco Vicente.

76.     Defendants knew that Plaintiff had never confessed to Vicente and that Vicente's testimony was false. In fact, Defendants manufactured all of Vicente's statements implicating Plaintiff.

77.     What Plaintiff did not know at the time of the investigation is that Vicente was already known to Defendants and had been used by them to help "solve" other murders with false statements.

78.     In May 1993, Vicente had been arrested on four felony charges. He was facing up to 100 years in prison, was suffering from heroin withdrawal, and was highly vulnerable to Defendants' efforts to fabricate false evidence.

79.     In addition, Defendants used violence and promised deals to Vicente in order to fabricate statements from him.

80.     Defendants used statements that they manufactured from Vicente to implicate at least five innocent men in murders they did not commit.

81.     In addition to Plaintiff's case, Defendants manufactured statements from Vicente in the following cases:

  a.     Vicente provided a false statement that, while he had been in a holding cell following his arrest, a stranger named Robert Bouto confessed to him that he had murdered a man named Salvador Ruvalcaba. In fact, Bouto never murdered anyone and did not make any confession to Vicente. The City of Chicago has determined in its own investigation of Defendant Guevara's misconduct that Bouto is innocent, and Bouto has since been exonerated.

  b.     Shortly after implicating Bouto, Vicente provided a false statement that, in February of 1993, he encountered Jose Montanez, Armando Serrano, and George Pacheco as they talked about murdering Rodrigo Vargas. Having shown Vicente crime scene photos and fed him details about the crime, Defendants had Vicente regurgitate an account that aligned with the Defendants' theory of Vargas' murder and that implicated all three men.

Montanez and Serrano were convicted of the murder. They have since been exonerated.

82.     In Plaintiff's case, Defendants had Vicente say that while he was in a holding cell waiting for his criminal case to be called, Plaintiff confessed to the Roman shooting.

83.     Plaintiff purportedly confessed to Vicente despite being in a crowded bullpen with over a dozen other inmates and 10 sheriff's deputies.

84.     In fact, Defendants made up the entire story and used Vicente as their mouthpiece.

85.     Plaintiff never confessed anything to Vicente; he was innocent.

86.     Vicente has since recanted his statements implicating Bouto, Serrano, Montanez, Pacheco, and Plaintiff.

87.     Vicente has testified that Defendants repeatedly beat him in order to get him to tell their fabricated stories.

88.     Vicente has testified that Defendants fed him facts and used intimidation, threats and physical abuse to force him to provide false testimony.

**Policy and Practice of Wrongly Convicting Innocent Persons in Violation of Due Process**

89.     The Chicago Police Department is responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of incidents like the one endured by Plaintiff.

90.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

91.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) fabricating eyewitness identifications; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4)

manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

92.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements that implicated innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses who then adopted the false narratives as their own for the purpose of wrongly convicting innocent persons. In addition, Chicago Police Department officers routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threated, pressured, or offered inducements to make false statements.

93.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into adopting a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives to avoid inconsistencies between witnesses' stories.

94. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

95. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

96. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

97. The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Roman murder and investigation at issue here.

98. In addition, a set of clandestine files related to Area 5 homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

14

99.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area 5 Detective Division during the investigation into the Roman murder.

100.    The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

101.    Prior to and during the period in which Plaintiff was falsely charged with and convicted of the Roman murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

102.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

103.    As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which

15

the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

104.    This includes Defendants in this case. By way of example, Defendant Guevara and Mr. Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and/or Halvorsen engaged in serious investigative misconduct, including many cases in which they obtained false identifications, manipulated and coerced suspects and witnesses, and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

105.    The City of Chicago and its police department also failed in the years prior to the Plaintiff's wrongful charging and conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

> a.    The conduct of live lineup, photographic, and other identification procedures.
>
> b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

16

c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

106. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

107. The city's failure to train, supervise, and discipline its officers, including Defendant Guevara, other Defendants, and Mr. Halvorsen condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

108. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

109.     The policies and practices described in the foregoing paragraphs were also approved the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

110.     As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men over the span of two decades. Like Plaintiff, these men have lodged independent accusations of similar misconduct against Defendant Guevara.

111.     As of the filing of this complaint, 19 men have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Plaintiff, the other 18 men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, and Thomas Sierra.

112.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

113.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully discipline Guevara and others, it is apparent that Guevara engaged in such

misconduct because he had every reason to believe that the City of Chicago and its police department condoned his behavior.

114. Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. These allegations include the manipulation of dozens of witnesses to provide false identifications, as well as every single instance of misconduct detailed below.

115. Examples of Defendant Guevara's misconduct include:

    a. Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely

claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.    Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.    In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.    In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.    Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.     In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.     Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.     After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Defendant Gawrys, and his supervisor Ed Mingey.

i.     In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did

not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k. In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l. In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking Velazquez to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if Velazquez did not talk. All of the false details in Velazquez's eventual statement were provided by Guevara.

m. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of

committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

n.   In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

o.   In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses previously told the police that they had not been able to see the shooter.

p.   In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

q.   In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

r.    In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

s.    In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

t.    In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

u.    In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup

24

at Guevara's direction. The prosecution abandoned murder charges against
that individual.

v.     In 1997, Defendant Guevara coerced Robert Ruiz into making a false
       identification. Guevara detained Ruiz repeatedly over the course of a ten-
       day period, locking him in an interrogation room without food, water, or a
       bathroom. Though Ruiz kept telling Guevara that he had not seen the
       shooter or the driver involved in the crime, Guevara told Ruiz whom to
       identify and what to say in his statement. Ruiz finally implicated Freddy
       and Concepcion Santiago in the murder because Ruiz believed that
       Guevara would continue to harass him until he changed his story. Ruiz
       recanted his identification at trial, and the judge found Freddy and
       Concepcion Santiago not guilty. The trial judge found it disturbing that
       Guevara was the lead detective in the case because the victim was
       Guevara's nephew.

w.     In November 2001, Defendant Guevara's girlfriend, Judith Martinez,
       attended a trial in which Guevara was testifying and observed the
       testimony of trial witnesses. She then conferred with Guevara, even
       though the Court had ordered for all witnesses to be excluded from the
       courtroom to prevent witness collusion.

x.     In 2011, the First District Appellate Court granted Tony Gonzalez a post-
       conviction hearing based on evidence that Defendant Guevara conducted
       an unduly suggestive lineup. In this instance, Guevara had concocted a

photo array in which Gonzalez's photo was the only one that stood out from the rest.

y.  In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

z.  In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

aa.  In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards.

Witnesses who saw Hunt while in custody corroborated his claims that the Area 5 police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

bb.    In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Anna, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

cc.    In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

dd.    In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

27

ee.   In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ff.   In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

gg.   In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

hh.   In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara

28

told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

ii.    In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Mr. Halvorsen, in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

jj.    In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

kk.    In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

ll.    In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-

day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

mm. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

nn. In 1995, Defendant Guevara and Mr. Halvorsen coerced a confession from 17-year- old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him

numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

oo. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

pp. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses named Ruth Antonetty, Debbie Daniels and Maria Castro to falsely identify Ariel Gomez as the shooter even though they had informed Guevara that they could not identify him as the shooter.

qq. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

rr.     In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite the fact that she did have real knowledge of the crime he was questioning her about.

ss.     In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in order to coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement implicating himself in a murder that he was not involved in.

tt.     In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

116.    As set forth above, the City of Chicago failed to meaningfully discipline its police officers, including Defendants Guevara and the other Defendants, for their misconduct. Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## Plaintiff's Wrongful Prosecution and Conviction

117.    Between 1993 and 1994, as the result of the Defendants' misconduct and based on the false evidence described in this Complaint, Plaintiff was arrested, prosecuted, and convicted of murder.

118.    In the absence of the Defendants' misconduct, Plaintiff would never have been arrested, indicted, prosecuted, or convicted. At no point in time between 1993 and the present

day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of Roman's murder.

119.   Defendants' fabrication of evidence was not disclosed to state prosecutors, Plaintiff, or his criminal defense attorneys in advance of his criminal trial. In fact, Defendants suppressed all evidence that exonerated Plaintiff.

120.   Defendants used false police reports to cover up their misconduct. They provided those false reports to state prosecutors, and those reports became the basis for charging and prosecuting Plaintiff.

121.   In addition, Vicente's account was presented by Defendants as legitimate evidence. Defendants suppressed that they knew that Vicente's testimony was false, and they worked to undermine Plaintiff's efforts to discredit Vicente.

122.   Defendants also gave false statements to state prosecutors and provided false testimony at Plaintiff's criminal trial.

123.   Defendant Guevara testified falsely that Ochoa's initial description fit a description of Plaintiff.

124.   He also provided testimony supporting the inculpatory statement that he and Mr. Halvorsen had fabricated, doubling down on the lie about Plaintiff admitting to being near the crime scene on June 7.

125.   No inculpatory evidence other than the evidence fabricated by Defendants was introduced at Plaintiff's criminal trial.

126.   At all times, Defendants suppressed the true circumstances of their identification procedures and their interactions with Ochoa, Rodriguez, and other eyewitnesses.

127. At all times, Defendant Biebel was aware of Defendants' misconduct and their fabrication of a case against Plaintiff. As a supervisor, he nevertheless intentionally ignored the Defendants' misconduct and decided to make Plaintiff liable for a crime he did not commit, rather than directing the investigating officers to find the person who had actually committed the crime. In addition, Defendant Biebel and the other supervisors of the Defendants explicitly authorized their investigative misconduct.

128. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

129. Plaintiff maintained his innocence throughout the proceedings. He testified in his own defense saying, "I'm sorry for the death of the girl but I had nothing to do with it." And again, prior to his sentencing, Plaintiff asserted his innocence unequivocally.

130. However, because of Defendants' false and manufactured evidence, Plaintiff was wrongly convicted and sentenced to decades in prison.

131. Plaintiff was 25 years old when his ordeal began. He spent the next 16 years of his life imprisoned for a crime that he did not commit.

132. Plaintiff's whole life was turned upside down without any warning. His young adulthood was entirely consumed by the horror of his wrongful imprisonment.

133. Plaintiff had a newborn son at the time he was wrongly arrested. As a result of Defendants' misconduct, Plaintiff was imprisoned for most of his son's childhood and adolescence. Plaintiff lost his chance to raise his child, which has had a profound impact on Plaintiff's life, and on his relationship with his son and his son's mother.

134.    In addition, Plaintiff was taken away from and missed out on the lives of his family and friends. He returned home to relationships changed by or lost to over a decade of wrongful incarceration.

135.    Plaintiff was robbed of his young adulthood and his formative years. He was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

136.    During his 16 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum-security prisons.

137.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

138.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

139.    Plaintiff has been branded as a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

140.    Plaintiff fought hard to prove his innocence. He appealed and filed multiple petitions for post-conviction relief.

141.    On January 16, 2019, Plaintiff's petition for post-conviction relief was granted, his conviction was set aside, and all charges against him were dropped.

142.    At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half his life.

## COUNT I

### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

143.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

144.    As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

145.    In the manner described more fully above, Defendants manufactured evidence and solicited false evidence—including false identifications, false witness statements, and false witness testimony that they knew to be false and perjured—from Ochoa, Rodriguez, and Vicente, among others. Defendants also fabricated police reports falsely implicating Plaintiff in the crime.

146.    Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

147.    Defendants also procured supposed eyewitness identifications implicating Plaintiff in the crime, by using unduly suggestive identification techniques during photo identifications and during live lineups. Defendants knew that these identifications were false and unreliable, but they caused them to be used during Plaintiff's criminal trial. These fabricated identifications caused Plaintiff's wrongful conviction.

148.    In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that

Defendants had manufactured identifications and witness testimony, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

149.    In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

150.    The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

151.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

152.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

153.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II

### 42 U.S.C. § 1983 – Unlawful Detention
### (Fourth and Fourteenth Amendments)

154.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

155.    In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue,

37

and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

156.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

157.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

158.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

159.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT III**

**42 U.S.C. § 1983 – Failure to Intervene**

160.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

161.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

162.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

163.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

164.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

165.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV

### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

166.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

167.    In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to abricate evidence and to detain, prosecute, and convict Plaintiff for the Roman homicide, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

168.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

169.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

170.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

171.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

172.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT V

### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

173.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

174.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

175.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or

alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

176.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

177.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

178.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were denied due process, including but not limited to one or more of the following: (1) suspects were selected during identification procedures by eyewitnesses who had been instructed by police on which suspect to identify; (2) suspects were shown suggestive photo arrays; (3) suspects were shown suggestive live lineups; (4) identification procedures were not accurately documented; and (5) supervisors with knowledge of permissible and impermissible identification techniques did not properly supervise or discipline police officers and employees such that the fabricated and improper identifications continued unchecked.

179.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

180.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

181.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

182.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

183.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed

against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

184. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI

### State Law Claim – Malicious Prosecution

185. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

186. In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

187. In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

188. The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in January 2019.

189. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

190.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### State Law Claim – Intentional Infliction of Emotional Distress

191.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

192.     The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

193.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### State Law Claim – Willful and Wanton Conduct

194.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

195.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Roman murder investigation.

196.     Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

197.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

44

## COUNT IX

### State Law Claim – Civil Conspiracy

198.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

199.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

200.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

201.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

202.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

203.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X

### State Law Claim – *Respondeat Superior*

204.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

205.    While committing the misconduct alleged in the preceding paragraphs, the

Defendants were employees, members, and agents of the City of Chicago, acting at all relevant

times within the scope of their employment.

206.    Defendant City of Chicago is liable as principal for all torts committed by its

agents.

## COUNT XI

### State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

207.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

208.    Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to

pay any tort judgment for compensatory damages for which employees are liable within the

scope of their employment activities.

209.    The Defendants were employees, members, and agents of the City of Chicago,

acting at all relevant times within the scope of their employment in committing the misconduct

described herein.

210.    The City of Chicago is responsible to pay any judgment entered against the

Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the

amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs

and interest.

WHEREFORE, Plaintiff GERALDO IGLESIAS, respectfully requests that this Court

enter a judgment in his favor and against Defendants REYNALDO GUEVARA, JOANN

HALVORSEN as Special Representative for ERNEST HALVORSEN, STEVE GAWRYS,

ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO, Illinois, awarding

compensatory damages, attorneys' fees, and costs against each Defendant, and, because they

acted willfully, wantonly, and/or malicious, punitive damages against each of the Individual

Defendants, and any other relief that this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, GERALDO IGLESIAS, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**GERALDO IGLESIAS**

BY:     s/ Rachel Brady
        *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steven Art
Joshua Tepfer
Rachel Brady
Sean Starr
John Hazinski
LOEVY & LOEVY
311 N. Aberdeen
Chicago, Illinois 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

I, Rachel Brady, an attorney, certify that on May 1, 2020, I served the foregoing First Amended Complaint to all counsel of record via the CM/ECF filing system.


/s/ Rachel Brady
*One of Plaintiff's Attorneys*