**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| GERALDO IGLESIAS, | ) | Case No. 19 C 6508 |
| | ) | |
| *Plaintiff,* | ) | Hon. Franklin U. Valderrama, |
| | ) | District Judge |
| *v.* | ) | |
| | ) | |
| REYNALDO GUEVARA, *et al.* | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants.* | ) | |

**PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AGAINST THE CITY OF CHICAGO**

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................................1

UNDISPUTED FACTS ...................................................................................................................3

ARGUMENT ...................................................................................................................................3

    A. The City Is Precluded From Relitigating the Evidence Suppression Policy.........................3

           1. Iglesias's Monell Theory Regarding Evidence Suppression ..............................4

           2. The City Lost the Same Monell Theory In Fields ................................................6

           3. The City Was Precluded From Relitigating the Issue in Kluppelberg.................9

           4. The City Lost the Same Monell Theory In Rivera ...........................................10

           5. The City Is Precluded From Relitigating the Same Issue Here ........................12

        (a) The Issue Is the Same As That In Fields and Rivera...............................................12

        (b) The City's Policy Remained The Same During Time Period At Issue in Fields, Rivera, and This Case ...............................................................................................................14

        (c) The Issue Was Actually Litigated In Fields and Rivera........................................16

        (d) The Issue Was Essential to the Fields and Rivera Judgments...............................16

        (e) The City Had A Full and Fair Opportunity to Litigate In Past Cases ...................17

        (f) There Is No Equitable Reason Not to Apply Issue Preclusion .............................17

    B.    The City of Chicago Cannot Raise A Genuine Dispute of Material Fact Regarding Its Evidence Suppression Policy...........................................................................................................18

           1. A Municipality Is Liable When Its Policymakers Promulgate Deficient Policies or Fail to Adopt Needed Policies ......................................................................................19

           2. The Summary Judgment Record Reflects That City Policymakers Promulgated Deficient Policies and Failed to Adopt Policies In Response to Notice of a Citywide Evidence Suppression Problem.............................................................................................20

        (a) The City Had Notice of A Problem of Widespread Evidence Suppression ..........21

        (b) The City Failed to Promulgate Policies to Solve the Evidence Suppression Problem .......................................................................................................................22

           3.    The City Cannot and Does Not Contest This Evidence..........................24

CONCLUSION...............................................................................................................................25

## TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)........................................................................19

*Avitia v. Metro. Club of Chicago* 924 F.2d 689 (7th Cir. 1991).................................................... 17

*Bailey v. Andrews,* 811 F.2d 366 (7th Cir. 1987)......................................................................  4

*Board of County Commissioners v. Brown,* 520 U.S. 397 (1997)............................................... 3, 20

*Calhoun v. Ramsey,* 408 F.3d 375 (7th Cir. 2005).................................................................... 19

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).................................................................... 19

*Chicago Truck Drivers v. Century Motor Freight, Inc.,* 125 F.3d 526 (7th Cir. 1997)................ 17

*Davis v. Carter,* 452 F.3d 686 (7th Cir. 2006)................................................................... 3

*Fields v. Chicago*, No. 10 C 1168 (N.D. Ill. Oct. 12, 2017)................................................... 1, 6, 9

*Fields v. Chicago*, 981 F.3d 534 (7th Cir. 2020)...................................................................... 1, 6, 9

*Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372 (7th Cir. 2017)........................................... 3, 19

*In re Tapper,* 123 B.R. 594 (Bankr. N.D. Ill. 1991)....................................................... 16

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020)................................................................ 19

*Jenkins v. Bartlett,* 487 F.3d 482 (7th Cir. 2007)........................................................... 3

*Johnson v. Dominguez,* 5 F.4th 818 (7th Cir. 2021)...................................................... 19

*Jones v. Chicago*, 87 C 2536 (N.D. Ill.)................................................................... 5, 9, 22

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012)........................................................ 20

*Kluppelberg v. Burge*, (N.D. Ill. Aug. 7, 2017)............................................... 1, 9, 10, 17

*Lucky Brand Dungarees v. Marcel Fashions Group,* 140 S. Ct. 1589 (2020)........................... 15

*Matter of Magnafici,* 16 B.R. 246 (Bankr. N.D. Ill. 1981)............................................................. 13

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)....................................................... 3

*Palmer v. City of Chicago*, No. 82 C 2349 (N.D. Ill.)..................................................................... 5

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)................................................................. 4, 18

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)................................................................. 3, 20

*Rivera v. Guevara,* (N.D. Ill. Sept. 20, 2019)...................................................................... 1, 10, 14

*Sornberger v. Knoxville*, 434 F.3d 1006 (7th Cir. 2006).................................................................. 3

*Staats v. Cnty. of Sawyer*, 220 F.3d 511 (7th Cir. 2000)................................................................. 4

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998)........................................................................... 20

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010)................................................................... 5

## Other Authorities

18 Wright & Miller, Fed. Prac. & Proc. Juris. § 4403 (3d ed.)......................................................... 4

18 Wright & Miller, Fed. Prac. & Proc. Juris. § 4416 (3d ed.)......................................................... 4

Fed. R. Civ. P. 56(a)...................................................................................................................... 16

## INTRODUCTION

Geraldo Iglesias was wrongly convicted of the 1993 murder of Monica Roman. In 2019, he was exonerated, his conviction was vacated, and all charges against him were dropped. The State of Illinois awarded Iglesias a certificate of innocence in 2022.

In this lawsuit, Iglesias contends that his conviction was based solely on evidence fabricated by the individual Defendant Chicago Police officers. The investigation that led to his conviction was led by notorious former Chicago Police detective Reynaldo Guevara, who has caused more than 40 wrongful convictions for murder. Iglesias asserts that, in addition to fabricating evidence, the Defendants suppressed material exculpatory and impeachment evidence, and that they manipulated witnesses and fabricated witness identifications of Iglesias as the perpetrator. In response to questions about his investigation of Iglesias, Defendant Guevara has asserted his Fifth Amendment right not to incriminate himself. The claims against the individual Defendants in this case turn on hotly disputed facts and will require a jury trial.

Iglesias's *Monell* claims against the City of Chicago, however, are on a different footing. For two reasons, partial summary judgment should be granted on Iglesias's *Monell* claims. First, the City is precluded from relitigating one of Plaintiff's *Monell* theories—that the City had an official policy of suppressing exculpatory evidence—having litigated and lost precisely the same *Monell* theory in two recent federal civil trials, *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411, at *3 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), and *Rivera v. Guevara*, No. 12-CV-4428, 2019 WL 13249674, at *2 (N.D. Ill. Sept. 20, 2019). Another Court in this District has already concluded that the City is precluded from relitigating this theory. *Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017). While Iglesias concedes that the City will be able to litigate at trial the causation issue—whether the City's policy of evidence

1

suppression contributed to Iglesias's wrongful conviction—it cannot relitigate the existence of that official policy. Partial summary judgment should be granted to Iglesias on those grounds.

The doctrine of preclusion exists to prevent a repeat litigant like the City from consuming judicial resources by relitigating issues that have been fully aired in prior cases to a definitive conclusion. Applying this principle promotes finality, conserves litigation resources, and prevents a party from taking multiple bites of the apple to create disparate litigation outcomes. The City has litigated Iglesias's evidence suppression *Monell* theory exhaustively, including in another case involving Defendant Guevara. It has lost repeatedly at trial, and those jury verdicts have been upheld by Judges in this District and by the Seventh Circuit. In these circumstances, there is no justification to allow the City to relitigate the same issue again in this case.

Second and independently, with respect to another of Iglesias's *Monell* theories, the City has not and cannot raise any genuine issue of material fact requiring a trial. Iglesias contends that, in response to notice that the Chicago Police Department had a citywide problem of evidence suppression in homicide cases, City policymakers promulgated facially deficient written policies, which permitted the suppression of exculpatory evidence. This theory is supported by all of the evidence adduced by both sides in the summary judgment record, and the City's own designated Rule 30(b)(6) witnesses and experts do not contest it. Accordingly, summary judgment should be granted to Iglesias on this theory as well. Again, Iglesias concedes that the City will have the chance to litigate at trial whether its facially deficient policies caused the suppression of evidence in Iglesias's case, but it cannot relitigate whether it put in place deficient policies.

The *Monell* theories addressed in this motion have been litigated exhaustively. The City has lost these theories at trial every time. Still, the City engages in protracted litigation of these

2

same theories in subsequent litigation. Efficient resolution of pending litigation and conservation of judicial and party resources demands that the City's perpetual and vexatious litigation of the same *Monell* issues be brought to an end.

**UNDISPUTED FACTS**

Iglesias has prepared an extensive account of the undisputed material facts relevant to this partial motion for summary judgment in his Local Rule 56.1 statement. Instead of repeating facts here, he discusses them in detail in the arguments below.

**ARGUMENT**

The City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of Iglesias's constitutional rights were caused by: (1) application of an express policy, including a deficient policy that reflects a conscious municipal decision not to adopt or to omit needed policies, *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*); (2) a widespread custom or practice that pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Commissioners v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger v. Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006).

**A.      The City Is Precluded From Relitigating the Evidence Suppression Policy**

Summary judgment is warranted because the City is precluded from relitigating Iglesias's *Monell* theory that the City had an official policy during the relevant time period of suppressing exculpatory evidence. Whether issue preclusion should be applied is a legal question that this

3

Court considers *de novo*; if the Court encounters a factual issue in resolving that question, it construes the evidence in the light most favorable to the nonmoving party. *Staats v. Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000).

Preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party . . . and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Among other things, preclusion encourages finality in litigation, avoids inconsistent results, and protects courts against the burdens of repetitious litigation, particularly from parties, like the City of Chicago, who might otherwise insist on a second, third, fourth try on issues that federal courts have thoroughly considered and decided against them. 18 WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. §§ 4403, 4416 (3d ed.).

For issue preclusion (also called collateral estoppel) to apply in a § 1983 suit, four requirements must be met: (1) the issue must be the same as that involved in the prior judicial proceeding; (2) the issue must actually have been litigated; (3) the issue must have been resolved; and (4) the issue must have been necessary to the judgment in the prior proceeding. *Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987). Each criteria is met for the theory that the City had an official policy of suppressing exculpatory and impeachment evidence.

### 1. Iglesias's Monell Theory Regarding Evidence Suppression

Iglesias contends in this case that he was wrongly convicted of the 1993 murder of Monica Roman. The crime was investigated by the individual Defendants, who were based at Area Five Detective Division of the Chicago Police Department. Iglesias contends that material exculpatory evidence was suppressed throughout his wrongful conviction. SOF 1.

For example, Iglesias contends that, during the Roman investigation, Defendants manufactured and solicited false evidence, which they fabricated in lineup reports,

supplementary reports, and other police records, and suppressed evidence, including by refusing to document investigative steps and by withholding documents and reports that would have shown that Plaintiff was innocent and that could have been used to undermine the testimony of the State's witnesses. SOF 1.

Iglesias's position is that the concealment of exculpatory evidence in his criminal case was not an isolated incident, but instead was done pursuant to the City's official policy of suppressing investigative information in homicide investigations. SOF 1. In support of this claim, Plaintiff has amassed substantial evidence, including the City's past litigation concerning this issue, written policies, testimony of the City's Rule 30(b)(6) designees, and his police practices expert Thomas Tiderington.

The evidence reflects that, starting in the early 1980s, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of evidence and due process violations. SOF 2-5, 8, 11-13. City policymakers responded by promulgating written policies, which were intended to address the widespread evidence suppression problem, but those policies were facially deficient, had limited effect, and did not correct the problem. SOF 14-31, 33-40, 42-45, 47-59. Instead, the suppression of evidence in homicide investigations continued unabated. SOF 18, 19, 23, 26, 28-30, 34-36, 38-40, 44-59 . The City's Rule 30(b)(6) witnesses testified that an audit of homicide files revealed that evidence suppression issues were present citywide, and that the promulgated policies did not solve the problem. SOF 2, 8-10, 13, 35-39.

Plaintiff's expert Tiderington concurred that the written policies could not solve the evidence suppression problem. Tiderington reviewed and analyzed 475 Area Five investigative files from 1991-1995 that were provided to him for analysis, as well as 344 Area Five files from 1995-1998 that were provided to him for analysis, and compared them to available permanent retention files and criminal defense files for those time periods. SOF 50. Based on his review, Tiderington concluded that the Special Orders did nothing to ameliorate the evidence suppression issues of which the City was aware: (1) detectives consistently used handwritten notes not on GPRs, and also used to-from memos, rather than including that information in GPRs and Supplemental Reports; (2) inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete); (3) not all relevant information in unofficial documents was transcribed in official reports—including potentially exculpatory information contained on handwritten notes, not transferred into official reports–leaving those official reports incomplete; and (4) criminal defense files revealed that important investigative materials were regularly withheld from criminal defendants. SOF 50-59.

Based on this evidence, Iglesias contends that the City had an official policy of suppressing exculpatory and impeachment evidence in homicide investigations.

### 2. The City Lost the Same *Monell* Theory In *Fields*

In 2016, precisely the same evidence suppression theory was tried to a verdict against the City in *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.). Nathson Fields was wrongfully convicted and sent to death row for the 1984 murders of Jerome Smith and Talman Hickman on the south side of Chicago. *See* 2017 WL 3987356. After his conviction was reversed and he was acquitted in his 2009 retrial, Fields filed a § 1983 lawsuit, claiming that investigating officers had suppressed exculpatory information throughout his criminal proceedings, and contending that the City of Chicago was liable for its official policy of evidence suppression.

*Id.* During discovery in Fields's civil lawsuit, it came to light that investigative information had been suppressed in a clandestine file, which contained highly exculpatory material. *Id.*

As in this case, Fields developed evidence that the evidence suppressed in his case was not an isolated incident. The evidence in Fields was the same as the evidence in this case, it included past litigation, written policies, Rule 30(b)(6) testimony, and experts on both sides, and it concerned exactly the same City policy of evidence suppression. In that case, Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas One, Two, Three, and Four. SOF 46-47. Comparison of the CPD homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. SOF 47. Fields thus introduced uncontroverted evidence that the City's policy of evidence suppression persisted from the early 1980s until 2009.

*Fields* was tried over the course of five weeks in November and December 2016 before Judge Kennelly. The City was capably defended by attorneys from Dykema Gossett, an experienced litigation firm whose lawyers have been defending the City in countless § 1983 cases for a period of decades. Fields was represented by the same counsel that represents Iglesias here. During trial, both sides presented extensive *Monell* evidence, which is collected

in the parties' post-trial submissions. SOF 62.

When Fields's *Monell* claim was submitted to the jury, the jury was instructed that, to succeed on his *Monell* claim, Fields had to prove:

> 1. Material exculpatory and/or impeachment evidence in the possession of the Chicago Police Department was concealed from the prosecutor, and the evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence. . . . .
>
> 2. At the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence. The term policy means: (a) an express policy, (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . ., (c) A decision or policy statement made by the Superintendent of Police. This includes the Superintendent's approval of a decision or policy made by someone else, or (d) A practice of failing to train or supervise employees. . . .
>
> 3. The policy as described in paragraph 2 caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case.
>
> 4. The plaintiff was damaged as a result.

SOF 61.

At the conclusion of the trial on December 15, 2016, the jury found for Fields on the *Monell* claim (and other claims too), and it awarded $22 million in compensatory damages (as well as punitive damages). SOF 63. Judge Kennelly entered judgment on the verdict. SOF 63.

The City filed a post-trial motion challenging the *Monell* judgment under Rules 50 and 59. SOF 63. Judge Kennelly denied the City's post-trial motion, concluding:

> Fields's evidence, including evidence of systematic underproduction of police reports, was sufficient to show a systemic failing that went beyond his own case. The City and police department were on notice, via the *Jones/Palmer* litigation and the department's own subsequent internal inquiry, of deficiencies in its recordkeeping and record-production practices that, at least in some situations, led to harm. And Fields offered evidence that permitted a reasonable jury to find that the policies instituted to deal with these problems were insufficient to correct them. . . . The gaps here include, but are not limited to, insufficient or unnecessarily subjective instructions regarding what materials had to be maintained, insufficient instructions on producing materials to prosecutors, and the absence of any supervision or after-the-fact auditing.

8

*Fields*, 2017 WL 3987356, at *3.

The City appealed and the Seventh Circuit affirmed, concluding that the *Monell* verdict against the City regarding its policy of suppressing exculpatory evidence was amply supported. *Fields v. Chicago*, 981 F.3d 534, 563 (7th Cir. 2020). Indeed, the Seventh Circuit decided that the City's knowledge of the risk of constitutional violations caused by its policy was "unquestionable in this case." *Id.* The Seventh Circuit reaffirmed that it had recognized this particular policy of the City, stating, "[i]n *Jones*, 856 F.2d at 996, we recognized that the custom of the maintenance of street files was department-wide and of long standing, and that a jury could therefore conclude it was consciously approved at the highest policy-making level for decisions involving the police department. . . . In fact, the City in *Jones* did not even contest that the use of such a practice presented a due process problem[.]" *Id.*

### 3. The City Was Precluded From Relitigating the Issue in *Kluppelberg*

In 2017, based on *Fields* alone, Judge Lefkow concluded in *Kluppelberg v. Burge*, No. 13 C 3963 (N.D. Ill.), that the City was precluded from relitigating whether it had an official policy of suppressing exculpatory evidence, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017). Like *Fields*, *Kluppelberg* concerned a claim that the City had a policy of suppressing exculpatory evidence that resulted in the suppression of investigative information in a 1984 homicide arson investigation that led to James Kluppelberg's 1988 arrest and 1989 wrongful conviction, and Kluppelberg advanced that theory with all of the same evidence offered in *Fields*, including an expert analysis of 164 additional homicide files from Area Three.

Judge Lefkow granted Kluppelberg's motion to preclude the City from relitigating whether it had a policy of suppressing exculpatory evidence. *Kluppelberg*, 276 F. Supp. 3d at 776; SOF 71. The City argued "it is impossible for the court to determine from a general jury

9

verdict whether the issues are the same and whether determination of the issue was essential to the final judgment in the first action" and that it would be unfair to apply issue preclusion, but the court rejected these arguments. *Kluppelberg*, 276 F. Supp. 3d at 776-79; SOF 71.

### 4. The City Lost the Same *Monell* Theory In *Rivera*

In 2018, again the same *Monell* theory was tried and resulted in a jury verdict against the City in *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.).[1] SOF 66-67. Rivera was wrongfully convicted of the 1988 murder of Felix Valentin on the northwest side of Chicago. Like Iglesias, Rivera's conviction was based on false evidence fabricated by Chicago Police officers working out of Detective Area Five. As in this case, the investigation was led by Defendant Guevara.

After Rivera's conviction was vacated and charges against him were dropped in 2011, Rivera, too, filed a § 1983 lawsuit. Like Iglesias, Rivera claimed that the defendants had suppressed exculpatory information throughout his criminal proceedings, and he contended that the City was liable for its official policy of suppressing exculpatory evidence. Like Fields before him and Iglesias here, Rivera amassed evidence to show that the suppression of evidence was not an isolated incident but was the result of municipal policy, including evidence of the City's past litigation of the issue, its written policies, its designated Rule 30(b)(6) witness, and expert testimony. That evidence used in *Rivera* showed that the Chicago Police Department was aware, based on *Jones* and *Palmer*, that it had a problem of suppressing evidence in 1982, that the reforms the City put in place in response were deficient, and that evidence suppression in homicide investigations continued unabated, throughout the time period that Rivera was prosecuted and convicted. SOF 66-69.

---

[1] Prior to trial, Rivera made an underdeveloped argument for issue preclusion based on *Fields*, which spanned three paragraphs in his summary judgment response. *Rivera*, No. 10 C 4428, Dkt. 321 at 53-54. The decision rejecting preclusion in *Rivera* is discussed below, *infra* at 14-15.

10

As in *Fields*, Rivera's expert, Michael Brasfield, conducted an analysis of 435 Chicago Police Department homicide files, this time from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. SOF 59, 70. That analysis was not rebutted by the City's expert; while Fields established the City's policy of evidence suppression from the early 1980s to 2009, Rivera introduced unchallenged evidence that the policy was alive and well between 1985 and 1991. SOF 68-70.

*Rivera* was tried in June 2018 before Judge Gottschall. The City was capably defended by the same attorneys representing the Defendants here. Iglesias's counsel represented Rivera. At trial, both sides presented extensive *Monell* evidence, which is collected in the post-trial submissions in *Rivera*. SOF 68.

The jury was instructed that, to succeed on his *Monell* claim, Rivera had to prove:

1. The plaintiff's constitutional rights were violated as defined in these instructions;

2. The City of Chicago has a policy of concealing material exculpatory and/or impeachment evidence. The term policy means: (a) An express policy; or (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . . .; or (c) A decision or policy statement, including a decision not to adopt a needed policy, made by the City of Chicago; or (d) A practice of failing to train employees of the City of Chicago or the Chicago Police Department.

3. The policy as described in paragraph 2 caused the violation of the plaintiff's constitutional rights.

SOF 66.

At the conclusion of the trial on June 28, 2018, the jury found for Rivera on the *Monell* claim (and other claims), and it awarded $17 million in compensatory damages (and punitive damages). SOF 67. Judge Gottschall entered judgment on the verdict. SOF 67. The City filed a

post-trial motion challenging the *Monell* judgment under Rules 50 and 59. SOF 68. Judge

Gotschall denied that motion. *Rivera*, 2019 WL 13249674, at \*4; SOF 69.

### 5. The City Is Precluded From Relitigating the Same Issue Here

The City is precluded from relitigating in this case the issue of whether it had an official

policy of suppressing exculpatory and impeachment evidence at the time of Iglesias's wrongful

conviction. All four criteria for the application of issue preclusion are firmly satisfied, and there

is no equitable reason not to apply the doctrine.

### (a) The Issue Is the Same As That In *Fields* and *Rivera*

On the first factor, Iglesias's *Monell* theory that the City had an official policy of

suppressing exculpatory and impeachment evidence at the time of the Roman murder and his

subsequent prosecution and conviction is the same as the issue litigated to judgment against the

City in *Fields* and *Rivera*. In fact, the issues are identical in every material respect.

All three cases concern a theory, evidence, and argument that the City's evidence

suppression problem was first exposed in *Jones* and *Palmer*, that policymaking officials at the

highest levels of City government and the Chicago Police Department were on notice of and

investigated the problem, and that new written policies were promulgated in response. Those

written policies—Special Orders 83-1, 83-2, 86-3, and the effectively identical 1988 Standard

Operating Procedures—are the same in all three cases. In all three, the plaintiffs offered a large

volume of evidence that the City's policy response was deficient—the written policies did not

end the problem of evidence suppression across the Chicago Police Department during the

relevant time period—consisting of written policies, testimony from the City's own designated

Rule 30(b)(6) witnesses, legions of cases in which material evidence was suppressed (including

*Fields*, *Kluppelberg*, and *Rivera*), and testimony from experts on both sides. Indeed, the

categories of evidence in play in each of the three cases are precisely the same. In many

instances, the witnesses are the same, the testimony at issue is the same, and the documentary evidence on which both sides rely is the same.

Moreover, in each of the cases the plaintiffs' experts have undertaken detailed analyses of hundreds of Chicago Police Department homicide files, which have all reached the same conclusion that the persistent problem of evidence suppression continued without interruption across investigations conducted by the Chicago Police Department at all relevant times. In each of the cases, the City's experts have responded without contesting the accuracy of plaintiffs' experts' data. Fundamentally, there has been no dispute in the exchange of expert viewpoints that the City's policy of evidence suppression continued after the implementation of new policies in the wake of *Palmer* and *Jones.* In fact, that assertion has been unanimously supported by the City's own Rule 30(b)(6) witnesses. SOF 31-39, 42-45.

The identity of *Monell* issues does not end there. Rivera was implicated in a 1988 shooting in the Humboldt Park neighborhood, which was investigated by Defendant Guevara and others stationed in Area Five, leading to Rivera's prosecution and conviction in 1990. Iglesias was implicated in a 1993 shooting that occurred just a few blocks away, which was also investigated by Defendant Guevara and officers from Area Five, resulting in Iglesias's conviction in 1994. It is hard to imagine how the cases could be more analogous for preclusion purposes.

Moreover, the cases are being tried by the same attorneys, in the same courthouse, under the same Local Rules, pursuant to the same federal statutes and constitutional provisions, eliminating any concern that there is something anomalous about one of the cases. Issue preclusion asks whether the issue between a past case and the present one are the same in relevant respects, not in every respect possible, *Matter of Magnafici*, 16 B.R. 246, 254 (Bankr.

13

N.D. Ill. 1981), and these cases satisfy that standard. Indeed, *Rivera* and this case are identical in nearly every possible way.

### (b) The City's Policy Remained The Same During Time Period At Issue in *Fields*, *Rivera*, and This Case

The City may try to argue as it has in past cases that the issue in these cases is not the same because the time at which the cases were investigated are different. This Court should reject that argument—the fact that the cases occurred at different times between 1984 and 1994 does not mean that the City's policy was different. In fact, the City has admitted that the relevant policy was the same from 1983 all the way into the 2000s. SOF 42-44, 49; *see also* SOF 45. Thus, the policies at issue in *Fields* and *Rivera* regarding evidence disclosure are the same policies in effect at the time of Iglesias's wrongful conviction.

When Rivera argued at summary judgment in his case that the City should be precluded from relitigating the issue given *Fields*, Judge Gotschall concluded that preclusion did not apply because *Fields* concerned an investigation in 1984 and *Rivera* one in 1988, which "render[ed] the issue in *Fields* sufficiently dissimilar to defeat collateral estoppel." *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1062-63 (N.D. Ill. May 11, 2018). "Widespread practices do not necessarily persist indefinitely," the Court said, "And the gravamen of the City's position on this practice, pointing to the aspirations stated in the orders issued in the wake of the *Palmer/Jones* cases, is that the CPD was on a path of reform." *Id.*[2]

If the City argues that preclusion should not apply because the time frame at issue in Iglesias's case is different than that at issue in *Rivera* or *Fields*, there are at least four reasons to

---

[2] As discussed, Rivera's presentation of the preclusion argument was limited to three paragraphs in his response to the defendants' motions for summary judgment in that case, SOF 65, accordingly the Court's analysis of the issue was similarly truncated, *Rivera*, 319 F. Supp. 3d at 1062-63.

14

reject that argument. First, contrary to Judge Gotschall's conclusion, *Fields* did not establish an official policy in effect only in 1984, the year of the crime at issue there. Instead, *Fields* established that the policy was in effect, at minimum, from 1983 to 1989 and 1999 to 2009, both before and after the time frame in which Iglesias was investigated, prosecuted, and convicted. SOF 46. The City could not seriously suggest that its policy was the same both before and after Iglesias's wrongful conviction but different at the time that conviction occurred.

Second, though *Rivera* rejected the application of issue preclusion based solely on *Fields*, the issue has since been tried again, in *Rivera* itself, and there is now a second verdict against the City on the same issue. That the City has now *twice* lost the same issue considerably amplifies the argument for applying issue preclusion to prevent relitigation of the issue this time. One judgment alone is enough to invoke preclusion, *Lucky Brand Dungarees v. Marcel Fashions Group*, 140 S. Ct. 1589, 1594 (2020), and here even if there were a question raised by the City about one of the judgments, there are two that have preclusive effect. Moreover, with respect to time frame, the verdict in *Rivera* established that the City's evidence suppression policy was alive and well in Area Five between 1985 and 1991, the time period at issue in that case. Together *Fields* and *Rivera* establish a citywide policy of evidence suppression between 1983 and 2009, with a tremendous amount of evidence that the policy was persistent and causing wrongful convictions in Area Five for years leading up to Iglesias's criminal case.

Third, to the extent there were arguments that *Fields* and *Rivera* had differences that entitled the City to the benefit of the doubt about whether its policies were the same in both cases, those arguments about differences are not present here. There is nothing dissimilar at all between *Rivera* and this case. This case and *Rivera* are nearly identical—the crimes were investigated by the same police officers and prosecuted within a period of four to five years.

15

Fourth, and perhaps most importantly, in recent 30(b)(6) testimony and other evidence, the City has now admitted—as the evidence in *Fields* and *Rivera* established—that there was no change whatsoever in any of the City's policies regarding evidence suppression at any time between 1988 (the time of crime at issue in *Rivera*) and 1993 (at the time of the crime in this case). In fact, the policies remained the same from 1983 through 2012. SOF 42, 43-49. Multiple 30(b)(6) representatives have testified to the unchanged nature of these policies, including the areas of deficiencies. SOF 42-43.

### (c)    The Issue Was Actually Litigated In *Fields* and *Rivera*

Next, the City cannot dispute that the issue was actually litigated in both *Fields* and *Rivera*. In both cases it was the central *Monell* theory contested throughout discovery, at a full jury trial on the merits, in post-trial motions, and in *Fields* on appeal, entailing a huge volume of evidence on both sides. A full trial on the merits is the "situation most clearly contemplated by the 'actually litigated' standard." *In re Tapper*, 123 B.R. 594, 601 (Bankr. N.D. Ill. 1991).

### (d)    The Issue Was Essential to the *Fields* and *Rivera* Judgments

Nor can the City credibly argue that the *Monell* issue on which Iglesias seeks preclusion was not essential to the final judgment in both *Fields* and *Rivera*. The juries in both *Fields* and *Rivera* were each instructed that, to find against the City on the policy claim, the plaintiffs had to prove by a preponderance of the evidence that the City had a policy of concealing material exculpatory evidence. SOF 61 (*Monell* Instruction in *Fields*) ("it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence"); SOF 66 (*Monell* Instruction in *Rivera*) ("The City of Chicago had a policy of concealing material exculpatory and/or impeachment evidence"). The verdicts and resulting judgments against the City in these cases therefore necessarily required a finding that the City had a policy of concealing exculpatory evidence, for that was the *Monell* theory on which each jury was instructed. *See*

16

*Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 777 (N.D. Ill. 2017) ("[T]here is no other policy or practice that would have supported the verdict[.]"). Were there any doubt that the litigation of the issue was essential to the judgment, the City's principal argument in its post-trial motions in *Rivera* and *Fields* and on appeal in *Fields* was that there was not sufficient evidence to support this *Monell* theory and thus the judgments against it. *Rivera*, 2019 WL 13249674, at *4; *Fields*, 2017 WL 4553411, at *3, *aff'd*, 981 F.3d at 563.

> **(e)     The City Had A Full and Fair Opportunity to Litigate In Past Cases**

On the last factor, it is beyond dispute that the City had a full and fair opportunity to litigate the issue in *Fields* and *Rivera*. Assisted by experienced counsel, the City did so at every stage (summary judgment, motions *in limine*, at trial, in Rule 50 and Rule 59 motions, and appeal), using every type of evidence (including written policies, designated Rule 30(b)(6) witnesses, and expert opinion testimony). SOF 62-70; *see also Rivera*, 2019 WL 13249674, at *4 (discussing the litigation of the issue at each stage). A party has a full opportunity to litigate "[o]nce a party is afforded a hearing on an issue that comports with due process," absent circumstances not present. *Avitia v. Metro. Club of Chicago*, 924 F.2d 689, 691 (7th Cir. 1991).

> **(f)     There Is No Equitable Reason Not to Apply Issue Preclusion**

Lastly, there is no equitable reason not to apply issue preclusion in this case. The Supreme Court has expressed concern that issue preclusion might be "unfair to a defendant" if in the first action (1) the defendant was sued for "small or nominal damages" for which the defendant "may have had little incentive to defend vigorously"; (2) the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; or (3) "the second action affords the defendant procedural opportunities [e.g., discovery procedures] unavailable in the first action that could readily cause a different result." *Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997)

(quoting *Parklane Hosiery*, 439 U.S. at 330-31). None of these situations is present here: *Fields* and *Rivera* were each multi-million dollar lawsuits; the judgment in those cases are consistent, not inconsistent, with past judgments in litigation in this district, including in *Jones* and *Palmer*; and the procedural opportunities in each case were the same in all respects.

* * *

All four requirements for applying issue preclusion are satisfied. There is no equitable reason to avoid applying the doctrine. The City is before the Court as a repeat, losing litigant on the question whether it had an official policy of suppressing exculpatory and impeachment evidence. Multiple federal juries have concluded that the City had such a policy; multiple federal judges have found those verdicts amply supported and have entered judgments against the City; the Seventh Circuit has affirmed the City's liability on this ground. This Court should prevent the City's continued misuse of the judicial system and hold that it is precluded from relitigating whether it had an official policy of suppressing exculpatory and impeachment evidence.

If the Court decides this motion on preclusion grounds, then it will have no reason to address the alternative argument below that summary judgment should be granted because there are no material disputes on Iglesias's theory that City policymakers promulgated facially deficient policies in response to the problem of evidence suppression.

**B.      The City of Chicago Cannot Raise A Genuine Dispute of Material Fact Regarding Its Evidence Suppression Policy**

Alternatively, Iglesias seeks summary judgment on his theory that City policymakers put in place facially deficient written policies, which permitted the suppression of exculpatory evidence. Even if the Court concludes that the City is not precluded from relitigating its evidence suppression policy, the Court should grant summary judgment on this theory.

18

Summary judgment is warranted if "there is no genuine dispute as to any material fact," FED. R. CIV. P. 56(a), meaning that a reasonable jury could not return a verdict for the nonmoving party, here the City, *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the City cannot produce evidence sufficient to establish an element essential to its case, then it cannot survive a summary judgment challenge. *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The City has not produced any evidence in discovery to oppose the theory that its final policymakers put in place written policies that were facially deficient to stop the suppression of exculpatory evidence in homicide investigations. Instead, all of the evidence, including the City's own experts, supports this theory.

### 1. A Municipality Is Liable When Its Policymakers Promulgate Deficient Policies or Fail to Adopt Needed Policies

The Seventh Circuit has reaffirmed repeatedly that a municipal decision to promulgate deficient policies or to omit or refuse to adopt needed policies creates liability under the express policy framework of *Monell*. *J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020) (*en banc*) (gaps in policy and municipal failures to act give rise to municipal liability when municipality is on notice of constitutional problems); *Glisson*, 849 F.3d at 381 ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable."); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability).

19

Closely related, a municipality is liable under *Monell* for the deliberate conduct of its final policymakers whose acts are fairly said to be those of the municipality. *Board of County Commissioners v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). This includes a policymaker's decision to omit policies necessary to solve a problem of which the policymaker has notice. *Vodak v. Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (actions of policymakers about how to implement policy gives rise to liability); *see also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (policymaker aware of a systematic lapse in policy who fails to correct renders municipality liable).

> **2.** **The Summary Judgment Record Reflects That City Policymakers Promulgated Deficient Policies and Failed to Adopt Policies In Response to Notice of a Citywide Evidence Suppression Problem**

Iglesias contends that the City is liable under *Monell* because the Chicago Police Department's express written policies governing the creation, maintenance, and production of homicide investigative files were facially deficient, and because the City's final policymakers, who admit they were on notice of the problem of systemic suppression of investigative materials, chose not to adopt policies to ensure transmission of investigative information to prosecutors and criminal defendants. Iglesias asserts that these municipal actions caused the suppression of exculpatory investigative materials in Iglesias's case. While Iglesias again concedes that the City may contest this final point at trial—whether its municipal actions caused the violation of Iglesias's constitutional rights—it has not adduced any evidence to create a genuine dispute of material fact about whether its policymakers promulgated facially deficient policies that permitted the suppression of exculpatory evidence.

(a)     **The City Had Notice of A Problem of Widespread Evidence Suppression**

It is beyond dispute that following *Jones* and *Palmer* City policymakers had notice of a citywide problem of evidence suppression in homicide cases starting in 1982. The City's own Rule 30(b)(6) witness, James Hickey, testified that the City was aware of this problem by 1982 at the latest. SOF 8. In the criminal prosecution at issue in *Jones*, a Chicago Police detective whistleblower informed the criminal justice system and City policymakers that exculpatory evidence was routinely suppressed. SOF 2-3. The *Jones* case resulted in a jury verdict finding a custom of maintaining "street files" that were withheld from the State's Attorney's Office and criminal defendants. SOF 3-4.

In response to the revelations in *Jones*, a class action lawsuit captioned *Palmer v. City of Chicago* was filed, and during hearings in that litigation City policymakers testified and were put on notice that the Chicago Police Department was suppressing information in homicide investigations, including (a) by allowing documents created during homicide investigations to be placed in unofficial parallel files kept by the detectives, commonly referred to as street files, (b) by failing to document pertinent investigative leads and other information in police reports, in essence concealing whole branches of the investigation, and (c) by failing to disclose exculpatory and impeaching information to prosecutors and criminal defendants. SOF 5, 7-8.

City policymakers, including the City's designated Rule 30(b)(6) witness Hickey, investigated the issue, concluding that the problem of evidence suppression was present citywide. SOF 8-10. They concluded that the problem arose from the Chicago Police Department's "decentralized" file system for homicide investigations, whereby investigative steps were documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel

21

files that were not disclosed to criminal defendants, and because entire branches of homicide investigations were not documented in official reports. SOF 8-10. City officials were aware that the street files practice documented above resulted in wrongful prosecutions and convictions. SOF 11-13.

By the time the *Jones* case got to the Seventh Circuit in 1988, that Court observed that the City's custom of evidence suppression was "department-wide and of long standing," was a "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself," and that "the jury was entitled to conclude that it had been consciously approved at the highest policy-making level for decisions involving the police department[.]" SOF 4; *Jones*, 856 F.3d at 996.

**(b)      The City Failed to Promulgate Policies to Solve the Evidence Suppression Problem**

It is also undisputed that City policymakers responded to the evidence suppression problem by promulgating written policies that on their face were insufficient to solve the problem. First, this is clear from the face of the written policies themselves. Detective Division Special Orders 83-1 (effective February 3, 1983), 83-2 (effective May 2, 1983), and 86-3 (effective May 29, 1986), put in place in response to the problem, required that detectives keep notes and memoranda on a new official form called a "General Progress Report" and preserve them in a new "Investigative File" kept in the Detective Area. SOF 20, 24-29. But the written policies had facial deficiencies, including: (1) the policies did not include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files," SOF 23, 26, 29, 30, 34, 36; (2) they allowed for the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be

gathered from all of those locations, SOF 23, 26, 29, 30, 35, 36; (3) they failed to cover gang crimes officers and other non-detective investigators participating in homicide investigations, meaning there was no change in rules when it came to investigative information gathered by these individuals, SOF 23, 26, 37; (4) they left to the discretion of detectives what information to record in official files, based on detectives' own subjective determinations, SOF 23, 26, 29, 30, 38; (5) they did nothing to ensure that the Chicago Police Department subpoena service unit (charged with responding to subpoenas from the criminal justice system for investigative information), the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, SOF 23, 34, 36, 39, 40.

Second, the City policymakers' deficient response to the evidence suppression problem is evident in the fact that the promulgated policies contained the above facial deficiencies, despite Judge Shadur's identification in *Palmer* of many of these specific problems as those in need of a solution. SOF 19, 23. That put the City's policymakers on notice at such a particular level of detail of the failures that needed correcting that the policymakers' decision to leave these particular gaps in policy cannot be construed as anything more than an explicit decision to allow the problem to continue. SOF 34-40.

Third, the City's deficient response is further shown by the Chicago Police Department's lack of effort to implement the new Special Orders. Policymakers were aware of a substantial resistance with the Chicago Police Department to any change in policies requiring disclosure of information. SOF 11-12. Still, the City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies. SOF 22, 31.

Fourth, the City's policymakers and designees in charge of this policymaking concede that the Special Orders it put in place did not address Judge Shadur's concerns, and that the policies put forth were insufficient to overcome a problem as entrenched as the Chicago Police Department's evidence suppression policy. SOF 31-40, 42-49. And as discussed above, after Special Order 86-3 there was no further change in City policy before the time that Iglesias was wrongly convicted of the Roman murder. SOF 29-30, 42-49.

### 3. The City Cannot and Does Not Contest This Evidence

As described above, the evidence in the record on Iglesias's *Monell* theory that City policymakers responded to notice of a citywide problem of evidence suppression with facially deficient policies all points in one direction. The City cannot create a genuine dispute on any part of this express policy *Monell* theory, and thus Iglesias is entitled to summary judgment.

In response to the ample evidence above–including, among other things, the City's own written policies, 30(b)(6) designees and district court and appellate rulings–the City has not put forth a single fact witness, Rule 30(b)(6) witness, or even expert witness who challenges Iglesias's evidence. The City's 30(b)(6) designees have admitted that the policies put in place were deficient in various ways, and did not address a number of the deficiencies in the policies that Judge Shadur explicitly identified, including the continued use of parallel files, the lack of any guidance as to what constituted relevant information that needed to be documented, the lack of any guidance to the subpoena service unit about what to gather in response to document requests from prosecutors and criminal defendants, and most fundamentally the lack of any directive to produce all investigative information contained in police investigative files. SOF 34-40, 42. It is particularly striking that, despite disclosing five experts in this case, the City has not disclosed any expert to defend the City's express written policies governing the documentation

24

and disclosure of exculpatory and impeachment evidence–*i.e.*, Special Orders 83-1, 83-2, and their progeny. SOF 41.

* * *

The record reflects that City policymakers had notice of a citywide problem of evidence suppression in homicide investigations starting in 1982, promulgated facially deficient policies in response, failed to implement them, and then left the bad policies in place well past Iglesias's wrongful conviction. The City has not and cannot adduce evidence that creates a genuine issue of material fact on this *Monell* theory. If the Court does not grant summary judgment more broadly on preclusion grounds, it should grant summary judgment on this theory.

**CONCLUSION**

For these reasons, this Court should grant summary judgment on issue preclusion grounds on the *Monell* theory that the City had an official policy of suppressing exculpatory and impeachment evidence. Alternatively, this Court should conclude that there are no genuine disputes of material fact on the *Monell* theory that City policymakers promulgated facially deficient policies in response to the problem of evidence suppression, and it should grant summary judgment on that theory.

**January 29, 2024**                                    RESPECTFULLY SUBMITTED,

**GERALDO IGLESIAS**

By: _/s/ Steve Art_____
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
**LOEVY & LOEVY**

25

311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

26

**CERTIFICATE OF SERVICE**

I, Steve Art, an attorney, hereby certify that, on January 29, 2024, I filed the foregoing

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY AGAINST THE CITY OF CHICAGO

using the Court's CM/ECF system, which effected service on all counsel of record.

        /s/ Steve Art          
        *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

27