*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 21

**CHICAGO POLICE**
# ARREST REPORT
CPD-11.420 (REV 6/92)

| 1 NAME (LAST - FIRST - MIDDLE) | | | 2 SEX | 3 RACE | 4 AGE | 5 DATE OF BIRTH DAY MONTH YEAR |
|---|---|---|---|---|---|---|
| IGLESIAS, Geraldo | | | M | WH | 24 | |

| 6 C.B.R NO | 7 ALIAS OR NICKNAME | 8 DIST./RES | 9 HEIGHT | 10 WEIGHT | 11 HAIR | 12 HAIR STYLE | 13 EYES | 14 COMPLEXION |
|---|---|---|---|---|---|---|---|---|
| 94 22 967 | "SNAKE"  Imperial Gangster | 025 | 5-10 | 150 | Blk | Short | Brn | Med |

| 15 I.R. NO | 16 RESIDENCE ADDRESS | APT. NO./FLOOR | 17 DISTING MARKS, SCARS, DISABILITIES, ETC. | 18 SOCIAL SECURITY NO |
|---|---|---|---|---|
| | 1725 W. Belden | | Tatoo Rt/Arm I G | Unknown |

| 19 Y.D. NO | 16A CITY - STATE | ZIP CODE | HOME TELEPHONE | 20 STATE/PLACE OF BIRTH | 21 DRIVERS LICENSE NO | STATE |
|---|---|---|---|---|---|---|
| | Chicago | 60647 | None | Illinois | None | |

| 22 RD NO | 23 OCCUPATION | 24 BUSINESS NAME - ADDRESS | CITY - STATE  ZIP CODE | BUSINESS TELEPHONE |
|---|---|---|---|---|
| X-250303 | Unemployed | DNA | | |

| 25 ADDRESS OF ARREST | 26 NO. ARRESTED | 27 LOCATION CODE FOR NATURE OF PREMISES | 28 BEAT OF ARREST | 29 DATE OF ARREST DAY MONTH YEAR | TIME | 30 ARRESTEE TRANSPORTED TO UNIT | BY BEAT | TIME |
|---|---|---|---|---|---|---|---|---|
| 2135 N. Spualding | 1 | 304 | 1414 | 23 June 93 | 1800 | 652 | 5535 | 1810 |

| 31 RESISTED ARREST | 32 WEAPON | 33 PROPERTY INVENTORY NO(S) | 34 FOR NARCOTIC ARREST | APPROX WT NO PILLS | EST STREET VALUE CALL ORG CRIME |
|---|---|---|---|---|---|
| YES ☐  NO ☒ | PISTOL ☐ REVOLVER ☐ RIFLE ☐ SHOT. GUN ☐ KNIFE ☐ OTHER (SPECIFY) ☐ | DNA | ☐ SUSPECT CANNABIS ☐ SUSPECT CONTROLLED SUBSTANCE | | PAX 0-662  $ |

| 35 VEHICLE - YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE LICENSE NO OR V.I.N | DISPOSITION OF VEHICLE |
|---|---|---|---|---|---|---|
| DNA ARRESTEE | | | | | | |

| 36 PERSON IN INVESTIGATIVE UNIT NOTIFIED | UNIT NOTIFIED | TIME | 37 DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME | IF YES - NAME OF Y D MEMBER NOTIFIED - TIME | 38 NAME OF A.S.A/FEL REV | CHARGES APPROVED | TIME |
|---|---|---|---|---|---|---|---|
| DNA | | | ☐ YES  ☒ NO | | Mike LATZ | ☐ YES  ☐ NO | |

| 39 VICTIM/COMPLAINANT | NAME | SEX | RACE | AGE | HOME ADDRESS | CITY - STATE | ZIP CODE | TELEPHONE NO |
|---|---|---|---|---|---|---|---|---|
| | Det. E. HALVORSEN | M | W | 42 | 5555 W. Grand | Chgo | 60630 | 312 746-8282 |

| VICTIM INJURED | IF YES - DESCRIBE INJURIES | VICTIM HOSPITALIZED | HOSPITAL NAME |
|---|---|---|---|
| ☒ YES ☐ NO | Gunshot to head/Homicide | ☐ YES ☐ NO  ☐ TREATED & RELEASED | |

| 40 REFERENCES (CH - PAR.) | 41 OFFENSES | 42 DISPOSITIONS | 40 REFERENCES (CH - PAR.) | 41 OFFENSES | 42 DISPOSITIONS |
|---|---|---|---|---|---|
| 1 720/5-9-1a2 | First Degree | | 5 | | |
| 2 | Murder | | 6 | | |
| 3 | | | 7 | | |
| 4 | | | 8 | | |

**43 NARRATIVE** (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

The above named defendant, Gerardo IGELESIAS, was placed in custody for the murder of

Monica ROMAN.  Gerardo IGELESIAS was identified in a line-up, as the person who on 7 June 93,

at 2148 N. Sawyer, shot Monica ROMAN in the head with a handgun, killing Monica ROMAN

ARRESTING DETECTIVES:  T. RICCIO #20870
                       S. GAWRYS #20689

| | I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge. | | | |
|---|---|---|---|---|
| FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE | STAR NO 20867 | UNIT 652 | DEPUTY CLERK'S SIGNATURE | STAR/EMP. NO. 1073 |

| 44 FIRST ARRESTING/APPEARING OFFICER. PRINT NAME | BEAT NO. | FURLO | D O GRP | MISD /ORD CRT KEY | 45 SECOND ARRESTING OFFICER. PRINT NAME - STAR NO | UNIT | 46 VEHICLE ASSIGNED ☐ ONE ☐ TWO ☐ PO ☐ OTHER |
|---|---|---|---|---|---|---|---|
| Det. E. HALVORSEN | 5535 | 9 | 7 | | Det. R. GUEVARA | 20861  652 | |

| 47 INITIAL APPROVAL OF PROBABLE CAUSE: SIG. - STAR | 48 RESULTS OF FINGERPR. CHECK WAIVED BY: SIG - STAR | DATE | TIME | 49 APPROVAL OF CHARGES: SIG - STAR | DATE | TIME |
|---|---|---|---|---|---|---|
| | | | | | | |

| WATCH COMMANDER'S NOTATIONS |
|---|
| |

| 50 ARRESTEE SEARCHED BY | STAR/EMP. NO  UNIT | 51 DATE RECEIVED - LOCKUP | TIME | 52 PERS. PROPERTY RECEIPT NO | 53 TELEPHONE NO CALLED | TIME |
|---|---|---|---|---|---|---|
| 54 BOOKING OFFICER | STAR/EMP. NO  UNIT | 55 TIME FINGERPRINTED | 56 TIME PHOTOGRAPHED | 57 TIME FED | 58 PLACED IN CELL NO | |

**COURT INFORMATION**

| 59 ARR OFF DESIRED COURT DATE | BRANCH - CALL | 60 COURT SET TO HANDLE | 61 INITIAL COURT DATE | BRANCH - CALL | 62 FINAL CRT. DATE | BRANCH - CALL |
|---|---|---|---|---|---|---|
| 25 June 93 | 66 | ☐ YES ☒ NO | | | | |

| 63 BONDED - DATE | TIME | 64 BOND RECEIPT NO |
|---|---|---|

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 22

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 1:19-CV-6508

## GERALDO IGLESIAS

## V.

## REYNALDO GUEVERA, ET AL.

## DEPONENT:

## STEPHEN  GAWRYS

## DATE:

## October 27, 2021



a courtroom **powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1       IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3            EASTERN DIVISION

4   HON. FRANKLIN U. VALDERRAMA, DISTRICT JUDGE

5     HON. MARIA VALDEZ, MAGISTRATE JUDGE

6        CASE NO. 1:19-CV-6508

7

8          GERALDO IGLESIAS,

9            Plaintiff

10

11             V.

12

13       REYNALDO GUEVERA, ET AL.,

14           Defendants

15

16

17

18

19

20

21

22

23  DEPONENT: STEPHEN GAWRYS

24  DATE:     OCTOBER 27, 2021

25  REPORTER: AALAYAH PURNELL



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                       APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, GERALDO IGELSIAS:

 4   John Hazinski

 5   Loevy & Loevy

 6   311 North Aberdeen Street

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: hazinski@loevy.com

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

14   Austin Rahe

15   Rock Fusco & Connelly, LLC

16   321 North Clark Street

17   Chicago, Illinois 60654

18   Telephone No.: (312) 494-1000

19   Facsimile No.: (312) 494-1001

20   E-mail: arahe@rfclaw.com

21   (Appeared via videoconference)

22

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 7 of 782 PageID #:13265
The Deposition of GARRY, taken 01/06/2021

3

```
 1                   APPEARANCES (CONTINUED)

 2

 3    ON BEHALF OF THE DEFENDANT, REYNALDO GUEVERA:

 4    Kevin E. Zibolski

 5    Leinenweber Baroni & Daffada, LLC

 6    1150 Wilmette Avenue

 7    Suite E

 8    Wilmette, Illinois 60091

 9    Telephone No.: (866) 786-3705

10    Facsimile No.: (800) 896-2193

11    E-mail: kevin@ilesq.com

12    (Appeared via teleconference)

13

14    ON BEHALF OF THE DEFENDANTS, STEPHEN GAWRYS, ROBERT

15    BIEBEL, ANTHONY RICCIO, AND ERNEST HALVORSEN:

16    Josh Engquist

17    The Sotos Law Firm, P.C.

18    141 West Jackson Boulevard

19    Suite 1240A

20    Chicago, Illinois 60604

21    Telephone No.: (630) 735-3300

22    Facsimile No.: (630) 773-0980

23    E-mail: jengquist@jsotoslaw.com

24    (Appeared via videoconference)

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 8 of 782 PageID #:13266
The Deposition of JAMES, taken 3/26/2021

4

```
 1                      INDEX

 2                                     Page

 3   PROCEEDINGS                         6

 4   DIRECT EXAMINATION BY MR. HAZINSKI     7

 5

 6

 7                    EXHIBITS

 8   Exhibit                           Page

 9   1 - Supplementary Report (RFC 10-13)   66

10   2 - Arrest Report (RFC 14)          72

11   3 - Supplementary Report

12   (RFC IGLESIAS 48-55)               74

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        STIPULATION

 2

 3    The VIDEO deposition of STEPHEN GAWRYS was taken at

 4    KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND

 5    FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in

 6    which all participants attended remotely, on WEDNESDAY,

 7    the 27th day of OCTOBER 2021, at approximately 11:02

 8    a.m. EST; said deposition was taken pursuant to the

 9    FEDERAL Rules of Civil Procedure.  The oath in this

10    matter was sworn remotely pursuant to FRCP 30.

11

12    It is agreed that AALAYAH PURNELL, being a Notary Public

13    and Court Reporter, may swear the witness and that the

14    reading and signing of the completed transcript by the

15    witness is not waived.

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 10 of 782 PageID #:13268
The Deposition of STEPHEN GAWRYS, taken on October 27, 2021

6

```
 1                    PROCEEDINGS

 2

 3       COURT REPORTER:  We are on record.  My name is

 4  Aalayah Purnell.  I'm the video technician and

 5  court reporter today.  Today is the 27th day of

 6  October 2021. The time is 11:03 a.m. Eastern

 7  Standard Time.  We are convened by videoconference

 8  to take the deposition of Stephen Gawrys in the

 9  matter of Geraldo Iglesias versus Reynaldo Guevara,

10  et al., pending in the United States District Court

11  for the Northern District of Illinois, Eastern

12  Division, case number 1:19-CV-6508.  Will counsel

13  please state your appearance, how you are

14  attending, and the location you are attending from,

15  starting with Plaintiff's counsel?

16       MR. HAZINSKI:  This is John Hazinski

17  representing the plaintiff, Geraldo Iglesias,

18  appearing remotely from Chicago.

19       MR. RAHE:  This is Austin Rahe appearing for

20  the defendant, City of Chicago, via Zoom from the

21  Chicagoland area.

22       MR. ENGQUIST:  You don't need to put it on me.

23  Josh Engquist, also taking it via Zoom in the

24  Chicagoland area.  I'm with my client, Mr. Gawrys.

25  I represent the other individual defendants, with
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the exception of Mr. Guevara.

2         MR. ZIBOLSKI:  Good morning.  This is Kevin

3    Zibolski for Defendant Guevara.  I'm attending by

4    telephone from the City of Chicago.

5         COURT REPORTER:  Thank you, Mr. Gawrys, will

6    you please state your full name for the record?

7         THE WITNESS:  Sure.  First name is Stephen,

8    S-T-E-P-H-E-N.  Last name is Gawrys, G-A-W-R-Y-S.

9         COURT REPORTER:  Thank you.  And do all

10   parties agree that the witness is, in fact,

11   Mr. Gawrys?

12        MR. HAZINSKI:  Yes.

13        MR. RAHE:  Yes.

14        COURT REPORTER:  Thank you.  Sir, will you

15   please raise your right hand?  Do you solemnly

16   swear or affirm that the testimony you are about to

17   give will be the truth, the whole truth, and

18   nothing but the truth?

19        THE WITNESS:  I do.

20        COURT REPORTER:  Thank you.  Counsel, you may

21   begin.

22        MR. HAZINSKI:  Thank you.

23             DIRECT EXAMINATION

24   BY MR. HAZINSKI:

25        Q    So sir, your name is pronounced Gawrys; is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   that right?

 2       A    Correct.

 3       Q    Thank you.  Have you ever given a deposition

 4   before?

 5       A    Hear me?

 6       Q    Yes.  I'm sorry, did you answer?  It didn't

 7   come through.

 8       A    Yeah, I did.  I said yes.  I'll speak louder.

 9       Q    Thank you.  I appreciate that.  How many

10   times?

11       A    Two or three times.

12       Q    Well, you have some familiarity with this

13   process, but just to make sure things go smoothly, I'm

14   going to go over some ground rules in the beginning. The

15   first of which we've already run into a little bit,

16   which is, especially in these remote contexts, it's

17   important that we try not to speak over one another,

18   because, as you can tell, the court reporter here is

19   taking down everything we say.  So I'll do my best to

20   let you finish answering a question before I start

21   asking a new one and I'd ask that you try to let me

22   finish asking before you answer; is that fair?

23       A    Fair.

24       Q    Thank you.  If you don't understand a question

25   that I ask whether because it's a confusing question or
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  because there's some problem with the technology, please

2  ask me to clarify or restate or rephrase the question.

3  And if you answer it, I'll assume that you understood

4  me; is that fair?

5      A    Fair.

6      Q    You're welcome to take a break at any time

7  you'd like to.

8      A    Okay.

9      Q    So the only thing I'd ask is that you not take

10  a break while I still have a question pending to you,

11  okay?  Mr. Gawrys, do you have any medical issues or are

12  you taking any medications that affect your memory?

13      A    Yes.  Both.

14      Q    And what are the medical issues that affect

15  your memory?

16      A    I have bad back, bad hip.  It's from a cancer

17  surgery.

18      MR. ENGQUIST:  He's asking if it affects your

19      memory though, Steve.

20      THE WITNESS:  Pardon me?

21      MR. ENGQUIST:  If it affects your memory.

22      A    Oh, no, it doesn't affect my memory.  And I

23  took Tylenol, that's all.

24  BY MR. HAZINSKI:

25      Q    Well, I'm sorry to hear about that.  And you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   know, if, for example, I know we're going to be sitting

2   for a long time today, so if you need to take a break or

3   readjust.

4        A    Yeah, I'll let you know.

5        Q    Please feel free, because we don't want you to

6   have to be in pain during this process.

7        A    Thank you.

8        Q    Other than Tylenol, are you taking any

9   medications that, and I'm asking only because if there

10   are any medications you might be taking that would

11   affect your memory?

12        A    No.

13        Q    You're in the room with your attorney,

14   Mr. Engquist, correct?

15        A    Correct.

16        Q    Is anybody else in there with you?

17        A    No.  Just my dog.

18        Q    Did you review any documents to prepare for

19   this deposition?

20        A    Yes.

21        Q    What documents did you review?

22        A    Supplementary, just the investigative file.  I

23   looked through that.

24        Q    About how many pages long was the

25   investigative file that you looked through?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A    I don't know.

2     Q    Did you read the entire investigative file

3 carefully?

4     A    Most of it.  I tried to.  Yeah, most of it.

5     Q    Did you review any transcripts in preparation

6 for your deposition?

7     A    Yes.

8     Q    What transcripts did you review?

9     A    I believe it was from Guevara.

10    Q    It was the testimony of Mr. Guevara?

11    A    Yes.

12    Q    Was the testimony from a criminal case or from

13 a civil case?

14    A    From this case.

15    Q    Okay.  When you say "from this case," do you

16 mean from the criminal trial in this case?

17    A    Yes.

18    Q    Other than Mr. Guevara's testimony, did you

19 review any other transcripts?

20    A    No.

21    Q    Did you look at any photographs?

22    A    Any further what?

23    Q    Any photographs?

24    A    No.

25    Q    In the investigative file you looked through,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  I think you mentioned seeing supplementary reports. What

2  other kinds of documents did you review in the

3  investigative file?

4      A    Maybe the original sub, some of the other

5  subs, investigative subs, went through  -- went through

6  that, and then the sub with Guevara, Halvorsen, and then

7  Riccio, and my name on it.

8      Q    Did you review any handwritten police reports?

9      A    No.

10     Q    Did you meet with one or more of your

11 attorneys to prepare for this deposition?

12     A    Yes.

13     Q    How many times?

14     A    One time.

15     Q    When was that?

16     A    That would be during my  -- after my last

17 deposition.  What was it last week?  Week before?

18     Q    What case was it in which you gave that last

19 deposition?

20     A    That was Maisonette.

21     Q    Did you have the same attorneys representing

22 you in that case?

23     A    Yes.

24     Q    Are you a defendant in the Maisonette case or

25 were you just a witness?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I was just a witness.

2    Q    How long was your meeting with your attorney

3    to prepare for this deposition?

4    A    I'm not sure.  I don't know.  Maybe a couple

5    hours.

6    Q    Other than your attorney, have you talked to

7    anybody else about your deposition in this case?

8    A    No.

9    Q    Mr. Gawrys, are you currently employed?

10   A    Yes.

11   Q    Where do you work?

12   A    I work at Cook County Assessor's Office.

13   Q    And what do you do at the Cook County

14   Assessor's Office?

15   A    I'm Chief of Investigations.

16   Q    What are your responsibilities in that role?

17   A    I have a team of investigators and we

18   investigate erroneous exemptions on properties.

19   Q    Do you supervise that team?

20   A    Yes.

21   Q    And how long have you had that job?

22   A    Since 2014.

23   Q    I want to go back in time.  When were you

24   first hired by the Chicago Police Department?

25   A    November 1st, 1977.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And what was your first assignment within the
2  police department?

3    A    Patrol division.

4    Q    How long did you remain in the patrol
5  division?

6    A    Well, I went from the district to a
7  specialized unit in -- I don't know what year it was.
8  I'm not sure.  '84, '85, somewhere in there.

9    Q    What was the name of the specialized unit you
10  went to?

11    A    Special Operations Group.  We were the south
12  unit.

13    Q    And what were the responsibilities of the
14  Special Operations Group?

15    A    Responsibilities were to -- We were a mobile
16  unit that we can go into any area on the south side and
17  help assist the district personnel if they were having
18  unusual crime patterns or things that were going on that
19  they needed help on they couldn't handle.

20    Q    Did your rank change when you joined the
21  Special Operations Group?

22    A    No.

23    Q    Who was your supervisor, or who was in charge
24  of supervising you in that role?

25    A    I have no idea.  I don't remember.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Was it a sergeant?

 2        A     Yes.

 3        Q     And how long did you remain with Special

 4   Operations?

 5        A     I really don't remember.  Maybe two, three

 6   years.

 7        Q     Where'd you go after that?

 8        A     I got promoted to gang specialist.

 9        Q     What year was that promotion?

10        A     Maybe 1985, '86.  I'm not sure.

11        Q     How long in total were you a gang specialist,

12   approximately?

13        A     Until 1990.

14        Q     Was Rey Guevara one of your partners when you

15   were a gang specialist?

16        A     Yes.

17        Q     Do you recall what period of time he was your

18   partner?

19        A     No, I did not.

20        Q     Do you know if it was for more or less than a

21   year?

22        A     I have no idea.

23        Q     Did you have multiple partners while you were

24   a gang crime specialist?

25        A     Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Do you recall the names of any of your other
2  partners while you were a gang crime specialist?

3    A    Maybe Joe Sparks was one.  I don't know.  I
4  don't remember.  I couldn't be sure.

5    Q    What did it mean to be partnered with another
6  officer when you were a gang crime specialist?

7    A    You just worked with that other person.

8    Q    If you were partnered with a particular
9  officer, did that mean that you worked on all of your
10  cases together?

11    A    Yeah, for the most part.

12    Q    Can you estimate about how many cases you
13  worked on in gang crimes with then gang crimes Officer
14  Guevara?

15    A    No, I have no idea.

16    Q    What were the responsibilities of a gang crime
17  specialist?

18    A    Gang crime specialist, we were assigned, most
19  of us, two gangs to monitor, and what you did is you
20  collected information, intelligence, whatever you want
21  to say, which consisted of cars and how many members in
22  the section, who went to jail, who's coming out of
23  prison.  Those types of things.

24    Q    When you said you were assigned two gangs, two
25  as in T-W-O gangs?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yeah, two.

 2        Q     The number.

 3        A     One, two.  Right.

 4        Q     Which two gang did you specialize in?

 5        A     I had the Latin Kings at Leavitt and Schuler

 6   and the Insane Unknowns, they were around, I think it

 7   was Damen and Armitage.

 8        Q     As a gang crime specialist, were you ever in

 9   charge of monitoring any other gangs?

10        A     No, that was my only two responsibilities.

11        Q     Okay.  From what you remember during your

12   partnership, what gangs did Officer Guevara specialize

13   in?

14        A     One of them he had was the Latin Lovers.  I

15   don't remember the second one.

16        Q     Was there a particular -- so you mentioned two

17   intersections associated with each of the gangs that you

18   were in charge of monitoring.  What geographic area of

19   the city was that in?

20        A     I don't know what you want.  What do you mean

21   area?

22        Q     What part of the city is it in --

23        A     It's the North side.

24        Q     Okay.  Particular neighborhood?

25        A     One was Wicker Park.  The other was Bucktown,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   I'm guessing.  I don't know.  I don't remember.
2       Q    So would it be fair to say that for the two
3   gangs that you specialized in, that it was your job to
4   know who the members of those gangs were?
5       A    Yes.
6
7
8       Q    Did you frequently make arrests of gang
9   members?
10      A    Yes.
11      Q    Did you know the nicknames of the people that
12  were in those gangs?
13      A    For the most part, yes.
14      Q    As a gang crimes officer, did you ever have to
15  investigate serious crimes or violent crimes?
16      A    Yes.
17      Q    Okay.  As part of those investigations, did
18  you interview witnesses, for example?
19      A    Yes.
20      Q    Now on some occasions, gang crimes officers
21  would work with violent crimes detectives, correct?
22      A    That's correct.  Did you hear me?
23      Q    I'm sorry, my connection froze and I couldn't
24  hear your answer.  Could you say the answer one more
25  time?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    What's the question again?  You said we work
 2   together?
 3        Q    Yeah.  Sometimes gang crime specialists work
 4   with violent crimes detectives, right?
 5        A    Yes.
 6        Q    If a violent crime occurred and there was
 7   suspected gang involvement, were there always violent
 8   crimes detectives that worked on that case, or was it
 9   sometimes that gang crimes specialists would investigate
10   it without working with detectives?
11             MR. ENGQUIST:  Objection.  Calls for
12        speculation.  Also lack of foundation.  But go
13        ahead.
14        A    If it was a violent crime, it was investigated
15   by the detectives.
16        Q    When you worked as a gang crimes specialist,
17   can you describe how you would be assigned to work on a
18   particular investigation?
19        A    It would be by a sergeant.
20        Q    And was the sergeant who did the assignments a
21   gang crime sergeant or someone from the detective
22   division?
23        A    No, it'd be a gang crimes sergeant.
24        Q    As a gang crimes officer, did you ever show
25   photographs to eyewitnesses?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2             MR. ENGQUIST:  Objection.  Vague.  Go ahead.

 3        Q    I think we got the answer.  So did gang crimes

 4   officers, when you were a gang crime specialist, keep

 5   books with photographs of known gang members in them?

 6        A    Did we keep them?  What do you mean?

 7        Q    Like -- let me --

 8        A    We had books --

 9        Q    Let me ask it a different way.  As a gang

10   crimes specialist, did you have access to books of

11   photographs of known gang members?

12        A    Yes.

13        Q    Okay,  Was there a name for those books?

14        A    I don't know about a specific name.  There

15   were just gang books.

16        Q    Gang books.  Okay.  As a gang crimes

17   specialist, were you responsible for putting together

18   those books?

19        A    No.

20        Q    As a specialist in particular gangs, were you

21   ever responsible for adding or removing photographs from

22   a gang book?

23        A    No, you couldn't remove photos from there.

24   Well, you shouldn't, let's put it that way.  You

25   shouldn't move.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q       Where were those books stored?
 2        A       Gang crimes office.
 3        Q       At the time you were a gang crimes specialist
 4   where was the gang crimes office?
 5        A       Belmont and Western.
 6        Q       Was that office shared with any other police
 7   details or divisions?
 8        A       Yes.
 9        Q       Which ones?
10        A       It was an area building, so I think it was
11   area three at the time.  I'm not sure, the numbers keep
12   changing.  But we had the 19th District was in there,
13   patrol division.  And then you had the detective
14   division on the second floor.  Youth division was there.
15        Q       And you said the -- and so, at that space at
16   Belmont and Western, was the gang crimes office -- did
17   it have its own dedicated space within that building?
18        A       Yes.
19        Q       Okay.  Is -- and it was -- and the gang books
20   were stored in that dedicated space, correct?
21        A       Administrative office, yes.
22        Q       What were those gang books used for?
23        A       Identifications.
24        Q       Can you explain how you would use one of those
25   gang books for identifications?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A    If you had witnesses, you would bring them to

2  the office.  Depending on the information you had, you

3  would pull those books.

4     **Q**    **Did you ever take a gang book out?  Take it**

5  **out with you into the field?**

6     A    I don't remember doing it, but I may have.  I

7  don't know.

8     **Q**    **Okay.  From your experience, do you know who**

9  **was responsible within the police department for adding**

10  **photos to gang books or taking photos out of gang books?**

11     A    No.

12     MR. ENGQUIST:  Objection to foundation.

13     **Q**    **And as a gang crimes officer, did you**

14  **personally ever have occasion to show gang books to**

15  **witnesses during criminal investigations?**

16     A    Yes.

17     **Q**    **Do you recall approximately how many times you**

18  **did that?**

19     A    No.

20     **Q**    **As a gang crimes specialist, did you take**

21  **notes during investigations?**

22     A    Yes.

23     **Q**    **At the time, were you required to take notes**

24  **on any particular form or type of report?**

25     A    Say that again.  On a certain report?  Could

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    you repeat that, please?

2        Q    Let me -- I'll just ask it in a more direct

3    over.  Were you required to make handwritten notes on

4    GPRs as a gang crime specialist?

5        A    No.

6        Q    Did you take notes during witness interviews?

7            MR. ENGQUIST:  Objection.  Vague.  And

8        objection to foundation.

9        A    I guess I can answer.  What was it?  What are

10   you asking again?  Say that again.

11       Q    When you were working as a gang crimes

12   specialist, you said you took notes during investigation

13   sometimes.  Did you take notes during witness

14   interviews?

15       A    Yes.

16       Q    Were there other circumstances during

17   investigations that you conducted as a gang crimes

18   specialist where you took notes?

19       A    Could have been.  Depends on the

20   circumstances.

21       Q    Could you give me an example?

22       A    Photo ID out of one of the gang books.

23       Q    So if there was a positive photo ID out of one

24   of the gang books, how would you document that

25   information?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    We would put that on a -- well, we could put
 2   it on a department patrol division supplementary, or we
 3   would call the detectives on the case to let them know
 4   that we do have an ID.  That was for sure.
 5        Q    Other than putting the information on a patrol
 6   division supplementary or calling the detectives, are
 7   there any other ways that you would document a positive
 8   ID from a gang book?
 9        A    No.  I can't think of any.
10        Q    As a gang crimes specialist, did you ever
11   write memos or notes to detectives that you were working
12   with on a case?
13        A    I don't remember doing it.
14        Q    If you took notes, handwritten notes, during
15   an investigation as a gang crime specialist, what would
16   you do with those notes after you made them?
17        A    Depends on what the notes were.
18        Q    Can you explain what you mean?
19        A    I don't know what you're looking for.  What
20   you mean by "notes."
21        Q    To take one example, let's say you made
22   handwritten notes of a witness interview.  After you
23   made those handwritten notes, what would you use them
24   for?
25        A    Use them for?  We would notify detective
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    division, if need be, then reduce those notes to a
 2    supplementary report.
 3        Q    And when you say "if need be, reduce them to a
 4    supplementary report," what do you mean?
 5        A    Well, it depends what the notes were.  I mean,
 6    I don't know how to explain it.  If you're there with a
 7    witness or something and you're talking to somebody and
 8    detectives come in, sometimes detectives would come to
 9    our office and bring a witness in to show our books, so
10    we would assist them and show them the books because
11    outsiders weren't really allowed to most of the time,
12    unless they're really well-known detectives, to go
13    through our books.
14        Q    When you say "outsiders," do you mean folks
15    who aren't in gang crimes?
16        A    Yeah.  Outside units.
17        Q    Got it.  So if you had handwritten notes from
18    a witness interview that you took as a gang crime
19    specialist, you said you might notify the detective
20    division and, if need be, you might reduce those notes
21    to a supplementary report; is that correct?
22        A    We would tell the detective division.
23        Q    In every case?
24        A    Well, if it's a violent crime case.  I don't
25    know what the case is you're talking -- you know, you
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    have in mind.  So if it's a violent crime case, of
 2    course we're going to tell the detectives.  But you have
 3    to -- that's their responsibility for the case, not
 4    ours.  So we're just there to assist them.
 5         Q    And when you say "tell the detectives," do you
 6    mean that you would tell the detectives everything that
 7    had happened with the witness?
 8         A    As far as the interview?
 9         Q    Yeah.
10         A    Yes.
11         Q    And in some circumstances, you might also make
12    a supplementary report based on your handwritten notes,
13    right?
14         A    If need be, yes.
15         Q    How did you decide whether to make a
16    supplementary report or not?
17         A    Depends on the information you have.
18         Q    Okay.  Can you explain a little more what you
19    mean by that?
20         A    No.  I mean, I don't know what you're looking
21    for, but if they had the responsibility of clearing the
22    case, detective division, then we're just there to
23    assist them with information if it's a gang-related
24    case.
25         Q    I'll try to ask the question in a more
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    specific way and maybe it'll be clearer.  If you had,

2    let's say, made handwritten notes of a witness interview

3    during an investigation of a violent crime as a gang

4    crimes specialist, you had to make a decision about

5    whether or not to document that information in a

6    supplementary report and I'm wondering if you could tell

7    me what are the factors that you would consider in

8    deciding whether to prepare a supplementary report?

9         A    It would depend on the witness.  What the

10   witnesses is telling you.  If we take a witness, just

11   for an example, I don't know what you're going at, but

12   we take a witness and they're in our office, our gang

13   office, and we start showing them photos, if there's an

14   ID, or there is no ID, we're going to mark down what we

15   did as far as what books we showed.

16        Q    And when you say "mark down what we did," do

17   you mean putting it in a sup report?

18        A    Yeah.  What book, what photo, if there was an

19   ID.  And then you notify detective division.  But as far

20   as --

21        Q    And --

22        A    -- never mind.

23        Q    I'm sorry.  I didn't mean to interrupt you.

24        A    No, that's all right.  I don't want to start

25   babbling here.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q      Fair enough.  And just to be clear, you would

 2   put it in a sup if there was an ID or if there was no

 3   ID, correct?

 4      A      Yes.

 5      Q      Besides documenting positive identifications

 6   from a photo book, are there other circumstances as a

 7   gang crimes specialist that you would prepare

 8   supplementary reports?

 9      A      Sure.

10      Q      Can you give me some examples?

11      A      Robberies, auto thefts, sexual assaults,

12   narcotics.

13      Q      After you prepared a supplementary report --

14   well, let me back up.

15      A      Hold on.  Okay.  We're good.

16      Q      Is it fair to say that you would -- when you

17   had to prepare a supplementary report, you would rely on

18   the handwritten notes that you had made to, sort of,

19   reduce that information into the typed report?

20      A      Yes.

21      Q      Okay.  And after you did that, what would you

22   do with the handwritten notes?

23      A      Run.

24      Q      Sorry, could you say that again?

25      A      Run the report, destroy the notes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  As a gang crime specialist, did any
 2   supervisor ever tell you that you were required to hold
 3   onto those notes?
 4        A    I don't think so.
 5        Q    Okay.  When you prepared a sup report
 6   documenting some investigative step, what would you do
 7   with that completed report?
 8        A    Hand it in to a supervisor.
 9        Q    Okay.  Was it your responsibility to make sure
10   that copies of any report you wrote made it to
11   detectives?
12        A    No, it was not.  But I would make a copy of it
13   and either drop off a copy or put it in the mail.
14        Q    As a gang crime specialist, did you ever
15   maintain written lists of known gang members?
16        A    You mean, as far as what I was responsible for
17   or just in general?
18        Q    Did you ever maintain  -- so one of your
19   responsibilities, I think you said, was to know who was
20   in the gangs that you specialized in.
21        A    Yes.
22        Q    And so to that end, did you ever maintain
23   written lists of the names of the people in each of the
24   gangs?
25        A    Yes, I believe so.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Do you know if that list also had nicknames of

2 those people?

3      A    It probably did.

4      Q    Do you know where you kept that list?

5      A    Where I kept that, oh, probably in my locker.

6      Q    Okay.  Was that your locker at the gang crimes

7 office?

8      A    Yes.

9      Q    Did you ever keep any other work-related

10 documents in your locker at gang crimes?

11      A    I can't remember.

12      Q    As a gang crime specialist, did you work with

13 confidential informants?

14      A    I don't know if they would call them

15 confidential informants in the formal way.  It depends

16 on what you mean.

17      Q    I imagine that as a gang crime specialist, you

18 probably had to be gathering a lot of information from

19 people on the street about gang activities; is that

20 fair?

21      A    That's fair.  Yeah.  You could say it in that

22 way, yes.

23      Q    Okay.  And later on, as a detective, there's a

24 sort of a formal term called confidential informant,

25 right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. ENGQUIST:  Objection.  Foundation.  And I
 2       think you're mischaracterizing the evidence but go
 3       ahead.
 4       A    I don't know of any.  There's no formal system
 5  for confidential informants.  I mean, there are people
 6  that you use, you call confidential informants, but
 7  people on the street give you information.  But as far
 8  as anything structured, no.
 9  BY MR HAZINSKI:
10       Q    Okay.  Did you ever obtain information  --
11  when you were working as a gang crime specialist, did
12  you ever obtain information that was relevant to your
13  investigation from a witness or somebody on the street
14  and -- but kept their eye identity confidential from the
15  other officers working on the case?
16            MR. ENGQUIST:  Objection to form.  Go ahead.
17       A    I don't understand what you mean really.
18       Q    Okay.  I'm not trying to be tricky.  I think
19  I'm just doing a poor job explaining.  So for example,
20  was there ever a situation where you got some piece of
21  information from somebody and you shared that
22  information with your other officers, but you said, for
23  instance, this is from someone  -- this is a
24  confidential who gave this to me.
25       A    I would share information with other officers
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    on the case.  I mean, everybody's got to know what's

2    going on here.  It would be a little dangerous

3    withholding stuff from somebody that's working on the

4    case.

5         Q    And why is that?

6         A    Well, things can happen, you know.  I don't

7    know.  You just want to let them know.  I mean, if

8    you're working on a case, you can't have secrets on it

9    between other officers.

10        Q    As a gang crime specialist, did you work with

11   particular detective areas more than others?

12        A    Yes.

13        Q    And which ones did you mainly work with?

14        A    Area 5.

15        Q    Okay.  Were there particular detectives within

16   Area 5 that you worked with most frequently as a gang

17   crime specialist?

18        A    Sometimes it turned out that way.

19        Q    Do you recall who those detectives were?

20        A    We pretty much worked with everybody, but it

21   was Ernie Halvorsen, Jack Leonard, Gillie McLaughlin. We

22   worked with Santa Padre, Mohan.  It was around a lot of

23   detectives, but mainly ones that were assigned to do

24   gang cases, I guess, back then.  I don't know how they

25   were doing it when we were gang specialists, but those

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  are kind of the people we went to.

2      Q    Okay.  As a gang crime specialist  -- so let

3  me actually do this a little out of order.  So after

4  gang crimes, you were promoted to detective, right?

5      A    Pardon?  What was that?

6      Q    After you worked in gang crimes, you were

7  promoted to detective?

8      A    Yes.

9      Q    And I believe you said that was 1990, you got

10 that promotion, right?

11     A    Correct.

12     Q    And how long were you a detective?

13     A    Six years.

14     Q    So '96?

15     A    Correct.

16     Q    Who were your partners when you were a

17 detective?

18     A    All of them?

19     Q    Yeah.

20     A    It's quite a list.  Well, Guevera, Ray

21 Guevera, Ernie Halvorsen.  I worked with Jack Leonard.

22 Is this as a gang specialist or when I made detective?

23 I'm sorry.

24     Q    When you made detective, that six-year period.

25     A    Oh, okay.  Yeah, you work with a lot of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  different detectives.  Let's see.  Who else?  What did I

2  say?  Jack Leonard, Ernie.  There were quite a few.  I

3  mean, there was some on midnights when you had to do

4  your midnight turn.  I don't remember their names.  Tony

5  Riccio.  That's all I can remember right now.

6      Q    Okay.  When you were promoted from gang crime

7  specialists to detective, did you have to go through any

8  additional training?

9      A    Yes.

10     Q    And what did that involve?

11     A    I don't remember.

12     Q    Do you recall whether it was classroom

13  training?

14     A    Yes, it was.

15     Q    Okay.  Do you remember about how long that

16  training lasted?

17     A    No, I don't remember.

18     Q    Okay.  Do you remember who provided the

19  training?

20     A    Who provided the training?  No.  No, it was

21  from the academy.

22     Q    Okay.  When you transitioned from being a gang

23  crime specialist to a detective, did your practices

24  around notetaking during criminal investigations change?

25     A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          Q      Okay.  How so?

 2          A      Detective division is required to use GPRs,

 3   general progress reports, they're called, for their

 4   notetaking.

 5          Q      When you were a detective, did you have an

 6   understanding of why the detectives were required to use

 7   GPRs?

 8          A      Understanding?  No, I think it was just a

 9   formal way of keeping things in order.

10          Q      So when you became a detective, from that

11   point on did you always make handwritten notes on GPRs?

12          A      For the most part, yes.

13          Q      But not always?

14          A      I would say 95% of the time.

15          Q      So in that other 5% of cases, what were the

16   circumstances where you wouldn't use a GPR?

17          A      I don't know what circumstances.  Sometimes

18   you would just write it on a piece of paper and then

19   include it in the file.

20          Q      As a detective at Area 5, did you conduct

21   lineup and photo array, eyewitness identification

22   procedures?

23                 MR. ENGQUIST:  Sorry.  Did you say as a

24          detective?

25                 MR. HAZINSKI:  Yeah.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. ENGQUIST:  Okay.

2     A     Yes.

3  BY MR. HAZINSKI:

4     Q     Was that a routine part of your work as a

5  detective?

6     A     Yes.

7     Q     As an Area 5 detective, did you ever suggest

8  to a witness who they should pick from a photo array or

9  from a live lineup?

10     A     Never.

11     Q     Okay.  Would that have been improper?

12     A     Yes.

13     Q     Why?

14     A     You're telling a witness who to pick.

15     Q     Did you ever see any other detectives tell a

16  witness who to pick?

17     A     No.

18     Q     As an Area 5 detective, did you ever write a

19  false report about what happened during an eyewitness

20  identification procedure?

21     A     No.

22     Q     Earlier, we were talking about confidential

23  informants.  And correct me if I'm wrong, but it sounds

24  like there was no formal designation of categorizing

25  someone as a confidential informant within Area 5; is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that right?

2        A    I don't understand what you're asking.  Are

3    you asking  -- go ahead.  I don't know what you're

4    asking.

5        Q    Do you have an understanding of what the term

6    confidential informant refers to?

7        A    Yes.

8        Q    Okay.  And what does that refer to?

9        A    It refers to someone that's given you

10   information in confidence.

11       Q    As an Area 5 detective, were there policies or

12   training that you received on working with confidential

13   informants?

14            MR. ENGQUIST:  Objection to foundation, form,

15       compound.

16       A    I don't remember anything formal.

17       Q    Did you ever receive any informal training on

18   working with confidential informants?

19            MR. ENGQUIST:  Objection to form.  Informal.

20       A    No.

21       Q    Is it fair to say that if you got information

22   from a confidential informant, and now we're talking

23   about your work as a detective, that you would not put

24   that informant's name in a typed report documenting the

25   information?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1        A    Correct.

2        Q    And that was in order to keep their identity a

3   secret, right?

4        A    Yes.

5        Q    So separate from the report, did you ever make

6   records of, or notes of, who the confidential informant

7   was or write it down in any way?

8        A    I usually knew them, so, no.

9        Q    Okay.  So it was sort of on you to remember

10  who the informant was that provided that piece of

11  information, right?

12       A    I'm trying to think of an instant, but it

13  might have been.  You know, I'm not sure, but I wouldn't

14  make it known to anyone.

15       Q    Would you keep the identity of a confidential

16  informant confidential from the other officers you were

17  working with on an investigation?

18       A    It depends who the officers were if they

19  didn't need to know.  My partner, maybe on that day, I

20  would tell.  I talked to so-and-so and this is whatever

21  happened.  Other than that, I don't think I ever went

22  beyond that.

23       Q    During your time as a detective, did an

24  assistant state's attorney ever ask you to reveal the

25  identity of a confidential informant?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Not that I remember.

2    Q    When you investigated cases as an Area 5

3    detective, did you ever obtain information or statements

4    from jailhouse informants?

5    A    No.  Let me ask you something.  Are you asking

6    within the jail, or people that came out of the jail, or

7    how do you mean that?

8    Q    Yeah, let me make it a little more specific.

9    Let's back up.  So did you ever, when investigating a

10   case as an Area 5 detective, get information from

11   someone in exchange for leniency with respect to pending

12   criminal charges against that person?

13   A    No.

14   Q    When you were an Area 5 detective, were you

15   aware that sometimes individuals would receive leniency

16   in exchange for providing information?

17   A    No.

18   Q    Was there a policy that prohibited Area 5

19   detectives from doing that?

20   A    I think it was a department policy.  You

21   couldn't make promises to anyone.

22   Q    So in other words, if a detective offered

23   someone something, someone who was locked up, they made

24   them an offer in exchange for providing information,

25   that would go against the rules of the department?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2             MR. ENGQUIST:  Objection to foundation to that

 3        question.

 4        Q    Who was responsible for  -- what was the rank

 5   of the person responsible for assigning detectives to

 6   homicide investigations while you were a detective?

 7             MR. ENGQUIST:  Objection.  Calls for

 8        Speculation.  Foundation.  (Inaudible).  Go ahead.

 9             COURT REPORTER:  I'm sorry.  I didn't hear the

10        objection.

11             MR. ENGQUIST:  Objection, foundation.  Also

12        calls for speculation.  It's also an incomplete

13        hypothetical.

14        A    To answer your question, the on-duty sergeant

15   for the violent crimes unit, one of the sergeants, would

16   assign you to the case.

17   BY MR. HAZINSKI:

18        Q    Okay.  Did you ever, as a detective, did you

19   ever help out on cases that you weren't officially

20   assigned to?

21        A    Yes.

22        Q    Okay.  And how would it come to be that you

23   would work on a case that you weren't assigned to?

24        A    Maybe they were just asking for an assistance.

25        Q    When you say "they" were asking, who was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 45 of 782 PageID #:13303
The Deposition of BRIAN FORBERG, taken on October 29, 2021

41

1  asking?

2     A    I mean -- the other detectives would ask to go

3  arrest somebody or whatever, you would go with them,

4  provide assistance, backup.

5     Q    Okay.  The notes and reports that you created

6  during investigations when you were an Area 5

7  detectives, were those  -- did you store all of those in

8  a single file?

9     A    Yes.

10    Q    Was there a name for that file?

11    A    Investigative file.

12    Q    Did that file go by any other names that

13  you're aware of?

14    A    Probably had nicknames for them.  We had a

15  nickname.  I think officially, it was called the

16  investigative file.  We might call it street file,

17  whatever.  Mostly, it was investigative file.

18    Q    Okay.  You said that as a detective, about 95%

19  of the time approximately, you would make handwritten

20  notes on GPRs, correct?

21    A    Correct.

22    Q    Okay.  After you wrote out a GPR, what would

23  you do with it?

24    A    It would be included in the investigative

25  file.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  For you as the detective who wrote the
2    GPR, were you responsible putting it in the
3    investigative file?
4    A    I don't know about responsibility, but I did
5    it.
6    Q    What do you mean by that?
7    A    Well, I mean, nobody else had the
8    responsibility to do something like that.  I mean, it
9    wasn't like we talked about gang pictures and things
10   like that, that the front office, while we were gang
11   specialists, they would take care of it, the
12   administrative staff.  Here, there was no staff, it was
13   just, you did it, you punched holes in it, then you put
14   it in the file, and you marked it in the front of the
15   contents.
16   Q    Got it.  So there was no, you know, system for
17   staff to --
18   A    No, you just included it in the file.  So
19   whoever or picked up that file would read that and then
20   it would be up to date.
21   Q    Okay.  Did you have to submit GPRs for
22   supervisor approval?
23   A    I don't think so.  I mean, they would look at
24   it, I guess.  I'm not sure how that worked.  I don't
25   remember.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Did you have to submit typed reports for

 2   supervisor approval?

 3        A     Yes.

 4        Q     Okay.  So I'm curious, once you hand in a

 5   typed report to a supervisor to approve it, did you get

 6   to see that report again?

 7        A     Only a copy of it in the file.  The original

 8   report that you typed out, went on.  It just, wherever

 9   it went.

10        Q     Okay.  So earlier, when we were talking about

11   GPRs, I believe you said you were the one who would put

12   your own GPRs in the file.  Is that true for sup reports

13   that you made as well, that you were the one who put

14   them in the file?

15        A     Yes.

16        Q     Okay.  So I just want to understand the kind

17   of steps of the process.  So would you give the

18   original, for example, to the supervisor to review and

19   then make a copy to put in the file?

20        A     Yes.

21        Q     Okay.  So there would be a copy that didn't

22   have a supervisor's signature on it, and then the

23   supervisor would have the original to sign off on; is

24   that fair?

25        A     It could be, yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Okay.  And was the supervisor who reviewed the

2 files a sergeant in Area 5?

3     A    Say that again.

4     Q    was the supervisor who signed off on typed

5 reports a sergeant within Area 5?

6     A    Yeah, it might.  Yeah, usually, it was.

7     Q    Okay.  Was it ever somebody else?

8     A    It could be.

9     Q    Who else could it be?

10     A    It could be your lieutenant.

11     Q    Okay.  So I was just asking you about

12 investigative files when you were a detective.  I want

13 to kind of go back to the period when you worked in gang

14 crimes.  Was there any file that was similar to or

15 operated like the investigative file for gang crimes off

16 officers to use?

17     A    No, I don't know of any.

18     Q    Okay.  So from what you remember, is it fair

19 to say there was no separate file with reports or notes

20 maintained by gang crimes officers that was from an

21 investigative file maintained by the detectives?

22     A    No.

23     Q    Why did you stop working as a detective?

24     A    I got promoted to sergeant.

25     Q    Okay.  And that was in '96?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Correct.

 2        Q     And you left Area 5 at that point?

 3        A     Yes, I did.

 4        Q     And where'd you go?

 5        A     Back to the patrol division, 22nd District.

 6        Q     Was there an option for you at that point to

 7  continue as a sergeant at Area 5?

 8        A     No.

 9        Q     Did you apply to become a sergeant?

10        A     Yes, I did.

11        Q     Okay.  And at that point, did you want to stop

12  working as a detective?

13        A     I didn't want to; I just took the promotion

14  exam.

15        Q     Okay.  Did you choose to go back to patrol?

16        A     No, you don't really have a choice.

17        Q     Okay.  So what years were you a sergeant in

18  patrol?

19        A     Well, '96 I got made sergeant.  I went to the

20  22nd district.  I stayed there.  I don't know how long,

21  a couple years.  And then I moved on to the training

22  division.

23        Q     Do you remember what year you started working

24  at the training division?

25        A     Yeah, I couldn't tell you for sure.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Was your rank still sergeant when you
 2   went to training?
 3        A    Yes.
 4        Q    Okay.  So what were your responsibilities as a
 5   sergeant in the training division?
 6        A    I, myself, along with another sergeant were
 7   responsible, the unit was called Instructional Design
 8   and Quality Control, and there, we recently search
 9   lesson plans that were taught to recruit, and to
10   suburban police who we also taught, and that was
11   according to the Illinois Standards Board from the State
12   of Illinois.
13        Q    Okay.  And so, just so I understand, were you
14   responsible for developing training curricula for police
15   officers?
16        A    Yes.
17        Q    Okay.  Do you remember the subject of  --
18   well, actually, let me back up.  Did the training
19   materials that you worked on encompass all different
20   kinds of policing responsibilities or were they focused
21   on specific areas?
22        A    No, it was covering a lot of areas.
23        Q    Okay.  Did it cover report writing, for
24   example?
25        A    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q     Okay.  Did it cover witness interviews?

2       A     Yes.

3       Q     About how long were you in the training

4   division?

5       A     Maybe six years.

6       Q     Do you remember what year you left training?

7       A     Well, I mean, you figure '96.  I don't know

8   when I got in there.  Made sergeant in '93.  I don't

9   know.  I don't remember.

10      Q     Where did you go after you were in the

11  training division?

12      A     I went to Internal Affairs.

13      Q     Okay.  What were your responsibilities in

14  Internal Affairs?

15      A     I was sergeant.  I was head of a team of

16  investigators.

17      Q     And what did the team of investigators do?

18      A     Investigated allegations against police

19  officers.

20      Q     As the sergeant in charge of the team of

21  investigators, were you responsible for actually doing

22  any investigation, or were you in a more supervisory

23  capacity?

24      A     Both.

25      Q     Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Oh, what?

 2      Q    How big was that team?

 3      A    Oh, gosh.  Oh, man, I don't know.  Maybe six

 4  investigators?  I'm not sure.  Four?  Or about six.  I'm

 5  not sure.

 6      Q    Were you the only investigation team within

 7  Internal Affairs?  Or were there other teams operating

 8  alongside you?

 9      A    There were other teams.

10      Q    Okay.  Did your team have a specific focus or

11  did it cover allegations citywide?

12      A    It was citywide allegations, all types.

13      Q    Okay.  So would it be fair to say that you

14  investigated and were responsible for overseeing

15  investigations into patrol officers and detectives and

16  any other officer potentially?

17      A    Yes.

18      Q    In general, could you please describe the

19  steps that were involved in investigating allegations of

20  misconduct?

21           MR. ENGQUIST:  I object.  That's vague.  So

22      the form.  And it also calls for speculation

23      because there's no parameters at all.  But go

24      ahead.

25      A    Of misconduct?  It depends what it was. Things
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    were -- we were assigned by a lieutenant, I was, for the
 2    team to investigate.  We'd be given assignments. Ours
 3    were not real major investigations, I mean as far as
 4    major, major, like investigating corrupt policemen
 5    taking money, things like that.  That was given to --
 6    There was another unit within Internal Affairs.  I think
 7    it was called the Confidential Unit or something.  And
 8    they handle a lot of those cases.
 9    BY MR. HAZINSKI:
10        Q    As a sergeant working on these investigations,
11    were you responsible for making findings or
12    recommendations about -- in connection with these
13    complaints?
14        A    Yes.
15        Q    Okay.  So who did you issue those findings or
16    recommendations to?
17        A    My lieutenant.
18        Q    Okay.  Were you personally responsible for the
19    decision about whether to impose discipline?
20        A    Well, I would recommend discipline.
21        Q    Okay.  After you made that recommendation, was
22    it somebody else's job to determine whether that
23    discipline should be imposed?
24        A    Yes.  It was reviewed by the lieutenant.
25        Q    Okay.  So about how many years were you in
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Internal Affairs?

2         A    I think it came out to like three-and-a-half.

3         Q    Okay.  And approximately what time period, if

4    you could estimate, were you in Internal Affairs?

5         A    All right.  Well, I retired in 2008 of

6    January.  So if we went back three years, do the math,

7    that would leave you at what?  2005, you asked when I

8    got there.  So around that time.

9         Q    Okay.

10        A    So --

11        Q    During your time at Internal Affairs, could

12   you estimate approximately what percentage of the cases

13   you investigated, you recommended a discipline be

14   imposed?

15        A    I couldn't tell you.  I have no idea.

16        Q    Would it be fair to say it was more than half

17   the time?

18        A    No idea.

19        Q    Okay.  Did you keep track of that information

20   about how many instances you were recommending

21   discipline?

22        A    No.

23        Q    Okay.  During your time in Internal Affairs,

24   did you ever come to the conclusion that a police

25   officer that you were investigating had falsified a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   police report?

 2        A    I can't remember if we ever did any of those

 3   cases.

 4        Q    Okay.  Were those cases handled by the

 5   confidential unit that you mentioned?

 6        A    I'm not sure.  Might have been someone else.

 7        Q    Okay.  So could you give me a sense of what

 8   types of complaints you did investigate most often?

 9        A    Rule violations, policy violations of the

10   department, some criminal activity, thefts.  That's

11   about it.  I can't really remember anymore.

12        Q    Were you yourself ever, at any point in your

13   career at the CPD, the subject of a complaint?

14        A    Yes.

15        Q    Okay.  Do you remember how many complaints

16   there were?

17        A    I think total -- I don't remember.  I had some

18   minor ones.

19        Q    Do you recall what the allegations were for

20   those complaints?

21        A    I remember one was a city sticker.  Being off

22   my beat when I first came on the job.  I can't remember

23   any more than that.

24             MR. HAZINSKI:  Okay.  Could we, if it's okay

25        with you, Mr. Gawrys, could we maybe take a five-
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 56 of 782 PageID #:13314
The Deposition of STEPHEN GAWRYS, taken on October 6, 2021

52

```
 1        minute break and come back?
 2             THE WITNESS:  Sure.  Yeah, that'd be good. Now
 3        is a good time.  All right.
 4             COURT REPORTER:  Okay.  We are going off
 5        record.  The time is 12:13 p.m. Eastern Standard
 6        Time.
 7                     (OFF THE RECORD)
 8             COURT REPORTER:  We are back on record.  The
 9        time is 12:27 p.m. Eastern Standard Time.
10   BY MR. HAZINSKI:
11        Q    All right, Mr. Gawrys, I had a couple follow-
12   up questions regarding the files, and I want to focus on
13   the investigative files from the time that you were
14   working as a detective at Area 5, okay?
15        A    Okay.
16        Q    So were those investigative files stored at
17   Area 5?
18             MR. ENGQUIST:  Foundation.
19        A    Yes.
20        Q    They were, sorry?
21        A    Yes, they were.
22        Q    Okay.  And you had to access those sometimes,
23   for instance, to put GPRs in them, right?
24        A    Yes.
25        Q    When you were working as a detective, was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  there a particular room or particular office where they

2  were kept?

3        A     Yes.

4        Q     And where was that?

5        A     It was in an office, mainly for sergeants, and

6  a lieutenant was in there.

7        Q     Okay.  So I imagine, because there were a lot

8  of investigations going on at the same time, that there

9  were, like, a pretty large volume of investigative files

10  being kept in that office.  Right?

11       A     Correct.

12       Q     Okay.  Were they kept in boxes on shelves?

13       A     No.  They were in file cabinets.

14       Q     After a case was closed, would the

15  investigative file stay in those file cabinets?

16             MR. ENGQUIST:  Object to the foundation.  Go

17       ahead.

18       A     No.  Part of that, well, not part, a lot of

19  that would go, would be -- I guess it would be

20  transferred downtown where a real permanent file was

21  kept.

22       Q     Is there a name for the permanent file?

23       A     I don't know one.

24       Q     Okay.  And the investigative files, sometimes

25  they would have an inventory sheet on the top that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   listed the contents of the file; is that correct?
 2        A    Correct.
 3        Q    Okay.  And your understanding from when you
 4   were a detective, what was the purpose of that inventory
 5   sheet?
 6        A    Just to track what was inside the file.
 7        Q    Okay.  So when you, as a detective, put
 8   something in the file yourself, like you punched it, you
 9   put it in, were you responsible for noting that on the
10   inventory sheet?
11        A    Yes.
12        Q    Okay.  And did you make that note on the
13   inventory sheet at the same time that you put the thing
14   in the file?
15        A    Yes.
16        Q    Okay.  Were you able to take -- during the
17   course of an investigation, were you permitted to take
18   the investigative file with you out of the office where
19   it was stored?
20        A    Yes, we could.
21        Q    Okay.  Were you able to take it out in the
22   field with you?
23        A    Sometimes we did.
24        Q    Okay.  Were you required to note anywhere that
25   you had removed the file from the office?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A    Right.  You had to -- I believe we had to let

 2   the sergeant know.  I'm not sure about it, but I know

 3   somewhere it was written down or something, from what I

 4   remember.

 5       Q    And at some point after a case was closed,

 6   your understanding was that it would get sent somewhere

 7   else and the information would be kept in some more

 8   permanent file.  Right?

 9            MR. ENGQUIST:  Objection.  Calls for

10       speculation.  Go ahead.

11       A    Yeah, I believe so.  I think there was a copy

12   of the file kept in the office.  I'm not sure.

13       Q    After a case was closed, did you ever go back

14   through the investigative file and take out documents

15   that weren't necessary?

16       A    No.

17       Q    Okay.  So you testified that you reviewed some

18   documents in preparation for this deposition.  Before

19   looking at those documents, did you have any

20   recollection of the Roman homicide investigation?

21       A    No.

22       Q    So I'm going to ask you now about what you can

23   independently remember, and I want to define that so

24   that it's clear.  When I ask you about an independent

25   recollection, what I mean to ask is what you remember

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   separate or apart from what's actually written on the

2   paper.  It's something you have an independent memory

3   of, separate from anything you reviewed in preparation

4   for the deposition.  Does that make sense?

5        A    Sort of.  You asked me if I had any

6   recollection before I looked at the reports.  Is that

7   your question?

8        Q    I did ask that question.

9        A    Yeah.  No, I didn't remember the case at all.

10  None of it.

11       Q    Okay.  But now, having looked at some reports,

12  you know some things about the case that you just

13  gleaned from looking at the paper.  Right?

14       A    Right.

15       Q    Okay.  Did the process of looking at those

16  police reports and other documents, did that bring back

17  any independent memories of the investigation beyond

18  what you just saw written down?

19       A    No.  The only thing is the victim's name.  I

20  kind of remembered.

21       Q    Okay.  For example, reviewing the reports

22  didn't jog any independent memories of any work you

23  performed on the case?

24       A    No.

25       Q    And it didn't jog your memory about any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    communications you had with other officers during the
 2    investigation?
 3         A    No.
 4         Q    About how long in total did you spend
 5    reviewing documents before your deposition?
 6         A    Maybe an hour, hour-and-a-half?  Maybe not
 7    even.  Somewhere in there.
 8         Q    Okay.  So we're going to talk a little bit
 9    about this Roman homicide investigation.  Would it be
10    fair to say that the only details of that investigation
11    that you can testify to are details that you've saw in
12    your recent review of the reports?
13         A    Yes.
14         Q    Okay.
15         A    Just what I read in there.
16         Q    Okay.  I want to ask you now about your
17    knowledge of some of the people involved in this case,
18    the first being Rey Guevara.  So you were partnered with
19    Rey Guevara as a gang crime specialist, right?
20         A    Correct.
21         Q    Okay.  But at some point, he was promoted to
22    Area 5 detectives, right?
23         A    Promoted to detective.
24         Q    Right.
25         A    And assigned to Area 5.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Thank you for that clarification.  Were you
 2   and he promoted and assigned to Area 5 at the same time?
 3        A    Yes.
 4        Q    Okay.  At the time that you were both promoted
 5   to detective and assigned to Area 5, were you partners
 6   in gang crimes?
 7        A    Yes.
 8        Q    And when you were promoted to detective and
 9   assigned to Area 5, did you partner up as detectives?
10        A    Sometimes.
11        Q    Sorry, could you repeat that?
12        A    Sometimes, sometimes.
13        Q    Sometimes.  Okay.  Did you work the same shift
14   as Detective Guevara at Area 5?
15        A    Sometimes.
16        Q    Okay.  Did your shifts change over the years?
17        A    Yes.
18        Q    Okay.  Do you recall what shift you worked in
19   1993?
20        A    No.
21        Q    Okay.  When was the last time you spoke with
22   Rey Guevara?
23        A    Someone else asked me that.  That was before
24   May of this year.
25        Q    And did you speak with him in person or over
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   the phone?

2       A    Over the phone.  He doesn't live here anymore.

3   So I think I said before that I was going down to Texas

4   to see my sister, and he's kind of close to the area I

5   was going, maybe two, three hours away.  And I wanted to

6   see if I had time to maybe just stop in and visit him,

7   which I never did.

8       Q    Okay.  Is Rey Guevara still a friend of yours?

9

10

11      A    I consider him a friend.  Yes.

12      Q    About how often do you talk with him?

13      A    Not often.  Maybe holidays.

14      Q    When was the last time you saw him in person?

15      A    That would be the Rivera case.

16      Q    Okay.  And it was when that Rivera case went

17  to trial?

18      A    Yes.

19      Q    Okay.  Were you friends with Rey Guevara

20  outside of work when the two of you were working

21  together in gang crimes?

22      A    We didn't associate a lot together.

23      Q    Okay.  What about when you were detectives?

24  Were you friends outside of work?

25      A    No, we didn't socialize much there either.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 64 of 782 PageID #:13322
The Deposition of STEPHEN HAWKINS, taken on August 29, 2021

60

```
 1        Q    Okay.  When would you say that you became
 2   friends with Rey Guevara?
 3        A    I have no idea.
 4        Q    Would you say it was after you left Area 5?
 5        A    No, it was probably in gangs.
 6        Q    Okay.  Is it a fair summary to say you were
 7   friends with him at work, but didn't socialize with him
 8   much outside of work in gang crimes?
 9        A    Yes.
10        Q    Okay.  When you last talked with Rey Guevara
11   in May, did your conversation touch on any of the
12   ongoing lawsuits against him?
13        A    No.
14        Q    Okay.  Have you ever talked to Rey Guevara
15   about the fact that he's invoked the Fifth Amendment
16   right to remain silent in response to questioning about
17   his work as a police officer?
18        A    I don't remember it if we did.
19        Q    Did you ever have a conversation with him
20   where it was the two of you talking and you said, for
21   instance, "Hey, Rey, why are you doing that?"
22             MR. ENGQUIST:  Objection.  Asked and answered.
23        He already answered the question.  You can answer
24        it one more time.  Go ahead.
25        A    Not sure.  But I think, "Why are you doing
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    it?" "Man, it was just on the advice of his attorneys."
 2    And we left it at that.
 3    BY MR. HAZINSKI:
 4        Q     Were you present during his testimony?  Were
 5    you present in the courtroom during his testimony at the
 6    Rivera trial?
 7        A     Yes.
 8        Q     Okay.  You knew Ernie Halvorsen from your work
 9    at Area 5, right?
10        A     Yes.
11        Q     Okay.  Was Ernie Halvorsen a friend of yours?
12        A     Not a friend.  We were acquaintances, work
13    acquaintances.
14        Q     Did you ever socialize with Ernie Halvorsen
15    outside of work?
16        A     Not that I remember.
17        Q     From your own observations, do you know if
18    Guevara and Halvorsen ever socialized outside of work?
19        A     I don't know.
20        Q     When was the last time you talked to Ernie
21    Halvorsen?
22        A     Probably couldn't tell you.  I have no idea.
23        Q     Okay.  Did you stay in touch with him after
24    you left Area 5?
25        A     No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  For a period of time you were partnered
 2   with Tony Riccio; is that right?
 3        A    Yes.
 4        Q    Okay.  For the record, that's R-I-C-C-I-O.  Did
 5   you consider Tony Riccio a friend outside of work?
 6        A    No, we didn't socialize together.
 7        Q    Okay.  When was the last time you talked to
 8   Tony Riccio?
 9        A    Couldn't tell you.  A long time ago.
10        Q    Did you keep in touch with Mr. Riccio after
11   you left Area 5?
12        A    No.
13        Q    Okay.  Did you know Robert Biebel?
14        A    Yes.
15        Q    Okay.  And what was his position at Area 5?
16        A    He was the sergeant.
17        Q    Was Biebel one of the people who would
18   sometimes be responsible for approving your reports?
19        A    I'm not sure.  Could have been.
20        Q    Were you friends with Robert Biebel while you
21   worked at Area 5?
22        A    Yes, we were friendly together.
23        Q    Did you socialize with him outside of the
24   office?
25        A    No.  The only time we ever met as a group of
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   guys, it was like Christmastime.  That was many years
 2   ago.  We would see each other and it was just a get-
 3   together, but that stopped.  So --
 4        Q    Okay.  And that was after you left Area 5,
 5   right?
 6        A    Yes.
 7        Q    Okay.  Can you estimate approximately what
 8   year was the last time you had one of those get-
 9   togethers?
10        A    No idea.  It was a long time ago.  When these
11   cases started, it was just we didn't get together
12   anymore.
13        Q    After there were more lawsuits?
14        A    Yes.
15        Q    Okay.  Do you recall the last time you talked
16   to Mr. Biebel?
17        A    I saw him at the attorneys' offices walking
18   out the door, or he was sitting in there.  I'm not sure.
19        Q    Did you have a conversation with him at that
20   point?
21        A    Well, talk, "Hi, how are you?  Haven't seen
22   you in a while." That's about it.
23        Q    Did you talk to him at all about any of the
24   lawsuits that either of you was involved in?
25        A    No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Do you recall ever having any conversations
 2   with a man named Geraldo Iglesias?
 3        A    No.
 4        Q    Okay.  Do you recall ever having any
 5   conversations with somebody who went by the nickname
 6   Snake?
 7        A    No.
 8        Q    Okay.  Now, you as a gang crime specialist,
 9   did you have any specialized knowledge of or familiarity
10   with a gang called the Imperial Gangsters?
11        A    Yeah, I know who they were.
12        Q    Okay.  Do you know what territory they
13   occupied?
14        A    I can't remember right now.
15        Q    But the IGs, the Imperial Gangsters, were not
16   one of the gangs that you were responsible for, right?
17        A    What's that again?  Say that over?
18        Q    I'll rephrase the question.  You weren't a
19   specialist in the Imperial Gangsters, right?
20        A    No.
21        Q    Okay.  During the time that you were at gang
22   crimes, do you recall which gang crimes specialists did
23   specialize in the Imperial Gangsters?
24        A    No, I do not.
25        Q    Okay.  Do you know an individual by the name
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of Rosendo Ochoa?

2         A    No.

3         Q    Do you know a person that goes by either

4              Rosendo Ochoa or any of the following aliases:

5    Geraldo Negaera (phonetic), Victor Lopez, or Ricardo

6    Mahia?

7         A    No.

8         Q    Just for the record, going forward, if I say

9    Rosendo Ochoa, I'm going to be referring to those alias

10   as well: Negaera or Lopez or Mahia, okay?

11        A    Okay.

12        Q    Do you know an individual named Hugo

13   Rodriguez?

14        A    No.

15        Q    Okay.

16        A    I mean, it's a name, but there's a lot of

17   them.

18             MR. HAZINSKI:  Yeah.  So I want to show you a

19        document now, and just -- Counsel, so this will be

20        the report produced at RFC 10 through 13.  And

21        Mr. Gawrys, what I'm going to do is --

22             MR. ENGQUIST:  Just give me one second.  Let

23        me just -- I'm going to have a hard copy of it, so

24        I don't have to look over his shoulder.  Go ahead.

25             MR. HAZINSKI:  All right.  So what I'm going

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          to do is show my screen with you so that we can be
 2          looking at it together.  So --
 3                    MR. ENGQUIST:  Is this going to be Exhibit 1?
 4                    MR. HAZINSKI:  Yeah.
 5                    MR. ENGQUIST:  Exhibit 1 is RFC 10 through 13?
 6                    MR. HAZINSKI:  Yep.
 7                    MR. ENGQUIST:  Okay.
 8     BY MR. HAZINSKI:
 9          Q    So Mr. Gawrys, are you able to see the
10     document that I just shared with you here?
11                    (EXHIBIT 1 MARKED FOR IDENTIFICATION)
12          A    Yes, I do.
13          Q    Okay.  And if you need me to scroll or zoom to
14     see any part of it, please just let me know, okay?
15          A    Okay.
16          Q    So Mr. Gawrys, is this one of the documents
17     that you reviewed in preparation for your deposition
18     today?
19          A    Yes, it is.
20          Q    Do you recognize what kind of report this is?
21          A    It's a supplementary report.
22          Q    Okay.  Is this type of supplementary report,
23     would it be accurate to call it a cleared closed report?
24          A    I don't think so.
25          Q    Okay.  In general, do you know what a cleared
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   closed report is?

2       A    Yes.  It's arrests were made and there is no

3   other subjects wanted in the case.

4       Q    Okay.  So I'm going to zoom in now to a part

5   on the first page here.  And do you see on the left that

6   the box next to "cleared closed" has an X in it?

7       A    Yes.

8       Q    Does that indicate to you that this is a

9   cleared closed report?

10      A    Yes, I would take it that way.

11      Q    Fair enough.  So what is the purpose of a

12  cleared closed report in a homicide investigation?

13      A    It's just what I said, that the case is now

14  closed because all the subjects are either in custody or

15  been in accounted for to finish the investigation.

16      Q    What type of information would normally be

17  documented in a cleared closed report in terms of the

18  course of the investigation?

19      A    I don't understand what you're trying to ask.

20  I mean, a lot of information's in there, so I -- it's

21  different kinds of information.  Can you be more

22  specific?

23      Q    Is one purpose of a cleared closed report to

24  summarize the course of the criminal investigation?

25      A    Yes.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

602.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  Is it also -- is another purpose of a

2  cleared closed report to identify the evidence

3  implicating the arrestee?

4      A    Yes.

5      Q    Now, your name appears on this report,

6  correct?

7      A    Correct.

8      Q    Okay.  And it's at the bottom, and there's a

9  number written next to your name, which is 20689.  Was

10  that your star number?

11      A    Correct.

12      Q    Okay.  And your name appears next to detective

13      A.   Riccio.  Do you see that?

14      A    Yes.

15      Q    At this period of time in 1993, was Mr. Riccio

16  your partner?

17      A    On that day, probably.

18      Q    Does the fact that your name appears in the

19  bottom of this report mean that you were involved in the

20  preparation of this report in some way?

21      A    Yes.

22      Q    Okay.  Now I want to go to the next page,

23  which is RFC 11, and it says arresting detective, and

24  then it lists the names Halvorsen, Guevara, Riccio, and

25  Gawrys, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Right.
 2        Q    So does that mean that you were one of the
 3   detectives responsible for arresting the defendant?
 4        A    Yes.
 5        Q    Okay.  Now I want to ask you about the
 6   investigation section on this page.  We're still looking
 7   at RFC 11.  Do you see the first sentence of the
 8   investigation section where it says, "On 21-June-93, the
 9   reporting detectives were contacted by a confidential
10   informant?"  And then it goes on to note information
11   that the informant provided.  Do you see that part of
12   the report?
13        A    Yes, in the first paragraph.
14        Q    Yes.  So you reviewed this report in
15   preparation for your deposition.  Do you remember
16   whether you were the one who typed this up?
17        A    No, I did not type this.
18        Q    Okay.  Do you remember being contacted by a
19   confidential informant at any point during the Roman
20   homicide investigation?
21        A    It had nothing to do with this case.
22        Q    Okay.
23        A    Other than assist the arrest.
24        Q    So sometimes -- I want to ask a hypothetical
25   question now, sir, stepping away from the details of
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   this investigation.  So sometimes as a detective, you

2   would take over or pick up working on a case that some

3   other detectives had previously been investigating,

4   right?

5        A    Right.

6        Q    Okay.  Now let's say that you did that and you

7   were -- and as part of taking over the case, would it be

8   your usual practice to review the police reports that

9   had been prepared up to that point?

10       A    Yes.

11       Q    Okay.  Suppose that you did that and you were

12  taking over a case and reviewing the reports, and the

13  reports referred to a confidential informant, and you

14  wanted to find out who that individual was.  Was there

15  any way for you to get that information?

16       A    Only by talking to the detectives that wrote

17  the report about that confidential informant.

18       Q    Other than talking to those detectives, was

19  there any other way to get that information?

20       A    I don't know of any.  I can't think of any.

21       Q    Okay.  So now I want to scroll down to RFC 13,

22  and this is the final page of this report.  And the

23  names at the bottom, it just says Detective E.

24  Halvorsen, Detective R. Guevara.  Do you see that?

25       A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Do you know why your name and detective

 2    Riccio's name aren't listed at the end of this report,

 3    even though they appear on the first page?

 4        A    No, I don't know.  I had nothing else to do

 5    with the case.

 6        Q    Okay.  So you testified that you believe that

 7    you were involved in making the arrest of Geraldo

 8    Iglesias and that was it, right?

 9        A    Yes.  I assisted in the arrest, from what I'm

10    reading.

11        Q    Okay.  So how do you know that that was the

12    extent of your involvement in this case?

13        A    Because my name doesn't appear anywhere else

14    as doing anything.

15        Q    Okay.  Is it fair to say that you believe that

16    if you had had any other involvement in the

17    investigation, that your involvement would be documented

18    in some of the other reports in the investigative file?

19        A    Yes.

20        Q    For instance, if you had interviewed

21    witnesses, that information would be documented?

22        A    Yes.

23        Q    If you had conducted a photo array, or a live

24    lineup procedure, there would be documentation of that

25    as well?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.

2    Q    Do you know whether you communicated with

3    either Guevara, Halvorsen, or Riccio about the Roman

4    homicide investigation while it was ongoing?

5    A    No.

6    Q    All right.  I'm going to show you another

7    report now.  And so this will be Exhibit 2, and it's

8    RFC 14 for the record.  Are you able to see this report?

9              (EXHIBIT 2 MARKED FOR IDENTIFICATION)

10   A    Okay.  I see it.

11   Q    And is this one of the reports you reviewed in

12   preparation for your deposition today?

13   A    Yes, I looked at it.

14   Q    Okay.  And this is an arrest report

15   documenting the arrest of Geraldo Iglesias on

16   June 23, 1993, correct?

17   A    Yes.

18   Q    Okay.  So the report is authored by Halvorsen

19   and Guevara.  And it lists as arresting detectives

20   T. Riccio and S. Gawrys, right?

21   A    Right.

22   Q    Okay.  Do you recall how you came to be

23   involved in Geraldo Iglesias' arrest?

24   A    I don't remember specifically.

25   Q    Do you have any memory of arresting Geraldo

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Iglesias?

 2       A    No.

 3       Q    Do you have any memory of anybody asking you

 4   to assist with this part of the case?

 5       A    No.

 6       Q    Do you have any memory of what anyone told you

 7   about why Iglesias was being arrested?

 8       A    No.

 9       Q    Do you have any memory of reviewing any

10   reports or other police documents after being asked to

11   assist with this arrest?

12       A    No.

13       Q    So earlier, you said that one way that a

14   person could be pulled into a case that they weren't

15   formally assigned to is because another detective might

16   ask them for help executing an arrest; is that right?

17       A    Correct.

18       Q    Okay.  Is it your belief that that's what

19   happened in this case?

20       A    I would say so, yes.

21       Q    Okay.  Now, in the cases -- Just as a matter

22   of your normal practice and procedure, when you were

23   asked to assist other detectives in making an arrest,

24   would it have been typical for you to review the reports

25   and other police documents in the investigative file at
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    that point?

2        A    Before you assisted them in the arrest?

3        Q    Yes.

4        A    No.

5        Q    Okay.

6        A    I wouldn't.

7        Q    So if you were assisting other detectives in

8    making an arrest, was it your responsibility to make an

9    independent determination about whether the evidence

10   supported the arrest?

11       A    No.

12       Q    In other words, were you just assisting the

13   other detectives and trusting their investigative work?

14       A    Yes.

15       Q    Do you have any reason to dispute that any of

16   the information documented in this arrest report is

17   accurate?

18       A    Say that again, what was that?  You broke up a

19   little.

20       Q    Sure.  Do you have any reason to believe that

21   any of the information documented in this arrest report

22   is inaccurate?

23       A    No.

24       Q    I want to ask you, show you now another

25   document.  Let me see if I can find the right one.  So
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   this is -- we'll make this Exhibit 3, and this is a
2   police report that's been date stamped as RFC Iglesias,
3   48 through 55.  Mr. Gawrys, are you able to see the
4   first page of this report on your screen?
5                   (EXHIBIT 3 MARKED FOR IDENTIFICATION)
6       A    Can you make it --
7            MR. ENGQUIST:  One second.  You got -- you got
8       to give me time to go flipping through, what is it
9       again?
10           MR. HAZINSKI:  It's 48 through 55.
11           THE WITNESS:  Could you make it a little
12      bigger?
13           MR. HAZINSKI:  Yeah.  And Josh, I'll give you
14      as much time as you need to get there.
15           MR. ENGQUIST:  Yeah, I'm there now.
16           THE WITNESS:  That's good.  Okay.
17           MR. ENGQUIST:  I'm not sure what page you're
18      on, but I'm at the fourth page.
19           THE WITNESS:  48.
20           MR. ENGQUIST:  Okay.
21           MR. HAZINSKI:  Thank you.
22           THE WITNESS:  Sure.  Shockton (phonetic).
23           MR. ENGQUIST:  Yeah, I got it.
24           THE WITNESS:  Okay.
25   BY MR. HAZINSKI:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Mr. Gawrys, was this one of the reports that

2    you reviewed in preparation for your deposition?

3    A    No.

4    Q    Okay.

5    A    Might have gone -- passed by it.  But no, I

6    didn't actually read it.

7    Q    Okay.  So I want to just ask you about some

8    things about this report.  So understanding that you

9    didn't author this, do you see near the top where it --

10   Box number two says, "Address of original incident/

11   offense." Do you see that box?

12   A    Yes.

13   Q    Okay.  You see there's two words next to that

14   with boxes corresponding that say "verified" and

15   "corrected?"

16   A    Yes.

17   Q    Okay.  And in this case, one of those is --

18   says corrected, and it has an X through it.  From your

19   understanding and your familiarity with these types of

20   supplementary reports, what do those words "verified"

21   and "corrected" refer to?

22   A    Rest of the incident.

23   Q    Okay.  And so, what are the circumstances

24   where an officer would mark "verified" on a

25   supplementary report?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 81 of 782 PageID #:13339
The Deposition of STEPHEN HAWKINS, taken on 01/02/2021

77

```
 1        A    I don't know.  I think it's just -- I never
 2   marked those.  It looks like they -- from here, you had
 3   the wrong address somewhere and they corrected it.
 4        Q    Okay.  I want to scroll down now and ask you
 5   about some information that's written on this report.  So
 6   looking now at RFC 50, do you see that there are some
 7   handwritten notes on this page?
 8        A    Yes.
 9        Q    Is that your handwriting?
10        A    No.
11        Q    Do you recognize whose handwriting that is?
12        A    No, I do not.
13        Q    Okay.  Continuing onto the following page, and
14   now this is RFC 51.  Is the handwritten note on this
15   page your handwriting?
16        A    No.
17        Q    Okay.  As you were looking through the
18   investigative file in preparation for your deposition,
19   did you see any handwritten notes that you recognized to
20   be your handwriting?
21        A    No.
22        Q    Okay.
23        A    I wouldn't have any.
24        Q    What do you mean by that?
25        A    I wouldn't have any notes in there.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And why is that?

2    A    Because I didn't work on the file, work on the

3    case.

4    Q    Okay.  If you didn't work on the case apart

5    from the arrest, why is your name written on the clear,

6    closed report?

7    A    Because it was at the end, making the arrest.

8    I was included in that narrative.

9    Q    Okay.  So I've stopped sharing my screen now.

10   So you testified earlier it's your belief that you were

11   partnered with detective Riccio on the day of Geraldo

12   Iglesias' arrest, correct?

13   A    Correct.

14   Q    Okay.  Now, do you know from your review of

15   documents, whether Detective Riccio was involved in any

16   aspect of the Roman homicide investigation beyond the

17   arrest?

18   A    I have no idea.

19   Q    If you were partnered with Detective Riccio,

20   was it fair to say that you were working with him during

21   your entire shift that day?

22   A    It could be.

23   Q    Do you remember one way or the other on --

24   A    No.

25   Q    -- June 23rd, 1993?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     No, I do not.

2      Q     In your review of the investigative file, did

3   you see any police reports or notes reflecting that

4   Detective Riccio helped conduct eyewitness

5   identification procedures on June 23rd, 1993?

6      A     No, I do not.

7      Q     Okay.  If reports show that he was present

8   during those procedures, do you have any reason to

9   dispute the truth of that?

10     A     No.

11     Q     If it's true that Detective Riccio was helping

12  to conduct eyewitness identification procedures

13  following Geraldo Iglesias' arrest on June 23rd, 1993.

14  As you sit here today, are you able to say that you were

15  or were not present also during those procedures?

16     A     I was not present.

17     Q     How do you know?

18     A     My name doesn't appear on the reports.

19     Q     As you sit here today, can you say what you

20  were doing at the time of those identification

21  procedures?

22     A     No idea.  Any number of things.

23     Q     Can you explain why it would be that Detective

24  -- both you and Detective Riccio participated in Geraldo

25  Iglesias' arrest, but then only Detective Riccio

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    remained involved in the investigation?

2        A    I would be guessing, but I would say that

3    either I left work, I was called to do another job,

4    maybe called to assist someone else.

5        Q    Is there any doubt in your mind that your

6    entire involvement in the Roman homicide investigation

7    was limited to executing the arrest of Geraldo Iglesias?

8        A    Yes.  That was it.

9        Q    Okay.  In other words, no doubt in your mind?

10       A    No doubt.

11       Q    Okay.  Do you know who Francisco Vicente is?

12       A    No.

13       Q    Have you ever heard that name before?

14       A    I think I've heard the name.

15       Q    What, if anything, do you know about Francisco

16   Vicente?

17            MR. ENGQUIST:  I'm going to object and

18            instruct him not to answer if his only information

19            came from discussions with his attorneys.  So to

20            the extent that the information only came from your

21            attorneys, acknowledge and answer the question.  So

22            you can answer anything beyond that, go ahead.  But

23            if not, you're not answering.  Go ahead.

24       A    I don't know.  What was the question?  Do I

25   know that guy, or --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. HAZINSKI:

    Q    Yes.

    A    I'm sorry.

    Q    Apart -- So I'm not interested in information that your lawyers gave to you in any confidential communications you had with them.  So setting those aside.  What, if anything, do you know about Francisco Vicente?

    A    I don't remember anything, nothing.

    Q    Okay.  Do you remember ever interacting with Francisco Vicente during any homicide investigation?

    A    No.

    Q    Okay.  Do you have any information about how Francisco Vicente came to be involved in the Roman homicide investigation?

    A    No.

    Q    During your review of documents in preparation for this deposition, do you remember seeing any documents pertaining to Francisco Vicente?

    A    No.

    Q    Did you testify at any criminal proceedings against Geraldo Iglesias?

    A    No.

    Q    As you sit here today, do you have any personal knowledge about whether there was probable



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    cause to prosecute Geraldo Iglesias for murder?

2        A    I have no idea.

3        Q    Do you have an opinion, one way or the other,

4    about whether Iglesias is guilty of the Roman homicide?

5        A    No idea.

6        Q    Does the fact that Reynaldo Guevara has pled

7    the Fifth Amendment in response to questioning about his

8    conduct during the Roman homicide investigation affect

9    your opinion of Geraldo Iglesias' guilt or innocence?

10       A    No.

11       Q    Okay.  Now I only have a couple more questions

12   that I -- before I wrap up I just would like to, if you

13   don't mind, if we could take another short break.

14       A    Sure.  Okay.  Five, 10 minutes?  What do you

15   want?

16            MR. ENGQUIST:  Let's take a good five,

17       10 minutes.  Maybe stretch your legs too.

18            MR. HAZINSKI:  Yeah.  That sounds great, all

19       right.

20            COURT REPORTER:  We're going off record.  The

21       time is 1:09 p.m. Eastern Standard Time.

22                 (OFF THE RECORD)

23            COURT REPORTER:  We are back on record.  The

24       time is 1:21 p.m. Eastern Standard Time.

25   BY MR. HAZINSKI:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      Q    All right.  Mr. Gawrys, I just have a few
 2 follow up questions before we finish, before I finish my
 3 questioning.  So at various times when you were an Area
 4 5 detective, you said you had a lot of different
 5 partners over the time that you were there, right?
 6      A    Correct.
 7      Q    Now, did your partners change day to day or
 8 week to week?  Or did you -- were you assigned a single
 9 partner for a longer period of time?
10           MR. ENGQUIST:  I'm sorry, just for
11      clarification, you're talking about the -- or the
12      five or so, five to six years that he was there?
13      Or you more in the beginning, or we just talking in
14      general?  I just want to make sure.
15 BY MR. HAZINSKI:
16      Q    Just in general.  Over the time that you were
17 at Area 5.  Because you said you had different partners
18 at different times, and I'm curious if you would have
19 one partner for a period -- for a lengthy period and
20 then another, or if it would change back and forth
21 routinely?
22      A    Well, I mean, obviously things would change.
23 If you went to midnights, everybody had to do their time
24 on the midnight shift.  So I mean, obviously you didn't
25 go as partners.  You just -- there were permanent
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  detectives on that shift that liked working midnights.

2  So you worked with them.  On day watch, I don't know.  I

3  mean, it's -- you team up with people that were

4  available.  And that was also on a third watch, but you

5  did work sometimes steady with people.  For how long?  I

6  don't know.  I have no idea.  I don't remember.

7      **Q    Okay.  On any given day shift, did you have**

8  **the ability to choose who your partner was going to be**

9  **or was that told to you by a supervisor?**

10      A    We'd kind of choose between ourselves to work.

11  It just depended what we were doing.

12      **Q    Okay.  Was there a period of time after which**

13  **you stopped partnering up with Guevara?**

14      A    Yeah, I left the watch.  I went either

15  midnight -- Midnights or second watch, which is day

16  shift.

17      **Q    And when was that approximately?**

18      A    I have no idea.

19      **Q    Are you able to estimate approximately how**

20  **many investigations you worked on as partners with**

21  **Detective Guevara, as a detective?**

22      A    No, I don't know.

23      **Q    Would it be fair to say it was more than 10?**

24      A    I would say so.

25      **Q    Okay.  In your experience working as a**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    detective alongside Guevara, did you observe whether he

2    ever took notes during homicide investigations?

3         A    Yes.  I believe he took notes.

4         Q    Okay.  And you yourself took notes during

5    homicide investigations as a detective, right?

6         A    Yes.

7         Q    Okay.  For example, if you -- when you were

8    working as a violent crimes detective, if you were

9    interviewing a witness, was it your ordinary practice to

10   make contemporaneous handwritten notes during the

11   witness interview?

12        MR. ENGQUIST:  Objection, call for speculation

13        and vague.  Go ahead.

14        COURT REPORTER:  I'm sorry, I didn't get your

15        objection.

16        MR. ENGQUIST:  Objection, calls for

17        speculation and vague.

18        A    Yes, I would make notes.

19   BY MR. HAZINSKI:

20        Q    And as we discussed before, you would make

21   those notes on general progress reports, right?

22        A    Right.

23        Q    Okay.  From your own observations, was it also

24   detective Guevara's practice to make handwritten notes

25   during witness interviews during homicide

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    investigations?

2         A    I have no idea a lot of times what he did, so.

3    I wasn't working with him all the time.

4         Q    Okay.  On the occasions that you were working

5    with him, did you ever observe that he was failing to

6    take notes in a circumstance in which you would've taken

7    notes?

8         A    No.

9         Q    And I guess I want to ask the same thing with

10   respect to Tony Riccio.  So when you worked alongside

11   Detective Riccio in Area 5, did he also make handwritten

12   notes during homicide investigations?

13        A    I'm sure he did.  Yes.

14        Q    Okay.  That was sort of the standard practice

15   for all Area 5 detectives on your understanding, right?

16             MR. ENGQUIST:  Objection, calls for

17        speculation, vague.  Go ahead.  And foundation.

18        A    I would say that's for all detectives.

19        Q    Yeah.  Earlier I asked you some questions

20   about photo books, gang books, but I asked those

21   questions in the context of your work as a gang crime

22   specialist.  So but now I want to talk about when you

23   were a detective at Area 5.  As an Area 5 detective, did

24   you have access to those same gang books?

25        A    For the gang unit?  Is that what you were
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 91 of 782 PageID #:13349
The Deposition of JOHN HALLORAN, taken 02/01/2021

87

 1  asking?

 2      Q    Yeah.

 3      A    Yes.

 4      Q    This, the gang books we were talking about

 5  earlier?

 6      A    Yes.

 7      Q    You did?  Okay.  Now I believe you said that

 8  access to those books would sometimes be limited to

 9  outsiders; is that right?

10      A    Yes, they would ask to use the books.

11      Q    Okay.  Now were there any gang books, and I

12  apologize if there's a siren on my end of the call --

13      A    It's your call.

14      Q    Were there gang books that were stored at --

15  In the same building as Area 5?

16      A    Gang books?  I don't know.  They had some

17  photos there, but I'm not sure what they were.

18      Q    Did you personally, in the course of any

19  investigations as an Area 5 detective, did you ever ask

20  to use one of those gang books to show photographs?

21      A    Which ones?  Area 5?  I don't know what Area 5

22  had.  I don't remember if they had gang books.  They

23  just had people they arrested.

24      Q    All right.  Any gang books.  Did you -- do you

25  remember as a detective ever using those?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    I don't know where you're -- are you saying

2    that Area 5 had gang books?

3       Q    No, I just mean in general, not even gang

4    books specifically stored at Area 5, but gang books

5    stored anywhere.  Do you remember as a detective ever

6    using such a gang book?

7       A    Yeah, I used gang books.

8       Q    Okay.  Do you remember where you would go get

9    them?

10      A    I went to the gang office, it'd be at Belmont

11   and Western.

12      Q    Okay.  And at that time, was that still

13   Area 3?

14      A    Yes, I believe what the building was called,

15   that area.

16      Q    Okay.  Now were the gang books organized with

17   members of all different gangs mixed together, or were

18   they separated out were each book just had one gang?

19      A    They were separated.

20      Q    Okay.  So for example, there might be a gang

21   book that corresponded to the Latin Lovers that had

22   photographs of just known Latin Lovers members in it,

23   right?

24      A    Right.

25      Q    Okay.  Do you know one way or another whether

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    -- Well, let me ask it this way.  Did the department

 2    maintain gang books for all the major Chicago street

 3    gangs?

 4             MR. ENGQUIST:  Object to the foundation.

 5    A    Not that I know of.

 6    Q    Okay.  Now you specialized in Latin Kings and

 7    the Insane Unknowns, right?

 8    A    Right.

 9    Q    Were there gang books for those two gangs?

10    A    Yes.

11    Q    Okay.  Do you know, as you sit today, whether

12    there was a gang book for the Imperial Gangsters?

13    A    There were.

14    Q    Okay.  In your review of the police reports

15    and other documents in the investigative file, as you

16    were preparing for your deposition today, did you come

17    to be familiar with what the evidence was implicating

18    Geraldo Iglesias in the Roman homicide?

19    A    I read that.  I think it was a photo ID?

20    Somebody gave information, and then they did a photo

21    spread.  I am not too sure.  I didn't concentrate on

22    that too much.

23    Q    Okay.  Fair to say that when you were

24    reviewing the documents, you were mainly looking out to

25    see whether you were involved?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Correct.

 2        Q    Okay.  Do you know, for any of the eye

 3   witnesses in this case, whether they had a good or bad

 4   opportunity to view the perpetrator?

 5        A    No idea.

 6             MR. ENGQUIST:  I'm sorry.  Could you repeat

 7        the que -- did you say good or bad opportunity to

 8        be the perpetrator, or did you say --

 9             MR. HAZINSKI:  Sorry, to view.  To view.

10             MR. ENGQUIST:  To view, okay.  Okay.  I'm

11        sorry.  That's why I was confused.  Okay, sorry.

12   BY MR. HAZINSKI:

13        Q    No worries.  Do you know one way or the other,

14   whether any identifications that were made in -- during

15   the Roman homicide investigation were reliable?

16        A    No, I wasn't there.

17        Q    Okay.  Since this lawsuit was filed, have you

18   had any communications with any of the other defendants

19   in this case, including Guevara, Mr. Halvorsen, or

20   Mr. Riccio about this lawsuit?

21        A    No.

22        Q    Okay.  And this process of answering questions

23   about this case and reviewing the documents here today,

24   did that process bring back any independent memories of

25   the Roman homicide investigation that you didn't have
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 95 of 782 PageID #:13353
The Deposition of STEPHEN GAWRYS, taken on October 30, 2021

91

1    before we started this deposition?

2        A    No.

3            MR. HAZINSKI:  Okay.  All right, Mr. Gawrys, I

4        don't have any further questions for you at this

5        time. Thank you.

6            THE WITNESS:  Okay.  Thank you.  Anything? No?

7            MR. ENGQUIST:  We're waiting for Austin.  Who

8        else is on that?  I'm sorry.  Austin, or I think

9        Kevin's on.  Anything from either of you?  Or do

10       you admitted or whatever?

11           MR. RAHE:  The City doesn't have any

12       questions.

13           MR. ZIBOLSKI:  This is Kevin.  No questions

14       for Guevara.

15           MR. ENGQUIST:  None for me.  We'll reserve.

16           COURT REPORTER:  Okay.  We are going off

17       record.  The time is 1:33 p.m. Eastern Standard

18       Time. Will all parties please continue to remain on

19       the line?

20               (DEPOSITION CONCLUDED AT 1:33 P.M.)

21

22

23

24

25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              CERTIFICATE OF REPORTER

 2

 3    I do hereby certify that the witness in the foregoing

 4    transcript was taken on the date, and at the time and

 5    place set out on the Title page here of by me after

 6    first being duly sworn to testify the truth, the whole

 7    truth, and nothing but the truth; and that the said

 8    matter was recorded stenographically and mechanically by

 9    me and then reduced to typwritten form under my

10    direction, and constitutes a true record of the

11    transcript as taken, all to the best of my skill and

12    ability.  I certify that I am not a relative or employee

13    of either counsel, and that I am in no way interested

14    financially, directly or indirectly, in this action.

15

16

17

18    

19

20

21

22    AALAYAH PURNELL,

23    COURT REPORTER/NOTARY

24    COMMISSION EXPIRES:  03/22/2025

25    SUBMITTED ON: 12/06/2021
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 97 of 782 PageID #:13355
The Deposition of STEPHEN GAWRYS, taken on October 29, 2021

93

**Exhibits**

**Exhibit 1_ GAWRYS**
66:3,5,11

**Exhibit 2_ GAWRYS**
72:7,9

**Exhibit 3_ GAWRYS**
75:1,5

---

**1**

**1** 66:3,5,11
**10** 65:20 66:5 82:14,17 84:23
**11** 68:23 69:7
**11:03** 6:6
**12:13** 52:5
**12:27** 52:9
**13** 65:20 66:5 70:21
**14** 72:8
**1977** 13:25
**1985** 15:10
**1990** 15:13 33:9
**1993** 58:19 68:15 72:16 78:25 79:5,13
**19th** 21:12
**1:09** 82:21
**1:19-CV-6508** 6:12
**1:21** 82:24
**1:33** 91:17,20
**1st** 13:25

---

**2**

**2** 72:7,9

**2005** 50:7
**2008** 50:5
**2014** 13:22
**2021** 6:6
**20689** 68:9
**21-june-93** 69:8
**22nd** 45:5,20
**23** 72:16
**23rd** 78:25 79:5,13
**27th** 6:5

---

**3**

**3** 75:1,5 88:13

---

**4**

**48** 75:3,10,19

---

**5**

**5** 32:14,16 35:20 36:7,18, 25 37:11 39:2, 10,14,18 41:6 44:2,5 45:2,7 52:14,17 57:22, 25 58:2,5,9,14 60:4 61:9,24 62:11,15,21 63:4 83:4,17 86:11,15,23 87:15,19,21 88:2,4
**5%** 35:15
**50** 77:6
**51** 77:14
**55** 75:3,10

---

**8**

**84** 14:8
**85** 14:8

**86** 15:10

---

**9**

**93** 47:8
**95%** 35:14 41:18
**96** 33:14 44:25 45:19 47:7

---

**A**

**a.m.** 6:6
**Aalayah** 6:4
**ability** 84:8
**academy** 34:21
**access** 20:10 52:22 86:24 87:8
**accounted** 67:15
**accurate** 66:23 74:17
**acknowledge** 80:21
**acquaintances** 61:12,13
**activities** 30:19
**activity** 51:10
**adding** 20:21 22:9
**additional** 34:8
**address** 76:10 77:3
**administrative** 21:21 42:12
**admitted** 91:10
**advice** 61:1
**Affairs** 47:12, 14 48:7 49:6 50:1,4,11,23

**affect** 9:12,14, 22 10:11 82:8
**affects** 9:18,21
**affirm** 7:16
**agree** 7:10
**ahead** 19:13 20:2 31:3,16 37:3 40:8 48:24 53:17 55:10 60:24 65:24 80:22,23 85:13 86:17
**alias** 65:9
**aliases** 65:4
**allegations** 47:18 48:11,12, 19 51:19
**allowed** 25:11
**alongside** 48:8 85:1 86:10
**Amendment** 60:15 82:7
**answering** 8:20 80:23 90:22
**anymore** 51:11 59:2 63:12
**apologize** 87:12
**appearance** 6:13
**appearing** 6:18,19
**appears** 68:5, 12,18
**apply** 45:9
**approval** 42:22 43:2
**approve** 43:5
**approving** 62:18
**approximately** 15:12 22:17 41:19 50:3,12

**63:7 84:17,19
**area** 6:21,24 14:16 17:18,21 21:10,11 32:14, 16 35:20 36:7, 18,25 37:11 39:2,10,14,18 41:6 44:2,5 45:2,7 52:14,17 57:22,25 58:2, 5,9,14 59:4 60:4 61:9,24 62:11,15,21 63:4 83:3,17 86:11,15,23 87:15,19,21 88:2,4,13,15
**areas** 32:11 46:21,22
**Armitage** 17:7
**array** 35:21 36:8 71:23
**arrest** 41:3 69:23 71:7,9 72:14,15,23 73:11,16,23 74:2,8,10,16,21 78:5,7,12,17 79:13,25 80:7
**arrested** 73:7 87:23
**arrestee** 68:3
**arresting** 68:23 69:3 72:19,25
**arrests** 18:8 67:2
**aspect** 78:16
**assaults** 28:11
**Assessor's** 13:12,14
**assign** 40:16
**assigned** 16:18,24 19:17 32:23 40:20,23 49:1 57:25 58:2,5,9 73:15 83:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

assigning 40:5

assignment 14:1

assignments 19:20 49:2

assist 14:17 25:10 26:4,23 69:23 73:4,11, 23 80:4

assistance 40:24 41:4

assistant 38:24

assisted 71:9 74:2

assisting 74:7, 12

associate 59:22

assume 9:3

attending 6:14 7:3

attorney 10:13 13:2,6 38:24

attorneys 12:11,21 61:1 80:19,21

attorneys' 63:17

Austin 6:19 91:7,8

author 76:9

authored 72:18

auto 28:11

aware 39:15 41:13

---

**B**

babbling 27:25

back 9:16 13:23 28:14 32:24 39:9 44:13 45:5,15

46:18 50:6 52:1,8 55:13 56:16 82:23 83:20 90:24

backup 41:4

bad 9:16 90:3,7

based 26:12

beat 51:22

begin 7:21

beginning 8:14 83:13

belief 73:18 78:10

Belmont 21:5, 16 88:10

Biebel 62:13, 17,20 63:16

big 48:2

bigger 75:12

bit 8:15 57:8

Board 46:11

book 20:22 22:4 24:8 27:18 28:6 88:6,18,21 89:12

books 20:5,8, 10,13,15,16,18 21:1,19,22,25 22:3,10,14 23:22,24 25:9, 10,13 27:15 86:20,24 87:4, 8,10,11,14,16, 20,22,24 88:2, 4,7,16 89:2,9

bottom 68:8,19 70:23

box 67:6 76:10, 11

boxes 53:12 76:14

break 9:6,10 10:2 52:1 82:13

bring 22:1 25:9 56:16 90:24

broke 74:18

Bucktown 17:25

building 21:10, 17 87:15 88:14

---

**C**

cabinets 53:13,15

call 24:3 30:14 31:6 41:16 66:23 85:12 87:12,13

called 30:24 35:3 41:15 46:7 49:7 64:10 80:3,4 88:14

calling 24:6

calls 19:11 40:7,12 48:22 55:9 85:16 86:16

cancer 9:16

capacity 47:23

care 42:11

career 51:13

carefully 11:3

cars 16:21

case 6:12 11:12,13,14,15, 16 12:18,22,24 13:7 19:8 24:3, 12 25:23,24,25 26:1,3,22,24 31:15 32:1,4,8 39:10 40:16,23 53:14 55:5,13 56:9,12,23 57:17 59:15,16 67:3,13 69:21 70:2,7,12 71:5, 12 73:4,14,19 76:17 78:3,4 90:3,19,23

cases 16:10,12 32:24 35:15 39:2 40:19 49:8

50:12 51:3,4 63:11 73:21

categorizing 36:24

change 14:20 34:24 58:16 83:7,20,22

changing 21:12

charge 14:23 17:9,18 47:20

charges 39:12

Chicago 6:18, 20 7:4 13:24 89:2

Chicagoland 6:21,24

Chief 13:15

choice 45:16

choose 45:15 84:8,10

Christmastime 63:1

circumstance 86:6

circumstance s 23:16,20 26:11 28:6 35:16,17 76:23

city 6:20 7:4 17:19,22 51:21 91:11

citywide 48:11,12

civil 11:13

clarification 58:1 83:11

clarify 9:2

classroom 34:12

clear 28:1 55:24 78:5

cleared 66:23, 25 67:6,9,12, 17,23 68:2

clearer 27:1

clearing 26:21

client 6:24

close 59:4

closed 53:14 55:5,13 66:23 67:1,6,9,12,14, 17,23 68:2 78:6

collected 16:20

communicate d 72:2

communicatio ns 57:1 81:6 90:18

complaint 51:13

complaints 49:13 51:8,15, 20

completed 29:7

compound 37:15

concentrate 89:21

CONCLUDED 91:20

conclusion 50:24

conduct 35:20 79:4,12 82:8

conducted 23:17 71:23

confidence 37:10

confidential 30:13,15,24 31:5,6,14,24 36:22,25 37:6, 12,18,22 38:6, 15,16,25 49:7 51:5 69:9,19 70:13,17 81:5

confused 90:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 99 of 782 PageID #:13357
The Deposition of STEPHEN HAWKYNS, taken on October 29, 2021

95

**confusing** 8:25

**connection** 18:23 49:12

**consisted** 16:21

**contacted** 69:9,18

**contemporaneous** 85:10

**contents** 42:15 54:1

**context** 86:21

**contexts** 8:16

**continue** 45:7 91:18

**Continuing** 77:13

**Control** 46:8

**convened** 6:7

**conversation** 60:11,19 63:19

**conversations** 64:1,5

**Cook** 13:12,13

**copies** 29:10

**copy** 29:12,13 43:7,19,21 55:11 65:23

**correct** 8:2 10:14,15 18:21, 22 21:20 25:21 28:3 33:11,15 36:23 38:1 41:20,21 45:1 53:11 54:1,2 57:20 68:6,7, 11,25 72:16 73:17 78:12,13 83:6 90:1

**corrected** 76:15,18,21 77:3

**corresponded** 88:21

**corrupt** 49:4

**counsel** 6:12, 15 7:20 65:19

**County** 13:12, 13

**couple** 13:4 45:21 52:11 82:11

**court** 6:3,5,10 7:5,9,14,20 8:18 40:9 52:4, 8 82:20,23 85:14 91:16

**courtroom** 61:5

**cover** 46:23 47:1 48:11

**covering** 46:22

**CPD** 51:13

**created** 41:5

**crime** 14:18 15:24 16:2,6, 16,18 17:8 19:3,6,14,21 20:4 23:4 24:15 25:18,24 26:1 27:3 29:1,14 30:12,17 31:11 32:10,17 33:2 34:6,23 57:19 64:8 86:21

**crimes** 16:13 18:14,15,20,21 19:4,8,9,16,23, 24 20:3,10,16 21:2,3,4,16 22:13,20 23:11, 17 24:10 25:15 27:4 28:7 30:6, 10 33:4,6 40:15 44:14,15,20 58:6 59:21 60:8 64:22 85:8

**criminal** 11:12, 16 22:15 34:24 39:12 51:10 67:24 81:21

**curious** 43:4 83:18

**curricula** 46:14

**custody** 67:14

---

**D**

**Damen** 17:7

**dangerous** 32:2

**date** 42:20 75:2

**day** 6:5 38:19 68:17 78:11,21 83:7 84:2,7,15

**decide** 26:15

**deciding** 27:8

**decision** 27:4 49:19

**dedicated** 21:17,20

**defendant** 6:20 7:3 12:24 69:3

**defendants** 6:25 90:18

**define** 55:23

**department** 13:24 14:2 22:9 24:2 39:20,25 51:10 89:1

**depend** 27:9

**depended** 84:11

**Depending** 22:2

**depends** 23:19 24:17 25:5 26:17 30:15 38:18 48:25

**deposition** 6:8 8:3 10:19 11:6 12:11,17,19 13:3,7 55:18 56:4 57:5 66:17 69:15 72:12

76:2 77:18 81:18 89:16 91:1,20

**describe** 19:17 48:18

**Design** 46:7

**designation** 36:24

**destroy** 28:25

**details** 21:7 57:10,11 69:25

**detective** 19:21 21:13 24:25 25:19,22 26:22 27:19 30:23 32:11 33:4,7,12,17, 22,24 34:7,23 35:2,5,10,20,24 36:5,7,18 37:11,23 38:23 39:3,10,14,22 40:6,18 41:18 42:1 44:12,23 45:12 52:14,25 54:4,7 57:23 58:5,8,14 68:12,23 70:1, 23,24 71:1 73:15 78:11,15, 19 79:4,11,23, 24,25 83:4 84:21 85:1,5,8, 24 86:11,23 87:19,25 88:5

**detectives** 18:21 19:4,8, 10,15 24:3,6,11 25:8,12 26:2,5, 6 29:11 32:15, 19,23 34:1 35:6 36:15 39:19 40:5 41:2,7 44:21 48:15 57:22 58:9 59:23 69:3,9 70:3,16,18 72:19 73:23 74:7,13 84:1 86:15,18

**determination** 74:9

**determine** 49:22

**developing** 46:14

**direct** 7:23 23:2

**discipline** 49:19,20,23 50:13,21

**discussed** 85:20

**discussions** 80:19

**dispute** 74:15 79:9

**district** 6:10,11 14:6,17 21:12 45:5,20

**division** 6:12 14:3,5 19:22 21:13,14 24:2,6 25:1,20,22 26:22 27:19 35:2 45:5,22,24 46:5 47:4,11

**divisions** 21:7

**document** 23:24 24:7 27:5 65:19 66:10 74:25

**documentation** 71:24

**documented** 67:17 71:17,21 74:16,21

**documenting** 28:5 29:6 37:24 72:15

**documents** 10:18,21 12:2 30:10 55:14,18, 19 56:16 57:5 66:16 73:10,25 78:15 81:17,19 89:15,24 90:23

**dog** 10:17

**door** 63:18



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 100 of 782 PageID #:13358
The Deposition of STEPHEN GAWRYS, taken 04-06-2021

96

doubt 80:5,9, 10

downtown 53:20

drop 29:13

---

**E**

earlier 36:22 43:10 73:13 78:10 86:19 87:5

Eastern 6:6,11 52:5,9 82:21,24 91:17

else's 49:22

employed 13:9

encompass 46:19

end 29:22 71:2 78:7 87:12

Engquist 6:22, 23 9:18,21 10:14 19:11 20:2 22:12 23:7 31:1,16 35:23 36:1 37:14,19 40:2,7,11 48:21 52:18 53:16 55:9 60:22 65:22 66:3,5,7 75:7,15,17,20, 23 80:17 82:16 83:10 85:12,16 86:16 89:4 90:6,10 91:7,15

entire 11:2 78:21 80:6

Ernie 32:21 33:21 34:2 61:8,11,14,20

erroneous 13:18

estimate 16:12 50:4,12 63:7 84:19

et al 6:10

---

everybody's 32:1

evidence 31:2 68:2 74:9 89:17

exam 45:14

EXAMINATION 7:23

examples 28:10

exception 7:1

exchange 39:11,16,24

executing 73:16 80:7

exemptions 13:18

exhibit 66:3,5, 11 72:7,9 75:1, 5

experience 22:8 84:25

explain 21:24 24:18 25:6 26:18 79:23

explaining 31:19

extent 71:12 80:20

eye 31:14 90:2

eyewitness 35:21 36:19 79:4,12

eyewitnesses 19:25

---

**F**

fact 7:10 60:15 68:18 82:6

factors 27:7

failing 86:5

fair 8:22,23 9:4, 5 18:2 28:1,16 30:20,21 37:21 43:24 44:18

---

48:13 50:16 57:10 60:6 67:11 71:15 78:20 84:23 89:23

false 36:19

falsified 50:25

familiar 89:17

familiarity 8:12 64:9 76:19

feel 10:5

field 22:5 54:22

figure 47:7

file 10:22,25 11:2,25 12:3 35:19 41:8,10, 11,12,16,17,25 42:3,14,18,19 43:7,12,14,19 44:14,15,19,21 53:13,15,20,22 54:1,6,8,14,18, 25 55:8,12,14 71:18 73:25 77:18 78:2 79:2 89:15

filed 90:17

files 44:2,12 52:12,13,16 53:9,24

final 70:22

find 70:14 74:25

findings 49:11, 15

finish 8:20,22 67:15 83:2

five- 51:25

flipping 75:8

floor 21:14

focus 48:10 52:12

focused 46:20

folks 25:14

---

follow 83:2

follow- 52:11

form 22:24 31:16 37:14,19 48:22

formal 30:15, 24 31:4 35:9 36:24 37:16

formally 73:15

forward 65:8

foundation 19:12 22:12 23:8 31:1 37:14 40:2,8,11 52:18 53:16 86:17 89:4

fourth 75:18

Francisco 80:11,15 81:7, 11,14,19

free 10:5

frequently 18:8 32:16

friend 59:8,11 61:11,12 62:5

friendly 62:22

friends 59:19, 24 60:2,7 62:20

front 42:10,14

froze 18:23

full 7:6

---

**G**

G-A-W-R-Y-S 7:8

gang 15:8,11, 15,24 16:2,6, 13,16,18 17:4,8 18:8,14,20 19:3,7,9,16,21, 23,24 20:3,4,5, 9,11,15,16,22 21:2,3,4,16,19, 22,25 22:4,10, 13,14,20 23:4,

---

11,17,22,24 24:8,10,15 25:15,18 27:3, 12 28:7 29:1, 14,15 30:6,10, 12,17,19 31:11 32:10,16,24,25 33:2,4,6,22 34:6,22 42:9,10 44:13,15,20 57:19 58:6 59:21 60:8 64:8,10,21,22 86:20,21,24,25 87:4,11,14,16, 20,22,24 88:2, 3,4,6,7,10,16, 18,20 89:2,9,12

gang-related 26:23

gangs 16:19, 24,25 17:9,12, 17 18:3,4,12 20:20 29:20,24 60:5 64:16 88:17 89:3,9

Gangsters 64:10,15,19,23 89:12

gathering 30:18

gave 12:18 31:24 81:5 89:20

Gawrys 6:8,24 7:5,8,11,25 9:11 13:9 51:25 52:11 65:21 66:9,16 68:25 72:20 75:3 76:1 83:1 91:3

general 29:17 35:3 48:18 66:25 83:14,16 85:21 88:3

geographic 17:18

Geraldo 6:9,17 64:2 65:5 71:7 72:15,23,25 78:11 79:13,24

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 101 of 782 PageID #:13359
The Deposition of STEPHEN GAWRYLA, taken 04/06/2021

97

80:7 81:22 82:1,9 89:18

get- 63:2,8

Gillie 32:21

give 7:17 23:21 28:10 31:7 43:17 51:7 65:22 75:8,13

gleaned 56:13

good 7:2 28:15 52:2,3 75:16 82:16 90:3,7

gosh 48:3

GPR 35:16 41:22 42:2

GPRS 23:4 35:2,7,11 41:20 42:21 43:11,12 52:23

great 82:18

ground 8:14

group 14:11, 14,21 62:25

guess 23:9 32:24 42:24 53:19 86:9

guessing 18:1 80:2

Guevara 6:9 7:1,3 11:9,10 12:6 15:14 16:14 17:12 57:18,19 58:14, 22 59:8,19 60:2,10,14 61:18 68:24 70:24 72:3,19 82:6 84:13,21 85:1 90:19 91:14

Guevara's 11:18 85:24

Guevera 33:20,21

guilt 82:9

guilty 82:4

guy 80:25

guys 63:1

---

**H**

half 50:16

Halvorsen 12:6 32:21 33:21 61:8,11, 14,18,21 68:24 70:24 72:3,18 90:19

hand 7:15 29:8 43:4

handle 14:19 49:8

handled 51:4

handwriting 77:9,11,15,20

handwritten 12:8 23:3 24:14,22,23 25:17 26:12 27:2 28:18,22 35:11 41:19 77:7,14,19 85:10,24 86:11

happen 32:6

happened 26:7 36:19 38:21 73:19

hard 65:23

Hazinski 6:16 7:12,22,24 9:24 31:9 35:25 36:3 40:17 49:9 51:24 52:10 61:3 65:18,25 66:4,6,8 75:10, 13,21,25 81:1 82:18,25 83:15 85:19 90:9,12 91:3

head 47:15

hear 8:5 9:25 18:22,24 40:9

heard 80:13,14

helped 79:4

helping 79:11

Hey 60:21

hip 9:16

hired 13:24

hold 28:15 29:2

holes 42:13

holidays 59:13

homicide 40:6 55:20 57:9 67:12 69:20 72:4 78:16 80:6 81:11,15 82:4,8 85:2,5,25 86:12 89:18 90:15,25

hour 57:6

hour-and-a-half 57:6

hours 13:5 59:5

Hugo 65:12

hypothetical 40:13 69:24

---

**I**

ID 23:22,23 24:4,8 27:14,19 28:2,3 89:19

idea 14:25 15:22 16:15 50:15,18 60:3 61:22 63:10 78:18 79:22 82:2,5 84:6,18 86:2 90:5

identification 35:21 36:20 66:11 72:9 75:5 79:5,12,20

identifications 21:23,25 28:5 90:14

identify 68:2

identity 31:14

38:2,15,25

Iglesias 6:9,17 64:2 71:8 72:15 73:1,7 75:2 80:7 81:22 82:1,4 89:18

Iglesias' 72:23 78:12 79:13,25 82:9

IGS 64:15

Illinois 6:11 46:11,12

imagine 30:17 53:7

Imperial 64:10, 15,19,23 89:12

implicating 68:3 89:17

important 8:17

impose 49:19

imposed 49:23 50:14

improper 36:11

inaccurate 74:22

Inaudible 40:8

incident 76:10, 22

include 35:19

included 41:24 42:18 78:8

including 90:19

incomplete 40:12

independent 55:24 56:2,17, 22 74:9 90:24

independently 55:23

individual 6:25 64:25 65:12 70:14

individuals 39:15

informal 37:17,19

informant 30:24 36:25 37:6,22 38:6, 10,16,25 69:10, 11,19 70:13,17

informant's 37:24

informants 30:13,15 31:5,6 36:23 37:13,18 39:4

information 16:20 22:2 23:25 24:5 26:17,23 27:5 28:19 30:18 31:7,10,12,21, 22,25 37:10,21, 25 38:11 39:3, 10,16,24 50:19 55:7 67:16,21 69:10 70:15,19 71:21 74:16,21 77:5 80:18,20 81:4,13 89:20

information's 67:20

innocence 82:9

Insane 17:6 89:7

inside 54:6

instance 31:23 52:23 60:21 71:20

instances 50:20

instant 38:12

instruct 80:18

Instructional 46:7

intelligence 16:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**interacting** 81:10

**interested** 81:4

**Internal** 47:12, 14 48:7 49:6 50:1,4,11,23

**interrupt** 27:23

**intersections** 17:17

**interview** 18:18 24:22 25:18 26:8 27:2 85:11

**interviewed** 71:20

**interviewing** 85:9

**interviews** 23:6,14 47:1 85:25

**inventory** 53:25 54:4,10, 13

**investigate** 13:18 18:15 19:9 49:2 51:8

**investigated** 19:14 39:2 47:18 48:14 50:13

**investigating** 39:9 48:19 49:4 50:25 70:3

**investigation** 19:18 23:12 24:15 27:3 31:13 38:17 47:22 48:6 54:17 55:20 56:17 57:2,9,10 67:12,15,18,24 69:6,8,20 70:1 71:17 72:4 78:16 80:1,6 81:11,15 82:8 90:15,25

**investigations**

13:15 18:17 22:15,21 23:17 34:24 40:6 41:6 48:15 49:3,10 53:8 84:20 85:2,5 86:1,12 87:19

**investigative** 10:22,25 11:2, 25 12:3,5 29:6 41:11,16,17,24 42:3 44:12,15, 21 52:13,16 53:9,15,24 54:18 55:14 71:18 73:25 74:13 77:18 79:2 89:15

**investigators** 13:17 47:16,17, 21 48:4

**invoked** 60:15

**involve** 34:10

**involved** 48:19 57:17 63:24 68:19 71:7 72:23 78:15 80:1 81:14 89:25

**involvement** 19:7 71:12,16, 17 80:6

**issue** 49:15

**issues** 9:11,14

___

## J

**Jack** 32:21 33:21 34:2

**jail** 16:22 39:6

**jailhouse** 39:4

**January** 50:6

**job** 13:21 18:3 31:19 49:22 51:22 80:3

**Joe** 16:3

**jog** 56:22,25

**John** 6:16

**joined** 14:20

**Josh** 6:23 75:13

**June** 72:16 78:25 79:5,13

___

## K

**keeping** 35:9

**Kevin** 7:2 91:13

**Kevin's** 91:9

**kind** 33:1 43:16 44:13 56:20 59:4 66:20 84:10

**kinds** 12:2 46:20 67:21

**Kings** 17:5 89:6

**knew** 38:8 61:8

**knowledge** 57:17 64:9 81:25

___

## L

**lack** 19:12

**large** 53:9

**lasted** 34:16

**Latin** 17:5,14 88:21,22 89:6

**lawsuit** 90:17, 20

**lawsuits** 60:12 63:13,24

**lawyers** 81:5

**leave** 50:7

**Leavitt** 17:5

**left** 45:2 47:6 60:4 61:2,24 62:11 63:4 67:5 80:3 84:14

**legs** 82:17

**lengthy** 83:19

**leniency** 39:11,15

**Leonard** 32:21 33:21 34:2

**lesson** 46:9

**lieutenant** 44:10 49:1,17, 24 53:6

**limited** 80:7 87:8

**lineup** 35:21 36:9 71:24

**list** 30:1,4 33:20

**listed** 54:1 71:2

**lists** 29:15,23 68:24 72:19

**live** 36:9 59:2 71:23

**location** 6:14

**locked** 39:23

**locker** 30:5,6, 10

**long** 10:2,24 13:2,21 14:4 15:3,11 33:12 34:15 45:20 47:3 57:4 62:9 63:10 84:5

**longer** 83:9

**looked** 10:23, 25 11:25 56:6, 11 72:13

**Lopez** 65:5,10

**lot** 30:18 32:22 33:25 46:22 49:8 53:7,18 59:22 65:16 67:20 83:4 86:2

**louder** 8:8

**Lovers** 17:14 88:21,22

___

## M

**made** 24:16,21, 23 27:2 28:18 29:10 33:22,24 39:23 43:13 45:19 47:8 49:21 67:2 90:14

**Mahia** 65:6,10

**mail** 29:13

**maintain** 29:15,18,22 89:2

**maintained** 44:20,21

**Maisonette** 12:20,24

**major** 49:3,4 89:2

**make** 8:13 18:8 23:3 26:11,15 27:4 29:9,12 35:11 38:5,14 39:8,21 41:19 43:19 54:12 56:4 74:8 75:1, 6,11 83:14 85:10,18,20,24 86:11

**making** 49:11 71:7 73:23 74:8 78:7

**man** 48:3 61:1 64:2

**mark** 27:14,16 76:24

**marked** 42:14 66:11 72:9 75:5 77:2

**materials** 46:19

**math** 50:6

**matter** 6:9 73:21

**Mclaughlin** 32:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 103 of 782 PageID #:13361
The Deposition of STEPHEN GAWRYS, taken 04/06/2021

99

medical 9:11, 14

medications 9:12 10:9,10

meet 12:10

meeting 13:2

members 16:21 18:4,9 20:5,11 29:15 88:17,22

memories 56:17,22 90:24

memory 9:12, 15,19,21,22 10:11 56:2,25 72:25 73:3,6,9

memos 24:11

mentioned 12:1 17:16 51:5

met 62:25

midnight 34:4 83:24 84:15

midnights 34:3 83:23 84:1,15

mind 26:1 27:22 80:5,9 82:13

minor 51:18

minute 52:1

minutes 82:14, 17

mischaracteri zing 31:2

misconduct 48:20,25

mixed 88:17

mobile 14:15

Mohan 32:22

money 49:5

monitor 16:19

monitoring 17:9,18

morning 7:2

move 20:25

moved 45:21

multiple 15:23

murder 82:1

_____

**N**

named 64:2 65:12

names 16:1 29:23 34:4 41:12 68:24 70:23

narcotics 28:12

narrative 78:8

needed 14:19

Negaera 65:5, 10

neighborhood 17:24

nickname 41:15 64:5

nicknames 18:11 30:1 41:14

normal 73:22

North 17:23

Northern 6:11

note 54:12,24 69:10 77:14

notes 22:21,23 23:3,6,12,13,18 24:11,14,16,17, 20,22,23 25:1, 5,17,20 26:12 27:2 28:18,22, 25 29:3 35:11 38:6 41:5,20 44:19 77:7,19, 25 79:3 85:2,3, 4,10,18,21,24 86:6,7,12

notetaking 34:24 35:4

notify 24:25 25:19 27:19

noting 54:9

November 13:25

number 6:12 17:2 68:9,10 76:10 79:22

numbers 21:11

_____

**O**

object 48:21 53:16 80:17 89:4

objection 19:11 20:2 22:12 23:7,8 31:1,16 37:14, 19 40:2,7,10,11 55:9 60:22 85:12,15,16 86:16

observations 61:17 85:23

observe 85:1 86:5

obtain 31:10, 12 39:3

occasion 22:14

occasions 18:20 86:4

occupied 64:13

occurred 19:6

Ochoa 65:1,4,9

October 6:6

offense 76:11

offer 39:24

offered 39:22

office 13:12,14 21:2,4,6,16,21 22:2 25:9 27:12,13 30:7

42:10 53:1,5,10 54:18,25 55:12 62:24 88:10

officer 16:6,9, 13 17:12 18:14 19:24 22:13 48:16 50:25 60:17 76:24

officers 18:20 20:4 31:15,22, 25 32:9 38:16, 18 44:16,20 46:15 47:19 48:15 57:1

offices 63:17

officially 40:19 41:15

on-duty 40:14

ongoing 60:12 72:4

operated 44:15

operating 48:7

Operations 14:11,14,21 15:4

opinion 82:3,9

opportunity 90:4,7

option 45:6

order 33:3 35:9 38:2

ordinary 85:9

organized 88:16

original 12:4 43:7,18,23 76:10

outsiders 25:11,14 87:9

overseeing 48:14

_____

**P**

p.m. 52:5,9

82:21,24 91:17, 20

Padre 32:22

pages 10:24

pain 10:6

paper 35:18 56:2,13

paragraph 69:13

parameters 48:23

Pardon 9:20 33:5

Park 17:25

part 16:11 17:22 18:13,17 35:12 36:4 53:18 66:14 67:4 69:11 70:7 73:4

participated 79:24

parties 7:10 91:18

partner 15:18 38:19 58:9 68:16 83:9,19 84:8

partnered 16:5,8 57:18 62:1 78:11,19

partnering 84:13

partners 15:14,23 16:2 33:16 58:5 83:5,7,17,25 84:20

partnership 17:12

passed 76:5

patrol 14:3,4 21:13 24:2,5 45:5,15,18 48:15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

patterns 14:18

pending 6:10
9:10 39:11

people 18:11
29:23 30:2,19
31:5,7 33:1
39:6 57:17
62:17 84:3,5
87:23

percentage
50:12

performed
56:23

period 15:17
33:24 44:13
50:3 62:1 68:15
83:9,19 84:12

permanent
53:20,22 55:8
83:25

permitted
54:17

perpetrator
90:4,8

person 16:7
39:12 40:5
58:25 59:14
65:3 73:14

personal
81:25

personally
22:14 49:18
87:18

personnel
14:17

pertaining
81:19

phone 59:1,2

phonetic 65:5
75:22

photo 23:22,23
27:18 28:6
35:21 36:8
71:23 86:20
89:19,20

photographs
11:21,23 19:25

20:5,11,21
87:20 88:22

photos 20:23
22:10 27:13
87:17

pick 36:8,14,16
70:2

picked 42:19

pictures 42:9

piece 31:20
35:18 38:10

plaintiff 6:17

Plaintiff's 6:15

plans 46:9

pled 82:6

point 35:11
45:2,6,11 51:12
55:5 57:21
63:20 69:19
70:9 74:1

police 12:8
13:24 14:2 21:6
22:9 46:10,14
47:18 50:24
51:1 56:16
60:17 70:8
73:10,25 75:2
79:3 89:14

policemen
49:4

policies 37:11

policing 46:20

policy 39:18,20
51:9

poor 31:19

position 62:15

positive 23:23
24:7 28:5

potentially
48:16

practice 70:8
73:22 85:9,24
86:14

practices
34:23

preparation
11:5 55:18 56:3
66:17 68:20
69:15 72:12
76:2 77:18
81:17

prepare 10:18
12:11 13:3 27:8
28:7,17

prepared
28:13 29:5 70:9

preparing
89:16

present 61:4,5
79:7,15,16

pretty 32:20
53:9

previously
70:3

prison 16:23

probable
81:25

problem 9:1

procedure
36:20 71:24
73:22

procedures
35:22 79:5,8,
12,15,21

proceedings
6:1 81:21

process 8:13
10:6 43:17
56:15 90:22,24

produced
65:20

progress 35:3
85:21

prohibited
39:18

promises
39:21

promoted 15:8
33:4,7 34:6
44:24 57:21,23
58:2,4,8

promotion
15:9 33:10
45:13

pronounced
7:25

properties
13:18

prosecute
82:1

provide 41:4

provided
34:18,20 38:10
69:11

providing
39:16,24

pull 22:3

pulled 73:14

punched 42:13
54:8

Purnell 6:4

purpose 54:4
67:11,23 68:1

put 6:22 20:24
24:1 28:2 29:13
37:23 42:13
43:11,13,19
52:23 54:7,9,13

putting 20:17
24:5 27:17 42:2

**Q**

Quality 46:8

question 8:20,
24,25 9:2,10
19:1 26:25
40:3,14 56:7,8
60:23 64:18
69:25 80:21,24

questioning
60:16 82:7 83:3

questions
52:12 82:11
83:2 86:19,21
90:22 91:4,12,
13

promotion
15:9 33:10
45:13

pronounced
7:25

properties
13:18

prosecute
82:1

provide 41:4

provided
34:18,20 38:10
69:11

providing
39:16,24

pull 22:3

pulled 73:14

punched 42:13
54:8

Purnell 6:4

purpose 54:4
67:11,23 68:1

put 6:22 20:24
24:1 28:2 29:13
37:23 42:13
43:11,13,19
52:23 54:7,9,13

putting 20:17
24:5 27:17 42:2

**R**

R-I-C-C-I-O
62:4

Rahe 6:19 7:13
91:11

raise 7:15

rank 14:20 40:4
46:1

Ray 33:20

read 11:2 42:19
57:15 76:6
89:19

reading 71:10

readjust 10:3

real 49:3 53:20

reason 74:15,
20 79:8

recall 15:17
16:1 22:17
32:19 34:12
51:19 58:18
63:15 64:1,4,22
72:22

receive 37:17
39:15

received 37:12

recent 57:12

recently 46:8

recognize
66:20 77:11

recognized
77:19

recollection
55:20,25 56:6

recommend
49:20

recommendati
on 49:21

recommendati
ons 49:12,16

recommended
50:13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 105 of 782 PageID #:13363
The Deposition of STEPHEN GAWRISH, taken on October 27, 2021

101

recommending 50:20

record 6:3 7:6 52:5,7,8 62:4 65:8 72:8 82:20,22,23 91:17

records 38:6

recruit 46:9

reduce 25:1,3, 20 28:19

refer 37:8 76:21

referred 70:13

referring 65:9

refers 37:6,9

reflecting 79:3

relevant 31:12

reliable 90:15

rely 28:17

remain 14:4 15:3 60:16 91:18

remained 80:1

remember 14:25 15:5 16:4 17:11,15 18:1 22:6 24:13 30:11 34:4,5, 11,15,17,18 37:16 38:9 39:1 42:25 44:18 45:23 46:17 47:6,9 51:2,11, 15,17,21,22 55:4,23,25 56:9 60:18 61:16 64:14 69:15,18 72:24 78:23 81:9,10,18 84:6 87:22,25 88:5,8

remembered 56:20

remote 8:16

remotely 6:18

remove 20:23

removed 54:25

removing 20:21

repeat 23:1 58:11 90:6

rephrase 9:2 64:18

report 22:24,25 25:2,4,21 26:12,16 27:6, 8,17 28:13,17, 19,25 29:5,7,10 36:19 37:24 38:5 43:5,6,8 46:23 51:1 65:20 66:20,21, 22,23 67:1,9, 12,17,23 68:2, 5,19,20 69:12, 14 70:17,22 71:2 72:7,8,14, 18 74:16,21 75:2,4 76:8,25 77:5 78:6

reporter 6:3,5 7:5,9,14,20 8:18 40:9 52:4, 8 82:20,23 85:14 91:16

reporting 69:9

reports 12:1,8 28:8 35:3 41:5 43:1,12 44:5,19 56:6,11,16,21 57:12 62:18 70:8,12,13 71:18 72:11 73:10,24 76:1, 20 79:3,7,18 85:21 89:14

represent 6:25

representing 6:17 12:21

required 22:23 23:3 29:2 35:2, 6 54:24

reserve 91:15

respect 39:11 86:10

response 60:16 82:7

responsibilities 13:16 14:13, 15 16:16 17:10 29:19 46:4,20 47:13

responsibility 26:3,21 29:9 42:4,8 74:8

responsible 20:17,21 22:9 29:16 40:4,5 42:2 46:7,14 47:21 48:14 49:11,18 54:9 62:18 64:16 69:3

Rest 76:22

restate 9:2

retired 50:5

reveal 38:24

review 10:18, 21 11:5,8,19 12:2,8 43:18 57:12 70:8 73:24 78:14 79:2 81:17 89:14

reviewed 44:1 49:24 55:17 56:3 66:17 69:14 72:11 76:2

reviewing 56:21 57:5 70:12 73:9 89:24 90:23

Rey 15:14 57:18,19 58:22 59:8,19 60:2, 10,14,21

Reynaldo 6:9 82:6

RFC 65:20 66:5 68:23 69:7

70:21 72:8 75:2 77:6,14

Ricardo 65:5

Riccio 12:7 34:5 62:2,5,8, 10 68:13,15,24 72:3,20 78:11, 15,19 79:4,11, 24,25 86:10,11 90:20

Riccio's 71:2

Rivera 59:15, 16 61:6

Robberies 28:11

Robert 62:13, 20

Rodriguez 65:13

role 13:16 14:24

Roman 55:20 57:9 69:19 72:3 78:16 80:6 81:14 82:4,8 89:18 90:15,25

room 10:13 53:1

Rosendo 65:1, 4,9

routine 36:4

routinely 83:21

Rule 51:9

rules 8:14 39:25

run 8:15 28:23, 25

**S**

S-T-E-P-H-E-N 7:8

Santa 32:22

Schuler 17:5

screen 66:1 75:4 78:9

scroll 66:13 70:21 77:4

search 46:8

secret 38:3

secrets 32:8

section 16:22 69:6,8

sense 51:7 56:4

sentence 69:7

separate 38:5 44:19 56:1,3

separated 88:18,19

sergeant 15:1 19:19,20,21,23 40:14 44:2,5,24 45:7,9,17,19 46:1,5,6 47:8, 15,20 49:10 55:2 62:16

sergeants 40:15 53:5

setting 81:6

sexual 28:11

share 31:25

shared 21:6 31:21 66:10

sharing 78:9

sheet 53:25 54:5,10,13

shelves 53:12

shift 58:13,18 78:21 83:24 84:1,7,16

shifts 58:16

Shockton 75:22

short 82:13

shoulder 65:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**show** 19:24 22:14 25:9,10 65:18 66:1 72:6 74:24 79:7 87:20

**showed** 27:15

**showing** 27:13

**side** 14:16 17:23

**sign** 43:23

**signature** 43:22

**signed** 44:4

**silent** 60:16

**similar** 44:14

**single** 41:8 83:8

**sir** 7:14,25 69:25

**siren** 87:12

**sister** 59:4

**sit** 79:14,19 81:24 89:11

**sitting** 10:1 63:18

**situation** 31:20

**six-year** 33:24

**smoothly** 8:13

**Snake** 64:6

**so-and-so** 38:20

**socialize** 59:25 60:7 61:14 62:6,23

**socialized** 61:18

**solemnly** 7:15

**sort** 28:18 30:24 38:9 56:5 86:14

**sounds** 36:23 82:18

**south** 14:11,16

**space** 21:15, 17,20

**Sparks** 16:3

**speak** 8:8,17 58:25

**Special** 14:11, 14,21 15:3

**specialist** 15:8,11,15,24 16:2,6,17,18 17:8 19:16 20:4,10,17,20 21:3 22:20 23:4,12,18 24:10,15 25:19 27:4 28:7 29:1, 14 30:12,17 31:11 32:10,17 33:2,22 34:23 57:19 64:8,19 86:22

**specialists** 19:3,9 32:25 34:7 42:11 64:22

**specialize** 17:4,12 64:23

**specialized** 14:7,9 18:3 29:20 64:9 89:6

**specific** 20:14 27:1 39:8 46:21 48:10 67:22

**specifically** 72:24 88:4

**speculation** 19:12 40:8,12 48:22 55:10 85:12,17 86:17

**spend** 57:4

**spoke** 58:21

**spread** 89:21

**staff** 42:12,17

**stamped** 75:2

**standard** 6:7 52:5,9 82:21,24

86:14 91:17

**Standards** 46:11

**star** 68:10

**start** 8:20 27:13,24

**started** 45:23 63:11 91:1

**starting** 6:15

**state** 6:13 7:6 46:11

**state's** 38:24

**statements** 39:3

**States** 6:10

**stay** 53:15 61:23

**stayed** 45:20

**steady** 84:5

**step** 29:6

**Stephen** 6:8 7:7

**stepping** 69:25

**steps** 43:17 48:19

**Steve** 9:19

**sticker** 51:21

**stop** 44:23 45:11 59:6

**stopped** 63:3 78:9 84:13

**store** 41:7

**stored** 21:1,20 52:16 54:19 87:14 88:4,5

**street** 30:19 31:7,13 41:16 89:2

**stretch** 82:17

**structured** 31:8

**stuff** 32:3

**subject** 46:17 51:13

**subjects** 67:3, 14

**submit** 42:21 43:1

**subs** 12:5

**suburban** 46:10

**suggest** 36:7

**summarize** 67:24

**summary** 60:6

**supervise** 13:19

**supervising** 14:24

**supervisor** 14:23 29:2,8 42:22 43:2,5, 18,23 44:1,4 84:9

**supervisor's** 43:22

**supervisory** 47:22

**supplementary** 10:22 12:1 24:2,6 25:2,4, 21 26:12,16 27:6,8 28:8,13, 17 66:21,22 76:20,25

**supported** 74:10

**Suppose** 70:11

**surgery** 9:17

**suspected** 19:7

**swear** 7:16

**system** 31:4 42:16

**T**

**T-W-O** 16:25

**taking** 6:23 8:19 9:12 10:8, 10 22:10 49:5 70:7,12

**talk** 57:8 59:12 63:21,23 86:22

**talked** 13:6 38:20 42:9 60:10,14 61:20 62:7 63:15

**talking** 25:7,25 36:22 37:22 43:10 60:20 70:16,18 83:11, 13 87:4

**taught** 46:9,10

**team** 13:17,19 47:15,17,20 48:2,6,10 49:2 84:3

**teams** 48:7,9

**technician** 6:4

**technology** 9:1

**telephone** 7:4

**telling** 27:10 36:14

**term** 30:24 37:5

**terms** 67:17

**territory** 64:12

**testified** 55:17 71:6 78:10

**testify** 57:11 81:21

**testimony** 7:16 11:10,12, 18 61:4,5

**Texas** 59:3

**that'd** 52:2

**thefts** 28:11



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 107 of 782 PageID #:13365
The Deposition of STEPHEN GAWRISZ, taken on October 27, 2021

103

51:10

**thing** 9:9 54:13 56:19 86:9

**things** 8:13 14:18 16:23 32:6 35:9 42:9 48:25 49:5 56:12 76:8 79:22 83:22

**three-and-a-half** 50:2

**time** 6:6,7 9:6 10:2 12:14 13:23 15:17 18:25 21:3,11 22:23 25:11 35:14 38:23 41:19 50:3,8, 11,17,23 52:3, 5,6,9,13 53:8 54:13 58:2,4,21 59:6,14 60:24 61:20 62:1,7,9, 25 63:8,10,15 64:21 68:15 75:8,14 79:20 82:21,24 83:5, 9,16,23 84:12 86:3 88:12 91:5,17,18

**times** 8:10,11 12:13 22:17 83:3,18 86:2

**today** 6:5 10:2 66:18 72:12 79:14,19 81:24 89:11,16 90:23

**togethers** 63:9

**told** 73:6 84:9

**Tony** 34:4 62:2, 5,8 86:10

**top** 53:25 76:9

**total** 15:11 51:17 57:4

**touch** 60:11 61:23 62:10

**track** 50:19 54:6

**training** 34:8, 13,16,19,20 37:12,17 45:21, 24 46:2,5,14,18 47:3,6,11

**transcripts** 11:5,8,19

**transferred** 53:20

**transitioned** 34:22

**trial** 11:16 59:17 61:6

**tricky** 31:18

**true** 43:12 79:11

**trusting** 74:13

**truth** 7:17,18 79:9

**turn** 34:4

**turned** 32:18

**Tylenol** 9:23 10:8

**type** 22:24 66:22 67:16 69:17

**typed** 28:19 37:24 43:1,5,8 44:4 69:16

**types** 16:23 48:12 51:8 76:19

**typical** 73:24

___

**U**

**understand** 8:24 31:17 37:2 43:16 46:13 67:19

**understanding** 35:6,8 37:5 54:3 55:6 76:8, 19 86:15

**understood** 9:3

**unit** 14:7,9,12, 16 40:15 46:7 49:6,7 51:5 86:25

**United** 6:10

**units** 25:16

**Unknowns** 17:6 89:7

**unusual** 14:18

**usual** 70:8

___

**V**

**vague** 20:2 23:7 48:21 85:13,17 86:17

**verified** 76:14, 20,24

**versus** 6:9

**Vicente** 80:11, 16 81:8,11,14, 19

**victim's** 56:19

**Victor** 65:5

**video** 6:4

**videoconference** 6:7

**view** 90:4,9,10

**violations** 51:9

**violent** 18:15, 21 19:4,6,7,14 25:24 26:1 27:3 40:15 85:8

**visit** 59:6

**volume** 53:9

___

**W**

**waiting** 91:7

**walking** 63:17

**wanted** 59:5 67:3 70:14

**watch** 84:2,4, 14,15

**ways** 24:7

**week** 12:17 83:8

**well-known** 25:12

**Western** 21:5, 16 88:11

**where'd** 15:7 45:4

**Wicker** 17:25

**withholding** 32:3

**witnesses** 18:18 22:1,15 27:10 71:21 90:3

**wondering** 27:6

**words** 39:22 74:12 76:13,20 80:9

**work** 13:11,12 18:21 19:1,3,17 30:12 32:10,13 33:25 36:4 37:23 40:23 56:22 58:13 59:20,24 60:7, 8,17 61:8,12, 15,18 62:5 74:13 78:2,4 80:3 84:5,10 86:21

**work-related** 30:9

**worked** 16:7,9, 13 19:8,16 32:16,20,22 33:6,21 42:24 44:13 46:19 58:18 62:21 84:2,20 86:10

**working** 19:10 23:11 24:11 31:11,15 32:3,8 37:12,18 38:17 44:23 45:12,23 49:10 52:14,25 59:20 70:2

78:20 84:1,25 85:8 86:3,4

**worries** 90:13

**would've** 86:6

**wrap** 82:12

**write** 24:11 35:18 36:18 38:7

**writing** 46:23

**written** 29:15, 23 55:3 56:1,18 68:9 77:5 78:5

**wrong** 36:23 77:3

**wrote** 29:10 41:22 42:1 70:16

___

**Y**

**year** 14:7 15:9, 21 45:23 47:6 58:24 63:8

**years** 15:6 33:13 45:17,21 47:5 49:25 50:6 58:16 63:1 83:12

**Youth** 21:14

___

**Z**

**Zibolski** 7:2,3 91:13

**zoom** 6:20,23 66:13 67:4



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 23

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 1:19-CV-6508

## GERALDO IGLESIAS

## V.

## REYNALDO GUEVARA, ET AL.

## DEPONENT:

## ANTHONY RICCIO

## DATE:

## May 18, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3               EASTERN DIVISION

4             CASE NO. 1:19-CV-6508

5          HON. FRANKLIN U. VALDERRAMA,

6              DISTRICT JUDGE

7           HON. MARIA VALDEZ,

8            MAGISTRATE JUDGE

9

10           GERALDO IGLESIAS,

11               Plaintiff

12

13                V.

14

15         REYNALDO GUEVARA, ET AL.,

16             Defendants

17

18

19

20

21

22

23 DEPONENT: ANTHONY RICCIO

24 DATE:      MAY 18, 2022

25 REPORTER: SYDNEY LITTLE



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS:

 4   Anand Swaminathan, Esquire

 5   Rachel Brady, Esquire

 6   Isabella Aguilar, Esquire

 7   Loevy & Loevy

 8   311 North Aberdeen Street

 9   Third Floor

10   Chicago, Illinois 60607

11   Telephone No.: (312) 243-5900

12   E-mail: anand@loevy.com

13           brady@loevy.com

14           aguilar@loevy.com

15   (Appeared via videoconference)

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, ANTHONY RICCIO, ROBERT

 4   BIEBEL, ERNEST HALVORSEN, STEVE GAWRYS:

 5   Dave Brueggen, Esquire

 6   The Sotos Law Firm, P.C.

 7   141 West Jackson Boulevard

 8   Suite 1240A

 9   Chicago, Illinois 60604

10   Telephone No.: (630) 735-3300

11   E-mail: dbrueggen@jsotoslaw.com

12   (Appeared via videoconference)

13

14   ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

15   Megan McGrath, Esquire

16   Leinenweber Baroni & Daffada LLC

17   120 North LaSalle Street

18   Suite 2000

19   Chicago, Illinois 60602

20   Telephone No.: (866) 786-3705

21   E-mail: mkm@ilesq.com

22   (Appeared via videoconference)

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

 4   Eileen Rosen, Esquire

 5   Rock Fusco & Connelly, LLC

 6   321 North Clark Street

 7   Chicago, Illinois 60654

 8   Telephone No.: (312) 494-1000

 9   E-mail: erosen@rfclaw.com

10   (Appeared via videoconference)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          INDEX
 2                                              Page
 3    PROCEEDINGS                                  7
 4    DIRECT EXAMINATION BY MR. SWAMINATHAN        9
 5    CROSS EXAMINATION BY MS. ROSEN             343
 6
 7                        EXHIBITS
 8    Exhibit                                    Page
 9    1 - Chicago Police Department Supplementary  190
10          Report June 24, 1993
11          RFC IGLESIAS 90-93
12    2 - Chicago Police Department Supplementary  243
13          Report June 23, 1993
14          RFC IGLESIAS 97-98
15    3 - Chicago Police Department Supplementary  246
16           Report June, 23, 1993
17           RFC IGLESIAS 94-96
18    4 - Chicago Police Department Supplementary  251
19          Report June, 14, 1993
20          RFC SERR/MONT 68-72
21    5 - GPR'S RFC IGLESIAS 59-77               269
22    6 - RFC IGLESIAS 7                         272
23    7 - RFC IGLESIAS 5                         273
24    8 - Anthony Riccio Incident Report/        316
25          Investigation RFC IGLESIAS 1442-1567
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          STIPULATION

 2

 3   The VIDEO deposition of ANTHONY RICCIO was taken at

 4   KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND

 5   FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in

 6   which all participants attended remotely, on WEDNESDAY

 7   the 18th day of MAY 2022 at 10:01 a.m.; said deposition

 8   was taken pursuant to the FEDERAL Rules of Civil

 9   Procedure. The oath in this matter was sworn remotely

10   pursuant to FRCP 30.

11

12   It is agreed that SYDNEY LITTLE, being a Notary Public

13   and Court Reporter for the State of ILLINOIS, may swear

14   the witness and that the reading and signing of the

15   completed transcript by the witness is not waived.

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                PROCEEDINGS

 2

 3      COURT REPORTER:  On record.  My name is Sydney

 4  Little.  I'm the online video technician and court

 5  reporter today representing Kentuckiana Court

 6  Reporters, located at 730 West Main Street, Suite

 7  101, Louisville, Kentucky 40202 [sic].  Today is the

 8  17th [sic] day of May 2022.  The time is 10:02 a.m.

 9  We are convened by videoconference to take the

10  deposition of Anthony Riccio in the matter of

11  Geraldo Iglesias versus Reynaldo Guevara, et al.

12  pending in the United States District Court for the

13  Northern District of Illinois, Eastern Division,

14  case number 1:19-CV-6508.  Will everyone but the

15  witness please state your appearance, how you're

16  attending, and the location you are attending from

17  starting with plaintiff's counsel?

18      MR. SWAMINATHAN:  Anand Swaminathan for

19  plaintiff, Geraldo Iglesias, appearing by Zoom from

20  Chicago.

21      MS. ROSEN:  Eileen Rosen on behalf of

22  defendant, City of Chicago, appearing by Zoom in

23  Chicago.

24      MR. BRUEGGEN:  Dave Brueggen on behalf of the

25  witness, Defendant Riccio, also representing
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 117 of 782 PageID #:13375
The Deposition of ANTHONY RICCIO, taken on May 18, 2022

8

1    Defendant Gawrys, Biebel, and Halvorsen, both
2    appearing from Chicago.
3         MS. MCGRATH:  Good morning.  Megan McGrath,
4    appearing for Defendant Guevara, appearing from
5    Chicago.
6         COURT REPORTER:  All right, thank you.
7    Mr. Riccio, will you please state your name for the
8    record?
9         THE WITNESS:  Anthony Riccio.  And if I could
10   just clarify something.  You said today was
11   May 17th.  It's May 18th.
12        COURT REPORTER:  Oh, excuse me.  Sorry.  Thank
13   you.
14        THE WITNESS:  No problem.
15        COURT REPORTER:  Do all parties stipulate that
16   the witness is, in fact, Anthony Riccio?
17        MR. SWAMINATHAN:  So stipulated from the
18   plaintiff.
19        MS. MCGRATH:  So stipulated.
20        COURT REPORTER:  Thank you.  Mr. Riccio, will
21   you please raise your right hand?  Do you solemnly
22   swear or affirm that the testimony you are about to
23   give will be the truth, the whole truth, and nothing
24   but the truth?
25        THE WITNESS:  I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              COURT REPORTER:  Thank you.  Counsel, you may
 2       begin.
 3              MR. SWAMINATHAN:  Thank you.
 4                    DIRECT EXAMINATION
 5    BY MR. SWAMINATHAN:
 6       Q     Mr. Riccio, please state and spell your name
 7    for the record.
 8       A     Anthony Riccio, R-I-C-C-I-O.
 9       Q     And did you pronounce that Riccio with a --
10       A     Yes, I do.
11       Q     Okay.  All right.  I'll -- I will try to do
12    that.  And I have referred to you as Mr. Riccio, and I
13    hope that is acceptable to you.  I know you've had a
14    distinguished career in the Chicago Police Department,
15    but some of your prior titles are a little wordy for my
16    -- for purposes of the deposition.  So --
17       A     Absolutely.
18       Q     -- is it perfectly respectful to you if I call
19    you Mr. Riccio?
20       A     Absolutely.  Thank you.
21       Q     Okay.  All right.  Thank you.  Okay.
22    Mr. Riccio, can you tell me if you've ever been
23    previously deposed?
24       A     I have been, yes.
25       Q     How many times have you been deposed, sir?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Difficult to say.  I -- I could ballpark it at
 2  maybe a dozen.  It's -- it's hard to say over the course
 3  of, you know, a 35-year career.  Maybe a dozen or so.  I
 4  -- it's difficult to say.
 5      Q    Understood.  Have you -- have -- has every
 6  time you have been deposed been in the context of your
 7  work as a police officer?
 8      A    To the best of my recollection, yes.
 9      Q    Do you recall any instances when you were --
10  when you were deposed with regard to a personal matter
11  unrelated to your work as a police officer?
12      A    No, not that I can recall.
13      Q    Okay.  Have you ever been sued in your
14  personal capacity unrelated to your work as a Chicago
15  police officer?
16      A    No.  I have not.
17      Q    Have you ever sued anyone unrelated to your
18  work as a Chicago police officer?
19      A    No.  Nothing that I could think of.  I mean,
20  maybe a traffic accident or something with the
21  insurance, but I -- I don't think anything has --
22  nothing's ever gone to court or been deposed or
23  anything.  But other than that, no.
24      Q    Okay.  Other than something like a traffic
25  accident, you can't recall any instances in which you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    had a personal lawsuit unrelated to your police work,
 2    correct?
 3         A    That's correct.
 4         Q    Okay.  The times that you -- the approximately
 5    dozen times that you have been deposed, when is the last
 6    time you've had such a deposition?
 7         A    Probably like several months ago.
 8         Q    What was the matter on which you were deposed?
 9         A    It's a lawsuit from current and former police
10    department employees.  I was -- I was deposed as a
11    witness and -- I think it's -- it's regarding the
12    demotion or failure to promote, something of that
13    nature.  An internal thing within the police department.
14    I was deposed as a witness.
15         Q    And were you ever deposed in a case based on
16    your work as a homicide detective?
17         A    I -- I -- I couldn't say yes or no.  I have to
18    say I don't recall.
19         Q    Okay.  Have you ever been deposed during the
20    course of your police career as a defendant in a
21    lawsuit?
22         A    Yes.
23         Q    Okay.  How many times have you been deposed as
24    a defendant in a lawsuit?
25         A    I -- I don't recall the number.  I would say a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  small number, maybe two to three.  I -- I really don't
2  recall.
3       Q    Thank you.  And you understand that today
4  you're being deposed as a defendant in this lawsuit,
5  correct, sir?
6       A    Yes, I do.
7       Q    Okay.  So other than this instance, it's your
8  recollection that approximately two to three times
9  you've been previously deposed as a defendant in a
10  lawsuit based on your police work, correct?
11      A    Yes, that's correct.
12      Q    Okay.  And tell me, in any of those prior
13  instances when you were a defendant in a lawsuit based
14  on your police work, was there ever a judgment entered
15  against you?
16      A    I don't recall.  A lot of times you don't get
17  the outcome of them.  The cases are settled or disposed
18  of, and you don't really know.  So I would have to say I
19  don't know would be probably the best answer I can give
20  you on that.
21      Q    Are you aware of any instances when you were
22  previously a defendant in which the case settled by a
23  monetary payment?
24      A    I -- I -- I don't know.  Perhaps.  But again,
25  I don't know, because a lot of times that information is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    never provided back to the officer.

2        Q    Okay.  With regard to those two to three prior

3    instances in which you've been deposed where you were a

4    defendant in a lawsuit, tell me what you remember about

5    any of those lawsuits against you.

6        A    I -- I really don't have a recollection of

7    what the facts were.  And again, they were probably

8    quite old.  I really don't recall what the facts of

9    those were.  I'm sorry.

10       Q    Okay.  Were any of those prior lawsuits

11   related to your work as a detective?

12       A    Again, I -- I don't recall.  That was such a

13   long time ago.  Off the top of my head, I would say no.

14   But I -- I -- I don't want to be held to that because,

15   again, it was such a long time ago.

16       Q    Understood.  Any of those prior instances in

17   relate -- strike that.  Any of those prior two to three

18   instances when you were deposed in cases where you were

19   a defendant, were they cases that emanated from your

20   work as a gang crimes officer?

21       A    Again, I -- it -- I -- I can't say with

22   certainties.  I would just have to say I don't recall.

23       Q    Okay.  All right.  How many times have you

24   been -- strike that.  Have you testified in court -- in

25   court on numerous occasions?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Yes, I have.

 2      Q    As a sworn police officer?

 3      A    Yes.  Correct.

 4      Q    Okay.  Would you say you've testified in court

 5 hundreds of times?

 6      A    Yeah.  I mean, hundreds might be -- might be

 7 excessive, but often -- a lot.

 8      Q    Okay.  Would you say that it's probably been

 9 over 100 times that you've testified in court under

10 oath?

11      A    I would say it's probably about 100 times.

12 Maybe in that vicinity.

13      Q    Okay.  All right.  And you understand you're

14 under oath today, correct?

15      A    Correct.

16      Q    Okay.  And you understand what that means,

17 correct?

18      A    Yes.

19      Q    Okay.  All right.  Let me just go through the

20 ground rules.  I suspect you know them, but I will say

21 them again here today.  This is basically a question-

22 and-answer session.  I'll ask my questions, you'll

23 answer them to the best of your ability, and there'll be

24 a court reporter taking that down.  So first important

25 rule is we have to -- I need to hear verbal answers. Yes
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    or no, not nods of the heads or uh-huh because the court
 2    reporter can't take that down, okay?
 3         A    Got it.
 4         Q    Okay.  Next important rule is for the court
 5    reporter, we can't be talking at the same time, so
 6    please make sure I finish my question before you answer,
 7    okay?
 8         A    Got it.
 9         Q    There will be times in the deposition where
10    you will surely know where my question is going and
11    where it's going to end, but please try to make sure I
12    finish my question before you answer, okay?
13         A    Got it.
14         Q    Similarly, if I have started to ask you my
15    next question because I thought you were done answering
16    and you had more to say, please let me know and I'll let
17    you finish your answer, okay?
18         A    Got it.
19         Q    Okay.  You and I both talk fast, and so the
20    court reporter may at times tell us to slow down, but
21    barring that, just be aware that she is trying her best
22    to take it all down so we should try to help her do
23    that, okay?
24         A    Understood.
25         Q    If I ask you a question and you don't
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Anthony Ritchie, taken on May 25, 2021

1    understand my question, please let me know and I will

2    rephrase it, okay?

3        A    Okay.

4        Q    And if you answer my question, I'll assume you

5    understood my question, also fair?

6        A    Fair.

7        Q    Okay.  If you need to take a break at any

8    point, we can do that.  We just need to answer any

9    pending question before we take a break, okay?

10       A    Good.

11       Q    All right.  A couple of yes or no questions

12   that -- so I'm not asking you to get into details.  Just

13   answer these yes or no to the extent you can, okay?

14   First question.  Are you taking any medications that

15   would prevent you from being able to understand my

16   questions and answer them today?

17       A    No, I'm not.

18       Q    Do you suffer from any medical conditions that

19   would prevent you from being able to understand my

20   questions and answer them today?

21       A    No, I don't.

22       Q    Is there any reason you believe that you're

23   not in the position today to be able to understand my

24   questions and answer them truthfully?

25       A    No, I am not.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  All right.  Sir, do you speak Spanish?

2      A      No, I don't.

3      Q      At any point during the time you were a

4 Chicago police officer have you been a Spanish speaker?

5      A      No, I have not.

6      Q      When speaking with or interviewing witnesses

7 who speak Spanish, have you ever been able to conduct

8 those interviews yourself, or have you always required a

9 translator?

10     A      I would've always required a translator.

11     Q      And during the course of your career, I assume

12 there have been instances when you have interviewed

13 Spanish speakers?

14     A      There -- more than likely there was, yes.  I

15 don't recall specifically, but yes.

16     Q      In general, that has occurred during the

17 course of your time as an investigator, fair?

18     A      Most likely, yes.

19     Q      And in those instances, would you typically

20 use other Chicago police officers who were Spanish

21 speakers as a translator?

22     A      Sometimes, yes.  There were translators

23 available through the department as well.  Sometimes you

24 would use a citizen.  You would use whatever was

25 expedient.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q    Okay.  But in none of those instances did you
 2   try to speak Spanish or interpret for yourself; is that
 3   fair?
 4        A    No.  That's fair.  Yes.
 5        Q    Okay.  All right.  Officer -- sir, could you
 6   tell me what you did to prepare for today's deposition?
 7        A    I talked with my attorneys and reviewed some
 8   of the pertinent reports.
 9        Q    Anything else?
10        A    No.  That was all.
11        Q    How many meetings did you have with your
12   attorneys?
13        A    Two.
14        Q    When was the first of those meetings?
15        A    The first was Monday the 16th of May.
16        Q    And when was the second of those meetings?
17        A    Tuesday the 17th of May.
18        Q    Okay.  Who was present for your meeting on
19   Monday, May 16th?
20        A    Myself and my two attorneys.
21        Q    And when you say your two attorneys, who are
22   you referring to?
23        A    Josh and Dave.
24        Q    Josh is Josh Engquist?
25        A    Yes, it is.  Yes, it is.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And -- and Dave is Dave Brueggen?

2    A    Yes.  Correct.

3    Q    Anyone else for that meeting on May 16th?

4    A    The same.  Myself and my two attorneys.

5    Q    Sorry, let me ask it again.  I think you might

6    have misunderstood me.  At that first meeting on

7    May 16th, was anyone present other than yourself and

8    Mr. Brueggen and Mr. Engquist?

9    A    Oh.  No.  No, no one else was present.

10   Q    Okay.  Did anybody else participate by phone?

11   A    No.

12   Q    Okay.  For your meeting on Tuesday the 17th,

13   who was present at that meeting?

14   A    Myself, my two attorneys, and, for a time,

15   Eileen Rosen was also present.

16   Q    Okay.  So on Tuesday the 17th, the attorneys

17   present were Mr. Engquist, Mr. Brueggen, and Ms. Rosen,

18   correct?

19   A    That's correct.

20   Q    Okay.  How long was your meeting on Monday the

21   16th?

22   A    God, I don't -- I don't recall.  Maybe like

23   three hours.

24   Q    Okay.  And how long was your meeting on

25   Tuesday the 17th?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    A little bit longer.  Maybe four hours.  I'm

 2  just -- I'm just guessing on both of these.  Ball

 3  parking it.

 4      Q    Okay.  And other than those two meetings, did

 5  you have any prior meetings with counsel in preparation

 6  for any earlier scheduled deposition in this case?

 7      A    We had talked about scheduling.  No specifics

 8  about the case.  But those were the only two meetings

 9  where we talked and discussed the case and prepared for

10  the deposition.

11      Q    Okay.  Did you do any work independently to

12  prepare for today's deposition in terms of reviewing

13  documents or anything else outside the presence of

14  counsel?

15      A    No.

16      Q    Did you have any substantive conversations

17  about the deposition with counsel other than in those

18  two meetings on Monday and Tuesday?

19      A    No.

20      Q    Okay.  Did you review documents in your first

21  meeting with counsel on Monday the 16th?

22      A    Yes.

23      Q    What documents did you review?

24      A    Documents from the case file, specifically two

25  lineup sup reports, the arrest report, investigative

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  file inventory.  I want to say that was it.  I don't

2  recall any others.  There may have been a couple others

3  that we talked about, but I think primarily those were

4  the ones.

5      Q     And those documents that you've described so

6  far all -- are all forms of police reports, correct?

7      A     Correct.

8      Q     Okay.  And did you review all of the police

9  reports in the file or select police reports in the

10 file?

11     A     Just select police reports.

12     Q     Okay.  And so, you recall that among the

13 police reports you would've reviewed on Monday were the

14 two lineup supplementary reports, correct?

15     A     Correct.

16     Q     And also the arrest report, correct?

17     A     Correct.

18     Q     And also, did you say the inventory?

19     A     Investigative file inventory, yes.

20     Q     Okay.  Did you also review the cleared closed

21 report?

22     A     No, I did not.

23     Q     Did you also review the initial scene reports?

24     A     No, I did not.

25     Q     Did you review any GPRs?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 A No, I did not.

2 Q **Did you review any photos?**

3 A Yes.  There were two lineup photos that I

4 reviewed.

5 Q **Any other photos you reviewed in that meeting?**

6 A No.  Those were the only two photos.

7 Q **Okay.  Any transcripts or testimony that you**

8 **reviewed?**

9 A No.

10 Q **In your meeting on -- well, strike that.**

11 **Anything else you recall -- any -- strike that.  Any**

12 **other documents you recall reviewing during your first**

13 **meeting on Monday the 16th?**

14 A Not that I can recall, but it was kind of a

15 lengthy meeting.  But to the best of my recollection,

16 those were the only ones.

17 Q **Okay.  And so, to the best of your**

18 **recollection in your meeting on Monday the 16th, the**

19 **only type of documents you reviewed were police reports,**

20 **correct?**

21 A Well, police reports, photos, the

22 investigative file inventory.  I don't know if that's a

23 report, per se.  It's more of a form.  But yeah, that --

24 that was all.  Yes.

25 Q **Okay.  Thank you.  And let me clarify, then.**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   That's a good -- that's a good point.  The only

2   documents you reviewed in your meeting on Monday the

3   16th were documents generated as part of the police

4   investigation, fair?

5        A    That's fair.

6        Q    Okay.  On Tuesday the 17th, did you review any

7   documents other than documents generated as part of the

8   police investigation?

9        A    No, I did not.

10       Q    Okay.  On Tuesday, did you review any

11  additional or new documents other than the documents you

12  reviewed on Monday?

13       A    No.  The same documents.

14       Q    Okay.  So the documents you reviewed on

15  Tuesday -- strike that.  So on Tuesday you did review

16  the same set of documents you reviewed on Monday?

17       A    Yes, to some degree.  We reviewed them again.

18  Yes.

19       Q    Okay.  So at any point during your preparation

20  for this deposition did you review all the documents in

21  the investigative file?

22       A    No.

23       Q    At any point in preparation for this

24  deposition did you review the cleared closed report?

25       A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 133 of 782 PageID #:13391
Jose Lopez 30(b)(6) Anthony Riccio - Vol. II, Page 133, 96:2

24

 1      Q    At any point in preparation for today's

 2  deposition did you review any of the original or initial

 3  scene supplementary reports?

 4      A    No.

 5      Q    And at any point in preparation for today's

 6  deposition did you review any GPRs?

 7      A    No.

 8      Q    In preparation for today's deposition did you

 9  review the complaint that was filed in this case?

10      A    No.

11      Q    In preparation for today's deposition did you

12  review any document requests or interrogatory requests

13  that were submitted to you?

14      A    We did review the interrogatory that you had

15  requested of us.

16      Q    Okay.  And you provided a supplement to that

17  interrogatory, correct?

18      A    That's correct.

19      Q    Okay.  Other than that interrogatory, any

20  other discovery requests that you reviewed in

21  preparation for today?

22      A    No.

23      Q    Have you ever previously -- prior to the

24  reviewing that document at yesterday's deposition -- at

25  yesterday's preparation -- well, strike that.  Prior to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1   reviewing the interrogatory responses in your
2   preparation for today's deposition this week, had you
3   previously ever seen those responses?
4        A    Yes.  When they were initially submitted.
5        Q    Okay.  Had you previously seen any requests
6   for production that were submitted to you?
7        A    I would say no because I don't know what those
8   are.
9        Q    Okay.  Did you ever receive any requests for
10  documents from your counsel?
11           MR. BRUEGGEN:  Object.  I think you're kind of
12       getting into attorney-client privilege.  I think you
13       need to clarify the question, Anand.  You're asking
14       if we asked him for documents?  I think that's --
15           MR. SWAMINATHAN:  No.  I'm asking if he ever
16       received -- okay.  So let me -- yeah, let me clarify
17       and ask it a little differently.
18  BY MR. SWAMINATHAN:
19       Q    In this case, there were a set of requests for
20  production.  Basically a request for the party,
21  yourself, to produce documents.  Did you ever receive or
22  review such a document?
23       A    I was asked if I had any --
24           MR. BRUEGGEN:  And -- and --
25           THE WITNESS:  Sorry.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BRUEGGEN:  Don't -- don't talk about
 2         anything that we talked about.
 3              THE WITNESS:  Okay.
 4              MR. BRUEGGEN:  He's just asking if you saw the
 5         document.  If you --
 6              THE WITNESS:  Okay.
 7              MR. BRUEGGEN:  -- recall seeing --
 8              MR. SWAMINATHAN:  Correct.
 9              MR. BRUEGGEN:  -- the document.
10              MR. SWAMINATHAN:  That's correct.  So let me
11         clarify.
12    BY MR. SWAMINATHAN:
13         Q    Without going to any attorney-client
14    communications.  I don't want to know about any
15    conversations you had with counsel.  I want to know only
16    if the document identified as a request for production
17    or a request for you to produce documents is something
18    you've ever seen?
19         A    I'm going to go with no because I don't recall
20    ever seeing it, so
21         Q    Okay.  Okay.  In your preparation for today's
22    deposition, have you reviewed any transcripts of
23    depositions or trials?
24              MR. BRUEGGEN:  Objection, asked and answered.
25         Go ahead, sir.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     No, I have not.
 2        Q     Have you reviewed any material related to the
 3   post-conviction proceedings that resulted in Mr.
 4   Iglesias' exoneration?
 5        A     No, I have not.
 6        Q     Okay.  And just to sort of clarify, as we move
 7   forward through the deposition, we're obviously going to
 8   be talking today about the homicide case that resulted
 9   in the conviction of Geraldo Iglesias.  When I refer to
10   Mr. Iglesias, you understand that I'm referring to the
11   plaintiff in this case, correct?
12        A     Yes.  Yes, I understand.
13        Q     And you understand that this lawsuit concerns
14   an -- police -- underlying police investigation into the
15   murder of a woman named Monica Roman, correct?
16        A     Yes.  I understand that.
17        Q     Okay.  And so, for purposes of today's
18   deposition, when I refer to the Roman investigation or
19   the Roman homicide investigation, you understand that
20   I'm referring to the underlying homicide investigation
21   that resulted in Mr. Iglesias' conviction, fair?
22        A     Fair.
23        Q     Okay.  And when I -- and when I refer to Mr.
24   Iglesias or I refer to this case, I'm referring to the
25   homicide investigation that resulted in Mr. Iglesias'
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 137 of 782 PageID #:13395
The Deposition of Anthony Ridley, taken on May 18, 2023

28

1  conviction, correct?

2      A    Understood.  Yes, sir.

3      Q    Thank you.  All right.  So with that -- with

4  that sort of clarification, I -- you might have answered

5  the question.  I apologize if I'm asking it again.  Are

6  you aware of any of the evidence or information that

7  resulted in Mr. Iglesias' conviction being vacated?

8          MR. BRUEGGEN:  Object to form.

9      A    No, I am not.

10      Q    Have you reviewed any of the post-conviction

11  documents or court-related materials related to Mr.

12  Iglesias' exoneration?

13          MR. BRUEGGEN:  Objection.  Asked and answered.

14      Go ahead, sir.

15      A    No, I am not aware of anything.

16      Q    Did you testify at the trial of Mr. Iglesias?

17      A    No, I did not.

18      Q    Did you testify any pre-trial proceedings

19  related to Mr. Iglesias' case?

20      A    No.  And let me qualify my last answer.  Not

21  that I recall.  Again, this was 30 years ago.  I don't

22  recall testifying at the trial or pre-trial or -- or

23  anything else.

24      Q    Okay.

25      A    That said, it was 30 years ago.  I don't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   recall.
 2       Q    Okay.  Did -- when you reviewed documents in
 3   preparation for today's deposition related to the
 4   underlying Roman investigation, prior to that, when was
 5   the last time you'd ever seen any underlying documents
 6   related to the Roman investigation?
 7       A    I would say probably back in Area 5 when the
 8   incident occurred.  Again, I don't recall if I was
 9   called to testify at trial.  I don't -- I don't remember
10   being there, so I'll just say I don't recall.  But if,
11   in fact, I was not at the trial, then it would be at
12   Area 5 when the -- when the incident was being
13   investigated.
14       Q    Okay.  So other than back at the time of the
15   underlying investigation -- well, strike that -- between
16   the time of Mr. Iglesias' conviction at minimum, through
17   the time you reviewed the documents in preparation for
18   today's deposition this week, you did not review any of
19   the underlying police reports related to the Roman
20   investigation at all, correct?
21            MR. BRUEGGEN:  Object to form.  Go ahead, sir.
22       A    That's correct.  With one caveat.  My
23   attorneys did provide me with copies of it shortly after
24   I was notified of this lawsuit, so I -- and I don't
25   remember the timeframe on that.  Maybe eight months ago,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    ten -- maybe even longer.  Maybe a couple years ago.

2        Q    Okay.

3        A    Having said that, they gave me a stack of

4    those reports that I perused at the time, and then,

5    quite honestly, put in a drawer and haven't seen since.

6        Q    Okay, thank you.  And that's -- you've

7    anticipated my next question, which --

8        A    Okay.

9        Q    -- was going to be to ask you, once you found

10   out that this lawsuit had been filed -- I assume when

11   you first learned of the lawsuit, you had not at any

12   time recently you reviewed any documents related to the

13   Roman investigation, correct?

14       A    Correct.

15       Q    Okay.  So when you found out that you were a

16   defendant in the Roman -- in this lawsuit related to the

17   Roman investigation, did you have any specific memory of

18   the investigation at that point?

19       A    No, not at all.

20       Q    Okay.  When you -- and so, after you found out

21   that you had been sued, did you then -- (coughs) excuse

22   me, then receive documents related to the underlying

23   investigation?

24       A    I did receive those documents, yes.

25       Q    And are you still in possession of those

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   documents?

 2        A    I still have those documents, yes.

 3        Q    Okay.  And are those documents all documents

 4   generated as part of the police investigation?

 5        A    They are.

 6        Q    Is it the entire investigative file for the

 7   case?

 8             MR. BRUEGGEN:  Object to foundation.  Go ahead,

 9        sir.

10        A    Yeah, I couldn't say with certainty.  I --

11   because I don't know what was in the file.  It's, you

12   know, maybe about an inch-and-a-half thick of reports.

13   And again, to be perfectly honest, I -- I didn't review

14   that -- that pile at all.  But perusing it, I believe

15   that it does contain contents from the investigative

16   file.

17        Q    Okay.  And based on your review of it, did it

18   contain the kinds of documents you typically would see

19   in an investigative file based on your experience?

20        A    Yes, it did.

21        Q    Okay.  And was it essentially a larger

22   collection of materials than what you specifically

23   reviewed in preparation for today's deposition this

24   week?

25        A    Yes, it is.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And so, you spent some time perusing

2  that material when you first received it; is that fair?

3    A    I think that would probably be overstating how

4  -- how much I looked at it.  I was still working at the

5  time.  I was a first deputy.  I remember getting the

6  packet and maybe flipping through pages and, quite

7  honestly, I put it in a drawer until I figured I would

8  need it again.

9    Q    Okay.  How much total time do you spent -- do

10  you think you spent looking at it when you first

11  received that set of materials?

12    A    Less than -- less than five minutes.  Maybe

13  less than -- less than three minutes.  Yeah.

14    Q    Okay.  Once you found out you were a defendant

15  in this lawsuit, other than conversations with counsel

16  -- I want you to put that to this side.  When you found

17  out that you were a defendant in this lawsuit, did you

18  speak to anyone else who was a current or former police

19  officer about that?

20    A    No, not that I can recall.

21    Q    Did you receive a copy of the complaint?

22    A    Yes.

23    Q    Okay.  And you -- and the complaint identified

24  other police officers who were defendants in the

25  lawsuit, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     You know, I didn't read the complaint either.
 2   I discussed it with my attorneys at the time they gave
 3   it to me, but I didn't read the complaint either.
 4        Q     Did you recognize the names of any of the
 5   other defendants in the lawsuit?
 6        A     Probably.  Again, I don't -- I don't recall
 7   reading it.  But yeah, I -- I certainly know the other
 8   defendants.  (phone rings).
 9        Q     Did you -- do you need to take that call?
10        A     No, no, no.  It's probably spam, actually.
11        Q     Okay.  Did you -- after you received -- found
12   out about that lawsuit against you, did you have any
13   conversations with Reynaldo Guevara?
14        A     No.
15        Q     Between the time that you found out about this
16   lawsuit and today, have you had any conversations with
17   Reynaldo Guevara?
18        A     No.
19        Q     When was the last time you've ever spoken to
20   Mr. Guevara?
21        A     Oh, God.  I would say, and I'm ball parking,
22   25 years ago.  20 years ago.
23        Q     Would that have been while in the context of
24   your work as a Chicago police officer?
25        A     Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    And so, would it have been at work, or would

 2   it have been outside of work?

 3        A    No.  It would've definitely been at work if,

 4   in fact, it was 20 years ago.  It may have been longer.

 5   It's -- it's been a very long time.

 6        Q    Was it -- was the last time you spoke with

 7   Detective Guevara while you were a detective or in some

 8   supervisory capacity?

 9        A    It -- well, I was -- I was a sergeant in Area

10   5 after I was a detective in Area 5.  So obviously,

11   Guevara worked in Area 5, so it would've been while I

12   was a sergeant working at Area 5.

13        Q    Okay.  So after you moved on from being a

14   sergeant at Area 5, did you ever have any other

15   communication with Detective Guevara between that time

16   and today?

17        A    I'll say no with a caveat that, you know,

18   possibly a hello and goodbye, but I -- I really don't

19   recall.  I don't -- I don't think that I had any contact

20   with him after I left Area 5.

21        Q    Okay.  Thank you.  And during the time that

22   you worked with Detective Guevara at Area 5, either in

23   your capacity as a detective or as a sergeant, did you

24   ever socialize with Detective Guevara?

25        A    No.  Never.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 144 of 782 PageID #:13402
The Deposition of ANTHONY RICCIO, taken on May 14, 2021

35

1      Q    Did you ever spend time with him outside of

2 work getting drinks or anything like that?

3      A    Never.

4      Q    When you -- did you -- when you found out

5 about this lawsuit, did you have any communications with

6 Ernest Halvorsen?

7      A    No.  I believe Ernest Halvorsen was deceased

8 when I found out about it.

9      Q    Okay.  When you -- when was the last time

10 you'd ever spoken to Ernest Halvorsen?

11      A    Probably when I left Area 5, which would've

12 been in 1998.  I don't recall any contact with him after

13 that as well.

14      Q    Okay.  And that was -- so 1998 is when you

15 left your position as a sergeant in the -- at Area 5,

16 correct?

17      A    That's correct.

18      Q    Okay.  Did you have any -- strike that.  Did

19 you ever socialize with Ernest Halvorsen?

20      A    No.  Never.

21      Q    Did you attend his funeral?

22      A    No, I did not.

23      Q    When is the last time you had any

24 conversations or contact with Steven Gawrys?

25      A    Probably when I left Area 5 as well, in 1998.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I don't recall any contact with him after that unless

2    our paths crossed at work or something.  But again,

3    Steve and I never socialized or had any sort of

4    relationship outside of work.

5        Q    So let me ask the question, just so that I

6    have the question rather than a compound form.  Have you

7    ever socialized outside of work with Steve Gawrys?

8        A    No.

9        Q    Okay.  When's the last time you ever spoke

10   with Bob Biebel?

11       A    I had dinner with Bob Biebel -- there was a

12   group of people who had dinner, and Bob Biebel was one

13   of them.  I would say maybe six months ago, eight months

14   ago.

15       Q    Did you talk about this lawsuit at all?

16       A    No.

17       Q    Did you talk about your Chicago policework at

18   all?

19       A    Yes.

20       Q    At that time, was Mr. Biebel in the Chicago

21   Police Department?

22       A    No.  He had been retired for years.

23       Q    Okay.  Did you talk at all about your work as

24   a homicide detective during that dinner?

25       A    Not that I can recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q      Who else was present?

2        A      There was a group of people -- I know a guy

3    named Bob Myers was present.  Tony Wojcik was present.

4    There were a couple guys there.  I -- I don't even know

5    -- I don't even remember their names.  A guy named

6    George McMurray was present.  I think it was McMurray.

7        Q      Was it John McMurray or George McMurray?

8        A      Oh, maybe it was John McMurray.  John

9    McMurray.  Yeah.

10       Q      And what was the reason that that particular

11   group of people were getting together for dinner

12   approximately?

13       A      Oh, just because we had all been -- we had all

14   been coworkers at one point in time or another in our

15   career and some, you know, associations.  We hadn't seen

16   each other for a long time, so one of the guys kind of

17   set up a dinner for everybody to just meet up and catch

18   up and chit-chat.

19       Q      Who set up the dinner?

20       A      I think it was Bob Myers set it up.

21       Q      And was it -- was the commonality all people

22   who had previously worked as detectives, or was it some

23   other commonality?

24              MR. BRUEGGEN:  Object to foundation.  Go ahead,

25       sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A    Yeah.  Chicago police officers.  I don't -- I

2    don't think everybody there had been a detective.

3    Q    Okay.  Did you talk to Tony Wojcik during that

4    dinner?

5    A    Yes.

6    Q    And what did you and Tony Wojcik discuss?

7    A    Oh, I -- war stories, family.  I don't -- I

8    don't remember anything with certainty, but that was

9    kind of the -- the vibe of the night.  Just, you know,

10   rehashing war stories and how good things were and how

11   bad things are.  Just chit-chat, small talk, family

12   stuff.

13   Q    What do you mean by how good things were and

14   how bad things are now?

15   A    Well, just the state of the police department.

16   And, you know, one thing police like to do when they get

17   together is talk about how good things used to be and

18   how bad things turned out.  So that was it.  Just --

19   just chit-chatting and, you know, how things have

20   changed on the police department and how bosses have

21   changed.  Small talk.

22   Q    Any conversation with Mr. Wojcik about any

23   past homicide cases?

24   A    No.

25   Q    Any conversation with Mr. Wojcik about any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 148 of 782 PageID #:13406
The Deposition of ANTHONY RICCIO, taken on May 14, 2021

39

```
 1   lawsuits?

 2        A    No.

 3        Q    Any conversation with Mr. Biebel about any

 4   lawsuits?

 5        A    No.

 6        Q    Any conversation with Mr. Biebel about any

 7   past homicide cases?

 8        A    No, not that I can recall.

 9        Q    During the course of that dinner, did Rey

10   Guevara's name come up at all?

11        A    Not that I can recall.

12        Q    Okay.  When you were at that dinner, were you

13   aware that Mr. Biebel had also been sued as a defendant

14   in this lawsuit?

15        A    I may have been.  I don't want to say for

16   sure.  I may have been aware of it.  I don't recall.

17        Q    Was that fact mentioned at all in your

18   conversations with Mr. Biebel that evening?

19        A    No.  We didn't -- we didn't discuss that at

20   all.

21        Q    Have you had any meetings with Mr. Biebel in

22   prep -- during the course of this lawsuit and -- well

23   strike that.  Have you -- have you had any meetings with

24   counsel in which other defendants in this lawsuit were

25   present?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 149 of 782 PageID #:13407
The Deposition of ANTHONY RICCIO, taken on May 14, 2021

40

 1      A     No.

 2      Q     Okay.  When is the last time you spoke with Ed

 3 Mingey?

 4      A     Probably when Ed Mingey retired, which I think

 5 was before I left Area 5.  So I don't recall

 6 specifically.  It wasn't after 1998 when I left, but I

 7 just don't remember the timing of when he retired.  But

 8 after I left Area 5, I hadn't seen or talked to Ed

 9 Mingey at all.

10      Q     Have you ever socialized with Ed Mingey?

11      A     No.

12      Q     During the time that you were a sergeant

13 overseeing homicide detectives, was he also in that same

14 role?

15      A     Well --

16           MR. BRUEGGEN:  Object to form.  Misstates his

17      testimony.  Go ahead, sir.

18      A     Just for clarification, when I was a sergeant,

19 I was a robbery sergeant.  I didn't oversee homicide

20 investigations.  Ed Mingey was a homicide sergeant.  I

21 don't remember if we were sergeants there at the same

22 time.  That's -- that -- my memory's not clear on that

23 if he had retired prior to me coming back as a sergeant.

24      Q     Very good.  So let's actually take this as a

25 chance to walk through your background.  And we'll go

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   through it quickly because I know there's a long --
2   there's a long history there.  Let me -- before I do
3   that, let me just ask you quickly.  What are you doing
4   currently, sir?
5        A    Currently I work for Monterrey Security in a
6   consultant-type position.
7        Q    What is Monterrey Security?
8        A    It's a private security company located in
9   Chicago.
10       Q    And is that -- what kind of security do they
11  provide?  Is it sort of for distin -- for, you know,
12  dignitaries?  Is it sort of for the bank at the end of
13  the street?  Give me a sense of kind of work it is.
14       A    It's pretty broad.  I mean they do -- they do
15  bank security, they do a lot of events security, Bears
16  games, Chicago Fire games, concerts.  They have security
17  on CTA, so it's kind of wide-ranging.
18       Q    Okay.  And you receive income from that
19  position as a consultant for Monterrey Security?
20       A    I'm sorry, can you repeat that?
21       Q    Sorry.  Do you receive income from Monterrey
22  Security in that --
23       A    Oh, yep.  Yes, I do.
24       Q    Okay.  And do you receive a police pension?
25       A    Yes, I do.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q    Do you have any other sources of income?

2       A    No, I do not.

3       MR. SWAMINATHAN:  Okay.  I was going to ask you

4   a little bit more about your assets and net worth

5   related to punitive damages.  But Dave, I think we

6   have the agreement in place in this case about

7   punitive damages?  Correct me if I'm wrong.

8       MR. BRUEGGEN:  Yes.  We're going to kick that

9   can down the road until after summary judgment and

10  then we'll revisit it at that time.

11  BY MR. SWAMINATHAN:

12      Q    Okay.  Got it.  Okay.  All right.  So we will

13  move on from that topic.  Mr. Riccio, let's just walk

14  through your police career.  I have a general sense of

15  it, but it's helpful for me to have you sort of walk me

16  through as best you can.  And I think maybe the most

17  efficient way to do it is to have you just sort of

18  start, you know, with your entry into the Chicago Police

19  Department, the first position you held, and sort of

20  just walk me through your positions.  And this will be

21  the rare instance where I may cut you off at a moment

22  here or there, just to make sure -- to clarify that I've

23  understood sort of what you said, and sort of have you

24  continue.  But let's just walk through it so I've got a

25  sense, okay?  Thank you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Okay.  So I'll go kind of broad.  If you want

 2 specifics, let me know.

 3      Q    **Thank you.**

 4      A    I'm not sure about the dates exactly because

 5 there's a lot, but I'll give you the best I can.  I was

 6 hired in August of 1986, and I was a patrol officer for

 7 four years until 1990.  In 1990, I was promoted to

 8 detective, and I was a detective until 1994 when I was

 9 promoted to sergeant.  And I remained a sergeant until

10 1998 when I was promoted to lieutenant.  I was a

11 lieutenant from '98 to 2008.  In 2008, I was promoted to

12 commander.  I was a commander until 2013.  In 2013, I

13 was promoted to deputy chief, in 2015, I was promoted to

14 chief, and in 2017, I was promoted to first deputy

15 superintendent.

16      **Q    Okay.  And then you -- and when did you**

17 **retire?**

18      A    I retired in August of 2020.

19      **Q    Okay.  And I think, correct me if I'm wrong,**

20 **you had previously intended to retire earlier than**

21 **August of 2020 and then stayed on; is that right?**

22      A    Just a few months earlier, and then I was

23 requested to remain on through most of the summer, which

24 I did.

25      **Q    Okay.  And then, when did you take up the**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   position with Monterrey Security?

 2       A    I want to say January of '21.

 3       Q    Did you have any other jobs that you had held

 4   during the time that you were a Chicago Police Officer

 5   until your retirement in August 2020?

 6       A    Occasionally like as a patrolman, I would work

 7   a security job here or there at a venue, but nothing --

 8   nothing steady or -- or anything like that.

 9       Q    All right.  So you were a patrol officer from

10   1986 to 1990 when you were promoted to detective.  During

11   that period of time, did you ever work out of Gang

12   Crimes North?

13       A    Yes I did.

14       Q    And what was the period of time you worked out

15   of Gang Crimes North?

16       A    Again, I'm like really fuzzy on these years.

17   So I would say probably around '80 -- 1988 to the time I

18   was promoted in 1990.  But again, I'm just ballparking

19   these dates.  I'm not sure about them.

20       Q    And at that time, was your title gang crimes

21   specialist or gang crimes officer?  What was it?

22       A    Gang crimes officer.  I was on the -- what

23   they call the tactical side of the house.

24       Q    Okay.  And just -- what was the distinction

25   between this -- I know that there are these two
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  different concepts, right?  Gang crimes officer and gang

2  crimes specialist, correct?

3       A    Right, right.

4       Q    In that time period.  So what was the

5  difference or distinction in terms of what they did or

6  did not do?

7       A    Well, there was a couple.  For one thing, gang

8  crime specialists received a higher rate of pay.  They

9  were considered more investigators, investigative.  That

10  was not me.  I was on the tactical side of the house,

11  which is you basically supplemented district manpower

12  going to areas where there was a lot of gang conflicts

13  and you did enforcement.  So you were arresting gang

14  members involved in, you know, criminal activity,

15  on-view things.  They -- they wanted us to run name

16  checks for warrants and check cars for guns and things

17  like that.  So we were -- they called us the tactical

18  side of the house.  The specialists were more

19  investigators. They didn't -- they did a lot of

20  investigating and they had knowledge of the nicknames of

21  gang members and things like that.

22       Q    Okay.  So the gang -- because you were never a

23  gang crime specialist?

24       A    That's correct.  I was never that.

25       Q    Got it.  But they were also working out of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Gang Crimes North just as the gang crimes officers were?

2      A    Yeah.  We had the same office.  We had --

3  reported to the same location, but then we split.

4      Q    Okay.

5      A    But they didn't attend our roll calls.  They

6  -- they really did their own thing.

7      Q    Got it.  So would gang crimes -- would -- so

8  would gang crimes specialists participate or assist in

9  homicide investigations?

10         MR. BRUEGGEN:  Object to foundation.  Go ahead,

11    sir.

12     A    Yeah.  I -- anecdotally, I could say yes.  But

13  I really don't know what the gang crime specialists did

14  because, again, I was never part of that.  It was almost

15  like -- it was almost like two separate units, really.

16  They operated independent of us, we, independent of

17  them.  We just reported to the same location.

18     Q    Okay.  And then in terms of gang crimes

19  officers, would they participate or assist in gang -- in

20  homicide investigations?

21     A    Typically, no.

22     Q    Okay.  Okay.  So when you were a gang crimes

23  officer, you were working out of Gang Crimes North,

24  correct?

25     A    Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         Q    And do you recall who your supervisors were in
 2    that position?
 3         A    For most of the time I was there, it was a
 4    sergeant named Dan Amaday, and I couldn't spell his last
 5    name today, but he was my sergeant most -- for 99
 6    percent of the time that I was there.
 7         Q    During the time you were working as a -- out
 8    of Gang Crimes North, was Rey Guevara also working out
 9    of Gang Crimes North?
10              MR. BRUEGGEN:  Object to foundation.  Go ahead,
11        sir.
12         A    Yep.  Rey Guevara was on the specialist side
13    of the house in Gang Crimes North, yes.
14         Q    Would you have interactions with him also as
15    he was working on Gang Crimes North at the same time as
16    you?
17         A    No.
18         Q    Did you -- at that time, was Ed Mingey
19    overseeing gang crimes specialists at Gang Crimes North?
20         A    Yes, he was.
21         Q    Did he have any supervisory role over your
22    work?
23         A    No, he did not.
24         Q    Okay.  Did Steve Gawrys work out of Gang
25    Crimes North during the period you were there?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    Yes, he did.

2       Q    And was he working as a gang specialist or

3   gang officer?

4       A    He was on the specialist side of the house.

5       Q    And did you work with him at all?

6       A    No, I did not.

7       Q    As a gang crimes officer, did you specialize

8   in any particular gangs?

9       A    No.

10      Q    Was that part of a gang crimes officer's role

11  to sort of identify certain gangs or have to be assigned

12  certain gangs to focus on?

13      A    I believe that was more of the specialist side

14  of the house.  We were kind of put wherever, like, a

15  gang conflict flared up.  So one day we could have been

16  in the 25th District, the next day we could have been in

17  the 14th District, we could have been in the 17th

18  District.  So they kind of moved us around within Area 5

19  to respond to increases in gang activity.  Increased

20  shootings or -- or conflicts or something of that

21  nature.

22      Q    Okay.  While you were in Gang Crimes North,

23  did you work with Joe Miedzianowski?

24      A    No.  He was also on the specialist side of the

25  house.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  You became a detective in 1990.  What
2  sort of unit within the detective division did you enter
3  in 1990?
4    A    So for, like, the first year I was in the auto
5  theft unit.
6    Q    And then where'd you go after that?
7    A    After that I went to Area 5.
8    Q    And when you went to Area 5, what kind of
9  cases did you work?
10    A    Primarily, I worked homicides.
11    Q    Okay.  So as a detective from 1990 to '94, you
12  worked either in auto theft or in violent crimes,
13  correct?
14    A    That's correct.
15    Q    And when I say violent crimes -- and I may --
16  I've used the term violent crimes now, and I've used the
17  term homicides.  Is there a distinction?  I mean, are
18  homicide investigators and violent crimes investigators
19  basically the same people?
20        MR. BRUEGGEN:  Object to form.
21    A    Yeah.  I -- you know what it is, over the
22  course of time, they've -- they've carved out the
23  homicide guys and then they put them back in violent
24  crimes.  So when I was there, it was Area 5 violent
25  crimes.  Since that time, they've carved out the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    homicide guys, so it's just homicides.  But yeah, I was
 2    there -- it was Area 5 violent crimes.
 3         Q    Okay.  So when you were there, it was called
 4    violent crimes.  And one of the things you investigated
 5    as a violent crimes detective was homicides, correct?
 6         A    That's correct.
 7         Q    And the group of people who investigated
 8    homicides were in fact violent crimes detectives,
 9    correct?
10         A    Yes, that's correct.
11         Q    Okay.  And when you were a violent crimes
12    detective from 1990 -- approximately 1991 to 1994, who
13    was your supervisor?
14         A    There were -- there were multiple supervisors.
15    I was kind of low man on seniority, so I found myself
16    going to midnights quite frequently.  My supervisor on
17    midnights was a guy named Lee Epplen and a guy named
18    Frank Capitelli.  When I was on days, it would've been
19    either Bob Biebel, Ed Mingey, a guy named Tom Lee.  I
20    can't remember.  There were others as well.
21         Q    Okay.  So the shifts that you worked while you
22    were a detective -- strike that.  While you were a
23    violent crimes detective from '91 to '94, were either
24    midnights or days?
25         A    Primarily, yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 160 of 782 PageID #:13418
The Deposition of John Anthony Ritchie, taken on May 16, 2023

51

```
 1        Q    Okay.  And just remind me the shifts in the
 2   day.  There's three shifts.
 3        A    Correct.
 4        Q    And first shift is which?
 5        A    The first shift would start at like 11:00 p.m.
 6   and go to like 7:00 a.m.
 7        Q    And is that -- and that's the same thing as
 8   midnight shift, correct?
 9        A    Correct.  Midnight shift, yeah.  Now there
10   were variations.  There were guys who started at like
11   midnight and went to 8:00 a.m., but it was primarily
12   those hours.
13        Q    Okay.  When you say you worked midnights,
14   you're referring to working first shift, correct?
15        A    Correct.
16        Q    Okay.  And then what was second shift?
17   Approximately 7:00 a.m. to what time?
18        A    First shift -- or, second shift, the day shift
19   was -- I was an early start, so I started at 7:00 a.m.
20   and I'd get off at 3:00.  Most of the guys started at, I
21   want to say, 8:30 and got off at 4:30.
22        Q    Okay.  So second shift was days, correct?
23        A    Correct.
24        Q    So you worked midnights, or first shift, for a
25   period of time, and then you switched to second shift,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   or days, correct?

 2        A    I kind of jumped back between the two.  Again,

 3   because I was low man on seniority.  So if first watch

 4   was short due to guys being on vacation or -- or, you

 5   know, being out sick, then because I was so low on

 6   seniority, I would get bumped down to that midnight

 7   shift kind of regularly.  So there was really no -- no

 8   rhyme or reason to it.  It was just, hey, we need you to

 9   fill in this month.  And I would find myself on

10   midnights.

11        Q    Okay.  And third shift was referred to as

12   what?

13        A    The afternoon shift.  And that typically

14   started at like 4:00 p.m. and went to about midnight.

15        Q    Okay.  And did you ever work afternoons?

16        A    No, not that I can recall.

17        Q    Okay.  When you worked as a violent crime

18   detective, did you work with Rey Guevara?

19        A    No.

20        Q    When you -- and why is it that you -- he was

21   working as a violent crime detective at the same time,

22   correct?

23        A    He was, but he always worked afternoons and I

24   don't think I ever worked afternoons.  I don't want to

25   say never, but rarely, if ever.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  So basically, he worked a different

2  shift than you throughout the time you were a violent

3  crimes detective; is that right?

4      A      That's correct.

5      Q      Who were your partners as a violent crimes

6  detective?

7      A      So partners in the detective division are not

8  as clear cut as they would be in patrol.  So a lot of

9  times it's more of teaming up with.  So I teamed up with

10  Steve Gawrys kind of regularly, but that was it.  On

11  midnights, you didn't have a partner.  Midnights

12  everybody was solo.  But on days I would frequently team

13  up with Steve.  But then again, a lot of times I would

14  -- I would be by myself.

15      Q      Okay.  So other than Steve Gawrys, you didn't

16  have any sort of regular guys you partnered with; is

17  that right?

18      A      No, that's correct.

19      Q      And then on any given case, could you partner

20  with somebody else, just because of that case and that

21  particular circumstance?

22      A      That -- yeah.  Because what would happen is

23  there would be a case that would require multiple

24  detectives to go to a scene or -- or to follow up on it,

25  and you would kind of team up with whoever happened to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 163 of 782 PageID #:13421
The Deposition of Dale Anthony Riedel, taken on May 19, 2022

54

1   get assigned to it.

2       **Q   Okay. During the time you worked as a violent**

3   **crime -- you mentioned gang crimes specialist earlier.**

4   **During -- and now I'm asking you about your time as a**

5   **detective. During the time you were a violent crimes**

6   **detective, would you sometimes work with gang crimes**

7   **specialists to assist you in homicide investigations?**

8       A   Sometimes they would provide us information.

9   We'd never really work with them. They had their own

10   thing and their own partners and did their own thing.

11   But occasionally, we would seek them out as a resource

12   because they were very familiar with nicknames and gang

13   affiliations, which was something that, as a detective,

14   you're really kind of distanced from. So you would kind

15   of seek them out occasionally on gang-related incidents,

16   yes.

17       **Q   And then, what are the kinds of things they**

18   **would assist with on gang-related investigations?**

19       A   Just know -- you know, they were very good

20   with knowledge of who's -- what gangs were having

21   conflicts. They were knowledgeable about nicknames. If

22   a witness provided you with a nickname, you could call a

23   gang specialist and say, "Do you know a person by this

24   nickname in this particular gang?" And often they did.

25   And if they didn't, you know, they would go out and find

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    out who that individual was for you.  So they were --

2    they were a good resource, I guess is the best way to

3    put it.

4        Q    And would they some -- so would they sometimes

5    assist gang investigations by going out and talking to

6    witnesses?

7              MR. BRUEGGEN:  Object to foundation, form.  Go

8        ahead, sir.

9        A    Yeah.  Typically detectives didn't want gang

10   specialists talking to the witnesses.  So I don't want

11   to say it didn't happen because it did, but typically we

12   would ask them to stay away from the witnesses.

13       Q    And why is that?

14       A    Well, because you get -- you know, there's

15   issues with documenting things and then there's -- if

16   it's -- if you have multiple people interviewing the

17   same witness, you tend to burn the witness out.  They

18   don't want to keep telling their story to multiple

19   people.  So I think for the continuity and to avoid

20   burning out the witness, we would ask that, you know,

21   gang specialists or tactical officers or beat officers

22   -- not just gang specialists.  We would ask that they

23   didn't contact witnesses and just kind of leave that

24   function up to the detectives.

25       Q    And what were the documentation issues with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   having gang crime specialists interview witnesses?

2       A    The -- the type of report that's generated.

3   Detectives generate a much different report.  Detectives

4   tended to be more thorough in their documentation than

5   gang specialists did.  I don't want to say that's the

6   case for everybody, but it was -- it was cleaner to just

7   let the detectives handle those -- those type of

8   interviews.

9       Q    Okay.  Once you became a sergeant in 1994,

10  what was your -- what was your supervisory role as a

11  sergeant?

12      A    So initially I went to patrol.  I was a

13  sergeant in the 16th district.  I want to say I was

14  there for about 18 months and then I was transferred

15  back into the detective division in Area 5.

16      Q    Okay.  So you became a supervisor in the

17  detective division around 1995 to '96, fair?

18      A    Yes.  It was probably -- yeah, '95 or '96, and

19  I remained there until '98.

20      Q    Okay.  And in that capacity as a sergeant

21  supervising detective at Area 5, you were supervising, I

22  think you said, rob -- the robbery team rather than

23  violent crimes detectives, correct?

24      A    That's correct.

25      Q    Did you work on any homicide investigations

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  during that time as a sergeant?

2      A    Not that I can recall.  It was almost

3  exclusively -- I mean, you never know if something

4  popped up, but I want to say it was almost exclusively

5  robbery cases.

6      Q    Okay.  And as a supervisor of detectives in

7  the period from around '95, '96 to 1998, what did that

8  role entail in terms of supervising the detectives?

9          MR. BRUEGGEN:  Object to form, vague.  Go

10     ahead, sir.

11     A    Yeah.  I mean, can you -- can you narrow that?

12     Q    Let me ask a better question.  What was --

13  strike that.  How would you go about supervising

14  detectives in their investigations as a sergeant?

15     A    You would assign them cases that would come

16  in, you would, you know, ensure that their

17  investigations were accurate.  You would review reports.

18  You would review case reports that came into the area

19  from the patrol officers.  And then there was a lot of

20  administrative function involved with being a sergeant

21  as well, making sure that you had enough robbery

22  detectives to staff each day, making sure that their

23  cases are turned in in a timely manner, that they don't

24  have a lot of cases on what was called the late list.

25  You would make sure that there weren't too many people

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   taking the day off.  A lot of administrative functions

2   come with being a supervisor in the detective division.

3         Q   **Tell me about what the late list is.**

4         A   The late list is a list that's generated by

5   the administrative unit in the area that basically says

6   within 30 days of getting a case, you're supposed to

7   have some sort of disposition on it, whether it's an

8   arrest or whether the case is -- you know, there's no

9   leads to it, so you close it out.  But you have to make

10   sure you submit the paperwork.  Something has to be done

11   with the case.  There has to be some investigative

12   activity on it.  And when cases -- when there's no

13   record of investigative activity, this late list would

14   be generated, and then you would grab the detective and

15   say, hey, you need to clear up your late list.

16         Q   **Okay.  So essentially cases where there had**

17   **not been a disposition within 30 days of the case being**

18   **assigned would go on the late list.  Do I have that**

19   **right?**

20         A   That's correct.

21         MS. ROSEN:  Objection, form.

22         Q   **Okay.  And then to resolve that, something had**

23   **to be submitted to the sergeant; is that right?**

24         A   Yes.  Yes.

25         Q   **Okay.  And what was it that would have to be**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 submitted to the sergeant?

2    A    Just some record of investigative activity,

3 that they're waiting for fingerprints to be returned.

4 Some explanation of why the case hadn't been resolved,

5 to some degree, within 30 days.  And frequently, it was

6 they were waiting for fingerprints to come back or they

7 were -- submitted something for DNA or the victim was

8 out of town or unavailable, but you had to provide some

9 explanation as to why the case hadn't been resolved in

10 30 days.  And I think the examples I just gave you cover

11 about 99 percent of why cases were unresolved.

12    Q    And then would the way that that case came off

13 the late list would be by submission of a supplementary

14 report, for example?  Or was it by a -- like a different

15 -- a memo to the sergeant that's different than the

16 actual usual reports within an investigation?

17    A    Yeah, no.  Just some sort of a supplemental

18 report that explains -- resolves the case or explains

19 the delay.

20    Q    Okay.  And that -- would that type of

21 supplementary -- would that be like a supplementary

22 report basically?

23    A    Yes.

24    Q    And so, that would go into the investigative

25 file for the case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    I could not speak to that.  No, I don't know.

 2      Q    Oh, okay.  So when you had some submission

 3 related to resolving being on the late list, you don't

 4 know whether that submission would go on the -- into the

 5 investigative file; is that right?

 6      A    That's correct.  I don't.

 7      Q    Okay.  Was the late -- when you were working

 8 as a violent crimes detective, was there also a late

 9 list that applied for violent crimes detectives?

10           MR. BRUEGGEN:  Object to foundation.

11      A    There was, yes.

12      Q    Okay.  So is it the same process?

13           MR. BRUEGGEN:  Object to foundation.  Go ahead.

14      A    Yes.  Yes, it is.  Same process.

15      Q    Okay.  All right.  During the time you were

16 working as a detective and sergeant, there was a late

17 list basically to help ensure that investigations,

18 whether robberies or violent crimes, were being --

19 essentially, they were progressing in some way; is that

20 right?

21           MR. BRUEGGEN:  Object to form.  Go ahead.

22      A    That's correct.

23      Q    And when a case -- if a detective had cases

24 that were on the late list, there would be a need --

25 there would be some check-in with the supervisors; is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    that right?
2         A    Yes, that's correct.
3         Q    And if a detective had, you know, a longer
4    list of cases on the late list than other detectives,
5    what was done about that?
6              MR. BRUEGGEN:  Object to form and complete
7         hypothetical.  Go ahead, sir.
8         A    You'd get hounded by the sergeant and the
9    sergeant would tell you to clear up your late list,
10   basically.  It wasn't such an issue on the violent crime
11   side because the cases called out for, you know, some
12   sort of investigative actions.  Typically, we saw these
13   late lists for the property crime side of the house
14   where a detective is given, you know, six burglary cases
15   a day.  That's where we typically saw the late lists.
16        Q    As a sergeant, was there any tracking of, you
17   know, how often detectives were closing cases?
18             MR. BRUEGGEN:  Object to form, foundation.  Go
19        ahead.
20        A    There was -- the administrative unit took care
21   of that.  But I really have no knowledge of how that
22   worked or
23        Q    So you weren't responsible for tracking it,
24   but there was some tracking that was occurring of what
25   percentage of cases, for example, that a detective was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    closing; is that right?

2         MR. BRUEGGEN:  Object to form and foundation.

3      Go ahead.

4      A    I don't recall seeing -- are you talking about

5    like percentages of what they closed or how they closed

6    them or something?

7      Q    Yeah.  Any form of tracking about whether or

8    not -- you know, for each detective, hey, here's how

9    many cases they're assigned.  Here's how many cases

10   they're closing.  Here's how many cases they're not

11   closing.  Is there any that -- of that kind of tracking

12   that was taking place?

13     A    Not that I'm aware of.

14     Q    Okay.  If you had detectives who were doing --

15   strike that.  Was there any -- was there any assessment

16   of a detective's performance that was taking place

17   during the time you were working as a sergeant

18   overseeing detectives?

19     A    No, there was not.

20     Q    Was there any assessment of detective's

21   performance that was taking place while you were working

22   as a detective -- a violent crimes detective?

23     A    If there was, I wasn't aware of it.

24     Q    Did you ever receive performance evaluations?

25     A    Yes, for a time.  But then the department

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   stopped those and I don't remember, like, where in my
 2   career those had stopped.
 3        Q    Did you ever receive performance evaluations
 4   while you were a detective?
 5        A    I don't recall.  I don't recall if they
 6   stopped those prior to then, or while I was a -- I don't
 7   recall.  I do remember getting them, but I couldn't say
 8   whether it was as a patrolman or a detective or -- or
 9   even as a sergeant.  It was a long time ago.
10        Q    Okay.  Were the documentation requirements the
11   same whether you were in the violent crimes unit or the
12   robbery unit for a detective?
13             MR. BRUEGGEN:  Object to form.
14             MS. ROSEN:  Object to form.
15        A    Documentation of what?
16        Q    Thank you.  Sorry about that.  That's a poor
17   question.  With regard to documentation of
18   investigations and investigative steps, was it the same
19   regardless of whether you were in the robbery unit or
20   the violent crimes unit?
21             MR. BRUEGGEN:  Object to form.
22        A    Yeah, I don't know that I can answer that
23   because I'm not -- I'm not sure.  I don't understand the
24   question.  I'm sorry.
25        Q    Yeah.  So during the time that you were a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   detective in violent crimes, you had -- it was required
 2   that you create documentation as part of your work as a
 3   homicide investigator, correct?
 4        A    Well, it's required that you document your
 5   investigative steps, yes.
 6        Q    Yes.  Okay.  So one -- so just to be clear,
 7   when you were a homicide detective, when you were a
 8   violent crimes detective, it was required that you
 9   document the investigative steps you took during the
10   course of the investigation, fair?
11        A    Yes.  That's correct.
12        Q    And that documentation could take the form of
13   notes and reports, correct?
14             MR. BRUEGGEN:  Object to the form.  Vague.
15        A    Yeah.  Yeah -- again, I can't answer that
16   because notes -- you're saying notes or reports?
17        Q    Yeah.  That is what I meant.  Yeah.  So what
18   I'm -- yeah, let me clarify that.  Was it a requirement
19   that everything you do get into a supplementary report?
20             MR. BRUEGGEN:  Object to form.  Vague.
21        A    Yeah.  I don't know that I can answer that.
22        Q    Okay.  Was there a requirement that, as you're
23   conducting the investigation, the investigative steps
24   you take get documented either in a GPR or some notes or
25   in a report?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BRUEGGEN:  Object to form.  Vague.
 2       A     I'll say yes.  Yeah.
 3       Q     Okay.  In other words, it's not -- there's not
 4  a set rule that it's got to be in a particular form in a
 5  particular document.  The point is, if you're taking the
 6  investigative steps, you got to get it documented and
 7  it's not as important which particular document it gets
 8  into; is that fair?
 9       A     Okay.
10              MR. BRUEGGEN:  Object to form.
11       A     Yeah.  Okay.  I'll get -- I'll say yes.
12       Q     Okay.  So the idea being that, as a violent
13  crimes detective, if -- strike that.  The idea being
14  that, if someone looks at the homicide investigation,
15  the investigative file, whether it's a sergeant or a
16  prosecutor, they will see all of the investigative steps
17  that were taken by the detectives on the case; is that
18  correct?
19              MR. BRUEGGEN:  Object to form.  Incomplete
20        hypothetical and foundation.  Go ahead.
21       A     Yes, that's correct.
22       Q     And was that the training that some -- that an
23  investigative file should capture all of the
24  investigative steps taken by the detectives?
25              MR. BRUEGGEN:  Object to form.  Go ahead.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.
 2        Q    And was that your expectation as a supervisor
 3   during the time you were working as a sergeant
 4   overseeing detectives?
 5        A    Yes, it was.
 6        Q    And was that your understanding of what the
 7   policy required during the time you were working as a
 8   detective and as a sergeant over detectives?
 9             MS. ROSEN:  Objection, form.
10        A    So I can't speak to policy 30 years ago.  So
11   it -- I wouldn't be able to answer that.  I'm sorry.
12        Q    Okay.  And this idea that you have indicated,
13   that, you know, documenting the steps that were taken
14   during the course of an investigation was something that
15   you were trained on and that was required, there was an
16   important reason that it was important to document all
17   of the investigative steps, correct?
18             MR. BRUEGGEN:  Object to form.  Vague and
19        misstates his testimony.
20        A    Yes.  Correct.
21        Q    And what were the reasons that it was
22   important to document all of the investigative steps
23   taken during an investigation -- homicide investigation,
24   for example?
25        A    Well, it's important to document them because
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   you want to make sure that there's a record of what

2   you're doing in trying to clear the case.

3       Q    Okay.  And was it important to document all

4   the steps that were -- that you were taking as a

5   homicide detective in order to assist other homicide

6   investigators who were also participating in the

7   investigation?

8       A    Yes.  That could be one of the reasons as

9   well.  Yeah.

10      Q    And was it important to document all the steps

11  you were taking in a homicide investigation, as a

12  detective, in order to ensure that all of that material

13  was getting to the prosecutors and criminal defense in

14  any court case?

15          MR. BRUEGGEN:  Object to form.  Go ahead.

16      A    Yes.  That's also another reason for it.  Sure.

17      Q    And so were you trained on Brady obligations

18  as a homicide detective?

19          MR. BRUEGGEN:  Form.

20      A    God, I can't remember.  My -- my training was

21  30 years ago.  I can't remember that at all.

22      Q    When you were working as a homicide detective,

23  would it be fair to say you understood that there was

24  this concept of Brady obligations?

25          MS. ROSEN:  Objection, form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Again, I don't remember from 30 years ago. I'm
 2  sorry, Counsel.
 3      Q    Did you have an understanding that -- at the
 4  time you were working as a homicide detective that it
 5  was important to ensure that information learned during
 6  the homicide investigation was being turned over to the
 7  prosecutors?
 8           MR. BRUEGGEN:  Object to form.
 9      A    Yes.
10      Q    And was it your understanding -- what was your
11  understanding about whether detectives could withhold
12  information learned during an investigation from
13  prosecutors?
14           MR. BRUEGGEN:  Object to form, vague.  Go
15      ahead.
16      A    Yeah.  My understanding is obviously you
17  should never withhold information from the prosecutor.
18      Q    So was it your training that detectives were
19  required to disclose all of the information learned
20  during the investigation with prosecutors?
21           MR. BRUEGGEN:  Objection, form and foundation.
22      Go ahead.
23      A    Yeah.  Again, my training was 30 years ago.  I
24  can't say whether we were trained on that or not.
25      Q    Was it your understanding that you were
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 178 of 782 PageID #:13436
The Deposition of ANTHONY Riccio, taken on May 17, 2022

69

```
 1   required to turn over all of the information you've

 2   learned during the investigation to prosecutors?

 3           MR. BRUEGGEN:  Objection, form.  Asked and

 4       answered.  Go ahead.

 5       A    Yes.

 6       Q    And was that similarly your expectation when

 7   you became a supervisor?

 8           MR. BRUEGGEN:  Objection.  Asked and answered.

 9       Go ahead.

10       A    Yes, it was.

11       Q    And what were the tools that you used as a

12   homicide detective to ensure that you were documenting

13   all of the information that you had learned during a

14   homicide investigation?

15           MR. BRUEGGEN:  Object to form, vague.

16       A    Yeah.  Again, that was 30 years ago.  I mean,

17   the tools to document would be supplementary reports and

18   GPRs.

19       Q    Okay.  Were you -- strike that.  Was it your

20   understanding, at the time you worked as a homicide

21   detective, that it was important to write thorough and

22   accurate reports?

23       A    Yes.

24       Q    And was it your understanding -- strike that.

25   Was it your practice as a homicide detective to write
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    thorough and accurate reports?

2         A    I certainly did my best.  I can't say that

3    they were always, you know, completely accurate or as

4    thorough as they should be.  But, I mean, you certainly

5    try your best at the time.  Yes.

6         Q    And when you wrote reports as a homicide

7    detective, you knew that you may have to -- strike that.

8    When you wrote reports as a homicide detective, you knew

9    that you may have to rely on those reports in testifying

10   in criminal cases, correct?

11        A    That's correct.

12        Q    And you did -- as a homicide detective, was it

13   your practice to rely on your -- to look back at your

14   reports in preparing yourself to testify at a trial?

15             MR. BRUEGGEN:  Object to the form. Foundation.

16        A    Yes, it was.

17        Q    And was it often the case that you needed

18   those reports to be able to refresh your memory about

19   your investigation in order to be able to testify at

20   trials?

21        A    Yes, it was.

22        Q    Okay.  And so for that reason, did you ensure

23   that you were writing thorough and accurate reports to

24   ensure that you could provide truthful testimony at

25   trials?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. BRUEGGEN:  Objection to form.  Go ahead.

 2       A    Again, you know, you do your best at the time.

 3  You hope that you're as complete and accurate as

 4  possible.  Certainly that is always your intention, yes.

 5       Q    Did you take notes to help you ensure that you

 6  were writing thorough and accurate reports?

 7            MR. BRUEGGEN:  Objection to form.  Incomplete

 8       hypothetical.  Go ahead.

 9       A    Yeah.  It really depended on the situation.

10  Sometimes you would.  If it was an interview that

11  involved some degree of detail, you would take notes. If

12  it was something that didn't require -- something that

13  was -- you know, you could just sit down and type out

14  without having notes.  So it really varied.  It depended

15  on the circumstance.

16       Q    If it was an interview of somebody that was

17  providing you with substantive information out in the

18  field, would you -- was it your practice to typically

19  take notes?

20            MR. BRUEGGEN:  Objection to form.  And can you

21       restate that?  It was -- I couldn't catch it because

22       you were moving some documents.  Sorry.

23  BY MR. SWAMINATHAN:

24       Q    My apologies.  If you were out talking to a

25  witness and they were providing you with substantive
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 information or details, was it your practice to take

2 notes of those conversations so that you could type that

3 up later in your report accurately and thoroughly?

4          MR. BRUEGGEN:  Objection.  Incomplete

5     hypothetical.  Go ahead.

6     A    Again, it depended on the circumstance.  It

7 depended on the degree of information.  If it was

8 something very small, like the offender lives in that

9 house, you know, I wouldn't.  If it was here's a

10 nickname, then I probably wouldn't take notes because it

11 doesn't -- there's not a great deal of detail.  If

12 there's a great deal of detail, then I would take notes.

13 So it really depends on the information.

14     Q    Got it.  So the more details that were being

15 provided, you would then -- strike that.  If the person

16 was providing you with significant numbers of details,

17 you would then take notes.  That was your practice?

18     A    If it was something beyond my capacity to

19 remember it accurately, then I would take notes, yes.

20     Q    Okay.  And in terms of your own practice,

21 other than, you know, a very basic piece of information,

22 a nickname, an address, that type of thing, was it your

23 typical practice to take notes if somebody was actually

24 telling you substantively, you know, here's what

25 happened during the course of this crime.  Here's what I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   witnessed.  Did you typically take notes of those kinds
 2   of interviews?
 3              MR. BRUEGGEN:  Objection to form.  Vague.
 4        Incomplete hypothetical.  Go ahead.
 5        A    Typically, yes.  If there was -- if there was
 6   more information than my capacity to remember, then yes,
 7   I would take notes.
 8        Q    Okay.  And it -- (coughs) excuse me.  As a
 9   violent crimes detective, it was necessary regularly to
10   go to the scene of the underlying crimes, correct?
11        A    Correct.
12        Q    And when you went to the scene of a crime, it
13   was typical to interview scene witnesses, correct?
14        A    That's correct.
15        Q    And when you interviewed scene witnesses who
16   had any information to actually provide about having
17   seen the actual crime, your -- was it your practice to
18   try to learn as much as you could from them about what
19   they had seen?
20        A    Yes.
21        Q    And when you had individuals who -- you know,
22   if somebody said, I didn't see it, I didn't hear
23   anything, my understanding is you wouldn't necessarily
24   take notes of that conversation, fair?
25              MR. BRUEGGEN:  Object to form.  Go ahead.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Fair.  I think you would -- you would document
 2  the fact that you spoke to them, and that they didn't
 3  have information.  Sometimes that was of value as well,
 4  but yes.
 5      Q    Okay.  And in fact, the fact that somebody
 6  initially speaks to you and indicates that they don't
 7  have any information is, itself, investigative
 8  information that needs to be documented, either in a GPR
 9  or in a report, correct?
10          MR. BRUEGGEN:  Objection.  Form.  Incomplete
11      hypothetical.  Go ahead.
12      A    That's correct.
13      Q    Okay.  In other words, the interview with the
14  witness is still important -- strike that.  That
15  witness, for example, if a week later they say, oh, I
16  actually saw the whole thing.  Here's this information.
17  It's important information that they had originally said
18  they didn't see or hear anything, you agree with that?
19          MR. BRUEGGEN:  Object to form.  Vague.  Go
20      ahead.
21      A    In that hypothetical, I would say yeah.  That
22  was -- that would be important.  Yes.
23      Q    In any event, that would be one reason why you
24  would document the initial conversation with that
25  witness, where they indicated they didn't see or hear

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    it, even though that information isn't particularly

 2    valuable to your investigation; is that fair?

 3         A    That's fair.

 4              MR. BRUEGGEN:  Object to form.

 5         Q    All right.  So if I understand you correctly,

 6    conversations with -- strike that.  Each person that's

 7    interviewed during the course of a homicide

 8    investigation, that's information that would be

 9    documented, correct?

10              MR. BRUEGGEN:  Objection.  Form.  Vague.

11         Incomplete hypothetical.

12         A    Yeah.  I don't know that I said that.  I'm

13    sorry.  Can you repeat it?

14         Q    Yeah.  Anytime you have a conversation with a

15    witness about the underlying homicide, that's something

16    that needed to be documented, correct?

17              MS. ROSEN:  Objection.  Form.

18         A    Yeah.  I mean, I don't want to say a blanket

19    yes.  I would say in most cases that's probably

20    accurate, but I'm sure that there are exceptions to that

21    as well.  So I can't -- I can't agree and say, you know,

22    with absolute certainty that's basically all the time.

23         Q    Was it your practice that conversations with

24    witnesses about an underlying homicide was something you

25    documented during the course of your time?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1         MR. BRUEGGEN:  Objection.  Form.  Foundation.
 2     Go ahead.
 3     A     You know, I think there's an issue of
 4  relevance.  It really would depend on this -- on this
 5  scenario.  So to say a blanket yes, I think, would be
 6  inaccurate.  I could say most of the time that's
 7  probably the case, but I do think that there's -- it's
 8  hard to say yes, just to give you a blanket yes on that.
 9     Q     Understood.  And so, maybe a better way for me
10  to try to understand your testimony is this.  You've
11  indicated that your practice was if you spoke to
12  somebody, even if they tell you, hey, you know, I'm a
13  scene witness, but I didn't see or hear anything. That's
14  something you would document, correct?
15     A     Correct.
16     Q     Okay.  And that was something you were
17  expected to document, correct?
18     A     That's correct.
19         MR. BRUEGGEN:  Object to foundation.
20     Q     And so, what would be the kind of circumstance
21  where you would talk to somebody about the underlying
22  homicide and you wouldn't document it?
23         MR. BRUEGGEN:  Objection.  Form.  Vague.
24     A     Yeah.  I don't know that I even want to come
25  up with a hypothetical, because I don't have one off the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    top of my head.  I just -- I don't think I'm comfortable

 2    with a blanket, you know, that you would document

 3    everybody all the time.

 4        Q    Okay.  Got it.  So as a general practice --

 5    strike that.  As a general matter, your practice was to

 6    document any interviews with witnesses; is that fair?

 7        A    That's fair.

 8        Q    Okay.  And as a general rule, was it your

 9    practice to document any leads that you developed during

10    the investigation?

11        A    Yes.

12        Q    And was it your practice to document any

13    suspects or persons of interest you identified during

14    the investigation?

15        A    Yes.

16        Q    Was it your practice to document any time

17    photos were shown to witnesses?

18             MR. BRUEGGEN:  Objection.  Form.  Vague.

19        A    Yes.

20        Q    Okay.  If gang books were shown to witnesses,

21    that was -- that needed to be documented, correct?

22             MR. BRUEGGEN:  Objection.  Form.  Foundation.

23        A    Yeah.  I don't know that I could answer that.

24    I never showed gang books to anyone.

25        Q    Do you --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I --

2    Q    Go ahead.

3    A    I don't -- no.  I wouldn't be able to answer

4   that because I don't know the circumstances of it.  And

5   I -- like I said, I've never shown gang books.

6    **Q    Okay.  Did you have cases in which gang books**

7   **were shown to your -- to the witnesses in one of your**

8   **homicide investigations?**

9         MR. BRUEGGEN:  Object to foundation.

10   A    Yeah.  I don't know.  If they were, I didn't

11  do it because, again, I didn't show gang books.  So I

12  couldn't say with certainty if --

13   **Q    Okay.  Putting -- I'm sorry, go ahead.  I**

14  **didn't mean to cut you off.  Go ahead.**

15   A    No, I was just going to say I could -- I

16  couldn't say with certainty whether that was or was not

17  done in any of my cases.

18   **Q    Okay.  Putting aside gang books for the**

19  **moment, talking about photos other than gang book**

20  **photos.  Would you document any time photos, like photo**

21  **arrays, were shown to witnesses?**

22   A    Yeah.  Yeah.  So the only time I would show

23  photos would be as part of a photo array, and that would

24  be documented.  Yes.

25   **Q    Okay.  Regardless of whether the photo array**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 188 of 782 PageID #:13446
The Deposition of ANTHONY RICCIO, taken on May 18, 2023

79

1  resulted in a positive or negative identification,
2  correct?
3       A    That's correct.
4       Q    Okay.  And in terms of your documentation of
5  these various things, conversations with witnesses,
6  leads, and so on.  My understanding is, you know,
7  whether you documented it in the form of a note before
8  you put it into a report would just depend on whether it
9  was something you felt you could remember, you know,
10  long enough to be able to get it accurately into a
11  report; is that fair?
12            MR. BRUEGGEN:  Object to form.  Vague.  Go
13       ahead.
14       A    That's fair.
15       Q    Okay.  And typically if you interviewed a
16  witness during -- strike that.  For example, a scene
17  witness in -- strike that.  Your practice, if you
18  interviewed scene witnesses after a shooting, if they
19  were providing you with information about what they saw,
20  if it was more than just very basic information, was it
21  your practice to take notes about what they were telling
22  you?
23       A    Yes, it was.
24            MR. BRUEGGEN:  Object to form.  Asked and
25       answered.  Go ahead.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A    Yes, it was.

 2    Q    Okay.  And if they provided you with reason to

 3   suspect a particular person as being involved in the

 4   crime, or a particular gang, or something else that

 5   would constitute a lead, was it your practice to take

 6   notes on that information?

 7         MR. BRUEGGEN:  Objection, form.

 8    A    Yes, it was.

 9    Q    If you received information from witnesses

10   that pointed to or indicated the involvement of a

11   particular gang, was that the kind of thing you

12   considered a lead?

13    A    Yes.  That would be a lead.  Sure.

14    Q    And what were the kinds of things you could do

15   with a lead that a particular gang was responsible for a

16   -- for a homicide.

17         MR. BRUEGGEN:  Objection, incomplete

18    hypothetical and vague.  Go ahead.

19    A    Yeah, I -- again, we're going back 30 years. I

20   don't remember what tools were available 30 years ago

21   for me to follow up on that.  So I wouldn't be able to

22   answer that.

23    Q    Fair.  And let me just ask a more direct

24   question.  And it was not on cops -- strike that.  Would

25   it be fair to say that there were times, as a detective,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 190 of 782 PageID #:13448
The Deposition of Anthony Riccio, taken on May 19, 2023

81

1    when often you might not get a lead as to the particular

2    person responsible, but you might get a lead about the

3    particular gang that was involved, fair?

4        A    Yes.

5        Q    And in those instances, was one tool available

6    to detective, the use of gang books?

7        A    I -- again, I don't know because I didn't use

8    gang books.  I don't know where they were kept.  It was

9    never a resource that I went to.

10        Q    Okay.  Was it your understanding at that time

11    that there were gang crimes officers or -- strike that.

12    Was it your understanding at that time that there were

13    gang books that were available, even if you, in your own

14    cases, was choosing not to use them?

15            MS. ROSEN:  Objection.  Form.

16            MR. BRUEGGEN:  Objection to form.

17        A    I don't know when the gang books stopped being

18    in existence, so I don't know if they were still there

19    when I was a detective or not.  I know they were there

20    when I was in gang crimes, but I don't know like where

21    they were housed, and I don't know at what point gang

22    books went away, because they did at some point.  So I

23    really can't answer that.

24        Q    As a homicide detective, if gang books were

25    being shown to witnesses in your homicide investigation,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  was it your expectation that that information would get

2  documented in your case?

3         MR. BRUEGGEN:  Objection.  Form.  Incomplete

4     hypothetical.  Go ahead.

5     A     Yeah.  I mean, it is a hypothetical.  I would

6  say that if someone was showing gang books in a case of

7  mine, that I would -- I would expect there to be some

8  sort of documentation and to let me know what was going

9  on.  Typically, as a detective, you didn't -- again, you

10 didn't want your witnesses interviewed by multiple

11 police officers.  So I would -- you know, I would've

12 frowned upon that.  But again, I don't know -- but if it

13 occurred, yes, I would expect there to be documentation.

14        MR. BRUEGGEN:  Anand, are you getting to a

15    place where you can take a quick break?

16        MR. SWAMINATHAN:  Yeah, yeah, yeah.  That's --

17    why don't we do that right now.

18        MR. BRUEGGEN:  All right.  Thanks.

19        THE WITNESS:  Thanks.

20        MR. SWAMINATHAN:  Yeah.  Thank you.

21        COURT REPORTER:  We're off the record.  The

22    time is 11:22.

23        (OFF THE RECORD)

24        COURT REPORTER:  We are back on the record for

25    the deposition of Anthony Riccio, being conducted by

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        videoconference.  My name is Sydney Little.  Today
 2        is May 18, 2022, and the time is 11:33 a.m.
 3   BY MR. SWAMINATHAN:
 4        Q    Okay.  Just let me wrap up the last few
 5   questions on documentation, and then why don't we -- why
 6   don't we keep moving here.  Based on your training --
 7   strike that.  Based on your experience as a -- the time
 8   you were a homicide detective, and as a supervisor over
 9   detectives, would you agree that it -- that what is
10   relevant during the course of a -- course of an
11   investigation may change over time?
12        A    Yes, I would agree with that.
13        Q    In other words, information that was sometimes
14   -- sometimes did not seem important or relevant at one
15   point may become more important as more information is
16   learned?
17        A    Yes, I would agree.
18        Q    And is that one of the reasons that it was
19   important to document the steps that were taken during
20   the course of the investigation and the information
21   learned during the investigation?
22            MR. BRUEGGEN:  Objection.  Form.  Go ahead.
23        A    Yes.  I would agree with that as well.
24        Q    Okay.  If I look at a ho -- you know, when I
25   say if I -- strike that.  If someone looks at the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 193 of 782 PageID #:13451
The Deposition of ANTHONY RIDOLFI, taken on May 19, 2023

84

```
1   investigative file, the overall homicide file for the
2   investigation, should one see documentation of all the
3   individuals that were suspects in that investigation?
4           MR. BRUEGGEN:  Objection.  Incomplete
5       hypothetical.  Vague.
6       A    Yes.
7       Q    Should one see documentation of all gangs that
8   were, for example, suspected in the investigation?
9           MS. ROSEN:  Object to form.
10      A    Yeah.  Again, it's hard to say.  Each homicide
11  is very unique.  I don't know that, you know, we could
12  say broadly something like that.
13      Q    Fair.  Should one see documentation of the
14  reasons that people were suspects in the investigation?
15      A    Yes, they should.
16      Q    And should you see documentation of the basis
17  for arresting any suspects?
18      A    Yes, you should.
19      Q    And there should be documentation of the basis
20  for probable cause against any suspects, correct?
21          MR. BRUEGGEN:  Objection.  Form.
22      A    Yes, there should.
23      Q    And there should be documentation of the basis
24  on which charges were sought against that individual,
25  correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Yes, there should.

2      Q    **And ultimately, there should be documentation**

3  **of the investigative steps that were taken to ultimately**

4  **secure charges, correct?**

5          MR. BRUEGGEN:  Objection.  Asked and answered.

6      Go ahead.

7      A    Yes, that's accurate.

8      Q    **And there should be documentation of any**

9  **information that was learned during the investigation**

10  **that might not point at the person who is ultimately**

11  **charged, correct?**

12          MR. BRUEGGEN:  Objection.  Anand, can you

13      restate that?  When you're moving the computer, I

14      lose words here or there.  So I'm not getting the

15      whole context of the question.

16  BY MR. SWAMINATHAN:

17      Q    **My apologies.  Let me say it again.  And there**

18  **should be documentation of any information that does not**

19  **point at the suspect, or the person who was ultimately**

20  **charged, that was learned during the investigation,**

21  **correct?**

22      A    When that information exists in cases.  There

23  are cases where it doesn't, but there are cases where it

24  does.  In cases where it does, yes, it should be --

25  should be contained in that file.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1         Q    Got it.  In other words, if there's in -- not
2    only should all the information that inculpateds the
3    person should be documented, but also any information
4    that might exculpate the potential -- the suspect or the
5    person charged should also be documented, correct?
6         A    Correct.  When that information exists, it
7    should be documented, yes.
8         Q    Okay.  And would you agree that any
9    information about alternate suspects is the kind of
10   potentially exculpatory information that should be
11   documented?
12        A    Yes.  I would agree.  When that information
13   exists, that it should be documented, yes.
14        Q    And when any -- and when any information
15   exists about alternate suspects, that should be
16   documented as potentially exculpatory information for if
17   a different person is charged, correct?
18             MR. BRUEGGEN:  Objection, form.  Go ahead.
19        A    Yes, that's correct.
20        Q    And if, in an investigation, you have
21   information pointing to a different gang than the per --
22   than the gang affiliation of the person who was charged,
23   that's information that should be documented as
24   potentially exculpatory, correct?
25             MR. BRUEGGEN:  Objection.  Form.  Vague.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yeah, I'm sorry.  Can you repeat that one?

 2        Q     Yes.  If you have a -- maybe I'm -- that's an

 3   overly wordy question.  Let me try to say it more

 4   clearly.  If, in an investigation, you have information

 5   pointing to the involvement of a particular gang, but

 6   the person who's charged is a member of a different

 7   gang, that's potentially exculpatory information that

 8   needs to be documented, correct?

 9             MR. BRUEGGEN:  Objection.  Form.  Vague.

10        A     Yes.  That should be.  That should be

11   documented.

12        Q     Okay.  And during your work as a homicide

13   investigator, that is the type of information you

14   would've documented, correct?

15             MR. BRUEGGEN:  Objection.  Form.

16        A     That would've been my personal practice, yes.

17        Q     Okay.  Going back to your background.  We made

18   it to your time as a sergeant supervising detectives.

19   And then you became a lieutenant in and around 1998,

20   correct?

21        A     That's correct.

22        Q     Okay.  And when you became a lieutenant, what

23   districts or units did you work in?

24        A     I was in patrol for quite a while.  And again,

25   the years are kind of fuzzy.  I was in the 25th
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   District, the 15th District, and then I was transferred
 2   into Area 3 detectives somewhere around 2005, maybe
 3   2006.
 4        Q    Okay.  So until you became an Area 3
 5   lieutenant overseeing detectives, you were overseeing
 6   patrol officers, correct?
 7        A    That's correct.
 8        Q    And as a lieutenant overseeing patrol, did
 9   that include any units like gang crimes officers, or was
10   it exclusively, you know, patrol officers?
11        A    It was exclusively patrol officers assigned to
12   the watch that I would've been assigned to.
13        Q    Okay.  Okay.  And then you became an area --
14   strike that.  You said around 19 -- strike that.  You
15   said that around 2005, you became a lieutenant
16   overseeing Area 3 detectives; is that correct?
17        A    That's correct.
18        Q    And were there particular units within the
19   detective division who you were overseeing?
20        A    I was overseeing Area 3 violent crimes.
21        Q    Okay.  So what was the period of time that you
22   were overseeing Area 3 violent crimes detectives?
23        A    Again, I'm not sure about the -- exactly when.
24   2005, maybe 2006 until 2008.
25        Q    Okay.  When you -- which is when you became a
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 198 of 782 PageID #:13456
The Deposition of ANTHONY RICCIO, taken on May 19, 2023

89

1   commander, correct?

2        A    Correct.

3        Q    Okay.  So during your time as a lieutenant

4   overseeing Area 3 violent crimes detectives, give me a

5   sort of overall description of what that job entailed.

6             MR. BRUEGGEN:  Object to form.  Vague.  Go

7        ahead.

8        A    It's primarily administrative.  You know,

9   you're looking at manpower, you're looking at, you know,

10  making sure that you have adequate coverage on each day.

11  There's a lot of meetings that you have to attend.  So

12  it's primarily an administrative function to oversee the

13  operation of the unit you monitor over time.  You make

14  -- you try to make sure that the right people are in the

15  right places.  You know, their talents are being

16  utilized as well as possible.

17       Q    Okay.  Would you have any day-to-day

18  involvement in homicide investigations at all as a

19  lieutenant?

20       A    No.  I mean, occasionally, if there was some

21  sort of an important -- well, they're all important -- a

22  heater, maybe something that the media took a lot of

23  interest in, you would go to the scene and, you know,

24  just kind of get briefed up as much as possible on the

25  case.  I mean, I think basically you wanted to know as

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   much about the case as needed to answer questions from

2   above.  So you didn't get into the details of the case,

3   but, you know, the broader facts of the case and stuff

4   you would want to know on particular cases on those

5   heater cases.

6       Q    What was the type of, you know, paperwork or

7   administrative material that was coming to you, as a

8   lieutenant, either from sergeants or homicide

9   detectives?

10      A    I don't remember there being a lot of

11  paperwork coming to me as a lieutenant from the bottom

12  up.  It was more from the top down.  And again, it was

13  more administrative type things.  You didn't do, you

14  know, a lot of reviewing of cases.  Those were all

15  approved at the sergeant level.  So it was -- again, it

16  was primarily like administrative things coming from the

17  top down.

18      Q    Okay.  To what extent, as a lieutenant, did

19  you have involvement in training of homicide detectives?

20      A    None.

21      Q    But back when you were a sergeant supervising

22  robbery detectives, what was your -- what was your

23  involvement in training?

24      A    There was no training component.

25      Q    Okay.  So where -- what was the -- where was



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the training coming from for homicide detectives during

2    the time you were a sergeant and lieutenant if it wasn't

3    coming from the supervisors?

4        A    The training would come from other seasoned

5    detectives primarily.  I mean, they were trained in the

6    academy, when they were promoted, and then the training

7    would come from, you know, other -- putting them with

8    other, more seasoned detectives.

9        Q    Okay.  When you were working as a detective,

10   was there anybody who you considered sort of the

11   seasoned detective who trained you?

12       A    I -- when I -- when I first -- well, I was an

13   auto theft detective, so I worked with -- and I couldn't

14   tell you who -- more seasoned auto theft detectives.

15   When I came to Area 5, I don't really recall who I

16   worked with that kind of took me under their wing and

17   trained me a little bit.  I think I kind of bounced

18   around a lot.  So nobody in particular, I would have to

19   say.

20       Q    As a lieutenant, were you -- as a lieutenant

21   overseeing violent crimes detectives at Area 3, was

22   there any form of tracking that you were engaged in

23   terms of how each detective was doing in terms of open

24   -- closing cases?

25            MR. BRUEGGEN:  Objection.  Form.  Vague.  Go

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      ahead.

 2          A    I don't recall any kind of tracking with that,

 3     no.

 4          **Q    Were there any tools available to you, either**

 5     **when you were a sergeant or as a lieutenant, to be able**

 6     **to incentivize those detectives who were doing a better**

 7     **job in terms of -- or performing better in terms of**

 8     **closing cases?**

 9              MR. BRUEGGEN:  Objection.  Form.  Vague.

10          A    No, I don't -- I don't think there was

11     anything to incentivize them.  You know, pretty much, as

12     a police department, there really is nothing that you

13     can do to incentivize them other than maybe accommodate

14     them when they wanted a day off or, you know, giving the

15     new car, when it came in, to the better detectives.  But

16     as far as like any other sort of incentives, there

17     really was nothing you could do for them.

18          **Q    What about merit promotions?**

19          A    Merit promotions were considered by the

20     commanders.  So as a lieutenant, you really played no

21     role in it.  I mean, if maybe the commander asked for

22     your input.  But typically the commander got one or two

23     picks and they pretty much knew who the people were that

24     were doing the job, or who they wanted to submit for

25     their merit choices.  So you really didn't play a role

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  in that at all as a lieutenant.

2      Q   And in terms of the merit promotion process,

3  was that -- were merit promotion something that applied

4  all the way up through the chain, or was it just

5  something that applied, you know, to move from patrol to

6  detective, or from detective to sergeant, or did it

7  apply throughout the chain?

8          MR. BRUEGGEN:  Objection.  Form and foundation.

9      A   Yeah.  So there's merit promotions to the rank

10 of detective.  There's merit promotions to the rank of

11 sergeant.  There's merit promotions to the rank of

12 lieutenant.  And then I guess it's merit promotions to

13 the rank of captain as well.  There's -- it's a

14 different process for captains.  But for those -- for

15 those three ranks, there are merit promotions.

16 Detective, sergeant, and lieutenant.  The captain's

17 process is completely different.  But those three ranks,

18 yes, there was merit.

19     Q   And then after that, there's no merits

20 promotions once you get above the level of lieutenants,

21 putting aside the unique process for captain; is that

22 right?

23     A   Right.  Yeah.  The captain's process, you

24 apply.  So if you're a lieutenant and you want to be a

25 captain, you go through an application procedure, and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    then ultimately the superintendent decides who he wants
 2    to make.  Above captain, it's all exempt.  It's strictly
 3    selected by the superintendent.
 4         Q    Got it.  Okay.  What about -- so okay.  In
 5    terms of the ability to reward those detectives who seem
 6    to be doing -- you know, working the hardest or doing
 7    the best job closing cases, other than, you know, the
 8    rare instance of a merits promotion, were there any
 9    other tools available to you as a lieutenant?
10         A    No, there really -- there really wasn't.  You
11    know, other than like, you know, give them special
12    consideration if they want the 4th of July off or, you
13    know, last minute notice because it's their kid's
14    birthday or something.  But there was really no --
15    nothing that you had at your -- available to incentivize
16    or reward anybody who's doing a particularly good job or
17    working hard for you.
18         Q    What about overtime?
19              MR. BRUEGGEN:  Objection.  Form.
20         A    Overtime was what it was.  I mean, if a -- if
21    a detective was working on a case that ran beyond their
22    shift, which was extremely common, then they would
23    report to the on-duty sergeant, which was typically the
24    following watch.  They would report to the on-duty
25    sergeant, say hey, Sarge, I got this going or that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    going.  I'd like to work overtime.  It was up to the

 2    sergeant.  You know, overtime in the detective division

 3    is kind of abundant, really.  It's a necessary

 4    abundance, I guess.  But that was -- there were times

 5    when sergeants said no and there were times when

 6    sergeants said yes.

 7        **Q    Was that -- was the -- was overtime something**

 8    **that was -- well, strike that.  Was it one of your**

 9    **administrative roles as a lieutenant, was it also to**

10    **keep track of the amount of overtime and sort of try to**

11    **make efforts to limit the amount of overtime at all?**

12            MR. BRUEGGEN:  Objection.  Form.  Vague.

13        A    It -- you -- you know, you received a report,

14    and it was usually like a month versus month.  So this

15    March versus last March, you're up.  And then, you know,

16    typically I would have a talk with the sergeants and

17    say, hey guys, tighten the belt a little bit.  You know,

18    we're spending money that's not in the budget.  We got

19    to -- we got to tighten the belt a little bit and slow

20    it down.  There were -- there were some bosses who were

21    real sticklers about it, and there were other bosses

22    that were more lenient about it.  So it really kind of

23    varied.  And it -- and it also changed with time.  There

24    were times when overtime was like a lockdown.  There was

25    other times when the department seemed a little bit more

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    lax about overtime.
 2         Q    Okay.  So from a -- from the perspective of
 3    detectives, in terms of overtime, my understanding is
 4    basically if your investigation required you to continue
 5    on past your shift, you'd earn overtime for that; is
 6    that right?
 7         A    Yes.  You would earn overtime for it, yes.
 8         Q    And the sergeant would have to approve that,
 9    correct?
10         A    Correct.
11         Q    And what about going to court?  Would that be
12    a source of overtime?
13         A    Yeah.  Court was -- again, that was something
14    that we always felt that we didn't have a lot of control
15    over because you get a subpoena, the department can't
16    say, ignore that subpoena and don't show up because our
17    overtime is too high.  So that was one component of
18    overtime that we really -- you know, I hate to say it,
19    but we just -- we really didn't have the ability to
20    control it because we didn't have the ability to say,
21    ignore a subpoena from the court.
22         Q    And you anticipated my question.  So when --
23    even when there were lockdowns in terms -- or, you know,
24    strike that.  Even when there were efforts to limit
25    overtime, that did not apply to when detectives would go
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to court to testify, correct?

2      A    That's correct.  There was an effort at one

3  point, I remember, where the department wanted a call to

4  the state's attorney who issued the subpoena to say hey,

5  you know, you subpoenaed four detectives on this.  Do

6  you really need all four?  How long are you going to

7  need them for?  It had limited, if any, success.  So I

8  think there was kind of a feeling like, yeah, we really

9  don't have the ability to control -- and the state's

10  attorneys would -- you know, sometimes they would say

11  yeah, we can cut it down to two guys.  But for the most

12  part, they subpoenaed who they needed and we really

13  didn't have the ability to control that, versus

14  extension of tour, which we did have the ability to

15  control.

16      **Q    Okay.  And so, if a detective -- if I**

17  **understand correctly, if the detective worked afternoons**

18  **or midnights, they would get overtime when they went to**

19  **court, correct?**

20      A    Well, I mean, even day detectives would get

21  overtime for going to court if it occurred on their days

22  off.  So it just -- if you were off-duty during those

23  court hours, whether you were on vacation, or whether it

24  was your day off, or you were working afternoons or

25  midnights, as long as you were off duty during the time

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    of the court's subpoena, then you would be given

 2    overtime.

 3         Q    Okay.  But for days, it would have to be

 4    because if was your day off.  Otherwise, if you went to

 5    court on a day that you were on, you wouldn't get

 6    overtime for that if you were on days?

 7         A    That's correct.

 8         Q    But if you were on afternoons or midnights,

 9    you were always going to get overtime for going to

10    court, correct?

11         A    That's correct.

12         Q    Okay.  And so, if you had detectives who

13    closed more cases, would they get more overtime,

14    specifically if they worked on afternoons or midnights?

15         A    If --

16              MR. BRUEGGEN:  Objection.  Form.  Incomplete

17         hypothetical.  Go ahead.

18         A    Yeah.  So just closing a case doesn't

19    necessarily correlate to court appearances.  So it would

20    have to be closing a case that's going to trial that the

21    state's attorney believes your presence is needed for.

22    So just the mere fact that you've closed a case doesn't

23    necessarily correlate to a court appearance.

24         Q    And that's in part because, if I'm -- maybe --

25    I think what I'm misunderstanding is, closing a case
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 doesn't necessarily mean you closed it with charges

2 being approved with criminal prosecution, right?

3        A    That's correct.  But even cases that were

4 closed with prosecution didn't always translate into a

5 court appearance as well.

6        Q    For violent crimes cases where the case was

7 closed with charges and prosecution, would those

8 detectives who closed more cases successfully have the

9 opportunity for more overtime?

10        A    Again, not necessarily.  Some of the -- you

11 would get guys that would plead guilty and there was no

12 court involved at all.  There were -- there were cases

13 that detectives were on where -- based on the facts of

14 the case or the way the reports were written, that

15 weren't required to make an appearance in court.  So I

16 don't know that -- necessarily that making a lot of

17 arrests or getting a lot of cases charged always

18 translated into a court appearance.

19        Q    Okay.  In terms of -- well, strike that. Let's

20 move on for now.  As a -- you became a commander in

21 2008.  What was your -- what groups or units were you

22 overseeing as a commander?

23        A    So for about the first year, year-and-a-half,

24 I was patrol.  I was a 16th District.  And then after

25 that, I was transferred back into the detective division

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to Area 4 detective division.  And I was there until the
2  department did a consolidation of areas.  They went from
3  five areas to three areas.  I couldn't tell you when.
4  Maybe around 2011, and I'm just guessing.  At that time,
5  I went from Area 4, which closed, to Area Central as the
6  commander.  So they moved me from 4 to Central.

7      Q    Okay.  And then how long did you stay in that
8  -- so it was around 2010, if I -- if my math is right,
9  that you became a commander overseeing the detective
10  division at Area 4, correct?

11     A    2009, 2010.  Yeah, I don't -- I don't remember
12  exactly when.

13     Q    Okay.  And then what was the point -- I know
14  -- I understand that the -- there was a consolidation,
15  but at what point did you stop overseeing detective
16  division as a commander?

17     A    In 2013, I was promoted to deputy chief of
18  detectives.

19     Q    Okay.  All right.  So you remained the
20  commander overseeing detective division areas in the
21  period from 2009 or 2010 through 2013 when you became
22  deputy chief, correct?

23     A    That's correct.

24     Q    And in what way was your position as the
25  commander overseeing a detective division different than

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    your role as a lieutenant in that function earlier in

 2    your career?

 3         A    It's a much broader area of responsibility.

 4    You're in charge of filing crimes -- excuse me, property

 5    crimes, special victims.  You're in charge of all the

 6    civilians.  There's a -- it's a -- it's very wide

 7    ranging, really.

 8         Q    And then who did you report to in that

 9    position as commander?

10         A    I reported to the deputy chief of detectives.

11    At the time it was a guy named Dean Andrews.

12         Q    And then the deputy chief of detectives

13    reported to the chief of detectives, correct?

14         A    That's correct.

15         Q    Okay.  All right.  So during the period of

16    time that you were a commander overseeing first

17    detective division Area 4, and then Area Central, you

18    were seeing -- you were overseeing all of the detective

19    units within that division, correct?

20         A    That's correct.

21         Q    Okay.  And that would include violent crimes

22    throughout that period of 2009 through 2013, correct?

23         A    That's correct.

24         Q    Between the time that you had been in the

25    function of a detective in 19 -- you know, 1991 through
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 1994 -- oh, sorry, 1990 to 1994.  So let's actually

2 narrow that down.  From the time you were working as a

3 violent crimes detective in the period from 1991 to '94,

4 to the time that you're now a commander overseeing

5 detective division areas from approximately 2010 to

6 2013, what changes took place in terms of the day-to-day

7 practice of conducting investigations based on your

8 experience?

9         MR. BRUEGGEN:  Objection, form.

10        MS. ROSEN:  Objection.  Form, foundation.

11    A    Yeah.  I couldn't even guess.  I don't recall.

12 I mean, I'm certain at the time, I knew, but I couldn't

13 even guess at that.

14    Q    Were there any different rules in terms of the

15 documentation requirements from the time that you were

16 practicing as a detective to the time you were

17 overseeing these detective division areas, as far as

18 you're aware?

19        MS. ROSEN:  Objection.  Form, foundation.

20    A    Yeah.  Again, I could not recall if there were

21 or not.

22    Q    Okay.  So sitting here today, you don't recall

23 any specific things that detectives were required to do

24 differently in terms of documentation when you came back

25 in the commander role; is that fair?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MS. ROSEN:  Objection.  Form, foundation.

 2     A    Yeah, I don't recall at all.

 3     Q    Okay.  So -- and let me do it this way.  From

 4  the time you were working as a detective -- strike that.

 5  From the time you were working as a detective to the

 6  time when you came back in a sergeant's capacity

 7  overseeing detectives, do you recall any differences in

 8  the documentation requirements of detectives?

 9          MR. BRUEGGEN:  Objection, form.

10          MS. ROSEN:  Objection.  Form, foundation.

11     A    No.  That -- again, that was 30 years ago.  I

12  don't recall what changes or if there were any changes.

13  I don't recall.

14     Q    Was there any point in time when you -- strike

15  that.  You know, I asked you a bunch of questions about

16  what were the kinds of things that needed to be

17  documented during the course of a homicide

18  investigation, and we went through those answers.  We're

19  not -- we won't go through them again, but was there any

20  point when you would say, in one of my supervisory

21  roles, whether as a sergeant or lieutenant or commander,

22  that the answer would change to those questions about

23  the kinds of things that needed to be documented by

24  detectives?

25          MR. BRUEGGEN:  Objection.  Form, vague.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 213 of 782 PageID #:13471
The Deposition of AARON RICHARD TAYLOR, on 11/13/2023
104

```
 1        MS. ROSEN:  Form, foundation.
 2     A    Yeah.  Again, I don't -- I don't -- no.  I
 3  don't recall that.  That's --
 4     Q    Okay.  From the time that you had been a
 5  detective yourself to the time you were a lieutenant
 6  overseeing detectives, can you recall any example of
 7  anything that changed about the documentation
 8  requirement of detectives?
 9        MR. BRUEGGEN:  Objection, form.
10        MS. ROSEN:  Objection.  Form, foundation.
11     A    Again, I don't remember.
12     Q    And the last question.  From the time that you
13  were a detective yourself to the time you became a
14  commander overseeing detectives, do you recall any
15  instances of -- or examples of changes to the
16  documentation requirements that applied to detectives?
17        MR. BRUEGGEN:  Objection, form.
18        MS. ROSEN:  Objection, form.
19        MR. BRUEGGEN:  Asked and answered.
20        MS. ROSEN:  Foundation.
21     A    Yeah.  There -- there may have been.  But
22  again, I don't recall.
23  BY MR. SWAMINATHAN:
24     Q    And when you say there may have been, can you
25  think of any examples or instances of any changes?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. BRUEGGEN:  Objection.  Asked and answered,
 2     foundation.
 3     A     No, I cannot.
 4     Q     Okay.  When you -- and you said that in 2013,
 5     you became a deputy chief -- oh, strike that.  When you
 6     were working as a commander overseeing detectives at
 7     Area 4, did you have a detective named Kriston Kato
 8     working under you?
 9     A     No.  I believe Kato -- I don't know.  I don't
10     recall.  I know Kato left at some point.  I don't recall
11     if he was gone when I got there.  I want to say he -- he
12     may have been gone.  I don't recall.
13     Q     So it sounds like you're aware of who Kriston
14     Kato is?
15     A     Yes.
16     Q     Why are you aware of him?
17     A     Kriston Kato worked for the fraternal order of
18     police after he retired, and I would see him at
19     different events and functions and things of that
20     nature.
21     Q     Did you -- what role, if any, have you ever
22     had with the FOP?
23     A     What role have I had with the FOP?
24     Q     Yeah.
25     A     None.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  Just attending various events is when

2  you see him?

3      A     He would attend them on behalf of the FOP

4  sometimes.  I believe he was also part of their shooting

5  team.  So I would see him at -- at shooting -- police

6  shooting events.  But yeah, no.  Beyond that, I really

7  don't know if he --

8      Q     I'm sorry, go ahead.

9      A     No.  I was going to say, I don't know if he

10 was still in Area 4 when I got there, or if he had

11 already been gone.  I want to say he might have been

12 gone already.  I don't remember ever supervising him.

13     Q     Is there any point in which you became aware

14 of a number of allegations of abuse or misconduct

15 against Mr. Kato?

16     A     No.

17     Q     Is there any point during your time as a --

18 in, you know, moving up as a commander, as a chief, and

19 so on -- in higher positions in the Chicago Police

20 Department when you learned of allegations of misconduct

21 against Kriston Kato?

22          MS. ROSEN:  I have an objection to this line of

23     questioning related to Kato.  It has nothing to do

24     with the Guevara cases.  And, you know, we've -- I

25     haven't said anything up to now, but it feels like

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        you're doing discovery for different cases.  And

 2        stating as an objection to that because the City's

 3        lawyers in the other cases are not present.

 4  BY MR. SWAMINATHAN:

 5        Q    You can go ahead.  Mr. Riccio, you can go

 6  ahead.

 7        A    I'm sorry, what was the question?

 8        Q    Yeah, I'll repeat it and we'll have the same

 9  objection.  And why don't we just do this for the

10  record?  I think Ms. Rosen may have some objections to

11  some of my questions about other officers who are not

12  Rey Guevara related officers during this deposition.

13  I'll note that.  From our perspective, we have a

14  different position which is that this is a case that

15  involves allegations of abuse.  And so, we think

16  allegations of abuse beyond just Mr. Guevara are

17  relevant to our case.  And so, we have a different view

18  than Ms. Rosen, but certainly I appreciate Ms. Rosen's

19  position is different than ours.  And you can have a

20  standing objection related to all of those types of

21  questions to the extent -- to the extent I'm asking

22  them.  So I will repeat my question and then we can --

23  we can keep going.

24             MR. BRUEGGEN:  Anand, did you say you -- this

25        is a case of abuse?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. SWAMINATHAN:  This is a case that does

2      involve allegations of abuse against Francisco

3      Vicente. So there are allegations of abuse against

4      individuals in this case.

5          MS. ROSEN:  Can I -- just to clarify just for a

6      second, I appreciate the standing objection so we

7      can get through it.  But is it your intention to go

8      through a series of other cases and other officers

9      during this deposition?  And how much time do you

10     think you're going to spend doing that, because I

11     may have a different view in terms of accepting the

12     standing objection and perhaps resolving it in a

13     different way, so

14         MR. SWAMINATHAN:  To the extent I have

15     questions about others, it's going to be -- I

16     suspect it's going to be in the context of my

17     various lines of questioning.  I don't have a whole

18     -- I don't have an hour planned to ask about a bunch

19     of other instances of abuse involving a bunch of

20     other officers at that -- to the extent that you're

21     asking me.

22         MS. ROSEN:  Yeah.  Okay.  Thank you.

23  BY MR. SWAMINATHAN:

24     Q     Okay.  Okay.  So I think the question that

25  I'll ask again, and Eileen's objection will apply, is,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    is there any point during your time as an exempt -- I'm
 2    confused.  When you get higher up, you become exempt or
 3    you become non-exempt?  Remind me.
 4         A    You become exempt.
 5         Q    You become exempt.  Yeah.  Okay.  All right.
 6    So during the time that you were in a position within
 7    the Chicago Police Department as an exempt employee, did
 8    you ever learn of allegations of abuse or misconduct
 9    against Kriston Kato?
10              MR. BRUEGGEN:  Object to form.  Go ahead.
11         A    No, I did not.
12         Q    During the time that you worked as a
13    supervisor overseeing Area -- strike that.  During the
14    time you were supervising the detective divisions,
15    either as a sergeant or lieutenant or as a commander,
16    did you ever have any command authority or supervisory
17    role over Mr. Boudreau?
18              MR. BRUEGGEN:  Objection to foundation.  Go
19        ahead.
20         A    I'll say no.  But I don't know who that is, so
21    I can't say conclusively that I didn't.
22         Q    Okay.  All right.  When you became deputy
23    chief -- strike that.  As a commander overseeing
24    detectives, did you have any responsibility for writing
25    policies?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 219 of 782 PageID #:13477
Prev Deposition of Anthony Riccio - taken on 1/19, 2022
110

1          MR. BRUEGGEN:  Objection.  Form, vague.

2      A    Very limited.  You know, you could set your

3  own policy on, for example, how to get approval for

4  overtime.  You could set different policies within your

5  unit that were applicable to your unit.  But the broader

6  Bureau of Detective policies or anything that conflicts

7  with department policies, no.

8      Q    Okay.  Did you -- at any point in time when

9  you were overseeing -- when you were in supervisory

10  capacities in any of the detective divisions, did you

11  have any involvement in writing or modifying any of the

12  general orders or special orders that applied to

13  detectives?

14          MR. BRUEGGEN:  Objection.  Form, vague.

15      A    As a deputy chief, I was given orders that

16  were being rewritten, and maybe even as a commander, to

17  review as part of -- I forgot what they call it.

18  Staffing.  They called it staffing.  So they would -- if

19  there was a new order coming out, they would send it to

20  the exempts within the bureau for staffing suggestions

21  like, hey, this is a bad idea, or oh, this is a good

22  idea.  Let's change this a little, let's change that a

23  little.  So that was a common practice.  Even when the

24  department would change orders, they would send those

25  orders out for that staffing.  But that was it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      Q    During the entire time that you were either a
 2  detective or a supervisor overseeing detectives, are you
 3  aware of any different policies that applied in terms of
 4  documentation requirements between the different
 5  detective areas in which you worked?
 6          MR. BRUEGGEN:  Objection.  Form, vague.
 7      A    Again, I'm so removed from that.  I wouldn't
 8  be able to say if -- at the time, yes, or at the time,
 9  no.  So it's just -- I don't recall.
10      Q    Are you aware of any general -- strike that.
11  Are you aware of any special orders that applied to
12  detectives that applied only to detectives from
13  particular areas?
14          MR. BRUEGGEN:  Objection.  Form, vague.
15      A    Well, policies that were set in-house by the
16  commanders of those areas would apply specifically to
17  the personnel in those areas.  Some were, you know, when
18  you can take your lunch or what room roll call was going
19  to be held in, but they were only binding on the
20  individuals within that area.  And again, it couldn't be
21  anything that conflicted with the broader detective
22  division rules or the broader department rules.  So
23  typically, they were more of housekeeping type things.
24      Q    Got it.  I think you went right where my mind
25  was, so let me ask it maybe a better way.  The detective
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   division special orders were formal sets of policies and

2   requirements that applied to the detective division,

3   correct?

4       A    That's correct.

5       Q    And those detective division special orders

6   applied to all of the areas, correct?

7       A    Unless the order itself was specifically

8   geared at violent crimes or auto theft or whatever.  But

9   they were broader -- intended to apply, for the most

10  part, to all detectives, yes.

11       Q    Okay.  Thank you.  And that's a useful

12  clarification.  So let me ask a better question.  The

13  detective division special orders that applied to

14  violent crimes detectives applied to violent crime

15  detectives in all of the areas, correct?

16       A    Typically, unless there was a carve-out for

17  some reason that was for a special area, yes.  But

18  typically, unless it had an exemption in it or it had a

19  carve-out for someone, then they applied to everyone.

20  Yes.

21       Q    Okay.  And some of the kind of housekeeping

22  type of policies that a commander could have, those are

23  not things that are captured in the detective division's

24  special orders, fair?

25       A    Fair.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    Okay.  So before we come to those kind of
 2  housekeeping pieces, sticking with the detective
 3  division special orders, are you aware of any detective
 4  division special orders that had carve-outs for specific
 5  areas?
 6            MR. BRUEGGEN:  Object to foundation.  Go ahead.
 7       A    Again, I'm so removed from it, I don't recall
 8  if that was the case or not.  I believe there were some.
 9  But again, that was so long ago I couldn't say it with
10  certainty.
11       Q    Okay.  And so, unless there was a carve-out
12  written right into the detective division special order,
13  the special order would otherwise apply to all of the
14  violent crimes detectives across all areas, correct?
15       A    That's correct.
16       Q    And then in terms of some of the policies that
17  could be set by the commander at that level, I think you
18  indicated that those were usually what you called
19  housekeeping types of issues, correct?
20       A    For the most part, they were housekeeping
21  issues, yes.
22       Q    Okay.  And so, an example of the kind of
23  housekeeping issue you're describing is when you can
24  take lunch or, you know, when you can clock in or clock
25  out, those kinds of things?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 223 of 782 PageID #:13481
Prev. Deposition of Anthony Riccio taken on March 23, 2023
114

```
 1        A    Right, exactly.  Where roll call is going to
 2   be held, can't have lunch in the interview rooms
 3   anymore.  Yeah, things of that nature.  Housekeeping,
 4   yeah.
 5        Q    Okay.  Not -- are you aware of any of the kind
 6   of commander-level housekeeping policies that applied to
 7   how a detective goes about conducting homicide
 8   investigations?
 9             MR. BRUEGGEN:  Object to form, vague.
10        A    Yeah.  I am not aware of any of those.
11        Q    Are you aware of any commander-level
12   housekeeping policies that apply to the documentation
13   requirements that apply to homicide detectives?
14             MR. BRUEGGEN:  Objection, form.
15        A    I'll -- I'll say I'm not aware of them.  But
16   I'm going to, you know, throw a caveat in there that,
17   again, this -- I am so far removed from -- from that,
18   that I don't -- I can't say with any kind of certainty.
19        Q    During the time you were a commander, did you
20   ever set any commander-level policies on housekeeping
21   issues that applied to -- that set your own
22   documentation standards for -- for your detectives in
23   your area?
24             MR. BRUEGGEN:  Object to form.
25        A    Again, I'll say no with the caveat that I am
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    really removed from it and I can't say with absolute

2    certainty.

3        Q    Did you -- do you recall any commander-level

4    housekeeping issues that were ever set -- strike that.

5    Do you remember any commander-level housekeeping

6    policies that were ever set about how detectives go

7    about conducting their interviews of witnesses?

8            MR. BRUEGGEN:  Objection.  Form, foundation.

9        A   I'll have to say -- give the same answer.  I'm

10    not, as I sit here.   But again, I'm years removed from

11    it.  So I couldn't say with certainty.

12        Q    Okay.  And would it be fair to say that your

13    experience is that to the extent there were commander-

14    level policies that were set, things like overall

15    documentation practices or interview practices for

16    witnesses is not the type of housekeeping stuff that was

17    the typical subject of commander-level policies; is that

18    fair?

19            MS. ROSEN:  Objection.  Form, foundation.

20        A   Again, I'll -- I'll say that's accurate with

21    the caveat that I am far removed from -- from that, so I

22    could not say with certainty.

23        Q    And to the extent there were commander-level

24    policies set in any detective area, those commander-

25    level policies could not be contradictory to the special

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 225 of 782 PageID #:13483
The Deposition of Anthony Riccio, Taken on March 25, 2021
116

```
 1   orders or detective -- or general orders; is that
 2   correct?
 3           MS. ROSEN:  Objection, form.
 4       A    Yes.  That is accurate, yes.
 5       Q    So in other words, they couldn't -- a
 6   commander-level policy could not change the requirements
 7   set in detective division special orders, correct?
 8       A    Yes.  That's accurate.
 9       Q    Any commander-level policies that are set
10   could not change the requirements set in any general
11   orders, correct?
12       A    Yes.  That's also accurate.
13           MS. ROSEN:  I'm going to -- sorry to interrupt,
14       but I just want to note for the record that you've
15       been asking a lot of questions related to the
16       witness' experiences as a commander and above, and
17       he didn't become a commander until 15 or 20 years
18       after the events of this lawsuit.  And so, the
19       relevance of this line of questioning is tenuous at
20       best.  And so, the City is objecting that we are
21       spending all this time on these types of questions
22       that are not really relevant to or proportional to
23       the claims in this case, even considering the Monell
24       claims, because you're talking about his experiences
25       ten, 15, 20-plus years later.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. SWAMINATHAN:
 2        Q    Okay.  All right.  So let's move on to your
 3   time as a deputy chief.  Which units or department did
 4   you have responsibility over as deputy chief?
 5        A    So I was deputy chief of detectives, which put
 6   me in charge of everything in the detective division,
 7   you know, absent the chief.
 8        Q    And how long were you in that role?
 9        A    From 2013 until 2015.
10        Q    And then at that point you became a chief in
11   overseeing what unit?
12        A    The Bureau of Organized Crime.
13        Q    And if I understand correctly, that is a
14   different bureau than the Bureau of Detectives, correct?
15        A    That's correct.
16        Q    Okay.  So at that point when you became a
17   chief, you were not overseeing detectives any longer,
18   correct?
19        A    That's correct.  There were a few detectives
20   who worked in the Bureau of Organized Crime in different
21   units.  But as a whole, no, there was no -- there were
22   very few detectives.  Maybe a handful.
23        Q    And what were the types of officers that
24   worked in the Bureau of Organized Crime?
25        A    What do you -- what do you mean by what type
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    of officers?

 2         Q    Yeah.  In other words, was it gang crimes

 3    officers?  Was it patrol officers?  Was it detectives?

 4    Was it bomb and arson?  You know, who were the types of

 5    -- essentially, line-level or -- well, strike that.  Who

 6    -- what was -- who were -- what were the titles of the

 7    types of, you know, non-supervisory staff that worked in

 8    the Bureau of Organized Crime?

 9              MR. BRUEGGEN:  Objection, form.

10              MS. ROSEN:  Objection, relevance.

11         A    They were just patrol officers, like I said,

12    other than the exception of maybe a handful, like

13    half-a-dozen detectives.

14         Q    And then when you -- and then you were in that

15    position until 2017 when you became the first deputy; is

16    that correct?

17         A    Yes, I believe that's correct.

18         Q    Okay.  And then when you became the first

19    deputy, what was your -- what was your responsibilities

20    in terms of oversight within the police department?

21              MR. BRUEGGEN:  Objection, form.

22         A    I guess that's kind of -- you know, the

23    catchall phrase they say is you're in charge of

24    day-to-day operations.  So everything in the department

25    fell under me other than the office of the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   superintendent.
 2       Q    Okay.  And which superintendent did you work
 3   under during the time you were the first deputy?
 4       A    I was appointed by Eddie Johnson, and then I
 5   remained there during Charlie Beck when he was the
 6   interim.  And then for a short time under David Brown
 7   when he became superintendent.
 8       Q    Okay.  And then you remained in that role
 9   until August 2020 when you retired, correct?
10       A    That's correct.
11       Q    At any of the -- at any point in time while
12   you were an exempt employee, were you involved in
13   writing any policies?  You identified a staffing policy
14   that you were involved in writing, I think at one point,
15   correct?
16            MS. ROSEN:  Objection.  Form, mischaracterizes
17        his testimony.  I think you've misinterpreted what
18        he meant by staffing.
19   BY MR. SWAMINATHAN:
20       Q    Okay.  Yeah.  Let me re-ask the question then.
21   At any point you were in as -- you were an exempt
22   employee, were you involved in any writing of any
23   policies for the department?
24            MR. BRUEGGEN:  Objection, form.  Go ahead.
25       A    Yes.  So as the chief of organized crime, I
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 actually rewrote all the Bureau of Organized Crime
2 special orders.
3     **Q    Okay.  Okay.  And in any other positions that**
4 **you held, did you rewrite or write any of the policies**
5 **for any of your -- any special orders or general orders?**
6     A    Other than what we talked about, where
7 staffing -- where it's sent out to a large group and you
8 kind of review it and make suggestions, no.  So that
9 would be -- I didn't write them or rewrite them, that
10 would be more of you weigh in on them and you either
11 concur or not concur and enter your suggestions or your
12 recommendations.  And then it's up to research and
13 development to ultimately decide whether or not they
14 want to make changes based on your recommendations or
15 not.
16     **Q    Okay.  Were you assigned to the -- as a**
17 **detective -- strike that.  Were you, as a detective,**
18 **assigned to work on the Monica Roman homicide**
19 **investigation?**
20     A    I was assigned to assist one day with the
21 arrest of the offender, and then the conducting of
22 lineups.
23     **Q    And who assigned you to do those things?**
24     A    I'll say the on-duty sergeant, but I don't
25 recall who that was.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Who were the lead detectives on the --

 2   in the Roman homicide investigation?

 3             MR. BRUEGGEN:  Objection.  Foundation, form. Go

 4       ahead.

 5        A    The lead detectives were Rey Guevara and Ernie

 6   Halvorsen.

 7        Q    Okay.  Were you -- did you serve as a lead

 8   detective at all on the Roman homicide investigation?

 9        A    No.

10        Q    Did Steve Gawrys serve at all as a lead

11   detective on the Roman homicide investigation?

12        A    No.

13        Q    Okay.  And in terms of serving as a lead

14   detective on a homicide investigation, what does that

15   mean within -- you know, if you're explaining to a jury,

16   what does it mean to say Rey Guevara and Ernest

17   Halvorsen were the lead detectives on the case?

18             MR. BRUEGGEN:  Objection, form.

19        A    Just that they had -- they had the paper.  I

20   really don't know how to explain it.  A lead detective

21   is kind of something that somebody made up along the

22   way.  I think it was just that they had the most

23   familiarity and the most -- the follow-up responsibility

24   based on circumstances that occur sometimes.  I don't

25   want to get into a hypothetical, but they had the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    responsibility for it at some point in the

2    investigation.

3         Q    And so, as the lead detectives -- well, strike

4    that.  Putting it another way, if somebody was keeping a

5    cold case list and, you know, this case ended up on that

6    list, the detectives that you'd speak to as a supervisor

7    about that case were Guevara and Halvorsen; is that

8    right?

9              MR. BRUEGGEN:  Objection, form.

10        A    Well, yes and no.  At -- at the point where

11   the initial -- initially where the case gets started, it

12   would be the scene detectives.  And then at some point,

13   it could be other detectives based on a multitude of

14   different factors.

15        Q    I see.  Okay.  So the case may have had a

16   different assigned or lead detective initially, and then

17   that could change over the course of the investigation,

18   correct?

19        A    I believe that's accurate, yes.

20        Q    Okay.  And in this case, at least by the -- by

21   the time you got involved in the investigation, the lead

22   detectives at that point were Rey Guevara and Ernie

23   Halvorsen, correct?

24        A    That's correct.

25        Q    Okay.  Did you play any role in solving the
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Roman homicide?
 2              MR. BRUEGGEN:  Objection.  Go ahead.
 3         A    No, I did not.
 4         Q    Who did play -- who did solve the Roman
 5    homicide case -- strike that.  Who did ultimately solve
 6    the case for purposes of obtaining charges?
 7              MR. BRUEGGEN:  Objection, form.
 8              MS. ROSEN:  Form.
 9         A    Halvorsen and Guevara.
10         Q    Did you personally develop any evidence that
11    was used to justify Geraldo Iglesias' arrest?
12              MR. BRUEGGEN:  Objection, form.  Develop.
13         A    No, I did not.
14         Q    Did you develop any evidence that was used to
15    justify his charges?
16              MR. BRUEGGEN:  Objection, form.  Develop.
17         A    No, I did not.
18         Q    Did you personally develop any of the evidence
19    that was used to justify his conviction?
20              MR. BRUEGGEN:  Objection, form.
21         A    No, I did not.
22         Q    Who did develop the evidence that was used to
23    justify Geraldo Iglesias' arrest?
24              MR. BRUEGGEN:  Objection, form.
25              MS. ROSEN:  Form, foundation.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 233 of 782 PageID #:13491
The Deposition of Arthur Riddle, taken on page 233, 962

124

```
 1        A     Guevara and Halvorsen.
 2        Q     Who developed the evidence that was used to
 3   justify Geraldo Iglesias' charges?
 4              MR. BRUEGGEN:  Objection, form.
 5              MS. ROSEN:  Form, foundation.
 6        A     I don't know that I can answer that.  Who
 7   developed the evidence?  Is that what the question was?
 8        Q     Yeah.  Yeah.  Who developed the evidence that
 9   was used to obtain charges against Geraldo Iglesias?
10              MR. BRUEGGEN:  Objection, form.
11              MS. ROSEN:  Form, foundation.
12        A     I don't think I know enough about the case to
13   be able to answer that.
14        Q     Who developed the evidence that ultimately was
15   used to convict Geraldo Iglesias in this case?
16              MR. BRUEGGEN:  Objection to form.
17              MS. ROSEN:  Objection to form, foundation.
18        A     Again, same answer.  I don't know that I have
19   enough information.  I don't have enough information to
20   answer that.
21        Q     In this investigation, did you have any -- did
22   you ever go to the scene of the crime in this case?
23        A     No, I did not.
24        Q     Did you have any involvement in the first few
25   days of the investigation when scene witnesses were
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  being interviewed?

2      A    No, I did not.

3      Q    What is the first day that you got involved in

4  this investigation in any capacity?

5      A    I don't remember the date.  It was when I was

6  asked -- when I was asked to back up Guevara and

7  Halvorsen on an arrest.

8      Q    And what does that mean to back them up on an

9  arrest?

10      A    To be an extra presence.  They were going to

11  arrest a suspect for murder and they requested an extra

12  car.

13      Q    Okay.  So did Guevara and Halvorsen personally

14  go to arrest Mr. Iglesias?

15      A    Yes, they did.

16      Q    And did you go with them?

17      A    No, we did not go with them.  We went

18  separately.  And by we, I mean Steve Gawrys and myself.

19      Q    Okay.  And so, you went to the same location,

20  but you went in a separate car?

21      A    Yes.  I don't know that we ever -- I don't

22  know that we went to the same location.  I think we were

23  more in the vicinity of the location.  We weren't

24  present for the physical arrest.

25      Q    Okay.  And that was my next question.  So you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 235 of 782 PageID #:13493
The Deposition of Anthony Riccio, taken on May 26, 2022
126

1  did not participate in the physical arrest of Geraldo

2  Iglesias; is that correct?

3      A    That's correct.

4      Q    And then what role, if any, did you play in

5  that arrest?

6      A    Again, just, we were there or en route there

7  or in a close proximity.  And I don't recall because

8  it's such a long time ago.  Just to be a backup for

9  them.  In the event that they needed help, we would've

10 been there or close by there.

11     Q    Okay.  Okay.  And then after that arrest was

12 made, did you -- strike that.  Was anybody else arrested

13 at the same time as Mr. Iglesias, as far as you recall?

14         MR. BRUEGGEN:  Objection, foundation.  Go

15     ahead.

16     A    I do not know.

17     Q    Okay.  Did you go back to the police station

18 after that?

19     A    Yes.

20     Q    And then after you were back at Area 5, what

21 role did you play in the investigation?

22     A    I was asked to assist in the conducting of two

23 lineups.

24     Q    And what role did you play in assisting in

25 those two lineups?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I was inside of the lineup room where the
 2   suspect and the fillers were.  And basically my role was
 3   to tell them, you know, one at a time to step up to the
 4   glass, make different facing movements, turn left, turn,
 5   right, and then return to their -- their place in line.
 6   And that same process was repeated for -- for everyone
 7   in the lineup.
 8        Q    So you were not in the room with the witnesses
 9   viewing the lineup, you were in the room with the
10   suspect and fillers, correct?
11        A    That's accurate, yes.
12        Q    Okay.  And is that true for both -- strike
13   that.  Is that true for all of the lineups that you
14   participated in?
15        A    Yes.  It's true for all lineups, yes.
16        Q    Were there any lineups that you participated
17   in in which you were in the room with the witnesses?
18        A    No.
19        Q    And how many total lineups did you assist in?
20        A    There were two lineups.  The first lineup
21   involved one witness.  The second lineup, I believe,
22   involved three different witnesses.
23        Q    And in terms of -- strike that.  So what --
24   for the second lineup that involved three witnesses, how
25   do you know it involved three different witnesses?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 237 of 782 PageID #:13495
Prev Deposition of Anthony Riccio    Taken on May 23, 2023
128

1    A    Well, because you have to do the -- the -- the

2    cadence, the sequence of having them step up to the

3    glass individually.  You have to repeat that process

4    three separate times.  I believe it was three.  It -- it

5    could have been two, it could have been four, but you

6    have to repeat that same process each time a new witness

7    is brought to the viewing glass.

8        Q    Okay.  And so, were the three witnesses all on

9    the other side of the wall looking at the lineup one by

10   one?

11       A    Yes, correct.

12       Q    And were they -- were they all in the room

13   together or were they separate?

14            MR. BRUEGGEN:  Object to foundation.

15       A    I -- I do not know because I was inside the

16   room with the suspect and the fillers.

17       Q    Okay.  Do you have an understanding of why

18   those particular individuals were in the -- reviewing

19   the lineup?

20            MR. BRUEGGEN:  Object to form.

21       A    I -- I -- I don't.  I can only assume that

22   they were witnesses and that was why they were viewing

23   it, but I'm -- I'm speculating.  I think that's why most

24   people are asked to view it.

25       Q    Did you have any role in gathering the fillers

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  for the lineups?

2      A   I don't recall.  I -- I mean, I would've had

3  some role in -- in -- in fillers, but I don't recall

4  what that role was.  I know some of them came from the

5  lockup.  Others were volunteers that came in.  But, I

6  mean, it was so long ago, I don't recall how they -- how

7  that came to be.

8      Q   Okay.  But do you have any recollection of

9  whether you performed any -- strike that.  Whether

10  participated in that process of gathering fillers?

11      A   I -- I -- I do not recall doing that, no.

12  Typically, I -- I -- I mean, I could say that I never

13  went out on the street to gather up fillers, so I would

14  -- I would say that that was the same in this time as

15  well.

16      Q   Okay.  And in terms of participating in these

17  two lineups, would it -- strike that.  While you were in

18  the room with the suspect and the fillers, who was in

19  the room with the witnesses who were viewing the lineup

20  for those two lineups?

21      A   I do not know.  Because again, I was inside

22  the room with the fillers and the suspect, so I don't

23  know what was occurring outside of that room.

24      Q   Was it your understanding that you were

25  assisting Rey Guevara and Ernie Halvorsen in conducting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 239 of 782 PageID #:13497
The Deposition of ANTHONY RITCHIE, taken on March 23, 2023
130

1    those lineups?

2        A    Yes.

3        Q    Okay.  And so, was it your understanding that

4    it was Ernie Halvorsen and Rey Guevara who were with the

5    witnesses viewing the lineup?

6        A    Yes.

7            MS. ROSEN:  Objection to form, foundation.

8        A    That -- that was my understanding, yes.

9        Q    Okay.  And sitting here today, can you say

10   whether it was both of them in the room or if it was

11   just one of them in the room?

12       A    I could not say, again.  Because from where I

13   was, you can't see out of that room, you can only see

14   into that room.

15       Q    Okay.  So your understanding is that one or

16   both of Ernie Halvorsen and Rey Guevara were with the

17   witnesses viewing those lineups; is that correct?

18       A    Yes, sir.  That's correct.

19       Q    When you got involved in the investigation in

20   the capacity you just told us about, did you review any

21   aspects of the case file up to that point?

22       A    No, I did not.

23       Q    Did you have any knowledge or information

24   about the investigation when you got involved?

25       A    I -- I just knew that a young girl had been

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 240 of 782 PageID #:13498
The Deposition of ANTHONY RICCIO, taken on May 26, 2023
131

1   killed.  I don't -- again, as I sit here, I -- I -- I

2   don't know what I knew back then, but I just -- I -- I

3   just knew the -- the very basics of the case.  It was a

4   murder investigation of a young girl.

5        Q     After you participated in those two lineups,

6   did you have any further involvement in the Roman

7   homicide investigation?

8        A     No.

9        Q     Did you -- (coughs) excuse me.  Did you ever

10  learn about a witness named Francisco Vicente?

11       A     No, I did not.

12       Q     Did you ever learn of -- that police

13  detectives had obtained a statement from a witness

14  stating that Mr. Iglesias had confessed to this person

15  about the crime?

16       A     No, I did not.

17       Q     As you sit here today, do you have any

18  opinion, one way or the other, about whether Geraldo

19  Iglesias is guilty of the Roman murder?

20       A     I -- I don't know enough about the case to

21  have a -- an opinion on it.  I know that he was

22  identified by a couple of the witnesses who saw the

23  lineup.  But I don't know, beyond that, any of the facts

24  of the case.

25       Q     Okay.  And you have not -- I think you

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  indicated that you have not seen any of the evidence

2  that was presented at trial, correct?

3      A    That's correct.

4      Q    And you have not seen any of the evidence that

5  was presented during the post-conviction process that

6  resulted in his conviction being thrown out, correct?

7      A    That's also correct.

8      Q    Okay.  And your information about him being

9  identified is based on your review of the two lineup

10  reports; is that correct?

11     A    No.  I -- I would've been told.  Following the

12  lineups, I would've been told, here's what the -- the

13  witness said or, you know, this witness said he saw him,

14  this witness said he didn't.  So after the lineup, I

15  would've been given enough information to complete the

16  lineup supplementary report.

17     Q    Okay.  Thank you.  And that's an important

18  clarification.  So when -- your testimony about your

19  participation in those two lineups, is it based at all

20  on memory, or is it based entirely on your review of

21  those lineup reports in preparation for this deposition?

22     A    It's based entirely on reviewing those

23  reports.

24     Q    Okay.  So you don't have any independent

25  memory of those lineups or learning about the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  identifications of Mr. Iglesias, fair?

2      A    Fair.

3      Q    Okay.  And you don't have any independent

4  memory of going out to arrest Geraldo Iglesias, correct?

5      A    That's correct.

6      Q    Everything that you're able to testify to

7  about what you did during the course of this

8  investigation is based on your review of documents; is

9  that correct?

10     A    Yes, that's correct.

11     Q    Okay.  And so, are you relying on the accuracy

12  of those documents for purposes of your testimony?

13     A    I am.

14     Q    Okay.  With regard to the identifications of

15  Mr. Iglesias, your knowledge of that is, again, sitting

16  here today, based on your review of documents, correct?

17     A    Correct.

18     Q    Okay.  And so, as you sit here today in light

19  of the evidence you're aware of and -- and the

20  information you have indicated that you have not seen.

21  As you sit here today, do you have an opinion about

22  whether Geraldo Iglesias did, in fact, murder Monica

23  Roman?

24          MR. BRUEGGEN:  Objection.  Asked and answered.

25      Go ahead.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yeah.  Again, all I can say is I know that
 2   from my review of those reports, that he was positively
 3   identified as the shooter in -- in the lineups.  So that
 4   would, you know, be the basis of my -- of my knowledge
 5   of the case, really, and -- and his guilt or innocence
 6   based on that.  Beyond that --
 7        Q    So -- I'm sorry, go ahead.
 8        A    I was going to say, beyond that, I -- I have
 9   no -- no knowledge of anything.
10        Q    Okay.  And so, if you were to be before the
11   jury in this case, would you -- would it be -- would you
12   indicate to the jury that you believe Geraldo Iglesias
13   is guilty of this crime?
14        A    I --
15             MS. ROSEN:  Objection, form.
16             MR. BRUEGGEN:  Objection to form.
17        A    Yeah.  Again, all I could say is that I know
18   that he was positively identified in a lineup.  Guilt or
19   innocence is not for my -- for me to decide.  I know
20   that he was positively identified in these lineups.
21        Q    Okay.  And so, you would not -- strike that.
22   If I understand you correctly, it is not your testimony
23   that you personally believe that Geraldo Iglesias
24   committed this crime, correct?
25             MR. BRUEGGEN:  Objection, form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q   Yeah.  And strike that.  I don't want to put

2  unfair words in your mouth.  Let me ask it a better way.

3  Sitting here today, you are not prepared to offer an

4  opinion about whether or not Geraldo Iglesias committed

5  this crime as a matter of fact, correct?

6     A   Well, I didn't -- I didn't witness it, so I

7  certainly can't say with absolute certainty that he did

8  it.  All I can say is that I conducted two lineups, and

9  he was identified as the shooter during those lineups.

10  So, you know, having not witnessed it, all -- all I know

11  is the facts from the reports that I authored.

12     Q   Okay.

13     A   That's really all I can say.

14     Q   And you consider the information that you have

15  had available to you to be sufficient information for

16  you to offer an opinion about whether or not he's guilty

17  or innocent?

18     MR. BRUEGGEN:  Objection, form.

19     A   Yeah, no.  I don't -- I don't think I said

20  that.  Again, I didn't witness it, so I would not be

21  able to say that he did it or did not do it.  All I can

22  say is, based on the two lineups, two individuals

23  identified him as the shooter.

24     Q   Okay.  As you sit here today, are you aware

25  that Reynaldo Guevara has been accused of misconduct in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  many cases other than this one?

2      A    Yes, I am.

3      Q    And sitting here today, are you aware that Rey

4  Guevara has been accused of manipulating eyewitnesses

5  during lineup procedures in many cases other than this

6  one?

7      A    No, I am not.

8      Q    Okay.  As you sit here today, are you aware

9  that he's asserted his fifth amendment right in response

10  to all questions about his conduct in this case?

11      A    Yes, I am aware of that.

12      Q    And are you aware that he has asserted his

13  fifth amendment right with regard to whether he

14  manipulated the witnesses Hugo Rodriguez and Rosendo

15  Ochoa?

16          MR. BRUEGGEN:  Objection, form and to the

17      extent it calls for attorney-client privilege.

18      Anything we talked about, you don't have to tell

19      him.

20          THE WITNESS:  Got it.

21          MR. BRUEGGEN:  But do you have an independent

22      basis from anything we talked about?

23      A    Okay, got it.  No, I am not aware of that.

24  BY MR. SWAMINATHAN:

25      Q    Okay.  And based on your involvement in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    lineups, are you in a position to vouch for what Rey

2    Guevara did or did not do when he was in the room with

3    the witnesses viewing the lineup?

4            MS. ROSEN:  Objection to form.

5            MR. BRUEGGEN:  Objection, form.

6        A    No.  Again, I was inside the -- the lineup

7    room with the suspect and the fillers, and that room is

8    designed so you cannot hear out or see out.  So anything

9    that was occurring outside of that room, any

10   conversations, any interaction with witnesses or anyone

11   else would've been outside of -- of my ability to have

12   knowledge of it.

13       Q    Okay.  So would it be -- so if I understand

14   you correctly, what happened in the room when the

15   witnesses were identifying Geraldo Iglesias is something

16   that you were not there for, correct?

17       A    What happened --

18           MR. BRUEGGEN:  Objection to form, vague.

19       A    Yeah.  Are you asking me about what happened

20   in the viewing room or in the room with the suspect and

21   the fillers?

22       Q    Yeah, good question.  So I'm referring to the

23   room where the witness is viewing the lineup containing

24   the suspect and fillers.  So let's use the right

25   nomenclature.  So is that --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     That's --

2       Q     Do you call that the viewing room?

3       A     Typically the viewing room or the viewing

4  area, right.  Yes.

5       Q     Okay.  So you were never in the viewing area

6  during these lineups, correct?

7       A     Correct.

8       Q     And so, you don't know what happened in the

9  viewing area during these lineups, correct?

10       A     Correct.  Again, the room is designed so that

11  you cannot see out or hear conversations going on

12  outside of the room.  So you're really kind of in this

13  isolated little bubble with the suspect and with the

14  fillers.

15       Q     So you cannot vouch for what Rey Guevara or

16  Ernie Halvorsen did when they were in the viewing room

17  with the witnesses viewing the lineup, correct?

18       A     That --

19            MS. ROSEN:  Object to form.

20            MR. BRUEGGEN:  Asked and answered.  Go ahead.

21       A     Yeah, that is accurate.  Yes.

22       Q     Okay.  Sitting here today, do you feel, based

23  on your experience having worked with Rey Guevara and

24  Ernest Halvorsen, that you can offer an opinion about

25  whether or not they engaged in misconduct during the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  time they were with the witnesses viewing the lineup?

2         MR. BRUEGGEN:  Object to form.

3         MS. ROSEN:  Objection to form, vague,

4     foundation.

5     A    No, I -- I could not offer an opinion either

6  way on whatever interaction they had with the witnesses,

7  no.

8     Q    Okay.  When you -- you indicated that you're

9  not aware of details of what specific things Rey Guevara

10  has asserted the fifth amendment with regard to, but you

11  were aware that he had asserted the fifth amendment as a

12  general matter.  I have that correct, right?

13    A    That's correct, yes.

14    Q    And are you also aware that Ernest Halvorsen,

15  at one point, asserted the fifth amendment with regard

16  to his conduct as a Chicago police officer?

17    A    I was not aware of that, no.

18    Q    Okay.  When you found out that Rey Guevara was

19  asserting his fifth amendment right with regard to this

20  case and other cases, what was your reaction?

21        MS. MCGRATH:  Objection, form.

22    A    I -- I don't know that I had a reaction.  I

23  knew that -- I knew that it had happened.  I -- I don't

24  know that I really had a reaction to it at all.

25    Q    When did you first learn about any allegations

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 249 of 782 PageID #:13507
Prev Deposition of Anthony Riccio - taken on 11/29, 2023
140

1    of misconduct against Rey Guevara?

2        A    It's been a while.  Several years, probably

3    when the media -- when the news started covering it, was

4    when I heard about it.

5        Q    Did you ever hear of any allegations of

6    misconduct against Rey Guevara during the time -- strike

7    that.  Did you ever hear of any allegations of

8    misconduct against Detective Guevara through internal

9    police channels?

10            MR. BRUEGGEN:  Objection, form.

11       A    No.  Not that I can recall.

12       Q    Did you ever hear of any allegations of

13   misconduct against Rey Guevara from any other police

14   officers, detectives, or otherwise?

15       A    Broadly, generally, I think it's well-known

16   that -- that Guevara has these allegations against him.

17   As far as when or how -- specifics, I don't -- I don't

18   -- I couldn't provide you with those.

19       Q    Okay.  The knowledge about Reynaldo Guevara

20   having these allegations against him, is that something

21   that's been known from before the time the media reports

22   first started or after?

23            MS. MCGRATH:  Objection to form, foundation.

24            MS. ROSEN:  Objection to form, foundation.

25       A    I -- that would be after the media reports, is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 250 of 782 PageID #:13508
Prev Deposition of Anthony Riccio - taken on Page 25, 2023
141

1    when I found out about it.  I don't know when anybody
2    else found out about it.
3         Q    And knowledge about these general allegations
4    against Reynaldo Guevara, does it go as high as the
5    superintendent of police?
6              MS. ROSEN:  Objection to form, foundation.
7              MS. MCGRATH:  Objection to form, foundation.
8         A    I couldn't say.  I never had a conversation
9    with the superintendent about Reynaldo Guevara.
10        Q    And did you have any -- do you have any
11   information that any of the superintendents you worked
12   with had knowledge of the allegations against Rey
13   Guevara?
14             MS. ROSEN:  Objection.  Form, foundation.
15        A    No.  There's -- there's -- there's nothing to
16   indicate to me that they had any knowledge of any sort
17   of wrongdoing about Guevara.
18        Q    Okay.  And what -- strike that.  Was -- did
19   you have -- strike that.  When you say it was generally
20   known within the department that there were these
21   general allegations against Guevara, what do you mean by
22   that?  What form did that take?
23             MR. BRUEGGEN:  Objection, misstates his
24        testimony.  That's not what he said, Anand.
25        A    Yeah, no.  I -- I think what it -- what I mean

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 251 of 782 PageID #:13509
The Deposition of Anthony Riccio, taken on May 25, 2023
142

1   is that people who had worked with Guevara in particular

2   would -- talked about it, that he had these legal

3   troubles now.  That was it.

4        **Q   And who did you hear talking about these**

5   **general legal troubles that he had?**

6        A   I -- I don't recall.  It's -- it's been so

7   long ago.  I think it's just common knowledge among Area

8   5 detectives that Guevara had these problems.

9        **Q   Okay.  And is that information that was**

10  **communicated to you from other detectives or prior**

11  **detectives?**

12       MR. BRUEGGEN:  Objection, foundation.

13      A   Yeah, I don't -- I don't even recall.  I mean,

14  again, it's -- it's so old, I don't know -- I don't

15  remember where I heard it.  I -- I just remember seeing

16  it on TV, seeing him taking the fifth.

17       **Q   Upon learning that there were these**

18  **allegations against Reynaldo Guevara, at that time -- at**

19  **the time you learned this, you were an -- you were an**

20  **exempt employee, correct?**

21      A   I don't recall when I learned it, yeah.

22      **Q   But let's see.  You would've been -- you**

23  **became an exempt employee -- let's see here.  Where on**

24  **my notes -- when did you -- when did you first become an**

25  **exempt employee?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A    2008.

 2    Q    Okay.  And when you first learned about media

 3  stories about Reynaldo Guevara was after 2008; you agree

 4  with that?

 5    A    I -- I would agree with that, yes.

 6    Q    Okay.  So the first time you learned about

 7  allegations against detective Guevara was when you were

 8  at the commander level or higher, either a deputy chief

 9  or first deputy, correct?

10    A    Correct.

11    Q    And when you learned of those allegations

12  against detective Guevara, you also learned that he was

13  pleading the fifth with regard to the allegations

14  against him, correct?

15    A    Yes.  I believe I saw that on TV.

16    Q    Okay.  What actions, if any, did you take when

17  you learned this information?

18    A    There -- there were no actions to take.  You

19  know, it was under investigation.  There was nothing for

20  me to do.

21    Q    And when you say it was under investigation,

22  who was it under investigation by?

23    A    The department.  I knew that there were --

24  there was investigations -- there were civil suits going

25  on, so I knew that -- that the case was -- that he was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 253 of 782 PageID #:13511
The Deposition of Anthony Riccio, taken on May 25, 2023
144

1  under investigation.

2      Q    And when you say he was under investigation,

3  are you referring to the civil suits or are you

4  referring to something else?

5      A    The civil suits.

6      Q    Okay.  Other than the civil suits, were you

7  aware of any other investigation involving detective

8  Guevara?

9      A    No, I was not.

10     Q    Okay.  So other -- and so, you were not --

11 when you learned this information during the time you

12 were an exempt employee, were you aware of there being

13 any internal investigation within the Chicago Police

14 Department of these allegations against him?

15         MS. ROSEN:  Object to form, foundation.

16     A    No.  In fact, I believe that Guevara had --

17 had long been retired, so there would be no internal

18 investigations.  Internal investigations are only for

19 current employees.

20     Q    Okay.  When you learned of this information,

21 did you take any steps to try to initiate any kind of

22 internal investigations involving Detective Guevara?

23     A    No.  Again, internal investigations are only

24 for current employees.  He would have been long retired.

25     Q    When you learned about this information, did



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 254 of 782 PageID #:13512
The Deposition of ANTHONY RICCIO, taken on May 25, 2022
145

1   you initiate any steps to try to review the past cases
2   in which Detective Guevara had been involved in securing
3   convictions?

4       A    No.

5       Q    Do you know whether any such investigations
6   were initiated by any of your colleagues?

7            MS. ROSEN:  Objection, form, foundation.

8       A    I do not know.  But I'll say again that
9   investigations within the department are only for
10  current employees.  So retired employees' allegations of
11  misconduct are not investigated by the department.

12      Q    Okay.  Are you aware that, at some point, an
13  investigation was conducted by the law firm Sidley
14  Austin into Rey Guevara?

15      A    No, I do not.  No, I've never heard of them.

16      Q    Okay.  Did you ever become aware of the
17  conclusions of the Sidley Austin Law Firm about
18  allegations and misconduct against Rey Guevara?

19           MS. ROSEN:  Objection, form, foundation.

20      A    No.  Again, I've never heard of them, and I've
21  never -- I was never aware that there was an
22  investigation.

23      Q    Okay.  During the time that you were first
24  deputy to the superintendent, did you ever learn about
25  the conclusions of the Sidley Austin investigation being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 255 of 782 PageID #:13513
Prev. Deposition of Ann R. ... taken on ...

146

1    shared with the superintendent?

2            MS. ROSEN:  Objection.  Form, foundation.

3       A    No.  Again, I never discussed it with the

4    superintendent, nor was I aware of this investigation.  I

5    had never heard of it until now.

6       Q    Okay.  So the investigation results have never

7    been shared with you; is that correct?

8       A    They've never been shared with me.  That's

9    correct, yes.

10      Q    Is that surprising to you -- strike that. I'll

11   represent to you the Sidley Austin investigation

12   concluded that, at least in some cases, Rey Guevara had

13   committed misconduct, including physically abusing

14   witnesses, okay?  If that was the conclusion of the

15   investigators hired by the City of Chicago, is it

16   surprising to you that that information would not have

17   been shared with you?

18           MR. BRUEGGEN:  Object to form.

19           MS. ROSEN:  Objection.  Form, foundation, and

20      is not entirely accurate, but you can answer.

21      A    No.  That -- that doesn't surprise me.  Again,

22   Rey Guevara was a former employee, and I don't know why

23   that information would've been shared with me.  So no, I

24   -- I wouldn't be surprised that it was not.

25      Q    Okay.  And so, when you say you're not



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    surprised that it wouldn't have been shared with you,

2    help me understand why you wouldn't expect that

3    information to have been shared at your level of the

4    command staff.

5          MR. BRUEGGEN:  Objection, form.

6          MS. ROSEN:  Objection, form, foundation, and

7      relevance.  We're talking about events that happened

8      in the last couple years, and this has to do with a

9      claim that originates in the early '90s.  Under any

10     view of Monell, you're not getting this evidence in

11     front of a jury, so I have a -- a relevance and

12     proportionality objection.  We have been at this for

13     two -- almost three hours now, and you've asked

14     about ten minutes of questions related to the Roman

15     homicide.  So I am -- I am getting at the end of my

16     patience.

17         MR. SWAMINATHAN:  So I'll just note for the

18     record, we have a different view about what is going

19     to be relevant to the issues of notice and

20     deliberate indifference involving Chicago Police

21     Department, but we don't have to resolve those

22     debates here.

23  BY MR. SWAMINATHAN:

24     Q    Why don't you go ahead, Mr. Riccio?

25     A    Again, he was a former employee, so there's no

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 257 of 782 PageID #:13515
Prev Deposition of Anthony Riccio   taken on May 25, 2023
148

 1  -- no expectation that the behavior of a former employee

 2  would be brought to my attention.

 3      Q    Okay.  Was there any expectation that when

 4  conduct involves -- strike that.  So if I understand

 5  correctly, when conduct involves somebody who has left

 6  the police department, there's not really anything that

 7  can occur internally when that happens; is that right?

 8          MR. BRUEGGEN:  Objection, form.

 9          MS. ROSEN:  Objection.  Form and foundation.

10      A    There's nothing -- there's no investigation

11  that can occur internally because internal

12  investigations are for current employees only.  So the

13  behavior of a past employee, while it may have some

14  relevance for training or -- or, you know, a way to

15  improve ourselves, there's no internal investigation

16  that can be conducted into a former employee.

17      Q    Okay.  So putting aside the word internal

18  investigation, which I understand you to be saying is

19  exclusively for current employees -- do I have that part

20  right?

21      A    Correct.

22      Q    Okay.  So putting aside that concept, could

23  the police department initiate an investigation or audit

24  based on the conduct of a former employee?

25          MS. ROSEN:  Objection to form, foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 258 of 782 PageID #:13516
Prev Deposition of Anthony Riccio  taken on May 25, 2022
149

```
 1          MR. BRUEGGEN:  Objection to form, foundation.
 2     A    That would be outside the -- the scope of my
 3   knowledge.  I -- I have no knowledge of that.  If, in
 4   fact, that happened or did not happen, I don't know.
 5     Q    Are you aware of any instances in which any
 6   kind of investigation or audit of any kind was conducted
 7   based on allegations of misconduct against a former
 8   Chicago police officer?
 9          MR. BRUEGGEN:  Objection to form.
10          MS. ROSEN:  Form, foundation.
11     A    I'm not aware of any.  That's not to say they
12   didn't happen, I'm just saying that, in -- in my
13   capacity, that -- that I'm not aware of them.
14     Q    Okay.  Are you aware of any kind of
15   investigation that took place within the Chicago Police
16   Department to assess best practices or training or
17   otherwise based on the allegations of misconduct against
18   Rey Guevara?
19          MR. BRUEGGEN:  Objection, form.
20          MS. ROSEN:  Objection form, foundation.
21     A    I'm not aware of any.  Again, there may very
22   well have been, but I am not aware of any.
23     Q    Are you aware of any kind of audit that
24   occurred within the Chicago Police Department to assess
25   the impact of any misconduct by Reynaldo Guevara on past
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    investigations and cases?

 2          MR. BRUEGGEN:  Object to form.

 3          MS. ROSEN:  Object to form, foundation.

 4    A     Again, I'm not aware of any.  That's not to

 5    say that I would've been made aware of it if it

 6    occurred.  But I -- I -- as I sit here, I am not aware

 7    of any, no.

 8    Q     Okay.  And based on your --

 9    A     I'm not --

10    Q     Go ahead.

11          MR. BRUEGGEN:  Do you have a -- where are you

12       at in your outline as far as time?  I'm just

13       wondering if we should take a break for lunch

14       because we --

15          MR. SWAMINATHAN:  Yeah.  Why don't -- I have

16       just a couple more questions on this line that I

17       have to make sense to take a break for lunch and

18       then -- and then -- and then come back.  But I

19       need --

20          MR. BRUEGGEN:  Well, I will talk --

21          MR. SWAMINATHAN:  I need a few minutes.

22          MR. BRUEGGEN:  I'll talk to Mr. Riccio about

23       how long of a break he wants.  But, you know, at

24       least take a break --

25          MR. SWAMINATHAN:  Yeah, for sure.  Yeah, for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        sure.  Why don't we take -- why don't we plan to
 2        take a lunch break and he can -- you guys can decide
 3        how long you -- how long you want do that.  But can
 4        we go another two minutes or so?
 5             MR. BRUEGGEN:  Yeah, yeah.
 6             THE WITNESS:  Yeah, I'm good.
 7             MR. SWAMINATHAN:  You're good?  Okay.
 8             THE WITNESS:  I'm good.
 9   BY MR. SWAMINATHAN:
10        Q    Based on your extensive experience in the
11   Chicago Police Department, to the extent any kind of
12   investigation or audit was conducted to try to assess
13   any impact on best practices or training, who in the
14   police department would be responsible for that or know
15   about that?
16             MR. BRUEGGEN:  Object to form.
17             MS. ROSEN:  Form, foundation.
18        A    It -- it's difficult to say.  It could be at
19   -- at the training division.  It could be within the
20   Bureau of Detectives.  It -- those would -- and I'm just
21   answering, you know, based on -- on my knowledge from
22   two years ago.  Those would be the places that I would
23   most likely see something like that occur.  It could be
24   in -- in the law office within the police department,
25   the general counsel's office.  Again, it's -- I'm -- I'm
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    just speculating.  All I know is that it never came to

2    my level.

3         Q    Okay.  And during the time that you were a

4    commander, deputy -- or deputy chief overseeing

5    detectives, did you ever have any investigations that

6    were conducted under your command into allegations of

7    misconduct against Reynaldo Guevara?

8              MR. BRUEGGEN:  Objection.  Form, foundation,

9         asked and answered.

10        A    Can you repeat that?

11        Q    During the time that you were a commander and

12   deputy chief overseeing detective division -- detectives

13   in detective division, did you ever initiate any

14   investigations into allegations of misconduct against

15   Reynaldo Guevara?

16        A    No.  But I think Guevara was already retired

17   before I became a commander.  I -- I don't know when he

18   retired specifically, but I believe he was gone prior to

19   the time that I even became a commander in the detective

20   division, which was like 2009 or 2010.  I believe he was

21   already retired.

22        Q    Okay.  And during the time that you were a

23   commander and deputy chief overseeing detectives, did

24   you initiate any kind of effort to assess best practices

25   or trainings or otherwise to address the types of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    allegations of misconduct against Reynaldo Guevara?

2            MR. BRUEGGEN:  Objection to form.

3            MS. ROSEN:  Objection.  Form, foundation.

4       A    I -- I -- I would say no, I don't recall.  I

5    don't recall that ever coming up, no.

6       Q    Okay.  During the time that you were a

7    sergeant and a lieutenant and a commander overseeing or

8    supervising detectives, are you aware of any instances

9    in which any trainings or -- let's start with -- let's

10   start with trainings.  Are you aware of any instances in

11   which any trainings were conducted with detectives

12   during the time you were a supervisor as a sergeant,

13   lieutenant, or commander, in which there were trainings

14   put in place based on allegations of misconduct against

15   detectives?

16           MS. ROSEN:  Objection, form, foundation.

17      A    Yeah, I -- I think that was kind of an ongoing

18   thing.  Anytime that there was some sort of a finding in

19   court, or even if -- even in a civil judgment or

20   something that adversely affected some detective or --

21   or -- or the way we did things, there was training to

22   kind of modify it and come in line with whatever that

23   ruling was or whatever that law was.  So I think those

24   training -- that training was kind of ongoing.  That was

25   a continuous thing.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      Q    So there were instances when trainings were
 2   conducted with detectives based on the outcomes of civil
 3   lawsuits?
 4      A    I -- I believe that there were, yeah.  There
 5   was -- there were some.  And I -- I don't remember
 6   specifics.  I mean, sometimes it was something as basic
 7   as a -- as a roll call training where you would sit down
 8   and discuss with the detectives, like, hey, somebody,
 9   you know, just had a -- there -- we lost a lawsuit based
10   on -- based on this or based on that, and then here's a
11   way that we need to make some corrections or -- or
12   modifications or -- or go in a different direction.
13   There -- there was -- I think that was kind of an
14   ongoing thing anytime something happened.  Even losing a
15   case in criminal court where it was lost, for example,
16   because you didn't document who was in the room when you
17   read Miranda to the -- to the offender would bring
18   about, you know, like, hey, from now on, in these
19   reports, we got to document who was present or -- or
20   what time Miranda was read, or -- so there -- I think it
21   was kind of an ongoing thing.  Any time that you -- you
22   took a ding because an offender beat you at trial or
23   beat a case at trial or won a civil lawsuit, I think we
24   always tried to modify our practices to -- to try to
25   make sure it didn't happen again.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    Okay.  So outcomes at the -- at criminal

 2   trials was something that was being followed within

 3   detective divisions; is that right?

 4       A    Yes.  I mean, that would be brought back to us

 5   by detectives who would say, I lost this case.  This

 6   robbery offender got off because of XYZ.  You know, OJ

 7   Simpson's case led to best practices with collecting

 8   evidence at the crime scene for DNA processing.  So

 9   there's always -- there's -- it's -- it's a constant

10   evolving of -- of policies and procedures, whether it's

11   documenting things or interviewing or -- or the rooms or

12   filling out paperwork.  That -- there's -- there's --

13   there's a constant evolving to try to not repeat

14   mistakes, I think.  And that's -- that's something that

15   was ongoing, and that was something that I stressed

16   during my time as a supervisor in the detective

17   division.  And I saw many other supervisors in the

18   detective division doing the exact same thing.

19       Q    Okay.  So thank you for that.  So detective

20   division supervisors, in your experience, were keeping

21   track of what was happening in the criminal courts in

22   cases involving their detectives, correct?

23       A    I don't know --

24            MR. BRUEGGEN:  Object to form.

25       A    Yeah, I don't know that it was necessarily
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  keeping track.  I think a detective would come back and
2  say, I -- I -- you know, I was annihilated on the stand
3  because of ABC, and then that would kind of translate
4  into roll call training.  As -- when I was a deputy
5  chief of detectives, when I got wind of things like
6  that, I would try to make sure we integrated that into
7  training for the new detectives as well.  So again,
8  there was this constant evolving of our -- our
9  practices, whether it was documenting, interviewing,
10 detention, you know, the -- we got annihilated on a
11 civil suit for 48 hour -- for exceeding the 48 hours of
12 -- of detention.  That led to a new policy that, on 48
13 hours, if the state won't charge, they walk out the
14 door.  That led to the duty judges.  You know, the duty
15 judges kind of evolved from that, where we could go to a
16 duty judge and -- and -- and, you know, be able to
17 detain somebody beyond that 48 hours.  So there was --
18 there was a -- just a constant updating of policies to
19 try to do it better, to try to do it right, to -- to
20 make sure that we didn't lose these cases in court, to
21 make sure that we didn't expose detectives to -- to
22 civil liability.  So that was -- that was always
23 ongoing.
24      Q    And this -- and -- and these -- and these
25 efforts to basically learn from what was happening in --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   during criminal cases was something that supervisors
 2   were doing; is that right?
 3        A     Yeah.  So then when it was brought back to
 4   their attention that -- that something happened, this --
 5   that was -- that was something that we tried to learn
 6   from and pass on at roll call.  I don't know that it
 7   always translated into policy.  Sometimes I'm sure that
 8   it did, with the 48-hour rule for example, translate
 9   into policy, so
10        Q     When -- oh, go ahead.
11        A     Yeah.  So -- so it was -- you tried to learn
12   from your mistakes.  I mean, really that was -- that was
13   what it was all about.  Nobody was -- was trying to
14   skirt the system or -- or get around things.  You would
15   -- you would lose and you would realize, here's why we
16   lost, let's do it differently the next time.  And -- and
17   that was something that we were constantly doing within
18   the detective division.  Nobody wanted to see a murder
19   offender walk out the door because of some documentation
20   on paper that was -- was screwed up or -- or -- or, you
21   know, some -- some misstep or, you know, you detained
22   him too long and -- and now you -- he's going to be
23   getting out.  So there was -- or, you know, the evidence
24   was not collected right, or you didn't preserve this --
25   when DNA came around again, for example, the initial

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   collection of DNA, I think we learned from the OJ
2   Simpson trial, had to be very, very carefully done.  So
3   there was always an effort to learn and improve.
4        Q    So as -- if I understand correctly, so as a
5   sergeant, lieutenant, and commander overseeing
6   detectives, your experience is that there were times
7   when the outcomes in criminal trials resulted in
8   trainings for detectives; is that right?
9        A    Yes.  I think that's accurate.  Yes.
10       Q    And of course, the first step to that is the
11  -- as a supervisor and as sergeants, lieutenants and
12  commanders in the detective division, they were learning
13  about these outcomes in criminal trials in order to be
14  able to conduct trainings for their staff; is that
15  correct?
16       A    Yeah.
17            MR. BRUEGGEN:  Object to form.
18       A    Typically detectives would bring that
19  information back and then that would be the subject of
20  -- of roll call training, sometimes just within an area,
21  sometimes much broader throughout the detective
22  division.  Sometimes it was incorporated into the
23  training for new detectives, newly promoted detectives.
24  Sometimes it was in-service training.  So it took
25  various forms, but it was -- it was -- it was a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    constant.  It was -- it was nonstop.  There was always
 2    an effort to improve and not make the same mistake
 3    twice.
 4         Q    And that was inside --
 5         MR. BRUEGGEN:  Anand --
 6         MR. SWAMINATHAN:  Go ahead.
 7         MR. BRUEGGEN:  Good time for the break?  You
 8      said two minutes --
 9         MR. SWAMINATHAN:  I said about two more
10      minutes.  Let's finish this line so that we're --
11      that we can move on.
12    BY MR. SWAMINATHAN:
13         Q    So one of the -- one of the things that would
14    be a -- strike that.  So if defendants were -- a
15    defendant beat a case, basically, got an acquittal, that
16    was the kind of information that detectives were
17    bringing back to the sergeants, lieutenants and
18    commanders that could result in some training; is that
19    right?
20         MS. ROSEN:  Objection, form.
21         MR. BRUEGGEN:  Misstates his testimony, but go
22      ahead.
23       A    Yeah.  I -- I don't know that that was what I
24    was saying.  I think that if you lost it because of
25    something that we were doing, then we would -- you know,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   sometimes you just lose a case.  Sometimes the evidence
2   isn't there or, you know, there's a multitude of
3   reasons.  But if it was -- it was an error on our part
4   or something that we think we could do better, that's
5   where the training came in.
6        Q    Okay.  And -- understood.  Not every single
7   case in which somebody beats --
8        A    No.
9        Q    -- results in a training, fair?
10       A    Right.
11       Q    But in some instances it would, correct?
12       A    Right.
13       Q    And so, one of the things that the supervisors
14  were doing was keeping track, as a general matter, of
15  what was happening in the criminal court so that they
16  could conduct better training and improve practices
17  within the department, correct?
18            MS. ROSEN:  Objection, form.
19       A    Yeah.  I don't know that they were keeping
20  track.  I think it was -- it was just evolving if things
21  evolved.  I don't know that there was any keeping track.
22       Q    Understood.  If a motion to suppress a
23  confession or statement was granted, is that the kind of
24  thing that would be brought back to the supervisors to
25  try to improve practices?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BRUEGGEN:  Objection.

 2              MS. ROSEN:  Form, foundation, hypothetical.

 3         A    Yeah.  I -- again, that -- I think that's -- I

 4    think that's overstating or -- or -- or kind of broad

 5    for what I'm stating.  It's -- it's where we took a hit

 6    for something that we either did or did not do.

 7    Sometimes a motion to suppress is successful for other

 8    reasons.  But if it was an error on our part,

 9    documentation or whatever, those were the types of

10    things that we could turn around and train detectives to

11    not do again.

12         Q    Information about Brady violations that were

13    found in state court, was that the kind information that

14    would come back to supervisors in order to improve

15    practices?

16              MS. ROSEN:  Object to form, foundation.

17              MR. BRUEGGEN:  Incomplete hypothetical.

18         A    Yeah.  I --

19              COURT REPORTER:  Counselors, I can't note both

20         of your objections at the same time, so if you could

21         please do one at a time.  Thank you.  Sorry to

22         interrupt.

23              MR. SWAMINATHAN:  Do one of you want to go

24         ahead and repeat your objection?

25              MR. BRUEGGEN:  Well, I --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. SWAMINATHAN:  Why don't I -- why don't I
 2      strike the question.  Let's -- I think I probably
 3      don't even remember what the question was.  But
 4      let's take the break now.  This is a perfectly good
 5      time.
 6              MR. BRUEGGEN:  All right.  Give me a second
 7      here.  Anand, can we do like a half-an-hour?  Come
 8      back about --
 9              MR. SWAMINATHAN:  That makes sense.
10              MR. BRUEGGEN:  -- 1:40-ish?  Maybe a little
11      before that?
12              MR. SWAMINATHAN:  Yeah, perfect.  Perfect.
13      Thank you, everybody.
14              COURT REPORTER:  We are now off the record, the
15      time is 1:07.
16              (OFF THE RECORD).
17              COURT REPORTER:  We are back on the record for
18      the deposition of Anthony Riccio being conducted by
19      videoconference.  My name is Sydney Little.  Today
20      is May 18, 2022, and the time is 1:57 p.m.
21  BY MR. SWAMINATHAN:
22      Q    Okay.  Mr. Riccio did you have a chance to get
23  some lunch?
24      A    Yes, I did.  Thanks.
25      Q    Okay.  And are you -- you're feeling ready to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    keep going?

2         A    I'm ready.

3         Q    Okay.  I asked you a number of questions about

4    Reynaldo Guevara.  What was your opinion of Rey Guevara

5    as a detective when you worked with him?

6         A    I rarely worked with Rey Guevara.  He worked

7    afternoons and I almost exclusively worked days and

8    midnights, so I had very little contact with him.

9         Q    So did you form any opinion about Rey Guevara?

10        A    No, I really -- I really didn't.

11        Q    Did you -- did Rey Guevara have any reputation

12   that you knew of during the time you worked with him?

13        MR. BRUEGGEN:  Object to form.  Go ahead.

14        A    None -- none that came to me.  None that I was

15   -- became aware of.

16        Q    At any point prior to the time that you

17   learned of the media -- from the media about allegations

18   against Rey Guevara, did you have -- did he have a

19   reputation that you knew of, of any kind?

20        MR. BRUEGGEN:  Objection, form.

21        MS. MCGRATH:  Objection, form.

22        MR. BRUEGGEN:  Go ahead.

23        A    No, he did not.  Not that I'm aware of.

24   BY MR. SWAMINATHAN:

25        Q    What opinion did you have of Ernie Halvorsen

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  based on your work with him as a detective?

2      A    Same.  I rarely worked with or saw Ernie

3  Halvorsen because, again, he worked afternoons.  I

4  worked the day shift, sometimes the midnight shift.  So

5  the only time I would see either one of those guys is if

6  I was working over from the day shift.  Then I would --

7  I would see them.

8      Q    What reputation, if any, did Ernie Halvorsen

9  have as a detective?

10          MR. BRUEGGEN:  Object to form.  Go ahead.

11     A    Yeah, I don't -- I don't think I was really

12 aware of a reputation for Ernie either.  I really -- our

13 paths didn't cross.  I really had no opinion or -- or

14 anything of him or Rey, either way.

15     Q    Okay.  I asked you some questions before the

16 lunch break about the allegations of misconduct against

17 Rey Guevara.  And we talked about the idea that he was

18 not a current employee at the time that you learned

19 about these allegations of misconduct.

20     A    Right.

21     Q    I want to go back to that just very briefly.

22 If Rey Guevara had been a current employee at the time

23 you learned of the allegations of misconduct against

24 him, what -- what could you or would you have done if

25 you learned of those allegations?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              MR. BRUEGGEN:  Objection --

 2              MS. ROSEN:  Objection.  Form, foundation,

 3         incomplete hypothetical.

 4       A    Well, if he -- if he had been a current

 5   employee at the time those allegations came out, there

 6   would have been a complaint registered against him,

 7   complaint register number, CR number, they call them,

 8   based on the allegations that were presented in the --

 9   in the media.

10       Q    And then what would that have -- what would

11   that have resulted in?

12              MR. BRUEGGEN:  Objection, speculation.

13       A    An investigation would've been conducted,

14   either by internal affairs or whatever the independent

15   investigating body is, COPA, IPRA, OPS, whatever it was

16   at the time.  And one of those agencies would've

17   conducted an investigation into whatever the allegations

18   against him were.

19       Q    Okay.  And would that have -- when those

20   allegations came to light, would it be -- would it

21   result in the opening of one CR or multiple for each

22   separate instance of alleged misconduct?

23              MR. BRUEGGER:  Objection, form.

24              MS. ROSEN:  Objection.  Form and foundation.

25       A    The -- I -- I -- I actually -- the smartest
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   thing I could do is just tell you, I'm not certain.  I
 2   -- I would just be guessing at any answer.  Allegations
 3   from a particular complaint are all investigated
 4   together.  If there's different complaints from
 5   different incidents, those would all be investigated
 6   together.  So there could be multiple allegations from
 7   one incident, they would all be investigated together by
 8   the same body.
 9        Q    Okay.  Are CRs ever opened for retired cops or
10   former police officers?
11             MS. ROSEN:  Objection.  Form, foundation.
12        A    No, they are not.  Only current employees can
13   be the subject of a CR investigation.
14        Q    Okay.  And we had talked earlier about the
15   fact that any findings that had been reached by the
16   Sidley Austin team were not shared with you regarding
17   their finding as to Rey Guevara's abuse, correct?
18             MR. BRUEGGEN:  Objection, form, misstates his
19        testimony.
20        A    I -- I --
21        Q    Can I re-ask the question?  Sorry.  Was that
22   unclear?
23        A    No, no.  I -- I -- I'm unaware of that
24   investigation or any findings from that investigation.
25   This -- this is the first I'm hearing of it.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  If Rey Guevara had been a current
 2   employee, you expect that if there had been findings of
 3   misconduct by him, it would have been shared with you if
 4   there had -- if he had in fact been a current employee?
 5             MR. BRUEGGEN:  Objection.  Form, foundation,
 6        and speculation.
 7        A    Yeah.  Can you repeat the question actually?
 8        Q    Yeah.  If there had been findings of
 9   misconduct by the Sidley Austin investigation against
10   Rey Guevara and he was still a current employee at that
11   time, do you then expect that you would've learned about
12   those findings?
13             MR. BRUEGGEN:  Objection, speculation,
14        foundation, incomplete hypothetical.  Go ahead, sir.
15        A    Yeah.  It -- it's hard to answer just based on
16   that.  It depends what those findings were.  So really
17   it's -- it's impossible to say whether or not they
18   would've been shared with me.
19        Q    Okay.  Going back to the time that you were a
20   commander overseeing detectives, so this is the period
21   from in and around -- period of time between 2008 and
22   2013.  During that period, were there ever any instances
23   when allegations of physical abuse or other misconduct
24   were raised against detectives who were current
25   detectives?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUEGGEN:  Object to foundation.  Go ahead,

2     sir.

3     A    I don't recall.  I would say in a -- in a time

4     span that large, that that's probably a safe bet that

5     there had to be some sort of allegations.  I would say

6     that they were rare.  But again, I -- I couldn't say for

7     sure that there were or were not any that occurred.

8     **Q    When there were allegations of misconduct**

9     **during the course of homicide investigation, was that**

10    **information supposed to be shared with you as the**

11    **commander overseeing detectives?**

12         MR. BRUEGGEN:  Objection.  Form, incomplete

13    hypothetical, vague.

14    A    Yeah.  I mean, I hate to say -- the question

15    just doesn't -- it's impossible to answer the way the

16    question's presented.  There's a lot of different

17    scenarios that could -- could come into play where I

18    would be notified as the commander.  There's also many

19    scenarios where I would not be notified.  So it's

20    impossible to really pin down an answer for you on that.

21    **Q    Thank you.  When you were -- when you were a**

22    **commander overseeing detectives, what were the**

23    **circumstances in which allegations of misconduct against**

24    **homicide detectives working under your supervision would**

25    **have been, or should have been shared with you?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1           MR. BRUEGGEN:  Objection.  Form, foundation.
 2      A    If the allegations were not going to be
 3 investigated by the independent investigation agency,
 4 IPRA or COPA, and not going to be investigated by
 5 internal affairs, they would come to the unit to be
 6 investigated.  In that case, they would come through my
 7 office as the commander, I would read those allegations,
 8 and then I would give them to a lieutenant, who in turn
 9 would assign it to a sergeant to conduct the initial
10 investigation into the misconduct.  So in those
11 situations, I would be aware of it.  The only other
12 scenario that I could think of as I sit here is if the
13 allegations were of something so egregious that it
14 warranted some sort of immediate action.  For example,
15 the superintendent would be stripping someone of their
16 police powers or something.  Then it would -- it would
17 also come to my attention at that point.  The -- when an
18 investigation was completed and there was a finding, if
19 the finding required discipline of even a reprimand up
20 to a suspension, that would also come to my attention.
21 So there are times when, as the commander, you do know
22 -- you become aware of allegations against officers.
23 There are many times when there's allegations that you
24 are not made aware of.  There's also confidential
25 investigations that are held by a very select small
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    group of people in internal affairs to investigate.

2    Those obviously are not shared with anyone outside of a

3    very small group of individuals.

4    **Q    What are the circumstances in which**

5    **investigations were not conducted by, you know, the**

6    **internal affairs division or the civilian investigating**

7    **body, whatever it was at that particular time, and**

8    **instead would be assigned to the unit?**

9    MR. BRUEGGEN:  Object to foundation, form.  Go

10   ahead.

11   A    I actually don't know.  That was like one of

12   the -- the mysteries that we've never figured out.  They

13   simply elected not to investigate it, yet it warranted

14   an investigation, so it would be sent to the unit.  But

15   I don't know -- I mean, you'd have to talk to someone in

16   internal affairs as to why or why they didn't want to

17   take on certain cases.

18   **Q    And so if it came to the unit for you to**

19   **assign as the commander, you would then assign it --**

20   **would you then assign it to lieutenants or sergeants or**

21   **what?**

22   A    I would give it to the lieutenant in charge of

23   that oversight office, and then he would assign it to

24   the most appropriate sergeant.  So if it was a -- a

25   property crimes detective that was accused, I would give

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 280 of 782 PageID #:13538
The Deposition of Kevin Rickford, taken on May 18, 2021

171

 1  it to the property crimes lieutenant.  He would assign

 2  it to the most appropriate sergeant, which would most

 3  likely just be a sergeant from that watch that the

 4  detective worked, and that sergeant would conduct the

 5  investigation.

 6      Q    So the -- you said the investigations that

 7  were conducted by the -- strike that.  The

 8  investigations that came to the units to be investigated

 9  would ultimately be investigated by individuals who were

10  supervising the individual who was accused, correct?

11         MR. BRUEGGEN:  Objection, form, misstates

12     testimony.  Go ahead.

13      A    Generally, yes.  But -- but like with

14  everything else, there were -- there were exceptions. So

15  not always, I would say.

16      Q    But -- so the general rule was that you would

17  assign the investigation to a supervisor who had

18  supervisory authority over that particular individual,

19  correct?

20      A    Again, not necessarily that -- that person,

21  but you would -- someone of that rank.  It didn't have

22  to be their supervisor.  Occasionally it was,

23  occasionally it was not.  But definitely a person a rank

24  above the accused.  So it would normally be a sergeant

25  investigating a detective.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 281 of 782 PageID #:13539
Prev Deposition of Antonio Rticled: Dixon/2on Page 281 of 782
172

1    Q    And were there ever any steps to ensure that

2    the individuals who were investigating officers were not

3    the supervisors who work day-to-day with these

4    detectives?

5            MR. BRUEGGEN:  Object to form.

6    A    No, there were not.  In fact, that was

7    oftentimes the most appropriate person because they had

8    access to that person.  They -- they worked the same

9    hours and that was the person who would best be able to

10   interview them and -- and get the information that they

11   needed to conduct the investigation.

12   Q    Did you ever have concerns about bias in

13   having somebody who worked day-to-day with somebody also

14   investigate them for misconduct?

15   A    No.  I didn't.  And the reason was because

16   that investigation had a lot of review and oversight. So

17   when -- when the sergeant was finished with it, it went

18   to the lieutenant, and the lieutenant reviewed it and

19   had to sign off on it.  And then it would come to the

20   commander who would review it and sign off on it. And

21   then it would go to internal affairs, and internal

22   affairs would have to review and sign off on it.  So

23   there were a lot of eyes that looked at that

24   investigation after the -- after the sergeant was

25   finished with it.  And any one of the people in that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    chain had the ability to send it back for further

2    investigation or pick up the investigation themselves if

3    they felt it was warranted.  So I wasn't -- I wasn't

4    concerned about that.

5        Q    During the time that you -- I'm changing gears

6    here for a minute.  During the time you were working as

7    a homicide detective, did you ever get tips on a murder

8    case from a confidential informant?

9        A    How are you defining confidential informant?

10       Q    It -- that is a term that is in the documents

11   in this case, and so I'm using that term -- I'm simply

12   repeating the term.  But why don't you tell me if

13   there's -- what that term means, or if there's a

14   different term I should be using, just because I don't

15   know how to define it.

16       A    Sure.  Well, there's confidential informants

17   that -- that -- kind of a broad thing, and people use it

18   differently.  There's confidential informants who are

19   actually registered by the department, and -- which

20   means there's a database somewhere that they know who

21   these individuals are, their -- their affiance on search

22   warrants and things like that.  Other people use the

23   term confidential informant for a citizen who calls the

24   area and says, hey, I -- I know who -- who did this

25   shooting, or I know who broke into somebody's house. You

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 283 of 782 PageID #:13541
Prev Deposition of Anthony Riccio taken on May 26, 2023
174

1    know, I have some information.  Some people use it for a
2    citizen who flags you down on the street and says, I
3    don't want to get involved, but the guy standing over
4    there is holding a gun, or the guy standing over there
5    robbed the gas station yesterday.  So it's -- it's kind
6    of a wide range of -- people use that term kind of
7    loosely.  There's -- you know, I think if you want to
8    break it down, there's cooperating individuals and then
9    there's confidential informants.  Cooperating individual
10   may be anonymous, may not be anonymous, may be known
11   just to the individual he provides to the officer, he
12   provides the information to.  So it really could run the
13   gamut.
14        **Q    Okay.  So let's start with -- so I think the**
15   **terms you're using are confidential informant and**
16   **cooperating individual, correct?**
17        A    I think that kind of separates the two groups
18   the best, yes.
19        **Q    And the -- and the confidential informant is a**
20   **person who is registered in a database within the**
21   **Chicago police department and may be somebody who is --**
22   **sort of somebody who is used regularly to help advanced**
23   **cases, correct?**
24        A    Correct.  Typically they're paid.  They're
25   very -- they're very controlled.  And those individuals

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    are known, identified, and typically work with one

2    particular officer all the time.  They may call them up

3    today and say, I know who broke into a house.  They may

4    call them tomorrow and say, there's three guns in the --

5    in this guy's garage.  So and so's driving a stolen car.

6    So they provide -- regularly, I would say, they provide

7    information to the police.

8         Q     Okay.  And those individuals are often paid

9    compensation for that, correct?

10        A     Correct.

11        Q     Okay.  And then separate from that, the

12   cooperating individual is what you define more as

13   somebody who - who is more just like an anonymous caller

14   or somebody who stops you and says, hey, I have

15   information in this one particular instance, but they're

16   not people who are repeatedly involved in assisting

17   investigations, correct?

18        A     Correct.  Sometimes they elect to be

19   anonymous, sometimes they're okay with not being

20   anonymous.  They usually don't want to have any sort of

21   formal role in the investigation like, you know, being

22   on paper with the officer, going into court, testifying,

23   but they're willing to provide some degree of

24   information for detectives, or sometimes police officers

25   to follow up or to advance an investigation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 285 of 782 PageID #:13543
Prev Deposition of Anthony Riccio    taken on May 9, 2023
176

1     Q    Okay.  All right.  So let's start with the --

2    with those definitions, let's start with the

3    confidential informant idea --

4    A    Okay.

5    Q    -- with the definitions you've now given me.

6    So did you ever get a tip on a murder case from a

7    confidential informant as we defined it?

8    A    As we defined it, no, I did not.  I did not

9    have any confidential informants working for me.

10    Q    Okay.  Did detectives have confidential

11    informants that they would ever use in murder cases?

12    A    I -- I -- I couldn't speak to that.  I don't

13    know of any personally.  They may have, I don't know.

14    That's a very confidential thing when you have a

15    confidential informant.  So that's -- it's not something

16    you would share generally with someone outside of

17    yourself and the -- the unit that maintains those --

18    those names and the identities of those individuals.  So

19    I'm not aware of any.  I'm certain there are, but I'm

20    not aware specifically of anybody.

21    Q    Were you -- were detectives trained on this --

22    the idea that there was this, you know, ability to

23    develop confidential informants and then have some

24    resources available to try to have these individuals

25    assist in investigations?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 286 of 782 PageID #:13544
Prev Deposition of Anthony Riddle, Taken on Page 286, 9022

177

1          MR. BRUEGGEN:  Object to form.

2          MS. ROSEN:  Objection to foundation.

3     A    I'm not -- I'm not sure of the training that

4  would be involved in that.

5     **Q    Was the unit -- what was the unit that tracked**

6  **this information, sort of in a registered database or so**

7  **on?**

8          MS. ROSEN:  Objection, foundation.

9     A    I don't even know the name of the unit that

10  tracks them.

11    **Q    Okay.  When you were working as a homicide**

12  **detective, did you know that there was the ability to**

13  **use confidential informants and have resources available**

14  **to register and pay confidential informants?**

15         MR. BRUEGGEN:  Objection to form.

16         MS. ROSEN:  Objection, foundation.

17    A    I was aware of it.  But again, I didn't have

18  any, so I never made use of it.

19    **Q    Okay.  When you were a homicide detective, did**

20  **you ever learn of any instances in which your colleagues**

21  **relied on a confidential informant to develop**

22  **information in their investigation?**

23    A    Again, as I stated earlier, that -- it's a

24  very confidential thing, so I -- I know that it was

25  occurring, but I don't -- I -- I don't know any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 287 of 782 PageID #:13545
Prev Deposition of Antonio Riccio   taken on March 28, 2023
178

1   specifics about who or when, or -- or anything of that

2   nature.

3       Q    Okay.  And in those cases where there were

4   confidential informants that a detective or any other

5   officer was working with, that individual, you say,

6   would be registered in a database.  What do you mean by

7   that?

8           MS. ROSEN:  Objection, form, foundation, and

9       misstates his -- his testimony.  He hasn't said that

10      any detectives used confidential informants as he

11      defined it.

12          THE WITNESS:  I'm sorry.  Can you repeat the

13      question?

14  BY MR. SWAMINATHAN:

15      Q    Yeah.  When somebody was -- you referenced the

16  idea that there are confidential informants who were

17  registered in a database, correct?

18      A    Correct.

19      Q    Okay.  So what information is registered in

20  the database for confidential informants?

21          MR. BRUEGGEN:  Object to foundation.

22      A    I don't know.  I've -- I've never seen the

23  database.

24      Q    Did you have people who -- would you ever

25  supervise individuals who, whether they were detectives

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   or patrol officers or tactical officers, who had the
 2   ability to be able to register people in this database
 3   of confidential informants?

 4          MR. BRUEGGEN:  Object to form, foundation.  Go
 5     ahead.

 6     A    I don't know if -- I think anybody has the
 7   ability to register an informant.  I -- I don't know
 8   that people under my command did or did not.  I really
 9   don't know.

10     Q    Was it your understanding that these
11   individuals who were registered as confidential
12   informants, that information about who they are, where
13   they lived, that type of information was being tracked?

14          MS. ROSEN:  Objection, foundation.

15     A    I -- I -- I'm not sure I understand what you
16   mean by the information being tracked.

17     Q    What I simply mean is if you say, I have a
18   confidential informant, somewhere within the CPD system
19   they have the ability to identify the identity of who
20   this person is, who is serving as a confidential
21   informant, correct?

22     A    Correct.

23     Q    And that information may not be a -- may not
24   be widely available, but there's some information that's
25   being kept, you know, closely guarded within the Chicago

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   Police Department that specifically identifies who that

2   person is who's serving as confidential informant,

3   correct?

4        A    Yes, that's correct.

5        Q    Okay.  And then information about the amount

6   of money they're being paid is also being tracked,

7   right?

8             MR. BRUEGGEN:  Object to foundation.  Go ahead.

9        A    I -- I don't know if it's being tracked or

10  not.  I would assume that it is, but I -- I don't know.

11       Q    Okay.  Now, one of the reasons that it's

12  important to track information like that is because it

13  can be relevant in any subsequent investigations or

14  prosecutions to know what somebody has been paid to

15  provide certain information, correct?

16            MS. ROSEN:  Objection, foundation.

17            MR. BRUEGGEN:  Objection, form.

18       A    I -- I don't know that that's correct.

19       Q    Okay.  To the extent there was information --

20  no, strike that.  To the extent a registered

21  confidential informant was being given access to

22  financial resources or any other forms of benefits, was

23  that information tracked as part of the registered

24  database?

25            MS. ROSEN:  Objection, foundation.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1          MR. BRUEGGEN:  Asked and answered.  Go ahead,
 2     sir.
 3     A    Were that information what?  I -- you kind of
 4  broke up --
 5     Q    Was that information being tracked, any
 6  financial payments or other forms of benefit for the --
 7  for a given confidential informant?
 8          MR. BRUEGGEN:  Foundation, asked and answered.
 9     Go ahead.
10     A    Yeah.  Again, I've never seen the database, so
11  I -- I can't say what's in it or not in it.
12     Q    Okay.  And ultimately, what is your
13  understanding of why there was a need to track or
14  register confidential informants?
15          MR. BRUEGGEN:  Objection, foundation.
16     A    I -- I don't -- I don't -- I -- I can't answer
17  that.  I don't know.
18     Q    Okay.  Now, in terms of cooperating
19  individuals, you identified, you know, these individuals
20  -- well, strike that.  For cooperating individuals, was
21  there any form of tracking or maintaining of information
22  about who these individuals were?
23     A    Not that I'm aware of.
24     Q    If a detective said -- you know, spoke to
25  somebody and they had information about an
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   investigation, but said, hey, I don't want, you know, to
 2   be going to court and all those things, that person is
 3   essentially saying, I want to remain anonymous, correct?
 4        A    Oftentimes yes, they want to be anonymous.
 5   Yes.
 6        Q    Okay.  And then where that individual wanted
 7   to remain anonymous, what would be done as a detective
 8   in terms of gathering their information but, you know,
 9   trying to honor their desire for anonymity?
10            MR. BRUEGGEN:  Object to form.  Vague.
11        A    I think it really varied by the circumstance.
12   Sometimes people would just come up to you and provide
13   you information.  They said, I don't want to get
14   involved, so you don't know their name, you don't -- you
15   don't know anything about them.  Many times it was a
16   phone call placed to the area.  I'd like to talk to the
17   investigator who's investigating case ABC, and then they
18   would provide information to that detective.  So it --
19   it took a lot of different forms.  Typically though,
20   cooperating individuals want to be anonymous, and it's a
21   one-time shot.  They provide you information and then
22   they're gone.
23        Q    And was the expectation that you try to get
24   their name or contact information for them?
25        A    At least --
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 292 of 782 PageID #:13550
Prev Deposition of Anthony Riccio - taken on Page 29, 2023

183

```
 1            MR. BRUEGGEN:  Object to form.

 2       A    I'm sorry.  You'd always want to try to get

 3   the information in case you needed to -- to run

 4   something else past them or ask them some additional

 5   questions.  But, you know, I think it was rare that

 6   somebody who was cooperating under those circumstances

 7   would want to provide a cell phone number or a home

 8   address or a name or anything like that.  But I think

 9   detectives did, for the most part, make an effort to try

10   to get identifiers so you can always go back to that

11   person if you had more questions.  But it was rare that

12   somebody in that predicament would want to provide that

13   information.

14       Q    Okay.  And where -- a -- so a detective was

15   expected to try to get that information if they could

16   get it from the person, correct?

17       A    Correct.

18       Q    And if they got that information, the

19   expectation was that they would write that down,

20   correct?

21            MR. BRUEGGEN:  Objection.  Form, incomplete

22       hypothetical.

23       A    Correct.

24       Q    Okay.  And could that be information that

25   wouldn't necessarily need to go into a typed
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  supplementary report, but would -- but the documentation

2  would be maintained somewhere so that it could be

3  available for later?

4        MS. ROSEN:  Objection.

5        MR. BRUEGGEN:  Objection, form, foundation.

6     A    Yes.  But I think we're kind of getting into

7  the area now -- we're getting away from cooperating

8  individuals into witnesses.  So a cooperating individual

9  typically does not want to provide any information that

10 would enable a detective to recontact them.

11    Q    When -- did you have instances when someone

12 would call into the area and would say, hey, I have some

13 information or I have a tip, but it was coming into like

14 a general number, it wasn't coming to the specific

15 detective on the case?

16    A    Yeah.  I would say that was probably almost a

17 daily occurrence.

18    Q    Okay.  And so, when you had -- when tips came

19 into the detective division areas, you know, a caller --

20 strike that.  Somebody calls in and says, hey, I have a

21 tip on a case, and they provide that information.  Would

22 the expectation be that information is then passed to

23 the detectives who are assigned to the case?

24    A    Yes.

25    Q    Okay.  And how would that information get

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   from, you know, the general number of someone calling

2   into the area to the detectives assigned to case?

3          MR. BRUEGGEN:  Objection, foundation,

4      incomplete hypothetical.  Go ahead.

5      A    So it varied.  I mean, in my time in the

6   detective division, if somebody called up and said they

7   had information on a particular case, that call was

8   routed to the most appropriate person.  If the detective

9   assigned to that case was working, the phone call would

10  go to them.  If their partner was working, phone call

11  would go to their partner.  Sometimes the detectives

12  were out on the street, and you have to remember this

13  was before there was wide use of cell phones or

14  anything, sometimes the desk officer would say, there's

15  nobody here.  Let me take the information.  And they

16  would jot down the information and forward it to the

17  appropriate detective, or they would transfer the call

18  into the detective's sergeant, and the sergeant would

19  then take that information.  So it really ran the gamut.

20  Ideally, you want to give it to the most appropriate

21  person.  Sometimes the most appropriate person is just

22  the guy working the desk or -- or the detective's

23  supervisor.

24     Q    Okay.  So one of the ways in which those tips

25  would get to the detective would be through the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   supervisor if the detective is not there that day,
 2   correct?
 3        A    It is one of the possibilities.  Yes.
 4        Q    And then the sergeant would pass that
 5   information on to the detective, correct?
 6        A    That's correct.
 7        Q    Okay.  And the expectation would be that any
 8   information learned from the confidential informant was
 9   ultimately being documented, either by the supervisor
10   who took the call or by the detective, correct?
11        A    That's correct.
12        Q    Okay.  And all of the information learned from
13   that confidential informant, to whatever extent that
14   was, would be documented, correct?
15             MS. ROSEN:  Objection, form.  You're using
16        confidential informant --
17             MR. SWAMINATHAN:  Oh, I'm sorry.
18             MS. ROSEN:  -- and I thought we were talking
19        about cooperating individual.
20             MR. SWAMINATHAN:  I'm sorry.  Let me re-ask the
21        question, because I did not mean to --
22             MS. ROSEN:  I think you did it the last -- the
23        prior question too.
24   BY MR. SWAMINATHAN:
25        Q    Okay.  All right.  Thank you.  If information
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  was learned from a cooperating individual, that -- the

2  expectation was that information was being documented,

3  whether that was being done by the sergeant who took the

4  call or the detective who took the call, correct?

5      A   Yes, that's correct.

6      Q   Okay.  And when -- I think you indicated that

7  when calls came in like this from potential cooperating

8  individuals, the expectation was to try to gather as

9  much information as possible from that person, correct?

10      A   Yes.  That would be the -- that would be the

11  objective.  Yes.

12      Q   Okay.  And if the person was -- and the

13  expectation was to try to get names and contact

14  information, if you could get it, correct?

15      A   Yes, that's correct.

16      Q   And if you could, that had to be documented,

17  correct?

18          MR. BRUEGGEN:  Object to form.

19      A   Yes, that's correct.

20      Q   And was the expectation to try to get

21  information to test the veracity of, you know, the

22  information that was coming in?

23          MR. BRUEGGEN:  Object to form.

24      A   I'm sorry, can you repeat that?

25      Q   Yeah.  I was asking about testing the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  veracity, by which I mean trying to get some information

2  about why does this person claim to know this

3  information, is this information credible, that kind

4  thing.  So let me ask -- let me re-ask the question with

5  that clarification.  Was the expectation that when these

6  kinds of calls came in from cooperating individuals,

7  that questions were asked to try to assess the

8  credibility of the information that was coming in?

9      A    So, I mean, obviously I can't speak for anyone

10  but myself, but I would say that in -- in my situation,

11  that would be something that I would -- I would want to

12  know how -- you know, how is it that you came to be in

13  possession of this information?  Did you witness it, did

14  you hear it secondhand, did your girlfriend tell you?

15  Whatever.  So yeah, I -- I would say that, you know, you

16  would want to find that out.  Now again, somebody who

17  doesn't want to be identified is probably not going to

18  be real forthcoming with how they came to be in

19  possession of that information, but occasionally it did

20  happen.

21      Q    Okay.  And ultimately, as you indicated,

22  oftentimes you know with a cooperating individual that

23  it may be a one -- you may have one shot at it, right?

24      A    That's correct.

25      Q    And so the -- was it the -- was it your -- was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the expectation that you try to get as much information

2    as you can about what they know and how they know it in

3    that first call?

4         A    Yes.  Because there's a good chance there may

5    not be a second call.  So you do your best.  Some people

6    are more talkative than others and provide a greater

7    level of detail.  Others would say what they had to say

8    and simply hang up on you.

9         Q    Yeah.  Okay.  And then whatever that level of

10   information was that you ultimately were able to extract

11   from the individual needed to be documented, correct?

12        A    That's correct.

13        Q    Okay.  Were efforts ever made to identify

14   confidential informants, even, you know -- even after

15   they indicated they didn't want to give you their name

16   or information, you might -- we'll strike that.  Let me

17   ask you a better question.  And I -- I switched to

18   confidential informant again.  So I think Eileen was

19   going to remind me, thank you.  Were there efforts ever

20   made to identify, for example, based on the incoming

21   phone number, the identity of a cooperating individual?

22             MR. BRUEGGEN:  Objection, foundation.  Go

23        ahead.

24        A    You know, again --

25             MS. ROSEN:  At what point in time?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Yeah.  I'm asking during the time that you
 2   were a detective.

 3        A    So I don't even know if there was caller ID
 4   when I was a detective.  So I -- I -- I don't think I
 5   can answer that because I don't recall if there was
 6   caller ID.  And again, I can only speak for myself.  I
 7   don't know that I spent too much time trying to identify
 8   the cooperating individual as I did trying to
 9   investigate the lead that the cooperating individual
10   provided.

11        Q    All right.  Let me show you a document we'll
12   mark as Exhibit 1.

13             (EXHIBIT 1 MARKED FOR IDENTIFICATION)

14        A    Sure.

15             MR. BRUEGGEN:  And Anand, we have hard copies
16        of them, so can I give him the hard copy?  That
17        would be easier for him to look at.

18   BY MR. SWAMINATHAN:

19        Q    Yep, you can do that.  So why don't we take a
20   look at the clear closed report?  So this is --

21             MS. ROSEN:  Did you circulate exhibits, or no?

22             MR. SWAMINATHAN:  What's that?

23             MS. ROSEN:  Did you circulate exhibits or no?

24             MR. SWAMINATHAN:  Yeah.  Margaret sent them
25        earlier.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 300 of 782 PageID #:13558
The Deposition of JOHN ANTHONY RICCIO, taken on May 10, 2023
191

1            MS. ROSEN:  Okay.  Thanks.

2            MR. SWAMINATHAN:  I can also pull them up on

3       the screen.  You tell me.  If that's easier, we can

4       just do that?

5            MR. BRUEGGEN:  Anand, if you just throw it up

6       on the screen, so we make sure we're on -- literally

7       on the same page.  Then you take it down and you can

8       refer to a hard copy.

9  BY MR. SWAMINATHAN:

10       Q     Okay.  Let me just pull it up here.  Okay. I'm

11  going to pull up RFC Iglesias 10 through 13, but let put

12  it up on the screen.  All right.  Do you see the screen

13  now Mr. Riccio?

14       A     Yes, but you know what?  I'm going to wait for

15  the hard copy, because that's like a lot smaller than my

16  eyeballs.

17       Q     Yeah.  Okay.

18       A     Okay.  Yes.  I -- I do see it.

19       Q     Okay.  What I'm showing you is a document I've

20  marked as Exhibit 1 to your deposition.  It's RFC

21  Iglesias -- oh, sorry.  Let's use the copy that said RFC

22  Iglesias 90, so go to 90.

23       A     Okay.

24       Q     What I've marked as Exhibit 1 is RFC Iglesias

25  90 through 93.  And if you look at the first page, it's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  identified as a Chicago Police Department Supplementary

2  Report, and at the bottom, it has a date of submission

3  of June 24, 1993.  Do you have that document in front of

4  you, sir?

5      A    I got June 20 -- oh, I'm sorry.  Yes.  Okay. I

6  see it.  Yes.

7      Q    Yeah.  Okay.

8      A    Yes.

9      Q    All right.  Is this a document -- why don't

10  you take a chance to go through the -- just take a leaf

11  through this document.  First let me know if this is the

12  document you reviewed in preparation for today's

13  deposition?

14      A    No, this is not the document that I reviewed.

15      Q    Okay.  So let start on the first page.

16      A    Okay.

17      Q    So looking at the first page, RFC Iglesias 90?

18      A    Yes.

19      Q    The top or first page of the supplementary

20  report, you see it indicates that an individual named

21  Geraldo Iglesias is in custody.  You see that?

22      A    Yes, I do.

23      Q    Okay.  Then at the bottom of the page, it

24  lists the names of four detectives?

25      A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Can you identify who the four detectives are,

2   who are listed there?

3    A    Halvorsen, Guevara, myself, and Gawrys.

4    Q    Okay.  Did you sign this report?

5    A    No, I did not.

6    Q    Okay.  That signature that's there on the

7   bottom left-hand side, that's not your signature,

8   correct?

9    A    Correct.  That's Ernie Halvorsen.

10    Q    Okay.  And if you look at page 4 of this

11   document, the last page, which is RFC 93?

12    A    Okay.

13    Q    It indicates there the names of two detectives

14   at the very end, Ernie Halvorsen and Rey Guevara.  Do

15   you see that?

16    A    Yes, I do.

17    Q    Okay.  So they're listed at the end of this

18   report, but -- and you are not listed at the end of this

19   report, correct?

20    A    Correct.

21    Q    So why is that?

22        MR. BRUEGGEN:  Object to foundation,

23     speculation.  Go ahead.

24    A    I did not author the report.

25    Q    Okay.  And if you didn't author the report,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 303 of 782 PageID #:13561
The Deposition of AARON RICCIO, taken on May 10, 2022
194

1  why is your name listed on the first page of the report?

2         MR. BRUEGGEN:  Object to foundation,

3     speculation.  Go ahead, sir.

4     A     Yeah, I -- all I could do is speculate just

5  because I helped out with the arrest and the lineups.

6     Q     Okay.  So you did not have any involvement in

7  drafting this report; is that right?

8     A     That's correct.

9     Q     Did you review this report before it was

10 submitted?

11    A     No, I did not.

12    Q     Okay.  All right.  Let's take a look at the

13 second page of this document, RFC Iglesias 91?

14    A     Yes.

15    Q     Okay.  It lists their arresting detectives

16 near the top of the page and it lists Mr. Halvorsen,

17 Guevara, Riccio, and Gawrys.  Do you see that?

18    A     Yes, I do.

19    Q     Okay.  Does that provide you with any

20 indication about what your role was in this

21 investigation?

22    A     It -- it does, yes.  That was, as I stated

23 earlier, we provided backup to Halvorsen and -- we being

24 myself and Gawrys, provided backup to Halvorsen and

25 Guevara when they affected the arrest.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Okay.  Do you see under the notifications, it

2  lists ASA Mike Latz, felony review?

3     A    Yes, I do.

4     Q    Okay.  Did you have any conversations with

5  ASA Mike Latz about the Roman homicide investigation?

6     A    No, never did.

7     Q    Okay.  Do you recall having any interactions

8  with him at all during the course of your involvement in

9  this investigation?

10     A    No.  I never spoke to him.

11     Q    Do you know what investigative steps Mr. Latz

12  participated in or did not participate in during this

13  investigation?

14     A    No, I do not.

15     Q    Okay.  If you look at the first paragraph of

16  the narrative that begins "on 21 June, '93," do you see

17  that?

18     A    Yes, I do.

19     Q    Okay.  It says there that the reporting

20  detectives -- we'll strike that.  It says "R/DETS,"

21  which is a reference to the reporting detectives,

22  correct?

23     A    That's correct.

24     Q    Okay.  And so when it makes reference to the

25  reporting detectives, who is it referring to in this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    report?

2         A    Halvorsen and Guevara.

3         Q    Okay.  So you are not one of the reporting

4    detectives on this report; is that correct?

5         A    That's correct.

6         Q    Okay.  And the fact that your name is listed

7    on the first page, along with Guevara and Halvorsen,

8    does that indicate that you were one of the reporting

9    detectives on this case?

10        A    No.  I think they were just giving us credit

11   for assisting.

12        Q    Okay.  And so, is it the -- the reason --

13   well, strike that.  Reporting detectives, would it be

14   fair to say, is a reference to the two detectives who

15   have authored this report as listed on the last page of

16   the report?

17        A    Yes.  I -- that would be accurate.  Halvorsen

18   and Guevara.

19        Q    Okay.  All right.  So it says here the

20   reporting detectives were contacted by a confidential

21   informant who is a member of the Imperial Gangsters

22   street gang.  So let's pause there for a second.  You

23   see where I'm looking, sir?

24        A    Yes, I do.

25        Q    Okay.  And when it says the reporting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 306 of 782 PageID #:13564
The Deposition of ANTHONY RICCIO, taken on May 18, 2023
197

1  detectives were contacted by a confidential informant,

2  you are not one of the reporting detectives who was

3  contacted by a confidential informant, correct?

4      A    Correct.  I was never contacted by anyone

5  regarding this case.

6      Q    Okay.  And the reference to a confidential

7  informant here, does that appear to you to be a

8  confidential informant as you've defined it or a

9  cooperating individual as you have described -- defined

10 it?

11     A    I -- I would have to speculate because I

12 really don't know if the individual who contacted them

13 was, as we defined it, a confidential informant or was a

14 cooperating individual.

15     Q    Okay.

16     A    The only -- the only thing I can add to that

17 is -- excuse me -- they know that this individual who

18 contacted them who they're calling a confidential

19 informant -- they know that he or she is a member of the

20 Imperial Gangster street gang.  So, you know, you can

21 infer from that what you will.  I -- it -- I don't know

22 if that means he's a confidential informant, someone

23 that they've registered or someone they've worked with

24 before, or if this is strictly someone who called up

25 with information.  I -- I wouldn't be able to answer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    that.

 2         Q    Okay.  And have you seen any -- well, strike

 3    that.  Do you know who the individual is who's referred

 4    to here as the confidential informant on RFC Iglesias

 5    91?

 6         A    No.  I have never known that information.

 7         Q    Okay.  And I think you answered my next

 8    question.  Have you ever known who the person was who

 9    was the confidential informant referenced on this page?

10         A    No, I have never known.

11         Q    Did Ernie Halvorsen or Rey Guevara ever tell

12    you any information about who their confidential

13    informant was?

14         A    No.  In fact, I was not even aware that a

15    confidential informant provided information on this.

16         Q    Okay.  Is it your understanding that -- well,

17    strike that.  Are you aware of any documentation that

18    was ever created to provide information about who this

19    confidential informant was?

20         A    No, I am not.

21         Q    Okay.  And if you had received information

22    from a confidential informant or cooperator --

23    cooperating individual in this case, that -- you

24    would've written down any information you received from

25    that individual, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           MR. BRUEGGEN:  Object to form.  Vague.

2      A     Again, I -- I -- I think we talked about this

3    a little earlier.  Not necessarily.  It depends on the

4    level of detail that that cooperating individual or --

5    or confidential informant provided.  If it was something

6    very simple, like this narrative says, people in the

7    gang were talking about Snake killing a girl in a car at

8    Sawyer and Palmer.  I don't know that I would've written

9    that down on a GPR.  It would've been part of a

10   supplementary report, certainly, but I don't know if I

11   would've taken notes.  I believe your question was about

12   notes.  I don't -- I don't know that I would've taken

13   notes about that.

14     Q     Fair point.  So I think -- and I didn't mean

15   to ask it that way.  I guess what I mean is, if you had

16   received the -- a call under this -- on -- strike that.

17   If you had been the person who received this

18   information, you would have documented, either in a GPR

19   or a supplementary report, all of the information you

20   learned about who that confidential informant was and

21   what they knew, correct?

22     A     Yes, that's correct.  Yes.

23     Q     Okay.  Now, if you look at the next paragraph?

24     A     Uh-huh.

25     Q     It says, "the reporting detectives had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   previous contact with the member of the Imperial
 2   Gangster street gang with the nickname of Snake."  You
 3   see that?
 4        A    Yes.
 5        Q    Did you ever have any previous contact with a
 6   member of the Imperial Gangsters street gang with the
 7   nickname of Snake?
 8        A    No, I --
 9             MR. BRUEGGEN:  Object to foundation.  Sorry.
10        A    No, I never did.  I never heard of Snake.
11        Q    Okay.  They indicate -- the report indicates
12   that they knew that Snake was, in fact, Geraldo
13   Iglesias.  Had you had any previous contact with a
14   member of the Imperial Gangsters named Geraldo Iglesias?
15        A    No.  I had never had any contact with him,
16   that I'm aware of anyway.
17        Q    Okay.  And so, were you a person who was able
18   to connect the name Snake to Geraldo Iglesias?
19        A    No, I was not.
20        Q    Okay.  It indicates that the reporting
21   detectives had a Polaroid photo of Iglesias.  Did you
22   have a Polaroid photo of Iglesias?
23        A    No, I did not.
24        Q    Do you know where the Polaroid photo came from
25   that they had of Iglesias?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 310 of 782 PageID #:13568
The Deposition of ANTHONY RICCIO, taken on May 11, 2023
201

1    A    No, I do not.

2    Q    And in this paragraph, the reference to the

3  reporting detectives again, is a reference to Rey

4  Guevara and Ernie Halvorsen; is that correct?

5    A    Yes.  Any -- any reference in this report that

6  says reporting detectives would be Halvorsen and Guevara

7  only.

8    Q    Okay.  Okay.  Did you keep any Polaroid photos

9  of known gang members when you were detective?

10   A    No.  No, I did not.

11   Q    Did you -- were you - did you know of other

12  detectives who kept photos of known gang members?

13   A    It was a long time ago.  I'm going to go with

14  no, but I -- I mean, at the time there may have been,

15  but not that I recall.

16   Q    Okay.  Did you have access to a -- to a

17  Polaroid camera in the police department?

18   A    Yes.

19   Q    Okay.  And what did you use the Polaroid

20  camera for?

21   A    Photographing evidence.  At scenes

22  occasionally that would be secondary to the evidence

23  technician.  Sometimes -- because back then it was all

24  done on film.  It had to be developed.  It took time and

25  then it took time to get those pictures.  So a lot of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    times you would take Polaroid photos of the scene and

2    use those to show the state's attorney or other

3    detectives in -- in conducting your investigation.  So

4    it had some use back then when everything else was still

5    in film and there was lengthy delays before you could

6    actually get the photos.

7        Q    Okay.  The next paragraph says that on

8    June 22, 1993, Detectives Halvorsen and Guevara

9    interviewed eyewitness Rosendo Ochoa.  Do you see that?

10       A    Yes, I do.

11       Q    Did you participate in any way in the

12   interview of Rosendo Ochoa?

13       A    No, I never interviewed anyone from this case.

14       Q    Okay.  It says that Mr. Ochoa stated that he

15   got a good look at the shooter's face and would be able

16   to identify him if he saw him again.  You see that?

17       A    Yes, I do.

18       Q    Did you participate in any conversation with

19   -- in which Mr. Ochoa said that?

20       A    No.  Again, I never interviewed anyone in this

21   case.

22       Q    Okay.  We talked earlier about interviewing of

23   witnesses at the scene.  Do you recall that?

24       A    Yes, I do.

25       Q    And when you conducted scene interviews of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   witnesses, the primary purpose was to develop as much

2   information you could about what that person might know

3   about the underlying crime, correct?

4       A    That's correct.

5       Q    Okay.  When you interviewed -- I asked these

6   same questions to Detective Santapadre.  When you

7   interviewed scene witnesses, was your practice to try to

8   gather as much information as you could from that person

9   about what they saw and heard?

10      A    Yes.

11      Q    Okay.  And in doing so, would you gather as

12  much information as you could about whether that

13  individual might be able to identify the perpetrator?

14      A    Yes.

15      Q    And when you conducted interviews with scene

16  witnesses, would you ask those individuals if they

17  believed they got a good enough look to be able to

18  identify the perpetrator?

19      A    As a practice, I would not.  I don't know that

20  that was everybody's practice, but I -- I would not.

21      Q    And during -- was it your practice to

22  determine, as you were interviewing these individuals,

23  whether you believed they had gotten a good enough

24  opportunity to be able to identify the perpetrator?

25           MR. BRUEGGEN:  Object to form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     I think that you could kind of make that
2   assumption, make that leap, that based on what they told
3   you, they -- they may or may not be able to identify the
4   offender.  I never like to put that down on paper
5   because sometimes people are reluctant to say that they
6   could.  So I never -- I never liked to lock anyone in by
7   saying that in an initial scene supp.

8      **Q     Okay.  So if the person provided you with**
9   **information indicating whether or not they thought they**
10  **could make an identification, would you put that down?**

11     A     If someone told me that, yes.  But again, I
12  don't -- I don't -- in -- in a lot of interviews, I
13  don't think anyone ever said that to me.  But if they
14  were to say that to me that, I could recognize them if I
15  saw him again, I would certainly document it.  Yes.

16     **Q     Okay.  And if the person told you, I didn't**
17  **get a good enough look at the person's face, would you**
18  **also document that?**

19     A     I would document that as well.  But again, I
20  would never ask that question of any witness. "Could you
21  identify him if you saw him again?  I would never ask
22  it.  If it was something they volunteered as part of
23  their statement, I would certainly put it in my supp to
24  -- to be thorough, but that was not something that I
25  would ever ask a witness.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  And how would you decide -- if you

2  didn't ask witnesses that, how would you decide whether

3  or not to show photos, for example, of a -- of a

4  potential suspect to a witness?

5          MR. BRUEGGEN:  Objection, form.  Incomplete

6      hypothetical.  Go ahead.

7      A    That was the -- that was the reason I didn't

8  ask.  I -- I just operated under the assumption that if

9  you're listed as a witness, then we develop a suspect,

10  I'm going to show you a photo spread.

11     Q    Okay.

12     A    So, you know, at that time they may say, I

13  never really got a good look at his face.  Or, you know,

14  maybe they wouldn't and they would view the photo

15  spread.  But as -- as a practice, I never liked to do

16  that simply because I didn't want to rule anybody out as

17  a witness or, you know, lock anybody in as an

18  eyewitness.

19     Q    All right.  And in terms of -- so then, if I

20  understand correctly, once you developed a perpetrator

21  -- strike that.  Once you developed a suspect, your

22  practice was to show that suspect to anybody who was a

23  scene witness, who had some viewing opportunity; is that

24  right?

25          MR. BRUEGGEN:  Objection, form.  Misstates his

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        testimony.

 2        A    That's correct, yes.

 3        Q    Rather than have people tell you themselves

 4   whether or not they think they got a good enough view to

 5   be able to make an identification, you would rather just

 6   show them the photos and see if they're able to make the

 7   identification or not, correct?

 8        A    Yes, that's accurate.

 9        Q    Okay.  All right.  And so, in your -- during

10   the time that you were serving as a homicide detective,

11   was it common for you to show photos to -- of suspects,

12   to individuals and have them say, sorry, I didn't get a

13   good enough view, I can't make an identification?

14             MR. BRUEGGEN:  Objection, form, foundation.

15        Anand, are you saying photos or photo?

16             MR. SWAMINATHAN:  Photos.

17             MR. BRUEGGEN:  Photos?

18        A    A photo -- a photo array, a photo spread

19   you're talking about?  Yes.

20   BY MR. SWAMINATHAN:

21        Q    I'm referring to a photo array.  Yeah.

22        A    Yes.  Yeah.  It -- it was not uncommon to show

23   a photo array to someone who was a witness and have them

24   say, I never really got a good look at his face, so I

25   can't pick anyone out.  Yes, that -- that was not
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 uncommon.

2  **Q And in terms of photo arrays versus lineups,**

3 **what were the circumstances in which you'd conduct a**

4 **photo array as opposed to a lineup?**

5  A You know, that's -- it -- it really varied.

6 Certainly when a person was in custody, you would show

7 the physical lineup.  Sometimes state's attorneys would

8 require you to do both, regardless of custody.  So it

9 really kind of varied.  If someone was not in custody

10 and you had a suspect, you would certainly show the

11 photo array to develop as part of your probable cause to

12 make an arrest.  But there were times when state's

13 attorneys wanted, even when someone's in custody, wanted

14 you to show a photo array as well as a physical lineup.

15 And again, this goes back 30 years ago, but that was the

16 -- that was the requirement sometimes of the state's

17 attorney's office.

18  **Q Excuse me.  In your practice, if you had**

19 **somebody in custody, would you have witnesses view a**

20 **photo array, or would you have them view a lineup?**

21  A Well again, if they're in custody on a -- a

22 felony, you're working with felony reviews, so you would

23 have to -- if they've already seen a photo array, then

24 you would just let them see the physical lineup.  If

25 they hadn't, you would have to defer to the state's

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    attorney.  And I think different state's attorneys did

2    -- had different requirements on -- on different days.

3    So sometimes even though somebody was in custody,

4    state's attorney would say, show them a photo array.

5    Others would say, just show them the physical lineup. So

6    you had to work with the state's attorney to get charges

7    and kind of defer to their -- their requirements.

8         **Q    There were times when you would have**

9    **individuals in custody where you had not called felony**

10   **review yet, correct?**

11        A    Yes.  I mean, you'd get them in custody, but

12   you would almost immediately call felony review because

13   they would come in and they would, you know, weigh in

14   heavily on what additional investigative steps they

15   wanted prior to approving charges.  So it was -- it was

16   relatively soon after you had somebody in custody that

17   you would contact them.  Circumstances differed on -- on

18   different -- different cases, but it was usually a

19   pretty quick notification of felony review.  In fact,

20   they -- they would get kind of upset if you waited too

21   long to bring them in on something.

22        **Q    Well, in this case, for example, according to**

23   **the report, felony review wasn't -- you know, the**

24   **lineups were conducted with Rosendo Ochoa before felony**

25   **review was ever called, correct?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 318 of 782 PageID #:13576
The Deposition of ANTHONY RICCIO, taken on May 11, 2022

209

```
 1       A    I -- I don't remember.

 2       Q    Okay.  I mean, but you -- as a detective,

 3  there would be times when you have somebody in custody

 4  and you would be making a determination about whether to

 5  show a photo array or whether to show a lineup, and that

 6  would -- and that would happen before you have felony

 7  review coming in, correct?

 8       A    On occasion that was the case.  On occasion it

 9  was not, so --

10       Q    And when you -- oh, I'm sorry.  I didn't mean

11  cut you off.

12       A    No, I was just going to say, it worked both

13  ways.  There were times when felony review would tell

14  you to do it.  There was times when felony review would

15  tell you not to do it.  Sometimes they were not there

16  and you made the decision.  It really varied.

17       Q    And when you were making that decision on your

18  own and you had somebody in custody, would you conduct

19  photo arrays, or would you conduct lineups?

20            MR. BRUEGGEN:  Objection, incomplete

21       hypothetical.

22       A    Yeah.  It's difficult to say.  The

23  circumstances of each case are very different, the

24  witnesses are very different, so it would be difficult

25  to say like hard and fast, whichever -- whichever path
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you would take.  And again, we're talking about the

2  detective division 30 years ago versus the detective

3  division now.

4      Q    Yeah.  So the -- back again, when you were a

5  detective at that time, did you ever have -- well,

6  strike that.  When you were a detective, what were the

7  kind of circumstances in which you'd have as -- a

8  suspect in custody, but you'd show a photo array to the

9  witness rather than have them view the lineup?

10     A    I don't recall.  I mean, from 30 years ago, it

11 -- it would be impossible for me to try to recall a

12 situation where I would do that.

13     Q    Okay.  And during the time that you were

14 serving as a detective, were there concerns about

15 tainting the possible outcomes of lineups by showing

16 individuals photos beforehand?

17     A    I -- I don't --

18         MR. BRUEGGEN:  Objection.  Wait, when you say

19     photos, are you talking about photo array or are you

20     talking about, you know, an individual photo

21     suspect?  I just want to make sure it's clear what

22     you're asking him.

23 BY MR. SWAMINATHAN:

24     Q    I'm talking about photos generally, whether

25 it's in the form of an individual photo or multiple

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   photos in the form of an array.  Any time you show
2   somebody a lineup, do you agree if that person has seen
3   a photo of the person who's going to be in the lineup
4   before that, it has some impact -- it can have an impact
5   on the lineup, correct?
6           MS. ROSEN:  Objection.  Form, foundation.
7       A    Yeah.  I -- I really don't know.  I -- I -- I
8   couldn't answer that question.
9       Q    Were detectives trained that they should try
10  to avoid having a person view a photo of their suspect
11  right before they go in and view a lineup containing the
12  same suspect?
13          MS. ROSEN:  Objection.  Form, foundation.
14      A    I -- I don't recall the detective training.
15      Q    Okay.  Was -- when you practiced as a
16  detective, did you ever have concerns about showing a
17  witness a set of photos containing your suspect and then
18  having them view a lineup where the only person that's
19  the same is the suspect?
20      A    Again, that was 30 years ago.  I don't recall
21  if I had concerns about that.  I don't recall if I did
22  it or not.  It was just --it was 30 years ago and I just
23  don't have a recollection of it.
24      Q    Well, with your experience you have today
25  after multiple decades in the police department, would
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that be a concern to you if somebody is showing somebody

2  photos right before they go in to view a lineup?

3          MR. BRUEGGEN:  Objection.  Form and incomplete

4     hypothetical.

5     A    Well, I know the policy has changed regarding

6  that -- or a policy has been established.  I don't know

7  that it's changed.  Policy has been established

8  regarding showing photo arrays when someone is in

9  custody.  So I don't know what it was 30 years ago, but

10  I know that in the -- in the interim, there was -- there

11  were changes in policy that prohibit that, except under

12  like certain circumstances.  If a victim is -- or a

13  witness is hospitalized and can't come in to physically

14  see a lineup, you would show a photo array.  If there's

15  some other reason they can't come in, they're out of

16  state or something, obviously there has to be some other

17  -- some other means of identification so you would show

18  them a photo array.  But 30 years ago, I -- I don't know

19  that that was the policy or not the policy.

20     Q    Okay.  All right.  So if I understand

21  correctly, the policy now is that if somebody -- if

22  there was a suspect in custody, barring unusual

23  circumstances, the witness should view the lineup and

24  not be shown of photo array beforehand, correct?

25     A    That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 322 of 782 PageID #:13580
The Deposition of ALAN RICHTER, taken on March 22, 2023
213

1    Q    And that policy exists because of a concern

2  about contaminating the lineup procedure, correct?

3         MR. BRUEGGEN:  Objection to foundation.

4         MS. ROSEN:  Foundation, calls for speculation.

5    A    Yeah.  I -- I don't know why that policy

6  exists.

7    Q    Do you have any idea as a 30-year Chicago

8  police officer why that policy was put in place?

9         MR. BRUEGGEN:  Object to form and foundation.

10   A    No, I do not.

11   Q    And sitting here today, do you have any view

12 -- personal view, about the possibility that showing

13 somebody photos of your suspect, right before they go in

14 and view a lineup containing the same suspect, is

15 problematic?

16        MR. BRUEGGEN:  Object to form.

17   A    Do I have -- what was the question?  Do I have

18 a --

19   Q    Do you have concerns about the idea about --

20 about the idea of showing somebody photos of somebody as

21 your suspect right before they go in and do a lineup

22 with only that person in it?

23        MR. BRUEGGEN:  Object to form.

24   A    I -- I -- I would have concerns about that,

25 sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  And ultimately at the time that you
 2   were practicing as a detective, was it your general
 3   practice when you had somebody in custody to have them
 4   view a lineup rather than have them view photos?
 5        A    I -- I don't recall what my practice was
 6   30 years ago.
 7        Q    Okay.  Do you agree, sitting here today,
 8   that'll -- that if somebody has shown a lineup
 9   containing a suspect, it's of less evidentiary value if
10   the person was just shown a photo array in which the
11   only person is the same is the suspect?
12             MS. ROSEN:  Objection.  Form, foundation, calls
13        for speculation as to what has evidentiary value.
14        A    Yes, I would agree.
15        Q    Okay.  Let's go back to the cleared closed
16   report here.  We're on RFC Iglesias 91.  All right.  Are
17   you still seeing the document on your screen right now?
18   Well, you're looking -- you're looking at it on your --
19   on the hard copy, sorry.
20        A    Yes.  Yes, I am.
21        Q    Okay.  So looking at the bottom of RFC
22   Iglesias 91.
23        A    Uh-huh.
24        Q    The last paragraph indicates -- I'll just --
25   I'll just paraphrase it, that Mr. Iglesias was placed
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 324 of 782 PageID #:13582
The Deposition of ANTHONY RICCIO, taken on May 22, 2023

215

```
 1   into custody on June 23, 1993.  That's the arrest of
 2   Mr. Iglesias in which you had some limited involvement,
 3   correct?
 4        A    Yes, it is.
 5        Q    Okay.  And it indicates at the last sentence
 6   that he was informed of the allegations against him and
 7   that he would be required to stand in the lineup.  Is
 8   that something you did?
 9        A    No.  No.  I never had any contact or
10   conversation with him.
11        Q    Okay.  Turning to the next page.  This is
12   page 3 of the report.  RFC Iglesias 92.
13        A    Yes.
14        Q    It indicates that on June 23, 1993 at two --
15   2000 hours, or 8:00 p.m., a lineup was at Area 5 and
16   that Rosendo Ochoa identified Geraldo Iglesias as the
17   person he saw shoot and kill Monica Roman.  Do you see
18   that?
19        A    Yes, I do.
20        Q    Okay.  You -- that is a lineup that you
21   participated in, correct?
22        A    I -- I assisted in that lineup, yes.
23        Q    Okay.  And you assisted in that lineup by
24   being in the room with the suspect and the fillers, not
25   with Mr. Ochoa, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 325 of 782 PageID #:13583
The Deposition of Anthony Riccio, taken on May 12, 2023
216

1      A    That's correct.

2      Q    When you were -- when that lineup occurred, do

3  you have any knowledge about what -- strike that.  Do

4  you have any personal knowledge about what Mr. Ochoa

5  said during that lineup identification procedure?

6      A    No firsthand knowledge.  I was just told by

7  either Guevara or Halvorsen that Ochoa selected Iglesias

8  as the person who he saw shoot and kill Monica Roman.

9      Q    Okay.  That was information provided to you by

10  Guevara and Halvorsen?

11      A    Correct.

12      Q    Okay.  And they gave you that information for

13  you to include in your own lineup report, correct?

14      A    That's correct.

15      Q    Okay.  If -- would you say that Guevara and

16  Halvorsen conducted that lineup or that you conducted

17  that lineup?

18      A    They conducted the lineup.  I mean, it was

19  their case.  It was their witnesses.  They conducted the

20  lineup.  I just assisted in the lineup by calling up the

21  participants to the front window, having them do facing

22  movementsh and then return back to their original

23  position.

24      Q    So if they're the ones that conducted the

25  lineup, why didn't they write the lineup report?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUEGGEN:  Objection foundation.

2      A    I don't know.  I mean, typically, there's a

3  lot of things that you have going on when you have

4  witnesses present.  You have a homicide offender in

5  custody, there's a lot of things that you're doing.  So

6  if they ask me to do the lineup supp report, it's a

7  relatively open and shut factual case to type up, so I

8  would've assisted by completing the report for them.

9      Q    And then -- (coughs) excuse me, I asked you

10  about personal knowledge about what Mr. Ochoa said

11  during that lineup procedure.  So let me ask you the

12  flip side of that coin.  Do you have any knowledge --

13  strike that.  Do you have any personal knowledge about

14  what Rey Guevara or Ernie Halvorsen said to Rosendo

15  Ochoa while he was viewing that lineup?

16      A    No, I don't.  When you're inside the room, you

17  cannot hear or see anything going on outside of that

18  room.

19      Q    And so, this lineup that is documented --

20  strike that.  This lineup which was viewed by Rosendo

21  Ochoa documented at the top of page RFC 92, do you have

22  any knowledge about what occurred in the viewing room

23  between Mr. Guevara and Halvorsen and Mr. Ochoa?

24      A    No, I do not.

25      Q    I'm going to go back to page 2 for a moment.  I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 327 of 782 PageID #:13585
The Deposition of ANTHONY RICCIO, taken on March 22, 2022
218

```
 1    just missed one piece.  If you look in the second to
 2    last paragraph, the one that begins with "On 22 June
 3    '93," do you see that?
 4         A    Yes, I do.
 5         Q    Okay.  I think we made it through the first
 6    sentence of that paragraph.  I want to ask you about the
 7    next sentence, the last two sentences there, it looks
 8    like.
 9         A    Okay.
10         Q    If you look at the middle of that paragraph,
11    it says, "Rosendo Ochoa was shown a photo spread
12    consisting of (8) Polaroid Color Photos."  You see that?
13         A    Yes, I do.
14         Q    Okay.  Did you have any role in creating that
15    photo spread?
16         A    No, I did not.
17         Q    Do you know where the photos came from that
18    were used in that photo spread?
19         A    No, I do not.
20         Q    Did you ever create photo spreads during the
21    time you were working as a homicide detective?
22         A    Yes, I did.
23         Q    And what was your practice in terms of trying
24    to create photo spreads?
25              MR. BRUEGGEN:  Object to form.  Vague.  Go
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    ahead.

2        A    I could just speak from a general memory of

3    it.  And that is that you want to find individuals who

4    have a likeness to the suspect.  And if there's nothing

5    about the suspect that would be suggestive to the person

6    viewing the lineup, they would be able to look at it and

7    say, this is the person based on something in the photo

8    or something that they're wearing -- you want it to be

9    strictly an identification of the individual's face, so

10   you just try to keep the pictures as similar as possible

11   and make sure there's nothing suggestive about them.

12       Q    If you had a witness looking at a lineup --

13   strike that.  If you had a witness looking at a photo

14   array, and that witness had previously given you certain

15   descriptors of the individual who was the perpetrator,

16   would you try to ensure that the participants in the

17   photo array all had that same feature?

18       A    To the degree possible, yes.  I mean, you

19   can't get clones, obviously, but you would try to get

20   people with as similar description as possible to what

21   the witness said they looked like.

22       Q    So for example, if you had a witness who

23   described the perpetrator as having a particular

24   hairstyle, you would try to get fillers for the photo

25   array who all had the same or very similar hairstyles,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 329 of 782 PageID #:13587
The Deposition of AARON RICE, taken on May 12, 2023
220

1    correct?

2        A    No.  Actually you would try to get fillers who

3    look like the photograph of the suspect.  So they can

4    shave their head -- if the witness said he had

5    dreadlocks and you got six people with dreadlocks and

6    your suspect shaved his head and you have him with his

7    head shaved, then he stands out.  So you want to get

8    fillers to match as closely as possible what the

9    photograph of your suspect looks like, not necessarily

10   what the description was at the time.  Facial hair can

11   be grown or shaved, head hair can be grown or shaved.

12   There's a lot of variables that actually go into it. But

13   you want the photos to look as similar as possible. Same

14   with a physical lineup, as similar as possible.

15       **Q    And similarly, if you have a suspect who gives**

16   **-- well, let's use something that -- we'll call it a**

17   **little bit more of an immutable characteristic.  If you**

18   **have a suspect -- strike that.  If you have a witness**

19   **who had identified somebody who was, you know, over six**

20   **feet tall -- particularly tall or particularly short,**

21   **would you try to ensure that you had photo array**

22   **participants who were equally tall or short?**

23            MR. BRUEGGEN:  Objection, form.

24       A    Again, not necessarily.  I think there's ways

25   to compensate for that, just showing head shots, for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 330 of 782 PageID #:13588
Prev Deposition of Anthony Riccio taken on May 18, 2023
221

```
1   example.  Or having everybody seated makes it more
2   difficult to determine heights.  I mean, ideally if you
3   can get -- if your suspect is 6'2" and you can get all
4   your fillers to be 6'2", that's great.  But that's not
5   always the case.  In fact, that's the exception.
6        Q    Okay.
7        A    So I think you just want to make sure that
8   nobody stands out and that your -- you want to make sure
9   your suspect doesn't stand out against the other photos.
10       Q    And again, to be clear, once you have --
11  you're comparing to the photo of your suspect; is that
12  right?
13       A    That's the best way to do it.  Not necessarily
14  to the description provided by the witness, but to the
15  photo of your suspect.  Certain things you can't change.
16  You can't change the fact that you're heavyset, you
17  can't change if you've got a tattoo on your forehead,
18  but hair can be changed, facial hair can be changed,
19  glasses can be taken on or off, baseball caps.  So you
20  just want -- the photo that you present that day of your
21  suspect should be not very dissimilar from the fillers
22  that you're using.
23       Q    Okay.  And the complexion is probably a better
24  example or build --
25       A    Sure.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    -- so let me see if understand correctly.  For

2    example, if you have a witness who describes somebody as

3    being light-complected and your suspect is

4    light-complected in the photo that you have of them,

5    then you need to ensure that your fillers are also all

6    light-complected, correct?

7    A    To the best of your ability, that would be --

8    yeah, that would be ideal.

9    Q    And in terms of your ability to put together a

10   photo array back in that time period of 1993, how was

11   that done?  What collection of material did you have to

12   create your photo array to try to make a fair array?

13   A    You could use Polaroid photos.  You could use

14   the department's IR photos, or CV photos, you know,

15   photos of people who have been previously arrested who

16   look very similar to your suspect.  That was really it.

17   I mean, on rare occasions you'd get a photograph with

18   ten guys in it and you knew your suspect was one of

19   them.  There were times, if you had nothing else at your

20   disposal, where you could show a witness that photo and

21   they could look through that photo and say, yeah, it's

22   this guy over here.  That happened on occasion when

23   there were limited options or limited options available

24   to you.

25   Q    If you were using -- you said one of the ways

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   to make your -- to get your fillers is using Polaroid

2   photos.  Where were the Polaroid photos that could be

3   used to create an array?

4        A    Well, you'd have to have a Polaroid of your

5   suspect.  And I don't know if you would just take that

6   photograph of him on the street or if there was another

7   photograph of him somewhere that you had access to.  You

8   know, I've seen detectives drive down the street to a

9   group of guys and snap photographs of them if they were

10  willing volunteers and use them in photo spreads when

11  they were using Polaroids.  But I think the most common

12  method was probably the department's CV photos or IR

13  photos.

14       Q    So the department CV photos, were those

15  available online, like through a computer, or were they

16  all sort of collected in hard copy form?

17       A    At the time when I was a detective, you had to

18  drive down to headquarters to the graphic arts section

19  and you had to request the photos and they would --

20  you'd wait about an hour, they'd print them out and hand

21  them to you.  Since then, now you can click a button

22  and, you know, get as many as you want off the computer.

23       Q    I see.  So back in that time, the difficult

24  practice to create a photo array was to go to graphic

25  arts and have them print out a series of photos for you?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 333 of 782 PageID #:13591
Prev Deposition of Anthony Riccio - taken on March 23, 2023
224

1     A     Correct.

2     Q     And would you provide them with essentially

3 the description that you wanted and then they would

4 identify people for you?

5     A     Yeah.  They would kind of look through some of

6 the -- the photos.  They usually had a big box there

7 that you could kind of thumb through and look for them.

8 They had them divided up by White guys, Hispanic guys,

9 Black guys, Asians, and they would kind of divide them

10 up and you can kind of thumb through them.  But in the

11 absence of anything good, they would work with you to

12 try to find some that were good enough to present as

13 part of a photo spread.

14    Q     And while you were working as a detective at

15 that time, were you aware of any collection of Polaroids

16 that were kept in the office that would be used to

17 create photo arrays when using Polaroid photos?

18    A     Yeah.  There were some books like robbery

19 books.  I think there were burglary books.  There was a

20 room in there that housed a lot of these old, basically

21 like photo albums.  And guys could also look through

22 there and pull out photos of some of these individuals

23 and use those as fillers as well.

24    Q     Those albums that were kept in the -- at the

25 detective division, were any of those gang books?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No.  I don't remember ever seeing the gang

2  books.  I don't think they were ever kept up in the

3  detective areas, if there were, because those were more

4  like the gang crimes books or gang specialists' books. I

5  think they created them and maintained them.

6    Q    Looking again at that last paragraph -- or

7  that second to last paragraph.

8    A    Yes.

9    Q    The last sentence indicates that, "After

10  viewing this photo array, Rosendo Ochoa identified a

11  picture of Geraldo Iglesias, as being the person he saw

12  shoot and kill Monica Roman."  Do you see that?

13    A    Yes, I do.

14    Q    Do you have any personal knowledge about what

15  happened during the course of that viewing procedure in

16  which Mr. Ochoa purportedly identified Geraldo Iglesias

17  from a photo array?

18    A    No.  Again, the extent of my involvement was

19  backup on the arrest and in the room with the fillers

20  and the suspect during the lineups, and that was it.  I

21  never interviewed any witnesses, never had access to

22  evidence, or anything like that.

23    Q    Can you vouch, in any way, for what Mr. Ochoa

24  said when he viewed the photo array that was presented

25  to him by Guevara and Halvorsen?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 335 of 782 PageID #:13593
The Deposition of ANTHONY RICCIO, taken on March 16, 2023
226

```
 1        A    No --
 2             MR. BRUEGGEN:  Object to form.
 3        A    Sorry.  No, I cannot.
 4        Q    Can you vouch, in any way, for what Rey
 5   Guevara and Ernie Halvorsen said or did when they showed
 6   photos to Rosendo Ochoa?
 7             MR. BRUEGGEN:  Object to form.
 8        A    No, I cannot.
 9        Q    Do you know whether that photo array was shown
10   to Mr. Ochoa at the police station or at home -- in Mr.
11   Ochoa's home?
12             MR. BRUEGGEN:  Object to foundation.
13        A    No, I do not.
14        Q    Okay.  Turn to the next page.  If you look at
15   the second paragraph, it indicates, "On 23 June 93 at
16   2020 hrs. an interview was conducted with Geraldo
17   Iglesias in the line-up room of Area Five Violent
18   Crimes."  And it indicates the interview was conducted
19   by Halvorsen and Guevara.  Did you participate in any
20   way in any interview for Geraldo Iglesias?
21        A    No.  Again, I never participated in any
22   interview of any person at any time in this case.
23        Q    Did you -- I think -- so strike that.  So you
24   have never -- have you ever spoken to Geraldo Iglesias?
25        A    Never.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUEGGEN:  Just to clarify, except for

2     during lineups when you talk to all the people?

3     Step forward, stuff like that.  I just want to make

4     sure -

5  BY MR. SWAMINATHAN:

6      Q    Well, yeah.  Fair point.  Let's clarify that

7  because I'm not trying to trick you here.

8      A    Except for providing instructions during the

9  lineup procedure, I have never spoken to him.

10     Q    And by the way, at that time when you

11 conducted the lineup procedure, he never said anything

12 to you, correct?

13     A    No, he never said anything to me.

14     Q    So as far as you know, Geraldo Iglesias has

15 never, ever said anything to you ever?

16     A    That's correct, never.

17     Q    And other then you giving him instructions

18 during the lineup procedure, have you ever had any

19 conversation with Mr. Iglesias?

20     A    Never.  Before, during, or after this

21 incident, I never had any contact with him outside of

22 instructions during the lineup procedures.

23     Q    Was Mr. Iglesias someone that you were ever

24 targeting in any investigation that you conducted?

25     A    No, he was not.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    If you look at that next paragraph, it
 2  indicates -- it's a paragraph that begins with the
 3  description of the summary of Geraldo Iglesias'
 4  interview.
 5       A    Yes.
 6       Q    If you look around the middle of that
 7  paragraph, it indicates, "He admitted that he hangs
 8  out," do you see that sentence that I'm referring to?
 9       A    Yes, I do.
10       Q    Okay.  It indicates, "He admitted that he
11  hangs out in the area of the Boys Club at the corner of
12  Sawyer and Palmer."  Do you see that?
13       A    Yes, I do.
14       Q    Then later on at the last sentence there it
15  indicates, "He does not recall what he did on 7th June
16  of '93 and has no alibi for his whereabouts on that date
17  at 1556 hours."  Do you see that?
18       A    Yes, I do.
19       Q    Now take as much time as you need to read that
20  paragraph.  But do you agree with me that nowhere in
21  this description of the interview with Geraldo Iglesias
22  does it say that he ever told the detectives that at the
23  time of the shooting he was at the corner of Sawyer and
24  Palmer?
25       A    Yes.  I agree with you that it does not say
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   that.
 2       Q    Okay.  And if Geraldo Iglesias had told the
 3   detectives that he was at the corner of Sawyer and
 4   Palmer, where the shooting occurred, at the time the
 5   shooting occurred, that would be a big deal, correct?
 6            MR. BRUEGGEN:  Objection, form.
 7       A    What do you mean it would be a big deal?
 8       Q    Fair point.  Let me ask that in a better way.
 9   You agree with me it would be incriminating, correct?
10            MS. ROSEN:  Object to form.
11       A    Yeah.  Placing himself at the scene of the
12   shooting would be incriminating.
13       Q    Okay.  And if somebody made an incriminating
14   statement placing themselves at -- strike that.  If a
15   suspect incriminates himself by placing himself at the
16   scene of the crime when it happened, that's the kind of
17   thing that detectives would put -- would try to get into
18   a handwritten statement from the suspect, correct?
19            MS. ROSEN:  Objection, form.  Foundation as to
20        handwritten statement.
21            MR. BRUEGGEN:  Incomplete hypothetical.  Go
22        ahead.
23       A    Yes, I think they would want that in a
24   handwritten statement, if possible.
25   BY MR. SWAMINATHAN:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 339 of 782 PageID #:13597
The Deposition of AUTHOR REDACTED, taken on Page 339 of 782

230

1    Q    All right.  So if Gerald Iglesias had told

2    Detectives Guevara and Halvorsen that he was at the

3    scene of the crime when it occurred, you would expect

4    some attempt to get a handwritten statement from

5    Mr. Iglesias, correct?

6         MS. ROSEN:  Objection.  Form, foundation, calls

7      for speculation, incomplete hypothetical.

8    A    Yes, I would.

9    Q    And you would expect that that information

10   would have been communicated to the assistant state's

11   attorney from felony review who was ultimately called

12   into the case, correct?

13        MR. BRUEGGEN:  Object to form.  What

14     information?

15   A    Yes, I would.

16   Q    Okay.  Are you aware that Reynaldo Guevara

17   came to trial in this case and testified that Geraldo

18   Iglesias told him that he was at the scene of this crime

19   when it occurred?

20   A    No, I was not aware of that.

21   Q    Okay.  Let's look at the next paragraph there.

22   A    Yes.

23   Q    It says, "The reporting detectives contacted

24   felony review and ASA Mike Latz arrived at Area Five." I

25   think you indicated earlier, you had no interactions

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  with Mr. Latz, correct?

2      A    That's correct.

3      Q    It indicates that Latz interviewed --

4  conducted an interview with Rosendo Ochoa in that

5  paragraph.  Did you participate in any interview with

6  Ochoa with ASA Latz?

7      A    No.  I never participated in an interview with

8  anyone in this investigation at any time.

9      Q    Did you have any knowledge that ASA Latz was

10  at Area 5 related to this investigation?

11         MR. BRUEGGEN:  Object to foundation.

12     A    I probably did at the time.  I -- I -- I don't

13  know for certain.  I'm -- I'm assuming that I would've

14  known that the ASA was in there.

15     Q    Okay.  And were you -- are you in a position

16  to be able to say, you know, based on seeing ASA Latz at

17  Area 5, what aspects of this investigation ASA Latz

18  participated in?

19         MR. BRUEGGEN:  Object to form.  Asked and

20     answered.  Go ahead.

21     A    No.  I have no idea the degree.  I never spoke

22  to the ASA at all.

23     Q    The next sentence indicates that a second

24  eyewitness, Arnell Moore was brought into Area 5 Violent

25  Crimes.  Do you see that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

1     A    Yes, I do.

2     Q    And then it says, "Arnell Moore was

3     interviewed by ASA Latz and provided the same

4     information that he had previously told detectives."

5     Having a chance now to -- having to look at this

6     information in this report, does that refresh your

7     memory at all about whether you participated in any

8     interview of Arnell Moore?

9     A    No.  I never participated in an interview with

10    anyone in this case at any time.

11    Q    All right.  The next paragraph begins, "The

12    reporting detectives located three of the persons who

13    were in the car with the victim when she was shot."  Do

14    you see that?

15    A    Yes, I do.

16    Q    Did you make -- did you participate in any

17    efforts to locate the individuals who had been in the

18    car with the victim?

19         MR. BRUEGGEN:  Object to foundation.  Go ahead,

20    sir.

21    A    No, I did not.  The extent of my involvement

22    was to back them up on the arrest and to assist inside

23    the viewing room during the lineups.

24    Q    It says that the driver of the car was in

25    Mexico, but then it says, "Rodriguez, Coronell, and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Sanchez all came into Area Five.  Rodriguez, Coronell,
 2    and Sanchez spoke very limited English and were
 3    interviewed by ASA Latz with Detective Guevara as
 4    interpreter."  Do you see that, sir?
 5         A    Yes, I do.
 6         Q    Did you -- having had a chance to review that,
 7    does that refresh your memory as to whether you
 8    participated at all in interviews with Mr. Rodriguez,
 9    Coronell, or Sanchez?
10         A    No.  I never participated in interviews with
11    anyone in this case.
12         Q    Okay.  And it says, "During this interview,
13    Hugo Rodriguez stated that he would be able to identify
14    the person who shot Monica Roman."  Do you have any
15    personal knowledge about Mr. Rodriguez making such a
16    statement?
17         A    No, I do not.  I wasn't present for that.
18         Q    Did the Detectives Guevara and Halvorsen ever
19    tell you that they got information from Rodriguez
20    stating he could make an identification?
21         A    No.  Not prior to the lineup.  After the
22    lineup they told me that he did identify the offender as
23    the person who he saw shoot Monica Roman.
24         Q    Did they tell you that -- did they tell you
25    before the lineup that he said to them, hey, I'll be
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  able to identify the person who shot Monica Roman if you

2  show me a lineup.

3      A    No.

4          MR. BRUEGGEN:  Question asked and answered.

5      Sorry, go ahea.

6      A    No.  No, they did not.

7          MS. ROSEN:  And whenever it's convenient, if we

8      could take a short break.

9          MR. SWAMINATHAN:  Yeah.  Why don't we go maybe

10     another two minutes here.  I'm almost done with this

11     section.

12         MS. ROSEN:  Will you do it when you say two

13     minutes?  But okay.

14         MR. SWAMINATHAN:  Well, maybe let's say four

15     minutes.  I'll see if I can beat it here.

16 BY MR. SWAMINATHAN:

17     Q    It says the next -- the beginning of the next

18 paragraph on the last page.

19     A    Beginning of the next paragraph on the last

20 page.

21     Q    I'm sorry, I'm sorry.  Let's start on page 4.

22 Why don't I -- rather than break my promise, why don't

23 we take our break right now?

24     A    Okay.

25         MS. ROSEN:  Want to say in five minutes?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 344 of 782 PageID #:13602
The Deposition of ANTHONY RICCIO, taken on May 18, 2022

235

```
 1              MR. SWAMINATHAN:  Yeah, no problem.
 2              COURT REPORTER:  Off the record, the time is
 3         3:22.
 4                 (OFF THE RECORD)
 5              COURT REPORTER:  We are back on the record for
 6         the deposition of Anthony Riccio being conducted by
 7         videoconference.  My name is Sydney Little.  Today
 8         is May 18, 2022, and the time is 3:31 p.m.
 9    BY MR. SWAMINATHAN:
10         Q    Okay.  Let's turn to where we left off, page 3
11    of the report.  We're looking again at Exhibit 1 to your
12    deposition, and we're looking at page 3 of this report
13    RFC Iglesias 92.
14         A    Got it.
15         Q    And let's actually turn to page 4.
16         A    Okay.
17         Q    So that's RFC Iglesias 93.  At the top of the
18    page it indicates that "On 24 June '93 at 12:30 a.m. or
19    0030 hrs.  Detective Rey Guevara and ASA Latz showed
20    Hugo Rodriguez the same photo array previously viewed by
21    Rosendo Ochoa."  Do you see that?
22         A    Yes, I do.
23         Q    Now first of all, do you have any personal
24    knowledge about whether ASA Latz participated in that
25    photo array procedure?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    I have no personal knowledge, no.

 2       Q    And if ASA Latz indicated that he doesn't

 3  believe or recall participating in that photo array

 4  procedure, do you have any reason to dispute that?

 5            MR. BRUEGGEN:  Object to form.

 6       A    I have no reason to agree or disagree.

 7       Q    Okay.  During the time that you were a

 8  homicide detective, in your experience, did the ASAs

 9  participate in the photo array procedures?

10       A    I don't recall that ever happening with one of

11  my cases.

12       Q    Do you recall any instances when the ASAs

13  participated in the lineup procedures?  Meaning they'd

14  be in the viewing room with witnesses when you conducted

15  the lineup?

16       A    Never on one of my cases.  I can only speak

17  for my own.  But never on one of mine.

18       Q    Okay.  So on the cases -- during the time you

19  were a detective, on your cases, you cannot recall any

20  instances when an ASA participated in a photo array or

21  lineup procedure you conducted, correct?

22       A    That's accurate, yes.

23       Q    Okay.  It says that Hugo Rodriguez viewed the

24  same photo array previously reviewed by Rosendo Ochoa.

25  Can you agree with me, based on this report,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Mr. Iglesias was already in custody and had been

2   questioned, correct?

3       A    Yes, that's correct.

4       Q    Do you know why Mr. Rodriguez was shown a

5   photo array rather than a lineup?

6           MR. BRUEGGEN:  Object to foundation.

7       Speculation.  Go ahead.

8       A    I do not know, no.

9       Q    Under the circumstances documented in this

10  report as we've gone through it so far, would you have

11  conducted a photo array, or would you have conducted a

12  lineup?

13          MR. BRUEGGEN:  Objection.  Incomplete

14      hypothetical.  Speculation.  Go ahead.

15      A    I mean, because I don't have all the facts as

16  far as what the ASA was asking for, it's difficult for

17  me to answer that.  I would say that without any input

18  from the ASA, I would've shown a live lineup as opposed

19  to a photo array.  But I don't if the ASA was requiring

20  or requesting or, you know, asked for a photo array

21  first.  I -- I don't know.  Absent the state's attorney,

22  I would've gone right to the live physical lineup.

23      Q    Okay.  And if it'd been you without a state's

24  attorney involvement, why would you have gone straight

25  to the lineup rather than conduct a photo array first?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Because the offender or the suspect was in

 2   custody.

 3        Q    And why, under those circumstances, would you

 4   rather conduct a lineup than a photo array?

 5        A    Well, one reason is because if you conduct a

 6   photo array you still have to conduct the live physical

 7   lineup anyway.  So the photo array is really -- I don't

 8   understand the need to do a photo array first.  Again,

 9   unless the state's attorney said this is what I want.

10   But you still have to do a live lineup anyway.

11        Q    Okay.  So unless the ASA requested it --

12   strike that.  If it was just you, you wouldn't have

13   conducted the photo array before the lineup because for

14   one reason, you would've had to do the lineup anyway, so

15   there was no reason to do the photo array, correct?

16        A    That's correct.

17        Q    Now with regard to that first paragraph

18   documenting a photo array procedure conducted with Hugo

19   Rodriguez, do you have any knowledge about what Hugo

20   Rodriguez said or did during the course of that photo

21   array procedure?

22        A    No, I do not.

23        Q    Do you have any knowledge about what Reynaldo

24   Guevara said or did during that photo array procedure?

25        A    No, I do not.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Do you have any knowledge about how many times

2    Hugo Rodriguez was shown photos during the course of

3    this investigation before he was -- before he viewed the

4    lineup that you participated in?

5    A    No, I do not.

6    Q    If -- strike that.  If -- and you never showed

7    Hugo Rodriguez any photos during the course of this

8    investigation, correct?

9    A    That's correct.

10   Q    Each time you ever showed Hugo Rodriguez

11   photos, you would've documented it, correct?

12       MR. BRUEGGEN:  Objection form.  He just

13   testified he never showed him photos, sir.

14   Q    Sorry.  Let me -- I want to be clear with it.

15   I'm saying, if you had shown Mr. Rodriguez photos,

16   however many different times you showed him photos, you

17   would've documented each of those times, correct?

18   A    That is correct.

19   Q    And if Mr. Rodriguez has indicated in his

20   deposition that he was showed photos at least three

21   times or more, would you have documented each of those

22   three times or more?

23       MR. BRUEGGEN:  Objection.  Misstates

24   Mr. Rodriguez's testimony.  Go ahead.

25   A    Yes.  Each time that he would've been shown

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 349 of 782 PageID #:13607
The Deposition of ANTHONY RICCIO, taken on March 24, 2022
240

1     photos, I would've documented each of those instances,

2     yes.

3         Q     Looking down to the third paragraph, we

4     skipped a paragraph there.

5         A     Yes.

6         Q     "On 24 June '93 at 1:25 a.m., a second lineup

7     was conducted at Area Five Violent Crimes. After

8     viewing this lineup, Hugo Rodriguez identified Geraldo

9     Iglesias as the person he saw shoot and kill Monica

10     Roman." Do you see that, sir?

11         A     Yes, sir, I do.

12         Q     Okay. And that's the lineup we -- that's the

13     second lineup that we discussed earlier where you

14     participated exclusively by being in the room with the

15     suspect and fillers, correct?

16         A     That is correct.

17         Q     Okay. Do you have any personal knowledge

18     about what Hugo Rodriguez said or did during the course

19     of that lineup procedure?

20         A     No, I do not.

21         Q     And do you have any knowledge about what Rey

22     Guevara or Ernie Halvorsen said or did during that

23     lineup procedure?

24         A     No, I do not.

25         Q     And it indicates that, "Lineup procedures were



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 350 of 782 PageID #:13608
Prev Deposition of An Richie - taken on Page 35, 9627
241

1    also conducted with Efrain Torres and David Chmieleski."
2    Do you see that?
3         A    Yes, I do see that.
4         Q    And it indicates that neither of them
5    identified anyone from the lineup.  Do you see that?
6         A    Yes, I do.
7         Q    Do you have any knowledge about what
8    Mr. Torres or Mr. Chmieleski said during the course of
9    those identification procedures?
10        A    No, I do not.  I was just told following the
11   lineups -- following this lineup at 1:25 a.m. exactly
12   what it states there.  I was told that an individual
13   named Efrain Torres viewed the lineup and that
14   Chmieleski viewed the lineup and that they both did not
15   make an identification because they did not see the face
16   of the shooter.
17        Q    And where it indicates that "Efrain Torres did
18   not witness this incident occur and made no
19   identifications," is that information that Mr. Torres
20   ever told you, that he did not witness this incident?
21        A    No.  I never spoke to any of these
22   individuals.  That would've been conveyed to me from
23   either Halvorsen or Guevara.
24        Q    Okay.  All right.  Why don't you just take one
25   second.  I think we've gone through almost the entire

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 report, but why don't you take as long as you feel like
2 you need to take a look at this report and let me know
3 whether after reviewing this report it refreshes your
4 memory about any part of your involvement in this
5 investigation beyond what you've told us here today.
6     A    Okay.  No.  There's nothing in here that
7 provides me with any additional information other than
8 what I've already told you.
9     Q    So other than your -- strike that.  Having had
10 an opportunity to review this cleared closed report
11 we've marked as Exhibit 1, does it refresh your memory
12 that you participated in this investigation in any way
13 beyond what you've told us so far today?  That is, that
14 you participated in a limited way in the arrest of
15 Geraldo Iglesias and in a limited way in two lineups
16 conducted in this case?
17         MR. BRUEGGEN:  Object to form.  Go ahead, sir.
18     A    That's correct.  That was the extent of my
19 involvement in this case.
20     Q    And this review of this cleared closed report
21 does not cause you to believe you had any additional
22 involvement; is that correct?
23     A    That's accurate.  Yes, that's correct.
24     Q    All right.  Let's pull this down.  I'm going
25 to do the Ochoa lineup report.  This is RFC Iglesias 97

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    and 98.  I'll just note for the record while Dave is

2    grabbing the hard copy for you, I have -- I am now

3    sharing my screen and showing you a document that we'll

4    mark as Exhibit 2.  This is RFC Iglesias 97 to 98.  This

5    is identified as a supplementary report from the Chicago

6    Police Department submitted on June 23, 1993.  Sir, this

7    is a document you reviewed in preparation for today's

8    deposition, correct?

9              (EXHIBIT 2 MARKED FOR IDENTIFICATION)

10    A    Yes, this is.

11    Q    And I see your name is listed at the bottom,

12    correct?

13    A    Yes, it is.

14    Q    And is that your signature in the bottom left?

15    A    Yes, that's my signature.

16    Q    Did you author this report?

17    A    Yes, I did.

18    Q    And did you sign this report?

19    A    Yes, I did.

20    Q    And did Mr. Halvorsen and Mr. Guevara both

21    also sign this report?

22    A    No.  I signed on their behalf.

23    Q    Okay.  If you look at the next page.

24    A    Yes.

25    Q    Fair to say this is your documentation of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 353 of 782 PageID #:13611
The Deposition of ANTHONY RICCIO, taken on May 19, 2023
244

 1    lineup viewed by Rosendo Ochoa?

 2        A    Yes, it is.

 3        Q    Okay.  And it lists -- it contains a section

 4    identifying the persons conducting the lineup.  Do you

 5    see that?

 6        A    Yes, I do.

 7        Q    And it identifies yourself and Mr. Halvorsen

 8    and Mr. Guevara, correct?

 9        A    That's correct.

10        Q    Okay.  And so based on that documentation,

11    does it indicate to you that anybody else participated

12    in this lineup procedure?

13        A    No.  Just -- just myself, Halvorsen, and

14    Guevara.

15        Q    Okay.  And it is sometimes the case that, for

16    example, a criminal defense counsel or -- or a gang

17    crimes officer, or somebody may on occasion be present

18    or participate in a lineup, correct?

19        A    I would say rarely.  But yes, I -- it's

20    happened, but it's rare.

21        Q    And when that happens, there's -- that can

22    actually be documented in these lineup reports either in

23    the Persons Conducting Lineup section or Additional

24    Persons Present During Lineup, correct?

25        A    That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Antonio Rivera, taken on March 16, 2023

```
 1        Q    Okay.  So where there are additional

 2   individuals who participate or are present for a lineup,

 3   those additional individuals would be listed on the

 4   lineup supplementary report, correct?

 5        A    Yes, sir.

 6        Q    Okay.  And so in this case, you have

 7   documented the only three people who participated in the

 8   lineup, yourself, Mr. Halvorsen, and Mr. Guevara,

 9   correct?

10        A    That's correct.

11        Q    Okay.  All right.  And then we have -- we

12   won't belabor the point here.  It indicates that

13   Mr. Ochoa identified Geraldo Iglesias.  And I think as

14   we have now established ad nauseum, this -- the lineup

15   itself was conducted by Guevara and Halvorsen with the

16   witness.  And so, any information about what Mr. Ochoa

17   -- who Mr. Ochoa identified comes from Mr. Guevara and

18   Mr. Halvorsen, correct?

19        A    That's correct.

20        Q    Okay.  And so basically you filled in the

21   information on this report about what Mr. Ochoa did and

22   who he identified based on information provided to you

23   by Guevara and Halvorsen, correct?

24        A    That's correct.

25        Q    Okay.  And the names of the individuals who
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  participated in the lineup and their lineup positions,
2  where did you get that from?
3        A     From those individuals.  Based on the fact
4  that there's home addresses provided rather than CB
5  numbers, would've been my practice for individuals who
6  voluntarily came in to act as fillers for the lineup.  So
7  they were not people who were in custody down in the
8  lockup of the 25th District.  So these would've been
9  volunteer fillers.
10       Q     Okay.  All right.  And then if we look at the
11  next -- let's pull up the next report here.  All right.
12  We'll mark this as Exhibit 3.  This is RFC Iglesias
13  94 through 96, and it's the Chicago Supplementary Report
14  with the date submitted of 23 June '93.
15                (EXHIBIT 3 MARKED FOR IDENTIFICATION)
16       A     Got it.
17       Q     You got it?  Okay.  Sir, this is a document
18  you reviewed in preparation for today's deposition,
19  correct?
20       A     Yes, it is.
21       Q     And this is the second lineup that we have
22  been discussing, correct?
23       A     Yes, it is.
24       Q     Okay.  On the first page of this document, it
25  lists your name in the bottom left, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Correct.

 2      Q    Is that your signature?

 3      A    Yes, it is.

 4      Q    Okay.  And then it also lists Ernie Halvorsen

 5   as being a report submitter, correct?

 6      A    Yes, correct.

 7      Q    And is that your signature -- or is that

 8   Ernest Halvorsen's signature?

 9      A    No, I signed on his behalf.

10      Q    Okay.  And this -- unlike the earlier lineup

11   report, this one does not include Detective Guevara's

12   name.  Do you see that?

13      A    I do.  I -- I don't have an explanation for

14   it.  I'm not sure why his name was omitted from there.

15   He was included in the Persons Conducting Lineup section

16   and he was included on page 3, but I don't have an

17   explanation for why I omitted to put his name on that

18   front page.

19      Q    Okay.  So you've, again, anticipated my

20   question.  So I'll just ask it cleanly.  So if you look

21   at the next page of this document, it indicates that the

22   persons conducting the lineup where yourself,

23   Mr. Halvorsen, and Mr. Guevara, correct?

24      A    Correct.

25      Q    Okay.  So the fact that you have not included

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Mr. Guevara's name on the first page in the Report
 2    Submission section does not, in any way, indicate that
 3    Mr. Guevara did not participate this lineup, correct?
 4         A    No.  That would've been a -- an oversight.  An
 5    omission on my part.
 6         Q    Okay.  And based on the information contained
 7    in the Persons Conducting Lineup section listing Guevara
 8    and his inclusion on the third page of this report, fair
 9    to say that Mr. Guevara did participate in this lineup?
10         A    Yes, that's correct.
11         Q    Okay.  And Mr. Guevara was not in the lineup
12    room with you and the suspect and the fillers, but
13    instead with -- in the viewing room with the
14    participants viewing the lineup, correct?
15         A    That's correct.
16         Q    Okay.  Now, if you look at page 2 of this
17    document where it lists the persons conducting lineup,
18    if anyone else had been present for this lineup, either
19    in the viewing room or the lineup room where you were,
20    you would've included their name here, correct?
21         A    I would've.  Yes.
22         Q    And if an ASA had been present for this
23    lineup, you would've included their name here, correct?
24         A    Yes, I would.
25         Q    Okay.  So based on this report, would you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1    agree with me ASA Latz did not participate in this
2    lineup procedure?
3         A    Yes, that's correct.
4         Q    Okay.  And again, looking at the results of
5    this lineup -- this series of lineups as documented in
6    the investigation section, all of the information about
7    what occurred in the lineup, as viewed by the witnesses,
8    comes from Rey Guevara and Ernie Halvorsen, correct?
9         A    That's correct.
10        Q    Okay.  Now, if you look at the first page of
11   this report, it indicates that the report was submitted
12   on June 23, 1993 at 9:00 p.m.  Do you see that?  Or
13   21:00 hours?
14        A    Yes, that's also an error.
15        Q    Okay.  And how do you know that's an error?
16        A    Because a lineup was not conducted until 1:25
17   in the morning, the following morning.  I think what I
18   did is, I probably took that directly off the previous
19   lineup supp that I created, because that's the same date
20   and time from the previous lineup supp, so that was a --
21   an -- an error on my part.
22        Q    Okay.  Any other explanation for why that time
23   is incorrect?
24        A    No, that was it.  That would -- that would be
25   it.  I just took it off the previous lineup report.
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 359 of 782 PageID #:13617
The Deposition of ANTHONY RITCHIE, taken on May 15, 2023

250

1     Q     Okay.

2     A     Yeah.

3     Q     Okay.  And then if you look at the next page

4  of the report, page 3 -- if you look at the top right,

5  it lists 22 February 1993.  Do you see that?

6     A     Yes, I do.

7     Q     Can you explain what -- why that date is on

8  this page 3 of this report?

9     A     Yeah, that's -- that's also a -- a typo.  Back

10  when we were doing these, the front page would've had to

11  been created in a typewriter and the other pages were

12  word documents.  So to keep the formatting the same --

13  as you could see on page 2, there's a great deal of

14  formatting, indenting, all that other stuff.  Typically,

15  to keep that formatting the same, I would type over an

16  old lineup supp to create it, and I -- apparently here

17  on page 3, I failed to change the -- the date and the RD

18  number.

19     Q     Okay.  So the date and RD number are both

20  wrong, correct?

21     A     Yes, that's correct.

22     Q     And that's basically a typo on your part?

23     A     That's a typo, yeah.

24     Q     Okay.  And it's a vestige of a different

25  template of a report that you used to start filling this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  in, correct?

 2       A    Yes, that's correct.

 3       Q    Okay.  All right.  Let's take a look at a

 4  document I'll mark as Exhibit 4.  Give me one second.

 5  Sorry, I'm updating my exhibit numbers so that I keep

 6  track of it.  All right.  All right.  I'm showing you a

 7  document I've marked as Exhibit 4.  This is a

 8  supplementary report Bates stamped RFC Serr/Mont,

 9  S-E-R-R/M-O-N-T, pages 68 through 72.

10            (EXHIBIT 4 MARKED FOR IDENTIFICATION)

11       A    Okay.

12       Q    And it has date of the report submission as

13  June 14, 1993, okay?

14       A    Okay.

15       Q    This is not a document you reviewed in

16  preparation for today's deposition, correct?

17       A    Correct.

18       Q    Okay.  And if you look at this document just

19  to make sure there's no confusion, this is a document

20  with a different victim, Rodrigo Vargas, and it's got an

21  RD number of 054183, which is not the RD number of the

22  Monica Roman investigation.  Can you see that?

23       A    Yes, I do.

24       Q    Okay.  So I'm showing you, just to be clear, a

25  report that is not from the Monica Roman investigation.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Got it.

 2        Q     You'll understand why in a second.  Okay.  So

 3   this report that I'm showing you is a report that was

 4   authored by what appears to be Detective Halvorsen and

 5   Detective Guevara.  Do you agree?

 6        A     Yes, I agree.

 7        Q     Okay.  And do you recognize either of their

 8   signatures at the bottom of the page?

 9        A     No, I -- I don't.

10        Q     Okay.  And this report states that it was

11   submitted on June 14th at 6:00 p.m., correct?

12        A     Yes, correct.  1993.

13        Q     Okay.  And in terms of practice among

14   detectives, when you have two detectives listed, one on

15   the left and one on the right, does that usually provide

16   some indication about who actually drafted or wrote the

17   report?

18        A     Not always.  Some guys would put themselves in

19   the box on the left, other guys would defer to their

20   partner, put him on the left.  So it -- there's really

21   no -- no hard and fast rule on it.

22        Q     Okay.  All right.  If you look at the second

23   page of this report -- I'm not going to go through this

24   whole report with you and -- of course, you're welcome

25   to look at it if you'd like, but on the second page is
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   the only piece that I wanted to ask you about.  It

2   indicates a section that lists witnesses, and if you

3   see, a person by the name of Timothy Rankins listed

4   there?

5        A    Yes.  Okay.  Yep.  Yep.

6        Q    Okay.  And it -- (coughs) excuse me, it says

7   that he's an admitted member of the Spanish Cobra street

8   gang, nickname of Loco.  Do you see that?

9        A    Yes, I do.

10       Q    Do you have any personal memory of ever

11  interviewing or speaking with a person named Timothy

12  Rankins?

13       A    No, I don't.

14       Q    Okay.  So if you look at that -- I want you to

15  -- why don't you just read that paragraph right there at

16  the bottom of page 2 and let me know when you've had a

17  chance to finish reading that.

18       A    Okay.  Okay.

19       Q    Okay.  And why don't we take a look at this --

20  at the top of the next page, page 3, where it indicates

21  Timothy Rankins was first questioned on 11 June '93.  Do

22  you see that?

23       A    Yes.

24       Q    Okay.  All right.  So looking at this

25  paragraph here at the bottom of page 2, this report
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 363 of 782 PageID #:13621
The Deposition of XXXXX XXXXX, taken on May 16, 2023
254

```
 1   indicates that on -- by June 10th at the latest,
 2   Detective Mingey had learned information suggesting that
 3   the perpetrator in the Monica Roman case was a member of
 4   the Spanish Cobras, correct?
 5           MR. BRUEGGEN:  Objection, form.  Misstates the
 6       -- what it says there.  You said Detective Mingey.
 7   He's a sergeant.
 8   BY MR. SWAMINATHAN:
 9       Q    Oh, I'm sorry, Sergeant Mingey.  Yeah, let me
10   restate that.  So let -- I'm looking here at the bottom
11   of this page, it says, "Preliminary information in the
12   Roman shooting indicated that the offenders may have
13   been members of the Spanish Cobras street gang."  Do you
14   see that?
15       A    Yes, I do.
16       Q    And then it indicates that Sergeant Mingey
17   elected to interview Timothy Rankins for any knowledge
18   he may possess about the Roman shooting.  Do you see
19   that?
20       A    Yes, I do.
21       Q    Okay.  And there's a little bit of ambiguity
22   because it says on June 10, 1993, Timothy Rankins was
23   arrested for an armed robbery, and then on the top of
24   the next page, it says Timothy Rankins was first
25   questioned on 11th of June '93.  Do you see that?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 364 of 782 PageID #:13622
The Deposition of John Rivera, taken on May 18, 2023
255

1      A     Yes.

2      Q     Okay.  So based on the information contained

3   in this report, by June 11th at the latest, Sergeant

4   Mingey knew of information suggesting that the Roman

5   homicide perpetrator was a Spanish Cobra, correct?

6      A     Correct.

7      Q     Sorry, did you answer?

8      A     Yes.  Yes, I did.  I said correct.  Yes.

9      Q     Okay.  All right.  And then this report was

10  submitted on June 14th by Detectives Halvorsen and

11  Guevara, correct?

12     A     Yes, it was.

13     Q     Okay.  And so by June 14th at the latest, the

14  date of this report, Guevara and Halvorsen knew as well

15  that there had been a lead indicating the involvement of

16  the Spanish Cobras in the Roman homicide investigation,

17  correct?

18          MR. BRUEGGEN:  Objection, form.

19     A     Yes, that's correct.

20     Q     Okay.  And the information about what the lead

21  was indicating, that the perpetrator of the Roman

22  homicide was a member of the Spanish Cobras, is that

23  information contained here?

24     A     I'm sorry.  What was your question?  The

25  information --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Yes.  The reason that they had information
 2   indicating that the Roman shooting may have been
 3   committed by members of the Spanish Cobras, that's not
 4   actually documented here, correct?
 5        A     That's correct.  That is not documented here.
 6        Q     Okay.  So who provided this information, what
 7   exactly the information, and so on, that's not
 8   documented in this supplementary report from a different
 9   homicide investigation.  Do you agree with that?
10        A     Well, I've only read the first two paragraphs
11   and it's not documented in the first two paragraphs.  I
12   don't know if it's documented somewhere else in here.
13   It's kind of a --
14        Q     Okay, I will do this.  I'll represent to you
15   that it's not documented elsewhere in this report, but
16   I'm also happy to give you an opportunity to read this
17   entire report if you want a chance to, before I ask you
18   anything further.
19        A     No.  I mean, I'll -- I'll -- I'll leave it up
20   to you.  If you -- if -- if there's questions that
21   pertain to the report in general, I'll have to read the
22   whole report.  If there's --
23        Q     Okay.
24        A     If it's just out of these first two
25   paragraphs, I could certainly answer those.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  So why don't -- why don't I keep going,
 2   and then if you feel like at any point you need to
 3   either read more of the report or the whole report, you
 4   just do that, okay?
 5        A    Okay.
 6        Q    Okay.  So any information about what the lead
 7   was that pointed to the Spanish Cobras and who that
 8   information came from, would you expect that information
 9   to have been documented in the Roman homicide as opposed
10   to this homicide?
11             MR. BRUEGGEN:  Objection.  Form, incomplete
12        hypothetical.
13             MS. ROSEN:  Foundation.
14             MR. BRUEGGEN:  Go ahead.
15        A    Yeah, I would -- I would expect there to be
16   some documentation of that somewhere.  You know,
17   probably not in this -- in this case, but in the Roman
18   file.  I would think that it would be in there if -- if
19   the information about the offender coming from the
20   Spanish Cobras -- I would -- I would think that it would
21   be documented in the Roman file.
22   BY MR. SWAMINATHAN:
23        Q    Okay.  So whatever information had led them to
24   believe that the perpetrator may be a member of the
25   Spanish Cobras, that should be documented, not
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 367 of 782 PageID #:13625
The Deposition of ANTHONY RICCIO, taken on May 16, 2023
258

1    necessarily in this supplementary report, but in a

2    supplementary report or GPR in the Roman case, correct?

3         A    Yes.  It's --

4              MS. ROSEN:  Objection.  Form, foundation.

5         Q    Did you get the answer, ma'am?

6         A    Yeah.  My answer is yes, correct.

7         Q    Okay.  All right.  And then -- and do you have

8    any reason to doubt that a GPR or supplementary report

9    would've been created in the Roman homicide file

10   documenting that lead?

11             MR. BRUEGGEN:  Objection.  Form, speculation.

12             MS. ROSEN:  Form, foundation.

13        A    No.  I -- I don't have any knowledge as to

14   whether or not one was created or whether or not that

15   information is contained somewhere within that file or a

16   GPR.  I - I don't have any information on that.

17        Q    But to the extent -- your expectation is that

18   information would be documented in that file, correct?

19             MR. BRUEGGEN:  Objection.  Asked and answered,

20        form, and foundation.  Go ahead.

21        A    Yes, that would be my expectation.

22        Q    And you have any reason to doubt that

23   somebody, either Detectives Guevara or Halvorsen or

24   Mingey, did, in fact, document that in that file?

25             MS. ROSEN:  Objection.  Form, foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yeah.  Again, I don't know that it was or was
 2   not, so I really can't speak to that.
 3        Q    Would you expect -- given that this
 4   information was known to Sergeant Mingey, would you
 5   expect that Sergeant Mingey ensured that there was some
 6   documentation of that lead involving the Spanish Cobras
 7   in the Roman homicide file?
 8             MR. BRUEGGEN:  Objection.  Form, foundation,
 9        speculation.
10        A    I -- I would think someone would've.  I -- I
11   don't know that it would've been Sergeant Mingey.  I
12   don't -- I don't know that sergeants necessarily do that
13   documentation.  It looks like here that Rankins was
14   passed on to Halvorsen and Guevara, so I would think
15   that that information would've been -- would've been
16   covered by them.
17        Q    Okay.  And so, because Mingey -- Mingey might
18   would've -- strike that.  If Mingey knew that there was
19   a lead blaming the Spanish Cobras in the Roman homicide,
20   he either would've documented that himself or more
21   likely ensured that Guevara or Halvorsen documented that
22   in the file, correct?
23             MS. ROSEN:  Objection.  Form, foundation, calls
24        for speculation.
25        A    Yeah.  Again, I couldn't say what Mingey, you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  know, would or would not do or did or did not do, but I

2  -- I -- I will agree that it should be documented.

3       Q    Okay.  And do you have any reason to believe

4  that in this -- that it would not have been documented

5  in this particular instance?

6            MS. ROSEN:  Objection.  Form, foundation.

7       A    Do I --

8       Q    And strike that.  Let me -- just let me ask

9  you differently maybe to make it a little clearer.  Do

10  you have any reason to believe the typical practice of

11  documenting this information would not have been

12  followed in this particular case?

13            MS. ROSEN:  Objection.  Form, foundation, calls

14     for speculation.

15       A    I do -- I do not, because I -- I don't know if

16  -- if it was or was not documented.  So I -- I can't

17  speak to that.

18       Q    And to the extent it was documented, that

19  would've been what you expected to be done, correct?

20            MR. BRUEGGEN:  Objection.  Form and foundation,

21     calls for speculation.

22       A    Yes, that's correct.

23       Q    And to the extent it was not documented, that

24  would've been contrary to policy and practice, correct?

25            MS. ROSEN:  Objection.  Form, foundation, calls

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          for speculation.
 2          A    I -- I think it would've been contrary to what
 3     I personally would do per my personal practice.  I don't
 4     know that that would violate any particular policy of
 5     the Department or the Detective Division.
 6          Q    Can you say, one way or the other, whether it
 7     would violate any policies of the Department?
 8               MR. BRUEGGEN:  Object to foundation.
 9          A    I -- I could say that I don't know of any
10     policy that would require that.  I mean, there's a broad
11     interpretation of some policies that -- that you may,
12     you know, capture it under the umbrella, but I don't
13     know.  My personal practice, I would -- I would've -- I
14     would've put that in there.  But I -- I'm not aware of
15     any policy that specifically states what should or
16     should not be contained as far as information of this
17     nature.
18          Q    If Geraldo Iglesias was a member of the
19     Imperial Gangsters, that would be -- this would be
20     potentially exculpatory information as we discussed
21     earlier, correct?
22               MS. ROSEN:  Objection.  Form, foundation,
23          incomplete hypothetical, calls for a legal
24          conclusion.
25          A    It could potentially be, yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    And under the Detective Division special
 2   orders, potentially exculpatory information was required
 3   to be documented and disclosed to criminal defendants,
 4   correct?
 5             MR. BRUEGGEN:  Objection, foundation.
 6        A    Yeah.  I'm not familiar with a -- with a
 7   Detective Division order that requires that.  I believe
 8   that's just part of being a thorough investigator, but I
 9   don't know specific -- if you're asking me specifically
10   is there an order that says that, I'm not certain.  It's
11   -- I'm, you know, 25 years removed from -- from any of
12   that, so
13        Q    Okay.  All right.  Let's move on.  Based on
14   this report, do you agree that this lead pointing to the
15   Spanish Cobras was followed up on by -- by Sergeant
16   Mingey through his questioning of Timothy Rankins,
17   correct?
18             MR. BRUEGGEN:  Objection.  Form, incomplete
19        hypothetical.  Go ahead.
20        A    I mean, you know, based on the first two
21   paragraphs that said Sergeant Mingey conducted an
22   interview and then passed Rankins onto Halvorsen and
23   Guevara, so I think that -- you know, Mingey, based on
24   the information that he developed, you know, took --
25   took the actions that you would expect a Detective
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 372 of 782 PageID #:13630
The Deposition of JON ANTHONY RICCIO, taken on March 17, 2022
263

1    Division supervisor to do, and that is put the

2    information in the hands of the field investigators,

3    yes.

4        Q   Okay.  And so, the fact that Mingey followed

5    up with Rankins about this lead involving the Spanish

6    Cobras being the perpetrators of the Roman crime, is

7    that an indication to you that Mingey took the lead

8    seriously?

9           MR. BRUEGGEN:  Objection, speculation.

10       A   Yeah, it's -- it's -- it -- definitely, I

11    believe that he took the lead seriously.  In fact, this

12    is -- I mean, when you read it, it says Timothy Rankins

13    was known to Sergeant Mingey as being a member of the

14    Spanish Cobra street gang and that Mingey initiated the

15    -- the debriefing with Rankins.  So I think that he --

16    you know, he takes the initiative on this, so it's more

17    than following up a tip or a clue.  I think he -- he

18    actually does the debriefing that -- that kind of looks

19    into it in the first place.

20        Q   And -- and would you agree with me, this

21    paragraph indicates that -- that Sergeant Mingey treated

22    this as a serious lead related to the Roman

23    investigation, correct?

24       A   Yes.

25           MR. BRUEGGEN:  Objection, asked and answered,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 373 of 782 PageID #:13631
The Deposition of ANTHONY RICCIO, taken on May 17, 2022
264

 1      form.

 2          A    Yes, I agree.

 3          Q    Is this lead regarding the Spanish Cobras the

 4      kind of thing that should have been turned over to

 5      prosecutors?

 6              MR. BRUEGGEN:  Objection, form.

 7          A    You know, again, that's -- it's hard to say.  I

 8      -- I think that everything should be shared with the

 9      prosecutors to -- to -- to make a more informed

10      decision.  So my personal practice would be if I had

11      knowledge of this, I think I would've given it to them

12      and let them know.  But, you know, I -- I can't speak

13      for anybody else.

14          Q    Did you know about this lead?

15          A    No.  I didn't know anything about this.

16          Q    Okay.  Did you, at any point that you were

17      involved in the Roman homicide investigation, ever know

18      that there was a lead pointing to the Spanish Cobras?

19          A    No.  I had no knowledge of this case, that

20      lead, or even the Roman homicide.  I -- I had no

21      knowledge of any of those.

22          Q    Okay.  And based on your years of experience

23      with the Chicago Police Department and -- both as a

24      detective and as a supervisor of detectives in numerous

25      capacities, are you aware of any mechanism that would

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   ensure that the information contained in this report

2   under a different RD number would be disclosed to

3   prosecutors in the Roman prosecution?

4        MS. ROSEN:  Objection.  Form, foundation, calls

5    for speculation.

6   A   I am not aware of any mechanism for that.

7   Q   Okay.  And -- strike that.  So based on your

8   years of experience as a detective and as a supervisor

9   of detectives, was the information in the homicide file

10   for that RD number disclosed to prosecutors?

11        MR. BRUEGGEN:  Objection to form, foundation.

12        MS. ROSEN:  Objection, form.

13   Q   Yeah.  Let me re-ask it.  That's a really poor

14   question.  Each homicide investigation has its own RD

15   number with its own investigative file, correct?

16   A   Yes, that's correct.

17   Q   Okay.  And based on your experience, what

18   portion if -- of the investigative file would be passed

19   on to the prosecutors once charges have been brought?

20        MR. BRUEGGEN:  Objection.

21        MS. ROSEN:  Objection.

22   A   The entire --

23        MS. ROSEN:  Form, foundation.  Yeah.

24   A   The entire file would be given to prosecutors.

25   Q   Okay.  Could detectives pick and choose which

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  portion of the investigative file to pass on?

2      A    No.

3      Q    Would detectives ever go through a process of

4  culling down the investigative file before they passed

5  it on?

6          MR. BRUEGGEN:  Object to form.  Did you say

7      culling or calling?

8      Q    Culling.  C-U-L-L-I-N-G.

9          MR. BRUEGGEN:  Object to form.

10     A    No, they would not.  Not to my knowledge.

11     Q    Okay.  And other than the investigative file,

12  was there any other -- strike that.  Other than the

13  investigative file for the particularly -- particular RD

14  number of the investigation, what else from the

15  Detective Division would be passed on to a prosecutor?

16         MR. BRUEGGEN:  Object to foundation.

17     A    Photographs that may not be in that file that

18  were maintained for that RD number.  I -- I mean, I

19  think all the -- all the paperwork, all the

20  documentation, is going to be in that investigative

21  file.  Photos.  I -- I don't -- there's nothing else I

22  can think of off the top of my head.  I mean, there may

23  be some things that are not contained in that file that

24  are contained elsewhere in the department, such as the

25  photos, but -- and I believe now those are all online

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 376 of 782 PageID #:13634
Prev Deposition of Anthony Riccio taken on March 17, 2021

267

```
 1    anyway.  But at the time, sometimes if there were, you

 2    know, a large number of photographs, then the State's

 3    Attorney's Office would order those directly from the

 4    graph guard section of the Police Department.

 5         Q    Okay.  In the -- just using the Roman homicide

 6    investigation as an example, in the Roman homicide

 7    investigation, the typical practice would've been to

 8    produce the entire Roman homicide investigative file to

 9    the prosecutors, correct?

10         A    That's correct.

11         Q    Okay.  And any information then that was

12    included in the Roman investigative file would go to the

13    prosecutors, correct?

14         A    Yes, that's correct.

15         Q    And if there was information, for example,

16    that was in a supplementary report in another case, like

17    this Exhibit 5 that I just showed you -- did we mark

18    this as Exhibit 4 or Exhibit 5?  Exhibit 4, I'm sorry.

19    If there was any information in a supplementary report

20    in a different case, like this Serrano/Montanez

21    supplementary report in Exhibit 4 that I showed you, is

22    there any mechanism to ensure that that report

23    containing information about the Roman case would be

24    produced to the prosecutors in the Roman case?

25              MS. ROSEN:  Objection, form, foundation,
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          incomplete hypothetical.

2          A     No.  There is no mechanism other than the

3    detective including it, but there is no mechanism to

4    ensure that that happens.

5          **Q     Okay.  And the only way for that -- so the**

6    **only mechanism that exist is that the information is**

7    **supposed to be documented in the Roman investigative**

8    **file itself, since that's what's going to go to the**

9    **prosecutor, correct?**

10              MS. ROSEN:  Objection.  Form, foundation.

11         A     You know, it could be something as simple as

12   including this -- this -- a copy of this report with

13   that section highlighted.  I -- I don't know that a

14   separate report needs to be generated to capture the

15   same information that's -- that's contained here.  But

16   yeah, there should be something in -- in the file that

17   indicates what this information is here.

18         **Q     Let's pull that document down.  All right. I'm**

19   **showing you a document that I have marked as Exhibit 5.**

20   **This is the set of GPRs in the case.  Let me just pull**

21   **them up here.  Okay.  I've marked as Exhibit 5 RFC**

22   **Iglesias 59 through 77, and I think we should -- we're**

23   **likely going to go through this quickly, because all I'm**

24   **going to ask you is whether you recognize any of the**

25   **handwriting on any of these pages, okay?  And I --**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 378 of 782 PageID #:13636
The Deposition of AMAR ARCHIE, taken on page 17, 2023

269

```
1    suspect I know the answer, but -- so let me -- should I
2    just go through these one by one for you, or do you want
3    the -- Dave, do you have the document?
4              (EXHIBIT 5 MARKED FOR IDENTIFICATION)
5         MR. BRUEGGEN:  Yeah, I'm pulling it up right
6       now.  You said 59 through 70?
7         MR. SWAMINATHAN:  59 through page 77.
8         MR. BRUEGGEN:  We have the document here.
9         THE WITNESS:  Okay.  Do you want me to just go
10      page by page?
11   BY MR. SWAMINATHAN:
12        Q    Yeah.  Why don't -- why don't we -- why don't
13   you just go through it and tell me if you recognize any
14   of the handwriting on any of these pages.  And then when
15   you're done, just tell -- why don't you go through it
16   all, and then just tell me at the end, and then we can
17   clear it up if we need to?
18        MR. BRUEGGEN:  So just to be clear Anand, if he
19      recognizes his handwriting or anybody else's
20      handwriting?
21        Q    Exactly correct.
22        A    Okay.  There's nothing on 59 that I recognize.
23        Q    So nothing on 59 is your handwriting or any --
24   why don't we do it this way?  Let's just go through and
25   identify any handwriting that's yours, okay?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Okay.

 2        Q     And then if there's -- if there's one where

 3   you identify -- where you say, "I -- it's not my

 4   handwriting, but I actually recognize who this is," we

 5   can -- let me know that, but just first go through and

 6   tell me if any of this handwriting is yours.

 7        A     Okay.  So on page 59, nothing is my

 8   handwriting, nor do I recognize anyone else's.  Do you

 9   want me to do it like that?

10        Q     Yeah, that's fine.

11        A     On page 60, none of this is my handwriting,

12   nor do I recognize anyone else's.

13        Q     Okay.  Page 61?

14        A     Page 61, none of this is my handwriting, nor

15   do I recognize it as anyone else's.

16        Q     Page 62?

17        A     Page 62, none of this is my handwriting, nor

18   do I recognize anyone else.

19        Q     Page 63?

20        A     Page 63, none of this is my handwriting, nor

21   do I recognize anyone else.

22        Q     Page 64?

23        A     Page 64, none of this is my handwriting, nor

24   do I recognize anyone else.

25        Q     Page 65?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Page 65, none of this is my handwriting, nor
 2   do I recognize anyone else.
 3        Q     Page 66?
 4        A     Page 66.  None of this is my handwriting, nor
 5   do I recognize anyone else.
 6        Q     Page 67.
 7        A     Page 67 is a graph and some handwriting.  None
 8   of this was mine, nor anyone else's that I recognize.
 9        Q     Page 68.
10        A     Page 68.  I have a blank page; is that
11   accurate?
12        Q     Okay.  So do I.  Page 69.
13        A     Page 69.  None of this is my handwriting, nor
14   do I recognize anyone else.
15        Q     Page 70.
16        A     Page 70 and is not my handwriting, nor do I
17   recognize it as anyone else.
18        Q     Page 71.
19        A     Page 71 is not my handwriting, nor do I
20   recognize it as anyone else.
21        Q     Page 72.
22        A     72 is not my handwriting, nor do I recognize
23   anyone else.
24        Q     73.
25        A     Page 73 is not my handwriting, nor do I
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    recognize anyone else.

 2         Q     Page 74.

 3         A     Page 74 is not my handwriting, nor do I

 4    recognize anyone else.

 5         Q     Page 75.

 6         A     75 is not my handwriting, nor do I recognize

 7    it as anyone else.

 8         Q     Page 76 is a Vehicle Inquiry Report.  We can

 9    skip that one.  I just wanted to keep the handwritten

10    notes in sequence.

11         A     And --

12         Q     Page 60 -- page 77.

13         A     77 is not mine, nor do I recognize it as

14    anyone else.

15         Q     Okay.  Thank you.  Now, if we go back to page

16    76 the page before that --

17         A     Yes.

18         Q     -- the Vehicle Inquiry.

19         A     Yes.

20         Q     Did you perform this Vehicle Inquiry Request?

21         A     Let's see.  No, I did not.

22         Q     Okay.  Let me close this up.  All right.  I'm

23    showing you a document I'm marking as Exhibit 6.  I

24    think this will be very quick.

25              (EXHIBIT 6 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 382 of 782 PageID #:13640
The Deposition of ANTHONY RICCIO, taken on March 28, 2023
273

1    A    Okay.

2    Q    I'm just putting it up on the screen here

3  because it's going to be -- I think just some chicken

4  scratch on a page here.  Okay.  Looking at RFC Iglesias

5  7, there -- looks like there's some numbers that have

6  been written on a piece of paper.  Do you recognize that

7  handwriting as being your own?

8    A    No.  It is not mine, nor do I recognize it as

9  anyone else.

10    Q    Okay.  Close that up.  I'm showing you a

11  document marked as Exhibit 7, which is RFC Iglesias 5.

12  Do you recognize that handwriting?

13         (EXHIBIT 7 MARKED FOR IDENTIFICATION)

14    A    No.  It is not mine and nor do I recognize it

15  as anyone else.

16         MS. ROSEN:  What was the Bates on that one?  It

17    was cut off on the screen.

18    Q    RFC 6 -- RFC Iglesias 5, sorry.  Okay.  I

19  think you answered this, but let me just confirm.  Have

20  you ever had any communications with an individual named

21  Francisco Vicente or Frankie Vicente?

22    A    No.  Not that I'm aware of.

23    Q    Okay.  Did you ever work with a police officer

24  named Bill Dorsch?

25    A    Bill Dorsch worked in Area 5 when I was there.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 We didn't work -- we worked the same shift, but we

2 weren't partners.  We didn't work together.  He worked

3 with a guy named Johnston, I think.

4   **Q Do you have any opinion of Bill Dorsch?**

5   A No, not particularly.  He was always kind of

6 an entertaining guy to be honest, but no -- no opinion

7 either way of him.

8   **Q Any opinion of him good or bad in terms of his**

9 **skills as a homicide investigator?**

10   A No.  No.  I think he always did a decent job.

11   **Q Okay.  Have you ever seen a Chicago police**

12 **detective commit misconduct during the course of your**

13 **career?**

14   A Not that I can recall.  I'll have to go with

15 no.  But again, I -- I can't recall.  That was so long

16 ago and there's various degrees of misconduct.  But off

17 the top of my head, no.  I -- I certainly would've

18 reported it or taken some kind of an action, and I don't

19 recall ever doing that.

20   **Q You again, anticipated my next question.  Have**

21 **you ever reported a Chicago police detective for**

22 **committing misconduct in their treatment of civilians?**

23   A No.  I mean, as a supervisor, if someone

24 brought it to your attention, you would have to initiate

25 a complaint against them.  And I can't say with



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   certainty that that didn't happen, so I'll just have to
2   say I don't recall as far as that goes.  If -- if a
3   citizen brought it to my attention that they were
4   mistreated for some reason.  You know, if I was to hear
5   something that alerted me, I would certainly have to
6   take action.  I don't recall that happening, but again,
7   I can't say with certainly that it didn't.
8        Q    Okay.  So let me try to break that down a
9   little bit.  Again, starting with detectives, can you
10  recall any instance in which you came to believe that a
11  Chicago police detective had committed misconduct?
12       A    Can you re -- restate the question?
13       Q    Yeah.
14       A    Repeat it.
15       Q    Have you had any instances when you believed
16  -- based on information you learned that you believed a
17  Chicago police detective had committed misconduct in his
18  treatment of a civilian?
19       A    Again, I -- there may have been.  I just don't
20  recall if -- I can say with certainty that if I was
21  aware of it or I did become aware of it, I would've
22  taken some action, initiated a complaint, and I don't
23  know that I did or did not do that.  It's just so long
24  ago.  I just can't remember.  Cer -- certainly nothing
25  so egregious that it would stick in my mind.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    Okay.

 2       A    Yeah.  So yeah, I have to go with I don't

 3  recall, possibly.

 4       Q    Okay.  And as you sit here today, can you

 5  recall any instance when you personally came to the

 6  belief that one of your fellow detectives had committed

 7  misconduct in their treatment of a civilian?

 8            MR. BRUEGGEN:  Object to form.  Go ahead.

 9       A    No, I cannot.  As I sit here right now, I -- I

10  can't, no.

11       Q    Okay.  And can you -- as you sit here today,

12  can you recall any instance in which you reported to a

13  supervisor that you believed one of your colleagues had

14  committed misconduct against a civilian?

15       A    No.  I don't ever remember having to report

16  someone, no.

17       Q    Okay.  And can you -- during your time as a

18  Chicago police officer in all your various capacities,

19  do you recall any instances in which you personally

20  reported another colleague in the Chicago Police

21  Department for committing misconduct in their treatment

22  of a civilian?

23       A    Yes.

24       Q    And how many times did that occur?

25       A    And I hope you don't ask me for specifics
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   because I can't provide them.  But I would say, you
 2   know, I was -- I was a supervisor for, like, 25 of my 35
 3   years.  So in that capacity, that's -- you know, that's
 4   one of the things that you have to do, unfortunately. So
 5   I would say maybe a dozen times, maybe two dozen times I
 6   would have to initiate a -- a -- a complaint
 7   investigation against an officer for some sort of
 8   misconduct.
 9       Q    And where you had to do that and say, based on
10   misconduct, would -- is that misconduct sort of internal
11   department misconduct or department -- or misconduct in
12   terms of treatment of a citizen or civilian?
13            MR. BRUEGGEN:  Object to foundation.  Go ahead.
14       A    You know, if citizens bring it to your
15   attention, then, you know, that's -- that's one method.
16   There's also just one that sticks out on the top of my
17   head, because it was -- it turned kind of ugly.  The --
18   there was an officer who -- we were in the 17th District
19   and had to do a search warrant at a bar and he actually
20   tipped off the bar owner that we were coming in, so I
21   initiated a complaint investigation against him.  But as
22   far as like -- like witnessing an officer mistreating a
23   citizen, I don't know that -- that I've ever witnessed
24   that.  Now again, most of my career I spent as a
25   supervisor.  And while, you know, we all agree those
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  things happen, they don't happen in front of
2  supervisors.  So, you know, it wasn't likely that
3  something like that would happen in my presence.  But if
4  a citizen brought it to my attention, there's a very cut
5  and dry policy on how it's supposed to be followed, and
6  I -- I always followed that policy.
7      Q    Okay.  And so the policy was that if a citizen
8  came to a supervisor with a complaint that an officer
9  had committed misconduct, the supervisor was required to
10 report that by opening a CR, correct?
11     A    That's correct.
12     Q    Okay.  And you always followed that policy,
13 correct?
14     A    I did.
15     Q    Okay.  And of those approximately 12 times
16 that you recall initiating a complaint against an
17 officer for mistreatment of civilians, what percentage
18 of -- or what number of those 12 were the example that I
19 just to speak -- the example I just gave where a
20 civilian came to you and you have an obligation to
21 report it?
22         MS. ROSEN:  Objection, misstates his testimony.
23    I think he said 12 to 24.
24     Q    I'm sorry.
25     A    Yeah.  I mean, I'm -- I'm really ball parking

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 388 of 782 PageID #:13646
The Deposition of Antion Ritchie, taken on March 18, 2022
279

```
 1   when I say 12.  I -- I'm just thinking like, you know,
 2   12 would be a -- a complaint.  I -- I mean, there would
 3   be a complaint every two years.  So it was probably a
 4   higher number than that, but -- so the question is what
 5   -- what number of those was --
 6        Q    Yeah.  In the cases where you reported an
 7   officer by opening a CR, has it been pursuant to the
 8   mandatory obligation to report any instances when a
 9   civilian comes to you as a supervisor?
10        A    Oh, okay.  I -- I would say maybe, you know,
11   maybe three-quarters of them came from a civilian
12   complaint and maybe the other quarter, or maybe, you
13   know, a third came from things that came to my
14   attention.  Again, when -- when there's going to be
15   misconduct, the officer is not going to do it in the
16   presence of a supervisor.  I mean, that would be -- that
17   would be, you know, not smart.  So it's not something
18   that, as a supervisor, you're going to witness firsthand
19   very often.  So the bulk of those complaints are going
20   to come to you via a citizen or from a third party or
21   something of that nature.  So maybe two-thirds of the
22   complaints that I ever filed came from citizens. Another
23   one-third came from things that I saw or -- or found out
24   on my own.
25        Q    Okay.  Okay.  During the time that you were a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 389 of 782 PageID #:13647
The Deposition of Anthony Riccio, taken on May 18, 2022

280

1  Chicago Police Officer, was there ever a period of time
2  in which you would acknowledge the existence of a code
3  of silence within the department with regard to
4  misconduct by Chicago police officers?
5          MS. ROSEN:  Objection.  Form.
6     A    You know, early on in my career, I think that
7  there was -- I don't -- I don't want to call it a code
8  of silence, but there was a reluctance for anyone to --
9  to talk about misconduct among the ranks.  You know, no
10 one's ever said, hey, it's a code of silence, or you
11 can't say anything.  I think there was just a reluctance
12 to ever talk about anything of that nature.  And over
13 the course of time, that kind of broke down.  And -- to
14 the point now where I would -- I -- I think I can
15 honestly say that in the last few years of my career,
16 that was -- that was nonexistent.  The accountability
17 for not saying something or for lying is probably worse
18 than the offense itself.  So -- yeah.  So I -- I -- I
19 mean, there was probably a time -- and I'm not going to,
20 you know, call it a code of silence, but there was
21 probably a time when cooperation was -- was really
22 frowned upon by your coworkers.  So there was not a lot
23 of -- certainly nobody volunteered to come forward and
24 -- and say anything like very early on in my career.
25    Q    Okay.  And then you said that your view is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that today it's -- it's actually gotten much better?

2        A    Oh, my God.   Lightyears better, yeah.

3        Q    What sparked the change in your view?   Was it

4   a -- was it a particular superintendent?   Was there a

5   particular policy change?   What was it?

6        MS. ROSEN:   Objection, form.

7        A    Yeah.   I don't know.   I think the climate has

8   changed, certainly.   There's just a -- nobody wants to

9   stick their neck out to lie for somebody who's -- who's

10  -- who's breaking the rules.   So it -- there's kind of a

11  feeling now, if you're going to break the rules, you --

12  you better be prepared to suffer the consequences

13  because I'm not going to go down because, you know,

14  you're breaking the rules.   So I think the whole, you

15  know, keep your mouth shut or, you know, you're going to

16  be ostracized if you speak out has -- has really kind of

17  gone away as far as I know.   I mean, it -- you know, and

18  again as -- as a first deputy superintendent, you're

19  seven ranks removed from what's going on on the streets.

20  And, you know, that's the unfortunate reality of working

21  out of that -- that headquarters.   But you still hear

22  enough and you see enough and -- and, you know, weekly

23  meetings with internal affairs and stuff, you can see

24  where there's a level of cooperation among officers who

25  witness other officers misconduct now that certainly was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 391 of 782 PageID #:13649

Prev. Deposition of Anthony Riccio - Taken on May 18, 2023

282

1    not there 35, 37 years ago when I came on.

2        Q    Okay.  And I know you've made public comments

3    relatively recently in the recent years about the need

4    to rebuild trust with communities, which I thought was

5    cool.  You -- is that part of one of the ways that, in

6    your view, the department in recent years has been

7    focused on rebuilding trust, just to sort of try to

8    ensure that there's more accountability?

9        A    It -- it is.  I think that's a big part of it.

10   There's -- there's got to be accountability where

11   there's misconduct, but I think we also have to be able

12   to differentiate the difference between misconduct and

13   mistakes.  Mistakes we can correct through training,

14   misconduct we have to correct through discipline.  And

15   the important thing is we can't -- we can't confuse the

16   two.  We have to be sure that when you make a mistake

17   that that's addressed through training.  And we don't

18   want to -- you know, we don't want to decapitate a guy

19   because he made a mistake.  Misconduct, totally

20   different animal.  I think we have to be clear and firm

21   on how we handle that, but mistakes have to be handled

22   differently.

23       Q    And so this -- I think without calling it -- I

24   think -- I don't want to put words in your mouth so -- I

25   want to be fair to you.  This culture that you described

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    where there was -- when -- in your earlier years, when

2    there was a reluctance to talk about misconduct among

3    the ranks, I think is the phrase you used.

4        A    Yes.

5        Q    In your view, when did that change and that

6    culture really change?  I know you said today it's much

7    different.  Was it the Laquan McDonald moment, or what

8    moment sort of changed that in your mind?

9              MS. ROSEN:  Objection.  Form, foundation.

10       A    I -- I think it changed prior to McDonald,

11   because you saw a lot of officers come out and testify

12   about exactly what happened in -- in McDonald.  There

13   was no -- there was no effort to cover that up.  I mean,

14   despite some media coverage, I was -- I was kind of kept

15   abreast of everything that was going on in that.  And so

16   I think that it -- I think it's something that's been

17   kind of building, it's kind of evolved over the course

18   of time, and it's to the point now where -- where I

19   think it's -- if it's happening, it's extremely rare and

20   it's much more the exception than -- than the rule.  But

21   I think it's been -- it -- kind of a gradual thing.  I

22   don't think there was any one -- one incident or one day

23   where suddenly people woke up and said oh, my God -- now

24   having said that, the department began holding officers

25   who give testimony in these -- in these incidents about

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  other officers accountable through that Rule 14

2  violation that -- a false official report, and Rule 14

3  is a fireable offense.  So you've got a guy who -- who

4  may be looking at a three-day suspension for violating a

5  pursuit policy.  If the partner lies about it, he's

6  looking at getting fired.  Now he's looking at a Rule 14

7  violation.  The driver of the car might get three days

8  for violating the pursuit policy, but the guy who lies

9  might be looking at getting fired.  So I think the

10 application of Rule 14 to these -- these investigations,

11 ECR investigations, has probably put officers in a

12 position where they're thinking, hey, this is my health

13 insurance.  This is my paycheck.  This is my kids'

14 tuition.  This is the mortgage on my house.  I'm not

15 going to risk my job and lie because you screwed up.  So

16 you screw up, go in and own it, take your three days,

17 learn from it, and move on versus I'm going to lie to

18 cover up for you and then risk losing my job.  So I

19 think the application of that Rule 14 violation has --

20 has -- has moved -- moved this forward quite a bit.  You

21 know, body cameras, I think for -- for all the good that

22 they do as far as capturing crime and some of the insane

23 behavior that officers have to deal with, they also keep

24 them more on the straight and narrow as well.  So I

25 think body cameras have helped.  So I think it's been a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 394 of 782 PageID #:13652
The Deposition of John Richter, taken on May 19, 2022
285

1  lot of things in a -- in kind of a building over the

2  course of time that's really led to a much -- there is

3  no code of silence.  It's -- it's eroded any -- any sort

4  of reluctance or -- or -- or desire to -- to cover up

5  any sort of misconduct.  That's my opinion.  I -- I

6  could be wrong, but that's my opinion.

7  **Q    So in your view, a major step has been the**

8  **enforcement of Rule 14 violations.  Do I have that**

9  **right?**

10  A    I -- I think that's been a major recent step,

11  yes.  I think body cameras, you know, looking back

12  several years when those first came out, I think that

13  was an important step and --

14  **Q    When did -- oh, I'm sorry.  Go ahead.**

15  A    No, go ahead.  And -- and I think there's been

16  other kind of milestones along the way, but it's just

17  been a gradual breaking down of it and -- you know, to

18  the point where we're at today and I -- and I think

19  we're -- we're in a good place.  I think there's always

20  room to improve, but I think we're in a good place

21  today.

22  **Q    Okay.  Thank you for that.  So when did that**

23  **Rule 14 -- strike that.  The enforcement of Rule 14**

24  **violations as a major step forward, when did that begin,**

25  **approximately?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    That was --

2           MR. BRUEGGEN:  Object to form, foundation.  Go

3      ahead.

4      A    I think that was something that kind of came

5  to be during Eddie Johnson and my tenure kind of early

6  on.  So maybe like, you know, that 2017, 2018 timeframe.

7  I think we, in some discussions with internal affairs,

8  started implementing that element into the statements.

9  So -- to the point where officers are told, this is an

10 official report.  If you're lying, you're violating Rule

11 14 and you're subject to termination.  So I think

12 introducing that into every -- every statement that's

13 taken helped enormously.  So yeah.  It -- it's still

14 relatively new.  You know, maybe five, six years that's

15 -- that's been around, but I think it's helped a lot.

16     Q    And then the -- another big step that you

17 mentioned was the advent of body -- the body cameras.

18     A    Right.

19     Q    Around -- when did that start to get

20 introduced into the Chicago Police Department?  Again,

21 approximately.

22     A    Well, in-car cameras started first, and that

23 was probably around 2014.  And so, that helped.  And as

24 you know, Laquan McDonald was captured, not on body

25 cameras, but on an in-car camera.  And so, when we saw

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 396 of 782 PageID #:13654
Prev Deposition of Anthony Riccio Taken on May 19, 2022
287

1  the in-car cameras, we would -- we saw like, you know,
2  indisputable facts.  Even the presence of video cameras
3  all over everywhere you go, as much as detectives go and
4  pull those -- those -- those cameras for criminal
5  investigations, internal affairs pulls them.  IPRA pulls
6  them for police investigations as -- as well.  So I
7  think the presence of in-car cameras, video cameras,
8  certainly body-worn cameras, that has -- has helped
9  enormously as well.  Because you can't -- I mean, the
10  camera captures what it captures, and sometimes there's
11  an excuse and there's things happening outside the eye
12  of the camera.  But for the most part, the camera tells
13  an indisputable story.  So that helps to bring about
14  more accurate statements in these misconduct cases as
15  well.  I -- we would review them regularly when I was up
16  with Superintendent Johnson.  We would review body
17  cameras from incidents that had -- that had occurred.
18          There's a unit that was formed within the
19  police department, the Force Review Unit, that anytime
20  there's a use of force, they will review the -- the
21  paper report, but they will also pull the body cameras
22  from anybody who was there.  And they will review all
23  the footage on the body camera to ensure that -- a
24  couple things: number one, were the policies followed?
25  And number two, is there a need for additional training

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 397 of 782 PageID #:13655
The Deposition of ANTHONY RICCIO, taken on May 18, 2022
288

1    of some sort?  So the presence of body cameras has --

2    has been great as far as training and as far as also

3    ensuring accurate statements.  And -- and, you know,

4    where there's misconduct, then there's -- there's going

5    to be discipline as well.

6         Q    Okay --

7         MR. BRUEGGEN:  Can we take a quick break so I

8    can run to the bathroom?

9         MR. SWAMINATHAN:  Yeah, sorry.

10        COURT REPORTER:  We're off the record.  The

11   time is 4:41.

12             (OFF THE RECORD)

13        COURT REPORTER:  We're back on the record for

14   the deposition of Anthony Riccio being conducted by

15   videoconference.  My name is Sydney Little.  Today

16   is May 18, 2022, and the time is 4:49.

17   BY MR. SWAMINATHAN:

18        Q    All right.  One of the things you identified

19   as making -- as resulting in a big step in improving the

20   culture of a reluctance to talk about misconduct among

21   the ranks, was the change in the mid-2000s, call it 2015

22   approximately, when there was greater enforcement of

23   Rule 14 violations, correct?

24        A    Correct.

25        Q    Okay.  And then another big step in changing

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 398 of 782 PageID #:13656
The Deposition of JON ANTHONY RICE, taken on May 19, 2023
289

```
 1    the culture of reluctance to talk about misconduct among
 2    the ranks was the advent of body cameras, in-car
 3    cameras, and other video footage, correct?
 4         A    Yes, correct.
 5         Q    And that took place, fair to say, starting in
 6    probably the early 2010s and on as more and more cameras
 7    were becoming more prevalent.
 8         A    Yeah.  Approximately, yes.
 9         Q    Okay.  And then, what else was a big step in
10    changing and ending that culture of a reluctance to talk
11    about misconduct among the ranks, other than those two
12    things you've just discussed?
13              MR. BRUEGGEN:  Object to form.  Misstates his
14         testimony.  Go ahead.
15         A    I -- I don't know that I could put my thumb on
16    any one particular thing.  And I -- I should point out
17    that there was some individuals who were reluctant to
18    say things, but I don't want it to appear that that was
19    like the culture of the department.  There were some
20    individuals who had always had this reluctance, but not
21    the entire department or not the culture of the
22    department.
23         Q    So is it your testimony that, in fact, there
24    wasn't any kind of culture within the police department
25    in which there was -- it was frowned upon to talk about
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   misconduct by fellow officers?

 2          MR. BRUEGGEN:  Object to form, culture.  Go

 3      ahead.

 4      A    No.  I think there were individuals who felt

 5   that way, but as far as a culture within the department,

 6   I don't believe that was ever the case, no.  But there

 7   were certainly individuals who felt that way, yes.

 8      Q    Yeah.  And what -- why do you believe there

 9   were officers who felt that way in your -- the early

10   part of your career as you mentioned?

11      A    I -- I -- I don't -- I don't recall.  I don't

12   know what it was that led me to conclude that.  I mean,

13   again, it was 30 years ago, so it's hard to put my thumb

14   on it.

15      Q    That -- the fact -- the idea that there were

16   people who were feeling that way and had a reluctance to

17   talk about -- to talk about misconduct among the ranks,

18   fair to say that continued well into the 2000s?

19          MR. BRUEGGEN:  Object to form.  Vague.  Go

20      ahead.

21      A    I don't know.  I mean, again, it's -- it's

22   certain individuals, it's not everybody.  So I would

23   imagine that there probably were, but I couldn't say for

24   certain.  But there -- you know, there were individuals

25   probably who felt that way into the 2000s.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Were you aware that in 2016 in a lawsuit filed

2  by CPD Whistleblowers Shannon Spalding and Daniel

3  Echeverria, the City offered to stipulate that a code of

4  silence existed in the Chicago Police Department?

5         MS. ROSEN:  Objection.  Form, foundation, and

6     I'm pretty sure mischaracterizes what happened.

7      A    No.  I -- I was not aware of that case or

8  those individuals.

9      Q    Do you dispute that well -- strike that.

10  You're aware, I assume, that in December of 2015 in a

11  speech to City Counsel, Rahm Emmanuel acknowledged the

12  existence of a code of silence, correct?

13         MS. ROSEN:  Objection.  Objection.  Form,

14     foundation, and mischaracterizes what the mayor

15     said.

16      A    Yes, I was -- I was aware that he said that.

17      Q    Okay.  And what was your reaction to that?

18      A    I -- I disagreed.

19      Q    Okay.  And did you ever say that publicly?

20      A    No.  I -- well, I don't -- I don't know.  Not

21  -- not publicly, like, you know, to the news media or

22  anything, but I -- I certainly -- I certainly didn't

23  agree that there was a code of silence.  He made it

24  sound like it was a cultural thing or it was rampant

25  throughout the department.  And I -- I didn't agree with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 401 of 782 PageID #:13659
Prev Deposition of Anthony Riccio    taken on March 10, 2023
292

1    that.

2        Q    So is your -- is your view about the

3    difference between -- your disagreement with the mayor

4    at that time was not that there weren't -- your

5    disagreement was -- let me see if I understand

6    correctly.  Your disagreement when the mayor made that

7    comment is that he made it sound like it was more

8    prevalent of a problem than it was; is that correct?

9        A    I -- I -- I think that's accurate.  I think

10   that his statement implied that it was -- the Chicago

11   Police Department had a code of silence and it kind of

12   gave the impression that it was the entire department,

13   or it was rampant through the department.  And again, I

14   would say that there were individuals within the

15   department.  It's an organization of, you know, about

16   14,000 sworn and civilian.  So certainly, there are

17   individuals who would feel that way, but I -- I don't

18   believe that was the overall culture of the department.

19   And I think his statement to -- was interpreted by me

20   and -- and probably by many that it was a cultural thing

21   or that it was rampant through the department.  And I --

22   I disagreed with that.

23       Q    Okay.  Do you agree that, at the time the

24   mayor made those comments in 2015, that there were --

25   there were still significant numbers of individuals in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the Chicago Police Department, even if not rampant or

2  entirely, who felt a reluctance to talk about misconduct

3  among their fellow officers?

4          MR. BRUEGGEN:  Object to form.

5          MS. ROSEN:  Foundation.

6     A    Yeah.  I mean, I -- I think the term you said

7  was significant number.  I don't know that it -- that

8  it's a significant number or what constitutes a

9  significant number.  I -- I will -- I will agree that

10 there were some individuals and there have been

11 throughout my career some individuals who felt that way,

12 but I -- again, I don't think that's the prevailing

13 thought among people in the department.  It -- it -- it

14 certainly hasn't been my experience that that was

15 prevailing or cultural, but there are some individuals

16 who have felt that way always, and there probably still

17 are some today.  But I don't think that's prevalent or

18 the -- the majority.  I think it's a -- a small number

19 of individuals who feel that way.

20    Q    Do you -- the reluctance to talk about

21 misconduct among the ranks that you -- that you observed

22 to some extent from earlier in your career, would you

23 say that that -- the big change in terms of that -- the

24 extent to which you see that problem, the change

25 occurred substantially once you got into the timeframe

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 403 of 782 PageID #:13661
The Deposition of ANTHONY RICCIO, taken on March 20, 2021

294

1    of 2010 when you started to have video and you started

2    to have this greater enforcement of Rule 14 violations?

3            MR. BRUEGGEN:  Object to form.

4        A    No.  I think, as I said earlier, it's -- it's

5    been a -- kind of a gradual eroding of that.  Excuse me.

6    Again, I don't think it was ever rampant, but I think

7    that that small group of individuals who felt this way

8    is probably an even smaller group today.  And that the

9    -- I don't -- I don't think it started like in the 2010s

10   or -- or anything.  I think it's been a continuous

11   improvement.

12       Q    The reluctance to talk about misconduct among

13   the ranks that you experienced earlier in your career,

14   what was the part of your career would you say you

15   experienced that and observed that reluctance to talk

16   about misconduct?

17       A    God.  I mean, that's 30 years ago.  I -- I

18   don't even know that I could nail that down.  It's been

19   so long.  I wouldn't be able to pin that down.

20       Q    Was that something that you experienced and

21   observed during the first ten years of your career?

22       A    Again, I don't think that I could pin it down

23   to a certain timeframe.  It's just been so long.  I'd be

24   just -- I'd be guessing.

25       Q    As you look back on your career and you -- and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 404 of 782 PageID #:13662
Prev Deposition of Anthony Riccio · taken on March 10, 2023
295

1    you made that observation about those earlier years, can

2    you pinpoint it to being associated with the time that

3    you were working as a tactical officer or detective, or

4    as a sergeant, anything like that?

5        A    No.  I -- I think as you move up the ranks

6    though, you become more detached from -- from what's

7    going on.  So you have less -- less information about --

8    about what's -- what's actually going on at that -- at

9    that street level.  So it would be impossible for me to

10    actually pin down when it was.

11        Q    Okay.  And would it be fair to say that in

12    terms of your ability to really observe that reluctance

13    to talk about misconduct among the ranks, that it's the

14    kind of thing that, you know, once you move to this

15    level of lieutenant and higher, it becomes harder and

16    harder to observe that because you're at least one layer

17    removed from the day-to-day officers.

18        MS. ROSEN:  Objection, foundation.

19        A    Yeah.  I mean, even -- even as a sergeant,

20    you're -- you're removed from the -- you're one rank

21    removed from -- from that.  And then as you continue to

22    move up, you continue to be more and more detached from

23    it.  You see improvements in different ways, like we

24    talked about earlier.  But yeah, I mean, you -- you do.

25    The more you move up, the more detached, unfortunately,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 405 of 782 PageID #:13663
The Deposition of JOHN RICHARDSON, taken on May 10, 2023
296

1   you are from what's going on on this street.

2       Q    The reluctance to talk about misconduct among

3   the ranks that you observed earlier in your career, do

4   you -- would you say that observation and -- of yours is

5   based on your experience in the period from 1986 to

6   1994, before you became a sergeant?

7           MR. BRUEGGEN:  Object to foundation.

8       A    I'm sorry, can you repeat the question?

9       Q    Yes.  So that -- the reluctance to talk about

10  misconduct among the ranks that you observed earlier in

11  your career, would you say that that is based primarily

12  on observant -- observations made during the period of

13  your career between '86 and '94 when you first became a

14  supervisor?

15          MR. BRUEGGEN:  Objection, foundation.  Go

16      ahead.

17      A    Yeah.  I mean, I don't know that's the

18  accurate either.  And again, it wasn't the culture.  It

19  wasn't -- it wasn't so prevailing.  It was a limited

20  group of individuals, a small number of individuals, I

21  think.  So it's really difficult to pin down exactly

22  like when this was, or -- or who was involved in it or

23  -- or -- or anything.  So I think just a group of

24  individuals has always been present.  But again, it's

25  not the culture.  In a -- in a -- in an organization of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 406 of 782 PageID #:13664
The Deposition of AARON RICCIO, taken on May 16, 2023
297

 1  14,000 people I -- a small group of people who feel that

 2  way or may have felt that way at one time or another is

 3  -- is -- it -- really a -- a limited number.

 4       Q    In terms of -- you've identified several

 5  things that took place in the 2010s that you think

 6  resulted in a major improvement in terms of reducing

 7  reluctance to talk about misconduct among the ranks,

 8  fair?

 9       A    Fair.

10       Q    Okay.  Tell me any things that you recall from

11  the period of the 2000s that you believe were a major

12  step in reducing the reluctance to talk misconduct among

13  the ranks?

14       A    I don't know that I could pinpoint anything

15  beyond then, partially because my memory is not that

16  good.  But -- you know, I don't know if it was just

17  changing times or -- or -- or whatever it was, but that

18  small group of individuals, I believe, just continued to

19  get smaller and smaller.  And the reluctance to -- to

20  talk about that, I think, just eroded over time.

21       Q    Are there -- I'm sorry, go ahead.

22       A    I was going to say policemen now are different

23  than policemen were 30 years ago, and policemen 30 years

24  ago are different than policemen 50 years ago.  It's --

25  it's just, the profession evolved.  And -- and the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 407 of 782 PageID #:13665
The Deposition of ANTHONY RICHIE, taken on May 10, 2023
298

```
1   people in it evolved with the times.
2        Q    Do -- can you -- are there any improvements or
3   steps or reforms you can identify from the 1990s that
4   you believe significant -- that were a major step in
5   reducing a reluctance to talk about misconduct among
6   ranks?
7        A    Not off the top of my head, no.
8        Q    And I think I might have asked this, but are
9   -- can you identify any reforms or steps that you
10  believe occurred in the 2000s that reduced the
11  reluctance to talk about misconduct among the ranks?
12       A    Not that I can think of off the top of my
13  head.
14       Q    Okay.  All right.  And then let me ask you
15  about -- I asked you a few questions about -- about
16  (Inaudible) previously, and you had indicated that
17  you --
18       A    Anand, can you start over?  I lost that when
19  you grabbed that.
20       Q    I asked you some previous questions about Joe
21  Miedzianowski, who you indicated was a gang specialist
22  when you were a gang officer.  So you were not in the
23  same group, correct?
24       A    That's correct.
25       Q    Okay.  And you indicated that you really
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   didn't interact with him that often because you were

2   working in different tactical groups, correct?

3       A   I -- I think it's fair to say I didn't

4   interact with him at all.

5       Q   Okay.  Did you -- did he have any reputation

6   during the time that you were both working as gang --

7   gang officers?

8       A   No.  I don't know that he had a reputation,

9   no.  I mean, he was just a -- he was a very strong,

10  physical guy, muscular.  I remember he had a crushing

11  handshake, but as far as -- as anything else about him?

12  No, I really didn't know -- I didn't know him.  I really

13  didn't -- I think if he saw me today, he wouldn't be

14  able to tell you who I was.  He was just -- you know, I

15  knew of him because he was such a strong, muscular guy,

16  kind of big personality.

17      Q   Did you ever see him around the detective

18  division talking with any detectives?  Strike that. When

19  you were -- let me clarify, actually.  Let me ask it a

20  better way.  When you were a detective working out of

21  Area 5 --

22      A   Yes.

23      Q   -- would you ever see you Joe Miedzianowski

24  over in the detective division area?

25      A   I don't recall ever seeing him there.  Again,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I worked days and midnights and he -- maybe he worked a

2    different watch.  I don't -- I really don't know, but I

3    don't recall seeing him up there.

4        Q    Do you have any knowledge one way or other

5    about whether Joe Miedzianowski would sometimes come and

6    meet with Rey Guevara at Area 5?

7        A    I -- I have no knowledge.

8          MS. ROSEN:  Object to foundation.

9        Q    Did you ever hear about allegations from

10   detectives that Joe Miedzianowski was interfering or

11   tampering in homicide investigations?

12       A    Sometime -- sometime after I was gone, I had

13   heard that he had been banned from going up to Area 5. I

14   -- I don't know what the reason for it was, but I knew

15   that there was some conflict.  And I don't know if it

16   was a conflict between him and another detective or

17   something that brought that on, but I believe the

18   commander of Area 5 prohibited him from coming up to

19   Area 5.

20       Q    And when you learned about that, that he had

21   been banned from Area 5, that was while he was still a

22   police officer before he'd been arrested by the feds,

23   correct?

24       A    Yes.  That was while he was still a -- a gang

25   specialist, I believe.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 410 of 782 PageID #:13668
The Deposition of ANTHONY RICCIO, taken on May 18, 2023
301

1    Q    Okay.  So would that have been while you were

2  working -- this was after you were done being a

3  detective, correct?

4    A    You know, I don't re -- recall when it

5  happened.  I don't remember if I was a sergeant up there

6  or if I was a detective up there.  I wasn't part of

7  whatever the incident was that led to that.  I just

8  remember guys talking about Miedzianowski is not allowed

9  up on the floor anymore per the commander.  And I really

10  don't -- I mean, I may have known at the time, but I --

11  I don't know as I sit here, what the reason for that

12  was.

13    Q    Okay.  When -- and so in the period from '95

14  or '96 to 1998, you were sergeant in the detective

15  division, correct?

16    A    Correct.

17    Q    And so was that -- would that basically be the

18  time period when you likely learned that he'd been

19  banned from Area 5?

20    A    Again, I don't -- I don't remember if I had

21  still been a detective when that happened or if I had

22  even been gone from Area 5.  I -- I really don't

23  remember when that occurred or when I learned about that

24  occurring.

25    Q    Okay.  Did you ever learn why he had been

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1   banned from Area 5?

2       A    Again, at the time I may have known.  I don't

3   know it as I sit here.  I don't know if it was a problem

4   that he had with a detective or -- or another reason.

5   I'm -- I'm not certain.  There -- there was -- there was

6   something that -- and I -- and I couldn't tell you when

7   I -- when I learned about it.  That -- I know it was a

8   long time ago.

9       Q    Did you ever -- while you were a detective,

10  did you ever have concerns about gang crimes officers or

11  other officers interfering in homicide investigations

12  because of their own involvement with potential

13  criminality?

14      A    No.

15      Q    During the time -- when you eventually -- was

16  -- when you eventually found out that Miedzianowski had

17  banned -- had been banned, at that point, did you ever

18  hear anything about issues with gang crimes officers or

19  anybody else tampering in homicide investigations?

20      A    No.

21      Q    Did you ever hear anything about Miedzianowski

22  taking documents from homicide files and giving them to

23  gang members?

24      A    No.

25      Q    At any point when you were a sergeant,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    lieutenant, or commander at -- over detectives, did you

2    ever learn about concerns that police officers had

3    stolen or taken documents from homicide investigations

4    and shared them with gang members?

5        A    No.

6        Q    If there had been concerns raised as high as

7    the commander over detectives that an officer was taking

8    documents from homicide files and sharing them with gang

9    members, is that information you would've expected to

10    learn about and wanted to learn about during the time

11    you were a sergeant and lieutenant and commander

12    overseeing detectives?

13          MS. ROSEN:  Objection.  Form.

14          MR. BRUEGGEN:  Objection.  Form, foundation,

15      incomplete hypothetical.

16        A    When I was a sergeant up there, I was a

17    sergeant in robbery.  So if this was happening, where --

18    what you said, documents being taken out of homicide

19    files, I don't know that would've come to my attention

20    because it was a complete different operation.  Homicide

21    and robbery were -- were two completely separate groups

22    of individuals.  So I don't know that that would've been

23    something that would've been shared with me, or if I

24    would've, you know, found out from just chit-chat on the

25    floor.  So I -- I -- my answer to that would probably be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 413 of 782 PageID #:13671
The Deposition of Anthony Riccio, taken on March 10, 2023
304

1    no.

2        Q    Was there any point in the time that you were

3    a detective, sergeant, lieutenant, or commander in which

4    you came to learn of any internal CPD investigation into

5    Joe Miedzianowski?

6        A    No.  I believe the first that I heard about

7    Joe Miedzianowski having a problem is -- when he was

8    actually indicted by the feds, I think was the first

9    time that I heard anything about Joe Miedzianowski

10    having problems.

11        Q    Are you -- during your time as a detective,

12    sergeant, lieutenant, and commander, are you aware of

13    any efforts to review -- strike that.  During the time

14    that you were a detective, sergeant, lieutenant, and

15    commander, are you aware of any efforts to find out who

16    else within the Chicago Police Department may have been

17    involved in his criminality?

18        MS. ROSEN:  Objection, form foundation.

19        A    Yeah.  I -- I don't know if there was or was

20    not any sort of investigation of the nature that you're

21    speaking of.  I don't know.

22        Q    And you're not aware of any as you sit here

23    today, correct?

24        A    I am not.

25        Q    And at any point in your career in the Chicago

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   Police Department from the time you were a -- a
2   detective all the way through the time that you retired
3   as a first deputy superintendent, did you ever come to
4   learn of any internal Chicago Police Department
5   investigation into the full scope of the criminality
6   associated with Joe Miedzianowski?
7        A    I did not.  That's not to say that there was
8   or was not one.  I -- but I was never made aware of one.
9        Q    Okay.  Do you -- did you ever wonder in your
10  role as a supervisor -- I mean, and the time you learned
11  about the Miedzianowski criminal enterprise was, you
12  said, when you first saw the news about his indictment,
13  correct?
14       A    Correct.
15       Q    So at that time, around 1998, you were -- you
16  were -- you were -- you had just gone from sergeant to
17  lieutenant, correct?
18       A    I -- I -- I don't know when it was.  If you're
19  saying it was 1998, then yes, that -- that was when I
20  was promoted to lieutenant.
21       Q    Okay.  So did you, at that time, have any
22  questions or concerns about how a Chicago police officer
23  could be running a criminal enterprise out of the
24  Chicago Police Department with no one knowing about it?
25            MS. ROSEN:  Objection.  Form, foundation as to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    no one knowing about it.

2       A   Yeah, that was outside of my scope, so I --I

3    didn't -- I had no involvement in it or

4       **Q**   **Are you aware of any CPD investigation into**

5    **how he got away with it for so long?**

6       MR. BRUEGGEN:  Objection, foundation.

7       A   There may have been.  I'm not aware of it, nor

8    would I have been aware of it.

9       **Q**   **Do you believe the fact that Joe Miedzianowski**

10   **was able to engage in the conduct that he was ultimately**

11   **convicted of for as long as he was reflects some**

12   **reluctance on the part of his colleagues to come forward**

13   **about misconduct?**

14      MS. ROSEN:  Objection.  Form, foundation, calls

15     for speculation.

16      A   Yeah.  I -- I couldn't say either way.

17      **Q**   **Did it surprise you that this police officer**

18   **had engaged in this level of criminality without anybody**

19   **reporting it for so long out of the Chicago Police**

20   **Department?**

21      MS. ROSEN:  Objection.  Form, foundation, calls

22     for speculation about who reported it and when.

23      A   I -- I think that -- well, obviously there was

24    an investigation because it wound up with him being

25    arrested.  I don't know who conducted the investigation,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    if it was CPD or the FBI, or there was some sort of a

 2    coordinated investigation.  But I mean, obviously there

 3    was a criminal investigation.

 4        Q    Yeah.  Based on a complaint from an ATF agent

 5    by federal investigators.  But any internal CPD

 6    reporting that you're aware of that resulted in that

 7    investigation into Miedzianowski?

 8             MS. ROSEN:  Objection.  Form, foundation,

 9        mischaracterizes the evidence.

10        A    I am not aware, nor would I have been aware or

11    should I have been made aware, of such an investigation.

12        Q    Okay.  There are allegations in this case of

13    -- that a key witness, Francisco Vicente, was physically

14    abused by Reynaldo -- Reynaldo Guevara and Ernest

15    Halvorsen.  I assume you saw that in the complaint,

16    correct?

17        A    I haven't read the complaint.

18        Q    Oh, okay.  I'm sorry.  In your time as a

19    Chicago police officer, do you acknowledge, as somebody

20    who's been in the Chicago Police Department for more

21    than what, three decades, that there were instances in

22    which Chicago Police Detectives abused suspects and

23    witnesses?

24             MR. BRUEGGEN:  Objection.  Form, foundation.

25        A    Yeah.  I mean, I -- I can't acknowledge that
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 417 of 782 PageID #:13675
Prev Deposition of Anthony Riccio     taken on May 11, 2023

308

1  because I have no firsthand knowledge of it.  So, you

2  know, all I could say is I never witnessed it or had any

3  information about it.  So it's -- I can't acknowledge

4  that something like that happened.

5       Q    Are you aware of any internal acknowledgement

6  within the Chicago Police Department that there has been

7  abuse that occurred in interrogation rooms in detective

8  division areas?

9            MR. BRUEGGEN:  Objection.  Form and foundation.

10      A    Yeah.  I'm not aware of any acknowledgement of

11 it.  I -- it's not to say there isn't, it's just that I

12 personally am not aware of it.

13      Q    And during your time as a sergeant,

14 lieutenant, commander, deputy chief overseeing detective

15 divisions -- either detectives or detective divisions

16 entirely, was there any point at which you came to the

17 conclusion that, yes, I acknowledge that, in fact, there

18 are instances of abuse that have occurred in these

19 detective divisions?

20           MR. BRUEGGEN:  Objection.  Form, foundation,

21    asked and answered.

22      A    I don't recall any abuses of the type that

23 you're talking about being brought to my attention

24 during my tenure within the -- the detective division.

25      Q    Are you aware of any instances during the time

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that you worked as a -- that -- either as a detective or

2  at any point when you were supervising detectives, when

3  there was any internal effort to make reforms in terms

4  of interrogation practices based on allegations or

5  findings of abuse by Chicago police officers?

6          MS. ROSEN:  Objection.  Form, foundation.

7      A    No.  I mean, you know, cameras were placed in

8  interview rooms for -- for different types of

9  investigations.  And I think that was -- was a -- a good

10  step.

11     Q    I'm sorry.  Yeah, why don't you go ahead and

12  then I'll ask you my other question.  Sorry.

13     A    Yeah.  No.  I -- I think that was a good step

14  that -- that cameras were placed in -- in the interview

15  rooms for certain -- to record certain types of

16  interrogations.

17     Q    When that -- when cameras were put into

18  interrogation rooms, that was done based on a -- based

19  on a statute, not based on a particular instance of

20  misconduct involving a Chicago police officer, fair?

21         MR. BRUEGGEN:  Object to foundation.

22     A    I -- I know they were expanded in -- into

23  other types of investigations, sexual assaults, armed

24  robbery with firearms, but I don't know that that was

25  based on a statute.  But I don't know what the initial

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    rollout was for cameras during homicide investigations.

2    I don't know.

3        Q    During your time as a detective, were you ever

4    told or talked to or trained about -- in relation to the

5    allegations of misconduct against Jon Burge?

6            MR. BRUEGGEN:  Object to foundation.

7        A    No.  That preceded my time in the detective

8    division.

9        Q    During your time as a sergeant in the Chicago

10   Police Department, were you ever trained or talked to

11   about the allegations of misconduct against Jon Burge?

12           MR. BRUEGGEN:  Object to foundation.

13           MS. ROSEN:  Wait, can you repeat the question?

14       Q    During your time as a sergeant in the Chicago

15   Police Department, were you -- were you ever talked to

16   or trained based on the allegations of misconduct

17   against Jon Burge?

18           MR. BRUEGGEN:  Object to form, compound,

19       foundation.

20       A    Not that I can recall.

21       Q    Did the allegations of misconduct against Jon

22   Burge result in any training that you conducted as a

23   sergeant to your detectives?

24           MR. BRUEGGEN:  Object to foundation.

25       A    I -- I don't know.  I don't even recall when

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the allegations against Burge came out, if I was still a
 2   sergeant or if I was even in the detective division.  I
 3   -- I -- I don't -- I don't recall when that was.
 4        Q    When you were a lieutenant overseeing
 5   detectives, did you -- were you ever talked to or
 6   trained in relation -- strike that.  During the time
 7   that you were a lieutenant in the Chicago Police
 8   Department, did anybody in the department ever talk to
 9   you or train you in order to make changes based on the
10   allegations of misconduct against Jon Burge?
11            MR. BRUEGGEN:  Object to form, compound,
12        foundation.
13        A    No.
14        Q    Are you aware of the allegations against Jon
15   Burge resulting -- strike that.  Are you aware of the
16   allegations and findings against Jon Burge resulting in
17   any changes to the practices of the detective division,
18   based on your experience as a lieutenant?
19            MR. BRUEGGEN:  Object to form and foundation.
20        A    There may have been, but I -- I don't know.  I
21   can't connect those dots.  It was a long time ago for
22   me.
23        Q    As you sit here today, can you identify any
24   changes that were made while you were lieutenant in the
25   Chicago Police Department based on the allegations and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   findings against Jon Burge?

 2           MR. BRUEGGEN:  Objection.  Form, foundation,

 3       asked and answered.

 4       A    Again, there may have been, but I can't

 5   connect those dots.  If some of the changes were related

 6   to the Burge allegations, I -- I don't know.

 7       Q    And as you sit here today, can you identify

 8   any changes that were made in the detective divisions

 9   based on the allegations and findings against Detective

10   Guevara while you were a commander overseeing

11   detectives?

12           MR. BRUEGGEN:  Objection.  Form, foundation.

13       A    No.  None that I can think of.

14       Q    And as you sit here today, can you identify

15   any changes that were made based on the allegations and

16   findings of misconduct against Jon Burge during the time

17   you were a deputy chief overseeing detectives?

18           MR. BRUEGGEN:  Objection.  Form and foundation.

19       A    No.  I -- I can't connect those dots.  I don't

20   know if any of the changes that were made were related

21   to Burge or not.

22       Q    Did you ever receive -- or did you ever

23   receive any training about how to conduct interrogations

24   based on the findings of misconduct against Jon Burge?

25           MR. BRUEGGEN:  Object to foundation.  Form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 422 of 782 PageID #:13680
The Deposition of JOHN ANDREWS, taken on May 12, 2023
313

```
 1        A     No.
 2        Q     Did you ever conduct any trainings for
 3   detectives working under you based on the findings of
 4   misconduct against Jon Burge?
 5              MR. BRUEGGEN:  Object to form and foundation.
 6        A     No, I did not.
 7        Q     Are you aware of any supervisors -- strike
 8   that.  Are you aware -- are you aware of any sergeants,
 9   lieutenants, or commanders that you've worked with in
10   the detective division who ever -- who have ever
11   acknowledged that Jon Burge abused suspects in
12   interrogation rooms?
13              MR. BRUEGGEN:  Object to form.
14        A     I don't -- I don't think I ever had that
15   conversation with anyone.  So my answer to that would be
16   no.
17        Q     Are you aware of any investigation that was
18   made to identify if the problems -- strike that.  Are
19   you aware of any CPD investigation during your time over
20   -- either as a detective or overseeing detectives in
21   which there was any CPD investigation to identify if the
22   allegations and findings involving Jon Burge were also
23   true of others other than Jon Burge?
24              MR. BRUEGGEN:  Object to form and foundation.
25              MS. ROSEN:  Objection.  And calls for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          speculation.

 2          A    Yeah, there -- there may have been, but I'm

 3    not aware.

 4          Q    Okay.  And are you aware of any CPD

 5    investigation to identify if the allegations and finding

 6    -- findings against Burge spread to other areas of the

 7    Chicago Police Department?

 8               MR. BRUEGGEN:  Object to form, foundation.

 9               MS. ROSEN:  Also speculation.  And I don't know

10          what you mean by the word spread.  And you're asking

11          questions of like a 30(b)(6) witness, and Mr. Riccio

12          is definitely not a 30(b)(6) witness.  He's a

13          defendant in this case.  So whatever it is you're

14          trying to do here is improper.

15    BY MR. SWAMINATHAN:

16          Q    Go ahead.

17          A    No, I do not.

18               MS. ROSEN:  How much longer do you have?  You

19          had represented earlier that you thought you'd be

20          done by 5:00 and we're well past that.  So can you

21          let me know how much more time you have because I

22          need to make arrangements.

23               MR. SWAMINATHAN:  I think I've got about three

24          to five minutes.  I think we can take a break now

25          and I'm just going to see what else I've got left.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        I think it's probably no more than a few minutes.
 2        And I -- I just need two minutes.
 3              COURT REPORTER:  All right.  We're off the
 4        record.  The time is 5:22.
 5                (OFF THE RECORD)
 6              COURT REPORTER:  We are back on the record for
 7        the deposition of Anthony Riccio being conducted by
 8        videoconference.  My name is Sydney Little.  Today
 9        is May 18, 2022, and the time is 5:29 p.m.
10   BY MR. SWAMINATHAN:
11        Q    Okay.  I have one last set of questions for
12   you, sir.  And I appreciate your patience.  Sir, have
13   you ever been disciplined by the Chicago Police
14   Department?
15        A    Yes.
16        Q    How many times?
17        A    To the best of my recollection, one.
18        Q    And when was that instance?
19        A    1987, '88, '89.  Something like that.  Late --
20   late '80s.
21        Q    Was that an incident involving a man named Gus
22   Andros?
23        A    Yes, that was it.
24        Q    Okay.  And did you ultimately suffer any
25   discipline for that incident?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          A    A three-day suspension.

 2          Q    Was that three-day suspension upheld, or was

 3     it ultimately removed?

 4          A    You know, that's a good question.  I -- I

 5     believe it was ultimately removed.  I never served it. I

 6     never had the time taken away from me, so I believe --

 7     and it goes back a long way.  I believe that it was --

 8     it was tossed out.  And I don't remember why, if it was

 9     an arbitration or a grievance or whatever the facts may

10     be.  I do remember never having to serve the punishment,

11     the discipline.  So I -- I thought it was removed.

12          Q    I'm showing you a document.  This is the last

13     thing I want to go through with you.  I'm showing you a

14     document that we are going to mark -- I think we're on

15     Exhibit 8, and it is RFC Iglesias 1442 through 1567. And

16     the first page indicates it's a Command Channel review

17     complaint register investigation number 162909. And the

18     date initiated is December 13th, it looks like, 1988.

19     You see that, sir?

20               (EXHIBIT 8 MARKED FOR IDENTIFICATION)

21          A    Yes, I do.

22          Q    Okay.  I am not going to go through this whole

23     thing with you.  I just want to go through one section

24     primarily.  Okay.  I'm turning to page --

25               MR. BRUEGGEN:  I've given him a hard copy.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 426 of 782 PageID #:13684
The Deposition of ANTHONY RICCIO, taken on May 12, 2023

317

1      Q      You have a hard copy?

2      A      Yes, I do.

3             MR. BRUEGGEN:  Yeah.  You if can tell him the

4      page number --

5      Q      Yeah.  So let's go page 61, which is RFC

6      Iglesias 1502.

7      A      Yes.

8      Q      Okay.  So this is the beginning of a -- name

9      of person interviewed, it says Anthony J. Riccio.  Is

10     that where you are?

11     A      Yes, that's correct.  Yes.

12     Q      Okay.  All right.  I'm going to ask you about

13     your interview, okay?  And we're just going to go

14     through it.  All right.  So you were questioned during

15     -- during the -- during the CR investigation, you were

16     questioned by this -- by the CR investigators, correct?

17     A      Yes.

18     Q      Okay.  And I'm just going to -- I'm going to

19     -- I'm going to skip around a little bit, so just make

20     sure you're keeping up with me, okay?

21     A      Okay.

22     Q      I'm going to look on this -- on page 1502, I'm

23     looking at line 16.

24     A      Yes.

25     Q      "Question: On the above date, did you and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   Officer Navarro affect the arrest of one Gus Andros at

2   the Amoco Gas Station located at Peterson and California

3          Avenues?  Answer: Yes."  Do you see that, sir?

4   A     Yes, I do.

5   Q     Is that -- is that true that you did, in fact,

6   arrest Gus Andros at the Amoco gas station?

7   A     Yes, that's true.

8   Q     Okay.  And so you don't dispute that you were

9   personally involved in an interaction with Gus Andros?

10  A     Correct.

11  Q     Okay.  It indicates -- we're turning to the

12  next page now.

13  A     Okay.

14  Q     It indicates starting on line 2 -- the end of

15  line 2, it says, "A man seated in his car began yelling

16  and screaming obscenities and creating a disturbance.  I

17  told him to leave on several occasions and to stop his

18  yelling.  He refused and I informed him that he was

19  under arrest."

20  A     Yes.

21  Q     Is that statement true?

22  A     Yes, it is.

23  Q     Did Gus Andros begin yelling and scream

24  obscenities at you?

25  A     Yes, he did.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 428 of 782 PageID #:13686
The Deposition of Anthony Riccio, taken on May 12, 2023

319

1     Q   It states, "He started his car, placed it in

2 gear. I reached inside of his window, turned the car

3 off." Is that true?

4     A   Yeah. To the best of my recollection, this is

5 all -- this is all accurate. Yes.

6     Q   Okay. It says here that, "He struck me on the

7 right side of my head." Is that a true statement that

8 Gus Andros struck you on the right side of your head?

9     A   To the best of my recollection. Again, I have

10 no independent recollection of this, so I'm just going

11 off of this statement.

12     Q   Okay. And as you sit here today, do you stand

13 by your statement that he struck you on the right side

14 of your head?

15     A   Well, as I sit here today, I'm basically

16 saying I have no independent recollection. I'm going

17 off this statement on this paper.

18     Q   Did you tell the truth when you gave this

19 statement?

20     A   Yes.

21     Q   It says here that you, "Pulled open the door

22 and he started kicking me." Is that a true statement

23 that Gus Andros started kicking you?

24     A   Again, I have no independent recollection of

25 this. I'm just going off the statement on this paper.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  "At that time, with my free hand, I
2    used a technique known as a head stun learned in the
3    academy."  Did you use a head stun on Gus Andros?
4    A    Again, I have no independent recollection. I'm
5    going off of what it says on this paper.  Yes.
6    Q    Okay.  Moving down.  It says -- when you
7    reached into Mr. Andros -- this is line 14, "When you
8    reached into Mr. Andros' car, did you hit him across the
9    face with an object?"  "Answer: No, I didn't."  Is that
10   truthful testimony?
11   A    Again, I'm going off what it says on this
12   paper.  I have no independent recollection of this.
13   Q    Do you stand by what's written on that piece
14   of paper that you never hit Mr. Andros across the face
15   with an object?
16   A    I have no independent recollection of this
17   incident.  This was from 1987, I believe.  1987, 1988.
18   So I'm going off of what is on this paper.
19   Q    And what's on this piece of paper, sitting
20   here today, is it truthful or not truthful or you can't
21   say?
22   A    It's -- it's truthful.
23   Q    Okay.  And it says on this piece of paper --
24   strike that.  Did you, at any point -- let me just ask
25   you.  Did you at any point hit Mr. Andros with your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   flashlight or mag light?

2      A   No.  I never used my flashlight or mag light

3   as a weapon.  So I could say with certainty that that

4   was not the case --

5      Q   Okay.

6      A   -- in this incident either.

7      Q   Okay.  When you -- it says here, "When you

8   applied this head stun, did you apply it to Mr. Andros'

9   face?"  "Answer: I believe so."  Is that true?

10     A   I have no independent recollection of this. So

11   I'm just going off of what's on this paper.

12     Q   Okay.  If you look at line 23, it says,

13      "Question: Did you, at that time, once he was

14   out of the car, start to beat him about his body and his

15   face with your fists?"  "Answer: No."  Is that truthful

16   testimony?

17     A   I have no independent recollection of this. So

18   I'm just going off of this paper.

19     Q   Is the statement that you did not beat him

20   about his body and his face with your fists true, is it

21   not true, or you can't say sitting here today?

22      MR. BRUEGGEN:  Objection, misstates the

23     testimony quoted, but go ahead.

24     A   Yeah.  I -- I can say that I have no

25   independent recollection of this incident.  We're



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 431 of 782 PageID #:13689
The Deposition of ANTHONY RICE, taken on May 18, 2023
322

1 talking about a 30-second incident that happened

2 30 years ago. I have no independent recollection of

3 this. My only recollection is what is on this paper.

4 **Q Okay. And so, as you sit here today, do you**

5 **stand by this statement that you did not beat him about**

6 **his body and his face with your fists?**

7 A That's what it says on the paper and I have no

8 independent recollection of the incident, so I can only

9 go by what's written on this paper.

10 **Q Okay. The next -- line 26 says, "Did you at**

11 **any time have a flashlight in your hand?" And your**

12 **answer is, "No." Was that true?**

13 A I have no independent recollection of this

14 incident. So all I could do is go by what's written on

15 this paper.

16 **Q Looking at line 9 now on that page, it says,**

17 **"Once in the station, did you apologize to**

18 **Mr. Andros for hitting him?" "Answer: No." Is that**

19 **true or not true or you don't remember?**

20 A I have no independent recollection of this

21 incident. This was an incident that lasted probably

22 30 seconds as -- as most fights do, 30 years ago. So

23 all I could do is go by what is on this paper.

24 **Q Okay. And do you ultimately stand by what you**

25 **have written on this piece of paper about whether or not**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 432 of 782 PageID #:13690
Prev Deposition of Anthony Riccio - taken on May 18, 2023
323

1    you apologized to -- for hitting Mr. Andros?

2       A    Well, you asked me if I stand by it.  I'm --

3    I'm reading it just as you are.  I have no independent

4    recollection of what happened.  All I can do is read

5    what's on this paper.  Again, it's a 30-second fight

6    that happened 30 years ago, so I have no independent

7    recollection.  All I know is what it says on this paper.

8       Q    Did you give -- when you were interviewed

9    during the course of this investigation, is it possible

10    that you gave some information during that investigation

11    that was false?

12       A    No, it's not possible.  But again, this was a

13    30-second fight that happened 30 years ago.  So all I

14    can do is go by what's on this paper.

15       Q    Okay.  When you gave this statement to the

16    investigator, your testimony is that the testimony you

17    gave was entirely truthful; is that correct?

18           MR. BRUEGGEN:  Object to the form.

19       A    The statement that I gave to the investigator

20    at the time was the facts as I knew them at the time,

21    which was 30 years ago.  To sit here today, 30 years

22    later, and recount a 30-second incident with an

23    individual, it's impossible for me to say, other than

24    what's on this paper.

25       Q    Okay.  If you look at line 19, it says, "and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  you deny" -- strike that.  Line 19 says, "Question: And

 2  you do deny striking him with your fists after you

 3  pulled him out of his car; is that correct?  Answer:

 4  Yes.  I deny striking him with my fist at any time." Was

 5  that statement truthful?

 6      A    Again, 30 years ago, this was a 30-second

 7  fight.  I don't recall the incident at all.  All I can

 8  do is go by what is written on this paper.

 9      Q    Okay.  Looking at the next page, starting at

10  line 2, It says, "Question: How did Mr. Andros resist

11  being arrested.  Answer: By punching and kicking at me

12  after he was told that he was under arrest."  Do you see

13  that, sir?

14      A    Yes, I do.

15      Q    Is that statement truthful?

16      A    Again, this incident occurred 30 years ago. It

17  probably was 30 seconds in duration.  That may be even

18  long.  I don't have an independent recollection of it.

19  All I know is from what I'm reading on this paper. And

20  this is the first time I've read this in 30 years, so I

21  have no independent recollection of this.

22      Q    Let's take a look at -- this is page 110,

23  which is RFC 1551.  This is a statement from Lieutenant

24  James Morgan regarding subject injury to Police Officer

25      A.  Riccio.  And it says, "The reporting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  lieutenant does not remember conferring with Police

2  Officer Riccio regarding an injury while making the

3  arrest of Gus Andros.  Reporting lieutenant has 21 years

4  of experience as a supervisor.  'If an officer is

5  injured, then I would have told him to have his

6  supervisor prepare an IOD report before'" entering --

7  "'ending his tour of duty.'"  You see that, sir?  If you

8  said anything to him about suffering any injuries, he

9  would've told you to prepare an IOD report, correct?

10       A    That's what he's saying, yes.

11       Q    Okay.  And did you, in fact, tell the

12  lieutenant that you had suffered any injury?

13       A    I don't recall.  Again, this was 30 years ago.

14  I have no clue who James Morgan is actually.

15       Q    Okay.  And if the lieutenant ultimately

16  provided a statement indicating that you were wrong when

17  you said that you had in -- you had suffered an injury

18  and told him that, do you dispute the statement of the

19  lieutenant?

20            MR. BRUEGGEN:  Object to form.

21       A    Yeah.  I don't understand the question.

22       Q    During the course of this investigation, it is

23  documented in this -- that you indicated that you did,

24  in fact, tell the lieutenant that you had been injured.

25  Is the lieutenant providing false information when he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   indicates that if you had provided that information to

2   him, he would've told you to write an IOD report?

3          MR. BRUEGGEN:  Object to form.  Argumentative.

4     A    Yeah.  I don't even know that I told him that

5   I suffered an injury.  I don't even -- I don't even

6   recall that.  Unless that's in here somewhere, I don't

7   recall ever -- ever saying that.

8     Q    Okay.

9     A    But again, it was a 30-second incident that

10  occurred 30 years ago, so I don't recall.  I have no

11  independent recollection of this incident whatsoever.

12    Q    Do you agree that, when you first received the

13  three-day suspension, the investigator had concluded

14  that you had, in fact, struck and beaten Mr. Andros?

15    A    No, I don't.  I don't recall that, no.

16    Q    Do you agree that the investigator, in

17  concluding that you should be suspended for three days,

18  ultimately rejected your statement that you had not, in

19  any way, attacked this individual, Mr. Andros?

20         MR. BRUEGGEN:  Object to foundation.

21    A    No, I don't.  I don't recall that.  I don't

22  know that I ever read the investigator's finding.  And

23  if I did it, it would've been 30 years ago, and I have

24  no independent recollection of it whatsoever.

25    Q    You ultimately appealed the finding of the CR

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    investigator and -- is that correct?
 2         A    I don't -- I don't recall if I appealed it or
 3    not.
 4              MR. BRUEGGEN:  Do you have a page number,
 5         Anand, that you could refer him to?
 6              MR. SWAMINATHAN:  Yeah.  Let's see here.
 7              MR. BRUEGGEN:  The RFC --
 8    BY MR. SWAMINATHAN:
 9         Q    RFC 1564, the last three pages of the report
10    -- or of the document.
11         A    Okay.
12         Q    It says, "The investigator terminated" --
13    okay, here we go.  If you look at this document, it
14    says, acute -- if you look at the top of the page, it
15    says, "This is an office of professional standards
16    recommendation that Police Officer Anthony Riccio be
17    suspended for a period of three days for violating
18    department rule."  You see that?
19         A    Yes.
20         Q    And then it says, "Rule 8, disrespect to or
21    maltreatment of any person while on or off duty."  Do
22    you see that?
23         A    Yes.
24         Q    And then it indicates, in count one, in that
25    on 4 August 1988 at approximately 2330 hours, while in
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  an Amoco service station, located at 5953 North Carol --

2  California, the accused leaned into Mr. Gus Andros's car

3  window and struck him across the face with a flashlight.

4  Do you see that?

5      A    Yes.

6      Q    So that was the conclusion of the CR

7  investigator, correct?

8      A    That is count one.  So that's the first

9  allegation.  Yes.

10     Q    And that is the ultimate finding of the CR

11  investigator before any subsequent hearing, correct?

12     A    I did not read this, so I do not know.

13     Q    Okay.  Now, you agree with me that that

14  finding in count one is contrary to what you said in

15  your statement to the investigator, that you did not

16  strike this individual with your flashlight, correct?

17     A    That's correct.

18     Q    Okay.  So ultimately, the CR investigator

19  rejected your statement that you did not strike this

20  person with a flashlight, correct?

21     A    Correct.

22     Q    And then count two says, in that on 4 August

23  1988 at approximately 2330 hours, while in an Amoco

24  service station at 5953 North California, accused pulled

25  Mr. Gus Andros out of his car and struck him with his

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    fists about his body and face.  That's the second
 2    conclusion of the CR investigator, correct?
 3         A    That's correct.
 4         Q    And that's -- and essentially that is a
 5    rejection of your statement to the CR investigator that,
 6    in fact, you did not do that, correct?
 7         A    That's correct.
 8         Q    Okay.  So the CR investigator didn't believe
 9    you when you gave that statement, correct?
10         A    That's correct.
11         Q    Okay.  And then ultimately it says, Officer
12    Riccio rejected the recommendation, which was a
13    three-day suspension, and requested a hearing before the
14    complaint review panel.  Do you see that?
15         A    Yes, I do.
16         Q    Okay.  And then ultimately a hearing was held
17    in front of the -- in front of the review panel,
18    correct?
19         A    I don't recall that.
20         Q    You don't remember participating in that
21    interview?
22         A    No.
23         Q    Okay.  Let me just go down here.  I'm almost
24    at the end.  If you look at the last -- let's see here.
25    1566.  Second to last page.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Okay.

2    Q    It says, "On 20 of April 1989, the complaint

3  review panel convened to review complaint register

4  number 162909.  The accused appeared before the panel to

5  contest both the sustained finding and the recommended

6  penalty.  The accused was represented by Mr. Walter

7  Siemieniak of the Fraternal Order of Police."  And then

8  it goes through and identifies your statement to this

9  review panel.  Do you recall at all your testimony

10  before the review panel?

11    A    No.  I don't even recall being in front of the

12  review panel.

13    Q    Okay.  Did -- but looking at this report, it

14  appears you testified in front of that panel, correct?

15    A    Yes.  Correct.

16    Q    Were any other -- did any other witnesses

17  testify or give statements before the panel?

18    A    I don't recall being in front of the panel.  I

19  don't recall this incident at all.

20    Q    Do you know if the victim, Gus Andros, was

21  given an opportunity to appear before the panel?

22    A    I thought I just saw in here that he was given

23  that opportunity.

24    Q    Where do you see that?

25    A    No, I don't.  I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q    Okay.  You don't see anything here that
 2   indicates that Mr. Andros gave a statement to the panel,
 3   correct?
 4      A    Correct.
 5      Q    And you don't see anything in here indicating
 6   that the panel gave him an opportunity to provide a
 7   statement, correct?
 8      A    I don't, but I know that that is -- the policy
 9   is that he would have the ability to come in or the
10   option of coming in and providing a statement.
11      Q    Okay.  Now that should -- that is -- you're
12   saying that's what the policy was, that he should have
13   been given such an opportunity?
14      A    He would've been.  Yes.
15      Q    Pursuant to policy, correct?
16      A    Correct.
17      Q    And you don't -- you can't say one way or the
18   other whether that occurred in this case, correct?
19      A    No.  I have no independent recollection of
20   this case.
21      Q    Okay.  Last thing.  You told this complaint
22   review panel when you were before them, based on this
23   report, that, in fact, you had not struck Mr. Andros
24   with your flashlight or beat him about the body once he
25   was out of the car, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A    I would have to read it, but I believe that
 2   would be consistent with my statement to OPS.
 3    **Q    Okay.  And as a result of that review process,**
 4   **ultimately the panel decided to find the complaint not**
 5   **sustained, correct?**
 6         MR. BRUEGGEN:  Object to form.  Misstates the
 7      document.
 8    A    So looking at 1567, it says --
 9    **Q    Okay.  Let's look at, yeah, 1567.  Yes.**
10    A    Yeah.  It says, "The panel unanimously agreed
11   that the case should be not sustained.  The panel cited
12   the fact that police officers are allowed to use the
13   force necessary to affect an arrest.  They concluded
14   that Officer Riccio was justified in using the approved
15   defense technique called a head stun.  In additional --
16   in addition, the panel placed great weight on the
17   incoming lockup report, which indicated no injuries, as
18   well as photos taken of Andros immediately after the
19   incident."  So this would -- this would say that
20   physical evidence was not consistent with the statement
21   of Mr. Andros, and being struck in the face with a
22   flashlight, which amounts to pretty much a metal pipe,
23   and how he would, you know, an hour later be admitted
24   into the lockup with no injuries and photos showing no
25   injuries, I think, is kind of an indictment of the story

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  that he told, more so than the account that I told.

2      Q    Okay.  And so ultimately, they decided to not

3  sustain the allegations, correct?

4      A    That's correct.

5      Q    And your point is that, if, in fact, he had --

6  if you had actually done the things he accused you of,

7  he would've probably suffered a broken bone or

8  something, correct?

9      A    Well, I think that if he had been struck with

10  a metal pipe, what amounts to a metal pipe across the

11  face, that he would have had a complaint of injury,

12  number one.  And a lockup report, which is lockup

13  keepers in a different district that I don't know,

14  indicated that he had no injuries.  And the photograph

15  that's taken immediately after arrest also showed no

16  injuries on his face.

17      Q    The lockup keeper worked for the Chicago

18  police department, correct?

19      A    Yes.

20      Q    Okay.  Last page.  Let's go to page 91, which

21  is RFC 1532.

22      A    Okay.

23      Q    This document is from a Dr. Norman J. Markus,

24  plastic reconstructive and cosmetic surgery, dated

25  August 19, 1988, it appears.  The document states that,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 443 of 782 PageID #:13701
The Deposition of ANTHONY RICCIO, taken on May 14, 2021

334

1    "This 22-year-old male was seen in my office on August

2    11, 1988 for evaluation of post-traumatic facial

3    injuries."  I won't read the whole thing.  But it says

4    -- it refers to the incident occurring at a gas station

5    a week earlier and indicates that he was struck on the

6    left side of the nasal bridge with a flashlight.  And

7    this is obviously information being reported to the

8    doctor by Mr. Andros, correct?

9        A    Yes.  Correct.

10       Q    Okay.  And it states here that the patient's

11   glasses were broken.  Do you see that?

12       A    No.

13       Q    If you look in the middle of that first

14   paragraph.  "The patient's glasses were broken."  Do you

15   see that?

16       A    Okay.

17       Q    Do you recall that, in fact, his glasses were

18   broken during the course of this incident?

19       A    I don't even recall him wearing glasses.

20       Q    It indicates the patient was brought to the

21   police station and noted bleeding from the right side of

22   the nose and difficulty breathing on both sides.  Do you

23   see that?

24       A    Yes, I do.

25       Q    Okay.  So do you recall that, in fact, he had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  reported that he had been -- he was suffering bleeding

2  on his face and difficulty breathing?

3            MS. ROSEN:  Objection.  Form.  Foundation.

4       A    No.  Again, and I'm going to repeat this as

5  many times as necessary.  This is a 30-second issue that

6  happened 30 years ago.  This was a fight.  I don't deny

7  hitting him.  I definitely did not hit him with a metal

8  flashlight.  The metal flashlight with the batteries in

9  it is probably similar to hitting someone with a pipe. I

10 definitely didn't do that.  And any injuries that he

11 sustained as a result of this were deemed to be an

12 adequate use of force, an appropriate use of force by a

13 panel.  The physical evidence at the time of his arrest,

14 including a photograph taken at the time of his arrest,

15 do not show the injuries that he's claiming.  And

16 whatever's contained in this report is information that

17 he provided to his doctor about glasses being broken.

18 It's the first I've heard about anything about glasses

19 being broken.  So I'm going to -- I'm going to say,

20 yeah, no.  I disagree with it strongly.

21      Q    Okay.  And you used -- the only technique you

22 say you used against him was a head stun, correct?

23      A    That's correct.

24      Q    Okay.  And a head stun is not a strike,

25 correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Anthony Riccio, taken on May 16, 2023

```
 1        A    A head stun is ex -- is absolutely a strike.

 2        Q    Where -- how -- tell me.  Explain what a head

 3   stun is.

 4        A    A head stun is a strike to the head using the

 5   bottom of -- of the palm of your hand.

 6        Q    And where -- where do you strike the

 7   individual?

 8        A    Well, the goal is to strike him in the head,

 9   but a fight is a fight.  I mean, I'm getting punched,

10   he's getting punched.  It's very dynamic.  And if, in

11   fact, you're trying to strike somebody in the head and

12   you hit him in the nose, that's -- you know, that's an

13   unfortunate byproduct of a fight, I would have to say.

14        Q    Okay.  And so where it says here, "Subsequent

15   evaluation at Edgewater Hospital revealed a nasal

16   fracture."  Do you see that?

17        A    Yes.

18        Q    Okay.  So you agree with me, in fact, this

19   patient -- this individual did suffer significant

20   injuries as a result of what happened in that -- in that

21   gas station parking lot, correct?

22             MS. ROSEN:  Objection.  Form, foundation.  This

23        is a week later.

24        Q    Correct.

25        A    Yeah.  I don't agree with you, no.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 446 of 782 PageID #:13704
Prev Deposition of Anthony Riccio taken on May 14, 2021
337

```
 1        Q     Okay.  So your -- is it your testimony that,
 2   in fact, you did not cause a nasal fracture to Mr.
 3   Andros?
 4             MS. ROSEN:  Objection.  Form.  Foundation.
 5        A     I don't know if I caused a nasal fracture to
 6   Mr. Andros.  I know that Mr. Andros and I were involved
 7   in a fight.  I know that after, a panel unanimously said
 8   that the case should be not sustained, that they also
 9   used -- ruled that the use of force was necessary to
10   affect the arrest, and that I was justified in using the
11   technique that I used.  So that's -- you know, that's
12   what I -- physical evidence -- and Counsel, if nothing
13   else, you've sat here and talked to me for seven hours
14   about physical evidence.  So let's not pretend physical
15   evidence isn't important all of a sudden, because it
16   says here physical evidence -- you know, the lockup
17   report indicates no injuries and photos taken
18   immediately after the incident.  So you can't talk to me
19   for seven hours about the importance of physical
20   evidence, and then turn around and tell me that physical
21   evidence is all of a sudden not so important because
22   that's the convenient -- that's the convenient answer.
23   And the other thing I'll say.  The other thing I'll say
24   is you can't sit here for seven hours and indict
25   investigators of the Chicago police department, and then
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   turn around and tell me the investigation conducted by
 2   somebody in OPS, who is not a trained investigator by
 3   any means comparable to any Chicago police investigator,
 4   is all of a sudden some sort of a great investigator,
 5   and this was a wonderful investigation.  Clearly a panel
 6   that reviewed this investigation disagreed, as do I.
 7   Unfortunately, not everybody -- unfortunately not
 8   everybody submits to an arrest the way they're supposed
 9   to.  Mr. Andros is one of those individuals.  And in a
10   30-second fight 30 years ago, Mr. Andros elected to
11   resist arrest and to fight with me.  And while I don't
12   have an independent recollection of it, I can certainly
13   go by the statements that I made at the time and by the
14   review of this by that panel that say that this was an
15   appropriate use of force in affecting this arrest.
16       Q    Okay.  So as you sit here today, your
17   testimony is, in fact, you did not strike Mr. Andros
18   with a flashlight, correct?
19       A    Yes.  Correct.
20            MS. ROSEN:  Objection.  Asked and answered.
21       Q    And your testimony today is you did not strike
22   Mr. Andros about the body and face, correct?
23            MR. BRUEGGEN:  Objection.  Misstates his
24       testimony.
25       A    That is -- that is not what I said, no.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 448 of 782 PageID #:13706
Prev Deposition Under Anthon Riccio - taken on March 14, 2023
339

1      Q   Okay.  Sorry.  Let me correct that.  Your

2  testimony today is you did not strike Mr. Andros about

3  the body and face after you pulled him out of the car,

4  correct?

5      A   Counsel, I'm going to conclude the questioning

6  on this topic with saying I am standing by the statement

7  that I have in this.  I have no independent

8  recollection.  Any further questions that you want to

9  ask me on this, I'm going to not answer you because I --

10  you're trying to twist my words now and you're trying to

11  put things into my mouth.  You're trying to tell me what

12  a wonderful investigation was conducted by OPS on this.

13  And I'm telling you that the OPS investigators lack even

14  the most basic investigative skills when compared to a

15  Chicago police detective.  So let's not spend seven

16  hours beating up the detective --

17      Q   No, this is important.  This is very good. I'm

18  glad you raised this.  I have a couple questions about

19  that.  One --

20      A   (Inaudible).

21      Q   I want to be clear.  I want to be clear.

22      MR. BRUEGGEN:  Hold on.  We're going to take a

23    quick break so that Mr. Riccio can collect himself.

24      THE WITNESS:  I'm good.  I'm good.

25      MS. ROSEN:  No.  We're take -- let's take a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 449 of 782 PageID #:13707
The Deposition of ANTHONY RICCIO, taken on May 18, 2022
340

```
 1    break.
 2            COURT REPORTER:  All right.  We're off the
 3        record.  The time is 5:58.
 4              (OFF THE RECORD)
 5            COURT REPORTER:  We are back on the record for
 6        the deposition of Anthony Riccio being conducted by
 7        videoconference.  My name is Sydney Little.  Today
 8        is May 18, 2022, and the time is 6:04 p.m.
 9    BY MR. SWAMINATHAN:
10        Q    Okay.  Mr. Riccio, did you -- strike that. Was
11    it your belief that the OPS investigator who conducted
12    this investigation did a poor job?
13        A    It's my belief that they came to the wrong
14    conclusion.  I don't know that they did a poor job or
15    not, but they came to the wrong conclusion.
16        Q    And do you believe there was a problem in this
17    time period, in the late 1980s, of OPS investigators
18    reaching sustained findings in cases where they should
19    not have?
20            MR. BRUEGGEN:  Object to form.
21        A    I really don't know.  I can't speak to that.
22        Q    Okay.  And on the second paragraph of this
23    document I've had -- we have in front of you, which is
24    again, you have it as RFC Iglesias 1532?
25        A    Yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    The beginning of the second paragraph says,

2  "On examination, the nasal pyramid is displaced to the

3  right side in a C-shaped deformity.  On intranasal

4  examination, the septum is displaced into the right

5  nasal cavity with obstruction.  Review of the x-rays

6  revealed a nasal fracture."  Sir, did you cause those

7  injuries to Mr. Andros?

8         MR. BRUEGGEN:  Object to foundation.

9    A    I don't know if I caused those injuries or

10  not.  I gave him a head stun, and I don't know if I

11  caused those injuries or not.  You have to remember the

12  reason we went to this location was because of a fight

13  that he was involved in, and that this appearance at the

14  doctor's office was a week after his arrest.  So I don't

15  know if I did or not.

16    Q    What evidence do you have that he was

17  personally involved in a fight at that location?

18    A    A 911 call of people fighting.

19    Q    And there were a number of other people at

20  that locate -- at that gas station, correct?

21    A    Yes.

22    Q    And so, how do you know he was one of the

23  participants in that fight?

24    A    I know that the group of individuals he was

25  with were part of that fight.  I don't know specifically

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 451 of 782 PageID #:13709
The Deposition of JON ANTHONY RITCHIE, taken on May 18, 2023
342

1    that he was or was not one of the individuals fighting.

2         Q    Okay.  So to be clear, you have no evidence

3    that he was personally involved in a fight, correct?

4         A    I have no evidence that he was, and I have no

5    evidence that he was not.

6         Q    Okay.  All right.  Thank you.

7         A    It was a 911 call of a fight going on in the

8    gas station involving the group that he was with.

9         Q    And what group was he with?

10        A    I don't know.  A group of guys.

11        Q    How do you know which group he was with?

12             MR. BRUEGGEN:  Object to foundation.

13        A    I don't.

14        Q    How do you know he was with the group of

15   people that were involved in a fight?

16        A    Because he was with -- because we were told

17   that there was a fight in progress at that gas station

18   with a group of individuals.  And when we showed up,

19   there was a group of individuals fighting.

20        Q    Did you observe -- you didn't observe Mr.

21   Andros fighting, correct?

22        A    I don't recall.  This incident happened 30

23   years ago, and I have no independent recollection of it.

24        Q    Okay.  So as you sit here today, you are not

25   claiming that you ever observed Mr. Andros participating

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  in a fight, correct?

2      A    That's correct.  I'm not claiming that I -- he

3  was or was not.  I don't recall.

4          MR. SWAMINATHAN:  Okay.  All right.  I have

5      nothing else.

6          MR. BRUEGGEN:  Can you take down -- stop

7      sharing?

8          MR. SWAMINATHAN:  Oh, yeah.

9          MR. BRUEGGEN:  Megan, Eileen, you guys have

10     questions?

11              CROSS EXAMINATION

12  BY MS. ROSEN:

13     Q    I just have one follow-up question to ask you,

14  Mr. Riccio, about the late list that you talked about a

15  million hours ago.

16     A    Yes.

17     Q    I think you said something like, if there

18  wasn't a disposition within 30 days, you made it to the

19  late list, or the case made it to the late list.  Is

20  that what you said?

21     A    If I did, I misspoke.  There had to be some

22  sort of action on it within 30 days.

23     Q    Wait.  So when you say -- sorry, go ahead.

24     A    No, not a disposition.  Not a -- you know, a

25  suspended, or closed, or something like that, but some

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    sort of action.  You had to have contacted the victim or

2    sent a letter to the victim or something of that nature.

3         **Q     So some kind of investigative activity had to**

4    **have occurred?**

5         A     Correct.

6              MS. ROSEN:  Okay.  That's all I have.

7              MR. SWAMINATHAN:  Nothing else.  No response

8         from me.

9              MS. MCGRATH:  I don't have anything.  Thank

10        you.

11             MR. BRUEGGEN:  I don't have anything.  We'll

12        reserve signature.

13             MR. SWAMINATHAN:  Okay.  Thanks everybody.

14        Thank you for your time, Mr. Riccio.

15             COURT REPORTER:  Actually, if you could all

16        hang on for just a second.  So did you want to take

17        care of that, or would you like me to send him the

18        copy?

19             MR. BRUEGGEN:  For signature?

20             COURT REPORTER:  Yeah.  For signature.

21             MR. BRUEGGEN:  I'll take care of it, yes. I'll

22        take care of it.

23             COURT REPORTER:  Okay.  So I'll send that to

24        you.  All right.  Great.  Anand, how would you like

25        your copy?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. SWAMINATHAN:  I'm not ordering currently.

 2          COURT REPORTER:  Not ordering.  No video?  Oh,

 3   well, you get the video since you -- okay.  Dave,

 4   how would you like your copy?

 5          MR. BRUEGGEN:  Can I just get an electronic

 6   version?

 7          COURT REPORTER:  Sure.  Would you like a copy

 8   of the video?

 9          MR. BRUEGGEN:  No, not at this time.

10          COURT REPORTER:  All right.

11          MR. BRUEGGEN:  If you have the exhibits, you

12   could have the exhibits attached to the PDF?

13          COURT REPORTER:  Yeah, of course.  No problem.

14   Megan, how would you like your copy?

15          MS. MCGRATH:  I don't need one right now. Thank

16   you.

17          COURT REPORTER:  Okay.  No video either?

18          MS. MCGRATH:  No, thanks.

19          COURT REPORTER:  All right.  Eileen, how would

20   you like your copy?

21          MS. ROSEN:  Need a copy of our video.

22          COURT REPORTER:  All right, sounds good.  I'm

23   going to get us off the record.  I have one

24   spelling.

25          (DEPOSITION CONCLUDED AT 6:09 P.M.)
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                    CERTIFICATE OF REPORTER

2                       STATE OF ILLINOIS

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Stipulation page hereof, by me

7    after first being duly sworn to testify the truth, the

8    whole truth, and nothing but the truth; and that the

9    said matter was recorded by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19   

20

21

22   SYDNEY LITTLE

23   COURT REPORTER/NOTARY

24   MY COMMISSION EXPIRES: 03/18/2026

25   SUBMITTED ON:  05/27/2022

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| | | | | |
|---|---|---|---|---|
| **Exhibits** | **1** | **1566** 329:25 | **1994** 43:8 50:12 56:9 102:1 296:6 | **2011** 100:4 |

**Exhibits**

**EXHIBIT 1_ RICCIO**
190:12,13
191:20,24
235:11 242:11

**EXHIBIT 2_ RICCIO** 243:4, 9

**EXHIBIT 3_ RICCIO**
246:12,15

**EXHIBIT 4_ RICCIO** 251:4, 7,10 267:18,21

**EXHIBIT 5_ RICCIO**
267:17,18
268:19,21
269:4

**EXHIBIT 6_ RICCIO**
272:23,25

**EXHIBIT 7_ RICCIO**
273:11,13

**EXHIBIT 8_ RICCIO**
316:15,20

**(**

**(8)** 218:12

**-**

**--I** 306:2

**--it** 211:22

**0**

**0030** 235:19

**054183** 251:21

---

**1**

**1** 190:12,13
191:20,24
235:11 242:11

**10** 191:11
254:22

**100** 14:9,11

**101** 7:7

**10:02** 7:8

**10th** 254:1

**11** 253:21 334:2

**110** 324:22

**11:00** 51:5

**11:22** 82:22

**11:33** 83:2

**11th** 254:25
255:3

**12** 278:15,18,23
279:1,2

**12:30** 235:18

**13** 191:11

**13th** 316:18

**14** 251:13
284:1,2,6,10,19
285:8,23
286:11 288:23
294:2 320:7

**14,000** 292:16
297:1

**1442** 316:15

**14th** 48:17
252:11 255:10,
13

**15** 116:17,25

**1502** 317:6,22

**1532** 333:21
340:24

**1551** 324:23

**1556** 228:17

**1564** 327:9

---

**1566** 329:25

**1567** 316:15
332:8,9

**15th** 88:1

**16** 317:23

**162909** 316:17
330:4

**16th** 18:15,19
19:3,7,21 20:21
22:13,18 23:3
56:13 99:24

**17th** 7:8 8:11
18:17 19:12,16,
25 23:6 48:17
277:18

**18** 56:14 83:2
162:20 235:8
288:16 315:9
340:8

**18th** 8:11

**19** 88:14 101:25
323:25 324:1
333:25

**1980s** 340:17

**1986** 43:6
44:10 296:5

**1987** 315:19
320:17

**1988** 44:17
316:18 320:17
327:25 328:23
333:25 334:2

**1989** 330:2

**1990** 43:7
44:10,18 49:1,
3,11 50:12
102:1

**1990s** 298:3

**1991** 50:12
101:25 102:3

**1993** 192:3
202:8 215:1,14
222:10 243:6
249:12 250:5
251:13 252:12
254:22

---

**1994** 43:8
50:12 56:9
102:1 296:6

**1995** 56:17

**1998** 35:12,14,
25 40:6 43:10
57:7 87:19
301:14 305:15,
19

**1:07** 162:15

**1:19-CV-6508**
7:14

**1:25** 240:6
241:11 249:16

**1:40-ish**
162:10

**1:57** 162:20

---

**2**

**2** 217:25 243:4,
9 248:16
250:13 253:16,
25 318:14,15
324:10

**20** 33:22 34:4
116:17 192:5
330:2

**20-plus** 116:25

**2000** 215:15

**2000s** 290:18,
25 297:11
298:10

**2005** 88:2,15,
24

**2006** 88:3,24

**2008** 43:11
88:24 99:21
143:1,3 167:21

**2009** 100:11,21
101:22 152:20

**2010** 100:8,11,
21 102:5
152:20 294:1

**2010s** 289:6
294:9 297:5

---

**2011** 100:4

**2013** 43:12
100:17,21
101:22 102:6
105:4 117:9
167:22

**2014** 286:23

**2015** 43:13
117:9 288:21
291:10 292:24

**2016** 291:1

**2017** 43:14
118:15 286:6

**2018** 286:6

**2020** 43:18,21
44:5 119:9
226:16

**2022** 7:8 83:2
162:20 235:8
288:16 315:9
340:8

**21** 44:2 195:16
325:3

**21:00** 249:13

**22** 202:8 218:2
250:5

**22-year-old**
334:1

**23** 215:1,14
226:15 243:6
246:14 249:12
321:12

**2330** 327:25
328:23

**24** 192:3 235:18
240:6 278:23

**25** 33:22 262:11
277:2

**25th** 48:16
87:25 246:8

**26** 322:10

---

**3**

**3** 88:2,4,16,20,
22 89:4 91:21



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 457 of 782 PageID #:13715
The Deposition of ANTHONY RICCIO, taken on May 15, 2023

348

215:12 235:10,
12 246:12,15
247:16 250:4,8,
17 253:20

**30** 28:21,25
58:6,17 59:5,10
66:10 67:21
68:1,23 69:16
80:19,20
103:11 207:15
210:2,10
211:20,22
212:9,18 214:6
290:13 294:17
297:23 322:2,
22 323:6,13,21
324:6,16,17,20
325:13 326:10,
23 335:6
338:10 342:22
343:18,22

**30(b)(6)**
314:11,12

**30-second**
322:1 323:5,13,
22 324:6 326:9
335:5 338:10

**30-year** 213:7

**35** 277:2 282:1

**35-year** 10:3

**37** 282:1

**3:00** 51:20

**3:22** 235:3

**3:31** 235:8

───────────
**4**
───────────

**4** 100:1,5,6,10
101:17 105:7
106:10 193:10
234:21 235:15
251:4,7,10
267:18,21
327:25 328:22

**40202** 7:7

**48** 156:11,12,17

**48-hour** 157:8

**4:00** 52:14

**4:30** 51:21

**4:41** 288:11

**4:49** 288:16

**4th** 94:12

───────────
**5**
───────────

**5** 29:7,12 34:10,
11,12,14,20,22
35:11,15,25
40:5,8 48:18
49:7,8,24 50:2
56:15,21 91:15
126:20 142:8
215:15 231:10,
17,24 267:17,
18 268:19,21
269:4 273:11,
18,25 299:21
300:6,13,18,19,
21 301:19,22
302:1

**50** 297:24

**59** 268:22
269:6,7,22,23
270:7

**5953** 328:1,24

**5:00** 314:20

**5:22** 315:4

**5:29** 315:9

**5:58** 340:3

───────────
**6**
───────────

**6** 272:23,25
273:18

**6'2"** 221:3,4

**60** 270:11
272:12

**61** 270:13,14
317:5

**62** 270:16,17

**63** 270:19,20

**64** 270:22,23

**65** 270:25 271:1

**66** 271:3,4

**67** 271:6,7

**68** 251:9 271:9,
10

**69** 271:12,13

**6:00** 252:11

**6:04** 340:8

**6:09** 345:25

───────────
**7**
───────────

**7** 273:5,11,13

**70** 269:6
271:15,16

**71** 271:18,19

**72** 251:9
271:21,22

**73** 271:24,25

**730** 7:6

**74** 272:2,3

**75** 272:5,6

**76** 272:8,16

**77** 268:22 269:7
272:12,13

**7:00** 51:6,17,19

**7th** 228:15

───────────
**8**
───────────

**8** 316:15,20
327:20

**80** 44:17

**80s** 315:20

**86** 296:13

**88** 315:19

**89** 315:19

**8:00** 51:11
215:15

**8:30** 51:21

───────────
**9**
───────────

**9** 322:16

**90** 191:22,25
192:17

**90s** 147:9

**91** 50:23 194:13
198:5 214:16,
22 333:20

**911** 341:18
342:7

**92** 215:12
217:21 235:13

**93** 191:25
193:11 195:16
218:3 226:15
228:16 235:17,
18 240:6
246:14 253:21
254:25

**94** 49:11 50:23
102:3 246:13
296:13

**95** 56:18 57:7
301:13

**96** 56:17,18
57:7 246:13
301:14

**97** 242:25 243:4

**98** 43:11 56:19
243:1,4

**99** 47:5 59:11

**9:00** 249:12

───────────
**A**
───────────

**a.m.** 7:8 51:6,
11,17,19 83:2
235:18 240:6
241:11

**ABC** 156:3
182:17

**ability** 14:23
94:5 96:19,20
97:9,13,14
137:11 173:1

176:22 177:12
179:2,7,19
222:7,9 295:12
331:9

**abreast** 283:15

**absence**
224:11

**absent** 117:7
237:21

**absolute** 75:22
115:1 135:7

**absolutely**
9:17,20 336:1

**abundance**
95:4

**abundant** 95:3

**abuse** 106:14
107:15,16,25
108:2,3,19
109:8 166:17
167:23 308:7,
18 309:5

**abused**
307:14,22
313:11

**abuses** 308:22

**abusing**
146:13

**academy** 91:6
320:3

**acceptable**
9:13

**accepting**
108:11

**access** 172:8
180:21 201:16
223:7 225:21

**accident**
10:20,25

**accommodate**
92:13

**account** 333:1

**accountability**
280:16 282:8,
10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

accountable 284:1

accuracy 133:11

accurate 57:17 69:22 70:1,3,23 71:3,6 75:20 85:7 115:20 116:4,8,12 122:19 127:11 138:21 146:20 158:9 196:17 206:8 236:22 242:23 271:11 287:14 288:3 292:9 296:18 319:5

accurately 72:3,19 79:10

accused 135:25 136:4 170:25 171:10, 24 328:2,24 330:4,6 333:6

acknowledge 280:2 307:19, 25 308:3,17

acknowledged 291:11 313:11

acknowledge ment 308:5,10

acquittal 159:15

act 246:6

action 169:14 274:18 275:6, 22 343:22 344:1

actions 61:12 143:16,18 262:25

activity 45:14 48:19 58:12,13 59:2 344:3

actual 59:16 73:17

acute 327:14

ad 245:14

add 197:16

addition 332:16

additional 23:11 183:4 208:14 242:7, 21 244:23 245:1,3 287:25 332:15

address 72:22 152:25 183:8

addressed 282:17

addresses 246:4

adequate 89:10 335:12

administrative 57:20 58:1,5 61:20 89:8,12 90:7,13,16 95:9

admitted 228:7,10 253:7 332:23

advance 175:25

advanced 174:22

advent 286:17 289:2

adversely 153:20

affairs 165:14 169:5 170:1,6, 16 172:21,22 281:23 286:7 287:5

affect 318:1 332:13 337:10

affected 153:20 194:25

affecting 338:15

affiance 173:21

affiliation 86:22

affiliations 54:13

affirm 8:22

afternoon 52:13

afternoons 52:15,23,24 97:17,24 98:8, 14 163:7 164:3

agencies 165:16

agency 169:3

agent 307:4

agree 74:18 75:21 83:9,12, 17,23 86:8,12 143:3,5 211:2 214:7,14 228:20,25 229:9 236:6,25 249:1 252:5,6 256:9 260:2 262:14 263:20 264:2 277:25 291:23,25 292:23 293:9 326:12,16 328:13 336:18, 25

agreed 332:10

agreement 42:6

ahea 234:5

ahead 26:25 28:14 29:21 31:8 37:24 40:17 46:10 47:10 55:8 57:10 60:13,21 61:7,19 62:3 65:20,25 67:15 68:15,22 69:4,9 71:1,8 72:5 73:4,25 74:11, 20 76:2 78:2, 13,14 79:13,25 80:18 82:4

83:22 85:6 86:18 89:7 92:1 98:17 106:8 107:5,6 109:10, 19 113:6 119:24 121:4 123:2 126:15 133:25 134:7 138:20 147:24 150:10 157:10 159:6,22 161:24 163:13, 22 164:10 167:14 168:1 170:10 171:12 179:5 180:8 181:1,9 185:4 189:23 193:23 194:3 205:6 219:1 229:22 231:20 232:19 237:7,14 239:24 242:17 257:14 258:20 262:19 276:8 277:13 285:14, 15 286:3 289:14 290:3, 20 296:16 297:21 309:11 314:16 321:23 343:23

albums 224:21,24

alerted 275:5

alibi 228:16

allegation 328:9

allegations 106:14,20 107:15,16 108:2,3 109:8 139:25 140:5,7, 12,16,20 141:3, 12,21 142:18 143:7,11,13 144:14 145:10, 18 149:7,17 152:6,14 153:1, 14 163:17 164:16,19,23, 25 165:5,8,17, 20 166:2,6

167:23 168:5,8, 23 169:2,7,13, 22,23 215:6 300:9 307:12 309:4 310:5,11, 16,21 311:1,10, 14,16,25 312:6, 9,15 313:22 314:5 333:3

alleged 165:22

allowed 301:8 332:12

alternate 86:9, 15

Amaday 47:4

ambiguity 254:21

amendment 136:9,13 139:10,11,15, 19

Amoco 318:2,6 328:1,23

amount 95:10, 11 180:5

amounts 332:22 333:10

Anand 7:18 25:13 82:14 85:12 107:24 141:24 159:5 162:7 190:15 191:5 206:15 269:18 298:18 327:5 344:24

and-answer 14:22

Andrews 101:11

Andros 315:22 318:1,6,9,23 319:8,23 320:3, 7,14,25 322:18 323:1 324:10 325:3 326:14, 19 328:25 330:20 331:2, 23 332:18,21 334:8 337:3,6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

338:9,10,17,22
339:2 341:7
342:21,25

**Andros'** 320:8
321:8

**Andros's**
328:2

**anecdotally**
46:12

**animal** 282:20

**annihilated**
156:2,10

**anonymity**
182:9

**anonymous**
174:10 175:13,
19,20 182:3,4,
7,20

**answering**
15:15 151:21

**answers** 14:25
103:18

**Anthony** 7:10
8:9,16 9:8
82:25 162:18
235:6 288:14
315:7 317:9
327:16 340:6

**anticipated**
30:7 96:22
247:19 274:20

**anymore**
114:3 301:9

**anytime** 75:14
153:18 154:14
287:19

**apologies**
71:24 85:17

**apologize** 28:5
322:17

**apologized**
323:1

**apparently**
250:16

**appealed**
326:25 327:2

**appearance**
7:15 98:23
99:5,15,18
341:13

**appearances**
98:19

**appeared**
330:4

**appearing**
7:19,22 8:2,4

**appears** 252:4
330:14 333:25

**applicable**
110:5

**application**
93:25 284:10,
19

**applied** 60:9
93:3,5 104:16
110:12 111:3,
11,12 112:2,6,
13,14,19 114:6,
21 321:8

**apply** 93:7,24
96:25 108:25
111:16 112:9
113:13 114:12,
13 321:8

**appointed**
119:4

**approval**
110:3

**approve** 96:8

**approved**
90:15 99:2
332:14

**approving**
208:15

**approximately**
11:4 12:8 37:12
50:12 51:17
102:5 278:15
285:25 286:21
288:22 289:8
327:25 328:23

**April** 330:2

**arbitration**

316:9

**area** 29:7,12
34:9,10,11,12,
14,20,22 35:11,
15,25 40:5,8
48:18 49:7,8,24
50:2 56:15,21
57:18 58:5
88:2,4,13,16,
20,22 89:4
91:15,21 100:1,
5,10 101:3,17
105:7 106:10
109:13 111:20
112:17 114:23
115:24 126:20
138:4,5,9 142:7
158:20 173:24
182:16 184:7,
12 185:2
215:15 226:17
228:11 230:24
231:10,17,24
233:1 240:7
273:25 299:21,
24 300:6,13,18,
19,21 301:19,
22 302:1

**areas** 45:12
100:2,3,20
102:5,17 111:5,
13,16,17 112:6,
15 113:5,14
184:19 225:3
308:8 314:6

**Argumentative** 326:3

**armed** 254:23
309:23

**Arnell** 231:24
232:2,8

**arrangements**
314:22

**array** 78:23,25
206:18,21,23
207:4,11,14,20,
23 208:4 209:5
210:8,19 211:1
212:14,18,24
214:10 219:14,
17,25 220:21
222:10,12

223:3,24
225:10,17,24
226:9 235:20,
25 236:3,9,20,
24 237:5,11,19,
20,25 238:4,6,
7,8,13,15,18,
21,24

**arrays** 78:21
207:2 209:19
212:8 224:17

**arrest** 20:25
21:16 58:8
120:21 123:11,
23 125:7,9,11,
14,24 126:1,5,
11 133:4 194:5,
25 207:12
215:1 225:19
232:22 242:14
318:1,6,19
324:12 325:3
332:13 333:15
335:13,14
337:10 338:8,
11,15 341:14

**arrested**
126:12 222:15
254:23 300:22
306:25 324:11

**arresting**
45:13 84:17
194:15

**arrests** 99:17

**arrived** 230:24

**arson** 118:4

**arts** 223:18,25

**ASA** 195:2,5
230:24 231:6,9,
14,16,17,22
232:3 233:3
235:19,24
236:2,20
237:16,18,19
238:11 248:22
249:1

**ASAS** 236:8,12

**Asians** 224:9

**aspects**

130:21 231:17

**assaults**
309:23

**asserted**
136:9,12
139:10,11,15

**asserting**
139:19

**assess** 149:16,
24 151:12
152:24 188:7

**assessment**
62:15,20

**assets** 42:4

**assign** 57:15
169:9 170:19,
20,23 171:1,17

**assigned**
48:11 54:1
58:18 62:9
88:11,12
120:16,18,20,
23 122:16
170:8 184:23
185:2,9

**assist** 46:8,19
54:7,18 55:5
67:5 120:20
126:22 127:19
176:25 232:22

**assistant**
230:10

**assisted**
215:22,23
216:20 217:8

**assisting**
126:24 129:25
175:16 196:11

**associations**
37:15

**assume** 16:4
17:11 30:10
128:21 180:10
291:10 307:15

**assuming**
231:13

**assumption**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 460 of 782 PageID #:13718
The Deposition of ANTHONY RICCIO, taken on May 16, 2023

351

204:2 205:8

**ATF** 307:4

**attached** 345:12

**attacked** 326:19

**attempt** 230:4

**attend** 35:21 46:5 89:11 106:3

**attending** 7:16 106:1

**attention** 148:2 157:4 169:17,20 274:24 275:3 277:15 278:4 279:14 303:19 308:23

**attorney** 97:4 98:21 202:2 208:1,4,6 230:11 237:21, 24 238:9

**attorney's** 207:17 267:3

**attorney-client** 25:12 26:13 136:17

**attorneys** 18:7,12,20,21 19:4,14,16 29:23 33:2 97:10 207:7,13 208:1

**audit** 148:23 149:6,23 151:12

**August** 43:6, 18,21 44:5 119:9 327:25 328:22 333:25 334:1

**Austin** 145:14, 17,25 146:11 166:16 167:9

**author** 193:24, 25 243:16

**authored** 135:11 196:15 252:4

**authority** 109:16 171:18

**auto** 49:4,12 91:13,14 112:8

**Avenues** 318:3

**avoid** 55:19 211:10

**aware** 12:21 15:21 28:6,15 39:13,16 62:13, 23 102:18 105:13,16 106:13 111:3, 10,11 113:3 114:5,10,11,15 133:19 135:24 136:3,8,11,12, 23 139:9,11,14, 17 144:7,12 145:12,16,21 146:4 149:5,11, 13,14,21,22,23 150:4,5,6 153:8,10 163:15,23 164:12 169:11, 22,24 176:19, 20 177:17 181:23 198:14, 17 200:16 224:15 230:16, 20 261:14 264:25 265:6 273:22 275:21 291:1,7,10,16 304:12,15,22 305:8 306:4,7,8 307:6,10,11 308:5,10,12,25 311:14,15 313:7,8,17,19 314:3,4

_____

**B**

**back** 13:1 29:7, 14 40:23 49:23 52:2 56:15 59:6

70:13 80:19 82:24 87:17 90:21 99:25 102:24 103:6 125:6,8 126:17, 20 131:2 150:18 155:4 156:1 157:3 158:19 159:17 160:24 161:14 162:8,17 164:21 167:19 173:1 183:10 201:23 202:4 207:15 210:4 214:15 216:22 217:25 222:10 223:23 232:22 235:5 250:9 272:15 285:11 288:13 294:25 315:6 316:7 340:5

**background** 40:25 87:17

**backup** 126:8 194:23,24 225:19

**bad** 38:11,14, 18 110:21 274:8

**ball** 20:2 33:21 278:25

**ballpark** 10:1

**ballparking** 44:18

**bank** 41:12,15

**banned** 300:13,21 301:19 302:1, 17

**bar** 277:19,20

**barring** 15:21 212:22

**baseball** 221:19

**based** 11:15 12:10,13 31:17, 19 83:6,7 99:13

102:7 120:14 121:24 122:13 132:9,19,20,22 133:8,16 134:6 135:22 136:25 138:22 148:24 149:7,17 150:8 151:10,21 153:14 154:2,9, 10 164:1 165:8 167:15 189:20 204:2 219:7 231:16 236:25 244:10 245:22 246:3 248:6,25 255:2 262:13, 20,23 264:22 265:7,17 275:16 277:9 296:5,11 307:4 309:4,18,19,25 310:16 311:9, 18,25 312:9,15, 24 313:3 331:22

**basic** 72:21 79:20 154:6 339:14

**basically** 14:21 25:20 45:11 49:19 53:1 58:5 59:22 60:17 61:10 75:22 89:25 96:4 127:2 156:25 159:15 224:20 245:20 250:22 301:17 319:15

**basics** 131:3

**basis** 84:16,19, 23 134:4 136:22

**Bates** 251:8 273:16

**bathroom** 288:8

**batteries** 335:8

**Bears** 41:15

**beat** 55:21

154:22,23 159:15 234:15 321:14,19 322:5 331:24

**beaten** 326:14

**beating** 339:16

**beats** 160:7

**Beck** 119:5

**before'** 325:6

**began** 283:24 318:15

**begin** 9:2 285:24 318:23

**beginning** 234:17,19 317:8 341:1

**begins** 195:16 218:2 228:2 232:11

**behalf** 7:21,24 106:3 243:22 247:9

**behavior** 148:1,13 284:23

**belabor** 245:12

**belief** 276:6 340:11,13

**believed** 203:17,23 275:15,16 276:13

**believes** 98:21

**belt** 95:17,19

**benefit** 181:6

**benefits** 180:22

**bet** 168:4

**bias** 172:12

**Biebel** 8:1 36:10,11,12,20 39:3,6,13,18,21 50:19

**big** 224:6



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 461 of 782 PageID #:13719
The Deposition of ANTHONY RICCIO, taken on May 16, 2023
352

229:5,7 282:9
286:16 288:19,
25 289:9
293:23 299:16

**Bill** 273:24,25
274:4

**binding** 111:19

**birthday** 94:14

**bit** 20:1 42:4
91:17 95:17,19,
25 220:17
254:21 275:9
284:20 317:19

**Black** 224:9

**blaming**
259:19

**blank** 271:10

**blanket** 75:18
76:5,8 77:2

**bleeding**
334:21 335:1

**Bob** 36:10,11,
12 37:3,20
50:19

**body** 165:15
166:8 170:7
284:21,25
285:11 286:17,
24 287:16,21,
23 288:1 289:2
321:14,20
322:6 329:1
331:24 338:22
339:3

**body-worn**
287:8

**bomb** 118:4

**bone** 333:7

**book** 78:19

**books** 77:20,
24 78:5,6,11,18
81:6,8,13,17,
22,24 82:6
224:18,19,25
225:2,4

**bosses** 38:20
95:20,21

**bottom** 90:11
192:2,23 193:7
214:21 243:11,
14 246:25
252:8 253:16,
25 254:10
336:5

**Boudreau**
109:17

**bounced** 91:17

**box** 224:6
252:19

**Boys** 228:11

**Brady** 67:17,24
161:12

**break** 16:7,9
82:15 150:13,
17,23,24 151:2
159:7 162:4
164:16 174:8
234:8,22,23
275:8 281:11
288:7 314:24
339:23 340:1

**breaking**
281:10,14
285:17

**breathing**
334:22 335:2

**bridge** 334:6

**briefed** 89:24

**briefly** 164:21

**bring** 154:17
158:18 208:21
277:14 287:13

**bringing**
159:17

**broad** 41:14
43:1 161:4
173:17 261:10

**broader** 90:3
101:3 110:5
111:21,22
112:9 158:21

**broadly** 84:12
140:15

**broke** 173:25
175:3 181:4
280:13

**broken** 333:7
334:11,14,18
335:17,19

**brought** 128:7
148:2 155:4
157:3 160:24
231:24 265:19
274:24 275:3
278:4 300:17
308:23 334:20

**Brown** 119:6

**Brueggen** 7:24
19:1,8,17
25:11,24 26:1,
4,7,9,24 28:8,
13 29:21 31:8
37:24 40:16
42:8 46:10
47:10 49:20
55:7 57:9
60:10,13,21
61:6,18 62:2
63:13,21 64:14,
20 65:1,10,19,
25 66:18 67:15,
19 68:8,14,21
69:3,8,15 70:15
71:1,7,20 72:4
73:3,25 74:10,
19 75:4,10
76:1,19,23
77:18,22 78:9
79:12,24 80:7,
17 81:16 82:3,
14,18 83:22
84:4,21 85:5,12
86:18,25 87:9,
15 89:6 91:25
92:9 93:8 94:19
95:12 98:16
102:9 103:9,25
104:9,17,19
105:1 107:24
109:10,18
110:1,14 111:6,
14 113:6 114:9,
14,24 115:8
118:9,21
119:24 121:3,
18 122:9 123:2,
7,12,16,20,24

124:4,10,16
126:14 128:14,
20 133:24
134:16,25
135:18 136:16,
21 137:5,18
138:20 139:2
140:10 141:23
142:12 146:18
147:5 148:8
149:1,9,19
150:2,11,20,22
151:5,16 152:8
153:2 155:24
158:17 159:5,7,
21 161:1,17,25
162:6,10
163:13,20,22
164:10 165:1,
12 166:18
167:5,13 168:1,
12 169:1 170:9
171:11 172:5
177:1,15
178:21 179:4
180:8,17 181:1,
8,15 182:10
183:1,21 184:5
185:3 187:18,
23 189:22
190:15 191:5
193:22 194:2
199:1 200:9
203:25 205:5,
25 206:14,17
209:20 210:18
212:3 213:3,9,
16,23 217:1
218:25 220:23
226:2,7,12
227:1 229:6,21
230:13 231:11,
19 232:19
234:4 236:5
237:6,13
239:12,23
242:17 254:5
255:18 257:11,
14 258:11,19
259:8 260:20
261:8 262:5,18
263:9,25 264:6
265:11,20
266:6,9,16
269:5,8,18
276:8 277:13

286:2 288:7
289:13 290:2,
19 293:4 294:3
296:7,15
303:14 306:6
307:24 308:9,
20 309:21
310:6,12,18,24
311:11,19
312:2,12,18,25
313:5,13,24
314:8 316:25
317:3 321:22
323:18 325:20
326:3,20 327:4,
7 332:6 338:23
339:22 340:20
341:8 342:12
343:6,9 344:11,
19,21 345:5,9,
11

**BRUEGGER**
165:23

**bubble** 138:13

**budget** 95:18

**build** 221:24

**building**
283:17 285:1

**bulk** 279:19

**bumped** 52:6

**bunch** 103:15
108:18,19

**bureau** 110:6,
20 117:12,14,
20,24 118:8
120:1 151:20

**Burge** 310:5,
11,17,22 311:1,
10,15,16 312:1,
6,16,21,24
313:4,11,22,23
314:6

**burglary** 61:14
224:19

**burn** 55:17

**burning** 55:20

**button** 223:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 462 of 782 PageID #:13720
The Deposition of ANTHONY RICCIO, taken on May 16, 2023

353

**byproduct** 336:13

---

**C**

**C-SHAPED** 341:3

**C-U-L-L-I-N-G** 266:8

**cadence** 128:2

**California** 318:2 328:2,24

**call** 9:18 33:9 44:23 54:22 97:3 110:17 111:18 114:1 138:2 154:7 156:4 157:6 158:20 165:7 175:2,4 182:16 184:12 185:7,9, 10,17 186:10 187:4 189:3,5 199:16 208:12 220:16 280:7, 20 288:21 341:18 342:7

**called** 29:9 45:17 50:3 57:24 61:11 110:18 113:18 185:6 197:24 208:9,25 230:11 332:15

**caller** 175:13 184:19 190:3,6

**calling** 185:1 197:18 216:20 266:7 282:23

**calls** 46:5 136:17 173:23 184:20 187:7 188:6 213:4 214:12 230:6 259:23 260:13, 21,25 261:23 265:4 306:14, 21 313:25

**camera** 201:17,20

**cameras** 284:21,25 285:11 286:17, 22,25 287:1,2, 4,7,8,17,21 288:1 289:2,3,6 309:7,14,17 310:1

**capacities** 110:10 264:25 276:18

**capacity** 10:14 34:8,23 56:20 72:18 73:6 103:6 125:4 130:20 149:13 277:3

**Capitelli** 50:18

**caps** 221:19

**captain** 93:13, 21,25 94:2

**captain's** 93:16,23

**captains** 93:14

**capture** 65:23 261:12 268:14

**captured** 112:23 286:24

**captures** 287:10

**capturing** 284:22

**car** 92:15 125:12,20 175:5 199:7 232:13,18,24 284:7 318:15 319:1,2 320:8 321:14 324:3 328:2,25 331:25 339:3

**care** 61:20 344:17,21,22

**career** 9:14 10:3 11:20 17:11 37:15

42:14 63:2 101:2 274:13 277:24 280:6, 15,24 290:10 293:11,22 294:13,14,21, 25 296:3,11,13 304:25

**carefully** 158:2

**Carol** 328:1

**cars** 45:16

**carve-out** 112:16,19 113:11

**carve-outs** 113:4

**carved** 49:22, 25

**case** 7:14 11:15 12:22 20:6,8,9,24 24:9 25:19 27:8,11,24 28:19 31:7 42:6 53:19,20,23 56:6 57:18 58:6,8,11,17 59:4,9,12,18,25 60:23 65:17 67:2,14 70:17 76:7 82:2,6 89:25 90:1,2,3 94:21 98:18,20, 22,25 99:6,14 107:14,17,25 108:1,4 113:8 116:23 121:17 122:5,7,11,15, 20 123:5,6 124:12,15,22 130:21 131:3, 20,24 134:5,11 136:10 139:20 143:25 154:15, 23 155:5,7 159:15 160:1,7 169:6 173:8,11 176:6 182:17 183:3 184:15, 21,23 185:2,7,9 196:9 197:5 198:23 202:13,

21 208:22 209:8,23 216:19 217:7 221:5 226:22 230:12,17 232:10 233:11 242:16,19 244:15 245:6 254:3 257:17 258:2 260:12 264:19 267:16, 20,23,24 268:20 290:6 291:7 307:12 314:13 321:4 331:18,20 332:11 337:8 343:19

**cases** 12:17 13:18,19 38:23 39:7 49:9 57:5, 15,23,24 58:12, 16 59:11 60:23 61:4,11,14,17, 25 62:9,10 70:10 75:19 78:6,17 81:14 85:22,23,24 90:4,5,14 91:24 92:8 94:7 98:13 99:3,6,8,12,17 106:24 107:1,3 108:8 136:1,5 139:20 145:1 146:12 150:1 155:22 156:20 157:1 170:17 174:23 176:11 178:3 208:18 236:11,16,18, 19 279:6 287:14 340:18

**catch** 37:17 71:21

**catchall** 118:23

**caused** 337:5 341:9,11

**caveat** 29:22 34:17 114:16, 25 115:21

**cavity** 341:5

**CB** 246:4

**cell** 183:7 185:13

**Central** 100:5, 6 101:17

**Cer** 275:24

**certainties** 13:22

**certainty** 31:10 38:8 75:22 78:12,16 113:10 114:18 115:2,11,22 135:7 275:1,20 321:3

**chain** 93:4,7 173:1

**chance** 40:25 162:22 189:4 192:10 232:5 233:6 253:17 256:17

**change** 83:11 103:22 110:22, 24 116:6,10 122:17 221:15, 16,17 250:17 281:3,5 283:5,6 288:21 293:23, 24

**changed** 38:20,21 95:23 104:7 212:5,7 221:18 281:8 283:8,10

**changing** 173:5 288:25 289:10 297:17

**Channel** 316:16

**channels** 140:9

**characteristic** 220:17

**charge** 101:4,5 117:6 118:23 156:13 170:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**charged** 85:11, 20 86:5,17,22 87:6 99:17

**charges** 84:24 85:4 99:1,7 123:6,15 124:3, 9 208:6,15 265:19

**Charlie** 119:5

**check** 45:16

**check-in** 60:25

**checks** 45:16

**Chicago** 7:20, 22,23 8:2,5 9:14 10:14,18 17:4,20 33:24 36:17,20 38:1 41:9,16 42:18 44:4 106:19 109:7 139:16 144:13 146:15 147:20 149:8, 15,24 151:11 174:21 179:25 192:1 213:7 243:5 246:13 264:23 274:11, 21 275:11,17 276:18,20 280:1,4 286:20 291:4 292:10 293:1 304:16, 25 305:4,22,24 306:19 307:19, 20,22 308:6 309:5,20 310:9, 14 311:7,25 314:7 315:13 333:17 337:25 338:3 339:15

**chicken** 273:3

**chief** 43:13,14 100:17,22 101:10,12,13 105:5 106:18 109:23 110:15 117:3,4,5,7,10, 17 119:25 143:8 152:4,12, 23 156:5 308:14 312:17

**chit-chat** 37:18 38:11 303:24

**chit-chatting** 38:19

**Chmieleski** 241:1,8,14

**choices** 92:25

**choose** 265:25

**choosing** 81:14

**circulate** 190:21,23

**circumstance** 53:21 71:15 72:6 76:20 182:11

**circumstances** 78:4 121:24 168:23 170:4 183:6 207:3 208:17 209:23 210:7 212:12, 23 237:9 238:3

**cited** 332:11

**citizen** 17:24 173:23 174:2 275:3 277:12, 23 278:4,7 279:20

**citizens** 277:14 279:22

**City** 7:22 116:20 146:15 291:3,11

**City's** 107:2

**civil** 143:24 144:3,5,6 153:19 154:2, 23 156:11,22

**civilian** 170:6 275:18 276:7, 14,22 277:12 278:20 279:9, 11 292:16

**civilians** 101:6 274:22 278:17

**claim** 147:9 188:2

**claiming** 335:15 342:25 343:2

**claims** 116:23, 24

**clarification** 28:4 40:18 112:12 132:18 188:5

**clarify** 8:10 22:25 25:13,16 26:11 27:6 42:22 64:18 108:5 227:1,6 299:19

**cleaner** 56:6

**cleanly** 247:20

**clear** 40:22 53:8 58:15 61:9 64:6 67:2 190:20 210:21 221:10 239:14 251:24 269:17, 18 282:20 339:21 342:2

**cleared** 21:20 23:24 214:15 242:10,20

**clearer** 260:9

**click** 223:21

**climate** 281:7

**clock** 113:24

**clones** 219:19

**close** 58:9 126:7,10 272:22 273:10

**closed** 21:20 23:24 62:5 98:13,22 99:1, 4,7,8 100:5 190:20 214:15 242:10,20 343:25

**closely** 179:25 220:8

**closing** 61:17 62:1,10,11 91:24 92:8 94:7 98:18,20,25

**Club** 228:11

**clue** 263:17 325:14

**Cobra** 253:7 255:5 263:14

**Cobras** 254:4, 13 255:16,22 256:3 257:7,20, 25 259:6,19 262:15 263:6 264:3,18

**code** 280:2,7, 10,20 285:3 291:3,12,23 292:11

**coin** 217:12

**cold** 122:5

**colleague** 276:20

**colleagues** 145:6 177:20 276:13 306:12

**collect** 339:23

**collected** 157:24 223:16

**collecting** 155:7

**collection** 31:22 158:1 222:11 224:15

**Color** 218:12

**comfortable** 77:1

**command** 109:16 147:4 152:6 179:8 316:16

**commander** 43:12 89:1 92:21,22 99:20, 22 100:6,9,16, 20,25 101:9,16 102:4,25

103:21 104:14 105:6 106:18 109:15,23 110:16 112:22 113:17 114:19 116:16,17 143:8 152:4,11, 17,19,23 153:7, 13 158:5 167:20 168:11, 18,22 169:7,21 170:19 172:20 300:18 301:9 303:1,7,11 304:3,12,15 308:14 312:10

**commander-** 115:13,24

**commander-level** 114:6,11, 20 115:3,5,17, 23 116:6,9

**commanders** 92:20 111:16 158:12 159:18 313:9

**comment** 292:7

**comments** 282:2 292:24

**commit** 274:12

**committed** 134:24 135:4 146:13 256:3 275:11,17 276:6,14 278:9

**committing** 274:22 276:21

**common** 94:22 110:23 142:7 206:11 223:11

**commonality** 37:21,23

**communicated** 142:10 230:10

**communication** 34:15

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 464 of 782 PageID #:13722
The Deposition of ANTHONY RICCIO, taken on May 16, 2023

355

communications 26:14 35:5 273:20

communities 282:4

company 41:8

comparable 338:3

compared 339:14

comparing 221:11

compensate 220:25

compensation 175:9

complaint 24:9 32:21,23 33:1,3 165:6,7 166:3 274:25 275:22 277:6, 21 278:8,16 279:2,3,12 307:4,15,17 316:17 329:14 330:2,3 331:21 332:4 333:11

complaints 166:4 279:19, 22

complete 61:6 71:3 132:15 303:20

completed 169:18

completely 70:3 93:17 303:21

completing 217:8

complexion 221:23

component 90:24 96:17

compound 36:6 310:18 311:11

computer 85:13 223:15, 22

concept 67:24 148:22

concepts 45:1

concern 212:1 213:1

concerned 173:4

concerns 27:13 172:12 210:14 211:16, 21 213:19,24 302:10 303:2,6 305:22

concerts 41:16

conclude 290:12 339:5

concluded 146:12 326:13 332:13 345:25

concluding 326:17

conclusion 146:14 261:24 308:17 328:6 329:2 340:14, 15

conclusions 145:17,25

conclusively 109:21

concur 120:11

conditions 16:18

conduct 17:7 136:10 139:16 148:4,5,24 158:14 160:16 169:9 171:4 172:11 207:3 209:18,19 237:25 238:4,5, 6 306:10 312:23 313:2

conducted 82:25 135:8 145:13 148:16 149:6 151:12 152:6 153:11 154:2 162:18 165:13,17 170:5 171:7 202:25 203:15 208:24 216:16, 18,19,24 226:16,18 227:11,24 231:4 235:6 236:14,21 237:11 238:13, 18 240:7 241:1 242:16 245:15 249:16 262:21 288:14 306:25 310:22 315:7 338:1 339:12 340:6,11

conducting 64:23 102:7 114:7 115:7 120:21 126:22 129:25 202:3 244:4,23 247:15,22 248:7,17

conferring 325:1

confessed 131:14

confession 160:23

confidential 169:24 173:8,9, 16,18,23 174:9, 15,19 176:3,7, 9,10,14,15,23 177:13,14,21, 24 178:4,10,16, 20 179:3,11,18, 20 180:2,21 181:7,14 186:8, 13,16 189:14, 18 196:20 197:1,3,6,8,13, 18,22 198:4,9, 12,15,19,22 199:5,20

confirm 273:19

conflict 48:15 300:15,16

conflicted 111:21

conflicts 45:12 48:20 54:21 110:6

confuse 282:15

confused 109:2

confusion 251:19

connect 200:18 311:21 312:5,19

consequences 281:12

consideration 94:12

considered 45:9 80:12 91:10 92:19

consistent 332:2,20

consisting 218:12

consolidation 100:2,14

constant 155:9,13 156:8, 18 159:1

constantly 157:17

constitute 80:5

constitutes 293:8

consultant 41:19

consultant-type 41:6

contact 34:19 35:12,24 36:1

55:23 163:8 182:24 187:13 200:1,5,13,15 208:17 215:9 227:21

contacted 196:20 197:1,3, 4,12,18 230:23 344:1

contained 85:25 248:6 255:2,23 258:15 261:16 265:1 266:23, 24 268:15 335:16

contaminating 213:2

contents 31:15

contest 330:5

context 10:6 33:23 85:15 108:16

continue 42:24 96:4 295:21,22

continued 290:18 297:18

continuity 55:19

continuous 153:25 294:10

contradictory 115:25

contrary 260:24 261:2 328:14

control 96:14, 20 97:9,13,15

controlled 174:25

convened 7:9 330:3

convenient 234:7 337:22

conversation 38:22,25 39:3,6 73:24 74:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

75:14 141:8
202:18 215:10
227:19 313:15

**conversations**
20:16 26:15
32:15 33:13,16
35:24 39:18
72:2 75:6,23
79:5 137:10
138:11 195:4

**conveyed**
241:22

**convict** 124:15

**convicted**
306:11

**conviction**
27:9,21 28:1,7
29:16 123:19
132:6

**convictions**
145:3

**cool** 282:5

**cooperating**
174:8,9,16
175:12 181:18,
20 182:20
183:6 184:7,8
186:19 187:1,7
188:6,22
189:21 190:8,9
197:9,14
198:23 199:4

**cooperation**
280:21 281:24

**cooperator**
198:22

**coordinated**
307:2

**COPA** 165:15
169:4

**copies** 29:23
190:15

**cops** 80:24
166:9

**copy** 32:21
190:16 191:8,
15,21 214:19
223:16 243:2

268:12 316:25
317:1 344:18,
25 345:4,7,14,
20,21

**corner** 228:11,
23 229:3

**Coronell**
232:25 233:1,9

**correct** 11:2,3
12:5,10,11
14:3,14,15,17
19:2,18,19
21:6,7,14,15,
16,17 22:20
24:17,18 26:8,
10 27:11,15
28:1 29:20,22
30:13,14 32:25
35:16,17 42:7
43:19 45:2,24
46:24,25 49:13,
14 50:5,6,9,10
51:3,8,9,14,15,
22,23 52:1,22
53:4,18 56:23,
24 58:20 60:6,
22 61:2 64:3,
11,13 65:18,21
66:17,20 70:10,
11 73:10,11,13,
14 74:9,12
75:9,16 76:14,
15,17,18 77:21
79:2,3 84:20,25
85:4,11,21
86:5,6,17,19,24
87:8,14,20,21
88:6,7,16,17
89:1,2 96:9,10
97:1,2,19 98:7,
10,11 99:3
100:10,22,23
101:13,14,19,
20,22,23 112:3,
4,6,15 113:14,
15,19 116:2,7,
11 117:14,15,
18,19 118:16,
17 119:9,10,15
122:18,23,24
126:2,3 127:10
128:11 130:17,
18 132:2,3,6,7,
10 133:4,5,9,

10,16,17
134:24 135:5
137:16 138:6,7,
9,10,17 139:12,
13 142:20
143:9,10,14
146:7,9 148:21
155:22 158:15
160:11,17
166:17 171:10,
19 174:16,23,
24 175:9,10,17,
18 178:17,18
179:21,22
180:3,4,15,18
182:3 183:16,
17,20,23 186:2,
5,6,10,11,14
187:4,5,9,14,
15,17,19
188:24 189:11,
12 193:8,9,19,
20 194:8
195:22,23
196:4,5 197:3,4
198:25 199:21,
22 201:4 203:3,
4 206:2,7
208:10,25
209:7 211:5
212:24,25
213:2 215:3,21,
25 216:1,11,13,
14 220:1 222:6
224:1 227:12,
16 229:5,9,18
230:5,12 231:1,
2 236:21 237:2,
3 238:15,16
239:8,9,11,17,
18 240:15,16
242:18,22,23
243:8,12 244:8,
9,18,24,25
245:4,9,10,18,
19,23,24
246:19,22,25
247:1,5,6,23,24
248:3,10,14,15,
20,23 249:3,8,9
250:20,21
251:1,2,16,17
252:11,12
254:4 255:5,6,
8,11,17,19
256:4,5 258:2,

6,18 259:22
260:19,22,24
261:21 262:4,
17 263:23
265:15,16
267:9,10,13,14
268:9 269:21
278:10,11,13
282:13,14
288:23,24
289:3,4 291:12
292:8 298:23,
24 299:2
300:23 301:3,
15,16 304:23
305:13,14,17
307:16 317:11,
16 318:10
323:17 324:3
325:9 327:1
328:7,11,16,17,
20,21 329:2,3,
6,7,9,10,18
330:14,15
331:3,4,7,15,
16,18,25 332:5
333:3,4,8,18
334:8,9 335:22,
23,25 336:21,
24 338:18,19,
22 339:1,4
341:20 342:3,
21 343:1,2
344:5

**corrections**
154:11

**correctly** 75:5
97:17 117:13
134:22 137:14
148:5 158:4
205:20 212:21
222:1 292:6

**correlate**
98:19,23

**cosmetic**
333:24

**coughs** 30:21
73:8 131:9
217:9 253:6

**counsel** 7:17
9:1 20:5,14,17,
21 25:10 26:15
32:15 39:24

68:2 244:16
291:11 337:12
339:5

**counsel's**
151:25

**Counselors**
161:19

**count** 327:24
328:8,14,22

**couple** 16:11
21:2 30:1 37:4
45:7 131:22
147:8 150:16
287:24 339:18

**court** 7:3,4,5,
12 8:6,12,15,20
9:1 10:22
13:24,25 14:4,
9,24 15:1,4,20
67:14 82:21,24
96:11,13,21
97:1,19,21,23
98:5,10,19,23
99:5,12,15,18
153:19 154:15
156:20 160:15
161:13,19
162:14,17
175:22 182:2
235:2,5 288:10,
13 315:3,6
340:2,5 344:15,
20,23 345:2,7,
10,13,17,19,22

**court's** 98:1

**court-related**
28:11

**courts** 155:21

**cover** 59:10
283:13 284:18
285:4

**coverage**
89:10 283:14

**covered**
259:16

**covering**
140:3

**coworkers**
37:14 280:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 466 of 782 PageID #:13724
The Deposition of ANTHONY RICCIO, taken on May 16, 2023

357

**CPD** 179:18
291:2 304:4
306:4 307:1,5
313:19,21
314:4

**CR** 165:7,21
166:13 278:10
279:7 317:15,
16 326:25
328:6,10,18
329:2,5,8

**create** 64:2
218:20,24
222:12 223:3,
24 224:17
250:16

**created** 198:18
225:5 249:19
250:11 258:9,
14

**creating**
218:14 318:16

**credibility**
188:8

**credible** 188:3

**credit** 196:10

**crime** 45:8,23
46:13 52:17,21
54:3 56:1
61:10,13 72:25
73:12,17 80:4
112:14 117:12,
20,24 118:8
119:25 120:1
124:22 131:15
134:13,24
135:5 155:8
203:3 229:16
230:3,18 263:6
284:22

**crimes** 13:20
44:12,15,20,21,
22 45:1,2 46:1,
7,8,18,22,23
47:8,9,13,15,
19,25 48:7,10,
22 49:12,15,16,
18,24,25 50:2,
4,5,8,11,23
53:3,5 54:3,5,6
56:23 60:8,9,18

62:22 63:11,20
64:1,8 65:13
73:9,10 81:11,
20 88:9,20,22
89:4 91:21 99:6
101:4,5,21
102:3 112:8,14
113:14 118:2
170:25 171:1
225:4 226:18
231:25 240:7
244:17 302:10,
18

**criminal** 45:14
67:13 70:10
99:2 154:15
155:1,21 157:1
158:7,13
160:15 244:16
262:3 287:4
305:11,23
307:3

**criminality**
302:13 304:17
305:5 306:18

**cross** 164:13
343:11

**crossed** 36:2

**CRS** 166:9

**crushing**
299:10

**CTA** 41:17

**culling** 266:4,
7,8

**cultural** 291:24
292:20 293:15

**culture** 282:25
283:6 288:20
289:1,10,19,21,
24 290:2,5
292:18 296:18,
25

**current** 11:9
32:18 144:19,
24 145:10
148:12,19
164:18,22
165:4 166:12
167:1,4,10,24

**custody**
192:21 207:6,8,
9,13,19,21
208:3,9,11,16
209:3,18 210:8
212:9,22 214:3
215:1 217:5
237:1 238:2
246:7

**cut** 42:21 53:8
78:14 97:11
209:11 273:17
278:4

**CV** 222:14
223:12,14

———

**D**

**daily** 184:17

**damages** 42:5,
7

**Dan** 47:4

**Daniel** 291:2

**database**
173:20 174:20
177:6 178:6,17,
20,23 179:2
180:24 181:10

**date** 125:5
192:2 228:16
246:14 249:19
250:7,17,19
251:12 255:14
316:18 317:25

**dated** 333:24

**dates** 43:4
44:19

**Dave** 7:24
18:23 19:1 42:5
243:1 269:3
345:3

**David** 119:6
241:1

**day** 7:8 48:15,
16 51:2,18
57:22 58:1
61:15 89:10
92:14 97:20,24
98:4,5 120:20

125:3 164:4,6
186:1 221:20
283:22

**day-to-day**
89:17 102:6
118:24 172:3,
13 295:17

**days** 50:18,24
51:22 52:1
53:12 58:6,17
59:5,10 97:21
98:3,6 124:25
163:7 208:2
284:7,16 300:1
326:17 327:17
343:18,22

**deal** 72:11,12
229:5,7 250:13
284:23

**Dean** 101:11

**debates**
147:22

**debriefing**
263:15,18

**decades**
211:25 307:21

**decapitate**
282:18

**deceased** 35:7

**December**
291:10 316:18

**decent** 274:10

**decide** 120:13
134:19 151:2
205:1,2

**decided** 332:4
333:2

**decides** 94:1

**decision**
209:16,17
264:10

**deemed**
335:11

**defendant**
7:22,25 8:1,4
11:20,24 12:4,
9,13,22 13:4,19

30:16 32:14,17
39:13 159:15
314:13

**defendants**
32:24 33:5,8
39:24 159:14
262:3

**defense** 67:13
244:16 332:15

**defer** 207:25
208:7 252:19

**define** 173:15
175:12

**defined** 176:7,
8 178:11 197:8,
9,13

**defining** 173:9

**definitions**
176:2,5

**deformity**
341:3

**degree** 23:17
59:5 71:11 72:7
175:23 219:18
231:21

**degrees**
274:16

**delay** 59:19

**delays** 202:5

**deliberate**
147:20

**demotion**
11:12

**deny** 324:1,2,4
335:6

**department**
9:14 11:10,13
17:23 36:21
38:15,20 42:19
62:25 92:12
95:25 96:15
97:3 100:2
106:20 109:7
110:7,24
111:22 117:3
118:20,24
119:23 141:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

143:23 144:14
145:9,11
147:21 148:6,
23 149:16,24
151:11,14,24
160:17 173:19
174:21 180:1
192:1 201:17
211:25 223:14
243:6 261:5,7
264:23 266:24
267:4 276:21
277:11 280:3
282:6 283:24
286:20 287:19
289:19,21,22,
24 290:5 291:4,
25 292:11,12,
13,15,18,21
293:1,13
304:16 305:1,4,
24 306:20
307:20 308:6
310:10,15
311:8,25 314:7
315:14 327:18
333:18 337:25

**department's**
222:14 223:12

**depend** 76:4
79:8

**depended**
71:9,14 72:6,7

**depends** 72:13
167:16 199:3

**deposed** 9:23,
25 10:6,10,22
11:5,8,10,14,
15,19,23 12:4,9
13:3,18

**deposition**
7:10 9:16 11:6
15:9 18:6 20:6,
10,12,17 23:20,
24 24:2,6,8,11,
24 25:2 26:22
27:7,18 29:3,18
31:23 82:25
107:12 108:9
132:21 162:18
191:20 192:13
235:6,12
239:20 243:8

246:18 251:16
288:14 315:7
340:6 345:25

**depositions**
26:23

**deputy** 32:5
43:13,14
100:17,22
101:10,12
105:5 109:22
110:15 117:3,4,
5 118:15,19
119:3 143:8,9
145:24 152:4,
12,23 156:4
281:18 305:3
308:14 312:17

**describes**
222:2

**describing**
113:23

**description**
89:5 219:20
220:10 221:14
224:3 228:3,21

**descriptors**
219:15

**designed**
137:8 138:10

**desire** 182:9
285:4

**desk** 185:14,22

**detached**
295:6,22,25

**detail** 71:11
72:11,12 189:7
199:4

**details** 16:12
72:1,14,16 90:2
139:9

**detain** 156:17

**detained**
157:21

**detective**
11:16 13:11
34:7,10,15,22,
23,24 36:24
38:2 43:8 44:10

49:1,2,11 50:5,
12,22,23 52:18,
21 53:3,6,7
54:5,6,13
56:15,17,21
58:2,14 60:8,
16,23 61:3,14,
25 62:8,22
63:4,8,12 64:1,
7,8 65:13 66:8
67:5,12,18,22
68:4 69:12,21,
25 70:7,8,12
73:9 80:25
81:6,19,24 82:9
83:8 88:19
91:9,11,13,23
93:6,10,16
94:21 95:2
97:16,17 99:25
100:1,9,15,20,
25 101:17,18,
25 102:3,5,16,
17 103:4,5
104:5,13 105:7
109:14 110:6,
10 111:2,5,21,
25 112:2,5,13,
23 113:2,3,12
114:7 115:24
116:1,7 117:6
120:17 121:8,
11,14,20
122:16 140:8
143:7,12 144:7,
22 145:2
152:12,13,19
153:20 155:3,
16,18,19 156:1
157:18 158:12,
21 163:5 164:1,
9 170:25 171:4,
25 173:7
177:12,19
178:4 181:24
182:7,18
183:14 184:10,
15,19 185:6,8,
17,25 186:1,5,
10 187:4 190:2,
4 201:9 203:6
206:10 209:2
210:2,5,6,14
211:14,16
214:2 218:21
223:17 224:14,

25 225:3 233:3
235:19 236:8,
19 247:11
252:4,5 254:2,6
261:5 262:1,7,
25 264:24
265:8 266:15
268:3 274:12,
21 275:11,17
295:3 299:17,
20,24 300:16
301:3,6,14,21
302:4,9 304:3,
11,14 305:2
308:7,14,15,19,
24 309:1 310:3,
7 311:2,17
312:8,9 313:10,
20 339:15,16

**detective's**
62:16,20
185:18,22

**detectives**
37:22 40:13
50:8 53:24
55:9,24 56:3,7,
23 57:6,8,14,22
60:9 61:4,17
62:14,18 65:17,
24 66:4,8
68:11,18 83:9
87:18 88:2,5,
16,22 89:4
90:9,19,22
91:1,5,8,14,21
92:6,15 94:5
96:3,25 97:5,20
98:12 99:8,13
100:18 101:10,
12,13 102:23
103:7,8,24
104:6,8,14,16
105:6 109:24
110:13 111:2,
12 112:10,14,
15 113:14
114:13,22
115:6 117:5,14,
17,19,22 118:3,
13 121:1,5,17
122:3,6,12,13,
22 131:13
140:14 142:8,
10,11 151:20
152:5,12,23

153:8,11,15
154:2,8 155:5,
22 156:5,7,21
158:6,8,18,23
159:16 161:10
167:20,24,25
168:11,22,24
172:4 175:24
176:10,21
178:10,25
183:9 184:23
185:2,11
192:24 193:1,
13 194:15
195:20,21,25
196:4,9,13,14,
20 197:1,2
199:25 200:21
201:3,6,12
202:3,8 211:9
223:8 228:22
229:3,17 230:2,
23 232:4,12
233:18 252:14
255:10 258:23
264:24 265:9,
25 266:3 275:9
276:6 287:3
299:18 300:10
303:1,7,12
307:22 308:15
309:2 310:23
311:5 312:11,
17 313:3,20

**detention**
156:10,12

**determination**
209:4

**determine**
203:22 221:2

**develop**
123:10,12,14,
16,18,22
176:23 177:21
203:1 205:9
207:11

**developed**
77:9 124:2,7,8,
14 201:24
205:20,21
262:24

**development**
120:13



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

differed 208:17

difference 45:5 282:12 292:3

differences 103:7

differentiate 282:12

differently 25:17 102:24 157:16 173:18 260:9 282:22

difficult 10:1,4 151:18 209:22, 24 221:2 223:23 237:16 296:21

difficulty 334:22 335:2

dignitaries 41:12

ding 154:22

dinner 36:11, 12,24 37:11,17, 19 38:4 39:9,12

direct 9:4 80:23

direction 154:12

directly 249:18 267:3

disagree 236:6 335:20

disagreed 291:18 292:22 338:6

disagreement 292:3,5,6

discipline 169:19 282:14 288:5 315:25 316:11

disciplined 315:13

disclose 68:19

disclosed 262:3 265:2,10

discovery 24:20 107:1

discuss 38:6 39:19 154:8

discussed 20:9 33:2 146:3 240:13 261:20 289:12

discussing 246:22

discussions 286:7

displaced 341:2,4

disposal 222:20

disposed 12:17

disposition 58:7,17 343:18, 24

dispute 236:6 291:9 318:8 325:18

disrespect 327:20

dissimilar 221:21

distanced 54:14

distin 41:11

distinction 44:24 45:5 49:17

distinguished 9:14

district 7:12,13 45:11 48:16,17, 18 56:13 88:1 99:24 246:8 277:18 333:13

districts 87:23

disturbance 318:16

divide 224:9

divided 224:8

division 7:13 49:2 53:7 56:15,17 58:2 88:19 95:2 99:25 100:1,10, 16,20,25 101:17,19 102:5,17 111:22 112:1,2, 5,13 113:3,4,12 116:7 117:6 151:19 152:12, 13,20 155:17, 18,20 157:18 158:12,22 170:6 184:19 185:6 210:2,3 224:25 261:5 262:1,7 263:1 266:15 299:18, 24 301:15 308:8,24 310:8 311:2,17 313:10

division's 112:23

divisions 109:14 110:10 155:3 308:15, 19 312:8

DNA 59:7 155:8 157:25 158:1

doctor 334:8 335:17

doctor's 341:14

document 24:12,24 25:22 26:5,9,16 64:4, 9 65:5,7 66:16, 22,25 67:3,10 69:17 74:1,24 76:14,17,22 77:2,6,9,12,16 78:20 83:19 154:16,19 190:11 191:19 192:3,9,11,12, 14 193:11 194:13 204:15,

18,19 214:17 243:3,7 246:17, 24 247:21 248:17 251:4,7, 15,18,19 258:24 268:18, 19 269:3,8 272:23 273:11 316:12,14 327:10,13 332:7 333:23, 25 340:23

documentatio n 55:25 56:4 63:10,15,17 64:2,12 79:4 82:8,13 83:5 84:2,7,13,16, 19,23 85:2,8,18 102:15,24 103:8 104:7,16 111:4 114:12, 22 115:15 157:19 161:9 184:1 198:17 243:25 244:10 257:16 259:6, 13 266:20

documented 64:24 65:6 74:8 75:9,16,25 77:21 78:24 79:7 82:2 86:3, 5,7,11,13,16,23 87:8,11,14 103:17,23 186:9,14 187:2, 16 189:11 199:18 217:19, 21 237:9 239:11,17,21 240:1 244:22 245:7 249:5 256:4,5,8,11, 12,15 257:9,21, 25 258:18 259:20,21 260:2,4,16,18, 23 262:3 268:7 325:23

documenting 55:15 66:13 69:12 155:11 156:9 238:18

258:10 260:11

documents 20:13,20,23,24 21:5 22:12,19 23:2,3,7,11,13, 14,16,20 25:10, 14,21 26:17 28:11 29:2,5,17 30:12,22,24 31:1,2,3,18 71:22 133:8,12, 16 173:10 250:12 302:22 303:3,8,18

door 156:14 157:19 319:21

Dorsch 273:24,25 274:4

dots 311:21 312:5,19

doubt 258:8,22

dozen 10:2,3 11:5 277:5

drafted 252:16

drafting 194:7

drawer 30:5 32:7

dreadlocks 220:5

drinks 35:2

drive 223:8,18

driver 232:24 284:7

driving 175:5

dry 278:5

due 52:4

duration 324:17

duty 97:25 156:14,16 327:21

duty.' 325:7

dynamic 336:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**E**

earlier 20:6
43:20,22 54:3
101:1 166:14
177:23 190:25
194:23 199:3
202:22 230:25
240:13 247:10
261:21 283:1
293:22 294:4,
13 295:1,24
296:3,10
314:19 334:5

early 51:19
147:9 280:6,24
286:5 289:6
290:9

earn 96:5,7

easier 190:17
191:3

Eastern 7:13

Echeverria
291:3

ECR 284:11

Ed 40:2,4,8,10,
20 47:18 50:19

Eddie 119:4
286:5

Edgewater
336:15

efficient 42:17

effort 97:2
152:24 158:3
159:2 183:9
283:13 309:3

efforts 95:11
96:24 156:25
189:13,19
232:17 304:13,
15

Efrain 241:1,
13,17

egregious
169:13 275:25

Eileen 7:21
19:15 189:18

343:9 345:19

Eileen's
108:25

elect 175:18

elected 170:13
254:17 338:10

electronic
345:5

element 286:8

else's 269:19
270:8,12,15
271:8

emanated
13:19

Emmanuel
291:11

employee
109:7 119:12,
22 142:20,23,
25 144:12
146:22 147:25
148:1,13,16,24
164:18,22
165:5 167:2,4,
10

employees
11:10 144:19,
24 145:10
148:12,19
166:12

employees'
145:10

en 126:6

enable 184:10

end 15:11
41:12 147:15
193:14,17,18
269:16 318:14
329:24

ended 122:5

ending 289:10
325:7

enforcement
45:13 285:8,23
288:22 294:2

engage 306:10

engaged 91:22
138:25 306:18

English 233:2

Engquist
18:24 19:8,17

enormously
286:13 287:9

ensure 57:16
60:17 67:12
68:5 69:12
70:22,24 71:5
172:1 219:16
220:21 222:5
265:1 267:22
268:4 282:8
287:23

ensured 259:5,
21

ensuring
288:3

entail 57:8

entailed 89:5

enter 49:2
120:11

entered 12:14

entering 325:6

enterprise
305:11,23

entertaining
274:6

entire 31:6
111:1 241:25
256:17 265:22,
24 267:8
289:21 292:12

entry 42:18

Epplen 50:17

equally 220:22

Ernest 35:6,7,
10,19 121:16
138:24 139:14
247:8 307:14

Ernie 121:5
122:22 129:25
130:4,16
138:16 163:25

164:2,8,12
193:9,14
198:11 201:4
217:14 226:5
240:22 247:4
249:8

eroded 285:3
297:20

eroding 294:5

error 160:3
161:8 249:14,
15,21

essentially
31:21 58:16
60:19 118:5
182:3 224:2
329:4

established
212:6,7 245:14

et al 7:11

evaluation
334:2 336:15

evaluations
62:24 63:3

evening 39:18

event 74:23
126:9

events 41:15
105:19 106:1,6
116:18 147:7

eventually
302:15,16

everybody's
203:20

evidence 28:6
123:10,14,18,
22 124:2,7,8,14
132:1,4 133:19
147:10 155:8
157:23 160:1
201:21,22
225:22 307:9
332:20 335:13
337:12,14,15,
16,20,21
341:16 342:2,4,
5

evidentiary
214:9,13

evolved
156:15 160:21
283:17 297:25
298:1

evolving
155:10,13
156:8 160:20

exact 155:18

examination
9:4 341:2,4
343:11

examples
59:10 104:15,
25

exceeding
156:11

exception
118:12 221:5
283:20

exceptions
75:20 171:14

excessive
14:7

exclusively
57:3,4 88:10,11
148:19 163:7
240:14

exculpate 86:4

exculpatory
86:10,16,24
87:7 261:20
262:2

excuse 8:12
30:21 73:8
101:4 131:9
197:17 207:18
217:9 253:6
287:11 294:5

exempt 94:2
109:1,2,4,5,7
119:12,21
142:20,23,25
144:12

exemption
112:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 470 of 782 PageID #:13728
The Deposition of ANTHONY RICCIO, taken on May 19, 2022
361

exempts 110:20

exhibit 190:12, 13 191:20,24 235:11 242:11 243:4,9 246:12, 15 251:4,5,7,10 267:17,18,21 268:19,21 269:4 272:23, 25 273:11,13 316:15,20

exhibits 190:21,23 345:11,12

exist 268:6

existed 291:4

existence 81:18 280:2 291:12

exists 85:22 86:6,13,15 213:1,6

exoneration 27:4 28:12

expanded 309:22

expect 82:7,13 147:2 167:2,11 230:3,9 257:8, 15 259:3,5 262:25

expectation 66:2 69:6 82:1 148:1,3 182:23 183:19 184:22 186:7 187:2,8, 13,20 188:5 189:1 258:17, 21

expected 76:17 183:15 260:19 303:9

expedient 17:25

experience 31:19 83:7 102:8 115:13 138:23 151:10

155:20 158:6 211:24 236:8 264:22 265:8, 17 293:14 296:5 311:18 325:4

experienced 294:13,15,20

experiences 116:16,24

explain 121:20 250:7 336:2

explaining 121:15

explains 59:18

explanation 59:4,9 247:13, 17 249:22

expose 156:21

extension 97:14

extensive 151:10

extent 16:13 90:18 107:21 108:14,20 115:13,23 136:17 151:11 180:19,20 186:13 225:18 232:21 242:18 258:17 260:18, 23 293:22,24

extra 125:10,11

extract 189:10

extremely 94:22 283:19

eye 287:11

eyeballs 191:16

eyes 172:23

eyewitness 202:9 205:18 231:24

eyewitnesses 136:4

---

**F**

face 202:15 204:17 205:13 206:24 219:9 241:15 320:9, 14 321:9,15,20 322:6 328:3 329:1 332:21 333:11,16 335:2 338:22 339:3

facial 220:10 221:18 334:2

facing 127:4 216:21

fact 8:16 29:11 34:4 39:17 50:8 74:2,5 98:22 133:22 135:5 144:16 149:4 166:15 167:4 172:6 196:6 198:14 200:12 208:19 221:5, 16 246:3 247:25 258:24 263:4,11 289:23 290:15 306:9 308:17 318:5 325:11, 24 326:14 329:6 331:23 332:12 333:5 334:17,25 336:11,18 337:2 338:17

factors 122:14

facts 13:7,8 90:3 99:13 131:23 135:11 237:15 287:2 316:9 323:20

factual 217:7

failed 250:17

failure 11:12

fair 16:5,6 17:17 18:3,4 23:4,5 27:21,22 32:2 56:17

64:10 65:8 67:23 73:24 74:1 75:2,3 77:6,7 79:11,14 80:23,25 81:3 84:13 102:25 112:24,25 115:12,18 133:1,2 160:9 196:14 199:14 222:12 227:6 229:8 243:25 248:8 282:25 289:5 290:18 295:11 297:8,9 299:3 309:20

false 284:2 323:11 325:25

familiar 54:12 262:6

familiarity 121:23

family 38:7,11

fast 15:19 209:25 252:21

FBI 307:1

feature 219:17

February 250:5

federal 307:5

feds 300:22 304:8

feel 138:22 242:1 257:2 292:17 293:19 297:1

feeling 97:8 162:25 281:11 290:16

feels 106:25

feet 220:20

fell 118:25

fellow 276:6 290:1 293:3

felony 195:2 207:22 208:9, 12,19,23,24

209:6,13,14 230:11,24

felt 79:9 96:14 173:3 290:4,7, 9,25 293:2,11, 16 294:7 297:2

field 71:18 263:2

fight 323:5,13 324:7 335:6 336:9,13 337:7 338:10,11 341:12,17,23, 25 342:3,7,15, 17 343:1

fighting 341:18 342:1,19,21

fights 322:22

figured 32:7 170:12

file 20:24 21:1, 9,10,19 22:22 23:21 31:6,11, 16,19 59:25 60:5 65:15,23 84:1 85:25 130:21 257:18, 21 258:9,15,18, 24 259:7,22 265:9,15,18,24 266:1,4,11,13, 17,21,23 267:8, 12 268:8,16

filed 24:9 30:10 279:22 291:1

files 302:22 303:8,19

filing 101:4

fill 52:9

filled 245:20

fillers 127:2,10 128:16,25 129:3,10,13,18, 22 137:7,21,24 138:14 215:24 219:24 220:2,8 221:4,21 222:5 223:1 224:23 225:19 240:15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 471 of 782 PageID #:13729
The Deposition of ANTHONY Riccio, taken on May 19, 2023

362

246:6,9 248:12

**filling** 155:12 250:25

**film** 201:24 202:5

**financial** 180:22 181:6

**find** 52:9 54:25 188:16 219:3 224:12 304:15 332:4

**finding** 153:18 166:17 169:18, 19 314:5 326:22,25 328:10,14 330:5

**findings** 166:15,24 167:2,8,12,16 309:5 311:16 312:1,9,16,24 313:3,22 314:6 340:18

**fine** 270:10

**fingerprints** 59:3,6

**finish** 15:6,12, 17 159:10 253:17

**finished** 172:17,25

**Fire** 41:16

**fireable** 284:3

**firearms** 309:24

**fired** 284:6,9

**firm** 145:13,17 282:20

**firsthand** 216:6 279:18 308:1

**fist** 324:4

**fists** 321:15,20 322:6 324:2 329:1

**flags** 174:2

**flared** 48:15

**flashlight** 321:1,2 322:11 328:3,16,20 331:24 332:22 334:6 335:8 338:18

**flip** 217:12

**flipping** 32:6

**floor** 301:9 303:25

**focus** 48:12

**focused** 282:7

**follow** 53:24 80:21 175:25

**follow-up** 121:23 343:13

**footage** 287:23 289:3

**FOP** 105:22,23 106:3

**force** 287:19, 20 332:13 335:12 337:9 338:15

**forehead** 221:17

**forgot** 110:17

**form** 22:23 28:8 29:21 36:6 40:16 49:20 55:7 57:9 58:21 60:21 61:6,18 62:2,7 63:13, 14,21 64:12,14, 20 65:1,4,10, 19,25 66:9,18 67:15,19,25 68:8,14,21 69:3,15 70:15 71:1,7,20 73:3, 25 74:10,19 75:4,10,17 76:1,23 77:18, 22 79:7,12,24 80:7 81:15,16 82:3 83:22

84:9,21 86:18, 25 87:9,15 89:6 91:22,25 92:9 93:8 94:19 95:12 98:16 102:9,10,19 103:1,9,10,25 104:1,9,10,17, 18 109:10 110:1,14 111:6, 14 114:9,14,24 115:8,19 116:3 118:9,21 119:16,24 121:3,18 122:9 123:7,8,12,16, 20,24,25 124:4, 5,10,11,16,17 128:20 130:7 134:15,16,25 135:18 136:16 137:4,5,18 138:19 139:2,3, 21 140:10,23, 24 141:6,7,14, 22 144:15 145:7,19 146:2, 18,19 147:5,6 148:8,9,25 149:1,9,10,19, 20 150:2,3 151:16,17 152:8 153:2,3, 16 155:24 158:17 159:20 160:18 161:2, 16 163:9,13,20, 21 164:10 165:2,23,24 166:11,18 167:5 168:12 169:1 170:9 171:11 172:5 177:1,15 178:8 179:4 180:17 181:21 182:10 183:1,21 184:5 186:15 187:18, 23 199:1 203:25 205:5, 25 206:14 210:25 211:1,6, 13 212:3 213:9, 16,23 214:12 218:25 220:23 223:16 226:2,7

229:6,10,19 230:6,13 231:19 236:5 239:12 242:17 254:5 255:18 257:11 258:4, 11,12,20,25 259:8,23 260:6, 13,20,25 261:22 262:18 264:1,6 265:4, 11,12,23 266:6, 9 267:25 268:10 276:8 280:5 281:6 283:9 286:2 289:13 290:2, 19 291:5,13 293:4 294:3 303:13,14 304:18 305:25 306:14,21 307:8,24 308:9, 20 309:6 310:18 311:11, 19 312:2,12,18, 25 313:5,13,24 314:8 323:18 325:20 326:3 332:6 335:3 336:22 337:4 340:20

**formal** 112:1 175:21

**formatting** 250:12,14,15

**formed** 287:18

**forms** 21:6 158:25 180:22 181:6 182:19

**forthcoming** 188:18

**forward** 27:7 185:16 227:3 280:23 284:20 285:24 306:12

**found** 30:9,15, 20 32:14,16 33:11,15 35:4,8 50:15 139:18 141:1,2 161:13 279:23 302:16

303:24

**foundation** 31:8 37:24 46:10 47:10 55:7 60:10,13 61:18 62:2 65:20 68:21 70:15 76:1,19 77:22 78:9 93:8 102:10,19 103:1,10 104:1, 10,20 105:2 109:18 113:6 115:8,19 121:3 123:25 124:5, 11,17 126:14 128:14 130:7 139:4 140:23, 24 141:6,7,14 142:12 144:15 145:7,19 146:2, 19 147:6 148:9, 25 149:1,10,20 150:3 151:17 152:8 153:3,16 161:2,16 165:2, 24 166:11 167:5,14 168:1 169:1 170:9 177:2,8,16 178:8,21 179:4, 14 180:8,16,25 181:8,15 184:5 185:3 189:22 193:22 194:2 200:9 206:14 211:6,13 213:3, 4,9 214:12 217:1 226:12 229:19 230:6 231:11 232:19 237:6 257:13 258:4,12,20,25 259:8,23 260:6, 13,20,25 261:8, 22 262:5 265:4, 11,23 266:16 267:25 268:10 277:13 283:9 286:2 291:5,14 293:5 295:18 296:7,15 300:8 303:14 304:18 305:25 306:6, 14,21 307:8,24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

308:9,20 309:6,
21 310:6,12,19,
24 311:12,19
312:2,12,18,25
313:5,24 314:8
326:20 335:3
336:22 337:4
341:8 342:12

**fracture**
336:16 337:2,5
341:6

**Francisco**
108:2 131:10
273:21 307:13

**Frank** 50:18

**Frankie** 273:21

**fraternal**
105:17 330:7

**free** 320:1

**frequently**
50:16 53:12
59:5

**front** 147:11
192:3 216:21
247:18 250:10
278:1 329:17
330:11,14,18
340:23

**frowned** 82:12
280:22 289:25

**full** 305:5

**function** 55:24
57:20 89:12
101:1,25

**functions** 58:1
105:19

**funeral** 35:21

**fuzzy** 44:16
87:25

——————

**G**

**games** 41:16

**gamut** 174:13
185:19

**gang** 13:20
44:11,15,20,21,

22 45:1,7,12,
13,21,22,23
46:1,7,8,13,18,
19,22,23 47:8,
9,13,15,19,24
48:2,3,7,10,15,
19,22 54:3,6,
12,23,24 55:5,
9,21,22 56:1,5
77:20,24 78:5,
6,11,18,19
80:4,11,15
81:3,6,8,11,13,
17,20,21,24
82:6 86:21,22
87:5,7 88:9
118:2 196:22
197:20 199:7
200:2,6 201:9,
12 224:25
225:1,4 244:16
253:8 254:13
263:14 298:21,
22 299:6,7
300:24 302:10,
18,23 303:4,8

**gang-related**
54:15,18

**gangs** 48:8,11,
12 54:20 84:7

**Gangster**
197:20 200:2

**Gangsters**
196:21 200:6,
14 261:19

**garage** 175:5

**gas** 174:5
318:2,6 334:4
336:21 341:20
342:8,17

**gather** 129:13
187:8 203:8,11

**gathering**
128:25 129:10
182:8

**gave** 30:3 33:2
59:10 216:12
278:19 292:12
319:18 323:10,
15,17,19 329:9
331:2,6 341:10

**Gawrys** 8:1
35:24 36:7
47:24 53:10,15
121:10 125:18
193:3 194:17,
24

**gear** 319:2

**geared** 112:8

**gears** 173:5

**general** 17:16
42:14 77:4,5,8
110:12 111:10
116:1,10 120:5
139:12 141:3,
21 142:5
151:25 160:14
171:16 184:14
185:1 214:2
219:2 256:21

**generally**
140:15 141:19
171:13 176:16
210:24

**generate** 56:3

**generated**
23:3,7 31:4
56:2 58:4,14
268:14

**George** 37:6,7

**Gerald** 230:1

**Geraldo** 7:11,
19 27:9 123:11,
23 124:3,9,15
126:1 131:18
133:4,22
134:12,23
135:4 137:15
192:21 200:12,
14,18 215:16
225:11,16
226:16,20,24
227:14 228:3,
21 229:2
230:17 240:8
242:15 245:13
261:18

**get all** 221:3

**girl** 130:25
131:4 199:7

**girlfriend**
188:14

**give** 8:23 12:19
41:13 43:5 76:8
89:4 94:11
115:9 162:6
169:8 170:22,
25 185:20
189:15 190:16
251:4 256:16
283:25 323:8
330:17

**giving** 92:14
196:10 227:17
302:22

**glad** 339:18

**glass** 127:4
128:3,7

**glasses**
221:19 334:11,
14,17,19
335:17,18

**goal** 336:8

**God** 19:22
33:21 67:20
281:2 283:23
294:17

**good** 8:3 16:10
23:1 38:10,13,
17 40:24 54:19
55:2 94:16
110:21 137:22
151:6,7,8 159:7
162:4 189:4
202:15 203:17,
23 204:17
205:13 206:4,
13,24 224:11,
12 274:8
284:21 285:19,
20 297:16
309:9,13 316:4
339:17,24
345:22

**goodbye** 34:18

**GPR** 64:24
74:8 199:9,18
258:2,8,16

**GPRS** 21:25
24:6 69:18

268:20

**grab** 58:14

**grabbed**
298:19

**grabbing**
243:2

**gradual** 283:21
285:17 294:5

**granted** 160:23

**graph** 267:4
271:7

**graphic**
223:18,24

**great** 72:11,12
221:4 250:13
288:2 332:16
338:4 344:24

**greater** 189:6
288:22 294:2

**grievance**
316:9

**ground** 14:20

**group** 36:12
37:2,11 50:7
120:7 170:1,3
223:9 294:7,8
296:20,23
297:1,18
298:23 341:24
342:8,9,10,11,
14,18,19

**groups** 99:21
174:17 299:2
303:21

**grown** 220:11

**guard** 267:4

**guarded**
179:25

**guess** 55:2
93:12 95:4
102:11,13
118:22 199:15

**guessing** 20:2
100:4 166:2
294:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 473 of 782 PageID #:13731
The Deposition of ANTHONY RICCIO, taken on May 19, 2023
364

**Guevara** 7:11
8:4 33:13,17,20
34:7,11,15,22,
24 47:8,12
52:18 106:24
107:12,16
121:5,16 122:7,
22 123:9 124:1
125:6,13
129:25 130:4,
16 135:25
136:4 137:2
138:15,23
139:9,18 140:1,
6,8,13,16,19
141:4,9,13,17,
21 142:1,8,18
143:3,7,12
144:8,16,22
145:2,14,18
146:12,22
149:18,25
152:7,15,16
153:1 163:4,6,
9,11,18 164:17,
22 167:1,10
193:3,14
194:17,25
196:2,7,18
198:11 201:4,6
202:8 216:7,10,
15 217:14,23
225:25 226:5,
19 230:2,16
233:3,18
235:19 238:24
240:22 241:23
243:20 244:8,
14 245:8,15,17,
23 247:23
248:3,7,9,11
249:8 252:5
255:11,14
258:23 259:14,
21 262:23
300:6 307:14
312:10

**Guevara's**
39:10 166:17
247:11 248:1

**guilt** 134:5,18

**guilty** 99:11
131:19 134:13
135:16

**gun** 174:4

**guns** 45:16
175:4

**Gus** 315:21
318:1,6,9,23
319:8,23 320:3
325:3 328:2,25
330:20

**guy** 37:2,5
50:17,19
101:11 174:3,4
185:22 222:22
274:3,6 282:18
284:3,8 299:10,
15

**guy's** 175:5

**guys** 37:4,16
49:23 50:1
51:10,20 52:4
53:16 95:17
97:11 99:11
151:2 164:5
222:18 223:9
224:8,9,21
252:18,19
301:8 342:10
343:9

———

**H**

———

**hair** 220:10,11
221:18

**hairstyle**
219:24

**hairstyles**
219:25

**half-a-dozen**
118:13

**half-an-hour**
162:7

**Halvorsen** 8:1
35:6,7,10,19
121:6,17 122:7,
23 123:9 124:1
125:7,13
129:25 130:4,
16 138:16,24
139:14 163:25
164:3,8 193:3,
9,14 194:16,23,

24 196:2,7,17
198:11 201:4,6
202:8 216:7,10,
16 217:14,23
225:25 226:5,
19 230:2
233:18 240:22
241:23 243:20
244:7,13 245:8,
15,18,23 247:4,
23 249:8 252:4
255:10,14
258:23 259:14,
21 262:22
307:15

**Halvorsen's**
247:8

**hand** 8:21
223:20 320:1
322:11 336:5

**handful** 117:22
118:12

**handle** 56:7
282:21

**handled**
282:21

**hands** 263:2

**handshake**
299:11

**handwriting**
268:25 269:14,
19,20,23,25
270:4,6,8,11,
14,17,20,23
271:1,4,7,13,
16,19,22,25
272:3,6 273:7,
12

**handwritten**
229:18,20,24
230:4 272:9

**hang** 189:8
344:16

**hangs** 228:7,
11

**happen** 53:22
55:11 149:4,12
154:25 188:20
209:6 275:1

278:1,3

**happened**
53:25 72:25
137:14,17,19
138:8 139:23
147:7 149:4
154:14 157:4
222:22 225:15
229:16 244:20
283:12 291:6
301:5,21 308:4
322:1 323:4,6,
13 335:6
336:20 342:22

**happening**
155:21 156:25
160:15 236:10
275:6 283:19
287:11 303:17

**happy** 256:16

**hard** 10:2 76:8
84:10 94:17
167:15 190:15,
16 191:8,15
209:25 214:19
223:16 243:2
252:21 264:7
290:13 316:25
317:1

**harder** 295:15,
16

**hardest** 94:6

**hate** 96:18
168:14

**head** 13:13
77:1 220:4,6,7,
11,25 266:22
274:17 277:17
298:7,13 319:7,
8,14 320:2,3
321:8 332:15
335:22,24
336:1,2,4,8,11
341:10

**headquarters**
223:18 281:21

**heads** 15:1

**health** 284:12

**hear** 14:25

73:22 74:18,25
76:13 137:8
138:11 140:5,7,
12 142:4
188:14 217:17
275:4 281:21
300:9 302:18,
21

**heard** 140:4
142:15 145:15,
20 146:5
200:10 203:9
300:13 304:6,9
335:18

**hearing** 166:25
328:11 329:13,
16

**heater** 89:22
90:5

**heavily** 208:14

**heavyset**
221:16

**heights** 221:2

**held** 13:14
42:19 44:3
111:19 114:2
120:4 169:25
329:16

**helped** 194:5
284:25 286:13,
15,23 287:8

**helpful** 42:15

**helps** 287:13

**hey** 52:8 58:15
62:8 76:12
94:25 95:17
97:4 110:21
154:8,18
173:24 175:14
182:1 184:12,
20 233:25
280:10 284:12

**high** 96:17
141:4 303:6

**higher** 45:8
106:19 109:2
143:8 279:4
295:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 474 of 782 PageID #:13732
The Deposition of ANTHONY RICCIO, taken on May 19, 2023

365

**highlighted** 268:13

**hired** 43:6 146:15

**Hispanic** 224:8

**history** 41:2

**hit** 161:5 320:8, 14,25 335:7 336:12

**hitting** 322:18 323:1 335:7,9

**ho** 83:24

**Hold** 339:22

**holding** 174:4 283:24

**home** 183:7 226:10,11 246:4

**homicide** 11:16 27:8,19, 20,25 36:24 38:23 39:7 40:13,19,20 46:9,20 49:18, 23 50:1 54:7 56:25 64:3,7 65:14 66:23 67:5,11,18,22 68:4,6 69:12, 14,20,25 70:6, 8,12 75:7,15,24 76:22 78:8 80:16 81:24,25 83:8 84:1,10 87:12 89:18 90:8,19 91:1 103:17 114:7, 13 120:18 121:2,8,11,14 123:1,5 131:7 147:15 168:9, 24 173:7 177:11,19 195:5 206:10 217:4 218:21 236:8 255:5,16, 22 256:9 257:9, 10 258:9 259:7, 19 264:17,20

265:9,14 267:5, 6,8 274:9 300:11 302:11, 19,22 303:3,8, 18,20 310:1

**homicides** 49:10,17 50:1, 5,8

**honest** 31:13 274:6

**honestly** 30:5 32:7 280:15

**honor** 182:9

**hope** 9:13 71:3 276:25

**Hospital** 336:15

**hospitalized** 212:13

**hounded** 61:8

**hour** 108:18 156:11 223:20 332:23

**hours** 19:23 20:1 51:12 97:23 147:13 156:11,13,17 172:9 215:15 228:17 249:13 327:25 328:23 337:13,19,24 339:16 343:15

**house** 44:23 45:10,18 47:13 48:4,14,25 61:13 72:9 173:25 175:3 284:14

**housed** 81:21 224:20

**housekeeping** 111:23 112:21 113:2,19,20,23 114:3,6,12,20 115:4,5,16

**hrs** 226:16 235:19

**Hugo** 136:14 233:13 235:20 236:23 238:18, 19 239:2,7,10 240:8,18

**hundreds** 14:5,6

**hypothetical** 61:7 65:20 71:8 72:5 73:4 74:11,21 75:11 76:25 80:18 82:4,5 84:5 98:17 121:25 161:2,17 165:3 167:14 168:13 183:22 185:4 205:6 209:21 212:4 229:21 230:7 237:14 257:12 261:23 262:19 268:1 303:15

———————

**I**

**ID** 190:3,6

**idea** 65:12,13 66:12 110:21, 22 164:17 176:3,22 178:16 213:7, 19,20 231:21 290:15

**ideal** 222:8

**ideally** 185:20 221:2

**identification** 79:1 190:13 204:10 206:5,7, 13 212:17 216:5 219:9 233:20 241:9, 15 243:9 246:15 251:10 269:4 272:25 273:13 316:20

**identifications** 133:1,14 241:19

**identified** 26:16 32:23 77:13 119:13 131:22 132:9 134:3,18,20 135:9,23 175:1 181:19 188:17 192:1 215:16 220:19 225:10, 16 240:8 241:5 243:5 245:13, 17,22 288:18 297:4

**identifiers** 183:10

**identifies** 180:1 244:7 330:8

**identify** 48:11 179:19 189:13, 20 190:7 193:1 202:16 203:13, 18,24 204:3,21 224:4 233:13, 22 234:1 269:25 270:3 298:3,9 311:23 312:7,14 313:18,21 314:5

**identifying** 137:15 244:4

**identities** 176:18

**identity** 179:19 189:21

**Iglesias** 7:11, 19 27:9,10,24 28:16 124:9,15 125:14 126:2, 13 131:14,19 133:1,4,15,22 134:12,23 135:4 137:15 191:11,21,22, 24 192:17,21 194:13 198:4 200:13,14,18, 21,22,25 214:16,22,25 215:2,12,16 216:7 225:11,

16 226:17,20, 24 227:14,19, 23 228:21 229:2 230:1,5, 18 235:13,17 237:1 240:9 242:15,25 243:4 245:13 246:12 261:18 268:22 273:4, 11,18 316:15 317:6 340:24

**Iglesias'** 27:4, 21,25 28:7,12, 19 29:16 123:11,23 124:3 228:3

**ignore** 96:16, 21

**Illinois** 7:13

**imagine** 290:23

**immediately** 208:12 332:18 333:15 337:18

**immutable** 220:17

**impact** 149:25 151:13 211:4

**Imperial** 196:21 197:20 200:1,6,14 261:19

**implementing** 286:8

**implied** 292:10

**importance** 337:19

**important** 14:24 15:4 65:7 66:16,22,25 67:3,10 68:5 69:21 74:14,17, 22 83:14,15,19 89:21 132:17 180:12 282:15 285:13 337:15, 21 339:17



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

impossible 167:17 168:15, 20 210:11 295:9 323:23

impression 292:12

improper 314:14

improve 148:15 158:3 159:2 160:16, 25 161:14 285:20

improvement 294:11 297:6

improvements 295:23 298:2

improving 288:19

in-car 286:22, 25 287:1,7 289:2

in-house 111:15

in-service 158:24

inaccurate 76:6

Inaudible 298:16 339:20

incentives 92:16

incentivize 92:6,11,13 94:15

inch-and-a-half 31:12

incident 29:8, 12 166:7 227:21 241:18, 20 283:22 301:7 315:21, 25 320:17 321:6,25 322:1, 8,14,21 323:22 324:7,16 326:9, 11 330:19 332:19 334:4,

18 337:18 342:22

incidents 54:15 166:5 283:25 287:17

include 88:9 101:21 216:13 247:11

included 247:15,16,25 248:20,23 267:12

including 146:13 268:3, 12 335:14

inclusion 248:8

income 41:18, 21 42:1

incoming 189:20 332:17

incomplete 65:19 71:7 72:4 73:4 74:10 75:11 80:17 82:3 84:4 98:16 161:17 165:3 167:14 168:12 183:21 185:4 205:5 209:20 212:3 229:21 230:7 237:13 257:11 261:23 262:18 268:1 303:15

incorporated 158:22

incorrect 249:23

Increased 48:19

increases 48:19

incriminates 229:15

incriminating 229:9,12,13

inculpateds 86:2

indenting 250:14

independent 46:16 132:24 133:3 136:21 165:14 169:3 319:10,16,24 320:4,12,16 321:10,17,25 322:2,8,13,20 323:3,6 324:18, 21 326:11,24 331:19 338:12 339:7 342:23

independently 20:11

indicating 204:9 255:15, 21 256:2 325:16 331:5

indication 194:20 252:16 263:7

indict 337:24

indicted 304:8

indictment 305:12 332:25

indifference 147:20

indisputable 287:2,13

individual 55:1 84:24 171:10, 18 174:9,11,16 175:12 178:5 182:6 184:8 186:19 187:1 188:22 189:11, 21 190:8,9 192:20 197:9, 12,14,17 198:3, 23,25 199:4 203:13 210:20, 25 219:15 241:12 273:20 323:23 326:19 328:16 336:7, 19

individual's 219:9

individually 128:3

individuals 73:21 84:3 108:4 111:20 128:18 135:22 170:3 171:9 172:2 173:21 174:8,25 175:8 176:18,24 178:25 179:11 181:19,20,22 182:20 184:8 187:8 188:6 203:16,22 206:12 208:9 210:16 219:3 224:22 232:17 241:22 245:2,3, 25 246:3,5 289:17,20 290:4,7,22,24 291:8 292:14, 17,25 293:10, 11,15,19 294:7 296:20,24 297:18 303:22 338:9 341:24 342:1,18,19

infer 197:21

informant 173:8,9,23 174:15,19 176:3,7,15 177:21 179:7, 18,21 180:2,21 181:7 186:8,13, 16 189:18 196:21 197:1,3, 7,8,13,19,22 198:4,9,13,15, 19,22 199:5,20

informants 173:16,18 174:9 176:9,11, 23 177:13,14 178:4,10,16,20 179:3,12 181:14 189:14

information 12:25 28:6 54:8

68:5,12,17,19 69:1,13 71:17 72:1,7,13,21 73:6,16 74:3,7, 8,16,17 75:1,8 79:19,20 80:6,9 82:1 83:13,15, 20 85:9,18,22 86:2,3,6,9,10, 12,14,16,21,23 87:4,7,13 124:19 130:23 132:8,15 133:20 135:14, 15 141:11 142:9 143:17 144:11,20,25 146:16,23 147:3 158:19 159:16 161:12, 13 168:10 172:10 174:1, 12 175:7,15,24 177:6,22 178:19 179:12, 13,16,23,24 180:5,12,15,19, 23 181:3,5,21, 25 182:8,13,18, 21,24 183:3,13, 15,18,24 184:9, 13,21,22,25 185:7,15,16,19 186:5,8,12,25 187:2,9,14,21, 22 188:1,3,8, 13,19 189:1,10, 16 197:25 198:6,12,15,18, 21,24 199:18, 19 203:2,8,12 204:9 216:9,12 230:9,14 232:4, 6 233:19 241:19 242:7 245:16,21,22 248:6 249:6 254:2,11 255:2, 4,20,23,25 256:1,6,7 257:6,8,19,23 258:15,16,18 259:4,15 260:11 261:16, 20 262:2,24 263:2 265:1,9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 476 of 782 PageID #:13734
The Deposition of ANTHONY RICCIO, taken on May 19, 2022
367

267:11,15,19,
23 268:6,15,17
275:16 295:7
303:9 308:3
323:10 325:25
326:1 334:7
335:16

**informed**
215:6 264:9
318:18

**initial** 21:23
24:2 74:24
122:11 157:25
169:9 204:7
309:25

**initially** 25:4
56:12 74:6
122:11,16

**initiate** 144:21
145:1 148:23
152:13,24
274:24 277:6

**initiated** 145:6
263:14 275:22
277:21 316:18

**initiating**
278:16

**initiative**
263:16

**injured** 325:5,
24

**injuries** 325:8
332:17,24,25
333:14,16
334:3 335:10,
15 336:20
337:17 341:7,9,
11

**injury** 324:24
325:2,12,17
326:5 333:11

**innocence**
134:5,19

**innocent**
135:17

**input** 92:22
237:17

**Inquiry** 272:8,

18,20

**insane** 284:22

**inside** 127:1
128:15 129:21
137:6 159:4
217:16 232:22
319:2

**instance** 12:7
42:21 94:8
165:22 175:15
260:5 275:10
276:5,12
309:19 315:18

**instances**
10:9,25 12:13,
21 13:3,16,18
17:12,19 18:1
81:5 104:15,25
108:19 149:5
153:8,10 154:1
160:11 167:22
177:20 184:11
236:12,20
240:1 275:15
276:19 279:8
307:21 308:18,
25

**instructions**
227:8,17,22

**insurance**
10:21 284:13

**integrated**
156:6

**intended** 43:20
112:9

**intention** 71:4
108:7

**interact** 299:1,
4

**interaction**
137:10 139:6
318:9

**interactions**
47:14 195:7
230:25

**interest** 77:13
89:23

**interfering**

300:10 302:11

**interim** 119:6
212:10

**internal** 11:13
140:8 144:13,
17,18,22,23
148:11,15,17
165:14 169:5
170:1,6,16
172:21 277:10
281:23 286:7
287:5 304:4
305:4 307:5
308:5 309:3

**internally**
148:7,11

**interpret** 18:2

**interpretation**
261:11

**interpreted**
292:19

**interpreter**
233:4

**interrogation**
308:7 309:4,18
313:12

**interrogations**
309:16 312:23

**interrogatory**
24:12,14,17,19
25:1

**interrupt**
116:13 161:22

**interview** 56:1
71:10,16 73:13
74:13 114:2
115:15 172:10
202:12 226:16,
18,20,22 228:4,
21 231:4,5,7
232:8,9 233:12
254:17 262:22
309:8,14
317:13 329:21

**interviewed**
17:12 73:15
75:7 79:15,18
82:10 125:1
202:9,13,20

203:5,7 225:21
231:3 232:3
233:3 317:9
323:8

**interviewing**
17:6 55:16
155:11 156:9
202:22 203:22
253:11

**interviews**
17:8 56:8 73:2
77:6 115:7
202:25 203:15
204:12 233:8,
10

**intranasal**
341:3

**introduced**
286:20

**introducing**
286:12

**inventory**
21:1,18,19
22:22

**investigate**
170:1,13
172:14 190:9

**investigated**
29:13 50:4,7
145:11 166:3,5,
7 169:3,4,6
171:8,9

**investigating**
45:20 165:15
170:6 171:25
172:2 182:17

**investigation**
23:4,8 27:14,
18,19,20,25
29:4,6,15,20
30:13,17,18,23
31:4 59:16
64:10,23 65:14
66:14,23 67:7,
11 68:6,12,20
69:2,14 70:19
75:2,8 77:10,14
81:25 83:11,20,
21 84:2,3,8,14
85:9,20 86:20

87:4 96:4
103:18 120:19
121:2,8,11,14
122:2,17,21
124:21,25
125:4 126:21
130:19,24
131:4,7 133:8
143:19,21,22
144:1,2,7,13
145:13,22,25
146:4,6,11
148:10,15,18,
23 149:6,15
151:12 165:13,
17 166:13,24
167:9 168:9
169:3,10,18
170:14 171:5,
17 172:11,16,
24 173:2
175:21,25
177:22 182:1
194:21 195:5,9,
13 202:3
227:24 231:8,
10,17 239:3,8
242:5,12 249:6
251:22,25
255:16 256:9
263:23 264:17
265:14 266:14
267:6,7 277:7,
21 304:4,20
305:5 306:4,24,
25 307:2,3,7,11
313:17,19,21
314:5 316:17
317:15 323:9,
10 325:22
338:1,5,6
339:12 340:12

**investigations**
40:20 46:9,20
54:7,18 55:5
56:25 57:14,17
60:17 63:18
78:8 89:18
102:7 114:8
143:24 144:18,
22,23 145:5,9
148:12 150:1
152:5,14
169:25 170:5
171:6,8 175:17



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

176:25 180:13
284:10,11
287:5,6 300:11
302:11,19
303:3 309:9,23
310:1

**investigative**
20:25 21:19
22:22 23:21
31:6,15,19 45:9
58:11,13 59:2,
24 60:5 61:12
63:18 64:5,9,23
65:6,15,16,23,
24 66:17,22
74:7 84:1 85:3
195:11 208:14
265:15,18
266:1,4,11,13,
20 267:8,12
268:7 339:14
344:3

**investigator**
17:17 64:3
87:13 182:17
262:8 274:9
323:16,19
326:13,16
327:1,12 328:7,
11,15,18 329:2,
5,8 338:2,3,4
340:11

**investigator's**
326:22

**investigators**
45:9,19 49:18
67:6 146:15
263:2 307:5
317:16 337:25
339:13 340:17

**involve** 108:2

**involved** 45:14
57:20 71:11
80:3 81:3 99:12
119:12,14,22
122:21 125:3
127:21,22,24,
25 130:19,24
145:2 174:3
175:16 177:4
182:14 264:17
296:22 304:17
318:9 337:6

341:13,17
342:3,15

**involvement**
80:10 87:5
89:18 90:19,23
110:11 124:24
131:6 136:25
194:6 195:8
215:2 225:18
232:21 237:24
242:4,19,22
255:15 302:12
306:3

**involves**
107:15 148:4,5

**involving**
108:19 144:7,
22 147:20
155:22 259:6
263:5 309:20
313:22 315:21
342:8

**IOD** 325:6,9
326:2

**IPRA** 165:15
169:4 287:5

**IR** 222:14
223:12

**isolated**
138:13

**issue** 61:10
76:3 113:23
335:5

**issued** 97:4

**issues** 55:15,
25 113:19,21
114:21 115:4
147:19 302:18

———————

**J**

**James** 324:24
325:14

**January** 44:2

**job** 44:7 89:5
92:7,24 94:7,16
274:10 284:15,
18 340:12,14

**jobs** 44:3

**Joe** 48:23
298:20 299:23
300:5,10 304:5,
7,9 305:6 306:9

**John** 37:7,8

**Johnson** 119:4
286:5 287:16

**Johnston**
274:3

**Jon** 310:5,11,
17,21 311:10,
14,16 312:1,16,
24 313:4,11,22,
23

**Josh** 18:23,24

**jot** 185:16

**judge** 156:16

**judges** 156:14,
15

**judgment**
12:14 42:9
153:19

**July** 94:12

**jumped** 52:2

**June** 192:3,5
195:16 202:8
215:1,14 218:2
226:15 228:15
235:18 240:6
243:6 246:14
249:12 251:13
252:11 253:21
254:1,22,25
255:3,10,13

**jury** 121:15
134:11,12
147:11

**justified**
332:14 337:10

**justify** 123:11,
15,19,23 124:3

———————

**K**

**Kato** 105:7,9,
10,14,17

106:15,21,23
109:9

**keeper** 333:17

**keepers**
333:13

**keeping** 122:4
155:20 156:1
160:14,19,21
317:20

**Kentuckiana**
7:5

**Kentucky** 7:7

**key** 307:13

**kick** 42:8

**kicking**
319:22,23
324:11

**kid's** 94:13

**kids'** 284:13

**kill** 215:17
216:8 225:12
240:9

**killed** 131:1

**killing** 199:7

**kind** 22:14
25:11 37:16
38:9 41:10,13,
17 43:1 48:14,
18 49:8 50:15
52:2,7 53:10,25
54:14 55:23
62:11 76:20
80:11 86:9
87:25 89:24
91:16,17 92:2
95:3,22 97:8
112:21 113:1,
22 114:5,18
118:22 120:8
121:21 138:12
144:21 149:6,
14,23 151:11
152:24 153:17,
22,24 154:13,
21 156:3,15
159:16 160:23
161:4,13
163:19 173:17

174:5,6,17
181:3 184:6
188:3 204:1
207:9 208:7,20
210:7 224:5,7,
9,10 229:16
256:13 263:18
264:4 274:5,18
277:17 280:13
281:10,16
283:14,17,21
285:1,16 286:4,
5 289:24
292:11 294:5
295:14 299:16
332:25 344:3

**kinds** 31:18
54:17 73:1
80:14 103:16,
23 113:25
188:6

**knew** 70:7,8
92:23 102:12
130:25 131:2,3
139:23 143:23,
25 163:12,19
199:21 200:12
222:18 255:4,
14 259:18
299:15 300:14
323:20

**knowing**
305:24 306:1

**knowledge**
45:20 54:20
61:21 130:23
133:15 134:4,9
137:12 140:19
141:3,12,16
142:7 149:3
151:21 216:3,4,
6 217:10,12,13,
22 225:14
231:9 233:15
235:24 236:1
238:19,23
239:1 240:17,
21 241:7
254:17 258:13
264:11,19,21
266:10 300:4,7
308:1

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**knowledgeabl
e** 54:21

**Kriston** 105:7,
13,17 106:21
109:9

**L**

**lack** 339:13

**Laquan** 283:7
286:24

**large** 120:7
168:4 267:2

**larger** 31:21

**lasted** 322:21

**late** 57:24 58:3,
4,13,15,18
59:13 60:3,7,8,
16,24 61:4,9,
13,15 315:19,
20 340:17
343:14,19

**latest** 254:1
255:3,13

**Latz** 195:2,5,11
230:24 231:1,3,
6,9,16,17 232:3
233:3 235:19,
24 236:2 249:1

**law** 145:13,17
151:24 153:23

**lawsuit** 11:1,9,
21,24 12:4,10,
13 13:4 27:13
29:24 30:10,11,
16 32:15,17,25
33:5,12,16 35:5
36:15 39:14,22,
24 116:18
154:9,23 291:1

**lawsuits** 13:5,
10 39:1,4 154:3

**lawyers** 107:3

**lax** 96:1

**layer** 295:16

**lead** 80:5,12,
13,15 81:1,2

121:1,5,7,10,
13,17,20 122:3,
16,21 190:9
255:15,20
257:6 258:10
259:6,19
262:14 263:5,7,
11,22 264:3,14,
18,20

**leads** 58:9 77:9
79:6

**leaf** 192:10

**leaned** 328:2

**leap** 204:2

**learn** 73:18
109:8 131:10,
12 139:25
145:24 156:25
157:5,11 158:3
177:20 284:17
301:25 303:2,
10 304:4 305:4

**learned** 30:11
68:5,12,19
69:2,13 83:16,
21 85:9,20
106:20 142:19,
21 143:2,6,11,
12,17 144:11,
20,25 158:1
163:17 164:18,
23,25 167:11
186:8,12 187:1
199:20 254:2
275:16 300:20
301:18,23
302:7 305:10
320:2

**learning**
132:25 142:17
158:12

**leave** 55:23
256:19 318:17

**led** 155:7
156:12,14
257:23 285:2
290:12 301:7

**Lee** 50:17,19

**left** 34:20
35:11,15,25

40:5,6,8 105:10
127:4 148:5
235:10 243:14
246:25 252:15,
19,20 314:25
334:6

**left-hand**
193:7

**legal** 142:2,5
261:23

**lengthy** 22:15
202:5

**lenient** 95:22

**letter** 344:2

**level** 90:15
93:20 113:17
115:14,25
143:8 147:3
152:2 189:7,9
199:4 281:24
295:9,15
306:18

**liability** 156:22

**lie** 281:9
284:15,17

**lies** 284:5,8

**lieutenant**
43:10,11 87:19,
22 88:5,8,15
89:3,19 90:8,
11,18 91:2,20
92:5,20 93:1,
12,16,24 94:9
95:9 101:1
103:21 104:5
109:15 153:7,
13 158:5 169:8
170:22 171:1
172:18 295:15
303:1,11 304:3,
12,14 305:17,
20 308:14
311:4,7,18,24
324:23 325:1,3,
12,15,19,24,25

**lieutenants**
93:20 158:11
159:17 170:20
313:9

**light** 133:18
165:20 321:1,2

**light-
complected**
222:3,4,6

**Lightyears**
281:2

**likeness** 219:4

**limit** 95:11
96:24

**limited** 97:7
110:2 215:2
222:23 233:2
242:14,15
296:19 297:3

**line-level**
118:5

**line-up** 226:17

**lines** 108:17

**lineup** 20:25
21:14 22:3
127:1,7,9,20,
21,24 128:9,19
129:19 130:5
131:23 132:9,
14,16,21
134:18 136:5
137:3,6,23
138:17 139:1
207:4,7,14,20,
24 208:5 209:5
210:9 211:2,3,
5,11,18 212:2,
14,23 213:2,14,
21 214:4,8
215:7,15,20,22,
23 216:2,5,13,
16,17,18,20,25
217:6,11,15,19,
20 219:6,12
220:14 227:9,
11,18,22
233:21,22,25
234:2 236:13,
15,21 237:5,12,
18,22,25 238:4,
7,10,13,14
239:4 240:6,8,
12,13,19,23,25
241:5,11,13,14
242:25 244:1,4,

12,18,22,23,24
245:2,4,8,14
246:1,6,21
247:10,15,22
248:3,7,9,11,
14,17,18,19,23
249:2,5,7,16,
19,20,25
250:16

**lineups** 120:22
126:23,25
127:13,15,16,
19,20 129:1,17,
20 130:1,17
131:5 132:12,
19,25 134:3,20
135:8,9,22
137:1 138:6,9
194:5 207:2
208:24 209:19
210:15 225:20
227:2 232:23
241:11 242:15
249:5

**list** 57:24 58:3,
4,13,15,18
59:13 60:3,9,
17,24 61:4,9
122:5,6 343:14,
19

**listed** 193:2,17,
18 194:1 196:6,
15 205:9
243:11 245:3
252:14 253:3

**listing** 248:7

**lists** 61:13,15
192:24 194:15,
16 195:2 244:3
246:25 247:4
248:17 250:5
253:2

**literally** 191:6

**live** 237:18,22
238:6,10

**lived** 179:13

**lives** 72:8

**locate** 232:17
341:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 479 of 782 PageID #:13737
The Deposition of ANTHONY RICCIO, taken on May 16, 2023

370

**located** 7:6
41:8 232:12
318:2 328:1

**location** 7:16
46:3,17 125:19,
22,23 341:12,
17

**lock** 204:6
205:17

**lockdown**
95:24

**lockdowns**
96:23

**lockup** 129:5
246:8 332:17,
24 333:12,17
337:16

**Loco** 253:8

**long** 13:13,15
19:20,24 34:5
37:16 41:1,2
63:9 79:10
97:6,25 100:7
113:9 117:8
126:8 129:6
142:7 144:17,
24 150:23
151:3 157:22
201:13 208:21
242:1 274:15
275:23 294:19,
23 302:8 306:5,
11,19 311:21
316:7 324:18

**longer** 20:1
30:1 34:4 61:3
117:17 314:18

**looked** 32:4
172:23 219:21

**loosely** 174:7

**lose** 85:14
156:20 157:15
160:1

**losing** 154:14
284:18

**lost** 154:9,15
155:5 157:16
159:24 298:18

**lot** 12:16,25
14:7 41:15 43:5
45:12,19 53:8,
13 57:19,24
58:1 89:11,22
90:10,14 91:18
96:14 99:16,17
116:15 168:16
172:16,23
182:19 191:15
201:25 204:12
217:3,5 220:12
224:20 280:22
283:11 285:1
286:15 336:21

**Louisville** 7:7

**low** 50:15 52:3,
5

**lunch** 111:18
113:24 114:2
150:13,17
151:2 162:23
164:16

**lying** 280:17
286:10

---

**M**

**made** 87:17
121:21 126:12
150:5 169:24
177:18 189:13,
20 209:16
218:5 229:13
241:18 282:2,
19 291:23
292:6,7,24
295:1 296:12
305:8 307:11
311:24 312:8,
15,20 313:18
338:13 343:18,
19

**mag** 321:1,2

**Main** 7:6

**maintained**
184:2 225:5
266:18

**maintaining**
181:21

**maintains**
176:17

**major** 285:7,
10,24 297:6,11
298:4

**majority**
293:18

**make** 15:6,11
42:22 57:25
58:9 67:1
89:13,14 94:2
95:11 99:15
120:8,14 127:4
150:17 154:11,
25 156:6,20,21
159:2 183:9
191:6 204:1,2,
10 206:5,6,13
207:12 210:21
219:11 221:7,8
222:12 223:1
227:3 232:16
233:20 241:15
251:19 260:9
264:9 282:16
309:3 311:9
314:22 317:19

**makes** 162:9
195:24 221:1

**making** 57:21,
22 89:10 99:16
209:4,17
233:15 288:19
325:2

**male** 334:1

**maltreatment**
327:21

**man** 50:15 52:3
315:21 318:15

**mandatory**
279:8

**manipulated**
136:14

**manipulating**
136:4

**manner** 57:23

**manpower**
45:11 89:9

**March** 95:15

**Margaret**
190:24

**mark** 190:12
243:4 246:12
251:4 267:17
316:14

**marked** 190:13
191:20,24
242:11 243:9
246:15 251:7,
10 268:19,21
269:4 272:25
273:11,13
316:20

**marking**
272:23

**Markus** 333:23

**match** 220:8

**material** 27:2
32:2 67:12 90:7
222:11

**materials**
28:11 31:22
32:11

**math** 100:8

**matter** 7:10
10:10 11:8 77:5
135:5 139:12
160:14

**mayor** 291:14
292:3,6,24

**Mcdonald**
283:7,10,12
286:24

**Mcgrath** 8:3,19
139:21 140:23
141:7 163:21
344:9 345:15,
18

**Mcmurray**
37:6,7,8,9

**Meaning**
236:13

**means** 14:16
173:13,20
197:22 212:17

338:3

**meant** 64:17
119:18

**mechanism**
264:25 265:6
267:22 268:2,3,
6

**media** 89:22
140:3,21,25
143:2 163:17
165:9 283:14
291:21

**medical** 16:18

**medications**
16:14

**meet** 37:17
300:6

**meeting** 18:18
19:3,6,12,13,
20,24 20:21
22:5,10,13,15,
18 23:2

**meetings**
18:11,14,16
20:4,5,8,18
39:21,23 89:11
281:23

**Megan** 8:3
343:9 345:14

**member** 87:6
196:21 197:19
200:1,6,14
253:7 254:3
255:22 257:24
261:18 263:13

**members**
45:14,21 201:9,
12 254:13
256:3 302:23
303:4,9

**memo** 59:15

**memory** 30:17
70:18 132:20,
25 133:4 219:2
232:7 233:7
242:4,11
253:10 297:15

**memory's**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

40:22

**mentioned**
39:17 54:3
286:17 290:10

**mere** 98:22

**merit** 92:18,19,
25 93:2,3,9,10,
11,12,15,18

**merits** 93:19
94:8

**metal** 332:22
333:10 335:7,8

**method** 223:12
277:15

**Mexico** 232:25

**mid-2000s**
288:21

**middle** 218:10
228:6 334:13

**midnight** 51:8,
9,11 52:6,14
164:4

**midnights**
50:16,17,24
51:13,24 52:10
53:11 97:18,25
98:8,14 163:8
300:1

**Miedzianowsk
i** 48:23 298:21
299:23 300:5,
10 301:8
302:16,21
304:5,7,9
305:6,11 306:9
307:7

**Mike** 195:2,5
230:24

**milestones**
285:16

**million** 343:15

**mind** 111:24
275:25 283:8

**mine** 82:7
236:17 271:8
272:13 273:8,
14

**Mingey** 40:3,4,
9,10,20 47:18
50:19 254:2,6,
9,16 255:4
258:24 259:4,5,
11,17,18,25
262:16,21,23
263:4,7,13,14,
21

**minimum**
29:16

**minute** 94:13
173:6

**minutes** 32:12,
13 147:14
150:21 151:4
159:8,10
234:10,13,15,
25 314:24
315:1,2

**Miranda**
154:17,20

**mischaracteri
zes** 119:16
291:6,14 307:9

**misconduct**
106:14,20
109:8 135:25
138:25 140:1,6,
8,13 145:11,18
146:13 149:7,
17,25 152:7,14
153:1,14
164:16,19,23
165:22 167:3,9,
23 168:8,23
169:10 172:14
274:12,16,22
275:11,17
276:7,14,21
277:8,10,11
278:9 279:15
280:4,9 281:25
282:11,12,14,
19 283:2 285:5
287:14 288:4,
20 289:1,11
290:1,17 293:2,
21 294:12,16
295:13 296:2,
10 297:7,12
298:5,11

**306**:13 309:20
310:5,11,16,21
311:10 312:16,
24 313:4

**misinterpreted**
119:17

**missed** 218:1

**misspoke**
343:21

**misstates**
40:16 66:19
141:23 159:21
166:18 171:11
178:9 205:25
239:23 254:5
278:22 289:13
321:22 332:6
338:23

**misstep**
157:21

**mistake** 159:2
282:16,19

**mistakes**
155:14 157:12
282:13,21

**mistreated**
275:4

**mistreating**
277:22

**mistreatment**
278:17

**misunderstan
ding** 98:25

**misunderstoo
d** 19:6

**modifications**
154:12

**modify** 153:22
154:24

**modifying**
110:11

**moment** 42:21
78:19 217:25
283:7,8

**Monday** 18:15,
19 19:20 20:18,
21 21:13 22:13,

18 23:2,12,16

**Monell** 116:23
147:10

**monetary**
12:23

**money** 95:18
180:6

**Monica** 27:15
120:18 133:22
215:17 216:8
225:12 233:14,
23 234:1 240:9
251:22,25
254:3

**monitor** 89:13

**Monterrey**
41:5,7,19,21
44:1

**month** 52:9
95:14

**months** 11:7
29:25 36:13
43:22 56:14

**Moore** 231:24
232:2,8

**Morgan** 324:24
325:14

**morning** 8:3
249:17

**mortgage**
284:14

**motion** 160:22
161:7

**mouth** 135:2
281:15 282:24
339:11

**move** 27:6
42:13 93:5
99:20 117:2
159:11 262:13
284:17 295:5,
14,22,25

**moved** 34:13
48:18 100:6
284:20

**movements**
127:4

**movementsh**
216:22

**moving** 71:22
83:6 85:13
106:18 320:6

**multiple** 50:14
53:23 55:16,18
82:10 165:21
166:6 210:25
211:25

**multitude**
122:13 160:2

**murder** 27:15
125:11 131:4,
19 133:22
157:18 173:7
176:6,11

**muscular**
299:10,15

**Myers** 37:3,20

**mysteries**
170:12

———————

**N**

**nail** 294:18

**named** 27:15
37:3,5 47:4
50:17,19
101:11 105:7
131:10 192:20
200:14 241:13
253:11 273:20,
24 274:3
315:21

**names** 33:4
37:5 176:18
187:13 192:24
193:13 245:25

**narrative**
195:16 199:6

**narrow** 57:11
102:2 284:24

**nasal** 334:6
336:15 337:2,5
341:2,5,6

**nature** 11:13
48:21 105:20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 481 of 782 PageID #:13739
The Deposition of ANTHONY RICCIO, taken on May 18, 2023

372

114:3 178:2
261:17 279:21
280:12 304:20
344:2

**nauseum**
245:14

**Navarro** 318:1

**necessarily**
73:23 98:19,23
99:1,10,16
155:25 171:20
183:25 199:3
220:9,24
221:13 258:1
259:12

**neck** 281:9

**needed** 70:17
75:16 77:21
90:1 97:12
98:21 103:16,
23 126:9
172:11 183:3
189:11

**negative** 79:1

**net** 42:4

**newly** 158:23

**news** 140:3
291:21 305:12

**nickname**
54:22,24 72:10,
22 200:2,7
253:8

**nicknames**
45:20 54:12,21

**night** 38:9

**nods** 15:1

**nomenclature**
137:25

**non-exempt**
109:3

**non-
supervisory**
118:7

**nonexistent**
280:16

**nonstop** 159:1

**Norman**
333:23

**North** 44:12,15
46:1,23 47:8,9,
13,15,19,25
48:22 328:1,24

**Northern** 7:13

**nose** 334:22
336:12

**note** 79:7
107:13 116:14
147:17 161:19
243:1

**noted** 334:21

**notes** 64:13,
16,24 71:5,11,
14,19 72:2,10,
12,17,19,23
73:1,7,24 79:21
80:6 142:24
199:11,12,13
272:10

**nothing's**
10:22

**notice** 94:13
147:19

**notification**
208:19

**notifications**
195:1

**notified** 29:24
168:18,19

**number** 7:14
11:25 12:1
106:14 163:3
165:7 183:7
184:14 185:1
189:21 250:18,
19 251:21
265:2,10,15
266:14,18
267:2 278:18
279:4,5 287:24,
25 293:7,8,9,18
296:20 297:3
316:17 317:4
327:4 330:4
333:12 341:19

**numbers**
72:16 246:5
251:5 273:5
292:25

**numerous**
13:25 264:24

---

**O**

**oath** 14:10,14

**object** 25:11
28:8 29:21 31:8
37:24 40:16
46:10 47:10
49:20 55:7 57:9
60:10,13,21
61:6,18 62:2
63:13,14,21
64:14,20 65:1,
10,19,25 66:18
67:15 68:8,14
69:15 70:15
73:25 74:19
75:4 76:19 78:9
79:12,24 84:9
89:6 109:10
113:6 114:9,24
128:14,20
138:19 139:2
144:15 146:18
150:2,3 151:16
155:24 158:17
161:16 163:13
164:10 168:1
170:9 172:5
177:1 178:21
179:4 180:8
182:10 183:1
187:18,23
193:22 194:2
199:1 200:9
203:25 213:9,
16,23 218:25
226:2,7,12
229:10 230:13
231:11,19
232:19 236:5
237:6 242:17
261:8 266:6,9,
16 276:8
277:13 286:2
289:13 290:2,
19 293:4 294:3
296:7 300:8

309:21 310:6,
12,18,24
311:11,19
312:25 313:5,
13,24 314:8
320:9,15
323:18 325:20
326:3,20 332:6
340:20 341:8
342:12

**objecting**
116:20

**objection**
26:24 28:13
58:21 66:9
67:25 68:21
69:3,8 71:1,7,
20 72:4 73:3
74:10 75:10,17
76:1,23 77:18,
22 80:7,17
81:15,16 82:3
83:22 84:4,21
85:5,12 86:18,
25 87:9,15
91:25 92:9 93:8
94:19 95:12
98:16 102:9,10,
19 103:1,9,10,
25 104:9,10,17,
18 105:1
106:22 107:2,9,
20 108:6,12,25
109:18 110:1,
14 111:6,14
114:14 115:8,
19 116:3 118:9,
10,21 119:16,
24 121:3,18
122:9 123:2,7,
12,16,20,24
124:4,10,16,17
126:14 130:7
133:24 134:15,
16,25 135:18
136:16 137:4,5,
18 139:3,21
140:10,23,24
141:6,7,14,23
142:12 145:7,
19 146:2,19
147:5,6,12
148:8,9,25
149:1,9,19,20
152:8 153:2,3,

16 159:20
160:18 161:1,
24 163:20,21
165:1,2,12,23,
24 166:11,18
167:5,13
168:12 169:1
171:11 177:2,8,
15,16 178:8
179:14 180:16,
17,25 181:15
183:21 184:4,5
185:3 186:15
189:22 205:5,
25 206:14
209:20 210:18
211:6,13 212:3
213:3 214:12
217:1 220:23
229:6,19 230:6
237:13 239:12,
23 254:5
255:18 257:11
258:4,11,19,25
259:8,23 260:6,
13,20,25
261:22 262:5,
18 263:9,25
264:6 265:4,11,
12,20,21
267:25 268:10
278:22 280:5
281:6 283:9
291:5,13
295:18 296:15
303:13,14
304:18 305:25
306:6,14,21
307:8,24 308:9,
20 309:6 312:2,
12,18 313:25
321:22 335:3
336:22 337:4
338:20,23

**objections**
107:10 161:20

**objective**
187:11

**obligation**
278:20 279:8

**obligations**
67:17,24

**obscenities**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 482 of 782 PageID #:13740
The Deposition of ANTHONY RICCIO, taken on May 18, 2023

373

318:16,24

**observant**
296:12

**observation**
295:1 296:4

**observations**
296:12

**observe**
295:12,16
342:20

**observed**
293:21 294:15,
21 296:3,10
342:25

**obstruction**
341:5

**obtain** 124:9

**obtained**
131:13

**obtaining**
123:6

**occasion**
209:8 222:22
244:17

**occasionally**
44:6 54:11,15
89:20 171:22,
23 188:19
201:22

**occasions**
13:25 222:17
318:17

**occur** 121:24
148:7,11
151:23 241:18
276:24

**occurred**
17:16 29:8
82:13 97:21
149:24 150:6
168:7 216:2
217:22 229:4,5
230:3,19 249:7
287:17 293:25
298:10 301:23
308:7,18
324:16 326:10
331:18 344:4

**occurrence**
184:17

**occurring**
61:24 129:23
137:9 177:25
301:24 334:4

**Ochoa** 136:15
202:9,12,14,19
208:24 215:16,
25 216:4,7
217:10,15,21,
23 218:11
225:10,16,23
226:6,10 231:4,
6 235:21
236:24 242:25
244:1 245:13,
16,17,21

**Ochoa's**
226:11

**off-duty** 97:22

**offender** 72:8
120:21 154:17,
22 155:6
157:19 204:4
217:4 233:22
238:1 257:19

**offenders**
254:12

**offense** 280:18
284:3

**offer** 135:3,16
138:24 139:5

**offered** 291:3

**office** 46:2
118:25 151:24,
25 169:7
170:23 207:17
224:16 267:3
327:15 334:1
341:14

**officer** 10:7,11,
15,18 13:1,20
14:2 17:4 18:5
32:19 33:24
43:6 44:4,9,21,
22 45:1 46:23
48:3,7 139:16
149:8 174:11
175:2,22 178:5

185:14 213:8
244:17 273:23
276:18 277:7,
18,22 278:8,17
279:7,15 280:1
295:3 298:22
300:22 303:7
305:22 306:17
307:19 309:20
318:1 324:24
325:2,4 327:16
329:11 332:14

**officer's** 48:10

**officers** 17:20
32:24 38:1
46:1,19 55:21
57:19 81:11
82:11 88:6,9,
10,11 107:11,
12 108:8,20
117:23 118:1,3,
11 140:14
166:10 169:22
172:2 175:24
179:1 280:4
281:24,25
283:11,24
284:1,11,23
286:9 290:1,9
293:3 295:17
299:7 302:10,
11,18 303:2
309:5 332:12

**official** 284:2
286:10

**oftentimes**
172:7 182:4
188:22

**OJ** 155:6 158:1

**omission**
248:5

**omitted**
247:14,17

**on-duty** 94:23,
24 120:24

**on-view** 45:15

**one's** 280:10

**one-third**
279:23

**one-time**
182:21

**ongoing**
153:17,24
154:14,21
155:15 156:23

**online** 7:4
223:15 266:25

**open** 91:23
217:7 319:21

**opened** 166:9

**opening**
165:21 278:10
279:7

**operated**
46:16 205:8

**operation**
89:13 303:20

**operations**
118:24

**opinion**
131:18,21
133:21 135:4,
16 138:24
139:5 163:4,9,
25 164:13
274:4,6,8
285:5,6

**opportunity**
99:9 203:24
205:23 242:10
256:16 330:21,
23 331:6,13

**opposed** 207:4
237:18 257:9

**OPS** 165:15
332:2 338:2
339:12,13
340:11,17

**option** 331:10

**options** 222:23

**order** 67:5,12
70:19 105:17
110:19 112:7
113:12,13
158:13 161:14
262:7,10 267:3
311:9 330:7

**ordering**
345:1,2

**orders** 110:12,
15,24,25
111:11 112:1,5,
13,24 113:3,4
116:1,7,11
120:2,5 262:2

**organization**
292:15 296:25

**organized**
117:12,20,24
118:8 119:25
120:1

**original** 24:2
216:22

**originally**
74:17

**originates**
147:9

**ostracized**
281:16

**outcome** 12:17

**outcomes**
154:2 155:1
158:7,13
210:15

**outline** 150:12

**overly** 87:3

**oversee** 40:19
89:12

**overseeing**
40:13 47:19
62:18 66:4
88:5,8,16,19,
20,22 89:4
91:21 99:22
100:9,15,20,25
101:16,18
102:4,17 103:7
104:6,14 105:6
109:13,23
110:9 111:2
117:11,17
152:4,12,23
153:7 158:5
167:20 168:11,
22 303:12
308:14 311:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 483 of 782 PageID #:13741
The Deposition of ANTHONY RICCIO, taken on May 18, 2022

374

312:10,17
313:20

**oversight**
118:20 170:23
172:16 248:4

**overstating**
32:3 161:4

**overtime**
94:18,20 95:1,
2,7,10,11,24
96:1,3,5,7,12,
17,18,25 97:18,
21 98:2,6,9,13
99:9 110:4

**owner** 277:20

**P**

**p.m.** 51:5 52:14
162:20 215:15
235:8 249:12
252:11 315:9
340:8 345:25

**packet** 32:6

**pages** 32:6
250:11 251:9
268:25 269:14
327:9

**paid** 174:24
175:8 180:6,14

**palm** 336:5

**Palmer** 199:8
228:12,24
229:4

**panel** 329:14,
17 330:3,4,9,
10,12,14,17,18,
21 331:2,6,22
332:4,10,11,16
335:13 337:7
338:5,14

**paper** 121:19
157:20 175:22
204:4 273:6
287:21 319:17,
25 320:5,12,14,
18,19,23
321:11,18
322:3,7,9,15,

23,25 323:5,7,
14,24 324:8,19

**paperwork**
58:10 90:6,11
155:12 266:19

**paragraph**
195:15 199:23
201:2 202:7
214:24 218:2,6,
10 225:6,7
226:15 228:1,2,
7,20 230:21
231:5 232:11
234:18,19
238:17 240:3,4
253:15,25
263:21 334:14
340:22 341:1

**paragraphs**
256:10,11,25
262:21

**paraphrase**
214:25

**parking** 20:3
33:21 278:25
336:21

**part** 23:3,7 31:4
46:14 48:10
64:2 78:23
97:12 98:24
106:4 110:17
112:10 113:20
148:19 160:3
161:8 180:23
183:9 199:9
204:22 207:11
224:13 242:4
248:5 249:21
250:22 262:8
282:5,9 287:12
290:10 294:14
301:6 306:12
341:25

**partially**
297:15

**participants**
216:21 219:16
220:22 248:14
341:23

**participate**
19:10 46:8,19

126:1 195:12
202:11,18
226:19 231:5
232:16 236:9
244:18 245:2
248:3,9 249:1

**participated**
127:14,16
129:10 131:5
195:12 215:21
226:21 231:7,
18 232:7,9
233:8,10
235:24 236:13,
20 239:4
240:14 242:12,
14 244:11
245:7 246:1

**participating**
67:6 129:16
236:3 329:20
342:25

**participation**
132:19

**parties** 8:15

**partner** 53:11,
19 185:10,11
252:20 284:5

**partnered**
53:16

**partners** 53:5,
7 54:10 274:2

**party** 25:20
279:20

**pass** 157:6
186:4 266:1

**passed** 184:22
259:14 262:22
265:18 266:4,
15

**past** 38:23 39:7
96:5 145:1
148:13 149:25
183:4 314:20

**path** 209:25

**paths** 36:2
164:13

**patience**

147:16 315:12

**patient** 334:20
336:19

**patient's**
334:10,14

**patrol** 43:6
44:9 53:8 56:12
57:19 87:24
88:6,8,10,11
93:5 99:24
118:3,11 179:1

**patrolman**
44:6 63:8

**pause** 196:22

**pay** 45:8
177:14

**paycheck**
284:13

**payment** 12:23

**payments**
181:6

**PDF** 345:12

**penalty** 330:6

**pending** 7:12
16:9

**pension** 41:24

**people** 36:12
37:2,11,21
49:19 50:7
55:16,19 57:25
84:14 89:14
92:23 128:24
142:1 170:1
172:25 173:17,
22 174:1,6
175:16 178:24
179:2,8 182:12
189:5 199:6
204:5 206:3
219:20 220:5
222:15 224:4
227:2 245:7
246:7 283:23
290:16 293:13
297:1 298:1
341:18,19
342:15

**percent** 47:6
59:11

**percentage**
61:25 278:17

**percentages**
62:5

**perfect** 162:12

**perfectly** 9:18
31:13 162:4

**perform**
272:20

**performance**
62:16,21,24
63:3

**performed**
129:9

**performing**
92:7

**period** 44:11,
14 45:4 47:25
51:25 57:7
88:21 100:21
101:15,22
102:3 167:20,
21,22 222:10
280:1 296:5,12
297:11 301:13,
18 327:17
340:17

**perpetrator**
203:13,18,24
205:20 219:15,
23 254:3 255:5,
21 257:24

**perpetrators**
263:6

**person** 54:23
72:15 75:6 80:3
81:2 85:10,19
86:3,5,17,22
87:6 131:14
171:20,23
172:7,8,9
174:20 179:20
180:2 182:2
183:11,16
185:8,21 187:9,
12 188:2 198:8
199:17 200:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 484 of 782 PageID #:13742
The Deposition of ANTHONY RICCIO, taken on May 18, 2023

375

203:2,8 204:8,
16 207:6 211:2,
3,10,18 213:22
214:10,11
215:17 216:8
219:5,7 225:11
226:22 233:14,
23 234:1 240:9
253:3,11 317:9
327:21 328:20

**person's**
204:17

**personal**
10:10,14 11:1
87:16 213:12
216:4 217:10,
13 225:14
233:15 235:23
236:1 240:17
253:10 261:3,
13 264:10

**personality**
299:16

**personally**
123:10,18
125:13 134:23
176:13 261:3
276:5,19
308:12 318:9
341:17 342:3

**personnel**
111:17

**persons** 77:13
232:12 244:4,
23,24 247:15,
22 248:7,17

**perspective**
96:2 107:13

**pertain** 256:21

**pertinent** 18:8

**perused** 30:4

**perusing**
31:14 32:1

**Peterson**
318:2

**phone** 19:10
33:8 182:16
183:7 185:9,10
189:21

**phones** 185:13

**photo** 78:20,
23,25 200:21,
22,24 205:10,
14 206:15,18,
21,23 207:2,4,
11,14,20,23
208:4 209:5,19
210:8,19,20,25
211:3,10 212:8,
14,18,24
214:10 218:11,
15,18,20,24
219:7,13,17,24
220:21 221:11,
15,20 222:4,10,
12,20,21
223:10,24
224:13,17,21
225:10,17,24
226:9 235:20,
25 236:3,9,20,
24 237:5,11,19,
20,25 238:4,6,
7,8,13,15,18,
20,24

**photograph**
220:3,9 222:17
223:6,7 333:14
335:14

**Photographing**
201:21

**photographs**
223:9 266:17
267:2

**photos** 22:2,3,
5,6,21 77:17
78:19,20,23
201:8,12 202:1,
6 205:3 206:6,
11,15,16,17
210:16,19,24
211:1,17 212:2
213:13,20
214:4 218:12,
17 220:13
221:9 222:13,
14,15 223:2,12,
13,14,19,25
224:6,17,22
226:6 239:2,7,
11,13,15,16,20
240:1 266:21,

25 332:18,24
337:17

**phrase** 118:23
283:3

**physical**
125:24 126:1
167:23 207:7,
14,24 208:5
220:14 237:22
238:6 299:10
332:20 335:13
337:12,14,16,
19,20

**physically**
146:13 212:13
307:13

**pick** 173:2
206:25 265:25

**picks** 92:23

**picture** 225:11

**pictures**
201:25 219:10

**piece** 72:21
218:1 253:1
273:6 320:13,
19,23 322:25

**pieces** 113:2

**pile** 31:14

**pin** 168:20
294:19,22
295:10 296:21

**pinpoint** 295:2
297:14

**pipe** 332:22
333:10 335:9

**place** 42:6
62:12,16,21
82:15 102:6
127:5 149:15
153:14 213:8
263:19 285:19,
20 289:5 297:5

**places** 89:15
151:22

**placing**
229:11,14,15

**plaintiff** 7:19
8:18 27:11

**plaintiff's** 7:17

**plan** 151:1

**planned**
108:18

**plastic** 333:24

**play** 92:25
122:25 123:4
126:4,21,24
168:17

**played** 92:20

**plead** 99:11

**pleading**
143:13

**point** 16:8 17:3
23:1,19,23
24:1,5 30:18
37:14 65:5
81:21,22 83:15
85:10,19 97:3
100:13,15
103:14,20
105:10 106:13,
17 109:1 110:8
117:10,16
119:11,14,21
122:1,10,12,22
130:21 139:15
145:12 163:16
169:17 189:25
199:14 227:6
229:8 245:12
257:2 264:16
280:14 283:18
285:18 286:9
289:16 302:17,
25 304:2,25
308:16 309:2
320:24,25
333:5

**pointed** 80:10
257:7

**pointing** 86:21
87:5 262:14
264:18

**Polaroid**
200:21,22,24
201:8,17,19

202:1 218:12
222:13 223:1,2,
4 224:17

**Polaroids**
223:11 224:15

**police** 9:14
10:7,11,15,18
11:1,9,13,20
12:10,14 14:2
17:4,20 21:6,8,
9,11,13 22:19,
21 23:3,8 27:14
29:19 31:4
32:18,24 33:24
36:21 38:1,15,
16,20 41:24
42:14,18 44:4
82:11 92:12
105:18 106:5,
19 109:7
118:20 126:17
131:12 139:16
140:9,13 141:5
144:13 147:20
148:6,23 149:8,
15,24 151:11,
14,24 166:10
169:16 174:21
175:7,24 180:1
192:1 201:17
211:25 213:8
226:10 243:6
264:23 267:4
273:23 274:11,
21 275:11,17
276:18,20
280:1,4 286:20
287:6,19
289:24 291:4
292:11 293:1
300:22 303:2
304:16 305:1,4,
22,24 306:17,
19 307:19,20,
22 308:6 309:5,
20 310:10,15
311:7,25 314:7
315:13 324:24
325:1 327:16
330:7 332:12
333:18 334:21
337:25 338:3
339:15

**policemen**



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

297:22,23,24
**policework** 36:17
**policies** 109:25 110:4,6, 7 111:3,15 112:1,22 113:16 114:6, 12,20 115:6,14, 17,24,25 116:9 119:13,23 120:4 155:10 156:18 261:7, 11 287:24
**policy** 66:7,10 110:3 116:6 119:13 156:12 157:7,9 212:5, 6,7,11,19,21 213:1,5,8 260:24 261:4, 10,15 278:5,6, 7,12 281:5 284:5,8 331:8, 12,15
**poor** 63:16 265:13 340:12, 14
**popped** 57:4
**portion** 265:18 266:1
**position** 16:23 35:15 41:6,19 42:19 44:1 47:2 100:24 101:9 107:14,19 109:6 118:15 137:1 216:23 231:15 284:12
**positions** 42:20 106:19 120:3 246:1
**positive** 79:1
**positively** 134:2,18,20
**possess** 254:18
**possession** 30:25 188:13, 19
**possibilities** 186:3
**possibility** 213:12
**possibly** 34:18 276:3
**post-conviction** 27:3 28:10 132:5
**post-traumatic** 334:2
**potential** 86:4 187:7 205:4 302:12
**potentially** 86:10,16,24 87:7 261:20,25 262:2
**powers** 169:16
**practice** 69:25 70:13 71:18 72:1,17,20,23 73:17 75:23 76:11 77:4,5,9, 12,16 79:17,21 80:5 87:16 102:7 110:23 203:7,19,20,21 205:15,22 207:18 214:3,5 218:23 223:24 246:5 252:13 260:10,24 261:3,13 264:10 267:7
**practiced** 211:15
**practices** 115:15 149:16 151:13 152:24 154:24 155:7 156:9 160:16, 25 161:15 309:4 311:17
**practicing** 102:16 214:2
**pre-trial** 28:18, 22
**preceded** 310:7
**predicament** 183:12
**Preliminary** 254:11
**prep** 39:22
**preparation** 20:5 23:19,23 24:1,5,8,11,21, 25 25:2 26:21 29:3,17 31:23 132:21 192:12 243:7 246:18 251:16
**prepare** 18:6 20:12 325:6,9
**prepared** 20:9 135:3 281:12
**preparing** 70:14
**presence** 20:13 98:21 125:10 278:3 279:16 287:2,7 288:1
**present** 18:18 19:7,9,13,15,17 37:1,3,6 39:25 107:3 125:24 154:19 217:4 221:20 224:12 233:17 244:17, 24 245:2 248:18,22 296:24
**presented** 132:2,5 165:8 168:16 225:24
**preserve** 157:24
**pretend** 337:14
**pretty** 41:14 92:11,23 208:19 291:6 332:22
**prevailing** 293:12,15 296:19
**prevalent** 289:7 292:8 293:17
**prevent** 16:15, 19
**previous** 200:1,5,13 249:18,20,25 298:20
**previously** 9:23 12:9,22 24:23 25:3,5 37:22 43:20 219:14 222:15 232:4 235:20 236:24 298:16
**primarily** 21:3 49:10 50:25 51:11 89:8,12 90:16 91:5 296:11 316:24
**primary** 203:1
**print** 223:20,25
**prior** 9:15 12:12 13:2,10, 16,17 20:5 24:23,25 29:4 40:23 63:6 142:10 152:18 163:16 186:23 208:15 233:21 283:10
**private** 41:8
**privilege** 25:12 136:17
**probable** 84:20 207:11
**problem** 8:14 235:1 292:8 293:24 302:3 304:7 340:16 345:13
**problematic** 213:15
**problems** 142:8 304:10 313:18
**procedure** 93:25 213:2 216:5 217:11 225:15 227:9, 11,18 235:25 236:4,21 238:18,21,24 240:19,23 244:12 249:2
**procedures** 136:5 155:10 227:22 236:9, 13 240:25 241:9
**proceedings** 7:1 27:3 28:18
**process** 60:12, 14 93:2,14,17, 21,23 127:6 128:3,6 129:10 132:5 266:3 332:3
**processing** 155:8
**produce** 25:21 26:17 267:8
**produced** 267:24
**production** 25:6,20 26:16
**profession** 297:25
**professional** 327:15
**progress** 342:17
**progressing** 60:19
**prohibit** 212:11
**prohibited** 300:18
**promise** 234:22
**promote** 11:12

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 486 of 782 PageID #:13744
The Deposition of ANTHONY RICCIO, taken on May 18, 2023

377

**promoted** 43:7,9,10,11, 13,14 44:10,18 91:6 100:17 158:23 305:20

**promotion** 93:2,3 94:8

**promotions** 92:18,19 93:9, 10,11,12,15,20

**pronounce** 9:9

**property** 61:13 101:4 170:25 171:1

**proportional** 116:22

**proportionalit y** 147:12

**prosecution** 99:2,4,7 265:3

**prosecutions** 180:14

**prosecutor** 65:16 68:17 266:15 268:9

**prosecutors** 67:13 68:7,13, 20 69:2 264:5,9 265:3,10,19,24 267:9,13,24

**provide** 29:23 41:11 54:8 59:8 70:24 73:16 140:18 175:6, 23 180:15 182:12,18,21 183:7,12 184:9, 21 189:6 194:19 198:18 224:2 252:15 277:1 331:6

**provided** 13:1 24:16 54:22 72:15 80:2 190:10 194:23, 24 198:15 199:5 204:8 216:9 221:14 232:3 245:22

246:4 256:6 325:16 326:1 335:17

**providing** 71:17,25 72:16 79:19 227:8 325:25 331:10

**proximity** 126:7

**public** 282:2

**publicly** 291:19,21

**pull** 191:2,10, 11 224:22 242:24 246:11 268:18,20 287:4,21

**pulled** 319:21 324:3 328:24 339:3

**pulling** 269:5

**pulls** 287:5

**punched** 336:9,10

**punching** 324:11

**punishment** 316:10

**punitive** 42:5,7

**purportedly** 225:16

**purpose** 203:1

**purposes** 9:16 27:17 123:6 133:12

**pursuant** 279:7 331:15

**pursuit** 284:5,8

**put** 30:5 32:7, 16 48:14 49:23 55:3 79:8 117:5 135:1 153:14 191:11 204:4, 10,23 213:8 222:9 229:17 247:17 252:18,

20 261:14 263:1 282:24 284:11 289:15 290:13 309:17 339:11

**putting** 78:13, 18 91:7 93:21 122:4 148:17, 22 273:2

**pyramid** 341:2

———————

**Q**

**qualify** 28:20

**quarter** 279:12

**question** 15:6, 10,12,15,25 16:1,4,5,9,14 25:13 28:5 30:7 36:5,6 57:12 63:17,24 80:24 85:15 87:3 96:22 104:12 107:7,22 108:24 112:12 119:20 124:7 125:25 137:22 162:2,3 166:21 167:7 168:14 178:13 186:21, 23 188:4 189:17 198:8 199:11 204:20 211:8 213:17 234:4 247:20 255:24 265:14 274:20 275:12 279:4 296:8 309:12 310:13 316:4 317:25 321:13 324:1, 10 325:21 343:13

**question's** 168:16

**question-** 14:21

**questioned** 237:2 253:21 254:25 317:14, 16

**questioning** 106:23 108:17 116:19 262:16 339:5

**questions** 14:22 16:11,16, 20,24 83:5 90:1 103:15,22 107:11,21 108:15 116:15, 21 136:10 147:14 150:16 163:3 164:15 183:5,11 188:7 203:6 256:20 298:15,20 305:22 314:11 315:11 339:8, 18 343:10

**quick** 82:15 208:19 272:24 288:7 339:23

**quickly** 41:1,3 268:23

**quoted** 321:23

———————

**R**

**R-I-C-C-I-O** 9:8

**R/dets** 195:20

**Rahm** 291:11

**raise** 8:21

**raised** 167:24 303:6 339:18

**rampant** 291:24 292:13, 21 293:1 294:6

**ran** 94:21 185:19

**range** 174:6

**ranging** 101:7

**rank** 93:9,10, 11,13 171:21, 23 295:20

**Rankins** 253:3, 12,21 254:17, 22,24 259:13 262:16,22

263:5,12,15

**ranks** 93:15,17 280:9 281:19 283:3 288:21 289:2,11 290:17 293:21 294:13 295:5, 13 296:3,10 297:7,13 298:6, 11

**rare** 42:21 94:8 168:6 183:5,11 222:17 244:20 283:19

**rarely** 52:25 163:6 164:2 244:19

**rate** 45:8

**re-ask** 119:20 166:21 186:20 188:4 265:13

**reached** 166:15 319:2 320:7,8

**reaching** 340:18

**reaction** 139:20,22,24 291:17

**read** 33:1,3 154:17,20 169:7 228:19 253:15 256:10, 16,21 257:3 263:12 307:17 323:4 324:20 326:22 328:12 332:1 334:3

**reading** 33:7 253:17 323:3 324:19

**ready** 162:25 163:2

**real** 95:21 188:18

**reality** 281:20

**realize** 157:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 487 of 782 PageID #:13745
The Deposition of ANTHONY RICCIO, taken on May 18, 2023

378

**reason** 16:22 37:10 52:8 66:16 67:16 70:22 74:23 80:2 112:17 172:15 196:12 205:7 212:15 236:4,6 238:5, 14,15 256:1 258:8,22 260:3, 10 275:4 300:14 301:11 302:4 341:12

**reasons** 66:21 67:8 83:18 84:14 160:3 161:8 180:11

**rebuild** 282:4

**rebuilding** 282:7

**recall** 10:9,12, 25 11:18,25 12:2,16 13:8, 12,22 17:15 19:22 21:2,12 22:11,12,14 26:7,19 28:21, 22 29:1,8,10 32:20 33:6 34:19 35:12 36:1,25 39:8, 11,16 40:5 47:1 52:16 57:2 62:4 63:5,7 91:15 92:2 102:11,20, 22 103:2,7,12, 13 104:3,6,14, 22 105:10,12 111:9 113:7 115:3 120:25 126:7,13 129:2, 3,6,11 140:11 142:6,13,21 153:4,5 168:3 190:5 195:7 201:15 202:23 210:10,11 211:14,20,21 214:5 228:15 236:3,10,12,19 274:14,15,19 275:2,6,10,20 276:3,5,12,19 278:16 290:11

297:10 299:25 300:3 301:4 308:22 310:20, 25 311:3 324:7 325:13 326:6,7, 10,15,21 327:2 329:19 330:9, 11,18,19 334:17,19,25 342:22 343:3

**receive** 25:9, 21 30:22,24 32:21 41:18,21, 24 62:24 63:3 312:22,23

**received** 25:16 32:2,11 33:11 45:8 80:9 95:13 198:21,24 199:16,17 326:12

**recent** 282:3,6 285:10

**recently** 30:12 282:3

**recognize** 33:4 204:14 252:7 268:24 269:13, 22 270:4,8,12, 15,18,21,24 271:2,5,8,14, 17,20,22 272:1, 4,6,13 273:6,8, 12,14

**recognizes** 269:19

**recollection** 10:8 12:8 13:6 22:15,18 129:8 211:23 315:17 319:4,9,10,16, 24 320:4,12,16 321:10,17,25 322:2,3,8,13,20 323:4,7 324:18, 21 326:11,24 331:19 338:12 339:8 342:23

**recommendati on** 327:16 329:12

**recommendati ons** 120:12,14

**recommended** 330:5

**reconstructive** 333:24

**recontact** 184:10

**record** 7:3 8:8 9:7 58:13 59:2 67:1 82:21,23, 24 107:10 116:14 147:18 162:14,16,17 235:2,4,5 243:1 288:10,12,13 309:15 315:4,5, 6 340:3,4,5 345:23

**recount** 323:22

**reduced** 298:10

**reducing** 297:6,12 298:5

**refer** 27:9,18, 23,24 191:8 327:5

**reference** 195:21,24 196:14 197:6 201:2,3,5

**referenced** 178:15 198:9

**referred** 9:12 52:11 198:3

**referring** 18:22 27:10,20,24 51:14 137:22 144:3,4 195:25 206:21 228:8

**refers** 334:4

**reflects** 306:11

**reforms** 298:3, 9 309:3

**refresh** 70:18 232:6 233:7 242:11

**refreshes** 242:3

**refused** 318:18

**regard** 10:10 13:2 63:17 133:14 136:13 139:10,15,19 143:13 238:17 280:3

**register** 165:7 177:14 179:2,7 181:14 316:17 330:3

**registered** 165:6 173:19 174:20 177:6 178:6,17,19 179:11 180:20, 23 197:23

**regular** 53:16

**regularly** 52:7 53:10 73:9 174:22 175:6 287:15

**rehashing** 38:10

**rejected** 326:18 328:19 329:12

**rejection** 329:5

**relate** 13:17

**related** 13:11 27:2 28:11,19 29:3,6,19 30:12,16,22 42:5 60:3 106:23 107:12, 20 116:15 147:14 231:10 263:22 312:5, 20

**relation** 310:4 311:6

**relationship** 36:4

**relevance** 76:4 116:19 118:10

**refreshes** 242:3

147:7,11 148:14

**relevant** 83:10, 14 107:17 116:22 147:19 180:13

**relied** 177:21

**reluctance** 280:8,11 283:2 285:4 288:20 289:1,10,20 290:16 293:2, 20 294:12,15 295:12 296:2,9 297:7,12,19 298:5,11 306:12

**reluctant** 204:5 289:17

**rely** 70:9,13

**relying** 133:11

**remain** 43:23 182:3,7

**remained** 43:9 56:19 100:19 119:5,8

**remember** 13:4 29:9,25 32:5 37:5 38:8 40:7,21 50:20 63:1,7 67:20,21 68:1 72:19 73:6 79:9 80:20 90:10 97:3 100:11 104:11 106:12 115:5 125:5 142:15 154:5 162:3 185:12 209:1 225:1 275:24 276:15 299:10 301:5,8,20,23 316:8,10 322:19 325:1 329:20 341:11

**remind** 51:1 109:3 189:19

**removed** 111:7 113:7 114:17 115:1,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 488 of 782 PageID #:13746
The Deposition of ANTHONY RICCIO, taken on May 18, 2023
379

10,21 262:11
281:19 295:17,
20,21 316:3,5,
11

**repeat** 41:20
75:13 87:1
107:8,22 128:3,
6 152:10
155:13 161:24
167:7 178:12
187:24 275:14
296:8 310:13
335:4

**repeated**
127:6

**repeatedly**
175:16

**repeating**
173:12

**rephrase** 16:2

**report** 20:25
21:16,21 22:23
23:24 56:2,3
59:14,18,22
64:19,25 72:3
74:9 79:8,11
94:23,24 95:13
101:8 132:16
184:1 190:20
192:2,20 193:4,
18,19,24,25
194:1,7,9
196:1,4,15,16
199:10,19
200:11 201:5
208:23 214:16
215:12 216:13,
25 217:6,8
232:6 235:11,
12 236:25
237:10 242:1,2,
3,10,20,25
243:5,16,18,21
245:4,21
246:11,13
247:5,11 248:1,
8,25 249:11,25
250:4,8,25
251:8,12,25
252:3,10,17,23,
24 253:25
255:3,9,14
256:8,15,17,21,

22 257:3 258:1,
2,8 262:14
265:1 267:16,
19,21,22
268:12,14
272:8 276:15
278:10,21
279:8 284:2
286:10 287:21
325:6,9 326:2
327:9 330:13
331:23 332:17
333:12 335:16
337:17

**reported** 46:3,
17 101:10,13
274:18,21
276:12,20
279:6 306:22
334:7 335:1

**reporter** 7:3,5
8:6,12,15,20
9:1 14:24 15:2,
5,20 82:21,24
161:19 162:14,
17 235:2,5
288:10,13
315:3,6 340:2,5
344:15,20,23
345:2,7,10,13,
17,19,22

**Reporters** 7:6

**reporting**
195:19,21,25
196:3,8,13,20,
25 197:2
199:25 200:20
201:3,6 230:23
232:12 306:19
307:6 324:25
325:3

**reports** 18:8
20:25 21:6,9,
11,13,14,23
22:19,21 24:3
29:19 30:4
31:12 57:17,18
59:16 64:13,16
69:17,22 70:1,
6,8,9,14,18,23
71:6 99:14
132:10,21,23
134:2 135:11

140:21,25
154:19 244:22

**represent**
146:11 256:14

**represented**
314:19 330:6

**representing**
7:5,25

**reprimand**
169:19

**reputation**
163:11,19
164:8,12 299:5,
8

**request** 25:20
26:16,17
223:19 272:20

**requested**
24:15 43:23
125:11 238:11
329:13

**requesting**
237:20

**requests**
24:12,20 25:5,
9,19

**require** 53:23
71:12 207:8
261:10

**required** 17:8,
10 64:1,4,8
66:7,15 68:19
69:1 96:4 99:15
102:23 169:19
215:7 262:2
278:9

**requirement**
64:18,22 104:8
207:16

**requirements**
63:10 102:15
103:8 104:16
111:4 112:2
114:13 116:6,
10 208:2,7

**requires** 262:7

**requiring**
237:19

**research**
120:12

**reserve** 344:12

**resist** 324:10
338:11

**resolve** 58:22
147:21

**resolved** 59:4,
9

**resolves** 59:18

**resolving** 60:3
108:12

**resource**
54:11 55:2 81:9

**resources**
176:24 177:13
180:22

**respectful**
9:18

**respond** 48:19

**response**
136:9 344:7

**responses**
25:1,3

**responsibilitie
s** 118:19

**responsibility**
101:3 109:24
117:4 121:23
122:1

**responsible**
61:23 80:15
81:2 151:14

**restate** 71:21
85:13 254:10
275:12

**result** 159:18
165:21 310:22
332:3 335:11
336:20

**resulted** 27:3,
8,21,25 28:7
79:1 132:6
158:7 165:11
297:6 307:6

**resulting**
288:19 311:15,
16

**results** 146:6
160:9 249:4

**retire** 43:17,20

**retired** 36:22
40:4,7,23 43:18
105:18 119:9
144:17,24
145:10 152:16,
18,21 166:9
305:2

**retirement**
44:5

**return** 127:5
216:22

**returned** 59:3

**revealed**
336:15 341:6

**review** 20:20,
23 21:8,20,23,
25 22:2 23:6,
10,15,20,24
24:2,6,9,12,14
25:22 29:18
31:13,17 57:17,
18 110:17
120:8 130:20
132:9,20 133:8,
16 134:2 145:1
172:16,20,22
194:9 195:2
208:10,12,19,
23,25 209:7,13,
14 230:11,24
233:6 242:10,
20 287:15,16,
19,20,22
304:13 316:16
329:14,17
330:3,9,10,12
331:22 332:3
338:14 341:5

**reviewed** 18:7
21:13 22:4,5,8,
19 23:2,12,14,
16,17 24:20
26:22 27:2
28:10 29:2,17
30:12 31:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

172:18 192:12, 14 236:24 243:7 246:18 251:15 338:6

**reviewing** 20:12 22:12 24:24 25:1 90:14 128:18 132:22 242:3

**reviews** 207:22

**revisit** 42:10

**reward** 94:5,16

**rewrite** 120:4,9

**rewritten** 110:16

**rewrote** 120:1

**Rey** 39:9 47:8, 12 52:18 107:12 121:5, 16 122:22 129:25 130:4, 16 136:3 137:1 138:15,23 139:9,18 140:1, 6,13 141:12 145:14,18 146:12,22 149:18 163:4,6, 9,11,18 164:14, 17,22 166:17 167:1,10 193:14 198:11 201:3 217:14 226:4 235:19 240:21 249:8 300:6

**Reynaldo** 7:11 33:13,17 135:25 140:19 141:4,9 142:18 143:3 149:25 152:7,15 153:1 163:4 230:16 238:23 307:14

**RFC** 191:11,20, 21,24 192:17 193:11 194:13 198:4 214:16, 21 215:12

217:21 235:13, 17 242:25 243:4 246:12 251:8 268:21 273:4,11,18 316:15 317:5 324:23 327:7,9 333:21 340:24

**rhyme** 52:8

**Riccio** 7:10,25 8:7,9,16,20 9:6, 8,9,12,19,22 42:13 82:25 107:5 147:24 150:22 162:18, 22 191:13 194:17 235:6 288:14 314:11 315:7 317:9 324:25 325:2 327:16 329:12 332:14 339:23 340:6,10 343:14 344:14

**rings** 33:8

**risk** 284:15,18

**road** 42:9

**rob** 56:22

**robbed** 174:5

**robberies** 60:18

**robbery** 40:19 56:22 57:5,21 63:12,19 90:22 155:6 224:18 254:23 303:17, 21 309:24

**Rodrigo** 251:20

**Rodriguez** 136:14 232:25 233:1,8,13,15, 19 235:20 236:23 237:4 238:19,20 239:2,7,10,15, 19 240:8,18

**Rodriguez's** 239:24

**role** 40:14 47:21 48:10 56:10 57:8 92:21,25 101:1 102:25 105:21, 23 109:17 117:8 119:8 122:25 126:4, 21,24 127:2 128:25 129:3,4 175:21 194:20 218:14 305:10

**roles** 95:9 103:21

**roll** 46:5 111:18 114:1 154:7 156:4 157:6 158:20

**rollout** 310:1

**Roman** 27:15, 18,19 29:4,6,19 30:13,16,17 120:18 121:2,8, 11 123:1,4 131:6,19 133:23 147:14 195:5 215:17 216:8 225:12 233:14,23 234:1 240:10 251:22,25 254:3,12,18 255:4,16,21 256:2 257:9,17, 21 258:2,9 259:7,19 263:6, 22 264:17,20 265:3 267:5,6, 8,12,23,24 268:7

**room** 111:18 127:1,8,9,17 128:12,16 129:18,19,22, 23 130:10,11, 13,14 137:2,7, 9,14,20,23 138:2,3,10,12, 16 154:16 215:24 217:16, 18,22 224:20 225:19 226:17 232:23 236:14

240:14 248:12, 13,19 285:20

**rooms** 114:2 155:11 308:7 309:8,15,18 313:12

**Rosen** 7:21 19:15,17 58:21 63:14 66:9 67:25 75:17 81:15 84:9 102:10,19 103:1,10 104:1, 10,18,20 106:22 107:10, 18 108:5,22 115:19 116:3, 13 118:10 119:16 123:8, 25 124:5,11,17 130:7 134:15 137:4 138:19 139:3 140:24 141:6,14 144:15 145:7, 19 146:2,19 147:6 148:9,25 149:10,20 150:3 151:17 153:3,16 159:20 160:18 161:2,16 165:2, 24 166:11 177:2,8,16 178:8 179:14 180:16,25 184:4 186:15, 18,22 189:25 190:21,23 191:1 211:6,13 213:4 214:12 229:10,19 230:6 234:7,12, 25 257:13 258:4,12,25 259:23 260:6, 13,25 261:22 265:4,12,21,23 267:25 268:10 273:16 278:22 280:5 281:6 283:9 291:5,13 293:5 295:18 300:8 303:13 304:18 305:25

306:14,21 307:8 309:6 310:13 313:25 314:9,18 335:3 336:22 337:4 338:20 339:25 343:12 344:6 345:21

**Rosen's** 107:18

**Rosendo** 136:14 202:9, 12 208:24 215:16 217:14, 20 218:11 225:10 226:6 231:4 235:21 236:24 244:1

**route** 126:6

**routed** 185:8

**rule** 14:25 15:4 65:4 77:8 157:8 171:16 205:16 252:21 283:20 284:1,2,6,10,19 285:8,23 286:10 288:23 294:2 327:18, 20

**ruled** 337:9

**rules** 14:20 102:14 111:22 281:10,11,14

**ruling** 153:23

**run** 45:15 174:12 183:3 288:8

**running** 305:23

**S**

**S-E-R-R/M-O-N-T** 251:9

**safe** 168:4

**Sanchez** 233:1,2,9

**Santapadre**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

203:6

**Sarge** 94:25

**sat** 337:13

**Sawyer** 199:8
228:12,23
229:3

**scenario** 76:5
169:12

**scenarios**
168:17,19

**scene** 21:23
24:3 53:24
73:10,12,13,15
76:13 79:16,18
89:23 122:12
124:22,25
155:8 202:1,23,
25 203:7,15
204:7 205:23
229:11,16
230:3,18

**scenes** 201:21

**scheduled**
20:6

**scheduling**
20:7

**scope** 149:2
305:5 306:2

**scratch** 273:4

**scream** 318:23

**screaming**
318:16

**screen** 191:3,
6,12 214:17
243:3 273:2,17

**screw** 284:16

**screwed**
157:20 284:15

**search** 173:21
277:19

**seasoned**
91:4,8,11,14

**seated** 221:1
318:15

**secondary**

201:22

**secondhand**
188:14

**seconds**
322:22 324:17

**section** 223:18
234:11 244:3,
23 247:15
248:2,7 249:6
253:2 267:4
268:13 316:23

**secure** 85:4

**securing**
145:2

**security** 41:5,
7,8,10,15,16,
19,22 44:1,7

**seek** 54:11,15

**select** 21:9,11
169:25

**selected** 94:3
216:7

**send** 110:19,24
173:1 344:17,
23

**seniority**
50:15 52:3,6

**sense** 41:13
42:14,25
150:17 162:9

**sentence**
215:5 218:6,7
225:9 228:8,14
231:23

**sentences**
218:7

**separate** 46:15
125:20 128:4,
13 165:22
175:11 268:14
303:21

**separately**
125:18

**separates**
174:17

**septum** 341:4

sequence
128:2 272:10

**sergeant** 34:9,
12,14,23 35:15
40:12,18,19,20,
23 43:9 47:4,5
56:9,11,13,20
57:1,14,20
58:23 59:1,15
60:16 61:8,9,16
62:17 63:9
65:15 66:3,8
87:18 90:15,21
91:2 92:5 93:6,
11,16 94:23,25
95:2 96:8
103:21 109:15
120:24 153:7,
12 158:5 169:9
170:24 171:2,3,
4,24 172:17,24
185:18 186:4
187:3 254:7,9,
16 255:3 259:4,
5,11 262:15,21
263:13,21
295:4,19 296:6
301:5,14
302:25 303:11,
16,17 304:3,12,
14 305:16
308:13 310:9,
14,23 311:2

**sergeant's**
103:6

**sergeants**
40:21 90:8
95:5,6,16
158:11 159:17
170:20 259:12
313:8

**series** 108:8
223:25 249:5

**Serr/mont**
251:8

**Serrano/
montano**
267:20

**serve** 121:7,10
316:10

**served** 316:5

**service** 328:1,
24

**serving** 121:13
179:20 180:2
206:10 210:14

**session** 14:22

**set** 23:16 25:19
32:11 37:17,19,
20 65:4 110:2,4
111:15 113:17
114:20,21
115:4,6,14,24
116:7,9,10
211:17 268:20
315:11

**sets** 112:1

**settled** 12:17,
22

**sexual** 309:23

**Shannon**
291:2

**share** 176:16

**shared** 146:1,
7,8,17,23
147:1,3 166:16
167:3,18
168:10,25
170:2 264:8
303:4,23

**sharing** 243:3
303:8 343:7

**shave** 220:4

**shaved** 220:6,
7,11

**shift** 51:4,5,8,9,
14,16,18,22,24,
25 52:7,11,13
53:2 94:22 96:5
164:4,6 274:1

**shifts** 50:21
51:1,2

**shoot** 215:17
216:8 225:12
233:23 240:9

**shooter** 134:3
135:9,23
241:16

**shooter's**
202:15

**shooting**
79:18 106:4,5,6
173:25 228:23
229:4,5,12
254:12,18
256:2

**shootings**
48:20

**short** 52:4
119:6 220:20,
22 234:8

**shortly** 29:23

**shot** 182:21
188:23 232:13
233:14 234:1

**shots** 220:25

**show** 78:11,22
96:16 190:11
202:2 205:3,10,
22 206:6,11,22
207:6,10,14
208:4,5 209:5
210:8 211:1
212:14,17
222:20 234:2
335:15

**showed** 77:24
226:5 235:19
239:6,10,13,16,
20 267:17,21
333:15 342:18

**showing** 82:6
191:19 210:15
211:16 212:1,8
213:12,20
220:25 243:3
251:6,24 252:3
268:19 272:23
273:10 316:12,
13 332:24

**shown** 77:17,
20 78:5,7,21
81:25 212:24
214:8,10
218:11 226:9
237:4,18 239:2,
15,25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 491 of 782 PageID #:13749
The Deposition of ANTHONY RICCIO, taken on May 10, 2023
382

**shut** 217:7 281:15

**sic** 7:7,8

**sick** 52:5

**side** 32:16 44:23 45:10,18 47:12 48:4,13, 24 61:11,13 128:9 193:7 217:12 319:7,8, 13 334:6,21 341:3

**sides** 334:22

**Sidley** 145:13, 17,25 146:11 166:16 167:9

**Siemieniak** 330:7

**sign** 172:19,20, 22 193:4 243:18,21

**signature** 193:6,7 243:14, 15 247:2,7,8 344:12,19,20

**signatures** 252:8

**signed** 243:22 247:9

**significant** 72:16 292:25 293:7,8,9 298:4 336:19

**silence** 280:3, 8,10,20 285:3 291:4,12,23 292:11

**similar** 219:10, 20,25 220:13, 14 222:16 335:9

**similarly** 15:14 69:6 220:15

**simple** 199:6 268:11

**simply** 170:13 173:11 179:17

189:8 205:16

**Simpson** 158:2

**Simpson's** 155:7

**single** 160:6

**sir** 9:25 12:5 17:1 18:5 26:25 28:2,14 29:21 31:9 37:25 40:17 41:4 46:11 47:11 55:8 57:10 61:7 130:18 167:14 168:2 181:2 192:4 194:3 196:23 232:20 233:4 239:13 240:10,11 242:17 243:6 245:5 246:17 315:12 316:19 318:3 324:13 325:7 341:6

**sit** 71:13 115:10 131:1, 17 133:18,21 135:24 136:8 150:6 154:7 169:12 276:4,9, 11 301:11 302:3 304:22 311:23 312:7, 14 319:12,15 322:4 323:21 337:24 338:16 342:24

**sitting** 102:22 130:9 133:15 135:3 136:3 138:22 213:11 214:7 320:19 321:21

**situation** 71:9 188:10 210:12

**situations** 169:11

**skills** 274:9 339:14

**skip** 272:9

317:19

**skipped** 240:4

**skirt** 157:14

**slow** 15:20 95:19

**small** 12:1 38:11,21 72:8 169:25 170:3 293:18 294:7 296:20 297:1, 18

**smaller** 191:15 294:8 297:19

**smart** 279:17

**smartest** 165:25

**Snake** 199:7 200:2,7,10,12, 18

**snap** 223:9

**so's** 175:5

**socialize** 34:24 35:19

**socialized** 36:3,7 40:10

**solemnly** 8:21

**solo** 53:12

**solve** 123:4,5

**solving** 122:25

**somebody's** 173:25

**someone's** 207:13

**sort** 27:6 28:4 36:3 41:11,12 42:15,17,19,23 48:11 49:2 53:16 58:7 59:17 61:12 82:8 89:5,21 91:10 92:16 95:10 141:16 153:18 168:5 169:14 174:22 175:20 177:6 223:16 277:7,

10 282:7 283:8 285:3,5 288:1 304:20 307:1 338:4 343:22 344:1

**sought** 84:24

**sound** 291:24 292:7

**sounds** 105:13 345:22

**source** 96:12

**sources** 42:1

**Spalding** 291:2

**spam** 33:10

**span** 168:4

**Spanish** 17:1, 4,7,13,20 18:2 253:7 254:4,13 255:5,16,22 256:3 257:7,20, 25 259:6,19 262:15 263:5, 14 264:3,18

**sparked** 281:3

**speak** 17:1,7 18:2 32:18 60:1 66:10 122:6 176:12 188:9 190:6 219:2 236:16 259:2 260:17 264:12 278:19 281:16 340:21

**speaker** 17:4

**speakers** 17:13,21

**speaking** 17:6 253:11 304:21

**speaks** 74:6

**special** 94:11 101:5 110:12 111:11 112:1,5, 13,17,24 113:3, 4,12,13 115:25 116:7 120:2,5 262:1

**specialist** 44:21 45:2,23 47:12 48:2,4, 13,24 54:3,23 298:21 300:25

**specialists** 45:8,18 46:8,13 47:19 54:7 55:10,21,22 56:1,5

**specialists'** 225:4

**specialize** 48:7

**specific** 30:17 102:23 113:4 139:9 184:14 262:9

**specifically** 17:15 20:24 31:22 40:6 98:14 111:16 112:7 152:18 176:20 180:1 261:15 262:9 341:25

**specifics** 20:7 43:2 140:17 154:6 178:1 276:25

**speculate** 194:4 197:11

**speculating** 128:23 152:1

**speculation** 165:12 167:6, 13 193:23 194:3 213:4 214:13 230:7 237:7,14 258:11 259:9, 24 260:14,21 261:1 263:9 265:5 306:15, 22 314:1,9

**speech** 291:11

**spell** 9:6 47:4

**spelling** 345:24



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

spend 35:1
108:10 339:15

spending
95:18 116:21

spent 32:1,9,
10 190:7
277:24

split 46:3

spoke 34:6
36:9 40:2 74:2
76:11 181:24
195:10 231:21
233:2 241:21

spoken 33:19
35:10 226:24
227:9

spread 205:10,
15 206:18
218:11,15,18
224:13 314:6,
10

spreads
218:20,24
223:10

stack 30:3

staff 57:22
118:7 147:4
158:14

staffing
110:18,20,25
119:13,18
120:7

stamped 251:8

stand 156:2
215:7 221:9
319:12 320:13
322:5,24 323:2

standards
114:22 327:15

standing
107:20 108:6,
12 174:3,4
339:6

stands 220:7
221:8

start 42:18
51:5,19 153:9,

10 174:14
176:1,2 192:15
234:21 250:25
286:19 298:18
321:14

started 15:14
51:10,19,20
52:14 122:11
140:3,22 286:8,
22 294:1,9
319:1,22,23

starting 7:17
275:9 289:5
318:14 324:9

state 7:15 8:7
9:6 38:15
156:13 161:13
212:16

state's 97:4,9
98:21 202:2
207:7,12,16,25
208:1,4,6
230:10 237:21,
23 238:9 267:2

stated 177:23
194:22 202:14
233:13

statement
131:13 160:23
204:23 229:14,
18,20,24 230:4
233:16 286:12
292:10,19
318:21 319:7,
11,13,17,19,22,
25 321:19
322:5 323:15,
19 324:5,15,23
325:16,18
326:18 328:15,
19 329:5,9
330:8 331:2,7,
10 332:2,20
339:6

statements
286:8 287:14
288:3 330:17
338:13

states 7:12
241:12 252:10
261:15 319:1
333:25 334:10

stating 107:2
131:14 161:5
233:20

station 126:17
174:5 226:10
318:2,6 322:17
328:1,24 334:4,
21 336:21
341:20 342:8,
17

statute 309:19,
25

stay 55:12
100:7

stayed 43:21

steady 44:8

step 127:3
128:2 158:10
227:3 285:7,10,
13,24 286:16
288:19,25
289:9 297:12
298:4 309:10,
13

steps 63:18
64:5,9,23 65:6,
16,24 66:13,17,
22 67:4,10
83:19 85:3
144:21 145:1
172:1 195:11
208:14 298:3,9

Steve 36:3,7
47:24 53:10,13,
15 121:10
125:18

Steven 35:24

stick 275:25
281:9

sticking 113:2

sticklers 95:21

sticks 277:16

stipulate 8:15
291:3

stipulated
8:17,19

stolen 175:5

303:3

stop 100:15
318:17 343:6

stopped 63:1,
2,6 81:17

stops 175:14

stories 38:7,10
143:3

story 55:18
287:13 332:25

straight 237:24
284:24

street 7:6
41:13 129:13
174:2 185:12
196:22 197:20
200:2,6 223:6,8
253:7 254:13
263:14 295:9
296:1

streets 281:19

stressed
155:15

strictly 94:2
197:24 219:9

strike 13:17,24
22:10,11 23:15
24:25 29:15
35:18 39:23
50:22 57:13
62:15 65:13
69:19,24 70:7
72:15 74:14
75:6 77:5
79:16,17 80:24
81:11 83:7,25
88:14 95:8
96:24 99:19
103:4,14 105:5
109:13,23
111:10 115:4
118:5 120:17
122:3 123:5
126:12 127:12,
23 129:9,17
134:21 135:1
140:6 141:18,
19 146:10
148:4 159:14
162:2 171:7

180:20 181:20
184:20 189:16
195:20 196:13
198:2,17
199:16 205:21
210:6 216:3
217:13,20
219:13 220:18
226:23 229:14
238:12 239:6
242:9 259:18
260:8 265:7
266:12 285:23
291:9 299:18
304:13 311:6,
15 313:7,18
320:24 324:1
328:16,19
335:24 336:1,4,
6,8,11 338:17,
21 339:2
340:10

striking 324:2,
4

stripping
169:15

strong 299:9,
15

strongly
335:20

struck 319:6,8,
13 326:14
328:3,25
331:23 332:21
333:9 334:5

stuff 38:12 90:3
115:16 227:3
250:14 281:23

stun 320:2,3
321:8 332:15
335:22,24
336:1,3,4
341:10

subject 115:17
158:19 166:13
286:11 324:24

submission
59:13 60:2,4
192:2 248:2
251:12

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 493 of 782 PageID #:13751
The Deposition of ANTHONY RICCIO, taken on May 19, 2023
384

**submit** 58:10
92:24

**submits** 338:8

**submitted**
24:13 25:4,6
58:23 59:1,7
194:10 243:6
246:14 249:11
252:11 255:10

**submitter**
247:5

**subpoena**
96:15,16,21
97:4 98:1

**subpoenaed**
97:5,12

**subsequent**
180:13 328:11
336:14

**substantially**
293:25

**substantive**
20:16 71:17,25

**substantively**
72:24

**success** 97:7

**successful**
161:7

**successfully**
99:8

**sudden**
337:15,21
338:4

**suddenly**
283:23

**sued** 10:13,17
30:21 39:13

**suffer** 16:18
281:12 315:24
336:19

**suffered**
325:12,17
326:5 333:7

**suffering**
325:8 335:1

**sufficient**
135:15

**suggesting**
254:2 255:4

**suggestions**
110:20 120:8,
11

**suggestive**
219:5,11

**suit** 156:11

**Suite** 7:6

**suits** 143:24
144:3,5,6

**summary** 42:9
228:3

**summer** 43:23

**superintenden
t** 43:15 94:1,3
119:1,2,7
141:5,9 145:24
146:1,4 169:15
281:4,18
287:16 305:3

**superintenden
ts** 141:11

**supervise**
178:25

**supervising**
56:21 57:8,13
87:18 90:21
106:12 109:14
153:8 171:10
309:2

**supervision**
168:24

**supervisor**
50:13,16 56:16
57:6 58:2 66:2
69:7 83:8
109:13 111:2
122:6 153:12
155:16 158:11
171:17,22
185:23 186:1,9
263:1 264:24
265:8 274:23
276:13 277:2,
25 278:8,9

**sufficient** ... (continued)
279:9,16,18
296:14 305:10
325:4,6

**supervisors**
47:1 50:14
60:25 91:3
155:17,20
157:1 160:13,
24 161:14
172:3 278:2
313:7

**supervisory**
34:8 47:21
56:10 103:20
109:16 110:9
171:18

**supp** 204:7,23
217:6 249:19,
20 250:16

**supplement**
24:16

**supplemental**
59:17

**supplementar
y** 21:14 24:3
59:13,21 64:19
69:17 132:16
184:1 192:1,19
199:10,19
243:5 245:4
246:13 251:8
256:8 258:1,2,8
267:16,19,21

**supplemented**
45:11

**supposed**
58:6 168:10
268:7 278:5
338:8

**suppress**
160:22 161:7

**surely** 15:10

**surgery**
333:24

**surprise**
146:21 306:17

**surprised**
146:24 147:1

**surprising**
146:10,16

**suspect** 14:20
80:3 85:19 86:4
108:16 125:11
127:2,10
128:16 129:18,
22 137:7,20,24
138:13 205:4,9,
21,22 207:10
210:8,21
211:10,12,17,
19 212:22
213:13,14,21
214:9,11
215:24 219:4,5
220:3,6,9,15,18
221:3,9,11,15,
21 222:3,16,18
223:5 225:20
229:15,18
238:1 240:15
248:12 269:1

**suspected**
84:8

**suspects**
77:13 84:3,14,
17,20 86:9,15
206:11 307:22
313:11

**suspended**
326:17 327:17
343:25

**suspension**
169:20 284:4
316:1,2 326:13
329:13

**sustain** 333:3

**sustained**
330:5 332:5,11
335:11 337:8
340:18

**Swaminathan**
7:18 8:17 9:3,5
25:15,18 26:8,
10,12 42:3,11
71:23 82:16,20
83:3 85:16
104:23 107:4
108:1,14,23
117:1 119:19
136:24 147:17,

23 150:15,21,
25 151:7,9
159:6,9,12
161:23 162:1,9,
12,21 163:24
178:14 186:17,
20,24 190:18,
22,24 191:2,9
206:16,20
210:23 227:5
229:25 234:9,
14,16 235:1,9
254:8 257:22
269:7,11 288:9,
17 314:15,23
315:10 327:6,8
340:9 343:4,8
344:7,13 345:1

**swear** 8:22

**switched**
51:25 189:17

**sworn** 14:2
292:16

**Sydney** 7:3
83:1 162:19
235:7 288:15
315:8 340:7

**system** 157:14
179:18

———

**T**

**tactical** 44:23
45:10,17 55:21
179:1 295:3
299:2

**tainting** 210:15

**takes** 263:16

**taking** 14:24
16:14 58:1
62:12,16,21
65:5 67:4,11
142:16 302:22
303:7

**talents** 89:15

**talk** 15:19 26:1
36:15,17,23
38:3,11,17,21
76:21 95:16
150:20,22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

170:15 182:16
227:2 280:9,12
283:2 288:20
289:1,10,25
290:17 293:2,
20 294:12,15
295:13 296:2,9
297:7,12,20
298:5,11 311:8
337:18

**talkative** 189:6

**talked** 18:7
20:7,9 21:3
26:2 40:8 120:6
136:18,22
142:2 164:17
166:14 199:2
202:22 295:24
310:4,10,15
311:5 337:13
343:14

**talking** 15:5
27:8 55:5,10
62:4 71:24
78:19 116:24
142:4 147:7
186:18 199:7
206:19 210:1,
19,20,24
299:18 301:8
308:23 322:1

**tall** 220:20,22

**tampering**
300:11 302:19

**targeting**
227:24

**tattoo** 221:17

**team** 53:12,25
56:22 106:5
166:16

**teamed** 53:9

**teaming** 53:9

**technician** 7:4
201:23

**technique**
320:2 332:15
335:21 337:11

**telling** 55:18
72:24 79:21

339:13

**tells** 287:12

**template**
250:25

**ten** 30:1 116:25
147:14 222:18
294:21

**tend** 55:17

**tended** 56:4

**tenuous**
116:19

**tenure** 286:5
308:24

**term** 49:16,17
173:10,11,12,
13,14,23 174:6
293:6

**terminated**
327:12

**termination**
286:11

**terms** 20:12
45:5 46:18 57:8
72:20 79:4
91:23 92:7 93:2
94:5 96:3,23
99:19 102:6,14,
24 108:11
111:3 113:16
118:20 121:13
127:23 129:16
174:15 181:18
182:8 205:19
207:2 218:23
222:9 252:13
274:8 277:12
293:23 295:12
297:4,6 309:3

**test** 187:21

**testified** 13:24
14:4,9 230:17
239:13 330:14

**testify** 28:16,
18 29:9 70:14,
19 97:1 133:6
283:11 330:17

**testifying**
28:22 70:9

175:22

**testimony**
8:22 22:7 40:17
66:19 70:24
76:10 119:17
132:18 133:12
134:22 141:24
159:21 166:19
171:12 178:9
206:1 239:24
278:22 283:25
289:14,23
320:10 321:16,
23 323:16
330:9 337:1
338:17,21,24
339:2

**testing** 187:25

**that'll** 214:8

**theft** 49:5,12
91:13,14 112:8

**there'll** 14:23

**thick** 31:12

**thing** 11:13
38:16 45:7 46:6
51:7 54:10
72:22 74:16
80:11 153:18,
25 154:14,21
155:18 160:24
166:1 173:17
176:14 177:24
188:4 197:16
229:17 264:4
282:15 283:21
289:16 291:24
292:20 295:14
316:13,23
331:21 334:3
337:23

**things** 38:10,
11,13,14,17,18,
19 45:15,16,21
50:4 54:17
55:15 79:5
80:14 90:13,16
102:23 103:16,
23 105:19
111:23 112:23
113:25 114:3
115:14 120:23
139:9 153:21

155:11 156:5
157:14 159:13
160:13,20
161:10 173:22
182:2 217:3,5
221:15 266:23
277:4 278:1
279:13,23
285:1 287:11,
24 288:18
289:12,18
297:5,10 333:6
339:11

**thinking** 279:1
284:12

**thought** 15:15
186:18 204:9
282:4 293:13
314:19 316:11
330:22

**three-day**
284:4 316:1,2
326:13 329:13

**three-quarters**
279:11

**throw** 114:16
191:5

**thrown** 132:6

**thumb** 224:7,
10 289:15
290:13

**tighten** 95:17,
19

**time** 7:8 10:6
11:6 13:13,15
15:5 17:3,17
19:14 29:5,14,
16,17 30:4,12
32:1,5,9 33:2,
15,19 34:5,6,
15,21 35:1,9,23
36:9,20 37:14,
16 40:2,12,22
42:10 44:4,11,
14,17,20 45:4
47:3,6,7,15,18
49:22,25 51:17,
25 52:21 53:2
54:2,4,5 57:1
60:15 62:17,25
63:9,25 66:3,7

68:4 69:20 70:5
71:2 75:22,25
76:6 77:3,16
78:20,22 81:10,
12 82:22 83:2,
7,11 87:18
88:21 89:3,13
91:2 95:23
97:25 100:4
101:11,16,24
102:2,4,12,15,
16 103:4,5,6,14
104:4,5,12,13
106:17 108:9
109:1,6,12,14
110:8 111:1,8
114:19 116:21
117:3 119:3,6,
11 122:21
126:8,13 127:3
128:6 129:14
139:1 140:6,21
142:18,19
143:6 144:11
145:23 150:12
152:3,11,19,22
153:6,12
154:20,21
155:16 157:16
159:7 161:20,
21 162:5,15,20
163:12,16
164:5,18,22
165:5,16
167:11,19,21
168:3 170:7
173:5,6 175:2
185:5 189:25
190:1,7 201:13,
14,24,25
205:12 206:10
210:5,13 211:1
214:1 218:21
220:10 222:10
223:17,23
224:15 226:22
227:10 228:19,
23 229:4 231:8,
12 232:10
235:2,8 236:7,
18 239:10,25
249:20,22
267:1 276:17
279:25 280:1,
13,19,21
283:18 285:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

288:11,16
292:4,23 295:2
297:2,20 299:6
301:10,18
302:2,8,15
303:10 304:2,9,
11,13 305:1,2,
10,15,21
307:18 308:13,
25 310:3,7,9,14
311:6,21
312:16 313:19
314:21 315:4,9
316:6 320:1
321:13 322:11
323:20 324:4,
20 335:13,14
338:13 340:3,8,
17 344:14
345:9

**timeframe**
29:25 286:6
293:25 294:23

**timely** 57:23

**times** 9:25
11:4,5,23 12:8,
16,25 13:23
14:5,9,11 15:9,
20 53:9,13
80:25 95:4,5,
24,25 128:4
158:6 169:21,
23 182:15
202:1 207:12
208:8 209:3,13,
14 222:19
239:1,16,17,21,
22 276:24
277:5 278:15
297:17 298:1
315:16 335:5

**timing** 40:7

**Timothy** 253:3,
11,21 254:17,
22,24 262:16
263:12

**tip** 176:6
184:13,21
263:17

**tipped** 277:20

**tips** 173:7
184:18 185:24

**title** 44:20

**titles** 9:15
118:6

**today** 7:5,7
8:10 12:3
14:14,21 16:16,
20,23 24:21
27:8 33:16
34:16 47:5 83:1
102:22 130:9
131:17 133:16,
18,21 135:3,24
136:3,8 138:22
162:19 175:3
211:24 213:11
214:7 235:7
242:5,13 276:4,
11 281:1 283:6
285:18,21
288:15 293:17
294:8 299:13
304:23 311:23
312:7,14 315:8
319:12,15
320:20 321:21
322:4 323:21
338:16,21
339:2 340:7
342:24

**today's** 18:6
20:12 24:1,5,8,
11 25:2 26:21
27:17 29:3,18
31:23 192:12
243:7 246:18
251:16

**told** 130:20
132:11,12
204:2,11,16
216:6 228:22
229:2 230:1,18
232:4 233:22
241:10,12,20
242:5,8,13
286:9 310:4
318:17 324:12
325:5,9,18
326:2,4 331:21
333:1 342:16

**Tom** 50:19

**tomorrow**
175:4

**Tony** 37:3 38:3,
6

**tool** 81:5

**tools** 69:11,17
80:20 92:4 94:9

**top** 13:13 77:1
90:12,17
192:19 194:16
217:21 235:17
250:4 253:20
254:23 266:22
274:17 277:16
298:7,12
327:14

**topic** 42:13
339:6

**Torres** 241:1,8,
13,17,19

**tossed** 316:8

**total** 32:9
127:19

**totally** 282:19

**tour** 97:14
325:7

**town** 59:8

**track** 95:10
155:21 156:1
160:14,20,21
180:12 181:13
251:6

**tracked** 177:5
179:13,16
180:6,9,23
181:5

**tracking** 61:16,
23,24 62:7,11
91:22 92:2
181:21

**tracks** 177:10

**traffic** 10:20,24

**train** 161:10
311:9

**trained** 66:15
67:17 68:24
91:5,11,17
176:21 211:9
310:4,10,16

**311**:6 338:2

**training** 65:22
67:20 68:18,23
83:6 90:19,23,
24 91:1,4,6
148:14 149:16
151:13,19
153:21,24
154:7 156:4,7
158:20,23,24
159:18 160:5,9,
16 177:3
211:14 282:13,
17 287:25
288:2 310:22
312:23

**trainings**
152:25 153:9,
10,11,13 154:1
158:8,14 313:2

**transcripts**
22:7 26:22

**transfer**
185:17

**transferred**
56:14 88:1
99:25

**translate** 99:4
156:3 157:8

**translated**
99:18 157:7

**translator**
17:9,10,21

**translators**
17:22

**treated** 263:21

**treatment**
274:22 275:18
276:7,21
277:12

**trial** 28:16,22
29:9,11 70:14
98:20 132:2
154:22,23
158:2 230:17

**trials** 26:23
70:20,25 155:2
158:7,13

**trick** 227:7

**troubles**
142:3,5

**true** 127:12,13,
15 313:23
318:5,7,21
319:3,7,22
321:9,20,21
322:12,19

**trust** 282:4,7

**truth** 8:23,24
319:18

**truthful** 70:24
320:10,20,22
321:15 323:17
324:5,15

**truthfully**
16:24

**Tuesday** 18:17
19:12,16,25
20:18 23:6,10,
15

**tuition** 284:14

**turn** 69:1 127:4
161:10 169:8
226:14 235:10,
15 337:20
338:1

**turned** 38:18
57:23 68:6
264:4 277:17
319:2

**turning** 215:11
316:24 318:11

**TV** 142:16
143:15

**twist** 339:10

**two-thirds**
279:21

**type** 22:19
56:2,7 59:20
71:13 72:2,22
87:13 90:6,13
111:23 112:22
115:16 117:25
179:13 217:7
250:15 308:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 496 of 782 PageID #:13754
The Deposition of ANTHONY RICCIO, taken on May 19, 2023
387

typed 183:25

types 107:20
113:19 116:21
117:23 118:4,7
152:25 161:9
309:8,15,23

typewriter
250:11

typical 72:23
73:13 115:17
260:10 267:7

typically 17:19
31:18 46:21
52:13 55:9,11
61:12,15 71:18
73:1,5 79:15
82:9 92:22
94:23 95:16
111:23 112:16,
18 129:12
138:3 158:18
174:24 175:1
182:19 184:9
217:2 250:14

typo 250:9,22,
23

_____

U

ugly 277:17

uh-huh 15:1
199:24 214:23

ultimate
328:10

ultimately
85:2,3,10,19
94:1 120:13
123:5 124:14
171:9 181:12
186:9 188:21
189:10 214:1
230:11 306:10
315:24 316:3,5
322:24 325:15
326:18,25
328:18 329:11,
16 332:4 333:2

umbrella
261:12

unanimously
332:10 337:7

unavailable
59:8

unaware
166:23

unclear 166:22

uncommon
206:22 207:1

underlying
27:14,20 29:4,
5,15,19 30:22
73:10 75:15,24
76:21 203:3

understand
12:3 14:13,16
16:1,15,19,23
27:10,12,13,16,
19 63:23 75:5
76:10 97:17
100:14 117:13
134:22 137:13
147:2 148:4,18
158:4 179:15
205:20 212:20
222:1 238:8
252:2 292:5
325:21

understanding
66:6 68:3,10,
11,16,25 69:20,
24 73:23 79:6
81:10,12 96:3
128:17 129:24
130:3,8,15
179:10 181:13
198:16

understood
10:5 13:16
15:24 16:5 28:2
42:23 67:23
76:9 160:6,22

unfair 135:2

unfortunate
281:20 336:13

unique 84:11
93:21

unit 49:2,5 58:5
61:20 63:11,12,

19,20 89:13
110:5 117:11
169:5 170:8,14,
18 176:17
177:5,9 287:18,
19

United 7:12

units 46:15
87:23 88:9,18
99:21 101:19
117:3,21 171:8

unlike 247:10

unrelated
10:11,14,17
11:1

unresolved
59:11

unusual
212:22

updating
156:18 251:5

upheld 316:2

upset 208:20

usual 59:16

utilized 89:16

_____

V

vacated 28:7

vacation 52:4
97:23

vague 57:9
64:14,20 65:1
66:18 68:14
69:15 73:3
74:19 75:10
76:23 77:18
79:12 80:18
84:5 86:25 87:9
89:6 91:25 92:9
95:12 103:25
110:1,14 111:6,
14 114:9
137:18 139:3
168:13 182:10
199:1 218:25
290:19

valuable 75:2

Vargas 251:20

variables
220:12

variations
51:10

varied 71:14
95:23 182:11
185:5 207:5,9
209:16

Vehicle 272:8,
18,20

venue 44:7

veracity
187:21 188:1

verbal 14:25

version 345:6

versus 7:11
95:14,15 97:13
207:2 210:2
284:17

vestige 250:24

vibe 38:9

Vicente 108:3
131:10 273:21
307:13

vicinity 14:12
125:23

victim 59:7
212:12 232:13,
18 251:20
330:20 344:1,2

victims 101:5

video 7:4
287:2,7 289:3
294:1 345:2,3,
8,17,21

videoconferen
ce 7:9 83:1
162:19 235:7
288:15 315:8
340:7

view 107:17
108:11 128:24
147:10,18
205:14 206:4,

13 207:19,20
210:9 211:10,
11,18 212:2,23
213:11,12,14
214:4 280:25
281:3 282:6
283:5 285:7
292:2

viewed 217:20
225:24 235:20
236:23 239:3
241:13,14
244:1 249:7

viewing 127:9
128:7,22
129:19 130:5,
17 137:3,20,23
138:2,3,5,9,16,
17 139:1
205:23 217:15,
22 219:6
225:10,15
232:23 236:14
240:8 248:13,
14,19

violate 261:4,7

violating
284:4,8 286:10
327:17

violation
284:2,7,19

violations
161:12 285:8,
24 288:23
294:2

violent 49:12,
15,16,18,23,24
50:2,4,5,8,11,
23 52:17,21
53:2,5 54:2,5
56:23 60:8,9,18
61:10 62:22
63:11,20 64:1,8
65:12 73:9
88:20,22 89:4
91:21 99:6
101:21 102:3
112:8,14
113:14 226:17
231:24 240:7

voluntarily
246:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 497 of 782 PageID #:13755
The Deposition of ANTHONY RICCIO, taken on May 19, 2021

388

**volunteer** 246:9

**volunteered** 204:22 280:23

**volunteers** 129:5 223:10

**vouch** 137:1 138:15 225:23 226:4

**W**

**wait** 191:14 210:18 223:20 310:13 343:23

**waited** 208:20

**waiting** 59:3,6

**walk** 40:25 42:13,15,20,24 156:13 157:19

**wall** 128:9

**Walter** 330:6

**wanted** 45:15 89:25 92:14,24 97:3 157:18 182:6 207:13 208:15 224:3 253:1 272:9 303:10

**war** 38:7,10

**warrant** 277:19

**warranted** 169:14 170:13 173:3

**warrants** 45:16 173:22

**watch** 52:3 88:12 94:24 171:3 300:2

**ways** 185:24 209:13 220:24 222:25 282:5 295:23

**weapon** 321:3

**wearing** 219:8 334:19

**week** 25:2 29:18 31:24 74:15 334:5 336:23 341:14

**weekly** 281:22

**weigh** 120:10 208:13

**weight** 332:16

**well-known** 140:15

**West** 7:6

**whatever's** 335:16

**whatsoever** 326:11,24

**When's** 36:9

**where'd** 49:6

**whereabouts** 228:16

**whichever** 209:25

**Whistleblowers** 291:2

**White** 224:8

**wide** 101:6 174:6 185:13

**wide-ranging** 41:17

**widely** 179:24

**wind** 156:5

**window** 216:21 319:2 328:3

**wing** 91:16

**withhold** 68:11,17

**witness'** 116:16

**witnessed** 73:1 135:10 277:23 308:2

**witnesses** 17:6 55:6,10, 12,23 56:1 73:13,15 75:24

77:6,17,20 78:7,21 79:5,18 80:9 81:25 82:10 115:7,16 124:25 127:8, 17,22,24,25 128:8,22 129:19 130:5, 17 131:22 136:14 137:3, 10,15 138:17 139:1,6 146:14 184:8 202:23 203:1,7,16 205:2 207:19 209:24 216:19 217:4 225:21 236:14 249:7 253:2 307:23 330:16

**witnessing** 277:22

**Wojcik** 37:3 38:3,6,22,25

**woke** 283:23

**woman** 27:15

**won** 154:23

**wonderful** 338:5 339:12

**wondering** 150:13

**word** 148:17 250:12 314:10

**words** 65:3 74:13 83:13 85:14 86:1 116:5 118:2 135:2 282:24 339:10

**wordy** 9:15 87:3

**work** 10:7,11, 14,18 11:1,16 12:10,14 13:11, 20 20:11 33:24 34:1,2,3 35:2 36:2,4,7,23 41:5,13 44:6,11 47:22,24 48:5, 23 49:9 52:15,

18 54:6,9 56:25 64:2 87:12,23 95:1 119:2 120:18 164:1 172:3 175:1 208:6 224:11 273:23 274:1,2

**worked** 34:11, 22 37:22 44:14 49:10,12 50:21 51:13,24 52:17, 23,24 53:1 54:2 61:22 69:20 91:13,16 97:17 98:14 105:17 109:12 111:5 117:20,24 118:7 138:23 141:11 142:1 163:5,6,7,12 164:2,3,4 171:4 172:8,13 197:23 209:12 273:25 274:1,2 300:1 309:1 313:9 333:17

**working** 32:4 34:12 45:25 46:23 47:7,8,15 48:2 51:14 52:21 60:7,16 62:17,21 66:3,7 67:22 68:4 91:9 94:6,17,21 97:24 102:2 103:4,5 105:6,8 164:6 168:24 173:6 176:9 177:11 178:5 185:9,10,22 207:22 218:21 224:14 281:20 295:3 299:2,6, 20 301:2 313:3

**worse** 280:17

**worth** 42:4

**would've** 17:10 21:13 34:3,11 35:11 50:18 82:11 87:14,16 88:12 126:9 129:2 132:11,12,15

137:11 142:22 146:23 150:5 165:13,16 167:11,18 198:24 199:8,9, 11,12 217:8 231:13 237:18, 22 238:14 239:11,17,25 240:1 241:22 246:5,8 248:4, 20,21,23 250:10 258:9 259:10,11,15, 18,20 260:19, 24 261:2,13,14 264:11 267:7 274:17 275:21 303:9,19,22,23, 24 325:9 326:2, 23 331:14 333:7

**wound** 306:24

**wrap** 83:4

**write** 69:21,25 120:4,9 183:19 216:25 326:2

**writing** 70:23 71:6 109:24 110:11 119:13, 14,22

**written** 99:14 113:12 198:24 199:8 273:6 320:13 322:9, 14,25 324:8

**wrong** 42:7 43:19 250:20 285:6 325:16 340:13,15

**wrongdoing** 141:17

**wrote** 70:6,8 252:16

**X**

**x-rays** 341:5

**XYZ** 155:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

## Y

**year** 49:4 99:23

**year-and-a-half** 99:23

**years** 28:21,25
30:1 33:22 34:4
36:22 43:7
44:16 66:10
67:21 68:1,23
69:16 80:19,20
87:25 103:11
115:10 116:17,
25 140:2 147:8
151:22 207:15
210:2,10
211:20,22
212:9,18 214:6
262:11 264:22
265:8 277:3
279:3 280:15
282:1,3,6 283:1
285:12 286:14
290:13 294:17,
21 295:1
297:23,24
322:2,22 323:6,
13,21 324:6,16,
20 325:3,13
326:10,23
335:6 338:10
342:23

**yelling** 318:15,
18,23

**yesterday**
174:5

**yesterday's**
24:24,25

**young** 130:25
131:4

## Z

**Zoom** 7:19,22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 24

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME
* DAY    MO.    YR.
**07 Jun 93     1556**

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/Murder 1st Degree | 0110 | 2148 N. Sawyer | 1414 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒YES ☐2NO | IF NO, CORRECT ALL VICTIM INFOR-MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1YES ☒2NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| ROMAN, Monica | | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| street | 304 | 1 | 1 |

| 11. ☒VERIFIED ☐UPDATE TO | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|
| CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | CODE NO. | CODE NO. | |

19.
| DESCRIBE PROPERTY IN NARRATIVE. T – TAKEN;    R = RECOVERED | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT. |

| | 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|---|
| ☐ VERIFIED | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ |
| | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |
| ☐ UPDATE TO | 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | 1-1 FIREARMS | 6 NARC./DANGEROUS DRUGS | 5 OTHER | 6 NONE |
| | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T |
| | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |

| | 20. NAME (LAST – FIRST – M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT, NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN. JURIS. YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| VICTIMS UPDATE ONLY 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| OFFENDERS UPDATE ONLY 1. | | | | | | | | |
| 2. | | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | 1 OFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 | | | OFF. 2 | | | | |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐USED ☐STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☐X DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| dna | | DNA | ☒FIELD ☐3 SUMMARY | 652 | XX PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED |

| STATUS CONT'D. | | 5 EXC. | 6 EXC. | 7 CLSD. | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐3 CLRD. CLOSED | ☐4 CLRD. OPEN | ☐ CLRD. CLOSED | ☐ CLRD. OPEN | ☐ NON-CRIM. | ☐1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. REFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. |
| | | | | | | | | | ☐ ADULT ☐ JUV. |

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

**This is an Area Five Violent Crimes Unit Report.**

DATA ENTERED
ED AREA 5

Continued on page two.

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – * DAY    MO.    YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| NORMAL | 23 Jun 93 | 2100 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| DET. A. RICCIO 20870 | | DET. E. Halvorsen #20692 | | Biebel |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY–MO.–YR.) | TIME |
| | | DET. R. Guevera #20316 | | 25 JUN 1993 | 0935 |

*MUST BE COMPLETED IN ALL CASES

CPD-11.411-B (REV. 8/85)

95. R.D. NO.
X
2
5
0
3

RFC-Iglesias 000127

20 JUN 1995

RFC-Iglesias 000128

**THIS IS A LINE-UP SUPPLEMENTARY REPORT:**

**LINE-UP CONDUCTED UNDER RD#**     X-250 303

**LOCATION, DATE AND TIME:**     Area Five Viewing Room, 23 Jun
93, at 2000 hours.

**PERSONS CONDUCTING LINE-UP:**     Det. A. Riccio  #20870  A5/VC
Det. E. Halvorsen#20692  A5/VC
Det. A. Guevera  #20861  A5/VC

**PERSONS PARTICIPATING IN LINE-UP:**  1. VICENS, Jose     M/WH/19

2. SANTOS, Edgardo  M/WH/25

3. M███████, C███████  M/WH/17

4. V███ K███████  M/WH/17

5. IGLESIAS, Geraldo  M/WH/24



**PERSONS VIEWING LINE-UP:**     1. OCHOA, Rosendo

**PERSONS IDENTIFIED IN LINE-UP:**     #5 IGLESIAS, Geraldo was
positively identified by witness OCHOA as the person whom he
observed shoot the victim, Monica ROMAN.

**PHOTOGRAPHS TAKEN BY:**     Det. E. Halvorsen #20692  A5/VC

**INVESTIGATION:**     In furtherance of the invest-
igation into the homicide of
Monica ROMAN, R/d's conducted the above line-up.  The suspect of
the line-up, Geraldo IGLESIAS, was permitted to pick his position
in the line-up.  All participants were required to stand, face the
viewing window, and make facing movements.  OCHOA positively
identified IGLESIAS as the subject he observed fire a gun at the
vehicle in which the victim was a passenger.

Det. E. Halvorsen #20692, Area Five Violent Crimes.
Det. R. Guevera #20861, Area Five Violent Crimes.
Det. Anthony Riccio #20870, Area Five Violent Crimes.

RFC-Iglesias 000129

RFC-Iglesias 000130

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 25



*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 26

SCHOOL    ( TUR )
10:00
1 4/100
EVERYDAY

RFC-Iglesias 000077

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 27

| SCREEN FELONY | ✗ |
|---|---|
| ARREST WARRANT | |
| SEARCH WARRANT | |
| JUVENILE | |
| POLICE SHOOTING | |

Start Time: 20:1(6)   Finish Time: 03:00

23 JUN 93   53   1   8   4   4

| Date | Action No. | Number of Defendants | Number of Victims/Witnesses | Page | of | Pages |

## DEFENDANT NUMBER _____

| Name: | Last | | First | | Middle | | Suffix |
|---|---|---|---|---|---|---|---|
| Address: | Street | | | City | | State | Zip |
| Sex: | Race: | DOB: | LID: | | SID: | | FBI: |
| AKA: | Last | | First | | Country of Birth | | |

## CHARGES/ACTIONS   DEFENDANT NUMBER _____                    Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |

## STATEMENT   DEFENDANT NUMBER _____                    Continued ☐

| Type: | Date: | Time:  : | Court Reporter: |
|---|---|---|---|

Statement Witnesses:

Statement Summary:

## ARREST   DEFENDANT NUMBER _____                    Continued ☐

| RD/AR No.: | CB/DCN: | | |
|---|---|---|---|
| Place of Arrest: | | Date: | Time:  : |
| Arrest Reason: | Means of ID: | | ASA Present ☐ |
| Arresting Agency: | Area: | District: | |
| Arresting Officer: | Star: | Assignment: | |
| Arresting Officer: | Star: | Assignment: | |
| Investigator: | Star: | Assignment: | |

## EVIDENCE/INVESTIGATION                    Continued ☐

Additional Investigations Requested:

Officer Receiving Request:

| Physical Evidence | Property Number | How Recovered |
|---|---|---|

## INCIDENT                    Continued ☐

| On or from Date: | At or between Time: | Weapon type: |
|---|---|---|
| to Date: | to Time: | Location: |

Incident Summary:

CCSAO Iglesias000471

**Defendant**

**MC Number**

ENDANT NUMBER

| | Last | | First | | Middle | | Suffix |

ress: | Street | | | City | | State | Zip

: | Last | Race: | DOB: | LID: | First | SID: | Country of Birth | FBI:

**ARGES/ACTIONS   DEFENDANT NUMBER** _____ Continued ☐

rge | Action | Reason

**TEMENT   DEFENDANT NUMBER** _____ Continued ☐

ement Witnesses: | Date: | Time: : | Court Reporter:
☐ ASA   ☐ P. Officer   ☐ Other

ement Summary:

**Charge**

**IEST   DEFENDANT NUMBER** _____ Continued ☐

AR No.: | CB/DCN:
e of Arrest: | Date: | Time:
st Reason: | Means of ID: | ASA Present ☐
sting Agency: | Area: | District:
sting Officer: | Star: | Assignment:
sting Officer: | Star: | Assignment:
stigator: | Star: | Assignment:

**TIM/WITNESS NUMBER**   **7**   Continued ☐

e | Last **CHMICLESKI** | First **DAVID** | Middle **A** | Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other: | Suffix
ress: | Street ▓▓▓▓▓▓ | **1ST** | City | State | Zip
e Phone: **312**▓ | Work Phone: ( ) | Ext.
M | Race: **W** | DOB: ▓▓▓ | DL: | State | Number | Public Aid No.: **UNK.**
erty Loss: $ | Personal Injury: **NONE**
ted to Defendant: **NO** | Handicap: **NONE**

s:  SAW A RUN PAST HIM IMMEDIATELY   | SCHURZ H.S.
TER THE SHOOTING - COULD NOT PICK   | **87-90**
OUT OF A LINE-UP. W SAW A ONLY FOR AN INSTANT | WRIGHT COLLEGE
| FOR G.E.D.

**TIM/WITNESS NUMBER**   **8**   Continued ☐

e | **WITNESS**
e | Last **TORRES-MIRANDA** | First **EFRAIN** | Middle | Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other: | Suffix
ress: | Street ▓▓▓▓▓▓ | **3 SOUTH** | City | State | Zip
e Phone: **312**▓ | Work Phone: ( ) | Ext.
M | Race: ▓ | DOB: ▓▓▓ | DL: | State | Number | Public Aid No.: ▓▓▓ **3062**
erty Loss: $ **0** | Personal Injury: **NONE**
ted to Defendant: **NO** | Handicap: **NONE**

s:
W A GROUP OF ▓▓ I.G.'s (IMPERIAL GANGSTERS)
FRONT OF THE BOYS CLUB BEFORE THE SHOOTING.
MATCHED DESCRIPTION OF SHOOTER. 5 MINUTES DID NOT PICK
A OUT OF LINE-UP.

**Defendant**

**T EVENT/ASA**

t event date **LATZ** | Unit **FRU** | Next event | Location
Approval type: ☒ Personal ☐ Telephone

**A ENTRY** _____ | Date _____ | Entered By _____ | **PCN** _____

**Branch**

Start Time: 20 78   Finish Time: 83 00

| | SCREEN FELONY |
|---|---|
| | ARREST WARRANT |
| | SEARCH WARRANT |
| | JUVENILE |
| | POLICE SHOOTING |

| 23 JUN 93 | 53 | 1 | 8 | 3 | 4 |
|---|---|---|---|---|---|
| Date | Action No | Number of Defendants | Number of Victims/Witnesses | Page | of | Pages |

**DEFENDANT NUMBER _____**

| Name: | Last | First | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street | City | State | Zip |
| Sex: | Race: | DOB: | LID: | SID: | FBI: |
| AKA: | Last | First | Country of Birth |

**CHARGES/ACTIONS   DEFENDANT NUMBER _____**                    Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**STATEMENT   DEFENDANT NUMBER_____**                    Continued ☐

| Type: | Date: | Time: : | Court Reporter: |
|---|---|---|---|

Statement Witnesses:

Statement Summary:

**ARREST   DEFENDANT NUMBER _____**                    Continued ☐

| RD/AR No.: | CB/DCN: | | |
|---|---|---|---|
| Place of Arrest: | | Date: | Time: : |
| Arrest Reason | Means of ID: | | ASA Present ☐ |
| Arresting Agency: | | Area: | District: |
| Arresting Officer: | | Star: | Assignment: |
| Arresting Officer: | | Star: | Assignment: |
| Investigator: | | Star: | Assignment: |

**EVIDENCE/INVESTIGATION**                    Continued ☐

Additional Investigations Requested:

Officer Receiving Request:

| Physical Evidence | Property Number | How Recovered |
|---|---|---|

**INCIDENT**                    Continued ☐

| On or from Date: | At or between Time: | Weapon type: |
|---|---|---|
| to Date: | to Time: | Location: |

Incident Summary:

## DEFENDANT NUMBER

| Name: | Last | First | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street | | City | State | Zip |
| Sex: | Race: | DOB: | LID: | SID: | FBI: |
| AKA: | Last | First | Country of Birth |

## CHARGES/ACTIONS   DEFENDANT NUMBER                                     Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |

## STATEMENT   DEFENDANT NUMBER                                          Continued ☐

| Type: | Date: | Time: : | Court Reporter: |
|---|---|---|---|
| Statement Witnesses: | | ☐ ASA | ☐ P. Officer | ☐ Other |
| Statement Summary: | | | |

## ARREST   DEFENDANT NUMBER                                             Continued ☐

| RD/AR No.: | CB/DCN: |
|---|---|
| Place of Arrest: | Date: | Time: : |
| Arrest Reason: | Means of ID: | ASA Present ☐ |
| Arresting Agency: | Area: | District: |
| Arresting Officer: | Star: | Assignment: |
| Arresting Officer: | Star: | Assignment: |
| Investigator: | Star: | Assignment: |

## VICTIM/WITNESS NUMBER   5                                             Continued ☐

Type: WITNESS   Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:

| Name: | Last RODRIGUEZ | First HUGO | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street | City | State | Zip |
| Home Phone: ( ) NONE | Work Phone: ( ) NONE | Ext. |
| Sex: M Race: H DOB: | DL: State | Number | Public Aid No.: UNK. |
| Property Loss: $ | Personal Injury: NO | Handicap: NO |
| Related to Defendant: NO | | |

Notes: SEATED IN THE MIDDLE BACK SEAT – PICKED Δ [SENN H.S.
OUT OF A LINE-UP. HEARD ONE SHOT HEARD   2ND YEAR]
A SAY "KING LOVE". HEARD 4 MORE SHOTS. TURNED & SAW Δ.

## VICTIM/WITNESS NUMBER   6                                             Continued ☐

Type:   Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:

| Name: | Last CORONELL | First JOSE | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street | City | State | Zip |
| Home Phone: ( ) | Work Phone: ( ) ___ ___ Ext. 0734 |
| Sex: M Race: H DOB: 25 NOV 71 | DL: State | Number | Public Aid No. |
| Property Loss: $ –0– | Personal Injury: NO | Handicap: NO |
| Related to Defendant: NO | | |

Notes: SEATED BEHIND VICTIM IN THE CAR –   WORKS @ FOOD LIFE REST.
SAID THAT WHEN HE HEARD SHOTS HE DUCKED   835 N. MICHIGAN
& ONLY SAW SHOOTER FROM BEHIND

## NEXT EVENT/ASA

| Next event date | Next event | Location |
|---|---|---|
| ASA LATZ | Unit FRU | Approval type: ☒ Personal ☐ Telephone |

## DATA ENTRY _____ Date _____ Entered By ____   PCN _____

Start Time: 20-70    Finish Time: 03:00

| | | | | | | |
|---|---|---|---|---|---|---|
| SCREEN FELONY | | | | | | |
| ARREST WARRANT | | | | | | |
| SEARCH WARRANT | | | | | | |
| JUVENILE | | | | | | |
| POLICE SHOOTING | | | | | | |

23 JUN 93    53    1    8    2    4
Date    Action No.    Number of Defendants    Number of Victims/Witnesses    Page    of    Pages

**DEFENDANT NUMBER**

| | | | | |
|---|---|---|---|---|
| Name: | Last | First | Middle | Suffix |
| Address: | Street | City | State | Zip |
| Sex: | Race: | DOB: | LID: | SID: | FBI: |
| AKA: | Last | First | Country of Birth |

**CHARGES/ACTIONS    DEFENDANT NUMBER** _____    Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**STATEMENT    DEFENDANT NUMBER** _____    Continued ☐

| | | | |
|---|---|---|---|
| Type: | Date: | Time: : | Court Reporter: |

Statement Witnesses:

Statement Summary:

**ARREST    DEFENDANT NUMBER** _____    Continued ☐

| | |
|---|---|
| RD/AR No. | CB/DCN: |
| Place of Arrest: | Date: Time: |
| Arrest Reason: | Means of ID: ASA Present ☐ |
| Arresting Agency: | Area: District: |
| Arresting Officer: | Star: Assignment: |
| Arresting Officer: | Star: Assignment: |
| Investigator: | Star: Assignment: |

**EVIDENCE/INVESTIGATION**    Continued ☐

Additional Investigations Requested:

Officer Receiving Request:

| Physical Evidence: | Property Number | How Recovered |
|---|---|---|
| | | |

**INCIDENT**    Continued ☐

| On or from: Date: | At or between Time: | Weapon type: |
|---|---|---|
| to Date: | to Time: | Location: |

Incident Summary:

W# 3 was dropping his son off and saw the
shooter from 10-15 feet away.

**DEFENDANT NUMBER**

| Name: | Last | First | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street | | City | State | Zip |
| Sex: | Race: | DOB: | LID: | SID: | FBI: |
| AKA: | Last | First | Country of Birth |

**CHARGES/ACTIONS   DEFENDANT NUMBER_____   Continued ☐**

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |

**STATEMENT   DEFENDANT NUMBER_____   Continued ☐**

| Type: | Date: | Time: | Court Reporter: |
|---|---|---|---|

Statement Witnesses:   ☐ ASA   ☐ P. Officer   ☐ Other

Statement Summary:

**ARREST   DEFENDANT NUMBER_____   Continued ☐**

| RD/AR No.: | CB/DCN: | | |
|---|---|---|---|
| Place of Arrest: | | Date: | Time: |
| Arrest Reason: | Means of ID: | | ASA Present ☐ |
| Arresting Agency: | Area: | District: | |
| Arresting Officer: | Star: | Assignment: | |
| Arresting Officer: | Star: | Assignment: | |
| Investigator: | Star: | Assignment: | |

**VICTIM/WITNESS NUMBER 3   Continued ☐**

| Type | WITNESS | Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other: |
|---|---|---|
| Name | Last MOORE   First ARNELL   Middle 2ND | Suffix |
| Address: | Street | City | State | Zip |
| Home Phone: (███) ███ | Work Phone: (███) ███ | Ext. |
| Sex M Race B | DOB ███ | DL: State | Number ██ | Public Aid No. ████-0738 |
| Property Loss: $ 0 | Personal Injury: NONE | |
| Related to Defendant: NO | Handicap: NONE | |

Notes:
THIS W3 WAS 10-15 Ft AWAY FROM THE DRIVER FOR MAVIS BUS CO.
SHOOTER - HE COULD NOT PICK ∆ OUT
OF A LINE-UP. SAID THAT ∆ SHOOTER WAS WEARING A HOOD.

**VICTIM/WITNESS NUMBER 4   Continued ☐**

| Type | WITNESS | Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other: |
|---|---|---|
| Name | Last SANCHEZ   First DANIEL   Middle | Suffix |
| Address: | Street | City | State | Zip |
| Home Phone: (███) NONE | Work Phone: (███) NONE | Ext. |
| Sex M Race H | DOB ███ | DL: State | Number | Public Aid No. UNK. |
| Property Loss: $ 0 | Personal Injury: NONE | |
| Related to Defendant: NO | Handicap: NONE | |

Notes:
SEATED IN THE BACK SEAT LEFT SIDE - WINDOWS IN THE CAR
WERE DOWN - CLAIMS THAT HE DID NOT SEE SHOOTER - CLAIMS
SHOOTER YELLED "KING LOVE" - HEARD 5 SHOTS AND DUCKED DOWN

**NEXT EVENT/ASA**

| Next event date | | Next event | Location |
|---|---|---|---|
| ASA LATZ | Unit FRU | Approval type: ☒ Personal ☐ Telephone | |

**DATA ENTRY_____   Date_____   Entered By_____   PCN_____**

CCSAO Iglesias000476

MC Number · Defendant · Branch

GANG-RELATED HOMICIDE

05:00

| | Start Time: 20078 | Finish Time: |
|---|---|---|

| Date | Action No. | Number of Defendants | Number of Victims/Witnesses | Page | of | Pages |
|---|---|---|---|---|---|---|
| 23 JUN 93 | 53 | 1 | 8 | 1 | | 4 |

SCREEN FELONY
ARREST WARRANT
SEARCH WARRANT
JUVENILE
POLICE SHOOTING

## DEFENDANT NUMBER 1

| Name: | Last IGLESIAS | First GERALDO | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street ▮▮▮ | City | State | Zip |

| Sex: M | Race: H | DOB: ▮▮▮ | ID: ▮▮▮ | SID: | FBI: |
|---|---|---|---|---|---|

| AKA: | Last | First "SNAKE" | Country of Birth |
|---|---|---|---|

## CHARGES/ACTIONS   DEFENDANT NUMBER                                    Continued ☐

| Charge | Action | Reason |
|---|---|---|
| MURDER | APPROVED | |

## STATEMENT   DEFENDANT NUMBER                                          Continued ☐

Type: ORAL   Date: 23 JUN 93   Time: 20.55   Court Reporter:

Statement Witnesses: DET. HALVORSEN, ASA LATZ

Statement Summary: AOR, Δ SAID THAT HE DOES NOT KNOW WHERE HE WAS AT THE TIME OF THE SHOOTING. Δ ADMITTED THAT HE IS A GANG MEMBER "I.G." Δ ADMITTED THAT HE HANGS OUT NEAR THE SCENE OF THE SHOOTING BUT SAYS HE KNOWS NOTHING ABOUT THE SHOOTING.

## ARREST   DEFENDANT NUMBER                                             Continued ☐

RD/AR No. X-701177   CB/DCN:

| Place of Arrest: 2135 N. SPAULDING | Date: 23 JUN 93 | Time: 18.00 |
|---|---|---|

Arrest Reason: INVESTIGATION/INF. TIP   Means of ID: LINE-UP

| | | Area: 5 | District: 14 | ASA Present ☐ |
|---|---|---|---|---|
| Arresting Agency: CPD | | | | |
| Arresting Officer: DET. RICCIO | Star: 20870 | Assignment: A/5 VC | | |
| Arresting Officer: DET. HALVORSEN | Star: 20692 | Assignment: A/5 VC | | |
| Investigator: DET. GUEVARA | Star: 20861 | Assignment: A/5 VC | | |

## EVIDENCE/INVESTIGATION                                                Continued ☐

Additional Investigations Requested: ~~GET EYEWITNESS + GET WITNESSES WHO~~

Officer Receiving Request: DET. HALVORSEN   ~~WERE IN CAR W/ VICTIM.~~

| Physical Evidence | Property Number | How Recovered |
|---|---|---|
| ONE BULLET | 1135801 | FROM CAR ROOF |
| VIAL OF BLOOD | 1093793 | FROM A VICTIM |
| SEALED BULLET ENVELOPE | 1093793 | FROM VICTIM |

## INCIDENT                                                              Continued ☐

| On or from Date: 7 JUN 93 | At or Between Time: 15:56 | Weapon type: | Location: 2148 N. SAWYER |
|---|---|---|---|

Incident Summary: at above DTL, Δ fired 4-5 shots at a 1982 oldsmobile driven by Jesus Gonzalez. V was a passenger in the vehicle. When Jesus Gonzalez noticed that V was shot, he drove to a gas station at 2338 N. Sacremento and called police. Δ was seen by W#2 and another W. Δ fled down an alley after putting a black hood over his head.

**DEFENDANT NUMBER**

| Name: | Last | First | | Middle | | Suffix |
|---|---|---|---|---|---|---|
| Address: | Street | | City | | State | Zip |
| Sex: | Race: | DOB: | LID: | SID: | | FBI: |
| AKA: | Last | | First | Country of Birth | | |

**CHARGES/ACTIONS    DEFENDANT NUMBER _____**                                Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |

**STATEMENT    DEFENDANT NUMBER _____**                                Continued ☐

| Type: | Date: | Time: : | Court Reporter: |
|---|---|---|---|
| Statement Witnesses: | | ☐ ASA | ☐ P. Officer    ☐ Other |
| Statement Summary: | | | |

**ARREST    DEFENDANT NUMBER _____**                                Continued ☐

| RD/AR No.: | | CB/DCN: | | |
|---|---|---|---|---|
| Place of Arrest: | | | Date: | Time: |
| Arrest Reason: | Means of ID: | | | ASA Present ☐ |
| Arresting Agency: | | Area: | District: | |
| Arresting Officer: | | Star: | Assignment: | |
| Arresting Officer: | | Star: | Assignment: | |
| Investigator: | | Star: | Assignment: | |

**VICTIM/WITNESS NUMBER ____1____**                                Continued ☐

Type: VICTIM - DECEDENT    Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other:

| Name | Last ROMAN ████ | First MONICA | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street ████████ | City | State | Zip |

Home Phone: 312-███████    Work Phone: (    )    Ext.

Sex: F  Race: H  DOB: ████  DL:    State    Number    Public Aid No.:

Property Loss: $ Ø    Personal Injury: GSW TO FOREHEAD, // HOMICIDE

Related to Defendant: NO    Handicap: #164 JUNE 1993: DR-CHOI

Notes:

STUDENT SENN H.S.

**VICTIM/WITNESS NUMBER ____2____**                                Continued ☐

Type: EYEWITNESS    Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other:

| Name | Last OCHOA | First ROSENDO | Middle | Suffix |
|---|---|---|---|---|
| Address: | Street ████████ | City | State | Zip |

Home Phone: (312) ████████    Work Phone: (    ) PAGER 812-2071    Ext.

Sex: M  Race: H  DOB:    DL:    State    Number    Public Aid No.: NONE

Property Loss: $ Ø    Personal Injury: NO

Related to Defendant: NO    Handicap: W SPEAKS ONLY SPANISH

Notes: (DET. CUEVARA INTERPRETED)

THIS W SAW Δ FROM HIS 2ND FLOOR WINDOW — Δ
WAS ACROSS THE STREET FACING HIM. W SAW Δ FIRE
5 SHOTS FROM BLACK .22·25 cal pistol. UNOBSTRUCTED VIEW/ POS. I.D.

**NEXT EVENT/ASA**

| Next event date 24 JUN 93 | Next event PH | Location 66 |
|---|---|---|
| ASA LATZ | Unit FRV | Approval type: ☒ Personal  ☐ Telephone |

**DATA ENTRY _____**

| Date | Entered By | PCN |
|---|---|---|

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 28

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

**CASE NO. 1:19-CV-6508**

**GERALDO IGLESIAS**

V.

**REYNALDO GUEVARA, ET AL.**

**DEPONENT:**

**MICHAEL LATZ**

**DATE:**

**January 18, 2022**



a courtroom
powerhouse

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4                CASE NO 1:19-CV-6508

5

6                  GERALDO IGLESIAS,

7                       Plaintiff

8

9                         V.

10

11              REYNALDO GUEVARA, ET AL.,

12                     Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT: MICHAEL LATZ

24   DATE:      JANUARY 18, 2022

25   REPORTER: AMANDA DEMENT



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS:

 4   Rachel Brady, Esquire

 5   Loevy & Loevy

 6   311 North Aberdeen Street

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: brady@loevy.com

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, STEPHEN GAWRYS, ROBERT

14   BIEBEL, ANTHONY RICCIO, AND ERNEST HALVORSEN:

15   Kyle Christie, Esquire

16   The Sotos Law Firm, P.C.

17   141 West Jackson Boulevard

18   Suite 1240A

19   Chicago, Illinois 60604

20   Telephone No.: (630) 735-3308

21   E-mail: kchristie@jsotoslaw.com

22   (Appeared via videoconference)

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    APPEARANCES (CONTINUED)

 2

 3    ON BEHALF OF DEFENDANT, REYNALDO GUEVARA:

 4    Megan McGrath, Esquire

 5    Leinenweber Baroni & Daffada, LLC

 6    1150 Wilmette Avenue

 7    Suite E

 8    Wilmette, Illinois 60091

 9    Telephone No.: (866) 786-3705

10    E-mail: mkm@ilesq.com

11     (Appeared via videoconference)

12

13    ON BEHALF OF DEFENDANT, CITY OF CHICAGO:

14    Austin Rahe, Esquire

15    Rock Fusco & Connelly, LLC

16    321 North Clark Street

17    Chicago, Illinois 60654

18    Telephone No.: (312) 494-1000

19    E-mail: arahe@rfclaw.com

20     (Appeared via videoconference)

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                  APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF DEPONENT, MICHAEL LATZ:

 4   John C. Coyne, Esquire

 5   Law Offices of John C. Coyne

 6   53 West Jackson Blvd.

 7   Chicago, Illinois 60604

 8   Telephone No.: (312) 929-4308

 9   E-mail: jjc@johnccoynelaw.com

10   (Appeared via videoconference)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 523 of 782 PageID #:13781
The Deposition of MICHAEL LATZ, taken on January 28, 2022

5

```
 1                          INDEX
 2                                              Page
 3    PROCEEDINGS                                 7
 4    DIRECT EXAMINATION BY MS. BRADY             8
 5    CROSS EXAMINATION BY MR. CHRISTIE         115
 6    EXAMINATION BY MR. RAHE                   120
 7    REDIRECT EXAMINATION BY MS. BRADY         122
 8    RE-EXAMINATION BY MR. RAHE                125
 9
10                         EXHIBITS
11    Exhibit                                   Page
12    1 - CCSAO Iglesias 470-478, Felony Review  43
13        Jacket
14    2 - RFC-Iglesias 9, Felony Minute Sheet Form 52
15        101
16    3 - CCSAO Iglesias 157-159, Case Fact Sheet  52
17    4 - RFC-Iglesias 90-93, Clear Closed        62
18        Supplementary Report
19
20
21
22
23
24
25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          STIPULATION

 2

 3   The deposition of MICHAEL LATZ was taken at KENTUCKIANA

 4   COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR,

 5   CHICAGO, ILLINOIS 60606, via videoconference in which

 6   all participants attended remotely, MONDAY. the 18TH day

 7   of JANUARY 2022. at approximately 10:31 a.m.; said

 8   deposition was taken pursuant to the FEDERAL Rules of

 9   Civil Procedure. The oath in this matter was sworn

10   remotely pursuant to FRCP 30.

11

12   It is agreed that AMANDA DEMENT, being a Notary Public

13   and Court Reporter for the State of ILLINOIS,

14   may swear the witness and that the reading and

15   signing of the completed transcript by the

16   witness is not waived.

17

18

19

20

21

22

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 525 of 782 PageID #:13783
The Deposition of MICHAEL LATZ, taken on January 25, 2022

7

```
 1              PROCEEDINGS
 2      COURT REPORTER:  Okay.  We are now on the
 3 record.  Will all parties, except for the witness,
 4 please state your appearance, how you're attending,
 5 and your location?
 6      MS. BRADY:  Yes.  Good morning.  This is
 7 Rachel Brady, attending on behalf of the plaintiff.
 8 I'm participating remotely via Zoom from Chicago.
 9      MR. CHRISTIE:  Bob Christie on behalf of the
10 defendant officers, attending remotely in Chicago.
11      MS. MCGRATH:  Megan McGrath on behalf of
12 Defendant Guevara, attending remotely from Chicago.
13      MR. RAHE:  This is Austin Rahe, R-A-H-E,
14 attending remotely from the Chicagoland area.
15 I'm here on behalf of the City of Chicago.
16      MR. COYNE:  And on behalf of the witness,
17 Michael Latz, John Coyne, C-O-Y-N-E, attending
18 remotely from Chicago.
19      COURT REPORTER:  Okay.  Thank you.  Mr. Latz,
20 will you please state your full name for the record?
21      THE WITNESS:  Michael Latz, L-A-T-Z.
22      COURT REPORTER:  Thank you.  Do all parties
23 stipulate that the witness is, in fact, Michael
24 Latz?
25      MS. BRADY:  Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 526 of 782 PageID #:13784
The Deposition of MICHAEL LATZ, taken on January 30, 2023

8

```
 1              MR. RAHE:  Yes.

 2              MS. MCGRATH:  Yes.

 3              MR. CHRISTIE:  Yep.

 4              COURT REPORTER:  Okay.  Mr. Latz, will you

 5       please raise your right hand?  Do you solely swear

 6       or affirm that the testimony you're about to give

 7       will be the truth, the whole truth, and nothing but

 8       the truth?

 9              THE WITNESS:  I do.

10              COURT REPORTER:  Okay.  You may begin.

11                    DIRECT EXAMINATION

12  BY MS. BRADY:

13       Q    Good morning, Mr. Latz.  My name is Rachel

14  Brady and I represent Geraldo Iglesias, who's the

15  plaintiff in this case.  Have you ever been deposed

16  before?

17       A    No.

18       Q    So I'll go over some of the ground rules, just

19  so we're on the same page for today.  I'm going to ask

20  you questions, and your answers are going to be under

21  oath so, just as if you were testifying in a courtroom.

22  If you don't understand one of my questions, please ask

23  me to rephrase or clarify.  If you answer my question,

24  I'm going to assume you understood it.  So, just be sure

25  to ask me to clarify if you have any questions.  So, the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    court reporter can get a clean record, please try your

2    very best to let me finish my complete question before

3    you start your answer, and I'll do my best to let you

4    finish your complete answer before I start my next

5    question.  I understand that things can get a little

6    tricky just because of the Zoom format, but I'm going to

7    do my very best, and I would ask that you do, as well.

8    And because the court reporter is taking a transcript,

9    it's important that you keep your answers verbal.  So

10   saying yes or no, as opposed to nodding your head, or

11   saying uh-huh, or uh-uh.  And from time to time, your

12   lawyer or one of the other lawyers here might object to

13   one of my questions.  Unless your lawyer instructs you

14   not to answer the question, you can let everybody finish

15   their objections, and then, you can go ahead and answer

16   the question that's pending.  Okay?

17        A    Yes.

18        Q    All right.  And we can take a break whenever

19   you need one.  The only thing I would ask is that if

20   there is a question pending, that you answer the

21   question, and then, we can go on a break.  Okay?

22        A    I understand.

23        Q    Okay.  Is there any reason that you cannot

24   provide complete and accurate answers to my questions

25   today?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     No.
 2        Q     Do you have any conditions that affect your
 3   memory?
 4        A     No.
 5        Q     Do you take any medication that affects your
 6   memory?
 7        A     No.
 8        Q     Are you familiar with the allegations in this
 9   civil lawsuit?
10        A     No.
11        Q     You understand that you are not a defendant,
12   right?
13        A     Yes.
14        Q     And that you have not been accused of any
15   misconduct, right?
16        A     Yes.
17        Q     Okay.  Did you review any documentary material
18   to prepare for this deposition, such as police reports
19   or transcripts?
20        A     Yes.
21        Q     What did you review to prepare for this
22   deposition?
23        A     I reviewed the felony review folder, which was
24   completed in this case, which, I believe, that I
25   completed.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  And did you have a chance to look at
 2   the exhibits that were sent around, just about 20 or 30
 3   minutes ago?
 4            MR. COYNE:  Yeah.  Let me interject, counsel,
 5        really quickly.  Just for the record, we did, my
 6        office did make requests for documents and exhibits
 7        from plaintiff's office to be forwarded in
 8        preparation for the deposition.  We did not receive
 9        any from plaintiff's counsel, nor have I received
10        any as of this moment regarding this deposition,
11        just for the record.
12            MS. BRADY:  Oh, okay.  So, I sent them this
13        morning.  We can go off the record and I can send
14        them to you again.  John, I want to make sure you
15        have them.
16            MR. COYNE:  Okay.
17            MS. BRADY:  Okay, so let's take a quick break
18        and go off the record, and I'll send everything.
19             (OFF THE RECORD)
20            COURT REPORTER:  Okay, we're back on the
21        record.
22            MR. COYNE:  All right.  Just for the record,
23        did receive from plaintiff's counsel, four documents
24        as attachments to an e-mail regarding the deposition
25        this morning.  One is a supplementary report
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  regarding victim, Monica Roman, Chicago Police

2  Department, dated 7 June, 1993.  Secondly, there's a

3  felony review folder -- or strike that.  There's a

4  felony minute sheet form 101, that's one page.

5  Thirdly, there is a felony review folder with a case

6  file document.  And lastly, there is a case fact

7  sheet for Geraldo Iglesias, dated June 24 of '93,

8  which appears to be case information.  I'm going to

9  be forwarding -- I have not had a chance to review

10  them in detail, and nonetheless to move this along,

11  I will be forwarding all four of these documents to

12  the witness so that he can view them as needed for

13  the deposition. Thank you.

14  BY MS. BRADY:

15      Q    So Mr. Latz, your counsel just sent you the

16  documents that I might use as exhibits today.  But apart

17  from those documents that are coming to you now, have

18  you reviewed any documentary material or transcripts, or

19  anything like that to prepare for this deposition?

20      A    Only what I said earlier.  I did review the

21  felony review folder, which was completed in conjunction

22  with this case.

23      Q    Okay.  And where did you find the felony

24  review folder?

25          MR. COYNE:  Objection.  Form.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    A copy of the felony review folder was sent to
 2   me by e-mail.
 3        Q    And from whom was the felony review folder
 4   sent to you?
 5        A    My attorney.
 6        Q    Okay.  And have you -- strike that.  When you
 7   looked at the felony review folder, did you
 8   independently recall your participation in this case?
 9        A    I did not.  I did not independently recall.
10        Q    Okay.  Did it refresh your recollection in any
11   way?
12        A    Only vaguely.
13        Q    Okay.  And did you remember filling out any of
14   the information on the felony review folder?
15        A    I did not.
16        Q    And when you say it refreshed your
17   recollection vaguely about the case, can you tell me
18   what you recalled about the case after you looked at the
19   felony review folder?
20        A    I meant vaguely, in the sense that I recalled
21   I was assigned a felony review that summer.  I recalled
22   who the felony review trial supervisors were, my felony
23   trial supervisors.  I recall that I did -- I was called
24   to Area Five for, you know, several murders that summer.
25   But I did not recall any specific incidents regarding
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   this case.

2       Q    Okay.  And was that felony review folder the

3   only document you reviewed in connection with this case,

4   as you prepared for your deposition?

5       A    I reviewed, but did not, you know, study the

6   detective supplementary report.

7       Q    Okay.  And how did you get the supplementary

8   report?

9       A    It was sent to me by e-mail.

10      Q    Okay.  From whom?

11      A    My attorney.

12      Q    All right.  Are there any other documents, or

13  transcripts, or anything to that effect, that you

14  reviewed to prepare for this deposition?

15      A    No.

16      Q    Did you read about Mr. Iglesias's case online,

17  or in the news, or anything like that?

18      A    I did not.

19      Q    Okay.  Have you spoken about this deposition

20  with attorneys representing any of the defendants in

21  this civil case?  And that would be attorneys for the

22  individual defendants, Reynaldo Guevara, or the City of

23  Chicago?

24      A    About two years ago, I received a telephone

25  call from attorneys for defendants, and I forget which

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 533 of 782 PageID #:13791
The Deposition of MICHAEL LaFLOR, taken on January 28, 2022

15

 1    one, and I can't remember the name.  But I did speak to

 2    an attorney for the defense.

 3         Q    And can you tell me what you discussed?

 4         A    The attorney asked me if I recalled this case,

 5    being the felony review assistant on this case, and I

 6    told him I did not recall it at all.

 7         Q    Did you discuss anything else with that

 8    attorney?

 9         A    No.

10         Q    Have you spoken about this deposition, or

11    about the Iglesias case since its conclusion, with

12    anyone else, apart from your attorney and the attorney

13    that you just told me about?

14         A    I did -- no.  I didn't talk about the

15    substance of the case.  I did tell people that I was

16    being deposed.

17         Q    And for any of the people that you told you

18    were being deposed, did anybody discuss the substance of

19    the case, or their participation, or their recollection

20    of this case at all?

21         A    No.

22         Q    Okay.  Are you currently employed?

23         A    Yes.

24         Q    Who's your employer?

25         A    I'm self-employed.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And what's the name of your law firm, I
 2  assume?
 3        A     Michael Latz, Attorney at Law.
 4        Q     Okay.  And for how long have you had your own
 5  firm?
 6        A     Since last March -- March 1st.
 7        Q     And when did you leave the Cook County State's
 8  Attorney's office?
 9        A     I left the Cook County State's Attorney's
10  office in 1995, I believe.
11        Q     Do you remember when in 1995?
12        A     I do not.
13        Q     And why did you leave the Cook County State's
14  Attorney's office?
15        A     I left the Cook County State's Attorney's
16  office to take a job with a law firm in Chicago.
17        Q     And what kind of law firm did you leave the
18  State's Attorney's office for?
19        A     It was a law firm that did insurance defense.
20        Q     And for how long were you -- well, strike
21  that.  What was the name of the law firm?
22        A     O'Connor, Schiff and Meyer.
23        Q     And for how long were you at O'Connor, Schiff
24  and Meyer?
25        A     Approximately three years.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    And where did you go after that?

2      A    After that, I went to a firm by the name of

3 Potter and Schaffner.

4      **Q    What kind of law does Potter and Schaffner do?**

5      A    Employment law, wage and hour.  Both -- mostly

6 on the plaintiff side.

7      **Q    How long were you at Potter and Schaffner?**

8      A    Approximately three years.

9      **Q    So that takes us up through about 2001;**

10 **is that right?**

11      A    I would say probably 2000 so.

12      **Q    All right.  And then, where did you go after**

13 **Potter and Schaffner?**

14      A    Went to a firm named Bollinger Ruberry and

15 Garvey.

16      **Q    And for how long were you there?**

17      A    Approximately seven years.

18      **Q    And what kind of work did you do there?**

19      A    It was insurance defense.

20      **Q    So after you left in around 2007, where did**

21 **you go?**

22      A    A firm called Ancel Glink.

23      **Q    And for how long were you at Ancel Glink?**

24      A    Approximately three years -- three and a half

25 years.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 536 of 782 PageID #:13794
The Deposition of MICHAEL LATZ, taken on January 30, 2023

18

1      Q      What kind of work did you do there?

2      A      Ancel Glink does a lot of representation of

3  municipalities and government agencies, and I

4  represented municipalities when they were sued.

5      Q      Did you do any work representing

6  municipalities in Section 1983 civil rights suits?

7      A      In my -- yes.

8      Q      All right.  So, I think, we're up through

9  about 2010.  Where did you go after you left Ancel

10 Glink?

11     A      I was appointed as a Commissioner of Illinois

12 Workers' Compensation, and I served as both Commissioner

13 and Chairman of Illinois Workers' Compensation

14 Commission.

15     Q      Until when?

16     A      That was four years.

17     Q      So around through 2014?

18     A      Yes.

19     Q      Okay.  And then, what did you do after you

20 left the Illinois Workers' Compensation Commission?

21     A      I went to a firm called McAndrews Norgle.

22     Q      What kind of work does McAndrews and Norgle

23 do?

24     A      80 percent is workers' compensation defense.

25     Q      All right.  And did you do workers' comp

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    defense while you were there?
2        A    Yes.
3        Q    And then, when did you leave McAndrews and
4    Norgle?
5        A    About three years later, I went to a firm
6    called Litchfield Cavo.
7        Q    And for how long were you at Litchfield Cavo?
8        A    Approximately -- just less than four years.
9        Q    What kind of work did you do at Litchfield
10   Cavo?
11       A    Workers' compensation defense and insurance
12   defense.
13       Q    And is that when -- when you left Litchfield
14   Cavo, is that when you went out on your own?
15       A    That's correct.
16       Q    Okay.  All right.  So now I want to talk about
17   your time at the Cook County State's Attorney's office.
18   And you said you left in 1995, what was your job title
19   in 1995?
20       A    I was an Assistant State's Attorney, in the
21   Criminal Prosecutions Bureau.
22       Q    And how long were you an ASA in the Criminal
23   Prosecutions Bureau?
24       A    The entire time I was an Assistant State's
25   Attorney, I was in the Criminal Prosecutions Bureau.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 538 of 782 PageID #:13796
The Deposition of MICHAEL KATZ, taken on January 30, 2014

20

```
 1       Q    When did you start at the Cook County State's
 2  Attorney's office?
 3       A    February 1, 1990.
 4       Q    So you were there for about five, six years?
 5       A    That's correct.
 6       Q    Okay.  And once you left the Cook County
 7  State's Attorney's office, did you have any more
 8  involvement in the cases that you worked on while you
 9  were there?
10       A    Could you restate or rephrase that question?
11       Q    Sure.  So after you left the Cook County
12  State's Attorney's office, did you continue to work on
13  any of the criminal prosecutions, that you had been
14  assigned to while you were at the State's Attorney's
15  office?
16       A    No.
17       Q    Did you have any direct involvement in the
18  prosecution of cases that you were working on, while you
19  were at the State's Attorney's office?
20       A    No.
21            MR. COYNE:  Objection. Form.  Sorry.  Go ahead.
22       Q    Why did you leave the State's Attorney's
23  office?
24       A    Excuse me, could you restate that question?
25       Q    Sure.  Why did you leave the State's
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Attorney's office?
 2        A    To take a job in a law firm.  Make more money.
 3        Q    Did you have any employment in the legal
 4   profession before you started at the Cook County State's
 5   Attorney's office?
 6        A    Yes.
 7        Q    And what was it?
 8        A    When I was a law student, I was employed at
 9   the St. Joseph County Prosecutor's office in Indiana, as
10   an intern.  And after I was sworn in, I worked for three
11   months at my brother's law firm.
12        Q    All right.  When did you graduate law school?
13        A    1989.
14        Q    And do you speak Spanish?
15        A    I am not fluent.  I understand Spanish, but
16   I'm not -- I don't speak it fluently.
17        Q    Do you understand Spanish fluently?
18        A    No.
19        Q    Did you understand Spanish back in 1993?
20        A    No.
21        Q    When did you start to learn Spanish?
22        A    I started to learn in high school.  I took
23   high school Spanish.
24        Q    And in 1993, was the extent of your Spanish
25   education high school Spanish?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 540 of 782 PageID #:13798
The Deposition of MICHAEL LATZ, taken on January 10, 2023

22

```
 1        A     Yes.

 2        Q     How many years of Spanish did you take in high

 3   school?

 4        A     Four.

 5        Q     And did you take Spanish in college at all?

 6        A     Yes.

 7        Q     How many years?

 8        A     One or two.

 9        Q     Did you study abroad in a Spanish speaking

10   country?

11        A     I did not.

12        Q     So four years of high school Spanish, two

13   years of college Spanish.  Did you have any other

14   Spanish education up through 1993?

15              MR. COYNE:  Objection.  Form.

16        A     No.

17        Q     Did you study in high school, a particular

18   dialect of Spanish, and by that, I mean Mexican Spanish,

19   Puerto Rican Spanish, Spain Spanish?

20              MR. COYNE:  Objection.  Form.

21        A     The Spanish we were taught was Castiliano,

22   which was basically Spanish, Spanish.

23        Q     And did the same go for your Spanish education

24   in college?

25              MR. COYNE:  Objection.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    No.

 2       Q    What dialect, or origin of Spanish, did you

 3  study in college?

 4            MR. COYNE:  I'm sorry, Rachel, did we get an

 5       answer to the last question?  I didn't catch it.

 6            MS. BRADY:  Oh, I'm sorry.

 7            MR. COYNE:  Was there an answer?

 8            THE WITNESS:  What was the question, please?

 9  BY MS. BRADY:

10       Q    It was whether you studied the same Castiliano

11  Spanish in college, as you did in high school?

12       A    I don't recall.

13       Q    All right.  So, I have some questions now

14  about the State's Attorney's office, and specifically,

15  the felony review process, and I'm limiting my questions

16  to the 1993 timeframe.  So I know you weren't there for

17  a terribly long time, but if I don't give you a

18  timeframe, I'm asking you about 1993.  Okay?

19       A    Yes.

20       Q    All right.  So can you tell me what the

21  responsibilities of a felony review prosecutor were in

22  the Cook County State's Attorney's office in the 1993

23  timeframe?

24            MR. COYNE:  Objection.  Foundation.  Go ahead.

25       A    I cannot tell you what the responsibilities
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 542 of 782 PageID #:13800
The Deposition of MICHAEL LATZ, taken on January 12, 2022

24

1  were, in terms of any sort of policy or job description.

2  I could tell you what I did in 1993.

3  **Q     Yeah.  Please do.**

4      A     Well, as a felony review assistant, we were

5  responsible for assessing charges which were submitted

6  by detectives and other Chicago police officers and

7  determine whether they would receive approval for filing

8  felony charges.  That's it.

9      **Q     Okay.  And when you say charges that were**

10 **submitted by detectives, what does that mean?**

11     A     Detectives would submit the evidence, which

12 they prepared in the form of reports and statements, and

13 request approval for felony charges.

14     **Q     Okay.  And how were you, as a felony review**

15 **prosecutor, notified that a detective wanted approval**

16 **for charges?**

17     A     We were, at that time in 1993, we had pagers

18 issued by the State's Attorney's office, and when the

19 pager would page you, you'd know to call into the

20 State's Attorney's office, and you'd be given an

21 assignment.

22     **Q     Okay.  So your assignments came from, like a**

23 **dispatch at the State's Attorney's office, and not from**

24 **the police department directly; is that accurate?**

25     A     That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Right.  And during your five or six years at

2    the State's Attorney's office, did you have a specific

3    assignment in felony review, or did people kind of

4    rotate through those positions?

5         MR. COYNE:  Objection.  Form.

6    A    I did not have a specific assignment felony

7    review.  I was a member of a felony review team, and

8    just received assignments, kind of a rotating order.

9    Q    And you said you were at felony review in the

10   summer of 1993?

11   A    Yes.

12   Q    Did you do any other rotations in felony

13   review?

14   A    I just had one rotation in felony review, if

15   you could call it a rotation, which lasted approximately

16   a year.

17   Q    And then, when you were a felony review

18   prosecutor, after you made the decision whether to

19   approve or deny charges, did your involvement in the

20   prosecution typically end, or did you stay on and

21   continue working on the case?

22        MR. COYNE:  Objection.  Form and foundation. Go

23     ahead.

24   A    If I could just clarify.  Depending upon what

25   the charge is, it wasn't always my call whether to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 approve or deny charges. But once the charges were

2 approved or denied, my participation in the case ended.

3     **Q**   **And when you say it wasn't always your call**

4 **whether to approve or deny charges, can you explain what**

5 **you meant by that?**

6     A   Yeah. Certain, very serious crimes, we needed

7 -- I needed approval of the felony trial supervisor, or

8 maybe someone even higher up in felony review, in order

9 to have the charges approved.

10     **Q**   **And in those situations, if you were the one**

11 **who got called out to the station to review evidence,**

12 **would you make a recommendation to the felony trial**

13 **supervisor or up?**

14     MR. COYNE: Objection. Form.

15     A   It depends upon the case, and the particular

16 facts of the case.

17     **Q**   **Who was the felony trial supervisor in 1993?**

18     A   There were -- there was more than one. Each

19 felony review team had at least one, maybe two felony

20 trial supervisors.

21     **Q**   **And do you remember who the felony trial**

22 **supervisors were in 1993?**

23     A   Are you saying the team that I was on?

24     **Q**   **Yes.**

25     A   Frank Difranco, and David Studenroth.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    All right.  And when you looked at the felony
 2   review folder for the Monica Roman/Geraldo Iglesias case
 3   that you mentioned earlier, were you able to tell
 4   whether you were the one who approved charges, or
 5   whether you submitted them up the chain for review?
 6        A    I was not.
 7        Q    You were not able to tell?
 8        A    That's correct.  I was not able to tell.
 9        Q    Where would I look to be able to figure out if
10   you were the one who approved charges versus someone
11   else up the chain?
12             MR. COYNE:  Objection.  Foundation.
13        A    I don't know.
14        Q    All right.  Oh, you said that there were
15   multiple felony review teams, and that Frank Difranco
16   and David Studenroth were the supervisors of you were
17   team.  How many other teams were there in 1993?
18        A    I do not recall.
19        Q    Okay.  And how did the teams work?  Were they
20   assigned to specific areas, or specific stations, or
21   specific categories of crimes, or something else?
22        A    I don't recall.
23        Q    And do you recall how many times you were
24   called out to a station to approve charges, during your
25   tenure on the felony review team?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 546 of 782 PageID #:13804
The Deposition of MICHAEL LATZ, taken 30/January/2023

28

```
 1        A    I do not recall.

 2        Q    Was it more along the lines of once a day, or

 3   once a week, or once a month?

 4             MR. COYNE:  Objection.  Foundation.

 5        A    There was no regular schedule.  That could

 6   have been random.  It could have been several times a

 7   day, or not at all during the shift.  There was no --

 8        Q    Okay.  And I'm not trying to pin you down on a

 9   specific number, but just so that I can have an

10   understanding of your involvement, and kind of what it

11   just looked like on your end, can you give me an

12   estimate of the number of times you went out to review

13   felony charges during your year on felony review?

14             MR. COYNE:  Sorry.  Same objection.

15        A    I'm sorry.  I couldn't give you an estimate.

16   This was 30 years ago, and I just -- it would just be a

17   pure guess.

18        Q    Okay.  Was it more than 10?

19        A    Yes.

20             MR. COYNE:  Same objection.

21        Q    Was it more than 50?

22             MR. COYNE:  Same objection.

23        A    Was what more than 50?

24        Q    The number of times that you went out to a

25   station to approve felony charges, or to evaluate felony
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    charges?

2        A    Yes.

3        Q    Okay.  And do you recall how many of the

4    felony charges that you were called out to approve were

5    homicides?

6        A    I do not recall.

7        Q    Do you have an estimate of the percentage of

8    the work that you did that -- on felony review that

9    involved homicides?

10            MR. COYNE:  Objection.  Foundation.

11       A    It would just be pure guess.

12       Q    Okay.  What other felonies were you called out

13   to review other than homicides?  What other categories

14   of felonies?

15       A    Armed robberies would be an example.

16   Aggravated batteries would be another example.

17       Q    All right.  So I want to discuss with you now

18   the obligations of state prosecutors, under Brady versus

19   Maryland.  So do you have an understanding of the state

20   prosecutor's obligation under Brady?

21            MR. COYNE:  Objection.  Foundation and form.

22       A    I am familiar with what's called the Brady

23   Rule.

24       Q    And what is that?

25       A    The obligation of prosecutors to disclose

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   exculpatory evidence to the defense.

 2       Q    And in 1993, did you understand that the state

 3   prosecutor's obligation under Brady required them to

 4   disclose all exculpatory evidence to the defense?

 5            MR. COYNE:  Objection.  Foundation.

 6            MR. RAHE:  Objection to form, as well.

 7       A    I don't recall what I knew in 1993.

 8       Q    Do you have any reason to think that you were

 9   not aware of your obligation under Brady versus Maryland

10   in 1993?

11            MR. COYNE:  Same objection.

12            MR. RAHE:  Objection to form.

13       A    I don't understand the question.

14       Q    So as you sit here today, you understand the

15   prosecutor's obligation under the Brady Rule, right?

16       A    Yes.

17       Q    And do you understand that obligation to

18   include a requirement that prosecutors need to turn over

19   all exculpatory evidence or potentially exculpatory

20   evidence to the defense?

21       A    I wouldn't say --

22            MR. COYNE:  Objection to form.

23            MR. RAHE:  Objection to form.

24       Q    Can you repeat your answer?  I think it got

25   covered up by objections.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I wouldn't say that's exactly my understanding
 2   of it, but I would say that's one description of the
 3   Brady Rule.
 4        Q    Okay.  What about the description I just gave
 5   doesn't square exactly with your understanding of the
 6   Brady Rule?
 7             MR. COYNE:  Objection.  Form.
 8             MR. RAHE:  Objection.
 9        A    It's not all Brady versus Maryland says.
10        Q    Okay.  Do you understand that at least one
11   component of the Brady Rule is that state prosecutors
12   need to disclose all potentially exculpatory evidence to
13   the defense?
14        A    Yes.
15             MR. COYNE:  Same objection.  Go ahead.
16             MR. RAHE:  Objection to form.
17        Q    And do you have any reason to think that you
18   did not know that, or did not have that understanding
19   about the Brady Rule, back when you were at the state's
20   attorney's office?
21             MR. RAHE:  Objection.  Form.  Foundation.
22        A    Could you rephrase the question, please?
23        Q    Yeah.  So let me give a little context.  So I
24   asked if you had that understanding of the Brady Rule
25   that we just discussed back in 1993.  And you say you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 550 of 782 PageID #:13808
The Deposition of MICHAEL DVORAK, taken on January 30, 2023

32

```
 1   don't know.  You don't remember what you knew in 1993.
 2           So my question is:  Do you think that you
 3   probably knew that in 1993?
 4           MR. RAHE:  Same objection.  Form and
 5      foundation.
 6           MR. COYNE:  Objection.
 7      A    It is likely that, 1993, that I was aware of
 8   Brady.  Yes.
 9   BY MS. BRADY:
10      Q    Okay.  And given all of your training in law
11   school, and your internship in the prosecutor's office
12   in St. Joseph County, and the training, if any, that you
13   had to go through at the state's attorney's office, do
14   you think you have a reason to suspect that you did not
15   know about the Brady obligation back in 1993?
16           MR. RAHE:  Objection.  Form.  Foundation.
17           MR. COYNE:  Objection.  Form.
18      A    No.
19      Q    Are you familiar with the prosecutor's duty to
20   seek justice and not merely convict?
21           MR. COYNE:  Objection.  Form.
22           MR. RAHE:  Objection.  Form.
23      A    Yes.
24      Q    And did you follow the Brady Rule during your
25   time in the prosecutor's office?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 551 of 782 PageID #:13809
The Deposition of MICHAEL METZ, taken on January 30, 2024

33

```
 1              MR. RAHE:  Objection to form.

 2              MR. COYNE:  Objection to form, foundation.

 3       A     What do you mean by follow?

 4       Q     Did you disclose all potentially exculpatory

 5    evidence of which you were aware, or otherwise ensure

 6    that it was disclosed to criminal defendants?

 7              MR. RAHE:  Objection.  Form.  Foundation.

 8       A     When I was a prosecutor and had the obligation

 9    to make disclosures, I always did so to the best of my

10    ability and knowledge.

11       Q     Okay.  Do you have any reason to think that,

12    at any point, you were aware of potentially exculpatory

13    information that you did not produce to a criminal

14    defendant?

15              MR. RAHE:  Same objection.

16              MR. COYNE:  Objection to form.

17       A     Could you restate the question?

18       Q     Yeah.  Do you have any reason to think that,

19    if you were aware of exculpatory information -- oh,

20    strike that.  Can we assume that, if you as a

21    prosecutor, were aware of potentially exculpatory

22    information, that you made sure that it was turned over

23    to the defense?

24              MR. RAHE:  Same objections.

25              MR. COYNE:  Objection.  Also calls for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 552 of 782 PageID #:13810
The Deposition of MICHAEL ZATZ, taken 30/January, 2022

34

1    speculation.

2        A    I can't answer that question the way it's

3    stated.  There's over a thousand assistant state

4    attorneys in the Cook County State's Attorney's office.

5    BY MS. BRADY:

6        Q    So my question is about you and your practice.

7    So can you think of any instances, while you were at the

8    state's attorney's office, in which you were aware of

9    potentially exculpatory information, and you did not

10   follow the protocol to disclose it to the defendants?

11            MR. RAHE:  Same objections.

12       A    No.

13       Q    Did the Cook County State's Attorney's office

14   have a procedure or a standard protocol in the 1993

15   timeframe to ensure that all potentially exculpatory

16   information got turned over to the defense?

17            MR. RAHE:  Same objections.

18            MR. COYNE:  Objection.  Form.  Foundation.

19       A    I don't know.

20       Q    Did you ever respond to discovery requests

21   while you were at the state's attorney's office?

22       A    Yes.

23       Q    And what are discovery requests?

24       A    Well, discovery is a mechanism by which the

25   party asked the other party for documents and other

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  evidence to be disclosed.
 2       Q    And did you ever have the responsibility of
 3  responding to discovery requests while you were at the
 4  state's attorney's office?
 5       A    I believe so.
 6       Q    And would it be fair to say that it was --
 7  strike that.  Were you given any training on how to
 8  respond to discovery requests at the state's attorney's
 9  office?
10       A    I don't recall specifically any training.
11       Q    So how did you learn what to do when you got a
12  discovery request from the defense?
13            MR. COYNE:  Objection.  Form.
14       A    I don't -- is your question -- is how did you
15  learn how to do it?  Is that what your question is?
16       Q    Yeah.  Yes.
17       A    I don't recall.
18       Q    Do you have any reason to think that you were
19  not given some sort of instruction, either formal, or on
20  the job training, about how to respond to discovery
21  requests at the prosecutor's office?
22            MR. RAHE:  Objection.  Foundation.
23       A    It's kind of a compound question, but you are
24  -- I do know that I learned, during the course when I
25  was an assistant state attorney, of how to respond to
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    discovery requests.

2        Q    And when you were in felony review, were you

3    responsible for responding to discovery requests?

4        A    No.

5        Q    Can you think of any instances, while you were

6    in felony review, where you learned about exculpatory or

7    potentially exculpatory material that had not been

8    disclosed to the defense attorneys?

9            MR. COYNE:  Objection.  Form.  Foundation.

10           MR. RAHE:  Form.  Foundation.

11       A    Did you hear my answer?

12       Q    I didn't.

13       A    Oh, could you repeat the question?

14       Q    Oh, yeah.  Can you think of a time, when you

15   were in felony review, where you learned about

16   exculpatory or potentially exculpatory evidence that had

17   not been disclosed to the defense?

18           MR. COYNE:  I apologize, Rachel.  Same

19       objections.

20       A    No.  Never.

21       Q    All right.  These next questions are, I assume

22   I know the answers, but I just have to ask them.  Did

23   you ever personally withhold exculpatory evidence from

24   defense?

25       A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Are you aware of any instance in which any
2  prosecutor at the CCSAO withheld exculpatory evidence
3  from the defense?
4         MR. COYNE:  Objection.  Form.  Foundation.
5    A    No.
6    Q    Back in the mid-90s, did the Cook County
7  State's Attorney's office have a file-keeping system
8  that allowed defense attorneys to come review the
9  prosecutor's file?
10        MR. COYNE:  Objection.  Form.  Foundation.
11        MR. RAHE:  Form.  Foundation.
12   A    I don't know.
13   Q    In the mid-90s, are you aware whether the Cook
14 County State's Attorney's office prosecutors were able
15 to go inspect Chicago Police Department files?
16        MR. COYNE:  Same objection.
17        MR. RAHE:  Followed.
18   A    I don't know.
19   Q    Did you ever personally inspect a file at the
20 Chicago Police Department or its records division?
21   A    I did not.
22   Q    Okay.  So now, I'm going to ask you about your
23 practices in general, as a felony review prosecutor. And
24 so, I'm not asking about a specific case, but just kind
25 of your approach to doing things.  So when you were a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  felony review prosecutor in 1993, what was your process

2  for determining whether to approve charges against a

3  suspect?

4      MR. COYNE:  Rachel, so I don't have to keep

5      interrupting you.  Can I just get a continuing line

6      of objection on form and foundation, based on his

7      testimony that he doesn't recall what he knew in

8      1993?  That way I don't have to keep interrupting.

9      Thank you.

10     A    I think that's too general of a question to

11  answer.  I wonder if you could be more specific.

12  BY MS. BRADY:

13     Q    Yeah.  So in the instances in which you were

14  called down to a station, to decide whether to approve

15  charges against someone, how did you decide what was

16  sufficient evidence to approve charges versus not

17  approve charges?

18     A    I don't know if I could answer that without

19  the specific context of what the charge was, what the

20  evidence was, and it was different in every case.  You

21  know, and I would just be speculating if I was to give

22  you an example, as I sit here today.  I could answer

23  questions, but they'd have to be more specific

24  questions.

25     Q    Okay.  Was the felony-reviewed decision to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 approve charges in any way different from the actual

2 decision to charge a criminal defendant, or was it all

3 one and the same?

4       MR. RAHE:  Objection.  Form.

5   A   I don't know.  I don't know, as I sit here

6 today, whether there was any difference, and I don't

7 know what you're referring to.  What do you mean the

8 decision to charge.

9   Q   Okay.  Did you ever make a decision to approve

10 charges that was overruled by one of your supervisors?

11   A   I don't recall.

12   Q   Do you recall if you were ever -- or strike

13 that.  Do you recall ever making a decision not to

14 approve charges, that was overruled by a supervisor?

15   A   I don't recall.

16   Q   And am I correct in understanding the process

17 as you described it, which is that the police would

18 contact the state's attorney's office when they believed

19 they had enough evidence to charge someone, and then, a

20 felony review prosecutor would go to the station, and

21 review the evidence available, and then, determine

22 whether the evidence established probable cause to

23 charge?

24       MR. RAHE:  Objection.  Form.  Misstates the

25    prior testimony.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. COYNE:  And foundation.
 2        A     I don't -- I can't agree that that's exactly
 3   the way it worked.
 4   BY MS. BRADY:
 5        Q     Was that typically the way that it worked in
 6   your experience?
 7        A     No.
 8              MR. COYNE:  Objection to form.
 9        Q     Okay.  Can you tell me --
10              MR. COYNE:  Sorry.
11              MS. BRADY:  I didn't hear your objection.
12              MR. RAHE:  Oh, objection.  Just the same
13      objection.
14   BY MS. BRADY:
15        Q     Can you tell me what about your practice
16   differed from the explanation for the question I just
17   asked?
18        A     Well, not my practice, just the way it was
19   worded wasn't exactly the way it went, in my
20   recollection.
21        Q     Okay.  So can you tell me, in your
22   recollection, how it did go?
23        A     The police, generally a detective, would call
24   state attorney's felony review, and ask for a review of
25   felony charges -- a request for felony charges, and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    dependent upon the type of charge it was, it could be

2    handled either over the phone, or a felony review

3    assistant would be sent out to the area to review the

4    charges.

5        Q    And did the police tell the felony review

6    prosecutor what charges they were seeking?

7            MR. COYNE:  Objection.  Form and foundation.

8        A    Generally, yes.

9        Q    And would it be fair to say that, in deciding

10   whether to approve charges, you relied on information

11   provided to you by the detectives that asked you to come

12   review the case?

13           MR. RAHE:  Objection.  Form.

14       A    Yes.

15       Q    Did you rely on the information or evidence

16   provided by detectives to be complete and accurate?

17           MR. COYNE:  Objection.  Form.

18       A    Yes.

19       Q    Can you think of an instance in which you ever

20   went to a station to evaluate charges, and you thought

21   that there was evidence that had been fabricated?

22       A    No.

23       Q    Can you think of an instance in which you ever

24   went to a station to evaluate charges, where you thought

25   that the officers giving you the information were being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  untruthful?

2          MR. COYNE:  Objection.  Form.

3    A    No.

4    Q    And in the mid-90s, if you thought there was

5  insufficient evidence to approve charges, how did you

6  communicate that to the detectives?

7    A    I would state one of two things.  Either

8  felony charges are not approved, or make it a continuing

9  investigation and ask for, you know, other witnesses to

10  be interviewed or something like that.

11    Q    Okay.  And can you explain the difference

12  between felony charges are not approved and make it a

13  continuing investigation?

14    A    No.  I can't explain that any more than I just

15  did.

16    Q    Okay.  Are there instances that you can think

17  of in which you went to review charges, and you just

18  denied them outright, and it ended the investigation?

19          MR. COYNE:  Objection.  Form.

20    A    As I sit here --

21          MR. RAHE:  Object to foundation.  I'm sorry.

22    A    As I sit here today, I can't remember any

23  specific situations, but I know that I did not approve

24  felony charges on many occasions.

25    Q    And as you sit here today, can you think of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  any specific instances in which you went to review
 2  charges, and you told the detectives to keep
 3  investigating?
 4       A    Not specific cases, but I know that it
 5  happened.
 6       Q    If you -- oh, strike that.  Did you have a
 7  practice of memorializing your thought process or
 8  decision making process that you undertook in order to
 9  decide whether to approve charges or deny them?
10            MR. COYNE:  Objection.  Form.
11       A    I didn't keep any notes other than what was
12  memorialized in the felony review folder.
13       Q    All right.  I'm going to put up an exhibit.
14  We'll call this Exhibit 1.  Give me a second to get it
15  at my screen.  Okay.  Can you see this?
16            (EXHIBIT 1 MARKED FOR IDENTIFICATION)
17       A    I can.
18            MR. RAHE:  So you can, Mike, or can't.
19            THE WITNESS:  I can.  I can.
20            MR. RAHE:  So the felony review case filing.
21  BY MS. BRADY:
22       Q    Yeah.  My computer says it stopped sharing.
23  Let me put it up again.  Okay.  Can you see this
24  document on your screen?
25       A    I can see that.  Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q   Okay.  So for the record, this is a nine page

2  PDF, beginning at Bates label, CCSAO Iglesias, 470.

3  Are you familiar with this layout?

4       MR. RAHE:  Objection to form and foundation.

5     Q  And I'm not asking questions about this

6  document, specifically, but just about this kind of

7  category of document, and I can flip through the pages

8  if you'd like me to.

9       MR. RAHE:  (Inaudible).

10    A  I am familiar with this form, if that's what

11  you're asking.

12     Q  Yeah.  So I'll flip through so you can see the

13  rest of the pages, just so we're on the same page.

14       MR. RAHE:  Rachel, just to clarify, this

15      exhibit includes the top sheet, which is a criminal

16      file case document, which, I believe, is a separate

17      document from felony review, but just for purposes

18      of the questions, I wanted to clarify whether the

19      questions are going to pertain to the entire

20      exhibit, or just a felony review folder.

21  BY MS. BRADY:

22     Q  Yes.  I included that in error.  So the first

23  page of this document is not part of the felony review

24  folder; is that right?

25    A  This first page looks like it's a felony file

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 563 of 782 PageID #:13821
The Deposition of MICHAEL KARL, taken on January 5, 2022

45

1    jacket.  I've never seen this before.

2        **Q    Okay.**

3        A    Looks like it's the file jacket that's capped

4    with the felony trial.

5        **Q    Okay.  So flipping now to the second page of**

6    **this PDF, which is CCSAO, Iglesias, 471.  When you talk**

7    **about the felony review folder, is this the document**

8    **that you're talking about?**

9        A    Yes.

10       **Q    Okay.  So this folder, which is Exhibit 1, is**

11   **this the place where you would memorialize your thoughts**

12   **about whether to approve charges?**

13            MR. COYNE:  Objection to form.

14       A    This is where I would record the information

15   which I gleaned, when I came to the area, and recorded

16   what evidence, summarized what evidence was told to me

17   by the detectives in order to, you know, prove, or deny

18   felony charges.

19       **Q    Okay.  And not asking about this document**

20   **specifically, but just about this category of felony**

21   **review jackets.  When you were recording the information**

22   **about various witnesses, where did you get it?**

23            MR. RAHE:  Objection to form.

24       A    Where did I get what, the felony review

25   folders?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 564 of 782 PageID #:13822
The Deposition of MICHAEL RATZ, taken on January 30, 2024

46

1    Q    Oh, I'm sorry.  Yeah.  Where did you get the

2    information about what the various witnesses had to say?

3         MR. RAHE:  Same objection.

4    A    It depends.  As often as possible, I would

5    interview the witnesses myself.

6    Q    Okay.  Did you also get it from available

7    police reports?

8    A    Yeah.  I did review police reports when I went

9    to the area, to begin the analysis of doing a felony

10   review.

11   Q    Okay.  And did you also obtain information

12   about witnesses or other evidence in the investigations

13   orally from detectives?

14   A    I don't recall specifically, but likely.

15   Q    And would it be fair to say that you, as a

16   felony review prosecutor, did not independently

17   investigate cases before deciding whether to approve or

18   decline charges against a defendant?

19        MR. COYNE:  Objection to form.

20   A    Yes.

21   Q    Would it be fair to say that your decisions

22   were based on evidence brought to you by local law

23   enforcement agencies?

24        MR. COYNE:  Objection to form.

25   A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q    Did you rely on detectives to give you their
 2  general progress reports when you were determining
 3  whether to approve charges?
 4         MR. RAHE:  Objection to form and foundation.
 5    A    I don't know what you mean progress reports.
 6    Q    So by way of background, there are a couple of
 7  categories of reports.  So there's the supplementary
 8  reports, which I think you mentioned earlier, as having
 9  been a document that you reviewed to prepare for this
10  deposition.  And then, there were also general progress
11  reports, and sometimes, they were just handwritten
12  notes, and sometimes, they actually said general
13  progress report in the upper left-hand corner.  Do you
14  remember there being a difference between the types of
15  reports that I'm describing?
16         MR. CHRISTIE:  Object to form.  Go ahead.
17    A    I would just like to correct this.  I didn't
18  review a supplementary report before I came here.  I saw
19  one but I didn't review it.
20    Q    Okay.  That was -- yeah -- my bad.
21    A    I don't recall the specific names of the
22  reports that I reviewed when I was called out to do a
23  felon review.
24    Q    Did you typically review any handwritten
25  notes?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    I don't recall reviewing any handwritten
 2 notes.
 3      Q    And do you recall any instances in which you
 4 based your decision, whether to approve charges, on
 5 information provided by a confidential informant?
 6      A    No.  (Coughs) Excuse me.
 7      Q    And you said that sometimes you would
 8 interview witnesses, and sometimes, you would rely on
 9 police reports or police providing you with information
10 in some capacity?
11      A    I don't think that's what I said.  I said it
12 depends upon the case, that we try to interview
13 eyewitnesses as often as possible.
14      Q    Okay.  And what would determine whether you
15 were able to interview an eyewitness before deciding
16 whether to approve charges?
17      A    I don't know.  It would depend upon the case.
18 It would certainly, of course, depend upon whether they
19 were cooperative, and depend upon whether they were
20 available.
21      Q    Was your decision to approve charges based
22 upon a determination of whether there was probable
23 cause?
24      A    As I sit here today, I honestly cannot
25 remember the standard that we were giving for assessing
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   whether to approve or deny felony charges.

2      **Q    Do you have any reason to believe that this**

3   **standard that you used to determine whether to approve**

4   **felony charges was anything other than probable cause?**

5         MR. CHRISTIE:  Objection.  Form.

6      A    Yes.

7      **Q    And why do you think that it could have been**

8   **something other than probable cause?**

9      A    Well -- I don't have this specific, but

10  probable cause is pretty low standard.  And we had, I

11  would say, a little bit of a higher standard, and it's

12  more than probable cause.  It's more likely that we

13  would have reasonable probable-hood of success at trial.

14     **Q    Can you think of any instances while you were**

15  **in felony review where you approved charges, and then,**

16  **detectives continued to investigate the case?**

17     A    I don't know of any.

18     **Q    Are you aware of whether the Chicago Police**

19  **Department had any sort of database in the early '90s to**

20  **track reliability of confidential informants?**

21     A    No.

22         MR. CHRISTIE:  Foundation.

23         MR. COYNE:  Form and foundation to that

24    question.

25  BY MS. BRADY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    All right.  So you've told me about

 2   information in police reports, witness interviews, and

 3   information provided to you orally by detectives that

 4   you would consider in deciding whether to approve

 5   charges.  What other kinds of materials did you review

 6   while you were in felony review in order to determine

 7   whether to approve charges?

 8        A    Could you name the ones that you said already?

 9        Q    Yep.  Written police reports, witness

10   interviews, and information conveyed orally by police.

11        A    Statements of the defendant, if any.

12        Q    Okay.  Anything else?

13        A    As I sit here, I can't think of anything else.

14        Q    And, I think, you may have answered this

15   already, but if you spoke with a witness or a suspect in

16   deciding whether to approve charges, would you

17   memorialize that conversation somewhere?

18        A    Could you just restate that question?

19        Q    Yeah.  If you spoke with a witness or a

20   suspect, while you were in the process of deciding

21   whether to approve charges, would you memorialize that

22   conversation somewhere?

23        A    Yes.

24        Q    And where would you memorialize it?

25        A    In the felony review folder.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 569 of 782 PageID #:13827
The Deposition of MICHAEL PATZ, taken on January 30, 2023

51

1       Q    What is a felony minute sheet?

2       A    I don't know.

3       Q    Are you familiar with the term, felony 101?

4       A    No.

5       Q    Apart from the felony review folder that we

6  just discussed, were you, as a felony review prosecutor,

7  responsible for writing up any other paperwork, or

8  reports, or documents, or anything like that to

9  memorialize your decision to approve or deny charges?

10      A    The felony review folder is the only way I

11  recall that we documented our felony review calls.

12      Q    Okay.  I'm going to put up now what we'll call

13  Exhibit 2.  For the record, this is a one-page document

14  at Bates label, RFC Iglesias 9.  Can you see this

15  document on your screen?

16           (EXHIBIT 2 MARKED FOR IDENTIFICATION)

17      A    I do.

18      Q    Do you need me to zoom in?

19      A    Please.  Yes, please.

20      Q    Okay.  So here at the top is this felony

21  minute sheet form 101.  Do you see that?

22      A    I do.

23      Q    Okay.  Do you recall ever using or writing one

24  of these felony minute sheet form 101?

25      A    What do you mean by using?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 570 of 782 PageID #:13828
The Deposition of MICHAEL IATT, taken on January 30, 2023

52

```
 1        Q     Using the form to memorialize your thoughts or
 2   actions or decisions?
 3        A     I never created a form 101.
 4        Q     Okay.  Do you know as a matter practice who
 5   was responsible for writing the felony 101 form?
 6        A     I do not.
 7        Q     All right.
 8             MR. COYNE:  Sorry.  Did you mark that as 2,
 9       Rachel, or no?
10             MS. BRADY:  I did.
11             MR. COYNE:  Exhibit 2.  Thank you.
12   BY MS. BRADY:
13        Q     What is the state's attorney case fact sheet?
14        A     I do not know.
15        Q     I'm going to put up a document.  We'll call it
16   Exhibit 3.  For the record, this is a three-page
17   document, beginning at Bates CCSAO Iglesias 157.  Can
18   you see this document on your screen?
19             (EXHIBIT 3 MARKED FOR IDENTIFICATION)
20        A     Can you enlarge it a little bit?
21        Q     Sure.
22        A     That -- thank you.  I can see it.  Yes.
23        Q     Okay.  And I'm going to scroll down so you can
24   take a look at each page.  And you can ignore the
25   highlighting for now.  Okay.  Have you had a chance to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 571 of 782 PageID #:13829
The Deposition of MICHAEL FRITZ, taken on January 5, 2022

53

```
 1    take a look at this case fact sheet?
 2         A    Could you scroll back to the top, please? Yes.
 3    I see it.
 4         Q    All right.  Did you, as a felony review
 5    prosecutor, prepare this case fact sheet, or were you --
 6    strike that.  Were you as a federal -- strike that. Were
 7    you, as a felony review prosecutor, responsible for
 8    preparing case fact sheets like this?
 9         A    No.
10         Q    Did you rely on these kinds of case fact
11    sheets during your duties in felony review?
12         A    No.
13         Q    Did you as a felony review prosecutor, ever
14    make promises to witnesses in exchange for testimony, or
15    statements, or other information?
16              MR. CHRISTIE:  Objection.  Form.
17         A    Never.
18         Q    Are you aware of any instance in which anyone
19    from the Cook County State's Attorney's office made a
20    promise to a witness in exchange for testimony or other
21    information?
22              MR. CHRISTIE:  Objection.  Form, foundation.
23         A    I think that's a -- do you mean ever -- in any
24    kind of promise ever?
25         Q    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I -- could you repeat or restate the question?

2    Q    Sure.  Are you aware of any instances in which

3  anyone from the Cook County State's Attorney's office

4  made a promise to a witness in exchange for testimony or

5  other information?

6         MR. CHRISTIE:  Same objection.

7    A    I don't have a specific recollection in mind.

8  I do know that -- well, have a general recollection of

9  promising witnesses that they be protected and that they

10 -- but other than that, nothing.

11   Q    Okay.  Are you aware of instances in which a

12 criminal defendant in one case, or a suspect in one

13 case, would be offered a deal in exchange for testimony

14 in another case?

15   A    No.

16        MR. CHRISTIE:  Objection.  Form, foundation to

17     previous question.

18   Q    And in the instance you described where

19 witnesses were promised protection in exchange for

20 information, would that deal be memorialized somewhere?

21        MR. CHRISTIE:  Objection.  Same.

22   A    I don't recall.

23   Q    Were you ever responsible for working out the

24 plea agreements with criminal defendants while you were

25 at the state's attorney's office?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 573 of 782 PageID #:13831
The Deposition of MICHAEL KATZ, taken on January 18, 2022

55

```
 1      A    In what context?

 2      Q    Any context.

 3      A    Yes.

 4      Q    And if you worked out a plea deal with a

 5  suspect or a defendant, would you be sure to memorialize

 6  that somewhere?

 7           MR. COYNE:  Objection.  Incomplete

 8      hypothetical.

 9      Q    Strike that.  In the instances in which you

10  worked out plea deals with defendants while you were at

11  the state's attorney's office, would you memorialize the

12  terms of the deal somewhere?

13      A    Yes.

14           MR. COYNE:  Objection to form.

15      Q    To the best of your understanding, was it the

16  practice at the state's attorney's office to memorialize

17  the terms of any deals reached with defendants?

18           MR. CHRISTIE:  Objection.  Form.

19      A    I can't speak to policies or what other people

20  did.  Only to what I recollect that I did.

21      Q    Do you have reason to think that there were

22  prosecutors at the state's attorney's office in the

23  early '90s who were not memorializing the terms of plea

24  deals that they had reached with criminal defendants?

25           MR. CHRISTIE:  Objection to form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 574 of 782 PageID #:13832
The Deposition of MICHAEL LATZ, taken on January 24, 2023

56

```
 1        A    Well, all plea deals are memorialized.
 2             MR. CHRISTIE:  Objection to form and
 3      speculation.  Sorry.  Go ahead.
 4        A    All-plea deals are memorialized by the court
 5   when the plea is taken.
 6   BY MS. BRADY:
 7        Q    And to the best of your understanding, those
 8   plea deals include all of the terms of the deal, right?
 9        A    I don't know.
10        Q    Do you have reason to think that anyone at the
11   state's attorney's office in the early '90s was making
12   deals with criminal defendants whose terms were not
13   memorialized somewhere or otherwise disclosed?
14             MR. CHRISTIE:  Objection.  Form, foundation,
15      calls for speculation.
16        A    No.
17        Q    All right.  So now I'm going to ask you some
18   questions about the Iglesias, Roman case, specifically.
19   So if now would be a good time to take a break, we can
20   do that.  Otherwise, we can plow through.  It's up to
21   you.
22             MR. COYNE:  Why don't we take five?
23             MS. BRADY:  Sure.
24             MR. COYNE:  Let's take five minutes.  Okay,
25      thanks.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 575 of 782 PageID #:13833
The Deposition of MICHAEL LATZ, taken on January 18, 2022

57

```
 1          COURT REPORTER:  We'll go off the record.
 2             (OFF THE RECORD)
 3          COURT REPORTER:  Okay.  We're back on the
 4       record.
 5  BY MS. BRADY:
 6       Q    Okay.  Mr. Latz, you told me earlier that even
 7  after looking at the felony review folder, you had no
 8  independent recollection of the specifics of the
 9  Iglesias' case; is that right?
10       A    That's correct.
11       Q    Do you have any independent recollection of
12  the contents of the prosecution file?
13       A    I do not.
14       Q    I will represent to you that we have a file
15  that was provided to us by the Cook County State's
16  Attorney's office.  Do you have any way of knowing or is
17  -- strike that.  Is there any way that we can look at
18  that file and determine when documents were placed in
19  it?
20          MR. COYNE:  Objection.  Foundation.
21       A    Not that I know of.
22       Q    Do you recall a witness by the name of
23  Fransico Vicente?
24       A    I have no independent recollection at all.
25       Q    What about a witness named Frankie Vicente?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    No.

 2       Q    What about a witness named Chino (phonetic)?

 3       A    No.

 4       Q    Do you recall a man by the name of Rosendo

 5  Ochoa?

 6       A    I do not.

 7       Q    Do you recall a man by the name of Hugo

 8  Rodriguez?

 9       A    No.

10       Q    David Chmieleski?

11       A    No.

12       Q    Efrain Torres?

13       A    No.

14       Q    Do you have any independent recollection of

15  Geraldo Iglesias?

16       A    I do not.

17       Q    Do you remember speaking about the Iglesias'

18  case with David Studenrach?

19       A    No.

20       Q    Do you remember talking about the Iglesias'

21  prosecution with Pridy Peroysing (phonetic)?

22       A    No.

23       Q    Do you remember speaking with the -- any of

24  the defense attorneys about the Iglesias' prosecution so

25  that would be John DeLeon or Donna MaKowski?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 577 of 782 PageID #:13835
The Deposition of MICHAEL LATZ, taken on January 10, 2023

59

1    MR. COYNE: You mean criminal -- I'm sorry. You

2  mean criminal defense attorneys, correct?

3    MS. BRADY: Yes.

4    MR. COYNE: Thank you.

5  A  No. If you're asking me, do I recollect ever

6 speaking to them? No.

7 BY MS. BRADY:

8  **Q  Okay. And do you recall speaking with any CPD**

9 **employees about this case?**

10  A  I do not recall speaking to any of the Chicago

11 police that was assigned to this case.

12  **Q  Do you recall any conversations you've ever**

13 **had with Reynaldo Guevara?**

14  A  I do not.

15  **Q  Do you remember Reynaldo Guevara at all?**

16  A  Vaguely.

17  **Q  What do you remember about him?**

18  A  I was sent to Area Five pretty frequently that

19 summer. I knew that he was a detective in Area Five.

20  **Q  Do you remember anything else about him?**

21  A  No.

22  **Q  Do you remember any cases that he presented to**

23 **you?**

24  A  Well, other than this one, just because my

25 recollection has been refreshed. I don't remember any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   others.
 2       Q    Do you remember Detective Halvorsen -- Ernie
 3   Halvorsen?
 4       A    Vaguely.
 5       Q    What do you remember about Detective
 6   Halvorsen?
 7       A    I remember that he was a detective in Area
 8   Five.
 9       Q    Okay.  Do you remember anything else about him
10   or any other cases?
11       A    No.
12       Q    Do you remember were a Detective Steve Gawrys?
13       A    I do not.
14       Q    Do you remember Sergeant Biebel over at Area
15   Five?
16       A    Only vaguely.
17       Q    What do you remember about Sergeant Biebel?
18       A    Just that he was a sergeant of detectives.
19   That's it.
20       Q    When you were reviewing cases at Area Five,
21   was he as a sergeant typically involved in your
22   interviews or decision-making process?
23       A    Typically, no.
24       Q    And can you think of any instances in which he
25   was?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    I cannot.

2      Q    Okay.  And do you remember a CP Detective

3  Ritchio (phonetic) or Riccio?

4      A    I do.  Yes.

5      Q    What do you remember about him?

6      A    I worked with detective Riccio on a few cases.

7  He knew me by name.  He was a friendly guy.  And of

8  course, I watched him as he -- from afar as he

9  progressed in the ranks at the Chicago Police

10  Department.

11      Q    And what do you mean you watched as he

12  progressed through the ranks?

13      A    I believe, he reached a pretty high rank in

14  the Chicago police Department.

15      Q    And when you say you watched from afar, what

16  do you mean?

17      A    I mean that I've seen him on TV.  I've seen

18  him at press conferences.  That's what I mean.

19      Q    Okay.  Did you have any personal or friendly

20  relationship with him?

21      A    I would call us friendly, but just within that

22  confines of the police.  We didn't meet outside socially

23  anywhere.

24      Q    Do you remember any cases that you worked on

25  with then Detective Riccio while you were at the state

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    attorney's office?

2         A    No.

3         Q    And do you recall making any of the decisions

4    to approve or not approve charges in the Iglesias' case?

5         A    I do not.

6         Q    And do you know, as you sit here today,

7    independent of any documents, how you decided whether to

8    approve or not approve charges against Geraldo Iglesias?

9              MR. COYNE:  Let me note an objection.  And to

10        the extent that a question, actually calls into

11        question application of the attorney work product

12        doctrine. Before I go any further, let me just ask

13        Mr. Latz, do you know the answer to that question?

14        Without answering it, just tell me whether you know

15        the answer to the question or not.

16             THE WITNESS:  No.

17             MR. COYNE:  All right.  Then I'll -- won't be

18        in need to insert the instruction.  Go ahead.

19   BY MS. BRADY:

20        Q    Okay.  So I'm going to put up now a document

21   that we will call Exhibit 4.  And for the record, this

22   is a four-page document, beginning at Bates RFC Iglesias

23   90.  Can you see this supplementary report on your

24   screen?

25             (EXHIBIT 4 MARKED FOR IDENTIFICATION)



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 581 of 782 PageID #:13839
The Deposition of MICHAEL LOTZ, taken on January 5, 2023

63

1      A    I can, Ms. Brady.  I wonder if you could

2   enlarge it for me.

3      Q    Yes.  And I'll flip through all the pages, so

4   you can familiarize yourself with it.  Can you see this?

5      A    I can.

6      Q    Okay.  Just let me know when you're ready for

7   me to scroll.

8      A    Scroll down.  Okay.  Okay.  Okay.  Okay. Okay.

9   Okay.

10      Q    That's it.  And I'll just add for the record

11   that the highlighting on here is mine, just for ease of

12   communication during this Zoom deposition.  It wasn't in

13   the original document.

14      A    Good.

15      Q    All right.  Have you had an opportunity to

16   review this whole report?

17      A    You just showed it to me.  I've taken a few

18   minutes to just briefly review it.

19      Q    Sure.  Are there any places on this document

20   that you want to go back and look at, or read more

21   carefully?

22      A    Well, depends upon the question, I guess. I'll

23   tell you if I need to.

24           MR. COYNE:  Yeah.  Let me just object to

25       foundation as to that question, since he hasn't read

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      it yet, but go ahead.
 2  BY MS. BRADY:
 3      Q    If I ask you about specific portions, I'll
 4  give you a chance to read them more thoroughly.  But
 5  just for now, do you feel like you're familiar with the
 6  report in terms of its layout and the places where your
 7  name appears?
 8          MR. COYNE:  Objection.  Foundation.
 9      A    I see that my name appears.  I did not create
10  this document, and it was obviously created after the
11  felony review process was over by someone else.
12      Q    All right.  And during your time in felony
13  review, was that your practice to review documents
14  written by detectives that detailed your participation
15  in a case?
16      A    No.
17      Q    Okay.  So would it be fair to say that you did
18  not review this report after it was written?
19          MR. COYNE:  Objection.  Foundation.
20      A    I have no recollection of reviewing this
21  report after it was created.
22      Q    Okay.  And it would not have been your
23  practice to do so, right?
24      A    No.  Would not.
25      Q    All right.  So having, kind of looked at just
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the general contents of this report, does this refresh
 2   your recollection at all about the Geraldo Iglesias'
 3   prosecution or the Monica Roman murder?
 4        A    Really, it does not.
 5        Q    All right.  So take a look here, kind of in
 6   the middle spot of the second page of this document, it
 7   says "Notifications ASA Mike Latz felony review."
 8        A    Yes.
 9        Q    That -- was that you?
10        A    I didn't create this document, but I assume it
11   was me.
12        Q    Okay.  And it appears from this document, and
13   we can take a look at the felony review folder, if you
14   want confirmation.  And here, it says on the third page
15   of this document, "The R/DETS contacted felony review
16   and ASA Latz reviewed the investigative file and
17   interviewed Rosendo Ochoa.  A second witness, Arnell
18   Moore, was brought into Area Five VC," which, I believe,
19   stands for violent crimes.  "Arnell Moore was
20   interviewed by ASA Latz and provided the same
21   information that he previously had told detectives.
22   Arnell Moore stated that he did not get a good look at
23   the face of the shooter and would not be able to make an
24   identification." Do you see that?
25        A    I do.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 584 of 782 PageID #:13842
The Deposition of MICHAEL LATZ, taken on 30 January 2020

66

```
 1        Q    Does this refresh your recollection at all
 2  about interviewing this person named Rosendo Ochoa?
 3        A    It does not.
 4        Q    All right.  The next paragraph says, "The
 5  reporting detectives located three of the persons who
 6  were in the car with the victim when she was shot. Those
 7  persons are Hugo Rodriguez, Jose Cornell, and Daniel
 8  Sanchez.  The driver of the car, Jesus Gonzalez, was in
 9  Mexico, but was expected to return to Chicago.
10  Rodriguez, Cornell, Sanchez spoke very limited English
11  and were interviewed by ASA Latz, but Detective R.
12  Guevara as interpreter.  During this interview, Hugo
13  Rodriguez stated that he would be able to identify the
14  person who shot Monica Roman.  Do you see that?
15        A    I do.
16        Q    Okay.  Does this refresh your recollection at
17  all about interviewing any of the witnesses to this
18  case, or anything else about your participation?
19        A    I don't remember those interviews at all.
20        Q    Okay.  Do you recall other instances in which
21  you interviewed folks at Area Five and Reynaldo Guevara
22  translated?
23        A    I do not.  I'm sorry.
24             MR. CHRISTIE:  Objection to form.
25        Q    All right.  So we can see here at the top of
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    this page, it appears, like Mr. Ochoa had viewed a
2    lineup and identified Geraldo Iglesias as the person who
3    shot and killed Monica Roman.  Do you see that?
4         A    I do.
5         Q    I'm going to flip to the first page and direct
6    your attention to this paragraph where it says, "On 21
7    June, 1993, the reporting detectives were contacted by a
8    confidential informant who's a member of the Imperial
9    Gangsters Street Gang.  This informant stated that many
10   members of the gang were talking about snake killing a
11   girl in a car on Sawyer and Palmer.  The informant could
12   not elaborate any further." Do you see that?
13        A    I do.
14             MR. COYNE:  Rachel, I think you're referring to
15        page 2, not page 1, just from what I'm looking at.
16             MS. BRADY:  Oh, I'm sorry.  Did I say page 1?
17             MR. COYNE:  Correct.
18   BY MS. BRADY:
19        Q    Okay.  Yeah, that was my bad.  Page 2 of this
20   document.  All right.  So would you agree that based on
21   this report, the evidence that detectives had at the
22   time they come contacted you was a lineup identification
23   from Rosendo Ochoa and that information provided by the
24   confidential informant?
25             MR. CHRISTIE:  Objection.  Form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MR. COYNE:  Objection.  Form.  Yeah.  Let me -
 2     - let me -- objection.  Form, foundation.
 3     Argumentative and requires speculation based upon
 4     his testimony thus far.  Go ahead.
 5     A    This document which we're looking at was not
 6     created until after I did my felony review evaluation.  I
 7     did not rely up upon this document in any way in making
 8     that decision.  And I don't have any other recollection
 9     of anything that was presented to me when I came to Area
10     Five on that day in June, 1993.
11     BY MS. BRADY:
12          Q    Do you have a reason to believe that this
13     report is inaccurate?
14          MR. COYNE:  Same objection.
15     A    I have no basis that's called accurate nor
16     inaccurate.
17          Q    All right.  So here, this highlighted
18     paragraph on page 3 of the report, which is RFC Iglesias
19     92, it lists that you were interviewed -- or you
20     interviewed people?  The final paragraph notes that, as
21     well.  Do you see that?
22          A    I do see the paragraph.  Yes.
23          Q    Okay.  Would it -- strike that.  Could we look
24     at the felony review folder then to determine the
25     contents of those interviews?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. COYNE:  Objection.  Form.
 2         A    Yes.
 3         Q    Okay.  All right.  I'm flipping back to
 4    Exhibit 1, which is the felony review jacket.  I'm going
 5    to flip through and find the names of the people who we
 6    just discussed.  One of them was Rosendo Ochoa.  I'm
 7    sorry, one of them was Arnell Moore.  I see him as
 8    witness number 3 on page 476 of this document.  Do you
 9    see that?
10         A    I do.
11              MR. COYNE:  Rachel, which exhibit number is
12         this again?
13              MS. BRADY:  This is Exhibit 1.
14              MR. COYNE:  One.  Okay.
15              MS. BRADY:  Yeah.  I'm going to go back and
16         forth between exhibits 4 and 1 a couple of times.
17              MR. COYNE:  Okay.
18    BY MS. BRADY:
19         A    Do you have a question?
20         Q    Oh yeah.  I'm sorry.  I thought you were
21    looking.  Would this be the place where you would have
22    memorialized your conversation with Arnell Moore?
23         A    Yes.
24         Q    Okay.  Do you have any reason to think that
25    there's anything incomplete about this writeup of what
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 588 of 782 PageID #:13846
The Deposition of MICHAEL LATZ, taken on January 30, 2024

70

1  he said to you?

2          MR. COYNE:  Objection -- sorry.  Object to

3      foundation.

4          MR. CHRISTIE:  Objection to form.

5      A    As I sit here today, I have no reason to

6  believe that there's anything incomplete about this

7  summary.

8      Q    All right.  So it looks like after you

9  interviewed Arnell Moore, you and Guevara talked to Hugo

10  Rodriguez, Jose Cornell, and Daniel Sanchez, and I see

11  that by looking at page 3 of the supplementary report

12  we've been looking at.

13          MR. COYNE:  Let me just catch up with you

14      Rachel before.

15          MS. BRADY:  -- sure.  The final paragraph on

16      page 3.

17          MR. COYNE:  Okay.

18          MR. CHRISTIE:  And we're back on Exhibit 4?

19          MS. BRADY:  Yes.

20          MR. CHRISTIE:  Okay.

21          MR. COYNE:  Got it.  Thank you.

22      A    Based upon my review of what appears to be a

23  felony review folder in my handwriting, that I did

24  interview Sanchez, Rodriguez, and Cornell.

25  BY MS. BRADY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q     Okay.  I'm flipping back now to Exhibit 1 and

2   we can see the interview with Sanchez is here on page

3   476 at the bottom; is that right?

4     A     I'm sorry, what's the question?

5     Q     Your interview with Daniel Sanchez is

6   memorialized here on page 476?

7     A     I would say that my interview with Sanchez is

8   summarized in the three lines of that box called

9   "Victim Witness number 4."

10    Q     Okay.  And as far as you know, this is an

11  accurate summary of what he told you?

12          MR. COYNE:  Object to foundation.

13    A     As I sit here today, 30 years later, that's an

14  accurate summary of what he told me.

15    Q     Okay.  You talked to Daniel Sanchez, Jose

16  Cornell, and Hugo Rodriguez.  So Jose Cornell looks like

17  he appears on page 474 of your felony review file. Would

18  you agree with that?

19    A     Yes.  A summary of that interview appears on

20  474.

21    Q     Okay.  And as you sit here today, do you

22  believe that this is an accurate writeup, or an accurate

23  summary, of what he told you?

24          MR. COYNE:  Objection.  Foundation.

25    A     Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 590 of 782 PageID #:13848
The Deposition of MICHAEL KATZ, taken on January 30, 2020

72

1      Q     Here we have, above that on page 474, witness

2   number 5, Hugo Rodriguez.  Do you see that?

3      A     I do.

4      Q     Does this, as far as you know, seem like an

5   accurate summary of what Mr. Rodriguez told you?

6          MR. COYNE:  Same objection.

7      A     I don't have any independent recollection so I

8   really can't say.  But, I have no reason to believe it's

9   not an accurate summary.

10      Q     Okay.  All right.  Guevara says that he was --

11   or this report says Guevara was translating these

12   interviews?

13      A     That's what the report says.

14      Q     It says here?  Were you able to understand

15   what Guevara and the witnesses were saying to each

16   other?

17          MR. COYNE:  Objection to form.

18      A     I have no recollection of that.

19      Q     Do you have any reason to think that he was

20   not translating accurately?

21          MR. COYNE:  Objection.  Foundation.

22      A     I have no reason.

23          MR. CHRISTIE:  Objection.  Speculation, too.

24      Go ahead, sir.

25      A     I have no independent recollection, so

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  therefore, I have no reason to believe he was not

2  translating that correctly.

3  BY MS. BRADY:

4      Q    Okay.  I think I also missed one.  It says

5  here, Mike Latz, in this paragraph on page 3, Mike Latz

6  interviewed Rosendo Ochoa, and I just want to find that

7  on your felony review folder.  Where --

8          MR. CHRISTIE:  Rachel, it could be at the last

9      page.

10     Q    Oh, thank you.  This is page 478 of this

11 folder, the very bottom box.  It says "Eyewitness

12 Rosendo Ochoa."  Do you see that?

13     A    I do.

14     Q    Do you have any reason to think that there's

15 something inaccurate about your summary of what Rosendo

16 Ochoa told you through Detective Guevara who

17 interpreted?

18         MR. COYNE:  Objection.  Foundation.

19     A    I have no independent recollection.  Therefore,

20 I have no reason to believe it's not an accurate

21 summary.

22     Q    Okay.  All right.  Going back to this police

23 report.  I'm now flipping to page 4 of the report.  Do

24 you see that?

25     A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  At the very top, it says, "On 24 June,

2    '93 at 0030 hours, Detective R. Guevara and A.S.A. M.

3    Latz showed Hugo Rodriguez the same photo array

4    previously viewed by Rosendo Ochoa.  After viewing this

5    photo array, Hugo Rodriguez identified the photo of

6    Geraldo Iglesias as the person he saw shooting Monica

7    Roman.  This photo array was inventoried for evidence."

8    Do you see that?

9      A    I do.

10     Q    Okay.  Up to this point, according to this

11   report, it looks like you had a photo array

12   identification from Hugo Rodriguez.  Information

13   provided by a confidential informant.  And a lineup

14   identification from Rosendo Ochoa.  At that point, it

15   says, "A.S.A. Latz requested that two other persons

16   listed in the police reports as potential witnesses,

17   Efrain Torres, and David Chmieleski, be allowed to

18   review Geraldo Iglesias in a lineup." Do you see that?

19     A    I do.

20     Q    Okay.  Does this paragraph give you any

21   insight now, 30 years later, about the value of the

22   evidence that detectives Guevara and Halvorson had

23   presented to you up until that point?

24          MR. COYNE:  Objection.  Form, foundation.

25     A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 593 of 782 PageID #:13851
The Deposition of MICHAEL LATZ, taken 30/January 98, 2023

75

```
 1           MR. CHRISTIE:  Objection.
 2      Q    Would I be correct in interpreting this as one
 3  of those situations where you said you need to do more
 4  investigation before I can approve charges?
 5           MR. COYNE:  Same objection.
 6           MR. CHRISTIE:  Objection also causes
 7     speculation.
 8      A    I don't have any independent recollection of
 9  this at all, so I don't know what the proper inference
10  is.
11      Q    Okay.  A while back, you told me that there
12  were three things that you would do when called to a
13  station to review charges.  You would approve them.  You
14  would deny them, or you would say conduct some more
15  investigation.  Am I remembering that correctly?
16      A    Yes.
17      Q    Okay.  If you would have approved charges at
18  this point, 0030 hours, would you have requested that
19  police go interview more witnesses?
20           MR. COYNE:  Objection.  Foundation.
21      A    I guess, I don't understand the question.
22  Please restate the question.
23      Q    Sure.  The second paragraph of this report
24  says that you requested, if it's true --  you requested
25  two other people look at a lineup.  Does that seem like
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   an accurate summary based on this report?

2          MR. COYNE:  Same objection.

3      A    I have no independent recollection.

4      Q    Sure.  I understand that.  Would you agree

5   that based on this report, what happened was, you

6   interviewed all of the people who appear in these

7   witness slots on your felony review folder that we've

8   discussed so far, and requested that Detectives go view

9   -- pick up some more witnesses to view a lineup?

10         MR. COYNE:  Objection.  Form, foundation.

11     A    I really don't have any recollection of that.

12  That's what this supplementary report says.

13     Q    Do you have a reason to think that this report

14  is inaccurate?

15         MR. COYNE:  Same objection.

16         MR. CHRISTIE:  Objection.  Calls for

17     speculation.

18     A    No.

19  BY MS. BRADY:

20     Q    Okay.  Let's just assume that this is what

21  happened.  That this report is accurate so far.  And you

22  interviewed Rodriguez, Ochoa, Arnell Moore, Jose

23  Cornell, and Daniel Sanchez.  I think that's it.  And

24  then you said, "Please go have two other witnesses look

25  at Geraldo Iglesias in a lineup." As you sit here today,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    does that provide you with any information about what
 2    the value of the evidence or the interviews you had done
 3    already was?
 4         A    No.
 5              MR. COYNE:  Objection to form.  Foundation. Go
 6         ahead.  Rachel, can I, just to make it easier on you
 7         and given the Zoom delays, can I get a continuing
 8         line of objections?  Will you accept based on form
 9         and foundation as to any questions from this witness
10         pertaining to this case sub-report in light of his
11         testimony, that he has no independent recollection
12         of it?  That way, I won't have to keep interrupting
13         you.
14              MS. BRADY:  Yes.
15              MR. COYNE:  That'll make it easier. Thank you.
16              MR. CHRISTIE:  We'll just join just to make it
17         easier.
18              MR. COYNE:  I think, it will.  Yeah.  That way
19         we won't be stepping on the witness's answer or your
20         question.  Thank you.
21              MS. BRADY:  Well, it's been the policy
22         throughout that one objection for our defendant is
23         for all of the defendants.  So, I think, we're still
24         doing that.
25              MR. COYNE:  This is my first deposition in this
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 596 of 782 PageID #:13854
The Deposition of MICHAEL LATZ, taken on January 26, 2018

78

 1      case so I wasn't aware of that.

 2            MS. BRADY:  No.  I wasn't talking to you, John.

 3            MR. COYNE:  Okay.

 4            MS. BRADY:  Just clarifying for the record.

 5            MR. COYNE:  Oh, I got you.  Okay.  I

 6      understand.

 7            MS. BRADY:  Okay.  I think there's a question

 8      pending.

 9            MR. COYNE:  There is.  I objected to it.  You

10      want to hear it again, Mike?

11            THE WITNESS:  Yes, please.

12  BY MS. BRADY:

13      Q    Okay.  I'm going to do my best to ask the

14  question again.  I don't remember it exactly.  So, I'll

15  just ask a new question.  Assuming that the information

16  in this report is accurate, which is that you were

17  presented with the investigative file.  You knew that

18  Rosendo Ochoa had viewed a lineup and picked out Geraldo

19  Iglesias, and you spoke with witnesses, Arnell Moore,

20  Ochoa, Hugo Rodriguez, Jose Cornell, and Daniel Sanchez,

21  and you knew that Hugo Rodriguez had picked Geraldo

22  Iglesias out of a photo array.  Why would you have

23  requested that detectives go out and get two more

24  witnesses to look at a lineup?

25            MR. COYNE:  Separately from my earlier

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      objection, clearly that calls for attorney work
 2      product. I'm just going to ask you before we further
 3      investigate and engage in any analysis in that
 4      regard Mike, do you know the answer to the question
 5      she just asked you? Without answering it, do you
 6      know the answer?
 7           THE WITNESS:  No.
 8           MR. COYNE:  Okay.
 9  BY MS. BRADY:
10      **Q    Based on your practice, reviewing charges as a**
11  **felony review prosecutor, would it be safe to assume**
12  **that at this point, when you requested additional**
13  **witnesses come in and view lineups, you did not believe**
14  **there was sufficient evidence to approve charges?**
15           MR. COYNE:  And again, my question based upon
16      the fact that the question you just asked.  First of
17      all, for the record, we have a continuing line of
18      objections as to form and foundations as to any
19      question to this witness, based on this document.
20      Separately from that line of objections, the issue
21      is now the application of the attorney work product
22      privilege under Rule 26, et seq. to this question.
23      So Mike, once again, without answering the question,
24      in order to assess whether to instruct you on that
25      privilege, do know the answer to the question she

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 598 of 782 PageID #:13856
The Deposition of MICHAEL LATZ, taken on January 28, 2022

80

1    just asked you?

2         THE WITNESS:  Could you repeat the question?

3         MR. COYNE:  Yeah.  Can the court reporter read

4    it back, Rachel, or if you prefer, you can just

5    rephrase it or whatever you want to do.  I'm just --

6         MS. BRADY:  We can have the court reporter read

7    it back.

8         MR. COYNE:  -- great.

9         COURT REPORTER:  Give me one moment.

10        MR. COYNE:  Can you turn the volume up, please?

11        COURT REPORTER:  Yeah.  One second.

12         (REPORTER PLAYS BACK REQUESTED TESTIMONY)

13        MR. COYNE:  Amanda, I'm just going to ask --

14   I'm sorry.  I'm going to ask that the entire

15   question, including the beginning, which qualifies

16   the rest of the question.  If you please replay the

17   entire question. Thank you.

18        COURT REPORTER:  Yes.

19         (REPORTER PLAYS BACK REQUESTED TESTIMONY)

20        MR. COYNE:  And again, Mike, the issue is,

21   because this is a why question.  This is asking you

22   why you did something, which clearly invokes the

23   attorney work product privilege under Rule 26.  The

24   question I have for you, without your answering that

25   question that she just asked you, do you know the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        answer?

 2             THE WITNESS:  Yes.  I do know.

 3             MR. COYNE:  All right then.  All right.  Well,

 4        I would instruct you not to answer the question then

 5        based on attorney work product privilege.

 6   BY MS. BRADY:

 7        Q    Mr. Latz, are you going to take your

 8   attorney's advice and assert work product protection

 9   over the response to my question?

10        A    Yes.

11             MR. COYNE:  And for the record, I'm not asking

12        him to invoke it.  I'm instructing him not to

13        answer. So the proper question would be, is he going

14        to follow his attorney's advice?  Just for the

15        record, but, I think, he's answered.

16             MS. BRADY:  Yeah.  I need his testimony on

17        whether he's invoking the work product protection.

18             MR. COYNE:  Well, he's not.  His attorney is.

19        He's following my instruction not to answer.  I'm

20        the one that's invoking the work product privilege.

21             MS. BRADY:  Sure.  So you can't invoke the

22        privilege on his behalf.

23             MR. COYNE:  I can instruct him not to answer.

24        I'm sorry.  Go ahead, Rachel.  I didn't mean to

25        interrupt you.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 600 of 782 PageID #:13858
The Deposition of MICHAEL LATZ, taken on January 18, 2022

82

1    MS. BRADY:  Yeah.  He needs to be the one to

2  invoke it because it's his protection.

3    THE WITNESS:  I will take my attorney's advice.

4    MS. BRADY:  Okay.

5    MR. COYNE:  Yeah.  That's what he's doing. He's

6  following his attorney's instruction.

7    MS. BRADY:   Okay.  Are you also asserting

8  work product protection over the information I'm

9  looking for?

10    MR. COYNE:  Objection. Foundation.  I don't

11  even know if he knows what it is.  What the

12  privilege is.  But go ahead.  Objection.

13  Foundation.  You can answer if you can.

14   A    Yes.

15    MS. BRADY:  Okay.  We are going to reserve the

16  right to reopen this deposition after we have a

17  chance to raise this issue with the court, if

18  necessary.

19    MR. COYNE:  Sure.  And just to clarify, you

20  believe that the question you asked him, which

21  involves his answering why he did something or did

22  not do something with respect to his approving

23  charges, it's your position that that question, why

24  he did something with respect to his approving or

25  not approving charges, that that does not invoke the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   attorney work product privilege?
 2        MS. BRADY:  That's correct.  Because I'm asking
 3   about his practice.
 4        MR. COYNE:  Well, no, the practice you
 5   predicated the question was the practice.  But then,
 6   you applied the practice, which has been undefined
 7   and untestified to, to the question of what he did
 8   in this case.  So, I think, we have an obligation
 9   under Rule 37.2, before you file a motion to compel,
10   or I file a motion for protective order, to suss
11   that issue out.  So if you're asking him about his
12   practices, I think, that's fair game.  If you're
13   asking him, "But what were your practices in 1993 as
14   a felony review assistant," then, I think, that's
15   fair game.  Although I have a continuing line of
16   objections based on foundation, since he doesn't
17   recall what he knew in 1993.  But holding that
18   aside, I believe, it's fair game to ask him about
19   his practices.  If you're asking him why he did or
20   did not pursue a particular line of inquiry or
21   action regarding charges, then it's my position that
22   that does clearly invoke the attorney work product
23   privilege, but I'd be happy to hear you out before I
24   elect further.
25        MS. BRADY:  Sure.  We can continue the Rule
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    37.2 discussions at a later time after I've had a

 2    chance to compile some case law.  I'll just say for

 3    the record right now that, it's our position that

 4    courts will find that the work product protection in

 5    the case of prosecutors is -- we've litigated in

 6    several of these cases against the city, does not

 7    apply when there's an overwhelming need for the

 8    information and whether or not it was -- depending

 9    on which privileges you're invoking. So, I will just

10    say that, I believe, that we have a good faith

11    argument the work product protection might not apply

12    here, and that we can continue these conversations

13    at a later time.

14         MR. COYNE:  Well, let me respond to that.  If

15    you're talking about the potential of

16    inconveniencing this witness by bringing him back,

17    then, I think, we do have to have the conversation.

18    Because what I initially heard you say was you were

19    referring to practices, and therefore, the attorney

20    work product privilege did not apply.  Now, what you

21    just said is, it does apply, and therefore, you're

22    referring to something other than practices.  But

23    the judge is going to hold that you have an

24    overwhelming need.  So, let me just make sure I

25    understand.  Are you saying the attorney work
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    product privilege does apply in this case, but

2    there's an overwhelming need for the information,

3    and therefore, it should be overruled?  Or are you

4    saying that you're asking about practices, and

5    therefore you're not invoking the attorney work

6    product privilege?

7         MS. BRADY:  As to my questions about practice,

8    I'm saying, work product protection doesn't apply.

9    As for my question about how his practices -- what

10   we can infer based on information that he doesn't

11   remember, documentary information presented in this

12   report, and what he knows about his practices, I'm

13   saying that the work product protection doesn't

14   apply because we're not asking about specific

15   decisions that he made in this case.  He doesn't

16   remember them.  He's already testified about that.

17   So any questions about practice as applied to a

18   hypothetical set of facts are not covered.  I'm also

19   saying that even if they are covered, we would have

20   a right to the information anyway.

21        MR. COYNE:  Sure.  Well, in that case, in order

22   to avoid -- first of all, I asked him if he knew the

23   answer to the question and he said yes, first of

24   all.  So when you say he didn't know the answer to

25   the question, I disagree.  Number two, I'm going to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   suggest, because my goal, I represent this witness,
 2   I don't want him to be inconvenienced.  I'm going to
 3   invite you to call the judge.  We can agree to
 4   disagree, and then we can have the judge make the
 5   call right now, in order to avoid the possibility
 6   even of this witness having to be inconvenienced and
 7   take further time off work to come back.
 8           THE WITNESS:  I'm sorry, John?
 9           MR. COYNE:  Go ahead, Mike.
10           THE WITNESS:  If I have an opportunity, can I
11   have an opportunity to speak to you and maybe --
12           MR. COYNE:  Yeah, let's do this.  Yeah. Rachel,
13   we might be able to solve this problem.  Give us
14   five minutes.  We'll address it.  And we might be
15   able to head off this dispute after a brief
16   conference with the client.
17           MS. BRADY:  Sounds good.  Let's go off the
18   record.
19           MR. COYNE:  Okay.  Five minutes.
20            (OFF THE RECORD)
21           COURT REPORTER:  We're on the record.
22           MR. COYNE:  With regard to the issue of
23   attorney work product privilege, we went off the
24   record briefly to allow me as counsel for the
25   witness to look into that matter.  And having looked
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        into it further, I think we're okay.  I asked that
 2        the witness be permitted to hear the question again,
 3        and then, we can proceed from there.
 4              COURT REPORTER:  Okay.  Just give me one minute
 5        to find the question, because there's a lot of
 6        talking before.  Okay.
 7                 (REPORTER PLAYS BACK REQUESTED TESTIMONY)
 8        A     No.
 9              MR. COYNE:  Sorry?  What was the last word?
10              COURT REPORTER:  Have done already.
11              MR. COYNE:  No.  I thought I heard another word
12        there.  Anyway, I would renew earlier objections.
13        I'll let the witness answer the question.
14        A     The answer is no.
15  BY MS. BRADY:
16        Q     Okay.
17        A     The fact that I asked to speak to two more
18  witnesses doesn't give me any inference from the value
19  of the evidence, which I had already reviewed.
20        Q     As a matter of practice, if you would have
21  thought that the evidence presented at the time you
22  requested that the two additional witnesses come in was
23  sufficient to approve charges, would you have approved
24  them at that time?
25        A     I can't answer that because the two witnesses
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    did come in and I did interview them as a matter of my
 2    personal practice.
 3         Q    Sure.  My question isn't whether you
 4    ultimately approved charges after hearing the additional
 5    evidence.  My question is:  As a matter of your own
 6    practice in deciding whether to approve charges, if the
 7    evidence available up until the point at which you
 8    requested additional evidence was sufficient, would you
 9    have approved charges at that time?
10         A    I cannot answer.  I don't have any specific
11    recollection about this case, what my thinking was, and
12    why I did what I did, but I can say this.  It is my
13    practice in every single case, is to interview all of
14    the witnesses that were identified, if that was
15    possible.  Sometimes, it wasn't possible.  But the
16    extent that it was possible, it was my personal practice
17    to interview every witness which was identified in
18    police reports.
19         Q    Okay.  So speaking now about your practices,
20    and we talked about this a little bit earlier, I'll take
21    this down for now.  You said that your decision to
22    approve charges or ask investigators to do more
23    investigating or deny charges that right, kind of depend
24    on the, of that was available; is that right?
25         A    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    And it was case specific; is that right?

2      A    Yes.

3      Q    Was it your practice to approve charges if you

4  felt that the evidence that was presented to you was

5  sufficient to charge?

6      A   In murder cases, I had to have the approval of

7  the felony trial supervisor, at least.  And maybe even

8  higher than that, but yes, of course, I always look for

9  sufficient evidence in order to approve charges.

10     Q    And -- okay.  So I have a couple questions

11  about that.  Was it the case when you were in felony

12  review that you needed approval to approve charges for

13  all homicides?

14     A    My recollection is yes.

15     Q    Okay.  Putting Exhibit 4 back up, can you see

16  this on your screen?

17     A    I can.

18     Q    This bottom paragraph says A.S.A. Latz after

19  having reviewed all the facts and circumstances of this

20  investigation approved charging Geraldo Iglesias with

21  first degree murder.  Do you see that?

22     A    I do.

23     Q    Okay.  Does this give you any information

24  about whether you needed approval from your supervisor

25  to decide on approving charges?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 608 of 782 PageID #:13866
The Deposition of MICHAEL LATZ, taken 30/January, 2013

90

```
 1        A      It does not.

 2        Q      So the fact that it says you approved the

 3   charging decision, maybe doesn't mean that you were the

 4   one who approved it?

 5        A      I probably needed approval to do the approval.

 6        Q      Okay.  So how would you have gone about

 7   getting the approval to do the approval?

 8        A      In this case or during that time?

 9        Q      During that time, generally.

10        A      There was a -- I would page -- have my felony

11   trial supervisor paged.  This is a time before cell

12   phones and I'd have them paged with a request to call me

13   at Area Five.  And over the phone, I would summarize the

14   evidence, summarize what we've done so far, and I would

15   get oral approval in order for the approval for the

16   approval or instructions to deny the felony approval or

17   instructions to do a continuing investigation.

18        Q      All right.  And would those discussions be

19   memorialized anywhere?

20        A      Not by me.

21        Q      Okay.  So here where it says A.S.A. Latz

22   requested that the two other persons come in and view

23   lineups, do we have any way of knowing whether your

24   supervisor told you to do that, or you just decided on

25   your own?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I do not.

 2        Q    Was it your practice to contact -- oh, strike

 3    that.  It was your practice or a job requirement, maybe

 4    for you to get approval for approving all homicide

 5    charges; is that right?

 6        A    That's my recollection.  Yes.

 7        Q    Okay.  And so if you thought there was

 8    sufficient evidence to charge, you would contact your

 9    supervisor, and they would give you approval or reject

10    your determination, and say you needed more information;

11    is that right?

12        A    That's my recollection.

13        Q    And you don't remember who that supervisor was

14    in this case, right?

15        A    I have no independent recollection of that.

16        Q    You said your supervisors in '93 were David

17    Studenroth and --

18             MR. COYNE:  Frank Difranco.

19        Q    Yes.  Frank Difranco; is that right?

20        A    That's what I said.  Yes.

21        Q    Okay.  So you would've called one of those two

22    people to discuss approving charges at least once, but

23    possibly twice.

24        A    That's correct.  Let me just clarify.  I

25    would've called felony review and had the felony review
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   paged, then both of them and have one of them call

2   probably back in Area Five.  That's the way that

3   would've worked.

4        Q    Okay.  And there's no way we can tell from

5   looking at your felony review notes, who you called or

6   what they said; is that right?

7        A    Give me a minute just to look.  I didn't see

8   any name memorialized on here.  So no, it doesn't state

9   who gave me approval for the approval.

10       Q    Okay.  So it's possible, looking at this

11  report, assuming the information in the report is

12  accurate about what information was presented to you and

13  what you knew.  That, at this point, before you

14  requested that Torres and Chmieleski come in and view

15  lineups, either you had concluded that there was not

16  sufficient evidence to charge yet, or you thought there

17  was sufficient evidence to charge, but your supervisor

18  said you needed more information before you could

19  approve charges; is that right?

20       A    I can't make -- I can't make those

21  assumptions.  I don't -- I don't have any recollection

22  of that, and it could have happened a number of

23  different ways.

24       Q    Okay.  So what are the other ways that it

25  could have happened beyond the two options that I just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    described?

2        A    I think that -- what are the two options you

3    described?

4        Q    So at this point here in between, when you

5    spoke with the five people, and when you requested that

6    two more people come in and get view lineups, either you

7    concluded that there wasn't sufficient evidence to

8    charge and wanted more information, or you thought there

9    was sufficient evidence to charge and you called your

10   supervisor and your supervisor said, no, you can't

11   approve charges yet.  The cops need more information.

12       A    I just can't swear that it happened that way.

13   I don't have any independent recollection.  You know, I,

14   I don't know whether this is a chronology.  I don't

15   think it is a chronology.  So say at this point, you

16   know, I may have asked if -- to speak to the witnesses

17   before, you know, before this -- this other thing

18   happened.  I -- I just can't trust this chronology.  I

19   do know that I would've had to have called my felony

20   trial supervisor for approval.  That's as much as I

21   could say.

22       Q    Okay.  So assuming this is a chronology,

23   because here we have June 24th said, 0030 hours, and

24   then, June 24th at 0125 hours, and then, June 24th at

25   0140 hours, assuming this is a chronology and that this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  is the point at which you said, "Go out and get these

2  two more witnesses to look at a lineup."  Can you think

3  of any other way that it might have happened, that you

4  decided that the cops needed more information other than

5  you decided there wasn't sufficient evidence to charge,

6  or your supervisor told you there wasn't sufficient

7  evidence to charge?

8      A    Yes.  The -- the personal practice was to

9  speak to every witness who was identified.  And so

10  that's -- that's something that, you know, I would've

11  done in every, every case where I could get the

12  witnesses in.

13     Q    Okay.  Are there any other ways that this

14  might have gone down other than the three options that

15  we've discussed, which is, you said there wasn't enough

16  information to charge, your supervisor said there wasn't

17  enough information to charge, or you decided

18  independently that you just wanted to speak with

19  everyone before deciding whether to charge.

20     A    I don't -- I don't agree with that

21  characterization at all.  I can't agree with that.

22     Q    What was wrong about it?

23     A    Well, I don't know.  Let me just add --

24         MR. COYNE:  Aside from my continuing line of

25     objectives, let me just add that Mr. Latz's earlier

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            testimony, but go ahead Mike.  Sorry To interrupt.
 2        A    I don't have an independent recollection of
 3   the chronology, and how things occurred, and in what
 4   order.  Okay.  But I do know that in every case I go
 5   into -- every case I went into at that time, I wanted to
 6   speak to every witness who's identified.  Okay.  And if
 7   there were multiple eyewitnesses identified, you know,
 8   the -- that -- I wanted to see what they, you know, had
 9   to say regarding the -- a line up.  It was just -- it
10   was just customary for me to find out what every witness
11   had to say.  Okay.  So I don't think the fact that I did
12   that, I don't think it is any reflection on what I was
13   thinking at the time or what the -- what our thinking
14   was with regard to the quality of the evidence at the
15   time.  Because that was something that we did in every
16   case tried to speak to every witness.
17   BY MS. BRADY:
18        Q    Okay.  So you wanted to speak to every witness
19   who was available no matter what?
20        A    Well, not no matter what.  Every witness that
21   I could was reasonable and practical to do.  So some
22   witnesses don't cooperate.
23        Q    Okay.  So if it was reasonable and practical
24   for you to speak to all of the witnesses in this case,
25   you would have wanted to speak to them?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A     Yes.

2          Q     Before making a decision about approving

3    charges.

4          A     Yes.

5          Q     And that was your practice, regardless of what

6    you thought about the value of the evidence that had

7    been amassed at any point before you were done speaking

8    with everyone; is that right?

9          A     Well, I - I -- that's not exactly how I would

10   say it.  Okay.  So if I was going to deny a case right

11   off the bat, you know, I wouldn't have to speak to every

12   witness.

13         Q     Why is that?

14         A     Because the case wasn't being approved, it was

15   being denied.

16         Q     Why would you not want to speak to everyone to

17   get all the information before deciding whether to deny?

18         A     Well, I can't think of a specific case when I

19   did.

20         Q     Okay.  So you wanted to speak to every witness

21   no matter what when it was practical to do so,

22   regardless of what your opinions were about the evidence

23   that had been generated up to the point where you had

24   spoken with everyone?

25               MR. COYNE:  Objection.  Mischaracterizes his



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1     earlier testimony.  Go ahead.  Can answer if you

 2     can, Mike.

 3         A    Oh, what's the question again, please.

 4  BY MS. BRADY:

 5         Q    **You wanted to speak to every witness who was**

 6  **available and willing to speak to you, regardless of**

 7  **what your opinions were about the evidence that was**

 8  **available until the point when you decided to approve**

 9  **charges?**

10         MR. COYNE:  Same objection.

11         A    Rachel.  And my recollection, in every case,

12  as much as practical, I wanted to interview every

13  witness who was identified.

14         Q    **All right.  Taking a look at this police**

15  **report again, I'm on page 4 of the report, which is RFC**

16  **Iglesias 93.  Can you see this?**

17         A    I can.

18         Q    **Okay.  It says here that this person Hugo**

19  **Rodriguez came in and viewed a lineup.  Do you have any**

20  **way of telling whether you watched this lineup occur?**

21         A    I do not.

22         MR. COYNE:  What page is that Rachel?  I'm

23     sorry.  I just want to get on that page.

24         MS. BRADY:  This is the fourth page of this

25     subpage 93, RFC Iglesias 93.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1          MR. COYNE:  Thank you.
 2    BY MS. BRADY:
 3          Q    Was it your practice to watch lineup
 4    procedures as they were taking in place?
 5          A    It -- it was not my practice, too.  I don't
 6    know whether I viewed this lineup or not.  I know there
 7    were times when I did.  I did view lineups, but I don't
 8    know whether I viewed this lineup or not.
 9          Q    Was there anything that dictated, whether you
10    would want to watch a live lineup as a matter of
11    practice?
12          A    As a matter of practice, no.
13          Q    Was it your practice to watch detectives
14    perform photo array procedures, or other photo
15    identification procedures?
16          A    It was not my practice.  I know there were
17    occasions when I was present when a photo array was --
18    was viewed but it was not my practice to participate in
19    that.
20          Q    And do you have any reason to think that the
21    Iglesias' case that we're talking about today was one of
22    those instances in which you watched the lineup occur?
23          A    I have no way to know one way or the other.
24          Q    Do you have any reason to think that the
25    Iglesias' case was one in which you watched a photo

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    identification person?

2        A    No.

3        Q    Am I correct in understanding that it would

4    not have been your practice to watch the live lineups

5    that were performed while you were at Area Five in the

6    Iglesias' case?

7            MR. COYNE:  Objection.  Mischaracterizes his

8        prior testimony.  Go ahead.

9        A    It was not my practice, too, although there

10   may have been some occasions when I did.

11       Q    And if you would have made any promises or

12   offers to any of the witnesses that you interviewed here

13   at the station on June 24, 1993, would you have

14   memorialized that information somewhere?  Actually

15   strike that.  Do you recall making any offers or

16   promises to any of the witnesses that we've discussed

17   here in exchange for information?

18       A    I do not.

19       Q    Would it have been your practice to do so?

20       A    No.  Absolutely not.

21       Q    Okay.  Can you say with confidence that you

22   did not make any promises or offers to any of these

23   witnesses in exchange for information?

24       A    Yes.

25       Q    All right.  And you told me earlier that it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 618 of 782 PageID #:13876
The Deposition of MICHAEL ZATZ, taken on January 18, 2023
100

```
 1   was -- strike that.  You told me earlier that in felony

 2   review -- oh, do you need to take a break?

 3          THE WITNESS:  Can I take a break?  Someone just

 4      come to my back door.  Just for a second.

 5          MS. BRADY:  Yeah.  Sure.  Yep.  Let's go off

 6      the record.

 7             (OFF THE RECORD)

 8   BY MS. BRADY:

 9      Q    You told me earlier that when you were in

10   felony review, your participation in a particular case

11   ended as soon as charges were approved or not approved;

12   is that correct?

13      A    That is correct.

14      Q    Do you have any reason to think that you

15   continue to participate in the Iglesias' investigation

16   after you approved charges on June 24, 1993?

17      A    I have no recollection of ever hearing about

18   the case again or participating in any way after June

19   24, 1993.

20      Q    Do you have a reason to think that you did

21   continue to participate in the case after June 24, 1993?

22      A    No.

23      Q    I have some questions now about your awareness

24   of particular misconduct in the Iglesias' case that Mr.

25   Iglesias alleges occurred.  It's going to be a bit of a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  slog, but I got to ask those so please just bear with

2  me.  Were you aware at any point during the prosecution

3  of Geraldo Iglesias, that any member of the Chicago

4  Police Department engaged in misconduct involving

5  witness coercion?

6       A    No.

7       Q    Suggestive identification procedures?

8       A    No.

9       Q    Promises made to witnesses?

10      A    No.

11      Q    Threats made against witnesses?

12      A    No.

13      Q    Deals on criminal cases offered to witnesses?

14      A    No.

15      Q    Whether witnesses were fed facts, that would

16 cause them to implicate Geraldo Iglesias?

17      A    No.

18      Q    Police reports that were not disclosed?

19      A    No.

20      Q    False facts that were included in police

21 reports?

22      A    No.

23      Q    Fabrication of any evidence?

24      A    No.

25      Q    Concealing of any exculpatory evidence?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    No.
 2      Q    If you had been aware of any of those types of
 3  misconduct that we just discussed, would you have turned
 4  that information over to a supervisor or to Mr.
 5  Iglesias' defense attorneys?
 6      A    I would've reported it.
 7      Q    Where would you have reported it?
 8      A    Up my chain of command.
 9      Q    Would that have been one of the supervisors
10  that we've discussed earlier?
11      A    It would've been through -- through felony
12  review.
13      Q    And would you also have been memorialized it
14  somewhere?
15      A    It depends.
16      Q    What does it depend on?
17      A    I don't know.  Depends on the situation.
18      Q    So you think there's a situation in which you
19  would've learned about unconstitutional conduct
20  committed by police officers and you would not have
21  documented it somewhere?
22      A    No.  That's not what I said.  That's not what
23  I said at all.
24      Q    So it -- oh, go ahead.
25      A    You're asking me to speculate because I never
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 621 of 782 PageID #:13879
The Deposition of MICHAEL LATZ, taken on January 26, 2022
103

1    saw any such conduct.  Okay.  You're asking me to

2    speculate what I would've done if I had seen such

3    conduct, but I don't recall ever seeing such conduct.

4        Q    Okay.  As you sit here today, do you have any

5    independent recollection of the evidence that formed the

6    basis on which you approved charges in the Iglesias'

7    case?

8        A    Independent recollection, no.

9        Q    Can you figure out the answer to that question

10   based on a review of your felony review jacket?

11            MR. COYNE:  Objection.  Form, calls for

12       speculation.

13       A    Are you asking me if I could draw some

14   inferences from the material on the review folder?

15       Q    Yes.

16       A    I could draw some inferences.

17       Q    Okay.  Let's take a look.  Do you have a hard

18   copy of this?

19       A    No.

20       Q    Okay.  So I will flip through and just let me

21   know when you're ready for me to change pages.  And to

22   clarify, my question is whether you can infer based on -

23   - or what you can infer based on the information in this

24   felony review folder about the evidence that caused you

25   to approve charges?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 622 of 782 PageID #:13880
The Deposition of MICHAEL LATZ, taken on January 23, 2024
104

1          MR. COYNE:  Rachel, just let me ask you just so
2      we can head off the obvious dispute or potential
3      dispute.  You intend on asking him why as an
4      attorney, working as a prosecutor in the felony
5      review division, why he approved charges?  Are you -
6      - do you intend to go beyond what is written on the
7      felony review folder?

8          MS. BRADY:  Only if he has an independent
9      recollection of something that's not on the folder.

10         MR. COYNE:  Okay.  We can take it as needed.

11 BY MS. BRADY:

12     Q    Okay.  All right.  So do you see thing on page
13 471 that allows you to infer about the evidence that
14 gave you reason to approve charges?

15     A    No.

16     Q    What about page 472?

17     A    Do I see -- your question, do I see anything
18 that that supports my approval of charges?  Is that's
19 what your question is?

20     Q    Sort of.  So I asked you if you knew what
21 evidence supported charges, and you said you might be
22 able to infer from your felony review folder.  So I'm
23 asking you to take a look at your felony review folder
24 and draw that inference.

25     A    I don't have any independent recollection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 623 of 782 PageID #:13881
The Deposition of MICHAEL LATZ, taken on January 25, 2022
105

 1    It's just from the felony review folder.

 2        Q    Okay.

 3        A    The answer would be two eyewitnesses

 4    identified the defendant.

 5        Q    **Anything else?**

 6        A    Not that I could see.

 7        Q    **So the two eyewitnesses were Rosendo Ochoa and**

 8    **Hugo Rodriguez.  I'll just represent that to you.  If**

 9    **you would have known that either of those witness did**

10    **not actually have an opportunity to see the shooter,**

11    **would that have undermined your decision to approve**

12    **charges?**

13        MR. COYNE:  Objection to form.  Let me object.

14        Let me -- Rachel, just so we can -- we don't have to

15        get into the same discourse.  Let me have a quick

16        conversation off the record with the witness,

17        please.

18        MS. BRADY:  Sure.  Can I tell you about this

19        line of questions?

20        MR. COYNE:  Sure.  You can go ahead.

21        MS. BRADY:  So that you will have all of the

22        information.  So I'm going to ask seven, maybe eight

23        questions and they're all to the effect of, if you

24        would've known that X was true, would that have

25        impacted your decision to approve charges?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 624 of 782 PageID #:13882
The Deposition of MICHAEL LATZ, taken on January 29, 2021
106

1    MR. COYNE:  Sure.  So yeah.  You intend on

2  asking him if X were the case?

3    MS. BRADY:  Yes.

4    MR. COYNE:  Would you have approved or not

5  approved?

6    MS. BRADY:  Yes.

7    MR. COYNE:  And your position is that, I

8  assume, you agree that that's at least seems pretty

9  clearly the work product, but it's your position.

10  The 7th Circuit case law dictates in this case.

11  Your belief is that your compelling need as

12  plaintiff's counsel for the answer to that question

13  will override the work product privilege.

14    MS. BRADY:  Our position is -- oh yeah.

15  My position is also that it's not necessarily work

16  product because these are hypotheticals given that

17  he doesn't remember what we're asking.

18    MR. COYNE:  I got you.

19    MS. BRADY:  Yep.

20    MR. COYNE:  I got you.  Okay.  Fair enough.

21  I understand.  Give me one minute.  We'll be right

22  back on. Mike, I'm going to call you.

23      (OFF THE RECORD)

24    COURT REPORTER:  Okay.  We're back on the

25  record.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 625 of 782 PageID #:13883
The Deposition of MICHAEL LATZ, taken on January 25, 2022

107

 1           MR. COYNE:  All right.  Just for the record, we
 2      had the colloquy about questions, which may invoke
 3      the attorney work product privilege, which
 4      obviously, the goal is to allow the deposition to go
 5      continue seamlessly, and at the same time, protect
 6      the witness's interest in any privileges which may
 7      apply.  Off the record, I had a chance to discuss
 8      this issue with the witness and application of the
 9      privilege, and we'll go ahead and allow him to
10      proceed.  Thank you.  Of course, renewing the
11      attorney, the continuing line of objections we have
12      as to form and foundation for the reasons previously
13      stated.  Thank you.
14  BY MS. BRADY:
15      Q    I think there's a question pending.  Can the
16  court reporter please read it back?
17           COURT REPORTER:  Yes.
18      Q    Or play it back?
19           (REPORTER PLAYS BACK REQUESTED TESTIMONY)
20           COURT REPORTER:  Did you guys hear that?
21           MR. RAHE:  I didn't hear the end.  I heard,
22      "undermined" was the last word.
23           COURT REPORTER:  Okay.  My computer froze
24      during that, so I'll play it again.
25           (REPORTER PLAYS BACK REQUESTED TESTIMONY)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 626 of 782 PageID #:13884
The Deposition of MICHAEL LATZ, taken on January 25, 2023
108

```
 1    BY MS. BRADY:
 2         Q    Did you hear the question, Mr. Latz?
 3         A    I did.  It's a hypothetical question and it's
 4    one I can't answer without all the context.  You know,
 5    why is it they couldn't view the shooter.  It just calls
 6    for speculation.
 7         Q    Does it matter why the witnesses couldn't see
 8    the shooter if they couldn't see the shooter, but made
 9    identifications of the shooter anyway?
10         A    Is that a question?
11         Q    Yeah.
12         A    Oh, what's the question?
13         Q    Does it matter why the witnesses couldn't see
14    the shooter if they said they couldn't see the shooter
15    and yet made an identification anyway?
16         A    I don't know.  It could.
17         Q    Why would it matter why a witness couldn't see
18    a shooter?
19         A    I don't know.  It's just a -- it's a game of
20    hypothesis and speculation.
21         Q    Are you saying that there are instances in
22    which a witness could have not seen a person commit a
23    crime-
24         A    I'm not saying that.
25         Q    -- and you would have relied on that witness'
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 627 of 782 PageID #:13885
The Deposition of MICHAEL KATZ, taken on January 19, 2022
109

1    eyewitness identification anyway?

2        A    I'm not saying that.

3        Q    Okay.  If you would have known that Guevara

4    and Halvorsen suggested to either Ochoa or Rodriguez who

5    to pick out of the lineup, would that have undermined

6    your decision to approve charges?

7            MR. COYNE:  Before you answer, Mike, let me

8        just interpose a separate and distinct line of

9        objection in addition to the earlier.  He's answered

10       that he cannot answer a hypothetical question.  He

11       didn't say that he wouldn't.  He said he can't

12       answer a hypothetical question.  So in light of

13       that, Rachel, will you accept that additional basis

14       for objection as continuing in order to avoid

15       interruption?

16           MS. BRADY:  Sure.

17           MR. COYNE:  Thank you.  Okay.  Go ahead, Mike.

18       A    I can't answer hypothetical.  If then, what --

19   I can't, with all honesty.

20   BY MS. BRADY:

21       Q    Okay.  So if you would have known that one of

22   the detectives in this case suggested to a witness who

23   the witness should identify, are you saying that that

24   would not have undermined your decision to approve

25   charges, that you might have approved charges anyway,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  knowing that the detectives had performed suggestive

2  identification procedures?

3      A    If I believed that, it's called for

4  hypothetical, but if I believed that, I'm sure it

5  would've affected my decision.

6      Q    If you would have known that there was an

7  undisclosed witness who knew who the shooter was and

8  detectives withheld information about that witness,

9  would you have wanted to interview that witness, as

10 well, pursuant to your practice of wanting to interview

11 all witnesses?

12     A    Again, you're asking a hypothetical, which

13 isn't complete, but as I said earlier, I would want to

14 interview every witness they identified.

15     Q    And if you learned that Guevara was

16 translating, for you, conversations with witnesses

17 incorrectly, would that have undermined your decision to

18 approve charges?

19     A    If I learned that, it would.

20     Q    And if you'd known that either of the two

21 eyewitnesses, Ochoa, or Rodriguez, were made promises by

22 detectives in exchange for their identifications, would

23 that have undermined your decision to approve charges?

24     A    It depends on the exact promises -- the exact

25 things said.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 629 of 782 PageID #:13887
The Deposition of MICHAEL LATZ, taken on January 29, 2021
111

1      Q   Okay.

2      MR. COYNE:  I'm sorry.  I didn't hear his

3  answer to the previous question.  Rachel, maybe you

4  did, or somebody did.  I think, it got cut off.  If

5  you had known about a witness, not the translation

6  one, the one before that.  An undisclosed witness

7  who actually knew who the shooter was.  I didn't

8  hear his answer to that question.

9      MS. BRADY:  Can the court reporter read back

10  the answer?

11      MR. COYNE:  Yeah, please.

12      COURT REPORTER:  I actually didn't get an

13  answer to that question.  I think he coughed over

14  it.

15 BY MS. BRADY:

16      Q   Oh, okay.  So I'll ask it again.  Mr. Latz, if

17 you'd known that there was a witness who knew who the

18 shooter was and detectives withheld information about

19 that witness, would you have wanted to speak with that

20 witness, pursuant to your policy of wanting to speak

21 with all witnesses?

22      A   As I stated before, it was my policy to speak

23 to all witnesses who are identified, so yes.

24      Q   And then, I asked a question about, if you had

25 known that the two eyewitnesses or either of the two

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   eyewitnesses were made undisclosed promises by
 2   detectives in exchange for their identifications.
 3        A    I think, I answered that one already, didn't
 4   I?
 5        Q    Yeah, and you said it depends on the promise.
 6        A    Yes.
 7        Q    What does it depend on?
 8        A    It depends on the promises, the things
 9   actually said.
10        Q    What kinds of promises would be acceptable
11   promises that wouldn't cause you to question their
12   identifications?
13        A    I don't know.  I'd have to see what the actual
14   promises were.
15        Q    What if you'd known that either of the two
16   eyewitnesses were promised leniency in criminal cases in
17   exchange for their identifications of Mr. Iglesias,
18   would that have undermined your decision to approve
19   charges?
20        A    Possibly.  It would depend upon the actual
21   words and circumstances.
22        Q    So are you saying that there are circumstances
23   under which detectives could have made promises to
24   witnesses that they would be, or secure leniency in
25   sentencing that they did not disclose to anyone?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 631 of 782 PageID #:13889
The Deposition of MICHAEL LaTZ, taken on January 31, 2023
113

1       A     I don't know.  I'd have to know the actual
2   terms, words, and circumstances.
3       **Q     Are you aware of allegations of misconduct**
4   **lodged against Reynaldo Guevara by dozens of people who**
5   **are claiming that their convictions were wrongful?**
6       A     I'm only generally aware of that, where that
7   this case exists, but I'm not aware of any specific
8   instances.
9       **Q     Are you aware that Geraldo Iglesias is one of**
10  **19 men who've been exonerated after being convicted on**
11  **murder charges resulting from misconduct committed by**
12  **Guevara?**
13      A     No.
14          MR. COYNE:  And by the way, Mike, you can
15      answer these questions in so far as they do not
16      require you to disclose information you received
17      from your attorney pursuant to confidential
18      communications to the extent that you can answer
19      those questions without disclosing those.  Go ahead.
20          MS. MCGRATH:  Object to the form of the
21      previous question.
22  BY MS. BRADY:
23      **Q     You can answer.**
24      A     No.
25      **Q     You said you were generally aware of**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    allegations of misconduct against Reynaldo Guevara?

2        A    Yes.

3        Q    Do any of those or the sum total of those

4    allegations cause you to question the integrity of

5    Reynaldo Guevara's work at the Chicago Police

6    Department?

7        A    I haven't made any conclusion.

8        Q    Did you have any knowledge of or involvement

9    in her Geraldo Iglesias' post-conviction proceedings?

10       A    I did not.

11       Q    Were you involved in any way in the decision

12   not to recharge Geraldo Iglesias with the Roman murder?

13       A    No.

14       Q    I have a couple more questions that I have to

15   ask.  So sorry, I got to ask them.  Did you conspire

16   with any police officer in this case to deprive Geraldo

17   Iglesias of his constitutional rights?

18       A    No.

19       Q    Did you withhold any exculpatory evidence from

20   Geraldo Iglesias?

21       A    No.

22       Q    Did anyone from the Chicago Police Department

23   present to you any exculpatory evidence which you then

24   withheld?

25       A    I was not involved in the prosecution of this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 633 of 782 PageID #:13891
The Deposition of MICHAEL LATZ, taken on January 13, 2022
115

 1    case, so no.

 2        Q    Did you hear of any Chicago Police Department

 3    employee receiving exculpatory evidence and not

 4    disclosing it?

 5        A    No.

 6        Q    Has our discussion today or our review of

 7    documents refreshed your recollection about this case

 8    whatsoever?

 9        A    No.

10        MS. BRADY:  Okay.  I do not have any more of

11    questions, so I will thank you for your time and

12    turn it over to the other attorneys who might have

13    some follow- ups for you.

14        MR. COYNE:  Can we just take a quick five-

15    minute break at this point, and then, come back?

16        MS. BRADY:  Sure.

17        MR. RAHE:  Sure.

18        COURT REPORTER:  Okay.  We're going off the

19    record.

20          (OFF THE RECORD)

21        COURT REPORTER:  We are back on the record.

22            CROSS EXAMINATION

23    BY MR. CHRISTIE:

24        Q    All right.  Good afternoon, Mr. Latz, my

25    name's Todd Christie.  I represent several of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 634 of 782 PageID #:13892
The Deposition of MICHAEL KATZ, taken on January 30, 2023
116

1  defendant officers in this case.  I just have a few

2  questions for you.  I just want to circle back.  When

3  did you start on felony review for the Cook County

4  State's Attorney's office?

5       A    It was probably late '92 or early '93.

6       Q    And you said you stayed on there for about a

7  year?

8       A    Yes.

9       Q    So from '92 to about the end of '93?

10      A    Approximately.

11      Q    Okay.  So you were there for about a year.

12  Okay.  When you were determining to approve charges on

13  felony review was your main goal to assess whether there

14  was enough evidence to bring a conviction?

15           MS. BRADY:  Objection.  Leading.

16      A    I don't know if that was the standard.  The

17  standard was, I think, a reasonably likelihood of a

18  conviction, but make sure all the elements of a crime --

19  there was evidence to support all the elements of the

20  charge.

21      Q    But you're looking for something more than

22  just probable cause?

23      A    Yes.

24      Q    And in your general practice, when you were

25  brought into the police station to look over charges,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   would you review the investigative file or police

 2   reports?

 3        A    I would review everything that which was given

 4   to me by the detectives, which generally included an

 5   arrest report, supplementary reports.

 6        Q    Photographs?

 7        A    Sometimes.

 8        Q    Medical examiners reports, if available?

 9        A    If available.

10        Q    So you'd review as much evidence that was

11   brought to you as possible?

12        A    Exactly.

13        Q    And then, you'd also as you said earlier, you

14   like to interview witnesses.

15        A    Yes.

16        Q    And you'd interview as many witnesses as you

17   possibly could that were reasonable and practical to

18   bring in?

19        A    Yes.

20        Q    And as you brought up the felony review

21   folder, you reviewed -- or you interviewed several

22   witnesses in this case?

23        A    Yes.

24        Q    Okay.

25             MS. BRADY:  Objection.  Form.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 636 of 782 PageID #:13894
The Deposition of MICHAEL KATZ, taken on January 30, 2024
118

1      Q    And when you interview witnesses on felony

2  review, do you independently vet their credibility?

3          MR. RAHE:  Objection.  Form.

4          MS. BRADY:  Objection.  Form.

5      A   You know, it's been 30 years.  I think we

6  naturally make an assessment credibility.

7      Q    You have reviewed the testimony --

8          MR. RAHE:  I'm sorry, I didn't catch that. I'm

9    sorry, he cut out there.  I didn't catch your -- the

10    answer because it cut out on my end.  It's been 30

11    years, what?

12      A   It's been 30 years and I have no specific

13  recollection.  Although, I think, it's natural to make

14  an assessment of credibility.

15          MR. RAHE:  Okay.  Gotcha.

16  BY MR. CHRISTIE:

17      Q    And when you're vetting those witnesses, do

18  you determine if police had ever coerced them to say

19  anything to you?

20          MS. BRADY:  Objection.  Form.  Also,

21    foundation.

22          MR. RAHE:  Join.

23      A   No.  I do not.

24  BY MR. CHRISTIE:

25      Q    In this case, you don't recall observing any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  police officers coerce a witness to say something to

2  you?

3      A    I do not recall that.

4      Q    And if you did observe police officers

5  coercing a witness to say something, you would've

6  reported that?

7      A    Yes.

8      Q    If you observed any police officers making

9  suggestive identifications to a witness to identify a

10  suspect, you would report that?

11      A    Yes.

12      Q    And you don't recall doing that in this case?

13      A    I don't recall seeing any instance of

14  suggestive identification.

15      Q    When you were determined whether to approve

16  charges, did police officers have any influence over

17  your decision making process?

18          MS. BRADY:  Objection.  Form, foundation.

19      A    What do you mean by "any influence"?

20      Q    Did you independently analyze and assess the

21  facts?

22      A    That determination is made independently of

23  what the police department wants.

24      Q    And when you approve charges, you have a good

25  faith belief that there's enough evidence to bring

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 638 of 782 PageID #:13896
The Deposition of MICHAEL LATZ, taken on January 30, 2020
120

1    forward charges?

2        A    Yes.

3        Q    And in this case, there were charges approved

4    by you?

5        A    I have no independent recollection, but

6    according to the felony review folder, yes.

7            MR. RITCHIE:  Okay.  I have no further

8        questions.  Thank you, Mr. Latz.

9            THE WITNESS:  Thank you.

10            MR. COYNE:  Anyone else?

11            MS. MCGRATH:  I don't have any questions. Thank

12        you, Mr. Latz.

13            THE WITNESS:  Thank you.

14            MR. RAHE:  One second.  We can stay on the

15        record.  I just have a couple questions for you,

16        Mr. Latz.

17                    EXAMINATION

18    BY MR. RAHE:

19        Q    My name's Austin Rahe.  I represent the

20    defendant, City of Chicago.  Do you remember you talked

21    a little about -- a bit earlier about these two

22    witnesses, Efrain Torres and David Chmieleski?

23        A    I do.

24        Q    And those were the witnesses that you wanted

25    to come back in to view to do an identification

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 639 of 782 PageID #:13897
The Deposition of MICHAEL LATZ, taken 30/January 30, 2023
121

1    procedure, a lineup, I think?

2        A    According to the felony review folder, that's

3    what it says.

4        Q    Okay.  And did you - well, did you see in any

5    of those reports that David Chmieleski and Efrain Torres

6    had previously said they were not able to see the

7    shooter's face?

8        A    I don't recall what the reports say.

9        Q    Okay.  So let's assume that previously, when

10            Efrain Torres and David Chmieleski were

11   interviewed by the police, they said that they were

12   unable to identify, or unable to see the shooter's face,

13   so, I guess, my question is:  If they had previously

14   said that and you knew about it, what would be the

15   purpose of bringing them back into view a lineup?

16            MR. CHRISTIE:  Objection.  Form, foundation.

17            MS. BRADY:  Join.

18       A    If you're asking me to take an -- I don't have

19   any independent recollection of why I did anything in

20   this case.  But if you're asking for an inference from

21   the felony review folders, because -- my practice was to

22   talk to every witness myself and not just rely upon what

23   was in police reports.

24       Q    Okay.  So it would make sense for them to come

25   in so you could talk to them just to ensure that they

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 640 of 782 PageID #:13898
The Deposition of MICHAEL LATZ, taken on January 10, 2023
122

1  didn't have any change of mind, or maybe they would

2  remember something differently when they came in and

3  talked to you?

4       MR. CHRISTIE:  Same objection.

5       MS. BRADY:  Objection.  Same objection.

6  A    Yeah.  Just to establish whether they -- what

7  they actually saw for myself.

8  Q    Okay.  And let's say they came in to talk to

9  you and they told you, "We didn't see the shooter's

10 face." They told you specifically, then, what would be

11 the purpose of showing them a lineup?

12      MR. CHRISTIE:  Same objections.

13      MS. BRADY:  Join.

14 A    To see whether they could make an

15 identification of the suspect.

16 Q    Even if they didn't see his face?

17      MR. CHRISTIE:  Same objections.

18      MS. BRADY:  Also, argumentative.

19 A    Yes.

20      MR. RAHE:  Okay.  Thank you.  That's all the

21  questions I have.  Anyone else?

22                 REDIRECT EXAMINATION

23 BY MS. BRADY:

24 Q    I have a brief follow-up.  Mr. Latz, you

25 mentioned that sometimes, when you interviewed witnesses

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 641 of 782 PageID #:13899
The Deposition of MICHAEL LATZ, taken on January 31, 2022
123

1  as a felony review prosecutor, you vetted them for

2  credibility.  Do you remember saying that just a couple

3  minutes ago?

4         A    No.  I don't think I said that.  I said --

5              MR. RAHE:  I don't -- that wasn't his

6        testimony, actually, but go ahead.

7         Q    Okay.  So can you tell me what you did while

8  interviewing witnesses when you wanted to evaluate their

9  credibility?

10        A    I think, you misconstrued what I said.  I

11  said, naturally, you make a credibility assessment and

12  just naturally, when you talk to anyone, you make a

13  credibility assessment.  And I can't tell you what I did

14  because I have no specific recollection.  I just know

15  that whenever I speak to a witness in the capacity as a

16  lawyer, I just have to make a subconscious assessment of

17  credibility.

18        Q    Okay.  And did you memorialize witness

19  statements in your felony review folder even though you

20  were making credibility assessments about them?

21              MR. RAHE:  Objection.  Form.

22        A    Please, I don't understand the question. Could

23  you --

24        Q    Sure.

25        A    -- rephrase the question?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 642 of 782 PageID #:13900
The Deposition of MICHAEL BATZ, taken on January 6, 2022
124

1    Q    Yeah.  You said it's natural to evaluate

2  people's credibility just as an attorney, when you're

3  talking to witnesses.  Did you memorialize what

4  witnesses told you irrespective of any determinations

5  you made about their credibility?

6    A    I -- in the felony review file folder that I

7  have, you could see that there's three lines.  We're

8  giving the summary of what witnesses said.  And in those

9  three lines, I would summarize what they said.  I don't

10 think I made any judgment of credibility on any of the

11 witnesses.  I don't think I memorialized any assessment

12 of credibility on any of those witnesses, but I don't

13 have any independent knowledge or independent

14 recollection.

15   Q    Okay.  And if you would have made any

16 determinations that the witnesses were less than

17 credible, you would have recorded their statements on

18 those three lines anyway, right?

19        MR. RAHE:  Form, foundation.  Go ahead.  Yeah.

20   A    What?  I'm sorry.  What's the question again?

21 Could you rephrase it because I would summarize their

22 statement.  In the three lines, I'm given to do that,

23 okay?  Are you asking me if I would make any credibility

24 assessment?

25   Q    No.  I'm just asking you that, even if you did

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 643 of 782 PageID #:13901
The Deposition of MICHAEL LATZ, taken on January 4, 2024
125

1  make a credibility determination, would you have still

2  summarized what the witness said anyway?

3      A    I would probably summarize what the witness

4  said.  Yes.

5          MS. BRADY:  Okay.  I do not have any more

6      questions, so I believe we're done.

7          MR. RAHE:    I'm sorry.  I just have one more.

8          MR. COYNE:    Go ahead.

9          MR. RAHE:    Sorry, John.

10         MR. COYNE:  It's all right.

11                 RE-EXAMINATION

12  BY MR. RAHE:

13     Q    I'm going back to what I was just talking

14  about a few minutes ago.  Is the purpose of having

15  witnesses that didn't see the shooter's face view a

16  lineup to be thorough in the investigation of the facts

17  before you potentially approve serious felony charges

18  against a suspect?

19         MS. BRADY:  I'm going to object to these

20      questions on the ground that they're beyond the

21      scope of my redirect, and also to that one on form

22      and foundation.

23         MR. COYNE:  Join on form and foundation.  Go

24      ahead, Mike, you can answer if you know.

25     A    In this specific case, I don't have a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 644 of 782 PageID #:13902
The Deposition of MICHAEL LATZ, taken on January 40, 2023
126

1    recollection of why we called those witnesses in other
2    than I know it was a practice to speak to every witness
3    that was identified in police reports, if possible.
4    BY MR. RAHE:
5        Q    Right.  I'm saying more generally, if you're -
6    - I'm just trying to figure out what the purpose would
7    be of having witnesses review a lineup when they said
8    they didn't see the shooter's face, and I'm wondering if
9    that purpose is to be as thorough as possible in your
10   investigation before you approve the felony charges.
11       A    I would agree with that.  It's an effort to be
12   thorough.
13           MR. RAHE:    Great.  Thank you.  That's all
14       the questions I have.
15           MR. COYNE:  Okay, Mike, you have, unless
16       Rachel, you have anything further based on that?
17           MS. BRADY:  No.  I'm done.  Thank you,
18       everyone.
19           MR. COYNE:  Okay.
20           THE WITNESS:  Thank you.
21           MR. COYNE:  Mike, you have the right to review.
22       As you know, in light of your practice, you have the
23       right to review your transcript and you can't make
24       any substantive changes, but to review the
25       transcript prior to its being completed, you can

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    reserve that right or you can waive it, which do you

2    so choose?

3           THE WITNESS:  Reserve.

4           MR. COYNE:  Okay.  Reserve signature.  Thank

5    you, all.

6           COURT REPORTER:  Okay.  Thank you.  We're going

7    off the record.

8              (DEPOSITION CONCLUDED AT 2:04 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 646 of 782 PageID #:13904
The Deposition of MICHAEL ZATZ, taken on January 20, 2022
128

```
1              CERTIFICATE OF REPORTER
2                 STATE OF ILLINOIS
3

4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded stenographically and mechanically
10   by me and then reduced to typwritten form under my
11   direction, and constitutes a true record of the
12   transcript as taken, all to the best of my skill and
13   ability.  I certify that I am not a relative or
14   employee of either counsel, and that I am in no way
15   interested financially, directly or indirectly, in this
16   action.
17
18
19
20
21
22   AMANDA DEMENT,
23   COURT REPORTER/NOTARY
24   COMMISSION EXPIRES:  11/24/2022
25   SUBMITTED ON: 01/25/2022
```

AMANDA DEMENT
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 24, 2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 647 of 782 PageID #:13905
The Deposition of MICHAEL LATZ, taken on January 6, 2022

129

**Exhibits**

**EXHIBIT 1_**
**LATZ** 43:14,16
45:10 69:4,13
71:1
**EXHIBIT 2_**
**LATZ** 51:13,16
52:11
**EXHIBIT 3_**
**LATZ** 52:16,19
**EXHIBIT 4_**
**LATZ** 62:21,25
70:18 89:15

**0**

**0030** 74:2
75:18 93:23
**0125** 93:24
**0140** 93:25

**1**

**1** 20:3 43:14,16
45:10 67:15,16
69:4,13,16 71:1
**10** 28:18
**101** 12:4 51:13,
21,24 52:3,5
**157** 52:17
**19** 113:10
**1983** 18:6
**1989** 21:13
**1990** 20:3
**1993** 12:2
21:19,24 22:14
23:16,18,22
24:2,17 25:10
26:17,22 27:17
30:2,7,10 31:25
32:1,3,7,15
34:14 38:1,8
67:7 68:10
83:13,17 99:13
100:16,19,21

**1995** 16:10,11
19:18,19
**1st** 16:6

**2**

**2** 51:13,16 52:8,
11 67:15,19
**20** 11:2
**2000** 17:11
**2001** 17:9
**2007** 17:20
**2010** 18:9
**2014** 18:17
**21** 67:6
**24** 12:7 74:1
99:13 100:16,
19,21
**24th** 93:23,24
**26** 79:22 80:23
**2:04** 127:8

**3**

**3** 52:16,19
68:18 69:8
70:11,16 73:5
**30** 11:2 28:16
71:13 74:21
118:5,10,12
**37.2** 83:9 84:1

**4**

**4** 62:21,25
69:16 70:18
71:9 73:23
89:15 97:15
**470** 44:2
**471** 45:6
104:13
**472** 104:16
**474** 71:17,20
72:1

**476** 69:8 71:3,6
**478** 73:10

**5**

**5** 72:2
**50** 28:21,23

**7**

**7** 12:2
**7th** 106:10

**8**

**80** 18:24

**9**

**9** 51:14
**90** 62:23
**90s** 49:19
55:23 56:11
**92** 68:19 116:5,
9
**93** 12:7 74:2
91:16 97:16,25
116:5,9

**A**

**A.S.A.** 74:2,15
89:18 90:21
**ability** 33:10
**abroad** 22:9
**Absolutely**
99:20
**accept** 77:8
109:13
**acceptable**
112:10
**accurate** 9:24
24:24 41:16
68:15 71:11,14,
22 72:5,9 73:20

76:1,21 78:16
92:12
**accurately**
72:20
**accused** 10:14
**action** 83:21
**actions** 52:2
**actual** 39:1
112:13,20
113:1
**add** 63:10
94:23,25
**addition** 109:9
**additional**
79:12 87:22
88:4,8 109:13
**address** 86:14
**advice** 81:8,14
82:3
**afar** 61:8,15
**affect** 10:2
**affected** 110:5
**affects** 10:5
**affirm** 8:6
**afternoon**
115:24
**agencies** 18:3
46:23
**Aggravated**
29:16
**agree** 40:2
67:20 71:18
76:4 86:3
94:20,21 106:8
126:11
**agreements**
54:24
**ahead** 9:15
20:21 23:24
25:23 31:15
47:16 56:3
62:18 64:1 68:4
72:24 77:6
81:24 82:12
86:9 95:1 97:1

99:8 102:24
105:20 107:9
109:17 113:19
123:6 124:19
125:8,24
**All-plea** 56:4
**allegations**
10:8 113:3
114:1,4
**alleges** 100:25
**allowed** 37:8
74:17
**Amanda** 80:13
**amassed** 96:7
**analysis** 46:9
79:3
**analyze** 119:20
**Ancel** 17:22,23
18:2,9
**answering**
62:14 79:5,23
80:24 82:21
**answers** 8:20
9:9,24 36:22
**apologize**
36:18
**appearance**
7:4
**appears** 12:8
64:7,9 65:12
67:1 70:22
71:17,19
**application**
62:11 79:21
107:8
**applied** 83:6
85:17
**apply** 84:7,11,
20,21 85:1,8,14
107:7
**appointed**
18:11
**approach**
37:25
**approval** 24:7,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

13,15 26:7
89:6,12,24
90:5,7,15,16
91:4,9 92:9
93:20 104:18

**approve** 25:19
26:1,4 27:24
28:25 29:4
38:2,14,16,17
39:1,9,14 41:10
42:5,23 43:9
45:12 46:17
47:3 48:4,16,21
49:1,3 50:4,7,
16,21 51:9
62:4,8 75:4,13
79:14 87:23
88:6,22 89:3,9,
12 92:19 93:11
97:8 103:25
104:14 105:11,
25 109:6,24
110:18,23
112:18 116:12
119:15,24
125:17 126:10

**approved**
26:2,9 27:4,10
42:8,12 49:15
75:17 87:23
88:4,9 89:20
90:2,4 96:14
100:11,16
103:6 104:5
106:4,5 109:25
120:3

**approving**
82:22,24,25
89:25 91:4,22
96:2

**approximately**
16:25 17:8,17,
24 19:8 25:15
116:10

**area** 7:14 13:24
41:3 45:15 46:9
59:18,19 60:7,
14,20 65:18
66:21 68:9
90:13 92:2 99:5

**areas** 27:20

**argument**

84:11

**argumentative**
68:3 122:18

**Armed** 29:15

**Arnell** 65:17,
19,22 69:7,22
70:9 76:22
78:19

**array** 74:3,5,7,
11 78:22 98:14,
17

**arrest** 117:5

**ASA** 19:22
65:7,16,20
66:11

**assert** 81:8

**asserting** 82:7

**assess** 79:24
116:13 119:20

**assessing**
24:5 48:25

**assessment**
118:6,14
123:11,13,16
124:11,24

**assessments**
123:20

**assigned**
13:21 20:14
27:20 59:11

**assignment**
24:21 25:3,6

**assignments**
24:22 25:8

**assistant** 15:5
19:20,24 24:4
34:3 35:25 41:3
83:14

**assume** 8:24
16:2 33:20
36:21 65:10
76:20 79:11
106:8 121:9

**assuming**
78:15 92:11
93:22,25

**assumptions**
92:21

**attachments**
11:24

**attending** 7:4,
7,10,12,14,17

**attention** 67:6

**attorney** 13:5
14:11 15:2,4,8,
12 16:3 19:20,
25 35:25 52:13
62:11 79:1,21
80:23 81:5,18
83:1,22 84:19,
25 85:5 86:23
104:4 107:3,11
113:17 124:2

**attorney's**
16:8,9,14,15,18
19:17 20:2,7,
12,14,19,22
21:1,5 23:14,22
24:18,20,23
25:2 31:20
32:13 34:4,8,
13,21 35:4,8
37:7,14 39:18
40:24 53:19
54:3,25 55:11,
16,22 56:11
57:16 62:1
81:8,14 82:3,6
116:4

**attorneys**
14:20,21,25
34:4 36:8 37:8
58:24 59:2
102:5 115:12

**Austin** 7:13
120:19

**avoid** 85:22
86:5 109:14

**aware** 30:9
32:7 33:5,12,
19,21 34:8
37:1,13 49:18
53:18 54:2,11
78:1 101:2
102:2 113:3,6,
7,9,25

**awareness**
100:23

―――――――

**B**

**back** 11:20
21:19 31:19,25
32:15 37:6 53:2
57:3 63:20
69:3,15 70:18
71:1 73:22
75:11 80:4,7,
12,19 84:16
86:7 87:7 89:15
92:2 100:4
106:22,24
107:16,18,19,
25 111:9
115:15,21
116:2 120:25
121:15 125:13

**background**
47:6

**bad** 47:20
67:19

**based** 38:6
46:22 48:4,21
67:20 68:3
70:22 76:1,5
77:8 79:10,15,
19 81:5 83:16
85:10 103:10,
22,23 126:16

**basically**
22:22

**basis** 68:15
103:6 109:13

**bat** 96:11

**Bates** 44:2
51:14 52:17
62:22

**batteries**
29:16

**bear** 101:1

**begin** 8:10
46:9

**beginning**
44:2 52:17
62:22 80:15

**awareness**
100:23

**behalf** 7:7,9,
11,15,16 81:22

**belief** 106:11
119:25

**believed** 39:18
110:3,4

**Biebel** 60:14,
17

**bit** 49:11 52:20
88:20 100:25
120:21

**Bob** 7:9

**Bollinger**
17:14

**bottom** 71:3
73:11 89:18

**box** 71:8 73:11

**Brady** 7:6,7,25
8:12,14 11:12,
17 12:14 23:6,9
29:18,20,22
30:3,9,15 31:3,
6,9,11,19,24
32:8,9,15,24
34:5 38:12
40:4,11,14
43:21 44:21
49:25 52:10,12
56:6,23 57:5
59:3,7 62:19
63:1 64:2
67:16,18 68:11
69:13,15,18
70:15,19,25
73:3 76:19
77:14,21 78:2,
4,7,12 79:9
80:6 81:6,16,21
82:1,4,7,15
83:2,25 85:7
86:17 87:15
95:17 97:4,24
98:2 100:5,8
104:8,11
105:18,21
106:3,6,14,19
107:14 108:1
109:16,20
111:9,15
113:22 115:10,
16 116:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

117:25 118:4,
20 119:18
121:17 122:5,
13,18,23 125:5,
19 126:17

**break** 9:18,21
11:17 56:19
100:2,3 115:15

**briefly** 63:18
86:24

**bring** 116:14
117:18 119:25

**bringing** 84:16
121:15

**brother's**
21:11

**brought** 46:22
65:18 116:25
117:11,20

**Bureau** 19:21,
23,25

---

**C**

**C-O-Y-N-E**
7:17

**call** 14:25
24:19 25:15,25
26:3 40:23
43:14 51:12
52:15 61:21
62:21 86:3,5
90:12 92:1
106:22

**called** 13:23
17:22 18:21
19:6 26:11
27:24 29:4,12,
22 38:14 47:22
68:15 71:8
75:12 91:21,25
92:5 93:9,19
110:3 126:1

**calls** 33:25
51:11 56:15
62:10 76:16
79:1 103:11
108:5

**capacity** 48:10

123:15

**capped** 45:3

**car** 66:6,8
67:11

**carefully** 63:21

**case** 8:15
10:24 12:5,6,8,
22 13:8,17,18
14:1,3,16,21
15:4,5,11,15,
19,20 25:21
26:2,15,16 27:2
37:24 38:20
41:12 43:20
44:16 48:12,17
49:16 52:13
53:1,5,8,10
54:12,13,14
56:18 57:9
58:18 59:9,11
62:4 64:15
66:18 77:10
78:1 83:8 84:2,
5 85:1,15,21
88:11,13 89:1,
11 90:8 91:14
94:11 95:4,5,
16,24 96:10,14,
18 97:11 98:21,
25 99:6 100:10,
18,21,24 103:7
106:2,10
109:22 113:7
114:16 115:1,7
116:1 117:22
118:25 119:12
120:3 121:20
125:25

**cases** 20:8,18
43:44 46:17
59:22 60:10,20
61:6,24 84:6
89:6 101:13
112:16

**Castiliano**
22:21 23:10

**catch** 23:5
70:13 118:8,9

**categories**
27:21 29:13
47:7

**category** 44:7
45:20

**caused** 103:24

**Cavo** 19:6,7,
10,14

**CCSAO** 37:2
44:2 45:6 52:17

**cell** 90:11

**chain** 27:5,11
102:8

**Chairman**
18:13

**chance** 11:1
12:9 52:25 64:4
82:17 84:2
107:7

**change** 103:21
122:1

**characterizati
on** 94:21

**charge** 25:25
38:19 39:2,8,
19,23 41:1 89:5
91:8 92:16,17
93:8,9 94:5,7,
16,17,19
116:20

**charges** 24:5,
8,9,13,16 25:19
26:1,4,9 27:4,
10,24 28:13,25
29:1,4 38:2,15,
16,17 39:1,10,
14 40:25 41:4,
6,10,20,24
42:5,8,12,17,24
43:2,9 45:12,18
46:18 47:3
48:4,16,21
49:1,4,15 50:5,
7,16,21 51:9
62:4,8 75:4,13,
17 79:10,14
82:23,25 83:21
87:23 88:4,6,9,
22,23 89:3,9,
12,25 91:5,22
92:19 93:11
96:3 97:9
100:11,16

103:6,25 104:5,
14,18,21
105:12,25
109:6,25
110:18,23
112:19 113:11
116:12,25
119:16,24
120:1,3 125:17
126:10

**charging**
89:20 90:3

**Chicago** 7:8,
10,12,15,18
12:1 14:23
16:16 24:6
37:15,20 49:18
59:10 61:9,14
66:9 101:3
114:5,22 115:2
120:20

**Chicagoland**
7:14

**Chino** 58:2

**Chmieleski**
58:10 74:17
92:14 120:22
121:5,10

**choose** 127:2

**Christie** 7:9
8:3 47:16 49:5,
22 53:16,22
54:6,16,21
55:18,25 56:2,
14 66:24 67:25
70:4,18,20
72:23 73:8
75:1,6 76:16
77:16 115:23,
25 118:16,24
121:16 122:4,
12,17

**chronology**
93:14,15,18,22,
25 95:3

**circle** 116:2

**Circuit** 106:10

**circumstance
s** 89:19 112:21,
22 113:2

**city** 7:15 14:22
84:6 120:20

**civil** 10:9 14:21
18:6

**claiming** 113:5

**clarify** 8:23,25
25:24 44:14,18
82:19 91:24
103:22

**clarifying** 78:4

**clean** 9:1

**client** 86:16

**coerce** 119:1

**coerced**
118:18

**coercing**
119:5

**coercion**
101:5

**college** 22:5,
13,24 23:3,11

**colloquy** 107:2

**command**
102:8

**Commission**
18:14,20

**Commissioner**
18:11,12

**commit** 108:22

**committed**
102:20 113:11

**communicate**
42:6

**communicatio
n** 63:12

**communicatio
ns** 113:18

**comp** 18:25

**compel** 83:9

**compelling**
106:11

**compensation**
18:12,13,20,24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 650 of 782 PageID #:13908
The Deposition of MICHAEL LATZ, taken on January 26, 2022

132

19:11

**compile** 84:2

**complete** 9:2, 4,24 41:16 110:13

**completed** 10:24,25 12:21 126:25

**component** 31:11

**compound** 35:23

**computer** 43:22 107:23

**Concealing** 101:25

**concluded** 92:15 93:7 127:8

**conclusion** 15:11 114:7

**conditions** 10:2

**conduct** 75:14 102:19 103:1,3

**conference** 86:16

**conferences** 61:18

**confidence** 99:21

**confidential** 48:5 49:20 67:8,24 74:13 113:17

**confines** 61:22

**confirmation** 65:14

**conjunction** 12:21

**connection** 14:3

**conspire** 114:15

**constitutional** 114:17

**contact** 39:18 91:2,8

**contacted** 65:15 67:7,22

**contents** 57:12 65:1 68:25

**context** 31:23 38:19 55:1,2 108:4

**continue** 20:12 25:21 83:25 84:12 100:15, 21 107:5

**continued** 49:16

**continuing** 38:5 42:8,13 77:7 79:17 83:15 90:17 94:24 107:11 109:14

**conversation** 50:17,22 69:22 84:17 105:16

**conversations** 59:12 84:12 110:16

**conveyed** 50:10

**convict** 32:20

**convicted** 113:10

**conviction** 116:14,18

**convictions** 113:5

**Cook** 16:7,9, 13,15 19:17 20:1,6,11 21:4 23:22 34:4,13 37:6,13 53:19 54:3 57:15 116:3

**cooperate** 95:22

**cooperative** 48:19

**cops** 93:11 94:4

**copy** 13:1 103:18

**Cornell** 66:7, 10 70:10,24 71:16 76:23 78:20

**corner** 47:13

**correct** 19:15 20:5 24:25 27:8 39:16 47:17 57:10 59:2 67:17 75:2 83:2 91:24 99:3 100:12,13

**correctly** 73:2 75:15

**coughed** 111:13

**Coughs** 48:6

**counsel** 11:4, 9,23 12:15 86:24 106:12

**country** 22:10

**County** 16:7,9, 13,15 19:17 20:1,6,11 21:4, 9 23:22 32:12 34:4,13 37:6,14 53:19 54:3 57:15 116:3

**couple** 47:6 69:16 89:10 114:14 120:15 123:2

**court** 7:2,19,22 8:4,10 9:1,8 11:20 56:4 57:1,3 80:3,6,9, 11,18 82:17 86:21 87:4,10 106:24 107:16, 17,20,23 111:9, 12 115:18,21 127:6

**courtroom** 8:21

**courts** 84:4

**covered** 30:25 85:18,19

**Coyne** 7:16,17 11:4,16,22 12:25 20:21 22:15,20,25 23:4,7,24 25:5, 22 26:14 27:12 28:4,14,20,22 29:10,21 30:5, 11,22 31:7,15 32:6,17,21 33:2,16,25 34:18 35:13 36:9,18 37:4, 10,16 38:4 40:1,8,10 41:7, 17 42:2,19 43:10 45:13 46:19,24 49:23 52:8,11 55:7,14 56:22,24 57:20 59:1,4 62:9,17 63:24 64:8,19 67:14,17 68:1, 14 69:1,11,14, 17 70:2,13,17, 21 71:12,24 72:6,17,21 73:18 74:24 75:5,20 76:2, 10,15 77:5,15, 18,25 78:3,5,9, 25 79:8,15 80:3,8,10,13,20 81:3,11,18,23 82:5,10,19 83:4 84:14 85:21 86:9,12,19,22 87:9,11 91:18 94:24 96:25 97:10,22 98:1 99:7 103:11 104:1,10 105:13,20 106:1,4,7,18,20 107:1 109:7,17 111:2,11 113:14 115:14 120:10 125:8, 10,23 126:15,

19,21 127:4

**CP** 61:2

**CPD** 59:8

**create** 64:9 65:10

**created** 52:3 64:10,21 68:6

**credibility** 118:2,6,14 123:2,9,11,13, 17,20 124:2,5, 10,12,23 125:1

**credible** 124:17

**crime** 116:18

**crime-** 108:23

**crimes** 26:6 27:21 65:19

**criminal** 19:21, 22,25 20:13 33:6,13 39:2 44:15 54:12,24 55:24 56:12 59:1,2 101:13 112:16

**CROSS** 115:22

**customary** 95:10

**cut** 111:4 118:9,10

---

**D**

---

**Daniel** 66:7 70:10 71:5,15 76:23 78:20

**database** 49:19

**dated** 12:2,7

**David** 26:25 27:16 58:10,18 74:17 91:16 120:22 121:5, 10

**day** 28:2,7 68:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

deal 54:13,20 55:4,12 56:8

deals 55:10,17, 24 56:1,4,8,12 101:13

decide 38:14, 15 43:9 89:25

decided 62:7 90:24 94:4,5,17 97:8

deciding 41:9 46:17 48:15 50:4,16,20 88:6 94:19 96:17

decision 25:18 38:25 39:2,8,9, 13 43:8 48:4,21 51:9 68:8 88:21 90:3 96:2 105:11,25 109:6,24 110:5, 17,23 112:18 114:11 119:17

decision-making 60:22

decisions 46:21 52:2 62:3 85:15

decline 46:18

defendant 7:10,12 10:11 33:14 39:2 46:18 50:11 54:12 55:5 77:22 105:4 116:1 120:20

defendants 14:20,22,25 33:6 34:10 54:24 55:10,17, 24 56:12 77:23

defense 15:2 16:19 17:19 18:24 19:1,11, 12 30:1,4,20 31:13 33:23 34:16 35:12 36:8,17,24 37:3,8 58:24 59:2 102:5

degree 89:21

delays 77:7

Deleon 58:25

denied 26:2 42:18 96:15

deny 25:19 26:1,4 43:9 45:17 49:1 51:9 75:14 88:23 90:16 96:10,17

department 12:2 24:24 37:15,20 49:19 61:10,14 101:4 114:6,22 115:2 119:23

depend 48:17, 18,19 88:23 102:16 112:7, 20

dependent 41:1

depending 25:24 84:8

depends 26:15 46:4 48:12 63:22 102:15, 17 110:24 112:5,8

deposed 8:15 15:16,18

deposition 10:18,22 11:8, 10,24 12:13,19 14:4,14,19 15:10 47:10 63:12 77:25 82:16 107:4 127:8

deprive 114:16

describing 47:15

description 24:1 31:2,4

detail 12:10

detailed 64:14

detective 14:6 24:15 40:23 59:19 60:2,5,7, 12 61:2,6,25 66:11 73:16 74:2

detectives 24:6,10,11 41:11,16 42:6 43:2 45:17 46:13 47:1 49:16 50:3 60:18 64:14 65:21 66:5 67:7,21 74:22 76:8 78:23 98:13 109:22 110:1,8,22 111:18 112:2, 23 117:4

determination 48:22 91:10 119:22 125:1

determinations 124:4,16

determine 24:7 39:21 48:14 49:3 50:6 57:18 68:24 118:18

determined 119:15

determining 38:2 47:2 116:12

dialect 22:18 23:2

dictated 98:9

dictates 106:10

differed 40:16

difference 39:6 42:11 47:14

differently 122:2

Difranco 26:25 27:15 91:18,19

direct 8:11 20:17 67:5

directly 24:24

disagree 85:25 86:4

disclose 29:25 30:4 31:12 33:4 34:10 112:25 113:16

disclosed 33:6 35:1 36:8,17 56:13 101:18

disclosing 113:19 115:4

disclosures 33:9

discourse 105:15

discovery 34:20,23,24 35:3,8,12,20 36:1,3

discuss 15:7, 18 29:17 91:22 107:7

discussed 15:3 31:25 51:6 69:6 76:8 94:15 99:16 102:3,10

discussion 115:6

discussions 84:1 90:18

dispatch 24:23

dispute 86:15 104:2,3

distinct 109:8

division 37:20 104:5

doctrine 62:12

document 12:6 14:3 43:24 44:6,7,16,17,23 45:7,19 47:9 51:13,15 52:15, 17,18 62:20,22

63:13,19 64:10 65:6,10,12,15 67:20 68:5,7 69:8 79:19

documentary 10:17 12:18 85:11

documented 51:11 102:21

documents 11:6,23 12:11, 16,17 14:12 34:25 51:8 57:18 62:7 64:13 115:7

Donna 58:25

door 100:4

dozens 113:4

draw 103:13,16 104:24

driver 66:8

duties 53:11

duty 32:19

**E**

e-mail 11:24 13:2 14:9

earlier 12:20 27:3 47:8 57:6 78:25 87:12 88:20 94:25 97:1 99:25 100:1,9 102:10 109:9 110:13 117:13 120:21

early 49:19 55:23 56:11 116:5

ease 63:11

easier 77:6,15, 17

education 21:25 22:14,23

effect 14:13 105:23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 652 of 782 PageID #:13910
The Deposition of MICHAEL LATZ, taken on January 05, 2022

134

effort 126:11

Efrain 58:12
74:17 120:22
121:5,10

elaborate
67:12

elect 83:24

elements
116:18,19

employed
15:22 21:8

employee
115:3

employees
59:9

employer
15:24

employment
17:5 21:3

end 25:20
28:11 107:21
116:9 118:10

ended 26:2
42:18 100:11

enforcement
46:23

engage 79:3

engaged 101:4

English 66:10

enlarge 52:20
63:2

ensure 33:5
34:15 121:25

entire 19:24
44:19 80:14,17

Ernie 60:2

error 44:22

establish
122:6

established
39:22

estimate
28:12,15 29:7

evaluate 28:25
41:20,24 123:8
124:1

evaluation
68:6

evidence
24:11 26:11
30:1,4,19,20
31:12 33:5 35:1
36:16,23 37:2
38:16,20 39:19,
21,22 41:15,21
42:5 45:16
46:12,22 67:21
74:7,22 77:2
79:14 87:19,21
88:5,7,8 89:4,9
90:14 91:8
92:16,17 93:7,9
94:5,7 95:14
96:6,22 97:7
101:23,25
103:5,24
104:13,21
114:19,23
115:3 116:14,
19 117:10
119:25

exact 110:24

EXAMINATIO
N 8:11 115:22
120:17 122:22

examiners
117:8

exchange
53:14,20 54:4,
13,19 99:17,23
110:22 112:2,
17

exculpatory
30:1,4,19 31:12
33:4,12,19,21
34:9,15 36:6,7,
16,23 37:2
101:25 114:19,
23 115:3

Excuse 20:24
48:6

exhibit 43:13,
14,16 44:15,20
45:10 51:13,16

52:11,16,19
62:21,25 69:4,
11,13 70:18
71:1 89:15

exhibits 11:2,6
12:16 69:16

exists 113:7

exonerated
113:10

expected 66:9

experience
40:6

explain 26:4
42:11,14

explanation
40:16

extent 21:24
62:10 88:16
113:18

eyewitness
48:15 73:11
109:1

eyewitnesses
48:13 95:7
105:3,7 110:21
111:25 112:1,
16

_____

F

fabricated
41:21

Fabrication
101:23

face 65:23
121:7,12
122:10,16
125:15 126:8

fact 7:23 12:6
52:13 53:1,5,8,
10 79:16 87:17
90:2 95:11

facts 26:16
85:18 89:19
101:15,20
119:21 125:16

fair 35:6 41:9

46:15,21 64:17
83:12,15,18
106:20

faith 84:10
119:25

False 101:20

familiar 10:8
29:22 32:19
44:3,10 51:3
64:5

familiarize
63:4

February 20:3

fed 101:15

federal 53:6

feel 64:5

felon 47:23

felonies 29:12,
14

felony 10:23
12:3,4,5,21,23
13:1,3,7,14,19,
21,22 14:2 15:5
23:15,21 24:4,
8,13,14 25:3,6,
7,9,12,14,17
26:7,8,12,17,
19,21 27:1,15,
25 28:13,25
29:4,8 36:2,6,
15 37:23 38:1
39:20 40:24,25
41:2,5 42:8,12,
24 43:12,20
44:17,20,23,25
45:4,7,18,20,24
46:9,16 49:1,4,
15 50:6,25
51:1,3,5,6,10,
11,20,24 52:5
53:4,7,11,13
57:7 64:11,12
65:7,13,15
68:6,24 69:4
70:23 71:17
73:7 76:7 79:11
83:14 89:7,11
90:10,16 91:25
92:5 93:19
100:1,10

102:11 103:10,
24 104:4,7,22,
23 105:1 116:3,
13 117:20
118:1 120:6
121:2,21 123:1,
19 124:6
125:17 126:10

felony-
reviewed
38:25

felt 89:4

figure 27:9
103:9 126:6

file 12:6 37:9,
19 44:16,25
45:3 57:12,14,
18 65:16 71:17
78:17 83:9,10
117:1 124:6

file-keeping
37:7

files 37:15

filing 24:7
43:20

filling 13:13

final 68:20
70:15

find 12:23 69:5
73:6 84:4 87:5
95:10

finish 9:2,4,14

firm 16:1,5,16,
17,19,21 17:2,
14,22 18:21
19:5 21:2,11

five- 115:14

flip 44:7,12
63:3 67:5 69:5
103:20

flipping 45:5
69:3 71:1 73:23

fluent 21:15

fluently 21:16,
17

folder 10:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 653 of 782 PageID #:13911
The Deposition of MICHAEL LATZ, taken on January 5, 2022
135

12:3,5,21,24
13:1,3,7,14,19
14:2 27:2 43:12
44:20,24 45:7,
10 50:25 51:5,
10 57:7 65:13
68:24 70:23
73:7,11 76:7
103:14,24
104:7,9,22,23
105:1 117:21
120:6 121:2
123:19 124:6

**folders** 45:25
121:21

**folks** 66:21

**follow** 32:24
33:3 34:10
81:14

**follow-** 115:13

**follow-up**
122:24

**forget** 14:25

**form** 12:4,25
20:21 22:15,20
24:12 25:5,22
26:14 29:21
30:6,12,22,23
31:7,16,21
32:4,16,17,21,
22 33:1,2,7,16
34:18 35:13
36:9,10 37:4,
10,11 38:6
39:4,24 40:8
41:7,13,17
42:2,19 43:10
44:4,10 45:13,
23 46:19,24
47:4,16 49:5,23
51:21,24 52:1,
3,5 53:16,22
54:16 55:14,18,
25 56:2,14
66:24 67:25
68:1,2 69:1
70:4 72:17
74:24 76:10
77:5,8 79:18
103:11 105:13
107:12 113:20
117:25 118:3,4,

20 119:18
121:16 123:21
124:19 125:21,
23

**formal** 35:19

**format** 9:6

**formed** 103:5

**forward** 120:1

**forwarded**
11:7

**forwarding**
12:9,11

**foundation**
23:24 25:22
27:12 28:4
29:10,21 30:5
31:21 32:5,16
33:2,7 34:18
35:22 36:9,10
37:4,10,11 38:6
40:1 41:7 42:21
44:4 47:4
49:22,23 53:22
54:16 56:14
57:20 63:25
64:8,19 68:2
70:3 71:12,24
72:21 73:18
74:24 75:20
76:10 77:5,9
82:10,13 83:16
107:12 118:21
119:18 121:16
124:19 125:22,
23

**foundations**
79:18

**four-page**
62:22

**fourth** 97:24

**Frank** 26:25
27:15 91:18,19

**Frankie** 57:25

**Fransico**
57:23

**frequently**
59:18

**friendly** 61:7,
19,21

**froze** 107:23

**full** 7:20

_____

**G**

**game** 83:12,15,
18 108:19

**gang** 67:9,10

**Gangsters**
67:9

**Garvey** 17:15

**gave** 31:4 92:9
104:14

**Gawrys** 60:12

**general** 37:23
38:10 47:2,10,
12 54:8 65:1
116:24

**generally**
40:23 41:8 90:9
113:6,25 117:4
126:5

**generated**
96:23

**Geraldo** 8:14
12:7 58:15 62:8
65:2 67:2 74:6,
18 76:25 78:18,
21 89:20 101:3,
16 113:9 114:9,
12,16,20

**get all** 96:17

**girl** 67:11

**give** 8:6 23:17
28:11,15 31:23
38:21 43:14
47:1 64:4 74:20
80:9 86:13
87:4,18 89:23
91:9 92:7
106:21

**giving** 41:25
48:25 124:8

**gleaned** 45:15

**Glink** 17:22,23
18:2,10

**goal** 86:1 107:4
116:13

**Gonzalez** 66:8

**good** 7:6 8:13
56:19 63:14
65:22 84:10
86:17 115:24
119:24

**Gotcha** 118:15

**government**
18:3

**graduate**
21:12

**great** 80:8
126:13

**ground** 8:18
125:20

**guess** 28:17
29:11 63:22
75:21 121:13

**Guevara** 7:12
14:22 59:13,15
66:12,21 70:9
72:10,11,15
73:16 74:2,22
109:3 110:15
113:4,12 114:1

**Guevara's**
114:5

**guy** 61:7

**guys** 107:20

_____

**H**

**half** 17:24

**Halvorsen**
60:2,3,6 109:4

**Halvorson**
74:22

**hand** 8:5

**handled** 41:2

**handwriting**
70:23

**handwritten**
47:11,24 48:1

**happened**
43:5 76:5,21
92:22,25 93:12,
18 94:3

**happy** 83:23

**hard** 103:17

**head** 9:10
86:15 104:2

**hear** 36:11
40:11 78:10
83:23 87:2
107:20,21
108:2 111:2,8
115:2

**heard** 84:18
87:11 107:21

**hearing** 88:4
100:17

**high** 21:22,23,
25 22:2,12,17
23:11 61:13

**higher** 26:8
49:11 89:8

**highlighted**
68:17

**highlighting**
52:25 63:11

**hold** 84:23

**holding** 83:17

**homicide** 91:4

**homicides**
29:5,9,13 89:13

**honestly** 48:24

**honesty**
109:19

**hour** 17:5

**hours** 74:2
75:18 93:23,24,
25

**Hugo** 58:7
66:7,12 70:9
71:16 72:2
74:3,5,12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 654 of 782 PageID #:13912
The Deposition of MICHAEL KATZ, taken on January 24, 2022

136

78:20,21 97:18
105:8

**hypothesis**
108:20

**hypothetical**
55:8 85:18
108:3 109:10,
12,18 110:4,12

**hypotheticals**
106:16

—————

**I**

**identification**
43:16 51:16
52:19 62:25
65:24 67:22
74:12,14 98:15
99:1 101:7
108:15 109:1
110:2 119:14
120:25 122:15

**identifications**
108:9 110:22
112:2,12,17
119:9

**identified** 67:2
74:5 88:14,17
94:9 95:6,7
97:13 105:4
110:14 111:23
126:3

**identify** 66:13
109:23 119:9
121:12

**Iglesias** 8:14
12:7 15:11 27:2
44:2 45:6 51:14
52:17 56:18
58:15 62:8,22
67:2 68:18
74:6,18 76:25
78:19,22 89:20
97:16,25
100:25 101:3,
16 112:17
113:9 114:12,
17,20

**Iglesias'** 57:9
58:17,20,24
62:4 65:2

98:21,25 99:6
100:15,24
102:5 103:6
114:9

**Iglesias's**
14:16

**ignore** 52:24

**Illinois** 18:11,
13,20

**impacted**
105:25

**Imperial** 67:8

**implicate**
101:16

**important** 9:9

**inaccurate**
68:13,16 73:15
76:14

**Inaudible** 44:9

**incidents**
13:25

**include** 30:18
56:8

**included** 44:22
101:20 117:4

**includes** 44:15

**including**
80:15

**incomplete**
55:7 69:25 70:6

**inconvenience
d** 86:2,6

**inconvenienci
ng** 84:16

**incorrectly**
110:17

**independent**
57:8,11,24
58:14 62:7
72:7,25 73:19
75:8 76:3 77:11
91:15 93:13
95:2 103:5,8
104:8,25 120:5
121:19 124:13

**independently**
13:8,9 46:16
94:18 118:2
119:20,22

**Indiana** 21:9

**individual**
14:22

**infer** 85:10
103:22,23
104:13,22

**inference** 75:9
87:18 104:24
121:20

**inferences**
103:14,16

**influence**
119:16,19

**informant** 48:5
67:8,9,11,24
74:13

**informants**
49:20

**information**
12:8 13:14
33:13,19,22
34:9,16 41:10,
15,25 45:14,21
46:2,11 48:5,9
50:2,3,10
53:15,21 54:5,
20 65:21 67:23
74:12 77:1
78:15 82:8 84:8
85:2,10,11,20
89:23 91:10
92:11,12,18
93:8,11 94:4,
16,17 96:17
99:14,17,23
102:4 103:23
105:22 110:8
111:18 113:16

**initially** 84:18

**inquiry** 83:20

**insert** 62:18

**insight** 74:21

**inspect** 37:15,
19

**instance** 37:1
41:19,23 53:18
54:18 119:13

**instances** 34:7
36:5 38:13
42:16 43:1 48:3
49:14 54:2,11
55:9 60:24
66:20 98:22
108:21 113:8

**instruct** 79:24
81:4,23

**instructing**
81:12

**instruction**
35:19 62:18
81:19 82:6

**instructions**
90:16,17

**instructs** 9:13

**insufficient**
42:5

**insurance**
16:19 17:19
19:11

**integrity** 114:4

**intend** 104:3,6
106:1

**interest** 107:6

**interject** 11:4

**intern** 21:10

**internship**
32:11

**interpose**
109:8

**interpreted**
73:17

**interpreter**
66:12

**interpreting**
75:2

**interrupt** 81:25
95:1

**interrupting**
38:5,8 77:12

**interruption**
109:15

**interview** 46:5
48:8,12,15
66:12 70:24
71:2,5,7,19
75:19 88:1,13,
17 97:12 110:9,
10,14 117:14,
16 118:1

**interviewed**
42:10 65:17,20
66:11,21 68:19,
20 70:9 73:6
76:6,22 99:12
117:21 121:11
122:25

**interviewing**
66:2,17 123:8

**interviews**
50:2,10 60:22
66:19 68:25
72:12 77:2

**inventoried**
74:7

**investigate**
46:17 49:16
79:3

**investigating**
43:3 88:23

**investigation**
42:9,13,18
75:4,15 89:20
90:17 100:15
125:16 126:10

**investigations**
46:12

**investigative**
65:16 78:17
117:1

**investigators**
88:22

**invite** 86:3

**invoke** 81:12,
21 82:2,25
83:22 107:2

**invokes** 80:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**invoking** 81:17,20 84:9 85:5

**involved** 29:9 60:21 114:11, 25

**involvement** 20:8,17 25:19 28:10 114:8

**involves** 82:21

**involving** 101:4

**irrespective** 124:4

**issue** 79:20 80:20 82:17 83:11 86:22 107:8

**issued** 24:18

---

**J**

**jacket** 45:1,3 69:4 103:10

**jackets** 45:21

**Jesus** 66:8

**job** 16:16 19:18 21:2 24:1 35:20 91:3

**John** 7:17 11:14 58:25 78:2 86:8 125:9

**join** 77:16 118:22 121:17 122:13 125:23

**Jose** 66:7 70:10 71:15,16 76:22 78:20

**Joseph** 21:9 32:12

**judge** 84:23 86:3,4

**judgment** 124:10

**June** 12:2,7 67:7 68:10 74:1

93:23,24 99:13 100:16,18,21

**justice** 32:20

---

**K**

**killed** 67:3

**killing** 67:10

**kind** 16:17 17:4,18 18:1,22 19:9 25:3,8 28:10 35:23 37:24 44:6 53:24 64:25 65:5 88:23

**kinds** 50:5 53:10 112:10

**knew** 30:7 32:1,3 38:7 59:19 61:7 78:17,21 83:17 85:22 92:13 104:20 110:7 111:7,17 121:14

**knowing** 57:16 90:23 110:1

**knowledge** 33:10 114:8 124:13

---

**L**

**L-A-T-Z** 7:21

**label** 44:2 51:14

**lasted** 25:15

**lastly** 12:6

**late** 116:5

**Latz** 7:17,19, 21,24 8:4,13 12:15 16:3 57:6 62:13 65:7,16, 20 66:11 73:5 74:3,15 81:7 89:18 90:21 108:2 111:16 115:24 120:8,

12,16 122:24

**Latz's** 94:25

**law** 16:1,3,16, 17,19,21 17:4,5 21:2,8,11,12 32:10 46:22 84:2 106:10

**lawsuit** 10:9

**lawyer** 9:12,13 123:16

**lawyers** 9:12

**layout** 44:3 64:6

**Leading** 116:15

**learn** 21:21,22 35:11,15

**learned** 35:24 36:6,15 102:19 110:15,19

**leave** 16:7,13, 17 19:3 20:22, 25

**left** 16:9,15 17:20 18:9,20 19:13,18 20:6, 11

**left-hand** 47:13

**legal** 21:3

**leniency** 112:16,24

**light** 77:10 109:12 126:22

**likelihood** 116:17

**limited** 66:10

**limiting** 23:15

**lines** 28:2 71:8 124:7,9,18,22

**lineup** 67:2,22 74:13,18 75:25 76:9,25 78:18, 24 94:2 97:19, 20 98:3,6,8,10,

22 109:5 121:1, 15 122:11 125:16 126:7

**lineups** 79:13 90:23 92:15 93:6 98:7 99:4

**listed** 74:16

**lists** 68:19

**Litchfield** 19:6,7,9,13

**litigated** 84:5

**live** 98:10 99:4

**local** 46:22

**located** 66:5

**location** 7:5

**lodged** 113:4

**long** 16:4,20,23 17:7,16,23 19:7,22 23:17

**looked** 13:7,18 27:1 28:11 64:25 86:25

**lot** 18:2 87:5

**low** 49:10

---

**M**

**made** 25:18 33:22 53:19 54:4 85:15 99:11 101:9,11 108:8,15 110:21 112:1, 23 114:7 119:22 124:5, 10,15

**main** 116:13

**make** 11:6,14 21:2 26:12 33:9 39:9 42:8,12 53:14 65:23 77:6,15,16 84:24 86:4 92:20 99:22 116:18 118:6, 13 121:24 122:14 123:11,

12,16 124:23 125:1 126:23

**making** 39:13 43:8 56:11 62:3 68:7 96:2 99:15 119:8,17 123:20

**Makowski** 58:25

**man** 58:4,7

**March** 16:6

**mark** 52:8

**MARKED** 43:16 51:16 52:19 62:25

**Maryland** 29:19 30:9 31:9

**material** 10:17 12:18 36:7 103:14

**materials** 50:5

**matter** 52:4 86:25 87:20 88:1,5 95:19,20 96:21 98:10,12 108:7,13,17

**Mcandrews** 18:21,22 19:3

**Mcgrath** 7:11 8:2 113:20 120:11

**meant** 13:20 26:5

**mechanism** 34:24

**Medical** 117:8

**medication** 10:5

**meet** 61:22

**Megan** 7:11

**member** 25:7 67:8 101:3

**members** 67:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 656 of 782 PageID #:13914
The Deposition of MICHAEL KATZ, taken on January 25, 2022

138

**memorialize**
45:11 50:17,21,
24 51:9 52:1
55:5,11,16
123:18 124:3

**memorialized**
43:12 54:20
56:1,4,13 69:22
71:6 90:19 92:8
99:14 102:13
124:11

**memorializing**
43:7 55:23

**memory** 10:3,6

**men** 113:10

**mentioned**
27:3 47:8
122:25

**Mexican** 22:18

**Mexico** 66:9

**Meyer** 16:22,24

**Michael** 7:17,
21,23 16:3

**mid-90s** 37:6,
13 42:4

**middle** 65:6

**Mike** 43:18
65:7 73:5 78:10
79:4,23 80:20
86:9 95:1 97:2
106:22 109:7,
17 113:14
125:24 126:15,
21

**mind** 54:7
122:1

**mine** 63:11

**minute** 12:4
51:1,21,24 87:4
92:7 106:21
115:15

**minutes** 11:3
56:24 63:18
86:14,19 123:3
125:14

**Mischaracteriz es** 96:25 99:7

**misconduct**
10:15 100:24
101:4 102:3
113:3,11 114:1

**misconstrued**
123:10

**missed** 73:4

**Misstates**
39:24

**moment** 11:10
80:9

**money** 21:2

**Monica** 12:1
27:2 65:3 66:14
67:3 74:6

**month** 28:3

**months** 21:11

**Moore** 65:18,
19,22 69:7,22
70:9 76:22
78:19

**morning** 7:6
8:13 11:13,25

**motion** 83:9,10

**move** 12:10

**multiple** 27:15
95:7

**municipalities**
18:3,4,6

**murder** 65:3
89:6,21 113:11
114:12

**murders** 13:24

_____

**N**

_____

**name's** 115:25
120:19

**named** 17:14
57:25 58:2 66:2

**names** 47:21
69:5

**natural** 118:13
124:1

**naturally**
118:6 123:11,
12

**necessarily**
106:15

**needed** 12:12
26:6,7 89:12,24
90:5 91:10
92:18 94:4
104:10

**news** 14:17

**nodding** 9:10

**nonetheless**
12:10

**Norgle** 18:21,
22 19:4

**note** 62:9

**notes** 43:11
47:12,25 48:2
68:20 92:5

**Notifications**
65:7

**notified** 24:15

**number** 28:9,
12,24 69:8,11
71:9 72:2 85:25
92:22

_____

**O**

_____

**O'CONNOR**
16:22,23

**oath** 8:21

**object** 9:12
42:21 47:16
63:24 70:2
71:12 105:13
113:20 125:19

**objected** 78:9

**objection**
12:25 20:21
22:15,20,25
23:24 25:5,22
26:14 27:12
28:4,14,20,22

29:10,21 30:5,
6,11,12,22,23
31:7,8,15,16,21
32:4,6,16,17,
21,22 33:1,2,7,
15,16,25 34:18
35:13,22 36:9
37:4,10,16 38:6
39:4,24 40:8,
11,12,13 41:7,
13,17 42:2,19
43:10 44:4
45:13,23 46:3,
19,24 47:4 49:5
53:16,22 54:6,
16,21 55:7,14,
18,25 56:2,14
57:20 62:9
64:8,19 66:24
67:25 68:1,2,14
69:1 70:2,4
71:24 72:6,17,
21,23 73:18
74:24 75:1,5,6,
20 76:2,10,15,
16 77:5,22 79:1
82:10,12 96:25
97:10 99:7
103:11 105:13
109:9,14
116:15 117:25
118:3,4,20
119:18 121:16
122:4,5 123:21

**objections**
9:15 30:25
33:24 34:11,17
36:19 77:8
79:18,20 83:16
87:12 107:11
122:12,17

**objectives**
94:25

**obligation**
29:20,25 30:3,
9,15,17 32:15
33:8 83:8

**obligations**
29:18

**observe** 119:4

**observed**
119:8

**observing**
118:25

**obtain** 46:11

**obvious** 104:2

**occasions**
42:24 98:17
99:10

**occur** 97:20
98:22

**occurred** 95:3
100:25

**Ochoa** 58:5
65:17 66:2
67:1,23 69:6
73:6,12,16
74:4,14 76:22
78:18,20 105:7
109:4 110:21

**offered** 54:13
101:13

**offers** 99:12,
15,22

**office** 11:6,7
16:8,10,14,16,
18 19:17 20:2,
7,12,15,19,23
21:1,5,9 23:14,
22 24:18,20,23
25:2 31:20,23
32:11,13,25
34:4,8,13,21
35:4,9,21 37:7,
14 39:18 53:19
54:3,25 55:11,
16,22 56:11
57:16 62:1
116:4

**officer** 114:16

**officers** 7:10
24:6 41:25
102:20 116:1
119:1,4,8,16

**one-page**
51:13

**online** 14:16

**opinions** 96:22
97:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 657 of 782 PageID #:13915
The Deposition of MICHAEL BATZ, taken on January 25, 2022
139

**opportunity** 63:15 86:10,11 105:10

**opposed** 9:10

**options** 92:25 93:2 94:14

**oral** 90:15

**orally** 46:13 50:3,10

**order** 25:8 26:8 43:8 45:17 50:6 79:24 83:10 85:21 86:5 89:9 90:15 95:4 109:14

**origin** 23:2

**original** 63:13

**outright** 42:18

**override** 106:13

**overruled** 39:10,14 85:3

**overwhelming** 84:7,24 85:2

———————
**P**
———————

**P.M.** 127:8

**paged** 90:11, 12 92:1

**pager** 24:19

**pagers** 24:17

**pages** 44:7,13 63:3 103:21

**Palmer** 67:11

**paperwork** 51:7

**paragraph** 66:4 67:6 68:18,20,22 70:15 73:5 74:20 75:23 89:18

**part** 44:23

**participate** 98:18 100:15, 21

**participating** 7:8 100:18

**participation** 13:8 15:19 26:2 64:14 66:18 100:10

**parties** 7:3,22

**party** 34:25

**PDF** 44:2 45:6

**pending** 9:16, 20 78:8 107:15

**people** 15:15, 17 25:3 55:19 68:20 69:5 75:25 76:6 91:22 93:5,6 113:4

**people's** 124:2

**percent** 18:24

**percentage** 29:7

**perform** 98:14

**performed** 99:5 110:1

**permitted** 87:2

**Peroysing** 58:21

**person** 66:2,14 67:2 74:6 97:18 99:1 108:22

**personal** 61:19 88:2,16 94:8

**personally** 36:23 37:19

**persons** 66:5,7 74:15 90:22

**pertain** 44:19

**pertaining** 77:10

**phone** 41:2 90:13

**phones** 90:12

**phonetic** 58:2, 21 61:3

**photo** 74:3,5,7, 11 78:22 98:14, 17,25

**Photographs** 117:6

**pick** 76:9 109:5

**picked** 78:18, 21

**pin** 28:8

**place** 45:11 69:21 98:4

**places** 63:19 64:6

**plaintiff** 7:7 8:15 17:6

**plaintiff's** 11:7,9,23 106:12

**play** 107:18,24

**PLAYS** 80:12, 19 87:7 107:19, 25

**plea** 54:24 55:4,10,23 56:1,5,8

**plow** 56:20

**point** 33:12 74:10,14,23 75:18 79:12 88:7 92:13 93:4,15 94:1 96:7,23 97:8 101:2 115:15

**police** 10:18 12:1 24:6,24 37:15,20 39:17 40:23 41:5 46:7,8 48:9 49:18 50:2,9,10 59:11 61:9,14, 22 73:22 74:16 75:19 88:18 97:14 101:4,18, 20 102:20

114:5,16,22 115:2 116:25 117:1 118:18 119:1,4,8,16,23 121:11,23 126:3

**policies** 55:19

**policy** 24:1 77:21 111:20, 22

**portions** 64:3

**position** 82:23 83:21 84:3 106:7,9,14,15

**positions** 25:4

**possibility** 86:5

**possibly** 91:23 112:20 117:17

**post-conviction** 114:9

**potential** 74:16 84:15 104:2

**potentially** 30:19 31:12 33:4,12,21 34:9,15 36:7,16 125:17

**Potter** 17:3,4,7, 13

**practical** 95:21,23 96:21 97:12 117:17

**practice** 34:6 40:15,18 43:7 52:4 55:16 64:13,23 79:10 83:3,4,5,6 85:7, 17 87:20 88:2, 6,13,16 89:3 91:2,3 94:8 96:5 98:3,5,11, 12,13,16,18 99:4,9,19 110:10 116:24 121:21 126:2, 22

**practices** 37:23 83:12,13, 19 84:19,22 85:4,9,12 88:19

**predicated** 83:5

**prefer** 80:4

**preparation** 11:8

**prepare** 10:18, 21 12:19 14:14 47:9 53:5

**prepared** 14:4 24:12

**preparing** 53:8

**present** 98:17 114:23

**presented** 59:22 68:9 74:23 78:17 85:11 87:21 89:4 92:12

**press** 61:18

**pretty** 49:10 59:18 61:13 106:8

**previous** 54:17 111:3 113:21

**previously** 65:21 74:4 107:12 121:6,9, 13

**Pridy** 58:21

**prior** 39:25 99:8 126:25

**privilege** 79:22,25 80:23 81:5,20,22 82:12 83:1,23 84:20 85:1,6 86:23 106:13 107:3,9

**privileges** 84:9 107:6

**probable** 39:22 48:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

49:4,8,10,12
116:22

**probable-hood** 49:13

**problem** 86:13

**procedure** 34:14 121:1

**procedures** 98:4,14,15 101:7 110:2

**proceed** 87:3 107:10

**proceedings** 7:1 114:9

**process** 23:15 38:1 39:16 43:7,8 50:20 60:22 64:11 119:17

**produce** 33:13

**product** 62:11 79:2,21 80:23 81:5,8,17,20 82:8 83:1,22 84:4,11,20 85:1,6,8,13 86:23 106:9,13, 16 107:3

**profession** 21:4

**progress** 47:2, 5,10,13

**progressed** 61:9,12

**promise** 53:20, 24 54:4 112:5

**promised** 54:19 112:16

**promises** 53:14 99:11,16, 22 101:9 110:21,24 112:1,8,10,11, 14,23

**promising** 54:9

**proper** 75:9 81:13

**prosecution** 20:18 25:20 57:12 58:21,24 65:3 101:2 114:25

**prosecutions** 19:21,23,25 20:13

**prosecutor** 23:21 24:15 25:18 33:8,21 37:2,23 38:1 39:20 41:6 46:16 51:6 53:5,7,13 79:11 104:4 123:1

**prosecutor's** 21:9 29:20 30:3,15 32:11, 19,25 35:21 37:9

**prosecutors** 29:18,25 30:18 31:11 37:14 55:22 84:5

**protect** 107:5

**protected** 54:9

**protection** 54:19 81:8,17 82:2,8 84:4,11 85:8,13

**protective** 83:10

**protocol** 34:10,14

**prove** 45:17

**provide** 9:24 77:1

**provided** 41:11,16 48:5 50:3 57:15 65:20 67:23 74:13

**providing** 48:9

**Puerto** 22:19

**pure** 28:17 29:11

**purpose** 121:15 122:11 125:14 126:6,9

**purposes** 44:17

**pursuant** 110:10 111:20 113:17

**pursue** 83:20

**put** 43:13,23 51:12 52:15 62:20

**Putting** 89:15

———

**Q**

**qualifies** 80:15

**quality** 95:14

**question** 8:23 9:2,5,14,16,20, 21 20:10,24 23:5,8 30:13 31:22 32:2 33:17 34:2,6 35:14,15,23 36:13 38:10 40:16 49:24 50:18 54:1,17 62:10,11,13,15 63:22,25 69:19 71:4 75:21,22 77:20 78:7,14, 15 79:4,15,16, 19,22,23,25 80:2,15,16,17, 21,24,25 81:4, 9,13 82:20,23 83:5,7 85:9,23, 25 87:2,5,13 88:3,5 97:3 103:9,22 104:17,19 106:12 107:15 108:2,3,10,12 109:10,12 111:3,8,13,24 112:11 113:21 114:4 121:13 123:22,25

124:20

**questions** 8:20,22,25 9:13,24 23:13, 15 36:21 38:23, 24 44:5,18,19 56:18 77:9 85:7,17 89:10 100:23 105:19, 23 107:2 113:15,19 114:14 115:11 116:2 120:8,11, 15 122:21 125:6,20 126:14

**quick** 11:17 105:15 115:14

**quickly** 11:5

———

**R**

**R-A-H-E** 7:13

**R/dets** 65:15

**Rachel** 7:7 8:13 23:4 36:18 38:4 44:14 52:9 67:14 69:11 70:14 73:8 77:6 80:4 81:24 86:12 97:11,22 104:1 105:14 109:13 111:3 126:16

**Rahe** 7:13 8:1 30:6,12,23 31:8,16,21 32:4,16,22 33:1,7,15,24 34:11,17 35:22 36:10 37:11,17 39:4,24 40:12 41:13 42:21 43:18,20 44:4, 9,14 45:23 46:3 47:4 107:21 115:17 118:3,8, 15,22 120:14, 18,19 122:20 123:5,21 124:19 125:7,9, 12 126:4,13

**raise** 8:5 82:17

**random** 28:6

**rank** 61:13

**ranks** 61:9,12

**RE-EXAMINATION** 125:11

**reached** 55:17, 24 61:13

**read** 14:16 63:20,25 64:4 80:3,6 107:16 111:9

**ready** 63:6 103:21

**reason** 9:23 30:8 31:17 32:14 33:11,18 35:18 49:2 55:21 56:10 68:12 69:24 70:5 72:8,19,22 73:1,14,20 76:13 98:20,24 100:14,20 104:14

**reasonable** 49:13 95:21,23 117:17

**reasons** 107:12

**recall** 13:8,9, 23,25 15:6 23:12 27:18,22, 23 28:1 29:3,6 30:7 35:10,17 38:7 39:11,12, 13,15 46:14 47:21 48:1,3 51:11,23 54:22 57:22 58:4,7 59:8,10,12 62:3 66:20 83:17 99:15 103:3 118:25 119:3, 12,13 121:8

**recalled** 13:18, 20,21 15:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

receive 11:8,
23 24:7

received 11:9
14:24 25:8
113:16

receiving
115:3

recharge
114:12

recollect 55:20
59:5

recollection
13:10,17 15:19
40:20,22 54:7,8
57:8,11,24
58:14 59:25
64:20 65:2
66:1,16 68:8
72:7,18,25
73:19 75:8
76:3,11 77:11
88:11 89:14
91:6,12,15
92:21 93:13
95:2 97:11
100:17 103:5,8
104:9,25 115:7
118:13 120:5
121:19 123:14
124:14 126:1

recommendati
on 26:12

record 7:3,20
9:1 11:5,11,13,
18,19,21,22
44:1 45:14
51:13 52:16
57:1,2,4 62:21
63:10 78:4
79:17 81:11,15
84:3 86:18,20,
21,24 100:6,7
105:16 106:23,
25 107:1,7
115:19,20,21
120:15 127:7

recorded
45:15 124:17

recording
45:21

records 37:20

redirect
122:22 125:21

referring 39:7
67:14 84:19,22

reflection
95:12

refresh 13:10
65:1 66:1,16

refreshed
13:16 59:25
115:7

regard 79:4
86:22 95:14

regular 28:5

reject 91:9

relationship
61:20

reliability
49:20

relied 41:10
108:25

rely 41:15 47:1
48:8 53:10 68:7
121:22

remember
13:13 15:1
16:11 26:21
32:1 42:22
47:14 48:25
58:17,20,23
59:15,17,20,22,
25 60:2,5,7,9,
12,14,17 61:2,
5,24 66:19
78:14 85:11,16
91:13 106:17
120:20 122:2
123:2

remembering
75:15

remotely 7:8,
10,12,14,18

renew 87:12

renewing
107:10

reopen 82:16

repeat 30:24
36:13 54:1 80:2

rephrase 8:23
20:10 31:22
80:5 123:25
124:21

replay 80:16

report 11:25
14:6,8 47:13,18
62:23 63:16
64:6,18,21 65:1
67:21 68:13,18
70:11 72:11,13
73:23 74:11
75:23 76:1,5,
12,13,21 78:16
85:12 92:11
97:15 117:5
119:10

reported
102:6,7 119:6

reporter 7:2,
19,22 8:4,10
9:1,8 11:20
57:1,3 80:3,6,9,
11,12,18,19
86:21 87:4,7,10
106:24 107:16,
17,19,20,23,25
111:9,12
115:18,21
127:6

reporting 66:5
67:7

reports 10:18
24:12 46:7,8
47:2,5,7,8,11,
15,22 48:9
50:2,9 51:8
74:16 88:18
101:18,21
117:2,5,8
121:5,8,23
126:3

represent 8:14
57:14 86:1
105:8 115:25
120:19

representation

18:2

represented
18:4

representing
14:20 18:5

request 24:13
35:12 40:25
90:12

requested
74:15 75:18,24
76:8 78:23
79:12 80:12,19
87:7,22 88:8
90:22 92:14
93:5 107:19,25

requests 11:6
34:20,23 35:3,
8,21 36:1,3

require 113:16

required 30:3

requirement
30:18 91:3

requires 68:3

reserve 82:15
127:1,3,4

respect 82:22,
24

respond 34:20
35:8,20,25
84:14

responding
35:3 36:3

response 81:9

responsibilitie
s 23:21,25

responsibility
35:2

responsible
24:5 36:3 51:7
52:5 53:7 54:23

rest 44:13
80:16

restate 20:10,
24 33:17 50:18
54:1 75:22

resulting
113:11

return 66:9

review 10:17,
21,23 12:3,5,9,
20,21,24 13:1,
3,7,14,19,21,22
14:2 15:5
23:15,21 24:4,
14 25:3,7,9,13,
14,17 26:8,11,
19 27:2,5,15,25
28:12,13 29:8,
13 36:2,6,15
37:8,23 38:1
39:20,21 40:24
41:2,3,5,12
42:17 43:1,12,
20 44:17,20,23
45:7,21,24
46:8,10,16
47:18,19,23,24
49:15 50:5,6,25
51:5,6,10,11
53:4,7,11,13
57:7 63:16,18
64:11,13,18
65:7,13,15
68:6,24 69:4
70:22,23 71:17
73:7 74:18
75:13 76:7
79:11 83:14
89:12 91:25
92:5 100:2,10
102:12 103:10,
14,24 104:5,7,
22,23 105:1
115:6 116:3,13
117:1,3,10,20
118:2 120:6
121:2,21 123:1,
19 124:6 126:7,
21,23,24

reviewed
10:23 12:18
14:3,5,14 47:9,
22 65:16 87:19
89:19 117:21
118:7

reviewing 48:1
60:20 64:20
79:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 660 of 782 PageID #:13918
The Deposition of MICHAEL KATZ, taken on January 06, 2022

142

Reynaldo 14:22 59:13,15 66:21 113:4 114:1,5

RFC 51:14 62:22 68:18 97:15,25

Rican 22:19

Riccio 61:3,6, 25

rights 18:6 114:17

RITCHIE 120:7

Ritchio 61:3

robberies 29:15

Rodriguez 58:8 66:7,10,13 70:10,24 71:16 72:2,5 74:3,5, 12 76:22 78:20, 21 97:19 105:8 109:4 110:21

Roman 12:1 56:18 65:3 66:14 67:3 74:7 114:12

Roman/ geraldo 27:2

Rosendo 58:4 65:17 66:2 67:23 69:6 73:6,12,15 74:4,14 78:18 105:7

rotate 25:4

rotating 25:8

rotation 25:14, 15

rotations 25:12

Ruberry 17:14

Rule 29:23 30:15 31:3,6, 11,19,24 32:24 79:22 80:23 83:9,25

rules 8:18

---

S

safe 79:11

Sanchez 66:8, 10 70:10,24 71:2,5,7,15 76:23 78:20

Sawyer 67:11

Schaffner 17:3,4,7,13

schedule 28:5

Schiff 16:22,23

school 21:12, 22,23,25 22:3, 12,17 23:11 32:11

scope 125:21

screen 43:15, 24 51:15 52:18 62:24 89:16

scroll 52:23 53:2 63:7,8

seamlessly 107:5

Section 18:6

secure 112:24

seek 32:20

seeking 41:6

self-employed 15:25

send 11:13,18

sense 13:20 121:24

sentencing 112:25

separate 44:16 109:8

Separately 78:25 79:20

seq 79:22

sergeant

60:14,17,18,21

served 18:12

set 85:18

sharing 43:22

sheet 12:4,7 44:15 51:1,21, 24 52:13 53:1,5

sheets 53:8,11

shift 28:7

shooter 65:23 105:10 108:5,8, 9,14,18 110:7 111:7,18

shooter's 121:7,12 122:9 125:15 126:8

shooting 74:6

shot 66:6,14 67:3

showed 63:17 74:3

showing 122:11

side 17:6

signature 127:4

single 88:13

sir 72:24

sit 30:14 38:22 39:5 42:20,22, 25 48:24 50:13 62:6 70:5 71:13,21 76:25 103:4

situation 102:17,18

situations 26:10 42:23 75:3

slog 101:1

slots 76:7

snake 67:10

socially 61:22

solely 8:5

solve 86:13

sort 24:1 35:19 49:19 104:20

Sounds 86:17

Spain 22:19

Spanish 21:14, 15,17,19,21,23, 24,25 22:2,5,9, 12,13,14,18,19, 21,22,23 23:2, 11

speak 15:1 21:14,16 55:19 86:11 87:17 93:16 94:9,18 95:6,16,18,24, 25 96:11,16,20 97:5,6 111:19, 20,22 123:15 126:2

speaking 22:9 58:17,23 59:6, 8,10 88:19 96:7

specific 13:25 25:2,6 27:20,21 28:9 37:24 38:11,19,23 42:23 43:1,4 47:21 49:9 54:7 64:3 85:14 88:10 89:1 96:18 113:7 118:12 123:14 125:25

specifically 23:14 35:10 44:6 45:20 46:14 56:18 122:10

specifics 57:8

speculate 102:25 103:2

speculating 38:21

speculation 34:1 56:3,15 68:3 72:23 75:7 76:17 103:12

108:6,20

spoke 50:15,19 66:10 78:19 93:5

spoken 14:19 15:10 96:24

spot 65:6

square 31:5

St 21:9 32:12

standard 34:14 48:25 49:3,10,11 116:16,17

stands 65:19

start 9:3,4 20:1 21:21 116:3

started 21:4,22

state 7:4,20 29:18,19 30:2 31:11 34:3 35:25 40:24 42:7 61:25 92:8

state's 16:7,9, 13,15,18 19:17, 20,24 20:1,7, 12,14,19,22,25 21:4 23:14,22 24:18,20,23 25:2 31:19 32:13 34:4,8, 13,21 35:4,8 37:7,14 39:18 52:13 53:19 54:3,25 55:11, 16,22 56:11 57:15 116:4

stated 34:3 65:22 66:13 67:9 107:13 111:22

statement 124:22

statements 24:12 50:11 53:15 123:19 124:17

station 26:11 27:24 28:25

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

38:14 39:20
41:20,24 75:13
99:13 116:25

**stations** 27:20

**stay** 25:20
120:14

**stayed** 116:6

**stepping** 77:19

**Steve** 60:12

**stipulate** 7:23

**stopped** 43:22

**Street** 67:9

**strike** 12:3
13:6 16:20
33:20 35:7
39:12 43:6 53:6
55:9 57:17
68:23 91:2
99:15 100:1

**Studenrach**
58:18

**Studenroth**
26:25 27:16
91:17

**student** 21:8

**studied** 23:10

**study** 14:5
22:9,17 23:3

**sub-report**
77:10

**subconscious**
123:16

**submit** 24:11

**submitted**
24:5,10 27:5

**subpage** 97:25

**substance**
15:15,18

**substantive**
126:24

**success** 49:13

**sued** 18:4

**sufficient**

38:16 79:14
87:23 88:8
89:5,9 91:8
92:16,17 93:7,9
94:5,6

**suggest** 86:1

**suggested**
109:4,22

**suggestive**
101:7 110:1
119:9,14

**suits** 18:6

**sum** 114:3

**summarize**
90:13,14 124:9,
21 125:3

**summarized**
45:16 71:8
125:2

**summary** 70:7
71:11,14,19,23
72:5,9 73:15,21
76:1 124:8

**summer** 13:21,
24 25:10 59:19

**supervisor**
26:7,13,17
39:14 89:7,24
90:11,24 91:9,
13 92:17 93:10,
20 94:6,16
102:4

**supervisors**
13:22,23 26:20,
22 27:16 39:10
91:16 102:9

**supplementar
y** 11:25 14:6,7
47:7,18 62:23
70:11 76:12
117:5

**support**
116:19

**supported**
104:21

**supports**
104:18

**suspect** 32:14
38:3 50:15,20
54:12 55:5
119:10 122:15
125:18

**suss** 83:10

**swear** 8:5
93:12

**sworn** 21:10

**system** 37:7

---

**T**

---

**takes** 17:9

**taking** 9:8
97:14 98:4

**talk** 15:14
19:16 45:6
121:22,25
122:8 123:12

**talked** 70:9
71:15 88:20
120:20 122:3

**talking** 45:8
58:20 67:10
78:2 84:15 87:6
98:21 124:3
125:13

**taught** 22:21

**team** 25:7
26:19,23 27:17,
25

**teams** 27:15,
17,19

**telephone**
14:24

**telling** 97:20

**tenure** 27:25

**term** 51:3

**terms** 24:1
55:12,17,23
56:8,12 64:6
113:2

**terribly** 23:17

**testified** 85:16

**testifying** 8:21

**testimony** 8:6
38:7 39:25
53:14,20 54:4,
13 68:4 77:11
80:12,19 81:16
87:7 95:1 97:1
99:8 107:19,25
118:7 123:6

**That'll** 77:15

**thing** 9:19
93:17 104:12

**things** 9:5
37:25 42:7
75:12 95:3
110:25 112:8

**thinking** 88:11
95:13

**Thirdly** 12:5

**thought** 41:20,
24 42:4 43:7
69:20 87:11,21
91:7 92:16 93:8
96:6

**thoughts**
45:11 52:1

**thousand** 34:3

**Threats** 101:11

**three-page**
52:16

**time** 9:11
19:17,24 23:17
24:17 32:25
36:14 56:19
64:12 67:22
84:1,13 86:7
87:21,24 88:9
90:8,9,11 95:5,
13,15 107:5
115:11

**timeframe**
23:16,18,23
34:15

**times** 27:23
28:6,12,24
69:16 98:7

**title** 19:18

**today** 8:19
9:25 12:16
30:14 38:22
39:6 42:22,25
48:24 62:6 70:5
71:13,21 76:25
98:21 103:4
115:6

**Todd** 115:25

**told** 15:6,13,17
43:2 45:16 50:1
57:6 65:21
71:11,14,23
72:5 73:16
75:11 90:24
94:6 99:25
100:1,9 122:9,
10 124:4

**top** 44:15 51:20
53:2 66:25 74:1

**Torres** 58:12
74:17 92:14
120:22 121:5,
10

**total** 114:3

**track** 49:20

**training** 32:10,
12 35:7,10,20

**transcript** 9:8
126:23,25

**transcripts**
10:19 12:18
14:13

**translated**
66:22

**translating**
72:11,20 73:2
110:16

**translation**
111:5

**trial** 13:22,23
26:7,12,17,20,
21 45:4 49:13
89:7 90:11
93:20

**tricky** 9:6

**true** 75:24
105:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

trust 93:18

truth 8:7,8

turn 30:18 80:10 115:12

turned 33:22 34:16 102:3

TV 61:17

type 41:1

types 47:14 102:2

typically 25:20 40:5 47:24 60:21,23

**U**

uh-huh 9:11

uh-uh 9:11

ultimately 88:4

unable 121:12

unconstitutional 102:19

undefined 83:6

undermined 105:11 107:22 109:5,24 110:17,23 112:18

understand 8:22 9:5,22 10:11 21:15,17, 19 30:2,13,14, 17 31:10 72:14 75:21 76:4 78:6 84:25 106:21 123:22

understanding 28:10 29:19 31:1,5,18,24 39:16 55:15 56:7 99:3

understood 8:24

undertook 43:8

undisclosed 110:7 111:6 112:1

untestified 83:7

untruthful 42:1

upper 47:13

ups 115:13

**V**

vaguely 13:12, 17,20 59:16 60:4,16

VC 65:18

verbal 9:9

versus 27:10 29:18 30:9 31:9 38:16

vet 118:2

vetted 123:1

vetting 118:17

Vicente 57:23, 25

victim 12:1 66:6 71:9

view 12:12 76:8,9 79:13 90:22 92:14 93:6 98:7 108:5 120:25 121:15 125:15

viewed 67:1 74:4 78:18 97:19 98:6,8,18

viewing 74:4

violent 65:19

volume 80:10

**W**

wage 17:5

waive 127:1

wanted 24:15 44:18 93:8 94:18 95:5,8, 18,25 96:20 97:5,12 110:9 111:19 120:24 123:8

wanting 110:10 111:20

watch 98:3,10, 13 99:4

watched 61:8, 11,15 97:20 98:22,25

ways 92:23,24 94:13

week 28:3

whatsoever 115:8

who've 113:10

withheld 37:2 110:8 111:18 114:24

withhold 36:23 114:19

witness' 108:25

witness's 77:19 107:6

witnesses 42:9 45:22 46:2,5,12 48:8 53:14 54:9,19 66:17 72:15 74:16 75:19 76:9,24 78:19, 24 79:13 87:18, 22,25 88:14 93:16 94:2,12 95:22,24 99:12, 16,23 101:9,11, 13,15 108:7,13 110:11,16 111:21,23 112:24 117:14, 16,22 118:1,17 120:22,24 122:25 123:8 124:3,4,8,11,

12,16 125:15 126:1,7

wondering 126:8

word 87:9,11 107:22

worded 40:19

words 112:21 113:2

work 17:18 18:1,5,22 19:9 20:12 27:19 29:8 62:11 79:1,21 80:23 81:5,8,17,20 82:8 83:1,22 84:4,11,20,25 85:5,8,13 86:7, 23 106:9,13,15 107:3 114:5

worked 20:8 21:10 40:3,5 55:4,10 61:6,24 92:3

workers' 18:12,13,20,24, 25 19:11

working 20:18 25:21 54:23 104:4

would've 91:21,25 92:3 93:19 94:10 102:6,11,19 103:2 105:24 110:5 119:5

writeup 69:25 71:22

writing 51:7,23 52:5

written 50:9 64:14,18 104:6

wrong 94:22

wrongful 113:5

**Y**

year 25:16 28:13 116:7,11

years 14:24 16:25 17:8,17, 24,25 18:16 19:5,8 20:4 22:2,7,12,13 25:1 28:16 71:13 74:21 118:5,11,12

**Z**

zoom 7:8 9:6 51:18 63:12 77:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 29

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property (inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE–TIME**
DAY: 07  MO: Jun  YR: 93  1556

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒ VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/Murder 1st Degree | 0110 | 2148 N. Sawyer | 1414 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒ YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| ROMAN, Monica | | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| street | 304 | 1 | 1 |

| ORIGINAL SPACES | 11. ☒ VERIFIED | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUR. |
|---|---|---|---|---|---|---|---|---|
| | ☐ UPDATE CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. |

**19.** DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN;   R = RECOVERED. — FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| PROPERTY | | 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|---|---|
| ☐ VERIFIED | | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ |
| | | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |
| ☐ UPDATE TO | | 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | 1 FIREARMS | & NARC./DANGEROUS DRUGS | 5 OTHER | 6 NONE |
| | | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T |
| | | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT, NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN. JD. YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| OFF. 1 | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | OFF. 2 | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 33. OFF'S. VEHICLE ☐ USED ☐ STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. ☒ DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|
| | |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☒ FIELD ☐ 3 SUMMARY | UNIT NO. 652 | 53. STATUS ☒ PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |
|---|---|---|---|---|---|
| dna | | DNA | | | |

| STATUS CONT'D. | | 5 EXC. | 6 EXC. | 7 CLSD. | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐ 3 CLRD. CLOSED | ☐ 4 CLRD. OPEN | ☐ CLRD. CLOSED | ☐ CLRD. OPEN | ☐ NON-CRIM. | ☐ 1 ARREST & PROSEC. | ☐ 2 DIRECTED TO JUV. CRT. | ☐ 3 COMPL. RFUSD. TO PROSECUTE | ☐ 4 COMMUNITY ADJUSTMENT | ☐ 5 OTHER EXCEPT. ☐ ADULT ☐ JUV. |

**55.** ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**60. NARRATIVE**

This is an Area Five Violent Crimes Unit Report.

Continued on page two.

DATA ENTERED
I'D AREA 5

56. R.D. NO. X 2 5 0 3 0 3

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY: 23  MO: Jun  YR: 93 | TIME 2100 | 92. SUPERVISOR APPROVING (PRINT NAME) BIEBEL | STAR NO. 1545 |
|---|---|---|---|---|
| NORMAL | | | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE Biebel |
|---|---|---|---|---|
| DET. A. RICCIO 20870 | | DET. E. Halvorsen #20692 | | |

| SIGNATURE | SIGNATURE | 95. DATE APPROVED (DAY–MO.–YR.) 25 JUN 1993 | TIME 0940 |
|---|---|---|---|
| Riccio | E. Halvorsen | | |

CPD 11.416 (Rev. 3/85)   *MUST BE COMPLETED IN ALL CASES

RFC-Iglesias 000131

RFC-Iglesias 000132

**THIS IS A LINE-UP SUPPLEMENTARY REPORT:**

| | |
|---|---|
| **LINE-UP CONDUCTED UNDER RD#** | X-250 303 |
| **LOCATION, DATE AND TIME:** | Area Five Viewing Room, 24 Jun 93, at 0125 hours. |
| **PERSONS CONDUCTING LINE-UP:** | Det. A. Riccio    #20870   A5/VC<br>Det. E. Halvorsen#20692   A5/VC<br>Det. A. Guevera   #20861   A5/VC |
| **PERSONS PARTICIPATING IN LINE-UP:** | 1. DeJesus, Juan  M/WH/18<br>   CB# |
| | 2. MUNOZ, Ernesto M/WH/22<br>   CB# |
| | 3. QUIROZ, Miquel M/WH/18 |
| | 4. LOPEZ, Juan  M/WH/18 |
| | 5. PULOS, Ruben   M/WH/23<br>   CB# |
| | 6. IGLESIAS, Geraldo  M/WH/24<br>   CB# |
| **PERSONS VIEWING LINE-UP:** | 1. RODRIQUEZ, Hugo<br>2. TORRES, Efrian<br>3. CHMIELESKI, David |

**PERSONS IDENTIFIED IN LINE-UP:**      #5 IGLESIAS, Geraldo was positively identified by witness Hugo RODRIQUEZ as the person whom he observed shoot the victim, Monica ROMAN.

**PHOTOGRAPHS TAKEN BY:**           Det. E. Halvorsen #20692  A5/VC

**INVESTIGATION:**                   In furtherance of the investigation into the homicide of Monica ROMAN, R/d's conducted the above line-up.  The suspect of the line-up, Geraldo IGLESIAS, was permitted to pick his position in the line-up.  All participants were required to stand, face the viewing window, and make facing movements.  RODRIQUEZ positively identified IGLESIAS as the subject he observed fire a gun at the vehicle in which the victim was a passenger.  Witnesses TORRES and CHMIELESKI viewed the line-up but were unable to make an identification because they never saw the face of the offender.

RFC-Iglesias 000133

RFC-Iglesias 000134

Detective Division                           22 February 1993
Area 5 Violent Crimes                         RD# X-079 312

## Page 3

Det. E. Halvorsen #20692, Area Five Violent Crimes.
Det. R. Guevera #20861, Area Five Violent Crimes.
Det. Anthony Riccio #20870, Area Five Violent Crimes.

RFC-Iglesias 000135

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 30

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   GERALDO IGLESIAS,              )
                                   )
4                  Plaintiff,      )
                                   )
5           vs.                    )    No. 19 CV 6508
                                   )
6   REYNALDO GUEVARA, et al.,      )
                                   )
7                  Defendants.     )

8          The video-recorded deposition of

9   EFRAIN MIRANDA, taken pursuant to the Federal Rules

10  of Civil Procedure, before Katie K. Elliott,

11  Certified Shorthand Reporter No. 084-004537, via

12  Zoom Video Teleconference, on Wednesday,

13  April 28, 2021, commencing at 10:00 o'clock a.m.

14  pursuant to subpoena.

15          APPEARANCES:

16              LOEVY & LOEVY, by
                MR. JOHN HAZINSKI
17              (311 North Aberdeen Street, Third Floor
                 Chicago, Illinois  60607
18               312.243.5900
                 john@loevy.com)
19                 appeared on behalf of the plaintiff;

20

21

22

23

24

```
 1        APPEARANCES:  (Cont'd)

 2            LEINENWEBER BARONI & DAFFADA, LLC, by
              MS. MEGAN K. McGRATH
 3             (120 North LaSalle Street, Suite 2000
               Chicago, Illinois  60603
 4             866.786.3705
               mkm@ilesq.com)
 5                appeared on behalf of the defendant
                 Reynaldo Guevara;
 6
              ROCK FUSCO & CONNELLY, LLC, by
 7            MR. AUSTIN G. RAHE
               (321 North Clark Street, Suite 2200
 8             Chicago, Illinois  60654
               312.494.1000
 9             arahe@rfclaw.com)
                  appeared on behalf of the defendant
10             City of Chicago;

11        THE SOTOS LAW FIRM, PC, by
          MR. DAVID A. BRUEGGEN and
12        MR. KYLE CHRISTIE
           (141 West Jackson Boulevard, Suite 1240A
13         Chicago, Illinois  60604
           630.735.3300
14         dbrueggen@jsotoslaw.com)
              appeared on behalf of the individual
15            defendants.

16     ALSO PRESENT:

17            Mr. Derek Letellier, Legal Videographer,
                  Urlaub Bowen & Associates.
18
                   *   *   *   *   *   *   *
19

20

21

22

23

24
```

```
 1                        I N D E X

 2
    Witness:                                    Page
 3
         EFRAIN MIRANDA
 4
             Examination by:
 5
                Mr. Brueggen.................    6
 6              Mr. Rahe....................    56
                Mr. Hazinski................    57
 7              Mr. Brueggen................    94
                Mr. Rahe....................    97
 8              Mr. Hazinski................    98

 9

10

11                    E X H I B I T S

12
    No.   Description              Marked/Referenced
13
       1  Two Photographs - CCSAO
14        Iglesias000011........................   16
       2  Photograph - CCSAO Iglesias 00003......  41
15     3  Declaration - Iglesias 002121-002122...  47

16
             (Exhibits attached/scanned.)
17

18                       -  -  -

19

20

21

22

23

24
```

1          THE VIDEO TECHNICIAN:  This is media unit 1.

2    We are now on the video record.  This is the

3    videotaped subpoenaed deposition of Efrain Miranda

4    being taken on April 28, 2021.  The time is now

5    10:00 a.m., as indicated on the video screen.

6                    This deposition is being taken

7    remotely by agreement of the parties by a court

8    reporter certified to administer the oath and take

9    depositions in the State of Illinois.

10                   This deposition is being taken on

11   behalf of the defendant and video recorded on

12   behalf of the defendant in the matter Iglesias

13   versus Guevara, et al.  The case number is

14   19 CV 06508, filed in the United States District

15   Court for the Northern District of Illinois,

16   Eastern Division.

17                   My name is Derek Letellier,

18   certified legal videographer, representing Urlaub

19   Bowen & Associates with offices at 20 North Clark

20   Street, Suite 600, Chicago, Illinois.  The court

21   reporter today is Katie Elliott, also of Urlaub

22   Bowen & Associates.

23                   Counsel, please identify yourselves

24   for the video record, state the parties which you

1  represent, and state your agreement to this

2  deposition being taken remotely.

3        MR. BRUEGGEN:  Good morning.  My name is Dave

4  Brueggen.  I represent the defendant officers in

5  this case, and I agree to the video deposition

6  being taken remotely.

7        MR. RAHE:  This is Austin Rahe, R-a-h-e, for

8  the defendant City of Chicago.  Same agreement.

9        MS. McGRATH:  Megan McGrath on behalf of

10 defendant Guevara.  Same agreement.

11       MR. CHRISTIE:  Good morning.  Kyle Christie

12 on behalf of individual defendants.  Same agreement.

13       MR. HAZINSKI:  Good morning.  This is John

14 Hazinski, H-a-z-i-n-s-k-i, on behalf of the

15 plaintiff, Geraldo Iglesias; also agreeing to

16 proceed remotely.

17       THE VIDEO TECHNICIAN:  If the court reporter

18 could please remotely swear in the witness.

19                     (Witness sworn.)

20                     EFRAIN MIRANDA

21 called as a witness herein, having been first duly

22 sworn, was examined and testified as follows:

23

24

```
 1                         EXAMINATION
 2   BY MR. BRUEGGEN:
 3        Q.    Good morning, Mr. Miranda.
 4                    Can you please state your full name
 5   for the record?
 6        A.    Efrain Torres Miranda.
 7        Q.    And is it okay if I call you
 8   Mr. Miranda?
 9        A.    That's fine.
10        Q.    Mr. Miranda, have you ever testified in
11   court or given a deposition?
12        A.    No.
13        Q.    Okay.  There's a couple rules.  As you
14   can see, we're doing this via Zoom, and the court
15   reporter is going to type everything that's said,
16   so we need to make sure all our answers are out
17   loud.  If you could use yes and noes.  If you say
18   uh-uh or uh-huh or nod your head, I may follow up
19   with, Is that a yes, or, is that a no.  I'm not
20   trying to be rude.  Just trying to get a clean
21   record.
22                    Okay, sir?
23        A.    Yes, sir.
24        Q.    And because of that, since the court
```

```
 1  reporter is typing everything, we need to take

 2  turns speaking.  It's not like normal conversation

 3  where we just talk.  If you could wait until I

 4  finish my questions; and likewise, I will wait

 5  until you finish your answers before I pose a new

 6  question, just so we're not talking at the same

 7  time.  All right?

 8       A.    Fair.

 9       Q.    I don't anticipate this taking all that

10  long.  But at any time if you need to take a break

11  for any reason, just let us know.  I'd just ask if

12  there's a question pending you give us an answer,

13  and then we can take a break for whatever reason,

14  okay?

15       A.    Okay.

16       Q.    I'll be asking a lot of questions

17  today, as will some other attorneys.  If you don't

18  understand a question or don't hear it or the audio

19  breaks up or there's a problem with the internet,

20  just let us know and we will rephrase the question,

21  okay?

22       A.    Okay.

23       Q.    If you answer the question, we will

24  assume you understood it.  All right?
```

```
 1        A.    Yes.
 2        Q.    And finally, today you may hear some
 3   objections from the attorneys.  If an attorney
 4   objects, just allow the objection, and then we'll
 5   have you answer after the objection, okay?
 6        A.    Okay.
 7        Q.    Mr. Miranda, is there anybody else in
 8   the room with you right now?
 9        A.    No.
10        Q.    Do you have any documents from this
11   case with you right now?
12        A.    All I have is the (indicating) -- can
13   you read that?
14        Q.    Yes.  It appears you're holding up a
15   subpoena to testify that told you that you needed
16   to appear via Zoom today?
17        A.    Exactly.  That's it.
18        Q.    All right.  Prior to this deposition
19   today, did you talk to David Chmieleski --
20        A.    Yeah.
21        Q.    -- about this deposition?
22        A.    Yeah.
23        Q.    And did you talk to him about his
24   testimony, or just the fact that you had a
```

```
 1  deposition?

 2        A.    Just the fact that he had it.  We're

 3  roommates.  We see each other all the time, so ...

 4        Q.    Did Mr. Chmieleski tell you anything

 5  about any of the questions I'm going to ask?

 6        A.    No.

 7        Q.    Did he tell you if I was nice or mean?

 8        A.    He says everything went cool, so ...

 9        Q.    Okay.  Mr. Miranda, are you hearing me

10  okay, or do you need me to speak louder?

11        A.    I -- there's just a glare in the room

12  so I'm turning my head.  I'm sorry, but yeah, I can

13  hear you.

14        Q.    Okay, great.

15              How old are you today?

16        A.    46.

17        Q.    Where do you currently reside?

18        A.    ██████████████████████.

19        Q.    How long have you lived at that address?

20        A.    A year and a month.

21        Q.    Who do you currently live there with?

22        A.    David Chmieleski.

23        Q.    Any other roommates?

24        A.    No.
```

```
 1        Q.    How long have you known David
 2   Chmieleski?
 3        A.    1986 I want to say.  Grammar school.
 4        Q.    Mr. Miranda, where did you go to high
 5   school?
 6        A.    Karl Schurz High School.
 7        Q.    Did you graduate?
 8        A.    No.
 9        Q.    Did you go and obtain your GED?
10        A.    Yes.
11        Q.    And when did you obtain your GED?
12        A.    '89.
13        Q.    After obtaining your GED, did you take
14   any additional educational, formal educational
15   courses?
16        A.    No.
17        Q.    Do you have any professional licenses?
18        A.    No.
19        Q.    Are you currently employed?
20        A.    Yes.
21        Q.    Where are you employed, sir?
22        A.    I work for Anshe Emet Synagogue.
23        Q.    Can you spell that, please?
24        A.    Yes.  It's A-n-s-h-e, E-m-e-t,
```

```
 1  Synagogue.  It's a -- it's a synagogue and private
 2  school in Wrigleyville.
 3        Q.    And what do you do for the synagogue
 4  and private school?
 5        A.    We do security maintenance mostly.
 6        Q.    How long have you been working for that
 7  synagogue?
 8        A.    Nine years in March.  Yeah, this past
 9  March.
10        Q.    Mr. Miranda, have you ever been the
11  victim of a crime?
12        A.    Me, yes.
13        Q.    More than one crime or just one?
14        A.    When I was younger, I was shot at,
15  things like that.  Nothing ever went to court or
16  anything like that, but yeah.
17        Q.    You say you were younger.
18              Do you remember roughly how old you
19  were?
20        A.    14.
21        Q.    Where were you living when you were 14?
22        A.    Oh, geez.  Um ...
23        Q.    And, sir, if you don't remember the
24  exact address, if you just have the general
```

 1  location in the City?

 2       A.     Fullerton and Kimball in Logan Square,

 3  that area.

 4       Q.     And can you tell us what you were doing

 5  when you were shot at?

 6       A.     Yeah.  I was riding my bicycle.  It was

 7  during the summertime, and something happened on a

 8  different street.  And next thing I know, glass and

 9  bricks, all this stuff starts breaking up around me.

10              I hit the ground and a bunch of

11  gang-bangers had a little shoot-out right in front

12  of me, and they actually shot at me.

13       Q.     And after that incident, did you speak

14  to the police about what had occurred?

15       A.     I just went home.  We spoke to the

16  police after that, but nothing ever happened.

17       Q.     Have you ever filed a lawsuit against

18  anybody?

19       A.     No.

20       Q.     Have you ever been sued?

21       A.     No.

22       Q.     Have you ever been convicted of a crime?

23       A.     No.

24       Q.     And, Mr. Miranda, just generally, are

```
 1   you taking any medications, or do you have any
 2   conditions that would impact your ability to
 3   remember things or testify truthfully today?
 4          A.    No.
 5          Q.    Do you recall where you lived in June
 6   of 1993?
 7          A.    '93, that would have been ███ --
 8   geez -- what was it?    ████  or ██████████.
 9                 Not ██████████.
10          Q.    Was that an apartment or a house?
11          A.    It was an apartment building on the
12   third floor south.
13          Q.    Who did you reside with in June of 1993?
14          A.    That would have been my mother.
15          Q.    And on the third floor south, would
16   that have been the back of the building?
17          A.    Yes.  The apartment closest to the
18   alley.
19          Q.    How long had you lived at 2148 North
20   Sawyer in roughly June of 1993?
21          A.    Four years probably.  '90, '91 I think
22   we moved in.
23          Q.    And prior to that, was that when you
24   were living in Logan Square?
```

1     A.    Actually, no.  There was another
2  apartment just down the street, and we moved out of
3  that one into the Sawyer apartments.
4     Q.    Mr. Miranda, can you tell us about --
5  was there any gang activity in the area of Sawyer
6  and Palmer by your apartment building?
7     A.    Always.  Back in that day, yes.
8     Q.    Were you a member of any gang?
9     A.    No.
10     Q.    What gangs were in that area?
11     A.    In the immediate area, I believe they
12  were called Insane Gangster Disciples.
13     Q.    And when you say the immediate area,
14  was that their, if you will, their turf or their
15  area that they controlled?
16     A.    Yeah.  For -- it was a couple blocks,
17  yes.  There was a different -- every couple blocks,
18  there's a different gang.
19     Q.    And what other gangs were in the
20  general area besides the IGs?
21     A.    It depends on what -- which area --
22  which direction you were going in.  If you went
23  north, it was the Cobras.  If you went south, you
24  had the Kings.  The Kings were to the west, and

```
 1  more Disciples to the east.
 2        MR. HAZINSKI:  I'm going to interpose an
 3  objection to the last -- the last question based on
 4  form.
 5  BY MR. BRUEGGEN:
 6        Q.    And growing up in that area knowing the
 7  gangs around there, were you aware of certain
 8  colors that were affiliated with gangs?
 9        A.    Yeah, you kind of had to, but yes.
10        Q.    Okay.  And why did you kind of have to
11  know what colors were affiliated with gangs?
12        A.    There were -- back then, you couldn't
13  wear certain colors to go into certain areas.  They
14  had to be neutral colors.  Even if you weren't in a
15  gang, you'd still be harassed.
16        Q.    And do you know what colors the IGs
17  were?
18        MR. HAZINSKI:  Objection to form.
19        THE WITNESS:  I think it was red and black.
20  BY MR. BRUEGGEN:
21        Q.    In 1993, were you employed?
22        A.    I don't think so.
23        Q.    Were you going to school?
24        A.    No.
```

1      Q.    And what were you doing kind of on a

2   day-to-day basis back in 1993?

3      A.    I believe that's the period which I was

4   helping build -- construct a church that I went to.

5      Q.    And where was that church located?

6      A.    4307 West Grand Avenue.

7      Q.    Were you being paid to build that

8   church, or was that a volunteer?

9      A.    Volunteer.

10      Q.    Back in the neighborhood at -- and the

11   building you told us about, if you let me jump

12   right to, let me show what we'll mark as Exhibit

13   No. 1.

14              And, Mr. Miranda, what I'm going to

15   do is I'm going to show a picture on the screen,

16   and I will ask you some questions about it, okay?

17      A.    Okay.

18      THE VIDEO TECHNICIAN:  Sir, do you want the

19   exhibit recorded on the video record?

20      MR. BRUEGGEN:  Yes, if you would, please.

21      THE VIDEO TECHNICIAN:  Sure.

22   BY MR. BRUEGGEN:

23      Q.    Mr. Miranda, do you see a document on

24   your screen?

```
 1          A.    Yes.
 2          Q.    And this, for the record, is CCSAO
 3   Iglesias 000011.
 4                And, Mr. Miranda, I want to direct
 5   you to the top photo in the photos there, and so I
 6   will zoom in so it's easier for you to see.
 7          A.    Okay.
 8          Q.    Do you see the photo on your screen,
 9   sir?
10          A.    Yeah.
11          Q.    And can you identify what that's a
12   photo of?
13          A.    That's the apartment building I lived
14   in.
15          Q.    Is that the apartment building on North
16   Sawyer, at 2148 North Sawyer?
17          A.    Yes.
18          Q.    And looking at that, can you tell us --
19   your apartment was the third floor.  Would that be
20   the top floor as --
21          A.    Yes.
22          Q.    -- seen in --
23          A.    Yes.
24          Q.    And back -- would it be back to the
```

1   left of the picture kind of behind the trees?

2          A.     Right behind the tree, right there, yes.

3          Q.     Looking at the photo -- and I'm going

4   to use -- directing you, do you see these people

5   standing outside?

6          A.     Yes, sir.

7          Q.     And can you tell me was that an

8   entryway to the building?

9          A.     Yeah.

10         Q.     A side door?

11         A.     It was actually the main door.

12         Q.     Okay.  So that was the main door.

13                And inside that, were there stairs

14  up to the various levels?

15         A.     Yes.

16         Q.     In the general area of Sawyer -- or

17  strike that.

18                What was the street that would be --

19  the building was on in addition to Sawyer?

20         A.     Palmer.

21         Q.     So the building was on the corner of

22  Sawyer and Palmer?

23         A.     Yes.

24         Q.     And I think earlier you mentioned

 1  behind the building would be an alley?

 2          A.    Yes.

 3          Q.    Do you recall whether there was a boys

 4  club in the area of Sawyer and Palmer?

 5          A.    It was a -- yes, catty-corner to the

 6  building.

 7          Q.    And did you ever go to that boys club?

 8          A.    No.

 9          Q.    Do you know what the boys club was for?

10  What activities happened or what happened there?

11          A.    Usually just a bunch of kids hanging

12  out, having fun.

13          Q.    Did you ever see gang members hanging

14  out at the boys club?

15          MR. HAZINSKI:  Objection to form.

16          THE WITNESS:  I mean, they were on all the

17  corners, so it's hard to say whether or not they --

18  they hung out there or not, but they were

19  everywhere.

20  BY MR. BRUEGGEN:

21          Q.    And when you saw people hanging out on

22  corners, could you tell based on what they were

23  wearing whether they were gang members?

24          A.    Uh-uh.

```
 1          MR. HAZINSKI:  Is that a --

 2          THE WITNESS:  I'm sorry, no.  I apologize.

 3          MR. BRUEGGEN:  Thanks, John.

 4   BY MR. BRUEGGEN:

 5          Q.    Were any drugs sold in your

 6   neighborhood?

 7          A.    Not that I know of, no.  I couldn't --

 8   can't really answer that.

 9          Q.    And when you saw gang members hanging

10   out on the corners like you told us about, do you

11   know what they were doing?

12          A.    In front of my house, it was just

13   usually hanging out and being loud and obnoxious,

14   breaking into cars.  That happened a few times.

15   There was a lot of car theft going on in the -- in

16   the area as well.

17          Q.    Would gang members yell at people and

18   represent their gangs?

19          A.    Yeah.

20          MR. HAZINSKI:  Object to form.

21   BY MR. BRUEGGEN:

22          Q.    Would you see gang members in the

23   general area of your apartment flashing gang signs?

24          A.    Yes.
```

Urlaub Bowen & Associates, Inc.  312-781-9586

```
 1       Q.    And you told us about a shooting that
 2  you had at your prior apartment in Logan Square.
 3              Did you ever witness any gang
 4  violence in the area of Palmer and Sawyer?
 5       MR. HAZINSKI:  Objection, misstates
 6  testimony.
 7       THE WITNESS:  I seen violence, yeah.
 8  BY MR. BRUEGGEN:
 9       Q.    Were there a lot of shootings that
10  occurred in the general area of Palmer and Sawyer?
11       MR. HAZINSKI:  Objection, vague.
12       THE WITNESS:  I want to say yes.  There was
13  quite a bit of shooting, fighting.
14  BY MR. BRUEGGEN:
15       Q.    Do you recall a shooting that happened
16  right near your building at about 3:50 p.m. on
17  June 7th of 1993?
18       A.    I don't remember the exact date.  But
19  if this is -- if I remember, I remember there was a
20  shooting around that time.
21       Q.    And what do you recall about that
22  shooting?
23       A.    I was in my apartments.  I was watching
24  television, listening to music, and it was broad
```

```
 1   daylight.  Must have been the afternoon.  There
 2   were some shots fired, and that was about it.
 3        Q.    Did you see that shooting with your
 4   eyes?
 5        A.    No.
 6        Q.    But you heard shots fired?
 7        A.    Shots, yeah.
 8        Q.    Do you remember how many shots?
 9        A.    No.
10        Q.    Did you hear anything before you heard
11   the gunshots?  Any yelling?
12        A.    No.
13        Q.    How about after the gunshots?  Did you
14   hear anything?  Yelling?  Screaming?
15        A.    Not that I remember, no.
16        Q.    After you heard the gunshots, what did
17   you do, sir?
18        A.    I looked out the window across the
19   street.  That's usually where gang-bangers are.
20   And there were people standing there, and that was
21   about it.
22        Q.    All right.  Sir, and when you say you
23   looked out the window, would that be one of the
24   windows that faced out onto Sawyer, or one of the
```

```
 1  windows that faced onto the alley?

 2         A.    No, the windows face out to Sawyer.

 3         Q.    What did you see when you looked out

 4  that window?

 5         A.    The alley across Palmer -- across

 6  Sawyer, it continues, and there was just some

 7  people there in the yard.

 8         Q.    Did you see the scene of where the

 9  shooting had occurred?

10         A.    No.

11         Q.    Did you see a car outside driving away

12  or anything?

13         A.    No.

14         Q.    Prior to being in your apartment that

15  day and watching TV, where had you been?

16         A.    Sleeping probably.  We didn't -- we

17  didn't go out much.

18         Q.    And why didn't you go out much?

19         A.    To tell you truth, it's because of the

20  gangs.  We used to get a lot of -- we used to get

21  hassled by them.

22         Q.    Had you been outside that day and

23  walked past the boys club?

24         A.    No.
```

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 693 of 782 PageID #:13951

```
 1        Q.    After you heard the shooting, did you
 2   call the police?
 3        A.    No.
 4        Q.    Did the police arrive on scene?
 5        A.    Yeah.
 6        Q.    Do you know how long after the shooting
 7   that the police arrived?
 8        A.    I don't recall.  I don't remember.
 9        Q.    Was it --
10        A.    It couldn't have been that long.
11        Q.    And that was going to be my next
12   question:  Was it more than a half an hour?
13        A.    I would say no.
14        Q.    Was it more than 15 --
15        A.    20 minutes --
16        Q.    -- minutes?  Sorry, what --
17        A.    15, 20 minutes, sorry.
18        Q.    And when the police arrived on scene,
19   were you still looking out your window?
20        A.    No.
21        Q.    On that day of the shooting, did you
22   talk to the police?
23        A.    Yes.  Someone let the -- the officers
24   into the -- the building, and they made their
```

1  rounds upstairs.

2      Q.    And when you say made their rounds

3  upstairs, what do you mean by that, sir?

4      A.    You hear them knocking on the doors as

5  they came up the stairs to talk to everyone.

6      Q.    Eventually did the officers knock on

7  your door?

8      A.    Yes.

9      Q.    Did you invite them into your apartment?

10     A.    Yes.

11     Q.    And did they ask you questions about

12  the shooting?

13     A.    They asked me, yes.

14     Q.    Do you recall the names of anybody you

15  spoke to, any police officers you spoke to?

16     A.    No, I don't.

17     Q.    Do you remember whether they were

18  uniformed or plainclothes?

19     A.    I want to say they were uniformed

20  first.  They were -- I believe they were the ones

21  responding.

22     Q.    And when you say uniformed first, did

23  you talk to other police that day in addition to

24  the uniformed ones?

```
 1        A.    Yeah.   They -- when they left, they
 2   told us that, myself and my mother, that they --
 3   someone else might be coming back to speak with us,
 4   and that's when the detectives came.
 5        Q.    Do you remember the names of the
 6   detectives you spoke to?
 7        A.    No, I don't.
 8        Q.    Do you recall what -- was it more than
 9   one detective that you spoke to that day?
10        A.    There were two.
11        Q.    Do you recall what either detective
12   looked like?
13        A.    No, it's been so long, no; a short
14   visit.
15        Q.    Do you know how long after you spoke to
16   the uniformed officers that the detectives arrived?
17        A.    I would say an hour.
18        Q.    And can you tell me what the detectives
19   asked you?
20        A.    Basically the same questions you're
21   asking me:  What have I seen, what I'd been doing,
22   did I hear or see anything out of the ordinary
23   before or whatever, and ...
24        Q.    What did you tell the detectives?
```

```
 1        A.    The same thing I told you.  I was, you
 2   know, watching television, listening to music.
 3   Just it was a hot day.  I was trying to get some
 4   air, so ...
 5        Q.    Did the detectives do anything else
 6   other than just ask you questions?
 7        A.    Yes, they showed me a book.  A couple
 8   books --
 9        Q.    And --
10        A.    -- with pictures in them.
11        Q.    When you say "books," were these like
12   photo albums with multiple --
13        A.    Yes.
14        Q.    -- pictures?
15        A.    Binders with multiple pictures.
16        Q.    Do you recall how many binders you
17   looked at?
18        A.    One, maybe two.
19        Q.    Do you recall how large these binders
20   were?
21        A.    I don't recall.  I mean, maybe -- I'm
22   trying to remember the size of them.  Maybe
23   three-inch on the binder.  I didn't look through
24   the entire book though.  There were different
```

1  sections.

2       Q.    And do you know -- did the detectives

3  direct you to different sections to look at?

4       A.    They just opened up the book, handed it

5  to me, and just said, just look and see if you

6  recognize anyone.

7       Q.    Do you know what those photos were of

8  or who they were of?

9       A.    I could tell they were all criminals

10 because they were all mugshots it looked like.

11 Other than that, no.

12      Q.    Were you able to identify anybody in

13 the photos?

14      A.    No.

15      Q.    Were the detectives asking if you could

16 identify anybody that you had seen at the shooting?

17      A.    Yeah.  And I told them I didn't see

18 anyone.

19      Q.    After you told them you didn't see

20 anybody, what did they do?

21      A.    They left a card.  They left.  They

22 said they would be in contact, and they left.

23      Q.    Do you still have that card that was

24 left?

1       A.      No, no.

2       Q.      Didn't know if you were maybe using it

3   as a bookmark or something.

4       A.      No, I wish.  That's too many apartments

5   in between.

6       Q.      When you spoke to the detectives, did

7   you provide your contact information?

8       A.      My phone number and my name.  That's

9   about it.

10      Q.      Were you willing to speak to the

11  detectives?

12      A.      Yeah, I had no problems.

13      Q.      Did you feel any pressure that you

14  needed to talk to them?

15      A.      No.

16      Q.      Do you recall if you went to the police

17  station that same day as the shooting?

18      A.      Yeah.  Later on in the night, they -- I

19  was contacted by -- I believe it was one of the

20  original detectives.  And they sent someone to come

21  pick us up and take us to Area Five I believe it

22  was, the crimes unit.

23      Q.      So let's go back to the -- the first

24  conversation with the uniformed officers, how long

```
 1   did that conversation last?

 2         A.    A few minutes.

 3         Q.    And then you had a discussion with

 4   detectives in your apartment.  How long did the

 5   actual conversation last?

 6         A.    20 minutes, half an hour.

 7         Q.    And did that include the time you were

 8   looking at the photos?

 9         A.    Yes.

10         Q.    Did the detectives -- or strike that.

11               Did the uniformed officers also

12   speak to your mother?

13         A.    No.  She -- she seen after whatever had

14   happened, so they didn't really -- they just asked

15   her her name.  That was about it.

16         Q.    Did the detectives speak to your mother?

17         A.    No.

18         Q.    Do you know if your mother saw anything

19   related to the shooting?

20         A.    No.  Like I said, she would have been

21   at work until way later, so no.

22         Q.    So now, anything else you recall about

23   your interaction with the detectives at your

24   apartment when they came to talk to you after you
```

```
 1   had talked to the uniformed officers?

 2        A.    No.

 3        Q.    And then I believe you told us later on

 4   you were called by one of the original detectives?

 5        A.    Uh-hmm.

 6        Q.    Is that a yes?

 7        A.    Yes, I'm sorry.

 8        Q.    Not a problem.

 9              Do you recall that detective's name?

10        A.    No.

11        Q.    Do you recall anything about him?

12        A.    Not really, no.

13        Q.    What did the detective say to you when

14   he called you?

15        A.    If I remember correctly, they wanted to

16   know or he wanted to know if we'd be willing to

17   come and look at some photos or look at something.

18   And I remember us telling him -- or I told him, I

19   says, Well, I didn't really see anything.  He

20   says -- but then he asked me again, and then I told

21   him, Yeah, that's fine.

22        Q.    And you said telling "us" and "we."

23              Who were you speaking of besides

24   yourself?
```

```
 1        A.    So my mother was still there.  At that
 2   point she was there.
 3        Q.    After that call -- or strike that.
 4              In that call, you agreed to go look
 5   at something else?
 6        A.    Right, yes.
 7        Q.    Did you understand that they wanted you
 8   to come to the police station?
 9        A.    Yes.
10        Q.    Did they say whether you had to go on
11   your own, or whether they would send someone to
12   pick you up?
13        A.    They said they would send someone, a
14   car to come pick us up.
15        Q.    Do you recall what time of the day this
16   was?
17        A.    It was at night.  11, 11:30 at night.
18        Q.    And your recollection is the same day
19   as the shooting that you received this call to come
20   look at something?
21        A.    From what I remember, yes.  It all
22   happened around -- in the same day.
23        Q.    After you received that call, what
24   happened next relating to this shooting?
```

```
 1        A.    Within 10 minutes, there was another
 2   call letting us know that -- that they were there,
 3   that they pulled up.  And that's when I saw David,
 4   and we both got into the car, and they drove us
 5   to the -- to the police station.
 6        Q.    When the people -- the police arrived,
 7   did they come up to your apartment, or did they
 8   just call you?
 9        A.    They went to the door.
10        Q.    And was there a buzzer on the door that
11   you could --
12        A.    Yes.
13        Q.    -- ring different apartments?
14        A.    Yes.  Sorry, I didn't mention that.
15        Q.    Not a problem, sir.
16              The police that showed up to pick
17   you up, were they plainclothes or uniformed
18   officers?
19        A.    Plainclothes.
20        Q.    Was it the same plainclothes officers
21   you had previously spoken to?
22        A.    I want to say yes.
23        Q.    After they buzzed your apartment, did
24   you go down to the car?
```

```
 1        A.    Yes.

 2        Q.    Did your mother go with you?

 3        A.    No.

 4        Q.    And when you went down to the car, you

 5   saw -- you said you saw David Chmieleski?

 6        A.    Uh-hmm.

 7        Q.    Is that a yes?

 8        A.    Yes.

 9        Q.    Did you and David both get into the

10   same car?

11        A.    Yes.

12        Q.    Did the plainclothes officers in the

13   car say anything to you?

14        A.    No.

15        Q.    What happened after you guys got in the

16   car?

17        A.    They drove us up to Grand and Central.

18        Q.    The police station located there at

19   Grand and Central?

20        A.    Yes.

21        Q.    When you guys got to Grand and Central,

22   what happened to you?

23        A.    We walked in, went into an area where

24   there were some desks.  I was seated at one; David
```

1  was seated at another desk.  And then someone came

2  out and spoke to us.  I don't remember his name,

3  but he mentioned that he was either working with or

4  was like an assistant district attorney or

5  something like that.

6          Q.    You spoke to somebody who said they

7  were a dis -- assistant district attorney or a

8  prosecutor?

9          A.    Or something like that.  I can't

10  remember really the exact title.

11          Q.    Did you ultimately speak to that person?

12          A.    He just introduced himself, and then

13  the detectives were there as well, and that's when

14  they told me that they wanted me -- asked me to

15  participate in a lineup, to -- to view a lineup.

16          Q.    The assistant district attorney or

17  attorney, do you recall what he looked like?

18          A.    It was a younger, mid 30s, white

19  gentleman.  I believe he had like brown or blond

20  hair, something like that.

21          Q.    Was he tall, short?

22          A.    I would say as tall as I am,

23  five-eleven.

24          Q.    And was he thin, heavyset?

```
 1          A.    I don't remember that.  I'm sorry.

 2          Q.    Not a problem.

 3                And the detectives that you said you

 4   spoke to and asked you look at a lineup, were those

 5   the same detectives you had spoken to previously?

 6          A.    Uh-hmm.

 7          Q.    Is that yes?

 8          A.    Yes.

 9          Q.    And were they the same detectives that

10   had driven you to Area Five?

11          A.    I want to say yes.

12          Q.    So after sitting at the desks, you and

13   David, were you guys near each other?

14          A.    I don't remember.

15          Q.    Were you guys talking?

16          A.    I don't remember having a conversation

17   with him while we were there.

18          Q.    And so while you're sitting at the

19   desk, the first thing you remember happening is

20   this gentleman who was an assistant district

21   attorney or assistant state's attorney coming up

22   and talking to you?

23          A.    Yes.

24          Q.    And then after you spoke to him, is
```

Case: 1:19-cv-06508 Document #: 249-4 Filed: 01/30/24 Page 706 of 782 PageID #:13964

1  that when the plainclothes officers or detectives

2  came up and asked you to view a lineup?

3       A.    Correct, yes.

4       Q.    Any other events happen between the

5  time you arrived at the police station until you

6  went to view the lineup?

7       A.    No.

8       Q.    Can you tell us about going to view the

9  lineup.

10      A.    I was escorted into a room, a small

11 room, dark room.  And there was one person in

12 there, plus the detective who brought me in.

13             And the detective told me what was

14 going to happen.  They were going to bring out some

15 people, different profiles, and to take my time and

16 see if I recognized anyone from that day.

17      Q.    The detective who brought you in there,

18 was that the same detective that you had -- that

19 had driven you to the police station?

20      MR. HAZINSKI:  Objection to --

21      THE WITNESS:  One of --

22      MR. HAZINSKI:  -- form.

23      THE WITNESS:  -- the two.

24

 1  BY MR. BRUEGGEN:

 2       Q.    And that other person in the room, do

 3  you remember who that was?

 4       A.    No, they didn't speak.

 5       Q.    Do you know if that was a police

 6  officer or an attorney?

 7       A.    He wasn't dressed like a police

 8  officer, so I couldn't tell you.  Might have been a

 9  detective, or I'm not sure.

10       Q.    Do you recall what that other detective

11  looked like or potential detective looked like?

12       A.    Not really.  It was kind of dark.

13       Q.    But you say that person did not say

14  anything to you?

15       A.    No, not at all.

16       Q.    The detective that brought you in, what

17  did he say to you?

18       A.    He told me what was going to happen.

19  They're going to bring some people out and have

20  them take different profiles or whatnot, and to

21  look carefully, take my time, and see if I had

22  recognized anyone from the day.

23       Q.    Did you then look at people behind the

24  glass?

```
 1          A.     Yeah.

 2          Q.     Did you recognize anybody from the day?

 3          A.     No.

 4          Q.     Did you tell the detective that you

 5   were with that you did not recognize anybody?

 6          A.     Yes.

 7          Q.     And what happened after that?

 8          A.     I was brought out back to the desk

 9   where I met up with David, and a few minutes later,

10   they drove us home.

11          Q.     Do you know if David viewed a lineup

12   that night?

13          A.     Uh-hmm.

14          Q.     Is that a yes?

15          A.     Yes.  I'm sorry.

16          Q.     No problem, sir.

17                 How do you know that David viewed a

18   lineup that night?

19          A.     He -- he just asked what happened.  I

20   said, Yeah, I went to look at a lineup; and he said

21   the same thing.

22          Q.     While you were reviewing that lineup,

23   did you feel any pressure from the detectives to

24   identify somebody?
```

EFRAIN MIRANDA, 04/28/2021                                    Page 40

1          A.    No.

2          Q.    On the other side of the glass where

3    you saw people to view, was -- did you see a police

4    officer or detective?

5          A.    I don't remember if there was anyone

6    other than them.

7          Q.    While you were viewing that lineup, did

8    any detective or police officer indicate a specific

9    person they wanted you to choose?

10         A.    No.

11         Q.    Did the detectives that you interacted

12   with, did they act professionally?

13         A.    They were fine, yes.

14         Q.    Did any of them yell at you?

15         A.    No.

16         Q.    Were they mean to you?

17         A.    No.

18         Q.    Were you willing to look at whatever

19   they wanted you to look at to try to help?

20         A.    Yes.

21         Q.    Did any police officer or detective do

22   anything that made you feel uncomfortable?

23         A.    No.

24         Q.    Now, Mr. Miranda, I'm going to show you

```
 1   what we'll mark as Exhibit No. 2, and after I put

 2   things on the record, I'm going to have you look at

 3   it and I'm going to ask you if you can tell me if

 4   you recognize it, okay?

 5        A.    Okay.

 6        Q.    Mr. Miranda, I'm showing you what's

 7   been marked as Exhibit No. 2.  And for the record,

 8   it's CCSAO Iglesias 00003.

 9              Do you see photos up on the screen?

10        A.    Yes.

11        Q.    Let me zoom in.  Can you see that more

12   clearly?

13        A.    Yes.

14        Q.    And do you recognize anything about

15   that photo?

16        A.    No.

17        Q.    Mr. Miranda, do you recall how many

18   people were on the other side of the glass in the

19   lineup that you viewed?

20        A.    No.

21        Q.    Is that a no?

22        A.    No.  I'm trying --

23        Q.    Was it --

24        A.    -- to remember.
```

 1        Q.    Was it more than three?
 2        A.    I believe it was more than three.  I
 3   just -- it happened so fast.  It was like maybe
 4   eight, maybe less.  I'm not sure.
 5        Q.    After the lineup, did you speak to the
 6   assistant state's attorney or prosecutor again?
 7        A.    No.
 8        Q.    You said after the lineup you went
 9   outside, you saw David, and the police drove you
10   home?
11        A.    Yes.  Within a few minutes, yeah.
12        Q.    Were you ever -- when was the next time
13   you were contacted about the shooting that happened?
14        A.    Like maybe four months ago.
15        Q.    So you were never contacted again by
16   the police or by any attorneys regarding the
17   criminal case after that lineup until just recently?
18        A.    Correct.
19        Q.    And what happened four months ago?  Can
20   you tell us?
21        A.    I started to receive emails -- I'm
22   sorry -- voicemails and calls from an unknown
23   number.  And it end up being a -- someone working
24   for an attorney.  And then I believe -- I believe a

1  private detective that works for you guys I believe

2  contacted us about the case and explained more in

3  detail.

4        Q.    And so let's start with you received

5  calls and voicemails from an unknown number, right?

6        A.    Right.

7        Q.    And then from listening to the

8  voicemails, you understood it was somebody who was

9  working with an attorney who was investigating this

10  case.

11        A.    Correct.

12        Q.    Do you remember that person's name?

13        A.    I -- I'm sorry.  I don't actually.

14        Q.    Did you ever talk to that person,

15  either via phone or in person?

16        A.    On the phone, I called the person after

17  a while because they called so much, I just wanted

18  to end it all.  I spoke to the person, and that's

19  when they informed me what they were doing.  And

20  they set up a time where they can come and talk to

21  us.

22        Q.    And when you say "us," who do you mean?

23        A.    David Chmieleski.

24        Q.    Was the investigator also trying to

1   speak to your roommate David?

2        A.    Yeah.

3        Q.    And how many voicemails did you get --

4   or strike that.

5              How many phone calls did you get

6   from the investigator before you called him back?

7        A.    A lot.  I want to say a few voicemails,

8   like once or twice a day, for a good week or two.

9        Q.    When you called him back, what did he

10  explain to you?

11       A.    He asked me if I remember an incident

12  that happened way back when and if I'd be willing

13  to talk about it.

14       Q.    What did you say to him?

15       A.    I told him I don't remember.  I told

16  him exactly that I didn't see anything.  I don't

17  remember much about it.  But if he wants to talk,

18  that's fine.

19              Then that's when he came by.

20       Q.    You met him in person?

21       A.    I don't know if it was the same person

22  or someone working for them.  I remember there was

23  a young gentleman that came, and he -- he had some

24  affidavits that he wanted to sign after taking

 1  some infor -- some -- he asked us some questions,

 2  took down some information, came back with some

 3  affidavits he wanted us to sign.

 4       Q.    So you met with him on one occasion and

 5  provided information to this young gentleman?

 6       A.    Yeah.

 7       Q.    Do you know if the young gentleman was

 8  an attorney or an investigator?

 9       A.    I don't think -- I don't think either.

10  It might have been someone that worked with them,

11  like in an office capacity.  But other than that,

12  I'm not -- I don't think he was a detective.

13       Q.    So you met with the young person,

14  provided them information, and then how long after

15  that did that same young person return with a

16  document for you to sign?

17       A.    Within a day or so?

18       Q.    And do you recall what that document

19  said that the young person wanted you to sign?

20       A.    Yeah.  Basically it was our -- our

21  record of what we had spoken about, the questions

22  he had asked and my answers.  So a statement I

23  guess you would say.

24       Q.    When you were speaking to that

1  gentleman who was asking you questions about this,

2  was there anything in particular that he was

3  focusing on?

4         A.    Just what we had seen, what I had seen

5  that day.  He kept asking what did I see.  I told

6  him again, no, I didn't see anything.  Just heard

7  it.

8               I don't recall -- I think he asked

9  about the lineup.  But other than that, I don't

10 recall anything else.

11        Q.    Do you recall any specific areas of

12 inquiry about the lineup?

13        A.    I think he asked if I chose anyone, and

14 I told him, No, I didn't choose anyone.

15        Q.    Did he ask you about any of your

16 interactions with the detectives or the police?

17        A.    I don't think so.

18        Q.    After you signed that -- or strike that.

19               Why did you sign that declaration?

20        A.    I thought that he was just there to

21 take our -- our version of what had happened that

22 day from our standpoint.  And I thought that'd be

23 the end of it because we didn't really see

24 anything, and I didn't know it would lead to

```
 1  something bigger, so ...
 2               To me, I -- I just wanted to -- like
 3  I said, I just wanted to sign it and be done with
 4  it.
 5       Q.    How many -- strike that.
 6               The document signed, was that the
 7  only document you received or saw from that person?
 8       A.    Yes.
 9       Q.    And, Mr. Miranda, I'm going to show you
10  another exhibit, if you could bear with me.  This
11  will be Exhibit No. 3.
12               Mr. Miranda, do you see an exhibit
13  up on your screen?
14       A.    Yes.
15       Q.    I'm sure it's small.  And for the
16  record, this is Exhibit Iglesias 002121-2122.  And
17  can you see this -- sir, are you participating on a
18  cell phone?
19       A.    No, I'm on an iPad.
20       Q.    iPad, okay.  So it's somewhat big, and
21  I can zoom in for you.
22               Do you recognize what I'm showing as
23  Exhibit 3?
24                    (Phone interruption.)
```

```
 1          THE WITNESS:  Yeah.
 2   BY MR. BRUEGGEN:
 3      Q.    And I --
 4      A.    Yeah.
 5      Q.    -- will scroll down.  Let me get to the
 6   next page.
 7                    What do you recognize Exhibit 3 to
 8   be?
 9      A.    Well, that's the page -- the paper we
10   had to sign.
11      Q.    That's the document that you signed
12   after speaking to that person?
13      A.    Yes.
14      Q.    Do you know if David Chmieleski signed
15   a declaration?
16      A.    I believe so.
17      Q.    And do you know did David tell you
18   anything about him signing a declaration?
19      A.    We were both here when -- when the
20   gentleman came, so he kind of did both at the same
21   time.  That's how come I know.
22      Q.    And after you signed your declaration,
23   do you know if the gentleman ever returned to visit
24   you or David?
```

```
 1        A.    Haven't seen him since.

 2        Q.    And then after that, you also mentioned

 3   you talked to another investigator.

 4        A.    Yes.  It was --

 5        Q.    And how long ago was that?

 6        A.    A month ago.  He's the one that brought

 7   us the -- the subpoenas.

 8        Q.    Do you recall what you spoke to that

 9   investigator about?

10        A.    Really nothing.  He just -- he was

11   there to give us the subpoena, and what it was for,

12   and he was nice.  But it was a 5-minute

13   conversation, if that, and then he left.  Never

14   came inside.

15        Q.    And when you got that subpoena, that's

16   when you realized signing that declaration wasn't

17   the end of your involvement?

18        A.    Yep, yes.

19        Q.    Well, we all appreciate you

20   participating today.  I just have a few more

21   questions, and then I will be done and some of the

22   other attorneys might have some questions.

23        A.    Okay.

24        Q.    I'm going to ask you if you know
```

1  certain people or if the names sound familiar, and

2  then I'll ask --

3         A.    Okay.

4         Q.    -- how they sound familiar, okay?

5               The name Mercy Cordo?

6         A.    No.

7         Q.    How about Monica Roman?

8         A.    No.

9         Q.    How about somebody by the name of

10 Bernice Bullocks?

11        A.    Bernice Bullocks was my neighbor at

12 Palmer apartments.  She lived on the first floor

13 across from David.

14        Q.    Did Bernice have any children?

15        A.    She had one child.  He was mentally

16 retarded.  His name is Stevie, I think.

17        Q.    Do you know if Bernice witnessed

18 anything about the shooting on June of --

19        A.    No.

20        Q.    -- 1993?

21        A.    No, we -- we rarely talked.

22        Q.    What about somebody by the name of

23 Frank Vasquez?  Does that name ring a bell?

24        A.    No.

1      Q.    Do you know somebody by the name of

2  Arnell Moore?

3      A.    No.

4      Q.    How about somebody named Rozando Ochoa?

5      A.    No.

6      Q.    Do you know somebody named Daniel

7  Sanchez?

8      A.    No.

9      Q.    How about somebody with the name Hugo

10 Rodriguez?

11     A.    No.

12     Q.    Somebody named Jesus Gonzalez?

13     A.    No.

14     Q.    You know somebody named Jose -- Jose

15 Coronell?

16     A.    No.

17     Q.    Do you know somebody named Geraldo

18 Iglesias?

19     A.    No.

20     Q.    How about a girl named Rosie Cruz?

21     A.    No.

22     Q.    Or a girl named Miran Yevez [phonetic]?

23     A.    No.

24     Q.    And, sir, earlier you told us that the

1   investigator who reached out to you you said about

2   four months ago called and left multiple voicemails?

3          A.    Yes.

4          Q.    Do you still have those voicemails?

5          A.    Oh, geez.  I don't think so.  I

6   regularly delete my stuff.

7          Q.    No, understandable.

8                Do you still have that

9   investigator's phone number?

10         A.    Uh-uh.

11         Q.    Is that a no?

12         A.    No.  I think I actually blocked his

13  number.

14         Q.    And why did you block his number?

15         A.    The first one, I explained to him that

16  I can't receive phone calls while I'm at work, and

17  that's the time that he seemed to call was every

18  time I'm at work over and over and over again.

19                So it was either turn off my phone

20  or block his number.

21         Q.    And what are your normal hours of work?

22         A.    Now I work from 8:00 o'clock in the

23  morning to 4:30, 5:30 at night in the p.m.

24         Q.    When the investigator was calling you,

1  did you have the same hours of work, or were they

2  different?

3       A.   It -- it varied due to COVID since the

4  schools weren't really opening yet fully.  My hours

5  would change.  I would work at night or I would

6  work in the morning, so I never really knew what my

7  schedule was going to be until I went to work the

8  next day.

9       Q.   And, sir, do you recall if the

10 gentleman you spoke to who was leaving you the

11 voicemail, if his name was Oscar?

12      A.   That sounds familiar.

13      Q.   Do you know if the gentleman who

14 brought you the document to sign and met with you,

15 whether that was Oscar?

16      A.   I think it was.

17      Q.   Do you recall ever speaking to Oscar

18 and an attorney on a call?

19      A.   An attorney?  I remember speaking to

20 Oscar and a person, yes.

21      Q.   And another person?

22      A.   Another person.  He would -- he had his

23 phone, and I guess he would contact the other

24 person on the phone and say, I'm here with

```
 1  Mr. Miranda and so and so.

 2          Q.    Got you.

 3                So when he met with you in person,

 4  he called someone up on the phone for you to talk

 5  to that person.

 6          A.    Yes.

 7          Q.    Do you know who that person he called

 8  was?

 9          A.    I don't remember the name.  He told me

10  his name, but I -- I can't recall.

11          Q.    Do you recall anything about the person

12  that was on the phone, whether they said they were

13  an attorney or whether they were a paralegal or --

14          A.    I believe it was attorney.

15          Q.    Do you know who that attorney was

16  representing, if anybody?

17          A.    No.  They said they were working for

18  some sort of organization.  I forgot the name of

19  the organization.

20          Q.    Did they tell you what the purpose of

21  the organization was?

22          A.    Somewhere along the lines of being some

23  sort of a watchdog group, like -- or police over

24  watch or something like that.
```

```
 1        Q.    And did they tell you what they did as
 2  a watchdog group or police over watch?
 3        A.    No.  I didn't speak to that person that
 4  long.
 5        Q.    Did they tell you why they wanted to
 6  get your statement regarding the shooting that
 7  occurred?
 8        A.    From what I can remember, they had
 9  explained to me that something went wrong with
10  the -- some trial or someone was put in prison
11  wrongfully.  It was very confusing to me, the way
12  he explained it.  But I guess they were trying to
13  say that the officer had did something wrong, so
14  some officer.  And yeah, that was about it.
15        Q.    And based on your interactions with the
16  detectives and the police officers, did you believe
17  any officer had done anything wrong in relation to
18  your interactions?
19        A.    With my interactions from -- from back
20  then?
21        Q.    Yes, sir.
22        A.    No.
23        MR. BRUEGGEN:  Mr. Miranda, those are all the
24  questions I have.  Some of the other attorneys
```

```
 1  might have some questions.  Thank you very much for
 2  your time and patience.
 3          THE WITNESS:  Thank you.
 4          MR. RAHE:  Hi, Mr. Miranda, I may have a few
 5  questions for you.  Would you mind if we took a
 6  quick 5-minute bathroom break before then?
 7          THE WITNESS:  That's fine.
 8          MR. RAHE:  Okay, great.  Thank you.
 9          THE VIDEO TECHNICIAN:  We are going off the
10  record.  The time is 10:58 a.m.
11                          (Recess taken.)
12          THE VIDEO TECHNICIAN:  We are back on the
13  record.  The time is 11:06 a.m.  You may proceed.
14                          EXAMINATION
15  BY MR. RAHE:
16      Q.   Hi, Mr. Miranda, my name is Austin
17  Rahe.  I'm an attorney for the City of Chicago in
18  this lawsuit.  I just have a couple questions for
19  you.
20              So you talked a little bit about
21  that investigator that called you a bunch of times,
22  and then you ended up meeting with him, right?
23      A.   Yes.
24      Q.   You remember that, okay.
```

```
 1              Did you -- whenever you signed that
 2   declaration, did you feel like you had to sign it
 3   in order to get him to leave you alone?
 4        A.    Kind of.
 5        MR. RAHE:  Okay.  That's all the questions I
 6   have.
 7                    EXAMINATION
 8   BY MR. HAZINSKI:
 9        Q.    Hi, Mr. Miranda.  My name is John
10   Hazinski.  I'm an attorney.  I represent the
11   plaintiff in this lawsuit, Geraldo Iglesias.
12   Thanks so much for your time today.
13              I have a few follow-up questions
14   that are going to go over some of the ground that
15   was already covered in your previous questioning,
16   but I just want to get clear on a few topics, if
17   that's okay.
18        A.    That's fine.
19        Q.    Thanks.
20              So in preparation for this
21   deposition, did you have any conversations with any
22   attorneys within the last month or so?
23        A.    No.
24        Q.    Okay.  Did anybody who was an attorney
```

```
 1  for the defendants in this case reach out to you

 2  and try to talk to you?

 3       A.    Uh-uh.

 4       Q.    Okay.

 5       MR. BRUEGGEN:  Is that a no, sir?

 6       THE WITNESS:  Sorry, no.

 7       MR. HAZINSKI:  Thanks.

 8       MR. BRUEGGEN:  Sorry, John.

 9  BY MR. HAZINSKI:

10       Q.    And -- and you mentioned you had a

11  short conversation with David about his deposition

12  that happened yesterday, right?

13       A.    Yes.

14       Q.    But you didn't get into the substance

15  of what he testified about, right?

16       A.    No.

17       Q.    Okay.  And so I want to ask you about

18  the declaration you signed that the investigator

19  brought you after you had a conversation with him,

20  okay?

21       A.    Okay.

22       Q.    Now, you testified that you had had a

23  phone conversation with him before the declaration

24  was put together, right?
```

```
 1        A.    I believe we spoke before, yes.
 2        Q.    Okay.  And during that conversation,
 3  you provided some information to him about what you
 4  remembered from this incident all the way back in
 5  1993?
 6        A.    What I -- yeah, whatever I could
 7  remember, yeah.
 8        Q.    And then the investigator, did he --
 9  did he or somebody else take that information and
10  put that in the -- the declaration that you later
11  signed?
12        MR. BRUEGGEN:  Object to foundation,
13  speculation.  Go ahead, sir.
14        THE WITNESS:  From what I can remember, it
15  had parts of my statements on there.  There were
16  some mistakes that were made, and they had to -- I
17  had to initial the -- I had to initial the -- the
18  repairs, I guess.
19  BY MR. HAZINSKI:
20        Q.    Okay.  And you specifically remember
21  initialing a copy of a statement?
22        A.    I don't remember if it was initial or
23  just sign.  There was a part where in the statement
24  they had for some reason David and I talking
```

 1  downstairs.  And I told them no, I was upstairs,
 2  and I didn't have contact with David until after
 3  everything happened.
 4       Q.    Got it.
 5       A.    And I guess they said that -- that
 6  would be fixed, and on the final copy, it wouldn't
 7  be there or whatever.
 8       Q.    Okay.  And so during this process, you
 9  basically went through and checked to make sure
10  everything in there was right before you signed?
11       A.    Correct.
12       Q.    Okay.  And when you read through it,
13  other than that thing you just mentioned about you
14  talking to David or being with David, did you
15  notice anything else that was wrong?
16       A.    You know, I -- I can't remember right
17  now.
18       Q.    Okay.
19       A.    I'm trying to think back.  That's the
20  only thing I can -- I can remember right now that
21  was an issue.  Other than that, I'm not so sure.
22       Q.    Okay.  Did you feel like the document
23  that they had prepared was an accurate summary of
24  what you had told them for the most part?

```
 1        A.    For the most part, yes.
 2        Q.    Okay.  And this guy who had been
 3   calling you repeatedly, whose name might have been
 4   Oscar, he was trying to get in contact with you for
 5   about how long before you ended up actually talking
 6   to him?
 7        A.    Oh, I -- I wouldn't know.  I -- the
 8   only time I really paid attention was I guess
 9   someone came to the house and spoke to David, got
10   in contact with someone.  He told me someone came
11   by.  And that's when I figured, okay, we should
12   give this guy a call.
13        Q.    Up until that point, had you gotten a
14   little irritated with all the contacts that he
15   was trying --
16        A.    Well --
17        Q.    -- to make with you?
18        A.    -- I just didn't know who it was.
19   Because I had to change my number because of scams
20   and things like that.  So when an unknown number
21   keeps calling me and calling me and calling me,
22   then I usually don't pick up unknown calls.  If I
23   don't know the number, I don't pick it up.
24        Q.    Right.
```

```
 1        A.      In that sense, yes.

 2        Q.      Okay.  And he would sometimes call you

 3   at inconvenient times, right?

 4        A.      Yeah.

 5        Q.      Yeah.  Because your work schedule was

 6   changing a lot around that time, right?

 7        A.      Right.

 8        Q.      Yeah.

 9        A.      I can't always answer the phone, so ...

10        Q.      And sometimes he would catch you while

11   you were at work, and you wouldn't -- wouldn't be

12   able to answer the call while you were working,

13   right?

14        A.      Correct.

15        Q.      Okay.  Would it be fair to say that

16   when you were receiving all these calls from this

17   unknown number, you didn't want to deal with

18   whatever that was?

19        MR. BRUEGGEN:  Object to form.

20                Go ahead, sir.

21        THE WITNESS:  If it was at work, I didn't

22   want to deal with it.  Other than that, I just

23   mostly just wanted to find out what was going on.

24
```

1  BY MR. HAZINSKI:

2          Q.    Yeah.

3          A.    But once he explained it to me, then ...

4          Q.    And once you understood what was going

5  on and what it was all about, were you willing to

6  provide information to this person about what you

7  remembered?

8          A.    Yeah, I have no problem.  I mean, just

9  whatever I could recall, yeah.

10         Q.    Yeah.  It's fair to say that you -- you

11 thought telling him what you knew would get him off

12 your back, so to speak?

13         A.    No.  It was more of a I didn't

14 understand why after all this time.  I didn't

15 understand the -- the entire scope of it.

16               But no, I didn't feel like it was --

17 I wanted to get the process over and done with and

18 do what I could.  But other than that, no, I

19 wouldn't say that.

20         Q.    Okay.  And did you -- did you tell the

21 truth in all your conversations with this

22 investigator?

23         A.    Yeah.

24         Q.    Okay.

```
 1        A.    I had no reason not to.

 2        Q.    And you didn't hide anything from him

 3   that you thought might be significant?

 4        A.    No.  I figured the more -- I mean, from

 5   what I can remember, it was a long time ago.  But

 6   intentionally hide, no.

 7        Q.    Okay.  And you also had a conversation

 8   where Oscar was -- or this person whose name might

 9   be Oscar, this investigator was present with you,

10   and then there was also someone on the phone you

11   were speaking with at that time, right?

12        A.    Right.

13        Q.    And you think that person on the phone

14   was probably an attorney?

15        A.    From what I can remember.  I don't

16   remember the name, but I just remember he was

17   speaking with someone.

18        Q.    Okay.

19        A.    It seemed to be an authority over him,

20   I guess.

21        Q.    Got it.

22              A boss of some kind.

23        A.    Yeah.

24        Q.    And that person on the phone said
```

1  something about what organization he worked for,

2  right?

3      A.    Oscar and the gentleman said something

4  about a -- I don't even remember the name of the

5  organization.  I remember they said that they were

6  working for some -- some group or on behalf of them.

7      Q.    Okay.  And they said they were working

8  on something involving misconduct by police

9  officers?

10     A.    No, they didn't use that term.

11     Q.    Okay.

12     A.    They said specifically in this case

13  something about a -- oh, geez, exactly -- the exact

14  wording.  It wasn't that vague.  I think it was

15  more towards the case.

16     Q.    Okay.  Did anybody at any time make you

17  any promises or promise to give you anything or do

18  anything for you in exchange for signing the

19  declaration?

20     A.    No.

21     Q.    Did anybody ever make any threats to

22  you?  Like there would be consequences if you

23  didn't sign a declaration?

24     A.    No.

```
 1        Q.    Okay.  So would it be fair to say you

 2   signed the declaration because it was true based on

 3   your review of it and not because of any promises

 4   or threats?

 5        A.    There were no promises or threats made,

 6   no.

 7        Q.    Okay, great.

 8              So I want to kind of jump back now

 9   to 1993 and just make sure I understand kind of the

10   sequence of events, if that's --

11        A.    Okay.

12        Q.    -- okay?

13              So you remember being in your

14   apartment when you heard gunshots outside, right?

15        A.    I heard the gunshots, yes.

16        Q.    Okay.  You don't remember exactly what

17   you were doing before that, but you think you

18   probably were sleeping?  Is that fair?

19        A.    If it was in the afternoon, I remember

20   I was listening to music because that's where the

21   stereo system was, and the television was on when

22   the shooting had occurred.  If it was before that,

23   we're talking hours before that, I would have been

24   sleeping.
```

```
 1        Q.     Okay.  Do you have any memory of going
 2   for a walk or going out to run errands or anything
 3   like that earlier in the day?
 4        A.     No.  Like I said, back then, it was
 5   either working at the church or in the house.
 6        Q.     Okay.  And so you are -- were in -- on
 7   the third floor in the south unit of the building
 8   at 2148 North Sawyer.  Do I have that right?
 9        A.     Yes.
10        Q.     Okay.  And the windows in that unit,
11   did they -- did those windows look to the east and
12   to the south?
13        A.     Yes.
14        Q.     Okay.  Did you have any windows in that
15   unit that let you look straight north?
16        A.     No.
17        Q.     Okay.
18        A.     No.  All the windows are pretty much on
19   the Sawyer side, and there's like one window that
20   looks into the neighbor's yard headed towards the
21   other street, the opposite direction.
22        Q.     Okay.  And you had said you lived
23   nearby in another unit before you and your mom
24   moved into the unit at 2148 North Sawyer; is that
```

```
 1  right?
 2       A.    It was a different apartment building
 3  up the street.
 4       Q.    When you say --
 5       A.    I believe it was --
 6       Q.    Go ahead.
 7       A.    2130 -- I'm sorry, no.  Yeah, 2130 on
 8  the same street.  It was a huge apartment building.
 9       Q.    Okay.  On -- on Sawyer a little bit to
10  the south; is that right?
11       A.    Yeah, right.
12       Q.    And at -- at your unit at 2148 Sawyer,
13  you said it was the third floor, right?
14       A.    Uh-hmm.
15       Q.    Were there any --
16       MR. BRUEGGEN:  Is that a yes?
17       THE WITNESS:  Yes.
18       MR. HAZINSKI:  Thank you.
19       MR. BRUEGGEN:  Sorry, John.
20  BY MR. HAZINSKI:
21       Q.    It's real easy to lapse into ordinary
22  conversation, and I mess up all the time, so we'll
23  just do our best to try to --
24       A.    Okay.
```

1        Q.      -- remind ourselves.

2                Was there a floor of apartments

3    above the one you lived on, or were you the top

4    floor apartments in that building?

5        A.      That was the top floor that I lived on.

6    It was three floors.

7        Q.      Three.

8                And so at that time when you were

9    living there, David Chmieleski lived in the -- on

10   the first floor in the north unit, right?

11       A.      The first floor in the middle unit.

12       Q.      In the middle unit.

13       A.      Right.  There were three sections:

14   The -- the one that faced Palmer, then there was

15   the middle units that had the -- the side entrance,

16   and then the rear units.  That's where we lived up

17   at the top.

18       Q.      Was the side entrance a door on Sawyer?

19       A.      It was off of Sawyer.

20       Q.      Okay.

21       A.      In -- in between the middle units and

22   the rear units, which is pretty much the main --

23   the main entrance.

24       Q.      To get to your apartment on the third

1  floor north, were you able to use that entrance on

2  Sawyer, or did you have to use a different one?

3          A.    No, that was that or through the porch

4  from the alley.

5          Q.    Okay, got it.  Thanks for clarifying

6  that.

7                       Did you have any relationship with

8  any of the folks who lived on the second floor of

9  that building?

10         A.    The only person I remember living on

11 the second floor was an elderly woman, and she

12 didn't really talk to anyone at all.  I don't even

13 remember her name.  On the second floor and the

14 rest of the building, pretty much from the second

15 floor up, I don't think there was anyone that lived

16 there.

17         Q.    Okay.  So do you have any memory of --

18 let me -- let me jump ahead a little bit.

19                       So after the shooting, some

20 uniformed officers came to the building to talk to

21 the people that lived there, right?

22         A.    Correct.

23         Q.    Okay.  And during that conversation,

24 did you -- did you tell those uniformed officers

1  basically what you told us about what you witnessed?

2       A.    More or less.  It was a very -- it

3  wasn't a long conversation.  They were upstairs for

4  a few minutes, and then they took down -- they were

5  writing down on the pad some information, did we

6  see anything, hear anything, whatever.

7       Q.    Right.

8       A.    And I told them pretty much yeah, I

9  heard the gunshots.  That was about it.

10      Q.    Did you tell them you went and looked

11 out the window and didn't see anything?

12      A.    Uh-uh.

13      Q.    You didn't tell them that?

14      A.    It didn't come up, I don't think.  Like

15 I said, it was -- they weren't there for that long.

16 When the detectives came, they asked more questions

17 for the -- yeah.

18      Q.    Okay.  So Sawyer, back as it existed,

19 that block of Sawyer back in 1993, June '93 --

20      A.    Uh-huh.

21      Q.    -- had a number of trees, right?

22      A.    Uh-hmm.

23      MR. BRUEGGEN:  Is that a yes?

24      THE WITNESS:  Yes, sorry.

 1  BY MR. HAZINSKI:

 2          Q.    Thanks.

 3                And looking out the window of your

 4  unit back then, did the trees obstruct your view of

 5  any part of the street at all?

 6          A.    Yes.  I could see the building across

 7  the street and the alley, and I could see the boys

 8  club.  But the street corner, I couldn't see.

 9          Q.    Okay.  And that was because the trees

10  were blocking the view?

11          A.    Right.

12          Q.    And at this time of year in -- in June,

13  were there leaves on the trees that made it harder

14  to see?

15          A.    I -- I would imagine so.  I mean, yeah.

16          Q.    Just based on your general knowledge of

17  trees?

18          A.    Yeah.  I mean, there was a big tree out

19  in front.  It was always there until it got cut

20  down after a lightning storm.  Yeah, there were

21  trees all over.

22          Q.    Okay.  And so basically because of

23  those trees, you would only have a pretty limited

24  view of what was going on in the exterior, right?

```
 1        A.    Uh-hmm.

 2        Q.    Yes?

 3        MR. BRUEGGEN:  Is that a yes?

 4        THE WITNESS:  Yes.

 5 BY MR. HAZINSKI:

 6        Q.    Thanks, okay.

 7             So after you talked to the uniformed

 8 officers, the detectives came to talk to you, right?

 9        A.    Yes.

10        Q.    And your mom was not yet home when they

11 first arrived?

12        A.    When the officers came, she was not

13 home.  She came when the -- the detectives came,

14 then she was home at that time.

15        Q.    Okay.  So she came home at some point

16 in the interim between the uniformed officers

17 leaving and the detectives showing up?

18        A.    Yes.

19        Q.    Is your mom's name -- your mom's name

20 is Sara or Sara?

21        A.    Yes.

22        Q.    Okay.  Did your mom tell you that she

23 had seen anything in connection with the shooting

24 incident?
```

1        A.    No, she was at work.

2        Q.    Okay.  And you said when the detectives

3   came you told them that you hadn't seen anything in

4   terms of the actual shooting or who had done the

5   shooting, right?

6        A.    Right.

7        Q.    Okay.  But you don't remember what

8   exactly these detectives looked like, do you?

9        A.    It's been so long.  I can't remember.

10       Q.    Do you remember if they were white?

11       A.    I want to say yes.  I just can't

12   remember if both of them were white.

13       Q.    Okay.  Do you remember if either of

14   them were black?

15       A.    No.

16       Q.    No, meaning you don't remember, or no,

17   meaning you don't think they were?

18       A.    No, meaning I don't remember.

19       Q.    Okay.  Do you speak Spanish?

20       A.    Yes.  Not fluently, but yes.

21       Q.    Do you remember speaking any Spanish

22   with any of the police you talked to at any point

23   during all this?

24       A.    No.

```
 1        Q.    It was all -- all in English?

 2        A.    Yeah.

 3        Q.    Okay.  So the detectives showed up, and

 4   you relate to them basically what you've told us

 5   about hearing the gunshots, going to the window,

 6   and looking and not seeing anything, right?

 7        A.    Yeah.  All I could see was the alley,

 8   like I said before, across the street.  The reason

 9   being is there's been shootings before, and usually

10   that's where it comes from.  We had bullet holes in

11   the garage and the basement because of that.

12        Q.    Okay.  Sorry if you answered this

13   already, but do you remember when you heard the

14   gunshots and went to look out the window of your

15   unit, were you looking out the east facing windows?

16        A.    Yeah.  They all face east, except for

17   the one in my bedroom.

18        Q.    Okay.

19        A.    They all -- yeah, this would have been

20   the living room, yeah, it's right across the street

21   to the building across the street.

22        Q.    Do you recall or can you give your best

23   estimate of how long you looked out of the window

24   when you did that?
```

1        A.    It was a few -- it was a few seconds.

2   Maybe -- I don't know.  I was startled by it.  I

3   remember that.  And I got up and I looked.  I

4   didn't stick my head out.  I just looked across the

5   street maybe for like, you know, half a minute.

6        Q.    Okay.  The detectives who showed up at

7   your apartment gave you some books of photos to

8   look through, right?

9        A.    Right.

10        Q.    Did they have those with them when they

11   came up to your apartment?

12        A.    Yes.

13        Q.    Okay.  And they asked you to look

14   through to see if you could identify anybody who

15   had a picture in those books, right?

16        A.    Yes.

17        Q.    Okay.  At that point had you already

18   told them that you didn't see anything relating to

19   the shooting?

20        A.    Uh-hmm, yes.

21        Q.    Did they explain to you why they wanted

22   you to look at those books after you told them that

23   you hadn't seen anything?

24        A.    They -- from what I can remember,

 1  they -- after I told them I didn't see anything,

 2  they said, Well, can you take a look and see if you

 3  remember anyone from the day, like maybe hanging

 4  out around the neighborhood that day.

 5       Q.    Okay.

 6       A.    If I -- if I remember correctly.  It

 7  was something along those lines.

 8       Q.    Did you tell them that you had seen

 9  anybody on that day?

10       A.    No.  I told them I didn't see anyone

11  because I haven't left.  And once -- after I looked

12  at the photo album, the pictures they showed me, I

13  told them I didn't recognize anyone at all, period.

14       Q.    Meaning, you didn't even recognize

15  anybody just that you knew generally unrelated to

16  the incident?

17       A.    Yes.

18       Q.    Okay.  Like for instance, you didn't

19  recognize anybody as like a guy you'd seen on a

20  corner recently or anything like that?

21       A.    Correct.

22       Q.    Okay.  The detectives you were talking

23  to in your apartment, were they taking notes during

24  your conversation?

```
 1          A.    I can't remember.

 2          Q.    Okay.  Apart from giving you the photo

 3   books to look through, one or more photo books I

 4   should say, did they give you anything else to look

 5   at?

 6          A.    No.

 7          Q.    Okay.  The people in the photo books,

 8   you said you thought they were criminals because

 9   they looked like they were all mugshots, right?

10          A.    Right.

11          Q.    Do you have any idea whether those

12   books had pictures of people who were members of

13   gangs?

14          A.    I have no clue.

15          Q.    Okay.

16          A.    Yeah.

17          Q.    Did the detectives -- when you were

18   talking to them in your apartment, did the

19   detectives tell you they thought the shooting might

20   have been gang related?

21          A.    No, not that I remember.  That never

22   came up.  I don't think so.

23          Q.    Okay.  So those detectives left after

24   maybe 20 minutes or half an hour; is that right?
```

1      A.    A little bit less than that, but yeah,

2  it sounds about right.

3      Q.    Okay.  And you took the time to look

4  through the photo books they gave you to see if you

5  recognized anybody, right?

6      A.    Right.

7      Q.    Okay.  I said photo books, but it could

8  have just been one photo book or possibly more?

9      A.    I can't remember if it was one or two

10  binders.  Might have been one big one or two

11  smaller ones, but yeah.

12      Q.    And that definitely happened in your

13  apartment, right?

14      A.    In the apartment.

15      Q.    Okay.  Did your mom look through those

16  photo books as well?

17      A.    No.

18      Q.    Okay.  Did you tell those detectives

19  that you had seen somebody wearing a black starter

20  jacket earlier that day?

21      A.    No.

22      Q.    Did you tell them that you had seen

23  members of the -- the IGs earlier that day?

24      A.    I don't remember saying it.  So I mean,

 1   it doesn't mean they weren't there, but I -- I

 2   don't remember saying that at all.

 3       Q.    Okay.  Do you remember telling the

 4   detectives you saw someone wearing pink or red

 5   pants earlier that day?

 6       A.    No.

 7       Q.    Do you remember telling detectives you

 8   saw someone wearing baggy pants or a black hoodie

 9   earlier that day?

10       A.    No.

11       Q.    Did you ever tell detectives that you

12   saw someone who was about five-foot-four inches in

13   height or 140 pounds?

14       A.    No.

15       Q.    Okay.  And did you tell detectives that

16   you had seen three small children in the area

17   earlier that day?

18       A.    No.

19       Q.    Okay.  So the detectives were there for

20   a little while when you looked at the photo books,

21   and then they left, right?

22       A.    Yes.

23       Q.    And they gave you a card at that point,

24   but you don't still have that, right?

1        A.    No.

2        Q.    Okay.  Now, you testified that you

3   think that you got picked up and taken to the

4   station soon after that, right?

5        A.    It was -- after they left -- yeah, it

6   was nighttime when they came to pick us up.

7        Q.    Okay.

8        A.    They were -- the detectives were

9   here -- were at the place on Sawyer, it was still

10  daytime.

11       Q.    Okay.

12       A.    And then after that, they sent

13  someone -- they had called first to let us know

14  they were sending a car.

15       Q.    Okay.  And you testified that was --

16  that later in the evening that happened around like

17  11:00 or 11:30, right?

18       A.    Around that time.  I remember it was

19  late.

20       Q.    Okay.  And you're pretty sure it was

21  the same -- all that happened on the same day?

22       A.    I want to say yes, from what I can

23  remember.

24       Q.    Is it possible it was maybe a day or

 1  two later?

 2       A.    I don't think so.  I mean, from what

 3  I -- it's hard remembering back then.  But from my

 4  mind, I remember it happening on the same day.

 5       Q.    Okay.  Is it possible it was as long as

 6  two weeks later?

 7       A.    Oh, no.

 8       Q.    Okay.  Sorry, one -- one second here.

 9            So you mentioned that there was a

10  gang that had its kind of central turf in that area

11  around Sawyer and Palmer, right?

12       A.    Yes.

13       Q.    And you said they were called the

14  Insane Gangster Disciples?

15       A.    Yeah.

16       Q.    Okay.  And Mr. Brueggen, the attorney

17  for the defendant officers, was asking you some

18  questions where he used the abbreviation IGs.

19       A.    Right.

20       Q.    Is that what you understood him to be

21  referring to in those questions?

22       A.    Yes.

23       Q.    Okay.  Did you personally know any

24  members of that gang back in 1993?

```
1        A.    I didn't -- did not hang out with any
2   of those people, no.
3        Q.    Okay.
4        A.    I knew the ...
5        Q.    So I want to talk about when you were
6   picked up and brought to the station.
7                    So they -- someone gave you a call
8   ahead of time to let you know that you were going
9   to get picked up, right?
10       A.    Right.
11       Q.    Okay.  But you don't remember who it
12  was specifically that called you?
13       A.    I -- I believe it was one of the
14  detectives.
15       Q.    One of the ones you had talked --
16  talked to previously?
17       A.    That came to the house previously.
18       Q.    Okay.  And they picked up you and David
19  from 2148 North Sawyer, right?
20       A.    Correct.
21       Q.    And they brought you to that police
22  station over on West Grand Avenue?
23       A.    Yes.
24       Q.    Okay.  Which you -- you -- I think you
```

1   referred to it as Area Five before, right?

2          A.    Well, that's what it was called before,

3   yeah.

4          Q.    Okay.  Do you recall how many officers

5   came to pick up you and David?

6          A.    Two.

7          Q.    Okay.  But you're not sure -- it could

8   have been the same ones that had talked to you

9   earlier, but you don't remember?

10         A.    I don't remember, but may have been the

11  same people, but I don't remember.

12         Q.    Okay.  Besides those two officers and

13  yourself and David, was anybody else in the car at

14  that point?

15         A.    No.

16         Q.    Okay.  And you were brought to the

17  station, and you and David were seated at desks at

18  the station, right?

19         A.    I was seated at one desk, he sat in

20  another, and then I guess we were separated.

21         Q.    At that point did you know why you were

22  at the station?

23         A.    To look at the lineup.

24         Q.    Okay.  Did -- did you look at any

 1  photographs while you were at the station?

 2        A.    Not that I remember.

 3        Q.    Okay.  You don't remember looking

 4  through a similar one of those binders full of

 5  photos?

 6        A.    No, no.

 7        Q.    Okay.  Do you remember seeing David

 8  look through any photos or any binders of photos at

 9  the station?

10        A.    No.  Like I said, we were -- I hadn't

11  seen him until we were getting ready to leave.  So

12  after we initially got there, we were not in the

13  same room or in the same area.

14        Q.    Okay.  So you were separated into

15  different rooms inside the station?

16        A.    I -- I wouldn't say rooms but just

17  desks.  He was in another area.  I didn't really

18  see him.

19        Q.    Okay.

20        A.    Yeah.

21        Q.    He -- he wasn't close enough nearby you

22  where you were able to keep an eye on him the whole

23  time.

24        A.    Exactly.

```
 1      Q.    Okay.  And you weren't able to have
 2  conversations back and forth with him until the
 3  very end of your time at the station, right?
 4      A.    Correct.
 5      Q.    Okay.  Did any detectives come and talk
 6  to you while you were at the station before you
 7  actually went in to see the lineup?
 8      A.    A detective, no.  There was, like I
 9  told the gentleman prior, someone who -- I don't
10  remember his title -- that came and introduced
11  himself and thanked us for coming in.  And they
12  explained what was going to happen about the
13  lineup, and that was it.
14      Q.    Okay.
15      A.    Very brief.
16      Q.    And that person you understood to be a
17  prosecutor of some kind, right?
18      A.    Or district -- I -- I seem to remember
19  assistant district attorney or something like that.
20  I don't exactly remember the name or anything.
21      Q.    Is it possible he said he was an
22  assistant state's attorney?
23      A.    Perhaps.
24      Q.    Okay.  Other than that conversation
```

```
 1   with that gentleman, did you talk to anybody else

 2   in the period while you were at the station waiting

 3   to see the lineup?

 4        A.    No.

 5        Q.    Do you know whether David talked to

 6   anybody during that --

 7        A.    I do not.

 8        Q.    You don't know.

 9        A.    No.

10        Q.    Okay.  How long would you estimate you

11   were at the station before you went in to view the

12   lineup?

13        A.    10 minutes.

14        Q.    Okay.  And so you would have gotten

15   picked up from your home sometime around 11:00 or

16   11:30 that evening, right?

17        A.    Yes.

18        Q.    And about how long did the drive to the

19   station take?

20        A.    Like 10 minutes.

21        Q.    Okay.  And then you were there for

22   another 10 minutes before you saw the lineup.

23        A.    Right.

24        Q.    So would it be fair to say that lineup
```

1   procedure, based on your memory of the timing,

2   would have happened at or before midnight of that

3   evening?

4           A.    At or before, that sounds right.

5           Q.    Okay.  Do you remember who it was that

6   actually brought you into the room to look at the

7   lineup?

8           A.    No, I do not.

9           Q.    And you said you remember there being a

10  detective in that room as well as another person;

11  is that right?

12          A.    The detective who brought me into the

13  room was one of the people who picked us up, and

14  there was another person in the room, but I didn't

15  speak to that person.

16          Q.    Okay.  And that person didn't say

17  anything to you or say anything to anyone else?

18          A.    Not at all.

19          Q.    Do you have any memory of what that

20  person looked like at all?

21          A.    No.  Like I said, I remember it was

22  dark.  I knew there was someone there, but I didn't

23  speak to them.  I didn't -- I could vaguely see

24  them.

```
 1        Q.    Okay.  The person who had introduced
 2   himself to you as an assistant district attorney or
 3   something like that --
 4        A.    Uh-hmm.
 5        Q.    -- was that person in the room with you
 6   during the lineup procedure?
 7        A.    No.
 8        Q.    Okay.  The mystery person who was in
 9   the lineup room that you didn't get a good look at,
10   do you know one way or another whether that person
11   was a police officer?
12        MR. BRUEGGEN:  Object to form, "mystery."
13              Go ahead, sir.
14        THE WITNESS:  Yeah, I can't tell you that.  I
15   can't answer that question.  I would -- I mean,
16   they were -- I don't even remember how they were
17   dressed.  I just remember there was another person
18   there.  They were just off to the side.
19   BY MR. HAZINSKI:
20        Q.    Okay.  Was David ever in the room
21   viewing the lineup at the same time as you?
22        A.    No.
23        Q.    Was anybody else ever brought in to the
24   room to view the lineup while you were in there?
```

1      A.    No.  It was just the person that

2  brought me in and the mystery person.

3      Q.    Okay.  Your understanding from talking

4  to David a little later was that he had viewed the

5  same lineup in the same manner as you, right?

6      A.    Yeah.

7      Q.    Are you aware of anybody else who was

8  at the station at that time who was viewing the

9  same lineup?

10     A.    No --

11     MR. BRUEGGEN:  Object to foundation.

12             Go ahead.

13     THE WITNESS:  Not that I noticed.  I didn't

14  notice anyone else other than David and myself.

15  BY MR. HAZINSKI:

16     Q.    Okay.

17     A.    There were people there.  I just -- I

18  don't know what they were there for.

19     Q.    Right, okay.

20             And you said that during that

21  procedure no one suggested to you who -- who to

22  pick out, right?

23     A.    Correct.

24     Q.    Okay.  At that point had you already

 1  told the detectives that you hadn't seen anything?

 2       A.    Oh, yeah.

 3       Q.    Did you tell detectives that more than

 4  once?

 5       A.    Whenever it was asked of me.

 6       Q.    From your point of view, did you have

 7  any understanding of why you were being asked to

 8  look at a lineup?

 9       MR. BRUEGGEN:  Object to form, speculation.

10            Go ahead, sir.

11       THE WITNESS:  I was confused.  I didn't

12  really understand why I was looking at a lineup

13  when I had already told them that I hadn't seen

14  anyone afterwards or before.  But I figured, you

15  know, it's police, they're asking.  You know, maybe

16  however I could help, I could help, so I went along

17  with it.

18  BY MR. HAZINSKI:

19       Q.    Okay.  Did anybody in that lineup look

20  familiar to you in any way?

21       A.    Not really, no.

22       Q.    Okay.  About how long in total would

23  you say you were in that lineup room?

24       A.    3 minutes.

1      Q.     Okay.  And then when you left the
2   lineup room, did the detective who had brought you
3   in there leave with you as well?
4      A.     Yes.
5      Q.     What about the other individual in the
6   room?  Did that person leave with you as well?
7      A.     I have no idea.  I don't recall them
8   leaving or coming with us, or I don't remember
9   seeing them again after that.
10      Q.     Okay.  Do you know between you and
11   David which of the two of you went to look at that
12   lineup first?
13      A.     I can't remember, to be honest with you.
14      Q.     Okay.
15      A.     I want to say David went first, but I
16   just don't remember.
17      Q.     Okay.  When you left the lineup room,
18   did you go back to the desk where you had been
19   sitting before?
20      A.     Yes.
21      Q.     Okay.  And you were there for a few
22   minutes before you left, right?
23      A.     Right.  They -- they told us that they
24   were going to take us back, and that's when I saw

1   David.

2        Q.    Okay.  And at that point you had a

3   little opportunity to talk to David, right?

4        A.    Not really.  It was like another couple

5   minutes, and then we were -- went back to his -- to

6   the car and then they drove us home.

7        Q.    How long in total would you estimate

8   you were at the police station?

9        A.    20 minutes, half an hour, if that.

10       Q.    Okay.

11       A.    It wasn't very long.  And it didn't

12  seem like it was that long.

13       Q.    Okay.  And after you left the lineup --

14  the lineup room, did you have any more

15  conversations with the person who identified

16  himself as an assistant district attorney?

17       A.    No.

18       Q.    Okay.  And who drove you home from the

19  station?

20       A.    The same two officers that brought us

21  there, or the detectives.

22       Q.    Okay.  And one of those officers was

23  the same person who had escorted you into that

24  lineup room, right?

1        A.    Yeah.

2        Q.    Okay.  Have you ever heard of a former

3   Chicago police detective named Reynaldo Guevara?

4        A.    No.

5        Q.    Okay.  Do you ever remember ever

6   reading any news coverage about him?

7        A.    No, I can't say I have.

8        Q.    Okay.  Do you have any understanding of

9   what the -- of what the claims or the allegations

10  in this lawsuit are?

11       A.    Not really.  It's kind of confusing.

12       MR. HAZINSKI:  Okay.  Let me just make -- let

13  me check and make sure I don't have anything else

14  for you right now.

15       THE WITNESS:  Okay.

16       MR. HAZINSKI:  That's all I have for you at

17  this time, Mr. Miranda.

18       THE WITNESS:  Okay.  Thank you.

19                    FURTHER EXAMINATION

20  BY MR. BRUEGGEN:

21       Q.    Mr. Miranda, I just have a couple quick

22  questions in follow-up.

23                    Earlier, Mr. Hazinski was just

24  questioning you, asked you some questions about if

 1  you recalled telling police officers certain

 2  information?  Do you recall those questions?

 3      A.    Yes.

 4      Q.    Do you recall all the information you

 5  provided to either the uniformed police officers or

 6  the detectives?

 7      A.    All of the information?

 8      Q.    Yes.

 9      A.    Like I pretty much didn't see anything

10  and about the -- the gunshots.  That was about it.

11      Q.    But what I'm asking you is:  Do you

12  recall each piece of information you provided them

13  25, 30 years ago?

14      A.    Oh, I don't -- I don't think so.  Like

15  faces and things like that and the people, I don't

16  remember, so I pretty much just went off of memory

17  what I remember now.

18      Q.    So -- and earlier I think in my

19  questioning, you had said -- or maybe it was in

20  Mr. Hazinski's questioning, you had said that the

21  police asked you if you had seen anybody that you

22  recognized from seeing in the neighborhood that day.

23      A.    They asked me if -- from what I

24  remember, they asked me if I -- look at the

1  pictures to see if I saw anyone that might have

2  been hanging out in the area previous to or

3  afterwards.

4        Q.    So based on that, it was your

5  understanding that the police weren't asking if you

6  saw the shooter, but rather whether you had seen

7  anybody in the neighborhood.

8        A.    Right.  At first they asked me if I saw

9  what had happened, and I told them no.  And then

10  that's when the rest came about, yeah.

11       Q.    Okay.  And do you have any recollection

12  of whether you told the police that you had seen

13  other gang members hanging out in the area earlier

14  that day?

15       A.    That's a hard question to answer

16  because they were always there.  They lived

17  literally in the one building over.  The -- so it's

18  like I don't remember it being a thing where I

19  said, Oh, the gang-bangers, this certain person was

20  there, but they were always in the neighborhood.

21       Q.    So it's possible you said that you saw

22  gang-bangers earlier that day before the shooting.

23  You just don't recall one way or another?

24       MR. HAZINSKI:  Objection --

```
 1          THE WITNESS:  Correct.

 2          MR. HAZINSKI:  -- mischaracterizes testimony.

 3   BY MR. BRUEGGEN:

 4          Q.    I'm sorry.  I didn't hear.  What'd you

 5   say?  What was your answer, sir?

 6          A.    Correct.

 7          MR. BRUEGGEN:  Those are all the questions I

 8   have.  Anybody else?

 9          MR. HAZINSKI:  I have a little --

10          MR. RAHE:  I have some.

11          MR. HAZINSKI:  Oh, go ahead, Austin.

12                     FURTHER EXAMINATION

13   BY MR. RAHE:

14          Q.    Mr. Miranda, do you know if any

15   witnesses or potential witnesses viewed a lineup,

16   the same lineup at the police station after you,

17   other than maybe David Chmieleski?

18          A.    No.  Like I said, when we left the

19   police station that day, that was the last I've

20   ever heard of it until previously -- or until

21   recently.

22          Q.    While -- while you were at the police

23   station for the lineup, were you checking the time

24   or anything like that?
```

```
 1        A.    No.

 2        Q.    So now here we are 28 years later, and

 3   you're just kind of giving your best guess at how

 4   long you think you were at the police station

 5   28 years ago, right?

 6                        (Interruption.)

 7        THE WITNESS:  Yes.  Right.  Like I said, I

 8   knew it was late at night, and we got back --

 9                        (Interruption.)

10        THE WITNESS:  -- around midnight.  If it was

11   after that, I mean, give or take an hour or half an

12   hour.  Spot on what time exactly it was, no, I just

13   knew it was late at night.  Probably due to the

14   fact that my mom was upset.

15        MR. RAHE:  Got you.  All right.  That's all

16   the questions I have.  Thank you very much.

17                   FURTHER EXAMINATION

18   BY MR. HAZINSKI:

19        Q.    I just have a couple quick questions to

20   follow up on what Mr. Brueggen asked you a second

21   ago.

22              So earlier you testified to your

23   memory of what you had been doing before the

24   shooting and what you did when you heard the
```

1  gunshots, right?

2         A.    Right.

3         Q.    And that's information you relayed to

4  the police, right?

5         A.    Yeah.

6         Q.    Did you ever tell police that you had

7  been out and about earlier in the day?

8         A.    No.

9         Q.    Because you hadn't been out and about

10 earlier --

11        A.    Because I hadn't been out, right.

12        Q.    You hadn't been outside and had the

13 opportunity to see people hanging out on a street

14 corner a few hours before the shooting, for

15 example, right?

16        A.    Not that street corner.  Like I said,

17 the only view from my house is the alley across the

18 street usually where they congregated.

19        Q.    So you didn't have a chance to be

20 outside to see a group of people hanging --

21        A.    (Nodding.)

22        Q.    -- outside the boys club, for instance?

23        A.    Not at all.

24        Q.    Okay.  And you wouldn't have told that

1   to the police if it wasn't true, right?

2       A.    Well, correct.

3       MR. HAZINSKI:  Okay.  I have nothing more for

4   you.

5       MR. BRUEGGEN:  Anybody else?

6               I have nothing else for you,

7   Mr. Miranda, but there is one thing we need to talk

8   to you about.

9               As I mentioned earlier, the court

10  reporter is typing everything up.  So you have the

11  right to review once this is typed up.  You can

12  coordinate with the court reporter to go review the

13  transcript and make sure everything was taken down

14  correctly.  You can't change your answers from a

15  yes to a no, but you can correct either

16  mistranscriptions if she misheard you or spellings,

17  and you can reserve signature.

18              The other option you have is you can

19  waive signature and trust the court reporter took

20  down everything correctly, and then it'd be over.

21              But the choice is yours whether you

22  want to reserve signature and then coordinate with

23  the court reporter to review the transcript to make

24  sure it's correct or whether you'd like to waive

 1   signature.

 2          THE WITNESS:  I waive signature.

 3          MR. BRUEGGEN:  Okay.  Let the record reflect

 4   signature waived.

 5          THE VIDEO TECHNICIAN:  This is the end of

 6   media unit 1.  This concludes the deposition of

 7   Efrain Miranda.  The video will be retained by

 8   Urlaub Bowen & Associates.  We are going off the

 9   record.  The time is 11:55 a.m.

10                          (The proceedings adjourned at

11                           11:55 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                      REPORTER'S CERTIFICATE

3        I, Katie K. Elliott, do hereby certify that
    EFRAIN MIRANDA was duly sworn by me to testify the
4    whole truth, that the foregoing deposition was
    recorded stenographically by me and was reduced to
5    computerized transcript under my direction, and
    that the said deposition constitutes a true record
6    of the testimony given by said witness.

7        I further certify that the reading and
    signing of the deposition was waived by the
8    deponent.

9        I further certify that I am not a relative
    or employee or attorney or counsel of any of the
10   parties, or a relative or employee of such attorney
    or counsel, or financially interested directly or
11   indirectly in this action.

12       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Chicago,
13   Illinois, this 1st day of June 2021.

14

15                  _Katie K. Elliott_

16              Illinois CSR No. 084-004537

17

18

19

20

21

22

23

24

EFRAIN MIRANDA, 04/28/2021

**Exhibits**

**1 Miranda 042821-1** 16:12,13

**2 Miranda 042821-2** 41:1,7

**3 Miranda 042821-3** 47:11,23 48:7

**0**

**000011** 17:3

**00003** 41:8

**002121-2122** 47:16

**06508** 4:14

**1**

**1** 4:1 16:13 101:6

**10** 33:1 87:13,20,22

**10:00** 4:5

**10:58** 56:10

**11** 32:17

**11:00** 81:17 87:15

**11:06** 56:13

**11:30** 32:17 81:17 87:16

**11:55** 101:9,11

**14** 11:20,21

**140** 80:13

**15** 24:14,17

**19** 4:14

**1986** 10:3

**1993** 13:6,13,20 15:21 16:2 21:17
  50:20 59:5 66:9 71:19 82:24

**2**

**2** 41:1,7

**20** 4:19 24:15,17 30:6 78:24 93:9

**2021** 4:4

**2130** 68:7

**2140** 13:7

**2146** 13:8

**2148** 13:8,19 17:16 67:8,24 68:12
  83:19

**25** 95:13

**28** 4:4 98:2,5

**2814** 9:18

**3**

**3** 47:11,23 48:7 91:24

**30** 95:13

**30s** 35:18

**3:50** 21:16

**4**

**4307** 16:6

**46** 9:16

**4:30** 52:23

**5**

**5-minute** 49:12 56:6

**5:30** 52:23

**6**

**600** 4:20

**7**

**7th** 21:17

**8**

**89** 10:12

**8:00** 52:22

**9**

**90** 13:21

**91** 13:21

**93** 13:7 71:19

**A**

**A-N-S-H-E** 10:24

**a.m.** 4:5 56:10,13 101:9,11

**abbreviation** 82:18

**ability** 13:2

**accurate** 60:23

**act** 40:12

**activities** 19:10

**activity** 14:5

**actual** 30:5 74:4

**addition** 18:19 25:23

**additional** 10:14

**address** 9:19 11:24

**adjourned** 101:10

**administer** 4:8

**affidavits** 44:24 45:3

**affiliated** 15:8,11

**afternoon** 22:1 66:19

**agree** 5:5

**agreed** 32:4

**agreeing** 5:15

**agreement** 4:7 5:1,8,10,12

**ahead** 59:13 62:20 68:6 70:18 83:8
  89:13 90:12 91:10 97:11

**air** 27:4

**album** 77:12

**albums** 27:12

**allegations** 94:9

**alley** 13:18 19:1 23:1,5 70:4 72:7
  75:7 99:17

**Anshe** 10:22

**answers** 6:16 7:5 45:22 100:14

**anticipate** 7:9

**apartment** 13:10,11,17 14:2,6
  17:13,15,19 20:23 21:2 23:14 25:9
  30:4,24 33:7,23 66:14 68:2,8 69:24
  76:7,11 77:23 78:18 79:13,14

**apartments** 14:3 21:23 29:4 33:13
  50:12 69:2,4

EFRAIN MIRANDA, 04/28/2021

**apologize** 20:2

**appears** 8:14

**April** 4:4

**area** 12:3 14:5,10,11,13,15,20,21 15:6 18:16 19:4 20:16,23 21:4,10 29:21 34:23 36:10 80:16 82:10 84:1 85:13,17 96:2,13

**areas** 15:13 46:11

**Arnell** 51:2

**arrive** 24:4

**arrived** 24:7,18 26:16 33:6 37:5 73:11

**assistant** 35:4,7,16 36:20,21 42:6 86:19,22 89:2 93:16

**Associates** 4:19,22 101:8

**assume** 7:24

**attention** 61:8

**attorney** 8:3 35:4,7,16,17 36:21 38:6 42:6,24 43:9 45:8 53:18,19 54:13,14,15 56:17 57:10,24 64:14 82:16 86:19,22 89:2 93:16

**attorneys** 7:17 8:3 42:16 49:22 55:24 57:22

**audio** 7:18

**Austin** 5:7 56:16 97:11

**authority** 64:19

**Avenue** 16:6 83:22

**aware** 15:7 90:7

---

**B**

**back** 13:16 14:7 15:12 16:2,10 17:24 26:3 29:23 39:8 44:6,9,12 45:2 55:19 56:12 59:4 60:19 63:12 66:8 67:4 71:18,19 72:4 82:3,24 86:2 92:18,24 93:5 98:8

**baggy** 80:8

**based** 15:3 19:22 55:15 66:2 72:16 88:1 96:4

**basement** 75:11

**basically** 26:20 45:20 60:9 71:1 72:22 75:4

**basis** 16:2

**bathroom** 56:6

**bear** 47:10

**bedroom** 75:17

**behalf** 4:11,12 5:9,12,14 65:6

**bell** 50:23

**Bernice** 50:10,11,14,17

**bicycle** 12:6

**big** 47:20 72:18 79:10

**bigger** 47:1

**binder** 27:23

**binders** 27:15,16,19 79:10 85:4,8

**bit** 21:13 56:20 68:9 70:18 79:1

**black** 15:19 74:14 79:19 80:8

**block** 52:14,20 71:19

**blocked** 52:12

**blocking** 72:10

**blocks** 14:16,17

**blond** 35:19

**book** 27:7,24 28:4 79:8

**bookmark** 29:3

**books** 27:8,11 76:7,15,22 78:3,7, 12 79:4,7,16 80:20

**boss** 64:22

**Bowen** 4:19,22 101:8

**boys** 19:3,7,9,14 23:23 72:7 99:22

**break** 7:10,13 56:6

**breaking** 12:9 20:14

**breaks** 7:19

**bricks** 12:9

**bring** 37:14 38:19

**broad** 21:24

**brought** 37:12,17 38:16 39:8 49:6 53:14 58:19 83:6,21 84:16 88:6,12 89:23 90:2 92:2 93:20

**brown** 35:19

**Brueggen** 5:3,4 6:2 15:5,20 16:20, 22 19:20 20:3,4,21 21:8,14 38:1 48:2 55:23 58:5,8 59:12 62:19 68:16,19 71:23 73:3 82:16 89:12 90:11 91:9 94:20 97:3,7 98:20 100:5 101:3

**build** 16:4,7

**building** 13:11,16 14:6 16:11 17:13,15 18:8,19,21 19:1,6 21:16 24:24 67:7 68:2,8 69:4 70:9,14,20 72:6 75:21 96:17

**bullet** 75:10

**Bullocks** 50:10,11

**bunch** 12:10 19:11 56:21

**buzzed** 33:23

**buzzer** 33:10

---

**C**

**call** 6:7 24:2 32:3,4,19,23 33:2,8 52:17 53:18 61:12 62:2,12 83:7

**called** 5:21 14:12 31:4,14 43:16,17 44:6,9 52:2 54:4,7 56:21 81:13 82:13 83:12 84:2

**calling** 52:24 61:3,21

**calls** 42:22 43:5 44:5 52:16 61:22 62:16

**capacity** 45:11

**car** 20:15 23:11 32:14 33:4,24 34:4,10,13,16 81:14 84:13 93:6

**card** 28:21,23 80:23

**carefully** 38:21

**cars** 20:14

**case** 4:13 5:5 8:11 42:17 43:2,10 58:1 65:12,15

**catch** 62:10

**catty-corner** 19:5

**CCSAO** 17:2 41:8

**cell** 47:18

**central** 34:17,19,21 82:10

**certified** 4:8,18

**chance** 99:19

**change** 53:5 61:19 100:14

**changing** 62:6

**check** 94:13

**checked** 60:9

**checking** 97:23

**Chicago** 4:20 5:8 56:17 94:3

**child** 50:15

EFRAIN MIRANDA, 04/28/2021

**children** 50:14 80:16

**Chmieleski** 8:19 9:4,22 10:2 34:5 43:23 48:14 69:9 97:17

**choice** 100:21

**choose** 40:9 46:14

**chose** 46:13

**Christie** 5:11

**church** 16:4,5,8 67:5

**City** 5:8 12:1 56:17

**claims** 94:9

**clarifying** 70:5

**Clark** 4:19

**clean** 6:20

**clear** 57:16

**close** 85:21

**closest** 13:17

**club** 19:4,7,9,14 23:23 72:8 99:22

**clue** 78:14

**Cobras** 14:23

**colors** 15:8,11,13,14,16

**concludes** 101:6

**conditions** 13:2

**confused** 91:11

**confusing** 55:11 94:11

**congregated** 99:18

**connection** 73:23

**consequences** 65:22

**construct** 16:4

**contact** 28:22 29:7 53:23 60:2 61:4,10

**contacted** 29:19 42:13,15 43:2

**contacts** 61:14

**continues** 23:6

**controlled** 14:15

**conversation** 7:2 29:24 30:1,5 36:16 49:13 58:11,19,23 59:2 64:7 68:22 70:23 71:3 77:24 86:24

**conversations** 57:21 63:21 86:2 93:15

**convicted** 12:22

**cool** 9:8

**coordinate** 100:12,22

**copy** 59:21 60:6

**Cordo** 50:5

**corner** 18:21 72:8 77:20 99:14,16

**corners** 19:17,22 20:10

**Coronell** 51:15

**correct** 37:3 42:18 43:11 60:11 62:14 70:22 77:21 83:20 86:4 90:23 97:1,6 100:2,15,24

**correctly** 31:15 77:6 100:14,20

**Counsel** 4:23

**couple** 6:13 14:16,17 27:7 56:18 93:4 94:21 98:19

**courses** 10:15

**court** 4:7,15,20 5:17 6:11,14,24 11:15 100:9,12,19,23

**coverage** 94:6

**covered** 57:15

**COVID** 53:3

**crime** 11:11,13 12:22

**crimes** 29:22

**criminal** 42:17

**criminals** 28:9 78:8

**Cruz** 51:20

**cut** 72:19

**CV** 4:14

**D**

**Daniel** 51:6

**dark** 37:11 38:12 88:22

**date** 21:18

**Dave** 5:3

**David** 8:19 9:22 10:1 33:3 34:5,9, 24 36:13 39:9,11,17 42:9 43:23 44:1 48:14,17,24 50:13 58:11 59:24 60:2,14 61:9 69:9 83:18 84:5,13,17 85:7 87:5 89:20 90:4,14 92:11,15 93:1,3 97:17

**day** 14:7 23:15,22 24:21 25:23 26:9 27:3 29:17 32:15,18,22 37:16 38:22 39:2 44:8 45:17 46:5,22 53:8

67:3 77:3,4,9 79:20,23 80:5,9,17 81:21,24 82:4 95:22 96:14,22 97:19 99:7

**day-to-day** 16:2

**daylight** 22:1

**daytime** 81:10

**deal** 62:17,22

**declaration** 46:19 48:15,18,22 49:16 57:2 58:18,23 59:10 65:19, 23 66:2

**defendant** 4:11,12 5:4,8,10 82:17

**defendants** 5:12 58:1

**delete** 52:6

**depends** 14:21

**deposition** 4:3,6,10 5:2,5 6:11 8:18,21 9:1 57:21 58:11 101:6

**depositions** 4:9

**Derek** 4:17

**desk** 35:1 36:19 39:8 84:19 92:18

**desks** 34:24 36:12 84:17 85:17

**detail** 43:3

**detective** 26:9,11 31:13 37:12,13, 17,18 38:9,10,11,16 39:4 40:4,8,21 43:1 45:12 86:8 88:10,12 92:2 94:3

**detective's** 31:9

**detectives** 26:4,6,16,18,24 27:5 28:2,15 29:6,11,20 30:4,10,16,23 31:4 35:13 36:3,5,9 37:1 39:23 40:11 46:16 55:16 71:16 73:8,13, 17 74:2,8 75:3 76:6 77:22 78:17, 19,23 79:18 80:4,7,11,15,19 81:8 83:14 86:5 91:1,3 93:21 95:6

**direct** 17:4 28:3

**directing** 18:4

**direction** 14:22 67:21

**dis** 35:7

**Disciples** 14:12 15:1 82:14

**discussion** 30:3

**district** 4:14,15 35:4,7,16 36:20 86:18,19 89:2 93:16

**Division** 4:16

**document** 16:23 45:16,18 47:6,7 48:11 53:14 60:22

EFRAIN MIRANDA, 04/28/2021

**documents** 8:10

**door** 18:10,11,12 25:7 33:9,10 69:18

**doors** 25:4

**downstairs** 60:1

**dressed** 38:7 89:17

**drive** 87:18

**driven** 36:10 37:19

**driving** 23:11

**drove** 33:4 34:17 39:10 42:9 93:6, 18

**drugs** 20:5

**due** 53:3 98:13

**duly** 5:21

---

**E**

**E-M-E-T** 10:24

**earlier** 18:24 51:24 67:3 79:20,23 80:5,9,17 84:9 94:23 95:18 96:13, 22 98:22 99:7,10 100:9

**easier** 17:6

**east** 15:1 67:11 75:15,16

**Eastern** 4:16

**easy** 68:21

**educational** 10:14

**Efrain** 4:3 5:20 6:6 101:7

**elderly** 70:11

**Elliott** 4:21

**emails** 42:21

**Emet** 10:22

**employed** 10:19,21 15:21

**end** 42:23 43:18 46:23 49:17 86:3 101:5

**ended** 56:22 61:5

**English** 75:1

**entire** 27:24 63:15

**entrance** 69:15,18,23 70:1

**entryway** 18:8

**errands** 67:2

**escorted** 37:10 93:23

**estimate** 75:23 87:10 93:7

**et al** 4:13

**evening** 81:16 87:16 88:3

**events** 37:4 66:10

**Eventually** 25:6

**exact** 11:24 21:18 35:10 65:13

**EXAMINATION** 6:1 56:14 57:7 94:19 97:12 98:17

**examined** 5:22

**exchange** 65:18

**exhibit** 16:12,19 41:1,7 47:10,11, 12,16,23 48:7

**existed** 71:18

**explain** 44:10 76:21

**explained** 43:2 52:15 55:9,12 63:3 86:12

**exterior** 72:24

**eye** 85:22

**eyes** 22:4

---

**F**

**face** 23:2 75:16

**faced** 22:24 23:1 69:14

**faces** 95:15

**facing** 75:15

**fact** 8:24 9:2 98:14

**fair** 7:8 62:15 63:10 66:1,18 87:24

**familiar** 50:1,4 53:12 91:20

**fast** 42:3

**feel** 29:13 39:23 40:22 57:2 60:22 63:16

**fighting** 21:13

**figured** 61:11 64:4 91:14

**filed** 4:14 12:17

**final** 60:6

**finally** 8:2

**find** 62:23

**fine** 6:9 31:21 40:13 44:18 56:7 57:18

**finish** 7:4,5

**fired** 22:2,6

**five-eleven** 35:23

**five-foot-four** 80:12

**fixed** 60:6

**flashing** 20:23

**floor** 13:12,15 17:19,20 50:12 67:7 68:13 69:2,4,5,10,11 70:1,8,11,13, 15

**floors** 69:6

**fluently** 74:20

**focusing** 46:3

**folks** 70:8

**follow** 6:18 98:20

**follow-up** 57:13 94:22

**forgot** 54:18

**form** 15:4,18 19:15 20:20 37:22 62:19 89:12 91:9

**formal** 10:14

**foundation** 59:12 90:11

**Frank** 50:23

**front** 12:11 20:12 72:19

**full** 6:4 85:4

**Fullerton** 12:2

**fully** 53:4

**fun** 19:12

---

**G**

**gang** 14:5,8,18 15:15 19:13,23 20:9,17,22,23 21:3 78:20 82:10,24 96:13

**gang-bangers** 12:11 22:19 96:19, 22

**gangs** 14:10,19 15:7,8,11 20:18 23:20 78:13

**Gangster** 14:12 82:14

**garage** 75:11

**gave** 76:7 79:4 80:23 83:7

**GED** 10:9,11,13

**geez** 11:22 13:8 52:5 65:13

EFRAIN MIRANDA, 04/28/2021

**general** 11:24 14:20 18:16 20:23 21:10 72:16

**generally** 12:24 77:15

**gentleman** 35:19 36:20 44:23 45:5,7 46:1 48:20,23 53:10,13 65:3 86:9 87:1

**Geraldo** 5:15 51:17 57:11

**girl** 51:20,22

**give** 7:12 49:11 61:12 65:17 75:22 78:4 98:11

**giving** 78:2 98:3

**glare** 9:11

**glass** 12:8 38:24 40:2 41:18

**Gonzalez** 51:12

**good** 5:3,11,13 6:3 44:8 89:9

**graduate** 10:7

**Grammar** 10:3

**Grand** 16:6 34:17,19,21 83:22

**great** 9:14 56:8 66:7

**ground** 12:10 57:14

**group** 54:23 55:2 65:6 99:20

**growing** 15:6

**guess** 45:23 53:23 55:12 59:18 60:5 61:8 64:20 84:20 98:3

**Guevara** 4:13 5:10 94:3

**gunshots** 22:11,13,16 66:14,15 71:9 75:5,14 95:10 99:1

**guy** 61:2,12 77:19

**guys** 34:15,21 36:13,15 43:1

                    H

**H-A-Z-I-N-S-K-I** 5:14

**hair** 35:20

**half** 24:12 30:6 76:5 78:24 93:9 98:11

**handed** 28:4

**hang** 83:1

**hanging** 19:11,13,21 20:9,13 77:3 96:2,13 99:13,20

**happen** 37:4,14 38:18 86:12

**happened** 12:7,16 19:10 20:14 21:15 30:14 32:22,24 34:15,22 39:7,19 42:3,13,19 44:12 46:21 58:12 60:3 79:12 81:16,21 88:2 96:9

**happening** 36:19 82:4

**harassed** 15:15

**hard** 19:17 82:3 96:15

**harder** 72:13

**hassled** 23:21

**Hazinski** 5:13,14 15:2,18 19:15 20:1,20 21:5,11 37:20,22 57:8,10 58:7,9 59:19 63:1 68:18,20 72:1 73:5 89:19 90:15 91:18 94:12,16, 23 96:24 97:2,9,11 98:18 100:3

**Hazinski's** 95:20

**head** 6:18 9:12 76:4

**headed** 67:20

**hear** 7:18 8:2 9:13 22:10,14 25:4 26:22 71:6 97:4

**heard** 22:6,10,16 24:1 46:6 66:14, 15 71:9 75:13 94:2 97:20 98:24

**hearing** 9:9 75:5

**heavyset** 35:24

**height** 80:13

**helping** 16:4

**hide** 64:2,6

**high** 10:4,6

**hit** 12:10

**holding** 8:14

**holes** 75:10

**home** 12:15 39:10 42:10 73:10,13, 14,15 87:15 93:6,18

**honest** 92:13

**hoodie** 80:8

**hot** 27:3

**hour** 24:12 26:17 30:6 78:24 93:9 98:11,12

**hours** 52:21 53:1,4 66:23 99:14

**house** 13:10 20:12 61:9 67:5 83:17 99:17

**huge** 68:8

**Hugo** 51:9

**hung** 19:18

                    I

**idea** 78:11 92:7

**identified** 93:15

**identify** 4:23 17:11 28:12,16 39:24 76:14

**Iglesias** 4:12 5:15 17:3 41:8 47:16 51:18 57:11

**IGS** 14:20 15:16 79:23 82:18

**Illinois** 4:9,15,20

**imagine** 72:15

**impact** 13:2

**inches** 80:12

**incident** 12:13 44:11 59:4 73:24 77:16

**include** 30:7

**inconvenient** 62:3

**indicating** 8:12

**individual** 5:12 92:5

**infor** 45:1

**information** 29:7 45:2,5,14 59:3,9 63:6 71:5 95:2,4,7,12 99:3

**informed** 43:19

**initial** 59:17,22

**initialing** 59:21

**initially** 85:12

**inquiry** 46:12

**Insane** 14:12 82:14

**inside** 18:13 49:14 85:15

**instance** 77:18 99:22

**intentionally** 64:6

**interacted** 40:11

**interaction** 30:23

**interactions** 46:16 55:15,18,19

**interim** 73:16

**internet** 7:19

**interpose** 15:2

Index: interruption-mid

EFRAIN MIRANDA, 04/28/2021

**interruption** 47:24 98:6,9

**introduced** 35:12 86:10 89:1

**investigating** 43:9

**investigator** 43:24 44:6 45:8 49:3,9 52:1,24 56:21 58:18 59:8 63:22 64:9

**investigator's** 52:9

**invite** 25:9

**involvement** 49:17

**involving** 65:8

**ipad** 47:19,20

**irritated** 61:14

**issue** 60:21

**J**

**jacket** 79:20

**Jesus** 51:12

**John** 5:13 20:3 57:9 58:8 68:19

**Jose** 51:14

**jump** 16:11 66:8 70:18

**June** 13:5,13,20 21:17 50:18 71:19 72:12

**K**

**Karl** 10:6

**Katie** 4:21

**kids** 19:11

**Kimball** 12:2

**kind** 15:9,10 16:1 18:1 38:12 48:20 57:4 64:22 66:8,9 82:10 86:17 94:11 98:3

**Kings** 14:24

**knew** 53:6 63:11 77:15 83:4 88:22 98:8,13

**knock** 25:6

**knocking** 25:4

**knowing** 15:6

**knowledge** 72:16

**Kyle** 5:11

**L**

**lapse** 68:21

**large** 27:19

**late** 81:19 98:8,13

**lawsuit** 12:17 56:18 57:11 94:10

**lead** 46:24

**leave** 57:3 85:11 92:3,6

**leaves** 72:13

**leaving** 53:10 73:17 92:8

**left** 18:1 26:1 28:21,22,24 49:13 52:2 77:11 78:23 80:21 81:5 92:1,17,22 93:13 97:18

**legal** 4:18

**Letellier** 4:17

**letting** 33:2

**levels** 18:14

**licenses** 10:17

**lightning** 72:20

**likewise** 7:4

**limited** 72:23

**lines** 54:22 77:7

**lineup** 35:15 36:4 37:2,6,9 39:11,18,20,22 40:7 41:19 42:5,8,17 46:9,12 84:23 86:7,13 87:3,12,22,24 88:7 89:6,9,21,24 90:5,9 91:8,12,19,23 92:2,12,17 93:13,14,24 97:15,16,23

**listening** 21:24 27:2 43:7 66:20

**literally** 96:17

**live** 9:21

**lived** 9:19 13:5,19 17:13 50:12 67:22 69:3,5,9,16 70:8,15,21 96:16

**living** 11:21 13:24 69:9 70:10 75:20

**located** 16:5 34:18

**location** 12:1

**Logan** 12:2 13:24 21:2

**long** 7:10 9:19 10:1 11:6 13:19 24:6,10 26:13,15 29:24 30:4 45:14 49:5 55:4 61:5 64:5 71:3,15 74:9 75:23 82:5 87:10,18 91:22 93:7,11,

12 98:4

**looked** 22:18,23 23:3 26:12 27:17 28:10 35:17 38:11 71:10 74:8 75:23 76:3,4 77:11 78:9 80:20 88:20

**lot** 7:16 20:15 21:9 23:20 44:7 62:6

**loud** 6:17 20:13

**louder** 9:10

**M**

**made** 24:24 25:2 40:22 59:16 66:5 72:13

**main** 18:11,12 69:22,23

**maintenance** 11:5

**make** 6:16 60:9 61:17 65:16,21 66:9 94:12,13 100:13,23

**manner** 90:5

**March** 11:8,9

**mark** 16:12 41:1

**marked** 41:7

**matter** 4:12

**Mcgrath** 5:9

**meaning** 74:16,17,18 77:14

**media** 4:1 101:6

**medications** 13:1

**meeting** 56:22

**Megan** 5:9

**member** 14:8

**members** 19:13,23 20:9,17,22 78:12 79:23 82:24 96:13

**memory** 67:1 70:17 88:1,19 95:16 98:23

**mentally** 50:15

**mention** 33:14

**mentioned** 18:24 35:3 49:2 58:10 60:13 82:9 100:9

**Mercy** 50:5

**mess** 68:22

**met** 39:9 44:20 45:4,13 53:14 54:3

**mid** 35:18

EFRAIN MIRANDA, 04/28/2021

**middle** 69:11,12,15,21

**midnight** 88:2 98:10

**mind** 56:5 82:4

**minute** 76:5

**minutes** 24:15,16,17 30:2,6 33:1 39:9 42:11 71:4 78:24 87:13,20,22 91:24 92:22 93:5,9

**Miran** 51:22

**Miranda** 4:3 5:20 6:3,6,8,10 8:7 9:9 10:4 11:10 12:24 14:4 16:14,23 17:4 40:24 41:6,17 47:9,12 54:1 55:23 56:4,16 57:9 94:17,21 97:14 100:7 101:7

**mischaracterizes** 97:2

**misconduct** 65:8

**misheard** 100:16

**misstates** 21:5

**mistakes** 59:16

**mistranscriptions** 100:16

**mom** 67:23 73:10,22 79:15 98:14

**mom's** 73:19

**Monica** 50:7

**month** 9:20 49:6 57:22

**months** 42:14,19 52:2

**Moore** 51:2

**morning** 5:3,11,13 6:3 52:23 53:6

**mother** 13:14 26:2 30:12,16,18 32:1 34:2

**moved** 13:22 14:2 67:24

**mugshots** 28:10 78:9

**multiple** 27:12,15 52:2

**music** 21:24 27:2 66:20

**mystery** 89:8,12 90:2

## N

**named** 51:4,6,12,14,17,20,22 94:3

**names** 25:14 26:5 50:1

**nearby** 67:23 85:21

**needed** 8:15 29:14

**neighbor** 50:11

**neighbor's** 67:20

**neighborhood** 16:10 20:6 77:4 95:22 96:7,20

**neutral** 15:14

**Newcastle** 9:18

**news** 94:6

**nice** 9:7 49:12

**night** 29:18 32:17 39:12,18 52:23 53:5 98:8,13

**nighttime** 81:6

**nod** 6:18

**Nodding** 99:21

**noes** 6:17

**normal** 7:2 52:21

**north** 4:19 9:18 13:19 14:23 17:15, 16 67:8,15,24 69:10 70:1 83:19

**Northern** 4:15

**notes** 77:23

**notice** 60:15 90:14

**noticed** 90:13

**number** 4:13 29:8 42:23 43:5 52:9, 13,14,20 61:19,20,23 62:17 71:21

## O

**oath** 4:8

**Object** 20:20 59:12 62:19 89:12 90:11 91:9

**objection** 8:4,5 15:3,18 19:15 21:5,11 37:20 96:24

**objections** 8:3

**objects** 8:4

**obnoxious** 20:13

**obstruct** 72:4

**obtain** 10:9,11

**obtaining** 10:13

**occasion** 45:4

**occurred** 12:14 21:10 23:9 55:7 66:22

**Ochoa** 51:4

**office** 45:11

**officer** 38:6,8 40:4,8,21 55:13,14, 17 89:11

**officers** 5:4 24:23 25:6,15 26:16 29:24 30:11 31:1 33:18,20 34:12 37:1 55:16 65:9 70:20,24 73:8,12, 16 82:17 84:4,12 93:20,22 95:1,5

**offices** 4:19

**opened** 28:4

**opening** 53:4

**opportunity** 93:3 99:13

**opposite** 67:21

**option** 100:18

**order** 57:3

**ordinary** 26:22 68:21

**organization** 54:18,19,21 65:1,5

**original** 29:20 31:4

**Oscar** 53:11,15,17,20 61:4 64:8,9 65:3

## P

**p.m.** 21:16 52:23

**pad** 71:5

**paid** 16:7 61:8

**Palmer** 14:6 18:20,22 19:4 21:4,10 23:5 50:12 69:14 82:11

**pants** 80:5,8

**paper** 48:9

**paralegal** 54:13

**part** 59:23 60:24 61:1 72:5

**participate** 35:15

**participating** 47:17 49:20

**parties** 4:7,24

**parts** 59:15

**past** 11:8 23:23

**patience** 56:2

**pending** 7:12

**people** 18:4 19:21 20:17 22:20 23:7 33:6 37:15 38:19,23 40:3 41:18 50:1 70:21 78:7,12 83:2 84:11 88:13 90:17 95:15 99:13,20

**period** 16:3 77:13 87:2

EFRAIN MIRANDA, 04/28/2021

**person** 35:11 37:11 38:2,13 40:9 43:14,15,16,18 44:20,21 45:13,15, 19 47:7 48:12 53:20,21,22,24 54:3, 5,7,11 55:3 63:6 64:8,13,24 70:10 86:16 88:10,14,15,16,20 89:1,5,8, 10,17 90:1,2 92:6 93:15,23 96:19

**person's** 43:12

**personally** 82:23

**phone** 29:8 43:15,16 44:5 47:18, 24 52:9,16,19 53:23,24 54:4,12 58:23 62:9 64:10,13,24

**phonetic** 51:22

**photo** 17:5,8,12 18:3 27:12 41:15 77:12 78:2,3,7 79:4,7,8,16 80:20

**photographs** 85:1

**photos** 17:5 28:7,13 30:8 31:17 41:9 76:7 85:5,8

**pick** 29:21 32:12,14 33:16 61:22, 23 81:6 84:5 90:22

**picked** 81:3 83:6,9,18 87:15 88:13

**picture** 16:15 18:1 76:15

**pictures** 27:10,14,15 77:12 78:12 96:1

**piece** 95:12

**pink** 80:4

**place** 81:9

**plainclothes** 25:18 33:17,19,20 34:12 37:1

**plaintiff** 5:15 57:11

**point** 32:2 61:13 73:15 74:22 76:17 80:23 84:14,21 90:24 91:6 93:2

**police** 12:14,16 24:2,4,7,18,22 25:15,23 29:16 32:8 33:5,6,16 34:18 37:5,19 38:5,7 40:3,8,21 42:9,16 46:16 54:23 55:2,16 65:8 74:22 83:21 89:11 91:15 93:8 94:3 95:1,5,21 96:5,12 97:16,19,22 98:4 99:4,6 100:1

**porch** 70:3

**pose** 7:5

**possibly** 79:8

**potential** 38:11 97:15

**pounds** 80:13

**preparation** 57:20

**prepared** 60:23

**present** 64:9

**pressure** 29:13 39:23

**pretty** 67:18 69:22 70:14 71:8 72:23 81:20 95:9,16

**previous** 57:15 96:2

**previously** 33:21 36:5 83:16,17 97:20

**prior** 8:18 13:23 21:2 23:14 86:9

**prison** 55:10

**private** 11:1,4 43:1

**problem** 7:19 31:8 33:15 36:2 39:16 63:8

**problems** 29:12

**procedure** 88:1 89:6 90:21

**proceed** 5:16 56:13

**proceedings** 101:10

**process** 60:8 63:17

**professional** 10:17

**professionally** 40:12

**profiles** 37:15 38:20

**promise** 65:17

**promises** 65:17 66:3,5

**prosecutor** 35:8 42:6 86:17

**provide** 29:7 63:6

**provided** 45:5,14 59:3 95:5,12

**pulled** 33:3

**purpose** 54:20

**put** 41:1 55:10 58:24 59:10

### Q

**question** 7:6,12,18,20,23 15:3 24:12 89:15 96:15

**questioning** 57:15 94:24 95:19,20

**questions** 7:4,16 9:5 16:16 25:11 26:20 27:6 45:1,21 46:1 49:21,22 55:24 56:1,5,18 57:5,13 71:16 82:18,21 94:22,24 95:2 97:7 98:16, 19

**quick** 56:6 94:21 98:19

### R

**R-A-H-E** 5:7

**Rahe** 5:7 56:4,8,15,17 57:5 97:10, 13 98:15

**rarely** 50:21

**reach** 58:1

**reached** 52:1

**read** 8:13 60:12

**reading** 94:6

**ready** 85:11

**real** 68:21

**realized** 49:16

**rear** 69:16,22

**reason** 7:11,13 59:24 64:1 75:8

**recall** 13:5 19:3 21:15,21 24:8 25:14 26:8,11 27:16,19,21 29:16 30:22 31:9,11 32:15 35:17 38:10 41:17 45:18 46:8,10,11 49:8 53:9, 17 54:10,11 63:9 75:22 84:4 92:7 95:2,4,12 96:23

**recalled** 95:1

**receive** 42:21 52:16

**received** 32:19,23 43:4 47:7

**receiving** 62:16

**recently** 42:17 77:20 97:21

**recess** 56:11

**recognize** 28:6 39:2,5 41:4,14 47:22 48:7 77:13,14,19

**recognized** 37:16 38:22 79:5 95:22

**recollection** 32:18 96:11

**record** 4:2,24 6:5,21 16:19 17:2 41:2,7 45:21 47:16 56:10,13 101:3, 9

**recorded** 4:11 16:19

**red** 15:19 80:4

**referred** 84:1

**referring** 82:21

**reflect** 101:3

**regularly** 52:6

EFRAIN MIRANDA, 04/28/2021

**relate** 75:4

**related** 30:19 78:20

**relating** 32:24 76:18

**relation** 55:17

**relationship** 70:7

**relayed** 99:3

**remember** 11:18,23 13:3 21:18,19
22:8,15 24:8 25:17 26:5 27:22
31:15,18 32:21 35:2,10 36:1,14,16,
19 38:3 40:5 41:24 43:12 44:11,15,
17,22 53:19 54:9 55:8 56:24 59:7,
14,20,22 60:16,20 64:5,15,16 65:4,
5 66:13,16,19 70:10,13 74:7,9,10,
12,13,16,18,21 75:13 76:3,24 77:3,
6 78:1,21 79:9,24 80:2,3,7 81:18,
23 82:4 83:11 84:9,10,11 85:2,3,7
86:10,18,20 88:5,9,21 89:16,17
92:8,13,16 94:5 95:16,17,24 96:18

**remembered** 59:4 63:7

**remembering** 82:3

**remind** 69:1

**remotely** 4:7 5:2,6,16,18

**repairs** 59:18

**repeatedly** 61:3

**rephrase** 7:20

**reporter** 4:8,21 5:17 6:15 7:1
100:10,12,19,23

**represent** 5:1,4 20:18 57:10

**representing** 4:18 54:16

**reserve** 100:17,22

**reside** 9:17 13:13

**responding** 25:21

**rest** 70:14 96:10

**retained** 101:7

**retarded** 50:16

**return** 45:15

**returned** 48:23

**review** 66:3 100:11,12,23

**reviewing** 39:22

**Reynaldo** 94:3

**riding** 12:6

**ring** 33:13 50:23

**Rodriguez** 51:10

**Roman** 50:7

**room** 8:8 9:11 37:10,11 38:2 75:20
85:13 88:6,10,13,14 89:5,9,20,24
91:23 92:2,6,17 93:14,24

**roommate** 44:1

**roommates** 9:3,23

**rooms** 85:15,16

**Rosie** 51:20

**roughly** 11:18 13:20

**rounds** 25:1,2

**Rozando** 51:4

**rude** 6:20

**rules** 6:13

**run** 67:2

---

**S**

**Sanchez** 51:7

**Sara** 73:20

**sat** 84:19

**Sawyer** 13:9,20 14:3,5 17:16
18:16,19,22 19:4 21:4,10 22:24
23:2,6 67:8,19,24 68:9,12 69:18,19
70:2 71:18,19 81:9 82:11 83:19

**scams** 61:19

**scene** 23:8 24:4,18

**schedule** 53:7 62:5

**school** 10:3,5,6 11:2,4 15:23

**schools** 53:4

**Schurz** 10:6

**scope** 63:15

**Screaming** 22:14

**screen** 4:5 16:15,24 17:8 41:9
47:13

**scroll** 48:5

**seated** 34:24 35:1 84:17,19

**seconds** 76:1

**sections** 28:1,3 69:13

**security** 11:5

**send** 32:11,13

**sending** 81:14

**sense** 62:1

**separated** 84:20 85:14

**sequence** 66:10

**set** 43:20

**shoot-out** 12:11

**shooter** 96:6

**shooting** 21:1,13,15,20,22 22:3
23:9 24:1,6,21 25:12 28:16 29:17
30:19 32:19,24 42:13 50:18 55:6
66:22 70:19 73:23 74:4,5 76:19
78:19 96:22 98:24 99:14

**shootings** 21:9 75:9

**short** 26:13 35:21 58:11

**shot** 11:14 12:5,12

**shots** 22:2,6,7,8

**show** 16:12,15 40:24 47:9

**showed** 27:7 33:16 75:3 76:6
77:12

**showing** 41:6 47:22 73:17

**side** 18:10 40:2 41:18 67:19 69:15,
18 89:18

**sign** 44:24 45:3,16,19 46:19 47:3
48:10 53:14 57:2 59:23 65:23

**signature** 100:17,19,22 101:1,2,4

**signed** 46:18 47:6 48:11,14,22
57:1 58:18 59:11 60:10 66:2

**significant** 64:3

**signing** 48:18 49:16 65:18

**signs** 20:23

**similar** 85:4

**sir** 6:22,23 10:21 11:23 16:18 17:9
18:6 22:17,22 25:3 33:15 39:16
47:17 51:24 53:9 55:21 58:5 59:13
62:20 89:13 91:10 97:5

**sitting** 36:12,18 92:19

**size** 27:22

**sleeping** 23:16 66:18,24

**small** 37:10 47:15 80:16

**smaller** 79:11

**sold** 20:5

**sort** 54:18,23

EFRAIN MIRANDA, 04/28/2021

**sound** 50:1,4

**sounds** 53:12 79:2 88:4

**south** 13:12,15 14:23 67:7,12 68:10

**Spanish** 74:19,21

**Spaulding** 13:8,9

**speak** 9:10 12:13 26:3 29:10 30:12,16 35:11 38:4 42:5 44:1 55:3 63:12 74:19 88:15,23

**speaking** 7:2 31:23 45:24 48:12 53:17,19 64:11,17 74:21

**specific** 40:8 46:11

**specifically** 59:20 65:12 83:12

**speculation** 59:13 91:9

**spell** 10:23

**spellings** 100:16

**spoke** 12:15 25:15 26:6,9,15 29:6 35:2,6 36:4,24 43:18 49:8 53:10 59:1 61:9

**spoken** 33:21 36:5 45:21

**Spot** 98:12

**Square** 12:2 13:24 21:2

**stairs** 18:13 25:5

**standing** 18:5 22:20

**standpoint** 46:22

**start** 43:4

**started** 42:21

**starter** 79:19

**startled** 76:2

**starts** 12:9

**state** 4:9,24 5:1 6:4

**state's** 36:21 42:6 86:22

**statement** 45:22 55:6 59:21,23

**statements** 59:15

**States** 4:14

**station** 29:17 32:8 33:5 34:18 37:5,19 81:4 83:6,22 84:17,18,22 85:1,9,15 86:3,6 87:2,11,19 90:8 93:8,19 97:16,19,23 98:4

**stereo** 66:21

**Stevie** 50:16

**stick** 76:4

**storm** 72:20

**straight** 67:15

**street** 4:20 12:8 14:2 18:18 22:19 67:21 68:3,8 72:5,7,8 75:8,20,21 76:5 99:13,16,18

**strike** 18:17 30:10 32:3 44:4 46:18 47:5

**stuff** 12:9 52:6

**subpoena** 8:15 49:11,15

**subpoenaed** 4:3

**subpoenas** 49:7

**substance** 58:14

**sued** 12:20

**suggested** 90:21

**Suite** 4:20

**summary** 60:23

**summertime** 12:7

**swear** 5:18

**sworn** 5:19,22

**synagogue** 10:22 11:1,3,7

**system** 66:21

---

**T**

**taking** 7:9 13:1 44:24 77:23

**talk** 7:3 8:19,23 24:22 25:5,23 29:14 30:24 43:14,20 44:13,17 54:4 58:2 70:12,20 73:8 83:5 86:5 87:1 93:3 100:7

**talked** 31:1 49:3 50:21 56:20 73:7 74:22 83:15,16 84:8 87:5

**talking** 7:6 36:15,22 59:24 60:14 61:5 66:23 77:22 78:18 90:3

**tall** 35:21,22

**TECHNICIAN** 4:1 5:17 16:18,21 56:9,12 101:5

**television** 21:24 27:2 66:21

**telling** 31:18,22 63:11 80:3,7 95:1

**term** 65:10

**terms** 74:4

**testified** 5:22 6:10 58:15,22 81:2,

15 98:22

**testify** 8:15 13:3

**testimony** 8:24 21:6 97:2

**thanked** 86:11

**that'd** 46:22

**theft** 20:15

**thin** 35:24

**thing** 12:8 27:1 36:19 39:21 60:13, 20 96:18 100:7

**things** 11:15 13:3 41:2 61:20 95:15

**thought** 46:20,22 63:11 64:3 78:8, 19

**threats** 65:21 66:4,5

**three-inch** 27:23

**time** 4:4 7:7,10 9:3 21:20 30:7 32:15 37:5,15 38:21 42:12 43:20 48:21 52:17,18 56:2,10,13 57:12 61:8 62:6 63:14 64:5,11 65:16 68:22 69:8 72:12 73:14 79:3 81:18 83:8 85:23 86:3 89:21 90:8 94:17 97:23 98:12 101:9

**times** 20:14 56:21 62:3

**timing** 88:1

**title** 35:10 86:10

**today** 4:21 7:17 8:2,16,19 9:15 13:3 49:20 57:12

**told** 8:15 16:11 20:10 21:1 26:2 27:1 28:17,19 31:3,18,20 35:14 37:13 38:18 44:15 46:5,14 51:24 54:9 60:1,24 61:10 71:1,8 74:3 75:4 76:18,22 77:1,10,13 86:9 91:1,13 92:23 96:9,12 99:24

**top** 17:5,20 69:3,5,17

**topics** 57:16

**Torres** 6:6

**total** 91:22 93:7

**transcript** 100:13,23

**tree** 18:2 72:18

**trees** 18:1 71:21 72:4,9,13,17,21, 23

**trial** 55:10

**true** 66:2 100:1

Index: trust-zoom

EFRAIN MIRANDA, 04/28/2021

| | | |
|---|---|---|
| **trust** 100:19 | | **west** 14:24 16:6 83:22 |
| **truth** 23:19 63:21 | **V** | **What'd** 97:4 |
| **truthfully** 13:3 | | **whatnot** 38:20 |
| **turf** 14:14 82:10 | **vague** 21:11 65:14 | **white** 35:18 74:10,12 |
| **turn** 52:19 | **vaguely** 88:23 | **window** 22:18,23 23:4 24:19 67:19 |
| **turning** 9:12 | **varied** 53:3 | 71:11 72:3 75:5,14,23 |
| **turns** 7:2 | **Vasquez** 50:23 | **windows** 22:24 23:1,2 67:10,11, |
| **TV** 23:15 | **version** 46:21 | 14,18 75:15 |
| **type** 6:15 | **versus** 4:13 | **witnessed** 50:17 71:1 |
| **typed** 100:11 | **victim** 11:11 | **witnesses** 97:15 |
| **typing** 7:1 100:10 | **video** 4:1,2,5,11,24 5:5,17 16:18, | **woman** 70:11 |
| | 19,21 56:9,12 101:5,7 | **wording** 65:14 |
| **U** | **view** 35:15 37:2,6,8 40:3 72:4,10, | **work** 10:22 30:21 52:16,18,21,22 |
| | 24 87:11 89:24 91:6 99:17 | 53:1,5,6,7 62:5,11,21 74:1 |
| **Uh-hmm** 31:5 34:6 36:6 39:13 | **viewed** 39:11,17 41:19 90:4 97:15 | **worked** 45:10 65:1 |
| 68:14 71:22 73:1 76:20 89:4 | **viewing** 40:7 89:21 90:8 | **working** 11:6 35:3 42:23 43:9 |
| **uh-huh** 6:18 71:20 | **violence** 21:4,7 | 44:22 54:17 62:12 65:6,7 67:5 |
| **uh-uh** 6:18 19:24 52:10 58:3 71:12 | **visit** 26:14 48:23 | **works** 43:1 |
| **ultimately** 35:11 | **voicemail** 53:11 | **Wrigleyville** 11:2 |
| **uncomfortable** 40:22 | **voicemails** 42:22 43:5,8 44:3,7 | **writing** 71:5 |
| **understand** 7:18 32:7 63:14,15 | 52:2,4 | **wrong** 55:9,13,17 60:15 |
| 66:9 91:12 | **volunteer** 16:8,9 | **wrongfully** 55:11 |
| **understandable** 52:7 | | |
| **understanding** 90:3 91:7 94:8 | **W** | **Y** |
| 96:5 | | |
| **understood** 7:24 43:8 63:4 82:20 | **wait** 7:3,4 | **yard** 23:7 67:20 |
| 86:16 | **waiting** 87:2 | **year** 9:20 72:12 |
| **uniformed** 25:18,19,22,24 26:16 | **waive** 100:19,24 101:2 | **years** 11:8 13:21 95:13 98:2,5 |
| 29:24 30:11 31:1 33:17 70:20,24 | **waived** 101:4 | **yell** 20:17 40:14 |
| 73:7,16 95:5 | **walk** 67:2 | **yelling** 22:11,14 |
| **unit** 4:1 29:22 67:7,10,15,23,24 | **walked** 23:23 34:23 | **yesterday** 58:12 |
| 68:12 69:10,11,12 72:4 75:15 | **wanted** 31:15,16 32:7 35:14 40:9, | **Yevez** 51:22 |
| 101:6 | 19 43:17 44:24 45:3,19 47:2,3 55:5 | **young** 44:23 45:5,7,13,15,19 |
| **United** 4:14 | 62:23 63:17 76:21 | **younger** 11:14,17 35:18 |
| **units** 69:15,16,21,22 | **watch** 54:24 55:2 | |
| **unknown** 42:22 43:5 61:20,22 | **watchdog** 54:23 55:2 | **Z** |
| 62:17 | **watching** 21:23 23:15 27:2 | |
| **unrelated** 77:15 | **wear** 15:13 | **zoom** 6:14 8:16 17:6 41:11 47:21 |
| **upset** 98:14 | **wearing** 19:23 79:19 80:4,8 | |
| **upstairs** 25:1,3 60:1 71:3 | **week** 44:8 | |
| **Urlaub** 4:18,21 101:8 | **weeks** 82:6 | |