*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 31

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3  GERALDO IGLESIAS,           )
                                )
 4            Plaintiff,        )
                                )
 5        vs.                   )   No. 19 CV 06508
                                )
 6  REYNALDO GUEVARA, ET AL.,   )
                                )
 7            Defendants.       )

 8

 9          The videotaped videoconference

10  deposition of DAVID CHMIELESKI, taken

11  pursuant to the Federal Rules of Civil

12  Procedure, before Maribeth Reilly, Certified

13  Shorthand Reporter No. 084-002306, on April

14  27, 2021, commencing at 10:01 a.m. pursuant

15  to notice.

16

17  APPEARANCES:

18

19          LOEVY & LOEVY, by
            MR. JOHN HAZINSKI
20          (311 North Aberdeen
             Third Floor
21           Chicago, Illinois 60606)
             john@loevy.com
22
                    appeared on behalf of the
23                  plaintiff;

24
```

```
 1   APPEARANCES:   (Cont'd)

 2


 3           THE SOTOS LAW FIRM, P.C., by
             MR. DAVID A. BRUEGGEN
 4           MR. KYLE CHRISTIE
             (141 West Jackson Boulevard,
 5            Suite 1240A
              Chicago, Illinois  60604
 6            dbrueggen@jsotoslaw.com)

 7                   appeared on behalf of the City
                     of Chicago police officer
 8                   defendants;

 9

             ROCK FUSCO & CONNELLY, LLC, by
10           MR. AUSTIN G. RAHE
              (312 North Clark Street, Suite 2200
11            Chicago, Illinois 60654
              arahe@rfclaw.com)
12
                     appeared on behalf of the
13                   defendant City of Chicago;

14
             LEINENWEBER BARONI & DAFFADA, LLC, by
15           MR. KEVIN ZIBOLSKI
              (120 North LaSalle Street, Suite 2000
16            Chicago, Illinois 60602
              kevin@ilesq.com)
17
                     appeared on behalf of the
18                   defendant Guevara.

19

20   ALSO PRESENT:

21
             BRETT SCHATZLE, Legal Videographer;
22
             MARIBETH REILLY, Certified Shorthand
23           Reporter.

24
```

```
1                        I N D E X

2

   Witness:                                 Page
3
         DAVID CHMIELESKI
4
              Examination by:
5
              Mr. Brueggen................6, 90
6
              Mr. Rahe....................55
7
              Mr. Hazinski................60
8

9

10

11

12                    E X H I B I T S

13  No.   Description          Marked/Referenced

14  CHMIELESKI DEPOSITION

15  1     Photos Bates-stamped
          CCSAO Iglesias 0011..............17
16
    2     Photos Bates-stamped
17        CCSAO Iglesias 0003..............40

18  3     Document Bates-stamped
          Iglesias 2123-2124..............46
19

20  CONFIDENTIAL PORTIONS               PAGE

21  Excerpt No. 1.........................56

22

23                    * * * * * * *

24
```

```
 1           THE VIDEOGRAPHER:  This is the
 2   beginning of Media Unit 1, and we are now on
 3   the video record at 10:01 a.m.
 4               This is the videotaped
 5   videoconference deposition of David
 6   Chmieleski being taken on April 27, 2021.
 7   This deposition is being taken on behalf of
 8   the defendant in the matter of Geraldo
 9   Iglesias v. Reynaldo Guevara, et al.  The
10   case number is 19 CV 06508 filed in the
11   United States District Court for the
12   Northern District of Illinois, Eastern
13   Division.
14               My name is Brett Schatzle,
15   legal videographer, representing Urlaub,
16   Bowen & Associates, with offices at 20 North
17   Clark Street, Suite 600, Chicago, Illinois.
18   The court reporter today is Maribeth Reilly,
19   also of Urlaub, Bowen & Associates.
20               Counsel, please identify
21   yourselves for the video record and the
22   parties which you represent.
23           MR. BRUEGGEN:  Good morning,
24   Mr. Chmieleski.  My name is Dave Brueggen.
```

1  I represent the defendant officers in this

2  case.

3          THE WITNESS:  Good morning.

4          MR. RAHE:  This is Austin Rahe for

5  the City of Chicago.

6          MR. CHRISTIE:  This is Kyle

7  Christie on behalf of the individual

8  defendants.

9          MR. ZIBOLSKI:  This is Kevin

10 Zibolski on behalf of Defendant Guevara.

11          MR. BRUEGGEN:  John, your turn.

12          MR. HAZINSKI:  Okay.  I wasn't

13 sure if Kyle had made his appearance

14 already.  This is John Hazinski,

15 H-a-z-i-n-s-k-i, on behalf of the plaintiff,

16 Geraldo Iglesias.

17          THE VIDEOGRAPHER:  Will the court

18 reporter please swear in the witness.

19              (Witness duly sworn.)

20

21

22

23

24

```
 1                    DAVID A. CHMIELESKI,
 2    called as a witness herein, was examined and
 3    testified as follows:
 4                    EXAMINATION
 5    BY MR. BRUEGGEN:
 6        Q.  Good morning, Mr. Chmieleski.  Can
 7    you please state your full name, and spell
 8    your last name for the record?
 9        A.  Sure.  David Andrew Chmieleski.
10    Last name is C-h-m, as in money,
11    i-e-l-e-s-k-i.
12        Q.  Thank you.  And just since we are
13    doing this via Zoom, I just wanted to ask is
14    there anybody else present in the room with
15    you?
16        A.  No.  I'm by myself.
17        Q.  Do you have any documents related
18    to the case that we are going to talk about
19    today with you?
20        A.  Just a document for the summons.
21    That's it, yeah.
22        Q.  The subpoena.  All right.  Great.
23    And, sir, have you ever given a deposition
24    before?
```

1      A.   No, I haven't.

2      Q.   Have you ever testified in court?

3      A.   No.

4      Q.   So there is a couple of ground

5  rules that we will go over.  And throughout,

6  if you forget, we will remind you.  But

7  first off, we need all your answers to be

8  out loud.

9      A.   Okay.

10     Q.   So use yes and noes.  If you use

11 uh-huh or uh-uh or nod or shake your head,

12 we can see you.  But to make sure the record

13 is clear, I may follow up with:  "Is that a

14 yes or is that a no?" just to clear the

15 record up.  Okay?

16     A.   Okay.

17     Q.   And also, since we are doing it

18 via video, and the court reporter is typing

19 everything that's said, it's important that

20 we take turns speaking.  So I would ask that

21 you wait until I am done with my question

22 before giving an answer; and likewise, I

23 will wait until you are done answering

24 before I pose a new question.  Okay?

```
 1       A.   Okay.  No problem.
 2       Q.   If at any time you need to take a
 3  break for any reason to use the bathroom, to
 4  get something to drink, just let us know.  I
 5  ask if there is a question pending, you
 6  provide an answer, and then we will take a
 7  break.  Okay?
 8       A.   Okay.
 9       Q.   I will be asking many questions
10  today, as some other attorneys might ask
11  questions.  If at any time you don't
12  understand a question or didn't hear us or
13  the video froze, just let us know so we can
14  rephrase.  Okay?
15       A.   Okay.
16       Q.   If you answer a question, we will
17  assume you understood the question.  Okay?
18       A.   Okay.
19       Q.   Also today, you may hear
20  objections from some of the attorneys.
21  Since we don't have a judge here to rule on
22  objections, we will have you still answer
23  the question.  So if you hear an attorney
24  objecting, let them finish the objection,
```

```
 1   and then we will ask you to provide the best

 2   answer you can.  Okay?

 3       A.  Okay.

 4       Q.  Mr. Chmieleski, how old are you

 5   today?

 6       A.  47.

 7       Q.  Where do you currently reside?

 8       A.  ██████████████████, Chicago,

 9   Illinois.

10       Q.  How long have you lived there?

11       A.  About 13 years.

12       Q.  Is that a house or an apartment?

13       A.  It's a two-flat.

14       Q.  Do you have a unit number?

15       A.  First floor.

16       Q.  Who do you reside with?

17       A.  Me and my roommate.

18       Q.  What's your roommate's name?

19       A.  Efrain Torres.

20       Q.  How long have you been roommates

21   with Efrain Torres?

22       A.  About two years.

23       Q.  Mr. Chmieleski, where did you go

24   to high school?
```

1      A.   Carl Schurz.

2      Q.   Did you graduate?

3      A.   Yes.

4      Q.   What year did you graduate?

5      A.   Wow, '92.  Oh, man, I am not sure.

6  I haven't even thought about it.

7      Q.   Let me say another thing.  You

8  know, again, we don't want you to guess

9  today, but give us your best recollection.

10 And if you have to tell us it's an

11 estimation, that's fine as well.  Okay?

12     A.   Okay.

13     Q.   Did you have any formal education

14 after graduating from high school?

15     A.   No.

16     Q.   Do you have any professional

17 licenses?

18     A.   Security.

19     Q.   And what type of license is that?

20     A.   PERC card.

21     Q.   And does that just allow you to

22 work as a security guard of sorts?

23     A.   Yes.

24     Q.   Are you currently employed?

```
 1        A.   Yes.

 2        Q.   Who is your current employer?

 3        A.   Securitas Security Service.

 4        Q.   Are you assigned to a certain

 5   building or location?

 6        A.   Certain building, yes.

 7        Q.   Is that -- where is that building

 8   located, generally?

 9        A.   It's downtown, River North area.

10        Q.   How long have you been working for

11   Securitas?

12        A.   About 20 years.

13        Q.   Have you ever been a victim of a

14   crime?

15        A.   Yes.

16        Q.   And tell us what happened?

17        A.   I was a teenager, and I got jumped

18   walking in the alley by four guys -- five

19   guys.

20        Q.   Were you robbed or just beat up?

21        A.   I just got beat up.

22        Q.   Have you ever been sued in a

23   lawsuit?

24        A.   No.
```

```
 1        Q.   Have you ever filed a lawsuit?

 2        A.   No.

 3        Q.   Have you ever filed a workers'

 4   compensation claim?

 5        A.   No.

 6        Q.   Have you ever been convicted of

 7   any crime?

 8        A.   No.

 9        Q.   Sir, are you on any medications or

10   suffer any conditions that would make it

11   difficult for you to provide clear and

12   honest testimony today?

13        A.   No.

14        Q.   Where did you live in June

15   of 1993?

16        A.   I lived at 2148 North Sawyer.

17        Q.   Was that a house or an apartment?

18        A.   Apartment building.

19        Q.   Did you have a specific unit that

20   you lived in?

21        A.   Yes.  I lived on the first floor.

22        Q.   Was it just one unit per floor, or

23   were there multiple units?

24        A.   There were two units.
```

 1        Q.   Which unit did you reside in?

 2        A.   First floor.

 3        Q.   Yeah, but was it east unit, west

 4   unit, north, front, back?

 5        A.   North, north.

 6        Q.   Who did you live with in June

 7   of 1993?

 8        A.   That would be my father.

 9        Q.   In June of 1993, how long had you

10   been living at 2148 North Sawyer?

11        A.   I lived there since I was seven

12   years old.  20 years, I think.  I don't

13   know.

14        Q.   Was there an alley behind the

15   building?

16        A.   Yes.

17        Q.   Do you recall which direction that

18   alley ran?

19        A.   That was -- that was -- what was

20   that?  Is that south?

21        Q.   Sorry.

22        A.   Yes, that was it.

23        Q.   What was the nearest east-west

24   street to your building off of Sawyer?

```
 1        A.   What was that?  Palmer.
 2        Q.   Do you recall was there a boys'
 3   club located near Palmer and Sawyer?
 4        A.   Yes.
 5        Q.   Where was that located?
 6        A.   That was across the street from
 7   Sawyer.
 8        Q.   Was it on a corner, or was it --
 9        A.   Yes, it was on the corner, yeah.
10        Q.   Did you ever go to that boys'
11   club?
12        A.   Yes, yes.
13        Q.   Can you tell us what that boys'
14   club was?  What activities were done there,
15   or what happened there?
16             MR. HAZINSKI:  Object to form.
17             THE WITNESS:  Card games, board
18   games, basketball.  They had a pottery
19   class, just hanging out with friends.
20   BY MR. BRUEGGEN:
21        Q.   Was that open to anybody that was
22   in the neighborhood?
23        A.   Yes.
24             MR. HAZINSKI:  Objection to form.
```

1  BY MR. BRUEGGEN:

2      Q.  Were there any age limitations on

3  who could go to the boys' club?

4          MR. HAZINSKI:  Objection to form.

5          THE WITNESS:  I don't remember.  I

6  don't remember.

7  BY MR. BRUEGGEN:

8      Q.  Did any gangs hang around the

9  boys' club?

10          MR. HAZINSKI:  Objection to form.

11          THE WITNESS:  Honestly, I don't

12  remember.  They could have.  I don't

13  remember.

14  BY MR. BRUEGGEN:

15      Q.  Back in 1993, were you a member of

16  any gangs?

17      A.  No.

18      Q.  Back in June of 1993, did you have

19  a job?

20      A.  Did I?  I think I was working for

21  Printers Repair Parts.  I am not sure.

22      Q.  Did you have any type of job where

23  you helped watch children or a child?

24      A.  Yes.  My next-door neighbor,

```
 1  Bernice Bullocks.
 2       Q.  By your next-door neighbor, would
 3  she be the first floor south unit then?
 4       A.  Yes.
 5       Q.  What did you do for Ms. Bullocks?
 6       A.  She went out a lot, and I just
 7  checked up on her son every once in a while,
 8  make sure he was okay.
 9       Q.  What was her son's name?
10       A.  Steve.
11       Q.  How old was Ms. Bullock's son?
12       A.  At the time?
13       Q.  Yes, sir.
14       A.  Probably 13.  I am not sure.
15       Q.  Was there any reason that you were
16  watching him?
17       A.  Yes.  He had Down's syndrome.
18       Q.  So watching him, would you be
19  baby-sitting him; or would you just check in
20  on him?
21       A.  I checked up on him.  He was right
22  across from me.  She gave me the key.  I
23  would just go in there, see if he was all
24  right, and then go back to my unit.
```

1      Q.  Mr. Chmieleski, can you see me

2   okay when I speak?

3      A.  Yes.

4      Q.  Okay.  I am going to show you what

5   we will mark as Exhibit No. 1, and I will

6   put it up on the screen, and if you can just

7   confirm that you can see it?  I am putting

8   it up right now.  Do you see?

9      A.  Okay.  Yeah, yeah, yes.

10              (Whereupon, Chmieleski

11              Deposition Exhibit No. 1 was

12              screen-shared/referenced.)

13          MR. BRUEGGEN:  And for the record,

14   Exhibit No. 1 will be CCSAO Iglesias 0011.

15   BY MR. BRUEGGEN:

16      Q.  And do you see two photos there,

17   sir?

18      A.  Yes.

19      Q.  I want to focus on just the top

20   photo.  So I will zoom in so you can see it,

21   okay, a little clearer?

22      A.  Okay.

23      Q.  Do you recognize what's depicted

24   in the top photo of Exhibit No. 1?

```
 1       A.   Yes.

 2       Q.   What is that?

 3       A.   It's the building I lived in, and

 4  I see people by my unit, which is right over

 5  here, where the guys are just standing,

 6  right above there, first floor.

 7       Q.   Is that a building you lived in

 8  back in June of 1993?

 9       A.   Yes.

10       Q.   So 2148 North Sawyer?

11       A.   Yes.

12       Q.   And you say the people in the

13  photo, that's the top photo of Exhibit

14  No. 1, are near a door?

15       A.   Yes, right above them would be my

16  unit.

17       Q.   Okay.

18       A.   Right over here, right over there.

19       Q.   So in that exhibit on the side of

20  the building where the people are, is that a

21  door to enter the building or --

22       A.   Yes.

23       Q.   -- or specifically to enter your

24  unit?
```

1        A.   To enter the building.

2        Q.   And you were just kind of

3   directing us to where your apartment was.

4   Can you tell us from that door on the side

5   of the building, would your apartment be to

6   the left of it or to the right of it?

7        A.   To the right.

8        Q.   So the front of the building

9   there?

10       A.   Yes, yes.

11       Q.   And then where did Ms. Bullocks

12  live?

13       A.   She lived right on the left side

14  over here, next to -- up above, up above the

15  guy with the beige coat.  That was her

16  floor.

17       Q.   Okay.  Did you know a person by

18  the name of Arnell Moore?

19       A.   No.

20       Q.   Mr. Chmieleski, do you recall a

21  shooting happening at about 3:50 p.m. on

22  June 7, 1993, near your building?

23       A.   I heard -- I heard gunshots.  I

24  was talking with somebody upfront.  I was

1  kind of in the door right there, not out of

2  it, but sort of -- right in front of the

3  door over there.

4       Q.  When you say "the door," is that

5  the side door where you see people in

6  Exhibit No. 1?

7       A.  Yes.  I wasn't quite out.  I was

8  inside still, but I was talking to somebody

9  outside, and a guy ran past me.

10      Q.  Do you recall who you were

11  speaking to?

12      A.  I thought it was my friend Efrain,

13  but he said it wasn't him, so I -- I am not

14  sure.

15      Q.  You say you recall hearing

16  gunshots?

17      A.  I think I heard a shot, and then

18  someone ran past wearing a hoodie.  It was

19  like a second, and they had their face

20  covered.  I saw someone.  It could have been

21  a man, a woman.  It could have been a

22  bystander running.  I wasn't sure.  That's

23  all I saw.

24      Q.  Do you recall how many gunshots

1  you heard?

2       A.  No, I don't.

3       Q.  Did you actually see the shooting

4  or just hear gunshots?

5       A.  I just heard something, heard a

6  shot.

7       Q.  Prior to hearing the shots, did

8  you hear anything else?  People talking,

9  screaming?

10      A.  No.  I was focused talking with

11 somebody.

12      Q.  How about after the gunshots, did

13 you hear anything?  Tires screeching, or

14 yelling?

15      A.  It was so long ago, I don't even

16 remember.

17      Q.  You said when you heard the

18 gunshots, you would have been inside the

19 building but in the doorway on the side of

20 the building that we just looked at?

21      A.  Yes.

22      Q.  And the person you were speaking

23 to, were they outside the building?

24      A.  Yes.

1    Q.  Do you remember if Stevie was

2 around when you heard the gunshots?

3    A.  No, no.

4    Q.  When you were watching Stevie or

5 looking after him, would he be escorted to

6 the building by a bus driver?

7    A.  Yes.

8    Q.  Do you remember was it the same

9 bus driver every day?

10    A.  I don't remember.  I really wasn't

11 involved in that.  I would just watch her

12 son every once in a while.  She would throw

13 me a few bucks to watch him every once in a

14 while.  That was pretty much it.

15    Q.  Were you ever watching her son

16 when the bus driver would drop him off at

17 the building?

18    A.  No.

19    Q.  Prior to hearing the gunshots, did

20 you see anybody standing outside of the

21 building in the general area?

22    A.  No.

23    Q.  What did you do after you heard

24 the gunshots?

1        A.   Yeah.   I went back into -- I ran

2   up to my unit.

3                  By the way, I heard a gunshot,

4   but I wasn't sure it was a gunshot at first

5   because I was absorbed with talking with my

6   friend, and then somebody ran past, and then

7   I went up to my unit.

8        Q.   Were you standing in that doorway

9   when someone ran past?

10        A.   Yes.

11        Q.   Tell us, what did you do when you

12   went up to your unit?

13        A.   I think I -- I would have -- my

14   natural instinct was just to look out my

15   window blinds to see what was going on.

16   That's probably what I did.

17        Q.   And do you recall doing that, or

18   are you just thinking that's what you did?

19        A.   I am thinking that's what I would

20   have did.

21        Q.   Do you have any recollection of

22   seeing anything when you looked out the

23   window blinds?

24        A.   No.

```
 1        Q.  When you heard the gunshots, did
 2   you know where the gunshots had taken place?
 3   What location or area?
 4        A.  No.
 5        Q.  Did you ever see a car outside
 6   your window on the corner of Sawyer and
 7   Palmer shortly after gunshots?
 8        A.  I can't remember.
 9             MR. HAZINSKI:  Object to the form,
10   belatedly.
11   BY MR. BRUEGGEN:
12        Q.  Going back to the person that you
13   said you saw running by, okay, sir?
14        A.  Yes.
15        Q.  Can you describe that person via
16   height and weight?
17        A.  It was so fast, it was like
18   seconds.  I just saw a person went by, a
19   hoodie covering their face.  I couldn't tell
20   you the height.  I don't even know if it was
21   a male or female.  It was so fast.  That's
22   all I saw.
23        Q.  Was it a large person, like a
24   heavy-set person or --
```

1      A.  I -- thinking back, I don't

2   remember a heavy-set person.  He seemed

3   maybe average.  I would go with average

4   build.

5      Q.  You said they were wearing a

6   hoodie covering their head?

7      A.  Yes, head and arms, yeah.

8      Q.  Do you remember what color the

9   hoodie was?

10     A.  Black.  I remember it was black.

11     Q.  Do you remember the color of their

12  pants or shorts?

13     A.  No.  I just saw the hoodie.

14     Q.  Sir, going back to Exhibit No. 1,

15  and I will share that with you again, put it

16  up on the screen.

17     A.  Okay.

18     Q.  Do you see that, sir?

19     A.  Yes.

20     Q.  On Exhibit No. 1, you were at the

21  door, which I am indicating, there is a

22  gentleman in what looks like a gray sport

23  coat right outside.  Do you see that?

24     A.  Yes.  I was standing there, and he

1  ran past me towards the alley.

2      Q.  And could you tell me, did he run

3  from the front of the building out here,

4  back towards the, looks like, garages?

5      A.  I couldn't tell.  I just remember

6  they ran in the direction of the alley.  I

7  don't know where they were coming from.

8      Q.  But when he ran past you when you

9  were looking out that door, did he run from

10 your left to your right?

11     A.  Yes.  Yes, left to right, yes.

12     Q.  And then you said he ran to an

13 alley.  Where is the alley located?

14     A.  It's right behind the garage

15 that's attached to the building.  He ran in

16 that direction, that direction.

17     Q.  Looking at Exhibit 1, would that

18 be by the gentleman that looks like a black

19 with a little bit of blue on the shoulder?

20     A.  Yes.

21     Q.  And did you see if the gentleman

22 who ran by ran into the alley?

23     A.  No, I didn't see that.  I wasn't

24 out of the door, so I didn't see him turn or

```
 1  anything.
 2       Q.  After the shooting, did you call
 3  the police?
 4       A.  No.
 5       Q.  Did the police come to the scene
 6  after the shooting?
 7       A.  Yes, because the police -- I don't
 8  even remember.  I remember they came to my
 9  house late at night, and they wanted me to
10  see photos and stuff and a lineup.
11       Q.  Do you recall was that the same
12  day of the shooting or at a different time?
13       A.  Same day.  I think it was the same
14  day, yeah.
15       Q.  Do you recall whether it was
16  police that came to your house in uniforms,
17  or were they dressed in plainclothes?
18       A.  I think it was plainclothes
19  detectives, yeah, yeah.  I don't remember a
20  uniform.
21       Q.  Do you remember how long after the
22  shooting that the police came to your
23  apartment?
24       A.  It was late at night.  I don't
```

1  remember the time, but it was -- it was some

2  time after.  Probably 9:00 p.m. at night.  I

3  am not sure.

4        Q.  How many police came to your door?

5        A.  I think two.  I can't be

6  100 percent on that.  I think maybe two.

7        Q.  Do you recall the name of either

8  of the police officers who came to your

9  door?

10       A.  No, I don't.

11       Q.  Do you recall what the police

12  officers looked like that came to your door?

13       A.  No, I completely forgot about

14  this.  I don't even remember.

15       Q.  Did you speak to the police

16  officers when they came to your door?

17       A.  Yes.

18       Q.  Where did you talk to the police?

19       A.  They came to my home, my unit.

20       Q.  And did you agree to speak with

21  the police?

22       A.  Yeah, yeah.  I told them what I

23  saw, which wasn't much, but they still

24  wanted me to come to the police station.

1       Q.   Sir, do you remember more than one

2   interaction with police, speaking to the

3   police about this incident?

4       A.   Oh, man, I can't remember.  No,

5   no.

6       Q.   Do you recall speaking to police

7   after the incident and providing them

8   information and the police leaving?

9       A.   I don't remember.

10      Q.   When you spoke to the police, did

11  you provide your contact information?

12      A.   Oh, man, did I?  I must -- I

13  guess, yes, because they came to my home, so

14  yeah.

15      Q.   Do you recall anything you told

16  the police when they came to your home and

17  you spoke to them in your home?

18      A.   I remember I -- I was a little bit

19  irritated because I didn't want to go to the

20  police station but I wouldn't be of any help

21  because I didn't see anything.  They wanted

22  me to see photos, but I couldn't pick

23  anything out because I didn't see a face.

24      Q.   When you spoke to the police at

1  your house, did they want you to look at

2  photos at that time?

3       A.  I don't remember if they showed me

4  photos.  I only remember the photos when I

5  went to the police station.

6       Q.  What do you recall about photos at

7  the police station?

8       A.  They had me look through them.  I

9  thought it was -- I didn't see any point to

10 it, but I looked through them anyways, and I

11 kept telling them, no, I don't recognize

12 anybody.  I didn't see a face.

13           And then they had me go to a

14 lineup to see if I could pick somebody out,

15 and I didn't pick anybody out because I

16 didn't see anybody.

17      Q.  When the police were at your

18 apartment, do you remember how long you

19 spoke to them when they were inside your

20 apartment?

21      A.  It was briefly.  I don't recall

22 exact time.  It wasn't too long, I think.

23      Q.  Was it more than a half an hour?

24      A.  I would say less.

```
 1        Q.  Was it more than 15 minutes?
 2        A.  Man, what was it?  I don't recall.
 3        Q.  Do you recall the police officers
 4   that you spoke to then leaving your
 5   apartment that evening?
 6        A.  Yes.
 7        Q.  After the police officers left
 8   your apartment, did you have another contact
 9   with other police officers or detectives?
10        A.  Only until late at night when they
11   came to pick me up.  That was it.
12        Q.  Do you recall whether that was the
13   same day or whether that was some time after
14   the shooting?
15        A.  I'm thinking -- I'm thinking it
16   was the same day.
17        Q.  Tell me what happened when they
18   came?  You say late at night.  Can you tell
19   me was that early hours of the morning or
20   late at night?
21        A.  It was late at night.  It was late
22   at night.  My father woke me up.  I think I
23   was sleeping, and he told me that the police
24   were here, they wanted to talk to me.
```

1      Q.  And the police that were at your

2  apartment at that time, were they in

3  uniforms or plainclothes?

4      A.  I can't be 100 percent sure, but I

5  don't remember, that I can recall, any

6  uniforms.  I think they were plainclothes.

7      Q.  Do you recall either of the police

8  officers' names?

9      A.  No, I don't.

10     Q.  Do you recall a description of

11 either of them?

12     A.  No.  This whole incident, I

13 completely forgot about until last year when

14 I got notified about it.

15     Q.  So those police officers, what did

16 they say to you when they showed up at your

17 apartment late at night?

18     A.  I don't even remember.  It's just

19 they wanted me to come down to the station

20 and look at pictures and do a lineup, check,

21 you know -- I kept telling them I didn't see

22 anything.  What would be the point?  I can't

23 help them because I didn't see anything, but

24 I went.  They wanted me to go, so I went.

1      Q.  And you agreed to go with them?

2      A.  Yes.

3      Q.  You wanted to try to help out the

4  best you could?

5      A.  Yeah, even though it wouldn't be

6  any help.

7      Q.  Did the police officers that you

8  remember in plainclothes, did they drive you

9  to the police station?

10     A.  Yes, they did.  Drove me there and

11  drove me back home.

12     Q.  Do you remember where the police

13  station was located?

14     A.  Where was it?  No.

15     Q.  Was anybody with you when you were

16  picked up?  Did you ride with anybody else

17  to the police station?

18     A.  Yes, my best friend.  He lived in

19  the building, Efrain Torres.

20     Q.  And that's your current roommate?

21     A.  Yes.

22     Q.  In addition to speaking to you,

23  the police also had Mr. Torres?

24     A.  Can you repeat that please?

1      Q.   Yes.   In addition to speaking to

2   you that night, the police also had

3   Mr. Torres that they drove to the station

4   that night?

5      A.   Yes.

6      Q.   Do you know if the police had

7   talked to Mr. Torres that night?

8      A.   I -- I am not sure.   You'd have to

9   talk to him.   I don't remember.

10      Q.   Do you know if the police had

11   previously talked to Efrain Torres at a

12   prior time?

13      A.   I don't remember.

14      Q.   What happened after you arrived at

15   the police station?

16      A.   They had me look at photos.   I

17   looked at them.   I didn't see any point to

18   it, but I did.

19      Q.   Can you tell me, can you describe

20   the photos that you looked at?   Was it just

21   individual photos?   Was it a photo book?

22   Was it several photos on a piece of paper?

23   Can you describe what you looked at?

24      A.   It was like a photo book with

 1  different pictures of people.

 2       Q.  Do you know if the photo book had

 3  any type of name or affiliation?

 4       A.  No, I don't recall that.

 5       Q.  Do you recall how thick the photo

 6  book was?

 7       A.  Yeah, I think it was a pretty

 8  thick book, I think I remember, yeah.

 9       Q.  Like an inch or two inches thick?

10       A.  Bigger than that, bigger.

11       Q.  So three inches, four inches

12  thick?

13       A.  Yes, a big solid book with lots of

14  photos.

15       Q.  And you looked through all the

16  photos?

17       A.  I looked through them.  I don't

18  know -- I don't remember if I looked through

19  all of them, but I looked through it.  You

20  know, they wanted me to look through it so I

21  did.

22       Q.  So because you had only seen a

23  black hoodie, you hadn't seen the person's

24  face, you couldn't identify anybody in the

1   photos?

2        A.  Yes, that's why I thought it was

3   pointless to me, but I looked anyway.

4        Q.  Do you recall who showed you the

5   photos, whether it was --

6        A.  No, I don't.  I don't recall.

7        Q.  You don't have any description?

8   Was it a plainclothes person or a uniformed

9   person?

10       A.  I don't recall.  I don't even

11  remember.

12       Q.  Do you remember where you were

13  when you looked at the photos?  What type of

14  room or setting?

15       A.  Yeah, I think I was in a room.  I

16  don't know what kind of room, but just some

17  room.  I don't remember.

18       Q.  Was anybody else in the room with

19  you when you were looking at the photos?

20       A.  Man, was there?  I can't -- I

21  can't recall.  I don't want to give you a

22  yes or no if I don't remember.

23       Q.  That's perfectly fine, sir.  And

24  so, you were handed the book and asked to I

1  look at photos and see if you recognize

2  anybody?

3      A.  Yes.

4      Q.  Any other interaction with the

5  police?  Any other interaction with the

6  police regarding the photos?

7      A.  No.  They just, look through them,

8  and then I handed it back and told them, you

9  know, I can't help you.

10     Q.  You also mentioned earlier that

11  you viewed a lineup, right?

12     A.  Yes, yes.

13     Q.  Was that before or after you

14  looked at the photos?

15     A.  After.

16     Q.  Can you tell us about this lineup

17  that you looked at?  How did it work?

18     A.  I think I went to a room, and

19  there was a glass.  Of course, they couldn't

20  see me, and I saw some people standing

21  there, and they wanted to know if I

22  recognized anybody, and I told them no.

23     Q.  Do you remember the detective or

24  officer that was with you asking if you

1   recognize anybody?

2        A.  I don't know.  I don't remember

3   the -- I remember somebody asked me if I

4   recognized.  I don't know who it was, and I

5   just told them no, I can't help you.  I

6   just -- that's what I kept telling them, I

7   couldn't help them.

8        Q.  You don't recall that person who

9   asked you if you recognized anybody --

10       A.  No.

11       Q.  -- their name?

12       A.  I don't recall what they looked

13  like.

14       Q.  And you said on the other side of

15  the glass were people for you to look at?

16       A.  Yes.

17       Q.  Do you recall was there an officer

18  or a detective in with those people?

19       A.  I don't recall.

20       Q.  After you told the person that was

21  in the room with you that you couldn't

22  identify anybody, what happened then?

23       A.  What happens?  I don't know if I

24  went back to look at more photos.  I don't

1   remember.  Maybe I went to look at more

2   photos, and I didn't pick anybody out, and

3   then they took me home.

4        Q.  Sir, for the lineup, were you

5   willing to participate in the lineup and

6   look at it?

7        A.  Yeah.  I told them I didn't see

8   any point to it, but they wanted me to look

9   anyway so, you know, I wasn't going to

10  argue, so I went and looked anyways.

11       Q.  And did the person that was in the

12  room with you when you were viewing the

13  lineup pressure you to choose anybody?

14       A.  I don't recall any pressure.  I

15  know I was irritated with the whole thing.

16  But not really "pressure" pressure.  No, I

17  am going to go with a no on that.

18       Q.  Did any police officer or

19  detective ever indicate a certain person for

20  you to pick out?

21       A.  No.

22       Q.  Did any of the police officers or

23  detectives do anything that made you feel

24  uncomfortable during the lineup?

```
 1      A.  No.
 2      Q.  I think you described it as you
 3 were annoyed because you had not seen
 4 anything and that's why?
 5      A.  Yeah.  I was annoyed with the
 6 whole experience.  I thought it was
 7 pointless, but I wanted to be helpful, I
 8 guess.
 9              (Whereupon, Chmieleski
10               Deposition Exhibit No. 2 was
11               screen-shared/referenced.)
12 BY MR. BRUEGGEN:
13      Q.  Sir, I am going to show you what
14 we will mark as Exhibit No. 2.  Sir, do you
15 see a couple of photos up on the screen
16 here?
17      A.  Yes.
18      Q.  This will be marked as Exhibit 2,
19 and for the record, this is CCSAO Iglesias
20 00003.  Do you see that, sir?  I can zoom
21 in.
22      A.  Okay, yes.
23      Q.  And do you know what this is a
24 photograph of?
```

```
 1        A.  Is it a lineup?
 2        Q.  I am just asking for what your --
 3   if you recognize this photo at all or the
 4   people --
 5        A.  No.
 6        Q.  -- in the photo?
 7        A.  No.
 8        Q.  Do you recall after participating
 9   in the lineup whether you spoke with an
10   Assistant State's Attorney?
11        A.  I don't recall that.
12        Q.  Do you recall speaking to attorney
13   that night when you were at the police
14   station?
15        A.  No.
16        Q.  And after the lineup, do you
17   recall that you were driven home by the
18   police?
19        A.  Yes.
20        Q.  Do you remember how long that
21   interaction took from when you left your
22   apartment to when you returned?
23        A.  I don't recall.
24        Q.  To the best of your recollection,
```

1  did it take a couple of hours; or was it

2  like half a day?

3       A.  Oh, it was -- it was -- oh, man, I

4  don't recall.  I don't remember.

5       Q.  After that night at the police

6  station when you were asked to do the

7  lineup, when was the next time you spoke to

8  anybody about this case and what you saw?

9       A.  That was it.  I didn't -- I don't

10 remember speaking to anybody until last

11 year.  I completely forgot about the whole

12 incident.

13      Q.  Tell me about last year when you

14 spoke to somebody?

15      A.  Some guy Oscar, I think, came by,

16 and he just wanted to know about -- he was

17 asking me questions about it.  He was

18 working for an attorney, I think.  I don't

19 remember, and he just wanted to hear my

20 point of view, what happened, which wasn't

21 much, because it's pretty much what I am

22 telling you.

23      Q.  Is there anything that you told

24 Oscar that you haven't told us so far today?

 1       A.   That same thing I told you, I told
 2   Oscar.
 3       Q.   How many times did you speak to
 4   Oscar?
 5       A.   Man, he came by like four times.
 6       Q.   Was there a reason he came by four
 7   times?
 8       A.   He had some stuff that was printed
 9   out that he wanted me to sign.  Basically,
10   it was a form.  Pretty much everything I
11   told him was on the form, and he wanted me
12   to read it to make sure it was correct, and
13   I signed it.  And then something was wrong,
14   and then he came back, and he wanted me to
15   check it, and I checked it over again, and
16   that was it.
17       Q.   So did you talk to this person
18   Oscar a couple of times before he came with
19   the paper?
20       A.   Yeah, he came by a lot, but I was
21   never home.  So he kept coming by a lot, and
22   at first, I didn't want to talk to this guy.
23   I didn't know who he was, but then I
24   realized he was going to keep coming, so I

1  answered his phone call.  I -- you know, he

2  left his phone number, and I got back to

3  him.

4       Q.  Did you tell him -- did you answer

5  his questions?

6       A.  Yeah, I did.  And I told him what

7  I saw, which wasn't much, and he was on a

8  speakerphone with a lawyer or attorney or

9  somebody, and they were listening to what I

10 was saying, and he was writing it down, I

11 guess, and that was it.

12      Q.  And then you said he brought you a

13 piece of paper that purported to say what

14 you told him?

15      A.  Yes, yes.

16      Q.  And --

17      A.  He asked to make a correction.

18      Q.  Was that the last time you saw him

19 was when he brought the piece of paper?

20      A.  Yes.  And that was supposed to be

21 it, and I was supposed to be done with the

22 whole thing.

23      Q.  Understandable.  At that time when

24 he brought you the piece of paper, did you

1   sign that piece of paper?

2        A.  Yes, I looked it over, and it

3   looked fine, and then I signed it.  I asked

4   for a copy.  And he said, I couldn't get a

5   copy yet.  They would mail it to me.  I

6   never got nothing.

7        Q.  Did they ever mail you a copy?

8        A.  No.

9        Q.  You also mentioned something about

10  some corrections.  What did you mean by

11  that?

12       A.  I think he was talking to Efrain

13  about this stuff.  He also talked to Efrain

14  and got his point of view.  What was the

15  correction?  It was -- what was it about?

16  It was -- it was something that wasn't a big

17  deal.  I didn't realize why he came over

18  about that.  What was it?  Man, I wish

19  Efrain was here.  He'd remember that.  He's

20  got a better memory than me.  I don't

21  remember.  It was -- it was so

22  insignificant, I don't even remember it.

23       Q.  Sir, why did you sign that

24  declaration?

```
 1        A.  I figured it would be done with.

 2   And he said it would be, you know, we'd be

 3   done, and we won't bother you no more.

 4        Q.  Have you been bothered by him?

 5        A.  No.  I am exaggerating.  I was

 6   just irritated that he was coming by a lot.

 7   I work the night shift, and I think he was

 8   coming by a lot in the morning when I was

 9   sleeping.

10        Q.  Did you feel any pressure to sign

11   the declaration?

12        A.  No, no.

13                (Whereupon, Chmieleski

14                 Deposition Exhibit No. 3 was

15                 screen-shared/referenced.)

16   BY MR. BRUEGGEN:

17        Q.  Sir, I am going to show you what

18   we will mark as Exhibit 3.  Sir, do you see

19   a document up on your screen?

20        A.  Yes.

21        Q.  And this is a two-page document.

22   I want to show you this.  Page 1 is Iglesias

23   2123, and page 2 is Iglesias 2124.

24        A.  Yes.
```

1      Q.  Do you see that?  And look at page

2   2, do you see your signature on there?

3      A.  Yes.  Okay, that's -- that was the

4   correction.  When he crossed out and put

5   "someone," and then my initials, that was

6   the correction, okay.

7      Q.  What do you recognize Exhibit 3 to

8   be?

9      A.  Let me read this.  Pretty much a

10   printed-off form of what I told him of what

11   I saw.

12      Q.  Exhibit 3 is the declaration you

13   were just telling us about that Oscar came

14   by for you to sign?

15      A.  Yes.

16      Q.  And you pointed out that on the

17   first page of Exhibit 3, there is some

18   cross-outs with some handwriting?

19      A.  Yes.  That's what he came back

20   for, yes.  Okay, I forgot about that there.

21      Q.  Was this corrected after you had

22   already signed it?

23      A.  Yes.

24      Q.  So let's look at the first

1  correction in paragraph 2, it originally

2  said "That day I was talking to a friend,

3  Efrain Torres"?

4       A.  Yes.

5       Q.  You see "friend Efrain Torres" is

6  struck out, and it says "someone outside."

7  Do you see that?

8       A.  Yes, because Efrain said it wasn't

9  him I was talking to, so I thought it was.

10  It was so long ago.  I thought it was

11  probably him I was talking to, but he said

12  it wasn't him, so they crossed it out.

13       Q.  Then did you put your initials

14  next to the changes there?

15       A.  Yes.

16       Q.  Then below that in number 3, it

17  looks like you added to that statement that

18  says, "They showed me an album full of lots

19  of pictures"?

20       A.  Yes.

21       Q.  Before that, you said, "either at

22  the station or at home."  Do you see that,

23  sir?

24       A.  Yes.  Because I couldn't recall if

1  they showed it to me at home or not.  I

2  wasn't sure about that.  I remember the

3  station definitely, but I don't remember if

4  it was at home.

5      Q.  Do you remember how many times you

6  looked at photo albums?

7      A.  I remember the station.  I can

8  recall that clearly without a doubt.

9      Q.  Sir, going to the second page of

10 Exhibit No. 3, and paragraph 6 up here.  I

11 will zoom in, make it a little clearer,

12 easier for you to read.  Can you see that

13 okay?

14     A.  Yes.

15     Q.  At the last sentence of paragraph

16 6, it says, "I felt some pressure to pick

17 someone but I never did."  Do you see that,

18 sir?

19     A.  Yes, yes.  Oh, man.

20     Q.  My question for you is:  Were

21 those your words?  Did you tell the

22 investigator that you felt some pressure to

23 pick someone?

24     A.  I don't -- man, I don't remember.

1  Like I said, I was irritated with the whole

2  thing.  I know they wanted me to pick

3  someone.  But pressure, oh, man, that's a

4  hard one because I, obviously, didn't pick

5  anybody, so it wasn't that much pressure.

6  So I am going to have to go with no on that.

7       Q.  At the time of this incident, you

8  had been living in that neighborhood for at

9  least ten years?

10      A.  I had been living there since I

11  was seven years old in that neighborhood.

12      Q.  I am an attorney.  I can't do math

13  that quick, so I will say just roughly ten

14  years or more?

15      A.  Yes, more, more.

16      Q.  Were you familiar with any gangs

17  that frequented your neighborhood?

18      A.  I stayed out of the gangs.  I

19  didn't deal with any of that stuff.

20      Q.  Did you ever have any run-ins with

21  gangs?

22      A.  No, except for the one time when I

23  was walking with my friend through the

24  alley, and I got jumped when I was a

1   teenager.  He ran off, and I then looked

2   behind me, and they just swarmed me.

3        Q.  Do you know if you had been jumped

4   by a gang?

5        A.  I think it was a gang because I

6   was pretty stupid that day, and I was

7   wearing red and black.

8        Q.  So you think it was you were

9   wearing colors of a gang --

10       A.  Yes.

11       Q.  -- and they had an issue with

12  that?

13       A.  Right.

14       Q.  Do you recall how old you were at

15  the time?

16       A.  Maybe I was 17.  I am not sure.

17       Q.  Was it before or after the

18  shooting that we have been talking about?

19       A.  Oh, that was way before.

20       Q.  And the friend that you were with,

21  who was that?

22       A.  Old friend, that was Jesse

23  Montero.

24       Q.  Sir, I wanted to ask you if you

1   know some people, and I am just going to

2   read you some names, and just let me know if

3   you know them, and then I will ask you how

4   you know them, okay?

5       A.   Yes.

6       Q.   Did you know someone by the name

7   of Mercy Cordero?

8       A.   No.

9       Q.   How about somebody by the name of

10  Monica Roman?

11      A.   No.

12      Q.   Did you know somebody by the name

13  of Frank Vasquez?

14      A.   No.

15      Q.   Did you know somebody by the name

16  of Rosendo Ochoa?

17      A.   No.

18      Q.   Did you know somebody by the name

19  of Daniel Sanchez?

20      A.   No.

21      Q.   Did you know somebody by the name

22  of Freido Rodriguez?

23      A.   No.

24      Q.   Did you know somebody by the name

1   of Jesus Gonzales?

2        A.   No.

3        Q.   Did you know somebody by the name

4   of Jose Cornell?

5        A.   No.

6        Q.   Did you know somebody by the name

7   of Geraldo Iglesias?

8        A.   No.

9        Q.   Did you know somebody by the name

10  of Francisco Vicente?

11       A.   No.

12       Q.   Did you know somebody named Rosie

13  Cruz?

14       A.   No.

15       Q.   How about a girl by the name of

16  Miranda Nievez?

17       A.   No.

18       Q.   Sir, just going back to your

19  interactions with the detectives or police

20  related to this case, did anybody act

21  unprofessional towards you?

22       A.   No, no.

23       Q.   Did any detective or police

24  officer ever force you to do something you

1  didn't want to do?

2       A.  No.  They were pretty

3  professional.

4       Q.  Did anybody tell you we want you

5  to pick this person?

6       A.  No.  They wanted me to keep

7  looking.  That's what irritated me.

8  Because, you know, what am I going to find

9  if I didn't see anything?  They kept wanting

10 me to look and look.  Are you sure?  Are you

11 sure?  Yeah, I'm sure.

12      Q.  So they were persistent in trying

13 to get you to view things?

14      A.  Yeah.  You know, take a second

15 look.  You know, look through the pictures.

16 You saw everything?  I'm like, yeah, I see

17 no point to it.  But, yeah, I looked through

18 it.

19      Q.  And did they ever point out a

20 picture or point out a person and say, "Are

21 you sure it's not this guy?

22      A.  No, I don't remember anything like

23 that.

24          MR. BRUEGGEN:  Sir, those are all

1  the questions I have.  Some of the other

2  attorneys probably have some questions, but

3  thank you very much for your time.  I

4  appreciate it.

5          THE WITNESS:  Thank you.  No

6  problem.

7          MR. HAZINSKI:  I have some

8  questions, but I want to make sure I give --

9          MR. BRUEGGEN:  Austin or Kevin, do

10 you guys have any questions.

11         MR. ZIBOLSKI:  This is Kevin.  I

12 don't have any follow-up to that.

13         MR. RAHE:  Yeah, I just have a

14 couple of questions.

15                  EXAMINATION

16 BY MR. RAHE:

17     Q.  Hi, Mr. Chmieleski, my name is

18 Austin Rahe.  I am an attorney for the

19 defendant City of Chicago in this case.

20     A.  Hello.

21     Q.  I just have a couple of questions

22 for you.

23     A.  Sure.

24     Q.  The person Oscar who kept stopping

1  by your place, do you have his cell phone

2  number or card still handy?

3      A.  Yes.  Hold on.  Let me see.  I

4  think it's on my phone here.  Where is he

5  at?  Hold on.  Yes, I got his number.

6      Q.  What is his number?

7              (Whereupon, certain

8               proceedings were had and

9               designated as Confidential -

10              Attorneys' Eyes Only and are

11              transcribed under separate

12              cover.)

13              *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

```
 1                  (Whereupon, the following
 2                   proceedings were not
 3                   designated as Confidential -
 4                   Attorneys' Eyes Only:)
 5   BY MR. RAHE:
 6        Q.  Do you have Oscar's last name?
 7        A.  No.
 8        Q.  And then you said that the
 9   individual that ran by you, his face was
10   covered?
11        A.  Yeah, I saw a side profile with a
12   hoodie on.
13        Q.  So I am just -- I just want to
14   understand what you mean by covered because,
15   you know, my understanding is when, you
16   know, someone is wearing a hoodie, the front
17   of their face is not covered.  There is an
18   opening, right?
19        A.  Yes.  That's why I said it was a
20   side profile.  The hoodie was over their
21   head, and I just saw a side profile of the
22   person running by.  That was it.  The hoodie
23   was on, and that's all I saw.
24        Q.  So the hoodie was, you know, big
```

 1  enough --

 2       A.  Yes.

 3       Q.  -- to maybe go over the sides?

 4       A.  Yes, yes.

 5       Q.  And he was running by, so you

 6  didn't see?

 7       A.  Yes, like one second.  It was so

 8  fast.

 9       Q.  And then you said you lived with

10  Efrain Torres now, right?

11       A.  Yes.  Now, yeah.

12       Q.  And that's the same individual

13  that you were talking about who you were

14  friends with back in 1993, right?

15       A.  Yes.  He lived up on the third

16  floor.

17       Q.  And you guys have just remained

18  friends over the years?

19       A.  Oh, yeah.  We've been buddies

20  since grammar school.

21       Q.  Did you talk with Efrain Torres

22  about your deposition at all today?

23       A.  We talked about it, yeah.  We

24  talked about this.

1       Q.   What did you guys talk about?

2       A.   Pretty much what did he see, and

3  he asked what I saw.  Like I said, I thought

4  I was talking to him that day, but he said

5  it wasn't him so, you know, I was like,

6  okay.

7       Q.   And what did he tell you about

8  what he saw?

9       A.   He pretty much just told me he

10  didn't see much of anything.  He said, he

11  heard the gunshots, and he looked out his

12  window.

13       Q.   And did he say what he saw, or he

14  just looked out there, he didn't see

15  anything?

16       A.   I don't remember.  You'd have to

17  talk to him, but I don't remember what he

18  said.

19       Q.   When did you have this

20  conversation with Efrain Torres?

21       A.   I think the time when I got into

22  contact with Oscar, and he wanted to know

23  what we saw.

24       Q.   But since then, you haven't talked

1  about anything to do with this case with

2  Efrain Torres?

3      A.  No, not really.  Like I said, we

4  both pretty much didn't see anything, so

5  there wasn't really much to talk about.

6      Q.  Do you know anybody by the name of

7  Geraldo Iglesias?

8      A.  No.

9      Q.  When you were at the lineup, did

10 you recognize anyone at all, even if they

11 weren't -- were not involved in the

12 shooting?

13     A.  I didn't recognize anybody.

14         MR. RAHE:  All right.  That's all

15 the questions I have.  Thank you.

16         THE WITNESS:  Okay.  Thank you.

17                 EXAMINATION

18 BY MR. HAZINSKI:

19     Q.  Hi, Mr. Chmieleski; is that right?

20     A.  Yes.

21     Q.  I also have an often mispronounced

22 Polish last name, so I will do my best to

23 get it right.

24     A.  Okay.

1      Q.  I am an attorney.  My name is

2  John.  I represent the plaintiff in this

3  case, who is Geraldo Iglesias, which is a

4  name you have heard a couple of times, okay?

5      A.  Okay.

6      Q.  And I just want to ask a few quick

7  follow-up questions, and I will try not to

8  take long because I want to be sensitive of

9  your time this morning.

10      A.  No problem, sure.

11      Q.  Thank you.  So before this

12  deposition, you got a subpoena in the mail,

13  or was it hand delivered to you?

14      A.  It was hand delivered to me by a

15  detective Mark -- what was his name?  Mark

16  Zelky.

17      Q.  And when was that?

18      A.  I don't remember the exact date.

19      Q.  Was it within the last couple of

20  weeks?

21      A.  It was further back, yeah.

22  Probably about a month ago, I think.  Maybe

23  more, I am not sure.

24      Q.  Do you know who issued that

 1  subpoena to you for this deposition today?

 2       A.  No.  I have it in my hand.  A law

 3  firm, Sotos Law Firm.

 4       Q.  Do you know that Sotos Law Firm is

 5  the firm representing the police officer

 6  defendants in this case?

 7       A.  No, I didn't.

 8       Q.  So did you talk with any attorneys

 9  in advance of your deposition?

10       A.  No.

11       Q.  And we were talking a little bit

12  about you meeting with someone named Oscar.

13  Do you remember talking about that?

14       A.  Yes.

15       Q.  Oscar got in contact with you and

16  told you that he was working for some

17  lawyers in a case and wanted to ask you

18  questions, right?

19       A.  Yes.

20       Q.  And I believe you testified that

21  you basically told Oscar the same

22  information that you told us here today; is

23  that fair?

24       A.  Exactly, yes.

```
 1        Q.  And then eventually, Oscar came
 2   back to you with that information written
 3   out on a sheet and asked you to look over
 4   that; is that fair?
 5        A.  Yes, yes.
 6        Q.  When you looked over it, the first
 7   time you looked over it, did you see
 8   anything in there that you thought was wrong
 9   or needed to be changed?
10        A.  The first time I looked over it, I
11   just -- no, I didn't see anything that
12   needed to be changed.
13        Q.  But you did read through it and
14   just kind of made sure everything was
15   correct, right?
16        A.  Yes.
17        Q.  And then on another occasion,
18   Oscar came back, and that's when there were
19   corrections made; right?
20        A.  Yes.
21        Q.  And those were the corrections
22   that were in the handwriting on the document
23   that Mr. Brueggen showed you, right?
24        A.  Yes.
```

1      Q.  So I want to kind of go back and

2  ask you a couple of questions about 1993.

3  So you had -- you made a little bit of

4  money, it sounds like, watching Bernice

5  Bullock's son, Steve; is that right?

6      A.  Yes.

7      Q.  How did you come to start doing

8  that?

9      A.  She was a good friend.  She would

10  come over to our house a lot, talk with me

11  and my father.  She used our phone a lot.

12  And she was just a good friend, you know.

13  And she went out a lot, and she never had

14  any -- she just leaves her son alone all the

15  time.  So she'd give me a few bucks, you

16  know, gave me a key, go watch in on him and

17  see if he is okay, and I did that every once

18  in a while, and she would give me some

19  money.

20      Q.  Was Steve Bullocks -- you said he

21  had Down's syndrome; right?

22      A.  Yes.  He had some medical

23  problems, yes.

24      Q.  Did he require any special care as

1   a result of that?

2          A.   I don't remember.  She pretty much

3   just left him in his room all the time.

4   That's what I remember when it came to her

5   son, and he didn't really talk a lot.  He

6   just -- he did his own thing, I guess.

7          Q.   Around that time in 1993 was he

8   going to school?

9          A.   No, he wasn't going to school.  He

10  was -- no.

11         Q.   Do you know if he went to any kind

12  of programs or anything during the day?

13         A.   Yeah, I think she had him going to

14  some kind of program.

15         Q.   Do you know how he would get to

16  and from that program?

17         A.   I remember a school bus would

18  always pick him up, so I think that's how

19  they did it, yeah.  A little school bus

20  would pull up in front of the building.

21         Q.   In the current day, are you still

22  in touch with either Bernice Bullocks or

23  Steve Bullocks at all?

24         A.   Oh, no, no, definitely not, no.

```
 1        Q.  Did you lose contact with them
 2   after you moved out of that apartment?
 3        A.  Yes.
 4        Q.  So asking now specifically about
 5   the day of the shooting incident that we
 6   have been talking about, you said you were
 7   talking with someone that you think might
 8   have been Efrain Torres --
 9        A.  Yes.
10        Q.  -- while you were standing in the
11   doorway of that apartment building; is that
12   right?
13        A.  Right, yes.
14        Q.  And he remembers it differently,
15   fair?
16        A.  Yes, he said it differently, yes.
17   He said, I wasn't talking to you.  I am,
18   like, oh, okay.  I thought it was you.
19        Q.  If you weren't talking to Efrain
20   Torres, do you have any idea who it could
21   have been that you were talking to?
22        A.  Oh, man, I know I was talking to
23   somebody.  I don't remember.  He said it
24   wasn't him, so I don't remember.  It must
```

1  have been someone from the neighborhood.  I

2  don't remember.  Like I said, that was so

3  far back.  Until last year, I completely

4  forgot about this whole thing.

5      Q.  Is there anything specific that

6  leads you to believe that it was Efrain and

7  not someone else that you were talking to?

8  Any particular memories that make you say

9  that?

10     A.  I thought it was him because we

11 were always hanging out in front of the

12 building.  We were always talking, so I

13 figured if I was talking to somebody, I

14 thought it was him.  He was my neighbor, and

15 we were always chilling out.

16     Q.  Yeah.  While you were standing

17 there, you heard gunshots; right?

18     A.  Yes.  I was standing at the

19 doorway, and I heard the gunshots, yes, yes.

20     Q.  Do you know -- do you remember --

21 the person you were talking to, whether it

22 was Efrain or somebody else, do you remember

23 what they did?

24     A.  I think they just ran off, I

1  think.  I don't remember coming into my

2  apartment after that, so they must have just

3  ran off.

4      Q.  You also saw a person wearing a

5  black hoodie with the hood pulled up run by

6  you in front of you?

7      A.  Yes, it was so quick, just ran by

8  me and that was it.

9      Q.  So that door that you were

10 standing in that we have been talking about,

11 that door is on Sawyer; right?

12     A.  Yes.

13     Q.  And Sawyer is a north-south

14 street?

15     A.  Yes.

16     Q.  And so the person ran -- was

17 running -- coming from the north and running

18 south past that doorway; is that right?

19     A.  Towards the alley, yes.

20     Q.  About how long in total would you

21 estimate you had an opportunity to view that

22 person that was running?

23     A.  It was like a second, if even

24 that.  It was so quick, so fast.

1     Q.  And the hood was up, which

2  prevented you from having a real view of

3  their face; right?

4     A.  Yes.  It could have been a woman.

5  It could have been a child.  I don't

6  remember.  It was -- it was so quick.

7     Q.  When that person ran by, did you

8  recognize that by their clothes or any other

9  indicators that they were a gang member?

10    A.  No, no.  It could have been

11 somebody running from gunshots.  I don't

12 know who that was.

13    Q.  So you don't even know if that

14 person was the shooter?

15    A.  No, no, I don't even know if they

16 were the shooter.  I don't know who they

17 were.

18    Q.  Earlier Mr. Brueggen asked you a

19 question.  I want to clarify your answer.  I

20 think he asked if you remembered whether

21 Steve, the boy you watched, was around when

22 the shooting happened.  Do you remember

23 that?

24    A.  No, I -- I definitely -- he

1   definitely wasn't.  I give a no on that.

2        Q.  How do you remember that

3   specifically?

4        A.  I would remember if he was in

5   the -- out there or if he was in the -- out

6   -- if he was by -- I would have remembered

7   if he was there or if he wasn't.  That I

8   would have remembered.

9        Q.  Would you have remembered like --

10  strike that question.

11            Do you know if he might have

12  been inside of his apartment?

13       A.  Yeah, he would have been inside --

14  yes, he would have been inside his

15  apartment.

16       Q.  So he could have been in the

17  general vicinity but just not, you know,

18  physically present where you were standing;

19  right?

20       A.  Yeah, yeah, he would have been in

21  his room, as usual.

22       Q.  Got it.  So then you said that a

23  couple police officers came to talk to you

24  pretty soon after the shooting, right?

```
 1      A.  Yes.  I think they were asking
 2  everybody in the building what was going on.
 3  And, you know, I just told them that I
 4  didn't see anything.  I saw the person run
 5  by, side profile, a second, who knows who
 6  that was.
 7      Q.  And that first time those police
 8  showed up, it was night-time; right?
 9      A.  Yes, they came at night to come
10  pick me up.
11      Q.  But the shooting had happened in
12  the afternoon of one of the days around
13  then, right?
14      A.  The afternoon, yes.
15      Q.  And you said it was -- you said
16  you don't really remember what they looked
17  like, these cops that came to you?
18      A.  No, I completely -- I completely
19  forgot about that.
20      Q.  So you don't remember if they were
21  white or black or another ethnicity?
22      A.  I know they weren't black.  Maybe
23  white or white-Hispanic.  It would have to
24  be that, either white or white-Hispanic.
```

1      Q.  There was then also a time after

2  those police left where you were -- where

3  some police came and picked you up and took

4  you to the police station, right?

5      A.  Yes.

6      Q.  And do you know for sure, one way

7  or the other, whether that was the same

8  night that those cops initially came to

9  visit you or a different night?

10     A.  I can't give you 100 percent on

11 this, but it feels to me like it was the

12 same day.  It was the same day.  I am not

13 100 percent sure on that.  Was it the second

14 day?  I am not sure, but it feels to me like

15 it was the same day at night.

16     Q.  It's possible it could have been a

17 little later, but it's also possible it

18 could have been the same day; right?

19     A.  Yes.

20     Q.  Now, when those cops first came to

21 talk to you, did you tell them the same

22 thing you have been telling us; namely, you

23 didn't get a view of the person who did it?

24     A.  Exactly.  I told them the side

1   profile, the ran past, hoodie on the head,

2   didn't see nothing, don't know who they

3   were, but, you know, they still wanted me to

4   go.

5       Q.  Yeah.  When you say they still

6   wanted you to go --

7       A.  Uh-huh.

8       Q.  -- are you talking about kind of

9   the first interaction you had with the

10  police that came to see you or a later

11  interaction?

12      A.  That was the later one at night

13  when they came to pick me up.

14      Q.  The first time the cops came to

15  see you, did they ask you to go to the

16  station or do anything else like that?

17      A.  No, no.

18      Q.  Do you have any idea why the

19  police wanted you to go look at photos and

20  look at a lineup at that point?

21      A.  No, I don't.

22          MR. BRUEGGEN:  Objection.

23  Speculation.

24          THE WITNESS:  I could never

```
 1   understand why they wanted me to go if I
 2   could be no help to them.  I couldn't pick
 3   anybody out because I didn't see anything,
 4   so I never saw the point of going there in
 5   the first place.
 6   BY MR. HAZINSKI:
 7        Q.  You told that to them, didn't you?
 8        A.  Yes, yes.
 9        Q.  Did you ever tell them that it
10   wasn't going to be helpful for you to go
11   look at photos?
12        A.  Yes, I told them I would be no
13   help.  But, you know, they wanted me to go,
14   so I went.  You know, I wasn't going to
15   argue.  So, you know, they said they will
16   bring me back.  So I'm like, okay, if you
17   are going to bring me back to my home, all
18   right.  I will go.  I will help you out.  I
19   am not going to be any help.  I can't pick
20   anybody, but if you want me to go, I went.
21        Q.  Did they tell you why they wanted
22   you to go even though you told them you
23   hadn't seen anything that would be helpful?
24        A.  I don't know.  They wanted me just
```

1  to go to look at photos.  And again, I

2  didn't see the point to that, but I did it.

3      Q.  Have you on any other occasions,

4  not just around this time, but like ever in

5  your life done any kind of looking at photos

6  or looking at lineups as part of a police

7  investigation?

8      A.  No.  That was the first time.

9      Q.  Since then, have you ever done

10 anything like that?

11     A.  No.

12     Q.  On the occasion where the police

13 brought you to the station; namely, like the

14 second interaction you have been talking

15 about --

16     A.  Yes.

17     Q.  -- do you remember if those were

18 the same officers or different officers from

19 the ones you initially talked to?

20     A.  Man, I can't be a hundred -- I

21 can't recall.  I don't remember.  I don't

22 want to give you a yes or no if I can't

23 remember.

24     Q.  It's possible it could have been

 1  the same guys; it's possible it could have

 2  different guys?

 3      A.  It's possible, yes.

 4      Q.  And you don't remember --

 5  similarly with the first guys, you don't

 6  remember any specific details about the

 7  second set of police officers you interacted

 8  with; right?

 9      A.  No.  Like I said, everything just

10  happened.  I completely forgot about this

11  whole incident.

12      Q.  Fair to say that you don't

13  remember every detail of your interactions

14  with the police that happened all that time

15  ago?

16          MR. BRUEGGEN:  Objection.  Form.

17          THE WITNESS:  All I remember is I

18  was irritated having to go down there, and I

19  knew I wasn't going to be of any help, but

20  they wanted me to go maybe because -- I

21  don't know why they wanted me to go down

22  there.  You know, they said they would bring

23  me back, so it would be quick, I guess, so I

24  did it, even though there was no point to

1  it.

2  BY MR. HAZINSKI:

3      Q.  You figured it would be better to

4  just cooperate with what they wanted you to

5  do?

6          MR. BRUEGGEN:  Objection.  Form.

7          THE WITNESS:  Yes, I didn't want

8  to argue with the cops so I cooperated, you

9  know.

10  BY MR. HAZINSKI:

11      Q.  When the police took you to the

12  station, they brought Efrain as well?

13      A.  Yes, he was with me.

14      Q.  Was he with you in your apartment

15  when the cops showed up?

16      A.  Yeah.  He came downstairs because

17  they wanted him to go out there.  I don't

18  remember if they called him up or if they

19  went and knocked on his door, and he came

20  down.  I forgot how that happened, but I

21  remember he came with me down there to look

22  at the lineup and the pictures, too.

23      Q.  Do you remember anything that

24  Efrain said to the police during that

 1  interaction?

 2       A.  No.  You'd have to talk to him.

 3       Q.  And did the two of you ride in the

 4  back of the car?

 5       A.  Yes, we were in the back.  We were

 6  in the back, yes.

 7       Q.  Do you remember talking to him or

 8  having any kind of conversation with him

 9  during that ride?

10       A.  No.  We were just both looking out

11  the windows, and that was it.

12       Q.  I believe you testified you don't

13  remember exactly where the police station

14  was that you went to?

15       A.  Yes.

16       Q.  Do you remember the general

17  neighborhood it was in?

18       A.  It was definitely in the area.  I

19  forget the police station.  It had to have

20  been the nearest one, but I forget which one

21  it was.  I can't recall where it was at.

22       Q.  Do you know if it was in or around

23  the neighborhoods of Austin or Galewood on

24  the West Side?

1      A.  It was within my area.  Jimmy

2    would know that one.  It wasn't a long --

3    how long was it?  I don't recall being in

4    the car too long, but I can't remember the

5    police station we went to.  I can't

6    remember.

7      Q.  Do you remember anything about

8    what the police station looked like?

9      A.  No. Like I said, I forgot about

10   this incident.  It was out of my memory for

11   so long.

12     Q.  Okay.  While you were at the

13   station, you looked at a thick book of

14   photos; is that right?

15     A.  Yes.

16     Q.  Do you remember what the pictures

17   of the people -- so let me take a step back.

18   Strike that question.

19             The photos, were they Polaroid

20   photos?

21     A.  I think they were -- if they were

22   strictly Polaroid as far as the camera, I

23   don't remember.  It was just a bunch of

24   photos.  Polaroids, I am sure there were

 1  Polaroids in there, yeah.

 2       Q.  And each photo showed one person,

 3  right?

 4       A.  Yeah, yeah, just some people in

 5  there, yeah.

 6       Q.  Do you remember if there were

 7  names written near those photos?

 8       A.  No, I don't remember names on

 9  there.  I don't remember any names.

10       Q.  Do you know what the -- if the

11  people in those photos all looked similar or

12  all looked different in any way?

13       A.  I think you had people too much --

14  people who looked different, a variety of

15  different stuff.

16       Q.  Do you remember whether the people

17  in the photos you were looking at were all

18  men?

19       A.  Yes, they were all men, yes.

20       Q.  Do you remember if they were all

21  Latino?

22       A.  Were they all strictly

23  100 percent, I don't recall.

24       Q.  Do you remember if any of them

1  were Latino?

2       A.  Yes, they were.  They were, yeah.

3  Yes.

4       Q.  Do you have any idea where those

5  -- so earlier Mr. Brueggen asked you a

6  question about whether you had -- you knew

7  how the pictures came to be in that book,

8  whether they were affiliated with anything.

9  Do you remember that?

10      A.  No.  They just handed me a book

11 and I looked through the book.  That was it.

12      Q.  Did they ever tell you it was a

13 photo book of members of a gang?

14      A.  I don't recall them saying that

15 specifically.

16      Q.  At the time you were looking at

17 it, did you understand it to be a book with

18 pictures of members of a particular gang?

19      A.  Yeah.  I knew I was looking

20 through a book with criminals in there, so I

21 figured that.  That's why he was showing me,

22 you know.

23      Q.  So where was Efrain when you were

24 looking at that book?

```
 1          MR. BRUEGGEN:  Objection to
 2  foundation.  If you know?
 3          THE WITNESS:  I don't remember if
 4  he was in the same room with me, or he was
 5  in a separate room.  He's got a way better
 6  memory than me.  I can't recall.
 7  BY MR. HAZINSKI:
 8       Q.  Do you know whether he looked at
 9  the same book that you looked at?
10       A.  I don't recall.  You have to ask
11  him.
12       Q.  Sorry, just one second.  So about
13  how long in total do you think you were
14  looking through the photos in that book?
15       A.  Let me think back.  Probably,
16  maybe 20 minutes.  Because they wanted me to
17  look -- they wanted me to look at it very --
18  you know, not glimpse it real quick.  They
19  wanted me to really look at the pictures.
20  So, you know, I looked through it as best as
21  I could and told them I didn't recognize
22  anybody.
23       Q.  Who did you tell that to
24  specifically, do you remember?
```

 1        A.   I don't remember.

 2        Q.   So it was a couple officers who

 3   had come to your apartment to pick you up

 4   and brought you to the station, right?

 5        A.   Yes.

 6        Q.   Do you remember if you were

 7   dealing with those same people throughout

 8   that evening, or if there were different

 9   people you were dealing with as well?

10        A.   I don't remember if it was the

11   same people from earlier.  I don't recall.

12        Q.   And after you told them you

13   couldn't pick anybody out of the book

14   because you hadn't seen the person, they

15   asked you to look at a lineup; right?

16        A.   Yes.

17        Q.   Did they tell you why they wanted

18   you to look at a lineup?

19        A.   To see if I recognize anybody, and

20   I told them, how am I going to recognize

21   anybody if I don't recognize anybody from

22   the pictures?  I don't recognize the person

23   I saw that ran past me.  You know, like I

24   said, I didn't want to argue.  There were a

1  bunch of formalities, and I just had to do

2  it anyways.  I did.  I looked, and I told

3  them, no, I don't recognize anybody.

4       Q.  So at that point, from your

5  perspective, you looking at a lineup was

6  pretty pointless; right?

7       A.  Yes.

8       Q.  And you testified you don't

9  remember if there was an officer in the room

10  with you while you were looking at that

11  lineup, do you?

12       A.  I don't remember.

13       Q.  There might have been an officer

14  there, but maybe not?

15       A.  Exactly.  Maybe; maybe not, right.

16       Q.  Is it possible there could have

17  been multiple officers?

18       A.  It's possible.  I don't remember

19  that to be honest with you.  It's possible.

20       Q.  Earlier you testified that you

21  knew that the cops wanted you to pick

22  someone out of a lineup.  What did you mean

23  by that?

24            MR. BRUEGGEN:  Objection.

 1  Misstates his testimony, but go ahead.

 2          THE WITNESS:  The point of being

 3  there is they, obviously, want me to pick

 4  somebody even though I told them I didn't --

 5  how am I going to pick somebody?  I didn't

 6  see a face.  They wanted me to look through

 7  the photos to pick somebody.  They,

 8  obviously, wanted me to recall something

 9  even though I didn't see anything.  They

10  wanted me to pick somebody or recall

11  something maybe I forgot.  But I didn't pick

12  anything because I didn't see any face.

13          But they, obviously, wanted me

14  to pick somebody.  Like I said, I wasn't too

15  much pressure because I, obviously, didn't

16  pick anybody.  But like I said, I was

17  irritated when I went there, and maybe I

18  felt a little bit of pressure, but not that

19  much pressure, but they wanted me to pick

20  somebody.

21     Q.  Fair to say that you didn't feel

22  too much pressure to the point where you

23  felt compelled to pick somebody, but you

24  felt some pressure?

 1      A.  Yes, yes.

 2      Q.  And you were a little bit

 3 irritated during that whole interaction?

 4      A.  Yes.  Like I said, and I was

 5 sleeping when they came to pick me up, and I

 6 didn't see any point to going down there and

 7 looking through things when I would be no

 8 help to them.

 9      Q.  Yeah.  And you were pretty -- you

10 told them over and over again that you

11 hadn't seen anything, right?

12      A.  Yes.

13      Q.  Yeah.  But every time you told

14 them that, they still kept asking you to be

15 involved in this process; right?

16      A.  Yeah, yeah, like, look through the

17 photo book.  Are you sure?  Yeah, I'm pretty

18 sure.

19      Q.  I believe you testified you don't

20 remember having a conversation with an

21 Assistant State's Attorney after that, but

22 do you know what an Assistant State's

23 Attorney is?

24      A.  No.

1      Q.  Do you remember ever during the

2  time you were at the police station ever

3  meeting anybody that told you they were a

4  lawyer or a prosecutor?

5      A.  I can't give you a yes or no

6  because I don't remember.

7      Q.  If there was a police report that

8  documented that you had met for at least a

9  little bit of time with a prosecutor, would

10  you have any reason to dispute that?

11      A.  No.

12      Q.  Is it fair to say you don't

13  remember every single interaction you had

14  with everybody while you were at the

15  station, right?

16      A.  Right.  That was so long ago, and

17  after all this time, memory is really weird,

18  you know.

19      Q.  So the stuff that you have

20  testified to today in this deposition, you

21  have testified to the best of your memory,

22  and when you haven't been able to remember,

23  you have told us that; is that fair?

24      A.  Yes, correct, yes.

1      Q.  I appreciate that, and I

2  understand it's a very long time ago, so I

3  appreciate that.  One quick second here.

4           So you ended up signing a

5  declaration that Oscar brought to you,

6  right?

7      A.  The officer?

8      Q.  That Oscar brought to you.

9      A.  Oh, Oscar, yes, yes.

10      Q.  And Oscar had been pretty

11  persistent in trying to get ahold of you,

12  right?

13      A.  Oh, yeah, yeah.

14      Q.  And it was starting to get a

15  little irritating; is that fair?

16      A.  Yes, yes.

17      Q.  Did Oscar ever promise you

18  anything in exchange for talking to him?

19      A.  No, no. He said he worked for some

20  charity something, some charity, or

21  whatever, some foundation or something.

22      Q.  Do you remember if he told you he

23  worked for lawyers?

24      A.  I don't remember him saying that.

```
 1        Q.  I believe you testified earlier
 2  during your deposition that he stated he was
 3  working for lawyers.  Do you remember giving
 4  that testimony?
 5        A.  Let me think, let me think.  Wait
 6  a second.  When he was on the phone with --
 7  that was listening in, yeah, yeah, yeah, he
 8  said that was a lawyer that was listening
 9  into our conversation on the phone, yeah,
10  okay, yeah.
11        Q.  Do you remember whether he told
12  you the lawyer represented Geraldo Iglesias?
13        A.  I think he said he did, yes, yes.
14        Q.  Do you remember who that lawyer
15  was that you talked to?
16        A.  No.
17        Q.  Did you ever -- did you ever hide
18  anything or conceal anything that you know
19  about this incident from Oscar when you were
20  talking to him?
21        A.  No.  I did the best I could.  I
22  told him everything I saw.  I didn't even
23  know why he was at my place to begin with.
24  I didn't even know why I am out here.  I saw
```

1  nothing.  It's like, I don't know what help

2  I would be to Oscar when I didn't see

3  anything.  But still, you know, he wanted to

4  know what I saw.

5       Q.  And you told him what you knew so

6  that he would stop talking to you?

7       A.  Yeah, exactly.

8       Q.  But what you told him was the

9  truth, right?

10      A.  Oh, yes, it was the truth, yes.

11      Q.  He didn't threaten you or

12  anything?

13      A.  Oh, no, no, no.

14          MR. HAZINSKI:  All right.  I don't

15  have any questions -- any more questions for

16  you, Mr. Chmieleski.  Thank you.

17          THE WITNESS:  Okay.  Thank you.

18          MR. BRUEGGEN:  Mr. Chmieleski, I

19  just have a couple quick in follow-up.

20          THE WITNESS:  Sure.

21              FURTHER EXAMINATION

22  BY MR. BRUEGGEN:

23      Q.  Very brief.  Earlier when you were

24  asked a question about what police station

1  you went to, I thought you said Jimmy would

2  know that.  Did I mishear you?  Did you say

3  Jimmy?

4        A.  Yes, Jimmy would have known that.

5        Q.  Who is Jimmy?

6        A.  We call him Jimmy.  Efrain,

7  Efrain, sorry.  We call him Jimmy.  Yeah.

8  He likes to be called Jimmy instead of

9  Efrain.

10       Q.  When you were being questioned by

11 the police, were you aware that there had

12 been a woman that had been murdered in the

13 shooting that you had heard?

14       A.  I heard that a woman was shot.  I

15 don't remember if she was murdered or not.

16       Q.  You said the police were basically

17 trying to exhaust your memory whether you

18 had any --

19       A.  Yes.

20       Q.  -- recollection?

21       A.  Yes, yes.

22       Q.  And just making attempts to show

23 you things to see if it sparked a memory --

24       A.  Yes.

1      Q.  -- of your recollection?

2      A.  Yes.

3      Q.  And I know it was annoying that

4  they kept doing the same thing, right,

5  that's what you told us?

6      A.  Yes.

7      Q.  And you talked briefly about Steve

8  who you watched?

9      A.  Yes.

10     Q.  Would you ever spend time in his

11 apartment, or did you just pop in and check

12 on him?

13     A.  I always popped in and checked up

14 on him if he was all right.

15     Q.  When you spoke to Oscar about that

16 declaration, did he tell you or did the

17 attorney who was listening tell you why they

18 wanted that declaration?

19     A.  They just told me they wanted to

20 get my point of view of what I saw.  That

21 was pretty much it.  They wanted to know

22 what I saw, and that was it.  They just

23 wanted to hear my version.

24     Q.  Did Oscar or the attorney focus on

1  whether the police officers had pressured

2  you or --

3       A.  Yes, a little bit, yes.

4       Q.  And again, I think you told us

5  that you felt pressure, but it was just the

6  pressure to keep looking at things?

7       A.  Yeah, it was mainly irritation,

8  yeah.

9       Q.  If I keep going, you might have

10 irritation towards me?

11      A.  No, you're good.  You're good.

12      Q.  After you signed that declaration,

13 did Oscar stop coming by?

14      A.  Yes, he just came by a second time

15 to correct it.

16      Q.  And after that, any contact with

17 Oscar?

18      A.  No.  I told him I was done.  That

19 was it.

20      Q.  Did Oscar tell you that would be

21 the end of it?  If you signed a declaration,

22 there wouldn't be any more contact in the

23 case?

24      A.  Yeah, he said we were finished.

```
 1  He wouldn't bother me any more.  We're done.

 2          MR. BRUEGGEN:  Mr. Chmieleski,

 3  those are all the questions I had in

 4  follow-up.  I don't know if Austin has

 5  anything.

 6          MR. RAHE:  I have no follow-up.

 7          MR. BRUEGGEN:  I take it, Kevin

 8  has no follow-up.

 9              John, do you have anything?

10          MR. ZIBOLSKI:  No, I'm good.

11          MR. HAZINSKI:  No.

12  BY MR. BRUEGGEN:

13      Q.  Mr. Chmieleski, you are done, but

14  there is one last thing I have to do.

15      A.  Sure.

16      Q.  I have to explain something called

17  signature.  As I mentioned, the court

18  reporter has typed up everything that's been

19  said, so there will be a transcript of your

20  questions and answers.  And as the witness,

21  you have the right to review that --

22      A.  Okay.

23      Q.  -- to make sure that she has

24  written down everything correctly.  You
```

1  can't change any of your answers.  You can't

2  change a "yes" to a "no" or a "no" to a

3  "yes" or add to an answer.  But you can

4  change if she misheard you or mistranscribed

5  things, you can change that.  That's an

6  option you have, and you can reserve

7  signature, which means once this is typed

8  up, you'd have to coordinate with the court

9  reporter to go review a copy.  You would

10  review it, make any changes like that where

11  she misheard you.

12       A.  Okay.

13       Q.  The other option is you can waive

14  signature and just trust the court reporter

15  wrote down everything that we said

16  correctly, but the option is yours, if you

17  want to reserve and go have to review it, or

18  whether you want to waive it.

19       A.  I trust the court reporter.

20            MR. BRUEGGEN:  Let the record

21  reflect signature is waived.  That is it,

22  Mr. Chmieleski.  Thank you very much for

23  your time.  We appreciate it.

24            THE WITNESS:  All right.  Thank

1   you.  Have a good day.

2           THE VIDEOGRAPHER:  This concludes

3   the deposition.  Going off the video record

4   at 11:27 at the end of Media Unit No. 1.

5

6

7                   (Deposition proceedings

8                    concluded at 11:27 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1  STATE OF ILLINOIS   )
                        )    SS:
 2  COUNTY OF DU PAGE   )

 3       I, MARIBETH REILLY, a notary public

 4  within and for the County of DuPage and

 5  State of Illinois, do hereby certify that

 6  heretofore, to-wit, on April 27, 2021,

 7  remotely appeared before me via Zoom, DAVID

 8  CHMIELESKI, in a cause now pending and

 9  undetermined in the United District Court,

10  Northern District of Illinois, Eastern

11  Division, wherein GERALDO IGLESIAS is the

12  Plaintiff, and REYNALDO GUEVARA, ET AL are

13  the Defendants.

14       I further certify that the said DAVID

15  CHMIELESKI was first duly sworn to testify

16  the truth, the whole truth and nothing but

17  the truth in the cause aforesaid; that the

18  testimony then given by said witness was

19  reported stenographically by me in the

20  remote presence of the said witness, and

21  afterwards reduced to typewriting by

22  Computer-Aided Transcription, and the

23  foregoing is a true and correct transcript

24  of the testimony so given by said witness as
```

1 | aforesaid.

2 |     I further certify that the signature

3 | to the foregoing deposition was waived by

4 | the witness for the respective parties.

5 |     I further certify that the taking of

6 | this deposition was pursuant to subpoena and

7 | that there were present at the deposition

8 | the attorneys hereinbefore mentioned.

9 |     I further certify that I am not

10 | counsel for nor in any way related to the

11 | parties to this suit, nor am I in any way

12 | interested in the outcome thereof.

13 |     IN TESTIMONY WHEREOF:  I have hereunto

14 | set my hand and affixed my notarial seal

15 | this 10th day of May, 2021.

16 |

17 |

18 |

19 |

20 |

21 |     NOTARY PUBLIC, DUPAGE COUNTY, ILLINOIS

22 |     LIC. NO. 084-002306

23 |

24 |

DAVID CHMIELESKI, 04/27/2021

**Exhibits**

**1 Chmieleski 042721-1** 17:5,11, 14,24 18:13,14 20:6 25:14,20 26:17

**2 Chmieleski 042721-2** 40:10, 14,18

**3 Chmieleski 042721-3** 46:14,18 47:7,12,17 49:10

---

**0**

**00003** 40:20

**0011** 17:14

**06508** 4:10

---

**1**

**1** 4:2 17:5,11,14,24 18:14 20:6 25:14,20 26:17 46:22 96:4

**100** 28:6 32:4 72:10,13 80:23

**10:01** 4:3

**11:27** 96:4,8

**13** 9:11 16:14

**15** 31:1

**17** 51:16

**19** 4:10

**1993** 12:15 13:7,9 15:15,18 18:8 19:22 58:14 64:2 65:7

---

**2**

**2** 40:10,14,18 46:23 47:2 48:1

**20** 4:16 11:12 13:12 82:16

**2021** 4:6

**2123** 46:23

**2124** 46:23

**2148** 12:16 13:10 18:10

**27** 4:6

**2814** 9:8

---

**3**

**3** 46:14,18 47:7,12,17 48:16 49:10

**3:50** 19:21

---

**4**

**47** 9:6

---

**6**

**6** 49:10,16

**600** 4:17

---

**7**

**7** 19:22

---

**9**

**92** 10:5

**9:00** 28:2

---

**A**

**a.m.** 4:3 96:8

**absorbed** 23:5

**act** 53:20

**activities** 14:14

**add** 95:3

**added** 48:17

**addition** 33:22 34:1

**advance** 62:9

**affiliated** 81:8

**affiliation** 35:3

**afternoon** 71:12,14

**age** 15:2

**agree** 28:20

**agreed** 33:1

**ahead** 85:1

**ahold** 88:11

**album** 48:18

**albums** 49:6

**alley** 11:18 13:14,18 26:1,6,13,22 50:24 68:19

**Andrew** 6:9

**annoyed** 40:3,5

**annoying** 92:3

**answering** 7:23

**answers** 7:7 94:20 95:1

**apartment** 9:12 12:17,18 19:3,5 27:23 30:18,20 31:5,8 32:2,17 41:22 66:2,11 68:2 70:12,15 77:14 83:3 92:11

**appearance** 5:13

**April** 4:6

**area** 11:9 22:21 24:3 78:18 79:1

**argue** 39:10 74:15 77:8 83:24

**arms** 25:7

**Arnell** 19:18

**arrived** 34:14

**assigned** 11:4

**Assistant** 41:10 86:21,22

**Associates** 4:16,19

**assume** 8:17

**attached** 26:15

**attempts** 91:22

**attorney** 8:23 41:10,12 42:18 44:8 50:12 55:18 61:1 86:21,23 92:17, 24

**attorneys** 8:10,20 55:2 62:8

**Attorneys'** 56:10 57:4

**Austin** 5:4 55:9,18 78:23 94:4

**average** 25:3

**aware** 91:11

---

**B**

**baby-sitting** 16:19

**back** 13:4 15:15,18 16:24 18:8 23:1 24:12 25:1,14 26:4 33:11 37:8 38:24 43:14 44:2 47:19 53:18 58:14 61:21 63:2,18 64:1 67:3 74:16,17 76:23 78:4,5,6 79:17 82:15

**basically** 43:9 62:21 91:16

**basketball** 14:18

**bathroom** 8:3

**beat** 11:20,21

**begin** 89:23

**beginning** 4:2

**behalf** 4:7 5:7,10,15

**beige** 19:15

**belatedly** 24:10

**Bernice** 16:1 64:4 65:22

**big** 35:13 45:16 57:24

**bigger** 35:10

**bit** 26:19 29:18 62:11 64:3 85:18 86:2 87:9 93:3

**black** 25:10 26:18 35:23 51:7 68:5 71:21,22

**blinds** 23:15,23

**blue** 26:19

**board** 14:17

**book** 34:21,24 35:2,6,8,13 36:24 79:13 81:7,10,11,13,17,20,24 82:9, 14 83:13 86:17

**bother** 46:3 94:1

**bothered** 46:4

**Bowen** 4:16,19

**boy** 69:21

**boys'** 14:2,10,13 15:3,9

**break** 8:3,7

**Brett** 4:14

**briefly** 30:21 92:7

**bring** 74:16,17 76:22

**brought** 44:12,19,24 75:13 77:12 83:4 88:5,8

**Brueggen** 4:23,24 5:11 6:5 14:20 15:1,7,14 17:13,15 24:11 40:12 46:16 54:24 55:9 63:23 69:18 73:22 76:16 77:6 81:5 82:1 84:24 90:18,22 94:2,7,12 95:20

**bucks** 22:13 64:15

**buddies** 58:19

**build** 25:4

**building** 11:5,6,7 12:18 13:15,24 18:3,7,20,21 19:1,5,8,22 21:19,20, 23 22:6,17,21 26:3,15 33:19 65:20 66:11 67:12 71:2

**Bullock's** 16:11 64:5

**Bullocks** 16:1,5 19:11 64:20 65:22,23

**bunch** 79:23 84:1

**bus** 22:6,9,16 65:17,19

**bystander** 20:22

---

**C**

**C-H-M** 6:10

**call** 27:2 44:1 91:6,7

**called** 6:2 77:18 91:8 94:16

**camera** 79:22

**car** 24:5 78:4 79:4

**card** 10:20 14:17 56:2

**care** 64:24

**Carl** 10:1

**case** 4:10 5:2 6:18 42:8 53:20 55:19 60:1 61:3 62:6,17 93:23

**CCSAO** 17:14 40:19

**cell** 56:1

**change** 95:1,2,4,5

**changed** 63:9,12

**charity** 88:20

**check** 16:19 32:20 43:15 92:11

**checked** 16:7,21 43:15 92:13

**Chicago** 4:17 5:5 9:8 55:19

**child** 15:23 69:5

**children** 15:23

**chilling** 67:15

**Chmieleski** 4:6,24 6:1,6,9 9:4,23 17:1,10 19:20 40:9 46:13 55:17 60:19 90:16,18 94:2,13 95:22

**choose** 39:13

**Christie** 5:6,7

**City** 5:5 55:19

**claim** 12:4

**clarify** 69:19

**Clark** 4:17

**class** 14:19

**clear** 7:13,14 12:11

**clearer** 17:21 49:11

**clothes** 69:8

**club** 14:3,11,14 15:3,9

**coat** 19:15 25:23

**color** 25:8,11

**colors** 51:9

**compelled** 85:23

**compensation** 12:4

**completely** 28:13 32:13 42:11 67:3 71:18 76:10

**conceal** 89:18

**concluded** 96:8

**concludes** 96:2

**conditions** 12:10

**Confidential** 56:9 57:3

**confirm** 17:7

**contact** 29:11 31:8 59:22 62:15 66:1 93:16,22

**conversation** 59:20 78:8 86:20 89:9

**convicted** 12:6

**cooperate** 77:4

**cooperated** 77:8

**coordinate** 95:8

**cops** 71:17 72:8,20 73:14 77:8,15 84:21

**copy** 45:4,5,7 95:9

**Cordero** 52:7

**Cornell** 53:4

**corner** 14:8,9 24:6

**correct** 43:12 63:15 87:24 93:15

**corrected** 47:21

**correction** 44:17 45:15 47:4,6 48:1

**corrections** 45:10 63:19,21

**correctly** 94:24 95:16

**Counsel** 4:20

**couple** 7:4 40:15 42:1 43:18 55:14,21 61:4,19 64:2 70:23 83:2 90:19

DAVID CHMIELESKI, 04/27/2021

**court** 4:11,18 5:17 7:2,18 94:17 95:8,14,19

**cover** 56:12

**covered** 20:20 57:10,14,17

**covering** 24:19 25:6

**crime** 11:14 12:7

**criminals** 81:20

**cross-outs** 47:18

**crossed** 47:4 48:12

**Cruz** 53:13

**current** 11:2 33:20 65:21

**CV** 4:10

## D

**Daniel** 52:19

**date** 61:18

**Dave** 4:24

**David** 4:5 6:1,9

**day** 22:9 27:12,13,14 31:13,16 42:2 48:2 51:6 59:4 65:12,21 66:5 72:12,14,15,18 96:1

**days** 71:12

**deal** 45:17 50:19

**dealing** 83:7,9

**declaration** 45:24 46:11 47:12 88:5 92:16,18 93:12,21

**defendant** 4:8 5:1,10 55:19

**defendants** 5:8 62:6

**delivered** 61:13,14

**depicted** 17:23

**deposition** 4:5,7 6:23 17:11 40:10 46:14 58:22 61:12 62:1,9 87:20 89:2 96:3,7

**describe** 24:15 34:19,23

**description** 32:10 36:7

**designated** 56:9 57:3

**detail** 76:13

**details** 76:6

**detective** 37:23 38:18 39:19 53:23 61:15

**detectives** 27:19 31:9 39:23 53:19

**differently** 66:14,16

**difficult** 12:11

**directing** 19:3

**direction** 13:17 26:6,16

**dispute** 87:10

**District** 4:11,12

**Division** 4:13

**document** 6:20 46:19,21 63:22

**documented** 87:8

**documents** 6:17

**door** 18:14,21 19:4 20:1,3,4,5 25:21 26:9,24 28:4,9,12,16 68:9,11 77:19

**doorway** 21:19 23:8 66:11 67:19 68:18

**doubt** 49:8

**Down's** 16:17 64:21

**downstairs** 77:16

**downtown** 11:9

**dressed** 27:17

**drink** 8:4

**drive** 33:8

**driven** 41:17

**driver** 22:6,9,16

**drop** 22:16

**drove** 33:10,11 34:3

**duly** 5:19

## E

**earlier** 37:10 69:18 81:5 83:11 84:20 89:1 90:23

**early** 31:19

**easier** 49:12

**east** 13:3

**east-west** 13:23

**Eastern** 4:12

**education** 10:13

**Efrain** 9:19,21 20:12 33:19 34:11 45:12,13,19 48:3,5,8 58:10,21

59:20 60:2 66:8,19 67:6,22 77:12, 24 81:23 91:6,7,9

**employed** 10:24

**employer** 11:2

**end** 93:21 96:4

**ended** 88:4

**enter** 18:21,23 19:1

**escorted** 22:5

**estimate** 68:21

**estimation** 10:11

**et al** 4:9

**ethnicity** 71:21

**evening** 31:5 83:8

**eventually** 63:1

**exact** 30:22 61:18

**exaggerating** 46:5

**EXAMINATION** 6:4 55:15 60:17 90:21

**examined** 6:2

**exchange** 88:18

**exhaust** 91:17

**exhibit** 17:5,11,14,24 18:13,19 20:6 25:14,20 26:17 40:10,14,18 46:14,18 47:7,12,17 49:10

**experience** 40:6

**explain** 94:16

**Eyes** 56:10 57:4

## F

**face** 20:19 24:19 29:23 30:12 35:24 57:9,17 69:3 85:6,12

**fair** 62:23 63:4 66:15 76:12 85:21 87:12,23 88:15

**familiar** 50:16

**fast** 24:17,21 58:8 68:24

**father** 13:8 31:22 64:11

**feel** 39:23 46:10 85:21

**feels** 72:11,14

**felt** 49:16,22 85:18,23,24 93:5

**female** 24:21

**figured** 46:1 67:13 77:3 81:21

**filed** 4:10 12:1,3

**find** 54:8

**fine** 10:11 36:23 45:3

**finish** 8:24

**finished** 93:24

**firm** 62:3,4,5

**floor** 9:15 12:21,22 13:2 16:3 18:6 19:16 58:16

**focus** 17:19 92:24

**focused** 21:10

**follow** 7:13

**follow-up** 55:12 61:7 90:19 94:4,6, 8

**force** 53:24

**forget** 7:6 78:19,20

**forgot** 28:13 32:13 42:11 47:20 67:4 71:19 76:10 77:20 79:9 85:11

**form** 14:16,24 15:4,10 24:9 43:10, 11 47:10 76:16 77:6

**formal** 10:13

**formalities** 84:1

**foundation** 82:2 88:21

**Francisco** 53:10

**Frank** 52:13

**Freido** 52:22

**frequented** 50:17

**friend** 20:12 23:6 33:18 48:2,5 50:23 51:20,22 64:9,12

**friends** 14:19 58:14,18

**front** 13:4 19:8 20:2 26:3 57:16 65:20 67:11 68:6

**froze** 8:13

**full** 6:7 48:18

---

### G

**Galewood** 78:23

**games** 14:17,18

**gang** 51:4,5,9 69:9 81:13,18

**gangs** 15:8,16 50:16,18,21

**garage** 26:14

**garages** 26:4

**gave** 16:22 64:16

**general** 22:21 70:17 78:16

**generally** 11:8

**gentleman** 25:22 26:18,21

**Geraldo** 4:8 5:16 53:7 60:7 61:3 89:12

**girl** 53:15

**give** 10:9 36:21 55:8 64:15,18 70:1 72:10 75:22 87:5

**giving** 7:22 89:3

**glass** 37:19 38:15

**glimpse** 82:18

**Gonzales** 53:1

**good** 4:23 5:3 6:6 64:9,12 93:11 94:10 96:1

**graduate** 10:2,4

**graduating** 10:14

**grammar** 58:20

**gray** 25:22

**Great** 6:22

**ground** 7:4

**guard** 10:22

**guess** 10:8 29:13 40:8 44:11 65:6 76:23

**Guevara** 4:9 5:10

**gunshot** 23:3,4

**gunshots** 19:23 20:16,24 21:4,12, 18 22:2,19,24 24:1,2,7 59:11 67:17,19 69:11

**guy** 19:15 20:9 42:15 43:22 54:21

**guys** 11:18,19 18:5 55:10 58:17 59:1 76:1,2,5

---

### H

**H-A-Z-I-N-S-K-I** 5:15

**half** 30:23 42:2

**hand** 61:13,14 62:2

**handed** 36:24 37:8 81:10

**handwriting** 47:18 63:22

**handy** 56:2

**hang** 15:8

**hanging** 14:19 67:11

**happened** 11:16 14:15 31:17 34:14 38:22 42:20 69:22 71:11 76:10,14 77:20

**happening** 19:21

**hard** 50:4

**Hazinski** 5:12,14 14:16,24 15:4,10 24:9 55:7 60:18 74:6 77:2,10 82:7 90:14 94:11

**head** 7:11 25:6,7 57:21 73:1

**hear** 8:12,19,23 21:4,8,13 42:19 92:23

**heard** 19:23 20:17 21:1,5,17 22:2, 23 23:3 24:1 59:11 61:4 67:17,19 91:13,14

**hearing** 20:15 21:7 22:19

**heavy-set** 24:24 25:2

**height** 24:16,20

**helped** 15:23

**helpful** 40:7 74:10,23

**hide** 89:17

**high** 9:24 10:14

**Hold** 56:3,5

**home** 28:19 29:13,16,17 33:11 39:3 41:17 43:21 48:22 49:1,4 74:17

**honest** 12:12 84:19

**Honestly** 15:11

**hood** 68:5 69:1

**hoodie** 20:18 24:19 25:6,9,13 35:23 57:12,16,20,22,24 68:5 73:1

**hour** 30:23

**hours** 31:19 42:1

**house** 9:12 12:17 27:9,16 30:1 64:10

**hundred** 75:20

---

### I

**i-e-l-e-s-k-i** 6:11

DAVID CHMIELESKI, 04/27/2021

**idea** 66:20 73:18 81:4

**identify** 4:20 35:24 38:22

**Iglesias** 4:9 5:16 17:14 40:19 46:22,23 53:7 60:7 61:3 89:12

**Illinois** 4:12,17 9:9

**important** 7:19

**inch** 35:9

**inches** 35:9,11

**incident** 29:3,7 32:12 42:12 50:7 66:5 76:11 79:10 89:19

**indicating** 25:21

**indicators** 69:9

**individual** 5:7 34:21 57:9 58:12

**information** 29:8,11 62:22 63:2

**initially** 72:8 75:19

**initials** 47:5 48:13

**inside** 20:8 21:18 30:19 70:12,13, 14

**insignificant** 45:22

**instinct** 23:14

**interacted** 76:7

**interaction** 29:2 37:4,5 41:21 73:9,11 75:14 78:1 86:3 87:13

**interactions** 53:19 76:13

**investigation** 75:7

**investigator** 49:22

**involved** 22:11 60:11 86:15

**irritated** 29:19 39:15 46:6 50:1 54:7 76:18 85:17 86:3

**irritating** 88:15

**irritation** 93:7,10

**issue** 51:11

**issued** 61:24

**J**

**Jesse** 51:22

**Jesus** 53:1

**Jimmy** 79:1 91:1,3,4,5,6,7,8

**job** 15:19,22

**John** 5:11,14 61:2 94:9

**Jose** 53:4

**judge** 8:21

**jumped** 11:17 50:24 51:3

**June** 12:14 13:6,9 15:18 18:8 19:22

**K**

**Kevin** 5:9 55:9,11 94:7

**key** 16:22 64:16

**kind** 19:2 20:1 36:16 63:14 64:1 65:11,14 73:8 75:5 78:8

**knew** 76:19 81:6,19 84:21 90:5

**knocked** 77:19

**Kyle** 5:6,13

**L**

**large** 24:23

**late** 27:9,24 31:10,18,20,21 32:17

**Latino** 80:21 81:1

**law** 62:2,3,4

**lawsuit** 11:23 12:1

**lawyer** 44:8 87:4 89:8,12,14

**lawyers** 62:17 88:23 89:3

**leads** 67:6

**leaves** 64:14

**leaving** 29:8 31:4

**left** 19:6,13 26:10,11 31:7 41:21 44:2 65:3 72:2

**legal** 4:15

**license** 10:19

**licenses** 10:17

**life** 75:5

**likes** 91:8

**likewise** 7:22

**limitations** 15:2

**lineup** 27:10 30:14 32:20 37:11,16 39:4,5,13,24 41:1,9,16 42:7 60:9 73:20 77:22 83:15,18 84:5,11,22

**lineups** 75:6

**listening** 44:9 89:7,8 92:17

**live** 12:14 13:6 19:12

**lived** 9:10 12:16,20,21 13:11 18:3, 7 19:13 33:18 58:9,15

**living** 13:10 50:8,10

**located** 11:8 14:3,5 26:13 33:13

**location** 11:5 24:3

**long** 9:10,20 11:10 13:9 21:15 27:21 30:18,22 41:20 48:10 61:8 68:20 79:2,3,4,11 82:13 87:16 88:2

**looked** 21:20 23:22 28:12 30:10 34:17,20,23 35:15,17,18,19 36:3, 13 37:14,17 38:12 39:10 45:2,3 49:6 51:1 54:17 59:11,14 63:6,7,10 71:16 79:8,13 80:11,12,14 81:11 82:8,9,20 84:2

**lose** 66:1

**lot** 16:6 43:20,21 46:6,8 64:10,11, 13 65:5

**lots** 35:13 48:18

**loud** 7:8

**M**

**made** 5:13 39:23 63:14,19 64:3

**mail** 45:5,7 61:12

**make** 7:12 12:10 16:8 43:12 44:17 49:11 55:8 67:8 94:23 95:10

**making** 91:22

**male** 24:21

**man** 10:5 20:21 29:4,12 31:2 36:20 42:3 43:5 45:18 49:19,24 50:3 66:22 75:20

**Maribeth** 4:18

**mark** 17:5 40:14 46:18 61:15

**marked** 40:18

**math** 50:12

**matter** 4:8

**means** 95:7

**Media** 4:2 96:4

**medical** 64:22

**medications** 12:9

**meeting** 62:12 87:3

**member** 15:15 69:9

**members** 81:13,18

**memories** 67:8

**memory** 45:20 79:10 82:6 87:17, 21 91:17,23

**men** 80:18,19

**mentioned** 37:10 45:9 94:17

**Mercy** 52:7

**met** 87:8

**minutes** 31:1 82:16

**Miranda** 53:16

**mishear** 91:2

**misheard** 95:4,11

**mispronounced** 60:21

**Misstates** 85:1

**mistranscribed** 95:4

**money** 6:10 64:4,19

**Monica** 52:10

**Montero** 51:23

**month** 61:22

**Moore** 19:18

**morning** 4:23 5:3 6:6 31:19 46:8 61:9

**moved** 66:2

**multiple** 12:23 84:17

**murdered** 91:12,15

**N**

**named** 53:12 62:12

**names** 32:8 52:2 80:7,8,9

**natural** 23:14

**nearest** 13:23 78:20

**needed** 63:9,12

**neighbor** 15:24 16:2 67:14

**neighborhood** 14:22 50:8,11,17 67:1 78:17

**neighborhoods** 78:23

**Newcastle** 9:8

**next-door** 15:24 16:2

**Nievez** 53:16

**night** 27:9,24 28:2 31:10,18,20,21, 22 32:17 34:2,4,7 41:13 42:5 46:7 71:9 72:8,9,15 73:12

**night-time** 71:8

**nod** 7:11

**noes** 7:10

**north** 4:16 9:8 11:9 12:16 13:4,5, 10 18:10 68:17

**north-south** 68:13

**Northern** 4:12

**notified** 32:14

**number** 4:10 9:14 44:2 48:16 56:2, 5,6

**O**

**Object** 14:16 24:9

**objecting** 8:24

**objection** 8:24 14:24 15:4,10 73:22 76:16 77:6 82:1 84:24

**objections** 8:20,22

**occasion** 63:17 75:12

**occasions** 75:3

**Ochoa** 52:16

**officer** 37:24 38:17 39:18 53:24 62:5 84:9,13 88:7

**officers** 5:1 28:8,12,16 31:3,7,9 32:15 33:7 39:22 70:23 75:18 76:7 83:2 84:17 93:1

**officers'** 32:8

**offices** 4:16

**open** 14:21

**opening** 57:18

**opportunity** 68:21

**option** 95:6,13,16

**originally** 48:1

**Oscar** 42:15,24 43:2,4,18 47:13 55:24 59:22 62:12,15,21 63:1,18 88:5,8,9,10,17 89:19 90:2 92:15,24 93:13,17,20

**Oscar's** 57:6

**P**

**p.m.** 19:21 28:2

**Palmer** 14:1,3 24:7

**pants** 25:12

**paper** 34:22 43:19 44:13,19,24 45:1

**paragraph** 48:1 49:10,15

**part** 75:6

**participate** 39:5

**participating** 41:8

**parties** 4:22

**Parts** 15:21

**past** 20:9,18 23:6,9 26:1,8 68:18 73:1 83:23

**pending** 8:5

**people** 18:4,12,20 20:5 21:8 35:1 37:20 38:15,18 41:4 52:1 79:17 80:4,11,13,14,16 83:7,9,11

**PERC** 10:20

**percent** 28:6 32:4 72:10,13 80:23

**perfectly** 36:23

**persistent** 54:12 88:11

**person** 19:17 21:22 24:12,15,18, 23,24 25:2 36:8,9 38:8,20 39:11,19 43:17 54:5,20 55:24 57:22 67:21 68:4,16,22 69:7,14 71:4 72:23 80:2 83:14,22

**person's** 35:23

**perspective** 84:5

**phone** 44:1,2 56:1,4 64:11 89:6,9

**photo** 17:20,24 18:13 34:21,24 35:2,5 41:3,6 49:6 80:2 81:13 86:17

**photograph** 40:24

**photos** 17:16 27:10 29:22 30:2,4,6 34:16,20,21,22 35:14,16 36:1,5,13, 19 37:1,6,14 38:24 39:2 40:15 73:19 74:11 75:1,5 79:14,19,20,24 80:7,11,17 82:14 85:7

**physically** 70:18

DAVID CHMIELESKI, 04/27/2021

**pick** 29:22 30:14,15 31:11 39:2,20 49:16,23 50:2,4 54:5 65:18 71:10 73:13 74:2,19 83:3,13 84:21 85:3, 5,7,10,11,14,16,19,23 86:5

**picked** 33:16 72:3

**picture** 54:20

**pictures** 32:20 35:1 48:19 54:15 77:22 79:16 81:7,18 82:19 83:22

**piece** 34:22 44:13,19,24 45:1

**place** 24:2 56:1 74:5 89:23

**plainclothes** 27:17,18 32:3,6 33:8 36:8

**plaintiff** 5:15 61:2

**point** 30:9 32:22 34:17 39:8 42:20 45:14 54:17,19,20 73:20 74:4 75:2 76:24 84:4 85:2,22 86:6 92:20

**pointed** 47:16

**pointless** 36:3 40:7 84:6

**Polaroid** 79:19,22

**Polaroids** 79:24 80:1

**police** 27:3,5,7,16,22 28:4,8,11,15, 18,21,24 29:2,3,6,8,10,16,20,24 30:5,7,17 31:3,7,9,23 32:1,7,15 33:7,9,12,17,23 34:2,6,10,15 37:5, 6 39:18,22 41:13,18 42:5 53:19,23 62:5 70:23 71:7 72:2,3,4 73:10,19 75:6,12 76:7,14 77:11,24 78:13,19 79:5,8 87:2,7 90:24 91:11,16 93:1

**Polish** 60:22

**pop** 92:11

**popped** 92:13

**pose** 7:24

**pottery** 14:18

**present** 6:14 70:18

**pressure** 39:13,14,16 46:10 49:16,22 50:3,5 85:15,18,19,22,24 93:5,6

**pressured** 93:1

**pretty** 22:14 35:7 42:21 43:10 47:9 51:6 54:2 59:2,9 60:4 65:2 70:24 84:6 86:9,17 88:10 92:21

**prevented** 69:2

**previously** 34:11

**printed** 43:8

**printed-off** 47:10

**Printers** 15:21

**prior** 21:7 22:19 34:12

**problem** 8:1 55:6 61:10

**problems** 64:23

**proceedings** 56:8 57:2 96:7

**process** 86:15

**professional** 10:16 54:3

**profile** 57:11,20,21 71:5 73:1

**program** 65:14,16

**programs** 65:12

**promise** 88:17

**prosecutor** 87:4,9

**provide** 8:6 9:1 12:11 29:11

**providing** 29:7

**pull** 65:20

**pulled** 68:5

**purported** 44:13

**put** 17:6 25:15 47:4 48:13

**putting** 17:7

**Q**

**question** 7:21,24 8:5,12,16,17,23 49:20 69:19 70:10 79:18 81:6 90:24

**questioned** 91:10

**questions** 8:9,11 42:17 44:5 55:1, 2,8,10,14,21 60:15 61:7 62:18 64:2 90:15 94:3,20

**quick** 50:13 61:6 68:7,24 69:6 76:23 82:18 88:3 90:19

**R**

**Rahe** 5:4 55:13,16,18 57:5 60:14 94:6

**ran** 13:18 20:9,18 23:1,6,9 26:1,6, 8,12,15,22 51:1 57:9 67:24 68:3,7, 16 69:7 73:1 83:23

**read** 43:12 47:9 49:12 52:2 63:13

**real** 69:2 82:18

**realize** 45:17

**realized** 43:24

**reason** 8:3 16:15 43:6 87:10

**recall** 13:17 14:2 19:20 20:10,15, 24 23:17 27:11,15 28:7,11 29:6,15 30:6,21 31:2,3,12 32:5,7,10 35:4,5 36:4,6,10,21 38:8,12,17,19 39:14 41:8,11,12,17,23 42:4 48:24 49:8 51:14 75:21 78:21 79:3 80:23 81:14 82:6,10 83:11 85:8,10

**recognize** 17:23 30:11 37:1 38:1 41:3 47:7 60:10,13 69:8 82:21 83:19,20,21,22 84:3

**recognized** 37:22 38:4,9

**recollection** 10:9 23:21 41:24 91:20 92:1

**record** 4:3,21 6:8 7:12,15 17:13 40:19 95:20 96:3

**red** 51:7

**reflect** 95:21

**Reilly** 4:18

**related** 6:17 53:20

**remained** 58:17

**remember** 15:5,6,12,13 21:16 22:1,8,10 24:8 25:2,8,10,11 26:5 27:8,19,21 28:1,14 29:1,4,9,18 30:3,4,18 32:5,18 33:8,12 34:9,13 35:8,18 36:11,12,17,22 37:23 38:2, 3 39:1 41:20 42:4,10,19 45:19,21, 22 49:2,3,5,7,24 54:22 59:16,17 61:18 62:13 65:2,4,17 66:23,24 67:2,20,22 68:1 69:6,22 70:2,4 71:16,20 75:17,21,23 76:4,6,13,17 77:18,21,23 78:7,13,16 79:4,6,7, 16,23 80:6,8,9,16,20,24 81:9 82:3, 24 83:1,6,10 84:9,12,18 86:20 87:1,6,13,22 88:22,24 89:3,11,14 91:15

**remembered** 69:20 70:6,8,9

**remembers** 66:14

**remind** 7:6

**Repair** 15:21

**repeat** 33:24

**rephrase** 8:14

**report** 87:7

**reporter** 4:18 5:18 7:18 94:18 95:9,14,19

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID CHMIELESKI, 04/27/2021

**represent** 4:22 5:1 61:2

**represented** 89:12

**representing** 4:15 62:5

**require** 64:24

**reserve** 95:6,17

**reside** 9:7,16 13:1

**result** 65:1

**returned** 41:22

**review** 94:21 95:9,10,17

**Reynaldo** 4:9

**ride** 33:16 78:3,9

**River** 11:9

**robbed** 11:20

**Rodriguez** 52:22

**Roman** 52:10

**room** 6:14 36:14,15,16,17,18
37:18 38:21 39:12 65:3 70:21 82:4,
5 84:9

**roommate** 9:17 33:20

**roommate's** 9:18

**roommates** 9:20

**Rosendo** 52:16

**Rosie** 53:12

**roughly** 50:13

**rule** 8:21

**rules** 7:5

**run** 26:2,9 68:5 71:4

**run-ins** 50:20

**running** 20:22 24:13 57:22 58:5
68:17,22 69:11

———————————————

**S**

**Sanchez** 52:19

**Sawyer** 12:16 13:10,24 14:3,7
18:10 24:6 68:11,13

**scene** 27:5

**Schatzle** 4:14

**school** 9:24 10:14 58:20 65:8,9,17,
19

**Schurz** 10:1

**screaming** 21:9

**screeching** 21:13

**screen** 17:6 25:16 40:15 46:19

**screen-shared/referenced**
17:12 40:11 46:15

**seconds** 24:18

**Securitas** 11:3,11

**security** 10:18,22 11:3

**sensitive** 61:8

**sentence** 49:15

**separate** 56:11 82:5

**Service** 11:3

**set** 76:7

**setting** 36:14

**shake** 7:11

**share** 25:15

**she'd** 64:15

**sheet** 63:3

**shift** 46:7

**shooter** 69:14,16

**shooting** 19:21 21:3 27:2,6,12,22
31:14 51:18 60:12 66:5 69:22
70:24 71:11 91:13

**shortly** 24:7

**shorts** 25:12

**shot** 20:17 21:6 91:14

**shots** 21:7

**shoulder** 26:19

**show** 17:4 40:13 46:17,22 91:22

**showed** 30:3 32:16 36:4 48:18
49:1 63:23 71:8 77:15 80:2

**showing** 81:21

**side** 18:19 19:4,13 20:5 21:19
38:14 57:11,20,21 71:5 72:24
78:24

**sides** 58:3

**sign** 43:9 45:1,23 46:10 47:14

**signature** 47:2 94:17 95:7,14,21

**signed** 43:13 45:3 47:22 93:12,21

**signing** 88:4

**similar** 80:11

**similarly** 76:5

**single** 87:13

**sir** 6:23 12:9 16:13 17:17 24:13
25:14,18 29:1 36:23 39:4 40:13,14,
20 45:23 46:17,18 48:23 49:9,18
51:24 53:18 54:24

**sleeping** 31:23 46:9 86:5

**solid** 35:13

**son** 16:7,11 22:12,15 64:5,14 65:5

**son's** 16:9

**sort** 20:2

**sorts** 10:22

**Sotos** 62:3,4

**sounds** 64:4

**south** 13:20 16:3 68:18

**sparked** 91:23

**speak** 17:2 28:15,20 43:3

**speakerphone** 44:8

**speaking** 7:20 20:11 21:22 29:2,6
33:22 34:1 41:12 42:10

**special** 64:24

**specific** 12:19 67:5 76:6

**specifically** 18:23 66:4 70:3 81:15
82:24

**Speculation** 73:23

**spell** 6:7

**spend** 92:10

**spoke** 29:10,17,24 30:19 31:4 41:9
42:7,14 92:15

**sport** 25:22

**standing** 18:5 22:20 23:8 25:24
37:20 66:10 67:16,18 68:10 70:18

**start** 64:7

**starting** 88:14

**state** 6:7

**State's** 41:10 86:21,22

**stated** 89:2

**statement** 48:17

DAVID CHMIELESKI, 04/27/2021

**States** 4:11

**station** 28:24 29:20 30:5,7 32:19 33:9,13,17 34:3,15 41:14 42:6 48:22 49:3,7 72:4 73:16 75:13 77:12 78:13,19 79:5,8,13 83:4 87:2,15 90:24

**stayed** 50:18

**step** 79:17

**Steve** 16:10 64:5,20 65:23 69:21 92:7

**Stevie** 22:1,4

**stop** 90:6 93:13

**stopping** 55:24

**street** 4:17 13:24 14:6 68:14

**strictly** 79:22 80:22

**strike** 70:10 79:18

**struck** 48:6

**stuff** 27:10 43:8 45:13 50:19 80:15 87:19

**stupid** 51:6

**subpoena** 6:22 61:12 62:1

**sued** 11:22

**suffer** 12:10

**Suite** 4:17

**summons** 6:20

**supposed** 44:20,21

**swarmed** 51:2

**swear** 5:18

**sworn** 5:19

**syndrome** 16:17 64:21

---

**T**

**talk** 6:18 28:18 31:24 34:9 43:17, 22 58:21 59:1,17 60:5 62:8 64:10 65:5 70:23 72:21 78:2

**talked** 34:7,11 45:13 58:23,24 59:24 75:19 89:15 92:7

**talking** 19:24 20:8 21:8,10 23:5 45:12 48:2,9,11 51:18 58:13 59:4 62:11,13 66:6,7,17,19,21,22 67:7, 12,13,21 68:10 73:8 75:14 78:7 88:18 89:20 90:6

**teenager** 11:17 51:1

**telling** 30:11 32:21 38:6 42:22 47:13 72:22

**ten** 50:9,13

**testified** 6:3 7:2 62:20 78:12 84:8, 20 86:19 87:20,21 89:1

**testimony** 12:12 85:1 89:4

**thick** 35:5,8,9,12 79:13

**thing** 10:7 39:15 43:1 44:22 50:2 65:6 67:4 72:22 92:4 94:14

**things** 54:13 86:7 91:23 93:6 95:5

**thinking** 23:18,19 25:1 31:15

**thought** 10:6 20:12 30:9 36:2 40:6 48:9,10 59:3 63:8 66:18 67:10,14 91:1

**threaten** 90:11

**throw** 22:12

**time** 8:2,11 16:12 27:12 28:1,2 30:2,22 31:13 32:2 34:12 42:7 44:18,23 50:7,22 51:15 55:3 59:21 61:9 63:7,10 64:15 65:3,7 71:7 72:1 73:14 75:4,8 76:14 81:16 86:13 87:2,9,17 88:2 92:10 93:14 95:23

**times** 43:3,5,7,18 49:5 61:4

**Tires** 21:13

**today** 4:18 6:19 8:10,19 9:5 10:9 12:12 42:24 58:22 62:1,22 87:20

**told** 28:22 29:15 31:23 37:8,22 38:5,20 39:7 42:23,24 43:1,11 44:6,14 47:10 59:9 62:16,21,22 71:3 72:24 74:7,12,22 82:21 83:12, 20 84:2 85:4 86:10,13 87:3,23 88:22 89:11,22 90:5,8 92:5,19 93:4,18

**top** 17:19,24 18:13

**Torres** 9:19,21 33:19,23 34:3,7,11 48:3,5 58:10,21 59:20 60:2 66:8,20

**total** 68:20 82:13

**touch** 65:22

**transcribed** 56:11

**transcript** 94:19

**trust** 95:14,19

**truth** 90:9,10

**turn** 5:11 26:24

**turns** 7:20

**two-flat** 9:13

**two-page** 46:21

**type** 10:19 15:22 35:3 36:13

**typed** 94:18 95:7

**typing** 7:18

---

**U**

**uh-huh** 7:11 73:7

**uh-uh** 7:11

**uncomfortable** 39:24

**understand** 8:12 57:14 74:1 81:17 88:2

**Understandable** 44:23

**understanding** 57:15

**understood** 8:17

**uniform** 27:20

**uniformed** 36:8

**uniforms** 27:16 32:3,6

**unit** 4:2 9:14 12:19,22 13:1,3,4 16:3,24 18:4,16,24 23:2,7,12 28:19 96:4

**United** 4:11

**units** 12:23,24

**unprofessional** 53:21

**upfront** 19:24

**Urlaub** 4:15,19

**usual** 70:21

---

**V**

**variety** 80:14

**Vasquez** 52:13

**version** 92:23

**Vicente** 53:10

**vicinity** 70:17

**victim** 11:13

**video** 4:3,21 7:18 8:13 96:3

**videoconference** 4:5

---

DAVID CHMIELESKI, 04/27/2021

**view** 42:20 45:14 54:13 68:21 69:2 72:23 92:20

**viewed** 37:11

**viewing** 39:12

**visit** 72:9

---

**W**

---

**wait** 7:21,23 89:5

**waive** 95:13,18

**waived** 95:21

**walking** 11:18 50:23

**wanted** 6:13 27:9 28:24 29:21 31:24 32:19,24 33:3 35:20 37:21 39:8 40:7 42:16,19 43:9,11,14 50:2 51:24 54:6 59:22 62:17 73:3,6,19 74:1,13,21,24 76:20,21 77:4,17 82:16,17,19 83:17 84:21 85:6,8,10, 13,19 90:3 92:18,19,21,23

**wanting** 54:9

**watch** 15:23 22:11,13 64:16

**watched** 69:21 92:8

**watching** 16:16,18 22:4,15 64:4

**wearing** 20:18 25:5 51:7,9 57:16 68:4

**weeks** 61:20

**weight** 24:16

**weird** 87:17

**west** 13:3 78:24

**white** 71:21,23,24

**white-hispanic** 71:23,24

**window** 23:15,23 24:6 59:12

**windows** 78:11

**woke** 31:22

**woman** 20:21 69:4 91:12,14

**words** 49:21

**work** 10:22 37:17 46:7

**worked** 88:19,23

**workers'** 12:3

**working** 11:10 15:20 42:18 62:16 89:3

**Wow** 10:5

**writing** 44:10

**written** 63:2 80:7 94:24

**wrong** 43:13 63:8

**wrote** 95:15

---

**Y**

---

**year** 10:4 32:13 42:11,13 67:3

**years** 9:11,22 11:12 13:12 50:9,11, 14 58:18

**yelling** 21:14

---

**Z**

---

**Zelky** 61:16

**Zibolski** 5:9,10 55:11 94:10

**zoom** 6:13 17:20 40:20 49:11

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 32



*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 33

# CASE NO. 1:19-CV-6505

# GERALDO IGLESIAS

## V.

# REYNALDO GUEVARA, ET AL.

# DEPONENT:

# ROBERT BIEBEL

# DATE:

# October 29, 2021

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF ILLINOIS

3  EASTERN DIVISION

4  HON. FRANKLIN U. VALDERRAMA,

5  DISTRICT JUDGE

6  HON. MARIA VALDEZ,

7  MAGISTRATE JUDGE

8  CASE NO. 1:19-CV-6505

9

10  GERALDO IGLESIAS,

11  Plaintiff

12

13  V.

14

15  REYNALDO GUEVARA, ET AL.,

16  Defendants

17

18

19

20

21

22

23  DEPONENT: ROBERT BIEBEL

24  DATE:  OCTOBER 29, 2021

25  REPORTER: SUSAN L. HARRILL (BELL)

```
1              APPEARANCES

2

3   ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS:

4   John Hazinski

5   Isabella Aguilar

6   Loevy & Loevy

7   311 North Aberdeen Street

8   Third Floor

9   Chicago, Illinois 60607

10  Telephone No.: (312) 243-5900

11  E-mail: hazinski@loevy.com

12  aguilar@loevy.com

13  (Appeared via videoconference)

14

15  ON BEHALF OF THE DEFENDANTS, STEPHEN GAWRYS, ROBERT

16  BIEBEL, ANYTHONY RICCIO, AND ERNEST HALVORSEN:

17  David Brueggen

18  The Sotos Law Firm, P.C.

19  141 West Jackson Boulevard

20  Suite 1240A

21  Chicago, Illinois 60604

22  Telephone No.: (630) 735-3308

23  E-mail: dbrueggen@jsotoslaw.com

24  (Appeared via videoconference)

25
```

1  APPEARANCES (CONTINUED)

2

3  ON BEHALF OF DEFENDANT, REYNALDO GUEVARA:

4  Megan McGrath

5  Leinenweber Baroni & Daffada, LLC

6  1150 Wilmette Avenue

7  Suite E

8  Wilmette, Illinois 60091

9  Telephone No.: (866) 786-3705

10  Facsimile No.: (800) 896-2193

11  E-mail: mkm@ilesq.com

12  (Appeared via videoconference)

13

14  ON BEHALF OF DEFENDANT, CITY OF CHICAGO:

15  Katie Barber

16  Rock Fusco & Connelly, LLC

17  321 North Clark Street

18  Chicago, Illinois 60654

19  Telephone No.: (312) 494-1000

20  E-mail: cbarber@rfclaw.com

21  (Appeared via videoconference)

22

23

24

25

| | | |
|---|---|---|
| 1 | INDEX | |
| 2 | | Page |
| 3 | PROCEEDINGS | 6 |

DIRECT EXAMINATION BY MR. HAZINSKI          8

CROSS EXAMINATION BY MS. BARBER          146


                    EXHIBITS

Exhibit                          Page

1  RFC-IGLESIAS 90-93 Clear Closed Report      98

2  RFC-IGLESIAS 97-98 Supplementary Report      106

3  RFC-IGLESIAS 94-96 Supplementary Report      113

4  RFC-IGLESIAS 163 Crime Scene Processing
   Report                          120

5  RFC-IGLESIAS 16 Crime Scene Processing
   Report                          126

STIPULATION

The VIDEO deposition of ROBERT BIEBEL was taken

KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER STREET,

22ND FLOOR, CHICAGO, ILLINOIS 60606, via videoconference

in which all participants attended remotely, FRIDAY the

29TH day of OCTOBER 2021 at 10:01 a.m.; said VIDEO

deposition was taken pursuant to the FEDERAL Rules of

Civil Procedure. The oath in this matter was sworn

remotely pursuant to FRCP 30.

It is agreed that SUSAN L. HARRILL (BELL), being a

Notary Public and Court Reporter for the State of

ILLINOIS, may swear the witness and that the reading and

signing of the completed transcript by the witness is

not waived.

1                    PROCEEDINGS

2         COURT REPORTER:  We are now on the record.

3         My name is Laurin Harrill.  I'm the video

4    technician and court reporter today.  Today is the

5    29th day of October, 2021.  The time is 10:01 a.m.

6    We are convened by videoconference to take the

7    deposition of Robert Biebel in the matter of

8    Geraldo Iglesias v. Reynaldo Guevara, Et Al,

9    pending in the United States District Court for the

10   Northern District of Illinois, Eastern Division,

11   case number 1:19-CV-6508.  Will Counsel please

12   state your appearance, how you're attending, and

13   the location you're attending from, starting with

14   the Plaintiff's Counsel?

15        MR. HAZINSKI:  This is John Hazinski for the

16   Plaintiff, Geraldo Iglesias, appearing remotely via

17   Zoom from Chicago.

18        MR. BRUEGGEN:  I'm Dave Brueggen, appearing on

19   behalf of Deponent Robert Biebel, and defendants

20   Gawrys, Riccio, and Halvorsen, and we are appearing

21   remotely from my desk via Zoom.

22        COURT REPORTER:  We're having a little trouble

23   hearing you, or at least on my end.  Could you

24   restate that?  I'm sorry.

25        MR. BRUEGGEN:  I'm sorry.  I will be louder,

1    I'm sorry.  We're just using the one computer

2    today.  We use the one computer, so we don't get

3    the feedback.  If we need to call in, we can call

4    in and use the cell phone.  That might work better.

5        So Dave Brueggen on behalf of the deponent,

6    Bob Biebel, Defendant, and on behalf of defendants

7    Gawrys, Riccio, and Halvorsen, appearing from my desk in

8    Illinois.

9        MS. BARBER:  This is Katherine Barber for

10   Defendant, City of Chicago, appearing remotely from

11   Chicago.

12       MS. MCGRATH:  Megan McGrath for Defendant,

13   Guevara, appearing remotely from Chicago.

14       COURT REPORTER:  Thank you.  And do all

15   parties stipulate that you're in agreement that the

16   witness is who he says he is?

17       MR. HAZINSKI:  Yes.

18       MS. BARBER:  Yes.

19       MR. BRUEGGEN:  Yes.

20       MS. MCGRATH:  Yes.

21       COURT REPORTER:  Thank you.  And I just had an

22   Isabella join us in the waiting room.  Are we

23   expecting anyone else?

24       MR. HAZINSKI:  Isabella is representing the

25   Plaintiff.  She'll be observing this deposition.

1   She can be in.

2       COURT REPORTER:  Okay, perfect.  I'll admit

3   her.  Great.  And Mr. Biebel, will you please raise

4   your right hand?  Do you solemnly swear or affirm

5   that the testimony you're about to give will be the

6   truth, the whole truth, and nothing but the truth?

7       THE WITNESS:  Yes.

8       COURT REPORTER:  Thank you.  You may begin.

9           DIRECT EXAMINATION

10  BY MR. HAZINSKI:

11      Q   Thank you.  Good morning, Mr. Biebel.

12          Could you please state and spell your name for

13  the record?

14      A   Robert Biebel, B-I-E-B-E-L.

15      Q   Thank you.  Mr. Biebel, have you ever been

16  deposed before?

17      A   Yes.

18      Q   How many times?

19      A   Four, I believe.

20      Q   When was the most recent time?

21      A   Approximately a year ago.

22      Q   You recall what case that was in?

23      A   No.

24      Q   Okay.  So you have some experience in

25  depositions, but I'm going to go over some basic ground

1    rules to help things go smoothly, especially since we're

2    using this remote Zoom platform.  As you can tell,

3    there's a court reporter here taking down everything we

4    say, so it's important that we try to speak one at a

5    time.  I'll do my best to let you finish answering a

6    question before I ask another one.  And I would ask that

7    you try to let me finish asking a question before you

8    start giving an answer; is that fair?

9        A    Yes.

10       Q    Thank you.  If you don't understand a question

11   that I ask, whether it's because it's a confusing

12   question or because there's an issue with the technology

13   or the audio, please ask me to repeat the question or to

14   rephrase it and I'm happy to do that so that everything

15   is clear.  If you do answer the question, I'll assume

16   that you understood it, okay?  And I'm sorry, I'm

17   wondering if maybe I have an audio issue on my end.

18          Did you say something?

19       A    Are you talking to me?  Yes.

20       Q    Yes.  Thank you.  You're welcome to take

21   breaks whenever you want, for any reason, if you need to

22   use the restroom or anything like that.  I just ask that

23   you not ask to take a break while I still have a

24   question to you pending; is that fair?

25       A    Yes.

1    Q    Thank you.  Mr. Biebel, do you have any

2  medical issues or are you taking any medications that

3  affect your memory?

4    A    No.

5    Q    Okay.  What did you do to prepare for this

6  deposition today?

7    A    I met with my attorneys.

8    Q    And is Mr. Brueggen your attorney?

9    A    Yes.

10    Q    How many times did you meet with your

11  attorneys?

12    A    Three.  My best guess is three.

13    Q    Okay.  And when was the first time you met

14  with them to prepare for this deposition?

15    A    I don't remember exactly when that was.

16    Q    Was it within the last month, would you say?

17    A    It's twice in the last month, yes.

18    Q    Okay.  And about how long were each of your

19  meetings with your attorneys to prepare for this

20  deposition?

21    A    My guess is three hours each.

22    Q    Other than your attorneys, did you meet with

23  anybody else to prepare for this deposition?

24    A    No.

25    Q    Did you review any documents to prepare?



1    A    Yes.

2    Q    What documents did you review?

3    A    The case files.

4    Q    Okay.  And what kind of documents were in the

5  case files?

6    A    Police reports, which is what I remember

7  looking at.

8    Q    Okay.  Did you review any transcripts

9  testimony?

10   A    No.

11   Q    Did you review any photographs?

12   A    No.

13   Q    Did you review any video or audio recordings

14  of any kind?

15   A    No.

16   Q    Okay.  So other than your attorneys, have you

17  met with or talked to anybody else at all about your

18  deposition today?

19   A    No.

20   Q    Okay.  Mr. Biebel, are you currently employed?

21   A    No.

22   Q    Okay.  Are you retired?

23   A    Yes.

24   Q    How long have you been retired?

25   A    More than 10 years.

1    Q    What was your last job before you retired?

2    A    I was a Police Lieutenant, Chicago Police

3    Department.

4    Q    Could you briefly describe your career in the

5    Chicago Police Department?

6    A    I was hired 1972, worked in a Patrol Division

7    as a police officer till 1981.  I was promoted to

8    Sergeant in 1981.  I was a Sergeant until 1998.  I was

9    promoted Lieutenant.

10    Q    What was your assignment or your detail when

11    you were in the Patrol Division?

12    A    My initial assignment was the 20th Police

13    District.

14    Q    Did you have any other assignments in the

15    Patrol Division?

16    A    As a police officer, no.

17    Q    Okay.  And then when you became a Sergeant in

18    '81, did you stay in the 20th District?

19    A    No, I was assigned to the 24th District.

20    Q    Okay.  And how long did you stay there?

21    A    Approx -- about a year.

22    Q    Okay.  And where'd you go after that?

23    A    I was just -- I was transferred to the Gang

24    Crimes North Unit.

25    Q    Okay.  As a Sergeant in the Gang Crimes North

1    Unit, what were your responsibilities?

2       A   I supervised gang specialists.

3       Q   Okay.  And what did supervising gang

4    specialists involve on a day-to-day basis?

5       A   Look -- follow-up gang-related cases that may

6    have happened.  Reviewing intelligence that they

7    gathered.

8       Q   In -- as a Gang Crimes Sergeant, were you

9    responsible for reviewing reports?

10      A   When reports came through, I -- I -- I

11   reviewed them, yes.

12      Q   Okay.  How long were you a Sergeant in Gang

13   Crimes North?

14      A   I was assigned in 1982 and left in 1988.

15      Q   Okay.  And where did you go after that?

16      A   I went to the Wood Street District, District

17   13.

18      Q   Okay.  And how long were you at District 13?

19      A   Approximately three months.

20      Q   Okay.  And where'd you go after that?

21      A   Area 5 Violent Crimes.

22      Q   Why did you leave Gang Crimes North to go to

23   District 13?

24      A   I would -- I was transferred out of there.

25      Q   Okay.  Was there any particular reason you

1    were transferred out?

2           MR. BRUEGGEN:  Object to form.  Go ahead.

3      A    I act -- I don't know why.

4      Q    Okay.  Did any of your superior officers give

5    you any explanation for why you were being transferred

6    at any point?

7      A    No.

8      Q    Okay.  And when you left District 13 to go to

9    Area 5, why did you leave District 13?

10     A    I was transferred.

11     Q    Okay.  And similarly that time, did you get

12   any explanation about why you were being transferred?

13     A    I -- I was requested by Commander Fruin.

14     Q    Okay.  And who was Commander Fruin?

15     A    He was the commander of Area 5 detectives.

16     Q    Would you mind just spelling his name for the

17   record, please?

18     A    F as in Frank, R-U-I-N.

19     Q    Thank you.  Okay.  And how long were you at

20   Area 5?

21     A    December 1988 to November 9 -- 1998.

22     Q    And then in '98, you became a lieutenant; is

23   that right?

24     A    Yes.

25     Q    Okay.  And where were you assigned when you

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 128 of 550 PageID #:14168
The Deposition of ROBERT L. BIEBEL, taken on October 28, 2020

15

1  became a Lieutenant?

2  A  Foster Avenue, District -- 20th District.

3  Q  What were your responsibilities as a

4  Lieutenant at the Foster Avenue District?

5  A  I was the field lieutenant.

6  Q  What did a field lieutenant do?

7  A  He supervised the street officers.

8  Q  So when you became a sergeant in 1981, did you

9  receive additional training at that point?

10  A  Yes.

11  Q  Okay.  And what did that training involve?

12  A  I don't recall.

13  Q  Do you recall if it was classroom training?

14  A  Yes.

15  Q  Do you recall who provided that training?

16  A  Training Division, the Chicago Police

17  Department.

18  Q  Okay.  Do you recall if it was training that

19  was specifically for sergeants?

20  A  Yes.

21  Q  Okay.  Do you recall how long that training

22  lasted?

23  A  I believe it was a month, I'm not real sure.

24  Q  Okay.  And, similarly, when you were promoted

25  to Lieutenant, was there additional training at that

1    point?

2        A    Yes.

3        Q    Okay.  Do you recall what that training was

4    about?

5        A    The duties of the field lieutenants under

6    Lieutenants Field Lieutenants, yes.

7        Q    Okay.  Could you describe how the duties of a

8    field lieutenant differ from the details -- the duties

9    of a sergeant?

10       A    The sergeants are under the command of the

11   lieutenant.

12       Q    Okay.  So on a day-to-day basis, how did your

13   work change when you went from -- other than being

14   assigned to a different location, in terms of your

15   supervisory tasks, how did your work change when you

16   went from being a sergeant to a lieutenant?

17           MR. BRUEGGEN:  Object to form.  Go ahead.

18           COURT REPORTER:  I'm sorry, was that an

19       objection?

20           MR. BRUEGGEN:  Object to form.  If you have

21       difficulty hearing me, I'll do --

22           MR. HAZINSKI:  Yeah, we can't hear your audio,

23       like, at all.

24           MR. BRUEGGEN:  Okay.  Soon, I will come with

25       something. If you can't hear, have a better angle

1      from the mic.

2           THE WITNESS:  Go ahead.  Is there a question

3      sitting on my platter here?

4  BY MR. HAZINSKI:

5      Q    I was just hoping you could explain how your

6  responsibilities changed from when you were a sergeant

7  to when you became a lieutenant.

8      A    In general, I became a lieutenant, I was then

9  supervising sergeants and -- and -- and the street --

10  street officers.

11      Q    Okay.

12      A    Just --

13      Q    Did you -- as a lieutenant, did you have less

14  direct dealings with the street officers?

15           MR. BRUEGGEN:  Object to form.  Go ahead, sir.

16      A    All right.  I -- I saw my street officers

17  every day.

18      Q    Okay.  And I want to ask a little more about

19  your time at Gang Crimes North.  You said that was

20  '82 through '88, correct?

21      A    Yes.

22      Q    Okay.  And you said one of your

23  responsibilities as a sergeant there was to follow up on

24  gang-related cases, right?

25      A    That wasn't my job, it was the job of the

1  officers.

2      Q    Okay.  Was one of your responsibilities as

3  sergeant, I believe, you said it was reviewing

4  intelligence?

5      A    Yeah.  One of the duties of the Gang Crime

6  Specialist was to keep intelligence on every gang that

7  was assigned to that area that we were working.

8      Q    Okay.  So as a sergeant, were you involved in

9  that intelligence gathering at all?

10     A    No.

11     Q    Okay.  Were you responsible for keeping track

12  of any information about the gangs?

13         MR. BRUEGGEN:  Object to form.

14     A    I would read the report submitted by the

15  Gang Crime Specialist as to the particular gang that

16  they were assigned on.

17     Q    Okay.  So other than reading the reports that

18  the officers submitted, what were your other

19  responsibilities as a Gang Crime Sergeant?

20     A    To supervise them on while -- while they're

21  working.

22     Q    Okay.  And so specifically, what tasks did you

23  perform while supervising those officers?

24     A    To make sure they came to work every day, and

25  from time to time would inquire to about what -- what

1    they were doing for their watch or while they were

2    working in the watch.

3        Q    Okay.  Other than reading reports, making sure

4    that the officers came to work and occasionally

5    inquiring about some of their work, did you have any

6    other responsibilities as a sergeant in gang crimes?

7        A    I don't -- I don't remember.

8        Q    Okay.  Was Officer Rey Guevara assigned to

9    Gang Crimes North while you were a sergeant there?

10       A    Yes.

11       Q    And Mr. Biebel, I understand your attorney,

12   Mr. Brueggen, is in the room with you, correct?

13       A    Yes.

14       Q    Is anybody else there currently?

15       A    No.

16       Q    Okay.  Thanks.  So in total, you spent

17   approximately almost 40 years at the CPD, right?

18       A    Yes.

19       Q    Okay.  During that time, did you have any

20   complaints filed against you?

21       A    I -- I only remember one.

22       Q    Okay.  And what's that one you remember?

23       A    Was a civil case involving Davey Frost.

24       Q    When was that about?

25       A    I don't know exactly the year.

1         Maybe '89, 1990, something of that nature.

2    Q    Okay.  And that was when you were already at

3  Area 5, correct?

4    A    Yes.

5    Q    Do you recall what the allegations were in

6  that complaint?

7    A    Verbal abuse.

8    Q    Were you the person who was alleged to have

9  done the verbal abuse?

10   A    No.

11   Q    Who was the person alleged?

12   A    Detective Brennan.

13   Q    Do you recall what the result of that

14  complaint was?

15   A    I believe mine was unfounded.

16   Q    Did you ever receive any form of discipline

17  from the Department during your career?

18   A    No.

19   Q    So I want to focus specifically on your time

20  at Area 5, as it pertains to this case, and even more

21  specifically in the period around 1993.  So in that

22  period of time, could you describe the chain of command

23  at Area 5?

24   A    I don't remember who was working there at that

25  time.  There was a commander.  We have a lieutenant,

1    numerous sergeants, and detectives.

2        Q    Do you recall who any of the other sergeants

3    --

4        A    Excuse me?  I didn't hear you.  I didn't hear

5    the question.

6        Q    Sorry, it sounded like there was some kind of

7    audio interference.  I'm not sure.

8        A    Right.

9        Q    Let me ask it again.  Do you recall who any of

10   the other sergeants were at Area 5 in 1993?

11       A    Sergeant Mingey was working there at the time.

12       Q    Besides Mingey, do you remember any others?

13       A    I can't remember, you know, because I was

14   there for so long.  Sometimes they -- some stayed for a

15   while, some didn't.  So Sergeant Mingey, I -- I know of,

16   and Lee Epplen was there, I believe, at the time, too.

17       Q    Okay.  And so your direct report at that time

18   was to a lieutenant in Area 5?

19       A    Yes.

20       Q    Okay.  You -- do you -- you don't recall who

21   that person was in '93?

22       A    In reviewing reports earlier, I -- I remember

23   seeing John Farrell's name in there.

24       Q    Okay.  And could you spell that, please?

25       A    F-A-R-R-E-L-L.

1    Q   Okay, thank you.  And the lieutenant was

2  responsible for supervising all of the sergeants,

3  correct?

4    A   Yes.

5    Q   Okay.  I want to ask you a little bit about

6  your responsibilities as a sergeant in Area 5.

7        Again, still focusing on 1993.  So was one of

8  your responsibilities to supervise homicide

9  investigations?

10   A   Yes.

11   Q   Okay.  And what did that involve?

12   A   Reviewing reports, interviewing or debriefing

13  the detectives assigned to -- to the status of their

14  homicides, and what to go further with, if -- if need

15  be.

16   Q   You say briefing with the detectives; what do

17  you mean?

18   A   Well, everyday roll call.  We would take roll

19  and each detective would tell us cases that they're

20  working.  We had specific detectives assigned to

21  homicides and then we had the other matters that

22  Area 5 Violent Crimes dealt with.  And during roll call,

23  they would speak of the cases that they're working about

24  and -- and -- and -- and the status of the case at that

25  time.

1    Q    Okay.  And would that roll call happen at the

2    start of each shift?

3    A    Yes.

4    Q    Okay.  Do you remember what shift you worked

5    in 1993?

6    A    I worked the day watch.

7    Q    What were the hours of the day watch?

8    A    7:00 to 3:00, 3:30 or so.

9    Q    Okay.  And so during the roll call when

10    detectives would talk about their cases, what kind of

11    information would they share?

12    A    If there was a case, in general, they would

13    say if they're looking for anybody, what -- what has to

14    be done, if they need any help canvasing, given -- given

15    specific information of maybe of a car wanted, area

16    where it happened, that kind of stuff that they would

17    talk about.

18    Q    Okay.  So when you mem -- earlier when you

19    mentioned debriefing with detectives, did that only just

20    happen during the roll call or did that happen at other

21    times, too?

22    A    It was usually only at roll call.

23        It's usually there on the street.

24    Q    Okay.  Oh, you said on the street?

25    A    Well, they're field detectives, so they would

1    go out on -- it's just term that we use is when they're

2    out on the street, working.

3         Q    Oh, okay.  The actual physical roll call would

4    happen in the office at Area 5?

5         A    Right, yes.

6         Q    Thank you, just wanted to clarify that.

7              So other than reviewing reports and holding

8    these roll calls with detectives, did you have other

9    responsibilities when you were supervising homicide

10   investigations at Area 5?

11        A    Well, homicide -- I -- I supervised all

12   investigations on Area 5, including rape cases, robbery

13   cases, aggravated battery cases, shooting cases, theft

14   battery cases, phone call cases.  You know, that was,

15   like, the realm that we have there, you know, and I --

16   and every day I would come in to find out who my

17   detectives that were working at specific day, and

18   determine my manpower status for that watch.  So I was

19   supervising anything that came in about stuff that might

20   be what we call fresh, something that just occurred, and

21   determine whether we should do an immediate follow-up on

22   it.  Or, if I had somebody in custody, in an ar -- in a

23   district that needed felony review and they were seeking

24   felony charges, I would get detectives to go out and

25   talk to them on that, to be assigned to this case for

1   review.  You know, if we had people in the hospital, we

2   had dead cases where people might be naturally dead, we

3   might send them out.  Those are the various things I

4   had.  I dealt with the news media.  I dealt with

5   downtown, calling about whatever active cases we might

6   have or maybe newsworthy cases.

7       Q   Okay.  So just so that make sure I understood

8   because you just gave me a lot of information.  I want

9   to make sure I understood all of it.  So one of your

10  responsibilities would be dealing with the news media

11  and it -- was that, like, responding to media inquiries?

12      A   Yes.

13      Q   Okay.  Did detectives ever directly respond to

14  media inquiries, or did it have to go through you?

15      A   I don't recall detectives doing it, but that

16  doesn't say they didn't, you know?

17      Q   Okay.  And you were also -- I think you said

18  you were responsible for assigning detectives to cases,

19  right?

20      A   Yes.

21      Q   Okay.  And you would do that when there was a

22  fresh case; is that right?

23      A   Yes.

24      Q   Okay.  How did you decide which detectives to

25  assign to a particular case?

1     A    First, I have to decide who is working right

2  now.  See, I -- to clarify that, there's -- there's two

3  different processes for assigning cases.  Current cases

4  that came over the telephone that needed responsibility

5  was my decision to send it to.  They went to what we

6  call case management in the back.  They would assign the

7  Court cases that have been reported, but we never

8  followed up on it on the front end.  So to get back to

9  that, if a case came through, I'd have to see what my

10  manpower was at that time.  Because on the day watch, I

11  had people that were in court all the time.  I had

12  people that are working cases, maybe in the district.

13        So that's when I would decide who would be his

14  response -- who would get the case, case that came

15  through.

16     Q    Okay.  When you were making decisions about

17  who to assign to particular cases, did you consider, for

18  example, whether particular detectives had better skills

19  or expertise that would be suited to that case?

20     A    Well, there was -- in 1993, I don't remember

21  if there -- we -- we used to have, like, specific teams

22  that were dead -- specific cases.  We had rape -- rape

23  specialists.  We had phone specialists and we had guys

24  who were assigned to strictly serious -- serious

25  batteries and gunshots and homicides.

1    Q    Okay.  So I guess, I'll ask a narrower

2  question then.  So when you were -- when a homicide came

3  -- homicide case came in and you had to assign

4  detectives to work on the homicide case, in deciding who

5  to assign, did you consider whether particular

6  detectives had better skills or expertise in picking who

7  you were going to assign?

8    A    If they're one of our designated homicide

9  teams, I would send them.

10    Q    Okay.  Was there ever a situation where there

11  were multiple homicide teams you could have assigned,

12  and you had to decide which of them would be better

13  suited to a particular case?

14    A    Yes.

15    Q    Okay.  And how did you make that decision?

16    A    A lot of times, it depended on where -- where

17  -- where it occurred.  It occurred -- we had, like, five

18  districts or six districts in those days.  You go back

19  and -- to -- to the teams where they came from, I sort

20  of knew who -- where they were assigned before they

21  became detectives.

22    Q    And why was it helpful to know where they were

23  assigned before they were detectives?

24    A    Because they -- they were familiar with the --

25  the people in the district normally, yes.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 141 of 550 PageID #:14181
The Deposition of ROBERT J. DELANEY, October 13, 2020

28

1    Q   Okay.  So in your role as a supervisor in

2   Area 5 in 1993, were you actively involved in

3   investigating, personally, these cases?

4    A   I did not --

5       MR. BRUEGGEN:  Object to form.

6    A   Oh, I'm sorry.  I did not investigate any

7   cases that I remember.

8    Q   Okay.  So for example, as a sergeant, did you

9   ever interview witnesses?

10    A   No.

11    Q   Okay.  As a sergeant, did you ever help

12   conduct eyewitness identification procedures?

13    A   No.

14    Q   Did you ever help conduct interrogations?

15    A   No.

16    Q   Did you participate in decisions about whether

17   to contact felony review?

18    A   No.

19    Q   Okay.  In other words, the decision about

20   whether to contact felony review was within the purview

21   of the detectives?

22    A   Yes.

23    Q   Okay.  Now, when -- for example, when

24   detectives were taking investigative steps such as

25   interrogating a witness or a suspect, while they were in

1    that process, would they consult with you about how it

2    was going?

3        A    From time to time, they may have, yes.

4        Q    Okay.  Do you ever remember that specifically

5    happening?

6        A    No.

7        Q    Okay.  Did detectives ever come to you for

8    advice because they were stuck in an investigation and

9    didn't know how to proceed?

10       A    No.

11       Q    Okay.  Would it be fair to say that you didn't

12    -- it was not one of your responsibilities to make sure

13    that these cases got solved?

14       A    To make sure they got solved?  No, I -- it

15    wasn't my responsibility.  That it -- that an honest

16    investigation went through and they -- they covered --

17    tried -- tried to cover all the bases that left no --

18    nothing hanging.  So if it got called, you know, to --

19    to -- to review the files from time to time to see if an

20    -- an -- anything go forward.

21       Q    Okay.  So it was one of your responsibilities

22    to make sure that the detectives were diligently

23    investigating their cases, right?

24            MR. BRUEGGEN:  Object to form.

25       A    I don't know -- understand what diligently

1   means in your - in -- in your perspective, sir.

2       Q    Well, I was just trying to characterize what

3   you had just said and if I mischaracterized it, I didn't

4   mean to.  But it sounded like one of your jobs was to

5   make sure that leads were followed up on, for example?

6       A    Right.  And it would be through the debriefing

7   process that we had at roll call in the morning or, in

8   -- in my case, in the morning.  And if -- if they need

9   any assistance to go forward with it, you know?

10      Q    Okay.  So what kind of assistance are you

11  referring to?

12      A    If they -- well, someone needs to cover a

13  hospital, an event that somebody's seriously injured

14  while they're on the scene of a thing, or go down to the

15  ME's office and be present for the posts, those are the

16  kind of things that we did for the assistance on that.

17      Q    Okay.  Do you recall any instances in which

18  you discovered that detectives that you supervised had

19  failed to follow up on leads that you believe they

20  should have followed up on?

21      A    No, not that I recall.

22      Q    Okay.  And you said you were responsible for

23  reviewing cases after they went cold, right?

24      A    From time to time, I would -- I would have to

25  submit a report on cases that were old, yes.  So I would

1    have to pick up the file and review the file.

2       Q    Okay.  And so how did you keep track of which

3    cases hadn't been solved yet?

4       A    We had a file system that had open cases and

5    closed cases.

6       Q    Can you describe that file system, briefly?

7       A    I believe there were five-drawer file cases,

8    metal with drawers in them, and the cases -- that's

9    where the homicide cases were put in.  And we had a

10   board that we could look to see what cases were still

11   open by month, and I could review that board, and then

12   go into the file and do it that way, so --

13      Q    Okay.  And you said after a certain period of

14   time, you -- if a case was still unsolved, you'd have to

15   look it over; is that right?

16      A    Well, the boss would always look for -- for

17   his meetings.  We would have to review the open cases

18   and do a status report via communications with the

19   commander.

20      Q    Okay.  And when you say the boss, is that the

21   commander?

22      A    Yes.  I'm sorry, the commander.

23      Q    No, that's okay.  About how often would you

24   have those meetings around this time, in 1993?

25      A    I don't remember.

1    Q    Okay.  Was it more than once a year?

2    A    I believe so, yes.

3    Q    Was it once a month?

4    A    Well, it -- it depends on what kind of

5    meetings the boss was going to.  Like, I -- for example,

6    he would come in, "I got a meeting in the 15th District.

7    Give me a rundown on -- on open cases from a specific

8    period of time."  I would go in and write a summary of

9    the open cases, you know.

10    Q    Now, when you prepared summaries of open

11    cases, did you do that just based on the paper, or did

12    you also talk to the detectives who were involved?

13    A    No.  Normally just -- I opened up the file and

14    reviewed the file.

15    Q    Got it.  Do you recall ever having to follow

16    up with any of the detectives as part of that review

17    process to get more information about what had happened

18    in the investigation?

19    A    I don't remember doing that, no.

20    Q    Okay.  And so in the meetings with the

21    commander where you would discuss open cases, what kind

22    information would you provide about them?

23    A    From what the -- from what the file says, you

24    -- to why its stats -- that it - it -- why it became

25    cold.  You know, we would review it and then -- and it

1    would say that -- could be a case that there's no --

2    there's no clues to follow up on, that kind of stuff.

3        Q    And what was your understanding of the purpose

4    of providing that information to the commander?

5        A    Because he asked for it.

6        Q    Okay.  Did he ever tell you why he wanted that

7    information?

8        A    Like I said before, he could be going to a

9    meeting and conferring with the tac lieutenants and the

10   commanders of the district -- specific district and tell

11   them this, if they give -- and give them information

12   that these are the cases that were open, because they're

13   -- they were -- because of their responsibilities in

14   these districts, they had to respond to their crime --

15   their crime statistics, also.

16       Q    Okay.  Did a commander or a lieutenant in

17   Area 5 ever tell you that there were too many unsolved

18   cases or too many cold cases in your area?

19       A    No.

20       Q    Okay.  Did you ever receive pressure of any

21   kind to close more cases?

22       A    No.

23       Q    Okay.  Was one of your responsibilities as a

24   supervisor in Area 5 to discipline detectives?

25       A    One of the supervised responsibility in police

1    department is to discipline their manpower, if need be.

2        Q    Okay.  So for you, as a sergeant overseeing

3    detectives, that would've been -- your responsibility

4    would be to discipline detectives, if need be?

5        A    If there was complaints against detectives, I

6    could discipline them, yes.

7        Q    Okay.  Do you recall ever having to hand out

8    any discipline to detectives while you were a sergeant

9    at Area 5?

10       A    No.

11       Q    Were you responsible for providing any

12   training to the detectives you supervised at Area 5?

13       A    No.

14       Q    Generally speaking, was one of your

15   responsibilities, as a sergeant at Area 5, to ensure

16   that the officers you supervised followed Chicago Police

17   Department policies?

18          MR. BRUEGGEN:  Object to form.  John, you said

19       the officers, and I don't know if you're trying to

20       distinguish between detectives.  I just want to

21       make sure it's clear.

22          MR. HAZINSKI:  Yeah, I just mean anyone he

23       supervised.

24          MR. BRUEGGEN:  Got you.  Thank you.

25          THE WITNESS:  Please repeat the question.

1   BY MR. HAZINSKI:

2       Q    Sure.  Was one of your responsibilities as a

3   sergeant at Area 5 to make sure that the detectives or

4   other officers you supervised complied with Chicago

5   Police Department policies?

6       A    Yes.  On day-to-day basis, yes.

7       Q    Okay.  So in that role, were you familiar with

8   the police department's written policies?

9       A    In general, yes.

10      Q    Okay.  And what do you mean by, "in general"?

11      A    Well, specifically, I can't -- I -- I would

12  not be able to specifically say which policy would be

13  there.  Would -- it was -- I could refer to it, you

14  know, because we want them to come to work, we want them

15  to do their job, and -- and -- and eight for eight, as

16  they used to say, so --

17      Q    What does that mean?

18      A    Eight hours for eight hours' pay.

19      Q    Making sure that no one was slacking off,

20  essentially?

21      A    Exactly.

22      Q    As a sergeant in Area 5, did you have physical

23  copies of Chicago Police Department policies that you

24  were able to consult?

25      A    They were available.

1    Q    Okay.  Where were they available?

2    A    I think in a binder-y form in the commander's

3  office.

4    Q    Did those include Chicago Police Department

5  general orders?

6    A    Yes.

7    Q    Did they include CPD special orders?

8    A    Yes.

9    Q    Do you recall if they included any other types

10  of written directives?

11    A    There was a handbook for detectives that were

12  given to them during their training on how to -- how to

13  investigate certain types of crimes that they have.

14    Q    So then, in addition to the general orders,

15  special orders, and detective handbooks, can you think

16  of any other written directives that were in that

17  collection in the commander's office?

18    A    Well, we -- you know, and to get back to

19  directives, we also had a CO book that we had.  It was a

20  commanding officers' book that we reviewed every day at

21  roll call.  And there were directives from -- in -- in

22  -- in those books, we would discuss them at roll call.

23    Q    Okay.  And what was the subject matter of the

24  directives in the commanding officer book?

25    A    It went from day-to-day.  It's a different --

1  it was a different thing, whatever -- whatever was

2  relevant for that day.  They -- they could be -- it

3  wasn't every day, but it was at -- particular times it

4  would be in the CO book.  Maybe something from the

5  Chief of discs coming down, something maybe from the

6  superintendent's office, maybe something from the deputy

7  chief's office, or something maybe from the patrol

8  division.

9      Q    Okay.  So the directives from the CO book that

10  you reviewed at roll call, those came in periodically

11  from higher up, and you were required to relay those to

12  the detectives; is that right?

13      A    Yeah.  They -- they would put them in the --

14  the front office would put them in the CO book.

15          The CO book would be used at -- we used the CO

16  book at every -- at every roll call.

17      Q    Got it.  Can you give any examples of the

18  kinds of directives of the subject matter or the

19  directives that would come into the CO book?

20      A    No, I don't remember.

21      Q    Do you recall if it had to do with day-to-day

22  police operations?

23      A    I believe so, yes.

24      Q    So in supervising officers at Area 5, you used

25  the phrase "eight for eight" to mean you wanted to make

1  sure that the detectives or other folks that you

2  supervised were putting in an honest day's work and

3  doing their jobs essentially, right?

4     A   Yes.

5     Q   Okay.  If you learned that a detective was not

6  doing that -- well, actually, let me ask it this way.

7  Did you ever come to learn or come to suspect that a

8  detective was not doing that?

9     A   No, not that I remember.

10     Q   Was one of your responsibilities as a sergeant

11  in Area 5 to monitor for potential misconduct by

12  detectives?

13     A   As a specific thing?  In general, yeah, if

14  something was -- was -- I -- I would -- it would be my

15  responsibility to take action on it, yes.

16     Q   Okay.  When you became a sergeant, did you

17  receive training on how to monitor for misconduct by

18  detectives?

19     A   I don't remember.

20     Q   Okay.  Do you recall ever learning or coming

21  to believe that any of the detectives you supervised had

22  engaged in misconduct?

23     A   Not that I recall.

24     Q   Do you recall ever having to escalate any

25  concerns about any of the detectives you supervised to a

1  lieutenant or another higher-up in the department?

2     A   I don't remember ever doing that, no.

3     Q   And I believe earlier, you testified that you

4  don't remember ever having to hand out any sort of

5  formal discipline to detectives under your supervision;

6  is that correct?

7     A   Yes.

8     Q   Short of a -- something formal, like a written

9  reprimand, did you ever have to sit down with a

10  detective and give them a talking-to or help them course

11  correct some aspect of their job performance?

12     A   I don't remember.

13     Q   Okay.  One of your responsibilities as a

14  sergeant was to approve written reports, right?

15     A   Yes.

16     Q   Can you please describe the process of

17  reviewing and approving a report that was submitted to

18  you?

19     A   I don't understand.

20     Q   So detectives would prepare written reports

21  and then turn them into you for your approval, correct?

22     A   They would -- they would put them in a basket.

23  It was an end basket.

24     Q   Where was that basket located?

25     A   On the sergeant's desk.

1    Q    So actually, let's take a step back.  So was

2   the sergeant's desk in an office in the Area 5, or was

3   it kind of in the main central area?

4    A    It was in an office.

5    Q    Okay.  Was that office shared with anybody

6   else?

7    A    The office itself had two -- two detectives

8   assigned to it doing clerical -- basically clerical

9   work, and the -- there was a desk for a sergeant.

10    Q    And the commander had his own office, right?

11    A    Lieutenant had his own office, Commander had

12   their own office.

13    Q    Okay.  And at any given time in this period

14   around 1993, there was just one commander and one

15   lieutenant for Area 5?

16    A    No, there was a lieutenant assigned to

17   property crimes.

18    Q    Okay.  So there were two lieutenants?

19    A    Two lieutenants who normally worked the area,

20   yes.

21    Q    And so one was in charge of property, meaning

22   the other one was in charge of violent crimes?

23    A    Yes.

24    Q    Okay.  And so you, as a sergeant, would review

25   reports that were left on the basket on the sergeant's

1  desk, right?

2     A    Yes.

3     Q    Okay.  So how would you go about reviewing and

4  approving those reports?

5     A    I would remove them from the basket, read

6  them, and then -- and if -- and then sign them off --

7  sign off on them so they can go into the official files.

8     Q    When you read through them, what were you

9  looking for?

10    A    A, the first thing, is the status of the case,

11 and B, does the narrative of the -- of the report

12 justify the status of the case that I'm reading?

13    Q    Okay.  So when you say status of the case,

14 could you explain a little more what that means?

15    A    Well, there's several types of classifications

16 on a case.  It could be suspended.  You get a report

17 suspending the case.  We could get a report that clears

18 the case.  What -- we could have a report that's a

19 progress report that there's no adjudication of it at --

20 yet, that just -- information.  That's -- that's what

21 the box is on the front end.

22    Q    Okay.  So you would read the narrative

23 description in the report and make sure that it matched

24 up, so to speak, with the status that had been indicated

25 on the first page of the report; is that right?

1     A    Yes.

2     Q    Okay.  Other than that, was there anything

3  else you were looking for when you reviewed reports?

4     A    I just looked for clarity if the report makes

5  sense when you read it.

6     Q    Okay.  You recall ever reviewing any reports

7  that you felt didn't make sense?

8     A    And -- in my career as a sergeant?  I think --

9  yes, I -- I -- I believe so.  Yes.

10     Q    Do you recall what you did in those

11  circumstances?

12     A    I turned them back to the -- the detective who

13  authored them and had them corrected.

14     Q    So when detectives put the report in the

15  in-basket to be reviewed by the sergeant, what they were

16  submitting was their completed report, right?  As

17  opposed to a partial draft of a report?

18     A    No, it's -- it was a report for approval, so

19  they can go downtown into the files.

20     Q    Okay.  And when you say, "go downtown," what

21  are you referring to?

22     A    I believe that the assigned report went

23  downtown for the filing system.

24     Q    Okay.

25     A    The official files.

1    Q    To the records division?

2    A    I -- yeah, that's the place.

3    Q    Okay.  So essentially, once -- would it be

4  fair to say that once the detective turned the report

5  into you, if you reviewed and approved it, at that

6  point, it would get sent off and it would not go back to

7  the detectives after that point, right?

8    A    It -- it -- after it was signed, I put it in

9  another basket.  It's a signed basket, where the case

10  management people would retrieve it and send it on its

11  way to downtown.

12    Q    Okay.

13    A    To the records, or wherever they went.

14    Q    Okay.  Would it have been proper for a

15  detective, in 1993 in Area 5, to submit a report for

16  approval, get a supervisor signature, and then retrieve

17  the report and change information in the report?

18    A    It's -- anything's possible.  This -- it's

19  -- the -- the basket -- after I put it in the basket, it

20  sits there.  When it was retrieved, it could be hours,

21  it could be immediately.  I don't know.  The possibility

22  exists that somebody could pick it up and change it.

23    Q    Okay.  Would that have been proper according

24  to your understanding of the procedures at the time?

25    A    No.  What would be proper was, say, if he

1    would -- the detective, for example, would come up to me

2    and say, "Listen, I think I need to change something on

3    this report.  Can I get it back?"  And then -- then they

4    -- then I would -- we would try to find it and change

5    it

6        Q    And if that happened -- so in other words, a

7    detective could go back and change a report that had

8    already been approved, but only if the detective cleared

9    it with you, so to speak?

10       A    No, see, we got to -- if -- if it -- if it --

11   if you're talking about immediately, you know, if I sign

12   a report, 20 minutes later, he comes in and tells me,

13   "There's a mistake, I got to make" -- he can correct any

14   mistake by the use of a supplemental report.  And it

15   would be the form set again, and just -- and it -- and

16   it's is a sub correcting information.  This is to

17   correct -- the CB number's wrong, say, for example, on a

18   -- in a -- and -- and -- and this is submitted for that

19   correction.  So he doesn't need to pick up the report,

20   pull out the pages, and change it.  He could do it via

21   -- that's the -- the process would be to do a

22   supplementary report on it.

23       Q    I see.  So the way to fix a mistake is to file

24   a new report explaining what the issue was?

25       A    Right.

1    Q    Would it be improper for a detective to, for

2    example, use white-out on a report that had been

3    submitted for approval to -- and write over new

4    information?

5         MR. BRUEGGEN:  Object to form.  Incomplete

6     hypothetical.  Go ahead.

7    A    At that time, there would be white-out on

8    forms at times, because in -- in those days, we were

9    using - the -- the departments had typewriters, whereas

10   some of the detectives had their own word processors.

11        So white-out would exist on some of our forms

12   in those days.

13   Q    Right.  If a detective noticed a mistake in a

14   report after it had been submitted, or realized that

15   there had been a mistake in a report, you said that the

16   appropriate course is to submit a new report explaining

17   what the mistake was, and I'm trying to ask if it would

18   also have been appropriate for a detective to fix that

19   mistake using white-out instead.

20        MR. BRUEGGEN:  Object to form.  Misstates his

21    testimony.

22    A    Depends on the location of where the original

23   report -- the original document we're talking about,

24   that he wants to change, where it was.  If it's

25   downtown, he has to do a supplementary report correcting

1    that mistake.  If -- if -- if he came to me and said,

2    "Listen, I just submitted something, I got to change

3    something on it," I'd give him back his report, you

4    know?

5        Q    So when you reviewed reports before approving

6    them, you testified that you wanted to make sure that

7    the narrative description in the reports supported the

8    classification of the status on the first page, and that

9    it was -- the report was clear and made sense.  Other

10   than those things, was there anything else you were

11   looking for when you reviewed reports for approval?

12       A    If it was -- if it was involved in arrest, I'd

13   see if the CB numbers and air numbers are correct, the

14   name of the offender shown.  But aside from that, that's

15   -- you know, it -- that's -- I would assign it, but with

16   the CB numbers and name of the offender would be

17   declared closed or declared open.  Its classification it

18   means the case is cleared.

19       Q    Okay.  Did the process of reviewing these

20   reports for approval require you to read them carefully?

21           MR. BRUEGGEN:  Object to form.

22       A    I read all the reports that I -- I signed.

23           How careful I read them, I don't know.  I

24   don't -- I would assume I read them carefully.

25       Q    Okay.  For you, as a sergeant in 1993 at Area

1  5, would it have been appropriate for you to sign off on

2  reports without reading them?

3      A    I can't imagine why I wouldn't read something

4  if I signed it.

5      Q    Now, when you were reviewing reports from the

6  in-basket, did you review each report on its own, as you

7  were treated from -- together with other reports that

8  had been filed on that same investigation?

9          COURT REPORTER:  I'm sorry, this is the Court

10         Reporter.  My audio cut out.  Could you repeat that

11         question?

12  BY MR. HAZINSKI:

13     Q    Sure.  So when you reviewed reports from the

14  in-basket, did you review each report that was submitted

15  on its own one by one, or did you consult the -- that

16  report, alongside with the other reports that had been

17  already submitted in that case?

18         MR. BRUEGGEN:  Object to form.  Incomplete

19         hypothetical.  Go ahead.

20     A    I would take -- I would just review the forms

21  as they were submitted.

22     Q    Okay.  So for example, if you had a new

23  progress supp report in an ongoing investigation, it was

24  not your usual practice to go retrieve the investigative

25  file for that case and pull the other reports to review

1   them along with the new report, right?

2        MR. BRUEGGEN:  Object to form.

3   A   Yes.

4   Q   Okay.

5        THE WITNESS:  Down to take a break?

6        MR. HAZINSKI:  Oh yeah, we can --

7        MR. BRUEGGEN:  Why don't we take a break?

8        He needs --

9        COURT REPORTER:  Okay.  We're off the record.

10   The time is 11:00 a.m.

11          (OFF THE RECORD)

12        COURT REPORTER:  We're back on the record.

13        The time is 11:05 a.m.

14   BY MR. HAZINSKI:

15   Q   So Mr. Biebel, you mentioned that there were

16   some occasions on which you might be reviewing a report

17   and determined that it was unclear and asked the

18   detective to fix it.  Could you estimate about how often

19   that happened?

20   A   Not very often.

21   Q   Okay.  When you say not very often, would it

22   happen weekly, or less often than that?

23   A   Less often.

24   Q   Did it happen more than once a year?

25   A   I don't remember.  I don't think so, though.

1    Q    Okay.  Do you recall if there were any

2  officers that you had to -- and when I say officers, I

3  mean detectives or other individuals you supervised,

4  whose reports you had to send back for more clarity

5  repeatedly?

6    A    No.  There are none -- not that I remember.

7        I don't believe so, no.

8    Q    And earlier, you testified about what happened

9  to these reports after they were approved, and you said

10  that once they got approval, they would be sent

11  downtown, right?

12    A    After I approved them, I would put them in a

13  basket behind -- on -- in the sergeant's office, on the

14  file cabinets.  And from time to time, the case

15  management people who are in charge of the -- the case

16  files in the area would take those things and process

17  them downtown -- to downtown.  I don't know how they did

18  it, but they made their way downtown.

19    Q    Were the case manager people in the area sworn

20  officers?

21    A    Yes.

22    Q    Were they detectives?

23    A    Yes.  There was a case -- there was a case

24  management sergeant, and he had what we called summary

25  detectives in the back.

1    Q   Were those summary detectives the ones that

2    had desks in the same office with the sergeant's desk?

3    A   No, those were different.

4    Q   Okay.  Do you recall who the case management

5    sergeant was at Area 5 in 1993?

6    A   Bill Murray.

7    Q   As a sergeant in Area 5, were you ever

8    responsible for placing reports or other documents into

9    investigative files?

10   A   Was it my duty to do it; is that your

11   question?  Please repeat the question.

12   Q   Was it one of your responsibilities to do

13   that?

14   A   No.

15   Q   Okay.  Whose responsibility was it?

16   A   The detectives'.

17   Q   Okay.  In your role as a sergeant at Area 5,

18   did you ever have occasion to look through or examine

19   investigative files?

20   A   Yes.

21   Q   Okay.  And what were the circumstances where

22   you would do that?

23   A   As I said earlier, I was -- when someone would

24   ask me to put a report together on open cases, I would

25   review investigative files and type reports from that.

1    Q   Okay.  Outside of that context, where you were

2   doing your review of open cases, did you ever have any

3   reason to look in investigative files?

4    A   I believe I -- I'm -- I'm sure I have.

5        When people call on the phone and want to know

6   the status of a case, I might turn around and pull up

7   the case and review it and give them their answers if

8   they ask.

9    Q   Okay.  Earlier, you testified that you were,

10   at the time, generally familiar with CPD's policies in

11   connection with your supervision of the detectives to

12   make sure that they were generally adhering to those

13   policies; is that a fair summary?

14    A   Yes.

15    Q   Okay.  So I want to ask you about your

16   recollection of some particular policies.  So do you

17   recall whether there were any policies in effect in 1993

18   pertaining to jailhouse informants?

19    A   I'm not aware of that, no.

20    Q   Okay.  And just to be clear, when I say

21   jailhouse informants -- I'll ask it another way just so

22   it's clear.  Do you know whether the police department

23   in 1993 had any policies about offering leniency or

24   benefits to an incarcerated witness in exchange for

25   their cooperation in an investigation?

```
1      A    I'm not aware of that.

2      Q    Okay.  Do you know whether there was a policy

3  in place in 1993 that prohibited doing that?

4      A    I'm not aware of that.

5      Q    Okay.  In 1993, were there any CPD policies

6  that you recall governing the use of confidential

7  informants?

8      A    I don't -- what's a confidential informant?

9      Q    Okay.  So is that -- does that term

10 confidential informant have any meaning to you?

11     A    From new -- from television and movies, I've

12 heard -- heard the term.  I've seen the term -- in my

13 mind, a confidential informant is a cooperating

14 individual that you -- that people come in contact with

15 on the street.

16     Q    Were you familiar with that term from your

17 work at Area 5, or just from media?

18     A    The term?  What term are you talking of?

19     Q    Confidential informant.

20     A    Confidential informant was used --

21 specifically in this matter, I saw it -- I -- I saw it

22 -- I read it today, or yesterday, or whenever when I let

23 -- review the reports.  It's my understanding

24 confidential informant, as used in our reports, was a

25 cooperating individual who -- who didn't want to be
```

1    identified for safety issues.

2        Q    Back in 1993, did you have an understanding of

3    what the term confidential informant meant?

4        A    As I just said, my -- my understanding of

5    confidential informant, in 1993, was a subject who

6    didn't want to be identified for fear of reprisal and

7    was going to offer street information as to whatever the

8    detective would be seeking.

9        Q    Okay.  Do you recall any Chicago Police

10   Department policies that were in place in 1993 relating

11   to the use of confidential informants?

12       A    I'm not aware of a policy at that time.

13       Q    Okay.  Do you recall any occasion when you

14   were a sergeant at Area 5 where you asked a detective to

15   reveal the identity of a confidential informant?

16       A    I did not.

17       Q    Do you know whether detectives in Area 5, in

18   1993, maintained lists or other records of the identity

19   of confidential informants?

20       A    I'm not aware of that.

21       Q    I want to ask you now a little bit about file

22   keeping at Area 5.  When you became a sergeant, do you

23   recall whether you received any training on the

24   obligation to turn over evidence and information to

25   criminal defendants?

```
 1          MR. BRUEGGEN:  Object to form.  Go ahead.

 2     A    I don't remember.  I don't recall that.

 3     Q    Do you recall, at any point in your career,

 4  receiving training on the subject of the obligation to

 5  turn over evidence and information to criminal

 6  defendants?

 7     A    I don't recall.

 8     Q    Okay.  As you sit here today, do you have an

 9  understanding of the nature of the obligation to turn

10  over information and evidence to criminal defendants?

11          MR. BRUEGGEN:  Object to form.  Go ahead, sir.

12     A    Yes.

13     Q    Okay.  And what is your understanding?

14     A    That if someone subpoenas information, you --

15  you fill the subpoena.

16     Q    In 1993, as a sergeant at Area 5, did you have

17  any responsibility to ensure that evidence and

18  information were disposed to criminal defendants?

19     A    No.

20     Q    Whose responsibility was it?

21          MR. BRUEGGEN:  Object to foundation.

22          COURT REPORTER:  Was that an objection?

23          MR. BRUEGGEN:  Yes.  Object to foundation,

24  sorry.

25          THE WITNESS:  I don't know whose
```

1    responsibility that was.

2  BY MR. HAZINSKI:

3        Q    In 1993, if you learned that a detective had

4  hidden or concealed evidence so that it wouldn't reach

5  criminal defendants, would that have constitute of a --

6  constituted a violation of policy in your understanding?

7        MR. BRUEGGEN:  Objection.  Incomplete

8    hypothetical and form.

9        MS. BARBER:  I couldn't -- I don't know if

10   anybody else heard that objection.  I did not.

11       THE WITNESS:  I didn't know what she said, JD.

12       MS. BARBER:  I just said that I didn't hear

13   the objection, but maybe I was the only one.

14       MS. MCGRATH:  No, I couldn't hear it either,

15   Katie.

16       MR. BRUEGGEN:  Objection.  Incomplete

17   hypothetical and form.

18       MS. MCGRATH:  Thank you.

19       THE WITNESS:  Please repeat the question

20   there.

21  BY MR. HAZINSKI:

22       Q    Sure, and I'll try to ask it maybe in a

23  slightly clearer way.  So generally speaking, one of

24  your responsibilities as a sergeant was to make sure

25  that detectives adhered to CPD policies broadly, and I

1   want to know if that included any supervision to make

2   sure that detectives were meeting their obligations to

3   turn over evidence and information so that it would

4   reach criminal defendants?

5       MR. BRUEGGEN:  Objection.  Form, incomplete

6    hypothetical, vague.

7    A   The detective's responsibility was to -- to

8   inventory, if need be, and put into the investigative

9   file and send it down into the Records section any and

10   all paperwork that they're dealing with.

11    Q   If you had learned that detectives were

12   withholding any paperwork from the investigative file,

13   would that have represented a breach of policy as it

14   existed in 1993?

15       MR. BRUEGGEN:  Objection.  Form, incomplete

16    hypothetical.

17    A   I'm not familiar with what the 1993 policies

18   were in regards to something of that nature.

19    Q   Okay.  So was the investigative file the file

20   that Area 5 detectives used to store police reports and

21   notes while an investigation was ongoing?

22    A   Yes.

23    Q   Were there any other terms for that file?

24    A   I think we called it the -- the running file,

25   street file, investigative file.

1    Q    Did you ever hear that file called a working

2  file?

3    A    I've -- I've heard the term working file, yes.

4    Q    Okay.  And were those investigative files

5  stored in the sergeant's office at Area 5?

6    A    Yes.

7    Q    In file cabinets, correct?

8    A    Yes.

9    Q    Were the file cabinets kept locked?

10    A    In 1993 or in general?

11    Q    In 1993.

12    A    I don't remember it happened in 1993, but

13  subsequent to that day, subsequent, it became an issue,

14  so we began locking the -- locking the files.

15    Q    You recall approximately when they started

16  doing that?

17    A    During my term there, I don't recall exactly

18  when.

19    Q    Okay.  And your term there ended in, I'm

20  sorry, '98, correct?

21    A    I was promoted in 1998 out of there, yes.

22    Q    Okay.  Do you recall what precipitated this

23  change where they started locking the file cabinets?

24    A    No.

25    Q    Do you recall how that change was implemented?

1    In other words, do you recall whether it was a directive

2    you received from supervisors?

3        A    As I recall, a meeting was held for the

4    personnel supervisor Area 5, saying that we're going to

5    lock the files, and there was a key, there was -- that

6    -- that in order -- if someone wanted a file out, they'd

7    have to ask a sergeant to open up the file for their

8    access.

9        Q    Do you recall Phil Cline was one of the people

10   involved in that meeting?

11       A    Excuse me?

12       Q    Do you recall Phil Cline was one of the people

13   involved in that meeting?

14       A    He was a commander at one time at Area 5, yes.

15       Q    Do you recall if he was involved in that

16   meeting relating to the file cabinets?

17       A    It's possible.  I don't remember exactly it

18   was -- it was during my -- it was during my tenure at

19   Area 5 and he was one of my commanders in those days.

20       Q    Okay.  Do you recall whether the decision to

21   start locking the file cabinets for the investigative

22   files was the result of concerns about officers

23   tampering with those files?

24       A    I don't know what the basis of that was.

25       Q    Okay.

1    A    Just know that they came about, we had a

2    meeting about it, and -- and there was some type of an

3    order that the -- the -- the files should be locked.

4    Q    Okay.  Did you know Joseph Miedzianouski?

5    A    Yes.

6    Q    Okay.  Did you ever have any conversations

7    with Phil Cline about Joseph Miedzianouski?

8    A    No.

9    Q    Was Joe Miedzianouski one of the officers that

10   you supervised when you were a sergeant of Gang Crimes

11   North?

12   A    Yes.  At one time or another, yes.

13   Q    Okay.  In your supervision of Joe

14   Miedzianouski in Gang Crimes, did you have an

15   opportunity to form an opinion about his police work?

16   A    Yes.

17   Q    And what opinion was that?

18   A    He was a very good police officer.

19   Q    What were his strengths as a police officer?

20   A    His personality and his -- his rapport with

21   the -- with the gangs that he was assigned to.

22   Q    Joe Miedzianouski had good rapport with the

23   gangs, you're saying?

24   A    Yes.

25   Q    Do you ever become concerned that his rapport

1   with the gangs was too good?

2       A    No.

3       Q    You said his personality was his strength.

4   Could you describe what you mean by that?

5       A    He was an outgoing, personable individual who,

6   in my mind, could relate to the younger people on -- on

7   from the street.

8       Q    Okay.  Do you recall which gangs he focused on

9   as a gang crime specialist?

10      A    When he worked in Area 6, I think he had the

11  Simon City Royals.

12      Q    And was that the period of time when you

13  supervised him?

14      A    Yes.

15      Q    Okay.  Did you continue to interact with

16  Joseph Miedzianouski after you became a sergeant in Area

17  5?

18      A    Yes.

19          MR. BRUEGGEN:  Object to form.

20      A    Oh, excuse me.  Yes.

21      Q    All right.  What capacity did you interact

22  with him at Area 5?

23      A    Professional.

24      Q    Okay.  He was still working in Gang Crimes at

25  that period of time, correct?

1    A   In -- yeah, he had -- he was a gang -- he was

2  a gang specialist, as long as I can remember.

3    Q   Okay.  And in his work as a gang crime

4  specialist, did he sometimes come to the Area 5 offices?

5    A   He may have, yes.

6    Q   Okay.  Do you remember ever interacting with

7  him at Area 5?

8    A   I don't remember ever talking to him up there.

9  I talked to him on the phone from Area 5, but I don't

10  remember seeing him up at the office.

11    Q   Do you have memories of specific conversations

12  you had with him on the phone while you were at Area 5?

13    A   Nothing specific.

14    Q   Okay.  Do you recall why you were talking to

15  him on the phone from Area 5?

16    A   Well, I was aware when I -- after I left the

17  Gang Unit, they gave him a -- he was a -- the gang

18  specialist in charge of the Latin Kings.  And, from time

19  to time, if we had a -- a murder involving the Latin

20  Kings, or I would call him, tell him -- inform him about

21  the fresh -- whenever at the time I talked to him would

22  be a fresh case, and could he find out or ask around who

23  -- who we should look for.

24    Q   But how about how many times did you contact

25  Joe Miedzianouski to receive that kind of information?

1    A    I don't know how many times that was.  I don't

2    remember.

3    Q    Was it routine?

4        MR. BRUEGGEN:  Object to form.  Go ahead.

5    A    If you mean what -- when we had a La -- a -- a

6    -- a -- a -- a gang shooting involving his gang, chances

7    are I'd probably call him and ask him about it.

8    Q    Now, when a new case came in involving a gang,

9    was it your practice to always contact a gang crimes

10   officer who specialized in that gang?

11   A    I -- say that question again, sir.  I didn't

12   understand.

13   Q    Sure.  When a new case came in involving a

14   gang, was it your practice to always get on the phone

15   with a gang crimes officer who specialized in that gang?

16   A    I would get on the phone or -- or reach out to

17   whoever I knew was working that specific gang.  I would

18   do that on -- with people beside Joe Miedzianouski.

19   Q    Okay.  You recall any of the other gang crimes

20   officers you would contact to get that kind of

21   information?

22   A    I would -- I would -- I -- I -- I had a

23   rapport with Jorge Figueroa, and I don't remember any of

24   the other guys, but I'm sure I had encounters with them

25   because -- depending on which gang case was involved.

1     Q    What gang or gangs did Jorge Figueroa

2   specialize in?

3     A    He was a -- an Imperial Gangster specialist.

4     Q    Okay.  So if you contacted a gang crimes

5   officer to get information when a new case came in, and

6   they provided you some information, what would you do

7   with that information?

8     A    I -- first of all, they would -- I would tell

9   them who had the case.  I expected them, if they got the

10   information, would call the detective who had the -- who

11   was assigned the matter.  Joe called me and said that

12   so-and-so, I would pass it on to whomever the detective

13   was assigned that specific case.

14    Q    Apart from cases involving gangs where you

15   would contact gang crimes officers to get information,

16   in other types of cases, did you ever make similar

17   inquiries at the start of a case to gather information?

18        MR. BRUEGGEN:  Object to form.

19    A    I -- I -- I don't understand what you just

20   said, sir, I'm sorry.

21    Q    No, it's okay.  It was kind of a confusing

22   question.  Let me explain what I mean.  So early on in

23   this deposition, I asked you sort of about your

24   responsibilities in Area 5 as a sergeant, and you said

25   that you were not an investigator, and you were not the

1    one investigating these cases.  But it sounds like, from

2    your recent testimony, that you would -- when there was

3    a gang involved case, you would do -- you would make

4    phone calls or inquiries with gang crimes officers to

5    develop some preliminary information; is that a fair

6    summary of your testimony?

7        A    My purpose of that was to notify them that the

8    gang that they were a specialty in was involved in a

9    shooting or a murder on a previous, whatever reason I

10   was calling them, and that so-and-so was assigned to the

11   case.  I was just informing them that if -- could -- if

12   they look into it, get ahold of whomever the detective

13   assigned to that matter was.

14       Q    Okay.  In some cases where the gang crimes

15   officers would come back to you with information and

16   then you would pass that on to the detectives, right?

17       A    Right.

18       Q    Okay.  So what I want to know is, apart from

19   the context of gang crimes, where you might reach out to

20   gang crimes officers to notify them and perhaps receive

21   information, were there any other cases where you would

22   make similar inquiries, unrelated to gangs, when a new

23   case came in?

24            MR. BRUEGGEN:  Object to form.

25       A    I don't recall anything to that, no.

1    Q    Okay.  Were you working at Area 5 in the

2  period of time when Joe Miedzianouski was arrested and

3  charged with federal crimes?

4    A    I don't remember when he was arrested, and I

5  don't remember when he was charged with a federal crime.

6    Q    Okay.

7    A    Could you give me a date?  I would tell you if

8  it was within a date period.  I could tell you that, but

9  --

10    Q    Well, I guess more specifically, what I'm

11  asking is whether you remember those events occurring

12  while you were still working as an Area 5 sergeant?

13    A    Again, I don't remember when it happened, so I

14  don't know if I was -- it happened so -- so long ago.

15        I don't know where I was assigned the day they

16  arrested Joe.

17    Q    Do you remember learning that he had been

18  arrested?

19    A    I believe so.  Yes, I -- I remember probably

20  hearing it from the news media, and I'm sure I got phone

21  calls about it, you know?

22    Q    Do you remember who called you about it?

23    A    No.

24    Q    Okay.  Do you remember what your reaction was

25  when you learned he had been arrested?

1    A    I was in shock.

2    Q    Yeah.  Do you remember what crimes they had

3  arrested him for?

4    A    No.

5    Q    Okay.  Do you recall any instance in which

6  Phil Cline or any other supervisor at Area 5 banned

7  Joe Miedzianouski from Area 5 for any period of time?

8    A    I didn't know that happened.

9    Q    Okay.  Did Phil Cline ever tell you that he

10  believed that Joe Miedzianouski had tampered with a

11  homicide investigation?

12    A    No.

13    Q    Okay.  I want to go back to file -- talking

14  about file keeping.  So investigative files were in

15  these file cabinets, but in the period of 1993, those

16  file cabinets were not locked and were generally

17  accessible to the detectives working in the area; is

18  that right?

19    A    Yes.

20    Q    Okay.  Now, after they became locked, who had

21  access to them?

22    A    The -- the sergeants.

23    Q    So once -- so you testified that, in this

24  period in 1993, you were not responsible for putting

25  documents into investigative files.  That was the

1    detective's responsibility, right?

2        A    Yes.

3        Q    Once those filing cabinets were locked later

4    on, was it still the detective's responsibility to file

5    reports and other notes into the investigative file?

6        A    Because it was in -- it was an investigative

7    file that the detectives worked with every day, the --

8    the file didn't permanently stay there.  They -- once it

9    was removed, it was in the possession of that detective.

10   And if they generated a new report based on it, their

11   responsibility was to put it in there and log it,

12   because I believe there was a log in there, and -- and

13   who -- who -- who placed it in there.  And we also had a

14   guy in charge of those files who filled the subpoenas

15   and -- and whatever reports need to be filed, his job

16   was to put those in that file, too, and fill the

17   subpoenas.

18       Q    Okay.  So even back, you know, in 1993, in

19   that earlier period of time, when detectives were

20   investigating a case, is it fair to say that they would

21   keep the homicide file with them during the pendency of

22   the investigation rather than returning it to the

23   sergeant's office over and over again?

24            MS. BARBER:  Objection.  Form, foundation.

25            MR. BRUEGGEN:  Form.

1    A    It is by understanding that if they weren't

2    using the file, they put it back into the files.

3    Q    Okay.  Were you responsible for making sure

4    that detectives put all reports, notes, and other

5    documents generated during criminal investigations into

6    the investigative file?

7         MR. BRUEGGEN:  Objection.  Asked and answered,

8     form.  Go ahead, sir.

9         THE WITNESS:  The responsibility of -- of

10     putting items into that file is the responsibility

11     of the detective.

12   BY MR. HAZINSKI:

13    Q    Okay.  If -- in 1993, if a detective wrote a

14   report and didn't put it into the investigative file, is

15   that something that you would have been able to notice?

16        MR. BRUEGGEN:  Object to form, incomplete

17     hypothetical, vague.

18    A    If a file -- if -- if a report was written and

19   I put it in the basket, I -- I wouldn't look to see if

20   it was in the file, if that's the question you're asking

21   me.

22    Q    Okay.  You said you wouldn't?

23    A    I would not.

24    Q    Okay.

25    A    Wasn't my policy.

1  Q   Okay.  So detectives would prepare written

2  reports, typewritten sup reports in 1993, for the most

3  part, to document significant investigative steps; is

4  that fair?

5  A   I -- I heard -- I don't understand what you

6  meant by that.  Could you ask the question again?

7  Q   Yeah.  So if there was a major development in

8  the case, detectives would generally document that in a

9  typed report, right?

10  A   Yes.

11  Q   Okay.  So were detectives required to prepare

12  those written reports immediately after the events that

13  occurred?  Or, were they allowed to wait some period of

14  time before they typed it up?

15      MR. BRUEGGEN:  Object to form.

16  A   It -- it -- it -- it depends on the case.

17      It depends on the day.  Depends on what their

18  schedule is. It could be receiving information.  We

19  would hope that they would get it in as soon as

20  possible.

21      Now, if -- that -- that doesn't mean before

22  their tour's over.  We also had constraints because of

23  overtime, so what we want them to do is get it in and

24  pass -- and so we can get it -- get it officially filed.

25  Q   Okay.

1    MS. BARBER:  And I'm sorry to interrupt, but

2  did the Court Reporter get the objection for that

3  previous question?

4    COURT REPORTER:  I did.  It was form, correct?

5    MS. BARBER:  Okay.  Okay.  Thank you.

6    COURT REPORTER:  Thank you.

7    MR. BRUEGGEN:  And are you guys having a hard

8  time hearing me?

9    MR. HAZINSKI:  Slightly.

10    MR. BRUEGGEN:  Maybe I'm going to call in on

11  my cell phone, I got my cell phone, if you -- that

12  way, hopefully it's easier.  Won't be missing my

13  beautiful objections, I'm sure I'll be --

14    MR. HAZINSKI:  Dave, are you still working on

15  calling in?

16    MR. BRUEGGEN:  Yeah.  Yeah.  I -- hold on,

17  there we go.  Let me see if this works.  Can you

18  guys hear us?

19    MR. HAZINSKI:  Yes.

20    MR. BRUEGGEN:  Bob, can you hear him?

21    THE WITNESS:  Yes.

22    MR. BRUEGGEN:  Good.  Hopefully this will be

23  better.  My phone might be a little more sensitive

24  than the computer.

25    MR. HAZINSKI:  You sound a lot clearer, Dave,

1    so hopefully that will resolve the issue going

2    forward.

3         MR. BRUEGGEN:  Great.  Thank you for your

4    patience.

5    BY MR. HAZINSKI:

6         Q    Of course.  So Mr. Biebel, based on your

7    understanding of policy in 1993 at Area 5, were

8    detectives allowed to keep their own files of police

9    reports, notes, or other documents separate from the

10   main investigative file?

11        MR. BRUEGGEN:  Objection.  Form.  Go ahead,

12   sir.

13        A    It's my understanding there was supposedly

14   only one file, and it was the investigative file.

15        Q    Okay.  And during violent crimes

16   investigations, did detectives frequently take

17   handwritten notes?

18        MR. BRUEGGEN:  Object to form.

19        A    Some have, yes.  I don't remember who and

20   when, and -- but there were handwritten notes taken.

21        Q    Okay.  Were there any policies or rules

22   governing how detectives were supposed to make

23   handwritten notes?

24        A    I don't remember.

25        Q    Do you recall whether detectives were required

1 to make handwritten notes on general progress reports?

2  A I don't remember, but we -- we -- we preferred

3 that would occur, yes.

4  Q Okay.  When you say you preferred, could you

5 explain what you mean by that?

6  A Instead of having, like, a matchbook in the

7 file that they took notes on, if you remember what a

8 matchbook was, or just general napkins or something, we

9 would prefer that they would use the document.

10  Q Okay.  And why is that?

11  A It's -- it's concise and it's -- it fits the

12 file, you know?

13  Q Okay.

14  A So and it becomes more official, I think,

15 because it -- if you look at the -- the GPR has a

16 department document number on it and sort of makes an

17 official document that way.

18  Q Okay.  Were detectives who made handwritten

19 notes on GPRs required to submit those GPRs to a

20 sergeant for approval?

21  A There is a sergeant box on the GPR, and it was

22 -- it was supposed to be the policy that we -- that they

23 submit to us, and we can sign them.

24  Q When you say "supposed to be the policy," what

25 do you mean by that?

1    A    The -- it -- my understanding that's what the

2    policy is.  That we signed the case -- or that the --

3    the GPR.

4    Q    In 1993 --

5    A    Leaving it in the sergeant --

6    Q    In 1993, was that policy generally followed?

7        MR. BRUEGGEN:  Object to form.

8    A    I -- I don't remember.

9    Q    Okay.  Were officers who wrote GPR supposed to

10   sign it?

11   A    I -- If -- if -- I don't remember what it

12   looks like, but I believe their -- their signature is on

13   it, yes.

14   Q    Okay.  As a sergeant in Area 5 in 1993, did

15   you review and approve handwritten general progress

16   reports?

17   A    I don't remember specifically, but I'm sure I

18   did.

19   Q    Okay.  Now, you were not -- so earlier, when I

20   was asking you about whether it was common for

21   handwritten -- for detectives to make handwritten notes

22   during homicide investigations -- or, sorry, I believe I

23   said violent crimes investigations, I believe you

24   indicated that some detectives may have done so, and

25   some detectives may not have done so; was that a -- is

1    that accurate?

2        A    From best of my knowledge, yes.

3        Q    Okay.  Do you recall which detectives

4    generally did not take notes?

5        A    No.

6        Q    Okay.  In 1993, as a matter of policy, as you

7    understood it, would it have been appropriate for a

8    detective to make handwritten notes, summarize those

9    notes in a typed supplementary report, which was

10   submitted for approval, and then destroy the handwritten

11   notes?

12       MR. BRUEGGEN:  Object to form.  Compound.

13       Go ahead.

14       A    Oh, I -- I don't have any firsthand knowledge

15   of that.

16       Q    Okay.  Were you aware of any policies that

17   existed in 1993 that required Area 5 detectives to keep

18   their handwritten notes?

19       MR. BRUEGGEN:  Object to form.

20       A    I'm not aware of that, no.

21       Q    Okay.  So I believe you testified that after

22   an investigation was closed, other officers at Area 5

23   would be responsible for transmitting the file to a

24   different part of the police department; is that right?

25       A    I -- I'm confused at the early part of your

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 188 of 550 PageID #:14228
The Deposition of ROBERT J. BARTIK, taken on October 9, 2020

75

1  question. Could you please repeat it?

2     Q   Sure. After a -- an investigation was closed,

3  at the end of the investigation, in other words, there

4  would be officers at Area 5 who were responsible for

5  taking the investigative file and transmitting it to

6  some other part of the police department, right?

7     A   Investigative file stayed in our office until

8  -- for a certain period of time. I don't remember what

9  the time parameters are, but because of -- because it's

10 a -- we had a -- in those file cabinets we had, we had

11 closed cases. Those cases are those who were arrested

12 with CB numbers and now it's in the Court system. Those

13 files were accessed when subpoenas came, inquiries were

14 made on it, and we had a -- we had a person who filled

15 those subpoenas.

16    Q   Okay.

17    A   And -- and the paperwork that I put in the

18 basket would be collected and sent downtown.

19    Q   I see. Okay. And you said that a closed case

20 with an arrest and a CB number, and so forth, would stay

21 in that office at Area 5 for some period of time?

22    A   Yes.

23    Q   Do you recall whether there was a definite

24 time limit after which it would be removed?

25       MS. BARBER: Objection. Form --

```
 1     A    I -- I --
 2          MS. BARBER:  -- foundation.
 3     A    I -- I don't know.  I don't know what the
 4   policy is on that.
 5     Q    Okay.  Do you know -- one way or the other, do
 6   you know where those closed investigative files would go
 7   after they left the sergeant's office?
 8          MS. BARBER:  Objection.  Form --
 9          MR. BRUEGGEN:  Object to foundation.
10          MS. BARBER:  -- foundation.
11          MR. HAZINSKI:  I'm sorry.  I couldn't hear the
12    answer.
13          THE WITNESS:  I haven't answered it yet --
14   BY MR. HAZINSKI:
15     Q    Oh.
16     A    -- maybe that's why.  It is my understanding
17   that once the case left Area 5, the investigative file
18   was sent downtown, of which -- and they kept that file
19   somewhere.  I don't know how.  Never -- never saw it.
20     Q    Okay.  And you said there was a person in
21   Area 5 whose job was to respond to subpoenas that came
22   in, right?
23          MS. BARBER:  Objection --
24     A    Yes.
25          MS. BARBER:  -- form, foundation.
```

1    Q    Okay.  And was that person a sergeant or a

2  detective?

3         MS. BARBER:  Objection.  Form --

4    A    A detective.

5         MS BARBER:  -- foundation

6    Q    Okay.  In 1993, do you know who that detective

7  was?

8    A    No.  I don't remember who it was.

9    Q    As a sergeant in Area 5, in 1993, were you

10  responsible for overseeing the work of the detective who

11  responded to subpoenas?

12         MR. BRUEGGEN:  Object to form.  Vague.

13    A    My understanding is that that detective was

14  assigned to the commander's office.

15    Q    In other words, that wasn't your supervisory

16  responsibility, it was someone else's?

17    A    Responsibility -- no, it wasn't my

18  responsibility.  I -- I had supervisory -- I -- I was a

19  sergeant and -- and he was a detective, so I had that

20  responsibility, but the direct responsibility went to

21  the front office.

22    Q    Okay.  So I guess what I'm trying to figure

23  out is as a sergeant in Area 5 in your role, do you --

24  were you responsible for making sure, for example, that

25  the detective who was responding to subpoenas was

1   providing complete and accurate subpoena responses?

2        MR. BRUEGGEN:  Objection.  Form.  Vague.

3        Asked and answered.  Go ahead.

4    A   The responsibility would be that I -- I had no

5   -- I would never look over his files.  He was working

6   for the sergeant in the commander's office.

7    Q   Okay, thank you.  Mr. Biebel -- so you knew

8   Rey Guevara from your time in gang crimes and your time

9   at Area 5, right?

10   A   Yes.

11   Q   Okay.  When you worked in the same parts of

12  the police department, were the two of you friends

13  outside of work?

14   A   Friends -- I -- we were acquaintances.

15       I would socialize with him occasionally, yes.

16   Q   What kinds of things would you do when you

17  socialized with him?

18   A   We had a softball team, and he was one of our

19  players.  I played with him on those.

20   Q   Okay.  Do you remember any other times you

21  socialized with Rey Guevara outside of the softball

22  team?

23   A   Sure.  Occasionally when I was drinking, I

24  would probably go out and have a drink with him.

25   Q   And was this at gang crimes, at Area 5, or

1   both?

2       A   Just at gang crimes.

3       Q   Okay.  Did you socialize with Rey Guevara --

4   so I guess I can ask -- the softball team -- was the

5   softball team in existence when you were at Area 5?

6       A   I don't remember if the softball team's at

7   Area 5, but there could have been.  I don't remember,

8   though.

9       Q   Okay.  And you -- so while he worked in gang

10  crimes, you would go out and have a drink, but that

11  stopped once you were both working in Area 5; is that

12  right?

13      A   It stopped in 1986.

14      Q   Okay.  And why did it stop in 1986?

15      A   When I quit drinking.

16      Q   Once you stopped drinking, apart from the

17  softball team, did you socialize with Rey Guevara in any

18  way?

19      A   I don't remember.  No, I don't think I did,

20  but I don't remember.

21      Q   Do you recall the last time you spoke with

22  him?

23      A   No.

24      Q   Okay.  Do you recall ever speaking with him

25  after you became a lieutenant?

1    A    I may have, but I don't remember.

2    Q    Okay.  At Area 5, he was a detective.  I want

3    to make sure I get the dates right.  Do you recall what

4    year he became a detective?

5    A    No.

6    Q    Okay.  Would it be fair to say that he was a

7    detective at Area 5 for more -- at least five years

8    while you were a supervising sergeant there?

9    A    Yes.

10   Q    Okay.  Possibly longer?

11   A    Possibly longer.

12   Q    Yeah.  And during that period of time, did you

13   approve and supervise the reports of investigations that

14   he worked on?

15   A    Yes.

16   Q    Are you able to estimate about how many

17   investigations that he worked on you supervised?

18   A    I don't -- I don't understand what you mean by

19   supervised.

20   Q    Well, one of your jobs at Area 5 was to

21   supervise homicide investigations, right?

22   A    Yeah.  Yes, that's true.

23   Q    Okay.  And he worked on many homicide

24   investigations, right?

25   A    Yes, he did.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 194 of 550 PageID #:14234
The Deposition of ROBERT BARTIK, taken on October 4, 2023

81

1    Q    Okay.  Do you recall how many homicide

2    investigations that Rey Guevara worked on you were

3    responsible for supervising?

4    A    Rey worked a different watch than I did, so I

5    really didn't have any direct supervision with Rey.

6         He worked the third watch, I worked the second

7    watch.  Once in a while, we might see each other, but I

8    would sign the reports if they were submitted.  If his

9    name was on it, then I guess that's part of my

10   supervisory responsibilities.

11   Q    Okay.  Were you and Rey Guevara on different

12   shifts the entire time that the two of you worked at

13   Area 5?

14   A    In most cases, yes.  But time to time, I might

15   have filled in on the third watch for reasons beyond my

16   control.

17   Q    Okay.  In reviewing the reports prepared by

18   Rey Guevara during his investigations, and working in

19   the same detective area as him, did you have an

20   opportunity observe his detective work?

21        MS. BARBER:  Objection.  Form.

22   A    I didn't have much contact with him when he

23   was working third watch and I was working the second

24   watch.

25   Q    Did you have an opportunity to develop an

1   opinion about the quality of his detective work?

2       MS. BARBER:  Same objection.

3    A   Because of his ethnicity, say, and his -- and

4  his -- and his social life down in the community, he was

5  pretty successful in his investigations.

6    Q   Okay.  What do you mean when you say, "his

7  social life in his community"?

8    A   Rey was an active church member.  He was an

9  active -- I believe he -- he belonged or was a member of

10  the Puerto Rican parade committee.  He lived in the

11  neighborhood.  He had family in the neighborhood.  So --

12  so based on that, he had -- he had access to a lot of

13  people down there.

14    Q   Okay.  And it is your opinion that his access

15  to those people and his community helped him work on

16  cases he was investigating at Area 5?

17       MR. BRUEGGEN:  Objection.  Form.  Go ahead.

18    A   Yes.

19    Q   Okay.  Can you think of any specific examples

20  where that was true?

21       MR. BRUEGGEN:  Objection.  Form.

22    A   No.

23    Q   Apart from his ethnicity and the social life

24  in his community, did you observe that -- or come to

25  believe that Rey Guevara had any other strengths as an



1    investigator?

2         MS. BARBER:  Objection.  Form.

3         MR. BRUEGGEN:  Object to form.

4    A    He spoke Spanish fluently.

5    Q    And why was that helpful?

6    A    Because we had a -- our area consisted of

7    Spanish speaking victims and offenders, and -- and he

8    could communicate with them.

9    Q    Do you recall who, if any other detectives at

10   Area 5 in 1993, spoke Spanish?

11   A    I don't recall the Spanish officers in 1993 in

12   Area 5 other than Rey Guevara.

13   Q    Okay.  And Rey was and is Puerto Rican, right?

14   A    Yes.

15   Q    Okay.  Do you recall if there were any other

16   Puerto Rican officers at Area 5 in 1993?

17   A    I don't remember who was in Area 5 in 1993.

18   Q    Okay.  Did you ever form the opinion or belief

19   that Rey Guevara was particularly skilled at obtaining

20   confessions from suspects in criminal investigations?

21        MS. BARBER:  Objection.  Form.

22        MR. BRUEGGEN:  Objection.  Form.

23   A    Please repeat the question, sir.

24   Q    Did you ever come to believe or form an

25   opinion that Rey Guevara was better or excelled at

1  obtaining confessions from suspects in criminal

2  investigations?

3       MS. BARBER:  Same objection.

4       MR. BRUEGGEN:  Objection.  Form and compound.

5  Go ahead.

6  A   I'm not aware of that.

7  Q   Okay.  Is it fair to say that Detective

8  Guevara was knowledgeable about gangs, given his prior

9  experience as a gang crimes officer?

10      MS. BARBER:  Objection.  Form.

11  A   Yes.

12  Q   Okay.  Was it your opinion that Detective

13  Guevara's knowledge about gangs as an asset to him as an

14  investigator at Area 5?

15      MR. BRUEGGEN:  Objection.  Form.  Vague.

16  A   My opinion is yes.

17  Q   Okay.  While you were at Area 5, did anyone

18  ever tell you -- oh, strike that question.  While you

19  were at Area 5, did you ever learn or come to believe

20  that Detective Guevara had fabricated a police report?

21      MR. BRUEGGEN:  Objection.  Form.

22  A   No.

23  Q   Okay.  While you were at Area 5, did you ever

24  learn or come to believe that Detective Guevara had

25  improperly manipulated an eyewitness identification

1 procedure?

2     MS. BARBER: Objection. Form.

3     MR. BRUEGGEN: Objection. Form.

4   A  But -- no.

5   Q  Okay. While you were at Area 5, did you ever

6 learn or come to believe that Detective Guevara used

7 unlawful or coercive tactics during an interrogation?

8     MS. BARBER: Objection. Form.

9     MR. BRUEGGEN: Objection. Form and compound.

10   Go ahead.

11     THE WITNESS: No.

12 BY MR. HAZINSKI:

13   Q  Okay. While you were working at Area 5, did

14 you ever learn or come to believe that Detective Guevara

15 ever committed perjury?

16     MR. BRUEGGEN: Objection. Form, compound.

17     Go ahead.

18   A  No.

19   Q  Did you ever have any concerns of any kind

20 about Detective Guevara's work as a detective at Area 5?

21     MS. BARBER: Objection. Form.

22     MR. BRUEGGEN: Objection. Vague.

23   A  Repeat the question, please.

24   Q  When you were a supervisor at Area 5, did you

25 have any concerns of any kind at any point about

1    Detective Guevara's work?

2          MS. BARBER:  Same objection.

3          MR. BRUEGGEN:  Objection.  Form, vague.

4      A    No.  No, I don't picture -- no.

5    BY MR. HAZINSKI:

6      Q    Okay.  As you sit here today, are you aware

7    that, in response to questioning about his work as an

8    Area 5 detective, that Guevara has invoked his Fifth

9    Amendment right to remain silent?

10          MR. BRUEGGEN:  Objection to the extent that it

11         calls for any attorney-client communications.

12          So with that, Bob, don't tell them anything

13         you learned from me. You want to rephrase the

14         question, John, just to --

15          MR. HAZINSKI:  Yeah, I can --

16          MR. BRUEGGEN:  -- exclude that?  For the --

17          MR. HAZINSKI:  I can phrase it differently.

18          MR. BRUEGGEN:  Thank you.

19    BY MR. HAZINSKI:

20      Q    So I'm not interested in anything that was a

21    communication between you and your attorneys that was

22    confidential.  So setting that aside, and apart from

23    that, are you aware that Detective Guevara has invoked

24    his Fifth Amendment right to remain silent in response

25    to questioning about his work as an Area 5 detective?

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 200 of 550 PageID #:14240
The Deposition of ROBERT MILLSTEAD, taken on October 20, 2020

87

1      MR. BRUEGGEN:  Objection.  Form.  Go ahead.

2   A   Yes.

3   Q   Okay.  And how did you learn that?

4   A   From my debriefings on other matters that I'm

5  an accused of -- his work.

6      MR. BRUEGGEN:  Let's clarify that.  Bob, are

7   you -- don't tell them anything you talked to any

8   attorneys about in any other cases.  When you say

9   "debriefing", do you mean from other cases that you

10   did depositions in?

11      THE WITNESS:  Yeah.

12      MR. BRUEGGEN:  Okay.

13      THE WITNESS:  The, the depositions I sat on,

14   it was indicated during those depositions that that

15   had occurred.

16  BY MR. HAZINSKI:

17   Q   Okay.  Did you ever see any media reports,

18  like, news coverage or newspaper articles about

19  Detective Guevara in, let's say within the last five

20  years?

21   A   I don't recall specifically yes, but I'm sure

22  I have.

23   Q   Okay.  So does knowing that Guevara has

24  invoked his Fifth Amendment rights not to answer

25  questions about his police work because the answers

1    might incriminate him, does that affect your opinion

2    about the quality of his police work at Area 5?

3         MR. BRUEGGEN:  Objection.  Form.  Vague.

4    A    No.

5    Q    Okay.  Why not?

6    A    With my experience with Rey, he did a -- a

7    real good job at Area 5.

8    Q    Okay.  Does the fact that Guevara has now

9    taken the Fifth Amendment, in response to questioning

10   about his police work, cause you to question whether you

11   should have supervised him differently or more closely

12   at Area 5?

13        MR. BRUEGGEN:  Objection.  Form.  Compound.

14    Speculation.

15    A    My supervisory responsibility in Area 5 with

16   Rey Guevara was limited as to the time I worked at

17   different watches with him, and most of our encounters

18   were short and -- and brief.

19    Q    Okay.  So with respect to my question, do you

20   have any regrets or concerns about the quality of your

21   own supervision of Rey Guevara at Area 5?

22        MR. BRUEGGEN:  Objection.  Form.  Compound.

23    Speculation.  Go ahead.

24    A    I have no regrets on my supervisory of the

25   times that I had contact with Rey Guevara at Area 5.

1    Q    Do you have any regrets at all about your

2    supervision of any other officers at Area 5?

3         MR. BRUEGGEN:  Objection.  Form.  Vague.

4    Speculation.  Go ahead.

5    A    Not that I can think of at this time.

6         MR. BRUEGGEN:  John, are you switching topics?

7    Or --

8         MR. HAZINSKI:  I am.

9         MR. BRUEGGEN:  I'm just looking for a break

10   whenever it's convenient, if now works before you

11   get to a new topic.

12        MR. HAZINSKI:  Okay.

13        MR. BRUEGGEN:  All right.  Stay for place.

14        COURT REPORTER:  Okay.  We are --

15        MR. BRUEGGEN: Couple minute stretch.

16        COURT REPORTER:  -- off record.  We're off the

17   record.  The time is 12:05.

18          (OFF THE RECORD)

19        THE WITNESS:  It's in a different box again.

20        COURT REPORTER:  We are back on the record.

21   The time is 12:13.

22   BY MR. HAZINSKI:

23   Q    Okay, Mr. Biebel, before I move on, I just

24   wanted to ask.  So you mentioned that from your

25   perspective as a supervisor, Rey Guevara benefited from

1    his connections to the community that he lived in and

2    his ability to speak Spanish, among other things.

3            Well, I guess let me ask this professional

4    question.

5            Do you ever -- were you ever responsible for

6    assigning Rey Guevara to a case?

7        A    Assigning him what, please?

8        Q    To a case.

9        A    I don't remember.  I'm sure I did.

10       Q    Okay.  If a case came in where the ability to

11   speak Spanish or connections to the community that

12   Guevara lived in might have been helpful, would that

13   have affected your decision about whether to assign him

14   to that particular case?

15       A    Like I said before, most of the time, our --

16   our professional dealings was in passing because we

17   worked different watches.  So if on the second watch I

18   had a Spanish speaker, I don't believe I had any on the

19   second watch, perhaps I would use -- whoever -- whomever

20   I send would have to deal with the -- with the local

21   police or the local district -- those who speak it the

22   language.

23       Q    Sorry.  I think I didn't hear the last couple

24   words of your answer.  Could you just say the very end

25   of it again, please?

1    A   If I sent somebody on a Spanish-speaking case

2  while I was working, and I had nobody to send that spoke

3  Spanish, I would have them communicate through whatever

4  police officers might be on the scene of that specific

5  case were we were sending them.

6    Q   Okay.  You also supervised Detective Ernest

7  Halverson at Area 5, right?

8    A   In the same way I supervised Rey Guevara.

9    Q   Okay.

10    A   We worked different watches, and our -- it was

11  usually casual passings and -- and really had nothing

12  professional because I -- chances are I was probably

13  gone when they came -- came into work.

14    Q   Okay.  Were you ever friends with Ernest

15  Halverson outside of work?

16    A   I wouldn't say friends.  We were

17  acquaintances.  And, again, if there was a unit party or

18  something, I would be at the same party as he.

19    Q   Okay.  Do you recall the last time you spoke

20  with Ernest Halverson?

21    A   That was at a meeting?  I was -- I was at the

22  lawyer's a few -- about a month before he passed.

23    Q   Okay.  And did you have any conversations with

24  Ernest Halverson at that point outside of the presence

25  of your lawyers?

1    A    No.

2    Q    Okay.  Did you attend any funeral or memorial

3  service for Detective Halverson when he died?

4    A    I'm sorry, but I couldn't do it.  My -- my

5  mother-in-law passed away the same day.

6    Q    Oh, I'm sorry to hear that.  So even though

7  Detective Halverson worked a different watch than you at

8  Area 5, did you have occasion to review and approve

9  police reports that he wrote as a sergeant?

10    A    Yes.

11    Q    Okay.  In the process of reviewing and

12  approving Detective Halverson's police reports, did --

13  were you able to form any opinion about his police work?

14    A    Yes.

15    Q    And what opinion was that?

16    A    He was a good policeman.

17    Q    Okay.  What were his strengths as a policeman?

18    A    Typing.  He was -- he was -- he was

19  professional in everything he said and did.

20    Q    There's an old joke about someone who writes

21  you a recommendation letter, and the thing they say is

22  if they have really good handwriting, that's a really

23  bad sign.  When you compliment Ernest Halverson's

24  typing, is that to denigrate any other aspect of his

25  police work?

1    A    No, but he seemed to be the -- the -- the

2  typist in that -- in that team of his.

3    Q    Okay.  Was Rey Guevara able to type reports?

4        MR. BRUEGGEN:  Objection.  Foundation, if you

5    know.

6        MS. BARBER:  Objection.  Form.

7        THE WITNESS:  I had read -- I read reports

8    typed by Rey Guevara in the past.

9  BY MR. HAZINSKI:

10    Q    Okay.  And when you said, "Detective Halverson

11  was the typist in that group of his", what group are you

12  referring to?  Or maybe you said team.

13    A    I said team.

14    Q    Team.

15    A    I said team, and his team is Rey Guevara and

16  Ernie Halverson.

17    Q    Okay.  So it's just the team of two?

18    A    Team of two.

19    Q    At Area 5, did you supervise Detective Steven

20  Garris?

21    A    Yes.

22    Q    Okay.  Did he work the same watch as you?

23    A    He did, yes, and I think he worked third watch

24  for a while, too.  I'm not real sure.  But, yes, he

25  worked with me on days.

The Deposition of ROBERT RIALMO, taken on October 23, 2020

1    Q    Did you supervise Steven Garris as a Sergeant

2  in gang crimes, as well?

3    A    Yes.

4    Q    Okay.  From supervising Steven Garris in gang

5  crimes and later at Area 5, did you have an opportunity

6  to form an opinion about the quality of his police work?

7    A    Yes.

8    Q    And what opinion is that?

9    A    He was very good at what he did.

10    Q    What were his strengths as a police officer

11  and a detective?

12    A    Communication skills.  His attitude, his

13  professionalism.  And he had good handwriting.

14    Q    Did you supervise Anthony or Tony Riccio at

15  Area 5?

16    A    Yes.

17    Q    Okay.  Did you work with Detective Riccio

18  professionally before Area 5 at any point?

19    A    He was in gang crimes, I think, but he left --

20  I left before he got there.  So I think Area 5 was the

21  first place I encountered Anthony Riccio.

22    Q    Okay.  Were you ever friends with Riccio

23  outside of work?

24    A    No.

25    Q    Okay.  Did you ever socialize with him beyond

1   the, you know -- so you mentioned some kind of social

2   gatherings with folks from Area 5?

3       A    I don't recall ever being at retirement

4   parties or the like with Tony Riccio.

5       Q    Okay.  And do you know if you worked the same

6   shift as Riccio?

7       A    He was a day watch guy for a while, but my

8   understanding, he was working third watch once now and

9   then, so, yeah, he normally was a day guy.

10      Q    Did you have the opportunity to form an

11  opinion about Riccio's work as a detective?

12      A    Yes.

13      Q    And what opinion is that?

14      A    He was good detective.

15      Q    What were his strengths as a detective?

16      A    His professionalism, his attitude.  The way he

17  carried himself.  He was always well-dressed.

18      Q    While you were a sergeant at Area 5, did you

19  ever learn or come to believe that Halverson, Garris, or

20  Riccio ever engaged in any type of misconduct?

21          MR. BRUEGGEN:  Object to form.  Go ahead.

22      A    No.

23      Q    Okay.  While you were a Sergeant at Area 5,

24  did you ever learn or come to believe that any detective

25  you supervised engaged in any kind of serious

1   misconduct?

2       MR. BRUEGGEN: Object to form. Compound.

3       Go ahead.

4   A   The word "serious" is what? What -- meaning

5   what?

6   Q   Let's say while you were a sergeant at Area 5,

7   did you ever learn or come to believe that any detective

8   you supervised had committed a fireable offense?

9   A   No.

10       MR. BRUEGGEN: Object to form.

11   A   I'm sorry. No.

12   Q   While you were a sergeant at Area 5, did you

13   ever learn or come to believe that any detective you

14   supervised committed a felony in the course of their

15   police work?

16   A   No.

17   Q   You said that you had three meetings to

18   prepare for this deposition, and that those meetings

19   were, you estimated, about three hours each, right?

20   A   Yes.

21   Q   Before you started that preparation, did you

22   have any recollection of the Monica Roman homicide

23   investigation?

24   A   When -- when I made -- was made aware of the

25   -- I -- my -- the -- this investigation when I was

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 210 of 550 PageID #:14250
The Deposition of ROBERT MILLER, taken on October 19, 2023

97

1    served with civil papers regarding this matter.

2        Q    Okay.  And when you received those civil

3    papers, did you remember anything about any events back

4    in 1993 relating to that investigation?

5        A    No.

6        Q    Okay.  So I understand you've done a lot of

7    review and looked at documents and had meetings to

8    discuss the case, but I want to ask you about your

9    independent recollections, which what I really mean is

10   things you remember apart from reviewing the documents.

11   And so did the process of reviewing documents or

12   discussing the case in preparation for this deposition

13   bring back any independent memories of this

14   investigation, beyond what is noted on the

15   documentation?

16          MR. BRUEGGEN:  Object to form.  Go ahead.

17       A    No.

18       Q    No.  Do you have an independent memory of any

19   communications or conversations you had with anyone

20   about the Roman homicide investigation in 1993?

21       A    No.

22       Q    Would it be fair to say that everything you

23   can testify to about the details of this investigation

24   that happened in 1993 come from your review of reports

25   and documents, as opposed to your independent memory?

1      MR. BRUEGGEN:  Object to form.  Vague and

2    misstates the testimony so far.  Go ahead.

3      A    Everything I reviewed on the paper is what I

4  know about this Roman homicide.

5      Q    Okay.  So Mr. Biebel, I'd like to show you a

6  document now.  And so for Counsel, for the record, I

7  guess we'll make this Exhibit 1, and it's the report

8  produced at RFC 90 through 93.  And Mr. Biebel, what I'd

9  like to do is to share my screen with you to show you

10   this report.

11            (EXHIBIT 1 MARKED FOR IDENTIFICATION)

12      MR. BRUEGGEN:  And, John, did you send over

13    the exhibits?

14      MR. HAZINSKI:  I didn't.

15      MR. BRUEGGEN:  Or special --

16      MR. HAZINSKI:  What we did on Wednesday is

17    they were all just from the investigative and the

18    RD file, and so there's nothing surprising, and the

19    same is true here, so if you need time to pull them

20    up, that's okay.  We can do that.

21      MR. BRUEGGEN:  No, I've got it --

22      MS. BARBER:  Are you saying --

23      MR. BRUEGGEN:  -- on big screen, but I also

24    have a hard copy.

25      MR. HAZINSKI:  Okay.

1      MR. BRUEGGEN:  Sorry.  Go ahead.

2      MS. BARBER:  Are you saying, basically, you're

3  using the -- probably going to use the exhibits

4  that were used on Wednesday?

5      MR. HAZINSKI:  They'll be -- largely.

6      They'll -- there'll be some different ones,

7  but, no, I'm just saying like they're documents we

8  all have, so we can just -- I can share my screen

9  and we can look them together, and then if folks

10  need a chance to pull them up, I'll just give you

11  the Bates and we can all --

12      MS. BARBER:  Yeah, we can just take all --

13  take -- for me -- on my purposes, we can just go

14  and see how it goes, but, yeah, I might need some

15  time to pull it up.

16      MR. HAZINSKI:  Yeah.  And just let me know.

17      MS. MCGRATH:  Same here.

18  BY MR. HAZINSKI:

19   Q   So the first thing is going to be RFC 90

20  through 93, which is like the clear closed report.

21      And so Mr. Biebel, I'm going to share my

22  screen with you. This will take me just a short second.

23   A   Like, right now -- okay, trying to find some

24  --

25   Q   We'll be looking at the same thing.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 213 of 550 PageID #:14253
The Deposition of ROBERT BIEBEL, taken on October 26, 2020

100

1      MR. BRUEGGEN:  He's got a large screen that it

2    should pop up on, so it should be more --

3      MR. HAZINSKI:  Uh-huh.

4      MR. BRUEGGEN:  -- legible once you share.

5      MR. HAZINSKI:  Okay.

6      MR. BRUEGGEN:  So can you see that?

7      THE WITNESS:  Yes.  Okay.

8  BY MR. HAZINSKI:

9    Q    All right.  So Mr. Biebel, is -- do you

10  recognize this as one of the documents you reviewed in

11  preparation for your deposition today?

12    A    Yes.

13    Q    Okay.  And could you describe what type of

14  document this is?

15    A    It's a clear closing sup submitted on the case

16  of Roman Monica UCR Code 0110.

17    Q    And on the bottom right of the first page of

18  this document, is that your signature written there?

19    A    Yes.

20    Q    Okay.  And was your star number 1545?

21    A    In 1993, that was my star number.

22    Q    Okay.  It changed at some point?

23    A    When I was promoted.

24    Q    Okay.  And looking still at that bottom right

25  corner, it has a date and time.  A date of June 25,

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 214 of 550 PageID #:14254
The Deposition of ROBERT BARTIK, taken on October 19, 2020
101

1    1993, and time of 09:20; do you see that?

2        A    Yes.

3        Q    Does that reflect the time when you signed off

4    on the report?

5        A    Yes.

6        Q    Okay.  When you were approving reports as a

7    Sergeant at Area 5, did you always make sure to note the

8    correct date and time when you signed reports?

9            MR. BRUEGGEN:  Object to form.  Go on, sir.

10       A    Yes.

11       Q    Now, do you have any independent memory of

12   reviewing or signing this report back in 1993 when it

13   crossed your desk?

14       A    I have no memory of that at 1993.  I do not

15   recall it.

16       Q    Okay.  Is it fair to say that there are times

17   as an Area 5 sergeant you reviewed a large number of

18   cleared closed reports that were submitted to you by

19   detectives?

20       A    Yes.

21       Q    Okay.

22       A    I also signed non -- non-cleared closed files

23   too, while I was in Area 5 --

24       Q    Right.

25       A    -- so then -- okay, so just to clarify that

1   point.

2       Q    Sure.  So based on your familiarity with this

3   type of report, what's your understanding of the kind of

4   information that detectives in 1993 were expected to

5   include in a cleared closed supplementary report?

6           MR. BRUEGGEN:  Objection.  Form, incomplete

7       hypothetical.  Go ahead.

8       A    There was a form set that there -- where they

9   used to follow onto how to do a report, and you'd

10  identify the victim, identify the offenders, conditions,

11  date, time of occurrence.  I -- I think it's motive,

12  interviews and other stuff I might have omitted but, in

13  general, that's about what these things did in -- in a

14  matter of the form set.

15      Q    Okay.  When you were reviewing cleared closed

16  reports as a sergeant at Area 5 in this period around

17  1993, if you observed that one of those categories of

18  information you just listed was missing from the report,

19  would that lead you to withhold its approval?

20          MR. BRUEGGEN:  Objection, form.  Go ahead.

21      A    It's not necessarily so.  We could just -- if

22  -- if something's missing, I could -- I could sign off

23  on it, depending on the circumstances of a person that

24  day, and have them complete another supplementary report

25  that -- and put additional information on it.  Same form

1   set, the supplemental report, the CPD form, and submit

2   it as a supplement to the cleared closing.

3       Q   Okay.  Did cleared closed reports that you

4   reviewed at Area 5, did they typically summarize the

5   course of the criminal investigation?

6           MR. BRUEGGEN:  Objection.  Form.

7   A   Yes.

8       Q   Okay.  And on your understanding, as a

9   supervisor reviewing these reports, were cleared closed

10  reports supposed to identify all of the evidence that

11  the police had discovered implicating the defendant?

12          MR. BRUEGGEN:  Objection.  Form, incomplete

13   hypothetical.  Go ahead.

14  A   It summarizes their investigation.

15      Q   Okay.  And would the summary of the

16  investigation include a description of the evidence that

17  had been uncovered implicating the defendant?

18          MR. BRUEGGEN:  Object to form.

19  A   If -- if it's -- if it's identified somewhere

20  else, they could refer to it by inventory number, but

21  chances are it -- it would be on the report that they --

22      Q   Okay.

23  A   -- would submit.

24      Q   All right.  Now, on the first page of this

25  report, we're still looking at RFC-IGLESIAS 90, you see

1    it has the names of Officers or Detectives Halvorsen,

2    Guevara, Riccio, and Daris, correct?

3        A    Yes.

4        Q    Okay.  From looking just at the first page of

5    this report, are you able to tell who typed it up?

6        A    Can I tell -- I -- Ernie Halvorsen probably

7    typed it because his first name is in the box, the first

8    box.

9        Q    Okay, so the fact that his is the first of the

10   four names listed there leads you to suspect that it was

11   likely Halvorsen who typed this up?

12       A    That's his -- that's his signature, and that's

13   the only signature on that page.

14       Q    Okay, so it's both -- it's -- are you saying

15   it's both the fact that his is the first name in the top

16   left box of the signatures, and the fact that his pen

17   signature is there, lead you to believe that he's the

18   one who typed it up?

19       A    Yes.

20       Q    Okay.  And Detectives Guevara, Riccio, and

21   Daris did not sign the first page of this report in pen,

22   correct?

23       A    Correct.

24       Q    From your perspective as a supervisor at

25   Area 5 in 1993, was that permitted for just one officer

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 218 of 550 PageID #:14258
The Deposition of ROBERT RIESSEL, taken on October 18, 2023
105

1   to sign?

2       A    I don't -- I don't remember the policies and

3   -- and so it had one signature on it.  Why they didn't

4   sign it is beyond me and I never asked a question why it

5   wasn't signed.

6       Q    Okay.  And I want to scroll down now to the

7   next page, which is RFC 91, and just ask you a quick

8   question on this page.  So at the very top there's some

9   information.  You know, on the left it says Detective

10  Division Area 5 Violent Crimes, then the number two, and

11  then over on the right, 24 June, 1983 RD number

12  X-250303.  Do you see that?

13      A    Yes.

14      Q    Okay.  And that information on the top right

15  with the date and the RD number, were detectives

16  required to include that information on the top of the

17  pages of the supplementary reports that they typed up?

18          MR. BRUEGGEN:  Object to form, foundation.

19          Go ahead.

20      A    It's not required but it indicates an RD

21  number, and that's -- and that's really what we're star

22  -- this is -- this is a computer-generated report that

23  I'm looking at.  The previous one was a typewritten

24  report.

25      Q    When you say the previous one, do you mean the

1    previous page we were looking at?

2        A    The one we just talked about before that 90 --

3    90 or whatever it was.  Quote stuff.

4        Q    Okay, so I'll just -- I'm going to scroll up.

5        A    The previous page, yeah.

6        Q    Yeah.

7        A    You're going down to it now.  That's -- that

8    is a typewritten report.  A typewriter was used to fill

9    that report out.

10       Q    I see, and then I'll scroll down to the next

11   page, RFC 91, and this, you're saying, was prepared on a

12   computer, not on a typewriter, correct?

13       A    On a word processor.  Now, whether it was a

14   computer, I don't know.  1993, we were going through

15   changes as to word -- word processors versus

16   typewriters.

17       Q    Okay.  Since this was prepared -- this page of

18   this report was prepared on a word processor, does that

19   mean that this information on the top right with the

20   date and the RD number was generated automatically?

21       A    Yes.

22       Q    Okay.  I want to show you another document

23   now, and just for the record and for Counsel, I guess

24   we'll make this Exhibit 2, and it's the lineup report at

25   the Bates range RFC 97 to 98.  Mr. Biebel, are you able

1   to see this document here?

2              (EXHIBIT 2 MARKED FOR IDENTIFICATION)

3      A   Yes.

4      Q   Okay.  Do you recognize this as one of the

5   reports that you reviewed in preparation for your

6   deposition?

7      A   Yes.

8      Q   Okay.  And on the bottom right of this page,

9   is that your signature?

10     A   Yes.

11     Q   And it indicates that you approved this report

12  at 9:35 a.m. on June 25, 1993; is that right?

13     A   Yes.

14     Q   Okay.  And but the date of the report, the

15  date this report's submitted, is noted as June 23, 1993,

16  right?

17     A   Yes.

18     Q   Okay.  From looking at the first page of this

19  report, are you able to tell who prepared it?

20     A   Yes.

21     Q   And who's that?

22     A   Tony Riccio.

23     Q   Okay.  And how do you know that?

24     A   That's his signature.

25     Q   Okay.  The signatures -- the pen signatures of

1   Detectives Halvorsen and Guevara also appear on this

2   page, correct?

3       A   Yes.

4       Q   Okay.  Given that there's three different pen

5   signatures for these detectives, how do you know that it

6   was Riccio that wrote this report?

7       A   Says Tony Riccio signed -- he's in the first

8   box.

9       Q   Okay.  Above Detective Guevara's name, where

10  that the name is written in pen, based on your --

11      A   Uh-huh.

12      A   -- familiarity and experience reviewing

13  reports at Area 5, do you recognize whether that's

14  actually Guevara's signature?

15          MR. BRUEGGEN:  Object to foundation.

16          Go ahead.

17      A   I don't believe that's his signature, no.

18      Q   Okay.

19      A   That's his name.  That's not -- I don't think

20  that's his signature.

21      Q   Okay.  Similarly, with respect to the

22  Halvorsen signature, do you believe that to be Detective

23  Halvorsen's own signature?

24      A   That's his name, but I don't believe that's

25  his signature.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 222 of 550 PageID #:14262
The Deposition of ROBERT F. BOYLE, taken on October 23, 2020

109

1    Q    Okay.  Hypothetically, if Detective Riccio

2    signed the names Halvorsen, Guevara above their

3    typewritten names, was that appropriate as a matter of

4    policy at Area 5 in 1993?

5         MR. BRUEGGEN:  Objection.  Form, incomplete

6         hypothesis.

7    A    Is my opinion that Ernie Halvorsen and Guevara

8    okayed Tony Riccio to put his -- their names on there,

9    signed -- signed for them.

10   Q    Okay.  And what makes you think that they

11   okayed it?

12   A    It's my professional opinion.

13   Q    Okay.  Was that a commonplace thing when

14   reports were being prepared at Area 5 for one detective

15   to okay another to sign it on their behalf

16        MR. BRUEGGEN:  Object to form.

17   A    From my experience, that reports are -- are

18   signed -- normally signed by the prepared person with

19   the permission of the partners, which signed the

20   partner's name.  That's -- that's on general offense

21   case reports that are submitted at a district level at

22   that time, and -- and in some cases, the supplementary

23   reports at the area.

24   Q    Okay.  I want to show you the next page of

25   this document which is RFC 98.  So I've scrolled down

1    now to the second page.

2    A    Okay.

3    Q    This report documents a lineup procedure that

4    occurred at Area 5 in the viewing room at 8:00 p.m. on

5    June 23, 1993; is that correct?

6    A    Yes.

7    Q    Were you present at Area 5 when that lineup

8    took place?

9    A    Was I there when the lineup happened, or was I

10   assigned to Area 5 on that date?

11   Q    Were you there when the lineup happened?

12   A    No.

13   Q    How do you know?

14   A    I worked the day watch.  I -- probably I was

15   off at 3:00 in the afternoon.

16   Q    Okay.  Other than what's documented in this

17   report and any other reports you reviewed describing the

18   events of this lineup, do you have any knowledge about

19   what actually occurred at Area 5 during this lineup

20   procedure?

21   A    No.

22   Q    Okay.  And so -- and this report specifically

23   says that the lineup occurred at 2000 hours or 8:00 p.m.

24   In your experience reviewing and approving these

25   reports, were detectives supposed to note the time when

1    the lineup occurred?

2         MR. BRUEGGEN:  Objection.  Form.

3     A    That's part of the -- the -- the -- the form

4    set that they -- they're asked to fill out on something

5    like this.

6     Q    Okay.  If you were reviewing a report -- a

7    lineup supplementary report that had no information in

8    it about when the lineup took place, would you have

9    approved that report?

10        MR. BRUEGGEN:  Objection.  Form, incomplete

11     hypothetical, vague.

12     A    If I noticed it, I probably would say,

13    "Clarify it."  If not, would've just been a -- a bypass

14    or something I missed.

15     Q    Was the time information about when a lineup

16    took place the kind of detail you were looking for

17    carefully when you reviewed reports to approve them?

18        MR. BRUEGGEN:  Objection.  Form, vague.

19        Go ahead.

20     A    I read a report.  I didn't look specifically

21    for times of occurrence and dates.  I read a report and

22    -- and then approved on it.

23     Q    Okay.  Do you have any understanding of why

24    the default form set for a lineup supp required

25    detectives to note the location, date, and time of the

1    lineup?

2         MR. BRUEGGEN:  Object to foundation, form.

3         Go ahead.

4    A    That's the suggested format that they learned

5    while they were in the -- detective school.  I think

6    that's part of -- of that thing we talked about earlier,

7    about is the -- is the -- the detective handbook on how

8    to do reports.

9    Q    Okay.  I want to direct you now a little lower

10   on the page to the investigation section of this report,

11   and it's the paragraph that starts, "In furtherance of

12   the investigation."  Do you see that paragraph?

13   A    Yes.

14   Q    Okay, so then the third sentence of the

15   paragraphs says, "All participants were required to

16   stand, face the viewing window, and make facing

17   movements."  Do you see that?

18   A    Yes.

19   Q    Okay.  What are facing movements?

20   A    Probably moving their head.  I -- I -- I don't

21   know exactly what that means.

22   Q    Okay.  Is that a term that you were familiar

23   with from your work at Area 5?

24   A    I -- I believe I've seen it in the past.

25         It's movement of changing the faces.  I just -

1   - I think it's self-explanatory in my mind.  That's

2   probably why I never questioned it.

3       Q    Maybe I'm just missing what it's refers to,

4   but could you -- would you be able to demonstrate for me

5   what a facing movement is?

6       A    No.  It's -- it's -- they're probably made to

7   move their -- my -- my assumption in reading this is

8   that turn to the left, move your head to the right, move

9   your head to the left, which I --

10      Q    Okay.

11      A    -- just did.

12      Q    Facing different directions, you mean?

13      A    Right, so you get a -- a profile view on each

14  side.

15      Q    I see.  Okay.  So I want to show you now, and

16  I guess this will be Exhibit 3 if my numbering is right,

17  another lineup report.  For the record it's RFC 94

18  through 96.  Mr. Biebel, are you able to see this report

19  that I put on the screen?

20          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

21      A    That's not a lineup report, I don't think.

22      Q    Well, let's see.  So --

23      A    The one you got up on the screen is not -- not

24  a lineup report.

25      Q    Okay.  Well, I'll scroll down here, and we'll

1  look at the second page.  RFC 95.  Do you recognize this

2  to be a line report?

3      A    Yes, because it says, "This is a lineup

4  supplement."

5      Q    Okay, but from your review looking at the

6  first page, it appears not to be a lineup report,

7  correct?

8      A    I -- it usually would say that a lineup report

9  here on the first line of the narrative, but based on

10  which the second page would tell me it's a lineup

11  report.

12      Q    Okay.  Is this one of the reports that you

13  reviewed in preparation for your deposition today?

14      A    Yes.

15      Q    And, once again, is that your signature

16  appearing on the bottom right of the first page?

17      A    Yes.

18      Q    And it indicates that you signed off at

19  9:40 a.m. on June 25, 1993, correct?

20      A    Yes.

21      Q    The report notes that it was submitted on June

22  23, 1993, at 9:00 p.m.; is that right?

23      A    Yes.

24      Q    Okay, so I'm going to scroll down to the next

25  page, which is RFC 95, and this notes that the lineup

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 228 of 550 PageID #:14268
The Deposition of ROBERT WILSON, taken on October 6, 2020
115

1  procedure took place in Area 5 viewing room on

2  June 24, 1993, at 01:25 hours, correct?

3      A   Yes.

4      Q   Okay.  And that's 1:25 a.m. obviously, right?

5      A   Yes.

6      Q   Were you present at Area 5 when this lineup

7  took place?

8      A   No.

9      Q   Okay, again this was outside of your shift,

10  correct?

11     A   Yes.

12     Q   Okay.  Other than what's written in this

13  report of this lineup and other reports describing this

14  lineup, do you have any knowledge about what actually

15  occurred in this particular lineup?

16     A   No.

17     Q   Okay.  So -- and this is a report of a lineup

18  procedure that occurred on June 24, 1993, but the report

19  itself as we saw on page 94 is dated June 23rd.  Do you

20  agree that those two dates are inconsistent?

21     A   You got to check the form.

22     Q   At least one of those dates has to be wrong,

23  doesn't it?

24     A   Yes.  My guess is the first one, because it's

25  a typewritten report.  The second one is a form -- form

1   report, did on a word processor.

2       Q    Okay.  So why does the fact that it's

3   typewritten versus being a word processor make you think

4   that it's more likely that the typewritten page has the

5   mistake?

6       A    Because they -- my guess is they used the

7   previous submitted supplementary.  This is the

8   typewritten one, and -- and -- and probably photocopied

9   it because they didn't have to retype it.  That's my

10  opinion.  So it already had the bottom filled out.

11      Q    This report was signed by at -- has -- or, at

12  least it has the names of Riccio and Halvorsen at the

13  bottom, correct?

14      A    Yes.

15      Q    This one does not have Detective Guevara's

16  name listed on the bottom of the first page, right?

17      A    Right.

18      Q    Okay.  Does that affect your thinking about

19  whether it was just photocopied from another report?

20      A    I -- I believe it was a photocopy of another

21  report.

22      Q    Okay.

23      A    But I could be wrong.

24      Q    Now, I want to scroll down to the third page

25  of this report, which is page 93 - or, I'm sorry, page

1    96.  And this is -- has the names of Detectives

2    Halvorsen, Guevara, and Riccio listed, correct?

3        A    Let me guess.  I don't have it -- yes.

4        Q    Okay, and what date is written on the top

5    right of this page?

6        A    Let me go to it.  It says 22 February.

7            MR. BRUEGGEN:  Tell him if you want to go up

8    and he'll direct you.

9        A    It's -- it's -- I don't know how you got that.

10   That's -- that's a -- that's a different RD number.

11       Q    Right.  Fair to say that this is not the

12   correct third page of this report?

13           MR. BRUEGGEN:  Object to foundation, form.

14           Go ahead.

15       A    It's a possibility it's not the same form.

16           I don't know.  It's a whole different RD

17   number.

18       Q    Was that discrepancy something you noticed

19   when you were reviewing this report in 1993?

20           MR. BRUEGGEN:  Objection.  Form.

21       A    I don't even know if this would --

22           MR. BRUEGGEN:  Assumes facts not in evidence.

23       A    I don't even know if that was in the file when

24   I signed the front page.

25       Q    Okay.  If this page was in the report that you

1   were reviewing and you had noticed that discrepancy,

2   would you have brought it to the attention of the

3   detectives?

4       A   Yeah, because the February date stands out to

5   me.

6       Q   Yeah, because that's almost four months, or

7   more than four months --

8       A   Yeah.

9       Q   -- before the lineup line it's documenting.

10      A   Probably could be.  So -- what it tells me

11  here is that, somehow, this got intermingled with that

12  and end -- ended up in this -- this file.

13      Q   Okay.  Is that unusual for -- in your

14  experience, for pages to get intermingled in that way?

15          MR. BRUEGGEN:  Objection.  Form.

16      A   I don't recall it being like that at all.

17          I -- somehow there's a mix-up in here.  They

18  put the wrong page in, or they intended -- you know, I

19  got -- I've got my -- they maybe wanted to change the

20  dates and the -- and the RD number.  And I don't

21  remember ever seeing a page three with the -- with the

22  names that -- can you go back to the page before?

23      Q   Sure.

24      A   All right.  That -- so it's a continuation

25  page.  For some reason, whatever they did they put --

1    they -- they -- they were probably following -- filling

2    in a blank fill-in thing and forgot to change the RD

3    number on it, you know?

4        Q    Okay.

5        A    So I didn't see it.  I don't remember seeing

6    it.  Had I seen it, it would've been changed.

7        Q    Okay.  Now, and this is an example of another

8    page.  The -- and now here, again, we're looking at RFC

9    95 that was prepared on the word processor, right?

10       A    I -- it's my opinion it was a word processing

11   supp, yes.

12       Q    Okay.  And page 96, can you tell whether this

13   was created on a typewriter or a word processor?

14       A    I don't know, but it looks like a regular

15   typewriter, but I'm not -- I can't -- I can't be

16   certain.

17       Q    Okay.  Is it possible that you were the person

18   who caused these pages from different cases to become

19   intermingled?

20           MR. BRUEGGEN:  Object to speculation.

21       A    I don't know how to answer that properly.

22           It's -- it's there.  I don't who intermingled

23   it.

24           Could I have done it?  I don't think I did,

25   but if it happened, I don't understand why a February

The Deposition of ROBERT BIEBEL, taken on October 20, 2020

1    case would be in a file in June.

2       Q   Yeah.  I want to ask you now about another

3    report and this is -- well, I guess this will be

4    Exhibit 4 and this is RFC 163.  Now, Mr. Biebel, is this

5    a report that you reviewed in preparation for your

6    deposition today?

7            (EXHIBIT 4 MARKED FOR IDENTIFICATION)

8       A   Go down a little further.  Oh, did I look and

9    see this?  Yeah, it was in the file, yes.

10      Q   Okay.  Now there's a supervisor's signature

11   box with a signature in it, on the bottom right.  Do you

12   see that?

13      A   Yes.

14      Q   And that's not your signature, is that?

15      A   No, that's not my name either.

16      Q   Right.  And so do you know who --

17      A   That's not my star number, either.

18      Q   Right.  Do you know whose name and --

19      A   I guess it's --

20      Q   -- star number that is?

21      A   It's -- I believe it's Sergeant Kuhn.

22      Q   Okay.  And how did Sergeant Kuhn spell his

23   name?

24      A   K-U-H-N.

25      Q   And was Sergeant Kuhn another Area 5 sergeant

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 234 of 550 PageID #:14274
The Deposition of ROBERT BARTIK, taken on October 20, 2020
121

1    in 1993?

2        A    He must be, because I'm looking at his

3    signature.  He was -- he was with us for a while in

4    Area 5.  I don't remember what years, but he must have

5    been there in 1993.

6        Q    Okay.  Do you know what shift he worked around

7    that time at Area 5?

8            MR. BRUEGGEN:  Object to foundation.

9            Go ahead.

10       A    I don't remember him in Area 5 in '93, but had

11   he been working in '93 which tells me by this report he

12   was on the third watch.

13       Q    Okay.  So apparently, according to the

14   information here, this was approved on the third watch

15   because of the time that's noted?

16       A    Yes.  It -- it was submitted on the midnight,

17   because it happened after 1:00 in the morning, or it

18   could be third watch, yeah.

19       Q    Okay.

20       A    That's one that -- this is -- this was signed

21   in order for the film to go down to the crime lab or

22   wherever it went.

23       Q    Okay.  And so this is a crime scene processing

24   report form, right?

25       A    Well, this is a form called a crime system,

1    yeah.  It's -- it's for photos of -- of a lineup and a

2    -- and a list of -- because the -- the -- the

3    identifiers on top tells you who -- who's on the bottom,

4    you know?

5        Q    Yeah.

6        A    Who stood the lineup.

7        Q    And so what was the purpose of this type of

8    report?

9        A    This is a report, it's like a -- a -- a mail

10   slip.  This report went down with the film in the mail

11   that night or the -- whenever --

12       Q    And so did you ever approve reports like this

13   one, crime scene processing report forms that documented

14   photos of participants in a lineup procedure?

15           MR. BRUEGGEN:  Object to form.  Go ahead.

16       A    In my career, I'm sure I had.

17       Q    Okay.  And you said that this would be sent

18   along with the photos to a different section of the CPD?

19           MR. BRUEGGEN:  Objection.  Misstates his

20       testimony.

21       A    That thing would -- that would be attached to

22   the film that went down to wherever the film processing

23   in -- in the crime lab, the crime --

24       Q    Okay.

25       A    -- scene, wherever it is.

1    Q   And so do you recall in 1993 -- well, let me

2    back up.  Looking at this page, are you able to tell

3    whether this is prepared using a typewriter?

4    A   It looks like it's a typewriter-prepared form,

5    because we didn't have form filler in those days, so

6    they used the typewriter for most of these

7    department-issued forms in 1993.

8    Q   Do you know -- in 1993, did crime scene

9    processing report forms, like this one, use carbon paper

10   that had different layers where you would write on the

11   top and it would make impressions below?

12   A   Yeah, I -- I -- see, I'm not really familiar

13   with this form itself, but my guess is that that's

14   possible, yes.

15   Q   Okay.

16   A   Because the -- the front page -- go -- can you

17   scroll down a little bit?

18   Q   Yes.

19   A   Okay, let's see.  No, usually it'll tell you

20   -- I -- I don't know if there's a -- this is a form set

21   or this could be a regular form, so I'm not sure.

22        I -- I don't remember seeing -- I -- I've

23   never -- never dealt with these forms that -- that I can

24   recall, but I think it might be a single page.

25   Q   This is a -- this is signed by Detective

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 237 of 550 PageID #:14277
The Deposition of ROBERT MILLER, taken on October 23, 2020

124

1    Halvorsen, right?

2        A    That's his name, yeah.

3        Q    Do you recognize that pen signature to be

4    Detective Halvorsen's signature?

5            MR. BRUEGGEN:  Object to foundation.

6            Go ahead.

7        A    My professional opinion, that's not his

8    signature.

9        Q    Okay.  Do you have any information or

10   knowledge that would allow you to determine who signed

11   that, if not Detective Halvorsen?

12       A    No, sir.

13       Q    Okay.  So -- and then it documents in the

14   boxes that say date arrived, time and time completed; do

15   you see those boxes near the bottom right?

16       A    Bottom right says date arrived, okay.

17       Q    Right, and it says 24 June, 01:20, and

18   01:25 in those boxes, correct?

19       A    Yes, that's what it says.

20       Q    And do those boxes -- based on your

21   understanding, are those supposed to document when the

22   lineup began and when it concluded?

23           MR. BRUEGGEN:  Object to foundation.

24       A    I don't know what they mean because it's --

25   it's confused.  This is -- because it's a crime scene

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 238 of 550 PageID #:14278
The Deposition of ROBERT RIALMO, taken on October 6, 2020
125

1  report, that's usually when they come onto the scene of

2  a -- in progress or a -- a fresh scene, this is the

3  lineup report.  Those -- those numbers in my mind are

4  meaningless, those times, the time arrived.  This is

5  basically for the technician, the crime technician or

6  crime lab person who would do that.

7      Q    So when you say they're meaningless, are you

8  saying they have nothing to do with the rest of the

9  report?

10         MR. BRUEGGEN:  Object to foundation.  Misstates

11      testimony.

12      A    My belief is it's -- it -- the 120 might mean

13  when the -- when the film got into the hands of Sergeant

14  Kuhn, he put the 120, and then after he secured the

15  package to send downtown, it was 125.  These are general

16  numbers.

17      Q    Okay.  I want to go back and show you the

18  report we were just looking at, which we had called

19  Exhibit 3, and go back up to the second page.  And this

20  documents a lineup occurring on June 24, 1993, at 0125

21  hours at Area 5; do you see that?

22      A    Yes.

23      Q    Does that provide any information to you or

24  clarify to you at all the significance of the date and

25  time information on the crime scene processing report we

1    were just looking at?

2        A    I -- I -- after I seen Sergeant Kuhn's

3    signature, 125 is the time that the -- this -- this

4    thing ends.  At 125 in there.  I can't answer for him.

5    I'm just -- I could guess.  I could have an opinion, but

6    that is when the -- the viewing took place.

7        Q    Okay.  So I want to show you now another

8    report and this will be Exhibit 5, and it's a report

9    produced at RFC 16.  Are you able to see this page?

10               (EXHIBIT 5 MARKED FOR IDENTIFICATION)

11       A    I can see it.  Yes.

12       Q    Okay.  Does this appear to you to be a carbon

13   paper copy?

14       A    It's -- it's possible.  I'd say yellow.

15            I don't know if it's carbon.  No, it does --

16   it could be.

17       Q    Okay.  Do you recognize --

18       A    I'm not familiar with it.  I -- I'm not

19   familiar with a crime scene processing report.  I really

20   -- the -- the -- a plain one, I don't know what they

21   look like.  We didn't use them that often, except for

22   our lineups.

23       Q    Similar to the one we just reviewed, can you

24   tell whether this was prepared on a typewriter or a word

25   processor?

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 240 of 550 PageID #:14280
The Deposition of Robert Bartlett, taken on October 26, 2020
127

1    A    I guess it was done on a typewriter.

2    Q    Okay.  And this one bears Sergeant Halverson's

3  name, right?

4    A    Yes.

5    Q    Okay.  And it has the same signature as the

6  one we just looked at, right?

7    A    Yes.

8    Q    Okay.  And again, you don't believe that to be

9  Detective Halverson's own signature, correct?

10    A    It's my opinion it's not his signature.

11    Q    And this copy of the report also has Sergeant

12  Kuhn's signature in the supervisor signature box, right?

13    A    Yes.

14    Q    Okay.

15    A    I think the same thing.

16    Q    On this copy of the report, the boxes that say

17  date arrived, time, and time completed are empty, aren't

18  they?

19    A    Yes.

20    Q    Okay.  Those same boxes are filled in on the

21  version of this report at RFC 163 that we were looking

22  at a moment ago, right?

23    A    Yes.

24    Q    Okay.  Based on your understanding of the

25  policies in place in 1993, would it have been

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 241 of 550 PageID #:14281
The Deposition of ROBERT SIELSKI, taken 07/26/2022

128

1   appropriate for a detective to submit a report like this

2   for supervisor approval, and then after the fact, go

3   back and fill in time information?

4           MR. BRUEGGEN:  Object to form.  Assumes facts

5       not in evidence, and incomplete hypothetical.

6       A    I don't remember what the policy would be at

7   that time.

8       Q    Okay.  So nothing that you can recall would

9   prohibit an officer or a detective from submitting a

10  report with that information blank, and then filling in

11  and after the fact?

12          MR. BRUEGGEN:  Objection.  Form.  It's

13      misrepresenting the record.

14      A    Please repeat the question.  Thank you.

15      Q    No policy that you're aware of would've

16  prohibited a detective from submitting a report like

17  this for approval, obtaining a supervisor signature, and

18  then going back and filling in the date and time

19  information after the fact?

20          MR. BRUEGGEN:  Same objections.

21      A    I wouldn't have done it.

22      Q    Would it been consistent with policies as you

23  understood it?

24          MR. BRUEGGEN:  Objection.  Asked and answered.

25      Form.  Assumes facts not in evidence.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 242 of 550 PageID #:14282
The Deposition of ROBERT BIEBEL, taken on October 23, 2020

129

1    A    I'm not aware of the policy.  I'm not -- I

2    don't remember the policy at that time, as I never - or,

3    I very seldom or even ever dealt with crime scene

4    processing reports.

5    Q    Okay.  Do you have any firsthand knowledge

6    about when or how this report was created?

7    A    No.

8        MR. HAZINSKI:  Okay.  I am nearing the end and

9    I just want to take a quick break to review before

10    I wrap up.  Is that okay with everybody if we take

11    a break?

12        MR. BRUEGGEN:  Not a problem, John.  How long

13    do you want?

14        MR. HAZINSKI:  10 -- let's say 10 minutes.

15        MR. BRUEGGEN:  Sounds good.

16        COURT REPORTER:  Okay.  We are off the record.

17    The time is 1:10.

18          (OFF THE RECORD)

19        COURT REPORTER:  We are back on the record.

20    The time is 1:24.

21    BY MR. HAZINSKI:

22    Q    All right.  Thanks for your time today,

23    Mr. Biebel.  I have a few, kind of wrap-up questions

24    before we finish.  Before I ask those, I want to circle

25    back to a couple points from earlier in the deposition.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 243 of 550 PageID #:14283
The Deposition of ROBERT LULETICH, taken on October 5, 2021
130

1    So I was asking you earlier today about whether you had

2    any role in ensuring that detectives put notes and

3    reports into investigative files.  And I believe you

4    testified that it was a detective's responsibility to

5    make sure that those got placed in the investigative

6    file; do you recall that?

7         MR. BRUEGGEN:  Object to form.

8    A   Yes.

9    Q   Was there -- as far as you know, in 1993, was

10   there any other sergeants or other supervising officer

11   in Area 5 who was responsible for making sure that the

12   detectives put notes and reports into investigative

13   files?

14        MR. BRUEGGEN:  Object to foundation, form.

15        Go ahead.

16   A   I don't recall anybody specifically assigned

17   to that matter.  I'm sure it could happen, but somebody

18   whose sole responsibility is to -- to maintain the

19   investigative files was all in the hands of the --

20   usually the detective assigned to the matter.

21   Q   Okay.  You say it could happen.  What are you

22   referring to?

23   A   Yes.

24   Q   But like, what do you -- when you say you

25   believe it could happen, that someone --

1 A That a sergeant -- that a sergeant can do

2 that, yes.

3 Q Okay.

4 A There was other sergeants besides myself who

5 worked in Area 6 -- or, Area 5 in those days.

6 Q Okay.  And so you're saying it's possible that

7 other sergeants took on that supervisory role to make

8 sure that detectives put notes and reports into

9 investigative files?

10 A In general, the investigative files was -- was

11 there a sergeant in charge of making sure of that, or

12 there's a sergeant on a case-by-case basis could pick up

13 a file and evaluate whether enough stuff is in there.

14   I mean, that could happen.

15 Q Okay.

16 A But I don't recall anybody, any sergeant

17 responsible specifically for each one of those files --

18 for the -- for the files in general.

19 Q Okay.  When we were talking about your

20 responsibilities as supervising sergeant, we also -- you

21 also said that one of your responsibilities was to

22 discipline officers, if it was discovered that they had

23 engaged in misconduct; is that right?

24 A No, because my -- the point is if somebody's

25 accused of -- of -- of engaging in unlawful conduct, the

1    supervisor would institute a CR investigation and send

2    it through the channels.  And -- and depending on what

3    type of complaint or -- or allegation there might be, it

4    would be distributed to whatever investigative agency

5    was working in 1993, OPS, IAD, local, you know, in-

6    house, I guess you would call it.

7        Q    So as a supervisor at Area 5, did you have any

8    role in handing out discipline to detectives?

9        A    No.

10       Q    Okay.  As a supervisor at Area 5, did you have

11   any role in monitoring detectives' conduct to keep an

12   eye out for violations of policy?

13           MR. BRUEGGEN:  Objection.  Asked and answered.

14           MS. BARBER:  And objection, form.

15       A    If I observed a violation, it -- it was my

16   duty to -- to do a report in order to just to discipline

17   or a start investigation on -- on any of the individual

18   detectives.

19       Q    So if it came to your attention that

20   detectives you supervised had engaged in serious

21   misconduct, what were your responsibilities as the

22   sergeant armed with that information?

23           MR. BRUEGGEN:  Object to form.  Incomplete

24       hypothetical, speculation, but go ahead.

25       A    It depends on who -- who brought it to my

1    attention.  If it was a fellow detective, I would have

2    him submit a report and I would put a cover letter on

3    it, institute in a CR -- an investigation and send it

4    through channels.  And if I was notified by the front

5    office that something was sustained and a certain

6    individual had time off, I would have to tell them what

7    the findings were on some investigation they might have

8    been subject to.

9        Q    Okay.  I want to ask you also about the report

10   that we looked at, that we marked as Exhibit 3, and

11   you'll recall this was the report that on the third page

12   had the different RD number on it; do you remember that?

13       A    Yes.

14       Q    Okay.  When you were looking at that report,

15   the -- fair -- is it based on what I observed, is it

16   fair to say the mistake with the RD number jumped out to

17   you?

18       A    Yes.

19       Q    Yeah.  And you noticed it before I mentioned

20   anything about it, right?

21       A    Yes.

22       Q    Okay.

23       A    I noticed that -- that the date stuck -- stuck

24   to me.  And then I saw the RD number was too -- was too

25   small, but it was an X0 number, which wouldn't

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 247 of 550 PageID #:14287
The Deposition of ROBERT ALLEN, taken on October 27, 2020
134

1   constitute a June case.

2   Q   Right.

3   A   But that's what stuck out at me, two things.

4   Q   X0 would be more like a January, February

5   case?

6   A   January, February case.  Yes.

7   Q   Got you.  So based on that, do you have an

8   opinion about whether you would've noticed those details

9   when you were reviewing this report back in 1993?

10      MR. BRUEGGEN:  Objection, form, speculation.

11      Go ahead, sir.

12   A   Sitting here, I -- looking at that form, I

13   would've definitely made some kind of a observation on

14   it.  You know, I -- maybe I didn't even look at page

15   three on that.  I'm not sure.  I can't answer it because

16   I don't remember those -- these reports.  So if I saw it

17   today like that, I would've saw -- I -- I believe I

18   would've brought that to attention, because to me, it

19   looks like a big mistake.  Something -- something

20   happened there that they inadvertently put one thing in

21   for another.

22   Q   Yeah.

23   A   That's my point.

24   Q   I asked about the report I showed you as

25   Exhibit 4, which was the crime scene processing report

1   that had his name on the bottom --

2          COURT REPORTER:  Counsel --

3          MR. BRUEGGEN:  John, you cut out a little bit

4   there.

5   BY MR. HAZINSKI:

6      Q    Okay.  I'll ask it again.  I'm just -- I just

7   want to orient you to what I'm going to ask about.  So

8   Exhibit 4 was the first version of that crime scene

9   processing report that had Detective Halverson's name on

10  the bottom.  Do you remember that report?  You remember

11  testifying you believe that the signature --

12         COURT REPORTER:  Sorry.

13     Q    -- or the penmanship --

14         COURT REPORTER:  This is the Court Reporter.

15     Your question cut out again on my end.  Can you

16     repeat it one more time?  I'm sorry.

17  BY MR. HAZINSKI:

18     Q    Sure.  I apologize if I'm having connection

19  issues here.  And do you recall saying that the

20  signature under Detective Halverson's name was not

21  Detective Halverson's signature?

22     A    Yes.

23     Q    Okay.  Now earlier, when we were looking at a

24  different report, you mentioned that, sometimes, I

25  believe, a detective would, if multiple detectives names

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 249 of 550 PageID #:14289
The Deposition of ROBERT DWYER, taken on October 20, 2020
136

1   were on a report, one detective might give another

2   detective the option to sign their name; do you recall

3   that?

4       A   Yes.

5       Q   Okay.  Now, case was just -- in your

6   familiarity with policies in 1993, was it appropriate

7   for someone other than that one named detective to sign

8   the report?

9           MR. BRUEGGEN:  Objection.  Form.

10      A   He could -- he could have signed a report on

11  behalf of the other person --

12      Q   Okay.

13      A   -- with their permission.

14      Q   Does the fact that that doesn't appear to be

15  Ernest Halverson's signature on that report indicate to

16  you that some other detective was -- or some other

17  person was involved in the preparation of that report?

18          MR. BRUEGGEN:  Objection.  Speculation.

19      A   That -- that's the crime scene processing

20  report?

21      Q   Yes, sir.

22      A   My -- my speculation, my -- my opinion would

23  be someone could have signed it after the fact and they

24  noticed that it wasn't signed, or someone else could

25  have prepared it, that's a possibility.

1    Q    Okay.

2    A    And you use Ernie as the, if you want to use

3  the current terms, the lead detective or main guy in the

4  case.

5    Q    Okay.  Mr. Biebel, are you aware of

6  allegations that Detective Guevara caused numerous

7  individuals to be wrongfully convicted?

8        COURT REPORTER:  I'm sorry, your question --

9        MR. BRUEGGEN:  Objection.

10        COURT REPORTER:  -- cut out.  Could you repeat

11    it?

12  BY MR. HAZINSKI:

13    Q    Yes.  Mr. Biebel, are you aware of allegations

14  that Detective Guevara caused numerous individuals to be

15  wrongly convicted?

16        MR. BRUEGGEN:  Objection to the extent that

17    any attorney client privilege communications that

18    Mr. Biebel had with myself or other attorneys from

19    my office, but with that direction, any other

20    things are fair game.  Go ahead.

21        THE WITNESS:  Could you please the question?

22  BY MR. HAZINSKI:

23    Q    I'll rephrase to fit the objections.  So apart

24  from what you may have learned in confidential

25  communications from your attorneys, I don't want to know

1    about those, apart, are you aware of allegations that

2    Detective Guevara caused numerous individuals to be

3    wrongfully convicted of crimes they didn't commit?

4        A    I'm aware that there are -- are allegations

5    against Rey Guevara --

6        Q    Okay.

7        A    -- on other cases.

8        Q    And you were his -- a co-defendant along with

9    Guevara in several cases, right?

10       A    Yes.

11       Q    Including this one?  Do you know how many

12   cases you've been named as Co-defendant alongside

13   Detective Guevara?

14           MR. BRUEGGEN:  Object to foundation.

15           Go ahead.

16       A    I don't -- I -- I don't know if the exact

17   number.

18       Q    Okay.  Do the learning about allegations that

19   Detective Guevara caused individuals to be wrongly

20   convicted cause you, at any point, to question whether

21   you may have had a role in sending an innocent person to

22   prison?

23           MR. BRUEGGEN:  Objection.  Form.  Asked and

24       answered.

25       A    Could you repeat the question for me, please?

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 252 of 550 PageID #:14292
The Deposition of ROBERT BIEBEL, taken on October 23, 2020
139

1    Q    Did learning that there were allegations that

2   Detective Guevara may have caused a number of wrongful

3   convictions, did that ever cause you to question whether

4   you have made -- have played a role in sending an

5   innocent person to prison?

6        MR. BRUEGGEN:  Same objections.

7    A    It's -- it's an allegation, so it -- it's to

8   be determined.  I had no --

9        COURT REPORTER:  I'm sorry.  The last part of

10       that answer cut out.  Could you repeat it for me?

11       MR. BRUEGGEN:  Object to form.

12       THE WITNESS:  Oh, one way or the other.  You

13       want the whole answer?

14       COURT REPORTER:  The last thing I heard was

15       they are allegations, and then it started cutting

16       out.

17       MR. BRUEGGEN:  Just restate your whole answer,

18       Bob.

19       THE WITNESS:  I did.  The allegation of

20       wrongdoing by Rey Guevara had me -- I did not have

21       any kind of repercussions or feelings one way or

22       the other, because I never really investigated

23       cases with Rey Guevara.

24   BY MR. HAZINSKI:

25   Q    Okay.  Does it seem fair to you that you are

1    being sued alongside Rey Guevara in cases based on

2    allegations of things that he did wrong?

3        MR. BRUEGGEN:  Objection.  Form.  Vague.

4      A    You're asking me if -- do I think it's fair?

5    No, it's not fair.

6      Q    Why not?

7      A    Because I'm -- A, didn't investigate cases

8    with him, number one.  Number two, is I never really --

9    didn't never worked hand in hand on the same watch with

10   him.  He worked days.  I worked third watch in most

11   cases, and -- and I'm on the periphery as to the -- my

12   only input on this is I happen to sign my name on some

13   reports.

14     Q    Okay.  Does this seem fair to you that you are

15   being forced to sit here and answer questions about your

16   involvement in these cases while he invokes his Fifth

17   Amendment right to remain silent?

18       MR. BRUEGGEN:  Objection.  Form,

19      argumentative.

20     A    My personal opinion is I'm not very happy

21   having to give depositions on any matter.

22     Q    I don't blame you.  Did you testify at any

23   criminal proceedings against Geraldo Iglesias at any

24   point?

25     A    No.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 254 of 550 PageID #:14294
The Deposition of ROBERT MILLER, taken on October 25, 2021
141

1   Q   Have you ever spoken to Geraldo Iglesias?

2   A   No.

3   Q   Okay.  Do you have any personal knowledge of

4   whether there was probable cause to prosecute Geraldo

5   Iglesias for murder?

6        MR. BRUEGGEN:  Object to form.

7   A   In the review of the file indicated that the

8   investigation pointed finger at and determined that

9   subject was, in fact, the -- the killer of Roman, and

10  was charged after -- after investigation.

11  Q   Okay.  Does your review of those reports lead

12  you to believe that there was probable cause to

13  prosecute Geraldo Iglesias for murder?

14       MR. BRUEGGEN:  Same objection.  Asked and

15       answered.

16  A   Yes.

17  Q   Okay.  Do you have an opinion about whether

18  Geraldo Iglesias is guilty of the Roman homicide?

19  A   I don't have any opinion about this case.

20  Q   Okay.  As you sit here today, can you identify

21  the evidence that was uncovered during the Roman

22  homicide investigation implicating Geraldo Iglesias in

23  the murder?

24       MR. BRUEGGEN:  Objection.  Form.  John, do you

25       mean without reviewing the records, just from his

1    memory, or do you want him to look at the records?

2       MR. HAZINSKI:  Well, based on your review of

3    the records and all the preparation you've done.

4       MR. BRUEGGEN:  Okay.  But without looking at

5    the records now, is what you're saying, from his

6    memory?

7       THE WITNESS:  No.

8  BY MR. HAZINSKI:

9       Q    Okay.  From your review of the records, did

10   you learn that there were eyewitness identifications

11   that implicated Geraldo Iglesias?

12      A    In my review of the reports I signed,

13   indicated that he was picked out a line and -- and the

14   investigation went forward.

15      Q    Okay.  Do you have any personal knowledge

16   about whether any identifications made, and any lineups

17   were obtained legitimately or illegitimately?

18      MR. BRUEGGEN:  Objection.  Form.  Go ahead.

19      A    I -- please, I -- you just two -- used two

20   words that I don't understand, legitimately or

21   illegitimately.  So if you could re -- give me another

22   question with the same thought process.

23      Q    Do you have any personal knowledge about

24   whether any eyewitness identification procedures

25   involving Geraldo Iglesias were conducted in a reliable

1    way or an unreliable way?

2        MR. BRUEGGEN:  Objection.  Form.  Go ahead.

3      A    I have no personal knowledge in this

4    investigation.

5      Q    Okay.  Does the fact that Rey Guevara has

6    invoked his Fifth Amendment right to remain silent in

7    response to questioning about his conduct during the

8    Roman homicide investigation, specifically, affect your

9    opinion about the existence of probable cause, for

10   example?

11       MR. BRUEGGEN:  Objection.  Asked and answered,

12    form.

13     A    I have no opinion.

14     Q    Okay.  Did the process of answering questions

15   and reviewing documents today, during your deposition,

16   bring back any independent memories of the Monica Roman

17   homicide investigation that you didn't have when we

18   started the deposition this morning?

19     A    Does it bring back anything?  The question is

20   going back to 1993 and regarding this investigation, do

21   I have any -- recall knowledge; is that -- is that what

22   you're saying?

23     Q    Well, specifically --

24     A    Asking?

25     Q    -- what I'm trying to ask is, did, you know,

1    sitting here today and answering these questions,

2    sometimes talking about things will jog a memory or

3    bring back something, remind you, and I'm asking, did

4    this process of reviewing documents and answering

5    questions do that for you today and bring back any

6    independent memories you didn't have before we started

7    today?

8        A    Wow.

9           MR. BRUEGGEN:  Object to form.

10       A    I just -- I'm confused about the -- the -- you

11   want me to go back to 1993, I had no knowledge of that

12   case other than what I signed on paper.  I -- I didn't

13   -- I didn't participate in the investigation.  I didn't

14   assist in the investigation.  I did not investigate it.

15   All I did was read reports and signed them.

16       Q    Right.  Understand.  I must be asking my

17   question in a bad way because I'm not communicating

18   clearly, apparently.  So the question is, you know, we

19   talked earlier in the deposition about what you remember

20   -- what you do remember and don't remember, right?

21          And we established --

22       A    Remember what?

23       Q    -- what you do remember and what you don't

24   remember.  Are you able to hear me okay?  Is my audio

25   coming through?

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 258 of 550 PageID #:14298
The Deposition of ROBERT BIEBEL, taken on October 6, 2020
145

1    A    No, you're breaking up a little bit, so --

2    Q    Okay.  Let me -- I'll try to speak loudly and

3  ask a clearer question.  Before you started looking at

4  documents to prepare for this deposition, I believe you

5  said you had no memory of this case at all, right?

6    A    That is true.

7    Q    Okay.  And then reviewing those documents to

8  prepare for the deposition, you learned some things just

9  from what was on the paper, but it didn't bring -- they

10  didn't jog your memory about anything else beyond what

11  was on a paper, just through that process of review; is

12  that correct?

13    A    Yes.

14    Q    Okay.  Now, same thing for this process of

15  answering questions today, did this process of answering

16  questions and looking at documents today, bring back any

17  additional memories beyond just what we actually talked

18  about from looking at the paper and stuff?

19    A    No.

20    Q    Thank you.  Do you have any other information

21  about the Roman homicide investigation other than what

22  we've talked about today?

23        MR. BRUEGGEN:  Object to form.

24    Q    All right.  Thank you, Mr. Biebel.  I don't

25  have more questions at this time.

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 259 of 550 PageID #:14299
The Deposition of ROBERT BIEBEL, taken on 10/26/2023

146

1    A    Thank you.

2        MR. BRUEGGEN:  Anyone else have questions?

3            CROSS EXAMINATION

4  BY MS. BARBER:

5    Q    I have a few follow-up questions, just very,

6  very briefly.  Mr. Biebel, you were asked some questions

7  earlier today about -- well, you were asked lots of

8  questions about CPD policies.  In a particular, I

9  believe you were asked some questions about CPD's

10  policies as to detectives taking written notes,

11  handwritten notes.  And I believe that your answer to

12  the question about what -- about the -- what those

13  policies were, I believe you testified that you were not

14  aware of them.  And I want to clarify your testimony.

15  Was it that you weren't -- there were no -- was your

16  testimony that there were no policies as to detectives

17  taking handwritten notes, or just that you don't recall

18  what the actual policies were at the time?

19    A    My -- my answer is I don't recall the policies

20  in effect in 1993.

21    Q    Okay.  And you didn't review any written

22  general orders, or special orders, or anything like that

23  in preparation for your deposition, right?

24    A    I did not.

25    Q    Okay.  So I believe you were also asked about

1  CPD's policies as to something along the lines of the

2  detective's obligation to turn over evidence or

3  information to criminal defendants.  And again, you

4  testified, I believe your answer was, I'm not aware of

5  that.  And I want to clarify, are you saying that you,

6  again, just don't recall what the policies were at that

7  time?

8      A    My answer should have been, I don't recall the

9  policy of 1993 in regards to that question of the

10  detective turning over information.

11      Q    Okay.  That's all the questions I have.

12          MR. BRUEGGEN:  Megan, do you have anything?

13          MS. MCGRATH:  No, I don't.  Thank you.

14          MR. BRUEGGEN:  I don't have any questions.

15  John, do you say anything in follow-up?

16          MR. HAZINSKI:  No.  Nothing else for me.

17          COURT REPORTER:  Okay.  This concludes the

18  deposition --

19          MR. BRUEGGEN:  We will --

20          COURT REPORTER:  -- of Robert Biebel.

21          Oh, go ahead, sir.

22          MR. BRUEGGEN:  Okay.  We will reserve

23  signature.

24          COURT REPORTER:  Okay, perfect.

25          This concludes the deposition of Robert

1  Biebel.  The time is 1:49 and we are off the

2  record.

3         (DEPOSITION CONCLUDED AT 1:49 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         CERTIFICATE OF REPORTER

2           STATE OF ILLINOIS

3

4  I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Stipulation page hereof, by me

7  after first being duly sworn to testify the truth, the

8  whole truth, and nothing but the truth; and that the

9  said matter was recorded digitally by me and then

10  reduced to typewritten form under my direction, and

11  constitutes a true record of the transcript as taken,

12  all to the best of my skill and ability. I certify that

13  I am not a relative or employee of either counsel and

14  that I am in no way interested financially, directly or

15  indirectly, in this action.

16

17

18

19

20

21

22  SUSAN L. HARRILL (BELL)

23  COURT REPORTER/NOTARY

24  MY COMMISSION EXPIRES: 10/02/2024

25  SUBMITTED ON: 07/06/2022

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 263 of 550 PageID #:14303
The Deposition of ROBERT BIEBEL, taken on October 26, 2021

150

**Exhibits**

**EXHIBIT 1_ BIEBEL** 98:7, 11

**EXHIBIT 2_ BIEBEL** 106:24 107:2

**EXHIBIT 3_ BIEBEL** 113:16,20 125:19 133:10

**EXHIBIT 4_ BIEBEL** 120:4, 7 134:25 135:8

**EXHIBIT 5_ BIEBEL** 126:8, 10

**0**

**0110** 100:16

**0125** 125:20

**01:20** 124:17

**01:25** 115:2 124:18

**09:20** 101:1

**1**

**1** 98:7,11

**10** 11:25 129:14

**10:01** 6:5

**11:00** 48:10

**11:05** 48:13

**120** 125:12,14

**125** 125:15 126:3,4

**12:05** 89:17

**12:13** 89:21

**13** 13:17,18,23 14:8,9

**1545** 100:20

**15th** 32:6

**16** 126:9

**163** 120:4 127:21

**1972** 12:6

**1981** 12:7,8 15:8

**1982** 13:14

**1983** 105:11

**1986** 79:13,14

**1988** 13:14 14:21

**1990** 20:1

**1993** 20:21 21:10 22:7 23:5 26:20 28:2 31:24 40:14 43:15 46:25 50:5 51:17,23 52:3,5 53:2,5, 10,18 54:16 55:3 56:14,17 57:10,11,12 66:15,24 67:18 68:13 69:2 71:7 73:4,6,14 74:6, 17 77:6,9 83:10,11,16,17 97:4,20,24 100:21 101:1, 12,14 102:4,17 104:25 106:14 107:12,15 109:4 110:5 114:19,22 115:2,18 117:19 121:1,5 123:1,7,8 125:20 127:25 130:9 132:5 134:9 136:6 143:20 144:11 146:20 147:9

**1998** 12:8 14:21 57:21

**1:00** 121:17

**1:10** 129:17

**1:19-CV-6508**

**6:11**

**1:24** 129:20

**1:25** 115:4

**1:49** 148:1,3

**2**

**2** 106:24 107:2

**20** 44:12

**2000** 110:23

**2021** 6:5

**20th** 12:12,18 15:2

**22** 117:6

**23** 107:15 110:5 114:22

**23rd** 115:19

**24** 105:11 115:2,18 124:17 125:20

**24th** 12:19

**25** 100:25 107:12 114:19

**29th** 6:5

**3**

**3** 113:16,20 125:19 133:10

**3:00** 23:8 110:15

**3:30** 23:8

**4**

**4** 120:4,7 134:25 135:8

**40** 19:17

**5**

**5** 13:21 14:9,15, 20 20:3,20,23 21:10,18 22:6,

**22** 24:4,10,12 28:2 33:17,24 34:9,12,15 35:3,22 37:24 38:11 40:2,15 43:15 47:1 50:5,7,17 52:17 53:14,17,22 54:16 56:20 57:5 58:4,14,19 60:17,22 61:4, 7,9,12,15 63:24 65:1,12 66:6,7 71:7 73:14 74:17,22 75:4, 21 76:17,21 77:9,23 78:9,25 79:5,7,11 80:2, 7,20 81:13 82:16 83:10,12, 16,17 84:14,17, 19,23 85:5,13, 20,24 86:8,25 88:2,7,12,15, 21,25 89:2 91:7 92:8 93:19 94:5,15,18,20 95:2,18,23 96:6,12 101:7, 17,23 102:16 103:4 104:25 105:10 108:13 109:4,14 110:4, 7,10,19 112:23 115:1,6 120:25 121:4,7,10 125:21 126:8, 10 130:11 131:5 132:7,10

**6**

**6** 60:10 131:5

**7**

**7:00** 23:8

**8**

**81** 12:18

**82** 17:20

**88** 17:20

**89** 20:1

**8:00** 110:4,23

**9**

**9** 14:21

**90** 98:8 99:19 103:25 106:2,3

**91** 105:7 106:11

**93** 21:21 98:8 99:20 116:25 121:10,11

**94** 113:17 115:19

**95** 114:1,25 119:9

**96** 113:18 117:1 119:12

**97** 106:25

**98** 14:22 57:20 106:25 109:25

**9:00** 114:22

**9:35** 107:12

**9:40** 114:19

**A**

**a.m.** 6:5 48:10, 13 107:12 114:19 115:4

**ability** 90:2,10

**abuse** 20:7,9

**access** 58:8 66:21 82:12,14

**accessed** 75:13

**accessible** 66:17

**accurate** 74:1 78:1

**accused** 87:5 131:25

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 264 of 550 PageID #:14304
The Deposition of OFFICER ROBERT SILER, taken on October 24, 2023
151

acquaintances
78:14 91:17

act 14:3

action 38:15

active 25:5
82:8,9

actively 28:2

actual 24:3
146:18

addition 36:14

additional
15:9,25 102:25
145:17

adhered 55:25

adhering
51:12

adjudication
41:19

admit 8:2

advice 29:8

affect 10:3
88:1 116:18
143:8

affected 90:13

affirm 8:4

afternoon
110:15

agency 132:4

aggravated
24:13

agree 115:20

agreement
7:15

ahead 14:2
16:17 17:2,15
45:6 47:19
54:1,11 62:4
68:8 71:11
74:13 78:3
82:17 84:5
85:10,17 87:1
88:23 89:4
95:21 96:3
97:16 98:2 99:1
102:7,20

103:13 105:19
108:16 111:19
112:3 117:14
121:9 122:15
124:6 130:15
132:24 134:11
137:20 138:15
142:18 143:2
147:21

ahold 64:12

air 46:13

allegation
132:3 139:7,19

allegations
20:5 137:6,13
138:1,4,18
139:1,15 140:2

alleged 20:8,
11

allowed 69:13
71:8

alongside
47:16 138:12
140:1

Amendment
86:9,24 87:24
88:9 140:17
143:6

angle 16:25

answering 9:5
143:14 144:1,4
145:15

answers 51:7
87:25

Anthony
94:14,21

anything's
43:18

apologize
135:18

apparently
121:13 144:18

appearance
6:12

appearing
6:16,18,20 7:7,
10,13 114:16

appears 114:6

approval
39:21 42:18
43:16 45:3
46:11,20 49:10
72:20 74:10
102:19 128:2,
17

approve 39:14
73:15 80:13
92:8 111:17
122:12

approved 43:5
44:8 49:9,12
107:11 111:9,
22 121:14

approving
39:17 41:4 46:5
92:12 101:6
110:24

Approx 12:21

approximately
8:21 13:19
19:17 57:15

ar 24:22

area 13:21
14:9,15,20 18:7
20:3,20,23
21:10,18 22:6,
22 23:15 24:4,
10,12 28:2
33:17,18,24
34:9,12,15
35:3,22 37:24
38:11 40:2,3,
15,19 43:15
46:25 49:16,19
50:5,7,17 52:17
53:14,17,22
54:16 56:20
57:5 58:4,14,19
60:10,16,22
61:4,7,9,12,15
63:24 65:1,12
66:6,7,17 71:7
73:14 74:17,22
75:4,21 76:17,
21 77:9,23
78:9,25 79:5,7,
11 80:2,7,20
81:13,19 82:16
83:6,10,12,16,

17 84:14,17,19,
23 85:5,13,20,
24 86:8,25
88:2,7,12,15,
21,25 89:2 91:7
92:8 93:19
94:5,15,18,20
95:2,18,23
96:6,12 101:7,
17,23 102:16
103:4 104:25
105:10 108:13
109:4,14,23
110:4,7,10,19
112:23 115:1,6
120:25 121:4,7,
10 125:21
130:11 131:5
132:7,10

argumentative
140:19

armed 132:22

arrest 46:12
75:20

arrested 65:2,
4,16,18,25 66:3
75:11

arrived 124:14,
16 125:4
127:17

articles 87:18

aspect 39:11
92:24

asset 84:13

assign 25:25
26:6,17 27:3,5,
7 46:15 90:13

assigned
12:19 13:14
14:25 16:14
18:7,16 19:8
22:13,20 24:25
26:24 27:11,20,
23 40:8,16
42:22 59:21
63:11,13 64:10,
13 65:15 77:14
110:10 130:16,
20

assigning
25:18 26:3
90:6,7

assignment
12:10,12

assignments
12:14

assist 144:14

assistance
30:9,10,16

assume 9:15
46:24

Assumes
117:22 128:4,
25

assumption
113:7

attached
122:21

attend 92:2

attending
6:12,13

attention
118:2 132:19
133:1 134:18

attitude 94:12
95:16

attorney 10:8
19:11 137:17

attorney-client
86:11

attorneys
10:7,11,19,22
11:16 86:21
87:8 137:18,25

audio 9:13,17
11:13 16:22
21:7 47:10
144:24

authored
42:13

automatically
106:20

Avenue 15:2,4

aware 51:19

52:1,4 53:12,20
61:16 74:16,20
84:6 86:6,23
96:24 128:15
129:1 137:5,13
138:1,4 146:14
147:4

---

**B**

**B-I-E-B-E-L**
8:14

**back** 26:6,8
27:18 36:18
40:1 42:12 43:6
44:3,7 46:3
48:12 49:4,25
53:2 64:15
66:13 67:18
68:2 89:20
97:3,13 101:12
118:22 123:2
125:17,19
128:3,18
129:19,25
134:9 143:16,
19,20 144:3,5,
11 145:16

**bad** 92:23
144:17

**banned** 66:6

**Barber** 7:9,18
55:9,12 67:24
70:1,5 75:25
76:2,8,10,23,25
77:3,5 81:21
82:2 83:2,21
84:3,10 85:2,8,
21 86:2 93:6
98:22 99:2,12
132:14 146:4

**based** 32:11
67:10 71:6
82:12 102:2
108:10 114:9
124:20 127:24
133:15 134:7
140:1 142:2

**bases** 29:17

**basic** 8:25

**basically** 40:8
99:2 125:5

**basis** 13:4
16:12 35:6
58:24 131:12

**basket** 39:22,
23,24 40:25
41:5 43:9,19
49:13 68:19
75:18

**Bates** 99:11
106:25

**batteries**
26:25

**battery** 24:13,
14

**bears** 127:2

**beautiful** 70:13

**began** 57:14
124:22

**begin** 8:8

**behalf** 6:19
7:5,6 109:15
136:11

**belief** 83:18
125:12

**believed** 66:10

**belonged** 82:9

**benefited**
89:25

**benefits** 51:24

**Biebel** 6:7,19
7:6 8:3,11,14,
15 10:1 11:20
19:11 48:15
71:6 78:7 89:23
98:5,8 99:21
100:9 106:25
113:18 120:4
129:23 137:5,
13,18 145:24
146:6 147:20
148:1

**big** 98:23
134:19

**Bill** 50:6

**binder-y** 36:2

**bit** 22:5 53:21
123:17 135:3
145:1

**blame** 140:2

**blank** 119:2
128:10

**board** 31:10,11

**Bob** 7:6 70:20
86:12 87:6
139:18

**book** 36:19,20,
24 37:4,9,14,
15,16,19

**books** 36:22

**boss** 31:16,20
32:5

**bottom** 100:17,
24 107:8
114:16 116:10,
13,16 120:11
122:3 124:15,
16 135:1,10

**box** 41:21
72:21 89:19
104:7,8,16
108:8 120:11
127:12

**boxes** 124:14,
15,18,20
127:16,20

**breach** 56:13

**break** 9:23
48:5,7 89:9
129:9,11

**breaking**
145:1

**breaks** 9:21

**Brennan** 20:12

**briefing** 22:16

**briefly** 12:4
31:6 146:6

**bring** 97:13
143:16,19
144:3,5 145:9,
16

**broadly** 55:25

**brought** 118:2
132:25 134:18

**Brueggen**
6:18,25 7:5,19
10:8 14:2
16:17,20,24
17:15 18:13
19:12 28:5
29:24 34:18,24
45:5,20 46:21
47:18 48:2,7
54:1,11,21,23
55:7,16 56:5,15
60:19 62:4
63:18 64:24
67:25 68:7,16
69:15 70:7,10,
16,20,22 71:3,
11,18 73:7
74:12,19 76:9
77:12 78:2
82:17,21 83:3,
22 84:4,15,21
85:3,9,16,22
86:3,10,16,18
87:1,6,12 88:3,
13,22 89:3,6,9,
13,15 93:4
95:21 96:2,10
97:16 98:1,12,
15,21,23 99:1
100:1,4,6 101:9
102:6,20 103:6,
12,18 105:18
108:15 109:5,
16 111:2,10,18
112:2 117:7,13,
20,22 118:15
119:20 121:8
122:15,19
124:5,23
125:10 128:4,
12,20,24
129:12,15
130:7,14
132:13,23
134:10 135:3
136:9,18 137:9,
16 138:14,23
139:6,11,17
140:3,18 141:6,
14,24 142:4,18
143:2,11 144:9
145:23 146:2

147:12,14,19,
22

**bypass** 111:13

---

**C**

**cabinets** 49:14
57:7,9,23
58:16,21 66:15,
16 67:3 75:10

**call** 7:3 22:18,
22 23:1,9,20,22
24:3,14,20 26:6
30:7 36:21,22
37:10,16 51:5
61:20 62:7
63:10 70:10
132:6

**called** 29:18
49:24 56:24
57:1 63:11
65:22 121:25
125:18

**calling** 25:5
64:10 70:15

**calls** 24:8 64:4
65:21 86:11

**canvasing**
23:14

**capacity** 60:21

**car** 23:15

**carbon** 123:9
126:12,15

**career** 12:4
20:17 42:8 54:3
122:16

**careful** 46:23

**carefully**
46:20,24
111:17

**carried** 95:17

**case** 6:11 8:22
11:3,5 19:23
20:20 22:24
23:12 24:25
25:22,25 26:6,
9,14,19 27:3,4,
13 30:8 31:14

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 266 of 550 PageID #:14306
The Deposition of CHIEF ROBERT BIEBEL, taken on October 26, 2021
153

33:1 41:10,12, 13,16,17,18 43:9 46:18 47:17,25 49:14, 15,19,23 50:4 51:6,7 61:22 62:8,13,25 63:5,9,13,17 64:3,11,23 67:20 69:8,16 73:2 75:19 76:17 90:6,8, 10,14 91:1,5 97:8,12 100:15 109:21 120:1 134:1,5,6 136:5 137:4 141:19 144:12 145:5

**case-by-case** 131:12

**cases** 13:5 17:24 22:19,23 23:10 24:12,13, 14 25:2,5,6,18 26:3,7,12,17,22 28:3,7 29:13,23 30:23,25 31:3, 4,5,7,8,9,10,17 32:7,9,11,21 33:12,18,21 50:24 51:2 63:14,16 64:1, 14,21 75:11 81:14 82:16 87:8,9 109:22 119:18 138:7,9, 12 139:23 140:1,7,11,16

**casual** 91:11

**categories** 102:17

**caused** 119:18 137:6,14 138:2, 19 139:2

**CB** 44:17 46:13,16 75:12, 20

**cell** 7:4 70:11

**central** 40:3

**chain** 20:22

**chance** 99:10

**chances** 62:6 91:12 103:21

**change** 16:13, 15 43:17,22 44:2,4,7,20 45:24 46:2 57:23,25 118:19 119:2

**changed** 17:6 100:22 119:6

**changing** 112:25

**channels** 132:2 133:4

**characterize** 30:2

**charge** 40:21, 22 49:15 61:18 67:14 131:11

**charged** 65:3,5 141:10

**charges** 24:24

**check** 115:21

**Chicago** 6:17 7:10,11,13 12:2,5 15:16 34:16 35:4,23 36:4 53:9

**Chief** 37:5

**chief's** 37:7

**church** 82:8

**circle** 129:24

**circumstances** 42:11 50:21 102:23

**City** 7:10 60:11

**civil** 19:23 97:1,2

**clarify** 24:6 26:2 87:6 101:25 111:13 125:24 146:14 147:5

**clarity** 42:4

49:4

**classification** 46:8,17

**classifications** 41:15

**classroom** 15:13

**clear** 9:15 34:21 46:9 51:20,22 99:20 100:15

**cleared** 44:8 46:18 101:18 102:5,15 103:2, 3,9

**clearer** 55:23 70:25 145:3

**clears** 41:17

**clerical** 40:8

**client** 137:17

**Cline** 58:9,12 59:7 66:6,9

**close** 33:21

**closed** 31:5 46:17 74:22 75:2,11,19 76:6 99:20 101:18, 22 102:5,15 103:3,9

**closely** 88:11

**closing** 100:15 103:2

**clues** 33:2

**co-defendant** 138:8,12

**Code** 100:16

**coercive** 85:7

**cold** 30:23 32:25 33:18

**collected** 75:18

**collection** 36:17

**command**

16:10 20:22

**commander** 14:13,14,15 20:25 31:19,21, 22 32:21 33:4, 16 40:10,11,14 58:14

**commander's** 36:2,17 77:14 78:6

**commanders** 33:10 58:19

**commanding** 36:20,24

**commit** 138:3

**committed** 85:15 96:8,14

**committee** 82:10

**common** 73:20

**commonplace** 109:13

**communicate** 83:8 91:3

**communicating** 144:17

**communication** 86:21 94:12

**communications** 31:18 86:11 97:19 137:17, 25

**community** 82:4,7,15,24 90:1,11

**complaint** 20:6,14 132:3

**complaints** 19:20 34:5

**complete** 78:1 102:24

**completed** 42:16 124:14 127:17

**complied** 35:4

**compliment** 92:23

**compound** 74:12 84:4 85:9,16 88:13, 22 96:2

**computer** 7:1, 2 70:24 106:12, 14

**computer-generated** 105:22

**concealed** 55:4

**concerned** 59:25

**concerns** 38:25 58:22 85:19,25 88:20

**concise** 72:11

**concluded** 124:22 148:3

**concludes** 147:17,25

**conditions** 102:10

**conduct** 28:12, 14 131:25 132:11 143:7

**conducted** 142:25

**conferring** 33:9

**confessions** 83:20 84:1

**confidential** 52:6,8,10,13, 19,20,24 53:3, 5,11,15,19 86:22 137:24

**confused** 74:25 124:25 144:10

**confusing** 9:11 63:21

**connection**

51:11 135:18

**connections** 90:1,11

**consisted** 83:6

**consistent** 128:22

**constitute** 55:5 134:1

**constituted** 55:6

**constraints** 69:22

**consult** 29:1 35:24 47:15

**contact** 28:17, 20 52:14 61:24 62:9,20 63:15 81:22 88:25

**contacted** 63:4

**context** 51:1 64:19

**continuation** 118:24

**continue** 60:15

**control** 81:16

**convened** 6:6

**convenient** 89:10

**conversations** 59:6 61:11 91:23 97:19

**convicted** 137:7,15 138:3, 20

**convictions** 139:3

**cooperating** 52:13,25

**cooperation** 51:25

**copies** 35:23

**copy** 98:24 126:13 127:11,

16

**corner** 100:25

**correct** 17:20 19:12 20:3 22:3 39:6,11,21 44:13,17 46:13 57:7,20 60:25 70:4 101:8 104:2,22,23 106:12 108:2 110:5 114:7,19 115:2,10 116:13 117:2, 12 124:18 127:9 145:12

**corrected** 42:13

**correcting** 44:16 45:25

**correction** 44:19

**Counsel** 6:11, 14 98:6 106:23 135:2

**couple** 89:15 90:23 129:25

**court** 6:2,4,9, 22 7:14,21 8:2, 8 9:3 16:18 26:7,11 47:9 48:9,12 54:22 70:2,4,6 75:12 89:14,16,20 129:16,19 135:2,12,14 137:8,10 139:9, 14 147:17,20, 24

**cover** 29:17 30:12 133:2

**coverage** 87:18

**covered** 29:16

**CPD** 19:17 36:7 52:5 55:25 103:1 122:18 146:8

**CPD's** 51:10 146:9 147:1

**CR** 132:1 133:3

**created** 119:13 129:6

**crime** 18:5,15, 19 33:14,15 60:9 61:3 65:5 121:21,23,25 122:13,23 123:8 124:25 125:5,6,25 126:19 129:3 134:25 135:8 136:19

**crimes** 12:24, 25 13:8,13,21, 22 17:19 19:6,9 22:22 36:13 40:17,22 59:10, 14 60:24 62:9, 15,19 63:4,15 64:4,14,19,20 65:3 66:2 71:15 73:23 78:8,25 79:2,10 84:9 94:2,5,19 105:10 138:3

**criminal** 53:25 54:5,10,18 55:5 56:4 68:5 83:20 84:1 103:5 140:23 147:3

**CROSS** 146:3

**crossed** 101:13

**current** 26:3 137:3

**custody** 24:22

**cut** 47:10 135:3,15 137:10 139:10

**cutting** 139:15

———————

**D**

———————

**Daris** 104:2,21

**date** 65:7,8 100:25 101:8 102:11 105:15 106:20 107:14,

15 110:10 111:25 117:4 118:4 124:14, 16 125:24 127:17 128:18 133:23

**dated** 115:19

**dates** 80:3 111:21 115:20, 22 118:20

**Dave** 6:18 7:5 70:14,25

**Davey** 19:23

**day** 6:5 17:17 18:24 23:6,7 24:16,17 26:10 36:20 37:2,3 57:13 65:15 67:7 69:17 92:5 95:7,9 102:24 110:14

**day's** 38:2

**day-to-day** 13:4 16:12 35:6 36:25 37:21

**days** 27:18 45:8,12 58:19 93:25 123:5 131:5 140:10

**dead** 25:2 26:22

**deal** 90:20

**dealing** 25:10 56:10

**dealings** 17:14 90:16

**dealt** 22:22 25:4 123:23 129:3

**debriefing** 22:12 23:19 30:6 87:9

**debriefings** 87:4

**December** 14:21

**decide** 25:24 26:1,13 27:12

**deciding** 27:4

**decision** 26:5 27:15 28:19 58:20 90:13

**decisions** 26:16 28:16

**declared** 46:17

**default** 111:24

**defendant** 7:6, 10,11 103:11, 17

**defendants** 6:19 7:6 53:25 54:6,10,18 55:5 56:4 147:3

**definite** 75:23

**demonstrate** 113:4

**denigrate** 92:24

**department** 12:3,5 15:17 20:17 34:1,17 35:5,23 36:4 39:1 51:22 53:10 72:16 74:24 75:6 78:12

**department's** 35:8

**department-issued** 123:7

**departments** 45:9

**depended** 27:16

**depending** 62:25 102:23 132:2

**depends** 32:4 45:22 69:16,17 132:25

**deponent** 6:19 7:5

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 268 of 550 PageID #:14308
The Deposition of ROBERT BIEBEL, taken on October 29, 2020

155

**deposed** 8:16

**deposition** 6:7 7:25 10:6,14, 20,23 11:18 63:23 96:18 97:12 100:11 107:6 114:13 120:6 129:25 143:15,18 144:19 145:4,8 146:23 147:18, 25 148:3

**depositions** 8:25 87:10,13, 14 140:21

**deputy** 37:6

**describe** 12:4 16:7 20:22 31:6 39:16 60:4 100:13

**describing** 110:17 115:13

**description** 41:23 46:7 103:16

**designated** 27:8

**desk** 6:21 7:7 39:25 40:2,9 41:1 50:2 101:13

**desks** 50:2

**destroy** 74:10

**detail** 12:10 111:16

**details** 16:8 97:23 134:8

**detective** 20:12 22:19 36:15 38:5,8 39:10 42:12 43:4,15 44:1,7, 8 45:1,13,18 48:18 53:8,14 55:3 63:10,12 64:12 67:9 68:11,13 74:8 77:2,4,6,10,13, 19,25 80:2,4,7

81:19,20 82:1 84:7,12,20,24 85:6,14,20 86:1,8,23,25 87:19 91:6 92:3,7,12 93:10,19 94:11, 17 95:11,14,15, 24 96:7,13 105:9 108:9,22 109:1,14 112:5, 7 116:15 123:25 124:4, 11 127:9 128:1, 9,16 130:20 133:1 135:9,20, 21,25 136:1,2, 7,16 137:3,6,14 138:2,13,19 139:2 147:10

**detective's** 56:7 67:1,4 130:4 147:2

**detectives** 14:15 21:1 22:13,16,20 23:10,19,25 24:8,17,24 25:13,15,18,24 26:18 27:4,6, 21,23 28:21,24 29:7,22 30:18 32:12,16 33:24 34:3,4,5,8,12, 20 35:3 36:11 37:12 38:1,12, 18,21,25 39:5, 20 40:7 42:14 43:7 45:10 49:3,22,25 50:1 51:11 53:17 55:25 56:2,11, 20 64:16 66:17 67:7,19 68:4 69:1,8,11 71:8, 16,22,25 72:18 73:21,24,25 74:3,17 83:9 101:19 102:4 104:1,20 105:15 108:1,5 110:25 111:25 117:1 118:3 130:2,12 131:8 132:8,18,20

135:25 146:10, 16

**detectives'** 50:16 132:11

**determine** 24:18,21 124:10

**determined** 48:17 139:8 141:8

**develop** 64:5 81:25

**development** 69:7

**died** 92:3

**differ** 16:8

**differently** 86:17 88:11

**difficulty** 16:21

**diligently** 29:22,25

**direct** 8:9 17:14 21:17 77:20 81:5 112:9 117:8

**direction** 137:19

**directions** 113:12

**directive** 58:1

**directives** 36:10,16,19,21, 24 37:9,18,19

**directly** 25:13

**discipline** 20:16 33:24 34:1,4,6,8 39:5 131:22 132:8, 16

**discovered** 30:18 103:11 131:22

**discrepancy** 117:18 118:1

**discs** 37:5

**discuss** 32:21 36:22 97:8

**discussing** 97:12

**disposed** 54:18

**distinguish** 34:20

**distributed** 132:4

**district** 6:9,10 12:13,18,19 13:16,18,23 14:8,9 15:2,4 24:23 26:12 27:25 32:6 33:10 90:21 109:21

**districts** 27:18 33:14

**division** 6:10 12:6,11,15 15:16 37:8 43:1 105:10

**document** 45:23 69:3,8 72:9,16,17 98:6 100:14,18 106:22 107:1 109:25 124:21

**documentatio n** 97:15

**documented** 110:16 122:13

**documenting** 118:9

**documents** 10:25 11:2,4 50:8 66:25 68:5 71:9 97:7,10, 11,25 99:7 100:10 110:3 124:13 125:20 143:15 144:4 145:4,7,16

**downtown** 25:5 42:19,20, 23 43:11 45:25 49:11,17,18

75:18 76:18 125:15

**draft** 42:17

**drawers** 31:8

**drink** 78:24 79:10

**drinking** 78:23 79:15,16

**duties** 16:5,7,8 18:5

**duty** 50:10 132:16

━━━━━
E
━━━━━

**earlier** 21:22 23:18 39:3 49:8 50:23 51:9 67:19 73:19 112:6 129:25 130:1 135:23 144:19 146:7

**early** 63:22 74:25

**easier** 70:12

**Eastern** 6:10

**effect** 51:17 146:20

**else's** 77:16

**employed** 11:20

**empty** 127:17

**encountered** 94:21

**encounters** 62:24 88:17

**end** 6:23 9:17 26:8 39:23 41:21 75:3 90:24 118:12 129:8 135:15

**ended** 57:19 118:12

**ends** 126:4

**engaged** 38:22

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 269 of 550 PageID #:14309
The Deposition of CHIEF ROBERT BIEBEL, taken on October 29, 2020
156

95:20,25
131:23 132:20

**engaging**
131:25

**ensure** 34:15
54:17

**ensuring**
130:2

**entire** 81:12

**Epplen** 21:16

**Ernest** 91:6,14,
20,24 92:23
136:15

**Ernie** 93:16
104:6 109:7
137:2

**escalate** 38:24

**essentially**
35:20 38:3 43:3

**established**
144:21

**estimate** 48:18
80:16

**estimated**
96:19

**ethnicity** 82:3,
23

**evaluate**
131:13

**event** 30:13

**events** 65:11
69:12 97:3
110:18

**everyday**
22:18

**evidence**
53:24 54:5,10,
17 55:4 56:3
103:10,16
117:22 128:5,
25 141:21
147:2

**exact** 138:16

**EXAMINATIO
N** 8:9 146:3

**examine** 50:18

**examples**
37:17 82:19

**excelled** 83:25

**exchange**
51:24

**exclude** 86:16

**excuse** 21:4
58:11 60:20

**exhibit** 98:7,11
106:24 107:2
113:16,20
120:4,7 125:19
126:8,10
133:10 134:25
135:8

**exhibits** 98:13
99:3

**exist** 45:11

**existed** 56:14
74:17

**existence** 79:5
143:9

**exists** 43:22

**expected** 63:9
102:4

**expecting** 7:23

**experience**
8:24 84:9 88:6
108:12 109:17
110:24 118:14

**expertise**
26:19 27:6

**explain** 17:5
41:14 63:22
72:5

**explaining**
44:24 45:16

**explanation**
14:5,12

**extent** 86:10
137:16

**eye** 132:12

**eyewitness**
28:12 84:25

142:10,24

———————

**F**

———————

**F-A-R-R-E-L-L**
21:25

**fabricated**
84:20

**face** 112:16

**faces** 112:25

**facing** 112:16,
19 113:5,12

**fact** 88:8 104:9,
15,16 116:2
128:2,11,19
136:14,23
141:9 143:5

**facts** 117:22
128:4,25

**failed** 30:19

**fair** 9:8,24
29:11 43:4
51:13 64:5
67:20 69:4 80:6
84:7 97:22
101:16 117:11
133:15,16
137:20 139:25
140:4,5,14

**familiar** 27:24
35:7 51:10
52:16 56:17
112:22 123:12
126:18,19

**familiarity**
102:2 108:12
136:6

**family** 82:11

**Farrell's** 21:23

**fear** 53:6

**February**
117:6 118:4
119:25 134:4,6

**federal** 65:3,5

**feedback** 7:3

**feelings**

139:21

**fellow** 133:1

**felony** 24:23,
24 28:17,20
96:14

**felt** 42:7

**field** 15:5,6
16:5,6,8 23:25

**Figueroa**
62:23 63:1

**figure** 77:22

**file** 31:1,4,6,7,
12 32:13,14,23
44:23 47:25
49:14 53:21
56:9,12,19,23,
24,25 57:1,2,3,
7,9,23 58:6,7,
16,21 66:13,14,
15,16 67:4,5,7,
8,16,21 68:2,6,
10,14,18,20
71:10,14 72:7,
12 74:23 75:5,
7,10 76:17,18
98:18 117:23
118:12 120:1,9
130:6 131:13
141:7

**filed** 19:20 47:8
67:15 69:24

**files** 11:3,5
29:19 41:7
42:19,25 49:16
50:9,19,25 51:3
57:4,14 58:5,
22,23 59:3
66:14,25 67:14
68:2 71:8 75:13
76:6 78:5
101:22 130:3,
13,19 131:9,10,
17,18

**filing** 42:23
67:3

**fill** 54:15 67:16
106:8 111:4
128:3

**fill-in** 119:2

**filled** 67:14
75:14 81:15
116:10 127:20

**filler** 123:5

**filling** 119:1
128:10,18

**film** 121:21
122:10,22
125:13

**find** 24:16 44:4
61:22 99:23

**findings** 133:7

**finger** 141:8

**finish** 9:5,7
129:24

**fireable** 96:8

**firsthand**
74:14 129:5

**fit** 137:23

**fits** 72:11

**five-drawer**
31:7

**fix** 44:23 45:18
48:18

**fluently** 83:4

**focus** 20:19

**focused** 60:8

**focusing** 22:7

**folks** 38:1 95:2
99:9

**follow** 17:23
30:19 32:15
33:2 102:9

**follow-up** 13:5
24:21 146:5
147:15

**forced** 140:15

**forgot** 119:2

**form** 14:2
16:17,20 17:15
18:13 20:16
28:5 29:24
34:18 36:2
44:15 45:5,20

46:21 47:18 48:2 54:1,11 55:8,17 56:5,15 59:15 60:19 62:4 63:18 64:24 67:24,25 68:8,16 69:15 70:4 71:11,18 73:7 74:12,19 75:25 76:8,25 77:3,12 78:2 81:21 82:17,21 83:2,3,18,21, 22,24 84:4,10, 15,21 85:2,3,8, 9,16,21 86:3 87:1 88:3,13,22 89:3 92:13 93:6 94:6 95:10,21 96:2,10 97:16 98:1 101:9 102:6,8,14,20, 25 103:1,6,12, 18 105:18 109:5,16 111:2, 3,10,18,24 112:2 115:21, 25 117:13,15, 20 118:15 121:24,25 122:15 123:4,5, 13,20,21 128:4, 12,25 130:7,14 132:14,23 134:10,12 136:9 138:23 139:11 140:3, 18 141:6,24 142:18 143:2, 12 144:9 145:23

**formal** 39:5,8

**format** 112:4

**forms** 45:8,11 47:20 122:13 123:7,9,23

**forward** 29:20 30:9 71:2 142:14

**Foster** 15:2,4

**foundation** 54:21,23 67:24 76:2,9,10,25

77:5 93:4 105:18 108:15 112:2 117:13 121:8 124:5,23 125:10 130:14 138:14

**Frank** 14:18

**frequently** 71:16

**fresh** 24:20 25:22 61:21,22 125:2

**friends** 78:12, 14 91:14,16 94:22

**front** 26:8 37:14 41:21 77:21 117:24 123:16 133:4

**Frost** 19:23

**Fruin** 14:13,14

**funeral** 92:2

**furtherance** 112:11

————————

**G**

**game** 137:20

**gang** 12:23,25 13:2,3,8,12,22 17:19 18:5,6, 15,19 19:6,9 59:10,14 60:9, 24 61:1,2,3,17 62:6,8,9,10,14, 15,17,19,25 63:1,4,15 64:3, 4,8,14,19,20 78:8,25 79:2,9 84:9 94:2,4,19

**gang-related** 13:5 17:24

**gangs** 18:12 59:21,23 60:1,8 63:1,14 64:22 84:8,13

**Gangster** 63:3

**Garris** 93:20 94:1,4 95:19

**gather** 63:17

**gathered** 13:7

**gathering** 18:9

**gatherings** 95:2

**gave** 25:8 61:17

**Gawrys** 6:20 7:7

**general** 17:8 23:12 35:9,10 36:5,14 38:13 57:10 72:1,8 73:15 102:13 109:20 125:15 131:10,18 146:22

**generally** 34:14 51:10,12 55:23 66:16 69:8 73:6 74:4

**generated** 67:10 68:5 106:20

**Geraldo** 6:8,16 140:23 141:1,4, 13,18,22 142:11,25

**give** 8:5 14:4 32:7 33:11 37:17 39:10 46:3 51:7 65:7 99:10 136:1 140:21 142:21

**giving** 9:8

**good** 8:11 59:18,22 60:1 70:22 88:7 92:16,22 94:9, 13 95:14 129:15

**governing** 52:6 71:22

**GPR** 72:15,21 73:3,9

**GPRS** 72:19

**Great** 8:3 71:3

**ground** 8:25

**group** 93:11

**guess** 10:12,21 27:1 65:10 77:22 79:4 81:9 90:3 98:7 106:23 113:16 115:24 116:6 117:3 120:3,19 123:13 126:5 127:1 132:6

**Guevara** 6:8 7:13 19:8 78:8, 21 79:3,17 81:2,11,18 82:25 83:12,19, 25 84:8,20,24 85:6,14 86:8,23 87:19,23 88:8, 16,21,25 89:25 90:6,12 91:8 93:3,8,15 104:2,20 108:1 109:2,7 117:2 137:6,14 138:2, 5,9,13,19 139:2,20,23 140:1 143:5

**Guevara's** 84:13 85:20 86:1 108:9,14 116:15

**guilty** 141:18

**gunshots** 26:25

**guy** 67:14 95:7, 9 137:3

**guys** 26:23 62:24 70:7,18

————————

**H**

**Halverson** 91:7,15,20,24 92:3,7 93:10,16 95:19

**Halverson's**

92:12,23 127:2, 9 135:9,20,21 136:15

**Halvorsen** 6:20 7:7 104:1, 6,11 108:1,22 109:2,7 116:12 117:2 124:1,11

**Halvorsen's** 108:23 124:4

**hand** 8:4 34:7 39:4 140:9

**handbook** 36:11 112:7

**handbooks** 36:15

**handing** 132:8

**hands** 125:13 130:19

**handwriting** 92:22 94:13

**handwritten** 71:17,20,23 72:1,18 73:15, 21 74:8,10,18 146:11,17

**hanging** 29:18

**happen** 23:1, 20 24:4 48:22, 24 130:17,21, 25 131:14 140:12

**happened** 13:6 23:16 32:17 44:6 48:19 49:8 57:12 65:13,14 66:8 97:24 110:9,11 119:25 121:17 134:20

**happening** 29:5

**happy** 9:14 140:20

**hard** 70:7 98:24

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 271 of 550 PageID #:14311
The Deposition of CHIEF ROBERT BIEBEL, taken on October 23, 2020
158

**Harrill** 6:3

**Hazinski** 6:15
7:17,24 8:10
16:22 17:4
34:22 35:1
47:12 48:6,14
55:2,21 68:12
70:9,14,19,25
71:5 76:11,14
85:12 86:5,15,
17,19 87:16
89:8,12,22 93:9
98:14,16,25
99:5,16,18
100:3,5,8
129:8,14,21
135:5,17
137:12,22
139:24 142:2,8
147:16

**he'll** 117:8

**head** 112:20
113:8,9

**hear** 16:22,25
21:4 55:12,14
57:1 70:18,20
76:11 90:23
92:6 144:24

**heard** 52:12
55:10 57:3 69:5
139:14

**hearing** 6:23
16:21 65:20
70:8

**held** 58:3

**helped** 82:15

**helpful** 27:22
83:5 90:12

**hidden** 55:4

**higher** 37:11

**higher-up** 39:1

**hired** 12:6

**hold** 70:16

**holding** 24:7

**homicide** 22:8
24:9,11 27:2,3,
4,8,11 31:9

66:11 67:21
73:22 80:21,23
81:1 96:22
97:20 98:4
141:18,22
143:8,17
145:21

**homicides**
22:14,21 26:25

**honest** 29:15
38:2

**hope** 69:19

**hoping** 17:5

**hospital** 25:1
30:13

**hours** 10:21
23:7 35:18
43:20 96:19
110:23 115:2
125:21

**hours'** 35:18

**house** 132:6

**hypothesis**
109:6

**hypothetical**
45:6 47:19
55:8,17 56:6,16
68:17 102:7
103:13 111:11
128:5 132:24

**Hypothetically**
109:1

———————

**I**

———————

**IAD** 132:5

**identification**
28:12 84:25
98:11 107:2
113:20 120:7
126:10 142:24

**identifications**
142:10,16

**identified**
53:1,6 103:19

**identifiers**
122:3

**identify** 102:10
103:10 141:20

**identity** 53:15,
18

**Iglesias** 6:8,16
140:23 141:1,5,
13,18,22
142:11,25

**illegitimately**
142:17,21

**Illinois** 6:10
7:8

**imagine** 47:3

**immediately**
43:21 44:11
69:12

**Imperial** 63:3

**implemented**
57:25

**implicated**
142:11

**implicating**
103:11,17
141:22

**important** 9:4

**impressions**
123:11

**improper** 45:1

**improperly**
84:25

**in-** 132:5

**in-basket**
42:15 47:6,14

**inadvertently**
134:20

**incarcerated**
51:24

**include** 36:4,7
102:5 103:16
105:16

**included** 36:9
56:1

**including**
24:12 138:11

**incomplete**
45:5 47:18
55:7,16 56:5,15
68:16 102:6
103:12 109:5
111:10 128:5
132:23

**inconsistent**
115:20

**incriminate**
88:1

**independent**
97:9,13,18,25
101:11 143:16
144:6

**individual**
52:14,25 60:5
132:17 133:6

**individuals**
49:3 137:7,14
138:2,19

**inform** 61:20

**informant**
52:8,10,13,19,
20,24 53:3,5,15

**informants**
51:18,21 52:7
53:11,19

**information**
18:12 23:11,15
25:8 32:17,22
33:4,7,11 41:20
43:17 44:16
45:4 53:7,24
54:5,10,14,18
56:3 61:25
62:21 63:5,6,7,
10,15,17 64:5,
15,21 69:18
102:4,18,25
105:9,14,16
106:19 111:7,
15 121:14
124:9 125:23,
25 128:3,10,19
132:22 145:20
147:3,10

**informing**
64:11

**initial** 12:12

**injured** 30:13

**innocent**
138:21 139:5

**input** 140:12

**inquire** 18:25

**inquiries**
25:11,14 63:17
64:4,22 75:13

**inquiring** 19:5

**instance** 66:5

**instances**
30:17

**institute** 132:1
133:3

**intelligence**
13:6 18:4,6,9

**intended**
118:18

**interact** 60:15,
21

**interacting**
61:6

**interested**
86:20

**interference**
21:7

**intermingled**
118:11,14
119:19,22

**interrogating**
28:25

**interrogation**
85:7

**interrogations**
28:14

**interrupt** 70:1

**interview** 28:9

**interviewing**
22:12

**interviews**
102:12

**inventory** 56:8

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 272 of 550 PageID #:14312
The Deposition of ROBERT BIEBEL, taken on October 23, 2020

159

103:20

**investigate**
28:6 36:13
140:7 144:14

**investigated**
139:22

**investigating**
28:3 29:23 64:1
67:20 82:16

**investigation**
29:8,16 32:18
47:8,23 51:25
56:21 66:11
67:22 74:22
75:2,3 96:23,25
97:4,14,20,23
103:5,14,16
112:10,12
132:1,17 133:3,
7 141:8,10,22
142:14 143:4,8,
17,20 144:13,
14 145:21

**investigations**
22:9 24:10,12
68:5 71:16
73:22,23 80:13,
17,21,24 81:2,
18 82:5 83:20
84:2

**investigative**
28:24 47:24
50:9,19,25 51:3
56:8,12,19,25
57:4 58:21
66:14,25 67:5,6
68:6,14 69:3
71:10,14 75:5,7
76:6,17 98:17
130:3,5,12,19
131:9,10 132:4

**investigator**
63:25 83:1
84:14

**invoked** 86:8,
23 87:24 143:6

**invokes**
140:16

**involve** 13:4
15:11 22:11

**involved** 18:8
28:2 32:12
46:12 58:10,13,
15 62:25 64:3,8
136:17

**involvement**
140:16

**involving**
19:23 61:19
62:6,8,13 63:14
142:25

**Isabella** 7:22,
24

**issue** 9:12,17
44:24 57:13
71:1

**issues** 10:2
53:1 135:19

**items** 68:10

___

**J**

**jailhouse**
51:18,21

**January** 134:4,
6

**JD** 55:11

**job** 12:1 17:25
35:15 39:11
67:15 76:21
88:7

**jobs** 30:4 38:3
80:20

**Joe** 59:9,13,22
61:25 62:18
63:11 65:2,16
66:7,10

**jog** 144:2
145:10

**John** 6:15
21:23 34:18
86:14 89:6
98:12 129:12
135:3 141:24
147:15

**join** 7:22

**joke** 92:20

**Jorge** 62:23
63:1

**Joseph** 59:4,7
60:16

**jumped** 133:16

**June** 100:25
105:11 107:12,
15 110:5
114:19,21
115:2,18,19
120:1 124:17
125:20 134:1

**justify** 41:12

___

**K**

**K-U-H-N**
120:24

**Katherine** 7:9

**Katie** 55:15

**keeping** 18:11
53:22 66:14

**key** 58:5

**killer** 141:9

**kind** 11:4,14
21:6 23:10,16
30:10,16 32:4,
21 33:2,21 40:3
61:25 62:20
63:21 85:19,25
95:1,25 102:3
111:16 129:23
134:13 139:21

**kinds** 37:18
78:16

**Kings** 61:18,20

**knew** 27:20
62:17 78:7

**knowing** 87:23

**knowledge**
74:2,14 84:13
110:18 115:14
124:10 129:5
141:3 142:15,
23 143:3,21
144:11

**knowledgeabl
e** 84:8

**Kuhn** 120:21,
22,25 125:14

**Kuhn's** 126:2
127:12

___

**L**

**La** 62:5

**lab** 121:21
122:23 125:6

**language**
90:22

**large** 100:1
101:17

**largely** 99:5

**lasted** 15:22

**Latin** 61:18,19

**Laurin** 6:3

**lawyer's** 91:22

**lawyers** 91:25

**layers** 123:10

**lead** 102:19
104:17 137:3
141:11

**leads** 30:5,19
104:10

**learn** 38:7
84:19,24 85:6,
14 87:3 95:19,
24 96:7,13
142:10

**learned** 38:5
55:3 56:11
65:25 86:13
112:4 137:24
145:8

**learning** 38:20
65:17 138:18
139:1

**leave** 13:22
14:9

**Leaving** 73:5

**Lee** 21:16

**left** 13:14 14:8
29:17 40:25
61:16 76:7,17
94:19,20
104:16 105:9
113:8,9

**legible** 100:4

**legitimately**
142:17,20

**leniency** 51:23

**letter** 92:21
133:2

**level** 109:21

**lieutenant**
12:2,9 14:22
15:1,4,5,6,25
16:8,11,16
17:7,8,13 20:25
21:18 22:1
33:16 39:1
40:11,15,16
79:25

**lieutenants**
16:5,6 33:9
40:18,19

**life** 82:4,7,23

**limit** 75:24

**limited** 88:16

**lines** 147:1

**lineup** 106:24
110:3,7,9,11,
18,19,23 111:1,
7,8,15,24 112:1
113:17,21,24
114:3,6,8,10,25
115:6,13,14,15,
17 118:9 122:1,
6,14 124:22
125:3,20

**lineups** 126:22
142:16

**list** 122:2

**listed** 102:18
104:10 116:16
117:2

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 273 of 550 PageID #:14313
The Deposition of ROBERT BIEBEL, taken on October 23, 2020
160

**Listen** 44:2 46:2

**lists** 53:18

**lived** 82:10 90:1,12

**local** 90:20,21 132:5

**located** 39:24

**location** 6:13 16:14 45:22 111:25

**lock** 58:5

**locked** 57:9 59:3 66:16,20 67:3

**locking** 57:14, 23 58:21

**log** 67:11,12

**long** 10:18 11:24 12:20 13:12,18 14:19 15:21 21:14 61:2 65:14 129:12

**longer** 80:10, 11

**looked** 42:4 97:7 127:6 133:10

**lot** 25:8 27:16 70:25 82:12 97:6

**lots** 146:7

**louder** 6:25

**loudly** 145:2

**lower** 112:9

_____

**M**

**made** 46:9 49:18 72:18 75:14 96:24 113:6 134:13 139:4 142:16

**mail** 122:9,10

**main** 40:3 71:10 137:3

**maintain** 130:18

**maintained** 53:18

**major** 69:7

**make** 18:24 25:7,9 27:15 29:12,14,22 30:5 34:21 35:3 37:25 41:23 42:7 44:13 46:6 51:12 55:24 56:1 63:16 64:3,22 71:22 72:1 73:21 74:8 80:3 98:7 101:7 106:24 112:16 116:3 123:11 130:5 131:7

**makes** 42:4 72:16 109:10

**making** 19:3 26:16 35:19 68:3 77:24 130:11 131:11

**management** 26:6 43:10 49:15,24 50:4

**manager** 49:19

**manipulated** 84:25

**manpower** 24:18 26:10 34:1

**marked** 98:11 107:2 113:20 120:7 126:10 133:10

**matchbook** 72:6,8

**matched** 41:23

**matter** 6:7 36:23 37:18 52:21 63:11 64:13 74:6 97:1

102:14 109:3 130:17,20 140:21

**matters** 22:21 87:4

**Mcgrath** 7:12, 20 55:14,18 99:17 147:13

**ME's** 30:15

**meaning** 40:21 52:10 96:4

**meaningless** 125:4,7

**means** 30:1 41:14 46:18 112:21

**meant** 53:3 69:6

**media** 25:4,10, 11,14 52:17 65:20 87:17

**medical** 10:2

**medications** 10:2

**meet** 10:10,22

**meeting** 32:6 33:9 56:2 58:3, 10,13,16 59:2 91:21

**meetings** 10:19 31:17,24 32:5,20 96:17, 18 97:7

**Megan** 7:12 147:12

**mem** 23:18

**member** 82:8,9

**memorial** 92:2

**memories** 61:11 97:13 143:16 144:6 145:17

**memory** 10:3 97:18,25 101:11,14 142:1,6 144:2

145:5,10

**mentioned** 23:19 48:15 89:24 95:1 133:19 135:24

**met** 10:7,13 11:17

**metal** 31:8

**mic** 17:1

**midnight** 121:16

**Miedzianouski** 59:4,7,9,14,22 60:16 61:25 62:18 65:2 66:7,10

**mind** 14:16 52:13 60:6 113:1 125:3

**mine** 20:15

**Mingey** 21:11, 12,15

**minute** 89:15

**minutes** 44:12 129:14

**mischaracterized** 30:3

**misconduct** 38:11,17,22 95:20 96:1 131:23 132:21

**misrepresenting** 128:13

**missed** 111:14

**missing** 70:12 102:18,22 113:3

**misstates** 45:20 98:2 122:19 125:10

**mistake** 44:13, 14,23 45:13,15, 17,19 46:1 116:5 133:16 134:19

**mix-up** 118:17

**moment** 127:22

**Monica** 96:22 100:16 143:16

**monitor** 38:11, 17

**monitoring** 132:11

**month** 10:16, 17 15:23 31:11 32:3 91:22

**months** 13:19 118:6,7

**morning** 8:11 30:7,8 121:17 143:18

**mother-in-law** 92:5

**motive** 102:11

**move** 89:23 113:7,8

**movement** 112:25 113:5

**movements** 112:17,19

**movies** 52:11

**moving** 112:20

**multiple** 27:11 135:25

**murder** 61:19 64:9 141:5,13, 23

**Murray** 50:6

_____

**N**

**named** 136:7 138:12

**names** 104:1, 10 109:2,3,8 116:12 117:1 118:22 135:25

**napkins** 72:8

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page: 274 of 550 PageID #:14314
The Deposition of ROBERT DIEBEL, taken on October 29, 2020

161

narrative 41:11,22 46:7 114:9

narrower 27:1

naturally 25:2

nature 20:1 54:9 56:18

nearing 129:8

necessarily 102:21

needed 24:23 26:4

neighborhood 82:11

news 25:4,10 65:20 87:18

newspaper 87:18

newsworthy 25:6

night 122:11

non-cleared 101:22

North 12:24,25 13:13,22 17:19 19:9 59:11

Northern 6:10

note 101:7 110:25 111:25

noted 97:14 107:15 121:15

notes 56:21 67:5 68:4 71:9, 17,20,23 72:1, 7,19 73:21 74:4,8,9,11,18 114:21,25 130:2,12 131:8 146:10,11,17

notice 68:15

noticed 45:13 111:12 117:18 118:1 133:19, 23 134:8 136:24

notified 133:4

notify 64:7,20

November 14:21

number 6:11 72:16 75:20 100:20,21 101:17 103:20 105:10,11,15, 21 106:20 117:10,17 118:20 119:3 120:17,20 133:12,16,24, 25 138:17 139:2 140:8

number's 44:17

numbering 113:16

numbers 46:13,16 75:12 125:3,16

numerous 21:1 137:6,14 138:2

—————

**O**

Object 14:2 16:17,20 17:15 18:13 28:5 29:24 34:18 45:5,20 46:21 47:18 48:2 54:1,11,21,23 60:19 62:4 63:18 64:24 68:16 69:15 71:18 73:7 74:12,19 76:9 77:12 83:3 95:21 96:2,10 97:16 98:1 101:9 103:18 105:18 108:15 109:16 112:2 117:13 119:20 121:8 122:15 124:5,23 125:10 128:4

130:7,14 132:23 138:14 139:11 141:6 144:9 145:23

objection 16:19 54:22 55:7,10,13,16 56:5,15 67:24 68:7 70:2 71:11 75:25 76:8,23 77:3 78:2 81:21 82:2,17,21 83:2,21,22 84:3,4,10,15,21 85:2,3,8,9,16, 21,22 86:2,3,10 87:1 88:3,13,22 89:3 93:4,6 102:6,20 103:6, 12 109:5 111:2, 10,18 117:20 118:15 122:19 128:12,24 132:13,14 134:10 136:9, 18 137:9,16 138:23 140:3, 18 141:14,24 142:18 143:2, 11

objections 70:13 128:20 137:23 139:6

obligation 53:24 54:4,9 147:2

obligations 56:2

observation 134:13

observe 81:20 82:24

observed 102:17 132:15 133:15

observing 7:25

obtained 142:17

obtaining

83:19 84:1 128:17

occasion 50:18 53:13 92:8

occasionally 19:4 78:15,23

occasions 48:16

occur 72:3

occurred 24:20 27:17 69:13 87:15 110:4,19,23 111:1 115:15, 18

occurrence 102:11 111:21

occurring 65:11 125:20

October 6:5

offender 46:14,16

offenders 83:7 102:10

offense 96:8 109:20

offer 53:7

offering 51:23

office 24:4 30:15 36:3,17 37:6,7,14 40:2, 4,5,7,10,11,12 49:13 50:2 57:5 61:10 67:23 75:7,21 76:7 77:14,21 78:6 133:5 137:19

officer 12:7,16 19:8 36:24 59:18,19 62:10, 15 63:5 84:9 94:10 104:25 128:9 130:10

officers 14:4 15:7 17:10,14, 16 18:1,18,23

19:4 34:16,19 35:4 37:24 49:2,20 58:22 59:9 62:20 63:15 64:4,15, 20 73:9 74:22 75:4 83:11,16 89:2 91:4 104:1 131:22

officers' 36:20

offices 61:4

official 41:7 42:25 72:14,17

officially 69:24

okayed 109:8, 11

omitted 102:12

ongoing 47:23 56:21

open 31:4,11, 17 32:7,9,10,21 33:12 46:17 50:24 51:2 58:7

opened 32:13

operations 37:22

opinion 59:15, 17 82:1,14 83:18,25 84:12, 16 88:1 92:13, 15 94:6,8 95:11,13 109:7, 12 116:10 119:10 124:7 126:5 127:10 134:8 136:22 140:20 141:17, 19 143:9,13

opportunity 59:15 81:20,25 94:5 95:10

opposed 42:17 97:25

OPS 132:5

option 136:2

order 58:6 59:3 121:21 132:16

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 275 of 550 PageID #:14315
The Deposition of ROBERT DIEBEL, taken on October 25, 2020

162

**orders** 36:5,7, 14,15 146:22

**orient** 135:7

**original** 45:22, 23

**outgoing** 60:5

**overseeing** 34:2 77:10

**overtime** 69:23

**— P —**

**p.m.** 110:4,23 114:22 148:3

**package** 125:15

**pages** 44:20 105:17 118:14 119:18

**paper** 32:11 98:3 123:9 126:13 144:12 145:9,11,18

**papers** 97:1,3

**paperwork** 56:10,12 75:17

**parade** 82:10

**paragraph** 112:11,12

**paragraphs** 112:15

**parameters** 75:9

**part** 32:16 69:3 74:24,25 75:6 81:9 111:3 112:6 139:9

**partial** 42:17

**participants** 112:15 122:14

**participate** 28:16 144:13

**parties** 7:15 95:4

**partner's** 109:20

**partners** 109:19

**parts** 78:11

**party** 91:17,18

**pass** 63:12 64:16 69:24

**passed** 91:22 92:5

**passing** 90:16

**passings** 91:11

**past** 93:8 112:24

**patience** 71:4

**patrol** 12:6,11, 15 37:7

**pay** 35:18

**pen** 104:16,21 107:25 108:4, 10 124:3

**pendency** 67:21

**pending** 6:9 9:24

**penmanship** 135:13

**people** 25:1,2 26:11,12 27:25 43:10 49:15,19 51:5 52:14 58:9,12 60:6 62:18 82:13,15

**perfect** 8:2 147:24

**perform** 18:23

**performance** 39:11

**period** 20:21, 22 31:13 32:8 40:13 60:12,25 65:2,8 66:7,15, 24 67:19 69:13 75:8,21 80:12

102:16

**periodically** 37:10

**periphery** 140:11

**perjury** 85:15

**permanently** 67:8

**permission** 109:19 136:13

**permitted** 104:25

**person** 20:8,11 21:21 75:14 76:20 77:1 102:23 109:18 119:17 125:6 136:11,17 138:21 139:5

**personable** 60:5

**personal** 140:20 141:3 142:15,23 143:3

**personality** 59:20 60:3

**personally** 28:3

**personnel** 58:4

**perspective** 30:1 89:25 104:24

**pertaining** 51:18

**pertains** 20:20

**Phil** 58:9,12 59:7 66:6,9

**phone** 7:4 24:14 26:23 51:5 61:9,12,15 62:14,16 64:4 65:20 70:11,23

**photocopied** 116:8,19

**photocopy** 116:20

**photographs** 11:11

**photos** 122:1, 14,18

**phrase** 37:25 86:17

**physical** 24:3 35:22

**pick** 31:1 43:22 44:19 131:12

**picked** 142:13

**picking** 27:6

**picture** 86:4

**place** 43:2 52:3 53:10 89:13 94:21 110:8 111:8,16 115:1, 7 126:6 127:25

**placing** 50:8

**plain** 126:20

**Plaintiff** 6:16 7:25

**Plaintiff's** 6:14

**platform** 9:2

**platter** 17:3

**played** 78:19 139:4

**players** 78:19

**point** 14:6 15:9 16:1 43:6,7 54:3 85:25 91:24 94:18 100:22 102:1 131:24 134:23 138:20 140:24

**pointed** 141:8

**points** 129:25

**police** 11:6 12:2,5,7,12,16 15:16 33:25 34:16 35:5,8,23 36:4 37:22 51:22 53:9

56:20 59:15,18, 19 71:8 74:24 75:6 78:12 84:20 87:25 88:2,10 90:21 91:4 92:9,12, 13,25 94:6,10 96:15 103:11

**policeman** 92:16,17

**policies** 34:17 35:5,8,23 51:10,13,16,17, 23 52:5 53:10 55:25 56:17 71:21 74:16 105:2 127:25 128:22 136:6 146:8,10,13,16, 18,19 147:1,6

**policy** 35:12 52:2 53:12 55:6 56:13 68:25 71:7 72:22,24 73:2,6 74:6 76:4 109:4 128:6,15 129:1, 2 132:12 147:9

**pop** 100:2

**possession** 67:9

**possibility** 43:21 117:15 136:25

**Possibly** 80:10,11

**posts** 30:15

**potential** 38:11

**practice** 47:24 62:9,14

**precipitated** 57:22

**prefer** 72:9

**preferred** 72:2, 4

**preliminary** 64:5

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 276 of 550 PageID #:14316
The Deposition of OFC ROBERT BIEBEL, taken on October 29, 2020
163

**preparation** 96:21 97:12 100:11 107:5 114:13 120:5 136:17 142:3 146:23

**prepare** 10:5, 14,19,23,25 39:20 69:1,11 96:18 145:4,8

**prepared** 32:10 81:17 106:11,17,18 107:19 109:14, 18 119:9 123:3 126:24 136:25

**presence** 91:24

**present** 30:15 110:7 115:6

**pressure** 33:20

**pretty** 82:5

**previous** 64:9 70:3 105:23,25 106:1,5 116:7

**prior** 84:8

**prison** 138:22 139:5

**privilege** 137:17

**probable** 141:4,12 143:9

**problem** 129:12

**procedure** 85:1 110:3,20 115:1,18 122:14

**procedures** 28:12 43:24 142:24

**proceed** 29:9

**proceedings** 6:1 140:23

**process** 29:1 30:7 32:17

**processes** 26:3

**processing** 119:10 121:23 122:13,22 123:9 125:25 126:19 129:4 134:25 135:9 136:19

**processor** 106:13,18 116:1,3 119:9, 13 126:25

**processors** 45:10 106:15

**produced** 98:8 126:9

**professional** 60:23 90:3,16 91:12 92:19 109:12 124:7

**professionalis m** 94:13 95:16

**professionally** 94:18

**profile** 113:13

**progress** 41:19 47:23 72:1 73:15 125:2

**prohibit** 128:9

**prohibited** 52:3 128:16

**promoted** 12:7,9 15:24 57:21 100:23

**proper** 43:14, 23,25

**properly** 119:21

**property**

39:16 44:21 46:19 49:16 92:11 97:11 142:22 143:14 144:4 145:11, 14,15

**prosecute** 141:4,13

**provide** 32:22 125:23

**provided** 15:15 63:6

**providing** 33:4 34:11 78:1

**Puerto** 82:10 83:13,16

**pull** 44:20 47:25 51:6 98:19 99:10,15

**purpose** 33:3 64:7 122:7

**purposes** 99:13

**purview** 28:20

**put** 31:9 37:13, 14 39:22 42:14 43:8,19 49:12 50:24 56:8 67:11,16 68:2, 4,14,19 75:17 102:25 109:8 113:19 118:18, 25 125:14 130:2,12 131:8 133:2 134:20

**putting** 38:2 66:24 68:10

**— Q —**

**quality** 82:1 88:2,20 94:6

**question** 9:6,7, 10,12,13,15,24 17:2 21:5 27:2 34:25 47:11 50:11 55:19 62:11 63:22 68:20 69:6 70:3 75:1 83:23 84:18 85:23 86:14 88:10,19 90:4 105:4,8 128:14 135:15

137:8,21 138:20,25 139:3 142:22 143:19 144:17, 18 145:3 146:12 147:9

**questioned** 113:2

**questioning** 86:7,25 88:9 143:7

**questions** 87:25 129:23 140:15 143:14 144:1,5 145:15, 16,25 146:2,5, 6,8,9 147:11,14

**quick** 105:7 129:9

**quit** 79:15

**Quote** 106:3

**— R —**

**R-U-I-N** 14:18

**raise** 8:3

**range** 106:25

**rape** 24:12 26:22

**rapport** 59:20, 22,25 62:23

**reach** 55:4 56:4 62:16 64:19

**reaction** 65:24

**read** 18:14 41:5,8,22 42:5 46:20,22,23,24 47:3 52:22 93:7 111:20,21 144:15

**reading** 18:17 19:3 41:12 47:2 113:7

**real** 15:23 88:7 93:24

**realized** 45:14

**realm** 24:15

**reason** 9:21 13:25 51:3 64:9 118:25

**reasons** 81:15

**recall** 8:22 15:12,13,15,18, 21 16:3 20:5,13 21:2,9,20 25:15 30:17,21 32:15 34:7 36:9 37:21 38:20,23,24 42:6,10 49:1 50:4 51:17 52:6 53:9,13,23 54:2,3,7 57:15, 17,22,25 58:1, 3,9,12,15,20 60:8 61:14 62:19 64:25 66:5 71:25 74:3 75:23 79:21,24 80:3 81:1 83:9, 11,15 87:21 91:19 95:3 101:15 118:16 123:1,24 128:8 130:6,16 131:16 133:11 135:19 136:2 143:21 146:17, 19 147:6,8

**receive** 15:9 20:16 33:20 38:17 61:25 64:20

**received** 53:23 58:2 97:2

**receiving** 54:4 69:18

**recent** 8:20 64:2

**recognize** 100:10 107:4 108:13 114:1 124:3 126:17

**recollection** 51:16 96:22

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 277 of 550 PageID #:14317
The Deposition of CHIEF ROBERT BIEBEL, taken on October 23, 2020

164

**recollections**
97:9

**recommendati
on** 92:21

**record** 6:2 8:13
14:17 48:9,11,
12 89:16,17,18,
20 98:6 106:23
113:17 128:13
129:16,18,19
148:2

**recordings**
11:13

**records** 43:1,
13 53:18 56:9
141:25 142:1,3,
5,9

**refer** 35:13
103:20

**referring** 30:11
42:21 93:12
130:22

**refers** 113:3

**reflect** 101:3

**regrets** 88:20,
24 89:1

**regular** 119:14
123:21

**relate** 60:6

**relating** 53:10
58:16 97:4

**relay** 37:11

**relevant** 37:2

**reliable** 142:25

**remain** 86:9,24
140:17 143:6

**remember**
10:15 11:6
19:7,21,22
20:24 21:12,13,
22 23:4 26:20
28:7 29:4 31:25
32:19 37:20
38:9,19 39:2,4,
12 48:25 49:6
54:2 57:12
58:17 61:2,6,8,

10 62:2,23
65:4,5,11,13,
17,19,22,24
66:2 71:19,24
72:2,7 73:8,11,
17 75:8 77:8
78:20 79:6,7,
19,20 80:1
83:17 90:9
97:3,10 105:2
118:21 119:5
121:4,10
123:22 128:6
129:2 133:12
134:16 135:10
144:19,20,22,
23,24

**remind** 144:3

**remote** 9:2

**remotely** 6:16,
21 7:10,13

**remove** 41:5

**removed** 67:9
75:24

**repeat** 9:13
34:25 47:10
50:11 55:19
75:1 83:23
85:23 128:14
135:16 137:10
138:25 139:10

**repeatedly**
49:5

**repercussions**
139:21

**rephrase** 9:14
86:13 137:23

**report** 18:14
21:17 30:25
31:18 39:17
41:11,16,17,18,
19,23,25 42:4,
14,16,17,18,22
43:4,15,17
44:3,7,12,14,
19,22,24 45:2,
14,15,16,23,25
46:3,9 47:6,14,
16,23 48:1,16
50:24 67:10

68:14,18 69:9
74:9 84:20
98:7,10 99:20
101:4,12 102:3,
5,9,18,24
103:1,21,25
104:5,21
105:22,24
106:8,9,18,24
107:11,14,19
108:6 110:3,17,
22 111:6,7,9,
20,21 112:10
113:17,18,21,
24 114:2,6,8,
11,21 115:13,
17,18,25 116:1,
11,19,21,25
117:12,19,25
120:3,5 121:11,
24 122:8,9,10,
13 123:9 125:1,
3,9,18,25
126:8,19
127:11,16,21
128:1,10,16
129:6 132:16
133:2,9,11,14
134:9,24,25
135:9,10,24
136:1,8,10,15,
17,20

**report's**
107:15

**reported** 26:7

**reporter** 6:2,4,
22 7:14,21 8:2,
8 9:3 16:18
47:9,10 48:9,12
54:22 70:2,4,6
89:14,16,20
129:16,19
135:2,12,14
137:8,10 139:9,
14 147:17,20,
24

**reports** 11:6
13:9,10 18:17
19:3 21:22
22:12 24:7
39:14,20 40:25
41:4 42:3,6
46:5,7,11,20,22
47:2,5,7,13,16,

25 49:4,9 50:8,
25 52:23,24
56:20 67:5,15
68:4 69:2,12
71:9 72:1 73:16
80:13 81:8,17
87:17 92:9,12
93:3,7 97:24
101:6,8,18
102:16 103:3,9,
10 105:17
107:5 108:13
109:14,17,21,
23 110:17,25
111:17 112:8
114:12 115:13
122:12 129:4
130:3,12 131:8
134:16 140:13
141:11 142:12
144:15

**represented**
56:13

**representing**
7:24

**reprimand**
39:9

**reprisal** 53:6

**requested**
14:13

**require** 46:20

**required** 37:11
69:11 71:25
72:19 74:17
105:16,20
111:24 112:15

**reserve** 147:22

**resolve** 71:1

**respect** 88:19
108:21

**respond** 25:13
33:14 76:21

**responded**
77:11

**responding**
25:11 77:25

**response**
26:14 86:7,24

88:9 143:7

**responses**
78:1

**responsibilitie
s** 13:1 15:3
17:6,23 18:2,19
19:6 22:6,8
24:9 25:10
29:12,21 33:13,
23 34:15 35:2
38:10 39:13
50:12 55:24
63:24 81:10
131:20,21
132:21

**responsibility**
26:4 29:15
33:25 34:3
38:15 50:15
54:17,20 55:1
56:7 67:1,4,11
68:9,10 77:16,
17,18,20 78:4
88:15 130:4,18

**responsible**
13:9 18:11 22:2
25:18 30:22
34:11 50:8
66:24 68:3
74:23 75:4
77:10,24 81:3
90:5 130:11
131:17

**rest** 125:8

**restate** 6:24
139:17

**restroom** 9:22

**result** 20:13
58:22

**retired** 11:22,
24 12:1

**retirement**
95:3

**retrieve** 43:10,
16 47:24

**retrieved**
43:20

**returning**
67:22

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 278 of 550 PageID #:14318
The Deposition of ROBERT BIEBEL, taken on October 23, 2019

165

**retype** 116:9

**reveal** 53:15

**review** 10:25
11:2,8,11,13
24:23 25:1
28:17,20 29:19
31:1,11,17
32:16,25 40:24
47:6,14,20,25
50:25 51:2,7
52:23 73:15
92:8 97:7,24
114:5 129:9
141:7,11 142:2,
9,12 145:11
146:21

**reviewed**
13:11 32:14
36:20 37:10
42:3,15 43:5
46:5,11 47:13
98:3 100:10
101:17 103:4
107:5 110:17
111:17 114:13
120:5 126:23

**reviewing**
13:6,9 18:3
21:22 22:12
24:7 30:23
39:17 41:3 42:6
46:19 47:5
48:16 81:17
92:11 97:10,11
101:12 102:15
103:9 108:12
110:24 111:6
117:19 118:1
134:9 141:25
143:15 144:4
145:7

**Rey** 19:8 78:8,
21 79:3,17
81:2,4,5,11,18
82:8,25 83:12,
13,19,25 88:6,
16,21,25 89:25
90:6 91:8 93:3,
8,15 138:5
139:20,23
140:1 143:5

**Reynaldo** 6:8

**RFC** 98:8 99:19
105:7 106:11,
25 109:25
113:17 114:1,
25 119:8 120:4
126:9 127:21

**RFC-
IGLESIAS**
103:25

**Rican** 82:10
83:13,16

**Riccio** 6:20 7:7
94:14,17,21,22
95:4,6,20
104:2,20
107:22 108:6,7
109:1,8 116:12
117:2

**Riccio's** 95:11

**rights** 87:24

**robbery** 24:12

**Robert** 6:7,19
8:14 147:20,25

**role** 28:1 35:7
50:17 77:23
130:2 131:7
132:8,11
138:21 139:4

**roll** 22:18,22
23:1,9,20,22
24:3,8 30:7
36:21,22 37:10,
16

**Roman** 96:2
97:20 98:4
100:16 141:9,
18,21 143:8,16
145:21

**room** 7:22
19:12 110:4
115:1

**routine** 62:3

**Royals** 60:11

**rules** 9:1 71:21

**rundown** 32:7

**running** 56:24

**S**

**safety** 53:1

**sat** 87:13

**scene** 30:14
91:4 121:23
122:13,25
123:8 124:25
125:1,2,25
126:19 129:3
134:25 135:8
136:19

**schedule**
69:18

**school** 112:5

**screen** 98:9,23
99:8,22 100:1
113:19,23

**scroll** 105:6
106:4,10
113:25 114:24
116:24 123:17

**scrolled**
109:25

**section** 56:9
112:10 122:18

**secured**
125:14

**seeking** 24:23
53:8

**seldom** 129:3

**self-
explanatory**
113:1

**send** 25:3 26:5
27:9 43:10 49:4
56:9 90:20 91:2
98:12 125:15
132:1 133:3

**sending** 91:5
138:21 139:4

**sense** 42:5,7
46:9

**sensitive**
70:23

**sentence**
112:14

**separate** 71:9

**sergeant** 12:8,
17,25 13:8,12
15:8 16:9,16
17:6,23 18:3,8,
19 19:6,9
21:11,15 22:6
28:8,11 34:2,8,
15 35:3,22
38:10,16 39:14
40:9,24 42:8,15
46:25 49:24
50:5,7,17
53:14,22 54:16
55:24 58:7
59:10 60:16
63:24 65:12
72:20,21 73:5,
14 77:1,9,19,23
78:6 80:8 92:9
94:1 95:18,23
96:6,12 101:7,
17 102:16
120:21,22,25
125:13 126:2
127:2,11 131:1,
11,12,16,20
132:22

**sergeant's**
39:25 40:2,25
49:13 50:2 57:5
67:23 76:7

**sergeants**
15:19 16:10
17:9 21:1,2,10
22:2 66:22
130:10 131:4,7

**served** 97:1

**service** 92:3

**set** 44:15
102:8,14 103:1
111:4,24
123:20

**setting** 86:22

**share** 23:11
98:9 99:8,21
100:4

**shared** 40:5

**She'll** 7:25

**shift** 23:2,4
95:6 115:9
121:6

**shifts** 81:12

**shock** 66:1

**shooting**
24:13 62:6 64:9

**short** 39:8
88:18 99:22

**show** 98:5,9
106:22 109:24
113:15 125:17
126:7

**showed**
134:24

**shown** 46:14

**side** 113:14

**sign** 41:6,7
44:11 47:1
72:23 73:10
81:8 92:23
102:22 104:21
105:1,4 109:15
136:2,7 140:12

**signature**
43:16 73:12
100:18 104:12,
13,17 105:3
107:9,24
108:14,17,20,
22,23,25
114:15 120:10,
11,14 121:3
124:3,4,8 126:3
127:5,9,10,12
128:17 135:11,
20,21 136:15
147:23

**signatures**
104:16 107:25
108:5

**signed** 43:8,9
46:22 47:4 73:2
101:3,8,22
105:5 108:7
109:2,9,18,19
114:18 116:11
117:24 121:20

123:25 124:10 136:10,23,24 142:12 144:12, 15

**significance** 125:24

**significant** 69:3

**signing** 101:12

**silent** 86:9,24 140:17 143:6

**similar** 63:16 64:22 126:23

**similarly** 14:11 15:24 108:21

**Simon** 60:11

**single** 123:24

**sir** 17:15 30:1 54:11 62:11 63:20 68:8 71:12 83:23 101:9 124:12 134:11 136:21 147:21

**sit** 39:9 54:8 86:6 140:15 141:20

**sits** 43:20

**sitting** 17:3 134:12 144:1

**situation** 27:10

**skilled** 83:19

**skills** 26:18 27:6 94:12

**slacking** 35:19

**slightly** 55:23 70:9

**slip** 122:10

**small** 133:25

**smoothly** 9:1

**so-and-so** 63:12 64:10

**social** 82:4,7, 23 95:1

**socialize** 78:15 79:3,17 94:25

**socialized** 78:17,21

**softball** 78:18, 21 79:4,5,6,17

**sole** 130:18

**solemnly** 8:4

**solved** 29:13, 14 31:3

**somebody's** 30:13 131:24

**something's** 102:22

**sort** 27:19 39:4 63:23 72:16

**sound** 70:25

**sounded** 21:6 30:4

**sounds** 64:1 129:15

**Spanish** 83:4, 7,10,11 90:2, 11,18 91:3

**Spanish-speaking** 91:1

**speak** 9:4 22:23 41:24 44:9 90:2,11,21 145:2

**speaker** 90:18

**speaking** 34:14 55:23 79:24 83:7

**special** 36:7,15 98:15 146:22

**specialist** 18:6,15 60:9 61:2,4,18 63:3

**specialists** 13:2,4 26:23

**specialize** 63:2

**specialized** 62:10,15

**specialty** 64:8

**specific** 22:20 23:15 24:17 26:21,22 32:7 33:10 38:13 61:11,13 62:17 63:13 82:19 91:4

**specifically** 15:19 18:22 20:19,21 29:4 35:11,12 52:21 65:10 73:17 87:21 110:22 111:20 130:16 131:17 143:8, 23

**speculation** 88:14,23 89:4 119:20 132:24 134:10 136:18, 22

**spell** 8:12 21:24 120:22

**spelling** 14:16

**spent** 19:16

**spoke** 79:21 83:4,10 91:2,19

**spoken** 141:1

**stand** 112:16

**stands** 118:4

**star** 100:20,21 105:21 120:17, 20

**start** 9:8 23:2 58:21 63:17 132:17

**started** 57:15, 23 96:21 139:15 143:18 144:6 145:3

**starting** 6:13

**starts** 112:11

**state** 6:12 8:12

**States** 6:9

**statistics** 33:15

**stats** 32:24

**status** 22:13, 24 24:18 31:18 41:10,12,13,24 46:8 51:6

**stay** 12:18,20 67:8 75:20 89:13

**stayed** 21:14 75:7

**step** 40:1

**steps** 28:24 69:3

**Steven** 93:19 94:1,4

**stipulate** 7:15

**stood** 122:6

**stop** 79:14

**stopped** 79:11, 13,16

**store** 56:20

**stored** 57:5

**street** 13:16 15:7 17:9,10, 14,16 23:23,24 24:2 52:15 53:7 56:25 60:7

**strength** 60:3

**strengths** 59:19 82:25 92:17 94:10 95:15

**stretch** 89:15

**strictly** 26:24

**strike** 84:18

**stuck** 29:8 133:23 134:3

**stuff** 23:16 24:19 33:2 102:12 106:3 131:13 145:18

**subject** 36:23 37:18 53:5 54:4 133:8 141:9

**submit** 30:25 43:15 45:16 72:19,23 103:1, 23 128:1 133:2

**submitted** 18:14,18 39:17 44:18 45:3,14 46:2 47:14,17, 21 74:10 81:8 100:15 101:18 107:15 109:21 114:21 116:7 121:16

**submitting** 42:16 128:9,16

**subpoena** 54:15 78:1

**subpoenas** 54:14 67:14,17 75:13,15 76:21 77:11,25

**subsequent** 57:13

**successful** 82:5

**sued** 140:1

**suggested** 112:4

**suited** 26:19 27:13

**summaries** 32:10

**summarize** 74:8 103:4

**summarizes** 103:14

**summary** 32:8 49:24 50:1 51:13 64:6 103:15

**superintendent's** 37:6

**superior** 14:4

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 280 of 550 PageID #:14320
The Deposition of CHIEF ROBERT BIEBEL, taken on October 28, 2021
167

supervise 18:20 22:8 80:13,21 93:19 94:1,14

supervised 13:2 15:7 24:11 30:18 33:25 34:12,16,23 35:4 38:2,21,25 49:3 59:10 60:13 80:17,19 88:11 91:6,8 95:25 96:8,14 132:20

supervising 13:3 17:9 18:23 22:2 24:9,19 37:24 80:8 81:3 94:4 130:10 131:20

supervision 39:5 51:11 56:1 59:13 81:5 88:21 89:2

supervisor 28:1 33:24 43:16 58:4 66:6 85:24 89:25 103:9 104:24 127:12 128:2, 17 132:1,7,10

supervisor's 120:10

supervisors 58:2

supervisory 16:15 77:15,18 81:10 88:15,24 131:7

supp 47:23 111:24 119:11

supplement 103:2 114:4

supplemental 44:14 103:1

supplementar y 44:22 45:25 74:9 102:5,24 105:17 109:22 111:7 116:7

supported 46:7

supposed 71:22 72:22,24 73:9 103:10 110:25 124:21

supposedly 71:13

surprising 98:18

suspect 28:25 38:7 104:10

suspects 83:20 84:1

suspended 41:16

suspending 41:17

sustained 133:5

swear 8:4

switching 89:6

sworn 49:19

system 31:4,6 42:23 75:12 121:25

———————

T

tac 33:9

tactics 85:7

taking 9:3 10:2 28:24 75:5 146:10,17

talk 23:10,17 24:25 32:12

talked 11:17 61:9,21 87:7 106:2 112:6 144:19 145:17, 22

talking 9:19 44:11 45:23 52:18 61:8,14 66:13 131:19 144:2

talking-to 39:10

tampered 66:10

tampering 58:23

tasks 16:15 18:22

team 78:18,22 79:4,5,17 93:2, 12,13,14,15,17, 18

team's 79:6

teams 26:21 27:9,11,19

technician 6:4 125:5

technology 9:12

telephone 26:4

television 52:11

tells 44:12 118:10 121:11 122:3

tenure 58:18

term 24:1 52:9, 12,16,18 53:3 57:3,17,19 112:22

terms 16:14 56:23 137:3

testified 39:3 46:6 49:8 51:9 66:23 74:21 130:4 146:13 147:4

testify 97:23 140:22

testifying 135:11

testimony 8:5 11:9 45:21 64:2,6 98:2 122:20 125:11

146:14,16

theft 24:13

there'll 99:6

thing 30:14 37:1 38:13 41:10 92:21 99:19,25 109:13 112:6 119:2 122:21 126:4 127:15 134:20 139:14 145:14

things 9:1 25:3 30:16 46:10 49:16 78:16 90:2 97:10 102:13 134:3 137:20 140:2 144:2 145:8

thinking 116:18

thought 142:22

till 12:7

time 6:5 8:20 9:5 10:13 14:11 17:19 18:25 19:19 20:19,22, 25 21:11,16,17 22:25 26:10,11 29:3,19 30:24 31:14,24 32:8 40:13 43:24 45:7 48:10,13 49:14 51:10 53:12 58:14 59:12 60:12,25 61:18,19,21 65:2 66:7 67:19 69:14 70:8 75:8,9,21,24 78:8 79:21 80:12 81:12,14 88:16 89:5,17, 21 90:15 91:19 98:19 99:15 100:25 101:1,3, 8 102:11 109:22 110:25 111:15,25 121:7,15 124:14 125:4,

25 126:3 127:17 128:3,7, 18 129:2,17,20, 22 133:6 135:16 145:25 146:18 147:7 148:1

times 8:18 10:10 23:21 27:16 37:3 45:8 61:24 62:1 78:20 88:25 101:16 111:21 125:4

today 6:4 7:2 10:6 11:18 52:22 54:8 86:6 100:11 114:13 120:6 129:22 130:1 134:17 141:20 143:15 144:1,5,7 145:15,16,22 146:7

Tony 94:14 95:4 107:22 108:7 109:8

top 104:15 105:8,14,16 106:19 117:4 122:3 123:11

topic 89:11

topics 89:6

total 19:16

tour's 69:22

track 18:11 31:2

training 15:9, 11,13,15,16,18, 21,25 16:3 34:12 36:12 38:17 53:23 54:4

transcripts 11:8

transferred 12:23 13:24 14:1,5,10,12

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 281 of 550 PageID #:14321
The Deposition of ROBERT BIEBEL, taken on October 24, 2019
168

transmitting 74:23 75:5

treated 47:7

trouble 6:22

true 80:22 82:20 98:19 145:6

truth 8:6

turn 39:21 51:6 53:24 54:5,9 56:3 113:8 147:2

turned 42:12 43:4

turning 147:10

type 50:25 59:2 93:3 95:20 100:13 102:3 122:7 132:3

typed 69:9,14 74:9 93:8 104:5,7,11,18 105:17

types 36:9,13 41:15 63:16

typewriter 106:8,12 119:13,15 123:3,6 126:24 127:1

typewriter-prepared 123:4

typewriters 45:9 106:16

typewritten 69:2 105:23 106:8 109:3 115:25 116:3,4, 8

typically 103:4

typing 92:18, 24

typist 93:2,11

## U

UCR 100:16

Uh-huh 100:3 108:11

unclear 48:17

uncovered 103:17 141:21

understand 9:10 19:11 29:25 39:19 62:12 63:19 69:5 80:18 97:6 119:25 142:20 144:16

understanding 33:3 43:24 52:23 53:2,4 54:9,13 55:6 68:1 71:7,13 73:1 76:16 77:13 95:8 102:3 103:8 111:23 124:21 127:24

understood 9:16 25:7,9 74:7 128:23

unfounded 20:15

unit 12:24 13:1 61:17 91:17

United 6:9

unlawful 85:7 131:25

unrelated 64:22

unreliable 143:1

unsolved 31:14 33:17

unusual 118:13

usual 47:24

## V

vague 56:6 68:17 77:12 78:2 84:15 85:22 86:3 88:3 89:3 98:1 111:11,18 140:3

verbal 20:7,9

version 127:21 135:8

versus 106:15 116:3

victim 102:10

victims 83:7

video 6:3 11:13

videoconference 6:6

view 113:13

viewing 110:4 112:16 115:1 126:6

violation 55:6 132:15

violations 132:12

violent 13:21 22:22 40:22 71:15 73:23 105:10

## W

wait 69:13

waiting 7:22

wanted 23:15 24:6 33:6 37:25 46:6 58:6 89:24 118:19

watch 19:1,2 23:6,7 24:18 26:10 81:4,6,7, 15,23,24 90:17, 19 92:7 93:22, 23 95:7,8

110:14 121:12, 14,18 140:9,10

watches 88:17 90:17 91:10

Wednesday 98:16 99:4

weekly 48:22

well-dressed 95:17

where'd 12:22 13:20

white-out 45:2,7,11,19

whomever 63:12 64:12 90:19

window 112:16

withhold 102:19

withholding 56:12

witnesses 28:9

wondering 9:17

Wood 13:16

word 45:10 96:4 106:13,15, 18 116:1,3 119:9,10,13 126:24

words 28:19 44:6 58:1 75:3 77:15 90:24 142:20

work 7:4 16:13, 15 18:24 19:4,5 27:4 35:14 38:2 40:9 52:17 59:15 61:3 77:10 78:13 81:20 82:1,15 85:20 86:1,7,25 87:5,25 88:2,10 91:13,15 92:13, 25 93:22 94:6, 17,23 95:11

96:15 112:23

worked 12:6 23:4,6 40:19 60:10 67:7 78:11 79:9 80:14,17,23 81:2,4,6,12 88:16 90:17 91:10 92:7 93:23,25 95:5 110:14 121:6 131:5 140:9,10

working 18:7, 21 19:2 20:24 21:11 22:20,23 24:2,17 26:1,12 57:1,3 60:24 62:17 65:1,12 66:17 70:14 78:5 79:11 81:18,23 85:13 91:2 95:8 121:11 132:5

works 70:17 89:10

would've 34:3 111:13 119:6 128:15 134:8, 13,17,18

Wow 144:8

wrap 129:10

wrap-up 129:23

write 32:8 45:3 123:10

writes 92:20

written 35:8 36:10,16 39:8, 14,20 68:18 69:1,12 100:18 108:10 115:12 117:4 146:10, 21

wrong 44:17 115:22 116:23 118:18 140:2

wrongdoing 139:20

**wrongful**
139:2

**wrongfully**
137:7 138:3

**wrongly**
137:15 138:19

**wrote** 68:13
73:9 92:9 108:6

_____

**X**

**X-250303**
105:12

**X0** 133:25
134:4

_____

**Y**

**year** 8:21 12:21
19:25 32:1
48:24 80:4

**years** 11:25
19:17 80:7
87:20 121:4

**yellow** 126:14

**yesterday**
52:22

**younger** 60:6

_____

**Z**

**Zoom** 6:17,21
9:2

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 34

1          IN RE:     PEOPLE VS. GERALDO IGLESIAS

2                   GJ NO -- 676

3                   93 CR 15199 01

4

5        BEFORE THE GRAND JURY OF COOK COUNTY

6                 JUNE 2022

7

8        REPORT OF GRAND JURY PROCEEDINGS on

9  June 25, 1993, at the Cook County Criminal Courts

10  Building, 2600 South California Avenue, Chicago,

11  Illinois 60608.

12

13  PRESENT:

14  MR. JACK O'MALLEY,
     State's Attorney of Cook County, Illinois, by:

15  MS. MARY ROBERTS,
     Appeared on behalf of the People

16  of the State of Illinois

17

18  WITNESS:   DETECTIVE REYNALDO GUEVARA

19

20  REPORTED BY:
     RENAY PATTERSON-SEBANC, CSR, RPR

21  OFFICIAL COURT REPORTER
     2650 CALIFORNIA, ROOM C402

22  CHICAGO, ILLINOIS 60608
     ILLINOIS CSR LICENSE NO. 084-004206

23

24

—1—

JGS_Iglesias 00174

1    THE FOREPERSON:  Would you raise your right hand,

2  please?

3                         (Witness duly sworn.)

4    MS. ROBERTS:  I'm Assistant State's Attorney Mary

5  Roberts, Homicide Sex Unit.  We're seeking a True Bill

6  of Indictment against Geraldo Iglesias for the offense

7  of first degree murder, committed against Monica Roman,

8  on or about June 7, 1993, at 2148 North Sawyer,

9  Chicago, Cook County, Illinois.

10       The Grand Jury has the right to question any

11  person against whom the State's Attorney is seeking a

12  Bill of Indictment, or any other person, and to obtain

13  and examine any documents or transcripts real rant to

14  the matter being prosecuted by the State's Attorney.

15       The State would call Detective Guevara.

16            DETECTIVE REYNALDO GUEVARA,

17  called as a witness, having been first duly sworn, was

18  examined and testified as follows:

19                       EXAMINATION

20                    BY MS. ROBERTS:

21    Q.   Please state your name and spell your last

22  name.

23    A.   Detective Reynaldo Guevara, G-u-e-v-a-r-a, my

24  Star Number 20861.  I'm assigned to Chicago Police

—2—

JGS_Iglesias 00175

```
 1    Department, Area Five, Violent Crimes Unit.

 2         Q.   And were you assigned --

 3              Have you been sworn?

 4         A.   Yes, I have.

 5         Q.   Were you assigned to investigate the first

 6    degree murder committed by Geraldo Iglesias against

 7    Monica Roman on or about 7.19.1993?

 8         A.   Yes, I was.

 9         Q.   And did your investigation show that Monica

10    Roman was alive prior to June 7, 1993?

11         A.   Yes, it did.

12         Q.   Did your investigation into Monica Roman was

13    in the area of 2148 North Sawyer at 4:00 p.m. on

14    June 7, 1993?

15         A.   It did.

16         Q.   Did your investigation show that the defendant

17    Geraldo Iglesias was present at that time?

18         A.   Yes, it did.

19         Q.   Did your investigation show that the defendant

20    was armed with a handgun?

21         A.   Yes, it did.

22         Q.   Did your investigation show that the victim

23    was unarmed?

24         A.   Yes, that's correct.
```

— 3 —

JGS_Iglesias 00176

1    Q.    Did your investigation show that the defendant

2    fired five shots at the automobile the victim was a

3    passenger in?

4    A.    That's correct.

5    Q.    Did your investigation show that the defendant

6    shot the victim in the head?

7    A.    Yes, it did.

8    Q.    Did your investigation show that Dr. Choi (ph)

9    of the Medical Examiner's Office did an autopsy of the

10   victim, Monica Roman?

11   A.    Yes.

12   Q.    What did Dr. Choi's autopsy reveal as the

13   cause of death?

14   A.    Victim died as a result of one gunshot wound

15   to the head.

16   Q.    And did your investigation show that the

17   victim died on June 8, 1993?

18   A.    Yes, it did.

19   Q.    Did you learn these facts from your interviews

20   with witnesses?

21   A.    That's correct.

22   Q.    All these incidents happened in Chicago, Cook

23   County, Illinois?

24   A.    That's correct.

—4—

JGS_Iglesias 00177

1          MS. ROBERTS:   I have no further questions.

2              Does the Grand Jury?

3       THE FOREPERSON:   No questions.

4              Please step down.   Thank you.

5                         (Witness excused.)

6                         (WHEREUPON, the Grand Jury was

7                         left alone to deliberate, after

8                         which the following proceedings

9                         were had:)

10    SERGEANT AT ARMS:   True Bill.

11                        (WHEREUPON, the above-entitled

12                        cause was continued for

13                        arraignment before the Presiding

14                        Judge of the Criminal Division.)

15

16

17

18

19

20

21

22

23

24

—5—

JGS_Iglesias 00178

```
 1   STATE OF ILLINOIS )
                       ) SS:
 2   COUNTY OF C O O K )

 3

 4            I, RENAY PATTERSON-SEBANC, Official Court

 5   Reporter in the State of Illinois, do hereby certify

 6   that that I note-read the stenotype notes of THOMAS

 7   MANNO, to the best of my ability, of the proceedings

 8   had at the aforementioned cause before the Grand Jury

 9   of Cook County, Illinois; that I thereafter caused the

10   foregoing to be transcribed into typewriting, which I

11   hereby certify to be a true and accurate transcript of

12   the proceedings had.

13

14

15   _____
     Renay Patterson Sebanc, CSR, RPR
16   Official Court Reporter
     License No. 084-004206
17

18

19

20   Dated this 20th day
     of June 2022
21

22

23

24
```

—6—

JGS_Iglesias 00179

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 35

```
STATE OF ILLINOIS )
              ) SS.
COUNTY OF COOK   )
```

The June, 1993 Grand Jury of the

Circuit Court of Cook County.

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about JUNE 7, 1993 at and within the County of Cook

GERALDO IGLESIAS

committed the offense of     FIRST DEGREE MURDER

in that    HE, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND

KNOWINGLY SHOT AND KILLED MONICA ROMAN

WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1-A(1) OF THE ILLINOIS REVISED

STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1606

IGLESIAS 000922

CCSAO-Serr-Mont_00019651

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about JUNE 7, 1993 at and within the County of Cook

GERALDO IGLESIAS

committed the offense of        FIRST DEGREE MURDER

in that     HE, WITHOUT LAWFUL JUSTIFICATION SHOT

AND KILLED MONICA ROMAN WITH A GUN

KNOWING THAT SUCH SHOOTING WITH A GUN

CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY

HARM TO MONICA ROMAN, IN VIOLATION

OF CHAPTER 38, SECTION 9-1-A(2) OF THE ILLINOIS

REVISED STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1607

IGLESIAS 000923

CCSAO-Serr-Mont_00019652

**TRUE BILL**

**PRESENTED GRAND JURY**

BY: _____

Assistant State's Attorney

DATE _6-25-93_ G.J.# _Jun 676_

IGLESIAS 000925

CCSAO-Serr-Mont_00019654

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 36

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3
    GERALDO IGLESIAS,              )
 4                                 )
              Plaintiff,           )
 5                                 )
         vs.                       )   No. 19 CV 6508
 6                                 )
    REYNALDO GUEVARA, ET AL.,      )
 7                                 )
              Defendants.          )
 8

 9

10          The VIDEOTAPED VIDEOCONFERENCE

11   deposition of JOHN DeLEON, taken under oath

12   on Wednesday, April 6, 2022, conducted via

13   Zoom Teleconference pursuant to the Federal

14   Rules of Civil Procedure, before Maribeth

15   Reilly, State of Illinois Notary Public, and

16   Certified Shorthand Reporter,

17   No. 084-002306, commencing at 10:00 a.m.

18

19

20

21

22

23

24
```

```
 1   APPEARANCES:   (REMOTELY)

 2

         LOEVY & LOEVY, by
 3       MS. RACHEL BRADY
         311 North Aberdeen Street
 4       3rd Floor
         Chicago, Illinois   60607
 5       (312) 243-5900
         brady@loevy.com
 6
              Appeared on behalf of the
 7            Plaintiff;

 8

 9       LEINENWEBER BARONI & DAFFADA, LLC, by
         MS. MEGAN McGRATH
10       120 North LaSalle Street
         Suite 2000
11       Chicago, Illinois   60602
         (866) 786-3705
12       mkm@ilesq.com

13            Appeared on behalf of Defendant
              Reynaldo Guevara;
14

15
         THE SOTOS LAW FIRM, P.C., by
16       MR. DAVID A. BRUEGGEN
         141 West Jackson Boulevard
17       Suite 1240A
         Chicago, Illinois   60604
18       (630) 735-3300
         dbrueggen@jsotoslaw.com
19
              Appeared on behalf of
20            the individual defendant police
              officers;
21

22

23

24
```

```
 1   APPEARANCES:  (REMOTELY)

 2        ROCK FUSCO & CONNELLY, LLC, by
          MR. AUSTIN G. RAHE
 3        333 West Wacker Drive
          19th Floor
 4        Chicago, Illinois  60606
          (312) 494-1000
 5        arahe@rfclaw.com

 6             Appeared on behalf of Defendant
               City of Chicago.
 7

 8

 9

10   ALSO PRESENT:

11        MS. RACHEL WELLING,
               Legal Videographer;
12

13        MS. MARIBETH REILLY,
               Certified Shorthand Reporter.
14

15             * * * * * * *

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X

 2  Witness:                              Page

 3       JOHN DeLEON

 4            Examination by:
             Mr. Brueggen              7
 5           Mr. Rahe                  170
             Ms. Brady                 178

 6

 7                 E X H I B I T S

 8  DeLEON DEPOSITION
                                   Screen-Shared/
 9  No.    Description              Referenced

10  1      Document Bates-stamped          35
           DeLeon SDT 0000128

11
    2      Document Bates-stamped
12         2143 and 2144                   42

13  3      Document Bates-stamped
           Iglesias 925                    48

14
    4      Document Bates-stamped
15         Iglesias 2138 through 2139      51

16  5      Document Bates-stamped
           Iglesias 303-4, 311-314         56

17
    6      Document Bates-stamped
18         RFC Iglesias pages 56 and 57    72

19  7      Document Bates-stamped
           RFC Iglesias pages 59 and 60    79

20
    8      Document Bates-stamped
21         RFC Iglesias pages 48 to 55     87

22  9      Document Bates-stamped
           RFC Iglesias pages 40 to 42     95

23
    10     Document Bates-stamped
24         RFC Iglesias pages 10 to 13     99
```

```
 1              E X H I B I T S

 2  DeLEON DEPOSITION
                              Screen-Shared/
 3  No.   Description              Referenced

 4
    11   Document Bates-stamped
 5       Iglesias 2297 through 2302        117

 6  12   Document Bates-stamped           119
         Iglesias 2303 through 2306
 7
    13   Document Bates-stamped
 8       Iglesias 2156 and 2157           121

 9  14   Document Bates-stamped
         Iglesias 2158                    123
10
    15   Document Bates-stamped           126
11       Iglesias 2159

12  16   Document Bates-stamped           130
         Iglesias 2150 to 2152
13
    17   Document Bates-stamped           132
14       Iglesias 2153 and 2154

15  18   Document Bates-stamped           134
         Iglesias 2330 to 2335
16
    19   Document Bates-stamped           137
17       Iglesias 2161 through 2162

18  20   Document Bates-stamped
         Iglesias 1145                    139
19
    21   Document Bates-stamped
20       Iglesias 897 through 899         144

21  22   Document Bates-stamped           157
         Iglesias 1440 to 1441
22

    23   Highlighted copy of a           199
23       document Bates-stamped
         RFC Iglesias pages 10 to 13
24       (Exhibit 10)
```

```
 1              THE VIDEOGRAPHER:  This is the
 2   beginning of Media Unit 1, and we are now on
 3   the video record at 10:00 a.m.
 4              This is the videotaped video
 5   conference discovery deposition of John
 6   DeLeon, being taken on April 6, 2022.  This
 7   deposition is being taken on behalf of the
 8   Defendant in the matter of Geraldo Iglesias
 9   versus Reynaldo Guevara, et al.
10              The case number is 19 CV 6508
11   filed in the United States District Court
12   for the Northern District of Illinois,
13   Eastern Division.
14              My name is Rachel Welling,
15   legal videographer, representing Urlaub,
16   Bowen & Associates, with offices at 20 North
17   Clark Street, Suite 600, Chicago, Illinois.
18   The court reporter today is Maribeth Reilly,
19   also of Urlaub, Bowen & Associates.
20              Counsel, please identify
21   yourselves for the video record and the
22   parties which you represent.
23              MS. BRADY:  Good morning.  This is
24   Rachel Brady.  I represent the plaintiff.
```

```
 1            MR. BRUEGGEN:  Good morning.  I am
 2   Dave Brueggen.  I represent Defendants
 3   Biebel, Gawrys, Riccio, and Halvorsen.
 4            MS. McGRATH:  Good morning.  My
 5   name is Megan McGrath, and I represent
 6   Defendant Guevara.
 7            MR. RAHE:  Good morning.  My name
 8   is Austin Rahe, R-a-h-e, and I represent
 9   Defendant City of Chicago.
10            THE VIDEOGRAPHER:  Will the court
11   reporter please swear in the witness.
12               (Witness duly sworn.)
13                  JOHN DeLEON,
14   called as a witness herein, was examined and
15   testified as follows:
16                  EXAMINATION
17   BY MR. BRUEGGEN:
18       Q.  Good morning, Mr. DeLeon.  Can you
19   please state your full name for the record.
20       A.  It's John Raymond DeLeon.
21       Q.  Mr. DeLeon, have you ever given a
22   deposition before?
23       A.  I don't recall giving one.
24       Q.  Have you ever taken a deposition
```

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 302 of 550 PageID #:14342

```
 1  before?
 2        A.   No, I don't recall taking one.   I
 3  am pretty much an in court trial lawyer.
 4        Q.   Fair enough.   Let me go over just
 5  some general rules.   Obviously, we are doing
 6  this via Zoom, so it's a little different.
 7  You can see me, so it will be easy.
 8  Hopefully, we won't talk over each other,
 9  but I would ask that you wait until I finish
10  a question before you pose an answer.   And
11  likewise, I will wait until you are done
12  with your answer before I pose a new
13  question.   Okay?
14        A.   Okay.
15        Q.   Also, if you could answer out loud
16  and orally just like at a trial with yes or
17  no, as opposed to uh-huh or uh-uh or nodding
18  or shaking your head.   Is that okay?
19        A.   Right.
20        Q.   I am going to be asking you some
21  questions today.   If at any time you need a
22  break, that's not a problem, just let us
23  know.   I'd just ask if there is a question
24  pending, you answer the question, and then
```

```
 1   we can take a break.  Okay?
 2        A.  Okay.
 3        Q.  And also, since this is via Zoom,
 4   if for any reason you don't hear my question
 5   or you don't understand my question, there
 6   is technical glitches or something of that
 7   nature, just let us know, and I can repeat
 8   the question or rephrase the question as
 9   necessary.  Okay?
10        A.  Okay.
11        Q.  Sir, is there anyone in the room
12   with you right now?
13        A.  No.
14        Q.  Do you have any documents related
15   to Mr. Iglesias with you?
16        A.  No.
17        Q.  And just because we are doing this
18   via Zoom, if at any time someone joins you
19   in the room or you pull out any documents,
20   if you could just let us know since we can't
21   see what you are doing necessarily, I would
22   appreciate that.  Okay?
23        A.  Okay.
24        Q.  And during the deposition, I will
```

```
 1   probably show you some exhibits.  I will put
 2   them up on the screen.  When they are up on
 3   the screen, you are in charge if you need me
 4   to zoom in, if you need me to move it, make
 5   it bigger, smaller, whatever, you tell me
 6   what I need to do, and I will do it because
 7   the goal is to make sure that you can review
 8   whatever you need to review to answer the
 9   questions.  Okay?
10       A.  Okay.
11       Q.  Prior to this deposition, have you
12   spoken to anybody about the substance of a
13   deposition or actually questions that might
14   be posed in the deposition, as opposed to
15   just scheduling?
16       A.  Not to the substance really.
17       Q.  Have you spoken to people, or was
18   it just scheduling the deposition and
19   availability?
20       A.  Scheduling, availability, yes.  I
21   spoke briefly to Rachel Brady about
22   scheduling, and more or less how the -- I
23   have never done a Zoom, like I told you.  So
24   I asked them questions about that, too.
```

1    Q.  Not a problem.  Did you talk about

2  any substance of the deposition, your

3  representation of Mr. Iglesias during that

4  discussion?

5    A.  Not that I can recall, no.  Other

6  than I was his lawyer, and I had a

7  co-counsel named Donna Makowski.  I think

8  that was -- that issue came up.

9    Q.  Sir, did you review any documents

10  prior to this deposition related to

11  Mr. Iglesias?

12    A.  No.

13    Q.  And have you seen any news or

14  media coverage about Mr. Iglesias's case

15  that you recall?

16    A.  A long time ago I saw something on

17  the news.  I think it was around the time

18  that he was being released, but I don't

19  remember the circumstances of it.

20    Q.  After you saw that, did you do any

21  research online and look into what had

22  happened with him?

23    A.  No.

24    Q.  When you saw that, did you recall

```
 1   that you had represented Mr. Iglesias back

 2   in 1993?

 3        A.  If I remember right -- and again,

 4   my memory is somewhat vague, Attorney

 5   Makowski contacted me and said something

 6   about -- reminded me that I represented him.

 7        Q.  When was the last time you

 8   reviewed any documents regarding

 9   Mr. Iglesias?

10        A.  It would have been around the time

11   of the trial, during the trial, and probably

12   shortly afterwards, the sentencing, during

13   the process of representing him.  I haven't

14   seen a document since then.

15        Q.  Okay.  And do you have any

16   recollection of your representation of

17   Mr. Iglesias as you sit here, any

18   independent recollection?

19        A.  Very little.

20        Q.  What do you remember, sir?

21        A.  I remember that I represented him.

22   I remember what he looked like at that time,

23   and I remembered after Donna Makowski

24   reminded me that she was co-counsel on the
```

```
 1   case.  I remember that; she was with me.
 2   But I don't remember the trial.  I don't
 3   know if it was a bench trial or a jury
 4   trial.
 5                  It was a long time ago, and
 6   unfortunately, 2008 I had a stroke, and it
 7   has harmed a lot of my memory prior to 2008.
 8   I have a good memory for anything after
 9   2008, but prior to 2008, there are things
10   that I don't remember very well.
11        Q.  And I appreciate that, sir.  Thank
12   you for telling us about that.
13                  Are there any other things
14   that impact your ability to testify
15   truthfully and accurately today to the best
16   of your ability?
17        A.  No.
18        Q.  Sir, do you recall any of the
19   details of the crime that Mr. Iglesias was
20   charged with, whether it was a murder,
21   attempted murder, agg. batt?
22        A.  I remember it was -- I remember it
23   was a murder case, and I believe it was a
24   shooting of some sort.
```

1      Q.  Do you recall if it was gang

2  related?

3      A.  I can only assume it was gang

4  related because at the time he was involved

5  with gangs, or he previously had been

6  involved with gangs.

7      Q.  All right, sir.  And shifting

8  gears, how old are you today?

9      A.  I'm 71.

10     Q.  Are you still practicing law?

11     A.  Yes, I am.

12     Q.  Are you practicing full-time or

13  just kind of an of counsel role?

14     A.  It's more part-time.  I take

15  cases.  I used to try a lot of cases every

16  year.  I'm probably doing 25 percent of what

17  I used to do when I was full-time.

18     Q.  And what types of cases are you

19  trying nowadays?

20     A.  Well, gun cases, misdemeanor

21  cases.  I try to stay away from murder

22  cases, although I am co-counsel on a few of

23  them.  My daughter is a defense attorney,

24  and I help her out.

```
 1        Q.  In what city do you currently
 2   reside?
 3        A.  I am in Valparaiso, Indiana.
 4        Q.  Do you practice in Indiana or just
 5   in Illinois?
 6        A.  Pretty much just in Illinois.  I
 7   have practiced in Indiana, but I haven't
 8   taken any cases in Indiana since I moved
 9   here.
10        Q.  Sir, what's the highest level of
11   education you have completed?
12        A.  Law school.
13        Q.  When did you complete law school?
14        A.  1977.
15        Q.  What law school did you attend?
16        A.  DePaul University.
17        Q.  After completing law school, did
18   you have any additional education in law,
19   like an LLM or anything of that nature?
20        A.  No.
21        Q.  CLE, stuff like that, but no
22   certificates or anything?
23        A.  Right.  CLEs, every year CLEs,
24   right.
```

```
 1        Q.  Where did you go to undergrad?

 2        A.  University of Illinois.

 3        Q.  Is that Chicago or Champaign?

 4        A.  Circle Campus they called it back

 5   then, Chicago.

 6        Q.  When did you graduate University

 7   of Illinois?

 8        A.  I think it was '74.

 9        Q.  Did you go right from undergrad to

10   law school?

11        A.  I think I did.  I know I took a

12   year off somewhere in there, but I can't

13   remember which year it was.

14        Q.  When were you licensed to practice

15   in Illinois?

16        A.  '78, I believe.  November of '78,

17   I think.

18        Q.  Have you been practicing -- strike

19   that.

20             Have you been practicing in

21   Illinois since 1978 through the present with

22   your current part-time practice?

23        A.  Yes.

24        Q.  Did you take any breaks or years
```

 1  off from practicing law at any time?

 2       A.  When I had a stroke in 2008, I was

 3  off pretty much for about a year for my

 4  recovery.

 5       Q.  Have you ever served in the

 6  military?

 7       A.  No.

 8       Q.  In your current practice, do you

 9  work for a firm?

10       A.  No.

11       Q.  You are a sole practitioner, sir?

12       A.  Sole practitioner.

13       Q.  How long have you been as a sole

14  practitioner?

15       A.  40-something years, forty -- I

16  don't know exactly how many, 43 or

17  something, 44 to today's date.

18       Q.  What was your first job after

19  being licensed in Illinois?

20       A.  I was hired by Sam Adam, and Ed

21  Genson right after I was sworn in.

22       Q.  Was that doing criminal defense?

23       A.  Right.

24       Q.  How long did you work for Sam Adam

```
 1   and Ed Genson?
 2       A.  I worked directly for them for, I
 3   would say, a good -- it's maybe six, eight
 4   years.  It's hard to say exactly because
 5   solo practitioners pick up young lawyers to
 6   work with them, and Sam Adam and Ed Genson
 7   weren't actually a firm.  They shared office
 8   space, so I would do work for both of them
 9   like on a case-by-case basis, and I had an
10   office in the suite.  I was not a partner in
11   the office, so to say.  So I was like a
12   subcontractor --
13       Q.  So you --
14       A.  -- for them.
15       Q.  -- you were basically an associate
16   underneath them kind of learning the
17   practice of law by doing stuff for them,
18   right?
19       A.  Right.
20       Q.  And at some point, did you then
21   leave working underneath them as like an
22   associate and start your own practice?
23       A.  Gradually, little by little over
24   the years, you end up doing that, yes.  I
```

 1 | was still in Sam Adam's office and Ed
 2 | Genson's office when the Iglesias case --
 3 | when I did the Iglesias case.
 4 |     Q.  When you say you were in their
 5 | office, were you -- basically you had office
 6 | space in their office, and you worked on --
 7 |     A.  Right.
 8 |     Q.  -- some cases with them, but you
 9 | also did some cases on your own?
10 |     A.  Right.
11 |     Q.  Was there any formal affiliation
12 | with Sam Adam or Mr. Genson at that time, or
13 | was it kind of a loose affiliation of
14 | sharing office space?
15 |     A.  It was a loose affiliation of
16 | sharing office space.
17 |     Q.  When you started going off on your
18 | own, how would you get your clients?
19 |     A.  They'd call me.
20 |     Q.  Did you advertise, or was it
21 | mostly referrals?
22 |     A.  Word-of-mouth referrals.
23 |     Q.  Have you ever had any partners in
24 | your practice, or have you always been a

```
 1  sole practitioner?
 2      A.  I've always been a sole
 3  practitioner.
 4      Q.  As a sole practitioner, did you
 5  ever have any associates underneath you?
 6      A.  Well, not associates underneath
 7  me, no.
 8      Q.  Did you have a similar type of
 9  relationship that you had with Mr. Adam and
10  Mr. Genson where you would have associates
11  who would do work on some of your cases but
12  were trying to also start their own
13  practice?
14      A.  Yes.
15      Q.  You mentioned earlier that Donna
16  Makowski worked on the Iglesias case with
17  you, right?
18      A.  Yes.
19      Q.  What was your relationship with
20  Donna Makowski back in 1993?
21      A.  She came into Sam Adam's office
22  and offered -- you know, when she was part
23  of the office, again sharing office space,
24  she would offer her services as a young
```

```
 1  lawyer to help another lawyer like myself.
 2  And so I know she did continuances for me,
 3  and she ended up trying the Iglesias case
 4  with me.
 5       Q.  Did you have any type of formal
 6  relationship with her, or would she just
 7  cover things for you?
 8       A.  It wasn't formal, right.
 9       Q.  How was she compensated for
10  working on the Iglesias case with you?
11       A.  I don't remember, but more than
12  likely, it was like, we usually -- if we
13  worked -- have a young lawyer work with us,
14  we'd pay them.  You know, out of the fees
15  that the family of Iglesias would have paid
16  us, she would get paid, too.
17       Q.  Was it like an hourly fee for the
18  young associates, or was it like just a
19  percentage of whatever the payment was?
20       A.  We never did hourly fee.  It would
21  be percentage of some sort.
22       Q.  Back in the early or mid-'90s, did
23  you ever have an hourly fee for your
24  clients, or would it be a flat fee depending
```

```
 1  on the case?
 2       A.  Flat fee depending on the case.
 3       Q.  How long did you and Ms. Makowski
 4  share office space with Mr. Adam and
 5  Mr. Genson?
 6       A.  I don't remember exactly how long
 7  it was.  It was a few years, but I don't
 8  remember how long.
 9       Q.  Do you recall when you left
10  sharing office space with Mr. Adam and
11  Mr. Genson and moved into your own office
12  somewhere?
13       A.  I don't remember the year.
14       Q.  But it was after you had handled
15  the Iglesias case?
16       A.  It was sometime after, yeah.  I
17  was still in the Monadnock Building.  Best
18  way I can explain it to you, we originally
19  were in 134 North LaSalle where Sam Adam's
20  and Ed Genson's offices were on the third
21  floor, and that's where I had an office for
22  many years.
23            And then when Genson decided
24  to move to the Monadnock Building, many of
```

1  the young lawyers followed him and shared

2  office space in his suit, which is what I

3  did.  And then, eventually, I took up office

4  space next to his suite in a separate suite,

5  but we still had a relationship pretty much

6  up until the time he passed away, which is

7  just about two years ago.

8          Q.  When you shared office space with

9  other attorneys, did you share support

10 staff?

11         A.  Yes, secretaries, and all that,

12 yes.

13         Q.  Secretaries or paralegals?

14         A.  Yes.

15         Q.  Who would manage your file?  Would

16 you keep your own file, or was that handled

17 by office staff?

18         A.  No.  I keep my own file.

19         Q.  In the early to mid-'90s, did you

20 focus on any particular area of criminal

21 law?

22         A.  Not really, just pretty much

23 whatever came in the door, drug cases,

24 murder cases, gun cases, whatever it was.

```
 1      Q.  Did you represent a lot of gang
 2  members?
 3      A.  Yes, I did.
 4      Q.  Was there any particular gang that
 5  you represented more gang members than
 6  others?
 7          MS. BRADY:  Objection.  Form.
 8              You can go ahead and answer.
 9  BY MR. BRUEGGEN:
10      Q.  From time to time, there may be
11  objections.  You will just go ahead and
12  answer since we don't have a judge to rule
13  on the objections.  Okay, sir?
14      A.  Right.  I represented just about
15  every street gang member of different gangs
16  in the City at one time or another.  They
17  seem to trust me a lot because I myself came
18  up through the City of Chicago streets.
19  While I was not a card carrying member of
20  any gang, I had associations as a youth with
21  many, many street gangs, friends that became
22  gang leaders, and they remained friends
23  after I became a lawyer, and they came to me
24  because they trusted me.
```

```
 1                  So I'm trying to remember.  I
 2    believe Iglesias was associated with the
 3    Cobras street gang, I think.  I'm not sure.
 4    And I had a lot of Cobra street gang
 5    members.
 6         Q.  No problem, sir, and we can get
 7    into the details later.  I am just
 8    generally -- so those friends that you had
 9    growing up who went the gang life way, were
10    those sources of referrals gang members to
11    you because they trusted you?
12         A.  Yes.
13              MS. BRADY:  Objection.
14    Foundation.
15                  Go ahead.
16    BY MR. BRUEGGEN:
17         Q.  Back in the mid to early '90s and
18    late '80s, did you represent both People and
19    Folk?
20         A.  I'm sure I did.  But just to let
21    you know, I don't know who -- what gang
22    member or what gang is Peoples and what gang
23    is Folks.  Because I tried to represent --
24    even though they were alleged gang members,
```

1   I tried to represent individuals, and I

2   would tell my clients that I do not want to

3   hear what section or factions they were with

4   because I don't care.  I'm just trying to

5   help one person at a time.  And I also tried

6   to speak to them to get out of the gang to

7   reform themselves.

8              Again, because I was born and

9   raised in the City, I knew the evils of

10  gangs.  I also knew the good stuff from

11  gangs, but I was trying to do the best I

12  could to go back to my community where I

13  came from, which was the Hispanic community,

14  and change things and try to get gang

15  members to stop shooting each other, stop

16  killing each other, and to stop fighting.

17      Q.  Sir, can you tell us what --

18      A.  I don't know who's Peoples and

19  who's Folks.

20      Q.  I appreciate the answer, sir.  Can

21  you tell us what area of the City you grew

22  up in?

23      A.  I grew up originally on Taylor

24  Street.  It was a Mexican community there in

1  Little Italy that I was a part of, and then

2  I moved to 26th Street, which became,

3  unfortunately, gang ridden also.  And I

4  would hang around in Pilsen and in the Latin

5  community on the Near West Side and West

6  Side.

7            I ended up going north

8  sometimes because I had a very good friend

9  who was the president of the Young Lords

10  street gang in the Puerto Rican neighborhood

11  and ended up representing him, Jose Cha Cha

12  Jimenez, who was famous in the '60s and

13  '70s.

14     Q.  Sir, you said the West Side.  Did

15  you hang out in the Humboldt Park area

16  growing up at all?

17     A.  I would go up there to visit

18  friends, gang members that were just friends

19  that were, unfortunately, gang members also.

20  But again, I kind of went all over the

21  place.

22            I was involved in different

23  programs to try and reach out to young gang

24  members.  And so as part of my volunteer

1  duties, I would go and talk to people in

2  Humboldt Park who were gang members.

3       Q.  Sir, those duties you just talked

4  about, about going out and talking to gang

5  members about reforming and getting out of

6  gangs, when did you do that?  Was that after

7  you were a licensed attorney or before?

8       A.  It started before.  I worked

9  for -- eventually, I got a paying job.  It

10  was volunteer basically with a group called

11  Latin American Youth Center.  In Spanish

12  they called it Centro, C-e-n-t-r-o, and they

13  had a gang intervention unit.  And because I

14  knew a lot of people from the streets, I

15  would volunteer to help out, and we would go

16  out to different areas of the City and talk

17  to the young people and young members of

18  gangs and try and keep them calm and try and

19  keep things quiet on the streets.  And,

20  eventually, I went to law school, and I

21  still kept the same contacts.

22              I later became the president

23  of the board of directors for the Latin

24  American Youth Center, and I served in that

```
 1  post for about 30 years, and we still had

 2  our gang intervention unit.  We partnered up

 3  with a Christian organization, and we did a

 4  lot of work in the streets for a Christian

 5  organization.  I can't remember the name of

 6  it right now.  It will pop in my head

 7  eventually.  I remember the pastor's name,

 8  Reverend Gordon McLean, and we did a lot of

 9  work in Humboldt Park with Gordon McLean.

10      Q.  Sir, if later on you remember the

11  name of the Christian organization, you can

12  just, you know, tell us at that time, okay?

13      A.  Okay.

14      Q.  Going back, I appreciate that you

15  didn't really talk to your clients about

16  what gangs or factions they were affiliated

17  with, but did you ever have any issues with

18  representing rival gang members at the same

19  time?

20          MS. BRADY:  Objection.  Form and

21  foundation.

22          THE WITNESS:  I didn't have any

23  problem with that.  I believe that most of

24  the young men I represent knew I was going
```

1  to do the best I could for them even if I

2  represented a rival also, so I didn't see it

3  as a conflict, and neither did they because

4  they kept coming to me.

5  BY MR. BRUEGGEN:

6      Q.  Sir, I'd like to talk about your

7  general practice back in the early to

8  mid-'90s.

9      A.  Sure.

10     Q.  When you were retained in a

11 homicide case, was it your practice to

12 subpoena the law enforcement agency that was

13 involved in investigating that case?

14     A.  We would normally send out

15 subpoenas to the Chicago Police Department

16 for street files, all police reports, you

17 know, the catchall subpoena, so we could get

18 original reports on the case right away.  Of

19 course, the State also once we filed an

20 appearance had to tender discovery to us so

21 we would be getting discovery through a

22 subpoena and by way of a motion for

23 discovery, police reports.

24     Q.  Let me take a quick step back.  In

1  your practice, did you mostly practice in

2  Cook County?

3       A.  Mostly in Cook County, yes.

4       Q.  How early -- strike that.

5            After you were retained in a

6  murder case, how soon after being retained

7  would you be issuing subpoenas to the

8  various law enforcement agencies that were

9  involved in the investigation?

10           MS. BRADY:  Objection.  Form.

11           MR. BRUEGGEN:  You can go ahead

12  and answer.

13           THE WITNESS:  We would do it as

14  fast as possible.

15  BY MR. BRUEGGEN:

16      Q.  Why would you want -- sorry, go

17  ahead.

18      A.  I didn't have a time limit.  I

19  would just do it as fast as I could.

20      Q.  Why would you want to do it as

21  fast as you could?

22      A.  Because I was interested in

23  getting to know what the police report said

24  about this case as fast as possible for the

1   client's sake, my sake, too.  I wanted to

2   know what I'm getting into, you know.

3        Q.  Sir, when you were retained in

4   murder cases, was it your practice to

5   interview the various witnesses who were

6   involved in the investigation?

7        A.  We would do it if there wasn't

8   enough funds for a private investigator.  If

9   there was enough funds for a private

10  investigator, then we'd ask the investigator

11  to go do it.

12       Q.  Sir, I don't think I understood

13  your answer.  You said if there weren't

14  enough funds to hire an investigator, then

15  you would ask the investigator to go do it?

16  Am I misunderstanding?

17       A.  No.  If there weren't enough

18  funds, we'd do it.

19       Q.  Gotcha.

20       A.  The lawyers.  I would take another

21  lawyer with me, and we would look over it,

22  and we'd try and track down the witnesses

23  and talk to them.

24               And if there was enough funds

```
 1   for a private investigator, of course, we'd

 2   hire a private investigator to go interview

 3   the witness.

 4        Q.  How would you determine which

 5   witnesses to interview and which witnesses

 6   you didn't need to interview?

 7        A.  From the police reports.

 8        Q.  Would you also talk to your

 9   clients about the police reports and

10   witnesses to get additional information as

11   to which witnesses would need to be

12   interviewed versus which ones did not?

13        A.  Of course, yes.

14        Q.  When you'd represent clients who

15   were accused of murder, would you talk to

16   them about a potential alibi or other

17   defenses?

18        A.  Of course.

19        Q.  If your client provides you an

20   alibi witness or statements, was that

21   something you would then investigate?

22        A.  Of course.

23        Q.  Sir, now I'd like to move on to

24   talk about Mr. Iglesias, and I appreciate
```

1  you don't have a lot of independent

2  recollection, and I will try to refresh your

3  recollection with documents as necessary.

4  So if at any time you don't recall, just let

5  me know, okay?

6          A.  Okay.

7          Q.  I wanted to start by, do you

8  recall that we sent you a subpoena for a

9  copy of your file of Mr. Iglesias within the

10 last couple of years?

11         A.  I don't recall.

12         Q.  Do you know if you have a copy of

13 your file for Mr. Iglesias?

14         A.  I don't have a copy of a file.

15         Q.  So what I'd like to do is I'd like

16 to mark an exhibit right now.  It's going to

17 be the response I received to the subpoena,

18 and what will happen is it will go up on the

19 screen.  Okay?  So give me a second.  Let me

20 get it up on the screen.

21         A.  Okay.

22         Q.  Again, if you need me to zoom in,

23 just let me know.

24         A.  Okay.

```
 1                    (Whereupon, DeLeon Deposition

 2                     Exhibit No. 1 was

 3                     screen-shared/referenced.)

 4    BY MR. BRUEGGEN:

 5         Q.  Mr. DeLeon, do you see a document

 6    up on your screen?

 7         A.  Yes, I do.

 8              MR. BRUEGGEN:  And for the record,

 9    this is the subpoena response to the

10    subpoena to Mr. DeLeon.

11    BY MR. BRUEGGEN:

12         Q.  Sir, can you just take a minute to

13    review that response.

14         A.  Okay, I read it.

15         Q.  And, sir, having reviewed that

16    response, does that refresh your

17    recollection as to receiving a subpoena from

18    my office?

19         A.  Again, I don't have any

20    independent recollection of receiving it.  I

21    see I did, and I responded.

22         Q.  You see that you responded and you

23    made a diligent search but were unable to

24    find a copy of Mr. Iglesias's file; is that
```

 1  right?

 2       A.  Right.

 3       Q.  And you also note that you had a

 4  retention period following the termination

 5  or completion of any representation of 15

 6  years.  Am I understanding that correct?

 7            MS. BRADY:  Objection.

 8            THE WITNESS:  That's what it says.

 9            MS. BRADY:  Form.

10            MR. BRUEGGEN:  I'm sorry, sir.  I

11  didn't get your answer.

12            THE WITNESS:  That's what it says,

13  15 years.

14  BY MR. BRUEGGEN:

15       Q.  As you sit here today, do you know

16  if Mr. Iglesias's file if you had destroyed

17  it pursuant to your regular record retention

18  policy of 15 years, given that you

19  represented him back in '93 and '94?

20       A.  I can see that it was destroyed,

21  yeah.

22            MS. BRADY:  Dave, I am just going

23  to object to form.  I don't think it says

24  the record retention policy was 15 years.  I

 1  think he says he destroyed them over 15

 2  years ago.  I just want to clarify that.

 3            MR. BRUEGGEN:  Ah, okay.  I

 4  appreciate that, Rachel.

 5  BY MR. BRUEGGEN:

 6       Q.  Mr. DeLeon, do you have a formal

 7  record retention policy for your client

 8  files?

 9       A.  No.  Let me say this, my

10  recollection is I would normally keep files

11  for seven years, which was, I believe, the

12  time that -- the amount of time you are

13  supposed to keep a file for according to

14  Internal Revenue Service records.  And over

15  the years, I have kept files, more or less,

16  around that time.

17            And periodically, when my

18  storage facility was full -- or at one time

19  I even used my garage, my garage got

20  overfull, I would call one of those shredder

21  trucks, and we would shred the files.

22            I don't have an exact policy.

23  You know what I am saying?

24       Q.  No.  I appreciate that.  It sounds

```
 1  like you didn't have an exact policy, but

 2  you followed the guidelines from the IRS to

 3  make sure that you retained --

 4       A.  Right.

 5       Q.  Sir, as you sit here today, is

 6  there any way to know what was in your file

 7  for Mr. Iglesias?

 8       A.  Other than my normal custom, and

 9  it would have the police reports, my notes,

10  you know, the indictment, the normal

11  documents that are in files.

12       Q.  Sir, are you aware of any other

13  complete copies of the file that you had for

14  Mr. Iglesias that exist today?

15       A.  No.

16       Q.  Do you know if Ms. Makowski had a

17  file for Mr. Iglesias?

18            MS. BRADY:  Objection.

19  Foundation.

20            THE WITNESS:  You'd have to ask

21  her.  I don't know.

22  BY MR. BRUEGGEN:

23       Q.  When you worked with Ms. Makowski,

24  do you know if she kept separates files on
```

1  the same cases that you had files on?

2          MS. BRADY:  Objection.

3  Foundation.

4          THE WITNESS:  I don't think she

5  kept a separate file.  Because at the time,

6  she was in the same suite I was, and we

7  would work off the same file.

8              And again, my recollection was

9  she was with me during the trial, but I did

10 all the work.  Normally I try my own cases.

11 And it's possible, but I doubt very much,

12 that she cross-examined any witnesses.  She

13 was probably just note-taking.

14 BY MR. BRUEGGEN:

15     Q.  In Mr. Iglesias's case, do you

16 have any recollection of how you were

17 retained?

18     A.  Specific, no.

19     Q.  And Mr. Iglesias says that he

20 believed that you may have been contacted by

21 his sister or mother to be retained in the

22 case.  And my question is, was that common

23 that you would be contacted by family

24 members of a client?

```
 1      A.  Yes, yes.  Normally that was very

 2 common.

 3      Q.  Do you have any recollection of

 4 representing Mr. Iglesias in another

 5 criminal matter, possession of controlled

 6 substance prior to being retained in the

 7 murder case?

 8      A.  I don't have an independent

 9 recollection of that, but I probably

10 represented him.  I remember his -- him

11 pretty well as far as his face, and that he

12 was a nice young man that I thought would

13 benefit from me representing him.

14           Because again, I was always

15 trying to reform my clients.  I was a born

16 again Christian then.  I am now.  And part

17 of my practice is to try to talk to young

18 men about their future, not on the streets

19 of Chicago, their future in eternity.  You

20 understand what I am saying, I'm sure,

21 right?

22      Q.  Yes, sir, I appreciate that.

23      A.  So I would always develop a

24 relationship with them, so I think I
```

1  represented him maybe in more than one case

2  because most of my clients I represented

3  them on several things.  I just don't

4  remember the specifics of it, if it was a

5  drug case or what it was.

6      Q.  And I appreciate that, sir, and I

7  know it was a long time ago, so I appreciate

8  you telling me whatever you can remember.

9           Do you -- strike that.

10           At that time, would you have

11  been retained by Mr. Iglesias, and you would

12  have brought Ms. Makowski on board?

13      MS. BRADY:  Objection.  Form.

14      THE WITNESS:  I'm not sure because

15  I know that Mr. Iglesias also knew Donna

16  Makowski.  She might have even represented

17  him on something.  I don't know, but I know

18  she knew him also.

19           And I think she's -- it's

20  coming back to me a little bit that she had

21  a relationship, at least by phone or with

22  the sister of Iglesias, I think.  But again,

23  you'd have to ask her that.  I don't have

24  any specific recollection of it.  I just

```
 1  seem to think that she spoke to the sister.
 2  BY MR. BRUEGGEN:
 3      Q.  Sir, do you recall were there
 4  cases where Ms. Makowski took on a case and
 5  then would bring you in because of your
 6  experience at the time to help?
 7      A.  Yes, that would happen.
 8      Q.  Sir, I'd like to show you another
 9  document, see if this refreshes your
10  recollection.
11          MR. BRUEGGEN:  For the record,
12  this is Iglesias 2143 and Iglesias 2144.
13  Sir, I will share this right now.
14          MS. BRADY:  Are you marking this
15  as an exhibit, Dave?
16          MR. BRUEGGEN:  Yes.  This will be
17  2, I'm sorry.
18              (Whereupon, DeLeon Deposition
19               Exhibit No. 2 was
20               screen-shared/referenced.)
21  BY MR. BRUEGGEN:
22      Q.  Mr. DeLeon, do you see a document
23  up on your screen?
24      A.  Yes, I do.
```

 1        Q.   Are you able to read that, or do

 2   you need me to zoom in?

 3        A.   No, I can read it.

 4        Q.   And there is two pages here.  Here

 5   is the first page and let me show you the

 6   second page.

 7        A.   Okay.  I can read it.

 8        Q.   Can you identify what types of

 9   documents these are?

10        A.   These are appearance forms.

11        Q.   And this is a document that would

12   be filed to officially appear on behalf of a

13   criminal defendant?

14        A.   Yes.

15        Q.   And I will represent to you that

16   these were disclosed by Mr. Iglesias and

17   appear to be part of Mr. Iglesias's record

18   on appeal.  At the bottom it says C11 down

19   here?

20        A.   Right.

21        Q.   C12?

22        A.   Right.

23        Q.   So again, on these appearances,

24   there is no case number.  Do you see that,

1  sir?

2      A.  I see there is no case number.  I

3  am not sure --

4      Q.  Can you read the file stamp on

5  Ms. Makowski's?  Let me zoom in here.  And

6  it appears to me it says, June 24, 1993?

7      A.  I think you are right.  June 24,

8  1993.  It's kind of blurry, but that's what

9  it looks like.

10     Q.  Which would be consistent with the

11 return date up above, June 24, 1993?

12     A.  Right.

13     Q.  Sir, do you know if this was

14 Ms. Makowski's appearance for Mr. Iglesias's

15 murder case?

16         MS. BRADY:  Objection.

17 Foundation.

18         THE WITNESS:  I see where it says

19 room number, and it says bond court, so it

20 appears that she appeared for bond court.  I

21 can't identify for what case it is.

22 BY MR. BRUEGGEN:

23     Q.  Can you tell from the appearance

24 what date the bond court would have been?

1       A.  What what?  I'm sorry, I missed

2  that.

3       Q.  Can you tell from Ms. Makowski's

4  appearance what date the bond court would

5  have been?

6            MS. BRADY:  Objection.

7  Foundation.  Sorry.  Go ahead.

8  BY MR. BRUEGGEN:

9       Q.  The return date, does that

10  indicate anything?

11       A.  I believe that would indicate the

12  date she was there, June 24, '93.

13       Q.  Sir, going to the second page,

14  which is Iglesias 2144, do you see a

15  signature right above attorney?

16       A.  Right, that's my signature.

17       Q.  And below charge, you see it says

18  murder?

19       A.  Yes, I see that.

20       Q.  And at this time, I think you told

21  us you were in the Monadnock Building, which

22  would have been 53 West Jackson, right?

23       A.  Right, that's it.

24       Q.  And, unfortunately, your

1    appearance doesn't have a stamp on it, a

2    file stamp on it?

3        A.  Right.

4        Q.  Reviewing this, do you have any

5    recollection of when you appeared in

6    Mr. Iglesias's case?

7        A.  No, I don't, and there is no date

8    on it, which is not unusual.  When you are

9    filling out an appearance form, getting

10   ready to run in front of the judge,

11   sometimes you miss something.

12       Q.  Sir, I'd like to ask you just

13   something about criminal law.  After a

14   person is arrested for murder charges, what

15   would be the next step in the process that

16   the State would do?

17           MS. BRADY:  Objection.  Foundation

18   and form.

19           THE WITNESS:  They would do an

20   initial appearance for bond hearing.

21   BY MR. BRUEGGEN:

22       Q.  And after the initial appearance

23   for bond hearing, would there be grand jury

24   proceedings, or would they just proceed on

```
 1  the initial criminal complaint?
 2            MS. BRADY:  Objection.  Form.
 3  Foundation.
 4            THE WITNESS:  They are supposed to
 5  get a preliminary hearing date, but most
 6  murder cases -- in fact, I think all murder
 7  cases are indicted by grand juries.  They
 8  don't give you preliminary hearings on
 9  murder cases in Cook County.
10  BY MR. BRUEGGEN:
11      Q.  Do you recall when whether
12  Mr. Iglesias's case -- strike that.
13            Do you recall whether
14  Mr. Iglesias was indicted by a grand jury
15  for the murder that you represented him?
16      A.  I don't have any recollection of
17  saying it was a grand jury indictment, but I
18  would say he must have been indicted by the
19  grand jury.  Because again, they don't give
20  you preliminary hearings, so it must have
21  been an indictment.
22      Q.  Sir, having practiced criminal law
23  for a long time, are you familiar with the
24  documents from a grand jury in a grand jury
```

1  indictment?

2       A.  Sure.

3              (Whereupon, DeLeon Deposition

4               Exhibit No. 3 was

5               screen-shared/referenced.)

6  BY MR. BRUEGGEN:

7       Q.  Sir, I'd like to show you what we

8  will mark as -- sorry, sir.  Did you say

9  something?

10      A.  No.

11      Q.  Okay.  I'd like to show you what

12 we will mark as Exhibit 3.  And for the

13 record, this is Iglesias 925.

14             Sir, do you see a document up

15 on your screen?

16      A.  Yes.

17      Q.  And I will zoom in.  You can see

18 there is just -- it appears to be a stamp,

19 and I'll zoom into that so it's a little

20 easier to read.  Do you see that, sir?

21      A.  Yes, I do.

22      Q.  And do you know what this stamp

23 is?

24      A.  Well, it appears to be a

```
 1   verification that a true bill was presented
 2   by the grand jury on June 25, 1993.  It
 3   doesn't have a case number.  It has a grand
 4   jury number, June 676, and it doesn't have a
 5   name on this document.
 6        Q.  Does this have an Assistant
 7   State's Attorney's name?  You see that, it
 8   says Mary Roberts, I believe?
 9        A.  Mary Roberts, but it doesn't have
10   a defendant's name, right.
11        Q.  Do you know Mary Roberts?
12        A.  It doesn't ring a bell.
13        Q.  You did not know her as an
14   Assistant State's Attorney back in the '90s?
15        A.  I may have, but I don't remember.
16        Q.  Fair enough.  Does this document
17   that we have marked as Exhibit 3 indicate
18   that Mr. Iglesias's case was presented to
19   the grand jury on June 25th of 1993?
20             MS. BRADY:  Objection.
21   Foundation.
22             THE WITNESS:  I can only tell you
23   it says, True Bill Presented Grand Jury,
24   Mary Roberts, State's Attorney, and then it
```

```
 1   has a date June 25, '93, and the grand jury
 2   number 676, but it doesn't have
 3   Mr. Iglesias's name on it, so I can't tell
 4   you that this is the document of Iglesias.
 5   BY MR. BRUEGGEN:
 6        Q.  I understand you.  Can you tell us
 7   what --
 8        A.  Unless there is another page
 9   but --
10        Q.  Can you tell us whether this
11   indicates that some case was presented to
12   the grand jury?
13        A.  Right, some case.
14           MS. BRADY:  Objection.
15   Foundation.
16   BY MR. BRUEGGEN:
17        Q.  Sir, when you are representing a
18   criminal defendant -- again, this is a
19   general question.  Would you be aware when
20   their case is being presented to the grand
21   jury if you were representing them at that
22   time?
23        A.  No.  The State doesn't notify us,
24   and we are not allowed to be present.
```

```
 1              (Whereupon, DeLeon Deposition
 2               Exhibit No. 4 was
 3               screen-shared/referenced.)
 4  BY MR. BRUEGGEN:
 5      Q.  Sir, showing you what we will mark
 6  as Exhibit 4, which for the record is
 7  Iglesias 2138 through 2139.
 8              Sir, do you see a document up
 9  on your screen?
10      A.  Yes, I do.
11      Q.  Are you able to read that?
12      A.  Yes, I do.  I can.
13      Q.  And --
14      A.  It says, People versus Geraldo
15  Iglesias, Grand Jury No. 676.
16      Q.  Sir, have you ever seen a document
17  like this?  And I want to make sure you see
18  both pages.  So there is this first page
19  that has a file stamp over to the right, and
20  then the second page.
21      A.  Right.
22      Q.  Sir, can you identify what this
23  document is?
24      A.  It's the grand jury indictment of
```

```
 1  Geraldo Iglesias with a copy of the charge.
 2       Q.  And can you see the file stamp
 3  over in the corner?
 4       A.  Yes.
 5       Q.  Let me zoom in, so it's a little
 6  easier to read.  You can see it dated July
 7  8, 1993?
 8       A.  Yes.
 9       Q.  Would that indicate that
10  Mr. Iglesias would have been indicted, and
11  it would have been filed on July 8th of
12  1993?
13          MS. BRADY:  Objection.
14  Foundation.
15          THE WITNESS:  Yes.
16  BY MR. BRUEGGEN:
17       Q.  Sir, on this slip, it lists
18  witnesses.  Do you see that?
19       A.  Yes.
20       Q.  Does that list all the witnesses
21  who testified at the grand jury?
22          MS. BRADY:  Objection.
23  Foundation.
24          THE WITNESS:  It says Detective R.
```

 1  Guevara, witness.

 2  BY MR. BRUEGGEN:

 3       Q.  That was a poor question.

 4       A.  I assume that means he was the

 5  only witness that testified at the grand

 6  jury.

 7       Q.  Sir, having not been a State's

 8  Attorney, do you have any experience in

 9  dealing with the grand jury?

10          MS. BRADY:  Objection.  Form.

11          THE WITNESS:  I have been present

12  with clients who were pleading the Fifth

13  before the grand jury in Cook County several

14  times.  That's the only experience I have

15  dealing with the grand jury.

16  BY MR. BRUEGGEN:

17       Q.  So earlier you told us that

18  normally the criminal defense attorney

19  wouldn't be notified of a grand jury

20  proceedings but --

21       A.  Yes.

22       Q.  -- if a client you represented was

23  being subpoenaed for the grand jury, then

24  you could be a party to it?

```
 1        A.  Right.

 2        Q.  Okay.  Thank you for the

 3   clarification, sir.

 4             Having seen what we have

 5   marked as Exhibit 4, indicating the grand

 6   jury indictment was filed on July 8th of

 7   1993, does that refresh your recollection

 8   whether you were retained by Mr. Iglesias

 9   before or after he was indicted?

10        A.  It doesn't give me any specific

11   recollection, no.

12        Q.  Sir, back to you educating me on

13   criminal law.  After an indictment is filed,

14   what's the next step after that in the

15   criminal process?

16        A.  He'll be transferred to the chief

17   judge for arraignment.

18        Q.  What is an arraignment?

19        A.  Announcement of the charges and

20   defendant enters a plea normally of not

21   guilty at that time.

22        Q.  At the arraignment, is anything

23   done with bail?

24        A.  No.
```

1      Q.  Would bail have normally been set

2  prior to an indictment and arraignment?

3      A.  Yes, yes, it's done prior to the

4  preliminary hearing stage.

5      Q.  If you are retained by a client

6  after their indictment prior to the

7  arraignment, do you normally appear on

8  behalf of your client at the arraignment?

9      A.  Yes.

10         MS. BRADY:  I am going to object

11  to the foundation and form just as to the

12  time frame.

13  BY MR. BRUEGGEN:

14      Q.  Sir, let me ask, back in 1993 if

15  you were retained by a client prior to their

16  arraignment, would you then represent them

17  at the arraignment?

18      A.  Either I or somebody who I sent if

19  I couldn't be there for some reason.  But if

20  I was his lawyer, yes.

21      Q.  As you sit here today, do you have

22  any recollection of whether you were at

23  Mr. Iglesias's arraignment?

24      A.  No, I don't remember.

```
 1                  (Whereupon, DeLeon Deposition

 2                   Exhibit No. 5 was

 3                   screen-shared/referenced.)

 4   BY MR. BRUEGGEN:

 5       Q.  Sir, I am going to share another

 6   document with you.  And for the record, this

 7   is Iglesias page 303 through 314, and we

 8   will mark this as Exhibit 5.

 9                  And this is a report of

10   proceedings from August 23, 1993, in the

11   Iglesias case.  Let me share that with you,

12   and then I am going to give you an

13   opportunity to review it as much as you'd

14   like.  Okay, sir?

15       A.  Okay.

16       Q.  Sir, do you see a document up on

17   your screen?

18       A.  Yes.

19       Q.  Are you able to read that or do

20   you need me to zoom in?

21       A.  No.  I can read it.

22       Q.  Okay.  Do you see the first page

23   is the case of People of the State of

24   Illinois versus Geraldo Iglesias?
```

```
 1        A.  Right.

 2        Q.  And the case number 93 15199?

 3        A.  Yes.

 4        Q.  With the charge of murder?

 5        A.  Yes.

 6        Q.  And again, the date is August 23,

 7   1993.  Do you see that, sir?

 8        A.  Yes, I do.

 9        Q.  And under appearances, it says

10   Mr. John DeLeon appeared on behalf of the

11   defendant.  Do you see that, sir?

12        A.  Yes.

13        Q.  And Mr. John DeLeon is yourself,

14   right?

15        A.  Right.

16        Q.  Having reviewed or -- strike that.

17             Let me -- would you like to

18   read the transcript, sir, and then I can ask

19   you some questions about it?

20        A.  No.

21        Q.  Having reviewed the first page of

22   Exhibit 5, does that refresh your

23   recollection as to whether you were present

24   for Mr. Iglesias's arraignment?
```

```
 1         MS. BRADY:  Objection.
 2 Foundation.  The transcript is a
 3 continuance.
 4         THE WITNESS:  It doesn't jog my
 5 memory or refresh my recollection.  In other
 6 words, I can't remember that I was there.
 7 But the document says appeared on behalf.  I
 8 must have been there for the court reporter
 9 to put that in there.
10 BY MR. BRUEGGEN:
11     Q.  Okay, sir.  And what I will do now
12 is I will go to page 3 of Exhibit 5.  Do you
13 see that there is a court reported statement
14 of what occurred at Mr. Iglesias's
15 arraignment?
16     A.  Right.
17     Q.  And do you see there is -- go
18 ahead, sir.
19     A.  It appears I am speaking, as
20 recorded by the court reporter.  And I said,
21 "Mr. Iglesias is in custody.  He has a new
22 charge.  I see him up on Thursday according
23 to this for the original case he had on your
24 Honor's call."
```

```
 1              So that must be what I said.
 2    I don't, again, remember it, but it must be
 3    what I said.
 4         Q.  Fair enough, sir.  And I would
 5    ask, generally, prior to stepping up in
 6    representation of a client in arraignment,
 7    would you have met with your client to
 8    discuss the case?
 9              MS. BRADY:  Objection.
10    Foundation.
11              THE WITNESS:  By that time, I
12    would have normally visited him at the jail
13    if there had been time enough to do that, or
14    I would speak to him in the lockup before
15    the case was called.
16    BY MR. BRUEGGEN:
17         Q.  When you spoke to your clients,
18    what did you normally talk to them about
19    before the arraignment?
20              MS. BRADY:  Objection.
21    Foundation.  Form.
22              THE WITNESS:  I would just tell
23    them what was going to happen.
24
```

1  BY MR. BRUEGGEN:

2      Q.  Would you talk to them about

3  any -- I'm sorry, go ahead.

4      A.  And I would tell them you are

5  going to be arraigned in a few minutes, and

6  we are going to get a continuance.  I will

7  try and get the police reports and go visit

8  you would be the normal conversation for

9  arraignment day.  But I have no independent

10  recollection of this.

11      Q.  No, I understand, sir.  I am just

12  asking just generally how you handled

13  meeting with clients before arraignments.

14          Would you talk to them about

15  details of the case, or was it simply just

16  explaining the procedure of the arraignment?

17          MS. BRADY:  Objection.  Foundation

18  and form.

19          THE WITNESS:  Just to proceed

20  because we don't want to -- you want to talk

21  in private, and the lockup in the back is

22  not private.  Everybody can hear what you

23  say.

24

 1   BY MR. BRUEGGEN:

 2       Q.  And, sir, you read what is written

 3   on page 3 of Exhibit 5 that "Mr. Iglesias is

 4   in custody.  He has a new charge.  I see him

 5   up on Thursday according to this call for

 6   the original case."

 7               Do you see that, sir?

 8       A.  Yes.

 9       Q.  Does that refresh your

10   recollection of whether Mr. Iglesias had

11   another case that you were representing him

12   on?

13               MS. BRADY:  Objection.

14   Foundation.

15               THE WITNESS:  It does not refresh

16   my recollection, but from reading it, he

17   must have had a case on the call already

18   because that's what it says.

19   BY MR. BRUEGGEN:

20       Q.  And going down to line 9, it says,

21   attributed to Mr. DeLeon, "I am not sure

22   what the State wants to do.  I assume they

23   will elect.  The old case is up on Thursday,

24   a drug case."

```
 1                Do you see that, sir?

 2      A.  Yes.

 3      Q.  Can you tell us what it means to

 4  elect, for the State to elect?

 5      A.  Well, when there are two cases

 6  pending on the same defendant, the State has

 7  the right to chose which case they will

 8  proceed on to prosecute first.  And it's

 9  their choice.  The defense has no say-so in

10  it.

11                So they can choose -- for

12  example, if he had a prior case which was

13  pending on that judge's call, and then the

14  murder case came to the same judge, which

15  appears what happened, according to these

16  documents, the State would have to have time

17  to decide which case they were going to

18  prosecute first, and that's what is called

19  an election.  They elect or choose which

20  case they are going to proceed on first.

21      Q.  Sir, going back to Exhibit 5,

22  below where we just read, this is attributed

23  to you.  "This is Geraldo Iglesias.  John

24  DeLeon on his behalf.  Acknowledge receipt
```

1  of discovery tendered."

2           Do you see that, sir?

3      A.  Yes.

4      Q.  Can you tell us what that means?

5      A.  That would mean that the sheriff

6  just walked him into the courtroom, and I am

7  introducing him to the judge.  Because

8  again, there's no camera.  You have to put

9  everything on the record so that the court

10  reporter can type it down and everybody

11  knows what's going on who reads this

12  transcript.

13           So this is Geraldo Iglesias.

14  That's what you would normally say when the

15  person walks before the judge.  And then you

16  identify yourself that you are appearing on

17  his behalf.

18           By that time, it appears the

19  State must have handed me some documents in

20  discovery because I say acknowledge receipt

21  of discovery tendered, whatever they

22  tendered.  It's normally not complete

23  discovery at that moment in time.  They give

24  you what limited discovery they have, and

 1  that's what I am acknowledging.

 2       Q.  Sir, having reviewed that

 3  transcript, do you have any recollection of

 4  the volume of documents the State tendered

 5  to you at that time?

 6       A.  No.  That's why I'm saying, I

 7  don't know what they tendered, but whatever

 8  they handed me, I acknowledged receipt of.

 9       Q.  Sir, in your practice when the

10  State tendered discovery to you, would you

11  keep that separate from other documents in

12  your file, like a complete set of what the

13  State had given you at that point?

14       A.  Right, you put it -- well, you put

15  it in your folder and separate it from other

16  documents, yes, normally.

17       Q.  Why would you do that?

18       A.  Just so you know what you were

19  tendered on that day, in case an issue comes

20  up about discovery, and they say, oh, well,

21  we gave you that on the last court date.

22  Then you have a folder that shows you what

23  they gave you on that court date, and you

24  can say, no, you didn't.  This is all you

1  gave me, and you show it to them with the

2  date on the folder that says that's what was

3  given to you on that day.  They also

4  normally have a document with the discovery

5  listing what they gave you with a date on

6  it.

7       Q.  When you say a document, was that

8  like a form document that they would fill

9  out and list what they gave you, or was that

10 like a document they created?

11      A.  A form document.  It's a

12 preprinted document that will say State's

13 discovery, and then they -- at that time, in

14 handwriting, they would write down, copy of

15 Guevara police reports, copy of, you know,

16 whatever they gave you, you know.  They

17 would list them.

18      Q.  Do you have any recollection of

19 whether that occurred in Mr. Iglesias's

20 case?

21      A.  I have no recollection of even

22 being there.

23      Q.  Fair enough.  After the State

24 tendered the initial discovery, would you

```
 1  then review that discovery?
 2       A.  Sure.
 3       Q.  Would you review that with your
 4  client as well?
 5       A.  Eventually.
 6       Q.  At that time, would you then take
 7  it upon yourself or through an investigator
 8  to track down various witnesses?
 9       A.  Sure.
10       Q.  How would you determine which
11  witnesses to track down at that point after
12  getting initial discovery and talking to
13  your client about it?
14           MS. BRADY:  Objection.  Misstates
15  the testimony.
16  BY MR. BRUEGGEN:
17       Q.  Go ahead, sir.
18       A.  Normally, if the reports have
19  witnesses listed and what they said to the
20  police, you would put what they said.  If
21  what they said is a narration, then you
22  would want to speak to them to verify that
23  narration or ask questions about that
24  narration.
```

```
 1                  So you'd pick them by order
 2    of importance.  If you read the reports and
 3    there were three people listed that the
 4    police talked to, if one of them said, I was
 5    walking down the street, I heard a shot, but
 6    I didn't see anything, well, you can put
 7    that guy to the last because he's not going
 8    to be a witness more than likely.  He didn't
 9    see anything, you know.
10                  And if you come across one
11    that says, I was walking down the street, I
12    saw the whole thing, well, then you want to
13    send an investigator or go see that guy
14    right away, you know.  And again, you would
15    kind of order of appearance, order of
16    importance, you would try and interview
17    them.
18                  Eventually, you want to talk
19    to all the people that are listed because
20    just because somebody says, I didn't see
21    anything doesn't mean he didn't see
22    anything.  It could mean, I don't want to be
23    involved.  I don't want to say I saw
24    anything, so you still want to interview
```

 1  that person.

 2      Q.  I appreciate that, sir.  It sounds

 3  like you are telling us you would triage so

 4  you could talk to those people that appear

 5  to have the most relevant information first,

 6  but ultimately, you want to talk to

 7  everybody?

 8      A.  Right.

 9      Q.  Sir, I am going to go through a

10  bunch of documents now.  I just want to

11  check, do you want to take a break?  It

12  would be a good time for a quick break if

13  you want to just stand up and stretch,

14  otherwise I can just move on ahead, but we

15  will be going through more documents now.

16      A.  Okay, if you will give me just two

17  minutes.

18      Q.  Not a problem, sir.  We'll take a

19  break and come back in two minutes.  Give us

20  two minutes, the court reporter is going to

21  read us off the record.

22      A.  Okay.

23          THE VIDEOGRAPHER:  We are off the

24  video record at 11:07 a.m.

```
 1                  (Whereupon, a break was taken

 2                    at 11:07 a.m. to 11:11 a.m.)

 3            THE VIDEOGRAPHER:  We are back on

 4     the video record at 11:11 at the beginning

 5     of Media Unit 2.

 6     BY MR. BRUEGGEN:

 7         Q.  Mr. DeLeon, I want to ask you

 8     about your experience up until about 1993

 9     through 1995.  At that time, do you know how

10     many trials you had done?

11         A.  Murder cases or trials in general?

12         Q.  Well, let's start with whichever

13     one is easier for you to estimate a number.

14         A.  By that time, I probably tried 150

15     cases, probably 100 murder cases.  I tried

16     so many, I really can't remember, to be

17     honest with you.  I tried a lot with Sam

18     Adam.  I tried a lot with Ed Genson.  I

19     tried a lot of them alone.  I didn't really

20     keep track of them other than to tell you

21     that every year, it was somewhere between 20

22     and 25 trials; benches, juries.  I tried a

23     lot of cases by 1993 from 1977.

24         Q.  And were the majority of those
```

1    cases in Cook County regarding Chicago

2    Police Department investigations?

3         A.  The majority, yeah.  But I've

4    traveled all over the United States and

5    tried cases, actually.  I have been in 12

6    states doing mostly drug cases, but the

7    traveling comes into play.

8         Q.  Are you licensed in any other

9    states other than Illinois and Indiana?

10        A.  No, no, not licensed.  But as a

11   trial lawyer, all you need is a local

12   counsel, and you can try a case in any state

13   in the United States.

14        Q.  A pro hac vice?

15        A.  Right.

16        Q.  Do you do any work in federal

17   court?

18        A.  Limited, but yes.  I tried several

19   cases in federal court, not as much as state

20   court, of course.

21             I have kind of a policy, I try

22   to stay out of federal court if I can

23   because it's well-known that federal

24   government wins 95 percent of their juries.

```
 1   I like to win.  I don't like to get beat up
 2   every time I go to court, so I try to take
 3   cases in state court where I can still win,
 4   and I do have or did have a pretty good
 5   victory rate.  The last two years we haven't
 6   done much because of the pandemic, you know.
 7       Q.  Sir, so in about 1993 to '95, what
 8   was your victory rate at that point in your
 9   career up to that point?
10       A.  I am just going to give you a wild
11   estimate, about 75 percent on trials.
12       Q.  So it's fair to say that by '93,
13   you were a pretty successful criminal
14   defense trial attorney?
15       A.  Yes, I was.
16       Q.  Sir, also in 1993, were you pretty
17   familiar with the various documents created
18   by the Chicago Police Department?
19       A.  Yes, I was.
20           MS. BRADY:  Objection.  Vague.
21   Sorry, that was my fault.
22               Dave, can you finish your
23   question.
24
```

```
 1   BY MR. BRUEGGEN:

 2        Q.  Yes.  Let me just rephrase it.

 3             By 1993, were you familiar

 4   with the various documents that were created

 5   by the Chicago Police Department for

 6   criminal investigations?

 7             MS. BRADY:  Objection.

 8   Foundation.

 9             THE WITNESS:  Pretty much.  I've

10   seen every document that they use normally.

11                  (Whereupon, DeLeon Deposition

12                   Exhibit No. 6 was

13                   screen-shared/referenced.)

14   BY MR. BRUEGGEN:

15        Q.  Sir, I am going to show you a

16   document.  And for the record, this is RFC

17   Iglesias 56 and 57.  I'm going to put it up

18   on the screen and I'm going to give you a

19   second to look at it, and then I'll ask you

20   some questions, okay?

21        A.  Okay.

22        Q.  Sir, do you see a document up on

23   your screen?

24        A.  Yes.
```

 1        Q.  And are you able to read that, or
 2   do you need me to zoom in?
 3        A.  No.  I can see it.
 4        Q.  And this is the first page.  Let
 5   me know when you are done looking at the
 6   first page, and then I will show you the
 7   second page.
 8        A.  Okay, I have read it.
 9        Q.  And here is the second page of
10   that document.
11            MR. BRUEGGEN:  Rachel, for the
12   record, we will mark this as Exhibit 6.
13            MS. BRADY:  Thanks.
14   BY MR. BRUEGGEN:
15        Q.  Sir, having had a chance to review
16   Exhibit 6, which is RFC Iglesias pages 56
17   and 57, can you tell us generally what that
18   document is?
19        A.  It looks like an initial police
20   report and looks like it was written by
21   Officer Zuniga, down at the bottom, an
22   incident that happened June 7, 1993, and
23   describes a shooting.
24        Q.  Sir, if I called it a general

1  offense case report, does that refresh your

2  recollection as to what this document is

3  called?

4      A.  Sounds right, general offense case

5  report.

6      Q.  And do you know when this document

7  is normally created with an investigation?

8  Beginning, middle, end?

9      A.  Beginning.

10         MS. BRADY:  Objection.

11  Foundation.

12  BY MR. BRUEGGEN:

13      Q.  In your time practicing in Cook

14  County up until 1993, I'm sure you had seen

15  documents of this form many times?

16      A.  Many times.

17      Q.  And, sir, what information does

18  this document contain?

19      A.  Well, it just explains that there

20  was a shooting by an offender, who according

21  to this, walked out of a walkway or yelled

22  "King Love" and started shooting at people.

23      Q.  Sir, having reviewed Exhibit 6,

24  does that refresh your recollection as to

1  your defense representation of Mr. Iglesias?

2      A.  No, it doesn't.  This doesn't have

3  Mr. Iglesias's name on it anywhere, and

4  nothing on this document reminds me of the

5  Iglesias case.  In fact, it says here that

6  the person yelled "King Love."  As far as I

7  remember, Iglesias was a Cobra.  He was not

8  a Latin King.

9      Q.  And, Mr. DeLeon, I will represent

10  to you that this is the general offense case

11  report for the murder for which Mr. Iglesias

12  was convicted when you represented him,

13  okay?

14      A.  Okay.

15      Q.  In addition to information about

16  the crime, this document also lists

17  information about witnesses, right?

18      A.  Yes, it does.

19      Q.  And is this -- the information

20  about witnesses, would these be the

21  witnesses that you would then -- I use the

22  term "triage," but look at to determine who

23  you want to talk to potentially?

24      A.  Right.  If this is a report on his

```
 1  case, we would read it, and eventually try
 2  to talk to these people.
 3      Q.  On Exhibit 6, there are witnesses
 4  listed right here, which is about one-third
 5  of the way down.  Do you see that, sir?
 6      A.  Yes.
 7      Q.  I will try and highlight.  It
 8  doesn't highlight very well.
 9              Also on the second page,
10  there's witnesses who are listed in the
11  narrative section.  Do you see those?
12      A.  Yes.
13      Q.  And for the witnesses, it provides
14  some general information about the witness,
15  contact information?
16      A.  Right.
17      Q.  And for some witnesses, it also
18  provides some substantive information about
19  what they witnessed or what they heard.  Do
20  you see that?
21      A.  Right.
22      Q.  And looking at Exhibit 6, I want
23  to direct you to starting right here.  Do
24  you see where I am highlighting?
```

```
 1        A.   Yes.

 2        Q.   The bottom of the first column?

 3        A.   Yes.

 4        Q.   It says, school bus driver Arnell

 5   from Mavis Bus Company?

 6        A.   Right.

 7        Q.   Male 1/35, there is a phone

 8   number, was unloading a handicapped child,

 9   and also saw the shooting.  Do you see that,

10   sir?

11        A.   Yes.

12        Q.   Sir, in reviewing this, would that

13   be somebody that you would want to

14   interview?

15        A.   Yes.

16        Q.   And then after that, it notes,

17   Sarah Torres, provides her address and her

18   phone number and says, her son relates that

19   he saw the offender come out of the Boys

20   Club at Sawyer and Palmer.  Do you see that,

21   sir?

22        A.   Yes.

23        Q.   And would that indicate to you

24   that you would want to interview Ms. Torres
```

```
 1   and her son?
 2           MS. BRADY:  Objection.
 3   Foundation.
 4           THE WITNESS:  Yes.
 5   BY MR. BRUEGGEN:
 6       Q.  As you sit here today, do you
 7   recall if you talked to any -- either the
 8   bus driver or Ms. Torres or her son about
 9   this case?
10       A.  I have no recollection about who
11   was interviewed or when or -- or whether I
12   or anyone else did.  I just don't remember
13   the case.  This does not refresh my
14   recollection.
15       Q.  Fair enough.  Fair enough.
16               But, in general, that
17   information that the witnesses with the
18   contact information would be information you
19   would use to track down these witnesses if
20   you chose to interview them?
21           MS. BRADY:  Objection.
22           THE WITNESS:  Right.
23           MS. BRADY:  Foundation and form.
24
```

```
 1                  (Whereupon, DeLeon Deposition

 2                   Exhibit No. 7 was

 3                   screen-shared/referenced.)

 4   BY MR. BRUEGGEN:

 5       Q.  Showing you what we will mark as

 6   Exhibit No. 7.  I'm going to put a document

 7   up on your screen and I'm going to let you

 8   look at it just like the last one so you are

 9   comfortable with it, and then I will ask you

10   questions, okay, sir?

11            MR. BRUEGGEN:  For the record,

12   Exhibit 7 will be RFC Iglesias pages 59 and

13   60.

14   BY MR. BRUEGGEN:

15       Q.  Sir, do you see a document up on

16   your screen?

17       A.  Yes.

18       Q.  And can you read it?

19       A.  Yes.

20       Q.  Why don't you take time to look at

21   the first page, and then I will show you the

22   second page.

23       A.  Okay.

24            Okay.
```

```
 1        Q.  Having had a chance to look at
 2   Exhibit 7, do you see that Exhibit 7 lists
 3   people's names and contact information?
 4        A.  Yes.
 5        Q.  And do you recall that some of the
 6   people's names and contact information were
 7   also included in Exhibit 6, the general
 8   offense case report, or the initial report
 9   that we talked about?
10        A.  If you say they were listed.
11        Q.  I can go back and show you Exhibit
12   6 if you want.
13        A.  I am just telling you, I don't
14   remember what's listed.  I assume some of
15   them is a list of witnesses by hand by the
16   detective, and the other report is the typed
17   report with the witnesses listed.  That's
18   what it appears to me.
19        Q.  Sir, looking at the second page of
20   Exhibit No. 7 --
21        A.  Right.
22        Q.  -- directing you to, there is a
23   list of witnesses.  Do you see that?
24        A.  Yes.
```

```
 1        Q.  And then there is some indication
 2   that Rosendo Ochoa was a pedestrian, and
 3   then the next four people listed there,
 4   there is reference to a car.  Do you see
 5   that?
 6        A.  Yes.
 7        Q.  Does that refresh your
 8   recollection as to any of the details in
 9   Mr. Iglesias's case as to whether a car was
10   involved?
11        A.  No.
12        Q.  Going back to the first page of
13   Exhibit 7, it lists a person, Bernice
14   Bullocks?
15        A.  Okay.  Bernice Bullocks.
16        Q.  Do you see that, sir, right here?
17        A.  Yes.
18        Q.  Can you make that out?
19        A.  Yeah.
20        Q.  And there's a Hyatt S. Bullocks?
21        A.  Right.
22        Q.  Bus driver Arnell and a Torres,
23   Sarah.  Sir, do you see that?
24        A.  Right.
```

```
 1        Q.  And going back to Exhibit 6, do
 2   you see those are the same people that are
 3   listed in the general offense case report in
 4   the narrative section?
 5        A.  Yes.
 6        Q.  And under Sarah Torres at the
 7   bottom, do you see there is a note -- and I
 8   am looking at the printed, and it says, "Son
 9   came from boys club."  Sir, do you see that?
10        A.  Yes.
11        Q.  Do you recall that was the same
12   information that was attributed to her in
13   the general offense case report?
14             MS. BRADY:  Objection.  Misstates
15   the record.
16   BY MR. BRUEGGEN:
17        Q.  Sir, you see that the information
18   about Ms. Torres' "Son came from boys club"
19   also indicates -- is the information that
20   Ms. Torres indicates in Exhibit 6 now that
21   relates that he saw an offender come out of
22   the boys club.  Do you see that?
23        A.  Right.
24        Q.  Same general information that the
```

 1 | boys club was relevant to this crime?
 2 |      A.   Right.
 3 |      Q.   Then, sir, over on the left, there
 4 | is some cursive handwriting.  I am going to
 5 | do my best to box it.  Do you see this, sir?
 6 |      A.   Yes.
 7 |      Q.   Let me zoom in.  Do you see that
 8 | it says, "son came from the boys club."  Do
 9 | you see that?
10 |      A.   Yes.
11 |      Q.   And that's the same as what is
12 | written down below in regular handwriting?
13 |      A.   Right.
14 |      Q.   And below that, it appears, to say
15 | "knows Shorti."  Do you see that, sir?
16 |           MS. BRADY:  Objection.
17 | Foundation.  I don't think that's what it
18 | says but ...
19 | BY MR. BRUEGGEN:
20 |      Q.   Do you see right below, that
21 | cursive where it says, "son came from the
22 | boys club."  It appears to say, "knows,"
23 | k-n-o-w-s?
24 |      A.   Right.

1      Q.  And then after that, it says,

2   "Shorti," S-h-o-r-t-i?  Do you see that?

3          MS. BRADY:  Objection.  Form.

4   Misstates the evidence.

5          THE WITNESS:  I can't really read

6   that.

7   BY MR. BRUEGGEN:

8      Q.  Can you make out any of those

9   letters, or you don't know what it says?

10     A.  I see an "S" and "H." The rest of

11  it is a little bit blurry here, a little bit

12  squiggly.

13     Q.  Do you see right before the down

14  arrow, there appears to be an "I" with a

15  pretty clear dot above it?

16         MS. BRADY:  Objection.  Form and

17  foundation and misstates the record.

18         THE WITNESS:  It looks -- it could

19  be an "I."

20         MR. BRUEGGEN:  Okay.

21  BY MR. BRUEGGEN:

22     Q.  Sir, I want you to be able to see

23  me when I am asking questions because

24  sometimes, you know, it's easier to

1  understand.

2            In your practice as a criminal

3  defense attorney, are you familiar with what

4  a shorti is?

5       A.  A short person, I guess.

6       Q.  Are you aware of whether shorti

7  was slang for a younger person?

8            MS. BRADY:  Objection.

9  Foundation.

10           THE WITNESS:  I'm not sure.  I

11  mean, the term is used for different things,

12  you know.

13  BY MR. BRUEGGEN:

14      Q.  Can you tell us what in your

15  practice you've experienced shorti being

16  used to describe?

17      A.  Well, again, it could be a short

18  person.  It could be gang terminology for a

19  young gang member or for a small, young -- a

20  young gang member.

21           Gangs have levels, like they

22  have, for lack of a better term, senior

23  members and junior members, you know.  And a

24  slang term for the junior members, the

1  little guys, the young kids would be a

2  shorti.

3       Q.  I think you told us the

4  terminology is not necessarily just

5  affiliated with gangs.  It's also affiliated

6  just generally with the culture at the time.

7  Do I understand you correctly?

8       A.  Sure, yes.  It could be just a

9  short person.

10      Q.  Sir, in your practice as a

11 criminal defense attorney, were you familiar

12 with something called a scene supp. report

13 or a field investigation report?

14      A.  Scene supp., you said?

15      Q.  A scene supplementary report or a

16 field investigation report?

17      A.  Oh, sure, sure, supplementary

18 report.

19      Q.  And what was your understanding of

20 what that was?

21      A.  It was just a follow-up report

22 after the initial report.

23      Q.  Sir, I am going to show you

24 another document.

```
 1              For the record, it's
 2  Bates-stamped RFC Iglesias 48 to 55, and I
 3  will mark this as Exhibit 8.
 4                  (Whereupon, DeLeon Deposition
 5                   Exhibit No. 8 was
 6                   screen-shared/referenced.)
 7  BY MR. BRUEGGEN:
 8      Q.  Can you see this document up on
 9  your screen?
10      A.  Right, I do, supplementary report,
11  right.
12      Q.  I am going to direct you down, you
13  see it's dated June 7th of '93?
14      A.  Yes.
15      Q.  Can you read that?  And again, if
16  you need me to zoom in, because I know you
17  are working on a computer, but if something
18  is hard to read, just let me know.  I can
19  zoom in because I want to make sure you can
20  see these documents.
21      A.  Okay.
22      Q.  I am going to scroll through this.
23  And having looked at this document, have you
24  seen documents like this before in your
```

1  practice as a criminal defense attorney?

2       A.  Sure.

3       Q.  Is this the type of document that

4  you would review to get more information

5  about a crime and potential witnesses and

6  how to defend a crime?

7       A.  Yes.

8       Q.  Sir, showing you the first two

9  substantive pages.  Again, the first is a

10  cover page, but then the next two pages are

11  RFC49 and 50.  Do you see that those have

12  headings at the left and then information on

13  the right?

14       A.  Yes.

15       Q.  And from looking at this, do you

16  recall this type of report being prepared by

17  Chicago Police Department for crimes?

18       A.  Yes.

19       Q.  And this provides general

20  information about the investigation of a

21  crime?

22       A.  Yes.

23       Q.  Including this example indicates

24  who the victim is, a description of the

1  wanted person, the injuries to the victim,

2  and where they were taken?

3       A.  Right.

4       Q.  And it also includes the location

5  of the incident, the date, time, weather and

6  lighting?

7       A.  Yes.

8       Q.  And again, this is general

9  background information about when this crime

10 occurred, right?

11      A.  Yes.

12      Q.  And then there is manner/motive.

13 Do you know what that is?

14      A.  Yes.

15      Q.  And what is manner and motive?

16      A.  Well, how it happened, and I

17 suppose why it happened, motive.

18      Q.  And then going to the second page,

19 RFC50, it indicates vehicle used.  Do you

20 see that, sir?

21      A.  Yes.

22      Q.  It provides information about a

23 1982 Olds four-door blue vinyl top, gray

24 body, and provides the license plate number

1  and VIN number.  Do you see that, sir?

2       A.  Yes.

3       Q.  And that's information that you

4  would use depending on the case as part of

5  your investigation of the criminal defense,

6  right?

7       A.  Sure.

8       Q.  And below that, there is something

9  that says evidence, and it lists photographs

10 of scene, photos of above auto, recovered

11 fired bullet from vinyl top.  Do you see

12 that, sir?

13      A.  Yes.

14      Q.  As a criminal defense attorney,

15 that would indicate to you what evidence had

16 been collected, right?

17      A.  Yes.

18      Q.  And that would be evidence that

19 you would either want to have copies of or

20 be able to view, right?

21      A.  Yes.

22      Q.  And below that, it says, personnel

23 assigned.  Did you understand that that

24 would be the police officers and detectives

 1   who were assigned to investigate the case at

 2   that time?

 3        A.  Yes.

 4        Q.  So that would provide you

 5   information about which police officers were

 6   involved, to the extent you wanted to talk

 7   to them or interview any of them, right?

 8        A.  They would tell me who they were.

 9   But I can guarantee you one thing, police

10   officers don't talk to defense attorneys

11   about their cases.

12        Q.  Fair enough.

13        A.  So, no, I would not try to talk to

14   them because I know they would not talk to

15   me.  It's a waste of time.

16        Q.  Understood.  It would at least

17   give you their names if you needed to

18   subpoena them for trial, right?

19        A.  That it would do.

20        Q.  Below that, it says, witnesses.

21   Do you see that, sir?

22        A.  Yes.

23        Q.  And it lists witnesses going on to

24   the next page?

```
 1        A.  Yes.  More witnesses.
 2        Q.  And then below that -- strike
 3   that.
 4               The witnesses, these are names
 5   that we had seen in the other documents that
 6   we previously looked at, right, the one
 7   handwritten list of witness names, and then
 8   the general offense case report?
 9        A.  Yes.
10        Q.  And then below witnesses, it says
11   interview.  Do you see that, sir?
12        A.  Yes.
13        Q.  And that would indicate which of
14   the witnesses had been interviewed?
15        A.  Yes.
16        Q.  Then there is to be interviewed,
17   which would indicate who still needed to be
18   talked to at that time?
19        A.  Right.
20        Q.  And then below that, it says,
21   investigation, and we get to a long
22   narrative.  Do you see that, sir?
23        A.  Right.
24        Q.  And this investigation is kind of
```

1  meat and potatoes of this report where it

2  tells you what various witnesses said, and I

3  think you alluded to this earlier, that

4  there would be summaries of what witnesses

5  said, right?

6       A.  Right.

7       Q.  And so this would be something

8  that you would pay attention to in defending

9  a client to figure out which witness said

10  what, what information they had in order to

11  determine who you wanted to interview,

12  right?

13       A.  Right.

14           MS. BRADY:  I am just going to

15  object to the foundation to the extent that

16  this report doesn't necessarily accurately

17  reflect what the witnesses said.  It just

18  has -- yeah, I will just leave it at that.

19  BY MR. BRUEGGEN:

20       Q.  Mr. DeLeon, again, what I was

21  asking you is this is kind of a stepping-off

22  point for your investigation of a criminal

23  defense, is it would give you some

24  information about witnesses, but then you

1   would go and corroborate that yourself and

2   find out if they could help you otherwise,

3   right?

4        A.  Right.

5        Q.  You see here on page RFC Iglesias

6   54, it says, Sarah Torres?

7        A.  Yes, right.

8        Q.  And it has information attributed

9   to her?

10        A.  Right.

11        Q.  And then below that, it says,

12   Efrain Torres and has information attributed

13   to him?

14        A.  Right.

15        Q.  And you can tell from this that

16   Efrain Torres is the son of Sarah Torres,

17   and I will direct you to, it says, Torres

18   stated that he lives on the third floor of

19   ██████████████████  with his mother?

20        A.  Right.

21        Q.  And we know from Sarah Torres up

22   here that she lived on the third floor, same

23   unit, right?

24        A.  Right.

1      Q.  So we knew Sarah Torres, and we

2  knew what her son's name was, right?

3      A.  Right.

4      Q.  And this would be information that

5  you would have, and you would talk to your

6  client about who to interview, and what to

7  interview them about, and what happened,

8  right?

9      A.  Right.

10          MS. BRADY:  Objection.

11  Foundation.

12              (Whereupon, DeLeon Deposition

13               Exhibit No. 9 was

14               screen-shared/referenced.)

15  BY MR. BRUEGGEN:

16      Q.  Sir, showing you another document.

17          For the record, this will be

18  marked as Exhibit No. 9, and it's RFC

19  Iglesias 40 through 42.

20      A.  Okay.

21      Q.  Sir, do you see this document up

22  on your screen?

23      A.  Yes.

24      Q.  Let me flip through this.  Again,

```
 1   this document is part of the documents you

 2   have seen in your representation of criminal

 3   defense in cases investigated by the Chicago

 4   Police Department?

 5        A.  Yes.

 6        Q.  And specifically page RFC Iglesias

 7   41, do you see it lists witnesses?

 8        A.  Yes.

 9        Q.  And David Chmieleski, Arnell

10   Moore, and Bernice Bullocks?

11        A.  Yes.

12        Q.  Do you recall that on the previous

13   document, there were some witnesses that

14   still needed to be interviewed?

15        A.  Yes.

16        Q.  So this indicates that those

17   witnesses had been interviewed at a

18   subsequent report?

19        A.  Yes.

20        Q.  And you can see it's dated the

21   June 8th of '93?

22        A.  Yes.

23        Q.  Sir, again this is the type of

24   document that you would review with the
```

1  client to determine if you needed to

2  yourself go out and interview these

3  witnesses or have an investigator do that?

4      A.  Yes.

5      Q.  Sir, just a general question about

6  when you were retained in a case, and there

7  was a flat rate for your representation,

8  would there also be an additional flat rate

9  for expenses to hire investigators, or was

10  it all in one fee?

11      A.  I think pretty much in one fee.

12      Q.  So it was a flat rate, and out of

13  that amount, you would then dictate whether

14  you could afford to hire investigators based

15  on the amount of work you would have to do?

16      A.  Right.

17      Q.  Do you have any recollection of

18  how much you charged for a -- did you charge

19  a flat rate for murder cases?

20      A.  Every one was a little different.

21  But, in general, I think it was around

22  10,000 per murder case in the '90s.

23      Q.  And would that change based on,

24  you know, if you will, how extensive the

```
 1   murder case was?  Or would it be $10,000 up
 2   to pretrial, and then for trial, it might be
 3   more?
 4        A.  It could change, but I don't
 5   remember exactly.  I am just taking a guess.
 6        Q.  No problem, sir.  I appreciate
 7   your clarification.  In your practice as a
 8   criminal defense attorney, do you remember a
 9   supplementary report called a clear close
10   report?
11        A.  Yes.
12        Q.  Is that a yes?
13        A.  I believe so.
14        Q.  Do you recall what that is?
15        A.  It's a report that -- clear close,
16   I think it's a report that would make the
17   conclusion of who to put out a warrant for
18   or who to arrest or that an arrest was made.
19        Q.  Do you recall whether clear close
20   reports would also provide substantive
21   information about the investigation?
22        A.  Sure.
23
24
```

```
 1                  (Whereupon, DeLeon Deposition

 2                   Exhibit No. 10 was

 3                   screen-shared/referenced.)

 4    BY MR. BRUEGGEN:

 5         Q.  I am going to show you what we

 6    will mark as Exhibit 10, which is RFC

 7    Iglesias 10 through 13, and I will put it up

 8    on your screen and give you a chance to look

 9    at it.  Okay, sir?

10         A.  Okay.

11         Q.  Sir, do you see a document up on

12    your screen?

13         A.  Yes.

14         Q.  And I want to direct you down, you

15    see it's dated June 24th of '93?

16         A.  Yes.

17         Q.  And in custody, it says, Iglesias,

18    Geraldo?

19         A.  Right.

20         Q.  Sir, let me give you a chance to

21    read this to see if it refreshes your

22    recollection about Mr. Iglesias's case,

23    okay?  I am going to show you the first

24    page.  Is this legible to you?
```

```
 1        A.  Yes.
 2        Q.  And I will give you a moment to
 3   read it, and then I will show you the next
 4   page when you are done, and then the final
 5   page after that.  I would appreciate if you
 6   would read it, sir.
 7        A.  Okay, let me read it.
 8             Okay.
 9        Q.  I will show you the next page,
10   sir.
11        A.  Okay.
12        Q.  And the last page, sir.
13        A.  Okay.
14        Q.  Sir, having had a chance to review
15   Exhibit 10, does that refresh your
16   recollection about Mr. Iglesias's defense?
17        A.  I don't have any independent
18   recollection other than what I just read.
19   It doesn't -- it doesn't take me back to the
20   case or remind of anything, no.
21        Q.  Fair enough, sir.  I want to
22   direct you to some parts of this case.  You
23   see -- I am going to try to highlight it,
24   but this says, "This informant stated that
```

 1   many members of the gang were talking about

 2   Snake killing a girl in a car on Sawyer and

 3   Palmer."

 4            Do you see, sir?

 5       A.  Yes.

 6       Q.  Do you know what Mr. Iglesias's

 7   nickname was?

 8       A.  I don't recall.

 9       Q.  And in your practice representing

10   criminal defendants, would you find out what

11   their nickname was to put it into context?

12       A.  Sometimes, but it doesn't ring a

13   bell.

14       Q.  Fair enough.  Sir, you had a

15   chance to review Exhibit 10.  It indicates

16   that a photo array was shown to the witness

17   Rosendo Ochoa.  Do you recall reading that?

18       A.  Right.

19       Q.  He identified Mr. Iglesias out of

20   that photo array?

21       A.  Right.

22       Q.  And then Mr. Iglesias was picked

23   up and put in a lineup, right?

24       A.  Yes, right.

```
 1        Q.  And in that physical lineup,
 2   Mr. Ochoa identified Mr. Iglesias?
 3        A.  Right.
 4            MS. BRADY:  I am going to object,
 5   Dave, again to the extent that this report
 6   doesn't necessarily reflect what happened,
 7   but just the detective's take or explanation
 8   of what happened.
 9            MR. BRUEGGEN:  Okay.
10   BY MR. BRUEGGEN:
11        Q.  And I am directing you to page RFC
12   Iglesias 12, the little number down in the
13   right-hand corner that we used, Bates
14   stamps.
15        A.  Yes.
16        Q.  And there is a section attributed
17   to an interview of Mr. Iglesias.  Do you see
18   that, sir?
19        A.  Yes.
20        Q.  And you have had a chance to
21   review that?
22        A.  Yes.
23        Q.  And you saw that Mr. Iglesias
24   admitted to being a member of the Imperial
```

1   Gangsters street gang.  Do you see that,

2   sir?

3          MS. BRADY:  Objection.

4   Foundation.

5          THE WITNESS:  Yes, I see that.  I

6   thought he was a Cobra.  But again, my

7   memory is so bad about this, so that I guess

8   I was mistaken if that's him saying he was

9   an Imperial Gangster.

10             But there was a gang called

11  Imperial Gangsters, and I did represent many

12  of those members also.

13  BY MR. BRUEGGEN:

14     Q.  Sir, my question is:  In this

15  report and having reviewed various things

16  made by your client, is that the type of

17  information you would have then reviewed

18  with your client to confirm that they, in

19  fact, said those things?

20     A.  Sure, we would go over reports

21  together.

22     Q.  And this --

23     A.  I don't remember -- I don't

24  remember going over the reports with him.

```
 1   And I don't remember whether he said that --
 2   what he said to me, if he said anything
 3   about --
 4           MS. BRADY:  Sorry.  I am going to
 5   put the same foundation objection that this
 6   doesn't necessarily reflect what
 7   Mr. Iglesias actually said.
 8           MR. BRUEGGEN:  And I appreciate
 9   that, Rachel.
10   BY MR. BRUEGGEN:
11       Q.  And what I am just getting at,
12   your course of practice would be if there is
13   a statement attributed to your client, your
14   course of practice would be to talk to your
15   client about that statement to find out if
16   it's true, if it's false, you know, what
17   additional information they have?
18       A.  Sure.
19       Q.  Right?
20       A.  Right.
21       Q.  And in this statement that's
22   attributed to your client, it indicated that
23   he had been in Chicago during the entire
24   month of June, but he does not recall what
```

```
 1  he did on June 7th, '93, and has no alibi

 2  for his whereabouts on that date.

 3              Do you see that, sir?

 4      A.  Yes, I see that.

 5      Q.  And is that something that you

 6  would have talked to your client about, a

 7  potential alibi, and stuff of that nature?

 8      A.  Sure.  But again, I don't remember

 9  doing that.

10      Q.  And in there, it notes that

11  Mr. Iglesias told the police that he gets

12  home from school at 1400 hours.  Do you see

13  that, sir?

14      A.  Yes.

15      Q.  And is that something you would

16  have been aware of at the time that you were

17  representing Mr. Iglesias, whether he was in

18  school or whether he was working, and what

19  his hours were?

20              MS. BRADY:  Objection.  Form.

21              THE WITNESS:  I -- again, whatever

22  it says there is what I would have read, if

23  that's their report.

24
```

 1  BY MR. BRUEGGEN:

 2       Q.  I'm sorry, sir.  I think that was

 3  a bad question.

 4              What I am asking is, was it

 5  your course of practice to talk to your

 6  clients about whether they had jobs, whether

 7  they were going to school, and kind of what

 8  hours they were at their job, and what hours

 9  they were in school?

10       A.  Sure.

11       Q.  And that would be relevant to

12  potentially finding an alibi or make some

13  type of argument of impossibility based on

14  location, right?

15       A.  Sure.

16       Q.  After the section on talking to

17  Mr. Iglesias, there is reference to

18  contacting felony review and ASA Mike Latz

19  arriving at Area 5.  Do you see that, sir?

20  It's right here.

21       A.  Yes, I see it.

22       Q.  Do you remember ASA Mike Latz?

23       A.  No.

24       Q.  Do you know what felony review is?

1      A.  Felony review is the system that

2  the State's Attorney's Office has to

3  determine if a charge is going to be filed.

4  The police have to take their case to the

5  felony review assistant and get his

6  permission.  So that State's Attorney

7  appears to be the one that would have okayed

8  the charges after the policemen showed this

9  report to the State's Attorney.

10     Q.  Sir, do you see that that State's

11  Attorney also -- in your reviewing of this,

12  the State's Attorney also asked the police

13  to bring in additional witnesses to review

14  lineups?

15     A.  Right.

16     Q.  And then going to the last page,

17  specifically ASA Latz requested that two

18  other persons listed in the police reports

19  as potential witnesses, Efrain Torres and

20  David Chmieleski, be allowed to view

21  Mr. Iglesias in the lineup.  Do you see

22  that, sir?

23     A.  Right.

24     Q.  And then a lineup was conducted

```
 1   where Efrain Torres made no identification

 2   and Mr. Chmieleski made no identification;

 3   is that right?

 4        A.  Right, right.

 5        Q.  But Mr. Hugo Rodriguez did make an

 6   identification and chose Mr. Iglesias,

 7   according to the police report, right?

 8        A.  Right.

 9        Q.  When reviewing this, would Efrain

10   Torres and Chmieleski be more relevant as

11   witnesses since they were unable to identify

12   your client and they were potential

13   witnesses?

14             MS. BRADY:  Objection.  Form.

15             THE WITNESS:  What was the

16   question again?

17   BY MR. BRUEGGEN:

18        Q.  What I am getting at is both

19   Mr. Torres and Mr. Chmieleski viewed a

20   lineup in which your client was standing.

21   You understand that, right?

22        A.  Right.

23             MS. BRADY:  Objection.  Sorry, I

24   am just going to object that -- the same
```

 1 | objection I have been making, which is it
 2 | characterizes as true the information in
 3 | this report.
 4 | BY MR. BRUEGGEN:
 5 |     Q.  Sir, setting that aside.  What the
 6 | report indicates that Mr. Torres, Efrain
 7 | Torres and David Chmieleski viewed a lineup
 8 | that had your client as a participant in
 9 | that lineup, right?
10 |     A.  Right.
11 |     Q.  And that neither of them was able
12 | to identify your client, right?
13 |     A.  Right.
14 |     Q.  And that potentially is
15 | information that could be good for your
16 | client's defense, that he wasn't picked out
17 | by a potential witness, right?
18 |     A.  Right.
19 |     Q.  And would that make interviewing
20 | Mr. Torres and Mr. Chmieleski more important
21 | in representing your client?
22 |         MS. BRADY:  Objection.  Form.
23 |         THE WITNESS:  It could.
24 |

```
 1   BY MR. BRUEGGEN:
 2       Q.  And at the end, we see that
 3   charges were approved, and looking right
 4   here, according to the report, charges were
 5   approved and Mr. Iglesias -- strike that.
 6               In this report we see that
 7   Mr. Latz, ASA Latz, approved charges of
 8   first degree murder against Mr. Iglesias,
 9   right?
10       A.  That's what it says.
11       Q.  Okay.  And after that, that gets
12   us back to what we previously talked about
13   with the indictment and stuff of that
14   nature, it starts the criminal proceedings,
15   right?
16       A.  Right.
17       Q.  Sir, in your practice in the early
18   to mid-'90s, after you had reviewed the
19   records and speak to your client, if you
20   believed there was a good faith basis to
21   move to quash an arrest and suppress
22   evidence discovered after that arrest, would
23   you file that motion?
24               MS. BRADY:  Objection.  Form.
```

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 405 of 550 PageID #:14445

```
 1          THE WITNESS:  I would file
 2  whatever motion I thought was appropriate.
 3  BY MR. BRUEGGEN:
 4      Q.  So if after looking at records and
 5  talking to your client you believed that the
 6  arrest was improper, you would file a motion
 7  to quash that arrest?
 8      A.  Sure.
 9      Q.  And in this case, I will represent
10  to you that you did not file a motion to
11  quash the arrest of Mr. Iglesias.  Okay,
12  sir?
13      A.  Okay.
14      Q.  Based on that, would it be fair to
15  believe that you did not believe it was
16  appropriate to file a motion to quash the
17  arrest?
18          MS. BRADY:  Objection.  Foundation
19  and form.
20          THE WITNESS:  I would say yes.
21  BY MR. BRUEGGEN:
22      Q.  If Mr. Iglesias claimed any abuse
23  by the police, that would be something that
24  would be a basis of a motion to quash,
```

```
 1  right?
 2       A.  Yes, could be.
 3       Q.  And, sir, I am about to move into
 4  another section.  We have been going for
 5  about an hour.  I just want to offer a break
 6  to you.  I know this might be your first
 7  dep.  I just want to make sure you
 8  understand we take breaks.  So if you want
 9  to take a quick break, we can, or I can just
10  go into the next section.
11       A.  Let's keep going.
12       Q.  Okay.  And, sir, earlier we talked
13  about you receiving the initial tender of
14  documents from the State.  Do you remember
15  that, it was in the transcript?
16       A.  In the transcript, yes.
17       Q.  Yes.
18       A.  But I don't remember it.
19       Q.  That's correct.  According to the
20  transcript, you received the initial tender
21  of documents on August 23rd of 1993?
22       A.  Right.
23       Q.  Do you recall whether that initial
24  tender of documents had reference to a
```

1   witness by the name of Francisco Vicente?

2        A.  I do not recall.

3        Q.  Does the name Francisco Vicente

4   mean anything to you as you sit here today?

5        A.  I really don't recall.

6        Q.  Do you recall when representing

7   Mr. Iglesias that a witness who was a

8   jailhouse informant came forward against

9   your client?

10       A.  I recently had a conversation with

11  Donna Makowski, and she reminded me that

12  there was a jailhouse informant, but I

13  didn't have any independent recollection of

14  it.

15       Q.  When did you have that information

16  with Ms. Makowski?

17       A.  In the last two weeks maybe.

18  After I got the subpoena.  I don't remember

19  the exact date.  It had to be in the last

20  few weeks.

21       Q.  Did you reach out to Ms. Makowski

22  after you received the subpoena?

23       A.  I called her to just let her know

24  that she might get a subpoena because I did

1  remember that she was in the trial with me.

2  Or actually, I don't remember if she called

3  me about that.  Maybe she heard about it

4  first.

5                    I don't remember to be honest

6  with you, but we had a conversation where

7  she reminded me that there was a jailhouse

8  informant in the case, but I didn't remember

9  the name.

10      Q.  Okay.  Did Ms. Makowski remind you

11  of anything else from your representation of

12  Mr. Iglesias?

13      A.  Not that I can recall right now.

14      Q.  Do you recall her saying anything

15  about the jailhouse informant?

16      A.  Other than that I think she said

17  he had been an informant in several cases,

18  that this wasn't the only case he was an

19  informant on, kind of like a professional

20  witness, I'd say.  That's the conversation

21  we had.

22      Q.  And was your conversation with

23  Ms. Makowski solely based on this jailhouse

24  informant?

1      A.   That's the part I remember.

2      Q.   Did you talk substantively about

3   the crime that Mr. Iglesias was charged

4   with?

5      A.   Not really because I didn't have

6   any recollection of it other than it being a

7   murder.

8      Q.   Did Ms. Makowski try to remind you

9   of any of the details?

10      A.   Try to remind me?  No.

11         MS. BRADY:  Objection to form.

12         THE WITNESS:  I just -- just said

13   it in passing.

14   BY MR. BRUEGGEN:

15      Q.   After Ms. Makowski reminded you

16   that there was an informant, a jailhouse

17   informant that was involved in several

18   cases, did you recall how that informant fit

19   into Iglesias's case?

20      A.   No.

21      Q.   In representing criminal

22   defendants, have you had multiple cases

23   where there's a jailhouse informant?

24         MS. BRADY:  Objection.  Form.

```
 1            THE WITNESS:  I can't remember
 2  another case where there was a jailhouse
 3  informant.
 4  BY MR. BRUEGGEN:
 5       Q.  Again, is a jailhouse informant,
 6  is that a common thing that happens in
 7  criminal cases, or is it relatively rare?
 8            MS. BRADY:  Objection.  Form and
 9  foundation.
10            THE WITNESS:  I don't know if it's
11  rare, but I -- in my experience, it didn't
12  happen too often, but it happens.
13  BY MR. BRUEGGEN:
14       Q.  I will represent to you in this
15  case, Mr.  Francisco Vicente was
16  incarcerated with Mr. Iglesias and
17  Mr. Vicente gave a statement in which he
18  said Mr. Iglesias confessed to him.  Okay,
19  sir?
20       A.  Okay.
21       Q.  With that, with my representation,
22  would you have wanted to interview
23  Mr. Vicente?
24       A.  Sure.
```

```
 1          MS. BRADY:  Objection.  Form and
 2   foundation.
 3   BY MR. BRUEGGEN:
 4       Q.  Why would you have wanted to
 5   interview Mr. Vicente?
 6       A.  He was an alleged witness.  We'd
 7   want to talk to him.
 8       Q.  Do you have any recollection of
 9   whether you were able to interview
10   Mr. Vicente in Mr. Iglesias's case?
11       A.  I have no recollection.
12       Q.  Sir, I am going to show you a
13   couple of documents that are reports of
14   proceedings, just very quickly, and then I
15   will have some follow-up questions, okay?
16               For the record, this will be
17   Exhibit 11, and it is Bates-stamped Iglesias
18   2297 through 2302 and is a report of
19   proceedings from January 12, 1994.
20                   (Whereupon, DeLeon Deposition
21                    Exhibit No. 11 was
22                    screen-shared/referenced.)
23   BY MR. BRUEGGEN:
24       Q.  Sir, do you see a document up on
```

1  your screen?

2        A.  Yes, I do.

3        Q.  Do you see this is a report of

4  proceedings in the case of People of the

5  State of Illinois versus Geraldo Iglesias,

6  dated January 12, 1994?

7        A.  Yes.

8        Q.  I want to direct you to page

9  Iglesias 2298 and towards the bottom.

10        A.  Okay.

11        Q.  Starting at line 18, if you can

12  just read that.

13        A.  Okay.

14        Q.  To be complete, I want to give you

15  the rest of it.

16        A.  Okay.

17        Q.  I don't know if you read this

18  here, but I will represent to you, and I am

19  sure Rachel will confirm, that it appears to

20  be a mistranscription, but the witness's

21  name was Francisco Vicente, and they have it

22  as Bacenti?

23        A.  Correct.

24        Q.  Having looked at that, is that

1  consistent with what you told me earlier

2  that you would have wanted to interview

3  Mr. Vicente, who was incarcerated?

4       A.  Right.

5       Q.  And it appears that you attempted

6  to, but were unable to get in because he was

7  in protective custody?

8       A.  Right, that's what it says.

9              (Whereupon, DeLeon Deposition

10             Exhibit No. 12 was

11             screen-shared/referenced.)

12  BY MR. BRUEGGEN:

13       Q.  For now I am going to share

14  another report of proceedings from March

15  24th of '94 that we will mark as Exhibit 12.

16             And for the record, it's

17  Iglesias 2303 through 2306.

18       A.  Okay.

19       Q.  Sir, do you see a document up on

20  your screen?

21       A.  Yes.

22       Q.  And again, this is from the case

23  against Mr. Iglesias, and it's dated March

24  24th of '94.  Do you see that, sir?

```
 1      A.  Yes.

 2      Q.  And I am going to direct you to

 3 the second page, and direct you to -- if you

 4 could just read what is attributed to you on

 5 that page.

 6      A.  Okay.

 7      Q.  And, sir, having reviewed that,

 8 does that refresh your recollection as to

 9 whether you were able to interview

10 Mr. Vicente?

11      A.  It doesn't remind me what happened

12 back then.  I understand what it says.

13      Q.  Fair enough.  And you wouldn't

14 represent to the Court that you were able to

15 interview a witness unless you actually had

16 been able to interview the witness, right?

17      A.  Right.

18         MS. BRADY:  Objection.  Form.

19 BY MR. BRUEGGEN:

20      Q.  Sir, when you interview witnesses

21 yourself, would you take notes?

22      A.  Sure.

23      Q.  Would you create any type of

24 formal memo or anything like that?
```

```
 1        A.  Just my notes, handwritten notes

 2   on a yellow pad, put it in the file, and

 3   save it.

 4        Q.  To the extent that you interviewed

 5   Mr. Vicente and took notes, those would be

 6   things that you would have kept in your

 7   file?

 8        A.  Right.

 9        Q.  And that would be stuff you would

10   want to have handy to be able to use at

11   trial?

12        A.  Right.

13                (Whereupon, DeLeon Deposition

14                 Exhibit No. 13 was

15                 screen-shared/referenced.)

16   BY MR. BRUEGGEN:

17        Q.  Sir, I am going to show you

18   another document that was filed with the

19   Court on March 24, 1994, in Mr. Iglesias's

20   case, and I want you to just take a second

21   and review it if you would, please.

22                We will mark this Exhibit 13.

23   And for the record, it's Iglesias 2156 and

24   2157.
```

1          Sir, do you see a document up

2    on your screen?

3        A.  Yes.

4        Q.  And let me show you the second

5    page of that.  Do you see a signature there?

6        A.  Yes.

7        Q.  Is that your signature?

8        A.  Yes.

9        Q.  And can you tell us what this

10   document is?

11       A.  I am asking for supplemental

12   discovery, and we are asking what I asked

13   for in the transcript, for the discovery of

14   what other cases Mr. Vicente had given

15   statements on and copies of the statements.

16       Q.  So again, this is, if you will, a

17   formalized request for supplemental

18   discovery --

19       A.  Right.

20       Q.  -- that you had orally represented

21   to the Court?

22       A.  Right.

23       Q.  Was this request, in part, based

24   on your interview of Mr. Vicente?

```
 1        A.  I don't know.  I don't remember

 2   interviewing Mr. Vicente, but it appears to

 3   be.

 4            MS. BRADY:  Objection.  Form and

 5   foundation to that last question.

 6   BY MR. BRUEGGEN:

 7        Q.  Sir, are you done with your

 8   answer?

 9        A.  Yes.

10                (Whereupon, DeLeon Deposition

11                 Exhibit No. 14 was

12                 screen-shared/referenced.)

13   BY MR. BRUEGGEN:

14        Q.  So I want to show you another

15   document from the case.  We will mark this

16   as Exhibit 14.  And for the record, it's

17   Iglesias 2158.

18        A.  Okay.

19        Q.  Sir, do you see a document on your

20   screen in Mr. Iglesias's case that appears

21   to be stamped May 6, 1994?

22        A.  Okay.  Okay.

23        Q.  Do you see that document, sir?

24        A.  Yes, I have read it.  I see the
```

```
 1  date, yes.
 2       Q.  And this document is a motion for
 3  more specific discovery that was filed?
 4       A.  Right, right.
 5       Q.  And it's signed by Ms. Makowski,
 6  but you and her were working on this case
 7  together, right?
 8       A.  Right.
 9       Q.  And again, you were looking for
10  specific information about all compensation,
11  monetary and non-monetary compensation for
12  Mr. Vicente?
13       A.  Right, right.
14       Q.  Why were you looking for that,
15  sir?
16       A.  Well, if a witness is paid money
17  or given special favors at the jail for
18  giving information and informing on someone,
19  it would go to his credibility, so I am
20  asking for the information to see what they
21  gave him.
22       Q.  And based on the last two
23  exhibits, your supplemental motion for
24  discovery and your motion for more specific
```

1   discovery, do you recall whether the State

2   responded to those motions?

3        A.   Don't remember.

4        Q.   And if the State had not responded

5   to those motions, would you have brought it

6   up to the Court?

7        A.   Sure.

8        Q.   Would you have made sure that you

9   got responses to those motions before going

10  to trial?

11       A.   Sure.

12            MS. BRADY:   Objection.

13  Foundation, to the extent he wouldn't

14  necessarily know if he had received complete

15  responses.

16  BY MR. BRUEGGEN:

17       Q.   I'm sorry, sir.   Did you answer?

18       A.   I forgot the question.

19       Q.   Yeah.   My question was, if you had

20  not received responses to your motions for

21  specific discovery regarding Mr. Vicente,

22  would you have gone to trial representing

23  Mr. Iglesias not having received the

24  responses?

```
 1       A.   Probably would --
 2            MS. BRADY:  Objection.  Go ahead.
 3            THE WITNESS:  I would have asked
 4   the judge to order the State to give me an
 5   answer to those questions, and I'm sure the
 6   judge would make sure that that was
 7   answered.
 8   BY MR. BRUEGGEN:
 9       Q.   And that would be important
10   because for the reasons you said, it gives
11   you information to help defend your client
12   against Mr. Vicente's testimony?
13       A.   Right, right.
14                 (Whereupon, DeLeon Deposition
15                  Exhibit No. 15 was
16                  screen-shared/referenced.)
17   BY MR. BRUEGGEN:
18       Q.   Sir, I am going to show you
19   another document, which we will mark as
20   Exhibit 15.
21                 For the record, this is
22   Iglesias 2159.
23       A.   Okay.
24       Q.   Sir, do you see a document up on
```

 1   your screen?

 2        A.   Yes.

 3        Q.   And you see that it was filed in

 4   Mr. Iglesias's case, and it's titled

 5   "Supplemental Answer"?

 6        A.   Right.

 7        Q.   Can you tell us what this document

 8   is, sir?

 9        A.   It says supplemental answer, and

10   it lists three witnesses.

11        Q.   You signed that document, sir?

12        A.   Yes.

13        Q.   And so does this indicate that

14   those are witnesses that you and

15   Mr. Iglesias may rely on in his defense of

16   the criminal case against him?

17        A.   Right.

18        Q.   Do you have any recollection of a

19   witness by the name of Edgar Santos?

20        A.   I don't remember any of these

21   three witnesses' names or who they are or

22   why I even put them on an answer.

23        Q.   Is it fair to say that when you

24   filed this answer, they would have had some

 1  relevance to your theory of defense?

 2      A.  Yes.

 3          MS. BRADY:  Objection.

 4  Foundation.

 5  BY MR. BRUEGGEN:

 6      Q.  And, again, sir, you wouldn't just

 7  disclose random witnesses just because,

 8  right?

 9          MS. BRADY:  Objection.  Form.

10          THE WITNESS:  Of course, if I am

11  giving witnesses' names, they must have been

12  relevant at the time.  But I have no

13  independent recollection of who they are or

14  what they were going to testify to right

15  now.

16  BY MR. BRUEGGEN:

17      Q.  Sir, if I have informed you that

18  Edgar Santos was Mr. Iglesias's friend who

19  he was arrested with and who stood in the

20  first lineup with Mr. Iglesias where he was

21  identified by Mr. Ochoa, does that refresh

22  your recollection as to Mr. Santos'

23  relevance?

24          MS. BRADY:  Objection.  Assumes

```
 1   facts not in evidence.
 2           THE WITNESS:  No, it does not.
 3   BY MR. BRUEGGEN:
 4       Q.  And if I told you that Jesus
 5   Velasquez was the plaintiff's cellmate at
 6   Cook County jail, who plaintiff has
 7   testified to was present when he had
 8   conversation with Mr. Vicente, does that
 9   refresh your recollection as to his
10   relevance?
11           MS. BRADY:  Objection.  Assumes
12   facts not in evidence.
13           THE WITNESS:  No, it does not.
14   BY MR. BRUEGGEN:
15       Q.  Again, if Mr. Iglesias had told
16   you that there was someone else present when
17   he had his conversation with Mr. Vicente,
18   that would potentially be a witness you
19   would want to call, right?
20       A.  Yes.
21       Q.  Again, I'm sure maybe you don't
22   remember, but as you gleaned, Mr. Vicente
23   says that Mr. Iglesias confessed to him and
24   Mr. Iglesias denied that, okay, sir?
```

Case: 1:19-cv-06508 Document #: 249-5 Filed: 01/30/24 Page 424 of 550 PageID #:14464

```
 1       A.  Okay.

 2       Q.  And so with that, any other

 3  potential witnesses to that conversation

 4  would be relevant, right?

 5       A.  Yes.

 6            MS. BRADY:  Objection.  Form to

 7  the last question.

 8                 (Whereupon, DeLeon Deposition

 9                  Exhibit No. 16 was

10                  screen-shared/referenced.)

11  BY MR. BRUEGGEN:

12       Q.  Sir, I am going to show you what

13  we will mark as Exhibit 16.

14            And for the record, this is

15  Iglesias 2150 to 2152.  I will put it up on

16  the screen.

17       A.  Okay.

18       Q.  Sir, do you see a document up on

19  your screen?

20       A.  Yes.

21       Q.  And I will give you a chance to

22  review the first page of that document.

23       A.  Okay.

24       Q.  Sir, the first page is letterhead
```

1  from your office that notes you're including

2  supplemental answers to discovery; is that

3  correct?

4      A.  Yes.

5      Q.  And it was signed by a Chris

6  Siller.  Do you see that?

7      A.  Yes.

8      Q.  Was he one of those associates who

9  worked on cases with you from time to time?

10      A.  No.  She was a secretary of mine.

11      Q.  Gotcha.  So looking at page

12  Iglesias 2151, do you see a supplemental

13  answer to discovery?

14      A.  Yes.

15      Q.  Do you see you disclose now

16  additional witnesses that may be called?

17      A.  Right.

18      Q.  Let me show you the last page.

19  It's just a continuation, but looking at

20  Iglesias 2151, do you see the name Richard

21  Garvin?

22      A.  Yes.

23      Q.  Do you know who Richard Garvin is?

24      A.  No.

1     Q.  Do you know if Richard Garvin was

2  another criminal defense attorney who

3  practiced around the same time you did?

4     A.  I don't ring a bell -- his name

5  does not ring a bell.  I don't know who he

6  is.

7     Q.  And on this list, you also have

8  Donna Makowski disclosed as a witness.  Do

9  you see that, sir?

10     A.  Yes, I see that.

11     Q.  Do you have any recollection of

12  why you would have disclosed Ms. Makowski

13  who was also representing Mr. Iglesias with

14  you as a witness?

15     A.  Don't remember.

16              (Whereupon, DeLeon Deposition

17               Exhibit No. 17 was

18               screen-shared/referenced.)

19  BY MR. BRUEGGEN:

20     Q.  Sir, the next document that I will

21  make as an exhibit that I am going to share

22  with you, I want you to look at it and see

23  if you can identify the handwriting.

24              For the record, this will be

```
 1   Exhibit 17, and it is Bates stamp Iglesias
 2   2153 and 2154.
 3              All right, sir, let me put
 4   this document up so you can see it.
 5       A.  Okay.
 6       Q.  Do you see a document up on your
 7   screen?
 8       A.  Yes.
 9       Q.  And it's called possible witnesses
10   and lists a bunch of names.  Do you see
11   that, sir?
12       A.  Yes.
13       Q.  Do you recognize the handwriting
14   here?
15       A.  Could be mine, but I'm not sure
16   because it's printed.
17       Q.  Showing you the second page, it
18   has also some cursive names.  Do you
19   recognize that handwriting?
20       A.  That handwriting, I don't
21   recognize, but I don't think that's mine.
22       Q.  Sir, in dealing with a case where
23   you have a jailhouse informant, would the --
24   strike that.
```

```
 1                  In dealing with a case with a
 2   jailhouse informant would the interaction
 3   between two -- the witness and your client
 4   be important?
 5            MS. BRADY:  Objection.  Form.
 6            THE WITNESS:  I'm not sure what
 7   you are asking.
 8   BY MR. BRUEGGEN:
 9      Q.  Yeah.  I realized that when I was
10   thinking about the question.  I apologize
11   for that.
12                  Would the time or the date of
13   the interaction between your client and the
14   jailhouse informant be important to your
15   defense to determine whether it was even
16   possible?
17            MS. BRADY:  Objection.  Form.
18            THE WITNESS:  Sure.
19            MS. BRADY:  And incomplete
20   hypothetical.
21   BY MR. BRUEGGEN:
22      Q.  Sir, do you recall there was -- in
23   the case of Mr. Iglesias, there was a
24   question about the date when Mr. Iglesias
```

```
 1  had his conversation with Mr. Vicente?

 2       A.  I have no recollection of that.

 3              (Whereupon, Deposition

 4               Exhibit No. 18 was

 5               screen-shared/referenced.)

 6  BY MR. BRUEGGEN:

 7       Q.  Sir, I will show you another

 8  exhibit, which is another report of

 9  proceedings from Mr. Iglesias's case, dated

10  October 5th of 1994, and we will mark this

11  as Exhibit 18.

12              And for the record, it's

13  Iglesias 2330 to 2335.

14       A.  Okay.

15       Q.  Do you see a document up on your

16  screen?

17       A.  Yes.

18       Q.  Do you see it's a report of

19  proceedings in Mr. Iglesias's case dated

20  October 5, 1994?

21       A.  Yes.

22       Q.  And you see under appearances, it

23  says you were present?

24       A.  Yes.
```

```
 1        Q.  I am going to direct you to
 2   Iglesias 2333 and ask if you can read lines
 3   5 through 16.
 4        A.  Okay.
 5        Q.  Read them to yourself, and then I
 6   will have some questions.
 7        A.  Okay.
 8        Q.  Having had a chance to look at
 9   Exhibit 18, does that refresh your
10   recollection that there was an issue about
11   the date that Mr. Vicente had a conversation
12   with your client, Mr. Iglesias?
13            MS. BRADY:  Objection.  Form.
14            THE WITNESS:  It does not refresh
15   my recollection, but I understand what it
16   says.
17   BY MR. BRUEGGEN:
18        Q.  And again, if you had told the
19   Court that, it would have been true and
20   accurate at the time, right?
21        A.  Yes.
22        Q.  And did you see that you had also
23   had a potential witness that you were going
24   to bring in from Taylorville Correctional
```

```
 1   Center?
 2        A.   That's what it says, yeah.
 3        Q.   And do you have any recollection
 4   of what that witness was going to testify
 5   to?
 6        A.   No.  I have no recollection of
 7   this at all.
 8        Q.   But from the context, it was
 9   relevant to the date of Mr. Vicente and
10   Mr. Iglesias's conversation?
11           MS. BRADY:  Objection.  Foundation
12   and form.
13           THE WITNESS:  I assume it was
14   relevant, otherwise I wouldn't bring him in.
15   BY MR. BRUEGGEN:
16        Q.   Do you recall filing a motion to
17   bar Mr. Vicente's testimony, who was the
18   jailhouse informant?
19        A.   No, I don't recall.
20               (Whereupon, DeLeon Deposition
21                Exhibit No. 19 was
22                screen-shared/referenced.)
23   BY MR. BRUEGGEN:
24        Q.   I am going to mark another
```

 1  exhibit.  This will be Exhibit 19.

 2                    And for the record, this is

 3  Iglesias 2161 through 2162.

 4                    Sir, do you see a document up

 5  on your screen?

 6      A.  Yes.

 7      Q.  Can you tell us what this document

 8  is?  And let me show you the second page as

 9  well.

10      A.  Okay.  I have read it.

11      Q.  Having read that, does that

12  refresh your recollection about moving to

13  bar Mr. Vicente as a witness?

14      A.  No, it does not.

15      Q.  Do you have any recollection of

16  how the Court ruled on this motion?

17      A.  I don't remember filing it.  It

18  appears there is a motion to bar, but I have

19  no independent recollection of what happened

20  to the motion.

21      Q.  Why would you move to bar the

22  admission of a jailhouse confession?

23      A.  Well, it says in the motion why,

24  unreliability, whatever I wrote in there.

```
 1       Q.  Sir, was the potential of a
 2   jailhouse confession being admitted into
 3   evidence against your client, was that
 4   concerning to you?
 5       A.  Yes, of course, because it's --
 6   any confession, whether it's to a policeman
 7   or to another witness, whether it's a
 8   jailhouse witness or not is going to be
 9   damaging to his defense.
10       Q.  Sir, I think I asked you this, but
11   let me make sure.  Do you have any
12   recollection of interviewing Rosendo Ochoa
13   in your defense of Mr. Iglesias?
14       A.  No.
15               (Whereupon, DeLeon Deposition
16                Exhibit No. 20 was
17                screen-shared/referenced.)
18   BY MR. BRUEGGEN:
19       Q.  I am going to mark Exhibit 20,
20   which for the record, is Iglesias 1145, and
21   I'd like to show that to you, sir.  If you
22   take a minute and review this document, I
23   will have some questions for you.  Okay?  Do
24   you see the document, sir?
```

```
 1        A.  Yes.

 2        Q.  If you can take a minute and read

 3   that.  Are you able to read that, or do you

 4   need me to make it bigger?

 5        A.  I can read it.

 6        Q.  All right.

 7        A.  Okay.  I've read it.

 8        Q.  Sir, having had a chance to review

 9   Exhibit 20, which is Iglesias 1145, does

10   that refresh your recollection about

11   interviewing Mr. Ochoa?

12        A.  No, it does not.

13        Q.  On Exhibit 20, is this your

14   signature at the bottom?

15        A.  Yes.

16        Q.  And your signature at the bottom,

17   would that represent that you had prepared a

18   memorandum of interview of Rosendo Ochoa?

19        A.  Yes.  I just don't remember.

20        Q.  Fair enough.

21        A.  All right.

22        Q.  Do you know why you prepared a

23   memorandum of interview of Rosendo Ochoa?

24        A.  Just to document it, I guess, but
```

 1  I don't remember.

 2       Q.  And, sir, I earlier asked you

 3  about when you interviewed witnesses if you

 4  took notes or created interviews, and you

 5  said you normally just took notes on a

 6  yellow legal pad or something of that

 7  nature, right?

 8       A.  Yes.  I don't know how to type, so

 9  I must have had my secretary type up what I

10  wrote.

11       Q.  Okay.

12       A.  So I could tender a good copy to

13  the State, I think.

14       Q.  And why would you need to

15  tender --

16                    (Reporter clarification.)

17       A.  My handwriting is not that good,

18  so I would have wanted it to be legible.

19       Q.  Why would you need to tender a

20  copy of this to the estate -- to the State,

21  sorry?

22       A.  Well, because any time they take a

23  statement from somebody, they have to tender

24  it by discovery rules.  If I take a

 1  statement, I have to tender it to them by

 2  discovery rules.

 3       Q.  So would your statement of

 4  Mr. Vicente have been tendered to the State?

 5            MS. BRADY:  Objection.  Form.

 6            THE WITNESS:  I don't remember

 7  writing down a statement from Vicente.

 8  BY MR. BRUEGGEN:

 9       Q.  So maybe the -- maybe it's a poor

10  question, but is there a difference between

11  interviewing someone and taking notes and,

12  quote/unquote, taking a statement from that

13  person?

14       A.  No, it's the same thing.

15       Q.  So if you interviewed or -- strike

16  that.

17            As we discussed earlier by, if

18  you will, yourself or somebody working with

19  you.  Do you recall that?

20       A.  Right.

21       Q.  And so the notes of that interview

22  would have been tendered to the State?

23            MS. BRADY:  Objection.

24  Foundation.

 1          THE WITNESS:  I'm not sure what

 2   your question is.

 3   BY MR. BRUEGGEN:

 4       Q.  Again, I am just trying to

 5   understand that if you interview a witness

 6   and you take notes, do you have to turn

 7   those notes over to the State as part of

 8   discovery?

 9       A.  We are supposed to, yeah.

10       Q.  So if notes were taken when

11   Mr. Vicente was interviewed by yourself or

12   somebody else working on Mr. Iglesias's

13   case, those notes should have been turned

14   over to the State, right?

15       A.  I believe so, yes.  But again, I

16   have no recollection of interviewing

17   Mr. Vicente.

18       Q.  When you interviewed Mr. Ochoa,

19   were you limited in any questions you could

20   ask him by the State's Attorney being

21   present?

22       A.  I don't recall the interview of

23   Mr. Ochoa, so I can't answer that.

24       Q.  So let me ask a general question.

 1  When you are interviewing a witness for the

 2  State, can the State's Attorney limit what

 3  you can ask them about and what you cannot

 4  ask about?

 5          MR. BRUEGGEN:  Objection.  Form.

 6          THE WITNESS:  Again, I am not sure

 7  what you are asking.

 8  BY MR. BRUEGGEN:

 9      Q.  I am asking if it's a State

10  witness that you are interviewing, can the

11  State's Attorney say, you can interview him,

12  but you can't ask him about this topic?  Is

13  that allowed?

14      A.  I don't know.  It depends what

15  topic it is.

16      Q.  Sir, I am pretty sure I know the

17  answer, but do you have any recollection of

18  sending an investigator to interview Hugo

19  Rodriguez in the Iglesias case?

20      A.  I don't remember.

21              (Whereupon, DeLeon Deposition

22               Exhibit No. 21 was

23               screen-shared/referenced.)

24

 1  BY MR. BRUEGGEN:

 2       Q.  Let me show you what we will mark

 3  as Exhibit 21.

 4                 For the record, this is

 5  Iglesias 897 through 899.

 6       A.  Okay.

 7       Q.  Do you see a document up on your

 8  screen, sir?

 9       A.  Yes.

10       Q.  And I am going to give you the

11  opportunity if you want, if you'd like to

12  read this.  It's a three-page document with

13  what appear to be notes on the first page,

14  and then some more notes, and looks like a

15  question-answer session.  Do you see that,

16  sir?

17       A.  Yes.

18       Q.  Would you like to review this?

19       A.  Yeah, I can take a quick look at

20  it.

21       Q.  Okay.  Yes, thank you.

22       A.  Okay, I finished this page.

23             Okay, I finished this page.

24             Okay, finished.

1      Q.  All right, sir.  This is
2  consistent with what we talked about
3  earlier, depending on the case, you may hire
4  an investigator to go interview witnesses,
5  right?
6      A.  Right.
7      Q.  In this case, it appears that you
8  hired an investigator from Blue Night
9  Detective Agency?
10         MS. BRADY:  Objection.
11  Foundation.
12         THE WITNESS:  Again, I have no
13  independent recollection that I hired Blue
14  Night Detective Agency, but it appears they
15  went and interviewed the witnesses, so I
16  guess I must have.  I just don't remember
17  it.
18  BY MR. BRUEGGEN:
19      Q.  Fair enough.  Do you work a lot
20  with Blue Night Detective Agency?  Do you
21  remember that agency independently?
22      A.  I don't independently remember
23  that agency.  I must have at that time used
24  them.  I don't see a name of an investigator

 1  on the report.  That might refresh my

 2  recollection, but I don't see his name

 3  anywhere.

 4       Q.  I do not either.

 5            When you use investigators to

 6  go out and interview witnesses, would you

 7  give the investigators the questions you

 8  would want them to ask the witness?

 9       A.  Sure.  We'd discuss -- I'd give

10  them reports.  We'd discuss it, and a lot of

11  times, I would even write out the questions.

12  So it's possible I wrote out those questions

13  that they asked.  Because I see they typed

14  out specific questions and got answers.

15  Those on page 2, whatever it is.  But again,

16  I have no recollection of this.

17       Q.  One of the benefits of you

18  providing the questions for the investigator

19  to ask is that would get you the information

20  that you are specifically looking for,

21  right?

22       A.  Right.  Because even though they

23  are trained investigators, a lot of them are

24  ex-policemen.  Sometimes they don't ask the

```
 1  right questions.
 2       Q.  As you sit here today, do you
 3  recall calling Mr. Iglesias as a witness in
 4  his own defense?
 5       A.  I don't remember.
 6       Q.  Prior to putting on a client in
 7  his own defense, would you have a
 8  conversation with the client about his
 9  constitutional rights to testify?
10       A.  Sure.
11       Q.  I wanted to talk to you about
12  alibis.  Are you familiar with the idea of a
13  general alibi versus a specific alibi?  And
14  let me explain it, a general alibi is I work
15  every day from 9:00 to 5:00, but I don't
16  recall what I did on that specific day, but
17  I normally work 9:00 to 5:00 versus a
18  specific alibi, on that specific date, I was
19  at work and I recall that.
20       A.  Okay.
21           MS. BRADY:  Objection.  Form.
22  BY MR. BRUEGGEN:
23       Q.  Are you familiar with that or --
24       A.  I understand that, what you are
```

```
 1   saying.
 2        Q.  And earlier you looked at what the
 3   police attributed to Mr. Iglesias about his
 4   alibi?
 5        A.  Right.
 6        Q.  And he couldn't remember
 7   specifically what he did on the date of the
 8   shooting, but told them that he was
 9   generally in school until a certain time.
10   Do you recall that?
11        A.  I have no recollection of speaking
12   to Mr. Iglesias about an alibi.  I probably
13   did, but I don't remember it.
14        Q.  And if Mr. Iglesias had told you
15   that his normal -- he doesn't remember
16   specifically what he did on a date, but
17   normally he would go to school and work, and
18   then return home and take care of his child
19   so his girlfriend could do other things,
20   would you have wanted to call his girlfriend
21   to testify to that general alibi?
22            MS. BRADY:  Objection.
23   Foundation.  Form.  Incomplete hypothetical.
24            THE WITNESS:  I don't know.  I
```

```
 1   might.  I'm not sure.
 2              If it's that general an alibi,
 3   I'm not sure that I would think it was that
 4   good for his defense.  Certainly, it's
 5   better to have a specific alibi.
 6   BY MR. BRUEGGEN:
 7       Q.  And that's an assessment you would
 8   have made at the time of trial; is that
 9   fair?
10       A.  Pretty much, just like whether or
11   not the defendant testifies, you asked me
12   earlier.  Whether a defendant testifies,
13   just to let you know, in general, probably
14   80 percent of the time, you advise clients
15   not to testify because they have
16   backgrounds.  That's usually the reason a
17   client doesn't testify.
18              Because even though you may
19   believe in his defense, and you may believe
20   what he is telling you, if he takes the
21   stand and testifies that he has three prior
22   convictions for whatever, having a gun,
23   drugs, whatever it is, the trier of facts
24   certainly is going to look at his background
```

1  and sometimes judge him just by his

2  background no matter what he says.  So

3  sometimes a defendant hurts himself by

4  testifying, even if he is telling the truth

5  100 percent, and you believe in it.

6          So a lot of times you will

7  advise the defendant I wouldn't testify if I

8  was you because you are just going to be

9  destroyed on the stand with your background

10 and the judge or jury is going to convict

11 you because of your background.

12          So all that would have gone

13 into whether or not Iglesias decided to

14 testify or not.  But in the long run, it's

15 his decision.

16          Sorry for taking off of the

17 question.  I don't remember what it was now.

18          THE REPORTER:  I think Dave is

19 frozen.

20          THE WITNESS:  Oh, is that why?

21 Yeah, you're right.  I must have bored him

22 to death.

23          Dave, are you there?  We

24 can't hear you.

```
 1            THE REPORTER:  Rachel, you want to
 2  take us off until he comes back on.
 3            MS. BRADY:  I think we lost him.
 4  Let's go off the record.
 5            THE VIDEOGRAPHER:  We are off the
 6  record at 12:46 at the end of Media
 7  Unit 2.
 8                 (Whereupon, a break was taken
 9                  at 12:46 p.m. to 12:54 p.m.)
10            THE VIDEOGRAPHER:  We are back on
11  the video record at 12:54 at the beginning
12  of Media Unit 3.
13  BY MR. BRUEGGEN:
14     Q.  Mr. DeLeon, again, I'm sorry about
15  losing connectivity there.
16     A.  No problem.
17     Q.  This is, you know, why Zoom deps
18  are not always the easiest, but I appreciate
19  your patience so far.
20     A.  Well, it sounds like there is
21  light at the end of the tunnel.  We are
22  almost there, so I am ready.
23     Q.  Yes.  And so moving on, obviously,
24  you know that Mr. Iglesias was convicted
```

 1  after the trial, right?

 2      A.  Correct.

 3      Q.  And after post-trial motions and

 4  motion for a new trial, did you have any

 5  other involvement in Mr. Iglesias's case and

 6  the appeal?

 7      A.  Not that I remember.

 8      Q.  Do you remember that in his

 9  appeal, he was represented by Sidley &

10  Austin, they had been appointed?

11      A.  I don't remember.

12          MS. BRADY:  Objection.

13  Foundation.

14          THE WITNESS:  I don't remember.

15  BY MR. BRUEGGEN:

16      Q.  Do you know the outcome of his

17  appeal?

18      A.  He won something because,

19  obviously, we are here, and he got out.  I

20  think he got out because I saw him out

21  actually, very briefly, at 26th Street once.

22      Q.  When did you see him?

23      A.  That's a good question.  I'm

24  thinking it might have been three, four

```
 1   years ago, and I am just wild guessing.  I
 2   happened to -- it was definitely before the
 3   pandemic.  I happened to be walking through
 4   26th Street to do my normal work, and I saw
 5   a large group of people by the Chief Judge,
 6   Room 101 outside in the hall, and a young
 7   man walked up to me and said, Mr. DeLeon.
 8   He might have said John.  I don't know,
 9   because most of my clients just called me by
10   my first name.  Do you remember me?  And I
11   said, no, I'm sorry, I don't.
12                   So then he introduced himself
13   who he was and the name, you know, jogged my
14   memory, and I looked at him, and I kind of
15   remembered his face.  And he told me he won
16   some sort of motion, and he was out, and
17   that's -- that was basically the
18   conversation.
19        Q.  Were you aware that
20   Mr. Iglesias -- strike that.
21                   Were you aware that
22   Mr. Iglesias filed post-conviction
23   petitions?
24                   MS. BRADY:  Objection.  Foundation
```

 1  or form as to time frame, whether he is

 2  aware now or at the time.

 3          THE WITNESS:  I'm aware now.

 4  BY MR. BRUEGGEN:

 5      Q.  Sorry?

 6      A.  I'm aware now, but I didn't know

 7  anything about it at the time.

 8      Q.  Were you ever alerted to one of

 9  Mr. Iglesias's post-conviction petition

10  arguments that you had failed to move to

11  quash his arrest?

12      A.  No.  Don't remember that either.

13      Q.  We talked about that before, that

14  if there was a basis to move to quash his

15  arrest, that's a motion that you would have

16  filed, right?

17          MS. BRADY:  Objection.  Asked and

18  answered.

19          THE WITNESS:  If I thought it was

20  appropriate, I would have filed it.  If I

21  didn't file it, it's because I didn't think

22  it was appropriate.  And I respect

23  Mr. Iglesias and any client who files any

24  kind of motion.  If the trial is lost, they

1  have to do everything they can to try and

2  get a new trial, including call me

3  incompetent.  I'm used to that.  All lawyers

4  are.  It's part of the practice.

5  BY MR. BRUEGGEN:

6       Q.  I understand.  Thank you.

7            The next thing I wanted to ask

8  you about was the 2005 time frame, do you

9  have a recollection of talking to

10 Ms. Makowski about Mr. Iglesias?

11      A.  I have no recollection of it, no.

12      Q.  Do you recall that Ms. Makowski

13 sent letters to Mr. Iglesias in the 2005

14 time frame?

15          MS. BRADY:  Objection.

16 Foundation.

17          THE WITNESS:  I don't recall it.

18 BY MR. BRUEGGEN:

19      Q.  Does the name Gabriel Oberfield

20 ring any bells?

21      A.  Not at all.

22      Q.  He was a student at the Medill

23 School of Journalism.

24      A.  Doesn't ring a bell.  I know

1   Medill School of Journalism, but it doesn't

2   ring a bell.

3          MR. BRUEGGEN:  And, Rachel, can

4   you throw up those two letters?  Were you

5   able to pull them out?  Thank you for

6   helping me.

7          MS. BRADY:  Sure.

8              (Whereupon, DeLeon Deposition

9               Exhibit No. 22 was

10              screen-shared/referenced.)

11  BY MR. BRUEGGEN:

12     Q.  Mr. DeLeon, we are going to mark

13  my last exhibit, which will be Number 22.

14              And for the record, it's

15  Iglesias 1440 to 1441.

16     A.  Okay.

17     Q.  Sir, are you able to see a

18  document up on the screen?

19     A.  Yes.

20     Q.  And this exhibit is a two-page

21  exhibit.  There's two documents.  If you can

22  take a minute and just read the first

23  document that's up there.  That's

24  Iglesias --

```
1        A.  Yes, I see it.

2        Q.  -- 1440?

3        A.  Right.

4             I've read it.

5        Q.  All right, sir.

6             And, Rachel, can you go to the

7   second page, please.  Thank you.

8             If you'd take a moment and

9   read the second page of Exhibit 22.

10       A.  Okay.

11       Q.  Sir, having reviewed those two

12  letters from Ms. Makowski, does that refresh

13  your recollection about talking to

14  Ms. Makowski in 2005 about Mr. Iglesias?

15       A.  Not really.

16       Q.  Can you tell me how it refreshes

17  you?

18       A.  Well, she -- when I had that

19  recent conversation with her, she mentioned

20  that she had written him a couple of

21  letters, but I didn't know the content of

22  the letters really other than it was trying

23  to help him with his post-conviction or

24  something like that.
```

```
 1            MR. BRUEGGEN:  Okay.  And, Rachel,
 2   if you can go to the first page again.  I
 3   apologize, but thank you for your help.
 4            MS. BRADY:  Sure.
 5   BY MR. BRUEGGEN:
 6       Q.  Sir, in this letter, it states the
 7   last sentence of the letter, "John needs to
 8   know if you have anyone working on your
 9   post-conviction."
10            Do you see that?
11       A.  Yeah.
12       Q.  Do you recall whether you were
13   interested in working on a post-conviction
14   petition for Mr. Iglesias?
15       A.  I can tell you right now I was not
16   interested in working on a post-conviction
17   for anyone.  I am not a post-conviction
18   lawyer, and I am not sure why Donna wrote
19   that in there.  But we may have had a
20   conversation that I don't recall about
21   Mr. Iglesias.
22            Because I see there was
23   something about -- in the other letter about
24   a sex offender because I do remember
```

1  something about a law -- a sex offender

2  registration law affecting any person who

3  committed a crime against a juvenile, and

4  for some reason, he was thrown into that

5  category and had received notice that he was

6  going to have to report after he was

7  released, I guess, or something like that.

8              In that part of the

9  conversation recently, Donna reminded me

10 that he was considered a person that has to

11 register because of the age of the victim in

12 his case.  That part, I remember.

13             But I don't know why she would

14 put John wants to know because I would -- I

15 did not take on his post-conviction.  And if

16 she brought it up to me, I would have told

17 her to contact the Innocence Project at

18 Northwestern or one of the other groups that

19 specializes in this kind of stuff because I

20 do not do post-convictions.

21    Q.  Okay.

22             MR. BRUEGGEN:  And, Rachel, if you

23 could go to the second page again.

24

```
 1   BY MR. BRUEGGEN:
 2       Q.  Sir, the first line of this, which
 3   is the second page of Exhibit 22, it says,
 4   "John and I were contacted by a reporter
 5   named Gabriel Oberfield from Medill News."
 6              Do you see that?
 7       A.  Yes.  And I have no independent
 8   recollection of being contacted by Gabriel
 9   Oberfield.  It could have happened.  I just
10   don't remember.
11       Q.  And, sir, if you had been
12   contacted by a person from the media saying
13   that a witness in one of your cases has
14   since come out and said he lied or misstated
15   the truth, how would you have responded?
16              MS. BRADY:  Objection.  Foundation
17   and form.  Also I think assumes facts not in
18   evidence and misstates the record.
19              THE WITNESS:  Well, it appears
20   that the way we responded was Donna sent him
21   notice of it.
22   BY MR. BRUEGGEN:
23       Q.  And, sir, before Ms. Makowski
24   would have sent him notice, would you have
```

```
 1   expected her to contact you to talk about

 2   what to do?

 3            MS. BRADY:  Objection.

 4   Foundation.

 5            THE WITNESS:  I know she would

 6   have contacted me because we are still

 7   friends.  And even though we're not in the

 8   same office for a few years, she would -- we

 9   speak every once in a while.  I send her a

10   case once in a while.  She sends me a case

11   once in a while.

12                And certainly if something

13   came up about an old case, just like when

14   this came up, I called her and had a

15   conversation with her, or maybe -- again,

16   maybe she called me, but we had a

17   conversation recently about me being

18   subpoenaed, and me telling her, you might be

19   subpoenaed.  You were co-counsel on that

20   case, so we speak once in a while.

21   BY MR. BRUEGGEN:

22       Q.  Sir, going back to the letter, the

23   last line of the first paragraph says, "He

24   sent your file and I am forwarding it to
```

1   you."

2              Do you see that?

3        A.  Is that in the first paragraph.

4        Q.  Yes, the first paragraph, the last

5   line of -- this is the August 24, 2005,

6   letter.

7        A.  I see what it says, but I have no

8   recollection of being involved in sending a

9   file.

10       Q.  I appreciate that, but from the

11  context of the letter, it appears that

12  Gabriel Oberfield had sent the -- had sent

13  Mr. Iglesias's file?

14       A.  Oh, okay.

15       Q.  And Ms. Makowski was forwarding it

16  to Mr. Iglesias?

17       A.  Okay.  He sent the file to

18  Ms. Makowski, is that what it says?

19       Q.  Just from the context, it says,

20  "He sent your file and I am forwarding it to

21  you."

22       A.  Oh, okay.  Right, I guess.

23       Q.  My question to you is, do you know

24  how Mr. Oberfield would have gotten a copy

```
 1   of Mr. Iglesias's file?

 2           MS. BRADY:  Objection.  Foundation

 3   and form.

 4           THE WITNESS:  I don't know.

 5   BY MR. BRUEGGEN:

 6       Q.  Is it fair to say that you

 7   wouldn't have provided Mr. Oberfield a copy

 8   of Mr. Iglesias's file unless you had

 9   Mr. Iglesias's consent?

10       A.  Of course.

11           MS. BRADY:  Objection.  Foundation

12   to the extent it's unclear from the photo

13   what file anyone is talking about.

14           THE WITNESS:  It is a little

15   vague.  I thought they were saying that I

16   sent the file.  He has sent your file.

17   BY MR. BRUEGGEN:

18       Q.  Again, the way I read it is the

19   "he" is referring to Gabe Oberfield.

20               But regardless, is it fair to

21   say that you would not have given

22   Mr. Iglesias's file to anyone without

23   Mr. Iglesias's permission or a Court order?

24   Is that fair?
```

```
 1        A.   I'm sure I wouldn't do anything
 2   inconsistent with Mr. Iglesias's wishes.
 3             But again, this letter isn't
 4   from me.  It's from Donna, and I know she
 5   put my name on it, but I don't remember it
 6   at all.
 7        Q.   It's not a problem.
 8             MR. BRUEGGEN:  Rachel, can you
 9   take down the exhibits, please.
10             MS. BRADY:  Sure.
11             MR. BRUEGGEN:  Thank you.
12   BY MR. BRUEGGEN:
13        Q.   Mr. DeLeon, do you recall getting
14   a call from Mr. Iglesias in 2005, so it
15   would have been after August after these
16   letters were sent?
17        A.   No, I have no recollection of
18   that.
19        Q.   Sir, in 2005, were you familiar
20   with the We Demand Justice Group?
21        A.   It doesn't ring a bell, but there
22   were so many groups like that out there.  I
23   just don't remember that particular name.
24        Q.   In 2005, were you aware of any
```

```
 1  allegations against Detective Guevara?
 2            MS. BRADY:  Objection.
 3  Foundation.
 4            THE WITNESS:  I can't say the
 5  year, but allegations against Guevara,
 6  official allegations, I'd seen several of
 7  them on television.  I just don't remember
 8  the exact years.
 9                 But I will tell you this,
10  that during the time I practiced in the '80s
11  and '90s, where Mr. Guevara was involved in
12  cases that I defended, drug cases, gun
13  cases, probably even some murder cases,
14  Police Officer Guevara had a reputation.
15  Unfortunately, that reputation on the street
16  among lawyers and defendants was not very
17  good before it exploded into a media frenzy
18  that he was doing things inconsistent with
19  the ends of justice.
20                 He just had a reputation for
21  being a very tough cop that would do
22  whatever it took to make an arrest and get a
23  conviction.  That's what I can tell you,
24  unfortunately.
```

1            I am sorry to say that, but

2    that's just the way it was.  You know, there

3    were a lot of police officers that had bad

4    reputations.  And when you are a defense

5    lawyer in the system, you hear it.  You

6    know, you hear it by way of rumor from other

7    people.

8    BY MR. BRUEGGEN:

9        Q.  Sir, did you -- were you aware of

10   Guevara's reputation, as you just described,

11   back when you were representing

12   Mr. Iglesias?

13       A.  His reputation wasn't as notorious

14   then, but I don't know when he got

15   transferred to work on murder cases, but I

16   think that's when his reputation started

17   getting more notorious to be the kind of

18   person to bend the rules.

19       Q.  Sir, with that knowledge --

20       A.  I can't tell you the years,

21   though.  I can't tell you the years exactly.

22       Q.  Sir, with that knowledge, did you

23   attempt to use that in helping defend

24   clients where Detective Guevara was involved

 1  in the case?

 2      A.  Well, I didn't -- I didn't have

 3  any impeachable evidence, you know, that I

 4  could use to impeach him, if that's what you

 5  are asking me, when defending Iglesias or if

 6  I was representing a defendant on a drug

 7  case or something.  It was just a general

 8  bad reputation.  That's all I can tell you.

 9      Q.  So that reputation was based on

10  rumors?

11      A.  Yes.

12      Q.  And scuttlebutt?

13      A.  Yes.

14      Q.  Sir, were you familiar with the

15  reputation of Ernest Halvorsen or any rumors

16  against him?

17      A.  Halvorsen, I remember that

18  detective's name, I think it involved more

19  with Area 1, if I am not mistaken.  I am

20  depending on a bad memory, okay, because --

21      Q.  No, I understand that, sir.

22      A.  I really have, unfortunately, lost

23  some memory as a result of my stroke, and I

24  realize that.  But I try to reach back and

1  remembered Halvorsen is a name that rings a

2  bell.  He was -- I think he was a detective

3  in murder cases, and he had a bad reputation

4  also.

5      Q.  And can you tell me what that bad

6  reputation was?

7      A.  That again, he would bend the

8  rules to get a conviction.

9      Q.  Is that similarly based on rumor

10 and supposition?

11     A.  Sure, rumors.

12     Q.  Sir, how about the name Gawrys,

13 Steve Gawrys, does that name ring a bell at

14 all?

15     A.  Doesn't ring a bell.

16     Q.  How about the name Tony Riccio,

17 does that name ring a bell?

18     A.  No.

19     Q.  The name Bob Biebel, does that

20 name ring a bell?

21     A.  No.

22     Q.  Sir, other than the one

23 conversation you had with Mr. Iglesias that

24 you told us about at 26th and California,

 1  have you had any conversations with

 2  Mr. Iglesias since the time you represented

 3  him?

 4       A.  No.

 5            MR. BRUEGGEN:  Sir, those are all

 6  the questions I have.  Thank you very much

 7  for your patience and answering the

 8  questions.

 9            THE WITNESS:  Thank you.  I can

10  sign off then?

11            MR. BRUEGGEN:  No, no.  I'm sorry,

12  there's other attorneys that may have

13  questions as well.

14            THE WITNESS:  Okay.

15            MR. BRUEGGEN:  I am not that

16  important, sir.

17                    EXAMINATION

18  BY MR. RAHE:

19       Q.  Hi, Mr. DeLeon.  My name is Austin

20  Rahe.  I represent the Defendant City of

21  Chicago in this case.

22       A.  Sure.

23       Q.  I just have a few questions for

24  you.  Earlier you had mentioned that you

```
 1   don't -- you didn't know or you don't know
 2   the different gangs that fall under the
 3   umbrella of People or Folks.
 4                   Do you remember that
 5   conversation?
 6        A.  Yes.
 7        Q.  Is that based on your knowledge
 8   today, or did you ever have knowledge of the
 9   gangs that fell under each of those
10   umbrellas?
11        A.  I would purposely ignore those
12   classifications.  I know there is some
13   lawyers that could tell you who was under
14   either of those umbrellas.  I didn't want to
15   know it.  I didn't want to learn it.  So I
16   just kept it out of my mind.
17        Q.  Okay.
18        A.  So I don't have -- you could throw
19   a name at me now, and I will tell you I
20   don't know whether they are People or Folks.
21        Q.  Okay.  And you said you
22   represented gang members that could have
23   been from either People or Folks?
24        A.  Yes.  Yes, I'm sure I did.
```

```
 1        Q.  When you issued a subpoena in a
 2   criminal case, you know, down at the bottom
 3   left-hand corner, I think back then, it had
 4   a little space for you to fill in your name
 5   and your --
 6        A.  Uh-huh.
 7        Q.  -- and address, right?
 8        A.  Sure.
 9        Q.  Did you always write your name in
10   there, or did you have some sort of stamp
11   that you would put on there?
12        A.  You mean sign it?
13        Q.  No, not necessarily sign it.  But
14   so each time you file a pleading, you know,
15   you put whatever, respectfully submitted,
16   by, you know, John DeLeon, and then under
17   it, you might have your name, firm name,
18   address and phone number.  You know what I
19   am talking about?
20        A.  Right.
21        Q.  So on the bottom of a subpoena
22   back then, when you would issue it in a
23   criminal case, it had a little preselected,
24   like preprinted like block there where you
```

```
 1  could write your name next to it.  Do you
 2  know what I am talking about?
 3       A.  Okay.  I'm not sure.  I mean, I
 4  would sign it if it required a signature, or
 5  if it didn't require a signature or my
 6  secretary would type our name and address on
 7  there.  Whatever it needed, that's what we
 8  would put on there.  I just don't remember.
 9       Q.  Do you ever remember your law firm
10  having -- or you or your firm having a stamp
11  that had your name, address, and telephone
12  number on it?
13       A.  We might have.  I'm pretty sure we
14  probably did because I think I used to stamp
15  all my files, too, with that same stamp.
16       Q.  Thank you.  Do you recall what
17  years you did that?  Have you done it your
18  whole career?  No?
19       A.  I can't remember.
20       Q.  Did you ever represent an
21  individual named Jacques Rivera?
22       A.  What was the name?
23       Q.  Jacques Rivera.
24       A.  How do you spell his first name?
```

```
 1        Q.  J-a-c-q-u-e-s, I believe.
 2        A.  I don't remember.
 3        Q.  Okay.  Do you remember -- sorry,
 4   what was that?
 5        A.  I don't remember the name.  I
 6   mean, it's possible.  Rivera, I represented
 7   probably a hundred Riveras.
 8        Q.  Did you ever -- well, have you
 9   ever had any former clients that were
10   criminal defendants in murder cases be or
11   have their convictions reversed other than
12   Mr. Iglesias?
13        A.  I think I have, but I don't
14   remember any of them.
15        Q.  You don't remember any of the
16   names?
17        A.  No.
18        Q.  Have you ever issued a subpoena in
19   a case with your name and information on it
20   where you did not represent the criminal
21   defendant?
22             MS. BRADY:  Objection.  Form.
23             THE WITNESS:  I don't think so.
24   Why would I issue a subpoena for a person
```

 1  that I don't represent?

 2  BY MR. RAHE:

 3      Q.  You don't remember, or you don't

 4  think you have ever done that?

 5      A.  I don't think I have ever done

 6  that.  Why would I do that?

 7          MR. RAHE:  That might be all the

 8  questions I have, but I would like to -- if

 9  we could just take two minutes here --

10  that's literally all I need -- to see if I

11  have anything else.

12          THE WITNESS:  Okay.

13          MR. RAHE:  Is that okay?  Thanks.

14          THE VIDEOGRAPHER:  Do you want to

15  go off the record?

16          MR. RAHE:  Yes, if we can go off

17  the record.

18          THE VIDEOGRAPHER:  We are off the

19  record at 1:21 p.m.

20              (Whereupon, a break was had at

21               1:21 p.m. to 1:24 p.m.)

22          THE VIDEOGRAPHER:  We are back on

23  the video record at 1:24 p.m.

24

 1  BY MR. RAHE:

 2      Q.  Mr. DeLeon, you said you worked

 3  with -- you have worked with some gang

 4  intervention or prevention programs in the

 5  past?

 6      A.  Right.

 7      Q.  Did you ever work in the same gang

 8  intervention program as Mr. Iglesias did?

 9          MS. BRADY:  Objection.

10  Foundation.

11          THE WITNESS:  I'm not sure.  I'm

12  not sure.  I don't remember.

13              I do remember now the name of

14  the organization I worked with with the

15  pastor, Gordon McLean.  It was called Youth

16  for Christ.  We did a lot together.  I don't

17  know if that was the one that Geraldo

18  Iglesias worked in or not.

19  BY MR. RAHE:

20      Q.  Was that associated with a church

21  or something?

22      A.  Yes.  It's a born again Christian

23  church that was sponsored by -- funded by --

24  gosh, he was the most famous pastor in

1   America.  He passed away.  Billy Graham,

2   Billy Graham's organization.

3        Q.  Where was that church located?

4        A.  Well, it's not a building.  Billy

5   Graham's church is basically Christian

6   churches everywhere.  Okay?  It could be in

7   somebody's house that get together in a

8   group.  I can't give you an address, in

9   other words.

10       Q.  Gotcha.

11       A.  Billy Graham's original offices

12  are in California.  That's all I know.

13       Q.  Did you ever work with a gang

14  intervention program through the YMCA?

15       A.  Yes, I did.

16       Q.  Tell me a little bit about that

17  program.  What was it called, and where was

18  the YMCA located?

19       A.  The original YMCA I worked with

20  was on Ashland and Monroe, I believe, and it

21  was -- it's -- it's no longer a YMCA.  I

22  think that's the -- that's now the federal

23  halfway house for federal court.  It was

24  Duncan YMCA, and the director's last name I

1   think was Hector Acosta, but I can't

2   remember for sure if that was the name.

3        Q.  Do you remember the years that you

4   worked with that YMCA?

5        A.  That was before I was a lawyer,

6   but I don't remember the years.

7        Q.  Did you ever work with a program

8   called CeaseFire?

9        A.  I've heard of CeaseFire.  I spoke

10  to, during that time period, with some of

11  the representatives, but I didn't work

12  officially with them.  You know what I mean?

13  I think that was a City program, if I am not

14  mistaken, funded by the City.

15       Q.  Did you ever obtain clients from

16  your work in these gang intervention

17  programs?

18           MS. BRADY:  Objection.  Foundation

19  and form.

20           THE WITNESS:  Not that I can

21  recall.

22           MR. RAHE:  All right.  Those are

23  all the questions I have for you.  I will

24  turn you over to either Ms. McGrath or

```
 1   Ms. Brady.  Thank you.

 2           THE WITNESS:  Thank you.

 3           MS. McGRATH:  I don't have

 4   anything right now.

 5                   EXAMINATION

 6   BY MS. BRADY:

 7       Q.  Mr. DeLeon, I have a few questions

 8   for you.  I am Rachel Brady.  I represent

 9   Gerald Iglesias in this civil litigation.

10       A.  Okay.

11       Q.  I am going to follow up on a

12   couple of spots that Dave asked you about,

13   so it might be a little disjointed, so just

14   bear with me here.

15       A.  Okay.

16       Q.  Did you have a typical practice in

17   the mid-'90s for deciding which witnesses to

18   disclose as people you might call at trial?

19       A.  I'm not sure I understand your

20   question.

21       Q.  Sure.  How did you decide which

22   witnesses to include on your -- the

23   discovery responses where you listed the

24   people that you might call at trial?
```

```
 1        A.  Well, we would always list
 2   everybody and anybody who may be called.
 3   There wasn't a list that was for sure of
 4   people you were going to call because you
 5   have to anticipate things.  Situations
 6   change in the middle of trial sometimes
 7   even, and so you have to -- since you have
 8   to list your witnesses, basically you listed
 9   everybody because you never knew who might
10   become relevant.
11             In the middle of trial, some
12   witness might say, oh well, this is what
13   happened, and I spoke to Jose Gomez about
14   this.  Wait a minute.  Jose Gomez?  And then
15   you remember that name was on the police
16   list that you thought was nobody and didn't
17   say anything, didn't see anything.
18             So if you don't list them, you
19   don't get to call them, so we listed
20   everybody.  That was basically our practice.
21        Q.  And did you always call everyone
22   you disclosed?
23        A.  No.  That's what I am saying.
24   Sometimes you didn't.
```

```
 1        Q.  Sure.

 2        A.  In fact, usually you didn't.

 3        Q.  And would I be correct in

 4   interpreting that there is any number of

 5   reasons why you wouldn't call a witness?

 6        A.  Sure.  I couldn't name them all

 7   there's so many reasons.

 8        Q.  And you have no recollection of

 9   disclosing any particular witness in this

10   case, right?

11        A.  No, I don't know.  The answers to

12   discovery or the ones that were shown to me,

13   no independent recollection of that stuff.

14        Q.  One of the names on those

15   discovery responses that you looked at

16   earlier was Jesus Velasquez, and I think I

17   know the answer to these questions, but I

18   have to ask them.

19        A.  Sure.  I understand.

20        Q.  Do you have any recollection of

21   why you didn't call Mr. Velasquez at trial?

22        A.  I can't remember who he is, how he

23   relates to the case, or why I did or didn't

24   call him, no.
```

 1       Q.  Does the fact that you didn't call
 2   him at trial allow you to draw any
 3   conclusions about what his testimony would
 4   have been?
 5       A.  No.
 6       Q.  You said that you relied on police
 7   reports to come up with an order of
 8   importance for witnesses that you would try
 9   to talk to.  Am I understanding that right?
10       A.  Yes.
11            MR. BRUEGGEN:  Objection to the
12   extent it misstates his prior testimony, but
13   go ahead.
14   BY MS. BRADY:
15       Q.  Were you always successful in
16   locating and interviewing every witness you
17   wanted to?
18       A.  No.
19       Q.  What are some of the reasons that
20   you wouldn't talk to a witness before trial?
21       A.  Because a lot of witnesses would
22   refuse to talk to us, especially policemen
23   and State's witnesses.  If the State had
24   control of their witnesses, they would

1  basically tell their witnesses don't talk to

2  the defense lawyer, don't talk to anybody

3  except the State's Attorney investigator.  I

4  know that's what they would do.  Because

5  witnesses actually told me, I can't talk to

6  you, the State's Attorney told me not to

7  talk to you.

8             Even if I said to them, look,

9  we have a right to interview you.  Don't you

10 think it's fair that you tell me what I need

11 to know to properly represent my client?

12 That wouldn't convince people.  They still

13 would listen to the State's Attorney's, so

14 that's the answer I can give you.

15     Q.  Would it be accurate to say that

16 you tried harder to talk to witnesses who

17 seemed more important to you based on the

18 police reports that you had access to?

19             MR. BRUEGGEN:  Objection.  Form.

20             THE WITNESS:  Sure.  If the

21 witness was important, we'd try harder to

22 interview them.

23 BY MS. BRADY:

24     Q.  And if there was a witness who the

 1  police report said they didn't see anything,

 2  maybe you wouldn't try as hard to talk to

 3  that witness; is that fair?

 4       A.  Sometimes we wouldn't get to them,

 5  and it wouldn't matter that we didn't

 6  because the police report took them out of

 7  it anyways.

 8            You can imagine if a witness

 9  tells a detective, I didn't see anything,

10  that's it, you know, not even so many words.

11  And then I go talk to them, then all of a

12  sudden, he's telling me everything that he

13  saw.  He's going to get impeached if I put

14  him on the stand.  And now he is saying,

15  well, I saw the whole thing, that's not him.

16            Well, don't you think the

17  State's Attorney is going to get up and say,

18  well, wait a minute, Detective Guevara

19  talked to you, and you told Detective

20  Guevara you didn't see anything, that you

21  were looking the other way.  The witness is

22  worthless.  You see what I am mean?

23       Q.  Yes.

24       A.  That's why a lot of times you

 1  don't bother to call the witness who's

 2  already been interviewed by the detectives

 3  and says I saw nothing.

 4       Q.  You were also shown a formal typed

 5  memo documenting an interview that you did

 6  with the prosecutor and a witness named

 7  Rosendo Ochoa?

 8       A.  Right.  And I don't remember that

 9  at all.

10       Q.  So I want to -- I'm sorry, go

11  ahead.

12       A.  I saw that.

13       Q.  And I want to ask about your

14  practice for making formal typed memos about

15  witness interviews, as opposed to just

16  taking handwritten notes.

17            Well, I guess backing up, did

18  you have a practice for deciding whether or

19  not you were going to create a formalized

20  type memo of a witness interview versus just

21  taking notes or not taking notes at all?

22       A.  I didn't have a set practice.

23  Sometimes we would just take notes,

24  handwritten.  Sometimes I would give those

1   notes to the secretary to type them up

2   because my handwriting might have been

3   pretty bad in the memo, and sometimes we

4   wouldn't.  You know, there was no set

5   practice.

6          Q.  When you say sometimes you

7   wouldn't, what do you mean?

8          A.  Well, sometimes I would just stick

9   the handwritten notes in my file, and that's

10  it.

11         Q.  Were there times when you did not

12  take notes at all during a witness

13  interview?

14         A.  If I was interviewing a witness,

15  and he wasn't -- and if he said, for

16  example, I didn't see anything, I might not

17  take any notes on that.

18         Q.  And you said that you would turn

19  over the notes of your interviews to the

20  State.  Do you remember saying that?

21         A.  If it was a formalized memo, I

22  would give it to the State.  And usually if

23  the person gave me a formalized statement,

24  cooperative, and I wrote it out, and then I

1   had my secretary type it up, then, yes, I

2   would give a copy to the State.

3        Q.  Okay.  Am I understanding

4   correctly that you just had kind of your own

5   handwritten notes about a witness interview,

6   that you would not have necessarily turned

7   that over to the State?

8        A.  Sometimes that wouldn't go to the

9   State because it was attorney work product,

10  depending on how it was written and what was

11  said because a lot of times I am writing the

12  kind of cross-examination questions in there

13  or I am writing my thoughts in there, and

14  that's work product.  Work product you don't

15  tender.

16       Q.  I am going to put up a couple of

17  documents that you looked at already.  I

18  have some specific questions about them, so

19  give me a second.

20       A.  Okay.

21       Q.  I am putting up the document that

22  David introduced as, I believe, Exhibit 20,

23  which is the formalized memo of this

24  interview with Rosendo Ochoa and ASA

1  Studenroth and yourself.  Do you remember

2  looking at this a little bit earlier?

3       A.  Yes.

4       Q.  Do you have any reason to think

5  that this report did not accurately

6  memorialize what Mr. Ochoa told you during

7  this interview?

8            MR. BRUEGGEN:  Objection.

9            MR. RAHE:  Objection to form and

10  foundation.

11            THE WITNESS:  Again, I see the

12  memo.  My signature is on there.  It must be

13  what he said.  I don't have a recollection

14  of the interview, but I don't remember the

15  interview.

16  BY MS. BRADY:

17       Q.  Do you recall David Studenroth

18  ever contacting you and saying no, this is

19  not what he said during this interview, he

20  said something else, or this isn't accurate,

21  or anything like that?

22       A.  No.

23       Q.  So this document reflects that

24  Mr. Ochoa told you that he was in his house

1  looking out the second floor window.  Do you

2  see that?

3       A.  Right.

4       Q.  And he says he sees the guy behind

5  a tree shoot at the car.  Do you see that?

6       A.  Yes.

7       Q.  He says the person who shot was a

8  male Hispanic, black pants?

9       A.  Right.

10      Q.  Black hooded sweatshirt, hood up,

11 his skin color was lighter than mine.  He

12 looked white, but he was Latino.

13           Do you see that?

14      A.  Yes.

15      Q.  Do you have any reason to think

16 that this is not accurate?

17      A.  No.  Again, I don't remember it.

18 If it's written there, that's what I signed.

19 It must have been accurate at the time.

20      Q.  And then David showed you Exhibit

21 21.  I think this is the correct exhibit

22 label, which is this typed interview of Hugo

23 Rodriguez from the Blue Night Detective

24 Agency.  Do you remember looking at that a

```
 1  little bit earlier?
 2       A.  Yes.
 3       Q.  And I think the reason that -- it
 4  is suggested that maybe this was your
 5  interview.  It says case number
 6  Iglesias/DeLeon here at the top.  Do you see
 7  that?
 8       A.  Yes.
 9       Q.  Can you tell by looking at this
10  document whether you were even the one who
11  sent the investigator from the Blue Night
12  Detective Agency to do this interview?
13       A.  I believe I must have.
14       Q.  And what gives you that
15  impression?
16       A.  Well, I would have sent an
17  investigator to talk to the witnesses, but
18  again, I don't have any independent
19  recollection of it.
20       Q.  All right.  And do you generally
21  trust your investigators were accurately
22  memorializing their interviews?
23       A.  Sure.
24       Q.  And it appears from this document
```

1   that Mr. Rodriguez says the shooter was

2   dressed in all black.  Do you see that?

3        A.  Yes.

4        Q.  And the question is:  Did you tell

5   him -- the officer at the scene that the

6   shooter was a male Hispanic, light

7   complexion?  And the answer is yes.

8        A.  Yes.

9        Q.  The question is:  "You saw him as

10  he ran away?

11               "Yes.

12               "And you observed him from

13          behind?

14               "Yes."

15               Do you see that?

16       A.  Yes.

17       Q.  Did you have any reason to think

18  that anything in this transcript of

19  Mr. Rodriguez's interview was inaccurate?

20       A.  No reason to believe it was

21  inaccurate.  I'm sure Blue Night is a

22  professional organization, and they did

23  their job.

24       Q.  Do you recall whether the State

1  ever offered Guevara Iglesias any sort of

2  plea deal?

3       A.  I don't recall.

4       Q.  Were you aware in the mid-'90s

5  that police officers kept handwritten notes

6  in their files, as well as typed

7  memorialized general progress reports and

8  supp. reports?

9           MR. RAHE:  Object to form.

10          THE WITNESS:  I was aware that

11 police would take notes and put them in a

12 file called a street file.  I just don't

13 remember when that came out.  I remember it

14 wasn't a known practice at the beginning of

15 my career, but I remember sometime, I don't

16 know if it was in the late '80s or early

17 '90s, the news came out that there were

18 working files that the police had called

19 street files that they were not tendering to

20 the defense.  And that the scandal, shall we

21 call it, came out, and all of a sudden they

22 had to tender street files to defense

23 lawyers on hundreds of cases that they had

24 never done that before.

1      Q.  Did you as a defense attorney in

2  the mid-90's have a way of getting access to

3  the street file or handwritten notes that

4  police officers had created?

5           MR. RAHE:  Objection to form and

6  foundation.

7           THE WITNESS:  Well, if -- again, I

8  don't remember when that revelation came

9  out, what year it was, but I remember it was

10  a scandal.  And after it came out, after

11  defense lawyers like myself were notified

12  that they had these street files, we would

13  start subpoenaing them.  That's the method

14  that we used.  We would send a specific

15  subpoena naming street files.

16  BY MS. BRADY:

17      Q.  And do you -- strike that.

18           Did you have any way of

19  knowing whether all of the handwritten notes

20  had been provided to you in response to the

21  subpoena?

22           MR. RAHE:  Objection to form and

23  foundation.

24           THE WITNESS:  We had no way of

1  checking that.  That would be up to the

2  person sending out the material.

3  BY MS. BRADY:

4      Q.  Did you generally trust that the

5  Cook County State's Attorney's Office was

6  providing you with all of the documents in

7  their possession that you had requested?

8          MR. RAHE:  Form.

9          THE WITNESS:  I mean, we would --

10  the system is based on us.  They trust us to

11  tender our discovery, and we trust them to

12  tender their discovery.  And that's why it

13  was a scandal when we found out there were

14  street files not tendered.

15  BY MS. BRADY:

16      Q.  So you are talking about the

17  police department?

18      A.  No.  I am talking about State's

19  Attorney's Office, too.  If the State's

20  Attorney's Office knew that police were

21  generating street files, why didn't they

22  tender it to us --

23      Q.  Okay.

24      A.  -- if they knew?  Unless the

```
 1  police department was keeping them in the
 2  dark too about it.  I don't know the answers
 3  to those questions.
 4       Q.  Can you recall an instance, as you
 5  sit here today, in which you ever believed
 6  that a prosecutor did not provide you with
 7  all the potential exculpatory information
 8  that the prosecutor had access to?
 9       A.  I can't recall any specific
10  instance today, no.
11       Q.  If you would have known that there
12  was a witness to the shooting that
13  Mr. Iglesias was convicted of who knew the
14  shooter, saw a lineup, viewed Mr. Iglesias
15  in a lineup and did not identify himself as
16  the shooter, would you have relied on that
17  information at trial?
18           MR. BRUEGGEN:  Objection.
19  Misstates the record.  Assumes facts not in
20  evidence.
21           Go ahead, sir.
22           THE WITNESS:  That's a lot of ifs,
23  but I certainly would have tried.
24
```

 1  BY MS. BRADY:

 2       Q.  How would you have relied on that

 3  information?

 4            MR. BRUEGGEN:  Objection.

 5  Speculation.

 6            THE WITNESS:  Well, I suppose you

 7  interview the witness, and if the witness

 8  says that not only that he could not

 9  identify the witness -- I mean not identify

10  Mr. Iglesias, but he'd have to say, that's

11  not him, then you'd call him as a witness.

12  BY MS. BRADY:

13       Q.  Would you agree that that -- if a

14  witness knew who the shooter was and then

15  looked at Mr. Iglesias in a lineup and did

16  not select him that that would be

17  exculpatory?

18            MS. McGRATH:  Objection.  Form.

19            MR. BRUEGGEN:  Assumes facts not

20  in evidence.  Calls for speculation.

21  Incomplete hypothetical.

22            Go ahead.

23            THE WITNESS:  I'm not sure -- if

24  he is going to say that's not him, that's

```
 1   exculpatory.  Just the fact he doesn't
 2   recognize him, I don't think is that strong.
 3   BY MS. BRADY:
 4       Q.  So it's not that strong, but it
 5   still is at least a little exculpatory,
 6   right?
 7            MR. BRUEGGEN:  Objection.  Form.
 8            THE WITNESS:  Again, I think it
 9   could help you but not much.  Because the
10   State's Attorney is going to get up and say,
11   you didn't identify him in the lineup, and
12   the witness says, I'm not sure.  I didn't
13   identify him because I wasn't sure it was
14   him.  Then you are running the gamble that
15   he is going to say, well, now that I am
16   staring at him here in court, it does look
17   like him.  I have had that happen in a
18   trial, so I wouldn't want to risk that.
19   BY MS. BRADY:
20       Q.  Okay.
21       A.  I wasn't the lawyer on it.  It was
22   another lawyer in my -- in a trial I was
23   doing.  There were two defendants fell into
24   that trap and caught a finger and lost the
```

 1  case.

 2      Q.  I want to show you what I believe

 3  Dave identified as exhibit --

 4          MR. BRUEGGEN:  Which document is

 5  it, Rachel?

 6          MS. BRADY:  Wait, give me a

 7  second.  It's the clear close stuff.

 8          MR. BRUEGGEN:  Clear close is

 9  Exhibit 10, RFC 10 to 13.

10  BY MS. BRADY:

11      Q.  I am going to put up a document

12  that you looked at earlier.  This was

13  Exhibit 10.  Can you see this document on

14  your screen?

15      A.  Yes.

16      Q.  This is my version, and I put some

17  highlighting in it just to direct your

18  attention.

19      A.  Okay.

20          MR. BRUEGGEN:  Rachel, just to

21  clarify, are you going to leave the

22  highlighting in there?  Because if you are,

23  can we mark it as 10A then just so we have a

24  copy of the one with the highlighting?  So

```
 1   when we go back and read the transcript, we

 2   know what was directed to.

 3          MS. BRADY:  Let's just mark this

 4   as a totally different exhibit.  So we will

 5   call this 23.

 6          MR. BRUEGGEN:  Yes.

 7          MS. BRADY:  So we are introducing

 8   a new exhibit.  We are calling it 23.

 9

10             (Whereupon, DeLeon Deposition

11              Exhibit No. 23 was

12              screen-shared/referenced.)

13   BY MS. BRADY:

14      Q.  And this is the same clear close

15   report, but it has my highlighting in it.

16      A.  I didn't see it.  Oh, now I see

17   the highlighting, okay.

18      Q.  Okay.  So you were asked some

19   questions about various witnesses in this

20   case and the relative importance of each of

21   the different witnesses, and I think that

22   you had said if a witness looked at a lineup

23   and didn't make any identifications that you

24   would want to talk to that witness, right?
```

```
 1              MR. BRUEGGEN:  Objection.  Form.
 2              THE WITNESS:  I'd talk to the
 3   witness.  I said I may not call him.
 4              MS. BRADY:  I need to find another
 5   report.  Can we go off the record for a
 6   second.
 7              THE VIDEOGRAPHER:  We are off the
 8   record at 1:52 p.m.
 9
10              (Whereupon, a break was taken
11               at 1:52 p.m. to 1:53 p.m.)
12              THE VIDEOGRAPHER:  We are back on
13   the record at 1:53 p.m.
14   BY MS. BRADY:
15       Q.  I am very sorry about that.  So
16   here in this report, you can see the
17   highlighted section.  It says, "ASA Latz
18   requested that two other persons listed in
19   the police reports as potential witnesses,
20   Efrain Torres and David Chmieleski, be
21   allowed to view Geraldo Iglesias in a
22   lineup."
23       A.  Yes.
24       Q.  And here, the next highlighted
```

1  section says, "Efrain Torres did not witness

2  this incident occur and made no

3  identifications."

4            Do see that?

5      A.  Right.

6      Q.  So what stock do you place in a

7  witness' non-identification if the report

8  says that he did not witness the incident?

9            MR. BRUEGGEN:  Objection.  Form.

10  Incomplete hypothetical.

11            Go ahead.

12            THE WITNESS:  Well, I don't put

13  any stock in it, in his identification, or

14  misidentification or attempted

15  identification because he said he didn't

16  witness the incident.

17            MS. BRADY:  Okay.

18            THE WITNESS:  And the David

19  Chmieleski here says he never saw the face

20  of the offender, so what significance is it

21  that he didn't pick him out of the lineup?

22  BY MS. BRADY:

23      Q.  Okay.  And if you would have known

24  while you were investigating this case that,

```
 1  in fact, Efrain Torres knew the shooter,
 2  would that have changed your interpretation
 3  of his identification?
 4       A.  How would I know that?  It says he
 5  didn't witness the incident.
 6            MR. BRUEGGEN:  Belated objection
 7  to form and incomplete hypothetical.
 8  BY MS. BRADY:
 9       Q.  So I am putting up what I believe
10  was Exhibit 7.  This is RFC Iglesias 59,
11  which I think you took a look at earlier.
12       A.  I saw that, yes.
13       Q.  And I am directing your attention
14  to this handwriting down in the lower
15  left-hand corner, and this is an interview
16  with Sarah Torres, and it says here --
17       A.  Okay.
18       Q.  -- at least the way I am
19  interpreting this, son came from the boys
20  club, knows shooter.  Do you see that?
21       A.  Okay.
22            MR. BRUEGGEN:  Objection.
23  Objection to the extent it misstates what it
24  says there.
```

```
 1                Go ahead.
 2   BY MS. BRADY:
 3       Q.  Do you agree that at least it's a
 4   little ambiguous what this says, that it
 5   could say that son came from boys club,
 6   knows shooter?
 7            MR. BRUEGGEN:  Objection.
 8   Foundation.  Form.
 9            THE WITNESS:  I don't know.  That
10   is written so badly, I don't know if it says
11   knows shooter or knows shorti.  I don't
12   know.  I don't know what that second word
13   is.
14   BY MS. BRADY:
15       Q.  Is it possible that it says "knows
16   shooter"?
17            MR. BRUEGGEN:  Objection.
18            THE WITNESS:  It's possible.
19            MR. BRUEGGEN:  Foundation.
20   Speculation.
21   BY MS. BRADY:
22       Q.  So if you would have known that
23   Sarah Torres's son knew the shooter, and by
24   that I mean if you wouldn't have had access
```

```
 1   to this document, and then you would have

 2   seen this section of the police report that

 3   says, Efrain Torres did not witness the

 4   incident and made no identification, would

 5   that have changed your approach to Efrain

 6   Torres as a witness?

 7           MR. BRUEGGEN:  Objection.

 8   Incomplete hypothetical.

 9           MS. McGRATH:  Objection.  Form.

10           THE WITNESS:  Well, it would have

11   changed my approach, and I'd want to talk to

12   Efrain Torres or have the investigator talk

13   to him and get to the bottom, yes.  Because

14   I can see the ambiguity here.  Police say he

15   didn't -- he told the police he didn't

16   witness it, and the other notes insinuate

17   that he knew the shooter.

18   BY MS. BRADY:

19       Q.  And, in fact, this police report

20   that says Efrain Torres did not witness this

21   incident occur, that's just the detective's

22   version of what the witness may have said,

23   right?  It doesn't necessarily mean that he

24   said that at all, does it?
```

```
 1      A.  Yes.

 2           MR. RAHE:  Object to form and

 3  foundation.

 4           MS. BRADY:  Sorry, what was your

 5  answer?

 6           THE WITNESS:  Yes.

 7  BY MS. BRADY:

 8      Q.  Were you aware at any point during

 9  Geraldo Iglesias's criminal proceedings that

10  the detectives made up a fake confidential

11  informant?

12           MS. McGRATH:  Objection to form.

13           MR. BRUEGGEN:  Objection.

14  Foundation.

15           THE WITNESS:  I don't recall being

16  aware of that.

17  BY MS. BRADY:

18      Q.  If you had been aware that the

19  detectives made up a confidential informant

20  and that no such confidential informant

21  actually existed, what would you have done

22  with that information?

23           MS. McGRATH:  Objection.  Form.

24           MR. BRUEGGEN:  Assumes facts not
```

```
 1  in evidence.  Incomplete hypothetical.
 2            THE WITNESS:  If I could, I would
 3  bring it out, obviously, but I don't know
 4  how I could possibly know that.
 5  BY MS. BRADY:
 6      Q.  If you would have been aware
 7  during Geraldo Iglesias's prosecution that
 8  the police used suggestive identification
 9  procedures in order to get eyewitnesses to
10  identify Geraldo Iglesias out of a lineup,
11  would you have used that information in some
12  way?
13      A.  Of course.
14            MS. McGRATH:  Objection to form.
15            MR. BRUEGGEN:  Objection.  Assumes
16  facts not in evidence.
17  BY MS. BRADY:
18      Q.  Why do you say of course?
19      A.  Well, if I have any evidence that
20  the police used wrongdoing to convict
21  somebody, I am obligated to bring it out,
22  and I want to bring it out to show they did
23  wrong, and they are convicting an innocent
24  person.
```

```
 1           MS. BRADY:  I believe that I am
 2  done with my questioning.  Give me one
 3  minute to just look over my notes.
 4           THE WITNESS:  Okay.
 5           MS. BRADY:  Thanks.  Let's go off
 6  the record for four minutes.
 7           THE VIDEOGRAPHER:  We are off the
 8  record at 1:59 p.m.
 9
10           (Whereupon, a break was taken
11            at 1:59 p.m. to 2:03 p.m.)
12           THE VIDEOGRAPHER:  We are back on
13  the video record at 2:03 p.m.
14           MS. BRADY:  Thanks, everyone, for
15  that little break.  I don't have any more
16  questions, but some of the other attorneys
17  might have some follow-up, but I will thank
18  you for your time.
19           THE WITNESS:  Thank you.
20           MR. BRUEGGEN:  Mr. DeLeon, I don't
21  have anything in follow-up.
22                Austin, Megan, do you guys
23  have anything?
24           MR. RAHE:  City doesn't have
```

 1  anything.

 2          MS. McGRATH:  Everybody has asked

 3  for a minute here, but can I take a

 4  two-minute break just to look at something

 5  in my notes just to make sure I understand,

 6  and I probably don't, but I just want to

 7  check this note.  So I am going to do the

 8  two minutes like everybody else.

 9          THE WITNESS:  Okay.

10          THE VIDEOGRAPHER:  We are off the

11  video record at 2:04 p.m.

12              (Whereupon, a break was taken

13               at 2:04 p.m. to 2:07 p.m.)

14          THE VIDEOGRAPHER:  We are back on

15  the video record at 2:07.

16          MS. McGRATH:  Thank you.  And

17  thank you for your patience, letting me look

18  at my notes, Mr. DeLeon.  I don't have any

19  additional questions, and thank you so much

20  for your time.

21          MR. BRUEGGEN:  Mr. DeLeon, I have

22  one additional question, but it's not

23  substantive, but it's about the transcript,

24  whether you'd like to reserve signature or

1    waive signature.  I am going to explain that

2    to you is the court reporter has been typing

3    everything up.  When it's printed out, you

4    have the opportunity to reserve, you know,

5    you get to read it over.  You can't change

6    any answers, but you can correct

7    mistranscriptions, stuff of that nature, and

8    you sign off on it.  Or you can waive

9    signature and trust she wrote down

10   everything appropriately, but the choice is

11   yours, sir.

12            THE WITNESS:  I trust her.  Waive

13   signature.

14            MR. BRUEGGEN:  Let the record

15   reflect signature is waived.  You are done,

16   Mr. DeLeon.  I appreciate your time.  Thank

17   you very much.

18            THE WITNESS:  Thank you.  Thank

19   you, everybody.  Have a good day.

20                  (Discussion had off the

21                   stenographic record.)

22            THE VIDEOGRAPHER:  This concludes

23   today's deposition of John DeLeon.  We are

24   off the video record at 2:08 p.m. at the end

1   of Media Unit 3.

2                    (Deposition proceedings

3                     concluded at 2:08 p.m.)

4

5

6

7                    *  *  *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS   )
                        )   SS:
2   COUNTY OF DUPAGE    )

3

4        I, MARIBETH REILLY, a notary public

5   within and for the County of DuPage and

6   State of Illinois, do hereby certify that

7   heretofore, to-wit, on April 6, 2022, JOHN

8   DeLEON remotely appeared before me via Zoom

9   Teleconference in a cause now pending and

10  undetermined in the United States District

11  Court, Northern District of Illinois,

12  Eastern Division, wherein GERALDO IGLESIAS

13  is the Plaintiff, and the CITY OF CHICAGO,

14  ET AL., are the Defendants.

15       I further certify that the said JOHN

16  DeLEON was first administered an oath to

17  testify the truth, the whole truth and

18  nothing but the truth in the cause

19  aforesaid; that the testimony then given by

20  said witness was reported stenographically

21  by me in the remote presence of the said

22  witness, and afterwards reduced to

23  typewriting by Computer-Aided Transcription,

24  and the foregoing is a true and correct

1 transcript of the testimony so given by said

2 witness as aforesaid.

3     I further certify that the signature

4 to the foregoing deposition was waived by

5 the witness, and that there were present at

6 the deposition the attorneys hereinbefore

7 mentioned.

8     I further certify that I am not

9 counsel for nor in any way related to the

10 parties to this suit, nor am I in any way

11 interested in the outcome thereof.

12     IN TESTIMONY WHEREOF:  I certify to

13 the above facts this 25th day of April,

14 2022.

15

16

17

18

19 _____
   MARIBETH REILLY, CSR
20 LICENSE NO. 084-002306

21

22

23

24

Index: $10,000–2303

JOHN DELEON, 04/06/2022

### Exhibits

**1 DeLeon 040622-1** 35:2

**2 DeLeon 040622-2** 42:19

**3 DeLeon 040622-3** 48:4,12 49:17

**4 DeLeon 040622-4** 51:2,6 54:5

**5 DeLeon 040622-5** 56:2,8 57:22 58:12 61:3 62:21

**6 DeLeon 040622-6** 72:12 73:12, 16 74:23 76:3,22 80:7,11,12 82:1, 20

**7 DeLeon 040622-7** 79:2,6,12 80:2,20 81:13 202:10

**8 DeLeon 040622-8** 87:3,5

**9 DeLeon 040622-9** 95:13,18

**10 DeLeon 040622-10** 5:24 99:2, 6 100:15 101:15 198:9,13

**11 DeLeon 040622-11** 117:17,21

**12 DeLeon 040622-12** 119:10,15

**13 DeLeon 040622-13** 121:14,22

**14 DeLeon 040622-14** 123:11,16

**15 DeLeon 040622-15** 126:15,20

**16 DeLeon 040622-16** 130:9,13

**17 DeLeon 040622-17** 132:17 133:1

**18 DeLeon 040622-18** 135:4,11 136:9

**19 DeLeon 040622-19** 137:21 138:1

**20 DeLeon 040622-20** 139:16,19 140:9,13 187:22

**21 DeLeon 040622-21** 144:22 145:3 189:20,21

**22 DeLeon 040622-22** 157:9 158:9 161:3

**23 DeLeon 040622-23** 199:11

### $

**$10,000** 98:1

### 1

**1** 6:2 35:2 168:19

**1/35** 77:7

**10** 99:2,6,7 100:15 101:15 198:9,13

**10,000** 97:22

**100** 69:15 151:5

**101** 154:6

**10:00** 6:3

**10A** 198:23

**11** 117:17,21

**1145** 139:20 140:9

**11:07** 68:24 69:2

**11:11** 69:2,4

**12** 70:5 102:12 117:19 118:6 119:10,15

**12:46** 152:6,9

**12:54** 152:9,11

**13** 99:7 121:14,22 198:9

**134** 22:19

**14** 123:11,16

**1400** 105:12

**1440** 157:15 158:2

**1441** 157:15

**15** 36:5,13,18,24 37:1 126:15,20

**150** 69:14

**15199** 57:2

**16** 130:9,13 136:3

**17** 132:17 133:1

**18** 118:11 135:4,11 136:9

**19** 6:10 137:21 138:1

**1977** 15:14 69:23

**1978** 16:21

**1982** 89:23

**1993** 12:2 20:20 44:6,8,11 49:2,19 52:7,12 54:7 55:14 56:10 57:7 69:8,23 71:7,16 72:3 73:22 74:14 112:21

**1994** 117:19 118:6 121:19 123:21 135:10,20

**1995** 69:9

**1:21** 175:19,21

**1:24** 175:21,23

**1:52** 200:8,11

**1:53** 200:11,13

**1:59** 207:8,11

### 2

**2** 42:17,19 69:5 147:15 152:7

**20** 6:16 69:21 139:16,19 140:9,13 187:22

**2005** 156:8,13 158:14 163:5 165:14,19,24

**2008** 13:6,7,9 17:2

**2022** 6:6

**21** 144:22 145:3 189:21

**2138** 51:7

**2139** 51:7

**2143** 42:12

**2144** 42:12 45:14

**2148** 94:19

**2150** 130:15

**2151** 131:12,20

**2152** 130:15

**2153** 133:2

**2154** 133:2

**2156** 121:23

**2157** 121:24

**2158** 123:17

**2159** 126:22

**2161** 138:3

**2162** 138:3

**22** 157:9,13 158:9 161:3

**2297** 117:18

**2298** 118:9

**23** 56:10 57:6 199:5,8,11

**2302** 117:18

**2303** 119:17

JOHN DELEON, 04/06/2022

**2306** 119:17

**2330** 135:13

**2333** 136:2

**2335** 135:13

**23rd** 112:21

**24** 44:6,7,11 45:12 121:19 163:5

**24th** 99:15 119:15,24

**25** 14:16 49:2 50:1 69:22

**25th** 49:19

**26th** 27:2 153:21 154:4 169:24

**2:03** 207:11,13

**2:04** 208:11,13

**2:07** 208:13,15

**2:08** 209:24 210:3

---

### 3

**3** 48:4,12 49:17 58:12 61:3 152:12 210:1

**30** 29:1

**303** 56:7

**314** 56:7

---

### 4

**4** 51:2,6 54:5

**40** 95:19

**40-something** 17:15

**41** 96:7

**42** 95:19

**43** 17:16

**44** 17:17

**48** 87:2

---

### 5

**5** 56:2,8 57:22 58:12 61:3 62:21 106:19 135:20 136:3

**50** 88:11

**53** 45:22

**54** 94:6

---

**55** 87:2

**56** 72:17 73:16

**57** 72:17 73:17

**59** 79:12 202:10

**5:00** 148:15,17

**5th** 135:10

---

### 6

**6** 6:6 72:12 73:12,16 74:23 76:3,22 80:7,12 82:1,20 123:21

**60** 79:13

**600** 6:17

**60s** 27:12

**6508** 6:10

**676** 49:4 50:2 51:15

---

### 7

**7** 73:22 79:2,6,12 80:2,20 81:13 202:10

**70s** 27:13

**71** 14:9

**74** 16:8

**75** 71:11

**78** 16:16

**7th** 87:13 105:1

---

### 8

**8** 52:7 87:3,5

**80** 150:14

**80s** 25:18 166:10 192:16

**897** 145:5

**899** 145:5

**8th** 52:11 54:6 96:21

---

### 9

**9** 61:20 95:13,18

**90s** 25:17 49:14 97:22 166:11 192:17

---

**925** 48:13

**93** 36:19 45:12 50:1 57:2 71:12 87:13 96:21 99:15 105:1

**94** 36:19 119:15,24

**95** 70:24 71:7

**9:00** 148:15,17

---

### A

**a.m.** 6:3 68:24 69:2

**ability** 13:14,16

**abuse** 111:22

**access** 183:18 193:2 195:8 203:24

**accurate** 136:20 183:15 188:20 189:16,19

**accurately** 13:15 93:16 188:5 190:21

**accused** 33:15

**acknowledge** 62:24 63:20

**acknowledged** 64:8

**acknowledging** 64:1

**Acosta** 178:1

**Adam** 17:20,24 18:6 19:12 20:9 22:4,10 69:18

**Adam's** 19:1 20:21 22:19

**addition** 75:15

**additional** 15:18 33:10 97:8 104:17 107:13 131:16 208:19,22

**address** 77:17 172:7,18 173:6,11 177:8

**admission** 138:22

**admitted** 102:24 139:2

**advertise** 19:20

**advise** 150:14 151:7

**affecting** 160:2

**affiliated** 29:16 86:5

**affiliation** 19:11,13,15

**afford** 97:14

**age** 160:11

**agencies** 31:8

**agency** 30:12 146:9,14,20,21,23

---

JOHN DELEON, 04/06/2022

189:24 190:12

**agg** 13:21

**agree** 196:13 203:3

**ahead** 24:8,11 25:15 31:11,17 45:7
58:18 60:3 66:17 68:14 126:2
182:13 185:11 195:21 196:22
201:11 203:1

**alerted** 155:8

**alibi** 33:16,20 105:1,7 106:12
148:13,14,18 149:4,12,21 150:2,5

**alibis** 148:12

**allegations** 166:1,5,6

**alleged** 25:24 117:6

**allowed** 50:24 107:20 144:13
200:21

**alluded** 93:3

**ambiguity** 204:14

**ambiguous** 203:4

**America** 177:1

**American** 28:11,24

**amount** 37:12 97:13,15

**Announcement** 54:19

**answering** 170:7

**answers** 131:2 147:14 181:11
195:2 209:6

**anticipate** 180:5

**apologize** 134:10 159:3

**appeal** 43:18 153:6,9,17

**appearance** 30:20 43:10 44:14,23
45:4 46:1,9,20,22 67:15

**appearances** 43:23 57:9 135:22

**appeared** 44:20 46:5 57:10 58:7

**appearing** 63:16

**appears** 44:6,20 48:18,24 58:19
62:15 63:18 80:18 83:14,22 84:14
107:7 118:19 119:5 123:2,20
138:18 146:7,14 161:19 163:11
190:24

**appointed** 153:10

**approach** 204:5,11

**appropriately** 209:10

**approved** 110:3,5,7

**April** 6:6

**area** 23:20 26:21 27:15 106:19
168:19

**areas** 28:16

**argument** 106:13

**arguments** 155:10

**Arnell** 77:4 81:22 96:9

**arraigned** 60:5

**arraignment** 54:17,18,22 55:2,7,
8,16,17,23 57:24 58:15 59:6,19
60:9,16

**arraignments** 60:13

**array** 101:16,20

**arrest** 98:18 110:21,22 111:6,7,11,
17 155:11,15 166:22

**arrested** 46:14 128:19

**arriving** 106:19

**arrow** 84:14

**ASA** 106:18,22 107:17 110:7
187:24 200:17

**Ashland** 177:20

**assessment** 150:7

**assigned** 90:23 91:1

**assistant** 49:6,14 107:5

**associate** 18:15,22

**associates** 6:16,19 20:5,6,10
21:18 131:8

**associations** 24:20

**assume** 14:3 53:4 61:22 80:14
137:13

**assumes** 128:24 129:11 161:17
195:19 196:19 205:24 206:15

**attempt** 167:23

**attempted** 13:21 119:5 201:14

**attend** 15:15

**attention** 93:8 198:18 202:13

**attorney** 12:4 14:23 28:7 45:15
49:14,24 53:8,18 71:14 85:3 86:11
88:1 90:14 98:8 107:6,9,11,12
132:2 143:20 144:2,11 183:3,6
184:17 187:9 193:1 197:10

**Attorney's** 49:7 107:2 183:13
194:5,19,20

**attorneys** 23:9 91:10 170:12
207:16

**attributed** 61:21 62:22 82:12 94:8,
12 102:16 104:13,22 120:4 149:3

**August** 56:10 57:6 112:21 163:5
165:15

**Austin** 7:8 153:10 170:19 207:22

**auto** 90:10

**availability** 10:19,20

**aware** 38:12 50:19 85:6 105:16
154:19,21 155:2,3,6 165:24 167:9
192:4,10 205:8,16,18 206:6

---

**B**

**Bacenti** 118:22

**back** 12:1 16:4 20:20 21:22 25:17
26:12 29:14 30:7,24 36:19 41:20
49:14 54:12 55:14 60:21 62:21
68:19 69:3 80:11 81:12 82:1
100:19 110:12 120:12 152:2,10
162:22 167:11 168:24 172:3,22
175:22 199:1 200:12 207:12
208:14

**background** 89:9 150:24 151:2,9,
11

**backgrounds** 150:16

**backing** 185:17

**bad** 103:7 106:3 167:3 168:8,20
169:3,5 186:3

**badly** 203:10

**bail** 54:23 55:1

**bar** 137:17 138:13,18,21

**based** 97:14,23 106:13 111:14
114:23 122:23 124:22 168:9 169:9
171:7 183:17 194:10

**basically** 18:15 19:5 28:10 154:17
177:5 180:8,20 183:1

**basis** 18:9 110:20 111:24 155:14

**Bates** 102:13 133:1

**Bates-stamped** 87:2 117:17

**batt** 13:21

**bear** 179:14

**beat** 71:1

**beginning** 6:2 69:4 74:8,9 152:11

JOHN DELEON, 04/06/2022

192:14

**behalf** 6:7 43:12 55:8 57:10 58:7 62:24 63:17

**Belated** 202:6

**believed** 39:20 110:20 111:5 195:5

**bell** 49:12 101:13 132:4,5 156:24 157:2 165:21 169:2,13,15,17,20

**bells** 156:20

**bench** 13:3

**benches** 69:22

**bend** 167:18 169:7

**benefit** 40:13

**benefits** 147:17

**Bernice** 81:13,15 96:10

**Biebel** 7:3 169:19

**bigger** 10:5 140:4

**bill** 49:1,23

**Billy** 177:1,2,4,11

**bit** 41:20 84:11 177:16 188:2 190:1

**black** 189:8,10 191:2

**block** 172:24

**blue** 89:23 146:8,13,20 189:23 190:11 191:21

**blurry** 44:8 84:11

**board** 28:23 41:12

**Bob** 169:19

**body** 89:24

**bond** 44:19,20,24 45:4 46:20,23

**bored** 151:21

**born** 26:8 40:15 176:22

**bother** 185:1

**bottom** 43:18 73:21 77:2 82:7 118:9 140:14,16 172:2,21 204:13

**Bowen** 6:16,19

**box** 83:5

**boys** 77:19 82:9,18,22 83:1,8,22 202:19 203:5

**Brady** 6:23,24 10:21 24:7 25:13 29:20 31:10 36:7,9,22 38:18 39:2 41:13 42:14 44:16 45:6 46:17 47:2

49:20 50:14 52:13,22 53:10 55:10 58:1 59:9,20 60:17 61:13 66:14 71:20 72:7 73:13 74:10 78:2,21,23 82:14 83:16 84:3,16 85:8 93:14 95:10 102:4 103:3 104:4 105:20 108:14,23 109:22 110:24 111:18 115:11,24 116:8 117:1 120:18 123:4 125:12 126:2 128:3,9,24 129:11 130:6 134:5,17,19 136:13 137:11 142:5,23 146:10 148:21 149:22 152:3 153:12 154:24 155:17 156:15 157:7 159:4 161:16 162:3 164:2,11 165:10 166:2 174:22 176:9 178:18 179:1,6,8 182:14 183:23 188:16 193:16 194:3,15 196:1,12 197:3,19 198:6, 10 199:3,7,13 200:4,14 201:17,22 202:8 203:2,14,21 204:18 205:4,7, 17 206:5,17 207:1,5,14

**break** 8:22 9:1 68:11,12,19 69:1 112:5,9 152:8 175:20 200:10 207:10,15 208:4,12

**breaks** 16:24 112:8

**briefly** 10:21 153:21

**bring** 42:5 107:13 136:24 137:14 206:3,21,22

**brought** 41:12 125:5 160:16

**Brueggen** 7:1,2,17 24:9 25:16 30:5 31:11,15 35:4,8,11 36:10,14 37:3,5 38:22 39:14 42:2,11,16,21 44:22 45:8 46:21 47:10 48:6 50:5, 16 51:4 52:16 53:2,16 55:13 56:4 58:10 59:16 60:1 61:1,19 66:16 69:6 72:1,14 73:11,14 74:12 78:5 79:4,11,14 82:16 83:19 84:7,20,21 85:13 87:7 93:19 95:15 99:4 102:9, 10 103:13 104:8,10 106:1 108:17 109:4 110:1 111:3,21 115:14 116:4,13 117:3,23 119:12 120:19 121:16 123:6,13 125:16 126:8,17 128:5,16 129:3,14 130:11 132:19 134:8,21 135:6 136:17 137:15,23 139:18 142:8 143:3 144:5,8 145:1 146:18 148:22 150:6 152:13 153:15 155:4 156:5,18 157:3,11 159:1,5 160:22 161:1,22 162:21 164:5,17 165:8,11,12 167:8 170:5, 11,15 182:11 183:19 188:8 195:18 196:4,19 197:7 198:4,8,20 199:6 200:1 201:9 202:6,22 203:7,17,19 204:7 205:13,24 206:15 207:20 208:21 209:14

**building** 22:17,24 45:21 177:4

**bullet** 90:11

**Bullocks** 81:14,15,20 96:10

**bunch** 68:10 133:10

**bus** 77:4,5 78:8 81:22

---

C

**C-E-N-T-R-O** 28:12

**C11** 43:18

**C12** 43:21

**California** 169:24 177:12

**call** 19:19 37:20 58:24 61:5,17 62:13 129:19 149:20 156:2 165:14 179:18,24 180:4,19,21 181:5,21,24 182:1 185:1 192:21 196:11 199:5 200:3

**called** 7:14 16:4 28:10,12 59:15 62:18 73:24 74:3 86:12 98:9 103:10 113:23 114:2 131:16 133:9 154:9 162:14,16 176:15 177:17 178:8 180:2 192:12,18

**calling** 148:3 199:8

**Calls** 196:20

**calm** 28:18

**camera** 63:8

**Campus** 16:4

**car** 81:4,9 101:2 189:5

**card** 24:19

**care** 26:4 149:18

**career** 71:9 173:18 192:15

**carrying** 24:19

**case** 6:10 11:14 13:1,23 19:2,3 20:16 21:3,10 22:1,2,15 30:11,13, 18 31:6,24 39:15,22 40:7 41:1,5 42:4 43:24 44:2,15,21 46:6 47:12 49:3,18 50:11,13,20 56:11,23 57:2 58:23 59:8,15 60:15 61:6,11,17,23, 24 62:7,12,14,17,20 64:19 65:20 70:12 74:1,4 75:5,10 76:1 78:9,13 80:8 81:9 82:3,13 90:4 91:1 92:8 97:6,22 98:1 99:22 100:20,22 107:4 111:9 114:8,18 115:19 116:2,15 117:10 118:4 119:22 121:20 123:15,20 124:6 127:4,16 133:22 134:1,23 135:9,19 143:13 144:19 146:3,7 153:5 160:12 162:10,13,20 168:1,7 170:21

172:2,23 174:19 181:10,23 190:5
198:1 199:20 201:24

case-by-case 18:9

cases 14:15,18,20,21,22 15:8
19:8,9 20:11 23:23,24 32:4 39:1,10
42:4 47:6,7,9 62:5 69:11,15,23
70:1,5,6,19 71:3 91:11 96:3 97:19
114:17 115:18,22 116:7 122:14
131:9 161:13 166:12,13 167:15
169:3 174:10 192:23

catchall 30:17

category 160:5

caught 197:24

Ceasefire 178:8,9

cellmate 129:5

Center 28:11,24 137:1

Centro 28:12

certificates 15:22

Cha 27:11

Champaign 16:3

chance 73:15 80:1 99:8,20 100:14
101:15 102:20 130:21 136:8 140:8

change 26:14 97:23 98:4 180:6
209:5

changed 202:2 204:5,11

characterizes 109:2

charge 10:3 45:17 52:1 57:4 58:22
61:4 97:18 107:3

charged 13:20 97:18 115:3

charges 46:14 54:19 107:8 110:3,
4,7

check 68:11 208:7

checking 194:1

Chicago 6:17 7:9 16:3,5 24:18
30:15 40:19 70:1 71:18 72:5 88:17
96:3 104:23 170:21

chief 54:16 154:5

child 77:8 149:18

Chmieleski 96:9 107:20 108:2,10,
19 109:7,20 200:20 201:19

choice 62:9 209:10

choose 62:11,19

chose 62:7 78:20 108:6

Chris 131:5

Christ 176:16

Christian 29:3,4,11 40:16 176:22
177:5

church 176:20,23 177:3,5

churches 177:6

Circle 16:4

circumstances 11:19

city 7:9 15:1 24:16,18 26:9,21
28:16 170:20 178:13,14 207:24

civil 179:9

claimed 111:22

clarification 54:3 98:7 141:16

clarify 37:2 198:21

Clark 6:17

classifications 171:12

CLE 15:21

clear 84:15 98:9,15,19 198:7,8
199:14

CLES 15:23

client 33:19 37:7 39:24 53:22 55:5,
8,15 59:6,7 66:4,13 93:9 95:6 97:1
103:16,18 104:13,15,22 105:6
108:12,20 109:8,12,21 110:19
111:5 113:9 126:11 134:3,13
136:12 139:3 148:6,8 150:17
155:23 183:11

client's 32:1 109:16

clients 19:18 21:24 26:2 29:15
33:9,14 40:15 41:2 53:12 59:17
60:13 106:6 150:14 154:9 167:24
174:9 178:15

close 98:9,15,19 198:7,8 199:14

club 77:20 82:9,18,22 83:1,8,22
202:20 203:5

co-counsel 11:7 12:24 14:22
162:19

Cobra 25:4 75:7 103:6

Cobras 25:3

collected 90:16

color 189:11

column 77:2

comfortable 79:9

committed 160:3

common 39:22 40:2 116:6

community 26:12,13,24 27:5

Company 77:5

compensated 21:9

compensation 124:10,11

complaint 47:1

complete 15:13 38:13 63:22 64:12
118:14 125:14

completed 15:11

completing 15:17

completion 36:5

complexion 191:7

computer 87:17

concluded 210:3

concludes 209:22

conclusion 98:17

conclusions 182:3

conducted 107:24

conference 6:5

confessed 116:18 129:23

confession 138:22 139:2,6

confidential 205:10,19,20

confirm 103:18 118:19

conflict 30:3

connectivity 152:15

consent 164:9

considered 160:10

consistent 44:10 119:1 146:2

constitutional 148:9

contact 76:15 78:18 80:3,6 160:17
162:1

contacted 12:5 39:20,23 161:4,8,
12 162:6

contacting 106:18 188:18

contacts 28:21

content 158:21

context 101:11 137:8 163:11,19

continuance 58:3 60:6

Index: continuances-deposition

JOHN DELEON, 04/06/2022

**continuances** 21:2

**continuation** 131:19

**control** 182:24

**controlled** 40:5

**conversation** 60:8 113:10 114:6, 20,22 129:8,17 130:3 135:1 136:11 137:10 148:8 154:18 158:19 159:20 160:9 162:15,17 169:23 171:5

**conversations** 170:1

**convict** 151:10 206:20

**convicted** 75:12 152:24 195:13

**convicting** 206:23

**conviction** 166:23 169:8

**convictions** 150:22 174:11

**convince** 183:12

**Cook** 31:2,3 47:9 53:13 70:1 74:13 129:6 194:5

**cooperative** 186:24

**cop** 166:21

**copies** 38:13 90:19 122:15

**copy** 34:9,12,14 35:24 52:1 65:14, 15 141:12,20 163:24 164:7 187:2 198:24

**corner** 52:3 102:13 172:3 202:15

**correct** 36:6 112:19 118:23 131:3 153:2 181:3 189:21 209:6

**Correctional** 136:24

**correctly** 86:7 187:4

**corroborate** 94:1

**counsel** 6:20 14:13 70:12

**County** 31:2,3 47:9 53:13 70:1 74:14 129:6 194:5

**couple** 34:10 117:13 158:20 179:12 187:16

**court** 6:11,18 7:10 8:3 44:19,20,24 45:4 58:8,13,20 63:9 64:21,23 68:20 70:17,19,20,22 71:2,3 120:14 121:19 122:21 125:6 136:19 138:16 164:23 177:23 197:16 209:2

**courtroom** 63:6

**cover** 21:7 88:10

**coverage** 11:14

**create** 120:23 185:19

**created** 65:10 71:17 72:4 74:7 141:4 193:4

**credibility** 124:19

**crime** 13:19 75:16 83:1 88:5,6,21 89:9 115:3 160:3

**crimes** 88:17

**criminal** 17:22 23:20 40:5 43:13 46:13 47:1,22 50:18 53:18 54:13, 15 71:13 72:6 85:2 86:11 88:1 90:5,14 93:22 96:2 98:8 101:10 110:14 115:21 116:7 127:16 132:2 172:2,23 174:10,20 205:9

**cross-examination** 187:12

**cross-examined** 39:12

**culture** 86:6

**current** 16:22 17:8

**cursive** 83:4,21 133:18

**custody** 58:21 61:4 99:17 119:7

**custom** 38:8

**CV** 6:10


**D**


**damaging** 139:9

**dark** 195:2

**date** 17:17 44:11,24 45:4,9,12 46:7 47:5 50:1 57:6 64:21,23 65:2,5 89:5 105:2 113:19 124:1 134:12,24 136:11 137:9 148:18 149:7,16

**dated** 52:6 87:13 96:20 99:15 118:6 119:23 135:9,19

**daughter** 14:23

**Dave** 7:2 36:22 42:15 71:22 102:5 151:18,23 179:12 198:3

**David** 96:9 107:20 109:7 187:22 188:17 189:20 200:20 201:18

**day** 60:9 64:19 65:3 148:15,16 209:19

**deal** 192:2

**dealing** 53:9,15 133:22 134:1

**death** 151:22

**decide** 62:17 179:21

**decided** 22:23 151:13

**deciding** 179:17 185:18

**decision** 151:15

**defend** 88:6 126:11 167:23

**defendant** 6:8 7:6,9 43:13 50:18 54:20 57:11 62:6 150:11,12 151:3, 7 168:6 170:20 174:21

**defendant's** 49:10

**defendants** 7:2 101:10 115:22 166:16 174:10 197:23

**defended** 166:12

**defending** 93:8 168:5

**defense** 14:23 17:22 53:18 62:9 71:14 75:1 85:3 86:11 88:1 90:5,14 91:10 93:23 96:3 98:8 100:16 109:16 127:15 128:1 132:2 134:15 139:9,13 148:4,7 150:4,19 167:4 183:2 192:20,22 193:1,11

**defenses** 33:17

**degree** 110:8

**Deleon** 6:6 7:13,18,20,21 35:1,5, 10 37:6 42:18,22 48:3 51:1 56:1 57:10,13 61:21 62:24 69:7 72:11 75:9 79:1 87:4 93:20 95:12 99:1 117:20 119:9 121:13 123:10 126:14 130:8 132:16 137:20 139:15 144:21 152:14 154:7 157:8, 12 165:13 170:19 172:16 176:2 179:7 199:10 207:20 208:18,21 209:16,23

**Demand** 165:20

**denied** 129:24

**dep** 112:7

**department** 30:15 70:2 71:18 72:5 88:17 96:4 194:17 195:1

**Depaul** 15:16

**depending** 21:24 22:2 90:4 146:3 168:20 187:10

**depends** 144:14

**deposition** 6:5,7 7:22,24 9:24 10:11,13,14,18 11:2,10 35:1 42:18 48:3 51:1 56:1 72:11 79:1 87:4 95:12 99:1 117:20 119:9 121:13 123:10 126:14 130:8 132:16 135:3 137:20 139:15 144:21 157:8 199:10 209:23 210:2

JOHN DELEON, 04/06/2022

**deps** 152:17

**describe** 85:16

**describes** 73:23

**description** 88:24

**destroyed** 36:16,20 37:1 151:9

**details** 13:19 25:7 60:15 81:8 115:9

**detective** 52:24 80:16 146:9,14,20 166:1 167:24 169:2 184:9,18,19 189:23 190:12

**detective's** 102:7 168:18 204:21

**detectives** 90:24 185:2 205:10,19

**determine** 33:4 66:10 75:22 93:11 97:1 107:3 134:15

**develop** 40:23

**dictate** 97:13

**difference** 142:10

**diligent** 35:23

**direct** 76:23 87:12 94:17 99:14 100:22 118:8 120:2,3 136:1 198:17

**directed** 199:2

**directing** 80:22 102:11 202:13

**directly** 18:2

**director's** 177:24

**directors** 28:23

**disclose** 128:7 131:15 179:18

**disclosed** 43:16 132:8,12 180:22

**disclosing** 181:9

**discovered** 110:22

**discovery** 6:5 30:20,21,23 63:1, 20,21,23,24 64:10,20 65:4,13,24 66:1,12 122:12,13,18 124:3,24 125:1,21 131:2,13 141:24 142:2 143:8 179:23 181:12,15 194:11,12

**discuss** 59:8 147:9,10

**discussed** 142:17

**discussion** 11:4 209:20

**disjointed** 179:13

**District** 6:11,12

**Division** 6:13

**document** 12:14 35:5 42:9,22 43:11 48:14 49:5,16 50:4 51:8,16,

23 56:6,16 58:7 65:4,7,8,10,11,12 72:10,16,22 73:10,18 74:2,6,18 75:4,16 79:6,15 86:24 87:8,23 88:3 95:16,21 96:1,13,24 99:11 117:24 119:19 121:18 122:1,10 123:15,19, 23 124:2 126:19,24 127:7,11 130:18,22 132:20 133:4,6 135:15 138:4,7 139:22,24 140:24 145:7,12 157:18,23 187:21 188:23 190:10, 24 198:4,11,13 204:1

**documenting** 185:5

**documents** 9:14,19 11:9 12:8 34:3 38:11 43:9 47:24 62:16 63:19 64:4,11,16 68:10,15 71:17 72:4 74:15 87:20,24 92:5 96:1 112:14, 21,24 117:13 157:21 187:17 194:6

**Donna** 11:7 12:23 20:15,20 41:15 113:11 132:8 159:18 160:9 161:20 165:4

**door** 23:23

**dot** 84:15

**doubt** 39:11

**draw** 182:2

**dressed** 191:2

**driver** 77:4 78:8 81:22

**drug** 23:23 41:5 61:24 70:6 166:12 168:6

**drugs** 150:23

**duly** 7:12

**Duncan** 177:24

**duties** 28:1,3

---

**E**

---

**earlier** 20:15 53:17 93:3 112:12 119:1 141:2 142:17 146:3 149:2 150:12 170:24 181:16 188:2 190:1 198:12 202:11

**early** 21:22 23:19 25:17 30:7 31:4 110:17 192:16

**easier** 48:20 52:6 69:13 84:24

**easiest** 152:18

**Eastern** 6:13

**easy** 8:7

**Ed** 17:20 18:1,6 19:1 22:20 69:18

**Edgar** 127:19 128:18

**educating** 54:12

**education** 15:11,18

**Efrain** 94:12,16 107:19 108:1,9 109:6 200:20 201:1 202:1 204:3,5, 12,20

**elect** 61:23 62:4,19

**election** 62:19

**end** 18:24 74:8 110:2 152:6,21 209:24

**ended** 21:3 27:7,11

**ends** 166:19

**enforcement** 30:12 31:8

**enters** 54:20

**entire** 104:23

**Ernest** 168:15

**estate** 141:20

**estimate** 69:13 71:11

**et al** 6:9

**eternity** 40:19

**eventually** 23:3 28:9,20 29:7 66:5 67:18 76:1

**evidence** 84:4 90:9,15,18 110:22 129:1,12 139:3 161:18 168:3 195:20 196:20 206:1,16,19

**evils** 26:9

**ex-policemen** 147:24

**exact** 37:22 38:1 113:19 166:8

**EXAMINATION** 7:16 170:17 179:5

**examined** 7:14

**exculpatory** 195:7 196:17 197:1,5

**exhibit** 34:16 35:2 42:15,19 48:4, 12 49:17 51:2,6 54:5 56:2,8 57:22 58:12 61:3 62:21 72:12 73:12,16 74:23 76:3,22 79:2,6,12 80:2,7,11, 20 81:13 82:1,20 87:3,5 95:13,18 99:2,6 100:15 101:15 117:17,21 119:10,15 121:14,22 123:11,16 126:15,20 130:9,13 132:17,21 133:1 135:4,8,11 136:9 137:21 138:1 139:16,19 140:9,13 144:22 145:3 157:9,13,20,21 158:9 161:3 187:22 189:20,21 198:3,9,13 199:4,8,11 202:10

JOHN DELEON, 04/06/2022

**exhibits** 10:1 124:23 165:9

**exist** 38:14

**existed** 205:21

**expected** 162:1

**expenses** 97:9

**experience** 42:6 53:8,14 69:8 116:11

**experienced** 85:15

**explain** 22:18 148:14 209:1

**explaining** 60:16

**explains** 74:19

**explanation** 102:7

**exploded** 166:17

**extensive** 97:24

**extent** 91:6 93:15 102:5 121:4 125:13 164:12 182:12 202:23

**eyewitnesses** 206:9

---

**F**

**face** 40:11 154:15 201:19

**facility** 37:18

**fact** 47:6 75:5 103:19 181:2 182:1 197:1 202:1 204:19

**factions** 26:3 29:16

**facts** 129:1,12 150:23 161:17 195:19 196:19 205:24 206:16

**failed** 155:10

**fair** 8:4 49:16 59:4 65:23 71:12 78:15 91:12 100:21 101:14 111:14 120:13 127:23 140:20 146:19 150:9 164:6,20,24 183:10 184:3

**faith** 110:20

**fake** 205:10

**fall** 171:2

**false** 104:16

**familiar** 47:23 71:17 72:3 85:3 86:11 148:12,23 165:19 168:14

**family** 21:15 39:23

**famous** 27:12 176:24

**fast** 31:14,19,21,24

**fault** 71:21

**favors** 124:17

**federal** 70:16,19,22,23 177:22,23

**fee** 21:17,20,23,24 22:2 97:10,11

**fees** 21:14

**fell** 171:9 197:23

**felony** 106:18,24 107:1,5

**field** 86:13,16

**fighting** 26:16

**figure** 93:9

**file** 23:15,16,18 34:9,13,14 35:24 36:16 37:13 38:6,13,17 39:5,7 44:4 46:2 51:19 52:2 64:12 110:23 111:1,6,10,16 121:2,7 155:21 162:24 163:9,13,17,20 164:1,8,13, 16,22 172:14 186:9 192:12 193:3

**filed** 6:11 30:19 43:12 52:11 54:6, 13 107:3 121:18 124:3 127:3,24 154:22 155:16,20

**files** 30:16 37:8,10,15,21 38:11,24 39:1 155:23 173:15 192:6,18,19,22 193:12,15 194:14,21

**filing** 137:16 138:17

**fill** 65:8 172:4

**filling** 46:9

**final** 100:4

**find** 35:24 94:2 101:10 104:15 200:4

**finding** 106:12

**finger** 197:24

**finish** 8:9 71:22

**finished** 145:22,23,24

**fired** 90:11

**firm** 17:9 18:7 172:17 173:9,10

**fit** 115:18

**flat** 21:24 22:2 97:7,8,12,19

**flip** 95:24

**floor** 22:21 94:18,22 189:1

**focus** 23:20

**folder** 64:15,22 65:2

**Folk** 25:19

**Folks** 25:23 26:19 171:3,20,23

**follow** 179:11

**follow-up** 86:21 117:15 207:17,21

**forgot** 125:18

**form** 24:7 29:20 31:10 36:9,23 41:13 46:9,18 47:2 53:10 55:11 59:21 60:18 65:8,11 74:15 78:23 84:3,16 105:20 108:14 109:22 110:24 111:19 115:11,24 116:8 117:1 120:18 123:4 128:9 130:6 134:5,17 136:13 137:12 142:5 144:5 148:21 149:23 155:1 161:17 164:3 174:22 178:19 183:19 188:9 192:9 193:5,22 194:8 196:18 197:7 200:1 201:9 202:7 203:8 204:9 205:2,12,23 206:14

**formal** 19:11 21:5,8 37:6 120:24 185:4,14

**formalized** 122:17 185:19 186:21, 23 187:23

**forms** 43:10

**forty** 17:15

**forward** 113:8

**forwarding** 162:24 163:15,20

**found** 194:13

**foundation** 25:14 29:21 38:19 39:3 44:17 45:7 46:17 47:3 49:21 50:15 52:14,23 55:11 58:2 59:10, 21 60:17 61:14 72:8 74:11 78:3,23 83:17 84:17 85:9 93:15 95:11 103:4 104:5 111:18 116:9 117:2 123:5 125:13 128:4 137:11 142:24 146:11 149:23 153:13 154:24 156:16 161:16 162:4 164:2,11 166:3 176:10 178:18 188:10 193:6, 23 203:8,19 205:3,14

**four-door** 89:23

**frame** 55:12 155:1 156:8,14

**Francisco** 113:1,3 116:15 118:21

**frenzy** 166:17

**friend** 27:8 128:18

**friends** 24:21,22 25:8 27:18 162:7

**front** 46:10

**frozen** 151:19

**full** 7:19 37:18

**full-time** 14:12,17

JOHN DELEON, 04/06/2022

**funded** 176:23 178:14

**funds** 32:8,9,14,18,24

**future** 40:18,19

---

### G

**Gabe** 164:19

**Gabriel** 156:19 161:5,8 163:12

**gamble** 197:14

**gang** 14:1,3 24:1,4,5,15,20,22
25:3,4,9,10,21,22,24 26:6,14 27:3,
10,18,19,23 28:2,4,13 29:2,18
85:18,19,20 101:1 103:1,10 171:22
176:3,7 177:13 178:16

**gangs** 14:5,6 24:15,21 26:10,11
28:6,18 29:16 85:21 86:5 171:2,9

**Gangster** 103:9

**Gangsters** 103:1,11

**garage** 37:19

**Garvin** 131:21,23 132:1

**gave** 64:21,23 65:1,5,9,16 116:17
124:21 186:23

**Gawrys** 7:3 169:12,13

**gears** 14:8

**general** 8:5 30:7 50:19 69:11
73:24 74:4 75:10 76:14 78:16 80:7
82:3,13,24 88:19 89:8 92:8 97:5,21
143:24 148:13,14 149:21 150:2,13
168:7 192:7

**generally** 25:8 59:5 60:12 73:17
86:6 149:9 190:20 194:4

**generating** 194:21

**Genson** 17:21 18:1,6 19:12 20:10
22:5,11,23 69:18

**Genson's** 19:2 22:20

**Gerald** 179:9

**Geraldo** 6:8 51:14 52:1 56:24
62:23 63:13 99:18 118:5 176:17
200:21 205:9 206:7,10

**girl** 101:2

**girlfriend** 149:19,20

**give** 34:19 47:8,19 54:10 56:12
63:23 68:16,19 71:10 72:18 91:17
93:23 99:8,20 100:2 118:14 126:4
130:21 145:10 147:7,9 177:8

**giving** 7:23 124:18 128:11

**gleaned** 129:22

**glitches** 9:6

**goal** 10:7

**Gomez** 180:13,14

**good** 6:23 7:1,4,7,18 13:8 18:3
26:10 27:8 68:12 71:4 109:15
110:20 141:12,17 150:4 153:23
166:17 209:19

**Gordon** 29:8,9 176:15

**gosh** 176:24

**Gotcha** 32:19 131:11 177:10

**government** 70:24

**Gradually** 18:23

**graduate** 16:6

**Graham** 177:1

**Graham's** 177:2,5,11

**grand** 46:23 47:7,14,17,19,24
49:2,3,19,23 50:1,12,20 51:15,24
52:21 53:5,9,13,15,19,23 54:5

**gray** 89:23

**grew** 26:21,23

**group** 28:10 154:5 165:20 177:8

**groups** 160:18 165:22

**growing** 25:9 27:16

**guarantee** 91:9

**guess** 85:5 98:5 103:7 140:24
146:16 160:7 163:22 185:17

**guessing** 154:1

**Guevara** 6:9 7:6 53:1 65:15 166:1,
5,11,14 167:24 184:18,20 192:1

**Guevara's** 167:10

**guidelines** 38:2

**guilty** 54:21

**gun** 14:20 23:24 150:22 166:12

**guy** 67:7,13 189:4

**guys** 86:1 207:22

---

### H

**hac** 70:14

**halfway** 177:23

**hall** 154:6

**Halvorsen** 7:3 168:15,17 169:1

**hand** 80:15

**handed** 63:19 64:8

**handicapped** 77:8

**handled** 22:14 23:16 60:12

**handwriting** 65:14 83:4,12 132:23
133:13,19,20 141:17 186:2 202:14

**handwritten** 92:7 121:1 185:16,24
186:9 187:5 192:5 193:3,19

**handy** 121:10

**hang** 27:4,15

**happen** 34:18 42:7 59:23 116:12
197:17

**happened** 11:22 62:15 73:22
89:16,17 95:7 102:6,8 120:11
138:19 154:2,3 161:9 180:13

**hard** 18:4 87:18 184:2

**harder** 183:16,21

**harmed** 13:7

**He'll** 54:16

**head** 8:18 29:6

**headings** 88:12

**hear** 9:4 26:3 60:22 151:24 167:5,6

**heard** 67:5 76:19 114:3 178:9

**hearing** 46:20,23 47:5 55:4

**hearings** 47:8,20

**Hector** 178:1

**helping** 157:6 167:23

**highest** 15:10

**highlight** 76:7,8 100:23

**highlighted** 200:17,24

**highlighting** 76:24 198:17,22,24
199:15,17

**hire** 32:14 33:2 97:9,14 146:3

**hired** 17:20 146:8,13

JOHN DELEON, 04/06/2022

**Hispanic** 26:13 189:8 191:6

**home** 105:12 149:18

**homicide** 30:11

**honest** 69:17 114:5

**Honor's** 58:24

**hood** 189:10

**hooded** 189:10

**hour** 112:5

**hourly** 21:17,20,23

**hours** 105:12,19 106:8

**house** 177:7,23 188:24

**Hugo** 108:5 144:18 189:22

**Humboldt** 27:15 28:2 29:9

**hundred** 174:7

**hundreds** 192:23

**hurts** 151:3

**Hyatt** 81:20

**hypothetical** 134:20 149:23
196:21 201:10 202:7 204:8 206:1

———————————

**I**

**idea** 148:12

**identification** 108:1,2,6 201:13,15
202:3 204:4 206:8

**identifications** 199:23 201:3

**identified** 101:19 102:2 128:21
198:3

**identify** 6:20 43:8 44:21 51:22
63:16 108:11 109:12 132:23
195:15 196:9 197:11,13 206:10

**ifs** 195:22

**Iglesias** 6:8 9:15 11:3,11 12:1,9,17
13:19 19:2,3 20:16 21:3,10,15
22:15 25:2 33:24 34:9,13 38:7,14,
17 39:19 40:4 41:11,15,22 42:12
43:16 45:14 47:14 48:13 50:4 51:7,
15 52:1,10 54:8 56:7,11,24 58:21
61:3,10 62:23 63:13 72:17 73:16
75:1,5,7,11 79:12 87:2 94:5 95:19
96:6 99:7,17 101:19,22 102:2,12,
17,23 104:7 105:11,17 106:17
107:21 108:6 110:5,8 111:11,22
113:7 114:12 115:3 116:16,18
117:17 118:5,9 119:17,23 121:23

123:17 125:23 126:22 127:15
128:20 129:15,23,24 130:15
131:12,20 132:13 133:1 134:23,24
135:13 136:2,12 138:3 139:13,20
140:9 144:19 145:5 148:3 149:3,
12,14 151:13 152:24 154:20,22
155:23 156:10,13 157:15,24
158:14 159:14,21 163:16 165:14
167:12 168:5 169:23 170:2 174:12
176:8,18 179:9 192:1 195:13,14
196:10,15 200:21 202:10 206:10

**Iglesias's** 11:14 35:24 36:16
39:15 43:17 44:14 46:6 47:12
49:18 50:3 55:23 57:24 58:14
65:19 75:3 81:9 99:22 100:16
101:6 115:19 117:10 121:19
123:20 127:4 128:18 135:9,19
137:10 143:12 153:5 155:9 163:13
164:1,8,9,22,23 165:2 205:9 206:7

**Iglesias/deleon** 190:6

**ignore** 171:11

**Illinois** 6:12,17 15:5,6 16:2,7,15,21
17:19 56:24 70:9 118:5

**imagine** 184:8

**impact** 13:14

**impeach** 168:4

**impeachable** 168:3

**impeached** 184:13

**Imperial** 102:24 103:9,11

**importance** 67:2,16 182:8 199:20

**important** 109:20 126:9 134:4,14
170:16 183:17,21

**impossibility** 106:13

**impression** 190:15

**improper** 111:6

**inaccurate** 191:19,21

**incarcerated** 116:16 119:3

**incident** 73:22 89:5 201:2,8,16
202:5 204:4,21

**include** 179:22

**included** 80:7

**includes** 89:4

**including** 88:23 131:1 156:2

**incompetent** 156:3

**incomplete** 134:19 149:23 196:21

201:10 202:7 204:8 206:1

**inconsistent** 165:2 166:18

**independent** 12:18 34:1 35:20
40:8 60:9 100:17 113:13 128:13
138:19 146:13 161:7 181:13
190:18

**independently** 146:21,22

**Indiana** 15:3,4,7,8 70:9

**indicating** 54:5

**indication** 81:1

**indicted** 47:7,14,18 52:10 54:9

**indictment** 38:10 47:17,21 48:1
51:24 54:6,13 55:2,6 110:13

**individual** 173:21

**individuals** 26:1

**informant** 100:24 113:8,12 114:8,
15,17,19,24 115:16,17,18,23
116:3,5 133:23 134:2,14 137:18
205:11,19,20

**information** 33:10 68:5 74:17
75:15,17,19 76:14,15,18 78:17,18
80:3,6 82:12,17,19,24 88:4,12,20
89:9,22 90:3 91:5 93:10,24 94:8,12
95:4 98:21 103:17 104:17 109:2,15
113:15 124:10,18,20 126:11
147:19 174:19 195:7,17 196:3
205:22 206:11

**informed** 128:17

**informing** 124:18

**initial** 46:20,22 47:1 65:24 66:12
73:19 80:8 86:22 112:13,20,23

**injuries** 89:1

**Innocence** 160:17

**innocent** 206:23

**insinuate** 204:16

**instance** 195:4,10

**interaction** 134:2,13

**interested** 31:22 159:13,16

**Internal** 37:14

**interpretation** 202:2

**interpreting** 181:4 202:19

**intervention** 28:13 29:2 176:4,8
177:14 178:16

JOHN DELEON, 04/06/2022

**interview** 32:5 33:2,5,6 67:16,24 77:14,24 78:20 91:7 92:11 93:11 95:6,7 97:2 102:17 116:22 117:5,9 119:2 120:9,15,16,20 122:24 140:18,23 142:21 143:5,22 144:11,18 146:4 147:6 183:9,22 185:5,20 186:13 187:5,24 188:7,14,15,19 189:22 190:5,12 191:19 196:7 202:15

**interviewed** 33:12 78:11 92:14,16 96:14,17 121:4 141:3 142:15 143:11,18 146:15 185:2

**interviewing** 109:19 123:2 139:12 140:11 142:11 143:16 144:1,10 182:16 186:14

**interviews** 141:4 185:15 186:19 190:22

**introduced** 154:12 187:22

**introducing** 63:7 199:7

**investigate** 33:21 91:1

**investigated** 96:3

**investigating** 30:13 201:24

**investigation** 31:9 32:6 74:7 86:13,16 88:20 90:5 92:21,24 93:22 98:21

**investigations** 70:2 72:6

**investigator** 32:8,10,14,15 33:1,2 66:7 67:13 97:3 144:18 146:4,8,24 147:18 183:3 190:11,17 204:12

**investigators** 97:9,14 147:5,7,23 190:21

**involved** 14:4,6 27:22 30:13 31:9 32:6 67:23 81:10 91:6 115:17 163:8 166:11 167:24 168:18

**involvement** 153:5

**IRS** 38:2

**issue** 11:8 64:19 136:10 172:22 174:24

**issued** 172:1 174:18

**issues** 29:17

**issuing** 31:7

**Italy** 27:1

_____

**J**

**J-A-C-Q-U-E-S** 174:1

**Jackson** 45:22

**Jacques** 173:21,23

**jail** 59:12 124:17 129:6

**jailhouse** 113:8,12 114:7,15,23 115:16,23 116:2,5 133:23 134:2,14 137:18 138:22 139:2,8

**January** 117:19 118:6

**Jesus** 129:4 181:16

**Jimenez** 27:12

**job** 17:18 28:9 106:8 191:23

**jobs** 106:6

**jog** 58:4

**jogged** 154:13

**John** 6:5 7:13,20 57:10,13 62:23 154:8 159:7 160:14 161:4 172:16 209:23

**joins** 9:18

**Jose** 27:11 180:13,14

**Journalism** 156:23 157:1

**judge** 24:12 46:10 54:17 62:14 63:7,15 126:4,6 151:1,10 154:5

**judge's** 62:13

**July** 52:6,11 54:6

**June** 44:6,7,11 45:12 49:2,4,19 50:1 73:22 87:13 96:21 99:15 104:24 105:1

**junior** 85:23,24

**juries** 47:7 69:22 70:24

**jury** 13:3 46:23 47:14,17,19,24 49:2,4,19,23 50:1,12,21 51:15,24 52:21 53:6,9,13,15,19,23 54:6 151:10

**justice** 165:20 166:19

**juvenile** 160:3

_____

**K**

**k-n-o-w-s** 83:23

**keeping** 195:1

**kids** 86:1

**killing** 26:16 101:2

**kind** 14:13 18:16 19:13 27:20 44:8 67:15 70:21 92:24 93:21 106:7

114:19 154:14 155:24 160:19 167:17 187:4,12

**King** 74:22 75:6,8

**knew** 26:9,10 28:14 29:24 41:15,18 95:1,2 180:9 194:20,24 195:13 196:14 202:1 203:23 204:17

**knowing** 193:19

**knowledge** 167:19,22 171:7,8

_____

**L**

**label** 189:22

**lack** 85:22

**large** 154:5

**Lasalle** 22:19

**late** 25:18 192:16

**Latin** 27:4 28:11,23 75:8

**Latino** 189:12

**Latz** 106:18,22 107:17 110:7 200:17

**law** 14:10 15:12,13,15,17,18 16:10 17:1 18:17 23:21 28:20 30:12 31:8 46:13 47:22 54:13 160:1,2 173:9

**lawyer** 8:3 11:6 21:1,13 24:23 32:21 55:20 70:11 159:18 167:5 178:5 183:2 197:21,22

**lawyers** 18:5 23:1 32:20 156:3 166:16 171:13 192:23 193:11

**leaders** 24:22

**learn** 171:15

**learning** 18:16

**leave** 18:21 93:18 198:21

**left** 22:9 83:3 88:12

**left-hand** 172:3 202:15

**legal** 6:15 141:6

**legible** 99:24 141:18

**letter** 159:6,7,23 162:22 163:6,11 165:3

**letterhead** 130:24

**letters** 84:9 156:13 157:4 158:12,21,22 165:16

**letting** 208:17

JOHN DELEON, 04/06/2022

**level** 15:10

**levels** 85:21

**license** 89:24

**licensed** 16:14 17:19 28:7 70:8,10

**lied** 161:14

**life** 25:9

**light** 152:21 191:6

**lighter** 189:11

**lighting** 89:6

**likewise** 8:11

**limit** 31:18 144:2

**limited** 63:24 70:18 143:19

**lines** 136:2

**lineup** 101:23 102:1 107:21,24
108:20 109:7,9 128:20 195:14,15
196:15 197:11 199:22 200:22
201:21 206:10

**lineups** 107:14

**list** 52:20 65:9,17 80:15,23 92:7
132:7 180:1,3,8,16,18

**listed** 66:19 67:3,19 76:4,10 80:10,
14,17 81:3 82:3 107:18 179:23
180:8,19 200:18

**listen** 183:13

**listing** 65:5

**lists** 52:17 75:16 80:2 81:13 90:9
91:23 96:7 127:10 133:10

**literally** 175:10

**litigation** 179:9

**lived** 94:22

**lives** 94:18

**LLM** 15:19

**local** 70:11

**located** 177:3,18

**locating** 182:16

**location** 89:4 106:14

**lockup** 59:14 60:21

**long** 11:16 13:5 17:13,24 22:3,6,8
41:7 47:23 92:21 151:14

**longer** 177:21

**looked** 12:22 87:23 92:6 118:24

149:2 154:14 181:15 187:17
189:12 196:15 198:12 199:22

**loose** 19:13,15

**Lords** 27:9

**losing** 152:15

**lost** 152:3 155:24 168:22 197:24

**lot** 13:7 14:15 24:1,17 25:4 28:14
29:4,8 34:1 69:17,18,19,23 146:19
147:10,23 151:6 167:3 176:16
182:21 184:24 187:11 195:22

**loud** 8:15

**Love** 74:22 75:6

**lower** 202:14

---

**M**

**made** 35:23 98:18 103:16 108:1,2
125:8 150:8 201:2 204:4 205:10,19

**majority** 69:24 70:3

**make** 10:4,7 38:3 51:17 81:18 84:8
87:19 98:16 106:12 108:5 109:19
112:7 126:6 132:21 139:11 140:4
166:22 199:23 208:5

**making** 109:1 185:14

**Makowski** 11:7 12:5,23 20:16,20
22:3 38:16,23 41:12,16 42:4
113:11,16,21 114:10,23 115:8,15
124:5 132:8,12 156:10,12 158:12,
14 161:23 163:15,18

**Makowski's** 44:5,14 45:3

**male** 77:7 189:8 191:6

**man** 40:12 154:7

**manage** 23:15

**manner** 89:15

**manner/motive** 89:12

**March** 119:14,23 121:19

**Maribeth** 6:18

**mark** 34:16 48:8,12 51:5 56:8
73:12 79:5 87:3 99:6 119:15
121:22 123:15 126:19 130:13
135:10 137:24 139:19 145:2
157:12 198:23 199:3

**marked** 49:17 54:5 95:18

**marking** 42:14

**Mary** 49:8,9,11,24

**material** 194:2

**matter** 6:8 40:5 151:2 184:5

**Mavis** 77:5

**Mcgrath** 7:4,5 178:24 179:3
196:18 204:9 205:12,23 206:14
208:2,16

**Mclean** 29:8,9 176:15

**means** 53:4 62:3 63:4

**meat** 93:1

**media** 6:2 11:14 69:5 152:6,12
161:12 166:17 210:1

**Medill** 156:22 157:1 161:5

**meeting** 60:13

**Megan** 7:5 207:22

**member** 24:15,19 25:22 85:19,20
102:24

**members** 24:2,5 25:5,10,24 26:15
27:18,19,24 28:2,5,17 29:18 39:24
85:23,24 101:1 103:12 171:22

**memo** 120:24 185:5,20 186:3,21
187:23 188:12

**memorandum** 140:18,23

**memorialize** 188:6

**memorialized** 192:7

**memorializing** 190:22

**memory** 12:4 13:7,8 58:5 103:7
154:14 168:20,23

**memos** 185:14

**men** 29:24 40:18

**mentioned** 20:15 158:19 170:24

**met** 59:7

**method** 193:13

**Mexican** 26:24

**mid** 25:17

**mid-'90s** 21:22 23:19 30:8 110:18
179:17 192:4

**mid-90's** 193:2

**middle** 74:8 180:6,11

**Mike** 106:18,22

**military** 17:6

**mind** 171:16

**mine** 131:10 133:15,21 189:11

**minute** 35:12 139:22 140:2 157:22 180:14 184:18 207:3 208:3

**minutes** 60:5 68:17,19,20 175:9 207:6 208:8

**misdemeanor** 14:20

**misidentification** 201:14

**missed** 45:1

**misstated** 161:14

**misstates** 66:14 82:14 84:4,17 161:18 182:12 195:19 202:23

**mistaken** 103:8 168:19 178:14

**mistranscription** 118:20

**mistranscriptions** 209:7

**misunderstanding** 32:16

**moment** 63:23 100:2 158:8

**Monadnock** 22:17,24 45:21

**monetary** 124:11

**money** 124:16

**Monroe** 177:20

**month** 104:24

**Moore** 96:10

**morning** 6:23 7:1,4,7,18

**mother** 39:21 94:19

**motion** 30:22 110:23 111:2,6,10, 16,24 124:2,23,24 137:16 138:16, 18,20,23 153:4 154:16 155:15,24

**motions** 125:2,5,9,20 153:3

**motive** 89:15,17

**move** 10:4 22:24 33:23 68:14 110:21 112:3 138:21 155:10,14

**moved** 15:8 22:11 27:2

**moving** 138:12 152:23

**multiple** 115:22

**murder** 13:20,21,23 14:21 23:24 31:6 32:4 33:15 40:7 44:15 45:18 46:14 47:6,9,15 57:4 62:14 69:11, 15 75:11 97:19,22 98:1 110:8 115:7 166:13 167:15 169:3 174:10

**N**

**named** 11:7 161:5 173:21 185:6

**names** 80:3,6 91:17 92:4,7 127:21 128:11 133:10,18 174:16 181:14

**naming** 193:15

**narration** 66:21,23,24

**narrative** 76:11 82:4 92:22

**nature** 9:7 15:19 105:7 110:14 141:7 209:7

**necessarily** 9:21 86:4 93:16 102:6 104:6 125:14 172:13 187:6 204:23

**needed** 91:17 92:17 96:14 97:1 173:7

**neighborhood** 27:10

**news** 11:13,17 161:5 192:17

**nice** 40:12

**nickname** 101:7,11

**Night** 146:8,14,20 189:23 190:11 191:21

**nodding** 8:17

**non-identification** 201:7

**non-monetary** 124:11

**normal** 38:8,10 60:8 149:15 154:4

**north** 6:16 22:19 27:7 94:19

**Northern** 6:12

**Northwestern** 160:18

**note** 36:3 82:7 208:7

**note-taking** 39:13

**notes** 38:9 77:16 105:10 120:21 121:1,5 131:1 141:4,5 142:11,21 143:6,7,10,13 145:13,14 185:16, 21,23 186:1,9,12,17,19 187:5 192:5,11 193:3,19 204:16 207:3 208:5,18

**notice** 160:5 161:21,24

**notified** 53:19 193:11

**notify** 50:23

**notorious** 167:13,17

**November** 16:16

**nowadays** 14:19

**number** 6:10 43:24 44:2,19 49:3,4 50:2 57:2 69:13 77:8,18 89:24 90:1 102:12 157:13 172:18 173:12 181:4 190:5

**O**

**Oberfield** 156:19 161:5,9 163:12, 24 164:7,19

**object** 36:23 55:10 93:15 102:4 108:24 192:9 205:2

**objection** 24:7 25:13 29:20 31:10 36:7 38:18 39:2 41:13 44:16 45:6 46:17 47:2 49:20 50:14 52:13,22 53:10 58:1 59:9,20 60:17 61:13 66:14 71:20 72:7 74:10 78:2,21 82:14 83:16 84:3,16 85:8 95:10 103:3 104:5 105:20 108:14,23 109:1,22 110:24 111:18 115:11,24 116:8 117:1 120:18 123:4 125:12 126:2 128:3,9,24 129:11 130:6 134:5,17 136:13 137:11 142:5,23 144:5 146:10 148:21 149:22 153:12 154:24 155:17 156:15 161:16 162:3 164:2,11 166:2 174:22 176:9 178:18 182:11 183:19 188:8,9 193:5,22 195:18 196:4,18 197:7 200:1 201:9 202:6, 22,23 203:7,17 204:7,9 205:12,13, 23 206:14,15

**objections** 24:11,13

**obligated** 206:21

**observed** 191:12

**obtain** 178:15

**occur** 201:2 204:21

**occurred** 58:14 65:19 89:10

**Ochoa** 81:2 101:17 102:2 128:21 139:12 140:11,18,23 143:18,23 185:7 187:24 188:6,24

**October** 135:10,20

**offender** 74:20 77:19 82:21 159:24 160:1 201:20

**offense** 74:1,4 75:10 80:8 82:3,13 92:8

**offer** 20:24 112:5

**offered** 20:22 192:1

**office** 18:7,10,11 19:1,2,5,6,14,16 20:21,23 22:4,10,11,21 23:2,3,8,17 35:18 107:2 131:1 162:8 194:5,19,

JOHN DELEON, 04/06/2022

20

**officer** 73:21 166:14 191:5

**officers** 90:24 91:5,10 167:3 192:5
193:4

**offices** 6:16 22:20 177:11

**official** 166:6

**officially** 43:12 178:12

**okayed** 107:7

**Olds** 89:23

**one-third** 76:4

**online** 11:21

**opportunity** 56:13 145:11 209:4

**opposed** 8:17 10:14 185:15

**orally** 8:16 122:20

**order** 67:1,15 93:10 126:4 164:23
182:7 206:9

**organization** 29:3,5,11 176:14
177:2 191:22

**original** 30:18 58:23 61:6 177:11,
19

**originally** 22:18 26:23

**outcome** 153:16

**overfull** 37:20

_____

**P**

**p.m.** 152:9 175:19,21,23 200:8,11,
13 207:8,11,13 208:11,13 209:24
210:3

**pad** 121:2 141:6

**pages** 43:4 51:18 73:16 79:12
88:9,10

**paid** 21:15,16 124:16

**Palmer** 77:20 101:3

**pandemic** 71:6 154:3

**pants** 189:8

**paragraph** 162:23 163:3,4

**paralegals** 23:13

**Park** 27:15 28:2 29:9

**part** 20:22 27:1,24 40:16 43:17
90:4 96:1 115:1 122:23 143:7
156:4 160:8,12

**part-time** 14:14 16:22

**participant** 109:8

**parties** 6:22

**partner** 18:10

**partnered** 29:2

**partners** 19:23

**parts** 100:22

**party** 53:24

**passed** 23:6 177:1

**passing** 115:13

**past** 176:5

**pastor** 176:15,24

**pastor's** 29:7

**patience** 152:19 170:7 208:17

**pay** 21:14 93:8

**paying** 28:9

**payment** 21:19

**pedestrian** 81:2

**pending** 8:24 62:6,13

**people** 10:17 25:18 28:1,14,17
51:14 56:23 67:3,19 68:4 74:22
76:2 81:3 82:2 118:4 154:5 167:7
171:3,20,23 179:18,24 180:4
183:12

**people's** 80:3,6

**Peoples** 25:22 26:18

**percent** 14:16 70:24 71:11 150:14
151:5

**percentage** 21:19,21

**period** 36:4 178:10

**periodically** 37:17

**permission** 107:6 164:23

**person** 26:5 46:14 63:15 68:1 75:6
81:13 85:5,7,18 86:9 89:1 142:13
160:2,10 161:12 167:18 174:24
186:23 189:7 194:2 206:24

**personnel** 90:22

**persons** 107:18 200:18

**petition** 155:9 159:14

**petitions** 154:23

**phone** 41:21 77:7,18 172:18

**photo** 101:16,20 164:12

**photographs** 90:9

**photos** 90:10

**physical** 102:1

**pick** 18:5 67:1 201:21

**picked** 101:22 109:16

**Pilsen** 27:4

**place** 27:21 201:6

**plaintiff** 6:24 129:6

**plaintiff's** 129:5

**plate** 89:24

**play** 70:7

**plea** 54:20 192:2

**pleading** 53:12 172:14

**point** 18:20 64:13 66:11 71:8,9
93:22 205:8

**police** 30:15,16,23 31:23 33:7,9
38:9 60:7 65:15 66:20 67:4 70:2
71:18 72:5 73:19 88:17 90:24 91:5,
9 96:4 105:11 107:4,12,18 108:7
111:23 149:3 166:14 167:3 180:15
182:6 183:18 184:1,6 192:5,11,18
193:4 194:17,20 195:1 200:19
204:2,14,15,19 206:8,20

**policeman** 139:6

**policemen** 107:8 182:22

**policy** 36:18,24 37:7,22 38:1 70:21

**poor** 53:3 142:9

**pop** 29:6

**pose** 8:10,12

**posed** 10:14

**possession** 40:5 194:7

**possibly** 206:4

**post** 29:1

**post-conviction** 154:22 155:9
158:23 159:9,13,16,17 160:15

**post-convictions** 160:20

**post-trial** 153:3

**potatoes** 93:1

**potential** 33:16 88:5 105:7 107:19
108:12 109:17 130:3 136:23 139:1
195:7 200:19

**potentially** 75:23 106:12 109:14 129:18

**practice** 15:4 16:14,22 17:8 18:17, 22 19:24 20:13 30:7,11 31:1 32:4 40:17 64:9 85:2,15 86:10 88:1 98:7 101:9 104:12,14 106:5 110:17 156:4 179:16 180:20 185:14,18,22 186:5 192:14

**practiced** 15:7 47:22 132:3 166:10

**practicing** 14:10,12 16:18,20 17:1 74:13

**practitioner** 17:11,12,14 20:1,3,4

**practitioners** 18:5

**preliminary** 47:5,8,20 55:4

**prepared** 88:16 140:17,22

**preprinted** 65:12 172:24

**preselected** 172:23

**present** 16:21 50:24 53:11 57:23 129:7,16 135:23 143:21

**presented** 49:1,18,23 50:11,20

**president** 27:9 28:22

**pretrial** 98:2

**pretty** 8:3 15:6 17:3 23:5,22 40:11 71:4,13,16 72:9 84:15 97:11 144:16 150:10 173:13 186:3

**prevention** 176:4

**previous** 96:12

**previously** 14:5 92:6 110:12

**printed** 82:8 133:16 209:3

**prior** 10:11 11:10 13:7,9 40:6 55:2, 3,6,15 59:5 62:12 148:6 150:21 182:12

**private** 32:8,9 33:1,2 60:21,22

**pro** 70:14

**problem** 8:22 11:1 25:6 29:23 68:18 98:6 152:16 165:7

**procedure** 60:16

**procedures** 206:9

**proceed** 46:24 60:19 62:8,20

**proceedings** 46:24 53:20 56:10 110:14 117:14,19 118:4 119:14 135:9,19 205:9 210:2

**process** 12:13 46:15 54:15

**product** 187:9,14

**professional** 114:19 191:22

**program** 176:8 177:14,17 178:7, 13

**programs** 27:23 176:4 178:17

**progress** 192:7

**Project** 160:17

**properly** 183:11

**prosecute** 62:8,18

**prosecution** 206:7

**prosecutor** 185:6 195:6,8

**protective** 119:7

**provide** 91:4 98:20 195:6

**provided** 164:7 193:20

**providing** 147:18 194:6

**Puerto** 27:10

**pull** 9:19 157:5

**purposely** 171:11

**pursuant** 36:17

**put** 10:1 58:9 63:8 64:14 66:20 67:6 72:17 79:6 98:17 99:7 101:11, 23 104:5 121:2 127:22 130:15 133:3 160:14 165:5 172:11,15 173:8 184:13 187:16 192:11 198:11,16 201:12

**putting** 148:6 187:21 202:9

**Q**

**quash** 110:21 111:7,11,16,24 155:11,14

**question** 8:10,13,23,24 9:4,5,8 39:22 50:19 53:3 71:23 97:5 103:14 106:3 108:16 123:5 125:18, 19 130:7 134:10,24 142:10 143:2, 24 151:17 153:23 163:23 179:20 191:4,9 208:22

**question-answer** 145:15

**questioning** 207:2

**questions** 8:21 10:9,13,24 57:19 66:23 72:20 79:10 84:23 117:15 126:5 136:6 139:23 143:19 147:7, 11,12,14,18 148:1 170:6,8,13,23 175:8 178:23 179:7 181:17 187:12, 18 195:3 199:19 207:16 208:19

**quick** 30:24 68:12 112:9 145:19

**quickly** 117:14

**quiet** 28:19

**quote/unquote** 142:12

**R**

**R-A-H-E** 7:8

**Rachel** 6:14,24 10:21 37:4 73:11 104:9 118:19 152:1 157:3 158:6 159:1 160:22 165:8 179:8 198:5,20

**Rahe** 7:7,8 170:18,20 175:2,7,13, 16 176:1,19 178:22 188:9 192:9 193:5,22 194:8 205:2 207:24

**raised** 26:9

**ran** 191:10

**random** 128:7

**rare** 116:7,11

**rate** 71:5,8 97:7,8,12,19

**Raymond** 7:20

**reach** 27:23 113:21 168:24

**read** 35:14 43:1,3,7 44:4 48:20 51:11 52:6 56:19,21 57:18 61:2 62:22 67:2 68:21 73:1,8 76:1 79:18 84:5 87:15,18 99:21 100:3,6,7,18 105:22 118:12,17 120:4 123:24 136:2,5 138:10,11 140:2,3,5,7 145:12 157:22 158:4,9 164:18 199:1 209:5

**reading** 61:16 101:17

**reads** 63:11

**ready** 46:10 152:22

**realize** 168:24

**realized** 134:9

**reason** 9:4 55:19 150:16 160:4 188:4 189:15 190:3 191:17,20

**reasons** 126:10 181:5,7 182:19

**recall** 7:23 8:2 11:5,15,24 13:18 14:1 22:9 34:4,8,11 42:3 47:11,13 78:7 80:5 82:11 88:16 96:12 98:14, 19 101:8,17 104:24 112:23 113:2, 5,6 114:13,14 115:18 125:1 134:22 137:16,19 142:19 143:22 148:3,16, 19 149:10 156:12,17 159:12,20 165:13 173:16 178:21 188:17 191:24 192:3 195:4,9 205:15

JOHN DELEON, 04/06/2022

**receipt** 62:24 63:20 64:8

**received** 34:17 112:20 113:22 125:14,20,23 160:5

**receiving** 35:17,20 112:13

**recent** 158:19

**recently** 113:10 160:9 162:17

**recognize** 133:13,19,21 197:2

**recollection** 12:16,18 34:2,3 35:17,20 37:10 39:8,16 40:3,9 41:24 42:10 46:5 47:16 54:7,11 55:22 57:23 58:5 60:10 61:10,16 64:3 65:18,21 74:2,24 78:10,14 81:8 97:17 99:22 100:16,18 113:13 115:6 117:8,11 120:8 127:18 128:13,22 129:9 132:11 135:2 136:10,15 137:3,6 138:12,15,19 139:12 140:10 143:16 144:17 146:13 147:2,16 149:11 156:9,11 158:13 161:8 163:8 165:17 181:8, 13,20 188:13 190:19

**record** 6:3,21 7:19 35:8 36:17,24 37:7 42:11 43:17 48:13 51:6 56:6 63:9 68:21,24 69:4 72:16 73:12 79:11 82:15 84:17 87:1 95:17 117:16 119:16 121:23 123:16 126:21 130:14 132:24 135:12 138:2 139:20 145:4 152:4,6,11 157:14 161:18 175:15,17,19,23 195:19 200:5,8,13 207:6,8,13 208:11,15 209:14,21,24

**recorded** 58:20

**records** 37:14 110:19 111:4

**recovered** 90:10

**recovery** 17:4

**reference** 81:4 106:17 112:24

**referrals** 19:21,22 25:10

**referring** 164:19

**reflect** 93:17 102:6 104:6 209:15

**reflects** 188:23

**reform** 26:7 40:15

**reforming** 28:5

**refresh** 34:2 35:16 54:7 57:22 58:5 61:9,15 74:1,24 78:13 81:7 100:15 120:8 128:21 129:9 136:9,14 138:12 140:10 147:1 158:12

**refreshes** 42:9 99:21 158:16

**refuse** 182:22

**register** 160:11

**registration** 160:2

**regular** 36:17 83:12

**Reilly** 6:18

**related** 9:14 11:10 14:2,4

**relates** 77:18 82:21 181:23

**relationship** 20:9,19 21:6 23:5 40:24 41:21

**relative** 199:20

**released** 11:18 160:7

**relevance** 128:1,23 129:10

**relevant** 68:5 83:1 106:11 108:10 128:12 130:4 137:9,14 180:10

**relied** 182:6 195:16 196:2

**rely** 127:15

**remained** 24:22

**remember** 11:19 12:3,20,21,22 13:1,2,10,22 16:13 21:11 22:6,8,13 25:1 29:5,7,10 40:10 41:4,8 49:15 55:24 58:6 59:2 69:16 75:7 78:12 80:14 98:5,8 103:23,24 104:1 105:8 106:22 112:14,18 113:18 114:1,2,5,8 115:1 116:1 123:1 125:3 127:20 129:22 132:15 138:17 140:19 141:1 142:6 144:20 146:16,21,22 148:5 149:6,13,15 151:17 153:7,8,11,14 154:10 155:12 159:24 160:12 161:10 165:5,23 166:7 168:17 171:4 173:8,9,19 174:2,3,5,14,15 175:3 176:12,13 178:2,3,6 180:15 181:22 185:8 186:20 188:1,14 189:17,24 192:13,15 193:8,9

**remembered** 12:23 154:15 169:1

**remind** 100:20 114:10 115:8,10 120:11

**reminded** 12:6,24 113:11 114:7 115:15 160:9

**reminds** 75:4

**repeat** 9:7

**rephrase** 9:8 72:2

**report** 31:23 56:9 73:20 74:1,5 75:11,24 80:8,16,17 82:3,13 86:12, 13,15,16,18,21,22 87:10 88:16 92:8 93:1,16 96:18 98:9,10,15,16

102:5 103:15 105:23 107:9 108:7 109:3,6 110:4,6 117:18 118:3 119:14 135:8,18 147:1 160:6 184:1,6 188:5 199:15 200:5,16 201:7 204:2,19

**reported** 58:13

**reporter** 6:18 7:11 58:8,20 63:10 68:20 141:16 151:18 152:1 161:4 209:2

**reports** 30:16,18,23 33:7,9 38:9 60:7 65:15 66:18 67:2 98:20 103:20,24 107:18 117:13 147:10 182:7 183:18 192:7,8 200:19

**represent** 6:22,24 7:2,5,8 24:1 25:18,23 26:1 29:24 33:14 43:15 55:16 75:9 103:11 111:9 116:14 118:18 120:14 140:17 170:20 173:20 174:20 175:1 179:8 183:11

**representation** 11:3 12:16 36:5 59:6 75:1 96:2 97:7 114:11 116:21

**representatives** 178:11

**represented** 12:1,6,21 24:5,14 30:2 36:19 40:10 41:1,2,16 47:15 53:22 75:12 122:20 153:9 170:2 171:22 174:6

**representing** 6:15 12:13 27:11 29:18 40:4,13 50:17,21 61:11 101:9 105:17 109:21 113:6 115:21 125:22 132:13 167:11 168:6

**reputation** 166:14,15,20 167:10, 13,16 168:8,9,15 169:3,6

**reputations** 167:4

**request** 122:17,23

**requested** 107:17 194:7 200:18

**require** 173:5

**required** 173:4

**research** 11:21

**reserve** 208:24 209:4

**reside** 15:2

**respect** 155:22

**respectfully** 172:15

**responded** 35:21,22 125:2,4 161:15,20

**response** 34:17 35:9,13,16 193:20

**responses** 125:9,15,20,24 179:23 181:15

**rest** 84:10 118:15

**result** 168:23

**retained** 30:10 31:5,6 32:3 38:3 39:17,21 40:6 41:11 54:8 55:5,15 97:6

**retention** 36:4,17,24 37:7

**return** 44:11 45:9 149:18

**revelation** 193:8

**Revenue** 37:14

**Reverend** 29:8

**reversed** 174:11

**review** 10:7,8 11:9 35:13 56:13 66:1,3 73:15 88:4 96:24 100:14 101:15 102:21 106:18,24 107:1,5, 13 121:21 130:22 139:22 140:8 145:18

**reviewed** 12:8 35:15 57:16,21 64:2 74:23 103:15,17 110:18 120:7 158:11

**reviewing** 46:4 77:12 107:11 108:9

**Reynaldo** 6:9

**RFC** 72:16 73:16 79:12 87:2 94:5 95:18 96:6 99:6 102:11 198:9 202:10

**RFC49** 88:11

**RFC50** 89:19

**Rican** 27:10

**Riccio** 7:3 169:16

**Richard** 131:20,23 132:1

**ridden** 27:3

**right-hand** 102:13

**rights** 148:9

**ring** 49:12 101:12 132:4,5 156:20, 24 157:2 165:21 169:13,15,17,20

**rings** 169:1

**risk** 197:18

**rival** 29:18 30:2

**Rivera** 173:21,23 174:6

**Riveras** 174:7

**Roberts** 49:8,9,11,24

**Rodriguez** 108:5 144:19 189:23 191:1

**Rodriguez's** 191:19

**role** 14:13

**room** 9:11,19 44:19 154:6

**Rosendo** 81:2 101:17 139:12 140:18,23 185:7 187:24

**rule** 24:12

**ruled** 138:16

**rules** 8:5 141:24 142:2 167:18 169:8

**rumor** 167:6 169:9

**rumors** 168:10,15 169:11

**run** 46:10 151:14

**running** 197:14

---

**S**

**S-H-O-R-T-I** 84:2

**sake** 32:1

**Sam** 17:20,24 18:6 19:1,12 20:21 22:19 69:17

**Santos** 127:19 128:18

**Santos'** 128:22

**Sarah** 77:17 81:23 82:6 94:6,16,21 95:1 202:16 203:23

**save** 121:3

**Sawyer** 77:20 94:19 101:2

**say-so** 62:9

**scandal** 192:20 193:10 194:13

**scene** 86:12,14,15 90:10 191:5

**scheduling** 10:15,18,20,22

**school** 15:12,13,15,17 16:10 28:20 77:4 105:12,18 106:7,9 149:9,17 156:23 157:1

**screen** 10:2,3 34:19,20 35:6 42:23 48:15 51:9 56:17 72:18,23 79:7,16 87:9 95:22 99:8,12 118:1 119:20 122:2 123:20 127:1 130:16,19 133:7 135:16 138:5 145:8 157:18 198:14

**screen-shared/referenced** 35:3 42:20 48:5 51:3 56:3 72:13 79:3 87:6 95:14 99:3 117:22 119:11 121:15 123:12 126:16 130:10 132:18 135:5 137:22 139:17 144:23 157:10 199:12

**scroll** 87:22

**scuttlebutt** 168:12

**search** 35:23

**secretaries** 23:11,13

**secretary** 131:10 141:9 173:6 186:1 187:1

**section** 26:3 76:11 82:4 102:16 106:16 112:4,10 200:17 201:1 204:2

**sees** 189:4

**select** 196:16

**send** 30:14 67:13 162:9 193:14

**sending** 144:18 163:8 194:2

**sends** 162:10

**senior** 85:22

**sentence** 159:7

**sentencing** 12:12

**separate** 23:4 39:5 64:11,15

**separates** 38:24

**served** 17:5 28:24

**Service** 37:14

**services** 20:24

**session** 145:15

**set** 55:1 64:12 185:22 186:4

**setting** 109:5

**sex** 159:24 160:1

**shaking** 8:18

**share** 22:4 23:9 42:13 56:5,11 119:13 132:21

**shared** 18:7 23:1,8

**sharing** 19:14,16 20:23 22:10

**sheriff** 63:5

**shifting** 14:7

**shoot** 189:5

**shooter** 191:1,6 195:14,16 196:14 202:1,20 203:6,11,16,23 204:17

**shooting** 13:24 26:15 73:23 74:20, 22 77:9 149:8 195:12

**short** 85:5,17 86:9

**shorti** 83:15 84:2 85:4,6,15 86:2 203:11

JOHN DELEON, 04/06/2022

**shortly** 12:12

**shot** 67:5 189:7

**show** 10:1 42:8 43:5 48:7,11 65:1 72:15 73:6 79:21 80:11 86:23 99:5, 23 100:3,9 117:12 121:17 122:4 123:14 126:18 130:12 131:18 135:7 138:8 139:21 145:2 198:2 206:22

**showed** 107:8 189:20

**showing** 51:5 79:5 88:8 95:16 133:17

**shown** 101:16 181:12 185:4

**shows** 64:22

**shred** 37:21

**shredder** 37:20

**Side** 27:5,6,14

**Sidley** 153:9

**sign** 170:10 172:12,13 173:4 209:8

**signature** 45:15,16 122:5,7 140:14,16 173:4,5 188:12 208:24 209:1,9,13,15

**signed** 124:5 127:11 131:5 189:18

**significance** 201:20

**Siller** 131:6

**similar** 20:8

**similarly** 169:9

**simply** 60:15

**sir** 9:11 11:9 12:20 13:11,18 14:7 15:10 17:11 24:13 25:6 26:17,20 27:14 28:3 29:10 30:6 32:3,12 33:23 35:12,15 36:10 38:5,12 40:22 41:6 42:3,8,13 44:1,13 45:13 46:12 47:22 48:7,8,14,20 50:17 51:5,8,16,22 52:17 53:7 54:3,12 55:14 56:5,14,16 57:7,11,18 58:11, 18 59:4 60:11 61:2,7 62:1,21 63:2 64:2,9 66:17 68:2,9,18 71:7,16 72:15,22 73:15,24 74:17,23 76:5 77:10,12,21 79:10,15 80:19 81:16, 23 82:9,17 83:3,5,15 84:22 86:10, 23 88:8 89:20 90:1,12 91:21 92:11, 22 95:16,21 96:23 97:5 98:6 99:9, 11,20 100:6,10,12,14,21 101:4,14 102:18 103:2,14 105:3,13 106:2,19 107:10,22 109:5 110:17 111:12 112:3,12 116:19 117:12,24 119:19, 24 120:7,20 121:17 122:1 123:7, 19,23 124:15 125:17 126:18,24

127:8,11 128:6,17 129:24 130:12, 18,24 132:9,20 133:3,11,22 134:22 135:7 138:4 139:1,10,21,24 140:8 141:2 144:16 145:8,16 146:1 157:17 158:5,11 159:6 161:2,11,23 162:22 165:19 167:9,19,22 168:14, 21 169:12,22 170:5,16 195:21 209:11

**sister** 39:21 41:22 42:1

**sit** 12:17 36:15 38:5 55:21 78:6 113:4 148:2 195:5

**Situations** 180:5

**skin** 189:11

**slang** 85:7,24

**slip** 52:17

**small** 85:19

**smaller** 10:5

**Snake** 101:2

**sole** 17:11,12,13 20:1,2,4

**solely** 114:23

**solo** 18:5

**somebody's** 177:7

**son** 77:18 78:1,8 82:8,18 83:8,21 94:16 202:19 203:5,23

**son's** 95:2

**sort** 13:24 21:21 154:16 172:10 192:1

**sounds** 37:24 68:2 74:4 152:20

**sources** 25:10

**space** 18:8 19:6,14,16 20:23 22:4, 10 23:2,4,8 172:4

**Spanish** 28:11

**speak** 26:6 59:14 66:22 110:19 162:9,20

**speaking** 58:19 149:11

**special** 124:17

**specializes** 160:19

**specific** 39:18 41:24 54:10 124:3, 10,24 125:21 147:14 148:13,16,18 150:5 187:18 193:14 195:9

**specifically** 96:6 107:17 147:20 149:7,16

**specifics** 41:4

**speculation** 196:5,20 203:20

**spell** 173:24

**spoke** 10:21 42:1 59:17 178:9 180:13

**spoken** 10:12,17

**sponsored** 176:23

**spots** 179:12

**squiggly** 84:12

**staff** 23:10,17

**stage** 55:4

**stamp** 44:4 46:1,2 48:18,22 51:19 52:2 133:1 172:10 173:10,14,15

**stamped** 123:21

**stamps** 102:14

**stand** 68:13 150:21 151:9 184:14

**standing** 108:20

**staring** 197:16

**start** 18:22 20:12 34:7 69:12 193:13

**started** 19:17 28:8 74:22 167:16

**starting** 76:23 118:11

**starts** 110:14

**state** 7:19 30:19 46:16 50:23 56:23 61:22 62:4,6,16 63:19 64:4,10,13 65:23 70:12,19 71:3 112:14 118:5 125:1,4 126:4 141:13,20 142:4,22 143:7,14 144:2,9 182:23 186:20,22 187:2,7,9 191:24

**State's** 49:7,14,24 53:7 65:12 107:2,6,9,10,12 143:20 144:2,11 182:23 183:3,6,13 184:17 194:5, 18,19 197:10

**stated** 94:18 100:24

**statement** 58:13 104:13,15,21 116:17 141:23 142:1,3,7,12 186:23

**statements** 33:20 122:15

**states** 6:11 70:4,6,9,13 159:6

**stay** 14:21 70:22

**stenographic** 209:21

**step** 30:24 46:15 54:14

**stepping** 59:5

**stepping-off** 93:21

JOHN DELEON, 04/06/2022

**Steve** 169:13

**stick** 186:8

**stock** 201:6,13

**stood** 128:19

**stop** 26:15,16

**storage** 37:18

**street** 6:17 24:15,21 25:3,4 26:24 27:2,10 30:16 67:5,11 103:1 153:21 154:4 166:15 192:12,19,22 193:3,12,15 194:14,21

**streets** 24:18 28:14,19 29:4 40:18

**stretch** 68:13

**strike** 16:18 31:4 41:9 47:12 57:16 92:2 110:5 133:24 142:15 154:20 193:17

**stroke** 13:6 17:2 168:23

**strong** 197:2,4

**Studenroth** 188:1,17

**student** 156:22

**stuff** 15:21 18:17 26:10 105:7 110:13 121:9 160:19 181:13 198:7 209:7

**subcontractor** 18:12

**submitted** 172:15

**subpoena** 30:12,17,22 34:8,17 35:9,10,17 91:18 113:18,22,24 172:1,21 174:18,24 193:15,21

**subpoenaed** 53:23 162:18,19

**subpoenaing** 193:13

**subpoenas** 30:15 31:7

**subsequent** 96:18

**substance** 10:12,16 11:2 40:6

**substantive** 76:18 88:9 98:20 208:23

**substantively** 115:2

**successful** 71:13 182:15

**sudden** 184:12 192:21

**suggested** 190:4

**suggestive** 206:8

**suit** 23:2

**suite** 6:17 18:10 23:4 39:6

**summaries** 93:4

**supp** 86:12,14 192:8

**supplemental** 122:11,17 124:23 127:5,9 131:2,12

**supplementary** 86:15,17 87:10 98:9

**support** 23:9

**suppose** 89:17 196:6

**supposed** 37:13 47:4 143:9

**supposition** 169:10

**suppress** 110:21

**swear** 7:11

**sweatshirt** 189:10

**sworn** 7:12 17:21

**system** 107:1 167:5 194:10

---

**T**

**takes** 150:20

**taking** 8:2 98:5 142:11,12 151:16 185:16,21

**talk** 8:8 11:1 28:1,16 29:15 30:6 32:23 33:8,15,24 40:17 59:18 60:2, 14,20 67:18 68:4,6 75:23 76:2 91:6,10,13,14 95:5 104:14 106:5 115:2 117:7 148:11 162:1 182:9, 20,22 183:1,2,5,7,16 184:2,11 190:17 199:24 200:2 204:11,12

**talked** 28:3 67:4 78:7 80:9 92:18 105:6 110:12 112:12 146:2 155:13 184:19

**talking** 28:4 66:12 101:1 106:16 111:5 156:9 158:13 164:13 172:19 173:2 194:16,18

**Taylor** 26:23

**Taylorville** 136:24

**technical** 9:6

**telephone** 173:11

**television** 166:7

**telling** 13:12 41:8 68:3 80:13 150:20 151:4 162:18 184:12

**tells** 93:2 184:9

**tender** 30:20 112:13,20,24 141:12, 15,19,23 142:1 187:15 192:22 194:11,12,22

**tendered** 63:1,21,22 64:4,7,10,19 65:24 142:4,22 194:14

**tendering** 192:19

**term** 75:22 85:11,22,24

**termination** 36:4

**terminology** 85:18 86:4

**testified** 7:15 52:21 53:5 129:7

**testifies** 150:11,12,21

**testify** 13:14 128:14 137:4 148:9 149:21 150:15,17 151:7,14

**testifying** 151:4

**testimony** 66:15 126:12 137:17 182:3,12

**theory** 128:1

**thing** 67:12 91:9 116:6 142:14 156:7 184:15

**things** 13:9,13 21:7 26:14 28:19 41:3 85:11 103:15,19 121:6 149:19 166:18 180:5

**thinking** 134:10 153:24

**thought** 40:12 103:6 111:2 155:19 164:15 180:16

**thoughts** 187:13

**three-page** 145:12

**throw** 157:4 171:18

**thrown** 160:4

**Thursday** 58:22 61:5,23

**time** 8:21 9:18 11:16,17 12:7,10,22 13:5 14:4 17:1 19:12 23:6 24:10,16 26:5 29:12,19 31:18 34:4 37:12,16, 18 39:5 41:7,10 42:6 45:20 47:23 50:22 54:21 55:12 59:11,13 62:16 63:18,23 64:5 65:13 66:6 68:12 69:9,14 71:2 74:13 79:20 86:6 89:5 91:2,15 92:18 105:16 128:12 131:9 132:3 134:12 136:20 141:22 146:23 149:9 150:8,14 155:1,2,7 156:8,14 166:10 170:2 172:14 178:10 189:19 207:18 208:20 209:16

**times** 53:14 74:15,16 147:11 151:6 184:24 186:11 187:11

**titled** 127:4

**today** 6:18 8:21 13:15 14:8 36:15 38:5,14 55:21 78:6 113:4 148:2 171:8 195:5,10

JOHN DELEON, 04/06/2022

**today's** 17:17 209:23

**told** 10:23 45:20 53:17 86:3 105:11 119:1 129:4,15 136:18 149:8,14 154:15 160:16 169:24 183:5,6 184:19 188:6,24 204:15

**Tony** 169:16

**top** 89:23 90:11 190:6

**topic** 144:12,15

**Torres** 77:17,24 78:8 81:22 82:6, 20 94:6,12,16,17,21 95:1 107:19 108:1,10,19 109:6,7,20 200:20 201:1 202:1,16 204:3,6,12,20

**Torres'** 82:18

**Torres's** 203:23

**totally** 199:4

**tough** 166:21

**track** 32:22 66:8,11 69:20 78:19

**trained** 147:23

**transcript** 57:18 58:2 63:12 64:3 112:15,16,20 122:13 191:18 199:1 208:23

**transferred** 54:16 167:15

**trap** 197:24

**traveled** 70:4

**traveling** 70:7

**tree** 189:5

**triage** 68:3 75:22

**trial** 8:3,16 12:11 13:2,3,4 39:9 70:11 71:14 91:18 98:2 114:1 121:11 125:10,22 150:8 153:1,4 155:24 156:2 179:18,24 180:6,11 181:21 182:2,20 195:17 197:18,22

**trials** 69:10,11,22 71:11

**trier** 150:23

**trucks** 37:21

**true** 49:1,23 104:16 109:2 136:19

**trust** 24:17 190:21 194:4,10,11 209:9,12

**trusted** 24:24 25:11

**truth** 151:4 161:15

**truthfully** 13:15

**tunnel** 152:21

**turn** 143:6 178:24 186:18

**turned** 143:13 187:6

**two-minute** 208:4

**two-page** 157:20

**type** 20:8 21:5 63:10 88:3,16 96:23 103:16 106:13 120:23 141:8,9 173:6 185:20 186:1 187:1

**typed** 80:16 147:13 185:4,14 189:22 192:6

**types** 14:18 43:8

**typical** 179:16

**typing** 209:2

--------

**U**

**uh-huh** 8:17 172:6

**uh-uh** 8:17

**ultimately** 68:6

**umbrella** 171:3

**umbrellas** 171:10,14

**unable** 35:23 108:11 119:6

**unclear** 164:12

**undergrad** 16:1,9

**underneath** 18:16,21 20:5,6

**understand** 9:5 40:20 50:6 60:11 85:1 86:7 90:23 108:21 112:8 120:12 136:15 143:5 148:24 156:6 168:21 179:19 181:19 208:5

**understanding** 36:6 86:19 182:9 187:3

**understood** 32:12 91:16

**unit** 6:2 28:13 29:2 69:5 94:23 152:7,12 210:1

**United** 6:11 70:4,13

**University** 15:16 16:2,6

**unloading** 77:8

**unreliability** 138:24

**unusual** 46:8

**Urlaub** 6:15,19

--------

**V**

**vague** 12:4 71:20 164:15

**Valparaiso** 15:3

**vehicle** 89:19

**Velasquez** 129:5 181:16,21

**verification** 49:1

**verify** 66:22

**version** 198:16 204:22

**versus** 6:9 33:12 51:14 56:24 118:5 148:13,17 185:20

**vice** 70:14

**Vicente** 113:1,3 116:15,17,23 117:5,10 118:21 119:3 120:10 121:5 122:14,24 123:2 124:12 125:21 129:8,17,22 135:1 136:11 137:9 138:13 142:4,7 143:11,17

**Vicente's** 126:12 137:17

**victim** 88:24 89:1 160:11

**victory** 71:5,8

**video** 6:3,4,21 68:24 69:4 152:11 175:23 207:13 208:11,15 209:24

**view** 90:20 107:20 200:21

**viewed** 108:19 109:7 195:14

**VIN** 90:1

**vinyl** 89:23 90:11

**visit** 27:17 60:7

**visited** 59:12

**volume** 64:4

**volunteer** 27:24 28:10,15

--------

**W**

**wait** 8:9,11 180:14 184:18 198:6

**waive** 209:1,8,12

**waived** 209:15

**walked** 63:6 74:21 154:7

**walking** 67:5,11 154:3

**walks** 63:15

**walkway** 74:21

**wanted** 32:1 34:7 89:1 91:6 93:11 116:22 117:4 119:2 141:18 148:11 149:20 156:7 182:17

**warrant** 98:17

JOHN DELEON, 04/06/2022

**waste** 91:15

**weather** 89:5

**weeks** 113:17,20

**well-known** 70:23

**Welling** 6:14

**West** 27:5,14 45:22

**whereabouts** 105:2

**whichever** 69:12

**white** 189:12

**wild** 71:10 154:1

**win** 71:1,3

**window** 189:1

**wins** 70:24

**wishes** 165:2

**witness'** 201:7

**witness's** 118:20

**witnessed** 76:19

**witnesses** 32:5,22 33:5,10,11 39:12 52:18,20 66:8,11,19 75:17, 20,21 76:3,10,13,17 78:17,19 80:15,17,23 88:5 91:20,23 92:1,4, 10,14 93:2,4,17,24 96:7,13,17 97:3 107:13,19 108:11,13 120:20 127:10,14 128:7 130:3 131:16 133:9 141:3 146:4,15 147:6 179:17,22 180:8 182:8,21,23,24 183:1,5,16 190:17 199:19,21 200:19

**witnesses'** 127:21 128:11

**won** 153:18 154:15

**word** 203:12

**Word-of-mouth** 19:22

**words** 58:6 177:9 184:10

**work** 17:9,24 18:6,8 20:11 21:13 29:4,9 39:7,10 70:16 97:15 146:19 148:14,17,19 149:17 154:4 167:15 176:7 177:13 178:7,11,16 187:9,14

**worked** 18:2 19:6 20:16 21:13 28:8 38:23 131:9 176:2,3,14,18 177:19 178:4

**working** 18:21 21:10 87:17 105:18 124:6 142:18 143:12 159:8,13,16 192:18

**worthless** 184:22

**write** 65:14 147:11 172:9 173:1

**writing** 142:7 187:11,13

**written** 61:2 73:20 83:12 158:20 187:10 189:18 203:10

**wrong** 206:23

**wrongdoing** 206:20

**wrote** 138:24 141:10 147:12 159:18 186:24 209:9

---

## Y

**year** 14:16 15:23 16:12,13 17:3 22:13 69:21 166:5 193:9

**years** 16:24 17:15 18:4,24 22:7,22 23:7 29:1 34:10 36:6,13,18,24 37:2,11,15 71:5 154:1 162:8 166:8 167:20,21 173:17 178:3,6

**yelled** 74:21 75:6

**yellow** 121:2 141:6

**YMCA** 177:14,18,19,21,24 178:4

**young** 18:5 20:24 21:13,18 23:1 27:9,23 28:17 29:24 40:12,17 85:19,20 86:1 154:6

**younger** 85:7

**youth** 24:20 28:11,24 176:15

---

## Z

**zoom** 8:6 9:3,18 10:4,23 34:22 43:2 44:5 48:17,19 52:5 56:20 73:2 83:7 87:16,19 152:17

**Zuniga** 73:21

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 37

STATEMENT OF

FRANCISCO VICENTE AKA Chino

Taken July 16, 1993 At 10:45 A

At 2650 S. California Rm 406

Present Mary Roberts ASA

Ed Doyle CCSP star 556

This statement taken regarding the 1ST Degree Murder

of Monica Roman which occurred on June 7, 1993

at 2148 N Sawyer at 3:56 p.m. .

I understand I have the right to remain silent and that anything I
say can be used against me in a court of law. I understand that I
have the right to talk to a lawyer and have him present with me
during questioning, and if I cannot afford to hire a lawyer one
will be appointed by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement.

After being advised that Mary Roberts is
an assistant States attorney, a prosecutor and
not his lawyer and not Geraldo Iglesias' lawyer
Francisco Vicente AKA Chino agreed to give
the following Statement in summary and not
word for word.
Francisco Vicente AKA Chino who will here
in After be referred To As Chino throughout this
STATEMENT SAID THAT HE HAS KNOWN GERAldo IGlesias
AKA SNAKE for the lAST three years. (GERAldo IGlesias
will be referred to AS SNAKE for the remainder of this
STATEMENT)
Chino STATED THAT HE KNOWS SNAKE bECAUSE
both of them Are iN the Imperial GrANgsters
Street GANg Chino STATED THAT SNAKE hANgs out

CCSAO-Serr-Mont_00019581

Palmer with a Boys Club down the street on Palmer. Chino stated that snake hangs out in this area and he has hung out with snake by the Boys Club in this area.

Chino stated that on June 25, 1993 at approxiamately 5.30 - 6:00 in the moning he was in the Division 10 Bullpen in Division 10 in the Cook County Jail. Chino stated that snake was also in the Bullpen. Chino stated that he and snake began talking about murders that happened in their Neighborhood and they 1st talked about a murder that happened at Fullerton and Bernie. Central Park   mr. F.V E.D.

Chino stated that he told snake his mother had told him about a murder at Spaulding and Palmer. Chino said that snake told him that he was in jail for that murder

Snake told Chino that he was standing on the corner of Spaulding and Palmer with a few of the brothers and he saw a car coming down the street. Snake told Chino that the guys in the car were looking around and looking nervous. Snake told Chino he thought the guys in the car were Latin Eagles. Kings mr. F.V E.D. Snake told Chino that the car pulled up by the corner of the alley.

Snake told Chino that before the car pulled

Francisco Vicente          Mary Roberts ASA

started representing his gang and disrespecting the Latin King gang by showing different gang signals. Snake told Chino the guys in the car did not show any gang signs.

Chino stated that Snake told him that once the car parked in the alley a "Bitch" jumped out of the car and ran into the building by the alley Snake said that at this point one of the brothers ran and got a "gap" which is a gun and came back to where Snake was standing and gave Snake the gun.

Snake said that when the brother gave him the gun they walked closer to the car of Latin Kings. Snake said that as they got closer to the car the girl who had jumped out of the car was now back at the car with another female.

Snake said that he then started shooting at the car. Snake stated that when he shot he "shot the bitch in the head" Snake said that when he "shot the bitch in the head" he ran.

Chino said that he has not been promised anything or threatened in any way in exchange for this statement. He also understands that he can make any additions or corrections to this statement and has done so to this statement.

W. Edward Reyes

Francisco Vicente        Mary Roberts ASA

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 38

Second Division
October 28, 1997

No. 1-95-1249

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 93 CR 18173 |
| | ) | |
| ARMANDO SERRANO, | ) | Honorable |
| | ) | Michael B. Bolan, |
| Defendant-Appellant. | ) | Judge Presiding. |

O R D E R

Defendant Armando Serrano and codefendants Jorge Pacheco and Jose Montanez were tried in simultaneously held but severed bench trials. Defendant was convicted of first degree murder and attempted armed robbery and sentenced to consecutive prison terms of 45 years and 10 years respectively. He contends on appeal that the trial court erroneously admitted against him inculpatory statements made by a codefendant, that the State failed to prove him guilty beyond a reasonable doubt, and that the court abused its discretion by imposing consecutive sentences.

Defendant's convictions arose from the fatal shooting of Rodrigo Vargas on February 5, 1993. The victim's body was found in his van, parked near his residence on North Springfield Avenue in Chicago. Medical evidence showed that he died from multiple gunshot wounds, and two 9-millimeter bullets were recovered from

CCSAO-Serr-Mont_00000188

1-95-1249

his body.

Anna Velez, the victim's neighbor, testified that she heard gunshots at 5:30 a.m. on the day the victim was killed. She later discovered the victim's body inside his van. Another neighbor, Gary Shoop, also heard six or seven gunshots at 5:30 a.m. He saw a brown or tan General Motors sedan speed away and heard squealing tires as it turned the corner. The police recovered eight 9-millimeter shell casings next to the van. The victim's radio and his wallet containing $190 were in the locked van.

The State's chief witness was Francisco Vicente. The State established that it agreed to recommend concurrent six-year prison sentences on Vicente's three pending armed robbery charges and a consecutive three-year sentence on a pending robbery charge in exchange for his testimony. Because Vicente was arrested for armed robbery with a man nicknamed "Pistol Pete" and Detective Halvorsen had heard rumors that "Pistol Pete" was involved in this shooting, Halvorsen questioned Vicente in June 1993 regarding this case. Vicente told him that Pistol Pete was the correct nickname, but the man involved in the shooting was another Pistol Pete. Vicente then gave a lengthy statement about the victim's murder, including the nicknames of two other fellow street gang members, "Mando" and "Jordan," who were involved in the murder. Using a nickname file at the police station, Halvorsen was able to identify defendant as "Mando," "Pistol

2

CCSAO-Serr-Mont_00000189

1-95-1249

Pete" as codefendant Montanez, and "Jordan" as codefendant
Pacheco. When shown police department photographs on file for
the three men, Vicente identified them as the men about whom he
was speaking.

At trial, Vicente was asked, "Armando Serrano, how long have
you known him?" Vicente answered that he had known defendant for
six years. At the same time, defendant answered from the defense
table, "seen him around." Vicente identified defendant at trial
as a fellow gang member called "Mando."

About 8 a.m. on February 5, Vicente was "hanging out" when
defendant and codefendants drove up in a tan Buick. Montanez was
"playing with a bag of dope," which Vicente recognized as heroin.
Defendant and Pacheco exited the car. Anticipating that the
police might drive by, Montanez removed a 9-millimeter automatic
pistol from under the dashboard, put it into an air vent, locked
the car and threw the keys into the grass.

Vicente testified that the following conversation then took
place over several hours. Defendant and codefendants "were
talking about that they had committed a murder." The three of
them were arguing. Montanez stated that defendant "fucked up and
went at the guy the wrong way." Defendant, who was only a few
feet away, and Pacheco answered that they could always get
another "vic" to rob. Montanez stated that defendant "went at
the guy the wrong way" and if defendant had never grabbed the
radio, everything would have gone right. Defendant stated that

3

CCSAO-Serr-Mont_00000190

1-95-1249

if Montanez had grabbed the victim by his neck, maybe they would have had a better chance to get his money. Pacheco stated that Montanez was the biggest and should have been the one to grab the victim by the neck. The men then began calling each other "bitches" and "punk."

Vicente also testified that Montanez told him that the day before when they were at a gas station, the victim came in and pulled out a "big knot of money." Montanez said they were going to rob him. They could not do it at that time, however, because the victim's wife was aware they were being followed, and the victim's children were also in the van. Defendant did not object to or dispute anything Montanez told Vicente. Several days later, when Vicente asked Montanez how his car had been damaged, Montanez told him that Pacheco damaged the left front fender during the course of the robbery of "the Mexican stud."

Vicente admitted at trial that on February 5 he had used heroin about seven hours before talking with defendant and codefendants. He testified, however, that he was not "high" at the time but was "coming down off of it." He also admitted that he did not tell the police about the conversation until after he was arrested in May 1993 for armed robbery. On cross-examination, Vicente admitted that he had given the police a false name when he was arrested in 1990. He also admitted that he was presently incarcerated in the witness quarters and had been given cigarettes, a sweatsuit and a radio. He testified

4

CCSAO-Serr-Mont_00000191

1-95-1249

further that when defendant and codefendants drove up on February
5, they looked "scratchy" or drowsy as if they were "high" on
heroin. Vicente also admitted that while he was talking to
Montanez, he did not know whether defendant was listening. But
he persisted that "they were all bragging about it" in his
presence.

Vicente also testified on cross-examination that when he
spoke to Assistant State's Attorney Coghlan on September 21,
1994, and reviewed the detective's report of his previous
statement, he stated that the report was basically correct but
was missing certain information, which he had not previously told
the detectives. This information, which was also absent from
Vicente's grand jury testimony, was as follows. Defendant said
to Montanez, "You should have 'ganked' [explained as meaning to
apply a chokehold in order to rob] the victim so that I could
have gone through his pockets." Pacheco said, "Yeah, you're
bigger than us, you should have 'ganked' him from behind." The
three men began calling each other "bitches" and "punk." Also
defendant said, "well, we can always do another one."

The victim's wife, Wilda Vargas, testified through an
interpreter that on February 4, 1993, she and the victim had gone
to the bank and then stopped at a gas station. The victim went
into the station while she and their children stayed in the van.
A brown- and cream-colored four-door vehicle pulled in front of
the van at a 45 degree angle. Three men were in the vehicle --

5

CCSAO-Serr-Mont_00000192

1-95-1249

the driver and two men in the rear seat. She could see the driver and one passenger but could not see the face of the third man. She testified that after the driver went into the gas station and the victim returned to the van, the victim honked to signal the car in front to move. The victim became angry and cursed when the men would not move the car. The driver then returned to his vehicle and drove off, screeching the tires. As the victim drove toward their home, he told Wilda that the men were following them. Wilda saw the vehicle behind them but testified that she was unsure if it followed them all the way home because she did not look back after they made a left turn.

Wilda did not immediately think of this incident at the gas station when she learned her husband was shot the following morning. She did recall it later when questioned by detectives, and when she drove with them through the neighborhood around the gas station, she identified the brown- and cream-colored vehicle. It was later established that the car had no license plates, but the vehicle identification number showed that it was registered to codefendant Montanez. She testified that the vehicle had sustained damage that it did not have when she saw it at the gas station. Although Wilda testified that this identification occurred four days after the shooting, Detective Halvorsen testified that it actually occurred in June, four months after the shooting.

At trial, when first asked to identify the man who drove the

6

1-95-1249

vehicle at the gas station, Wilda identified defendant.  When the
prosecutor asked defendant and codefendants to stand, Wilda then
identified Montanez as the driver and stated, "He's heavier now."
In June 1993, Wilda identified photographs of defendant and
Montanez as the two men she saw in the brown vehicle.  At trial,
she chose the same photographs from an array and identified
Montanez as the driver and defendant as the passenger in the rear
seat.  She then, however, identified Pacheco at trial as the
passenger.  Wilda also testified that she viewed a lineup on June
11, 1993, and identified only defendant.  At trial, she viewed a
photograph of that lineup and again identified defendant from the
photograph.  However, when asked to identify the person in court
whom she had identified at the lineup, she identified Pacheco.
The court subsequently found Wilda's identification of defendant
unreliable

The trial court evaluated Vicente's testimony "with great
scrutiny" and found that because it was corroborated, a
conviction could be predicated upon it.  The court stated that it
was convinced beyond a reasonable doubt that defendant was with
Montanez at the scene of the murder and was talking about it
shortly afterward with Vicente, and thus found him guilty.

At the hearing on defendant's motion for a new trial,
defendant's counsel argued that if portions of Vicente's
statement that he had not included when first questioned and did
not include in his grand jury testimony were excluded from

7

CCSAO-Serr-Mont_00000194

1-95-1249

consideration, then at most defendant would have been implicated by an admission by silence. Counsel argued that defendant. who was on heroin when Montanez spoke to Vicente, could not be expected to respond when he was "doped up." The court found that the challenged "new" statements either did not relate to this crime (defendant stated they could always get another "vic") or did not implicate defendant further ("started calling each other bitches and punk"). Finding that the evidence against defendant was sufficient, the court denied defendant's motion.

At the sentencing hearing, the State presented in aggravation evidence of defendant's prior conviction for robbery. Police officers also testified to defendant's prior arrests for burglary, battery of a police officer following a traffic stop and possession of a controlled substance. The trial court stated that it considered the statutory factors in aggravation and mitigation and the possibility of defendant's rehabilitation. Stating that this crime of greed caused the death of a young, productive man and that it considered the sentence necessary for deterrence, the court imposed consecutive terms of 45 and 10 years in prison. The court subsequently denied defendant's motion to reconsider his sentence.

Defendant first contends that the trial court erred in admitting Montanez' statement to Vicente against defendant. When an incriminating statement is made in the presence and hearing of the accused and he does not object or contradict it, both the

8

1-95-1249

statement and the fact that he did not deny it are admissible as evidence of his admission by silence or implied admission. People v. Sneed, 274 Ill. App. 3d 287, 295 (1995); People v. Miller, 128 Ill. App. 3d 574, 583 (1984). To qualify as an admission by silence exception to the hearsay rule, there must be evidence that the defendant heard the statement, that it was made under circumstances which provided an opportunity for him to reply, and that a similarly situated person would ordinarily have denied the accusation. Sneed, 274 Ill. App. 3d at 295; People v. Goswami, 237 Ill. App. 3d 532, 535-37 (1992); People v. Cihak, 169 Ill. App. 3d 606, 611-13 (1988).

In this case, the evidence established that defendant did not deny, contradict or object to Montanez' statement to Vicente that "Mando [defendant] fucked up and went at the guy the wrong way" and if defendant had not grabbed the radio, everything would have gone right. This statement occurred in the context of a conversation in which defendant and codefendants on the morning of February 5, 1993, were talking about a murder they had committed. The trial court was aware of the fact that the men were using drugs, but found that this circumstance did not render the evidence in question inadmissible. See People v. Patterson, 154 Ill. 2d 414, 463 (1992). Because defendant did not deny Montanez' accusation, the trial court properly considered the statement and defendant's failure to deny it as an admission of its truth. Sneed, 274 Ill. App. 3d at 296; Miller, 128 Ill. App.

9

1-95-1249

3d at 583-84.

Defendant next contends that he was not proved guilty beyond a reasonable doubt because the State's only witness against him was a drug addict, was "significantly impeached" and testified in exchange for a plea bargain. Testimony of an addict must be viewed with caution and is enough to sustain a conviction if credible in view of the surrounding circumstances. People v. Steidl, 142 Ill. 2d 204, 227 (1991). A reviewing court must determine, viewing all of the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Batchelor, 171 Ill. 2d 367, 376 (1996). The trial court considered Vicente's testimony with great scrutiny and accepted it because it was corroborated by other evidence. The victim's wife identified Montanez' brown-and cream-colored car as the same vehicle she had seen at the gas station and following them home the night before the shooting. The victim's neighbor saw a brown or tan sedan leaving the scene just after several shots were fired. The shell casings recovered at the scene and the bullets recovered from the victim's body were 9 millimeter. Vicente saw Montanez remove a 9-millimeter automatic pistol from under the dashboard when he and defendant drove up after the shooting.

The trial court was in the best position to judge the credibility of Vicente's testimony (People v. Campbell, 146 Ill.

10

CCSAO-Serr-Mont_00000197

1-95-1249

2d 363, 375 (1992)), and the court found it sufficient to support defendant's conviction. We will not substitute our judgment for the trier of fact. <u>Campbell</u>, 146 Ill. 2d at 388-89. Viewing all the evidence in the light most favorable to the prosecution, we cannot say that no rational trier of fact could have found defendant accountable for first degree murder and attempted armed robbery beyond a reasonable doubt. <u>Batchelor</u>, 171 Ill. 2d at 377; see also <u>Campbell</u>, 146 Ill. 2d at 379-80, 389.

Finally, we find no merit to defendant's contention that the trial court abused its discretion by sentencing him to consecutive rather than concurrent terms of imprisonment. Section 5-8-4(a) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a) (West 1994)) states in pertinent part that a court "shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, *** in which event the court shall enter sentences to run consecutively." We agree with the State that the requirements for consecutive sentences were met in this case. See <u>People v. Arna</u>, 168 Ill. 2d 107, 113 (1995); <u>People v. Johnson</u>, 149 Ill. 2d 118, 159 (1992). Although the attempted armed robbery and first degree murder were committed during a single course of conduct during which there was no

11

CCSAO-Serr-Mont_00000198

1-95-1249

substantial change in defendant's criminal objective in attempting to rob the victim, serious bodily injury was inflicted on the victim. The bodily injury was inflicted during the course of an attempted armed robbery, which is a Class 1 felony punishable by 4 to 15 years in prison. 720 ILCS 5/18-2 (West 1994); 720 ILCS 5/8-4 (West 1994); 730 ILCS 5/5-8-1(a)(4)(West 1994). First degree murder is punishable by a prison term of 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 1994). The trial court did not abuse its discretion in sentencing defendant to consecutive terms of imprisonment. See People v. Medrano, 282 Ill. App. 3d 887, 896-97 (1996); People v. Porter, 277 Ill. App. 3d 194, 199 (1995); People v. Ivey, 267 Ill. App. 3d 310, 312-13 (1994); People v. Williams, 263 Ill. App. 3d 1098, 1108-09 (1994).

Accordingly, the judgment of the trial court is affirmed. As part of our judgment, we grant the State's request and assess defendant $100 in costs for this appeal.

Affirmed.

FROSSARD, J., with McNULTY, P.J., and TULLY, J., concurring.

12

CCSAO-Serr-Mont_00000199

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 39

## MEMORANDUM OF INTERVIEW OF ROSENDO OCHOA

Rosendo Ochoa a/k/a Geraldo Najera interviewed by Attorney De Leon in the presence of ASA Studenroth and Transportation D.O.C. Off. M. Patte and R Gib's, on October 5, 1994 at Room 602, Jury Chambers (Judge Suria's courtroom) witness Ochoa (Najera stated that he is in Galesburg Correctional Center for V.O.P. and a drug case.) Judge Hibbler gave him four years.

In summary he said: I was in my house looking out the second floor window. I saw the car Monica was in go North on Sawyer. It is a one-way north. I seen one guy behind a tree shoot at the car. No gang signs were exchanged, but the guy said something I could not hear. No-one in the car gave gang signs. I was about 2 houses down and across the street. The person who shot was a male hispanic, black pants, black hooded sweatshirt, hoodup, his skin color was lighter than mine. He looked white but he was Latino, not as dark as me. (The witness pointed to the ASA David Studenroth, white like this pointing his finger at ASA's hand) but not a white guy he was hispanic.) He again was asked if he was white the witness said, no he was definitely hispanic but light skin, not as dark as me. (indicating the witness Ochoa himself.) Witness was very descriptive as to the events and ASA commented on his excellent memory of events as they occurred.

Respectfully submitted,

John R. De Leon

IGLESIAS 001145

CCSAO-Serr-Mont_00019874

*Iglesias v. Guevara, et al.,*
19 CV 06508

# EXHIBIT 40

BLUE KNIGHT DETECTIVE AGENCY
AND SECURITY COMPANY, INC
9656 SOUTH COMMERCIAL AVENUE
CHICAGO, IL 60617

DATE: 12 NOV 94

CASE NO: IGLESIAS
DELEON

**INVESTIGATOR'S REPORT:**

NOV 9, 1530 HRS:  PROCEEDED TO 4903 N. TROY IN AN ATTEMPT
TO LOCATE HUGO RODRIGUEZ.  TALKED TO HISPANIC MALE,
RELATED THAT HUGO WOULD BE HOME AFTER 5:00 P.M..

NOAV 9, 2100 HRS:  RETURNED TO 4903 N. TROY IN ANOTHER
ATTEMPT TO CONTACT HUGO RODRIGUEZ.  SPOKE TO YOUNG
HISPANIC MALE WHO IDENTIFIED HIMSELF A HUGO'S BROTHER,
FRANK.  FRANK SAID THAT HUGO WAS NOT AT HOME AND DIDN'T
KNOW WHEN HE WOULD COME, MAYBE LATE.  GAVE FRANK MY
BUSINESS CARD AND REQUESTED THAT HE GIVE IT TO HUGO AND
HAVE HIM CALL ME TO SET UP A MEETING.

NOV 10, 1630 HRS:  PROCEEDED TO 4903 N. TROY IN AN ATTEMPT
TO CONTACT HUGO RODRIGUEZ.  SPOKE TO A HISPANIC MALE WHO
IDENTIFIED HIMSELF AS HUGO'S BROTHER, JUAN.  JUAN RELATED
THAT HUGO WAS NOT AT HOME AND DID NOT KNOW WHEN HE WOULD
RETURN, PROBABLY VERY LATE.  GAVE JUAN MY BUSINESS CARD
AND REQUESTED THAT HE TELL HUGO TO GIVE ME A CALL, TO CALL
COLLECT IF NECESSARY.

NOV 11, 0545 HRS:  ARRIVED AT 4903 N. TROY IN AN ATTEMPT
TO CONTACT HUGO RODRIGUEZ BEFORE HE WENT TO WORK.  WAITED
OUTSIDE OF RESIDENCE, APARTMENT WAS DARK.  A YOUNG
HISPANIC MALE EXITED THE BUILDING AT 0615 WITH A BICYCLE.
I APPROACHED HIM AND ASKED IF HE WAS HUGO, HE REPLIED NO
AND RODE HIS BIKE AWAY.

0630 HRS:  A MIDDLE AGED HISPANIC MALE EXITED THE BUILDING
CARRYING WHAT APPEARED TO BE A BAG OF GARBAGE AND A LUNCH
AND WENT AROUND THE SIDE OF THE BUILDING TO THROW THE
TRAASH AWAY.  I APPROACHED HIM AND ASKED HIM IF HE KNEW
HUGO RODRIGUEZ, HE REPLIES YES AND WE RETURNED TO THE
ENTRANCE TO THE APARTMENT BUILDING.  AS WE APPROACHED THE
DOOR, THREE YOUNG HISPANIC MALES WERE COMING OUT THE DOOR.
I  ASKED THE MAN IF ONE OF THEM WAS HUGO AND HE POINTED TO
THE LAST INDIVIDUAL, WHO STOPPED IN HIS TRACK AND LOOKED
VERY SURPRISED.  I ASKED HIM IF HE WAS HUGO AND HE SAID
NO.  I TOLD HIM THAT THE OTHER MAN SAID THAT HE WAS.  THEY
EXCHANGED WORD IN SPANISH.  I AGAIN ASKED THE YOUNG
HISPANIC MALE IF HE WAS HUGO AND HE STATED THAT HE WAS.  I
REQUEST TO TALK TO HIM FOR A FEW MOMENT TO WHICH HE
REPLIED THAT THEY WERE GOING TO WORK AND DID NOT HAVE TIME
AND WOULD SPEAK WITH ME LATER.  I ASKED HIM WHEN, HE
REPLIED LATAER.  I ASKED FOR A TIME, BUT ALL HE SAID WAS
LATER AND THE FOUR HISPANIC MALES HURRIED AWAY.

1800 HRS:  RETURNED TO 4903 N. TROY TO CONTACT HUGO
RODRIGUEZ.  THE DOOR WAS AGAIN ANSWERED BY HUGO'S BROTHER
FRANK.  FRANK STATED THAT HUGO WAS NOT AT HOME AND DID NOT
KNOW WHEN HE WOULD RETURN.  TOLD FRANK THAT I WOULD RETURN

IGLESIAS 000897

CCSAO-Serr-Mont_00019626

BLUE KNIGHT DETECTIVE AGENCY
AND SECURITY COMPANY, INC
9656 SOUTH COMMERCIAL AVENUE
CHICAGO, IL 60617

DATE: 12 NOV 94

CASE NO: IGLESIAS\
· DELEON

**INVESTIGATOR'S REPORT:**

IN THE MORNING TO TALK TO HUGO.

NOV 12, 0700 HRS: RETURNED TO 4903 N. TROY TO CONTACT
HUGO RODRIGUEZ. THE DOOR WAS ANSWERED BY A YOUNG HISPANIC
MALE. HE WAS IN THE GROUP OF HISPANIC MALES THAT I HAD
CONFRONTED AT 0630 HRS ON NOV 11TH, BUT NOT THE INDIVIDUAL
WHO HAD IDENTIFIED HIMSELF AS HUGO. WHEN ASKED TO SPEAK
WITH HUGO, HE REPLIED THAT HE WAS HUGO AND INVITED ME INTO
THE APARTMENT. AFTER ASCERTAINING THAT THIS INDIVIDUAL
WAS IN FACT HUGO RODRIGUEZ, I INTERVIEWED HIM IN SUBSTANCE
AS FOLLOWS:

Q: YOU SPOKE TO A LATINO OFFICER, OFFICER ZUNIGA AFTER
THE INCIDENT? YES.

A: YES.

Q: DID YOU TELL OFFICE ZUNIGA A DESCRIPTION OF THE
OFFENDER?

A: YES.

Q: WHAT WAS THAT DESCRIPTION?

A: HE WAS DRESSED ALL IN BLACK.

Q: DID YOU TELL HIM THE SHOOTER WAS A MALE HISPANIC LIGHT
COMPLEXION?

A: YES.

Q: YOU SAW HIM AS HE RAN AWAY?

A: YES.

Q: YOU OBSERVED HIM FROM BEHIND?

A: YES.

Q: TELL US WHAT YOU SAW?

A: RIGHT AFTER I HEARD THE SHOT I TURNED AND SAW HIS FACE
BEFORE HE COVERED IT UP AND TURNED AND RAN.

Q: YOU DID NOT SEE HIM WHILE HE WAS SHOOTING BECAUSE YOU
DUCKED DOWN CORRECT?

A: NO. WE WERE TALKING, WE HEARD THE SHOT AND I LOOKED
AROUND.

IGLESIAS 000898

CCSAO-Serr-Mont_00019627

BLUE KNIGHT DETECTIVE AGENCY          DATE: 12 NOV 94
AND SECURITY COMPANY, INC
9656 SOUTH COMMERCIAL AVENUE          CASE NO: IGLESIAS\
CHICAGO, IL 60617                                    · DELEON

**INVESTIGATOR'S REPORT:**


Q:  HE WAS HIDING BEHIND A TREE?

A:  NO.

Q:  SHOOTER PERSON WAS A TOTAL STRANGER TO YOU?  YOU NEVER
    SAW HIM BEFORE?

A:  I NEVER SAW HIM, I DON'T KNOW HIM.

Q:  ANY GNAG HAND SIGNS EXCHANGED BETWEEN YOU OR THE GUYS
    IN THE CAR AND HIM?

A:  NO, BECAUSE NOBODY IN THE CAR WAS A GANG MEMBER.

Q:  DID HE YELL "LATIN KING LOVE"?

A:  HE JUST SAID "KING LOVE" AND STARTED SHOOTING.

Q:  ONLY SAW ONE PERSON, ONE OFFENDER NOT A GROUP?

A:  HE WAS ALONE.

Q:  YOU DID NOT PICK PERSON OUT OF LINEUP?

A:  YES.

Q:  YOU LOOKED AT A LINEUP DIDN'T YOU?  (IN PERSON LINEUP)

A:  YES.

Q:  DID YOU ONLY LOOK AT A PHOTO LINEUP?

A:  FIRST PICTURES, THEN THROUGH THE GLASS AT PEOPLE.

Q:  AS YOU PICKED HIM OUT OF PHOTO LINEUP TOLD DETECTIVES
    IT LOOKS LIKE HIM BUT YOUR NOT SURE?

A:  NO, I WAS SURE.

Q:  ARE YOU A MEMBER OF A GANG?

A:  NO.

Q:  HAVE YOU EVER BEEN ARRESTED OR CONVICTED AS A
    JUVENILE?

A:  YES.  I WAS ARRESTED FOR A STOLEN STEREO.  I WAS THE
    DRIVER OF THE CAR, BUT IT IS ALL CLEARED UP NOW.

I THEN REQUESTED THAT HE READ AND SIGN HIS STATEMENT WHICH
HE DID.  I THANKED HIM FOR HIS TIME AND DEPARTED.

IGLESIAS 000899

CCSAO-Serr-Mont_00019628