# Exhibit A

# **EXPERT DECLARATION AND REPORT OF A. W. FINNELL & ASSOCIATES, LLC**

**Education & qualifications**

Anthony Finnell

My name is Anthony W. Finnell, and I have been actively involved in police practices and law enforcement since 1989. On March 15, 2013, I retired from the Indianapolis Metropolitan Police Department. Presently, I serve as the Vice President of the National Association for Civilian Oversight of Law Enforcement (NACOLE)[1]. I also work as a consultant on police oversight, policing and investigations for municipal and corporate organizations and institutions.

Prior to becoming a consultant, I worked in civilian oversight of law enforcement, serving as the Strategic Initiatives Manager for Seattle's Office of Inspector General for Public Safety (OIG), Executive Director for the Citizens' Police Review Board (CPRB) and as the Interim Executive Director for the Community Police Review Agency (CPRA), both for Oakland, CA. I also served as a Supervising Investigator for the Independent Police Review Authority (IPRA)[2], in Chicago, IL.

During my tenure with the Indianapolis Police Department (IPD) and then, the Indianapolis Metropolitan Police Department (IMPD)[3] I held many roles. My last assignment was as a Unit Supervisor overseeing the School Liaison Officers as they provided youth service programs within the public and private schools in Marion County, IN. I developed strategic alliances between the schools, business community, and the police department. I also recruited, trained, and mentored officers within the IMPD Community Affairs Branch.

As a Field Supervisor, at the rank of Sergeant, I supervised the activities of the Late Tactical Shift and Neighborhood Resource Officers of the Southeast District. This was accomplished by directing, mentoring, and training officers in the tasks they were to complete. I also ensured the community policing efforts of the department were carried out. I responded to regular patrol, field investigations, and other law enforcement related duties as needed. I maintained effective staffing levels to support the patrol needs of the shift and took disciplinary action when necessary.

In October 2004 I introduced and implemented a law enforcement based mentoring program called the O.K. (Our Kids) Program of Indiana, through IPD by fostering strategic alliances between the Indianapolis Public School system, the business community, and IPD. Part of the implementation included establishing the organizational structure of the O. K. Program of Indiana as a 501(c)3 not for profit organization. I developed and implemented fundraising activities to support the operational expenses of the O. K. Program of Indiana.

I worked as a Homicide and Robbery Detective, conducting investigations into criminal and non-criminal deaths, officer involved shootings, and bank, business and street level robberies and

---

[1] https://www.nacole.org.
[2] On October 5, 2016, the Chicago City Council passed an ordinance to establish the Civilian Office of Police Accountability (COPA), which replaced IPRA as the civilian oversight agency of the Chicago Police Department.
[3] It was created on January 1, 2007, by consolidating the Indianapolis Police Department and the road division of the Marion County Sheriff's Office.

carjackings. I was also tasked with conducting investigations into criminal allegations against sworn officers.

In my position as a Supervising Investigator at IPRA I reviewed complaints and allegations of excessive force or official misconduct against members of the Chicago Police Department, assigning cases to investigative staff. I monitored the progress of each investigation to ensure timeliness and compliance with established investigative procedures and standards. This was accomplished by reviewing and approving investigative reports prepared by staff. I conducted preliminary investigations immediately after officer-involved shooting incidents and assigned and oversaw follow-up investigations performed by staff. I provided training to staff in investigative techniques, reporting methods and departmental policies and procedures. I also provided testimony at criminal, administrative or arbitration proceedings against departmental personnel and oversaw the preparation and presentation of cases recommending suspension to the Complaint Review Panel. In my time at IPRA, I developed an intimate knowledge of CPD's disciplinary systems and processes. I also gained a historical understanding of CPD's disciplinary systems and practices going back to the late 1990s.

As the Executive Director of the Citizens' Police Review Board (CPRB) for the City of Oakland, I oversaw the administration and operations of the CPRB, reporting directly to the City Administrator. I worked closely with the appointed board to achieve the goals and objectives of the CPRB. I was responsible for planning, organizing, and coordinating CPRB support activities and operations consistent with the organization's mission; overseeing the process and review of citizen complaints of officer misconduct by sworn members of the Oakland Police Department; planning and developing program policies; and as assigned, performing other related work. Key priorities included expansion of community outreach efforts to increase awareness and to educate the public about CPRB services, while creating a more active environment for the community to provide ongoing input to the CPRB. Operationally, I strengthened investigative capabilities through staff development, and mentorship as well as increased staffing. Lastly, I provided technological improvements and ongoing training to staff and board members to better equip them as they worked to achieve the goals and objectives of the CPRB.

I facilitated the transition from the CPRB to the Community Police Review Agency (CPRA). This transition occurred because of an amendment to the Charter for the City of Oakland which created the Oakland Police Commission (Commission). As the Interim Executive Director, I was responsible for planning, developing and implementing all functions and activities of the CPRA, including effective responsiveness to the public and other client needs; implementing goals and objectives and ensuring the enforcement of applicable laws, ordinances and regulations; preparing and presenting reports to the Oakland Police Commission, the Mayor, the City Council, the Chief of Police and other boards and commissions regarding CPRA activities. The CPRA was responsible for the prompt and impartial investigation of civilian complaints of police misconduct or failure to perform a duty, as well as a review of procedures and tactics used during incidents resulting in serious injury and/or death.

I have served on the NACOLE Board of Directors since 2016. I served as the Chair of the Strategic Planning Committee (2016-2017), the Treasurer and Chair of the Elections and Bylaws Committee (2018-2021), and currently as Vice President.

My education includes a Bachelor of Science from Oakland City University and a Master of Business Administration from Keller Graduate School of Management.

A list of cases will be found in Attachment A; material reviewed for this case is in Attachment B; a complete and detailed resume are in Attachment C; copies of my expert reports in Sierra, Rodriguez, Reyes/Solache, and Velez are in Attachment D; and the CR datasets used in analyzing this case are in Attachment E-1 through E-3.

My compensation for work related to this case is $350 per hour, with a four-hour minimum. I bill a flat rate of $2450.00 per calendar day for depositions and trial testimony. I charge time spent traveling and waiting to testify under my regular billable rate. I may charge reasonable expenses with prior approval.

Dr. Timothy Knight

Timothy Knight began teaching at the college/university level in 1986. In addition to serving as Chair of the faculty council, Dr. Knight served as lead professor (department chair) of three departments, one of which was the Criminal Justice Department at Martin University. While serving at the University of Indianapolis, Dr. Knight taught all the community leadership development content in The School of Adult Learning (SAL). The focal point of the content was evidence-based community engagement, i.e., community-based research and data analysis, foundation and non-profit organizational development, and social entrepreneurship. That course of study was enhanced through his nine years of homicide investigation experience and work in the City of Oakland, California as a policy analyst at the Citizens Police Review Board.

Dr. Knight attained executive leadership, performance leadership, and diversity and inclusion certifications from Cornell University. He also is a licensed, qualified administrator trained to administer and interpret intercultural developmental inventories. Dr. Knight's twenty-three years of law-enforcement experience, coupled with his academic work, strengthen his skills for analysis, synthesis, and evaluation, competencies that are essential to analyzing police and government conduct and police-community relations. Dr. Knight also worked and supervised in-custody death investigations and officer-involved shootings. As a matter of routine, Dr. Knight worked on multi-jurisdictional investigations with the aid of and while supporting ATF and FBI agents, U.S. Marshal Service, DNR, and municipal and state agencies.

Many of the awards Dr. Knight earned during his IMPD career were in recognition of community service and engagement activities, advocacy of citizens - often in the face of unjust treatment by police and government officials - and standing in solidarity with officers who did the same.

After retiring from IMPD, Dr. Knight began working for the City of Oakland, California, first as a policy analyst and next as Chief of Staff for Oakland's elected City Auditor. Both assignments sharpened his analytical skills and increased his awareness of the ease with which trusted public service employees could violate public trust when independence, internal controls, adequate redundancy, and conscientious oversight were low administrative priorities.

Dr. Knight's academic background and training prepared him to drive social science research, including professional communications, multiple qualitative, quantitative, and mixed-method approaches to data collection and analysis, and report writing. Each is an essential skill set for the

work of investigating and reporting on behavioral trends, organizational culture, social systems, and group value formation and dynamics.

Dr. Knight's compensation for work related to this case is $350 per hour, with a four-hour minimum. Dr. Knight bills a flat rate of $2450.00 per calendar day for depositions and trial testimony. Dr. Knight charges time spent traveling and waiting to testify under his regular billable rate. Dr. Knight may charge reasonable expenses with prior approval.

Miroslava Meza

Ms. Meza is a Claremont Graduate University Alumna - M. S. in Mathematics with a sub-specialization in Operations Research and Statistics. Ms. Meza also holds bachelor's and master's degrees in Industrial Engineering from Monterrey Technology and Science Institute.

Currently, Ms. Meza is the Deputy Inspector General for the City of Seattle. Before her current role, she led the Policy and Statistics team at the City of Seattle's Office of Inspector General (OIG). Her team's main projects are public safety, policing research, and data analysis. In this position she has conducted a wide range of projects, from mapping Seattle Police Department's (SPD) disciplinary process to managing a multi-agency team to improve processes and data availability for police oversight.

Previously, Ms. Meza was project manager and main data analyst for a team working on a joint project between Southern California Edison and Claremont Graduate University. Ms. Meza's team developed genetic algorithms and managed to predict and minimize volatility in power outages within Southern California Edison's Los Angeles urban network.

Ms. Meza has more than 10 years of experience teaching applied statistics at the university level - her latest teaching experience was at Monterrey Institute of Technology and Higher Education, ranked No.6 in the Top 10 Universities in Latin America by Forbes. Ms. Meza has conducted demographic and social research regarding public policies and their impact on inclusion and gender issues for Sinaloa's State Government (Mexico).

Ms. Meza's compensation for work related to this case is $350 per hour, with a four-hour minimum. She bills a flat rate of $2450.00 per calendar day for depositions and trial testimony. She charges time spent traveling and waiting to testify under her regular billable rate. She may charge reasonable expenses with prior approval.

## Introduction

I was retained by Plaintiff's counsel in this matter to review testimony, policies, reports, complaint registers (CRs), and other documents, and to render an opinion as to the City of Chicago's policies, procedures, and practices as they related to the training, supervision and discipline of officers, and their relationship to the disciplinary histories and conduct of the Defendant Officers, as it relates to the 1993 wrongful conviction of Geraldo Iglesias.

Based on my review of the materials, coupled with my specialized training, education, and experience in the field of law enforcement, I have formed my opinion to a reasonable degree of professional certainty that the Defendants' law enforcement careers were wrought with numerous allegations of misconduct, many similar in nature to Plaintiff's allegations, and insufficient accountability for such actions. In addition, I have formulated opinions regarding the City of Chicago's policies, procedures and practices that departed from the generally accepted law enforcement practices at the time as they related to the city's investigation and discipline of officers accused of misconduct and tolerating a code of silence within the ranks of CPD that insulated wrongdoers and concealed misconduct.

All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration, and discipline-based upon my education, training and employment as a law enforcement officer, as well as my work as a law enforcement oversight practitioner, and my experience as a consultant in the field.

The opinions I have rendered here are based upon the materials reviewed regarding CPD's policies, procedures, and practices with respect to officer supervision, misconduct investigation and discipline; Defendant Officers' careers in law enforcement with CPD including CRs made against them and their CR histories; hundreds of CRs from 1989 – 1993 made against Area 5 detectives (described below); hundreds of CR files from 1995-1998 made against Area 5 detectives in connection with my expert work in *Reyes v. City of Chicago*, 18-cv-1028, and *Solache v. City of Chicago*, 18-cv-2312; hundreds of CR files from March 1996 – March 2001 made against Area 4 detectives and gang specialists in connection with my expert work in *Velez v. City of Chicago*, No. 18-CV-8144; and hundreds of CR files from 1991-1995 made against Area 5 detectives in connection with my expert work in *Sierra v. Guevara*, which resulted in data and conclusions consistent with my opinions here. The opinions are based upon my education, specialized law enforcement experience including as a supervising investigator for Chicago's Independent Police Review Authority (IPRA), training and knowledge of generally accepted standards and practices in the field, my continued work within the field of police practices, oversight of law enforcement agencies, and my work with other law enforcement agencies and municipalities around the country.

I also recognize that additional documentation may be provided to me. I welcome the opportunity to review any additional relevant material as the case proceeds. If this material is provided to me, I will be prepared to supplement my report.

## Methodology

The opinions in this report have been formulated to a reasonable degree of professional certainty

in the field of law enforcement. I base these opinions on my specialized education, training, and vast experience as a police officer, supervisor, investigator, law enforcement oversight practitioner, and recognized police practices expert.

The method I used in reaching my conclusions included a review of materials provided by Plaintiff's counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These practices originate from the United States Constitution which establishes the basis from which police policy, practices, and procedures derive. These standards have also been established in model policies promulgated by professional organizations such as the National Association for Civilian Oversight of Law Enforcement (NACOLE)[4], International Association of Chiefs of Police (IACP), the Commission on Accreditation for Law Enforcement (CALEA), and Council of Inspectors General on Integrity and Efficiency (CIGIE).[5] These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum (PERF). Lastly, these practices have been vetted through our courts as evidenced by innumerable United States Supreme Court decisions, some of which are cited within this report. I mention these important court decisions not to invade the province of the fact finder, but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the United States should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and day-to-day work assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in these police practices embodies the fundamentals that I employ in my professional examination of officer misconduct investigations and as a civilian law enforcement oversight practitioner. I provide my opinions with a reasonable degree of certainty within law enforcement, police activity, and police administration and supervision.

My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder.

---

[4] NACOLE Principles of Effective Oversight, Principles for Effective Oversight - National Association for Civilian Oversight of Law Enforcement (nacole.org), https://www.nacole.org/principles.

[5] Council of Inspectors General on Integrity and Efficiency (CIGIE) investigations standards, Qualitative Assessment Review Guidelines, https://www.ignet.gov/sites/default/files/files/QAR%20Guide%20Investigations%20July%202017.pdf.

The quantitative analysis is based in part on a compiled dataset of 325 Complaint Register files ("CRs") against City of Chicago detectives in Area 5 with a 1989-1993 timeframe. In the *Bouto* case, the City of Chicago was ordered by the court to produce all CRs from 1989-1993 against Area Five detectives.[6] The City of Chicago indicated that it would produce such files with an *incident date* of 1989-1993. [7] On May 28, 2021, the City reported to the Court that it had completed its production.[8] By agreement, CRs with incident dates between January 1, 1991-December 31, 1993 that had been previously produced by the City of Chicago in the *Sierra* litigation were used.[9] Identification of those CRs was done by Plaintiff's counsel and shared with counsel for the City of Chicago prior to this report.[10] In addition, because the City of Chicago had not produced 1989-1990 CRs in the *Sierra* case, additional CRs that had been produced by the City of Chicago only in the *Bouto case* and not in the *Sierra* case were used.[11] The CRs were not exclusively limited to those with incident dates of 1989-1993, although the vast majority fell in that range. For our analysis, we did not exclude any CR files that had been produced by the City for use in this case. Thus, nearly all, but not all, of the CR files have incident dates between 1989-1993.

In addition, the quantitative analysis considers known CRs for the Defendant Officers over the course of their careers with the Chicago Police Department; CR histories for Defendant Officers; Chicago Police Department Annual Reports from 1989 - 1993; and Cook County data for exonerations between 1989 and 2021 from the National Registry of Exonerations.

My opinions and the tables in this report rely on the analysis of the dataset of 325 Complaint Register Files described above, as well as a larger set of Complaint Register files and associated allegations (the "1989-1998 dataset") described below. The analysis of these files is set out in the tables in this report, as well as in Appendix A.

---

[6] Court Order of August 3, 2020 in *Bouto* case, at p.1.
[7] See Email dated January 20, 2021, at 3:47 p.m., with subject line "Bouto v. Guevara, et al.," from Kara Hutson - Rock Fusco & Connelly, LLC ("Pursuant to the Court's August 3 order...please find the first part of our production regarding the Monell CRs with an incident date occurring between 1989-1993. We are still waiting on additional files, and will produce them upon receipt.").
[8] Status Report of 5/28/21 in *Bouto* case.
[9] See Email from Ruth Brown, 7/8/2022, to Eileen Rosen ("Judge Cox ordered production of CRs from 1989-1993. Plaintiff Bouto intends to use the Sierra bates references for CRs with an incident date of January 1, 1991-December 31, 1993 that were produced in Sierra, and then Bouto references for the earlier CRs that were produced only in Bouto, and not in Sierra. I've attached the CR numbers and page references here. Let me know if there are any issues with this approach."); Email from Eileen Rosen, 7/28/2022, to Ruth Brown ("Because you are proposing reliance on two separate bates ranges we need to confirm that the non-Bouto designated documents match the Bouto production. Assuming there is no issue there we are fine with your proposal. We are still conducting the review and will let you know as soon as we are finished."); Email from Theresa Carney, "...we agree to your proposal to use the 'Sierra' bates numbers for the CR ...files dates January 1, 1991 – December 31, 1993 and identified in your July 20, 2022 excel spreadsheets."); Email from Eileen Rosen, 8/22/2022, to Ruth Brown ("I thought we had already told you we were okay with the July 8 spreadsheet. Sorry about that."). The CRs were identified in a July 8, 2022 spreadsheet sent by Plaintiff's counsel Ruth Brown to Eileen Rosen prior to this report.
[10] See sources in previous footnote.
[11] See sources in previous footnote.

In addition, in this report, I relied upon the statistical analysis and tables generated by Ms. Meza in support of my opinions. In addition, I relied on Dr. Knight for the qualitative analysis of the historical context, and cases relevant to this inquiry support my views. In my experience as an expert on policy disciplinary processes, I routinely collaborate with other experts and rely on similar analyses by other experts.

***1989-1993 Dataset description:*** The CR coding collected by the Plaintiff's team considered all 325 Complaint Register files, containing 891 individual investigations[12] and 2020 allegation counts (1997 of those with known allegation type), generally dated 1989-1993 as described on page 8, from investigations of detectives who worked at Area 5. From those 2020 Allegation counts, only 1997 had an allegation type identified by the City of Chicago.[13] For more details on the dataset, see Appendix A at 1.1 and 1.2.

My findings from my review of Area 5 files from 1989-1993 is consistent with my findings from a review of Area 5 files from 1995-1998 (*Reyes*), Area 5 files from 1991-1995 (*Sierra*), and Area 4 files from 1996-2001 (*Velez*). The policies regarding the investigation of civilian complaints were uniform Citywide. Because the City maintained a centralized internal affairs system—and consistent with the City's own admissions through 30(b)(6) testimony—it is my understanding that CPD maintained the same general Internal Affairs processes and practices across all Areas of the City.[14]

***1989-1998 Dataset description:*** I also relied on Ms. Meza's analysis of CR files and associated allegations provided by the City generally dated 1989-1998. These represented the Area 5 files analyzed in *Reyes*, *Sierra*, and *Bouto*. The purpose of that analysis was to evaluate whether the same patterns I found in 1989-1993 were present during the entire period of 1989-1998.

**Factual background**

I have reviewed substantial records from the underlying case to understand the backdrop on which I am offering opinions and the relationship between my opinions about training, supervision, discipline, and the conduct at issue in this case.

Plaintiff's lawsuit alleges that he was wrongfully convicted of a murder he did not commit due to the misconduct of several police officers including Defendants Guevara and Halvorsen and other

[12] Individual investigations are investigations in a single CR file against a single officer. Thus, a CR with allegations against three different officers would reflect three individual investigations.
[13] Specifically, the City of Chicago was ordered in the *Bouto* case to produce all CRs opened from 1989-1993 against Area Five detectives. Bouto Court Order of August 3, 2020, at 1. On May 28, 2021, the City reported to the court in *Bouto* that it had completed that production. *Bouto* case Dkt. 238. The CR files produced by the City pursuant to that order comprise the 1989-1993 dataset analyzed here.
[14] Deposition of Tina Skahill, AR-L 151674–76, 151681–151717 (describing the process for CPD's misconduct investigations between 1989 and 1996); Deposition of Lt. Joseph Bird, Case No. 1:18-CV-102, *Arturo DeLeon-Reyes v. Reynaldo Guevara, et al* and Case No. 1:18-CV-2312, *Gabriel Solache v. City of Chicago, et al*, December 22, 2021, at 34–113 (describing process for CPD's misconduct investigations from 1986-1998).

Defendants. Plaintiff alleges that Defendants violated his constitutional rights by, among other things, fabricating evidence from witnesses and suppressing exculpatory information.

In 2013, the City of Chicago commissioned an investigation into Detective Guevara and hired former United States Attorney Scott Lassar, now of Sidley Austin, to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that four men who alleged misconduct by Guevara are "most likely innocent." These men are Roberto Almodovar, Armando Serrano, Jose Montanez, and Robert Bouto. The Lassar team found evidence that Guevara improperly influenced eyewitnesses and conducted improper identification procedures, including telling witnesses whom to select from lineups and taking line-up witnesses to look at a suspect handcuffed in a bathroom in Bouto's case.[15] They also found that Defendants Halvorsen and Guevara reported as fact testimony from an informant that they knew to be false, likely played a role in developing that false evidence, and later testified to the truth of that false evidence at trial and before a grand jury.[16]

Lassar also reached conclusions in the convictions of Arturo Reyes and Gabriel Solache. After an investigation into the facts and evidence, Lassar's team found the allegations "that Guevara physically abused Solache and Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and Reyes were, in fact, physically abused during the course of their interrogations."[17]

In my experience, police departments understand that officers who are undisciplined and unsupervised are more likely to commit the types of transgressions that are alleged in Plaintiff's complaint. Therefore, police departments understand that they need a robust and supervisory system of discipline in place, and that the absence of such a system will result in exactly the types of abuses that befell Plaintiff.

**Opinions and Analysis**

**Opinion 1: The Chicago Police Department and the Defendant City of Chicago engaged in a widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices.**

To determine whether CPD and the City of Chicago had engaged in widespread disciplinary and supervisory practices that were in direct conflict with accepted law enforcement practices at the time of this incident required a thorough review of Chicago's accountability systems and the ways in which the City became aware of the potential departures from industry standards and law.

Our analysis begins with a discussion of the City's widespread practices relating to fabrication of witness statements through tactics including coercion; fabrication of witness identifications and misconduct during identification procedures; false testimony by officers; and coerced and false confessions. We discuss the City's accountability systems that include an evaluation of internal affairs' investigations pertaining to false witness statements and excessive force. This phase of my analysis will address the various elements related to the receipt and investigation of citizen

[15] *See* Lassar Report dated 3/3/2015, AR-L 522083-522126.
[16] *See* Lassar Report dated 3/3/2015, AR-L 522010-522067.
[17] *See* Lassar Report dated 12/12/2014, AR-L 517173-517192.

complaints, the imposition of discipline, lack of any pattern analysis to identify officers who repeatedly are accused of misconduct, and the failure of the City to implement a meaningful early intervention system to root out misconduct.

To supplement this discussion, our analysis includes discussion of the City's policies and practices for the investigation and discipline of officers accused of misconduct, qualitative and statistical analysis of the Defendants' CRs and civil lawsuits, and qualitative and statistical analysis of the City of Chicago's 1989 to 1993 CR production that include allegations of fabricated evidence. Finally, our analysis concludes with a discussion of Rule 14 allegations and the existence of a Code of Silence within the CPD.

## A. Beginning in the 1970s and continuing through at least 1995, the City of Chicago Police Department routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, physically abusing and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false.

Evidence of the City's widespread practice of fabricating witness identifications and statements, using tactics such as manipulation and coercion; false testimony by officers; and coercing false confessions can be found in the records from historical cases that continue to detract from the reputation of the City of Chicago and CPD.

### Historical Context

This case is not the first of its kind. Documents available to me reveal a long history of the City of Chicago facing litigants with claims of abuse in the form of fabrication of evidence including coerced witness statements and confessions leading to wrongful arrests and convictions. This history rife with a lack of transparency, permissive policies, and ineffectual efforts to correct its course of systemic abuse and harm to its citizens is insightful and predictive: because change did not occur within the City of Chicago and CPD, citizen abuse, violent and abusive interrogations, the code of silence, vigilante behavior, wrongful convictions, and irreparable harm to the public and public trust have persisted for decades without correction.

### 1. Pre-Guevara: The Jon Burge Era, 1972 - 1991

The City's widespread practice of fabricating evidence dates back to the 1970s. A voluminous body of evidence demonstrates that Jon Burge and other officers under his command routinely used torture tactics, including electrocution, cattle prods, putting plastic bags overs suspects' heads, and threatening with guns, to extract false statements from witnesses and suspects.[18] Despite complaints made to the City of Chicago and officers at the highest levels of CPD, and CPD's awareness of evidence procured by the use of torture, this corrupt practice went on for decades as these complaints were ignored or failed to be investigated.

The United States Court of Appeals for the Seventh Circuit described Burge's coercion of false

[18] G. Flint Taylor, The Chicago Police Torture Scandal: A Legal and Political History, 17 CUNY L. Rev. 329, 330 (2014).

confessions through physical force in this way:

> Burge . . .. was not pursuing a frolic of his own. He was enforcing the criminal law of Illinois overzealously by *extracting confessions from criminal suspects by improper means*. He was, as it were, *too* loyal an employee. He was acting squarely within the scope of his employment.[19]

### 2. The Goldston Report

Sadly, there are many examples of the fabrication of evidence by abusing and otherwise coercing suspects and witnesses during this era. Many of these instances were high profile and collectively were evaluated by the CPD in what is known as the "Goldston Report."

On January 25, 1990, a publication known as the "Chicago Reader" published an article titled *The House of Screams* by John Conroy. The article discussed the conduct of Jon Burge and others at the Area 2 police station, and the case of Andrew Wilson, an individual who had been abused by Burge and wrongfully convicted based on fabricated evidence.[20] Shortly after, in March 1990, two OPS investigators were tasked with re-investigating Wilson's CR (CR No. 12543) as well as to "determine if there was systematic abuse at Area 2 during that period [1982] and if so, to determine the culpability, if any, of Area 2 Command Personnel."[21] OPS investigator Francine Sanders reinvestigated Andrew Wilson's CR and ultimately sustained the allegations against Burge and the two other officers.

The broader investigation into the conduct of Burge and his associates was conducted by an OPS investigator by the name of Michael Goldston. Goldston concluded that misconduct levied by Burge and others, including fabrication of evidence and witness and suspect abuse, was both systematic and that command level officers knew about it and failed to report it:

> In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the ***usual beatings*** but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.
>
> The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Command members were aware of the systematic abuse and perpetuated it either by actively participating in the same or failing to take any action to bring it to an end. This conclusion is supported by the number of incidents in which the Area 2 offices are named as the location of the abuse.[22]

---

[19] *Wilson v. City of Chicago*, 120 F.3d 681, 685 (7th Cir. 1997).
[20] John Conroy, *House of Screams*, CHI. READER (Jan. 25, 1990), http://www.chicagoreader.com/chicago/house-of-screams/Content?oid=875107.
[21] Special Project Conclusion Report dated Nov. 2, 1990. AR-L 150959-150983.
[22] Goldston Report, Sept. 28, 1990, AR-L 150959-150983.

In my opinion, Goldston's conclusions provided notice of a departure from generally accepted law enforcement standards at the time and signaled a systemic failure in the CPD's system of accountability. Further, it evidenced behavior within the ranks of the CPD to which supervisory and command personnel had turned a blind eye and consciously ignored.

During his investigation, Goldston identified fifty (50) alleged victims of misconduct by officers at Area 2 from May 1973 through October 1985 and reported a statistical analysis, which included the following summary of the CR investigations that were initiated as a resulted of the alleged incidents of abuse/torture. The allegations included beatings (27 instances), electric shock (9 instances), a plastic bag or typewriter cover being put over the victim's head (13 instances), use of a firearm to threaten or strike the victim (11 instances), hangings (2), and more than one type of abuse was alleged in some instances.[23]

Goldston identified twenty-six (26) CR Files.[24] Of those seventeen (17) were assigned to OPS and nine (9) were assigned to the CPD's Internal Affairs Division (IAD). Not even one of those CRs resulted in a sustained finding. As of the time of his report, Goldston noted that all but one CR investigation was closed with no sustained findings and one CR investigation remained open.[25] Goldson also reported that nine (9) civil suits had been filed, of which five involved serious injuries. Of the lawsuits, five (5) had resulted in the City agreeing to settle; one ended in a mistrial; one was dismissed; in one, the defendants were granted summary judgment; and one was pending at the time of his report.[26]

In February 1992, United States District Court Judge Milton Shadur ordered the Goldston Report be publicly released.[27]

It has been my experience that police departments and the municipal governments who are ultimately responsible for the delivery of police services in their community receive notice of a potential departure from established standards and law when a complaint is made and/or a civil suit is filed that alleges an act of misconduct. In that regard, I believe the CRs and lawsuits noted within the Goldston Report provided a basis for action by the City of Chicago and CPD. In my opinion, such action would have included a re-examination of those previous complaints and the administration of appropriate remediation and affirmative action to ensure that such behavior stopped and that a clear message was sent throughout the ranks of the embattled department; and, a thorough review of the department's disciplinary processes, which had clearly failed to identify and root out misconduct for more than a decade despite more than two dozen CRs against a group of associated officers. I am not aware of any information that would cause me to conclude that the City or its police department re-examined any of the 26 CR investigations after the Goldston Report was issued in November 1990. Despite an OPS investigation that concluded that there was systematic misconduct that had resulted in at least 50 recognized

---

[23] Goldston Report, Sept. 28, 1990, Appendix F (Statistical Analysis), AR-L 150959-150983, at 1.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. Rev. 329, 339 (2014) (citing David Jackson, 13 Years of Cop Torture Alleged, Daley, Martin, Rip Internal Police Reports, Chi. Trib. (Feb. 8, 1992), http:// articles.chicagotribune.com/1992-02-08/news/9201120603_1_jon-burge-torture-chicago-police-board).

incidents, including 26 that were reported and assigned to OPS or IAD for investigation, not even one was re-opened and reinvestigated considering Goldston's conclusions.

Notwithstanding the notice provided by the Goldston Report, it appears to me that the City did not take any steps to address or remedy the systematic misconduct uncovered by Goldston's investigation, particularly considering the number of detectives accused of misconduct and the pervasive nature of the misconduct. I have not been made aware of any evidence that the City implemented any training, enacted any policies, or took any systemic response to specifically address the gross departures set out in Goldston's findings. The Goldston report pointed to systemic problems—a broken disciplinary system and widespread and accepted use of coercion and physical abuse to fabricate evidence—that demanded a systemic response. In my opinion, turning a blind eye to these findings is especially egregious given the fact that Burge was in a supervisory role in the CPD's Area 2, and presumably other (and perhaps younger) detectives learned how to manipulate and coerce suspects and witnesses by watching how Burge went about the work of fabricating evidence—in his case, through abusing suspects and witnesses that were entrusted to his care.

### 3. *Wilson v. City of Chicago*[28]

On February 14, 1982, Chicago Police officers arrested Andrew Wilson for the murder of two police officers. Investigating officers coerced Wilson into confessing to committing the murders by punching him, kicking him, smothering him with a plastic bag, electrocuting him, and pressing him against a hot radiator throughout the day of his arrest. Extensive contemporaneous medical and photographic evidence confirmed the horrific treatment detectives meted out on Wilson.

Wilson underwent two trials. The first ended in a conviction of first-degree murder and the death sentence. The Illinois Supreme Court reversed Wilson's conviction on the grounds that his confession, part of the evidence against him, was forced. Wilson was retried, sentenced, and convicted to life without possibility of parole. In addition to appealing the second conviction, Wilson sued for damages under 42 U.S.C. § 1983. He claimed that his confession was fabricated due to being physically tortured. The defendants included lieutenant Burge, several officers, and the City of Chicago. The first trial ended in a hung jury. The second trial resulted in a verdict affirming that Wilson's rights were violated but exonerated all the officers who participated in his torture.

The jury also found that the City of Chicago had a *de facto* policy authorizing its police officers to physically abuse persons suspected of having killed or injured a police officer. The jury also found the policy to abuse suspects was not the proximate cause of the physical abuse Wilson underwent. The court ruled in favor of the officers who abused Wilson. The Police Board, however, found three of the officers guilty of misconduct, suspending two of them and firing Burge. The Fraternal Order of Police hailed Burge a hero and unsuccessfully attempted to enter a float in the St. Patrick's Day parade in his honor.

---

[28] *Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993).

### 4. The Employment Termination of Jon Burge

The City eventually sought to impose formal discipline on the 3 officers that were involved in torturing Andrew Wilson. In February and March of 1992, the Police Board heard the case and took testimony from Wilson and several other Burge torture survivors. In 1993, the Board issued its order stating that Burge had physically abused Wilson, terminating Burge and recommending 15 months suspension of the other two.[29]

As previously stated in my report, the conduct of Jon Burge and the officers serving under his supervision during the time of this egregious conduct resulted in resounding notice to the City and the CPD. In fact, the improper and unlawful practices that occurred on Burge's watch as a CPD supervisor was reported and considered "common knowledge" according to a federal court:

> It was also common knowledge that in the early to mid–1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis.[30]

### 5. Special Prosecutor's Investigation and Report

In addition to the work of Investigator Goldston, the Office of the Special Prosecutor convened an investigation into Burge's improper and unlawful conduct. Their investigation spanned some four years and concluded in 2006. No criminal indictments resulted, but they did conclude that Burge had committed aggravated battery, obstruction of justice and perjury related to his abuse of Andrew Wilson and his later testimony about it.[31] They also concluded that several other officers had abused other individuals. The Report further found that because Jon Burge was the Commander of Area 2 and Area 3 and it was known he could abuse suspects and witnesses and fabricate evidence with impunity, those who served under his command recognized that they, too, could engage in the same abusive conduct without consequence.[32] It has been my experience that when an organization fails to establish and sustain effective systems of accountability and consciously turns a blind eye to misconduct, it sends a message throughout the organization that those who engage in misconduct may do so with impunity. I believe this to have been the case in the City of Chicago and throughout the CPD during the Burge Era.

In addition to the work of Goldston and the Office of the Special Prosecutor, the Illinois Legislature sought to remedy the illicit work of Burge and his confederates. In 2009, the legislature enacted the Illinois Torture and Inquiry Commission to address claims of abuse by police officers in the City of Chicago.[33] Eventually the City of Chicago acknowledged this stain

---

[29] G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. Rev. 329, 358 (2014).
[30] *U.S. ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999).
[31] G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. Rev. 329, 358 (2014).
[32] *Id.* at 359. *See* Special Prosecutor's Report. AR-L 150667-150958.
[33] 775 ILCS 40, et. seq.

on its history. In 2015, the City Council enacted the Reparations Ordinance for the Burge torture survivors. The ordinance included a formal apology from the Mayor and City Council for police abuse. Nevertheless, many of the torture survivors remained incarcerated for crimes they did not commit.

### 6. *People v. Wrice*[34]

On September 9, 1982, in the early morning hours, several men allegedly sexually assaulted, beat, and burned thirty-three-year-old K.B. The attack occurred in the attic of Wrice's Chicago home. Wrice was charged with rape, deviate sexual assault, and numerous other offenses. Prior to trial, Wrice moved to suppress inculpatory evidence he gave investigators because Detective Peter Dignan and Sergeant John Byrne, acolytes of Jon Burge, fabricated a confession from Wrice by physically abusing him.

Wrice testified that police took him to Area 2 Headquarters and placed him in a second-story room. Officers handcuffed him to a ring on the wall and questioned him. Unsatisfied with Wrice's responses, Detective Dignan freed him from the wall ring and told him that he (Dignan) "was fixing to do some police brutality." Dignan and Byrne took Wrice to a barred room located on the lower floor of the building, where they beat him with a 12- to 13-inch-long rubber hose, taped at each end, and a flashlight. Wrice sustained abuse to his groin, chest, and legs and eventually gave detectives a statement of admission.

A jury found Wrice guilty of armed violence, two counts of aggravated battery, deviate sexual assault, unlawful restraint, and rape. Wrice's first appeal was rejected. In 2000, Wrice filed a successive *pro se* post-conviction petition alleging violations of his due process rights. Wrice cited the report from the Chicago Police Department's Office of Professional Standards (OPS), establishing that abuse of prisoners and fabricated confessions at Area 2 were widespread and systematic. In October of 2007, Wrice filed a petition for leave to file another successive petition for post-conviction relief. In the petition, Wrice cited Special Prosecutor Edward J. Egan's findings of widespread and systematic mistreatment of suspects and witnesses by Chicago police officers, many of whom reported to Jon Burge. The court denied Wrice leave to file his second successive post-conviction. The appellate court reversed and remanded for a third-stage evidentiary hearing. Prosecutors appealed the Appellate Court decision to the U. S. Supreme Court, which agreed to hear the case. On February 2, 2012, the Supreme Court, with a unanimous opinion, affirmed the Appellate Court decision ordering a hearing on Wrice's claims. The ensuing hearing culminated in Wrice's exoneration and release.[35]

Wrice's case put the City of Chicago on notice that Burge's illegal tactics and torture of suspects and witnesses had spread throughout the Department to Burge's acolytes, including Dignan, Bryne, and others, as discussed in more detail below.

---

[34] *People v. Wrice*, 357 Ill. Dec. 33, 962 N.E.2d 934, 2012 IL 111860 (Ill. 2012).

[35] https://www.law.umich.edu/special/exoneration/pages/casedetail.aspx?caseid=4323.

### 7. A Pattern of Lawsuits and Exonerations in the 1980s and 1990s That Further Put the City on Notice of Additional Fabrications and Witness Manipulation, Specifically Including Identification Procedures

A series of lawsuits, judicial decisions, and media coverage put the City on notice of a widespread pattern of fabrication of eyewitness identifications and misconduct during identification procedures conducted by CPD officers. As one example, James Newsome was wrongfully convicted of the murder of a grocer following a Chicago Police Department investigation that included a false positive identification of Newsome in a lineup. CPD had knowledge of Newsome's wrongful conviction and the false identification as early as 1989, when it was ordered by a court to run unidentified fingerprints from the murder scene through its Automated Fingerprint Identification System and those fingerprints matched to a convicted murderer on death row.[36] Eventually, Newsome was exonerated and pardoned based on that forensic evidence; he then brought a federal civil rights suit in 1996. During the litigation, Anthony Rounds, a key eyewitness, stated in an affidavit in 1999 that that he told the police that he did not get a good look at the murderer, but was asked to view a line-up nonetheless; that at the line-up, he could not make an identification of either a face or a voice; and that at the line-up, he repeatedly told that to the police who "constantly" told him that "number 3 [plaintiff] looked and sounded like the gunman." Rounds swore that his fabricated testimony at Newsome's trial "was the creation of the plain clothes police officers" and "was based on what the police told [him] they knew, and not based on what [he] recalled."[37] In 2000, the district court denied the motion of two Chicago Police Department officers for summary judgment, detailing the plaintiff's evidence that they fabricated eyewitness identifications and conspired to wrongfully convict Newsome.[38] (A jury later awarded Newsome $15 million following a 2001 trial.[39])

The City also received notice of the wrongful conviction of Xavier Catron for murder following an investigation and line-ups with youth witnesses conducted by Chicago Police Department officer John Halloran. After Catron's trial, three key witnesses recanted their identifications of Catron, stating that they identified him only at the urging of the police.[40] (For his part, Halloran was subsequently named in three misconduct lawsuits that cost Chicago a total of $7,050,000.).[41]

In spring of 1982, the City was notified of extraordinary detective misconduct regarding witness identification procedures in the George Jones case.[42] A 12-year-old girl had been found raped and bludgeoned to death, and her 10-year-old brother beaten unconscious. To obtain an identification, two CPD detectives visited the brother shortly after he had come out of a coma; he remained in a

---

[36] Center on Wrongful Convictions, James Newsome, https://www.law.northwestern.edu/legalclinic/wrongfulconvictions/exonerations/il/james-newsome.html
[37] *See Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *2 (N.D. Ill. Apr. 26, 2000).
[38] *Id.* at *16; *see also Newsome v. James*, No. 96 C 7680, Dkt. 150, at 3-9 (N.D. Ill. May 16, 2000).
[39] *See* Chicago Tribune, Lineup suit nets $15 million, 2001 WLNR 10747375; *see also Newsome*, Case No. 96 C 7680 (N.D. Ill.) (docket); National Registry of Exonerations entry on James Newsome, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3504.).
[40] *See, e.g.*, Chicago Tribune, Man Leaves Prison, Forgives Accuser Who Recanted Story, 2000 WLNR 8294420.
[41] Case No. 07-cv-3994 (Robert Wilson); Case 06-L-9648 (Emmanual Lopez Lopez); Case No. 06-cv-6772 (Harold Hill).
[42] *Jones v. City of Chicago*, 856 F.2d 985, 989 (7th Cir. 1988).

"precarious mental state," according to a court of appeals decision. The detectives showed the boy six photographs: one of George Jones in a suit and five of other men photographed in mugshots. The boy indicated that he knew the person displayed in George Jones's photo but did not respond after the detectives asked him whether he knew the people in the other five photos. The detectives reported that failure to identify, but the report was buried in the Department's "street files" and was not turned over to prosecutors.[43] The next morning, detectives repeated the photo lineup, causing a repeat procedure with the same suspect. In a third identification procedure, detectives brought Jones to the boy's hospital bed, where the boy first said that Jones was not the assailant ("No, that's not the man, that's not the man, no, no, no"), and then said that he was the assailant ("Yes, that's him, yes") before eventually repeating "yes, no, yes, no" again and again. Apparently, the CPD detectives considered this to be a positive identification. In spring 1982, a police whistleblower put CPD on notice of this investigatory misconduct when, in the middle of George Jones's criminal trial, the whistleblower informed Jones's lawyers of the exculpatory information in the hidden street files. The judge declared a mistrial and the state's attorney dropped the case. CPD subsequently disciplined the police whistleblower who brought the misconduct to light but declined to discipline any of the detectives involved in the investigation. Litigation on Jones's case continued through 1988, when the Seventh Circuit upheld a jury verdict in favor of George Jones, meaning that the City was on continued notice of the misconduct as revealed through Jones's lawsuit.

In 1987, the Illinois Appellate Court reversed the 1982 murder conviction of Melvin Jones following evidence that the Chicago Police Department had no grounds to arrest Jones in the first place. Police had claimed that an eyewitness, Deneen Murray, had identified Jones in a line-up as the perpetrator of a triple murder to Chicago Police Department Officer Robert Flood. But between Jones's conviction and the 1987 reversal, Murray swore in an affidavit that, during Flood's questioning of her concerning the triple murder, she did not tell Flood that Jones was involved in the triple murder; (2) she did not know Jones in November 1982, when Flood questioned her; (3) she first saw Jones in a police station a month or so later; (4) she viewed a lineup (apparently to determine if any person therein was a person that she had seen involved in the triple murder); (5) Jones was in the lineup viewed by Murray; (6) Murray recognized Jones as being one of the persons in the lineup; (7) Murray did not pick out Jones as being involved in the triple murder.[44] Thus, by 1987, the City had notice that its officers were manipulating witness lineups.

Numerous DNA exonerations in the 1990s calling into question eyewitness identifications procured during Chicago Police Department investigations further put the City on notice of its faulty identification procedures and outcomes. As a few examples, Donald Reynolds and Billy Wardell were wrongfully convicted in 1988 of crimes related to the rape and attempted rape of two University of Chicago students in part based on victim identifications made during the Chicago Police Department investigation of the crime. Yet their convictions were subsequently vacated, and the charges dismissed after DNA testing excluded Reynolds and Wardell as potential

---

[43] The report also revealed that the boy had been murmuring a name that sounded like "George Anderson" or "George Henderson," which also tended to exculpate George Jones from the crime.
[44] *See* People v. Jones, 157 Ill. App. 3d 1006, 1025-27 (1987); *see also, e.g.*, Chicago Sun Times, Burge tortured me, too, ex-suspect says, 1992 WLNR 5316085; National Registry of Exonerations entry on Melvin Jones, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4176.

sources of the semen in the case. The case was widely reported in the media and the men sued the City of Chicago.[45]

Likewise, Robert Brown was wrongfully convicted of murder in 1984 after having been falsely identified in a Chicago Police Department lineup as the man who shot victim Ronnie Bell. Subsequently, the true killers confessed to the murder, exposing publicly the falsity of the identification of Brown, and Brown and his codefendant were released in 1989.[46]

And John Willis was likewise exonerated of a rape conviction by DNA evidence after false eyewitness identifications had been procured during a Chicago Police Department investigation. Willis brought a lawsuit widely covered in the media against Chicago Police Department officers and others.[47]

In another police investigation involving grocery store robberies in Chicago and nearby suburbs, Chicago police claimed that a string of witnesses had positively identified their suspect, Vincent Goldstein, as the perpetrator of four Chicago robberies that took place on September 11, September 25, November 5, and December 13 of 1993. Yet the robberies continued after Goldstein's arrest. Charges were dropped after Goldstein's employer provided a firm alibi for the December 13 robbery, and another person, Anthony Coker, confessed to Evanston police that he had committed the September 25 and November 5 robberies. The case directly raised the obvious question of how so many different witness misidentifications could have happened given Goldstein's innocence and was widely reported in the press in 1994.[48]

Further, the City has acknowledged that it was on notice as early as 1986 of the risks posed by improperly and suggestive eyewitness identification procedures. Through deposition testimony in this case, the City's representative testified that sergeants, lieutenants, and commanders of detectives widely understood that false identifications could result if photo identification procedures weren't conducted properly.[49] These supervisors also understood that photo identification procedures could be abused if they were not done correctly.[50]

Despite this widespread pattern of fabrications and misconduct in identification procedures, the Chicago Police Department never conducted any audits into misconduct relating to eyewitness

---

[45] *See, e.g.*, Chicago Sun Times, DNA tests free 2 men jailed for rape since '86, 1997 WLNR 7140007; Chicago Tribune, Section: 2 Found Guilty of Raping U. of C. Student in 1986, 1988 WLNR 1734965; National Registry of Exonerations entry on Donald Reynolds, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3574.

[46] Chicago Tribune, After 6 Years in Prison, 2 Men Cleared, 1989 WLNR 2542748; National Registry of Exonerations entry on Robert Brown, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3063.

[47] *See, e.g.*, Chicago Tribune, Ex-Inmate Exonerated Of Rapes Tries To Get His Life In Order, 2000 WLNR 8240260; Chicago Tribune, Prisoner To Go Free As DNA Clears Him In Beauty Shop Rape, 1999 WLNR 6721651; National Registry of Exonerations entry on John Willis, available at https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3756.

[48] Chicago Tribune, Wrong Guy Looked Right in Lineups, 1994 WLNR 4312248.

[49] 30(b)(6) Deposition of Lt. John Foster at 284.

[50] *Id.* at 284-85.

identifications from 1986 to 1998.[51] The City also never conducted any investigations into patterns of such misconduct, instead investigating only individual acts of alleged misconduct on a case-by-case basis through the Complaint Register system.[52] Even though CPD was well-aware of a repeated pattern of evidence fabrication and witness manipulation, even to the point of physical abuse and torture; and multiple wrongful convictions were overturned reflecting problems with false identifications occurring during CPD lineups; and command staff knew that identification procedures were ripe for abuse; nevertheless, no systemic audit or investigation was conducted into the CPD's identification procedures or practices.[53] And, as noted below, based on review of the 1989-1993 Dataset, the Complaint Register system did not reflect a single investigation of misconduct involving lineups by detectives in Area 5 at any time between 1989-1993.

The large body of information put the City on notice of widespread fabrication of eyewitness identifications and misconduct during identification procedures, and of the foreseeable risk of harm from wrongful convictions that resulted to the citizens of Chicago. In my opinion, the failure of the City to implement any meaningful changes considering the documented evidence of fabricated evidence by CPD officers is unconscionable and evidence of knowing disregard of the risk that investigators would continue to violate the rights of criminal suspects during investigations.

### 8. The City's Practice of Fabricated Statements and Coerced Confessions Spread to Burge's Acolytes

It's important to note that during Burge's tenure in Area 3, he served in a supervisory capacity. In my professional experience, I have come to recognize that the role of a supervisor is to provide guidance and oversight to those personnel who are assigned to their watch. In so doing, supervisors also set the tone and establish the acceptable standards of conduct. Given Burge's history of misconduct and the shortcuts that he took to "solve" the cases assigned to him, I question how effective he may have been in his supervisory role and the troubling influence he may have had on those within his span of control. The notion that his practices were not only acceptable, but also helped him to rise to the level of Commander, is especially disturbing and demonstrates to me the City and CPD's willful blindness to the widespread pattern of behavior that was evident in the cases in which Burge had been previously assigned.

During his assignment to CPD Area 3, Burge overlapped with Detectives Kenneth Boudreau and Jack Halloran. In total, over the course of their careers, Detectives Boudreau and Halloran were accused of at least 50 allegations of misconduct, including allegations of excessive force, allegations of false or fabricated statements or coerced confessions.

Burge's history of misconduct spread to other parts of the Department. Area 4 Detective Kriston Kato had 42 CRs over the course of his career in which he was accused of engaging in the similar types of egregious misconduct that Plaintiff has alleged in the context of the Roman homicide investigation including fabrication of evidence, false arrest, and physical abuse of witnesses.

[51] 30(b)(6) Deposition of Commander Levester Denham at 32.
[52] *Id.* at 39.
[53] *Id.* at 52.

Twenty-six different individuals accused Kato of abusing suspects and witnesses inside the police station, yet none of those allegations were sustained.

Finally, as set forth in more detail below, the City's failures to stop the rampant misconduct is exemplified in the numerous allegations against Area 5 Detective Defendant Guevara. He has been accused of fabricating evidence by dozens of people, including Plaintiff, and has been called a "bald face[d]" liar by the Cook County judge who presided in another post-conviction case involving the victims of his misconduct[54], and has refused to testify about his conduct as a CPD detective on grounds that a truthful response may incriminate him.

In addition, I have reviewed the report of Professor Richard Leo from *Reyes v. City of Chicago*. Dr. Leo's report reveals a systemic pattern of misconduct for decades, across all Areas of the CPD, involving numerous officers, and the torture and abuse of hundreds of innocent people. Specifically, Dr. Leo details that at least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the CPD and numerous police command personnel received continuing notice of a systemic practice of physical abuse and coercion of suspects in order to coerce and fabricate confessions. The physical abuse and coercion of custodial suspects to obtain confessions was systemic and widespread at Area 2 and perpetrated by Burge and those under his command; at Area 3 and perpetrated by Detectives Michael Kill, Boudreau, Halloran and several other CPD detectives; at Area 4 and perpetrated by Detective Kriston Kato and the Area 4 detectives with whom he worked cases; and at Area 5 and perpetrated by Detective Guevara, Detective Halvorson, and other Area 5 Chicago police detectives.

These examples are indicative of a pattern of conduct exacerbated by failed supervision, a fractured accountability system, and widespread ignorance of gross departures from generally accepted industry standards and established laws that govern the way police departments are supposed to operate. My belief in this regard is evident by innumerable historical records that include the indelible work of Jon Burge and the many reports that have been authored since his abhorrent behavior surfaced and signaled systemic failures in the CPD.

### 9. The City's Practice of Fabricating False Statements Was Further Revealed in FBI 302s

The City's widespread practice of fabricating evidence was again revealed in a Federal Bureau of Investigation (FBI) form 302 by former Assistant State's Attorney Terrence Johnson, who worked as a felony review attorney at CPD Area 1 in the mid-1990s. Johnson reported how detectives at Area 1 fabricated evidence from four Black teenagers: Terrill Swift, Harold Richardson, Michael Sanders, and Vincent Thames. The case in which these young men were involved was known at the time as the case of the "Englewood Four."[55] All four were eventually exonerated based on DNA evidence, which also linked to the real serial killer. The City eventually settled these four cases for over $31 million.

In the FBI form 302, former ASA Johnson described how detectives would feed witnesses facts about the murder, how they made promises of leniency by promising that whoever spoke first

---

[54] Reyes v. City of Chicago, 18-cv-01028. Introduction, pg. 3, item 12.
[55] Johnson 302 & Timeline, PTP-H Richardson 000301-306, and Johnson Dep.

would be a "witness" and that witnesses would go home (i.e., be released from police custody). Johnson further reported that the detectives worked to coordinate all the statements to line up with one another and falsely corroborate each other, and then practiced and rehearsed statements with the suspects prior to their giving their false statements.[56] In addition, Johnson described how the detectives coordinated their testimony at the suppression hearings, including using a "cheat sheet" of the timeline of their investigation/statements.[57]

In my opinion, the improper and unlawful tactics described by Johnson were wholly inconsistent with proper policing standards at the time. Furthermore, it reveals to me a highly coordinated and well-orchestrated strategy by detectives to fabricate evidence. These deeply dysfunctional and improper tactics utilized by detectives to fabricate not just one, but four interlocking confessions from teenagers signals a widespread pattern of fabrication that has much relevance to the way Iglesias was charged and prosecuted for the Roman murder. The Englewood case was investigated at Area 1 in 1995, just two years after Iglesias was arrested for the Roman murder. Moreover, the fabrication of evidence in the Englewood case, which included promises of leniency in order to manipulate suspects into making incriminating statements against others, mirrors some of the allegations in this case, including allegations regarding fabrication of statements of Francisco Vicente.[58]

Additionally, as documented in the June 2001 FBI 302 report of an interview with Mohammed Omar, CPD received information that its officers were engaging in criminal conduct, including providing protection to drug dealers, fabricating evidence, and taking bribes, but did no further investigation of its own into the allegations.[59] Omar's FBI 302 report was created during the investigation of CPD Gang Crimes Specialist Joseph Miedzianowski. In that report, witnessed by a member of the CPD's internal affairs division, Omar reported that he knew Defendant Guevara, and that Guevara's "policy" was to catch a person with drugs or guns, but let them buy their way out of trouble. Further, Omar reported that Guevara "accepted bribes to change positive or negative identifications during line-ups for murder cases." Omar provided a specific example of two cases where Guevara was implicated in fixing the cases in conjunction with an attorney Beuke, whom Omar said was a friend of Guevara's. Omar's information about Beuke's relationship to Guevara appears to be accurate, and his detailing of the criminal enterprise run by himself and Miedzianowski is supported by their federal convictions for the same.[60] Nonetheless, the record presented to me is devoid of any follow-up investigation of Omar's report (Klimas Dep., pp. 6, 12-13). There is no indication that Guevara was questioned, that IAD tried to question Beuke or find the two people specifically mentioned as having cases that were fixed by Guevara. These are the most fundamental steps that must be taken in any internal investigation, let alone one where the accusations are so serious. If true, what Omar is alleging is not only a terminable offense, but also criminal. Nevertheless, it is not acceptable for a

---

[56] *Id.*
[57] *Id.*
[58] See Iglesias First Amended Complaint paras. 75-88, 121.
[59] FBI 302 Report by Mohammed Omar, AR-L 101776-101791, at 14-15.
[60] Beuke Dep., AR-L 571205-571377, at 44, 66-67, 68-69, 69, 73-74, Complaint, *Maysonet v. Beuke*, AR-L 537371-537383, at ¶ 3-4, 6, 28, 30, 46.

department to abdicate investigative authority to ensure that its police officers are not victimizing its citizenry.

Omar's FBI 302 report further corroborates the broken disciplinary process that permits the misconduct described above with near impunity. The report also corroborates the Chicago Police Department's code of silence, under which officers knew they would be retaliated against for whistleblowing, encouraging officers to ignore misconduct by fellow officers. These systematic failures have been continuous from the time of the Roman homicide and Plaintiff's wrongful conviction through today.

### 10. The City of Chicago's Broken Accountability System Has Been Demonstrated Repeatedly and Over Decades

#### *a. Jones and Palmer*

Two federal court cases highlight the fact that well before Plaintiff's criminal case, CPD had a pattern of maintaining a code of silence within the Department instead of implementing centralized systems to collect and disclose investigative materials. These cases further demonstrate CPD's failure to maintain effective accountability systems.

*The George Jones Prosecution*

In 1981, twelve-year-old Sheila Pointer was raped and bludgeoned to death, and her 10-year-old brother Purvey was beaten unconscious in their home.[61] George Jones was ultimately arrested and prosecuted for the crime. During the CPD investigation of the Pointer murder, detectives gathered evidence that undermined the witnesses who had implicated Jones, and which Jones could have used to help defend himself, but this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[62]

After George Jones had been charged, a detective, Frank Laverty, who was investigating the case interviewed the victim's brother, Purvey, who told Laverty that there were two assailants, and both were wearing stocking masks. Laverty also documented other strong evidence that Jones was not the perpetrator. That information was also placed in the street file.[63] Laverty was told that, considering these facts, the prosecution of Jones had been abandoned. However, in the spring of 1992, Detective Laverty read in the newspaper that George Jones was on trial for the Pointer murder.[64] Laverty went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action. Laverty then went directly to Jones' criminal defense attorney and told the attorney about the information in the street file. After the court declared a mistrial, the State's Attorney dropped all charges against Jones.[65]

---

[61] *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Cir. 1988).
[62] *Id.* at 988-991.
[63] *Id.* at 990-91
[64] *Id.* at 991.
[65] *Id.* at 995-96.

*Palmer v. City of Chicago*

On April 16, 1982, shortly after Jones' prosecution, a class of plaintiffs filed a lawsuit in federal court to prevent the use of street files.[66] The plaintiffs immediately moved for a temporary restraining order (TRO). A TRO issued on April 20, 1982, and amended on September 24, 1982, required the CPD to preserve all street files and documents formerly placed in street files.[67]The TRO was amended because of allegations that detectives were continuing to keep investigative materials as their personal property and therefore not subject to CPD control.[68]

District Judge Milton Shadur oversaw the preliminary injunction hearing. Based on the evidence presented by the plaintiffs and by the City of Chicago, Judge Shadur found the exclusion of relevant information from official reports "was not random or infrequent."[69] In fact, by the City's admission, there were hundreds of street files in active use during the *Palmer* litigation itself. In granting the injunction, Judge Shadur found that the use of street files created a "grave risk" of non-disclosure of exculpatory information, including information that could be used to impeach witnesses.

On appeal, the Seventh Circuit reversed Judge Shadur in part, although it did order the CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies.[70] It vacated the preliminary injunction in all other respects because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. It did not revisit the factual findings that Judge Shadur made.

*The Jones Appeal*

After the *Palmer* litigation concluded, the Seventh Circuit issued an opinion in *Jones v. City of Chicago*,[71] in which Judge Posner affirmed liability against Chicago police officers for the withholding of evidence from Mr. Jones and affirmed liability against the City of Chicago for maintaining a street files practice.

Of note in the appellate court's decision is its finding that (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the street

---

[66] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985).
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id*; CPD Special Order 83-2A.
[71] *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988).

files practice existed, caused Jones injuries, and was "consciously approved at the highest policy-making level."[72]

The Seventh Circuit's decision highlighted the failure of CPD's leadership, which allowed Detective Laverty to be punished for coming forward while allowing those who actively attempted to thwart Laverty's efforts to reveal the truth to go without discipline or reprimand. Indeed, the United States Court of Appeals for the Seventh Circuit described the CPD's reaction to these events, writing that "the CPD should consider entering a commendation in Detective Laverty's personnel file for his adherence to the principles of honesty, decency, and justice." Instead, the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. By contrast, none of the defendants in the *Jones* case were disciplined for misconduct in the arrest and prosecution of George Jones.

In effect, CPD punished a whistleblower through unfavorable transfers while declining to discipline any officers involved in withholding exculpatory information from a criminal defendant. As a result, CPD officers received a clear message: whistleblowing will be punished, but suppression of evidence will not.

*b. Klipfel lawsuit and the Miedzianowski scandal*

The Mohammed Omar FBI 302, discussed above, came in the wake of ample additional information about Miedzianowski's rampant criminality, much of which was exposed by two whistleblowing agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The story of their whistleblowing, and their treatment for blowing the whistle, is as serious and grave a scandal as the underlying criminality of Joe Miedzianowski. who was eventually prosecuted federally and is serving a life sentence.[73]

In 1994, plaintiffs Diane Klipfel and Michael Casali, husband and wife ATF agents in Chicago, filed a lawsuit alleging that they were retaliated against for blowing the whistle on Miedzianowski's criminality. Ms. Klipfel was an ATF supervisor overseeing a joint task force with the Chicago Police Department focusing on crimes committed by Latino street gangs, and Chicago police officers Joseph Miedzianowski and John Galligan were assigned to the taskforce. Mr. Casali, meanwhile, was part of an ATF undercover investigation.

In February 1992, ATF agent Klipfel learned that while executing a search warrant, Miedzianowski got the key to a safe deposit box, from which he and CPD officer Michael Byrne stole thousands of dollars. In April 1992, ATF agent Casali learned from an informant that Miedzianowski was supplying gangs with guns and drugs and was involved in covering up a homicide. Ms. Klipfel and Mr. Casali made repeated disclosures to higher-ups in the ATF about the criminal conduct of Miedzianowski, Galligan, and other CPD officers. Klipfel even confronted Miedzianowski, and his response was a perfect example of the impunity he felt:

---

[72] *Id.* at 988, 991-92, 993, 995-996.
[73] *See* AR-L 144482–149218.

"Your husband and you both work in the city. Remember that, always remember that. And you better watch your darling kids. Your house could get lit up."

CPD's response to the serious allegations of two ATF agents was to protect Miedzianowski. CPD opened an Internal Affairs Investigation into Miedzianowski, but the investigation appears to have been a sham, and a perfect example of how CPD's broken disciplinary system creates a sense of impunity in officers like Miedzianowski. The record indicates that Internal Affairs shared information from its investigation with Miedzianowski, and permitted him to essentially participate in the investigation. A federal pleading in Miedzianowski's criminal case summarized the CPD investigation as follows:

> The search of Miedzianowski's residence revealed evidence that before the prior investigation [the CPD IAD investigation of plaintiffs' allegations] was completed, Miedzianowski received copies of witness statements and other reports generated in the course of that investigation. . . . [H]e was not authorized to have these documents. This and other evidence obtained during the instant investigation indicates that, at best, the prior investigation was compromised in that Miedzianowski was kept informed of the progress of the prior investigation as it occurred.[74]

Richard Risley, the head of CPD's Internal Affairs, knew about the allegations about Miedzianowski's criminality by 1993 at the latest. Records indicate that Risley not only failed to meaningfully investigate Miedzianowski, but was personally involved in trying to protect him. According to news reports related to the Klipfel's trial, Risley was caught on wiretaps communicating with Miedzianowski about the investigation, actively scheming with him to discredit the accuser, and stating that he had concealed information that would have implicated Miedzianowski, including a recorded conversations between Miedzianowski and a co-conspirator who was in prison. This is unfathomable misconduct by the head of CPD's primary internal disciplinary unit.

Further, news reports indicate that at the Klipfel trial, Philip Cline, then-Superintendent of the Chicago Police Department, testified that when he was a supervisor overseeing homicide investigations he suspected[75] Miedzianowski of interfering in homicide investigations on two different occasions. In one case, Miedzianowski removed documents from the homicide files and gave them to members of an involved street gang. Cline reported both incidents to Internal Affairs, but neither incident resulted in a sustained finding or discipline against Miedzianowski. In fact, publicly available data from the Invisible Institute tracking allegations of misconduct against CPD officers indicate that Miedzianowksi was the subject of at least twenty civilian complaints—none of which resulted in any discipline from the CPD.

---

[74] AR-L 149168.

[75] Chicago Tribune, *Police chief testifies in corrupt cop case*, Feb. 8, 2007 (available at https://www.chicagotribune.com/news/ct-xpm-2007-02-08-0702080137-story.html) (last visited August 8, 2022).

All of this is corroborated by former Chicago Police officer Juan Juarez, who provided an affidavit during discovery in the Klipfel lawsuit. Juarez, who worked in the 14th District (within Area 5) from 1992 until he resigned in 1997, stated as follows:

> During my time as an officer with the Chicago Police Department, it was my experience that Chicago Police Officers did not fear discipline from OPS or IAD because they knew that they would be shielded by the code of silence. In my experience as a Chicago Police Officer, the CPD had an unwritten policy of protecting police officers and shielding them from discipline or prosecution. . . .
>
> Other officers would not come forward with information they may have had or would even lie and falsify reports to corroborate the accused officer's version of facts.[76]

Klipfel and Casali ultimately prevailed at trial. The jury found the City liable under *Monell* for maintaining a code of silence and awarded the former ATF agents $9.75 million.

The records related to the Klipfel lawsuit and Miedzianowski's misconduct are a stunning example of the egregious officer misconduct that was caused by CPD's broken disciplinary system. Miedzianowski got away with misconduct for decades despite numerous civilian complaints, and even complaints from a police Commander and two ATF agents in good standing could not jolt CPD's disciplinary system into taking any effective action. The impact of such a culture of impunity cannot be underestimated. In my opinion, it is no coincidence that Reynaldo Guevara previously worked with Miedzianowski out of the same gang crimes unit before becoming a detective with his own scandalous history of misconduct.

c. *Obrycka v. City of Chicago*[77]

On February 19, 2007, Karolina Obrycka was working at Jesse's Shortstop Inn, a neighborhood bar in Chicago. Obrycka's shift started at 6:00 pm and ended at 2:00 a.m. Anthony Abbate, an off-duty Chicago police officer, was a patron at Jesse's Shortstop Inn on February 19, 2007. At 3:00 pm that day—before Obrycka started her shift—Abbate started a fight with another patron; the bartender at the time told Abbate that she would not serve him any more alcohol and he left the bar. But Abbate returned around 8:00 pm, consuming some mixed drinks and shots of brandy. Abbate then went behind the bar, after which Obrycka asked him to leave the bar area. Abbate complied but became more physically and verbally abusive as the night progressed. He repeatedly yelled "Chicago Police Department" while flexing his biceps. Even though Obrycka told Abbate not to come back behind the bar, Abbate again went behind the bar and punched and kicked Obrycka, telling her "nobody tells me what to do."

After the beating, Abbate left the bar and Obrycka dialed 911. Obrycka did not know Abbate was a police officer. A bar patron told Obrycka that Abbate was a Chicago Police Officer and Obrycka passed that information on to the 911 operator. The beating of Obrycka was captured on the bar's

---

[76] AR-L 149216

[77] *Obrycka v. City of Chicago*, Case No. 07 C 2372 (N.D. Ill. Feb. 23, 2012).

video recorder. Obrycka and other witnesses told responding officers that the person who assaulted Obrycka was a Chicago Police Officer, and that the incident was captured on video tape.

The supervisor in charge waited four days before signing the final police report. The first responding CPD officers wrote reports to CPD's Office of Professional Standards but failed to mention that the assailant was a CPD officer. Officers shared information about the ongoing investigation including that of video evidence with Abbate, who, in turn, made numerous attempts to acquire the tape from the bar. Abbate offered - through other officers acting on his behalf - to pay medical bills and lost wages to Obrycka if she would not pursue the case with the police and prosecutors. She refused to cooperate with Abbate. Abbate then threatened Obrycka and others to prevent them from disclosing video recordings of his beating Obrycka. Obrycka left her employment after receiving word of Abbate's threats. Abbate went as far as having his sister call the bar to ascertain Obrycka's last name. Investigators knew of Abbate's threats but did not disclose that information to the Office of Professional Standards.

On February 22, 2007, the Office of Professional Standards and Chief Investigator with other OPS personnel viewed the videotape of the incident and, as a result, invited SAO and IAD to investigate. After viewing the recordings, IAD and CPD took the reductionist approach characterizing the incident as a "bar fight" and recommended Abbate be charged with misdemeanor battery. In mid-March 2007, after signing the misdemeanor complaint and suffering CPD's inaction, Obrycka released the video of Abbate beating her. The SAO, following the release of the recording, approved felony charges for aggravated battery on June 2, 2009. The trial judge sentenced Abbate to two years of probation on June 23, 2009.

The failure of police supervision and discipline in the City of Chicago is not only demonstrated by the many examples above but is also a fact admitted by City policymakers and Chicago Police officers. Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within CPD.[78] In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in CPD.[79] In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."[80]

d. *Officer Ron Malczyk*[81]

Further evidence of misconduct by Defendants Guevara and Halvorsen is found in sworn testimony by Officer Ron Malczyk, as part of the investigation of the Ruben Gonzalez murder in 1995. Malczyk testified that Guevara and Halvorsen fabricated evidence regarding the murder of Ruben Gonzalez. Specifically, Malczyk had been initially questioned by two detectives (not Guevara and Halverson) at the scene of the murder, who documented that Malczyk told them that he arrived at the scene just after the shooting and two Hispanic gang members he had seen before the shooting pulled up; he told them to wait to be questioned, but they drove away before he could question them. Guevara and Halvorsen wrote a police report claiming that they reinterviewed

---

[78] Mayor Emanuel's Address to City Council Stresses Trust, Respect - WTTW.
[79] Chicago Police Union President Appears to Acknowledge Code of Silence - ABC7 Chicago.
[80] *See* DOJ Findings Report (2017) (AR-L 150084-AR-L 150247) at 19.
[81] Deposition of Officer Ron Malczyk, May 11, 2022, *Sierra v Guevara*, 18-cv-3029 (N.D. Ill.).

Malczyk several days later, and Malczyk this time told them that he had a conversation with the two Hispanic gang members at the murder scene right after the shooting, and that those gang members *identified the gang that committed the shooting and described the vehicle that was used*.[82] But those details were invented: Malczyk testified that he never had a conversation with those gang members and, further, never spoke to Guevara and Halvorsen about the murder at all.[83] During his deposition, Malczyk confirmed at least 22 times that a police report authored by Guevara and Halvorsen was inconsistent with his memory.[84]

Malczyk further testified that CPD had a lax and permissive disciplinary system, which helps explain why Guevara, Halvorsen, and others would have felt free to fabricate evidence. As an officer in the 14th District, Malczyk was "secretive" about the gang information he learned because he was "sure you had policemen who were actual gang members." Malczyk described seeing officers "pal around with gang members." He explained that some officers would leak information to gangs, so it was important not to tell those officers about search warrants.[85] Malczyk further explained that he never reported the gang activities of other officers because he "thought it would be a waste of time" and had heard of officers getting transferred for making complaints.[86]

Malczyk described a feeling of malaise from the lack of discipline and supervision: "You know, it got to a point [of] why even bother?"[87] Malczyk recounted telling a supervisor about an act of egregious misconduct: witnessing an officer "associating and dropping packages off" to gang members.[88] The offending officer was never disciplined and ended up getting promoted to a "cushy job" within the Department.[89] Another time, Malczyk reported to his sergeant that a civilian had flagged him down to report that another sergeant, Joseph Kosala, had "sexually molested" her.[90] Malczyk and his partner reported the complaint to his sergeant and filed a report on the misconduct, but Malczyk was never contacted by internal affairs personnel regarding his report. According to Malczyk, Kosala later retaliated against him by spreading rumors that he was a dope dealer.[91]

Malczyk's testimony about his experience, and the culture propagated within CPD, is a perfect description of a failed disciplinary system. It is also consistent with the data and analysis we conducted, discussed below.

### B. The City of Chicago had a Pattern and Practice of Fabricating Evidence

It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in fabricating evidence by extracting false statements from suspects and witnesses. Both internal police accounts and numerous lawsuits and

---

[82] *Id.* at 126:16–129:1; 131:18–135:16.
[83] *Id.* at 128:12–129:13.
[84] Guevara does not dispute Malczyk's testimony that Guevara fabricated the report, instead pleading the Fifth. Deposition of Reynaldo Guevara, Dec. 9, 2020.
[85] *Id.* at 44:10–21.
[86] *Id.* at 51:19–53:9.
[87] *Id.* at 157:20.
[88] *Id.* at 157:20–158:5.
[89] *Id.*
[90] *Id.* at 167:23–169:1.
[91] *Id.* at 172:25–173:8.

appeals brought by suspects alleging such misconduct substantiate that such misconduct occurred as an established practice, not just on an isolated basis. Plaintiff's allegations match a widespread custom and practice by Chicago Police Department officers of contriving false witness narratives for vulnerable witnesses for the purpose of wrongly convicting innocent people.

The National Exoneration Registry has identified 294 exonerations between 1961 and 2017 in Cook County, Illinois. Chicago is part of this County.[92] 260 of these 294 exonerations involved some type of police misconduct, especially for murder and drug-related convictions. And 79 out of 260 exonerations in Cook County during that period involved police misconduct related to false confession/fabricated evidence, mistaken witness identification, or false or misleading forensic evidence.

The CPD data analyzed by Ms. Meza shows that between 1989 and 1993, well over half (55.9%) of the allegations (1129 out of 2020 allegation counts) that CPD received regarding detectives assigned to Area 5 were classified as coerced confession, excessive force, fabricated statement/evidence, false arrest, improper inventory procedure, planted evidence, , threats, verbal abuse, and racial/ethnic slurs.[93] This subset includes both allegations specifically raised by Plaintiff and allegations that, in my training and experience, are associated with a risk of fabricated evidence, suppressed evidence, and wrongful convictions.[94] *See* Table 1.

A federal survey found that 8 percent of the use of force complaints received by large state and local law enforcement agencies in 2002 were sustained.[95] In the June 10, 2020, Washington Post article, *Police unions and police misconduct: What the research says about the connection,* about 7 percent of complaints of officer misconduct for unionized police agencies were sustained.[96]

By comparison, while the 1989-1993 Dataset revealed lower rates of sustained allegations for CPD officers after investigation for all types of complaints (4.21% percent, or 85/2020[97] allegations) (see Table 11), the sustained rate for excessive force complaints was just 2.07% (11/531) after investigation (see Table 8), and the sustained rate for complaints of false arrest was

---

[92] https://www.law.umich.edu/special/exoneration/Pages/about.aspx. The National Registry of Exonerations is an ongoing online archive that includes all known exonerations in the United States since 1989. There have been 3,192 exonerations as of August of 2022. University of Michigan, Law School, and University of California Irvine, Law School.

[93] The dataset records 2020 total allegations. From those, 1997 allegations have an allegation type identified by the City of Chicago. The remaining 23 allegations in the dataset do not have an allegation type identified by the City of Chicago.

[94] Allegations raised by Plaintiff Iglesias, for purposes of identifying corresponding allegations in the dataset, are false arrest (e.g., First Amended Complaint paras. 55, 117-118); excessive force (*e.g.*, *id.* para. 87); fabricated statement/evidence (*e.g.*, *id.* paras. 44-68); and threats and verbal abuse (*e.g.*, *id.* para. 88);

[95] Here's What Happens When You Complain about Cops to Cops, HuffPost News, https://www.huffpost.com/entry/internal-affairs-police-misconduct_n_5613ea2fe4b022a4ce5f87ce.

[96] Police unions and police misconduct: What the research says about the connection - The Washington Post, available at https://www.washingtonpost.com/business/2020/06/10/police-unions-violence-research-george-floyd/.

[97] The dataset records 2020 total allegations. From those, 1997 allegations have an allegation type identified by the City of Chicago. Twenty-three allegations in the dataset do not have an allegation type from the City's list.

0% (0/71) after investigation (see Table 6), and the sustained rate for complaints of fabricated statements/evidence was 6.45% (2/31) after investigation (see Table 4). The sustained rates for these categories were well below the national average.[98] The outcomes of these investigations reflect a deeply flawed system of investigating and disciplining serious police misconduct, particularly forms of police misconduct that cause wrongful convictions.

There is no standardization of data collection for agencies and units tasked with investigating officer misconduct across the country. This creates a challenge when analyzing sustain rates and disciplinary process efficacy. For instance, the San Francisco Department of Police Accountability (DPA), Oakland's Community Police Review Agency (CPRA), and Portland's (Oregon) Independent Police Review Division (IPR) investigate all allegations that are submitted; however only certain types of investigations are included when determining their sustain rates.[99] City of Seattle's Office of Police Accountability (OPA) issued findings for 1,208 allegations in 312 investigations in 2021. 26% of completed investigations contained one or more sustained finding.[100]

Allegations of coerced confession, excessive force, fabricated statement/evidence, false arrest, improper inventory procedure, planted evidence, , racial/ethnic slurs, threats, and verbal abuse constituted well over half (55.9%, 1129/2020) of the allegations made against Area 5 detectives (1989-1993), with the vast majority (1101/1129, or 97.5%) coming from external sources and just 28 out of 1129, or 2.5%, coming from internal sources. (Table 1)

Out of the 1129 allegations of allegations of coerced confession, excessive force, fabricated statement/evidence, false arrest, improper inventory procedure, planted evidence, racial/ethnic slurs, threats, and verbal abuse against Area 5 detectives (1989-1993), only 23 of 1129 (just 2.04%) were sustained after investigation (before internal review). (Table 2). After the subsequent internal review, only 10 of 1129 (0.9%) were sustained. (Table 3).

---

[98] Hickman, Matthew. Law Enforcement Management and Administrative Statistics, Citizen Complaints about Police Use of Force. US Department of Justice, Office of Justice Programs, Bureau of Statistics. June 2006.

> "Among those complaints having a final disposition at the time of data collection, about 8% were sustained, meaning there was sufficient evidence of the allegation to justify disciplinary action against the subject officer(s)." Page 1.

[99] San Francisco Department of Police Accountability, 2018 Third Quarter Report.

[100] City of Seattle, Office of Police Accountability 2021 Annual Report, April 2022, pg. 18.

*Table 1. Allegations in Chicago of coerced confession, excessive force, fabricated statement/evidence, false arrest, improper inventory procedure, planted evidence, threats, verbal abuse, racial/ethnic slurs (1989-1993 Dataset).*

| Origin of Complaint | Count of All Allegations | Count of Allegations of Following Types: Coerced Confession, Excessive Force, Fabricated Statement/Evidence, False Arrest, Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse | Percentage of Total Allegations |
|---|---|---|---|
| **External** | 1867 | 1101 (97.5%, 1101/1129) | 59% (1101/1867) |
| **Internal** | 144 | 28 (2.5%, 28/1129) | 19.4% (28/144) |
| **Origin Unknown**[101] | 9 | 0 (0%, 0/1129) | 0% (0/9) |
| **Grand Total** | **2020** | 1129 (100%, 1129/1129) | 55.9% (1129/2020) |

[101] There is 1 CR involving a domestic abuse allegation in which the complainant and complaint origin is redacted. The outcome of the investigation as to that allegation is not identified, and victim name and other information were redacted. The remaining 8 allegations of unknown origin arise from a CR documenting an allegation of Excessive Force by 8 CPD officers that does not identify the complainant or whether they were internal or external to CPD. The 8 Excessive Use of Force allegations were not sustained.

*Table 2. Allegations of coerced confession, excessive force, fabricated statement or fabricated evidence, false arrest, improper inventory procedure, planted evidence, threats, verbal abuse, racial/ethnic slurs, in Chicago by their findings after investigation (before full internal review) (1989-1993 Dataset).*[102]

| **Finding after investigation (Before internal review)** | **Origin of Allegation** | | **Grand Total** | **Percentage %** |
|---|---|---|---|---|
| | **External** | **Internal** | | |
| Exonerated | 38 | 0 | 38 | 3.37% (38/1129) |
| Not Sustained | 799 | 17 | 816 | 72.28% (816/1129) |
| Unfounded | 235 | 1 | 236 | 20.9% (236/1129) |
| Findings Unknown, No Documented Finding | 7 | 9 | 16 | 1.42% (16/1129) |
| **Count of Sustained Allegations of Coerced Confession, Excessive Force, Fabricated Statement/Evidence, False Arrest, Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse (before internal review)** | 22 | 1 | 23 | 2.04% (23/1129) |
| **Grand Total of Coerced Confession, Excessive Force, Fabricated Statement/Evidence, False Arrest, Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse Allegations** | **1101** | **28** | **1129** | **100% (1129/1129)** |

[102] "Full internal review" refers to all review of an investigator's finding and recommend discipline up to the initial finding and discipline imposed by the Superintendent, but before review by the Police Board or an arbitrator.

*Table 3. Allegations of coerced confession, excessive force, fabricated statement/evidence, false arrest, improper inventory procedure, planted evidence, racial/ethnic slurs, threats, verbal abuse in Chicago, by their findings after full internal review (1989-1993 Dataset).*

| | **Origin of Allegation** | | **Grand Total** | **Percentage** |
|---|---|---|---|---|
| **Finding after investigation (After full internal review)** | **External** | **Internal** | | |
| Unknown, No Discipline Served | 8 | 1 | 9 | 0.8% (9/1129) |
| Not Sustained | 4 | 0 | 4 | 0.35% (4/1129) |
| **Count of Sustained Allegations of Coerced Confession, Excessive Force, Fabricated Statement/Evidence, False Arrest, Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse (after full internal review)** | **10** | **0** | **10** | 0.89% (10/1129) |
| **Grand Total of Coerced Confession, Excessive Force, Fabricated Statement/Evidence, False Arrest, Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse Allegations** | 1101 | 28 | 1129 | 100% (1129/1129) |

When just allegations of fabricated statements/evidence are considered, 2 out of 31 (6.45%) were initially sustained after investigation, but that number fell to just 1 out of 31 (3.23%) after the subsequent internal review. (Table 4 and Table 5).

For allegations of false arrest, 0 out of 71 (0%) were sustained after investigation; accordingly, 0 out of 71 (0%) received any subsequent internal review. (Table 6 and Table 7).

For allegations of excessive force, 11 out of 531 (2.07%) were sustained after investigation, and that number fell to just 3 out of 531 (0.56%) after subsequent internal review. (Table 8 and Table 9).

*Table 4. Individual investigations of allegations of fabricated statements/evidence in Chicago, by their findings after investigation (before full internal review) (1989-1993 Dataset).*

| Finding after investigation (before review) | Origin of Allegation | | Grand Total | Percentage % |
|---|---|---|---|---|
| | External | Internal | | |
| Not Sustained | 13 | 1 | 14 | 45.16% (14/31) |
| Unfounded | 6 | 0 | 6 | 19.35% (6/31) |
| Not Applicable or Unknown | 0 | 9 | 9 | 29.03% (9/31) |
| **Count of Sustained Allegations of Fabricated Statements/Evidence (before review)** | 2 | 0 | 2 | 6.45% (2/31) |
| **Grand Total of Fabricated Statements/ Evidence Allegations** | **21** | **10** | **31** | **100% (31/31)** |

*Table 5. Investigations of allegations of fabricated statements/evidence in Chicago by their findings, after full internal review (1989-1993 Dataset).*

| Finding after full internal review | Origin of Allegation | | Grand Total | Percentage % |
|---|---|---|---|---|
| | External | Internal | | |
| Not Sustained/ Unfounded | 1 | 0 | 1 | 3.23% (1/31) |
| **Count of Sustained Allegations of Fabricated Statements/Evidence (after full internal review)** | 1 | 0 | 1 | 3.23% (1/31) |
| *[Not Sustained During Initial Investigation; so Not Reviewed Internally by CPD[103]]* | 19 | 10 | 29 | 93.55% (29/31) |
| **Grand Total of Fabricated Statements/Evidence Allegations** | **21** | **10** | **31** | **100% (31/31)** |

[103] Only sustained findings after investigations are subject to internal review by CPD, unless there is a special reason to open the CR case, i.e., civil lawsuit.

*Table 6. Investigations of allegations of false arrest in Chicago, by their findings after investigation (before full internal review) (1989-1993 Dataset).*

| **Finding after investigation (Before review)** | **Origin of Allegation** | | **Grand Total** | **Percentage %** |
|---|---|---|---|---|
| | **External** | **Internal** | | |
| Exonerated | 15 | 0 | 15 | 21.13% (15/71) |
| Not Sustained | 38 | 0 | 38 | 53.52% (38/71) |
| Unfounded | 18 | 0 | 18 | 25.35% (18/71) |
| **Count of Sustained Allegations of False Arrest (before review)** | 0 | 0 | 0 | 0% (0/71) |
| **Grand Total of False Arrest Allegations** | **71** | **0** | 71 | 100**% (71/71)** |

*Table 7. Allegations of false arrest in Chicago, by their findings after full internal review, (1989-1993 Dataset).*

| | **Origin of Allegation** | | | |
|---|---|---|---|---|
| **Finding after full internal review** | **External** | **Internal** | **Grand Total** | **Percentage %** |
| **Count of Sustained Allegations of False Arrest (after full internal review)** | 0 | 0 | 0 | 0% (0/71) |
| *[Not Sustained During Initial Investigation; so Not Reviewed Internally by CPD]* | 71 | 0 | 71 | 100% (71/71) |
| **Grand Total of False Arrest Allegation** | 71 | 0 | 71 | 100% (71/71) |

*Table 8. Allegations of Excessive Force in Chicago by Their Findings After Investigation Before Internal Review, (1989-1993 Dataset).*

| **Finding after investigation (Before review)** | **Origin of Allegation** | | **Grand Total** | **Percentage %** |
|---|---|---|---|---|
| | **External** | **Internal** | | |
| Exonerated | 15 | 0 | 15 | 2.82% (15/531) |
| Not Sustained | 387 | 1 | 388 | 73.07% (388/531) |
| Unfounded | 112 | 0 | 112 | 21.09% (112/531) |
| Finding unknown | **5** | **0** | **5** | 0.94% (5/531) |
| **Count of Sustained Allegations of Excessive Force (before review)** | 11 | 0 | 11 | 2.07% (11/531) |
| **Grand Total Excessive Force Allegations** | **530** | **1** | **531** | 100% (531/531) |

*Table 9. Allegations of excessive force in Chicago, by their findings after full internal review, (1989-1993 Dataset).*

| **Finding after full internal review** | **Origin of Allegation** | | **Grand Total** | **Percentage %** |
|---|---|---|---|---|
| | **External** | **Internal** | | |
| Count of Excessive Force allegations with Exonerated, Not Sustained, Unfounded, or No Documented Finding after Full Internal Review | 8 | 0 | 8 | 1.51% (8/531) |
| **Count of Sustained Excessive Force Allegations after Full Internal Review** | 3 | 0 | 3 | 0.56% (3/531) |
| *[Not Sustained During Initial Investigation; so Not Reviewed Internally by CPD]* | 519 | 1 | 520 | 97.93% (520/531) |
| **Grand Total of Excessive Force Allegations** | **530** | **1** | **531** | **100% (531/531)** |

Table 10, below, shows the number of allegations and the percentage of the total allegations filed against detectives assigned to Area 5 (1989 – 1993 Dataset), where the allegation types are those of the types raised by Plaintiff Iglesias: excessive force, fabricated statement/evidence, false arrest, threats, and verbal abuse. Those allegations comprised 45.8% of the external allegations (855/1867), and just 14.6% (21/144) of the internal allegations (see Table 10).

*Table 10. Allegations associated with those raised by Iglesias by the percentage of the total allegations filed, (1989-1993 Dataset).*

| **Allegation Type** | **Origin of Complaint** | | | | **Total Allegation Count** | **% of All Allegations** [104] |
|---|---|---|---|---|---|---|
| | **External Allegation Count** | **% of External Allegations Within the Dataset** | **Internal Allegation Count** | **% of Internal Allegations Within the Dataset** | | |
| Excessive Force | 530 | 28.4% (530/1867) | 1 | 0.7% (1/144) | 531 | 26.4% (531/2020) |
| Fabricated Statement/Evidence | 21 | 1.1% (21/1867) | 10 | 6.9% (10/144) | 31 | 1.5% (31/2020) |
| False Arrest | 71 | 3.8% (71/1867) | 0 | 0% (0/144) | 71 | 3.5% (71/2020) |
| Threats | 49 | 2.6% (49/1867) | 7 | 4.9% (7/144) | 56 | 2.8% (56/2020) |
| Verbal Abuse | 184 | 9.9% (184/1867) | 3 | 2.1% (3/144) | 187 | 9.3% (187/2020) |
| Subtotal subset of allegations | 855 | 45.8% (855/1867) | 21 | 14.6% (21/144) | 876 | 43.4% (876/2020) |
| Grand total allegations count in the dataset | **1867** | 100% | **144** | 100% | 2020 (2011 + 9 with unknown origin) | 100% |

CPD's low sustain rates for allegations of abuse is troubling. CPD had a history of torture of the most heinous form for decades. The Department had notice that the problem continued well after Burge, as it continued to receive CRs making similar allegations. Rather than see these similar allegations as a red flag that needed to be treated with the utmost seriousness, the CPD failed to meaningfully investigate and discipline officers. The following are a few examples of CRs that I reviewed that show the CPD's failure to meaningfully investigate allegations of fabricated statements/evidence, false arrest, and excessive force:

- CR No. 170855 (9/11/89), is a handwritten lawsuit, alleging that complainant was detained and questioned in an Area 5 interview room by officers who beat him, pulled his hair, and intentionally mistranslated his statements to accuse him of a murder. He did not give a statement. None of the accused officers were interviewed or were made to give statements regarding the allegations. This failure to investigate had drastic consequences: the

[104] All allegations with the dataset with known complaint origin. There are 9 allegations in the dataset with unknown origin. If added to the 2011 allegations that are known to be internal or external, the allegations sum to 2020 total allegations.

complainant was convicted of murder based on the officers' testimony, but his conviction was overturned after more than 11 years in prison based on evidence that he was in police custody on an unrelated charge at the time of the murder.[105]

- CR No. 180432 (11/15/89) is a complaint alleging that several officers entered his home and questioned him and a friend about a firearm. As alleged, during the interrogation, an officer struck the complainant on the stomach and slapped him on his head. He alleged that the officers took them to the 25th District station and further physically abused them there. Even though the investigator obtained a statement from the complainants on December 11, 1990, it took him nearly two months to send to/from requests to the accused officers. The to/from reports submitted by the officers are minimal; one officer denied specific uses of force, like striking with a flashlight, slapping on the head, or punching in the groin, but did not otherwise deny using force. One officer only denied slapping one complainant in the head, but did not deny any other uses of force. Three other witness officers denied that they observed physical "abuse" but did not deny observing the use of force or describe what they observed in any further way. The unexplained delay in investigation, and the failure to probe the officers' accounts in any way, reflects an abandonment of the duty to investigate complainant allegations.

- CR No. 198876 (2/25/93) is a complaint alleging that the complainant's 14-year-old son was detained for over six hours without parental notification in the investigation of a rape. The complainant reported his son missing at 8:15 pm on February 24, 1993. The missing persons complaint was closed out at 1:35 am on February 25, 1993. Detectives Friel and McMurray wrote in their to-from reports—which, except for a few words, were identical—that they had taken the boy home around 9:00 pm. No follow-up investigation was ever conducted with the Detectives to address this disparity or with the other police officers who had taken the missing-person report from the complainant. The complaint was closed out as not sustained.

- CR No. 191398 (4/3/92) is a complaint alleging that Detectives William Dorsch and William Johnston tried to persuade the complainant's daughter, a fifteen-year-old high school student, not to testify in a murder trial. The CR file indicates that, as initially given, the complaint indicates that the Detectives spent several hours questioning the fifteen-year-old at school during class time and had questioned her at school multiple times. Sergeant E.J. Mingey interviewed the mother and the daughter. His To/From reports on the subject, dated April 12, 1992, do not examine whether the detectives' questioning was excessive or coercive. In fact, they suggest that the detectives participated in pressuring the daughter not to testify, as they note that a prosecutor who participated in one of the interviews told the 15-year-old that she was "lying" and would "get into trouble" if she lied in court. Although Sergeant Mingey wrote that the 15-year-old stated that the detectives "never threatened her" and never told her to "change" her testimony, the report does not address the complainant's initial allegation: that the detectives tried to persuade her not to testify in court and pressured her on the subject through excessive questioning at school. The accused detectives were never interviewed regarding the complaints; instead, they wrote

[105] Chicago Tribune, "Man Wrongly Imprisoned in '88 Murder Sues City, 3 Officers," https://www.chicagotribune.com/news/ct-xpm-2001-01-31-0101310303-story.html.

very brief "To/From" statements. Their statements were inconsistent with the 15-year-old's account; the 15-year-old said that the prosecutor warned that she would get in trouble if she gave her account at trial, but Detective Johnston wrote that "[a]t no time was she persuaded to change her story." That statement is inconsistent with a prosecutor warning a witness that she would get in trouble if she testified consistently with her statement in court. No follow-up was ever conducted to take a statement from the detectives beyond their brief To/From memos and an interview by Sergeant Mingey with the accused detectives which shows no sign of probing or testing the detectives' accounts in any way. The investigators also did not interview the prosecutor who interviewed the 15-year-old. Finally, it appears that the complaint was investigated by a supervising sergeant in the same division as the accused detectives (Area Five Violent Crimes Unit). The lack of a thoroughness is especially concerning because the complaint was made in reference to a murder investigation, where risks of wrongful convictions and the need to ensure the integrity of police investigations are greatest. No discipline was imposed.

- CR No. 188994 (11/26/91) is a complaint alleging that four CPD officers and supervisors committed various violations in a raid on her apartment, including unnecessarily damaging her door, searching the apartment without a warrant, pointing a gun at her and her children, ransacking the apartment, refusing to identify themselves, taking her personal papers, and using profanity. The complainant alleged that she had to call 911 to get the officers to provide their badge numbers and the dispatcher told her that the officers had to provide their badge numbers. The responding officers were instructed to respond to each of the complainant's allegations, but they did not do so. Instead, the responding officers made brief written reports. Lieutenant Farrell did not address the complaint that he initially refused to identify himself or that the officers used profanity. Officer Deacy's to-from report was especially sparse and did not address whether the officers ever pointed their weapons at anyone, whether they ransacked the apartment, or whether they refused to identify themselves. Officer Feliciano and Officer Carothers's reports did not address whether the apartment was ransacked, and were of limited value because the officers were assigned to "outside security" for most of the search. And even though the complainant told OPS that she called 911 when the officers wouldn't identify themselves, no 911 call recording or transcript is in the complaint file. No discipline was imposed.

### C. CPD's Accountability System Routinely Failed to Thoroughly Investigate, Supervise, and Discipline Officers for Serious Misconduct in a Timely Manner

CPD's broken systems of accountability have had the effect of enabling the continuance of bad behavior that has infected the culture of the department negatively and allowed the Defendants' misconduct to go uninterrupted. I have identified several ways in which the City's investigations of officers' misconduct were lacking and failed to comport with generally accepted standards in the field of police practices and resulted in a widespread practice of deficient investigations. A review of the Defendants' disciplinary histories further reveals the inadequacy of the City's investigatory and disciplinary practices.

## The Historical Context

The People's Law Office's investigation into the Chicago Police Department identified sixty-five suspects who were tortured by Burge or other officers and detectives between 1972 and 1991 in Areas 2 and 3.[106] A report by the Office of Professional Standards (OPS), found that physical abuse "did occur and that it was systematic....[T]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture."[107]

In 1993, Burge was dismissed, and two detectives involved in the Wilson case were suspended by the Police Board.[108] According to reports, as of 1997, no other individual on the force had been disciplined for any of the identified sixty-four cases where torture was alleged.[109]

At that time, OPS reopened twelve of the torture cases and recommended discipline for several officers; however, the OPS director overruled the recommendations. In the cases of two sergeants identified as abusers involved with Burge, OPS investigators sustained complaints and recommended discipline; instead, one sergeant was decorated for valor by the mayor while the other retired with full benefits.[110]

No criminal prosecutions were pursued against the officers involved in the torture incidents. The U.S. Attorney's office reportedly learned of the Area 2 torture cases after the five-year statute of limitations for civil rights cases had passed; when it was suggested that conspiracy charges could still be brought against those involved who continued to cover up their involvement, there was still no action toward pursuing the cases.[111] When a re-investigation is conducted, misconduct is uncovered, and yet no discipline is meted out, the unmistakable message to the rank and file officers is that the department is not interested in deterring misconduct.

### 1. Majority of Complaints, Which Originate From the Community, Fail to be Sustained

As the CPD data analyzed by Ms. Meza show, most allegations from the 1989-1993 Dataset provided by CPD were from the community (92.4%, Figure 1) and most of these allegations never

---

[106] List of sixty-four alleged victims in Affidavit of G. Flint Taylor, *Illinois v. Patterson*, No. 86-C-6091 (Cook County Cir. Ct. filed November 13, 1996); Statement of G. Flint Taylor, before the Congressional Black Caucus, September 12, 1997, p. 2. For a detailed description of many of the torture allegations, *see* Conroy, "Town without pity," *Chicago Reader*; and Conroy, "The shocking truth," *Chicago Reader*, January 10, 1997.

[107] Office of Professional Standards report by investigator Michael Goldston, September 28, 1990 (hereinafter "Goldston Report'"), p. 3. Goldston's report listed the names of fifty alleged victims of torture and brutality, the names of detectives who had been involved, and stated: "Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end." Ibid.

[108] Human Rights Watch, Shielded from Justice: Police Brutality and Accountability in the United States: Chicago: Torture.

[109] Taylor, statement before Congressional Black Caucus, p. 3, and Conroy, "Town without pity," *Chicago Reader.*

[110] Human Rights Watch, Shielded from Justice: Police Brutality and Accountability in the United States: Chicago: Torture.

[111] Conroy, "Town without pity," *Chicago Reader.*

led to a sustained finding (1.12%, Table 11). The CR files provided by the Chicago Police Department document sustained findings approved by the Superintendent in only 1.12%[112] of all external allegations (those originating outside the CPD).[113] *See* Table 11. That 1.12% figure is far below the national averages. According to figures from the United States Department of Justice's Bureau of Justice Statistics, in 2002, the overall sustain rate *for external citizen complaints* was 8% across all large state and local law enforcement agencies nationwide.[114] These results are for cases that reached final disposition.

Even comparing to the other largest cities in America, Chicago's rate is much worse. In New York City, of the more than 103,000 civilian (i.e., external) complaints against NYC police officers filed over the past two decades, 7.5% were sustained.[115] In Los Angeles, 4% of complaints against LAPD Officers by the public (i.e., external complaints) in 2019 were sustained.[116]

Moreover, for internal and external complaints in the 1989-1993 Dataset alike, more than 60% of all initially sustained complaints did not ultimately result in a sustained finding after full internal review (see Table 11). Thus, officers would have recognized that the Department often chose not to sustain misconduct allegations despite initial investigative recommendations, contributing to an overall sense of impunity among those officers (Table 11).

From the dataset reviewed, 92.4% (1867/2020)[117] of the individual allegations were external, or from the community, while 7.1% (144/2020) were internal, or from within CPD. *See* Figure 1.

---

[112] 21 out of 1867 (1.12%) external allegations against CPD Area 5 detectives (1989-1993) were sustained after full review (Table 11).

[113] At the end of police misconduct investigations, the investigator recommends findings. Those are then reviewed by the CPD Command Channel, and ultimately the Police Superintendent determines the disciplinary outcome. This determination by the Superintendent is referred to in this report as the finding after full internal review. As discussed below, an officer can then appeal the Superintendent's determination. These findings by the Superintendent are referred to in this report as documented finding after full internal review.

[114] Hickman, Matthew. Law Enforcement Management and Administrative Statistics, Citizen Complaints about Police Use of Force. US Department of Justice, Office of Justice Programs, Bureau of Statistics. June 2006. Page 3, https://bjs.ojp.gov/content/pub/pdf/ccpuf.pdf.

[115] Drauth, D. (2021), NYPD: thousands of complaints, small percentage of officers disciplined, abc7NY.

[116] Leonard, E. (2020, August 18). Complaints against LAPD officers increased in 2019, NBC4, available at: https://www.nbclosangeles.com/investigations/lapd-los-angeles-police-complaints-2019/2414542/.

[117] Nine of the individual investigations lacked identification as to whether the complaint source was external or internal.

Figure 1. Allegations by their origin, 1989-1993 Dataset




| Source of Allegation | % Percentage |
|---|---|
| External | 92.4% (1867/2020) |
| Internal | 7.1% (144/2020) |
| Unknown | 0.4% (9/2020) |
| Grand Total | 100% (2020/2020) |

In the 1989-1993 Dataset, only 1.12% of allegations filed by the community reflected sustained findings by the Superintendent (after full internal review), in comparison with 7.64% of allegations filed by CPD personnel, see Table 11.[118]

*Table 11. Individual Allegations with sustained findings, before and after full internal CPD review, by source of complaint (1989-1993 Dataset).*[119]

| | External Allegations | | Internal Allegations | | Total | |
|---|---|---|---|---|---|---|
| | **% External** | **Allegation Counts** | **% Internal** | **Allegation Counts** | **% Total** | **Allegation Counts** |
| **% Allegations reflecting documented sustained finding before internal review** | 2.89% | (54/1867) | 21.53% | (31/144) | 4.21% | (85/2020) |
| **% Allegations reflecting documented sustained finding after full internal review** | 1.12% | (21/1867) | 7.64% | (11/144) | 1.58% | (32/2020) |
| **% Difference** | -61.11% | (-33/54) | -64.52% | (-20/31) | -62.4% | (-53/85) |

[118] Sustained rates need to be assessed in terms of allegations because a single complaint may allege more than one misconduct type and the final determination may be different for each allegation.
[119] 2011 allegations out of the 2020 clearly document the origin of the complaint, internal or external, while 9 allegations do not have enough information in their casefile to determine their origin.

*Table 12. Findings after investigation, and documented findings after full internal review of initially-sustained allegations (1989-1993 Dataset).*

| **Findings After Investigation** | **Origin of Initially-Sustained Allegation** | | | **Grand Total** |
|---|---|---|---|---|
| | **External** | **Internal** | **Unknown** | |
| Exonerated | 162 (8.7% 162/1867) | 13 (9% 13/144) | (0%) | 175 (8.7% 175/2020) |
| Not Sustained | 1209 (64.8% 1209/1867) | 51 (35.4% 51/144) | 8 (88.9% 8/9) | 1268 (62.8% 1268/2020) |
| Unfounded | 425 (22.8% 425/1867) | 39 (27.1% 39/144) | (0%) | 464 (23% 464/2020) |
| Unknown | 17 (0.9% 17/1867) | 10 (6.9% 10/144) | 1 (11.1% 1/9) | 28 (1.4% 28/2020) |
| Sustained | 54 (2.9% 54/1867) | 31 (21.5% 31/144) | (0%) | 85 (4.2% 85/2020) |
| **Findings After Full Internal Review** | | | | |
| Exonerated/Not-Sustained/ Unfounded/ N/A | 33 (1.8% 33/1867) | 20 (13.9% 20/144) | (0%) | 53 (0.3% 53/2020) |
| Sustained | 21 (1.1% 21/1867) | 11 (7.6% 11/144) | (0%) | 32 (1.6% 32/2020) |
| **Grand Total** | **1838 (100%)** | 144 (100%) | **9 (100%)** | 2020 (100%) |

*Figure 2. Documented Sustained Findings Before and After Full Internal Review.*




In police departments across the United States, the number of external complaints (larger or smaller) may reflect the level of confidence the community has in the disciplinary process.[120] In the 1989-1993 Dataset, CPD documented far more external complaints filed by community members per year than those filed by either Police Department peers or Chain of Command members: 1867 out of the 2020 total allegations (92.4%) in the dataset were filed by external complainants, while only 144 out of the 2020 allegations (7.1%) were filed by CPD members (internal complainants). Nine allegations out of 2020 do not have clear complaint origin (0.4%), see Figure 1.

### 2. CPD's Investigations that Did Lead to Sustained Findings Rarely Included Serious Allegations of Misconduct

Ms. Meza's analysis revealed there are substantial differences in the allegations that originate from internal versus external complaints. Seven allegation types (excessive force, warrantless search, verbal abuse, improper inventory procedure, other, property damage, mistreatment of juvenile) concentrate 80.4% of complaints that originate externally from the community. Four allegation types concentrate 80.4% of the *internal* complaints (other, inattention to duty, fabricated statement/evidence, rule violation). *See* Table 13 and Table 14.

---

[120] PERF, 2018. A Review on Minneapolis Police Department Internal Affairs. 2016.08 Oversight Commission - Complaint Filing Experience.pdf (mn.gov).

*Table 13. Frequency of types of top external allegations (80th percentile) in Chicago (1989-1993 Dataset).*

| Allegation type | Allegation Count | % External | Accumulative |
|---|---|---|---|
| **Excessive Force** | 530 | 28.6% (530/1853) | 28.6% |
| **Warrantless Search** | 240 | 13% (240/1853) | 41.6% (28.6+13) |
| **Verbal Abuse** | 184 | 9.9% (184/1853) | 51.5% (41.6+9.9) |
| **Improper Inventory Procedure** | 171 | 9.2% (171/1853) | 60.7% (51.5+9.2) |
| **Other** | 163 | 8.8% (163/1853) | 69.5% (60.7+8.8) |
| **Property Damage** | 111 | 6% (111/1853) | 75.5% (69.5+6) |
| **Mistreatment of Juvenile** | 91 | 4.9% (91/1853) | 80.4% (75.5+4.9) |
| **Subtotal Allegations in the 80th percentile** | **1490** | 80.4% (1490/1853) | **----** |
| **Total external complaints** | **1853** | **100%** | **----** |

*Table 14. Frequency of types of top internal allegations (80th percentile) in Chicago, (1989-1993 Dataset).*

| Allegation type | Allegation Count | % Internal | Accumulative |
|---|---|---|---|
| **Other** | 74 | 51.7% (74/143) | 51.7% |
| **Inattention to Duty** | 22 | 15.4% (22/143) | 67.1% (51.7+15.4) |
| **Fabricated Statement/Evidence** | 10 | 7% (10/143) | 74.1% (67.1+7) |
| **Rule Violation** | 9 | 6.3% (9/143) | 80.4% (74.1+6.3) |
| **Subtotal Allegations in the 80th Percentile** | **115** | 80.4% (115/143) | **-----** |
| **Total internal complaints** | **143** | **100%** | **-----** |

Table 15 shows that officers rarely reported one another for violating the rights of the people they were sworn to serve. Despite the extensive history of CPD officers physically abusing and coercing witnesses and suspects as outlined in Opinion 1, Section A of this report, only 11 allegations[121] of all of the allegations regarding Area 5 detectives in the 5-year 1989-1993 Dataset were internal reports made regarding excessive force or fabricating statements/evidence, see Table 15. In this five-year period, no officer ever made an allegation about another officer coercing a false witness statement or confession, despite the history discussed in Opinion 1,[122] Section A. This is a strong indicator of the code of silence with the CPD discussed above.

[121] The dataset shows 1 internal allegation of Excessive Force and 10 of Fabricated Statement/Evidence. See Table 15. Nine of the 10 internal allegations of fabricated statement/evidence arose in a single CR (200345) in which an officer was accused of having fabricating statements that related to her supervision and employment (for example, statements falsely accusing her supervisors of denying her particular assignments that she had requested, claiming to have timely arrived at work when she had not, and claiming to have arrested more people than she actually arrested).

[122] The dataset shows 0 Internal Allegations of Coerced Confession filed (1989-1993). See Table 15.

Excluding the "other" catch-all category, the most frequent external complaints were for excessive force, warrantless search, verbal abuse, and improper inventory procedure while the most frequent internal complaints were for inattention to duty, fabricated statement/evidence, and rule violation, s*ee* Table 13 and Table 14. Thus, the allegation types referred to by internal members of CPD are mostly related to procedural misconduct, while allegation types that were reported by community/citizens were often related to abuse against people interacting with the police.

As set forth in the following Table 15 and Table 16, however, an important finding from review of the CPD-provided dataset is that there is a substantial disconnect between the most frequent alleged officer misconduct as shown in Table 13, Table 14, and Table 17, and the types of misconduct for which allegations were sustained after investigation and after final review.

*Table 15. Source & category of sustained internal allegations with corresponding sustain rates (1989-1993 Dataset).*

| Allegations | Internal Allegation Count | Internal Sustained after Investigation | Sustained After Full Internal Review | % Allegations Sustained after Investigation | % Allegations Documented Sustained after Full Internal Review |
|---|---|---|---|---|---|
| Coerced Confession | 0 | 0 | 0 | 0.0% | 0.0% |
| Domestic Violence | 2 | 0 | 0 | 0.0% | 0.0% |
| Excessive Force | 1 | 0 | 0 | 0.0% | 0.0% |
| Fabricated Statement/Evidence | 10 | 0 | 0 | 0.0% | 0.0% |
| False Arrest | 0 | 0 | 0 | 0.0% | 0.0% |
| Improper Inventory Procedure | 7 | 0 | 0 | 0.0% | 0.0% |
| Inattention to Duty | 22 | 12 | 4 | 54.5% (12/22) | 18.2% (4/22) |
| Mistreatment of Juvenile | 0 | 0 | 0 | 0.0% | 0.0% |
| Other | 74 | 15 | 6 | 20.3% (15/74) | 8.1% (6/74) |
| Planted Evidence | 0 | 0 | 0 | 0.0% | 0.0% |
| Property Damage | 3 | 0 | 0 | 0.0% | 0.0% |
| Racial/Ethnic Slurs | 0 | 0 | 0 | 0.0% | 0.0% |
| Rule Violation | 9 | 2 | 0 | 22.2% (2/9) | 0.0% |
| Sexual Abuse | 0 | 0 | 0 | 0.0% | 0.0% |
| Theft | 1 | 0 | 0 | 0.0% | 0.0% |
| Threats | 7 | 0 | 0 | 0.0% | 0.0% |
| Unlawful Use/Display of Weapon | 1 | 1 | 1 | 100% (1/1) | 100% (1/1) |
| Verbal Abuse | 3 | 1 | 0 | 33.3% (1/3) | 0.0% |
| Warrantless Search | 3 | 0 | 0 | 0.0% | 0.0% |
| Not a City of Chicago Allegation type | 1 | 0 | 0 | 0.0% | 0.0% |
| **Grand Total of Internal Allegations** | **144** | **31** | **11** | **21.5% (31/144)** | **7.6% (11/144)** |

*Table 16. Source & category of sustained external allegations in Chicago with corresponding sustain rates (1989-1993 Dataset).*

| Allegations | External Allegation Count | External Sustained after Investigation | Sustained After Full Internal Review | % Allegations Sustained after Investigation | % Allegations Documented Sustained after Full Internal Review |
|---|---|---|---|---|---|
| **Coerced Confession** | 31 | 0 | 0 | 0.0% | 0.0% |
| **Domestic Violence** | 17 | 0 | 0 | 0.0% | 0.0% |
| **Excessive Force** | 530 | 11 | 3 | 2.1% (11/530) | 0.6% (3/530) |
| **Fabricated Statement or Fabricated Evidence** | 21 | 2 | 1 | 9.5% (2/21) | 4.8% (1/21) |
| **False Arrest** | 71 | 0 | 0 | 0.0% | 0.0% |
| **Improper Inventory Procedure** | 171 | 2 | 2 | 1.2% (2/171) | 1.2% (2/171) |
| **Inattention to Duty** | 52 | 4 | 2 | 7.7% (4/52) | 3.8% (2/52) |
| **Mistreatment of Juvenile** | 91 | 3 | 0 | 3.3% (3/91) | 0.0% |
| **Other** | 163 | 21 | 5 | 12.9% (21/163) | 3.1% (5/163) |
| **Planted Evidence** | 1 | 0 | 0 | 0.0% | 0.0% |
| **Property Damage** | 111 | 0 | 0 | 0.0% | 0.0% |
| **Racial/Ethnic Slurs** | 43 | 2 | 1 | 4.7% (2/43) | 2.3% (1/43) |
| **Rule Violation** | 7 | 0 | 0 | 0.0% | 0.0% |
| **Sexual Abuse** | 0 | 0 | 0 | 0.0% | 0.0% |
| **Theft** | 12 | 0 | 0 | 0.0% | 0.0% |
| **Threats** | 49 | 1 | 1 | 2% (1/49) | 2% (1/49) |
| **Unlawful Use/Display of Weapon** | 59 | 1 | 1 | 1.7% (1/59) | 1.7% (1/59) |
| **Verbal Abuse** | 184 | 4 | 2 | 2.2% (4/184) | 1.1% (2/184) |
| **Warrantless Search** | 240 | 3 | 3 | 1.3% (3/240) | 1.3% (3/240) |
| **Not a City of Chicago Allegation Type** | 14 | 0 | 0 | 0.0% | 0.0% |
| **Grand Total** | **1867** | **54** | **21** | **2.9% (54/1867)** | **1.1% (21/1867)** |

*Table 17. Source & category of sustained external and internal allegations in Chicago, with corresponding sustain rates, (1989-1993 Dataset)*

| Type of Allegations | Number of Allegations Sustained after Investigation | Number of Allegations Sustained after Full Internal Review | Total Allegations | % Allegations Sustained after Investigation | % Allegations Documented Sustained after Full Internal Review |
|---|---|---|---|---|---|
| **Excessive Force** | **11** | **3** | **531** | **2.1%** | **0.6%** |
| EXTERNAL | 11 | 3 | 530 | 2.1% | 0.6% |
| INTERNAL | 0 | 0 | 1 | 0.0% | 0.0% |
| **Fabricated Statement/Evidence** | **2** | **1** | **31** | **6.5%** | **3.2%** |
| EXTERNAL | 2 | 1 | 21 | 9.5% | 4.8% |
| INTERNAL | 0 | 0 | 10 | 0.0% | 0.0% |
| **Improper Inventory Procedure** | **2** | **2** | **178** | **1.1%** | **1.1%** |
| EXTERNAL | 2 | 2 | 171 | 1.2% | 1.2% |
| INTERNAL | 0 | 0 | 7 | 0.0% | 0.0% |
| **Inattention to Duty** | **16** | **6** | **74** | **21.6%** | **8.1%** |
| EXTERNAL | 4 | 2 | 52 | 7.7% | 3.8% |
| INTERNAL | 12 | 4 | 22 | 54.5% | 18.2% |
| **Mistreatment of Juvenile** | **3** | **0** | **91** | **3.3%** | **0.0%** |
| EXTERNAL | 3 | 0 | 91 | 3.3% | 0.0% |
| INTERNAL | **0** | 0 | 0 | N/A | N/A |
| **Other** | **36** | **11** | **237** | **15.2%** | **4.6%** |
| EXTERNAL | 21 | 5 | 163 | 12.9% | 3.1% |
| INTERNAL | 15 | 6 | 74 | 20.3% | 8.1% |
| **Racial/Ethnic Slurs** | **2** | **1** | **43** | **4.7%** | **2.3%** |
| EXTERNAL | 2 | 1 | 43 | 4.7% | 2.3% |
| INTERNAL | **0** | 0 | 0 | N/A | N/A |
| **Rule Violation** | **2** | **0** | **16** | **12.5%** | **0.0%** |
| EXTERNAL | 0 | 0 | 7 | 0.0% | 0.0% |
| INTERNAL | 2 | 0 | 9 | 22.2% | 0.0% |
| **Threats** | **1** | **1** | **56** | **1.8%** | **1.8%** |
| EXTERNAL | 1 | 1 | 49 | 2.0% | 2.0% |
| INTERNAL | 0 | 0 | 7 | 0.0% | 0.0% |
| **Unlawful Use/Display of Weapon** | **2** | **2** | **60** | **3.3%** | **3.3%** |
| EXTERNAL | 1 | 1 | 59 | 1.7% | 1.7% |
| INTERNAL | 1 | 1 | 1 | 100.0% | 100.0% |

| Type of Allegations | Number of Allegations Sustained after Investigation | Number of Allegations Sustained after Full Internal Review | Total Allegations | % Allegations Sustained after Investigation | % Allegations Documented Sustained after Full Internal Review |
|---|---|---|---|---|---|
| **Verbal Abuse** | **5** | **2** | **187** | **2.7%** | **1.1%** |
| EXTERNAL | 4 | 2 | 184 | 2.2% | 1.1% |
| INTERNAL | 1 | 0 | 3 | 33.3% | 0.0% |
| **Warrantless Search** | **3** | **3** | **243** | **1.2%** | **1.2%** |
| EXTERNAL | 3 | 3 | 240 | 1.3% | 1.3% |
| INTERNAL | 0 | 0 | 3 | 0.0% | 0.0% |
| **Coerced Confession** | **0** | **0** | **31** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 31 | 0.0% | 0.0% |
| INTERNAL | **0** | 0 | 0 | N/A | N/A |
| **Domestic Violence** | **0** | **0** | **20** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 17 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 2 | 0.0% | 0.0% |
| Unknown | 0 | 0 | 1 | 0.0% | 0.0% |
| **False Arrest** | **0** | **0** | **71** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 71 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 0 | N/A | N/A |
| **Planted Evidence** | **0** | **0** | **1** | 0.0% | 0.0% |
| EXTERNAL | 0 | 0 | 1 | 0.0% | 0.0% |
| INTERNAL | **0** | 0 | 0 | N/A | N/A |
| **Property Damage** | **0** | **0** | **114** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 111 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 3 | 0.0% | 0.0% |
| **Theft** | **0** | **0** | **13** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 12 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 1 | 0.0% | 0.0% |
| **Not a City of Chicago Allegation Type** | **0** | **0** | **23** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 14 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 1 | 0.0% | 0.0% |
| UNKNOWN | 0 | 0 | 8 | 0.0% | 0.0% |
| **Grand Total** | ***85*** | ***32*** | ***2020*** | ***4.2%*** | ***1.6%*** |

A review of the dataset shows that internal complaints were sustained at significantly higher rates than external complaints from the community.[123] In addition, sustained complaints disproportionally reflected misconduct relating to procedural misconduct (e.g., inattention to duty, rule violations, improper inventory procedure) or domestic violence, as opposed to abuses against community members while on duty (e.g., threats, excessive force, false arrest, warrantless search, verbal abuse). As the City's accountability system continually sustained internally-originated complaints at higher rates, and as those complaints were more likely to be less severe in nature, this reinforced the environment in which officers, like the Defendants in this case, could engage in serious misconduct violations with little fear of consequence.

*Table 18. Allegations associated with those raised by Iglesias and/or associated with a risk of wrongful convictions, by the percentage of the total allegations filed, with corresponding sustain rates after full internal review, (1989-1993 Dataset)*

| Type of Allegations | Number of Allegations Sustained after Investigation | Number of Allegations Sustained after Full Internal Review | Total Allegations | % Allegations Sustained after Investigation | % Allegations Documented Sustained after Full Internal Review |
|---|---|---|---|---|---|
| **Coerced Confession** | **0** | **0** | **31** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 31 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 0 | N/A | N/A |
| **Excessive Force** | **11** | **3** | **531** | **2.1%** | **0.6%** |
| EXTERNAL | 11 | 3 | 530 | 2.1% | 0.6% |
| INTERNAL | 0 | 0 | 1 | 0.0% | 0.0% |
| **Fabricated Statement/ Evidence** | **2** | **1** | **31** | **6.5%** | **3.2%** |
| EXTERNAL | 2 | 1 | 21 | 9.5% | 4.8% |
| INTERNAL | 0 | 0 | 10 | 0.0% | 0.0% |
| **False Arrest** | **0** | **0** | **71** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 71 | 0.0% | 0.0% |
| INTERNAL | 0 | 0 | 0 | N/A | N/A |
| **Improper Inventory Procedure** | **2** | **2** | **178** | **1.1%** | **1.1%** |
| EXTERNAL | 2 | 2 | 171 | 1.2% | 1.2% |
| INTERNAL | 0 | 0 | 7 | 0.0% | 0.0% |
| **Planted Evidence** | **0** | **0** | **1** | **0.0%** | **0.0%** |
| EXTERNAL | 0 | 0 | 1 | 0.0% | 0.0% |

123 It was found that the origin of a complaint has a relationship with the investigator assigning sustained findings, after investigation and before internal CPD review. See Appendix A for more details on how a chi-square test for independence was performed.

| **Type of Allegations** | **Number of Allegations Sustained after Investigation** | **Number of Allegations Sustained after Full Internal Review** | **Total Allegations** | **% Allegations Sustained after Investigation** | **% Allegations Documented Sustained after Full Internal Review** |
|---|---|---|---|---|---|
| INTERNAL | 0 | 0 | 0 | N/A | N/A |
| **Racial/Ethnic Slurs** | **2** | **1** | **43** | **4.7%** | **2.3%** |
| EXTERNAL | 2 | 1 | 43 | 4.7% | 2.3% |
| INTERNAL | 0 | 0 | 0 | N/A | N/A |
| **Threats** | **1** | **1** | **56** | **1.8%** | **1.8%** |
| EXTERNAL | 1 | 1 | 49 | 2.0% | 2.0% |
| INTERNAL | 0 | 0 | 7 | 0.0% | 0.0% |
| **Verbal Abuse** | **5** | **2** | **187** | **2.7%** | **11%** |
| EXTERNAL | 4 | 2 | 184 | 2.2% | 1.1% |
| INTERNAL | 1 | 0 | 3 | 33.3% | 0.0% |
| **Grand total of Coerced Confession, Excessive Force, Fabricated Statement/Evidence, False Arrest, Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse Allegations[124]** | **23** | **10** | **1129** | **2.0% (23/1129)** | **0.9% (10/1129)** |

Only 23 of the 1129 allegations (2.0%) of misconduct of the type alleged by Plaintiff and/or associated with wrongful convictions (coerced confession, excessive force, fabricated statement/evidence, false arrest, improper inventory procedure, planted evidence, racial/ethnic slurs, threats, verbal abuse), were sustained after investigation in the 1989-1993 Dataset (Table 18). Moreover, as reflected in Table 17 and Table 18, only 10 allegations out of the 1129 allegations of those types (0.9%) were sustained after final review, reflecting that officers who engaged in such misconduct faced almost no risk of accountability and were unlikely to face any discipline. It is well known in my field that the existence of a disciplinary process that rarely ever results in sustained findings for a particular category of misconduct signals to officers that they can engage in such serious misconduct with little fear of consequence, allowing them to perpetrate misconduct without fear of discipline and to understand in advance that their decisions

[124] Allegations associated with those raised by Plaintiff and/or associated with a risk of wrongful convictions.

take place within a system that will not seriously punish any misconduct they may choose to commit.

Further contributing to an officer's sense of impunity, even for those few allegations sustained after final review, officers were extremely unlikely to face any meaningful discipline, as shown in the following table:

*Table 19. Frequency of discipline served for all allegations sustained after final review in Chicago, by complaint source/type, (1989-1993 Dataset).*

| | **Allegation Count by Discipline Served; excluding allegations without discipline served.** | | | | | | |
|---|---|---|---|---|---|---|---|
| **Discipline Served[125]** | **Fabricated Statement/Evidence **** | **Improper Inventory Procedure**** | **Inattention to Duty** | **Other** | **Threats**** | **Warrantless Search** | **Grand Total** |
| No suspension - Violation noted. | 1 | 0 | 0 | 0 | 0 | 3 | 4 |
| Reprimand | 0 | 0 | 2 | 2 | 1 | 0 | 5 |
| Suspended 1 day | 0 | 0 | 1 | 1 | 0 | 0 | 2 |
| Suspended 2 days | 0 | 0 | 3 | 2 | 0 | 0 | 5 |
| Suspended 5 days | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Suspended 30 days | 0 | 0 | 0 | 4 | 0 | 0 | 4 |
| **Grand Total of documented discipline served** | **1** | **2** | **6** | **9** | **1** | **3** | **22** |

Options are granted jointly with other types of discipline.

Of the CRs I reviewed, the following are a couple of examples of CRs where the allegations were sustained, but the discipline imposed was next to nothing.

- CR No. 201465 (6/12/93) is a complaint where three officers were found to have entered a house to search for a suspect without a warrant. The complainant alleged that she was humiliated and terrified because she was naked when the search took place. Nevertheless, CPD imposed no discipline on the violating officers, instead reaching a disposition only of "violation noted."

[125] There are 10 allegations with sustained findings after full internal review out of those types alleged by Plaintiff and/or associated with wrongful convictions (Table 18). 4 allegations (fabricated statement/evidence, improper procedure, and threats) out of 10 have documented discipline served. One CR (185818) with 6 sustained allegations does not have documented the type of discipline served.

- CR No. 201388 (6/21/1993) is a complaint regarding excessive force. The OPS investigator sustained several complaints against Officer Donald Signoretti, including that he shot at a fleeing suspect without justification, abused two people without justification by pepper spraying them, striking them with a baton, and kicking one in the ribs, and then lied about his actions to OPS. He also shot another CPD officer while, according to him, trying to protect that officer from an assailant. No discipline is noted in the CR file. However, a search of the Citizens Police Data Project database of officer misconduct complaints reveals that Signoretti remained on the force until August 16, 2000, despite misconduct that warranted his firing.CR No. 203110 (8/26/93) is a complaint where, after supposedly seeing the complainant run a red light, park his car, and leave the area, an officer left a note on his car stating "see me tonight before 7:00 pm, or I will come after you and you will regret it." The officer stated that he intended to charge the complainant at the Area 5 station and that no other threat was intended. The investigator sustained a Rule 2[126] violation for leaving a threatening note. But the investigator did not consider whether the officer's threat violated the complainant's constitutional rights; for example, the right of a criminal defendant to remain silent. The initial recommendation was no discipline, violation noted; ultimately, the officer received a reprimand. There was also a long and unexplained delay; even though the officer admitted to leaving the note and there were no factual conflicts to investigate, the complaint was not closed for over 6 months.

**REVIEW OF DATA FROM 1989-1998**

Ms. Meza also analyzed the allegations from the combined Area 5 Detective CR's as analyzed in the *Reyes*, *Sierra*, and *Bouto* reports to evaluate whether the pattern identified in this report, and in my past reports, were consistent over the time period as a whole. This analysis includes additional allegation types because the dataset covers a larger period of years. Specifically, in the below analysis, we have added Forced to Sign Consent to Search Form as an allegation type associated with wrongful convictions.

Ms. Meza's methodology was to compile the CR's and allegations from the *Reyes*, *Sierra*, and *Bouto* datasets. There were duplicate CR's and associated allegations between *Bouto* and *Sierra*, and between *Sierra* and *Reyes*. All duplicate allegations were removed so that no allegations would be double counted. This process identified 4,746 allegations in the combined 1989-1998 dataset, which are analyzed below.

[126] Any action which impedes the Department's effort to achieve its policy or goals or brings discredit upon the Department.

*Table 20. Count of All Allegations and of Allegations Associated with Wrongful Convictions (1989-1998 Dataset).*

| **Origin of Complaint** | **Count of All Allegations** | **Coerced Confession, Excessive Force, Fabricated Statement or Fabricated Evidence, False Arrest, Forced to Sign Consent to Search Form,[127] Improper Inventory Procedure, Planted Evidence, Racial/Ethnic Slurs, Threats, Verbal Abuse** | **Percentage of Total Allegations** |
|---|---|---|---|
| **External** | 4338 | 2479 (97.6%, 2479/2541) | 2479 (52.2%, 2479/4746) |
| **Internal** | 369 | 61 (2.4%, 61/2541) | 61 (1.3%, 61/4746) |
| **Origin Unknown** | 39 | 1 (0.04%, 1/2541) | 1 (0.02%, 1/4746) |
| **Grand Total** | 4746 | 2541 (100%, 2541/2541) | 2541 (53.5%, 2541/4746) |

Table 20, above, shows that a majority of all allegations made against Area 5 detectives from 1989-1998 were associated with wrongful convictions (53.5%, 2541/4746). Of these, almost all (97.6%, 2479/2541) came from the community, and only a very small portion (2.4%, 61/2541) were generated internally.

[127] See text above regarding why Forced to Sign Consent to Search Form has been added here.

*Table 21. Source & category of sustained internal allegations in Chicago with corresponding sustain rates (1989-1998 Dataset).*

| Allegations | Internal Allegation Count | Internal Sustained after Investigation | Sustained After Full Internal Review | % Allegations Sustained after Investigation | % Allegations Documented Sustained after Full Internal Review |
|---|---|---|---|---|---|
| Coerced Confession | 0 | 0 | 0 | N/A | N/A |
| Domestic Violence | 5 | 2 | 0 | 40% (2/5) | 0% (0/5) |
| Excessive Force | 4 | 3 | 1 | 75% (3/4) | 25% (1/4) |
| Fabricated Statement or Fabricated Evidence | 17 | 2 | 0 | 11.8% (2/17) | 0% (0/17) |
| False Arrest | 4 | 2 | 1 | 50% (2/4) | 25% (1/4) |
| Forced to Sign Consent to Search Form | 0 | 0 | 0 | N/A | N/A |
| Improper Inventory Procedure | 17 | 2 | 0 | 11.8% (2/17) | 0% (0/17) |
| Inattention to Duty | 47 | 27 | 5 | 57.4% (27/47) | 10.6% (5/47) |
| Mistreatment of Juvenile | 1 | 0 | 0 | 0% (0/1) | 0% (0/1) |
| Not an Allegation Type, by the City | 1 | 0 | 0 | 0% (0/1) | 0% (0/1) |
| Other | 164 | 53 | 16 | 32.3% (53/164) | 9.8% (16/164) |
| Planted Evidence | 0 | 0 | 0 | N/A | N/A |
| Property Damage | 3 | 0 | 0 | 0% (0/3) | 0% (0/3) |
| Racial/Ethnic Slurs | 0 | 0 | 0 | N/A | N/A |
| Rule Violation | 59 | 43 | 19 | 72.9% (43/59) | 32.2% (19/59) |
| Sexual Abuse | 0 | 0 | 0 | N/A | N/A |
| Theft | 22 | 0 | 0 | 0% (0/22) | 0% (0/22) |
| Threats | 8 | 0 | 0 | 0% (0/8) | 0% (0/8) |
| Unlawful Use/Display of Weapon | 3 | 2 | 2 | 66.7% (2/3) | 66.7% (2/3) |
| Verbal Abuse | 11 | 4 | 2 | 36.4% (4/11) | 18.2% (2/11) |
| Warrantless Entry | 0 | 0 | 0 | N/A | N/A |
| Warrantless Search | 3 | 0 | 0 | 0% (0/3) | 0% (0/3) |
| Grand Total | 369 | 140 | 46 | 37.9% (140/369) | 12.5% (46/369) |

Table 21, above, shows that the internal review process greatly reduced the discipline rate of internal complaints—from 37.9% after investigation to 12.5% after full internal review—from 1989-1998.

*Table 22. Source & category of sustained external allegations in Chicago with corresponding sustain rates (1989-1998 Dataset).*

| **Allegations** | **External Allegation Count** | **External Sustained after Investigation** | **Sustained After Full Internal Review** | **% Allegations Sustained after Investigation** | **% Allegations Documented Sustained after Full Internal Review** |
|---|---|---|---|---|---|
| Coerced Confession | 51 | 0 | 0 | 0 (0/51) | 0% (0/51) |
| Domestic Violence | 64 | 11 | 11 | 17.2% (11/64) | 17.2% (11/64) |
| Excessive Force | 1091 | 35 | 6 | 3.2% (35/1091) | 0.5% (6/1091) |
| Fabricated Statement or Fabricated Evidence | 51 | 4 | 1 | 7.8% (4/51) | 2% (1/51) |
| False Arrest | 231 | 8 | 1 | 3.5% (8/231) | 0.4% (1/231) |
| Forced to Sign Consent to Search Form | 1 | 0 | 0 | 0% (0/1) | 0% (0/1) |
| Improper Inventory Procedure | 417 | 8 | 5 | 1.9% (8/417) | 1.2% (5/417) |
| Inattention to Duty | 107 | 4 | 2 | 3.7% (4/107) | 1.9% (2/107) |
| Mistreatment of Juvenile | 147 | 7 | 1 | 4.8% (7/147) | 0.7% (1/147) |
| Not an Allegation Type, by the City | 14 | 0 | 0 | 0% (0/14) | 0% (0/14) |
| Other | 386 | 24 | 7 | 6.2% (24/386) | 1.8% (7/386) |
| Planted Evidence | 32 | 0 | 0 | 0% (0/32) | 0% (0/32) |
| Property Damage | 303 | 4 | 0 | 1.3% (4/303) | 0% (0/303) |
| Racial/Ethnic Slurs | 80 | 2 | 1 | 2.5% (2/80) | 1.3% (1/80) |
| Rule Violation | 29 | 3 | 2 | 10.3% (3/29) | 6.9% (2/29) |
| Sexual Abuse | 12 | 0 | 0 | 0% (0/12) | 0% (0/12) |
| Theft | 41 | 1 | 0 | 2.4% (1/41) | 0% (0/41) |
| Threats | 126 | 2 | 1 | 1.6% (2/126) | 0.8% (1/126) |
| Unlawful Use/Display of Weapon | 128 | 4 | 4 | 3.1% (4/128) | 3.1% (4/128) |
| Verbal Abuse | 399 | 6 | 2 | 1.5% (6/399) | 0.5% (2/399) |
| Warrantless Entry | 1 | 0 | 0 | 0% (0/1) | 0% (0/1) |
| Warrantless Search | 627 | 14 | 9 | 2.2% (14/627) | 1.4% (9/627) |
| Grand Total | 4338 | 137 | 53 | 3.2% (137/4338) | 1.2% (53/4338) |

Table 22, above, shows that sustain rates were very low for external allegations from 1989-1998, and were especially low for frequently made allegations like verbal abuse (after full internal review 0.5%, 2/399), excessive force (after full internal review, 0.5%, 6/1091), and false arrest (after full internal review 0.4%, 1/231).

**CPD's Annual Reports**

I have reviewed CPD's annual reports for the corresponding time period of the City of Chicago's CR production (1989-1993). As set forth in more detail in Appendix Section 1.2, CPD's documentation in the annual reports is unclear, although CPD appears to have reported general figures regarding IAD and OPS investigations, including categorizing them by complaint type and indicating whether they involved a sustained finding. Assuming that CPD's figures refer to CR counts or individual investigations, my understanding is that these figures overstate the actual sustain rate in two ways: first, they treat any CR or individual investigation that results in any sustained finding as "sustained" even if there may be allegations and/or accused officers that did not result in a sustained finding; and second, they treat CRs or individual investigations with excessive force allegations as sustained even if the only sustained allegations relate to other kinds of misconduct.

*Table 23. OPS investigations reported in CPD Annual Reports for 1989-1993*

| Year | Reported OPS Excessive Force Complaints | Reported OPS Completed Investigations | Reported Number of Sustained CRs | Percentage |
|---|---|---|---|---|
| 1989[128] | Not available[129] | 2,221 | 139 | 6.3% (139/2,221) |
| 1990[130] | Not available[131] | 2,619 | 190 | 7.3% (190/2,619) |
| 1991[132] | 2,727 | 2,828 | 346 | 12.2% (346/2,828) |
| 1992[133] | 2,553 | 2,545 | 288 | 11.3% (288/2,545) |
| 1993[134] | 2,681 | 2,718 | 184 | 6.8% (184/2,718) |

[128] https://home.chicagopolice.org/wp-content/uploads/2014/12/1989-Annual-Report.pdf
[129] The Office of Professional Standards (OPS) and CPD started reporting the number of OPS Excessive Force complaints until 1991.
[130] https://home.chicagopolice.org/wp-content/uploads/2014/12/1990-Annual-Report.pdf
[131] The Office of Professional Standards (OPS) and CPD started reporting the number of OPS Excessive Force complaints until 1991.
[132] https://home.chicagopolice.org/wp-content/uploads/2014/12/1991-Annual-Report.pdf.
[133] https://home.chicagopolice.org/wp-content/uploads/2014/12/1992-Annual-Report.pdf.
[134] https://home.chicagopolice.org/wp-content/uploads/2014/12/1993-1994-Report.pdf.

*Table 24. Reported IAD Investigations in Chicago for 1989-1993.*

| **Year** | **IAD Investigation Category** | **Reported Number of CRs** | **Reported Sustained** | **Percentage** |
|---|---|---|---|---|
| 1989[135] | Civil Rights violations | 476 | 6 | 1.26% (6/476) |
| | Arrest/Lock-up Procedures | 455 | 54 | 11.87% (54/455) |
| | Bribery/corruption | 46 | 3 | 6.52% (3/46) |
| 1990[136] | Civil Rights violations | 635 | 6 | 0.94% (6/635) |
| | Arrest/Lock-up Procedures | 486 | 55 | 11.32% (55/486) |
| | Bribery/corruption | 53 | 19 | 35.85% (19/53) |
| 1991[137] | Civil Rights violations | 624 | 10 | 1.60% (10/624) |
| | Arrest/Lock-up Procedures | 379 | 62 | 16.40% (62/379) |
| | Bribery/corruption | 49 | 10 | 20.40% (10/49) |
| 1992[138] | Civil Rights violations | 526 | 6 | 1.10% (6/526) |
| | Arrest/Lock-up Procedures | 226 | 35 | 15.50% (35/226) |
| | Bribery/corruption | 63 | 14 | 22.20% (14/63) |
| 1993[139] | Civil Rights violations | 482 | 11 | 2.30% (11/482) |
| | Arrest/Lock-up Procedures | 225 | 83 | 36.90% (83/225) |
| | Bribery/corruption | 33 | 7 | 21.20% (7/33) |

Based on my professional experience in the field of police practices, police administration and accountability and the review of the evidence in this case, it is my opinion the City had a

---

[135] https://home.chicagopolice.org/wp-content/uploads/2014/12/1989-Annual-Report.pdf.
[136] https://home.chicagopolice.org/wp-content/uploads/2014/12/1990-Annual-Report.pdf.
[137] https://home.chicagopolice.org/wp-content/uploads/2014/12/1991-Annual-Report.pdf.
[138] https://home.chicagopolice.org/wp-content/uploads/2014/12/1992-Annual-Report.pdf.
[139] https://home.chicagopolice.org/wp-content/uploads/2014/12/1993-1994-Report.pdf.

widespread practice resulting in a *de facto* policy of failing to properly investigate officers accused of misconduct, supervise officers, and administer meaningful discipline for officers found to have fabricated evidence.

This widespread practice included: (1) the failure to investigate allegations of false evidence; (2) the failure to supervise and discipline officers accused of creating false evidence; (3) the failure to identify repeat offender officers or implement an early intervention prevention program; and (4) the perpetuation of a code of silence such that officers who committed misconduct believed they could do so with impunity. Both the superintendent of police and City Council had notice of this widespread practice and failed to remedy it. That was so although in the 1990s, it was well known that police departments had a responsibility to ensure that their officers were not fabricating evidence. If they did not provide that assurance, then, foreseeably, suspects' rights would invariably be violated.

> "Police accountability systems are vital to lawful policing. In combination with effective supervision, a robust accountability system can help identify, correct, and ultimately prevent unreasonable and unnecessary use of force."[140]
>
> "Yet, for an accountability system of any kind to work, it must be real, and it must have consequences. "It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens."[141]

Internal Investigations are a form of administrative inquiries that have been in place for decades to maintain reasonable parameters of performance in the field and to hold officers accountable for their conduct. Historically, it has been a customary practice for police agencies in the United States to have in place a mechanism for receiving and investigating allegations of misconduct by its membership. These investigations, and the policies that guide that process, typically impact four essential constituency groups: the person who has brought forth the allegation, the officer or officers on whom the allegation has been made, the involved agency and the municipality that employs them, and ultimately the community served by the officer and the agency they represent.

There have been a whole host of studies on police practices that have influenced the way law enforcement agencies in the U.S. go about establishing standards of conduct and investigations of misconduct within their ranks. The following serve as an example and have been widely known throughout the field of law enforcement: the 1931 Wickersham Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals. The Task Force Report provides particularly helpful guidance as it relates to discipline within a law enforcement agency.

---

[140] DOJ Findings Report, AR-L 150084-AR-L 150247, at 7.
[141] *Id.*

> "Discipline and accountability are essential to a police agency. The integrity of the police agency can be maintained by an effective and responsive discipline system. Certainly, public support will be strengthened by protecting them from police misconduct and corruption through the changing of inadequate police policies and procedures, and the correction or removal of employees guilty of misconduct. Police chief executives agree that discipline, positive and negative, is good for an organization; it assists in establishing the prestige of the organization in the specific occupational field and general community, in maintaining effective agency performance, and preserving employee morale. An inadequate discipline system many times will produce the opposite effect on an organization."[142]

The Task Force Report goes on to say that the police chief serves as the "ultimate police supervisor" and is tasked with monitoring the internal system frequently.[143] Moreover, they write:

> "The investigative procedures used, coupled with the subsequent adjudication process, are the most important elements in maintaining the confidence of the public and employees in the administration of discipline. The reason for investigating complaints of misconduct are: a. to maintain police agency integrity; b. to protect the public from police misconduct; c. to retrain and correct employees guilty of misconduct and remove those whose transgressions make them unacceptable for further police service; and d. to protect innocent police employees."[144]

In addition to those reasons set out above, I believe the following is critical to the mission of a robust, fair, and consistently enforced investigative, supervisory, and disciplinary process: the protection of the public from law enforcement officers who use their power and authority to corrupt the criminal justice process, impede the constitutional protections afforded to all who become suspects of crime and prosecution, physically abuse persons whom they have a duty to protect, and wholly disregard the sanctity of human life and dignity.

It has been my experience that law enforcement agencies demand high standards of discipline to ensure integrity within the ranks. Agencies simply cannot ignore or otherwise overlook the presence of misconduct. It is imperative that systems be in place to ensure fairness and be structured in a way that is reasonably calculated to remedy the behavior sought to be corrected.

This has been a widely known and accepted principle for the duration of my law enforcement career.

At every critical stage of the CPD's systems there are enormous barriers that prevent accountability and create a culture where officers who choose to do wrong are allowed to do so

---

[142] POLICE TASK FORCE REPORT OF THE COMMISSION ON CRIMINAL JUSTICE STANDARDS AND GOALS, at page 470.
[143] *Id.* at page 475.
[144] *Id.* at page 488.

without fear of punishment; barriers that discourage citizen complaints or prevent officers from reporting misconduct; barriers that prevent fair, thorough, and unbiased investigations; and even barriers to imposing discipline.

One of the primary functions of a police agency is to investigate reports of police misconduct and to take affirmative steps to address such misconduct when its existence is evident. "When it fails to perform this function effectively, an obvious consequence is an increase of malfeasance since perpetrators will feel that their actions will go unpunished."[145]

In addition to creating a mechanism that sets up roadblocks for the department to promptly and thoroughly investigate complaints and correct wrongdoing, the City of Chicago has made a conscious and deliberate decision to allow a process to remain in place which presented a clearly foreseeable risk of harm to the citizens of Chicago by allowing a large population of officers to escape discipline and continue to engage in conduct that is contrary to their oath of office and amounts to a *de facto* policy that has resulted in widespread patterns, practices, and customs that threaten the Constitutional rights of citizens and resulted in Plaintiff's injuries.

Not only did the City tolerate impediments and obstructions to misconduct investigations, but it also allowed for the existence of a disciplinary process that rarely ever resulted in any meaningful discipline and, thus, signaled to officers that it was ok to engage in misconduct with impunity and without fear of discipline. In fact, multiple problems with CPD's disciplinary system during the relevant time made it unlikely that officers would ever be disciplined for misconduct.

It is widely known that police officers act with great autonomy. Many of them work alone or with a single partner, have minimal direct oversight as they move from call to call and location to location, make critical decisions that directly impact personal liberty, and carry immediate authority that is greater than most government officials. With such great and autonomous power, swift accountability must follow. The way that accountability is best administered in a police agency is through clear and consistently enforced policy, engaged supervision, rigorous and frequently reinforced training, and a strong process by which citizen complaints are received and investigated. It is clear to me from the discovery materials that the way the City investigated complaints of misconduct was highly ineffective and further frustrated the accountability systems in place at the time of this incident.

During the time frame during which this incident occurred, administrative investigations (typically referred to as Internal Affairs Investigations) fell within the purview of either the Internal Affairs Division (IAD) or the Office of Professional Standards (OPS).[146] These were

---

[145] *Clark v. City of Muskegon*, 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). Also, see, Internal Affairs Conference Manual, 2017, Public Agency Training Council.

[146] The internal process through which complaints of police misconduct is investigated has a rich history in American Policing and dates to studies on police practices including the 1931 Wickersham Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals, and other similar studies since that time. These practices are embodied in model policies of nationally recognized police

meant to be vital to maintaining reasonable parameters that guide the performance by officers and the CPD as an organizational body within the City of Chicago.

During the more than 33 years in which I have been engaged in the profession of law enforcement and oversight of law enforcement agencies, a common police practice has been to investigate allegations of police misconduct which come to the attention of the police agency from any source, provided that the allegation, if later proven true, would amount to misconduct. This important and fundamental system of accountability not only helps to ferret our wrongdoers and hold them responsible for their actions, but when fairly and consistently applied it sends a resounding message to the entire organization that standards of conduct will be enforced. It also aids in identifying systemic issues, policy deficiencies and training needs.

These time-honored accountability systems and practices were in place then, and remain in place now, to properly inform and guide officers as to what they should or should not do, particularly when dealing with citizens during enforcement encounters. The supervisory practices, techniques, systems, and administrative investigations are the most critical aspect of controlling, monitoring and guiding field officer performance.

During the time of this incident, CPD's IAD investigated those allegations of police misconduct that were not within OPS's jurisdiction. OPS was tasked with investigating excessive force complaints. IAD investigated allegations such as coercion, mistreatment of witnesses, fabrication of witness/suspect statements, failure to disclose exculpatory evidence, holding a witness against their will and threatening to harm a witness if they did not provide a statement.[147] During this timeframe, OPS assigned a CR number to both IAD and OPS investigations and assigned the initial complaint category.[148] All complaints that would come in, either from IAD, a direct citizen contact, or a from a CPD supervisor, were funneled through OPS for assignment.[149] Four outcomes were possible at the end of an IAD or OPS investigation:

- Unfounded – the allegation was found to have not occurred;
- Exonerated – the conduct occurred but was lawful;
- Not Sustained – the allegation is unable to be proved or disproved;
- Sustained – the allegation occurred.[150]

---

professional groups such as the International Association of Chiefs of Police and the Police Executive Research Forum. They have been continuously referenced in authoritative texts such as the O.W. Wilson's POLICE ADMINISTRATION, a former Chicago Police Superintendent, and its many successors and the International City Management Association's texts on municipal police practices. It is extensively covered in specific training for administrative investigations by national training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), Northwestern University Police Traffic Institute (IL), Southern Police Institute (KY), and Public Agency Training Council (IN).

[147] Timothy Moore Deposition, Case No. 18-CV-8144, *John Velez v. City of Chicago,* et al, August 26, 2021, at 66-67; Joseph Bird Deposition, Case No. 1:18-CV-1028, *Arturo DeLeon-Reyes v. Reynaldo Guevara*, et al and Case No. 1:18-CV-2312, *Gabriel Solache v. City of Chicago,* et al, December 22, 2021, at 35-36.

[148] Moore Dep. at 69; Bird Dep. at 36, 55.

[149] Moore Dep. at 67-68; Bird Dep. at 41.

[150] Moore Dep. at 99; Bird Dep. at 61.

OPS was charged with the investigation of certain types of allegations that at this time largely consisted of excessive force complaints. OPS was nominally independent of the CPD but did fall within CPD's sphere of supervision and oversight. The lack of independence of the agency charged with investigating officers had significant adverse consequences, including that officers' accounts were believed over citizens and officers had multiple chances to contest the findings of the allegations made against them. Once a CR was assigned to OPS for investigation, the investigator would gather the documents and seek to interview the complainant and/or victim if the victim was not the complainant. The investigator was tasked with gathering evidence from witnesses or other physical evidence. Then the investigator would serve the accused officer with a notice of the allegations and waiver of counsel. The accused officers would have to respond by being interviewed, submitting a statement which was a question/answer format, or submitting a to/from memorandum. However, if the investigator could not contact the complainant or witnesses, the accused officer may not have to respond to the allegations. The investigator would then review the file and reach a finding. If the investigator reached a sustained finding, the investigator would then pull the accused officer's complimentary history such as award or commendations.[151] Pursuant to the FOP contract, the OPS investigator was only permitted to look at the accused officer's disciplinary history once a sustained finding was reached. If so, the OPS investigator could obtain a record of only prior sustained allegations from IAD.[152] It was not possible for the investigator to view the accused officer's prior CRs if they did not result in a sustained finding. Also, prior to 1991, the City destroyed most all CR files after five years.

Many of the barriers to the City's ability to effectively supervise, investigate, and discipline officers were the result of terms that the City agreed to in its collective bargaining agreements with the FOP. These limitations were not only known to the City, but also agreed to. The City yielding to the FOP prevented the City from identifying, disciplining, and stopping repeat patterns of officer misconduct.

### 3. OPS Investigations Failed to Investigate Officer Misconduct in a Manner that Comported with Accepted Police Practices as of 1993

#### a. The City Failed to Investigate Anonymous Complaints

During this time frame the City's General Order on Complaint and Disciplinary Procedures, General Order 82-14 and General Order 93-1, did not permit anonymous complaints to be investigated unless their allegations were criminal in nature.[153] In my opinion, such a policy and practice impedes the administration of discipline by creating obstacles that will ultimately preclude the investigation of police misconduct. Not only are these impediments problematic from the perspective of a misconduct investigation, but they also create the foreseeable and certain opportunity for countless complaints to go uninvestigated and countless officers who would otherwise need swift discipline or remediation to fall through the cracks only to surface in yet another tragic set of circumstances. One of the primary functions of a police agency is to

[151] Moore Dep. at 112; Bird Dep. at 62.
[152] Moore Dep. at 112; Bird Dep. at 63.
[153] General Order 93-3 (eff. 1/13/93), Department Member Bill of Rights No. D. at AR-L 150412; General Order 82-14 (eff. 10/15/82), Department Member Bill of Rights No. D. at AR-L 150374.

investigate reports of police misconduct and to take affirmative steps to address such misconduct when its existence is evident:

> *"When it fails to perform this function effectively, an obvious consequence is an increase of malfeasance since perpetrators will feel that their actions will go unpunished."*[154]

In addition to creating a mechanism that sets up roadblocks for the department to promptly and thoroughly investigate complaints and correct wrongdoing, the City of Chicago made a conscious and deliberate decision to allow a process to remain in place which presented a clearly foreseeable risk of harm to the citizens of Chicago by allowing a large population of officers to escape discipline and continue to engage in conduct that is contrary to their oath of office and amounts to a *de facto* policy that has resulted in widespread patterns, practices, and customs that threaten the Constitutional rights of citizens and resulted in Plaintiff's injuries.

**b. To/From Memorandums Were Widely Used Instead of In-Person Interviews of Accused Officers**

In my opinion, when investigators rely upon a written response to a small number of questions without any additional follow-up or the securing of a properly preserved audio statement, the risk of error and the omissions of information give way to a serious flaw in the investigative process.[155] While I recognize that written police reports are often the first historical record of an event and an officer's involvement in that fixed point in time, interviews are the starting point of the investigative process and serve as the means by which an investigator gathers all of the facts and can challenge a particular version of those facts, especially when that version is contradicted or is inconsistent with that which serves as the basis for a complaint.

> The *United States of America v. City of Pittsburg* case is instructive as to how such investigations are to be conducted: "*All interviews of complainants, involved officers, and witnesses shall be tape-recorded and transcribed*."[156]

> The Agreement further provides that investigators shall not accept a written statement from any officer in lieu of an interview: "*(I)nvestigators shall have the authority to answer all interviewees and to challenge their version of the facts*."[157]

While I recognize that the City of Chicago was not a party to that Agreement, I believe they have failed to follow the guiding principles that ensure fair, objective, and thorough investigations of police conduct.

In the CRs that were provided for my review, the rate of written to/from reports by accused officers is remarkably high. Even for serious allegations of misconduct like that which serves as the basis of this litigation, the investigator might accept a to/from memorandum in lieu of an

---

154 *Clark v. City of Muskegon,* 2000 U.S. Dist. LEXIS 6660 (WD MI. 2000). *See also*, Internal Affairs Conference Manual, 2017, Public Agency Training Council.
155 *See* Reiter, Lou, LAW ENFORCEMENT ADMINISTRATIVE INVESTIGATIONS, 3rd Edition, 2006, 11.2.
156 *United States of America v. City of Pittsburg*, No. 97 C 354 (W.D. Pa. 1997), ⁋56.
157 *Id.*

interview, including those for fabrication and suppression of evidence and abuse of suspects and witnesses. The following are a few examples from my review of the CR files in this case:

- CR No. 166047 (1/13/89) is an excessive force complaint by Mr. Edwin Everett against Officers Kevin Navarro and Anthony Riccio. Mr. Everett alleged that an officer struck him in the chest with his baton in retaliation for a remark that the officer perceived as sarcastic. The officers were not questioned regarding the alleged gratuitous use of excessive force; instead, they submitted to/from reports. One officer's report reads: "On 13Jan89, R/O was assigned to beat 4644, Gang Crimes North, with P.O. A. Riccio #2620 in a marked squad car, in full regulation uniform. At Approx. 1600 hrs R/O along with his partner had occasion to conduct a field interview with the complainant (Edwin Everett). At no time did R/O or his partner strike the complainant in the chest with a baton. R/O along with his partner conducted themselves in a professional and courteous manner at all times." The other officer's report reads: "On 13 Jan 89, R/O was assigned to beat 4644, Gang Crimes Unit – North, with P.O. K. Navarro #5944, in a marked squad car, in full regulation uniform. At approximately 1600 hours, R/O and his partner had occasion to conduct a street stop, and field interview with the complainant on the street at 5248 W. Huron. During the course of the interview, the complainant was never struck by R/O, or P.O. Navarro at any time. Both officers were professional at all times." These cursory responses, which were nearly identical and suggest coordination between the officers, were apparently acceptable to the Department, which requested no follow-up information and never interviewed the officers. The complaint was not sustained.

- CR No. 180432 (11/15/89), described in more detail above on page 39, reflects the hazards of relying on to/from statements in misconduct investigations, especially when officers are allowed to provide minimal responses and excused from providing any supplementary detail. In that investigation, even though officers accused of physically abusing two suspects did not deny using force or witnessing the use of force in their to/from statements, CPD never sought follow-up or in-person interviews with the accused officers, and instead denied the complaints without further investigation.

- CR No. 217624 (5/8/95) is a complaint alleging Detective Ronald Koncz and Detective Reynaldo Guevara physically abused complainant's son at an unknown location, by beating and pushing him to make him give them information regarding a homicide that took place approximately one year prior. The detectives were not subject to a live interview by the OPS investigator. Instead, they were permitted to submit a to/from memorandum in response to the allegations against them. The detectives provided nearly the same, but not verbatim, to/from reports in which they denied physically abusing or pushing the complainant's son. Ultimately, the allegation of physical abuse was not sustained.

- CR No. 201338 (6/18/93) is a complaint that Mr. Ted Jacobson alleged against Officer Frank Messina. Accordingly, Officer Messina: 1) verbally abused, 2) tackled, and 3) threw to the ground Mr. Jacobson before 4) intentionally placed handcuffs on him too tightly, used the handcuffs - attached to his wrist - to drag him. The same incident includes an allegation against Officer Alan Pergande. The allegation asserts that Officer Pergande grabbed Mr. Jacobson by the neck and pulled him out of the house. By Officer

Messina's admission, Mr. Ted Jacobson was not the target of any investigation. The officers believed Mr. Jacobson's son robbed two victims. Taking the victims to Mr. Jacobson's home, the officers placed the victims in peril and caused a disturbance leading to Mr. Ted Jacobson's abuse, injuries, and arrest. Messina and Pergande denied the allegations, ultimately resulting in an unfounded finding.

- CR No. 202244 (7/20/93) is a complaint Ms. Carlissa Hunter logged against Officers John Enault and Joseph Gorman. Ms. Hunter alleged that the officers 1) made a warrantless entry into her home without her consent, 2) forced her to sign a consent form permitting them to search her home, 3) placed a firearm to her head, 4) said to her: " . . . shut your fucking kids up", and 5) returned at approximately 2:00 am the following morning in an attempt to reenter her home. The officers in question gave a corroborating story carrying more weight than Ms. Hunter's statement resulting in a finding of no sustained.

In June of 1997, the United States Department of Justice notified the City of Steubenville, Ohio, among other things, that: "*The City's practice is to discourage civilians from making complaints, and to fail to investigate adequately those that are made. Civilians who do make formal complaints are discouraged from seeking formal resolution. Instead, the Chief of Police encourages his shift commanders to resolve complaints "in-house" --without documentation or disciplinary results. Where there is formal resolution of a civilian complaint, the documentation leading to such resolution, and apparently the investigation that would otherwise be documented, is practically nonexistent. Only seldom are statements taken from police officers, and even more rarely from other witnesses. Equally rarely is physical evidence collected or evaluated*".[158]

In my opinion, the prevalent use of to/from submissions of accused officers is evidence of systematic bias in favor of the officer in the context of administrative investigations. Moreover, this complacent way to gather information in response to alleged misconduct creates opportunity for vague, ambiguous, non-responsive, and even false statements that inevitably lead to an inaccurate and unjust result. In addition, it gives officers the opportunity to confer and provide consistent accounts. The data demonstrates that notwithstanding the fact that the investigator cannot assess credibility or probe further from a mere written response, the investigator still systematically and in the extreme majority of cases takes the word of the accused officer as provided in a written submission over the victim's or complainant's version of what occurred.

### D. CPD's Accountability System Had No Mechanism to Detect and Respond to Officers with High Numbers of Complaints

During the timeframe leading up to Mr. Iglesias's arrest in 1993, there was no formal process in place for CPD Command Staff and supervisors to track the number of CRs subordinates received. This information was held within the Bureau of Internal Affairs (BIA).[159] Command Staff or immediate supervisors might be notified of some complaints, such as excessive force, positive

[158] DOJ Findings Letter to City Law Director, Steubenville, Ohio, dated June 12, 1997.
[159] Moore Dep. at 49.

drug test results, or any related to criminal activity.[160] However, Command Staff or supervisors were not notified when the allegations involved such misconduct as *Brady* violations, mistreatment of witnesses, violation of a line-up or fabrication of witness statements.[161] Cases that would trigger notification to Command Staff members were cases that would result in the accused member being relieved of police powers, and these were few and far between.[162] Supervisors have a duty to take action when their subordinates generate a high number of CRs in a short amount of time. However, the supervisor must be aware of this, and there was no formal system in place to do so.[163]

CPD's broken systems of accountability has had the effect of enabling the continuance of bad behavior that has infected the culture of the department, negatively impacted its legitimacy in the community, and allowed the Defendants' conduct to go uninterrupted. A review of the Defendants' disciplinary histories further reveals the inadequacy of the City's investigatory and disciplinary practices.

From the 496 Area 5 Detectives investigated for complaints regarding incidents from 1989 to 1993, 10.7% of all accused officers (53/496 officers) were responsible for 41.4% of all allegations (837/2020 allegations), see Table 25. Officers who contributed to a high number of cases fall into the statistical outlier classification. Those officers with 4 or more CRs in the 1989-1993 Dataset fall into the category of statistical outlier, and they are in the third quartile plus 1.5 times the interquartile range.[164]

*Table 25. Officers in Chicago with 4 or more CRs opened between 1989-1993 fall above the third quartile plus 1.5 range; those are considered Outliers based on their abnormally high CR count.*

| | **Outlier** | **Not Outlier** | **Total** |
|---|---|---|---|
| Officer Count | 53 | 443 | 496 |
| % Officers | 10.7% | 89.3% | 100.0% |
| Allegation count | 837 | 1183 | 2020 |
| % Allegations | 41.4% | 58.6% | 100% |

Evidence of CPD's failure to supervise its officers properly and effectively can be found in CPD's failure to monitor and frequently audit the records they had at their disposal (complaint history, use of force history, training history, civil lawsuits, etc.) that could reasonably alert CPD to areas of misconduct that could lead to foreseeable risks of harm if left without intervention.

---

[160] Moore Dep. at 49-50; Bird Dep. at 144-145, 148-150.
[161] Moore Dep. at 51; Bird Dep. at 144-45; 148-50.
[162] Moore Dep. at 52.
[163] Moore Dep. at 55-56; Bird Dep. at 152.
[164] These outliers were statistically determined using the interquartile rule (anything above the third quartile plus 1.5 times the interquartile range) is considered as an outlier. The graphical representation of this method is known as Box Plot. For more technical information refer to Tukey, J. W. (1977). Exploratory Data Analysis. Reading: Addison-Wesley and Appendix A.

### E. The Structure of CPD's Review System Unduly Delayed Accountability

The City also had a complex and lengthy layer disciplinary review process. There were multiple layers of review before discipline is final and can be administered.

After a sustained finding was reached, the investigator's finding and recommended discipline would go through the Command Channel Review.[165] This consisted of two or three levels of review by rank supervisors for any sustained case other than those that involved a recommendation of separation. Separation cases bypassed the Command Channel Review and went straight to the superintendent.[166] The Command Channel reviewers could concur or not concur with the investigator's findings, or they could send the file back for additional investigation.[167] If the first two supervisors issued non-concurrences, the file would be reviewed by a third, higher ranking supervisor.[168] After the Command Channel Review was completed, the recommendation would be submitted to the Assistant Deputy Superintendent for presentation to the Superintendent.[169] During this time fame, the Superintendent had to approve all discipline, including reprimands.[170] If the case was sustained, an officer could appeal that finding. For recommendations of 6 to 30 days suspension, the officer could appeal to the Complaint Review Panel.[171] The Complaint Review Panel could only reduce findings and discipline. The Panel's findings would be reviewed by the Superintendent. An officer could also avail himself/herself of review by the Police Board.[172] The Police Board's determination was final and could only be appealed in court.[173]

Each of these layers of review created the opportunity for, and high probability of, interference in the effective administration of discipline and accountability. As shown in the next two tables, the evidence in the 1989 – 1993 Dataset supports the problematic nature of the complex, multilayered review process for any sustained finding.

---

[165] Bird Dep. at 70-71.
[166] Id.; Tina Skahill Deposition, Case No. 16-CV-1970, *Hood v. City of Chicago,* et al, July 2, 2019, at 82.
[167] Bird Dep. at 71-72.
[168] Bird Dep. at 72-73, 65; Skahill Dep. at 87.
[169] Bird Dep. at 69-70.
[170] Bird Dep. at 74-75; Skahill Dep. at 90-91.
[171] Bird Dep. at 81; Skahill Dep. at 135-137.
[172] Bird Dep. at 83-85; Skahill Dep. at 138-140.
[173] Bird Dep. at 86-87.

*Table 26. Proposed findings by Investigator, Command Channel, and CPD Superintendent, (1989-1993 Dataset).*

| | **Allegation Count, Proposed Findings by Investigator, Command Channel, and CPD Superintendent** | | |
|---|---|---|---|
| **Finding type** | **Investigator** | **Command Channel Review** | **CPD Superintendent (Final after Full Review)** |
| *Review not applicable* | ---- | *1935* | *1935* |
| Exonerated | 175 | 0 | 0 |
| Unfounded | 464 | 18 | 0 |
| Finding unknown, no documented finding | 28 | 27 | 43 |
| Not Sustained | 1268 | 1 | 10 |
| **Count of sustained allegations** | **85** | **39** | **32** |
| **Grand Total, Allegations Available for Review** | **2020** | **85** | **85** |

*Table 27. Proposed discipline by Investigator, Command Channel, and CPD Superintendent (Allegation Count), (1989-1993 Dataset).*

| **Discipline Proposed** | **Investigator** | **Command Channel Review** | **CPD Superintendent (Final after Full Review)** |
|---|---|---|---|
| Separation | 12 | 2 | 0 |
| Suspended 30 days | 2 | 2 | 2 |
| Suspended 15 days | 1 | 0 | 0 |
| Suspended 10 days | 0 | 1 | 1 |
| Suspended 5 days | 14 | 3 | 2 |
| Suspended 3 days | 6 | 3 | 0 |
| Suspended 2 days | 11 | 4 | 3 |
| Suspended one day | 8 | 5 | 5 |
| Suspension Length not specified | 0 | 0 | 2 |
| Reprimand (including written reprimand) | 8 | 6 | 4 |
| Violation noted | 5 | 4 | 3 |
| Documented sustained findings without documentation of proposed discipline | 18 | 8 | 10 |
| **Total Documented Sustained Findings after Investigation, Proposed by Command Channel Review, and After Full Internal Review[174]** | **85** | **38** | **32** |

Out of the 47 individual officers with sustained findings in the 1989-1993 Dataset provided by CPD, 20 (42.6%) of the officers contested or requested review of those findings through at least one procedure. Out of the 85 allegations with initial sustained findings in the 1989-1993 Dataset provided by CPD, 34 of the allegations (40%) were contested or subject to a request for review through at least one procedure.

[174] See row "Number of allegations with sustained findings" on Table 28.

*Table 28. Frequency of Requests for Review from Complaint Review Panel for Allegations by Outlier and Non-Outlier Officers (1989-1993 Dataset).*

| | Against Non-Outlier Officers | Against Outlier Officers | **Grand Total of Allegations** |
|---|---|---|---|
| Count of Total Allegations Made | 1183 | 837 | *2020* |
| Count of Allegations with Sustained Findings | **50** | **35** | ***85*** |
| Count of Allegations with a Request for Review | 19 | 15 | ***34*** |
| Percentage of Allegations with Sustained Findings with a Request for Review | 38% (19/50) | 42.9% (15/35) | 40% (34/85) |
| | Count of Non-Outlier Officers | Count of Outlier Officers | Grand Total of Officers |
| Number of Officers in 1989-1993 Dataset. | 443 | 53 | 496 |
| Number of Officers with Sustained Findings in the 1989-1993 Dataset | 31 | 16 | 47 |
| Number of Officers Who Requested Review of Sustained Findings in the 1989-1993 Dataset | 12 | 8 | 20 |
| Percentage of Officers who Requested Review of Allegations with Sustained Findings | 38.7% (12/31) | 50% (8/16) | 42.6% (20/47) |

*Table 29. Allegation count of officers in Chicago using resources to contest discipline (1989-1993 Dataset).*

<table>
<tr><th>Count of allegations with sustained findings after investigation</th><th>Requests for Complaint Review Panel, allegation count</th><th>Filed appeal of disciplinary decision to Police Board, allegation count</th><th>Grievance filed, allegation count</th><th>Allegations arbitrated</th></tr>
<tr><td>85</td><td>34</td><td>9</td><td>3</td><td>2</td></tr>
<tr><td rowspan="3">Outcomes</td><td colspan="2">Count of allegations with documented sustained findings after full internal review</td><td colspan="2">Arbitration Outcome[175]</td></tr>
<tr><td colspan="2" rowspan="2">32</td><td>Not Sustained</td><td>0</td></tr>
<tr><td>Sustained</td><td>2</td></tr>
</table>

CPD officers routinely used resources to dispute allegations against them. CPD's lengthy initial investigations and options to dispute findings caused delays in the application of appropriate discipline of its officers.

Defendant Guevara routinely took advantage of these broken systems while employed at CPD. The following salient examples show how Defendant Guevara utilized resources to substantially mitigate the discipline he received:

- CR No. 251502 is an internally generated complaint against Detective Reynaldo Guevara alleging that while off duty, he repeatedly demonstrated insubordination and disrespect toward a supervisory member of CPD by stating "fuck you" to Sergeant David Oravetz; engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant Oravetz in the chest; failed to comply with a direct order to leave the 014 District station by Sergeant Oravetz. This incident occurred on February 6, 1999, and was witnessed by several on-duty members of CPD. The CR was initiated by the District Watch Commander, Lt. Perry Nigro when he left his office to investigate a loud disturbance coming from the front desk area. Throughout the OPS investigation and directly to Area 5 Commander Gerard Mahnke, Guevara denied all allegations made against him, despite having numerous sworn members who were present when the incident occurred and provided statements to support the allegations. OPS recommended a 30-day suspension without pay on March 4, 1999. On April 12, 1999, Commander Mahnke recommended to CPD Assistant Deputy Superintendent of Internal Affairs Nathan Gibson, that the recommended discipline be reduced by 10 days, stating the following: *"I have reviewed the attached complaint register investigation regarding an off-duty incident involving Detective*

[175] The dataset contained two CRs arbitrated by Area 5 detectives, 185426 and 184785. The two allegations contested were "inattention to duty" and "other". CR# 184785 has one allegation arbitrated by an outlier-officer with 6 CRs in the 1989-1993 Dataset. Outliers have 4 or more CR's in the dataset.

*Reynaldo Guevara. I concur with the findings and recommendations of this investigation. However, considering the circumstances and his complementary and disciplinary history, I recommend that options be granted for ten (10) of the thirty days."* On April 27, 1999, Gibson recommended to CPD Superintendent Terry Hillard to follow the recommended 30-day suspension. Guevara filed a grievance to the Complaint Review Panel rejecting the recommended penalty, and the panel convened on August 31, 1999, to review the complaint. Guevara stated he had tried to apologize to the complainant and a 30-day suspension would be a hardship on his family. After hearing statements from Guevara, the Assistant Advocate, and reviewing all documents related to the investigation, the panel returned with the unanimous decision to concur with the sustained findings and the recommended 30-day suspension. The allegations were deemed to be sustained. Guevara received a 30-day suspension on November 15, 1999. The suspension was served from January 1 – 31, 2000. *On October 16, 2000, despite the seriousness of the actions of Guevara, and having gone through multiple channels of review, analysis, and consideration, the Bureau of Staff Services – Management and Labor Affairs Section reduced the discipline to 20-days and compensated Guevara with 10 days back pay for the actual suspension he had already served. And no Rule 14 violation was added or sustained, despite Guevara making false statements and standing by them.*

- CR No. 223928 is a complaint where allegations of a Rule 6 violation were sustained against Sergeant Louis Vasquez, Officer Robert Stubitsch, and Officer Jenny Molda and allegations of a Rule 9 violation[176] were sustained against Detective Reynaldo Guevara.[177] Det. Guevara was accused of physically striking his stepdaughter about the face. The recommended discipline for Sgt. Vasquez and Ofcs. Stubitsch and Molda was reprimand. The OPS investigator recommended a three-day suspension for Det. Guevara. The original incident occurred January 10, 1996. The investigation was initiated January 11, 1996, and was completed on February 6, 1996. Command Channel Review and the Assistant Deputy Superintendent, Internal Affairs Division concurred with the sustained finding and recommended discipline. Sgt. Vasquez and Ofcs. Stubitsch and Molda rejected the recommendation and requested a hearing before the CRP. On September 25, 1997, they appeared before the CRP and contested both the finding and recommended penalty. The CRP unanimously concurred with the sustained finding and penalty recommendation. Although Det. Guevara denied all allegations against him in his to/from memorandums to the investigator, there was sufficient evidence to sustain the allegation of striking the stepdaughter about the face. Yet, no Rule 14 violation was added, or sustained, despite finding Guevara had provided false information. This reviewer did not locate any documentation in the CR file to indicate justification for reducing the recommended three-day suspension to a suspension of one day. Det. Guevara served his one-day suspension on July 23, 1998.

---

[176] Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.
[177] The investigation against Det. Guevara was reopened May 13, 1996 at the request of the Commander, Area 5 Detective Division when new information became available for consideration.

The reality of the City's deeply flawed review process is that as soon as the investigator reached a sustained finding, there were many opportunities for that finding to be altered, and even if not altered, the recommended discipline could be reduced.

The aforementioned data and cumulative evidence are indicative of a broken and ineffective disciplinary process that invites officers to conceal misconduct and fosters a culture of silence and complacency that allows wrongdoers to act without fear of punishment and with impunity.

Finally, CPD's deeply flawed review process is also unnecessarily lengthy. The 1989-1993 Dataset was analyzed according to the following categories:

- ➢ Intake: the complaint is filed, data is collected, and the case is classified and assigned.
- ➢ Investigation: the investigation is planned and conducted.
- ➢ Deliberation of Finding: the type of finding is specified, and discipline (if any) is recommended.
- ➢ If Sustained Finding- Full Internal Review: another investigation is conducted, the command channel is reviewed, the Assistant Deputy Superintendent reviews the case, the Chief Administrator of Operations reviews the case, a Complaints Review panel is held, Officer can request review, and finally the Superintendent of Police reviews the case.
- ➢ After Full Internal Review: The finding is either changed or made final, the discipline could change, a grievance can be filed, which then leads to the arbitration process.
- ➢ External Review: the Chicago Police Board reviews the case and could make changes to the final finding as well as recommended discipline.
- ➢ Conclusion after Full External Review: the final complaint category is determined, discipline is recommended, however, at this point, the Superintendent of Police still could overrule discipline. This could then lead to a referral to CCSAO.

While the disciplinary process can include these multiple stages, not all of them are followed in each case. The 1989 - 1993 Dataset's *median length* from incident date to complaint filed is 8 days from incident and the *median days* any given complaint takes from incident date to case review completion is 46 days.

For cases where findings were sustained, the *median length* from the time of the incident date and the disciplinary steps are as follows:[178]

- 46 days from CR initiated to case review completed
- 446 days from CR initiated to discipline being imposed by the Superintendent of police if no review nor arbitration was requested
- 396 days from CR initiated to Complaint Review Panel Decision
- 511 days from CR initiated to final findings and discipline after full external review

The following table outlines the *median days* to advance throughout the disciplinary process.

---

[178] Median: The median is the data value that exactly divides the sample in half, with half of the observations smaller than the median and half of them larger. Source: Douglas C. Montgomery. Introduction to Statistical Quality Control, 8th Edition (p. 67). Wiley.

*Table 30. Disciplinary stages length in days (1989-1993 Dataset).*

| Number of Days | Max | Min | Mean | Median | Total Count of Allegations with Available Information |
|---|---|---|---|---|---|
| (1) Days from date of complaint until date of initiation of case review | 4152 | 1 | 117.4 | 8 | 1831 |
| (2) Days from date of CR initiation until date of case review completion | 817 | 1 | 75.2 | 46 | 1937 |
| (3) Days from date of CR initiation until date of Complaint Review Panel decision | 939 | 175 | 550 | 396 | 34 |
| (4) Days from date of CR initiation until imposition of discipline by Superintendent of Police | 715 | 183 | 449.1 | 446 | 21 |
| (5) Days from date of CR initiation until date of final finding (after full external review) | 511 | 449 | 490.3 | 511 | 3 |
| (6) Days from date of CR initiation until date of decision from outside arbitration | 1008 | 966 | 987 | 987 | 2 |

The dataset showed that the *median length* in days for the final discipline to be imposed by the Superintendent of Police is substantially longer when officers contest the original disciplinary determination (Table 30).

Based on the above, the Complaint Review Panel process adds approximately 350 days to the disciplinary process (396 - 46 = 350: Row 3, Complaint Review Panel decision minus Row 2, case review completion).

In cases where the Superintendent ultimately administers discipline, the internal review process adds approximately 400 days before discipline is administered (446 - 46 = 400: Row 4, Superintendent imposition of discipline minus Row 2, case review completion).

And full external review or arbitration makes the process even lengthier – adding approximately an additional 65 days for external review and an additional 541 days for arbitration on top of the already lengthy internal review process. (511 - 446 = 65: Row 5, full external review minus Row 4, Superintendent imposition of discipline; 987 - 446 = 541: Row 6, arbitration minus Row 4, Superintendent imposition of discipline). It should be noted that only 2 allegations in the dataset were arbitrated (Table 29 and Table 30).[179]

Lengthy delays within the disciplinary process allowed for officers to have multiple CRs open at a given time. The City of Chicago had established practices of not identifying police officers who

[179] The dataset contained two CRs arbitrated by Area 5 detectives: 185426 and 184785. The two allegations contested were "inattention to duty" and "other".

were repeatedly accused of the same kinds of serious misconduct and failing to investigate cases in which the police are implicated in a wrongful charge or conviction.

Despite awareness of systemic issues between the 1970s and 1990s, the City of Chicago and CPD failed to implement proper reform to keep officers from engaging in improper and illegal actions.

### F. CPD's Accountability System Routinely Failed to Detect or Discipline Fabrication of Eyewitness Identifications and Misconduct during Eyewitness Identification Procedures

Since before the 1993 Roman murder investigation, it has been common knowledge in law enforcement that a large percentage of erroneous convictions are the result of incorrect or improper eyewitness identifications and manipulation of witnesses. As discussed above, the City of Chicago and CPD received clear notice of a disturbing pattern in the 1980s and 1990s of fabrication of eyewitness identifications and eyewitness misidentifications leading to wrongful convictions. Nonetheless, the City did not put into place a system of accountability to root out and correct such misconduct, and its existing disciplinary system failed entirely to detect and discipline such misconduct.

While there are several reasons why witnesses may mistakenly select an innocent person from a show-up, line-up, or photographic array, suggestion during the selection process is a frequent cause. In February of 1992, the International Association of Chiefs of Police (IACP) developed a Model Policy pertaining to Show-ups, Photographic Identifications, and Line-ups. This policy was supplemented with a Concepts and Issues Paper authored by the IACP National Law Enforcement Policy Center in 1993 and has since been updated several times over the years. The IACP Law Enforcement Policy Center Model Policy pertaining to Eyewitness Identification is the latest revision to the original model policy.[180] This publication, and others by IACP, set out several guiding principles aimed at reforming the way law enforcement officers utilize line-ups, show-ups, and photographic arrays when seeking to identify suspects in criminal investigations. These principles have been the foundation of law enforcement training on eyewitness identification for many years and have been expanded upon to include both blind-administration and sequential presentation of photo arrays. The IACP Model Policy and corresponding Concept Paper placed law enforcement agencies on notice that failure to adhere to the procedures and precautions outlined in the document could result in misidentifications and unjust accusations or even convictions of innocent persons, while the actual culprit remained free.[181]

The CPD data analyzed by Ms. Meza shows that between 1989 and 1993, out of 1,997 allegation counts, there were *zero allegations* categorized as addressing misconduct in line-ups or photo arrays. Not a single external or internal complaint relating to either a line-up or a photo array was reflected in the dataset, even though fellow police officers and supervisors are in the best position to witness or learn of coercive and manipulative line-up and photo array misconduct by their colleagues and to report improper tactics and fabrications. The nonexistence of *any* complaints,

[180] IACP Model Policy on Eyewitness Identification (eff. Feb. 1992); IACP Law Enforcement Policy Center, *Eyewitness Identification* Concepts and Issue Paper (May 1993).
[181] IACP Law Enforcement Policy Center, *Eyewitness Identification* Concepts and Issue Paper (May 1993), pg. 2.

particularly internal, regarding line-up misconduct reflects a failure of accountability when considered alongside the evidence from other sources such as exonerations, lawsuits, and judicial decisions reflecting misconduct. When coupled with the problematically low sustain rate for documented complaints, the data indicates that the City's disciplinary system did not provide any meaningful deterrent against misconduct by police officers who sought to fabricate and manipulate show-ups, live lineup or photo array identifications, signaling to officers that they could engage in such misconduct with impunity and emboldening future abuses. Likewise, Table 16 shows that out of 31 coerced confession allegations made by civilians between 1989-1993, not a single one resulted in a sustained finding, despite the long and well documented history of coerced confessions by CPD, as discussed above.

As was generally known and accepted in law enforcement long before 1993, a police accountability system that does not root out and address misconduct and suggestive techniques during line-up and photo array identification procedures, and instead simply relies on the investigating officers to police themselves without any supervision or correction through the disciplinary system, leads to foreseeable abuses and fabrications of eyewitness identifications, as well as a foreseeable risk of harm to Chicago citizens from wrongful convictions.

### G. Failure to Address Rule 14 Allegations, the Chicago Police Department and the City of Chicago Condoned a Code of Silence

CPD operates with rules of conduct. Within these rules of conduct, prohibited acts include making a false report, written, or oral.[182] This standard applies whether an officer is testifying, preparing official records and documentation, and throughout the participation in an IAD Investigation. Failure to abide by or address Rule 14 allegations can lead to the deterioration of the public's trust and confidence in an individual officer as well as the department's ability to perform its official duties and responsibilities. Legal precedent has established that the effects of false reporting can impact an officer's ability to testify in the court of law.[183]

Defining the "*code of silence*" and providing historical context in American policing may be useful in determining its existence within a given set of facts, such as those before the court in this matter. In 1936, police administration expert August Vollmer wrote that *"It's unwritten law in police departments that police officers must never testify against their brother officer."*[184]

A *"code of silence"* refers to affirmative acts or omissions by an agency or its membership which insulate and protect its employees from accountability and criticism. The Code of Silence typically presents itself in various ways:

- ➢ Officers are comfortable engaging in misconduct, despite the presence of other officers, without the fear of reprisal or complaint.
- ➢ Repeated acts of misconduct go unreported or without any remedial action whatsoever.

---

[182] From the Rules and Regulations of the Chicago Police Department Adopted and Published by the Police Board.

[183] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419 (1995); and *State v. Laurie*, 139 N.H. 325, 653 A.2d 549 (1995).

[184] August Vollmer served on President Herbert Hoover's Wickersham Commission.

- ➢ The lack of any complaints initiated or otherwise investigated by supervisors.
- ➢ Acts of retaliation within the ranks when someone defies the code of silence.
- ➢ Officers behave contrary to reasonable practices when the act of misconduct transpires.
- ➢ When the situation should have alerted a reasonable officer and focused their attention on the wrong that was taking place, when asked, nobody saw or heard a thing.
- ➢ When the incident was so obvious that officers would have had to go to great lengths to not be aware that a wrong action was taking place.
- ➢ When officers respond with "I don't recall" and avoid, rather than deny, when asked about misconduct.[185]

In 1991, the Christopher Commission, which arose from the controversial incident involving Rodney King's interaction with members of the Los Angeles Police Department, stated that the "*code of silence*" was "…perhaps the greatest single barrier to the effective investigation and adjudication of complaints." The Christopher Commission also found that less than 2% of excessive force complaints were sustained; the process was skewed by the code of silence.[186]

It is notable that in the rare instances when allegations against Defendant Guevara, for example, were sustained, in each of those cases Guevara provided statements or reports denying that he had committed the misconduct for which findings were sustained. In other words, the investigators concluded based on their investigations that Guevara had lied to them. Yet Guevara received only modest discipline for one sustained Rule 14 violation against him (CR # 152902); in other disciplinary investigations where he demonstrably lied, CPD did not pursue Rule 14 violations against him at all (e.g., CR #s 223928, 251502). These disciplinary findings impugned Guevara's credibility and should have raised questions about whether he should be permitted to testify in Court. Sustained findings, and in particular findings that a police officer has lied or provided false information in police reports or to investigators (as should be documented in a Rule 14 violation), can be important Brady material that must be disclosed to prosecutors and criminal defendants. The failure to sustain Rule 14 violations against Guevara in those cases where he had been found to lie not only resulted in less discipline but may also have resulted in exculpatory or impeaching Brady material not being disclosed to the criminal justice system.

**Opinion 2: The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses.**

Ineffective mechanisms for detecting police misconduct and weak systems of accountability provided the perfect ecosystem for Guevara, Halvorsen, and others so inclined to engage in misconduct unchecked.

The Independent Commission on the Los Angeles Police Department (1991) found 44 officers with extremely high rates of citizen complaints who could have been identified from department records. Journalists have noted departments in which 2 percent of the officers accounted for as

---

[185] Internal Affairs Conference Manual, PATC, 2017.

[186] Independent Commission on the Los Angeles Police Department (Los Angeles, Calif.), & Christopher, W. (1991). *Report of the Independent Commission on the Los Angeles Police Department*. Los Angeles: The Commission.

much as 50 percent of the complaints.[187] Across the country, police disciplinary processes routinely fail to adequately deal with the small group of officers who represent a disproportionate share of complaints received and the number of use-of-force situations. It has become common knowledge that a few officers within a department often account for an inordinate number of complaints.[188]

There are dozens of known cases in which Defendants engaged in serious investigative misconduct, including many cases in which they were accused of using excessive force, threatening, manipulating, and coercing suspects and witnesses as well as fabricating statements and evidence. The Defendants engaged in such misconduct as they had no reason to fear that the City of Chicago or CPD would ever discipline them for doing so.

### A. Defendants Received Many CRs

The Defendants in Mr. Iglesias's lawsuit received many CRs during their careers – 64 known, in total.

Table 31 Known Complaint Register (CR) by Each Defendant.[189]

| **Defendant Name** | **Known CRs During Career** |
|---|---|
| Reynaldo Guevara | 30 |
| Ernest Halvorsen | 9 |
| Steve Gawrys | 3 |
| Anthony Riccio | 16 |
| Robert Biebel | 6 |
| Total | **64** |

With regard to the 1989-1993 Dataset of CRs for Area 5 detectives, as explained earlier, 10.7% of all accused officers (53/496 officers) were responsible for 41.8% of all allegations (837/2020 allegations) in the 1989-1993 Dataset (Table 25). Those officers with 4 or more CRs initiated

[187] Walker, Alpert, and Kennedy, 2000.
[188] New Perspectives in Policing, Harvard Kennedy School, 2011.
[189] These CRs were identified based on the CR Histories and CRs produced by the City for the Defendant Officers. Wherever counted CRs raise allegations against multiple Defendants, they are counted against each involved Defendant. The career CR counts of Guevara and Halvorsen were confirmed in the *Bouto* report and shared with defense counsel via email communications and spreadsheets exchanged on July 20, 2022 and September 30, 2022. The known CR counts for Gawrys, Riccio, and Biebel are based on CR documents I received from Plaintiff's counsel in connection with this report.

between 1989 and 1993 fall into the category of statistical outlier, and they are in the third quartile plus 1.5 times the interquartile range.[190]

The 1989-1993 dataset is limited to CR files against **Area 5 detectives**, and thus does not include CRs against defendants who were not detectives in Area 5 during that time period. As shown in the table below, based on the 1989-1993 dataset, Defendant Detective Guevara and Anthony Riccio were outliers.

*Table 32. Defendants' CR Histories*

| Accused Officer Name | Known CRs during Career | CRs Initiated Between 1989 - 1993[191] | Statistical Outlier Based on 1989-1993 Dataset? |
|---|---|---|---|
| Reynaldo Guevara | 30 | 4 | Yes |
| Ernest Halvorsen | 9 | None in dataset | N/A |
| Steve Gawrys | 3 | 2 | No |
| Anthony Riccio | 16 | 6 | Yes |
| Robert Biebel | 6 | 1 | No |
| Grand Total | **64** | **13** | **2** |

### B. Defendants Had Multiple Open Cases

As explained above, because of CPD's lengthy delays within the disciplinary process, these Defendants were allowed to have multiple CRs open at a given time. Considering the known allegations against the Defendant officers during their careers, Defendant Guevara had 5 CRs (16 allegations) that were opened in parallel with at least one other CR, while Defendant Halvorsen had 2 CRs (15 allegations) and Defendant Riccio had 2 CRs (4 allegations) open at the same time as another CR.

On account of the CPD's broken accountability system, these officers who were repeatedly accused of the same kinds of serious misconduct went undetected and were able to continue engaging in misconduct.

### C. Defendants Were Accused of Fabricating Evidence and Abuse of Citizens

What is particularly troubling and evident here is repeated allegations that Defendants Guevara, Halvorsen, Gawrys, Riccio, and Biebel engaged in numerous acts of egregious misconduct that (1) mirror those alleged by Plaintiff and/or (2) should have alerted CPD that these Defendants were at risk of causing wrongful convictions. Many of these allegations of misconduct occurred prior to Plaintiff's criminal trials and went undisciplined. Further, the misconduct appears to have

[190] These outliers were statistically determined using the interquartile rule (anything above the third quartile plus 1.5 times the interquartile range). See Appendix A for more details.
[191] From 1989-1993 Area 5 Dataset only.

continued even after Plaintiff's trial as well. In addition, these Defendants repeatedly engaged in abusive conduct, in uniform and off duty, without intervention from CPD.

**DEFENDANT GUEVARA CRs**

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 124631 | 5/8/1982 | Excessive Force; Verbal Abuse—Complainant submitted allegations on behalf of herself and her brother, Bernard Turner. Complainant alleged that Officers Guevara, McCarthy, Martinez, and Velez came up to her after she lit a cigarette on a bus and attempted to arrest her. Annie attempted to get off the bus by herself, but officers allegedly grabbed her, pushed her, struck her multiple times while pushing her off the bus and putting her in a squad car, and struck Bernard multiple times when he attempted to intervene. Throughout, officers allegedly cursed at Annie and Bernard repeatedly, including calling both racial slurs. | Guevara | Not Sustained | N/A |
| 143475 | 1/25/1985 | Warrantless Search – Complainant alleges that the accused officers came to his front door and ordered him to open it. Complainant refused, and the officers allegedly broke a pane of glass on the door, kicked doors open, and searched the premises for one hour. Accused officers allegedly did not show search or arrest warrants at any point despite requests from inhabitants of house. | Guevara | Not Sustained | N/A |
| 150473 | 4/16/1986 | Excessive Force; Verbal Abuse – Complainant alleges that the accused officer struck him, pushed him, and choked him after pulling him over. Complainant additionally alleges that Guevara verbally abused and threatened him, including calling him racial slurs. | Guevara | Allegation 1: Sustained; Allegation 2: Sustained; Allegation 3: Sustained; Allegation 4: Sustained | Sustained findings later apparently changed to not sustained. |

| **CR Number** | **Date of Incident** | **Allegations** | **Defendants Involved** | **Allegations against Defendants Sustained?** | **Discipline** |
|---|---|---|---|---|---|
| 152612 | 8/27/1986 | Excessive Force – Complainant submitted allegations on behalf of brother, Bill Buzzo. Victim alleged that accused officers struck him about the body, and that one accused officer put a gun to Buzzo's dog's head and threatened to shoot him. | Guevara | Not Sustained | N/A |
| 152902 | 9/18/1986 | Excessive Force; Failure to Notify; Release of Prisoner – Complainant alleged that Officer Guevara struck him and threw him multiple times. Captain Bazarek alleged that on the same date and time Officer Guevara failed to provide notice that he (Guevara) had been a victim of battery at Garcia's hands, and that Guevara released a prisoner without proper authorization. | Guevara | Excessive Force allegation not sustained; Failure to notify and release of prisoner sustained | 2-day suspensio n |
| 168160 | 5/10/1989 | Warrantless Search – Complainant lodged complaint on behalf of victim Petra Rodriguez. Complainant alleged that the accused searched the victim's basement apartment without a search warrant and the accused that failed to properly identify themselves as Chicago Police Officers. | Guevara | Not Sustained | N/A |
| 304802 | 9/11/1989 | False Arrest – Complainant was attorney for victim Juan Johnson. Complainant alleged via civil suit that Guevara illegally arrested Johnson for murder. | Guevara | Not Sustained | N/A |
| 182519 | 2/21/1991 | Verbal Abuse – Complainant alleged that Guevara yelled "shut up you do not know what the fuck you are talking about" when searching her property. | Guevara | Not Sustained | N/A |
| 195857 | 9/30/1992 | Other - Complainant alleged that Guevara forced victims to stand next to Latin Kings "Wall of Honor" and flash gang signs while he took their picture without explanation. CR stated that the accused was exonerated | Guevara | Exonerated | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| | | because while Guevara did take these photos, he did for official police purposes. | | | |
| 1086233 | 2/5/1993 | Fabricating Evidence – Complainant alleged that Guevara fabricated evidence and manipulated witnesses to prosecute him | Guevara Halvorsen | Administratively Closed | N/A |
| 205257 | 4/19/1994 | Excessive Force – Complainant Javier Mejia alleged that Guevara rear-ended his car while drunk, and then verbally abused him, verbally threatened him, and threatened him with a gun. Complainant Adolfo Mejia alleged that Guevara kicked him, told him to "shut up" when he complained of being handcuffed too tightly, and took items from the car. | Guevara | Not Sustained | N/A |
| 1038461 | 9/20/1994 | False Arrest – The reporting party alleges that the accused detective falsely arrested her son and charged him with murder. Investigation did not proceed because allegation was more than five years old. | Guevara | Administratively Closed | N/A |
| 217624 | 5/8/1995 | Excessive Force – Complainant alleged that the accused physically abused her son, Jossie Martinez, for information regarding a homicide. | Guevara | Not Sustained | N/A |
| 263553 | 7/29/1995 | Fabricating Evidence – Complainant submitted CR on behalf of victim Edwin Davila. Complainant alleged that Guevara told the victim he planned to tell witnesses to identify him in a line-up, and that Guevara tainted the line-up by making him the only line-up participant to show a tattoo on his back. | Guevara | Unfounded | N/A |
| 220046 | 8/10/1995 | Other – Complainant alleged that multiple CPD officers had suspended drivers' licenses, and the accused allegedly had not remedied their suspensions. | Guevara | Unknown | |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 1067861 | 12/13/1995 | Excessive Force – Complainant alleged that Guevara coerced a confession by physically abusing and threatening him and complainant's girlfriend. | Guevara | Administratively Closed | N/A |
| 223928 | 1/10/1996 | Excessive Force – Complainant alleged that Guevara struck victim on the right side of her face. | Guevara | Sustained | 1- or 3-day suspension |
| 236739 | 9/14/1996 | Other – Complainant alleged that the accused failed to treat complainant's injuries from being held in Abilene, TX while in TX to extradite him to Chicago. | Guevara | Not Sustained | N/A |
| 266681 | 6/28/1997 | Suggestive Lineup; Fabricated Evidence – The complainant alleged that Guevara forced several witnesses to falsely identify him as a murderer, leading to his being charged with a crime he did not commit. | Guevara | Not Sustained | N/A |
| 255701 | 7/8/1997 | False Arrest; Fabricated Evidence – Complainant alleged via civil lawsuit that the accused falsely arrested and incarcerated his client, Concepcion Santiago. | Guevara | Unfounded | N/A |
| 1089024 | 4/3/1998 | Excessive Force – Complainant alleged in civil suit that the accused officers used physical abuse to coerce his murder confession, and that the accused officers fabricated evidence to implicate complainant for murder. | Guevara Halvorsen | Open | N/A |
| 248946 | 10/4/1998 | Excessive Force – Complainant is Guevara's wife. She alleged that Guevara physically abused her during a fight. | Guevara | Not Sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 251502 | 2/6/1999 | Verbal Abuse – Complainant alleged that Guevara was insubordinate and disrespectful toward him, attempted to start a physical and verbal altercation with him, and violated his direct verbal order. | Guevara | Sustained | 30-day suspension, served, and then later reduced to 20-day suspension, resulting in 10 days of back pay. |
| 1079442 | 3/2/1999 | Excessive Force – Complainant alleges that the accused detective framed him for a crime he did not commit, leading to his wrongful conviction. He further alleges misconduct, corruption, coercion, witness tampering, and physical abuse. | Guevara | Administratively Close | N/A |
| 256148 | 8/24/1999 | Excessive Force – Complainant alleged Halvorsen grabbed head and twisted it while trying to force him to participate in a lineup and failed to provide him safety and security resulting in injury in custody | Guevara Halvorsen | exonerated | N/A |
| 283321 | 8/13/2002 | False Arrest; Verbal Abuse; Other – Complainant alleged that Guevara failed to identify himself as a CPD officer, placed him in a holding cell, and threatened him. | Guevara | Allegation 1: Exonerated; Allegation 2: Unfounded; Allegation 3: Not sustained | N/A |
| 297534 | 4/30/2004 | Other – Complainant alleged that the accused had a different date of birth listed on his IL driver's license as compared to his alpha file. The accused would have been over the mandatory CPD retirement age if the alleged age listed on his driver's license was verified. | Guevara | Unfounded | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 1089631 | unknown | Excessive Force – accused officer used coercive and manipulative tactics to obtain false statements to implicate the victim | Guevara Halvorsen | Unknown | N/A |
| 125360 | Unknown | Warrantless Search – Complainant alleges that the accused officers entered her home, failed to identify themselves, and searched her home without a warrant. | Guevara | Unknown | |
| 145129 | Unknown | False Arrest – Complainant Leshurn Hunt alleged false arrest | Guevara | Unknown | |
| 270916 | Unknown | Perjury - Investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Guevara and Halvorsen gave false testimony in 17 homicide cases. | Guevara Halvorsen | Not sustained | N/A |
| 1089749 | unknown | Excessive Force – Complainant alleges in civil suit that the accused officer subjected Gomez to physical and psychological abuse, and fabricated reports and evidence to obtain a false confession. | Guevara Halvorsen | Open | N/A |

**DEFENDANT HALVORSEN CRs**

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 157627 | 8/22/1987 | Excessive Force – Complainant alleged that accused officers slammed the victim up against a car. | Halvorsen | Not sustained | N/A |
| 177115 | 7/6/1990 | Excessive Force - Complainant alleges that the accused officer has threatened the victim that he will kill her with his gun on more than one occasion in the past | Halvorsen | Unfounded | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 1086233 | 2/5/1993 | Fabricating Evidence – Complainant alleged that Guevara fabricated evidence and manipulated witnesses to prosecute him | Guevara Halvorsen | Administratively Close | N/A |
| 240708 | 9/8/1996 | Warrantless Search, False Arrest - Complainant alleged that the accused officer entered and searched the second-floor apartment of Mr. Pong without a search or arrest warrant and unlawfully detained him without probable cause and at gun point. | Halvorsen | Not sustained | N/A |
| 255984 | 3/23/1997 | False Arrest; Fabricated Statement or Fabricated Evidence; Suggestive Lineup - Complainant alleges that Detective Halvorsen violated Mr. Angel Rodriguez's rights by (1) arresting him on a traffic warrant that was not in effect; (2) directed Rodriguez to participate in a line-up and failed to inform him of his rights nor that he was a suspect in a homicide investigation; and (3) prior to a formal lineup, showed a single photo of Rodriguez to a witness so that he could make a positive identification during the formal line-up. | Halvorsen | Allegation 1: Unfounded; Allegation 2: Not sustained; Allegation 3: Not sustained | N/A |
| 289081 | 3/1/1999 | Suggestive Lineup; Fabricated Evidence – Complainant alleged he was only identified as offender by witness who was shown photo spreads by Halvorsen which always contained complainant's photo; complainant also alleged witness was pressured by Halvorsen and Woodall into making the identification by threatening to charge witness with the murder and pressuring him to pick someone out as the offender when shown the photos. | Halvorsen | Not Sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 256148 | 8/24/1999 | Excessive Force – Complainant alleged Halvorsen grabbed head and twisted it while trying to force him to participate in a lineup and failed to provide him safety and security resulting in injury in custody | Guevara Halvorsen | exonerated | N/A |
| 1089631 | unknown | Excessive Force – accused officer used coercive and manipulative tactics to obtain false statements to implicate the victim | Guevara Halvorsen | Unknown | N/A |
| 270916 | Unknown | Perjury - Investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Guevara and Halvorsen gave false testimony in 17 homicide cases. | Guevara Halvorsen | Not sustained | N/A |

**DEFENDANT GAWRYS CRs**

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 152612 | 8/27/1986 | Complainant alleges that Guzman and Gawrys struck him about the body. Complainant further alleges that one of the accused officers placed a gun to his dog's head and threatened to shoot the dog | Gawrys | Not sustained | N/A |
| 168160 | 5/10/1989 | (1) The accused searched the victim's basement apartment without a search warrant; and (2) the accused failed to properly identify themselves as Chicago Police Officers | Gawrys | (1) Exonerated re: improper search and seizure; and (2) Not sustained re: misidentification | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 158153 | 9/26/1987 | Complainant alleged that after four casually dressed officers stopped him as he was walking to his car, the complainant was punched in the stomach and choked. Gawrys is listed as one of the four casually dressed officers. | Gawrys | Not sustained | N/A |

**DEFENDANT RICCIO CRs**

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 159984 | 3/31/1988-4/21/1988 | Excessive force during arrest. Complainant alleged that accused officer slapped him on the face, pushed him against a squad car, and handcuffed him too tightly. | Riccio | Not sustained | N/A |
| 161102 | 9/30/1988-10/19/1988 | Excessive force during arrest. Complainant/victim the accused officers took no action against Michael Richardson as he attempted to run her over. The accused kicked and struck her son about the body, and another accused officer body slammed him to the ground. Complainant further alleges that another accused used abusive language towards an unknown male and threw him up against a car. | Riccio | No sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 162909 | 8/4/1988 | Excessive force during arrest. Complainant/victim alleges that as he was purchasing gas at the above location, the accused pulled him out of his car and struck him once with an object across the face. The complainant/victim further alleges that the accused struck him about the face and body approximately 10 times. | Riccio | 1. Sustained, 2. Sustained, 3. Not Sustained | 3 day suspension without options recommended |
| 166047 | 1/13/1989 | Excessive force. The complainant alleges that while he questioned by two male white uniformed officers, one of the officers struck him on the chest with a baton. | Riccio | Unfounded (Riccio) | N/A |
| 166319 | 1/28/1989 | Excessive force during arrest. Complainant alleged that the accused kicked and struck him about the body repeatedly. | Riccio | Unfounded | N/A |
| 166646 | 2/16/1989 | Excessive force during arrest. Complainant alleges that the accused officers 1. beat complainant/victim, 2. beat hernandez, 3. struck complainant/victim about the body with a flashlight, 4. struck victim with a part of their body, and 4. threw victim to the ground. | Riccio | 1. Unfounded, 2. Not sustained, 3. Unfounded, 4. Not sustained, 5. Exonerated (Navarro and Sodini) 5. Unfounded (Riccio) | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 170344 | 7/22/1989 | Excessive force during arrest. Complainant alleges that unknown uniformed officers struck him about his legs with batons, struck him on his face with fists, dragged him from the stands into a tunnel, and that Giralamo took his wallet from him and Guthrie punched him about his body while he was handcuffed, and pushed him to the floor and kicked him in the back | Riccio | Not sustained (all allegations against Riccio) | N/A |
| 205543 | 8/3/1993 | Unlawful search - premise/vehicle. Complainant alleges that several male officers in casual dress entered her apartment, searched the premise without a warrant or permission. | Riccio | Unfounded | N/A |
| 243650 | 6/2/1997-6/5/1997 | 1. Complainant alleges that Riccio failed to take proper steps to ensure that a death notification was made to a family of a deceased homicide victim; 2. also alleges that Riccio passed on information about a deceased homicide victim to a Sun-Times reporter before notifying the family of the deceased. | Riccio | 1. Exonerated; 2. Not sustained | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 245163 | 4/7/1998 | Complainant alleges that Riccio and another detective 1. stopped his vehicle for no apparent reason, 2. held him for 57 hours without letting him make calls, 3. was never told that he was being charged, and 4. was never given his rights during this period. Unlawful search - premise/vehicle. | Riccio | Unfounded | N/A |
| 254469 | 6/20/1999 | Verbal abuse. Complainant alleges that Riccio verbally abused her by yelling vulgar language into her face and spraying saliva onto her face. | Riccio | Not sustained | N/A |
| 259977 | 2/12/2001 | Verbal abuse. Complainant alleges that Riccio told him "go back where you belong" and called him derogatory names. | Riccio | Not sustained | N/A |
| 300701 | 8/13/2004 | Complainant alleges that Riccio failed to obtain a CR number when informed of the improper conduct of a commander. | Riccio | Unfounded | N/A |

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 1022177 | 12/3/2008 | Complainant alleges that Riccio contacted his landlord asking to have him and his family evicted from their home; also alleges that Riccio told his (complainant's) landlord that he would have complainant evicted if he didn't leave. Allegation: conduct unbecoming. | Riccio | No affidavit | N/A |
| 1040158 | 4/3/2005 | Complainant alleges Riccio:<br>1) tackled complainant to the ground<br>2) punched complainant on the back of the head three times after handcuffing him<br>3) punched complainant once in the left eye after handcuffing him | Riccio | Allegation 1: Exonerated; Allegations 2-3: Unfounded | N/A |
| 1067745 | 3/1/2014 | Verbal abuse. Complainant alleges that Riccio directed profanities toward complainant when he attempted to park his vehicle. | Riccio | No conversation - Case to be filed | N/A |

**DEFENDANT BIEBEL CRs**

| CR Number | Date of Incident | Allegations | Defendants Involved | Allegations against Defendants Sustained? | Discipline |
|---|---|---|---|---|---|
| 153256 | 10/11/1986 | Excessive force. Biebel allegedly assisted another officer in striking the complainant, knocking him to the ground, and kicking him. | Biebel | Not sustained | N/A |
| 156137 | 5/20/1987 | Commission of crime. Biebel allegedly damaged the front and rear doors of an apartment and also damaged a built-in wooden cabinet located in the dining room of one of the apartments. | Biebel | Not sustained | N/A |
| 194728 | 2/15/1992 | Arrest/lockup procedure. Biebel allegedly falsely arrested complainant and completed false information in the report regarding the arrest. | Biebel | Not sustained | N/A |
| 1089749 | 6/16/1997 | Excessive force. Civil suit alleges that the accused officer subjected victim to physical and psychological abuse, and fabricated reports and evidence to obtain a false confession. Victim spent 20 years in prison and is now exonerated. | Biebel | Open investigati on | N/A |
| 1080924 | 4/3/1998 | Excessive force. Civil suit alleging that the accused officers used physical abuse to coerce the plaintiff's murder confession. Complainant also alleges the accused officers fabricated evidence to implicate the plaintiff for murder. | Biebel | Open investigati on | N/A |
| 1089631 | unknown | Excessive force. Accused officer allegedly used coercive and manipulative tactics to obtain false statements to implicate the victim. | Biebel | Open investigati on | N/A |

As set out above, the Defendants' complaint histories illustrate several of the deficiencies of City's investigatory and disciplinary system, including its failure to conduct rigorous investigations, credit testimony of victims and non-CPD witnesses, evaluate corroborating evidence in an unbiased manner, and recommend or implement meaningful discipline. As I have repeatedly pointed out, the obvious consequence of a broken accountability system is that officers who engage in misconduct do so without fear that they face any risk of discipline or intervention.

### D. Civil Lawsuits Provided Additional Notice to Policymakers

Civil lawsuits are often an indicator and provide fair warning that an officer, unit, or group of officers may be engaged in conduct that runs afoul the law, violates directives and general orders. These suits often tarnish the reputations of law-abiding officers and further deteriorate the reputation of the department and its standing with the community it serves.

Below are examples of civil lawsuits and the nature of those claims brought against just these Defendant officers accused of misconduct, some of which relate to the CR complaints discussed above. I have not conducted an independent assessment of these claims, nor do I have actual knowledge of the posture of the litigation. Nevertheless, it is my opinion that officers, including at the highest level in CPD, would take notice of such lawsuits:

| Caption | Complaint | Involved Members | Resolution |
|---|---|---|---|
| Hunt v. Jaglowski, et al., Case No. 85 C 1976 | 4th Amendment violations; false arrest; illegal interrogation | Guevara | Verdict for plaintiff against Weingart and Chicago and for Defendants on other claims |
| Pong v. Halvorsen, Mingey, et al., Case No. 97 C 06268 | 4th Amendment violations | Halvorsen | Settled |
| Vandergriff, et al v. Gawrys, et al. | Civil rights violations | Gawrys | Settled |
| Santiago v. Guevara, Case No. 99 C 4476 | Malicious prosecution; denial of constitutional rights | Guevara | Settled |
| Angel Rodriguez v. Halvorsen, et al., Case No. 03 C 3880 | Malicious prosecution; denial of constitutional rights | Halvorsen | Judgment in favor of defendants |
| Johnson v. Guevara, et al., Case No. 05 C 1042 | Wrongful conviction | Guevara | Verdict for plaintiff and against Guevara |
| Rivera v. Guevara, et al., Case No. 12 C 4428 | Wrongful conviction | Guevara | Verdict for plaintiff and against Guevara |
| Serrano v. Guevara, et al., Case No. 17 C 2869 | Wrongful conviction | Guevara Halvorsen | Settled |

| Caption | Complaint | Involved Members | Resolution |
|---|---|---|---|
| Montanez v. Guevara, et al., Case No. 17 C 4560 | Wrongful conviction | Guevara Halvorsen | Settled |
| Almodovar & Negron v. Guevara, et al., Case Nos. 18 C 02341 & 18 C 02701 | Wrongful conviction | Guevara Halvorsen | Ongoing |
| Maysonet v. Guevara, et al. Case No. 18 C 2342 | Wrongful conviction | Guevara | Ongoing |
| Sierra v. Guevara, et al., Case No. 18 C 03029 | Wrongful conviction | Guevara Halvorsen | Ongoing |
| Gomez v. Guevara, et al., Case No. 18 C 3335 | Wrongful conviction | Guevara | Ongoing |
| Ricardo Rodriguez v. City of Chicago, et al., Case No. 18 C 7951 | Wrongful conviction | Guevara Halvorsen | Ongoing |
| Bouto v. Guevara, et al., Case No. 19 C 02441 | Wrongful conviction | Guevara Halvorsen | Ongoing |
| Iglesias v. Guevara, et al., Case No. 19 C 6508 | Wrongful conviction | Guevara Halvorsen Gawrys Riccio Biebel | Ongoing |
| Johnson v. Guevara, et al., Case No. 20 C 4156 | Wrongful conviction | Guevara Halvorsen | Ongoing |

### E. Defendants Escaped Accountability

Defendants Guevara and Halvorsen received multiple CRs containing similarly themed allegations and patterns throughout their careers, and Guevara and Halvorsen were sued many times based on similarly themed allegations and patterns, yet none of their supervisors acted as if they noticed a pattern or showed concern for such behavior. This lack of supervisory oversight, as well as inadequate investigation, review, and discipline, in my opinion, is the reason Defendants were able to wreak havoc on the citizens of Chicago for so long. The lack of accountability continued after the Roman murder investigation.

### F. Additional Qualitative Analysis

This report reflects a multiple research methods approach, meaning that researchers use numbers, tables, graphs, hypothesis testing (quantitative analysis), and content analysis expressed in narrative form to make inferences about a data set. In addition to the empirical analysis conducted by Ms. Meza, the review of Defendant CRs, and the other CR reviews discussed in this report, Dr. Knight applied a qualitative lens to the data under review. In multiple-methods research, the data analyst may or may not use the same data set to derive their conclusions (Driessnack, et. al., 2007). In the case of this report, the analyst (Dr. Knight) used the same data set. Dr. Knight used a randomized case selection and review approach for the qualitative assessment, conducting a line-by-line reading of the material. Dr. Knight used both inductive and deductive analysis.

#### 1. Review Design

Dr. Knight reviewed a subset of police misconduct files to evaluate whether the quantitative findings of this multiple-methods report reflected the content and themes of the files themselves. The researcher is the primary instrument in phenomenological research design (Moustakas, 1994). The researcher collects and analyzes the data by identifying themes, developing textural and structural descriptions, and synthesizing them to create composite narratives that reveal the essence of the shared experience (Moustakas, 1994).

#### 2. Sampling Method

Dr. Knight used a randomized convenience sample and purposive design. Convenience typically refers to selecting a sample in physical proximity to the researcher. Randomized refers to selecting cases to review: Dr. Knight did not attempt to preselect cases. Dr. Knight took a random convenience sample, in the order in which he received and accessed them. Purposive refers to the reason Dr. Knight selected the data he reviewed: the CR investigations documented about police misconduct investigations within the City of Chicago between 1989 and 1993. As it concerns this study, proximity refers to the ease of accessibility. The City of Chicago provided the sample files chronicling the period of 1989-1993.

#### 3. Data Analysis

Dr. Knight used Moustakas' (2004) modification of Van Kaam's and the Stevick-Colaizzi-Keen methods of analyzing phenomenological data. There are eight stages to the Van Kaam method of data analysis (one is implicit) and four stages of data analysis in the Stevick-Colaizzi-Keen process (Moustakas, 2004, p. 120-22). In the Van Kaam method, Moustakas omits composite descriptions from the list of procedures but mentions it as a side note. He also skips the process of epoche from the modified Van Kaam method but includes it in the Stevick-Colaizzi-Keen adaptation. Omitted were the first two stages of the Van Kaam model wherein the researcher's experience of the phenomenon is analyzed using the same process as that used to examine the data collected from the research participants. For data analysis, Dr. Knight used Moustakas' modification of Van Kaam's method and integration into it the Stevick-Colaizzi-Keen process of identifying themes. He outlines the procedure below.

- Dr. Knight first completed a line-by-line review of 116 files, identifying emergent themes (inductive study).

- Dr. Knight then used the first review to determine themes and patterns of behavior and applied those themes to 15 cases reviewed in detail.

- Lastly, Dr. Knight reviewed the completed quantitative section of this report. Dr. Knight extracted themes from its findings and confirmed their presence in the qualitative review (deductive analysis). For identification of files reviewed, see Appendix A.

### 4. Emergent Themes

The primary themes to emerge from the data were:

(a) police abuse;

(b) police denial of allegations when accused;

(c) lack of credibility testing of police officer denials of allegations against them;

(d) crediting police officer accounts over those of citizens;

(e) perpetual amnesty for defendant officers, who were free to engage in egregious and abhorrent behavior without impactful consequences; and

(f) disregard of citizen complaints and denial of a sense of justice and of being heard.

The investigation revealed powerful disciplinary systems that allowed abuse to go unchecked and remained indifferent to citizens' pain and suffering. These themes were consistent with the other opinions and conclusions described in this report

## Conclusion

Defendants in this case benefited from a long legacy of abusive *de facto* policies in the Chicago Police Department. Disciplinary processes lacked urgency, intentionality, and were void of meaningful sanctions to correct or dismiss officers who committed wrongdoing. What's worse is that the policing structure was without mechanisms for detecting wrongdoing officers and the political will to hold them responsible for misconduct. Case after case after case demonstrated the willingness of police administrators, supervisors, and peer officers to regard officers who committed wrongdoing as paragons of truth, high value members of the police agency, essential to sustaining safety, and worthy of public leniency when under the *unjust* cloud of scrutiny, the cost of which was the invalidation and indignant treatment of the citizen, whose cries for justice went unheard and were awarded with beatings, stomping, burnings, mutilations, harsh sentencing, and dehumanization.

Slow justice breeds an impunity self-concept. Burge and other officers acted with abandonment with no fear of retribution. Burge was never disciplined for torture. He was not charged for that conduct. Instead, he was only sentenced in 2010 for lying about his conduct committed in the early 1980s. The incentive in this ecosystem of misconduct bends toward wrongdoing and invites villainy. Yet not every invitation needs to have an RSVP. Burge, like every law-abiding peace officer, possessed agency. With the same sense of abandonment and freedom to impose their will on citizens, Defendants could have courageously followed prescribed police practices, general orders, civil rights laws, and acted as a police-advocate for citizens. Instead, they chose to follow in the footsteps of Burge.

As a former law enforcement officer with over 31 years of experience working in a large metropolitan police department with experience in police supervision, homicide investigations, and with criminal and with experience leading organizations tasked with civilian oversight of law enforcement agencies, I bring the understanding that individual officers can and do operate as criminals for many years before being caught by the most intentional of supervisors and police commanders. The code of silence exists in layers and silos, meaning that criminal syndicates may thrive in isolation within closed and specialized police units and or within layers of the police rank structures. Street patrol officers of a particular district or beat may act as a closed unit and under the blanket of a complicit group of citizens who benefit from illicit relationships with sworn officers.

The City of Chicago is culpable: it failed to make meaningful investments in its ethical infrastructure. Each court ruling and every independent report written in response to Chicago officer and administration misdeeds is rife with recommendations for improving community engagement, monitoring, and responding to citizen abuse, eliminating racial mistreatment, and improving transparency, but progress toward those ends is slow and - in some cases - non-existent. Defendants exercised agency when they abused and mistreated citizens by manipulating and coercing witnesses and fabricating statements and evidence. The City of Chicago validated this abuse and mistreatment of citizens.

As described throughout this report, Defendants' misconduct—in particular that of Defendant Guevara—in this case is a direct result of the CPD's failure to meaningfully investigate, supervise, or discipline its officers for decades. CPD has a dark history of fabrication and suppression of

evidence, false and coerced statements and confessions, and a widespread practice of torture that was permitted to persist for decades, from the Burge era to this case, where Guevara and others continued to engage in the same misconduct. The fact that Defendant Guevara and others committed so many repeated serious transgressions during homicide investigations, resulting in the wrongful prosecution and conviction of innocent people and others accused of crimes, indicates that their supervising and fellow officers turned a blind eye to misconduct. This evidence is consistent with the existence of a code of silence within CPD discussed throughout my report. These repeated serious transgressions—confirmed during the Lassar investigation—demonstrate that the City of Chicago and the Chicago Police Department, including its IAD and other supervisory agencies, failed to adequately investigate, supervise, and/or discipline its officers.

The undersigned declare pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct based upon the information they have been provided to date. The undersigned reserve the right to modify their opinions should they receive new or additional information.

Anthony Finnell

Miroslava Meza

Dr. Timothy Knight

**Appendix A**

Analysis of Dataset provided by Plaintiff's legal team

**1. Support data and analysis for select tables**

1.1. General information about the 1989-1993 dataset

Dataset 1: Excel file with information related to Complaints Registered about Area 5 Detectives received and/or incident occurred between 1989 and 1993.

There are 325 Complaint Register files in the dataset, containing 891 individual investigations and 2020 allegation counts, produced by the City of Chicago in response to a court order to produce CR files from Area 5 with incident dates between 1989 and 1993. 2011 allegations out of the 2020 clearly document the origin of the complaint, internal or external, while 9 allegations do not have enough information in their casefile to determine their origin.

The main variables in this dataset are: (1) Complaint Register files, (2) individual investigations; and (3) allegations. The following table shows certain characteristics of the dataset.

*Table 33. General descriptive information about the dataset of police misconduct investigation. Area 5 Detectives, (1989-1993 Dataset).*

| | Complaint Register files (CRs) | Individual Investigations | Allegations |
|---|---|---|---|
| Count with at least one documented sustained allegation (before internal review) | 42 | 56 | 85 |
| Total in the dataset | 325 | 891 | 2020 |
| Percentage of Total | 12.92% (42/325) | 6.29% (56/891) | 4.21% (85/2020) |

1.2. Dataset size

CPD failed to document how it compiled its annual count of complaints received in its annual reports. Adding to the confusion, its methodology changed over time. For example, in 1989, the annual report included a total of 4,838 cases with "CR assigned" under what is marked in that report as table 28 - "Internal Affairs," but that list did not include complaints involving excessive force. In 1990, the report included a total of 7,824 complaints with "CR issued" and that list included complaints involving excessive force. From 1989–1992, there is no discussion of what it means for a CR to be assigned or issued. In 1993, a short explanation states that "A Complaint Register (CR) number is issued whenever a complaint is registered." However, it is still unclear whether each "complaint register investigation" with a "CR issued" in 1993 (marked in that report as table 27.a) reflects individual investigations (one into each officer) or CR's (one for each complaint).

If the CPD numbers reflect CRs instead of investigations or allegations, CPD's reporting methodology allows it to cover up misconduct. As discussed above, a citizen complaint can include multiple allegations of misconduct against multiple officers. If CPD has grouped multiple allegations against multiple officers into a single item on its annual report—and, potentially, reported that such a complaint is "sustained" when any single allegation is upheld within the complaint, whether or not that allegation was the most serious complaint or the focus of the citizen's complaint—then it is very difficult indeed to understand what is truly reflected in CPD's publicly reported disciplinary outcomes.

Still, even if every item listed in CPD's annual reports reflects a unique CR, the dataset is still sufficient to draw conclusions about CPD's practices and policies, for three reasons:

1. As discussed above, the City's internal affairs processes were centralized, and it is my understanding that its general processes and practices for resolving complaints was consistent across the various Areas and Districts in the City. (See page 9, footnote 14). The CR's analyzed in this case represent a complete set of such complaints against detectives at Area 5 over the time period at issue. A broad range of complaint types are represented, including both internal and external complaints. Making the reasonable assumption that the City did not process complaints differently on an Area-by-Area or District-by-District basis, it is fair to conclude that the complete set of Area 5 detective CR's, allegations, and investigations represented here are reasonably representative of the City's disciplinary system as a whole during the time period. That conclusion is supported by the fact that I have observed similar patterns of ineffectual discipline when examining sets of Chicago Police Department complaints from different time periods and different Areas in other analyses, as discussed above.

2. A police disciplinary system is appropriately assessed by how it handles complaints in the highest-stakes situations. Disciplinary allegations involving detectives are among the highest-stakes allegations that police departments are called on to resolve. Detectives are responsible for investigating the most serious crimes handled by police departments, including homicides. A department that fails to hold its detectives to high standards of conduct can expect to observe misconduct and constitutional violations, especially considering the high degree of pressure that detectives often face to close cases. The Chicago Police Department only has 5 detective Areas

across the Department, so it is reasonable to conclude that the Area 5 set analyzed here is a substantial subset of the complaints against detectives in all 5 areas. And CPD's handling of complaints against detectives is a fair barometer of its overall disciplinary integrity.

3. The dataset analyzed here is not a random sample; however, it represents a substantial number of complaints. To understand how the dataset compares to the population of all complaints, investigations, or allegations, it is helpful to use an analogy to random sampling. The theorem of the "Law of Large Numbers" shows that as the number of trials of a random process increases, the percentage difference between the expected and actual values goes to zero.[192] In a random sample context, we could use the traditional calculations for a Z-test and T-test sample size with a Student's t distribution, a significance level of ($\alpha$=0.05) and a power of (0.9), for small effects in mean differences using Cohens-d effect size (0.2).[193] Using that methodology, a set of 265 observations would be sufficient. Here, the available number of observations are 325, substantially higher than the calculated empirical sample.[194] This analogy indicates that the size of the Dataset—although the Dataset is not a sample—is larger than the empirical sample that would be reasonably required to draw reliable conclusions about the whole.

If the CPD annual reports reflect individual investigations in their CR counts (1989-1993) represent at least 2.3% (891/39,349) of all investigations reported by CPD in their annual reports for the years 1989 to 1993. See above at page 111 for more details regarding CPD's police misconduct investigations reporting between 1989 and 1993.

---

[192] Renze, John and Weisstein, Eric W. "Law of Large Numbers." From *MathWorld*--A Wolfram Web Resource. https://mathworld.wolfram.com/LawofLargeNumbers.html.

[193] When testing for small size effects, it means that the test will increase the sample size to detect even small effects. Kraft, Matthew, 2019. Interpreting Effect Sizes of Education Intervention. Brown University. EdWorking Paper No. 19-10.

[194] R code used for the calculation below:

```
library(MESS)
calculation=power_t_test(delta=0.2, sd=1, sig.level =0.05, power=0.9, ratio=1,
type="one.sample", alternative="two.sided", df.method="classical")
calculation
sample_size = ceiling(calculation$n)
sample_size
```

*Table 34. CPD complaints documented in their annual report (1989-1993).*

| Year of incident | CPD Annual report, Complaints Received[195] |
|---|---|
| 1989 | 7,229[196] |
| 1990 | 7,824[197] |
| 1991 | 7,958[198] |
| 1992 | 8,039[199] |
| 1993 | 8,299[200] |
| ***Total*** | **39,349** |

.

*Table 35. Dataset Size Compared to CPD Annually Reported Complaints*

| Year of incident | Dataset CPD Area 5, 1989-1993 | CPD Annual report, complaint received count | % Of total complaints registered by CPD included in the Dataset |
|---|---|---|---|
| Allegations | 2020 | **39,349** | 5.1% |
| Individual Investigations *(CR, employee)* | 891 | **39,349** | 2.3% |
| CRs | 325 | **39,349** | 0.8% |

1.3 Identification of Police Officer Outliers

Officers with 4 or more CRs opened between 1989 and 1993 are considered outliers (Table 37).

The goal is to assess if there is a subgroup of officers that are named at a higher frequency than most of their peers. Those will be referred as outliers and will be identified by their CR count in the 1989-1993 Dataset. In this analysis we will use the IQR criterion, all observations above 3rd

[195] Total CRs assigned per year by CPD Internal Affairs Bureau. Source, CPD Annual Reports from 1989 to 1993, section 28 Internal Affairs.
[196] https://home.chicagopolice.org/wp-content/uploads/2014/12/1989-Annual-Report.pdf
[197] https://home.chicagopolice.org/wp-content/uploads/2014/12/1990-Annual-Report.pdf
[198] https://home.chicagopolice.org/wp-content/uploads/2014/12/1991-Annual-Report.pdf
[199] https://home.chicagopolice.org/wp-content/uploads/2014/12/1992-Annual-Report.pdf
[200] https://home.chicagopolice.org/wp-content/uploads/2014/12/1993-1994-Report.pdf

quartile + (1.5 · IQR) or below 1st quartile – (1.5 · IQR) are considered as potential outliers. The following are the steps followed to identify those outliers.

**Step 1.** To assess the distribution of CR per officer, those are ordered from the maximum frequency of CRs initiated per officer in the dataset.

*Table 36. CR Counts Per Officer Ordered from Maximum to Minimum, Top 5 Rows and 2 Bottom Rows Displayed (1989-1993 Dataset).*

| | |
|---|---|
| Bernard Graf | 18 |
| John Pallohusky | 14 |
| Anthony Wojcik | 14 |
| John Riordan | 13 |
| Michael Cummings | 12 |
| … | … |
| William Voight | 1 |
| Willie Penn, Jr. | 1 |

***Step 2.*** The ordered list of 496 employees (above) can be divided into four equal size sets. Quartiles are the three points that divide the ordered distribution into four parts each containing one quarter of the scores. Q1 = first quartile, Q2 – second quartile, Q3 = third quartile, IQR = interquartile range and is calculated by subtracting Q3-Q1.[201]

*Table 37. Dataset Calculation of Quartile Locations for the Variable CR Count per Officer*

| Quartile | CR Count | Description |
|---|---|---|
| Q1 - First quartile. | 1 | 25% of officers in the 1989-1993 Dataset had 1 CR. |
| Q2 - Second quartile (Median) | 1 | 50% of officers in the 1989- 1993 Dataset had 1 CR |
| Q3- Third quartile | 2 | 75% of officers in the 1989-1993 Dataset had 2 or less CRs |
| IQR -Inter Quartile Range | 1 | Third quartile (2 CRs) – First quartile (1 CR) = 1 CR. |
| ***Q3 + (1.5 *IQR)*** | ***2+(1.5*1) = 3.5*** | Observations beyond these limits (3.5 CRs) are flagged as potential outliers (89.3% of officers had less than 4 CRs Non-outlier, 10.7% of all officers, had 4 or more CRs in the dataset) |
| Q1- (1.5*IQR) | 1-(1.5*1) = -0.5 ≈ 1 | The lowest value in the dataset is 1 CR. The lower limit can be approximated to 1. |

[201] Source: Wolfram|Alpha Knowledgebase, 2020.

| | | |
|---|---|---|
| Maximum Count of CRs in the dataset | 18 | |
| Minimum Count of CRs in the dataset | 1 | All officers in the dataset had at least 1 CR with incident date between 1989 and 1993. |

For the CR count by officer, we found that the minimum allegation count per officer is 1 allegation and the maximum in the dataset is 27 allegations by one officer between 1989 and 1993.

For the CR count per officer between 1989 and 1993, the 1st Quartile is 1 allegation, which means that 25% of the officers had 1 CR open. The 2nd Quartile, also known as median, is still 1 CR open. Which means that 50% of all officers in the dataset had only 1 CR open between 1989-1993, the 3rd Quartile is 2 CRs, which means that 75% of the officers in the dataset had 2 or less CRs between 1989 and 1993. The Interquartile Range (IQR) is 1, being the difference between the 3rd quartile and the 1st quartile.

***Step 3.*** The previous data is used to construct a box plot. This is a graphical display that simultaneously displays several important features of the data, such as location or central tendency, spread or variability, departure from symmetry, and identification of observations that lie unusually far from the bulk of the data (these observations are often called "outliers").[202]

A box plot displays the three quartiles, the minimum, and the maximum of the data on a rectangular box, aligned either horizontally or vertically. The box encloses the interquartile range with the left (or lower) line at the first quartile Q1 and the right (or upper) line at the third quartile Q3. A line is drawn through the box at the second quartile (which is the fiftieth percentile or the median) $Q2 = \tilde{x}$. A line at either end extends to the extreme values. These lines are usually called whiskers. Some authors refer to the box plot as the box and whisker plot.

For this analysis, the whiskers extend ***1.5 (Q3 − Q1)*** from the ends of the box, and observations beyond these limits are flagged as potential outliers. This variation of the basic procedure is called a modified box plot.[203]

The outliers for this dataset will be:

| | |
|---|---|
| ***Q3 + (1.5 IQR)*** | ***CR count ≥3.5 per officer (rounding up to 4 CRs)*** |

Thus, all officers with CR Count>3.5 are statistical outliers.

[202] Douglas C. Montgomery. Introduction to Statistical Quality Control, 8th Edition (p. 74). Wiley. Kindle Edition.
[203] Douglas C. Montgomery. Introduction to Statistical Quality Control, 8th Edition (p. 74). Wiley. Kindle Edition.

*Figure 3. Officer Outlier Identification, Boxplot by CR Count Open between 1989-1993*



*Table 38. List of Accused Officers by CR Count from 1989-1993: Those with 4 or more CRs are Outliers.*

| Officer Name | CR Count | Outlier Status |
|---|---|---|
| Bernard Graf | 18 | Outlier |
| John Pallohusky | 14 | Outlier |
| Anthony Wojcik | 14 | Outlier |
| John Riordan | 13 | Outlier |
| Anthony Carothers | 12 | Outlier |
| Michael Cummings | 12 | Outlier |
| Unknown officer | 11 | Outlier |
| Timothy Gilbert | 11 | Outlier |
| Thomas O'Connor | 10 | Outlier |
| John McMurray | 8 | Outlier |
| Harry Collins | 7 | Outlier |
| Edward Feliciano | 7 | Outlier |
| Roland Paulnitsky | 7 | Outlier |
| Bernard Brennan | 7 | Outlier |
| Anthony Shapiro | 6 | Outlier |
| Thomas Fallon | 6 | Outlier |
| Victor Guerrieri | 6 | Outlier |
| Joseph Salemme | 6 | Outlier |
| Anthony Riccio | 6 | Outlier |
| Harry Fenner | 6 | Outlier |
| Anthony DeLeonardis | 6 | Outlier |
| Robert Rutherford | 6 | Outlier |
| Antonio Baio | 6 | Outlier |
| William Dorsch | 6 | Outlier |
| John Smith | 6 | Outlier |
| Richard Curley | 5 | Outlier |
| Jeffrey Messina | 5 | Outlier |
| Jeffrey Kumorek | 5 | Outlier |
| Joseph Molitor | 5 | Outlier |
| John Enault | 5 | Outlier |
| David Friel | 5 | Outlier |
| Richard Maher | 5 | Outlier |
| Lynn Carroll | 5 | Outlier |
| Sam Greco | 5 | Outlier |
| Maria Pena | 5 | Outlier |
| John Chavez | 5 | Outlier |
| Mark Hawkins | 5 | Outlier |
| Michael Mancuso | 5 | Outlier |

| **Officer Name** | **CR Count** | **Outlier Status** |
|---|---:|---|
| Michael Stephens | 5 | Outlier |
| William Keating | 4 | Outlier |
| Eldridge Akers | 4 | Outlier |
| Donald Signoretti | 4 | Outlier |
| Maria Soto | 4 | Outlier |
| William Jackson | 4 | Outlier |
| James Baraniak | 4 | Outlier |
| Tyrone Jenkins | 4 | Outlier |
| Kirby Ball | 4 | Outlier |
| Carlos Velez | 4 | Outlier |
| Diego Flores | 4 | Outlier |
| Gregory Masonick | 4 | Outlier |
| Joseph O'Carroll | 4 | Outlier |
| Reynaldo Guevara | 4 | Outlier |
| Joseph Benigno | 4 | Outlier |
| … | … | … |
| William Jaconetti | 1 | Not Outlier |
| William Kaupert | 1 | Not Outlier |
| William Kuelbs | 1 | Not Outlier |
| William Lehner | 1 | Not Outlier |
| William McKenna | 1 | Not Outlier |
| William Town | 1 | Not Outlier |
| William Voight | 1 | Not Outlier |
| Willie Penn, Jr. | 1 | Not Outlier |

### 1.4 Comparing Findings of Internal and External Complaints

*Table 39. Testing Independence Between the Variable "Finding" before internal review, and the variable "Internal or External CR"*

<table>
<tr><td colspan="2">Hypothesis question, related to Internal and External Complaints: “sustained” after investigations independently from the origin of the complaint?<br><br>Conclusion, there is evidence that “sustained” findings after investigation (before internal review) is not independent from the origin of the complaint.<br><br>Thus, the origin of the complaint has some relationship with the investigator assigning sustained findings to an investigation.</td></tr>
<tr><td>P-value (2.2e-16)<0.05 significance level.<br><br>Ho: the findings by the investigator are independent of the origin of the complaint.<br><br><br>We reject Ho: Thus, sustained findings after investigation is NOT independent from the origin of the complaint. Thus, the origin of the complaint has some relationship with the findings by the investigator (before internal review).</td><td>Pearson's Chi-squared test with Yates' continuity correction<br><br>data: data$Finding and data$`Internal or External CR`<br>X-squared = 110.13, df = 1, p-value < 2.2e-16<br>*Testing for independence between request of review and source of the complaint.<br><br>**They are not independent.</td></tr>
<tr><td colspan="2">The variable “Finding” was reduced to two outcomes “sustained” “no”, the variable “Internal or Internal CR” excluded all the rows with unknown complaint origin.<br><br>R Script: Table40<-chisq.test(data$`Finding`,data$`Internal or External CR`)</td></tr>
</table>

### 2. List of Cases Reviewed in Dr. Knight’s Qualitative Review (see pages 107-108)

Inductive Analysis

166047
166319
166646
166878
167206
167252
167579
168160
168290

168561
168690
168726
168914
169057
169148
169287
169532
170021
170344
170373
170424
170490
170728
170855
170876
171130
171220
171410
171469
171720
171841
172123
172342
172748
173032
173170
173180
173291
173369
173399
173446
173479
173599
174179
174337
174743
174770
174777
175338
175513
176099
177248
178876
179140
179882

180004
180037
180229
180413
180432
180588
180779
183153
183857
184740
185013
185818
187197
188181
188351
188657
188699
188994
189646
189978
191619
192482
192992
193061
195857
196229
197193
197638
197800
198390
199154
199741
200345
200774
200441
200774
202171
202244
202387
203110
203174
203806
203901
204204
214716
205257

205542
205543
205566
192482
201338
196341
192482
205035

15 Cases Reviewed in Detail

167252
171841
180229
183857
184740
187197
188181
188657
188699
188994
192482
192992
193061
196341
196341

Deductive Analysis

196341
184740
187197
193061
192992
171841
180229
200345
201388
202244
203901
188181
188657
188699
188994
192482
202171

205035
200345
192482
183857
CR 2019-1186 (CR for the Bouto Lawsuit)

3. References

**Other sources are included in the body of the report, footnotes, and appendix.**

National Registry of Exonerations 2017. University of Michigan Law School. ExonerationsIn2017.pdf (umich.edu)

NATIONAL REGISTRY OF EXONERATIONS, UNIV. OF MICH. LAW SCH., EXONERATIONS IN 2015, at 1, 3-4, 7-8 (2016), http://www.law.umich.edu/special/exoneration/documents/exonerations in 2015.pdf Exonerations_in_2015.pdf (umich.edu)

Reichart, Brian (2016) “Tunnel Vision: Causes, Effects, and Mitigation Strategies,” Hofstra Law Review: Vol. 45: Iss. 2, Article 7. Available at: http://scholarlycommons.law.hofstra.edu/hlr/vol45/iss2/7

PERF, 2018. A Review on Minneapolis Police Department Internal Affairs. 2016.08 Oversight Commission - Complaint Filing Experience.pdf (mn.gov).

Sisca, Tracy. Arriazola, Sherrie (2009). The Chicago Police Board, a Ten-Year Analysis. The Chicago Justice Project, 2009. https://chicagojustice.org/wp-content/uploads/2016/08/cjp_cpb_report_2009.pdf

https://theintercept.com/2019/05/29/chicago-police-civilian-oversight-police-shooting-ricky-hayes/

Chicago Office of Police Accountability (COPA) https://www.chicagocopa.org/data-cases/case-portal/

Microsoft Word - 2010 Citywide Public View.doc (chicagopolice.org)

Chicago Police Department, Annual Reports 1989-1993.
https://home.chicagopolice.org/wp-content/uploads/2014/12/1989-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1990-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1991-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1992-Annual-Report.pdf
https://home.chicagopolice.org/wp-content/uploads/2014/12/1993-1994-Report.pdf

Chicago Office of Inspector General. Allegations of Police Misconduct, A Guide to the Complaint and Disciplinary Process, April 2021. https://www.chicago.gov/content/dam/city/depts/cpb/PoliceDiscipline/AllegMiscond20210401.pdf

https://informationportal.igchicago.org/complaint-and-administrative-notification-trends-and-statistics/

Driessnack, M., Valmi, D.S., Costa Mendes, I.A. (2007). An overview of research designs relevant to nursing: Part 3: Mixed and multiple methods. SciElo Brazil. doi.10.1590/S0104-11692007000400025

Creswell, J. (2009). Research design: Qualitative, quantitative, and mixed methods approaches. (3rd ed.). Sage Publications.
Creswell, J. W. (2007). Qualitative inquiry & research design: Choosing five approach (2nd ed.). Sage Publications.

Leedy, P. D. (1997). Practice research: Planning and design.
Merrill Publications.

Moustakas, C. (1994). Phenomenological research methods. Sage Publications.
Smith, D. W. (2005). Phenomenology. In Stanford encyclopedia of philosophy. From http://plato.stanford.edu/archives/win2005/entries/phenomenology.