# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,          )
                              )
        Plaintiff,            )
                              )
     vs.                      )
                              )
REYNALDO GUEVARA, ET AL.,     )
                              )
        Defendants.           )  No. 18 CV 01028
_____ )  Consolidated w/
                              )  No. 18 CV 02312
GABRIEL SOLACHE,              )
                              )
        Plaintiff,            )
                              )
     vs.                      )
                              )
REYNALDO GUEVARA, ET AL.,     )
                              )
        Defendants.           )

          VOLUME II OF II

       The CONTINUED VIDEOTAPED VIDEO

TELECONFERENCE deposition of THOMAS J.

TIDERINGTON, taken under oath on Thursday,

October 6, 2022, conducted via Zoom pursuant

to the Federal Rules of Civil Procedure,

before Maribeth Reilly, State of Illinois

Notary Public, and Certified Shorthand

Reporter No. 084-002306, commencing at

10:10 a.m. (CST).

THOMAS TIDERINGTON, 10/06/2022

Page 354..357

Page 354

APPEARANCES: (REMOTELY)

LOEVY & LOEVY, by
MR. ANAND SWAMINATHAN
MR. SEAN STARR
311 North Aberdeen Street
3rd Floor
Chicago, Illinois 60607
(312) 243-5900
anand@loevy.com
sean@loevy.com

Appeared on behalf of Plaintiff
Arturo DeLeon-Reyes
(Mr. Swaminathan was present with
the witness.)
PEOPLE'S LAW OFFICE, by
MS. JAN SUSLER
1180 North Milwaukee Avenue
Chicago, Illinois 60622
(771) 235-0070
jsusler@peopleslawoffice.com

Appeared on behalf of Plaintiff
Gabriel Solache;

LEINENWEBER BARONI & DAFFADA, LLC, by
MS. MEGAN K. McGRATH
120 North LaSalle Street
Suite 2000
Chicago, Illinois 60603
(312) 663-3003
mkm@ilesq.com

Appeared on behalf of Defendant
Reynaldo Guevara;

Page 356

INDEX

| WITNESS | EXAMINATION |
|---|---|
| THOMAS TIDERINGTON | |
| By Ms. Golden | 358 |
| By Ms. Rosen | 361 |
| By Mr. Swaminathan | 697 |

EXHIBITS

| NUMBER | SCREEN-SHARED/ REFERENCED |
|---|---|
| TIDERINGTON | |
| DEPOSITION EXHIBIT | |
| Deposition No. 4 | 392 |
| Deposition No. 6 | 415 |
| Deposition No. 9 | 460 |
| Deposition No. 10 | 450 |
| Deposition No. 12 | 680 |
| Deposition No. 13 | 525 |
| Deposition No. 14 | 528 |
| Deposition No. 15 | 540 |
| Deposition No. 16 | 541 |
| Deposition No. 17 | 545 |
| Deposition No. 18 | 545 |
| Deposition No. 19 | 553 |
| Deposition No. 20 | 568 |

Page 355

APPEARANCES: (REMOTELY)
THE SOTOS LAW FIRM, P.C. by
MS. CAROLINE JAMIESON GOLDEN
141 West Jackson Boulevard
Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
cgolden@jsotoslaw.com
Appeared on behalf of
the Individual Defendants except
Guevara;
ROCK FUSCO & CONNELLY, LLC, by
MS. EILEEN E. ROSEN
MS. ERICA FATIMA
MS. THERESA CARNEY
MS. JESSICA ZEHNER
333 West Wacker Drive
19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com
efatima@rfclaw.com
tcarney@rfclaw.com
jzehner@rfclaw.com
Appeared on behalf of Defendant
City of Chicago.

ALSO PRESENT:

MS. RACHEL WELLING,
Certified Legal Videographer;
MS. ROBYN FALASZ,
Exhibit Technician;

MS. MARIBETH REILLY,
Certified Shorthand Reporter;
MS. ISABELLA AGUILAR,
Loevy & Loevy;

MS. JANICE WILLIER,
Court reporter student.

Page 357

EXHIBITS

| NUMBER | SCREEN-SHARED/ REFERENCED |
|---|---|
| TIDERINGTON | |
| DEPOSITION EXHIBIT | |
| Deposition No. 21 | 584 |
| Deposition No. 23 | 615 |
| Deposition No. 24 | 641 |
| Deposition No. 25 | 636 |
| Deposition No. 26 | 654 |
| Deposition No. 27 | 657 |
| Deposition No. 29 | 668 |
| Deposition No. 30 | 669 |
| Deposition No. 31 | 674 |
| Deposition No. 33 | 684 |

(EXHIBITS SCANNED/ATTACHED.)

* * * * * * * *

THOMAS TIDERINGTON, 10/06/2022

Page 358..361

Page 358

THE VIDEOGRAPHER: We are back on the video record at 10:10 a.m. for Day 2 of the deposition of Thomas Tiderington.

THOMAS J. TIDERINGTON, called as a witness herein, having been previously duly sworn, was examined and testified further as follows:

CONTINUED EXAMINATION

BY MS. GOLDEN:

Q. Good morning, Mr. Tiderington.

A. Good morning.

Q. How are you doing?

A. I'm fine. Thank you.

Q. Did you have an evening of rest?

A. I did.

Q. I will remind you that -- I'm sorry.

A. For a few hours, yes.

Q. You are well enough to proceed?

A. I am.

Q. I will remind you that you are still under oath.

A. Yes, ma'am.

Q. You understand that?

Page 359

A. I do.

Q. What, if anything, did you do to prepare for the balance of this deposition in between the time that we finished last evening and began this morning?

A. Well, one of the things I did, I went back because you had asked me what other cases I testified in. So if you'd like to give me -- if you'd like me to give you that information, I would be happy to do so at this point.

Q. Did you do anything else other than go back and look at whatever cases you had testified in?

A. I --

Q. Did you meet with Mr. Swaminathan?

A. No, no. We both went our separate ways as soon as we got finished last night at 8:30, 9:00, whatever it was.

Q. Did you talk to anyone about the deposition last night or this morning?

A. No.

Q. Have you spoken to Mr. Brasfield about this case?

Page 360

A. I don't think I spoke to him. I don't think I talked with him, no. I may have -- there might have been a text message, but, no, I don't know. No, I didn't have any conversation about him -- or with him about this case at all.

Q. From the time you started working on it until the current time?

A. That's correct.

Q. Did you review any records other than the ones you mentioned about the other cases you worked on?

A. I went through my report again last night.

Q. Did you review anything other than your report?

A. Perhaps the -- when I say "perhaps," some of the case files, some of the record. Nothing in great detail, but just kind of skimmed through it.

Q. And when you say "case files," what are you referring to?

A. The police reports, the witness statements, those types of things.

Page 361

Q. And all of those items are in the material -- on the list of materials you reviewed?

A. Yes.

Q. Those are all materials that you reviewed before, right?

A. They were, yes.

Q. And those were all materials that you reviewed and considered before you issued your report, which is Exhibit 6 in the deposition?

A. That's correct, with the exception of the documents that we identified yesterday.

MS. GOLDEN: I don't have any other questions.

THE WITNESS: Thank you.

EXAMINATION

BY MS. ROSEN:

Q. Good morning, Mr. Tiderington. It's my turn.

A. Good morning.

Q. How are you?

A. I'm fine. Thank you.

Urlaub Bowen & Associates, Inc. 312-781-9586

THOMAS TIDERINGTON, 10/06/2022 — Page 362..365

Page 362

Q. My name is Eileen Rosen, and I represent the City of Chicago, and I am going to be asking you some questions about your report.

A. Okay.

MS. ROSEN: Anand, you know, your video is not on.

MR. ANAND: Sorry, sorry.

MS. ROSEN: No worries.

BY MS. ROSEN:

Q. So first, I have just some follow-up from your testimony yesterday. Based on your invoice we -- I think you testified yesterday that you billed 78 hours approximately in connection with the work you did in preparation of your report, correct?

A. That's correct.

Q. And then I think you told us that there was unbilled time as well, and my recollection is you estimated that at something like 20 to 40 hours. Did I get that right?

A. I may have -- I may have said

Page 363

that. I thought I said 40 or 50 hours. In reality, I don't know the exact number.

Q. Because you didn't keep track?

A. That's correct.

Q. And you spent, I think you said, another 15 or 20 hours in the last couple of weeks preparing for the deposition, correct?

A. That would be correct.

Q. So if you spent approximately 80 hours that you billed for, and approximately 50 hours that you didn't bill for, and then approximately 20 hours in the last couple of weeks, that would be the total amount of time that you spent reviewing materials in connection with this case, correct?

A. That is correct.

Q. And the Brasfield dep that you recently received, I think you said that was the Rivera case; is that right?

A. That's correct.

Q. Did you see Mr. Brasfield's trial testimony in Rivera?

A. I don't think so, no.

Q. I want to talk a little bit about

Page 364

your experiences in Fort Lauderdale and when you were at the DEA. Were the types of investigations that you worked on with the DEA similar to the types of investigations you did when you were with OCB?

A. There were some cases that were very similar when I was in the organized crime division, and there would be many cases that we worked with the DEA, so yes.

Q. And are those investigations that you worked on both with OCB and with when you were assigned to the DEA, were those long-term investigations?

A. Some were. Some were one-day investigations. Some were five-year investigations.

Q. And the five-year investigations, what types of cases were those?

A. Well, with the DEA, it involved international money laundering investigation.

Q. And with OCB, the longer-term investigations, what types of cases were those?

Page 365

A. Well, again, a wide variety of cases, but for the most part, it would have been cases involving drug cartels, and their criminal behavior, their criminal activities.

Q. And the goal was to dismantle the cartels, correct?

A. The overall goal, yes.

Q. And then the cases that were the shorter term, the one-day ones, what types of cases were those?

A. They could be drug raids. They could have been prostitution-related cases. They could have been anything crime -- you know, anything crime-related in the City of Fort Lauderdale involving any type of organized crime, whether it was the Mafia, whether it was the Colombia cartels. So there is really no -- it doesn't really fit into any one box, I should say.

Q. When you were assisting the DEA, you told us that some of the things that you did when you were assisting the DEA was to obtain information and in furtherance of

THOMAS TIDERINGTON, 10/06/2022                    Page 366..369

Page 366

whatever the investigation was that they were working on, correct? Is that one of the things that you would do, you and your team, I guess?

A. Certainly, yes.

Q. What other types of things did you do when you were in the role of assisting the DEA?

A. I'm sorry, I just want to make sure we are talking about the same thing. Are you talking about when I was assigned full-time to the DEA as a supervisor, or when I worked with the organized crime division in Fort Lauderdale and worked joint cases with the DEA?

Q. I meant the latter, sorry. I was not clear, the joint cases. When you were -- I think you said yesterday that you worked joint cases with the DEA while you were assigned to the Fort Lauderdale Police Department, and I am just trying to get a sense of like what type of assistance you would provide to the DEA in those circumstances?

Page 367

A. Well, again it would be, you know, kind of a wide spectrum of assistance, or perhaps joint investigations. There were many cases where we would at some point make a determination of whether we would charge somebody federally or whether we would charge them in a state investigation. You know, as I'm sure you know, there's federal charges -- you know, that there are state charges that, you know, that federal agents cannot necessarily bring forward and vice versa.

So we would analyze what type of case it was and whether we were better suited to bring the case to a -- to a state attorney or whether we take it to a federal prosecutor, so it was essentially a give-and-take.

Q. And when it was a case that it was going to be federally charged -- well, let me back up for a second.

Who made the decision about whether to pursue federal charges or state charges?

Page 368

A. Well, again, we are just generally speaking.

Q. Yes.

A. It would have been a collective decision made between the case agents, who in that role, I would have been a case agent. There would have been another special agent in the DEA, who's referred to perhaps as a GS-13, and then there would be supervisors involved in the decision. So it would be kind of a collective decision by, if you will, you know, the frontline guys, if you will.

Q. And there would be consultation with either State prosecutors and/or U.S. Attorneys?

A. Oftentimes, yes.

Q. And so they were involved in the decision-making about what types of charges, whether it be federal charges or --

A. Well, they would be involved in the discussions about whether we would charge them federally or whether it met the federal threshold. There are certain

Page 369

thresholds of quantities of drugs and types of cases that the Feds would take versus a case that we would take through the state court.

Q. I see. And when you were in the role of assisting, so you are assigned to Fort Lauderdale Police Department, you are assisting in a case that's going to be federally charged, what types of things would you do to assist in that type of a case?

A. Well, I guess it depends on which case. I mean, again generally speaking, if I was the undercover operative, my role would be just that. I would be the undercover officer. I would prepare reports or, you know, there were different methods that we used to collect evidence from wire tap investigations to covert listening devices and so on.

Q. And when you prepared reports, what types of reports would you prepare? Would they be Fort Lauderdale Police Department reports, or would they be DEA

THOMAS TIDERINGTON, 10/06/2022                           Page 370..373

Page 370

reports?

A. Well, for the most part, when we were -- when I was assisting -- when I say -- and again, maybe assisting is not the right word. When we were working joint investigations, I would prepare Fort Lauderdale documents, and the DEA agent would prepare DEA documents.

Q. And would you maintain those reports in the Fort Lauderdale Police Department?

A. They would have been, yes.

Q. And the DEA would maintain their reports in the DEA records place, wherever they keep their records, right?

A. That is correct.

Q. You testified yesterday about note-taking and in the context of the interview of witnesses, and I think you said that you kept notes a lot of the time in the more critical cases, but not in the more minor cases. Do I have that right?

MR. SWAMINATHAN: Objection to form and foundation.

Page 371

Go ahead.

THE WITNESS: I may have said that, but I don't know. And again, perhaps I should clarify that. If I was a patrol officer, and I went to the scene of an accident and the witness came and told me, you know, what occurred there, those were notes that I probably would not have kept or expected an officer to keep.

As a detective -- let me turn this off here so we don't have that buzzing here.

As a detective working criminal investigations, I would keep my notes, yes.

BY MS. ROSEN:

Q. And you would keep your notes for any type of case as a detective?

A. Any case that I -- yes, any case that I was involved in that I took notes on.

Q. Yes. And what did you take your notes on?

A. I'm sorry?

Q. What type of vehicle did you take

Page 372

your notes on? What did you write on?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Again, in Fort Lauderdale, we didn't have a specialized form that we used. It would have been legal pads primarily.

BY MS. ROSEN:

Q. So just a regular old legal pad, right?

A. For the most part. I'm sure there were other types of paper that I used. It's been quite a while.

Q. And then the notes, what would you do with the information that was contained in the notes?

A. They would be kept in the case file.

Q. And would you -- what would you do with the actual substance of the information? Would it just remain on the notes, or would you do something with the information that's on your notes?

Page 373

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I guess it depended on what type of case it was or, you know, you know, there were times that it would be included in the police report.

BY MS. ROSEN:

Q. And sometimes not?

A. And again, it -- you know, we are not really talking about a specific case, and you are asking me to think back 30 or 40 years, so I'm sure there were times that they would not be, yes.

Q. And then you said the notes would be kept in the case file. What are you referring to when you say the case file?

A. Well, at the time in Fort Lauderdale, the case agent, I believe they are still operating that way today, is the case agent would create a file, and he would be responsible or she would be responsible for the contents of that file, and that would be the official file for the

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022                    Page 374..377

Page 374

investigation.

Q. And where would that file be maintained?

A. It would have been kept within the detective bureau.

Q. In a particular place?

A. In the file cabinet.

Q. Was there a file room?

A. There were. We moved a couple of times, the detective bureau did. So, yes, there was always a location where the records were kept.

Q. And did detectives that were assigned to that particular unit have access to the file cabinets?

A. They would have, yes.

Q. And, obviously, you would have access to your own case files, right?

A. That's correct.

Q. And would you take those case files out on the street if you felt it was necessary and in furtherance of your investigation?

A. Probably not. Probably not. I

Page 375

don't think a case file would go out on the street. If there was -- if there were certain documents that were needed, of course, you could make copies of them and take those with you.

Q. So the documents that you felt were relevant for whatever investigative task you were about to do, you would make copies from the case file, and take the copies out with you out on the street, right?

A. Yeah, but I don't -- if you are asking me -- I can't remember ever doing that, but I don't know that it would be that unreasonable, yes.

Q. And then once you completed whatever the investigative task was, what would you do with the copies of those -- of those reports or notes or whatever it was that you photocopied?

A. Again, as I just testified, I don't recall doing that specifically. I can hypothetically tell you what, you know -- you know, if there is already the same copy

Page 376

in the case file, I would not expect the detective to put those notes or those reports back in there unless there were notes contained on them or additional information added to them.

Q. And what types of police reports did you and your fellow officers prepare when you worked in the Fort Lauderdale Police Department as a detective?

A. I'm sorry, what do you mean by what kind of reports?

Q. Yeah. Did they have names? The forms that you would utilize to prepare your reports, did they have names?

A. Yeah, there were reports where you would have the standardized case number based on like 82- and, you know, then there would be sequential numbers to them. We had supplemental reports.

Was the police report itself called by anything special? Not that I can recall.

I know in the time I spent with the DEA, their reports were called

Page 377

DEA-6s.

Q. And when you were in the Fort Lauderdale Police Department and you were investigating a particular case, what types of documents or information would you put in the case file?

A. Anything related to the case.

Q. And did the case file contain all original documents?

A. Or copies of the original documents, yes.

Q. For the case -- for the documents where there were copies of original documents, where were the original documents?

A. Well, I guess again -- again, we are -- we are kind of talking about hypotheticals here, so I am trying to think back of where -- you know, if a detective went to a doctor's office and said I need a copy of, you know, this report and somebody made a copy of the report for him, then that copy would have been placed into the case file and, you know, not the original.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022                    Page 378..381

Page 378

Q. How about police reports, with respect to any police report that was prepared in connection with whatever the investigation was, were the original reports maintained in the case file?

A. The original reports were then maintained in the case file. There may have been copies of them. But, yes, the originals would have been contained in the case file.

Q. Were there directives from the Fort Lauderdale Police Department regarding the creation of police reports and notes in case file?

A. I'm sure there were.

Q. As you sit here today, do you recall what the requirements were of the directives regarding the creation of police reports and notes in the case file?

A. I don't. I don't recall the specific policy. And, of course, the 22, 23 years that I spent there, I'm sure, they changed and evolved over time.

Q. And then with respect to when you

Page 379

were in the detective bureau at the Fort Lauderdale Police Department, I understood your testimony yesterday to be that the detective bureau had within it four different units; the violent crimes unit, OCB that eventually became special investigations, the homicide unit, and property crimes.

Did I get that right?

A. For the most part. And what I mean by "the most part," I mean, you know, over 22 years, it evolved and changed. But for the most part, yes, that was the make-up of our detective division.

Q. Was there somebody at the head of the detective division?

A. There was.

Q. And what was that person's title?

A. Well, obviously, the chief of police was in charge of everything. There was a deputy chief that had -- one deputy chief had control or responsibilities over the patrol division. There was another deputy chief that would have had control

Page 380

over the investigative services division, and then I think it was three deputy chiefs at one point, and another admin deputy chief.

Q. When you say investigative services, is that the same, synonymous with the detective bureau, or was the detective bureau within investigative -- you've got to let my finish my question.

A. I'm sorry. I'm sorry.

Q. -- or was the detective bureau within the investigative services?

A. Yes, and that's a good point. I am referring to it from different names. So, I mean, at one point in time, it was called investigative services. Other times it was called the detective bureau, but what I am speaking of is all the same. It is all the same.

Q. Okay, great. And then when you were the -- you were the captain, right? You were the commanding officer? You were a captain, that was your rank, and then your title was commander. Do I have that right?

Page 381

A. Right, that's correct.

Q. When you were the commander, did you report directly to the deputy chief of the detective bureau?

A. I did.

Q. And does the deputy chief report directly to the chief of police?

A. That's correct.

Q. And Mr. Brasfield was the chief of police at a point in time while you were at the Fort Lauderdale Police Department, correct?

A. Towards the end of my career, yes.

Q. And what was your rank at the time that Mr. Brasfield became chief of police in Fort Lauderdale?

A. I think it was a sergeant at that point.

Q. And before Mr. Brasfield became the chief of police in Fort Lauderdale, did you know him?

A. I did not.

Q. Was he the one that promoted you to captain?

THOMAS TIDERINGTON, 10/06/2022          Page 382..385

Page 382

A. I believe he was, yes.

Q. And was that a -- did you have to test into that position, or was that a meritorious promotion?

A. No. It was a testing process.

Q. And earlier today, Ms. Golden asked you if you had any conversations with Mr. Brasfield about this case, and you said, no, but you mentioned something about you might have texted with him.

Do you think you texted about this case?

A. Not anything about this case other than to say that I am -- that I was retained and that -- and that he was involved in some of the older cases, and I do recall that he either texted me back and he said, yes, I'm done. I don't want to have any conversations because I don't want to ever get dragged back into these cases, so that's why I recall that I did not have any conversation with him.

Q. And did he explain to you why he did not want to be dragged back into these

Page 383

cases?

A. No. It was a very short, maybe one sentence, and I kind of understood what he meant, and that's why I never had any conversation with him about his work or about any of the work that he did on any of the cases.

Q. What did you understand him to mean?

A. I don't want to get dragged back in, don't mention my name. I am not -- I mean, it was more of a -- I hadn't talked with Chief Brasfield for a long time, so it was -- and again, I have to express how brief the conversation was. I mean, it was just like a text message and, you know, hope you are doing well. I'm working on some of your old cases.

Great, great. You know, glad to hear you are doing this work and congratulations. But I do recall he said something to the effect that -- you know, that he's done, that he is no longer doing expert witness cases, and he would prefer

Page 384

not to -- I don't know if he said have a conversation, but I took it to mean that he -- you know, he didn't open the door for me to call and us have a conference or any discussion at all about the cases is kind of my take-away from that short message.

Q. Okay. So the information that you know about the work that Mr. Brasfield did on the Fields case, the Rivera case, and the Kluppelberg case comes solely from the reports that he prepared in those cases, correct?

A. That's correct. It certainly was not from him in any way, shape, or form.

Q. And I guess to be complete, and the deposition testimony that you were recently provided from the Rivera case, right?

A. Yes.

Q. All right. And with respect to the information in Mr. Brasfield's report in Rivera, did you read that report?

A. I did.

Q. And did you look at the

Page 385

spreadsheet that was attached to that report?

A. I did look at a spreadsheet, yes.

Q. Did you analyze the spreadsheet in any way, or did you just simply note that there was a spreadsheet that had lots of colors and lots of numbers and lots of lines?

A. No. I took some time to understand it, and I wanted to -- I wanted to really understand what it meant, and so I spent a great deal of time trying to understand it and analyze. I don't want to say I analyzed all of the information, but certainly various spot-checking of the data that was contained or attributed to the spreadsheet.

Q. And how did you spot-check? What do you mean?

A. Can I -- can we pull the chart up, and I can kind of go over it with you?

Q. Actually, I don't have -- I am talking about the Brasfield one, not yours. Right? I am talking about the one that was

THOMAS TIDERINGTON, 10/06/2022                    Page 386..389

Page 386

attached to Rivera.

A. I don't -- can you pull that up? I don't recall if I ever saw a specific spreadsheet attached to his report.

Q. Well, I will -- I will do that later if we have the time.

A. Okay.

Q. It's not a huge point for me.

As you sit here today, you don't recall whether or not Rivera, right, so I am talking -- I am not talking about your report right now, so I just want to be clear.

A. Right.

Q. The report that you reviewed that was prepared by Mr. Brasfield, as you sit here today, you don't recall whether or not there was a spreadsheet similar to the one in this case attached to that report that you reviewed?

A. I don't recall if it was attached to the report, no.

Q. Do you recall if you ever saw a spreadsheet from Rivera?

Page 387

A. From specifically -- I believe we are talking about the same spreadsheet. I think the spreadsheet that I have attached to my report, I am assuming it was the same spreadsheet that was used by Mike Brasfield.

Q. So is it your understanding that Mr. Brasfield analyzed the same files that you analyzed?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I don't -- I can't really say exactly what Mike did, and I don't recall in enough detail in his report, you know, really to answer that question.

BY MS. ROSEN:

Q. How about his report in Fields, right -- Mr. Brasfield -- hold on. Mr. Brasfield prepared a report in Fields. Did you review that report in connection with the work that you did in this case?

A. I believe I did.

Q. And did you note that there was a spreadsheet in the Fields report that was

Page 388

utilized by Mr. Brasfield?

A. Again, you know, it's been several months, so I don't recall. You have asked me about two reports from Mike Brasfield. I don't recall if the spreadsheet was attached to his reports or not.

I have been provided a spreadsheet. I don't know if it's the same spreadsheet, exact same spreadsheet that Mike Brasfield used or not. But if I did look at his report, I probably could answer that pretty quickly.

Q. As you sit here today, you don't know if Mr. Brasfield reviewed in connection with the work he did in Rivera and Fields the same files that you reviewed; is that correct?

A. I believe he did, but I don't know for sure.

Q. And with respect to the files that are referenced in the spreadsheet that is attached to your report, who prepared that spreadsheet?

A. Mr. Anand's office.

Page 389

Q. And do you know who at Mr. Swaminathan's office prepared the spreadsheet?

A. I don't.

Q. Do you know if it was one person or many people?

A. I know Anand -- well, I guess I can't get into the conversations, but I don't know how many people worked on that spreadsheet. I am assuming, and I could be wrong with an assumption, but I am assuming more than one person, but I don't know.

Q. Were you involved in the decision-making regarding what information to memorialize on the spreadsheet?

A. No. The spreadsheet was just provided. I didn't alter or edit the spreadsheet at all.

Q. And you were not involved in the creation of the spreadsheet, right? You had no input into the creation of the spreadsheet, correct?

A. That is correct.

Q. And were you provided the files

Page 390

that -- from which the data that is noted in the spreadsheet was taken?

A. Yes, I was.

Q. What files were you provided by category?

A. Can I -- again, can I pull -- can I open up the report or not?

Q. If you don't -- if you don't remember, we can -- we will get to it in the report. I am just wondering, do you have a -- as you sit here today, do you know what categories of files were reviewed --

A. Yeah.

Q. -- to prepare the spreadsheet?

A. Yeah. I mean they were the Public Defender -- files from the Public Defenders. They were permanent retention files, and they were investigative files.

Q. You said Public Defender files, investigative files, and what was the third?

A. Permanent retention files.

Q. Were you provided any Cook County State's Attorney office files?

A. I don't think so.

Page 391

Q. Are you aware that the parties in this case obtained files from the Cook County State's Attorney's Office, companion files to the files that you reviewed?

MR. SWAMINATHAN: Objection to form and foundation, especially based on the timing of when his report was compared to those disclosures, but go ahead.

THE WITNESS: I would have to look at my list of materials that were provided to me, but I don't recall as we sit here today that I was provided with any State Attorney files.

BY MS. ROSEN:

Q. And they are not referenced. I can tell you they are not referenced. In your materials reviewed, they were not provided to you.

My question is a little bit different. Do you know that we have them?

A. Are you telling me that you have them now?

Q. I am telling you that the parties in this case had them at the time that --

Page 392

A. Okay.

Q. -- at the time -- during discovery in this case. So my question is: Are you aware that the parties have the Cook County State's Attorney's Office files?

A. I guess I am now. I don't know that I was before.

Q. Pardon me.

A. I am sorry, I am making that difficult.

Q. No, no, no. I am just trying to understand what you had and what you know of and, you know, you are the expert, so I need to know what data points you rely on.

(Whereupon, Tiderington Deposition Exhibit No. 4 was screen-shared/referenced.)

BY MS. ROSEN:

Q. If we can take a look at Exhibit 4, which is the materials that you reviewed.

A. I'm sorry?

Q. Yes. We are going to put it up on the screen. It's Attachment B if you have the hard copy in front of you.

Page 393

MR. SWAMINATHAN: You want to grab the hard copy?

THE WITNESS: Yes. Exhibit 4.

BY MS. ROSEN:

Q. Do you have it?

A. Yes. Okay.

Q. Are we good?

A. Yes.

Q. And if we take a look at the materials reviewed. With respect to information related to the case, there are 146 -- no, wait a second. I'm sorry -- 116 items listed; is that correct?

A. That is correct.

Q. Have you reviewed -- actually, let me take that back. Hold on one second.

With respect to Items 1 through 96, did you review all of those materials?

A. I am going to go through and look if you don't mind.

Q. Yeah, sure.

A. I believe I did, yes.

Q. And when -- does that mean that

THOMAS TIDERINGTON, 10/06/2022                          Page 394..397

Page 394

you read all of them cover to cover, or does that mean that you did something less than that?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Probably something less than that, depending on what the document was.

BY MS. ROSEN:

Q. So can you tell me -- if you look at Item 38, it's the deposition transcript of Heather Brualdi. Do you see that?

A. I do.

Q. Did you read the entirety of Ms. Brualdi's deposition?

A. In that particular depo, I think I did read her deposition, yes.

Q. Do you have an understanding of who she is and what her role is in this -- in the Soto homicide?

A. I believe she is with the State's Attorney's Office.

Q. And do you have an understanding

Page 395

of what assignment she was in in 1998 at the time of the Soto homicide investigation?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I don't know specifically what her assignment was. It may have been in the depo, but I don't know exactly what it was as we sit here today.

BY MS. ROSEN:

Q. How about the deposition transcript of David Navarro, is that one that you read thoroughly?

A. I would have to pull that up to see if it would refresh my memory. For some reason, Ms. Brualdi's depo sticks out in my mind.

David Navarro, I would have to again confirm and refresh my memory to determine whether or not I read the entire depo or whether I just read parts of it.

Q. As you sit here today, do you have an understanding of or a memory of what Mr. Navarro's role was in the Soto homicide

Page 396

investigation?

A. You know, I don't. But if you gave me a trigger word or two, I probably would but ...

Q. Do you have a recollection of him being at the Cook County State's Attorney's Office at the time of the investigation?

A. That sounds about right.

Q. And do you know what his assignment was during the Soto -- you got to let me finish my question, sorry -- the Soto homicide investigation?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I don't.

BY MS. ROSEN:

Q. Did you read thoroughly the deposition transcript of Thomas O'Malley? That's Item Number 42.

A. I do believe I read his depo. I believe he is a State's Attorney. He worked in the State's Attorney's Office as well.

Q. Do you recall what his assignment

Page 397

was in 1998 at the time of the Soto homicide investigation?

A. Not specifically as to what their assignments were, no.

Q. Does the phrase "felony review" mean anything to you?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: That sounds perhaps where they may have been assigned to.

BY MS. ROSEN:

Q. And do you have an understanding of what being assigned to felony review at the Cook County State's Attorney's Office meant back in 1998?

A. Not in any great detail without again reviewing the deposition statements, testimony.

Q. And then Item Number 58 is the deposition of Kathleen Loughran. Do you see that?

A. I do.

Q. Do you know what case that

Page 398

deposition transcript came from?

A. I don't as we sit here today.

Q. Do you know what Ms. Loughran testified about in her deposition in whatever case the deposition transcript belongs to?

A. I do not, not as we sit here today without having the ability to refresh my memory.

Q. I would pull it up for you, but I don't know what dep transcript it is.

All right. Moving down to Item Number 94, Richard Brzeczek testimony. Do you see that there?

A. I do.

Q. What type of testimony was that?

A. Again, I was -- there's so many documents, I would have to pull it up and refresh my memory.

Q. Does the fact that you wrote "testimony" instead of "deposition testimony" mean it was something other than deposition?

A. It probably means that, yes.

Page 399

Q. How about with respect -- do you know who Richard Brzeczek is?

A. Again, I would -- I could easily refresh my memory. But as far as the memory test goes, right now, I don't recall exactly who -- what role he played in this investigation.

Q. And then with respect to Milton Deas, that also just says testimony. So is it safe to assume it's something other than deposition testimony?

A. That's correct.

Q. Do you recall who he is?

A. I don't.

Q. How about John Stibich, the same testimony again. Does that mean it's fair to assume not deposition testimony?

A. That's correct.

Q. And as you sit here today, do you recall who Mr. Stibich is?

A. If you give me two words, I will remember, but, no, I would have to refresh it.

Q. Okay. And then when we go to Item

Page 400

Number 97, that says 1995 to 1998, Area 5 investigative files. Do you see that there?

A. Yes, I do.

Q. And so you were -- you were provided all of the investigative files that are within that Bates range; is that correct?

A. I believe so, yes.

Q. And it's your understanding, I think, based on what you testified to earlier, that those investigative files were utilized in preparing the spreadsheet that is attached to your report in this case, correct?

A. I believe so, yes.

Q. Did you review each and every one of those investigative files?

A. No.

Q. How many investigative files are represented in Item No. 97, do you know?

A. 300-and-some. I don't know the exact number, maybe 340 or some -- somewhere around -- around 300.

Q. I think in your report -- and we

Page 401

will get there in a second -- you state 344. Does that sound about right?

A. It sounds about right.

Q. How many of those 344 investigative files did you review?

A. I am sorry. For some -- I have to get back. Oh, I lost the Zoom meeting. Okay, I'm back here now. I am sorry, could you please ask that again?

Q. Sure. Of the 344 investigative files that you were provided, how many did you actually review?

A. Well, I spot-checked several of them. I don't know if I have an exact number. I would say somewhere around -- well, I went through a lot of the files. I don't know that I -- on some, I spent more time than others, but I certainly went through a good number of the files.

Q. Can you estimate for me how many files you reviewed of the 344?

A. I probably looked at every one of the files, but some in greater detail than the others.

THOMAS TIDERINGTON, 10/06/2022

Page 402..405

Page 402

Q. How did you -- when you say you looked at every one of the files, what do you mean?

A. I skimmed through each of the files that I have, and some were -- I would stop, and I would look at them in more detail than others.

Q. What would -- why would you stop? Like what would cause you to stop?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: What would cause me to stop? I guess I don't understand that question, whether --

BY MS. ROSEN:

Q. Okay, let me try it this way. You believe you skimmed every file, all 344 files, correct?

A. I do.

Q. And you said, sometimes you spent more time with some files than others, right?

A. That's correct.

Page 403

Q. And what methodology were you utilizing to decide which files to spend more time with?

A. I don't know if there was any great methodology. I would look at if something caught my interest, or I was -- if it was something unusual, I spent more time on that.

Q. What types of things would catch your interest?

A. I guess, could I refer back to my report, and I can give you some examples?

Q. Yeah. We are going to get to -- you do discuss in some detail some of these files?

A. Right.

Q. I am just trying to get a sense of, you know, your process.

A. Yeah.

Q. So we will -- I will definitely give you an opportunity to look at that part of the report, and I even have some of the files marked as exhibits, and we can talk about them. I am just trying to get a sense

Page 404

of what types of things caught your interest or you found unusual.

Was there something in particular you were looking for, or was it more haphazard than that?

A. I would say that -- I mean, my -- the goal was to verify the information that was contained in the chart. And so I would -- when you say haphazardly, I don't know if I would agree to that. But I would go through the files and, you know, some of the files, I would look at more closely than others.

I don't know if there was any specific reason or rhyme or methodology in determining whether I am going to look at one file in greater detail than the other, but my goal was not to become familiar with each of the 300 files.

Q. So it was not your goal to become familiar with each of the investigations that underlie the 344 files you reviewed, correct?

A. I don't think it would have been

Page 405

humanly possible to do that.

Q. And why not?

A. Because there is 340 files, and each file contains many, many pages.

Q. Sometimes hundreds of pages, right?

A. That's correct.

Q. And you said -- you used the phrase "spot-check." What were you spot-checking? What were you looking -- what were you checking?

A. Well, I was -- again, initially, I was trying to understand what the chart meant, and then I would go through, and I'd look in a file and see, you know, if GPRs were contained in a particular file, or if there were to-and-from memos contained in a file. So that's kind of the things I was looking for are the categories that are outlined and listed in the chart.

Q. And then you also received -- listed here at Item 98, the 1995 to 1998 Cook County Public Defender files, right?

A. Yes.

THOMAS TIDERINGTON, 10/06/2022

Page 406..409

Page 406

Q. Did you review -- do you know how many files total were provided to you?

A. I think I have the number. I think the chart indicates how many files there were, but I don't recall specifically.

Q. I think it's somewhere in the -- you do have it in your report. It's somewhere in the 60-something range, I believe?

A. Yes.

Q. But regardless, did you review each of those files?

A. Again, I think I went through each of the files, but I don't want to say that I -- and I don't want to lead you to believe that I did it with -- that I reviewed in detail every document that was contained. That was not the case.

Q. Other than with respect to the 1995 to 1998 RD files, do you see that there?

A. Yes.

Q. And you were provided those as well, right?

Page 407

A. That's correct.

Q. And as you sit here right now, do you recall how many of those files you got?

A. I don't.

Q. And what is a RD file, do you know?

A. Record division file.

Q. And you used the phrase earlier "permanent retention file"?

A. Correct.

Q. Is there a distinction between the permanent retention file and the records division file?

A. Again, to be sure, I'd have to pull those up to refresh my memory.

Q. Pull what up?

A. Both the permanent retention files and the record files.

Q. Well, I don't see permanent retention files listed here. I only see record division files.

A. I think those are -- those are one in the same.

Q. Okay. All right. And then if we

Page 408

look at Items 117 to 146, Ms. Golden asked you some questions about those yesterday, and I just want to make sure I understand what their purpose here is in listing them here in this report.

A. Okay.

Q. Am I correct that you did not review all of these materials in connection with the preparation of your report?

A. Well, the material -- I guess what I explained yesterday, and I will try to explain again today, is that at some point in my career, I would have looked at all of these documents to some degree.

Did I use all of the listed documents here specifically to prepare that report? No.

You know, there's -- many of these documents or books, I don't footnote or I don't reference at all in the report. It was intended to demonstrate the types of material that I've had or that I have reviewed throughout my career, which, you know, over 44 years in some capacity.

Page 409

Q. Are we to assume that the materials listed here at Items 117 through 146 are relevant in some way to the opinions you were asked to evaluate -- let me start that over.

Are we to assume that Items 117 through 146 contain relevant information related to the -- your report?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

THE WITNESS: Probably not necessarily to my report, specifically. But to my universe of knowledge, I guess, is maybe a way to describe it of teaching and training officers and going through various seminars and training exercises. I think I, you know, am certainly not going to suggest that every one of these documents was specifically used in order to prepare my report.

The intent was to demonstrate the types of material that I have been exposed to throughout my career.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 410

BY MS. ROSEN:

Q. You talked yesterday about the French books that are on here, and I think you said the reason you added them is because Mr. Brasfield had them on his report. Did I get that right?

A. That's correct.

Q. And you don't speak French, right?

A. I don't.

Q. And so you don't really know what the contents of those French materials are, correct?

A. That's correct.

Q. Yesterday when Ms. Golden was asking you questions, she was specifically asking you about your opinions related to the gross deviation of acceptable standard police practices. Do you recall generally that testimony from yesterday?

A. I do recall, yes.

Q. And in the list of items that you identified as being a gross deviation, you mentioned police reports being withheld. Do you recall that?

Page 411

A. I would have to review my transcript or if you could read the question back to me. I vaguely recall, but if you are going to ask me specific questions about my testimony yesterday, I would have to -- or if you are going to ask me again about things I have already testified to, I think I would have to -- or I would want to hear the questions and hear my answers.

Q. Yeah. I am not like trying to impeach you or anything. I am just trying to direct you to this topic.

I guess I can ask it this way: Is it your opinion that police reports were withheld by the police officers that were involved in the homicide -- the Soto homicide investigation?

A. That is my opinion, yes.

Q. What specific police reports were withheld?

A. Well, again, I'd like to -- I'd have to go through the case file, and we can get specific.

Q. Have you detailed the police

Page 412

reports that you believe were withheld in your report?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Can we turn to those pages at this point, or are we going to just --

BY MS. ROSEN:

Q. No, I am just asking -- I am simply asking you will we find the answer to my question somewhere within the four corners of your report?

A. I'm sure we will.

Q. Okay. You said yesterday something about the Polaroids and that Polaroids are only taken of possible suspects. Do you recall testimony along those lines?

A. I do recall that we had that discussion, yes.

Q. What is the basis for your conclusion that the police department only takes Polaroids of possible suspects?

Page 413

MR. SWAMINATHAN: Objection to form and foundation.

THE WITNESS: Yeah, that's not what I -- I don't think that's what I testified to.

BY MS. ROSEN:

Q. Well, explain to me what you believe the importance of a Polaroid photo is in a Chicago Police Department homicide investigation?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: Well, I don't know -- I think my testimony related to specifically to the Soto investigation, and that's what I was testifying to yesterday.

BY MS. ROSEN:

Q. So explain to me with respect to the Soto investigation the importance or relevance of Polaroid photographs?

A. Well, obviously, the importance is the officers had to take photographs of these individuals for a reason. And

Page 414

everybody that was identified, everybody that was a witness, I did not see evidence that there was photographs taken of each witness.

There were photographs taken of specific individuals that had subsequently claimed that they were interrogated and treated as mistreated and treated as suspects in the case.

And I noted that in addition to Solache, Reyes, Mejia, that the only other photos were of those that also claim to have been mistreated by the police detectives.

BY MS. ROSEN:

Q. And what conclusion do you draw from those inferences?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Perhaps that they were suspects in this investigation.

BY MS. ROSEN:

Q. Okay.

Page 415

A. And again, if you would allow me, I did offer some analysis in my report, and it would be helpful if I was able to refresh my memory in terms of the Polaroid pictures.

Q. Yeah, we will get to that.

(Whereupon, Tiderington Deposition Exhibit No. 6 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit 6, which is your report, and we will go to page 33. So we are at Opinion 2 of your report, and the heading is "CPD's Policies and Practices Concerning Documentation and Disclosures in Homicide Investigations are Woefully Inadequate and Result in the Routine Failure to Document and Disclose the Documents and Information Learned during the Homicide Investigation to Criminal Defendants."

Did I read that correctly?

A. You did.

Q. So as I understand it, you have two main global criticisms. One is what you

Page 416

describe as a routine failure to document information, right?

A. That's correct.

Q. And the second is a routine failure to disclose the documents and information learned. Do I have that right?

A. You do.

Q. Now, with respect to your conclusion about a routine failure to document information learned in homicide investigations, other than your review of the information that you were provided in connection with the Soto homicide investigation, what else are you relying on to support that main point, number 1?

A. All right. And we can go through my report at this point?

Q. Yeah. I mean, if you feel like there is somewhere in your report that answers that question. You have it in front of you, correct?

A. I do.

Q. Yeah, sure.

Just so we are clear, I am

Page 417

uninterested in information related to the Soto homicide, right? I am looking for other evidence or data that you are relying on for the conclusion that there is a routine failure to document?

A. So not specific to the Soto case at all?

Q. Correct.

A. And then we can -- I can utilize the chart here to discuss the analysis there or not?

Q. Do you believe that that information is contained in the chart?

A. Well, certainly. Under -- there is information that the Chicago Police Department attempted to policies -- enacting policies that would require their officers to submit certain information into certain files, and the policy was not being followed globally within the department. I think there was testimony from the PD representatives that indicates that the policies were ineffective, and they did not ensure that documents were being forwarded

THOMAS TIDERINGTON, 10/06/2022                    Page 418..421

Page 418

as required by department policy.

Q. That's a different point, though, right? The failure to disclose is a different point than the failure to document, isn't it?

A. Well, no. Well, I think it's -- there is multiple issues within that question, and there is the street file issue where there is evidence that the officers were maintaining parallel files and that they had files that contained certain information that was never -- that never got to the permanent retention file or the investigative file.

There was significant exculpatory information that was found in street files, and this is again, in my view, all part of the problem within the Chicago Police Department in terms of creating the investigative files, properly creating the investigative files, holding the officers responsible for submitting the relevant documents, and then disclosing these documents as they are required to by law.

Page 419

Q. Okay. So let me try this again, because I thought we had agreed that there were two main points to be taken from the heading that I read that is accompanying Opinion Number 2, and that one was a failure to document, and the other was a failure to disclose?

A. Correct.

Q. Are those two separate points in your mind?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Well, I think they are two points, but they are all tied into the same issue. I think there is evidence in the record that witnesses were interviewed and that the proper GPRs were not being used to document the information, that there was investigative steps that were taken that were failed -- that there was a failure to document those investigative steps. I think that's what I saw throughout the investigations, and specifically in more

Page 420

detail, the Soto investigation.

BY MS. ROSEN:

Q. Yeah, so I am interested in what other investigations you observed a failure to document?

A. Right. If you want to look at the Jones investigation.

Q. Okay, so Jones, fine. That's one example. Tell me about any other example -- well, Jones, what was not documented in Jones?

A. Well, there was documentation -- well, false or misleading documentation of a photo lineup -- well, I'm sorry, of information that was used to convict a young man that was contrary to the reports that were found in a street file at some point later.

Q. That's an example of a failure to document, not a failure to disclose, a failure to document?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

Page 421

THE WITNESS: Well, I would say it was an overall failure to document the investigative stuff that the officers took in the Jones matter.

BY MS. ROSEN:

Q. What is the evidence that the officers in Jones failed to document?

A. All right. If you give me a second just to review that portion.

Q. Sure. What page are you reviewing?

A. Page 36 and 37.

Q. Okay.

A. Maybe it would be a good time to take a break as well after -- whenever you think it's appropriate. We have been going an hour and a half now.

Q. Yeah, sure. Why don't you just -- let's answer my question, and take a look at 36 and 37, and then tell me what was not documented in Jones?

A. Well, yeah, okay so in the Jones case, obviously, Officer Laverty documented his portion of the investigation in which he

Urlaub Bowen & Associates, Inc.  312-781-9586

THOMAS TIDERINGTON, 10/06/2022

Page 422..425

Page 422

concluded that Jones could not have possibly been the suspect. There was a separate street file that failed to document how they concluded that Jones was a suspect adequately to document how they concluded that Jones committed this crime.

MR. SWAMINATHAN: Are you good to keep going, or do you want to take a break?

MS. ROSEN: You can take a break if you are ready to take a break.

MR. SWAMINATHAN: It's up to you.

THE WITNESS: Yeah, I could take five minutes. Five minutes, would that be fine?

MS. ROSEN: Sure.

THE VIDEOGRAPHER: We are off the video record at 11:25 a.m.

(Whereupon, a break was taken at 11:25 a.m. to 11:34 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 11:34 a.m.

BY MS. ROSEN:

Q. In the George Jones case that we were just talking about happened in 1981,

Page 423

correct?

A. I believe so, yes.

Q. What other examples are in your report that support the notion that the Chicago Police Department's policies and practices resulted in a routine failure to document information learned during a homicide investigation?

A. Well again, before the break, I mean, we were talking about -- you had said, you know, you are really not talking about the Soto case, but, obviously, I did a deep dive into the Soto case versus a -- something lesser on the other 300 cases.

And what I saw in the Soto case, all right, in terms of, you know, not documenting, you know, what a witness said or didn't say, contemporaneous notes, the officer would interview a witness, and then a month later write a police report, and there were no responding notes with that.

These are things that I -- that were consistent when I was spot-checking the other cases that I would

Page 424

also find as an example.

Q. How were you able to determine when you were spot-checking the other cases that information was not being documented?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Well, there would be -- there would be cases where the police report would attribute statements to a witness, but then there were no notes. Some of the -- some of the cases in a homicide investigation, there were no notes whatsoever. Nothing on GPRs. Nothing on legal pads. Nothing in to-from memos.

So it's hard for me to believe or understand that a homicide investigation can be conducted without any type of written notes taken by a police officer.

BY MS. ROSEN:

Q. Do you list those examples in your report somewhere?

A. I don't think I listed them

Page 425

specifically, no.

Q. Can you identify them for us today, the case files that you are talking about?

A. I'm sure I could if we pull them up and go through them, yes, we could do that.

Q. We can go through all 344, is that the way that you propose that we figure out which case you are thinking about?

MR. SWAMINATHAN: Objection to form. Argumentative.

THE WITNESS: Well, I guess it's your decision how you want me to do it.

BY MS. ROSEN:

Q. I am asking you how can you answer the question? Is the only way for you to tell us which cases that you are thinking of is to go through all 344 files? Is that the only way to get an answer to the question?

A. Well, I don't think we have to --

MR. SWAMINATHAN: Go ahead.

THE WITNESS: I'm sorry. I don't think we have to go through 344. We could

THOMAS TIDERINGTON, 10/06/2022                    Page 426..429

Page 426

randomly pick a case, we could go through it together, and I can explain what I would expect to see in a case and what perhaps is missing.

BY MS. ROSEN:

Q. Why didn't you identify those cases in your report in support of your opinion?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: Well, I think I did, and I did identify several instances, and I think the Soto is probably the best example, and I think it's detailed pretty comprehensively.

BY MS. ROSEN:

Q. Can you direct me to your report where you list other cases other than the Soto homicide that are examples of detectives failing to document information, and other than Jones?

A. If you want to turn to page 50.

Q. Okay.

Page 427

A. We can go through those cases. I think that illustrates some of the examples that I could provide for you.

Q. When you say "those cases," are you referring to the list of RD numbers that appear about midway through the -- through the report?

A. That's correct.

Q. And you believe in those cases, there are examples of police officers failing to document information they learned in a homicide investigation; is that correct?

A. I do.

Q. And explain to me if the information was not documented how you know that the information existed?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: So I think your question is: If something is missing, how do you know it's missing?

Page 428

BY MS. ROSEN:

Q. Exactly.

A. Well -- and that's a good question, but I have reviewed and conducted enough criminal investigations to understand what you would typically see in a homicide file or any type of a criminal investigation file, and what I am seeing in many of the Chicago Police Department files is unlike what I would typically see in other police departments that I am familiar with.

Q. Other than this list of RD numbers, there is five of them, on page 50, anyplace else where you have identified files that support your conclusion that there was a routine failure to document information learned in a homicide investigation?

A. Well, I think we would also reference the chart in Attachment F, which also confirms my opinion there, I believe.

Q. Is there a column that says failure to document in the chart?

A. I don't think it says a failure to

Page 429

document, but it certainly says what's missing or what's contained within there. GPRs as an example. I think there is a column that lists that, and the numbers of cases that do not have GPRs in them.

Q. So if an investigative file doesn't have a GPR, that fact supports your conclusion of a failure to document; is that correct?

A. Well, it may. I don't want to say in every case, but it would be something that I would be concerned about. If I was a supervisor looking over a file, I would be concerned about that, yes. It would be -- I would expect in the vast majority of homicide cases that there would be some type of notes by the investigator.

Q. And did you look at the cases that are listed in the chart? Well, let me back up for a second, just so I am clear.

The point you are making is that when we look at the chart, we will find noted that there are investigative files without any GPRs in those files? Is that

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022

Page 430..433

Page 430

what you are saying?

A. Yes. Could I -- you don't mind if I look at the chart at this point, right?

Q. No, go ahead.

A. Okay.

Q. So is that the point you were making?

A. I think that's accurate, yes.

Q. Can you tell me what column you are looking at that establishes that?

A. There is a column that says, "Are there handwritten notes in the file not on GPRs?" is one file. "Are there any handwritten notes?" is another column.

Q. Is there a column that says, Are there GPRs in the investigative file?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: I am sorry, can you ask that again?

BY MS. ROSEN:

Q. Sure. Is there a column that notes whether or not there are GPRs in an

Page 431

investigative file?

A. There is a column that says, "Are there handwritten notes in a file that are not on GPRs?" is one of the files -- one of the columns.

Q. That's a different point?

A. Right.

Q. Right? That point is notes are in the file, they are just not on a GPR form?

MR. SWAMINATHAN: Are you asking -- go ahead.

BY MS. ROSEN:

Q. I am asking -- it's my understanding of the chart. Isn't that your understanding of the chart?

A. All right, yes.

Q. I thought the point you were making was that there are investigative files that contain no GPRs?

A. There are.

Q. Correct?

A. There are.

Q. And so I am asking you, when we look at this chart, what columns should I be

Page 432

looking for for that information?

A. "Are significant documents missing from the investigative file inventory?" is another column in there. And "Are there any handwritten notes?" All right, whether they are on GPRs or whether or not are they on legal pads. Are there any handwritten notes?

Q. That's your interpretation of that column?

A. That's my understanding, yes.

Q. What's your understanding based on?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

THE WITNESS: It says, "Are there any handwritten notes in the investigative file?" And then there is a column that goes through and says, yes, yes, yes, and then there are some that say, no, no, no.

BY MS. ROSEN:

Q. But that point is the point about there's handwritten notes that aren't being

Page 433

written on a GPR?

MR. SWAMINATHAN: No. Objection to form and foundation.

MS. ROSEN: Are you testifying, Anand?

MR. SWAMINATHAN: You are putting words in his mouth.

MS. ROSEN: Because you prepared the report, you want to explain it? I am asking him.

MR. SWAMINATHAN: You are putting words in his mouth.

MS. ROSEN: No. He can explain it. He can explain it.

MR. SWAMINATHAN: He just showed you the column, and you asked him a question about the next column. That's totally unfair.

MS. ROSEN: You know what, he utilized this column to do this report, these attachments for his opinion. He can be tasked with explaining it; not you.

MR. SWAMINATHAN: He is explaining, which what he -- he talked to

THOMAS TIDERINGTON, 10/06/2022                    Page 434..437

Page 434

you about one column, and you asked him a question that makes a premise about the next column. That's not fair.

MS. ROSEN: No more speaking objections, please.

MS. GOLDEN: Anand, I would just respectfully ask that you not shake your head yes or shake your head no.

MR. SWAMINATHAN: No, please.

MS. GOLDEN: Ms. Rosen has asked a question and before the witness has answered it. I just saw that a couple of times and nobody else is in the room. I know that it's -- it doesn't mean anything necessarily, however, I would just ask that you not -- try to refrain from doing that, please.

MR. SWAMINATHAN: Ask your next question.

BY MS. ROSEN:

Q. Any other columns that you believe support your opinion that there was a routine failure to document information learned from a homicide investigation?

Page 435

A. Okay, the fourth column from the -- from the left "Are significant documents missing from investigative file inventory?"

Q. What is investigative file inventory?

A. Well, the inventory sheet is where all of the documents that are contained within a case file should be on the inventory, and the way the Chicago Police Department, at least their policy, which I believe was deficient, they used that as the document to provide to the defense and others apparently, as an index of what is contained within the file.

Q. Okay. So this column that you are pointing to, which is Column I, right?

A. I don't have a -- what I am looking at doesn't have a letter on it.

Q. Well, that's too bad.

So the header is "Are significant documents missing from investigative file inventory? List report, type and dates." Correct?

Page 436

A. That's correct.

Q. So that means that the document is in the file, it's not listed on the investigative file inventory, correct?

A. That was one of the problems identified, yes.

Q. So that means that the information actually was documented -- the information learned in the homicide investigation was documented because it's in the file. The problem being identified there is that the investigative file inventory is incomplete, correct?

A. Again, that's one of the issues. And there is also another column that says, "Are there any handwritten notes?"

Q. Right. That's the one that you just told me about.

A. Right. But then you asked on whether or not I meant GPRs or whether or not I meant -- and what the column and what was contained in the file. There are some files -- my recollection when I went through some of these files that there were no

Page 437

handwritten notes whatsoever in the files about a homicide case.

Q. So your understanding of that particular column, which is -- reads, "Are there any handwritten notes?" is to capture whether or not there is any piece of paper in the file that contains handwriting? Do I have that correct?

A. That's my understanding.

Q. And what's the basis of your understanding for drawing that conclusion?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: Well, I did note -- I did go -- I did -- some of the files that I went through, there were -- there was a file that -- or there were files that I did not believe were consistent with what I normally see in a homicide investigation. And as I testified to, there were files that did not have any type of handwritten notes by the officer whatsoever.

THOMAS TIDERINGTON, 10/06/2022                    Page 438..441

Page 438

BY MS. ROSEN:

Q. By any officer?

A. By any officers.

Q. And did you compare -- how did you identify those files? From the chart or on your own?

A. Through my spot-checking of the cases.

Q. How many files are there in that column that say "no"?

A. I --

Q. Do you know?

A. I don't know offhand.

Q. Did you tabulate that?

A. I don't think I did, no.

Q. Okay. Any other data contained within your report to support the conclusion that there was a routine failure to document?

A. I think we discussed it.

Q. What is your understanding of what is meant by the use of the phrase "street file"?

A. My understanding is street files

Page 439

were files that were used that perhaps the detectives kept in their desk. I think they were also referred to perhaps as working files, and that they were not considered a formal file that would have been turned over.

Q. The investigative file -- are the investigative files that you reviewed formal files that are turned over?

A. Well, I mean, all of these files should be formal files within a police department, regardless of what they are called. These are -- any -- any documentation relating to a criminal case should be considered a formal file. And as you have pointed out, there's a number of different files within the Chicago Police Department, parallel files, and I believe that contributed to some of the problems that I see, that I see that I saw in conducting my analysis.

Q. But my question is a little bit different. You reviewed investigative files from 1995 to 1998, correct, 344 of them?

Page 440

A. That's correct.

Q. Were those considered formal files by the Chicago Police Department?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I believe those were considered standard, or we are using the word "formal." Yeah, I guess you have to define what "formal" means, I guess.

BY MS. ROSEN:

Q. Well, when I asked you your understanding of street file, you said files that were sometimes kept in desks that were not considered a formal file that would be turned over to the criminal process or to the prosecutors or to the defense attorneys. So then I am using that definition, your word, to ask you about investigative files.

A. Right.

Q. So you reviewed 344 investigative files from 1995 to 1998. Is it your understanding that those files were considered formal files to be turned over by

Page 441

the Chicago Police Department?

A. Yes.

Q. And did you see any evidence in your review of the materials -- let me start over.

Did you see any evidence in your review of the 344 investigative files that entire files were not turned over to criminal defendants or prosecutors?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: I think there were files missing from the Public Defender's Office, yes.

BY MS. ROSEN:

Q. Entire investigative files were missing from the Public Defender's Office?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I believe so, yes.

BY MS. ROSEN:

Q. Can you identify which RD numbers

THOMAS TIDERINGTON, 10/06/2022                    Page 442..445

Page 442

you are referencing?

A. You know what, I can't, not as we sit here. It's my recollection. I could be wrong. And if I am wrong and if you can point out that I am mistaken, I certainly would not argue about that.

Q. Do you in your report identify any files, any investigative files, that were completely missing from a criminal defense file?

A. From the Public Defender's file?

Q. Yes.

A. I don't think I identified any of those, no.

Q. On page 35 of your report, you state -- if we could put the exhibit back up, Exhibit 6. You state, "Standard police practice in 1998 was to maintain a centralized repository often referred to as a single 'murder book' or 'homicide file' to collect and store all investigative information learned during the course of a homicide investigation."

Do you see that there?

Page 443

A. I do.

Q. What is your basis for concluding it was standard police practice in 1998 to maintain a centralized repository?

A. Based on my experience.

Q. Anything else?

A. That's primarily my experience in working with several different police departments, yes.

Q. Well, Detroit, right?

A. That's correct.

Q. And Fort Lauderdale, right?

A. Correct.

Q. What other police department?

A. Well, the DEA and other departments that we worked joint investigations with. The Broward Sheriff's Office would be an example. You know, we worked many cooperative investigations.

Q. And it's your opinion based on that experience that the DEA maintained a centralized repository for its murder investigations?

A. No, not for homicide

Page 444

investigations. For their investigations.

Q. The DEA doesn't do homicide investigations, right?

A. That's correct. Well, they might participate in a homicide investigation, but typically what I am suggesting is the DEA has a central depository and a case agent that's responsible for that case file, which is consistent with how criminal investigations should be conducted.

Q. Do you know back in 1998 how New York handled its record keeping with respect to homicide investigations?

A. I do not.

Q. How about Los Angeles, do you know what -- how Los Angeles handled its record keeping or file maintenance with respect to homicide investigations back in 1998?

A. I think L.A. -- I think L.A. was the -- somewhat of the leader on the murder book of where there is one central depository for information.

Q. When did that come about?

A. I don't know exactly the date, but

Page 445

I know that that was what they taught, and I know that that's what they recommended.

Q. Is there any -- is there any police practice manual or national standards that you are relying on in support of your conclusion that it was standard police practice in 1998 to maintain a centralized repository for homicide investigations?

A. Well, I think IACP had information on it. I don't know if it dated back into 1998. That, I am unclear of, and I would probably have to look back and see what the dates were on that.

Q. The materials that you reference in your attachment?

A. No. You had asked whether IACP or any other -- well, any other -- you had asked any other department, but I had mentioned IACP often provides model policies to agencies, and I know they have spoken on this topic. I don't know if it was prior to 1998 or after 1998 is what I would have to go do additional research on.

Q. And you did not do that research

THOMAS TIDERINGTON, 10/06/2022                    Page 446..449

Page 446

before now?

A. You know what --

Q. You have got to let me finish my question.

A. I am sorry. I'm sorry.

Q. You did not do that research before you prepared your report, correct?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

THE WITNESS: I would have to again look back at the IACP information that I have listed to see exactly what the dates are on it.

BY MS. ROSEN:

Q. Listed on the attachments to your report you mean, right?

A. The material provided by IACP, yes.

Q. Right. You have some of that listed on your -- two of your attachments, right?

A. Right.

Q. So if it's not there, you didn't

Page 447

look at it, right?

A. That would be a fair assessment, yes.

Q. How did you learn about the George Jones case?

A. What do you mean how did I learn about it? The information was provided to me by plaintiff's counsel.

Q. And you also reference the Palmer litigation in your report, correct?

A. That's correct.

Q. How did you learn about the Palmer litigation?

A. That was information that was provided.

Q. And if we take a look at page 38 of your report, the last line above the paragraph with the heading "George Jones Appeal," it says, "The Seventh Circuit did not revisit or revise Judge Shadur's factual findings."

Do you see that?

A. I do.

Q. There is a citation to the Palmer

Page 448

case. Do you see that?

A. Yes.

Q. Did you read the Palmer case that you cite there?

A. Not in -- not in specific detail.

Q. So then how did you know that the Seventh Circuit did not revisit or revise Judge Shadur's factual finding?

A. I think I cut and pasted it from that ruling.

Q. From the Seventh Circuit ruling?

A. From the document that I reviewed. I don't know exactly if it was the Seventh Circuit or if it was some other document.

Q. So you cite to that Palmer case, right there, right? That's what that footnote means?

A. That's correct.

Q. So do you think that you cut and pasted from that particular decision that you cite there?

A. I very well may have.

Q. But you are not sure?

A. I can't tell you for sure at this

Page 449

point.

Q. Did you read any other opinions that were issue -- well, let me back up for a second. It says -- the citation says, Palmer versus City of Chicago, 755F.2d 560, (7th Cir. 1985). Do you see that there?

A. I do.

Q. Do you know what the F.2d is a reference to?

A. I don't.

Q. Do you know what the Cir. is a reference to?

A. Circuit, I believe.

Q. Do you have an understanding of what the Seventh Circuit is?

A. Probably not to the extent that you do.

Q. Do you have any understanding of what the Seventh Circuit is?

A. Not -- no, I don't. I know it's part of the judicial system in Chicago.

Q. Have you been provided any other opinions issued by the Seventh Circuit regarding the Palmer litigation after 1985?

THOMAS TIDERINGTON, 10/06/2022                    Page 450..453

Page 450

A. I don't think so.

(Whereupon, Tiderington Deposition Exhibit No. 10 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 10?

MR. SWAMINATHAN: Which exhibit?

MS. ROSEN: 10.

THE WITNESS: Which is what?

MS. ROSEN: It is the Seventh Circuit's opinion issued November 26, 1986, and if we go to page --

MR. SWAMINATHAN: You are showing him a different document that you are referring to than the footnote one you are talking about?

MS. ROSEN: That's correct, page 4. But you don't need to clue him in in that way, Anand.

MR. SWAMINATHAN: I am not clueing him in. I don't want there to be any confusion.

MS. ROSEN: Well, if he is

Page 451

confused, he is a big boy, and he can tell me.

MR. SWAMINATHAN: It wasn't your intention, obviously, to have him mistakenly think you were showing him a document other than the one you showed him, right? I didn't cause you any -- unless your intention was to mislead them.

MS. ROSEN: Of course not, but you don't need to be coaching your way through this.

MR. SWAMINATHAN: I'm not coaching my way through anything. I am just trying to confirm -- unless your purpose was to mislead him, what did I say to coach him?

MS. ROSEN: Oh, my god, just stop.

BY MS. ROSEN:

Q. Let's go to page 4 of the opinion, and you will see -- why is yours looking different than mine? Keep going.

So the pagination is a little bit different. I am going to ask you to take a look at the highlighted language here, and it's describing the lawsuit that

Page 452

you discuss in your report, the class action lawsuit. And the Seventh Circuit notes in that first highlighted paragraph:

"...it challenges the constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.' The District Court issued a temporary restraining order directing the City preserve such material pending decision on the plaintiff's motion for a preliminary injunction. In compliance with this order, the City adopted retention procedures that in 1993 the District Court by a preliminary injunction required the City to continue and in certain respects amplify."

Do you see that there?

A. I do.

Page 453

Q. And I take it, you have never read this opinion before I am showing it to you today, correct?

A. Well, can I look at the beginning of it?

Q. Sure. That's the beginning. It begins right there. That's where the language starts.

A. The beginning of the document, though?

Q. Sure.

A. I don't know how I could scroll. I can't scroll up and see.

Q. She will scroll. Robyn will scroll up for you.

A. All right. So I am just going to read it. Do you want me to read the document or just rely on the highlighted area?

Q. Yeah, I just want you to rely on the highlighted area, and I am asking you -- my question is: Have you read that language -- have you seen that language or read that language that I just read to you before I am

Page 454

showing it to you today?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: I have seen it. I don't know verbatim, but I have seen similar language to what you read to me.

BY MS. ROSEN:

Q. And then if we can go back to the page I was on, and then below more highlighted language, it says, "Meanwhile, the City had appealed from the grant of the preliminary injunction and in 1985, this Court reversed."

Do you see that?

A. I do.

Q. And then the citation there is to 755 F.2d 560 (7th Cir. 1985), which is the citation you have in footnote 61 of your report, right?

A. That's correct.

Q. And then reading on to the next highlighted section, it says:

"We also held, however, that

Page 455

the convicted defendants were entitled to a preliminary injunction (patterned on the temporary restraining order) directing the City to preserve the defendants' files until the defendants could discover whether they had any basis either for mounting a collateral attack on their convictions or for obtaining damages under Section 1983 for violation of their constitutional rights. We remanded the case for the entry of a suitable injunction."

Do you see that there?

A. I do see that.

Q. Did you understand that after the Seventh Circuit reversed Judge Shadur that they sent the case back under the conditions that I just read to you so that plaintiffs would have an opportunity to review the files?

A. Did I understand that from based

Page 456

on what you just read to me?

Q. No. Well, did you understand that as you were preparing your report that that's what happened?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: That's apparently what happened. I don't know if I knew that while I was doing my report or not.

BY MS. ROSEN:

Q. And then the next highlighted language reads:

"With the case back in the District Court, the plaintiffs' lawyers inspected the files but found nothing on which they could base a claim that any member of the class had been convicted in violation of the constitution."

Do you see that there?

A. I do.

Q. Were you aware that none of the files contained any material that indicated

Page 457

that any of the plaintiffs had had their constitutional rights violated?

MR. SWAMINATHAN: Objection to form and foundation. Misstates the testimony -- or the exhibit, rather.

THE WITNESS: I don't know if I was aware of that or not.

BY MS. ROSEN:

Q. Okay. If we can now go to the next highlighted portion, which shows up as page 7 for me. There we go.

All right. If we look to the highlighted middle of the page that begins, "The plaintiffs, we now know have lost this case." Do you see that?

A. I do see that.

Q. And then it goes on to say:

"The plaintiffs asked for a preliminary injunction. They got it, but this Court threw it out. The only relief we allowed was an order (never actually entered by the District Court so far as we can determine) directing the City

THOMAS TIDERINGTON, 10/06/2022

Page 458

to retain its 'street files' and allow convicted members of the plaintiff class to inspect them for information which they might use either to get their convictions overturned or to get damages for wrongful conviction."

And then it goes on, "Such an order is worthless if discovery turns up nothing; indeed, it's worse than worthless because then the party has incurred an expense without obtaining any benefit from it. That is what happened here. Upon reviewing the files, the plaintiffs' counsel were unable to find anything worthwhile. They went on a fishing expedition and the pond was empty."

Do you see that there?

A. I do see that.

Q. Were you aware that when you were preparing your report that the files that were at issue in the Palmer case, which were

Page 459

street files, which is as you described the informal files that weren't being turned over, that after plaintiffs' counsel in the Palmer litigation reviewed those files, they found nothing in those files that would allow them to either overturn their conviction or obtain money damages for a wrongful conviction? Is that something you were aware of when you prepared your report?

MR. SWAMINATHAN: Objection to form and foundation.

THE WITNESS: I don't know if I was aware of it at that time, no.

MS. ROSEN: We can take Exhibit 10 down.

BY MS. ROSEN:

Q. If we go to page 39 of your report, so back to Exhibit No. 6, at the bottom of page 39, it begins your discussion of the steps the Chicago Police Department took after Jones and Palmer, correct?

A. That's correct.

Q. Okay. And then in your opinion, those steps are inadequate to ensure that

Page 460

all relevant investigative materials are disclosed, correct?

A. That was my opinion or is my opinion, yes.

Q. If we go to page 40 of your report, you have a discussion of Special Order 83-1 at the bottom of the page. Do you see that there?

A. Yes.

Q. And this is one of the directives that in your view is inadequate, correct?

A. That's correct.

Q. And we already discussed it, but you are aware that Mike Brasfield provided opinions and testimony in a case called Fields, correct?

A. That's my understanding.

Q. And, in fact, you have some discussion of the Fields case in your report, correct?

A. That is correct.

(Whereupon, Tiderington Deposition Exhibit No. 9 was screen-shared/referenced.)

Page 461

BY MS. ROSEN:

Q. If we could take a look at Exhibit 9.

And you were provided some Fields materials other than Mr. Brasfield's report, correct?

A. I believe I was, yes.

Q. Item 85 and Item 86 are the -- in your attachment are Fields documents, Fields PRF and Fields area file, right?

A. I am looking at that at this point, yes.

Q. And there might be other Fields materials on here. I don't want to take the time to look, but in any event, you were provided some Fields material.

Were you provided any Fields trial testimony from the civil case?

A. I am going back to that attachment, so if you can bear with me for a second.

Q. Sure.

A. Okay. I found it. What -- I am sorry, if you could please reask your

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022                    Page 462..465

Page 462

question.

Q. There are Fields documents noted. I located quickly, as I am just looking at this, Items 85 and 86 are related to the Fields case, correct?

A. Yes.

Q. And 84, actually, right? 84, 85, and 86?

A. Yes.

Q. And then you also had Mr. Brasfield's report?

A. That's correct.

Q. So my question is: Were you provided any of the trial testimony from the Fields civil trial?

A. I don't recall seeing that. It's possible, but I don't recall as we sit here today that I reviewed it.

Q. So I am showing -- we have up here marked as Exhibit No. 9 testimony from March 13th of 2014 in Mr. Fields' civil case. If we can go to page 36 of the PDF, this is the -- wait, sorry.

If we could go to the next

Page 463

page, you will see that there is the direct examination of plaintiff's witness Lou Reiter. Do you know who Lou Reiter is?

A. I don't recall that name.

Q. As you can see here from Line 13 and 14 of the transcript, Mr. Reiter was a police consultant, and since this is the direct examination by plaintiff, he is plaintiff's expert --

A. Correct.

Q. -- in the Fields case that he is testifying in this transcript, okay?

MR. SWAMINATHAN: You want to explain to him what -- are you explaining what this transcript is, or what trial this is, or which trial this is? He's never seen this document.

MS. ROSEN: I've explained to him that it was testimony from Mr. Fields' trial. That's what I explained to him, and that is accurate.

MR. SWAMINATHAN: There are multiple trials. You haven't explained --

MS. ROSEN: I don't have to --

Page 464

Anand, if you want to ask him questions, then you can ask him question at the end.

(Nonreportable cross-talk.)

MR. SWAMINATHAN: You are asking him --

MS. ROSEN: This is my exam. Don't talk over me. I am going to conduct my exam as I see appropriate.

MR. SWAMINATHAN: No. But if you are going to -- you are showing him a document he has never seen before. If you are going to ask him about that document, you should give him the relevant context for the document, otherwise you are just trying to mislead him.

MS. ROSEN: I am not.

MR. SWAMINATHAN: So why are you --

MS. ROSEN: Anand, no, I am not. We are not going to -- we are not going to waste time on my record doing this.

MR. SWAMINATHAN: No, it's not a matter of wasting time. You said this is the trial transcript. Why are you making

Page 465

that ambiguous statement? You know what the real facts are. Why would you -- why don't you explain the circumstances? Why is it deliberately the case that you want to mislead him and not let him know the context?

MS. ROSEN: That is so inappropriate for you to be saying that. You have not even let me finish asking my questions.

Is it not true that this is trial testimony from Fields? It absolutely is true. Is it not true that Mr. Reiter was plaintiffs' expert? It is true. I am not misleading him at all, and you can stop talking now.

MR. SWAMINATHAN: Okay. Let the record reflect counsel is showing this witness a document that he has never seen before.

MS. ROSEN: You are making a speaking objection to try to coach the witness.

MR. SWAMINATHAN: And counsel is

THOMAS TIDERINGTON, 10/06/2022

Page 466..469

Page 466

making representations about what the document is that plaintiff's counsel, I believe, are misleading representations about what this is, given that the witness has not seen this document before and doesn't have a relevant context about trials, and what trial this is referring to. Go ahead.

BY MS. ROSEN:

Q. Okay. Can we go to page 36 of the PDF, please. And as you can see at the top of this page here, it says, Reiter, cross, right? So it's the cross-examination by the defendant -- one of the defense counsel in this case. And the question that is being asked and the answers are highlighted, but I would like to ask you some questions about, and I will read them.

"And actually it was -- it sounds like it was about -- it was implemented January of '83, and then the late '90s some other department started to get around to implementing written policies

Page 467

like this; is that true?

"Yes."

And then the question is:

"So Chicago was ahead of its time with respect to this written policy, isn't that true?"

And the answer is: "Yes."

Do you see that there?

A. I do see that.

Q. Have you ever heard from any source that the directives that were implemented by the Chicago Police Department after Jones and Palmer in 1983 were ahead of their time with respect to the written policy on documentation of information learned in homicide investigations?

MR. SWAMINATHAN: Objection to form and foundation and to any questions showing the witness -- taking a witness to page 36 of a 54-page document that he hasn't seen before and simply asking him out of context about one question and answer.

Go ahead.

THE WITNESS: I am sorry, could

Page 468

you please ask the question again just so I am clear?

MR. SWAMINATHAN: And I will just say same objection. Go ahead so you can get question and answer.

MS. ROSEN: Can you just read back my question, Maribeth.

(Whereupon, record read, as requested.)

MR. SWAMINATHAN: Same objection.

THE WITNESS: So I guess before I can answer that question, could I read a couple of pages back because they are discussing 83-1? So for context, I think it would be important for me to understand what was being discussed there.

MS. ROSEN: Sure. We can go back a couple of pages. Let's go back two pages.

THE WITNESS: I mean, I am trying to understand in context. This was an expert for the plaintiff or -- I don't know exactly who he is, I don't think.

BY MS. ROSEN:

Q. Okay, and that's fair. I am

Page 469

representing to you that he was the expert, one of plaintiff's experts in the Fields trial that took place in 2014 and --

A. In 2014?

Q. The civil trial that took place in 2014, yes. Not his criminal case, the civil case that took place.

MR. SWAMINATHAN: Not civil. You said the civil trial. This was not the civil trial.

MS. ROSEN: Oh, my god, Anand, honestly.

MR. SWAMINATHAN: You are misrepresenting the record to him.

MS. ROSEN: The civil trial that took place in 2014 is factually accurate.

MR. SWAMINATHAN: Why are you deliberating going out of your way to make it seem like there is only one civil trial?

MS. ROSEN: What difference does it make if there were one or seven? I am not going to keep engaging in this conversation with you.

MR. SWAMINATHAN: No, you are

Page 470

deliberately saying things to him to make it appear as though -- to create a sense of -- a set of facts that is not the case, and that bothers me.

MS. ROSEN: It is sworn testimony by a witness. Irrespective of when it was given or at what time period, it is sworn testimony.

MR. SWAMINATHAN: It is sworn testimony, but you are deliberately going out of your way to use phrases to make it seem as though there is one instance of a civil trial and --

MS. ROSEN: I am pretty sure he got the point now that there was a second civil trial. You have made that point, and I think it's irrelevant.

BY MS. ROSEN:

Q. Okay. So my question is really pretty simple. Had you heard from any source that Special Order 83-1 was ahead of its time?

MR. SWAMINATHAN: You can answer that question if you ever heard of it. You

Page 471

can answer that.

THE WITNESS: No, I haven't heard that.

MS. ROSEN: We are done with Exhibit No. 9. Thank you.

THE WITNESS: I'm sorry. Can I just for one clarification? Because I did answer but now I am reflecting on my answer. Ahead of their time in what respect?

BY MS. ROSEN:

Q. In terms of the policy being ahead of its time with respect to the requirements regarding documenting information related to homicide investigations?

MR. SWAMINATHAN: Objection to form and foundation.

You can go ahead.

BY MS. ROSEN:

Q. Did you answer?

A. Well, I guess I didn't answer because I -- then my next question would be: Which policy are you speaking of? And then I would have to look at that. So I don't know if you wanted me to get into that

Page 472

detail, and I don't know if my answer reflected a suggestion that I knew which policy that they were referring to. But nevertheless, I've never heard that Chicago PD was ahead of their time in the record keeping in any respect.

BY MS. ROSEN:

Q. It's with respect to the Special Order 83-1?

MR. SWAMINATHAN: Objection to form. Asked and answered.

THE WITNESS: So --

BY MS. ROSEN:

Q. That was on the page.

A. It was only -- it was only with respect to Special Order 83-1?

Q. Correct.

A. No, I would never have heard that from anybody.

I'm sorry, would this be a good time to take a quick break?

MS. ROSEN: Sure. I am going to need to break again in an hour. So if you want to take like a ten-minute break now,

Page 473

and then break for lunch at 1:30? It's up to you.

MR. SWAMINATHAN: That's a good question. Tom, can you -- I guess what she is saying in one hour she has to break. So we can do a lunch then if you can make it another hour. Or if you want to get lunch, we should do it now.

THE WITNESS: Are you only going to be gone for an hour, or is this going to maybe drag on into all day?

MS. ROSEN: No, no, no. I don't expect to be longer than 30 minutes, if that, so.

THE WITNESS: Yeah, why don't we take a quick break now and then if we can go to lunch while you have to do whatever you have to do.

MS. ROSEN: Perfect.

THE WITNESS: All right. Thank you.

MS. ROSEN: Yes.

THE VIDEOGRAPHER: We are off the video record at 12:32 p.m.

THOMAS TIDERINGTON, 10/06/2022　　　　　Page 474..477

Page 474

(Whereupon, a break was taken at 12:32 p.m. to 12:44 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 12:44 p.m.

BY MS. ROSEN:

Q. If we can go back to Exhibit 6, the report, and go to page 45. This section of your report discusses what in your opinion amount to the insufficient remedies to the street file problem. Do you see that?

A. I do.

Q. And so the first point is the continued use of parallel files, correct?

A. I'm sorry, where are you -- where are you at?

Q. Point 1 on page --

A. I was on page 45, I apologize.

Q. We are on page 45, right? "The policies described above are insufficient to remedy the street file problem."

A. I'm sorry. I was on the wrong page. I have it now.

Q. And one of your criticisms is

Page 475

about the continued use of parallel files, correct?

A. That's correct.

Q. And then if we go to the next page, another criticism is the discretion that is allowed to the detectives to determine what's relevant and needs to be documented and disclosed. Do you see that, that's the line there on paragraph 2 -- I mean, Point 2?

A. I do see that, yes.

Q. Okay. So is it your view that the detectives should not be allowed to utilize their discretion to determine what information is relevant to an investigation that needs to be memorialized?

A. That needs to be memorialized, you mean turned over?

Q. No. Memorialized, written down?

A. And again, I am thinking about your question and make sure I understand it completely. Should an officer have discretion about what they document in some type of a report?

Page 476

Q. Correct.

A. I think it would be somewhat discretionary with guidance from their department, but anything that is related to a criminal investigation, related to a homicide should be documented, and I think that's what law enforcement officers are taught from the academy on.

Q. And as I understand your criticism of the directives that were put in place after Jones and Palmer is that the directive did not specifically instruct the detectives regarding what needs to be documented. Do I have that right?

A. Which directive? I think I know, but I just want to clarify which directive or all of the directives?

Q. Well, let's go back to page 45 for a second. The heading is "The policies described above are insufficient to remedy the street files problem." Correct?

A. That's correct.

Q. What is that referencing? What policies is that referencing?

Page 477

A. The memos that came out, and eventually, the special order.

Q. So in your view, those policies are insufficient, right?

A. That's correct.

Q. And then if we go to the next page, page 46, one reason they are deficient is because they allow the detectives discretion to determine what is relevant and needs to be documented and disclosed. So I am focusing on the documented part of it so --

A. Right.

Q. -- as I understand it, you believe that despite the fact that you just told me that detectives have discretion that the CPD policies were insufficient because they allowed detectives to exercise their discretion in determining what's relevant and needs to be documented, right?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: Yeah, that's kind of

THOMAS TIDERINGTON, 10/06/2022                    Page 478..481

Page 478

a long question. I -- you would have to look at other CPD policies, and their policies would mandate what the officers should include in police reports. So in that respect, I don't think there is a lot of discretion. I think that the officers should follow whatever their policies are, and I think the policies would tell the officer that anything related to the investigation should be documented, and then we would move on to the next step of what should be disclosed.

BY MS. ROSEN:

Q. Okay, and we will get to the disclosure part of it as we talk about the problems that you identify further down in your report about disclosures.

The item number 3 is "No procedures or written instructions to subpoena responders to make sure investigative material from all location is disclosed." Do you see that?

A. I do.

Q. So is your criticism here simply

Page 479

that there is no written policy directing the subpoena response unit, specifically regarding units within the Chicago Police Department from which they can obtain records?

A. Well, that's certainly part of my criticism.

Q. What's the rest of your criticism with respect to the subpoena response unit?

A. Well, as the department spokesperson, there were problems, there was no way for the subpoena service unit, the records division, to know what units that they would need to query, and if they ever get a subpoena in order to get all the documents on a particular case.

MS. ROSEN: Can you read back his answer.

(Whereupon, the record was read as requested.)

BY MS. ROSEN:

Q. So your recollection is that the City of Chicago spokesperson said that there was no way for the subpoena service unit to

Page 480

know from where to get the documents? Is that what you just said?

A. Well, Hickey described that it was a -- I think it was an art, I think is the word that he used, and that it was possible in a case with multiple units working on the same investigation for the subpoena to go to only one of these units. So certainly, I am summarizing what his statements were, but that was my take-away from reading his testimony.

Q. Do you know how many subpoenas the subpoena service response unit processed in any given year in, say, 1998?

A. How many?

Q. Yes. How many subpoenas they processed?

A. I thought you were asking me to guess.

Q. No. Do you know? Do you have any idea?

A. No, I don't.

Q. And what is your understanding of how subpoenas work in the criminal court in

Page 481

Cook County?

A. I don't have an understanding of how they work.

Q. In your review of the materials in connection with the Soto homicide investigation, did you find a deficiency in any CPD response to any subpoena issued either by the state or any of the criminal defendants?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I don't recall seeing that.

BY MS. ROSEN:

Q. All right. If we move to page 48, the fourth point is: "There was inadequate training, and monitoring/auditing to ensure compliance with the special orders." Do you see that?

A. I am sorry, what page? You are on 48?

Q. Yes, Point 4.

A. Yes.

THOMAS TIDERINGTON, 10/06/2022

Page 482..485

Page 482

Q. So the fourth point you make here in this section is that there -- there was inadequate training and monitoring/auditing to ensure compliance with the special orders. Do you see that?

A. That's correct.

Q. And you reference the training that was done after Special Order 83-1 was issued, right?

A. Yes, that is correct.

Q. And I don't see anything in here about training that was done after the 86 directive was issued, or training that was done after the 1988 SOP was issued.

Do you have any information about training that was conducted within the detective division in connection with the issuance of those directives?

A. Well, I guess you'd have to look at Hickey's testimony that he believed that the detectives were reverting back to their own record keeping system. He was not aware of the policy being followed. There was no monitoring. There was no auditing of the

Page 483

system. If I understand your question correctly.

MS. ROSEN: Can you read back his answer again, please, sorry.

(Whereupon, record read, as requested.)

BY MS. ROSEN:

Q. And that's your memory of Mr. Hickey's testimony; is that correct?

A. It is.

Q. Back to my question, with respect to 19 -- let's go with 1988 when the SOP was issued, right, that's the standard operating procedure manual for the detective division, correct?

A. Yes, it is.

Q. And do you know, for example, when a new detective -- when a police officer made detective, say, in 1989 or 1990, do you know what the process was with respect to training for that new detective within the Chicago Police Department?

A. I don't.

Q. Do you know whether or not they

Page 484

went to specific detective training?

A. Well, in most police agencies, they do have that type of a system set up for new detectives, but I don't know. I don't believe I saw anything that would tell me about the training for the new detective.

Q. And so you don't know what was being trained with respect to the new directives related to general progress reports and investigative files, correct?

A. Well, only based on what Hickey and Winstrom testified to that it was inadequate, and it was deficient.

Q. They both testified that it was inadequate and it was deficient?

A. Well, those -- in summary, that's the take-away I got from their testimony, yes.

Q. Okay.

A. They also mentioned they weren't aware of any type of -- any officer ever being disciplined for violating any of these policies or procedures as well, which is somewhat -- well, not somewhat. It's highly

Page 485

unusual that officers -- somebody had to have violated a policy, and there should have been disciplinary action.

Q. What is the basis for your conclusion that somebody must have violated these policies, and there should have been a disciplinary action?

A. Because I have been a police officer for 44 years, and I know officers violate policies.

Q. Okay. All right. Let's go to page 49. At the top of page 49, you say, "A review of investigative files shows the special orders were not being followed." Do you see that?

A. I do.

Q. And when you say, "a review of the investigative files," you are referencing the investigative files that are referenced in the spreadsheet, correct?

A. That's correct.

Q. And you indicated here, "I received investigative files for 344 different homicide investigations conducted

THOMAS TIDERINGTON, 10/06/2022                          Page 486..489

Page 486

by Area 5 detectives for the period from 1995-1998." Do you see that?

A. That's correct.

Q. And that's the number we talked about earlier, right?

A. Yes, it is.

Q. And then you footnote, "For two homicide investigations, a permanent retention file was produced but no investigative file," and then you identify the two RD numbers. "Those two files are still listed in Attachment F. And as a result, the spreadsheet contains 346 rows, despite only 344 investigative files."

Do you see that?

A. I do.

Q. Is that something you figured out by comparing those 344 files you received to the spreadsheet?

A. I think that came about because I -- it wasn't adding up, so I asked counsel, plaintiff's counsel, to clarify that for me.

Q. Got it. All right. And then if

Page 487

we start looking at your findings midway through the page, you say, "Handwritten notes, not on general progress reports, are still routinely used." Do you see that?

A. I do.

Q. And then you say, "As discussed above, the special orders directed officers to use GPRs to take notes and were intended to eliminate the use of handwritten notes, which detectives had been treating as their own property and something they were not inclined to place in the CPD's file."

Do you see that?

A. I do.

Q. So, first of all, is it your interpretation of the directives that the directives mandate that any note must be taken on a GPR?

MR. SWAMINATHAN: Objection to form.

THE WITNESS: That's my understanding of their policy, yes.

BY MS. ROSEN:

Q. In a circumstance where a

Page 488

detective needed to take a note but didn't for whatever reason have a GPR or general progress report available to him, what is your opinion regarding what that particular detective should do in that circumstance?

A. I guess in what type of a setting? In an interview with a suspect? On the street? In a grocery store? I'm not sure I follow your question.

Q. Well, can you envision a circumstance where a detective is investigating a case, let's say out on the street, and he -- he or she does not have the GPR forms available for whatever reason. He's run out, they fell in a puddle, his coffee got spilled all over them, but the investigation is progressing, and the police officer is doing something that would require a note --

A. Right.

Q. -- to be taken. What should the police officer do in that circumstance?

MR. SWAMINATHAN: Objection to form. Foundation.

Page 489

Go ahead.

THE WITNESS: All right. Again, I would have to -- I would have to look at Chicago's GPR policy to see what guidance they gave in that with respect to their officers.

I think I mentioned my department did not require GPRs. I was looking at it from a policy perspective. If Chicago is requiring their officers to -- and perhaps had good reason because the problems they had in previous cases, if they -- and as pointed out yesterday that the sheer number of homicides that were occurring in Chicago, I believe required that the Chicago Police Department implement perhaps a more robust policy than maybe other departments. So Chicago Police Department implemented a GPR program, and it was apparently routinely being violated.

BY MS. ROSEN:

Q. That really wasn't my question. My question was: --

A. I am sorry, but I thought that was

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022                    Page 490..493

Page 490

your question.

Q. Yeah. So my question was: What is a police officer to do in a scenario where there is this policy, and yet they don't have a GPR available to them, and they need to take --

MR. SWAMINATHAN: Objection to form.

BY MS. ROSEN:

Q. -- and they need to take a note?

MR. SWAMINATHAN: Objection to form and foundation. Sorry.

THE WITNESS: Again, I don't know if you have the policy that we can pull up, and we can look at it. I think from a practical matter, there would be exceptions for officers to provide notes on something other than a GPR.

But if I am reviewing this case, or in my review of many cases, it didn't seem like it was the exception. It seemed to be the rule for most of -- for many of the cases that I looked at.

Page 491

BY MS. ROSEN:

Q. And if the handwritten notes that aren't written on GPRs are included in the investigative file, does that constitute a violation of a criminal defendant's constitutional rights?

MR. SWAMINATHAN: Sorry, I missed the first part. Can you read back that question, please. Sorry.

(Whereupon, the record was read as requested.)

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

THE WITNESS: No, I don't think it would constitute a violation of their constitutional rights. What I would -- what I was offering an opinion on is whether or not the officers were following the Chicago Police Department's policies on -- and their apparent attempt to have their officers understand that these notes that they were taking were not their personal property, and that they had to be maintained. They had to

Page 492

be disclosed, and they had to be turned over. So in my view, that is the apparent reason why because they were having so many problems that they implemented the GPR program.

If you are asking me is it okay for the officer to just typically ignore the policy, but it's okay because it doesn't really violate anybody's rights? Well, that's not how police departments operate.

BY MS. ROSEN:

Q. Did you see any evidence in the files you reviewed from -- the investigative files you reviewed from 1995 to 1998 that police officers were treating handwritten notes as their personal property?

A. Yes.

Q. Can you explain that to me?

A. Well, I mean, I reviewed testimony from the police spokesman that said that there was a -- it was a difficult process to get the officers to understand that these weren't personal -- that these personal

Page 493

notes had to be disclosed and documented.

Q. And he was talking about shortly after the institution of the policy in 1983, right?

MR. SWAMINATHAN: Object to form and foundation.

Go ahead.

THE WITNESS: Well, I think he said that the problem continues. And also I do recall seeing an OIG report that identified the problems that, I guess, we are talking about in '83 and '84, and they have identified the fact that the problems still exist today, and that was in, I believe, a 2020 OIG report without looking at it closer.

BY MS. ROSEN:

Q. The OIG -- the problem identified in the OIG report is the problem that the detectives were treating their notes as personal property? Is that what you are saying?

MR. SWAMINATHAN: Objection to form.

THOMAS TIDERINGTON, 10/06/2022

Page 494..497

Page 494

Go ahead.

THE WITNESS: I would have to look, and perhaps I am confusing it with Hickey and -- Hickey's and Winstrom's testimony, but I know that the OIG conducted an audit and found many of the same problems occurring in 2020 as were occurring back in the '80s and '90s.

BY MS. ROSEN:

Q. Right. But my question is very specific about whether or not you found evidence in your review of the 1995 to 1998 investigative files that police officers were treating notes as their personal property?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I saw evidence that the notes were not routinely being either -- either unexplainably there were no notes on investigations that you would reasonably expect to see notes and that many files were void of notes as well.

Page 495

MS. ROSEN: Can you read back his answer, please. Sorry

(Whereupon, record read, as requested.)

BY MS. ROSEN:

Q. Okay. The next point is -- actually, the last line of this paragraph is --

MR. SWAMINATHAN: I'm sorry, which line of which paragraph?

MS. ROSEN: The handwritten notes.

MR. SWAMINATHAN: Yeah, okay, sorry.

BY MS. ROSEN:

Q. It's the last two lines. "Of those, 154 of the 334 or approximately 46 percent contained handwritten notes not on GPRs." Do you see that?

A. I do.

Q. And then it says, "This is consistent with Brasfield's findings in Rivera, 61 percent, and Fields, 82 percent." Do you see that there?

A. I do.

Page 496

Q. In your review, 46 percent is consistent with 61 percent is consistent with the 82 percent; is that right?

A. I think it's consistent that the policy is not being followed.

Q. Is that what you mean by that?

A. It would be, yes.

Q. The next paragraph is to-from memos are still being used. And it says, "Special orders directed officers to stop using to-from memos." Do you see that?

A. I do.

Q. And you believe that's explicit in the directives?

A. I -- yes.

Well, I'm sorry, let's clarify what directive you are speaking of.

Q. Well, you say, "As discussed above, the special orders," plural, "also directed officers to stop using to-from memos."

A. Right. Can I review those real quick? I mean, if you are going to ask me questions about them, let me just have them

Page 497

in front of me.

Q. Well, I am not going to have you spend 20 minutes reviewing pages and pages and pages of directives.

A. Well, then there's not that many pages.

Q. Yeah, there are.

A. Okay.

Q. There's five different directives. So you put it in -- you reviewed the directives before you wrote your report, right?

A. I did.

Q. So are you -- you must be confident that when you reviewed the directive that they specifically mandated that officers stop using to-from memos, right?

MR. SWAMINATHAN: Objection to form and foundation. And objection, the witness has indicated that he would like to be able to review the order before answering the question. Counsel is refusing to let him do so.

THOMAS TIDERINGTON, 10/06/2022                    Page 498..501

Page 498

You can answer to the extent you can, Mr. Tiderington.

THE WITNESS: I'm sorry, if you can read that question back.

MS. ROSEN: Yeah, I will just rephrase it.

BY MS. ROSEN:

Q. When you wrote, "The special orders also directed officers to stop using to-from memos to communicate investigative information, you did that after reviewing the directives, correct?

MR. SWAMINATHAN: Same objection. Go ahead.

THE WITNESS: That's correct.

BY MS. ROSEN:

Q. And then the next point is Missing or Incomplete Inventory Sheets. Do you see that?

A. I do.

Q. And then if we go to the next page, page 50, you indicate -- you identify that 17 percent of the total investigative files contained no inventory sheet. Do you

Page 499

see that?

A. I do.

Q. Let me ask you this: With respect to the 1995 to 1998 investigative files, is it your understanding that each and every one of those investigative files is in the same condition, meaning it has the same information contained within them as they did at the time they were created during the respective homicide investigations?

A. That would have been my assumption, yes.

Q. And what's that assumption based on?

A. That was the information that was provided to me. There was no indication that it was only a partial file.

Certainly, if you have other information that is better information than I had to review, I would certainly consider it and would like to see it.

Q. Have you had any experience in responding to either a subpoena request or discovery request for police files during

Page 500

the course of your career as a police officer?

A. Yes.

Q. In what circumstance?

A. Throughout my career, I have had subpoenas issued for files, for documents. I for a short period of time, I was in charge of the Fort Lauderdale's Police Department's records division.

Q. And can you tell me --

A. I am not through answering.

MR. SWAMINATHAN: Sorry, let him finish.

THE WITNESS: And as a Plymouth Township police chief for 20 years, I certainly had a more intimate knowledge of the subpoena process in a small agency.

BY MS. ROSEN:

Q. But admittedly a small -- the records that are maintained in a small agency like Plymouth Township is very different than, say, Fort Lauderdale, right?

A. You know, I thought so when I first got hired as the police chief, but it

Page 501

surprisingly -- a small agency, you still have every aspect of policing to do. You have the same policies. You still have to buy vehicles. You have to do budgeting.

It's the scale. In larger agencies such as Chicago or Detroit, the larger agencies are broken down into precincts, and really -- or areas, and what a precinct or an area is in many respects is a small police department.

So I would not say, well, it's a small department, so you never really did any of this stuff. And in a small agency, I learned as the police chief, you are intimately involved in all of these things versus a larger department where you have a records department, and you have a subpoena department.

So anyways, hopefully, I explained that to you clearly.

Q. Have you ever had to locate police files that were 20 or 30 years old?

A. Yes.

Q. How often did you have to do that?

Urlaub Bowen & Associates, Inc.  312-781-9586

THOMAS TIDERINGTON, 10/06/2022        Page 502..505

Page 502

A. Well, again, I am looking back or thinking back, you know, as a detective, there would be cases where they were 20 or 30 -- maybe not 30. I would say probably maybe 15 or 20 years old, and what typically happens and what I feel is what the industry standard is or a reasonable way to do it, is a memorandum is sent to each unit within the police department detailing what information is being sought. And a commander of that particular unit is required to sign off that he searched his files, his records, and that there was a -- there were items either responsive or not responsive, and whether they had documents or did not have documents related to the subpoena.

Q. Okay. All right. Then the next point you make here is that the inventory sheets were incomplete. Do you see that, the second paragraph?

MR. SWAMINATHAN: Here at the bottom of page 49?

MS. ROSEN: I am at the top of page 50. "Even where there was an inventory

Page 503

sheet in many cases, the inventory sheet was incomplete. I found that 277 investigative files contained inventory sheets that were incomplete."

THE WITNESS: I do.

BY MS. ROSEN:

Q. How did you determine that the inventory sheets were incomplete?

A. Well, in some of the files I looked, and I saw certain items in the police report that were not reflected on the inventory sheet.

Q. Did you look at 277 investigative files and determine that the inventory sheets were incomplete, or was that something you got from the spreadsheet?

A. Well, I looked at some of them. Certainly I didn't look at 277, but that's something that was spot-checked and is reflected in the spreadsheet.

Q. Do you know how it was that the coders that created the spreadsheet determined that the inventory sheet was incomplete?

Page 504

A. No.

Q. And when you say "incomplete," do you mean that there were documents in the file that were not listed on the inventory sheet?

A. Yes. And again, just, I mean, if we discounted the chart, the analysis or the cases that I looked at or spot-checked, there were items in the file that were not contained on the inventory sheet. Some files didn't even have an inventory sheet.

Q. Right. That's a different point, but I am just trying to get an understanding of the definition of incomplete.

A. All right.

Q. So what you mean is there were documents in the file that were not listed on the inventory sheet? Is that what you mean?

A. That is correct.

Q. All right. And then the next paragraph is, "In addition, the inventory sheets do not appear to be contemporaneously updated as each new document is added."

Page 505

What exactly -- what problem exactly are you identifying there?

A. Well, it tells me that documents are routinely being kept someplace, and then perhaps added to the case file at some point in time, and then that's when the inventory sheet is completed. As you see on some of the cases, where all of these items are placed in the case file all on the same date by the same person.

Q. Do you have an understanding back in 1995 to 1998 who was responsible for maintaining the investigative file and completing the inventory sheet?

A. I think it speaks -- in the policy, I think it speaks to what -- I don't recall. I would have to look at it again. I don't recall specifically as we sit here today.

Q. And your concern is that the documents were being kept somewhere else before they were put in the investigative file? Is that what you thought?

A. Well, that's certainly a

THOMAS TIDERINGTON, 10/06/2022                    Page 506..509

Page 506

possibility.

Q. And what's your basis for that assumption?

MR. SWAMINATHAN: Objection to form.

THE WITNESS: Well, I guess from a practical matter, I -- the assumption I made is that the documents would be inventoried as they are placed in the file.

BY MS. ROSEN:

Q. Do you know the process by which, for example, GPRs make their way into an investigative file back in 1995 to 1998?

A. Well, they often did not, obviously, but I don't know the specific -- I am sorry?

Q. Go ahead.

A. Again, I would have to look at the policy that I had asked to review to see specifically as to what the Chicago Police Department's policy was.

Q. Do you have -- when you said they didn't make their way into the file, do you mean ever or belatedly?

Page 507

A. Well, both, I think.

Q. What evidence do you have that documents didn't make their way into the investigative file?

MR. SWAMINATHAN: Objection. Asked and answered.

MS. ROSEN: You can answer.

THE WITNESS: Well, I think we discussed that there is evidence that there is documents that never made it into the investigative file that were kept in detective drawers. They were kept in street files. I don't think anybody is disputing that.

BY MS. ROSEN:

Q. From 1995 to 1998?

A. I -- I do believe that, yes.

Q. What's the evidence to support your conclusion that during the time period of 1995 to 1998, there were documents that were -- that never made their way into the investigative files?

MR. SWAMINATHAN: Objection. Asked and answered.

Page 508

THE WITNESS: Again, I mean, I can pull out the chart. We can go through the same exercise that we already did.

BY MS. ROSEN:

Q. The document -- you mean, not documenting things, right? That's the exercise we did is you pointing out to me from the chart evidence that detectives were not documenting things. This is a different point.

The point we were just talking about, I thought, was whether or not documents that existed did not make their way ever into an investigative file. That's a different point.

MR. SWAMINATHAN: Your question? Sorry, go ahead.

BY MS. ROSEN:

Q. So that's what I thought we were talking about. Are we not talking about different things?

MR. SWAMINATHAN: Objection to form and foundation.

THE WITNESS: Well, I think we are

Page 509

talking -- well, I guess we are talking about two different things, or maybe I am confused by your questions.

MS. ROSEN: Okay. Well, that could be. It's 1:28, and I have to jump off, so this is a good place to take a break, and maybe I will have better questions.

THE WITNESS: Okay.

MR. SWAMINATHAN: Eileen, it's going to take us probably at least 45 minutes for lunch. It's up the street, so let's resume at about 45.

MS. ROSEN: So 2:15?

MR. SWAMINATHAN: Yes.

THE VIDEOGRAPHER: We are off the video record at 1:28.

(Whereupon, a break was taken at 1:28 p.m. to 2:25 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 2:25 p.m.

BY MS. ROSEN:

Q. If we can put Exhibit 6 back up on the screen, and we are still on page 50. I

Page 510

want to direct your attention to the bolded portion of the report near the bottom of the page where it says, Review of Permanent Retention Files. Do you see that there?

A. I do.

Q. And we said earlier that the permanent retention files are the records division files, correct?

A. That's my understanding, yes.

Q. Why do you use the phrase "permanent retention files" instead of record division files in this portion of your report?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I think that's what they were referred -- I saw reference to them. I think that's how Chicago refers to them as well.

BY MS. ROSEN:

Q. And then it says, "All relevant information in unofficial documents is not transcribed in official reports." Do you

Page 511

see that there?

A. I do.

Q. What is your definition of unofficial documents?

A. Well, I think we discussed it earlier, and perhaps the street files or documents that officers believed are personal information versus and information that perhaps they keep in their desk and not in either the investigative file or the permanent file.

Q. When you are referencing unofficial documents, you are referring to street files? Is that what you said?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I would -- I would consider any documents created by a law enforcement officer in the performance of their duties are official reports.

BY MS. ROSEN:

Q. So when you say, "unofficial documents not transcribed in official

Page 512

reports," I am trying to understand what you mean by unofficial documents, so?

A. Well, what I am -- I guess what I am explaining there is I think it's indisputable that the officers have taken notes. There is no other possible way for them to be able to create police reports a month later without the virtue of having taken some notes. And if you see a case file that does not have any notes but it has a very lengthy report with names and addresses and so on, you have to conclude the only way they could have done that is by taking notes that were not disclosed or -- I'm sorry, not placed into one of the -- either the retention file or in the investigative file.

Q. Okay. So this is based on your -- your reference to unofficial documents are documents that you have inferred exist because in your review of the files, there are files that contain no notes, and you believe those files should contain notes. Do I have that right?

Page 513

A. I think you do, yes.

Q. Okay. So the unofficial documents that you are referencing were not produced in the 344 investigative files that you reviewed, right?

A. That's correct.

Q. So you have never seen those files? It's just an inference -- I mean, you have never seen those, quote, unquote, unofficial documents? It's just an inference you are drawing based on your belief that in the cases where there are files where there are no notes, there should be notes?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

BY MS. ROSEN:

Q. Correct?

A. That would be accurate.

Q. So then you go on to say, "I was provided with permanent retention files for 341 homicide investigations for the time period 1995 to 1998." Do you see that?

THOMAS TIDERINGTON, 10/06/2022                    Page 514..517

Page 514

A. I do.

Q. Okay. Did you review all 341 permanent retention or records division files?

A. I skimmed through all of them, and some of them I took a closer look at than others.

Q. How many did you take a closer look at?

A. Oh, it's hard to estimate, but I don't know, maybe 20, 15, 20.

Q. And then if we go to page 51 of your report, it says, "First, I examined the permanent retention files standing alone to assess whether they communicated a complete picture of the investigation." Do you see that?

A. I do.

Q. Why was that your first step?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Well, I guess you have to take a first step in anything, but I

Page 515

wanted to get an understanding of the case, and I -- the best way to do that would be to look at what was contained in the permanent retention file.

BY MS. ROSEN:

Q. Why didn't you first look to the 344 investigative files you were provided?

A. I guess I could have.

Q. Is there a particular reason you didn't?

A. I don't think so.

Q. In your review of the permanent retention files, I assume you noticed that there were no GPRs contained in any permanent retention file, correct?

A. I think that's accurate, yes.

Q. And I assume you know from reading the depositions of the City of Chicago spokespeople, Mr. Hickey, Mr. Winstrom, that that's by design, right? That's intended?

A. That would be -- that was the intent. Apparently that was the intent of the policy, yes.

Q. So if you were interested in

Page 516

looking at notes in connection with a homicide investigation, you know that the only place to look is in the investigative file, correct?

A. Well, the notes were supposed to be transcribed into the official police reports as well.

Q. That was not my question. So let me try again. My question is: If you were interested in looking at the notes, then you knew that you had to look in the investigative file, right?

A. That's accurate, yes.

Q. And, in fact, yesterday, you repeatedly made the point when Ms. Golden was questioning you that in connection with the Soto homicide investigation, you were critical of the fact that there were not contemporaneous notes with the various interviews and interrogations that were being conducted, correct?

A. That's correct.

Q. And the reason you were critical of that is because you thought that without

Page 517

those notes, you couldn't follow the story precisely of the investigation, correct, and how it developed?

A. I don't think I testified. I don't think that was my testimony.

Q. Well, why are you concerned about the notes in the Soto homicide investigation?

A. Well, I am concerned about the notes because there were several interviews with the suspects, and there was no explanation as to what they said. The detective -- and I have interviewed many, many suspects in my career that you would expect that an officer, a detective, would be taking notes as to what was being told to them.

I think one of the witnesses even testified that she recalled -- and I don't recall which one -- but that Guevara was taking notes and that the notes -- there were no notes that would have corresponded with that interview.

Q. Okay. Then if we go to the second

THOMAS TIDERINGTON, 10/06/2022      Page 518..521

Page 518

paragraph, you note that Mr. Brasfield also reviewed the permanent retention files in connection with his report, correct?

A. That's my understanding, yes.

Q. And you actually quote him here, correct?

A. I do.

Q. And he in this paragraph uses the phrase "official file." Do you see that?

A. Yes.

Q. It's referenced in the third line?

A. Yes.

Q. And then it's referenced again?

A. Yes.

Q. And he is using that phrase in connection with current retention file or the records division file, correct?

A. I think so, yes.

Q. But the investigative file is also an official file, correct?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: It would be.

Page 519

BY MS. ROSEN:

Q. And as you said, you could just as easily have begun your review of the files by looking at the investigative files first instead of the records division files, correct?

MR. SWAMINATHAN: Objection to form and foundation. Mischaracterizes his testimony.

Go ahead.

THE WITNESS: That's correct.

BY MS. ROSEN:

Q. Then you go through an analysis that begins at the second half of the page where you compare permanent retention files to investigative files. Do you see that?

A. I do.

Q. Why did you -- what was the -- let me strike that.

Why did you compare the permanent retention or records division files to the investigative files?

A. Well, I wanted to see if the -- what was -- if the information in the

Page 520

investigative files was being transferred over to the retention files.

Q. In the investigative files, there are, in addition to the GPRs and handwritten notes, there are also the supplementary reports that are typed reports, correct?

A. Yes, there are.

Q. And those are the same typed reports that appear in the records division or permanent retention files, correct?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

THE WITNESS: I believe they are, yes.

BY MS. ROSEN:

Q. So when you compared the investigative file to the permanent retention file, you were -- you, obviously, were not finding the notes, right, or the GPRs, right?

A. That's correct.

Q. But you were finding supplementary reports, right?

Page 521

A. I believe there were supplementary reports in there, yes.

Q. Then you say, "Like Brasfield, I found many examples where information on handwritten notes was not transferred into official reports." Do you see that?

A. I do.

Q. When you say "official reports" right there, what precisely do you mean?

A. Police reports, supplemental reports.

Q. And when you reference handwritten notes, are you referencing handwritten notes and general progress reports and to-from memorandum that are all written in handwriting; or are you simply referencing -- let me start over.

When you reference handwritten notes, are you including GPRs and to-from memoranda in that reference?

A. I did, yes.

Q. So you were comparing the notes and the GPRs to the police reports, the supplementary reports and the permanent

Page 522

retention file, but not the report -- the same reports that were already contained in the investigative file?

A. I am sorry. I am not sure I followed that.

Q. I am just trying to understand why you were comparing the investigative file to the permanent retention file and what information you believed you were learning by that exercise?

A. Right. No, I understand your question now. And again, I think I testified earlier that I am familiar, you know, with one file containing all of the investigative reports, a single file, a single master file, and I was trying to understand how the Chicago PD operated with parallel files.

So part of it was a learning curve on my part to understand what was going into the retention files or records files, records division files, and how it was different than what was in the investigative file, and why there was two

Page 523

files.

Q. So then you say, "In many cases, the information," meaning the information that was not transferred from the notes to the supp reports, "is potentially exculpatory." Do you see that there?

A. It could be, yes.

Q. And then, "In addition to other instances discussed below, where such notes were not disclosed to criminal defendants, examples include," and then you list a series of Bates numbers. Do you see that there?

A. I do.

Q. So that -- those Bates numbers that you list right there, what are they precisely an example of?

A. Where notes were not disclosed to criminal defendants. So the notes would be contained in a certain file, and they were not in the Public Defender file.

Q. But you don't reference the Public Defender -- the companion Public Defender files there, correct?

Page 524

A. That's correct.

Q. Why not?

A. I perhaps should have.

Q. Okay. But in any event, this is -- these examples are examples of information you located in the investigative file that you did not find in the criminal defense file, correct?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

BY MS. ROSEN:

Q. The Public Defender file?

MR. SWAMINATHAN: Same objection.

Go ahead.

THE WITNESS: That's correct, yes.

BY MS. ROSEN:

Q. So let's take a look at some of these files. Let's look at -- and I think it will be easier for you, Mr. Tiderington, if you keep that page of your report in front of you because there's a lot of different numbers.

A. Okay.

Page 525

Q. These are the Bates number, but, obviously, the files are RD numbers. And if we are comparing, it's easier to compare the RD numbers, but this way we are all on the same page.

A. Okay.

(Whereupon, Tiderington Deposition Exhibit No. 13 was screen-shared/referenced.)

BY MS. ROSEN:

Q. So let's take a look at Exhibit No. 13. Okay, and if we can shrink that so it's 100 percent on the page on the screen so we can see the Bates number.

Okay. So at the bottom there, the Bates number is RFC-Solache/Reyes 76011. Do you see that?

A. I do.

Q. And I will represent to you -- and we will go through them, but just so you have an understanding, I have combined into one exhibit 76011 through 16, which is referenced in your report, okay?

A. Okay.

THOMAS TIDERINGTON, 10/06/2022                          Page 526..529

Page 526

Q. And that corresponds to RD number A596534, which we will see on the reports as we scroll through them.

So do you recall identifying these GPRs as GPRs that didn't exist in the Public Defender file?

MR. SWAMINATHAN: Objection to form. Foundation.

And I am just going to note for the record, I think there is a -- I think, Eileen, you are going to be spending time on this point probably significantly, and I think there is a misunderstanding. I am going to -- you can go ahead -- I can't -- you can go ahead and ask your questions, but I think it would be probably worthwhile to clarify this because I will end up trying to -- I will end up clearing this up later, but you will have wasted a bunch of time so I want to just note that.

MS. ROSEN: Thanks.

BY MS. ROSEN:

Q. Okay. So how did you conclude that these notes Bates-stamped 76011 through

Page 527

16 were not contained in the Public Defender file? What did you do? What was your methodology in discovering that?

A. Can I look at the other documents that you have?

Q. Sure, yeah, you can scroll through the pages.

A. I don't think I can scroll through.

MS. ROSEN: Robyn, can you just flip through the pages so he can look at them.

THE WITNESS: You know, I -- I don't remember this one specifically. The take-away, if you will, on this is this information that's contained here, you know, should have -- and if you are telling me it was turned over, it should have been turned over because it could be exculpatory.

BY MS. ROSEN:

Q. First of all, what's your basis for saying it could be exculpatory?

A. Well, I believe anything in an investigative file could be exculpatory.

Page 528

Q. So you haven't done any particular analysis that there is actually information in here that when you compare it to the investigation that was done leads you to believe that it's exculpatory? It's simply based on your belief that everything should get turned over because it's potentially exculpatory, right?

A. That's correct.

(Whereupon, Tiderington Deposition Exhibit No. 14 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Okay. All right. Let's take a look at Exhibit 14, which also comes from the investigative file for A596534.

MR. SWAMINATHAN: Was that the RD number you just said?

MS. ROSEN: Yes. A59 -- hold on A596534.

BY MS. ROSEN:

Q. So this is a Chicago Police Department Detective Division Supplementary Report. Do you see that?

Page 529

A. I do.

Q. And these are documents you are familiar with from reviewing 344 investigative files and the 341 RD files, right?

A. That's correct.

Q. And you will see at the top here it says, offense classification homicide. It says, IUCR code: Homicide, first degree murder/0110. Do you see that?

A. I do.

Q. You know what a IUCR code is, right?

A. I don't know if I know what that code is, no.

Q. Oh, you don't?

A. No.

Q. So you don't know what the number 0110 denotes?

A. I don't.

Q. And then it says, "Status/Code (this report): Exceptionally cleared closed." Do you see that?

A. I do.

THOMAS TIDERINGTON, 10/06/2022                    Page 530..533

Page 530

Q. Do you know what that means to be -- when an investigation is exceptionally cleared and closed?

A. I don't understand or I don't know what the -- what the Chicago Police Department codes are or what they mean as far as exceptionally cleared cases.

Q. Let's go to page 8 of the exhibit, and it says on the second full paragraph:

"On the 31st of December, 1996, at the conclusion of her investigation and after conferring with her supervisor, ASA Kazaglis rejected the lodging of murder charges against Lamon Weathers. ASA Kazaglis and her supervisor stated that the testimony of the witness Eric Camp would be required to buttress the lineup identification made by Vincent Accuros, and only then would charges be lodged. Without Camp's assistance in this investigation, the Cook County State's Attorney's

Page 531

Office stated that charges against Weathers could not be filed."

Do you see that there?

A. I do.

Q. And let's go to the last page of the report. Then if we go to the last three paragraphs, it says:

"In addition, the RDs feel they have exhausted all investigative leads, and they have made every reasonable attempt at gaining the cooperation of the decidedly uncooperative witness Eric Camp. Attempts at locating (recanvassing) any additional witnesses whose assistance would be helpful in this investigation also proved negative.

"Therefore, due to the above facts, the undersigned detectives respectfully request this case be considered exceptionally cleared and closed."

Do you see that?

Page 532

A. I do.

Q. And I will represent to you that exceptionally cleared/closed means that nobody was charged in this particular homicide investigation, and I searched the spreadsheet and there is no PD file.

So can you explain to me the point that you were trying to make with the notes that were Exhibit No. 13?

A. I'm sorry, could you go back to Exhibit 13?

Q. Absolutely.

A. And again, I don't remember this specifically, but generally speaking, I would find notes in the investigative file that were not, by policy, transcribed or explained in the police report is one of the things that I discovered.

Q. When you say "by policy," what do you mean?

A. Well, the police department had a policy that the detectives would transcribe their notes if it was, quote, relevant into the police department -- into the police

Page 533

report explaining the details of their notes.

Q. And is that in one of the directives that you analyzed, either 83 or 86 or the SOP? Is that where you are getting that the policy was that the notes had to be transcribed into the supplementary reports?

A. Yeah. I can't point as we sit here today exactly where I read that, but it certainly is a good practice, and something that I am familiar with that if there's some cryptic notes on a GPR, it would be only logical that you would expect the police report to reflect the meaning of those notes.

Q. So is the point of the examples in paragraph 51 -- on page 51 of your report that notes should be transcribed into -- into police reports? Or is it that notes should be produced so that we can find them in the PD file?

MR. SWAMINATHAN: Objection to form and foundation.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022

Page 534..537

Page 534

THE WITNESS: I guess the answer to that would be both, wouldn't it? It's my contention that detectives should be explaining the notes that they are taking if they are cryptic. And if it's seemingly important to the investigation to the point where they wrote the phone numbers down or addresses down or, you know, the victim said this or victim said that, I think it's important to have -- and I believe it's Chicago's policy that that would be included and explained in the police report. And then, of course, you know my position if it's in the police report, it certainly should be disclosed.

BY MS. ROSEN:

Q. And the notes should be disclosed, too, right?

A. They should be, yes.

Q. So we are in agreement that the notes should be disclosed and the police report should be disclosed, right?

A. If --

Q. The supplementary reports, right?

Page 535

A. If you are telling me that you agree with that, yes.

Q. So I guess I am back to -- and we can go back to page 51 of your report, Exhibit 6. So these examples that you have listed here, you told me were examples of reports that were not located -- that you could not locate in the Public Defender file, correct?

A. I think I told you a couple different things about those notes, and if you allow me to read from my police report, I found examples where the information on handwritten notes was not transferred into or transcribed or transferred into official reports. Brasfield made that same observation. In many cases, the information was perhaps exculpatory, and in other instances, it was my review -- and I certainly may have missed it -- but they oftentimes, I did not see them in the Public Defender's file.

Q. So these -- the Bates stamps that this paragraph -- I just need to understand

Page 536

what you are saying they are examples of. You are an expert. You are disclosed as having reviewed materials. These are the materials you reviewed, and you believe they support your opinions and that they are examples of something. I do not have a clear understanding of what that something is, so let's try it again. I'm sure it's me.

What these Bates stamps that are here on this page, what are they examples of?

A. Again, I will answer it, and pretty much I am going to answer it the same way I did the last time you asked the question, and probably the most concise way is to explain in my report. Many examples were information on handwritten notes was not transferred into official police reports. Okay, so I guess we can take it step-by-step, and I am not -- and again, you understand that portion of my opinion?

Q. Yes.

A. Okay. And in many cases, I

Page 537

believe that the information could be potentially exculpatory.

Q. Yes.

A. In other instances, there were notes that I assumed would have been in the Public Defender's file that I did not find in there.

And to take it one step further, I believe it's reasonable if there's notes, that the investigative detective took notes and that I would somehow see an explanation of those notes in their police reports explaining the importance or lack of importance of the notes that they took. If there is an address or phone number or description of a vehicle with no explanation in the police report, then I think it would be troublesome. Because in most cases, the police report, you know, perhaps is a short story where it takes you in different directions, and that's what I would expect to see in a police report.

Q. So let's go back to Exhibit 13.

THOMAS TIDERINGTON, 10/06/2022　　　　　　　Page 538..541

Page 538

What are these notes an example of?

MR. SWAMINATHAN: Objection. Asked and answered.

Go ahead.

THE WITNESS: I'd have to look at the police report, and I don't know, maybe this is the reason. Maybe this was included in the police report, but as we sit here, I don't think it was. Here is a phone number. All right. There is a reference "idiot." I don't know if he is speaking about his supervisor or if he is talking about a street name of somebody that's identified as a suspect.

So I am looking at this, and there is a lot of questions. Obviously, the detective felt it was important enough to write this down. And as I testified earlier, oftentimes they did not, so it's really shocking when they do write something down. It tells me that they thought it was pretty significant. And if it's significant, it should have been explained in the police report.

Page 539

Q. So this is a -- these pages, the six pages in exhibit 13 are not -- are examples of information that you say was not transferred to a supplementary report, right?

A. That's my understanding, yes.

Q. And did you --

A. I mean, to confirm that, I would have to go back, and I would have to look at the supplemental report and the police report, but that's my understanding, yes.

Q. Well, you did the work, right?

A. Well, but again, you know, there is 6,000 documents in this case, and if we are going to be concise, which I'm sure you want me to be, I would take the opportunity to go back and confirm what I am telling you.

Q. Right. But you chose these examples, so presumably when you --

A. Yes.

Q. -- chose the examples --

A. Right.

Q. -- you looked at the reports, and

Page 540

so you're confident in your work, are you not?

A. Well, yeah. But I'm also confident enough to understand that I have the ability to go back and refresh my memory and confirm what I am telling you because it's a complicated case. There is over 100 pages of my report, and there is 6,000 documents. I don't think this is supposed to be just a memory test. I think you are probably looking for the most precise and concise information that I can provide for you.

Q. Well, we are not going to spend hours for you to compare your examples to the reports when you are the one that created the examples. So if you are telling me that that's what this example is, then that's what we will go with.

(Whereupon, Tiderington Deposition Exhibit No. 15 was screen-shared/referenced.)

BY MS. ROSEN:

Q. All right. Let's take a look at

Page 541

Exhibit 15. So this is Bates-stamped 34554, which is the first Bates stamp in your list?

A. Can you make that -- I am sorry, can you make that a little bit larger?

Q. Yes.

A. We might have to -- there you go.

Q. Can you probably scroll so you can see the top of the document.

A. Exactly. If you can scroll down a little bit, please. Okay.

Q. What is this an example of?

A. Again, this is an example of perhaps the officer doing the right thing, taking notes on the GPR, and I think I referenced this because I don't believe that the information in the GPR is explained or contained in any way in the police report.

(Whereupon, Tiderington Deposition Exhibit No. 16 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 16, and if you scroll to the bottom of this page, the Bates number is AR-PD-041276. Do

THOMAS TIDERINGTON, 10/06/2022                    Page 542..545

Page 542

you see that?

A. I do.

Q. And you know from the work you have done in this case that AR-PD is the Bates range that was used by the Public Defender's Office, right?

A. That's my understanding, yes.

Q. And while this is a terrible copy, I think if you scroll to the top and scroll to the bottom, you will see that this is exactly a copy of Exhibit 15 that we were just looking at, right?

A. Yes.

Q. So that tells us that this GPR was produced and is contained in the Public Defender file, right?

A. I wasn't disputing that.

Q. But your point still is that this information should have been typed into a supp report of some sort, right?

A. That would be logical. That would be what I would expect in a professional investigation, yes.

Q. So it's your expectation that

Page 543

every bit of information that is written down on a note should be then transferred to some sort of supplementary report?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

THE WITNESS: That's not what I said at all. I said if a detective is taking notes and if the notes are important to the case, if the notes are, you know -- and if you go back to the last example, there is phone numbers, there is addresses, there is quotes of perhaps street names of individuals, there are times, and I would think that it would happen more often than not that if the officer, detective, took notes that there would be some type of a mention or trans -- and when I say transcribed, I don't necessarily mean verbatim, but I think that looking at this, there should be some explanation, although I can't make out on my computer screen exactly what this says, but I would have expected to see some notation in the police report.

Page 544

BY MS. ROSEN:

Q. And what is your basis for your opinion that there should have been information from this note in some other police report, despite the fact that the note was produced to the criminal defendant?

MR. SWAMINATHAN: Objection. Asked and answered.

Go ahead.

THE WITNESS: Well, an investigator's job is to collect evidence. And in order for items to be useful, the notes, I believe, are taken as part of his initial -- whether it's initial interview with somebody, but then I think there has to be some type of explanation as to the importance of what the notes are.

And I am not saying that each chicken scratch on a note would have to be transcribed, but I saw many instances in which notes were taken on GPRs and other forms where there is just no explanation whatsoever about what the notes meant, and I think that's highly unusual.

Page 545

(Whereupon, Tiderington Deposition Exhibit No. 17 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit 17.

A. I'm sorry, can you scroll back down. Okay.

Q. So this is 77368 and 77452, which are from your list, okay?

A. I see that.

Q. All right. And then I will represent to you that they are both out of the same investigative file. Let's take a look at Exhibit 18.

(Whereupon, Tiderington Deposition Exhibit No. 18 was screen-shared/referenced.)

BY MS. ROSEN:

Q. And this is also taken -- actually, this is the investigative file, so this is from RD number A744094. And those two notes that were in Exhibit 17 that are part of your list on page 51 come from this investigative file. In fact, there is the

THOMAS TIDERINGTON, 10/06/2022

Page 546..549

Page 546

first note, and it says, Daniela Crosoli. Do you see that?

A. I do.

Q. Then it says, sister of Adriana, and then there is an address, and I think it says, gave diaries to somebody on 10 October 96. Do you see that?

A. Yes.

MR. SWAMINATHAN: Eileen, what's the Bates page for that one?

MS. ROSEN: 77368.

MR. SWAMINATHAN: Thank you.

BY MS. ROSEN:

Q. And if we go to the next page, that's the resident alien card of Daniela. If we keep going, and there is an ID card -- keep going to the next page, sorry. There is an ID card for Adriana. You see that that was referenced in that note?

A. Okay.

Q. Then if we go to the next page, it's the back of that ID, and then if we go to the next page, that's the investigative file inventory sheet, right?

Page 547

A. Apparently, it is, yes. Well, I take that back, it's, obviously, incomplete obviously, right?

Q. Well, is it?

A. Well, where does it list the GPRs?

Q. Well, do we know if there is GPRs in this file yet?

A. You just showed them to me, didn't you?

Q. Okay, wait, those are just notes. Those are not GPRs. You distinguished between the notes and the GPRs, right?

MR. SWAMINATHAN: Objection to form. Foundation. Argumentative.

Go ahead.

THE WITNESS: Weren't the notes written on the GPRs?

BY MS. ROSEN:

Q. Were they?

A. Well, and you have identified part of the problem here because we can't figure it out.

Q. Well, I can figure it out. You can't figure it out.

Page 548

A. Perhaps you can tell me. Then we don't have to --

Q. I can represent to you that it doesn't appear to be that these notes are written on a GPR.

Do you know what a GPR form looks like?

A. I do.

Q. Can you describe it to me?

A. If you can go back and you can show me, and I can tell you that that's what it looks like.

Q. Where do you want us to go back to? The Daniela Crosoli reference?

A. No. I am sorry. And again, I am trying to save time for you as well. I don't want to waste time, but if you are -- if you are representing that this was not on the GPR, I will concede that.

Obviously, there is photocopies so sometimes you can't see all of the lines and so on. I don't see any indication on the file inventory of these notes.

Page 549

Q. Can we go back to the third, the third page of the PDF. This note right here?

A. Yes.

Q. Does this appear to you to be taken on a GPR?

A. No.

Q. All right. Let's go to page --

A. But again, to my point, what is it? What does it mean? Why are --

Q. I think we are going to get there.

A. Oh, okay.

Q. Page 10 of the PDF. Okay. So this is a supplementary report, right?

A. Yes, it is.

Q. And can you shrink it so that we have 100 percent of the page on the screen.

At the top of the page, you can see there Adriana Peptenar, the victim's name?

A. It's actually shrunk. I can't see it.

Q. We can make it bigger.

A. That's okay. I believe that's

Page 550

what her name is. I saw it when it was larger.

Q. And the note was the name and address of the sister of Adriana, right?

A. I believe so, yes.

Q. So that would be the significance of the note, right? It was identifying the sister of the victim?

A. Apparently, yes.

Q. And then if we scroll down a little bit, and you can maybe make it bigger so Mr. Tiderington can read it. At the bottom it says, offender now deceased, Stefan Peptenar, and then it provides descriptives of the offender, now deceased. Do you see that?

A. I do.

Q. And then you will also note above the narrative, there is some boxes that say, status continued. Do you see that on the -- and it says, closed cleared, cleared open, and then exceptionally cleared closed. Do you see that there?

A. I do.

Page 551

Q. And exceptionally cleared closed for the Chicago Police Department means that they have determined who the offender is, but there will be no charges lodged, which was the example from earlier when the state would not approve charges. Do you remember that other example of exceptionally cleared closed?

A. I do.

Q. And, obviously, in this particular case, the offender is now deceased; so, of course, there would be no charges being lodged, right?

A. That's logical, yes.

Q. And then if we go to page 13 of that same report, at the end of the report, it says, "With the suicidal death of the offender in this investigation, Stefan Peptenar, it is requested that this case be filed exceptionally/cleared/closed/death of the offender." Do you see that there?

A. I do.

Q. Obviously, in that particular case, there would be no charges and no

Page 552

criminal defense file to be produced, right? I mean to -- there would be no criminal defense file for us to review, right?

A. That makes perfect sense, right.

Q. So now let's go back to Exhibit 17. Now, that's the second note that you flagged in your report, right, from this same case?

A. That's correct.

Q. And it says, there is a phone number, right?

A. There is a phone number, yes.

Q. And then there is the numeral one, and it says large pan pizza. Do you see that?

A. Yep, yes.

Q. And then numeral 2, it says, crazy bread with sauce. Do you see that there?

A. I do see that there.

Q. And that's another -- then there is another phone number, right?

A. Right.

Q. So is it possible that what this is is that on the back of some report, the

Page 553

police officers that were working wrote down people's orders for dinner?

A. That's possible.

Q. All right.

A. And, by the way, I would not expect that to be transcribed into a police report.

(Whereupon, Tiderington Deposition Exhibit No. 19 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Then let's take a look at Exhibit 19, and this -- the RD number on this particular example is B447609, and the Bates numbers are the series of Bates numbers in your report that begin with 94055 and go all the way through 94096 to 99, so that whole line.

A. Okay.

Q. Are you following me? So these, we can go through them one page at a time so you can see them. These are other examples that are in this paragraph.

MR. SWAMINATHAN: I'm sorry, can

THOMAS TIDERINGTON, 10/06/2022      Page 554..557

Page 554

you go back to the first one?

MS. ROSEN: Sure, yes.

BY MS. ROSEN:

Q. So the first one are typed notes, right?

MR. SWAMINATHAN: And this is 94055?

MS. ROSEN: Yes.

MR. SWAMINATHAN: Yes.

BY MS. ROSEN:

Q. Let's talk about the first page. These are typed notes, right?

A. Yes, they are.

Q. On a general progress report?

A. That's what it looks like exactly.

Q. Do you see?

And there is boxes. It's a form, right, and so you just fill in the form?

A. Yes.

Q. And these particular detectives typed their general progress report or notes in the general progress report, right?

A. That appears what they did, yes.

Page 555

Q. So in this particular -- what are these notes an example of? Is this another example of information not being transcribed into the supplementary reports?

A. I would have to compare it to the police report and supplemental report.

Q. And you can't tell me if that's what this is an example of unless you compare it to the supplementary reports, right?

MR. SWAMINATHAN: Objection to form. Foundation.

Go ahead.

THE WITNESS: I mean, if you give me a minute or so to read this, maybe I can jog my memory as to why, the importance of it anyways.

BY MS. ROSEN:

Q. Okay.

A. Okay.

Q. Okay. So having reviewed the first page of this exhibit, does that refresh your recollection?

A. I'd have to look at the rest of

Page 556

the --

Q. Okay.

A. Because there's parts of these files, the officers did everything right. I'm not saying that 100 percent of the time they didn't do things correctly.

Q. In this particular -- with this particular GPR, having just read it as we are sitting here, is it your position that this information needed to be transferred to a supplementary report?

A. It should have been, yes. And more importantly, it sounds as though this occurred -- they were out in the field when all this happened. So I guess it would be my expectation that there would have been notes, and they would have used those notes to type this GPR but the notes still should have been in the case file.

Q. The notes are in the case file. They are in the investigative file. That's where you found them.

A. No, I understand that. But the corresponding notes that they used to type

Page 557

this GPR up.

Q. So you are assuming that there were notes?

MR. SWAMINATHAN: Objection to form.

Go ahead.

BY MS. ROSEN:

Q. Handwritten notes, that's what you are assuming because these are typed notes?

A. I -- and again, I didn't -- I don't know if I am making that assumption, but I said, it's sometimes logical for the detectives to take notes, and they may come back and because their handwriting is terrible, they may type it up, but they would still have the handwritten notes, and those handwritten notes still should have been included.

Q. So is that what this is an example of, your --

A. No, no, I don't know if that's what this is an example of because you only showed me one page of maybe 100 pages in this file, so I would have to go through the

THOMAS TIDERINGTON, 10/06/2022                    Page 558..561

Page 558

entire file, and perhaps refresh my memory, and maybe I would find some handwritten notes that would correspond with this GPR.

I would -- I mean, quite frankly, I think if they were going to type up a GPR that it would have been probably closer to policy if they would have typed up a supplemental report related to this.

Q. So now you are critical of the fact that they typed their notes so that they could be legible, is that what you are saying?

MR. SWAMINATHAN: Objection to form. Foundation. Misstates his testimony and argumentative.

Go ahead.

THE WITNESS: That's -- you know that's not what I said. We are sitting here talking about various hypothetical situations because I don't have the complete file in front of me, and I am suggesting that there is many possibilities that would perhaps demonstrate that they did everything correctly.

Page 559

I think you would agree or the command officers in Chicago would agree that if the officers went in the field, and they took handwritten notes, and then they came back and they typed their handwritten notes into a GPR -- and I am not saying that's what they did here, but I am just saying if this is what they did, the notes still would have been required to be placed into the investigative file.

BY MS. ROSEN:

Q. Right. But these are examples that you isolated and put in your report. So I am trying to figure out why these, these particular documents are important to you for purposes of your opinion.

And what I understood you to be saying is, first, you said this paragraph is examples of information that was not found in the PD file. Then you said this is information that is not transferred to the police reports, which is the supplementary reports, as I understand you.

So I am just trying to

Page 560

understand what these are supposed to be examples of.

A. Right. But, I'm sorry, but you also told me it wasn't important enough for us to go back and allow me to review the entire file. You are showing me one page of hundreds of documents, and you are asking me -- and I am -- again, I am giving you some possibilities of things that I thought of when I may have reviewed this that may have been answered if I had the ability to scroll through this file, instead of looking at one page and one sentence.

Q. Well, it's your report, and they are your examples.

A. Right. But I'm sorry, that's true, but I had the ability to look at the entire file, and now you are asking me to opine on one single piece of paper. And I am telling you or I am asking you, if we are going to have this discussion, it would be -- I could be more precise if I was allowed the opportunity to go through these files and further explain them to you.

Page 561

Q. Okay. Let's go to the next page. This is Bates 94058. What is this an example of?

A. Just for the record, so you have taken this one page out of the -- out of that case file, is that my understanding of what this exercise is?

Q. No. The exercise is is I have pulled all of the pages that you cited in your report as examples of something.

A. Right, right.

Q. So I am giving you the documents that you have identified in your report and asking you what they are examples of. I am not self-selecting pages. They are the pages you selected.

A. No, I understand. I just wanted to make sure I understood from your perspective what this is.

Again, for me to be able to refresh my memory, I would have to go back to the case file and reference that. And looking at it, I can't, as we sit here, recall exactly why I referenced this without

Page 562

having the ability to go back and look at that case file.

Q. Okay. Let's go to the next page, and this is Bates-stamped 94059, also from your report in that same sequence. What is this an example of?

A. Of course, it would be the GPR report, and this would be an example of notes that would have been produced by the investigative officer, the detective. And I believe these notes, if I remember correctly, they were not explained in the police report or any supplemental report.

Q. Let's go to the next page. This is 94060. What's this an example of?

MR. SWAMINATHAN: Objection to form and foundation for the reasons already stated, but go ahead.

THE WITNESS: Again, same answer. This is a document that I would have expected to be explained in a police report or supplement.

BY MS. ROSEN:

Q. Let's go to the next page, Bates

Page 563

stamp 94089. What's this one an example of?

A. I'm sorry, can you -- can you scroll back to the other -- can you go back?

Q. The previous page?

A. Yes.

MR. SWAMINATHAN: While he's doing that, Eileen, this 11-page exhibit, are these -- what makes up the 11 pages of this exhibit?

MS. ROSEN: The pages that he references, beginning at 94055 through 94096 through 99 on page 51 of his report.

MR. SWAMINATHAN: So this is 94055, 94058, 59, 60, 94089, 94092, 94094, and then 94906 through 99? That's all that this exhibit is?

MS. ROSEN: Correct. And they are all from the same investigative file.

MR. SWAMINATHAN: Yes.

THE WITNESS: And again, I would have to compare it to the rest of the file. There was a reason that I identified this.

BY MS. ROSEN:

Q. Okay. Let's go to the next page.

Page 564

A. At some point in the near future, can we plan for a five-minute break?

Q. Sure, as soon as we finish with this exhibit.

Let's go to the next page. 94092, what is this an example of?

MR. SWAMINATHAN: Can you go down a little bit.

THE WITNESS: So that's an example of information that should have been transcribed into a police report.

BY MS. ROSEN:

Q. Okay. Let's go to the next page. 94094, what's this an example of?

A. Again, I think it's relevant information that should have been explained in a police report.

Q. And let's go to the next page, 94096.

A. Same thing, it describes four hooded males, dark clothing, should have been contained in the police report.

Q. Let's go to the next page, 94097. What's this an example of?

Page 565

A. Same answer.

Q. Okay. Let's go to the next page, 94098. What's this an example of?

A. It appears to be suspect information, and it should have been contained in a police report or supplemental report.

Q. Okay. And then the next page, 94099?

A. Same answer.

Q. And then I think that's the end of this exhibit. And your answer -- your opinion that this information -- all of this information in these GPRs should have been transferred to a police report is irrespective of whether or not every single one of these documents is in the Public Defender file, correct?

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Well, yes, my first opinion would be that it should have been transcribed into a police report. And then

THOMAS TIDERINGTON, 10/06/2022                           Page 566..569

Page 566

if that was the case, then it should been found in the Public Defender's file.

BY MS. ROSEN:

Q. I am saying --

MR. SWAMINATHAN: Sorry, go ahead.

BY MS. ROSEN:

Q. I am saying if these GPRs are all in the Public Defender file, is it still your position or your opinion that the information needed to have been transcribed into a supplemental report as well?

A. Certainly.

(Ms. Isabella Aguilar entered the deposition proceedings.)

MR. SWAMINATHAN: That was Exhibit 16, right?

MS. ROSEN: No. That was Exhibit 19, I believe.

MR. SWAMINATHAN: Is that right, 19? Yeah, 19.

MS. ROSEN: Yes.

THE WITNESS: Before we take a break, earlier when we first started, I

Page 567

talked about some housekeeping matters that we were going to take care of as far as other cases that I have had listed from the other attorney yesterday.

BY MS. ROSEN:

Q. Oh.

A. Is that something that we want to discuss now, or is it not important at this point or --

Q. We can get to it at the end if we have time for it. I'd rather get done with what we need from your report.

A. Okay.

Q. Thank you.

A. Five minutes? Ten minutes?

Q. Let's do ten minutes.

A. All right, thanks.

THE VIDEOGRAPHER: We are off the video record at 3:35 p.m.

(Ms. Janice Willier, court reporter intern, exited the deposition proceedings.)

(Whereupon, a break was taken at 3:35 p.m. to 3:47 p.m.)

Page 568

THE VIDEOGRAPHER: We are back on the video record at 3:47 p.m.

(Whereupon, Tiderington Deposition Exhibit No. 20 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit 20, and this is -- Exhibit 20 is the investigative file for RD number C687989. And if we go to the second page, we have the investigative file inventory. Do you see that?

A. Yes. I'm sorry, what's -- is there a Bates stamp number on that?

Q. On which? The whole file?

A. Yes.

Q. Yes. It is -- it starts at 110109 and it goes to 110189. Contained within this investigative file are 110176 and 110180, which are examples listed on page 51 of your report.

A. Right, yes, okay.

Q. And this one, we have the whole investigative file is marked as an exhibit.

Page 569

MR. SWAMINATHAN: Exhibit 20, you said?

MS. ROSEN: Yes.

BY MS. ROSEN:

Q. And this is the investigative file inventory. Do you see that?

A. I do.

Q. And you see here under "Entering Member," it says Haas, H-a-a-s, over and over and over again?

A. Yes.

Q. Did you notice Detective Haas's name on multiple investigative file inventory sheets?

A. I did, yes.

Q. And, in fact, his name is all over the investigative file inventory sheet for the Soto homicide investigation, right?

A. His name and others, I believe, but Haas I do recall, yes.

Q. And do you have any understanding of what Detective Haas's function was back in 1998 with respect to the investigative file?

THOMAS TIDERINGTON, 10/06/2022　　　　　Page 570..573

Page 570

A. It's my understanding that Chicago policy is that they would designate a detective within the area or within the -- within the area to be the records person.

Q. Okay.

A. That's my understanding.

Q. And what's that understanding based on?

A. I thought I read it in a policy or a directive that this is a process that they are going to use.

Q. Let's see, so the first one that you have as an example here is 110176, which I thought I had a PDF number on, but I don't. Give me one second. I'll find it.

It is page 68 of the PDF, okay, and this says, "Sat, Terry was there when Kim spanked Cedric." Do you see that?

A. I do.

Q. And what is this an example of?

A. I am sorry, can you scroll down to -- I just want to look at the Bates number. Okay. And again, I know we are on page 68, but if you can go back a few pages

Page 571

so I can kind of orientate myself with this file.

Q. Sure.

A. It's 81 pages.

Q. Why don't we go to page --

A. Why don't we go to the beginning?

Q. No, we are not going to the beginning. We can go to page 66.

A. What's on page 65, though, is going to be my question, of course.

Q. Well, let's take a look at page 66. And, it says, 1 of 2. Do you see that at the top of the page?

A. I do.

Q. And --

MR. SWAMINATHAN: What's the Bates of this page? Sorry, before you ask the question, sorry.

MS. ROSEN: 110174.

MR. SWAMINATHAN: Okay.

BY MS. ROSEN:

Q. Do you recall reviewing this GPR when you were conducting your analysis?

A. Not specifically.

Page 572

Q. Do you recall a case where reviewing a case where a mother was accused of child abuse of her son that you highlighted in your report?

A. I do, yes.

Q. And, in fact, take a look at page 57 of your report. Are you looking at page 57 of your report?

A. I am.

Q. And you see that's Kim Mathis?

A. Yes.

Q. Same RD number C687989?

A. Yes.

Q. So you have a, you know, a couple of paragraph discussion about that case?

A. I do.

Q. So is that helping refresh your recollection about the circumstances of this particular case?

A. Yeah. Just if you don't mind, just give me one minute to read the -- kind of the summary that I included. Would that be all right?

Q. Yes, that's fine.

Page 573

A. Okay.

Q. So is your recollection refreshed about the circumstances of that particular homicide investigation?

A. Yes.

Q. Is that a case that you spent a little more time on than the others in reviewing?

A. I would say so, yes.

Q. Let's go to this first page of this general progress report. You see at the top it says Kimberly Mathis?

A. I do.

Q. And it has the date at the top of the report, right?

A. Correct.

Q. And then if you -- if we can scroll down, you can see, "This morning 4:50, victim was awake, said that his stomach hurt," and it goes on, and you see that?

A. I do.

Q. Is it your understanding based on your review of this file and this particular

Page 574

GPR that this is memorializing an interview with Kimberly Mathis?

A. It appears to be, yes.

Q. And then a couple of lines down, it says, "Friday victim spent day at sister Terry Mathis house." Do you see that?

A. Yes.

Q. So based on that, is it your understanding that Terry Mathis is Kimberly Mathis's sister?

A. I believe that the report indicated that was the sister, yes.

Q. And let's go to the next page now of this general progress report, it says, 2 of 2, and it looks like -- it says at the top there, "K. Mathis continued." Do you see that?

A. I'm sorry. Yes, I do.

Q. So this is a continuation of the interview of Ms. Mathis, right?

A. It appears to be, yes.

Q. And if we scroll down, it says, "Got off work today at 4:00 a.m., went home, Sebastian was there. Victim was lying on

Page 575

laundry bag in bedroom, had neighbor call police/ambulance." Do you see that there?

A. Yes.

Q. And then if we go to the next page, "Saturday, Terry was there when Kim spanked Cedric." Do you see that.

A. Yes.

Q. And that's the page, the Bates number on that one is 110176 that appears in your list on page 51?

A. Right.

Q. And it's my understanding based on our earlier discussion about the other examples in this paragraph is this is information that you would expect to be transcribed into a supplemental report, right?

A. Well, I guess first, I would have expected to see that perhaps on the GPR. I don't know what kind of document this was written on.

Q. Does it appear to you that perhaps that was the back side of the last page of the GPR that was her note -- the note of her

Page 576

interview?

A. Can you scroll up and maybe right on that?

Q. Can we go back to the preceding page. If you go back to the top of that page and keep going.

A. Yes, yes.

Q. See the two holes at the top there, the hole punch?

A. Yes.

Q. And scroll down, the next appears to be the back side, right, of that report, he ran out of space?

A. I think your conclusion is correct.

Q. Okay, great. All right. So the point of that particular page being noted on page 51 is that the information should have been transcribed into a supplemental report, right?

A. It should have been.

Q. And then if we scroll to 1180, just a couple more pages down, one more. That's 110180, also referenced in that

Page 577

paragraph on page 51, right?

A. Yes.

Q. And it says, "Kim paged Terry today around 5:00 p.m., said something like Terry come here now. I think Cedric is dead." Do you see that?

A. I do.

Q. And then does this appear to be the back side of a GPR?

A. It looks like that, yes.

Q. Why don't we scroll up a page. See there it says, Terry Mathis on the side?

A. Yes, I do.

Q. So does that appear to you to be an interview with Kim's sister, Terry?

A. It appears to be, yes.

Q. And then actually if we scroll up one more page, that says 2 of 2. Let's go up one more. And that's 1 of 2, and then for sure, it says, Terry Mathis across the top, and gives her identifiers, and starts memorializing the interview that was conducted, right?

A. Yes, it does.

Page 578

Q. And again, your point in including the Bates Number 110180, which was the back side of this set of GPRs was because it is an example of information that should be memorialized in a supplementary report, right?

A. Well, I guess before I answer that, could I review the police report and the supplement?

Q. Well, I am just trying to understand why it's in that paragraph, and I thought that was what we had established earlier is that these are examples of information that you determined should have been transcribed to a supplemental report?

MR. SWAMINATHAN: Objection to form and foundation. The witness has asked to be shown some single pages. He's asked to be able to see some other pages to answer the question, and counsel has not done that, so that's my objection.

Go ahead. You can answer.

THE WITNESS: And again, I am trying to be as accurate as possible, and

Page 579

I'd like to -- and I'd like to look at the police reports, and perhaps it would refresh my memory.

BY MS. ROSEN:

Q. So without reviewing the police reports, you can't tell me why you included 110176 and 110180 on page 51 of your report? Is that what you are saying?

A. I believe it would be helpful if I was allowed to refresh my memory is what I am suggesting.

Q. Unfortunately, I don't believe we have time for you to scroll through an 81-page file at this moment. Maybe at the end of the dep if there is time, we can do that.

A. Okay.

Q. But as we noted, Kim Mathis is discussed on page 57 of your report as well, correct?

A. That's correct.

Q. And if we go to page 56 of your report at the top of page 56 -- or it should be 57, yeah. Back one. There you go.

Page 580

It says, examples of relevant information in police files that was withheld from criminal defendants but should have been disclosed, correct?

A. That's correct.

Q. So am I correct in assuming that in this portion of the report, what you are illustrating are examples where relevant information, as memorialized in the police reports, was not in the PD file; is that right?

A. Well, no. I think -- well, I think there would be several components to that question. It would have been whether or not the GPR -- I am sorry, are you raising your hand?

Q. No.

A. I thought you wanted me to stop. It's whether or not the notes or the GPRs were provided.

The other component or the other part of that question in my mind was was the relevant information in the GPRs translated into a police report or explained

Page 581

in the police report?

So all of these examples may not contain all of those issues, and that's why I had asked to be allowed to refresh my memory by looking at the entire file, so I could give you a better answer.

Q. Okay. Let's take a look at your discussion of the Kim Mathis file at page 57.

You wrote: "This case involves the beating death of a child. The investigation revealed that Kim Mathis, the child's mother, admitted hitting the child on the back with a belt four or five times, and then he died two days later. The child died from blunt trauma to the abdomen. Detectives pursued Mathis and according to her testimony, beat, threatened and intimidated her into signing a statement that she had not read."

And the citation there is to the Public Defender file, right?

THOMAS TIDERINGTON, 10/06/2022                    Page 582..585

Page 582

A. It is, yes.

Q. And then:

"The handwritten statement and corresponding supplemental report says that Mathis admitted hitting the child in the back with a belt, and also stomping on his abdomen with her heel."

And then you cite to -- do you know what you are citing to there? Is that the RD file, or is that the investigative file, do you know?

A. I believe it's the investigative file.

Q. And then you say, "Mathis denied to the CCSAO that she kicked or stomped on her son," and you cite to the PD file. Do you see that there?

A. I do.

Q. Then you go on to say, "The investigative file includes handwritten notes with a potential beating -- witness to the beating. The handwritten note states that Mathis's sister had been at the

Page 583

apartment when the beating occurred." And that's a cite to 110176?

A. Right.

Q. Right? Which was the back side of the continuation of the interview of Kim Mathis, right?

A. That's correct.

Q. "But the clear/closed report says that Mathis's sister was not at the apartment during the beating and did not see the child at that time of the report." And then you cite to -- do you know if that is the investigative file or RD file?

A. I believe it's the investigative file.

Q. Okay. And then you say, "Given that Mathis disputed that she had stomped on her son's abdomen and testified that she was coerced into giving her statement, it would have been critical for the defense attorney to know of all witnesses who were at the house when the beating occurred." Do you see that?

A. I do.

Page 584

(Whereupon, Tiderington Deposition Exhibit No. 21 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at the PD file, Exhibit 21. Now, did you notice in your review of the files that a percentage of the files that were produced by the PD were redacted?

A. I did notice that, yes.

Q. Did you determine in any way approximately what percentage of the files were redacted?

A. I did not figure out a percentage, but I would agree that there were several files and several pages within the files that were redacted.

Q. So in this particular file, the first seven pages are redacted. So let's go to page 8, and this is Bates stamped 29833, which is the citation you provide in your report for the proposition that Mathis denied to the CCSAO that she kicked or stomped on her son. Do you see that?

Page 585

A. I do.

Q. So this is the document that you relied on to support your statement that Mathis denied to the Cook County State's Attorney's Office that she kicked or stomped on her son, right?

A. Well, I have to read it.

Q. Well, it's your citation, right?

A. It's my citation, but I want to read the report to make sure it's the same document.

Q. You want to read the whole document in order to determine whether or not this is the document that you cited in your report?

A. Well, if you are going to ask me questions.

MR. SWAMINATHAN: He wants to just look at this page that you have put in front of him.

MS. ROSEN: Go ahead, read it.

THE WITNESS: Can you -- again, if you can make it larger, please? Or I could -- well, I was going to say I could pull it

THOMAS TIDERINGTON, 10/06/2022

Page 586..589

Page 586

up on my computer but ...

And can we go to the page just before that as well?

MS. ROSEN: Sure. Why don't you scroll up a page.

THE WITNESS: All right. So then that's redacted, right?

MS. ROSEN: Yes. Everything is redacted up until this page.

THE WITNESS: Okay.

MR. SWAMINATHAN: I have it up on my computer and can make it bigger. Is that easier for you?

THE WITNESS: I am good on this one right now. If we are going to read many more, I will have to do that, though.

Can you scroll up just so I can see the bottom of the page, please? Thank you.

Next page, please.

And can you scroll up just a little bit more, please.

Okay.

Page 587

BY MS. ROSEN:

Q. So this is the document that you cite to to support the proposition in your report that Mathis denied to the CCSAO that she kicked or stomped on her son, right?

A. Well, you are on page 834. Are you talking about 833, or the whole document?

Q. I don't know. It's your citation. Let's go to 29833. That's the page I asked you to look at. You asked to read the next page.

A. Right.

Q. So you cited to this page. Is this the page that you are relying on to support the proposition that the CCSAO -- that Mathis denied to the CCSAO that she kicked or stomped on her son?

A. That's my understanding, yes.

Q. So it's your understanding that this memorializes an interview between a member of the Cook County State's Attorney's Office and the criminal defendant?

A. I believe that's what this

Page 588

document is.

Q. So it says, "I went to interview D," meaning Defendant "at CCJ today." Do you know what CCJ is an acronym for?

A. I don't. Cook County Jail. I'm sorry, Cook County Jail.

Q. Correct, yes, Cook County Jail.

Okay, let's go to the very last page of this report, which is -- hold on, and I will give it to you, 21 of the PDF. If you read the last paragraph:

"After much discussion with D's family and with D, I arranged for them all to meet together in the jury room. The State wasn't being unreasonable about the case at all. The State offered the defendant 20 years if defendant wanted to plead guilty. Eventually defendant decided to conference the case and Judge Egan went along with that offer. Defendant entered her plea of guilty and got 20 years with 967

Page 589

days' credit."

Do you see that there?

A. I do.

Q. Does that indicate to you that, in fact, this document represents the memorialization of interviews and other work done by Ms. Mathis's attorney and the Cook County State's Attorney?

A. Again, I am not an attorney. I don't know exactly, you know, if it was her attorney, if it was the State Attorney. I don't think I can answer that.

Q. Let's go to page 10 of the PDF. All right, and if we go to the bottom of the page at the entry that says 62599.

"The state informed me today that the reason we don't have the ME's report yet is because they send their reports out for typing and believe that the report was finished. In other words, they screwed up and don't know why. D told me that her sister doesn't want to talk to us without a

Urlaub Bowen & Associates, Inc.   312-781-9586

lawyer. The sister won't even talk to her own mother about what happened. The sister, however, has dumped her kids at her mother's house and left. Defendant gave me mom's name and number, Ali Matisck, Texas with a phone number because I want to talk to the kids if mom won't talk. Terry is acting like somebody with something to hide. I passed this on to Mary Clements and told her to get to the kids ASAP. The kids might be more honest than Terry, especially if Terry isn't around to influence them."

Do you see that there?

A. I do.

Q. Did you review this entire file when you were reviewing the PD file in connection with the opinions that you provided in this case?

A. In the Kim Mathis case or that

portion?

Q. Yes.

A. I did. I can't say I remember every word of the document, but I did, and certainly there are things that I understood and didn't understand.

Q. As you are looking at it now, does it seem to make more sense that this is actually the PD that is writing this document and not the Assistant State's Attorney?

A. It's quite possible, now that you point that out, yes.

Q. Then if we look at the entry below:

"6:28 this morning, Terry Mathis, defendant's sister called me. She wanted to make an appointment to see me with her 9-year-old daughter. She was certainly upset."

Do you see that?

A. I do.

Q. As I understood the point in your

report, if we go back to your report, which is Exhibit No. 6, your criticism was that the notes about Terry Mathis being a potential witness to the meeting should have been disclosed to the defense attorney. But quite clearly, from our review of the PD file, the defense attorney was in contact with the criminal defendant's sister, right?

A. It appears to be that way, yes.

Q. All right.

THE VIDEOGRAPHER: Mr. Tiderington.

THE WITNESS: Yes, ma'am.

THE VIDEOGRAPHER: Can you tip your screen down just a touch.

THE WITNESS: Sorry about that. I tipped it back to read. My eyes aren't what they used to be, and it's dark in here.

THE VIDEOGRAPHER: Thank you.

BY MS. ROSEN:

Q. Let's go -- you can take this exhibit down, and put the -- oh, this is the report, sorry.

Let's go to page 52 of the

report, and this is the section that begins with the heading "Criminal defense files show that important investigative materials are regularly withheld from criminal defendants." Do you see that there?

A. I do.

Q. When you say "withheld," what do you mean?

A. Generally speaking, that they didn't receive them.

Q. Are you -- when you use the word "withheld," are you intending to convey some kind of intent? Meaning, are you intending to convey that police officers were deliberately withholding information, or is it recklessness or negligence? Can you give me an idea of your opinion on that?

MR. SWAMINATHAN: Objection to form and foundation.

THE WITNESS: Yeah. I am just -- since we are kind of shifting gears, I just want to kind of orientate myself to where we are at with this, so if you can just bear with me for one second.

Page 594

MS. ROSEN: Yes.

BY MS. ROSEN:

Q. Are you reading your report?

A. I am just refreshing my memory.

Q. About your report?

A. Yes.

Q. Let me know when you have finished refreshing your memory about your report.

A. Okay.

Q. So back to my question about your use of the word "withheld." Are you intending to convey intentional conduct by police officers or reckless conduct or negligence or none of the above?

A. Well, I am making an observation of what the evidence is, and what was produced, what wasn't produced. I use the word "withheld" in the sense that it wasn't provided.

Can I -- can I go to what the individual intent of the officer was? No, I don't think I am doing that. I do think that there is a pattern of documents and information that is typically or routinely

Page 595

being withheld, and I guess you could conclude that if it's the responsibility of the police department to provide all of this information and it's not being done, it's being withheld.

Q. Let's talk about -- let's go to page 53. You say here, "Background on the Area North investigative files and my file review." Do you see that there?

A. Yes.

Q. What's Area North?

A. It's -- my understanding is it's like what I call a precinct. It's a division within the Chicago Police Department.

Q. And is it your understanding that in 1995 through 1998, the City of Chicago had a precinct that was designated Area North?

A. Well, you are using -- I know I use the word "precinct." Maybe that wasn't a good description. Area where detectives worked out of that was different than from the headquarters, I guess, is my

Page 596

understanding.

Q. I am not fixating on the word "precinct." I understood what you meant. I am fixating on Area North. Was there an Area North designation in the detective division in the time period of 1995 to 1998?

A. Yeah. I'm sorry. Yes, I believe there was.

Q. And then if we go to the last paragraph on that page, it says:

"For file comparison purposes, there were 105 criminal defense files provided corresponding to 72 investigative files. There were some cases with multiple defendants, so multiple criminal defense files for a single investigative file, or where the PD file produced did not have a corresponding investigative file, or where the PD file either contained no police documents or so few that it was treated as incomplete and not counted?"

Page 597

Do you see that there?

A. I do.

Q. So my understanding from that sentence is you were provided, we said, 344 investigative files, right?

A. That's correct.

Q. And then from that, you received corresponding criminal defense files of 105 but those matched to only 72 investigative files, right?

A. That's correct.

Q. So that 344 number was reduced down to 72, right?

A. Yes.

Q. For comparison purposes?

A. For comparison, yes.

Q. Then you have in Footnote 3, you identify RD numbers that were files produced by the Public Defender where there was no corresponding investigative file, right?

A. That's correct.

Q. Was there a corresponding RD file?

A. I don't know that answer as we sit here today.

THOMAS TIDERINGTON, 10/06/2022

Page 598..601

Page 598

Q. And then there were also files eliminated because they contained no police documents or so few that they were treated as incomplete?

A. That's correct.

Q. Right?

A. Yes. I'm sorry, I said --

Q. I think we stepped over each other.

A. Okay, yes.

Q. And those files are listed in paragraph -- in Footnote 114, right?

A. That's correct.

Q. And then if we go to the next page, it says:

"Finally I gave the City the benefit of the doubt for purposes of my analysis of criminal defense files as compared to investigative files. To that end, I excluded from my analysis criminal defense files in which it appears that the criminal defense file was incomplete, as mentioned above in

Page 599

Footnote 114. The files available came from the Public Defender's Office, so it is likely that in many of these instances, the case was transferred to private counsel, and so the criminal defense file may not be complete. Those files contain a strikethrough in Attachment F, leaving 63 files for calculation and analysis."

Correct?

A. That's correct.

Q. Okay. So from the total universe of investigative files that were provided to you, the 344 for comparison purposes, you only utilized 63 files; is that right?

A. In comparing them to the Public Defender's files?

Q. Yes.

A. Yes.

Q. And then we already talked about the fact that there are redactions in those files, right?

Page 600

A. We did.

Q. And did you account for those in any way?

A. For the redaction of the files?

Q. Yes.

A. I assume that there was perhaps some information that would be relevant that was redacted. I could only go based on the documents that were provided that were not redacted. I had no -- I had no way of determining what was underneath them.

Q. So with respect to the files that were redacted, did you have any understanding of why particular documents were redacted?

A. I believe they were redacted by the Public Defender's Office, but I don't know that if I -- I don't know if it was ever explained to me as the reason why they were redacted. I don't know.

Q. And you don't foreclose the possibility that relevant information could have been redacted, right?

A. Right. I am sure it could have

Page 601

been, yes.

Q. But despite the fact that many of these files were redacted, the fact that they were redacted did not cause you to remove those files from your analysis, like you did for some of these other -- under these other circumstances that we just discussed, right?

A. That's -- that's a fair statement, yes.

Q. Okay. Let's go to page 55 of your report. You say here, "My comparison of the investigative files to corresponding defense files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files," correct?

A. That's correct.

Q. And how did you determine that?

A. I looked at what was in the investigative file and compared it to what was in the Public Defender file.

Q. You personally did that? You compared the pages of the files page by

Urlaub Bowen & Associates, Inc. 312-781-9586

THOMAS TIDERINGTON, 10/06/2022                          Page 602..605

Page 602

page?

A. Well, I did a spot-check of that. I can't take credit for every one, but my intent was to -- if I was going -- by trying to understand what the chart meant, I spot-checked several cases, and it was consistent with what the analysis was.

Q. So you did not personally compare all 63 investigative files to all 63 PD files, correct?

A. That's correct.

Q. And you relied on the analysis as reflected in the spreadsheet, correct?

A. That's correct.

Q. And you spot-checked that analysis, right?

A. That is correct.

Q. And can you tell us what type of spot-checking you did?

A. I essentially went into some of the cases and looking at the chart, I looked at what was in the investigative file, compared it to what was compared to what was in the Public Defender's file.

Page 603

Q. And you found no errors in the chart?

A. I don't believe I did, no.

Q. Can you estimate how many investigative files you compared to criminal defense files personally?

A. Not many. I would say it was under ten.

Q. All right. And then you say:
"The documents missing from the defense attorney's files are important investigative materials. For example, the following significant discoverable items wereroutinely absent, and are precisely the kind of documents that should be routinely disclosed to a criminal defendant under normal police practices."
And then you identify handwritten notes and general progress reports, right?

A. That's correct.

Q. And that -- did you do that

Page 604

analysis in that paragraph yourself, or did you take it from the spreadsheet attached?

A. I took it from the spreadsheet.

Q. And then with respect to investigative file inventories, did you do that analysis yourself, or did you take it from the spreadsheet?

A. That one was pretty easy to look at. I don't want to take credit for it. I know I looked closer at that, but I would say I would still have to defer to the spreadsheet.

Q. And then you have this point about issuing a subpoena. And it says, "In many of cases I reviewed, the defense attorney issued a subpoena specifically for street files, and that subpoena appears in the investigative file, but not all of the documents in the investigative file were disclosed in response to the subpoena."
Do you see that?

A. I do.

Q. What was your understanding of -- do you have an understanding of why the

Page 605

subpoenas issued from the defense attorneys used the phrase "street files"?

A. I don't. I guess I don't want to opine on what they wrote in the subpoena.

Q. How are you able to conclude that there are documents missing from every criminal defense file when a majority, if not all, of the criminal defense files have redacted pages in them?

A. Well, again, you can only go on the information that was provided. If you have better information that I can use for comparison, I would certainly consider that.

Q. When you reviewed the PD files and saw the number of pages redacted, did it cause you any concern?

MR. SWAMINATHAN: Objection to form.

THE WITNESS: Well, the fact they were redacted was not, I don't think, a secret to anyone. I think anyone involved in this case knows that if they reviewed it that they would know that those pages were redacted. So no particular concern, I

THOMAS TIDERINGTON, 10/06/2022                    Page 606..609

Page 606

guess.

I certainly wish I would have had all of that unredacted information. I think it would have precluded this discussion we are having today.

BY MS. ROSEN:

Q. What do you mean it would have precluded the discussion we are having today?

THE VIDEOGRAPHER: Eileen, I am sorry, we are going to have to stop for just a second. I lost the last answer.

MS. ROSEN: Yes. We can go off the record.

THE VIDEOGRAPHER: Thank you. We are off the record at 4:40 p.m.

(Whereupon, a break was taken at 4:40 p.m. to 4:52 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 4:52 p.m.

MS. ROSEN: And, Maribeth, can you read back that last question that we didn't get an answer to.

Page 607

(Whereupon, the record was read as requested.)

THE WITNESS: I guess I -- what I meant was that I think we all would have liked to have seen what the redacted information was. If we knew what it was, we wouldn't be debating whether it was important, or whether it was a police report, or whether it was a work product from the State Attorney -- from Public Defender's Office.

BY MS. ROSEN:

Q. Okay.

A. But it is my understanding that police reports were not redacted from these files.

Q. What is the basis of your understanding that no police reports were redacted from this file?

A. I recall being told that by plaintiff's counsel.

Q. Which of plaintiffs' counsel told you that no police reports were redacted from the PD file?

Page 608

A. Anand.

Q. When did Anand tell you that no police reports were redacted from the PD file?

MR. SWAMINATHAN: Hold on. For purposes -- just so you know, our communications back and forth are privileged. However, to the extent there were certain assumptions that you were asked to make for purposes of your analysis, you can identify those assumptions. I think you have already done that, but you can identify the assumptions that you made.

BY MS. ROSEN:

Q. When did Anand tell you that no police reports were redacted from the PD file?

MR. SWAMINATHAN: Objection to form and mischaracterizes testimony.

Again, you can identify what assumptions, if any, you were told to make by counsel.

THE WITNESS: I think I did that.

Page 609

BY MS. ROSEN:

Q. You think you did what?

A. I made the assumption that police reports were not redacted.

Q. But you just told me Anand told you that?

MR. SWAMINATHAN: I didn't -- go ahead.

THE WITNESS: Well, I didn't say that. It was when I began looking at it.

BY MS. ROSEN:

Q. So before you prepared your report?

A. Certainly.

Q. And what exactly were you told about whether or not police reports were redacted from the PD file?

MR. SWAMINATHAN: Well, once again, you should not identify our communications, but you can identify to the extent I told you about any assumptions that you were told to make by counsel, you can identify them.

THE WITNESS: Again, as I

THOMAS TIDERINGTON, 10/06/2022

Page 610..613

Page 610

testified, I did not create this chart. I spent a great deal of time trying to understand what the chart contained. And I do recall -- I mean, it's obvious that I would be asked that question when I first began looking at the chart, and it wasn't today, and I was told that I could assume that the redacted areas contained work product from the Public Defender's Office:

BY MS. ROSEN:

Q. And were you provided an explanation for why it was safe to make the assumption that the redactions represented work product from the Public Defender's Office?

MR. SWAMINATHAN: You can answer the question. You are only to testify as to the assumptions you were told to make. So to the extent you can answer that question yes or no, you can do so.

THE WITNESS: I am sorry, can you read that question, please.

THE REPORTER: Do you want me to repeat it?

Page 611

THE WITNESS: Please.

(Whereupon, record read, as requested.)

THE WITNESS: Yes.

MS. ROSEN: Now I lost the question. Can you read my question back again, sorry.

(Whereupon, record read, as requested.)

BY MS. ROSEN:

Q. What was the explanation you were provided?

MR. SWAMINATHAN: You can answer as to whatever assumptions you were told to make or explanation related to those assumptions.

THE WITNESS: I think I have answered that the -- I was told that I could assume that police reports were not redacted and that any redaction was attorney work product.

BY MS. ROSEN:

Q. And you proceeded with your analysis based on that assumption, correct?

Page 612

A. That is correct.

Q. And if, in fact, there were police reports or other relevant information redacted in the PD files, would that change your conclusions that you reached in connection with your comparisons between the investigative file and the PD file?

MR. SWAMINATHAN: Objection to form.

I am sorry, could you read that back.

(Whereupon, record read, as requested.)

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: Certainly, I would consider that. I don't know if it would change my opinion. It might bolster my opinion.

BY MS. ROSEN:

Q. I mean, certainly, you'd have to concede, right, that if the materials or the majority of the materials that you have

Page 613

identified as being withheld because you didn't find them in the PD files, if they, in fact, are there and redacted for some reason, then, obviously, that would change your opinions, right?

A. Absolutely.

Q. Okay. And do you have any understanding of where or how the PD maintained their files from 1995 to 1998?

A. I do not.

I'm sorry, you said the PD. I am assuming you mean Public Defender, not the police department, is that --

Q. Thanks for checking that. Yes, I meant the Public Defender.

A. No, I don't.

Q. Let's take a look at page 56 of your report. Your discussion of Linox Jackson and Tyrone Hammond.

A. Right.

Q. You say:

"Linox Jackson and Tyrone Hammond were convicted of first degree murder after allegedly

THOMAS TIDERINGTON, 10/06/2022                    Page 614..617

Page 614

shooting Jerry Hall during on May 19, 1995."

There is a typo there.

"The defense attorney's file is missing extensive information inculpating two other suspects named Richell Akins (Tree) and Ralph Mahomes, including any suggestion that detectives considered them suspects, such as their IR histories and criminal record search."

Do you see that there?

A. I do.

Q. Which defense attorney's file are you referring to?

A. The Public Defender's Office.

Q. Was that Mr. Jackson's criminal defense file or Mr. Hammond's criminal defense file?

A. I wouldn't know that. I mean, I -- again, I know you don't want to go back and let me go through the files, but I would have to do that to answer that question.

Page 615

Q. But you didn't note it, right, here in your report which file or files you looked at?

A. I did not.

(Whereupon, Tiderington Deposition Exhibit No. 23 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 23. As you can see from the Bates stamp, it's AR-PD, so the name on the first page here is Linox Jackson. Do you see that?

A. I do.

Q. Is this a file that you reviewed in connection with your opinions in this case, specifically the paragraph -- the couple of paragraphs discussing Mr. Jackson's case on page 56?

A. I am just looking for the Bates number in my report.

Q. Well, you don't cite the PD file in your report?

A. Well, not there I don't, I guess but ...

Page 616

That appears to be, yes. Again, I'd have to -- if we can scroll through there, I am certain something would jar my memory, but I believe that's it, yes.

Q. Well, obviously, it has his name on it, right?

A. Yes, it does.

Q. And it says, charge murder, right?

A. Yep, yes.

Q. Let's go to the next page, that says, M number. Does that mean anything to you?

A. No.

Q. And then the next page is redacted, right?

A. Correct.

Q. And the next page, right?

A. Yes.

Q. Redacted? And the next page is redacted as well, correct?

A. Correct.

Q. As is the next page, right?

A. Correct.

Q. As is the next page, right?

Page 617

A. Yes.

Q. As is the next page, right?

A. Yes. All the pages that are -- don't have any writing on them are redacted.

Q. Okay. We can keep scrolling through. Okay, here we go.

So we are now on the eleventh page of the 51-page file, and this is a subpoena, right?

A. Yes.

Q. Issued, it looks like by the Assistant Public Defender that was representing Mr. Jackson, right?

A. Yes.

Q. But there's no stamps on it or a date of the time served or anything like that. Do you see that?

A. I don't see any timestamp on it. I see a witness date of May 9th, but I don't think that's what you are asking.

Q. Where it says, clerk of the court, that's not filled in?

A. No, it's not.

Q. And at the bottom, it says, "I

THOMAS TIDERINGTON, 10/06/2022                    Page 618..621

Page 618

served this subpoena by handing a copy to," et cetera, et cetera, that's not filled in, right?

A. You are correct, it's not.

Q. And in your review of all of these files, you noticed subpoenas, right? You commented on it. We just talked about that, right?

A. Yes.

Q. And did you notice in those subpoenas that when they were actually issued and served that they had -- all that information was filled out, right?

A. Well, I would have to go back and look at them and see if all that information was filled out.

Q. As you sit here today, you don't recall that?

A. Well, I do recall. If you are asking me if every one of them was filled out, I can't say that they were. But the premise that some of them were filled out, I would agree with you.

Q. I know you are not a lawyer, but

Page 619

the fact that this part of the subpoena is not filled out, does that indicate to you actually this subpoena was not served?

A. That would not indicate that to me. I mean, if you are telling me that's what it indicates from a lawyer's perspective, I would not disagree with you, but that's not what it would indicate to me.

Q. Let's go to the next page. It's another subpoena, right? This one to the Illinois State Police, right?

A. Yes.

Q. For their forensic science center -- to their forensic science center. Do you see that?

A. Yes.

Q. Do you have any understanding of what role in this time period, May of 2000, that Illinois State Police, specifically its forensic science center, had on homicides that took place in Chicago?

A. I can make an assumption, but I don't know if I'm right.

Q. You don't know, right? You don't

Page 620

know?

A. I don't know for sure, yes.

Q. And what's your assumption?

A. My assumption is that they were the crime lab where evidence perhaps was sent to them for analysis.

Q. Let's go to the next page.

A. Was I right?

Q. You are.

A. Thank you.

Q. The next page is -- looks like an appearance form. You see that there?

A. Yes.

Q. But it's not signed, right?

A. That doesn't appear to be signed, yes, you are correct.

Q. And the court number is blank. It just says OO, which denotes the year?

A. Right, yes.

Q. CR, but there is no court number there, right?

A. Yes, you're correct.

Q. And when you were reviewing this file, did you notice that?

Page 621

A. Quite honestly, no.

Q. Let's go to the next page. It's another copy of the same document, right?

A. Yes.

Q. And the next page, another copy of the same document, right?

A. Yes.

Q. And the next page, and this is something entitled, a motion for discovery, right.

A. That's what it says, yes, motion for discovery.

Q. And it's prepared on behalf of Mr. Jackson, right, now comes the defendant, Linox Jackson?

A. Yes.

Q. But once again, in the caption of the case, that 00 CR, nothing is filled out, right?

A. It's not.

Q. Let's go to the next. That's the continuation of the motion for discovery, right?

A. It is, yes.

THOMAS TIDERINGTON, 10/06/2022                    Page 622..625

Page 622

Q. And the next page. And the next page. And the next page. One more.

If we scroll to the bottom, and then it says, so those few pages there were the motion for discovery, right?

A. Can I read them? I'm kidding. I know it's late in the day, and I should not be trying to be a comedian. But, yes, that's what it appears to be, yes.

Q. And do you have any understanding of what a motion for discovery is in the context of a criminal case?

A. As it pertains to Chicago, probably not.

Q. And then if we go one more page, there is the signature page, but again, it's not signed, right?

A. Correct.

Q. Let's go to page 23 of the PDF, and this now appears to be a duplicate of the document we just saw, right?

A. Yes.

Q. Let's go to 24, 25, 26, 27, and that's a blank page, and then 28, and then

Page 623

29, and then 30. And with the exception of the blank page that was inserted in the middle there, that seems to be a duplicate of the motion for discovery, right?

A. It appears that way.

Q. And let's go to page 31. And what is that? It looks like another copy of the motion for discovery, right?

A. Yes.

Q. And there is still no court number in the caption, right?

A. Correct.

Q. Let's go to page 32, 33, 34, 35, 36, 37. And again, that's the signature page without a signature. So that would be now the third copy in this file for motion for discovery, right?

A. It appears so, yes.

Q. Then let's go to the next page. This looks like a form that appears to be utilized by the Public Defender's Office with respect to client interviews, right? It's a blank? It's not filled in in this case, right?

Page 624

A. Yes. Confidential, do not disclose, client interview is what it says.

Q. And then the next page is a continuation of that same form, right?

A. Yes.

Q. And the next page is another subpoena, right? This one has a 00MC1 number on it. Do you see that at the top?

A. Yes.

Q. Does that mean anything to you?

A. No. I am assuming it's a case number, but I don't know what significance it is.

Q. Then let's -- you can see this one, there is actually the stamp for the clerk of the court?

A. Yes.

Q. If you keep scrolling, it's actually stamped and served by. Do you see that?

A. Correct, stamped by the Illinois State Police.

Q. I think it's probably stamped by the person that served the subpoena, and

Page 625

then stamped -- the signature, and then stamped received by the Illinois State Police, right?

A. Yes.

Q. And let's go to the next page. This then is an appearance again in the 00MC1 case, right?

A. For some reason, the name's crossed off, so I don't know if that's what that means. If you tell me that that's what it means, I would not argue with you.

Q. Well, I am referring to the court number, it says case number and 00MC1, do you see that?

A. Right, yes.

Q. Which is different than the ones that weren't filled in were 00CR, right?

A. I believe so.

Q. If you don't --

A. Right.

Q. Sorry. But you don't know the distinction between those two?

A. I don't.

Q. Let's go to the next page.

Urlaub Bowen & Associates, Inc.  312-781-9586

THOMAS TIDERINGTON, 10/06/2022      Page 626..629

Page 626

A. The only thing I wanted to point out is the defendant's name was crossed off there.

Q. Yeah. I don't have any idea why. Maybe because it says Johnson and his name is Jackson.

Let's go to the next page, again, Johnson, same thing, but this time it's not crossed out, right?

A. But it's still wrong, yeah.

Q. It's still wrong but not crossed out?

A. Yes.

Q. Let's go to page 53. This is another subpoena that was served on the Chicago Police Department. You see the stamps on it, right?

A. Yes.

Q. But again, this is on the MC1 case, not the CR case?

A. Okay, yes.

Q. Let's go to page 44. This would be Mr. Jackson's IR history, correct?

A. It is.

Page 627

Q. Let's go to the next page, another subpoena, copy of the subpoena, I think, or maybe it's another subpoena to the Chicago Police Department, right?

A. Correct.

Q. Let's go to 46, an envelope, correct?

A. It appears to be an envelope. I can't tell if it's 8 1/2 by 11 or 11 by 14, but it appears to be an envelope, yes.

Q. Let's go to page 47. Another subpoena to the Chicago Police Department, and this time to the office of the superintendent. Do you see that?

A. Yes.

Q. Let's go to the next page. Another subpoena, this time to the records division of the Chicago Police Department. Do you see that?

A. I do.

Q. Let's go to the next page. This is another subpoena. This time to the photography division of the Chicago Police Department, right?

Page 628

A. Yes.

Q. Let's go to the next page. This is another subpoena to the Chicago Police Department. This time to the bureau of identification, right?

A. Correct.

Q. Let's go to the next page. This is another subpoena to the Chicago Police Department, and this time to the communications division of the Chicago Police Department, right?

A. Yes.

Q. Let's go to the next page. Oh, I guess that's the end of the file.

So there are no -- other than the IR history, there are no police reports in this particular file, correct?

A. That's correct, yes.

Q. So under the rules that you had established on page 53 about your analysis where the PD file contained no police documents, or so few that it was completed as incomplete, it was not counted, and that was the RD numbers were in Footnote 114,

Page 629

correct?

A. I am sorry, the footnotes were in?

Q. Sorry. The RD numbers for the cases that you did not analyze because the PD file produced did not have police documents, or so few that it was treated as incomplete and not counted, those RD numbers are listed in paragraph -- in Footnote 114 on page 53 of your report, right?

A. Yes. Just let me confirm that, but I think you are correct.

Q. Let me know when you are there.

A. Yes.

Q. And this particular case has an RD number of Z219872, and it's not listed in Footnote 114, right?

A. I think I believe you are correct, yes.

Q. And, in fact, you actually analyzed it specifically at page 56 of your report? It being this particular RD file or investigative file?

A. I did.

Q. And your conclusions were that

Urlaub Bowen & Associates, Inc.    312-781-9586

Page 630

certain documents that were in the investigative file weren't in the PD file, right?

A. That's correct.

Q. But under your own rules of engagement, this particular investigative file should not have been counted, correct?

A. I don't know that I -- how did you draw that conclusion?

Q. Well, this particular file has no police documents in it, and I thought --

A. Should it not have had police documents in it?

Q. Well, it was my understanding that based on what you said on page 53 of your report --

A. Right.

Q. -- was that if a PD file didn't have police documents in it, you weren't counting it, and you weren't analyzing it?

A. I think I said if there was so few documents in there. I don't know if I said if all the police reports were not in there. Maybe I did. I'll have to look at that

Page 631

again.

Q. Well, we can read it again. It's on the screen. It says:

"There were some cases where multiple defendants -- with multiple defendants, so multiple criminal defense files for a single investigative file, or where the PD file produced did not have a corresponding investigative file, or where the PD file either contained no police documents or so few that it was treated as incomplete and not counted."

A. And you could be correct there. Again, I think I reviewed 6,000 pages of documents. If I -- if I should have listed this in a footnote, I will take that responsibility. And if I go back and research it and think about it differently, I will let you know as well.

Q. So but going back to the fact that on page 56, you make the claim that documents were withheld because they were

Page 632

missing from the defense file, do you think that's a fair claim to make in a case where it's clear we have an incomplete file because there are zero police reports in the PD file?

A. I am not going to argue that point. Like I said, I would have to go back, and I know it's kind of late in the day here, but I am not -- if what you are saying is correct, and it appears that it is, I should have used that, and I should not have used that for the calculations.

Q. Or as an example on page 56 of your report, right?

A. That's correct. But like I said, I would have to look at it, perhaps a fresh look at it at some point. But I don't know what would have changed my opinion, and perhaps that should have been -- perhaps that was not the best example to use.

Q. Let's go to your analysis of James Edwards, Damaine Billups, Cornell Guthrie, Alex Lane, N-Wata Mitchell, Willie Johnson. In this particular case, you say that:

Page 633

"James Bryant was beaten and stabbed to death by a group of people on June 19th. CPD engaged in a sprawling investigation to figure out who and how many people had attacked him. The investigation led them to a suspect named Tremaine Willis. Investigators requested Willis's IR sheet and a photograph in early July of 1995, and then investigators canvassed the neighborhood and asked witnesses to look at photos to see if they could identify any of the assailants."

And there is a citation to -- do you know, that's got to be an investigative file, you think, or RD file?

A. I believe it's the investigative file.

Q. And then it says:

"There is no reference to Willis anywhere in the defense

THOMAS TIDERINGTON, 10/06/2022                    Page 634..637

Page 634

file. Detective also pursued an alternative suspect named Paul Thomas, aka Johnson. There is information on Thomas missing from the defense file, including, for instance, his arrest report."

Do you see that there?

A. I do.

Q. Let's take a look and look at -- do you know when you say "defense file" which of the six defendants you are referring to?

A. If we could pull up Z273605, I might be able to figure it out. As we sit here, I don't think I can recall, or I don't recall which suspects, or suspect, I guess.

Q. When you say we could pull up Z273605, what do you mean? Which file related Z273605?

A. The investigative file.

Q. All right. And you think the investigative file will help you to figure out which defense file you looked at?

A. Well, I am trying -- you are

Page 635

asking me to answer questions about this file, and it would be helpful to look at it from the beginning and, you know, maybe I can walk you through the analysis, and how I concluded it and my conclusions to it.

Q. But I had a specific question, which was, do you know which defense file? There are six -- let me just finish my question. There are six defendants that --

A. Okay.

Q. -- that apparently were charged in this case, right?

A. Correct.

Q. And so my question is: When you draw conclusions about what's in the defense file, I would like to know if you remember which defense file you were reviewing to draw those conclusions?

A. All right. I understand that, and like I said, I would like to look at all six of the files, and I could perhaps then answer that question.

Q. Well, see, we don't have six files because they weren't produced. So I am

Page 636

trying to figure out -- we only have a couple of the files, and I am trying to figure out --

A. Which ones -- I'm sorry, which ones do you have?

Q. Well, we have Willie Johnson. Would you like to take a look at Willie Johnson?

A. That might be the lucky number, so let's take a look at that.

Q. Okay. Let's take a look at Exhibit No. 25.

(Whereupon, Tiderington Deposition Exhibit No. 25 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Now, this is an over 1,000 page criminal defense file for Mr. Johnson.

A. Correct.

Q. And if we were to try to flip through every page of this file, we would be here until tomorrow, so I am not going to do that. I am going to allow you to look at -- if we ever get to portions of the file that

Page 637

aren't redacted, let's see if I can get there.

So if we go to page 34 of the PDF, so the first 33 pages are redacted of this file. And then we have this supplementary report that describes who the victim is. Do you see that?

A. Right. And that's -- and it indicates it's page 1 of the supplemental report.

Q. Correct. And we can go to the next page of the supplemental report, and it has some identifying information about where the crime happened, and then it identifies some witnesses and people that were interviewed, right?

A. Right.

Q. And then you can, if you want to read where it starts that investigation part, that first couple of paragraphs, and let me know if that refreshes your recollection at all about which of the criminal defense files you were analyzing?

A. I mean, this will be helpful

Page 638

because the other question was, were the police reports redacted. So my recollection, I believe the original report is in here as well, so right now we are looking at the supplemental report. But if we continue through, I think you will find that the original report is also in here on this particular case.
Q. When you say the original report, what do you mean, the original -- the general defense case report?
A. Yes.
Q. That doesn't tell us whether other reports were redacted, right? Like GPRs could have been redacted?
MR. SWAMINATHAN: Objection to form and foundation.
THE WITNESS: I guess it could have been, but I guess to -- I guess I thought your previous question -- and when I said that it was my understanding that police reports were not redacted, this -- I want to go through this file to confirm what I told you.

Page 639

BY MS. ROSEN:
Q. Well, you don't know. First of all, that can't confirm it. You have no idea what's been redacted. All you will know is that there are police reports in this file.
MR. SWAMINATHAN: Objection to form.
BY MS. ROSEN:
Q. And we are certainly not going to spend hours comparing the investigative file to the thousand page PD file?
A. Well, that's --
MR. SWAMINATHAN: Objection to form, foundation, and argumentative.
BY MS. ROSEN:
Q. So you have testified that you were operating under the assumption that all of the redacted pages represented work product, so that is the assumption you were working under, and that is the assumption that we will all work under with respect to your analysis in the case. We are certainly not going to take hours at the twelfth hour

Page 640

of your deposition to have you try and figure out if that's true or not. If you want to do that on your own time, then feel free.
MR. SWAMINATHAN: I don't know if there is a question pending, but I don't think that's what he asked for, but go ahead.
MS. ROSEN: Thanks.
BY MS. ROSEN:
Q. So the question that started all of this was there were six people charged in this case, and you are making assertions about information that was withheld, and so you wanted to look at this particular file to help answer that question.
Is this the file that you reviewed, Mr. Johnson's file, in arriving at your conclusions that certain materials were missing from the criminal defense file?
(Ms. Aguilar exited the deposition proceedings.)
THE WITNESS: I believe I reviewed all of the defendants' case files.

Page 641

(Whereupon, Tiderington Deposition Exhibit No. 24 was screen-shared/referenced.)
BY MS. ROSEN:
Q. Let's look at -- you indicate -- well, let's also take a look at what we will mark as -- or what has been marked as Exhibit 24, which is the investigative file in connection with this case, and if we could go to page 393 of the PDF.
No, that's not right. Can you scroll down to 403. Sorry, let me find it.
Let's go to 293, sorry.
Okay, so 293 is -- we are looking at the investigative file. If you can scroll so you can see the Bates stamp.
A. I'm sorry, just to clarify, which investigative file are we looking at at this point?
Q. The one for Z273605.
A. Okay.
Q. You have an understanding that when there is a murder that there is an investigative file that's prepared, and

there is only one investigative file, despite the fact that multiple people could get charged, right?
A. Well, there was not one. I mean, that's part of the problem. There is not one file. There's parallel files and --
Q. Have you seen more than one investigative file?
A. No, no, I am not -- no, if there's multiple defendants like the Soto case, there is one investigative file, and there were multiple defendants.
Q. Right, that was my question.
A. Okay.
Q. That was what I said, investigative file. I wasn't talking about parallels files or anything else, investigative file.
A. Okay.
Q. But the same isn't true on the defense, right? Every defendant has their own criminal defense file, right?
A. I believe that's the case, yes.
Q. Okay.

A. They would have a different attorney assigned to them, yes.
Q. Right. So if we go to -- we are in the investigative file. If we scroll to the bottom so you can see the Bates. So the Bates number is 40334, and that is one of the documents that you indicate is missing from the defense file, right? This is an arrest report for Mr. Thomas, somebody that you believe is an alternative suspect, right?
A. I am sorry, pull that up or scroll that up a little bit just so I can confirm, if you can.
Q. So that he can see the name.
A. Yeah, I just want to make -- make that a little larger.
I can't read that. If you can scroll up a little bit and a little bit more to the left.
Q. Do you see Thomas?
A. I see Thomas. I am trying to read the narrative.
Q. The narrative of what?

A. Well, the rest of the page.
Q. Okay.
A. I can't make that out after arrest. And if you could perhaps make that just a little bit larger.
Q. Above arrested, after identified by RO's as a wanted person in CPD daily bulletin, wanted for murder, probable cause to arrest.
A. Thank you. I appreciate the help.
Q. Sure. So this is a document that you say was not in the criminal defense file, right?
A. That's my understanding, yes.
Q. Let's go back to Exhibit No. 25, and let's go to page 393 of Exhibit No. 25. Isn't that the same arrest report we were just looking at?
A. And, I'm sorry, the Bates number at the bottom of the page there is what? It's from the Public Defender's Office, correct?
Q. Yes.
A. All right. And for which

defendant is this relating to?
Q. This is the Willie Johnson file.
A. I agree with you, it is in Willie Johnson, yes.
Q. Let's go back to Exhibit 24, if we could go to page 567 of the PDF. If you look at page 57 of your report, you say -- I guess it starts at the bottom of 56, you say:

"Finally, while the supplementary report states that a witness named Ms. Smith saw three or four suspects chasing the victim, there is a handwritten note stating that Ms. Smith said that it might have been only two people who were chasing the victim."

And the citation for that is RFC-Solache/Reyes 40609. And as you will see, this is the Bates number at the bottom matches the cite in your report, right?
A. Correct.
Q. Can you tell me where in this note

Page 646

it says that Ms. Smith said it might have been only two people who were chasing the victim?

A. Ms. Smith called the police in something two, three, four suspects chasing him.

Q. So it says two, three, or four, right?

A. It does.

Q. Which is consistent with the supplementary report, right?

A. I would have to look at the supplemental report.

Q. Well, look at what you say about the supplemental report in your report. It says, while the supplemental report states that a witness named Ms. Smith saw three or four suspects chasing the victim.

MR. SWAMINATHAN: Objection to form and foundation.

THE WITNESS: Well, I guess maybe I am not following the line of questioning, but the note says -- and again that would be, you know, was it two, was it three or

Page 647

was it four suspects chasing him? Would be my -- I guess my question that the officer should have clarified in this police report. That's why I wanted to go back and look at the supplemental report.

BY MS. ROSEN:

Q. Is your quarrel with the fact that the police report says three or four and the note says two, three, or four?

A. No, it's not necessarily a quarrel. But if you are asking me to be concise, I would like to go back and look at that supplemental report to refresh my memory to explain what I -- what I meant in that paragraph or in that sentence.

Q. Well, you don't cite the supplemental report, so there is no way for us to find it quickly.

A. Do you want me to look for it?

Q. No, I do not.

We can take those exhibits down and go back to his report.

Exhibit No. 6, let's go to page 57. This is Jose Melendez, A315294.

Page 648

Actually, I'm sorry, can we go back to Exhibit No. 25. In your report, you also indicate that there was -- the investigation led to a suspect by the name of Tremaine Willis, and that there is no reference to Willis anywhere in the defense file, right? That's on page 56 of your report? We talked about that a minute ago.

A. Yeah, but I am getting somewhat confused because we are going forward and then we are jumping back. So now we are back to the James Edwards case, is that what you want me to --

Q. Yes. I am back to RD number Z273605.

A. Okay.

Q. And we are now looking at Mr. Johnson's Public Defender file again, which was the file we were looking at before.

A. Okay.

Q. And in your report, which I think you also have in front of you, so we don't have to pull it up on the screen if you need

Page 649

to refresh your recollection, you note that the investigation led to a suspect named Tremaine Willis, right?

A. That's correct.

Q. And then you reference at the bottom of that first paragraph, there is no reference to Willis anywhere in the defense file, right?

A. That's correct.

Q. Let's go to page 461 of the PDF, what is that?

A. I believe it's a criminal history.

Q. For who?

A. Willie.

Q. Is that the same person as Tremaine Willis?

A. It appears to be, yes.

Q. So, in fact, there is a reference to him in the defense file, right?

A. Well, I guess you are still looking at the Willie Johnson defense file, correct?

Q. Correct.

A. Well, we are back to -- we are

Page 650

back to exactly where we were a few minutes ago. We would have to look at the other files to see if he is referenced in all of those.

Q. We don't have all of the files, so we cannot look.

A. I think I have them, and I can find it if you'd --

Q. You think you have all six of these defense files?

A. I would look. I would like to look. I don't know if I do or not.

Q. Well, okay, if we have time at the end, I will let you look.

A. We may want to, if we could take like a five-minute when you are done with that before we move on to the --

Q. A break, you mean?

A. Yeah. My wife is texting me, and I don't know if there is an issue, or she just wants me to bring bread home.

MS. ROSEN: Sure, we can take a break here.

THE VIDEOGRAPHER: We are off the

Page 651

video record at 5:43 p.m.

(Whereupon, a break was taken at 5:43 p.m. to 5:53 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 5:53 p.m.

BY MS. ROSEN:

Q. Let's go back to your report, Exhibit No. 6, page 57. We have a discussion here about Jose Melendez. It's A315294. Do you see that?

A. I do.

Q. And you say, "For this case, I focused on comparing the investigative file and permanent retention file, given the redactions in the PD file." Do you see that?

A. I do.

Q. And so I take it, in this particular case, there were so many redactions in the PD file that you did not believe that you could compare the investigative file to the PD file for purposes of your analysis; is that right?

A. That's fair, yes.

Page 652

Q. So why did you go through the exercise of comparing the investigative file to the permanent retention file or RD file?

A. I probably should not have. I mean, I -- it was probably not a great example. I am not arguing that point.

Q. Okay. And if you go to the last -- the last sentence of the discussion about Jose Melendez, it says, "Ms. Pantoja's undisclosed handwritten statement, on the other hand, states that she did not know how Mr. Melendez got to her house."

Do you see that?

A. I do.

Q. But you have no basis to say the handwritten statement was undisclosed, right? You didn't look at the PD file, or you couldn't compare the PD file because of the redactions, correct?

A. That's a fair conclusion, yes.

Q. And we already discussed Kim Mathis.

Let's see, with respect to the next witness -- I mean the next criminal

Page 653

defendant after Kim Mathis, so on page 58 of your report, Ardell Clemons.

A. Okay.

Q. So in this case you note that:

"This case involves the stabbing death of a woman named Nyree Johnson. The investigation revealed that Ardell Clemons, the victim's friend, had been living with the victim at the time of the murder. Detectives pursued Clemons who had fled to Florida. Clemons was arrested just a few days after the crime."

Do you see that?

A. Yes.

Q. And then you say, "The investigative file includes several documents that could have been relevant to the defense but were not in the Public Defender's file." Do you see that?

A. I do.

Q. And you note -- you identify a handwritten note about another potential

Page 654

suspect who had previously worked with the victim and was dating the victim, right?

A. Yes.

Q. And you cite the investigative file, I think, for that?

A. Correct.

(Whereupon, Tiderington Deposition Exhibit No. 26 was screen-shared/referenced.)

BY MS. ROSEN:

Q. If we could take a look at Exhibit No. 26 and go to page 194 of the PDF, scroll down. So that's 44288, right? So that's your citation, right, in your report?

A. Yes, yes, it is.

Q. And so this is the note that you are referencing when you say, "One handwritten note not in the PD file about another potential suspect who previously worked with the victim and was dating the victim." Do you see that?

A. I do.

Q. What information is contained in this report that leads you to conclude he is

Page 655

another potential suspect who previously worked with the victim and was dating the victim?

A. I would have to look at the -- I think that information is contained in the police report or the supplement.

Q. I see, okay. Then if we go to page 166 of the investigative file. This is the lease application that you reference, right?

A. Yes.

Q. And you state, "Another document in the investigative file but not in the PD file is an apartment lease noting that the victim left her former residence due to domestic violence, what would have been a lead into another potential alternative suspect."

Do you see that there?

A. I do.

Q. And is that based on the fact that -- well, why do you conclude -- who is the potential alternative suspect that you are inferring from this lease?

Page 656

MR. SWAMINATHAN: Objection to form.

THE WITNESS: I believe it was a boyfriend or somebody that had leased the -- that was listed on the lease with her.

BY MS. ROSEN:

Q. How do you know? What information do you have about that?

A. I think there's something, again, in the police report that would tie in the significance of the fact that there was a domestic violence incident. And, of course, any time you have a young lady stabbed to death, you would look at her relationships, her acquaintances, and it certainly is something that I'm sure a reasonable investigator would have considered.

Q. And when you are evaluating these materials, the note that we just looked at and this lease, are you evaluating it in the context of the information that you learned from reviewing the PD file?

A. I don't know if I follow that question.

Page 657

Q. Sure. When you were -- when you are evaluating those notes and concluding that these are potential suspects, and then you say that could have been relevant to the defense but were not in the Public Defender's file, right?

A. Correct.

Q. Are you evaluating the criminal defense file to evaluate what type of defense they were offering in the particular case?

A. No. My position is that any reasonable officer would understand that everything in a homicide file should be turned over to the prosecutor.

(Whereupon, Tiderington Deposition Exhibit No. 27 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 27, which is Mr. Clemons.

A. I'm sorry, and just to clarify that point, just to make sure that I am clear on that. I can't think of anything in

THOMAS TIDERINGTON, 10/06/2022      Page 658..661

Page 658

an investigative file, in a homicide investigative file that would not be relevant to an investigation; and, therefore, it would have been required to be turned over by virtue of a subpoena or work product to the -- for the State's Attorney.

Q. But you didn't -- you didn't look at any of the State's Attorney's files to see if any of these materials that you say were not in the criminal defense file were actually in the State's Attorney's files, right?

MR. SWAMINATHAN: Can you read that question back.

THE WITNESS: Yeah.

(Whereupon, the record was read as requested.)

THE WITNESS: That is correct. I did not have access to any State Attorney files.

BY MS. ROSEN:

Q. And were you ever told that we did actually receive the State Attorney files?

A. I think I was told that, yes.

Page 659

Q. Did you ask to review them?

MR. SWAMINATHAN: Objection to form and foundation. It was produced in February after disclosure.

MS. ROSEN: Okay.

BY MS. ROSEN:

Q. Did you ask to review them?

MS. ROSEN: It didn't stop you from giving him more materials in the last couple of weeks.

BY MS. ROSEN:

Q. Did you ask to review the State's Attorney's files?

A. Your question is, did I ask? I think when I first began examining the case and the chart, I was told what was available and that files from the State Attorney's Office, I was instructed or told that they were not available.

Q. But at some point, you knew they became available, right?

A. I think I found that out today.

Q. Today?

A. Yes.

Page 660

Q. Okay. If all of the information --

A. Maybe yesterday. I'm sorry, maybe yesterday, or maybe within the last couple of days it would have been. It's a late afternoon.

Q. If you found out that the materials you have identified in your report as being withheld are actually contained in the Cook County State's Attorney's files, would that change your conclusions that the Chicago Police Department withheld those materials?

A. If all the materials in the police department investigative files were turned over to the State Attorney's Office, I think that would have been proper and reasonable conduct on the part of the investigators.

Q. Going back to Mr. Clemon's case for just a second, if we could take a look at -- actually, let's -- yeah, let's take a look at page 414 of the PDF.

Do you recall that Mr. Clemons was picked up in Key West?

Page 661

A. I recall that he was in Florida. I knew that he fled to Florida. I don't know if I remember it was Key West, but yes.

MR. SWAMINATHAN: Smart man.

BY MS. ROSEN:

Q. And do you recall when you were reviewing his PD file in connection with your analysis in this case that he was interviewed by police officers from Key West and admitted that he called the Chicago Police Department and confessed to the crime and then confessed to the crime to the Key West police officers?

A. I am refreshing my memory. I vaguely recall that, yes.

Q. And did that, the fact that Mr. Clemons called the Chicago Police Department from Florida and confessed to the crime, and then confessed to the Key West police officers that picked him up and interviewed him impact your analysis in any way?

A. Again, I'd have to go back and read the details. I don't know exactly what

Urlaub Bowen & Associates, Inc.    312-781-9586

THOMAS TIDERINGTON, 10/06/2022                    Page 662..665

Page 662

he told the investigators from Key West, and if it comported with what he told the Chicago investigators.

Q. Did you notice as you were reviewing this file, this PD file, how many pages were redacted?

A. I don't recall that as I sit here today.

Q. All right. Let's -- we can take this exhibit down. Let's go back to the report, Exhibit No. 6. Exhibit No. 6 if we look at the bottom of page 58, this is Mr. Oscar Soto's case. This is another one that you reviewed, right?

Let me strike that. This is another case that you specifically analyzed and compared the investigative file to the Cook County Public Defender file, correct?

A. That is correct.

Q. How did you -- you have identified, I believe it's eight.

A. I am sorry. I didn't hear that question.

Q. I'm sorry, I mumbled.

Page 663

In this section of your report, you identified eight examples of cases where you sort of did a deeper dive and did comparisons between the investigative file and the Public Defender file, correct?

A. That's correct.

Q. How did you choose these particular files?

A. I think a combination of me picking some of them and some of the cases I was asked to look at by counsel.

Q. Can you tell us which cases counsel asked you to look at?

MR. SWAMINATHAN: That would require you to reveal our correspondence communications, so I would tell you not to answer that question. I guess you can answer the question yes or no, can you identify which ones. You can answer that question.

THE WITNESS: I don't recall which cases specifically I was asked to look at.

Page 664

BY MS. ROSEN:

Q. When you were asked to look at the cases, were you provided any information about why the particular cases were selected?

MR. SWAMINATHAN: You can answer that question yes or no.

THE WITNESS: No.

BY MS. ROSEN:

Q. Did counsel, plaintiff's counsel identify all of the cases for you?

A. I'm sorry, all of -- all of the eight or all of the cases in the chart?

Q. Of the eight.

A. No.

Q. They, obviously, identified all the cases in the chart. They have created the chart?

A. No.

Q. So, no, they didn't pick all of them?

A. No.

Q. But as you sit here today, you can't tell us if they picked one or seven,

Page 665

or anything in between, right?

A. I think I picked Melendez, and it was a terrible pick on my part. So beyond that, I really don't have a recollection.

Q. Let's take a look at Mr. Soto, who was discussed at the bottom of page 58 on to page 59. And it says:

"This case involves a gang-involved shooting from one vehicle to another vehicle. The victim was a man named Miguel Salas, who was shot on July 17, 1997, and died a few days later. Detectives investigating an unrelated aggravated battery decided to show a photo array from that case to the witnesses in the Salas shooting. Three witnesses allegedly identified two individuals as a passenger and the shooter on July 20, 1997. Later, on July 23, 1997, after Detective Guevara was apparently assigned to the case, a different man, Oscar

Urlaub Bowen & Associates, Inc.  312-781-9586

Page 666

Soto was identified as the shooter."

Q. Do you see that?

A. I do.

Q. And what is your basis for saying on July 23, 1997, after Detective Guevara was apparently assigned to the case?

A. It's an observation.

Q. Based on your review of the file?

A. Yes.

Q. And is it your -- was it your observation that the first time that Detective Guevara was assigned to the case was on July 23, 1997?

A. I believe so. But I know you are not going to want to hear this at the twelfth hour, but I would definitely want to review that to make sure that I am being accurate and concise.

Q. Do you have an understanding of what specifically Detective Guevara was assigned to do in connection with this particular investigation?

A. Yes. I would certainly like to

Page 667

refresh my memory by reviewing that file.

Q. And without reviewing the file, you can't my question, correct?

A. I want to be accurate, so I would prefer to review the file.

Q. And then you say:

"While two supplementary reports identifying the initial two suspects and indicating that" --

Let me start over.

It says, "While two supplementary reports identifying the initial two suspects and indicating that witnesses could not identify those suspects in a lineup, are in the permanent retention file, the arrest reports for those suspects are not and also do not appear to be in the PD file."

Do you see that there?

A. Yes.

Q. When you say the arrest reports

Page 668

for those suspects are not and also do not appear to be in the PD file, what are you saying? The arrest reports are not where?

A. In the Public Defender's file.

Q. Okay. But the supplementary reports are, correct?

A. I would have to look at that again to confirm.

Q. Okay.

A. And again, I want to point out as you did, some of these files are 700, 800, 900 pages long, so it is hard for me to answer that without refreshing my memory.

(Whereupon, Tiderington Deposition Exhibit No. 29 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit 29, and let's go to page 5. This is the RD file that you referenced that contains the two supplementary reports identifying the initial two suspects. So if we scroll down on this page.

A. We are still on the Soto case?

Page 669

Q. Correct, 59529, that's the citation in your report, right?

A. Correct.

Q. So that's one supp report, right? It's two pages. And then if we keep going, even though your citation seems incomplete, and we go to the next supp report that discusses a lineup, right, with another suspect, right?

A. Well, I don't see where it discusses a --

Q. Sorry. The next page. Where it discusses a lineup on the next page.

A. Okay.

Q. Right? This is the supp report that says the witnesses couldn't identify the lineup -- I mean couldn't identify the suspect?

A. Yes.

(Whereupon, Tiderington Deposition Exhibit No. 30 was screen-shared/referenced.)

BY MS. ROSEN:

Q. And then if we go to Exhibit 30,

Page 670

which is the Public Defender file, if we go to page 42 of that PDF. That's the same report, right, the first supplementary report we looked at? It talks about offender Razo?

A. I believe so, yes.

Q. And then if we go to the next page, it's blank, like it was in the other, in the permanent retention file. And then if we go to the next page, we get to the lineup report, and then the next page indicates that they couldn't pick out the witnesses, right? So those are all the same reports that were in the permanent retention file?

A. Yes.

Q. But the criticism is that these individuals' arrest reports aren't in the Public Defender file, right?

A. That's correct.

Q. And --

A. I'm sorry, and several handwritten GPRs did not appear in the Public Defender's file either.

Page 671

Q. Okay. But you don't detail those, do you? Oh, you do, okay. All right, let's go -- well, let's look at page 68 of the Public Defender's file, so Exhibit 30. And if we just scroll through that, you will see there is a whole bunch of redacted pages in here, right? You don't know what the PD actually redacted, you were just told to assume that it's work product, right?

A. That's correct, yes.

Q. Let's go to page 59 of your report, Exhibit No. 6, Mr. Rainey's case. So you state here:

"Cedric Morris was shot to death on June 10, 1996. Witnesses reported seeing one or two assailants with dark hoodies pulled over their faces. Detectives requested over a dozen IR photos sufficient to compile multiple photo arrays."

And then you cite a bunch of requests for photos and photos.

Page 672

And then you conclude, "This indicates that there were multiple potential suspects and potential multiple photo identification procedures performed, but the defense file does not include any information about these photos or lineups."

Do you see that?

A. I do.

Q. And are you certain -- well, what's the basis for your conclusion that the reason that all these photos were compiled was to conduct photo identification procedures?

A. Well, I guess that's part of the criticism that I have. I don't think it was detailed in the police report or in a supplemental report the purpose for requesting these.

Q. Okay. That -- sorry?

A. So I am left with making assumptions.

Q. I see. All right. And then

Page 673

further, it says:

"According to a lineup and supplementary report, Donnie Morris identified Guy Rainey out of a lineup. Rainey was ultimately charged. Morris's identification appears to be the only inculpatory evidence in the file. But there is a handwritten note in the investigative file with Morris's name on it and the statement 'Kevin Haas pull file to see if he is still wanted.'"

Do you see that?

A. I do.

Q. And that says:

"Haas's name does not appear in the defense file or in supplementary reports explaining his involvement. The note suggests Haas may have been an alternative suspect and that Morris could have been a suspect, which would have weighed on his

Page 674

credibility in identifying Rainey. This information written by the detectives clearly investigative in nature should have been disclosed."

Do you see that?

A. I do.

Q. And does that name, Kevin Haas, seem familiar to you?

A. It does.

Q. And do you believe that Detective Kevin Haas was a suspect, a viable suspect, in this investigation?

A. Probably not.

Q. Okay. Why did you write that in your report?

A. I think it was a mistake.

(Whereupon, Tiderington Deposition Exhibit No. 31 was screen-shared/referenced.)

BY MS. ROSEN:

Q. And if we pull Exhibit No. 31 and go to page 106 of the PDF, this is the note you are referencing, right?

Page 675

A. It is.

Q. Now that you have realized that Kevin Haas is, in fact, Detective Haas and was the individual for some period of time charged with dealing with the investigative files at the area, do you still believe that Morris could have been a suspect, and it would have weighed on his credibility in identifying Rainey?

A. Right. I am sorry. Can you go back up a couple of pages. I just kind of try to want to figure out how I made that mistake, and I think it was a GPR that was prepared, and that would be on the back side of the GPR if I remember correctly. A couple pages back.

And again, you know, clearly there's so many documents, I am not suggesting -- you don't have to go back that far. I just wanted to read the front of the GPR to see how I made that mistake. And certainly, I can amend my report and correct that.

Q. And, in fact, Donnie Morris was

Page 676

with Mr. Rainey at the time with Mr. -- sorry, let me start over.

Donnie Morris was with Cedric Morris at the time he was shot, correct?

MR. SWAMINATHAN: Can you give me the Bates, the note that we are talking about?

MS. ROSEN: Sure.

MR. SWAMINATHAN: The page reference.

MS. ROSEN: It is Bates Number 72857.

MR. SWAMINATHAN: Can you go back up? Yeah.

THE WITNESS: Okay, I'm sorry, your question again is?

BY MS. ROSEN:

Q. It says across the top here, Morris, Donnie, and then A403252. That's the RD number for this investigation correct?

A. That is correct, yes.

Q. Yes, okay. And Donnie Morris is the uncle of Cedric Morris and was with him

Page 677

when he got shot, right, when Cedric got shot?

A. Again, I would have to review the file to confirm that.

Q. We can take this exhibit down.

Was the Demetrius Johnson case that's listed at the bottom of page 59 of your report one of the files that plaintiff's counsel directed to your attention?

MR. SWAMINATHAN: Objection. I am instructing you not to answer. That would require you to reveal our correspondence and communications.

Go ahead.

MS. ROSEN: Did you say you instructed not to answer? Sorry.

MR. SWAMINATHAN: Yes.

THE WITNESS: I am sorry. How much longer do you think we will go, just for planning purposes?

MR. SWAMINATHAN: I think they've got about, I think, either 25 or 24 minutes left.

THOMAS TIDERINGTON, 10/06/2022

Page 678..681

Page 678

THE WITNESS: Okay. That's fine.

BY MS. ROSEN:

Q. All right. Let's go to page 63 of your report. There is a discussion here about the Polaroid photos in the Soto homicide investigation, a topic that we have touched upon throughout the last couple of days, right?

A. Yes.

Q. And this is your analysis regarding the Polaroid photos, right? And it rests, in part, on the fact that -- the fact that Polaroid photos were taken of Rosa Aranda, Jose Aranda, and Guadalupe Mejia led you to conclude that they were treated as alternative suspects and that would be important exculpatory and impeachment evidence, correct?

A. That's correct.

Q. Can you explain to me how it is that the fact that Rosa Aranda and Jose Aranda were treated as alternative suspects, if, in fact, that was true, was exculpatory evidence to Mr. Solache and Mr. Reyes?

Page 679

A. Well, if the police department had and detectives, if they had other suspects, they never explained in the police reports how they cleared these other suspects. If they believed that these other three individuals committed the crime and there is evidence in the record that suggests that they were held for a lengthy period of time, I think it was testimony that food was thrown at one of them, and they claim -- and I don't know if it actually happened, but they claim they were physically abused. If they were all treated as suspects, in my view, the detectives would have had some reason to suspect that they committed this crime; so, therefore, I believe the information would have been exculpatory towards Reyes and Solache.

Q. And specifically, what you are concluding here is that the Polaroid photos were withheld, right?

A. Well, I think they were withheld. I don't know if that's in dispute.

Q. Well, did you look at the

Page 680

impounded evidence in this case?

A. I did, yes.

Q. Did you notice that there in the impounded evidence, there is a Polaroid photo of Guadalupe Mejia?

A. Which Bates number are you referring to?

Q. Reyes 1 -- Reyes 000111.

A. Can you pull that up or should I find it?

(Whereupon, Tiderington Deposition Exhibit No. 12 was screen-shared/referenced.)

BY MS. ROSEN:

Q. No, I can. Let's mark Exhibit No. 12, or let's show him Exhibit No. 12. It's already marked.

So do you see that there is People's Exhibit No. 1? Do you recognize who is depicted in that photograph?

A. Yes.

Q. Who is that?

A. I'm sorry. Guadalupe, I believe.

Q. Do you think maybe it might be

Page 681

Adriana Mejia?

A. I am sorry. Let me look at all the other photos.

Q. I mean, I can --

A. Yeah, I don't want to try to identify.

Q. That's fine. So the photo in the top left, a woman in the teal sweatshirt is Adriana Mejia, and the other photograph in the top row, that's Rosaura Mejia.

A. Right.

Q. And then below in the left when you are facing the photograph is -- and it's People's Exhibit No. 3, that's Mr. Reyes. And then next to him is Mr. Solache, and then next to him is Guadalupe Mejia, right? So that's a Polaroid photograph that was taken at the police station, and it's part of the impounded evidence, right?

A. That's correct.

Q. And so --

A. I don't know if it's part of the impounded evidence. But if you say it is, I won't argue with you about that.

THOMAS TIDERINGTON, 10/06/2022                    Page 682..685

Page 682

Q. I will represent to you that the parties in this case went and pulled all the impounded evidence in connection with the Soto homicide investigation, and these photographs were in the impounded evidence, and Mr. Reyes's counsel took photographs of the impounded evidence, and this is one of the photographs that was taken.

So that -- so the fact that it was impounded, obviously, means that it was produced in court and utilized at the trial, and then impounded by the Circuit Court of Cook County. Do you understand that?

A. I believe so, yes.

Q. Okay. So that means Guadalupe's photograph, Polaroid photograph was actually produced, despite the fact that when we are reviewing the PD file today, we don't see it in there for whatever reason, right?

MR. SWAMINATHAN: Objection to form and foundation. Mischaracterizes the evidence, but go ahead.

THE WITNESS: It was not in -- it was not in the PD file if that's what you

Page 683

are asking me.

BY MS. ROSEN:

Q. Right. We know it was not in the PD file --

A. Right.

Q. -- but we have it available to us today, right?

A. Yes.

Q. We don't know if the PD file that is available to us today is a complete PD file, do we?

A. I don't have any way of knowing that, that's correct.

Q. And the fact that --

A. I guess -- I am sorry. I guess I made the assumption that it was.

Q. And why did you assume that?

A. Well I -- well, maybe it's naive, but why wouldn't it be a complete file? If they are asked to turn over the file, why wouldn't they? But I understand your point, it may not be a complete file.

Q. And certainly we know, regardless of that point, that Guadalupe Mejia's

Page 684

Polaroid photograph was produced and impounded in court, right?

MR. SWAMINATHAN: Objection to form and foundation. Mischaracterizes the evidence.

BY MS. ROSEN:

Q. You can answer.

A. Well, I don't know what was produced in court. I would have to refresh my -- I don't know if I read all of the trial testimony or looked at all of the exhibits.

But once again, if you are representing that that's what happened, I would not argue with you.

(Whereupon, Tiderington Deposition Exhibit No. 33 was screen-shared/referenced.)

BY MS. ROSEN:

Q. Let's take a look at Exhibit No. 33. Have you seen -- you can scroll through these photographs. Have you seen these photographs before?

A. I think I have seen.

Page 685

Q. Is it your understanding that these are photographs that were taken by the Cook County Public Defender's Office in this case to explain to the parties and the Court how they maintain their files from the 1990s?

A. I don't have that information.

Q. Does it seem to you based on a review of these photographs that the files are maintained in an orderly and pristine fashion?

We can scroll back through them actually so you can take a look at them.

A. But again, I don't know what --

MR. SWAMINATHAN: Objection to form.

Go ahead.

THE WITNESS: I don't know if this represents all homicide cases, felony cases, all shoplifting cases, or all cases. I don't know that, and perhaps there is a more centralized and organized area of their records retention rooms that have more

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022                                    Page 686..689

Page 686

sensitive investigations contained in them. I don't know that.

MS. ROSEN: Okay. Why don't we -- I think we have got about ten minutes or so left. Why don't we take a break so I can take a look at my notes, and we can finish up.

MR. SWAMINATHAN: Thank you.

THE VIDEOGRAPHER: We are off the video record at 6:37 p.m.

(Whereupon, a break was taken at 6:37 p.m. to 6:48 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 6:48 p.m.

BY MS. ROSEN:

Q. Other than the Polaroid photographs that you say were withheld on page 63 of your report, are there any other documents that you saw in the investigative file for the Soto homicide investigation that was not in the Public Defender's file?

A. As we sit here, I don't believe there were, but I want to explain my answer if I could.

Page 687

Q. Sure.

A. So there is a number of documents that it's more likely than not that the detectives would have had to produce or statements, handwritten notes -- I think I have testified to this earlier. It's unreasonable to think that there were not any types of notes of interviews with the suspects prior to the State Attorney coming in and taking the written statement. And if those documents, if they do exist, if those were not produced, certainly, this would be, I believe, a deviation of acceptable police practices.

Q. Okay. So if the detectives memorialized those things, and if those documents were not produced, then it would be a deviation, right?

A. Well, and it's a Catch 22. And if they didn't document these things, I think it's a deviation of police practices as well.

So either they didn't do it, which is inexcusable for a homicide

Page 688

detective, which is a deviation of normal police practices or reasonable police practices. Or if they did take notes and they didn't produce it, likewise. So either way, I think it's problematic.

Q. Different problem, but problematic, right?

A. Different problem from what?

Q. There are two different problems, but both are problematic?

A. No. I think it's all the same problem.

Q. Well, if they existed, and they were not produced, then that's one type of problem? If they weren't memorialized at all, that's a different kind of problem, right?

A. That's correct.

Q. You testified yesterday that it was highly unusual and not acceptable to, I think it was, detain somebody in an interrogation room for 40 hours. Is that right? Did I get that right?

A. That's accurate, yes.

Page 689

Q. So it's your opinion that under no circumstances is it permissible to detain somebody for 40 hours in an interrogation room?

MR. SWAMINATHAN: Objection to form. Asked and answered.

Go ahead.

THE WITNESS: You say under no circumstances, such as -- I mean, I guess I have to -- it's a hypothetical question, obviously. I would have to think about what situations it -- it's not common. It's not normal. I don't think it's reasonable.

BY MS. ROSEN:

Q. What is your basis for concluding that it's not common for an individual to be detained in an interrogation room for 40 hours?

A. Well, it's just not something that law enforcement officers do. We -- if we are going to lock somebody up, we give them the ability to use the restroom. We give the ability to sleep on a mattress. We give them some dignity. We don't make

THOMAS TIDERINGTON, 10/06/2022                    Page 690..693

Page 690

individuals sleep in a chair in a closet, in an interrogation room.

And I am also, oftentimes if people are left in an interrogation room, they are usually handcuffed because an interrogation room isn't the same as a jail cell. So I think there is testimony that they were locked to the wall. Whether that happened or not, I don't know. But certainly if that's what occurred, and if the Jury decides that that's what occurred, then certainly it would be inhumane treatment of a prisoner.

Q. So your position is that they shouldn't be continuously held in an interrogation room without allowing them to use the bathroom or be fed or to sleep on a cot, those types of things? It's not the 40-hour detention that you are quarreling with?

A. I'm sorry, did you say there was a cot, or is that a different scenario that we are talking about?

Q. I am trying to understand when you

Page 691

said, holding somebody in an interrogation room for 40 hours, whether you were being specific to this case, meaning the circumstances as you understood them in this case, or in any circumstance?

A. Again, from the departments that I am familiar with and from the federal agency I am familiar with, prisoners would only be held for a short period of time in an interrogation room. After a period of time, they would be put into a lockup facility that had the ability to allow a prisoner to be humanely -- treated humanely by allowing them to sleep. And so, no, I can't think of any -- and I also believe it's a violation of Chicago Police Department's policy of holding a prisoner in this fashion for such a long period of time in an interrogation room.

Q. Okay. With respect to the physical evidence that was collected in this case, what is your understanding of when the Chicago Police Department received results of the analysis that was done in connection

Page 692

with the interrogations of Mr. Solache and Mr. Reyes?

MR. SWAMINATHAN: Can you read back the question?

MS. ROSEN: I can rephrase it because I --

THE WITNESS: I don't think I understand the question.

BY MS. ROSEN:

Q. You understand that there was evidence that was collected, and it was tested for DNA and other things, right?

A. That's correct.

Q. And you understand that at some point, the Illinois State Police evaluated the evidence and reported back on its findings, right?

A. That's correct.

Q. Do you know when the ISP reported back its findings to the Chicago Police Department in relation to the days in which Mr. Solache and Mr. Reyes were in police custody?

A. Can I refresh my memory by looking

Page 693

at the case file?

Q. Sure. It's Exhibit No. 7.

A. I'm sorry. Can you pull that up or --

Q. Yes, I am asking. It's Exhibit No. 7.

A. I thought you were telling me to go get it.

MS. ROSEN: Robyn, can you get Exhibit No. 7. Got it?

EXHIBIT TECHNICIAN: One second. Technical difficulties here. One second for me to figure out what's wrong.

MR. SWAMINATHAN: I have a copy of the file in front of me. Do you want me to show it to him?

MS. ROSEN: Sure, fine. Yeah, that's fine. If he wants to just look at it that way. Flip through it, and then let me know when the ISP results were reported back.

It's probably quicker for you to just flip through the pages of the file you have in front of you.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 694

THE WITNESS: Yeah. I think I am looking at a report now, May 13, 1998. Is that the date that you --

BY MS. ROSEN:

Q. Can you just -- I don't know it off the top of my head, the precise date. What's the Bates number of the page you are looking at?

A. 097, 98, 99.

Q. Yes.

A. Okay. And I think to answer the question, the date was May 13th.

Q. When were Mr. Solache and Mr. Reyes in police custody?

A. Well, turning to my report there, just because I --

Q. Sure.

A. I'm sure you have the date, that I can tell you whether or not I agree with you on that. Because I am having -- struggling to find the date.

Q. April 3rd, 4th, 5th, that time frame?

A. After refreshing my memory, that

Page 695

sounds correct.

Q. So the lab results didn't come back until over a month after Mr. Solache and Mr. Reyes and Ms. Mejia were charged, right?

A. That's correct.

Q. And so at the time that the detectives were collecting the evidence from Mr. Solache's person, right, they collected his shoes, and they took Ms. Mejia's clothing, and whatever other items they took from the searches from the house, they had no idea whether or not, or what physical evidence was going to show or already showed, right?

A. Correct, yes, I don't think they had any physical evidence that showed that Reyes or Solache were responsible for the crime.

Q. Right. But what I am saying is they had no -- they had no physical evidence test results at the time that they were interrogating Mr. Solache and Mr. Reyes and Ms. Mejia?

Page 696

A. I would agree with you, yes.

Q. And then you testified that for some period of time you worked with -- I think you said with the DEA in Chicago; is that right?

A. I worked cooperative cases with the DEA in Chicago, yes.

Q. What time frame was that approximately?

A. Well, a couple of cases probably in the late '80s, and then some DEA cases in -- before nineteen -- between 1990 and 1995.

Q. Do you recall -- and you said you worked with Chicago Police Department -- you said you worked with Chicago police officers in that time frame, right?

A. Worked with the -- well, yeah, there were Chicago police officers. I remember one in particular. It was a Chicago K-9 handler, a K-9 handler I think that was assigned to the DEA task force that we were working with.

Q. Do you recall any of the names of

Page 697

any of the police officers that you worked with in those -- during that time frame?

A. I don't.

Q. Have you worked with any Chicago police officers after that 1990 and 1995 time frame?

A. No.

MS. ROSEN: I do not have any more questions.

MR. SWAMINATHAN: Megan, do you have any questions?

MS. McGRATH: I do not. Thank you.

EXAMINATION

BY MR. SWAMINATHAN:

Q. I just have a few questions, Mr. Tiderington. You had indicated several times in this deposition that you wanted to -- you wanted to clarify something based on if I can look at some records, if I understand correctly?

A. That's correct.

Q. What was the clarification you wanted to provided?

THOMAS TIDERINGTON, 10/06/2022                          Page 698..701

Page 698

A. I wanted to provide the information about what other cases I had testified in depositions. And then I also wanted to clarify, I think I mentioned there was a trademark infringement case that I was retained on, and the question was: How did this case get resolved, and did I testify or was I allowed to testify?

I went back last night, and I looked. I looked at some emails, and my understanding is that the case never went to trial. I received an email about two months ago from the attorney thanking me for my work and saying that my testimony contributed to whatever prevailing or whatever. But I also after reading it closely, I understood that the judge ruled that my testimony would not be relevant if it went to trial.

So I don't know -- again, I don't know if there was a Daubert hearing or if there wasn't. But my understanding, according to the attorney, was that he -- I was retained to examine drug products such

Page 699

as rolling papers, pipes, scales. And the attorney asked me to examine those to determine if they could be used with illegal drugs, with marijuana or cocaine. So my analysis was whether or not the products could be used with drugs.

Apparently, the judge -- and this is according to the attorney. The judge said that it wasn't relevant on whether or not the products could be used with drugs. What is relevant is whether or not the products could be used with tobacco, and I had testified that I was not a tobacco industry expert, which I am not, and, therefore, my testimony would not be relevant.

Q. I see, okay. You were asked some questions yesterday about whether there was evidence to support the conclusion more likely than not that Solache was abused. Do you recall that?

A. I do.

Q. Sir, your report does not actually opine on the question of whether, in fact,

Page 700

Mr. Solache was abused; is that correct?

A. That's correct, it does not.

Q. If the Jury credits Mr. Solache's testimony that he was abused, would that be a deviation from police practices?

A. It would be, yes.

Q. But in this case, you were not tasked with assessing whether you believed Solache or Guevara or whoever else regarding abuse, correct?

A. That's correct. I don't know if they were abused.

(Reporter clarification.)

Q. Would you agree that that's the Jury's role?

A. I do.

Q. But in this case, you were not tasked with assessing whether to believe Mr. Solache or Mr. Guevara or whoever else about abuse; is that right?

A. That's correct.

Q. Would you agree that's the role of the Jury?

A. I do.

Page 701

Q. And ultimately if the Jury credits Solache, that would be a deviation, correct?

A. It would be, yes.

Q. Putting aside of whether or not Guevara actually abused Solache or not, did you find other deviations from police practices in this case?

A. I did.

Q. And so any -- sorry, strike that.

So your opinions about deviations from police practices in this case, do they depend on a conclusion or a finding that Mr. Solache or Mr. Reyes was abused?

A. No, no, they would not.

MR. SWAMINATHAN: I have no other questions.

MS. ROSEN: I don't have any further questions based on that.

Carrie? Ms. Golden?

MS. GOLDEN: I am working on it.

MR. SWAMINATHAN: It's seven hours. Carrie, if you want to ask one, you can ask one, but we are at seven.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 702

MS. GOLDEN: I was just going to say I don't have any questions, but thank you, Anand, for your gracious allowance of one question.

MR. SWAMINATHAN: Okay, thank you, everybody.

MS. ROSEN: Are you reserving?

MR. SWAMINATHAN: Yes, we are reserving.

MS. ROSEN: Thanks, everyone.

THE WITNESS: Thank you all. I appreciate it.

THE VIDEOGRAPHER: We are off the video record at 7:07 p.m. at the conclusion of the deposition.

(Deposition proceedings.
concluded at 7:07 p.m.)

* * * * * * * *

Page 703

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

ARTURO DeLEON-REYES,
        Plaintiff,
    vs.
REYNALDO GUEVARA, ET AL.,
        Defendants.
_____ No. 18 CV 01028
GABRIEL SOLACHE,        No. 18 CV 02312
        Plaintiff,
    vs.
REYNALDO GUEVARA, ET AL.,
        Defendants.
        VOLUME II of II

I, THOMAS J. TIDERINGTON, being first administered an oath, say that I am the deponent in the aforesaid deposition taken on October 6, 2022; that I have read the foregoing transcript of my deposition, and affix my signature to same.

__Number of errata sheets attached.
__No errata sheets.

        THOMAS J. TIDERINGTON

Subscribed and sworn to before me this      day of       , 2022.

Notary Public

Page 704

STATE OF ILLINOIS )
            ) SS:
COUNTY OF DUPAGE )

    I, MARIBETH REILLY, a notary public within and for the County of DuPage and State of Illinois, do hereby certify that heretofore, to-wit, on October 6, 2022, remotely personally appeared before me, THOMAS TIDERINGTON, in a cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein ARTURO DELEON-REYES and GABRIEL SOLACHE are the Plaintiffs, and CITY OF CHICAGO, ET AL. are the Defendants.

    I further certify that the said THOMAS TIDERINGTON was first administered an oath to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the remote presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription,

Page 705

and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

    I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties and that there were present at the deposition the attorneys hereinbefore mentioned.

    I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

    IN TESTIMONY WHEREOF: I certify to the above facts this 17th day of October, 2022.

    _____
        MARIBETH REILLY, CSR
        LICENSE NO.: 084-002306

THOMAS TIDERINGTON, 10/06/2022 | Page 706

Page 706

Errata Sheet

NAME OF CASE: ARTURO DELEON-REYES vs REYNALDO GUEVARA

DATE OF DEPOSITION: 10/06/2022

NAME OF WITNESS: Thomas Tiderington

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____

THOMAS TIDERINGTON, 10/06/2022

### Exhibits

**4 Tiderington 100522-4**  392:16, 19,20 393:3

**6 Tiderington 100522-6**  361:10 415:7,10 442:17 459:18 474:6 509:23 535:5 592:2 647:23 651:8 662:11 671:13

**9 Tiderington 100622-9**  460:23 461:2,3 462:20 471:5

**10 Tiderington 100622-10**  450:3,6,7 459:14

**12 Tiderington 100622-12**  680:12,15,16

**13 Tiderington 100622-13**  525:8,11,12 532:9,11 537:24 539:2

**14 Tiderington 100622-14**  528:11,15

**15 Tiderington 100622-15**  540:21 541:1 542:11

**16 Tiderington 100622-16**  541:19,22,23 566:16,17

**17 Tiderington 100622-17**  545:2,5,22 552:5,6

**18 Tiderington 100622-18**  545:14,16

**19 Tiderington 100622-19**  553:9,12,13 566:18,19

**20 Tiderington 100622-20**  568:4,7,8 569:1

**21 Tiderington 100622-21**  584:2,6

**23 Tiderington 100622-23**  615:6,9,10

**24 Tiderington 100622-24**  641:2,8 645:5

**25 Tiderington 100622-25**  636:12,14 644:15,16 648:2

**26 Tiderington 100622-26**  654:8,11,12

**27 Tiderington 100622-27**  657:17,20,21

**29 Tiderington 100622-29**  668:15,18

**30 Tiderington 100622-30**  669:21,24 671:5

**31 Tiderington 100622-31**  674:19,22

**33 Tiderington 100622-33**  684:17,20,21

---

### 0

**00**  621:18

**000111**  680:8

**00CR**  625:17

**00MC1**  624:7 625:7,13

**0110**  529:19

**097**  694:9

---

### 1

**1**  393:17 416:15 474:17 571:12 577:19 637:9 680:8,19

**1,000**  636:17

**1/2**  627:9

**10**  450:3,7,9 459:14 546:6 549:13 589:13 671:16

**100**  525:13 540:7 549:17 556:5 557:23

**105**  596:12 597:8

**106**  674:23

**10:10**  358:2

**11**  563:8 627:9

**11-page**  563:7

**110109**  568:17

**110174**  571:19

**110176**  568:19 570:13 575:9 579:7 583:2

**110180**  568:20 576:24 578:2 579:7

**110189**  568:18

**114**  598:12 599:1 628:24 629:8,16

**116**  393:12

**117**  408:1 409:2,7

**1180**  576:22

**11:25**  422:17,19

**11:34**  422:19,21

**12**  680:12,16

**12:32**  473:24 474:2

**12:44**  474:2,4

**13**  463:5 525:8,12 532:9,11 537:24 539:2 551:15 694:2

**13th**  462:21 694:12

**14**  463:6 528:11,15 627:9

**146**  393:12 408:1 409:3,7

**15**  363:6 502:5 514:11 540:21 541:1 542:11

**154**  495:16

**16**  525:22 527:1 541:19,23 566:17

**166**  655:8

**17**  498:23 545:2,5,22 552:6 665:12

**18**  545:14,16

**19**  483:12 553:9,13 566:19,21 614:2

**194**  654:12

**1981**  422:24

**1983**  455:11 467:13 493:3

**1985**  449:6,24 454:13,18

**1986**  450:12

**1988**  482:14 483:12

**1989**  483:19

**1990**  483:19 696:12 697:5

**1990s**  685:6

**1993**  452:19

**1995**  400:1 405:22 406:20 439:24 440:22 492:15 494:12 499:4 505:12 506:13 507:16,20 513:24 595:17 596:6 613:9 614:2 633:11 696:13 697:5

**1995-1998**  486:2

**1996**  530:11 671:16

**1997**  665:13,21,22 666:6,14

**1998**  395:1 397:1,16 400:1 405:22 406:20 439:24 440:22 442:18 443:3 444:11,18 445:7,11,22 480:14 492:15 494:12 499:4 505:12 506:13 507:16,20 513:24 569:23 595:17 596:6 613:9 694:2

**19th**  633:3

**1:28**  509:5,17,19

THOMAS TIDERINGTON, 10/06/2022

**1:30** 473:1

---

**2**

---

**2** 358:2 415:12 419:5 475:9,10 552:17 571:12 574:14,15 577:18, 19

**20** 362:22 363:6,12 497:3 500:15 501:22 502:3,5 514:11 568:4,7,8 569:1 588:18,24 665:21

**2000** 619:18

**2014** 462:21 469:3,4,6,16

**2020** 493:15 494:7

**21** 584:2,6 588:10

**22** 378:21 379:12 687:19

**23** 378:21 615:6,10 622:19 665:22 666:6,14

**24** 622:23 641:2,8 645:5 677:23

**25** 622:23 636:12,14 644:15,16 648:2 677:23

**26** 450:12 622:23 654:8,12

**27** 622:23 657:17,21

**277** 503:2,13,18

**28** 622:24

**29** 623:1 668:15,18

**293** 641:13,14

**29833** 584:20 587:10

**2:15** 509:14

**2:25** 509:19,21

---

**3**

---

**3** 478:18 597:17 681:14

**30** 373:12 473:13 501:22 502:4 623:1 669:21,24 671:5

**300** 400:23 404:19 423:14

**300-and-some** 400:21

**31** 623:6 674:19,22

**31st** 530:10

**32** 623:13

**33** 415:12 623:13 637:4 684:17,21

**334** 495:16

**34** 623:13 637:3

**340** 400:22 405:3

**341** 513:23 514:2 529:4

**344** 401:1,4,10,21 402:18 404:22 425:8,19,24 439:24 440:21 441:7 485:23 486:14,18 513:4 515:7 529:3 597:4,12 599:16

**34554** 541:1

**346** 486:13

**35** 442:15 623:13

**36** 421:12,20 462:22 466:10 467:20 623:14

**37** 421:12,20 623:14

**38** 394:12 447:16

**39** 459:17,19

**393** 641:10 644:16

**3:35** 567:19,24

**3:47** 567:24 568:2

**3rd** 694:22

---

**4**

---

**4** 392:16,20 393:3 450:19 451:18 481:23

**40** 362:22 363:1 373:12 460:5 688:22 689:3,17 691:2

**40-hour** 690:19

**403** 641:12

**40334** 643:6

**40609** 645:20

**414** 660:22

**42** 396:20 670:2

**44** 408:24 485:9 626:22

**44288** 654:13

**45** 474:7,18,19 476:18 509:11,13

**46** 477:7 495:16 496:1 627:6

**461** 649:10

**47** 627:11

**48** 481:16,22

**49** 485:12 502:22

**4:00** 574:23

**4:40** 606:16,18

**4:50** 573:19

**4:52** 606:18,20

**4th** 694:22

---

**5**

---

**5** 400:1 486:1 668:19

**50** 363:1,11 426:23 428:13 498:22 502:24 509:24

**51** 514:12 533:18 535:4 545:23 563:12 568:20 575:10 576:18 577:1 579:7

**51-page** 617:8

**52** 592:24

**53** 595:7 626:14 628:20 629:9 630:15

**54-page** 467:20

**55** 601:11

**56** 579:22,23 613:17 615:18 629:20 631:23 632:13 645:8 648:7

**560** 449:5 454:18

**567** 645:6

**57** 572:7,8 579:19,24 581:9 645:7 647:24 651:8

**58** 397:20 653:1 662:12 665:6

**59** 563:14 665:7 671:12 677:7

**59529** 669:1

**5:00** 577:4

**5:43** 651:1,3

**5:53** 651:3,5

**5th** 694:22

---

**6**

---

**6** 361:10 415:7,10 442:17 459:18 474:6 509:23 535:5 592:2 647:23 651:8 662:11 671:13

**6,000** 539:14 540:8 631:16

**60** 563:14

**60-something** 406:8

**61** 454:19 495:22 496:2

Index: 62599-agencies

THOMAS TIDERINGTON, 10/06/2022

**62599** 589:15

**63** 599:10,17 602:9 678:3 686:18

**65** 571:9

**66** 571:8,12

**68** 570:16,24 671:4

**6:28** 591:16

**6:37** 686:10,12

**6:48** 686:12,14

---

**7**

**7** 457:11 693:2,6,10

**700** 668:11

**72** 596:13 597:9,13

**72857** 676:12

**755** 454:18

**755f.2d** 449:5

**76011** 525:16,22 526:24

**77368** 545:8 546:11

**77452** 545:8

**78** 362:14

**7:07** 702:14,17

**7th** 449:6 454:18

---

**8**

**8** 530:8 584:20 627:9

**80** 363:9

**800** 668:11

**80s** 494:8 696:11

**81** 571:4

**81-page** 579:14

**82** 495:22 496:3

**82-** 376:17

**83** 466:21 493:12 533:4

**83-1** 460:7 468:14 470:21 472:9,16 482:8

**833** 587:7

**834** 587:6

**84** 462:7 493:12

**85** 461:8 462:4,7

**86** 461:8 462:4,8 482:12 533:5

**8:30** 359:19

---

**9**

**9** 460:23 461:3 462:20 471:5

**9-year-old** 591:20

**900** 668:12

**90s** 466:22 494:8

**94** 398:13

**94055** 553:16 554:7 563:11,14

**94058** 561:2 563:14

**94059** 562:4

**94060** 562:15

**94089** 563:1,14

**94092** 563:14 564:6

**94094** 563:14 564:14

**94096** 553:17 563:11 564:19

**94097** 564:23

**94098** 565:3

**94099** 565:9

**94906** 563:15

**96** 393:18 546:7

**967** 588:24

**97** 400:1,20

**98** 405:22 694:9

**99** 553:17 563:12,15 694:9

**9:00** 359:19

**9th** 617:19

---

**A**

**a.m.** 358:2 422:17,19,21 574:23

**A315294** 647:24 651:10

**A403252** 676:19

**A59** 528:19

**A596534** 526:2 528:16,20

**A744094** 545:21

**abdomen** 581:18 582:7 583:18

**ability** 398:8 540:5 560:11,17 562:1 689:22,23 691:12

**absent** 603:15

**absolutely** 465:12 532:12 613:6

**abuse** 572:3 700:10,20

**abused** 679:12 699:20 700:1,4,12 701:5,14

**academy** 476:8

**acceptable** 410:17 687:13 688:20

**access** 374:14,18 658:19

**accident** 371:6

**accompanying** 419:4

**account** 600:2

**accurate** 430:8 463:21 469:16 513:20 515:16 516:13 578:24 666:19 667:4 688:24

**Accuros** 530:21

**accused** 572:2

**acquaintances** 656:15

**acronym** 588:4

**acting** 590:10

**action** 452:1 485:3,7

**activities** 365:5

**actual** 372:21

**added** 376:5 410:4 504:24 505:5

**adding** 486:21

**addition** 414:10 504:22 520:4 523:8 531:8

**additional** 376:4 445:23 531:15

**address** 537:16 546:5 550:4

**addresses** 512:12 534:8 543:12

**adequately** 422:5

**admin** 380:3

**admitted** 581:14 582:5 661:10

**admittedly** 500:19

**adopted** 452:18

**Adriana** 546:4,18 549:19 550:4 681:1,9

**afternoon** 660:6

**agencies** 445:20 484:2 501:6,7

THOMAS TIDERINGTON, 10/06/2022

**agency** 500:17,21 501:1,13 691:7

**agent** 368:7,8 370:7 373:19,21 444:7

**agents** 367:10 368:5

**aggravated** 665:15

**agree** 404:10 535:2 559:1,2 584:15 618:23 645:3 694:19 696:1 700:14, 22

**agreed** 419:2

**agreement** 534:20

**Aguilar** 566:13 640:21

**ahead** 371:1 372:4 373:3 387:11 391:8 394:6 395:5 396:15 397:9 402:12 409:11 412:5 413:13 414:20 419:13 420:24 424:7 425:22 426:11 427:20 430:4,19 431:11 432:16 437:14 440:6 441:12,21 446:10 454:4 456:7 466:8 467:4,13,23 468:4 470:21 471:9,11,17 472:5 477:23 481:12 489:1 491:14 493:7 494:1,18 498:14 506:17 508:17 510:16 511:17 513:17 514:22 518:23 519:10 520:13 524:11,15 526:14, 15 538:4 543:6 544:9 547:15 555:13 557:6 558:16 562:18 565:21 566:5 578:22 585:21 609:8 612:16 640:8 677:15 682:22 685:18 689:7

**aka** 634:3

**Akins** 614:7

**Alex** 632:23

**Ali** 590:7

**alien** 546:15

**alleged** 452:6

**allegedly** 613:24 665:19

**allowance** 702:3

**allowed** 457:21 475:6,13 477:18 560:22 579:10 581:4 698:8

**allowing** 690:16 691:13

**alter** 389:17

**alternative** 634:2 643:10 655:17, 23 673:22 678:16,22

**ambiguous** 465:1

**amend** 675:22

**amount** 363:13 474:9

**amplify** 452:22

**analysis** 415:2 417:10 439:21 504:7 519:13 528:2 571:23 598:18, 21 599:11 601:5 602:7,12,16 604:1,6 608:10 611:24 620:6 628:20 632:21 635:4 639:23 651:23 661:8,21 678:10 691:24 699:5

**analyze** 367:13 385:4,13 629:4

**analyzed** 385:14 387:7,8 533:4 629:20 662:16

**analyzing** 630:20 637:23

**Anand** 362:6,8 389:7 433:5 434:6 450:20 464:1,19 469:11 608:1,2,15 609:5 702:3

**Anand's** 388:24

**and/or** 368:15

**Angeles** 444:15,16

**answering** 497:22 500:11

**answers** 411:9 416:20 466:16

**anybody's** 492:9

**anyplace** 428:14

**apartment** 583:1,10 655:14

**apologize** 474:18

**apparent** 491:21 492:2

**apparently** 435:14 456:8 489:20 515:22 547:1 550:9 635:11 665:23 666:7 699:7

**Appeal** 447:19

**appealed** 454:12

**appearance** 620:12 625:6

**appears** 554:24 565:4 574:3,21 575:9 576:11 577:16 592:9 598:22 604:17 616:1 622:9,20 623:5,18,20 627:8,10 632:10 649:17 673:7

**application** 655:9

**appointment** 591:19

**approve** 551:6

**approximately** 362:15 363:9,10, 12 495:16 584:12 696:9

**April** 694:22

**AR-PD** 542:4 615:11

**AR-PD-041276** 541:24

**Aranda** 678:14,21,22

**Ardell** 653:2,8

**area** 400:1 453:19,21 461:10 486:1 501:9 570:3,4 595:8,11,18,22 596:4,5 675:6 685:23

**areas** 501:8 610:8

**argue** 442:6 625:11 632:6 681:24 684:15

**arguing** 652:6

**argumentative** 425:12 547:14 558:15 639:15

**arranged** 588:13

**array** 665:16

**arrays** 671:22

**arrest** 634:6 643:9 644:4,9,17 667:18,24 668:3 670:18

**arrested** 644:6 653:13

**arriving** 640:18

**art** 480:4

**ASA** 530:13,16

**ASAP** 590:14

**aspect** 501:2

**assailants** 633:16 671:18

**assertions** 640:13

**assess** 514:15

**assessing** 700:8,18

**assessment** 447:2

**assigned** 364:12 366:11,20 369:6 374:14 397:11,14 643:2 665:23 666:7,13,22 696:22

**assignment** 395:1,7 396:10,24

**assignments** 397:4

**assist** 369:10

**assistance** 366:22 367:2 530:23 531:16

**Assistant** 591:10 617:12

**assisting** 365:21,23 366:7 369:6,8 370:3,4

**assume** 399:10,17 409:1,6 515:13,17 600:6 610:7 611:19 671:9 683:17

THOMAS TIDERINGTON, 10/06/2022

**assumed** 537:5

**assuming** 387:4 389:10,11 557:2, 9 580:6 613:12 624:11

**assumption** 389:11 499:12,13 506:3,7 557:11 609:3 610:13 611:24 619:22 620:3,4 639:18,20, 21 683:16

**assumptions** 608:9,11,13,21 609:21 610:18 611:14,16 672:23

**attached** 385:1 386:1,4,19,21 387:3 388:5,22 400:13 604:2

**attachment** 392:23 428:20 445:15 461:9,20 486:12 599:9

**attachments** 433:21 446:16,21

**attack** 455:9

**attacked** 633:6

**attempt** 491:21 531:11

**attempted** 417:16

**Attempts** 531:14

**attention** 510:1 677:10

**attorney** 367:16 390:23 391:13 396:22 567:4 583:20 589:7,8,9,11 591:11 592:5,7 604:15 607:10 611:20 643:2 658:6,19,23 687:9 698:13,23 699:2,8

**attorney's** 391:3 392:5 394:23 396:6,23 397:15 530:24 585:5 587:22 603:11 614:4,15 658:8,11 659:13,17 660:10,16

**attorneys** 368:16 440:17 605:1

**attribute** 424:10

**attributed** 385:16

**audit** 494:6

**auditing** 482:24

**awake** 573:19

**aware** 391:1 392:4 456:23 457:7 458:22 459:9,13 460:14 482:22 484:21

---

**B**

---

**B447609** 553:14

**back** 358:1 359:7,13 367:21 373:12 376:3 377:19 382:17,20,24 383:10 393:16 397:16 401:7,8 403:11 411:3 422:20 429:19

442:16 444:11,18 445:10,12 446:12 449:3 454:9 455:20 456:14 459:18 461:19 468:6,13,17,18 474:3,6 476:18 479:17 482:21 483:3,11 491:8 494:7 495:1 498:4 502:1,2 505:11 506:13 509:20,23 532:10 535:3,4 537:24 539:9,17 540:5 543:11 545:6 546:22 547:2 548:10,13 549:1 552:5,24 554:1 557:14 559:5 560:5 561:21 562:1 563:3 568:1 569:22 570:24 575:23 576:4,5,12 577:9 578:2 579:24 581:15 582:6 583:4 592:1,17 594:10 606:19,22 608:7 611:6 612:11 614:22 618:14 631:19,22 632:8 644:15 645:5 647:4,12,22 648:2,11,12,14 649:24 650:1 651:4,7 658:14 660:19 661:23 662:10 675:11,14,16,19 676:13 685:12 686:13 692:4,16,20 693:21 695:3 698:9

**Background** 595:7

**bad** 435:20

**bag** 575:1

**balance** 359:3

**base** 456:18

**based** 362:13 376:17 391:6 400:10 432:12 443:5,20 455:24 484:11 499:13 512:18 513:11 528:6 570:8 573:23 574:8 575:12 600:8 611:24 630:15 655:21 666:9 685:8 697:19 701:19

**basis** 412:22 437:10 443:2 455:8 485:4 506:2 527:21 544:2 607:17 652:15 666:5 672:12 689:15

**Bates** 400:6 523:12,15 525:1,14, 16 535:23 536:10 541:2,24 542:5 546:10 553:14,15 561:2 562:24 568:14 570:22 571:16 575:8 578:2 584:20 615:10,19 641:16 643:5,6 644:19 645:21 676:6,11 680:6 694:7

**Bates-stamped** 526:24 541:1 562:4

**bathroom** 690:17

**battery** 665:15

**bear** 461:20 593:23

**beat** 581:20

**beaten** 633:1

**beating** 581:11 582:22,23 583:1, 10,22

**bedroom** 575:1

**began** 359:5 609:10 610:6 659:15

**begin** 553:16

**beginning** 453:4,6,9 563:11 571:6,8 635:3

**begins** 453:7 457:13 459:19 519:14 593:1

**begun** 519:3

**behalf** 621:13

**behavior** 365:4

**belatedly** 506:24

**belief** 513:12 528:6

**believed** 482:20 511:7 522:9 679:5 700:8

**belongs** 398:6

**belt** 581:15 582:6

**benefit** 458:13 598:17

**big** 451:1

**bigger** 549:23 550:11 586:12

**bill** 363:11

**billed** 362:14 363:10

**Billups** 632:22

**bit** 363:24 391:19 439:22 451:22 541:4,10 543:1 550:11 564:8 586:22 643:13,19 644:5

**blank** 620:17 622:24 623:2,23 670:8

**blunt** 581:17

**bolded** 510:1

**bolster** 612:19

**book** 442:20 444:21

**books** 408:19 410:3

**bothers** 470:4

**bottom** 459:19 460:7 502:22 510:2 525:15 541:23 542:10 550:13 586:18 589:14 617:24 622:3 643:5 644:20 645:8,21 649:6 662:12 665:6 677:7

**box** 365:20

**boxes** 550:19 554:17

THOMAS TIDERINGTON, 10/06/2022

**boy** 451:1

**boyfriend** 656:4

**Brasfield** 359:23 363:17 381:9,15, 19 382:8 383:13 384:8 385:23 386:16 387:5,7,18,19 388:1,4,10, 14 410:5 460:14 518:1 521:3 535:16

**Brasfield's** 363:21 384:21 461:5 462:11 495:21

**bread** 552:18 650:21

**break** 421:15 422:8,9,10,18 423:9 472:21,23,24 473:1,5,16 474:1 509:7,18 564:2 566:24 567:23 606:17 650:18,23 651:2 686:5,11

**bring** 367:11,15 650:21

**broken** 501:7

**Broward** 443:17

**Brualdi** 394:13

**Brualdi's** 394:16 395:16

**Bryant** 633:1

**Brzeczek** 398:13 399:2

**budgeting** 501:4

**bulletin** 644:8

**bunch** 526:20 671:7,23

**bureau** 374:5,10 379:1,4 380:7,8, 11,17 381:4 628:4

**buttress** 530:19

**buy** 501:4

**buzzing** 371:11

---

**C**

**C687989** 568:9 572:12

**cabinet** 374:7

**cabinets** 374:15

**calculation** 599:10

**calculations** 632:12

**call** 384:4 575:1 595:13

**called** 358:5 376:21,24 380:16,17 439:13 460:15 591:17 646:4 661:10,17

**Camp** 530:18 531:14

**Camp's** 530:22

**canvassed** 633:12

**capacity** 408:24

**captain** 380:21,23 381:24

**caption** 621:17 623:11

**capture** 437:5

**card** 546:15,16,18

**care** 567:2

**career** 381:13 408:13,23 409:24 500:1,5 517:14

**Carrie** 701:20,23

**cartels** 365:3,7,18

**case** 359:24 360:6,18,21 363:15, 19 367:14,15,19 368:5,6 369:3,8, 11,13 371:18,19 372:18 373:5,11, 16,17,19,21 374:18,20 375:1,9 376:1,16 377:4,6,7,8,12,23 378:5, 7,10,14,19 382:8,12,13 384:9,10, 17 386:19 387:21 391:2,24 392:3 393:11 397:24 398:5 400:13 406:18 411:22 414:9 417:6 421:23 422:23 423:12,13,16 425:3,10 426:1,3 429:11 435:9 437:2 439:14 444:7,8 447:5 448:1,3,15 455:13, 20 456:14 457:15 458:24 460:15, 19 461:18 462:5,21 463:11 465:4 466:15 469:6,7 470:3 479:16 480:6 488:12 490:20 505:5,9 512:9 515:1 531:21 539:14 540:7 542:4 543:10 551:11,19,24 552:8 556:19,20 561:6,22 562:2 566:1 572:1,2,15, 19 573:6 581:10 588:16,21 590:23, 24 599:4 605:22 615:16,18 621:18 622:12 623:24 624:11 625:7,13 626:20 629:14 632:2,24 635:12 638:8,11 639:23 640:13,24 641:9 642:10,23 648:12 651:12,19 653:4, 5 657:11 659:15 660:19 661:8 662:13,16 665:8,17,24 666:7,13 668:24 671:13 677:6 680:1 682:2 685:4 691:3,5,22 693:1 698:5,7,11 700:7,17 701:7,12

**cases** 359:8,13 360:12 364:6,9,18, 23 365:2,3,9,11,13 366:15,17,19 367:4 369:2 370:21,22 382:16,20 383:1,7,18,24 384:5,11 423:14,24 424:3,9,12 425:18 426:7,19 427:1, 4,9 429:5,16,18 438:8 489:12 490:20,23 502:3 503:1 504:8 505:8 513:12 523:2 530:7 535:17 536:24 537:19 567:3 596:15 602:6,21 604:15 629:4 631:4 663:3,11,13,23

664:3,4,11,13,17 685:20,21 696:6, 10,11 698:2

**catch** 403:9 687:19

**categories** 390:12 405:19

**category** 390:5

**caught** 403:6 404:1

**CCJ** 588:3,4

**CCSAO** 582:16 584:23 587:4,16, 17

**Cedric** 570:18 575:6 577:5 671:15 676:3,24 677:1

**cell** 690:7

**center** 619:14,20

**central** 444:7,21

**centralized** 442:19 443:4,22 445:7 685:23

**cetera** 618:2

**chair** 690:1

**challenges** 452:4

**change** 612:4,19 613:4 660:11

**changed** 378:23 379:12 632:18

**charge** 367:5,7 368:23 379:20 500:8 616:8

**charged** 367:20 369:9 532:4 635:11 640:12 642:3 673:6 675:5 695:4

**charges** 367:9,10,23,24 368:19,20 530:15,22 531:1 551:4,6,12,24

**chart** 385:20 404:8 405:13,20 406:4 417:10,13 428:20,23 429:19, 22 430:3 431:14,15,24 438:5 504:7 508:2,8 602:5,21 603:2 610:1,3,6 659:16 664:13,17,18

**chasing** 645:13,17 646:2,5,18 647:1

**checking** 405:11 613:14

**Chicago** 362:2 413:9 417:15 418:18 423:5 428:9 435:10 439:17 440:3 441:1 449:5,21 452:5 459:20 467:4,12 472:4 479:3,23 483:22 489:10,15,16,18 491:19 501:6 506:20 510:19 515:18 522:17 528:22 530:5 551:2 559:2 570:1 595:14,17 619:21 622:13 626:16 627:3,12,18,23 628:3,8,10 660:12 661:10,17 662:3 691:16,23 692:20

Index: Chicago's-computer

THOMAS TIDERINGTON, 10/06/2022

696:4,7,15,16,19,21 697:4

**Chicago's** 489:4 534:11

**chicken** 544:19

**chief** 379:19,21,22,24 380:4 381:3, 6,7,9,15,20 383:13 500:15,24 501:14

**chiefs** 380:2

**child** 572:3 581:11,14,17 582:6 583:11

**child's** 581:13

**choose** 663:8

**chose** 539:19,22

**Cir** 449:6,11 454:18

**Circuit** 447:19 448:7,11,14 449:13, 15,19,23 452:2 455:19 682:12

**Circuit's** 450:12

**circumstance** 487:24 488:5,11,22 500:4 691:5

**circumstances** 366:24 465:3 572:18 573:3 601:7 689:2,9 691:4

**citation** 447:24 449:4 454:17,19 581:23 584:21 585:8,9 587:9 633:17 645:19 654:14 669:2,6

**cite** 448:4,15,21 582:9,17 583:2,12 587:3 615:21 645:22 647:16 654:4 671:23

**cited** 561:9 585:14 587:14

**citing** 582:10

**City** 362:2 365:15 449:5 452:13,18, 21 454:12 455:5 457:24 479:23 515:18 595:17 598:16

**civil** 461:18 462:15,21 469:5,6,8,9, 10,15,19 470:13,16

**claim** 414:12 456:18 631:23 632:2 679:10,12

**claimed** 414:7

**clarification** 471:7 697:23 700:13

**clarified** 647:3

**clarify** 371:4 476:16 486:22 496:16 526:17 641:17 657:22 697:19 698:4

**class** 452:1 456:19 458:3

**classification** 529:8

**clear** 366:17 386:13 416:24 429:20 468:2 536:7 632:3 657:24

**clear/closed** 583:8

**cleared** 529:22 530:3,7 531:22 550:21,22 551:1,7 679:4

**cleared/closed** 532:3

**clearing** 526:18

**Clements** 590:12

**Clemon's** 660:19

**Clemons** 653:2,8,12,13 657:21 660:23 661:17

**clerk** 617:21 624:16

**client** 623:22 624:2

**closed** 529:23 530:3 531:23 550:21,22 551:1,8

**closely** 404:12 698:17

**closer** 493:16 514:6,8 558:7 604:10

**closet** 690:1

**clothing** 564:21 695:11

**clue** 450:19

**clueing** 450:21

**coach** 451:15 465:22

**coaching** 451:10,12

**cocaine** 699:4

**code** 529:9,12,15

**coders** 503:22

**codes** 530:6

**coerced** 583:19

**coffee** 488:16

**collateral** 455:9

**collect** 369:18 442:21 544:11

**collected** 452:8 691:21 692:11 695:9

**collecting** 695:8

**collective** 368:4,11

**Colombia** 365:18

**colors** 385:7

**column** 428:22 429:4 430:9,11,14, 15,23 431:2 432:4,10,19 433:16, 17,20 434:1,3 435:1,16,17 436:15,

21 437:4 438:10

**columns** 431:5,24 434:21

**combination** 663:10

**combined** 525:21

**comedian** 622:8

**command** 559:2

**commander** 380:24 381:2 502:10

**commanding** 380:22

**commented** 618:7

**committed** 422:6 679:6,15

**common** 689:12,16

**communicate** 498:10

**communicated** 514:15

**communications** 608:7 609:20 628:10 663:17 677:14

**companion** 391:3 523:23

**compare** 438:4 519:15,20 525:3 528:3 540:15 555:5,9 563:21 602:8 651:21 652:18

**compared** 391:7 520:17 598:19 601:21,24 602:23 603:5 662:17

**comparing** 486:18 521:22 522:7 525:3 599:18 639:11 651:13 652:2

**comparison** 596:11 597:15,16 599:16 601:12 605:13

**comparisons** 612:6 663:4

**compile** 671:21

**compiled** 672:14

**complete** 384:15 514:15 558:20 599:7 683:10,19,22

**completed** 375:16 505:7 628:22

**completely** 442:9 475:22

**completing** 505:14

**compliance** 452:17 481:19 482:4

**complicated** 540:7

**component** 580:21

**components** 580:13

**comported** 662:2

**comprehensively** 426:16

**computer** 543:22 586:1,12

THOMAS TIDERINGTON, 10/06/2022

**concealing** 452:7

**concede** 548:19 612:23

**concern** 505:20 605:16,24

**concerned** 429:12,14 517:6,9

**concise** 536:16 539:15 540:12 647:12 666:19

**conclude** 512:12 526:23 595:2 605:5 654:24 655:22 672:1 678:15

**concluded** 422:1,4,5 635:5 702:17

**concluding** 443:2 657:2 679:20 689:15

**conclusion** 412:23 414:16 416:9 417:4 428:15 429:8 437:11 438:17 445:6 485:5 507:19 530:11 576:14 630:9 652:20 672:12 699:19 701:12 702:14

**conclusions** 612:5 629:24 635:5, 15,18 640:19 660:11

**condition** 499:7

**conditions** 455:20

**conduct** 464:7 594:12,13 660:18 672:14

**conducted** 424:18 428:4 444:10 482:16 485:24 494:5 516:21 577:23

**conducting** 439:21 571:23

**conference** 384:4 588:21

**conferring** 530:12

**confessed** 661:11,12,18,19

**confident** 497:15 540:1,4

**Confidential** 624:1

**confirm** 395:19 451:14 539:8,17 540:6 629:10 638:23 639:3 643:13 668:8 677:4

**confirms** 428:21

**confused** 451:1 509:3 648:10

**confusing** 494:3

**confusion** 450:23

**congratulations** 383:21

**connection** 362:15 363:15 378:3 387:20 388:14 408:8 416:13 481:5 482:17 516:1,16 518:3,16 590:22 612:6 615:15 641:9 661:7 666:22

682:3 691:24

**considered** 361:9 439:4,15 440:2, 8,15,24 531:22 614:10 656:17

**consistent** 423:23 437:19 444:9 495:21 496:2,4 602:7 646:10

**constitute** 491:4,16

**constitution** 456:20

**constitutional** 455:12 457:2 491:6,17

**constitutionality** 452:5

**consultant** 463:7

**consultation** 368:14

**contact** 592:7

**contained** 372:16 376:4 378:9 385:16 404:8 405:16,17 406:17 417:13 418:11 429:2 435:8,15 436:22 438:16 456:24 495:17 498:24 499:8 503:3 504:10 515:3, 14 522:2 523:20 527:1,16 541:17 542:15 564:22 565:6 568:18 596:22 598:2 601:16 610:3,8 628:21 631:12 654:23 655:5 660:9 686:1

**contemporaneous** 423:18 516:19

**contemporaneously** 504:23

**contention** 534:3

**contents** 373:23 410:11

**context** 370:18 464:13 465:6 466:6 467:22 468:14,20 622:12 656:21

**continuation** 574:19 583:5 621:22 624:4

**continue** 452:21 638:6

**continued** 358:8 474:14 475:1 550:20 574:16

**continues** 493:9

**continuously** 690:15

**contrary** 420:16

**contributed** 439:19 698:15

**control** 379:22,24

**conversation** 360:5 382:22 383:5, 15 384:2 469:23

**conversations** 382:7,19 389:8

**convey** 593:12,14 594:12

**convict** 420:15

**convicted** 455:1 456:19 458:2 613:23

**conviction** 458:7 459:7,8

**convictions** 455:10 458:6

**Cook** 390:22 391:2 392:4 396:6 397:15 405:23 481:1 530:24 585:4 587:22 588:5,6,7 589:7 660:10 662:18 682:13 685:3

**cooperation** 531:12

**cooperative** 443:19 696:6

**copies** 375:4,9,10,18 377:10,13 378:8

**copy** 375:24 377:21,22,23 392:24 393:2 542:8,11 618:1 621:3,5 623:7,16 627:2 693:14

**Cornell** 632:22

**corners** 412:13

**correct** 360:9 361:12 362:17,18 363:4,7,8,15,16,20 365:7 366:2 370:16 374:19 381:1,8,12 384:12, 13 388:17 389:22,23 393:13,14 399:12,18 400:7,14 402:19,24 404:23 405:7 407:1,10 408:7 410:7,12,13 416:3,21 417:8 419:8 423:1 427:8,13 429:9 431:21 435:24 436:1,4,13 437:8 439:24 440:1 443:11,13 444:4 446:7 447:10,11 448:18 450:18 453:3 454:21 459:21,22 460:2,11,12,16, 20,21 461:6 462:5,12 463:10 472:17 474:14 475:2,3 476:1,21,22 477:5 482:6,10 483:9,15 484:10 485:20,21 486:3 498:12,15 504:20 510:8 513:6,19 515:15 516:4,21,22 517:2 518:3,6,17,20 519:6,11 520:6,10,22 523:24 524:1,8,16 528:9 529:6 535:9 552:9 563:17 565:18 573:16 576:15 579:20,21 580:4,5,6 583:7 588:7 597:6,11,21 598:5,13 599:12,13 601:17,18 602:10,11,13,14,17 603:23 611:24 612:1 616:16,20,21,23 618:4 620:16,22 622:18 623:12 624:21 626:23 627:5,7 628:6,17,18 629:1, 11,17 630:4,7 631:15 632:10,15 635:13 636:19 637:11 644:22 645:23 649:4,9,22,23 652:19 654:6 657:7 658:18 662:18,19 663:6,7 667:3 668:6 669:1,3 670:20 671:11 675:22 676:4,21,22 678:18,19

THOMAS TIDERINGTON, 10/06/2022

681:20 683:13 688:18 692:13,18 695:1,6,16 697:22 700:1,2,10,11, 21 701:2

**correctly** 415:21 483:2 556:6 558:24 562:12 675:15 697:21

**correspond** 558:3

**corresponded** 517:22

**correspondence** 663:16 677:13

**corresponds** 526:1

**cot** 690:18,22

**counsel** 447:8 458:16 459:3 465:18,24 466:2,14 486:22 497:23 578:20 599:6 607:21,22 608:22 609:22 663:12,14 664:10 677:9 682:6

**counted** 596:24 628:23 629:7 630:7 631:14

**counting** 630:20

**County** 390:22 391:3 392:4 396:6 397:15 405:23 481:1 530:24 585:4 587:22 588:5,6,7 589:8 660:10 662:18 682:13 685:3

**couple** 363:6,12 374:9 434:12 468:13,18 535:10 572:14 574:4 576:23 615:17 636:2 637:20 659:10 660:4 675:11,16 678:7 696:10

**court** 369:4 452:11,19 454:14 456:15 457:20,23 480:24 567:20 617:21 620:17,20 623:10 624:16 625:12 682:11,12 684:2,9 685:4

**cover** 394:1

**covert** 369:19

**CPD** 477:16 478:2 481:7 633:3 644:7

**CPD's** 415:13 487:12

**CR** 620:20 621:18 626:20

**crazy** 552:17

**create** 373:21 470:2 512:7 610:1

**created** 499:9 503:22 511:19 540:17 664:17

**creating** 418:19,20

**creation** 378:13,18 389:20,21

**credibility** 674:1 675:8

**credit** 589:1 602:3 604:9

**credits** 700:3 701:1

**crime** 364:8 365:14,17 366:13 422:6 620:5 637:14 653:14 661:11, 12,19 679:6,16 695:19

**crime-related** 365:15

**crimes** 379:5,8

**criminal** 365:4 371:14 415:19 428:5,7 439:14 440:16 441:9 442:9 444:9 452:8 469:6 476:5 480:24 481:8 491:5 523:10,19 524:7 544:6 552:1,2 580:3 587:23 592:8 593:2, 4 596:12,16 597:8 598:18,21,23 599:6 601:15 603:5,18 605:7,8 614:11,18,19 622:12 631:7 636:18 637:23 640:20 642:22 644:12 649:12 652:24 657:8 658:10

**critical** 370:21 516:18,23 558:9 583:20

**criticism** 475:5 476:9 478:24 479:7,8 592:2 670:17 672:17

**criticisms** 415:24 474:24

**Crosoli** 546:1 548:14

**cross** 466:12

**cross-examination** 466:13

**cross-talk** 464:3

**crossed** 625:9 626:2,9,11

**cryptic** 533:13 534:5

**current** 360:8 518:16

**curve** 522:20

**custody** 692:23 694:14

**cut** 448:9,19

---

**D**

**D's** 588:13

**daily** 644:7

**damages** 455:11 458:7 459:7

**Damaine** 632:22

**Daniela** 546:1,15 548:14

**dark** 564:21 592:18 671:18

**data** 385:15 390:1 392:14 417:3 438:16

**date** 444:24 505:9 573:14 617:16, 19 694:3,6,12,18,21

**dated** 445:10

**dates** 435:24 445:13 446:13

**dating** 654:2,20 655:2

**Daubert** 698:21

**daughter** 591:20

**David** 395:12,18

**day** 358:2 473:11 574:5 622:7 632:9

**days** 581:16 653:14 660:5 665:13 678:8 692:21

**days'** 589:1

**DEA** 364:2,4,9,12,19 365:21,23 366:8,12,15,19,23 368:8 369:24 370:7,8,13,14 376:24 443:15,21 444:2,6 696:4,7,11,22

**DEA-6S** 377:1

**dead** 577:6

**deal** 385:12 610:2

**dealing** 675:5

**Deas** 399:9

**death** 551:17 581:11 633:2 653:6 656:14 671:16

**debating** 607:7

**deceased** 550:13,15 551:11

**December** 530:10

**decide** 403:2

**decided** 588:20 665:16

**decidedly** 531:13

**decides** 690:11

**decision** 367:22 368:5,10,11 425:14 448:20 452:14

**decision-making** 368:19 389:14

**deep** 423:12

**deeper** 663:3

**defendant** 466:14 544:6 587:23 588:3,18,20,23 590:6 603:18 621:14 642:21 645:1 653:1

**defendant's** 491:5 591:17 592:8 626:2

**defendants** 415:20 441:9 455:1,7 481:9 523:10,19 580:3 593:5 596:16 631:5,6 634:11 635:9 642:10,12

THOMAS TIDERINGTON, 10/06/2022

**defendants'** 455:6 640:24

**Defender** 390:16,19 405:23 523:21,23 524:13 526:6 527:1 535:8 542:16 565:18 566:8 581:24 597:19 601:22 613:12,15 617:12 648:18 662:18 663:5 670:1,19

**Defender's** 441:14,18 442:11 535:22 537:6 542:6 566:2 599:2,19 600:17 602:24 607:11 610:9,14 614:17 623:21 644:21 653:21 657:6 668:4 670:23 671:5 685:3 686:21

**Defenders** 390:16

**defense** 435:13 440:17 442:9 466:14 524:8 552:1,3 583:20 592:5,7 593:2 596:12,17 597:8 598:18,21,23 599:7 601:13,15 603:6,11 604:15 605:1,7,8 614:4, 15,19,20 631:7 632:1 633:24 634:5,10,23 635:7,15,17 636:18 637:23 638:11 640:20 642:21,22 643:8 644:12 648:6 649:7,19,21 650:10 653:20 657:5,9,10 658:10 672:6 673:18

**defer** 604:11

**deficiency** 481:6

**deficient** 435:12 477:7 484:13,15

**define** 440:10

**definition** 440:18 504:14 511:3

**degree** 408:14 529:9 613:24

**deliberately** 465:4 470:1,10 593:15

**deliberating** 469:18

**Demetrius** 677:6

**demonstrate** 408:21 409:22 558:23

**denied** 582:15 584:23 585:4 587:4,17

**denotes** 529:19 620:18

**dep** 363:17 398:11 579:15

**department** 366:21 369:7,24 370:11 376:9 377:3 378:12 379:2 381:11 412:23 413:9 417:16,20 418:1,19 428:9 435:11 439:12,18 440:3 441:1 443:14 445:18 459:20 466:23 467:12 476:4 479:4,10 483:22 489:8,16,19 501:10,12,16, 17,18 502:9 528:23 530:6 532:21,

24 551:2 595:3,15 613:13 626:16 627:4,12,18,24 628:4,9,11 660:12, 15 661:11,18 679:1 691:23 692:21 696:15

**department's** 423:5 452:6,10 491:20 500:9 506:21 691:16

**departments** 428:11 443:9,16 489:18 492:10 691:6

**depend** 701:12

**depended** 373:4

**depending** 394:8

**depends** 369:12

**depicted** 680:20

**depo** 394:17 395:8,16,21 396:21

**deposition** 358:3 359:3,21 361:11 363:7 384:16 392:16 394:12,16,18 395:11 396:19 397:18,21 398:1,4, 5,21,23 399:11,17 415:7 450:3 460:23 525:8 528:11 540:21 541:19 545:2,16 553:9 566:14 567:22 568:4 584:2 615:6 636:14 640:1,22 641:2 654:8 657:17 668:15 669:21 674:19 680:12 684:17 697:18 702:15,16

**depositions** 515:18 698:3

**depository** 444:7,22

**deputy** 379:21,24 380:2,3 381:3,6

**describe** 409:15 416:1 548:9

**describes** 564:20 637:6

**describing** 451:24

**description** 537:16 595:22

**descriptives** 550:15

**design** 515:20

**designate** 570:2

**designated** 595:18

**designation** 596:5

**desk** 439:2 511:9

**desks** 440:14

**detail** 360:19 387:14 397:17 401:23 402:7 403:14 404:17 406:17 420:1 448:5 472:1 671:1

**detailed** 411:24 426:15 672:18

**detailing** 502:9

**details** 533:1 661:24

**detain** 688:21 689:2

**detained** 689:17

**detective** 371:10,13,18 374:5,10 376:2,9 377:19 379:1,4,14,16 380:7,11,17 381:4 482:17 483:14, 18,19,21 484:1,6 488:1,5,11 502:2 507:12 517:13,15 528:23 537:11 538:17 543:8,16 562:10 569:12,22 570:3 596:5 634:1 665:22 666:6, 13,21 674:11 675:3 688:1

**detectives** 374:13 414:14 426:21 439:2 475:6,13 476:12 477:8,16,18 482:21 484:4 486:1 487:10 493:20 508:8 531:20 532:22 534:3 554:21 557:13 581:18 595:22 614:9 653:11 665:14 671:20 674:3 679:2, 14 687:4,15 695:8

**detention** 690:19

**determination** 367:5

**determine** 395:20 424:2 457:24 475:7,14 477:9 503:7,14 584:11 585:13 601:19 699:3

**determined** 503:23 551:3 578:14

**determining** 404:16 477:19 600:11

**Detroit** 443:10 501:6

**developed** 517:3

**deviation** 410:17,22 687:13,18,21 688:1 700:5 701:2

**deviations** 701:6,11

**devices** 369:20

**diaries** 546:6

**died** 581:16,17 665:13

**difference** 469:20

**differently** 631:20

**difficult** 392:10 492:22

**difficulties** 693:12

**dignity** 689:24

**dinner** 553:2

**direct** 411:12 426:18 463:1,8 510:1

**directed** 487:7 496:10,20 498:9 677:9

THOMAS TIDERINGTON, 10/06/2022

**directing** 452:13 455:5 457:24 479:1

**directions** 537:22

**directive** 476:11,15,16 482:13 496:17 497:16 570:10

**directives** 378:11,18 460:10 467:11 476:10,17 482:18 484:9 487:16,17 496:14 497:4,9,11 498:12 533:4

**directly** 381:3,7

**disagree** 619:7

**disciplinary** 485:3,7

**disciplined** 484:22

**disclose** 415:17 416:5 418:3 419:7 420:20 624:2

**disclosed** 460:2 475:8 477:10 478:12,22 492:1 493:1 512:14 523:10,18 534:15,17,21,22 536:2 580:4 592:5 603:17 604:20 674:5

**disclosing** 418:23

**disclosure** 478:15 659:4

**disclosures** 391:8 415:15 478:17

**discounted** 504:7

**discover** 455:7

**discoverable** 603:14

**discovered** 532:18

**discovering** 527:3

**discovery** 392:2 458:9 499:24 621:9,12,22 622:5,11 623:4,8,17

**discretion** 475:5,14,23 477:9,16, 19 478:6

**discretionary** 476:3

**discuss** 403:14 417:10 452:1 567:8

**discussed** 438:20 460:13 468:16 487:6 496:18 507:9 511:5 523:9 579:19 601:8 652:21 665:6

**discusses** 474:8 669:8,11,13

**discussing** 468:14 615:17

**discussion** 384:5 412:21 459:19 460:6,19 560:21 572:15 575:13 581:8 588:12 606:5,8 613:18 651:9 652:8 678:4

**discussions** 368:22

**dismantle** 365:6

**dispute** 679:23

**disputed** 583:17

**disputing** 507:13 542:17

**distinction** 407:11 625:22

**distinguished** 547:11

**District** 452:11,19 456:15 457:23

**dive** 423:13 663:3

**division** 364:8 366:14 379:14,16, 23 380:1 407:7,13,21 479:13 482:17 483:14 500:9 510:8,12 514:3 518:17 519:5,21 520:9 522:22 528:23 595:14 596:6 627:18,23 628:10

**DNA** 692:12

**doctor's** 377:20

**document** 394:9 406:17 415:17 416:1,10 417:5 418:5 419:6,19,22 420:5,20,21 421:2,7 422:3,5 423:7 426:21 427:11 428:16,23 429:1,8 434:23 435:13 436:2 438:19 448:12,14 450:15 451:5 453:9,18 463:17 464:11,12,14 465:19 466:2, 5 467:20 475:23 504:24 508:5 541:8 562:20 575:20 585:2,11,13, 14 587:2,8 588:1 589:5 591:4,10 621:3,6 622:21 644:11 655:12 687:20

**documentation** 415:14 420:12,13 439:14 467:15

**documented** 420:10 421:21,23 424:4 427:16 436:8,10 475:8 476:6,13 477:10,11,20 478:10 493:1

**documenting** 423:17 471:13 508:6,9

**documents** 361:13 370:7,8 375:3, 6 377:5,9,11,12,14,15 398:18 408:14,16,19 409:19 415:18 416:5 417:24 418:23,24 432:2 435:3,8,22 461:9 462:2 479:16 480:1 500:6 502:15 504:3,17 505:3,21 506:8 507:3,10,20 508:13 510:23 511:4, 7,13,19,24 512:2,19,20 513:2,10 527:4 529:2 539:14 540:9 559:15 560:7 561:12 565:17 594:23 596:22 598:3 600:9,14 601:15 603:10,16 604:19 605:6 628:22 629:6 630:1,11,13,19,22 631:12, 17,24 643:7 653:19 675:18 686:19

687:2,11,17

**domestic** 655:16 656:12

**Donnie** 673:3 675:24 676:3,19,23

**door** 384:3

**doubt** 598:17

**dozen** 671:20

**drag** 473:11

**dragged** 382:20,24 383:10

**draw** 414:16 630:9 635:15,18

**drawers** 507:12

**drawing** 437:11 513:11

**drug** 365:3,12 698:24

**drugs** 369:1 699:4,6,11

**due** 531:19 655:15

**duly** 358:6

**dumped** 590:4

**duplicate** 622:20 623:3

**duties** 511:21

### E

**earlier** 382:6 400:11 407:8 486:5 510:6 511:6 522:13 538:19 551:5 566:24 575:13 578:13 687:6

**early** 633:10

**easier** 524:20 525:3 586:13

**easily** 399:3 519:3

**easy** 604:8

**edit** 389:17

**Edwards** 632:22 648:12

**effect** 383:22

**Egan** 588:21

**Eileen** 362:1 509:10 526:11 546:9 563:7 606:10

**eleventh** 617:7

**eliminate** 487:9

**eliminated** 598:2

**email** 698:12

**emails** 698:10

**empty** 458:19

THOMAS TIDERINGTON, 10/06/2022

**enacting** 417:16

**end** 381:13 464:2 526:18 551:16 565:11 567:10 579:15 598:20 628:14 650:14

**enforcement** 476:7 511:20 689:20

**engaged** 633:3

**engagement** 630:6

**engaging** 469:22

**ensure** 417:24 459:24 481:18 482:4

**entered** 457:22 566:14 588:23

**Entering** 569:8

**entire** 395:20 441:8,17 558:1 560:6,18 581:5 590:20

**entirety** 394:15

**entitled** 455:2 621:9

**entry** 455:14 589:15 591:14

**envelope** 627:6,8,10

**envision** 488:10

**Eric** 530:18 531:14

**errors** 603:1

**essentially** 367:17 602:20

**established** 578:12 628:20

**establishes** 430:10

**estimate** 401:20 514:10 603:4

**estimated** 362:21

**evaluate** 409:4 657:9

**evaluated** 692:15

**evaluating** 656:18,20 657:2,8

**evening** 358:14 359:5

**event** 461:15 524:4

**eventually** 379:6 477:2 588:20

**evidence** 369:18 414:2 417:3 418:9 419:16 421:6 441:3,6 492:13 494:12,19 507:2,9,18 508:8 544:11 594:16 620:5 673:8 678:18,24 679:7 680:1,4 681:19,23 682:3,5,7, 22 684:5 691:21 692:11,16 695:8, 14,17,21 699:19

**evolved** 378:23 379:12

**exact** 363:2 388:9 400:22 401:14

**exam** 464:6,8

**examination** 358:8 361:18 463:2, 8 697:14

**examine** 698:24 699:2

**examined** 358:6 514:13

**examining** 659:15

**examples** 403:12 423:3 424:22 426:20 427:2,10 521:4 523:11 524:5 533:17 535:5,6,13 536:1,6, 12,17 539:3,20,22 540:15,17 553:22 559:12,19 560:2,15 561:10, 14 568:20 575:14 578:13 580:1,8 581:2 663:2

**exception** 361:12 490:21 623:1

**exceptionally** 529:22 530:2,7 531:22 532:3 550:22 551:1,7

**exceptionally/cleared/closed/ death** 551:20

**exceptions** 490:16

**excluded** 598:20

**exculpatory** 418:16 452:7 523:6 527:19,22,24 528:5,8 535:18 537:2 678:17,23 679:17

**exercise** 477:18 508:3,7 522:10 561:7,8 652:2

**exercises** 409:17

**exhausted** 531:9

**exhibit** 361:10 392:16,19 393:3 415:7,10 442:16,17 450:3,6,8 457:5 459:14,18 460:23 461:2 462:20 471:5 474:6 509:23 525:8, 11,22 528:11,15 530:8 532:9,11 535:5 537:24 539:2 540:21 541:1, 19,22 542:11 545:2,5,14,16,22 552:5 553:9,12 555:22 563:7,9,16 564:4 565:12 566:16,18 568:4,7,8, 24 569:1 584:2,6 592:2,22 615:6,9 636:12,14 641:2,8 644:15,16 645:5 647:23 648:2 651:8 654:8,11 657:17,20 662:10,11 668:15,18 669:21,24 671:5,13 674:19,22 677:5 680:12,15,16,19 681:14 684:17,20 693:2,5,10,11

**exhibits** 403:23 647:21 684:12

**exist** 493:14 512:20 526:5 687:11

**existed** 427:17 508:13 688:13

**exited** 567:21 640:21

**expect** 376:1 426:3 429:15 473:13 494:23 517:15 533:14 537:22 542:22 553:6 575:15

**expectation** 542:24 556:16

**expected** 371:9 543:23 562:21 575:19

**expedition** 458:18

**expense** 458:12

**experience** 443:5,7,21 499:22

**experiences** 364:1

**expert** 383:24 392:13 463:9 465:14 468:21 469:1 536:2 699:14

**experts** 469:2

**explain** 382:23 408:12 413:7,19 426:2 427:15 433:9,13,14 463:14 465:3 492:19 532:7 536:17 560:24 647:14 678:20 685:4 686:23

**explained** 408:11 463:18,20,23 501:20 532:17 534:12 538:23 541:16 562:12,21 564:16 580:24 600:19 679:3

**explaining** 433:22,24 463:14 512:4 533:1 534:4 537:13 673:19

**explanation** 517:12 537:12,17 543:21 544:16,22 610:12 611:11, 15

**explicit** 496:13

**exposed** 409:24

**express** 383:14

**extensive** 614:5

**extent** 449:16 498:1 608:8 609:21 610:19

**eyes** 592:17

---

**F**

---

**F.2d** 449:8 454:18

**faces** 671:19

**facility** 691:11

**facing** 681:13

**fact** 398:20 429:7 460:18 477:15 493:13 516:14,18 544:5 545:24 558:10 569:16 572:6 589:5 599:23 601:2,3 605:19 612:2 613:3 619:1 629:19 631:22 642:2 647:7 649:18 655:21 656:11 661:16 675:3,24

THOMAS TIDERINGTON, 10/06/2022

678:12,13,21,23 682:9,17 683:14 699:24

**facts** 465:2 470:3 531:20

**factual** 447:20 448:8

**factually** 469:16

**failed** 419:21 421:7 422:3

**failing** 426:21 427:11

**failure** 415:17 416:1,5,9 417:5 418:3,4 419:5,6,22 420:4,19,20,21 421:2 423:6 428:16,23,24 429:8 434:23 438:18

**fair** 399:16 434:3 447:2 468:24 601:9 632:2 651:24 652:20

**false** 420:13

**familiar** 404:18,21 428:11 522:13 529:3 533:12 674:9 691:7,8

**family** 588:13

**fashion** 685:11 691:17

**February** 659:4

**fed** 690:17

**federal** 367:8,10,16,23 368:20,24 691:7

**federally** 367:6,20 368:23 369:9

**Feds** 369:2

**feel** 416:18 502:6 531:8 640:3

**fell** 488:15

**fellow** 376:7

**felony** 397:5,14 685:20

**felt** 374:21 375:6 538:17

**field** 556:14 559:3

**Fields** 384:9 387:17,19,24 388:15 460:16,19 461:5,9,10,13,16,17 462:2,5,15 463:11 465:12 469:2 495:22

**Fields'** 462:21 463:19

**figure** 425:9 547:21,23,24 559:14 584:14 633:5 634:14,22 636:1,3 640:2 675:12 693:13

**figured** 486:17

**file** 372:19 373:16,17,21,23,24 374:2,7,8,15 375:1,9 376:1 377:6, 8,24 378:5,7,10,14,19 402:18 404:17 405:4,15,16,18 407:5,7,9, 12,13 411:22 418:8,13,14 420:17

422:3 428:7,8 429:6,13 430:12,13, 16 431:1,3,9 432:3,19 435:3,5,9, 15,23 436:3,4,10,12,22 437:7,18 438:23 439:5,7,15 440:13,15 442:10,11,20 444:8,17 461:10 474:10,21 486:9,10 487:12 491:4 499:17 504:4,9,17 505:5,9,13,23 506:9,13,23 507:4,11 508:14 511:10,11 512:10,16,17 515:4,15 516:4,12 518:9,16,17,19,20 520:18,19 522:1,3,7,8,14,15,16,24 523:20,21 524:7,8,13 526:6 527:2, 24 528:16 532:6,15 533:22 535:9, 22 537:6 542:16 545:13,20,24 546:24 547:7 548:23 552:1,3 556:19,20,21 557:24 558:1,21 559:10,20 560:6,12,18 561:6,22 562:2 563:18,21 565:18 566:2,8 568:9,11,15,19,24 569:5,13,17,24 571:2 573:24 579:14 580:10 581:5, 8,24 582:11,12,14,17,21 583:13,15 584:5,18 590:20,21 592:7 595:8 596:11,18,19,20,21 597:20,22 598:23 599:7 601:21,22 602:22,24 604:5,18,19 605:7 607:19,24 608:4,17 609:17 612:7 614:4,15, 19,20 615:2,14,21 617:8 620:24 623:16 628:14,17,21 629:5,21,22 630:2,7,10,18 631:8,9,11 632:1,3,5 633:19,21 634:1,5,10,18,20,22,23 635:2,7,16,17 636:18,21,24 637:5 638:23 639:6,11,12 640:15,17,18, 20 641:8,15,18,24 642:1,6,8,11,16, 18,22 643:4,8 644:13 645:2 648:7, 18,19 649:8,19,21 651:13,14,15, 20,22 652:2,3,17,18 653:18,21 654:5,18 655:8,13,14 656:22 657:6,9,14 658:1,2,10 661:7 662:5, 17,18 663:5,6 666:9 667:1,2,5,18, 21 668:2,4,19 670:1,9,15,19,24 671:5 672:6 673:9,10,12,18 677:4 682:18,24 683:4,9,11,19,20,22 686:20,21 693:1,15,23

**filed** 531:2 551:20

**files** 360:18,21 374:18,21 387:7 388:16,20 389:24 390:4,12,16,17, 18,19,20,21,23 391:2,4,13 392:5 400:2,5,11,17,19 401:5,11,16,19, 21,23 402:2,5,19,22 403:2,15,23 404:11,12,19,22 405:3,23 406:2,4, 12,14,20 407:3,17,18,20,21 417:19 418:10,11,17,20,21 425:3,19 428:9,15 429:23,24 431:4,19 436:23,24 437:1,16,18,21 438:5,9, 24 439:1,4,8,9,10,11,17,18,23 440:2,13,19,22,23,24 441:7,8,14, 17 442:8 455:6,23 456:16,24

458:1,15,23 459:1,2,4,5 474:14 475:1 476:21 484:10 485:13,18,19, 23 486:11,14,18 492:14,15 494:13, 23 498:24 499:4,6,24 500:6 501:22 502:12 503:3,9,14 504:11 507:13, 22 510:4,7,8,11,12 511:6,14 512:21,22,23 513:4,8,13,22 514:4, 14 515:7,13 518:2 519:3,4,5,15,16, 22 520:1,2,3,10 522:18,21,22 523:1,24 524:19 525:2 529:4 556:4 560:23 580:2 584:7,8,12,16 593:2 595:8 596:13,14,17 597:5,8,10,18 598:1,11,19,20,22 599:1,8,10,15, 17,19,24 600:4,12 601:3,5,13,14, 15,17,24 602:9,10 603:5,6,11 604:17 605:2,8,14 607:16 612:4 613:2,9 614:23 615:2 618:6 631:7 635:21,23 636:2 637:23 640:24 642:6,17 650:3,5,10 658:8,11,20, 23 659:13,17 660:10,15 663:9 668:11 675:6 677:8 685:5,9

**files.'** 452:11

**fill** 554:18

**filled** 617:22 618:2,13,16,20,22 619:2 621:18 623:23 625:17

**Finally** 598:16 645:10

**find** 412:11 424:1 429:22 458:17 481:6 524:7 532:15 533:21 537:6 558:2 570:15 613:2 638:6 641:12 647:18 650:8 680:10 694:21 701:6

**finding** 448:8 520:20,23 701:13

**findings** 447:21 487:1 495:21 692:17,20

**fine** 358:13 361:24 420:8 422:14 572:24 678:1 681:7 693:17,18

**finish** 380:9 396:11 446:3 465:9 500:13 564:3 635:8 686:6

**finished** 359:4,18 589:21 594:7

**fishing** 458:18

**fit** 365:19

**five-minute** 564:2 650:16

**five-year** 364:15,17

**fixating** 596:2,4

**flagged** 552:7

**fled** 653:12 661:2

**flip** 527:11 636:20 693:19,23

**Florida** 653:12 661:1,2,18

THOMAS TIDERINGTON, 10/06/2022

**focused** 651:13

**focusing** 477:11

**follow** 478:7 488:9 517:1 656:23

**follow-up** 362:12

**food** 679:9

**footnote** 408:19 448:17 450:16 454:19 486:7 597:17 598:12 599:1 628:24 629:8,16 631:18

**footnotes** 629:2

**force** 696:22

**foreclose** 600:21

**forensic** 619:13,14,20

**form** 370:24 372:3,7 373:2 384:14 387:10 391:6 394:5 395:4 396:14 397:8 402:11 409:10 412:4 413:2, 12 414:19 419:12 420:23 424:6 425:12 426:10 427:19 430:18 431:9 432:15 433:3 437:13 440:5 441:11,20 446:9 454:3 456:6 457:4 459:11 467:18 471:16 472:11 477:22 481:11 487:20 488:24 490:8,12 491:13 493:5,24 494:17 497:20 506:5 508:23 510:15 511:16 513:16 514:21 518:22 519:8 520:12 524:10 526:8 533:24 543:5 547:14 548:6 554:18,19 555:12 557:5 558:14 562:17 565:20 578:17 593:19 605:18 608:19 612:9,15 620:12 623:20 624:4 638:17 639:8,15 646:20 656:2 659:3 682:21 684:4 685:17 689:6

**formal** 439:5,8,11,15 440:2,9,10, 15,24

**forms** 376:13 488:14 544:22

**Fort** 364:1 365:16 366:14,20 369:7, 23 370:6,10 372:5 373:18 376:8 377:2 378:12 379:2 381:11,16,20 443:12 500:8,22

**forward** 367:11 648:10

**forwarded** 417:24

**found** 404:2 418:16 420:17 456:17 459:5 461:23 494:6,11 503:2 521:4 535:13 556:22 559:20 566:2 603:1 659:22 660:7

**foundation** 370:24 391:6 409:10 413:2,12 420:23 426:10 430:18 432:15 433:3 437:13 441:11 446:9 454:3 457:4 459:11 467:18 471:16

477:22 488:24 490:12 491:13 493:6 497:20 508:23 513:16 519:8 520:12 524:10 526:8 533:24 543:5 547:14 555:12 558:14 562:17 578:17 593:19 638:17 639:15 646:20 659:3 682:21 684:4

**fourth** 435:1 481:17 482:1

**frame** 694:23 696:8,17 697:2,6

**frankly** 558:5

**free** 640:4

**French** 410:3,8,11

**fresh** 632:16

**Friday** 574:5

**friend** 653:9

**front** 392:24 416:20 497:1 524:22 558:21 585:19 648:23 675:20 693:15,24

**frontline** 368:12

**full** 530:9

**full-time** 366:12

**function** 569:22

**furtherance** 365:24 374:22

**future** 564:1

---

**G**

---

**gaining** 531:12

**gang-involved** 665:9

**gave** 396:3 489:5 546:6 590:6 598:16

**gears** 593:21

**general** 484:9 487:3 488:2 521:14 554:14,22,23 573:11 574:14 603:21 638:11

**generally** 368:1 369:13 410:18 532:14 593:9

**George** 422:23 447:4,18

**get all** 479:15

**give** 359:9 399:21 403:12,21 421:8 464:13 555:14 570:15 572:21 581:6 588:10 593:16 676:5 689:21, 22,23

**give-and-take** 367:18

**giving** 560:8 561:12 583:19 659:9

**glad** 383:19

**global** 415:24

**globally** 417:20

**goal** 365:6,8 404:7,18,20

**god** 451:16 469:11

**Golden** 358:9 361:15 382:6 408:1 410:14 434:6,10 516:15 701:20,21 702:1

**good** 358:10,11 361:20,22 380:13 393:7 401:19 421:14 422:7 428:3 472:21 473:3 489:11 509:6 533:11 586:14 595:22

**GPR** 429:7 431:9 433:1 487:18 488:2,14 489:4,19 490:5,18 492:4 533:13 541:14,16 542:14 548:5,6, 19 549:6 556:8,18 557:1 558:3,6 559:6 562:7 571:22 574:1 575:19, 24 577:9 580:15 675:13,15,21

**GPRS** 405:15 419:18 424:14 429:3,5,24 430:13,16,24 431:4,19 432:6 436:20 487:8 489:8 491:3 495:18 506:12 515:14 520:4,21 521:19,23 526:5 544:21 547:5,6, 11,12,17 565:14 566:7 578:3 580:19,23 638:14 670:23

**grab** 393:1

**gracious** 702:3

**grant** 454:12

**great** 360:19 380:20 383:19 385:12 397:17 403:5 576:16 610:2 652:5

**greater** 401:23 404:17

**grocery** 488:8

**gross** 410:17,22

**group** 633:2

**GS-13** 368:9

**Guadalupe** 678:14 680:5,23 681:16 683:24

**Guadalupe's** 682:15

**guess** 366:4 369:12 373:4 377:16 384:15 389:7 392:6 402:14 403:11 408:10 409:14 411:13 425:13 440:9,10 468:11 471:20 473:4 480:19 482:19 488:6 493:11 506:6 509:1 512:3 514:23 515:8 534:1 535:3 536:20 556:15 575:18 578:7 595:1,24 605:3 606:1 607:3 615:23

THOMAS TIDERINGTON, 10/06/2022

628:14 634:16 638:18,19 645:8 646:21 647:2 649:20 663:18 672:16 683:15 689:9

**Guevara** 517:20 665:23 666:6,13, 21 700:9,19 701:5

**guidance** 476:3 489:4

**guilty** 588:19,24

**Guthrie** 632:22

**Guy** 673:4

**guys** 368:12

---

**H**

---

**H-A-A-S** 569:9

**Haas** 569:9,20 673:12,21 674:8,12 675:3

**Haas's** 569:12,22 673:17

**half** 421:17 519:14

**Hall** 614:1

**Hammond** 613:19,23

**Hammond's** 614:19

**hand** 580:16 652:11

**handcuffed** 690:5

**handing** 618:1

**handled** 444:12,16

**handler** 696:21

**handwriting** 437:7 521:16 557:14

**handwritten** 430:12,14 431:3 432:5,7,18,24 436:16 437:1,5,22 487:2,9 491:2 492:16 495:11,17 520:4 521:5,12,13,18 535:14 536:18 557:8,16,17 558:2 559:4,5 582:3,21,23 603:21 645:14 652:10, 16 653:24 654:18 670:22 673:9 687:5

**haphazard** 404:5

**haphazardly** 404:9

**happen** 543:15

**happened** 422:24 456:4,9 458:14 556:15 590:3 637:14 679:11 684:14 690:9

**happy** 359:10

**hard** 392:24 393:2 424:16 514:10 668:12

**head** 379:15 434:8 694:6

**header** 435:21

**heading** 415:13 419:4 447:18 476:19 593:2

**headquarters** 595:24

**hear** 383:20 411:8,9 662:22 666:16

**heard** 467:10 470:20,24 471:2 472:4,18

**hearing** 698:21

**Heather** 394:13

**heel** 582:8

**held** 454:24 679:8 690:15 691:9

**helpful** 415:3 531:17 579:9 635:2 637:24

**helping** 572:17

**Hickey** 480:3 484:11 494:4 515:19

**Hickey's** 482:20 483:9 494:4

**hide** 590:11

**highlighted** 451:23 452:3 453:18, 21 454:11,23 456:12 457:10,13 466:16 572:4

**highly** 484:24 544:24 688:20

**hired** 500:24

**histories** 614:11

**history** 626:23 628:16 649:12

**hitting** 581:14 582:5

**hold** 387:18 393:16 528:19 588:9 608:5

**holding** 418:21 691:1,17

**hole** 576:9

**holes** 576:8

**home** 574:23 650:21

**homicide** 379:7 394:21 395:2,24 396:12 397:1 411:16,17 413:9 415:15,19 416:10,13 417:2 423:8 424:12,17 426:20 427:12 428:6,17 429:16 434:24 436:9 437:2,20 442:20,23 443:24 444:2,5,13,18 445:8 467:16 471:14 476:6 481:5 485:24 486:8 499:10 513:23 516:2, 17 517:7 529:8,9 532:5 569:18 573:4 657:14 658:1 678:6 682:4 685:20 686:20 687:24

**homicides** 489:14 619:20

**honest** 590:15

**honestly** 469:12 621:1

**hooded** 564:21

**hoodies** 671:18

**hope** 383:16

**hour** 421:17 472:23 473:5,7,10 639:24 666:17

**hours** 358:18 362:14,22 363:1,6, 10,11,12 540:15 639:11,24 688:22 689:3,18 691:2 701:23

**house** 574:6 583:22 590:5 652:12 695:12

**housekeeping** 567:1

**huge** 386:8

**humanely** 691:13

**humanly** 405:1

**hundreds** 405:5 560:7

**hurt** 573:20

**hypothetical** 558:19 689:10

**hypothetically** 375:23

**hypotheticals** 377:18

---

**I**

---

**IACP** 445:9,16,19 446:12,18

**ID** 546:16,18,22

**idea** 480:21 593:17 626:4 639:4 695:13

**identification** 530:20 628:5 672:4, 14 673:7

**identified** 361:13 410:22 414:1 428:14 436:6,11 442:13 493:11,13, 18 538:13 547:20 561:13 563:22 613:1 644:6 660:8 662:21 663:2 664:16 665:19 666:1 673:4

**identifiers** 577:21

**identifies** 637:14

**identify** 425:2 426:6,13 438:5 441:24 442:7 478:16 486:10 498:22 597:18 603:20 608:11,12, 20 609:19,20,23 633:15 653:23 663:20 664:11 667:16 669:16,17 681:6

THOMAS TIDERINGTON, 10/06/2022

**identifying** 505:2 526:4 550:7 637:13 667:8,13 668:21 674:1 675:9

**idiot** 538:10

**ignore** 492:8

**illegal** 699:3

**Illinois** 619:11,19 624:21 625:2 692:15

**illustrates** 427:2

**illustrating** 580:8

**impact** 661:21

**impeach** 411:11

**impeachment** 678:17

**implement** 489:16

**implemented** 466:21 467:12 489:19 492:4

**implementing** 466:24

**importance** 413:8,20,22 537:14 544:17 555:16

**important** 468:15 534:6,10 538:17 543:9 559:15 560:4 567:8 593:3 603:12 607:8 678:17

**importantly** 556:13

**impounded** 680:1,4 681:19,23 682:3,5,7,10,12 684:2

**inadequate** 415:16 459:24 460:11 481:17 482:3 484:13,15

**inappropriate** 465:8

**incident** 656:12

**inclined** 487:12

**include** 478:4 523:11 672:6

**included** 373:7 491:3 534:11 538:7 557:18 572:22 579:6

**includes** 582:21 653:18

**including** 521:19 578:1 614:8 634:5

**incomplete** 436:12 498:18 502:19 503:2,4,8,15,24 504:2,14 547:2 596:24 598:4,24 628:23 629:7 631:14 632:3 669:6

**inculpating** 614:6

**inculpatory** 673:8

**incurred** 458:12

**index** 435:14

**indicating** 667:9,15

**indication** 499:16 548:23

**indisputable** 512:5

**individual** 594:21 675:4 689:16

**individuals** 413:24 414:6 543:14 665:20 679:6 690:1

**individuals'** 670:18

**industry** 502:6 699:14

**ineffective** 417:23

**inexcusable** 687:24

**inference** 513:8,11

**inferences** 414:17

**inferred** 512:20

**inferring** 655:24

**influence** 590:16

**informal** 452:10 459:2

**information** 359:10 365:24 372:16,22,24 376:5 377:5 384:7,21 385:14 389:14 393:11 404:7 409:7 415:18 416:2,6,10,12 417:1,13,15, 18 418:12,16 419:19 420:15 423:7 424:4 426:21 427:11,16,17 428:17 432:1 434:23 436:7,8 442:22 444:22 445:9 446:12 447:7,14 458:4 467:15 471:13 475:15 482:15 498:11 499:8,15,19 502:9 510:23 511:8 519:24 521:4 522:9 523:3 524:6 527:16 528:2 535:13, 17 536:18 537:1 539:3 540:12 541:16 542:19 543:1 544:4 555:3 556:10 559:19,21 564:10,16 565:5, 13,14 566:10 575:15 576:18 578:4, 14 580:2,9,23 593:15 594:24 595:4 600:7,22 605:11,12 606:3 607:6 612:3 614:5 618:13,15 634:4 637:13 640:14 654:23 655:5 656:7, 21 660:2 664:3 672:7 674:2 679:17 685:7 698:2

**informed** 589:16

**infringement** 698:5

**inhumane** 690:12

**initial** 544:14 667:8,14 668:22

**initially** 405:12

**injunction** 452:16,20 454:13 455:3,15 457:19

**input** 389:21

**inserted** 623:2

**inspect** 458:3

**inspected** 456:16

**instance** 470:12 634:6

**instances** 426:13 523:9 535:19 537:4 544:20 599:4

**institution** 493:3

**instruct** 476:12

**instructed** 659:18 677:17

**instructing** 677:12

**instructions** 478:19

**insufficient** 474:9,20 476:20 477:4,17

**intended** 408:21 487:8 515:20

**intending** 593:12,13 594:12

**intent** 409:22 515:22 593:13 594:21 602:4

**intention** 451:4,8

**intentional** 594:12

**interest** 403:6,10 404:1

**interested** 420:3 515:24 516:10

**intern** 567:21

**international** 364:20

**interpretation** 432:9 487:16

**interrogated** 414:8

**interrogating** 695:23

**interrogation** 688:22 689:3,17 690:2,4,6,16 691:1,10,18

**interrogations** 516:20 692:1

**interview** 370:19 423:19 488:7 517:23 544:14 574:1,20 576:1 577:15,22 583:5 587:21 588:2 624:2

**interviewed** 419:18 517:13 637:16 661:9,21

**interviews** 516:20 517:10 589:6 623:22 687:8

**intimate** 500:16

**intimately** 501:15

**intimidated** 581:21

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022

**inventoried** 506:8

**inventories** 604:5

**inventory** 432:3 435:4,6,7,10,23 436:4,12 498:18,24 502:18,24 503:1,3,8,12,14,23 504:4,10,11,18,22 505:6,14 546:24 548:23 568:11 569:6,14,17

**investigating** 377:4 488:12 665:14

**investigation** 364:21 366:1 367:7 374:1,23 378:4 395:2 396:1,7,12 397:2 399:7 411:17 413:10,16,20 414:22 415:19 416:14 420:1,7 421:24 423:8 424:13,18 427:12 428:7,18 434:24 436:9 437:20 442:23 444:5 475:15 476:5 478:10 480:7 481:6 488:17 514:16 516:2,17 517:2,8 528:4 530:2,12,23 531:17 532:5 534:6 542:23 551:18 569:18 573:4 581:12 633:4,7 637:19 648:4 649:2 653:7 658:3 666:23 674:13 676:20 678:6 682:4 686:20

**investigations** 364:3,4,10,13,15,16,17,23 367:3 369:19 370:6 371:14 379:7 404:21 415:15 416:11 419:24 420:4 428:5 443:17,19,23 444:1,3,10,13,18 445:8 452:9 467:16 471:14 485:24 486:8 494:22 499:10 513:23 686:1

**investigative** 375:7,17 380:1,5,8,12,16 390:18,20 400:2,5,11,17,19 401:5,10 418:14,20,21 419:20,22 421:3 429:6,23 430:16 431:1,18 432:3,18 435:3,5,23 436:4,12 439:7,8,23 440:19,21 441:7,17 442:8,21 460:1 478:21 484:10 485:13,18,19,23 486:10,14 491:4 492:14 494:13 498:10,23 499:4,6 503:2,13 505:13,22 506:13 507:4,11,22 508:14 511:10 512:17 513:4 515:7 516:3,12 518:19 519:4,16,22 520:1,3,18 522:3,7,15,24 524:6 527:24 528:16 529:4 531:10 532:15 537:10 545:13,20,24 546:23 556:21 559:10 562:10 563:18 568:9,11,19,24 569:5,13,17,23 582:11,13,21 583:13,14 593:3 595:8 596:14,18,20 597:5,9,20 598:19 599:15 601:13,17,21 602:9,22 603:5,12 604:5,18,19 612:7 629:22 630:2,6 631:8,10 633:19,20 634:20,22 639:11 641:8,15,18,24 642:1,8,11,16,18 643:4 651:13,22 652:2 653:18 654:4

655:8,13 658:1,2 660:15 662:17 663:5 673:10 674:3 675:5 686:19

**investigator** 429:17 656:17

**investigator's** 544:11

**investigators** 633:9,12 660:18 662:1,3

**invoice** 362:13

**involved** 364:19 368:10,18,21 371:20 382:15 389:13,19 411:16 501:15 605:21

**involvement** 673:20

**involves** 581:10 653:5 665:8

**involving** 365:3,16

**IR** 614:11 626:23 628:16 633:10 671:21

**irrelevant** 470:17

**irrespective** 470:6 565:16

**Isabella** 566:13

**isolated** 559:13

**ISP** 692:19 693:20

**issuance** 482:18

**issue** 418:8 419:16 449:3 458:24 650:20

**issued** 361:10 449:23 450:12 452:11 481:7 482:9,13,14 483:13 500:6 604:16 605:1 617:11 618:12

**issues** 418:7 436:14 581:3

**issuing** 604:14

**item** 394:12 396:20 397:20 398:13 399:24 400:20 405:22 461:8 478:18

**items** 361:1 393:13,17 408:1 409:2,6 410:21 462:4 502:13 503:10 504:9 505:8 544:12 603:14 695:11

**IUCR** 529:9,12

**J**

**Jackson** 613:19,22 615:12 617:13 621:14,15 626:6

**Jackson's** 614:18 615:18 626:23

**jail** 588:5,6,7 690:6

**James** 632:21 633:1 648:12

**Janice** 567:20

**January** 466:21

**jar** 616:4

**Jerry** 614:1

**job** 544:11

**jog** 555:16

**John** 399:15

**Johnson** 626:5,8 632:23 634:3 636:6,8,18 645:2,4 649:21 653:7 677:6

**Johnson's** 640:18 648:18

**joint** 366:14,17,19 367:3 370:5 443:16

**Jones** 420:7,8,10,11 421:4,7,21,22 422:1,4,6,23 426:22 447:5,18 459:21 467:13 476:11

**Jose** 647:24 651:9 652:9 678:14,21

**judge** 447:20 448:8 455:19 588:21 698:17 699:7,9

**judicial** 449:21

**July** 633:11 665:12,21,22 666:6,14

**jump** 509:5

**jumping** 648:11

**June** 633:3 671:16

**jury** 588:15 690:11 700:3,23 701:1

**Jury's** 700:15

**K**

**K-9** 696:21

**Kathleen** 397:21

**Kazaglis** 530:13,16

**keeping** 444:12,17 472:6 482:22

**Kevin** 673:12 674:8,12 675:3

**Key** 660:24 661:3,9,12,19 662:1

**kicked** 582:16 584:23 585:5 587:5,18

**kidding** 622:6

**kids** 590:4,9,13,14

THOMAS TIDERINGTON, 10/06/2022

**Kim** 570:18 572:10 575:5 577:3 579:18 581:8,12 583:5 590:24 652:21 653:1

**Kim's** 577:15

**Kimberly** 573:12 574:2,9

**kind** 360:20 367:2 368:11 376:11 377:17 383:3 384:5 385:21 405:18 477:24 571:1 572:21 575:20 593:13,21,22 603:16 632:8 675:11 688:16

**Kluppelberg** 384:10

**knew** 456:9 472:2 516:11 607:6 659:20 661:2

**knowing** 683:12

**knowledge** 409:14 500:16

---

**L**

**L.A.** 444:19

**lab** 620:5 695:2

**lack** 537:14

**lady** 656:13

**Lamon** 530:15

**Lane** 632:23

**language** 451:23 453:8,22,23,24 454:7,11 456:13

**large** 552:14

**larger** 501:5,7,16 541:4 550:2 585:23 643:17 644:5

**late** 466:22 622:7 632:8 660:5 696:11

**Lauderdale** 364:1 365:16 366:14, 20 369:7,23 370:7,10 372:6 373:19 376:8 377:3 378:12 379:2 381:11, 16,20 443:12 500:22

**Lauderdale's** 500:8

**laundering** 364:20

**laundry** 575:1

**Laverty** 421:23

**law** 418:24 476:7 511:19 689:20

**lawsuit** 451:24 452:2

**lawyer** 590:1 618:24

**lawyer's** 619:6

**lawyers** 456:16

**lead** 406:15 655:17

**leader** 444:20

**leads** 528:4 531:10 654:24

**learn** 447:4,6,12

**learned** 415:18 416:6,10 423:7 427:11 428:17 434:24 436:9 442:22 467:16 501:14 656:21

**learning** 522:9,19

**lease** 655:9,14,24 656:5,20

**leased** 656:4

**leaving** 599:10

**led** 633:7 648:4 649:2 678:14

**left** 435:2 590:5 643:20 655:15 672:22 677:24 681:8,12 686:5 690:4

**legal** 372:7,10 424:15 432:7

**legible** 558:11

**lengthy** 512:11 679:8

**lesser** 423:14

**letter** 435:19

**likewise** 688:4

**lines** 385:8 412:19 495:15 548:22 574:4

**lineup** 420:14 530:19 667:17 669:8,13,17 670:11 673:2,5

**lineups** 672:8

**Linox** 613:18,22 615:12 621:15

**list** 361:2 391:10 410:21 424:22 426:19 427:5 428:12 435:23 523:11,16 541:2 545:9,23 547:5 575:10

**listed** 393:13 405:20,22 407:20 408:15 409:2 424:24 429:19 436:3 446:13,16,21 486:12 504:4,17 535:6 567:3 568:20 598:11 629:8, 15 631:17 656:5 677:7

**listening** 369:19

**listing** 408:4

**lists** 429:4

**litigation** 447:10,13 449:24 459:4

**living** 653:9

**locate** 501:21 535:8

**located** 462:3 524:6 535:7

**locating** 531:14

**location** 374:11 478:21

**lock** 689:21

**locked** 690:8

**lockup** 691:11

**lodged** 452:9 530:22 551:4,13

**lodging** 530:14

**logical** 533:14 542:21 551:14 557:12

**long** 383:13 478:1 668:12 691:18

**long-term** 364:13

**longer** 383:23 473:13 677:20

**longer-term** 364:22

**looked** 401:22 402:2 408:13 490:23 503:10,17 504:8 539:24 601:20 602:21 604:10 615:3 634:23 656:19 670:4 684:11 698:10

**Los** 444:15,16

**lost** 401:7 457:14 606:12 611:5

**lot** 370:20 401:16 478:5 524:22 538:16

**lots** 385:6,7

**Lou** 463:2,3

**Loughran** 397:21 398:3

**lucky** 636:9

**lunch** 473:1,6,7,17 509:12

**lying** 574:24

---

**M**

**made** 367:22 368:5 377:22 470:16 483:19 506:7 507:10,21 516:15 530:20 531:11 535:16 608:13 609:3 675:12,21 683:16

**Mafia** 365:17

**Mahomes** 614:8

**main** 415:24 416:15 419:3

**maintain** 370:9,13 442:18 443:4 445:7 685:5

THOMAS TIDERINGTON, 10/06/2022

**maintained** 374:3 378:5,7 443:21 491:24 500:20 613:9 685:10

**maintaining** 418:10 505:13

**maintenance** 444:17

**majority** 429:15 605:7 612:24

**make** 366:9 367:4 375:4,8 408:3 469:18,21 470:1,11 473:6 475:21 478:20 482:1 502:18 506:12,23 507:3 508:13 532:8 541:3,4 543:22 549:23 550:11 561:18 585:10,23 586:12 591:8,18 608:10,21 609:22 610:12,18 611:15 619:22 631:23 632:2 643:16 644:3,4 657:23 666:18 689:24

**make-up** 379:13

**makes** 434:2 552:4 563:8

**making** 392:9 429:21 430:7 431:18 464:24 465:21 466:1 557:11 594:15 640:13 672:22

**males** 564:21

**man** 420:16 661:4 665:11,24

**mandate** 478:3 487:17

**mandated** 497:16

**manual** 445:4 483:14

**March** 462:20

**Maribeth** 468:7 606:21

**marijuana** 699:4

**mark** 641:7 680:15

**marked** 403:23 462:20 568:24 641:7 680:17

**Mary** 590:12

**master** 522:16

**matched** 597:9

**matches** 645:22

**material** 361:2 408:10,22 409:23 446:18 452:8,14 456:24 461:16 478:21

**materials** 361:2,5,8 363:14 391:10,17 392:20 393:10,19 408:8 409:2 410:11 441:4 445:14 460:1 461:5,14 481:4 536:3,4 593:3 603:12 612:23,24 640:19 656:19 658:9 659:9 660:8,13,14

**Mathis** 572:10 573:12 574:2,6,9, 16,20 577:12,20 579:18 581:8,13,

19 582:5,15 583:6,17 584:22 585:4 587:4,17 590:24 591:17 592:3 652:22 653:1

**Mathis's** 574:10 582:24 583:9 589:7

**Matisck** 590:7

**matter** 421:4 464:23 490:16 506:7

**matters** 567:1

**mattress** 689:23

**MC1** 626:19

**Mcgrath** 697:12

**ME's** 589:18

**meaning** 499:7 523:3 533:15 588:3 593:13 691:3

**means** 398:24 436:2,7 440:10 448:17 530:1 532:3 551:2 625:10, 11 682:10,15

**meant** 366:16 383:4 385:11 397:16 405:14 436:20,21 438:22 544:23 596:3 602:5 607:4 613:15 647:14

**meet** 359:16 588:14

**meeting** 401:7 592:4

**Megan** 697:10

**Mejia** 414:11 678:14 680:5 681:1, 9,10,16 695:4,24

**Mejia's** 683:24 695:10

**Melendez** 647:24 651:9 652:9,12 665:2

**member** 456:18 569:9 587:22

**members** 458:2

**memoranda** 521:20

**memorandum** 502:8 521:15

**memorialization** 589:6

**memorialize** 389:15

**memorialized** 475:16,17,19 578:5 580:9 687:16 688:15

**memorializes** 587:21

**memorializing** 574:1 577:22

**memory** 395:15,19,23 398:9,19 399:4 407:15 415:4 483:8 540:5,10 555:16 558:1 561:21 579:3,10 581:5 594:4,8 616:4 647:14 661:14 667:1 668:13 692:24 694:24

**memos** 405:17 424:15 477:1 496:9,11,21 497:17 498:10

**mention** 383:11 543:18

**mentioned** 360:11 382:9 410:23 445:19 484:20 489:7 598:24 698:4

**meritorious** 382:4

**message** 360:4 383:16 384:6

**met** 368:23

**methodology** 403:1,5 404:15 527:3

**methods** 369:17

**middle** 457:13 623:3

**midway** 427:6 487:1

**Miguel** 665:11

**Mike** 387:5,13 388:4,10 460:14

**Milton** 399:8

**mind** 393:21 395:17 419:10 430:2 572:20 580:22

**mine** 451:20

**minor** 370:22

**minute** 555:15 572:21 648:8

**minutes** 422:13 473:13 497:3 509:12 567:15,16 650:1 677:23 686:4

**mischaracterizes** 519:8 608:19 682:21 684:4

**mislead** 451:8,15 464:15 465:5

**misleading** 420:13 465:15 466:3

**misrepresenting** 469:14

**missed** 491:7 535:20

**missing** 426:4 427:22,23 429:2 432:2 435:3,22 441:14,18 442:9 498:17 601:15 603:10 605:6 614:5 632:1 634:4 640:20 643:7

**Misstates** 457:4 558:14

**mistake** 674:17 675:13,21

**mistaken** 442:5

**mistakenly** 451:4

**mistreated** 414:8,13

**misunderstanding** 526:13

**Mitchell** 632:23

THOMAS TIDERINGTON, 10/06/2022

**model** 445:19

**mom** 590:9

**mom's** 590:6

**moment** 579:14

**money** 364:20 459:7

**monitoring** 482:24

**monitoring/auditing** 481:18
 482:3

**month** 423:20 512:8 695:3

**months** 388:3 698:12

**morning** 358:10,11 359:5,21
 361:20,22 573:18 591:16

**Morris** 671:15 673:4,23 675:7,24
 676:3,4,19,23,24

**Morris's** 673:6,11

**mother** 572:2 581:13 590:2

**mother's** 590:5

**motion** 452:15 621:9,11,22 622:5,
 11 623:4,8,16

**mounting** 455:9

**mouth** 433:7,12

**move** 478:11 481:16 650:17

**moved** 374:9

**Moving** 398:12

**multiple** 418:7 463:23 480:6
 569:13 596:15,16 631:5,6 642:2,
 10,12 671:22 672:2,4

**mumbled** 662:24

**murder** 442:20 443:22 444:20
 530:14 613:24 616:8 641:23 644:8
 653:11

**murder/0110** 529:10

**N**

**N-WATA** 632:23

**naive** 683:18

**name's** 625:8

**named** 614:7 633:8 634:2 645:12
 646:17 649:2 653:6 665:11

**names** 376:12,14 380:14 512:11
 543:13 696:24

**narrative** 550:19 643:23,24

**national** 445:4

**nature** 674:4

**Navarro** 395:12,18

**Navarro's** 395:24

**necessarily** 367:11 409:13 434:15
 543:19 647:10

**needed** 375:3 488:1 556:10
 566:10

**negative** 531:18

**negligence** 593:16 594:14

**neighbor** 575:1

**neighborhood** 633:13

**night** 359:18,21 360:14 698:9

**nineteen** 696:12

**nonreportable** 464:3

**normal** 603:19 688:1 689:13

**North** 595:8,11,19 596:4,5

**notation** 543:24

**note** 385:5 387:23 437:15 487:17
 488:1,19 490:10 518:1 526:9,20
 543:2 544:4,6,19 546:1,19 549:2
 550:3,7,18 552:6 575:24 582:23
 615:1 645:15,24 646:23 647:9
 649:1 653:4,23,24 654:16,18
 656:19 673:10,20 674:23 676:6

**note-taking** 370:18

**noted** 390:1 414:10 429:23 462:2
 576:17 579:18

**notes** 370:20 371:8,15,17,20,22
 372:1,15,17,23,24 373:15 375:19
 376:2,4 378:13,19 423:18,21
 424:11,13,19 429:17 430:12,14,24
 431:3,8 432:5,8,18,24 436:16
 437:1,5,22 452:2 487:3,8,9 490:17
 491:2,22 492:17 493:1,20 494:14,
 20,21,23,24 495:11,17 512:6,9,10,
 14,22,23 513:13,14 516:1,5,10,19
 517:1,7,10,16,21,22 520:5,20
 521:5,13,19,22 523:4,9,18,19
 526:24 532:9,15,23 533:2,6,13,16,
 19,20 534:4,17,21 535:11,14
 536:18 537:5,10,11,12,15 538:1
 541:14 543:9,10,17 544:13,17,21,
 23 545:22 547:10,12,16 548:4,24
 554:4,12,22 555:2 556:17,18,20,24
 557:3,8,9,13,16,17 558:3,10 559:4,

5,8 562:9,11 580:19 582:22 592:3
 603:21 657:2 686:6 687:5,8 688:3

**notice** 569:12 584:6,10 618:10
 620:24 662:4 680:3

**noticed** 515:13 618:6

**noting** 655:14

**notion** 423:4

**November** 450:12

**number** 363:2 376:16 396:20
 397:20 398:13 400:1,22 401:15,19
 406:3 416:15 419:5 439:16 478:18
 486:4 489:14 525:1,14,16 526:1
 528:18 529:18 537:16 538:9
 541:24 545:21 552:11,12,21
 553:13 568:9,14 570:14,23 572:12
 575:9 578:2 590:7,8 597:12 605:15
 615:20 616:11 620:17,20 623:10
 624:8,12 625:13 629:15 636:9
 643:6 644:19 645:21 648:14
 676:11,20 680:6 687:2 694:7

**numbers** 376:18 385:7 427:5
 428:13 429:4 441:24 486:11
 523:12,15 524:23 525:2,4 534:7
 543:12 553:15 597:18 628:24
 629:3,7

**numeral** 552:13,17

**Nyree** 653:7

**O**

**O'MALLEY** 396:19

**oath** 358:22

**Object** 493:5

**objection** 370:23 372:2 373:1
 387:9 391:5 394:4 395:3 396:13
 397:7 402:10 409:9 412:3 413:1,11
 414:18 419:11 420:22 424:5
 425:11 426:9 427:18 430:17
 432:14 433:2 437:12 440:4 441:10,
 19 446:8 454:2 456:5 457:3 459:10
 465:22 467:17 468:4,10 471:15
 472:10 477:21 481:10 487:19
 488:23 490:7,11 491:12 493:23
 494:16 497:19,20 498:13 506:4
 507:5,23 508:22 510:14 511:15
 513:15 514:20 518:21 519:7
 520:11 524:9,14 526:7 533:23
 538:2 543:4 544:7 547:13 555:11
 557:4 558:13 562:16 565:19
 578:16,21 593:18 605:17 608:18
 612:8,14 638:16 639:7,14 646:19

THOMAS TIDERINGTON, 10/06/2022

656:1 659:2 677:11 682:20 684:3 685:16 689:5

**objections** 434:5

**observation** 535:17 594:15 666:8, 12

**observed** 420:4

**obtain** 365:24 459:7 479:4

**obtained** 391:2

**obtaining** 455:10 458:13

**obvious** 610:4

**OCB** 364:5,11,22 379:6

**occurred** 371:7 556:14 583:1,22 690:10,11

**occurring** 489:15 494:7

**October** 546:6

**offender** 550:13,15 551:3,11,18, 21 670:5

**offense** 529:8

**offer** 415:2 588:22

**offered** 588:17

**offering** 491:18 657:10

**offhand** 438:13

**office** 377:20 388:24 389:2 390:23 391:3 392:5 394:23 396:7,23 397:15 441:15,18 443:18 531:1 542:6 585:5 587:23 599:3 600:17 607:11 610:9,15 614:17 623:21 627:13 644:21 659:18 660:16 685:3

**officer** 369:16 371:5,9 380:22 421:23 423:19 424:20 437:23 438:2 475:22 478:9 483:18 484:21 485:9 488:18,22 490:3 492:7 500:2 511:20 517:15 541:13 543:16 562:10 594:21 647:2 657:13

**officers** 376:7 409:16 411:15 413:23 417:17 418:9,21 421:3,7 427:10 438:3 476:7 478:3,6 485:1, 9 487:7 489:6,10 490:17 491:19,21 492:16,23 494:13 496:10,20 497:17 498:9 511:7 512:5 553:1 556:4 559:2,3 593:14 594:13 661:9,13,20 689:20 696:16,19 697:1,5

**official** 373:24 510:24 511:21,24 516:6 518:9,20 521:6,8 535:15 536:19

**oftentimes** 368:17 535:21 538:19 690:3

**OIG** 493:10,15,18,19 494:5

**older** 382:16

**one-day** 364:14 365:10

**OO** 620:18

**open** 384:3 390:7 550:21

**operate** 492:11

**operated** 522:17

**operating** 373:20 483:13 639:18

**operative** 369:14

**opine** 560:19 605:4 699:24

**opinion** 411:14,18 415:12 419:5 426:8 428:21 433:21 434:22 443:20 450:12 451:18 453:2 459:23 460:3,4 474:9 488:4 491:18 536:22 544:3 559:16 565:13,23 566:9 593:17 612:19,20 632:18 689:1

**opinions** 409:3 410:16 449:2,23 460:15 536:5 590:22 613:5 615:15 701:10

**opportunity** 403:21 455:22 539:16 560:23

**order** 409:20 452:12,17 455:4 457:22 458:9 460:7 470:21 472:9, 16 477:2 479:15 482:8 497:22 544:12 585:13

**orderly** 685:10

**orders** 481:19 482:5 485:14 487:7 496:10,19 498:9 553:2

**organized** 364:7 365:17 366:13 685:23

**orientate** 571:1 593:22

**original** 377:9,10,13,14,24 378:4,6 638:3,7,9,10

**originals** 378:9

**Oscar** 662:13 665:24

**outlined** 405:20

**overturn** 459:6

**overturned** 458:6

---

**P**

---

**p.m.** 473:24 474:2,4 509:19,21

567:19,24 568:2 577:4 606:16,18, 20 651:1,3,5 686:10,12,14 702:14, 17

**pad** 372:10

**pads** 372:8 424:15 432:7

**paged** 577:3

**pages** 405:4,5 412:7 468:13,18 497:3,4,6 527:7,11 539:1,2 540:8 557:23 561:9,15,16 563:8,10 570:24 571:4 576:23 578:18,19 584:16,19 601:24 605:9,15,23 617:3 622:4 631:16 637:4 639:19 662:6 668:12 669:5 671:7 675:11, 16 693:23

**pagination** 451:21

**Palmer** 447:9,12,24 448:3,15 449:5,24 458:24 459:4,21 467:13 476:11

**pan** 552:14

**Pantoja's** 652:9

**paper** 372:13 437:6 560:19

**papers** 699:1

**paragraph** 447:18 452:3 475:9 495:7,10 496:8 502:20 504:22 518:1,8 530:9 533:18 535:24 553:23 559:18 572:15 575:14 577:1 578:11 588:11 596:10 598:12 604:1 615:16 629:8 647:15 649:6

**paragraphs** 531:7 615:17 637:20

**parallel** 418:10 439:18 474:14 475:1 522:18 642:6

**parallels** 642:17

**Pardon** 392:8

**part** 365:2 370:2 372:12 379:10,11, 13 403:21 418:18 449:21 477:11 478:15 479:6 491:8 522:19,20 544:13 545:23 547:20 580:22 619:1 637:20 642:5 660:18 665:3 672:16 678:12 681:18,22

**partial** 499:17

**participate** 444:5

**parties** 391:1,23 392:4 682:2 685:4

**parts** 395:21 556:3

**party** 458:12

**passed** 590:12

**passenger** 665:20

**pasted** 448:9,20

**patrol** 371:4 379:23

**pattern** 594:23

**patterned** 455:3

**Paul** 634:2

**PD** 417:21 472:5 522:17 532:6 533:22 559:20 580:10 582:17 584:5,8 590:21 591:9 592:6 596:19,21 602:9 605:14 607:24 608:3,16 609:17 612:4,7 613:2,8, 11 615:21 628:21 629:5 630:2,18 631:9,11 632:5 639:12 651:15,20, 22 652:17,18 654:18 655:13 656:22 661:7 662:5 667:20 668:2 671:8 682:18,24 683:4,9,10

**PDF** 462:22 466:11 549:2,13 570:14,16 588:11 589:13 622:19 637:4 641:10 645:6 649:10 654:12 660:22 670:2 674:23

**pending** 452:14 640:6

**people** 389:6,9 633:3,5 637:15 640:12 642:2 645:17 646:2 690:4

**people's** 553:2 680:19 681:14

**Peptenar** 549:19 550:14 551:19

**percent** 495:17,22 496:1,2,3 498:23 525:13 549:17 556:5

**percentage** 584:7,12,14

**perfect** 473:19 552:4

**performance** 511:20

**performed** 672:5

**period** 470:7 486:1 500:7 507:19 513:24 596:6 619:18 675:4 679:8 691:9,10,18 696:3

**permanent** 390:17,21 407:9,12, 17,19 418:13 486:8 510:3,7,11 511:11 513:22 514:3,14 515:3,12, 15 518:2 519:15,21 520:10,18 521:24 522:8 651:14 652:3 667:17 670:9,14

**permissible** 689:2

**person** 389:5,12 505:10 570:4 624:24 644:7 649:15 695:9

**person's** 379:18

**personal** 491:23 492:17,24 493:21 494:14 511:8

**personally** 601:23 602:8 603:6

**perspective** 489:9 561:19 619:7

**pertains** 622:13

**phone** 534:7 537:16 538:9 543:12 552:10,12,21 590:8

**photo** 413:8 420:14 665:16 671:22 672:4,14 680:5 681:7

**photocopied** 375:20

**photocopies** 548:21

**photograph** 633:10 680:20 681:9, 13,17 682:16 684:1

**photographs** 413:21,23 414:3,5 682:5,6,8 684:22,23 685:2,9 686:17

**photography** 627:23

**photos** 414:12 633:14 671:21,24 672:7,13 678:5,11,13 679:20 681:3

**phrase** 397:5 405:9 407:8 438:22 510:10 518:9,15 605:2

**phrases** 470:11

**physical** 691:21 695:13,17,21

**physically** 679:12

**pick** 426:1 664:20 665:3 670:12

**picked** 660:24 661:20 664:24 665:2

**picking** 663:11

**picture** 514:16

**pictures** 415:4

**piece** 437:6 560:19

**pipes** 699:1

**pizza** 552:14

**place** 370:14 374:6 469:3,5,7,16 476:10 487:12 509:6 516:3 619:21

**plaintiff** 458:3 463:8 468:21

**plaintiff's** 447:8 452:15 463:2,9 466:2 469:2 486:22 607:21 664:10 677:9

**plaintiffs** 455:21 457:1,14,18

**plaintiffs'** 456:15 458:16 459:3 465:14 607:22

**plan** 564:2

**planning** 677:21

**played** 399:6

**plea** 588:23

**plead** 588:19

**plural** 496:19

**Plymouth** 500:14,21

**point** 359:11 367:4 380:3,13,15 381:10,18 386:8 408:12 412:7 416:15,17 418:2,4 420:17 429:21 430:3,6 431:6,8,17 432:23 442:5 449:1 461:12 470:15,16 474:13,17 475:10 481:17,23 482:1 495:6 498:17 502:18 504:12 505:5 508:10,11,15 516:15 526:12 532:8 533:9,17 534:6 542:18 549:9 564:1 567:9 576:17 578:1 591:13,24 604:13 626:1 632:7,17 641:19 652:6 657:23 659:20 668:10 683:21,24 692:15

**pointed** 439:16 489:13

**pointing** 435:17 508:7

**points** 392:14 419:3,9,15

**Polaroid** 413:8,21 415:4 678:5,11, 13 679:20 680:4 681:17 682:16 684:1 686:16

**Polaroids** 412:16,17,24

**police** 360:23 366:20 369:7,23 370:10 373:7 376:6,9,20 377:3 378:1,2,12,13,18 379:2,20 381:7, 10,11,15,20 410:18,23 411:14,15, 19,24 412:23 413:9 414:13 417:15 418:19 423:5,20 424:9,19 427:10 428:9,10 435:10 439:11,17 440:3 441:1 442:17 443:3,8,14 445:4,6 452:6 459:20 463:7 467:12 478:4 479:3 483:18,22 484:2 485:8 488:17,22 489:16,18 490:3 491:20 492:10,16,21 494:13 499:24 500:1, 8,15,24 501:10,14,21 502:9 503:11 506:20 512:7 516:6 521:10,23 528:22 530:5 532:17,21,24 533:14, 20 534:12,14,21 535:12 536:19 537:13,17,20,23 538:6,8,24 539:10 541:17 543:24 544:5 551:2 553:1,6 555:6 559:22 562:13,21 564:11,17, 22 565:6,15,24 578:8 579:2,5 580:2,9,24 581:1 593:14 594:13 595:3,14 596:22 598:2 601:17 603:19 607:8,15,18,23 608:3,16 609:3,16 611:19 612:2 613:13

619:11,19 624:22 625:3 626:16 627:4,12,18,23 628:3,8,11,16,21 629:5 630:11,12,19,23 631:12 632:4 638:2,22 639:5 646:4 647:3, 8 655:6 656:10 660:12,14 661:9, 11,13,17,20 672:18 679:1,3 681:18 687:13,21 688:2 691:16,23 692:15, 20,22 694:14 696:15,16,19 697:1,5 700:5 701:6,11

**police/ambulance** 575:2

**policies** 415:13 417:16,17,23 423:5 445:19 466:24 474:20 476:19,24 477:3,17 478:2,3,7,8 484:23 485:6,10 491:20 501:3

**policing** 501:2

**policy** 378:21 417:19 418:1 435:11 467:6,15 471:11,22 472:3 479:1 482:23 485:2 487:22 489:4,9,17 490:4,14 492:8 493:3 496:5 505:16 506:19,21 515:23 532:16,19,22 533:6 534:11 558:7 570:2,9 691:16

**pond** 458:19

**portion** 421:9,24 457:10 510:2,12 536:22 580:7 591:1

**portions** 636:24

**position** 382:3 534:13 556:9 566:9 657:12 690:14

**possibilities** 558:22 560:9

**possibility** 506:1 600:22

**possibly** 422:1

**potential** 582:22 592:4 653:24 654:19 655:1,17,23 657:3 672:3

**potentially** 523:5 528:7 537:2

**practical** 490:16 506:7

**practice** 442:18 443:3 445:4,7 452:7 533:11

**practices** 410:18 415:14 423:6 603:19 687:14,21 688:2,3 700:5 701:7,11

**preceding** 576:4

**precinct** 501:9 595:13,18,21 596:3

**precincts** 501:8

**precise** 540:11 560:22 694:6

**precisely** 517:2 521:9 523:17 603:16

**precluded** 606:4,8

**prefer** 383:24 667:5

**preliminary** 452:16,20 454:13 455:2 457:19

**premise** 434:2 618:22

**preparation** 362:16 408:9

**prepare** 359:3 369:16,22 370:6,8 376:7,13 390:14 408:16 409:20

**prepared** 369:21 378:3 384:11 386:16 387:19 388:22 389:2 433:8 446:7 459:9 609:12 621:13 641:24 675:14

**preparing** 363:7 400:12 456:3 458:23

**preserve** 452:13 455:5

**pretty** 388:12 426:15 470:14,20 536:14 538:22 604:8

**prevailing** 698:15

**previous** 489:12 563:4 638:20

**previously** 358:6 654:1,19 655:1

**PRF** 461:10

**primarily** 372:8 443:7

**prior** 445:21 687:9

**prisoner** 690:13 691:12,17

**prisoners** 691:8

**pristine** 685:10

**private** 599:5

**privileged** 608:8

**probable** 644:8

**problem** 418:18 436:11 474:10,21 476:21 493:9,18,19 505:1 547:21 642:5 688:6,8,12,15,16

**problematic** 688:5,7,10

**problems** 436:5 439:19 478:16 479:11 489:12 492:4 493:11,13 494:6 688:9

**procedure** 483:14

**procedures** 452:18 478:19 484:23 672:5,15

**proceed** 358:19

**proceeded** 611:23

**proceedings** 566:15 567:22 640:22 702:16

**process** 382:5 403:18 440:16 483:20 492:22 500:17 506:11 570:10

**processed** 480:13,17

**produce** 687:4 688:4

**produced** 486:9 513:3 533:21 542:15 544:6 552:1 562:9 584:8 594:17 596:19 597:18 629:5 631:9 635:24 659:3 682:11,17 684:1,9 687:12,17 688:14

**product** 607:9 610:9,14 611:21 639:20 658:6 671:10

**products** 698:24 699:5,10,12

**professional** 542:22

**program** 489:19 492:5

**progress** 484:9 487:3 488:3 521:14 554:14,22,23 573:11 574:14 603:21

**progressing** 488:17

**promoted** 381:23

**promotion** 382:4

**proper** 419:18 660:17

**properly** 418:20

**property** 379:8 487:11 491:23 492:17 493:21 494:15

**propose** 425:9

**proposition** 584:22 587:3,16

**prosecutor** 367:17 657:15

**prosecutors** 368:15 440:17 441:9

**prostitution-related** 365:13

**proved** 531:18

**provide** 366:23 427:3 435:13 490:17 540:12 584:21 595:3 698:1

**provided** 384:17 388:7 389:17,24 390:4,22 391:10,12,18 400:5 401:11 406:2,23 416:12 446:18 447:7,15 449:22 460:14 461:4,16, 17 462:14 499:16 513:22 515:7 580:20 590:23 594:19 596:13 597:4 599:15 600:9 605:11 610:11 611:12 664:3 697:24

**Public** 390:15,16,19 405:23 441:14,18 442:11 523:21,22,23 524:13 526:6 527:1 535:8,21 537:6 542:5,15 565:17 566:2,8 581:24 597:19 599:2,18 600:17 601:22

THOMAS TIDERINGTON, 10/06/2022

602:24 607:10 610:9,14 613:12,15 614:17 617:12 623:21 644:21 648:18 653:20 657:5 662:18 663:5 668:4 670:1,19,23 671:4 685:3 686:21

**puddle** 488:15

**pull** 385:20 386:2 390:6 395:14 398:10,18 407:15,16 425:5 490:14 508:2 585:24 634:13,17 643:12 648:24 673:12 674:22 680:9 693:3

**pulled** 561:9 671:19 682:2

**punch** 576:9

**purpose** 408:4 451:14 672:19

**purposes** 559:16 596:11 597:15 598:17 599:16 608:6,10 651:23 677:21

**pursue** 367:23

**pursued** 581:19 634:1 653:11

**put** 376:2 377:5 392:22 442:16 476:10 497:10 505:22 509:23 559:13 585:19 592:22 691:11

**putting** 433:6,11 701:4

---

**Q**

---

**quantities** 369:1

**quarrel** 647:7,11

**quarreling** 690:19

**query** 479:14

**question** 380:9 387:15 391:19 392:3 396:11 402:15 411:2 412:12 416:20 418:8 421:19 425:17,20 427:22 428:4 433:16 434:2,11,19 439:22 446:4 453:22 462:1,13 464:2 466:15 467:3,22 468:1,5,7, 12 470:19,24 471:21 473:4 475:21 478:1 483:1,11 488:9 489:22,23 490:1,2 491:9 494:10 497:23 498:4 508:16 516:8,9 522:12 536:16 571:10,18 578:20 580:14,22 594:10 606:22 610:5,17,19,22 611:6 614:24 635:6,9,14,22 638:1, 20 640:6,11,16 642:13 647:2 656:24 658:14 659:14 662:23 663:18,19,21 664:7 667:3 676:16 689:10 692:4,8 694:12 698:6 699:24 702:4

**questioning** 516:16 646:22

**questions** 361:16 362:3 408:2 410:15 411:4,9 464:1 465:10 466:17 467:18 496:24 509:3,8 526:16 538:16 585:17 635:1 697:9, 11,16 699:18 701:17,19 702:2

**quick** 472:21 473:16 496:23

**quicker** 693:22

**quickly** 388:12 462:3 647:18

**quote** 513:9 518:5 532:23

**quotes** 543:13

---

**R**

---

**raids** 365:12

**Rainey** 673:4,5 674:1 675:9 676:1

**Rainey's** 671:13

**raising** 580:16

**Ralph** 614:8

**ran** 576:13

**randomly** 426:1

**range** 400:6 406:8 542:5

**rank** 380:23 381:14

**Razo** 670:5

**RDS** 531:8

**reached** 612:5

**read** 384:22 394:1,15,18 395:13, 20,21 396:18,21 411:2 415:21 419:4 448:3 449:2 453:1,17,22,23, 24 454:7 455:21 456:1 466:18 468:6,8,12 479:17,20 483:3,5 491:8,11 495:1,3 498:4 533:10 535:12 550:12 555:15 556:8 570:9 572:21 581:22 585:7,10,12,21 586:15 587:11 588:11 592:17 606:22 607:2 610:22 611:2,6,8 612:10,12 622:6 631:2 637:19 643:18,22 658:13,17 661:24 675:20 684:10 692:3

**reading** 454:22 480:10 515:17 594:3 698:16

**reads** 437:4 456:13

**ready** 422:10

**real** 465:2 496:22

**reality** 363:2

**realized** 675:2

**reask** 461:24

**reason** 395:16 404:15 410:4 413:24 477:7 488:2,14 489:11 492:3 515:9 516:23 538:7 563:22 589:17 600:19 613:4 625:8 672:13 679:15 682:19

**reasonable** 502:7 531:11 537:9 656:16 657:13 660:17 688:2 689:13

**reasons** 562:17

**recall** 375:22 376:22 378:17,20 382:16,21 383:21 386:3,10,17,21, 23 387:14 388:3,5 391:11 396:24 399:5,13,20 406:5 407:3 410:18, 20,24 411:3 412:18,20 462:16,17 463:4 481:13 493:10 505:17,18 517:20 526:4 561:24 569:20 571:22 572:1 607:20 610:4 618:18, 19 634:15,16 660:23 661:1,6,15 662:7 663:22 696:14,24 699:21

**recalled** 517:19

**recanvassing** 531:15

**receive** 593:10 658:23

**received** 363:18 405:21 485:23 486:18 597:7 625:2 691:23 698:12

**recently** 363:18 384:17

**reckless** 594:13

**recklessness** 593:16

**recognize** 680:19

**recollection** 362:21 396:5 436:23 442:3 479:22 555:23 572:18 573:2 637:22 638:3 649:1 665:4

**recommended** 445:2

**record** 358:2 360:19 407:7,18,21 419:17 422:17,21 444:12,16 464:21 465:18 468:8 469:14 472:5 473:24 474:4 479:19 482:22 483:5 491:10 495:3 509:17,21 510:12 526:10 561:4 567:19 568:2 606:14, 16,20 607:1 611:2,8 612:12 614:12 651:1,5 658:16 679:7 686:10,14 702:14

**records** 360:10 370:14,15 374:12 407:12 479:5,13 500:9,20 501:17 502:12 510:7 514:3 518:17 519:5, 21 520:9 522:21,22 570:4 627:17 685:24 697:20

**redacted** 584:9,13,17,19 586:7,9 600:8,10,13,15,16,20,23 601:3,4

THOMAS TIDERINGTON, 10/06/2022

605:9,15,20,24 607:5,15,19,23 608:3,16 609:4,17 610:8 611:19 612:4 613:3 616:15,19,20 617:4 637:1,4 638:2,14,15,22 639:4,19 662:6 671:7,9

**redaction** 600:4 611:20

**redactions** 599:23 610:13 651:15, 20 652:19

**reduced** 597:12

**refer** 403:11

**reference** 408:20 428:20 445:14 447:9 449:9,12 482:7 510:18 512:19 521:12,18,20 523:22 538:10 548:14 561:22 633:23 648:6 649:5,7,18 655:9 676:10

**referenced** 388:21 391:15,16 485:19 518:11,13 525:23 541:15 546:19 561:24 576:24 650:3 668:20

**references** 563:11

**referencing** 442:1 476:23,24 485:18 511:12 513:3 521:13,16 654:17 674:24

**referred** 368:8 439:3 442:19 510:18

**referring** 360:22 373:17 380:14 427:5 450:16 466:7 472:3 511:13 614:16 625:12 634:12 680:7

**refers** 510:19

**reflect** 465:18 533:15

**reflected** 472:2 503:11,20 602:13

**reflecting** 471:8

**refrain** 434:16

**refresh** 395:15,19 398:8,19 399:4, 22 407:15 415:3 540:5 555:23 558:1 561:21 572:17 579:2,10 581:4 647:13 649:1 667:1 684:9 692:24

**refreshed** 573:2

**refreshes** 637:21

**refreshing** 594:4,8 661:14 668:13 694:24

**refusing** 497:23

**regular** 372:10

**regularly** 593:4

**Reiter** 463:3,6 465:13 466:12

**rejected** 530:14

**related** 377:7 393:11 409:8 410:16 413:15 417:1 462:4 471:13 476:4,5 478:9 484:9 502:16 558:8 611:15 634:19

**relating** 439:14 645:1

**relation** 692:21

**relationships** 656:14

**relevance** 413:21

**relevant** 375:7 409:3,7 418:22 460:1 464:13 466:6 475:7,15 477:9,19 510:22 532:23 564:15 580:1,8,23 600:7,22 612:3 653:19 657:4 658:3 698:18 699:9,11,16

**relied** 585:3 602:12

**relief** 457:21

**rely** 392:14 453:18,20

**relying** 416:14 417:3 445:5 587:15

**remain** 372:22

**remanded** 455:13

**remedies** 474:9

**remedy** 474:21 476:20

**remember** 375:13 390:9 399:22 527:14 532:13 551:6 562:11 591:3 635:16 661:3 675:15 696:20

**remind** 358:16,21

**remove** 601:5

**repeat** 610:24

**repeatedly** 516:15

**rephrase** 498:6 692:5

**report** 360:13,16 361:10 362:4,16 373:7 376:20 377:21,22 378:2 381:3,6 384:21,22 385:2 386:4,12, 15,19,22 387:4,14,17,19,20,24 388:11,22 390:7,10 391:7 400:13, 24 403:12,22 406:7 408:5,9,17,20 409:8,13,21 410:6 412:2,13 415:2, 11,12 416:17,19 423:4,20 424:10, 23 426:7,18 427:7 433:9,20 435:23 438:17 442:7,15 446:7,17 447:10, 17 452:1 454:20 456:3,10 458:23 459:9,18 460:6,20 461:6 462:11 474:7,8 475:24 478:17 488:3 493:10,15,19 497:11 503:11 510:2, 13 512:11 514:13 518:3 522:1

524:21 525:23 528:24 529:22 531:6 532:17 533:1,15,18 534:12, 14,22 535:4,12 536:17 537:18,20, 23 538:6,8,24 539:4,10,11 540:8 541:17 542:20 543:3,24 544:5 549:14 551:16 552:7,24 553:7,16 554:14,22,23 555:6 556:11 558:8 559:13 560:14 561:10,13 562:5,8, 13,21 563:12 564:11,17,22 565:6, 7,15,24 566:11 567:12 568:21 572:4,7,8 573:11,15 574:11,14 575:16 576:12,19 578:5,8,15 579:7,19,23 580:7,24 581:1 582:4 583:8,11 584:22 585:10,15 587:4 588:9 589:18,20 592:1,23 593:1 594:3,5,8 601:12 607:9 609:13 613:18 615:2,20,22 629:9,21 630:16 632:14 634:6 637:6,10,12 638:3,5,7,9,11 643:9 644:17 645:7, 11,22 646:11,13,15,16 647:3,5,8, 13,17,22 648:2,8,22 651:7 653:2 654:14,24 655:6 656:10 660:8 662:11 663:2 669:2,4,7,15 670:3,4, 11 671:13 672:18,19 673:3 674:16 675:22 677:8 678:4 686:18 694:2, 15 699:23

**reported** 671:17 692:16,19 693:20

**reporter** 567:21 610:23 700:13

**reports** 360:23 369:16,21,22,24 370:1,10,14 375:19 376:3,6,11,14, 15,19,24 378:1,4,6,13,19 384:11 388:4,6 410:23 411:14,19 412:1 420:16 478:4 484:10 487:3 510:24 511:21 512:1,7 516:7 520:6,9,24 521:2,6,8,10,11,14,23,24 522:2,15 523:5 526:2 533:8,20 534:24 535:7,16 536:20 537:13 539:24 540:16 555:4,9 559:22,23 579:2,6 580:10 589:19 603:22 607:15,18, 23 608:3,16 609:4,16 611:19 612:3 628:16 630:23 632:4 638:2,14,22 639:5 667:8,13,18,24 668:3,6,21 670:14,18 673:19 679:3

**repository** 442:19 443:4,22 445:8

**represent** 362:2 525:19 532:2 545:12 548:3 682:1

**representations** 466:1,3

**representatives** 417:22

**represented** 400:20 610:13 639:19

**representing** 469:1 548:18 617:13 684:14

THOMAS TIDERINGTON, 10/06/2022

**represents** 589:5 685:20

**request** 499:23,24 531:21

**requested** 468:9 479:20 483:6 491:11 495:4 551:19 607:2 611:3,9 612:13 633:9 658:17 671:20

**requesting** 672:20

**requests** 671:24

**require** 417:17 488:19 489:8 663:16 677:13

**required** 418:1,24 452:20 489:15 502:11 530:19 559:9 658:4

**requirements** 378:17 471:12

**requiring** 489:10

**research** 445:23,24 446:6 631:20

**reserving** 702:7,9

**residence** 655:15

**resident** 546:15

**resolved** 698:7

**respect** 378:2,24 384:20 388:20 393:10,17 399:1,8 406:19 413:19 416:8 444:12,17 467:5,14 471:9,12 472:6,8,16 478:5 479:9 483:11,20 484:8 489:5 499:3 569:23 600:12 604:4 623:22 639:22 652:23 691:20

**respectfully** 434:7 531:21

**respective** 499:10

**respects** 452:22 501:9

**responders** 478:20

**responding** 423:21 499:23

**response** 479:2,9 480:13 481:7 604:20

**responsibilities** 379:22

**responsibility** 595:2 631:19

**responsible** 373:22 418:22 444:8 505:12 695:18

**responsive** 502:14

**rest** 358:14 479:8 555:24 563:21 644:1

**restraining** 452:12 455:4

**restroom** 689:22

**rests** 678:12

**result** 415:16 486:13

**resulted** 423:6

**results** 691:23 693:20 695:2,22

**resume** 509:13

**retain** 458:1

**retained** 382:14 698:6,24

**retention** 390:17,21 407:9,12,17, 20 418:13 452:18 486:9 510:4,7,11 512:16 513:22 514:3,14 515:4,13, 15 518:2,16 519:15,21 520:2,10,19 522:1,8,21 651:14 652:3 667:18 670:9,14 685:24

**reveal** 663:16 677:13

**revealed** 581:12 601:14 653:8

**reversed** 454:14 455:19

**reverting** 482:21

**review** 360:10,15 387:20 393:18 397:5,14 400:16 401:5,12 406:1,11 408:8 411:1 416:11 421:9 441:4,7 455:22 481:4 485:13,17 490:20 494:12 496:1,22 497:22 499:20 506:19 510:3 512:21 514:2 515:12 519:3 535:19 552:3 560:5 573:24 578:8 584:7 590:20 592:6 595:9 618:5 659:1,7,12 666:9,18 667:5 677:3 685:9

**reviewed** 361:3,6,9 386:15,20 388:14,16 390:12 391:4,17 392:20 393:10,15 401:21 404:22 406:16 408:23 428:4 439:8,23 440:21 448:12 459:4 462:18 492:14,15,20 497:10,15 513:5 518:2 536:3,4 555:21 560:10 604:15 605:14,22 615:14 631:16 640:18,23 662:14

**reviewing** 363:14 397:18 421:11 458:15 490:19 497:3 498:11 529:3 571:22 572:2 573:8 579:5 590:21 620:23 635:17 656:22 661:7 662:5 667:1,2 682:18

**revise** 447:20 448:7

**revisit** 447:20 448:7

**Reyes** 414:11 678:24 679:18 680:8 681:14 692:2,22 694:14 695:4,18, 23 701:13

**Reyes's** 682:6

**RFC-SOLACHE/REYES** 525:16 645:20

**rhyme** 404:15

**Richard** 398:13 399:2

**Richell** 614:7

**rights** 455:13 457:2 491:6,17 492:9

**Rivera** 363:19,22 384:9,17,22 386:1,10,24 388:15 495:22

**RO's** 644:7

**robust** 489:17

**Robyn** 453:14 527:10 693:9

**role** 366:7 368:6 369:6,14 394:20 395:24 399:6 619:18 700:15,22

**rolling** 699:1

**room** 374:8 434:13 588:15 688:22 689:4,17 690:2,4,6,16 691:2,10,19

**rooms** 685:24

**Rosa** 678:13,21

**Rosaura** 681:10

**Rosen** 361:19 362:1,6,9,10 371:16 372:9 373:8 387:16 391:14 392:18 393:4 394:10 395:10 396:17 397:12 402:16 410:1 412:9 413:6, 18 414:15,23 415:9 420:2 421:5 422:9,15,22 424:21 425:15 426:5, 17 428:1 430:22 431:12 432:22 433:4,8,13,19 434:4,10,20 438:1 440:11 441:16,23 446:15 450:5,9, 11,18,24 451:9,16,17 454:8 456:11 457:8 459:14,16 461:1 463:18,24 464:6,16,19 465:7,21 466:9 468:6, 17,23 469:11,15,20 470:5,14,18 471:4,10,18 472:7,13,22 473:12, 19,22 474:5 478:13 479:17,21 481:15 483:3,7 487:23 489:21 490:9 491:1 492:12 493:17 494:9 495:1,5,11,14 498:5,7,16 500:18 502:23 503:6 506:10 507:7,15 508:4,18 509:4,14,22 510:21 511:22 513:18 515:5 519:1,12 520:16 524:12,17 525:10 526:21, 22 527:10,20 528:13,19,21 534:16 540:23 541:21 544:1 545:4,18 546:11,13 547:18 553:11 554:2,3, 8,10 555:18 557:7 559:11 562:23 563:10,17,23 564:12 566:3,6,18,22 567:5 568:6 569:3,4 571:19,21 579:4 584:4 585:21 586:4,8 587:1 592:20 594:1,2 606:6,13,21 607:12 608:14 609:1,11 610:10 611:5,10, 22 612:21 615:8 636:16 639:1,9,16 640:9,10 641:4 647:6 650:22 651:6

THOMAS TIDERINGTON, 10/06/2022

654:10 656:6 657:19 658:21 659:5, 6,8,11 661:5 664:1,9 668:17 669:23 674:21 676:8,11,17 677:16 678:2 680:14 683:2 684:6,19 686:3,15 689:14 692:5,9 693:9,17 694:4 697:8 701:18 702:7,10

**routine** 415:17 416:1,4,9 417:5 423:6 428:16 434:23 438:18

**routinely** 487:4 489:20 494:20 505:4 594:24 603:17

**row** 681:10

**rows** 486:13

**rule** 490:22

**ruled** 698:17

**rules** 628:19 630:5

**ruling** 448:10,11

**run** 488:15

───────────────

**S**

───────────────

**safe** 399:10 610:12

**Salas** 665:12,18

**Sat** 570:17

**Saturday** 575:5

**sauce** 552:18

**save** 548:16

**scale** 501:5

**scales** 699:1

**scenario** 490:3 690:22

**scene** 371:5

**science** 619:13,14,20

**scratch** 544:19

**screen** 392:23 509:24 525:13 543:22 549:17 592:15 631:3 648:24

**screen-shared/referenced** 392:17 415:8 450:4 460:24 525:9 528:12 540:22 541:20 545:3,17 553:10 568:5 584:3 615:7 636:15 641:3 654:9 657:18 668:16 669:22 674:20 680:13 684:18

**screwed** 589:22

**scroll** 453:12,13,14,15 526:3 527:6,8 541:7,9,23 542:9 545:6 550:10 560:11 563:3 570:21

573:18 574:22 576:2,11,22 577:11, 17 579:13 586:5,17,21 616:2 622:3 641:12,16 643:4,12,19 654:12 668:22 671:6 684:21 685:12

**scrolling** 617:5 624:18

**search** 614:12

**searched** 502:12 532:5

**searches** 695:12

**Sebastian** 574:24

**secret** 605:21

**section** 454:23 455:11 474:7 482:2 593:1 663:1

**seemingly** 534:5

**selected** 561:16 664:5

**self-selecting** 561:15

**seminars** 409:17

**send** 589:19

**sense** 366:22 403:17,24 470:2 552:4 591:8 594:18

**sensitive** 686:1

**sentence** 383:3 560:13 597:4 647:15 652:8

**separate** 359:17 419:9 422:2

**sequence** 562:5

**sequential** 376:18

**sergeant** 381:17

**series** 523:12 553:15

**served** 617:16 618:1,12 619:3 624:19,24 626:15

**service** 479:12,24 480:13

**services** 380:1,6,12,16

**set** 470:3 484:3 578:3

**setting** 488:6

**Seventh** 447:19 448:7,11,13 449:15,19,23 450:11 452:2 455:19

**Shadur** 455:19

**Shadur's** 447:20 448:8

**shake** 434:7,8

**shape** 384:14

**sheer** 489:14

**sheet** 435:7 498:24 503:1,12,23

504:5,10,11,18 505:7,14 546:24 569:17 633:10

**sheets** 498:18 502:19 503:3,8,15 504:23 569:14

**Sheriff's** 443:17

**shifting** 593:21

**shocking** 538:20

**shoes** 695:10

**shooter** 665:21 666:2

**shooting** 614:1 665:9,18

**shoplifting** 685:21

**short** 383:2 384:6 500:7 537:20 691:9

**shorter** 365:10

**shortly** 493:2

**shot** 665:12 671:15 676:4 677:1,2

**show** 548:11 593:3 665:16 680:16 693:16 695:14

**showed** 433:15 451:6 547:8 557:23 695:15,17

**showing** 450:14 451:5 453:2 454:1 462:19 464:10 465:18 467:19 560:6

**shown** 578:18

**shows** 457:10 485:13

**shrink** 525:12 549:16

**shrunk** 549:21

**side** 575:23 576:12 577:9,12 578:3 583:4 675:14

**sign** 502:11

**signature** 622:16 623:14,15 625:1

**signed** 620:14,15 622:17

**significance** 550:6 624:12 656:11

**significant** 418:15 432:2 435:2,22 538:22,23 603:14

**significantly** 526:12

**signing** 581:21

**similar** 364:4,7 386:18 454:6

**simple** 470:20

**simply** 385:5 412:11 467:21 478:24 521:16 528:5

THOMAS TIDERINGTON, 10/06/2022

| | | |
|---|---|---|
| **single** 442:20 522:15,16 560:19 565:16 578:18 596:17 631:8 | **speak** 410:8 | **stabbing** 653:6 |
| **Sir** 699:23 | **speaking** 368:2 369:13 380:18 434:4 465:22 471:22 496:17 532:14 538:11 593:9 | **stamp** 541:2 563:1 568:14 615:10 624:15 641:16 |
| **sister** 546:4 550:4,8 574:5,10,12 577:15 582:24 583:9 589:23 590:1, 3 591:17 592:8 | **speaks** 505:15,16 | **stamped** 584:20 624:19,21,23 625:1,2 |
| **sit** 378:16 386:9,16 388:13 390:11 391:11 395:9,22 398:2,7 399:19 407:2 442:3 462:17 505:18 533:9 538:8 561:23 597:23 618:17 634:14 662:7 664:23 686:22 | **special** 368:8 376:21 379:6 460:6 470:21 472:8,16 477:2 481:19 482:4,8 485:14 487:7 496:10,19 498:8 | **stamps** 535:23 536:10 617:15 626:17 |
| | **specialized** 372:6 | **standard** 410:17 440:8 442:17 443:3 445:6 483:13 502:7 |
| **sitting** 556:9 558:18 | **specific** 373:11 378:21 386:3 404:15 411:4,19,23 414:6 417:6 448:5 484:1 494:11 506:15 635:6 691:3 | **standardized** 376:16 |
| **situations** 558:20 689:12 | | **standards** 445:4 |
| **skimmed** 360:20 402:4,18 514:5 | **specifically** 375:22 387:1 395:7 397:3 406:5 408:16 409:13,20 410:15 413:16 419:24 425:1 476:12 479:2 497:16 505:18 506:20 527:14 532:14 571:24 604:16 615:16 619:19 629:20 662:16 663:23 666:21 679:19 | **standing** 514:14 |
| **sleep** 689:23 690:1,17 691:14 | | **start** 409:4 441:4 487:1 521:17 667:11 676:2 |
| **small** 500:17,19,20 501:1,10,12,13 | | **started** 360:7 466:23 566:24 640:11 |
| **Smart** 661:4 | | |
| **Smith** 645:12,15 646:1,4,17 | | **starts** 453:8 568:17 577:21 637:19 645:8 |
| **Solache** 414:11 678:24 679:18 681:15 692:1,22 694:13 695:3,18, 23 699:20 700:1,9,19 701:2,5,13 | **spectrum** 367:2 | **state** 367:7,9,15,23 368:15 369:3 391:12 401:1 442:16,17 481:8 551:5 588:15,17 589:11,16 607:10 619:11,19 624:22 625:2 655:12 658:19,23 659:17 660:16 671:14 687:9 692:15 |
| | **spend** 403:2 497:3 540:14 639:11 | |
| **Solache's** 695:9 700:3 | **spending** 526:11 | |
| **solely** 384:10 | **spent** 363:5,9,14 376:23 378:22 385:12 401:17 402:21 403:7 573:6 574:5 610:2 | |
| **someplace** 505:4 | | **State's** 390:23 391:3 392:5 394:22 396:6,22,23 397:15 530:24 585:4 587:22 589:8 591:10 658:6,8,11 659:12 660:10 |
| **son** 572:3 582:17 584:24 585:6 587:5,18 | **spilled** 488:16 | |
| **son's** 583:18 | **spoke** 360:1 | **stated** 530:17 531:1 562:18 |
| **SOP** 482:14 483:12 533:5 | **spoken** 359:23 445:20 | **statement** 465:1 581:22 582:3 583:19 585:3 601:9 652:10,16 673:12 687:10 |
| **sort** 542:20 543:3 663:3 | **spokesman** 492:21 | |
| **Soto** 394:21 395:2,24 396:10,11 397:1 411:16 413:16,20 416:13 417:2,6 420:1 423:12,13,15 426:14,20 481:5 516:17 517:7 569:18 642:10 665:5 666:1 668:24 678:5 682:4 686:20 | **spokespeople** 515:19 | **statements** 360:24 397:18 424:10 480:9 687:5 |
| | **spokesperson** 479:11,23 | |
| | **spot-check** 385:18 405:9 602:2 | **states** 582:23 645:11 646:16 652:11 |
| | **spot-checked** 401:13 503:19 504:8 602:6,15 | **stating** 645:15 |
| **Soto's** 662:13 | | **station** 681:18 |
| **sought** 502:10 | **spot-checking** 385:15 405:10 423:24 424:3 438:7 602:19 | **status** 550:20 |
| **sound** 401:2 | **sprawling** 633:4 | **Status/code** 529:21 |
| **sounds** 396:8 397:10 401:3 466:20 556:13 695:1 | **spreadsheet** 385:1,3,4,6,17 386:4,18,24 387:2,3,5,24 388:5,8, 9,21,23 389:3,10,15,16,18,20,22 390:2,14 400:12 485:20 486:13,19 503:16,20,22 532:6 602:13 604:2, 3,7,12 | **Stefan** 550:14 551:18 |
| **source** 467:11 470:21 | | **step** 478:11 514:19,24 537:8 |
| **space** 576:13 | | **step-by-step** 536:21 |
| **spanked** 570:18 575:6 | **stabbed** 633:2 656:13 | **stepped** 598:8 |

THOMAS TIDERINGTON, 10/06/2022

**steps** 419:20,23 459:20,24

**Stibich** 399:15,20

**sticks** 395:16

**stomach** 573:20

**stomped** 582:16 583:17 584:24 585:5 587:5,18

**stomping** 582:7

**stop** 402:6,8,9,14 451:16 465:15 496:10,20 497:17 498:9 580:18 606:11 659:8

**store** 442:21 488:8

**story** 517:1 537:21

**street** 374:21 375:2,10 418:8,17 420:17 422:3 438:22,24 440:13 452:10 458:1 459:1 474:10,21 476:21 488:8,13 507:12 509:12 511:6,14 538:13 543:13 604:16 605:2

**strike** 519:19 662:15 701:9

**strikethrough** 599:9

**struggling** 694:20

**stuff** 421:3 501:13

**submit** 417:18

**submitting** 418:22

**subpoena** 478:20 479:2,9,12,15, 24 480:7,13 481:7 499:23 500:17 501:17 502:16 604:14,16,17,20 605:4 617:9 618:1 619:1,3,10 624:7,24 626:15 627:2,3,12,17,22 628:3,8 658:5

**subpoenas** 480:12,16,24 500:6 605:1 618:6,11

**subsequently** 414:7

**substance** 372:21

**sufficient** 671:21

**suggest** 409:18

**suggesting** 444:6 558:21 579:11 675:19

**suggestion** 472:2 614:9

**suggests** 673:21 679:7

**suicidal** 551:17

**suitable** 455:14

**suited** 367:15

**summarizing** 480:9

**summary** 484:16 572:22

**superintendent** 627:14

**supervisor** 366:12 429:13 530:13, 16 538:12

**supervisors** 368:10

**supp** 523:5 542:20 669:4,7,15

**supplement** 562:22 578:9 655:6

**supplemental** 376:19 521:10 539:10 555:6 558:8 562:13 565:6 566:11 575:16 576:19 578:15 582:4 637:9,12 638:5 646:13,15,16 647:5,13,17 672:19

**supplementary** 520:5,23 521:1, 24 528:23 533:7 534:24 539:4 543:3 549:14 555:4,9 556:11 559:22 578:5 637:6 645:11 646:11 667:7,13 668:5,21 670:3 673:3,19

**support** 416:15 423:4 426:7 428:15 434:22 438:17 445:5 507:18 536:5 585:3 587:3,16 699:19

**supports** 429:7

**supposed** 516:5 540:9 560:1

**surprisingly** 501:1

**suspect** 422:2,4 488:7 538:14 565:4 633:8 634:2,16 643:10 648:4 649:2 654:1,19 655:1,18,23 669:9, 18 673:22,23 674:12 675:7 679:15

**suspects** 412:18,24 414:9,22 517:11,14 614:6,10 634:16 645:13 646:5,18 647:1 657:3 667:9,14,16, 19 668:1,22 672:3 678:16,22 679:2,4,13 687:9

**Swaminathan** 359:16 370:23 372:2 373:1 387:9 391:5 393:1 394:4 395:3 396:13 397:7 402:10 409:9 412:3 413:1,11 414:18 419:11 420:22 422:7,11 424:5 425:11,22 426:9 427:18 430:17 431:10 432:14 433:2,6,11,15,23 434:9,18 437:12 440:4 441:10,19 446:8 450:8,14,21 451:3,12 454:2 456:5 457:3 459:10 463:13,22 464:4,9,17,22 465:17,24 467:17 468:3,10 469:8,13,17,24 470:9,23 471:15 472:10 473:3 477:21 481:10 487:19 488:23 490:7,11 491:7,12 493:5,23 494:16 495:9,12 497:19 498:13 500:12 502:21

506:4 507:5,23 508:16,22 509:10, 15 510:14 511:15 513:15 514:20 518:21 519:7 520:11 524:9,14 526:7 528:17 533:23 538:2 543:4 544:7 546:9,12 547:13 553:24 554:6,9 555:11 557:4 558:13 562:16 563:6,13,19 564:7 565:19 566:5,16,20 569:1 571:16,20 578:16 585:18 586:11 593:18 605:17 608:5,18 609:7,18 610:16 611:13 612:8,14 638:16 639:7,14 640:5 646:19 656:1 658:13 659:2 661:4 663:15 664:6 676:5,9,13 677:11,18,22 682:20 684:3 685:16 686:8 689:5 692:3 693:14 697:10, 15 701:16,22 702:5,8

**Swaminathan's** 389:2

**sweatshirt** 681:8

**sworn** 358:6 470:5,7,9

**synonymous** 380:6

**system** 449:21 482:22 483:1 484:3

---

**T**

---

**tabulate** 438:14

**take-away** 384:6 480:10 484:17 527:15

**takes** 412:24 537:21

**taking** 467:19 491:23 512:14 517:16,21 534:4 541:14 543:9 687:10

**talk** 359:20 363:24 403:23 464:7 478:15 554:11 589:24 590:2,9,10 595:6

**talked** 360:2 383:12 410:2 433:24 486:4 567:1 599:22 618:7 648:8

**talking** 366:10,11 373:11 377:17 385:23,24 386:11 387:2 422:24 423:10,11 425:3 450:17 465:16 493:2,12 508:11,20 509:1 538:12 558:19 587:7 642:16 676:6 690:23

**talks** 670:4

**tap** 369:19

**task** 375:8,17 696:22

**tasked** 433:22 700:8,18

**taught** 445:1 476:8

**teaching** 409:15

THOMAS TIDERINGTON, 10/06/2022

**teal** 681:8

**team** 366:4

**Technical** 693:12

**TECHNICIAN** 693:11

**telling** 391:21,23 527:17 535:1 539:17 540:6,17 560:20 619:5 693:7

**tells** 505:3 538:21 542:14

**temporary** 452:12 455:4

**ten** 567:15,16 603:8 686:4

**ten-minute** 472:24

**term** 365:10

**terms** 415:4 418:19 423:16 471:11

**terrible** 542:8 557:15 665:3

**Terry** 570:17 574:6,9 575:5 577:3, 5,12,15,20 590:10,15,16 591:16 592:3

**test** 382:3 399:5 540:10 695:22

**tested** 692:12

**testified** 358:7 359:8,14 362:14 370:17 375:21 398:4 400:10 411:7 413:5 437:21 484:12,14 517:4,19 522:13 538:18 583:18 610:1 639:17 687:6 688:19 696:2 698:3 699:13

**testify** 610:17 698:7,8

**testifying** 413:17 433:4 463:12

**testimony** 362:12 363:22 379:3 384:16 397:19 398:13,16,21,22 399:9,11,16,17 410:19 411:5 412:18 413:15 417:21 457:5 460:15 461:18 462:14,20 463:19 465:12 470:5,8,10 480:11 482:20 483:9 484:17 492:20 494:5 517:5 519:9 530:17 558:14 581:20 608:19 679:9 684:11 690:7 698:14, 18 699:15 700:4

**testing** 382:5

**Texas** 590:7

**text** 360:3 383:16

**texted** 382:10,11,17

**texting** 650:19

**thanking** 698:13

**thing** 366:10 541:13 564:20 626:1, 8

**things** 359:6 360:24 365:22 366:3, 6 369:9 403:9 404:1 405:18 411:7 423:22 470:1 501:15 508:6,9,21 509:2 532:18 535:11 556:6 560:9 591:5 687:16,20 690:18 692:12

**thinking** 425:10,18 475:20 502:2

**Thomas** 358:3,4 396:19 634:3,4 643:9,21,22

**thought** 363:1 419:2 431:17 480:18 489:24 500:23 505:23 508:12,19 516:24 538:21 560:9 570:9,14 578:12 580:18 630:11 638:20 693:7

**thousand** 639:12

**threatened** 581:20

**threshold** 368:24

**thresholds** 369:1

**threw** 457:20

**thrown** 679:10

**Tiderington** 358:3,4,10 361:20 392:15 415:6 450:2 460:22 498:2 524:20 525:7 528:10 540:20 541:18 545:1,15 550:12 553:8 568:3 584:1 592:12 615:5 636:13 641:1 654:7 657:16 668:14 669:20 674:18 680:11 684:16 697:17

**tie** 656:10

**tied** 419:15

**time** 359:4 360:7,8 362:20 363:14 370:20 373:18 376:23 378:23 380:15 381:10,14 383:13 385:9,12 386:6 391:24 392:2 395:2 396:7 397:1 401:18 402:22 403:3,7 421:14 459:13 461:15 464:21,23 467:5,14 470:7,22 471:9,12 472:5, 21 499:9 500:7 505:6 507:19 513:23 526:12,20 536:15 548:16, 17 553:21 556:5 567:11 573:7 579:13,15 583:11 596:6 610:2 617:16 619:18 626:8 627:13,17,22 628:4,9 640:3 650:13 653:10 656:13 666:12 675:4 676:1,4 679:8 691:9,10,18 694:22 695:7,22 696:3,8,17 697:2,6

**times** 373:6,13 374:10 380:16 434:12 543:14 581:16 697:18

**timestamp** 617:18

**timing** 391:7

**tip** 592:14

**tipped** 592:17

**title** 379:18 380:24

**to-and-from** 405:17

**to-from** 424:15 496:8,11,20 497:17 498:10 521:14,19

**tobacco** 699:12,13

**today** 373:20 378:16 382:6 386:9, 17 388:13 390:11 391:12 395:9,22 398:2,7 399:19 408:12 425:3 453:3 454:1 462:18 493:14 505:19 533:10 574:23 577:4 588:3 589:16 597:24 606:5,9 610:7 618:17 659:22,23 662:8 664:23 682:18 683:7,10

**told** 362:19 365:22 371:6 436:18 477:15 517:16 535:6,10 560:4 589:23 590:13 607:20,22 608:21 609:5,15,21,22 610:7,18 611:14,18 638:24 658:22,24 659:16,18 662:1, 2 671:9

**Tom** 473:4

**tomorrow** 636:22

**top** 466:11 485:12 502:23 529:7 541:8 542:9 549:18 571:13 573:12, 14 574:16 576:5,8 577:21 579:23 624:8 676:18 681:8,10 694:6

**topic** 411:12 445:21 678:6

**total** 363:13 406:2 498:23 599:14

**totally** 433:17

**touch** 592:15

**touched** 678:7

**Township** 500:15,21

**track** 363:3

**trademark** 698:5

**trained** 484:8

**training** 409:16,17 481:18 482:3,7, 12,13,16 483:21 484:1,6

**trans** 543:18

**transcribe** 532:22

**transcribed** 510:24 511:24 516:6 532:16 533:7,19 535:15 543:19 544:20 553:6 555:3 564:11 565:24 566:10 575:16 576:19 578:15

**transcript** 394:12 395:12 396:19

THOMAS TIDERINGTON, 10/06/2022

398:1,5,11 411:2 463:6,12,15 464:24

**transferred** 520:1 521:5 523:4 535:14,15 536:19 539:4 543:2 556:10 559:21 565:15 599:5

**translated** 580:24

**trauma** 581:18

**treated** 414:8,9 596:23 598:3 629:6 631:13 678:15,22 679:13 691:13

**treating** 487:10 492:16 493:20 494:14

**treatment** 690:13

**Tree** 614:7

**Tremaine** 633:8 648:5 649:3,16

**trial** 363:21 461:18 462:14,15 463:15,16,20 464:24 465:12 466:7 469:3,5,9,10,15,19 470:13,16 682:11 684:11 698:12,19

**trials** 463:23 466:7

**trigger** 396:3

**troublesome** 537:19

**true** 465:11,13,14 467:1,6 560:17 640:2 642:20 678:23

**turn** 361:21 371:10 412:6 426:23 683:20

**turned** 439:5,9 440:16,24 441:8 459:2 475:18 492:1 527:18 528:7 657:15 658:5 660:15

**turning** 694:15

**turns** 458:10

**twelfth** 639:24 666:17

**type** 365:16 366:22 367:13 369:10 371:18,24 373:5 398:16 424:19 428:7 429:16 435:24 437:22 475:24 484:3,21 488:6 543:17 544:16 556:18,24 557:15 558:5 602:18 657:9 688:14

**typed** 520:6,8 542:19 554:4,12,22 557:9 558:7,10 559:5

**types** 360:24 364:2,4,18,23 365:10 366:6 368:19 369:1,9,22 372:13 376:6 377:4 403:9 404:1 408:21 409:23 687:8 690:18

**typically** 428:6,10 444:6 492:7 502:5 594:24

**typing** 589:19

**typo** 614:3

**Tyrone** 613:19,22

———————————

**U**

———————————

**U.S.** 368:15

**ultimately** 673:6 701:1

**unable** 458:16

**unbilled** 362:20

**uncle** 676:24

**unclear** 445:11

**uncooperative** 531:13

**undercover** 369:14,16

**underlie** 404:22

**underneath** 600:11

**undersigned** 531:20

**understand** 358:24 383:8 385:10, 11,13 392:12 402:14 405:13 408:3 415:23 424:17 428:5 455:18,24 456:2 468:15,20 475:21 476:9 477:14 483:1 491:22 492:23 512:1 522:6,11,17,20 530:4 535:24 536:22 540:4 556:23 559:23 560:1 561:17 578:11 591:6 602:5 610:3 635:19 657:13 682:13 683:21 690:24 692:8,10,14 697:21

**understanding** 387:6 394:19,24 395:23 397:13 400:9 431:14,15 432:11,12 437:3,9,11 438:21,24 440:13,23 449:14,18 460:17 480:23 481:2 487:22 499:5 504:13 505:11 510:9 515:1 518:4 525:21 536:7 539:6,11 542:7 561:6 569:21 570:1,6,7 573:23 574:9 575:12 587:19,20 595:12,16 596:1 597:3 600:14 604:23,24 607:14,18 613:8 619:17 622:10 630:14 638:21 641:22 644:14 666:20 685:1 691:22 698:11,22

**understood** 379:3 383:3 559:17 561:18 591:5,24 596:3 691:4 698:17

**undisclosed** 652:10,16

**unexplainably** 494:21

**unfair** 433:18

**uninterested** 417:1

**unit** 374:14 379:5,7 479:2,9,12,24 480:13 502:8,11

**units** 379:5 479:3,13 480:6,8

**universe** 409:14 599:14

**unlike** 428:9

**unofficial** 510:23 511:4,13,23 512:2,19 513:2,10

**unquote** 513:9

**unreasonable** 375:15 588:16 687:7

**unredacted** 606:3

**unrelated** 665:15

**unusual** 403:7 404:2 485:1 544:24 688:20

**updated** 504:24

**upset** 591:21

**utilize** 376:13 417:9 475:13

**utilized** 388:1 400:12 433:20 599:17 623:21 682:11

**utilizing** 403:2

———————————

**V**

———————————

**vaguely** 411:3 661:15

**variety** 365:1

**vast** 429:15

**vehicle** 371:24 537:17 665:10

**vehicles** 501:4

**verbatim** 454:6 543:20

**verify** 404:7

**versa** 367:12

**versus** 369:2 423:13 449:5 501:16 511:8

**viable** 674:12

**vice** 367:11

**victim** 534:8,9 550:8 573:19 574:5, 24 637:7 645:14,18 646:3,18 653:10 654:2,20,21 655:2,3,15 665:11

**victim's** 549:19 653:9

**video** 358:2 362:7 422:17,21 473:24 474:4 509:17,21 567:19 568:2 606:20 651:1,5 686:10,14

THOMAS TIDERINGTON, 10/06/2022

702:14

**view** 418:17 460:11 475:12 477:3 492:2 679:14

**Vincent** 530:20

**violate** 485:10 492:9

**violated** 457:2 485:2,5 489:20

**violating** 484:22

**violation** 455:12 456:20 491:5,16 691:15

**violence** 655:16 656:12

**violent** 379:5

**virtue** 512:8 658:5

**void** 494:24

### W

**wait** 393:12 462:23 547:10

**walk** 635:4

**wall** 690:8

**wanted** 385:10 471:24 515:1 519:23 561:17 580:18 588:19 591:18 626:1 640:15 644:7,8 647:4 673:13 675:20 697:18,19,24 698:1,4

**waste** 464:21 548:17

**wasted** 526:19

**wasting** 464:23

**ways** 359:18

**Weathers** 530:15 531:2

**weeks** 363:7,13 659:10

**weighed** 673:24 675:8

**wereroutinely** 603:15

**West** 660:24 661:3,9,13,19 662:1

**whatsoever** 424:14 437:1,23 544:23

**wide** 365:1 367:2

**wife** 650:19

**Willie** 632:23 636:6,7 645:2,3 649:14,21

**Willier** 567:20

**Willis** 633:8,24 648:5,6 649:3,7,16

**Willis's** 633:9

**Winstrom** 484:12 515:19

**Winstrom's** 494:4

**wire** 369:18

**withheld** 410:23 411:15,20 412:1 580:3 593:4,7,12 594:11,18 595:1, 5 613:1 631:24 640:14 660:9,12 679:21,22 686:17

**withholding** 593:15

**witnesses** 370:19 419:17 517:18 531:16 583:21 633:13 637:15 665:17,18 667:15 669:16 670:13 671:16

**Woefully** 415:16

**woman** 653:6 681:8

**wondering** 390:10

**word** 370:5 396:3 440:9,19 480:5 591:4 593:11 594:11,18 595:21 596:2

**words** 399:21 433:7,12 589:21

**work** 362:15 383:5,6,20 384:8 387:21 388:15 480:24 481:3 539:12 540:1 542:3 574:23 589:6 607:9 610:8,14 611:20 639:19,22 658:5 671:10 698:14

**worked** 360:12 364:3,9,11 366:13, 14,19 376:8 389:9 396:22 443:16, 19 595:23 654:1,20 655:2 696:3,6, 15,16,18 697:1,4

**working** 360:7 366:2 370:5 371:13 383:17 439:3 443:8 480:6 553:1 639:21 696:23 701:21

**worries** 362:9

**worse** 458:11

**worthless** 458:9,11

**worthwhile** 458:17 526:17

**write** 372:1 423:20 538:18,20 674:15

**writing** 591:9 617:4

**written** 424:19 433:1 466:24 467:6,14 475:19 478:19 479:1 491:3 521:15 543:1 547:17 548:5 575:21 674:2 687:10

**wrong** 389:11 442:4 474:22 626:10,11 693:13

**wrongful** 458:7 459:8

**wrote** 398:20 497:11 498:8 534:7 553:1 581:10 605:4

### Y

**year** 480:14 620:18

**years** 373:13 378:22 379:12 408:24 485:9 500:15 501:22 502:5 588:18,24

**yesterday** 361:14 362:12,14 366:18 370:17 379:3 408:2,11 410:2,14,19 411:5 412:15 413:17 489:13 516:14 567:4 660:3,4 688:19 699:18

**York** 444:12

**young** 420:15 656:13

### Z

**Z219872** 629:15

**Z273605** 634:13,18,19 641:20 648:15

**Zoom** 401:7