# Exhibit 36

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT

CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME (DAY MO. YR.): 07 Jun 93 1556

1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT: HOMICIDE/Murder 1st Degree
I-UCR OFF. CODE: 0110
2. ADDRESS OF ORIG. INCIDENT/OFFENSE: 2148 N. Sawyer — [X] VERIFIED [ ] 2 CORRECTED
3. BEAT OF OCCUR.: 1414

5. VICTIM'S NAME AS SHOWN ON CASE REPORT: ROMAN, Monica
CORRECT: [X] YES [ ] 2 NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27.
6. FIRE RELATED: [ ] 1 YES [X] 2 NO
7. BEAT ASSIGNED: 5535

8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: street
LOCATION CODE: 304
9. NO. OF VICTIMS: 1
10. NO. OF OFFENDERS: 1

CIRCUMSTANCES: 11. [X] VERIFIED [ ] UPDATE TO — 12. OBJECT/WEAPON CODE NOS. — 13. FIREARM FEATURES CODE NO. — 14. POINT/ENTRY CODE NO. — 15. POINT/EXIT CODE NO. — 16. BURGLAR ALARM CODE NOS. — 17. SAFE BURGLARY METHOD CODE NO. — 18. IF RESIDENCE WHERE WERE OCCUP. CODE NO.

19. PROPERTY: [ ] VERIFIED [ ] UPDATE TO — DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED. FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|
| [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R |
| 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & NARC./DANGEROUS DRUGS | 5 OTHER | 6 NONE |
| [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T [ ] R |

VICTIMS UPDATE ONLY

| | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

OFFENDERS UPDATE ONLY

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|---|---|
| OFF 1 | | | | OFF. 2 | | | | | |

33. OFF'S. VEHICLE [ ] USED [ ] STOLEN — YEAR — MAKE — BODY STYLE — COLOR — V.I.N. — STATE LICENSE NO. — STATE

34. SERIAL NOS. OR IDENTIFICATION NOS. [X] DNA [ ] 2 VERIFIED [ ] 3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA): dna
REV. CODE:
51. METHOD CODE: DNA
52. METHOD ASSIGNED: [X] FIELD [ ] 3 SUMMARY
UNIT NO.: 652
53. STATUS: [XX] PROGRESS [ ] 1 SUSPENDED [ ] 2 UNFOUNDED

STATUS CONT'D.: [ ] 3 CLRD. CLOSED [ ] 4 CLRD. OPEN [ ] 5 EXC. CLRD. CLOSED [ ] 6 EXC. CLRD. OPEN [ ] 7 CLSD. NON-CRIM.
54. IF CASE CLEARED, HOW CLEARED: [ ] 1 ARREST & PROSEC. [ ] 2 DIRECTED TO JUV. CRT. [ ] 3 COMPL. RFUSD. TO PROSECUTE [ ] 4 COMMUNITY ADJUSTMENT [ ] 5 OTHER EXCEPT. — [ ] ADULT [ ] JUV.

55. [ ] FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

This is an Area Five Violent Crimes Unit Report.

DATA ENTERED
D AREA 5

Continued on page two.

35. R.D. NO.: X 2 5 0 3 0 3

90. EXTRA COPIES REQUIRED (NO. & RECIPIENT): NORMAL
91. DATE THIS REPORT SUBMITTED (DAY MO. YR.): 23 Jun 93 — TIME: 2100
92. SUPERVISOR APPROVING (PRINT NAME): BIEBEL — STAR NO.: 1545
93. REPORTING OFFICER (PRINT NAME): DET. A. RICCIO 20870 — STAR NO.
94. REPORTING OFFICER (PRINT NAME): DET. E. Halvorsen #20692 — STAR NO.
SIGNATURE: [signature] — SIGNATURE: [signature] — DET. R. Guevera #20816
SIGNATURE: [signature]
95. DATE APPROVED (DAY–MO.–YR.): 25 JUN 1993 — TIME: 0935

CPD-11.411-B (Rev. 8/85) — *MUST BE COMPLETED IN ALL CASES

RFC-Iglesias 000128

**THIS IS A LINE-UP SUPPLEMENTARY REPORT:**

| | |
|---|---|
| **LINE-UP CONDUCTED UNDER RD#** | X-250 303 |
| **LOCATION, DATE AND TIME:** | Area Five Viewing Room, 23 Jun 93, at 2000 hours. |
| **PERSONS CONDUCTING LINE-UP:** | Det. A. Riccio #20870 A5/VC<br>Det. E. Halvorsen#20692 A5/VC<br>Det. A. Guevera #20861 A5/VC |
| **PERSONS PARTICIPATING IN LINE-UP:** | 1. VICENS, Jose M/WH/19<br>1714 N. Monticello 23 Mar 74<br><br>2. SANTOS, Edgardo M/WH/25<br>2916 W. Cortland 07 Nov 67<br><br>3. MONTALVO, Charlie M/WH/17<br>5122 W. Dickens 12 Sep 57<br><br>4. VEGA, Kenneth M/WH/17<br>4759 W. Drummond 06 May 76<br><br>5. IGLESIAS, Geraldo M/WH/24<br>3715 W. Belden 24 Jul 68 |
| **PERSONS VIEWING LINE-UP:** | 1. OCHOA, Rosendo |

**PERSONS IDENTIFIED IN LINE-UP:** #5 IGLESIAS, Geraldo was positively identified by witness OCHOA as the person whom he observed shoot the victim, Monica ROMAN.

**PHOTOGRAPHS TAKEN BY:** Det. E. Halvorsen #20692 A5/VC

**INVESTIGATION:** In furtherance of the investigation into the homicide of Monica ROMAN, R/d's conducted the above line-up. The suspect of the line-up, Geraldo IGLESIAS, was permitted to pick his position in the line-up. All participants were required to stand, face the viewing window, and make facing movements. OCHOA positively identified IGLESIAS as the subject he observed fire a gun at the vehicle in which the victim was a passenger.

**Det. E. Halvorsen #20692, Area Five Violent Crimes.**
**Det. R. Guevera #20861, Area Five Violent Crimes.**
**Det. Anthony Riccio #20870, Area Five Violent Crimes.**

RFC-Iglesias 000130

# Exhibit 37

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT

CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME: 07 Jun 93 | 1556

1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT: HOMICIDE/Murder 1st Degree
I-UCR OFF. CODE: 0110
2. ADDRESS OF ORIG. INCIDENT/OFFENSE: 2148 N. Sawyer — [X] VERIFIED [ ] 2 CORRECTED
3. BEAT OF OCCUR.: 1414

5. VICTIM'S NAME AS SHOWN ON CASE REPORT: ROMAN, Monica
CORRECT: [X] YES [ ] 2 NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27.
6. FIRE RELATED: [ ] 1 YES [X] 2 NO
7. BEAT ASSIGNED: 5535

8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: street
LOCATION CODE: 304
9. NO. OF VICTIMS: 1
10. NO. OF OFFENDERS: 1

CIRCUMSTANCES 11. [X] VERIFIED [ ] UPDATE TO | 12. OBJECT/WEAPON CODE NOS. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NOS. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE WHERE WERE OCCUP. CODE NO.

19. PROPERTY [ ] VERIFIED [ ] UPDATE TO — DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED. FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|
| [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R |
| 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & NARC./DANGEROUS DRUGS | 5 OTHER | 6 NONE |
| [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T $ [ ] R | [ ] T [ ] R |

VICTIMS UPDATE ONLY

| | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

OFFENDERS UPDATE ONLY

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|---|---|
| OFF 1 | | | | OFF. 2 | | | | | |

33. OFF'S. VEHICLE [ ] USED [ ] STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE

34. SERIAL NOS. OR IDENTIFICATION NOS. [X] DNA [ ] 2 VERIFIED [ ] 3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA): dna
REV. CODE:
51. METHOD CODE: DNA
52. METHOD ASSIGNED: [X] FIELD [ ] 3 SUMMARY
UNIT NO.: 652
53. STATUS: [XX] PROGRESS [ ] 1 SUSPENDED [ ] 2 UNFOUNDED

STATUS CONT'D.: [ ] 3 CLRD. CLOSED [ ] 4 CLRD. OPEN [ ] 5 EXC. CLRD. CLOSED [ ] 6 EXC. CLRD. OPEN [ ] 7 CLSD. NON-CRIM.
54. IF CASE CLEARED, HOW CLEARED: [ ] 1 ARREST & PROSEC. [ ] 2 DIRECTED TO JUV. CRT. [ ] 3 COMPL. RFUSD. TO PROSECUTE [ ] 4 COMMUNITY ADJUSTMENT [ ] 5 OTHER EXCEPT. [ ] ADULT [ ] JUV.

55. [ ] FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

60. NARRATIVE

This is an Area Five Violent Crimes Unit Report.

Continued on page two.

DATA ENTERED
'D AREA 5

35. R.D. NO.: X 2 5 0 3 0 3

90. EXTRA COPIES REQUIRED (NO. & RECIPIENT): NORMAL
91. DATE THIS REPORT SUBMITTED: 23 Jun 93 — TIME: 2100
92. SUPERVISOR APPROVING (PRINT NAME): BIEBEL — STAR NO.: 1545
SIGNATURE: Biebel

93. REPORTING OFFICER (PRINT NAME): DET. A. RICCIO — STAR NO.: 20870
SIGNATURE: A. Riccio
94. REPORTING OFFICER (PRINT NAME): DET. E. Halvorsen — STAR NO.: #20692
SIGNATURE: E. Halvorsen
95. DATE APPROVED (DAY–MO.–YR.): 25 JUN 1993 — TIME: 0940

CPD-11.411-B (Rev. 8/85)

*MUST BE COMPLETED IN ALL CASES

RFC-Iglesias 000132

**THIS IS A LINE-UP SUPPLEMENTARY REPORT:**

**LINE-UP CONDUCTED UNDER RD#** X-250 303

**LOCATION, DATE AND TIME:** Area Five Viewing Room, 24 Jun 93, at 0125 hours.

**PERSONS CONDUCTING LINE-UP:**
Det. A. Riccio #20870 A5/VC
Det. E. Halvorsen#20692 A5/VC
Det. A. Guevera #20861 A5/VC

**PERSONS PARTICIPATING IN LINE-UP:**

1. DeJesus, Juan M/WH/18
   CB# 9423-098
2. MUNOZ, Ernesto M/WH/22
   CB# 9423-030
3. QUIROZ, Miquel M/WH/18
   4906 N. Wolcott
4. LOPEZ, Juan M/WH/18
   1041 N. Ridgeway
5. PULOS, Ruben M/WH/23
   CB# 9423-108
6. IGLESIAS, Geraldo M/WH/24
   CB# 9422-967

**PERSONS VIEWING LINE-UP:**

1. RODRIQUEZ, Hugo
2. TORRES, Efrian
3. CHMIELESKI, David

**PERSONS IDENTIFIED IN LINE-UP:** #5 IGLESIAS, Geraldo was positively identified by witness Hugo RODRIQUEZ as the person whom he observed shoot the victim, Monica ROMAN.

**PHOTOGRAPHS TAKEN BY:** Det. E. Halvorsen #20692 A5/VC

**INVESTIGATION:** In furtherance of the investigation into the homicide of Monica ROMAN, R/d's conducted the above line-up. The suspect of the line-up, Geraldo IGLESIAS, was permitted to pick his position in the line-up. All participants were required to stand, face the viewing window, and make facing movements. RODRIQUEZ positively identified IGLESIAS as the subject he observed fire a gun at the vehicle in which the victim was a passenger. Witnesses TORRES and CHMIELESKI viewed the line-up but were unable to make an identification because they never saw the face of the offender.

RFC-Iglesias 000134

Detective Division
Area 5 Violent Crimes

22 February 1993
RD# X-079 312

Page 3

Det. E. Halvorsen #20692, Area Five Violent Crimes.
Det. R. Guevera #20861, Area Five Violent Crimes.
Det. Anthony Riccio #20870, Area Five Violent Crimes.

RFC-Iglesias 000135

# Exhibit 38

**CASE NO. 1:19-CV-6508**

**GERALDO IGLESIAS**

V.

**REYNALDO GUEVERA, ET AL.**

**DEPONENT:**

**STEPHEN GAWRYS**

**DATE:**

**October 27, 2021**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
HON. FRANKLIN U. VALDERRAMA, DISTRICT JUDGE
HON. MARIA VALDEZ, MAGISTRATE JUDGE
CASE NO. 1:19-CV-6508

GERALDO IGLESIAS,
Plaintiff

V.

REYNALDO GUEVERA, ET AL.,
Defendants

DEPONENT: STEPHEN GAWRYS
DATE: OCTOBER 27, 2021
REPORTER: AALAYAH PURNELL

APPEARANCES

ON BEHALF OF THE PLAINTIFF, GERALDO IGELSIAS:
John Hazinski
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: hazinski@loevy.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
Austin Rahe
Rock Fusco & Connelly, LLC
321 North Clark Street
Chicago, Illinois 60654
Telephone No.: (312) 494-1000
Facsimile No.: (312) 494-1001
E-mail: arahe@rfclaw.com
(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVERA:
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
1150 Wilmette Avenue
Suite E
Wilmette, Illinois 60091
Telephone No.: (866) 786-3705
Facsimile No.: (800) 896-2193
E-mail: kevin@ilesq.com
(Appeared via teleconference)

ON BEHALF OF THE DEFENDANTS, STEPHEN GAWRYS, ROBERT BIEBEL, ANTHONY RICCIO, AND ERNEST HALVORSEN:
Josh Engquist
The Sotos Law Firm, P.C.
141 West Jackson Boulevard
Suite 1240A
Chicago, Illinois 60604
Telephone No.: (630) 735-3300
Facsimile No.: (630) 773-0980
E-mail: jengquist@jsotoslaw.com
(Appeared via videoconference)

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MR. HAZINSKI | 7 |

EXHIBITS

| Exhibit | Page |
|---|---|
| 1 - Supplementary Report (RFC 10-13) | 66 |
| 2 - Arrest Report (RFC 14) | 72 |
| 3 - Supplementary Report (RFC IGLESIAS 48-55) | 74 |

STIPULATION

The VIDEO deposition of STEPHEN GAWRYS was taken at KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on WEDNESDAY, the 27th day of OCTOBER 2021, at approximately 11:02 a.m. EST; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that AALAYAH PURNELL, being a Notary Public and Court Reporter, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

COURT REPORTER: We are on record. My name is Aalayah Purnell. I'm the video technician and court reporter today. Today is the 27th day of October 2021. The time is 11:03 a.m. Eastern Standard Time. We are convened by videoconference to take the deposition of Stephen Gawrys in the matter of Geraldo Iglesias versus Reynaldo Guevara, et al., pending in the United States District Court for the Northern District of Illinois, Eastern Division, case number 1:19-CV-6508. Will counsel please state your appearance, how you are attending, and the location you are attending from, starting with Plaintiff's counsel?

MR. HAZINSKI: This is John Hazinski representing the plaintiff, Geraldo Iglesias, appearing remotely from Chicago.

MR. RAHE: This is Austin Rahe appearing for the defendant, City of Chicago, via Zoom from the Chicagoland area.

MR. ENGQUIST: You don't need to put it on me. Josh Engquist, also taking it via Zoom in the Chicagoland area. I'm with my client, Mr. Gawrys. I represent the other individual defendants, with

the exception of Mr. Guevara.

MR. ZIBOLSKI: Good morning. This is Kevin Zibolski for Defendant Guevara. I'm attending by telephone from the City of Chicago.

COURT REPORTER: Thank you, Mr. Gawrys, will you please state your full name for the record?

THE WITNESS: Sure. First name is Stephen, S-T-E-P-H-E-N. Last name is Gawrys, G-A-W-R-Y-S.

COURT REPORTER: Thank you. And do all parties agree that the witness is, in fact, Mr. Gawrys?

MR. HAZINSKI: Yes.

MR. RAHE: Yes.

COURT REPORTER: Thank you. Sir, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Thank you. Counsel, you may begin.

MR. HAZINSKI: Thank you.

DIRECT EXAMINATION

BY MR. HAZINSKI:

Q So sir, your name is pronounced Gawrys; is

that right?

A Correct.

Q Thank you. Have you ever given a deposition before?

A Hear me?

Q Yes. I'm sorry, did you answer? It didn't come through.

A Yeah, I did. I said yes. I'll speak louder.

Q Thank you. I appreciate that. How many times?

A Two or three times.

Q Well, you have some familiarity with this process, but just to make sure things go smoothly, I'm going to go over some ground rules in the beginning. The first of which we've already run into a little bit, which is, especially in these remote contexts, it's important that we try not to speak over one another, because, as you can tell, the court reporter here is taking down everything we say. So I'll do my best to let you finish answering a question before I start asking a new one and I'd ask that you try to let me finish asking before you answer; is that fair?

A Fair.

Q Thank you. If you don't understand a question that I ask whether because it's a confusing question or

because there's some problem with the technology, please ask me to clarify or restate or rephrase the question. And if you answer it, I'll assume that you understood me; is that fair?

A Fair.

Q You're welcome to take a break at any time you'd like to.

A Okay.

Q So the only thing I'd ask is that you not take a break while I still have a question pending to you, okay? Mr. Gawrys, do you have any medical issues or are you taking any medications that affect your memory?

A Yes. Both.

Q And what are the medical issues that affect your memory?

A I have bad back, bad hip. It's from a cancer surgery.

MR. ENGQUIST: He's asking if it affects your memory though, Steve.

THE WITNESS: Pardon me?

MR. ENGQUIST: If it affects your memory.

A Oh, no, it doesn't affect my memory. And I took Tylenol, that's all.

BY MR. HAZINSKI:

Q Well, I'm sorry to hear about that. And you

know, if, for example, I know we're going to be sitting for a long time today, so if you need to take a break or readjust.
A Yeah, I'll let you know.
Q Please feel free, because we don't want you to have to be in pain during this process.
A Thank you.
Q Other than Tylenol, are you taking any medications that, and I'm asking only because if there are any medications you might be taking that would affect your memory?
A No.
Q You're in the room with your attorney, Mr. Engquist, correct?
A Correct.
Q Is anybody else in there with you?
A No. Just my dog.
Q Did you review any documents to prepare for this deposition?
A Yes.
Q What documents did you review?
A Supplementary, just the investigative file. I looked through that.
Q About how many pages long was the investigative file that you looked through?

A I don't know.
Q Did you read the entire investigative file carefully?
A Most of it. I tried to. Yeah, most of it.
Q Did you review any transcripts in preparation for your deposition?
A Yes.
Q What transcripts did you review?
A I believe it was from Guevara.
Q It was the testimony of Mr. Guevara?
A Yes.
Q Was the testimony from a criminal case or from a civil case?
A From this case.
Q Okay. When you say "from this case," do you mean from the criminal trial in this case?
A Yes.
Q Other than Mr. Guevara's testimony, did you review any other transcripts?
A No.
Q Did you look at any photographs?
A Any further what?
Q Any photographs?
A No.
Q In the investigative file you looked through,

I think you mentioned seeing supplementary reports. What other kinds of documents did you review in the investigative file?
A Maybe the original sub, some of the other subs, investigative subs, went through -- went through that, and then the sub with Guevara, Halvorsen, and then Riccio, and my name on it.
Q Did you review any handwritten police reports?
A No.
Q Did you meet with one or more of your attorneys to prepare for this deposition?
A Yes.
Q How many times?
A One time.
Q When was that?
A That would be during my -- after my last deposition. What was it last week? Week before?
Q What case was it in which you gave that last deposition?
A That was Maisonette.
Q Did you have the same attorneys representing you in that case?
A Yes.
Q Are you a defendant in the Maisonette case or were you just a witness?

A I was just a witness.
Q How long was your meeting with your attorney to prepare for this deposition?
A I'm not sure. I don't know. Maybe a couple hours.
Q Other than your attorney, have you talked to anybody else about your deposition in this case?
A No.
Q Mr. Gawrys, are you currently employed?
A Yes.
Q Where do you work?
A I work at Cook County Assessor's Office.
Q And what do you do at the Cook County Assessor's Office?
A I'm Chief of Investigations.
Q What are your responsibilities in that role?
A I have a team of investigators and we investigate erroneous exemptions on properties.
Q Do you supervise that team?
A Yes.
Q And how long have you had that job?
A Since 2014.
Q I want to go back in time. When were you first hired by the Chicago Police Department?
A November 1st, 1977.

Q And what was your first assignment within the police department?
A Patrol division.
Q How long did you remain in the patrol division?
A Well, I went from the district to a specialized unit in -- I don't know what year it was. I'm not sure. '84, '85, somewhere in there.
Q What was the name of the specialized unit you went to?
A Special Operations Group. We were the south unit.
Q And what were the responsibilities of the Special Operations Group?
A Responsibilities were to -- We were a mobile unit that we can go into any area on the south side and help assist the district personnel if they were having unusual crime patterns or things that were going on that they needed help on they couldn't handle.
Q Did your rank change when you joined the Special Operations Group?
A No.
Q Who was your supervisor, or who was in charge of supervising you in that role?
A I have no idea. I don't remember.

Q Was it a sergeant?
A Yes.
Q And how long did you remain with Special Operations?
A I really don't remember. Maybe two, three years.
Q Where'd you go after that?
A I got promoted to gang specialist.
Q What year was that promotion?
A Maybe 1985, '86. I'm not sure.
Q How long in total were you a gang specialist, approximately?
A Until 1990.
Q Was Rey Guevara one of your partners when you were a gang specialist?
A Yes.
Q Do you recall what period of time he was your partner?
A No, I did not.
Q Do you know if it was for more or less than a year?
A I have no idea.
Q Did you have multiple partners while you were a gang crime specialist?
A Yes.

Q Do you recall the names of any of your other partners while you were a gang crime specialist?
A Maybe Joe Sparks was one. I don't know. I don't remember. I couldn't be sure.
Q What did it mean to be partnered with another officer when you were a gang crime specialist?
A You just worked with that other person.
Q If you were partnered with a particular officer, did that mean that you worked on all of your cases together?
A Yeah, for the most part.
Q Can you estimate about how many cases you worked on in gang crimes with then gang crimes Officer Guevara?
A No, I have no idea.
Q What were the responsibilities of a gang crime specialist?
A Gang crime specialist, we were assigned, most of us, two gangs to monitor, and what you did is you collected information, intelligence, whatever you want to say, which consisted of cars and how many members in the section, who went to jail, who's coming out of prison. Those types of things.
Q When you said you were assigned two gangs, two as in T-W-O gangs?

A Yeah, two.
Q The number.
A One, two. Right.
Q Which two gang did you specialize in?
A I had the Latin Kings at Leavitt and Schuler and the Insane Unknowns, they were around, I think it was Damen and Armitage.
Q As a gang crime specialist, were you ever in charge of monitoring any other gangs?
A No, that was my only two responsibilities.
Q Okay. From what you remember during your partnership, what gangs did Officer Guevara specialize in?
A One of them he had was the Latin Lovers. I don't remember the second one.
Q Was there a particular -- so you mentioned two intersections associated with each of the gangs that you were in charge of monitoring. What geographic area of the city was that in?
A I don't know what you want. What do you mean area?
Q What part of the city is it in --
A It's the North side.
Q Okay. Particular neighborhood?
A One was Wicker Park. The other was Bucktown,

I'm guessing. I don't know. I don't remember.
Q So would it be fair to say that for the two gangs that you specialized in, that it was your job to know who the members of those gangs were?
A Yes.
Q Did you frequently make arrests of gang members?
A Yes.
Q Did you know the nicknames of the people that were in those gangs?
A For the most part, yes.
Q As a gang crimes officer, did you ever have to investigate serious crimes or violent crimes?
A Yes.
Q Okay. As part of those investigations, did you interview witnesses, for example?
A Yes.
Q Now on some occasions, gang crimes officers would work with violent crimes detectives, correct?
A That's correct. Did you hear me?
Q I'm sorry, my connection froze and I couldn't hear your answer. Could you say the answer one more time?

A What's the question again? You said we work together?
Q Yeah. Sometimes gang crime specialists work with violent crimes detectives, right?
A Yes.
Q If a violent crime occurred and there was suspected gang involvement, were there always violent crimes detectives that worked on that case, or was it sometimes that gang crimes specialists would investigate it without working with detectives?
MR. ENGQUIST: Objection. Calls for speculation. Also lack of foundation. But go ahead.
A If it was a violent crime, it was investigated by the detectives.
Q When you worked as a gang crimes specialist, can you describe how you would be assigned to work on a particular investigation?
A It would be by a sergeant.
Q And was the sergeant who did the assignments a gang crime sergeant or someone from the detective division?
A No, it'd be a gang crimes sergeant.
Q As a gang crimes officer, did you ever show photographs to eyewitnesses?

A Yes.
MR. ENGQUIST: Objection. Vague. Go ahead.
Q I think we got the answer. So did gang crimes officers, when you were a gang crime specialist, keep books with photographs of known gang members in them?
A Did we keep them? What do you mean?
Q Like -- let me --
A We had books --
Q Let me ask it a different way. As a gang crimes specialist, did you have access to books of photographs of known gang members?
A Yes.
Q Okay, Was there a name for those books?
A I don't know about a specific name. There were just gang books.
Q Gang books. Okay. As a gang crimes specialist, were you responsible for putting together those books?
A No.
Q As a specialist in particular gangs, were you ever responsible for adding or removing photographs from a gang book?
A No, you couldn't remove photos from there. Well, you shouldn't, let's put it that way. You shouldn't move.

Q Where were those books stored?
A Gang crimes office.
Q At the time you were a gang crimes specialist where was the gang crimes office?
A Belmont and Western.
Q Was that office shared with any other police details or divisions?
A Yes.
Q Which ones?
A It was an area building, so I think it was area three at the time. I'm not sure, the numbers keep changing. But we had the 19th District was in there, patrol division. And then you had the detective division on the second floor. Youth division was there.
Q And you said the -- and so, at that space at Belmont and Western, was the gang crimes office -- did it have its own dedicated space within that building?
A Yes.
Q Okay. Is -- and it was -- and the gang books were stored in that dedicated space, correct?
A Administrative office, yes.
Q What were those gang books used for?
A Identifications.
Q Can you explain how you would use one of those gang books for identifications?

A If you had witnesses, you would bring them to the office. Depending on the information you had, you would pull those books.
Q Did you ever take a gang book out? Take it out with you into the field?
A I don't remember doing it, but I may have. I don't know.
Q Okay. From your experience, do you know who was responsible within the police department for adding photos to gang books or taking photos out of gang books?
A No.
MR. ENGQUIST: Objection to foundation.
Q And as a gang crimes officer, did you personally ever have occasion to show gang books to witnesses during criminal investigations?
A Yes.
Q Do you recall approximately how many times you did that?
A No.
Q As a gang crimes specialist, did you take notes during investigations?
A Yes.
Q At the time, were you required to take notes on any particular form or type of report?
A Say that again. On a certain report? Could

you repeat that, please?
Q Let me -- I'll just ask it in a more direct over. Were you required to make handwritten notes on GPRs as a gang crime specialist?
A No.
Q Did you take notes during witness interviews?
MR. ENGQUIST: Objection. Vague. And objection to foundation.
A I guess I can answer. What was it? What are you asking again? Say that again.
Q When you were working as a gang crimes specialist, you said you took notes during investigation sometimes. Did you take notes during witness interviews?
A Yes.
Q Were there other circumstances during investigations that you conducted as a gang crimes specialist where you took notes?
A Could have been. Depends on the circumstances.
Q Could you give me an example?
A Photo ID out of one of the gang books.
Q So if there was a positive photo ID out of one of the gang books, how would you document that information?

A We would put that on a -- well, we could put it on a department patrol division supplementary, or we would call the detectives on the case to let them know that we do have an ID. That was for sure.
Q Other than putting the information on a patrol division supplementary or calling the detectives, are there any other ways that you would document a positive ID from a gang book?
A No. I can't think of any.
Q As a gang crimes specialist, did you ever write memos or notes to detectives that you were working with on a case?
A I don't remember doing it.
Q If you took notes, handwritten notes, during an investigation as a gang crime specialist, what would you do with those notes after you made them?
A Depends on what the notes were.
Q Can you explain what you mean?
A I don't know what you're looking for. What you mean by "notes."
Q To take one example, let's say you made handwritten notes of a witness interview. After you made those handwritten notes, what would you use them for?
A Use them for? We would notify detective

division, if need be, then reduce those notes to a supplementary report.
Q And when you say "if need be, reduce them to a supplementary report," what do you mean?
A Well, it depends what the notes were. I mean, I don't know how to explain it. If you're there with a witness or something and you're talking to somebody and detectives come in, sometimes detectives would come to our office and bring a witness in to show our books, so we would assist them and show them the books because outsiders weren't really allowed to most of the time, unless they're really well-known detectives, to go through our books.
Q When you say "outsiders," do you mean folks who aren't in gang crimes?
A Yeah. Outside units.
Q Got it. So if you had handwritten notes from a witness interview that you took as a gang crime specialist, you said you might notify the detective division and, if need be, you might reduce those notes to a supplementary report; is that correct?
A We would tell the detective division.
Q In every case?
A Well, if it's a violent crime case. I don't know what the case is you're talking -- you know, you

have in mind. So if it's a violent crime case, of course we're going to tell the detectives. But you have to -- that's their responsibility for the case, not ours. So we're just there to assist them.
Q And when you say "tell the detectives," do you mean that you would tell the detectives everything that had happened with the witness?
A As far as the interview?
Q Yeah.
A Yes.
Q And in some circumstances, you might also make a supplementary report based on your handwritten notes, right?
A If need be, yes.
Q How did you decide whether to make a supplementary report or not?
A Depends on the information you have.
Q Okay. Can you explain a little more what you mean by that?
A No. I mean, I don't know what you're looking for, but if they had the responsibility of clearing the case, detective division, then we're just there to assist them with information if it's a gang-related case.
Q I'll try to ask the question in a more

specific way and maybe it'll be clearer. If you had, let's say, made handwritten notes of a witness interview during an investigation of a violent crime as a gang crimes specialist, you had to make a decision about whether or not to document that information in a supplementary report and I'm wondering if you could tell me what are the factors that you would consider in deciding whether to prepare a supplementary report?
A It would depend on the witness. What the witnesses is telling you. If we take a witness, just for an example, I don't know what you're going at, but we take a witness and they're in our office, our gang office, and we start showing them photos, if there's an ID, or there is no ID, we're going to mark down what we did as far as what books we showed.
Q And when you say "mark down what we did," do you mean putting it in a sup report?
A Yeah. What book, what photo, if there was an ID. And then you notify detective division. But as far as --
Q And --
A -- never mind.
Q I'm sorry. I didn't mean to interrupt you.
A No, that's all right. I don't want to start babbling here.

Q Fair enough. And just to be clear, you would put it in a sup if there was an ID or if there was no ID, correct?
A Yes.
Q Besides documenting positive identifications from a photo book, are there other circumstances as a gang crimes specialist that you would prepare supplementary reports?
A Sure.
Q Can you give me some examples?
A Robberies, auto thefts, sexual assaults, narcotics.
Q After you prepared a supplementary report -- well, let me back up.
A Hold on. Okay. We're good.
Q Is it fair to say that you would -- when you had to prepare a supplementary report, you would rely on the handwritten notes that you had made to, sort of, reduce that information into the typed report?
A Yes.
Q Okay. And after you did that, what would you do with the handwritten notes?
A Run.
Q Sorry, could you say that again?
A Run the report, destroy the notes.

Q Okay. As a gang crime specialist, did any supervisor ever tell you that you were required to hold onto those notes?
A I don't think so.
Q Okay. When you prepared a sup report documenting some investigative step, what would you do with that completed report?
A Hand it in to a supervisor.
Q Okay. Was it your responsibility to make sure that copies of any report you wrote made it to detectives?
A No, it was not. But I would make a copy of it and either drop off a copy or put it in the mail.
Q As a gang crime specialist, did you ever maintain written lists of known gang members?
A You mean, as far as what I was responsible for or just in general?
Q Did you ever maintain -- so one of your responsibilities, I think you said, was to know who was in the gangs that you specialized in.
A Yes.
Q And so to that end, did you ever maintain written lists of the names of the people in each of the gangs?
A Yes, I believe so.

Q Do you know if that list also had nicknames of those people?
A It probably did.
Q Do you know where you kept that list?
A Where I kept that, oh, probably in my locker.
Q Okay. Was that your locker at the gang crimes office?
A Yes.
Q Did you ever keep any other work-related documents in your locker at gang crimes?
A I can't remember.
Q As a gang crime specialist, did you work with confidential informants?
A I don't know if they would call them confidential informants in the formal way. It depends on what you mean.
Q I imagine that as a gang crime specialist, you probably had to be gathering a lot of information from people on the street about gang activities; is that fair?
A That's fair. Yeah. You could say it in that way, yes.
Q Okay. And later on, as a detective, there's a sort of a formal term called confidential informant, right?

MR. ENGQUIST: Objection. Foundation. And I think you're mischaracterizing the evidence but go ahead.
A I don't know of any. There's no formal system for confidential informants. I mean, there are people that you use, you call confidential informants, but people on the street give you information. But as far as anything structured, no.
BY MR HAZINSKI:
Q Okay. Did you ever obtain information -- when you were working as a gang crime specialist, did you ever obtain information that was relevant to your investigation from a witness or somebody on the street and -- but kept their eye identity confidential from the other officers working on the case?
MR. ENGQUIST: Objection to form. Go ahead.
A I don't understand what you mean really.
Q Okay. I'm not trying to be tricky. I think I'm just doing a poor job explaining. So for example, was there ever a situation where you got some piece of information from somebody and you shared that information with your other officers, but you said, for instance, this is from someone -- this is a confidential who gave this to me.
A I would share information with other officers

on the case. I mean, everybody's got to know what's going on here. It would be a little dangerous withholding stuff from somebody that's working on the case.
Q And why is that?
A Well, things can happen, you know. I don't know. You just want to let them know. I mean, if you're working on a case, you can't have secrets on it between other officers.
Q As a gang crime specialist, did you work with particular detective areas more than others?
A Yes.
Q And which ones did you mainly work with?
A Area 5.
Q Okay. Were there particular detectives within Area 5 that you worked with most frequently as a gang crime specialist?
A Sometimes it turned out that way.
Q Do you recall who those detectives were?
A We pretty much worked with everybody, but it was Ernie Halvorsen, Jack Leonard, Gillie McLaughlin. We worked with Santa Padre, Mohan. It was around a lot of detectives, but mainly ones that were assigned to do gang cases, I guess, back then. I don't know how they were doing it when we were gang specialists, but those

are kind of the people we went to.
Q Okay. As a gang crime specialist -- so let me actually do this a little out of order. So after gang crimes, you were promoted to detective, right?
A Pardon? What was that?
Q After you worked in gang crimes, you were promoted to detective?
A Yes.
Q And I believe you said that was 1990, you got that promotion, right?
A Correct.
Q And how long were you a detective?
A Six years.
Q So '96?
A Correct.
Q Who were your partners when you were a detective?
A All of them?
Q Yeah.
A It's quite a list. Well, Guevera, Ray Guevera, Ernie Halvorsen. I worked with Jack Leonard. Is this as a gang specialist or when I made detective? I'm sorry.
Q When you made detective, that six-year period.
A Oh, okay. Yeah, you work with a lot of

different detectives. Let's see. Who else? What did I say? Jack Leonard, Ernie. There were quite a few. I mean, there was some on midnights when you had to do your midnight turn. I don't remember their names. Tony Riccio. That's all I can remember right now.
Q Okay. When you were promoted from gang crime specialists to detective, did you have to go through any additional training?
A Yes.
Q And what did that involve?
A I don't remember.
Q Do you recall whether it was classroom training?
A Yes, it was.
Q Okay. Do you remember about how long that training lasted?
A No, I don't remember.
Q Okay. Do you remember who provided the training?
A Who provided the training? No. No, it was from the academy.
Q Okay. When you transitioned from being a gang crime specialist to a detective, did your practices around notetaking during criminal investigations change?
A Yes.

Q Okay. How so?
A Detective division is required to use GPRs, general progress reports, they're called, for their notetaking.
Q When you were a detective, did you have an understanding of why the detectives were required to use GPRs?
A Understanding? No, I think it was just a formal way of keeping things in order.
Q So when you became a detective, from that point on did you always make handwritten notes on GPRs?
A For the most part, yes.
Q But not always?
A I would say 95% of the time.
Q So in that other 5% of cases, what were the circumstances where you wouldn't use a GPR?
A I don't know what circumstances. Sometimes you would just write it on a piece of paper and then include it in the file.
Q As a detective at Area 5, did you conduct lineup and photo array, eyewitness identification procedures?
MR. ENGQUIST: Sorry. Did you say as a detective?
MR. HAZINSKI: Yeah.

MR. ENGQUIST: Okay.
A Yes.
BY MR. HAZINSKI:
Q Was that a routine part of your work as a detective?
A Yes.
Q As an Area 5 detective, did you ever suggest to a witness who they should pick from a photo array or from a live lineup?
A Never.
Q Okay. Would that have been improper?
A Yes.
Q Why?
A You're telling a witness who to pick.
Q Did you ever see any other detectives tell a witness who to pick?
A No.
Q As an Area 5 detective, did you ever write a false report about what happened during an eyewitness identification procedure?
A No.
Q Earlier, we were talking about confidential informants. And correct me if I'm wrong, but it sounds like there was no formal designation of categorizing someone as a confidential informant within Area 5; is

that right?
A I don't understand what you're asking. Are you asking -- go ahead. I don't know what you're asking.
Q Do you have an understanding of what the term confidential informant refers to?
A Yes.
Q Okay. And what does that refer to?
A It refers to someone that's given you information in confidence.
Q As an Area 5 detective, were there policies or training that you received on working with confidential informants?
MR. ENGQUIST: Objection to foundation, form, compound.
A I don't remember anything formal.
Q Did you ever receive any informal training on working with confidential informants?
MR. ENGQUIST: Objection to form. Informal.
A No.
Q Is it fair to say that if you got information from a confidential informant, and now we're talking about your work as a detective, that you would not put that informant's name in a typed report documenting the information?

Page 38

A Correct.
Q And that was in order to keep their identity a secret, right?
A Yes.
Q So separate from the report, did you ever make records of, or notes of, who the confidential informant was or write it down in any way?
A I usually knew them, so, no.
Q Okay. So it was sort of on you to remember who the informant was that provided that piece of information, right?
A I'm trying to think of an instant, but it might have been. You know, I'm not sure, but I wouldn't make it known to anyone.
Q Would you keep the identity of a confidential informant confidential from the other officers you were working with on an investigation?
A It depends who the officers were if they didn't need to know. My partner, maybe on that day, I would tell. I talked to so-and-so and this is whatever happened. Other than that, I don't think I ever went beyond that.
Q During your time as a detective, did an assistant state's attorney ever ask you to reveal the identity of a confidential informant?

Page 39

A Not that I remember.
Q When you investigated cases as an Area 5 detective, did you ever obtain information or statements from jailhouse informants?
A No. Let me ask you something. Are you asking within the jail, or people that came out of the jail, or how do you mean that?
Q Yeah, let me make it a little more specific. Let's back up. So did you ever, when investigating a case as an Area 5 detective, get information from someone in exchange for leniency with respect to pending criminal charges against that person?
A No.
Q When you were an Area 5 detective, were you aware that sometimes individuals would receive leniency in exchange for providing information?
A No.
Q Was there a policy that prohibited Area 5 detectives from doing that?
A I think it was a department policy. You couldn't make promises to anyone.
Q So in other words, if a detective offered someone something, someone who was locked up, they made them an offer in exchange for providing information, that would go against the rules of the department?

Page 40

A Yes.
MR. ENGQUIST: Objection to foundation to that question.
Q Who was responsible for -- what was the rank of the person responsible for assigning detectives to homicide investigations while you were a detective?
MR. ENGQUIST: Objection. Calls for Speculation. Foundation. (Inaudible). Go ahead.
COURT REPORTER: I'm sorry. I didn't hear the objection.
MR. ENGQUIST: Objection, foundation. Also calls for speculation. It's also an incomplete hypothetical.
A To answer your question, the on-duty sergeant for the violent crimes unit, one of the sergeants, would assign you to the case.
BY MR. HAZINSKI:
Q Okay. Did you ever, as a detective, did you ever help out on cases that you weren't officially assigned to?
A Yes.
Q Okay. And how would it come to be that you would work on a case that you weren't assigned to?
A Maybe they were just asking for an assistance.
Q When you say "they" were asking, who was asking?
A I mean -- the other detectives would ask to go arrest somebody or whatever, you would go with them, provide assistance, backup.

Page 41

Q Okay. The notes and reports that you created during investigations when you were an Area 5 detectives, were those -- did you store all of those in a single file?
A Yes.
Q Was there a name for that file?
A Investigative file.
Q Did that file go by any other names that you're aware of?
A Probably had nicknames for them. We had a nickname. I think officially, it was called the investigative file. We might call it street file, whatever. Mostly, it was investigative file.
Q Okay. You said that as a detective, about 95% of the time approximately, you would make handwritten notes on GPRs, correct?
A Correct.
Q Okay. After you wrote out a GPR, what would you do with it?
A It would be included in the investigative file.

Q Okay. For you as the detective who wrote the GPR, were you responsible putting it in the investigative file?
A I don't know about responsibility, but I did it.
Q What do you mean by that?
A Well, I mean, nobody else had the responsibility to do something like that. I mean, it wasn't like we talked about gang pictures and things like that, that the front office, while we were gang specialists, they would take care of it, the administrative staff. Here, there was no staff, it was just, you did it, you punched holes in it, then you put it in the file, and you marked it in the front of the contents.
Q Got it. So there was no, you know, system for staff to --
A No, you just included it in the file. So whoever or picked up that file would read that and then it would be up to date.
Q Okay. Did you have to submit GPRs for supervisor approval?
A I don't think so. I mean, they would look at it, I guess. I'm not sure how that worked. I don't remember.

Q Did you have to submit typed reports for supervisor approval?
A Yes.
Q Okay. So I'm curious, once you hand in a typed report to a supervisor to approve it, did you get to see that report again?
A Only a copy of it in the file. The original report that you typed out, went on. It just, wherever it went.
Q Okay. So earlier, when we were talking about GPRs, I believe you said you were the one who would put your own GPRs in the file. Is that true for sup reports that you made as well, that you were the one who put them in the file?
A Yes.
Q Okay. So I just want to understand the kind of steps of the process. So would you give the original, for example, to the supervisor to review and then make a copy to put in the file?
A Yes.
Q Okay. So there would be a copy that didn't have a supervisor's signature on it, and then the supervisor would have the original to sign off on; is that fair?
A It could be, yes.

Q Okay. And was the supervisor who reviewed the files a sergeant in Area 5?
A Say that again.
Q was the supervisor who signed off on typed reports a sergeant within Area 5?
A Yeah, it might. Yeah, usually, it was.
Q Okay. Was it ever somebody else?
A It could be.
Q Who else could it be?
A It could be your lieutenant.
Q Okay. So I was just asking you about investigative files when you were a detective. I want to kind of go back to the period when you worked in gang crimes. Was there any file that was similar to or operated like the investigative file for gang crimes off officers to use?
A No, I don't know of any.
Q Okay. So from what you remember, is it fair to say there was no separate file with reports or notes maintained by gang crimes officers that was from an investigative file maintained by the detectives?
A No.
Q Why did you stop working as a detective?
A I got promoted to sergeant.
Q Okay. And that was in '96?

A Correct.
Q And you left Area 5 at that point?
A Yes, I did.
Q And where'd you go?
A Back to the patrol division, 22nd District.
Q Was there an option for you at that point to continue as a sergeant at Area 5?
A No.
Q Did you apply to become a sergeant?
A Yes, I did.
Q Okay. And at that point, did you want to stop working as a detective?
A I didn't want to; I just took the promotion exam.
Q Okay. Did you choose to go back to patrol?
A No, you don't really have a choice.
Q Okay. So what years were you a sergeant in patrol?
A Well, '96 I got made sergeant. I went to the 22nd district. I stayed there. I don't know how long, a couple years. And then I moved on to the training division.
Q Do you remember what year you started working at the training division?
A Yeah, I couldn't tell you for sure.

Q Okay. Was your rank still sergeant when you went to training?
A Yes.
Q Okay. So what were your responsibilities as a sergeant in the training division?
A I, myself, along with another sergeant were responsible, the unit was called Instructional Design and Quality Control, and there, we recently search lesson plans that were taught to recruit, and to suburban police who we also taught, and that was according to the Illinois Standards Board from the State of Illinois.
Q Okay. And so, just so I understand, were you responsible for developing training curricula for police officers?
A Yes.
Q Okay. Do you remember the subject of -- well, actually, let me back up. Did the training materials that you worked on encompass all different kinds of policing responsibilities or were they focused on specific areas?
A No, it was covering a lot of areas.
Q Okay. Did it cover report writing, for example?
A Yes.

Q Okay. Did it cover witness interviews?
A Yes.
Q About how long were you in the training division?
A Maybe six years.
Q Do you remember what year you left training?
A Well, I mean, you figure '96. I don't know when I got in there. Made sergeant in '93. I don't know. I don't remember.
Q Where did you go after you were in the training division?
A I went to Internal Affairs.
Q Okay. What were your responsibilities in Internal Affairs?
A I was sergeant. I was head of a team of investigators.
Q And what did the team of investigators do?
A Investigated allegations against police officers.
Q As the sergeant in charge of the team of investigators, were you responsible for actually doing any investigation, or were you in a more supervisory capacity?
A Both.
Q Okay.

A Oh, what?
Q How big was that team?
A Oh, gosh. Oh, man, I don't know. Maybe six investigators? I'm not sure. Four? Or about six. I'm not sure.
Q Were you the only investigation team within Internal Affairs? Or were there other teams operating alongside you?
A There were other teams.
Q Okay. Did your team have a specific focus or did it cover allegations citywide?
A It was citywide allegations, all types.
Q Okay. So would it be fair to say that you investigated and were responsible for overseeing investigations into patrol officers and detectives and any other officer potentially?
A Yes.
Q In general, could you please describe the steps that were involved in investigating allegations of misconduct?
MR. ENGQUIST: I object. That's vague. So the form. And it also calls for speculation because there's no parameters at all. But go ahead.
A Of misconduct? It depends what it was. Things

were -- we were assigned by a lieutenant, I was, for the team to investigate. We'd be given assignments. Ours were not real major investigations, I mean as far as major, major, like investigating corrupt policemen taking money, things like that. That was given to -- There was another unit within Internal Affairs. I think it was called the Confidential Unit or something. And they handle a lot of those cases.
BY MR. HAZINSKI:
Q As a sergeant working on these investigations, were you responsible for making findings or recommendations about -- in connection with these complaints?
A Yes.
Q Okay. So who did you issue those findings or recommendations to?
A My lieutenant.
Q Okay. Were you personally responsible for the decision about whether to impose discipline?
A Well, I would recommend discipline.
Q Okay. After you made that recommendation, was it somebody else's job to determine whether that discipline should be imposed?
A Yes. It was reviewed by the lieutenant.
Q Okay. So about how many years were you in

Internal Affairs?
A I think it came out to like three-and-a-half.
Q Okay. And approximately what time period, if you could estimate, were you in Internal Affairs?
A All right. Well, I retired in 2008 of January. So if we went back three years, do the math, that would leave you at what? 2005, you asked when I got there. So around that time.
Q Okay.
A So --
Q During your time at Internal Affairs, could you estimate approximately what percentage of the cases you investigated, you recommended a discipline be imposed?
A I couldn't tell you. I have no idea.
Q Would it be fair to say it was more than half the time?
A No idea.
Q Okay. Did you keep track of that information about how many instances you were recommending discipline?
A No.
Q Okay. During your time in Internal Affairs, did you ever come to the conclusion that a police officer that you were investigating had falsified a

police report?
A I can't remember if we ever did any of those cases.
Q Okay. Were those cases handled by the confidential unit that you mentioned?
A I'm not sure. Might have been someone else.
Q Okay. So could you give me a sense of what types of complaints you did investigate most often?
A Rule violations, policy violations of the department, some criminal activity, thefts. That's about it. I can't really remember anymore.
Q Were you yourself ever, at any point in your career at the CPD, the subject of a complaint?
A Yes.
Q Okay. Do you remember how many complaints there were?
A I think total -- I don't remember. I had some minor ones.
Q Do you recall what the allegations were for those complaints?
A I remember one was a city sticker. Being off my beat when I first came on the job. I can't remember any more than that.
MR. HAZINSKI: Okay. Could we, if it's okay with you, Mr. Gawrys, could we maybe take a five-

minute break and come back?
THE WITNESS: Sure. Yeah, that'd be good. Now is a good time. All right.
COURT REPORTER: Okay. We are going off record. The time is 12:13 p.m. Eastern Standard Time.
(OFF THE RECORD)
COURT REPORTER: We are back on record. The time is 12:27 p.m. Eastern Standard Time.
BY MR. HAZINSKI:
Q All right, Mr. Gawrys, I had a couple follow-up questions regarding the files, and I want to focus on the investigative files from the time that you were working as a detective at Area 5, okay?
A Okay.
Q So were those investigative files stored at Area 5?
MR. ENGQUIST: Foundation.
A Yes.
Q They were, sorry?
A Yes, they were.
Q Okay. And you had to access those sometimes, for instance, to put GPRs in them, right?
A Yes.
Q When you were working as a detective, was

there a particular room or particular office where they were kept?
A Yes.
Q And where was that?
A It was in an office, mainly for sergeants, and a lieutenant was in there.
Q Okay. So I imagine, because there were a lot of investigations going on at the same time, that there were, like, a pretty large volume of investigative files being kept in that office. Right?
A Correct.
Q Okay. Were they kept in boxes on shelves?
A No. They were in file cabinets.
Q After a case was closed, would the investigative file stay in those file cabinets?
MR. ENGQUIST: Object to the foundation. Go ahead.
A No. Part of that, well, not part, a lot of that would go, would be -- I guess it would be transferred downtown where a real permanent file was kept.
Q Is there a name for the permanent file?
A I don't know one.
Q Okay. And the investigative files, sometimes they would have an inventory sheet on the top that

listed the contents of the file; is that correct?
A Correct.
Q Okay. And your understanding from when you were a detective, what was the purpose of that inventory sheet?
A Just to track what was inside the file.
Q Okay. So when you, as a detective, put something in the file yourself, like you punched it, you put it in, were you responsible for noting that on the inventory sheet?
A Yes.
Q Okay. And did you make that note on the inventory sheet at the same time that you put the thing in the file?
A Yes.
Q Okay. Were you able to take -- during the course of an investigation, were you permitted to take the investigative file with you out of the office where it was stored?
A Yes, we could.
Q Okay. Were you able to take it out in the field with you?
A Sometimes we did.
Q Okay. Were you required to note anywhere that you had removed the file from the office?

A Right. You had to -- I believe we had to let the sergeant know. I'm not sure about it, but I know somewhere it was written down or something, from what I remember.
Q And at some point after a case was closed, your understanding was that it would get sent somewhere else and the information would be kept in some more permanent file. Right?
MR. ENGQUIST: Objection. Calls for speculation. Go ahead.
A Yeah, I believe so. I think there was a copy of the file kept in the office. I'm not sure.
Q After a case was closed, did you ever go back through the investigative file and take out documents that weren't necessary?
A No.
Q Okay. So you testified that you reviewed some documents in preparation for this deposition. Before looking at those documents, did you have any recollection of the Roman homicide investigation?
A No.
Q So I'm going to ask you now about what you can independently remember, and I want to define that so that it's clear. When I ask you about an independent recollection, what I mean to ask is what you remember

separate or apart from what's actually written on the paper. It's something you have an independent memory of, separate from anything you reviewed in preparation for the deposition. Does that make sense?
A Sort of. You asked me if I had any recollection before I looked at the reports. Is that your question?
Q I did ask that question.
A Yeah. No, I didn't remember the case at all. None of it.
Q Okay. But now, having looked at some reports, you know some things about the case that you just gleaned from looking at the paper. Right?
A Right.
Q Okay. Did the process of looking at those police reports and other documents, did that bring back any independent memories of the investigation beyond what you just saw written down?
A No. The only thing is the victim's name. I kind of remembered.
Q Okay. For example, reviewing the reports didn't jog any independent memories of any work you performed on the case?
A No.
Q And it didn't jog your memory about any

communications you had with other officers during the investigation?
A No.
Q About how long in total did you spend reviewing documents before your deposition?
A Maybe an hour, hour-and-a-half? Maybe not even. Somewhere in there.
Q Okay. So we're going to talk a little bit about this Roman homicide investigation. Would it be fair to say that the only details of that investigation that you can testify to are details that you've saw in your recent review of the reports?
A Yes.
Q Okay.
A Just what I read in there.
Q Okay. I want to ask you now about your knowledge of some of the people involved in this case, the first being Rey Guevara. So you were partnered with Rey Guevara as a gang crime specialist, right?
A Correct.
Q Okay. But at some point, he was promoted to Area 5 detectives, right?
A Promoted to detective.
Q Right.
A And assigned to Area 5.

Q Thank you for that clarification. Were you and he promoted and assigned to Area 5 at the same time?
A Yes.
Q Okay. At the time that you were both promoted to detective and assigned to Area 5, were you partners in gang crimes?
A Yes.
Q And when you were promoted to detective and assigned to Area 5, did you partner up as detectives?
A Sometimes.
Q Sorry, could you repeat that?
A Sometimes, sometimes.
Q Sometimes. Okay. Did you work the same shift as Detective Guevara at Area 5?
A Sometimes.
Q Okay. Did your shifts change over the years?
A Yes.
Q Okay. Do you recall what shift you worked in 1993?
A No.
Q Okay. When was the last time you spoke with Rey Guevara?
A Someone else asked me that. That was before May of this year.
Q And did you speak with him in person or over

the phone?
A Over the phone. He doesn't live here anymore. So I think I said before that I was going down to Texas to see my sister, and he's kind of close to the area I was going, maybe two, three hours away. And I wanted to see if I had time to maybe just stop in and visit him, which I never did.
Q Okay. Is Rey Guevara still a friend of yours?
A I consider him a friend. Yes.
Q About how often do you talk with him?
A Not often. Maybe holidays.
Q When was the last time you saw him in person?
A That would be the Rivera case.
Q Okay. And it was when that Rivera case went to trial?
A Yes.
Q Okay. Were you friends with Rey Guevara outside of work when the two of you were working together in gang crimes?
A We didn't associate a lot together.
Q Okay. What about when you were detectives? Were you friends outside of work?
A No, we didn't socialize much there either.

Q Okay. When would you say that you became friends with Rey Guevara?
A I have no idea.
Q Would you say it was after you left Area 5?
A No, it was probably in gangs.
Q Okay. Is it a fair summary to say you were friends with him at work, but didn't socialize with him much outside of work in gang crimes?
A Yes.
Q Okay. When you last talked with Rey Guevara in May, did your conversation touch on any of the ongoing lawsuits against him?
A No.
Q Okay. Have you ever talked to Rey Guevara about the fact that he's invoked the Fifth Amendment right to remain silent in response to questioning about his work as a police officer?
A I don't remember it if we did.
Q Did you ever have a conversation with him where it was the two of you talking and you said, for instance, "Hey, Rey, why are you doing that?"
MR. ENGQUIST: Objection. Asked and answered. He already answered the question. You can answer it one more time. Go ahead.
A Not sure. But I think, "Why are you doing

it?" "Man, it was just on the advice of his attorneys." And we left it at that.
BY MR. HAZINSKI:
Q Were you present during his testimony? Were you present in the courtroom during his testimony at the Rivera trial?
A Yes.
Q Okay. You knew Ernie Halvorsen from your work at Area 5, right?
A Yes.
Q Okay. Was Ernie Halvorsen a friend of yours?
A Not a friend. We were acquaintances, work acquaintances.
Q Did you ever socialize with Ernie Halvorsen outside of work?
A Not that I remember.
Q From your own observations, do you know if Guevara and Halvorsen ever socialized outside of work?
A I don't know.
Q When was the last time you talked to Ernie Halvorsen?
A Probably couldn't tell you. I have no idea.
Q Okay. Did you stay in touch with him after you left Area 5?
A No.

Q Okay. For a period of time you were partnered with Tony Riccio; is that right?
A Yes.
Q Okay. For the record, that's R-I-C-C-I-O. Did you consider Tony Riccio a friend outside of work?
A No, we didn't socialize together.
Q Okay. When was the last time you talked to Tony Riccio?
A Couldn't tell you. A long time ago.
Q Did you keep in touch with Mr. Riccio after you left Area 5?
A No.
Q Okay. Did you know Robert Biebel?
A Yes.
Q Okay. And what was his position at Area 5?
A He was the sergeant.
Q Was Biebel one of the people who would sometimes be responsible for approving your reports?
A I'm not sure. Could have been.
Q Were you friends with Robert Biebel while you worked at Area 5?
A Yes, we were friendly together.
Q Did you socialize with him outside of the office?
A No. The only time we ever met as a group of

guys, it was like Christmastime. That was many years ago. We would see each other and it was just a get-together, but that stopped. So --
Q Okay. And that was after you left Area 5, right?
A Yes.
Q Okay. Can you estimate approximately what year was the last time you had one of those get-togethers?
A No idea. It was a long time ago. When these cases started, it was just we didn't get together anymore.
Q After there were more lawsuits?
A Yes.
Q Okay. Do you recall the last time you talked to Mr. Biebel?
A I saw him at the attorneys' offices walking out the door, or he was sitting in there. I'm not sure.
Q Did you have a conversation with him at that point?
A Well, talk, "Hi, how are you? Haven't seen you in a while." That's about it.
Q Did you talk to him at all about any of the lawsuits that either of you was involved in?
A No.

Q Do you recall ever having any conversations with a man named Geraldo Iglesias?
A No.
Q Okay. Do you recall ever having any conversations with somebody who went by the nickname Snake?
A No.
Q Okay. Now, you as a gang crime specialist, did you have any specialized knowledge of or familiarity with a gang called the Imperial Gangsters?
A Yeah, I know who they were.
Q Okay. Do you know what territory they occupied?
A I can't remember right now.
Q But the IGs, the Imperial Gangsters, were not one of the gangs that you were responsible for, right?
A What's that again? Say that over?
Q I'll rephrase the question. You weren't a specialist in the Imperial Gangsters, right?
A No.
Q Okay. During the time that you were at gang crimes, do you recall which gang crimes specialists did specialize in the Imperial Gangsters?
A No, I do not.
Q Okay. Do you know an individual by the name

of Rosendo Ochoa?
A No.
Q Do you know a person that goes by either Rosendo Ochoa or any of the following aliases: Geraldo Negaera (phonetic), Victor Lopez, or Ricardo Mahia?
A No.
Q Just for the record, going forward, if I say Rosendo Ochoa, I'm going to be referring to those alias as well: Negaera or Lopez or Mahia, okay?
A Okay.
Q Do you know an individual named Hugo Rodriguez?
A No.
Q Okay.
A I mean, it's a name, but there's a lot of them.
MR. HAZINSKI: Yeah. So I want to show you a document now, and just -- Counsel, so this will be the report produced at RFC 10 through 13. And Mr. Gawrys, what I'm going to do is --
MR. ENGQUIST: Just give me one second. Let me just -- I'm going to have a hard copy of it, so I don't have to look over his shoulder. Go ahead.
MR. HAZINSKI: All right. So what I'm going

to do is show my screen with you so that we can be looking at it together. So --
MR. ENGQUIST: Is this going to be Exhibit 1?
MR. HAZINSKI: Yeah.
MR. ENGQUIST: Exhibit 1 is RFC 10 through 13?
MR. HAZINSKI: Yep.
MR. ENGQUIST: Okay.
BY MR. HAZINSKI:
Q So Mr. Gawrys, are you able to see the document that I just shared with you here?
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
A Yes, I do.
Q Okay. And if you need me to scroll or zoom to see any part of it, please just let me know, okay?
A Okay.
Q So Mr. Gawrys, is this one of the documents that you reviewed in preparation for your deposition today?
A Yes, it is.
Q Do you recognize what kind of report this is?
A It's a supplementary report.
Q Okay. Is this type of supplementary report, would it be accurate to call it a cleared closed report?
A I don't think so.
Q Okay. In general, do you know what a cleared

closed report is?
A Yes. It's arrests were made and there is no other subjects wanted in the case.
Q Okay. So I'm going to zoom in now to a part on the first page here. And do you see on the left that the box next to "cleared closed" has an X in it?
A Yes.
Q Does that indicate to you that this is a cleared closed report?
A Yes, I would take it that way.
Q Fair enough. So what is the purpose of a cleared closed report in a homicide investigation?
A It's just what I said, that the case is now closed because all the subjects are either in custody or been in accounted for to finish the investigation.
Q What type of information would normally be documented in a cleared closed report in terms of the course of the investigation?
A I don't understand what you're trying to ask. I mean, a lot of information's in there, so I -- it's different kinds of information. Can you be more specific?
Q Is one purpose of a cleared closed report to summarize the course of the criminal investigation?
A Yes.

Q Okay. Is it also -- is another purpose of a cleared closed report to identify the evidence implicating the arrestee?
A Yes.
Q Now, your name appears on this report, correct?
A Correct.
Q Okay. And it's at the bottom, and there's a number written next to your name, which is 20689. Was that your star number?
A Correct.
Q Okay. And your name appears next to detective A. Riccio. Do you see that?
A Yes.
Q At this period of time in 1993, was Mr. Riccio your partner?
A On that day, probably.
Q Does the fact that your name appears in the bottom of this report mean that you were involved in the preparation of this report in some way?
A Yes.
Q Okay. Now I want to go to the next page, which is RFC 11, and it says arresting detective, and then it lists the names Halvorsen, Guevara, Riccio, and Gawrys, correct?

A Right.
Q So does that mean that you were one of the detectives responsible for arresting the defendant?
A Yes.
Q Okay. Now I want to ask you about the investigation section on this page. We're still looking at RFC 11. Do you see the first sentence of the investigation section where it says, "On 21-June-93, the reporting detectives were contacted by a confidential informant?" And then it goes on to note information that the informant provided. Do you see that part of the report?
A Yes, in the first paragraph.
Q Yes. So you reviewed this report in preparation for your deposition. Do you remember whether you were the one who typed this up?
A No, I did not type this.
Q Okay. Do you remember being contacted by a confidential informant at any point during the Roman homicide investigation?
A It had nothing to do with this case.
Q Okay.
A Other than assist the arrest.
Q So sometimes -- I want to ask a hypothetical question now, sir, stepping away from the details of

this investigation. So sometimes as a detective, you would take over or pick up working on a case that some other detectives had previously been investigating, right?
A Right.
Q Okay. Now let's say that you did that and you were -- and as part of taking over the case, would it be your usual practice to review the police reports that had been prepared up to that point?
A Yes.
Q Okay. Suppose that you did that and you were taking over a case and reviewing the reports, and the reports referred to a confidential informant, and you wanted to find out who that individual was. Was there any way for you to get that information?
A Only by talking to the detectives that wrote the report about that confidential informant.
Q Other than talking to those detectives, was there any other way to get that information?
A I don't know of any. I can't think of any.
Q Okay. So now I want to scroll down to RFC 13, and this is the final page of this report. And the names at the bottom, it just says Detective E. Halvorsen, Detective R. Guevara. Do you see that?
A Yes.

Q Okay. Do you know why your name and detective Riccio's name aren't listed at the end of this report, even though they appear on the first page?
A No, I don't know. I had nothing else to do with the case.
Q Okay. So you testified that you believe that you were involved in making the arrest of Geraldo Iglesias and that was it, right?
A Yes. I assisted in the arrest, from what I'm reading.
Q Okay. So how do you know that that was the extent of your involvement in this case?
A Because my name doesn't appear anywhere else as doing anything.
Q Okay. Is it fair to say that you believe that if you had had any other involvement in the investigation, that your involvement would be documented in some of the other reports in the investigative file?
A Yes.
Q For instance, if you had interviewed witnesses, that information would be documented?
A Yes.
Q If you had conducted a photo array, or a live lineup procedure, there would be documentation of that as well?

A Yes.
Q Do you know whether you communicated with either Guevara, Halvorsen, or Riccio about the Roman homicide investigation while it was ongoing?
A No.
Q All right. I'm going to show you another report now. And so this will be Exhibit 2, and it's RFC 14 for the record. Are you able to see this report?
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
A Okay. I see it.
Q And is this one of the reports you reviewed in preparation for your deposition today?
A Yes, I looked at it.
Q Okay. And this is an arrest report documenting the arrest of Geraldo Iglesias on June 23, 1993, correct?
A Yes.
Q Okay. So the report is authored by Halvorsen and Guevara. And it lists as arresting detectives T. Riccio and S. Gawrys, right?
A Right.
Q Okay. Do you recall how you came to be involved in Geraldo Iglesias' arrest?
A I don't remember specifically.
Q Do you have any memory of arresting Geraldo

Iglesias?
A No.
Q Do you have any memory of anybody asking you to assist with this part of the case?
A No.
Q Do you have any memory of what anyone told you about why Iglesias was being arrested?
A No.
Q Do you have any memory of reviewing any reports or other police documents after being asked to assist with this arrest?
A No.
Q So earlier, you said that one way that a person could be pulled into a case that they weren't formally assigned to is because another detective might ask them for help executing an arrest; is that right?
A Correct.
Q Okay. Is it your belief that that's what happened in this case?
A I would say so, yes.
Q Okay. Now, in the cases -- Just as a matter of your normal practice and procedure, when you were asked to assist other detectives in making an arrest, would it have been typical for you to review the reports and other police documents in the investigative file at

that point?
A Before you assisted them in the arrest?
Q Yes.
A No.
Q Okay.
A I wouldn't.
Q So if you were assisting other detectives in making an arrest, was it your responsibility to make an independent determination about whether the evidence supported the arrest?
A No.
Q In other words, were you just assisting the other detectives and trusting their investigative work?
A Yes.
Q Do you have any reason to dispute that any of the information documented in this arrest report is accurate?
A Say that again, what was that? You broke up a little.
Q Sure. Do you have any reason to believe that any of the information documented in this arrest report is inaccurate?
A No.
Q I want to ask you, show you now another document. Let me see if I can find the right one. So

this is -- we'll make this Exhibit 3, and this is a police report that's been date stamped as RFC Iglesias, 48 through 55. Mr. Gawrys, are you able to see the first page of this report on your screen?
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
A Can you make it --
MR. ENGQUIST: One second. You got -- you got to give me time to go flipping through, what is it again?
MR. HAZINSKI: It's 48 through 55.
THE WITNESS: Could you make it a little bigger?
MR. HAZINSKI: Yeah. And Josh, I'll give you as much time as you need to get there.
MR. ENGQUIST: Yeah, I'm there now.
THE WITNESS: That's good. Okay.
MR. ENGQUIST: I'm not sure what page you're on, but I'm at the fourth page.
THE WITNESS: 48.
MR. ENGQUIST: Okay.
MR. HAZINSKI: Thank you.
THE WITNESS: Sure. Shockton (phonetic).
MR. ENGQUIST: Yeah, I got it.
THE WITNESS: Okay.
BY MR. HAZINSKI:

Q Mr. Gawrys, was this one of the reports that you reviewed in preparation for your deposition?
A No.
Q Okay.
A Might have gone -- passed by it. But no, I didn't actually read it.
Q Okay. So I want to just ask you about some things about this report. So understanding that you didn't author this, do you see near the top where it -- Box number two says, "Address of original incident/ offense." Do you see that box?
A Yes.
Q Okay. You see there's two words next to that with boxes corresponding that say "verified" and "corrected?"
A Yes.
Q Okay. And in this case, one of those is -- says corrected, and it has an X through it. From your understanding and your familiarity with these types of supplementary reports, what do those words "verified" and "corrected" refer to?
A Rest of the incident.
Q Okay. And so, what are the circumstances where an officer would mark "verified" on a supplementary report?

A I don't know. I think it's just -- I never marked those. It looks like they -- from here, you had the wrong address somewhere and they corrected it.
Q Okay. I want to scroll down now and ask you about some information that's written on this report. So looking now at RFC 50, do you see that there are some handwritten notes on this page?
A Yes.
Q Is that your handwriting?
A No.
Q Do you recognize whose handwriting that is?
A No, I do not.
Q Okay. Continuing onto the following page, and now this is RFC 51. Is the handwritten note on this page your handwriting?
A No.
Q Okay. As you were looking through the investigative file in preparation for your deposition, did you see any handwritten notes that you recognized to be your handwriting?
A No.
Q Okay.
A I wouldn't have any.
Q What do you mean by that?
A I wouldn't have any notes in there.

Q And why is that?
A Because I didn't work on the file, work on the case.
Q Okay. If you didn't work on the case apart from the arrest, why is your name written on the clear, closed report?
A Because it was at the end, making the arrest. I was included in that narrative.
Q Okay. So I've stopped sharing my screen now. So you testified earlier it's your belief that you were partnered with detective Riccio on the day of Geraldo Iglesias' arrest, correct?
A Correct.
Q Okay. Now, do you know from your review of documents, whether Detective Riccio was involved in any aspect of the Roman homicide investigation beyond the arrest?
A I have no idea.
Q If you were partnered with Detective Riccio, was it fair to say that you were working with him during your entire shift that day?
A It could be.
Q Do you remember one way or the other on --
A No.
Q -- June 23rd, 1993?

A No, I do not.
Q In your review of the investigative file, did you see any police reports or notes reflecting that Detective Riccio helped conduct eyewitness identification procedures on June 23rd, 1993?
A No, I do not.
Q Okay. If reports show that he was present during those procedures, do you have any reason to dispute the truth of that?
A No.
Q If it's true that Detective Riccio was helping to conduct eyewitness identification procedures following Geraldo Iglesias' arrest on June 23rd, 1993. As you sit here today, are you able to say that you were or were not present also during those procedures?
A I was not present.
Q How do you know?
A My name doesn't appear on the reports.
Q As you sit here today, can you say what you were doing at the time of those identification procedures?
A No idea. Any number of things.
Q Can you explain why it would be that Detective -- both you and Detective Riccio participated in Geraldo Iglesias' arrest, but then only Detective Riccio

remained involved in the investigation?
A I would be guessing, but I would say that either I left work, I was called to do another job, maybe called to assist someone else.
Q Is there any doubt in your mind that your entire involvement in the Roman homicide investigation was limited to executing the arrest of Geraldo Iglesias?
A Yes. That was it.
Q Okay. In other words, no doubt in your mind?
A No doubt.
Q Okay. Do you know who Francisco Vicente is?
A No.
Q Have you ever heard that name before?
A I think I've heard the name.
Q What, if anything, do you know about Francisco Vicente?
MR. ENGQUIST: I'm going to object and instruct him not to answer if his only information came from discussions with his attorneys. So to the extent that the information only came from your attorneys, acknowledge and answer the question. So you can answer anything beyond that, go ahead. But if not, you're not answering. Go ahead.
A I don't know. What was the question? Do I know that guy, or --

BY MR. HAZINSKI:
Q Yes.
A I'm sorry.
Q Apart -- So I'm not interested in information that your lawyers gave to you in any confidential communications you had with them. So setting those aside. What, if anything, do you know about Francisco Vicente?
A I don't remember anything, nothing.
Q Okay. Do you remember ever interacting with Francisco Vicente during any homicide investigation?
A No.
Q Okay. Do you have any information about how Francisco Vicente came to be involved in the Roman homicide investigation?
A No.
Q During your review of documents in preparation for this deposition, do you remember seeing any documents pertaining to Francisco Vicente?
A No.
Q Did you testify at any criminal proceedings against Geraldo Iglesias?
A No.
Q As you sit here today, do you have any personal knowledge about whether there was probable

cause to prosecute Geraldo Iglesias for murder?
A I have no idea.
Q Do you have an opinion, one way or the other, about whether Iglesias is guilty of the Roman homicide?
A No idea.
Q Does the fact that Reynaldo Guevara has pled the Fifth Amendment in response to questioning about his conduct during the Roman homicide investigation affect your opinion of Geraldo Iglesias' guilt or innocence?
A No.
Q Okay. Now I only have a couple more questions that I -- before I wrap up I just would like to, if you don't mind, if we could take another short break.
A Sure. Okay. Five, 10 minutes? What do you want?
MR. ENGQUIST: Let's take a good five, 10 minutes. Maybe stretch your legs too.
MR. HAZINSKI: Yeah. That sounds great, all right.
COURT REPORTER: We're going off record. The time is 1:09 p.m. Eastern Standard Time.
(OFF THE RECORD)
COURT REPORTER: We are back on record. The time is 1:21 p.m. Eastern Standard Time.
BY MR. HAZINSKI:

Q All right. Mr. Gawrys, I just have a few follow up questions before we finish, before I finish my questioning. So at various times when you were an Area 5 detective, you said you had a lot of different partners over the time that you were there, right?
A Correct.
Q Now, did your partners change day to day or week to week? Or did you -- were you assigned a single partner for a longer period of time?
MR. ENGQUIST: I'm sorry, just for clarification, you're talking about the -- or the five or so, five to six years that he was there? Or you more in the beginning, or we just talking in general? I just want to make sure.
BY MR. HAZINSKI:
Q Just in general. Over the time that you were at Area 5. Because you said you had different partners at different times, and I'm curious if you would have one partner for a period -- for a lengthy period and then another, or if it would change back and forth routinely?
A Well, I mean, obviously things would change. If you went to midnights, everybody had to do their time on the midnight shift. So I mean, obviously you didn't go as partners. You just -- there were permanent

detectives on that shift that liked working midnights. So you worked with them. On day watch, I don't know. I mean, it's -- you team up with people that were available. And that was also on a third watch, but you did work sometimes steady with people. For how long? I don't know. I have no idea. I don't remember.
Q Okay. On any given day shift, did you have the ability to choose who your partner was going to be or was that told to you by a supervisor?
A We'd kind of choose between ourselves to work. It just depended what we were doing.
Q Okay. Was there a period of time after which you stopped partnering up with Guevara?
A Yeah, I left the watch. I went either midnight -- Midnights or second watch, which is day shift.
Q And when was that approximately?
A I have no idea.
Q Are you able to estimate approximately how many investigations you worked on as partners with Detective Guevara, as a detective?
A No, I don't know.
Q Would it be fair to say it was more than 10?
A I would say so.
Q Okay. In your experience working as a

detective alongside Guevara, did you observe whether he ever took notes during homicide investigations?
A Yes. I believe he took notes.
Q Okay. And you yourself took notes during homicide investigations as a detective, right?
A Yes.
Q Okay. For example, if you -- when you were working as a violent crimes detective, if you were interviewing a witness, was it your ordinary practice to make contemporaneous handwritten notes during the witness interview?
MR. ENGQUIST: Objection, call for speculation and vague. Go ahead.
COURT REPORTER: I'm sorry, I didn't get your objection.
MR. ENGQUIST: Objection, calls for speculation and vague.
A Yes, I would make notes.
BY MR. HAZINSKI:
Q And as we discussed before, you would make those notes on general progress reports, right?
A Right.
Q Okay. From your own observations, was it also detective Guevara's practice to make handwritten notes during witness interviews during homicide

investigations?
A I have no idea a lot of times what he did, so. I wasn't working with him all the time.
Q Okay. On the occasions that you were working with him, did you ever observe that he was failing to take notes in a circumstance in which you would've taken notes?
A No.
Q And I guess I want to ask the same thing with respect to Tony Riccio. So when you worked alongside Detective Riccio in Area 5, did he also make handwritten notes during homicide investigations?
A I'm sure he did. Yes.
Q Okay. That was sort of the standard practice for all Area 5 detectives on your understanding, right?
MR. ENGQUIST: Objection, calls for speculation, vague. Go ahead. And foundation.
A I would say that's for all detectives.
Q Yeah. Earlier I asked you some questions about photo books, gang books, but I asked those questions in the context of your work as a gang crime specialist. So but now I want to talk about when you were a detective at Area 5. As an Area 5 detective, did you have access to those same gang books?
A For the gang unit? Is that what you were

asking?
Q Yeah.
A Yes.
Q This, the gang books we were talking about earlier?
A Yes.
Q You did? Okay. Now I believe you said that access to those books would sometimes be limited to outsiders; is that right?
A Yes, they would ask to use the books.
Q Okay. Now were there any gang books, and I apologize if there's a siren on my end of the call --
A It's your call.
Q Were there gang books that were stored at -- In the same building as Area 5?
A Gang books? I don't know. They had some photos there, but I'm not sure what they were.
Q Did you personally, in the course of any investigations as an Area 5 detective, did you ever ask to use one of those gang books to show photographs?
A Which ones? Area 5? I don't know what Area 5 had. I don't remember if they had gang books. They just had people they arrested.
Q All right. Any gang books. Did you -- do you remember as a detective ever using those?

A I don't know where you're -- are you saying that Area 5 had gang books?
Q No, I just mean in general, not even gang books specifically stored at Area 5, but gang books stored anywhere. Do you remember as a detective ever using such a gang book?
A Yeah, I used gang books.
Q Okay. Do you remember where you would go get them?
A I went to the gang office, it'd be at Belmont and Western.
Q Okay. And at that time, was that still Area 3?
A Yes, I believe what the building was called, that area.
Q Okay. Now were the gang books organized with members of all different gangs mixed together, or were they separated out were each book just had one gang?
A They were separated.
Q Okay. So for example, there might be a gang book that corresponded to the Latin Lovers that had photographs of just known Latin Lovers members in it, right?
A Right.
Q Okay. Do you know one way or another whether

-- Well, let me ask it this way. Did the department maintain gang books for all the major Chicago street gangs?
MR. ENGQUIST: Object to the foundation.
A Not that I know of.
Q Okay. Now you specialized in Latin Kings and the Insane Unknowns, right?
A Right.
Q Were there gang books for those two gangs?
A Yes.
Q Okay. Do you know, as you sit today, whether there was a gang book for the Imperial Gangsters?
A There were.
Q Okay. In your review of the police reports and other documents in the investigative file, as you were preparing for your deposition today, did you come to be familiar with what the evidence was implicating Geraldo Iglesias in the Roman homicide?
A I read that. I think it was a photo ID? Somebody gave information, and then they did a photo spread. I am not too sure. I didn't concentrate on that too much.
Q Okay. Fair to say that when you were reviewing the documents, you were mainly looking out to see whether you were involved?

A Correct.
Q Okay. Do you know, for any of the eye witnesses in this case, whether they had a good or bad opportunity to view the perpetrator?
A No idea.
MR. ENGQUIST: I'm sorry. Could you repeat the que -- did you say good or bad opportunity to be the perpetrator, or did you say --
MR. HAZINSKI: Sorry, to view. To view.
MR. ENGQUIST: To view, okay. Okay. I'm sorry. That's why I was confused. Okay, sorry.
BY MR. HAZINSKI:
Q No worries. Do you know one way or the other, whether any identifications that were made in -- during the Roman homicide investigation were reliable?
A No, I wasn't there.
Q Okay. Since this lawsuit was filed, have you had any communications with any of the other defendants in this case, including Guevara, Mr. Halvorsen, or Mr. Riccio about this lawsuit?
A No.
Q Okay. And this process of answering questions about this case and reviewing the documents here today, did that process bring back any independent memories of the Roman homicide investigation that you didn't have

before we started this deposition?
A No.
MR. HAZINSKI: Okay. All right, Mr. Gawrys, I don't have any further questions for you at this time. Thank you.
THE WITNESS: Okay. Thank you. Anything? No?
MR. ENGQUIST: We're waiting for Austin. Who else is on that? I'm sorry. Austin, or I think Kevin's on. Anything from either of you? Or do you admitted or whatever?
MR. RAHE: The City doesn't have any questions.
MR. ZIBOLSKI: This is Kevin. No questions for Guevara.
MR. ENGQUIST: None for me. We'll reserve.
COURT REPORTER: Okay. We are going off record. The time is 1:33 p.m. Eastern Standard Time. Will all parties please continue to remain on the line?
(DEPOSITION CONCLUDED AT 1:33 P.M.)

CERTIFICATE OF REPORTER

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded stenographically and mechanically by me and then reduced to typwritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

AALAYAH PURNELL,
COURT REPORTER/NOTARY
COMMISSION EXPIRES: 03/22/2025
SUBMITTED ON: 12/06/2021

**Exhibits**

**Exhibit 1_ GAWRYS** 66:3,5,11
**Exhibit 2_ GAWRYS** 72:7,9
**Exhibit 3_ GAWRYS** 75:1,5

**1**

**1** 66:3,5,11
**10** 65:20 66:5 82:14,17 84:23
**11** 68:23 69:7
**11:03** 6:6
**12:13** 52:5
**12:27** 52:9
**13** 65:20 66:5 70:21
**14** 72:8
**1977** 13:25
**1985** 15:10
**1990** 15:13 33:9
**1993** 58:19 68:15 72:16 78:25 79:5,13
**19th** 21:12
**1:09** 82:21
**1:19-CV-6508** 6:12
**1:21** 82:24
**1:33** 91:17,20
**1st** 13:25

**2**

**2** 72:7,9
**2005** 50:7
**2008** 50:5
**2014** 13:22
**2021** 6:6
**20689** 68:9
**21-june-93** 69:8
**22nd** 45:5,20
**23** 72:16
**23rd** 78:25 79:5,13
**27th** 6:5

**3**

**3** 75:1,5 88:13

**4**

**48** 75:3,10,19

**5**

**5** 32:14,16 35:20 36:7,18, 25 37:11 39:2, 10,14,18 41:6 44:2,5 45:2,7 52:14,17 57:22, 25 58:2,5,9,14 60:4 61:9,24 62:11,15,21 63:4 83:4,17 86:11,15,23 87:15,19,21 88:2,4
**5%** 35:15
**50** 77:6
**51** 77:14
**55** 75:3,10

**8**

**84** 14:8
**85** 14:8
**86** 15:10

**9**

**93** 47:8
**95%** 35:14 41:18
**96** 33:14 44:25 45:19 47:7

**A**

**a.m.** 6:6
**Aalayah** 6:4
**ability** 84:8
**academy** 34:21
**access** 20:10 52:22 86:24 87:8
**accounted** 67:15
**accurate** 66:23 74:17
**acknowledge** 80:21
**acquaintances** 61:12,13
**activities** 30:19
**activity** 51:10
**adding** 20:21 22:9
**additional** 34:8
**address** 76:10 77:3
**administrative** 21:21 42:12
**admitted** 91:10
**advice** 61:1
**Affairs** 47:12, 14 48:7 49:6 50:1,4,11,23
**affect** 9:12,14, 22 10:11 82:8
**affects** 9:18,21
**affirm** 7:16
**agree** 7:10
**ahead** 19:13 20:2 31:3,16 37:3 40:8 48:24 53:17 55:10 60:24 65:24 80:22,23 85:13 86:17
**alias** 65:9
**aliases** 65:4
**allegations** 47:18 48:11,12, 19 51:19
**allowed** 25:11
**alongside** 48:8 85:1 86:10
**Amendment** 60:15 82:7
**answering** 8:20 80:23 90:22
**anymore** 51:11 59:2 63:12
**apologize** 87:12
**appearance** 6:13
**appearing** 6:18,19
**appears** 68:5, 12,18
**apply** 45:9
**approval** 42:22 43:2
**approve** 43:5
**approving** 62:18
**approximately** 15:12 22:17 41:19 50:3,12 63:7 84:17,19
**area** 6:21,24 14:16 17:18,21 21:10,11 32:14, 16 35:20 36:7, 18,25 37:11 39:2,10,14,18 41:6 44:2,5 45:2,7 52:14,17 57:22,25 58:2, 5,9,14 59:4 60:4 61:9,24 62:11,15,21 63:4 83:3,17 86:11,15,23 87:15,19,21 88:2,4,13,15
**areas** 32:11 46:21,22
**Armitage** 17:7
**array** 35:21 36:8 71:23
**arrest** 41:3 69:23 71:7,9 72:14,15,23 73:11,16,23 74:2,8,10,16,21 78:5,7,12,17 79:13,25 80:7
**arrested** 73:7 87:23
**arrestee** 68:3
**arresting** 68:23 69:3 72:19,25
**arrests** 18:8 67:2
**aspect** 78:16
**assaults** 28:11
**Assessor's** 13:12,14
**assign** 40:16
**assigned** 16:18,24 19:17 32:23 40:20,23 49:1 57:25 58:2,5,9 73:15 83:8

**assigning** 40:5
**assignment** 14:1
**assignments** 19:20 49:2
**assist** 14:17 25:10 26:4,23 69:23 73:4,11, 23 80:4
**assistance** 40:24 41:4
**assistant** 38:24
**assisted** 71:9 74:2
**assisting** 74:7, 12
**associate** 59:22
**assume** 9:3
**attending** 6:14 7:3
**attorney** 10:13 13:2,6 38:24
**attorneys** 12:11,21 61:1 80:19,21
**attorneys'** 63:17
**Austin** 6:19 91:7,8
**author** 76:9
**authored** 72:18
**auto** 28:11
**aware** 39:15 41:13

**B**

**babbling** 27:25
**back** 9:16 13:23 28:14 32:24 39:9 44:13 45:5,15 46:18 50:6 52:1,8 55:13 56:16 82:23 83:20 90:24
**backup** 41:4
**bad** 9:16 90:3,7
**based** 26:12
**beat** 51:22
**begin** 7:21
**beginning** 8:14 83:13
**belief** 73:18 78:10
**Belmont** 21:5, 16 88:10
**Biebel** 62:13, 17,20 63:16
**big** 48:2
**bigger** 75:12
**bit** 8:15 57:8
**Board** 46:11
**book** 20:22 22:4 24:8 27:18 28:6 88:6,18,21 89:12
**books** 20:5,8, 10,13,15,16,18 21:1,19,22,25 22:3,10,14 23:22,24 25:9, 10,13 27:15 86:20,24 87:4, 8,10,11,14,16, 20,22,24 88:2, 4,7,16 89:2,9
**bottom** 68:8,19 70:23
**box** 67:6 76:10, 11
**boxes** 53:12 76:14
**break** 9:6,10 10:2 52:1 82:13
**bring** 22:1 25:9 56:16 90:24
**broke** 74:18
**Bucktown** 17:25
**building** 21:10, 17 87:15 88:14

**C**

**cabinets** 53:13,15
**call** 24:3 30:14 31:6 41:16 66:23 85:12 87:12,13
**called** 30:24 35:3 41:15 46:7 49:7 64:10 80:3,4 88:14
**calling** 24:6
**calls** 19:11 40:7,12 48:22 55:9 85:16 86:16
**cancer** 9:16
**capacity** 47:23
**care** 42:11
**career** 51:13
**carefully** 11:3
**cars** 16:21
**case** 6:12 11:12,13,14,15, 16 12:18,22,24 13:7 19:8 24:3, 12 25:23,24,25 26:1,3,22,24 31:15 32:1,4,8 39:10 40:16,23 53:14 55:5,13 56:9,12,23 57:17 59:15,16 67:3,13 69:21 70:2,7,12 71:5, 12 73:4,14,19 76:17 78:3,4 90:3,19,23
**cases** 16:10,12 32:24 35:15 39:2 40:19 49:8 50:12 51:3,4 63:11 73:21
**categorizing** 36:24
**change** 14:20 34:24 58:16 83:7,20,22
**changing** 21:12
**charge** 14:23 17:9,18 47:20
**charges** 39:12
**Chicago** 6:18, 20 7:4 13:24 89:2
**Chicagoland** 6:21,24
**Chief** 13:15
**choice** 45:16
**choose** 45:15 84:8,10
**Christmastime** 63:1
**circumstance** 86:6
**circumstances** 23:16,20 26:11 28:6 35:16,17 76:23
**city** 6:20 7:4 17:19,22 51:21 91:11
**citywide** 48:11,12
**civil** 11:13
**clarification** 58:1 83:11
**clarify** 9:2
**classroom** 34:12
**clear** 28:1 55:24 78:5
**cleared** 66:23, 25 67:6,9,12, 17,23 68:2
**clearer** 27:1
**clearing** 26:21
**client** 6:24
**close** 59:4
**closed** 53:14 55:5,13 66:23 67:1,6,9,12,14, 17,23 68:2 78:6
**collected** 16:20
**communicated** 72:2
**communications** 57:1 81:6 90:18
**complaint** 51:13
**complaints** 49:13 51:8,15, 20
**completed** 29:7
**compound** 37:15
**concentrate** 89:21
**CONCLUDED** 91:20
**conclusion** 50:24
**conduct** 35:20 79:4,12 82:8
**conducted** 23:17 71:23
**confidence** 37:10
**confidential** 30:13,15,24 31:5,6,14,24 36:22,25 37:6, 12,18,22 38:6, 15,16,25 49:7 51:5 69:9,19 70:13,17 81:5
**confused** 90:11

**confusing** 8:25

**connection** 18:23 49:12

**consisted** 16:21

**contacted** 69:9,18

**contemporaneous** 85:10

**contents** 42:15 54:1

**context** 86:21

**contexts** 8:16

**continue** 45:7 91:18

**Continuing** 77:13

**Control** 46:8

**convened** 6:7

**conversation** 60:11,19 63:19

**conversations** 64:1,5

**Cook** 13:12,13

**copies** 29:10

**copy** 29:12,13 43:7,19,21 55:11 65:23

**correct** 8:2 10:14,15 18:21, 22 21:20 25:21 28:3 33:11,15 36:23 38:1 41:20,21 45:1 53:11 54:1,2 57:20 68:6,7, 11,25 72:16 73:17 78:12,13 83:6 90:1

**corrected** 76:15,18,21 77:3

**corresponded** 88:21

**corrupt** 49:4

**counsel** 6:12, 15 7:20 65:19

**County** 13:12, 13

**couple** 13:4 45:21 52:11 82:11

**court** 6:3,5,10 7:5,9,14,20 8:18 40:9 52:4, 8 82:20,23 85:14 91:16

**courtroom** 61:5

**cover** 46:23 47:1 48:11

**covering** 46:22

**CPD** 51:13

**created** 41:5

**crime** 14:18 15:24 16:2,6, 16,18 17:8 19:3,6,14,21 20:4 23:4 24:15 25:18,24 26:1 27:3 29:1,14 30:12,17 31:11 32:10,17 33:2 34:6,23 57:19 64:8 86:21

**crimes** 16:13 18:14,15,20,21 19:4,8,9,16,23, 24 20:3,10,16 21:2,3,4,16 22:13,20 23:11, 17 24:10 25:15 27:4 28:7 30:6, 10 33:4,6 40:15 44:14,15,20 58:6 59:21 60:8 64:22 85:8

**criminal** 11:12, 16 22:15 34:24 39:12 51:10 67:24 81:21

**curious** 43:4 83:18

**curricula** 46:14

**custody** 67:14

**D**

**Damen** 17:7

**dangerous** 32:2

**date** 42:20 75:2

**day** 6:5 38:19 68:17 78:11,21 83:7 84:2,7,15

**decide** 26:15

**deciding** 27:8

**decision** 27:4 49:19

**dedicated** 21:17,20

**defendant** 6:20 7:3 12:24 69:3

**defendants** 6:25 90:18

**define** 55:23

**department** 13:24 14:2 22:9 24:2 39:20,25 51:10 89:1

**depend** 27:9

**depended** 84:11

**Depending** 22:2

**depends** 23:19 24:17 25:5 26:17 30:15 38:18 48:25

**deposition** 6:8 8:3 10:19 11:6 12:11,17,19 13:3,7 55:18 56:4 57:5 66:17 69:15 72:12 76:2 77:18 81:18 89:16 91:1,20

**describe** 19:17 48:18

**Design** 46:7

**designation** 36:24

**destroy** 28:25

**details** 21:7 57:10,11 69:25

**detective** 19:21 21:13 24:25 25:19,22 26:22 27:19 30:23 32:11 33:4,7,12,17, 22,24 34:7,23 35:2,5,10,20,24 36:5,7,18 37:11,23 38:23 39:3,10,14,22 40:6,18 41:18 42:1 44:12,23 45:12 52:14,25 54:4,7 57:23 58:5,8,14 68:12,23 70:1, 23,24 71:1 73:15 78:11,15, 19 79:4,11,23, 24,25 83:4 84:21 85:1,5,8, 24 86:11,23 87:19,25 88:5

**detectives** 18:21 19:4,8, 10,15 24:3,6,11 25:8,12 26:2,5, 6 29:11 32:15, 19,23 34:1 35:6 36:15 39:15 40:5 41:2,7 44:21 48:15 57:22 58:9 59:23 69:3,9 70:3,16,18 72:19 73:23 74:7,13 84:1 86:15,18

**determination** 74:9

**determine** 49:22

**developing** 46:14

**direct** 7:23 23:2

**discipline** 49:19,20,23 50:13,21

**discussed** 85:20

**discussions** 80:19

**dispute** 74:15 79:9

**district** 6:10,11 14:6,17 21:12 45:5,20

**division** 6:12 14:3,5 19:22 21:13,14 24:2,6 25:1,20,22 26:22 27:19 35:2 45:5,22,24 46:5 47:4,11

**divisions** 21:7

**document** 23:24 24:7 27:5 65:19 66:10 74:25

**documentation** 71:24

**documented** 67:17 71:17,21 74:16,21

**documenting** 28:5 29:6 37:24 72:15

**documents** 10:18,21 12:2 30:10 55:14,18, 19 56:16 57:5 66:16 73:10,25 78:15 81:17,19 89:15,24 90:23

**dog** 10:17

**door** 63:18

**doubt** 80:5,9, 10

**downtown** 53:20

**drop** 29:13

**E**

**earlier** 36:22 43:10 73:13 78:10 86:19 87:5

**Eastern** 6:6,11 52:5,9 82:21,24 91:17

**else's** 49:22

**employed** 13:9

**encompass** 46:19

**end** 29:22 71:2 78:7 87:12

**Engquist** 6:22, 23 9:18,21 10:14 19:11 20:2 22:12 23:7 31:1,16 35:23 36:1 37:14,19 40:2,7,11 48:21 52:18 53:16 55:9 60:22 65:22 66:3,5,7 75:7,15,17,20, 23 80:17 82:16 83:10 85:12,16 86:16 89:4 90:6,10 91:7,15

**entire** 11:2 78:21 80:6

**Ernie** 32:21 33:21 34:2 61:8,11,14,20

**erroneous** 13:18

**estimate** 16:12 50:4,12 63:7 84:19

**et al** 6:10

**everybody's** 32:1

**evidence** 31:2 68:2 74:9 89:17

**exam** 45:14

**EXAMINATION** 7:23

**examples** 28:10

**exception** 7:1

**exchange** 39:11,16,24

**executing** 73:16 80:7

**exemptions** 13:18

**exhibit** 66:3,5, 11 72:7,9 75:1, 5

**experience** 22:8 84:25

**explain** 21:24 24:18 25:6 26:18 79:23

**explaining** 31:19

**extent** 71:12 80:20

**eye** 31:14 90:2

**eyewitness** 35:21 36:19 79:4,12

**eyewitnesses** 19:25

**F**

**fact** 7:10 60:15 68:18 82:6

**factors** 27:7

**failing** 86:5

**fair** 8:22,23 9:4, 5 18:2 28:1,16 30:20,21 37:21 43:24 44:18 48:13 50:16 57:10 60:6 67:11 71:15 78:20 84:23 89:23

**false** 36:19

**falsified** 50:25

**familiar** 89:17

**familiarity** 8:12 64:9 76:19

**feel** 10:5

**field** 22:5 54:22

**figure** 47:7

**file** 10:22,25 11:2,25 12:3 35:19 41:8,10, 11,12,16,17,25 42:3,14,18,19 43:7,12,14,19 44:14,15,19,21 53:13,15,20,22 54:1,6,8,14,18, 25 55:8,12,14 71:18 73:25 77:18 78:2 79:2 89:15

**filed** 90:17

**files** 44:2,12 52:12,13,16 53:9,24

**final** 70:22

**find** 70:14 74:25

**findings** 49:11, 15

**finish** 8:20,22 67:15 83:2

**five-** 51:25

**flipping** 75:8

**floor** 21:14

**focus** 48:10 52:12

**focused** 46:20

**folks** 25:14

**follow** 83:2

**follow-** 52:11

**form** 22:24 31:16 37:14,19 48:22

**formal** 30:15, 24 31:4 35:9 36:24 37:16

**formally** 73:15

**forward** 65:8

**foundation** 19:12 22:12 23:8 31:1 37:14 40:2,8,11 52:18 53:16 86:17 89:4

**fourth** 75:18

**Francisco** 80:11,15 81:7, 11,14,19

**free** 10:5

**frequently** 18:8 32:16

**friend** 59:8,11 61:11,12 62:5

**friendly** 62:22

**friends** 59:19, 24 60:2,7 62:20

**front** 42:10,14

**froze** 18:23

**full** 7:6

**G**

**G-A-W-R-Y-S** 7:8

**gang** 15:8,11, 15,24 16:2,6, 13,16,18 17:4,8 18:8,14,20 19:3,7,9,16,21, 23,24 20:3,4,5, 9,11,15,16,22 21:2,3,4,16,19, 22,25 22:4,10, 13,14,20 23:4, 11,17,22,24 24:8,10,15 25:15,18 27:3, 12 28:7 29:1, 14,15 30:6,10, 12,17,19 31:11 32:10,16,24,25 33:2,4,6,22 34:6,22 42:9,10 44:13,15,20 57:19 58:6 59:21 60:8 64:8,10,21,22 86:20,21,24,25 87:4,11,14,16, 20,22,24 88:2, 3,4,6,7,10,16, 18,20 89:2,9,12

**gang-related** 26:23

**gangs** 16:19, 24,25 17:9,12, 17 18:3,4,12 20:20 29:20,24 60:5 64:16 88:17 89:3,9

**Gangsters** 64:10,15,19,23 89:12

**gathering** 30:18

**gave** 12:18 31:24 81:5 89:20

**Gawrys** 6:8,24 7:5,8,11,25 9:11 13:9 51:25 52:11 65:21 66:9,16 68:25 72:20 75:3 76:1 83:1 91:3

**general** 29:17 35:3 48:18 66:25 83:14,16 85:21 88:3

**geographic** 17:18

**Geraldo** 6:9,17 64:2 65:5 71:7 72:15,23,25 78:11 79:13,24

80:7 81:22 82:1,9 89:18

**get-** 63:2,8

**Gillie** 32:21

**give** 7:17 23:21 28:10 31:7 43:17 51:7 65:22 75:8,13

**gleaned** 56:13

**good** 7:2 28:15 52:2,3 75:16 82:16 90:3,7

**gosh** 48:3

**GPR** 35:16 41:22 42:2

**GPRS** 23:4 35:2,7,11 41:20 42:21 43:11,12 52:23

**great** 82:18

**ground** 8:14

**group** 14:11, 14,21 62:25

**guess** 23:9 32:24 42:24 53:19 86:9

**guessing** 18:1 80:2

**Guevara** 6:9 7:1,3 11:9,10 12:6 15:14 16:14 17:12 57:18,19 58:14, 22 59:8,19 60:2,10,14 61:18 68:24 70:24 72:3,19 82:6 84:13,21 85:1 90:19 91:14

**Guevara's** 11:18 85:24

**Guevera** 33:20,21

**guilt** 82:9

**guilty** 82:4

**guy** 80:25

**guys** 63:1

**H**

**half** 50:16

**Halvorsen** 12:6 32:21 33:21 61:8,11, 14,18,21 68:24 70:24 72:3,18 90:19

**hand** 7:15 29:8 43:4

**handle** 14:19 49:8

**handled** 51:4

**handwriting** 77:9,11,15,20

**handwritten** 12:8 23:3 24:14,22,23 25:17 26:12 27:2 28:18,22 35:11 41:19 77:7,14,19 85:10,24 86:11

**happen** 32:6

**happened** 26:7 36:19 38:21 73:19

**hard** 65:23

**Hazinski** 6:16 7:12,22,24 9:24 31:9 35:25 36:3 40:17 49:9 51:24 52:10 61:3 65:18,25 66:4,6,8 75:10, 13,21,25 81:1 82:18,25 83:15 85:19 90:9,12 91:3

**head** 47:15

**hear** 8:5 9:25 18:22,24 40:9

**heard** 80:13,14

**helped** 79:4

**helping** 79:11

**Hey** 60:21

**hip** 9:16

**hired** 13:24

**hold** 28:15 29:2

**holes** 42:13

**holidays** 59:13

**homicide** 40:6 55:20 57:9 67:12 69:20 72:4 78:16 80:6 81:11,15 82:4,8 85:2,5,25 86:12 89:18 90:15,25

**hour** 57:6

**hour-and-a-half** 57:6

**hours** 13:5 59:5

**Hugo** 65:12

**hypothetical** 40:13 69:24

**I**

**ID** 23:22,23 24:4,8 27:14,19 28:2,3 89:19

**idea** 14:25 15:22 16:15 50:15,18 60:3 61:22 63:10 78:18 79:22 82:2,5 84:6,18 86:2 90:5

**identification** 35:21 36:20 66:11 72:9 75:5 79:5,12,20

**identifications** 21:23,25 28:5 90:14

**identify** 68:2

**identity** 31:14

38:2,15,25

**Iglesias** 6:9,17 64:2 71:8 72:15 73:1,7 75:2 80:7 81:22 82:1,4 89:18

**Iglesias'** 72:23 78:12 79:13,25 82:9

**IGS** 64:15

**Illinois** 6:11 46:11,12

**imagine** 30:17 53:7

**Imperial** 64:10, 15,19,23 89:12

**implicating** 68:3 89:17

**important** 8:17

**impose** 49:19

**imposed** 49:23 50:14

**improper** 36:11

**inaccurate** 74:22

**Inaudible** 40:8

**incident** 76:10, 22

**include** 35:19

**included** 41:24 42:18 78:8

**including** 90:19

**incomplete** 40:12

**independent** 55:24 56:2,17, 22 74:9 90:24

**independently** 55:23

**individual** 6:25 64:25 65:12 70:14

**individuals** 39:15

**informal** 37:17,19

**informant** 30:24 36:25 37:6,22 38:6, 10,16,25 69:10, 11,19 70:13,17

**informant's** 37:24

**informants** 30:13,15 31:5,6 36:23 37:13,18 39:4

**information** 16:20 22:2 23:25 24:5 26:17,23 27:5 28:19 30:18 31:7,10,12,21, 22,25 37:10,21, 25 38:11 39:3, 10,16,24 50:19 55:7 67:16,21 69:10 70:15,19 71:21 74:16,21 77:5 80:18,20 81:4,13 89:20

**information's** 67:20

**innocence** 82:9

**Insane** 17:6 89:7

**inside** 54:6

**instance** 31:23 52:23 60:21 71:20

**instances** 50:20

**instant** 38:12

**instruct** 80:18

**Instructional** 46:7

**intelligence** 16:20

**interacting** 81:10

**interested** 81:4

**Internal** 47:12, 14 48:7 49:6 50:1,4,11,23

**interrupt** 27:23

**intersections** 17:17

**interview** 18:18 24:22 25:18 26:8 27:2 85:11

**interviewed** 71:20

**interviewing** 85:9

**interviews** 23:6,14 47:1 85:25

**inventory** 53:25 54:4,10, 13

**investigate** 13:18 18:15 19:9 49:2 51:8

**investigated** 19:14 39:2 47:18 48:14 50:13

**investigating** 39:9 48:19 49:4 50:25 70:3

**investigation** 19:18 23:12 24:15 27:3 31:13 38:17 47:22 48:6 54:17 55:20 56:17 57:2,9,10 67:12,15,18,24 69:6,8,20 70:1 71:17 72:4 78:16 80:1,6 81:11,15 82:8 90:15,25

**investigations** 13:15 18:17 22:15,21 23:17 34:24 40:6 41:6 48:15 49:3,10 53:8 84:20 85:2,5 86:1,12 87:19

**investigative** 10:22,25 11:2, 25 12:3,5 29:6 41:11,16,17,24 42:3 44:12,15, 21 52:13,16 53:9,15,24 54:18 55:14 71:18 73:25 74:13 77:18 79:2 89:15

**investigators** 13:17 47:16,17, 21 48:4

**invoked** 60:15

**involve** 34:10

**involved** 48:19 57:17 63:24 68:19 71:7 72:23 78:15 80:1 81:14 89:25

**involvement** 19:7 71:12,16, 17 80:6

**issue** 49:15

**issues** 9:11,14

**J**

**Jack** 32:21 33:21 34:2

**jail** 16:22 39:6

**jailhouse** 39:4

**January** 50:6

**job** 13:21 18:3 31:19 49:22 51:22 80:3

**Joe** 16:3

**jog** 56:22,25

**John** 6:16

**joined** 14:20

**Josh** 6:23 75:13

**June** 72:16 78:25 79:5,13

**K**

**keeping** 35:9

**Kevin** 7:2 91:13

**Kevin's** 91:9

**kind** 33:1 43:16 44:13 56:20 59:4 66:20 84:10

**kinds** 12:2 46:20 67:21

**Kings** 17:5 89:6

**knew** 38:8 61:8

**knowledge** 57:17 64:9 81:25

**L**

**lack** 19:12

**large** 53:9

**lasted** 34:16

**Latin** 17:5,14 88:21,22 89:6

**lawsuit** 90:17, 20

**lawsuits** 60:12 63:13,24

**lawyers** 81:5

**leave** 50:7

**Leavitt** 17:5

**left** 45:2 47:6 60:4 61:2,24 62:11 63:4 67:5 80:3 84:13

**legs** 82:17

**lengthy** 83:19

**leniency** 39:11,15

**Leonard** 32:21 33:21 34:2

**lesson** 46:9

**lieutenant** 44:10 49:1,17, 24 53:6

**limited** 80:7 87:8

**lineup** 35:21 36:9 71:24

**list** 30:1,4 33:20

**listed** 54:1 71:2

**lists** 29:15,23 68:24 72:19

**live** 36:9 59:2 71:23

**location** 6:14

**locked** 39:23

**locker** 30:5,6, 10

**long** 10:2,24 13:2,21 14:4 15:3,11 33:12 34:15 45:20 47:3 57:4 62:9 63:10 84:5

**longer** 83:9

**looked** 10:23, 25 11:25 56:6, 11 72:13

**Lopez** 65:5,10

**lot** 30:18 32:22 33:25 46:22 49:8 53:7,18 59:22 65:16 67:20 83:4 86:2

**louder** 8:8

**Lovers** 17:14 88:21,22

**M**

**made** 24:16,21, 23 27:2 28:18 29:10 33:22,24 39:23 43:13 45:19 47:8 49:21 67:2 90:14

**Mahia** 65:6,10

**mail** 29:13

**maintain** 29:15,18,22 89:2

**maintained** 44:20,21

**Maisonette** 12:20,24

**major** 49:3,4 89:2

**make** 8:13 18:8 23:3 26:11,15 27:4 29:9,12 35:11 38:5,14 39:8,21 41:19 43:19 54:12 56:4 74:8 75:1, 6,11 83:14 85:10,18,20,24 86:11

**making** 49:11 71:7 73:23 74:8 78:7

**man** 48:3 61:1 64:2

**mark** 27:14,16 76:24

**marked** 42:14 66:11 72:9 75:5 77:2

**materials** 46:19

**math** 50:6

**matter** 6:9 73:21

**Mclaughlin** 32:21

**medical** 9:11, 14

**medications** 9:12 10:9,10

**meet** 12:10

**meeting** 13:2

**members** 16:21 18:4,9 20:5,11 29:15 88:17,22

**memories** 56:17,22 90:24

**memory** 9:12, 15,19,21,22 10:11 56:2,25 72:25 73:3,6,9

**memos** 24:11

**mentioned** 12:1 17:16 51:5

**met** 62:25

**midnight** 34:4 83:24 84:15

**midnights** 34:3 83:23 84:1,15

**mind** 26:1 27:22 80:5,9 82:13

**minor** 51:18

**minute** 52:1

**minutes** 82:14, 17

**mischaracterizing** 31:2

**misconduct** 48:20,25

**mixed** 88:17

**mobile** 14:15

**Mohan** 32:22

**money** 49:5

**monitor** 16:19

**monitoring** 17:9,18

**morning** 7:2

**move** 20:25

**moved** 45:21

**multiple** 15:23

**murder** 82:1

**N**

**named** 64:2 65:12

**names** 16:1 29:23 34:4 41:12 68:24 70:23

**narcotics** 28:12

**narrative** 78:8

**needed** 14:19

**Negaera** 65:5, 10

**neighborhood** 17:24

**nickname** 41:15 64:5

**nicknames** 18:11 30:1 41:14

**normal** 73:22

**North** 17:23

**Northern** 6:11

**note** 54:12,24 69:10 77:14

**notes** 22:21,23 23:3,6,12,13,18 24:11,14,16,17, 20,22,23 25:1, 5,17,20 26:12 27:2 28:18,22, 25 29:3 35:11 38:6 41:5,20 44:19 77:7,19, 25 79:3 85:2,3, 4,10,18,21,24 86:6,7,12

**notetaking** 34:24 35:4

**notify** 24:25 25:19 27:19

**noting** 54:9

**November** 13:25

**number** 6:12 17:2 68:9,10 76:10 79:22

**numbers** 21:11

**O**

**object** 48:21 53:16 80:17 89:4

**objection** 19:11 20:2 22:12 23:7,8 31:1,16 37:14, 19 40:2,7,10,11 55:9 60:22 85:12,15,16 86:16

**observations** 61:17 85:23

**observe** 85:1 86:5

**obtain** 31:10, 12 39:3

**occasion** 22:14

**occasions** 18:20 86:4

**occupied** 64:13

**occurred** 19:6

**Ochoa** 65:1,4,9

**October** 6:6

**offense** 76:11

**offer** 39:24

**offered** 39:22

**office** 13:12,14 21:2,4,6,16,21 22:2 25:9 27:12,13 30:7 42:10 53:1,5,10 54:18,25 55:12 62:24 88:10

**officer** 16:6,9, 13 17:12 18:14 19:24 22:13 48:16 50:25 60:17 76:24

**officers** 18:20 20:4 31:15,22, 25 32:9 38:16, 18 44:16,20 46:15 47:19 48:15 57:1

**offices** 63:17

**officially** 40:19 41:15

**on-duty** 40:14

**ongoing** 60:12 72:4

**operated** 44:15

**operating** 48:7

**Operations** 14:11,14,21 15:4

**opinion** 82:3,9

**opportunity** 90:4,7

**option** 45:6

**order** 33:3 35:9 38:2

**ordinary** 85:9

**organized** 88:16

**original** 12:4 43:7,18,23 76:10

**outsiders** 25:11,14 87:9

**overseeing** 48:14

**P**

**p.m.** 52:5,9 82:21,24 91:17, 20

**Padre** 32:22

**pages** 10:24

**pain** 10:6

**paper** 35:18 56:2,13

**paragraph** 69:13

**parameters** 48:23

**Pardon** 9:20 33:5

**Park** 17:25

**part** 16:11 17:22 18:13,17 35:12 36:4 53:18 66:14 67:4 69:11 70:7 73:4

**participated** 79:24

**parties** 7:10 91:18

**partner** 15:18 38:19 58:9 68:16 83:9,19 84:8

**partnered** 16:5,8 57:18 62:1 78:11,19

**partnering** 84:13

**partners** 15:14,23 16:2 33:16 58:5 83:5,7,17,25 84:20

**partnership** 17:12

**passed** 76:5

**patrol** 14:3,4 21:13 24:2,5 45:5,15,18 48:15

**patterns** 14:18
**pending** 6:10 9:10 39:11
**people** 18:11 29:23 30:2,19 31:5,7 33:1 39:6 57:17 62:17 84:3,5 87:23
**percentage** 50:12
**performed** 56:23
**period** 15:17 33:24 44:13 50:3 62:1 68:15 83:9,19 84:12
**permanent** 53:20,22 55:8 83:25
**permitted** 54:17
**perpetrator** 90:4,8
**person** 16:7 39:12 40:5 58:25 59:14 65:3 73:14
**personal** 81:25
**personally** 22:14 49:18 87:18
**personnel** 14:17
**pertaining** 81:19
**phone** 59:1,2
**phonetic** 65:5 75:22
**photo** 23:22,23 27:18 28:6 35:21 36:8 71:23 86:20 89:19,20
**photographs** 11:21,23 19:25 20:5,11,21 87:20 88:22
**photos** 20:23 22:10 27:13 87:17
**pick** 36:8,14,16 70:2
**picked** 42:19
**pictures** 42:9
**piece** 31:20 35:18 38:10
**plaintiff** 6:17
**Plaintiff's** 6:15
**plans** 46:9
**pled** 82:6
**point** 35:11 45:2,6,11 51:12 55:5 57:21 63:20 69:19 70:9 74:1
**police** 12:8 13:24 14:2 21:6 22:9 46:10,14 47:18 50:24 51:1 56:16 60:17 70:8 73:10,25 75:2 79:3 89:14
**policemen** 49:4
**policies** 37:11
**policing** 46:20
**policy** 39:18,20 51:9
**poor** 31:19
**position** 62:15
**positive** 23:23 24:7 28:5
**potentially** 48:16
**practice** 70:8 73:22 85:9,24 86:14
**practices** 34:23
**preparation** 11:5 55:18 56:3 66:17 68:20 69:15 72:12 76:2 77:18 81:17
**prepare** 10:18 12:11 13:3 27:8 28:7,17
**prepared** 28:13 29:5 70:9
**preparing** 89:16
**present** 61:4,5 79:7,15,16
**pretty** 32:20 53:9
**previously** 70:3
**prison** 16:23
**probable** 81:25
**problem** 9:1
**procedure** 36:20 71:24 73:22
**procedures** 35:22 79:5,8, 12,15,21
**proceedings** 6:1 81:21
**process** 8:13 10:6 43:17 56:15 90:22,24
**produced** 65:20
**progress** 35:3 85:21
**prohibited** 39:18
**promises** 39:21
**promoted** 15:8 33:4,7 34:6 44:24 57:21,23 58:2,4,8
**promotion** 15:9 33:10 45:13
**pronounced** 7:25
**properties** 13:18
**prosecute** 82:1
**provide** 41:4
**provided** 34:18,20 38:10 69:11
**providing** 39:16,24
**pull** 22:3
**pulled** 73:14
**punched** 42:13 54:8
**Purnell** 6:4
**purpose** 54:4 67:11,23 68:1
**put** 6:22 20:24 24:1 28:2 29:13 37:23 42:13 43:11,13,19 52:23 54:7,9,13
**putting** 20:17 24:5 27:17 42:2

### Q

**Quality** 46:8
**question** 8:20, 24,25 9:2,10 19:1 26:25 40:3,14 56:7,8 60:23 64:18 69:25 80:21,24
**questioning** 60:16 82:7 83:3
**questions** 52:12 82:11 83:2 86:19,21 90:22 91:4,12, 13

### R

**R-I-C-C-I-O** 62:4
**Rahe** 6:19 7:13 91:11
**raise** 7:15
**rank** 14:20 40:4 46:1
**Ray** 33:20
**read** 11:2 42:19 57:15 76:6 89:19
**reading** 71:10
**readjust** 10:3
**real** 49:3 53:20
**reason** 74:15, 20 79:8
**recall** 15:17 16:1 22:17 32:19 34:12 51:19 58:18 63:15 64:1,4,22 72:22
**receive** 37:17 39:15
**received** 37:12
**recent** 57:12
**recently** 46:8
**recognize** 66:20 77:11
**recognized** 77:19
**recollection** 55:20,25 56:6
**recommend** 49:20
**recommendation** 49:21
**recommendations** 49:12,16
**recommended** 50:13

**recommending** 50:20
**record** 6:3 7:6 52:5,7,8 62:4 65:8 72:8 82:20,22,23 91:17
**records** 38:6
**recruit** 46:9
**reduce** 25:1,3, 20 28:19
**refer** 37:8 76:21
**referred** 70:13
**referring** 65:9
**refers** 37:6,9
**reflecting** 79:3
**relevant** 31:12
**reliable** 90:15
**rely** 28:17
**remain** 14:4 15:3 60:16 91:18
**remained** 80:1
**remember** 14:25 15:5 16:4 17:11,15 18:1 22:6 24:13 30:11 34:4,5, 11,15,17,18 37:16 38:9 39:1 42:25 44:18 45:23 46:17 47:6,9 51:2,11, 15,17,21,22 55:4,23,25 56:9 60:18 61:16 64:14 69:15,18 72:24 78:23 81:9,10,18 84:6 87:22,25 88:5,8
**remembered** 56:20
**remote** 8:16
**remotely** 6:18
**remove** 20:23
**removed** 54:25
**removing** 20:21
**repeat** 23:1 58:11 90:6
**rephrase** 9:2 64:18
**report** 22:24,25 25:2,4,21 26:12,16 27:6, 8,17 28:13,17, 19,25 29:5,7,10 36:19 37:24 38:5 43:5,6,8 46:23 51:1 65:20 66:20,21, 22,23 67:1,9, 12,17,23 68:2, 5,19,20 69:12, 14 70:17,22 71:2 72:7,8,14, 18 74:16,21 75:2,4 76:8,25 77:5 78:6
**reporter** 6:3,5 7:5,9,14,20 8:18 40:9 52:4, 8 82:20,23 85:14 91:16
**reporting** 69:9
**reports** 12:1,8 28:8 35:3 41:5 43:1,12 44:5,19 56:6,11,16,21 57:12 62:18 70:8,12,13 71:18 72:11 73:10,24 76:1, 20 79:3,7,18 85:21 89:14
**represent** 6:25
**representing** 6:17 12:21
**required** 22:23 23:3 29:2 35:2, 6 54:24
**reserve** 91:15
**respect** 39:11 86:10
**response** 60:16 82:7
**responsibilities** 13:16 14:13, 15 16:16 17:10 29:19 46:4,20 47:13
**responsibility** 26:3,21 29:9 42:4,8 74:8
**responsible** 20:17,21 22:9 29:16 40:4,5 42:2 46:7,14 47:21 48:14 49:11,18 54:9 62:18 64:16 69:3
**Rest** 76:22
**restate** 9:2
**retired** 50:5
**reveal** 38:24
**review** 10:18, 21 11:5,8,19 12:2,8 43:18 57:12 70:8 73:24 78:14 79:2 81:17 89:14
**reviewed** 44:1 49:24 55:17 56:3 66:17 69:14 72:11 76:2
**reviewing** 56:21 57:5 70:12 73:9 89:24 90:23
**Rey** 15:14 57:18,19 58:22 59:8,19 60:2, 10,14,21
**Reynaldo** 6:9 82:6
**RFC** 65:20 66:5 68:23 69:7 70:21 72:8 75:2 77:6,14
**Ricardo** 65:5
**Riccio** 12:7 34:5 62:2,5,8, 10 68:13,15,24 72:3,20 78:11, 15,19 79:4,11, 24,25 86:10,11 90:20
**Riccio's** 71:2
**Rivera** 59:15, 16 61:6
**Robberies** 28:11
**Robert** 62:13, 20
**Rodriguez** 65:13
**role** 13:16 14:24
**Roman** 55:20 57:9 69:19 72:3 78:16 80:6 81:14 82:4,8 89:18 90:15,25
**room** 10:13 53:1
**Rosendo** 65:1, 4,9
**routine** 36:4
**routinely** 83:21
**Rule** 51:9
**rules** 8:14 39:25
**run** 8:15 28:23, 25

**S**

**S-T-E-P-H-E-N** 7:8
**Santa** 32:22
**Schuler** 17:5
**screen** 66:1 75:4 78:9
**scroll** 66:13 70:21 77:4
**search** 46:8
**secret** 38:3
**secrets** 32:8
**section** 16:22 69:6,8
**sense** 51:7 56:4
**sentence** 69:7
**separate** 38:5 44:19 56:1,3
**separated** 88:18,19
**sergeant** 15:1 19:19,20,21,23 40:14 44:2,5,24 45:7,9,17,19 46:1,5,6 47:8, 15,20 49:10 55:2 62:16
**sergeants** 40:15 53:5
**setting** 81:6
**sexual** 28:11
**share** 31:25
**shared** 21:6 31:21 66:10
**sharing** 78:9
**sheet** 53:25 54:5,10,13
**shelves** 53:12
**shift** 58:13,18 78:21 83:24 84:1,7,16
**shifts** 58:16
**Shockton** 75:22
**short** 82:13
**shoulder** 65:24

**show** 19:24 22:14 25:9,10 65:18 66:1 72:6 74:24 79:7 87:20

**showed** 27:15

**showing** 27:13

**side** 14:16 17:23

**sign** 43:23

**signature** 43:22

**signed** 44:4

**silent** 60:16

**similar** 44:14

**single** 41:8 83:8

**sir** 7:14,25 69:25

**siren** 87:12

**sister** 59:4

**sit** 79:14,19 81:24 89:11

**sitting** 10:1 63:18

**situation** 31:20

**six-year** 33:24

**smoothly** 8:13

**Snake** 64:6

**so-and-so** 38:20

**socialize** 59:25 60:7 61:14 62:6,23

**socialized** 61:18

**solemnly** 7:15

**sort** 28:18 30:24 38:9 56:5 86:14

**sounds** 36:23 82:18

**south** 14:11,16

**space** 21:15, 17,20

**Sparks** 16:3

**speak** 8:8,17 58:25

**Special** 14:11, 14,21 15:3

**specialist** 15:8,11,15,24 16:2,6,17,18 17:8 19:16 20:4,10,17,20 21:3 22:20 23:4,12,18 24:10,15 25:19 27:4 28:7 29:1, 14 30:12,17 31:11 32:10,17 33:2,22 34:23 57:19 64:8,19 86:22

**specialists** 19:3,9 32:25 34:7 42:11 64:22

**specialize** 17:4,12 64:23

**specialized** 14:7,9 18:3 29:20 64:9 89:6

**specific** 20:14 27:1 39:8 46:21 48:10 67:22

**specifically** 72:24 88:4

**speculation** 19:12 40:8,12 48:22 55:10 85:12,17 86:17

**spend** 57:4

**spoke** 58:21

**spread** 89:21

**staff** 42:12,17

**stamped** 75:2

**standard** 6:7 52:5,9 82:21,24 86:14 91:17

**Standards** 46:11

**star** 68:10

**start** 8:20 27:13,24

**started** 45:23 63:11 91:1

**starting** 6:15

**state** 6:13 7:6 46:11

**state's** 38:24

**statements** 39:3

**States** 6:10

**stay** 53:15 61:23

**stayed** 45:20

**steady** 84:5

**step** 29:6

**Stephen** 6:8 7:7

**stepping** 69:25

**steps** 43:17 48:19

**Steve** 9:19

**sticker** 51:21

**stop** 44:23 45:11 59:6

**stopped** 63:3 78:9 84:13

**store** 41:7

**stored** 21:1,20 52:16 54:19 87:14 88:4,5

**street** 30:19 31:7,13 41:16 89:2

**stretch** 82:17

**structured** 31:8

**stuff** 32:3

**subject** 46:17 51:13

**subjects** 67:3, 14

**submit** 42:21 43:1

**subs** 12:5

**suburban** 46:10

**suggest** 36:7

**summarize** 67:24

**summary** 60:6

**supervise** 13:19

**supervising** 14:24

**supervisor** 14:23 29:2,8 42:22 43:2,5, 18,23 44:1,4 84:9

**supervisor's** 43:22

**supervisory** 47:22

**supplementary** 10:22 12:1 24:2,6 25:2,4, 21 26:12,16 27:6,8 28:8,13, 17 66:21,22 76:20,25

**supported** 74:10

**Suppose** 70:11

**surgery** 9:17

**suspected** 19:7

**swear** 7:16

**system** 31:4 42:16

## T

**T-W-O** 16:25

**taking** 6:23 8:19 9:12 10:8, 10 22:10 49:5 70:7,12

**talk** 57:8 59:12 63:21,23 86:22

**talked** 13:6 38:20 42:9 60:10,14 61:20 62:7 63:15

**talking** 25:7,25 36:22 37:22 43:10 60:20 70:16,18 83:11, 13 87:4

**taught** 46:9,10

**team** 13:17,19 47:15,17,20 48:2,6,10 49:2 84:3

**teams** 48:7,9

**technician** 6:4

**technology** 9:1

**telephone** 7:4

**telling** 27:10 36:14

**term** 30:24 37:5

**terms** 67:17

**territory** 64:12

**testified** 55:17 71:6 78:10

**testify** 57:11 81:21

**testimony** 7:16 11:10,12, 18 61:4,5

**Texas** 59:3

**that'd** 52:2

**thefts** 28:11

51:10

**thing** 9:9 54:13 56:19 86:9

**things** 8:13 14:18 16:23 32:6 35:9 42:9 48:25 49:5 56:12 76:8 79:22 83:22

**three-and-a-half** 50:2

**time** 6:6,7 9:6 10:2 12:14 13:23 15:17 18:25 21:3,11 22:23 25:11 35:14 38:23 41:19 50:3,8, 11,17,23 52:3, 5,6,9,13 53:8 54:13 58:2,4,21 59:6,14 60:24 61:20 62:1,7,9, 25 63:8,10,15 64:21 68:15 75:8,14 79:20 82:21,24 83:5, 9,16,23 84:12 86:3 88:12 91:5,17,18

**times** 8:10,11 12:13 22:17 83:3,18 86:2

**today** 6:5 10:2 66:18 72:12 79:14,19 81:24 89:11,16 90:23

**togethers** 63:9

**told** 73:6 84:9

**Tony** 34:4 62:2, 5,8 86:10

**top** 53:25 76:9

**total** 15:11 51:17 57:4

**touch** 60:11 61:23 62:10

**track** 50:19 54:6

**training** 34:8, 13,16,19,20 37:12,17 45:21, 24 46:2,5,14,18 47:3,6,11

**transcripts** 11:5,8,19

**transferred** 53:20

**transitioned** 34:22

**trial** 11:16 59:17 61:6

**tricky** 31:18

**true** 43:12 79:11

**trusting** 74:13

**truth** 7:17,18 79:9

**turn** 34:4

**turned** 32:18

**Tylenol** 9:23 10:8

**type** 22:24 66:22 67:16 69:17

**typed** 28:19 37:24 43:1,5,8 44:4 69:16

**types** 16:23 48:12 51:8 76:19

**typical** 73:24

**U**

**understand** 8:24 31:17 37:2 43:16 46:13 67:19

**understanding** 35:6,8 37:5 54:3 55:6 76:8, 19 86:15

**understood** 9:3

**unit** 14:7,9,12, 16 40:15 46:7 49:6,7 51:5 86:25

**United** 6:10

**units** 25:16

**Unknowns** 17:6 89:7

**unusual** 14:18

**usual** 70:8

**V**

**vague** 20:2 23:7 48:21 85:13,17 86:17

**verified** 76:14, 20,24

**versus** 6:9

**Vicente** 80:11, 16 81:8,11,14, 19

**victim's** 56:19

**Victor** 65:5

**video** 6:4

**videoconference** 6:7

**view** 90:4,9,10

**violations** 51:9

**violent** 18:15, 21 19:4,6,7,14 25:24 26:1 27:3 40:15 85:8

**visit** 59:6

**volume** 53:9

**W**

**waiting** 91:7

**walking** 63:17

**wanted** 59:5 67:3 70:14

**watch** 84:2,4, 14,15

**ways** 24:7

**week** 12:17 83:8

**well-known** 25:12

**Western** 21:5, 16 88:11

**where'd** 15:7 45:4

**Wicker** 17:25

**withholding** 32:3

**witnesses** 18:18 22:1,15 27:10 71:21 90:3

**wondering** 27:6

**words** 39:22 74:12 76:13,20 80:9

**work** 13:11,12 18:21 19:1,3,17 30:12 32:10,13 33:25 36:4 37:23 40:23 56:22 58:13 59:20,24 60:7, 8,17 61:8,12, 15,18 62:5 74:13 78:2,4 80:3 84:5,10 86:21

**work-related** 30:9

**worked** 16:7,9, 13 19:8,16 32:16,20,22 33:6,21 42:24 44:13 46:19 58:18 62:21 84:2,20 86:10

**working** 19:10 23:11 24:11 31:11,15 32:3,8 37:12,18 38:17 44:23 45:12,23 49:10 52:14,25 59:20 70:2 78:20 84:1,25 85:8 86:3,4

**worries** 90:13

**would've** 86:6

**wrap** 82:12

**write** 24:11 35:18 36:18 38:7

**writing** 46:23

**written** 29:15, 23 55:3 56:1,18 68:9 77:5 78:5

**wrong** 36:23 77:3

**wrote** 29:10 41:22 42:1 70:16

**Y**

**year** 14:7 15:9, 21 45:23 47:6 58:24 63:8

**years** 15:6 33:13 45:17,21 47:5 49:25 50:6 58:16 63:1 83:12

**Youth** 21:14

**Z**

**Zibolski** 7:2,3 91:13

**zoom** 6:20,23 66:13 67:4

# Exhibit 39

**CASE NO. 1:19-CV-6508**

**GERALDO IGLESIAS**

V.

**REYNALDO GUEVARA, ET AL.**

**DEPONENT:**

**ANTHONY RICCIO**

**DATE:**

**May 18, 2022**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CASE NO. 1:19-CV-6508

HON. FRANKLIN U. VALDERRAMA,

DISTRICT JUDGE

HON. MARIA VALDEZ,

MAGISTRATE JUDGE

GERALDO IGLESIAS,

Plaintiff

V.

REYNALDO GUEVARA, ET AL.,

Defendants

DEPONENT: ANTHONY RICCIO

DATE: MAY 18, 2022

REPORTER: SYDNEY LITTLE

APPEARANCES

ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS:

Anand Swaminathan, Esquire
Rachel Brady, Esquire
Isabella Aguilar, Esquire
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: anand@loevy.com
brady@loevy.com
aguilar@loevy.com
(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, ANTHONY RICCIO, ROBERT

BIEBEL, ERNEST HALVORSEN, STEVE GAWRYS:

Dave Brueggen, Esquire

The Sotos Law Firm, P.C.

141 West Jackson Boulevard

Suite 1240A

Chicago, Illinois 60604

Telephone No.: (630) 735-3300

E-mail: dbrueggen@jsotoslaw.com

(Appeared via videoconference)


ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

Megan McGrath, Esquire

Leinenweber Baroni & Daffada LLC

120 North LaSalle Street

Suite 2000

Chicago, Illinois 60602

Telephone No.: (866) 786-3705

E-mail: mkm@ilesq.com

(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

Eileen Rosen, Esquire
Rock Fusco & Connelly, LLC
321 North Clark Street
Chicago, Illinois 60654
Telephone No.: (312) 494-1000
E-mail: erosen@rfclaw.com

(Appeared via videoconference)

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 7 |
| DIRECT EXAMINATION BY MR. SWAMINATHAN | 9 |
| CROSS EXAMINATION BY MS. ROSEN | 343 |

EXHIBITS

| Exhibit | Page |
|---|---|
| 1 - Chicago Police Department Supplementary Report June 24, 1993 RFC IGLESIAS 90-93 | 190 |
| 2 - Chicago Police Department Supplementary Report June 23, 1993 RFC IGLESIAS 97-98 | 243 |
| 3 - Chicago Police Department Supplementary Report June, 23, 1993 RFC IGLESIAS 94-96 | 246 |
| 4 - Chicago Police Department Supplementary Report June, 14, 1993 RFC SERR/MONT 68-72 | 251 |
| 5 - GPR'S RFC IGLESIAS 59-77 | 269 |
| 6 - RFC IGLESIAS 7 | 272 |
| 7 - RFC IGLESIAS 5 | 273 |
| 8 - Anthony Riccio Incident Report/ Investigation RFC IGLESIAS 1442-1567 | 316 |

STIPULATION

The VIDEO deposition of ANTHONY RICCIO was taken at KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on WEDNESDAY the 18th day of MAY 2022 at 10:01 a.m.; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that SYDNEY LITTLE, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

COURT REPORTER: On record. My name is Sydney Little. I'm the online video technician and court reporter today representing Kentuckiana Court Reporters, located at 730 West Main Street, Suite 101, Louisville, Kentucky 40202 [sic]. Today is the 17th [sic] day of May 2022. The time is 10:02 a.m. We are convened by videoconference to take the deposition of Anthony Riccio in the matter of Geraldo Iglesias versus Reynaldo Guevara, et al. pending in the United States District Court for the Northern District of Illinois, Eastern Division, case number 1:19-CV-6508. Will everyone but the witness please state your appearance, how you're attending, and the location you are attending from starting with plaintiff's counsel?

MR. SWAMINATHAN: Anand Swaminathan for plaintiff, Geraldo Iglesias, appearing by Zoom from Chicago.

MS. ROSEN: Eileen Rosen on behalf of defendant, City of Chicago, appearing by Zoom in Chicago.

MR. BRUEGGEN: Dave Brueggen on behalf of the witness, Defendant Riccio, also representing

Defendant Gawrys, Biebel, and Halvorsen, both appearing from Chicago.

MS. MCGRATH: Good morning. Megan McGrath, appearing for Defendant Guevara, appearing from Chicago.

COURT REPORTER: All right, thank you. Mr. Riccio, will you please state your name for the record?

THE WITNESS: Anthony Riccio. And if I could just clarify something. You said today was May 17th. It's May 18th.

COURT REPORTER: Oh, excuse me. Sorry. Thank you.

THE WITNESS: No problem.

COURT REPORTER: Do all parties stipulate that the witness is, in fact, Anthony Riccio?

MR. SWAMINATHAN: So stipulated from the plaintiff.

MS. MCGRATH: So stipulated.

COURT REPORTER: Thank you. Mr. Riccio, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Thank you. Counsel, you may begin.

MR. SWAMINATHAN: Thank you.

DIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q Mr. Riccio, please state and spell your name for the record.

A Anthony Riccio, R-I-C-C-I-O.

Q And did you pronounce that Riccio with a --

A Yes, I do.

Q Okay. All right. I'll -- I will try to do that. And I have referred to you as Mr. Riccio, and I hope that is acceptable to you. I know you've had a distinguished career in the Chicago Police Department, but some of your prior titles are a little wordy for my -- for purposes of the deposition. So --

A Absolutely.

Q -- is it perfectly respectful to you if I call you Mr. Riccio?

A Absolutely. Thank you.

Q Okay. All right. Thank you. Okay. Mr. Riccio, can you tell me if you've ever been previously deposed?

A I have been, yes.

Q How many times have you been deposed, sir?

A Difficult to say. I -- I could ballpark it at maybe a dozen. It's -- it's hard to say over the course of, you know, a 35-year career. Maybe a dozen or so. I -- it's difficult to say.

Q Understood. Have you -- have -- has every time you have been deposed been in the context of your work as a police officer?

A To the best of my recollection, yes.

Q Do you recall any instances when you were -- when you were deposed with regard to a personal matter unrelated to your work as a police officer?

A No, not that I can recall.

Q Okay. Have you ever been sued in your personal capacity unrelated to your work as a Chicago police officer?

A No. I have not.

Q Have you ever sued anyone unrelated to your work as a Chicago police officer?

A No. Nothing that I could think of. I mean, maybe a traffic accident or something with the insurance, but I -- I don't think anything has -- nothing's ever gone to court or been deposed or anything. But other than that, no.

Q Okay. Other than something like a traffic accident, you can't recall any instances in which you

had a personal lawsuit unrelated to your police work, correct?

A That's correct.

Q Okay. The times that you -- the approximately dozen times that you have been deposed, when is the last time you've had such a deposition?

A Probably like several months ago.

Q What was the matter on which you were deposed?

A It's a lawsuit from current and former police department employees. I was -- I was deposed as a witness and -- I think it's -- it's regarding the demotion or failure to promote, something of that nature. An internal thing within the police department. I was deposed as a witness.

Q And were you ever deposed in a case based on your work as a homicide detective?

A I -- I -- I couldn't say yes or no. I have to say I don't recall.

Q Okay. Have you ever been deposed during the course of your police career as a defendant in a lawsuit?

A Yes.

Q Okay. How many times have you been deposed as a defendant in a lawsuit?

A I -- I don't recall the number. I would say a

small number, maybe two to three. I -- I really don't recall.

Q Thank you. And you understand that today you're being deposed as a defendant in this lawsuit, correct, sir?

A Yes, I do.

Q Okay. So other than this instance, it's your recollection that approximately two to three times you've been previously deposed as a defendant in a lawsuit based on your police work, correct?

A Yes, that's correct.

Q Okay. And tell me, in any of those prior instances when you were a defendant in a lawsuit based on your police work, was there ever a judgment entered against you?

A I don't recall. A lot of times you don't get the outcome of them. The cases are settled or disposed of, and you don't really know. So I would have to say I don't know would be probably the best answer I can give you on that.

Q Are you aware of any instances when you were previously a defendant in which the case settled by a monetary payment?

A I -- I -- I don't know. Perhaps. But again, I don't know, because a lot of times that information is

never provided back to the officer.

Q Okay. With regard to those two to three prior instances in which you've been deposed where you were a defendant in a lawsuit, tell me what you remember about any of those lawsuits against you.

A I -- I really don't have a recollection of what the facts were. And again, they were probably quite old. I really don't recall what the facts of those were. I'm sorry.

Q Okay. Were any of those prior lawsuits related to your work as a detective?

A Again, I -- I don't recall. That was such a long time ago. Off the top of my head, I would say no. But I -- I -- I don't want to be held to that because, again, it was such a long time ago.

Q Understood. Any of those prior instances in relate -- strike that. Any of those prior two to three instances when you were deposed in cases where you were a defendant, were they cases that emanated from your work as a gang crimes officer?

A Again, I -- it -- I -- I can't say with certainties. I would just have to say I don't recall.

Q Okay. All right. How many times have you been -- strike that. Have you testified in court -- in court on numerous occasions?

A Yes, I have.
Q As a sworn police officer?
A Yes. Correct.
Q Okay. Would you say you've testified in court hundreds of times?
A Yeah. I mean, hundreds might be -- might be excessive, but often -- a lot.
Q Okay. Would you say that it's probably been over 100 times that you've testified in court under oath?
A I would say it's probably about 100 times. Maybe in that vicinity.
Q Okay. All right. And you understand you're under oath today, correct?
A Correct.
Q Okay. And you understand what that means, correct?
A Yes.
Q Okay. All right. Let me just go through the ground rules. I suspect you know them, but I will say them again here today. This is basically a question-and-answer session. I'll ask my questions, you'll answer them to the best of your ability, and there'll be a court reporter taking that down. So first important rule is we have to -- I need to hear verbal answers. Yes

or no, not nods of the heads or uh-huh because the court reporter can't take that down, okay?

A Got it.

Q Okay. Next important rule is for the court reporter, we can't be talking at the same time, so please make sure I finish my question before you answer, okay?

A Got it.

Q There will be times in the deposition where you will surely know where my question is going and where it's going to end, but please try to make sure I finish my question before you answer, okay?

A Got it.

Q Similarly, if I have started to ask you my next question because I thought you were done answering and you had more to say, please let me know and I'll let you finish your answer, okay?

A Got it.

Q Okay. You and I both talk fast, and so the court reporter may at times tell us to slow down, but barring that, just be aware that she is trying her best to take it all down so we should try to help her do that, okay?

A Understood.

Q If I ask you a question and you don't

understand my question, please let me know and I will rephrase it, okay?

A Okay.

Q And if you answer my question, I'll assume you understood my question, also fair?

A Fair.

Q Okay. If you need to take a break at any point, we can do that. We just need to answer any pending question before we take a break, okay?

A Good.

Q All right. A couple of yes or no questions that -- so I'm not asking you to get into details. Just answer these yes or no to the extent you can, okay? First question. Are you taking any medications that would prevent you from being able to understand my questions and answer them today?

A No, I'm not.

Q Do you suffer from any medical conditions that would prevent you from being able to understand my questions and answer them today?

A No, I don't.

Q Is there any reason you believe that you're not in the position today to be able to understand my questions and answer them truthfully?

A No, I am not.

Q Okay. All right. Sir, do you speak Spanish?
A No, I don't.
Q At any point during the time you were a Chicago police officer have you been a Spanish speaker?
A No, I have not.
Q When speaking with or interviewing witnesses who speak Spanish, have you ever been able to conduct those interviews yourself, or have you always required a translator?
A I would've always required a translator.
Q And during the course of your career, I assume there have been instances when you have interviewed Spanish speakers?
A There -- more than likely there was, yes. I don't recall specifically, but yes.
Q In general, that has occurred during the course of your time as an investigator, fair?
A Most likely, yes.
Q And in those instances, would you typically use other Chicago police officers who were Spanish speakers as a translator?
A Sometimes, yes. There were translators available through the department as well. Sometimes you would use a citizen. You would use whatever was expedient.

Q Okay. But in none of those instances did you try to speak Spanish or interpret for yourself; is that fair?
A No. That's fair. Yes.
Q Okay. All right. Officer -- sir, could you tell me what you did to prepare for today's deposition?
A I talked with my attorneys and reviewed some of the pertinent reports.
Q Anything else?
A No. That was all.
Q How many meetings did you have with your attorneys?
A Two.
Q When was the first of those meetings?
A The first was Monday the 16th of May.
Q And when was the second of those meetings?
A Tuesday the 17th of May.
Q Okay. Who was present for your meeting on Monday, May 16th?
A Myself and my two attorneys.
Q And when you say your two attorneys, who are you referring to?
A Josh and Dave.
Q Josh is Josh Engquist?
A Yes, it is. Yes, it is.

Q And -- and Dave is Dave Brueggen?
A Yes. Correct.
Q Anyone else for that meeting on May 16th?
A The same. Myself and my two attorneys.
Q Sorry, let me ask it again. I think you might have misunderstood me. At that first meeting on May 16th, was anyone present other than yourself and Mr. Brueggen and Mr. Engquist?
A Oh. No. No, no one else was present.
Q Okay. Did anybody else participate by phone?
A No.
Q Okay. For your meeting on Tuesday the 17th, who was present at that meeting?
A Myself, my two attorneys, and, for a time, Eileen Rosen was also present.
Q Okay. So on Tuesday the 17th, the attorneys present were Mr. Engquist, Mr. Brueggen, and Ms. Rosen, correct?
A That's correct.
Q Okay. How long was your meeting on Monday the 16th?
A God, I don't -- I don't recall. Maybe like three hours.
Q Okay. And how long was your meeting on Tuesday the 17th?

A A little bit longer. Maybe four hours. I'm just -- I'm just guessing on both of these. Ball parking it.

Q Okay. And other than those two meetings, did you have any prior meetings with counsel in preparation for any earlier scheduled deposition in this case?

A We had talked about scheduling. No specifics about the case. But those were the only two meetings where we talked and discussed the case and prepared for the deposition.

Q Okay. Did you do any work independently to prepare for today's deposition in terms of reviewing documents or anything else outside the presence of counsel?

A No.

Q Did you have any substantive conversations about the deposition with counsel other than in those two meetings on Monday and Tuesday?

A No.

Q Okay. Did you review documents in your first meeting with counsel on Monday the 16th?

A Yes.

Q What documents did you review?

A Documents from the case file, specifically two lineup sup reports, the arrest report, investigative

file inventory. I want to say that was it. I don't recall any others. There may have been a couple others that we talked about, but I think primarily those were the ones.

Q And those documents that you've described so far all -- are all forms of police reports, correct?

A Correct.

Q Okay. And did you review all of the police reports in the file or select police reports in the file?

A Just select police reports.

Q Okay. And so, you recall that among the police reports you would've reviewed on Monday were the two lineup supplementary reports, correct?

A Correct.

Q And also the arrest report, correct?

A Correct.

Q And also, did you say the inventory?

A Investigative file inventory, yes.

Q Okay. Did you also review the cleared closed report?

A No, I did not.

Q Did you also review the initial scene reports?

A No, I did not.

Q Did you review any GPRs?

A No, I did not.

Q Did you review any photos?

A Yes. There were two lineup photos that I reviewed.

Q Any other photos you reviewed in that meeting?

A No. Those were the only two photos.

Q Okay. Any transcripts or testimony that you reviewed?

A No.

Q In your meeting on -- well, strike that. Anything else you recall -- any -- strike that. Any other documents you recall reviewing during your first meeting on Monday the 16th?

A Not that I can recall, but it was kind of a lengthy meeting. But to the best of my recollection, those were the only ones.

Q Okay. And so, to the best of your recollection in your meeting on Monday the 16th, the only type of documents you reviewed were police reports, correct?

A Well, police reports, photos, the investigative file inventory. I don't know if that's a report, per se. It's more of a form. But yeah, that -- that was all. Yes.

Q Okay. Thank you. And let me clarify, then.

 That's a good -- that's a good point. The only documents you reviewed in your meeting on Monday the 16th were documents generated as part of the police investigation, fair?

A That's fair.

Q Okay. On Tuesday the 17th, did you review any documents other than documents generated as part of the police investigation?

A No, I did not.

Q Okay. On Tuesday, did you review any additional or new documents other than the documents you reviewed on Monday?

A No. The same documents.

Q Okay. So the documents you reviewed on Tuesday -- strike that. So on Tuesday you did review the same set of documents you reviewed on Monday?

A Yes, to some degree. We reviewed them again. Yes.

Q Okay. So at any point during your preparation for this deposition did you review all the documents in the investigative file?

A No.

Q At any point in preparation for this deposition did you review the cleared closed report?

A No.

Q At any point in preparation for today's deposition did you review any of the original or initial scene supplementary reports?

A No.

Q And at any point in preparation for today's deposition did you review any GPRs?

A No.

Q In preparation for today's deposition did you review the complaint that was filed in this case?

A No.

Q In preparation for today's deposition did you review any document requests or interrogatory requests that were submitted to you?

A We did review the interrogatory that you had requested of us.

Q Okay. And you provided a supplement to that interrogatory, correct?

A That's correct.

Q Okay. Other than that interrogatory, any other discovery requests that you reviewed in preparation for today?

A No.

Q Have you ever previously -- prior to the reviewing that document at yesterday's deposition -- at yesterday's preparation -- well, strike that. Prior to

reviewing the interrogatory responses in your preparation for today's deposition this week, had you previously ever seen those responses?

A Yes. When they were initially submitted.

Q Okay. Had you previously seen any requests for production that were submitted to you?

A I would say no because I don't know what those are.

Q Okay. Did you ever receive any requests for documents from your counsel?

MR. BRUEGGEN: Object. I think you're kind of getting into attorney-client privilege. I think you need to clarify the question, Anand. You're asking if we asked him for documents? I think that's --

MR. SWAMINATHAN: No. I'm asking if he ever received -- okay. So let me -- yeah, let me clarify and ask it a little differently.

BY MR. SWAMINATHAN:

Q In this case, there were a set of requests for production. Basically a request for the party, yourself, to produce documents. Did you ever receive or review such a document?

A I was asked if I had any --

MR. BRUEGGEN: And -- and --

THE WITNESS: Sorry.

MR. BRUEGGEN: Don't -- don't talk about anything that we talked about.

THE WITNESS: Okay.

MR. BRUEGGEN: He's just asking if you saw the document. If you --

THE WITNESS: Okay.

MR. BRUEGGEN: -- recall seeing --

MR. SWAMINATHAN: Correct.

MR. BRUEGGEN: -- the document.

MR. SWAMINATHAN: That's correct. So let me clarify.

BY MR. SWAMINATHAN:

Q Without going to any attorney-client communications. I don't want to know about any conversations you had with counsel. I want to know only if the document identified as a request for production or a request for you to produce documents is something you've ever seen?

A I'm going to go with no because I don't recall ever seeing it, so

Q Okay. Okay. In your preparation for today's deposition, have you reviewed any transcripts of depositions or trials?

MR. BRUEGGEN: Objection, asked and answered. Go ahead, sir.

A No, I have not.
Q Have you reviewed any material related to the post-conviction proceedings that resulted in Mr. Iglesias' exoneration?
A No, I have not.
Q Okay. And just to sort of clarify, as we move forward through the deposition, we're obviously going to be talking today about the homicide case that resulted in the conviction of Geraldo Iglesias. When I refer to Mr. Iglesias, you understand that I'm referring to the plaintiff in this case, correct?
A Yes. Yes, I understand.
Q And you understand that this lawsuit concerns an -- police -- underlying police investigation into the murder of a woman named Monica Roman, correct?
A Yes. I understand that.
Q Okay. And so, for purposes of today's deposition, when I refer to the Roman investigation or the Roman homicide investigation, you understand that I'm referring to the underlying homicide investigation that resulted in Mr. Iglesias' conviction, fair?
A Fair.
Q Okay. And when I -- and when I refer to Mr. Iglesias or I refer to this case, I'm referring to the homicide investigation that resulted in Mr. Iglesias'

conviction, correct?

A Understood. Yes, sir.

Q Thank you. All right. So with that -- with that sort of clarification, I -- you might have answered the question. I apologize if I'm asking it again. Are you aware of any of the evidence or information that resulted in Mr. Iglesias' conviction being vacated?

MR. BRUEGGEN: Object to form.

A No, I am not.

Q Have you reviewed any of the post-conviction documents or court-related materials related to Mr. Iglesias' exoneration?

MR. BRUEGGEN: Objection. Asked and answered. Go ahead, sir.

A No, I am not aware of anything.

Q Did you testify at the trial of Mr. Iglesias?

A No, I did not.

Q Did you testify any pre-trial proceedings related to Mr. Iglesias' case?

A No. And let me qualify my last answer. Not that I recall. Again, this was 30 years ago. I don't recall testifying at the trial or pre-trial or -- or anything else.

Q Okay.

A That said, it was 30 years ago. I don't

recall.

Q Okay. Did -- when you reviewed documents in preparation for today's deposition related to the underlying Roman investigation, prior to that, when was the last time you'd ever seen any underlying documents related to the Roman investigation?

A I would say probably back in Area 5 when the incident occurred. Again, I don't recall if I was called to testify at trial. I don't -- I don't remember being there, so I'll just say I don't recall. But if, in fact, I was not at the trial, then it would be at Area 5 when the -- when the incident was being investigated.

Q Okay. So other than back at the time of the underlying investigation -- well, strike that -- between the time of Mr. Iglesias' conviction at minimum, through the time you reviewed the documents in preparation for today's deposition this week, you did not review any of the underlying police reports related to the Roman investigation at all, correct?

MR. BRUEGGEN: Object to form. Go ahead, sir.

A That's correct. With one caveat. My attorneys did provide me with copies of it shortly after I was notified of this lawsuit, so I -- and I don't remember the timeframe on that. Maybe eight months ago,

ten -- maybe even longer. Maybe a couple years ago.
Q Okay.
A Having said that, they gave me a stack of those reports that I perused at the time, and then, quite honestly, put in a drawer and haven't seen since.
Q Okay, thank you. And that's -- you've anticipated my next question, which --
A Okay.
Q -- was going to be to ask you, once you found out that this lawsuit had been filed -- I assume when you first learned of the lawsuit, you had not at any time recently you reviewed any documents related to the Roman investigation, correct?
A Correct.
Q Okay. So when you found out that you were a defendant in the Roman -- in this lawsuit related to the Roman investigation, did you have any specific memory of the investigation at that point?
A No, not at all.
Q Okay. When you -- and so, after you found out that you had been sued, did you then -- (coughs) excuse me, then receive documents related to the underlying investigation?
A I did receive those documents, yes.
Q And are you still in possession of those

documents?

A I still have those documents, yes.

Q Okay. And are those documents all documents generated as part of the police investigation?

A They are.

Q Is it the entire investigative file for the case?

MR. BRUEGGEN: Object to foundation. Go ahead, sir.

A Yeah, I couldn't say with certainty. I -- because I don't know what was in the file. It's, you know, maybe about an inch-and-a-half thick of reports. And again, to be perfectly honest, I -- I didn't review that -- that pile at all. But perusing it, I believe that it does contain contents from the investigative file.

Q Okay. And based on your review of it, did it contain the kinds of documents you typically would see in an investigative file based on your experience?

A Yes, it did.

Q Okay. And was it essentially a larger collection of materials than what you specifically reviewed in preparation for today's deposition this week?

A Yes, it is.

Q Okay. And so, you spent some time perusing that material when you first received it; is that fair?
A I think that would probably be overstating how -- how much I looked at it. I was still working at the time. I was a first deputy. I remember getting the packet and maybe flipping through pages and, quite honestly, I put it in a drawer until I figured I would need it again.
Q Okay. How much total time do you spent -- do you think you spent looking at it when you first received that set of materials?
A Less than -- less than five minutes. Maybe less than -- less than three minutes. Yeah.
Q Okay. Once you found out you were a defendant in this lawsuit, other than conversations with counsel -- I want you to put that to this side. When you found out that you were a defendant in this lawsuit, did you speak to anyone else who was a current or former police officer about that?
A No, not that I can recall.
Q Did you receive a copy of the complaint?
A Yes.
Q Okay. And you -- and the complaint identified other police officers who were defendants in the lawsuit, correct?

A You know, I didn't read the complaint either. I discussed it with my attorneys at the time they gave it to me, but I didn't read the complaint either.
Q Did you recognize the names of any of the other defendants in the lawsuit?
A Probably. Again, I don't -- I don't recall reading it. But yeah, I -- I certainly know the other defendants. (phone rings).
Q Did you -- do you need to take that call?
A No, no, no. It's probably spam, actually.
Q Okay. Did you -- after you received -- found out about that lawsuit against you, did you have any conversations with Reynaldo Guevara?
A No.
Q Between the time that you found out about this lawsuit and today, have you had any conversations with Reynaldo Guevara?
A No.
Q When was the last time you've ever spoken to Mr. Guevara?
A Oh, God. I would say, and I'm ball parking, 25 years ago. 20 years ago.
Q Would that have been while in the context of your work as a Chicago police officer?
A Yes.

Q And so, would it have been at work, or would it have been outside of work?

A No. It would've definitely been at work if, in fact, it was 20 years ago. It may have been longer. It's -- it's been a very long time.

Q Was it -- was the last time you spoke with Detective Guevara while you were a detective or in some supervisory capacity?

A It -- well, I was -- I was a sergeant in Area 5 after I was a detective in Area 5. So obviously, Guevara worked in Area 5, so it would've been while I was a sergeant working at Area 5.

Q Okay. So after you moved on from being a sergeant at Area 5, did you ever have any other communication with Detective Guevara between that time and today?

A I'll say no with a caveat that, you know, possibly a hello and goodbye, but I -- I really don't recall. I don't -- I don't think that I had any contact with him after I left Area 5.

Q Okay. Thank you. And during the time that you worked with Detective Guevara at Area 5, either in your capacity as a detective or as a sergeant, did you ever socialize with Detective Guevara?

A No. Never.

Q Did you ever spend time with him outside of work getting drinks or anything like that?
A Never.
Q When you -- did you -- when you found out about this lawsuit, did you have any communications with Ernest Halvorsen?
A No. I believe Ernest Halvorsen was deceased when I found out about it.
Q Okay. When you -- when was the last time you'd ever spoken to Ernest Halvorsen?
A Probably when I left Area 5, which would've been in 1998. I don't recall any contact with him after that as well.
Q Okay. And that was -- so 1998 is when you left your position as a sergeant in the -- at Area 5, correct?
A That's correct.
Q Okay. Did you have any -- strike that. Did you ever socialize with Ernest Halvorsen?
A No. Never.
Q Did you attend his funeral?
A No, I did not.
Q When is the last time you had any conversations or contact with Steven Gawrys?
A Probably when I left Area 5 as well, in 1998.

I don't recall any contact with him after that unless our paths crossed at work or something. But again, Steve and I never socialized or had any sort of relationship outside of work.

Q So let me ask the question, just so that I have the question rather than a compound form. Have you ever socialized outside of work with Steve Gawrys?

A No.

Q Okay. When's the last time you ever spoke with Bob Biebel?

A I had dinner with Bob Biebel -- there was a group of people who had dinner, and Bob Biebel was one of them. I would say maybe six months ago, eight months ago.

Q Did you talk about this lawsuit at all?

A No.

Q Did you talk about your Chicago policework at all?

A Yes.

Q At that time, was Mr. Biebel in the Chicago Police Department?

A No. He had been retired for years.

Q Okay. Did you talk at all about your work as a homicide detective during that dinner?

A Not that I can recall.

Q Who else was present?

A There was a group of people -- I know a guy named Bob Myers was present. Tony Wojcik was present. There were a couple guys there. I -- I don't even know -- I don't even remember their names. A guy named George McMurray was present. I think it was McMurray.

Q Was it John McMurray or George McMurray?

A Oh, maybe it was John McMurray. John McMurray. Yeah.

Q And what was the reason that that particular group of people were getting together for dinner approximately?

A Oh, just because we had all been -- we had all been coworkers at one point in time or another in our career and some, you know, associations. We hadn't seen each other for a long time, so one of the guys kind of set up a dinner for everybody to just meet up and catch up and chit-chat.

Q Who set up the dinner?

A I think it was Bob Myers set it up.

Q And was it -- was the commonality all people who had previously worked as detectives, or was it some other commonality?

MR. BRUEGGEN: Object to foundation. Go ahead, sir.

A Yeah. Chicago police officers. I don't -- I don't think everybody there had been a detective.

Q Okay. Did you talk to Tony Wojcik during that dinner?

A Yes.

Q And what did you and Tony Wojcik discuss?

A Oh, I -- war stories, family. I don't -- I don't remember anything with certainty, but that was kind of the -- the vibe of the night. Just, you know, rehashing war stories and how good things were and how bad things are. Just chit-chat, small talk, family stuff.

Q What do you mean by how good things were and how bad things are now?

A Well, just the state of the police department. And, you know, one thing police like to do when they get together is talk about how good things used to be and how bad things turned out. So that was it. Just -- just chit-chatting and, you know, how things have changed on the police department and how bosses have changed. Small talk.

Q Any conversation with Mr. Wojcik about any past homicide cases?

A No.

Q Any conversation with Mr. Wojcik about any

lawsuits?

A No.

Q Any conversation with Mr. Biebel about any lawsuits?

A No.

Q Any conversation with Mr. Biebel about any past homicide cases?

A No, not that I can recall.

Q During the course of that dinner, did Rey Guevara's name come up at all?

A Not that I can recall.

Q Okay. When you were at that dinner, were you aware that Mr. Biebel had also been sued as a defendant in this lawsuit?

A I may have been. I don't want to say for sure. I may have been aware of it. I don't recall.

Q Was that fact mentioned at all in your conversations with Mr. Biebel that evening?

A No. We didn't -- we didn't discuss that at all.

Q Have you had any meetings with Mr. Biebel in prep -- during the course of this lawsuit and -- well strike that. Have you -- have you had any meetings with counsel in which other defendants in this lawsuit were present?

A No.

Q Okay. When is the last time you spoke with Ed Mingey?

A Probably when Ed Mingey retired, which I think was before I left Area 5. So I don't recall specifically. It wasn't after 1998 when I left, but I just don't remember the timing of when he retired. But after I left Area 5, I hadn't seen or talked to Ed Mingey at all.

Q Have you ever socialized with Ed Mingey?

A No.

Q During the time that you were a sergeant overseeing homicide detectives, was he also in that same role?

A Well --

MR. BRUEGGEN: Object to form. Misstates his testimony. Go ahead, sir.

A Just for clarification, when I was a sergeant, I was a robbery sergeant. I didn't oversee homicide investigations. Ed Mingey was a homicide sergeant. I don't remember if we were sergeants there at the same time. That's -- that -- my memory's not clear on that if he had retired prior to me coming back as a sergeant.

Q Very good. So let's actually take this as a chance to walk through your background. And we'll go

through it quickly because I know there's a long -- there's a long history there. Let me -- before I do that, let me just ask you quickly. What are you doing currently, sir?

A Currently I work for Monterrey Security in a consultant-type position.

Q What is Monterrey Security?

A It's a private security company located in Chicago.

Q And is that -- what kind of security do they provide? Is it sort of for distin -- for, you know, dignitaries? Is it sort of for the bank at the end of the street? Give me a sense of kind of work it is.

A It's pretty broad. I mean they do -- they do bank security, they do a lot of events security, Bears games, Chicago Fire games, concerts. They have security on CTA, so it's kind of wide-ranging.

Q Okay. And you receive income from that position as a consultant for Monterrey Security?

A I'm sorry, can you repeat that?

Q Sorry. Do you receive income from Monterrey Security in that --

A Oh, yep. Yes, I do.

Q Okay. And do you receive a police pension?

A Yes, I do.

Q Do you have any other sources of income?
A No, I do not.
MR. SWAMINATHAN: Okay. I was going to ask you a little bit more about your assets and net worth related to punitive damages. But Dave, I think we have the agreement in place in this case about punitive damages? Correct me if I'm wrong.
MR. BRUEGGEN: Yes. We're going to kick that can down the road until after summary judgment and then we'll revisit it at that time.
BY MR. SWAMINATHAN:
Q Okay. Got it. Okay. All right. So we will move on from that topic. Mr. Riccio, let's just walk through your police career. I have a general sense of it, but it's helpful for me to have you sort of walk me through as best you can. And I think maybe the most efficient way to do it is to have you just sort of start, you know, with your entry into the Chicago Police Department, the first position you held, and sort of just walk me through your positions. And this will be the rare instance where I may cut you off at a moment here or there, just to make sure -- to clarify that I've understood sort of what you said, and sort of have you continue. But let's just walk through it so I've got a sense, okay? Thank you.

A Okay. So I'll go kind of broad. If you want specifics, let me know.

Q Thank you.

A I'm not sure about the dates exactly because there's a lot, but I'll give you the best I can. I was hired in August of 1986, and I was a patrol officer for four years until 1990. In 1990, I was promoted to detective, and I was a detective until 1994 when I was promoted to sergeant. And I remained a sergeant until 1998 when I was promoted to lieutenant. I was a lieutenant from '98 to 2008. In 2008, I was promoted to commander. I was a commander until 2013. In 2013, I was promoted to deputy chief, in 2015, I was promoted to chief, and in 2017, I was promoted to first deputy superintendent.

Q Okay. And then you -- and when did you retire?

A I retired in August of 2020.

Q Okay. And I think, correct me if I'm wrong, you had previously intended to retire earlier than August of 2020 and then stayed on; is that right?

A Just a few months earlier, and then I was requested to remain on through most of the summer, which I did.

Q Okay. And then, when did you take up the

position with Monterrey Security?

A I want to say January of '21.

Q Did you have any other jobs that you had held during the time that you were a Chicago Police Officer until your retirement in August 2020?

A Occasionally like as a patrolman, I would work a security job here or there at a venue, but nothing -- nothing steady or -- or anything like that.

Q All right. So you were a patrol officer from 1986 to 1990 when you were promoted to detective. During that period of time, did you ever work out of Gang Crimes North?

A Yes I did.

Q And what was the period of time you worked out of Gang Crimes North?

A Again, I'm like really fuzzy on these years. So I would say probably around '80 -- 1988 to the time I was promoted in 1990. But again, I'm just ballparking these dates. I'm not sure about them.

Q And at that time, was your title gang crimes specialist or gang crimes officer? What was it?

A Gang crimes officer. I was on the -- what they call the tactical side of the house.

Q Okay. And just -- what was the distinction between this -- I know that there are these two

different concepts, right? Gang crimes officer and gang crimes specialist, correct?

A Right, right.

Q In that time period. So what was the difference or distinction in terms of what they did or did not do?

A Well, there was a couple. For one thing, gang crime specialists received a higher rate of pay. They were considered more investigators, investigative. That was not me. I was on the tactical side of the house, which is you basically supplemented district manpower going to areas where there was a lot of gang conflicts and you did enforcement. So you were arresting gang members involved in, you know, criminal activity, on-view things. They -- they wanted us to run name checks for warrants and check cars for guns and things like that. So we were -- they called us the tactical side of the house. The specialists were more investigators. They didn't -- they did a lot of investigating and they had knowledge of the nicknames of gang members and things like that.

Q Okay. So the gang -- because you were never a gang crime specialist?

A That's correct. I was never that.

Q Got it. But they were also working out of

Gang Crimes North just as the gang crimes officers were?

A Yeah. We had the same office. We had -- reported to the same location, but then we split.

Q Okay.

A But they didn't attend our roll calls. They -- they really did their own thing.

Q Got it. So would gang crimes -- would -- so would gang crimes specialists participate or assist in homicide investigations?

MR. BRUEGGEN: Object to foundation. Go ahead, sir.

A Yeah. I -- anecdotally, I could say yes. But I really don't know what the gang crime specialists did because, again, I was never part of that. It was almost like -- it was almost like two separate units, really. They operated independent of us, we, independent of them. We just reported to the same location.

Q Okay. And then in terms of gang crimes officers, would they participate or assist in gang -- in homicide investigations?

A Typically, no.

Q Okay. Okay. So when you were a gang crimes officer, you were working out of Gang Crimes North, correct?

A Correct.

Q And do you recall who your supervisors were in that position?
A For most of the time I was there, it was a sergeant named Dan Amaday, and I couldn't spell his last name today, but he was my sergeant most -- for 99 percent of the time that I was there.
Q During the time you were working as a -- out of Gang Crimes North, was Rey Guevara also working out of Gang Crimes North?
MR. BRUEGGEN: Object to foundation. Go ahead, sir.
A Yep. Rey Guevara was on the specialist side of the house in Gang Crimes North, yes.
Q Would you have interactions with him also as he was working on Gang Crimes North at the same time as you?
A No.
Q Did you -- at that time, was Ed Mingey overseeing gang crimes specialists at Gang Crimes North?
A Yes, he was.
Q Did he have any supervisory role over your work?
A No, he did not.
Q Okay. Did Steve Gawrys work out of Gang Crimes North during the period you were there?



A Yes, he did.
Q And was he working as a gang specialist or gang officer?
A He was on the specialist side of the house.
Q And did you work with him at all?
A No, I did not.
Q As a gang crimes officer, did you specialize in any particular gangs?
A No.
Q Was that part of a gang crimes officer's role to sort of identify certain gangs or have to be assigned certain gangs to focus on?
A I believe that was more of the specialist side of the house. We were kind of put wherever, like, a gang conflict flared up. So one day we could have been in the 25th District, the next day we could have been in the 14th District, we could have been in the 17th District. So they kind of moved us around within Area 5 to respond to increases in gang activity. Increased shootings or -- or conflicts or something of that nature.
Q Okay. While you were in Gang Crimes North, did you work with Joe Miedzianowski?
A No. He was also on the specialist side of the house.

Q Okay. You became a detective in 1990. What sort of unit within the detective division did you enter in 1990?

A So for, like, the first year I was in the auto theft unit.

Q And then where'd you go after that?

A After that I went to Area 5.

Q And when you went to Area 5, what kind of cases did you work?

A Primarily, I worked homicides.

Q Okay. So as a detective from 1990 to '94, you worked either in auto theft or in violent crimes, correct?

A That's correct.

Q And when I say violent crimes -- and I may -- I've used the term violent crimes now, and I've used the term homicides. Is there a distinction? I mean, are homicide investigators and violent crimes investigators basically the same people?

MR. BRUEGGEN: Object to form.

A Yeah. I -- you know what it is, over the course of time, they've -- they've carved out the homicide guys and then they put them back in violent crimes. So when I was there, it was Area 5 violent crimes. Since that time, they've carved out the

homicide guys, so it's just homicides. But yeah, I was there -- it was Area 5 violent crimes.

Q Okay. So when you were there, it was called violent crimes. And one of the things you investigated as a violent crimes detective was homicides, correct?

A That's correct.

Q And the group of people who investigated homicides were in fact violent crimes detectives, correct?

A Yes, that's correct.

Q Okay. And when you were a violent crimes detective from 1990 -- approximately 1991 to 1994, who was your supervisor?

A There were -- there were multiple supervisors. I was kind of low man on seniority, so I found myself going to midnights quite frequently. My supervisor on midnights was a guy named Lee Epplen and a guy named Frank Capitelli. When I was on days, it would've been either Bob Biebel, Ed Mingey, a guy named Tom Lee. I can't remember. There were others as well.

Q Okay. So the shifts that you worked while you were a detective -- strike that. While you were a violent crimes detective from '91 to '94, were either midnights or days?

A Primarily, yes.

Q Okay. And just remind me the shifts in the day. There's three shifts.
A Correct.
Q And first shift is which?
A The first shift would start at like 11:00 p.m. and go to like 7:00 a.m.
Q And is that -- and that's the same thing as midnight shift, correct?
A Correct. Midnight shift, yeah. Now there were variations. There were guys who started at like midnight and went to 8:00 a.m., but it was primarily those hours.
Q Okay. When you say you worked midnights, you're referring to working first shift, correct?
A Correct.
Q Okay. And then what was second shift? Approximately 7:00 a.m. to what time?
A First shift -- or, second shift, the day shift was -- I was an early start, so I started at 7:00 a.m. and I'd get off at 3:00. Most of the guys started at, I want to say, 8:30 and got off at 4:30.
Q Okay. So second shift was days, correct?
A Correct.
Q So you worked midnights, or first shift, for a period of time, and then you switched to second shift,

or days, correct?

A I kind of jumped back between the two. Again, because I was low man on seniority. So if first watch was short due to guys being on vacation or -- or, you know, being out sick, then because I was so low on seniority, I would get bumped down to that midnight shift kind of regularly. So there was really no -- no rhyme or reason to it. It was just, hey, we need you to fill in this month. And I would find myself on midnights.

Q Okay. And third shift was referred to as what?

A The afternoon shift. And that typically started at like 4:00 p.m. and went to about midnight.

Q Okay. And did you ever work afternoons?

A No, not that I can recall.

Q Okay. When you worked as a violent crime detective, did you work with Rey Guevara?

A No.

Q When you -- and why is it that you -- he was working as a violent crime detective at the same time, correct?

A He was, but he always worked afternoons and I don't think I ever worked afternoons. I don't want to say never, but rarely, if ever.

Q Okay. So basically, he worked a different shift than you throughout the time you were a violent crimes detective; is that right?

A That's correct.

Q Who were your partners as a violent crimes detective?

A So partners in the detective division are not as clear cut as they would be in patrol. So a lot of times it's more of teaming up with. So I teamed up with Steve Gawrys kind of regularly, but that was it. On midnights, you didn't have a partner. Midnights everybody was solo. But on days I would frequently team up with Steve. But then again, a lot of times I would -- I would be by myself.

Q Okay. So other than Steve Gawrys, you didn't have any sort of regular guys you partnered with; is that right?

A No, that's correct.

Q And then on any given case, could you partner with somebody else, just because of that case and that particular circumstance?

A That -- yeah. Because what would happen is there would be a case that would require multiple detectives to go to a scene or -- or to follow up on it, and you would kind of team up with whoever happened to

get assigned to it.

Q Okay. During the time you worked as a violent crime -- you mentioned gang crimes specialist earlier. During -- and now I'm asking you about your time as a detective. During the time you were a violent crimes detective, would you sometimes work with gang crimes specialists to assist you in homicide investigations?

A Sometimes they would provide us information. We'd never really work with them. They had their own thing and their own partners and did their own thing. But occasionally, we would seek them out as a resource because they were very familiar with nicknames and gang affiliations, which was something that, as a detective, you're really kind of distanced from. So you would kind of seek them out occasionally on gang-related incidents, yes.

Q And then, what are the kinds of things they would assist with on gang-related investigations?

A Just know -- you know, they were very good with knowledge of who's -- what gangs were having conflicts. They were knowledgeable about nicknames. If a witness provided you with a nickname, you could call a gang specialist and say, "Do you know a person by this nickname in this particular gang?" And often they did. And if they didn't, you know, they would go out and find

out who that individual was for you. So they were -- they were a good resource, I guess is the best way to put it.

Q And would they some -- so would they sometimes assist gang investigations by going out and talking to witnesses?

MR. BRUEGGEN: Object to foundation, form. Go ahead, sir.

A Yeah. Typically detectives didn't want gang specialists talking to the witnesses. So I don't want to say it didn't happen because it did, but typically we would ask them to stay away from the witnesses.

Q And why is that?

A Well, because you get -- you know, there's issues with documenting things and then there's -- if it's -- if you have multiple people interviewing the same witness, you tend to burn the witness out. They don't want to keep telling their story to multiple people. So I think for the continuity and to avoid burning out the witness, we would ask that, you know, gang specialists or tactical officers or beat officers -- not just gang specialists. We would ask that they didn't contact witnesses and just kind of leave that function up to the detectives.

Q And what were the documentation issues with

having gang crime specialists interview witnesses?

A The -- the type of report that's generated. Detectives generate a much different report. Detectives tended to be more thorough in their documentation than gang specialists did. I don't want to say that's the case for everybody, but it was -- it was cleaner to just let the detectives handle those -- those type of interviews.

Q Okay. Once you became a sergeant in 1994, what was your -- what was your supervisory role as a sergeant?

A So initially I went to patrol. I was a sergeant in the 16th district. I want to say I was there for about 18 months and then I was transferred back into the detective division in Area 5.

Q Okay. So you became a supervisor in the detective division around 1995 to '96, fair?

A Yes. It was probably -- yeah, '95 or '96, and I remained there until '98.

Q Okay. And in that capacity as a sergeant supervising detective at Area 5, you were supervising, I think you said, rob -- the robbery team rather than violent crimes detectives, correct?

A That's correct.

Q Did you work on any homicide investigations

during that time as a sergeant?

A Not that I can recall. It was almost exclusively -- I mean, you never know if something popped up, but I want to say it was almost exclusively robbery cases.

Q Okay. And as a supervisor of detectives in the period from around '95, '96 to 1998, what did that role entail in terms of supervising the detectives?

MR. BRUEGGEN: Object to form, vague. Go ahead, sir.

A Yeah. I mean, can you -- can you narrow that?

Q Let me ask a better question. What was -- strike that. How would you go about supervising detectives in their investigations as a sergeant?

A You would assign them cases that would come in, you would, you know, ensure that their investigations were accurate. You would review reports. You would review case reports that came into the area from the patrol officers. And then there was a lot of administrative function involved with being a sergeant as well, making sure that you had enough robbery detectives to staff each day, making sure that their cases are turned in in a timely manner, that they don't have a lot of cases on what was called the late list. You would make sure that there weren't too many people

taking the day off. A lot of administrative functions come with being a supervisor in the detective division.

Q Tell me about what the late list is.

A The late list is a list that's generated by the administrative unit in the area that basically says within 30 days of getting a case, you're supposed to have some sort of disposition on it, whether it's an arrest or whether the case is -- you know, there's no leads to it, so you close it out. But you have to make sure you submit the paperwork. Something has to be done with the case. There has to be some investigative activity on it. And when cases -- when there's no record of investigative activity, this late list would be generated, and then you would grab the detective and say, hey, you need to clear up your late list.

Q Okay. So essentially cases where there had not been a disposition within 30 days of the case being assigned would go on the late list. Do I have that right?

A That's correct.

MS. ROSEN: Objection, form.

Q Okay. And then to resolve that, something had to be submitted to the sergeant; is that right?

A Yes. Yes.

Q Okay. And what was it that would have to be

submitted to the sergeant?

A Just some record of investigative activity, that they're waiting for fingerprints to be returned. Some explanation of why the case hadn't been resolved, to some degree, within 30 days. And frequently, it was they were waiting for fingerprints to come back or they were -- submitted something for DNA or the victim was out of town or unavailable, but you had to provide some explanation as to why the case hadn't been resolved in 30 days. And I think the examples I just gave you cover about 99 percent of why cases were unresolved.

Q And then would the way that that case came off the late list would be by submission of a supplementary report, for example? Or was it by a -- like a different -- a memo to the sergeant that's different than the actual usual reports within an investigation?

A Yeah, no. Just some sort of a supplemental report that explains -- resolves the case or explains the delay.

Q Okay. And that -- would that type of supplementary -- would that be like a supplementary report basically?

A Yes.

Q And so, that would go into the investigative file for the case?

A I could not speak to that. No, I don't know.
Q Oh, okay. So when you had some submission related to resolving being on the late list, you don't know whether that submission would go on the -- into the investigative file; is that right?
A That's correct. I don't.
Q Okay. Was the late -- when you were working as a violent crimes detective, was there also a late list that applied for violent crimes detectives?
MR. BRUEGGEN: Object to foundation.
A There was, yes.
Q Okay. So is it the same process?
MR. BRUEGGEN: Object to foundation. Go ahead.
A Yes. Yes, it is. Same process.
Q Okay. All right. During the time you were working as a detective and sergeant, there was a late list basically to help ensure that investigations, whether robberies or violent crimes, were being -- essentially, they were progressing in some way; is that right?
MR. BRUEGGEN: Object to form. Go ahead.
A That's correct.
Q And when a case -- if a detective had cases that were on the late list, there would be a need -- there would be some check-in with the supervisors; is

that right?

A Yes, that's correct.

Q And if a detective had, you know, a longer list of cases on the late list than other detectives, what was done about that?

MR. BRUEGGEN: Object to form and complete hypothetical. Go ahead, sir.

A You'd get hounded by the sergeant and the sergeant would tell you to clear up your late list, basically. It wasn't such an issue on the violent crime side because the cases called out for, you know, some sort of investigative actions. Typically, we saw these late lists for the property crime side of the house where a detective is given, you know, six burglary cases a day. That's where we typically saw the late lists.

Q As a sergeant, was there any tracking of, you know, how often detectives were closing cases?

MR. BRUEGGEN: Object to form, foundation. Go ahead.

A There was -- the administrative unit took care of that. But I really have no knowledge of how that worked or

Q So you weren't responsible for tracking it, but there was some tracking that was occurring of what percentage of cases, for example, that a detective was

closing; is that right?

MR. BRUEGGEN: Object to form and foundation.

Go ahead.

A I don't recall seeing -- are you talking about like percentages of what they closed or how they closed them or something?

Q Yeah. Any form of tracking about whether or not -- you know, for each detective, hey, here's how many cases they're assigned. Here's how many cases they're closing. Here's how many cases they're not closing. Is there any that -- of that kind of tracking that was taking place?

A Not that I'm aware of.

Q Okay. If you had detectives who were doing -- strike that. Was there any -- was there any assessment of a detective's performance that was taking place during the time you were working as a sergeant overseeing detectives?

A No, there was not.

Q Was there any assessment of detective's performance that was taking place while you were working as a detective -- a violent crimes detective?

A If there was, I wasn't aware of it.

Q Did you ever receive performance evaluations?

A Yes, for a time. But then the department

stopped those and I don't remember, like, where in my career those had stopped.

Q Did you ever receive performance evaluations while you were a detective?

A I don't recall. I don't recall if they stopped those prior to then, or while I was a -- I don't recall. I do remember getting them, but I couldn't say whether it was as a patrolman or a detective or -- or even as a sergeant. It was a long time ago.

Q Okay. Were the documentation requirements the same whether you were in the violent crimes unit or the robbery unit for a detective?

MR. BRUEGGEN: Object to form.

MS. ROSEN: Object to form.

A Documentation of what?

Q Thank you. Sorry about that. That's a poor question. With regard to documentation of investigations and investigative steps, was it the same regardless of whether you were in the robbery unit or the violent crimes unit?

MR. BRUEGGEN: Object to form.

A Yeah, I don't know that I can answer that because I'm not -- I'm not sure. I don't understand the question. I'm sorry.

Q Yeah. So during the time that you were a

detective in violent crimes, you had -- it was required that you create documentation as part of your work as a homicide investigator, correct?

A Well, it's required that you document your investigative steps, yes.

Q Yes. Okay. So one -- so just to be clear, when you were a homicide detective, when you were a violent crimes detective, it was required that you document the investigative steps you took during the course of the investigation, fair?

A Yes. That's correct.

Q And that documentation could take the form of notes and reports, correct?

MR. BRUEGGEN: Object to the form. Vague.

A Yeah. Yeah -- again, I can't answer that because notes -- you're saying notes or reports?

Q Yeah. That is what I meant. Yeah. So what I'm -- yeah, let me clarify that. Was it a requirement that everything you do get into a supplementary report?

MR. BRUEGGEN: Object to form. Vague.

A Yeah. I don't know that I can answer that.

Q Okay. Was there a requirement that, as you're conducting the investigation, the investigative steps you take get documented either in a GPR or some notes or in a report?

MR. BRUEGGEN: Object to form. Vague.

A I'll say yes. Yeah.

Q Okay. In other words, it's not -- there's not a set rule that it's got to be in a particular form in a particular document. The point is, if you're taking the investigative steps, you got to get it documented and it's not as important which particular document it gets into; is that fair?

A Okay.

MR. BRUEGGEN: Object to form.

A Yeah. Okay. I'll get -- I'll say yes.

Q Okay. So the idea being that, as a violent crimes detective, if -- strike that. The idea being that, if someone looks at the homicide investigation, the investigative file, whether it's a sergeant or a prosecutor, they will see all of the investigative steps that were taken by the detectives on the case; is that correct?

MR. BRUEGGEN: Object to form. Incomplete hypothetical and foundation. Go ahead.

A Yes, that's correct.

Q And was that the training that some -- that an investigative file should capture all of the investigative steps taken by the detectives?

MR. BRUEGGEN: Object to form. Go ahead.

A Yes.
Q And was that your expectation as a supervisor during the time you were working as a sergeant overseeing detectives?
A Yes, it was.
Q And was that your understanding of what the policy required during the time you were working as a detective and as a sergeant over detectives?
MS. ROSEN: Objection, form.
A So I can't speak to policy 30 years ago. So it -- I wouldn't be able to answer that. I'm sorry.
Q Okay. And this idea that you have indicated, that, you know, documenting the steps that were taken during the course of an investigation was something that you were trained on and that was required, there was an important reason that it was important to document all of the investigative steps, correct?
MR. BRUEGGEN: Object to form. Vague and misstates his testimony.
A Yes. Correct.
Q And what were the reasons that it was important to document all of the investigative steps taken during an investigation -- homicide investigation, for example?
A Well, it's important to document them because

you want to make sure that there's a record of what you're doing in trying to clear the case.

Q Okay. And was it important to document all the steps that were -- that you were taking as a homicide detective in order to assist other homicide investigators who were also participating in the investigation?

A Yes. That could be one of the reasons as well. Yeah.

Q And was it important to document all the steps you were taking in a homicide investigation, as a detective, in order to ensure that all of that material was getting to the prosecutors and criminal defense in any court case?

MR. BRUEGGEN: Object to form. Go ahead.

A Yes. That's also another reason for it. Sure.

Q And so were you trained on Brady obligations as a homicide detective?

MR. BRUEGGEN: Form.

A God, I can't remember. My -- my training was 30 years ago. I can't remember that at all.

Q When you were working as a homicide detective, would it be fair to say you understood that there was this concept of Brady obligations?

MS. ROSEN: Objection, form.

A Again, I don't remember from 30 years ago. I'm sorry, Counsel.

Q Did you have an understanding that -- at the time you were working as a homicide detective that it was important to ensure that information learned during the homicide investigation was being turned over to the prosecutors?

MR. BRUEGGEN: Object to form.

A Yes.

Q And was it your understanding -- what was your understanding about whether detectives could withhold information learned during an investigation from prosecutors?

MR. BRUEGGEN: Object to form, vague. Go ahead.

A Yeah. My understanding is obviously you should never withhold information from the prosecutor.

Q So was it your training that detectives were required to disclose all of the information learned during the investigation with prosecutors?

MR. BRUEGGEN: Objection, form and foundation. Go ahead.

A Yeah. Again, my training was 30 years ago. I can't say whether we were trained on that or not.

Q Was it your understanding that you were

required to turn over all of the information you've learned during the investigation to prosecutors?

MR. BRUEGGEN: Objection, form. Asked and answered. Go ahead.

A Yes.

Q And was that similarly your expectation when you became a supervisor?

MR. BRUEGGEN: Objection. Asked and answered. Go ahead.

A Yes, it was.

Q And what were the tools that you used as a homicide detective to ensure that you were documenting all of the information that you had learned during a homicide investigation?

MR. BRUEGGEN: Object to form, vague.

A Yeah. Again, that was 30 years ago. I mean, the tools to document would be supplementary reports and GPRs.

Q Okay. Were you -- strike that. Was it your understanding, at the time you worked as a homicide detective, that it was important to write thorough and accurate reports?

A Yes.

Q And was it your understanding -- strike that. Was it your practice as a homicide detective to write

thorough and accurate reports?

A I certainly did my best. I can't say that they were always, you know, completely accurate or as thorough as they should be. But, I mean, you certainly try your best at the time. Yes.

Q And when you wrote reports as a homicide detective, you knew that you may have to -- strike that. When you wrote reports as a homicide detective, you knew that you may have to rely on those reports in testifying in criminal cases, correct?

A That's correct.

Q And you did -- as a homicide detective, was it your practice to rely on your -- to look back at your reports in preparing yourself to testify at a trial?

MR. BRUEGGEN: Object to the form. Foundation.

A Yes, it was.

Q And was it often the case that you needed those reports to be able to refresh your memory about your investigation in order to be able to testify at trials?

A Yes, it was.

Q Okay. And so for that reason, did you ensure that you were writing thorough and accurate reports to ensure that you could provide truthful testimony at trials?

MR. BRUEGGEN: Objection to form. Go ahead.

A Again, you know, you do your best at the time. You hope that you're as complete and accurate as possible. Certainly that is always your intention, yes.

Q Did you take notes to help you ensure that you were writing thorough and accurate reports?

MR. BRUEGGEN: Objection to form. Incomplete hypothetical. Go ahead.

A Yeah. It really depended on the situation. Sometimes you would. If it was an interview that involved some degree of detail, you would take notes. If it was something that didn't require -- something that was -- you know, you could just sit down and type out without having notes. So it really varied. It depended on the circumstance.

Q If it was an interview of somebody that was providing you with substantive information out in the field, would you -- was it your practice to typically take notes?

MR. BRUEGGEN: Objection to form. And can you restate that? It was -- I couldn't catch it because you were moving some documents. Sorry.

BY MR. SWAMINATHAN:

Q My apologies. If you were out talking to a witness and they were providing you with substantive

information or details, was it your practice to take notes of those conversations so that you could type that up later in your report accurately and thoroughly?

MR. BRUEGGEN: Objection. Incomplete hypothetical. Go ahead.

A Again, it depended on the circumstance. It depended on the degree of information. If it was something very small, like the offender lives in that house, you know, I wouldn't. If it was here's a nickname, then I probably wouldn't take notes because it doesn't -- there's not a great deal of detail. If there's a great deal of detail, then I would take notes. So it really depends on the information.

Q Got it. So the more details that were being provided, you would then -- strike that. If the person was providing you with significant numbers of details, you would then take notes. That was your practice?

A If it was something beyond my capacity to remember it accurately, then I would take notes, yes.

Q Okay. And in terms of your own practice, other than, you know, a very basic piece of information, a nickname, an address, that type of thing, was it your typical practice to take notes if somebody was actually telling you substantively, you know, here's what happened during the course of this crime. Here's what I

witnessed. Did you typically take notes of those kinds of interviews?

MR. BRUEGGEN: Objection to form. Vague. Incomplete hypothetical. Go ahead.

A Typically, yes. If there was -- if there was more information than my capacity to remember, then yes, I would take notes.

Q Okay. And it -- (coughs) excuse me. As a violent crimes detective, it was necessary regularly to go to the scene of the underlying crimes, correct?

A Correct.

Q And when you went to the scene of a crime, it was typical to interview scene witnesses, correct?

A That's correct.

Q And when you interviewed scene witnesses who had any information to actually provide about having seen the actual crime, your -- was it your practice to try to learn as much as you could from them about what they had seen?

A Yes.

Q And when you had individuals who -- you know, if somebody said, I didn't see it, I didn't hear anything, my understanding is you wouldn't necessarily take notes of that conversation, fair?

MR. BRUEGGEN: Object to form. Go ahead.

A Fair. I think you would -- you would document the fact that you spoke to them, and that they didn't have information. Sometimes that was of value as well, but yes.

Q Okay. And in fact, the fact that somebody initially speaks to you and indicates that they don't have any information is, itself, investigative information that needs to be documented, either in a GPR or in a report, correct?

MR. BRUEGGEN: Objection. Form. Incomplete hypothetical. Go ahead.

A That's correct.

Q Okay. In other words, the interview with the witness is still important -- strike that. That witness, for example, if a week later they say, oh, I actually saw the whole thing. Here's this information. It's important information that they had originally said they didn't see or hear anything, you agree with that?

MR. BRUEGGEN: Object to form. Vague. Go ahead.

A In that hypothetical, I would say yeah. That was -- that would be important. Yes.

Q In any event, that would be one reason why you would document the initial conversation with that witness, where they indicated they didn't see or hear

it, even though that information isn't particularly valuable to your investigation; is that fair?

A That's fair.

MR. BRUEGGEN: Object to form.

Q All right. So if I understand you correctly, conversations with -- strike that. Each person that's interviewed during the course of a homicide investigation, that's information that would be documented, correct?

MR. BRUEGGEN: Objection. Form. Vague. Incomplete hypothetical.

A Yeah. I don't know that I said that. I'm sorry. Can you repeat it?

Q Yeah. Anytime you have a conversation with a witness about the underlying homicide, that's something that needed to be documented, correct?

MS. ROSEN: Objection. Form.

A Yeah. I mean, I don't want to say a blanket yes. I would say in most cases that's probably accurate, but I'm sure that there are exceptions to that as well. So I can't -- I can't agree and say, you know, with absolute certainty that's basically all the time.

Q Was it your practice that conversations with witnesses about an underlying homicide was something you documented during the course of your time?

MR. BRUEGGEN: Objection. Form. Foundation. Go ahead.

A You know, I think there's an issue of relevance. It really would depend on this -- on this scenario. So to say a blanket yes, I think, would be inaccurate. I could say most of the time that's probably the case, but I do think that there's -- it's hard to say yes, just to give you a blanket yes on that.

Q Understood. And so, maybe a better way for me to try to understand your testimony is this. You've indicated that your practice was if you spoke to somebody, even if they tell you, hey, you know, I'm a scene witness, but I didn't see or hear anything. That's something you would document, correct?

A Correct.

Q Okay. And that was something you were expected to document, correct?

A That's correct.

MR. BRUEGGEN: Object to foundation.

Q And so, what would be the kind of circumstance where you would talk to somebody about the underlying homicide and you wouldn't document it?

MR. BRUEGGEN: Objection. Form. Vague.

A Yeah. I don't know that I even want to come up with a hypothetical, because I don't have one off the

top of my head. I just -- I don't think I'm comfortable with a blanket, you know, that you would document everybody all the time.

Q Okay. Got it. So as a general practice -- strike that. As a general matter, your practice was to document any interviews with witnesses; is that fair?

A That's fair.

Q Okay. And as a general rule, was it your practice to document any leads that you developed during the investigation?

A Yes.

Q And was it your practice to document any suspects or persons of interest you identified during the investigation?

A Yes.

Q Was it your practice to document any time photos were shown to witnesses?

MR. BRUEGGEN: Objection. Form. Vague.

A Yes.

Q Okay. If gang books were shown to witnesses, that was -- that needed to be documented, correct?

MR. BRUEGGEN: Objection. Form. Foundation.

A Yeah. I don't know that I could answer that. I never showed gang books to anyone.

Q Do you --

A I --

Q Go ahead.

A I don't -- no. I wouldn't be able to answer that because I don't know the circumstances of it. And I -- like I said, I've never shown gang books.

Q Okay. Did you have cases in which gang books were shown to your -- to the witnesses in one of your homicide investigations?

MR. BRUEGGEN: Object to foundation.

A Yeah. I don't know. If they were, I didn't do it because, again, I didn't show gang books. So I couldn't say with certainty if --

Q Okay. Putting -- I'm sorry, go ahead. I didn't mean to cut you off. Go ahead.

A No, I was just going to say I could -- I couldn't say with certainty whether that was or was not done in any of my cases.

Q Okay. Putting aside gang books for the moment, talking about photos other than gang book photos. Would you document any time photos, like photo arrays, were shown to witnesses?

A Yeah. Yeah. So the only time I would show photos would be as part of a photo array, and that would be documented. Yes.

Q Okay. Regardless of whether the photo array

resulted in a positive or negative identification, correct?

A That's correct.

Q Okay. And in terms of your documentation of these various things, conversations with witnesses, leads, and so on. My understanding is, you know, whether you documented it in the form of a note before you put it into a report would just depend on whether it was something you felt you could remember, you know, long enough to be able to get it accurately into a report; is that fair?

MR. BRUEGGEN: Object to form. Vague. Go ahead.

A That's fair.

Q Okay. And typically if you interviewed a witness during -- strike that. For example, a scene witness in -- strike that. Your practice, if you interviewed scene witnesses after a shooting, if they were providing you with information about what they saw, if it was more than just very basic information, was it your practice to take notes about what they were telling you?

A Yes, it was.

MR. BRUEGGEN: Object to form. Asked and answered. Go ahead.

A Yes, it was.

Q Okay. And if they provided you with reason to suspect a particular person as being involved in the crime, or a particular gang, or something else that would constitute a lead, was it your practice to take notes on that information?

MR. BRUEGGEN: Objection, form.

A Yes, it was.

Q If you received information from witnesses that pointed to or indicated the involvement of a particular gang, was that the kind of thing you considered a lead?

A Yes. That would be a lead. Sure.

Q And what were the kinds of things you could do with a lead that a particular gang was responsible for a -- for a homicide.

MR. BRUEGGEN: Objection, incomplete hypothetical and vague. Go ahead.

A Yeah, I -- again, we're going back 30 years. I don't remember what tools were available 30 years ago for me to follow up on that. So I wouldn't be able to answer that.

Q Fair. And let me just ask a more direct question. And it was not on cops -- strike that. Would it be fair to say that there were times, as a detective,

when often you might not get a lead as to the particular person responsible, but you might get a lead about the particular gang that was involved, fair?

A Yes.

Q And in those instances, was one tool available to detective, the use of gang books?

A I -- again, I don't know because I didn't use gang books. I don't know where they were kept. It was never a resource that I went to.

Q Okay. Was it your understanding at that time that there were gang crimes officers or -- strike that. Was it your understanding at that time that there were gang books that were available, even if you, in your own cases, was choosing not to use them?

MS. ROSEN: Objection. Form.

MR. BRUEGGEN: Objection to form.

A I don't know when the gang books stopped being in existence, so I don't know if they were still there when I was a detective or not. I know they were there when I was in gang crimes, but I don't know like where they were housed, and I don't know at what point gang books went away, because they did at some point. So I really can't answer that.

Q As a homicide detective, if gang books were being shown to witnesses in your homicide investigation,

was it your expectation that that information would get documented in your case?

MR. BRUEGGEN: Objection. Form. Incomplete hypothetical. Go ahead.

A Yeah. I mean, it is a hypothetical. I would say that if someone was showing gang books in a case of mine, that I would -- I would expect there to be some sort of documentation and to let me know what was going on. Typically, as a detective, you didn't -- again, you didn't want your witnesses interviewed by multiple police officers. So I would -- you know, I would've frowned upon that. But again, I don't know -- but if it occurred, yes, I would expect there to be documentation.

MR. BRUEGGEN: Anand, are you getting to a place where you can take a quick break?

MR. SWAMINATHAN: Yeah, yeah, yeah. That's -- why don't we do that right now.

MR. BRUEGGEN: All right. Thanks.

THE WITNESS: Thanks.

MR. SWAMINATHAN: Yeah. Thank you.

COURT REPORTER: We're off the record. The time is 11:22.

(OFF THE RECORD)

COURT REPORTER: We are back on the record for the deposition of Anthony Riccio, being conducted by

videoconference. My name is Sydney Little. Today is May 18, 2022, and the time is 11:33 a.m.

BY MR. SWAMINATHAN:

Q Okay. Just let me wrap up the last few questions on documentation, and then why don't we -- why don't we keep moving here. Based on your training -- strike that. Based on your experience as a -- the time you were a homicide detective, and as a supervisor over detectives, would you agree that it -- that what is relevant during the course of a -- course of an investigation may change over time?

A Yes, I would agree with that.

Q In other words, information that was sometimes -- sometimes did not seem important or relevant at one point may become more important as more information is learned?

A Yes, I would agree.

Q And is that one of the reasons that it was important to document the steps that were taken during the course of the investigation and the information learned during the investigation?

MR. BRUEGGEN: Objection. Form. Go ahead.

A Yes. I would agree with that as well.

Q Okay. If I look at a ho -- you know, when I say if I -- strike that. If someone looks at the

investigative file, the overall homicide file for the investigation, should one see documentation of all the individuals that were suspects in that investigation?

MR. BRUEGGEN: Objection. Incomplete hypothetical. Vague.

A Yes.

Q Should one see documentation of all gangs that were, for example, suspected in the investigation?

MS. ROSEN: Object to form.

A Yeah. Again, it's hard to say. Each homicide is very unique. I don't know that, you know, we could say broadly something like that.

Q Fair. Should one see documentation of the reasons that people were suspects in the investigation?

A Yes, they should.

Q And should you see documentation of the basis for arresting any suspects?

A Yes, you should.

Q And there should be documentation of the basis for probable cause against any suspects, correct?

MR. BRUEGGEN: Objection. Form.

A Yes, there should.

Q And there should be documentation of the basis on which charges were sought against that individual, correct?

A Yes, there should.

Q And ultimately, there should be documentation of the investigative steps that were taken to ultimately secure charges, correct?

MR. BRUEGGEN: Objection. Asked and answered. Go ahead.

A Yes, that's accurate.

Q And there should be documentation of any information that was learned during the investigation that might not point at the person who is ultimately charged, correct?

MR. BRUEGGEN: Objection. Anand, can you restate that? When you're moving the computer, I lose words here or there. So I'm not getting the whole context of the question.

BY MR. SWAMINATHAN:

Q My apologies. Let me say it again. And there should be documentation of any information that does not point at the suspect, or the person who was ultimately charged, that was learned during the investigation, correct?

A When that information exists in cases. There are cases where it doesn't, but there are cases where it does. In cases where it does, yes, it should be -- should be contained in that file.

Q Got it. In other words, if there's in -- not only should all the information that inculpateds the person should be documented, but also any information that might exculpate the potential -- the suspect or the person charged should also be documented, correct?

A Correct. When that information exists, it should be documented, yes.

Q Okay. And would you agree that any information about alternate suspects is the kind of potentially exculpatory information that should be documented?

A Yes. I would agree. When that information exists, that it should be documented, yes.

Q And when any -- and when any information exists about alternate suspects, that should be documented as potentially exculpatory information for if a different person is charged, correct?

MR. BRUEGGEN: Objection, form. Go ahead.

A Yes, that's correct.

Q And if, in an investigation, you have information pointing to a different gang than the per -- than the gang affiliation of the person who was charged, that's information that should be documented as potentially exculpatory, correct?

MR. BRUEGGEN: Objection. Form. Vague.

A Yeah, I'm sorry. Can you repeat that one?

Q Yes. If you have a -- maybe I'm -- that's an overly wordy question. Let me try to say it more clearly. If, in an investigation, you have information pointing to the involvement of a particular gang, but the person who's charged is a member of a different gang, that's potentially exculpatory information that needs to be documented, correct?

MR. BRUEGGEN: Objection. Form. Vague.

A Yes. That should be. That should be documented.

Q Okay. And during your work as a homicide investigator, that is the type of information you would've documented, correct?

MR. BRUEGGEN: Objection. Form.

A That would've been my personal practice, yes.

Q Okay. Going back to your background. We made it to your time as a sergeant supervising detectives. And then you became a lieutenant in and around 1998, correct?

A That's correct.

Q Okay. And when you became a lieutenant, what districts or units did you work in?

A I was in patrol for quite a while. And again, the years are kind of fuzzy. I was in the 25th

District, the 15th District, and then I was transferred into Area 3 detectives somewhere around 2005, maybe 2006.

Q Okay. So until you became an Area 3 lieutenant overseeing detectives, you were overseeing patrol officers, correct?

A That's correct.

Q And as a lieutenant overseeing patrol, did that include any units like gang crimes officers, or was it exclusively, you know, patrol officers?

A It was exclusively patrol officers assigned to the watch that I would've been assigned to.

Q Okay. Okay. And then you became an area -- strike that. You said around 19 -- strike that. You said that around 2005, you became a lieutenant overseeing Area 3 detectives; is that correct?

A That's correct.

Q And were there particular units within the detective division who you were overseeing?

A I was overseeing Area 3 violent crimes.

Q Okay. So what was the period of time that you were overseeing Area 3 violent crimes detectives?

A Again, I'm not sure about the -- exactly when. 2005, maybe 2006 until 2008.

Q Okay. When you -- which is when you became a

commander, correct?

A Correct.

Q Okay. So during your time as a lieutenant overseeing Area 3 violent crimes detectives, give me a sort of overall description of what that job entailed.

MR. BRUEGGEN: Object to form. Vague. Go ahead.

A It's primarily administrative. You know, you're looking at manpower, you're looking at, you know, making sure that you have adequate coverage on each day. There's a lot of meetings that you have to attend. So it's primarily an administrative function to oversee the operation of the unit you monitor over time. You make -- you try to make sure that the right people are in the right places. You know, their talents are being utilized as well as possible.

Q Okay. Would you have any day-to-day involvement in homicide investigations at all as a lieutenant?

A No. I mean, occasionally, if there was some sort of an important -- well, they're all important -- a heater, maybe something that the media took a lot of interest in, you would go to the scene and, you know, just kind of get briefed up as much as possible on the case. I mean, I think basically you wanted to know as

much about the case as needed to answer questions from above. So you didn't get into the details of the case, but, you know, the broader facts of the case and stuff you would want to know on particular cases on those heater cases.

Q What was the type of, you know, paperwork or administrative material that was coming to you, as a lieutenant, either from sergeants or homicide detectives?

A I don't remember there being a lot of paperwork coming to me as a lieutenant from the bottom up. It was more from the top down. And again, it was more administrative type things. You didn't do, you know, a lot of reviewing of cases. Those were all approved at the sergeant level. So it was -- again, it was primarily like administrative things coming from the top down.

Q Okay. To what extent, as a lieutenant, did you have involvement in training of homicide detectives?

A None.

Q But back when you were a sergeant supervising robbery detectives, what was your -- what was your involvement in training?

A There was no training component.

Q Okay. So where -- what was the -- where was

the training coming from for homicide detectives during the time you were a sergeant and lieutenant if it wasn't coming from the supervisors?

A The training would come from other seasoned detectives primarily. I mean, they were trained in the academy, when they were promoted, and then the training would come from, you know, other -- putting them with other, more seasoned detectives.

Q Okay. When you were working as a detective, was there anybody who you considered sort of the seasoned detective who trained you?

A I -- when I -- when I first -- well, I was an auto theft detective, so I worked with -- and I couldn't tell you who -- more seasoned auto theft detectives. When I came to Area 5, I don't really recall who I worked with that kind of took me under their wing and trained me a little bit. I think I kind of bounced around a lot. So nobody in particular, I would have to say.

Q As a lieutenant, were you -- as a lieutenant overseeing violent crimes detectives at Area 3, was there any form of tracking that you were engaged in terms of how each detective was doing in terms of open -- closing cases?

MR. BRUEGGEN: Objection. Form. Vague. Go

ahead.

A I don't recall any kind of tracking with that, no.

Q Were there any tools available to you, either when you were a sergeant or as a lieutenant, to be able to incentivize those detectives who were doing a better job in terms of -- or performing better in terms of closing cases?

MR. BRUEGGEN: Objection. Form. Vague.

A No, I don't -- I don't think there was anything to incentivize them. You know, pretty much, as a police department, there really is nothing that you can do to incentivize them other than maybe accommodate them when they wanted a day off or, you know, giving the new car, when it came in, to the better detectives. But as far as like any other sort of incentives, there really was nothing you could do for them.

Q What about merit promotions?

A Merit promotions were considered by the commanders. So as a lieutenant, you really played no role in it. I mean, if maybe the commander asked for your input. But typically the commander got one or two picks and they pretty much knew who the people were that were doing the job, or who they wanted to submit for their merit choices. So you really didn't play a role

in that at all as a lieutenant.

Q And in terms of the merit promotion process, was that -- were merit promotion something that applied all the way up through the chain, or was it just something that applied, you know, to move from patrol to detective, or from detective to sergeant, or did it apply throughout the chain?

MR. BRUEGGEN: Objection. Form and foundation.

A Yeah. So there's merit promotions to the rank of detective. There's merit promotions to the rank of sergeant. There's merit promotions to the rank of lieutenant. And then I guess it's merit promotions to the rank of captain as well. There's -- it's a different process for captains. But for those -- for those three ranks, there are merit promotions. Detective, sergeant, and lieutenant. The captain's process is completely different. But those three ranks, yes, there was merit.

Q And then after that, there's no merits promotions once you get above the level of lieutenants, putting aside the unique process for captain; is that right?

A Right. Yeah. The captain's process, you apply. So if you're a lieutenant and you want to be a captain, you go through an application procedure, and

then ultimately the superintendent decides who he wants to make. Above captain, it's all exempt. It's strictly selected by the superintendent.

Q Got it. Okay. What about -- so okay. In terms of the ability to reward those detectives who seem to be doing -- you know, working the hardest or doing the best job closing cases, other than, you know, the rare instance of a merits promotion, were there any other tools available to you as a lieutenant?

A No, there really -- there really wasn't. You know, other than like, you know, give them special consideration if they want the 4th of July off or, you know, last minute notice because it's their kid's birthday or something. But there was really no -- nothing that you had at your -- available to incentivize or reward anybody who's doing a particularly good job or working hard for you.

Q What about overtime?

MR. BRUEGGEN: Objection. Form.

A Overtime was what it was. I mean, if a -- if a detective was working on a case that ran beyond their shift, which was extremely common, then they would report to the on-duty sergeant, which was typically the following watch. They would report to the on-duty sergeant, say hey, Sarge, I got this going or that

going. I'd like to work overtime. It was up to the sergeant. You know, overtime in the detective division is kind of abundant, really. It's a necessary abundance, I guess. But that was -- there were times when sergeants said no and there were times when sergeants said yes.

Q Was that -- was the -- was overtime something that was -- well, strike that. Was it one of your administrative roles as a lieutenant, was it also to keep track of the amount of overtime and sort of try to make efforts to limit the amount of overtime at all?

MR. BRUEGGEN: Objection. Form. Vague.

A It -- you -- you know, you received a report, and it was usually like a month versus month. So this March versus last March, you're up. And then, you know, typically I would have a talk with the sergeants and say, hey guys, tighten the belt a little bit. You know, we're spending money that's not in the budget. We got to -- we got to tighten the belt a little bit and slow it down. There were -- there were some bosses who were real sticklers about it, and there were other bosses that were more lenient about it. So it really kind of varied. And it -- and it also changed with time. There were times when overtime was like a lockdown. There was other times when the department seemed a little bit more

lax about overtime.

Q Okay. So from a -- from the perspective of detectives, in terms of overtime, my understanding is basically if your investigation required you to continue on past your shift, you'd earn overtime for that; is that right?

A Yes. You would earn overtime for it, yes.

Q And the sergeant would have to approve that, correct?

A Correct.

Q And what about going to court? Would that be a source of overtime?

A Yeah. Court was -- again, that was something that we always felt that we didn't have a lot of control over because you get a subpoena, the department can't say, ignore that subpoena and don't show up because our overtime is too high. So that was one component of overtime that we really -- you know, I hate to say it, but we just -- we really didn't have the ability to control it because we didn't have the ability to say, ignore a subpoena from the court.

Q And you anticipated my question. So when -- even when there were lockdowns in terms -- or, you know, strike that. Even when there were efforts to limit overtime, that did not apply to when detectives would go

to court to testify, correct?

A That's correct. There was an effort at one point, I remember, where the department wanted a call to the state's attorney who issued the subpoena to say hey, you know, you subpoenaed four detectives on this. Do you really need all four? How long are you going to need them for? It had limited, if any, success. So I think there was kind of a feeling like, yeah, we really don't have the ability to control -- and the state's attorneys would -- you know, sometimes they would say yeah, we can cut it down to two guys. But for the most part, they subpoenaed who they needed and we really didn't have the ability to control that, versus extension of tour, which we did have the ability to control.

Q Okay. And so, if a detective -- if I understand correctly, if the detective worked afternoons or midnights, they would get overtime when they went to court, correct?

A Well, I mean, even day detectives would get overtime for going to court if it occurred on their days off. So it just -- if you were off-duty during those court hours, whether you were on vacation, or whether it was your day off, or you were working afternoons or midnights, as long as you were off duty during the time

of the court's subpoena, then you would be given overtime.

Q Okay. But for days, it would have to be because if was your day off. Otherwise, if you went to court on a day that you were on, you wouldn't get overtime for that if you were on days?

A That's correct.

Q But if you were on afternoons or midnights, you were always going to get overtime for going to court, correct?

A That's correct.

Q Okay. And so, if you had detectives who closed more cases, would they get more overtime, specifically if they worked on afternoons or midnights?

A If --

MR. BRUEGGEN: Objection. Form. Incomplete hypothetical. Go ahead.

A Yeah. So just closing a case doesn't necessarily correlate to court appearances. So it would have to be closing a case that's going to trial that the state's attorney believes your presence is needed for. So just the mere fact that you've closed a case doesn't necessarily correlate to a court appearance.

Q And that's in part because, if I'm -- maybe -- I think what I'm misunderstanding is, closing a case

doesn't necessarily mean you closed it with charges being approved with criminal prosecution, right?

A That's correct. But even cases that were closed with prosecution didn't always translate into a court appearance as well.

Q For violent crimes cases where the case was closed with charges and prosecution, would those detectives who closed more cases successfully have the opportunity for more overtime?

A Again, not necessarily. Some of the -- you would get guys that would plead guilty and there was no court involved at all. There were -- there were cases that detectives were on where -- based on the facts of the case or the way the reports were written, that weren't required to make an appearance in court. So I don't know that -- necessarily that making a lot of arrests or getting a lot of cases charged always translated into a court appearance.

Q Okay. In terms of -- well, strike that. Let's move on for now. As a -- you became a commander in 2008. What was your -- what groups or units were you overseeing as a commander?

A So for about the first year, year-and-a-half, I was patrol. I was a 16th District. And then after that, I was transferred back into the detective division

to Area 4 detective division. And I was there until the department did a consolidation of areas. They went from five areas to three areas. I couldn't tell you when. Maybe around 2011, and I'm just guessing. At that time, I went from Area 4, which closed, to Area Central as the commander. So they moved me from 4 to Central.

Q Okay. And then how long did you stay in that -- so it was around 2010, if I -- if my math is right, that you became a commander overseeing the detective division at Area 4, correct?

A 2009, 2010. Yeah, I don't -- I don't remember exactly when.

Q Okay. And then what was the point -- I know -- I understand that the -- there was a consolidation, but at what point did you stop overseeing detective division as a commander?

A In 2013, I was promoted to deputy chief of detectives.

Q Okay. All right. So you remained the commander overseeing detective division areas in the period from 2009 or 2010 through 2013 when you became deputy chief, correct?

A That's correct.

Q And in what way was your position as the commander overseeing a detective division different than

your role as a lieutenant in that function earlier in your career?

A It's a much broader area of responsibility. You're in charge of filing crimes -- excuse me, property crimes, special victims. You're in charge of all the civilians. There's a -- it's a -- it's very wide ranging, really.

Q And then who did you report to in that position as commander?

A I reported to the deputy chief of detectives. At the time it was a guy named Dean Andrews.

Q And then the deputy chief of detectives reported to the chief of detectives, correct?

A That's correct.

Q Okay. All right. So during the period of time that you were a commander overseeing first detective division Area 4, and then Area Central, you were seeing -- you were overseeing all of the detective units within that division, correct?

A That's correct.

Q Okay. And that would include violent crimes throughout that period of 2009 through 2013, correct?

A That's correct.

Q Between the time that you had been in the function of a detective in 19 -- you know, 1991 through

1994 -- oh, sorry, 1990 to 1994. So let's actually narrow that down. From the time you were working as a violent crimes detective in the period from 1991 to '94, to the time that you're now a commander overseeing detective division areas from approximately 2010 to 2013, what changes took place in terms of the day-to-day practice of conducting investigations based on your experience?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection. Form, foundation.

A Yeah. I couldn't even guess. I don't recall. I mean, I'm certain at the time, I knew, but I couldn't even guess at that.

Q Were there any different rules in terms of the documentation requirements from the time that you were practicing as a detective to the time you were overseeing these detective division areas, as far as you're aware?

MS. ROSEN: Objection. Form, foundation.

A Yeah. Again, I could not recall if there were or not.

Q Okay. So sitting here today, you don't recall any specific things that detectives were required to do differently in terms of documentation when you came back in the commander role; is that fair?

MS. ROSEN: Objection. Form, foundation.

A Yeah, I don't recall at all.

Q Okay. So -- and let me do it this way. From the time you were working as a detective -- strike that. From the time you were working as a detective to the time when you came back in a sergeant's capacity overseeing detectives, do you recall any differences in the documentation requirements of detectives?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection. Form, foundation.

A No. That -- again, that was 30 years ago. I don't recall what changes or if there were any changes. I don't recall.

Q Was there any point in time when you -- strike that. You know, I asked you a bunch of questions about what were the kinds of things that needed to be documented during the course of a homicide investigation, and we went through those answers. We're not -- we won't go through them again, but was there any point when you would say, in one of my supervisory roles, whether as a sergeant or lieutenant or commander, that the answer would change to those questions about the kinds of things that needed to be documented by detectives?

MR. BRUEGGEN: Objection. Form, vague.

MS. ROSEN: Form, foundation.

A Yeah. Again, I don't -- I don't -- no. I don't recall that. That's --

Q Okay. From the time that you had been a detective yourself to the time you were a lieutenant overseeing detectives, can you recall any example of anything that changed about the documentation requirement of detectives?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection. Form, foundation.

A Again, I don't remember.

Q And the last question. From the time that you were a detective yourself to the time you became a commander overseeing detectives, do you recall any instances of -- or examples of changes to the documentation requirements that applied to detectives?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection, form.

MR. BRUEGGEN: Asked and answered.

MS. ROSEN: Foundation.

A Yeah. There -- there may have been. But again, I don't recall.

BY MR. SWAMINATHAN:

Q And when you say there may have been, can you think of any examples or instances of any changes?

MR. BRUEGGEN: Objection. Asked and answered, foundation.

A No, I cannot.

Q Okay. When you -- and you said that in 2013, you became a deputy chief -- oh, strike that. When you were working as a commander overseeing detectives at Area 4, did you have a detective named Kriston Kato working under you?

A No. I believe Kato -- I don't know. I don't recall. I know Kato left at some point. I don't recall if he was gone when I got there. I want to say he -- he may have been gone. I don't recall.

Q So it sounds like you're aware of who Kriston Kato is?

A Yes.

Q Why are you aware of him?

A Kriston Kato worked for the fraternal order of police after he retired, and I would see him at different events and functions and things of that nature.

Q Did you -- what role, if any, have you ever had with the FOP?

A What role have I had with the FOP?

Q Yeah.

A None.

Q Okay. Just attending various events is when you see him?

A He would attend them on behalf of the FOP sometimes. I believe he was also part of their shooting team. So I would see him at -- at shooting -- police shooting events. But yeah, no. Beyond that, I really don't know if he --

Q I'm sorry, go ahead.

A No. I was going to say, I don't know if he was still in Area 4 when I got there, or if he had already been gone. I want to say he might have been gone already. I don't remember ever supervising him.

Q Is there any point in which you became aware of a number of allegations of abuse or misconduct against Mr. Kato?

A No.

Q Is there any point during your time as a -- in, you know, moving up as a commander, as a chief, and so on -- in higher positions in the Chicago Police Department when you learned of allegations of misconduct against Kriston Kato?

MS. ROSEN: I have an objection to this line of questioning related to Kato. It has nothing to do with the Guevara cases. And, you know, we've -- I haven't said anything up to now, but it feels like

you're doing discovery for different cases. And stating as an objection to that because the City's lawyers in the other cases are not present.

BY MR. SWAMINATHAN:

Q You can go ahead. Mr. Riccio, you can go ahead.

A I'm sorry, what was the question?

Q Yeah, I'll repeat it and we'll have the same objection. And why don't we just do this for the record? I think Ms. Rosen may have some objections to some of my questions about other officers who are not Rey Guevara related officers during this deposition. I'll note that. From our perspective, we have a different position which is that this is a case that involves allegations of abuse. And so, we think allegations of abuse beyond just Mr. Guevara are relevant to our case. And so, we have a different view than Ms. Rosen, but certainly I appreciate Ms. Rosen's position is different than ours. And you can have a standing objection related to all of those types of questions to the extent -- to the extent I'm asking them. So I will repeat my question and then we can -- we can keep going.

MR. BRUEGGEN: Anand, did you say you -- this is a case of abuse?

MR. SWAMINATHAN: This is a case that does involve allegations of abuse against Francisco Vicente. So there are allegations of abuse against individuals in this case.

MS. ROSEN: Can I -- just to clarify just for a second, I appreciate the standing objection so we can get through it. But is it your intention to go through a series of other cases and other officers during this deposition? And how much time do you think you're going to spend doing that, because I may have a different view in terms of accepting the standing objection and perhaps resolving it in a different way, so

MR. SWAMINATHAN: To the extent I have questions about others, it's going to be -- I suspect it's going to be in the context of my various lines of questioning. I don't have a whole -- I don't have an hour planned to ask about a bunch of other instances of abuse involving a bunch of other officers at that -- to the extent that you're asking me.

MS. ROSEN: Yeah. Okay. Thank you.

BY MR. SWAMINATHAN:

Q Okay. Okay. So I think the question that I'll ask again, and Eileen's objection will apply, is,

is there any point during your time as an exempt -- I'm confused. When you get higher up, you become exempt or you become non-exempt? Remind me.

A You become exempt.

Q You become exempt. Yeah. Okay. All right. So during the time that you were in a position within the Chicago Police Department as an exempt employee, did you ever learn of allegations of abuse or misconduct against Kriston Kato?

MR. BRUEGGEN: Object to form. Go ahead.

A No, I did not.

Q During the time that you worked as a supervisor overseeing Area -- strike that. During the time you were supervising the detective divisions, either as a sergeant or lieutenant or as a commander, did you ever have any command authority or supervisory role over Mr. Boudreau?

MR. BRUEGGEN: Objection to foundation. Go ahead.

A I'll say no. But I don't know who that is, so I can't say conclusively that I didn't.

Q Okay. All right. When you became deputy chief -- strike that. As a commander overseeing detectives, did you have any responsibility for writing policies?

MR. BRUEGGEN: Objection. Form, vague.

A Very limited. You know, you could set your own policy on, for example, how to get approval for overtime. You could set different policies within your unit that were applicable to your unit. But the broader Bureau of Detective policies or anything that conflicts with department policies, no.

Q Okay. Did you -- at any point in time when you were overseeing -- when you were in supervisory capacities in any of the detective divisions, did you have any involvement in writing or modifying any of the general orders or special orders that applied to detectives?

MR. BRUEGGEN: Objection. Form, vague.

A As a deputy chief, I was given orders that were being rewritten, and maybe even as a commander, to review as part of -- I forgot what they call it. Staffing. They called it staffing. So they would -- if there was a new order coming out, they would send it to the exempts within the bureau for staffing suggestions like, hey, this is a bad idea, or oh, this is a good idea. Let's change this a little, let's change that a little. So that was a common practice. Even when the department would change orders, they would send those orders out for that staffing. But that was it.

Q During the entire time that you were either a detective or a supervisor overseeing detectives, are you aware of any different policies that applied in terms of documentation requirements between the different detective areas in which you worked?

MR. BRUEGGEN: Objection. Form, vague.

A Again, I'm so removed from that. I wouldn't be able to say if -- at the time, yes, or at the time, no. So it's just -- I don't recall.

Q Are you aware of any general -- strike that. Are you aware of any special orders that applied to detectives that applied only to detectives from particular areas?

MR. BRUEGGEN: Objection. Form, vague.

A Well, policies that were set in-house by the commanders of those areas would apply specifically to the personnel in those areas. Some were, you know, when you can take your lunch or what room roll call was going to be held in, but they were only binding on the individuals within that area. And again, it couldn't be anything that conflicted with the broader detective division rules or the broader department rules. So typically, they were more of housekeeping type things.

Q Got it. I think you went right where my mind was, so let me ask it maybe a better way. The detective

division special orders were formal sets of policies and requirements that applied to the detective division, correct?

A That's correct.

Q And those detective division special orders applied to all of the areas, correct?

A Unless the order itself was specifically geared at violent crimes or auto theft or whatever. But they were broader -- intended to apply, for the most part, to all detectives, yes.

Q Okay. Thank you. And that's a useful clarification. So let me ask a better question. The detective division special orders that applied to violent crimes detectives applied to violent crime detectives in all of the areas, correct?

A Typically, unless there was a carve-out for some reason that was for a special area, yes. But typically, unless it had an exemption in it or it had a carve-out for someone, then they applied to everyone. Yes.

Q Okay. And some of the kind of housekeeping type of policies that a commander could have, those are not things that are captured in the detective division's special orders, fair?

A Fair.

Q Okay. So before we come to those kind of housekeeping pieces, sticking with the detective division special orders, are you aware of any detective division special orders that had carve-outs for specific areas?

MR. BRUEGGEN: Object to foundation. Go ahead.

A Again, I'm so removed from it, I don't recall if that was the case or not. I believe there were some. But again, that was so long ago I couldn't say it with certainty.

Q Okay. And so, unless there was a carve-out written right into the detective division special order, the special order would otherwise apply to all of the violent crimes detectives across all areas, correct?

A That's correct.

Q And then in terms of some of the policies that could be set by the commander at that level, I think you indicated that those were usually what you called housekeeping types of issues, correct?

A For the most part, they were housekeeping issues, yes.

Q Okay. And so, an example of the kind of housekeeping issue you're describing is when you can take lunch or, you know, when you can clock in or clock out, those kinds of things?

A Right, exactly. Where roll call is going to be held, can't have lunch in the interview rooms anymore. Yeah, things of that nature. Housekeeping, yeah.

Q Okay. Not -- are you aware of any of the kind of commander-level housekeeping policies that applied to how a detective goes about conducting homicide investigations?

MR. BRUEGGEN: Object to form, vague.

A Yeah. I am not aware of any of those.

Q Are you aware of any commander-level housekeeping policies that apply to the documentation requirements that apply to homicide detectives?

MR. BRUEGGEN: Objection, form.

A I'll -- I'll say I'm not aware of them. But I'm going to, you know, throw a caveat in there that, again, this -- I am so far removed from -- from that, that I don't -- I can't say with any kind of certainty.

Q During the time you were a commander, did you ever set any commander-level policies on housekeeping issues that applied to -- that set your own documentation standards for -- for your detectives in your area?

MR. BRUEGGEN: Object to form.

A Again, I'll say no with the caveat that I am

really removed from it and I can't say with absolute certainty.

Q Did you -- do you recall any commander-level housekeeping issues that were ever set -- strike that. Do you remember any commander-level housekeeping policies that were ever set about how detectives go about conducting their interviews of witnesses?

MR. BRUEGGEN: Objection. Form, foundation.

A I'll have to say -- give the same answer. I'm not, as I sit here. But again, I'm years removed from it. So I couldn't say with certainty.

Q Okay. And would it be fair to say that your experience is that to the extent there were commander-level policies that were set, things like overall documentation practices or interview practices for witnesses is not the type of housekeeping stuff that was the typical subject of commander-level policies; is that fair?

MS. ROSEN: Objection. Form, foundation.

A Again, I'll -- I'll say that's accurate with the caveat that I am far removed from -- from that, so I could not say with certainty.

Q And to the extent there were commander-level policies set in any detective area, those commander-level policies could not be contradictory to the special

orders or detective -- or general orders; is that correct?

MS. ROSEN: Objection, form.

A Yes. That is accurate, yes.

Q So in other words, they couldn't -- a commander-level policy could not change the requirements set in detective division special orders, correct?

A Yes. That's accurate.

Q Any commander-level policies that are set could not change the requirements set in any general orders, correct?

A Yes. That's also accurate.

MS. ROSEN: I'm going to -- sorry to interrupt, but I just want to note for the record that you've been asking a lot of questions related to the witness' experiences as a commander and above, and he didn't become a commander until 15 or 20 years after the events of this lawsuit. And so, the relevance of this line of questioning is tenuous at best. And so, the City is objecting that we are spending all this time on these types of questions that are not really relevant to or proportional to the claims in this case, even considering the Monell claims, because you're talking about his experiences ten, 15, 20-plus years later.

BY MR. SWAMINATHAN:

Q Okay. All right. So let's move on to your time as a deputy chief. Which units or department did you have responsibility over as deputy chief?

A So I was deputy chief of detectives, which put me in charge of everything in the detective division, you know, absent the chief.

Q And how long were you in that role?

A From 2013 until 2015.

Q And then at that point you became a chief in overseeing what unit?

A The Bureau of Organized Crime.

Q And if I understand correctly, that is a different bureau than the Bureau of Detectives, correct?

A That's correct.

Q Okay. So at that point when you became a chief, you were not overseeing detectives any longer, correct?

A That's correct. There were a few detectives who worked in the Bureau of Organized Crime in different units. But as a whole, no, there was no -- there were very few detectives. Maybe a handful.

Q And what were the types of officers that worked in the Bureau of Organized Crime?

A What do you -- what do you mean by what type

of officers?

Q Yeah. In other words, was it gang crimes officers? Was it patrol officers? Was it detectives? Was it bomb and arson? You know, who were the types of -- essentially, line-level or -- well, strike that. Who -- what was -- who were -- what were the titles of the types of, you know, non-supervisory staff that worked in the Bureau of Organized Crime?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection, relevance.

A They were just patrol officers, like I said, other than the exception of maybe a handful, like half-a-dozen detectives.

Q And then when you -- and then you were in that position until 2017 when you became the first deputy; is that correct?

A Yes, I believe that's correct.

Q Okay. And then when you became the first deputy, what was your -- what was your responsibilities in terms of oversight within the police department?

MR. BRUEGGEN: Objection, form.

A I guess that's kind of -- you know, the catchall phrase they say is you're in charge of day-to-day operations. So everything in the department fell under me other than the office of the

superintendent.

Q Okay. And which superintendent did you work under during the time you were the first deputy?

A I was appointed by Eddie Johnson, and then I remained there during Charlie Beck when he was the interim. And then for a short time under David Brown when he became superintendent.

Q Okay. And then you remained in that role until August 2020 when you retired, correct?

A That's correct.

Q At any of the -- at any point in time while you were an exempt employee, were you involved in writing any policies? You identified a staffing policy that you were involved in writing, I think at one point, correct?

MS. ROSEN: Objection. Form, mischaracterizes his testimony. I think you've misinterpreted what he meant by staffing.

BY MR. SWAMINATHAN:

Q Okay. Yeah. Let me re-ask the question then. At any point you were in as -- you were an exempt employee, were you involved in any writing of any policies for the department?

MR. BRUEGGEN: Objection, form. Go ahead.

A Yes. So as the chief of organized crime, I

actually rewrote all the Bureau of Organized Crime special orders.

Q Okay. Okay. And in any other positions that you held, did you rewrite or write any of the policies for any of your -- any special orders or general orders?

A Other than what we talked about, where staffing -- where it's sent out to a large group and you kind of review it and make suggestions, no. So that would be -- I didn't write them or rewrite them, that would be more of you weigh in on them and you either concur or not concur and enter your suggestions or your recommendations. And then it's up to research and development to ultimately decide whether or not they want to make changes based on your recommendations or not.

Q Okay. Were you assigned to the -- as a detective -- strike that. Were you, as a detective, assigned to work on the Monica Roman homicide investigation?

A I was assigned to assist one day with the arrest of the offender, and then the conducting of lineups.

Q And who assigned you to do those things?

A I'll say the on-duty sergeant, but I don't recall who that was.

Q Okay. Who were the lead detectives on the -- in the Roman homicide investigation?

MR. BRUEGGEN: Objection. Foundation, form. Go ahead.

A The lead detectives were Rey Guevara and Ernie Halvorsen.

Q Okay. Were you -- did you serve as a lead detective at all on the Roman homicide investigation?

A No.

Q Did Steve Gawrys serve at all as a lead detective on the Roman homicide investigation?

A No.

Q Okay. And in terms of serving as a lead detective on a homicide investigation, what does that mean within -- you know, if you're explaining to a jury, what does it mean to say Rey Guevara and Ernest Halvorsen were the lead detectives on the case?

MR. BRUEGGEN: Objection, form.

A Just that they had -- they had the paper. I really don't know how to explain it. A lead detective is kind of something that somebody made up along the way. I think it was just that they had the most familiarity and the most -- the follow-up responsibility based on circumstances that occur sometimes. I don't want to get into a hypothetical, but they had the

responsibility for it at some point in the investigation.

Q And so, as the lead detectives -- well, strike that. Putting it another way, if somebody was keeping a cold case list and, you know, this case ended up on that list, the detectives that you'd speak to as a supervisor about that case were Guevara and Halvorsen; is that right?

MR. BRUEGGEN: Objection, form.

A Well, yes and no. At -- at the point where the initial -- initially where the case gets started, it would be the scene detectives. And then at some point, it could be other detectives based on a multitude of different factors.

Q I see. Okay. So the case may have had a different assigned or lead detective initially, and then that could change over the course of the investigation, correct?

A I believe that's accurate, yes.

Q Okay. And in this case, at least by the -- by the time you got involved in the investigation, the lead detectives at that point were Rey Guevara and Ernie Halvorsen, correct?

A That's correct.

Q Okay. Did you play any role in solving the

Roman homicide?

MR. BRUEGGEN: Objection. Go ahead.

A No, I did not.

Q Who did play -- who did solve the Roman homicide case -- strike that. Who did ultimately solve the case for purposes of obtaining charges?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Form.

A Halvorsen and Guevara.

Q Did you personally develop any evidence that was used to justify Geraldo Iglesias' arrest?

MR. BRUEGGEN: Objection, form. Develop.

A No, I did not.

Q Did you develop any evidence that was used to justify his charges?

MR. BRUEGGEN: Objection, form. Develop.

A No, I did not.

Q Did you personally develop any of the evidence that was used to justify his conviction?

MR. BRUEGGEN: Objection, form.

A No, I did not.

Q Who did develop the evidence that was used to justify Geraldo Iglesias' arrest?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Form, foundation.

A Guevara and Halvorsen.

Q Who developed the evidence that was used to justify Geraldo Iglesias' charges?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Form, foundation.

A I don't know that I can answer that. Who developed the evidence? Is that what the question was?

Q Yeah. Yeah. Who developed the evidence that was used to obtain charges against Geraldo Iglesias?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Form, foundation.

A I don't think I know enough about the case to be able to answer that.

Q Who developed the evidence that ultimately was used to convict Geraldo Iglesias in this case?

MR. BRUEGGEN: Objection to form.

MS. ROSEN: Objection to form, foundation.

A Again, same answer. I don't know that I have enough information. I don't have enough information to answer that.

Q In this investigation, did you have any -- did you ever go to the scene of the crime in this case?

A No, I did not.

Q Did you have any involvement in the first few days of the investigation when scene witnesses were

being interviewed?

A No, I did not.

Q What is the first day that you got involved in this investigation in any capacity?

A I don't remember the date. It was when I was asked -- when I was asked to back up Guevara and Halvorsen on an arrest.

Q And what does that mean to back them up on an arrest?

A To be an extra presence. They were going to arrest a suspect for murder and they requested an extra car.

Q Okay. So did Guevara and Halvorsen personally go to arrest Mr. Iglesias?

A Yes, they did.

Q And did you go with them?

A No, we did not go with them. We went separately. And by we, I mean Steve Gawrys and myself.

Q Okay. And so, you went to the same location, but you went in a separate car?

A Yes. I don't know that we ever -- I don't know that we went to the same location. I think we were more in the vicinity of the location. We weren't present for the physical arrest.

Q Okay. And that was my next question. So you

did not participate in the physical arrest of Geraldo Iglesias; is that correct?

A That's correct.

Q And then what role, if any, did you play in that arrest?

A Again, just, we were there or en route there or in a close proximity. And I don't recall because it's such a long time ago. Just to be a backup for them. In the event that they needed help, we would've been there or close by there.

Q Okay. Okay. And then after that arrest was made, did you -- strike that. Was anybody else arrested at the same time as Mr. Iglesias, as far as you recall?

MR. BRUEGGEN: Objection, foundation. Go ahead.

A I do not know.

Q Okay. Did you go back to the police station after that?

A Yes.

Q And then after you were back at Area 5, what role did you play in the investigation?

A I was asked to assist in the conducting of two lineups.

Q And what role did you play in assisting in those two lineups?

A I was inside of the lineup room where the suspect and the fillers were. And basically my role was to tell them, you know, one at a time to step up to the glass, make different facing movements, turn left, turn, right, and then return to their -- their place in line. And that same process was repeated for -- for everyone in the lineup.

Q So you were not in the room with the witnesses viewing the lineup, you were in the room with the suspect and fillers, correct?

A That's accurate, yes.

Q Okay. And is that true for both -- strike that. Is that true for all of the lineups that you participated in?

A Yes. It's true for all lineups, yes.

Q Were there any lineups that you participated in in which you were in the room with the witnesses?

A No.

Q And how many total lineups did you assist in?

A There were two lineups. The first lineup involved one witness. The second lineup, I believe, involved three different witnesses.

Q And in terms of -- strike that. So what -- for the second lineup that involved three witnesses, how do you know it involved three different witnesses?

A Well, because you have to do the -- the -- the cadence, the sequence of having them step up to the glass individually. You have to repeat that process three separate times. I believe it was three. It -- it could have been two, it could have been four, but you have to repeat that same process each time a new witness is brought to the viewing glass.

Q Okay. And so, were the three witnesses all on the other side of the wall looking at the lineup one by one?

A Yes, correct.

Q And were they -- were they all in the room together or were they separate?

MR. BRUEGGEN: Object to foundation.

A I -- I do not know because I was inside the room with the suspect and the fillers.

Q Okay. Do you have an understanding of why those particular individuals were in the -- reviewing the lineup?

MR. BRUEGGEN: Object to form.

A I -- I -- I don't. I can only assume that they were witnesses and that was why they were viewing it, but I'm -- I'm speculating. I think that's why most people are asked to view it.

Q Did you have any role in gathering the fillers

for the lineups?

A I don't recall. I -- I mean, I would've had some role in -- in -- in fillers, but I don't recall what that role was. I know some of them came from the lockup. Others were volunteers that came in. But, I mean, it was so long ago, I don't recall how they -- how that came to be.

Q Okay. But do you have any recollection of whether you performed any -- strike that. Whether participated in that process of gathering fillers?

A I -- I -- I do not recall doing that, no. Typically, I -- I -- I mean, I could say that I never went out on the street to gather up fillers, so I would -- I would say that that was the same in this time as well.

Q Okay. And in terms of participating in these two lineups, would it -- strike that. While you were in the room with the suspect and the fillers, who was in the room with the witnesses who were viewing the lineup for those two lineups?

A I do not know. Because again, I was inside the room with the fillers and the suspect, so I don't know what was occurring outside of that room.

Q Was it your understanding that you were assisting Rey Guevara and Ernie Halvorsen in conducting

those lineups?

A Yes.

Q Okay. And so, was it your understanding that it was Ernie Halvorsen and Rey Guevara who were with the witnesses viewing the lineup?

A Yes.

MS. ROSEN: Objection to form, foundation.

A That -- that was my understanding, yes.

Q Okay. And sitting here today, can you say whether it was both of them in the room or if it was just one of them in the room?

A I could not say, again. Because from where I was, you can't see out of that room, you can only see into that room.

Q Okay. So your understanding is that one or both of Ernie Halvorsen and Rey Guevara were with the witnesses viewing those lineups; is that correct?

A Yes, sir. That's correct.

Q When you got involved in the investigation in the capacity you just told us about, did you review any aspects of the case file up to that point?

A No, I did not.

Q Did you have any knowledge or information about the investigation when you got involved?

A I -- I just knew that a young girl had been

killed. I don't -- again, as I sit here, I -- I -- I don't know what I knew back then, but I just -- I -- I just knew the -- the very basics of the case. It was a murder investigation of a young girl.

Q After you participated in those two lineups, did you have any further involvement in the Roman homicide investigation?

A No.

Q Did you -- (coughs) excuse me. Did you ever learn about a witness named Francisco Vicente?

A No, I did not.

Q Did you ever learn of -- that police detectives had obtained a statement from a witness stating that Mr. Iglesias had confessed to this person about the crime?

A No, I did not.

Q As you sit here today, do you have any opinion, one way or the other, about whether Geraldo Iglesias is guilty of the Roman murder?

A I -- I don't know enough about the case to have a -- an opinion on it. I know that he was identified by a couple of the witnesses who saw the lineup. But I don't know, beyond that, any of the facts of the case.

Q Okay. And you have not -- I think you

indicated that you have not seen any of the evidence that was presented at trial, correct?

A That's correct.

Q And you have not seen any of the evidence that was presented during the post-conviction process that resulted in his conviction being thrown out, correct?

A That's also correct.

Q Okay. And your information about him being identified is based on your review of the two lineup reports; is that correct?

A No. I -- I would've been told. Following the lineups, I would've been told, here's what the -- the witness said or, you know, this witness said he saw him, this witness said he didn't. So after the lineup, I would've been given enough information to complete the lineup supplementary report.

Q Okay. Thank you. And that's an important clarification. So when -- your testimony about your participation in those two lineups, is it based at all on memory, or is it based entirely on your review of those lineup reports in preparation for this deposition?

A It's based entirely on reviewing those reports.

Q Okay. So you don't have any independent memory of those lineups or learning about the

identifications of Mr. Iglesias, fair?

A Fair.

Q Okay. And you don't have any independent memory of going out to arrest Geraldo Iglesias, correct?

A That's correct.

Q Everything that you're able to testify to about what you did during the course of this investigation is based on your review of documents; is that correct?

A Yes, that's correct.

Q Okay. And so, are you relying on the accuracy of those documents for purposes of your testimony?

A I am.

Q Okay. With regard to the identifications of Mr. Iglesias, your knowledge of that is, again, sitting here today, based on your review of documents, correct?

A Correct.

Q Okay. And so, as you sit here today in light of the evidence you're aware of and -- and the information you have indicated that you have not seen. As you sit here today, do you have an opinion about whether Geraldo Iglesias did, in fact, murder Monica Roman?

MR. BRUEGGEN: Objection. Asked and answered. Go ahead.

A Yeah. Again, all I can say is I know that from my review of those reports, that he was positively identified as the shooter in -- in the lineups. So that would, you know, be the basis of my -- of my knowledge of the case, really, and -- and his guilt or innocence based on that. Beyond that --

Q So -- I'm sorry, go ahead.

A I was going to say, beyond that, I -- I have no -- no knowledge of anything.

Q Okay. And so, if you were to be before the jury in this case, would you -- would it be -- would you indicate to the jury that you believe Geraldo Iglesias is guilty of this crime?

A I --

MS. ROSEN: Objection, form.

MR. BRUEGGEN: Objection to form.

A Yeah. Again, all I could say is that I know that he was positively identified in a lineup. Guilt or innocence is not for my -- for me to decide. I know that he was positively identified in these lineups.

Q Okay. And so, you would not -- strike that. If I understand you correctly, it is not your testimony that you personally believe that Geraldo Iglesias committed this crime, correct?

MR. BRUEGGEN: Objection, form.

Q Yeah. And strike that. I don't want to put unfair words in your mouth. Let me ask it a better way. Sitting here today, you are not prepared to offer an opinion about whether or not Geraldo Iglesias committed this crime as a matter of fact, correct?

A Well, I didn't -- I didn't witness it, so I certainly can't say with absolute certainty that he did it. All I can say is that I conducted two lineups, and he was identified as the shooter during those lineups. So, you know, having not witnessed it, all -- all I know is the facts from the reports that I authored.

Q Okay.

A That's really all I can say.

Q And you consider the information that you have had available to you to be sufficient information for you to offer an opinion about whether or not he's guilty or innocent?

MR. BRUEGGEN: Objection, form.

A Yeah, no. I don't -- I don't think I said that. Again, I didn't witness it, so I would not be able to say that he did it or did not do it. All I can say is, based on the two lineups, two individuals identified him as the shooter.

Q Okay. As you sit here today, are you aware that Reynaldo Guevara has been accused of misconduct in

many cases other than this one?

A Yes, I am.

Q And sitting here today, are you aware that Rey Guevara has been accused of manipulating eyewitnesses during lineup procedures in many cases other than this one?

A No, I am not.

Q Okay. As you sit here today, are you aware that he's asserted his fifth amendment right in response to all questions about his conduct in this case?

A Yes, I am aware of that.

Q And are you aware that he has asserted his fifth amendment right with regard to whether he manipulated the witnesses Hugo Rodriguez and Rosendo Ochoa?

MR. BRUEGGEN: Objection, form and to the extent it calls for attorney-client privilege. Anything we talked about, you don't have to tell him.

THE WITNESS: Got it.

MR. BRUEGGEN: But do you have an independent basis from anything we talked about?

A Okay, got it. No, I am not aware of that.

BY MR. SWAMINATHAN:

Q Okay. And based on your involvement in the

lineups, are you in a position to vouch for what Rey Guevara did or did not do when he was in the room with the witnesses viewing the lineup?

MS. ROSEN: Objection to form.

MR. BRUEGGEN: Objection, form.

A No. Again, I was inside the -- the lineup room with the suspect and the fillers, and that room is designed so you cannot hear out or see out. So anything that was occurring outside of that room, any conversations, any interaction with witnesses or anyone else would've been outside of -- of my ability to have knowledge of it.

Q Okay. So would it be -- so if I understand you correctly, what happened in the room when the witnesses were identifying Geraldo Iglesias is something that you were not there for, correct?

A What happened --

MR. BRUEGGEN: Objection to form, vague.

A Yeah. Are you asking me about what happened in the viewing room or in the room with the suspect and the fillers?

Q Yeah, good question. So I'm referring to the room where the witness is viewing the lineup containing the suspect and fillers. So let's use the right nomenclature. So is that --

A That's --

Q Do you call that the viewing room?

A Typically the viewing room or the viewing area, right. Yes.

Q Okay. So you were never in the viewing area during these lineups, correct?

A Correct.

Q And so, you don't know what happened in the viewing area during these lineups, correct?

A Correct. Again, the room is designed so that you cannot see out or hear conversations going on outside of the room. So you're really kind of in this isolated little bubble with the suspect and with the fillers.

Q So you cannot vouch for what Rey Guevara or Ernie Halvorsen did when they were in the viewing room with the witnesses viewing the lineup, correct?

A That --

MS. ROSEN: Object to form.

MR. BRUEGGEN: Asked and answered. Go ahead.

A Yeah, that is accurate. Yes.

Q Okay. Sitting here today, do you feel, based on your experience having worked with Rey Guevara and Ernest Halvorsen, that you can offer an opinion about whether or not they engaged in misconduct during the

time they were with the witnesses viewing the lineup?

MR. BRUEGGEN: Object to form.

MS. ROSEN: Objection to form, vague, foundation.

A No, I -- I could not offer an opinion either way on whatever interaction they had with the witnesses, no.

Q Okay. When you -- you indicated that you're not aware of details of what specific things Rey Guevara has asserted the fifth amendment with regard to, but you were aware that he had asserted the fifth amendment as a general matter. I have that correct, right?

A That's correct, yes.

Q And are you also aware that Ernest Halvorsen, at one point, asserted the fifth amendment with regard to his conduct as a Chicago police officer?

A I was not aware of that, no.

Q Okay. When you found out that Rey Guevara was asserting his fifth amendment right with regard to this case and other cases, what was your reaction?

MS. MCGRATH: Objection, form.

A I -- I don't know that I had a reaction. I knew that -- I knew that it had happened. I -- I don't know that I really had a reaction to it at all.

Q When did you first learn about any allegations

of misconduct against Rey Guevara?

A It's been a while. Several years, probably when the media -- when the news started covering it, was when I heard about it.

Q Did you ever hear of any allegations of misconduct against Rey Guevara during the time -- strike that. Did you ever hear of any allegations of misconduct against Detective Guevara through internal police channels?

MR. BRUEGGEN: Objection, form.

A No. Not that I can recall.

Q Did you ever hear of any allegations of misconduct against Rey Guevara from any other police officers, detectives, or otherwise?

A Broadly, generally, I think it's well-known that -- that Guevara has these allegations against him. As far as when or how -- specifics, I don't -- I don't -- I couldn't provide you with those.

Q Okay. The knowledge about Reynaldo Guevara having these allegations against him, is that something that's been known from before the time the media reports first started or after?

MS. MCGRATH: Objection to form, foundation.

MS. ROSEN: Objection to form, foundation.

A I -- that would be after the media reports, is

when I found out about it. I don't know when anybody else found out about it.

Q And knowledge about these general allegations against Reynaldo Guevara, does it go as high as the superintendent of police?

MS. ROSEN: Objection to form, foundation.

MS. MCGRATH: Objection to form, foundation.

A I couldn't say. I never had a conversation with the superintendent about Reynaldo Guevara.

Q And did you have any -- do you have any information that any of the superintendents you worked with had knowledge of the allegations against Rey Guevara?

MS. ROSEN: Objection. Form, foundation.

A No. There's -- there's -- there's nothing to indicate to me that they had any knowledge of any sort of wrongdoing about Guevara.

Q Okay. And what -- strike that. Was -- did you have -- strike that. When you say it was generally known within the department that there were these general allegations against Guevara, what do you mean by that? What form did that take?

MR. BRUEGGEN: Objection, misstates his testimony. That's not what he said, Anand.

A Yeah, no. I -- I think what it -- what I mean

is that people who had worked with Guevara in particular would -- talked about it, that he had these legal troubles now. That was it.

Q And who did you hear talking about these general legal troubles that he had?

A I -- I don't recall. It's -- it's been so long ago. I think it's just common knowledge among Area 5 detectives that Guevara had these problems.

Q Okay. And is that information that was communicated to you from other detectives or prior detectives?

MR. BRUEGGEN: Objection, foundation.

A Yeah, I don't -- I don't even recall. I mean, again, it's -- it's so old, I don't know -- I don't remember where I heard it. I -- I just remember seeing it on TV, seeing him taking the fifth.

Q Upon learning that there were these allegations against Reynaldo Guevara, at that time -- at the time you learned this, you were an -- you were an exempt employee, correct?

A I don't recall when I learned it, yeah.

Q But let's see. You would've been -- you became an exempt employee -- let's see here. Where on my notes -- when did you -- when did you first become an exempt employee?

A 2008.
Q Okay. And when you first learned about media stories about Reynaldo Guevara was after 2008; you agree with that?
A I -- I would agree with that, yes.
Q Okay. So the first time you learned about allegations against detective Guevara was when you were at the commander level or higher, either a deputy chief or first deputy, correct?
A Correct.
Q And when you learned of those allegations against detective Guevara, you also learned that he was pleading the fifth with regard to the allegations against him, correct?
A Yes. I believe I saw that on TV.
Q Okay. What actions, if any, did you take when you learned this information?
A There -- there were no actions to take. You know, it was under investigation. There was nothing for me to do.
Q And when you say it was under investigation, who was it under investigation by?
A The department. I knew that there were -- there was investigations -- there were civil suits going on, so I knew that -- that the case was -- that he was

under investigation.

Q And when you say he was under investigation, are you referring to the civil suits or are you referring to something else?

A The civil suits.

Q Okay. Other than the civil suits, were you aware of any other investigation involving detective Guevara?

A No, I was not.

Q Okay. So other -- and so, you were not -- when you learned this information during the time you were an exempt employee, were you aware of there being any internal investigation within the Chicago Police Department of these allegations against him?

MS. ROSEN: Object to form, foundation.

A No. In fact, I believe that Guevara had -- had long been retired, so there would be no internal investigations. Internal investigations are only for current employees.

Q Okay. When you learned of this information, did you take any steps to try to initiate any kind of internal investigations involving Detective Guevara?

A No. Again, internal investigations are only for current employees. He would have been long retired.

Q When you learned about this information, did

you initiate any steps to try to review the past cases in which Detective Guevara had been involved in securing convictions?

A No.

Q Do you know whether any such investigations were initiated by any of your colleagues?

MS. ROSEN: Objection, form, foundation.

A I do not know. But I'll say again that investigations within the department are only for current employees. So retired employees' allegations of misconduct are not investigated by the department.

Q Okay. Are you aware that, at some point, an investigation was conducted by the law firm Sidley Austin into Rey Guevara?

A No, I do not. No, I've never heard of them.

Q Okay. Did you ever become aware of the conclusions of the Sidley Austin Law Firm about allegations and misconduct against Rey Guevara?

MS. ROSEN: Objection, form, foundation.

A No. Again, I've never heard of them, and I've never -- I was never aware that there was an investigation.

Q Okay. During the time that you were first deputy to the superintendent, did you ever learn about the conclusions of the Sidley Austin investigation being

shared with the superintendent?

MS. ROSEN: Objection. Form, foundation.

A No. Again, I never discussed it with the superintendent, nor was I aware of this investigation. I had never heard of it until now.

Q Okay. So the investigation results have never been shared with you; is that correct?

A They've never been shared with me. That's correct, yes.

Q Is that surprising to you -- strike that. I'll represent to you the Sidley Austin investigation concluded that, at least in some cases, Rey Guevara had committed misconduct, including physically abusing witnesses, okay? If that was the conclusion of the investigators hired by the City of Chicago, is it surprising to you that that information would not have been shared with you?

MR. BRUEGGEN: Object to form.

MS. ROSEN: Objection. Form, foundation, and is not entirely accurate, but you can answer.

A No. That -- that doesn't surprise me. Again, Rey Guevara was a former employee, and I don't know why that information would've been shared with me. So no, I -- I wouldn't be surprised that it was not.

Q Okay. And so, when you say you're not

surprised that it wouldn't have been shared with you, help me understand why you wouldn't expect that information to have been shared at your level of the command staff.

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection, form, foundation, and relevance. We're talking about events that happened in the last couple years, and this has to do with a claim that originates in the early '90s. Under any view of Monell, you're not getting this evidence in front of a jury, so I have a -- a relevance and proportionality objection. We have been at this for two -- almost three hours now, and you've asked about ten minutes of questions related to the Roman homicide. So I am -- I am getting at the end of my patience.

MR. SWAMINATHAN: So I'll just note for the record, we have a different view about what is going to be relevant to the issues of notice and deliberate indifference involving Chicago Police Department, but we don't have to resolve those debates here.

BY MR. SWAMINATHAN:

Q Why don't you go ahead, Mr. Riccio?

A Again, he was a former employee, so there's no

-- no expectation that the behavior of a former employee would be brought to my attention.

Q Okay. Was there any expectation that when conduct involves -- strike that. So if I understand correctly, when conduct involves somebody who has left the police department, there's not really anything that can occur internally when that happens; is that right?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection. Form and foundation.

A There's nothing -- there's no investigation that can occur internally because internal investigations are for current employees only. So the behavior of a past employee, while it may have some relevance for training or -- or, you know, a way to improve ourselves, there's no internal investigation that can be conducted into a former employee.

Q Okay. So putting aside the word internal investigation, which I understand you to be saying is exclusively for current employees -- do I have that part right?

A Correct.

Q Okay. So putting aside that concept, could the police department initiate an investigation or audit based on the conduct of a former employee?

MS. ROSEN: Objection to form, foundation.

MR. BRUEGGEN: Objection to form, foundation.

A That would be outside the -- the scope of my knowledge. I -- I have no knowledge of that. If, in fact, that happened or did not happen, I don't know.

Q Are you aware of any instances in which any kind of investigation or audit of any kind was conducted based on allegations of misconduct against a former Chicago police officer?

MR. BRUEGGEN: Objection to form.

MS. ROSEN: Form, foundation.

A I'm not aware of any. That's not to say they didn't happen, I'm just saying that, in -- in my capacity, that -- that I'm not aware of them.

Q Okay. Are you aware of any kind of investigation that took place within the Chicago Police Department to assess best practices or training or otherwise based on the allegations of misconduct against Rey Guevara?

MR. BRUEGGEN: Objection, form.

MS. ROSEN: Objection form, foundation.

A I'm not aware of any. Again, there may very well have been, but I am not aware of any.

Q Are you aware of any kind of audit that occurred within the Chicago Police Department to assess the impact of any misconduct by Reynaldo Guevara on past

investigations and cases?

MR. BRUEGGEN: Object to form.

MS. ROSEN: Object to form, foundation.

A Again, I'm not aware of any. That's not to say that I would've been made aware of it if it occurred. But I -- I -- as I sit here, I am not aware of any, no.

Q Okay. And based on your --

A I'm not --

Q Go ahead.

MR. BRUEGGEN: Do you have a -- where are you at in your outline as far as time? I'm just wondering if we should take a break for lunch because we --

MR. SWAMINATHAN: Yeah. Why don't -- I have just a couple more questions on this line that I have to make sense to take a break for lunch and then -- and then -- and then come back. But I need --

MR. BRUEGGEN: Well, I will talk --

MR. SWAMINATHAN: I need a few minutes.

MR. BRUEGGEN: I'll talk to Mr. Riccio about how long of a break he wants. But, you know, at least take a break --

MR. SWAMINATHAN: Yeah, for sure. Yeah, for

sure. Why don't we take -- why don't we plan to take a lunch break and he can -- you guys can decide how long you -- how long you want do that. But can we go another two minutes or so?

MR. BRUEGGEN: Yeah, yeah.

THE WITNESS: Yeah, I'm good.

MR. SWAMINATHAN: You're good? Okay.

THE WITNESS: I'm good.

BY MR. SWAMINATHAN:

Q Based on your extensive experience in the Chicago Police Department, to the extent any kind of investigation or audit was conducted to try to assess any impact on best practices or training, who in the police department would be responsible for that or know about that?

MR. BRUEGGEN: Object to form.

MS. ROSEN: Form, foundation.

A It -- it's difficult to say. It could be at -- at the training division. It could be within the Bureau of Detectives. It -- those would -- and I'm just answering, you know, based on -- on my knowledge from two years ago. Those would be the places that I would most likely see something like that occur. It could be in -- in the law office within the police department, the general counsel's office. Again, it's -- I'm -- I'm

just speculating. All I know is that it never came to my level.

Q Okay. And during the time that you were a commander, deputy -- or deputy chief overseeing detectives, did you ever have any investigations that were conducted under your command into allegations of misconduct against Reynaldo Guevara?

MR. BRUEGGEN: Objection. Form, foundation, asked and answered.

A Can you repeat that?

Q During the time that you were a commander and deputy chief overseeing detective division -- detectives in detective division, did you ever initiate any investigations into allegations of misconduct against Reynaldo Guevara?

A No. But I think Guevara was already retired before I became a commander. I -- I don't know when he retired specifically, but I believe he was gone prior to the time that I even became a commander in the detective division, which was like 2009 or 2010. I believe he was already retired.

Q Okay. And during the time that you were a commander and deputy chief overseeing detectives, did you initiate any kind of effort to assess best practices or trainings or otherwise to address the types of

allegations of misconduct against Reynaldo Guevara?

MR. BRUEGGEN: Objection to form.

MS. ROSEN: Objection. Form, foundation.

A I -- I -- I would say no, I don't recall. I don't recall that ever coming up, no.

Q Okay. During the time that you were a sergeant and a lieutenant and a commander overseeing or supervising detectives, are you aware of any instances in which any trainings or -- let's start with -- let's start with trainings. Are you aware of any instances in which any trainings were conducted with detectives during the time you were a supervisor as a sergeant, lieutenant, or commander, in which there were trainings put in place based on allegations of misconduct against detectives?

MS. ROSEN: Objection, form, foundation.

A Yeah, I -- I think that was kind of an ongoing thing. Anytime that there was some sort of a finding in court, or even if -- even in a civil judgment or something that adversely affected some detective or -- or -- or the way we did things, there was training to kind of modify it and come in line with whatever that ruling was or whatever that law was. So I think those training -- that training was kind of ongoing. That was a continuous thing.

Q So there were instances when trainings were conducted with detectives based on the outcomes of civil lawsuits?

A I -- I believe that there were, yeah. There was -- there were some. And I -- I don't remember specifics. I mean, sometimes it was something as basic as a -- as a roll call training where you would sit down and discuss with the detectives, like, hey, somebody, you know, just had a -- there -- we lost a lawsuit based on -- based on this or based on that, and then here's a way that we need to make some corrections or -- or modifications or -- or go in a different direction. There -- there was -- I think that was kind of an ongoing thing anytime something happened. Even losing a case in criminal court where it was lost, for example, because you didn't document who was in the room when you read Miranda to the -- to the offender would bring about, you know, like, hey, from now on, in these reports, we got to document who was present or -- or what time Miranda was read, or -- so there -- I think it was kind of an ongoing thing. Any time that you -- you took a ding because an offender beat you at trial or beat a case at trial or won a civil lawsuit, I think we always tried to modify our practices to -- to try to make sure it didn't happen again.

Q Okay. So outcomes at the -- at criminal trials was something that was being followed within detective divisions; is that right?

A Yes. I mean, that would be brought back to us by detectives who would say, I lost this case. This robbery offender got off because of XYZ. You know, OJ Simpson's case led to best practices with collecting evidence at the crime scene for DNA processing. So there's always -- there's -- it's -- it's a constant evolving of -- of policies and procedures, whether it's documenting things or interviewing or -- or the rooms or filling out paperwork. That -- there's -- there's -- there's a constant evolving to try to not repeat mistakes, I think. And that's -- that's something that was ongoing, and that was something that I stressed during my time as a supervisor in the detective division. And I saw many other supervisors in the detective division doing the exact same thing.

Q Okay. So thank you for that. So detective division supervisors, in your experience, were keeping track of what was happening in the criminal courts in cases involving their detectives, correct?

A I don't know --

MR. BRUEGGEN: Object to form.

A Yeah, I don't know that it was necessarily

keeping track. I think a detective would come back and say, I -- I -- you know, I was annihilated on the stand because of ABC, and then that would kind of translate into roll call training. As -- when I was a deputy chief of detectives, when I got wind of things like that, I would try to make sure we integrated that into training for the new detectives as well. So again, there was this constant evolving of our -- our practices, whether it was documenting, interviewing, detention, you know, the -- we got annihilated on a civil suit for 48 hour -- for exceeding the 48 hours of -- of detention. That led to a new policy that, on 48 hours, if the state won't charge, they walk out the door. That led to the duty judges. You know, the duty judges kind of evolved from that, where we could go to a duty judge and -- and -- and, you know, be able to detain somebody beyond that 48 hours. So there was -- there was a -- just a constant updating of policies to try to do it better, to try to do it right, to -- to make sure that we didn't lose these cases in court, to make sure that we didn't expose detectives to -- to civil liability. So that was -- that was always ongoing.

Q And this -- and -- and these -- and these efforts to basically learn from what was happening in --

during criminal cases was something that supervisors were doing; is that right?

A Yeah. So then when it was brought back to their attention that -- that something happened, this -- that was -- that was something that we tried to learn from and pass on at roll call. I don't know that it always translated into policy. Sometimes I'm sure that it did, with the 48-hour rule for example, translate into policy, so

Q When -- oh, go ahead.

A Yeah. So -- so it was -- you tried to learn from your mistakes. I mean, really that was -- that was what it was all about. Nobody was -- was trying to skirt the system or -- or get around things. You would -- you would lose and you would realize, here's why we lost, let's do it differently the next time. And -- and that was something that we were constantly doing within the detective division. Nobody wanted to see a murder offender walk out the door because of some documentation on paper that was -- was screwed up or -- or -- or, you know, some -- some misstep or, you know, you detained him too long and -- and now you -- he's going to be getting out. So there was -- or, you know, the evidence was not collected right, or you didn't preserve this -- when DNA came around again, for example, the initial

collection of DNA, I think we learned from the OJ Simpson trial, had to be very, very carefully done. So there was always an effort to learn and improve.

Q So as -- if I understand correctly, so as a sergeant, lieutenant, and commander overseeing detectives, your experience is that there were times when the outcomes in criminal trials resulted in trainings for detectives; is that right?

A Yes. I think that's accurate. Yes.

Q And of course, the first step to that is the -- as a supervisor and as sergeants, lieutenants and commanders in the detective division, they were learning about these outcomes in criminal trials in order to be able to conduct trainings for their staff; is that correct?

A Yeah.

MR. BRUEGGEN: Object to form.

A Typically detectives would bring that information back and then that would be the subject of -- of roll call training, sometimes just within an area, sometimes much broader throughout the detective division. Sometimes it was incorporated into the training for new detectives, newly promoted detectives. Sometimes it was in-service training. So it took various forms, but it was -- it was -- it was a

constant. It was -- it was nonstop. There was always an effort to improve and not make the same mistake twice.

Q And that was inside --

MR. BRUEGGEN: Anand --

MR. SWAMINATHAN: Go ahead.

MR. BRUEGGEN: Good time for the break? You said two minutes --

MR. SWAMINATHAN: I said about two more minutes. Let's finish this line so that we're -- that we can move on.

BY MR. SWAMINATHAN:

Q So one of the -- one of the things that would be a -- strike that. So if defendants were -- a defendant beat a case, basically, got an acquittal, that was the kind of information that detectives were bringing back to the sergeants, lieutenants and commanders that could result in some training; is that right?

MS. ROSEN: Objection, form.

MR. BRUEGGEN: Misstates his testimony, but go ahead.

A Yeah. I -- I don't know that that was what I was saying. I think that if you lost it because of something that we were doing, then we would -- you know,

sometimes you just lose a case. Sometimes the evidence isn't there or, you know, there's a multitude of reasons. But if it was -- it was an error on our part or something that we think we could do better, that's where the training came in.

Q Okay. And -- understood. Not every single case in which somebody beats --

A No.

Q -- results in a training, fair?

A Right.

Q But in some instances it would, correct?

A Right.

Q And so, one of the things that the supervisors were doing was keeping track, as a general matter, of what was happening in the criminal court so that they could conduct better training and improve practices within the department, correct?

MS. ROSEN: Objection, form.

A Yeah. I don't know that they were keeping track. I think it was -- it was just evolving if things evolved. I don't know that there was any keeping track.

Q Understood. If a motion to suppress a confession or statement was granted, is that the kind of thing that would be brought back to the supervisors to try to improve practices?

MR. BRUEGGEN: Objection.

MS. ROSEN: Form, foundation, hypothetical.

A Yeah. I -- again, that -- I think that's -- I think that's overstating or -- or -- or kind of broad for what I'm stating. It's -- it's where we took a hit for something that we either did or did not do. Sometimes a motion to suppress is successful for other reasons. But if it was an error on our part, documentation or whatever, those were the types of things that we could turn around and train detectives to not do again.

Q Information about Brady violations that were found in state court, was that the kind information that would come back to supervisors in order to improve practices?

MS. ROSEN: Object to form, foundation.

MR. BRUEGGEN: Incomplete hypothetical.

A Yeah. I --

COURT REPORTER: Counselors, I can't note both of your objections at the same time, so if you could please do one at a time. Thank you. Sorry to interrupt.

MR. SWAMINATHAN: Do one of you want to go ahead and repeat your objection?

MR. BRUEGGEN: Well, I --

MR. SWAMINATHAN: Why don't I -- why don't I strike the question. Let's -- I think I probably don't even remember what the question was. But let's take the break now. This is a perfectly good time.

MR. BRUEGGEN: All right. Give me a second here. Anand, can we do like a half-an-hour? Come back about --

MR. SWAMINATHAN: That makes sense.

MR. BRUEGGEN: -- 1:40-ish? Maybe a little before that?

MR. SWAMINATHAN: Yeah, perfect. Perfect. Thank you, everybody.

COURT REPORTER: We are now off the record, the time is 1:07.

(OFF THE RECORD).

COURT REPORTER: We are back on the record for the deposition of Anthony Riccio being conducted by videoconference. My name is Sydney Little. Today is May 18, 2022, and the time is 1:57 p.m.

BY MR. SWAMINATHAN:

Q Okay. Mr. Riccio did you have a chance to get some lunch?

A Yes, I did. Thanks.

Q Okay. And are you -- you're feeling ready to

keep going?

A I'm ready.

Q Okay. I asked you a number of questions about Reynaldo Guevara. What was your opinion of Rey Guevara as a detective when you worked with him?

A I rarely worked with Rey Guevara. He worked afternoons and I almost exclusively worked days and midnights, so I had very little contact with him.

Q So did you form any opinion about Rey Guevara?

A No, I really -- I really didn't.

Q Did you -- did Rey Guevara have any reputation that you knew of during the time you worked with him?

MR. BRUEGGEN: Object to form. Go ahead.

A None -- none that came to me. None that I was -- became aware of.

Q At any point prior to the time that you learned of the media -- from the media about allegations against Rey Guevara, did you have -- did he have a reputation that you knew of, of any kind?

MR. BRUEGGEN: Objection, form.

MS. MCGRATH: Objection, form.

MR. BRUEGGEN: Go ahead.

A No, he did not. Not that I'm aware of.

BY MR. SWAMINATHAN:

Q What opinion did you have of Ernie Halvorsen

based on your work with him as a detective?
A Same. I rarely worked with or saw Ernie Halvorsen because, again, he worked afternoons. I worked the day shift, sometimes the midnight shift. So the only time I would see either one of those guys is if I was working over from the day shift. Then I would -- I would see them.
Q What reputation, if any, did Ernie Halvorsen have as a detective?
MR. BRUEGGEN: Object to form. Go ahead.
A Yeah, I don't -- I don't think I was really aware of a reputation for Ernie either. I really -- our paths didn't cross. I really had no opinion or -- or anything of him or Rey, either way.
Q Okay. I asked you some questions before the lunch break about the allegations of misconduct against Rey Guevara. And we talked about the idea that he was not a current employee at the time that you learned about these allegations of misconduct.
A Right.
Q I want to go back to that just very briefly. If Rey Guevara had been a current employee at the time you learned of the allegations of misconduct against him, what -- what could you or would you have done if you learned of those allegations?

MR. BRUEGGEN: Objection --

MS. ROSEN: Objection. Form, foundation, incomplete hypothetical.

A Well, if he -- if he had been a current employee at the time those allegations came out, there would have been a complaint registered against him, complaint register number, CR number, they call them, based on the allegations that were presented in the -- in the media.

Q And then what would that have -- what would that have resulted in?

MR. BRUEGGEN: Objection, speculation.

A An investigation would've been conducted, either by internal affairs or whatever the independent investigating body is, COPA, IPRA, OPS, whatever it was at the time. And one of those agencies would've conducted an investigation into whatever the allegations against him were.

Q Okay. And would that have -- when those allegations came to light, would it be -- would it result in the opening of one CR or multiple for each separate instance of alleged misconduct?

MR. BRUEGGER: Objection, form.

MS. ROSEN: Objection. Form and foundation.

A The -- I -- I -- I actually -- the smartest

thing I could do is just tell you, I'm not certain. I -- I would just be guessing at any answer. Allegations from a particular complaint are all investigated together. If there's different complaints from different incidents, those would all be investigated together. So there could be multiple allegations from one incident, they would all be investigated together by the same body.

Q Okay. Are CRs ever opened for retired cops or former police officers?

MS. ROSEN: Objection. Form, foundation.

A No, they are not. Only current employees can be the subject of a CR investigation.

Q Okay. And we had talked earlier about the fact that any findings that had been reached by the Sidley Austin team were not shared with you regarding their finding as to Rey Guevara's abuse, correct?

MR. BRUEGGEN: Objection, form, misstates his testimony.

A I -- I --

Q Can I re-ask the question? Sorry. Was that unclear?

A No, no. I -- I -- I'm unaware of that investigation or any findings from that investigation. This -- this is the first I'm hearing of it.

Q Okay. If Rey Guevara had been a current employee, you expect that if there had been findings of misconduct by him, it would have been shared with you if there had -- if he had in fact been a current employee?

MR. BRUEGGEN: Objection. Form, foundation, and speculation.

A Yeah. Can you repeat the question actually?

Q Yeah. If there had been findings of misconduct by the Sidley Austin investigation against Rey Guevara and he was still a current employee at that time, do you then expect that you would've learned about those findings?

MR. BRUEGGEN: Objection, speculation, foundation, incomplete hypothetical. Go ahead, sir.

A Yeah. It -- it's hard to answer just based on that. It depends what those findings were. So really it's -- it's impossible to say whether or not they would've been shared with me.

Q Okay. Going back to the time that you were a commander overseeing detectives, so this is the period from in and around -- period of time between 2008 and 2013. During that period, were there ever any instances when allegations of physical abuse or other misconduct were raised against detectives who were current detectives?

MR. BRUEGGEN: Object to foundation. Go ahead, sir.

A I don't recall. I would say in a -- in a time span that large, that that's probably a safe bet that there had to be some sort of allegations. I would say that they were rare. But again, I -- I couldn't say for sure that there were or were not any that occurred.

Q When there were allegations of misconduct during the course of homicide investigation, was that information supposed to be shared with you as the commander overseeing detectives?

MR. BRUEGGEN: Objection. Form, incomplete hypothetical, vague.

A Yeah. I mean, I hate to say -- the question just doesn't -- it's impossible to answer the way the question's presented. There's a lot of different scenarios that could -- could come into play where I would be notified as the commander. There's also many scenarios where I would not be notified. So it's impossible to really pin down an answer for you on that.

Q Thank you. When you were -- when you were a commander overseeing detectives, what were the circumstances in which allegations of misconduct against homicide detectives working under your supervision would have been, or should have been shared with you?

MR. BRUEGGEN: Objection. Form, foundation.

A If the allegations were not going to be investigated by the independent investigation agency, IPRA or COPA, and not going to be investigated by internal affairs, they would come to the unit to be investigated. In that case, they would come through my office as the commander, I would read those allegations, and then I would give them to a lieutenant, who in turn would assign it to a sergeant to conduct the initial investigation into the misconduct. So in those situations, I would be aware of it. The only other scenario that I could think of as I sit here is if the allegations were of something so egregious that it warranted some sort of immediate action. For example, the superintendent would be stripping someone of their police powers or something. Then it would -- it would also come to my attention at that point. The -- when an investigation was completed and there was a finding, if the finding required discipline of even a reprimand up to a suspension, that would also come to my attention. So there are times when, as the commander, you do know -- you become aware of allegations against officers. There are many times when there's allegations that you are not made aware of. There's also confidential investigations that are held by a very select small

group of people in internal affairs to investigate. Those obviously are not shared with anyone outside of a very small group of individuals.

Q What are the circumstances in which investigations were not conducted by, you know, the internal affairs division or the civilian investigating body, whatever it was at that particular time, and instead would be assigned to the unit?

MR. BRUEGGEN: Object to foundation, form. Go ahead.

A I actually don't know. That was like one of the -- the mysteries that we've never figured out. They simply elected not to investigate it, yet it warranted an investigation, so it would be sent to the unit. But I don't know -- I mean, you'd have to talk to someone in internal affairs as to why or why they didn't want to take on certain cases.

Q And so if it came to the unit for you to assign as the commander, you would then assign it -- would you then assign it to lieutenants or sergeants or what?

A I would give it to the lieutenant in charge of that oversight office, and then he would assign it to the most appropriate sergeant. So if it was a -- a property crimes detective that was accused, I would give

it to the property crimes lieutenant. He would assign it to the most appropriate sergeant, which would most likely just be a sergeant from that watch that the detective worked, and that sergeant would conduct the investigation.

Q So the -- you said the investigations that were conducted by the -- strike that. The investigations that came to the units to be investigated would ultimately be investigated by individuals who were supervising the individual who was accused, correct?

MR. BRUEGGEN: Objection, form, misstates testimony. Go ahead.

A Generally, yes. But -- but like with everything else, there were -- there were exceptions. So not always, I would say.

Q But -- so the general rule was that you would assign the investigation to a supervisor who had supervisory authority over that particular individual, correct?

A Again, not necessarily that -- that person, but you would -- someone of that rank. It didn't have to be their supervisor. Occasionally it was, occasionally it was not. But definitely a person a rank above the accused. So it would normally be a sergeant investigating a detective.

Q And were there ever any steps to ensure that the individuals who were investigating officers were not the supervisors who work day-to-day with these detectives?

MR. BRUEGGEN: Object to form.

A No, there were not. In fact, that was oftentimes the most appropriate person because they had access to that person. They -- they worked the same hours and that was the person who would best be able to interview them and -- and get the information that they needed to conduct the investigation.

Q Did you ever have concerns about bias in having somebody who worked day-to-day with somebody also investigate them for misconduct?

A No. I didn't. And the reason was because that investigation had a lot of review and oversight. So when -- when the sergeant was finished with it, it went to the lieutenant, and the lieutenant reviewed it and had to sign off on it. And then it would come to the commander who would review it and sign off on it. And then it would go to internal affairs, and internal affairs would have to review and sign off on it. So there were a lot of eyes that looked at that investigation after the -- after the sergeant was finished with it. And any one of the people in that

chain had the ability to send it back for further investigation or pick up the investigation themselves if they felt it was warranted. So I wasn't -- I wasn't concerned about that.

Q During the time that you -- I'm changing gears here for a minute. During the time you were working as a homicide detective, did you ever get tips on a murder case from a confidential informant?

A How are you defining confidential informant?

Q It -- that is a term that is in the documents in this case, and so I'm using that term -- I'm simply repeating the term. But why don't you tell me if there's -- what that term means, or if there's a different term I should be using, just because I don't know how to define it.

A Sure. Well, there's confidential informants that -- that -- kind of a broad thing, and people use it differently. There's confidential informants who are actually registered by the department, and -- which means there's a database somewhere that they know who these individuals are, their -- their affiance on search warrants and things like that. Other people use the term confidential informant for a citizen who calls the area and says, hey, I -- I know who -- who did this shooting, or I know who broke into somebody's house. You

know, I have some information. Some people use it for a citizen who flags you down on the street and says, I don't want to get involved, but the guy standing over there is holding a gun, or the guy standing over there robbed the gas station yesterday. So it's -- it's kind of a wide range of -- people use that term kind of loosely. There's -- you know, I think if you want to break it down, there's cooperating individuals and then there's confidential informants. Cooperating individual may be anonymous, may not be anonymous, may be known just to the individual he provides to the officer, he provides the information to. So it really could run the gamut.

Q Okay. So let's start with -- so I think the terms you're using are confidential informant and cooperating individual, correct?

A I think that kind of separates the two groups the best, yes.

Q And the -- and the confidential informant is a person who is registered in a database within the Chicago police department and may be somebody who is -- sort of somebody who is used regularly to help advanced cases, correct?

A Correct. Typically they're paid. They're very -- they're very controlled. And those individuals

are known, identified, and typically work with one particular officer all the time. They may call them up today and say, I know who broke into a house. They may call them tomorrow and say, there's three guns in the -- in this guy's garage. So and so's driving a stolen car. So they provide -- regularly, I would say, they provide information to the police.

Q Okay. And those individuals are often paid compensation for that, correct?

A Correct.

Q Okay. And then separate from that, the cooperating individual is what you define more as somebody who - who is more just like an anonymous caller or somebody who stops you and says, hey, I have information in this one particular instance, but they're not people who are repeatedly involved in assisting investigations, correct?

A Correct. Sometimes they elect to be anonymous, sometimes they're okay with not being anonymous. They usually don't want to have any sort of formal role in the investigation like, you know, being on paper with the officer, going into court, testifying, but they're willing to provide some degree of information for detectives, or sometimes police officers to follow up or to advance an investigation.

Q Okay. All right. So let's start with the -- with those definitions, let's start with the confidential informant idea --

A Okay.

Q -- with the definitions you've now given me. So did you ever get a tip on a murder case from a confidential informant as we defined it?

A As we defined it, no, I did not. I did not have any confidential informants working for me.

Q Okay. Did detectives have confidential informants that they would ever use in murder cases?

A I -- I -- I couldn't speak to that. I don't know of any personally. They may have, I don't know. That's a very confidential thing when you have a confidential informant. So that's -- it's not something you would share generally with someone outside of yourself and the -- the unit that maintains those -- those names and the identities of those individuals. So I'm not aware of any. I'm certain there are, but I'm not aware specifically of anybody.

Q Were you -- were detectives trained on this -- the idea that there was this, you know, ability to develop confidential informants and then have some resources available to try to have these individuals assist in investigations?

MR. BRUEGGEN: Object to form.
MS. ROSEN: Objection to foundation.
A I'm not -- I'm not sure of the training that would be involved in that.
Q Was the unit -- what was the unit that tracked this information, sort of in a registered database or so on?
MS. ROSEN: Objection, foundation.
A I don't even know the name of the unit that tracks them.
Q Okay. When you were working as a homicide detective, did you know that there was the ability to use confidential informants and have resources available to register and pay confidential informants?
MR. BRUEGGEN: Objection to form.
MS. ROSEN: Objection, foundation.
A I was aware of it. But again, I didn't have any, so I never made use of it.
Q Okay. When you were a homicide detective, did you ever learn of any instances in which your colleagues relied on a confidential informant to develop information in their investigation?
A Again, as I stated earlier, that -- it's a very confidential thing, so I -- I know that it was occurring, but I don't -- I -- I don't know any

specifics about who or when, or -- or anything of that nature.

Q Okay. And in those cases where there were confidential informants that a detective or any other officer was working with, that individual, you say, would be registered in a database. What do you mean by that?

MS. ROSEN: Objection, form, foundation, and misstates his -- his testimony. He hasn't said that any detectives used confidential informants as he defined it.

THE WITNESS: I'm sorry. Can you repeat the question?

BY MR. SWAMINATHAN:

Q Yeah. When somebody was -- you referenced the idea that there are confidential informants who were registered in a database, correct?

A Correct.

Q Okay. So what information is registered in the database for confidential informants?

MR. BRUEGGEN: Object to foundation.

A I don't know. I've -- I've never seen the database.

Q Did you have people who -- would you ever supervise individuals who, whether they were detectives

or patrol officers or tactical officers, who had the ability to be able to register people in this database of confidential informants?

MR. BRUEGGEN: Object to form, foundation. Go ahead.

A I don't know if -- I think anybody has the ability to register an informant. I -- I don't know that people under my command did or did not. I really don't know.

Q Was it your understanding that these individuals who were registered as confidential informants, that information about who they are, where they lived, that type of information was being tracked?

MS. ROSEN: Objection, foundation.

A I -- I -- I'm not sure I understand what you mean by the information being tracked.

Q What I simply mean is if you say, I have a confidential informant, somewhere within the CPD system they have the ability to identify the identity of who this person is, who is serving as a confidential informant, correct?

A Correct.

Q And that information may not be a -- may not be widely available, but there's some information that's being kept, you know, closely guarded within the Chicago

Police Department that specifically identifies who that person is who's serving as confidential informant, correct?

A Yes, that's correct.

Q Okay. And then information about the amount of money they're being paid is also being tracked, right?

MR. BRUEGGEN: Object to foundation. Go ahead.

A I -- I don't know if it's being tracked or not. I would assume that it is, but I -- I don't know.

Q Okay. Now, one of the reasons that it's important to track information like that is because it can be relevant in any subsequent investigations or prosecutions to know what somebody has been paid to provide certain information, correct?

MS. ROSEN: Objection, foundation.

MR. BRUEGGEN: Objection, form.

A I -- I don't know that that's correct.

Q Okay. To the extent there was information -- no, strike that. To the extent a registered confidential informant was being given access to financial resources or any other forms of benefits, was that information tracked as part of the registered database?

MS. ROSEN: Objection, foundation.

MR. BRUEGGEN: Asked and answered. Go ahead, sir.

A Were that information what? I -- you kind of broke up --

Q Was that information being tracked, any financial payments or other forms of benefit for the -- for a given confidential informant?

MR. BRUEGGEN: Foundation, asked and answered. Go ahead.

A Yeah. Again, I've never seen the database, so I -- I can't say what's in it or not in it.

Q Okay. And ultimately, what is your understanding of why there was a need to track or register confidential informants?

MR. BRUEGGEN: Objection, foundation.

A I -- I don't -- I don't -- I -- I can't answer that. I don't know.

Q Okay. Now, in terms of cooperating individuals, you identified, you know, these individuals -- well, strike that. For cooperating individuals, was there any form of tracking or maintaining of information about who these individuals were?

A Not that I'm aware of.

Q If a detective said -- you know, spoke to somebody and they had information about an

investigation, but said, hey, I don't want, you know, to be going to court and all those things, that person is essentially saying, I want to remain anonymous, correct?

A Oftentimes yes, they want to be anonymous. Yes.

Q Okay. And then where that individual wanted to remain anonymous, what would be done as a detective in terms of gathering their information but, you know, trying to honor their desire for anonymity?

MR. BRUEGGEN: Object to form. Vague.

A I think it really varied by the circumstance. Sometimes people would just come up to you and provide you information. They said, I don't want to get involved, so you don't know their name, you don't -- you don't know anything about them. Many times it was a phone call placed to the area. I'd like to talk to the investigator who's investigating case ABC, and then they would provide information to that detective. So it -- it took a lot of different forms. Typically though, cooperating individuals want to be anonymous, and it's a one-time shot. They provide you information and then they're gone.

Q And was the expectation that you try to get their name or contact information for them?

A At least --

MR. BRUEGGEN: Object to form.

A I'm sorry. You'd always want to try to get the information in case you needed to -- to run something else past them or ask them some additional questions. But, you know, I think it was rare that somebody who was cooperating under those circumstances would want to provide a cell phone number or a home address or a name or anything like that. But I think detectives did, for the most part, make an effort to try to get identifiers so you can always go back to that person if you had more questions. But it was rare that somebody in that predicament would want to provide that information.

Q Okay. And where -- a -- so a detective was expected to try to get that information if they could get it from the person, correct?

A Correct.

Q And if they got that information, the expectation was that they would write that down, correct?

MR. BRUEGGEN: Objection. Form, incomplete hypothetical.

A Correct.

Q Okay. And could that be information that wouldn't necessarily need to go into a typed

supplementary report, but would -- but the documentation would be maintained somewhere so that it could be available for later?

MS. ROSEN: Objection.

MR. BRUEGGEN: Objection, form, foundation.

A Yes. But I think we're kind of getting into the area now -- we're getting away from cooperating individuals into witnesses. So a cooperating individual typically does not want to provide any information that would enable a detective to recontact them.

Q When -- did you have instances when someone would call into the area and would say, hey, I have some information or I have a tip, but it was coming into like a general number, it wasn't coming to the specific detective on the case?

A Yeah. I would say that was probably almost a daily occurrence.

Q Okay. And so, when you had -- when tips came into the detective division areas, you know, a caller -- strike that. Somebody calls in and says, hey, I have a tip on a case, and they provide that information. Would the expectation be that information is then passed to the detectives who are assigned to the case?

A Yes.

Q Okay. And how would that information get

from, you know, the general number of someone calling into the area to the detectives assigned to case?

MR. BRUEGGEN: Objection, foundation, incomplete hypothetical. Go ahead.

A So it varied. I mean, in my time in the detective division, if somebody called up and said they had information on a particular case, that call was routed to the most appropriate person. If the detective assigned to that case was working, the phone call would go to them. If their partner was working, phone call would go to their partner. Sometimes the detectives were out on the street, and you have to remember this was before there was wide use of cell phones or anything, sometimes the desk officer would say, there's nobody here. Let me take the information. And they would jot down the information and forward it to the appropriate detective, or they would transfer the call into the detective's sergeant, and the sergeant would then take that information. So it really ran the gamut. Ideally, you want to give it to the most appropriate person. Sometimes the most appropriate person is just the guy working the desk or -- or the detective's supervisor.

Q Okay. So one of the ways in which those tips would get to the detective would be through the

supervisor if the detective is not there that day, correct?

A It is one of the possibilities. Yes.

Q And then the sergeant would pass that information on to the detective, correct?

A That's correct.

Q Okay. And the expectation would be that any information learned from the confidential informant was ultimately being documented, either by the supervisor who took the call or by the detective, correct?

A That's correct.

Q Okay. And all of the information learned from that confidential informant, to whatever extent that was, would be documented, correct?

MS. ROSEN: Objection, form. You're using confidential informant --

MR. SWAMINATHAN: Oh, I'm sorry.

MS. ROSEN: -- and I thought we were talking about cooperating individual.

MR. SWAMINATHAN: I'm sorry. Let me re-ask the question, because I did not mean to --

MS. ROSEN: I think you did it the last -- the prior question too.

BY MR. SWAMINATHAN:

Q Okay. All right. Thank you. If information

was learned from a cooperating individual, that -- the expectation was that information was being documented, whether that was being done by the sergeant who took the call or the detective who took the call, correct?

A Yes, that's correct.

Q Okay. And when -- I think you indicated that when calls came in like this from potential cooperating individuals, the expectation was to try to gather as much information as possible from that person, correct?

A Yes. That would be the -- that would be the objective. Yes.

Q Okay. And if the person was -- and the expectation was to try to get names and contact information, if you could get it, correct?

A Yes, that's correct.

Q And if you could, that had to be documented, correct?

MR. BRUEGGEN: Object to form.

A Yes, that's correct.

Q And was the expectation to try to get information to test the veracity of, you know, the information that was coming in?

MR. BRUEGGEN: Object to form.

A I'm sorry, can you repeat that?

Q Yeah. I was asking about testing the

veracity, by which I mean trying to get some information about why does this person claim to know this information, is this information credible, that kind thing. So let me ask -- let me re-ask the question with that clarification. Was the expectation that when these kinds of calls came in from cooperating individuals, that questions were asked to try to assess the credibility of the information that was coming in?

A So, I mean, obviously I can't speak for anyone but myself, but I would say that in -- in my situation, that would be something that I would -- I would want to know how -- you know, how is it that you came to be in possession of this information? Did you witness it, did you hear it secondhand, did your girlfriend tell you? Whatever. So yeah, I -- I would say that, you know, you would want to find that out. Now again, somebody who doesn't want to be identified is probably not going to be real forthcoming with how they came to be in possession of that information, but occasionally it did happen.

Q Okay. And ultimately, as you indicated, oftentimes you know with a cooperating individual that it may be a one -- you may have one shot at it, right?

A That's correct.

Q And so the -- was it the -- was it your -- was

the expectation that you try to get as much information as you can about what they know and how they know it in that first call?

A Yes. Because there's a good chance there may not be a second call. So you do your best. Some people are more talkative than others and provide a greater level of detail. Others would say what they had to say and simply hang up on you.

Q Yeah. Okay. And then whatever that level of information was that you ultimately were able to extract from the individual needed to be documented, correct?

A That's correct.

Q Okay. Were efforts ever made to identify confidential informants, even, you know -- even after they indicated they didn't want to give you their name or information, you might -- we'll strike that. Let me ask you a better question. And I -- I switched to confidential informant again. So I think Eileen was going to remind me, thank you. Were there efforts ever made to identify, for example, based on the incoming phone number, the identity of a cooperating individual?

MR. BRUEGGEN: Objection, foundation. Go ahead.

A You know, again --

MS. ROSEN: At what point in time?

Q Yeah. I'm asking during the time that you were a detective.

A So I don't even know if there was caller ID when I was a detective. So I -- I -- I don't think I can answer that because I don't recall if there was caller ID. And again, I can only speak for myself. I don't know that I spent too much time trying to identify the cooperating individual as I did trying to investigate the lead that the cooperating individual provided.

Q All right. Let me show you a document we'll mark as Exhibit 1.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

A Sure.

MR. BRUEGGEN: And Anand, we have hard copies of them, so can I give him the hard copy? That would be easier for him to look at.

BY MR. SWAMINATHAN:

Q Yep, you can do that. So why don't we take a look at the clear closed report? So this is --

MS. ROSEN: Did you circulate exhibits, or no?

MR. SWAMINATHAN: What's that?

MS. ROSEN: Did you circulate exhibits or no?

MR. SWAMINATHAN: Yeah. Margaret sent them earlier.

MS. ROSEN: Okay. Thanks.

MR. SWAMINATHAN: I can also pull them up on the screen. You tell me. If that's easier, we can just do that?

MR. BRUEGGEN: Anand, if you just throw it up on the screen, so we make sure we're on -- literally on the same page. Then you take it down and you can refer to a hard copy.

BY MR. SWAMINATHAN:

Q Okay. Let me just pull it up here. Okay. I'm going to pull up RFC Iglesias 10 through 13, but let put it up on the screen. All right. Do you see the screen now Mr. Riccio?

A Yes, but you know what? I'm going to wait for the hard copy, because that's like a lot smaller than my eyeballs.

Q Yeah. Okay.

A Okay. Yes. I -- I do see it.

Q Okay. What I'm showing you is a document I've marked as Exhibit 1 to your deposition. It's RFC Iglesias -- oh, sorry. Let's use the copy that said RFC Iglesias 90, so go to 90.

A Okay.

Q What I've marked as Exhibit 1 is RFC Iglesias 90 through 93. And if you look at the first page, it's

identified as a Chicago Police Department Supplementary Report, and at the bottom, it has a date of submission of June 24, 1993. Do you have that document in front of you, sir?

A I got June 20 -- oh, I'm sorry. Yes. Okay. I see it. Yes.

Q Yeah. Okay.

A Yes.

Q All right. Is this a document -- why don't you take a chance to go through the -- just take a leaf through this document. First let me know if this is the document you reviewed in preparation for today's deposition?

A No, this is not the document that I reviewed.

Q Okay. So let start on the first page.

A Okay.

Q So looking at the first page, RFC Iglesias 90?

A Yes.

Q The top or first page of the supplementary report, you see it indicates that an individual named Geraldo Iglesias is in custody. You see that?

A Yes, I do.

Q Okay. Then at the bottom of the page, it lists the names of four detectives?

A Yes.

Q Can you identify who the four detectives are, who are listed there?
A Halvorsen, Guevara, myself, and Gawrys.
Q Okay. Did you sign this report?
A No, I did not.
Q Okay. That signature that's there on the bottom left-hand side, that's not your signature, correct?
A Correct. That's Ernie Halvorsen.
Q Okay. And if you look at page 4 of this document, the last page, which is RFC 93?
A Okay.
Q It indicates there the names of two detectives at the very end, Ernie Halvorsen and Rey Guevara. Do you see that?
A Yes, I do.
Q Okay. So they're listed at the end of this report, but -- and you are not listed at the end of this report, correct?
A Correct.
Q So why is that?
MR. BRUEGGEN: Object to foundation, speculation. Go ahead.
A I did not author the report.
Q Okay. And if you didn't author the report,

why is your name listed on the first page of the report?

MR. BRUEGGEN: Object to foundation, speculation. Go ahead, sir.

A Yeah, I -- all I could do is speculate just because I helped out with the arrest and the lineups.

Q Okay. So you did not have any involvement in drafting this report; is that right?

A That's correct.

Q Did you review this report before it was submitted?

A No, I did not.

Q Okay. All right. Let's take a look at the second page of this document, RFC Iglesias 91?

A Yes.

Q Okay. It lists their arresting detectives near the top of the page and it lists Mr. Halvorsen, Guevara, Riccio, and Gawrys. Do you see that?

A Yes, I do.

Q Okay. Does that provide you with any indication about what your role was in this investigation?

A It -- it does, yes. That was, as I stated earlier, we provided backup to Halvorsen and -- we being myself and Gawrys, provided backup to Halvorsen and Guevara when they affected the arrest.

Q Okay. Do you see under the notifications, it lists ASA Mike Latz, felony review?

A Yes, I do.

Q Okay. Did you have any conversations with ASA Mike Latz about the Roman homicide investigation?

A No, never did.

Q Okay. Do you recall having any interactions with him at all during the course of your involvement in this investigation?

A No. I never spoke to him.

Q Do you know what investigative steps Mr. Latz participated in or did not participate in during this investigation?

A No, I do not.

Q Okay. If you look at the first paragraph of the narrative that begins "on 21 June, '93," do you see that?

A Yes, I do.

Q Okay. It says there that the reporting detectives -- we'll strike that. It says "R/DETS," which is a reference to the reporting detectives, correct?

A That's correct.

Q Okay. And so when it makes reference to the reporting detectives, who is it referring to in this

report?

A Halvorsen and Guevara.

Q Okay. So you are not one of the reporting detectives on this report; is that correct?

A That's correct.

Q Okay. And the fact that your name is listed on the first page, along with Guevara and Halvorsen, does that indicate that you were one of the reporting detectives on this case?

A No. I think they were just giving us credit for assisting.

Q Okay. And so, is it the -- the reason -- well, strike that. Reporting detectives, would it be fair to say, is a reference to the two detectives who have authored this report as listed on the last page of the report?

A Yes. I -- that would be accurate. Halvorsen and Guevara.

Q Okay. All right. So it says here the reporting detectives were contacted by a confidential informant who is a member of the Imperial Gangsters street gang. So let's pause there for a second. You see where I'm looking, sir?

A Yes, I do.

Q Okay. And when it says the reporting

detectives were contacted by a confidential informant, you are not one of the reporting detectives who was contacted by a confidential informant, correct?

A Correct. I was never contacted by anyone regarding this case.

Q Okay. And the reference to a confidential informant here, does that appear to you to be a confidential informant as you've defined it or a cooperating individual as you have described -- defined it?

A I -- I would have to speculate because I really don't know if the individual who contacted them was, as we defined it, a confidential informant or was a cooperating individual.

Q Okay.

A The only -- the only thing I can add to that is -- excuse me -- they know that this individual who contacted them who they're calling a confidential informant -- they know that he or she is a member of the Imperial Gangster street gang. So, you know, you can infer from that what you will. I -- it -- I don't know if that means he's a confidential informant, someone that they've registered or someone they've worked with before, or if this is strictly someone who called up with information. I -- I wouldn't be able to answer

that.

Q Okay. And have you seen any -- well, strike that. Do you know who the individual is who's referred to here as the confidential informant on RFC Iglesias 91?

A No. I have never known that information.

Q Okay. And I think you answered my next question. Have you ever known who the person was who was the confidential informant referenced on this page?

A No, I have never known.

Q Did Ernie Halvorsen or Rey Guevara ever tell you any information about who their confidential informant was?

A No. In fact, I was not even aware that a confidential informant provided information on this.

Q Okay. Is it your understanding that -- well, strike that. Are you aware of any documentation that was ever created to provide information about who this confidential informant was?

A No, I am not.

Q Okay. And if you had received information from a confidential informant or cooperator -- cooperating individual in this case, that -- you would've written down any information you received from that individual, correct?

MR. BRUEGGEN: Object to form. Vague.

A Again, I -- I -- I think we talked about this a little earlier. Not necessarily. It depends on the level of detail that that cooperating individual or -- or confidential informant provided. If it was something very simple, like this narrative says, people in the gang were talking about Snake killing a girl in a car at Sawyer and Palmer. I don't know that I would've written that down on a GPR. It would've been part of a supplementary report, certainly, but I don't know if I would've taken notes. I believe your question was about notes. I don't -- I don't know that I would've taken notes about that.

Q Fair point. So I think -- and I didn't mean to ask it that way. I guess what I mean is, if you had received the -- a call under this -- on -- strike that. If you had been the person who received this information, you would have documented, either in a GPR or a supplementary report, all of the information you learned about who that confidential informant was and what they knew, correct?

A Yes, that's correct. Yes.

Q Okay. Now, if you look at the next paragraph?

A Uh-huh.

Q It says, "the reporting detectives had

previous contact with the member of the Imperial Gangster street gang with the nickname of Snake." You see that?

A Yes.

Q Did you ever have any previous contact with a member of the Imperial Gangsters street gang with the nickname of Snake?

A No, I --

MR. BRUEGGEN: Object to foundation. Sorry.

A No, I never did. I never heard of Snake.

Q Okay. They indicate -- the report indicates that they knew that Snake was, in fact, Geraldo Iglesias. Had you had any previous contact with a member of the Imperial Gangsters named Geraldo Iglesias?

A No. I had never had any contact with him, that I'm aware of anyway.

Q Okay. And so, were you a person who was able to connect the name Snake to Geraldo Iglesias?

A No, I was not.

Q Okay. It indicates that the reporting detectives had a Polaroid photo of Iglesias. Did you have a Polaroid photo of Iglesias?

A No, I did not.

Q Do you know where the Polaroid photo came from that they had of Iglesias?

A No, I do not.
Q And in this paragraph, the reference to the reporting detectives again, is a reference to Rey Guevara and Ernie Halvorsen; is that correct?
A Yes. Any -- any reference in this report that says reporting detectives would be Halvorsen and Guevara only.
Q Okay. Okay. Did you keep any Polaroid photos of known gang members when you were detective?
A No. No, I did not.
Q Did you -- were you - did you know of other detectives who kept photos of known gang members?
A It was a long time ago. I'm going to go with no, but I -- I mean, at the time there may have been, but not that I recall.
Q Okay. Did you have access to a -- to a Polaroid camera in the police department?
A Yes.
Q Okay. And what did you use the Polaroid camera for?
A Photographing evidence. At scenes occasionally that would be secondary to the evidence technician. Sometimes -- because back then it was all done on film. It had to be developed. It took time and then it took time to get those pictures. So a lot of

times you would take Polaroid photos of the scene and use those to show the state's attorney or other detectives in -- in conducting your investigation. So it had some use back then when everything else was still in film and there was lengthy delays before you could actually get the photos.

Q Okay. The next paragraph says that on June 22, 1993, Detectives Halvorsen and Guevara interviewed eyewitness Rosendo Ochoa. Do you see that?

A Yes, I do.

Q Did you participate in any way in the interview of Rosendo Ochoa?

A No, I never interviewed anyone from this case.

Q Okay. It says that Mr. Ochoa stated that he got a good look at the shooter's face and would be able to identify him if he saw him again. You see that?

A Yes, I do.

Q Did you participate in any conversation with -- in which Mr. Ochoa said that?

A No. Again, I never interviewed anyone in this case.

Q Okay. We talked earlier about interviewing of witnesses at the scene. Do you recall that?

A Yes, I do.

Q And when you conducted scene interviews of

witnesses, the primary purpose was to develop as much information you could about what that person might know about the underlying crime, correct?

A That's correct.

Q Okay. When you interviewed -- I asked these same questions to Detective Santapadre. When you interviewed scene witnesses, was your practice to try to gather as much information as you could from that person about what they saw and heard?

A Yes.

Q Okay. And in doing so, would you gather as much information as you could about whether that individual might be able to identify the perpetrator?

A Yes.

Q And when you conducted interviews with scene witnesses, would you ask those individuals if they believed they got a good enough look to be able to identify the perpetrator?

A As a practice, I would not. I don't know that that was everybody's practice, but I -- I would not.

Q And during -- was it your practice to determine, as you were interviewing these individuals, whether you believed they had gotten a good enough opportunity to be able to identify the perpetrator?

MR. BRUEGGEN: Object to form.

A I think that you could kind of make that assumption, make that leap, that based on what they told you, they -- they may or may not be able to identify the offender. I never like to put that down on paper because sometimes people are reluctant to say that they could. So I never -- I never liked to lock anyone in by saying that in an initial scene supp.

Q Okay. So if the person provided you with information indicating whether or not they thought they could make an identification, would you put that down?

A If someone told me that, yes. But again, I don't -- I don't -- in -- in a lot of interviews, I don't think anyone ever said that to me. But if they were to say that to me that, I could recognize them if I saw him again, I would certainly document it. Yes.

Q Okay. And if the person told you, I didn't get a good enough look at the person's face, would you also document that?

A I would document that as well. But again, I would never ask that question of any witness. "Could you identify him if you saw him again? I would never ask it. If it was something they volunteered as part of their statement, I would certainly put it in my supp to -- to be thorough, but that was not something that I would ever ask a witness.

Q Okay. And how would you decide -- if you didn't ask witnesses that, how would you decide whether or not to show photos, for example, of a -- of a potential suspect to a witness?

MR. BRUEGGEN: Objection, form. Incomplete hypothetical. Go ahead.

A That was the -- that was the reason I didn't ask. I -- I just operated under the assumption that if you're listed as a witness, then we develop a suspect, I'm going to show you a photo spread.

Q Okay.

A So, you know, at that time they may say, I never really got a good look at his face. Or, you know, maybe they wouldn't and they would view the photo spread. But as -- as a practice, I never liked to do that simply because I didn't want to rule anybody out as a witness or, you know, lock anybody in as an eyewitness.

Q All right. And in terms of -- so then, if I understand correctly, once you developed a perpetrator -- strike that. Once you developed a suspect, your practice was to show that suspect to anybody who was a scene witness, who had some viewing opportunity; is that right?

MR. BRUEGGEN: Objection, form. Misstates his

testimony.

A That's correct, yes.

Q Rather than have people tell you themselves whether or not they think they got a good enough view to be able to make an identification, you would rather just show them the photos and see if they're able to make the identification or not, correct?

A Yes, that's accurate.

Q Okay. All right. And so, in your -- during the time that you were serving as a homicide detective, was it common for you to show photos to -- of suspects, to individuals and have them say, sorry, I didn't get a good enough view, I can't make an identification?

MR. BRUEGGEN: Objection, form, foundation. Anand, are you saying photos or photo?

MR. SWAMINATHAN: Photos.

MR. BRUEGGEN: Photos?

A A photo -- a photo array, a photo spread you're talking about? Yes.

BY MR. SWAMINATHAN:

Q I'm referring to a photo array. Yeah.

A Yes. Yeah. It -- it was not uncommon to show a photo array to someone who was a witness and have them say, I never really got a good look at his face, so I can't pick anyone out. Yes, that -- that was not

uncommon.

Q And in terms of photo arrays versus lineups, what were the circumstances in which you'd conduct a photo array as opposed to a lineup?

A You know, that's -- it -- it really varied. Certainly when a person was in custody, you would show the physical lineup. Sometimes state's attorneys would require you to do both, regardless of custody. So it really kind of varied. If someone was not in custody and you had a suspect, you would certainly show the photo array to develop as part of your probable cause to make an arrest. But there were times when state's attorneys wanted, even when someone's in custody, wanted you to show a photo array as well as a physical lineup. And again, this goes back 30 years ago, but that was the -- that was the requirement sometimes of the state's attorney's office.

Q Excuse me. In your practice, if you had somebody in custody, would you have witnesses view a photo array, or would you have them view a lineup?

A Well again, if they're in custody on a -- a felony, you're working with felony reviews, so you would have to -- if they've already seen a photo array, then you would just let them see the physical lineup. If they hadn't, you would have to defer to the state's

attorney. And I think different state's attorneys did -- had different requirements on -- on different days. So sometimes even though somebody was in custody, state's attorney would say, show them a photo array. Others would say, just show them the physical lineup. So you had to work with the state's attorney to get charges and kind of defer to their -- their requirements.

Q There were times when you would have individuals in custody where you had not called felony review yet, correct?

A Yes. I mean, you'd get them in custody, but you would almost immediately call felony review because they would come in and they would, you know, weigh in heavily on what additional investigative steps they wanted prior to approving charges. So it was -- it was relatively soon after you had somebody in custody that you would contact them. Circumstances differed on -- on different -- different cases, but it was usually a pretty quick notification of felony review. In fact, they -- they would get kind of upset if you waited too long to bring them in on something.

Q Well, in this case, for example, according to the report, felony review wasn't -- you know, the lineups were conducted with Rosendo Ochoa before felony review was ever called, correct?

A I -- I don't remember.

Q Okay. I mean, but you -- as a detective, there would be times when you have somebody in custody and you would be making a determination about whether to show a photo array or whether to show a lineup, and that would -- and that would happen before you have felony review coming in, correct?

A On occasion that was the case. On occasion it was not, so --

Q And when you -- oh, I'm sorry. I didn't mean cut you off.

A No, I was just going to say, it worked both ways. There were times when felony review would tell you to do it. There was times when felony review would tell you not to do it. Sometimes they were not there and you made the decision. It really varied.

Q And when you were making that decision on your own and you had somebody in custody, would you conduct photo arrays, or would you conduct lineups?

MR. BRUEGGEN: Objection, incomplete hypothetical.

A Yeah. It's difficult to say. The circumstances of each case are very different, the witnesses are very different, so it would be difficult to say like hard and fast, whichever -- whichever path

you would take. And again, we're talking about the detective division 30 years ago versus the detective division now.

Q Yeah. So the -- back again, when you were a detective at that time, did you ever have -- well, strike that. When you were a detective, what were the kind of circumstances in which you'd have as -- a suspect in custody, but you'd show a photo array to the witness rather than have them view the lineup?

A I don't recall. I mean, from 30 years ago, it -- it would be impossible for me to try to recall a situation where I would do that.

Q Okay. And during the time that you were serving as a detective, were there concerns about tainting the possible outcomes of lineups by showing individuals photos beforehand?

A I -- I don't --

MR. BRUEGGEN: Objection. Wait, when you say photos, are you talking about photo array or are you talking about, you know, an individual photo suspect? I just want to make sure it's clear what you're asking him.

BY MR. SWAMINATHAN:

Q I'm talking about photos generally, whether it's in the form of an individual photo or multiple

photos in the form of an array. Any time you show somebody a lineup, do you agree if that person has seen a photo of the person who's going to be in the lineup before that, it has some impact -- it can have an impact on the lineup, correct?

MS. ROSEN: Objection. Form, foundation.

A Yeah. I -- I really don't know. I -- I -- I couldn't answer that question.

Q Were detectives trained that they should try to avoid having a person view a photo of their suspect right before they go in and view a lineup containing the same suspect?

MS. ROSEN: Objection. Form, foundation.

A I -- I don't recall the detective training.

Q Okay. Was -- when you practiced as a detective, did you ever have concerns about showing a witness a set of photos containing your suspect and then having them view a lineup where the only person that's the same is the suspect?

A Again, that was 30 years ago. I don't recall if I had concerns about that. I don't recall if I did it or not. It was just --it was 30 years ago and I just don't have a recollection of it.

Q Well, with your experience you have today after multiple decades in the police department, would

that be a concern to you if somebody is showing somebody photos right before they go in to view a lineup?

MR. BRUEGGEN: Objection. Form and incomplete hypothetical.

A Well, I know the policy has changed regarding that -- or a policy has been established. I don't know that it's changed. Policy has been established regarding showing photo arrays when someone is in custody. So I don't know what it was 30 years ago, but I know that in the -- in the interim, there was -- there were changes in policy that prohibit that, except under like certain circumstances. If a victim is -- or a witness is hospitalized and can't come in to physically see a lineup, you would show a photo array. If there's some other reason they can't come in, they're out of state or something, obviously there has to be some other -- some other means of identification so you would show them a photo array. But 30 years ago, I -- I don't know that that was the policy or not the policy.

Q Okay. All right. So if I understand correctly, the policy now is that if somebody -- if there was a suspect in custody, barring unusual circumstances, the witness should view the lineup and not be shown of photo array beforehand, correct?

A That's correct.

Q And that policy exists because of a concern about contaminating the lineup procedure, correct?

MR. BRUEGGEN: Objection to foundation.

MS. ROSEN: Foundation, calls for speculation.

A Yeah. I -- I don't know why that policy exists.

Q Do you have any idea as a 30-year Chicago police officer why that policy was put in place?

MR. BRUEGGEN: Object to form and foundation.

A No, I do not.

Q And sitting here today, do you have any view -- personal view, about the possibility that showing somebody photos of your suspect, right before they go in and view a lineup containing the same suspect, is problematic?

MR. BRUEGGEN: Object to form.

A Do I have -- what was the question? Do I have a --

Q Do you have concerns about the idea about -- about the idea of showing somebody photos of somebody as your suspect right before they go in and do a lineup with only that person in it?

MR. BRUEGGEN: Object to form.

A I -- I -- I would have concerns about that, sure.

Q Okay. And ultimately at the time that you were practicing as a detective, was it your general practice when you had somebody in custody to have them view a lineup rather than have them view photos?

A I -- I don't recall what my practice was 30 years ago.

Q Okay. Do you agree, sitting here today, that'll -- that if somebody has shown a lineup containing a suspect, it's of less evidentiary value if the person was just shown a photo array in which the only person is the same is the suspect?

MS. ROSEN: Objection. Form, foundation, calls for speculation as to what has evidentiary value.

A Yes, I would agree.

Q Okay. Let's go back to the cleared closed report here. We're on RFC Iglesias 91. All right. Are you still seeing the document on your screen right now? Well, you're looking -- you're looking at it on your -- on the hard copy, sorry.

A Yes. Yes, I am.

Q Okay. So looking at the bottom of RFC Iglesias 91.

A Uh-huh.

Q The last paragraph indicates -- I'll just -- I'll just paraphrase it, that Mr. Iglesias was placed

into custody on June 23, 1993. That's the arrest of Mr. Iglesias in which you had some limited involvement, correct?

A Yes, it is.

Q Okay. And it indicates at the last sentence that he was informed of the allegations against him and that he would be required to stand in the lineup. Is that something you did?

A No. No. I never had any contact or conversation with him.

Q Okay. Turning to the next page. This is page 3 of the report. RFC Iglesias 92.

A Yes.

Q It indicates that on June 23, 1993 at two -- 2000 hours, or 8:00 p.m., a lineup was at Area 5 and that Rosendo Ochoa identified Geraldo Iglesias as the person he saw shoot and kill Monica Roman. Do you see that?

A Yes, I do.

Q Okay. You -- that is a lineup that you participated in, correct?

A I -- I assisted in that lineup, yes.

Q Okay. And you assisted in that lineup by being in the room with the suspect and the fillers, not with Mr. Ochoa, correct?

A That's correct.
Q When you were -- when that lineup occurred, do you have any knowledge about what -- strike that. Do you have any personal knowledge about what Mr. Ochoa said during that lineup identification procedure?
A No firsthand knowledge. I was just told by either Guevara or Halvorsen that Ochoa selected Iglesias as the person who he saw shoot and kill Monica Roman.
Q Okay. That was information provided to you by Guevara and Halvorsen?
A Correct.
Q Okay. And they gave you that information for you to include in your own lineup report, correct?
A That's correct.
Q Okay. If -- would you say that Guevara and Halvorsen conducted that lineup or that you conducted that lineup?
A They conducted the lineup. I mean, it was their case. It was their witnesses. They conducted the lineup. I just assisted in the lineup by calling up the participants to the front window, having them do facing movementsh and then return back to their original position.
Q So if they're the ones that conducted the lineup, why didn't they write the lineup report?

MR. BRUEGGEN: Objection foundation.

A I don't know. I mean, typically, there's a lot of things that you have going on when you have witnesses present. You have a homicide offender in custody, there's a lot of things that you're doing. So if they ask me to do the lineup supp report, it's a relatively open and shut factual case to type up, so I would've assisted by completing the report for them.

Q And then -- (coughs) excuse me, I asked you about personal knowledge about what Mr. Ochoa said during that lineup procedure. So let me ask you the flip side of that coin. Do you have any knowledge -- strike that. Do you have any personal knowledge about what Rey Guevara or Ernie Halvorsen said to Rosendo Ochoa while he was viewing that lineup?

A No, I don't. When you're inside the room, you cannot hear or see anything going on outside of that room.

Q And so, this lineup that is documented -- strike that. This lineup which was viewed by Rosendo Ochoa documented at the top of page RFC 92, do you have any knowledge about what occurred in the viewing room between Mr. Guevara and Halvorsen and Mr. Ochoa?

A No, I do not.

Q I'm going to go back to page 2 for a moment. I

just missed one piece. If you look in the second to last paragraph, the one that begins with "On 22 June '93," do you see that?

A Yes, I do.

Q Okay. I think we made it through the first sentence of that paragraph. I want to ask you about the next sentence, the last two sentences there, it looks like.

A Okay.

Q If you look at the middle of that paragraph, it says, "Rosendo Ochoa was shown a photo spread consisting of (8) Polaroid Color Photos." You see that?

A Yes, I do.

Q Okay. Did you have any role in creating that photo spread?

A No, I did not.

Q Do you know where the photos came from that were used in that photo spread?

A No, I do not.

Q Did you ever create photo spreads during the time you were working as a homicide detective?

A Yes, I did.

Q And what was your practice in terms of trying to create photo spreads?

MR. BRUEGGEN: Object to form. Vague. Go

ahead.

A I could just speak from a general memory of it. And that is that you want to find individuals who have a likeness to the suspect. And if there's nothing about the suspect that would be suggestive to the person viewing the lineup, they would be able to look at it and say, this is the person based on something in the photo or something that they're wearing -- you want it to be strictly an identification of the individual's face, so you just try to keep the pictures as similar as possible and make sure there's nothing suggestive about them.

Q If you had a witness looking at a lineup -- strike that. If you had a witness looking at a photo array, and that witness had previously given you certain descriptors of the individual who was the perpetrator, would you try to ensure that the participants in the photo array all had that same feature?

A To the degree possible, yes. I mean, you can't get clones, obviously, but you would try to get people with as similar description as possible to what the witness said they looked like.

Q So for example, if you had a witness who described the perpetrator as having a particular hairstyle, you would try to get fillers for the photo array who all had the same or very similar hairstyles,

correct?

A No. Actually you would try to get fillers who look like the photograph of the suspect. So they can shave their head -- if the witness said he had dreadlocks and you got six people with dreadlocks and your suspect shaved his head and you have him with his head shaved, then he stands out. So you want to get fillers to match as closely as possible what the photograph of your suspect looks like, not necessarily what the description was at the time. Facial hair can be grown or shaved, head hair can be grown or shaved. There's a lot of variables that actually go into it. But you want the photos to look as similar as possible. Same with a physical lineup, as similar as possible.

Q And similarly, if you have a suspect who gives -- well, let's use something that -- we'll call it a little bit more of an immutable characteristic. If you have a suspect -- strike that. If you have a witness who had identified somebody who was, you know, over six feet tall -- particularly tall or particularly short, would you try to ensure that you had photo array participants who were equally tall or short?

MR. BRUEGGEN: Objection, form.

A Again, not necessarily. I think there's ways to compensate for that, just showing head shots, for

example. Or having everybody seated makes it more difficult to determine heights. I mean, ideally if you can get -- if your suspect is 6'2" and you can get all your fillers to be 6'2", that's great. But that's not always the case. In fact, that's the exception.

Q Okay.

A So I think you just want to make sure that nobody stands out and that your -- you want to make sure your suspect doesn't stand out against the other photos.

Q And again, to be clear, once you have -- you're comparing to the photo of your suspect; is that right?

A That's the best way to do it. Not necessarily to the description provided by the witness, but to the photo of your suspect. Certain things you can't change. You can't change the fact that you're heavyset, you can't change if you've got a tattoo on your forehead, but hair can be changed, facial hair can be changed, glasses can be taken on or off, baseball caps. So you just want -- the photo that you present that day of your suspect should be not very dissimilar from the fillers that you're using.

Q Okay. And the complexion is probably a better example or build --

A Sure.

Q -- so let me see if understand correctly. For example, if you have a witness who describes somebody as being light-complected and your suspect is light-complected in the photo that you have of them, then you need to ensure that your fillers are also all light-complected, correct?

A To the best of your ability, that would be -- yeah, that would be ideal.

Q And in terms of your ability to put together a photo array back in that time period of 1993, how was that done? What collection of material did you have to create your photo array to try to make a fair array?

A You could use Polaroid photos. You could use the department's IR photos, or CV photos, you know, photos of people who have been previously arrested who look very similar to your suspect. That was really it. I mean, on rare occasions you'd get a photograph with ten guys in it and you knew your suspect was one of them. There were times, if you had nothing else at your disposal, where you could show a witness that photo and they could look through that photo and say, yeah, it's this guy over here. That happened on occasion when there were limited options or limited options available to you.

Q If you were using -- you said one of the ways

to make your -- to get your fillers is using Polaroid photos. Where were the Polaroid photos that could be used to create an array?

A Well, you'd have to have a Polaroid of your suspect. And I don't know if you would just take that photograph of him on the street or if there was another photograph of him somewhere that you had access to. You know, I've seen detectives drive down the street to a group of guys and snap photographs of them if they were willing volunteers and use them in photo spreads when they were using Polaroids. But I think the most common method was probably the department's CV photos or IR photos.

Q So the department CV photos, were those available online, like through a computer, or were they all sort of collected in hard copy form?

A At the time when I was a detective, you had to drive down to headquarters to the graphic arts section and you had to request the photos and they would -- you'd wait about an hour, they'd print them out and hand them to you. Since then, now you can click a button and, you know, get as many as you want off the computer.

Q I see. So back in that time, the difficult practice to create a photo array was to go to graphic arts and have them print out a series of photos for you?

A Correct.

Q And would you provide them with essentially the description that you wanted and then they would identify people for you?

A Yeah. They would kind of look through some of the -- the photos. They usually had a big box there that you could kind of thumb through and look for them. They had them divided up by White guys, Hispanic guys, Black guys, Asians, and they would kind of divide them up and you can kind of thumb through them. But in the absence of anything good, they would work with you to try to find some that were good enough to present as part of a photo spread.

Q And while you were working as a detective at that time, were you aware of any collection of Polaroids that were kept in the office that would be used to create photo arrays when using Polaroid photos?

A Yeah. There were some books like robbery books. I think there were burglary books. There was a room in there that housed a lot of these old, basically like photo albums. And guys could also look through there and pull out photos of some of these individuals and use those as fillers as well.

Q Those albums that were kept in the -- at the detective division, were any of those gang books?

A No. I don't remember ever seeing the gang books. I don't think they were ever kept up in the detective areas, if there were, because those were more like the gang crimes books or gang specialists' books. I think they created them and maintained them.

Q Looking again at that last paragraph -- or that second to last paragraph.

A Yes.

Q The last sentence indicates that, "After viewing this photo array, Rosendo Ochoa identified a picture of Geraldo Iglesias, as being the person he saw shoot and kill Monica Roman." Do you see that?

A Yes, I do.

Q Do you have any personal knowledge about what happened during the course of that viewing procedure in which Mr. Ochoa purportedly identified Geraldo Iglesias from a photo array?

A No. Again, the extent of my involvement was backup on the arrest and in the room with the fillers and the suspect during the lineups, and that was it. I never interviewed any witnesses, never had access to evidence, or anything like that.

Q Can you vouch, in any way, for what Mr. Ochoa said when he viewed the photo array that was presented to him by Guevara and Halvorsen?

A No --

MR. BRUEGGEN: Object to form.

A Sorry. No, I cannot.

Q Can you vouch, in any way, for what Rey Guevara and Ernie Halvorsen said or did when they showed photos to Rosendo Ochoa?

MR. BRUEGGEN: Object to form.

A No, I cannot.

Q Do you know whether that photo array was shown to Mr. Ochoa at the police station or at home -- in Mr. Ochoa's home?

MR. BRUEGGEN: Object to foundation.

A No, I do not.

Q Okay. Turn to the next page. If you look at the second paragraph, it indicates, "On 23 June 93 at 2020 hrs. an interview was conducted with Geraldo Iglesias in the line-up room of Area Five Violent Crimes." And it indicates the interview was conducted by Halvorsen and Guevara. Did you participate in any way in any interview for Geraldo Iglesias?

A No. Again, I never participated in any interview of any person at any time in this case.

Q Did you -- I think -- so strike that. So you have never -- have you ever spoken to Geraldo Iglesias?

A Never.

MR. BRUEGGEN: Just to clarify, except for during lineups when you talk to all the people? Step forward, stuff like that. I just want to make sure -

BY MR. SWAMINATHAN:

Q Well, yeah. Fair point. Let's clarify that because I'm not trying to trick you here.

A Except for providing instructions during the lineup procedure, I have never spoken to him.

Q And by the way, at that time when you conducted the lineup procedure, he never said anything to you, correct?

A No, he never said anything to me.

Q So as far as you know, Geraldo Iglesias has never, ever said anything to you ever?

A That's correct, never.

Q And other then you giving him instructions during the lineup procedure, have you ever had any conversation with Mr. Iglesias?

A Never. Before, during, or after this incident, I never had any contact with him outside of instructions during the lineup procedures.

Q Was Mr. Iglesias someone that you were ever targeting in any investigation that you conducted?

A No, he was not.

Q If you look at that next paragraph, it indicates -- it's a paragraph that begins with the description of the summary of Geraldo Iglesias' interview.

A Yes.

Q If you look around the middle of that paragraph, it indicates, "He admitted that he hangs out," do you see that sentence that I'm referring to?

A Yes, I do.

Q Okay. It indicates, "He admitted that he hangs out in the area of the Boys Club at the corner of Sawyer and Palmer." Do you see that?

A Yes, I do.

Q Then later on at the last sentence there it indicates, "He does not recall what he did on 7th June of '93 and has no alibi for his whereabouts on that date at 1556 hours." Do you see that?

A Yes, I do.

Q Now take as much time as you need to read that paragraph. But do you agree with me that nowhere in this description of the interview with Geraldo Iglesias does it say that he ever told the detectives that at the time of the shooting he was at the corner of Sawyer and Palmer?

A Yes. I agree with you that it does not say

that.

Q Okay. And if Geraldo Iglesias had told the detectives that he was at the corner of Sawyer and Palmer, where the shooting occurred, at the time the shooting occurred, that would be a big deal, correct?

MR. BRUEGGEN: Objection, form.

A What do you mean it would be a big deal?

Q Fair point. Let me ask that in a better way. You agree with me it would be incriminating, correct?

MS. ROSEN: Object to form.

A Yeah. Placing himself at the scene of the shooting would be incriminating.

Q Okay. And if somebody made an incriminating statement placing themselves at -- strike that. If a suspect incriminates himself by placing himself at the scene of the crime when it happened, that's the kind of thing that detectives would put -- would try to get into a handwritten statement from the suspect, correct?

MS. ROSEN: Objection, form. Foundation as to handwritten statement.

MR. BRUEGGEN: Incomplete hypothetical. Go ahead.

A Yes, I think they would want that in a handwritten statement, if possible.

BY MR. SWAMINATHAN:

Q All right. So if Gerald Iglesias had told Detectives Guevara and Halvorsen that he was at the scene of the crime when it occurred, you would expect some attempt to get a handwritten statement from Mr. Iglesias, correct?

MS. ROSEN: Objection. Form, foundation, calls for speculation, incomplete hypothetical.

A Yes, I would.

Q And you would expect that that information would have been communicated to the assistant state's attorney from felony review who was ultimately called into the case, correct?

MR. BRUEGGEN: Object to form. What information?

A Yes, I would.

Q Okay. Are you aware that Reynaldo Guevara came to trial in this case and testified that Geraldo Iglesias told him that he was at the scene of this crime when it occurred?

A No, I was not aware of that.

Q Okay. Let's look at the next paragraph there.

A Yes.

Q It says, "The reporting detectives contacted felony review and ASA Mike Latz arrived at Area Five." I think you indicated earlier, you had no interactions

with Mr. Latz, correct?
A That's correct.
Q It indicates that Latz interviewed -- conducted an interview with Rosendo Ochoa in that paragraph. Did you participate in any interview with Ochoa with ASA Latz?
A No. I never participated in an interview with anyone in this investigation at any time.
Q Did you have any knowledge that ASA Latz was at Area 5 related to this investigation?
MR. BRUEGGEN: Object to foundation.
A I probably did at the time. I -- I -- I don't know for certain. I'm -- I'm assuming that I would've known that the ASA was in there.
Q Okay. And were you -- are you in a position to be able to say, you know, based on seeing ASA Latz at Area 5, what aspects of this investigation ASA Latz participated in?
MR. BRUEGGEN: Object to form. Asked and answered. Go ahead.
A No. I have no idea the degree. I never spoke to the ASA at all.
Q The next sentence indicates that a second eyewitness, Arnell Moore was brought into Area 5 Violent Crimes. Do you see that?

A Yes, I do.

Q And then it says, "Arnell Moore was interviewed by ASA Latz and provided the same information that he had previously told detectives." Having a chance now to -- having to look at this information in this report, does that refresh your memory at all about whether you participated in any interview of Arnell Moore?

A No. I never participated in an interview with anyone in this case at any time.

Q All right. The next paragraph begins, "The reporting detectives located three of the persons who were in the car with the victim when she was shot." Do you see that?

A Yes, I do.

Q Did you make -- did you participate in any efforts to locate the individuals who had been in the car with the victim?

MR. BRUEGGEN: Object to foundation. Go ahead, sir.

A No, I did not. The extent of my involvement was to back them up on the arrest and to assist inside the viewing room during the lineups.

Q It says that the driver of the car was in Mexico, but then it says, "Rodriguez, Coronell, and

Sanchez all came into Area Five. Rodriguez, Coronell, and Sanchez spoke very limited English and were interviewed by ASA Latz with Detective Guevara as interpreter." Do you see that, sir?

A Yes, I do.

Q Did you -- having had a chance to review that, does that refresh your memory as to whether you participated at all in interviews with Mr. Rodriguez, Coronell, or Sanchez?

A No. I never participated in interviews with anyone in this case.

Q Okay. And it says, "During this interview, Hugo Rodriguez stated that he would be able to identify the person who shot Monica Roman." Do you have any personal knowledge about Mr. Rodriguez making such a statement?

A No, I do not. I wasn't present for that.

Q Did the Detectives Guevara and Halvorsen ever tell you that they got information from Rodriguez stating he could make an identification?

A No. Not prior to the lineup. After the lineup they told me that he did identify the offender as the person who he saw shoot Monica Roman.

Q Did they tell you that -- did they tell you before the lineup that he said to them, hey, I'll be

able to identify the person who shot Monica Roman if you show me a lineup.

A No.

MR. BRUEGGEN: Question asked and answered. Sorry, go ahea.

A No. No, they did not.

MS. ROSEN: And whenever it's convenient, if we could take a short break.

MR. SWAMINATHAN: Yeah. Why don't we go maybe another two minutes here. I'm almost done with this section.

MS. ROSEN: Will you do it when you say two minutes? But okay.

MR. SWAMINATHAN: Well, maybe let's say four minutes. I'll see if I can beat it here.

BY MR. SWAMINATHAN:

Q It says the next -- the beginning of the next paragraph on the last page.

A Beginning of the next paragraph on the last page.

Q I'm sorry, I'm sorry. Let's start on page 4. Why don't I -- rather than break my promise, why don't we take our break right now?

A Okay.

MS. ROSEN: Want to say in five minutes?

MR. SWAMINATHAN: Yeah, no problem.

COURT REPORTER: Off the record, the time is 3:22.

(OFF THE RECORD)

COURT REPORTER: We are back on the record for the deposition of Anthony Riccio being conducted by videoconference. My name is Sydney Little. Today is May 18, 2022, and the time is 3:31 p.m.

BY MR. SWAMINATHAN:

Q Okay. Let's turn to where we left off, page 3 of the report. We're looking again at Exhibit 1 to your deposition, and we're looking at page 3 of this report RFC Iglesias 92.

A Got it.

Q And let's actually turn to page 4.

A Okay.

Q So that's RFC Iglesias 93. At the top of the page it indicates that "On 24 June '93 at 12:30 a.m. or 0030 hrs. Detective Rey Guevara and ASA Latz showed Hugo Rodriguez the same photo array previously viewed by Rosendo Ochoa." Do you see that?

A Yes, I do.

Q Now first of all, do you have any personal knowledge about whether ASA Latz participated in that photo array procedure?

A I have no personal knowledge, no.
Q And if ASA Latz indicated that he doesn't believe or recall participating in that photo array procedure, do you have any reason to dispute that?
MR. BRUEGGEN: Object to form.
A I have no reason to agree or disagree.
Q Okay. During the time that you were a homicide detective, in your experience, did the ASAs participate in the photo array procedures?
A I don't recall that ever happening with one of my cases.
Q Do you recall any instances when the ASAs participated in the lineup procedures? Meaning they'd be in the viewing room with witnesses when you conducted the lineup?
A Never on one of my cases. I can only speak for my own. But never on one of mine.
Q Okay. So on the cases -- during the time you were a detective, on your cases, you cannot recall any instances when an ASA participated in a photo array or lineup procedure you conducted, correct?
A That's accurate, yes.
Q Okay. It says that Hugo Rodriguez viewed the same photo array previously reviewed by Rosendo Ochoa. Can you agree with me, based on this report,

Mr. Iglesias was already in custody and had been questioned, correct?

A Yes, that's correct.

Q Do you know why Mr. Rodriguez was shown a photo array rather than a lineup?

MR. BRUEGGEN: Object to foundation. Speculation. Go ahead.

A I do not know, no.

Q Under the circumstances documented in this report as we've gone through it so far, would you have conducted a photo array, or would you have conducted a lineup?

MR. BRUEGGEN: Objection. Incomplete hypothetical. Speculation. Go ahead.

A I mean, because I don't have all the facts as far as what the ASA was asking for, it's difficult for me to answer that. I would say that without any input from the ASA, I would've shown a live lineup as opposed to a photo array. But I don't if the ASA was requiring or requesting or, you know, asked for a photo array first. I -- I don't know. Absent the state's attorney, I would've gone right to the live physical lineup.

Q Okay. And if it'd been you without a state's attorney involvement, why would you have gone straight to the lineup rather than conduct a photo array first?

A Because the offender or the suspect was in custody.

Q And why, under those circumstances, would you rather conduct a lineup than a photo array?

A Well, one reason is because if you conduct a photo array you still have to conduct the live physical lineup anyway. So the photo array is really -- I don't understand the need to do a photo array first. Again, unless the state's attorney said this is what I want. But you still have to do a live lineup anyway.

Q Okay. So unless the ASA requested it -- strike that. If it was just you, you wouldn't have conducted the photo array before the lineup because for one reason, you would've had to do the lineup anyway, so there was no reason to do the photo array, correct?

A That's correct.

Q Now with regard to that first paragraph documenting a photo array procedure conducted with Hugo Rodriguez, do you have any knowledge about what Hugo Rodriguez said or did during the course of that photo array procedure?

A No, I do not.

Q Do you have any knowledge about what Reynaldo Guevara said or did during that photo array procedure?

A No, I do not.

Q Do you have any knowledge about how many times Hugo Rodriguez was shown photos during the course of this investigation before he was -- before he viewed the lineup that you participated in?

A No, I do not.

Q If -- strike that. If -- and you never showed Hugo Rodriguez any photos during the course of this investigation, correct?

A That's correct.

Q Each time you ever showed Hugo Rodriguez photos, you would've documented it, correct?

MR. BRUEGGEN: Objection form. He just testified he never showed him photos, sir.

Q Sorry. Let me -- I want to be clear with it. I'm saying, if you had shown Mr. Rodriguez photos, however many different times you showed him photos, you would've documented each of those times, correct?

A That is correct.

Q And if Mr. Rodriguez has indicated in his deposition that he was showed photos at least three times or more, would you have documented each of those three times or more?

MR. BRUEGGEN: Objection. Misstates Mr. Rodriguez's testimony. Go ahead.

A Yes. Each time that he would've been shown

photos, I would've documented each of those instances, yes.

Q Looking down to the third paragraph, we skipped a paragraph there.

A Yes.

Q "On 24 June '93 at 1:25 a.m., a second lineup was conducted at Area Five Violent Crimes. After viewing this lineup, Hugo Rodriguez identified Geraldo Iglesias as the person he saw shoot and kill Monica Roman." Do you see that, sir?

A Yes, sir, I do.

Q Okay. And that's the lineup we -- that's the second lineup that we discussed earlier where you participated exclusively by being in the room with the suspect and fillers, correct?

A That is correct.

Q Okay. Do you have any personal knowledge about what Hugo Rodriguez said or did during the course of that lineup procedure?

A No, I do not.

Q And do you have any knowledge about what Rey Guevara or Ernie Halvorsen said or did during that lineup procedure?

A No, I do not.

Q And it indicates that, "Lineup procedures were

also conducted with Efrain Torres and David Chmieleski." Do you see that?

A Yes, I do see that.

Q And it indicates that neither of them identified anyone from the lineup. Do you see that?

A Yes, I do.

Q Do you have any knowledge about what Mr. Torres or Mr. Chmieleski said during the course of those identification procedures?

A No, I do not. I was just told following the lineups -- following this lineup at 1:25 a.m. exactly what it states there. I was told that an individual named Efrain Torres viewed the lineup and that Chmieleski viewed the lineup and that they both did not make an identification because they did not see the face of the shooter.

Q And where it indicates that "Efrain Torres did not witness this incident occur and made no identifications," is that information that Mr. Torres ever told you, that he did not witness this incident?

A No. I never spoke to any of these individuals. That would've been conveyed to me from either Halvorsen or Guevara.

Q Okay. All right. Why don't you just take one second. I think we've gone through almost the entire

report, but why don't you take as long as you feel like you need to take a look at this report and let me know whether after reviewing this report it refreshes your memory about any part of your involvement in this investigation beyond what you've told us here today.

A Okay. No. There's nothing in here that provides me with any additional information other than what I've already told you.

Q So other than your -- strike that. Having had an opportunity to review this cleared closed report we've marked as Exhibit 1, does it refresh your memory that you participated in this investigation in any way beyond what you've told us so far today? That is, that you participated in a limited way in the arrest of Geraldo Iglesias and in a limited way in two lineups conducted in this case?

MR. BRUEGGEN: Object to form. Go ahead, sir.

A That's correct. That was the extent of my involvement in this case.

Q And this review of this cleared closed report does not cause you to believe you had any additional involvement; is that correct?

A That's accurate. Yes, that's correct.

Q All right. Let's pull this down. I'm going to do the Ochoa lineup report. This is RFC Iglesias 97

and 98. I'll just note for the record while Dave is grabbing the hard copy for you, I have -- I am now sharing my screen and showing you a document that we'll mark as Exhibit 2. This is RFC Iglesias 97 to 98. This is identified as a supplementary report from the Chicago Police Department submitted on June 23, 1993. Sir, this is a document you reviewed in preparation for today's deposition, correct?

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

A Yes, this is.

Q And I see your name is listed at the bottom, correct?

A Yes, it is.

Q And is that your signature in the bottom left?

A Yes, that's my signature.

Q Did you author this report?

A Yes, I did.

Q And did you sign this report?

A Yes, I did.

Q And did Mr. Halvorsen and Mr. Guevara both also sign this report?

A No. I signed on their behalf.

Q Okay. If you look at the next page.

A Yes.

Q Fair to say this is your documentation of the

lineup viewed by Rosendo Ochoa?

A Yes, it is.

Q Okay. And it lists -- it contains a section identifying the persons conducting the lineup. Do you see that?

A Yes, I do.

Q And it identifies yourself and Mr. Halvorsen and Mr. Guevara, correct?

A That's correct.

Q Okay. And so based on that documentation, does it indicate to you that anybody else participated in this lineup procedure?

A No. Just -- just myself, Halvorsen, and Guevara.

Q Okay. And it is sometimes the case that, for example, a criminal defense counsel or -- or a gang crimes officer, or somebody may on occasion be present or participate in a lineup, correct?

A I would say rarely. But yes, I -- it's happened, but it's rare.

Q And when that happens, there's -- that can actually be documented in these lineup reports either in the Persons Conducting Lineup section or Additional Persons Present During Lineup, correct?

A That's correct.

Q Okay. So where there are additional individuals who participate or are present for a lineup, those additional individuals would be listed on the lineup supplementary report, correct?

A Yes, sir.

Q Okay. And so in this case, you have documented the only three people who participated in the lineup, yourself, Mr. Halvorsen, and Mr. Guevara, correct?

A That's correct.

Q Okay. All right. And then we have -- we won't belabor the point here. It indicates that Mr. Ochoa identified Geraldo Iglesias. And I think as we have now established ad nauseum, this -- the lineup itself was conducted by Guevara and Halvorsen with the witness. And so, any information about what Mr. Ochoa -- who Mr. Ochoa identified comes from Mr. Guevara and Mr. Halvorsen, correct?

A That's correct.

Q Okay. And so basically you filled in the information on this report about what Mr. Ochoa did and who he identified based on information provided to you by Guevara and Halvorsen, correct?

A That's correct.

Q Okay. And the names of the individuals who

participated in the lineup and their lineup positions, where did you get that from?

A From those individuals. Based on the fact that there's home addresses provided rather than CB numbers, would've been my practice for individuals who voluntarily came in to act as fillers for the lineup. So they were not people who were in custody down in the lockup of the 25th District. So these would've been volunteer fillers.

Q Okay. All right. And then if we look at the next -- let's pull up the next report here. All right. We'll mark this as Exhibit 3. This is RFC Iglesias 94 through 96, and it's the Chicago Supplementary Report with the date submitted of 23 June '93.

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

A Got it.

Q You got it? Okay. Sir, this is a document you reviewed in preparation for today's deposition, correct?

A Yes, it is.

Q And this is the second lineup that we have been discussing, correct?

A Yes, it is.

Q Okay. On the first page of this document, it lists your name in the bottom left, correct?

A Correct.
Q Is that your signature?
A Yes, it is.
Q Okay. And then it also lists Ernie Halvorsen as being a report submitter, correct?
A Yes, correct.
Q And is that your signature -- or is that Ernest Halvorsen's signature?
A No, I signed on his behalf.
Q Okay. And this -- unlike the earlier lineup report, this one does not include Detective Guevara's name. Do you see that?
A I do. I -- I don't have an explanation for it. I'm not sure why his name was omitted from there. He was included in the Persons Conducting Lineup section and he was included on page 3, but I don't have an explanation for why I omitted to put his name on that front page.
Q Okay. So you've, again, anticipated my question. So I'll just ask it cleanly. So if you look at the next page of this document, it indicates that the persons conducting the lineup where yourself, Mr. Halvorsen, and Mr. Guevara, correct?
A Correct.
Q Okay. So the fact that you have not included

Mr. Guevara's name on the first page in the Report Submission section does not, in any way, indicate that Mr. Guevara did not participate this lineup, correct?

A No. That would've been a -- an oversight. An omission on my part.

Q Okay. And based on the information contained in the Persons Conducting Lineup section listing Guevara and his inclusion on the third page of this report, fair to say that Mr. Guevara did participate in this lineup?

A Yes, that's correct.

Q Okay. And Mr. Guevara was not in the lineup room with you and the suspect and the fillers, but instead with -- in the viewing room with the participants viewing the lineup, correct?

A That's correct.

Q Okay. Now, if you look at page 2 of this document where it lists the persons conducting lineup, if anyone else had been present for this lineup, either in the viewing room or the lineup room where you were, you would've included their name here, correct?

A I would've. Yes.

Q And if an ASA had been present for this lineup, you would've included their name here, correct?

A Yes, I would.

Q Okay. So based on this report, would you

agree with me ASA Latz did not participate in this lineup procedure?

A Yes, that's correct.

Q Okay. And again, looking at the results of this lineup -- this series of lineups as documented in the investigation section, all of the information about what occurred in the lineup, as viewed by the witnesses, comes from Rey Guevara and Ernie Halvorsen, correct?

A That's correct.

Q Okay. Now, if you look at the first page of this report, it indicates that the report was submitted on June 23, 1993 at 9:00 p.m. Do you see that? Or 21:00 hours?

A Yes, that's also an error.

Q Okay. And how do you know that's an error?

A Because a lineup was not conducted until 1:25 in the morning, the following morning. I think what I did is, I probably took that directly off the previous lineup supp that I created, because that's the same date and time from the previous lineup supp, so that was a -- an -- an error on my part.

Q Okay. Any other explanation for why that time is incorrect?

A No, that was it. That would -- that would be it. I just took it off the previous lineup report.

Q Okay.
A Yeah.
Q Okay. And then if you look at the next page of the report, page 3 -- if you look at the top right, it lists 22 February 1993. Do you see that?
A Yes, I do.
Q Can you explain what -- why that date is on this page 3 of this report?
A Yeah, that's -- that's also a -- a typo. Back when we were doing these, the front page would've had to been created in a typewriter and the other pages were word documents. So to keep the formatting the same -- as you could see on page 2, there's a great deal of formatting, indenting, all that other stuff. Typically, to keep that formatting the same, I would type over an old lineup supp to create it, and I -- apparently here on page 3, I failed to change the -- the date and the RD number.
Q Okay. So the date and RD number are both wrong, correct?
A Yes, that's correct.
Q And that's basically a typo on your part?
A That's a typo, yeah.
Q Okay. And it's a vestige of a different template of a report that you used to start filling this

in, correct?

A Yes, that's correct.

Q Okay. All right. Let's take a look at a document I'll mark as Exhibit 4. Give me one second. Sorry, I'm updating my exhibit numbers so that I keep track of it. All right. All right. I'm showing you a document I've marked as Exhibit 4. This is a supplementary report Bates stamped RFC Serr/Mont, S-E-R-R/M-O-N-T, pages 68 through 72.

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

A Okay.

Q And it has date of the report submission as June 14, 1993, okay?

A Okay.

Q This is not a document you reviewed in preparation for today's deposition, correct?

A Correct.

Q Okay. And if you look at this document just to make sure there's no confusion, this is a document with a different victim, Rodrigo Vargas, and it's got an RD number of 054183, which is not the RD number of the Monica Roman investigation. Can you see that?

A Yes, I do.

Q Okay. So I'm showing you, just to be clear, a report that is not from the Monica Roman investigation.

A Got it.

Q You'll understand why in a second. Okay. So this report that I'm showing you is a report that was authored by what appears to be Detective Halvorsen and Detective Guevara. Do you agree?

A Yes, I agree.

Q Okay. And do you recognize either of their signatures at the bottom of the page?

A No, I -- I don't.

Q Okay. And this report states that it was submitted on June 14th at 6:00 p.m., correct?

A Yes, correct. 1993.

Q Okay. And in terms of practice among detectives, when you have two detectives listed, one on the left and one on the right, does that usually provide some indication about who actually drafted or wrote the report?

A Not always. Some guys would put themselves in the box on the left, other guys would defer to their partner, put him on the left. So it -- there's really no -- no hard and fast rule on it.

Q Okay. All right. If you look at the second page of this report -- I'm not going to go through this whole report with you and -- of course, you're welcome to look at it if you'd like, but on the second page is

the only piece that I wanted to ask you about. It indicates a section that lists witnesses, and if you see, a person by the name of Timothy Rankins listed there?

A Yes. Okay. Yep. Yep.

Q Okay. And it -- (coughs) excuse me, it says that he's an admitted member of the Spanish Cobra street gang, nickname of Loco. Do you see that?

A Yes, I do.

Q Do you have any personal memory of ever interviewing or speaking with a person named Timothy Rankins?

A No, I don't.

Q Okay. So if you look at that -- I want you to -- why don't you just read that paragraph right there at the bottom of page 2 and let me know when you've had a chance to finish reading that.

A Okay. Okay.

Q Okay. And why don't we take a look at this -- at the top of the next page, page 3, where it indicates Timothy Rankins was first questioned on 11 June '93. Do you see that?

A Yes.

Q Okay. All right. So looking at this paragraph here at the bottom of page 2, this report

indicates that on -- by June 10th at the latest, Detective Mingey had learned information suggesting that the perpetrator in the Monica Roman case was a member of the Spanish Cobras, correct?

MR. BRUEGGEN: Objection, form. Misstates the -- what it says there. You said Detective Mingey. He's a sergeant.

BY MR. SWAMINATHAN:

Q Oh, I'm sorry, Sergeant Mingey. Yeah, let me restate that. So let -- I'm looking here at the bottom of this page, it says, "Preliminary information in the Roman shooting indicated that the offenders may have been members of the Spanish Cobras street gang." Do you see that?

A Yes, I do.

Q And then it indicates that Sergeant Mingey elected to interview Timothy Rankins for any knowledge he may possess about the Roman shooting. Do you see that?

A Yes, I do.

Q Okay. And there's a little bit of ambiguity because it says on June 10, 1993, Timothy Rankins was arrested for an armed robbery, and then on the top of the next page, it says Timothy Rankins was first questioned on 11th of June '93. Do you see that?

A Yes.

Q Okay. So based on the information contained in this report, by June 11th at the latest, Sergeant Mingey knew of information suggesting that the Roman homicide perpetrator was a Spanish Cobra, correct?

A Correct.

Q Sorry, did you answer?

A Yes. Yes, I did. I said correct. Yes.

Q Okay. All right. And then this report was submitted on June 14th by Detectives Halvorsen and Guevara, correct?

A Yes, it was.

Q Okay. And so by June 14th at the latest, the date of this report, Guevara and Halvorsen knew as well that there had been a lead indicating the involvement of the Spanish Cobras in the Roman homicide investigation, correct?

MR. BRUEGGEN: Objection, form.

A Yes, that's correct.

Q Okay. And the information about what the lead was indicating, that the perpetrator of the Roman homicide was a member of the Spanish Cobras, is that information contained here?

A I'm sorry. What was your question? The information --

Q Yes. The reason that they had information indicating that the Roman shooting may have been committed by members of the Spanish Cobras, that's not actually documented here, correct?

A That's correct. That is not documented here.

Q Okay. So who provided this information, what exactly the information, and so on, that's not documented in this supplementary report from a different homicide investigation. Do you agree with that?

A Well, I've only read the first two paragraphs and it's not documented in the first two paragraphs. I don't know if it's documented somewhere else in here. It's kind of a --

Q Okay, I will do this. I'll represent to you that it's not documented elsewhere in this report, but I'm also happy to give you an opportunity to read this entire report if you want a chance to, before I ask you anything further.

A No. I mean, I'll -- I'll -- I'll leave it up to you. If you -- if -- if there's questions that pertain to the report in general, I'll have to read the whole report. If there's --

Q Okay.

A If it's just out of these first two paragraphs, I could certainly answer those.

Q Okay. So why don't -- why don't I keep going, and then if you feel like at any point you need to either read more of the report or the whole report, you just do that, okay?

A Okay.

Q Okay. So any information about what the lead was that pointed to the Spanish Cobras and who that information came from, would you expect that information to have been documented in the Roman homicide as opposed to this homicide?

MR. BRUEGGEN: Objection. Form, incomplete hypothetical.

MS. ROSEN: Foundation.

MR. BRUEGGEN: Go ahead.

A Yeah, I would -- I would expect there to be some documentation of that somewhere. You know, probably not in this -- in this case, but in the Roman file. I would think that it would be in there if -- if the information about the offender coming from the Spanish Cobras -- I would -- I would think that it would be documented in the Roman file.

BY MR. SWAMINATHAN:

Q Okay. So whatever information had led them to believe that the perpetrator may be a member of the Spanish Cobras, that should be documented, not

necessarily in this supplementary report, but in a supplementary report or GPR in the Roman case, correct?

A Yes. It's --

MS. ROSEN: Objection. Form, foundation.

Q Did you get the answer, ma'am?

A Yeah. My answer is yes, correct.

Q Okay. All right. And then -- and do you have any reason to doubt that a GPR or supplementary report would've been created in the Roman homicide file documenting that lead?

MR. BRUEGGEN: Objection. Form, speculation.

MS. ROSEN: Form, foundation.

A No. I -- I don't have any knowledge as to whether or not one was created or whether or not that information is contained somewhere within that file or a GPR. I - I don't have any information on that.

Q But to the extent -- your expectation is that information would be documented in that file, correct?

MR. BRUEGGEN: Objection. Asked and answered, form, and foundation. Go ahead.

A Yes, that would be my expectation.

Q And you have any reason to doubt that somebody, either Detectives Guevara or Halvorsen or Mingey, did, in fact, document that in that file?

MS. ROSEN: Objection. Form, foundation.

A Yeah. Again, I don't know that it was or was not, so I really can't speak to that.

Q Would you expect -- given that this information was known to Sergeant Mingey, would you expect that Sergeant Mingey ensured that there was some documentation of that lead involving the Spanish Cobras in the Roman homicide file?

MR. BRUEGGEN: Objection. Form, foundation, speculation.

A I -- I would think someone would've. I -- I don't know that it would've been Sergeant Mingey. I don't -- I don't know that sergeants necessarily do that documentation. It looks like here that Rankins was passed on to Halvorsen and Guevara, so I would think that that information would've been -- would've been covered by them.

Q Okay. And so, because Mingey -- Mingey might would've -- strike that. If Mingey knew that there was a lead blaming the Spanish Cobras in the Roman homicide, he either would've documented that himself or more likely ensured that Guevara or Halvorsen documented that in the file, correct?

MS. ROSEN: Objection. Form, foundation, calls for speculation.

A Yeah. Again, I couldn't say what Mingey, you

know, would or would not do or did or did not do, but I -- I -- I will agree that it should be documented.

Q Okay. And do you have any reason to believe that in this -- that it would not have been documented in this particular instance?

MS. ROSEN: Objection. Form, foundation.

A Do I --

Q And strike that. Let me -- just let me ask you differently maybe to make it a little clearer. Do you have any reason to believe the typical practice of documenting this information would not have been followed in this particular case?

MS. ROSEN: Objection. Form, foundation, calls for speculation.

A I do -- I do not, because I -- I don't know if -- if it was or was not documented. So I -- I can't speak to that.

Q And to the extent it was documented, that would've been what you expected to be done, correct?

MR. BRUEGGEN: Objection. Form and foundation, calls for speculation.

A Yes, that's correct.

Q And to the extent it was not documented, that would've been contrary to policy and practice, correct?

MS. ROSEN: Objection. Form, foundation, calls

for speculation.

A I -- I think it would've been contrary to what I personally would do per my personal practice. I don't know that that would violate any particular policy of the Department or the Detective Division.

Q Can you say, one way or the other, whether it would violate any policies of the Department?

MR. BRUEGGEN: Object to foundation.

A I -- I could say that I don't know of any policy that would require that. I mean, there's a broad interpretation of some policies that -- that you may, you know, capture it under the umbrella, but I don't know. My personal practice, I would -- I would've -- I would've put that in there. But I -- I'm not aware of any policy that specifically states what should or should not be contained as far as information of this nature.

Q If Geraldo Iglesias was a member of the Imperial Gangsters, that would be -- this would be potentially exculpatory information as we discussed earlier, correct?

MS. ROSEN: Objection. Form, foundation, incomplete hypothetical, calls for a legal conclusion.

A It could potentially be, yes.

Q And under the Detective Division special orders, potentially exculpatory information was required to be documented and disclosed to criminal defendants, correct?

MR. BRUEGGEN: Objection, foundation.

A Yeah. I'm not familiar with a -- with a Detective Division order that requires that. I believe that's just part of being a thorough investigator, but I don't know specific -- if you're asking me specifically is there an order that says that, I'm not certain. It's -- I'm, you know, 25 years removed from -- from any of that, so

Q Okay. All right. Let's move on. Based on this report, do you agree that this lead pointing to the Spanish Cobras was followed up on by -- by Sergeant Mingey through his questioning of Timothy Rankins, correct?

MR. BRUEGGEN: Objection. Form, incomplete hypothetical. Go ahead.

A I mean, you know, based on the first two paragraphs that said Sergeant Mingey conducted an interview and then passed Rankins onto Halvorsen and Guevara, so I think that -- you know, Mingey, based on the information that he developed, you know, took -- took the actions that you would expect a Detective

Division supervisor to do, and that is put the information in the hands of the field investigators, yes.

Q Okay. And so, the fact that Mingey followed up with Rankins about this lead involving the Spanish Cobras being the perpetrators of the Roman crime, is that an indication to you that Mingey took the lead seriously?

MR. BRUEGGEN: Objection, speculation.

A Yeah, it's -- it's -- it -- definitely, I believe that he took the lead seriously. In fact, this is -- I mean, when you read it, it says Timothy Rankins was known to Sergeant Mingey as being a member of the Spanish Cobra street gang and that Mingey initiated the -- the debriefing with Rankins. So I think that he -- you know, he takes the initiative on this, so it's more than following up a tip or a clue. I think he -- he actually does the debriefing that -- that kind of looks into it in the first place.

Q And -- and would you agree with me, this paragraph indicates that -- that Sergeant Mingey treated this as a serious lead related to the Roman investigation, correct?

A Yes.

MR. BRUEGGEN: Objection, asked and answered,

form.

A Yes, I agree.

Q Is this lead regarding the Spanish Cobras the kind of thing that should have been turned over to prosecutors?

MR. BRUEGGEN: Objection, form.

A You know, again, that's -- it's hard to say. I -- I think that everything should be shared with the prosecutors to -- to -- to make a more informed decision. So my personal practice would be if I had knowledge of this, I think I would've given it to them and let them know. But, you know, I -- I can't speak for anybody else.

Q Did you know about this lead?

A No. I didn't know anything about this.

Q Okay. Did you, at any point that you were involved in the Roman homicide investigation, ever know that there was a lead pointing to the Spanish Cobras?

A No. I had no knowledge of this case, that lead, or even the Roman homicide. I -- I had no knowledge of any of those.

Q Okay. And based on your years of experience with the Chicago Police Department and -- both as a detective and as a supervisor of detectives in numerous capacities, are you aware of any mechanism that would

ensure that the information contained in this report under a different RD number would be disclosed to prosecutors in the Roman prosecution?

MS. ROSEN: Objection. Form, foundation, calls for speculation.

A I am not aware of any mechanism for that.

Q Okay. And -- strike that. So based on your years of experience as a detective and as a supervisor of detectives, was the information in the homicide file for that RD number disclosed to prosecutors?

MR. BRUEGGEN: Objection to form, foundation.

MS. ROSEN: Objection, form.

Q Yeah. Let me re-ask it. That's a really poor question. Each homicide investigation has its own RD number with its own investigative file, correct?

A Yes, that's correct.

Q Okay. And based on your experience, what portion if -- of the investigative file would be passed on to the prosecutors once charges have been brought?

MR. BRUEGGEN: Objection.

MS. ROSEN: Objection.

A The entire --

MS. ROSEN: Form, foundation. Yeah.

A The entire file would be given to prosecutors.

Q Okay. Could detectives pick and choose which

portion of the investigative file to pass on?

A No.

Q Would detectives ever go through a process of culling down the investigative file before they passed it on?

MR. BRUEGGEN: Object to form. Did you say culling or calling?

Q Culling. C-U-L-L-I-N-G.

MR. BRUEGGEN: Object to form.

A No, they would not. Not to my knowledge.

Q Okay. And other than the investigative file, was there any other -- strike that. Other than the investigative file for the particularly -- particular RD number of the investigation, what else from the Detective Division would be passed on to a prosecutor?

MR. BRUEGGEN: Object to foundation.

A Photographs that may not be in that file that were maintained for that RD number. I -- I mean, I think all the -- all the paperwork, all the documentation, is going to be in that investigative file. Photos. I -- I don't -- there's nothing else I can think of off the top of my head. I mean, there may be some things that are not contained in that file that are contained elsewhere in the department, such as the photos, but -- and I believe now those are all online

anyway. But at the time, sometimes if there were, you know, a large number of photographs, then the State's Attorney's Office would order those directly from the graph guard section of the Police Department.

Q Okay. In the -- just using the Roman homicide investigation as an example, in the Roman homicide investigation, the typical practice would've been to produce the entire Roman homicide investigative file to the prosecutors, correct?

A That's correct.

Q Okay. And any information then that was included in the Roman investigative file would go to the prosecutors, correct?

A Yes, that's correct.

Q And if there was information, for example, that was in a supplementary report in another case, like this Exhibit 5 that I just showed you -- did we mark this as Exhibit 4 or Exhibit 5? Exhibit 4, I'm sorry. If there was any information in a supplementary report in a different case, like this Serrano/Montanez supplementary report in Exhibit 4 that I showed you, is there any mechanism to ensure that that report containing information about the Roman case would be produced to the prosecutors in the Roman case?

MS. ROSEN: Objection, form, foundation,

incomplete hypothetical.

A No. There is no mechanism other than the detective including it, but there is no mechanism to ensure that that happens.

Q Okay. And the only way for that -- so the only mechanism that exist is that the information is supposed to be documented in the Roman investigative file itself, since that's what's going to go to the prosecutor, correct?

MS. ROSEN: Objection. Form, foundation.

A You know, it could be something as simple as including this -- this -- a copy of this report with that section highlighted. I -- I don't know that a separate report needs to be generated to capture the same information that's -- that's contained here. But yeah, there should be something in -- in the file that indicates what this information is here.

Q Let's pull that document down. All right. I'm showing you a document that I have marked as Exhibit 5. This is the set of GPRs in the case. Let me just pull them up here. Okay. I've marked as Exhibit 5 RFC Iglesias 59 through 77, and I think we should -- we're likely going to go through this quickly, because all I'm going to ask you is whether you recognize any of the handwriting on any of these pages, okay? And I --

suspect I know the answer, but -- so let me -- should I just go through these one by one for you, or do you want the -- Dave, do you have the document?

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

MR. BRUEGGEN: Yeah, I'm pulling it up right now. You said 59 through 70?

MR. SWAMINATHAN: 59 through page 77.

MR. BRUEGGEN: We have the document here.

THE WITNESS: Okay. Do you want me to just go page by page?

BY MR. SWAMINATHAN:

Q Yeah. Why don't -- why don't we -- why don't you just go through it and tell me if you recognize any of the handwriting on any of these pages. And then when you're done, just tell -- why don't you go through it all, and then just tell me at the end, and then we can clear it up if we need to?

MR. BRUEGGEN: So just to be clear Anand, if he recognizes his handwriting or anybody else's handwriting?

Q Exactly correct.

A Okay. There's nothing on 59 that I recognize.

Q So nothing on 59 is your handwriting or any -- why don't we do it this way? Let's just go through and identify any handwriting that's yours, okay?

A Okay.
Q And then if there's -- if there's one where you identify -- where you say, "I -- it's not my handwriting, but I actually recognize who this is," we can -- let me know that, but just first go through and tell me if any of this handwriting is yours.
A Okay. So on page 59, nothing is my handwriting, nor do I recognize anyone else's. Do you want me to do it like that?
Q Yeah, that's fine.
A On page 60, none of this is my handwriting, nor do I recognize anyone else's.
Q Okay. Page 61?
A Page 61, none of this is my handwriting, nor do I recognize it as anyone else's.
Q Page 62?
A Page 62, none of this is my handwriting, nor do I recognize anyone else.
Q Page 63?
A Page 63, none of this is my handwriting, nor do I recognize anyone else.
Q Page 64?
A Page 64, none of this is my handwriting, nor do I recognize anyone else.
Q Page 65?

A Page 65, none of this is my handwriting, nor do I recognize anyone else.
Q Page 66?
A Page 66. None of this is my handwriting, nor do I recognize anyone else.
Q Page 67.
A Page 67 is a graph and some handwriting. None of this was mine, nor anyone else's that I recognize.
Q Page 68.
A Page 68. I have a blank page; is that accurate?
Q Okay. So do I. Page 69.
A Page 69. None of this is my handwriting, nor do I recognize anyone else.
Q Page 70.
A Page 70 and is not my handwriting, nor do I recognize it as anyone else.
Q Page 71.
A Page 71 is not my handwriting, nor do I recognize it as anyone else.
Q Page 72.
A 72 is not my handwriting, nor do I recognize anyone else.
Q 73.
A Page 73 is not my handwriting, nor do I

recognize anyone else.

Q Page 74.

A Page 74 is not my handwriting, nor do I recognize anyone else.

Q Page 75.

A 75 is not my handwriting, nor do I recognize it as anyone else.

Q Page 76 is a Vehicle Inquiry Report. We can skip that one. I just wanted to keep the handwritten notes in sequence.

A And --

Q Page 60 -- page 77.

A 77 is not mine, nor do I recognize it as anyone else.

Q Okay. Thank you. Now, if we go back to page 76 the page before that --

A Yes.

Q -- the Vehicle Inquiry.

A Yes.

Q Did you perform this Vehicle Inquiry Request?

A Let's see. No, I did not.

Q Okay. Let me close this up. All right. I'm showing you a document I'm marking as Exhibit 6. I think this will be very quick.

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

A Okay.

Q I'm just putting it up on the screen here because it's going to be -- I think just some chicken scratch on a page here. Okay. Looking at RFC Iglesias 7, there -- looks like there's some numbers that have been written on a piece of paper. Do you recognize that handwriting as being your own?

A No. It is not mine, nor do I recognize it as anyone else.

Q Okay. Close that up. I'm showing you a document marked as Exhibit 7, which is RFC Iglesias 5. Do you recognize that handwriting?

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

A No. It is not mine and nor do I recognize it as anyone else.

MS. ROSEN: What was the Bates on that one? It was cut off on the screen.

Q RFC 6 -- RFC Iglesias 5, sorry. Okay. I think you answered this, but let me just confirm. Have you ever had any communications with an individual named Francisco Vicente or Frankie Vicente?

A No. Not that I'm aware of.

Q Okay. Did you ever work with a police officer named Bill Dorsch?

A Bill Dorsch worked in Area 5 when I was there.

We didn't work -- we worked the same shift, but we weren't partners. We didn't work together. He worked with a guy named Johnston, I think.

Q Do you have any opinion of Bill Dorsch?

A No, not particularly. He was always kind of an entertaining guy to be honest, but no -- no opinion either way of him.

Q Any opinion of him good or bad in terms of his skills as a homicide investigator?

A No. No. I think he always did a decent job.

Q Okay. Have you ever seen a Chicago police detective commit misconduct during the course of your career?

A Not that I can recall. I'll have to go with no. But again, I -- I can't recall. That was so long ago and there's various degrees of misconduct. But off the top of my head, no. I -- I certainly would've reported it or taken some kind of an action, and I don't recall ever doing that.

Q You again, anticipated my next question. Have you ever reported a Chicago police detective for committing misconduct in their treatment of civilians?

A No. I mean, as a supervisor, if someone brought it to your attention, you would have to initiate a complaint against them. And I can't say with

certainty that that didn't happen, so I'll just have to say I don't recall as far as that goes. If -- if a citizen brought it to my attention that they were mistreated for some reason. You know, if I was to hear something that alerted me, I would certainly have to take action. I don't recall that happening, but again, I can't say with certainly that it didn't.

Q Okay. So let me try to break that down a little bit. Again, starting with detectives, can you recall any instance in which you came to believe that a Chicago police detective had committed misconduct?

A Can you re -- restate the question?

Q Yeah.

A Repeat it.

Q Have you had any instances when you believed -- based on information you learned that you believed a Chicago police detective had committed misconduct in his treatment of a civilian?

A Again, I -- there may have been. I just don't recall if -- I can say with certainty that if I was aware of it or I did become aware of it, I would've taken some action, initiated a complaint, and I don't know that I did or did not do that. It's just so long ago. I just can't remember. Cer -- certainly nothing so egregious that it would stick in my mind.

Q Okay.
A Yeah. So yeah, I have to go with I don't recall, possibly.
Q Okay. And as you sit here today, can you recall any instance when you personally came to the belief that one of your fellow detectives had committed misconduct in their treatment of a civilian?
MR. BRUEGGEN: Object to form. Go ahead.
A No, I cannot. As I sit here right now, I -- I can't, no.
Q Okay. And can you -- as you sit here today, can you recall any instance in which you reported to a supervisor that you believed one of your colleagues had committed misconduct against a civilian?
A No. I don't ever remember having to report someone, no.
Q Okay. And can you -- during your time as a Chicago police officer in all your various capacities, do you recall any instances in which you personally reported another colleague in the Chicago Police Department for committing misconduct in their treatment of a civilian?
A Yes.
Q And how many times did that occur?
A And I hope you don't ask me for specifics

because I can't provide them. But I would say, you know, I was -- I was a supervisor for, like, 25 of my 35 years. So in that capacity, that's -- you know, that's one of the things that you have to do, unfortunately. So I would say maybe a dozen times, maybe two dozen times I would have to initiate a -- a -- a complaint investigation against an officer for some sort of misconduct.

Q And where you had to do that and say, based on misconduct, would -- is that misconduct sort of internal department misconduct or department -- or misconduct in terms of treatment of a citizen or civilian?

MR. BRUEGGEN: Object to foundation. Go ahead.

A You know, if citizens bring it to your attention, then, you know, that's -- that's one method. There's also just one that sticks out on the top of my head, because it was -- it turned kind of ugly. The -- there was an officer who -- we were in the 17th District and had to do a search warrant at a bar and he actually tipped off the bar owner that we were coming in, so I initiated a complaint investigation against him. But as far as like -- like witnessing an officer mistreating a citizen, I don't know that -- that I've ever witnessed that. Now again, most of my career I spent as a supervisor. And while, you know, we all agree those

things happen, they don't happen in front of supervisors. So, you know, it wasn't likely that something like that would happen in my presence. But if a citizen brought it to my attention, there's a very cut and dry policy on how it's supposed to be followed, and I -- I always followed that policy.

Q Okay. And so the policy was that if a citizen came to a supervisor with a complaint that an officer had committed misconduct, the supervisor was required to report that by opening a CR, correct?

A That's correct.

Q Okay. And you always followed that policy, correct?

A I did.

Q Okay. And of those approximately 12 times that you recall initiating a complaint against an officer for mistreatment of civilians, what percentage of -- or what number of those 12 were the example that I just to speak -- the example I just gave where a civilian came to you and you have an obligation to report it?

MS. ROSEN: Objection, misstates his testimony. I think he said 12 to 24.

Q I'm sorry.

A Yeah. I mean, I'm -- I'm really ball parking

when I say 12. I -- I'm just thinking like, you know, 12 would be a -- a complaint. I -- I mean, there would be a complaint every two years. So it was probably a higher number than that, but -- so the question is what -- what number of those was --

Q Yeah. In the cases where you reported an officer by opening a CR, has it been pursuant to the mandatory obligation to report any instances when a civilian comes to you as a supervisor?

A Oh, okay. I -- I would say maybe, you know, maybe three-quarters of them came from a civilian complaint and maybe the other quarter, or maybe, you know, a third came from things that came to my attention. Again, when -- when there's going to be misconduct, the officer is not going to do it in the presence of a supervisor. I mean, that would be -- that would be, you know, not smart. So it's not something that, as a supervisor, you're going to witness firsthand very often. So the bulk of those complaints are going to come to you via a citizen or from a third party or something of that nature. So maybe two-thirds of the complaints that I ever filed came from citizens. Another one-third came from things that I saw or -- or found out on my own.

Q Okay. Okay. During the time that you were a

Chicago Police Officer, was there ever a period of time in which you would acknowledge the existence of a code of silence within the department with regard to misconduct by Chicago police officers?

MS. ROSEN: Objection. Form.

A You know, early on in my career, I think that there was -- I don't -- I don't want to call it a code of silence, but there was a reluctance for anyone to -- to talk about misconduct among the ranks. You know, no one's ever said, hey, it's a code of silence, or you can't say anything. I think there was just a reluctance to ever talk about anything of that nature. And over the course of time, that kind of broke down. And -- to the point now where I would -- I -- I think I can honestly say that in the last few years of my career, that was -- that was nonexistent. The accountability for not saying something or for lying is probably worse than the offense itself. So -- yeah. So I -- I -- I mean, there was probably a time -- and I'm not going to, you know, call it a code of silence, but there was probably a time when cooperation was -- was really frowned upon by your coworkers. So there was not a lot of -- certainly nobody volunteered to come forward and -- and say anything like very early on in my career.

Q Okay. And then you said that your view is

that today it's -- it's actually gotten much better?

A Oh, my God. Lightyears better, yeah.

Q What sparked the change in your view? Was it a -- was it a particular superintendent? Was there a particular policy change? What was it?

MS. ROSEN: Objection, form.

A Yeah. I don't know. I think the climate has changed, certainly. There's just a -- nobody wants to stick their neck out to lie for somebody who's -- who's -- who's breaking the rules. So it -- there's kind of a feeling now, if you're going to break the rules, you -- you better be prepared to suffer the consequences because I'm not going to go down because, you know, you're breaking the rules. So I think the whole, you know, keep your mouth shut or, you know, you're going to be ostracized if you speak out has -- has really kind of gone away as far as I know. I mean, it -- you know, and again as -- as a first deputy superintendent, you're seven ranks removed from what's going on on the streets. And, you know, that's the unfortunate reality of working out of that -- that headquarters. But you still hear enough and you see enough and -- and, you know, weekly meetings with internal affairs and stuff, you can see where there's a level of cooperation among officers who witness other officers misconduct now that certainly was

not there 35, 37 years ago when I came on.

Q Okay. And I know you've made public comments relatively recently in the recent years about the need to rebuild trust with communities, which I thought was cool. You -- is that part of one of the ways that, in your view, the department in recent years has been focused on rebuilding trust, just to sort of try to ensure that there's more accountability?

A It -- it is. I think that's a big part of it. There's -- there's got to be accountability where there's misconduct, but I think we also have to be able to differentiate the difference between misconduct and mistakes. Mistakes we can correct through training, misconduct we have to correct through discipline. And the important thing is we can't -- we can't confuse the two. We have to be sure that when you make a mistake that that's addressed through training. And we don't want to -- you know, we don't want to decapitate a guy because he made a mistake. Misconduct, totally different animal. I think we have to be clear and firm on how we handle that, but mistakes have to be handled differently.

Q And so this -- I think without calling it -- I think -- I don't want to put words in your mouth so -- I want to be fair to you. This culture that you described

where there was -- when -- in your earlier years, when there was a reluctance to talk about misconduct among the ranks, I think is the phrase you used.

A Yes.

Q In your view, when did that change and that culture really change? I know you said today it's much different. Was it the Laquan McDonald moment, or what moment sort of changed that in your mind?

MS. ROSEN: Objection. Form, foundation.

A I -- I think it changed prior to McDonald, because you saw a lot of officers come out and testify about exactly what happened in -- in McDonald. There was no -- there was no effort to cover that up. I mean, despite some media coverage, I was -- I was kind of kept abreast of everything that was going on in that. And so I think that it -- I think it's something that's been kind of building, it's kind of evolved over the course of time, and it's to the point now where -- where I think it's -- if it's happening, it's extremely rare and it's much more the exception than -- than the rule. But I think it's been -- it -- kind of a gradual thing. I don't think there was any one -- one incident or one day where suddenly people woke up and said oh, my God -- now having said that, the department began holding officers who give testimony in these -- in these incidents about

other officers accountable through that Rule 14 violation that -- a false official report, and Rule 14 is a fireable offense. So you've got a guy who -- who may be looking at a three-day suspension for violating a pursuit policy. If the partner lies about it, he's looking at getting fired. Now he's looking at a Rule 14 violation. The driver of the car might get three days for violating the pursuit policy, but the guy who lies might be looking at getting fired. So I think the application of Rule 14 to these -- these investigations, ECR investigations, has probably put officers in a position where they're thinking, hey, this is my health insurance. This is my paycheck. This is my kids' tuition. This is the mortgage on my house. I'm not going to risk my job and lie because you screwed up. So you screw up, go in and own it, take your three days, learn from it, and move on versus I'm going to lie to cover up for you and then risk losing my job. So I think the application of that Rule 14 violation has -- has -- has moved -- moved this forward quite a bit. You know, body cameras, I think for -- for all the good that they do as far as capturing crime and some of the insane behavior that officers have to deal with, they also keep them more on the straight and narrow as well. So I think body cameras have helped. So I think it's been a

lot of things in a -- in kind of a building over the course of time that's really led to a much -- there is no code of silence. It's -- it's eroded any -- any sort of reluctance or -- or -- or desire to -- to cover up any sort of misconduct. That's my opinion. I -- I could be wrong, but that's my opinion.

Q So in your view, a major step has been the enforcement of Rule 14 violations. Do I have that right?

A I -- I think that's been a major recent step, yes. I think body cameras, you know, looking back several years when those first came out, I think that was an important step and --

Q When did -- oh, I'm sorry. Go ahead.

A No, go ahead. And -- and I think there's been other kind of milestones along the way, but it's just been a gradual breaking down of it and -- you know, to the point where we're at today and I -- and I think we're -- we're in a good place. I think there's always room to improve, but I think we're in a good place today.

Q Okay. Thank you for that. So when did that Rule 14 -- strike that. The enforcement of Rule 14 violations as a major step forward, when did that begin, approximately?

A That was --

MR. BRUEGGEN: Object to form, foundation. Go ahead.

A I think that was something that kind of came to be during Eddie Johnson and my tenure kind of early on. So maybe like, you know, that 2017, 2018 timeframe. I think we, in some discussions with internal affairs, started implementing that element into the statements. So -- to the point where officers are told, this is an official report. If you're lying, you're violating Rule 14 and you're subject to termination. So I think introducing that into every -- every statement that's taken helped enormously. So yeah. It -- it's still relatively new. You know, maybe five, six years that's -- that's been around, but I think it's helped a lot.

Q And then the -- another big step that you mentioned was the advent of body -- the body cameras.

A Right.

Q Around -- when did that start to get introduced into the Chicago Police Department? Again, approximately.

A Well, in-car cameras started first, and that was probably around 2014. And so, that helped. And as you know, Laquan McDonald was captured, not on body cameras, but on an in-car camera. And so, when we saw

the in-car cameras, we would -- we saw like, you know, indisputable facts. Even the presence of video cameras all over everywhere you go, as much as detectives go and pull those -- those -- those cameras for criminal investigations, internal affairs pulls them. IPRA pulls them for police investigations as -- as well. So I think the presence of in-car cameras, video cameras, certainly body-worn cameras, that has -- has helped enormously as well. Because you can't -- I mean, the camera captures what it captures, and sometimes there's an excuse and there's things happening outside the eye of the camera. But for the most part, the camera tells an indisputable story. So that helps to bring about more accurate statements in these misconduct cases as well. I -- we would review them regularly when I was up with Superintendent Johnson. We would review body cameras from incidents that had -- that had occurred.

There's a unit that was formed within the police department, the Force Review Unit, that anytime there's a use of force, they will review the -- the paper report, but they will also pull the body cameras from anybody who was there. And they will review all the footage on the body camera to ensure that -- a couple things: number one, were the policies followed? And number two, is there a need for additional training

of some sort? So the presence of body cameras has -- has been great as far as training and as far as also ensuring accurate statements. And -- and, you know, where there's misconduct, then there's -- there's going to be discipline as well.

Q Okay --

MR. BRUEGGEN: Can we take a quick break so I can run to the bathroom?

MR. SWAMINATHAN: Yeah, sorry.

COURT REPORTER: We're off the record. The time is 4:41.

(OFF THE RECORD)

COURT REPORTER: We're back on the record for the deposition of Anthony Riccio being conducted by videoconference. My name is Sydney Little. Today is May 18, 2022, and the time is 4:49.

BY MR. SWAMINATHAN:

Q All right. One of the things you identified as making -- as resulting in a big step in improving the culture of a reluctance to talk about misconduct among the ranks, was the change in the mid-2000s, call it 2015 approximately, when there was greater enforcement of Rule 14 violations, correct?

A Correct.

Q Okay. And then another big step in changing

the culture of reluctance to talk about misconduct among the ranks was the advent of body cameras, in-car cameras, and other video footage, correct?

A Yes, correct.

Q And that took place, fair to say, starting in probably the early 2010s and on as more and more cameras were becoming more prevalent.

A Yeah. Approximately, yes.

Q Okay. And then, what else was a big step in changing and ending that culture of a reluctance to talk about misconduct among the ranks, other than those two things you've just discussed?

MR. BRUEGGEN: Object to form. Misstates his testimony. Go ahead.

A I -- I don't know that I could put my thumb on any one particular thing. And I -- I should point out that there was some individuals who were reluctant to say things, but I don't want it to appear that that was like the culture of the department. There were some individuals who had always had this reluctance, but not the entire department or not the culture of the department.

Q So is it your testimony that, in fact, there wasn't any kind of culture within the police department in which there was -- it was frowned upon to talk about

misconduct by fellow officers?

MR. BRUEGGEN: Object to form, culture. Go ahead.

A No. I think there were individuals who felt that way, but as far as a culture within the department, I don't believe that was ever the case, no. But there were certainly individuals who felt that way, yes.

Q Yeah. And what -- why do you believe there were officers who felt that way in your -- the early part of your career as you mentioned?

A I -- I -- I don't -- I don't recall. I don't know what it was that led me to conclude that. I mean, again, it was 30 years ago, so it's hard to put my thumb on it.

Q That -- the fact -- the idea that there were people who were feeling that way and had a reluctance to talk about -- to talk about misconduct among the ranks, fair to say that continued well into the 2000s?

MR. BRUEGGEN: Object to form. Vague. Go ahead.

A I don't know. I mean, again, it's -- it's certain individuals, it's not everybody. So I would imagine that there probably were, but I couldn't say for certain. But there -- you know, there were individuals probably who felt that way into the 2000s.

Q Were you aware that in 2016 in a lawsuit filed by CPD Whistleblowers Shannon Spalding and Daniel Echeverria, the City offered to stipulate that a code of silence existed in the Chicago Police Department?

MS. ROSEN: Objection. Form, foundation, and I'm pretty sure mischaracterizes what happened.

A No. I -- I was not aware of that case or those individuals.

Q Do you dispute that well -- strike that. You're aware, I assume, that in December of 2015 in a speech to City Counsel, Rahm Emmanuel acknowledged the existence of a code of silence, correct?

MS. ROSEN: Objection. Objection. Form, foundation, and mischaracterizes what the mayor said.

A Yes, I was -- I was aware that he said that.

Q Okay. And what was your reaction to that?

A I -- I disagreed.

Q Okay. And did you ever say that publicly?

A No. I -- well, I don't -- I don't know. Not -- not publicly, like, you know, to the news media or anything, but I -- I certainly -- I certainly didn't agree that there was a code of silence. He made it sound like it was a cultural thing or it was rampant throughout the department. And I -- I didn't agree with

that.

Q So is your -- is your view about the difference between -- your disagreement with the mayor at that time was not that there weren't -- your disagreement was -- let me see if I understand correctly. Your disagreement when the mayor made that comment is that he made it sound like it was more prevalent of a problem than it was; is that correct?

A I -- I -- I think that's accurate. I think that his statement implied that it was -- the Chicago Police Department had a code of silence and it kind of gave the impression that it was the entire department, or it was rampant through the department. And again, I would say that there were individuals within the department. It's an organization of, you know, about 14,000 sworn and civilian. So certainly, there are individuals who would feel that way, but I -- I don't believe that was the overall culture of the department. And I think his statement to -- was interpreted by me and -- and probably by many that it was a cultural thing or that it was rampant through the department. And I -- I disagreed with that.

Q Okay. Do you agree that, at the time the mayor made those comments in 2015, that there were -- there were still significant numbers of individuals in

the Chicago Police Department, even if not rampant or entirely, who felt a reluctance to talk about misconduct among their fellow officers?

MR. BRUEGGEN: Object to form.

MS. ROSEN: Foundation.

A Yeah. I mean, I -- I think the term you said was significant number. I don't know that it -- that it's a significant number or what constitutes a significant number. I -- I will -- I will agree that there were some individuals and there have been throughout my career some individuals who felt that way, but I -- again, I don't think that's the prevailing thought among people in the department. It -- it -- it certainly hasn't been my experience that that was prevailing or cultural, but there are some individuals who have felt that way always, and there probably still are some today. But I don't think that's prevalent or the -- the majority. I think it's a -- a small number of individuals who feel that way.

Q Do you -- the reluctance to talk about misconduct among the ranks that you -- that you observed to some extent from earlier in your career, would you say that that -- the big change in terms of that -- the extent to which you see that problem, the change occurred substantially once you got into the timeframe

of 2010 when you started to have video and you started to have this greater enforcement of Rule 14 violations?

MR. BRUEGGEN: Object to form.

A No. I think, as I said earlier, it's -- it's been a -- kind of a gradual eroding of that. Excuse me. Again, I don't think it was ever rampant, but I think that that small group of individuals who felt this way is probably an even smaller group today. And that the -- I don't -- I don't think it started like in the 2010s or -- or anything. I think it's been a continuous improvement.

Q The reluctance to talk about misconduct among the ranks that you experienced earlier in your career, what was the part of your career would you say you experienced that and observed that reluctance to talk about misconduct?

A God. I mean, that's 30 years ago. I -- I don't even know that I could nail that down. It's been so long. I wouldn't be able to pin that down.

Q Was that something that you experienced and observed during the first ten years of your career?

A Again, I don't think that I could pin it down to a certain timeframe. It's just been so long. I'd be just -- I'd be guessing.

Q As you look back on your career and you -- and

you made that observation about those earlier years, can you pinpoint it to being associated with the time that you were working as a tactical officer or detective, or as a sergeant, anything like that?

A No. I -- I think as you move up the ranks though, you become more detached from -- from what's going on. So you have less -- less information about -- about what's -- what's actually going on at that -- at that street level. So it would be impossible for me to actually pin down when it was.

Q Okay. And would it be fair to say that in terms of your ability to really observe that reluctance to talk about misconduct among the ranks, that it's the kind of thing that, you know, once you move to this level of lieutenant and higher, it becomes harder and harder to observe that because you're at least one layer removed from the day-to-day officers.

MS. ROSEN: Objection, foundation.

A Yeah. I mean, even -- even as a sergeant, you're -- you're removed from the -- you're one rank removed from -- from that. And then as you continue to move up, you continue to be more and more detached from it. You see improvements in different ways, like we talked about earlier. But yeah, I mean, you -- you do. The more you move up, the more detached, unfortunately,

you are from what's going on on this street.

Q The reluctance to talk about misconduct among the ranks that you observed earlier in your career, do you -- would you say that observation and -- of yours is based on your experience in the period from 1986 to 1994, before you became a sergeant?

MR. BRUEGGEN: Object to foundation.

A I'm sorry, can you repeat the question?

Q Yes. So that -- the reluctance to talk about misconduct among the ranks that you observed earlier in your career, would you say that that is based primarily on observant -- observations made during the period of your career between '86 and '94 when you first became a supervisor?

MR. BRUEGGEN: Objection, foundation. Go ahead.

A Yeah. I mean, I don't know that's the accurate either. And again, it wasn't the culture. It wasn't -- it wasn't so prevailing. It was a limited group of individuals, a small number of individuals, I think. So it's really difficult to pin down exactly like when this was, or -- or who was involved in it or -- or -- or anything. So I think just a group of individuals has always been present. But again, it's not the culture. In a -- in a -- in an organization of

14,000 people I -- a small group of people who feel that way or may have felt that way at one time or another is -- is -- it -- really a -- a limited number.

Q In terms of -- you've identified several things that took place in the 2010s that you think resulted in a major improvement in terms of reducing reluctance to talk about misconduct among the ranks, fair?

A Fair.

Q Okay. Tell me any things that you recall from the period of the 2000s that you believe were a major step in reducing the reluctance to talk misconduct among the ranks?

A I don't know that I could pinpoint anything beyond then, partially because my memory is not that good. But -- you know, I don't know if it was just changing times or -- or -- or whatever it was, but that small group of individuals, I believe, just continued to get smaller and smaller. And the reluctance to -- to talk about that, I think, just eroded over time.

Q Are there -- I'm sorry, go ahead.

A I was going to say policemen now are different than policemen were 30 years ago, and policemen 30 years ago are different than policemen 50 years ago. It's -- it's just, the profession evolved. And -- and the

people in it evolved with the times.

Q Do -- can you -- are there any improvements or steps or reforms you can identify from the 1990s that you believe significant -- that were a major step in reducing a reluctance to talk about misconduct among ranks?

A Not off the top of my head, no.

Q And I think I might have asked this, but are -- can you identify any reforms or steps that you believe occurred in the 2000s that reduced the reluctance to talk about misconduct among the ranks?

A Not that I can think of off the top of my head.

Q Okay. All right. And then let me ask you about -- I asked you a few questions about -- about (Inaudible) previously, and you had indicated that you --

A Anand, can you start over? I lost that when you grabbed that.

Q I asked you some previous questions about Joe Miedzianowski, who you indicated was a gang specialist when you were a gang officer. So you were not in the same group, correct?

A That's correct.

Q Okay. And you indicated that you really

didn't interact with him that often because you were working in different tactical groups, correct?

A I -- I think it's fair to say I didn't interact with him at all.

Q Okay. Did you -- did he have any reputation during the time that you were both working as gang -- gang officers?

A No. I don't know that he had a reputation, no. I mean, he was just a -- he was a very strong, physical guy, muscular. I remember he had a crushing handshake, but as far as -- as anything else about him? No, I really didn't know -- I didn't know him. I really didn't -- I think if he saw me today, he wouldn't be able to tell you who I was. He was just -- you know, I knew of him because he was such a strong, muscular guy, kind of big personality.

Q Did you ever see him around the detective division talking with any detectives? Strike that. When you were -- let me clarify, actually. Let me ask it a better way. When you were a detective working out of Area 5 --

A Yes.

Q -- would you ever see you Joe Miedzianowski over in the detective division area?

A I don't recall ever seeing him there. Again,

I worked days and midnights and he -- maybe he worked a different watch. I don't -- I really don't know, but I don't recall seeing him up there.

Q Do you have any knowledge one way or other about whether Joe Miedzianowski would sometimes come and meet with Rey Guevara at Area 5?

A I -- I have no knowledge.

MS. ROSEN: Object to foundation.

Q Did you ever hear about allegations from detectives that Joe Miedzianowski was interfering or tampering in homicide investigations?

A Sometime -- sometime after I was gone, I had heard that he had been banned from going up to Area 5. I -- I don't know what the reason for it was, but I knew that there was some conflict. And I don't know if it was a conflict between him and another detective or something that brought that on, but I believe the commander of Area 5 prohibited him from coming up to Area 5.

Q And when you learned about that, that he had been banned from Area 5, that was while he was still a police officer before he'd been arrested by the feds, correct?

A Yes. That was while he was still a -- a gang specialist, I believe.

Q Okay. So would that have been while you were working -- this was after you were done being a detective, correct?

A You know, I don't re -- recall when it happened. I don't remember if I was a sergeant up there or if I was a detective up there. I wasn't part of whatever the incident was that led to that. I just remember guys talking about Miedzianowski is not allowed up on the floor anymore per the commander. And I really don't -- I mean, I may have known at the time, but I -- I don't know as I sit here, what the reason for that was.

Q Okay. When -- and so in the period from '95 or '96 to 1998, you were sergeant in the detective division, correct?

A Correct.

Q And so was that -- would that basically be the time period when you likely learned that he'd been banned from Area 5?

A Again, I don't -- I don't remember if I had still been a detective when that happened or if I had even been gone from Area 5. I -- I really don't remember when that occurred or when I learned about that occurring.

Q Okay. Did you ever learn why he had been

banned from Area 5?

A Again, at the time I may have known. I don't know it as I sit here. I don't know if it was a problem that he had with a detective or -- or another reason. I'm -- I'm not certain. There -- there was -- there was something that -- and I -- and I couldn't tell you when I -- when I learned about it. That -- I know it was a long time ago.

Q Did you ever -- while you were a detective, did you ever have concerns about gang crimes officers or other officers interfering in homicide investigations because of their own involvement with potential criminality?

A No.

Q During the time -- when you eventually -- was -- when you eventually found out that Miedzianowski had banned -- had been banned, at that point, did you ever hear anything about issues with gang crimes officers or anybody else tampering in homicide investigations?

A No.

Q Did you ever hear anything about Miedzianowski taking documents from homicide files and giving them to gang members?

A No.

Q At any point when you were a sergeant,

lieutenant, or commander at -- over detectives, did you ever learn about concerns that police officers had stolen or taken documents from homicide investigations and shared them with gang members?

A No.

Q If there had been concerns raised as high as the commander over detectives that an officer was taking documents from homicide files and sharing them with gang members, is that information you would've expected to learn about and wanted to learn about during the time you were a sergeant and lieutenant and commander overseeing detectives?

MS. ROSEN: Objection. Form.

MR. BRUEGGEN: Objection. Form, foundation, incomplete hypothetical.

A When I was a sergeant up there, I was a sergeant in robbery. So if this was happening, where -- what you said, documents being taken out of homicide files, I don't know that would've come to my attention because it was a complete different operation. Homicide and robbery were -- were two completely separate groups of individuals. So I don't know that that would've been something that would've been shared with me, or if I would've, you know, found out from just chit-chat on the floor. So I -- I -- my answer to that would probably be

no.

Q Was there any point in the time that you were a detective, sergeant, lieutenant, or commander in which you came to learn of any internal CPD investigation into Joe Miedzianowski?

A No. I believe the first that I heard about Joe Miedzianowski having a problem is -- when he was actually indicted by the feds, I think was the first time that I heard anything about Joe Miedzianowski having problems.

Q Are you -- during your time as a detective, sergeant, lieutenant, and commander, are you aware of any efforts to review -- strike that. During the time that you were a detective, sergeant, lieutenant, and commander, are you aware of any efforts to find out who else within the Chicago Police Department may have been involved in his criminality?

MS. ROSEN: Objection, form foundation.

A Yeah. I -- I don't know if there was or was not any sort of investigation of the nature that you're speaking of. I don't know.

Q And you're not aware of any as you sit here today, correct?

A I am not.

Q And at any point in your career in the Chicago

Police Department from the time you were a -- a detective all the way through the time that you retired as a first deputy superintendent, did you ever come to learn of any internal Chicago Police Department investigation into the full scope of the criminality associated with Joe Miedzianowski?

A I did not. That's not to say that there was or was not one. I -- but I was never made aware of one.

Q Okay. Do you -- did you ever wonder in your role as a supervisor -- I mean, and the time you learned about the Miedzianowski criminal enterprise was, you said, when you first saw the news about his indictment, correct?

A Correct.

Q So at that time, around 1998, you were -- you were -- you were -- you had just gone from sergeant to lieutenant, correct?

A I -- I -- I don't know when it was. If you're saying it was 1998, then yes, that -- that was when I was promoted to lieutenant.

Q Okay. So did you, at that time, have any questions or concerns about how a Chicago police officer could be running a criminal enterprise out of the Chicago Police Department with no one knowing about it?

MS. ROSEN: Objection. Form, foundation as to

no one knowing about it.

A Yeah, that was outside of my scope, so I --I didn't -- I had no involvement in it or

Q Are you aware of any CPD investigation into how he got away with it for so long?

MR. BRUEGGEN: Objection, foundation.

A There may have been. I'm not aware of it, nor would I have been aware of it.

Q Do you believe the fact that Joe Miedzianowski was able to engage in the conduct that he was ultimately convicted of for as long as he was reflects some reluctance on the part of his colleagues to come forward about misconduct?

MS. ROSEN: Objection. Form, foundation, calls for speculation.

A Yeah. I -- I couldn't say either way.

Q Did it surprise you that this police officer had engaged in this level of criminality without anybody reporting it for so long out of the Chicago Police Department?

MS. ROSEN: Objection. Form, foundation, calls for speculation about who reported it and when.

A I -- I think that -- well, obviously there was an investigation because it wound up with him being arrested. I don't know who conducted the investigation,

if it was CPD or the FBI, or there was some sort of a coordinated investigation. But I mean, obviously there was a criminal investigation.

Q Yeah. Based on a complaint from an ATF agent by federal investigators. But any internal CPD reporting that you're aware of that resulted in that investigation into Miedzianowski?

MS. ROSEN: Objection. Form, foundation, mischaracterizes the evidence.

A I am not aware, nor would I have been aware or should I have been made aware, of such an investigation.

Q Okay. There are allegations in this case of -- that a key witness, Francisco Vicente, was physically abused by Reynaldo -- Reynaldo Guevara and Ernest Halvorsen. I assume you saw that in the complaint, correct?

A I haven't read the complaint.

Q Oh, okay. I'm sorry. In your time as a Chicago police officer, do you acknowledge, as somebody who's been in the Chicago Police Department for more than what, three decades, that there were instances in which Chicago Police Detectives abused suspects and witnesses?

MR. BRUEGGEN: Objection. Form, foundation.

A Yeah. I mean, I -- I can't acknowledge that

because I have no firsthand knowledge of it. So, you know, all I could say is I never witnessed it or had any information about it. So it's -- I can't acknowledge that something like that happened.

Q Are you aware of any internal acknowledgement within the Chicago Police Department that there has been abuse that occurred in interrogation rooms in detective division areas?

MR. BRUEGGEN: Objection. Form and foundation.

A Yeah. I'm not aware of any acknowledgement of it. I -- it's not to say there isn't, it's just that I personally am not aware of it.

Q And during your time as a sergeant, lieutenant, commander, deputy chief overseeing detective divisions -- either detectives or detective divisions entirely, was there any point at which you came to the conclusion that, yes, I acknowledge that, in fact, there are instances of abuse that have occurred in these detective divisions?

MR. BRUEGGEN: Objection. Form, foundation, asked and answered.

A I don't recall any abuses of the type that you're talking about being brought to my attention during my tenure within the -- the detective division.

Q Are you aware of any instances during the time

that you worked as a -- that -- either as a detective or at any point when you were supervising detectives, when there was any internal effort to make reforms in terms of interrogation practices based on allegations or findings of abuse by Chicago police officers?

MS. ROSEN: Objection. Form, foundation.

A No. I mean, you know, cameras were placed in interview rooms for -- for different types of investigations. And I think that was -- was a -- a good step.

Q I'm sorry. Yeah, why don't you go ahead and then I'll ask you my other question. Sorry.

A Yeah. No. I -- I think that was a good step that -- that cameras were placed in -- in the interview rooms for certain -- to record certain types of interrogations.

Q When that -- when cameras were put into interrogation rooms, that was done based on a -- based on a statute, not based on a particular instance of misconduct involving a Chicago police officer, fair?

MR. BRUEGGEN: Object to foundation.

A I -- I know they were expanded in -- into other types of investigations, sexual assaults, armed robbery with firearms, but I don't know that that was based on a statute. But I don't know what the initial

rollout was for cameras during homicide investigations. I don't know.

Q During your time as a detective, were you ever told or talked to or trained about -- in relation to the allegations of misconduct against Jon Burge?

MR. BRUEGGEN: Object to foundation.

A No. That preceded my time in the detective division.

Q During your time as a sergeant in the Chicago Police Department, were you ever trained or talked to about the allegations of misconduct against Jon Burge?

MR. BRUEGGEN: Object to foundation.

MS. ROSEN: Wait, can you repeat the question?

Q During your time as a sergeant in the Chicago Police Department, were you -- were you ever talked to or trained based on the allegations of misconduct against Jon Burge?

MR. BRUEGGEN: Object to form, compound, foundation.

A Not that I can recall.

Q Did the allegations of misconduct against Jon Burge result in any training that you conducted as a sergeant to your detectives?

MR. BRUEGGEN: Object to foundation.

A I -- I don't know. I don't even recall when

the allegations against Burge came out, if I was still a sergeant or if I was even in the detective division. I -- I -- I don't -- I don't recall when that was.

Q When you were a lieutenant overseeing detectives, did you -- were you ever talked to or trained in relation -- strike that. During the time that you were a lieutenant in the Chicago Police Department, did anybody in the department ever talk to you or train you in order to make changes based on the allegations of misconduct against Jon Burge?

MR. BRUEGGEN: Object to form, compound, foundation.

A No.

Q Are you aware of the allegations against Jon Burge resulting -- strike that. Are you aware of the allegations and findings against Jon Burge resulting in any changes to the practices of the detective division, based on your experience as a lieutenant?

MR. BRUEGGEN: Object to form and foundation.

A There may have been, but I -- I don't know. I can't connect those dots. It was a long time ago for me.

Q As you sit here today, can you identify any changes that were made while you were lieutenant in the Chicago Police Department based on the allegations and

findings against Jon Burge?

MR. BRUEGGEN: Objection. Form, foundation, asked and answered.

A Again, there may have been, but I can't connect those dots. If some of the changes were related to the Burge allegations, I -- I don't know.

Q And as you sit here today, can you identify any changes that were made in the detective divisions based on the allegations and findings against Detective Guevara while you were a commander overseeing detectives?

MR. BRUEGGEN: Objection. Form, foundation.

A No. None that I can think of.

Q And as you sit here today, can you identify any changes that were made based on the allegations and findings of misconduct against Jon Burge during the time you were a deputy chief overseeing detectives?

MR. BRUEGGEN: Objection. Form and foundation.

A No. I -- I can't connect those dots. I don't know if any of the changes that were made were related to Burge or not.

Q Did you ever receive -- or did you ever receive any training about how to conduct interrogations based on the findings of misconduct against Jon Burge?

MR. BRUEGGEN: Object to foundation. Form.

A No.

Q Did you ever conduct any trainings for detectives working under you based on the findings of misconduct against Jon Burge?

MR. BRUEGGEN: Object to form and foundation.

A No, I did not.

Q Are you aware of any supervisors -- strike that. Are you aware -- are you aware of any sergeants, lieutenants, or commanders that you've worked with in the detective division who ever -- who have ever acknowledged that Jon Burge abused suspects in interrogation rooms?

MR. BRUEGGEN: Object to form.

A I don't -- I don't think I ever had that conversation with anyone. So my answer to that would be no.

Q Are you aware of any investigation that was made to identify if the problems -- strike that. Are you aware of any CPD investigation during your time over -- either as a detective or overseeing detectives in which there was any CPD investigation to identify if the allegations and findings involving Jon Burge were also true of others other than Jon Burge?

MR. BRUEGGEN: Object to form and foundation.

MS. ROSEN: Objection. And calls for

speculation.

A Yeah, there -- there may have been, but I'm not aware.

Q Okay. And are you aware of any CPD investigation to identify if the allegations and finding -- findings against Burge spread to other areas of the Chicago Police Department?

MR. BRUEGGEN: Object to form, foundation.

MS. ROSEN: Also speculation. And I don't know what you mean by the word spread. And you're asking questions of like a 30(b)(6) witness, and Mr. Riccio is definitely not a 30(b)(6) witness. He's a defendant in this case. So whatever it is you're trying to do here is improper.

BY MR. SWAMINATHAN:

Q Go ahead.

A No, I do not.

MS. ROSEN: How much longer do you have? You had represented earlier that you thought you'd be done by 5:00 and we're well past that. So can you let me know how much more time you have because I need to make arrangements.

MR. SWAMINATHAN: I think I've got about three to five minutes. I think we can take a break now and I'm just going to see what else I've got left.

I think it's probably no more than a few minutes. And I -- I just need two minutes.

COURT REPORTER: All right. We're off the record. The time is 5:22.

(OFF THE RECORD)

COURT REPORTER: We are back on the record for the deposition of Anthony Riccio being conducted by videoconference. My name is Sydney Little. Today is May 18, 2022, and the time is 5:29 p.m.

BY MR. SWAMINATHAN:

Q Okay. I have one last set of questions for you, sir. And I appreciate your patience. Sir, have you ever been disciplined by the Chicago Police Department?

A Yes.

Q How many times?

A To the best of my recollection, one.

Q And when was that instance?

A 1987, '88, '89. Something like that. Late -- late '80s.

Q Was that an incident involving a man named Gus Andros?

A Yes, that was it.

Q Okay. And did you ultimately suffer any discipline for that incident?

A A three-day suspension.

Q Was that three-day suspension upheld, or was it ultimately removed?

A You know, that's a good question. I -- I believe it was ultimately removed. I never served it. I never had the time taken away from me, so I believe -- and it goes back a long way. I believe that it was -- it was tossed out. And I don't remember why, if it was an arbitration or a grievance or whatever the facts may be. I do remember never having to serve the punishment, the discipline. So I -- I thought it was removed.

Q I'm showing you a document. This is the last thing I want to go through with you. I'm showing you a document that we are going to mark -- I think we're on Exhibit 8, and it is RFC Iglesias 1442 through 1567. And the first page indicates it's a Command Channel review complaint register investigation number 162909. And the date initiated is December 13th, it looks like, 1988. You see that, sir?

(EXHIBIT 8 MARKED FOR IDENTIFICATION)

A Yes, I do.

Q Okay. I am not going to go through this whole thing with you. I just want to go through one section primarily. Okay. I'm turning to page --

MR. BRUEGGEN: I've given him a hard copy.

Q You have a hard copy?
A Yes, I do.
MR. BRUEGGEN: Yeah. You if can tell him the page number --
Q Yeah. So let's go page 61, which is RFC Iglesias 1502.
A Yes.
Q Okay. So this is the beginning of a -- name of person interviewed, it says Anthony J. Riccio. Is that where you are?
A Yes, that's correct. Yes.
Q Okay. All right. I'm going to ask you about your interview, okay? And we're just going to go through it. All right. So you were questioned during -- during the -- during the CR investigation, you were questioned by this -- by the CR investigators, correct?
A Yes.
Q Okay. And I'm just going to -- I'm going to -- I'm going to skip around a little bit, so just make sure you're keeping up with me, okay?
A Okay.
Q I'm going to look on this -- on page 1502, I'm looking at line 16.
A Yes.
Q "Question: On the above date, did you and

Officer Navarro affect the arrest of one Gus Andros at the Amoco Gas Station located at Peterson and California Avenues? Answer: Yes." Do you see that, sir?

A Yes, I do.

Q Is that -- is that true that you did, in fact, arrest Gus Andros at the Amoco gas station?

A Yes, that's true.

Q Okay. And so you don't dispute that you were personally involved in an interaction with Gus Andros?

A Correct.

Q Okay. It indicates -- we're turning to the next page now.

A Okay.

Q It indicates starting on line 2 -- the end of line 2, it says, "A man seated in his car began yelling and screaming obscenities and creating a disturbance. I told him to leave on several occasions and to stop his yelling. He refused and I informed him that he was under arrest."

A Yes.

Q Is that statement true?

A Yes, it is.

Q Did Gus Andros begin yelling and scream obscenities at you?

A Yes, he did.

Q It states, "He started his car, placed it in gear. I reached inside of his window, turned the car off." Is that true?

A Yeah. To the best of my recollection, this is all -- this is all accurate. Yes.

Q Okay. It says here that, "He struck me on the right side of my head." Is that a true statement that Gus Andros struck you on the right side of your head?

A To the best of my recollection. Again, I have no independent recollection of this, so I'm just going off of this statement.

Q Okay. And as you sit here today, do you stand by your statement that he struck you on the right side of your head?

A Well, as I sit here today, I'm basically saying I have no independent recollection. I'm going off this statement on this paper.

Q Did you tell the truth when you gave this statement?

A Yes.

Q It says here that you, "Pulled open the door and he started kicking me." Is that a true statement that Gus Andros started kicking you?

A Again, I have no independent recollection of this. I'm just going off the statement on this paper.

Q Okay. "At that time, with my free hand, I used a technique known as a head stun learned in the academy." Did you use a head stun on Gus Andros?

A Again, I have no independent recollection. I'm going off of what it says on this paper. Yes.

Q Okay. Moving down. It says -- when you reached into Mr. Andros -- this is line 14, "When you reached into Mr. Andros' car, did you hit him across the face with an object?" "Answer: No, I didn't." Is that truthful testimony?

A Again, I'm going off what it says on this paper. I have no independent recollection of this.

Q Do you stand by what's written on that piece of paper that you never hit Mr. Andros across the face with an object?

A I have no independent recollection of this incident. This was from 1987, I believe. 1987, 1988. So I'm going off of what is on this paper.

Q And what's on this piece of paper, sitting here today, is it truthful or not truthful or you can't say?

A It's -- it's truthful.

Q Okay. And it says on this piece of paper -- strike that. Did you, at any point -- let me just ask you. Did you at any point hit Mr. Andros with your

flashlight or mag light?

A No. I never used my flashlight or mag light as a weapon. So I could say with certainty that that was not the case --

Q Okay.

A -- in this incident either.

Q Okay. When you -- it says here, "When you applied this head stun, did you apply it to Mr. Andros' face?" "Answer: I believe so." Is that true?

A I have no independent recollection of this. So I'm just going off of what's on this paper.

Q Okay. If you look at line 23, it says,

"Question: Did you, at that time, once he was out of the car, start to beat him about his body and his face with your fists?" "Answer: No." Is that truthful testimony?

A I have no independent recollection of this. So I'm just going off of this paper.

Q Is the statement that you did not beat him about his body and his face with your fists true, is it not true, or you can't say sitting here today?

MR. BRUEGGEN: Objection, misstates the testimony quoted, but go ahead.

A Yeah. I -- I can say that I have no independent recollection of this incident. We're

talking about a 30-second incident that happened 30 years ago. I have no independent recollection of this. My only recollection is what is on this paper.

Q Okay. And so, as you sit here today, do you stand by this statement that you did not beat him about his body and his face with your fists?

A That's what it says on the paper and I have no independent recollection of the incident, so I can only go by what's written on this paper.

Q Okay. The next -- line 26 says, "Did you at any time have a flashlight in your hand?" And your answer is, "No." Was that true?

A I have no independent recollection of this incident. So all I could do is go by what's written on this paper.

Q Looking at line 9 now on that page, it says,

"Once in the station, did you apologize to Mr. Andros for hitting him?" "Answer: No." Is that true or not true or you don't remember?

A I have no independent recollection of this incident. This was an incident that lasted probably 30 seconds as -- as most fights do, 30 years ago. So all I could do is go by what is on this paper.

Q Okay. And do you ultimately stand by what you have written on this piece of paper about whether or not

you apologized to -- for hitting Mr. Andros?

A Well, you asked me if I stand by it. I'm -- I'm reading it just as you are. I have no independent recollection of what happened. All I can do is read what's on this paper. Again, it's a 30-second fight that happened 30 years ago, so I have no independent recollection. All I know is what it says on this paper.

Q Did you give -- when you were interviewed during the course of this investigation, is it possible that you gave some information during that investigation that was false?

A No, it's not possible. But again, this was a 30-second fight that happened 30 years ago. So all I can do is go by what's on this paper.

Q Okay. When you gave this statement to the investigator, your testimony is that the testimony you gave was entirely truthful; is that correct?

MR. BRUEGGEN: Object to the form.

A The statement that I gave to the investigator at the time was the facts as I knew them at the time, which was 30 years ago. To sit here today, 30 years later, and recount a 30-second incident with an individual, it's impossible for me to say, other than what's on this paper.

Q Okay. If you look at line 19, it says, "and

you deny" -- strike that. Line 19 says, "Question: And you do deny striking him with your fists after you pulled him out of his car; is that correct? Answer: Yes. I deny striking him with my fist at any time." Was that statement truthful?

A Again, 30 years ago, this was a 30-second fight. I don't recall the incident at all. All I can do is go by what is written on this paper.

Q Okay. Looking at the next page, starting at line 2, It says, "Question: How did Mr. Andros resist being arrested. Answer: By punching and kicking at me after he was told that he was under arrest." Do you see that, sir?

A Yes, I do.

Q Is that statement truthful?

A Again, this incident occurred 30 years ago. It probably was 30 seconds in duration. That may be even long. I don't have an independent recollection of it. All I know is from what I'm reading on this paper. And this is the first time I've read this in 30 years, so I have no independent recollection of this.

Q Let's take a look at -- this is page 110, which is RFC 1551. This is a statement from Lieutenant James Morgan regarding subject injury to Police Officer

A. Riccio. And it says, "The reporting

lieutenant does not remember conferring with Police Officer Riccio regarding an injury while making the arrest of Gus Andros. Reporting lieutenant has 21 years of experience as a supervisor. 'If an officer is injured, then I would have told him to have his supervisor prepare an IOD report before'" entering -- "'ending his tour of duty.'" You see that, sir? If you said anything to him about suffering any injuries, he would've told you to prepare an IOD report, correct?

A That's what he's saying, yes.

Q Okay. And did you, in fact, tell the lieutenant that you had suffered any injury?

A I don't recall. Again, this was 30 years ago. I have no clue who James Morgan is actually.

Q Okay. And if the lieutenant ultimately provided a statement indicating that you were wrong when you said that you had in -- you had suffered an injury and told him that, do you dispute the statement of the lieutenant?

MR. BRUEGGEN: Object to form.

A Yeah. I don't understand the question.

Q During the course of this investigation, it is documented in this -- that you indicated that you did, in fact, tell the lieutenant that you had been injured. Is the lieutenant providing false information when he

indicates that if you had provided that information to him, he would've told you to write an IOD report?

MR. BRUEGGEN: Object to form. Argumentative.

A Yeah. I don't even know that I told him that I suffered an injury. I don't even -- I don't even recall that. Unless that's in here somewhere, I don't recall ever -- ever saying that.

Q Okay.

A But again, it was a 30-second incident that occurred 30 years ago, so I don't recall. I have no independent recollection of this incident whatsoever.

Q Do you agree that, when you first received the three-day suspension, the investigator had concluded that you had, in fact, struck and beaten Mr. Andros?

A No, I don't. I don't recall that, no.

Q Do you agree that the investigator, in concluding that you should be suspended for three days, ultimately rejected your statement that you had not, in any way, attacked this individual, Mr. Andros?

MR. BRUEGGEN: Object to foundation.

A No, I don't. I don't recall that. I don't know that I ever read the investigator's finding. And if I did it, it would've been 30 years ago, and I have no independent recollection of it whatsoever.

Q You ultimately appealed the finding of the CR

investigator and -- is that correct?

A I don't -- I don't recall if I appealed it or not.

MR. BRUEGGEN: Do you have a page number, Anand, that you could refer him to?

MR. SWAMINATHAN: Yeah. Let's see here.

MR. BRUEGGEN: The RFC --

BY MR. SWAMINATHAN:

Q RFC 1564, the last three pages of the report -- or of the document.

A Okay.

Q It says, "The investigator terminated" -- okay, here we go. If you look at this document, it says, acute -- if you look at the top of the page, it says, "This is an office of professional standards recommendation that Police Officer Anthony Riccio be suspended for a period of three days for violating department rule." You see that?

A Yes.

Q And then it says, "Rule 8, disrespect to or maltreatment of any person while on or off duty." Do you see that?

A Yes.

Q And then it indicates, in count one, in that on 4 August 1988 at approximately 2330 hours, while in

an Amoco service station, located at 5953 North Carol -- California, the accused leaned into Mr. Gus Andros's car window and struck him across the face with a flashlight. Do you see that?

A Yes.

Q So that was the conclusion of the CR investigator, correct?

A That is count one. So that's the first allegation. Yes.

Q And that is the ultimate finding of the CR investigator before any subsequent hearing, correct?

A I did not read this, so I do not know.

Q Okay. Now, you agree with me that that finding in count one is contrary to what you said in your statement to the investigator, that you did not strike this individual with your flashlight, correct?

A That's correct.

Q Okay. So ultimately, the CR investigator rejected your statement that you did not strike this person with a flashlight, correct?

A Correct.

Q And then count two says, in that on 4 August 1988 at approximately 2330 hours, while in an Amoco service station at 5953 North California, accused pulled Mr. Gus Andros out of his car and struck him with his

fists about his body and face. That's the second conclusion of the CR investigator, correct?

A That's correct.

Q And that's -- and essentially that is a rejection of your statement to the CR investigator that, in fact, you did not do that, correct?

A That's correct.

Q Okay. So the CR investigator didn't believe you when you gave that statement, correct?

A That's correct.

Q Okay. And then ultimately it says, Officer Riccio rejected the recommendation, which was a three-day suspension, and requested a hearing before the complaint review panel. Do you see that?

A Yes, I do.

Q Okay. And then ultimately a hearing was held in front of the -- in front of the review panel, correct?

A I don't recall that.

Q You don't remember participating in that interview?

A No.

Q Okay. Let me just go down here. I'm almost at the end. If you look at the last -- let's see here. 1566. Second to last page.

A Okay.

Q It says, "On 20 of April 1989, the complaint review panel convened to review complaint register number 162909. The accused appeared before the panel to contest both the sustained finding and the recommended penalty. The accused was represented by Mr. Walter Siemieniak of the Fraternal Order of Police." And then it goes through and identifies your statement to this review panel. Do you recall at all your testimony before the review panel?

A No. I don't even recall being in front of the review panel.

Q Okay. Did -- but looking at this report, it appears you testified in front of that panel, correct?

A Yes. Correct.

Q Were any other -- did any other witnesses testify or give statements before the panel?

A I don't recall being in front of the panel. I don't recall this incident at all.

Q Do you know if the victim, Gus Andros, was given an opportunity to appear before the panel?

A I thought I just saw in here that he was given that opportunity.

Q Where do you see that?

A No, I don't. I don't know.

Q Okay. You don't see anything here that indicates that Mr. Andros gave a statement to the panel, correct?

A Correct.

Q And you don't see anything in here indicating that the panel gave him an opportunity to provide a statement, correct?

A I don't, but I know that that is -- the policy is that he would have the ability to come in or the option of coming in and providing a statement.

Q Okay. Now that should -- that is -- you're saying that's what the policy was, that he should have been given such an opportunity?

A He would've been. Yes.

Q Pursuant to policy, correct?

A Correct.

Q And you don't -- you can't say one way or the other whether that occurred in this case, correct?

A No. I have no independent recollection of this case.

Q Okay. Last thing. You told this complaint review panel when you were before them, based on this report, that, in fact, you had not struck Mr. Andros with your flashlight or beat him about the body once he was out of the car, correct?

A I would have to read it, but I believe that would be consistent with my statement to OPS.

Q Okay. And as a result of that review process, ultimately the panel decided to find the complaint not sustained, correct?

MR. BRUEGGEN: Object to form. Misstates the document.

A So looking at 1567, it says --

Q Okay. Let's look at, yeah, 1567. Yes.

A Yeah. It says, "The panel unanimously agreed that the case should be not sustained. The panel cited the fact that police officers are allowed to use the force necessary to affect an arrest. They concluded that Officer Riccio was justified in using the approved defense technique called a head stun. In additional -- in addition, the panel placed great weight on the incoming lockup report, which indicated no injuries, as well as photos taken of Andros immediately after the incident." So this would -- this would say that physical evidence was not consistent with the statement of Mr. Andros, and being struck in the face with a flashlight, which amounts to pretty much a metal pipe, and how he would, you know, an hour later be admitted into the lockup with no injuries and photos showing no injuries, I think, is kind of an indictment of the story

that he told, more so than the account that I told.

Q Okay. And so ultimately, they decided to not sustain the allegations, correct?

A That's correct.

Q And your point is that, if, in fact, he had -- if you had actually done the things he accused you of, he would've probably suffered a broken bone or something, correct?

A Well, I think that if he had been struck with a metal pipe, what amounts to a metal pipe across the face, that he would have had a complaint of injury, number one. And a lockup report, which is lockup keepers in a different district that I don't know, indicated that he had no injuries. And the photograph that's taken immediately after arrest also showed no injuries on his face.

Q The lockup keeper worked for the Chicago police department, correct?

A Yes.

Q Okay. Last page. Let's go to page 91, which is RFC 1532.

A Okay.

Q This document is from a Dr. Norman J. Markus, plastic reconstructive and cosmetic surgery, dated August 19, 1988, it appears. The document states that,

"This 22-year-old male was seen in my office on August 11, 1988 for evaluation of post-traumatic facial injuries." I won't read the whole thing. But it says -- it refers to the incident occurring at a gas station a week earlier and indicates that he was struck on the left side of the nasal bridge with a flashlight. And this is obviously information being reported to the doctor by Mr. Andros, correct?

A Yes. Correct.

Q Okay. And it states here that the patient's glasses were broken. Do you see that?

A No.

Q If you look in the middle of that first paragraph. "The patient's glasses were broken." Do you see that?

A Okay.

Q Do you recall that, in fact, his glasses were broken during the course of this incident?

A I don't even recall him wearing glasses.

Q It indicates the patient was brought to the police station and noted bleeding from the right side of the nose and difficulty breathing on both sides. Do you see that?

A Yes, I do.

Q Okay. So do you recall that, in fact, he had

reported that he had been -- he was suffering bleeding on his face and difficulty breathing?

MS. ROSEN: Objection. Form. Foundation.

A No. Again, and I'm going to repeat this as many times as necessary. This is a 30-second issue that happened 30 years ago. This was a fight. I don't deny hitting him. I definitely did not hit him with a metal flashlight. The metal flashlight with the batteries in it is probably similar to hitting someone with a pipe. I definitely didn't do that. And any injuries that he sustained as a result of this were deemed to be an adequate use of force, an appropriate use of force by a panel. The physical evidence at the time of his arrest, including a photograph taken at the time of his arrest, do not show the injuries that he's claiming. And whatever's contained in this report is information that he provided to his doctor about glasses being broken. It's the first I've heard about anything about glasses being broken. So I'm going to -- I'm going to say, yeah, no. I disagree with it strongly.

Q Okay. And you used -- the only technique you say you used against him was a head stun, correct?

A That's correct.

Q Okay. And a head stun is not a strike, correct?

A A head stun is ex -- is absolutely a strike.

Q Where -- how -- tell me. Explain what a head stun is.

A A head stun is a strike to the head using the bottom of -- of the palm of your hand.

Q And where -- where do you strike the individual?

A Well, the goal is to strike him in the head, but a fight is a fight. I mean, I'm getting punched, he's getting punched. It's very dynamic. And if, in fact, you're trying to strike somebody in the head and you hit him in the nose, that's -- you know, that's an unfortunate byproduct of a fight, I would have to say.

Q Okay. And so where it says here, "Subsequent evaluation at Edgewater Hospital revealed a nasal fracture." Do you see that?

A Yes.

Q Okay. So you agree with me, in fact, this patient -- this individual did suffer significant injuries as a result of what happened in that -- in that gas station parking lot, correct?

MS. ROSEN: Objection. Form, foundation. This is a week later.

Q Correct.

A Yeah. I don't agree with you, no.

Q Okay. So your -- is it your testimony that, in fact, you did not cause a nasal fracture to Mr. Andros?

MS. ROSEN: Objection. Form. Foundation.

A I don't know if I caused a nasal fracture to Mr. Andros. I know that Mr. Andros and I were involved in a fight. I know that after, a panel unanimously said that the case should be not sustained, that they also used -- ruled that the use of force was necessary to affect the arrest, and that I was justified in using the technique that I used. So that's -- you know, that's what I -- physical evidence -- and Counsel, if nothing else, you've sat here and talked to me for seven hours about physical evidence. So let's not pretend physical evidence isn't important all of a sudden, because it says here physical evidence -- you know, the lockup report indicates no injuries and photos taken immediately after the incident. So you can't talk to me for seven hours about the importance of physical evidence, and then turn around and tell me that physical evidence is all of a sudden not so important because that's the convenient -- that's the convenient answer. And the other thing I'll say. The other thing I'll say is you can't sit here for seven hours and indict investigators of the Chicago police department, and then

turn around and tell me the investigation conducted by somebody in OPS, who is not a trained investigator by any means comparable to any Chicago police investigator, is all of a sudden some sort of a great investigator, and this was a wonderful investigation. Clearly a panel that reviewed this investigation disagreed, as do I. Unfortunately, not everybody -- unfortunately not everybody submits to an arrest the way they're supposed to. Mr. Andros is one of those individuals. And in a 30-second fight 30 years ago, Mr. Andros elected to resist arrest and to fight with me. And while I don't have an independent recollection of it, I can certainly go by the statements that I made at the time and by the review of this by that panel that say that this was an appropriate use of force in affecting this arrest.

Q Okay. So as you sit here today, your testimony is, in fact, you did not strike Mr. Andros with a flashlight, correct?

A Yes. Correct.

MS. ROSEN: Objection. Asked and answered.

Q And your testimony today is you did not strike Mr. Andros about the body and face, correct?

MR. BRUEGGEN: Objection. Misstates his testimony.

A That is -- that is not what I said, no.

Q Okay. Sorry. Let me correct that. Your testimony today is you did not strike Mr. Andros about the body and face after you pulled him out of the car, correct?

A Counsel, I'm going to conclude the questioning on this topic with saying I am standing by the statement that I have in this. I have no independent recollection. Any further questions that you want to ask me on this, I'm going to not answer you because I -- you're trying to twist my words now and you're trying to put things into my mouth. You're trying to tell me what a wonderful investigation was conducted by OPS on this. And I'm telling you that the OPS investigators lack even the most basic investigative skills when compared to a Chicago police detective. So let's not spend seven hours beating up the detective --

Q No, this is important. This is very good. I'm glad you raised this. I have a couple questions about that. One --

A (Inaudible).

Q I want to be clear. I want to be clear.

MR. BRUEGGEN: Hold on. We're going to take a quick break so that Mr. Riccio can collect himself.

THE WITNESS: I'm good. I'm good.

MS. ROSEN: No. We're take -- let's take a

break.

COURT REPORTER: All right. We're off the record. The time is 5:58.

(OFF THE RECORD)

COURT REPORTER: We are back on the record for the deposition of Anthony Riccio being conducted by videoconference. My name is Sydney Little. Today is May 18, 2022, and the time is 6:04 p.m.

BY MR. SWAMINATHAN:

Q Okay. Mr. Riccio, did you -- strike that. Was it your belief that the OPS investigator who conducted this investigation did a poor job?

A It's my belief that they came to the wrong conclusion. I don't know that they did a poor job or not, but they came to the wrong conclusion.

Q And do you believe there was a problem in this time period, in the late 1980s, of OPS investigators reaching sustained findings in cases where they should not have?

MR. BRUEGGEN: Object to form.

A I really don't know. I can't speak to that.

Q Okay. And on the second paragraph of this document I've had -- we have in front of you, which is again, you have it as RFC Iglesias 1532?

A Yes.

Q The beginning of the second paragraph says, "On examination, the nasal pyramid is displaced to the right side in a C-shaped deformity. On intranasal examination, the septum is displaced into the right nasal cavity with obstruction. Review of the x-rays revealed a nasal fracture." Sir, did you cause those injuries to Mr. Andros?

MR. BRUEGGEN: Object to foundation.

A I don't know if I caused those injuries or not. I gave him a head stun, and I don't know if I caused those injuries or not. You have to remember the reason we went to this location was because of a fight that he was involved in, and that this appearance at the doctor's office was a week after his arrest. So I don't know if I did or not.

Q What evidence do you have that he was personally involved in a fight at that location?

A A 911 call of people fighting.

Q And there were a number of other people at that locate -- at that gas station, correct?

A Yes.

Q And so, how do you know he was one of the participants in that fight?

A I know that the group of individuals he was with were part of that fight. I don't know specifically

that he was or was not one of the individuals fighting.

Q Okay. So to be clear, you have no evidence that he was personally involved in a fight, correct?

A I have no evidence that he was, and I have no evidence that he was not.

Q Okay. All right. Thank you.

A It was a 911 call of a fight going on in the gas station involving the group that he was with.

Q And what group was he with?

A I don't know. A group of guys.

Q How do you know which group he was with?

MR. BRUEGGEN: Object to foundation.

A I don't.

Q How do you know he was with the group of people that were involved in a fight?

A Because he was with -- because we were told that there was a fight in progress at that gas station with a group of individuals. And when we showed up, there was a group of individuals fighting.

Q Did you observe -- you didn't observe Mr. Andros fighting, correct?

A I don't recall. This incident happened 30 years ago, and I have no independent recollection of it.

Q Okay. So as you sit here today, you are not claiming that you ever observed Mr. Andros participating

in a fight, correct?

A That's correct. I'm not claiming that I -- he was or was not. I don't recall.

MR. SWAMINATHAN: Okay. All right. I have nothing else.

MR. BRUEGGEN: Can you take down -- stop sharing?

MR. SWAMINATHAN: Oh, yeah.

MR. BRUEGGEN: Megan, Eileen, you guys have questions?

CROSS EXAMINATION

BY MS. ROSEN:

Q I just have one follow-up question to ask you, Mr. Riccio, about the late list that you talked about a million hours ago.

A Yes.

Q I think you said something like, if there wasn't a disposition within 30 days, you made it to the late list, or the case made it to the late list. Is that what you said?

A If I did, I misspoke. There had to be some sort of action on it within 30 days.

Q Wait. So when you say -- sorry, go ahead.

A No, not a disposition. Not a -- you know, a suspended, or closed, or something like that, but some

sort of action. You had to have contacted the victim or sent a letter to the victim or something of that nature.

Q So some kind of investigative activity had to have occurred?

A Correct.

MS. ROSEN: Okay. That's all I have.

MR. SWAMINATHAN: Nothing else. No response from me.

MS. MCGRATH: I don't have anything. Thank you.

MR. BRUEGGEN: I don't have anything. We'll reserve signature.

MR. SWAMINATHAN: Okay. Thanks everybody. Thank you for your time, Mr. Riccio.

COURT REPORTER: Actually, if you could all hang on for just a second. So did you want to take care of that, or would you like me to send him the copy?

MR. BRUEGGEN: For signature?

COURT REPORTER: Yeah. For signature.

MR. BRUEGGEN: I'll take care of it, yes. I'll take care of it.

COURT REPORTER: Okay. So I'll send that to you. All right. Great. Anand, how would you like your copy?

MR. SWAMINATHAN: I'm not ordering currently.

COURT REPORTER: Not ordering. No video? Oh, well, you get the video since you -- okay. Dave, how would you like your copy?

MR. BRUEGGEN: Can I just get an electronic version?

COURT REPORTER: Sure. Would you like a copy of the video?

MR. BRUEGGEN: No, not at this time.

COURT REPORTER: All right.

MR. BRUEGGEN: If you have the exhibits, you could have the exhibits attached to the PDF?

COURT REPORTER: Yeah, of course. No problem. Megan, how would you like your copy?

MS. MCGRATH: I don't need one right now. Thank you.

COURT REPORTER: Okay. No video either?

MS. MCGRATH: No, thanks.

COURT REPORTER: All right. Eileen, how would you like your copy?

MS. ROSEN: Need a copy of our video.

COURT REPORTER: All right, sounds good. I'm going to get us off the record. I have one spelling.

(DEPOSITION CONCLUDED AT 6:09 P.M.)

          CERTIFICATE OF REPORTER

            STATE OF ILLINOIS


I do hereby certify that the witness in the foregoing

transcript was taken on the date, and at the time and

place set out on the Stipulation page hereof, by me

after first being duly sworn to testify the truth, the

whole truth, and nothing but the truth; and that the

said matter was recorded by me and then reduced to

typewritten form under my direction, and constitutes a

true record of the transcript as taken, all to the best

of my skill and ability. I certify that I am not a

relative or employee of either counsel and that I am in

no way interested financially, directly or indirectly,

in this action.







SYDNEY LITTLE

COURT REPORTER/NOTARY

MY COMMISSION EXPIRES: 03/18/2026

SUBMITTED ON:  05/27/2022

Exhibits

**EXHIBIT 1_ RICCIO** 190:12,13 191:20,24 235:11 242:11

**EXHIBIT 2_ RICCIO** 243:4, 9

**EXHIBIT 3_ RICCIO** 246:12,15

**EXHIBIT 4_ RICCIO** 251:4, 7,10 267:18,21

**EXHIBIT 5_ RICCIO** 267:17,18 268:19,21 269:4

**EXHIBIT 6_ RICCIO** 272:23,25

**EXHIBIT 7_ RICCIO** 273:11,13

**EXHIBIT 8_ RICCIO** 316:15,20

(

**(8)** 218:12

-

**--I** 306:2

**--it** 211:22

0

**0030** 235:19

**054183** 251:21

1

**1** 190:12,13 191:20,24 235:11 242:11

**10** 191:11 254:22

**100** 14:9,11

**101** 7:7

**10:02** 7:8

**10th** 254:1

**11** 253:21 334:2

**110** 324:22

**11:00** 51:5

**11:22** 82:22

**11:33** 83:2

**11th** 254:25 255:3

**12** 278:15,18,23 279:1,2

**12:30** 235:18

**13** 191:11

**13th** 316:18

**14** 251:13 284:1,2,6,10,19 285:8,23 286:11 288:23 294:2 320:7

**14,000** 292:16 297:1

**1442** 316:15

**14th** 48:17 252:11 255:10, 13

**15** 116:17,25

**1502** 317:6,22

**1532** 333:21 340:24

**1551** 324:23

**1556** 228:17

**1564** 327:9

**1566** 329:25

**1567** 316:15 332:8,9

**15th** 88:1

**16** 317:23

**162909** 316:17 330:4

**16th** 18:15,19 19:3,7,21 20:21 22:13,18 23:3 56:13 99:24

**17th** 7:8 8:11 18:17 19:12,16, 25 23:6 48:17 277:18

**18** 56:14 83:2 162:20 235:8 288:16 315:9 340:8

**18th** 8:11

**19** 88:14 101:25 323:25 324:1 333:25

**1980s** 340:17

**1986** 43:6 44:10 296:5

**1987** 315:19 320:17

**1988** 44:17 316:18 320:17 327:25 328:23 333:25 334:2

**1989** 330:2

**1990** 43:7 44:10,18 49:1, 3,11 50:12 102:1

**1990s** 298:3

**1991** 50:12 101:25 102:3

**1993** 192:3 202:8 215:1,14 222:10 243:6 249:12 250:5 251:13 252:12 254:22

**1994** 43:8 50:12 56:9 102:1 296:6

**1995** 56:17

**1998** 35:12,14, 25 40:6 43:10 57:7 87:19 301:14 305:15, 19

**1:07** 162:15

**1:19-CV-6508** 7:14

**1:25** 240:6 241:11 249:16

**1:40-ish** 162:10

**1:57** 162:20

2

**2** 217:25 243:4, 9 248:16 250:13 253:16, 25 318:14,15 324:10

**20** 33:22 34:4 116:17 192:5 330:2

**20-plus** 116:25

**2000** 215:15

**2000s** 290:18, 25 297:11 298:10

**2005** 88:2,15, 24

**2006** 88:3,24

**2008** 43:11 88:24 99:21 143:1,3 167:21

**2009** 100:11,21 101:22 152:20

**2010** 100:8,11, 21 102:5 152:20 294:1

**2010s** 289:6 294:9 297:5

**2011** 100:4

**2013** 43:12 100:17,21 101:22 102:6 105:4 117:9 167:22

**2014** 286:23

**2015** 43:13 117:9 288:21 291:10 292:24

**2016** 291:1

**2017** 43:14 118:15 286:6

**2018** 286:6

**2020** 43:18,21 44:5 119:9 226:16

**2022** 7:8 83:2 162:20 235:8 288:16 315:9 340:8

**21** 44:2 195:16 325:3

**21:00** 249:13

**22** 202:8 218:2 250:5

**22-year-old** 334:1

**23** 215:1,14 226:15 243:6 246:14 249:12 321:12

**2330** 327:25 328:23

**24** 192:3 235:18 240:6 278:23

**25** 33:22 262:11 277:2

**25th** 48:16 87:25 246:8

**26** 322:10

3

**3** 88:2,4,16,20, 22 89:4 91:21

215:12 235:10, 12 246:12,15 247:16 250:4,8, 17 253:20

**30** 28:21,25 58:6,17 59:5,10 66:10 67:21 68:1,23 69:16 80:19,20 103:11 207:15 210:2,10 211:20,22 212:9,18 214:6 290:13 294:17 297:23 322:2, 22 323:6,13,21 324:6,16,17,20 325:13 326:10, 23 335:6 338:10 342:22 343:18,22

**30(b)(6)** 314:11,12

**30-second** 322:1 323:5,13, 22 324:6 326:9 335:5 338:10

**30-year** 213:7

**35** 277:2 282:1

**35-year** 10:3

**37** 282:1

**3:00** 51:20

**3:22** 235:3

**3:31** 235:8

**4**

**4** 100:1,5,6,10 101:17 105:7 106:10 193:10 234:21 235:15 251:4,7,10 267:18,21 327:25 328:22

**40202** 7:7

**48** 156:11,12,17

**48-hour** 157:8

**4:00** 52:14

**4:30** 51:21

**4:41** 288:11

**4:49** 288:16

**4th** 94:12

**5**

**5** 29:7,12 34:10, 11,12,14,20,22 35:11,15,25 40:5,8 48:18 49:7,8,24 50:2 56:15,21 91:15 126:20 142:8 215:15 231:10, 17,24 267:17, 18 268:19,21 269:4 273:11, 18,25 299:21 300:6,13,18,19, 21 301:19,22 302:1

**50** 297:24

**59** 268:22 269:6,7,22,23 270:7

**5953** 328:1,24

**5:00** 314:20

**5:22** 315:4

**5:29** 315:9

**5:58** 340:3

**6**

**6** 272:23,25 273:18

**6'2"** 221:3,4

**60** 270:11 272:12

**61** 270:13,14 317:5

**62** 270:16,17

**63** 270:19,20

**64** 270:22,23

**65** 270:25 271:1

**66** 271:3,4

**67** 271:6,7

**68** 251:9 271:9, 10

**69** 271:12,13

**6:00** 252:11

**6:04** 340:8

**6:09** 345:25

**7**

**7** 273:5,11,13

**70** 269:6 271:15,16

**71** 271:18,19

**72** 251:9 271:21,22

**73** 271:24,25

**730** 7:6

**74** 272:2,3

**75** 272:5,6

**76** 272:8,16

**77** 268:22 269:7 272:12,13

**7:00** 51:6,17,19

**7th** 228:15

**8**

**8** 316:15,20 327:20

**80** 44:17

**80s** 315:20

**86** 296:13

**88** 315:19

**89** 315:19

**8:00** 51:11 215:15

**8:30** 51:21

**9**

**9** 322:16

**90** 191:22,25 192:17

**90s** 147:9

**91** 50:23 194:13 198:5 214:16, 22 333:20

**911** 341:18 342:7

**92** 215:12 217:21 235:13

**93** 191:25 193:11 195:16 218:3 226:15 228:16 235:17, 18 240:6 246:14 253:21 254:25

**94** 49:11 50:23 102:3 246:13 296:13

**95** 56:18 57:7 301:13

**96** 56:17,18 57:7 246:13 301:14

**97** 242:25 243:4

**98** 43:11 56:19 243:1,4

**99** 47:5 59:11

**9:00** 249:12

**A**

**a.m.** 7:8 51:6, 11,17,19 83:2 235:18 240:6 241:11

**ABC** 156:3 182:17

**ability** 14:23 94:5 96:19,20 97:9,13,14 137:11 173:1 176:22 177:12 179:2,7,19 222:7,9 295:12 331:9

**abreast** 283:15

**absence** 224:11

**absent** 117:7 237:21

**absolute** 75:22 115:1 135:7

**absolutely** 9:17,20 336:1

**abundance** 95:4

**abundant** 95:3

**abuse** 106:14 107:15,16,25 108:2,3,19 109:8 166:17 167:23 308:7, 18 309:5

**abused** 307:14,22 313:11

**abuses** 308:22

**abusing** 146:13

**academy** 91:6 320:3

**acceptable** 9:13

**accepting** 108:11

**access** 172:8 180:21 201:16 223:7 225:21

**accident** 10:20,25

**accommodate** 92:13

**account** 333:1

**accountability** 280:16 282:8, 10

**accountable** 284:1

**accuracy** 133:11

**accurate** 57:17 69:22 70:1,3,23 71:3,6 75:20 85:7 115:20 116:4,8,12 122:19 127:11 138:21 146:20 158:9 196:17 206:8 236:22 242:23 271:11 287:14 288:3 292:9 296:18 319:5

**accurately** 72:3,19 79:10

**accused** 135:25 136:4 170:25 171:10, 24 328:2,24 330:4,6 333:6

**acknowledge** 280:2 307:19, 25 308:3,17

**acknowledged** 291:11 313:11

**acknowledgement** 308:5,10

**acquittal** 159:15

**act** 246:6

**action** 169:14 274:18 275:6, 22 343:22 344:1

**actions** 61:12 143:16,18 262:25

**activity** 45:14 48:19 58:12,13 59:2 344:3

**actual** 59:16 73:17

**acute** 327:14

**ad** 245:14

**add** 197:16

**addition** 332:16

**additional** 23:11 183:4 208:14 242:7, 21 244:23 245:1,3 287:25 332:15

**address** 72:22 152:25 183:8

**addressed** 282:17

**addresses** 246:4

**adequate** 89:10 335:12

**administrative** 57:20 58:1,5 61:20 89:8,12 90:7,13,16 95:9

**admitted** 228:7,10 253:7 332:23

**advance** 175:25

**advanced** 174:22

**advent** 286:17 289:2

**adversely** 153:20

**affairs** 165:14 169:5 170:1,6, 16 172:21,22 281:23 286:7 287:5

**affect** 318:1 332:13 337:10

**affected** 153:20 194:25

**affecting** 338:15

**affiance** 173:21

**affiliation** 86:22

**affiliations** 54:13

**affirm** 8:22

**afternoon** 52:13

**afternoons** 52:15,23,24 97:17,24 98:8, 14 163:7 164:3

**agencies** 165:16

**agency** 169:3

**agent** 307:4

**agree** 74:18 75:21 83:9,12, 17,23 86:8,12 143:3,5 211:2 214:7,14 228:20,25 229:9 236:6,25 249:1 252:5,6 256:9 260:2 262:14 263:20 264:2 277:25 291:23,25 292:23 293:9 326:12,16 328:13 336:18, 25

**agreed** 332:10

**agreement** 42:6

**ahea** 234:5

**ahead** 26:25 28:14 29:21 31:8 37:24 40:17 46:10 47:10 55:8 57:10 60:13,21 61:7,19 62:3 65:20,25 67:15 68:15,22 69:4,9 71:1,8 72:5 73:4,25 74:11, 20 76:2 78:2, 13,14 79:13,25 80:18 82:4 83:22 85:6 86:18 89:7 92:1 98:17 106:8 107:5,6 109:10, 19 113:6 119:24 121:4 123:2 126:15 133:25 134:7 138:20 147:24 150:10 157:10 159:6,22 161:24 163:13, 22 164:10 167:14 168:1 170:10 171:12 179:5 180:8 181:1,9 185:4 189:23 193:23 194:3 205:6 219:1 229:22 231:20 232:19 237:7,14 239:24 242:17 257:14 258:20 262:19 276:8 277:13 285:14, 15 286:3 289:14 290:3, 20 296:16 297:21 309:11 314:16 321:23 343:23

**albums** 224:21,24

**alerted** 275:5

**alibi** 228:16

**allegation** 328:9

**allegations** 106:14,20 107:15,16 108:2,3 109:8 139:25 140:5,7, 12,16,20 141:3, 12,21 142:18 143:7,11,13 144:14 145:10, 18 149:7,17 152:6,14 153:1, 14 163:17 164:16,19,23, 25 165:5,8,17, 20 166:2,6 167:23 168:5,8, 23 169:2,7,13, 22,23 215:6 300:9 307:12 309:4 310:5,11, 16,21 311:1,10, 14,16,25 312:6, 9,15 313:22 314:5 333:3

**alleged** 165:22

**allowed** 301:8 332:12

**alternate** 86:9, 15

**Amaday** 47:4

**ambiguity** 254:21

**amendment** 136:9,13 139:10,11,15, 19

**Amoco** 318:2,6 328:1,23

**amount** 95:10, 11 180:5

**amounts** 332:22 333:10

**Anand** 7:18 25:13 82:14 85:12 107:24 141:24 159:5 162:7 190:15 191:5 206:15 269:18 298:18 327:5 344:24

**and-answer** 14:22

**Andrews** 101:11

**Andros** 315:22 318:1,6,9,23 319:8,23 320:3, 7,14,25 322:18 323:1 324:10 325:3 326:14, 19 328:25 330:20 331:2, 23 332:18,21 334:8 337:3,6

338:9,10,17,22 339:2 341:7 342:21,25

**Andros'** 320:8 321:8

**Andros's** 328:2

**anecdotally** 46:12

**animal** 282:20

**annihilated** 156:2,10

**anonymity** 182:9

**anonymous** 174:10 175:13, 19,20 182:3,4, 7,20

**answering** 15:15 151:21

**answers** 14:25 103:18

**Anthony** 7:10 8:9,16 9:8 82:25 162:18 235:6 288:14 315:7 317:9 327:16 340:6

**anticipated** 30:7 96:22 247:19 274:20

**anymore** 114:3 301:9

**anytime** 75:14 153:18 154:14 287:19

**apologies** 71:24 85:17

**apologize** 28:5 322:17

**apologized** 323:1

**apparently** 250:16

**appealed** 326:25 327:2

**appearance** 7:15 98:23 99:5,15,18 341:13

**appearances** 98:19

**appeared** 330:4

**appearing** 7:19,22 8:2,4

**appears** 252:4 330:14 333:25

**applicable** 110:5

**application** 93:25 284:10, 19

**applied** 60:9 93:3,5 104:16 110:12 111:3, 11,12 112:2,6, 13,14,19 114:6, 21 321:8

**apply** 93:7,24 96:25 108:25 111:16 112:9 113:13 114:12, 13 321:8

**appointed** 119:4

**approval** 110:3

**approve** 96:8

**approved** 90:15 99:2 332:14

**approving** 208:15

**approximately** 11:4 12:8 37:12 50:12 51:17 102:5 278:15 285:25 286:21 288:22 289:8 327:25 328:23

**April** 330:2

**arbitration** 316:9

**area** 29:7,12 34:9,10,11,12, 14,20,22 35:11, 15,25 40:5,8 48:18 49:7,8,24 50:2 56:15,21 57:18 58:5 88:2,4,13,16, 20,22 89:4 91:15,21 100:1, 5,10 101:3,17 105:7 106:10 109:13 111:20 112:17 114:23 115:24 126:20 138:4,5,9 142:7 158:20 173:24 182:16 184:7, 12 185:2 215:15 226:17 228:11 230:24 231:10,17,24 233:1 240:7 273:25 299:21, 24 300:6,13,18, 19,21 301:19, 22 302:1

**areas** 45:12 100:2,3,20 102:5,17 111:5, 13,16,17 112:6, 15 113:5,14 184:19 225:3 308:8 314:6

**Argumentative** 326:3

**armed** 254:23 309:23

**Arnell** 231:24 232:2,8

**arrangements** 314:22

**array** 78:23,25 206:18,21,23 207:4,11,14,20, 23 208:4 209:5 210:8,19 211:1 212:14,18,24 214:10 219:14, 17,25 220:21 222:10,12 223:3,24 225:10,17,24 226:9 235:20, 25 236:3,9,20, 24 237:5,11,19, 20,25 238:4,6, 7,8,13,15,18, 21,24

**arrays** 78:21 207:2 209:19 212:8 224:17

**arrest** 20:25 21:16 58:8 120:21 123:11, 23 125:7,9,11, 14,24 126:1,5, 11 133:4 194:5, 25 207:12 215:1 225:19 232:22 242:14 318:1,6,19 324:12 325:3 332:13 333:15 335:13,14 337:10 338:8, 11,15 341:14

**arrested** 126:12 222:15 254:23 300:22 306:25 324:11

**arresting** 45:13 84:17 194:15

**arrests** 99:17

**arrived** 230:24

**arson** 118:4

**arts** 223:18,25

**ASA** 195:2,5 230:24 231:6,9, 14,16,17,22 232:3 233:3 235:19,24 236:2,20 237:16,18,19 238:11 248:22 249:1

**ASAS** 236:8,12

**Asians** 224:9

**aspects** 130:21 231:17

**assaults** 309:23

**asserted** 136:9,12 139:10,11,15

**asserting** 139:19

**assess** 149:16, 24 151:12 152:24 188:7

**assessment** 62:15,20

**assets** 42:4

**assign** 57:15 169:9 170:19, 20,23 171:1,17

**assigned** 48:11 54:1 58:18 62:9 88:11,12 120:16,18,20, 23 122:16 170:8 184:23 185:2,9

**assist** 46:8,19 54:7,18 55:5 67:5 120:20 126:22 127:19 176:25 232:22

**assistant** 230:10

**assisted** 215:22,23 216:20 217:8

**assisting** 126:24 129:25 175:16 196:11

**associations** 37:15

**assume** 16:4 17:11 30:10 128:21 180:10 291:10 307:15

**assuming** 231:13

**assumption**

204:2 205:8

**ATF** 307:4

**attached** 345:12

**attacked** 326:19

**attempt** 230:4

**attend** 35:21 46:5 89:11 106:3

**attending** 7:16 106:1

**attention** 148:2 157:4 169:17,20 274:24 275:3 277:15 278:4 279:14 303:19 308:23

**attorney** 97:4 98:21 202:2 208:1,4,6 230:11 237:21, 24 238:9

**attorney's** 207:17 267:3

**attorney-client** 25:12 26:13 136:17

**attorneys** 18:7,12,20,21 19:4,14,16 29:23 33:2 97:10 207:7,13 208:1

**audit** 148:23 149:6,23 151:12

**August** 43:6, 18,21 44:5 119:9 327:25 328:22 333:25 334:1

**Austin** 145:14, 17,25 146:11 166:16 167:9

**author** 193:24, 25 243:16

**authored** 135:11 196:15 252:4

**authority** 109:16 171:18

**auto** 49:4,12 91:13,14 112:8

**Avenues** 318:3

**avoid** 55:19 211:10

**aware** 12:21 15:21 28:6,15 39:13,16 62:13, 23 102:18 105:13,16 106:13 111:3, 10,11 113:3 114:5,10,11,15 133:19 135:24 136:3,8,11,12, 23 139:9,11,14, 17 144:7,12 145:12,16,21 146:4 149:5,11, 13,14,21,22,23 150:4,5,6 153:8,10 163:15,23 164:12 169:11, 22,24 176:19, 20 177:17 181:23 198:14, 17 200:16 224:15 230:16, 20 261:14 264:25 265:6 273:22 275:21 291:1,7,10,16 304:12,15,22 305:8 306:4,7,8 307:6,10,11 308:5,10,12,25 311:14,15 313:7,8,17,19 314:3,4

**B**

**back** 13:1 29:7, 14 40:23 49:23 52:2 56:15 59:6 70:13 80:19 82:24 87:17 90:21 99:25 102:24 103:6 125:6,8 126:17, 20 131:2 150:18 155:4 156:1 157:3 158:19 159:17 160:24 161:14 162:8,17 164:21 167:19 173:1 183:10 201:23 202:4 207:15 210:4 214:15 216:22 217:25 222:10 223:23 232:22 235:5 250:9 272:15 285:11 288:13 294:25 315:6 316:7 340:5

**background** 40:25 87:17

**backup** 126:8 194:23,24 225:19

**bad** 38:11,14, 18 110:21 274:8

**ball** 20:2 33:21 278:25

**ballpark** 10:1

**ballparking** 44:18

**bank** 41:12,15

**banned** 300:13,21 301:19 302:1, 17

**bar** 277:19,20

**barring** 15:21 212:22

**baseball** 221:19

**based** 11:15 12:10,13 31:17, 19 83:6,7 99:13 102:7 120:14 121:24 122:13 132:9,19,20,22 133:8,16 134:6 135:22 136:25 138:22 148:24 149:7,17 150:8 151:10,21 153:14 154:2,9, 10 164:1 165:8 167:15 189:20 204:2 219:7 231:16 236:25 244:10 245:22 246:3 248:6,25 255:2 262:13, 20,23 264:22 265:7,17 275:16 277:9 296:5,11 307:4 309:4,18,19,25 310:16 311:9, 18,25 312:9,15, 24 313:3 331:22

**basic** 72:21 79:20 154:6 339:14

**basically** 14:21 25:20 45:11 49:19 53:1 58:5 59:22 60:17 61:10 75:22 89:25 96:4 127:2 156:25 159:15 224:20 245:20 250:22 301:17 319:15

**basics** 131:3

**basis** 84:16,19, 23 134:4 136:22

**Bates** 251:8 273:16

**bathroom** 288:8

**batteries** 335:8

**Bears** 41:15

**beat** 55:21 154:22,23 159:15 234:15 321:14,19 322:5 331:24

**beaten** 326:14

**beating** 339:16

**beats** 160:7

**Beck** 119:5

**before'** 325:6

**began** 283:24 318:15

**begin** 9:2 285:24 318:23

**beginning** 234:17,19 317:8 341:1

**begins** 195:16 218:2 228:2 232:11

**behalf** 7:21,24 106:3 243:22 247:9

**behavior** 148:1,13 284:23

**belabor** 245:12

**belief** 276:6 340:11,13

**believed** 203:17,23 275:15,16 276:13

**believes** 98:21

**belt** 95:17,19

**benefit** 181:6

**benefits** 180:22

**bet** 168:4

**bias** 172:12

**Biebel** 8:1 36:10,11,12,20 39:3,6,13,18,21 50:19

**big** 224:6

229:5,7 282:9 286:16 288:19, 25 289:9 293:23 299:16

**Bill** 273:24,25 274:4

**binding** 111:19

**birthday** 94:14

**bit** 20:1 42:4 91:17 95:17,19, 25 220:17 254:21 275:9 284:20 317:19

**Black** 224:9

**blaming** 259:19

**blank** 271:10

**blanket** 75:18 76:5,8 77:2

**bleeding** 334:21 335:1

**Bob** 36:10,11, 12 37:3,20 50:19

**body** 165:15 166:8 170:7 284:21,25 285:11 286:17, 24 287:16,21, 23 288:1 289:2 321:14,20 322:6 329:1 331:24 338:22 339:3

**body-worn** 287:8

**bomb** 118:4

**bone** 333:7

**book** 78:19

**books** 77:20, 24 78:5,6,11,18 81:6,8,13,17, 22,24 82:6 224:18,19,25 225:2,4

**bosses** 38:20 95:20,21

**bottom** 90:11 192:2,23 193:7 214:21 243:11, 14 246:25 252:8 253:16, 25 254:10 336:5

**Boudreau** 109:17

**bounced** 91:17

**box** 224:6 252:19

**Boys** 228:11

**Brady** 67:17,24 161:12

**break** 16:7,9 82:15 150:13, 17,23,24 151:2 159:7 162:4 164:16 174:8 234:8,22,23 275:8 281:11 288:7 314:24 339:23 340:1

**breaking** 281:10,14 285:17

**breathing** 334:22 335:2

**bridge** 334:6

**briefed** 89:24

**briefly** 164:21

**bring** 154:17 158:18 208:21 277:14 287:13

**bringing** 159:17

**broad** 41:14 43:1 161:4 173:17 261:10

**broader** 90:3 101:3 110:5 111:21,22 112:9 158:21

**broadly** 84:12 140:15

**broke** 173:25 175:3 181:4 280:13

**broken** 333:7 334:11,14,18 335:17,19

**brought** 128:7 148:2 155:4 157:3 160:24 231:24 265:19 274:24 275:3 278:4 300:17 308:23 334:20

**Brown** 119:6

**Brueggen** 7:24 19:1,8,17 25:11,24 26:1, 4,7,9,24 28:8, 13 29:21 31:8 37:24 40:16 42:8 46:10 47:10 49:20 55:7 57:9 60:10,13,21 61:6,18 62:2 63:13,21 64:14, 20 65:1,10,19, 25 66:18 67:15, 19 68:8,14,21 69:3,8,15 70:15 71:1,7,20 72:4 73:3,25 74:10, 19 75:4,10 76:1,19,23 77:18,22 78:9 79:12,24 80:7, 17 81:16 82:3, 14,18 83:22 84:4,21 85:5,12 86:18,25 87:9, 15 89:6 91:25 92:9 93:8 94:19 95:12 98:16 102:9 103:9,25 104:9,17,19 105:1 107:24 109:10,18 110:1,14 111:6, 14 113:6 114:9, 14,24 115:8 118:9,21 119:24 121:3, 18 122:9 123:2, 7,12,16,20,24 124:4,10,16 126:14 128:14, 20 133:24 134:16,25 135:18 136:16, 21 137:5,18 138:20 139:2 140:10 141:23 142:12 146:18 147:5 148:8 149:1,9,19 150:2,11,20,22 151:5,16 152:8 153:2 155:24 158:17 159:5,7, 21 161:1,17,25 162:6,10 163:13,20,22 164:10 165:1, 12 166:18 167:5,13 168:1, 12 169:1 170:9 171:11 172:5 177:1,15 178:21 179:4 180:8,17 181:1, 8,15 182:10 183:1,21 184:5 185:3 187:18, 23 189:22 190:15 191:5 193:22 194:2 199:1 200:9 203:25 205:5, 25 206:14,17 209:20 210:18 212:3 213:3,9, 16,23 217:1 218:25 220:23 226:2,7,12 227:1 229:6,21 230:13 231:11, 19 232:19 234:4 236:5 237:6,13 239:12,23 242:17 254:5 255:18 257:11, 14 258:11,19 259:8 260:20 261:8 262:5,18 263:9,25 264:6 265:11,20 266:6,9,16 269:5,8,18 276:8 277:13 286:2 288:7 289:13 290:2, 19 293:4 294:3 296:7,15 303:14 306:6 307:24 308:9, 20 309:21 310:6,12,18,24 311:11,19 312:2,12,18,25 313:5,13,24 314:8 316:25 317:3 321:22 323:18 325:20 326:3,20 327:4, 7 332:6 338:23 339:22 340:20 341:8 342:12 343:6,9 344:11, 19,21 345:5,9, 11

**BRUEGGER** 165:23

**bubble** 138:13

**budget** 95:18

**build** 221:24

**building** 283:17 285:1

**bulk** 279:19

**bumped** 52:6

**bunch** 103:15 108:18,19

**bureau** 110:6, 20 117:12,14, 20,24 118:8 120:1 151:20

**Burge** 310:5, 11,17,22 311:1, 10,15,16 312:1, 6,16,21,24 313:4,11,22,23 314:6

**burglary** 61:14 224:19

**burn** 55:17

**burning** 55:20

**button** 223:21

**byproduct** 336:13

C

**C-SHAPED** 341:3

**C-U-L-L-I-N-G** 266:8

**cadence** 128:2

**California** 318:2 328:2,24

**call** 9:18 33:9 44:23 54:22 97:3 110:17 111:18 114:1 138:2 154:7 156:4 157:6 158:20 165:7 175:2,4 182:16 184:12 185:7,9, 10,17 186:10 187:4 189:3,5 199:16 208:12 220:16 280:7, 20 288:21 341:18 342:7

**called** 29:9 45:17 50:3 57:24 61:11 110:18 113:18 185:6 197:24 208:9,25 230:11 332:15

**caller** 175:13 184:19 190:3,6

**calling** 185:1 197:18 216:20 266:7 282:23

**calls** 46:5 136:17 173:23 184:20 187:7 188:6 213:4 214:12 230:6 259:23 260:13, 21,25 261:23 265:4 306:14, 21 313:25

**camera** 201:17,20 286:25 287:10, 12,23

**cameras** 284:21,25 285:11 286:17, 22,25 287:1,2, 4,7,8,17,21 288:1 289:2,3,6 309:7,14,17 310:1

**capacities** 110:10 264:25 276:18

**capacity** 10:14 34:8,23 56:20 72:18 73:6 103:6 125:4 130:20 149:13 277:3

**Capitelli** 50:18

**caps** 221:19

**captain** 93:13, 21,25 94:2

**captain's** 93:16,23

**captains** 93:14

**capture** 65:23 261:12 268:14

**captured** 112:23 286:24

**captures** 287:10

**capturing** 284:22

**car** 92:15 125:12,20 175:5 199:7 232:13,18,24 284:7 318:15 319:1,2 320:8 321:14 324:3 328:2,25 331:25 339:3

**care** 61:20 344:17,21,22

**career** 9:14 10:3 11:20 17:11 37:15 42:14 63:2 101:2 274:13 277:24 280:6, 15,24 290:10 293:11,22 294:13,14,21, 25 296:3,11,13 304:25

**carefully** 158:2

**Carol** 328:1

**cars** 45:16

**carve-out** 112:16,19 113:11

**carve-outs** 113:4

**carved** 49:22, 25

**case** 7:14 11:15 12:22 20:6,8,9,24 24:9 25:19 27:8,11,24 28:19 31:7 42:6 53:19,20,23 56:6 57:18 58:6,8,11,17 59:4,9,12,18,25 60:23 65:17 67:2,14 70:17 76:7 82:2,6 89:25 90:1,2,3 94:21 98:18,20, 22,25 99:6,14 107:14,17,25 108:1,4 113:8 116:23 121:17 122:5,7,11,15, 20 123:5,6 124:12,15,22 130:21 131:3, 20,24 134:5,11 136:10 139:20 143:25 154:15, 23 155:5,7 159:15 160:1,7 169:6 173:8,11 176:6 182:17 183:3 184:15, 21,23 185:2,7,9 196:9 197:5 198:23 202:13, 21 208:22 209:8,23 216:19 217:7 221:5 226:22 230:12,17 232:10 233:11 242:16,19 244:15 245:6 254:3 257:17 258:2 260:12 264:19 267:16, 20,23,24 268:20 290:6 291:7 307:12 314:13 321:4 331:18,20 332:11 337:8 343:19

**cases** 12:17 13:18,19 38:23 39:7 49:9 57:5, 15,23,24 58:12, 16 59:11 60:23 61:4,11,14,17, 25 62:9,10 70:10 75:19 78:6,17 81:14 85:22,23,24 90:4,5,14 91:24 92:8 94:7 98:13 99:3,6,8,12,17 106:24 107:1,3 108:8 136:1,5 139:20 145:1 146:12 150:1 155:22 156:20 157:1 170:17 174:23 176:11 178:3 208:18 236:11,16,18, 19 279:6 287:14 340:18

**catch** 37:17 71:21

**catchall** 118:23

**caused** 337:5 341:9,11

**caveat** 29:22 34:17 114:16, 25 115:21

**cavity** 341:5

**CB** 246:4

**cell** 183:7 185:13

**Central** 100:5, 6 101:17

**Cer** 275:24

**certainties** 13:22

**certainty** 31:10 38:8 75:22 78:12,16 113:10 114:18 115:2,11,22 135:7 275:1,20 321:3

**chain** 93:4,7 173:1

**chance** 40:25 162:22 189:4 192:10 232:5 233:6 253:17 256:17

**change** 83:11 103:22 110:22, 24 116:6,10 122:17 221:15, 16,17 250:17 281:3,5 283:5,6 288:21 293:23, 24

**changed** 38:20,21 95:23 104:7 212:5,7 221:18 281:8 283:8,10

**changing** 173:5 288:25 289:10 297:17

**Channel** 316:16

**channels** 140:9

**characteristic** 220:17

**charge** 101:4,5 117:6 118:23 156:13 170:22

**charged** 85:11, 20 86:5,17,22 87:6 99:17

**charges** 84:24 85:4 99:1,7 123:6,15 124:3, 9 208:6,15 265:19

**Charlie** 119:5

**check** 45:16

**check-in** 60:25

**checks** 45:16

**Chicago** 7:20, 22,23 8:2,5 9:14 10:14,18 17:4,20 33:24 36:17,20 38:1 41:9,16 42:18 44:4 106:19 109:7 139:16 144:13 146:15 147:20 149:8, 15,24 151:11 174:21 179:25 192:1 213:7 243:5 246:13 264:23 274:11, 21 275:11,17 276:18,20 280:1,4 286:20 291:4 292:10 293:1 304:16, 25 305:4,22,24 306:19 307:19, 20,22 308:6 309:5,20 310:9, 14 311:7,25 314:7 315:13 333:17 337:25 338:3 339:15

**chicken** 273:3

**chief** 43:13,14 100:17,22 101:10,12,13 105:5 106:18 109:23 110:15 117:3,4,5,7,10, 17 119:25 143:8 152:4,12, 23 156:5 308:14 312:17

**chit-chat** 37:18 38:11 303:24

**chit-chatting** 38:19

**Chmieleski** 241:1,8,14

**choices** 92:25

**choose** 265:25

**choosing** 81:14

**circulate** 190:21,23

**circumstance** 53:21 71:15 72:6 76:20 182:11

**circumstances** 78:4 121:24 168:23 170:4 183:6 207:3 208:17 209:23 210:7 212:12, 23 237:9 238:3

**cited** 332:11

**citizen** 17:24 173:23 174:2 275:3 277:12, 23 278:4,7 279:20

**citizens** 277:14 279:22

**City** 7:22 116:20 146:15 291:3,11

**City's** 107:2

**civil** 143:24 144:3,5,6 153:19 154:2, 23 156:11,22

**civilian** 170:6 275:18 276:7, 14,22 277:12 278:20 279:9, 11 292:16

**civilians** 101:6 274:22 278:17

**claim** 147:9 188:2

**claiming** 335:15 342:25 343:2

**claims** 116:23, 24

**clarification** 28:4 40:18 112:12 132:18 188:5

**clarify** 8:10 22:25 25:13,16 26:11 27:6 42:22 64:18 108:5 227:1,6 299:19

**cleaner** 56:6

**cleanly** 247:20

**clear** 40:22 53:8 58:15 61:9 64:6 67:2 190:20 210:21 221:10 239:14 251:24 269:17, 18 282:20 339:21 342:2

**cleared** 21:20 23:24 214:15 242:10,20

**clearer** 260:9

**click** 223:21

**climate** 281:7

**clock** 113:24

**clones** 219:19

**close** 58:9 126:7,10 272:22 273:10

**closed** 21:20 23:24 62:5 98:13,22 99:1, 4,7,8 100:5 190:20 214:15 242:10,20 343:25

**closely** 179:25 220:8

**closing** 61:17 62:1,10,11 91:24 92:8 94:7 98:18,20,25

**Club** 228:11

**clue** 263:17 325:14

**Cobra** 253:7 255:5 263:14

**Cobras** 254:4, 13 255:16,22 256:3 257:7,20, 25 259:6,19 262:15 263:6 264:3,18

**code** 280:2,7, 10,20 285:3 291:3,12,23 292:11

**coin** 217:12

**cold** 122:5

**colleague** 276:20

**colleagues** 145:6 177:20 276:13 306:12

**collect** 339:23

**collected** 157:24 223:16

**collecting** 155:7

**collection** 31:22 158:1 222:11 224:15

**Color** 218:12

**comfortable** 77:1

**command** 109:16 147:4 152:6 179:8 316:16

**commander** 43:12 89:1 92:21,22 99:20, 22 100:6,9,16, 20,25 101:9,16 102:4,25 103:21 104:14 105:6 106:18 109:15,23 110:16 112:22 113:17 114:19 116:16,17 143:8 152:4,11, 17,19,23 153:7, 13 158:5 167:20 168:11, 18,22 169:7,21 170:19 172:20 300:18 301:9 303:1,7,11 304:3,12,15 308:14 312:10

**commander-** 115:13,24

**commander-level** 114:6,11, 20 115:3,5,17, 23 116:6,9

**commanders** 92:20 111:16 158:12 159:18 313:9

**comment** 292:7

**comments** 282:2 292:24

**commit** 274:12

**committed** 134:24 135:4 146:13 256:3 275:11,17 276:6,14 278:9

**committing** 274:22 276:21

**common** 94:22 110:23 142:7 206:11 223:11

**commonality** 37:21,23

**communicated** 142:10 230:10

**communication** 34:15

**communications** 26:14 35:5 273:20

**communities** 282:4

**company** 41:8

**comparable** 338:3

**compared** 339:14

**comparing** 221:11

**compensate** 220:25

**compensation** 175:9

**complaint** 24:9 32:21,23 33:1,3 165:6,7 166:3 274:25 275:22 277:6, 21 278:8,16 279:2,3,12 307:4,15,17 316:17 329:14 330:2,3 331:21 332:4 333:11

**complaints** 166:4 279:19, 22

**complete** 61:6 71:3 132:15 303:20

**completed** 169:18

**completely** 70:3 93:17 303:21

**completing** 217:8

**complexion** 221:23

**component** 90:24 96:17

**compound** 36:6 310:18 311:11

**computer** 85:13 223:15, 22

**concept** 67:24 148:22

**concepts** 45:1

**concern** 212:1 213:1

**concerned** 173:4

**concerns** 27:13 172:12 210:14 211:16, 21 213:19,24 302:10 303:2,6 305:22

**concerts** 41:16

**conclude** 290:12 339:5

**concluded** 146:12 326:13 332:13 345:25

**concluding** 326:17

**conclusion** 146:14 261:24 308:17 328:6 329:2 340:14, 15

**conclusions** 145:17,25

**conclusively** 109:21

**concur** 120:11

**conditions** 16:18

**conduct** 17:7 136:10 139:16 148:4,5,24 158:14 160:16 169:9 171:4 172:11 207:3 209:18,19 237:25 238:4,5, 6 306:10 312:23 313:2

**conducted** 82:25 135:8 145:13 148:16 149:6 151:12 152:6 153:11 154:2 162:18 165:13,17 170:5 171:7 202:25 203:15 208:24 216:16, 18,19,24 226:16,18 227:11,24 231:4 235:6 236:14,21 237:11 238:13, 18 240:7 241:1 242:16 245:15 249:16 262:21 288:14 306:25 310:22 315:7 338:1 339:12 340:6,11

**conducting** 64:23 102:7 114:7 115:7 120:21 126:22 129:25 202:3 244:4,23 247:15,22 248:7,17

**conferring** 325:1

**confessed** 131:14

**confession** 160:23

**confidential** 169:24 173:8,9, 16,18,23 174:9, 15,19 176:3,7, 9,10,14,15,23 177:13,14,21, 24 178:4,10,16, 20 179:3,11,18, 20 180:2,21 181:7,14 186:8, 13,16 189:14, 18 196:20 197:1,3,6,8,13, 18,22 198:4,9, 12,15,19,22 199:5,20

**confirm** 273:19

**conflict** 48:15 300:15,16

**conflicted** 111:21

**conflicts** 45:12 48:20 54:21 110:6

**confuse** 282:15

**confused** 109:2

**confusion** 251:19

**connect** 200:18 311:21 312:5,19

**consequences** 281:12

**consideration** 94:12

**considered** 45:9 80:12 91:10 92:19

**consistent** 332:2,20

**consisting** 218:12

**consolidation** 100:2,14

**constant** 155:9,13 156:8, 18 159:1

**constantly** 157:17

**constitute** 80:5

**constitutes** 293:8

**consultant** 41:19

**consultant-type** 41:6

**contact** 34:19 35:12,24 36:1 55:23 163:8 182:24 187:13 200:1,5,13,15 208:17 215:9 227:21

**contacted** 196:20 197:1,3, 4,12,18 230:23 344:1

**contained** 85:25 248:6 255:2,23 258:15 261:16 265:1 266:23, 24 268:15 335:16

**contaminating** 213:2

**contents** 31:15

**contest** 330:5

**context** 10:6 33:23 85:15 108:16

**continue** 42:24 96:4 295:21,22

**continued** 290:18 297:18

**continuity** 55:19

**continuous** 153:25 294:10

**contradictory** 115:25

**contrary** 260:24 261:2 328:14

**control** 96:14, 20 97:9,13,15

**controlled** 174:25

**convened** 7:9 330:3

**convenient** 234:7 337:22

**conversation** 38:22,25 39:3,6 73:24 74:24

75:14 141:8 202:18 215:10 227:19 313:15

**conversations** 20:16 26:15 32:15 33:13,16 35:24 39:18 72:2 75:6,23 79:5 137:10 138:11 195:4

**conveyed** 241:22

**convict** 124:15

**convicted** 306:11

**conviction** 27:9,21 28:1,7 29:16 123:19 132:6

**convictions** 145:3

**cool** 282:5

**cooperating** 174:8,9,16 175:12 181:18, 20 182:20 183:6 184:7,8 186:19 187:1,7 188:6,22 189:21 190:8,9 197:9,14 198:23 199:4

**cooperation** 280:21 281:24

**cooperator** 198:22

**coordinated** 307:2

**COPA** 165:15 169:4

**copies** 29:23 190:15

**cops** 80:24 166:9

**copy** 32:21 190:16 191:8, 15,21 214:19 223:16 243:2 268:12 316:25 317:1 344:18, 25 345:4,7,14, 20,21

**corner** 228:11, 23 229:3

**Coronell** 232:25 233:1,9

**correct** 11:2,3 12:5,10,11 14:3,14,15,17 19:2,18,19 21:6,7,14,15, 16,17 22:20 24:17,18 26:8, 10 27:11,15 28:1 29:20,22 30:13,14 32:25 35:16,17 42:7 43:19 45:2,24 46:24,25 49:13, 14 50:5,6,9,10 51:3,8,9,14,15, 22,23 52:1,22 53:4,18 56:23, 24 58:20 60:6, 22 61:2 64:3, 11,13 65:18,21 66:17,20 70:10, 11 73:10,11,13, 14 74:9,12 75:9,16 76:14, 15,17,18 77:21 79:2,3 84:20,25 85:4,11,21 86:5,6,17,19,24 87:8,14,20,21 88:6,7,16,17 89:1,2 96:9,10 97:1,2,19 98:7, 10,11 99:3 100:10,22,23 101:13,14,19, 20,22,23 112:3, 4,6,15 113:14, 15,19 116:2,7, 11 117:14,15, 18,19 118:16, 17 119:9,10,15 122:18,23,24 126:2,3 127:10 128:11 130:17, 18 132:2,3,6,7, 10 133:4,5,9, 10,16,17 134:24 135:5 137:16 138:6,7, 9,10,17 139:12, 13 142:20 143:9,10,14 146:7,9 148:21 155:22 158:15 160:11,17 166:17 171:10, 19 174:16,23, 24 175:9,10,17, 18 178:17,18 179:21,22 180:3,4,15,18 182:3 183:16, 17,20,23 186:2, 5,6,10,11,14 187:4,5,9,14, 15,17,19 188:24 189:11, 12 193:8,9,19, 20 194:8 195:22,23 196:4,5 197:3,4 198:25 199:21, 22 201:4 203:3, 4 206:2,7 208:10,25 209:7 211:5 212:24,25 213:2 215:3,21, 25 216:1,11,13, 14 220:1 222:6 224:1 227:12, 16 229:5,9,18 230:5,12 231:1, 2 236:21 237:2, 3 238:15,16 239:8,9,11,17, 18 240:15,16 242:18,22,23 243:8,12 244:8, 9,18,24,25 245:4,9,10,18, 19,23,24 246:19,22,25 247:1,5,6,23,24 248:3,10,14,15, 20,23 249:3,8,9 250:20,21 251:1,2,16,17 252:11,12 254:4 255:5,6, 8,11,17,19 256:4,5 258:2, 6,18 259:22 260:19,22,24 261:21 262:4, 17 263:23 265:15,16 267:9,10,13,14 268:9 269:21 278:10,11,13 282:13,14 288:23,24 289:3,4 291:12 292:8 298:23, 24 299:2 300:23 301:3, 15,16 304:23 305:13,14,17 307:16 317:11, 16 318:10 323:17 324:3 325:9 327:1 328:7,11,16,17, 20,21 329:2,3, 6,7,9,10,18 330:14,15 331:3,4,7,15, 16,18,25 332:5 333:3,4,8,18 334:8,9 335:22, 23,25 336:21, 24 338:18,19, 22 339:1,4 341:20 342:3, 21 343:1,2 344:5

**corrections** 154:11

**correctly** 75:5 97:17 117:13 134:22 137:14 148:5 158:4 205:20 212:21 222:1 292:6

**correlate** 98:19,23

**cosmetic** 333:24

**coughs** 30:21 73:8 131:9 217:9 253:6

**counsel** 7:17 9:1 20:5,14,17, 21 25:10 26:15 32:15 39:24 68:2 244:16 291:11 337:12 339:5

**counsel's** 151:25

**Counselors** 161:19

**count** 327:24 328:8,14,22

**couple** 16:11 21:2 30:1 37:4 45:7 131:22 147:8 150:16 287:24 339:18

**court** 7:3,4,5, 12 8:6,12,15,20 9:1 10:22 13:24,25 14:4, 9,24 15:1,4,20 67:14 82:21,24 96:11,13,21 97:1,19,21,23 98:5,10,19,23 99:5,12,15,18 153:19 154:15 156:20 160:15 161:13,19 162:14,17 175:22 182:2 235:2,5 288:10, 13 315:3,6 340:2,5 344:15, 20,23 345:2,7, 10,13,17,19,22

**court's** 98:1

**court-related** 28:11

**courts** 155:21

**cover** 59:10 283:13 284:18 285:4

**coverage** 89:10 283:14

**covered** 259:16

**covering** 140:3

**coworkers** 37:14 280:22

**CPD** 179:18 291:2 304:4 306:4 307:1,5 313:19,21 314:4

**CR** 165:7,21 166:13 278:10 279:7 317:15, 16 326:25 328:6,10,18 329:2,5,8

**create** 64:2 218:20,24 222:12 223:3, 24 224:17 250:16

**created** 198:18 225:5 249:19 250:11 258:9, 14

**creating** 218:14 318:16

**credibility** 188:8

**credible** 188:3

**credit** 196:10

**crime** 45:8,23 46:13 52:17,21 54:3 56:1 61:10,13 72:25 73:12,17 80:4 112:14 117:12, 20,24 118:8 119:25 120:1 124:22 131:15 134:13,24 135:5 155:8 203:3 229:16 230:3,18 263:6 284:22

**crimes** 13:20 44:12,15,20,21, 22 45:1,2 46:1, 7,8,18,22,23 47:8,9,13,15, 19,25 48:7,10, 22 49:12,15,16, 18,24,25 50:2, 4,5,8,11,23 53:3,5 54:3,5,6 56:23 60:8,9,18 62:22 63:11,20 64:1,8 65:13 73:9,10 81:11, 20 88:9,20,22 89:4 91:21 99:6 101:4,5,21 102:3 112:8,14 113:14 118:2 170:25 171:1 225:4 226:18 231:25 240:7 244:17 302:10, 18

**criminal** 45:14 67:13 70:10 99:2 154:15 155:1,21 157:1 158:7,13 160:15 244:16 262:3 287:4 305:11,23 307:3

**criminality** 302:13 304:17 305:5 306:18

**cross** 164:13 343:11

**crossed** 36:2

**CRS** 166:9

**crushing** 299:10

**CTA** 41:17

**culling** 266:4, 7,8

**cultural** 291:24 292:20 293:15

**culture** 282:25 283:6 288:20 289:1,10,19,21, 24 290:2,5 292:18 296:18, 25

**current** 11:9 32:18 144:19, 24 145:10 148:12,19 164:18,22 165:4 166:12 167:1,4,10,24

**custody** 192:21 207:6,8, 9,13,19,21 208:3,9,11,16 209:3,18 210:8 212:9,22 214:3 215:1 217:5 237:1 238:2 246:7

**cut** 42:21 53:8 78:14 97:11 209:11 273:17 278:4

**CV** 222:14 223:12,14

**D**

**daily** 184:17

**damages** 42:5, 7

**Dan** 47:4

**Daniel** 291:2

**database** 173:20 174:20 177:6 178:6,17, 20,23 179:2 180:24 181:10

**date** 125:5 192:2 228:16 246:14 249:19 250:7,17,19 251:12 255:14 316:18 317:25

**dated** 333:24

**dates** 43:4 44:19

**Dave** 7:24 18:23 19:1 42:5 243:1 269:3 345:3

**David** 119:6 241:1

**day** 7:8 48:15, 16 51:2,18 57:22 58:1 61:15 89:10 92:14 97:20,24 98:4,5 120:20 125:3 164:4,6 186:1 221:20 283:22

**day-to-day** 89:17 102:6 118:24 172:3, 13 295:17

**days** 50:18,24 51:22 52:1 53:12 58:6,17 59:5,10 97:21 98:3,6 124:25 163:7 208:2 284:7,16 300:1 326:17 327:17 343:18,22

**deal** 72:11,12 229:5,7 250:13 284:23

**Dean** 101:11

**debates** 147:22

**debriefing** 263:15,18

**decades** 211:25 307:21

**decapitate** 282:18

**deceased** 35:7

**December** 291:10 316:18

**decent** 274:10

**decide** 120:13 134:19 151:2 205:1,2

**decided** 332:4 333:2

**decides** 94:1

**decision** 209:16,17 264:10

**deemed** 335:11

**defendant** 7:22,25 8:1,4 11:20,24 12:4, 9,13,22 13:4,19 30:16 32:14,17 39:13 159:15 314:13

**defendants** 32:24 33:5,8 39:24 159:14 262:3

**defense** 67:13 244:16 332:15

**defer** 207:25 208:7 252:19

**define** 173:15 175:12

**defined** 176:7, 8 178:11 197:8, 9,13

**defining** 173:9

**definitions** 176:2,5

**deformity** 341:3

**degree** 23:17 59:5 71:11 72:7 175:23 219:18 231:21

**degrees** 274:16

**delay** 59:19

**delays** 202:5

**deliberate** 147:20

**demotion** 11:12

**deny** 324:1,2,4 335:6

**department** 9:14 11:10,13 17:23 36:21 38:15,20 42:19 62:25 92:12 95:25 96:15 97:3 100:2 106:20 109:7 110:7,24 111:22 117:3 118:20,24 119:23 141:20

143:23 144:14 145:9,11 147:21 148:6, 23 149:16,24 151:11,14,24 160:17 173:19 174:21 180:1 192:1 201:17 211:25 223:14 243:6 261:5,7 264:23 266:24 267:4 276:21 277:11 280:3 282:6 283:24 286:20 287:19 289:19,21,22, 24 290:5 291:4, 25 292:11,12, 13,15,18,21 293:1,13 304:16 305:1,4, 24 306:20 307:20 308:6 310:10,15 311:8,25 314:7 315:14 327:18 333:18 337:25

**department's** 222:14 223:12

**depend** 76:4 79:8

**depended** 71:9,14 72:6,7

**depends** 72:13 167:16 199:3

**deposed** 9:23, 25 10:6,10,22 11:5,8,10,14, 15,19,23 12:4,9 13:3,18

**deposition** 7:10 9:16 11:6 15:9 18:6 20:6, 10,12,17 23:20, 24 24:2,6,8,11, 24 25:2 26:22 27:7,18 29:3,18 31:23 82:25 107:12 108:9 132:21 162:18 191:20 192:13 235:6,12 239:20 243:8 246:18 251:16 288:14 315:7 340:6 345:25

**depositions** 26:23

**deputy** 32:5 43:13,14 100:17,22 101:10,12 105:5 109:22 110:15 117:3,4, 5 118:15,19 119:3 143:8,9 145:24 152:4, 12,23 156:4 281:18 305:3 308:14 312:17

**describes** 222:2

**describing** 113:23

**description** 89:5 219:20 220:10 221:14 224:3 228:3,21

**descriptors** 219:15

**designed** 137:8 138:10

**desire** 182:9 285:4

**desk** 185:14,22

**detached** 295:6,22,25

**detail** 71:11 72:11,12 189:7 199:4

**details** 16:12 72:1,14,16 90:2 139:9

**detain** 156:17

**detained** 157:21

**detective** 11:16 13:11 34:7,10,15,22, 23,24 36:24 38:2 43:8 44:10 49:1,2,11 50:5, 12,22,23 52:18, 21 53:3,6,7 54:5,6,13 56:15,17,21 58:2,14 60:8, 16,23 61:3,14, 25 62:8,22 63:4,8,12 64:1, 7,8 65:13 66:8 67:5,12,18,22 68:4 69:12,21, 25 70:7,8,12 73:9 80:25 81:6,19,24 82:9 83:8 88:19 91:9,11,13,23 93:6,10,16 94:21 95:2 97:16,17 99:25 100:1,9,15,20, 25 101:17,18, 25 102:3,5,16, 17 103:4,5 104:5,13 105:7 109:14 110:6, 10 111:2,5,21, 25 112:2,5,13, 23 113:2,3,12 114:7 115:24 116:1,7 117:6 120:17 121:8, 11,14,20 122:16 140:8 143:7,12 144:7, 22 145:2 152:12,13,19 153:20 155:3, 16,18,19 156:1 157:18 158:12, 21 163:5 164:1, 9 170:25 171:4, 25 173:7 177:12,19 178:4 181:24 182:7,18 183:14 184:10, 15,19 185:6,8, 17,25 186:1,5, 10 187:4 190:2, 4 201:9 203:6 206:10 209:2 210:2,5,6,14 211:14,16 214:2 218:21 223:17 224:14, 25 225:3 233:3 235:19 236:8, 19 247:11 252:4,5 254:2,6 261:5 262:1,7, 25 264:24 265:8 266:15 268:3 274:12, 21 275:11,17 295:3 299:17, 20,24 300:16 301:3,6,14,21 302:4,9 304:3, 11,14 305:2 308:7,14,15,19, 24 309:1 310:3, 7 311:2,17 312:8,9 313:10, 20 339:15,16

**detective's** 62:16,20 185:18,22

**detectives** 37:22 40:13 50:8 53:24 55:9,24 56:3,7, 23 57:6,8,14,22 60:9 61:4,17 62:14,18 65:17, 24 66:4,8 68:11,18 83:9 87:18 88:2,5, 16,22 89:4 90:9,19,22 91:1,5,8,14,21 92:6,15 94:5 96:3,25 97:5,20 98:12 99:8,13 100:18 101:10, 12,13 102:23 103:7,8,24 104:6,8,14,16 105:6 109:24 110:13 111:2, 12 112:10,14, 15 113:14 114:13,22 115:6 117:5,14, 17,19,22 118:3, 13 121:1,5,17 122:3,6,12,13, 22 131:13 140:14 142:8, 10,11 151:20 152:5,12,23 153:8,11,15 154:2,8 155:5, 22 156:5,7,21 158:6,8,18,23 159:16 161:10 167:20,24,25 168:11,22,24 172:4 175:24 176:10,21 178:10,25 183:9 184:23 185:2,11 192:24 193:1, 13 194:15 195:20,21,25 196:4,9,13,14, 20 197:1,2 199:25 200:21 201:3,6,12 202:3,8 211:9 223:8 228:22 229:3,17 230:2, 23 232:4,12 233:18 252:14 255:10 258:23 264:24 265:9, 25 266:3 275:9 276:6 287:3 299:18 300:10 303:1,7,12 307:22 308:15 309:2 310:23 311:5 312:11, 17 313:3,20

**detention** 156:10,12

**determination** 209:4

**determine** 203:22 221:2

**develop** 123:10,12,14, 16,18,22 176:23 177:21 203:1 205:9 207:11

**developed** 77:9 124:2,7,8, 14 201:24 205:20,21 262:24

**development** 120:13

**differed** 208:17

**difference** 45:5 282:12 292:3

**differences** 103:7

**differentiate** 282:12

**differently** 25:17 102:24 157:16 173:18 260:9 282:22

**difficult** 10:1,4 151:18 209:22, 24 221:2 223:23 237:16 296:21

**difficulty** 334:22 335:2

**dignitaries** 41:12

**ding** 154:22

**dinner** 36:11, 12,24 37:11,17, 19 38:4 39:9,12

**direct** 9:4 80:23

**direction** 154:12

**directly** 249:18 267:3

**disagree** 236:6 335:20

**disagreed** 291:18 292:22 338:6

**disagreement** 292:3,5,6

**discipline** 169:19 282:14 288:5 315:25 316:11

**disciplined** 315:13

**disclose** 68:19

**disclosed** 262:3 265:2,10

**discovery** 24:20 107:1

**discuss** 38:6 39:19 154:8

**discussed** 20:9 33:2 146:3 240:13 261:20 289:12

**discussing** 246:22

**discussions** 286:7

**displaced** 341:2,4

**disposal** 222:20

**disposed** 12:17

**disposition** 58:7,17 343:18, 24

**dispute** 236:4 291:9 318:8 325:18

**disrespect** 327:20

**dissimilar** 221:21

**distanced** 54:14

**distin** 41:11

**distinction** 44:24 45:5 49:17

**distinguished** 9:14

**district** 7:12,13 45:11 48:16,17, 18 56:13 88:1 99:24 246:8 277:18 333:13

**districts** 87:23

**disturbance** 318:16

**divide** 224:9

**divided** 224:8

**division** 7:13 49:2 53:7 56:15,17 58:2 88:19 95:2 99:25 100:1,10, 16,20,25 101:17,19 102:5,17 111:22 112:1,2, 5,13 113:3,4,12 116:7 117:6 151:19 152:12, 13,20 155:17, 18,20 157:18 158:12,22 170:6 184:19 185:6 210:2,3 224:25 261:5 262:1,7 263:1 266:15 299:18, 24 301:15 308:8,24 310:8 311:2,17 313:10

**division's** 112:23

**divisions** 109:14 110:10 155:3 308:15, 19 312:8

**DNA** 59:7 155:8 157:25 158:1

**doctor** 334:8 335:17

**doctor's** 341:14

**document** 24:12,24 25:22 26:5,9,16 64:4, 9 65:5,7 66:16, 22,25 67:3,10 69:17 74:1,24 76:14,17,22 77:2,6,9,12,16 78:20 83:19 154:16,19 190:11 191:19 192:3,9,11,12, 14 193:11 194:13 204:15,

18,19 214:17 243:3,7 246:17, 24 247:21 248:17 251:4,7, 15,18,19 258:24 268:18, 19 269:3,8 272:23 273:11 316:12,14 327:10,13 332:7 333:23, 25 340:23

**documentation** 55:25 56:4 63:10,15,17 64:2,12 79:4 82:8,13 83:5 84:2,7,13,16, 19,23 85:2,8,18 102:15,24 103:8 104:7,16 111:4 114:12, 22 115:15 157:19 161:9 184:1 198:17 243:25 244:10 257:16 259:6, 13 266:20

**documented** 64:24 65:6 74:8 75:9,16,25 77:21 78:24 79:7 82:2 86:3, 5,7,11,13,16,23 87:8,11,14 103:17,23 186:9,14 187:2, 16 189:11 199:18 217:19, 21 237:9 239:11,17,21 240:1 244:22 245:7 249:5 256:4,5,8,11, 12,15 257:9,21, 25 258:18 259:20,21 260:2,4,16,18, 23 262:3 268:7 325:23

**documenting** 55:15 66:13 69:12 155:11 156:9 238:18

258:10 260:11

**documents** 20:13,20,23,24 21:5 22:12,19 23:2,3,7,11,13, 14,16,20 25:10, 14,21 26:17 28:11 29:2,5,17 30:12,22,24 31:1,2,3,18 71:22 133:8,12, 16 173:10 250:12 302:22 303:3,8,18

**door** 156:14 157:19 319:21

**Dorsch** 273:24,25 274:4

**dots** 311:21 312:5,19

**doubt** 258:8,22

**dozen** 10:2,3 11:5 277:5

**drafted** 252:16

**drafting** 194:7

**drawer** 30:5 32:7

**dreadlocks** 220:5

**drinks** 35:2

**drive** 223:8,18

**driver** 232:24 284:7

**driving** 175:5

**dry** 278:5

**due** 52:4

**duration** 324:17

**duty** 97:25 156:14,16 327:21

**duty.'** 325:7

**dynamic** 336:10

E

**earlier** 20:6 43:20,22 54:3 101:1 166:14 177:23 190:25 194:23 199:3 202:22 230:25 240:13 247:10 261:21 283:1 293:22 294:4, 13 295:1,24 296:3,10 314:19 334:5
**early** 51:19 147:9 280:6,24 286:5 289:6 290:9
**earn** 96:5,7
**easier** 190:17 191:3
**Eastern** 7:13
**Echeverria** 291:3
**ECR** 284:11
**Ed** 40:2,4,8,10, 20 47:18 50:19
**Eddie** 119:4 286:5
**Edgewater** 336:15
**efficient** 42:17
**effort** 97:2 152:24 158:3 159:2 183:9 283:13 309:3
**efforts** 95:11 96:24 156:25 189:13,19 232:17 304:13, 15
**Efrain** 241:1, 13,17
**egregious** 169:13 275:25
**Eileen** 7:21 19:15 189:18 343:9 345:19
**Eileen's** 108:25
**elect** 175:18
**elected** 170:13 254:17 338:10
**electronic** 345:5
**element** 286:8
**else's** 269:19 270:8,12,15 271:8
**emanated** 13:19
**Emmanuel** 291:11
**employee** 109:7 119:12, 22 142:20,23, 25 144:12 146:22 147:25 148:1,13,16,24 164:18,22 165:5 167:2,4, 10
**employees** 11:10 144:19, 24 145:10 148:12,19 166:12
**employees'** 145:10
**en** 126:6
**enable** 184:10
**end** 15:11 41:12 147:15 193:14,17,18 269:16 318:14 329:24
**ended** 122:5
**ending** 289:10 325:7
**enforcement** 45:13 285:8,23 288:22 294:2
**engage** 306:10
**engaged** 91:22 138:25 306:18
**English** 233:2
**Engquist** 18:24 19:8,17
**enormously** 286:13 287:9
**ensure** 57:16 60:17 67:12 68:5 69:12 70:22,24 71:5 172:1 219:16 220:21 222:5 265:1 267:22 268:4 282:8 287:23
**ensured** 259:5, 21
**ensuring** 288:3
**entail** 57:8
**entailed** 89:5
**enter** 49:2 120:11
**entered** 12:14
**entering** 325:6
**enterprise** 305:11,23
**entertaining** 274:6
**entire** 31:6 111:1 241:25 256:17 265:22, 24 267:8 289:21 292:12
**entry** 42:18
**Epplen** 50:17
**equally** 220:22
**Ernest** 35:6,7, 10,19 121:16 138:24 139:14 247:8 307:14
**Ernie** 121:5 122:22 129:25 130:4,16 138:16 163:25 164:2,8,12 193:9,14 198:11 201:4 217:14 226:5 240:22 247:4 249:8
**eroded** 285:3 297:20
**eroding** 294:5
**error** 160:3 161:8 249:14, 15,21
**essentially** 31:21 58:16 60:19 118:5 182:3 224:2 329:4
**established** 212:6,7 245:14
**et al** 7:11
**evaluation** 334:2 336:15
**evaluations** 62:24 63:3
**evening** 39:18
**event** 74:23 126:9
**events** 41:15 105:19 106:1,6 116:18 147:7
**eventually** 302:15,16
**everybody's** 203:20
**evidence** 28:6 123:10,14,18, 22 124:2,7,8,14 132:1,4 133:19 147:10 155:8 157:23 160:1 201:21,22 225:22 307:9 332:20 335:13 337:12,14,15, 16,20,21 341:16 342:2,4, 5
**evidentiary** 214:9,13
**evolved** 156:15 160:21 283:17 297:25 298:1
**evolving** 155:10,13 156:8 160:20
**exact** 155:18
**examination** 9:4 341:2,4 343:11
**examples** 59:10 104:15, 25
**exceeding** 156:11
**exception** 118:12 221:5 283:20
**exceptions** 75:20 171:14
**excessive** 14:7
**exclusively** 57:3,4 88:10,11 148:19 163:7 240:14
**exculpate** 86:4
**exculpatory** 86:10,16,24 87:7 261:20 262:2
**excuse** 8:12 30:21 73:8 101:4 131:9 197:17 207:18 217:9 253:6 287:11 294:5
**exempt** 94:2 109:1,2,4,5,7 119:12,21 142:20,23,25 144:12
**exemption** 112:18

**exempts** 110:20

**exhibit** 190:12, 13 191:20,24 235:11 242:11 243:4,9 246:12, 15 251:4,5,7,10 267:17,18,21 268:19,21 269:4 272:23, 25 273:11,13 316:15,20

**exhibits** 190:21,23 345:11,12

**exist** 268:6

**existed** 291:4

**existence** 81:18 280:2 291:12

**exists** 85:22 86:6,13,15 213:1,6

**exoneration** 27:4 28:12

**expanded** 309:22

**expect** 82:7,13 147:2 167:2,11 230:3,9 257:8, 15 259:3,5 262:25

**expectation** 66:2 69:6 82:1 148:1,3 182:23 183:19 184:22 186:7 187:2,8, 13,20 188:5 189:1 258:17, 21

**expected** 76:17 183:15 260:19 303:9

**expedient** 17:25

**experience** 31:19 83:7 102:8 115:13 138:23 151:10 155:20 158:6 211:24 236:8 264:22 265:8, 17 293:14 296:5 311:18 325:4

**experienced** 294:13,15,20

**experiences** 116:16,24

**explain** 121:20 250:7 336:2

**explaining** 121:15

**explains** 59:18

**explanation** 59:4,9 247:13, 17 249:22

**expose** 156:21

**extension** 97:14

**extensive** 151:10

**extent** 16:13 90:18 107:21 108:14,20 115:13,23 136:17 151:11 180:19,20 186:13 225:18 232:21 242:18 258:17 260:18, 23 293:22,24

**extra** 125:10,11

**extract** 189:10

**extremely** 94:22 283:19

**eye** 287:11

**eyeballs** 191:16

**eyes** 172:23

**eyewitness** 202:9 205:18 231:24

**eyewitnesses** 136:4

**F**

**face** 202:15 204:17 205:13 206:24 219:9 241:15 320:9, 14 321:9,15,20 322:6 328:3 329:1 332:21 333:11,16 335:2 338:22 339:3

**facial** 220:10 221:18 334:2

**facing** 127:4 216:21

**fact** 8:16 29:11 34:4 39:17 50:8 74:2,5 98:22 133:22 135:5 144:16 149:4 166:15 167:4 172:6 196:6 198:14 200:12 208:19 221:5, 16 246:3 247:25 258:24 263:4,11 289:23 290:15 306:9 308:17 318:5 325:11, 24 326:14 329:6 331:23 332:12 333:5 334:17,25 336:11,18 337:2 338:17

**factors** 122:14

**facts** 13:7,8 90:3 99:13 131:23 135:11 237:15 287:2 316:9 323:20

**factual** 217:7

**failed** 250:17

**failure** 11:12

**fair** 16:5,6 17:17 18:3,4 23:4,5 27:21,22 32:2 56:17 64:10 65:8 67:23 73:24 74:1 75:2,3 77:6,7 79:11,14 80:23,25 81:3 84:13 102:25 112:24,25 115:12,18 133:1,2 160:9 196:14 199:14 222:12 227:6 229:8 243:25 248:8 282:25 289:5 290:18 295:11 297:8,9 299:3 309:20

**false** 284:2 323:11 325:25

**familiar** 54:12 262:6

**familiarity** 121:23

**family** 38:7,11

**fast** 15:19 209:25 252:21

**FBI** 307:1

**feature** 219:17

**February** 250:5

**federal** 307:5

**feds** 300:22 304:8

**feel** 138:22 242:1 257:2 292:17 293:19 297:1

**feeling** 97:8 162:25 281:11 290:16

**feels** 106:25

**feet** 220:20

**fell** 118:25

**fellow** 276:6 290:1 293:3

**felony** 195:2 207:22 208:9, 12,19,23,24 209:6,13,14 230:11,24

**felt** 79:9 96:14 173:3 290:4,7, 9,25 293:2,11, 16 294:7 297:2

**field** 71:18 263:2

**fight** 323:5,13 324:7 335:6 336:9,13 337:7 338:10,11 341:12,17,23, 25 342:3,7,15, 17 343:1

**fighting** 341:18 342:1,19,21

**fights** 322:22

**figured** 32:7 170:12

**file** 20:24 21:1, 9,10,19 22:22 23:21 31:6,11, 16,19 59:25 60:5 65:15,23 84:1 85:25 130:21 257:18, 21 258:9,15,18, 24 259:7,22 265:9,15,18,24 266:1,4,11,13, 17,21,23 267:8, 12 268:8,16

**filed** 24:9 30:10 279:22 291:1

**files** 302:22 303:8,19

**filing** 101:4

**fill** 52:9

**filled** 245:20

**fillers** 127:2,10 128:16,25 129:3,10,13,18, 22 137:7,21,24 138:14 215:24 219:24 220:2,8 221:4,21 222:5 223:1 224:23 225:19 240:15

246:6,9 248:12

**filling** 155:12 250:25

**film** 201:24 202:5

**financial** 180:22 181:6

**find** 52:9 54:25 188:16 219:3 224:12 304:15 332:4

**finding** 153:18 166:17 169:18, 19 314:5 326:22,25 328:10,14 330:5

**findings** 166:15,24 167:2,8,12,16 309:5 311:16 312:1,9,16,24 313:3,22 314:6 340:18

**fine** 270:10

**fingerprints** 59:3,6

**finish** 15:6,12, 17 159:10 253:17

**finished** 172:17,25

**Fire** 41:16

**fireable** 284:3

**firearms** 309:24

**fired** 284:6,9

**firm** 145:13,17 282:20

**firsthand** 216:6 279:18 308:1

**fist** 324:4

**fists** 321:15,20 322:6 324:2 329:1

**flags** 174:2

**flared** 48:15

**flashlight** 321:1,2 322:11 328:3,16,20 331:24 332:22 334:6 335:8 338:18

**flip** 217:12

**flipping** 32:6

**floor** 301:9 303:25

**focus** 48:12

**focused** 282:7

**follow** 53:24 80:21 175:25

**follow-up** 121:23 343:13

**footage** 287:23 289:3

**FOP** 105:22,23 106:3

**force** 287:19, 20 332:13 335:12 337:9 338:15

**forehead** 221:17

**forgot** 110:17

**form** 22:23 28:8 29:21 36:6 40:16 49:20 55:7 57:9 58:21 60:21 61:6,18 62:2,7 63:13, 14,21 64:12,14, 20 65:1,4,10, 19,25 66:9,18 67:15,19,25 68:8,14,21 69:3,15 70:15 71:1,7,20 73:3, 25 74:10,19 75:4,10,17 76:1,23 77:18, 22 79:7,12,24 80:7 81:15,16 82:3 83:22 84:9,21 86:18, 25 87:9,15 89:6 91:22,25 92:9 93:8 94:19 95:12 98:16 102:9,10,19 103:1,9,10,25 104:1,9,10,17, 18 109:10 110:1,14 111:6, 14 114:9,14,24 115:8,19 116:3 118:9,21 119:16,24 121:3,18 122:9 123:7,8,12,16, 20,24,25 124:4, 5,10,11,16,17 128:20 130:7 134:15,16,25 135:18 136:16 137:4,5,18 138:19 139:2,3, 21 140:10,23, 24 141:6,7,14, 22 144:15 145:7,19 146:2, 18,19 147:5,6 148:8,9,25 149:1,9,10,19, 20 150:2,3 151:16,17 152:8 153:2,3, 16 155:24 158:17 159:20 160:18 161:2, 16 163:9,13,20, 21 164:10 165:2,23,24 166:11,18 167:5 168:12 169:1 170:9 171:11 172:5 177:1,15 178:8 179:4 180:17 181:21 182:10 183:1,21 184:5 186:15 187:18, 23 199:1 203:25 205:5, 25 206:14 210:25 211:1,6, 13 212:3 213:9, 16,23 214:12 218:25 220:23 223:16 226:2,7 229:6,10,19 230:6,13 231:19 236:5 239:12 242:17 254:5 255:18 257:11 258:4, 11,12,20,25 259:8,23 260:6, 13,20,25 261:22 262:18 264:1,6 265:4, 11,12,23 266:6, 9 267:25 268:10 276:8 280:5 281:6 283:9 286:2 289:13 290:2, 19 291:5,13 293:4 294:3 303:13,14 304:18 305:25 306:14,21 307:8,24 308:9, 20 309:6 310:18 311:11, 19 312:2,12,18, 25 313:5,13,24 314:8 323:18 325:20 326:3 332:6 335:3 336:22 337:4 340:20

**formal** 112:1 175:21

**formatting** 250:12,14,15

**formed** 287:18

**forms** 21:6 158:25 180:22 181:6 182:19

**forthcoming** 188:18

**forward** 27:7 185:16 227:3 280:23 284:20 285:24 306:12

**found** 30:9,15, 20 32:14,16 33:11,15 35:4,8 50:15 139:18 141:1,2 161:13 279:23 302:16 303:24

**foundation** 31:8 37:24 46:10 47:10 55:7 60:10,13 61:18 62:2 65:20 68:21 70:15 76:1,19 77:22 78:9 93:8 102:10,19 103:1,10 104:1, 10,20 105:2 109:18 113:6 115:8,19 121:3 123:25 124:5, 11,17 126:14 128:14 130:7 139:4 140:23, 24 141:6,7,14 142:12 144:15 145:7,19 146:2, 19 147:6 148:9, 25 149:1,10,20 150:3 151:17 152:8 153:3,16 161:2,16 165:2, 24 166:11 167:5,14 168:1 169:1 170:9 177:2,8,16 178:8,21 179:4, 14 180:8,16,25 181:8,15 184:5 185:3 189:22 193:22 194:2 200:9 206:14 211:6,13 213:3, 4,9 214:12 217:1 226:12 229:19 230:6 231:11 232:19 237:6 257:13 258:4,12,20,25 259:8,23 260:6, 13,20,25 261:8, 22 262:5 265:4, 11,23 266:16 267:25 268:10 277:13 283:9 286:2 291:5,14 293:5 295:18 296:7,15 300:8 303:14 304:18 305:25 306:6, 14,21 307:8,24

308:9,20 309:6, 21 310:6,12,19, 24 311:12,19 312:2,12,18,25 313:5,24 314:8 326:20 335:3 336:22 337:4 341:8 342:12

**fracture** 336:16 337:2,5 341:6

**Francisco** 108:2 131:10 273:21 307:13

**Frank** 50:18

**Frankie** 273:21

**fraternal** 105:17 330:7

**free** 320:1

**frequently** 50:16 53:12 59:5

**front** 147:11 192:3 216:21 247:18 250:10 278:1 329:17 330:11,14,18 340:23

**frowned** 82:12 280:22 289:25

**full** 305:5

**function** 55:24 57:20 89:12 101:1,25

**functions** 58:1 105:19

**funeral** 35:21

**fuzzy** 44:16 87:25

**G**

**games** 41:16

**gamut** 174:13 185:19

**gang** 13:20 44:11,15,20,21, 22 45:1,7,12, 13,21,22,23 46:1,7,8,13,18, 19,22,23 47:8, 9,13,15,19,24 48:2,3,7,10,15, 19,22 54:3,6, 12,23,24 55:5, 9,21,22 56:1,5 77:20,24 78:5, 6,11,18,19 80:4,11,15 81:3,6,8,11,13, 17,20,21,24 82:6 86:21,22 87:5,7 88:9 118:2 196:22 197:20 199:7 200:2,6 201:9, 12 224:25 225:1,4 244:16 253:8 254:13 263:14 298:21, 22 299:6,7 300:24 302:10, 18,23 303:4,8

**gang-related** 54:15,18

**gangs** 48:8,11, 12 54:20 84:7

**Gangster** 197:20 200:2

**Gangsters** 196:21 200:6, 14 261:19

**garage** 175:5

**gas** 174:5 318:2,6 334:4 336:21 341:20 342:8,17

**gather** 129:13 187:8 203:8,11

**gathering** 128:25 129:10 182:8

**gave** 30:3 33:2 59:10 216:12 278:19 292:12 319:18 323:10, 15,17,19 329:9 331:2,6 341:10

**Gawrys** 8:1 35:24 36:7 47:24 53:10,15 121:10 125:18 193:3 194:17, 24

**gear** 319:2

**geared** 112:8

**gears** 173:5

**general** 17:16 42:14 77:4,5,8 110:12 111:10 116:1,10 120:5 139:12 141:3, 21 142:5 151:25 160:14 171:16 184:14 185:1 214:2 219:2 256:21

**generally** 140:15 141:19 171:13 176:16 210:24

**generate** 56:3

**generated** 23:3,7 31:4 56:2 58:4,14 268:14

**George** 37:6,7

**Gerald** 230:1

**Geraldo** 7:11, 19 27:9 123:11, 23 124:3,9,15 126:1 131:18 133:4,22 134:12,23 135:4 137:15 192:21 200:12, 14,18 215:16 225:11,16 226:16,20,24 227:14 228:3, 21 229:2 230:17 240:8 242:15 245:13 261:18

**get all** 221:3

**girl** 130:25 131:4 199:7

**girlfriend** 188:14

**give** 8:23 12:19 41:13 43:5 76:8 89:4 94:11 115:9 162:6 169:8 170:22, 25 185:20 189:15 190:16 251:4 256:16 283:25 323:8 330:17

**giving** 92:14 196:10 227:17 302:22

**glad** 339:18

**glass** 127:4 128:3,7

**glasses** 221:19 334:11, 14,17,19 335:17,18

**goal** 336:8

**God** 19:22 33:21 67:20 281:2 283:23 294:17

**good** 8:3 16:10 23:1 38:10,13, 17 40:24 54:19 55:2 94:16 110:21 137:22 151:6,7,8 159:7 162:4 189:4 202:15 203:17, 23 204:17 205:13 206:4, 13,24 224:11, 12 274:8 284:21 285:19, 20 297:16 309:9,13 316:4 339:17,24 345:22

**goodbye** 34:18

**GPR** 64:24 74:8 199:9,18 258:2,8,16

**GPRS** 21:25 24:6 69:18

268:20

**grab** 58:14

**grabbed** 298:19

**grabbing** 243:2

**gradual** 283:21 285:17 294:5

**granted** 160:23

**graph** 267:4 271:7

**graphic** 223:18,24

**great** 72:11,12 221:4 250:13 288:2 332:16 338:4 344:24

**greater** 189:6 288:22 294:2

**grievance** 316:9

**ground** 14:20

**group** 36:12 37:2,11 50:7 120:7 170:1,3 223:9 294:7,8 296:20,23 297:1,18 298:23 341:24 342:8,9,10,11, 14,18,19

**groups** 99:21 174:17 299:2 303:21

**grown** 220:11

**guard** 267:4

**guarded** 179:25

**guess** 55:2 93:12 95:4 102:11,13 118:22 199:15

**guessing** 20:2 100:4 166:2 294:24

**Guevara** 7:11 8:4 33:13,17,20 34:7,11,15,22, 24 47:8,12 52:18 106:24 107:12,16 121:5,16 122:7, 22 123:9 124:1 125:6,13 129:25 130:4, 16 135:25 136:4 137:2 138:15,23 139:9,18 140:1, 6,8,13,16,19 141:4,9,13,17, 21 142:1,8,18 143:3,7,12 144:8,16,22 145:2,14,18 146:12,22 149:18,25 152:7,15,16 153:1 163:4,6, 9,11,18 164:17, 22 167:1,10 193:3,14 194:17,25 196:2,7,18 198:11 201:4,6 202:8 216:7,10, 15 217:14,23 225:25 226:5, 19 230:2,16 233:3,18 235:19 238:24 240:22 241:23 243:20 244:8, 14 245:8,15,17, 23 247:23 248:3,7,9,11 249:8 252:5 255:11,14 258:23 259:14, 21 262:23 300:6 307:14 312:10

**Guevara's** 39:10 166:17 247:11 248:1

**guilt** 134:5,18

**guilty** 99:11 131:19 134:13 135:16

**gun** 174:4

**guns** 45:16 175:4

**Gus** 315:21 318:1,6,9,23 319:8,23 320:3 325:3 328:2,25 330:20

**guy** 37:2,5 50:17,19 101:11 174:3,4 185:22 222:22 274:3,6 282:18 284:3,8 299:10, 15

**guy's** 175:5

**guys** 37:4,16 49:23 50:1 51:10,20 52:4 53:16 95:17 97:11 99:11 151:2 164:5 222:18 223:9 224:8,9,21 252:18,19 301:8 342:10 343:9

**H**

**hair** 220:10,11 221:18

**hairstyle** 219:24

**hairstyles** 219:25

**half-a-dozen** 118:13

**half-an-hour** 162:7

**Halvorsen** 8:1 35:6,7,10,19 121:6,17 122:7, 23 123:9 124:1 125:7,13 129:25 130:4, 16 138:16,24 139:14 163:25 164:3,8 193:3, 9,14 194:16,23, 24 196:2,7,17 198:11 201:4,6 202:8 216:7,10, 16 217:14,23 225:25 226:5, 19 230:2 233:18 240:22 241:23 243:20 244:7,13 245:8, 15,18,23 247:4, 23 249:8 252:4 255:10,14 258:23 259:14, 21 262:22 307:15

**Halvorsen's** 247:8

**hand** 8:21 223:20 320:1 322:11 336:5

**handful** 117:22 118:12

**handle** 56:7 282:21

**handled** 282:21

**hands** 263:2

**handshake** 299:11

**handwriting** 268:25 269:14, 19,20,23,25 270:4,6,8,11, 14,17,20,23 271:1,4,7,13, 16,19,22,25 272:3,6 273:7, 12

**handwritten** 229:18,20,24 230:4 272:9

**hang** 189:8 344:16

**hangs** 228:7, 11

**happen** 53:22 55:11 149:4,12 154:25 188:20 209:6 275:1 278:1,3

**happened** 53:25 72:25 137:14,17,19 138:8 139:23 147:7 149:4 154:14 157:4 222:22 225:15 229:16 244:20 283:12 291:6 301:5,21 308:4 322:1 323:4,6, 13 335:6 336:20 342:22

**happening** 155:21 156:25 160:15 236:10 275:6 283:19 287:11 303:17

**happy** 256:16

**hard** 10:2 76:8 84:10 94:17 167:15 190:15, 16 191:8,15 209:25 214:19 223:16 243:2 252:21 264:7 290:13 316:25 317:1

**harder** 295:15, 16

**hardest** 94:6

**hate** 96:18 168:14

**head** 13:13 77:1 220:4,6,7, 11,25 266:22 274:17 277:17 298:7,13 319:7, 8,14 320:2,3 321:8 332:15 335:22,24 336:1,2,4,8,11 341:10

**headquarters** 223:18 281:21

**heads** 15:1

**health** 284:12

**hear** 14:25 73:22 74:18,25 76:13 137:8 138:11 140:5,7, 12 142:4 188:14 217:17 275:4 281:21 300:9 302:18, 21

**heard** 140:4 142:15 145:15, 20 146:5 200:10 203:9 300:13 304:6,9 335:18

**hearing** 166:25 328:11 329:13, 16

**heater** 89:22 90:5

**heavily** 208:14

**heavyset** 221:16

**heights** 221:2

**held** 13:14 42:19 44:3 111:19 114:2 120:4 169:25 329:16

**helped** 194:5 284:25 286:13, 15,23 287:8

**helpful** 42:15

**helps** 287:13

**hey** 52:8 58:15 62:8 76:12 94:25 95:17 97:4 110:21 154:8,18 173:24 175:14 182:1 184:12, 20 233:25 280:10 284:12

**high** 96:17 141:4 303:6

**higher** 45:8 106:19 109:2 143:8 279:4 295:15

**highlighted** 268:13

**hired** 43:6 146:15

**Hispanic** 224:8

**history** 41:2

**hit** 161:5 320:8, 14,25 335:7 336:12

**hitting** 322:18 323:1 335:7,9

**ho** 83:24

**Hold** 339:22

**holding** 174:4 283:24

**home** 183:7 226:10,11 246:4

**homicide** 11:16 27:8,19, 20,25 36:24 38:23 39:7 40:13,19,20 46:9,20 49:18, 23 50:1 54:7 56:25 64:3,7 65:14 66:23 67:5,11,18,22 68:4,6 69:12, 14,20,25 70:6, 8,12 75:7,15,24 76:22 78:8 80:16 81:24,25 83:8 84:1,10 87:12 89:18 90:8,19 91:1 103:17 114:7, 13 120:18 121:2,8,11,14 123:1,5 131:7 147:15 168:9, 24 173:7 177:11,19 195:5 206:10 217:4 218:21 236:8 255:5,16, 22 256:9 257:9, 10 258:9 259:7, 19 264:17,20 265:9,14 267:5, 6,8 274:9 300:11 302:11, 19,22 303:3,8, 18,20 310:1

**homicides** 49:10,17 50:1, 5,8

**honest** 31:13 274:6

**honestly** 30:5 32:7 280:15

**honor** 182:9

**hope** 9:13 71:3 276:25

**Hospital** 336:15

**hospitalized** 212:13

**hounded** 61:8

**hour** 108:18 156:11 223:20 332:23

**hours** 19:23 20:1 51:12 97:23 147:13 156:11,13,17 172:9 215:15 228:17 249:13 327:25 328:23 337:13,19,24 339:16 343:15

**house** 44:23 45:10,18 47:13 48:4,14,25 61:13 72:9 173:25 175:3 284:14

**housed** 81:21 224:20

**housekeeping** 111:23 112:21 113:2,19,20,23 114:3,6,12,20 115:4,5,16

**hrs** 226:16 235:19

**Hugo** 136:14 233:13 235:20 236:23 238:18, 19 239:2,7,10 240:8,18

**hundreds** 14:5,6

**hypothetical** 61:7 65:20 71:8 72:5 73:4 74:11,21 75:11 76:25 80:18 82:4,5 84:5 98:17 121:25 161:2,17 165:3 167:14 168:13 183:22 185:4 205:6 209:21 212:4 229:21 230:7 237:14 257:12 261:23 262:19 268:1 303:15

**I**

**ID** 190:3,6

**idea** 65:12,13 66:12 110:21, 22 164:17 176:3,22 178:16 213:7, 19,20 231:21 290:15

**ideal** 222:8

**ideally** 185:20 221:2

**identification** 79:1 190:13 204:10 206:5,7, 13 212:17 216:5 219:9 233:20 241:9, 15 243:9 246:15 251:10 269:4 272:25 273:13 316:20

**identifications** 133:1,14 241:19

**identified** 26:16 32:23 77:13 119:13 131:22 132:9 134:3,18,20 135:9,23 175:1 181:19 188:17 192:1 215:16 220:19 225:10, 16 240:8 241:5 243:5 245:13, 17,22 288:18 297:4

**identifiers** 183:10

**identifies** 180:1 244:7 330:8

**identify** 48:11 179:19 189:13, 20 190:7 193:1 202:16 203:13, 18,24 204:3,21 224:4 233:13, 22 234:1 269:25 270:3 298:3,9 311:23 312:7,14 313:18,21 314:5

**identifying** 137:15 244:4

**identities** 176:18

**identity** 179:19 189:21

**Iglesias** 7:11, 19 27:9,10,24 28:16 124:9,15 125:14 126:2, 13 131:14,19 133:1,4,15,22 134:12,23 135:4 137:15 191:11,21,22, 24 192:17,21 194:13 198:4 200:13,14,18, 21,22,25 214:16,22,25 215:2,12,16 216:7 225:11, 16 226:17,20, 24 227:14,19, 23 228:21 229:2 230:1,5, 18 235:13,17 237:1 240:9 242:15,25 243:4 245:13 246:12 261:18 268:22 273:4, 11,18 316:15 317:6 340:24

**Iglesias'** 27:4, 21,25 28:7,12, 19 29:16 123:11,23 124:3 228:3

**ignore** 96:16, 21

**Illinois** 7:13

**imagine** 290:23

**immediately** 208:12 332:18 333:15 337:18

**immutable** 220:17

**impact** 149:25 151:13 211:4

**Imperial** 196:21 197:20 200:1,6,14 261:19

**implementing** 286:8

**implied** 292:10

**importance** 337:19

**important** 14:24 15:4 65:7 66:16,22,25 67:3,10 68:5 69:21 74:14,17, 22 83:14,15,19 89:21 132:17 180:12 282:15 285:13 337:15, 21 339:17

**impossible** 167:17 168:15, 20 210:11 295:9 323:23

**impression** 292:12

**improper** 314:14

**improve** 148:15 158:3 159:2 160:16, 25 161:14 285:20

**improvement** 294:11 297:6

**improvements** 295:23 298:2

**improving** 288:19

**in-car** 286:22, 25 287:1,7 289:2

**in-house** 111:15

**in-service** 158:24

**inaccurate** 76:6

**Inaudible** 298:16 339:20

**incentives** 92:16

**incentivize** 92:6,11,13 94:15

**inch-and-a-half** 31:12

**incident** 29:8, 12 166:7 227:21 241:18, 20 283:22 301:7 315:21, 25 320:17 321:6,25 322:1, 8,14,21 323:22 324:7,16 326:9, 11 330:19 332:19 334:4, 18 337:18 342:22

**incidents** 54:15 166:5 283:25 287:17

**include** 88:9 101:21 216:13 247:11

**included** 247:15,16,25 248:20,23 267:12

**including** 146:13 268:3, 12 335:14

**inclusion** 248:8

**income** 41:18, 21 42:1

**incoming** 189:20 332:17

**incomplete** 65:19 71:7 72:4 73:4 74:10 75:11 80:17 82:3 84:4 98:16 161:17 165:3 167:14 168:12 183:21 185:4 205:5 209:20 212:3 229:21 230:7 237:13 257:11 261:23 262:18 268:1 303:15

**incorporated** 158:22

**incorrect** 249:23

**Increased** 48:19

**increases** 48:19

**incriminates** 229:15

**incriminating** 229:9,12,13

**inculpateds** 86:2

**indenting** 250:14

**independent** 46:16 132:24 133:3 136:21 165:14 169:3 319:10,16,24 320:4,12,16 321:10,17,25 322:2,8,13,20 323:3,6 324:18, 21 326:11,24 331:19 338:12 339:7 342:23

**independently** 20:11

**indicating** 204:9 255:15, 21 256:2 325:16 331:5

**indication** 194:20 252:16 263:7

**indict** 337:24

**indicted** 304:8

**indictment** 305:12 332:25

**indifference** 147:20

**indisputable** 287:2,13

**individual** 55:1 84:24 171:10, 18 174:9,11,16 175:12 178:5 182:6 184:8 186:19 187:1 188:22 189:11, 21 190:8,9 192:20 197:9, 12,14,17 198:3, 23,25 199:4 203:13 210:20, 25 219:15 241:12 273:20 323:23 326:19 328:16 336:7, 19

**individual's** 219:9

**individually** 128:3

**individuals** 73:21 84:3 108:4 111:20 128:18 135:22 170:3 171:9 172:2 173:21 174:8,25 175:8 176:18,24 178:25 179:11 181:19,20,22 182:20 184:8 187:8 188:6 203:16,22 206:12 208:9 210:16 219:3 224:22 232:17 241:22 245:2,3, 25 246:3,5 289:17,20 290:4,7,22,24 291:8 292:14, 17,25 293:10, 11,15,19 294:7 296:20,24 297:18 303:22 338:9 341:24 342:1,18,19

**infer** 197:21

**informant** 173:8,9,23 174:15,19 176:3,7,15 177:21 179:7, 18,21 180:2,21 181:7 186:8,13, 16 189:18 196:21 197:1,3, 7,8,13,19,22 198:4,9,13,15, 19,22 199:5,20

**informants** 173:16,18 174:9 176:9,11, 23 177:13,14 178:4,10,16,20 179:3,12 181:14 189:14

**information** 12:25 28:6 54:8 68:5,12,17,19 69:1,13 71:17 72:1,7,13,21 73:6,16 74:3,7, 8,16,17 75:1,8 79:19,20 80:6,9 82:1 83:13,15, 20 85:9,18,22 86:2,3,6,9,10, 12,14,16,21,23 87:4,7,13 124:19 130:23 132:8,15 133:20 135:14, 15 141:11 142:9 143:17 144:11,20,25 146:16,23 147:3 158:19 159:16 161:12, 13 168:10 172:10 174:1, 12 175:7,15,24 177:6,22 178:19 179:12, 13,16,23,24 180:5,12,15,19, 23 181:3,5,21, 25 182:8,13,18, 21,24 183:3,13, 15,18,24 184:9, 13,21,22,25 185:7,15,16,19 186:5,8,12,25 187:2,9,14,21, 22 188:1,3,8, 13,19 189:1,10, 16 197:25 198:6,12,15,18, 21,24 199:18, 19 203:2,8,12 204:9 216:9,12 230:9,14 232:4, 6 233:19 241:19 242:7 245:16,21,22 248:6 249:6 254:2,11 255:2, 4,20,23,25 256:1,6,7 257:6,8,19,23 258:15,16,18 259:4,15 260:11 261:16, 20 262:2,24 263:2 265:1,9

267:11,15,19, 23 268:6,15,17 275:16 295:7 303:9 308:3 323:10 325:25 326:1 334:7 335:16

**informed** 215:6 264:9 318:18

**initial** 21:23 24:2 74:24 122:11 157:25 169:9 204:7 309:25

**initially** 25:4 56:12 74:6 122:11,16

**initiate** 144:21 145:1 148:23 152:13,24 274:24 277:6

**initiated** 145:6 263:14 275:22 277:21 316:18

**initiating** 278:16

**initiative** 263:16

**injured** 325:5, 24

**injuries** 325:8 332:17,24,25 333:14,16 334:3 335:10, 15 336:20 337:17 341:7,9, 11

**injury** 324:24 325:2,12,17 326:5 333:11

**innocence** 134:5,19

**innocent** 135:17

**input** 92:22 237:17

**Inquiry** 272:8, 18,20

**insane** 284:22

**inside** 127:1 128:15 129:21 137:6 159:4 217:16 232:22 319:2

**instance** 12:7 42:21 94:8 165:22 175:15 260:5 275:10 276:5,12 309:19 315:18

**instances** 10:9,25 12:13, 21 13:3,16,18 17:12,19 18:1 81:5 104:15,25 108:19 149:5 153:8,10 154:1 160:11 167:22 177:20 184:11 236:12,20 240:1 275:15 276:19 279:8 307:21 308:18, 25

**instructions** 227:8,17,22

**insurance** 10:21 284:13

**integrated** 156:6

**intended** 43:20 112:9

**intention** 71:4 108:7

**interact** 299:1, 4

**interaction** 137:10 139:6 318:9

**interactions** 47:14 195:7 230:25

**interest** 77:13 89:23

**interfering** 300:10 302:11

**interim** 119:6 212:10

**internal** 11:13 140:8 144:13, 17,18,22,23 148:11,15,17 165:14 169:5 170:1,6,16 172:21 277:10 281:23 286:7 287:5 304:4 305:4 307:5 308:5 309:3

**internally** 148:7,11

**interpret** 18:2

**interpretation** 261:11

**interpreted** 292:19

**interpreter** 233:4

**interrogation** 308:7 309:4,18 313:12

**interrogations** 309:16 312:23

**interrogatory** 24:12,14,17,19 25:1

**interrupt** 116:13 161:22

**interview** 56:1 71:10,16 73:13 74:13 114:2 115:15 172:10 202:12 226:16, 18,20,22 228:4, 21 231:4,5,7 232:8,9 233:12 254:17 262:22 309:8,14 317:13 329:21

**interviewed** 17:12 73:15 75:7 79:15,18 82:10 125:1 202:9,13,20 203:5,7 225:21 231:3 232:3 233:3 317:9 323:8

**interviewing** 17:6 55:16 155:11 156:9 202:22 203:22 253:11

**interviews** 17:8 56:8 73:2 77:6 115:7 202:25 203:15 204:12 233:8, 10

**intranasal** 341:3

**introduced** 286:20

**introducing** 286:12

**inventory** 21:1,18,19 22:22

**investigate** 170:1,13 172:14 190:9

**investigated** 29:13 50:4,7 145:11 166:3,5, 7 169:3,4,6 171:8,9

**investigating** 45:20 165:15 170:6 171:25 172:2 182:17

**investigation** 23:4,8 27:14, 18,19,20,25 29:4,6,15,20 30:13,17,18,23 31:4 59:16 64:10,23 65:14 66:14,23 67:7, 11 68:6,12,20 69:2,14 70:19 75:2,8 77:10,14 81:25 83:11,20, 21 84:2,3,8,14 85:9,20 86:20 87:4 96:4 103:18 120:19 121:2,8,11,14 122:2,17,21 124:21,25 125:4 126:21 130:19,24 131:4,7 133:8 143:19,21,22 144:1,2,7,13 145:13,22,25 146:4,6,11 148:10,15,18, 23 149:6,15 151:12 165:13, 17 166:13,24 167:9 168:9 169:3,10,18 170:14 171:5, 17 172:11,16, 24 173:2 175:21,25 177:22 182:1 194:21 195:5,9, 13 202:3 227:24 231:8, 10,17 239:3,8 242:5,12 249:6 251:22,25 255:16 256:9 263:23 264:17 265:14 266:14 267:6,7 277:7, 21 304:4,20 305:5 306:4,24, 25 307:2,3,7,11 313:17,19,21 314:5 316:17 317:15 323:9, 10 325:22 338:1,5,6 339:12 340:12

**investigations** 40:20 46:9,20 54:7,18 55:5 56:25 57:14,17 60:17 63:18 78:8 89:18 102:7 114:8 143:24 144:18, 22,23 145:5,9 148:12 150:1 152:5,14 169:25 170:5 171:6,8 175:17

176:25 180:13 284:10,11 287:5,6 300:11 302:11,19 303:3 309:9,23 310:1

**investigative** 20:25 21:19 22:22 23:21 31:6,15,19 45:9 58:11,13 59:2, 24 60:5 61:12 63:18 64:5,9,23 65:6,15,16,23, 24 66:17,22 74:7 84:1 85:3 195:11 208:14 265:15,18 266:1,4,11,13, 20 267:8,12 268:7 339:14 344:3

**investigator** 17:17 64:3 87:13 182:17 262:8 274:9 323:16,19 326:13,16 327:1,12 328:7, 11,15,18 329:2, 5,8 338:2,3,4 340:11

**investigator's** 326:22

**investigators** 45:9,19 49:18 67:6 146:15 263:2 307:5 317:16 337:25 339:13 340:17

**involve** 108:2

**involved** 45:14 57:20 71:11 80:3 81:3 99:12 119:12,14,22 122:21 125:3 127:21,22,24, 25 130:19,24 145:2 174:3 175:16 177:4 182:14 264:17 296:22 304:17 318:9 337:6

341:13,17 342:3,15

**involvement** 80:10 87:5 89:18 90:19,23 110:11 124:24 131:6 136:25 194:6 195:8 215:2 225:18 232:21 237:24 242:4,19,22 255:15 302:12 306:3

**involves** 107:15 148:4,5

**involving** 108:19 144:7, 22 147:20 155:22 259:6 263:5 309:20 313:22 315:21 342:8

**IOD** 325:6,9 326:2

**IPRA** 165:15 169:4 287:5

**IR** 222:14 223:12

**isolated** 138:13

**issue** 61:10 76:3 113:23 335:5

**issued** 97:4

**issues** 55:15, 25 113:19,21 114:21 115:4 147:19 302:18

**J**

**James** 324:24 325:14

**January** 44:2

**job** 44:7 89:5 92:7,24 94:7,16 274:10 284:15, 18 340:12,14

**jobs** 44:3

**Joe** 48:23 298:20 299:23 300:5,10 304:5, 7,9 305:6 306:9

**John** 37:7,8

**Johnson** 119:4 286:5 287:16

**Johnston** 274:3

**Jon** 310:5,11, 17,21 311:10, 14,16 312:1,16, 24 313:4,11,22, 23

**Josh** 18:23,24

**jot** 185:16

**judge** 156:16

**judges** 156:14, 15

**judgment** 12:14 42:9 153:19

**July** 94:12

**jumped** 52:2

**June** 192:3,5 195:16 202:8 215:1,14 218:2 226:15 228:15 235:18 240:6 243:6 246:14 249:12 251:13 252:11 253:21 254:1,22,25 255:3,10,13

**jury** 121:15 134:11,12 147:11

**justified** 332:14 337:10

**justify** 123:11, 15,19,23 124:3

**K**

**Kato** 105:7,9, 10,14,17

106:15,21,23 109:9

**keeper** 333:17

**keepers** 333:13

**keeping** 122:4 155:20 156:1 160:14,19,21 317:20

**Kentuckiana** 7:5

**Kentucky** 7:7

**key** 307:13

**kick** 42:8

**kicking** 319:22,23 324:11

**kid's** 94:13

**kids'** 284:13

**kill** 215:17 216:8 225:12 240:9

**killed** 131:1

**killing** 199:7

**kind** 22:14 25:11 37:16 38:9 41:10,13, 17 43:1 48:14, 18 49:8 50:15 52:2,7 53:10,25 54:14 55:23 62:11 76:20 80:11 86:9 87:25 89:24 91:16,17 92:2 95:3,22 97:8 112:21 113:1, 22 114:5,18 118:22 120:8 121:21 138:12 144:21 149:6, 14,23 151:11 152:24 153:17, 22,24 154:13, 21 156:3,15 159:16 160:23 161:4,13 163:19 173:17

174:5,6,17 181:3 184:6 188:3 204:1 207:9 208:7,20 210:7 224:5,7, 9,10 229:16 256:13 263:18 264:4 274:5,18 277:17 280:13 281:10,16 283:14,17,21 285:1,16 286:4, 5 289:24 292:11 294:5 295:14 299:16 332:25 344:3

**kinds** 31:18 54:17 73:1 80:14 103:16, 23 113:25 188:6

**knew** 70:7,8 92:23 102:12 130:25 131:2,3 139:23 143:23, 25 163:12,19 199:21 200:12 222:18 255:4, 14 259:18 299:15 300:14 323:20

**knowing** 305:24 306:1

**knowledge** 45:20 54:20 61:21 130:23 133:15 134:4,9 137:12 140:19 141:3,12,16 142:7 149:3 151:21 216:3,4, 6 217:10,12,13, 22 225:14 231:9 233:15 235:24 236:1 238:19,23 239:1 240:17, 21 241:7 254:17 258:13 264:11,19,21 266:10 300:4,7 308:1

**knowledgeable** 54:21

**Kriston** 105:7, 13,17 106:21 109:9

**L**

**lack** 339:13

**Laquan** 283:7 286:24

**large** 120:7 168:4 267:2

**larger** 31:21

**lasted** 322:21

**late** 57:24 58:3, 4,13,15,18 59:13 60:3,7,8, 16,24 61:4,9, 13,15 315:19, 20 340:17 343:14,19

**latest** 254:1 255:3,13

**Latz** 195:2,5,11 230:24 231:1,3, 6,9,16,17 232:3 233:3 235:19, 24 236:2 249:1

**law** 145:13,17 151:24 153:23

**lawsuit** 11:1,9, 21,24 12:4,10, 13 13:4 27:13 29:24 30:10,11, 16 32:15,17,25 33:5,12,16 35:5 36:15 39:14,22, 24 116:18 154:9,23 291:1

**lawsuits** 13:5, 10 39:1,4 154:3

**lawyers** 107:3

**lax** 96:1

**layer** 295:16

**lead** 80:5,12, 13,15 81:1,2 121:1,5,7,10, 13,17,20 122:3, 16,21 190:9 255:15,20 257:6 258:10 259:6,19 262:14 263:5,7, 11,22 264:3,14, 18,20

**leads** 58:9 77:9 79:6

**leaf** 192:10

**leaned** 328:2

**leap** 204:2

**learn** 73:18 109:8 131:10, 12 139:25 145:24 156:25 157:5,11 158:3 177:20 284:17 301:25 303:2, 10 304:4 305:4

**learned** 30:11 68:5,12,19 69:2,13 83:16, 21 85:9,20 106:20 142:19, 21 143:2,6,11, 12,17 144:11, 20,25 158:1 163:17 164:18, 23,25 167:11 186:8,12 187:1 199:20 254:2 275:16 300:20 301:18,23 302:7 305:10 320:2

**learning** 132:25 142:17 158:12

**leave** 55:23 256:19 318:17

**led** 155:7 156:12,14 257:23 285:2 290:12 301:7

**Lee** 50:17,19

**left** 34:20 35:11,15,25 40:5,6,8 105:10 127:4 148:5 235:10 243:14 246:25 252:15, 19,20 314:25 334:6

**left-hand** 193:7

**legal** 142:2,5 261:23

**lengthy** 22:15 202:5

**lenient** 95:22

**letter** 344:2

**level** 90:15 93:20 113:17 115:14,25 143:8 147:3 152:2 189:7,9 199:4 281:24 295:9,15 306:18

**liability** 156:22

**lie** 281:9 284:15,17

**lies** 284:5,8

**lieutenant** 43:10,11 87:19, 22 88:5,8,15 89:3,19 90:8, 11,18 91:2,20 92:5,20 93:1, 12,16,24 94:9 95:9 101:1 103:21 104:5 109:15 153:7, 13 158:5 169:8 170:22 171:1 172:18 295:15 303:1,11 304:3, 12,14 305:17, 20 308:14 311:4,7,18,24 324:23 325:1,3, 12,15,19,24,25

**lieutenants** 93:20 158:11 159:17 170:20 313:9

**light** 133:18 165:20 321:1,2

**light-complected** 222:3,4,6

**Lightyears** 281:2

**likeness** 219:4

**limit** 95:11 96:24

**limited** 97:7 110:2 215:2 222:23 233:2 242:14,15 296:19 297:3

**line-level** 118:5

**line-up** 226:17

**lines** 108:17

**lineup** 20:25 21:14 22:3 127:1,7,9,20, 21,24 128:9,19 129:19 130:5 131:23 132:9, 14,16,21 134:18 136:5 137:3,6,23 138:17 139:1 207:4,7,14,20, 24 208:5 209:5 210:9 211:2,3, 5,11,18 212:2, 14,23 213:2,14, 21 214:4,8 215:7,15,20,22, 23 216:2,5,13, 16,17,18,20,25 217:6,11,15,19, 20 219:6,12 220:14 227:9, 11,18,22 233:21,22,25 234:2 236:13, 15,21 237:5,12, 18,22,25 238:4, 7,10,13,14 239:4 240:6,8, 12,13,19,23,25 241:5,11,13,14 242:25 244:1,4, 12,18,22,23,24 245:2,4,8,14 246:1,6,21 247:10,15,22 248:3,7,9,11, 14,17,18,19,23 249:2,5,7,16, 19,20,25 250:16

**lineups** 120:22 126:23,25 127:13,15,16, 19,20 129:1,17, 20 130:1,17 131:5 132:12, 19,25 134:3,20 135:8,9,22 137:1 138:6,9 194:5 207:2 208:24 209:19 210:15 225:20 227:2 232:23 241:11 242:15 249:5

**list** 57:24 58:3, 4,13,15,18 59:13 60:3,9, 17,24 61:4,9 122:5,6 343:14, 19

**listed** 193:2,17, 18 194:1 196:6, 15 205:9 243:11 245:3 252:14 253:3

**listing** 248:7

**lists** 61:13,15 192:24 194:15, 16 195:2 244:3 246:25 247:4 248:17 250:5 253:2

**literally** 191:6

**live** 237:18,22 238:6,10

**lived** 179:13

**lives** 72:8

**locate** 232:17 341:20

**located** 7:6 41:8 232:12 318:2 328:1

**location** 7:16 46:3,17 125:19, 22,23 341:12, 17

**lock** 204:6 205:17

**lockdown** 95:24

**lockdowns** 96:23

**lockup** 129:5 246:8 332:17, 24 333:12,17 337:16

**Loco** 253:8

**long** 13:13,15 19:20,24 34:5 37:16 41:1,2 63:9 79:10 97:6,25 100:7 113:9 117:8 126:8 129:6 142:7 144:17, 24 150:23 151:3 157:22 201:13 208:21 242:1 274:15 275:23 294:19, 23 302:8 306:5, 11,19 311:21 316:7 324:18

**longer** 20:1 30:1 34:4 61:3 117:17 314:18

**looked** 32:4 172:23 219:21

**loosely** 174:7

**lose** 85:14 156:20 157:15 160:1

**losing** 154:14 284:18

**lost** 154:9,15 155:5 157:16 159:24 298:18

**lot** 12:16,25 14:7 41:15 43:5 45:12,19 53:8, 13 57:19,24 58:1 89:11,22 90:10,14 91:18 96:14 99:16,17 116:15 168:16 172:16,23 182:19 191:15 201:25 204:12 217:3,5 220:12 224:20 280:22 283:11 285:1 286:15 336:21

**Louisville** 7:7

**low** 50:15 52:3, 5

**lunch** 111:18 113:24 114:2 150:13,17 151:2 162:23 164:16

**lying** 280:17 286:10

**M**

**made** 87:17 121:21 126:12 150:5 169:24 177:18 189:13, 20 209:16 218:5 229:13 241:18 282:2, 19 291:23 292:6,7,24 295:1 296:12 305:8 307:11 311:24 312:8, 15,20 313:18 338:13 343:18, 19

**mag** 321:1,2

**Main** 7:6

**maintained** 184:2 225:5 266:18

**maintaining** 181:21

**maintains** 176:17

**major** 285:7, 10,24 297:6,11 298:4

**majority** 293:18

**make** 15:6,11 42:22 57:25 58:9 67:1 89:13,14 94:2 95:11 99:15 120:8,14 127:4 150:17 154:11, 25 156:6,20,21 159:2 183:9 191:6 204:1,2, 10 206:5,6,13 207:12 210:21 219:11 221:7,8 222:12 223:1 227:3 232:16 233:20 241:15 251:19 260:9 264:9 282:16 309:3 311:9 314:22 317:19

**makes** 162:9 195:24 221:1

**making** 57:21, 22 89:10 99:16 209:4,17 233:15 288:19 325:2

**male** 334:1

**maltreatment** 327:21

**man** 50:15 52:3 315:21 318:15

**mandatory** 279:8

**manipulated** 136:14

**manipulating** 136:4

**manner** 57:23

**manpower** 45:11 89:9

**March** 95:15

**Margaret** 190:24

**mark** 190:12 243:4 246:12 251:4 267:17 316:14

**marked** 190:13 191:20,24 242:11 243:9 246:15 251:7, 10 268:19,21 269:4 272:25 273:11,13 316:20

**marking** 272:23

**Markus** 333:23

**match** 220:8

**material** 27:2 32:2 67:12 90:7 222:11

**materials** 28:11 31:22 32:11

**math** 100:8

**matter** 7:10 10:10 11:8 77:5 135:5 139:12 160:14

**mayor** 291:14 292:3,6,24

**Mcdonald** 283:7,10,12 286:24

**Mcgrath** 8:3,19 139:21 140:23 141:7 163:21 344:9 345:15, 18

**Mcmurray** 37:6,7,8,9

**Meaning** 236:13

**means** 14:16 173:13,20 197:22 212:17 338:3

**meant** 64:17 119:18

**mechanism** 264:25 265:6 267:22 268:2,3, 6

**media** 89:22 140:3,21,25 143:2 163:17 165:9 283:14 291:21

**medical** 16:18

**medications** 16:14

**meet** 37:17 300:6

**meeting** 18:18 19:3,6,12,13, 20,24 20:21 22:5,10,13,15, 18 23:2

**meetings** 18:11,14,16 20:4,5,8,18 39:21,23 89:11 281:23

**Megan** 8:3 343:9 345:14

**member** 87:6 196:21 197:19 200:1,6,14 253:7 254:3 255:22 257:24 261:18 263:13

**members** 45:14,21 201:9, 12 254:13 256:3 302:23 303:4,9

**memo** 59:15

**memory** 30:17 70:18 132:20, 25 133:4 219:2 232:7 233:7 242:4,11 253:10 297:15

**memory's**

40:22
**mentioned** 39:17 54:3 286:17 290:10
**mere** 98:22
**merit** 92:18,19, 25 93:2,3,9,10, 11,12,15,18
**merits** 93:19 94:8
**metal** 332:22 333:10 335:7,8
**method** 223:12 277:15
**Mexico** 232:25
**mid-2000s** 288:21
**middle** 218:10 228:6 334:13
**midnight** 51:8, 9,11 52:6,14 164:4
**midnights** 50:16,17,24 51:13,24 52:10 53:11 97:18,25 98:8,14 163:8 300:1
**Miedzianowski** 48:23 298:21 299:23 300:5, 10 301:8 302:16,21 304:5,7,9 305:6,11 306:9 307:7
**Mike** 195:2,5 230:24
**milestones** 285:16
**million** 343:15
**mind** 111:24 275:25 283:8
**mine** 82:7 236:17 271:8 272:13 273:8, 14
**Mingey** 40:3,4, 9,10,20 47:18 50:19 254:2,6, 9,16 255:4 258:24 259:4,5, 11,17,18,25 262:16,21,23 263:4,7,13,14, 21
**minimum** 29:16
**minute** 94:13 173:6
**minutes** 32:12, 13 147:14 150:21 151:4 159:8,10 234:10,13,15, 25 314:24 315:1,2
**Miranda** 154:17,20
**mischaracterizes** 119:16 291:6,14 307:9
**misconduct** 106:14,20 109:8 135:25 138:25 140:1,6, 8,13 145:11,18 146:13 149:7, 17,25 152:7,14 153:1,14 164:16,19,23 165:22 167:3,9, 23 168:8,23 169:10 172:14 274:12,16,22 275:11,17 276:7,14,21 277:8,10,11 278:9 279:15 280:4,9 281:25 282:11,12,14, 19 283:2 285:5 287:14 288:4, 20 289:1,11 290:1,17 293:2, 21 294:12,16 295:13 296:2, 10 297:7,12 298:5,11
306:13 309:20 310:5,11,16,21 311:10 312:16, 24 313:4
**misinterpreted** 119:17
**missed** 218:1
**misspoke** 343:21
**misstates** 40:16 66:19 141:23 159:21 166:18 171:11 178:9 205:25 239:23 254:5 278:22 289:13 321:22 332:6 338:23
**misstep** 157:21
**mistake** 159:2 282:16,19
**mistakes** 155:14 157:12 282:13,21
**mistreated** 275:4
**mistreating** 277:22
**mistreatment** 278:17
**misunderstanding** 98:25
**misunderstood** 19:6
**modifications** 154:12
**modify** 153:22 154:24
**modifying** 110:11
**moment** 42:21 78:19 217:25 283:7,8
**Monday** 18:15, 19 19:20 20:18, 21 21:13 22:13, 18 23:2,12,16
**Monell** 116:23 147:10
**monetary** 12:23
**money** 95:18 180:6
**Monica** 27:15 120:18 133:22 215:17 216:8 225:12 233:14, 23 234:1 240:9 251:22,25 254:3
**monitor** 89:13
**Monterrey** 41:5,7,19,21 44:1
**month** 52:9 95:14
**months** 11:7 29:25 36:13 43:22 56:14
**Moore** 231:24 232:2,8
**Morgan** 324:24 325:14
**morning** 8:3 249:17
**mortgage** 284:14
**motion** 160:22 161:7
**mouth** 135:2 281:15 282:24 339:11
**move** 27:6 42:13 93:5 99:20 117:2 159:11 262:13 284:17 295:5, 14,22,25
**moved** 34:13 48:18 100:6 284:20
**movements** 127:4
**movementsh** 216:22
**moving** 71:22 83:6 85:13 106:18 320:6
**multiple** 50:14 53:23 55:16,18 82:10 165:21 166:6 210:25 211:25
**multitude** 122:13 160:2
**murder** 27:15 125:11 131:4, 19 133:22 157:18 173:7 176:6,11
**muscular** 299:10,15
**Myers** 37:3,20
**mysteries** 170:12

## N

**nail** 294:18
**named** 27:15 37:3,5 47:4 50:17,19 101:11 105:7 131:10 192:20 200:14 241:13 253:11 273:20, 24 274:3 315:21
**names** 33:4 37:5 176:18 187:13 192:24 193:13 245:25
**narrative** 195:16 199:6
**narrow** 57:11 102:2 284:24
**nasal** 334:6 336:15 337:2,5 341:2,5,6
**nature** 11:13 48:21 105:20

114:3 178:2 261:17 279:21 280:12 304:20 344:2

**nauseum** 245:14

**Navarro** 318:1

**necessarily** 73:23 98:19,23 99:1,10,16 155:25 171:20 183:25 199:3 220:9,24 221:13 258:1 259:12

**neck** 281:9

**needed** 70:17 75:16 77:21 90:1 97:12 98:21 103:16, 23 126:9 172:11 183:3 189:11

**negative** 79:1

**net** 42:4

**newly** 158:23

**news** 140:3 291:21 305:12

**nickname** 54:22,24 72:10, 22 200:2,7 253:8

**nicknames** 45:20 54:12,21

**night** 38:9

**nods** 15:1

**nomenclature** 137:25

**non-exempt** 109:3

**non-supervisory** 118:7

**nonexistent** 280:16

**nonstop** 159:1

**Norman** 333:23

**North** 44:12,15 46:1,23 47:8,9, 13,15,19,25 48:22 328:1,24

**Northern** 7:13

**nose** 334:22 336:12

**note** 79:7 107:13 116:14 147:17 161:19 243:1

**noted** 334:21

**notes** 64:13, 16,24 71:5,11, 14,19 72:2,10, 12,17,19,23 73:1,7,24 79:21 80:6 142:24 199:11,12,13 272:10

**nothing's** 10:22

**notice** 94:13 147:19

**notification** 208:19

**notifications** 195:1

**notified** 29:24 168:18,19

**number** 7:14 11:25 12:1 106:14 163:3 165:7 183:7 184:14 185:1 189:21 250:18, 19 251:21 265:2,10,15 266:14,18 267:2 278:18 279:4,5 287:24, 25 293:7,8,9,18 296:20 297:3 316:17 317:4 327:4 330:4 333:12 341:19

**numbers** 72:16 246:5 251:5 273:5 292:25

**numerous** 13:25 264:24

**O**

**oath** 14:10,14

**object** 25:11 28:8 29:21 31:8 37:24 40:16 46:10 47:10 49:20 55:7 57:9 60:10,13,21 61:6,18 62:2 63:13,14,21 64:14,20 65:1, 10,19,25 66:18 67:15 68:8,14 69:15 70:15 73:25 74:19 75:4 76:19 78:9 79:12,24 84:9 89:6 109:10 113:6 114:9,24 128:14,20 138:19 139:2 144:15 146:18 150:2,3 151:16 155:24 158:17 161:16 163:13 164:10 168:1 170:9 172:5 177:1 178:21 179:4 180:8 182:10 183:1 187:18,23 193:22 194:2 199:1 200:9 203:25 213:9, 16,23 218:25 226:2,7,12 229:10 230:13 231:11,19 232:19 236:5 237:6 242:17 261:8 266:6,9, 16 276:8 277:13 286:2 289:13 290:2, 19 293:4 294:3 296:7 300:8 309:21 310:6, 12,18,24 311:11,19 312:25 313:5, 13,24 314:8 320:9,15 323:18 325:20 326:3,20 332:6 340:20 341:8 342:12

**objecting** 116:20

**objection** 26:24 28:13 58:21 66:9 67:25 68:21 69:3,8 71:1,7, 20 72:4 73:3 74:10 75:10,17 76:1,23 77:18, 22 80:7,17 81:15,16 82:3 83:22 84:4,21 85:5,12 86:18, 25 87:9,15 91:25 92:9 93:8 94:19 95:12 98:16 102:9,10, 19 103:1,9,10, 25 104:9,10,17, 18 105:1 106:22 107:2,9, 20 108:6,12,25 109:18 110:1, 14 111:6,14 114:14 115:8, 19 116:3 118:9, 10,21 119:16, 24 121:3,18 122:9 123:2,7, 12,16,20,24 124:4,10,16,17 126:14 130:7 133:24 134:15, 16,25 135:18 136:16 137:4,5, 18 139:3,21 140:10,23,24 141:6,7,14,23 142:12 145:7, 19 146:2,19 147:5,6,12 148:8,9,25 149:1,9,19,20 152:8 153:2,3, 16 159:20 160:18 161:1, 24 163:20,21 165:1,2,12,23, 24 166:11,18 167:5,13 168:12 169:1 171:11 177:2,8, 15,16 178:8 179:14 180:16, 17,25 181:15 183:21 184:4,5 185:3 186:15 189:22 205:5, 25 206:14 209:20 210:18 211:6,13 212:3 213:3 214:12 217:1 220:23 229:6,19 230:6 237:13 239:12, 23 254:5 255:18 257:11 258:4,11,19,25 259:8,23 260:6, 13,20,25 261:22 262:5, 18 263:9,25 264:6 265:4,11, 12,20,21 267:25 268:10 278:22 280:5 281:6 283:9 291:5,13 295:18 296:15 303:13,14 304:18 305:25 306:6,14,21 307:8,24 308:9, 20 309:6 312:2, 12,18 313:25 321:22 335:3 336:22 337:4 338:20,23

**objections** 107:10 161:20

**objective** 187:11

**obligation** 278:20 279:8

**obligations** 67:17,24

**obscenities**

318:16,24

**observant** 296:12

**observation** 295:1 296:4

**observations** 296:12

**observe** 295:12,16 342:20

**observed** 293:21 294:15, 21 296:3,10 342:25

**obstruction** 341:5

**obtain** 124:9

**obtained** 131:13

**obtaining** 123:6

**occasion** 209:8 222:22 244:17

**occasionally** 44:6 54:11,15 89:20 171:22, 23 188:19 201:22

**occasions** 13:25 222:17 318:17

**occur** 121:24 148:7,11 151:23 241:18 276:24

**occurred** 17:16 29:8 82:13 97:21 149:24 150:6 168:7 216:2 217:22 229:4,5 230:3,19 249:7 287:17 293:25 298:10 301:23 308:7,18 324:16 326:10 331:18 344:4

**occurrence** 184:17

**occurring** 61:24 129:23 137:9 177:25 301:24 334:4

**Ochoa** 136:15 202:9,12,14,19 208:24 215:16, 25 216:4,7 217:10,15,21, 23 218:11 225:10,16,23 226:6,10 231:4, 6 235:21 236:24 242:25 244:1 245:13, 16,17,21

**Ochoa's** 226:11

**off-duty** 97:22

**offender** 72:8 120:21 154:17, 22 155:6 157:19 204:4 217:4 233:22 238:1 257:19

**offenders** 254:12

**offense** 280:18 284:3

**offer** 135:3,16 138:24 139:5

**offered** 291:3

**office** 46:2 118:25 151:24, 25 169:7 170:23 207:17 224:16 267:3 327:15 334:1 341:14

**officer** 10:7,11, 15,18 13:1,20 14:2 17:4 18:5 32:19 33:24 43:6 44:4,9,21, 22 45:1 46:23 48:3,7 139:16 149:8 174:11 175:2,22 178:5 185:14 213:8 244:17 273:23 276:18 277:7, 18,22 278:8,17 279:7,15 280:1 295:3 298:22 300:22 303:7 305:22 306:17 307:19 309:20 318:1 324:24 325:2,4 327:16 329:11 332:14

**officer's** 48:10

**officers** 17:20 32:24 38:1 46:1,19 55:21 57:19 81:11 82:11 88:6,9, 10,11 107:11, 12 108:8,20 117:23 118:1,3, 11 140:14 166:10 169:22 172:2 175:24 179:1 280:4 281:24,25 283:11,24 284:1,11,23 286:9 290:1,9 293:3 295:17 299:7 302:10, 11,18 303:2 309:5 332:12

**official** 284:2 286:10

**oftentimes** 172:7 182:4 188:22

**OJ** 155:6 158:1

**omission** 248:5

**omitted** 247:14,17

**on-duty** 94:23, 24 120:24

**on-view** 45:15

**one's** 280:10

**one-third** 279:23

**one-time** 182:21

**ongoing** 153:17,24 154:14,21 155:15 156:23

**online** 7:4 223:15 266:25

**open** 91:23 217:7 319:21

**opened** 166:9

**opening** 165:21 278:10 279:7

**operated** 46:16 205:8

**operation** 89:13 303:20

**operations** 118:24

**opinion** 131:18,21 133:21 135:4, 16 138:24 139:5 163:4,9, 25 164:13 274:4,6,8 285:5,6

**opportunity** 99:9 203:24 205:23 242:10 256:16 330:21, 23 331:6,13

**opposed** 207:4 237:18 257:9

**OPS** 165:15 332:2 338:2 339:12,13 340:11,17

**option** 331:10

**options** 222:23

**order** 67:5,12 70:19 105:17 110:19 112:7 113:12,13 158:13 161:14 262:7,10 267:3 311:9 330:7

**ordering** 345:1,2

**orders** 110:12, 15,24,25 111:11 112:1,5, 13,24 113:3,4 116:1,7,11 120:2,5 262:2

**organization** 292:15 296:25

**organized** 117:12,20,24 118:8 119:25 120:1

**original** 24:2 216:22

**originally** 74:17

**originates** 147:9

**ostracized** 281:16

**outcome** 12:17

**outcomes** 154:2 155:1 158:7,13 210:15

**outline** 150:12

**overly** 87:3

**oversee** 40:19 89:12

**overseeing** 40:13 47:19 62:18 66:4 88:5,8,16,19, 20,22 89:4 91:21 99:22 100:9,15,20,25 101:16,18 102:4,17 103:7 104:6,14 105:6 109:13,23 110:9 111:2 117:11,17 152:4,12,23 153:7 158:5 167:20 168:11, 22 303:12 308:14 311:4

312:10,17 313:20

**oversight** 118:20 170:23 172:16 248:4

**overstating** 32:3 161:4

**overtime** 94:18,20 95:1, 2,7,10,11,24 96:1,3,5,7,12, 17,18,25 97:18, 21 98:2,6,9,13 99:9 110:4

**owner** 277:20

**P**

**p.m.** 51:5 52:14 162:20 215:15 235:8 249:12 252:11 315:9 340:8 345:25

**packet** 32:6

**pages** 32:6 250:11 251:9 268:25 269:14 327:9

**paid** 174:24 175:8 180:6,14

**palm** 336:5

**Palmer** 199:8 228:12,24 229:4

**panel** 329:14, 17 330:3,4,9, 10,12,14,17,18, 21 331:2,6,22 332:4,10,11,16 335:13 337:7 338:5,14

**paper** 121:19 157:20 175:22 204:4 273:6 287:21 319:17, 25 320:5,12,14, 18,19,23 321:11,18 322:3,7,9,15, 23,25 323:5,7, 14,24 324:8,19

**paperwork** 58:10 90:6,11 155:12 266:19

**paragraph** 195:15 199:23 201:2 202:7 214:24 218:2,6, 10 225:6,7 226:15 228:1,2, 7,20 230:21 231:5 232:11 234:18,19 238:17 240:3,4 253:15,25 263:21 334:14 340:22 341:1

**paragraphs** 256:10,11,25 262:21

**paraphrase** 214:25

**parking** 20:3 33:21 278:25 336:21

**part** 23:3,7 31:4 46:14 48:10 64:2 78:23 97:12 98:24 106:4 110:17 112:10 113:20 148:19 160:3 161:8 180:23 183:9 199:9 204:22 207:11 224:13 242:4 248:5 249:21 250:22 262:8 282:5,9 287:12 290:10 294:14 301:6 306:12 341:25

**partially** 297:15

**participants** 216:21 219:16 220:22 248:14 341:23

**participate** 19:10 46:8,19 126:1 195:12 202:11,18 226:19 231:5 232:16 236:9 244:18 245:2 248:3,9 249:1

**participated** 127:14,16 129:10 131:5 195:12 215:21 226:21 231:7, 18 232:7,9 233:8,10 235:24 236:13, 20 239:4 240:14 242:12, 14 244:11 245:7 246:1

**participating** 67:6 129:16 236:3 329:20 342:25

**participation** 132:19

**parties** 8:15

**partner** 53:11, 19 185:10,11 252:20 284:5

**partnered** 53:16

**partners** 53:5, 7 54:10 274:2

**party** 25:20 279:20

**pass** 157:6 186:4 266:1

**passed** 184:22 259:14 262:22 265:18 266:4, 15

**past** 38:23 39:7 96:5 145:1 148:13 149:25 183:4 314:20

**path** 209:25

**paths** 36:2 164:13

**patience** 147:16 315:12

**patient** 334:20 336:19

**patient's** 334:10,14

**patrol** 43:6 44:9 53:8 56:12 57:19 87:24 88:6,8,10,11 93:5 99:24 118:3,11 179:1

**patrolman** 44:6 63:8

**pause** 196:22

**pay** 45:8 177:14

**paycheck** 284:13

**payment** 12:23

**payments** 181:6

**PDF** 345:12

**penalty** 330:6

**pending** 7:12 16:9

**pension** 41:24

**people** 36:12 37:2,11,21 49:19 50:7 55:16,19 57:25 84:14 89:14 92:23 128:24 142:1 170:1 172:25 173:17, 22 174:1,6 175:16 178:24 179:2,8 182:12 189:5 199:6 204:5 206:3 219:20 220:5 222:15 224:4 227:2 245:7 246:7 283:23 290:16 293:13 297:1 298:1 341:18,19 342:15

**percent** 47:6 59:11

**percentage** 61:25 278:17

**percentages** 62:5

**perfect** 162:12

**perfectly** 9:18 31:13 162:4

**perform** 272:20

**performance** 62:16,21,24 63:3

**performed** 129:9

**performing** 92:7

**period** 44:11, 14 45:4 47:25 51:25 57:7 88:21 100:21 101:15,22 102:3 167:20, 21,22 222:10 280:1 296:5,12 297:11 301:13, 18 327:17 340:17

**perpetrator** 203:13,18,24 205:20 219:15, 23 254:3 255:5, 21 257:24

**perpetrators** 263:6

**person** 54:23 72:15 75:6 80:3 81:2 85:10,19 86:3,5,17,22 87:6 131:14 171:20,23 172:7,8,9 174:20 179:20 180:2 182:2 183:11,16 185:8,21 187:9, 12 188:2 198:8 199:17 200:17

203:2,8 204:8, 16 207:6 211:2, 3,10,18 213:22 214:10,11 215:17 216:8 219:5,7 225:11 226:22 233:14, 23 234:1 240:9 253:3,11 317:9 327:21 328:20

**person's** 204:17

**personal** 10:10,14 11:1 87:16 213:12 216:4 217:10, 13 225:14 233:15 235:23 236:1 240:17 253:10 261:3, 13 264:10

**personality** 299:16

**personally** 123:10,18 125:13 134:23 176:13 261:3 276:5,19 308:12 318:9 341:17 342:3

**personnel** 111:17

**persons** 77:13 232:12 244:4, 23,24 247:15, 22 248:7,17

**perspective** 96:2 107:13

**pertain** 256:21

**pertinent** 18:8

**perused** 30:4

**perusing** 31:14 32:1

**Peterson** 318:2

**phone** 19:10 33:8 182:16 183:7 185:9,10 189:21

**phones** 185:13

**photo** 78:20, 23,25 200:21, 22,24 205:10, 14 206:15,18, 21,23 207:2,4, 11,14,20,23 208:4 209:5,19 210:8,19,20,25 211:3,10 212:8, 14,18,24 214:10 218:11, 15,18,20,24 219:7,13,17,24 220:21 221:11, 15,20 222:4,10, 12,20,21 223:10,24 224:13,17,21 225:10,17,24 226:9 235:20, 25 236:3,9,20, 24 237:5,11,19, 20,25 238:4,6, 7,8,13,15,18, 20,24

**photograph** 220:3,9 222:17 223:6,7 333:14 335:14

**Photographing** 201:21

**photographs** 223:9 266:17 267:2

**photos** 22:2,3, 5,6,21 77:17 78:19,20,23 201:8,12 202:1, 6 205:3 206:6, 11,15,16,17 210:16,19,24 211:1,17 212:2 213:13,20 214:4 218:12, 17 220:13 221:9 222:13, 14,15 223:2,12, 13,14,19,25 224:6,17,22 226:6 239:2,7, 11,13,15,16,20 240:1 266:21, 25 332:18,24 337:17

**phrase** 118:23 283:3

**physical** 125:24 126:1 167:23 207:7, 14,24 208:5 220:14 237:22 238:6 299:10 332:20 335:13 337:12,14,16, 19,20

**physically** 146:13 212:13 307:13

**pick** 173:2 206:25 265:25

**picks** 92:23

**picture** 225:11

**pictures** 201:25 219:10

**piece** 72:21 218:1 253:1 273:6 320:13, 19,23 322:25

**pieces** 113:2

**pile** 31:14

**pin** 168:20 294:19,22 295:10 296:21

**pinpoint** 295:2 297:14

**pipe** 332:22 333:10 335:9

**place** 42:6 62:12,16,21 82:15 102:6 127:5 149:15 153:14 213:8 263:19 285:19, 20 289:5 297:5

**places** 89:15 151:22

**placing** 229:11,14,15

**plaintiff** 7:19 8:18 27:11

**plaintiff's** 7:17

**plan** 151:1

**planned** 108:18

**plastic** 333:24

**play** 92:25 122:25 123:4 126:4,21,24 168:17

**played** 92:20

**plead** 99:11

**pleading** 143:13

**point** 16:8 17:3 23:1,19,23 24:1,5 30:18 37:14 65:5 81:21,22 83:15 85:10,19 97:3 100:13,15 103:14,20 105:10 106:13, 17 109:1 110:8 117:10,16 119:11,14,21 122:1,10,12,22 130:21 139:15 145:12 163:16 169:17 189:25 199:14 227:6 229:8 245:12 257:2 264:16 280:14 283:18 285:18 286:9 289:16 302:17, 25 304:2,25 308:16 309:2 320:24,25 333:5

**pointed** 80:10 257:7

**pointing** 86:21 87:5 262:14 264:18

**Polaroid** 200:21,22,24 201:8,17,19 202:1 218:12 222:13 223:1,2, 4 224:17

**Polaroids** 223:11 224:15

**police** 9:14 10:7,11,15,18 11:1,9,13,20 12:10,14 14:2 17:4,20 21:6,8, 9,11,13 22:19, 21 23:3,8 27:14 29:19 31:4 32:18,24 33:24 36:21 38:1,15, 16,20 41:24 42:14,18 44:4 82:11 92:12 105:18 106:5, 19 109:7 118:20 126:17 131:12 139:16 140:9,13 141:5 144:13 147:20 148:6,23 149:8, 15,24 151:11, 14,24 166:10 169:16 174:21 175:7,24 180:1 192:1 201:17 211:25 213:8 226:10 243:6 264:23 267:4 273:23 274:11, 21 275:11,17 276:18,20 280:1,4 286:20 287:6,19 289:24 291:4 292:11 293:1 300:22 303:2 304:16 305:1,4, 22,24 306:17, 19 307:19,20, 22 308:6 309:5, 20 310:10,15 311:7,25 314:7 315:13 324:24 325:1 327:16 330:7 332:12 333:18 334:21 337:25 338:3 339:15

**policemen**

297:22,23,24

**policework** 36:17

**policies** 109:25 110:4,6, 7 111:3,15 112:1,22 113:16 114:6, 12,20 115:6,14, 17,24,25 116:9 119:13,23 120:4 155:10 156:18 261:7, 11 287:24

**policy** 66:7,10 110:3 116:6 119:13 156:12 157:7,9 212:5, 6,7,11,19,21 213:1,5,8 260:24 261:4, 10,15 278:5,6, 7,12 281:5 284:5,8 331:8, 12,15

**poor** 63:16 265:13 340:12, 14

**popped** 57:4

**portion** 265:18 266:1

**position** 16:23 35:15 41:6,19 42:19 44:1 47:2 100:24 101:9 107:14,19 109:6 118:15 137:1 216:23 231:15 284:12

**positions** 42:20 106:19 120:3 246:1

**positive** 79:1

**positively** 134:2,18,20

**possess** 254:18

**possession** 30:25 188:13, 19

**possibilities** 186:3

**possibility** 213:12

**possibly** 34:18 276:3

**post-conviction** 27:3 28:10 132:5

**post-traumatic** 334:2

**potential** 86:4 187:7 205:4 302:12

**potentially** 86:10,16,24 87:7 261:20,25 262:2

**powers** 169:16

**practice** 69:25 70:13 71:18 72:1,17,20,23 73:17 75:23 76:11 77:4,5,9, 12,16 79:17,21 80:5 87:16 102:7 110:23 203:7,19,20,21 205:15,22 207:18 214:3,5 218:23 223:24 246:5 252:13 260:10,24 261:3,13 264:10 267:7

**practiced** 211:15

**practices** 115:15 149:16 151:13 152:24 154:24 155:7 156:9 160:16, 25 161:15 309:4 311:17

**practicing** 102:16 214:2

**pre-trial** 28:18, 22

**preceded** 310:7

**predicament** 183:12

**Preliminary** 254:11

**prep** 39:22

**preparation** 20:5 23:19,23 24:1,5,8,11,21, 25 25:2 26:21 29:3,17 31:23 132:21 192:12 243:7 246:18 251:16

**prepare** 18:6 20:12 325:6,9

**prepared** 20:9 135:3 281:12

**preparing** 70:14

**presence** 20:13 98:21 125:10 278:3 279:16 287:2,7 288:1

**present** 18:18 19:7,9,13,15,17 37:1,3,6 39:25 107:3 125:24 154:19 217:4 221:20 224:12 233:17 244:17, 24 245:2 248:18,22 296:24

**presented** 132:2,5 165:8 168:16 225:24

**preserve** 157:24

**pretend** 337:14

**pretty** 41:14 92:11,23 208:19 291:6 332:22

**prevailing** 293:12,15 296:19

**prevalent** 289:7 292:8 293:17

**prevent** 16:15, 19

**previous** 200:1,5,13 249:18,20,25 298:20

**previously** 9:23 12:9,22 24:23 25:3,5 37:22 43:20 219:14 222:15 232:4 235:20 236:24 298:16

**primarily** 21:3 49:10 50:25 51:11 89:8,12 90:16 91:5 296:11 316:24

**primary** 203:1

**print** 223:20,25

**prior** 9:15 12:12 13:2,10, 16,17 20:5 24:23,25 29:4 40:23 63:6 142:10 152:18 163:16 186:23 208:15 233:21 283:10

**private** 41:8

**privilege** 25:12 136:17

**probable** 84:20 207:11

**problem** 8:14 235:1 292:8 293:24 302:3 304:7 340:16 345:13

**problematic** 213:15

**problems** 142:8 304:10 313:18

**procedure** 93:25 213:2 216:5 217:11 225:15 227:9, 11,18 235:25 236:4,21 238:18,21,24 240:19,23 244:12 249:2

**procedures** 136:5 155:10 227:22 236:9, 13 240:25 241:9

**proceedings** 7:1 27:3 28:18

**process** 60:12, 14 93:2,14,17, 21,23 127:6 128:3,6 129:10 132:5 266:3 332:3

**processing** 155:8

**produce** 25:21 26:17 267:8

**produced** 267:24

**production** 25:6,20 26:16

**profession** 297:25

**professional** 327:15

**progress** 342:17

**progressing** 60:19

**prohibit** 212:11

**prohibited** 300:18

**promise** 234:22

**promote** 11:12

**promoted** 43:7,9,10,11, 13,14 44:10,18 91:6 100:17 158:23 305:20

**promotion** 93:2,3 94:8

**promotions** 92:18,19 93:9, 10,11,12,15,20

**pronounce** 9:9

**property** 61:13 101:4 170:25 171:1

**proportional** 116:22

**proportionality** 147:12

**prosecution** 99:2,4,7 265:3

**prosecutions** 180:14

**prosecutor** 65:16 68:17 266:15 268:9

**prosecutors** 67:13 68:7,13, 20 69:2 264:5,9 265:3,10,19,24 267:9,13,24

**provide** 29:23 41:11 54:8 59:8 70:24 73:16 140:18 175:6, 23 180:15 182:12,18,21 183:7,12 184:9, 21 189:6 194:19 198:18 224:2 252:15 277:1 331:6

**provided** 13:1 24:16 54:22 72:15 80:2 190:10 194:23, 24 198:15 199:5 204:8 216:9 221:14 232:3 245:22 246:4 256:6 325:16 326:1 335:17

**providing** 71:17,25 72:16 79:19 227:8 325:25 331:10

**proximity** 126:7

**public** 282:2

**publicly** 291:19,21

**pull** 191:2,10, 11 224:22 242:24 246:11 268:18,20 287:4,21

**pulled** 319:21 324:3 328:24 339:3

**pulling** 269:5

**pulls** 287:5

**punched** 336:9,10

**punching** 324:11

**punishment** 316:10

**punitive** 42:5,7

**purportedly** 225:16

**purpose** 203:1

**purposes** 9:16 27:17 123:6 133:12

**pursuant** 279:7 331:15

**pursuit** 284:5,8

**put** 30:5 32:7, 16 48:14 49:23 55:3 79:8 117:5 135:1 153:14 191:11 204:4, 10,23 213:8 222:9 229:17 247:17 252:18, 20 261:14 263:1 282:24 284:11 289:15 290:13 309:17 339:11

**putting** 78:13, 18 91:7 93:21 122:4 148:17, 22 273:2

**pyramid** 341:2

**Q**

**qualify** 28:20

**quarter** 279:12

**question** 15:6, 10,12,15,25 16:1,4,5,9,14 25:13 28:5 30:7 36:5,6 57:12 63:17,24 80:24 85:15 87:3 96:22 104:12 107:7,22 108:24 112:12 119:20 124:7 125:25 137:22 162:2,3 166:21 167:7 168:14 178:13 186:21, 23 188:4 189:17 198:8 199:11 204:20 211:8 213:17 234:4 247:20 255:24 265:14 274:20 275:12 279:4 296:8 309:12 310:13 316:4 317:25 321:13 324:1, 10 325:21 343:13

**question's** 168:16

**question-** 14:21

**questioned** 237:2 253:21 254:25 317:14, 16

**questioning** 106:23 108:17 116:19 262:16 339:5

**questions** 14:22 16:11,16, 20,24 83:5 90:1 103:15,22 107:11,21 108:15 116:15, 21 136:10 147:14 150:16 163:3 164:15 183:5,11 188:7 203:6 256:20 298:15,20 305:22 314:11 315:11 339:8, 18 343:10

**quick** 82:15 208:19 272:24 288:7 339:23

**quickly** 41:1,3 268:23

**quoted** 321:23

**R**

**R-I-C-C-I-O** 9:8

**R/dets** 195:20

**Rahm** 291:11

**raise** 8:21

**raised** 167:24 303:6 339:18

**rampant** 291:24 292:13, 21 293:1 294:6

**ran** 94:21 185:19

**range** 174:6

**ranging** 101:7

**rank** 93:9,10, 11,13 171:21, 23 295:20

**Rankins** 253:3, 12,21 254:17, 22,24 259:13 262:16,22 263:5,12,15

**ranks** 93:15,17 280:9 281:19 283:3 288:21 289:2,11 290:17 293:21 294:13 295:5, 13 296:3,10 297:7,13 298:6, 11

**rare** 42:21 94:8 168:6 183:5,11 222:17 244:20 283:19

**rarely** 52:25 163:6 164:2 244:19

**rate** 45:8

**re-ask** 119:20 166:21 186:20 188:4 265:13

**reached** 166:15 319:2 320:7,8

**reaching** 340:18

**reaction** 139:20,22,24 291:17

**read** 33:1,3 154:17,20 169:7 228:19 253:15 256:10, 16,21 257:3 263:12 307:17 323:4 324:20 326:22 328:12 332:1 334:3

**reading** 33:7 253:17 323:3 324:19

**ready** 162:25 163:2

**real** 95:21 188:18

**reality** 281:20

**realize** 157:15

**reason** 16:22 37:10 52:8 66:16 67:16 70:22 74:23 80:2 112:17 172:15 196:12 205:7 212:15 236:4,6 238:5, 14,15 256:1 258:8,22 260:3, 10 275:4 300:14 301:11 302:4 341:12

**reasons** 66:21 67:8 83:18 84:14 160:3 161:8 180:11

**rebuild** 282:4

**rebuilding** 282:7

**recall** 10:9,12, 25 11:18,25 12:2,16 13:8, 12,22 17:15 19:22 21:2,12 22:11,12,14 26:7,19 28:21, 22 29:1,8,10 32:20 33:6 34:19 35:12 36:1,25 39:8, 11,16 40:5 47:1 52:16 57:2 62:4 63:5,7 91:15 92:2 102:11,20, 22 103:2,7,12, 13 104:3,6,14, 22 105:10,12 111:9 113:7 115:3 120:25 126:7,13 129:2, 3,6,11 140:11 142:6,13,21 153:4,5 168:3 190:5 195:7 201:15 202:23 210:10,11 211:14,20,21 214:5 228:15 236:3,10,12,19 274:14,15,19 275:2,6,10,20 276:3,5,12,19 278:16 290:11 297:10 299:25 300:3 301:4 308:22 310:20, 25 311:3 324:7 325:13 326:6,7, 10,15,21 327:2 329:19 330:9, 11,18,19 334:17,19,25 342:22 343:3

**receive** 25:9, 21 30:22,24 32:21 41:18,21, 24 62:24 63:3 312:22,23

**received** 25:16 32:2,11 33:11 45:8 80:9 95:13 198:21,24 199:16,17 326:12

**recent** 282:3,6 285:10

**recently** 30:12 282:3

**recognize** 33:4 204:14 252:7 268:24 269:13, 22 270:4,8,12, 15,18,21,24 271:2,5,8,14, 17,20,22 272:1, 4,6,13 273:6,8, 12,14

**recognizes** 269:19

**recollection** 10:8 12:8 13:6 22:15,18 129:8 211:23 315:17 319:4,9,10,16, 24 320:4,12,16 321:10,17,25 322:2,3,8,13,20 323:4,7 324:18, 21 326:11,24 331:19 338:12 339:8 342:23

**recommendation** 327:16 329:12

**recommendations** 120:12,14

**recommended** 330:5

**reconstructive** 333:24

**recontact** 184:10

**record** 7:3 8:8 9:7 58:13 59:2 67:1 82:21,23, 24 107:10 116:14 147:18 162:14,16,17 235:2,4,5 243:1 288:10,12,13 309:15 315:4,5, 6 340:3,4,5 345:23

**recount** 323:22

**reduced** 298:10

**reducing** 297:6,12 298:5

**refer** 27:9,18, 23,24 191:8 327:5

**reference** 195:21,24 196:14 197:6 201:2,3,5

**referenced** 178:15 198:9

**referred** 9:12 52:11 198:3

**referring** 18:22 27:10,20,24 51:14 137:22 144:3,4 195:25 206:21 228:8

**refers** 334:4

**reflects** 306:11

**reforms** 298:3, 9 309:3

**refresh** 70:18 232:6 233:7 242:11

**refreshes** 242:3

**refused** 318:18

**regard** 10:10 13:2 63:17 133:14 136:13 139:10,15,19 143:13 238:17 280:3

**register** 165:7 177:14 179:2,7 181:14 316:17 330:3

**registered** 165:6 173:19 174:20 177:6 178:6,17,19 179:11 180:20, 23 197:23

**regular** 53:16

**regularly** 52:7 53:10 73:9 174:22 175:6 287:15

**rehashing** 38:10

**rejected** 326:18 328:19 329:12

**rejection** 329:5

**relate** 13:17

**related** 13:11 27:2 28:11,19 29:3,6,19 30:12,16,22 42:5 60:3 106:23 107:12, 20 116:15 147:14 231:10 263:22 312:5, 20

**relation** 310:4 311:6

**relationship** 36:4

**relevance** 76:4 116:19 118:10 147:7,11 148:14

**relevant** 83:10, 14 107:17 116:22 147:19 180:13

**relied** 177:21

**reluctance** 280:8,11 283:2 285:4 288:20 289:1,10,20 290:16 293:2, 20 294:12,15 295:12 296:2,9 297:7,12,19 298:5,11 306:12

**reluctant** 204:5 289:17

**rely** 70:9,13

**relying** 133:11

**remain** 43:23 182:3,7

**remained** 43:9 56:19 100:19 119:5,8

**remember** 13:4 29:9,25 32:5 37:5 38:8 40:7,21 50:20 63:1,7 67:20,21 68:1 72:19 73:6 79:9 80:20 90:10 97:3 100:11 104:11 106:12 115:5 125:5 142:15 154:5 162:3 185:12 209:1 225:1 275:24 276:15 299:10 301:5,8,20,23 316:8,10 322:19 325:1 329:20 341:11

**remind** 51:1 109:3 189:19

**removed** 111:7 113:7 114:17 115:1,

10,21 262:11 281:19 295:17, 20,21 316:3,5, 11

**repeat** 41:20 75:13 87:1 107:8,22 128:3, 6 152:10 155:13 161:24 167:7 178:12 187:24 275:14 296:8 310:13 335:4

**repeated** 127:6

**repeatedly** 175:16

**repeating** 173:12

**rephrase** 16:2

**report** 20:25 21:16,21 22:23 23:24 56:2,3 59:14,18,22 64:19,25 72:3 74:9 79:8,11 94:23,24 95:13 101:8 132:16 184:1 190:20 192:2,20 193:4, 18,19,24,25 194:1,7,9 196:1,4,15,16 199:10,19 200:11 201:5 208:23 214:16 215:12 216:13, 25 217:6,8 232:6 235:11, 12 236:25 237:10 242:1,2, 3,10,20,25 243:5,16,18,21 245:4,21 246:11,13 247:5,11 248:1, 8,25 249:11,25 250:4,8,25 251:8,12,25 252:3,10,17,23, 24 253:25 255:3,9,14 256:8,15,17,21, 22 257:3 258:1, 2,8 262:14 265:1 267:16, 19,21,22 268:12,14 272:8 276:15 278:10,21 279:8 284:2 286:10 287:21 325:6,9 326:2 327:9 330:13 331:23 332:17 333:12 335:16 337:17

**reported** 46:3, 17 101:10,13 274:18,21 276:12,20 279:6 306:22 334:7 335:1

**reporter** 7:3,5 8:6,12,15,20 9:1 14:24 15:2, 5,20 82:21,24 161:19 162:14, 17 235:2,5 288:10,13 315:3,6 340:2,5 344:15,20,23 345:2,7,10,13, 17,19,22

**Reporters** 7:6

**reporting** 195:19,21,25 196:3,8,13,20, 25 197:2 199:25 200:20 201:3,6 230:23 232:12 306:19 307:6 324:25 325:3

**reports** 18:8 20:25 21:6,9, 11,13,14,23 22:19,21 24:3 29:19 30:4 31:12 57:17,18 59:16 64:13,16 69:17,22 70:1, 6,8,9,14,18,23 71:6 99:14 132:10,21,23 134:2 135:11 140:21,25 154:19 244:22

**represent** 146:11 256:14

**represented** 314:19 330:6

**representing** 7:5,25

**reprimand** 169:19

**reputation** 163:11,19 164:8,12 299:5, 8

**request** 25:20 26:16,17 223:19 272:20

**requested** 24:15 43:23 125:11 238:11 329:13

**requesting** 237:20

**requests** 24:12,20 25:5, 9,19

**require** 53:23 71:12 207:8 261:10

**required** 17:8, 10 64:1,4,8 66:7,15 68:19 69:1 96:4 99:15 102:23 169:19 215:7 262:2 278:9

**requirement** 64:18,22 104:8 207:16

**requirements** 63:10 102:15 103:8 104:16 111:4 112:2 114:13 116:6, 10 208:2,7

**requires** 262:7

**requiring** 237:19

**research** 120:12

**reserve** 344:12

**resist** 324:10 338:11

**resolve** 58:22 147:21

**resolved** 59:4, 9

**resolves** 59:18

**resolving** 60:3 108:12

**resource** 54:11 55:2 81:9

**resources** 176:24 177:13 180:22

**respectful** 9:18

**respond** 48:19

**response** 136:9 344:7

**responses** 25:1,3

**responsibilities** 118:19

**responsibility** 101:3 109:24 117:4 121:23 122:1

**responsible** 61:23 80:15 81:2 151:14

**restate** 71:21 85:13 254:10 275:12

**result** 159:18 165:21 310:22 332:3 335:11 336:20

**resulted** 27:3, 8,21,25 28:7 79:1 132:6 158:7 165:11 297:6 307:6

**resulting** 288:19 311:15, 16

**results** 146:6 160:9 249:4

**retire** 43:17,20

**retired** 36:22 40:4,7,23 43:18 105:18 119:9 144:17,24 145:10 152:16, 18,21 166:9 305:2

**retirement** 44:5

**return** 127:5 216:22

**returned** 59:3

**revealed** 336:15 341:6

**review** 20:20, 23 21:8,20,23, 25 22:2 23:6, 10,15,20,24 24:2,6,9,12,14 25:22 29:18 31:13,17 57:17, 18 110:17 120:8 130:20 132:9,20 133:8, 16 134:2 145:1 172:16,20,22 194:9 195:2 208:10,12,19, 23,25 209:7,13, 14 230:11,24 233:6 242:10, 20 287:15,16, 19,20,22 304:13 316:16 329:14,17 330:3,9,10,12 331:22 332:3 338:14 341:5

**reviewed** 18:7 21:13 22:4,5,8, 19 23:2,12,14, 16,17 24:20 26:22 27:2 28:10 29:2,17 30:12 31:23

172:18 192:12, 14 236:24 243:7 246:18 251:15 338:6

**reviewing** 20:12 22:12 24:24 25:1 90:14 128:18 132:22 242:3

**reviews** 207:22

**revisit** 42:10

**reward** 94:5,16

**rewrite** 120:4,9

**rewritten** 110:16

**rewrote** 120:1

**Rey** 39:9 47:8, 12 52:18 107:12 121:5, 16 122:22 129:25 130:4, 16 136:3 137:1 138:15,23 139:9,18 140:1, 6,13 141:12 145:14,18 146:12,22 149:18 163:4,6, 9,11,18 164:14, 17,22 166:17 167:1,10 193:14 198:11 201:3 217:14 226:4 235:19 240:21 249:8 300:6

**Reynaldo** 7:11 33:13,17 135:25 140:19 141:4,9 142:18 143:3 149:25 152:7,15 153:1 163:4 230:16 238:23 307:14

**RFC** 191:11,20, 21,24 192:17 193:11 194:13 198:4 214:16, 21 215:12

217:21 235:13, 17 242:25 243:4 246:12 251:8 268:21 273:4,11,18 316:15 317:5 324:23 327:7,9 333:21 340:24

**rhyme** 52:8

**Riccio** 7:10,25 8:7,9,16,20 9:6, 8,9,12,19,22 42:13 82:25 107:5 147:24 150:22 162:18, 22 191:13 194:17 235:6 288:14 314:11 315:7 317:9 324:25 325:2 327:16 329:12 332:14 339:23 340:6,10 343:14 344:14

**rings** 33:8

**risk** 284:15,18

**road** 42:9

**rob** 56:22

**robbed** 174:5

**robberies** 60:18

**robbery** 40:19 56:22 57:5,21 63:12,19 90:22 155:6 224:18 254:23 303:17, 21 309:24

**Rodrigo** 251:20

**Rodriguez** 136:14 232:25 233:1,8,13,15, 19 235:20 236:23 237:4 238:19,20 239:2,7,10,15, 19 240:8,18

**Rodriguez's** 239:24

**role** 40:14 47:21 48:10 56:10 57:8 92:21,25 101:1 102:25 105:21, 23 109:17 117:8 119:8 122:25 126:4, 21,24 127:2 128:25 129:3,4 175:21 194:20 218:14 305:10

**roles** 95:9 103:21

**roll** 46:5 111:18 114:1 154:7 156:4 157:6 158:20

**rollout** 310:1

**Roman** 27:15, 18,19 29:4,6,19 30:13,16,17 120:18 121:2,8, 11 123:1,4 131:6,19 133:23 147:14 195:5 215:17 216:8 225:12 233:14,23 234:1 240:10 251:22,25 254:3,12,18 255:4,16,21 256:2 257:9,17, 21 258:2,9 259:7,19 263:6, 22 264:17,20 265:3 267:5,6, 8,12,23,24 268:7

**room** 111:18 127:1,8,9,17 128:12,16 129:18,19,22, 23 130:10,11, 13,14 137:2,7, 9,14,20,23 138:2,3,10,12, 16 154:16 215:24 217:16, 18,22 224:20 225:19 226:17 232:23 236:14

240:14 248:12, 13,19 285:20

**rooms** 114:2 155:11 308:7 309:8,15,18 313:12

**Rosen** 7:21 19:15,17 58:21 63:14 66:9 67:25 75:17 81:15 84:9 102:10,19 103:1,10 104:1, 10,18,20 106:22 107:10, 18 108:5,22 115:19 116:3, 13 118:10 119:16 123:8, 25 124:5,11,17 130:7 134:15 137:4 138:19 139:3 140:24 141:6,14 144:15 145:7, 19 146:2,19 147:6 148:9,25 149:10,20 150:3 151:17 153:3,16 159:20 160:18 161:2,16 165:2, 24 166:11 177:2,8,16 178:8 179:14 180:16,25 184:4 186:15, 18,22 189:25 190:21,23 191:1 211:6,13 213:4 214:12 229:10,19 230:6 234:7,12, 25 257:13 258:4,12,25 259:23 260:6, 13,25 261:22 265:4,12,21,23 267:25 268:10 273:16 278:22 280:5 281:6 283:9 291:5,13 293:5 295:18 300:8 303:13 304:18 305:25

306:14,21 307:8 309:6 310:13 313:25 314:9,18 335:3 336:22 337:4 338:20 339:25 343:12 344:6 345:21

**Rosen's** 107:18

**Rosendo** 136:14 202:9, 12 208:24 215:16 217:14, 20 218:11 225:10 226:6 231:4 235:21 236:24 244:1

**route** 126:6

**routed** 185:8

**rule** 14:25 15:4 65:4 77:8 157:8 171:16 205:16 252:21 283:20 284:1,2,6,10,19 285:8,23 286:10 288:23 294:2 327:18, 20

**ruled** 337:9

**rules** 14:20 102:14 111:22 281:10,11,14

**ruling** 153:23

**run** 45:15 174:12 183:3 288:8

**running** 305:23

**S**

**S-E-R-R/M-O-N-T** 251:9

**safe** 168:4

**Sanchez** 233:1,2,9

**Santapadre**

203:6
**Sarge** 94:25
**sat** 337:13
**Sawyer** 199:8 228:12,23 229:3
**scenario** 76:5 169:12
**scenarios** 168:17,19
**scene** 21:23 24:3 53:24 73:10,12,13,15 76:13 79:16,18 89:23 122:12 124:22,25 155:8 202:1,23, 25 203:7,15 204:7 205:23 229:11,16 230:3,18
**scenes** 201:21
**scheduled** 20:6
**scheduling** 20:7
**scope** 149:2 305:5 306:2
**scratch** 273:4
**scream** 318:23
**screaming** 318:16
**screen** 191:3, 6,12 214:17 243:3 273:2,17
**screw** 284:16
**screwed** 157:20 284:15
**search** 173:21 277:19
**seasoned** 91:4,8,11,14
**seated** 221:1 318:15
**secondary** 201:22
**secondhand** 188:14
**seconds** 322:22 324:17
**section** 223:18 234:11 244:3, 23 247:15 248:2,7 249:6 253:2 267:4 268:13 316:23
**secure** 85:4
**securing** 145:2
**security** 41:5, 7,8,10,15,16, 19,22 44:1,7
**seek** 54:11,15
**select** 21:9,11 169:25
**selected** 94:3 216:7
**send** 110:19,24 173:1 344:17, 23
**seniority** 50:15 52:3,6
**sense** 41:13 42:14,25 150:17 162:9
**sentence** 215:5 218:6,7 225:9 228:8,14 231:23
**sentences** 218:7
**separate** 46:15 125:20 128:4, 13 165:22 175:11 268:14 303:21
**separately** 125:18
**separates** 174:17
**septum** 341:4
**sequence** 128:2 272:10
**sergeant** 34:9, 12,14,23 35:15 40:12,18,19,20, 23 43:9 47:4,5 56:9,11,13,20 57:1,14,20 58:23 59:1,15 60:16 61:8,9,16 62:17 63:9 65:15 66:3,8 87:18 90:15,21 91:2 92:5 93:6, 11,16 94:23,25 95:2 96:8 103:21 109:15 120:24 153:7, 12 158:5 169:9 170:24 171:2,3, 4,24 172:17,24 185:18 186:4 187:3 254:7,9, 16 255:3 259:4, 5,11 262:15,21 263:13,21 295:4,19 296:6 301:5,14 302:25 303:11, 16,17 304:3,12, 14 305:16 308:13 310:9, 14,23 311:2
**sergeant's** 103:6
**sergeants** 40:21 90:8 95:5,6,16 158:11 159:17 170:20 259:12 313:8
**series** 108:8 223:25 249:5
**Serr/mont** 251:8
**Serrano/ montanez** 267:20
**serve** 121:7,10 316:10
**served** 316:5
**service** 328:1, 24
**serving** 121:13 179:20 180:2 206:10 210:14
**session** 14:22
**set** 23:16 25:19 32:11 37:17,19, 20 65:4 110:2,4 111:15 113:17 114:20,21 115:4,6,14,24 116:7,9,10 211:17 268:20 315:11
**sets** 112:1
**settled** 12:17, 22
**sexual** 309:23
**Shannon** 291:2
**share** 176:16
**shared** 146:1, 7,8,17,23 147:1,3 166:16 167:3,18 168:10,25 170:2 264:8 303:4,23
**sharing** 243:3 303:8 343:7
**shave** 220:4
**shaved** 220:6, 7,11
**shift** 51:4,5,8,9, 14,16,18,22,24, 25 52:7,11,13 53:2 94:22 96:5 164:4,6 274:1
**shifts** 50:21 51:1,2
**shoot** 215:17 216:8 225:12 233:23 240:9
**shooter** 134:3 135:9,23 241:16
**shooter's** 202:15
**shooting** 79:18 106:4,5,6 173:25 228:23 229:4,5,12 254:12,18 256:2
**shootings** 48:20
**short** 52:4 119:6 220:20, 22 234:8
**shortly** 29:23
**shot** 182:21 188:23 232:13 233:14 234:1
**shots** 220:25
**show** 78:11,22 96:16 190:11 202:2 205:3,10, 22 206:6,11,22 207:6,10,14 208:4,5 209:5 210:8 211:1 212:14,17 222:20 234:2 335:15
**showed** 77:24 226:5 235:19 239:6,10,13,16, 20 267:17,21 333:15 342:18
**showing** 82:6 191:19 210:15 211:16 212:1,8 213:12,20 220:25 243:3 251:6,24 252:3 268:19 272:23 273:10 316:12, 13 332:24
**shown** 77:17, 20 78:5,7,21 81:25 212:24 214:8,10 218:11 226:9 237:4,18 239:2, 15,25

**shut** 217:7 281:15

**sic** 7:7,8

**sick** 52:5

**side** 32:16 44:23 45:10,18 47:12 48:4,13, 24 61:11,13 128:9 193:7 217:12 319:7,8, 13 334:6,21 341:3

**sides** 334:22

**Sidley** 145:13, 17,25 146:11 166:16 167:9

**Siemieniak** 330:7

**sign** 172:19,20, 22 193:4 243:18,21

**signature** 193:6,7 243:14, 15 247:2,7,8 344:12,19,20

**signatures** 252:8

**signed** 243:22 247:9

**significant** 72:16 292:25 293:7,8,9 298:4 336:19

**silence** 280:3, 8,10,20 285:3 291:4,12,23 292:11

**similar** 219:10, 20,25 220:13, 14 222:16 335:9

**similarly** 15:14 69:6 220:15

**simple** 199:6 268:11

**simply** 170:13 173:11 179:17 189:8 205:16

**Simpson** 158:2

**Simpson's** 155:7

**single** 160:6

**sir** 9:25 12:5 17:1 18:5 26:25 28:2,14 29:21 31:9 37:25 40:17 41:4 46:11 47:11 55:8 57:10 61:7 130:18 167:14 168:2 181:2 192:4 194:3 196:23 232:20 233:4 239:13 240:10,11 242:17 243:6 245:5 246:17 315:12 316:19 318:3 324:13 325:7 341:6

**sit** 71:13 115:10 131:1, 17 133:18,21 135:24 136:8 150:6 154:7 169:12 276:4,9, 11 301:11 302:3 304:22 311:23 312:7, 14 319:12,15 322:4 323:21 337:24 338:16 342:24

**sitting** 102:22 130:9 133:15 135:3 136:3 138:22 213:11 214:7 320:19 321:21

**situation** 71:9 188:10 210:12

**situations** 169:11

**skills** 274:9 339:14

**skip** 272:9 317:19

**skipped** 240:4

**skirt** 157:14

**slow** 15:20 95:19

**small** 12:1 38:11,21 72:8 169:25 170:3 293:18 294:7 296:20 297:1, 18

**smaller** 191:15 294:8 297:19

**smart** 279:17

**smartest** 165:25

**Snake** 199:7 200:2,7,10,12, 18

**snap** 223:9

**so's** 175:5

**socialize** 34:24 35:19

**socialized** 36:3,7 40:10

**solemnly** 8:21

**solo** 53:12

**solve** 123:4,5

**solving** 122:25

**somebody's** 173:25

**someone's** 207:13

**sort** 27:6 28:4 36:3 41:11,12 42:15,17,19,23 48:11 49:2 53:16 58:7 59:17 61:12 82:8 89:5,21 91:10 92:16 95:10 141:16 153:18 168:5 169:14 174:22 175:20 177:6 223:16 277:7, 10 282:7 283:8 285:3,5 288:1 304:20 307:1 338:4 343:22 344:1

**sought** 84:24

**sound** 291:24 292:7

**sounds** 105:13 345:22

**source** 96:12

**sources** 42:1

**Spalding** 291:2

**spam** 33:10

**span** 168:4

**Spanish** 17:1, 4,7,13,20 18:2 253:7 254:4,13 255:5,16,22 256:3 257:7,20, 25 259:6,19 262:15 263:5, 14 264:3,18

**sparked** 281:3

**speak** 17:1,7 18:2 32:18 60:1 66:10 122:6 176:12 188:9 190:6 219:2 236:16 259:2 260:17 264:12 278:19 281:16 340:21

**speaker** 17:4

**speakers** 17:13,21

**speaking** 17:6 253:11 304:21

**speaks** 74:6

**special** 94:11 101:5 110:12 111:11 112:1,5, 13,17,24 113:3, 4,12,13 115:25 116:7 120:2,5 262:1

**specialist** 44:21 45:2,23 47:12 48:2,4, 13,24 54:3,23 298:21 300:25

**specialists** 45:8,18 46:8,13 47:19 54:7 55:10,21,22 56:1,5

**specialists'** 225:4

**specialize** 48:7

**specific** 30:17 102:23 113:4 139:9 184:14 262:9

**specifically** 17:15 20:24 31:22 40:6 98:14 111:16 112:7 152:18 176:20 180:1 261:15 262:9 341:25

**specifics** 20:7 43:2 140:17 154:6 178:1 276:25

**speculate** 194:4 197:11

**speculating** 128:23 152:1

**speculation** 165:12 167:6, 13 193:23 194:3 213:4 214:13 230:7 237:7,14 258:11 259:9, 24 260:14,21 261:1 263:9 265:5 306:15, 22 314:1,9

**speech** 291:11

**spell** 9:6 47:4

**spelling** 345:24

**spend** 35:1 108:10 339:15

**spending** 95:18 116:21

**spent** 32:1,9, 10 190:7 277:24

**split** 46:3

**spoke** 34:6 36:9 40:2 74:2 76:11 181:24 195:10 231:21 233:2 241:21

**spoken** 33:19 35:10 226:24 227:9

**spread** 205:10, 15 206:18 218:11,15,18 224:13 314:6, 10

**spreads** 218:20,24 223:10

**stack** 30:3

**staff** 57:22 118:7 147:4 158:14

**staffing** 110:18,20,25 119:13,18 120:7

**stamped** 251:8

**stand** 156:2 215:7 221:9 319:12 320:13 322:5,24 323:2

**standards** 114:22 327:15

**standing** 107:20 108:6, 12 174:3,4 339:6

**stands** 220:7 221:8

**start** 42:18 51:5,19 153:9, 10 174:14 176:1,2 192:15 234:21 250:25 286:19 298:18 321:14

**started** 15:14 51:10,19,20 52:14 122:11 140:3,22 286:8, 22 294:1,9 319:1,22,23

**starting** 7:17 275:9 289:5 318:14 324:9

**state** 7:15 8:7 9:6 38:15 156:13 161:13 212:16

**state's** 97:4,9 98:21 202:2 207:7,12,16,25 208:1,4,6 230:10 237:21, 23 238:9 267:2

**stated** 177:23 194:22 202:14 233:13

**statement** 131:13 160:23 204:23 229:14, 18,20,24 230:4 233:16 286:12 292:10,19 318:21 319:7, 11,13,17,19,22, 25 321:19 322:5 323:15, 19 324:5,15,23 325:16,18 326:18 328:15, 19 329:5,9 330:8 331:2,7, 10 332:2,20 339:6

**statements** 286:8 287:14 288:3 330:17 338:13

**states** 7:12 241:12 252:10 261:15 319:1 333:25 334:10

**stating** 107:2 131:14 161:5 233:20

**station** 126:17 174:5 226:10 318:2,6 322:17 328:1,24 334:4, 21 336:21 341:20 342:8, 17

**statute** 309:19, 25

**stay** 55:12 100:7

**stayed** 43:21

**steady** 44:8

**step** 127:3 128:2 158:10 227:3 285:7,10, 13,24 286:16 288:19,25 289:9 297:12 298:4 309:10, 13

**steps** 63:18 64:5,9,23 65:6, 16,24 66:13,17, 22 67:4,10 83:19 85:3 144:21 145:1 172:1 195:11 208:14 298:3,9

**Steve** 36:3,7 47:24 53:10,13, 15 121:10 125:18

**Steven** 35:24

**stick** 275:25 281:9

**sticking** 113:2

**sticklers** 95:21

**sticks** 277:16

**stipulate** 8:15 291:3

**stipulated** 8:17,19

**stolen** 175:5

303:3

**stop** 100:15 318:17 343:6

**stopped** 63:1, 2,6 81:17

**stops** 175:14

**stories** 38:7,10 143:3

**story** 55:18 287:13 332:25

**straight** 237:24 284:24

**street** 7:6 41:13 129:13 174:2 185:12 196:22 197:20 200:2,6 223:6,8 253:7 254:13 263:14 295:9 296:1

**streets** 281:19

**stressed** 155:15

**strictly** 94:2 197:24 219:9

**strike** 13:17,24 22:10,11 23:15 24:25 29:15 35:18 39:23 50:22 57:13 62:15 65:13 69:19,24 70:7 72:15 74:14 75:6 77:5 79:16,17 80:24 81:11 83:7,25 88:14 95:8 96:24 99:19 103:4,14 105:5 109:13,23 111:10 115:4 118:5 120:17 122:3 123:5 126:12 127:12, 23 129:9,17 134:21 135:1 140:6 141:18, 19 146:10 148:4 159:14 162:2 171:7 180:20 181:20 184:20 189:16 195:20 196:13 198:2,17 199:16 205:21 210:6 216:3 217:13,20 219:13 220:18 226:23 229:14 238:12 239:6 242:9 259:18 260:8 265:7 266:12 285:23 291:9 299:18 304:13 311:6, 15 313:7,18 320:24 324:1 328:16,19 335:24 336:1,4, 6,8,11 338:17, 21 339:2 340:10

**striking** 324:2, 4

**stripping** 169:15

**strong** 299:9, 15

**strongly** 335:20

**struck** 319:6,8, 13 326:14 328:3,25 331:23 332:21 333:9 334:5

**stuff** 38:12 90:3 115:16 227:3 250:14 281:23

**stun** 320:2,3 321:8 332:15 335:22,24 336:1,3,4 341:10

**subject** 115:17 158:19 166:13 286:11 324:24

**submission** 59:13 60:2,4 192:2 248:2 251:12

**submit** 58:10 92:24

**submits** 338:8

**submitted** 24:13 25:4,6 58:23 59:1,7 194:10 243:6 246:14 249:11 252:11 255:10

**submitter** 247:5

**subpoena** 96:15,16,21 97:4 98:1

**subpoenaed** 97:5,12

**subsequent** 180:13 328:11 336:14

**substantially** 293:25

**substantive** 20:16 71:17,25

**substantively** 72:24

**success** 97:7

**successful** 161:7

**successfully** 99:8

**sudden** 337:15,21 338:4

**suddenly** 283:23

**sued** 10:13,17 30:21 39:13

**suffer** 16:18 281:12 315:24 336:19

**suffered** 325:12,17 326:5 333:7

**suffering** 325:8 335:1

**sufficient** 135:15

**suggesting** 254:2 255:4

**suggestions** 110:20 120:8, 11

**suggestive** 219:5,11

**suit** 156:11

**Suite** 7:6

**suits** 143:24 144:3,5,6

**summary** 42:9 228:3

**summer** 43:23

**superintendent** 43:15 94:1,3 119:1,2,7 141:5,9 145:24 146:1,4 169:15 281:4,18 287:16 305:3

**superintendents** 141:11

**supervise** 178:25

**supervising** 56:21 57:8,13 87:18 90:21 106:12 109:14 153:8 171:10 309:2

**supervision** 168:24

**supervisor** 50:13,16 56:16 57:6 58:2 66:2 69:7 83:8 109:13 111:2 122:6 153:12 155:16 158:11 171:17,22 185:23 186:1,9 263:1 264:24 265:8 274:23 276:13 277:2, 25 278:8,9 279:9,16,18 296:14 305:10 325:4,6

**supervisors** 47:1 50:14 60:25 91:3 155:17,20 157:1 160:13, 24 161:14 172:3 278:2 313:7

**supervisory** 34:8 47:21 56:10 103:20 109:16 110:9 171:18

**supp** 204:7,23 217:6 249:19, 20 250:16

**supplement** 24:16

**supplemental** 59:17

**supplementary** 21:14 24:3 59:13,21 64:19 69:17 132:16 184:1 192:1,19 199:10,19 243:5 245:4 246:13 251:8 256:8 258:1,2,8 267:16,19,21

**supplemented** 45:11

**supposed** 58:6 168:10 268:7 278:5 338:8

**suppress** 160:22 161:7

**surely** 15:10

**surgery** 333:24

**surprise** 146:21 306:17

**surprised** 146:24 147:1

**surprising** 146:10,16

**suspect** 14:20 80:3 85:19 86:4 108:16 125:11 127:2,10 128:16 129:18, 22 137:7,20,24 138:13 205:4,9, 21,22 207:10 210:8,21 211:10,12,17, 19 212:22 213:13,14,21 214:9,11 215:24 219:4,5 220:3,6,9,15,18 221:3,9,11,15, 21 222:3,16,18 223:5 225:20 229:15,18 238:1 240:15 248:12 269:1

**suspected** 84:8

**suspects** 77:13 84:3,14, 17,20 86:9,15 206:11 307:22 313:11

**suspended** 326:17 327:17 343:25

**suspension** 169:20 284:4 316:1,2 326:13 329:13

**sustain** 333:3

**sustained** 330:5 332:5,11 335:11 337:8 340:18

**Swaminathan** 7:18 8:17 9:3,5 25:15,18 26:8, 10,12 42:3,11 71:23 82:16,20 83:3 85:16 104:23 107:4 108:1,14,23 117:1 119:19 136:24 147:17, 23 150:15,21, 25 151:7,9 159:6,9,12 161:23 162:1,9, 12,21 163:24 178:14 186:17, 20,24 190:18, 22,24 191:2,9 206:16,20 210:23 227:5 229:25 234:9, 14,16 235:1,9 254:8 257:22 269:7,11 288:9, 17 314:15,23 315:10 327:6,8 340:9 343:4,8 344:7,13 345:1

**swear** 8:22

**switched** 51:25 189:17

**sworn** 14:2 292:16

**Sydney** 7:3 83:1 162:19 235:7 288:15 315:8 340:7

**system** 157:14 179:18

**T**

**tactical** 44:23 45:10,17 55:21 179:1 295:3 299:2

**tainting** 210:15

**takes** 263:16

**taking** 14:24 16:14 58:1 62:12,16,21 65:5 67:4,11 142:16 302:22 303:7

**talents** 89:15

**talk** 15:19 26:1 36:15,17,23 38:3,11,17,21 76:21 95:16 150:20,22

170:15 182:16
227:2 280:9,12
283:2 288:20
289:1,10,25
290:17 293:2,
20 294:12,15
295:13 296:2,9
297:7,12,20
298:5,11 311:8
337:18

**talkative** 189:6

**talked** 18:7
20:7,9 21:3
26:2 40:8 120:6
136:18,22
142:2 164:17
166:14 199:2
202:22 295:24
310:4,10,15
311:5 337:13
343:14

**talking** 15:5
27:8 55:5,10
62:4 71:24
78:19 116:24
142:4 147:7
186:18 199:7
206:19 210:1,
19,20,24
299:18 301:8
308:23 322:1

**tall** 220:20,22

**tampering**
300:11 302:19

**targeting**
227:24

**tattoo** 221:17

**team** 53:12,25
56:22 106:5
166:16

**teamed** 53:9

**teaming** 53:9

**technician** 7:4
201:23

**technique**
320:2 332:15
335:21 337:11

**telling** 55:18
72:24 79:21

339:13

**tells** 287:12

**template**
250:25

**ten** 30:1 116:25
147:14 222:18
294:21

**tend** 55:17

**tended** 56:4

**tenuous**
116:19

**tenure** 286:5
308:24

**term** 49:16,17
173:10,11,12,
13,14,23 174:6
293:6

**terminated**
327:12

**termination**
286:11

**terms** 20:12
45:5 46:18 57:8
72:20 79:4
91:23 92:7 93:2
94:5 96:3,23
99:19 102:6,14,
24 108:11
111:3 113:16
118:20 121:13
127:23 129:16
174:15 181:18
182:8 205:19
207:2 218:23
222:9 252:13
274:8 277:12
293:23 295:12
297:4,6 309:3

**test** 187:21

**testified** 13:24
14:4,9 230:17
239:13 330:14

**testify** 28:16,
18 29:9 70:14,
19 97:1 133:6
283:11 330:17

**testifying**
28:22 70:9

175:22

**testimony**
8:22 22:7 40:17
66:19 70:24
76:10 119:17
132:18 133:12
134:22 141:24
159:21 166:19
171:12 178:9
206:1 239:24
278:22 283:25
289:14,23
320:10 321:16,
23 323:16
330:9 337:1
338:17,21,24
339:2

**testing** 187:25

**that'll** 214:8

**theft** 49:5,12
91:13,14 112:8

**there'll** 14:23

**thick** 31:12

**thing** 11:13
38:16 45:7 46:6
51:7 54:10
72:22 74:16
80:11 153:18,
25 154:14,21
155:18 160:24
166:1 173:17
176:14 177:24
188:4 197:16
229:17 264:4
282:15 283:21
289:16 291:24
292:20 295:14
316:13,23
331:21 334:3
337:23

**things** 38:10,
11,13,14,17,18,
19 45:15,16,21
50:4 54:17
55:15 79:5
80:14 90:13,16
102:23 103:16,
23 105:19
111:23 112:23
113:25 114:3
115:14 120:23
139:9 153:21

155:11 156:5
157:14 159:13
160:13,20
161:10 173:22
182:2 217:3,5
221:15 266:23
277:4 278:1
279:13,23
285:1 287:11,
24 288:18
289:12,18
297:5,10 333:6
339:11

**thinking** 279:1
284:12

**thought** 15:15
186:18 204:9
282:4 293:13
314:19 316:11
330:22

**three-day**
284:4 316:1,2
326:13 329:13

**three-quarters**
279:11

**throw** 114:16
191:5

**thrown** 132:6

**thumb** 224:7,
10 289:15
290:13

**tighten** 95:17,
19

**time** 7:8 10:6
11:6 13:13,15
15:5 17:3,17
19:14 29:5,14,
16,17 30:4,12
32:1,5,9 33:2,
15,19 34:5,6,
15,21 35:1,9,23
36:9,20 37:14,
16 40:2,12,22
42:10 44:4,11,
14,17,20 45:4
47:3,6,7,15,18
49:22,25 51:17,
25 52:21 53:2
54:2,4,5 57:1
60:15 62:17,25
63:9,25 66:3,7

68:4 69:20 70:5
71:2 75:22,25
76:6 77:3,16
78:20,22 81:10,
12 82:22 83:2,
7,11 87:18
88:21 89:3,13
91:2 95:23
97:25 100:4
101:11,16,24
102:2,4,12,15,
16 103:4,5,6,14
104:4,5,12,13
106:17 108:9
109:1,6,12,14
110:8 111:1,8
114:19 116:21
117:3 119:3,6,
11 122:21
126:8,13 127:3
128:6 129:14
139:1 140:6,21
142:18,19
143:6 144:11
145:23 150:12
152:3,11,19,22
153:6,12
154:20,21
155:16 157:16
159:7 161:20,
21 162:5,15,20
163:12,16
164:5,18,22
165:5,16
167:11,19,21
168:3 170:7
173:5,6 175:2
185:5 189:25
190:1,7 201:13,
14,24,25
205:12 206:10
210:5,13 211:1
214:1 218:21
220:10 222:10
223:17,23
224:15 226:22
227:10 228:19,
23 229:4 231:8,
12 232:10
235:2,8 236:7,
18 239:10,25
249:20,22
267:1 276:17
279:25 280:1,
13,19,21
283:18 285:2

288:11,16 292:4,23 295:2 297:2,20 299:6 301:10,18 302:2,8,15 303:10 304:2,9, 11,13 305:1,2, 10,15,21 307:18 308:13, 25 310:3,7,9,14 311:6,21 312:16 313:19 314:21 315:4,9 316:6 320:1 321:13 322:11 323:20 324:4, 20 335:13,14 338:13 340:3,8, 17 344:14 345:9

**timeframe** 29:25 286:6 293:25 294:23

**timely** 57:23

**times** 9:25 11:4,5,23 12:8, 16,25 13:23 14:5,9,11 15:9, 20 53:9,13 80:25 95:4,5, 24,25 128:4 158:6 169:21, 23 182:15 202:1 207:12 208:8 209:3,13, 14 222:19 239:1,16,17,21, 22 276:24 277:5 278:15 297:17 298:1 315:16 335:5

**timing** 40:7

**Timothy** 253:3, 11,21 254:17, 22,24 262:16 263:12

**tip** 176:6 184:13,21 263:17

**tipped** 277:20

**tips** 173:7 184:18 185:24

**title** 44:20

**titles** 9:15 118:6

**today** 7:5,7 8:10 12:3 14:14,21 16:16, 20,23 24:21 27:8 33:16 34:16 47:5 83:1 102:22 130:9 131:17 133:16, 18,21 135:3,24 136:3,8 138:22 162:19 175:3 211:24 213:11 214:7 235:7 242:5,13 276:4, 11 281:1 283:6 285:18,21 288:15 293:17 294:8 299:13 304:23 311:23 312:7,14 315:8 319:12,15 320:20 321:21 322:4 323:21 338:16,21 339:2 340:7 342:24

**today's** 18:6 20:12 24:1,5,8, 11 25:2 26:21 27:17 29:3,18 31:23 192:12 243:7 246:18 251:16

**told** 130:20 132:11,12 204:2,11,16 216:6 228:22 229:2 230:1,18 232:4 233:22 241:10,12,20 242:5,8,13 286:9 310:4 318:17 324:12 325:5,9,18 326:2,4 331:21 333:1 342:16

**Tom** 50:19

**tomorrow** 175:4

**Tony** 37:3 38:3, 6

**tool** 81:5

**tools** 69:11,17 80:20 92:4 94:9

**top** 13:13 77:1 90:12,17 192:19 194:16 217:21 235:17 250:4 253:20 254:23 266:22 274:17 277:16 298:7,12 327:14

**topic** 42:13 339:6

**Torres** 241:1,8, 13,17,19

**tossed** 316:8

**total** 32:9 127:19

**totally** 282:19

**tour** 97:14 325:7

**town** 59:8

**track** 95:10 155:21 156:1 160:14,20,21 180:12 181:13 251:6

**tracked** 177:5 179:13,16 180:6,9,23 181:5

**tracking** 61:16, 23,24 62:7,11 91:22 92:2 181:21

**tracks** 177:10

**traffic** 10:20,24

**train** 161:10 311:9

**trained** 66:15 67:17 68:24 91:5,11,17 176:21 211:9 310:4,10,16

311:6 338:2

**training** 65:22 67:20 68:18,23 83:6 90:19,23, 24 91:1,4,6 148:14 149:16 151:13,19 153:21,24 154:7 156:4,7 158:20,23,24 159:18 160:5,9, 16 177:3 211:14 282:13, 17 287:25 288:2 310:22 312:23

**trainings** 152:25 153:9, 10,11,13 154:1 158:8,14 313:2

**transcripts** 22:7 26:22

**transfer** 185:17

**transferred** 56:14 88:1 99:25

**translate** 99:4 156:3 157:8

**translated** 99:18 157:7

**translator** 17:9,10,21

**translators** 17:22

**treated** 263:21

**treatment** 274:22 275:18 276:7,21 277:12

**trial** 28:16,22 29:9,11 70:14 98:20 132:2 154:22,23 158:2 230:17

**trials** 26:23 70:20,25 155:2 158:7,13

**trick** 227:7

**troubles** 142:3,5

**true** 127:12,13, 15 313:23 318:5,7,21 319:3,7,22 321:9,20,21 322:12,19

**trust** 282:4,7

**truth** 8:23,24 319:18

**truthful** 70:24 320:10,20,22 321:15 323:17 324:5,15

**truthfully** 16:24

**Tuesday** 18:17 19:12,16,25 20:18 23:6,10, 15

**tuition** 284:14

**turn** 69:1 127:4 161:10 169:8 226:14 235:10, 15 337:20 338:1

**turned** 38:18 57:23 68:6 264:4 277:17 319:2

**turning** 215:11 316:24 318:11

**TV** 142:16 143:15

**twist** 339:10

**two-thirds** 279:21

**type** 22:19 56:2,7 59:20 71:13 72:2,22 87:13 90:6,13 111:23 112:22 115:16 117:25 179:13 217:7 250:15 308:22

**typed** 183:25

**types** 107:20 113:19 116:21 117:23 118:4,7 152:25 161:9 309:8,15,23

**typewriter** 250:11

**typical** 72:23 73:13 115:17 260:10 267:7

**typically** 17:19 31:18 46:21 52:13 55:9,11 61:12,15 71:18 73:1,5 79:15 82:9 92:22 94:23 95:16 111:23 112:16, 18 129:12 138:3 158:18 174:24 175:1 182:19 184:9 217:2 250:14

**typo** 250:9,22, 23

**U**

**ugly** 277:17

**uh-huh** 15:1 199:24 214:23

**ultimate** 328:10

**ultimately** 85:2,3,10,19 94:1 120:13 123:5 124:14 171:9 181:12 186:9 188:21 189:10 214:1 230:11 306:10 315:24 316:3,5 322:24 325:15 326:18,25 328:18 329:11, 16 332:4 333:2

**umbrella** 261:12

**unanimously** 332:10 337:7

**unavailable** 59:8

**unaware** 166:23

**unclear** 166:22

**uncommon** 206:22 207:1

**underlying** 27:14,20 29:4, 5,15,19 30:22 73:10 75:15,24 76:21 203:3

**understand** 12:3 14:13,16 16:1,15,19,23 27:10,12,13,16, 19 63:23 75:5 76:10 97:17 100:14 117:13 134:22 137:13 147:2 148:4,18 158:4 179:15 205:20 212:20 222:1 238:8 252:2 292:5 325:21

**understanding** 66:6 68:3,10, 11,16,25 69:20, 24 73:23 79:6 81:10,12 96:3 128:17 129:24 130:3,8,15 179:10 181:13 198:16

**understood** 10:5 13:16 15:24 16:5 28:2 42:23 67:23 76:9 160:6,22

**unfair** 135:2

**unfortunate** 281:20 336:13

**unique** 84:11 93:21

**unit** 49:2,5 58:5 61:20 63:11,12, 19,20 89:13 110:5 117:11 169:5 170:8,14, 18 176:17 177:5,9 287:18, 19

**United** 7:12

**units** 46:15 87:23 88:9,18 99:21 101:19 117:3,21 171:8

**unlike** 247:10

**unrelated** 10:11,14,17 11:1

**unresolved** 59:11

**unusual** 212:22

**updating** 156:18 251:5

**upheld** 316:2

**upset** 208:20

**usual** 59:16

**utilized** 89:16

**V**

**vacated** 28:7

**vacation** 52:4 97:23

**vague** 57:9 64:14,20 65:1 66:18 68:14 69:15 73:3 74:19 75:10 76:23 77:18 79:12 80:18 84:5 86:25 87:9 89:6 91:25 92:9 95:12 103:25 110:1,14 111:6, 14 114:9 137:18 139:3 168:13 182:10 199:1 218:25 290:19

**valuable** 75:2

**Vargas** 251:20

**variables** 220:12

**variations** 51:10

**varied** 71:14 95:23 182:11 185:5 207:5,9 209:16

**Vehicle** 272:8, 18,20

**venue** 44:7

**veracity** 187:21 188:1

**verbal** 14:25

**version** 345:6

**versus** 7:11 95:14,15 97:13 207:2 210:2 284:17

**vestige** 250:24

**vibe** 38:9

**Vicente** 108:3 131:10 273:21 307:13

**vicinity** 14:12 125:23

**victim** 59:7 212:12 232:13, 18 251:20 330:20 344:1,2

**victims** 101:5

**video** 7:4 287:2,7 289:3 294:1 345:2,3, 8,17,21

**videoconference** 7:9 83:1 162:19 235:7 288:15 315:8 340:7

**view** 107:17 108:11 128:24 147:10,18 205:14 206:4, 13 207:19,20 210:9 211:10, 11,18 212:2,23 213:11,12,14 214:4 280:25 281:3 282:6 283:5 285:7 292:2

**viewed** 217:20 225:24 235:20 236:23 239:3 241:13,14 244:1 249:7

**viewing** 127:9 128:7,22 129:19 130:5, 17 137:3,20,23 138:2,3,5,9,16, 17 139:1 205:23 217:15, 22 219:6 225:10,15 232:23 236:14 240:8 248:13, 14,19

**violate** 261:4,7

**violating** 284:4,8 286:10 327:17

**violation** 284:2,7,19

**violations** 161:12 285:8, 24 288:23 294:2

**violent** 49:12, 15,16,18,23,24 50:2,4,5,8,11, 23 52:17,21 53:2,5 54:2,5 56:23 60:8,9,18 61:10 62:22 63:11,20 64:1,8 65:12 73:9 88:20,22 89:4 91:21 99:6 101:21 102:3 112:8,14 113:14 226:17 231:24 240:7

**voluntarily** 246:6

**volunteer** 246:9

**volunteered** 204:22 280:23

**volunteers** 129:5 223:10

**vouch** 137:1 138:15 225:23 226:4

**W**

**wait** 191:14 210:18 223:20 310:13 343:23

**waited** 208:20

**waiting** 59:3,6

**walk** 40:25 42:13,15,20,24 156:13 157:19

**wall** 128:9

**Walter** 330:6

**wanted** 45:15 89:25 92:14,24 97:3 157:18 182:6 207:13 208:15 224:3 253:1 272:9 303:10

**war** 38:7,10

**warrant** 277:19

**warranted** 169:14 170:13 173:3

**warrants** 45:16 173:22

**watch** 52:3 88:12 94:24 171:3 300:2

**ways** 185:24 209:13 220:24 222:25 282:5 295:23

**weapon** 321:3

**wearing** 219:8 334:19

**week** 25:2 29:18 31:24 74:15 334:5 336:23 341:14

**weekly** 281:22

**weigh** 120:10 208:13

**weight** 332:16

**well-known** 140:15

**West** 7:6

**whatever's** 335:16

**whatsoever** 326:11,24

**When's** 36:9

**where'd** 49:6

**whereabouts** 228:16

**whichever** 209:25

**Whistleblowers** 291:2

**White** 224:8

**wide** 101:6 174:6 185:13

**wide-ranging** 41:17

**widely** 179:24

**wind** 156:5

**window** 216:21 319:2 328:3

**wing** 91:16

**withhold** 68:11,17

**witness'** 116:16

**witnessed** 73:1 135:10 277:23 308:2

**witnesses** 17:6 55:6,10, 12,23 56:1 73:13,15 75:24 77:6,17,20 78:7,21 79:5,18 80:9 81:25 82:10 115:7,16 124:25 127:8, 17,22,24,25 128:8,22 129:19 130:5, 17 131:22 136:14 137:3, 10,15 138:17 139:1,6 146:14 184:8 202:23 203:1,7,16 205:2 207:19 209:24 216:19 217:4 225:21 236:14 249:7 253:2 307:23 330:16

**witnessing** 277:22

**Wojcik** 37:3 38:3,6,22,25

**woke** 283:23

**woman** 27:15

**won** 154:23

**wonderful** 338:5 339:12

**wondering** 150:13

**word** 148:17 250:12 314:10

**words** 65:3 74:13 83:13 85:14 86:1 116:5 118:2 135:2 282:24 339:10

**wordy** 9:15 87:3

**work** 10:7,11, 14,18 11:1,16 12:10,14 13:11, 20 20:11 33:24 34:1,2,3 35:2 36:2,4,7,23 41:5,13 44:6,11 47:22,24 48:5, 23 49:9 52:15, 18 54:6,9 56:25 64:2 87:12,23 95:1 119:2 120:18 164:1 172:3 175:1 208:6 224:11 273:23 274:1,2

**worked** 34:11, 22 37:22 44:14 49:10,12 50:21 51:13,24 52:17, 23,24 53:1 54:2 61:22 69:20 91:13,16 97:17 98:14 105:17 109:12 111:5 117:20,24 118:7 138:23 141:11 142:1 163:5,6,7,12 164:2,3,4 171:4 172:8,13 197:23 209:12 273:25 274:1,2 300:1 309:1 313:9 333:17

**working** 32:4 34:12 45:25 46:23 47:7,8,15 48:2 51:14 52:21 60:7,16 62:17,21 66:3,7 67:22 68:4 91:9 94:6,17,21 97:24 102:2 103:4,5 105:6,8 164:6 168:24 173:6 176:9 177:11 178:5 185:9,10,22 207:22 218:21 224:14 281:20 295:3 299:2,6, 20 301:2 313:3

**worse** 280:17

**worth** 42:4

**would've** 17:10 21:13 34:3,11 35:11 50:18 82:11 87:14,16 88:12 126:9 129:2 132:11,12,15 137:11 142:22 146:23 150:5 165:13,16 167:11,18 198:24 199:8,9, 11,12 217:8 231:13 237:18, 22 238:14 239:11,17,25 240:1 241:22 246:5,8 248:4, 20,21,23 250:10 258:9 259:10,11,15, 18,20 260:19, 24 261:2,13,14 264:11 267:7 274:17 275:21 303:9,19,22,23, 24 325:9 326:2, 23 331:14 333:7

**wound** 306:24

**wrap** 83:4

**write** 69:21,25 120:4,9 183:19 216:25 326:2

**writing** 70:23 71:6 109:24 110:11 119:13, 14,22

**written** 99:14 113:12 198:24 199:8 273:6 320:13 322:9, 14,25 324:8

**wrong** 42:7 43:19 250:20 285:6 325:16 340:13,15

**wrongdoing** 141:17

**wrote** 70:6,8 252:16

**X**

**x-rays** 341:5

**XYZ** 155:6

Y

**year** 49:4 99:23

**year-and-a-half** 99:23

**years** 28:21,25 30:1 33:22 34:4 36:22 43:7 44:16 66:10 67:21 68:1,23 69:16 80:19,20 87:25 103:11 115:10 116:17, 25 140:2 147:8 151:22 207:15 210:2,10 211:20,22 212:9,18 214:6 262:11 264:22 265:8 277:3 279:3 280:15 282:1,3,6 283:1 285:12 286:14 290:13 294:17, 21 295:1 297:23,24 322:2,22 323:6, 13,21 324:6,16, 20 325:3,13 326:10,23 335:6 338:10 342:23

**yelling** 318:15, 18,23

**yesterday** 174:5

**yesterday's** 24:24,25

**young** 130:25 131:4

Z

**Zoom** 7:19,22

# Exhibit 40

**CASE NO. 1:19-CV-6508**

**GERALDO IGLESIAS**

V.

**REYNALDO GUEVARA, ET AL.**

**DEPONENT:**

**ED MINGEY**

**DATE:**

**April 22, 2022**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

HON. FRANKLIN U. VALDERRAMA, DISTRICT JUDGE

HON. MARIA VALDEZ, MAGISTRATE JUDGE

CASE NO. 1:19-CV-6508

GERALDO IGLESIAS,

Plaintiff

V.

REYNALDO GUEVARA, ET AL.,

Defendants

DEPONENT: ED MINGEY

DATE: APRIL 22, 2022

REPORTER: KRYSTAL M. BARNES

APPEARANCES

ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS:
Rachel Brady, Esquire
Loevy & Loevy
311 North Aberdeen
Third Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: brady@loevy.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, ED MINGEY:
Josh Engquist, Esquire
The Sotos Law Firm, P.C.
141 West Jackson Boulevard
Suite 1240A
Chicago, Illinois 60604
Telephone No.: (630) 735-3308
E-mail: jengquist@jsotoslaw.com
(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
Megan McGrath, Esquire
Leinenweber Baroni & Daffada, LLC
1150 Wilmette Avenue
Suite E
Wilmette, Illinois 60091
Telephone No.: (866) 786-3705
Facsimile No.: (800) 896-2193
E-mail: mkm@ilesq.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
Austin Rahe, Esquire
Rock Fusco & Connelly, LLC
321 North Clark Street
Suite 2200
Chicago, Illinois 60654
Telephone No.: (312) 494-1000
E-mail: arahe@rfclaw.com
(Appeared via videoconference)

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MS. BRADY | 7 |

EXHIBITS

| Exhibit | Page |
|---|---|
| 1 - Arrest Report for Timothy Rankins, CCSAO 5880 | 20 |
| 2 - Supplementary report, JR-L3687 | 28 |
| 3 - Investigative file inventory, RFC-Iglesias 1 | 67 |
| 4 - Supplementary report, RFC-Iglesias 48 - 55 | 70 |
| 5 - Supplementary report, RFC-Iglesias 40-42 | 72 |

STIPULATION

The VIDEO deposition of ED MINGEY was taken at KENTUCKIANA COURT REPORTERS 30 SOUTH WACKER DRIVE, 22ND FLOOR CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on FRIDAY the 22ND day of APRIL 2022 at 10:02 a.m.; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that KRYSTAL M BARNES, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

COURT REPORTER: My name is Krystal Barnes. I'm the online video technician and court reporter today, representing Kentuckiana Court Reporters, located at 30 South Wacker Drive, the 22nd Floor, Chicago, Illinois 60606. Today is the 22nd day of April 2022, and the time is 10:02 a.m. We are convened by video deposition of Edward Mingey in the matter of Geraldo Iglesias versus Reynaldo Guevara, et al., pending in the United States District Court for the Northern District of Illinois, Eastern Division. Case Number 1:19-CV-6508. Will everyone but the witness please state your appearance, how you are attending, and the location you are attending from, starting with the plaintiff's counsel?

MS. BRADY: Good morning, everyone. My name is Rachel Brady, and I represent the plaintiff. I'm attending remotely via Zoom from Chicago.

MR. ENGQUIST: Hi, good morning. My name is Josh Engquist. I'm representing the witness today, but I also represent the -- all the named individual officer defendants with the exception of Reynaldo Guevara. We're attending remotely from our

office here in Chicago.

MS. MCGRATH: Good morning. My name is Megan McGrath. I represent Defendant Officer Guevara, and I'm attending remotely from Chicago.

MR. RAHE: Good morning. This is Austin Rahe, R-A-H-E, for Defendant, City of Chicago, appearing remotely via from the Chicagoland area.

COURT REPORTER: All right. Mr. Mingey, will you please state your full name for the record?

THE WITNESS: Edward Mingey.

COURT REPORTER: And all parties agree that the witness is, in fact, who he says he is?

MS. BRADY: Yes.

COURT REPORTER: Okay. Perfect.

MR. RAHE: Agreed.

MS. BRADY: Yes.

COURT REPORTER: Will you raise your -- will you raise your right hand for me, please, sir? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yep.

COURT REPORTER: Counsel may begin.

DIRECT EXAMINATION

BY MS. BRADY:

Q Good morning, Mr. Mingey. As I said earlier, my name is Rachel Brady, and I represent the plaintiff in this lawsuit. I know you've given depositions recently with our office, so I won't belabor the ground rules. But you said a little bit earlier that you're here in Chicago and that your attorney is in the room with you; is that right?
A Yes.
Q And is anyone else in the room with you?
A No.
Q Do you have any documents in front of you?
A No.
Q Did you have any conversations with your attorney to prepare for this deposition?
A Yes.
Q How many?
A One.
Q Okay. And about how long was that conversation?
A An hour or two.
Q And did you review any documents?
A I did.
Q What documents did you review?
A I -- I didn't read it, I went through the investigative file to see if my name was there.

Q The investigative file for which case?
A The case I'm here on.
Q Okay. So the Monica Roman investigative file in which Geraldo Iglesias was convicted, is that the one you're talking about?
A Yes.
Q Okay. Apart from reviewing the investigative file in the Monica Roman case, did you review any other documents to prepare for this deposition?
A No.
Q And when you were reviewing the investigative file for the Roman homicide, did it spark any independent recollection for you about the Roman shooting?
A No.
Q Okay. Do you have any independent recollection of speaking with a person named Timothy Rankins in connection with the Monica Roman homicide?
A Yes.
Q Okay. What do you recall about speaking with Timothy Rankins about the Monica Roman homicide?
A I was debriefing Mr. Rankins, and I probably asked him about a number of different cases of robberies, shootings, whatever, in the area, but I specifically remember asking about the Roman murder.

Q Do you recall -- oh, strike that. What specifically do you recall about your conversation with Timothy Rankins about the Roman murder?
A I asked him if he knew anything about that case, that incident.
Q Is that all you remember asking him?
A That's all I can recall.
Q Do you remember --
A I assume there's other things --
Q I'm sorry --
A -- but I don't know. I'm --
Q And do you recall what he said to you?
A He said he didn't know anything about it.
Q Do you recall why you had reason to believe that Timothy Rankins might have information about the Roman murder?
MR. ENGQUIST: Objection, foundation. Form. Go ahead.
A The only reason I talked to -- it's a debriefing situation where you would ask the person you -- if you're debriefing if he has any in general information about any illegal acts in the area that he's aware of. Especially if he's a gang member, you want to see what he knows, what help he can be to solve other crimes.

Q Okay. And do you have any specific recollection of why you asked Mr. Rankins about the Roman murder?
A No. No, other than the fact that you'd bring up -- in a debriefing, you would bring up current murders, major robberies, or anything that could help us clear cases, solve crimes.
Q Do you recall of the other cases you asked him about beyond the Roman homicide and the Vargas homicide?
A I didn't ask him about the Vargas homicide, he brought that up.
Q Okay. Do you recall asking him about any cases other than the Roman homicide?
A At this point, no, but I'm sure there were other cases I talked to him about.
Q Okay. I'm going to put up an exhibit. Give me one second.
MR. ENGQUIST: And just so you know, Rachel, off to Mr. Mingey's left hand side, I hooked up the -- a TV to the screen. So if he has trouble seeing it, it might help him to look at the screen. So just so you don't he's look -- someone got upset when he looked to his left before. When he looks to his left, he's looking at a big screen.
BY MS. BRADY:

Q Okay. Thank you. Do you recall providing a deposition in the case where the plaintiffs were Jose Montanez and Armando Serrano, in which you were asked about this interaction that you had with Mr. Rankins?
A You'd have to show me. Is there anything you could show me?
Q Sure.
A A report?
Q So what I'm putting up on the screen is your -- oh, can you see this document on your screen?
A Yeah. Yes.
Q Okay. I'll zoom in in just a second. I -- I can turn to the front page if you need me to, but I'll represent to you this is your deposition transcript from the Montanez and Serrano case. This is the second day of your deposition conducted on February 8, 2019. And this is a conversation which you're asked about this initial interaction with Timothy Rankins. And I'll let you read a couple of pages. I'm just going to ask you about a specific question and answer in here. But I'll let you familiarize yourself, so I'll flip back a page. Do you need me to blow it up for you?
A If you would a little bit.
Q Sure. And just let know when you're ready for me to scroll down.

A Okay. Okay. Okay.
Q Okay. Actually, I'll let you read the next page too. And so, for the record, I showed the witness Pages 248, 49, and 250 from his 2019 deposition in the Montanez case.
A Okay.
Q Okay. So I just want to clarify here on page 249 of this deposition, at line 20, the question is, "Was the murder that you went in there to question him about the murder -- murder of Monica Roman?" And you say, "I don't recall. If that's what the report says." Do you see that?
A Yes.
Q Okay. So I just want to clarify your testimony now. Do you have a specific recollection of speaking with Mr. Rankins about the Monica Roman case?
A I had a conversation with him I'm sure about other things, but I specifically remembered mentioning the Monica Roman homicide. I don't know how I mentioned it, whether I gave him locations, I really don't know. But I mentioned -- I asked him about that case.
Q Okay. And beyond your recollection that you spoke with him about the Monica Roman case, do you have any recollection of why -- of any independent recollection of why you were asking him about the Monica

Roman case.
A Well, I'm sure it was very current, but primarily, the young girl shot by gang bangers on the street, it's something you don't really -- you know, you have a tendency to remember something like that.
Q Okay. And you say it was a young girl, homicide on the street. Are you speculating right now, or are you kind of filling in the blanks, or do you have a specific recollection of this being the reason you wanted to talk to Mr. Rankins about that case?
A Do I specifically recall, no, but that would -- talking to him about that case, yes, that would be the reason.
Q Okay.
A It's a terrible case and --
Q Okay.
A -- just asked if he knew anything about it.
Q Okay. And do you have any other independent recollection about why you were asking Mr. Rankins about the Monica Roman case?
A No.
Q Okay. Since being informed that you needed to testify today in this case, have you spoken with anyone other than your attorneys about this deposition or the Monica Roman case?

A No.
Q Okay. Since learning that you would need to give this deposition, have you spoken with anyone other than your attorney about Timothy Rankins?
A No. Does it matter which screen I look at? Can you pick me up?
Q Yeah, I can see you and hear you.
MR. ENGQUIST: Yeah, your voice is on speakerphone, so it's okay. It's picking up the whole room.
BY MS. BRADY:
Q You were a sergeant in 1993; is that right?
A Yes, ma'am. I was.
Q And what were your job responsibilities as a sergeant?
A I had robbery oversight, and basically make sure everybody shows up for work. Assign jobs when they come in. Approve or disapprove overtime, that -- general, answer phones and so forth.
Q And as sergeant, was it one of your job responsibilities to participate in investigations by interviewing witnesses or suspects?
A No. What I did do was debrief people. I rarely interviewed people in custody for a specific offense that -- I would -- I would rarely do interviews

of other detectives' arrestees, except in a debriefing situation.
Q Okay. And can you -- oops, I'm sorry. I didn't mean to interrupt you.
A That's okay. Like this, if I'm being clear.
Q Yes. So can you tell me the difference between a debrief and an interview?
A Well, debriefing would be you'd talk to people in custody that appeared cooperative and ask them if they know anything that could help us get information on a crime that has not been solved.
Q And did you have a practice of speaking to every person who was in custody for any reason about all of the crimes that you were currently investigating?
A No.
Q So how did you decide who to debrief?
A When I had time, if -- a detective may come up and say, "Listen, do you want to talk to this guy about something else? He's very cooperative." But I didn't do it often, but I did do it. Because it's -- I didn't really have time to do those continually.
Q Okay. So one of the reasons that you might debrief someone would be if a detective told you that that person might have information about a case -- an active case; is that fair?

A Possible, sure.
Q Okay. And if you did a debrief with someone who had been arrested for something, was it your practice to document it?
A My practice would be to, if it was -- it would depend -- it basically depends on the situation.
Q What does it depend on?
A Well, it would depend on if -- I would usually -- depend -- the case -- if there was something positive about the debriefing, I would give it to a detective to document.
Q Okay. And generally speaking -- oh, strike that. And when you say if something positive came out of the debrief, what do you mean?
A Well, if -- for example, in Rankins, had something positive about Guevara's case, that would go right to the detectives, and they would document and so forth. But in the case of Monica Roman, there was nothing positive. No, I wouldn't document anything.
Q Okay. And when you say nothing positive, do you mean that Mr. Rankins didn't have any information for you?
A On that case, yes.
Q Okay. Can you describe for me the layout of the 25th District and the Area 5 offices? And actually,

before you do that, can you adjust your computer screen a little bit? I can only see the top half of your face.
A Sure.
Q Okay. Thanks.
A That better?
Q Yeah, that's better. Thank you.
A Can I still look at the big screen?
Q Yes.
A Okay.
Q So can you describe for me the physical layout of the 25th District in Area 5 Offices?
A Sure. You walk up to the second floor's detective offices. And then as you walk in, directly in front of you are a number of interview rooms. I couldn't tell you how many, six, eight of them. The washroom in the middle, and the floor. All the detectives would be on the floor.
Q Okay.
A At their desks.
Q And that was up a set of stairs?
A Yes. Yes.
Q Okay. And then where was the 25th District Office?
A First floor.
Q Okay. So when you walked in the front doors

to the building at Grand and Central, you were in the 25th District; is that right?
A Right.
Q Okay. And where was the 25th District lockup?
A That was in -- you walk in the front door of the 25th District. You'd have to pass the desk. And at the end of the desk, to the east would be the lockup.
Q Okay. And so back in 1993, when people were arrested for violent crimes in the 25th District boundaries, where were they taken?
MR. ENGQUIST: Objection, foundation.
A Arrested by who? Beat guys, detectives?
Q Beat cops.
A They'd be taken -- they'd be processed, their paperwork could be made out, and they'd be taken into the lock up.
Q Lockup on the 25th District?
A Yes.
Q Okay. And if a person was arrested and taken to the 25th District lockup, would that be documented on the arrest report?
MR. ENGQUIST: Objection, foundation. Calls for speculation. Go ahead.
A By who?
Q Whoever wrote the arrest report.

A You talking about detectives, patrolmen, or -- I don't know what -- what you mean.
Q Sure. Okay. So let's just take a look at the Rankins arrest report.
COURT REPORTER: While you're doing that, did you want to mark these, or are we just referencing them?
MS. BRADY: I don't need to mark the deposition, but I am going to mark this next document. And this will be Exhibit 1. We will call this Mingey Exhibit 1.
BY MS. BRADY:
Q Okay. Can you see this document on your screen?
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
A Yes, I can.
Q Okay. I'll scroll through the whole thing so you can see it, but just for the record, this is a one-page document Bates labeled CCSAO 5880, and this is from Montanez Serrano case.
MR. ENGQUIST: So wait a minute. What is the Bates stamp number?
Q Okay. So take a look. This is --
MR. ENGQUIST: What was the Bates number?
MS. BRADY: CCSAO 5880.

Q Okay. So here at the top you can see this is an arrest report. The arrestee's name is Timothy Rankins.
A Right.
Q The date is June 10, 1993. You see that?
A Yes.
Q Okay. So can we tell from looking at this report where Mr. Rankins was taken when he was arrested?
A There should be -- could you scroll down? Apparently the watch commander signed off on it. I think would give you an indication of -- kind of towards the bottom, below the watch commander's signature, when he hit the lockup, I guess. Not sure. I have a hard time reading this.
Q Okay. What about right here in box 30 that I'm highlighting, where it says, "Arrestee to Unit 025." Do you see that? It's right here.
A Yeah, right.
Q Does that tell us whether Mr. Rankins was taken to 25th District lockup or up to Area 5?
A I assume to 25th District lockup, but I really don't know, again.
Q Okay. Is --
A I --
Q In this box 30, is there a code that would

designate that the arrestee had been taken straight up to Area 5?
A Not really, not that I'm aware of, but I'm just -- I'm not sure.
Q Okay.
A Because I really -- my eyes aren't really that good, so...
Q Okay. Do you want me to zoom in? I want to make sure you can see it.
A You're talking about box 30 for transported?
Q Yes.
A That's the one? Okay. I got it.
Q Okay. So can we tell by looking at this box 30 whether Mr. Rankins was taken to the 25th District?
A Apparently so, yes.
Q Okay. And why do you say apparently so?
A Scroll down -- scroll down -- scroll down to the bottom and then see what -- what time the watch commander signed off on it. Signed off on charges at 00:20. At some point he was apparently taken up to the detective area, upstairs.
Q Okay. And what makes you say that?
A Well, because I talked to him upstairs.
Q Okay. Is there anything on this --

A I --
Q -- report that suggests to you he was taken upstairs?
A Well, charge -- charges were approved at 00:20, just after midnight. I -- I really don't know what you're asking specifically.
Q Okay.
A Could you be a little clearer?
Q Sure. We know from your recollection of speaking with Mr. Rankins that he was eventually taken up to the fifth -- to Area 5 for questioning, and we know that because you talked to him, right?
A Yes, correct.
Q Okay. And what I want to know, is there anywhere on this arrest report that would indicate to us that he was taken up to Area 5, or is it -- do we just know that because you know that you spoke with him there?
A I spoke to him -- detectives were processing Rankins for a -- for a robbery, so during the processing, he would really have to go to the second floor. State's attorneys would've to call possible lineups. Could be a variety of things that they had to do to get charges approved.
Q Okay. And typically speaking, in the early to

mid '90s, how were Area 5 detectives alerted when someone was arrested for a violent crime, like an armed robbery?
A They -- they would notify the dicks that there was an arrest made on a case and we'd send dicks out.
Q Okay. And can you adjust your computer screen a little bit again?
A Sorry about that.
Q Thank you.
A I'm having a hard time seeing.
Q Okay. So when you say they would notify the dicks, who notified whom? How -- can -- I just -- I -- strike that. I'm looking for a little bit more context about this process in which someone was arrested, and then eventually the detectives were notified. So can you tell me who notified whom that a person had been arrested, typically speaking?
A It would depend. It might be a radio call to the area that a person was taken into custody in 14. It could be police officers calling for the -- the desk saying that they have somebody in custody. It could be the sergeant of the arresting officers that called. It could be anybody.
Q Okay. And was that also the case for folks who were arrested for non-violent crimes?

A I -- I don't know what you mean.
Q Sure. So if someone was arrested and taken to 25th District lockup for not a violent crime, would detectives be notified in the same way that the person was taken into custody?
MR. ENGQUIST: Objection. Calls for speculation, incomplete hypothetical, no foundation. Go ahead.
A No idea. It could be anything. If detectives had to be involved in a case, the notification process would be similar. Could be the watch commander of the detention facility, the arresting officer's sergeant, the arresting officers themselves, could be really anybody. But that's if there was going to be detectives assigned to a specific case.
BY MS. BRADY:
Q Okay. And in what kinds of cases were detectives assigned?
A Usually violent crimes, major robberies, arrestees that -- that you want felony charges on, that -- that sort of thing.
Q Okay. And I asked you a little bit earlier the extent of your involvement in the actual investigations, and you said you were not generally involved in the investigations themselves, but was it

your practice as supervisor to review reports and tips and information generated by your detectives during their investigations?

MR. ENGQUIST: Objection, foundation. Calls for speculation. Go ahead.

A Could you repeat? I really don't know what you mean.

Q Sure. So you said that one of your responsibilities as a sergeant was to review detectives reports then assign them to investigations and make sure they were doing their jobs; is that right?

A I didn't say that. Basically my -- part of my job was to approve robbery reports and -- but I wouldn't review all reports to make sure -- I -- I -- I don't know what you're asking me. I really don't know.

Q Did you have a responsibility as a sergeant in the early '90s to review the case files that Area 5 detectives were working on?

A Whenever possible I'd review what was submitted to the desk and on the -- on the board when I got a chance. That would be one of the -- one of the things that I would do, if I had time.

Q Okay. And what's the board?

A The board is by the what -- by the sergeant's desk and the sergeant's office. It's the board where

you'd put all current sups and case reports and so forth. Because part of the responsibility you would have was, at the end of the day, you'd put all major incidents on a log, and depending on who was sitting in that chair, you'd have to do that. So you'd have to be aware of things that occurred on the watch and clear ups that were made, major incidents, and note them on the log so the boss would be aware of it in the morning.

Q Okay. And the information on the board, would that include sups generated in connection with homicides?

A It could, sure.

Q Were all sup reports supposed to go on the board back in the earlier or mid '90s?

A I couldn't answer that. I have no idea. You're talking about -- you're talking about violent -- you're talking about all violent reports?

Q Sure. Let's just talk exclusively about homicides now. So were all sups generated in connection with homicide investigations supposed to go on the board?

A Eventually, sure. They'd have to be signed off by the -- have to be signed off by an approving sergeant, copies would be put on the board so people would've access to what's pending, what's cleared, and

so forth.

Q Okay. All right. Let's take a look at what we'll call Mingey Exhibit 2. Okay. I just put up on the screen a five-page document beginning at Bates label JR-L3687. Can you see this on your screen?

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

A I can, yeah.

Q Sure. I'll zoom in for you so you can take a look at all of the pages, but I just want to explain the report on the record. So this is a supplementary report generated in connection with the Vargas homicide, where it says that Armando Serrano has been arrested. It's written and signed by Halverson and Guevara and approved by Sergeant Biebel. Do you see that?

A I do.

Q Okay. I'll zoom in here so you can take a look. Did you review this report as you prepared for this deposition?

A No.

Q Okay. Let me know when you want me to scroll down.

A You want me to read it?

Q Sure. I'm going to ask you about a specific paragraph, but I'll let you acquaint yourself with the whole document.

A Okay. Fine. You can go a little bit. Hold on. Okay. Okay. Okay.

Q Okay. So for our purposes, nothing in the Rankins interview is actually relevant. Do you still want to read the report?

A Oh, no.

Q Okay. So I'm just going to ask you some questions about this paragraph here. So I'll zoom in, and you can just leave it up on the screen.

A Okay.

Q Okay. So here at the bottom of this report, it says, "On 10, June '93, an individual named Timothy Rankins was arrested for an armed robbery, reported under RDX-25641. Timothy Rankins was known to Sergeant E. Mingey, number 1731, as being a member of this Spanish Cobras street gang. Area 5 violent crimes was at that time investigating the murder of a Monica Roman that occurred on 7, June '93, reported under RD number X-250303. Preliminary information in the Roman shooting indicated that the offenders may have been members of the Spanish Cobras street gang. Sergeant E. Mingey elected to interview Timothy Rankins for any knowledge he may possess about the Roman shooting." Do you see that?

A I do.

Q Okay. Does this refresh your recollection at all about why you wanted to talk to Timothy Rankins about the Roman shooting?

A The idea of talk -- debriefing Rankins was he was a -- he was cooperating with the dicks, I'm sure they told me that. I went in to find out about any crimes that he could help us out with in the area. I didn't go in there specifically, I don't believe, to talk about the Roman case or that wasn't my primary focus, would be any -- any information he could give us that would help us solve other crimes that were open.

Q Okay.

A But I did -- I do remember talking about the Roman case to him though. Yes.

Q Okay. And this report says that you had information that the Roman shooters may have been Spanish Cobras. Does that refresh your recollection at all?

A I -- that I had information there were Spanish Cobras, is that what you're asking me?

Q Yes.

A No, that's not true.

Q Why do you say --

A I had no --

Q -- that's not true?

A I had no idea who the -- as I sit here now, I have no idea what gang the offenders on the Roman homicide were from.

Q Okay. Do you have any reason to doubt that preliminary information in the Roman shooting indicated that the offenders may have been members of the Spanish Cobras street gang?

A They could have been -- they could have been any gang.

Q All right.

A I have no idea.

Q Okay. Do you have any reason to doubt the information contained in this paragraph?

A Well, I don't know if I ever -- if I knew Rankins. I don't recall. I may have, but I don't recall ever meeting him before. But again, we're going back a long way. But I know that I talked to Rankins about a number of cases, I'm sure. Specifically, I couldn't tell you, but I do remember talking about Monica Roman, for obvious reasons.

Q Sure. So my question is a little bit different. I'm wondering if you have a reason to doubt the information contained in this paragraph.

A Well, I -- I can't recall ever meeting Rankins. I may have. I have no idea whether he was a

Spanish Cobra during the conversation. Eventually that may have came out. But prior to talking to him, I just knew he was a gang member and -- that was cooperating with the detectives, and I thought it'd be a good person to debrief.

Q Okay. So it says here, "Timothy Rankins was known to Sergeant E. Mingey as being a member of the Spanish Cobras street gang." Do you have a reason to believe that this statement written in this report and signed by Sergeant Biebel was inaccurate, or is it just --

A No, I --

Q -- that you don't remember?

A I have no recollection of that guy at all. Did I see him or meet him in the neighborhood once or twice? I have no idea.

Q Okay. So what I'm understanding you say is that you don't remember, but you have no reason to believe that this information in the report is inaccurate; is that right?

A I have no recollection of that part of it at all.

Q Okay. If you have a reason to believe that there's something incorrect about this paragraph, please tell me what that reason is.

A What are you asking me now again? I -- I -- you're confusing me here.

Q Okay. So I know that you said you don't remember the details of the interaction. My question is whether you have a reason to believe that the detectives who wrote this paragraph included incorrect information in their report.

A Did they purposely put incorrect information into that report?

Q Not necessarily --

A I doubt it.

Q -- okay. Why -- okay.

A Doubt it, but I have no reason -- I have no knowledge of that whatsoever.

Q Okay.

A I doubt they would do that.

Q Okay. And as you sit here today, looking at this paragraph now, do you have any reason to think that this information is incorrect?

A I -- I really don't. I can't recall.

Q Okay.

A I have no idea what the conversation with the detectives were, and I have no recollection of ever meeting Rankins before, although it's possible.

Q Okay. Would it be fair to say that, as far as

you know, and as far as you're able to tell me right now, the information contained in this paragraph is correct?

A I don't think they'd put bogus information into a -- a sup. I -- I can't recall any of this, but I -- I'm certain they didn't put anything that -- everything that's there should have done there, I'm sure.

Q Okay.

A Whether I had a conversation or knowledge about Rankins in the past or what gang he was involved in, I have no recollection about that at all.

Q Okay. So there was information available, according to this report, that the offenders in the Roman shooting may have been members of the Spanish Cobras; is that right?

A That's what it says.

Q Okay. And the information available was that there were multiple perpetrators; is that right?

A On what -- I have no idea. Never read the case. You're talking about Roman, right?

Q Yeah.

A Never read the case.

Q Okay. So it says right --

A That I can recall.

Q Okay. Sure. So I'm not asking about your independent recollection right now. You've told me that you have no reason to think that the information in this report is incorrect, so my question is, the preliminary investigation information in the Roman shooting indicated that there were offenders, plural, right?

A Yes.

Q And that the offenders may have been Spanish Cobras, right?

A That's what it says, yes.

Q Okay.

A What are you asking?

MR. ENGQUIST: She's not asking, she's just reading.

A Okay.

Q Would you expect that information with this lead, that the shooters were members of the Spanish Cobras, would have been contained in the Roman investigative file?

A I haven't -- yeah, I didn't read the Roman investigative file just to see if my name was there, so I really don't know what was there or what should have been there. I -- I really have no idea.

Q I mean, do you agree that information that the shooter, what you called a pretty egregious homicide --

I don't think you used the word egregious, but I think you said that this one was pretty important because of -- it was a young girl who was shot, that any information about who the offenders were would be contained in the investigative file?

A It really depends.

Q What does it depend on?

A Well, when you talk about gang related shootings, sometimes gang bangers would shoot people in false flag and say they're from another gang. They might not be from any gang. It's really hard to know. All the information that you get on these cases and the people you talk to, if you're investigating one of these cases, all that information's important. But it -- a lot of that stuff is really misleading, because rival gang members, for example, Cobras and Gangsters, are part of the Folk Nation. They ride together. In other words, they're friends. They have a falling out, they become enemies, they shoot each other, then next week, the next month, they're friends again. So a lot of times it's -- it's really unclear who's really involved. That's why you should document everything and do the best you can to solve the case.

Q Okay. So you should document everything about all of the tips that you get and then work them -- try

to solve the case; is that right?

A Not necessarily. If a tip that you get leads nowhere, that would be up to the dick to put that in the report, in his closing report, or if he's taking notes into GPR's, that would be up to him.

Q I mean, clearly this --

A But --

Q Oops, I'm sorry. Go ahead.

A Certainly, if you get a tip about somebody that so and so did it, and you find out so and so is in jail at the time, do you have to document it? So -- It'd be to the detectives, but it seems like it would just be wasting space.

Q It would be wasting space to document a tip that someone had committed a crime?

A An anonymous tip comes into the police department saying that Joe Blow committed a murder, and you find out that Joe Blow was in jail for the last 20 years. It would be -- you could document it. That would be strictly up to the detectives. But it would be something that if you know is a fraudulent tip, phony tip, no.

Q Okay.

A You wouldn't have to.

Q So -- okay. So in this instance, would it be

fair to say that the preliminary information in the Roman shooting was that the offenders may have been Spanish Cobras, that this tip was still a good tip because you were asking Rankins about it?
A Well, first of all, I don't know what -- I don't -- the best of my recollection, I have no idea who the offenders were in the Monica Roman murder. I was just asking to get information on that case and other cases, if he could help us out. I had no idea, and it's -- to me, when I talk -- debrief, it doesn't -- gang affiliation for a rival offender, somebody that you think could be involved, that's something that's -- should be part of the case, but it's something you don't bring up with the -- with the person you're debriefing. You just ask them general, "Give us" -- you try to get general information about them, about these open cases.
Q Okay.
A If (Inaudible) that's clear.
Q Yeah. So would you expect a detective investigating a crime early on, we're talking, you know, crime scene sups, initial canvases, that a detective who got information that the shooter may have been a Spanish Cobra would document that tip?
A Would it be in the -- are you talking about -- wasn't it documented in the original reports? It's

documented there. It's documented. You'd have -- this is something that the detectives assigned would make a decision on that. Should it be -- should the fact that he was a member of the Spanish Cobras be -- be mentioned in the report? Is that what you're asking me?
Q I'm asking if it should be documented somewhere. In the original case report, for instance, you know, "Witness says that he thinks there was multiple shooters and they were both Spanish Cobras." That should be documented at the beginning of an investigation, right? And maybe it doesn't make it into a closing sup because it turns out to be wrong, but this is information that should be documented early on, right?
MR. ENGQUIST: I'm going to object. It's confusing. You -- are you asking if a witness says something, that you document what the witness says?
MS. BRADY: Yes.
MR. ENGQUIST: That that's -- okay. That's -- okay. Go ahead. You can ask -- answer the question.
A If that's what the witness says, yes.
BY MS. BRADY:
Q Okay. And your expectation of your detectives would be that if they received information that the

shooters, the Monica Roman shooters, were members of the Spanish Cobras that they would take steps to develop that lead, right?
A Repeat that --
Q Sure.
A I'm getting lost between both cases now. You're kind of confusing me.
Q Sure. Yeah. So my question now is just about this tip in the Roman case, where it appears that detectives got a tip that, in the Roman case, there were multiple offenders, and they were Spanish Cobras, and you said they should document that tip early on. Would you also expect them to develop that lead?
MR. ENGQUIST: Objection, form, foundation. Go ahead.
A If it was -- if the witnesses on a murder said that they heard that it was Spanish Cobras involved, that should go into a report. Yes.
Q Okay. And you would expect the detectives to develop that lead as well, right?
A Well, yes. You would have -- you would have witnesses that apparently could maybe identify the shooter in the Roman case. You'd have them view photos and try to develop. You'd have to vet the information out.

Q Okay. And you would expect detectives to document the steps they took to develop this lead, right?
A What lead are you talking about? Okay. Could you do me a favor? Could you get rid of that report? Because I -- you're asking me about Roman, and I'm looking at Vargas here.
Q Sure.
A Okay.
Q So I took down the exhibit. For our purposes now, I'm asking you about this lead in the Roman case, which is that somebody said the offenders were -- may have been Spanish Cobras.
MR. ENGQUIST: Objection, mischaracterizes his -- the evidence. But go ahead.
A A specific witness said they were Spanish Cobras?
Q It says, "Preliminary information in the Roman shooting indicated that the offenders may have been members of the Spanish Cobras." Okay? That -- that's -- for our purposes now, that's the lead that we're talking about.
A I don't know. What -- are you asking me should they have vetted that information and try to do something with that information?

Q Yes.
A Who's to say they didn't? I'm not familiar with that.
Q Right.
A So I don't know that they did or whether they didn't.
Q Right. My question is not whether you know specific information about the case. I -- I'm not asking you about your knowledge of the Vargas -- I'm sorry, the Roman investigation. I'm asking you, as a matter of practice, would you, as a supervisor, have expected your detectives to develop this lead that the offenders may have been Spanish Cobras?
MR. ENGQUIST: Objection, form, calls for speculation. Go ahead.
A It appears like they did? You mean prior to the closing sup? I don't know what you mean.
Q Okay. So Monica Roman was shot on June 7, 1993. This report says that information was available by June 10th that the offenders may have been Spanish Cobras. Are you with me so far?
A So far.
Q Okay. So at some point between June 7th and June 10th, a lead was developed that the shooters were Spanish Cobras, right?

A Apparently so.
Q Okay. Would you have expected the detectives who were working on the Roman investigation to pursue that lead?
A Didn't they? It appears like they did.
Q Sure. And was that your expectation, that the detectives working on the Roman homicide would have pursued this lead that the shooters were Cobras?
A That they'd pursue any lead. Lock yourself into Spanish Cobras, Disciples, Gangsters, Kings, you've got to keep an open mind when you're dealing with these gang shootings, because you don't know if somebody's giving you bogus information. You don't know if the offenders are false flagging so they don't get grabbed by the police and try to blame it on another gang. There's a lot of -- you've got to keep an open mind on this. If you get information about who may be involved, get ahold of the witnesses, see if they could identify photos. Debrief them, find out if they could give you more information. I -- I don't know anything about this case, but I know enough about it to think that they -- these guys would've done their best to see if they could get somebody identified.
Q Okay.
A Which they apparently did.

Q Sure. And why do you say they apparently did?
A Well, it's closed. Somebody was arrested.
Q You -- okay. Yeah, I understand. And would your expectation be that, as detectives were developing all of the leads that they got, including this lead that the shooters may have been Cobras, that they would document that investigation?
A It depends on the situation.
Q What does it depend on?
A Did they look into it, find out, "Well, they say that this guy did it, but we found out he's in jail"? That kind of stuff. It would depend on what they -- what they deem relevant to that case. First of all, I'm so unfamiliar with this case that I -- it's hard for me to answer your questions.
Q Sure.
A I don't even know for sure if the offenders were Gangsters, if they were Kings, if they were Disciples, Cobras. I really don't know. The original tip came in. I had no idea what that is, because I never read any of this. To the best of my knowledge, the best of my memory, didn't read it then and didn't read it now. Was I aware of it at the time? Probably. Was I again aware of the specific gang? To me, that's rather irrelevant. When you debrief somebody, you don't

want to lock yourself in. You want to ask them general questions, but -- and apparently I asked specific questions about Ms. Roman, because it was such a bad case.
MR. ENGQUIST: All right. We're going to -- let's just take a break. He's been going for about an hour. And I know, Rachel, you haven't gone into background, you haven't wasted his time doing that. But this is supposed to be on what he knows about the investigation of this case, or his involvement in this case, so if we're going to be doing hypotheticals and having him view stuff and do this -- that's not what this is supposed to be about. But why don't we take a break?
MS. BRADY: Okay.
MR. ENGQUIST: Can you give us just about five minutes or so?
MS. BRADY: Sure.
COURT REPORTER: Okay. We are off the record. It is 10:59 a.m.
(OFF THE RECORD)
COURT REPORTER: We are back on the record. The time is 11:06 a.m.
BY MS. BRADY:
Q So before we broke, you were saying that you

would not necessarily expect your detectives to document their efforts to develop a lead that the shooters were members of one gang or another; is that right?
A No, it's not. If they -- if a witness to a crime comes up with -- or members of this gang or that gang, I'm sure it would be documented and developed. If it -- I -- the problem here is I -- I'm assuming, when you say information that comes to a witness, that the police talked to an actual witness, not a tip over the phone or a -- something like that, a tip from an informant. All those things would be vetted. Some would be documented, others wouldn't be. That would be up to the detective assigned to that case, that's working on that case.
Q Okay. So am I understanding you correctly then that the Chicago Police Department did not have a policy that required detectives to document the tips that they got in connection with homicides?
MR. RAHE: This is Austin Rahe. I'm going to object to form, foundation, and speculation. Thank you.
Q You can answer.
A Are you talking about anonymous tips, tips from street sources, or -- or -- or actual information from witnesses that the police would talk to and

document during the course of their investigation on a report? I don't know what kind of tips you're referring to.
Q Sure. So I'm asking about any tip, an anonymous call, a street source, a tip from a witness.
A That would depend.
Q Okay. So as far as you understood the policy about documenting tips, were detectives required by policy to document tips that they got in connection with homicides?
MR. RAHE: Objection to form.
A What do you mean by --
MR. RAHE: Sorry. Objection to form and foundation.
A What do you mean by tips?
Q That someone provides them information that may provide a lead about the identity of a shooter.
A An unknown somebody or an actual witness in the case?
Q Does it matter?
A It's a big difference. Yes, it does.
Q Why?
A Well, a witness would tell you something, and you'd document everything the actual witness said. If you get an anonymous tip that Joe Blow did something and

you check and find out that Joe Blow has been in jail during the whole course of this, it would obviously be a bogus tip. Would you document it? It'd be up to the detectives. I wouldn't, but that's -- that's their call.
Q So there's no policy that required detectives to document all of the tips that they got --
MR. RAHE: Objection.
Q -- in investigating homicides?
MR. RAHE: Sorry about that, Rachel. Objection to form and foundation.
A Again, what tips are you talking about? You're talking about information from an actual witness that witnessed the crime or has specific information about the crime or an anonymous tip from a gang banger or from a telephone call? You'd vet that information. If it was -- if it was pertinent to the case and would help solving the crime, yes, you'd document it. It'd be up to the dicks, but you would document it. But if it turned out to be nothing, it'd be up to detectives assigned to the case, and it would be their call. But in a case with an anonymous tip that a guy did it that was in the penitentiary, no.
Q So --
A But --

Q -- if I'm understanding you correctly, detectives were not required by policy to document tips that did not pan out?
MR. RAHE: Objection to form and foundation.
A It would -- it -- it certainly -- it depends on the situation. However, if they get a tip that the guy that was involved in the case was in jail for the last 20 years and couldn't have possibly been the offender in a murder, do they have to document it? It'd be up to the detectives. I would say no.
Q Okay. Apart from --
A It just wouldn't be --
Q Sure. Apart from the situation you're describing where someone gets a tip that Joe Smith committed the murder, but actually Joe Smith had been in prison for 20 years and obviously couldn't have committed the murder, would policy require detectives to document all other tips?
MR. RAHE: Objection --
MR. ENGQUIST: Objection, foundation. Calls for speculation. And also, I just want to put another objection on here, Rachel. We went through this whole thing before we even brought him in here because we knew he wasn't involved in this investigation, and you -- you said, "Well, I want

to make sure he wasn't involved in this investigation." This is now something that has nothing to do with his involvement in the investigation at all, and you're asking him to basically opine about things he has no foundation for. So at this point I'm thinking that this was kind of rude to bring him in here and harass him, and I'm getting a little bit frustrated with the whole thing. If you want to ask him about his involvement in the investigation, which I think is already done, then let's just finish that up and complete it from there. Austin, I'm sorry. You might have another objection.

MR. RAHE: I just had an objection to incomplete hypothetical as well.

MS. BRADY: Krystal, can you please read back the question that's pending?

COURT REPORTER: Yes. Give me one second.

(COURT REPORTER PLAYS BACK REQUESTED QUESTION)

MR. RAHE: Objection to form.

BY MS. BRADY:

Q Did you hear that question?

A I did.

Q Would --

A That would depend. That would depend. If you get a tip about somebody who wasn't in jail, but you do a photo spread with the witnesses and they can't identify the guy, and obviously he wasn't involved in this -- in the case, it'd be up to detectives to see whether they wanted to document it or not. I would think that you could -- you know, they could and they couldn't. It depends. But if it turns out that that -- the tip has nothing to do with the case, that'd be up to the detectives.

Q Okay. So what I'm hearing you say, and correct me if I'm wrong, is that detectives were required to document only tips that supported the person that they ultimately thought committed the crime; is that right?

MR. RAHE: Objection, form and foundation.

MR. ENGQUIST: Join.

A No, I'm not saying that.

Q Okay. So I -- just -- I'm not sure I'm understanding then, because you're saying it's up to the detective. Detectives can decide what to document and not -- but then I said, "Well, detectives are only required to document tips that pan out." So can you help me understand what were detectives required to document when it came to tips?

A Well, if you have -- for example, you have -- you have witnesses out there that didn't see anybody. They heard gunshots. The victim was shot. They didn't see anybody. So any tip, really, that the police would get, unless it's about somebody who was in jail at the time, that's tip -- it's up to the detectives. But something like that should be documented, probably.

Q Okay. So if you received a tip -- strike that. If your detectives got a tip that was credible enough that it was worth pursuing, you would expect that tip to be documented somewhere; is that right?

MR. ENGQUIST: Objection to form and foundation.

A Either in a GPR or a case -- or report. But again, it's up to the detectives. Is it -- is it a valid tip which could point the police in the direction of the real shooter? It -- it'd be up to the dicks, but that would be something that probably should be documented.

Q Okay. So you would expect it to be documented if detectives received a tip that was credible enough to pursue; is that right?

MR. RAHE: Objection to form --

A No.

MR. RAHE: -- foundation, incomplete

hypothetical.

MR. ENGQUIST: Objection, asked and answer. Go ahead.

A Not necessarily.

BY MS. BRADY:

Q I thought you just said you would expect it to be, but it would be up to the detectives whether they wanted to write it down.

A What I'm referring to is a tip -- if you show photos about -- you -- you get a tip about a guy that may be involved in it, you show photos of that guy to the actual witnesses, and they say, "No, it's not him. Definitely not him," no.

Q You wouldn't expect that to be documented?

A No.

Q So if I'm understanding you correctly then, there's no policy that requires photo arrays to be documented if the witness doesn't pick the right person?

A I --

MR. ENGQUIST: Objection to form, to foundation, incomplete hypothetical. Go ahead.

A No idea what the policy regarding that was 30 years ago or 28 years ago. I can only tell you I -- hopefully my recollection is accurate. If you have a tip that turns out to be nothing but somebody's got an

ax to grind with somebody in particular, it would be the up to the dick if it's pertinent to that case to document or not. It's their call.

Q Okay. And if a tip was credible enough that -- strike that. If detectives at the crime scene got a tip that members of a certain gang committed the crime, and that tip was credible enough that detectives wanted to pursue it by conducting additional investigation, would you expect that tip to be at least written in the initial notes?

MR. RAHE: Incomplete hypothetical.

MR. ENGQUIST: Join.

A If they took notes, put it on a GPR, and so forth, it would be -- it -- everything depends on the situation. I don't know what you mean by a credible tip.

Q Sure. So a tip that's credible enough that the detectives say, "Hey, we should follow that tip. We should pursue it."

A Pursue it how? And where they getting the tip from?

Q By doing their investigation.

A Where are they getting the tip from? From an anonymous source, from a witness? There's a big difference in the two.

Q Okay. So your testimony is that detectives can choose to document tips that they get, that they believe are credible enough to follow up on, that they don't have to document them?

A If they think they're credible enough to follow up on them, they should document them.

Q Okay.

MR. ENGQUIST: Let's take a break. And Rachel, once again, when you -- we talked about specifically we objected to this deposition because it's harassing because he's not involved in the investigation, you specifically told us that you'd be asking him about that because it was unclear if he had any involvement in the investigation. This is not what this deposition's about, which leads me to believe that everything you told me (Inaudible) was incorrect or slightly off or maybe shaded in some way. So if you want to focus your deposition like you said you were going to, that's one thing. If this is nothing more than bringing in this man so you can try to ask him questions he has no foundation on to be some type of opinion witness for you, that is completely improper, and it's also something that you never said was a basis for this deposition, right? Am I right on that?

MS. BRADY: I don't agree with your characterization of what I said this deposition would be. I said I would keep it to a couple of hours. I said I would keep it to the Roman investigation. I'm asking him about the report, where his participation in the Roman investigation --

MR. ENGQUIST: But you're not asking him about a report or his involvement, you're asking him hypotheticals the whole way through. So we're going to take a break.

COURT REPORTER: Okay. We are off the record at 11:21 a.m.

(OFF THE RECORD)

COURT REPORTER: We are back on the record. The time is 11:30 a.m.

BY MS. BRADY:

Q Mr. Mingey, you don't know what information you were given about the Roman homicide, right?

A What do you mean? What I was aware of at the time?

Q At the time you interviewed Rankins?

A We had no idea.

Q Okay.

A I'm sure at the time I knew, but 30 years later, I have no idea what I knew at the time.

Q Okay. So you may have been aware that there was information available that the Roman shooters were Spanish Cobras?

A Could have been.

Q Okay. And according to the report that's Exhibit 2, you knew Rankins was a Spanish Cobra, right?

A No idea what he was.

Q Okay. But according to the report, I -- do you want me to put it back up?

MR. ENGQUIST: This has been asked and answered. He -- you read the report, and he said he agreed with what the report said. I'm not sure why we're doing -- it was asked and answer. So objection, asked and answer. You can answer it again.

A Could you ask question again, please?

BY MS. BRADY:

Q Sure. According to the report, you were aware that Rankins was a Spanish Cobra, right?

A That's what the report says. I had no idea -- looking back, I have no idea what gang he was a member of. During the interview, I'm sure that I became aware of what gang he was involved in. I can't even tell you what gang he's involved -- what gang he was running with

now. So whether I knew it at the time, I have no idea. Probably, maybe, could be.
Q Okay. Let's take a look at this report. Okay. It says here, "Timothy Rankins was known to Sergeant E. Mingey as being a member of the Spanish Cobras." Do you see that?
A Yes.
Q Does this suggest to you that you were, in fact, aware that Rankins was a member of the Spanish Cobras?
MR. ENGQUIST: Objection, asked and answered, harassing. Go ahead, sir.
A That's what it says, but like I told you, I can't recall ever meeting the guy. I'm sure during the interview I thought it was mentioned what gang he was running with. But I can't recall ever meeting the guy. If I did, I can't remember.
Q Okay. I'm not asking --
A I --
Q Sure. I'm not asking if you met him, I'm asking if you were aware he was a Spanish Cobra.
MR. ENGQUIST: Objection, asked and answered, harassing. Go ahead, sir.
A Prior to talking to him that day?
Q Yes.

A No, not that I can recall.
Q Okay. So you think this -- the information in this report is false?
A No. I might have -- during the conversation, I'm sure he mentioned who he was running with, but I can't recall talking to him. The only thing I can recall about that case is asking about Monica Roman. I'm sure I asked him about a number of other things. Did I know he was a Spanish Cobra before I talked to him? No, not that I can recall.
Q So your testimony now is that you did not know that he was a Spanish Cobra before you talked to him?
MR. ENGQUIST: Objection, mischaracterizing his testimony. He's already answered the question over and over again, sir. He can answer it again.
A During the conversation with him, I'm sure that his gang membership became apparent. Prior to talking to him, I can't recall if I knew -- I -- I -- I don't recall ever meeting the guy, and I -- there's no way I would've known what gang he was running with before I talked to him.
BY MS. BRADY:
Q Okay. So I'm sorry. I'm just trying to figure out if you're saying you don't remember whether you knew he was a Cobra, like you have no specific

recollection of learning that he was a Spanish Cobra, or as you sit here today, you know that you were not aware that he was a Spanish Cobra.
A Best of my recollection, I can't recall meeting him before, and I had no -- I really didn't know -- unless the detectives told me prior to going into the room that he was a Spanish Cobra. And that would -- that, to me, in my debriefing, that -- it -- although it's important to know what gang these guys are running with, it's not important in terms of trying to get information from these guys. But did I -- did I know he was a Spanish Cobra before I talked to him? To the best of my recollection, no, because I can't recall ever meeting him.
Q Okay. So this report is dated June 14, 1993. Do you see that?
A Yes, ma'am. Right.
Q Does that mean that, by June 14, 1995, the preliminary information in the Roman investigation indicated that there was potentially more than one shooter and that they were Spanish Cobras?
A Would you repeat that? I'll -- I have to read this again. You mean -- are you asking me how many offenders there were?
Q Nope. I'm asking you if the information was

available on June 14th, when this report was written, that there may have been more than one offender in the Roman shooting, and they were Spanish Cobras?
MR. ENGQUIST: Objection, foundation, calls for speculation.
A You mean before this report was made, or after it was -- after it was made and then given to people to sign?
Q Sure. Before the report was written on June 14, 1993, this information was available, right?
MR. ENGQUIST: Same objection. Calls for -- no foundation, calls for speculation. Go ahead.
A It may or may not have been, I'm not aware of it. Was I aware of it at the time? Could have been. I don't recall this case whatsoever.
Q Sure. So I --
A Whether I was aware of it at the time, I don't know.
Q Okay. Right. So I'm not asking you about your personal knowledge, I'm asking you if this report suggests that information that the offenders in the Monica Roman shooting may have been Spanish Cobra was available at the time the report was written.
MR. ENGQUIST: Objection, calls for speculation. Did he even write it? No foundation.

Go ahead, he can answer.
A I have no idea.
BY MS. BRADY:
Q So you think it's possible that the people who wrote this report, Guevara and Halverson, just completely made this up?
MR. ENGQUIST: Objection, now is argumentative. And go ahead.
A I'm sure they didn't.
Q Okay. So they didn't --
A I wasn't --
Q Sure. If they didn't make this up, then that means the information was available somewhere at the time they wrote the report. Do you agree?
A To them, sure.
Q Do you recall discussing with Guevara and Halverson this tip that the Roman shooters were Spanish Cobras?
MR. RAHE: I'm going to object as form, foundation, and mischaracterizing the report. But go ahead.
A I -- to the best of my recollection, I don't know who the Roman shooters were at the time. And I -- did I discuss with them anything about this? They have said that Rankins couldn't ID anybody or didn't know

anything about the case. I don't recall.
BY MS. BRADY:
Q Okay. So again, my question was, do you have any recollection of discussing this tip with Guevara and Halverson?
MR. ENGQUIST: Object to the form of the question.
MR. RAHE: Objection, it mischaracterizes the evidence.
A What tip?
BY MS. BRADY:
Q Well, the preliminary information gathered by detectives indicating that the offenders in the Roman shooting may have been Spanish Cobras.
MR. ENGQUIST: Objection, mischaracterizes --
MS. MCGRATH: Objection, form.
MR. ENGQUIST: Go ahead.
A I can't recall discussing the Roman homicide with anybody except for Mr. Rankins.
BY MS. BRADY:
Q Okay. Do you know who the witness was who provided information that the shooters in the homicide of Monica Roman were Spanish Cobras?
MR. ENGQUIST: Objection, mischaracterizing the evidence, no foundation, calls for speculation.

And you're mischaracterizing all the testimony from before. But go ahead, sir.
A Do I know who the witnesses in the Monica Roman case were?
BY MS. BRADY:
Q Who provided the information that we've been talking about?
MR. ENGQUIST: Objection, form, foundation. You're mischaracterizing that report, but go ahead, sir.
A No, I don't.
Q Okay. And do you know who obtained the information that the offenders may have been Spanish Cobras?
MR. ENGQUIST: Same objections. Once again, you're mischaracterizing everything. There's no lack -- there's lack of foundation and everything else. But go ahead, sir.
A No idea.
MS. BRADY: Okay. All right. I think I'm just about done. Can we take another five-minute break? I'm going to look over my notes.
COURT REPORTER: We --
MR. ENGQUIST: As long it's actually about what he can testify to, yeah, I'll take a five-

minute break.
COURT REPORTER: So sorry. We are off the record. It is 11:41 a.m.
(OFF THE RECORD)
COURT REPORTER: We are back on the record. The time is 11:55 a.m.
BY MS. BRADY:
Q Mr. Mingey, You may recall from our discussion earlier that the Monica Roman shooting occurred on June 7th. Do you remember that?
A I can't recall when it occurred, but --
Q Will you take my word for it?
A I'll take your word for it.
Q Okay.
A Yes, ma'am.
Q All right. So the Roman shooting occurred on June 7th. Do you agree that detectives assigned to the case would go to the scene and interview witnesses?
MR. ENGQUIST: I'm just going to object to the foundation and speculation. I -- you're asking someone -- somebody who didn't -- who you already know did investigate the case about something. I mean, it -- it's -- the objection is no foundation. Go ahead, sir.
A Again, I -- I really don't know anything about

this case, but I -- I would imagine that detectives would go out and talk to everybody involved in this case.

BY MS. BRADY:

Q Okay. And if one of the scene witnesses that the detective spoke to provided information to suggest that there were multiple shooters who were Spanish Cobras, would you expect them to document that information?

MR. ENGQUIST: Objection, calls for speculation. Also, seems to imply a mischaracterization of the actual evidence of the case, but go ahead.

A An actual witness to the incident said that there were multiple Spanish Cobras involved in the murder?

BY MS. BRADY:

Q Yes.

A Yes.

Q Are you aware as you sit here today -- I know the answer to this question. I just have to ask it. Are you aware as you sit here today of any investigation that occurred in the Monica Roman shooting after June 8th but before June 21st?

A I have no knowledge of the case before,

during, or after. The only thing I'm aware of is my conversation with Rankins about that case.

Q Okay.

A But as far as the investigation --

MR. ENGQUIST: You've answered the question, Ed.

Q Okay. I'm going put up what we'll call Exhibit 3, which, for the record, is the one-page document that's labeled RFC-Iglesias-1. Can you see this on your screen here?

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

A I can.

Q Okay. Do you know what this document is?

A It's an investigative file inventory.

Q Okay. And what is an investigative file inventory?

A That would document everything that's in the investigative file.

Q Okay. And can you tell by looking at this investigative file inventory what days the investigation occurred on?

A Started, I assume, on the 7th of June and ended on the 24th of June.

Q Okay.

MR. ENGQUIST: Ed, listen to the question. She

was --

THE WITNESS: Oh, I'm sorry.

MR. ENGQUIST: Go ahead.

THE WITNESS: Could you repeat?

BY MS. BRADY:

Q I'm just going to ask a different question. So here, would you agree that the first four lines include investigations that occurred on June 7th?

MR. ENGQUIST: Objection, foundation. Go ahead.

A Yes.

Q And that it looks like there's a self-report that was by McDonald and Rutherford on June 8th?

A Right. But we're dealing with -- those are the ones that -- the date it was entered -- I don't know if they're the same dates, but yes.

Q Okay. And then does it appear to you that there was any witness interviews conducted until June 24th?

MR. ENGQUIST: Objection to speculation, foundation --

A Going --

MR. ENGQUIST: -- foundation.

A Ms. Brady, have I really no knowledge of this case at all. I have no idea. I -- I would assume it's

documented in the closing sup, who the witnesses were and what they said and so forth. But that being said, I really don't know anything more about it, other than that document you're showing me.

Q Okay. And is --

A This is the first time I've seen it.

Q Sure. And does this document reveal that there were some interviews performed, sup reports written, on June 7th and 8th?

MR. ENGQUIST: I'm going to object. You're mischaracterizing the document, and lack of foundation, calls for speculation. Go ahead.

A There's a progress sup on the 7th, the date of entry. I assume -- well, I assume they have witness interviews on there.

BY MS. BRADY:

Q Okay. And then do you see anything else on this inventory sheet to reflect that there were witness interviews performed between June 9th and June 24th?

MR. ENGQUIST: I'm going to object once again because you're mischaracterizing the document with date of entry, and there's no foundation for him to be able to answer the question. So anything you get from this means nothing, Rachel, and you know that. Go ahead.

A I really have no idea.
BY MS. BRADY:
Q Okay. Let's take a look at the supp reports that were generated during this case, then.
MR. ENGQUIST: Once again, Rachel, this has nothing to do with his knowledge base about the case, and you know that, and that's what we actually talked about before you did this deposition, that it wouldn't be some harassing thing by going through things he didn't do. But apparently our 37.2, when we discussed that, meant nothing.
BY MS. BRADY:
Q Okay. I'm putting up what we will call Exhibit 4. Can you see this document on your screen?
(EXHIBIT 4 MARKED FOR IDENTIFICATION)
A Yes.
Q Okay. So for the record, this is an eight-page document beginning at Bates label RFC-Iglesias-48. Have you seen supplementary reports like this during your career as a sergeant in the Chicago Police Department?
A Yes.
Q Okay. Does this reflect a report written by Santopadre, Bogucki, and Schalk?

A It does.
Q Okay. And the date of the report is what?
MR. ENGQUIST: If you can read it off the report, go ahead.
A Seventh?
Q Okay.
A I -- again, I don't see that well.
Q Okay. Sure. So yeah, I'll represent to you it says June 7th on it. And would you agree that this report includes information about the victim, Monica Roman?
A Appears to, yes.
Q Okay. And it includes names of some witnesses?
A Yes.
MR. ENGQUIST: And just for the record, you're flipping through. Now you're on page 3.
MS. BRADY: I'm on page 3 now, yes.
BY MS. BRADY:
Q Okay. And then you can see there's, at the top of page 4, some witnesses continued, and it lists some more names, right?
A Yes.
Q Okay. And it has some interviews with various folks and then says that there's a couple people who

need to be interviewed still. Do you see that?
A Yes.
Q Okay. So does this seem to reflect to you the interviews that were performed with scene witnesses?
MR. ENGQUIST: Objection, foundation, calls for speculation. Go ahead.
A It appears to be.
Q Okay. Let's take a look at one more sup report. We'll call this Exhibit 5. Can you see this document on your screen?
(EXHIBIT 5 MARKED FOR IDENTIFICATION)
MR. ENGQUIST: What's the Bates stamp?
Q For the record, this is a three-page document Bates stamped RFC-Iglesias-40. Can you see this?
A Yes.
Q And here it says it's a field investigation progress report written by Rutherford and McDonald on June 8, '93. Do you see that?
A Yes, I do.
Q Okay. And this includes interviews with a couple more witnesses. Do you see that?
A Yes.
Q Okay. So between Exhibits 4 and 5 that we just looked at and the inventory sheet reflects that there were witness interviews performed on June 7th and

June 8th. Do you agree?
MR. ENGQUIST: I'm going to -- I'm going to object to the form of the question when you're talking about witness interviews being reflected on the investigative file inventory but go ahead. There's no foundation for that, but go ahead, sir.
BY MS. BRADY:
Q Sure. Yeah. I'll ask that question again. So between this -- these two supp reports that we just looked at, do they reflect to you that witness interviews were performed on June 7th and June 8th?
A Could you go back to the first page?
Q Sure.
A Yeah.
Q Okay. So here's June 8th. And the one we just looked at, which was Exhibit 4, that's June 7th. Do you see that?
A Yes, I do.
Q Okay. If there were any more witness interviews performed after June 8th, would you expect those to be documented somewhere?
A If there were any witness interviews, I'm sure they were.
Q Okay. And would you agree then that preliminary information in the Roman shooting indicated

that the offenders may have been members of the Spanish Cobra street gang would have been documented in a sup report or a GPR?

MR. ENGQUIST: Objection, foundation, calls for speculation. You're also mischaracterizing previous testimony in the document itself. Go ahead, sir.

A I have no idea. If it came up -- if it came from the witnesses, I'm sure it was documented. I -- who knows where this stuff comes from, or came from.

BY MS. BRADY:

Q Okay.

A If it came from the witnesses -- but, you know, that witnessed the information, that -- the incident, that'd be one thing. Where this came from, I don't know. Again, I'm not familiar with any part of this investigation whatsoever.

MS. BRADY: Okay. I do not have any more questions, so I will thank you for your time. It's possible one of the other attorneys might have some follow-ups.

THE WITNESS: Thank you.

MR. ENGQUIST: You don't need to thank her for that. Does anybody have anything else?

MR. RAHE: No.

MS. MCGRATH: I don't.

MR. ENGQUIST: We'll reserve.

MS. BRADY: Okay. Thanks, everybody.

COURT REPORTER: Okay. We are off the record. The time is 12:08 p.m.

(DEPOSITION CONCLUDED AT 12:08 P.M.)

CERTIFICATE OF REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

KRYSTAL M BARNES,
COURT REPORTER/NOTARY
COMMISSION EXPIRES: 02/18/2026
SUBMITTED ON: 09/29/2022

**Exhibits**

**Exhibit 1_ Mingey** 20:10, 11,15
**Exhibit 2_ Mingey** 28:3,6 57:7
**Exhibit 3_ Mingey** 67:8, 11
**Exhibit 4_ Mingey** 70:15, 16 73:16
**Exhibit 5_ Mingey** 72:9, 11

**0**

**00:20** 22:21 23:5
**025** 21:16

**1**

**1** 20:10,11,15
**10** 21:5 29:12
**10:02** 6:8
**10:59** 45:20
**10th** 42:20,24
**11:06** 45:23
**11:21** 56:13
**11:30** 56:16
**11:41** 65:3
**11:55** 65:6
**12:08** 75:5,6
**14** 24:19 60:15, 18 61:10
**14th** 61:1
**1731** 29:15
**1993** 15:12 19:8 21:5 42:19 60:15 61:10
**1995** 60:18
**1:19-CV-** 6:13

**2**

**2** 28:3,6 57:7
**20** 13:8 37:19 49:8,16
**2019** 12:16 13:4
**2022** 6:8
**21st** 66:24
**22nd** 6:6,7
**248** 13:4
**249** 13:8
**24th** 67:23 68:19 69:19
**250** 13:4
**25th** 17:25 18:11,22 19:2, 4,6,9,17,20 21:20,21 22:14 25:3
**28** 53:23

**3**

**3** 67:8,11 71:17, 18
**30** 6:6 21:15,25 22:10,14 53:23 56:25
**37.2** 70:11

**4**

**4** 70:15,16 71:21 72:23 73:16
**49** 13:4

**5**

**5** 17:25 18:11 21:20 22:2 23:11,16 24:1 26:17 29:16 72:9,11,23
**5880** 20:19,25

**6**

**60606** 6:7
**6508** 6:14

**7**

**7** 29:18 42:19
**7th** 42:23 65:10,17 67:22 68:8 69:9,13 71:9 72:25 73:11,16

**8**

**8** 12:16 72:18
**8th** 66:24 68:13 69:9 73:1,11, 15,20

**9**

**90s** 24:1 26:17 27:14
**93** 29:12,18 72:18
**9th** 69:19

**A**

**a.m.** 6:8 45:20, 23 56:13,16 65:3,6
**access** 27:25
**accurate** 53:24
**acquaint** 28:24
**active** 16:25
**acts** 10:22
**actual** 25:23 46:9,24 47:18, 24 48:13 53:12 66:12,14
**additional** 54:8
**adjust** 18:1 24:6
**affiliation** 38:11
**affirm** 7:19
**agree** 7:11 35:24 56:1 62:14 65:17 68:7 71:9 73:1, 24
**agreed** 7:15 57:13
**ahead** 10:18 19:23 25:8 26:5 37:8 39:20 40:15 41:15 42:15 53:3,21 58:12,23 61:12 62:1,8,21 63:17 64:2,9,18 65:24 66:13 68:3,10 69:12,25 71:4 72:6 73:5,6 74:7
**ahold** 43:18
**alerted** 24:1
**anonymous** 37:16 46:23 47:5,25 48:15, 22 54:24
**apparent** 59:17
**apparently** 21:10 22:16,17, 21 40:22 43:1, 25 44:1 45:2 70:11
**appearance** 6:15
**appeared** 16:9
**appearing** 7:6
**appears** 40:9 42:16 43:5 71:12 72:7
**approve** 15:18 26:13
**approved** 23:4,24 28:13
**approving** 27:23
**April** 6:8
**area** 7:7 9:24 10:22 17:25 18:11 21:20 22:2,22 23:11, 16 24:1,19 26:17 29:16 30:7
**argumentative** 62:8
**Armando** 12:3 28:12
**armed** 24:2 29:13
**arrays** 53:17
**arrest** 19:21,25 20:4 21:2 23:15 24:5
**arrested** 17:3 19:9,12,19 21:8 24:2,14,17,25 25:2 28:12 29:13 44:2
**arrestee** 21:16 22:1
**arrestee's** 21:2
**arrestees** 16:1 25:20
**arresting** 24:22 25:12,13
**assign** 15:17 26:10

**assigned** 25:15,18 39:2 46:13 48:21 65:17
**assume** 10:9 21:21 67:22 68:25 69:14
**assuming** 46:7
**attending** 6:15,16,20,25 7:4
**attorney** 8:6, 14 15:4
**attorneys** 14:24 23:22 74:20
**Austin** 7:5 46:19 50:12
**aware** 10:23 22:3 27:6,8 44:23,24 56:20 57:2,19,23 58:9,21 60:2 61:13,14,17 66:20,22 67:1
**ax** 54:1

**B**

**back** 12:21 19:8 27:14 31:17 45:22 50:16,19 56:15 57:10,22 65:5 73:12
**background** 45:8
**bad** 45:3
**banger** 48:15
**bangers** 14:3 36:9
**Barnes** 6:3
**base** 70:6
**basically** 15:16 17:6 26:12 50:5
**basis** 55:24
**Bates** 20:19, 22,24 28:4 70:19 72:12,14
**Beat** 19:12,13
**begin** 7:23
**beginning** 28:4 39:10 70:19
**belabor** 8:4
**Biebel** 28:14 32:10
**big** 11:24 18:7 47:21 54:24
**bit** 8:5 12:23 18:2 24:7,13 25:22 29:1 31:21 50:8
**blame** 43:15
**blanks** 14:8
**blow** 12:22 37:17,18 47:25 48:1
**board** 26:20, 23,24,25 27:9, 14,21,24
**Bogucki** 70:25
**bogus** 34:4 43:13 48:3
**boss** 27:8
**bottom** 21:12 22:19 29:11
**boundaries** 19:10
**box** 21:15,25 22:10,14
**Brady** 6:18,19 7:13,16,25 8:2 11:25 15:11 20:8,12,25 25:16 39:18,23 45:15,18,24 50:16,22 53:5 56:1,17 57:18 59:22 62:3 63:2,11,20 64:5,20 65:7 66:4,17 68:5,24 69:16 70:2,13 71:18,19 73:7 74:11,18 75:3
**break** 45:6,14 55:8 56:11 64:22 65:1
**bring** 11:4,5 38:14 50:7
**bringing** 55:20
**broke** 45:25
**brought** 11:11 49:23
**building** 19:1

**C**

**call** 20:10 23:22 24:18 28:3 47:5 48:5, 16,21 54:3 67:7 70:14 72:9
**called** 24:22 35:25
**calling** 24:20
**calls** 19:22 25:6 26:4 42:14 49:20 61:4,11, 12,24 63:25 66:10 69:12 72:5 74:4
**canvases** 38:21
**career** 70:21
**case** 6:13 9:1, 2,8 10:5 12:2, 15 13:5,16,21, 23 14:1,10,12, 15,20,23,25 16:24,25 17:9, 16,18,23 20:20 24:5,24 25:10, 15 26:17 27:1 30:9,14 34:21, 23 36:23 37:1 38:8,13 39:7 40:9,10,23 41:11 42:8 43:21 44:13,14 45:4,10,11 46:13,14 47:19 48:17,21,22 49:7 51:5,9 52:14 54:2 59:7 61:15 63:1 64:4 65:18,22 66:1, 3,13,25 67:2 68:25 70:4,7
**cases** 9:23 11:7,8,13,15 25:17 31:18 36:12,14 38:9, 16 40:6
**CCSAO** 20:19, 25
**Central** 19:1
**chair** 27:5
**chance** 26:21
**characterization** 56:2
**charge** 23:4
**charges** 22:20 23:4,24 25:20
**check** 48:1
**Chicago** 6:7, 20 7:1,4,6 8:6 46:16 70:21
**Chicagoland** 7:7
**choose** 55:2
**City** 7:6
**clarify** 13:7,14
**clear** 11:7 16:5 27:6 38:18
**cleared** 27:25
**clearer** 23:8
**closed** 44:2
**closing** 37:4 39:12 42:17 69:1
**Cobra** 32:1 38:23 57:7,20 58:21 59:9,12, 25 60:1,3,7,12 61:22 74:2
**Cobras** 29:16, 21 30:17,20 31:7 32:8 34:16 35:9,18 36:16 38:3 39:4,9 40:2,11,17 41:13,17,20 42:13,21,25 43:8,10 44:6,19 57:4 58:5,10 60:21 61:3 62:18 63:14,23 64:14 66:8,15
**code** 21:25
**commander** 21:10 22:20 25:11
**commander's** 21:12
**committed** 37:15,17 49:15, 17 51:14 54:6
**complete** 50:12
**completely** 55:23 62:6
**computer** 18:1 24:6
**CONCLUDED** 75:6
**conducted** 12:16 68:18
**conducting** 54:8
**confusing** 33:2 39:16 40:7
**connection** 9:18 27:10,19 28:11 46:18 47:9
**contained** 31:13,23 34:2 35:18 36:5
**context** 24:13
**continually**

16:21

**continued** 71:21

**convened** 6:9

**conversation** 8:19 10:2 12:17 13:17 32:1 33:22 34:10 59:4,16 67:2

**conversations** 8:13

**convicted** 9:4

**cooperating** 30:5 32:3

**cooperative** 16:9,19

**copies** 27:24

**cops** 19:13

**correct** 23:13 34:3 51:12

**correctly** 46:15 49:1 53:16

**counsel** 6:17 7:23

**couple** 12:19 56:3 71:25 72:21

**court** 6:3,4,5, 12 7:8,11,14, 17,23 20:5 45:19,22 50:18, 19 56:12,15 64:23 65:2,5 75:4

**credible** 52:9, 21 54:4,7,15,17 55:3,5

**crime** 16:11 24:2 25:3 37:15 38:20,21 46:5 48:14,15,18 51:14 54:5,6

**crimes** 10:25 11:7 16:14 19:9 24:25 25:19 29:16 30:7,11

**current** 11:5 14:2 27:1

**custody** 15:24 16:9,13 24:19, 21 25:5

**D**

**date** 21:5 68:15 69:13,22 71:2

**dated** 60:15

**dates** 68:16

**day** 6:7 12:15 27:3 58:24

**days** 67:20

**dealing** 43:11 68:14

**debrief** 15:23 16:7,16,23 17:2,14 32:5 38:10 43:19 44:25

**debriefing** 9:22 10:20,21 11:5 16:1,8 17:10 30:4 38:14 60:8

**decide** 16:16 51:21

**decision** 39:3

**deem** 44:13

**Defendant** 7:3, 6

**defendants** 6:24

**department** 37:17 46:16 70:22

**depend** 17:6,7, 8,9 24:18 36:7 44:9,12 47:6 51:1

**depending** 27:4

**depends** 17:6 36:6 44:8 49:5

51:8 54:14

**deposition** 6:9 8:14 9:9 12:2, 14,16 13:4,8 14:24 15:3 20:9 28:18 55:10,18, 25 56:2 70:9 75:6

**deposition's** 55:15

**depositions** 8:3

**describe** 17:24 18:10

**describing** 49:14

**designate** 22:1

**desk** 19:6,7 24:20 26:20,25

**desks** 18:19

**details** 33:4

**detective** 16:17,23 17:10 18:13 22:22 38:19,21 46:13 51:21 66:6

**detectives** 17:17 18:17 19:12 20:1 23:19 24:1,15 25:4,9,14,18 26:2,9,18 32:4 33:5,23 37:12, 20 39:2,24 40:10,19 41:1 42:12 43:2,7 44:4 46:1,17 47:8 48:4,6,20 49:2,10,17 51:5,10,12,21, 22,24 52:6,9, 15,21 53:7 54:5,7,18 55:1 60:6 63:13 65:17 66:1

**detectives'** 16:1

**detention** 25:12

**develop** 40:2, 13,20,24 41:2 42:12 46:2

**developed** 42:24 46:6

**developing** 44:4

**dick** 37:3 54:2

**dicks** 24:4,5,12 30:5 48:19 52:17

**difference** 16:6 47:21 54:25

**DIRECT** 7:24

**direction** 52:16

**directly** 18:13

**disapprove** 15:18

**Disciples** 43:10 44:19

**discuss** 62:24

**discussed** 70:11

**discussing** 62:16 63:4,18

**discussion** 65:8

**District** 6:12 17:25 18:11,22 19:2,4,6,9,17, 20 21:20,21 22:15 25:3

**Division** 6:13

**document** 12:10 17:4,11, 17,19 20:10,13, 19 28:4,25 36:22,24 37:11, 14,19 38:23 39:17 40:12 41:2 44:7 46:1, 17 47:1,9,24 48:3,7,18,19 49:2,9,18 51:6, 13,21,23,25

54:3 55:2,4,6 66:8 67:9,13,17 69:4,7,11,21 70:15,19 72:10, 13 74:6

**documented** 19:20 38:25 39:1,6,10,13 46:6,12 52:7, 11,19,20 53:14, 18 69:1 73:21 74:2,9

**documenting** 47:8

**documents** 8:11,21,23 9:9

**door** 19:5

**doors** 18:25

**doubt** 31:4,12, 22 33:11,13,16

**Drive** 6:6

**E**

**earlier** 8:1,5 25:22 27:14 65:9

**early** 23:25 26:17 38:20 39:13 40:12

**east** 19:7

**Eastern** 6:13

**Ed** 67:6,25

**Edward** 6:9 7:10

**efforts** 46:2

**egregious** 35:25 36:1

**eight-** 70:18

**elected** 29:22

**end** 19:7 27:3

**ended** 67:23

**enemies** 36:19

**Engquist** 6:21,

22 10:17 11:18 15:8 19:11,22 20:21,24 25:6 26:4 35:13 39:15,19 40:14 41:14 42:14 45:5,16 49:20 51:17 52:12 53:2,20 54:12 55:8 56:8 57:11 58:11,22 59:13 61:4,11,24 62:7 63:6,15,17,24 64:8,15,24 65:19 66:10 67:5,25 68:3,9, 20,23 69:10,20 70:5 71:3,16 72:5,12 73:2 74:4,23 75:2

**entered** 68:15

**entry** 69:14,22

**et al** 6:11

**eventually** 23:10 24:15 27:22 32:1

**evidence** 41:15 63:9,25 66:12

**EXAMINATION** 7:24

**exception** 6:24

**exclusively** 27:18

**exhibit** 11:16 20:10,11,15 28:3,6 41:10 57:7 67:8,11 70:15,16 72:9, 11 73:16

**Exhibits** 72:23

**expect** 35:16 38:19 40:13,19 41:1 46:1 52:10,20 53:6, 14 54:9 66:8 73:20

**expectation** 39:24 43:6 44:4

**expected** 42:12 43:2

**explain** 28:9

**extent** 25:23

**eyes** 22:6

**F**

**face** 18:2

**facility** 25:12

**fact** 7:12 11:4 39:3 58:9

**fair** 16:25 33:25 38:1

**falling** 36:18

**false** 36:10 43:14 59:3

**familiar** 42:2 74:16

**familiarize** 12:21

**favor** 41:5

**February** 12:16

**felony** 25:20

**field** 72:16

**figure** 59:24

**file** 8:25 9:1,3, 8,12 35:19,21 36:5 67:14,15, 18,20 73:5

**files** 26:17

**filling** 14:8

**find** 30:6 37:10, 18 43:19 44:10 48:1

**Fine** 29:1

**finish** 50:11

**five-** 64:25

**five-minute** 64:21

**five-page** 28:4

**flag** 36:10

**flagging** 43:14

**flip** 12:21

**flipping** 71:17

**floor** 6:6 18:16, 17,24 23:22

**floor's** 18:12

**focus** 30:10 55:18

**Folk** 36:17

**folks** 24:24 71:25

**follow** 54:18 55:3,6

**follow-ups** 74:21

**form** 10:17 40:14 42:14 46:20 47:11,13 48:11 49:4 50:21 51:16 52:12,23 53:20 62:19 63:6,16 64:8 73:3

**found** 44:11

**foundation** 10:17 19:11,22 25:8 26:4 40:14 46:20 47:14 48:11 49:4,20 50:5 51:16 52:13,25 53:21 55:22 61:4,12, 25 62:20 63:25 64:8,17 65:20, 23 68:9,21,23 69:12,22 72:5 73:6 74:4

**fraudulent** 37:21

**friends** 36:18, 20

**front** 8:11 12:13 18:14,25 19:5

**frustrated** 50:8

**full** 7:9

**G**

**gang** 10:23 14:3 29:16,21 31:2,7,9 32:3,8 34:11 36:8,9, 10,11,16 38:10 43:12,15 44:24 46:3,5,6 48:15 54:6 57:22,24, 25 58:15 59:17, 20 60:9 74:2

**Gangsters** 36:16 43:10 44:18

**gathered** 63:12

**gave** 13:20

**general** 10:21 15:19 38:15,16 45:1

**generally** 17:12 25:24

**generated** 26:2 27:10,19 28:11 70:4

**Geraldo** 6:10 9:4

**girl** 14:3,6 36:3

**give** 7:20 11:16 15:3 17:10 21:11 30:10 38:15 43:19 45:16 50:18

**giving** 43:13

**good** 6:18,21 7:2,5 8:1 22:7 32:4 38:3

**GPR** 52:14 54:13 74:3

**GPR's** 37:5

**grabbed** 43:14

**Grand** 19:1

**grind** 54:1

**ground** 8:4

**guess** 21:13

**Guevara** 6:11, 25 7:3 28:13 62:5,16 63:4

**Guevara's** 17:16

**gunshots** 52:3

**guy** 16:18 32:14 44:11 48:22 49:7 51:4 53:10,11 58:14, 16 59:19

**guys** 19:12 43:22 60:9,11

**H**

**half** 18:2

**Halverson** 28:13 62:5,17 63:5

**hand** 7:18 11:19

**harass** 50:7

**harassing** 55:11 58:12,23 70:9

**hard** 21:13 24:10 36:11 44:15

**hear** 15:7 50:23

**heard** 40:17 52:3

**hearing** 51:11

**Hey** 54:18

**highlighting** 21:16

**hit** 21:13

**Hold** 29:1

**homicide** 9:12, 18,21 11:9,10, 13 13:19 14:7 27:20 28:11 31:3 35:25 43:7

56:19 63:18,22
**homicides** 27:11,19 46:18 47:10 48:9
**hooked** 11:19
**hour** 8:20 45:7
**hours** 56:4
**hypothetical** 25:7 50:15 53:1,21 54:11
**hypotheticals** 45:12 56:10

**I**

**ID** 62:25
**idea** 25:9 27:15 30:4 31:1,2,11, 25 32:16 33:22 34:20 35:23 38:6,9 44:20 53:22 56:23 57:1,8,21,22 58:1 62:2 64:19 68:25 70:1 74:8
**IDENTIFICATION** 20:15 28:6 67:11 70:16 72:11
**identified** 43:23
**identify** 40:22 43:18 51:4
**identity** 47:17
**Iglesias** 6:10 9:4
**illegal** 10:22
**Illinois** 6:7,13
**imagine** 66:1
**imply** 66:11
**important** 36:2,14 60:9,10
**improper** 55:23
**inaccurate** 32:10,20
**Inaudible** 38:18 55:16
**incident** 10:5 66:14 74:15
**incidents** 27:4, 7
**include** 27:10 68:7
**included** 33:6
**includes** 71:10,13 72:20
**including** 44:5
**incomplete** 25:7 50:15 52:25 53:21 54:11
**incorrect** 32:24 33:6,8,19 35:4 55:17
**independent** 9:13,16 13:24 14:18 35:2
**indicating** 63:13
**indication** 21:11
**individual** 6:24 29:12
**informant** 46:11
**information** 10:15,22 16:10, 24 17:21 26:2 27:9 29:19 30:10,16,19 31:5,13,23 32:19 33:6,8,19 34:2,4,13,18 35:3,5,16,24 36:4,12 38:1,8, 16,22 39:13,25 40:24 41:18,24, 25 42:8,19 43:13,17,20 46:8,24 47:16 48:13,14,16 56:18 57:3 59:2 60:11,19,25 61:10,21 62:13 63:12,22 64:6, 13 66:6,9 71:10 73:25 74:14
**information's** 36:14
**informed** 14:22
**initial** 12:18 38:21 54:10
**instance** 37:25 39:7
**interaction** 12:4,18 33:4
**interrupt** 16:4
**interview** 16:7 18:14 29:4,22 57:23 58:15 65:18
**interviewed** 15:24 56:22 72:1
**interviewing** 15:22
**interviews** 15:25 68:18 69:8,15,19 71:24 72:4,20, 25 73:4,11,20, 22
**inventory** 67:14,16,20 69:18 72:24 73:5
**investigate** 65:22
**investigating** 16:14 29:17 36:13 38:20 48:9
**investigation** 35:5 39:11 42:10 43:3 44:7 45:10 47:1 49:25 50:2,4,10 54:8,22 55:12, 14 56:5,7 60:19 66:22 67:4,20 72:16 74:17
**investigations** 15:21 25:24,25 26:3,10 27:20 68:8
**investigative** 8:25 9:1,3,7,11 35:19,21 36:5 67:14,15,18,20 73:5
**involved** 25:10,25 34:11 36:21 38:12 40:17 43:17 49:7,24 50:1 51:4 53:11 55:11 57:24,25 66:2,15
**involvement** 25:23 45:10 50:3,10 55:14 56:9
**irrelevant** 44:25

**J**

**jail** 37:11,18 44:12 48:1 49:7 51:2 52:5
**job** 15:14,20 26:13
**jobs** 15:17 26:11
**Joe** 37:17,18 47:25 48:1 49:14,15
**Join** 51:17 54:12
**Jose** 12:2
**Josh** 6:22
**JR-L3687** 28:5
**June** 21:5 29:12,18 42:19, 20,23,24 60:15, 18 61:1,10 65:9,17 66:23, 24 67:22,23 68:8,13,19 69:9,19 71:9 72:18,25 73:1, 11,15,16,20

**K**

**Kentuckiana** 6:5
**kind** 14:8 21:11 40:7 44:12 47:2 50:7
**kinds** 25:17
**Kings** 43:10 44:18
**knew** 10:4 14:17 31:14 32:3 49:24 56:25 57:1,7 58:1 59:18,25
**knowledge** 29:22 33:14 34:10 42:9 44:21 61:20 66:25 68:24 70:6
**Krystal** 6:3 50:16

**L**

**label** 28:4 70:19
**labeled** 20:19 67:9
**lack** 64:17 69:11
**lawsuit** 8:3
**layout** 17:24 18:10
**lead** 35:17 40:3,13,20 41:2,4,11,21 42:12,24 43:4, 8,9 44:5 46:2 47:17

**leads** 37:2 44:5 55:15

**learning** 15:2 60:1

**leave** 29:9

**left** 11:19,23,24

**lines** 68:7

**lineups** 23:23

**listen** 16:18 67:25

**lists** 71:21

**located** 6:6

**location** 6:16

**locations** 13:20

**lock** 19:16 43:9 45:1

**lockup** 19:4,7, 17,20 21:13,20, 21 25:3

**log** 27:4,8

**long** 8:18 31:17 64:24

**looked** 11:23 72:24 73:10,16

**lost** 40:6

**lot** 36:15,20 43:16

**M**

**made** 19:15 24:5 27:7 61:6, 7 62:6

**major** 11:6 25:19 27:3,7

**make** 15:16 22:9 26:10,14 39:2,11 50:1 62:12

**makes** 22:23

**man** 55:20

**mark** 20:6,8,9

**MARKED** 20:15 28:6 67:11 70:16 72:11

**matter** 6:10 15:5 42:11 47:20

**Mcdonald** 68:13 72:17

**Mcgrath** 7:2,3 63:16 75:1

**means** 62:13 69:24

**meant** 70:11

**meet** 32:15

**meeting** 31:16, 24 33:24 58:14, 16 59:19 60:5, 14

**Megan** 7:2

**member** 10:23 29:15 32:3,7 39:4 57:22 58:5,9

**members** 29:20 31:6 34:15 35:17 36:16 40:1 41:20 46:3,5 54:6 74:1

**membership** 59:17

**memory** 44:22

**mentioned** 13:19,21 39:4 58:15 59:5

**mentioning** 13:18

**met** 58:20

**mid** 24:1 27:14

**middle** 18:16

**midnight** 23:5

**mind** 43:11,16

**Mingey** 6:9 7:8,10 8:1 20:11 28:3 29:15,21 32:7 56:18 58:5 65:8

**Mingey's** 11:19

**minute** 20:21 65:1

**minutes** 45:17

**mischaracterization** 66:12

**mischaracterizes** 41:14 63:8, 15

**mischaracterizing** 59:13 62:20 63:24 64:1,9,16 69:11,21 74:5

**misleading** 36:15

**Monica** 9:3,8, 18,21 13:10,16, 19,23,25 14:20, 25 17:18 29:17 31:20 38:7 40:1 42:18 59:7 61:22 63:23 64:3 65:9 66:23 71:10

**Montanez** 12:3,15 13:5 20:20

**month** 36:20

**morning** 6:18, 21 7:2,5 8:1 27:8

**multiple** 34:19 39:9 40:11 66:7,15

**murder** 9:25 10:3,16 11:3 13:9,10 29:17 37:17 38:7 40:16 49:9,15, 17 66:16

**murders** 11:6

**N**

**named** 6:23 9:17 29:12

**names** 71:13, 22

**Nation** 36:17

**necessarily** 33:10 37:2 46:1 53:4

**needed** 14:22

**neighborhood** 32:15

**non-violent** 24:25

**Northern** 6:12

**note** 27:7

**notes** 37:4 54:10,13 64:22

**notification** 25:10

**notified** 24:12, 15,16 25:4

**notify** 24:4,11

**number** 6:13 9:23 18:14 20:22,24 29:15, 18 31:18 59:8

**O**

**object** 39:15 46:20 62:19 63:6 65:19 69:10,20 73:3

**objected** 55:10

**objection** 10:17 19:11,22 25:6 26:4 40:14 41:14 42:14 47:11,13 48:8, 10 49:4,19,20, 22 50:13,14,21 51:16 52:12,23 53:2,20 57:15 58:11,22 59:13 61:4,11,24 62:7 63:8,15,16,24 64:8 65:23 66:10 68:9,20 72:5 74:4

**objections** 64:15

**obtained** 64:12

**obvious** 31:20

**occurred** 27:6 29:18 65:9,11, 16 66:23 67:21 68:8

**offender** 38:11 49:9 61:2

**offenders** 29:20 31:2,6 34:14 35:6,8 36:4 38:2,7 40:11 41:12,19 42:13,20 43:14 44:17 60:24 61:21 63:13 64:13 74:1

**offense** 15:25

**office** 7:1 8:4 18:23 26:25

**officer** 6:24 7:3

**officer's** 25:12

**officers** 24:20, 22 25:13

**offices** 17:25 18:11,13

**one-** 20:18

**one-page** 67:8

**online** 6:4

**oops** 16:3 37:8

**open** 30:11 38:16 43:11,16

**opine** 50:5

**opinion** 55:22

**original** 38:25 39:7 44:19

**oversight** 15:16

**overtime** 15:18

P

**p.m.** 75:5,6
**pages** 12:19 13:4 28:9
**pan** 49:3 51:23
**paperwork** 19:15
**paragraph** 28:24 29:8 31:13,23 32:24 33:6,18 34:2
**part** 26:12 27:2 32:21 36:17 38:13 74:16
**participate** 15:21
**participation** 56:6
**parties** 7:11
**pass** 19:6
**past** 34:11
**patrolmen** 20:1
**pending** 6:11 27:25 50:17
**penitentiary** 48:23
**people** 15:23, 24 16:8 19:8 27:24 36:9,13 61:7 62:4 71:25
**Perfect** 7:14
**performed** 69:8,19 72:4,25 73:11,20
**perpetrators** 34:19
**person** 9:17 10:20 16:13,24 19:19 24:16,19 25:4 32:4 38:14 51:13 53:18
**personal** 61:20
**pertinent** 48:17 54:2
**phone** 46:10
**phones** 15:19
**phony** 37:21
**photo** 51:3 53:17
**photos** 40:23 43:19 53:10,11
**physical** 18:10
**pick** 15:6 53:18
**picking** 15:9
**plaintiff** 6:19 8:2
**plaintiff's** 6:17
**plaintiffs** 12:2
**PLAYS** 50:19
**plural** 35:6
**point** 11:14 22:21 42:23 50:6 52:16
**police** 24:20 37:16 43:15 46:9,16,25 52:4,16 70:21
**policy** 46:17 47:7,9 48:6 49:2,17 53:17, 22
**positive** 17:9, 13,16,19,20
**possess** 29:23
**possibly** 49:8
**potentially** 60:20
**practice** 16:12 17:4,5 26:1 42:11
**preliminary** 29:19 31:5 35:4 38:1 41:18 60:19 63:12 73:25
**prepare** 8:14 9:9
**prepared** 28:17
**pretty** 35:25 36:2
**previous** 74:6
**primarily** 14:3
**primary** 30:9
**prior** 32:2 42:16 58:24 59:17 60:6
**prison** 49:16
**problem** 46:7
**PROCEEDINGS** 6:1
**process** 24:14 25:10
**processed** 19:14
**processing** 23:19,21
**progress** 69:13 72:17
**provide** 47:17
**provided** 63:22 64:6 66:6
**providing** 12:1
**purposely** 33:8
**purposes** 29:3 41:10,21
**pursue** 43:3,9 52:22 54:8,19, 20
**pursued** 43:8
**pursuing** 52:10
**put** 11:16 27:1, 3,24 28:3 33:8 34:4,6 37:3 49:21 54:13 57:10 67:7
**putting** 12:9 70:14

Q

**question** 12:20 13:8,9 31:21 33:4 35:4 39:21 40:8 42:7 50:17,20,23 57:17 59:14 63:3,7 66:21 67:5,25 68:6 69:23 73:3,8
**questioning** 23:11
**questions** 29:8 44:15 45:2,3 55:21 74:19

R

**R-A-H-E** 7:6
**Rachel** 6:19 8:2 11:18 45:7 48:10 49:22 55:9 69:24 70:5
**radio** 24:18
**Rahe** 7:5,15 46:19 47:11,13 48:8,10 49:4,19 50:14,21 51:16 52:23,25 54:11 62:19 63:8 74:25
**raise** 7:17,18
**Rankins** 9:18, 21,22 10:3,15 11:2 12:4,18 13:16 14:10,19 15:4 17:15,21 20:4 21:3,8,19 22:14 23:10,20 29:4,13,14,22 30:2,4 31:15, 17,25 32:6 33:24 34:11 38:4 56:22 57:7,20 58:4,9 62:25 63:19 67:2
**rarely** 15:24,25
**RDX-25641** 29:14
**read** 8:24 12:19 13:2 28:22 29:5 34:20,23 35:20 44:21,22,23 50:16 57:12 60:22 71:3
**reading** 21:14 35:14
**ready** 12:24
**real** 52:17
**reason** 10:14, 19 14:9,13 16:13 31:4,12, 22 32:8,18,23, 25 33:5,13,18 35:3
**reasons** 16:22 31:20
**recall** 9:20 10:1,2,7,12,14 11:8,12 12:1 13:11 14:11 31:15,16,24 33:20 34:5,25 58:14,16 59:1, 6,7,10,18,19 60:4,13 61:15 62:16 63:1,18 65:8,11
**received** 39:25 52:8,21
**recently** 8:4
**recollection** 9:13,17 11:2 13:15,22,24,25 14:9,19 23:9 30:1,17 32:14, 21 33:23 34:12 35:2 38:6 53:24 60:1,4,13 62:22 63:4
**record** 7:9 13:3 20:18 28:10 45:19,21,22 56:12,14,15

65:3,4,5 67:8 70:18 71:16 72:13 75:4

**referencing** 20:6

**referring** 47:2 53:9

**reflect** 69:18 70:24 72:3 73:10

**reflected** 73:4

**reflects** 72:24

**refresh** 30:1,17

**related** 36:8

**relevant** 29:4 44:13

**remember** 9:25 10:6,8 14:5 30:13 31:19 32:13,18 33:4 58:17 59:24 65:10

**remembered** 13:18

**remotely** 6:20, 25 7:4,7

**repeat** 26:6 40:4 60:22 68:4

**report** 12:8 13:11 19:21,25 20:4 21:2,8 23:2,15 28:10, 17 29:5,11 30:15 32:9,19 33:7,9 34:14 35:4 37:4 39:5, 7 40:18 41:5 42:19 47:2 52:14 56:5,9 57:6,9,12,13, 19,21 58:3 59:3 60:15 61:1,6,9, 20,23 62:5,14, 20 64:9 70:24 71:2,4,10 72:9, 17 74:3

**reported** 29:13,18

**reporter** 6:3,4 7:8,11,14,17,23 20:5 45:19,22 50:18,19 56:12, 15 64:23 65:2,5 75:4

**Reporters** 6:5

**reports** 26:1, 10,13,14 27:1, 13,17 38:25 69:8 70:3,20 73:9

**represent** 6:19,23 7:3 8:2 12:14 71:8

**representing** 6:5,22

**REQUESTED** 50:19

**require** 49:17

**required** 46:17 47:8 48:6 49:2 51:13,23,24

**requires** 53:17

**reserve** 75:2

**responsibilities** 15:14,21 26:9

**responsibility** 26:16 27:2

**reveal** 69:7

**review** 8:21,23 9:8 26:1,9,14, 17,19 28:17

**reviewing** 9:7, 11

**Reynaldo** 6:10,25

**RFC-IGLESIAS-1** 67:9

**RFC-IGLESIAS-40** 72:14

**RFC-IGLESIAS-48** 70:19

**rid** 41:5

**ride** 36:17

**rival** 36:15 38:11

**robberies** 9:24 11:6 25:19

**robbery** 15:16 23:20 24:3 26:13 29:13

**Roman** 9:3,8, 12,13,18,21,25 10:3,16 11:3,9, 13 13:10,16,19, 23 14:1,20,25 17:18 29:17,19, 23 30:3,9,14,16 31:2,5,20 34:15,21 35:5, 18,20 38:2,7 40:1,9,10,23 41:6,11,18 42:10,18 43:3,7 45:3 56:4,6,19 57:3 59:7 60:19 61:3,22 62:17, 23 63:13,18,23 64:4 65:9,16 66:23 71:11 73:25

**room** 8:6,9 15:10 60:7

**rooms** 18:14

**rude** 50:7

**rules** 8:5

**running** 57:25 58:16 59:5,20 60:9

**Rutherford** 68:13 72:17

**S**

**Santopadre** 70:25

**scene** 38:21 54:5 65:18 66:5 72:4

**Schalk** 70:25

**screen** 11:20, 21,24 12:9,10 15:5 18:1,7 20:14 24:6 28:4,5 29:9 67:10 70:15 72:10

**scroll** 12:25 20:17 21:9 22:18 28:20

**self-report** 68:12

**send** 24:5

**sergeant** 15:12,15,20 24:22 25:12 26:9,16 27:24 28:14 29:14,21 32:7,10 58:4 70:21

**sergeant's** 26:24,25

**Serrano** 12:3, 15 20:20 28:12

**set** 18:20

**Seventh** 71:5

**shaded** 55:17

**sheet** 69:18 72:24

**shoot** 36:9,19

**shooter** 35:25 38:22 40:23 47:17 52:17 60:21

**shooters** 30:16 35:17 39:9 40:1 42:24 43:8 44:6 46:2 57:3 62:17,23 63:22 66:7

**shooting** 9:14 29:19,23 30:3 31:5 34:15 35:5 38:2 41:19 61:3,22 63:14 65:9,16 66:23 73:25

**shootings** 9:24 36:9 43:12

**shot** 14:3 36:3 42:18 52:3

**show** 12:5,6 53:9,11

**showed** 13:3

**showing** 69:4

**shows** 15:17

**side** 11:19

**sign** 61:8

**signature** 21:12

**signed** 21:10 22:20 27:22,23 28:13 32:10

**similar** 25:11

**sir** 7:18 58:12, 23 59:15 64:2, 10,18 65:24 73:6 74:7

**sit** 31:1 33:17 60:2 66:20,22

**sitting** 27:4

**situation** 10:20 16:2 17:6 44:8 49:6,13 54:15

**slightly** 55:17

**Smith** 49:14,15

**solemnly** 7:19

**solve** 10:24 11:7 30:11 36:23 37:1

**solved** 16:11

**solving** 48:18

**somebody's** 43:12 53:25

**sort** 25:21

**source** 47:5 54:24

**sources** 46:24

**South** 6:6

**space** 37:13,14

**Spanish** 29:16, 21 30:17,19 31:6 32:1,8 34:15 35:8,17 38:3,22 39:4,9 40:2,11,17 41:13,16,20 42:13,21,25 43:10 57:4,7,20 58:5,9,21 59:9, 12 60:1,3,7,12, 21 61:3,22 62:17 63:14,23 64:13 66:7,15 74:1

**spark** 9:12

**speakerphone** 15:9

**speaking** 9:17, 20 13:16 16:12 17:12 23:10,25 24:17

**specific** 11:1 12:20 13:15 14:9 15:24 25:15 28:23 41:16 42:8 44:24 45:2 48:14 59:25

**specifically** 9:25 10:2 13:18 14:11 23:6 30:8 31:18 55:10,12

**speculating** 14:7

**speculation** 19:23 25:7 26:5 42:15 46:20 49:21 61:5,12, 25 63:25 65:20 66:11 68:20 69:12 72:6 74:5

**spoke** 13:23 23:17,19 66:6

**spoken** 14:23 15:3

**spread** 51:3

**stairs** 18:20

**stamp** 20:22 72:12

**stamped** 72:14

**Started** 67:22

**starting** 6:16

**state** 6:14 7:9

**State's** 23:22

**statement** 32:9

**States** 6:11

**steps** 40:2 41:2

**straight** 22:1

**street** 14:4,7 29:16,21 31:7 32:8 46:24 47:5 74:2

**strictly** 37:20

**strike** 10:1 17:12 24:13 52:8 54:5

**stuff** 36:15 44:12 45:12 74:10

**submitted** 26:20

**suggest** 58:8 66:6

**suggests** 23:2 61:21

**supervisor** 26:1 42:11

**supp** 70:3 73:9

**supplementary** 28:10 70:20

**supported** 51:13

**supposed** 27:13,20 45:9, 13

**sups** 27:1,10, 19 38:21

**suspects** 15:22

**swear** 7:19

**T**

**taking** 37:4

**talk** 14:10 16:8, 18 27:18 30:2, 4,9 36:8,13 38:10 46:25 66:2

**talked** 10:19 11:15 22:24 23:12 31:17 46:9 55:9 59:9, 12,21 60:12 70:8

**talking** 9:5 14:12 20:1 22:10 27:16,17 30:13 31:19 32:2 34:21 38:20,24 41:4, 22 46:23 48:12, 13 58:24 59:6, 18 64:7 73:4

**technician** 6:4

**telephone** 48:16

**tendency** 14:5

**terms** 60:10

**terrible** 14:15

**testify** 14:23 64:25

**testimony** 7:19 13:15 55:1 59:11,14 64:1 74:6

**that'd** 51:9 74:15

**thing** 20:17 25:21 49:23 50:9 55:19 59:6 67:1 70:10 74:15

**things** 10:9 13:18 23:23 26:22 27:6 46:11 50:5 59:8 70:10

**thinking** 50:6

**thinks** 39:8

**thought** 32:4 51:14 53:6 58:15

**three-page** 72:13

**time** 6:8 16:17, 21 21:14 22:19 24:10 26:22 29:17 37:11 44:23 45:8,23 52:6 56:16,21, 22,25 57:1 58:1 61:14,17,23 62:14,23 65:6 69:6 74:19 75:5

**times** 36:21

**Timothy** 9:17, 21 10:3,15 12:18 15:4 21:2 29:12,14,22 30:2 32:6 58:4

**tip** 37:2,9,14, 16,21,22 38:3, 23 40:9,10,12 44:20 46:9,10 47:4,5,25 48:3, 15,22 49:6,14 51:2,9 52:4,6,8, 9,11,16,21 53:9,10,25 54:4,6,7,9,16, 17,18,20,23 62:17 63:4,10

**tips** 26:1 36:25 46:17,23 47:2, 8,9,15 48:7,12 49:2,18 51:13, 23,25 55:2

**today** 6:5,7,22 14:23 33:17 60:2 66:20,22

**told** 16:23 30:6 35:2 55:12,16 58:13 60:6

**top** 18:2 21:1 71:21

**transcript** 12:14

**transported** 22:10

**trouble** 11:20

**true** 30:22,25

**truth** 7:20,21

**turn** 12:13

**turned** 48:20

**turns** 39:12 51:8 53:25

**TV** 11:20

**type** 55:22

**typically** 23:25 24:17

**U**

**ultimately** 51:14

**unclear** 36:21 55:13

**understand** 44:3 51:24

**understanding** 32:17 46:15 49:1 51:20 53:16

**understood** 47:7

**unfamiliar** 44:14

**Unit** 21:16

**United** 6:11

**unknown** 47:18

**ups** 27:6

**upset** 11:22

**upstairs** 22:22, 24 23:3

V

**valid** 52:16

**Vargas** 11:9,10 28:11 41:7 42:9

**variety** 23:23

**versus** 6:10

**vet** 40:24 48:16

**vetted** 41:24 46:11

**victim** 52:3 71:10

**video** 6:4,9

**view** 40:23 45:12

**violent** 19:9 24:2 25:3,19 27:16,17 29:16

**voice** 15:8

W

**Wacker** 6:6

**wait** 20:21

**walk** 18:12,13 19:5

**walked** 18:25

**wanted** 14:10 30:2 51:6 53:8 54:7

**washroom** 18:16

**wasted** 45:8

**wasting** 37:13, 14

**watch** 21:10,12 22:19 25:11 27:6

**week** 36:19

**whatsoever** 33:14 61:15 74:17

**witnessed** 48:14 74:14

**witnesses** 15:22 40:16,22 43:18 46:25 51:3 52:2 53:12 64:3 65:18 66:5 69:1 71:14,21 72:4,21 74:9,13

**wondering** 31:22

**word** 36:1 65:12,13

**words** 36:18

**work** 15:17 36:25

**working** 26:18 43:3,7 46:14

**worth** 52:10

**would've** 23:22 27:25 43:22 59:20

**write** 53:8 61:25

**written** 28:13 32:9 54:9 61:1, 9,23 69:9 70:24 72:17

**wrong** 39:12 51:12

**wrote** 19:25 33:6 62:5,14

X

**X-250303** 29:19

Y

**years** 37:19 49:8,16 53:23 56:25

**young** 14:3,6 36:3

Z

**zoom** 6:20 12:12 22:8 28:8,16 29:8

# Exhibit 41

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ORIGINAL

HON. JOHN Z. LEE

HON. M. DAVID WEISMAN

NO. 18 C 3029

THOMAS SIERRA,

Plaintiff

V.

REYNALDO GUEVARA, ET AL.,

Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)

DATE: JUNE 29, 2022

REPORTER: SYDNEY LITTLE

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

HON. CHARLES P. KOCORAS
NO. 18 C 3335

ARIEL GOMEZ,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 3

HON. MARY M. ROWLAND
HON. SUSAN E. COX
NO. 18 C 7951

RICARDO RODRIGUEZ,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 4

HON. JOHN F. KNESS
HON. SUSAN E. COX
NO. 19 C 2441

ROBERT BUOTO,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 5

HON. FRANKLIN U. VALDERRAMA
HON. MARIA VALDEZ
NO. 19 C 6508

GERALDO IGLESIAS,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

HON. SARA L. ELLIS
HON. HEATHER K. MCSHAIN
NO. 20 C 4156

DEMETRIUS JOHNSON,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, THOMAS SIERRA, ARIEL GOMEZ, RICARDO RODRIGUEZ, ROBERT BUOTO, GERALDO IGLESIAS, DEMETRIUS JOHNSON:
Anand Swaminathan, Esquire
Ruth Brown, Esquire
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: anand@loevy.com
ruth@loevy.com
(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
Eileen Rosen, Esquire
Jessica Zehner, Esquire
Rock Fusco & Connelly, LLC
333 West Wacker Drive
19th Floor
Chicago, Illinois 60606
Telephone No.: (312) 494-1000
E-mail: erosen@rfclaw.com
jzehner@rfclaw.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
Megan McGrath, Esquire
Josh Engquist, Esquire
Leinenweber Baroni & Daffada LLC
120 North LaSalle Street
Suite 2000
Chicago, Illinois 60602
Telephone No.: (866) 786-3705
E-mail: mkm@ilesq.com
jengquist@jsotoslaw.com
(Appeared via videoconference)

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 12 |
| DIRECT EXAMINATION BY MR. SWAMINATHAN | 15 |
| CROSS EXAMINATION BY MS. ROSEN | 349 |
| REDIRECT EXAMINATION BY MR. SWAMINATHAN | 349 |

EXHIBITS

| Exhibit | Page |
|---|---|
| 1 - Notice of Deposition | 53 |
| 2 - Amended Notice of Deposition | 54 |
| 3 - Organized Crime Division Special Order 93-01 - RFC 276-284 | 82 |
| 4 - City of Chicago Department of Police Identification Procedures - Foster 30(b)(6) 68-74 | 158 |
| 5 - Preservice Gang Specialist Training - Foster 30(b)(6) 75-279 | 179 |
| 6 - Interrogations Field and Custodial Line-Up Procedures - Foster 30(b)(6) 1-2 | 199 |
| 7 - General Order 88-18 Rescinding 88-18 - Foster 30(b)(6) 3-4 | 201 |

EXHIBITS (CONTINUED)

8 - Line-Up Procedures Special Order S06-02 - Foster 30(b)(6) 5-7 201

STIPULATION

The VIDEO deposition of LIEUTENANT JOHN FOSTER, 30(b)(6) was taken at KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, FLOOR 22, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on WEDNESDAY, the 29th day of JUNE 2022, at 10:09 a.m.; said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure 30(b)(6). The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that SYDNEY LITTLE, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

COURT REPORTER: On record. My name is Sydney Little. I'm the online video technician and court reporter today representing Kentuckiana Court Reporters, located at 30 South Wacker Drive, Floor 22, Chicago, Illinois 60606. Today is the 29th day of June 2022. The time is 10:10 a.m. We are convened by videoconference to take the deposition of Lieutenant John Foster, 30(b)(6) in the matter of Thomas Sierra versus Reynaldo Guevara, et al., number 18 C 3029; Ariel Gomez versus Reynaldo Guevara, et al., number 18 C 3335; Ricardo Rodriguez versus Reynaldo Guevara, et al., number 18 C 7951; Robert Buoto versus Reynaldo Guevara, et al., number 19 C 2441; Geraldo Iglesias versus Reynaldo Guevara, et al., number 19 C 6508; Demetrius Johnson versus Reynaldo Guevara, et al., number 20 C 4156, pending in the United States District Court for the Northern District of Illinois, Eastern Division. Will everyone, but the witness, please state your appearance, how you're attending, and the location you're attending from, starting with Plaintiff's counsel?

MR. SWAMINATHAN: Thank you. Anand

Swaminathan for plaintiff in all of those cases you just listed in the captions.

MS. ROSEN: Eileen Rosen for the City of Chicago and the witness for all of the cases that you just listed in the caption.

MR. SWAMINATHAN: And sorry. Sorry, before we keep going, for plaintiffs, my colleague Ruth Brown may also be joining for part of the day today. She's not currently on, but I'll just identify her appearance to the extent she logs on at some point.

MS. ZEHNER: And this is --

MR. ENGQUIST: Josh -- oh, go ahead.

MS. ZEHNER: Oh, thank you. This is Jessica Zehner on behalf of the City of Chicago, for all the cases, appearing remotely from Chicago.

MR. ENGQUIST: Josh Engquist on behalf of all the individual officer defendants in all the cases listed, with the exception of Reynaldo Guevara, attending remotely from my office in Chicago.

MS. MCGRATH: Megan McGrath on behalf of Defendant Reynaldo Guevara on all of the cases, attending remotely from my office in Chicago.

THE WITNESS: Don't want to click on anything with --

MS. ZEHNER: Thank you.

COURT REPORTER: Can you hold one second while I just fix the Zoom. Oh.
THE WITNESS: Thank you. I didn't want to do anything without knowing.
COURT REPORTER: All right. Lieutenant Foster, will you please state your name for the record?
THE WITNESS: John, J-O-H-N, Foster, F-O-S-T-E-R.
COURT REPORTER: Thank you. Do all parties stipulate that the witness is, in fact, Lieutenant John Foster?
MR. SWAMINATHAN: Plaintiff stipulates.
COURT REPORTER: Thank you, Lieutenant Foster --
MS. MCGRATH: Stipulates.
COURT REPORTER: Lieutenant Foster, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.
COURT REPORTER: Thank you. Counsel may begin.
DIRECT EXAMINATION

BY MR. SWAMINATHAN:
Q Thank you. Sir, could you state and spell your name for the record?
A John, J-O-H-N, Foster, F-O-S-T-E-R.
Q How old are you, sir?
A --6.
Q Sir, you cut out there for a second.
A 56.
Q Okay. And you indicated that you're currently Lieutenant; is that correct, sir?
A Yes.
Q Okay. And during the course of this deposition, I want to treat you with your respect you deserve, I will try to refer to you as Lieutenant Foster. If I refer you as Mr. Foster; is that okay?
A John works, too.
Q Okay. All right, I appreciate that. You're - - you said you indicated that you're currently a lieutenant to the Chicago Police Department. What is your detail or assignment?
A I'm assigned to Area 5 homicide.
Q So are you currently overseeing violent crime - - is it -- is the division referred to as Violent Crimes or Homicide?
A Currently the -- as of about three years ago,

they separated Homicide from Violent Crimes. So there's Homicide, Violent Crimes, and property crimes.
Q Okay. And so you're currently assigned to -- as a lieutenant overseeing homicide detectives and sergeants; is that correct?
A I'm the commanding officer of Area 5 -- Area 5 homicide, excuse me.
Q Okay. And then is there a -- and then, who do you report to? Do you report to a commander?
A Correct.
Q Okay. And who's the current Area 5 commander that you report to?
A Joel Howard.
Q And how long have you been in the position of lieutenant over Homicides?
A Approximately three years.
Q Okay. And were you previously a homicide detective at any point?
A Yes.
Q And I take it, then, when you were a detective, you were not a homicide detective, you were a violent crime detective; is that right?
A I was in the violent crime section, but I worked almost exclusively homicides when I was a detective.

Q Okay. What was the period of time you were a detective in violent crimes?
A Late 1999 to 2013.
Q Okay. Okay, when did you begin at the Chicago Police Department, sir?
A When that was -- when was I hired?
Q Yes.
A November of 1991.
Q Okay. Okay, all right. Let's walk quickly through your career. I'm not going to ask you about all of it, but I wanted to just make sure I have an understanding of your background. So why don't you walk me through your career? I may -- this is one of the rare times I may stop you as you're answering my questions, just to make sure I -- I'm keeping up with you. But can you take me through from the time you joined the police department?
A Well, obviously you go through the -- go through the police academy. I trained in the 10th District. After I was done with my training, I went to the 22nd District. I was on the TAC team in the 22nd District, I went to the 4th District.
Q So in --
A Back to the 4th --
Q -- sorry, let me pause you there. The time

that you were in the 22nd District, what period of time was that approximately?
A 1993 to maybe 1995 or '6.
Q Okay. So you spent -- for your first two years in the department from '91 to '93, you were in the 10th District; is that right?
A No, my first year I was in the academy, and I trained in the 10th District, so that would've been a first year, year-and-a-half.
Q Okay. And then you went over to the 22nd District approximately '93?
A Could've been '92, but yeah, approximately, yes.
Q And you served as patrol officer in the 22nd District?
A Correct.
Q And then when did you join the tactical team in the 22nd District?
A A short time after, six months.
Q Around '94 to '95?
A Yes.
Q Okay. And then how long were you on the tactical team?
A In the 22nd District?
Q Yes.

A Probably three years or so.
Q And what was your assignments or functions within that tactical team?
A Well, it's what the tactical officers do. You do aggressive patrol. Respond to in progress calls.
Q Were you focused on certain types of crimes?
A Not necessarily.
Q During the time that you were working in those approximately three years on the tactical team in the 22nd District, were there any periods of time when you were focused on particular types of crimes or criminal activity?
A Yes.
Q What were those?
A Well, if we had a -- my recollection is that we had a crime pattern of -- of an offender assaulting women along the Metro line. I -- I know we worked on that for a while. I -- there was a pattern of Frito-Lay drivers getting robbed. Those are the two that -- that I can recollect quickly.
Q Okay. What area is the 22nd District in?
A The southwest side of the city.
Q And what Detective Division area would that have had encompassed?
A Area 2.

Q Okay. During that time, did you work with any gang specialists or gang tactical officers?
A Yes.
Q And just help me understand those concepts that will obviously be relevant during the course of this deposition, but I have heard over the course of my time that -- both the terms, gang tactical officer and gang specialists. Are those the same thing or something different?
A Completely different.
Q Okay. And let's start with gang tactical officers. What are gang tactical officers?
A The gang -- there was at that time -- what time frame are you referring to?
Q Let's stick to that same time frame around the early to mid-1990s as a starting point.
A So at that point in time, there were three TAC teams and one gang team, gang tactical team. They basically did the same function at that point in time. And those would be gang tactical officers.
Q And what was that function?
A High crime suppression, aggressive patrol, things of that nature.
Q And what was the command structure for that group -- strike that. Let me ask a better question. Who

did those gang tactical officers report to?
A Each TAC team, including the gang team, had a -- had an individual sergeant that they reported to.
Q And did those sergeants report up through the same command for patrol officers?
A They would've reported to the tactical lieutenant who would've reported to the -- the commander of the 22nd District via Patrol. So yeah, they would be in the Patrol Division.
Q Okay. So they -- so those gang tactical officers were within the Patrol Division, do I have that right?
A Yes.
Q Okay. And we were talking with the period from the -- in the early '90s. Did that change at some point in terms of the reporting of gang tactical officers within the Patrol Division?
A Not that I'm aware of, no.
Q Okay. And then tell me comparatively what the role of gang specialist was in that period in the early to mid '90s?
MS. ROSEN: Object to the form. But you can answer.
A I did not have any interaction with gang specialists at that point. They weren't in the

districts that I'm -- that I can recollect.
Q Okay. You indicated earlier when I asked you that gang tactical officers and gang specialists were entirely different. So in what way were they different?
A Well, gang specialists were doing more intelligence gathering, they had more of an intelligence gathering mission than just going out and trying to suppress crime. They were more of an intelligence gathering.
Q Any other differences?
MS. ROSEN: Object to the form. You can answer.
A I know they're involved in -- in long -- longer term investigations. They work with the federal government and more conspiracy-type racketeering investigations.
Q Anything else?
MS. ROSEN: Object to the form. You can answer.
A Not that I can recall at this point.
Q Okay. And did they report with the Patrol Division or elsewhere?
A They, we're talking about the early '90s; is that correct, sir?
Q Yes.

A I believe that they were in the Patrol Division at that point in time.
Q And at what point did that change?
A I believe that until gangs was disbanded, they were in Patrol so, going forward.
Q Did they ever report within the Division of Organized Crime?
A Yes.
Q And when was that?
A I think that was previous or prior -- prior to -- it may have been after Patrol. They may have gone to Organized Crime after Patrol, so they were in Patrol and then they were moved to Organized Crime.
Q Okay. And you know approximately when that took place, was it in the early '90s or sometime later?
A Sometime later.
Q Okay. So there was some point when they moved from being within the Patrol Division to the Organized Crime section; is that right?
A Yes.
Q Okay. And can you say approximately when that was? Early '90s, late '90s, can you say it all?
A I want to say 1996, but I'm not completely positive about that.
Q Okay. And then at some point, did that change

in terms of what the gang specialists reporting into the Bureau of Organized Crime?
A Not that I'm aware of. I believe they were in Patrol Special Functions and then they ended up in Organized Crime, but that's --
Q And then --
A -- after that I disbanded.
Q And when were they disbanded?
A I don't -- I don't know the exact year.
Q Do you know approximately when?
A It had to be after '96, but I don't know when.
Q Okay. So you said you worked -- and strike that. So during the time that you were working in the -- on the tactical team, you said you had no interactions with gang specialists. Is that correct?
A In the early '90s we're talking about; is that correct?
Q Yes. During the period of time that you were working on the tactical team in the 22nd District, which is approximately '94 to '95 through about '98.
A I did not have -- I don't remember -- don't recollect having any kind of interaction with gang specialists.
Q Okay. And prior to the time you worked on the 22nd District tactical team, did you have any

interactions with or work with gang specialists?
A Not that I can recall.
Q Okay. So what was the next position you held in the department after your three years on the tactical team in the 22nd District?
A I went to the 4th District.
Q And what position did you have in the 4th District?
A I was a patrol officer, and I also was on the TAC team.
Q And what area was the 4th District within?
A Area 2.
Q Okay. And the TAC team, how long were you on -- in that position with the 4th District TAC team?
A Approximately, maybe 1998 or early '99.
Q Until when?
A It would've been -- would've been from '95 or '96 to '98 or '99.
Q Okay. So maybe I think I'm getting a little lost. In -- around '94 to '95 you joined the 22nd District TAC team; right?
A Yeah, it could -- it could have been '92 or '3, but yeah, I think I left 22 in '95 or '6, and then I went to the 4th District.
Q Okay. So you were on the TAC team for a

couple of years in the 22nd District and then moved on to the 4th Street around -- 4th District around '95. Do I have that right?
A Could've been '96, but approximately speaking, yes.
Q Okay. And then you were in that position in the 4th District tactical team until about '98 to '99. Do I have that correct?
A That is correct, sir.
Q Okay. And when you were on that tactical team, did -- were there any periods of time when you were focused on particular crimes or criminal activity?
A Not that I recollect at this point.
Q Okay. During that period of time, did you have interactions with gang tactical officers?
A Yes.
Q During that period of time, did you have interactions with a gang specialist?
A Not that I can recollect at this time.
Q Okay. What was your next position?
A I went to the narcotics section.
Q Assigned to what district or area?
A That would've been an Area 4 narcotics team.
Q Where was that unit based?
A I'm sorry, sir.

Q Where was that unit based?
A Homewood Square.
Q Okay. And what was your role in Area 4 narcotics?
A We -- I was on a street-level team that was tasked with street-level narcotics enforcement.
Q Did that include drug buys?
A Yes.
Q Did it include the use of confidential informants?
A Yes.
Q And were you a -- were you considered a tactical team officer at that point?
A On a -- I was on the narcotics enforcement team or the narcotics team, so we had -- I had served many roles on that team.
Q And so at that time, what were you referred to as? Were you considered a patrol officer, a TAC team officer, what were you considered?
A You were in narcotics. You were a narcotics officer. Narcotics was in the Organized Crime Division.
Q Okay. And was that your first position in the Organized Crime Division?
A Yes.
Q And how long were you in that position?

A Approximately a year.
Q Okay. Did you interact with gang tactical officers while you were working in that unit?
A No.
Q Did you interact with gang specialists while you worked in that unit?
A Not that I can recollect, no.
Q Okay. And you -- I think I asked you this and I don't remember what you said, so I apologize. I will object, asked and answered to my own question, but I apologize. Did you say you did work with confidential informants while you were in that unit?
A "In that unit" being narcotics?
Q Yes.
A Yes.
Q Okay. All right, what was your next position in the department?
A Made detective.
Q And so what year was that approximately when you made detective?
A It was late 1999 or very early 2000s to my recollection.
Q Okay. And what area were you assigned to?
A Area 1.
Q Okay. And did you make detective based on a

merit promotion or based on a test score?
A Test score.
Q Okay. When you joined Area 1 detectives, where were you first assigned within the Detective Division?
A Violent crimes.
Q And at that time, when you joined the Violent Crimes unit, what kinds of crimes were you investigating?
A Trajectory, or the tradition at Area 1 was, you started -- robberies were part of Violent Crimes and eventually you worked your way into investigating homicides.
Q Okay. And so was that your trajectory as well?
A It was, yes.
Q And approximately when did you start investigating homicides at Area 1?
A Area 1 at the time was very busy, so I would say within six months of being there, we were -- or I was working on murders.
Q Okay. And how long were you an Area 1 Violent Crimes detective?
A Until 2013.
Q Okay. And in 2013, were you promoted to

sergeant?
A I was, yes.
Q Okay. While you worked at Area 1 as a Violent Crimes detective, did you -- would it fair to say you investigated hundreds of homicides?
A You broke up a little bit. Can you repeat that?
Q Sorry. While you were at Area 1 Violent Crimes, would it be fair to say you investigated hundreds of homicides?
A Yes.
Q Did you work with other homicide detectives in investigating homicides?
A Yes.
Q Would -- did you work with -- strike that. Did you have different partners during the time you worked as an Area 1 homicide detective?
A Yes.
Q Did you interact with gang specialists during the time you worked as an Area 1 homicide detective?
A Not that I can recall, no.
Q Okay. Did you ever have interactions -- strike that. Did gang crimes officers ever assist in -- strike that. Did gang specialists ever assist in homicide investigations while you worked as an Area 1 detective?
A When I made detective, I believe the gang specialists had already been incorporated into the Detective Division.
Q And tell me what you mean by that.
A I mean that there were some gang specialists that were doing the job function as a detective.
Q In other words, they now had the title of detective.
A Oh, that's not what I said. They were doing the -- they were still gang specialists, if my recollection is correct, but they were doing the job as a -- of a detective.
Q Okay. So these were gang specialists who did not have the title of detective, they still had the title of gang specialists; correct?
A I believe at some point they were -- they were -- everybody was made a detective, but there was a -- there was that interim phase where they were still gang specialists and doing some detective tasks.
Q Okay. So those -- so there was a period of time when you were at Area 1 as detective, when you had gang specialists who still held that title who were participating in homicide investigations; correct?
A That was in -- after 2000.

Q Okay. And so for a period of time after 2000, these gang specialists were assigned to the Detective Division; correct?
A Yes.
Q And --
MS. ROSEN: And I'm going to lodge -- sorry, one second. I'm going to lodge an objection here. This is beyond the scope of the 30(b)(6) notice. The period of time extends to 1998. Now that we've established that what he's talking about happened in 2000, it's not relevant to the 30(b)(6) notice. Obviously, I'm not going to stop him quite yet, but at some point I will.
BY MR. SWARMINATHAN:
Q Understood, okay. And then in that period of -- and then there was some point after that, after 2000, when they just stopped being referred to as gang specialists and they became detectives; is that right?
A That's my recollection, yes.
Q Okay. And once they became detectives, they were performing -- they were clearly performing the functions of detectives in homicide investigations; correct?
A I can only speak for Area 1. I don't remember any gang specialist that turned detective that were -- that was doing homicide investigations.
Q Did that -- gang specialists that became detectives, what did they do then?
A Well, they -- they could have been -- they -- they could have served a multitude of other tasks, but my recollection is they weren't working on homicides. They could have been working on aggravated batteries or -- or burglaries or -- or anything -- any other criminal activity.
Q Okay.
MS. ROSEN: And just to be clear, all these answers, because they're beyond the scope of the 30(b)(6) notice and are limited to this witness' experiences at Area 1 and so, you know, like I said, you're beyond the 30(b)(6) notice. You get, like, maybe one more or two more questions on this, and then I'm going to cut it off. But I want to make sure that all the prior answers, because they're not within the scope of the 30(b)(6) are limited to information based on this witness' experiences, rather than as a 30(b)(6) witness.
BY MR. SWAMINATHAN:
Q And for these questions about your experience, sir, I'm focused on this section really on your experience, again, and understanding of the various

roles and experiences you had within the department. Okay. So you were in that detective position from -- okay, well, strike that. Let me ask you, who were your partners within Area 1 during the time you worked as a detective?

A Want their names?

Q Yeah.

MS. ROSEN: What -- why is that relevant to the 30(b)(6) issue? You've never asked that type of question before.

MR. SWAMINATHAN: Yeah -- this is somebody who was -- I'm going to be asking a number of questions about Homicide Detective Division practices and I want to know who are some of the people he worked with, so I have an understanding of, for example --

BY MR. SWAMINATHAN:

Q One of the things we're going to talk about, sir, let me ask you this sir, let's lay a little bit of foundation. Fair to say that as a homicide detectives, one of the forms of training for homicide detectives is on-the-job training; correct?

A Yes.

Q Okay. And in fact, in your experience, would you say on-the-job training was one of the primary ways

in which you learned how to perform the job of a detective?

A Can you re-form that question?

Q I'm happy to do so. Would you say on-the-job training was one of the primary ways you learned how to perform the job of a detective?

A I don't know if I would use the word "primary."

Q How would you describe it?

A I would say that it's a -- a multifaceted approach to training and on-the-job is -- is one of the facets, but not the primary facet.

Q During the course of your time as a detective, did you work with more experienced homicide detectives?

A Work with, yes.

Q Okay. And when you were in your early years as a homicide detective, did you have a partner -- did you have partners in the period of time between 1990, '91? Sorry. In the period, in your early time as a homicide detective, between 1990 and 2000 and the next few years, did you work with more seasoned homicide detectives?

MS. ROSEN: Object to the form.

A I -- I'm -- I'm getting confused as what you're asking me. I worked with more seasoned

detectives when I made detective, I wasn't partnered with them.

Q Okay, so when you first became detective, did you have a period of time when you sort of had -- where you sort of rode along with or followed a more seasoned detective?

A Yes. The -- there was a training period when you -- when you arrived at the area.

Q And how long was that training period?

A It was informal. It -- it could have been up to a month.

Q Okay. And that's not the pre-detective service training, that's training with somebody in the Detective Division for about a month; is that right?

A Again, it could have been longer, but that's correct. Yes.

Q Okay. And that was a form of on-the-job training; correct?

A Form of it, yes.

Q Okay. And then subsequent to working with that, through that -- during that -- after that one-month period, did you get assigned partners?

A Again, I don't want to be specific about the time frame. It could have been -- could have been longer. Some people obviously trained longer than --

some people didn't. I think it was just based on how quickly you picked up some of the paperwork and conducting investigations, so yeah, at some point after you were trained, some guys partnered up and some guys didn't.

Q Okay. Did you partner up?

A Yes.

Q Okay. Who was the officer or officers you worked with in the period when you were sort of training and following around another detective?

MS. ROSEN: So I'm going to -- I'm again asking you for the relevance of this. First of all, this 30(b)(6) notice is focused primarily, other than with the respect to the issue of identification procedures, on gang crime specialist practices and policies. You are spending an inordinate amount of time right now on Detective Division practices and policies. Those topics, by agreement, were addressed by Eric Winstrom in the Solache/Reye's case. And the relevance of who his partners were to it -- with respect to a 30(b)(6) notice, generally speaking, is not relevant and now is even less relevant based on what he's here for. So if - - unless you can explain to me the relevance of who his particular partners were in

the context of why we were here, I am going to instruct him not to answer.

MR. SWAMINATHAN: Yeah. So there're -- we -- there are multiple Detective Division topics that are on the table for today. I agree that some topics have been covered. Secondly, this -- a number of those topics, Detective Division topics and other topics, specifically relate to the issue of training and on-the-job training and those topics, whether they relate to Detective Division training or gang crimes training, it is important for me to lay some foundation and understand this witness's knowledge about training, training practices, and the individuals he's trained with are going to be relevant to the question, from our perspective -- I'm allowed to ask some background questions. We're about 30 minutes into this dep. I've not been asking inordinate questions about this; I've been asking him mostly about connections of his work to gang crimes. But all of my questions have been relevant to our topics, which is Detective Division training and gang crimes training and his experience in those groups for him to be able to answer questions on these topics through the course of today's deposition. I'm

going to ask him several questions. I don't have probably more than two questions on this topic, but then I'm moving on, but I'm going to ask him my two questions.

BY MR. SWAMINATHAN:

Q So sir, who trained you?

MS. ROSEN: No. Whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa.

MR. SWAMINATHAN: Oh, you can instruct him not to answer --

MS. ROSEN: No, you're not going to -- wait --

MR. SWAMINATHAN: -- and then we'll address it.

MS. ROSEN: Yeah. So I'm going to respond to what you just said.

MR. SWAMINATHAN: Yes.

MS. ROSEN: So first and foremost, with respect to, there are a variety of topics that we're going to be talking about today related to Detective Division, please tell me beyond identification procedures as identified in the notice at -- and if you'll given me a minute, I'll find the paragraph, what other Detective Division topics do you believe are fair game?

MR. SWAMINATHAN: Identification procedures,

gang book procedures, confidential informants.

MS. ROSEN: Gang book procedures was already addressed and so was informants.

MR. SWAMINATHAN: No, they were not, Eileen. We did Reyes, remember.

MS. ROSEN: Direct me to the order of what you're talking about --

MR. SWAMINATHAN: And it's in the notice that we just sent you guys a couple days ago. We didn't do gang books and confidential informants.

MS. ROSEN: And what -- wait a minute. No, no, no, no. I just -- we negotiated a multi-page, 30(b)(6) notice, so tell me what paragraphs you're talking about --

MR. SWAMINATHAN: I'm not going to --

MS. ROSEN: before we, like, fight about it, we're all on the same page.

MR. SWAMINATHAN: All right. Let me share my screen. This is the notice. Topic J, the use of confidential informants, this is a topic which --

MS. ROSEN: What paragraph? Can you -- wait, wait, wait.

MR. SWAMINATHAN: Yeah.

MS. ROSEN: Can you just tell me -- I don't see a paragraph.

MR. SWAMINATHAN: Yeah, this is one -- topic 1J and Topic 1K.

MS. ROSEN: Just hold on one second. Hold on one second, please.

MR. SWAMINATHAN: Yeah, I'm just saying, look at 1J and 1K.

MS. ROSEN: Okay. And which one? One what?

MR. SWAMINATHAN: 1J and 1K.

MS. ROSEN: Okay.

MR. SWAMINATHAN: And then look at 1 -- what is the one on identification, so let me pull it up. I think it's 1C. And 1C. Okay, for the other topics, we specifically referenced that the topics that have already been covered for detectives in Reyes/Solache, but for 1C --

MS. ROSEN: Okay, fine.

MR. SWAMINATHAN: J and K, those are the three topics --

MS. ROSEN: So --

MR. SWAMINATHAN: -- that are on the table for him with regard to the Detective Division. So again --

MS. ROSEN: Right.

MR. SWAMINATHAN: I'm -- I'll ask my questions and I like I said, I only have a couple questions

on this topic, so -- and there're really just two questions.

BY MR. SWAMINATHAN:

Q Sir, who were the officer -- or strike that. Who were the detective or detectives that you trained with when you joined the Detective Division in Area 1?

MS. ROSEN: Okay. Objection, relevance, beyond the scope. But you can answer it.

A I believe I initially trained with Dave Golubiak.

BY MR. SWAMINATHAN:

Q Anyone else?

A Maybe John Griffin.

Q Okay. Anyone else you can recall?

A I'm sure -- I'm sure there was others, I -- I -- I just don't know.

Q Can you spell Golubiak for the record, just for me and the court reporter?

A G-O-L-U-B-I-A-K.

Q Okay. All right, and the only other question I have on this particular topic is, can you identify for me the partners that you worked with during the time you were a detective at Area 1?

MS. ROSEN: What is the relevance of that? It has nothing to do with training.

MR. SWAMINATHAN: Same. I believe that the partners that he had are of -- are relevant to the issue of his training and on-the-job training that detectives receive. I mean, you can disagree with me, but I believe it's relevant. I believe it's relevant both to the issue of his experience and training, and any potential issues of bias, depending on his answer. That's my basis. That's the only other question I have on this topic.

MS. ROSEN: How? I don't understand the -- I don't understand why his personal training is relevant at all. So the identities of his -- right? The question is the City's training, generally. Fine, if you -- I let you ask the question about who his training officers were, as marginally relevant as I view that, but I don't understand at all how his partners through his 8- or 9-year career go to training or anything related to the 30(b)(6) notice, and I don't understand your -- the point that you're making about bias. What does that mean?

MR. SWAMINATHAN: Yeah, I mean, this is a trial witness. This is somebody who can come to this trial and testify to defend the City of Chicago's policies and practices. I'm entitled to

probe this witness to figure out relevant cross-examination questions of this witness. I want to know who this -- who Mr. Foster's partners were, because it may be that he partnered with people who I have some real questions about. It may be the subject of additional cross-examination questioning and follow-up, depending on what this witness says. So certainly I have the right to probe this witness about sources of bias and otherwise, because this is a trial witness. Ultimately, if you don't like my question, you -- obviously, you can make an objection to relevance. Obviously, that's not a basis to refuse to allow a witness to answer questions. I do understand if you take the position that his response to this question, as with several other questions, is an answer that's not binding testimony as to the City because it's not within the subject of the 30(b)(6) notice. I understand that objection, but if you're going to instruct him not to answer, I guess, obviously, you can, but I don't see the basis to do that and we're wasting time. I would like to answer this question and move on, and if -- you can make an objection to the relevance of the question, fine, but that's my response.

MS. ROSEN: Well, it's go -- it's more than just relevance; right? I don't understand how this is fair game for a 30(b)(6) witness?

MR. SWAMINATHAN: It's simply because I'm laying foundation for my cross -- a 30(b)(6) witness, yes, must provide binding testimony on the topics. But every 30(b)(6) witness who has ever been questioned is questioned about their background and potential bias because these are trial witnesses, and I'm entitled to ask these -- this witness questions just as I asked James Spratte and other detectives and -- or -- and 30(b)(6) deponents who came in and testified in this case and testified in trials like Jacque Guevara's case, because in our view, they had extreme bias and I wanted to be able to question that witness about his bias and I questioned him at his deposition about sources of bias. So I'm moving on, but this is my -- I've asked my question. Are you instructing him not to answer?

MS. ROSEN: I am -- I'm going to confer with my client, and then I will let you know. So if you want to take a break, so that I can do that, we can do that. Otherwise, we can move on, and you can come back to it.

MR. SWAMINATHAN: Yeah, we can take a break.
MS. ROSEN: Fine.
COURT REPORTER: All right. We're off the record. The time is 10:48.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022. The time is 10:56 a.m.
BY MR. SWAMINATHAN:
Q Okay. Sorry. Okay. Could you please identify for me the partners you had during the time you were an Area 1 detective?
MS. ROSEN: And I'm going to instruct him not to answer that question. It's beyond the scope of the 30(b)(6) notice. It's not relevant to his testimony as a 30(b)(6) notice, and I guess we can take it up with the court. I mean, obviously we can have a -- I have looked at this issue about bias, not in the last five minutes, but before. I believe that you're overstating it, but I'm certainly happy to discuss it with you when the depo's over, and if you can persuade me otherwise, obviously, I'll bring him back. Otherwise, we can

let the court decide.
MR. SWAMINATHAN: Okay. And are you also -- will you also instruct him not to answer any questions about his complaint register history?
MS. ROSEN: That is correct.
MR. SWAMINATHAN: Okay. All right. All right, so I won't go through those in one by one. I'll just -- we'll just indicate that to the extent I have questions about CRs, you're -- you will be instructing him not to answer those subjects as well?
MS. ROSEN: That is correct, and have you produced those CRs in any of these cases?
MR. SWAMINATHAN: I have not even -- I have not. I've only seen publicly available information about them. I don't have them.
MS. ROSEN: Well, that's a different question. My question is, did you produce them in this case? I know you -- you can see whatever --
MR. SWAMINATHAN: I don't have any CRs for him to produce. I can see his CRs in publicly available records, but I have -- know nothing about them, that's why I was going to ask him about them.
MS. ROSEN: I understand we can all, like, search the Internet and find information. I had a

specific question, which I think you've now answered, which in none of these cases, despite the hundreds and hundreds of thousands of pages that you've produced, have you produced this particular witness' CRs? So thank you.
MR. SWAMINATHAN: Not that I'm aware. No.
MS. ROSEN: Well, if you're not aware of it, who would be aware of it?
MR. SWAMINATHAN: I don't know, unless the city is aware that it's produced CRs for this individual as part of any of its productions, but I don't believe that to be the case.
MS. ROSEN: Okay. We can move on.
BY MR. SWAMINATHAN:
Q Okay. So sir, after you worked in the Detective Division, you moved up to sergeant. What was your first assignment as a sergeant?
A I was assigned back to the Patrol division shortly in the Fourth District.
Q And how long were you in Patrol in the Fourth District?
A Seven or eight months.
Q Okay. And before we move on, just to make sure I have a clear record, because we're going to -- we have to litigate this issue, sir, do you have three

sustained CRs during the course of your CPD career?
MS. ROSEN: Going to instruct him not to answer for the reasons I've previously articulated.
Q Okay. All right. As to the Patrol Fourth District, I take it, then, you were supervising patrol officers?
A Correct, yes.
Q Okay. And what area was the Fourth District in?
A Area 2.
Q Okay. And then what was the next position you held?
A It was -- assigned back to the detective division.
Q When was that?
A Where?
MS. ROSEN: When?
Q When was that?
A Early 2014, maybe.
Q Okay. And is that as a sergeant?
A That's correct. Yes.
Q Okay. And who were you supervising as a sergeant in the detective division beginning in 2014?
A Homicide detective.
Q What area?

A Area 2.
Q And then what was your next position?
A I was promoted to lieutenant.
Q And remind me when that was.
A January of '19, maybe.
Q Okay. So you -- and back then, you were a lieutenant -- you were promoted to lieutenant overseeing homicide detectives; correct?
A No, once I -- once you get promoted, you go -- generally go back to Patrol.
Q Okay. So you went back to Patrol in 2019 as a lieutenant; correct?
A Yeah, approximately. I'm not completely sure on these dates, but yes, I went back to Patrol briefly.
Q Okay. And in what district?
A Fifth District.
Q Okay. Which area is that in?
A Area 2.
Q Okay. And then what was your next position as lieutenant?
A Area 5 homicide.
Q Okay. And would that have also been in 2019 when you moved over to Area 5 homicide?
A It would've been, yes.
Q And you've been in that position since; correct?
A Correct.
Q Okay. During the time that you've -- you worked as a sergeant and a lieutenant, it -- overseeing homicide detectives, did you work with anyone who was in a position of gang specialist?
A There were no gang specialists in that time frame.
Q Okay. All right. Okay, sir, could you tell me what -- we'll strike that. Let me go through a couple background points. Sir, how many times have you been deposed?
A I -- I would say between 6-7 approximately. I don't know for sure.
Q Okay. And were those all in your capacity as a law enforcement officer?
A Yes.
Q Okay. You're -- strike that. When you -- let me just go through a couple background issues. This is a question-and-answer session. I'll ask you questions. You answer my questions to the best of your ability. A court reporter is taking it all down, so one important step is, let me ask my questions and finish asking my question before you answer the question, so we're not talking at the same time. Okay?

A Sure.
Q And likewise, if you're answering a question and I have mistakenly believed you've completed your answer, please let me know and I'll let you finish your answer. Okay?
A Sure.
Q There'll be times in the deposition where you know where I'm going with my question. Make sure I finish my question before you answer, fair?
A Sure.
Q Okay. No nods of the head, no "uh-huhs," because those are non-verbal answers that the court reporter cannot write down; fair?
A Sure.
Q If you don't understand my question -- you've already done this several times in the deposition, but if you don't understand my question, please ask me to rephrase it and I will do so; fair?
A Fair.
Q And likewise, if you answer my question, I'll assume you understood my question; fair?
A Fair.
Q Okay. If you need to take a break at any point, let us know and we will take a break, only rule is that you need to answer any pending question; fair?
A Fair.
Q Okay. A couple of "yes," "no" questions. I'm not asking for details of your medical history, so just listen carefully to my question. Are you taking any medications that would prevent you from being able to understand my questions and answer them today?
A No.
Q Do you have any medical conditions that would prevent you from being able to understand my questions and answer them today?
A No.
Q Okay. Okay. Let's pull up -- so you understand that you've been designated by the City of Chicago to provide testimony with regard to various 30(b)(6) topics today; correct?
A That's correct.
Q Okay. And you understand that this is for a -- a series of different cases, all of which were identified by the court reporter at the beginning of this deposition; correct?
A That's correct.
Q Okay. Let's -- I'm going to share my screen with you now. All right, this first, actually. Okay. All right. I'm showing you a document we will mark as Exhibit 1. Now, how do I -- one second. All right.

Let's pull it up. Here we go. It should be bigger. Okay. What I'm showing you now is a document I've marked as Exhibit 1. It's a four-page document. It's titled, Amended Supplemental Notice of Video Recorded Rule 30(b)(6) Deposition of City of Chicago, and it identifies the captions of various cases, Sierra, Gomez, Rodriguez, Buoto, Iglesias, and Johnson, and it identifies as -- you as a witness, Lieutenant John Foster. Do you see that, sir?

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

A I do, sir.

Q Okay. And it identifies various topics on which you will be testifying on behalf of the City of Chicago as a 30(b)(6) witness. Do you see that, sir?

A You don't have it displayed.

Q Let's see. Well, I'll move to -- I'll show you the actual set of topics in a moment. If you see it, this notice lists you as testifying as to topics 1A through F, 1J through K, and so on. Do you see that?

A I do. Yes.

Q Had you seen this particular Notice of Deposition before today?

A Yes.

Q Okay. All righty, and then let me pull this down and let me show you what we've marked as Exhibit 2.

Now, hold on here. All right. What I'm showing you now is the document I've marked as Exhibit 2. It contains the same case caption, and it's a 13-page document entitled, Amended Notice of Rule 30(b)(6) deposition of City of Chicago. Do you see that, sir?

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

A Yes.

Q Okay. And this lists various topics and subtopics on which you have been designated to testify; correct?

A That's correct.

Q Okay. And just looking at topics -- let's start with Topic 1A. Topic 1A, just to paraphrase, concerns -- this concerns the City's policies and practices for the period of 1986 to 1998 related to witness interrogations and interviews in homicide investigations. Do you see that, sir?

A I do.

Q And are you -- have -- you understand that you've been designated to provide binding testimony for the city today on that topic, specifically with regard to gang specialists; correct?

MS. ROSEN: I'm objecting to the form of the question, specifically to the -- your use of the word "binding," but you can go ahead and answer the question.

A Yes.

BY MR. SWAMINATHAN:

Q Okay. And Topic 1B -- I won't re-paraphrase them each time. So you understand that you are to provide binding testimony on behalf of the City of Chicago today as to Topic 1B, specifically with regard to gang crimes officers; correct?

MS. ROSEN: Same objection with respect to "binding, but you can answer.

A Yes.

MR. SWAMINATHAN: And you can have a standing objection, Eileen, to all of -- to that as to all of these.

MS. ROSEN: Okay. Thanks.

BY MR. SWAMINATHAN:

Q Yeah, and then as to -- you understand that you are to provide binding testimony today on behalf of the City of Chicago as to Topic 1C for both detectives and gang crimes officers; correct?

A Correct.

Q You understand that you're to provide binding testimony today as to Topic 1D as to gang crimes specialist only; correct?

A Correct.

Q And you understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 1E as to gang crime specialists only; correct?

A Correct.

Q And you understand you're to provide binding testimony today as to Topic 1F as to gang crime specialists only; correct?

A Correct. Yes.

Q And you understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 1J for both detectives and gang crime specialists; correct?

A Correct.

Q And you understand you're to provide binding testimony today on Topic 1K as to gang crime specialists and detectives; correct?

A Correct.

Q Okay. And you understand you're to provide binding testimony today on Topic 2A as to gang crime specialists only; correct?

A Correct.

Q You understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 2B for gang specialists only; correct?

A Correct.

Q And you understand you're to provide binding testimony today on Topic 2C as to gang crime specialist and detectives; correct?
A Correct.
Q You understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 2D as to gang crime specialists only; correct?
A Correct.
Q And you understand you're to provide binding testimony as to Topic 2E as to gang crime specialists only; correct?
A Correct.
Q You understand you're to provide binding testimony on behalf of the City of Chicago as to Topic 2F as to gang crimes only; correct?
A Correct.
Q And the same is true for Topic 2G; correct?
A Yes.
Q And you understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 2K as to detectives and gang crime specialists; correct?
A Correct.
Q And you understand you're to provide binding testimony today as to Topic 2L as to detectives and gang

crime specialists; correct?
A Correct.
Q And finally, you understand you're to provide binding testimony today as to Topic 13; correct?
A That's correct.
Q Okay. All right. Let me pull that down. Let me ask you what you did to prepare for today's deposition, sir?
A I met a few times with my -- the City's attorneys.
Q Okay. How many times did you meet with Counsel?
A Three.
Q I think you just cut out. Did you say three times?
A I did say three. Yes.
Q Okay. And who was present? Was I -- Ms. Rosen present when you met with the city?
A Yes.
Q Was anyone else present for those meetings?
A Did you ask me, who else?
Q Yes.
A Ms. Barber and Ms. Carney,
Q Anyone else -- any non-attorneys who were present at that meeting?

A Not that I'm aware of.
Q Okay. Did you -- approximately, how long did you spend in total in preparation -- strike that. Approximately how long in total did you spend across those three meetings?
A 10 hours, maybe. Maybe a little more.
Q You said 10 hours?
A Approximately.
Q Okay. And that was across those -- in total, across those three meetings; correct?
A Correct.
Q Okay. And when was the first of those three meetings? About how long ago?
A Couple weeks ago.
Q Okay. And when was the last of those meetings?
A One day.
Q Okay. Did you review any documents during the course of those meetings?
A Yes.
Q What documents did you review during the course of those meetings?
A The notice you just showed me, some general orders, some special orders. That's -- that's all I can recollect right now.

Q Approximately how many general orders and special orders did you review?
A Maybe two or three each.
Q Okay. Did you review any training materials?
A We did. Yes.
Q And what training material did you review?
A The pre-service gang specialist training.
Q Any other training materials? Did you answer?
A I did. I said, no.
Q Okay. The pre-service gang training material that you reviewed, had you ever seen that before?
A No.
Q Okay. Outside of your meetings with counsel, did you review any other documents other than during the course of your meetings in preparation for this deposition?
MS. ROSEN: I'm going to -- I just want to make a point of clarification. So when you asked about the training materials, it sounds like now, based on this question, you are assuming he reviewed them in my presence, so just to be clear --
BY MR. SWAMINATHAN:
Q I'll clarify the question, so just -- there's no ambiguity. The materials that you described

reviewing; did you review all of those materials in -- while you were meeting with counsel?

A No.

Q Okay. Did you review some of those materials outside of your time with counsel?

A Yes.

Q Which materials did you review on your own when you weren't with counsel?

A The pre-service gang training, several depositions, and some general special orders.

Q And so how many did you indicated that you had reviewed -- strike that. Did you review gang -- strike that. Did you review general orders and special orders while you were meeting with counsel?

A I believe so. Yes.

Q And then did you also review general orders and special orders on your own outside of the presence of counsel?

A Yes.

Q Were they the same materials?

A Yes.

Q Okay. What were the topics of the general orders and special orders that you reviewed whether in the presence of counsel or outside of counsel in preparation for this deposition?

A Lineup procedures. That's the only one I can really recall right this second.

Q Fair enough. Did you review any general orders or special orders related to the use of confidential informants?

A I don't necessarily know that there were any general or special orders that were on point regarding confidential informants during the time frame that we are discussing.

Q Okay. Did you review any general orders or special orders regarding confidential informants regardless of whether they were related to this time frame?

A I did not.

Q Okay. Did you review any general orders or special orders related to the use of gang or photo books?

A Did I look at any general orders or special orders regarding gang books?

Q That's right.

A Is that what you're asking? I don't believe there were any general orders or special orders pertaining to gang books in the time frame that we are discussing.

Q Okay. Are you -- outside of -- putting aside

whether it relates to this particular time frame, did you review any general orders or special orders related to gang book procedures?

A I don't believe there are any.

Q Okay. Did you review any general orders or special orders related to documentation practices or report writing?

A I believe the pre-service gang training touches on report writing.

Q Okay. So the gang -- the pre-service gang training materials you reviewed discussed some documentation or report requiring -- report writing requirements; is that right?

A Pre-service training program touches on report writing for the pre-service gang specialists.

Q Okay. Did you review any documentation -- strike that. Did you review any general orders or special orders, policies, related to documentation or report writing for detectives?

A I did not.

Q Did you view any general orders or special orders related to documentation or report writing for gang crime specialists?

A I don't believe there are any.

Q Okay. Did you --

A But I did not.

Q Oh, I'm sorry, go ahead. Sorry. Did you change your answer?

A No, I -- I did not.

Q Okay. All right. Did you -- you said you indicated that you -- strike that. Any other general orders or special orders, the subjects of which you can remember as you sit here today?

A Not as I sit here right now. No.

Q Okay. Did you review any general orders or special orders related to interviews or interrogation procedures?

A I don't believe I did. No.

Q Okay. You said you reviewed several depositions; is that right?

A I'm sorry, sir. You broke up.

Q You said you reviewed several depositions; is that right?

A Yes.

Q What depositions did you review?

A Mr. Hickey's deposition?

Q Any others?

A Ms. Sullivan's deposition.

Q Anyone else?

A Mr. Spratte's deposition?

Q Anyone else?
A Mr. Winstrom's deposition.
Q Anyone else?
A Not that I can recollect at this time.
Q Okay.
A I think they gave me more than enough.
Q Okay. How long did you spend reviewing all of those depositions of Hickey, Sullivan, Spratte, and Winstrom?
A You want me to guess? I -- I have -- I don't have any --
Q Yeah. Your approximation. I mean, I assume did it take you -- did it take several hours for you to read that material?
A Oh, easily, yes.
Q Okay. So can you give me an approximate amount of time you spent reviewing those depositions?
A I don't know. 20-30 hours, maybe.
Q Okay. So you spent some time to make sure you read through them and understood them; correct?
A Correct.
Q Okay. And how many different depositions did you review from Mr. Hickey?
A One.
Q Do you recall which case it was in?

A I do not.
Q Did you review multiple depositions for any of those individuals, Mr. Hickey, Sullivan, Spratte, or Winstrom?
A No.
Q Okay. When you reviewed the deposition of Mr. Hickey, was there any information in that deposition that you found to be false or inaccurate?
A No.
Q When you reviewed the deposition of Ms. Sullivan, was there any information you found in that deposition to be false or inaccurate?
A No.
Q When you reviewed the deposition of Mr. Spratte, was there any information that you found to be false or inaccurate?
A Not that I can recollect, no.
Q And when you reviewed the deposition of Mr. Winstrom, was there anything he said that you found to be false or inaccurate?
A Not that I can recall at this time, no.
Q Okay. Well, when you reviewed it, did you think to yourself, "That's wrong." at any point when you were reading it?
A Not that I can recall, no.

Q Okay. And when you reviewed the deposition of Mr. Spratte, was there any point as you were reading it when you said, "That's not right."
A Not that I can recall, no.
Q Okay. Okay. Any other -- other than the general orders and special orders you reviewed, the pre-service gang service training, and the four depositions that you've just identified, any other documents that you reviewed in preparation for today's deposition?
A Not that I can recall right now. There may have been a few other documents, but I just -- I don't remember what they were at this point.
Q Okay. Did you speak with anyone in preparation for today's deposition other than your meetings with counsel?
A No.
Q Did you speak with any Chicago police officers who may have experience on the topics on which you're testifying today in preparation for today's deposition?
A No.
Q Did you inform anyone in the Chicago Police Department that you'd be providing testimony on these topics today?
MS. ROSEN: I'm going to ask you to clarify that. So it's possible, because of the breadth of

your question, that you're invading attorney-client privilege.
MR. SWAMINATHAN: Let's move on. I'm not -- I don't really care. I guess I don't really care. Move on, but what I would like to do is take a quick break and use the bathroom. Why don't we take five minutes?
MS. ROSEN: Sure.
COURT REPORTER: All right. We're off the record. Time is 11:23.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little. Today is June 29, 2022, and the time is 11:30 a.m.
BY MR. SWAMINATHAN:
Q All right, sir, I want to ask you about Topic 1J in the Notice, which was a topic related to the use of confidential informants, anonymous calls, and confidential street sources as those terms are used in the applicable police reports in these cases. All right. So let me start with that Topic 1J and let me start with a terminology question. So I understand that the term, "confidential informant", could mean different

things to different people. So can you start by helping me understand what terminology, if any, exists with -- within the Chicago Police Department, for the concept of individuals who come forward and cooperate or work as informants for the Chicago Police Department?

A So as I understand it, a confidential informant is somebody that's registered, signed up, and is -- is getting paid for information that he or she provides the Chicago Police Department. So they have withstood the test of credibility and things of that nature.

Q Okay. And so that's called a -- so the term, "confidential informant", refers to this so-called registered confidential informant; is that right?

A Yes.

Q Okay. And a registered confidential informant -- what does the term "registered" mean when you refer to a registered confidential informant?

A We know the person's identity, where they live. We have -- you know, we have the ability to communicate with them and -- and things of that nature. So they're -- they're registered with the city with their name, and they're recognized as having provided accurate information on several occasions.

Q Okay. And then is there some documentation

that's retained within the police department for registered confidential informants?

A Yes.

Q Okay. And then, so in addition to registered confidential informants -- oh, so strike that. What is a cooperating individual? Is that the same thing or something different?

A Well, I -- I think there's -- there's -- it's different terms for different things, and not to get -- to muddy the waters. I think, you know, that if you're not a confidential informant, meaning you're not a formal registered informant, then you could be a street source and a street source could be confidential.

Q Okay. And so what is the -- what distinction, if any, are you identifying between those street sources that are not registered confidential informants?

A Street sources are not paid. They're not registered.

Q Okay. Any other categories or sort of names for people who fall within these categories other than registered confidential informants and cooperating individuals or street sources?

MS. ROSEN: Object to the form. You can answer.

A Those are -- those are the -- I think the

terms that are most commonly used in the police department.

Q Okay. And so a cooperating individual, are they -- is that somebody who you characterize as a street source, or is that a registered confidential informant? I guess that's the one term I was unsure about.

MS. ROSEN: Object to the form.

A I don't know that we, the police -- Chicago Police Department has a -- or a cooperating individual term. I know that -- like I -- like I said before, if you're registered as an informant or -- or a cooperating individual, if you're registered, you're getting paid. If you're a street source, you're not. So confidential informant and cooperating individual could be one and the same.

Q All right. During the period from 1986 to 1998, were there any policies that applied to the use of registered confidential informants by detectives?

A Not that I'm aware of.

Q Okay. During the period from 1986 to 1998, were there any policies that applied to the use of cooperating individuals or street sources by detectives?

MS. ROSEN: Object to the form.

A Not that I'm aware of, no.

Q Okay. During the period from 1986 to 1998, were there any policies that applied to the use of registered confidential informants by gang crimes specialists?

A None that I'm aware of.

Q And in the period from 1986 to 1998, were there any policies that applied to the use of cooperating individuals by gang crime specialists or street sources?

A So you're using cooperating individual -- cooperating individuals and street sources synonymously; Is that correct? Is that --

Q Yes, but tell me if I shouldn't. I mean, I'm not intending to deliberately mush them. I -- you tell me, would it be more appropriate for me to use just the term "street sources" in this context? Is that -- are you more comfortable with that?

A Yeah, I would -- I would think that -- I think for our purposes, a confidential informant and street sources would be -- are two -- two different -- you know, that would be a good distinguishing term.

Q Okay. So in other words, confidential informant refers to sort of this registered confidential informant who is paid, street sources basically refers to everything else; is that fair?

A Well, I don't know if -- I don't know if I would go with everything else, but a street source is somebody that doesn't get paid and provides information.

Q Okay. And if I understand correctly, other than those two general categories of registered confidential informants and street sources -- there you're not aware of any other categories that exist within the department; is that right?

MS. ROSEN: Object to the form.

A That's correct.

Q And the reason -- again, just to make sure I understand. The reason you don't want to use the "cooperating individual" is because it's ambiguous. It's not really clear which of those two groups it fits into; is that fair?

MS. ROSEN: Object to the form.

A I just think it -- cooperating individual could -- could mean a couple different things. I don't think it distinguishes between, are they paid? Have they been found credible? Have they -- so I just, I think for the police department's purposes, a street source can give you information, but it would be whoever's receiving that information to vet it a little more carefully than you, maybe you would with a confidential informant. That information would be vetted

also. But this -- I mean, when we're talking about street source, that could be somebody anonymous that phones in and provides information.

Q I think you anticipated my next question. So the things that would fall in the category of street sources would be things like, an anonymous caller who calls in; is that right?

A Correct.

Q Okay. What are other examples of the kind of people who would fall in the category of street sources?

A Street sources can be -- I think that's -- it's -- there's many different answers, but it could be somebody that a law enforcement officers had contact with in the past that provides them information just informally and says, hey, I heard this or maybe that. Or it could be, if somebody is a senior citizen walking his dog saying, "Hey, I saw this. I don't want to be involved. And -- and it was a red car." So those are all street sources. None of them are being provided compensation, but there's different levels of that information.

Q Okay. And then at what point would somebody who's been, you know, providing information informally to a detective or gang crime specialist or other investigator become -- need to be registered as a

registered CI?

MS. ROSEN: Object to the form.

A I don't -- I'm not -- I'm not completely clear what you're asking me.

Q Yeah. Is there sort of a point at which somebody is, needs to no longer be simply referred to as a street source, but needs to be registered as a confidential informant?

MS. ROSEN: Object to the form.

A Are you asking if there's a Chicago Police Department policy or practice?

Q Yeah. Thank you. Thank you for that clarification. So yeah, let's start from a policy perspective. Is there a set of circumstances that says, all right, once a certain circumstance occurs, then you need to have this person become a registered CI rather than just be a typical street source?

MS. ROSEN: Object to the form.

A There's no policy that I'm aware of regarding the morphing in -- morphing of a confidential source becoming a registered informant.

Q Okay. If somebody is going to be paid, do they then need to be a registered confidential informant if they're going to be paid?

A Yes.

Q Okay. So other than once somebody's going to be paid compensation for providing information, is there any other scenario or criteria that would say, okay, that's another scenario where you need to be registered as a confidential informant?

A Again, there's no policy about how somebody would become a registered informant as opposed to a street source.

Q Okay. And then let me go back to my original question. Are there any policies about the use of street sources by gang crime specialists?

A None that I'm aware, no.

Q Okay. And I just apologize that I don't remember if I asked this question before we went on that tangent. Are there any policies you are aware of that apply to the use of registered confidential informants by gang crime specialists?

A You got me off on that tangent --

MS. ROSEN: Objection, asked and answered.

A Can you -- can you repeat the question because you said I went on that tangent. You got me off my game.

Q Yeah, I got both of us off our game. Let me ask it again. Are there any policies you're aware of that apply to the use of registered confidential

informants by gang crime specialists?
A None that I'm aware, no.
Q Okay. Are there any policies you're aware of that apply to the documentation of the use of registered confidential informants or street sources by detectives?
A Not that I'm --
MS. ROSEN: Object to the form.
A None that I'm aware, no.
Q And are there any policies that apply to the documentation of the use of registered confidential informants or street sources by gang crime specialists?
MS. ROSEN: Object to the form.
A None that I'm aware, no.
Q Okay. And so with regard to the registration of confidential informants who are paid, would it be fair to say that registration process is something that is a practice of the police department, but out of policy in the period from '86 to '98?
MS. ROSEN: Well, no, but object to the form and beyond the scope of the 30(b)(6). If you want to confine it to detectives and gang crime specialists, fine.
MR. SWAMINATHAN: Yes, yes, so --
MS. ROSEN: But you said "police department wide" and we know that there are other policies and

practices related to Organized Crime, so.
BY MR. SWAMINATHAN:
Q Okay. So let's do it this way. So during the period of time from '86 to '98, were gang crime specialists ever part of the Organized Crime Bureau?
A Yes.
Q Okay. And during the period of time that they were part of the Organized Crime Bureau between '86 and '98 were gang -- were there any policies that applied to gang crime specialists that related to the documentation of registered confidential informants and/or street sources?
A None that I'm aware of.
Q Okay. What were the practices of gang crime specialists in the period from '86 to 1998, with regard to the use of registered confidential informants?
A Well, I know that they used them, but I don't know as to what the -- beyond that, what the practice was. I know that confidential sources are, or -- now you got me using your word. Confidential informants were being used and street sources were being used also.
Q Okay. So in period from '86 and '90 gang crime specialists did use confidential informants; correct?
A That's my understanding, yes.

Q And in the period from '86 to '98, gang crime specialists did use street sources; correct?
A My understanding, yes.
Q Okay. And it would be fair to say that in the period from '86 to '98, when gang crime specialists used confidential informants, there were no uniform policies or practices that applied to that use?
MS. ROSEN: Object. I'm sorry. Can you read back the question because I missed it.
Q I'll say it again, Eileen. In the period from 1986 to 1998, when gang crime specialists used confidential informants, would it be fair to say that there were no uniform policies or practices as to that use?
MS. ROSEN: Object to the form.
A I don't -- I agree with you that there was no policy that I'm aware of. Obviously, there was a practice of them being used. So yeah, there was a practice of them being used.
Q Understood. And -- and I guess I'm asking specifically with -- strike that. With regard to the practice of using them, were there any guidelines, directives, or other instructions, related to that use of confidential informants by gang crime specialists?
A Well, that would've been policy at that point

and there's none that I'm aware of.
Q Okay. And so --
MS. ROSEN: I'm sorry to do this. But can we take a quick break for just two minutes? Sorry.
MR. SWAMINATHAN: Yes.
COURT REPORTER: Sorry. We're off the record. The time is 11:44.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022, the time is 11:48 a.m.
BY MR. SWAMINATHAN:
Q Okay. Lieutenant Foster, are you aware of any directives or instructions given to gang crime specialists in the period from '86 to '98, with regard to their use of confidential informants?
A Okay. So I think where -- I think where I'm getting confused is gangs went -- gang specialists went to Organized Crime in 1993, I believe, and I said 1996 previously. And that when they went to -- when they went to Organized Crime in 1993, and I don't want to go on a tangent on you, they would've been covered by a Organized Crime Division order.

Q Okay. So there was some Organized Crime order that applied to gang specialist use of registered confidential informants beginning when they joined the Bureau of Organized Crime. Correct?
A In 1993. Yes. That's my recollection.
Q Okay. Okay. So let me go -- let me ask the other question then come back to that one to make sure we're clear, now that I think we're clarifying the issue. So actually, let's pull this up first and just do it that way. All right. I'm showing you the document I've marked as Exhibit 3, it's RFC 276 through 284. And the title is, Organized Crime Division Special Order 93-01, subject is Cooperating Individual Files(CI). You see that, sir?
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
A I do, sir.
Q Is this a document you reviewed in preparation for today's deposition?
A Yeah, I reviewed it a short time ago.
Q Okay. This document -- pause -- strike that. Did you review this document in the three prior meetings you had before today?
A No.
Q Did you review it as you were reviewing documents outside of those meetings before today?

A No.
Q Okay. All right. Did you see this document for the first time today?
A I did.
Q Okay. Have you had sufficient opportunity to be able to review this material in order to provide testimony on behalf of the city on the topic of the use of confidential informants today?
A I have not read it in its entirety, if that's what you're asking.
Q Are you -- do you feel prepared to testify on the topic of the use of confidential informants by the City of Chicago today? By gang crime specialists and detectives.
MS. ROSEN: Wait. Say that again. You broke up the rest of the --
Q Yeah. Sorry. With regard to the topic at issue, 1J, the use of confidential informants in the period from '86 to '98 by detectives and gang crime specialists. Are you prepared to testify on that topic today?
A Yes.
Q Okay. All right. All right. So this document that I just showed you, is this the document you're referring to regarding the policy that applied to

gang crime specialists, once they joined Organized Crime?
A Yes.
Q Okay. So if I understand correctly, for the period from 1986 to 1993, before gang crime specialists joined the Bureau of Organized Crime, there were no policies that applied to their use of confidential informants; correct?
A No, that I'm aware of. Correct.
Q Okay. And then once they joined Organized Crime in and around 1993, the policy that's listed here as Exhibit 3, began to apply to gang crimes specialists; correct?
A That's correct sir.
Q Okay. And this policy, it says, was effective as of January 7, 1993; Is that correct?
A That's correct.
Q And do you have any reason to dispute that that's when it became effective?
A No.
Q Okay. And would you agree with me that this policy applies only to the use of confidential informants or registered confidential informants and does not apply to the use of street sources?
A That's correct.

Q Okay. So for the entire period, from '86 to '98, there was no policy with regard to gang crime specialist use of street sources; correct?
A That's correct. Yes.
Q Okay. And having had a chance to review this, let me just clarify the other question that I think we've already addressed. But now that we've had a chance to review this, I want to make sure we're clear. This -- well, let me ask in a different way. This policy, exhibit 3, does not apply to Detective Division personnel; correct?
A Correct.
Q Okay. So for the period from '86 to '98, there was no policy with regard to cooperating individual files, or CIs, as identified in Exhibit 3, that applied to the use of confidential informants by detectives; correct?
A Yeah. I'm not sure I've ever seen a detective use a confidential informant, but no.
Q Okay. And this policy does not apply to the use of street sources by detectives; correct?
A That's correct.
Q Okay. Other than this policy, are you aware of any other policy documents that set forth any policy as related to the use of confidential informants or

street sources for any other groups within the Chicago Police Department, other than individuals in the Organized Crime unit?

A None that I'm aware of right now.

Q Okay. And this policy, exhibit 3, would it be fair to say applied -- well, let me ask this -- strike that. To whom did this special order, 93-01 Exhibit 3, apply?

A Well, it -- I think right away it says, the gang crime section, the asset forfeiture unit, and the intelligence section. Those are the three that they're calling out right away.

Q Okay. Okay. And were gang crime specialists trained on this policy when they joined the detective -- strike that -- were gang crime specialists trained on this policy when they joined the Bureau of Organized Crime?

A Yes.

Q Okay. And so were gang crime specialists trained on the need to register their CIs who met certain criteria as set forth in this policy?

A That's correct. Yes.

Q Okay. And other than this policy document, setting forth certain instructions about the use of confidential informants by gang crime specialists, were

there any other directives or instructions that set forth the practices that they should follow?

MS. ROSEN: Object to the form. Answer.

A The compound question is, can you simplify that a little bit for me?

Q Yeah. Again, so let me leave out some of the qualifiers. I'm focused exclusively on gang crime specialists for these questions. And I'm focused exclusively on the period once they joined Bureau of Organized Crime and this policy applied to them. Okay. So with that caveat, were there any instructions, guidelines, directives of any kind, other than this policy document, that provided guidance to gang crime specialists about what practices to follow with regard to the use of CIs?

A None that I'm aware of, no.

Q Okay. And prior to 1993, when gang crime specialists joined Organized Crime, were there any guidelines, directives, or other documents that provided guidance to gang crime specialists about the practices they should follow in using CIs?

A None that I'm aware of, no.

Q Okay. In the period between 1986 and 1993, when this policy would've first applied to gang crime specialists. So in that period from '86 to '93, what

were the practices of gang crime specialists with regard to the use of confidential informants?

A Well, obviously, like I said, they were -- they were being used in certain -- in certain type investigations and in some -- in other -- as in other investigations, I don't -- confidential sources or informants or whatever term you want to use, weren't being used in other type investigations.

Q Okay. And so in that period from '86 and '93, there were no set practices for how gang crime specialists were to use CIs. Correct?

MS. ROSEN: And just for point of clarification, you're talking about the type of confidential informant or cooperating individual, that is required to be registered or are you -- or is it broader than that?

BY MR. SWAMINATHAN:

Q No, I'm going to use only the terms "confidential informant" or "CI" or "street sources." Those are the only two categories. So CI, I'm referring to confidential informant; right? The two categories that we've identified, are you with me, Lieutenant?

A I am.

MR. SWAMINATHAN: Okay. Eileen, is that clarified?

MS. ROSEN: Yeah, I think so.

MR. SWAMINATHAN: Okay. All right. So --

MS. ROSEN: But now I've lost the question.

MR. SWAMINATHAN: Yeah, but now I'll ask the question again.

BY MR. SWAMINATHAN:

Q In the period from '86 to '93, before this policy applied to gang crime specialists, were there any set practices that were followed by gang crime specialists with regard to their use of CIs?

A None that I'm aware of.

Q Okay. And so in the period from '86 to '93, before this policy applied to them, would it be fair to say that the practices around the use of CIs by gang crime specialists was ad hoc?

MS. ROSEN: Object to the form. You haven't - - foundation.

Q Go ahead.

A Okay. Well, by ad hoc, I think you're -- I think you mean disorganized and without any type of control and I don't -- I don't necessarily know that I would agree with that.

Q Okay. So between '86 and '93 gang crime specialist use of CIs was not dictated by any set of

policies or set practices; fair?
MS. ROSEN: Object to the form. Foundation. You haven't even established that they used CIs in that time frame.
MR. SWAMINATHAN: No, he already testified that in the period from '86 to '98, gang crime specialists used CIs. We've already established that.
MS. ROSEN: In the broad period.
MR. SWAMINATHAN: Yeah. '86 to '98 specifically asked that.
MS. ROSEN: Object to the form. Foundation.
MR. SWAMINATHAN: Yeah.
A Your question is, did they use CIs?
BY MR. SWAMINATHAN:
Q No, we've already established -- you agree we've already established, they used -- gang crime specialists used CIs in the period from '86 to '98; fair?
MS. ROSEN: Object to the form.
A In certain type of investigations, yes.
Q Okay. When they used CIs in the period from 86 to 93, before they joined the Bureau of Organized Crime, there were no policies or set practices that applied to that use; fair?

MS. ROSEN: Object to the form. Foundation, beyond the scope of the 30(b)(6), if it doesn't apply to homicide. So there's still a foundation problem.
MR. SWAMINATHAN: Go ahead.
MS. ROSEN: He said, certain circumstances.
BY MR. SWAMINATHAN:
Q Go ahead.
A So again, in certain -- certain investigations they were being used, I don't believe there was any policy pre-1993. There obviously was a practice.
Q Okay. And who set the practices that applied in the period from '86 to '93 with regard to the use of confidential informants?
MS. ROSEN: Object to the form. Beyond the scope of the 30(b)(6) notice.
Q Go ahead.
A It would call for me to speculate. I don't know, but I would imagine it was the supervisors in the gang crimes section.
Q Meaning, would that be the sergeants and lieutenants?
A Yes.
Q Okay. All right. And then for the period from 1993 to 1998, were there -- let's strike that. In

the period from '86 to '93, what training, if any, was given to gang crime specialists about their use of confidential informants?
MS. ROSEN: Object to the form. Beyond the scope of the 30(b)(6), because you still haven't established that whatever he's talking about relates to homicides and that's the scope of the 30(b)(6) notice. So to the extent you know the answer to that question, you can answer.
A I don't really know.
Q Okay. Are you aware of any specific training for gang crime specialists, about their use of confidential informants in the period from '86 to '93?
MS. ROSEN: Same objection. Related to foundation and beyond the scope of the 30(b)(6) notice because you haven't established that what he is talking about applies to homicide investigation.
A The only information I have is some pre-service gang training that was dated 1996. It would be --
BY MR. SWAMINATHAN:
Q And does that the --
A -- outside the timeline that you're talking about.
Q Okay. That training that -- the pre-services

gang training you're talking about was, you said '96; correct?
A I believe so, yes.
Q Okay. Are you aware of any training existing with regard to the use of CIs by gang crime specialists prior to 1993?
MS. ROSEN: Same objection that I've been making about beyond the scope of the 30(b)(6) notice.
A None that I'm aware.
Q And are you aware of any gang crime specialist training, regarding the use of CIs prior to that 1996 training that you just referenced?
MS. ROSEN: Object to the form. Same objection with respect to beyond the scope of the 30(b)(6) notice.
A I am not.
Q Okay. And then with regard to the use of street sources, we've established that there is no -- there was no policy that applied to gang crime specialists with regard to their use of street sources, for the period of '86 through 1998; correct?
A That's correct. Excuse me.
Q And were there any set practices that applied to the use of street sources by gang crime specialists

in the period from '86 to '98?
A Well, again, you know, street sources cover -- covers a wide, wide variety of people providing information. So obviously I would say that the practice was to somehow, through a variety of methods, record that information that street sources may provide you.
Q Okay. And was that practice set -- who set that practice? Was it coming from a policy level or was it coming from the supervisors of detectives or from -- strike that. From the supervisors of gang crime specialists or the specialists themselves?
MS. ROSEN: Hold on a second. Can you either have the question read back or repeat it back?
MR. SWAMINATHAN: I'll re-ask. I'll re-ask it.
MS. ROSEN: Thanks.
BY MR. SWAMINATHAN:
Q The practice that you just described, who set that as the practice?
MS. ROSEN: Objection, beyond scope of the 30(b)(6) notice.
A I think the practice starts when you enter the Chicago Police Department Academy to record information that provided to you as a matter of any investigation.
Q Okay. So the practice during the period from

'86 next to '98, with regard to the use of street sources, was basically whatever the practices were with regard to documentation of information you're learning during the course of the investigation; is that fair?
A You would want to record information that you got from a street source that you determined to be relevant, yes.
Q Okay. And then in terms of what amount of information to collect about that street source, were there any policies or practices around that issue?
A When you say, "amount of information," can you -- can you tighten that up a little bit?
Q Yeah. Information about who they are, what their real name is, what their nickname is, where they live, any identifying information. Any past information they've provided about their reliability, all of those kinds of issues. So with that sort of -- does that make sense, what I'm saying?
A Yeah. Again, street sources are typically anonymous and they're street sources for a reason, that the information has to be vetted. And the -- the person providing that information is usually not willing to give you a lot of information about themselves.
Q Okay. You said street sources are supposed to be vetted. What do you mean by that?

A Well, for example, if I walk out of here today and somebody walks up to me and says -- points to somebody and says that gentleman just robbed a bank, I would probably not -- I would -- I would have to do further investigation before I would conduct an investigatory stop of that person. So you have to vet what they're saying. You have to -- you have to, you know, corroborate what they're saying.
Q Okay. And what is the type of, what were the type of steps detectives or gang crime specialists were expected to take to vet a street source before taking additional steps?
A You want to corroborate the information that they provided you.
Q And how were detectives expected, or gang crime specialists, expected to go about doing that?
A Well, it could be done in a multitude of ways. You could verify it via police reports. Was there -- was there a robbery using my scenario? Obviously, if there wasn't, then that information is not -- not accurate. If there was, and then the -- then that might lead you to a little more, take another additional investigatory step.
Q Okay. Ultimately, were there any policies or practices that defined what those corroborative steps

that were required when you had information that came in from a street source as a gang crime specialist or detective?
A Not that I'm aware of.
Q Okay. And so was that determination essentially made by the detectives themselves, about what amount of additional corroboration should be conducted when you get information from a street source?
MS. ROSEN: Object to the form.
A In regards to what? I mean, I think it's -- it would be kind of a case-by-case basis as to what crime we're talking about. And it could be something as minor as, they're repairing their cars in the alley against violating a city ordinance as all the way up to, you know, I saw somebody murder somebody.
Q Okay. In the period from '86 to '98, would you agree that detectives would get information from street sources in homicide cases?
MS. ROSEN: You broke up. Can you repeat it.
Q In the period from '86 to '98, did detectives get information from street sources in homicide cases?
A Sure.
Q And in the period from '86 to '98, did detectives get information from registered confidential informants?

A I've never seen that happen and I'm not aware of any confidential informant providing information directly to detectives.

Q Okay. And is there a policy that indicates that detectives are not to use registered confidential informants?

A No.

Q Okay. And so could detectives have registered confidential informants if they wanted to?

A Yes.

Q Okay. And your testimony is that, as you said here today, they could have them, but you're just not aware of if any detectives did; is that right?

MS. ROSEN: And I'm going to lodge an objection with respect to this question, because it's broader than homicide. If you want to leave it -- if you want to confine it to homicide, then I'll withdraw my objection. Otherwise it's beyond the scope of the 30(b)(6) notice.

Q Go ahead.

A I have never seen homicide detective use a confidential informant.

Q Okay. And -- excuse me. Did -- would you agree that in the period from '86 to 1998, gang crime specialists would get information from street sources

during the course of their investigations?

A Yes.

Q Okay. And would you agree with me that in the period from 1986 to 1998, gang crime specialists would sometimes assist in homicide investigations?

A Yes.

Q Okay. And when gang crime specialists assisted in homicide investigations, were they subject to the Detective Division special orders when they assisted in those homicide investigations?

A What time frame are we talking about?

Q In the period -- is there any point in the period from '86 to '98, when a gang crime specialist would be required to follow Detective Division special orders?

MS. ROSEN: You say '86 to '98, so we're back within the -- you're talking about the post-2000 thing; right?

MR. SWAMINATHAN: No.

A At no time were gang specialists, in the time frame that you just specified, part of the Detective Division. So though they would not be bound by Detective Division special orders, however, they would've been bound by Chicago Police Department, general orders.

BY MR. SWAMINATHAN:

Q Okay. So in period from '86 to '98, gang crime specialists were always subject to the general orders of the police department; correct?

A Every member of the Chicago Police Department is bound by the general orders.

Q Okay. And in the period from '86 to '98, there was no point when gang crime specialists were required to follow the Detective Division special orders; correct?

A Correct.

Q Okay. And when gang crime specialists assisted in homicide investigations, that didn't suddenly mean that the special orders for Detective Division applied to them; fair?

A Yes, that's correct.

Q Okay. And so -- and again, gang crime specialists were never trained that when they assisted in homicide investigations, they were then required to follow Detective Division policies; correct?

A Correct.

Q Okay. When gang -- did and -- fair to say, the period from '86 to '98, when gang crimes specialists assisted in homicide investigations, they would sometimes rely on street sources?

A Yes.

Q Okay. And when gang crime specialists relied on information from street sources in the period from '86 to '98 in assisting homicide investigations, were there any policies or practices that applied to that use?

A So from eight -- 1986 to 1998, gang specialist. I just want to make sure I heard this question correct. If they used a street source, there was no policy. Is that what you're asking me?

Q Were there any policies or practices that applied to their use of a street source in assisting a homicide investigation?

A No, not that I'm aware of.

Q Okay. Was there any training that was given to homicide -- strike that. Was there any training that was given to gang crime specialists assisting in homicide investigations regarding their use of street sources?

A Not that I'm aware of, no.

Q Okay. When gang crime specialists obtained information from street sources related to a homicide investigation, what documentation, if any, were they expected to create?

A Well, gang crime specialists did assist in

homicide investigations, but peripherally, and I think a lot -- in a lot of cases, they provided information to the detective orally, but ultimately they would've done a GIS report -- had -- if no other report was -- was applicable.
Q Okay. So gang crime spec -- what is a GIS report?
A Gang Investigation Section report, GIS.
Q Okay. And Gang Investigation Section reports were reports that gang specialists created; correct?
A Correct.
Q Okay. And I think you said the shorthand is GIS report; is that right?
A That's correct, sir.
Q Okay. And so a GIS report was a type of report that gang specialists would create on occasions when they assisted in homicide investigations; fair?
A Well, not necessarily. I don't -- they're not required to do a GIS, they -- a GIS report. They could have communicated with the detective whatever they needed to communicate. That wouldn't require a report. So they could have communicated orally.
Q Okay. So were there times -- strike that. If a -- were there circumstances in which a GI -- in which a gang crime specialist was required to create a GIS

report based on their assistance in a homicide investigation?
A None that I'm aware of, they were required to do a GIS report when no other report was applicable.
Q And what do you mean by that, "when no other report was applicable?"
MS. ROSEN: Anand, can you just get clarification? Because, you know, this gang crime shifts at '93, there's the shift, and so if you could just take care to make sure you're being clear on what time period. So you know, the GIS, I think, is a document that doesn't fit the whole- time frame, based on the information that we have. So just --
MR. SWAMINATHAN: All right.
MS. ROSEN: -- be -- be careful.
BY MR. SWAMINATHAN:
Q All right. Did the GIS report -- was that a report that applied to gang crime specialists before they joined the Bureau of Organized Crime?
A Yes, I believe so.
Q Okay. So did they fill out GIS reports both - - throughout the period from '86 to '98?
A I'm not -- I'm not entirely sure what they did after 1993, as far as reporting purposes -- for

reporting purposes.
Q After 1993, were there any reporting requirements -- was there any type of report that was the equivalent of a GIS report that gang specialists were required to prepare?
A 1993, they were using GIS reports.
Q I was saying after '93, when they joined Bureau of Organized Crime?
A Yes. They were using -- yes, I -- yeah. After 1993, they were using GIS reports.
Q Okay. And before 1993, you said they were using GIS reports?
A I don't believe they were.
Q Okay. I think we might have gotten confused there. Okay. So prior to 1993, are you aware of any type of report that gang crime specialists were expected to fill out related to their work?
A Yes, they were doing Patrol Division supplemental reports.
Q Okay. And in the period from '86 to 1993, when they were doing Patrol Division supplemental reports, were they required to document their assistance in homicide investigations on those reports?
A Not necessarily, no.
Q Okay. Were there -- were they required to

document their assistance in homicide investigations in any other type of report in the period from '86 to '93?
A Can you repeat that question?
Q In the period from '86 to '93, when they were filling out Patrol Division supplemental reports, was there any other type of document they were required to fill in during their assistance of homicide investigations?
A Not that I'm aware of. Not homicide investigations, no.
Q Okay. And then after 1993, when they assisted in homicide investigations, they would -- were there any other types of documents they were required to submit related to their assistance in a homicide investigation, other than a GIS report?
MS. ROSEN: Object to the form.
A None that I'm aware of.
Q Okay. And if I understand correctly, the practice was that a gang crime specialist between '93 and 1998 could either fill out a GIS report related to their assistance in a homicide investigation or share that information orally with a detective. Correct?
A I don't know that there was a -- was a conscious decision either/or, I think it was a -- it was more of a collaborative communication between a gang

specialist and detective as to hey, this is, you know, whatever information he was providing. Do you want me to do a report, or do you want to encompass that in your supplemental report? And I think that was up to the detective at that time, whether he was going to incorporate it in his report or if he wanted a separate -- post-1993, a GIS report, or supplemental report pre-1993.

Q Okay. So if -- in the period from -- well, let me ask this, because I think this is -- regardless of what type of report gang crime specialists fit -- filled in, for the entire period from '86 to -- well, strike that. Let me just build off of your last answer. Is the practice that you just described, was that the practice throughout the period from '86 to 1998, with regard to information gang crime specialists learned during the course of their assistance in homicide investigations?

MS. ROSEN: Objection, form.

A Can you tighten it up just a little bit?

Q Yep. The practice -- you just described a practice where there'd be a conversation between a gang crime specialist and a detective about who was going to document information. Correct?

A Correct.

Q And that answer applied to my question, which was about the period from '93 to 1998. So I want to clarify, is that -- was that practice also the practice in the period from '86 to 1993?

A Yes.

Q Okay. So throughout the period from '86 to 1998, the practice was that there'd be a conversation between the gang crime specialist and the detective about who was going to document certain information that might have been learned by the gang crime specialist; fair?

A Yes, the gang crime specialist would've -- it would've been the detective's choice how he wanted to document that in -- information that was provided by the gang specialist.

Q Okay. And so in the period from '86 to 1998, pertinent information learned by gang crime specialists during the court of -- course of their assistance in a homicide investigation could be documented in a gang crime specialist report or by the detectives; correct?

A Yes.

Q Okay. There was no policy that required gang crime specialists to document pertinent information they learned during a homicide investigation; correct?

A Document themselves, you mean?

Q Yes.

A That's correct. You're -- you're right. Yes.

Q And there was no policy that instructed gang crime specialists that they were required to have a conversation with detectives about what information they learned during the homicide investigation; correct?

MS. ROSEN: Object to the form.

A Yeah. Can you repeat that?

Q Yeah. The -- you described a practice of detectives and gang crime specialists having a conversation about who was going to document certain information. What I want to understand is, that back and forth, is that -- was that something that was done subject to policy, or was that the practice?

A Well, there's no policy that I'm aware of. It was just a -- a matter of sharing information and deciding how to best document it.

Q Was there any policy document in the period from '86 to 1998 that said gang crime specialists had to document pertinent information they learned during their assistance of a homicide investigation?

A None that I'm aware of.

Q Was there any policy document that instructed gang crime specialists that they had to fill out any -- a gang supplementary report or GIS of any pertinent

information they learned during a homicide investigation?

A There was no policy that I'm aware of.

Q Okay. Was there any policy that instructed gang specialists that they had to fill out a GIS or a Patrol Division special supplementary report? Strike that. Let me ask it without those unnecessary details. Was there any policy in the period from '86 to '98, 1998, that required gang specialists to document when they got information from a street source related to a homicide investigation?

A There was no policy that I'm aware of.

Q Okay. Now the practice -- in terms of practices regarding the documentation of information learned by gang specialists assisting homicide investigations, was the practices the same across areas of the police department, to the extent you know?

A As to how information was documented and shared?

Q Yes.

A Yes, I believe it was across all areas.

Q And what is the basis for that understanding?

A Well --

MS. ROSEN: Go ahead. And I'm -- actually, objection, outside the scope of the 30(b)(6)

notice, but you can answer.
A Just reading reports that I reviewed that seems to be from several different areas, so I -- I assumed it was across all areas.
BY MR. SWAMINATHAN:
Q Okay. With regard to the -- what the documents did you review that indicated to you that the practices were the same across areas of the police department?
A Some of the pre-service gang training materials.
Q Okay. And those pre-service gang training materials that you reviewed were a -- applied across all gang specialists that were working across the city. Correct?
A Well, the gang specialists in pre-service would've been -- would've graduated and been assigned across all areas or across the city, so that's my basis.
Q Yeah. Okay. And other than the gang services training that you reviewed that applied to all gang specialists across areas, are you -- what other information are you relying on to indicate the practices of gang specialists regarding documentation of their role in homicide investigations?
MS. ROSEN: Same objection, beyond the scope

of the 30(b)(6) notice, but you can answer.
A My review of Mr. Spratte's deposition.
Q Anything else?
A Not that I can --
MS. ROSEN: Same objection.
A -- not that I can think of right now.
Q Okay. In terms of the training provided to gang specialists about their assistance in homicide invest -- strike that. Did gang specialists get any formal training about their documentation related to their assistance of homicide investigations?
A Well, all I -- all I have to go on is -- is a 1996 training manual. So it would appear that they -- they've got some training about documenting information they received, but I do -- does it go into the specifics of a homicide investigation? I'm not sure it does.
Q Okay. Fair to say that the -- it's right that you're not aware of any training prior to 1996 for gang crime specialists related to their assistance in homicide investigations; fair?
A As far as training goes, is that what you're asking me?
Q Yes.
A You broke up. Yes?
Q Yes.

A Yes. You're -- you're correct, yes.
Q Okay. And are you aware of any training for gang crime specialists prior to 1996 with regard to their use of street sources?
A None that I'm aware of, no.
Q Are you aware of any training for detectives about the use of street sources in homicide investigations prior to 1996?
A Other than on-the-job, but I'm not aware of, no.
Q Okay. And I shouldn't have limited that to '96, because now we're talking with detectives. So let me ask a better question. Are you aware of any training for detectives in the period from '86 to 1998 with regard to their use of street sources in homicide investigations?
A I wasn't -- I did not have any of that stuff there -- any information -- that information reviewed, so I'm not aware of any.
Q Okay. Are you, as an agent -- as the individual designated for the Chicago Police Department, can you identify the existence of any training for homicide detectives with regard to their use of street sources in the period from '86 to 1998?
MS. ROSEN: And just so that we're clear,

you're talking about specifically street sources as distinct from training related to just witnesses generally; right?
BY MR. SWAMINATHAN:
Q Yes, go ahead.
A Yeah, that's correct.
Q Okay. And you -- you're not aware of any training for detectives in the period from '86 to 1998 with regard to the use of registered confidential informants; correct?
A Correct, yes.
Q Okay. All right. The -- I want to take a look at this policy that I've got on the screen here as Exhibit 3.
MS. ROSEN: You read it.
THE WITNESS: Yeah.
Q Can you see that if I make it a little bigger?
A Yeah. Thank you.
Q Okay. I think we established that this policy applied -- did not apply to detectives; correct?
A Correct.
Q And it applied to gang specialists once they joined the Organized Crime Division in 1993; correct?
A Correct. Yes.
Q Okay. And this document is specifically with

regard to cooperating individuals -- strike that. This policy is particularly -- applies to the use of confidential informants and not street sources; correct?
A Correct, yes.
Q Okay. And so the references to a cooperating individual or CI, in this document, is the idea of a confidential informant or registered CI as we've been using it; correct?
A That's correct, sir.
Q Okay. According to this policy, it identifies the reasons for having registered cooperating individuals. Do you see that, sir?
A What section are you at, sir?
Q I'm looking at section C in Roman numeral one.
A Ah -- see it, yes.
Q Okay. The cooperating individuals -- strike that. The policy was that I provided -- identified reasons why it was necessary to have registered cooperating individuals; correct?
A Correct.
Q Okay. And it -- and according to the policy, one of the reasons to register confident -- CIs was to document the identity of the person who was providing the information; correct?
A Correct.

Q Okay. And according to the policy, one of the reasons to register confidential informants was to be able to document their reliability; correct?
A Correct.
Q Okay. And ultimately, the credibility of the information provided by confidential informants was important to defending search warrants and other types of follow-ups that may be conducted by investigators based on information obtained from cooperating individuals, according to the policy. Correct?
MS. ROSEN: Objection to the form, but you can answer.
A I see that it supports credibility for search warrants. I'm not -- I don't see where it says -- document his or -- yeah. The other part of your question, I don't -- I don't see that. Can you tell me what number you're on?
Q Yeah, no, that is what I'm looking at. So it identifies here that one of the reasons that -- according to the policy, one of the reasons for registering confidential informants was to be able to support statements about their credibility in search warrants; correct?
A Yes.
Q Okay. And in the section right above that,

where it makes reference to reliability, what was the -- what does that mean, to say that it was important to document the reliability of confidential informants?
A Well, I would interpret it as their ability to provide accurate information.
Q Okay. And so in other words, it was documenting whether or not this person is, or historically had been, providing accurate information to police?
A Correct.
Q Okay. And then for these individuals who were identified as registered confidential informants, according to the policy -- who they were, the identity of these individuals was to be documented and collected; correct?
A Yes. For a registered informant, yes.
Q Okay. And pursuant to the policy, these registered confidential informants could still be anonymous; correct?
A Yes.
Q In other words, the police department could know who they are, but for purposes of documentation in search warrants, or other documents that may be seen by others, they could be anonymous; correct?
MS. ROSEN: Object to the form, and to your

use of the phrase "in other documents." Foundation, answer.
Q Go ahead.
A It's -- the policy says that they must be registered to be used as an anonymous source of information seeking a search warrant.
Q Okay. But you agree with me that confidential informants could be registered within the Chicago Police Department, but still retain anonymity outside of the department?
A As far as search warrants? Sure. You're not - - their -- their name's not going on the search warrant as an affiant, but --
Q And according --
A -- anonymity as far -- go ahead.
Q Go ahead. Sorry.
A Anonymity as far as something else is far too broad for me to comment on.
Q Okay. Looking at the policy, and this is in section two -- oh, sorry, section 3(b), the policy specifically indicates that police officers can reassure cooperating individuals that their identities will be carefully concealed. Do you see that, sir?
A I do, sir.
Q Okay. And was that also the practice, that

gang specialists and others would inform confidential informants that their information -- their identities could be concealed?

MS. ROSEN: Objection, form, incomplete. Hypothetical, I guess, because it's confined to search warrants, and you keep taking that out.

BY MR. SWAMINATHAN:

Q It's not -- let me ask you this. Does this policy, in section three, does it indicate that it is in any way limited to search warrants?

A Well, can you go -- I'm not -- I can't -- you're controlling the -- yeah.

MR. SWAMINATHAN: Am I supposed to look --

MS. ROSEN: Do you mind if I give him a hard copy, Anand? Do you mind if I give him a hard copy?

MR. SWAMINATHAN: Not at all. I can make it bigger or give him a hard copy, whichever you prefer.

A I'm old school. I like to look at the hard copy. Okay, so you're on section -- you're on three; right?

BY MR. SWAMINATHAN:

Q Yep.

A So you're on --

Q I'm on policy -- I'm on two, and I'm on 3(b), but you can take a look at the entire policy.

A Sure. Yeah, I would interpret that as this is -- all has to do with anonymity as far as search warrants.

Q Okay. So the -- would you say that this policy is -- applies entirely to and exclusively to the use of registered confidential informants for search warrants?

A Well, I -- I would say that's the primary thrust of it, yes, because that's -- that's what Organized Crime, at that point in time, was mostly doing, was search warrants. I don't think it has -- I don't think they're touching on confidential informants, as far as investigations are involved.

Q Okay. So this policy that is Exhibit 3 applied to the use of registered confidential informants by gang specialists in the period from '93 to '96, with regard to their use in support of search warrants. Correct?

A I think that's the primary function of this order. That's correct, yes.

Q Okay. Did this policy apply to the use of registered confidential informants by gang specialists in their assistance in homicide investigations?

A Well, I don't have the luxury of reading every pages, but as I'm paging through it seems -- the common theme of it seems to be search warrants.

Q Okay.

A So I don't necessarily know that it would have applied to homicide investigations.

Q Okay. All right. Okay, pull this down. With regard to detectives and their use of street sources, were there any policies that applied -- strike that. With regard to the detectives in the period from '86 to 1998 in homicide investigations, was there any practice of having detectives cultivate street sources?

MS. ROSEN: Object to the form, but you can answer.

A That's an interesting question. When you say "detectives," in general, or homicide detectives?

Q Yeah. Let's focus on -- let's make it an easier question. Let's focus on homicide. In the period from '86 to 1998, were homicide detectives trained to cultivate street sources?

A No.

Q In the period from '86 to 1998, was there a practice of detectives cultivating street sources?

MS. ROSEN: Object to the form.

A Yeah, I -- my answer would be cultivating is

not a good word. I think that detectives were receptive to receiving information about investigations they were conducting, but were they cultivating it by -- by whatever means they -- they thought might work? I don't know that was -- that was happening.

Q Okay.

A I mean, I know it wasn't.

Q In the period from '86 to 1998, when detectives received information from street sources, the practice was to vet that information. Correct?

A I think that's only prudent, yes.

Q Okay. And so was there any policy that set -- that applied to detectives receiving information from street sources that required them to vet the reliability of the information from street sources?

A Other than there's -- there's policy, obviously, you want to conduct a thorough investigation, but specifically on point about street sources? No.

Q Okay. And was there any -- strike that. Was there any policy document that set forth the obligation of detectives to document information received from gang crime specialists during the course of a homicide investigation?

A I'm sorry, I got distracted. Sorry. Can you -- can you repeat that? I apologize. That's my fault.

Q I will, happily. Was there a policy that applied to detectives in the period from '86 to 1998 that applied to information they received from gang crime specialists?
A Not that I'm aware of, no.
Q Okay. So you're not aware of any policy that created any requirements around the documentation of information received from gang crime specialists to homicide detectives; correct?
A Other than the -- again, the policy that I quoted to conduct a thorough and fair investigation, no, not that -- nothing specific to the -- on point to receiving information from a gang specialist.
Q Okay. With regard to the gang crime, any reports created by gang crime specialists related to a homicide investigation, were there any policies that existed about how those documents would get to detectives?
A So I -- I think it's a very rare instance when a gang crime specialist would generate a report on a homicide investigation. I think almost always they would've -- the detectives would incorporate that into a sup. But in the case that a gang specialist did do a report on something regarding a homicide investigation -- what's your question?

Q When gang crime specialists created documentation related to their work assisting a homicide investigation, were there any policies that set forth how that information would get to the detectives or the Detective Division?
A Okay, good question. There is something in some manual that I reviewed, it said that the gang crime specialists will forward all the reports to a supervisor, which is the commander of the gang investigation or Gang Investigation Section will, on a case-by-case basis, determine the appropriateness of the information and make sure it gets to the detectives. So there was a -- there is a -- there was a policy in -- in play there.
Q Okay. That -- the -- what you just described, was that information you're saying was in a policy document, or something else?
A It's something that I reviewed for this -- for our meeting today. But as to what specific document, I don't know, but I know I read it. There is something about the dissemination of Gang Investigation Section reports.
Q Okay. And the thing that you read indicated that the information that gang crime specialists document in their reports should be shared with the

Detective Division if the supervisor deems it appropriate; is that right?
MS. ROSEN: And we're confining this to how -- you started this with homicide; right?
MR. SWAMINATHAN: Yeah. Yes.
MS. ROSEN: Okay.
A Yeah. There's -- there's something that -- there's -- there's a mechanism that the commanding officer or the commander would, based on what he deemed appropriate, would make -- would disseminate that information.
BY MR. SWAMINATHAN:
Q Okay. We'll come back to that. On -- let's turn to the topic of gang books, and maybe try to get through one more topic, and then maybe take lunch. We could take lunch now, or we could try to get through one more topic. Why don't you guys tell me what you think makes sense?
MS. ROSEN: Well, can we do lunch now since it --
MR. SWAMINATHAN: Yeah.
MS. ROSEN: -- arrived, which was our --
MR. SWAMINATHAN: Yeah. Yeah.
MS. ROSEN: -- distraction five minutes ago.
MR. SWAMINATHAN: Perfect.

THE WITNESS: We just need your debit card so you can pay for lunch.
MR. SWAMINATHAN: Deal. Deal.
COURT REPORTER: All right. We're off the record. The time is 12:42.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little. Today is June 29, 2022, and the time is 1:19 p.m.
BY MR. SWAMINATHAN:
Q All right. Lieutenant, did you get a chance to grab some lunch?
A I did. I'll send you the bill.
Q All right. Are you ready to go forward?
A Yes.
Q Okay. I think before we left off, we were just talking about confidential informants and street sources. I want to just ask you a couple final questions about street sources in particular. You talked about the idea that there are no particular policies that apply to -- well, strike that. Let me just ask my question. Were detectives expected to vet inform -- you indicated that detectives were expected to

vet information that they learned from street sources; correct?
A Yes.
Q Okay. Were detectives expected to vet information from street sources before arresting someone based on that information?
MS. ROSEN: Object to the form, incomplete hypothetical.
A So I think that it would be on a case-by-case basis, depending on the nature of the information, the level of detail -- excuse me. So I don't -- I don't think you can, you know, just paint that -- that -- answer that question with a -- with a broad brush.
Q So putting aside registered confidential informants for a moment, but rather only street sources, could detectives -- were there scenarios where information provided by a street source would be sufficient to arrest someone?
A Yeah.
MS. ROSEN: Object to the form. You can answer.
A Again, that would be on a case-by-case basis. I don't know the scenario that, you know, that would lead you to -- to do that. So I -- yeah, I don't know the specifics.

Q Are you aware of any instances when probable cause was established based exclusively on information obtained from a street source?
MS. ROSEN: Object to the form. You can answer.
A As I sit here right now, I can't think of any scenario. But I'm not going to -- you know, there could be a scenario.
Q Okay. But fair to say, detectives were expected to vet information from street sources before arresting someone based on that information; correct?
MS. ROSEN: Object to the form.
A Well, I would think that you'd want to vet to establish probable cause.
Q Okay. Were detectives expected to vet information from street sources before making someone a suspect in the investigation?
MS. ROSEN: Object to the form.
A Yeah, and that would be on a -- excuse me, a case-by-case basis. The nature of the information, if it was deemed relevant, would certainly, if it was accurate and -- and detailed enough, there would be -- that person that they're identifying as an offender, if that's, in fact, the information, definitely would cause somebody to be included on a suspect list.

Q Okay. Were detectives expected to vet information from street sources before making -- before subjecting someone to a custodial interrogation?
MS. ROSEN: Object to the form.
A Well, custodial interrogation would mean they're under arrest, which would be the same -- kind of the same nature. You'd have to establish probable cause to -- to effect an arrest.
Q Which would require you to vet someone before subjecting them to arrest and custodial interrogation; correct?
A Again, it'd be on a case-by-case basis. I don't know the facts, but I -- I'm sure there are some circumstances where -- that the information alone may establish probable cause based on, you know, on the level of detail and things of that nature, that -- of the -- the anonymous information, or the street source information.
Q But -- and I guess that's what I'm trying to understand. If the person provided detailed information, the vetting would be confirming that those details were correct; right?
A Well, not necessarily. I mean, it -- it's just a matter of -- again, you know, you're trying to -- you want to paint this with a very broad brush, and I

don't -- I don't necessarily know that we can do that here. I would think in most cases that you would want to vet the information, but for instance, a husband kills a wife and the -- a -- a child calls the police station and says, "My father killed my mother, and his name is -- is John Foster," I -- I would think that might be enough right there based on, statistically, that husbands kill wives, trad -- you know, and when there's a domestic- related murder. So that -- that might be a scenario where there is enough.
Q Oh --
A So I don't think you can speak in generalities is, I guess, my answer.
Q Okay. But in the typical homicide investigation, the subject of this case, we're talking about scenarios in which the use of street sources really applies in cases where you have a case where you don't know who the identities are of the individuals. You don't know -- you have people trying to provide information about somebody who's not known to the police, is not someone who's at the scene, that type of thing. Correct?
A Well to answer your question, no, most people that kill another human being don't stick around. So in most cases, we don't know who the offender -- who the

offender is right away.
Q Okay. Were -- I'm sorry, go ahead.
A No, go ahead.
Q Were detectives expected to vet information from street sources before putting them in lineups?
A Well, again, I mean, if -- if the persons in a lineup, unless he's in the police station voluntarily, he would've been under arrest. And again, that would be a custodial event, so it would be the same answer.
Q Okay. Were detectives expected to vet information from street sources before putting someone in a photo array?
A Well, I think that's a little more of a tricky question there. One could argue that if the -- if the street source provided a very accurate, specific information, that may be enough to put somebody in a photo array. There's nobody in custody. And if you've got a good witness, I don't see a problem with that.
Q Okay. So if the witness provided detailed and what seemed like reliable information, that would be a scenario where a detective could put that person into a photo array on that basis?
A Well --
MS. ROSEN: Object to the form, but you can answer.

A Okay. So we've gone from street source to witness.
Q Oh, I'm sorry. I didn't mean to do that. No. I didn't. That was -- that's a misstatement by me. So let me -- I didn't mean to cut you off, but that was an error in my question. I did not mean to change the subject matter. So let me re-ask the question. If I understand your testimony, where a street source provided information that was sufficiently detailed or had some indicia of reliability, detectives could -- it would be appropriate for a detective to then put that person into a photo array?
MS. ROSEN: Object to the form.
A Again, I think that it's on a case-by-case basis, but if a street source was making himself a witness or maybe some kind of third-party involvement, yeah. You could put somebody in a photo array and show him to a potential witness.
Q Okay. And if I understand your testimony, you'd be looking for some indicia of reliability or detail before doing so; correct?
A Yeah. I mean, you know, when we talk about street sources, I would think a lot of the information comes in, honestly, via telephonically and they could -- they could say that, you know, "John F. Kennedy is the

offender and the murderer." Well, we know that that's not really accurate information and we wouldn't put a former president in a photo array.
Q But also, is it true that one of the things that does happen in these investigations is that sometimes you have people who call in anonymously and want to point somewhere or other than this source of, you know, the perpetrator. In other words, sometimes gangs know, you know, "I can provide information that's going to lead the police in a different direction."
MS. ROSEN: Object to the form.
A So again, you know, I think there's different levels of quality of street sources and anonymous information that you receive. And I think that has to be, you know, gauged by the person receiving that information.
Q Okay. And tell me what you mean by that?
A What I mean by "gauged?"
Q Yeah. What do you mean there's different levels of information that have to be gauged?
A Well, you know, going back to our anonymous people that call the police station on -- telephonically, you get people that maybe are not of a good -- in a good mental health situation that want to talk about, you know, vast conspiracies as a -- and that

could be one end of the range to another of a former girlfriend calling about her boyfriend that she saw in the news kill somebody. That she saw a video snippet on -- on social media and she's said, "I recognize this guy. That -- it's so-and-so." So one is obviously very -- not very valuable and the other potentially very valuable.
Q Okay. In other words, anonymous -- it's fair to say anonymous callers call into the police department regularly?
A Yes.
Q Okay. And would it be -- and it is often the case that information that comes in from anonymous callers doesn't pan out; is that true?
A Yes, that's true.
Q And was it known within the Chicago Police Department -- strike that. Was it known among detectives that sometimes people could call in anonymously and try to lead detectives in the wrong direction?
A Well, I sure -- I'm sure -- I'm sure that's a possibility. Yes.
Q Okay. And so one of the reasons that detectives were vetting information that came in anonymously was because often that information is

unreliable; correct?
A There's certainly an unreliability factor in anonymous phone calls. Yes.
Q And in the typical case, when detectives -- when homicide detectives get information from an anonymous caller saying, "Hey, I heard it was so-and-so," or "I heard it was so-and-so," they don't suddenly arrest that person; right?
MS. ROSEN: Object to the form. "Typical case," "suddenly," but you can answer.
A So again, it would be on a case-by-case basis. You could get a phone call that's -- that would say -- that would provide details that the public doesn't know about that case. And then they would say, "John Fosters is the offender." And because of those additional details that you know as a detective, nobody else knows, and this person is providing those, well that would increase that anonymous street source, however you want to characterize them, their credibility.
Q Okay. But -- and ultimately, what increases that credibility is the fact that they've provided information that's not otherwise publicly known? Beyond just simply saying it was so-and-so; correct?
A You're going to have to break that down for me.

Q Yeah. I guess what I identified was an example where someone calls in and says, "Hey, I heard it was so-and-so." Those are the kind of calls that do often come in, right, as anonymous calls?
A Yes.
Q And some people can provide additional details to support why they -- you know, why they say it was so-and-so, and some people cannot; right?
A Yes.
Q Okay. And where an individual can provide additional details beyond just saying it was so-and-so, that can help detectives vet the information to determine whether it's sufficient to treat somebody as a suspect, arrest them, and so on; fair?
A Fair.
Q Okay. And where somebody calls in and simply says, "I heard it was so-and-so," and hangs up the phone, would you agree with me that's not sufficient information for a detective to make an arrest; correct?
MS. ROSEN: Object to the form.
A Again, it's -- I would think it'd be on a case- by-case basis. If somebody says -- calls and says, "John Foster just killed somebody," and that's the fourth phone call you've received and it's the same information repeated, then that may be enough. That may

-- you know. So again, I don't think we can -- I don't think you can paint that with a broad brush. I think it has to be on a case-by-case basis.
Q But the important part of your example was, right, that you -- that's giving you multiple people providing you information, some of it in the immediate aftermath. And I'm -- and I completely -- in other words, what you're identifying in your responses, there's some corroboration that's taking place of any one of those callers; right? Which is that multiple other callers are also corroborating it; correct?
A Well, I think I understand what you're asking, but let me just give you a real time example of something that happened in the last couple months where there was a person that killed somebody, and five separate women all called and said it was this name that was involved in a -- that he was the shooter in this murder. And that's all they said. So yeah, I would think at that point, that would be more than enough. You've got five different women that are providing the same name that I think it would be -- the detective would be negligent not to put that person in a -- in a photo array.
Q Fair. And so I guess, and going back in that example, what made that information so powerful was that

multiple people were providing it; correct?
A Correct.
Q Okay. Now going back to my example, and maybe the way to do it is to talk without, you know, acknowledging that there can always be exceptions to every rule. Let me ask a slightly better question. In general, if someone calls as an anonymous caller and simply says, "I heard so-and-so did it." In general, that would not be sufficient for a detective to go out and subject somebody to arrest in the period from '86 to '98?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A Again, it's a case-by-case basis. I don't know that -- what other information detective may or may not have in regards to this case that you're -- you're talking about. (coughs) Excuse me. So it's hard to say. You know, if you -- because almost automatically when somebody calls and says it was so-and-so that did something, the detective's going to ask, "Well --" a follow-up question and they almost always get answered. And, you know, based on that, you're going to -- you're going to establish -- establish this person's credibility.
Q And if -- and so when -- if I understand you

correctly, when detectives would get one of these sort of anonymous calls, you know, pointing the finger at somebody, the expectation was that they would conduct some follow-up questioning to get additional information from that person; correct?
A I would say on a case-by-case basis. It may be the prudent thing to do, but again, there's -- there's - - every investigation is dynamic, and it may have its own unique set of circumstances, so that may not be necessary. I don't think that you can automatically say.
Q For example, if there's exigent circumstances crime is in progress, you may not sit around on the phone asking 10 questions: fair?
A Fair.
Q Putting aside exigent circumstances, would you agree that if a detective gets a phone call and someone anonymously points the finger at so-and-so, detectives were expected to ask follow-up information of that person; correct?
A Well, again, you know, it depends on -- it depends on the circumstances, but follow-up questions, I would think in most cases would be helpful, but there may be circumstances in which that's not possible.
Q Can you think of circumstances, other than

exigent circumstances, in which a detective wouldn't ask follow-up questions to an anonymous caller who says, "Hey, I heard it's so-and-so,"?
A Well, I think you brought up the example they hang up -- they hang up.
Q Okay. But until somebody hangs up, if they have somebody on the phone, the detectives were expected to try to get additional information from that person to be able to assess the reliability of the information; is that fair?
MS. ROSEN: Object to the form.
A Well, I guess -- I guess I would say there is -- they would try to get information. Sometimes people are calling in a very emotional state and it's hard to get information. They may -- they may ask it. They may not be able to. Maybe just screaming and, you know, emotional utterances. So I, you know, there -- there's -- there's a lot of circumstances in which you may not be able to elicit a follow-up question or answer.
Q So when detectives got an anonymous call, the practice was to ask additional follow-up information to assess the reliability of the information to the extent possible. Correct?
A Yeah. I think that it would be the most beneficial to ask follow-up questions, but again,

there's just no right or wrong way. And there's a lot of -- you know, these -- these anonymous phone calls are very fluid in their exchange of information, so you may not be able to.
Q Okay. And when additional information was obtained from the anonymous caller, that information was expected to be documented; correct?
A Documented. So again, I think that would be based on the relevant -- the relevancy of the information.
Q So if an anonymous caller called in and provided information that proved to be true, it would be important to document that information; correct?
MS. ROSEN: Object to the form.
A So I guess -- an anonymous phone caller calls and says -- provides what the detectives determined to be relevant information. Is that what you're asking?
Q Yeah. If a detective -- if somebody -- anonymous caller calls in and points the finger at so-and-so, let's start there. Is that information expected to be documented?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A So I guess to answer your question is where's this -- where is this phone call being received at?

Q Okay. So --
A You know, I mean -- go ahead.
Q No, go ahead. No, I'm sorry. I didn't mean to cut you off.
A I mean, most areas the phone call comes into a phone person. It may not be a detective, even. It could be a phone -- a person -- a police officer answering the phone and it could have came into 311. There's a whole -- there's a lot of paths that these anonymous phone calls can come in on.
Q Okay. Whatever path that information comes in on, step one is, detective gets information saying that an anonymous caller says it's so-and-so, whether they get it directly from the caller or whether they get it secondhand. Under CPD policies, is that supposed to be documented?
MS. ROSEN: Object to the form.
A I am not aware of any policy in this time frame that requires documentation of anonymous phone calls.
Q Okay. And if a detective ultimately decided to act on the information provided from an anonymous caller, would -- then would the information that came in from the anonymous caller expect to -- be expected to have been documented?

MS. ROSEN: Object to the form.
A Can you break that down a little bit?
Q Yeah. Now we have not just an anonymous phone call, but one that a detective decided to conduct some follow-up based on. At that point, are they expected to have documented the existence of that anonymous phone call?
A Well --
MS. ROSEN: Same objection. Form, but you can answer.
A I think the answer would there be, is the information relevant?
Q So a detective could conduct some follow-up based on information provided on an anonymous phone call and still potentially not document that anonymous phone call; is that right? Under CPD policy?
A Well, again, I -- there's no CPD policy regarding anonymous phone calls. So yeah, you would -- if you -- if a detective followed up on an anonymous phone tip and he determined it not to be relevant information, then you would not document that.
Q Okay. And if CPD -- and if the CPD detective received anonymous phone call and conducted some follow-up -- conducted some follow-up and found it to be reliable information, were they expected to document it?

MS. ROSEN: Reliable or relevant?
MR. SWAMINATHAN: Reliable.
MS. ROSEN: Objection, form.
A So I don't know what your definition of "reliable" is, but I prefer to use "relevant" and if it's relevant --
BY MR. SWAMINATHAN:
Q Let's do relevant. Let me -- well, I'm sorry. I'm sorry. Go ahead. I'll re-ask it. Sorry. I didn't mean to cut you off. I'll re-ask it so that -- because you said you didn't like "reliable;" right?
A Right.
Q Okay. All right. So let me re-ask it. If a detective received an anonymous phone call and deemed the information to be relevant, were they expected to document that anonymous phone call?
A Yes.
Q And would the detectives be expected to document all of the information they received from the anonymous caller?
A All-relevant information should be documented.
Q And relevant information at that point could be information that ultimately proves to be accurate that the anonymous caller provided and that proves to be inaccurate; correct?

A Well, I don't necessarily know that I agree with that. Inaccurate information is not relevant information.
Q So in other words, would you agree inaccurate information could be exculpatory information for a criminal defendant?
MS. ROSEN: Object to the form. You can answer.
A No, I don't necessarily know that I can agree with that.
Q Were detectives expected to document information that would be exculpatory to criminal defendants?
A Absolutely.
Q Okay. And in terms of whether or not information provided by an anonymous caller was inculpatory or exculpatory, that determination was up to the detectives; correct?
MS. ROSEN: Object to the form.
A Based on the information -- the relevance -- the relevancy of the information.
Q Okay. And so ultimately, whether a detective needed to document information provided by anonymous caller was up to the detective; correct?
MS. ROSEN: Object to the form.

A Based on the content of the information that he's received -- that he received, if it's relevant, he should document it. If it's not relevant, he doesn't necessarily have to document it.
Q Okay. And the determination of relevance is made by a detective, not some supervisor; correct?
A Relevant -- the -- the bar for relevancy is, is it of evidentiary value?
Q And is that bar set as a matter of policy or practice?
A I'm aware of no policy, so it's practice.
Q Okay. And that practice about whether a detective ultimately just decides that a piece of information is of evidentiary value is the determination that the detective makes on his or her own; correct?
MS. ROSEN: Object to the form.
A Well, again, a detective is not -- is not conducting a -- an investigation in a vacuum. So there are -- there's different levels of supervision that are monitoring the progress of the investigation.
Q Okay. If detectives receive information from somebody -- strike that. So if a detective put somebody in a photo array based on information provided by an anonymous caller or somebody who provides it confidentially, are they expected to document the

information they received from the anonymous caller?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A I think it would be based on -- excuse me. The relevancy of the information.
Q Okay. If the detective decided to put somebody in a photo array based on the information obtained from an anonymous caller, would -- is the detective expected to document any efforts to vet the information provided by that anonymous caller?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A Well, I think, again, it depends on the relevancy of the information.
Q If a detective received information -- strike that. If a detective decided to include somebody in a photo array based on information provided by an anonymous caller, are they expected to document the indicia of reliability of the anonymous caller that warranted putting somebody in the photo array?
MS. ROSEN: Objection, form.
A I don't -- I don't -- I think, again, it's on a case-by-case basis. And I think you have to determine the relevancy of the information that you're receiving in order to determine its value.

Q What are the types of -- you said it's on a case-by-case basis. So what are the types of cases in which a detective would be able -- would be expected to document the indicia of reliability of the information received from an anonymous caller if they decided to put somebody in a photo array based on that information?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A You're going to have to go much, much slower for me.
Q I'll do it again. You just said it's a case-by-case basis. So tell me what are the kind of cases where they would be expected to document those indicia of reliability that warranted including somebody in a photo array?
A So again, I'll go back -- I'll go --
MS. ROSEN: Objection, form. Sorry, go ahead.
A I'll go back to the husband killing the wife and a -- and a -- and a child calls. You may -- you may want to make sure -- you would need to vet that information for the purpose of a photo array. But somebody calling in saying it was June Bug that committed the murder, well, there's probably, you know, a couple thousand June Bugs in the city of Chicago. So that might be information that you want to get some --

gain some clarity and vet that. So those are -- that's what I mean by a case-by-case basis.
Q Let's turn to the subject of gang books. We talked about them briefly before. This is topic 1K in the Notice of Deposition. First of all, when I use the term "gang book," do you know what I'm referring to?
A I do, sir. Yes.
Q Okay. And do gang books also go by other names in the Chicago Police Department?
A Not that I'm aware of.
Q The term "photo book." Is that another term for gang books?
MS. ROSEN: Object to the form.
A There are different versions of photo books. There might be based on MO. Might be back in the day -- probably back in this time frame, there were guys, known robbers, that would be in a robbery book. Or known burglars that would be in a burglary book. But I think specific to our -- or germane to our conversation is gang books. And there were gang books created based on specific gangs.
Q Okay. So photo books could be by gang, photo books could be by type of crime or MO, et cetera? Does that make -- is that right?
A No. So photo books -- my understanding, photo

books is by crime, simplify, and gang books are by gang.
Q Okay. Got it. Got it. Okay. So okay. That helps me. So photo books are by crime or MO and gang books are by gang. Do I have that right?
A Yes.
Q Okay. And then I heard another term -- I've heard another term called "mug book." Is that something different or the same as one of those?
MS. ROSEN: Object to the form.
A I think we're really -- we're going in the way back machine here. I think mug books are the same as photo books.
Q Okay. All right. Okay. So first of all, starting with gang books. When were gang books -- well, strike that. With regard to -- let's start with detectives because this is a topic that applies for both detectives and gang crimes. So let me start by asking you as a general matter, how or when were gang books used in the Chicago Police Department?
A Well, again, you know, we're -- we're talking about -- I think the first time that -- in my review of materials, I saw gang books mentioned by Mr. Spratte in the '80s. So I assume that there were gang books in the '80s right up through, you know, 1993 or beyond when -- when they were -- they were disbanded. So I think for

that -- for our -- for our time frame, there were -- there was always the existence of gang books.

Q And just to be clear, in our -- and you said when they were disbanded. They weren't disbanded until well past -- you said not in the early '90s they weren't disbanded. They were disbanded much later; right?

A Yes.

Q Okay. I think you just misspoke. In our time period from '86 to 1998, gang books were used; correct?

A Correct. Yes.

Q Okay. And then can you tell me generally, how were gang books used in assistance of homicide investigations in the period from '86 to '98?

A Sure. So the detective may get assigned an -- a homicide investigation where there is a gang nexus, and they would go and ask a gang specialist about a particular gang. And from there, if there were witnesses, the gang books could be used for identification purposes if there was -- if it was properly documented. So that would be -- that would be one, you know, purpose of a gang book and how -- how it was used.

Q You said gang book could be shown to witnesses if it was properly documented. What do you mean by that?

A Well, it's my understanding that gang books were gang-specific and that each page was numbered. And then there was a line and then in the photo -- each photograph of suspects or gang members was -- was -- was numerically identified, too.

Q Okay. So in other words, there -- you could identify a specific page and location in the gang book where each photo was; correct?

A Correct.

Q Okay. And so you could document which photos or which books were shown and you could document what individuals were selected, if any; correct?

A Yes.

Q And when those books were shown, it was expected to be documented; correct?

A Is there an identification being made?

Q Does it matter?

A Well, I don't think we were documenting negative -- well, I -- we weren't documenting if an identification was -- was not being made in a -- in a gang book. So yeah, it does matter.

Q Okay. So in the period from '86 to 1998, if a gang book was shown and nobody was identified, that was not documented pursuant to practice; correct?

MS. ROSEN: Object to the form. I think

you've twisted it, but objection to form. You can answer.

A Can you repeat it?

MS. ROSEN: Yeah.

Q In the period from '86 to 1998, if nobody was identified from a gang book, was it documented?

MS. ROSEN: Was it documented or was it -- or was it required to be documented? If you're asking about the policy or if --

MS. SWAMINATHAN: I'm asking whether it was required to be documented. Yes or no?

MS. ROSEN: Okay.

A No, it was not.

BY MR. SWAMINATHAN:

Q Okay. In the period from '86 to 1998, was there any policy that required non-identifications in gang books to be documented?

A No.

Q In the period from '86 to --

A Not that I'm aware of.

Q In the period from '86 --

A Pardon me?

Q In the period from '86 to 1998, was there a practice of documenting non-identifications in gang books?

A No.

Q In the period from '86 to 1998 --

A Not that I'm aware of.

Q Sorry, you cut out at the end.

A I said no, not that I'm aware of, sir.

Q Okay. Have you seen any policy document or other written document that instructs detectives that they should document non-identifications from gang books in the period from '86 to 1998?

MS. ROSEN: Object to the form.

A Yeah. I'm unclear what you're asking.

Q Have you seen any document -- as the representative of the Chicago Police Department on this topic, you seen any document, policy or otherwise, that indicates to you that there was a requirement to document non-identifications by detectives or gang specialists from gang books?

MS. ROSEN: Object to the form.

A From 1986 to 1998? Is that correct?

Q Correct.

MS. ROSEN: And you're answering a specific policy that addressed that specific issue.

MR. SWAMINATHAN: No. No. I'm just -- you could -- but, no --

MS. ROSEN: I mean, specific practice?

BY MR. SWAMINATHAN:
Q I'll ask it again, but I -- if there's an objection to form, objection to form is okay, but I'll ask it again. Are you aware of any document, policy or otherwise -- you're saying, "Not that I'm aware of." So I want to be clear. Are you aware of any document, a policy document, or any other written document, that says you are not required to document non-identifications in photo book procedures -- gang book procedures?
A You know, my memory's failing me. I don't know. I may have reviewed a policy that said you have to document and I -- I'm not sure I'm able to distinguish this right now as we speak between photo arrays and lineups. So I'm going to go with not that I'm aware of right now, but I could be mistaken.
Q Okay. We're going to come back to photo arrays and lineup. Do you agree with me gang book procedures are not considered photo arrays or photo spreads; correct?
A Correct.
Q Okay. Photo spreads and lineups, there is a policy associated with those; correct?
A Correct.
Q Okay. And there is no policy in the period

from '86 to 1998 related to the use of gang books; correct?
A Correct.
Q Okay. And you are not aware of any policy document that requires Chicago Police detectives or gang specialists to document non-identifications in the period from '86 to 1998 from gang books; correct?
A Correct.
Q Okay. And you're not aware of any other written instruction to detectives that they are not required to document non-IDs in gang books; correct?
A Correct.
Q And as a matter of practice in the period from '86 to 1998, detectives and gang specialists would not document non-identifications in gang books; correct?
MS. ROSEN: Objection to the form.
A Can you re-ask that? I'm a little unclear.
Q In the period from '86 to '98, and again, we're focused only on that period, non-identifications -- and just to be clear, let's shorten the questions a little bit. I'm asking only about '86 to 1998 for homicide investigations, just so that we're operating within the confines of the notice. The practice was not to document non-identifications in gang books; correct?
MS. ROSEN: Object to the form.

A Correct.
Q Okay. And the training during that period from '86 to 1998 was that non-identification in gang books did not need to be documented; correct?
MS. ROSEN: Object to the form.
A I don't know that there's anything on point regarding the training.
Q Okay. With regard to positive identifications from gang books, again, in the period from '86 to 1998, focus on homicide investigations, if there's a positive identification in a gang book, what did the policy require?
A I believe that there was a -- there was requirements to notate, document if you will, the page, line, and specific picture that the witness that was viewing the gang book identified.
Q Okay. And so that was the requirement in the period from '86 to 1998 to document what page and location on the page had been selected; correct?
A Correct. There was a -- there was a page, there was a line, and there's specific picture numbers on each line.
Q Okay. And that was supposed to be documented in a Detective Division supplementary report; correct, if there was a positive identification?

MS. ROSEN: Object to the form.
A So again, it's a gang book. It could have been documented by a gang specialist; I suppose.
Q Okay. So the information could be documented either -- if it was done by a detective, it could be documented in a detective sup report. If it was done by a gang specialist, it could be documented in a gang's report; correct?
A So those are two -- those are two reports that you could use to document an identification, but there -- there are other avenues to document.
Q Okay. But either way, whichever -- which -- however it was documented, either a gang specialist or a detective that participated in that procedure was required to document the positive identification and the location of the photo that was identified; correct?
A Well, I don't know that there was a requirement. I think the policy is specific to photo arrays and lineups and you're -- I mean, I think we've established that looking at a gang book is not a photo array, so I don't know that there was a requirement, but I would certainly think that you'd want to document an identification.
Q Okay. So you agree even a positive -- even if there's a positive identification in a gang book, there

was no policy that required that to be documented; correct?
A Not that I'm aware of. No.
Q Okay. And you're saying as a matter of practice, that's what you believe detectives would do. Correct?
A Well, yeah. I would think you'd want to document the fact that you've now established a suspect.
Q Okay. You're saying, "I imagine you'd want to," but what I'm asking is, was that the practice or not in the period from '86 to 1998?
A Yes. That was the practice.
Q Okay. And was the practice to document the page and location of the photo that was identified?
A Well, again, I think we're getting into some sort of very specific information. I -- it was the practice to document that you've established a suspect. So I don't know that it was required to document the line and the page and all that to that level of detail.
Q Let's see here. Okay, this is Page 3. Okay. I'm going to show you a document I've marked as Exhibit 4. This is Bates stamped Foster 30(b)(6), 8 through 74. And the first page is titled City of Chicago Department of Police. Page 2 says Identification Procedures,. Sir, this is a document you reviewed in preparation for

today's deposition; correct?
(EXHIBIT 4 MARKED FOR IDENTIFICATION)
A Correct.
Q Okay. And this is a Detective Division training program related to identification procedures; correct?
A Correct.
Q And this is -- as a training that was provided beginning -- this was a training that was provided in 1996; correct?
A Correct.
Q Okay. And now this document consisting of 57 pages, is this -- this is essentially a packet of information that was used as related to the training provided in '96; correct?
A Yes. Correct.
Q Okay. All right. So -- and is this some -- so would this -- was this something that was provided, like, at roll call training? Was this a pre-service training? When was it provided to detectives?
A Well, right now you're showing me the half page of something. I don't know what training you're -- you're speaking about.
Q I'm talking about -- so this whole document, pages, you know, 1 through 67. Is this different

trainings, or is it one training? I'm just leafing through it here. I think this is a document you reviewed previously. If you guys have a hard copy, if that's easier, maybe you could pull that up.
MS. ROSEN: Yeah. I don't have that in the room with me. I can bring it here. I'm not sure -- well, he can answer the question, but --
BY MR. SWAMINATHAN:
Q Yeah. Why don't you see if you can answer. The first question is -- and then if you can't answer it, we can go pull -- we can have Eileen get that hard copy. But basically, my understanding is that this is one lesson plan related to Detective Division training on identification procedure. Is that right, or is that wrong?
A I think that's correct, from what I'm seeing.
Q Okay. And are -- and is it your understanding that this Exhibit 4 is essentially a lesson plan and associated documents that were used to train detectives about identification procedures?
A Yes.
Q Okay. And when would this training be given to detectives?
A Well, it appears to me it might be pre-service detective training.

Q okay. This was -- would you agree with me, this document, exhibit 4, is not training that was provided to gang crime specialists?
A That's correct.
Q Okay. And looking at this training, I'm looking at Foster 40. So the section that talks about identification procedures --
MS. ROSEN: Make it bigger?
MR. SWAMINATHAN: Yep. Yeah, yeah. This is section identification procedures, and it talks about photo identifications in section B. Oops. And it talks about various --
MS. ROSEN: Here, let's get the hard copy.
THE WITNESS: I'm okay.
MS. ROSEN: It's up to you.
THE WITNESS: Okay.
MR. SWAMINATHAN: Up to you. Do you want to hard -- get a hard copy? Is that easier?
MS. ROSEN: Yeah, it probably is. Can you just give me a minute to get a hard copy?
MR. SWAMINATHAN: Yeah, we'll go off the record. I'll just go -- I'll go use the rest room, too.
COURT REPORTER: All right. We're off the record. The time is 2:02.

(OFF THE RECORD)

COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster, being conducted by video conference. My name is Sydney Little. Today is June 29, 2022, and the time is 2:09 p.m.

BY MR. SWAMINATHAN:

Q I want to ask you -- I think you have the hard copy in front of you now, sir, of Exhibit 4?

A I do, yes.

Q Okay. All right. Let's go to Page 35 of that. It's Bates stamped Foster 42.

MS. ROSEN: Are you going to screen share it for everybody else or --

Q Oh, yeah, yeah. I can do that here. Okay. Okay, this is Foster 42. Are you -- tell me when you're on that page.

A I'm -- I'm there.

Q Okay. I'm asking specifically about paragraph 10 here, at the top of the page. And if you look at the -- if you look at the previous page, just for context, the previous page talks about photo spreads; right? It's not talking about gang book or photo book identification procedures. Agreed?

A Agreed.

Q Okay. So we look at paragraph 10. This is -- paragraph 10 is actually talking about gang book or photo book procedures; correct?

MS. ROSEN: Object to the form.

A Incorrect. It says photo albums. It doesn't say anything about gang books, unless I'm missing it.

Q Okay. So tell me what -- yeah. Tell -- so do you read paragraph 10 to apply to gang book procedures or not?

A No.

Q Okay. What are photo albums -- department photo albums?

A Same thing as -- it's just another term for photo books or photo or mug books. Mug, you know, books and albums are -- are one and the same.

Q Okay. So this -- these -- this training here, to the extent where it makes reference in paragraph 10 to department photo albums, does not include gang books; is that right?

A That's my interpretation. That's correct.

Q Okay. So in other words, where this training talks about documenting identifications from photo books in paragraph 10, it does not apply to gang book procedures; Is that correct?

MS. ROSEN: Object to the form.

A That's correct.

Q Okay. So in -- would you agree with me that in paragraph 10, detectives were trained that they should document positive identifications from photo books by identifying the pages shown to the witness and what photo was selected. Correct.

MS. ROSEN: Object to the form.

A Yes. If an identification was made, in -- in a photo album, as it's characterized here, they should document the book number and page number.

Q Okay. So pursuant to CPD training, detectives were expected to document the book number and page number of the identification made from photo books; correct?

MS. ROSEN: Objection, form.

A Photo albums or photo books, yes.

Q Okay. And were detectives expected to follow the training that they received?

A Sure.

Q Okay. And so the expectation was that detectives were supposed to document the book and page number of any positive identification from a photo book; correct?

MS. ROSEN: Objection, form.

A Correct.

Q Okay. And to the extent a smaller number of pages of that photo book were shown to a witness, that was also supposed to be documented in a supplementary report, according to this training; correct?

A You're going to have to slow it down a little bit. I missed -- I didn't get all that.

Q If you look at the second half of it says -- well, it says, "List in your supplementary report how many books or photos were viewed prior to the ID. It is also permissible to show two pages of the department photo book. That fact should also be noted in a supplementary report." Do you see all that in paragraph 10?

A I do. Yes.

Q In other words, the training says, "Document in a supplementary report what you actually showed the witness." Correct?

MS. ROSEN: Object to the form.

A Correct.

Q And then it also says, "And then also identify the exact page." And what does it say? "Page -- document the book number and page number of the actual identification." Correct?

A Correct. Yes.

Q And it was the expectation that Chicago police

officers followed the training in paragraph 10; correct?
A Correct, yes.
Q Okay. And there was no training, however, about the performance of gang book identification procedures; correct?
MS. ROSEN: Object to the form.
A That's correct. Yes.
Q Okay. And the training did not require detectives to document any gang books that were shown to witnesses; correct?
A There's no --
MS. ROSEN: Object to the form.
A There's no mention of gang books in this training presentation.
Q Okay. And so there was no expectation that detectives document what photos were shown, or what pages of a gang book were shown to a witness or what -- or the location of any positive identification. Do I understand you correctly?
MS. ROSEN: Object to the form, foundation, as to detectives and gang books.
A That's correct, sir, yes.
Q Okay. Do you have any understanding of why the Chicago police Department had a different -- had required a specific training about how they were to go

about documenting photo book identifications, that did not apply to gang book identifications?
MS. ROSEN: Object to the form.
A I -- I can only -- no. I can only speculate.
Q Okay. In terms of gang book -- would you agree that gang -- the procedure followed as a matter of practice in performing a gang book identification procedure and a photo book identification procedure was the same?
MS. ROSEN: Object to the form, foundation, as to detectives' use of gang books.
A Can you repeat that question please?
Q Yeah. The process for conducting a gang book identification procedure and a photo book identification procedure was basically the same; correct?
MS. ROSEN: Object to the form, foundation.
A The process appears similar, yes.
Q In other words, basically, you have a book full of photos. You have the witness look at all the photos and see if they recognize someone; correct?
MS. ROSEN: Object to the form.
A Correct.
Q Okay. And that's true for both photo books and gang books; correct?
A Correct.

Q Okay. Now, with regard to gang books, do you agree that detectives did use gang books to assist them in homicide investigations during the period from '86 to '98?
A I do think that the detectives, with the assistance of gang specialists, use gang books. I think the gang specialists are more the driver of that -- you know, those books.
Q Okay.
A They were more the -- they're the custodians of those books.
Q Okay. The gang specialists were the custodians of the books; correct?
A Of gang books. Correct.
Q Oh, thank you. Let's clarify. Who -- did detectives keep photo books?
A In a -- in that time period that we're talking about, yes.
Q Okay. Did detectives keep gang books?
A No.
Q Did gang specialists keep photo books, in that period?
A They called them gang books.
Q Okay. So gang specialists kept the gang books; correct?

A So again, I think we talked about this. Gang specialists kept gang-specific -- they organized books by a way of gang. And the other books that the detectives had were by way of crime.
Q Got it. So the -- to put simply, a gang book is essentially a book of photos of people all known to be members of one gang; correct?
A Correct.
Q Okay. And detectives would sometimes ask to be able to use those gang books to assist them in a homicide investigation; correct?
A Yes.
Q Okay. So for example, if detectives had a witness, they could show those gang books to a witness if they had some reason to suspect the involvement of a particular gang. Correct?
A Say that again.
Q Yeah. Detectives could have a witness view a gang book if they had a reason to believe that a suspect was a member, or the perpetrator was a member, of a particular gang; correct?
MS. ROSEN: Object to the form.
A Yeah. If the detectives thought there was a gang nexus, they would go to -- they would utilize the gang book as a resource.

Q Okay. And the practice -- you agree with me, in the period from '86 to 1998, there were, unfortunately, a lot of gang-related homicides in the city of Chicago; correct?
A Correct.
Q And would you agree that in the period from '86 to '98, it was common to have cases where detectives suspected the involvement of a particular gang?
A Yes.
Q But they did not have a particular suspect?
A Correct.
Q Okay. And in those instances, the detectives could use the gang books to see if they could hone in on a particular person within a particular gang; fair?
A They would need a witness to show those books to, but fair.
Q And so would you agree with me that it was common in that period to have witnesses who may have viewed the crime but were not familiar with who the perpetrator was. But the detectives could show a gang book to that witness, to see if they could hone in on a particular suspect?
MS. ROSEN: Object to the form.
A Yeah. I'm a little unclear what you're asking there.

Q Yeah. Let me -- I'll just -- I'll ask it -- I'll ask a different question. When -- what were the different ways in which detectives might suspect the involvement of a particular gang in a given shooting?
MS. ROSEN: We'll object to the form. You can answer.
A I guess it's -- it could be anything from -- ranging from the color of the clothing to information they receive, to information where the crime occurred. There's -- you know, there's many different, you know, things that could create a gang nexus.
Q Okay. So for example, obviously, if somebody indicates that the perpetrator was wearing certain clothing affiliated with a particular gang, that could be a lead pointing to that gang; fair?
A Yes.
Q If the crime occurred in a particular gang's territory, that could be a lead about who committed the crime; correct?
A Certainly a possibility, yes.
Q And the gang affiliation of a victim could, itself, be a lead about the involvement of a particular gang; correct?
A Correct.
Q And any known rivalries or beefs between

particular gangs could be a lead as to the involvement of a particular gang; correct?
A Correct. Yes.
Q And in any one of those instances, a gang book could be shown to witnesses; correct?
MS. ROSEN: Objection, form.
A Yes, could be.
Q And there was no particular requirements of a certain amount of probable cause or otherwise to be able to show a gang book to witnesses; correct?
A No. Correct.
Q Okay. So in other words, if you had any reason to suspect a particular gang, you could show gang books of that gang and hope to see if the witness might recognize somebody to have been involved; is that fair?
A Correct.
Q Okay. And if you happen to get a positive identification from one of those gang books, then that would give you a solid lead into an individual suspect, rather just -- than just an individual gang; fair?
A You broke up a little bit at the end.
Q Yeah. If you were lucky enough to get a positive identification from one of those gang book procedures, that would then allow you to hone in on a particular suspect within that particular gang; correct?

A Yes.
Q And where there was that type of positive identification from a gang book, typically, there would need to be some additional identification procedures conducted; correct? A gang book identification is not sufficient; is that right?
A Sufficient for what?
Q Good question. Is it sufficient for purposes of arrest?
A Yes, absolutely. I mean --
Q Okay. Was it sufficient for purposes of charging, or were they -- doing either a photo array or live lineup afterward, before seeking charges?
MS. ROSEN: Object to the form.
A We don't -- the police department doesn't determine what's -- what level is sufficient for charging. The state attorney's office would. But if you're asking me, historically and traditionally, what we would do, yes, we would conduct a photo array and do a lineup.
Q Okay. And why is that?
A Back in that time.
Q Why is that?
A Pardon me?
Q Why is that?

A Great question. That's the best question you've asked so far. So this -- when -- as a detective, you have to be prepared for this case to be scrutinized at trial. A photo array is one level of identification. The lineup is another level of identification. And presumably, when this witness goes to the grand jury, that's the third level of identification. So in a gang case, like you've -- like we're speaking about today, it's traditional, almost, that the witness would flip. And then you'd have all these layers of identification to confront that witness with. So that's just a detective preparing for an adversarial proceeding, you know, five years in the future.

Q Okay. Was there an understanding at that time that additional identification procedures would have less reliability, because the person is now seeing the same face over and over again?

MS. ROSEN: Object to the form.

A I'm not -- I'm not -- I can't speak to the reliability of identifications, but I can speak to the fact that they've looked at a photo array, probably a black-and-white computer-generated photograph at that time, or maybe a -- maybe not computer-generated, but it was a black-and-white photograph. Now, they're looking at somebody in real time, face-to-face, which people's

appearance change. And so I would think those are two separate procedures that this witness could potentially say, "I made a mistake, and this is not the right person."

Q If a witness selected somebody from a gang book, was there any expectation that they signed, you know, the back of the photo or anything like that to confirm the identification?

A So it's my understanding that the gang book photographs were not to be removed from those pages. So I don't think that it would've been possible to sign those pictures, because then obviously, that would've been suggestive for the next person looking at that -- looking at that photograph.

Q If there was a positive identification from a gang book, was there any expectation that the photo be inventoried or copied in some way?

A Not that I'm aware of.

Q Okay. When detectives sought to use gang books, could they conduct the gang book procedures themselves? Were they conducted by gang specialists or by both?

A Well, my understanding of what happened is the -- like I said before, the gang specialists were the custodians of the gang books. But the investigation is

run by the detectives. So the detectives would be present for the gang books being displayed. Although, those are probably, like I said, they belong to the gang specialists or the gang section. So the detective would be -- would've been involved in it.

Q But detectives didn't have to have a gang -- detectives needed to get the gang books from the gang specialists; right? Because the gang specialists were the custodians; right?

A Yeah. They were in possession of those books, or -- or their office, or their unit was.

Q Okay. The detectives were allowed to conduct gang book procedures without having a gang specialist with them; correct?

A Yes.

Q Were gang specialists allowed to conduct gang book procedures without detectives with them in homicide cases?

A I don't believe so.

Q Okay. So --

A The -- the detectives could have delegated that -- that authority for that specific purpose. But generally speaking, detectives would've conducted their own photo arrays, or shown the gang book, or -- or things like that.

Q Okay. So when --

A I'm not a gang specialist.

Q So when gang books were shown, you'd -- the detectives -- homicide detective would get them from the gang specialist, but they would conduct the gang book procedure themselves; fair?

MS. ROSEN: Object to the form.

A I think, generally speaking, on a case-by-case basis, yes. I think that's -- that's most commonly what would happen.

Q And the only times that gang specialists were to be conducting gang book procedures and homicide cases was if the detectives specifically gave them permission to do so; correct?

MS. ROSEN: Object to the form.

A So I believe the role of the gang specialist in the time frame that we're talking about is in support of homicide investigations. So I don't think that they would've been showing gang books without some kind of consent from the detectives investigating the homicide.

Q Okay. And could gang books be shown to witnesses -- strike that. Where were gang books shown to witnesses?

MS. ROSEN: Object to the form.

A That had adequate lighting to look at the

pictures and so you could actually get an -- you know, an accurate identification. So it could be on the street, in a building, in a police station.
Q Okay. So gang books procedures were conducted on the street with witnesses; correct?
MS. ROSEN: Object to the form.
A I have read documents or -- or depositions where there were cases where the gang books were in police vehicles. So presumably, on the street.
Q Okay. And there are gang procedures can be conducted at the Detective Division area; correct?
A I think that the first sentence I didn't get. I'm sorry.
Q Yeah. Basically any -- there was no limitations on where gang book procedures could be conducted; right?
A Not that I'm aware of. That's correct.
Q And gang books were allowed to leave the gang crime's custodian and be able to go out into the field; correct?
A Yeah. The -- at the convenience of a witness of who had to be done on the street, yes.
Q Okay. All right. And how were the gang books created or populated with photos?
A Well, as I understand it, they were

photographs, Polaroids, of admitted gang members by gangs, specific to each gang. And I believe that they were updated every six months, and every year they would do some kind of synoptic -- synoptic report. I presume that's some kind of audit report.
Q Okay. And so basically, the gang books would be based on the collection of photos that the gang specialists collected as they arrested people in the course of their various gang work; correct?
A Well, I think, yeah, people under arrest were certainly a -- an avenue that they got photographs from. But I think maybe interviewing people on the street, they would get photographs of them if they admitted to being in a gang or -- or things like that. So I think there's a few ways they were getting photographs.
Q Okay. Let's take a look at Exhibit 5.
(EXHIBIT 5 MARKED FOR IDENTIFICATION)
A What is this?
Q This is Exhibit 5 --
MS. ROSEN: What? Sorry.
Q Exhibit 5, Foster 75 through Foster 279. This is the Pre-service -- the title is Pre-service Gang Specialist. You reviewed this document in preparation for today's deposition; correct, sir?
A I did so, yes.

Q Okay.
MS. ROSEN: I have a copy of that in here. Do you mind if I give it to him?
Q Yeah. Please do. So why don't we start with page -- it's Foster 105. I'm sorry, Foster 107.
A All right. Let me get there. It's -- oh, you know what? You don't have the --
MS. ROSEN: I don't have the Bates on them. Sorry. Hold on. I -- the version I have in here --
Q It's listed as Page 9 at the bottom. It's, like, a 33rd page of the document, but it says Page 9 at the bottom.
A Okay. It's -- it's titled Intelligence Group?
Q Yeah. You got it. You got it.
A Okay.
Q If you look at the second page of this, that we're looking at now, this is Page 9, Foster 107. It says, "An additional responsibility of this group is the maintenance of this section's photo books." And that's a reference to what we've been calling gang books; correct?
A Correct.
Q "As each gang arrest information card is entered into the Gang Investigation Section database, an

arrest photo is requested of the subject. When this photo is received in this section, it is placed in a photo album, according to gang affiliation." Do you see that?
A I do, sir. Yes.
Q Okay. All right. So -- and this document that we're looking at, as we said, is the pre-service training document for gang specialists; correct?
A That's correct. Yes.
Q And this page that we're looking at now is a reference to the Gang Investigation Section standard operating procedures; correct?
A Correct. Yes.
Q Okay. So basically, as a matter of training and policy, it was understood that the Intelligence Group within the gang section was expected to be creating gang books based on gang arrest information cards; correct?
MS. ROSEN: In this time frame; right?
MR. SWAMINATHAN: Yes.
A That's correct. Yes.
Q Okay. And so -- and when we say, "in this time frame," we're referring to the period from '86 to '98; correct?
MS. ROSEN: Objection then, form. This is the

1995 or '6, or whatever it is.
Q Yeah. I'm sorry. Yeah. Okay. Okay, okay. I'm sorry. So this is -- sorry. Yeah. What is the year of this policy, as you understand it? this is a policy -- these are training documents that are attached to a letter dated January 23rd, 1995; correct?
A Correct.
Q Okay. All right. Now, do you have any -- is it your understanding that this -- is it your claim that this is the first training that was provided to gang specialists, with regard to these issues? Or is it your understanding that this is an example of the training that was provided over the period from '86 to '98?
A Well, this is my understanding, is this is the training that was provided in 1995 to persons making gang specialists. I don't know that we have any documentation or documents from other -- or for prior pre-service training.
Q Okay. But gang books were maintained by the Intelligence Group of the gang section, even prior to 1995. We agree about that; right?
MS. ROSEN: Object to the form. Foundation as to Intelligence Group.
Q Yeah, that's fine. I don't mean to reference it, but gang specialists were using gang books even

before 1995; right?
A If that's your question, yes.
Q Okay. And your understanding is that this process that's described here of gathering information from gang arrests and putting them into gang books, was a process that was followed throughout the period from '86 to '98; correct?
A Yes.
Q Okay. Now the -- and ultimately, what this particular document is referencing is that one of the ways in which these gang books were created was based on photos that were obtained in conjunction with gang arrests; right?
A Correct.
Q And one of the practices in the gang division, throughout the period from '86, 19 -- to 1998, was to collect information about gang members on arrest cards, or contact cards, or information cards; correct?
A Correct.
Q Okay. And let's take a look here. Let's see. I'm going to page -- so there's a better version of this. This is Foster -- I'm going to go to Foster 251, which is going to be -- it's near the back of the packet. And it's listed, it says Page 28 at the top left corner. It's near the back. It's about -- it's

177 out of 205 pages into the document.
A Okay.
Q Do you see that?
A I'm getting there. Be patient.
MS. ROSEN: I'm having a Bates stamped version brought in while we do this.
MR. SWAMINATHAN: Okay. Cool.
A Oh, I got it.
BY MR. SWAMINATHAN:
Q Okay. All right. You see -- what is -- is this a gang arrest contact card or gang arrest information card here, that's shown on this Foster 251?
A Yes.
Q Okay. All right. So this is what's referenced in that earlier standing -- standard operating procedure that we talked about; right? Where gang specialists, when they make an arrest, they fill out one of these cards; correct?
MS. ROSEN: Can you make this a little bigger?
MR. SWAMINATHAN: Yes.
A So this looks like it's a -- not necessarily an arrest record. It's a contact record.
Q Yeah. You said they created what I -- what would they call a gang arrest information card; correct?
MS. ROSEN: Object to the form.

A It's called a Contact Analysis Record on the top two boxes. It says -- you can check if he was arrested. (coughs) Excuse me. Or if it's for information only. So it's not necessarily, you're not collecting information for somebody necessarily under arrest.
Q Let's go back to page -- what was that? 30? Find it here. This is back at page 30. The one that was marked as Page 9, it's Foster 107.
A Okay.
Q "As each gang arrest information card is entered into the Gang Investigation Section database, an arrest photo is requested." And so what I'm trying to understand is, when it refers to the gang arrest information cards, and then requesting an arrest photo at the same time, is that contact card that we looked at, that's what that's referring to; correct?
MS. ROSEN: Objection, asked and answered.
A I don't necessarily know that's, in fact -- in fact, the case. Because this -- this contact, it says, "Contact analysis record." And if it was just for arrest, you wouldn't have you marking a box off saying he was arrested.
Q Are you aware of any -- oh, I'm sorry. Go ahead.

A No, go ahead.
Q Are you aware of any other type of gang arrest information card that's referred to in that paragraph that I read related to gang intelligence?
A I'm not -- but -- I'm not, but I don't know that this -- this -- this form that you're showing is a -- is a gang arrest card. I don't -- I don't know that it is.
Q So sitting here today, you can't say one way or the other, whether that is the card that's referenced in that gang intelligence paragraph; correct?
MS. ROSEN: Objection. Objection. Mischaracterizes testimony. I think he did just say it's not.
BY MR. SWAMINATHAN:
Q Okay. I want to be clear. Are you saying under oath, sir, that you are able to say, that as a matter -- that you are able to say that is not what's referenced on -- in page Foster 107?
A Well, what I'm saying is, it's called a gang arrest card in one thing. And here it's called a Contact Analysis Record. It's not the same terminology, so which would lead me to believe that it's not the same form.
Q Okay. If you look at this packet, are -- do

you see any other document that you understand could be the gang arrest information card?
MS. ROSEN: I'm going to object. He doesn't have this thing memorized. So if you actually want him to look through it to ensure that, then we're going to have to do that. But --
MR. SWAMINATHAN: Yeah, I mean, I will just say I have a general concern that this witness is, I think, able to testify about Detective Division processes and practices and policies, but I don't believe this witness is prepared or has the experience to testify about gang subjects and is really offering me, especially on a topic like this, answers that aren't really appropriate for 30(b)(6) deposition. I mean, he should be able to tell me whether it is or whether it's not. But if he's just surmising something from the bottom of what's written on a document, that's not -- I mean, I can do that. I can make some -- I can surmise whether it is or is not, based on the bottom of a document.
MS. ROSEN: That's a --
MR. SWAMINATHAN: That's not a 30(b)(6) witness.
MS. ROSEN: You're wrong, because he's

somebody that's familiar with how the police department speaks and how they reference their documents. And it is a rare occasion where the -- in fact, I can't think of any occasion where the police department talks about one document in one place and calls it one thing and talks about it in another place and calls it another. So I mean, I - - you know, you're -- whether or not you believe he's competent enough to be a 30(b)(6) witness on gang crimes is up to you. And you can deal with that, but you're going to -- in whatever way you feel necessary. But, you know, if you -- if you're specifically asking him to find, in this packet of materials, the reference to that particular card, which quite frankly, I'm not sure what -- how it fits within this 30(b)(6) notice, but we'll set that aside for a second. Then I'm -- all I said was, "Give him a chance to look through the document.
MR. SWAMINATHAN: The notice asked specifically about how these are the gang books and how they are created.
MS. ROSEN: I understand.
MR. SWAMINATHAN: Okay, so --
MS. ROSEN: That -- okay, but--

MR. SWAMINATHAN: Yeah. Okay. So let's just clarify the issue first. Okay?
BY MR. SWAMINATHAN:
Q When this document references gang arrest information cards, do you know what it's referring to?
A Oh, you're asking -- I'm sorry. What was your question, sir?
Q When -- on Foster 107, when it references gang arrest information cards, do you know what this is referring to?
A Gang arrest card? Yes.
Q Okay. Do -- have you seen a gang arrest information card as written on Foster 107?
A I do not.
Q Sorry. Have you ever seen a gang arrest information card as that phrase is used on Foster 107?
A I believe I have. It's been a very long time ago, but I have, I believe I have.
Q The document that we just looked at that said something about contact card at the bottom, is it your understanding that that is not the gang arrest information card that you have seen before?
A My concern is, is that this card, I assume this is front and back of the card because it looks like two separate -- there's a seam there in the middle of a

page. Is this front and back of that card?
Q I can only guess, but it looks to me like it's the front and back, both printed onto one page. But I don't know. You know better than I do.
A I don't -- as I'm sitting here right now, I don't think this is a gang arrest card.
Q Okay. And then let's take a look at -- I just sort of leafed through this here. I'm on Foster 119, which is probably about seven or eight pages after that gang intelligence page.
A Okay.
Q Okay. You see where it says Attachment number 4?
A Yeah. Yeah. I'm trying to -- yes, no.
Q This is probably about -- let's see, I think it's six or seven pages after that gang intelligence page. So it's about 45 pages into the document.
A We're getting the page record here. So I can go through this a little quicker.
MS. ROSEN: What's the Bates number on it?
MR. SWAMINATHAN: It's 119.
A Okay. It looks like what you're looking for, sir.
BY MR. SWAMINATHAN:
Q Is this -- looking at page Foster 119, does

this appear to be a gang arrest information card as referenced in that paragraph about gang intelligence?
A Yes.
Q Okay. All right. So this document on 180, this is basically a card that the gang specialist would fill in at the time they were making arrests; correct?
A Correct. Now, this wouldn't be exclusively used by a gang specialist. Anybody making an arrest, I believe they had a gang nexus to fill this card in also.
Q Okay. So in other words, beat officers could also fill these in if they have a gang nexus or they have a belief that that arrestee was a member of a particular gang; correct?
A Correct.
Q Okay. And would that information then be provided to the gang intelligence unit if it was filled in by somebody other than a gang specialist?
A So at that time, there was a -- there was information being shared from the district to the Gang Investigation Section or the gang unit back and forth.
Q Okay.
A So yes, that information would've been shared.
Q Okay. So these cards, even if they were filled out by a beat officer, would've ultimately been shared to the gang intelligence section; correct?

A Correct.
Q Okay. And then the gang intelligence section would've used these cards to then request photos that they would use to populate the gang books. Do I have it right?
A Certainly that was one way that they got photographs.
Q Yes. Okay. And so that was -- and when you say that was one way, which you're pointing out, is that they could actually gather photos to include in the gang books in additional ways too; correct?
A Correct.
Q Okay. But the expectation that was -- the expectation was that when they got one of these cards for somebody, they were to request a photo and include that in the gang books; correct? As at least part of the population of the gang books; correct?
A Yes; correct.
Q Okay. All right. I'm pulling that down for a moment. Were there any policies that set forth how the gang book procedures were supposed to be conducted? In other words, here's how you show the pages. Here's something you're supposed to say to them before you show them the photos. Was there any policy that set forth any set of instructions about how to go about showing

gang books to witnesses?
A There was no policy that I'm aware of. The gang books were shown, just like you'd read a book, you know, you turn the page from left to right.
Q Were there any admonishments provided to witnesses before they viewed gang books?
A There were no admonishments at that time. They weren't required.
Q Okay. And I'm asking, of course, exclusively about the period from '86 to '98 for all of these questions. And I'm asking you the questions with an understanding that detectives are the ones who primarily conducted these gang group procedures, unless they specifically delegated the task to a gang specialist. So it could have been conducted by a gang specialist. And I guess, let me be clear. In terms of what the procedures were for conducting the gang procedure, the gang book identification, there's no difference in terms of whether it was conducted by a detective versus a gang crimes officer in terms of the practices; correct?
A Correct.
Q Okay. So in terms of those practices, then -- strike that. Was there any policy that set -- I think we've established this. But in terms of, were there any policies that set forth what was to be documented after

a gang book identification procedure was completed by a detective or a gang specialist?

A You're not -- no, there was no policy regarding identifications made from gang books.

Q Okay. And we agree there was no training about what documentation was to be created based on gang book identifications; correct?

A Training given to whom?

Q To detectives or gang crime specialists.

A Specific to gang books?

Q Yes.

A That's correct.

Q Okay. Was there any -- and then in terms of a matter of practice, what was the practice of detectives in terms of what they documented when they conducted a gang book procedure?

A It would've been the same as a photo array. You would've documented the page number and the book, the page number and the line and the specific picture.

Q Okay. So the practice was, if there was a positive identification, detectives would document the page number and the location of the photo in which book; correct?

A Correct.

Q And they would document what books were shown

or what pages of books were shown; correct?

A Correct.

Q Okay. And then in terms of the practice, was there a practice of providing any kind of -- again -- strike that. Was there any practice in terms of creating any type of inventory or evidence associated with the positive identification from a gang book?

MS. ROSEN: Object to the form. I'm not sure what you're even asking.

A He is asking --

Q No, I'll strike the question. That was confusing. Were there any -- was there any policy provided -- strike that. Was there any policy that set forth what were practices that were prohibited in terms of how you could go about showing gang books to sus -- to witnesses?

A Well, there were general orders in the police department. Those -- those would cover showing, you know, what you were prohibited doing when -- when showing -- showing a witness a gang book. So those would still be in effect.

Q What were those general orders that would -- that set forth policy in terms of restrictions on what you could do during the course of a gang book procedure?

A Well, I -- there are lineup and photo array

procedures that you still had to follow. You couldn't, you know, for example, put your finger on the picture of the person you wanted them to identify. You couldn't make it suggestive. So those policies, those are general orders, and that would cover everything.

Q Okay. All right.

MR. SWAMINATHAN: Okay. Let's move on. One second. Any -- all right.

MS. ROSEN: Did you say something we were supposed to hear?

MR. SWAMINATHAN: No, I was just mumbling to myself while I find my --

MS. ROSEN: Okay. I thought that's what it was, but I just wanted to make sure.

BY MR. SWAMINATHAN:

Q No, my apologies. All right. Let me ask you about identification procedures, and in particular, lineups, photo arrays, and other related procedures. Okay. That's another one of the topics on which you're here to testify with regard to -- for both detectives and gang crimes specialists; correct?

A Correct.

Q Okay. So let's start with some terminology first. There are live lineups; correct? You know what I'm referring to when I'm referring to live lineups?

A Yes.

Q Okay. And just tell me in your words, what is a live lineup.

A Live lineup is where the suspect is standing with additional fillers and being viewed in real time by a witness. The witness is looking at hopefully five live bodies and is going to make a determination whether he can make an identification or not.

Q Okay. And then there is something called a photo array or photo spread; correct?

A Correct.

Q And what are photo arrays or photo spreads?

A So photo spreads, in this time frame, would've been probably IR photographs, other photographs shown to a witness to see if they can make an identification.

Q Okay. And then usually it was some set of photos consisting of a suspect and approximately a handful of fillers that would be shown to a witness; correct?

A Yeah. The policy is one suspect for four fillers. So you ideally would have five people in a photo array.

Q Okay.

A Or lineup, for that matter.

Q That was true for both; right? The number of

fillers that were required in a lineup or a photo array was the same; correct?
A Correct.
Q Okay. And we've already talked about then the idea that a gang book procedure or a photo book procedure is different than a photo array; correct?
A So yeah, I think I just want to make -- I just want to make the distinction between a gang book and a photo book, which are two different things.
Q Yes. Gang book and photo books are different things, but both of them are not photo arrays or photo spreads; correct?
A Right. There's policy that speaks to a photo book but doesn't speak to a gang book.
Q Okay. And so let me make sure I understand that. Let's take a look at the policy, actually. That was my question. Let's see. Is there a policy that speaks to -- there is a policy that speaks to live lineups; correct?
A Yes.
Q And is there -- there's a policy that speaks to photo arrays; correct?
A I believe it's one and the same policy, but yes.
Q Okay. And so that was going to be my next

question. Is there any difference in terms of the policy that applied to photo arrays and lineups?
A Not that I'm aware of. No. I believe it's all the same -- same general order.
Q Okay. Okay. And then was there any separate policy that applied to photo books?
A We just looked at some training material that speaks to photo books. I don't know if that's policy, but there was training material, but it doesn't mention gang books.
Q Okay. Let's take a look at Exhibit 6. This is Foster 1 and 2. This is a document you reviewed in preparation for today's deposition; correct?
(EXHIBIT 6 MARKED FOR IDENTIFICATION)
A Well, I don't --
MS. ROSEN: You go to the top, so we know which one it is.
MR. SWAMINATHAN: Yeah. Yeah.
MS. ROSEN: Blow it up a little because it's really bad copy. Or I can have it printed and brought in.
MR. SWAMINATHAN: Either one. And this book --
THE WITNESS: Oh, I have seen this.
BY MR. SWAMINATHAN:

Q You call this -- okay. This document provides -- is entitled Interrogations, Field and Custodial, but the subject is Lineup Procedures; correct?
A Yes.
Q Okay. And it says the effective date of this procedure was March 17, 1983; correct?
A Correct. Yes.
Q Okay. So this -- and this policy covers the conduct of lineups; correct?
A Yes.
Q Okay. And would you agree with me that a subsequent policy that you looked at references photo spreads or photo arrays; correct?
A Yes.
Q Okay. This policy does not reference photo spreads. It only references lineups; correct?
A Correct.
Q Okay. So just starting with the subject of photo arrays, this policy in Exhibit 6, Foster 1 and 2 did not -- apply to lineups, but not photo arrays; correct?
A Yes.
Q And then this policy also did not apply to photo book procedures or gang procedures; correct?
A Correct.

Q Okay. All right. And then if we look at Exhibit 7 -- let me share my screen. This is another document that you looked at in preparation for today's deposition. It's General Order 83-5 -- oh, let's see. No, no, no. This is 88-18 rescinding 83-5. And the subject is Lineup Procedures. It's two pages. Foster 3-4. This is a document you reviewed in preparation for today's deposition; correct?
(EXHIBIT 7 MARKED FOR IDENTIFICATION)
A Correct.
Q Okay. And this document also references lineups, but not photo arrays or photo books or gang books; correct?
A Correct.
Q Okay. And so this policy applied to lineup, but not photo arrays; correct?
A Correct.
Q And this policy, exhibit 7, did not apply to gang books or photo books; correct?
A Correct.
Q Okay. And then let's mark this Exhibit 8. And I'm showing you now document marked Exhibit 8. It is entitled Lineup Procedures, and its Special Order 06-02, Foster 5-7. This is a document you reviewed in preparation for today's deposition; correct?

(EXHIBIT 8 MARKED FOR IDENTIFICATION)
A Correct.
Q Okay. And this document references lineups. And it also references, if I can find it here, photo spreads; right?
A Which line are you on?
Q Let me pull it up for you here. Photo spread. It's the beginning of the word there. Photo spread. Do you see that?
A Yes.
Q Okay. So this policy document references lineups and photo spreads; correct?
A Correct.
Q Okay. So this policy in Exhibit 8 applied to both lineups and photo arrays; correct?
A Correct.
Q Okay. This policy in Exhibit 8 did not apply to photo books or gang books; correct?
A Correct.
Q Okay. And so sitting here today, are you aware of any other policy that applied to the conduct of photo book procedures?
A No.
Q Okay. The only information you're aware of that provided instruction to detectives about photo book

procedures is the reference in the Detective Division training that we looked at earlier; correct?
A Correct.
Q Okay. You're not aware of anything other than that paragraph that we reviewed in Exhibit 4; correct?
A That's correct.
Q Okay. All right. Let me go through a little bit more terminology. What is a photo show-up procedure?
A That's a misnomer. So there's photo arrays. There's a lineup, and then there's a show-up.
Q Okay. So what is a show-up?
A Show-up is an on-scene identification of the offender by a witness.
Q Okay. Is there a such thing as a photo show-up?
A Are you -- I think what you're asking is maybe a single -- shown somebody a single photograph?
Q Yes. That's what I'm referencing. So first I guess let me ask you, is the term photos show-up a term that was used in the Chicago Police Department?
A I have never heard it.
Q Okay. What I -- references to show-ups are reference to an in-person or on-scene viewing of a single suspect; correct?

A Yes.
Q Okay. Was it prohibited then to conduct -- to show a single photo of a suspect to a witness?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A No, not at all.
Q So you could conduct -- you could show single photos to witnesses?
A Yeah. It's on a case-by-case basis depending on the circumstances, but there are -- there are instances where a single photograph would be appropriate for identification purposes.
Q Okay. So what are the types of circumstances - - and so when that -- when a single photo is shown, what is that referred to in terms of an identification procedure?
A I would just call it a single photograph identification.
Q Okay.
A I've never heard the term photo show-up. But to answer your question, what circumstances, a girl, let's say her ex-boyfriend kills her new boyfriend, and she says, "Yeah, I dated him for four years. I saw him every day for four years. It was John Foster that did it." She doesn't need to look at -- she knows who I am.

And is this -- we would show her a one photograph. Is this the John Foster? Are we talking about the same John Foster? Yes, we are. That would be an appropriate identification because she's seen me for four years every day. She knows -- it's just basically for confirming that we're talking about the same John Foster.
Q Okay. So that's -- that scenario you're describing is one involving -- essentially where the witness is familiar or very familiar with the suspect; correct?
A Correct.
Q Okay. And in most identification procedures and lineups and photo arrays, typically the witnesses don't know the suspect other than having observed them commit a crime; correct?
A Correct.
Q Okay. Other than the familiar face confirmation, is it fair to say that showing single photos to witnesses was not permitted?
MS. ROSEN: Object to the form.
A I don't necessarily -- I think it has to be on a case-by-case basis. There's different levels of, oh, well, you know somebody. So it may be just somebody that, you know, they've known each other for two weeks,

but that may be sufficient. Again, I don't think you -- it's one of these -- you can't paint it with a broad brush.

Q Fair. Let me ask a different question. Are there -- what are the types of circumstances in which single photo procedures were permitted other than scenarios involving a -- where the suspect was familiar to the witness?

A Well, I can't think of one right now, but I would think when there's some familial stuff -- familial relationships, it has more to do with relationships than anything else.

Q Yeah.

A It doesn't have to do with someone knowing somebody's name. You might work with somebody for three years and not really know his name. All you know him as Skip or something. And so it doesn't -- it doesn't -- it just kind of goes to the familiarity of the potential suspect.

Q Under CPD policy, were detectives permitted to show single photos of suspects to witnesses where it was a stranger identification?

MS. ROSEN: Object to the form.

A I don't know if there's a direct policy violation there to do what you just said, but I don't

think it'd be a good idea.

Q Okay. And as a matter of practice, is it the case that Chicago police detectives were not to conduct single photo viewings of suspects for witnesses in stranger identification scenarios?

A Again, I'm not -- I'm not -- I'm fairly well, you know, nuanced on the line of procedures. I don't know that if there's a policy violation there, but again, I don't know that it's a very prudent thing to do.

Q And when there were stranger identifications, when detectives were engaging in efforts to identify a suspect who was a stranger to the witness, the expectation was that they would conduct procedures like lineups or photo arrays; correct?

A Correct. Yes.

Q The expectation was that in a stranger identification scenario, they would not be showing single photos to suspects; correct?

A Again, to be on a case-by-case basis. But generally speaking, you would not want to use show a single photograph to a witness that does not know the offender.

Q Okay. As a matter of policy, there was -- I think you've indicated there was no prohibition on

single photo -- single photos being shown; is that right?

A I didn't memorize the order, but I don't remember reading a prohibition. No.

Q Okay. And as a matter of practice, there was no direction or instruction given to detectives that single photos being shown to suspects was prohibited; correct?

A Correct.

Q And as a matter of training, detectives were not trained that single photos being shown to witnesses of strangers as suspects was prohibited; Is that correct?

A I think a matter of training, they were -- they were taught that having four fillers in a suspect in a photo array is the ideal course of -- pending an identification.

Q Were they trained that it was inappropriate to conduct -- to show single photos of suspects to witnesses in a stranger scenario?

A Again, I think it's -- I think you have to do it on a case-by-case basis, but generally speaking, I think it's better to do a photo array.

Q Okay. And then, you -- a cloth -- is there such thing as a clothing lineup?

A A what?

Q A clothing lineup?

A Clothing? Clothing lineup. Is there such a thing?

Q Yes. Is that a term that's familiar to you? Clothing lineups.

A I have read it maybe two or three times in 31 years.

Q Okay. And what is a clothing lineup?

A It's where a witness identifies the clothes as what the offender was wearing at the time of offense. And let me just note that the police department, the Chicago Police Department does not count that as an identification because clothing can be changed. And the value of a clothing lineup is at best dubious.

Q Okay. So you have seen very few -- if I understand you correctly, clothing lineups are not a regular practice of the Chicago Police Department.

A Correct.

Q I think you indicated that you've probably only seen two or three ever in your 31 years.

A That's correct. It's something that's driven by the state attorney's office. They may request that, but again, I don't know of what quality that would be or what would bring to the investigation, but sometimes the

state attorney's office would want something like that.
Q Okay. And am I understand you correctly, clothing lineups were not considered something of evidentiary value within the Chicago Police Department?
A Well, I wouldn't go that far. I said it's not counted as an identification.
Q I see that --
A It could be of evidence of value. That'd be something that would be determined at trial. But the evidentiary value at the time it's happening, at the time you're doing this lineup is beyond me, but I could see a scenario where it would be valuable potentially at trial.
Q Okay. And I misunderstood you. What you're saying -- so what you said is clothing lineups were not considered a positive identification within the Chicago Police Department.
A And by the Cook County State Attorney's Office, but yes, that's correct.
Q Okay. All right. And then clothing -- there was no policy regarding the performance of clothing lineups in the Chicago Police Department; correct?
A Correct.
Q Okay. And detectives were not trained in the performance of clothing lineups; correct?

A Correct.
Q Okay. And there was no common practice of performing clothing lineups in the Chicago Police Department; correct?
A Correct.
Q Okay. And in fact, to the extent there was any discussion of clothing lineups, it was that they are not considered positive identifications done within the Detective Division; correct?
A In the police department or the state attorney's office, it's not considered a positive identification for obvious reasons.
Q Okay. Now you mentioned live show-ups before, or you referred to those as on-scene identifications; correct?
A Correct.
Q Okay. What are the circumstances in which live show-ups were permitted?
A I believe the Supreme Court's held that you have to do it within one hour of the crime being committed. The witness would look at the offender. You want to make it as less suggestive as possible. So you don't want to -- you wouldn't want to have the witness look at this -- show-up as the guy, as the offender's sitting in a police car. Maybe have him stand outside,

and they can give you an indication, yes or no, this is the person I saw commit whatever offense you're investigating.
Q Okay.
A There is a time element. There is a time element there that I think is the most critical.
Q Okay. So detective -- the policy was that you're not to conduct live show-ups unless it's essentially very short in time after the crime itself; correct?
A One hour. That's correct. Yes.
Q Okay. So that -- was the training within the police department to use one hour, essentially, as the cutoff in terms of when you could conduct a live show-up?
A Correct.
Q Okay. And then was there any -- was there a policy that set forth the circumstances in which live show-up could be conducted?
A Can you repeat that question?
Q Was there any policy document that set out the circumstances in which live show-ups could be conducted?
A I don't know if there's anything specific on point, but I believe obviously the identification procedures, that general order would be applicable to

some extent.
Q Okay. Those policies that we just looked at, that are the lineup procedures or identification procedures, they don't specifically reference live shows; correct?
A Correct.
Q Okay. And when detectives were trained, it sounds like what you're saying -- strike that. It sounds like what you're saying is when detectives were trained, they were trained not to conduct live show-ups unless it was with -- they had the person -- they had their suspect in custody, and they were within one hour of the crime; correct?
MS. ROSEN: Object to the form. And you said the word "custody" because it's a term of art.
A So yeah, obviously to do a photo array, somebody would have to be detained. Yes. That's in fact mostly accurate.
Q Okay. Was there any other circumstances in which live show-ups were permitted other than when you had somebody detained and you were within one hour of the crime?
A Well, that's a really broad question.
MS. ROSEN: Object to the form.
A Yeah. I'm not sure what you're asking.

Q Let's do it this way. Were detectives trained that other than when you were bringing somebody who was detained to the scene within one hour, that there were any other circumstances in which live show-ups were appropriate?
A Oh, I guess not.
Q Okay.
A I'm really unclear of what you're asking.
Q What I'm asking is basically, detectives were trained that when they have a suspect, they should be conducting either photo arrays or live lineups to the extent possible; correct?
A Absolutely.
Q Okay. And detectives were trained that live show-up was something can be done only in the most extraordinary circumstances where you've got your suspect detained within one hour; correct?
A Correct.
Q Okay. And they weren't trained that there were any other circumstances that they should be aware of when they should be conducting live show-ups in lieu of photo arrays or lineups; correct?
A Can you rephrase that?
Q Yes. I guess what I'm saying is one could always conceive of some exigent scenario. But what I'm

asking is: In terms of training, were detectives trained that there were any other scenarios in which they should conduct a live show-up other than the one we've discussed, within one hour of the crime?
A Yeah. I don't -- I don't think so. No.
Q All right. Okay. Let's take a look at those policies again for a moment. I'm going to ask you in particular about -- this is Exhibit 7. It's 88-18. General Order 88-18. This was the second of the three orders that we looked at. And again, I think we talked about, this is one that applied only to lineups, but not photo arrays; correct?
A Correct.
Q Okay. This policy has an effective date of September 24, 1988. You see that?
A Yes.
Q Okay. What was the time period in which this policy was in place?
A Oh, obviously started in 1988. And unless it's been rescinded by another order, it's still in place. I'm not sure. The last order we looked at, the special order, so obviously went from a general order to a special order for some reason. But unless this has been rescinded, it's still in place, but I do believe there's a more modern order.

Q Okay. And that gets to my question, which is -- let's take a look at the other one. All right. This is Exhibit 8. This is the special order on lineup procedures. And this one we talked about does cover lineups and photo spreads; correct?
A Correct.
Q And this one expressly indicates that it was rescinded in July of 2011. Do you see that?
A Yep.
Q And this has the same effective date on it, September 24, 1988. You see that?
A Yes.
Q So my question is, which one applied? Or did they apply to different groups? I mean, in other words, when -- I guess let's do it this way. What was the time period in which Exhibit 7 was applicable?
A Let's go up and look at that second order again. What's the date on it? I know it's 1988, but what day?
Q Yeah, let me pull it up. Same date, September 24, 1988.
A Okay. Okay.
MS. ROSEN: Can you put the other one back up again?
Q Yeah. They appear to have the same issue date

and same effective date.
A Correct.
Q Do you know which one is the one that went into effect in -- on September 24 of 1988, between these two policies?
MS. ROSEN: So this one rescinds '88. At the top, it says rescinds 88-18?
MR. SWAMINATHAN: This one says rescinds, yeah, 88-18.
MS. ROSEN: Correct. And then if you scroll to the bottom.
MR. SWAMINATHAN: Yeah.
MS. ROSEN: There's a screw-up in the date. So this is later.
THE WITNESS: Yeah.
MR. SWAMINATHAN: Okay.
MS. ROSEN: So this is the later one.
MR. SWAMINATHAN: So when did this one go into --
MS. ROSEN: So you asked, when did -- yeah.
BY MR. SWAMINATHAN:
Q Okay. When did this one go into effect? Do we know?
A I think 26 April 2011. It says current, in the bottom, it says current as of 26 April 2011.

MS. ROSEN: If you can scroll up. I know we figured it out somewhere and now I can't find it.

MR. SWAMINATHAN: Maybe what we can do is at some point when we take the next break, can you guys see if you can --

MS. ROSEN: Yeah.

MR. SWAMINATHAN: -- figure out the answer to that and then we can go back on the record about it.

MS. ROSEN: Yeah.

MR. SWAMINATHAN: And I'll pull it down for now and we'll come back to it.

MS. ROSEN: Okay. Yeah, we'll do that.

BY MR. SWAMINATHAN:

Q Okay. All right, let me move forward and then I'll -- and then I'll come back to it. Okay. Let me focus for a moment on the issue of live show-ups, I know we talked about them briefly just now. We will go through that quickly. We've talked about any policy that applied. In circumstances where it was feasible to conduct a lineup procedure, did the City of Chicago prohibit the use of live show-ups instead of the lineup procedures?

MS. ROSEN: Object to the form.

A So I mean, if I'm -- I want to make sure I

have this question clearer. Where you could've done a lineup, you did a show-up?

Q Right. In other words, was there -- if you had somebody who you detained and you had the ability, for example, you had sufficient probable cause to bring them to the police station and put them in a lineup, was there any policy or practice or training about the idea that well, you should conduct the lineup in lieu of the live show-up?

A There was no policy, no.

Q Okay. Was there any --

A Other than the --

Q Go ahead.

A The time constraint, that's the only -- that's really the only constraint there is as far as show-ups.

Q So I think what you've indicated is if you're outside of one hour, the practice and the training was, go do a live lineup; correct?

A Correct.

Q Okay. If you were within the one hour, was the practice that you should go ahead and do the live show- up, or that if you can wait and do a lineup, you should do a lineup instead?

A Well, if you waited, then you would be detaining him without any kind of probable cause, and

we'd be having a different conversation. So waiting is not really an option. If you're -- if somebody's telling you this is the offender, then you're going to -- you -- you have to establish probable cause somehow, and that would -- the first, most immediate way would be to do a show-up.

Q Okay. And if you had probable cause both to detain and to arrest, so you didn't need to be able to get that identification on scene, was the expectation then that the detectives would wait and conduct a lineup in lieu of a live show-up?

A So I think generally that most detectives would do a show-up. So there -- there is no policy that you'd have to wait to do a lineup. So no, there's no policy. I think if you're within that, your -- your window, your time window, that you would do a show-up.

Q Okay. Would it be permissible under Chicago policy practice or training to conduct a live show-up if the police had the suspect's photograph already so you could conduct a photo array instead?

A Again, the -- the offenders in custody, you can only detain him for so long, and a show-up would be appropriate as long as you're within your -- your -- your window, your time window.

Q Okay. So the practice and the training was,

if you're within that one-hour window, you don't need to -- it's not better or preferable to wait and do a photo array or lineup, you can go ahead and do your live show-up; is that right?

A Correct.

Q Okay. And if you got outside of that one-hour window, then you had to wait to do either the photo array or the live lineup; correct?

A Yeah. I would say that would be prudent for you to do a photo array after that. Obviously, the identification is not as fresh.

Q Okay. And if you had -- already had sufficient information to arrest the suspect, you would -- you could still go ahead and conduct the live show-up in lieu of bringing them to the police station?

A Well, again, I think I would need a little more case specifics. It would be on a case-by-case basis. But yeah, you would still do a show-up if you're within that window. You don't necessarily have to, I suppose, if you already have a probable cause, but again, you're kind of speaking on -- on a very, very broad hypothetical.

Q Okay. You identified some restrictions around the performance of live show-up. So what were the -- what was the training that was provided to detectives

about how they should go about conducting live show-ups in order to limit the suggestibility or bias in those procedures?

A Well, obviously the first one is -- is the time window. The second one is, I think, some -- some officers would -- would take an extra step to maybe take the offender out of the -- out of the police car so he wouldn't be just sitting in a car and shining a flashlight in his face. So at least you'd have a more accurate identification if the guy was -- the offender was outside the car, you could see his height, weight, see his face more clearly. Obviously, somebody's more visible outside as opposed to sitting in a vehicle. So I -- I -- I would think that you would still want to take efforts to make sure the identification is -- is accurate and, you know, it's not tainted in any way or suggestive.

Q Okay. And so what were the types -- so I think you said one of the things that was done to try to reduce suggestion or tainting was to have the witness -- have the suspect be out of the vehicle; correct?

A I don't know that there's -- I know there's no policy, as far as that goes. I'm just offering some suggestions or some things that I've seen done that would limit the suggestiveness -- the suggestiveness of

a show-up.

Q Okay. So let's again, confirm there. As a matter of policy, there was no policy document that laid out specific things that were to be done in order to ensure that a live show-up was not suggestive or tainted; correct?

A Correct.

Q Okay. And then as a matter of practice, the practice was to -- what were the practices that were followed in order to reduce taint or suggestibility of live show-ups?

A So again, there's no policy. A photo, a show-up in -- in by its very nature is suggestive. So you want to limit that. I would think as a detective, you would want to limit that as much as possible. And one example I gave is having the suspect be viewed outside of a police car instead of in the back seat of a police car, where there's a very limited opportunity to -- to view -- to view him. So that would be one opportunity or one -- one thing you could do to mitigate some of the suggestiveness of the show-up.

Q And I think you indicated one of the things that detectives were trained on is that live show-ups are inherently suggestive; correct?

A I don't necessarily know that they were

trained on it. I -- I, in fact, I know they weren't. The -- the police department's policy is if you're within one hour, you can do a show-up. I'm speaking about the reluctance, or some -- some ways, to mitigate the suggestiveness of the show-up just through experience, what I've seen done and what I've done.

Q What were other things that you saw as a matter of practice in this period from '86 to '98 to mitigate the suggestiveness of live show-ups, other than having the person out of the vehicle?

A Sure. You may -- the -- the person may have ran from the police after he committed a crime, he may have cuts, scrapes. You may -- you may want to clean him up so he doesn't have blood running down his face, things, that would be another example. But I mean, the -- the -- the examples are countless. You -- you just -- I would think that a detective would want to mitigate the inherent suggestiveness as much as possible.

Q Okay. And so ultimately, was the expectation that detectives take as many steps as they could to mitigate the risks of suggestiveness in the live show-ups when they did conduct them?

MS. ROSEN: Object to the form.

A The ultimate goal of the detective is to -- to prosecute the right person. So everything else is a --

is a means to an end.

Q Okay. In other words, I think if I understand you correctly, detectives were trained that the goal is not just to get a positive identification and get an arrest, it's to actually get the right person; correct?

A Absolutely. Yes.

Q Okay. And so were detectives trained that one of the ways to go about ensuring that you're getting to the truth, not just an arrest, is to ensure that you conduct identification procedures in a way that's uncontaminated and unsuggestive?

A As much as possible in the dynamic situation, and -- and on a case-by-case basis, yes.

Q Okay. And were the detectives trained that they should engage in certain practices, best practices, so as to try to avoid suggestion and taint in their identification procedures?

MS. ROSEN: Object to the form.

A I'm not -- I'm not -- I'm not sure what you mean by "best practices."

Q Yeah. Let me -- let's put aside the concept of best practices. Were detectives trained in practices that they should engage in to try to reduce suggestibility and taint so that they can get accurate and reliable identifications?

A Are we talking about photo arrays or are we talking about identification procedures in general?
Q I'm talking in general.
A Absolutely, yes.
Q Yeah, okay. And -- because that training applies to any kind of identification procedure. The goal is to have a procedure that doesn't just result in a positive identification, but an accurate positive identification; correct?
A Correct, yes.
Q And that applied to all identification procedures, including live show-ups; correct?
A Correct.
Q Okay. And so what other practices were detectives trained on as a way to mitigate the suggestiveness of live show-ups? Well, strike that. Were detectives -- strike that. Having asked you the questions I did, were detectives trained that they should take whatever steps they could to mitigate the suggestiveness of live show-ups when they conducted them?
MS. ROSEN: Object to the form.
A So I -- I -- my recollection is the detectives were trained about, when it comes -- when it came to show-ups, that they had a time window that they had to

be in, but as far as mitigation of suggestiveness, I think that comes with experience. They weren't trained on that. That comes -- that comes with experience.
Q Okay. Were there, other than the requirement that the live show-up could only be done within one hour of the crime occurring, were there any other requirements that existed in terms of how a live show-up procedure could be conducted?
A Not that I'm aware of, no.
Q Okay. When detectives conducted live show-ups, was there any requirement that they get approval from a supervisor before conducting a live show-up?
A Not that I'm aware of. Again, that -- I don't know how practical that would be, you only have one hour and trying to find a supervisor that would authorize that would -- would, you know, obviously work into your one hour. So --
Q Okay.
A Yeah, the quick answer is no.
Q Okay. And so were detectives trained that, hey, if you've got your person in, if you've been able to detain somebody within one hour of the crime, that ideally, you should get to the scene and do a live show-up to the extent you can?
MS. ROSEN: Object to the form.

A Can you ask that again --
Q In other words --
A -- please?
Q -- when detectives had somebody, when detectives detained somebody within one hour and so had the opportunity to conduct a live show-up, was the training that they should conduct a live show-up if they can, or they should wait and conduct a photo array or a live lineup?
MS. ROSEN: Object to the form, incomplete hypothetical.
A So I think what you're asking here is a little unrealistic. Basically, when detectives are doing show-up, it's a -- it's a -- it's a crime that, A, a detective would go out on, B, that he would respond immediately to, so that limits it to about murders or -- or shootings. And the offender being detained would be not be detained by the detectives, he would've been detained by responding police officers. So when a detective would get on the scene, and of course he would respond as quickly as he can, he would learn that there's somebody being detained and -- and then decide what investigative steps would be the most appropriate. Sorry for the tangent.
Q No, not at all. And let me ask you maybe a

different and hopefully a better question. Were detectives trained that even if you've got somebody -- in -- who's detained within one hour and you have the opportunity to conduct a live show-up, were they trained on any preference between the live show-ups versus waiting and doing a photo array or live lineup?
MS. ROSEN: Object to the form.
A No. There's -- there's -- there's no preference other than, again, detective's experience would probably drive that decision, whether to do a photo -- a photo array or -- or a show-up.
Q Okay. So ultimately, determination about whether to do the live show-up or wait and do a photo array or a live lineup is up to the detective; correct?
MS. ROSEN: Object to this form.
A Correct. Like I said, most detectives will take advantage of having somebody detained if they're within that one-hour window and do a show-up.
Q Okay. Was there -- was removing handcuffs or any other evidence of the person being detained or arrested, was that a mitigating step that detectives were trained to follow?
A Again, there's no training as far as photo show-ups. Handcuffing would be something, removing the handcuffs could be a mitigating factor, but it's also a

-- a safety factor. So I think that would definitely be on a -- a very case-specific basis, whether handcuffs should or should not be removed.
Q Okay. In terms of documentation practices, what documentation was required for live show-ups?
A Well, you would document that in -- in some type of report, that an identification was made or -- or was not made.
Q So detectives were required to document live show-ups; correct?
A Yes.
Q Okay. And they were required -- were they required to document live show-ups regardless of whether it resulted in a positive or negative identification?
A Yes.
Q Okay. And was there any policy that set forth that live show-ups required to be documented, whether they were positive or negative?
A I don't believe that we have any policy that, at this point in time, the -- the time frame that we're speaking about, that's on point about regarding photo show-ups -- show-ups.
Q Okay. And for -- when live show-ups were conducted, you indicated they were required to be documented, what information was required to be

documented for a live show-up?
A Yeah, and there's no policy regarding show-ups, but I would -- my -- my experience would tell me that you would document who was looking at the show-up, the time would be very important of the show-up, and yeah, whether an identification was made. Another possibility, again, it's not training, is that because of the nature of the crime, that being, let's say, a homicide, you know that an ET or a -- a forensic investigators on the way, and you might have him photograph the -- the offender.
Q Okay. So you indicated there was, the expectation was that one of the things that was documented was the fact that you were within the one hour to conduct the live show-up; is that right?
A Correct.
Q Okay. And then you indicated that, if I understand correctly, that usually, if there was a positive identification in the live show-up, that there should be a photograph taken of the live show-up; is that right?
A I said, that's a -- that's something that they may want to -- they -- the detective may consider.
Q Okay. If I understand correctly, you indicated live show-ups would be the kind of thing that

happened in rare instances when detectives are going to the scene immediately, like a homicide investigation; correct?
A Correct.
Q Okay. And in homicide cases, evidence technicians go to the scene as well; correct?
A Back in the -- back in the time frame we're talking about, it would've been forensic investigators, but now it's ETs. So either way, somebody -- somebody from the police department that collects evidence would've responded to the scene. Yes.
Q Okay. And so given that somebody from the evidence technician or forensic investigator was going to the scene, usually when you're conducting live show-ups in homicide investigations, there would be somebody available to take photos; correct?
A Again, it's -- it's on a -- it's on a case-by-case basis, because you are, assuming you've got an identification, it may be more beneficial to take the offender back to the area and get them out of that, get them off the scene. It just depends. If the ET's there, maybe the ET's close and maybe this -- again, it's fluid and maybe you do take that picture. But I -- it's -- it's very case-specific.
Q Was the common -- was there any practice

within the department to take photos at the scene when live show-ups occurred?
A Was there any practice?
Q Yeah. Was it the common practice to take photos at the scene in homicide cases when there was a live show-up conducted?
MS. ROSEN: Object to the form.
A No, there's no -- I -- I don't -- there's no practice. It's just a matter of, you know, availability, and -- and again, very case specific.
Q Essentially, in other words, it was up to the detectives?
MS. ROSEN: Object to the form, mischaracterizes his testimony.
A I think it's being driven by the circumstances of the investigation, as -- as opposed to the detective just making a decision. I think it has to do with, there -- there's a multitude of factors that would weigh in on whether you were going to get -- get his photograph on the scene or not.
Q You indicated that detectives were required to document when they conducted live show-ups. What information -- well, strike that. Were they required to document the time that the live show-up took place?
MS. ROSEN: Objection. Asked and answered.

A Can you ask that again, please?
Q Yeah. Were detective required to document the time that the live show-up was conducted?
A Again, there's no requirement, there's no policy on photo -- oh, boy, show-ups other than the time window. And because of that, I would -- it -- it would be most beneficial to document the time to -- that the show-up was done so it would be admissible in court.
Q Okay. Was it required to document the location at which the photo show-up took place?
MS. ROSEN: Object to the -- you -- I'm sure you didn't mean to say photos show-up.
Q I'm sorry. Let me re-ask it. You are correct. Was it required to document the location of the live show-up?
A No requirements policy-wise. Again, it would probably be in practice something that would -- would've been done. Yes.
Q Okay. Was it expected to document the persons or eyewitnesses viewing the live show-up?
A Yes, that would be an important element.
Q Was it expected to document the officers present for the live show-up?
A Well, most -- most show-ups have a lot of police officers around it. So it -- that's kind of a --

it's an ambiguous. I don't think there's any requirement.
Q Was it expected to document the person or the detective that conducted the show-up?
A Sure. Yes.
Q In
A There's no requirement or policy requirement, but it would -- it would've -- should've been something that would -- would've made the supplemental report at some point.
Q Was there an expectation that the location of the suspect was documented in a live show-up? In other words, were they in the vehicle, were they standing outside, the circumstances involving the suspect's location?
A There's no policy on that. That would've been something that would've been by a case-by-case basis.
Q So essentially, it was up to the detective, whether to document the -- no, essentially, the circumstances of the viewing opportunity?
MS. ROSEN: Object to the form.
A Again, it's not -- the detective's not making the decision, the decisions being's driven by external factors that are involved in any kind of fluid investigation.

Q But in terms of what to document, was there an expectation? Was it up to the detectives whether or not to document the circumstances of the viewing opportunity? There was a lot of light, there was no light, we were inside, we were outside, he had handcuffs on, he didn't have handcuffs on, those various circumstances of the viewing opportunity, was it up to the detective whether to document those or was the expectation that they would document those?
A So I think what you're asking is, did the detective make the decision or does the detective make the decision on what to document, and my answer would be the same. The detective -- the -- the -- the circumstances of the investigation are driving those decisions, not necessarily the detective.
Q What do you mean by that in terms of whether or not they document something? What is it about the circumstances of the investigation that decide whether they document the circumstances of the viewing opportunity?
A Sure. So let's -- let's go back to the nexus that -- that you like to talk about gang -- gang murders. So let's say that the murder happens in a very -- a Latin King's stronghold and a 26 is the offender, he shoots and kills a Latin King, and he gets caught by

a group of other Latin Kings. And now, as unlikely as this may be, they hold them for the police. Well, when the detective gets there, he may just do a quick photo -- show-up, show-up, and then get this guy off the scene as fast as he can as -- as to not start, you know, a nuclear war. So that would be an example of circumstances driving a fluid investigation. And -- and I would -- I would argue that that detective made a wise decision because additional people probably were spared from getting hurt.
Q I understood, and I'm not asking about the detective's determinations about whether to get out of there quickly, whether to linger, whether to get the guy out of the vehicle or not. I'm asking what the subsequent documentation, that's all that I'm asking about. So in the fluid situation, I understand what you're saying, which is detectives have got to make some judgment calls about how they're going to handle the circumstances and based on the fluidity of the situation. Subsequent to that, when they're sitting down and writing their report, in terms of what they're documenting about that viewing opportunity, is it up to the detective whether to document those details about the circumstances of the viewing opportunity?
A So some -- some -- some detectives document

more heavily than others, but that's -- that's on a case-by-case basis and each detective has his own style as to what -- what he feels is relevant and what is not.
Q Was it up to detective -- strike that. Was the expectation that detectives document any comments made by the witnesses viewing a live show-up?
A I don't know if there was any expectation. Again, each detective had his own -- has his own style and some are more document-heavy than others.
Q Was the expectation that detectives document any statements about the level of confidence made by a witness during a live show-up?
A In this time frame that we're speaking of, those -- that was not an element that was something that was asked, it was either a positive identification or it wasn't. So those -- that wouldn't have been -- if the person made an identification, that was -- that was an identification.
Q Okay. So in this time period from '86 to '98, it was either a positive identification or a negative identification; correct?
A Correct.
Q Detectives were not instructed to document tentative identifications or confident statements about identifications; correct?

A Correct.
Q And that's true, not only for live show-ups, it's also true for photo arrays and live lineups as well; correct?
A During this time period.
Q Okay. In other words, in the period from '86 to 1998, when detectives conducted live lineups or photo arrays, they documented them either as positive identifications or negative identifications; correct?
A Correct.
Q In the period from '86 to 1998, detectives documented -- when detectives documented photo arrays and live lineups, they would not document if it was attentive of identification or other statements about the confidence level of the identification; correct?
A They would not, that's correct.
Q Okay. And that was a matter of both training and practice at that time, '86 to 1998; correct?
A Correct.
MS. ROSEN: Object to the form.
Q And to the extent identification procedures were conducted by gang specialists, that was also true for gang specialists; correct?
MS. ROSEN: Object to the form, foundation as to gang crime specialist conducting lineups.

A Can you re-ask that question, please, sir?
Q Yeah. To the extent gang specialists were involved in the performance of any type of identification procedure, the same is true for them; right? There was no expectation that they document anything other than positive identification or negative identification in this time period; correct?
MS. ROSEN: Objection, form and foundation as to documentation, but --
A That's correct. The same general orders that guide the detectives would've been -- would've bound the gang specialists as well.
Q Okay. So to the extent gang specialists participated in an identification procedure between '86 and 1998, they would not document tentative identifications or statements about the confidence level of identification; correct?
MS. ROSEN: Objection, form and foundation.
A Correct.
Q Okay. We're -- going back to the live show-ups, were detectives given any -- were detectives expected to document any instructions that they gave to the witnesses before viewing a live show-up?
A No.
Q Okay. During this time period from '86 to

1998, were detectives required to give witnesses any instructions before they viewed a live show-up?
MS. ROSEN: Objection, I think asked and answered, but go ahead.
A No.
Q During the time period from '86 to '98, were detectives required to -- strike that. Were detectives expected to give any instructions to witnesses before they viewed a live show-up?
A Can you say that again, please?
Q Yeah. But again, focus only on '86 to '98; right? Was there an expectation that detectives give particular instructions before a live show-up?
A No.
Q And --
MS. ROSEN: Can we take a break?
Q Yeah, let me ask one last question and let's take a break, if it's okay with you. You indicated that there was an expectation of documentation of live show-ups, what type of document were live show-ups to be documented on by detectives?
A Well, it could've been a supplemental report, could've been a general progress report. Those are the two that I can think of off the top of my head. There was a photograph taken that may be on a forensic report,

the three that I -- I would think would be most likely you'd find that information.

Q Okay. We can take a break, Eileen.

COURT REPORTER: Okay. We're off the record, the time is 3:47.

(OFF THE RECORD)

COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022, the time is 4:09 p.m.

BY MR. SWAMINATHAN:

Q Okay. All right. Lieutenant Foster, let me - - I'm going to put up a copy of Exhibit 7 and Exhibit 8, which are the line of procedures we looked at before. And first, I'm showing you a document marked Exhibit 7. This is 88-18. We looked at this previously and as we discussed, this was -- this is a lineup procedure general order that provides instruction or policy with regard to the conduct of lineups, live lineups, but not photo arrays, photo books or gang books; correct?

A Correct. Yes.

Q Okay. And then sorry, I kind of lost everybody on the screen. Okay. And this policy was in

place from 1980 -- from September 24, 1988 through 1996; correct? Oh sorry, we're from 1986 to 1998. So this policy was in place from September 24, 1988 through 1998; correct?

A 1998 is correct, yes.

Q Okay. And then looking at Exhibit -- showing you now Exhibit 8; this is Foster 5 through 7. This is Special Order S06-02. This is another lineup procedure policy that we looked at before; correct?

A Correct, yes.

Q Okay. And this policy additionally provides policy guidance with regard to the conduct of photo arrays in addition to live lineups; correct?

A Correct, yes.

Q Okay. And as far as you understand, this is the first policy that goes into -- that provides policy guidance as to the conduct of photo arrays; correct?

A Correct, sir. Yes.

Q Okay. And this policy, exhibit 8, went into effect after 1998; correct?

A Yes; correct.

Q Okay. In other words, this policy in Exhibit 8 did not apply during the period of our case, 1986 through 1998; correct?

A Correct, sir.

Q Okay. All right, let me pull this down. All right. Thanks for that clarification, Eileen. Let me ask you about -- I asked you earlier about positive identifications versus negative identifications during this time period from '86 to 1998, and that essentially identifications either were put into one of those two buckets; correct?

A Correct.

Q Okay. And so if a -- strike that. If a witness identified a filler during this time period, that would be documented as a non-identification or no ID; correct?

A Correct.

Q Okay. And if the suspect -- strike that. The witness made a tentative identification of the suspect, that was documented as a positive identification; correct?

MS. ROSEN: Object to the form. Can you re -- can you -- I just want to make sure I heard it right. Can you read the question back or say it again?

Q I'll just it again. In the period from '86 to 1998, if the witness made a tentative identification of the suspect, that was a positive identification; correct?

MS. ROSEN: Objection to form.

A Incorrect. You're not correct.

Q How was a tentative identification documented in the period from '86 to 1998?

A Those are -- not -- tentative ID is not considered an identification.

Q So was a tentative identification documented as a non-identification or no ID?

A Not an identification. I don't know how it ended up getting documented, but it's -- tentative ID is not an identification.

Q And then --

A It's not a positive identification.

Q Okay. And then what was the documentation requirement in the instances when there was a tentative identification?

A You would document it as a tentative ID, but police department and the state attorney's office don't consider that a positive identification, a tentative identification.

Q Was the requirement that tentative identifications be documented as tentative identifications?

A Well, I would -- yes. You would I -- identify that as a tentative ID, that witness wasn't sure.

Q Okay. And so was there a policy that required tentative identify -- was there any policy about how tentative identifications were to be documented?
A Not that I'm aware of, no.
Q Okay. Was there a -- was there any training on how tentative identifications were to be documented?
A Not that I'm aware of, no.
Q Okay. And what was the practice with regard to the ident -- with regard to the documentation of tentative identifications?
A They were considered non-identifications and I -- and documented as such.
Q Okay. And when you say they were documented as non-identifications, was the fact that the person was tentative about their identification documented?
A Yes.
Q In other words, the practice was to document a statement about their lack of confidence in the identification; is that right?
A Correct.
Q Okay. And during this period from '86 to 1998, what was considered a tentative identification?
A Anything less than 100 percent.
Q Okay. Okay. Now, if I understand correctly in this time period, detectives were not trained to ask

witnesses if they were 100 percent confident in their identifications; correct?
A Correct.
Q Okay. In this time period, detectives were not trained to obtain a statement of confidence from witnesses; correct?
A Correct.
Q Okay. So tentative identifications would only occur if the witness themself volunteered that they were not 100 percent certain; Is that correct?
A Correct.
Q Okay. And if a witness commented that they were not 100 percent certain, what steps were detectives permitted to take to try to understand what that meant?
MS. ROSEN: Object to the form.
A Yeah. I'm not clear on what you're asking.
Q I'll re-ask it. If a witness volunteered a statement that -- indicating that they were potentially something less than 100 percent certain in identification, were detectives permitted to conduct follow-up questioning of that witness to assess whether or not it was tentative versus a positive identification?
A Well, I don't know if -- I don't know that I like the word "permitted" because there is no policy. So

permission is I don't know is the best word. They could, I suppose, conduct a follow-up. But at that point, the -- the identification has been made or not made. So I'm not sure what you would -- what the goal of having follow-up questions would be if the person couldn't make an identification.
Q Okay. So let me break that into its components. So if a witness volunteered some information that suggested they may or may not be 100 percent certain in their identification, there was no policy that said detectives could or could not conduct any follow-up statements or questions to the witness; correct?
A Correct.
Q Okay. And then as a matter of practice, it was really up to detectives, whether or not they were going to do any further follow-up with the witness about what that identification was.
MS. ROSEN: Objection, form.
A Well, I -- I guess I would argue that your -- your question was what -- what I -- your wording was, what that I -- identification was. And -- and I would argue there was no identification. So there's really -- I'm just not sure why you'd have subsequent conversation --

Q Okay.
A -- with the witness.
Q Okay. In other words, the practice was that if -- once the witnesses provided to you an indication of uncertainty or lack of certainty in their identification, that was expected to be treated as a tentative identification or non-identification.
A Yeah. It was treated as not an identification and anything -- any follow-up questions could be -- I construed as you trying to influence the witness to change their mind. So I -- yeah.
Q Okay. So the expectation that detectives would not ask follow-up questions that might potentially influence the witness; is that fair?
A Again, there's no policy, but I -- in practice, I think once you -- once you got a less than 100 percent identification, then most detectives would've moved on.
Q Okay. Was there any policy to document how long it took witnesses to make identifications in the period from '86 to '98?
A How long, like, after looking at a line or -- or photo array -- how long it actually, no.
Q Okay. And it was not the practice during that period to document how long it took witnesses to make

identifications; correct?

A Correct.

Q Okay. Were detectives trained about documenting how long it took witnesses to make an identification?

A No.

Q Were detectives trained about whether the amount of time it took witnesses to make an identification was an indication of their level of certainty or confidence in the identification?

A No.

Q Were detectives trained that the amount of time it took a witness to make an identification was an indication of the accuracy or reliability of the identification?

A No.

MS. ROSEN: I have a belated objection to the assumption in that question that those things are related. So whatever that is, form or foundation but --

BY MR. SWAMINATHAN:

Q Okay. Let go back to the subject of live show- up which I promise I'm almost done with. We talked about the documentation associated with live show-ups and I -- just to be clear, the expectation was

that the person creating documentation of any live show-up would be the detective themselves; correct?

A I guess -- I guess the person that was conducting the show-up would document it in the appropriate fashion.

Q Okay. And that -- and the -- okay. So the person conducting the show-up was typically a detective; correct?

A Correct.

Q Okay. So the expectation then was that if the detective conducted a show-up, it would be that detective or his or her partner that documented the show-up; correct?

A Correct.

Q Were -- in homicide investigations, were scene officers permitted to carry -- carry out live show-ups?

A Scene officers. You mean patrol officers?

Q Yeah. Sorry, that was ambiguous. So in homicide investigations, were patrol officers or beat cars permitted to conduct live show-ups?

A I don't know that there's a policy regards -- in regards to who can do a show-up. Obviously, there's a policy of photo arrays and lineups, but I don't know that there's a policy for show-ups, and it has happened that patrolmen has conducted photo show-ups.

Q Okay. Patrol had conducted -- sorry. Go ahead.

A No. Is that -- is that -- is that extraordinary circumstance or -- yes. It's not -- it's unusual.

Q It was not typical practice for anyone other than detectives to conduct show-ups in homicide cases; correct?

A That's correct.

Q Okay. To the extent you can recall an instance when that occurred, an extraordinary instance, what were the circumstances?

MS. ROSEN: Object to the form.

A Police officers conducting show -- a show-up before the detectives arrived.

Q Okay.

A Still permissible, still in the time frame, but probably I -- I would consider it bad form.

Q Okay. What was the highest level of officer that was required to be present when a live show-up was conducted?

MS. ROSEN: Highest level of officer? Objection to form.

Q Yeah. Strike that. Let ask you differently. Let me ask it a better way. Was there any requirement

that any supervisor above a detective be present for a live show-up? Did you get the answer, court reporter, on the record? I -- it cut out for me a little bit?

COURT REPORTER: I did not. I didn't think he answered yet. Sorry.

A I said -- I said no.

Q I think we just cut out there in a second. Any restrictions on how many witnesses could view a live show-up at the same time?

A Well, again, there's no policy for show-ups, but obviously having multiple people look at a -- at a -- at a show-up at the same time would -- would be irregular and suggestive.

Q Okay. So the practice was the practice that detectives were not to have multiple witnesses view a show-up at the same time?

A Right; correct.

Q Okay. And was that the training for detectives as well with regard to live show-ups?

A In training for pre-service detective was very limited as far as show-ups are involved. You would've got that more of on-the-job through experience.

Q Okay. And once you had even a single positive identification and a live show-up, was it the practice to conduct additional live show-ups if you also had

other witnesses at the scene, or was the expectation that, now you've got probable cause to arrest, any future identification procedures should occur at the station?

A Great. That's a great question.

MS. ROSEN: Object to the form.

A Good question. Yeah, I would -- I would in practice after you get one show-up, the subsequent identification should come via photo array or -- and/or lineup.

Q Okay. And why was that?

A Establish probable cause with your one positive show-up and the subsequent identifications will be stronger and less suggestive using a photo array and/or lineup.

Q Okay. In other words, by doing a photo array and line -- lineup, those are less suggestive procedures; correct?

A Than -- than a show-up.

Q Then a live show-up; correct?

A Correct.

Q Okay. With regard to photo show-ups, I think you indicated -- we talked about the use of photo show-ups and that essentially it is -- there really are not circumstances in which photo show-ups are conducted in

stranger identification scenarios; correct?

MS. ROSEN: I'm going to object to the form.

A Yeah. I'm not sure what you're asking, sir.

Q Yeah. Let me just pull up Exhibit 4. Maybe I'm misremembering here. Let me see.

MS. ROSEN: Which one is this one? Is this the identification --

MR. SWAMINATHAN: This is the Detective Division pre-service training.

MS. ROSEN: Oh, I think it's -- yeah. Okay. Yep. What's the page number you're looking for?

MR. SWAMINATHAN: This is Foster 40. You have the Bates stamp version?

MS. ROSEN: Yep.

BY MR. SWAMINATHAN:

Q Okay. Let me know when you're there, Lieutenant.

A I am, sir.

Q Okay. All right. I'm looking -- this is the -- this is Foster 40 section on identification procedures as part of the Detective Division training lesson plan. And I'm looking in section B regarding photo identifications. Do you see that, sir?

A I do, sir.

Q Okay. And this is a section that's talking

about photo arrays; correct?

A Touches on photo arrays. Yes.

Q Okay. And this section, with the exception of number 10 that we talked about earlier, is focused on photo identifications; correct? Section B. I'm sorry. Is focused on photo arrays, not photo show-ups; correct?

A Yes, that's correct.

Q Okay. And in fact, in Paragraph 2 of this section, one that begins, "Whenever a suspect's loose photo is shown," do you see that?

A Yes.

Q These -- the training materials indicate that, "Whenever a suspect's loose photo is shown to a victim or witness, the photo will be placed in a group," do you see that?

A I do. Yes.

Q In other words, the training was that single photo show-ups or single-photo identification procedures were prohibited; correct?

A Yeah. I'm not seeing -- I'm not interpreting that the same way you are. This does not cover a single photo show-up as you're characterizing it. When somebody -- when a witness knows who the offender is.

Q Okay. So for purposes -- from a training perspective, there are two different scenarios, if I

understand correctly, where from a training perspective, the -- where you have a suspect who is familiar to the witness showing a loose photo just to confirm that you got the right person is permitted; correct?

A Correct. Yes.

Q Okay. And then in Paragraph 2, it's talking about stranger identification scenarios; correct?

A That's correct. It just says suspects' loose photos. Doesn't go into the knowledge the witness may have of the -- of the -- of the suspect.

Q Okay. But based on your experience, the way we should interpret Paragraph 2 is to understand that this is not talking about familiar faces. It's talking about stranger ID scenarios; correct?

A That's correct, sir. Yes.

Q Okay. And then the training that's in section B, Paragraph 2 is that detectives should not conduct photo show-ups or single-photo identification procedures involved in stranger scenarios; correct?

A Again, I think this is -- it's a case-by-case basis. I think there are some circumstances where you may have to, but this training is definitely pointing out or definitely alluding to that there are going to be issues and you're going to have to justify it. So in the most common of -- of circumstances, yeah, you should

have -- it should be a photo array or as they're describing, it's kind of poorly worded a suspect's loose photo should have -- be shown in a group presumably of other photographs.
Q Okay. And ultimately, if I -- is it fair to say that detectives were trained from the beginning, that if you're talking about a stranger identification scenario, you really should not be conducting single-photo identification procedures, unless there's some really unusual circumstance; fair?
A Correct. It's a kind of case-by-case basis, there are some reasons that you would, but generally speaking, you would -- you would do a photo array.
Q Okay. And detect -- were detectives trained on any of the circumstances in which you would conduct a single-photo identification procedure in a stranger scenario?
A Hold on a sec. Can you repeat that?
MS. ROSEN: Sorry.
A I'm sorry. Can you -- can you repeat that?
Q Detectives were not -- strike that. Were detectives trained on any of these circumstances in which a single-photo identification procedure could be conducted in a identification scenario?
A Obvious -- they were not trained in pre-

service. They would've learned some of those more unique circumstances on-the-job training, but as far as pre-service no.
Q Okay. So the pre-service training, was that basically, don't do that in stranger identification scenarios; fair?
A Correct.
Q Okay. And then on-the-job, what were the types of scenarios? Detectives were trained that single-photo identification procedures were permitted in single -- in stranger identification scenarios.
A Well, you know, like I said, there -- there's -- it's on a case-by-case basis and there's -- there's a million variables that you could throw in there, but a stranger is somebody -- I -- I think I used earlier. A guy you work with that you see every day, you may not know his -- his real name, but it's a person that you've seen every day. He might -- he may work in a -- four offices away. He's basically a stranger, but you know, in that circumstance, it -- it may be permissible, depending on some of the circumstances, to show that person a single finger, "Oh, this -- this is the person that you work with that you know as Skip." And that's the example that I used previously.
Q Okay. When -- if -- and when single photos

were shown to suspect -- strike that. When single photos were shown to witnesses, was that required to be documented?
A If it was relevant. Yes.
Q Okay. If -- let's start here. Was there any policy about showing single photos to suspects?
A Well, obviously there's some pre-service information regarding single photographs, but other than that, I don't believe there's any policy.
Q Okay. And so there was no policy prohibiting or permitting single-photo identification procedures; correct?
A Correct.
Q Okay. As a matter of practice, they were frowned upon in stranger identification scenario -- well, strike that. We've already covered the practice and the training. So let me just ask about documentation. As a matter of policy, there was no policy that set out the requirements for documentation related to single-photo identification procedures; correct?
A Correct.
Q Okay. And as a matter of practice, how were single-photo identification procedures documented?
A They would've been included in the

supplemental report that a detective showed a witness a single photograph.
Q Okay. And if a single photo was shown to a witness and it result -- and there was not a positive identification, was that required to be documented?
A Can you ask that again?
Q Yes. If a single photo was shown to a witness and it was -- and there was no positive identification, was that required to be documented by detectives?
A I don't know that there's any specific policy other than the photo array and lineup procedure orders that don't cover single photos. So I think in the strictest sense, they're -- they -- probably a single photo would not be covered under that order. But again, this is -- this may be something on a -- if the information is relevant, that detective may want to document and include in a supplemental report
Q As a matter of practice, were single-photo identification procedures documented in cases where there was a negative identification?
A Well, as a matter of practice, I think it's -- again -- it goes on -- it goes to a case-by-case basis. Some -- some detectives are, they document more than others. So I think it just has to do with each individual detective.

Q Okay. So it -- whether single-photo identification procedures that resulted in a negative identification were documented was essentially a case-by-case basis as decided by the detective involved; correct?

A Well, again, I partially agree with you. I don't know that the detective makes that decision. I -- she certainly plays a role in that decision, but circumstances and the information that's relevant would also play a role in what gets documented and what does not get documented.

Q But ultimately the -- that determination of what was relevant or not relevant is made by the detectives; correct?

A Well, not necessarily. I mean, relevant and not relevant is not determined by the detective. It's determined by what information is of evidentiary value.

Q And who makes that determination about the evidentiary value? Is it a supervisor or is it detective themselves?

A Well, it could -- it could be both.

Q To the extent the detective involved the supervisor; correct?

A Correct.

Q Okay. Were detectives required to inform

supervisors when they had negative identifications?

A I don't know if there's any requirement to run and tell your supervisor that you had a negative photo array or single photo, but I think in the normal course of a supervisor's duties, he would be kept abreast of the investigation. And -- and he would, maybe not in real time, but he would know that there, in fact, was a negative single photo or negative photo array or any kind of negative identification.

Q Okay. So the practice was that in the day-to-day performance of their work in homicide investigations, the homicide detectives would keep their supervisors abreast of how those investigations were proceeding; correct?

A Yes. I would -- I would say that's an integral role that a supervisor in the Detective Division serves or performs.

Q Especially in homicide cases; correct?

A Yes. Homicides are closely monitored, and the direction of the investigation is critical.

Q And the expectation was that detectives would keep supervisors abreast of any positive identifications or negative identifications they obtained during the course of a homicide investigation; correct?

A Well, I think the answer to that is some

detectives are more forthcoming with information to their supervisors and some are not. And I think it's incumbent upon the supervisor to identify which detectives need to be more closely monitored than others.

Q Okay. And maybe a better way to put it is there was not a requirement that detectives inform their supervisors every time they got a positive or negative identification, but the practice was to keep the supervisors abreast of the results of the identification procedures; is that fair?

A That is fair. As long as you don't attach a time frame to it.

Q In other words, you may not do it right away. You might do it later.

A Correct.

Q But the practice was at some point you'll update your supervisors of the results of the identification procedures in homicide cases.

A At some point, yes.

Q Okay. And that's true, regardless of whether it's a positive or negative identification; correct?

A Yes, that's correct.

Q Okay. And that's true regardless of whether the positive or negative identification occurs in a live

lineup, photo array, single photo show-up, live show-up, whatever it is; correct?

A Every aspect of a homicide investigation is monitored by a supervisor in the Detective Division. So yes, you're correct.

Q Okay. And I missed one. That's also true of gang books or photo book procedures, too; correct?

A Well, a Detective Division supervisor wouldn't be monitoring a gang book or photo or -- or -- or any kind of gang element. That would be done by the gang specialist supervisors.

Q But I thought you said earlier that the gang book procedures, the detectives would have to get the gang books from the gang specialists, but the detectives ultimately would conduct the gang book procedures, or they would delegate it to a gang specialist; correct?

A Correct.

Q Okay. So then if -- then once the gang procedure was -- the gang book procedure was conducted either by the detective or the gang specialist they delegated to, the detective would, of course, be informed of the results of that gang procedure, positive or negative; correct?

A At some point, yes.

Q Okay. And then the expectation was, just like

any other identification procedure, that the detectives would keep their supervisors abreast of the results of those gang procedures; correct?
A I understand what you're asking now. Yes, that's correct.
Q Okay. All right. All right. Let me move to - - let me ask you a couple more questions about photo show-up or photo -- single-photo identification procedures, I think is what you -- what you called them. Were detectives permitted to do single-photo identification procedures, basically showing a single photo to a witness before a lineup?
A Before a lineup?
Q Yes.
A What's the time -- what's -- I mean, again, it's a case-by-case basis, but I think you have to be more time-specific. Are -- are we talking about three days before the lineup or three minutes before the lineup?
Q Yeah. If you have somebody in custody and you -- and they're essentially, you could -- you have the ability to conduct a live lineup. Okay? Once you're in that scenario where you're in position to be able to conduct a live lineup, because the persons in custody, is it permitted to show a single photo of that suspect

to a witness who could view that lineup?
A I don't know that there's any policy that you shouldn't, although I think in the lineup general order, it does talk about keeping witnesses separated, but I don't think it's any -- there's anything specific spelled out as far as you cannot show them a single photograph before a lineup, but I'm not sure what purpose that would serve to do that.
Q So again, let's just break it down. As a matter of policy, there was no policy that prohibited detectives from showing single photos to witnesses before a live lineup when they've got somebody in custody; correct?
A That I'm aware of. You're correct.
Q Okay. As a matter of practice, was it permitted to show single photos to of your suspect, to a witness before a live lineup?
MS. ROSEN: Objection, form.
A Again, I think it would be on a case-to-case basis. It seems very unusual, but if -- but I -- you -- I'd have to know the circumstances of --
Q If you have somebody in custody with the intention of conducting a live lineup, is it permissible to show them the -- a photo that they selected of the person previously, you know, photo array, for example?

MS. ROSEN: Wait a second. A single photo or a photo array?
Q Yeah. Let me be clear. So often in the Chicago Police Department, you agree with me in homicide investigations, detectives would get a positive identification from a witness of their suspect in a photo array, and then they would subsequently conduct a lineup of that suspect; correct?
A Correct. Yes.
Q With the same witness; correct?
A Yes.
Q Okay. Now in those -- in that scenario, was it permissible for the detective once they brought the person to the station, they're going to have them view a lineup to show them the photo from the photo array of that single suspect that they had previously identified.
A I understand what you're asking. I don't know that there's any policy violation, but I can say that I've never seen that done before.
Q And --
A I don't know what purpose it serves, but again, there could be a circumstance that I haven't thought of that would do that.
Q Would you agree that is contrary to practice?
MS. ROSEN: Contrary to what? You broke up.

Q Practice, general practice.
A I would agree that it's unusual.
Q Okay. And would you agree that if a single photo of the suspect was shown to a witness before the live lineup, that it would taint that lineup?
MS. ROSEN: Object to the form.
A Well --
MS. ROSEN: And beyond the scope of the 30(b)(6) notice. He's not here to opine about taint.
A I would argue that in your scenario that the - - the lineup -- viewing of the lineup would already be tainted by your own argument, because they've already looked at a photo array and made an identification.
Q Okay.
A So it's kind of a moot point.
Q Okay. So the original photo array identification of the suspect taints the subsequent live lineup procedure, where that suspect is the only person that's the same from the photo array; is that fair?
MS. ROSEN: Objection. Beyond the scope of the 30 B6 notice. He's not here to opine about what constitutes taint in an identification procedure.
BY MR. SWAMINATHAN:

Q Go ahead.
MS. ROSEN: Beyond that. You can answer the question.
A So I was -- I was speaking about the scenario you gave me, and -- and this is in which this witness looked at a photo array and has already made an identification. And now he's being shown, or she's being shown a single photograph just prior to a lineup. And earlier you -- you alluded to the fact that lineups already tainted and that's -- that would be my answer, is your answer is the lineup is already tainted apparent -- according to you.
Q Well, I'm not -- it's not about according to me. I'm asking you. For example, was it -- I mean, we were talking about, what was the permitted set of practices? So was there a practice that you could show single photos of the person who's already been identified from a photo array after you've gotten a positive identification from the photo array?
MS. ROSEN: Objection, asked and answered.
A Again --
MS. ROSEN: Now you're going back to what you -- where you started before you got to the opining about taint. So objection asked and answered.
BY MR. SWAMINATHAN:

Q Go ahead.
A Again. I think that's a -- it would be on a case-by-case basis. Would take -- there would -- there could be some unusual set of circumstances where that would be done. I -- it -- I would -- the only thing I would answer that is it -- it appears unusual.
Q Okay. Was the practice to try to avoid having a witness view the suspect more times than necessary in order to avoid taint or suggestiveness?
MS. ROSEN: I'm sorry, could you read back the question?
Q Was the practice to avoid having a witness view the suspect more times than necessary in order to avoid taint or suggestion?
MS. ROSEN: Objection to form.
A So "as necessary," using your words, is kind of subjective. I -- I think an experienced detective likes having multiple layers of identification. So I don't necessarily know that the lineup is painted in my opinion. And again, the practice would be for detectives to obtain accurate, authentic identifications, so the right person is being identified.
Q Okay. And steps -- and I think you testified earlier that because detective's goal is to get to the

truth, not just get an arrest, they're going to take steps to try to mitigate things that will reduce the risk of a false identification; correct?
A Correct. Yes.
Q Okay. And one of the things that they do to try to do that is to try to create photo array procedures, and lineup procedures that have fillers that look similar to the suspect, for example; correct?
A Correct.
Q Okay. And would you agree with me that another thing -- another -- something that could be non-mitigating, that could actually create suggestion or taint in a lineup, would be if you show a picture of the suspect to the witness before they go into the lineup?
A So again, I don't know what the circumstances are and I suppose there could be a circumstance where you would do that. It's unusual.
A It's unusual, but not prohibited by policy.
Q Okay. And were detectives trained that they should not show photos of the suspect to the witness before an identification procedure because it could taint or reduce the reliability of that, or accuracy of that procedure?
MS. ROSEN: Objection, asked and answered, and foundation to the premise of the question, but you

can answer.
A The detectives are trained to obtain, if possible, accurate, authentic identifications.
BY MR. SWAMINATHAN:
Q Okay. Were detectives trained about conducting photo arrays or live lineups in which everyone was a suspect?
MS. ROSEN: Object to the form.
A You're going to have to run that by me again, sir, please.
Q In other -- yeah. In other words, could -- were detectives, were detectives -- under policy, could detectives conduct a photo array, for example, in which everybody was a potential suspect?
A Well, there's no policy on that, and I suppose chronology would weigh, would be a factor here. Because if there's been nobody identified and you're showing a photo array, everybody is a possible subject -- or a suspect, I'm sorry. So I guess in your scenario, with the limited information you're providing me, that it's possible that everybody's a suspect.
Q So was there any -- is there any policy that -- as I understand, there was no policy that prohibited detectives from conducting photo arrays in which all of the members of the photo array were people who were

potential suspects.
A Again, I don't think there's a policy violation, I think it's a matter of chronology. If there's nobody identified, then everybody's a suspect, and I don't see an issue there.
Q Okay. And so as a matter of practice, it would be appropriate for a detective to conduct a photo array in which everybody was a suspect?
MS. ROSEN: Objection to form, incomplete hypothetical.
A Again, I think it's a matter of, is there somebody been identified? The circumstances are so broad here, I don't know. I know that the policy says ideally you'd like to have four fillers for every suspect, but again, I don't -- you're -- I just -- I'm not really completely clear of what you're asking. So if there's been nobody identified, every -- if you don't know, if you're just taking a shot in the dark on a photo array, then everybody's a suspect.
Q So that, I mean, maybe that's another way to think about it. Let's say you've got a scenario where you got a detective who says, "Hey, we have information that suggests the person is a six-foot-tall Latino who's either a Spanish Cobra or an Imperial Gangster." Those are the two gangs we suspect, okay, and you've got some

description information that's pretty specific, tall guy, tall Latino guy, that he's in one of these two gangs. Could you create a photo array of known members of the Spanish Cobras and Imperial Gangsters who are six-foot-tall Latinos who match the description?
A You're holding up your hand like you're showing five pictures. Are you saying there's five pictures, or could I, in theory, show 55 pictures of Imperial Gangsters that fit the gender parameters of the description?
Q Yeah, let's start with what is typical of a photo array, which is something like 5, 6, 7, 8, 9 kind of photos. Do you agree with that?
A Yeah, five pictures is typically a photo array. I guess my question to you would be, how do you determine which five pictures to put in? I would think it would be -- yeah, which five pictures do you put in?
Q Yes, and that's my question. The five pictures, that's my que -- my question is the hypothetical is five question -- five pictures are put in, all of whom are people who the detective believes could have committed the crime, because they're members of the gangs they suspect and they fit the description. So that's essentially five people who are suspects: right? If any one of those people is identified, any

one of them would now be essentially somebody who could be arrested and subjected to interrogation or live lineups; correct?
MS. ROSEN: Object to the form, incomplete hypothetical. If you can answer, go ahead.
A This -- yeah, I don't have enough information. I don't -- I don't -- yeah, it's just not enough information.
Q In that example I just gave -- I'm sorry. In that scenario, what I've just described, it's different than a scenario in which you have fillers; right? Because a filler is -- a filler would be somebody who you know if the witness identifies that person, it's going to be a negative identification; correct?
A Correct.
Q In the scenario I've given you, any identification is going to be a positive identification; correct?
A Um --
MS. ROSEN: Never mind, go ahead.
A Not necessarily. I think that -- yeah, I think that's going to be some -- there's going to be a little more work required, far as if there is an identification based on your scenario, that that's, in fact, the offender. I think you're still -- you're a

ways away from going and getting him and subjecting him to a live lineup, as you termed it.
Q Okay. So in a --
MR. ENGQUIST: When you have a quick second, will I, can I take a quick break? I got to take care of a couple things, since it's getting close to five.
MR. SWAMINATHAN: Yeah, you want to take a break right now?
MR. ENGQUIST: Yeah, that'd be great.
MR. SWAMINATHAN: Yeah, okay.
MR. ENGQUIST: For five minutes.
COURT REPORTER: We're off the record, the time is 4:52 p.m.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022, the time is 4:58 p.m.
BY MR. SWAMINATHAN:
Q Okay. Let's take a look at Exhibit 4. Sorry, let's take a look at Exhibit 7. All right. This is General Order 88-18, which applied for the period from 19 -- of 1988 through 1998, in the time frame relevant

to this deposition; correct?
A That's correct.
Q Okay. And if you look at section G of this policy, it says, I think it is the second sentence, "When more than one suspect is placed in the lineup, the lineup ideally should consist of at least four non-suspects, in addition to the number of suspects in the lineup." Do you see that?
A I do, yes.
Q Okay. So at least with regard to lineups during this time period, an all-suspect lineup was prohibited by policy; correct?
A That's correct.
Q Okay. With regard to photo arrays, there was no prohibition on all-suspect photo arrays, because there was no policy in this time period; correct?
A Correct, I can see there's no policy.
Q Okay. Okay. All right, let's take a look at -- this is Exhibit 4 again, and again, this is the Detective Division training from 1996. Are you aware of any differences or changes in the training around identification procedures that were provided to detectives prior to 1996, in the period from 1988 to 1996?
A What's the Bates number you're -- you've got

up on the screen?
Q Yeah, this is Page 40 of the document, but really, my question is as to this entire document. We talked earlier about the fact that this Detective Division training manual is the training lesson plan from November of 1996; correct?
A Correct.
Q Okay. So this Exhibit 4 gives us information about what the training was that was conducted in 1996, and is it your understanding that this is consistent with the training that was provided through 1998, the end of this time period for this deposition?
A Yes.
Q Okay. And then you're designated to testify about the training, with regard to identification procedures, for the entirety of this period from 1986 to 1998; correct?
A Correct, yes.
Q Okay. So are you aware of any differences in the training regarding identification procedures that was provided to detectives prior to November of 1996?
A Well, I reviewed a few orders, and I do remember there being -- the differences are very nuanced, but there was something about documenting extraordinary circumstances, it's in and out of orders,

but that's the only thing of any kind of substance that I recall of any kind of difference between the -- between the orders.
Q Okay. So put -- and so basically, there was some very limited differences between the order that existed prior to 88-18 and 88-18; correct? You want me to say that again, was that confusing?
A I think you said the same order twice.
Q In the period from 1986 to 1998, there were basically two applicable lineup policies; correct? There was 88-18, which applied after 1988, and there was 83-5; correct? That's Exhibit 6 that we looked at earlier; correct?
A Yes.
Q Okay. And in terms of the requirements of those two policies, would you agree with me those two policies are very similar?
A Yes.
Q Okay. And what difference, if any, is there, in terms of -- substantively in terms of those, between those two policies, the policy before 1988 and the policy after?
A Yeah, I -- the only thing, like I said, I can recall is that there's a -- there's something in there about extraordinary circumstances or documenting

something, an unusual circumstance, but other than that they look very, very similar.
Q Okay. And then in terms of the training associated with these policies, we've -- now I'm going to pull Exhibit 4 back up again here but Exhibit 4 is the training that was provided in 1996, and my question for you is obviously you're designated as to the time period of 1986 all the way through 1998. So are you aware of any different training that was provided to detectives with regard to identification procedures in this period from 1988 through 1996, when this training was provided?
A I am not.
Q Okay. And so is it your understanding that the training that we're looking at here in Exhibit 4 about identification procedures for Detective Division, for detectives, is consistent with the training throughout the period from 1988 to 1996?
A Yes. As best of my knowledge, it's similar, yes.
Q Okay, all right. And so looking at this Exhibit 4, go back to that Page 40, approximately where we were before. Yeah, Foster 40. You see where -- all right, do you see where I am?
A Yes.

Q Okay, all right. Looking again at section B on photo identifications, again, just to be clear, this training and the information contained in this training essentially reflects the training that was provided to detectives throughout the period from 1988 to 1996; correct?

MS. ROSEN: I object to the form. I think you said '88 to 96, and I think you meant --

MR. SWAMINATHAN: I'm sorry, let me correct that. Thank you.

MS. ROSEN: 88 --

BY MR. SWAMINATHAN:

Q The information contained in this training packet in Exhibit 4 reflects the training that was provided to detectives over the period from 1986 to 1998 regarding ID procedures; correct?

A That's correct, yes.

Q Okay. And looking at Paragraph 1 of section B, it says, "Photographs of criminal offenders or suspects are an invaluable investigative aid to detectives." Do you see where I'm looking?

A Yes.

Q Okay. It says, "However, their value can be abused, and the identification and arrest that follow will be thrown out of court." Do you see that?

A I do.

Q What was the training for detectives about the ways in which their value can be abused?

A Well, I would -- my feeling would be that they could generate unduly suggestive photo arrays, which would, you know, make them too suggestive, and definitely erodes their authenticity and their value.

Q Okay. In other words, detectives were trained that -- really, what you talked about earlier, detectives were trained that if you don't do these procedures the right way, you could end up with positive identifications, but not necessarily accurate positive identifications?

A Correct.

Q Okay. And so really, in Paragraph 1, what it's talking about is detectives were trained that while photo identification procedures can be a useful tool at getting to the truth, they can result in errors if they're not done properly; is that fair?

A Yeah, I would say that's fair.

Q Okay. And would it be fair to say, based on your experience, that in this period from 1986 to 1998, it was understood by supervisors of detectives that it was important to conduct photo identification procedures in a way that wasn't suggestive, in order to ensure you

were getting the right person?

A I think in any identification procedure that you conduct; you don't want it to be unduly suggestive, and to protect the integrity of the identification.

Q Okay. And in your experience, was it understood within the supervisory staff, you know, sergeants, lieutenants, and commanders of detectives, that there were risks to photo identification procedures if they weren't being done the right way?

A Risks, as far as what?

Q Risks, as far as getting inaccurate identifications, if they're not done properly.

A Yeah, I think if a photo array's, you know, unduly suggestive, then it -- you could lead -- it could lead to an identification that's not, you know, authentic.

Q Okay. And essentially there was, as it says here, there was an understanding within the command staff of sergeants, lieutenants, and commanders that these photo identification procedures could be abused if they weren't done correctly; is that fair?

MS. ROSEN: Object to the form.

A I think that the -- yeah, I think that supervisors are there in the Detective Division to ensure that the policies are being followed so that the

ultimate goal to find the truth and find the right person that committed a crime are -- that's the end goal.

Q In your experience in the period from 1986 to 1998, did homicide detectives' supervisors know the policies that applied to homicide detectives?

A Yes.

Q Did the command staff, commanders, lieutenants, and sergeants, supervising homicide detectives understand why those policies existed?

A Yes.

Q And did they understand that when those policies were not being followed, it could result in false identifications or misidentifications?

A Yes.

Q And did those commanders, lieutenants, and sergeants want to ensure that proper identifications, accurate identifications, were being made, rather than just closing cases?

A Correct.

Q And in your experience, did that command staff take steps to monitor the overall process of identification procedures in these homicide divisions to ensure that the policies were being followed, in order to ensure that the processes weren't being abused?

A I think the role of a supervisor in the Detective Division is to monitor the investigation, all aspects of it, not just the identification procedures, to ensure the integrity of the investigation. That's one of the primary roles of the supervisor.

Q Okay. And ultimately, is it your belief that these -- that the sergeants, lieutenants, and commanders -- strike that. Ultimately did the sergeants, lieutenants, and commanders, in this period from '86 to 1998, understand the risks or possibility of abusing identification procedures if they weren't being done correctly?

MS. ROSEN: I'm going to object and say this is outside the scope of the 30(b)(6) notice. Understanding of sergeants and above is not -- is outside the scope, but you can answer.

A I'm unclear as to what you are characterizing as risks.

BY MR. SWAMINATHAN:

Q Yeah, and maybe I shouldn't, maybe "risk" is the wrong word. We should just use what's in the document, I think that's probably more fair. In this time period from '86 to 1998, did sergeants, lieutenants, and commanders understand that these identification procedures could be abused if they

weren't being done properly?

MS. ROSEN: Abused and the identification and arrest that would follow would be thrown out in court, if we're going to be use the language of the document.

BY MR. SWAMINATHAN:

Q Go ahead.

A Yeah, so the supervisors are aware that not following proper procedure could result in identification of the photographs being abused, sure.

Q Okay. Now with regard to -- let's look at Paragraph 3 of the document, I'll move on. Paragraph 3 is training on the idea that the photos that are shown as part of a photo array procedure should include fillers that match the same physical characteristics of the suspect; correct?

A Correct.

Q And that steps should be taken to ensure that whenever photos are shown, the suspect's photo is not different in kind from the photos of the fillers; correct?

A Correct.

Q Okay. And ultimately these are steps that are listed in Paragraph 4 to ensure that the photo array is not suggestive or doesn't lead the person to be more

likely to select only the suspect; correct?

A Correct.

Q Okay. And same thing with Paragraph 4 and five, those are paragraphs that provide training for detectives about various steps they should take, in terms of selecting fillers to ensure that the lineup is fair; correct?

A Yes, that's correct.

Q Okay. And so it would be fair to say that detectives were extensively trained on the idea that when that there was an importance to the process of selecting fillers for photo arrays?

A Say that question again, please.

Q Yes. Would it be fair to say detective were well trained on the idea that it's important to be selecting fillers in the right way, to be thoughtful about selecting fillers when conducting photo arrays?

A Yes, I would agree with that.

Q And detectives were trained that if they don't select fillers that look similar to their suspects, it undermines the value of their photo array procedure; correct?

A Not only that, it would be -- it would be subject to a motion in criminal court, and it could be lost, it could be quashed.

Q Okay. And ultimately, were detectives trained that these types, you know, what fillers you put into a photo array can itself result in suggestion that a detective doesn't even intend to have happen? In other words, it's easy to be suggestive, even without intending to?

MS. ROSEN: Object to the form.

A Sounds to me like you're talking about implicit bias.

Q No, and I'm not intending to talk about implicit bias. I'm just saying what this -- would it be fair to say that part of what this training is teaching detectives is that photo array procedures can be suggestive for a witness, even if the detective is not deliberately trying to be suggestive to a witness?

MS. ROSEN: Object to the form.

A Yeah, I'm not -- you're confusing me, but okay.

Q Let's move on. Let's do move on, let's move onto Paragraph 6. Paragraph 6 says that "Photo spreads will be shown to victims and witnesses separately and independently. After one identification is obtained, no further person should be allowed to view the photos." Do you see that?

A I do, yes.

Q Okay. And so can you explain for us what the training is there that detectives are being provided in Paragraph 6?
A So I think what's going on here is -- again, not worded as completely as well as it could have been, but when you show five photographs for -- to maintain that number, and somebody identifies those five photographs, they would sign these at the front or the back of that picture that they're identifying. At that point, those five photographs should be inventoried, and you use a new set of photographs, because the one picture that's been identified already has a signature on it. So that's, I think, that's what they're talking about there.
Q Okay. So was it the -- so you're identifying a practical concern, which is that once you've got a photo that's got a -- some writing on it, you don't want to use that same set of photos; is that right?
A Correct, that would be suggestive.
Q And in fact, the photos should be inventoried once they've been shown to a witness; correct?
A Correct.
Q Okay. And -- but isn't it also true what this paragraph is talking about is the idea that once you've got a positive identification from a photo array, you

typically have probable cause to arrest that suspect now; correct?
A Once you have one identification from a photo array, you would have probable cause to arrest, yes.
Q Okay.
A Yes.
Q And was it -- wasn't it the typical practice that once you've got a positive identification and you can arrest a suspect, that you shouldn't conduct additional photo arrays, but instead you should conduct -- subsequently, you should conduct live lineups?
A I think that was a decision that the detective would make based on a number of factors that has to do with the first person that made an identification. So my answer would be on a case-to-case basis, based on the circumstances, you may show multiple people photo arrays.
Q Okay. And so for example, if the first -- if you -- if the first person is shown a photo array and they're tentative about their identification, would that be a reason that you would conduct subsequent photo arrays?
A That would definitely be a reason, because the tentative ID, as we spoke about, is not an identification.

Q Okay. So in other words, it wouldn't be -- in that scenario, it wouldn't be sufficient probable cause, so you'd need to show a subsequent photo array before you could bring somebody in for a live lineup; correct?
A Correct, sir.
Q Okay. And putting aside unusual scenarios, if you have a true positive identification, detectives were trained, in Paragraph 6, that once you've got a positive identification in a photo array, you should stop conducting additional photo arrays; is that fair?
A No. What it says is you should not use -- after one identification is obtained, no further person should be allowed to view the photos, the photos being that set of five. You should use a new set of five. It doesn't say anything about not doing another photo array.
Q Okay. Other than the scenario in which you have a positive identification -- strike that. Other than the scenario in which you have a tentative identification in the initial photo array, what are other scenarios in which detectives would conduct additional photo arrays in lieu of a live lineup?
A We've talked about this, but I'll expound on it for you a little bit. In gang cases where you know that you have young witnesses that are going to flip

five years later at trial, and you want multiple layers of identification, you would show them all -- an experienced detective would show them all photo arrays and show them all lineups to get several layers of identification. If you have an elderly witness and you're concerned about him no longer being on the face of this earth, you may show another photo array to a younger witness. There could be -- you could have a chronology issue. You can't find a witness and one comes in, and that -- so there is a multitude of reasons why you would show more than one photo array, just to point out a few scenarios like you asked me to.
Q Okay. So is your testimony that in gang cases, it was more common to show photo arrays even after the initial photo positive identification in a photo array?
A I guess my testimony is that an experienced detective would want as many layers of identification as he could possibly get, in order to put the right person in jail.
Q Was there any policy that instructed detectives that they should not conduct additional photo arrays once they've gotten an initial positive identification in a photo array?
A No policy that I'm aware of, sir.

Q Was there any policy that instructed detectives that once you've obtained a positive identification in a photo array, that undermines the reliability of any subsequent live lineup?
A There's no policy that -- in that regard, no.
Q Was there any training that a photo array identification undermines any subsequent live lineup identification if the only person that's the same is the suspect?
MS. ROSEN: I'm going to object. Asked and answered.
A No, sir.
Q Okay. Looking at the information in the margins in Paragraph 6, do you see it says, "Remember that it is difficult for a victim or witness to make -- " let me -- I'm losing my train. Sorry, let me re-ask my question. You see where I'm looking in the margin there, on the right side?
A I do, yes.
Q Okay, all right. So detectives were trained in the period from 1986 to 1998, that it was difficult for victims or witnesses to make positive identifications from photos; correct?
A Correct. That's what it says, yes.
Q Detectives were trained, in the period from

1986 to 1998, that often victims or witnesses viewing photo arrays would make tentative identifications; correct?
A Correct, yes.
Q Okay. And is that consistent with your experience?
A No.
Q In your experience, was it common to have witnesses say that to make some identification, make a tentative identification in a photo array and indicate that they could be more sure if they saw a person in a lineup?
A I think the more likely scenario would be for somebody to not be able to make an identification, and then ask if they could look at a lineup when the offender was placed under arrest. That seemed, in my experience, would be the more common scenario.
Q Okay. In the period from '86 to 1998, as a matter of practice, how common was it for detectives to get positive identifications in photo array procedures?
MS. ROSEN: Object to the form, and outside the scope of the 30(b)(6) notice.
A I don't have any statistics for how often you would get a positive photo array.
Q Did detectives get any training on how often

they could expect to get positive identifications in photo arrays?
MS. ROSEN: Objection, form.
A No.
Q And to the extent there was any training about how often there would be positive identifications, is there anything you're aware of, other than this guidance in this document, indicating that most of the time victims or witnesses will indicate being tentative about an identification?
MS. ROSEN: Objection, form.
A Can you ask that question again?
Q Yeah. The question is: Are you aware of any other guidance, other than that guidance on the right side of Page 41?
A Yeah. No, I'm not.
Q Okay. And it says that in Paragraph 8, detectives have -- most detectives have the person identifying the suspect's photo sign the back of the photo and place the date and time of the ID on the back. Do you see that?
A I do, yes.
Q Okay. Was that the typical practice?
A Typical practice was, have them sign the photograph. Some people did it on the front, some

people did it on the back. Date and time was something that was, you know, done and not done, too. But the signature always was the big thing either, either on the front or back of the photograph.
Q Okay. And it was not required as a matter of policy; is that right?
A The signature?
Q Yeah, having someone sign the back, yeah.
A Not as a matter of policy, no.
Q Okay. Looking at Paragraph 11, can you tell me what Paragraph 11 means? I do not understand it.
A I think what it's saying there is don't bring a person in that does not have a photo -- so if you haven't been arrested at that point in time that we're talking about, there was no way to get a photograph.
Q I see.
A So if you did not have a prior arrest, then getting a photograph would've been next to impossible. And what they're saying is don't bring them in, don't arrest them, don't detain them, take a Polaroid, and then try to show it to somebody, because that would be an improper identification. That's my -- that's my sense of it.
Q Okay. All right. Looking at Page 44 of this, which involves special circumstances, let's see. This

is Foster 44; do you see the special circumstances section?
A I do, sir.
Q All right. And this talks about various special circumstances involving blind victims, masked offenders, and so on. Do you see that?
A I do, yes.
Q All right. So detectives were trained, in the period from 1986 to 1990, that blind victims could conduct lineups based on touch and smell. Is that true?
A That's correct, yes.
Q Is that something you ever did?
A No.
Q Detectives were trained, in the period from 1986 to 1998, that lineups could be conducted with masked offenders; correct?
A Correct.
Q And what were they trained on about how that could be conducted?
A Well, I think it -- I think it goes to are they fully masked, are they half-masked? That would be the first thing, and then at that point you could do a voice lineup. Like, let's say a robbery, and the offender said, "Give me your wallet," or something. And you could have them, each the suspect and the four

fillers, say the exact phrase that the potential robber said. So again, I don't know how valuable some of these are, that would be up to the trier of fact to determine, but they are -- that was something that was done on rare occasion.
Q Okay. And in Paragraph 4, it talks about juvenile lineups; correct?
A Correct.
Q Okay. And the last sentence of that says, "A youth officer may be required by law. If not, it's probably a good idea to have a youth officer present anyway." Do you see that?
A I do, yes.
Q Okay. So pursuant -- so in the training that was provided to detectives about identification procedures with juvenile witnesses, they were not told whether or not it was required by law; correct?
MS. ROSEN: Object to the form.
A Yeah, I'm unclear what you're looking for there.
Q I guess what I'm unclear about is, are they -- this training, the training that was provided to detectives was, maybe youth officers are required, maybe they're not; correct?
A That's what it says, it may be required by

law, yes.
Q Okay. So detectives weren't provided guidance about whether or not the youth officer's presence was required by law; correct?
MS. ROSEN: Objection to the form, foundation and mischaracterizes the paragraph.
Q Go ahead.
A What's your question?
Q Why don't I ask this question instead? Let me -- let me move on. Detectives were trained that they should have a youth officer present when conducting lineups with juvenile witnesses; correct?
A Are you talking about in Paragraph 4 -- number four?
Q Yes.
A I don't see where it says they should. It said it may be required by law and if not, you -- it'd be a good idea, but I don't see where it says you should.
Q Yeah. So isn't that what that -- I mean, what is the training? Is the training ultimately, "Hey, our -- what we're suggesting to you as detectives is, we're training you. Hey, it's a good idea to have a youth officer present when you conduct a lineup with juveniles," correct? That was the training provided to

detectives.
A Correct.
Q Okay. And so is it fair to say that the -- was it the common practice of detectives to then follow this training and typically have a youth officer present when they conducted lineups with juvenile witnesses?
A I would say that it was probably a good idea, but as far as what they did in 1986 and 1993, I'm not sure what role a youth officer would play in a lineup. There would be no questioning going on at that point. So I'm not sure what the role of the youth officer would've been during a lineup. The only thing I can -- the only thing I can surmise from this is if it's a juvenile offender, and I think this is where this is going, it's a juvenile offender amongst four adult fillers. Then the youth officer would be there to protect the juvenile's safety. And I think that's what -- what they're trying to say here. Not very well, I may add.
Q So you're indicating that this is at -- this actually applies only when not the witness is a juvenile, but when the suspect is a juvenile.
A I'm reading it again. So -- because I want to give you the best, accurate answer I can.
Q Yeah, please do.
A You were look -- you were taking a different

take on it than I was. I was thinking that the juvenile was the suspect in the lineup and that the youth officer was there to protect the juvenile from four adult fillers. And I take from your question, you're interpreting as the juvenile is a -- is the witness viewing the lineup? Is that correct?

Q Yes.

A Yeah. Yeah.

MS. ROSEN: Okay. Go ahead. If you have a follow-up question.

Q No, that's what I'm asking. Do you -- what is the -- I mean, you're the 30(b)(6) witness. I'm -- it doesn't matter what I think. What matters is what you tell me. Is Paragraph 4 reference to juvenile witnesses or juvenile suspects in lineups?

A Juvenile suspect, juvenile suspects, sir. I didn't mean to interrupt.

Q Okay. No. You didn't interrupt. I think this is the same. Let's move on from that. Let's talk about live lineups and in the period from 1986 to 1998, we've established that Exhibit 7 captures the policy that was in place during that time period with the limited exception of 1986 and 1987, when there were some slight differences with regard to special circumstances; correct?

A Correct. Yes.

Q Okay. And so looking at Exhibit 7, it sets forth various requirements under the policy for the conduct of live lineups; correct?

A Where -- where are you at, sir?

Q Just overall, this document sets forth various requirements about how live lineups are to be conducted and to be documented in the period from 1986 to 1998; correct?

A That's correct, sir. Yes.

Q Okay. Were there any other requirements in terms of what was required with regard to the conduct of live lineups that is not documented in this policy document?

A Well, this is the most on point order. I guess there would be a peripheral one -- persons in custody. There's a -- there's a -- an order that covers the treatment of prisoners in custody that I suppose would be applicable to this. These people are in custody, presumably. So that would -- that would be a peripheral order. Those are the only two I can think of right off the top of my head at 5:00 in the afternoon.

Q What is the relevance of that one that you're referring to about people in custody to the issue of lineup -- live lineup procedures?

A Well, there -- there's just a general order about the treatment of persons in custody. So these people -- the suspects in custody, it would go to how he's being treated.

Q Okay. But putting aside how the person in custody's being treated, if we focus on just the live lineup procedures themselves, is there anything that provides any policy guidance about how the live lineup procedure's to be conducted other than the information contained within this policy document?

A Not that I'm aware of.

Q Okay. And let's just pause for a moment and talk about gang specialists. Did gang specialists conduct live lineup procedures in the period from '86 to '98 in homicide cases?

A No.

Q Okay. Could gang -- would gang specialists sometimes assist in a live lineup procedures in the period from '86 to 1998 in homicide investigations?

A Yes.

Q Okay. In what way would they assist?

A Well, so what -- what happens with a lineup is some -- so a detective would go in with the persons viewing the lineup and he would walk into the room and -- and conduct that lineup. But as -- on the other side

of the window, there's four fillers and a suspect. And there's a detective in there or a gang specialist in there assisting with maybe making the suspect sit in a particular way or stand or come to the window. So that would be a role that gang specialists would play. He would assist in the lineup by being with the fillers and the suspect.

Q Would gang specialists be in the room with the detective who's conducting the lineup with the sus -- with the witness?

A I suppose it's possible, but generally the detective -- the detectives run the lineups and they would be with the witnesses because they would want to ensure the, you know, the -- the integrity of the identification.

Q Detectives -- because detectives conducted the lineups, it would be with the witness, there would be no reason for a gang specialist to be in the room with the witness; correct?

A Well, I don't know if I would agree -- necessarily agree with that. There -- there may be a -- there may be, you know, the gang specialist may have a relationship with the witness and the witness wants him there as a -- as kind of as a -- as emotional support. So as long as the gang specialist understands his role,

I don't -- I don't think that there's a -- there's not, there's not a policy violation, so he may serve a useful function.
Q Okay. Gang specialists would not be the ones talking to the witness and performing the procedure with the witness; correct?
A That's correct, sir.
Q Okay. And we talked about photo array earlier. As gang specialists, would they conduct photo array procedures in homicide cases?
A Under certain circumstances under the direction of a detective, they may conduct a photo array.
Q In other words, if the homicide detective expressly delegated that task to gang specialist.
A Correct. Yes.
Q And unless a detective expressly delegated photo array procedure to a gang specialist, they would not conduct photo arrays; correct?
A Not in a homicide investigation; correct.
Q Looking at this policy document, it's obviously a general order, which means it applies to all police officers; correct?
A That's correct, sir.
Q But in homicide cases, what you've indicated

is only detectives are conducting these lineup -- lineups. So this policy really -- homicide cases really applies only to homicide detectives; correct?
A Correct.
Q Okay. I asked you about whether there were any other policies that set forth requirements for how live lineups were conducted. I'm going to ask you a different question about documentation. Are there any other policies that set forth how live lineups were required to be documented other than this policy?
A Not that I'm aware of, no.
Q Okay. And pursuant to this policy, what was required to be documented is set forth in Paragraph J of the policy; correct?
A That's correct, sir.
Q Okay. And so pursuant to the policy in effect, in the period from 1986 to 1998, detectives were required to document the date, time and location of the lineup; correct?
A Correct.
Q They were required to document, essentially, the detectives that conducted the lineup; correct?
A Correct.
Q They were required to document the name and address of each person who viewed the lineup; correct?

A Correct.
Q They were required to document the name and address of each person present during the lineup, other than those detectives conducting the lineup; correct?
A Correct.
Q And that could include things like gang specialists who might have been assisting, or maybe a criminal defense attorney who might have been present or a parent might have been present; correct?
A Correct.
Q Gang -- the detectives were required to document all available information about each person participating in the lineup, such as their name, sex, race, age, height, weight, central booking, or IR numbers; correct?
A Correct. Yes.
Q Okay. And essentially they were -- what that is requiring them to do is identify to -- strike that. To document as much information they can about the identities of each of the people participating in the lineup; correct?
A Correct.
Q And that documentation about each of the people participating in the requirement was required under this policy, both for the suspect and for the

fillers; correct?
A Correct.
Q Okay. And under this policy, detectives were required to identify the name of any person's identified in the lineup; correct?
A Correct.
Q Okay. Now, during this period of time from '86 to 1998, if the person identified in the lineup was a filler, that would not be documented; correct?
A That's correct.
Q Okay. Because during this time period, if a filler was identified, would this -- would the lineup be documented at all?
A Can you ask that again?
Q Yes. If a filler was identified in the lineup, in the period from '86 to 1998, was there a requirement that lineup be documented at all?
A I think we were photographing lineups -- negative lineups. Yes.
Q You were photographing negative lineups, you said?
MS. ROSEN: They said -- are you asking about documenting? (Inaudible).
Q I'm just asking about documenting. That's why I thought you said photoing. So I want to make -- let

re-ask it. In the period from '86 to 1998, if a witness selected a filler in a lineup, was that lineup required to be documented?
A I believe it was, yes.
Q Okay. And if the person selected a filler that would not be documented -- that -- the person -- the filler who was identified would not be documented and instead it would just say that there was a non-identification; correct?
A You're going to have to say that again. You're going way too fast for me.
Q Yeah. I'll read it -- I'll say it again. Paragraph 6 says, "The name of the person identified in the lineup is required to be documented." You with me so far?
A Yes.
Q Okay. And you agree that was the policy in the period from '86 to '98; correct?
A Correct.
Q However, that was interpreted in that period to mean only if the suspect was identified; correct?
A Yes.
Q Okay. Because if a filler was the person identified in the lineup that was not documented in the period from '86 to '98; correct?

A That was not documented.
Q Okay. If you look --
A Correct.
Q Correct. Okay. Under this policy --
MS. ROSEN: Can we take a short break where it's convenient, because he needs to break.
MR. SWAMINATHAN: Yep. I'll just ask these last three questions, then we'll take a break. Is that okay?
MS. ROSEN: Sure. Yeah.
BY MR. SWAMINATHAN:
Q Under this -- under the policy, detectives were required to document the name, rank and star number of the person photographing the lineup; correct?
A Correct.
Q And during this time period, evidence technicians or forensic investigators would photograph lineups; correct?
A Yes.
Q Did detectives also photograph lineups themselves?
A I don't know if they were doing that in this time frame. I did read some -- something that they were doing that. So I believe that in certain circumstances, if an ET was unavailable, a detective would take the

photograph.
Q Was it -- in your experience, was it a common practice for detectives to take -- to photograph lineups themselves in the period from '86 to 1998?
A That was on a case-by-case basis. My recollection is some detectives like to take the photographs and someone wanted an ET. So I think it was preference by the detectives.
Q Okay. Last two questions. And then we'll take a break. It was required in the period from an '86 to 90 -- 1998 for detectives to document any comments made by counsel for the arrestee during the lineup; correct?
A Correct.
Q And "arrestee" references the suspect; correct?
A Yes.
Q Okay. And then finally, if there were anything -- any additional information or unusual circumstances that occurred during the lineup, that was required to be documented; correct?
A Correct.
Q Okay. It identifies several examples there -- strike that. If what occurred during the course of the ID -- of the lineup was that a witness indicated

uncertainty or a lack of confidence in their identification, what they said about their lack of confidence was not something that was documented during that time frame; correct?
A Are you asking me a question or are you reading something, because I don't see it.
Q No, I'm asking you because I think we talked about that earlier; right? Statements of confidence or a level of confidence were not documented -- were not required to be documented during that time period; correct?
A Correct?. Yes.
Q Okay. So Paragraph 9, when it talks about documenting additional information or unusual circumstances, it's not referring to statements about the confidence levels of witnesses; correct?
A That's correct. Yes.
Q Okay. All right. We can -- we'll take a break now.
COURT REPORTER: All right. We're off the -- we're off the record. The time is 5:44.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney

Little. Today is June 29, 2022. The time is 5:53 p.m.

MS. ROSEN: Can you tell me how much time we have on the record?

COURT REPORTER: We're at 6:07.

MS. ROSEN: Thank you.

BY MR. SWAMINATHAN:

Q Looking again at Exhibit 7. Under the policy of Exhibit 7, detectives were not required to document any instructions given by -- that they gave to the witnesses in lineups; correct?

A Correct.

Q As a matter of -- strike that. Were detectives trained that they were required to document anything other than what's contained in Paragraph J of Exhibit 7?

MS. ROSEN: Object to the form.

A No. This is -- this is the requirement policy- wise.

Q Okay. And as a matter of practice, did detectives typically document anything other than what you see identified here in Paragraph J of Exhibit 7?

A Not as a matter of practice, no.

Q Okay. Detectives, when they prepared their documentation of a lineup, they were to do so on

essentially supplementary reports or lineup reports; correct?

A Correct. There's a lineup supplementary report.

Q Okay. I think you said in the period from 1986 to 1998, there was no requirement for detectives to give any type of admonishment or instruction to a witness before viewing a lineup; correct?

A That's correct.

Q Okay. And there was --

MS. ROSEN: Objection, asked and answered.

Q -- and the practice was not to give any admonishment before having a witness view a lineup; correct?

A Correct.

Q Okay. And were there any -- was there any -- were there any prohibitions in the period from '86 to 1998 on what instructions a detective could give a witness before they viewed a lineup?

MS. ROSEN: Object to the form.

A I'm unclear what you're asking me.

Q Yes. In the period from '86 to 1988 were detectives told that there are any prohibitions on what they can say to a witness before they have them view a lineup?

MS. ROSEN: Objection, form.

A There was no policy. No.

Q Okay. Was there any policy guidance about whether or not -- about ensuring that the suspect didn't have restraints or any other indications that they were a person in custody during the course of a live lineup?

A I don't know if there's a Detective Division special order at this time, but obviously, you wouldn't have a suspect handcuffed while the other fillers were not handcuffed. So --

Q Okay. And in Paragraph G of this policy, the policy does require that detectives make efforts to try to have lineups in which the fillers look similar to the suspect; correct? I don't -- I didn't get -- we didn't get the answer.

A Yes. That's correct, sir. I'm sorry. Yes.

Q Okay. All right. And some of the categories that detectives are instructed under this policy to consider in terms of trying to create fillers that look similar to the suspect is to consider height and weight and hair and skin color; correct?

A That's correct. Yes.

Q Okay. And according to this policy, witnesses are not supposed to see the suspect with police officers in advance of viewing a lineup; correct?

A Correct. Yes.

Q Okay. And I mean, the policy specifically says that no suspect should be handcuffed during the lineup unless all of the other suspects -- subjects are handcuffed as well; correct?

A Correct.

Q Okay. And detectives were not required to have any supervisors with them when they conducted lineups; correct?

A That's correct.

Q And there was no super -- detectives did not need to have a supervisor approve the fairness of a lineup before they conducted it; correct?

MS. ROSEN: Object to the form.

A That's correct.

Q Okay.

MS. ROSEN: Sorry. There's some weird noise in my ceiling right now.

THE WITNESS: Sounds alive.

MS. ROSEN: It does sound alive.

BY MR. SWAMINATHAN:

Q Okay. Let's see. All right. Let's turn back to the subject of gang crimes.

A Okay.

Q And let's start with -- pull on some of these

other documents here. Sharing with you Exhibit 5, which is a document we previously marked. This is the pre-service gang specialist training; correct, sir?
A Yes.
Q Okay. This was a training provided in and around July of -- sorry, in and around January of 1995; correct?
A That's correct, yes.
Q Okay. And you are designated to provide testimony for the City of Chicago about training for gang crime detectives on various topics for the entire period from 1986 to 1998; correct?
A Correct. Yes.
Q Okay. And so is the training contained within this training document consistent with the training provided to gang crime specialists throughout the period from 1986 to 1998?
A Yes. That's correct.
Q Okay. All right. And so the training that we see contained -- strike that. Let's see. In homicide investigations, would gang crime specialists conduct interrogations of suspects?
A I'm -- I'm sure it's possible that the gang crime specialists interrogated suspects in other than homicide investigations

Q In homicide investigations, would gang crime specialists interrogate suspects?
A You're including homicide investigations?
Q I'm saying only in homicide investigations. You're designated only as to homicide investigations. So let me focus just on homicide investigations. In homicide investigations would de -- did -- would detectives -- strike that. In homicide investigations, did gang crime specialists interrogate suspects?
A No.
Q Okay. In homicide investigations when gang crimes officers did assist in homicide investigations; correct?
A Correct.
Q In the course of assisting in homicide investigations, gang crime specialists would not interrogate suspects; correct?
A Correct.
Q In the course of assisting in homicide investigations, would gang crime specialists interview witnesses?
A Sure. Yes.
Q Okay.
A At the behest of the detective.
Q Okay. And would -- and when gang crimes

officers assisted in investigations by interviewing witnesses, would they sometimes rely on their knowledge of the various gangs and their relationship to people in gangs?
A Yes.
Q Okay. And would it be the case that gang crime specialists would sometimes talk to somebody who they know on the streets and say, "Hey, you know, who has information about this particular crime?" That was part of their role in assisting in homicide investigations; correct?
A Correct.
Q Okay. And in the course of doing that, they might speak to somebody who actually shares information with them about -- that they happen to have about that underlying homicide investigation; correct?
A That's correct. Yes.
Q And when that occurred, what was the expectation of gang specialists when they received that information pertinent to the homicide investigation?
A I guess what you're asking me is they might -- there might be a couple things that would happen there. They would either bring that person in and have him talk directly to the detectives, or they could communicate with the detective that they found somebody that has

information, and how does the detective want to proceed. Or third, and probably less common, they could documented depending on the year on a Patrol Division supplemental report or GIS reports.
Q Okay. But if that gang crime specialist speaks the witness obviously -- and learns information in the course of trying to find out who may have information outside the presence of a detective, are they required to document that conversation that took place before they're able to bring that witness to the detective?
A Well, I guess I'm a little unclear what you're asking. So --
Q Yeah, in other words, what we were describing is a scenario where gang crime specialist is out talking to people he knows or has relationships with who's in the gangs, and in the course of doing so finds someone who comes to him and says, "Hey, here's this information I have," that turns out to be pertinent to the homicide investigation. So far a common scenario; correct?
A Yes.
Q Okay. So at that point, the ho -- the gang crime specialist has now learned information pertinent to the homicide investigation from a witness outside the presence of any detective; fair?

A Okay. So far they're on the street. Sure.
Q Okay. All right. And so at that point, the gang crime specialist has now effectively conducted an interview and learned information about homicide investigation that no one -- no detective or anybody else has participated in learning that information; correct?
A Correct.
Q Okay. And so one of the things that gang crime specialists might do at that point is take that witness and take them over to go speak with the detectives; correct?
A Correct.
Q Okay. That initial interview that's already happened before the witness is now going to go speak to the detectives, was there a requirement that conversation, the pertinent information learned during that conversation be documented?
A No.
Q Okay. Was there any requirement that the gang specialist take notes of that interview -- strike that. Was there any requirement that that gang specialist create documentation of that interview in which he learned pertinent information?
A No.

Q Okay. Was there any policy that required gang specialists to document that pertinent information learned during the course of that interview?
A No.
Q And were gang crime specialists trained to document that information that they learned -- pertinent information they learned during the course of that interview?
A I'm not sure they were trained to, so I would say there was no policy to document that, and I don't necessarily know that they were trained.
Q Okay. All right. Let me just pull up Exhibit 5. Now I'm looking at Page Foster 113 of the training documents at Exhibit 5.
A Okay.
Q Do you see the section of the bottom entitled Detective Division, Youth Division, Organized Crime Division?
A Yes.
Q Okay. And in that section, it says, "Gang analytical program reviews daily major incident logs produced by the Detective Division," correct?
A Correct.
Q Okay. And then it says, "Personnel from this section," referring to the gang section, "are assigned

to the Detective Division liaison program." Do you see that?
A Yes.
Q And it references the idea that gang specialists would conduct follow-up investigations into gang related incidents; correct?
A Correct.
Q And that would include homicides; correct?
MS. ROSEN: Object to the form, foundation.
A So I've gone ahead and read this whole paragraph. And this is something that I referenced earlier about --
Q Yep.
A It says the commander would disseminate reports. I would -- I would interpret this as gang-related incidents, including -- includes everything, but homicides.
Q And just tell me where it says that, or why you interpret it that way?
A Well, it doesn't -- it doesn't say it, but why I'm interpreting it that way is because if -- if you don't interpret it that way, you're -- you're basically documenting a parallel investigation, which would be counterproductive. So my interpretation of this is that when they're assisting detectives on an -- in a homicide

investigation, either the gang specialist or the detectives are going to document, but not both, because it seems to be right for impeachment at trial, potentially.
Q Okay. And is that interpretation based on any experience you have personally?
A Yes.
Q Okay. And what is the personal experience you're relying on to say that in this section is not -- is specifically excluding homicide investigations?
A I think we've -- I think my experience has been when -- when you have multiple people documenting the same event, you get several different perspectives and sometimes those perspectives are appear -- appear to be in conflict when they're not necessarily. So -- and that in something that's -- is as scrutinized as a homicide investigation, there should only be one set of documents that are -- are, you know, relating the facts as they occurred.
Q Okay. Let's take a look at 114. This refers to the responsibilities of the gang analytical program. Do you see that?
A Getting there. Okay. 114.
Q Okay. Yep. And it references the kind of information that was gathered by the gang analytical

program. And then it says, "They will provide a written overview of street gangs operating in each of the submitting districts." Do you see that?
A Yes.
Q And then it says, "The written gang -- " this is the last paragraph. "The written gang overview by the gang analytical program will be produced on a weekly basis, giving an up-to-date overview on street gangs to the districts, allowing for a coordinated allocation of the department resources to combat the growing gang problem." Do you see that?
A Yes.
Q Have you ever seen a weekly gang overview?
A I have not.
Q Okay. Do you know what information is contained in the weekly gang overviews?
A I do not know that. I'm not sure anybody's ever seen one of those.
Q What do you mean by that?
A I under -- I'm a -- I'm familiar with what the analytical program did. They -- they're basically liaison to the districts, but I don't know that a gang overview was ever generated on a consistent basis.
Q Okay. Taking a look at Foster 188, do you see that?

A Yes.
Q Okay. This is a report of investigation form of the Chicago Police Department for the Gang Investigation Section; correct?
A Commonly known as a GIS. Yes.
Q Okay. So this is the GIS. And if I understand you correctly, when gangs -- between '86 to 1998, as we've talked about, there was a period of time when gangs was in Organized Crime Bureau and a time when they were not; correct?
A Correct.
Q Okay. But because you're testifying with this entire period from '86 to 1998, if I understand you correctly, the -- whatever documentation gang specialists were creating throughout the period from '86 to 1998, the form may have changed between the GIS form and the -- and another form, but basically what they were required to document was the same; Is that correct?
A So there's two different forms, the GIS they would've used when they were in Organized Crime. And -- and before that they would use the Patrol Division supplemental report, which is a Patrol Division report. But yes, in effect, what they were documenting was the same, the content was the same. It was the form that

had changed at some point in 1993.
Q Okay. And in -- I think you've provided some comments about, in what circumstances gang specialists would write a report of investigations. So my question for you is: When gang specialists filled out reports of investigations, those were -- those have to submitted to their supervisors, correct?
A Correct.
Q Okay. And to -- and you said there may be instances when, at the detective's discretion, the gang detective -- the gang officer chooses to write the report of investigation or rather than the detective writing a supplementary report; correct?
A Can you -- can you rephrase that for me?
Q Yeah. I think what you said earlier, if I understand your testimony, when a gang specialist learns information during the course of a homicide investigation, the gang specialists may orally communicate that information to a detective, or they may write their own report of investigation; correct?
A Well, I think that's almost accurate. So when the gang specialist would learn information, he may communicate it orally to the detective who would then document it, if it's relevant in his supplemental report. Or -- and I think that was the most common

scenario. Or much less often they would do a Patrol Division supp or a GIS report, depending on the time frame.
Q Okay. So in the instances when they would do their own documentation, it would be either on this form or the Patrol Division supplementary report; correct?
A Depending on what year it was; correct.
Q Okay. And then looking at -- let's see, it was -- is it Foster? I'm looking -- I'm going Foster 237 to 237.
A Okay, hold on. 236 -- thanks, Eileen. 36 [sic].
Q Nope, 235. 235. 235 to 236.
A Okay. 235.
Q Okay. And 235 is essentially for purposes of the training. It's an example of the kind of information that gang specialists would fill into their GIS form during the course of assisting in a homicide investigation; correct?
A So yes, this is an example. I assume it was used for training and it does list the offense code as homicide. So this is something for educational purposes that was created, that they would generate one assisting in a homicide investigation.
Q Okay. And so gang specialists were trained on

the use of GIS forms during the time they were in the Organized Crime Bureau, they were trained on documenting information. They learned during a homicide investigation in a GIS form; correct?

A Again, if that's something that the detective wanted created, then that would've been done by this mechanism, otherwise it would've been done orally and incorporated into a Detective Division sub.

Q But I'm putting aside, I understand you're saying detectives are going to make that call whether they want to do it themselves or not, but the point is for gang crime specialists, they were trained on how to document information they learned during a homicide investigation in the GIS forms; correct?

A Yeah. They were trained on it. Yes.

Q Okay. And then this -- the -- this training here is training on how to document their pertinent information from a homicide investigation on a GIS form. But I think you've indicated they were similarly trained on filling out the supplementary report for Patrol when they were in that division; correct?

A Correct.

Q Okay.

COURT REPORTER: You have a half an hour. Sorry to interrupt

MR. SWAMINATHAN: You said what?

COURT REPORTER: You have a half an hour left.

BY MR. SWAMINATHAN:

Q All right. Thank you. Okay. And so then to the extent a gang officer was requested to fill out one of those supplementary reports or GIS forms to document pertinent information they learned during a homicide investigation, that information would ultimately have to be passed on to the homicide detectives; correct?

A Correct.

Q Would that -- so the GIS form or supplementary report that a gang specialist would fill out when they provided information in a homicide investigation, would that report go up the chain through the gang section?

A Yes.

Q Okay. And then it would go up the chain through the gang section and then it would have to make its way over to the Detective Division; correct?

MS. ROSEN: Object to the form. Foundation.

A So the report would be approved by the gang section -- investigation section, and then it would be -- it would be -- then there's a mechanism in place to the detectives would eventually get it. Yes. Is that your question?

Q Yeah, that was my question. And so but

basically the process of it getting to detectives, was through the supervisors in the gang section; correct?

MS. ROSEN: Object to the form.

A Well, the supervisor would sign off on it and then the commander or the commanding officer of the gangs would forward it on, if he deemed it appropriate.

Q Okay. And so essentially that determination was being made by the senior person in the gang section; correct?

A Correct.

Q Okay. And was there any policy document that set out the process for ensuring that these ROIs that applied -- that the GIS forms or supplementary reports that a gang specialist filled out that was pertinent to a homicide investigation would be -- was required to get over to the Detective Division?

A There was no policy that I'm aware of.

Q Okay. Are you aware of any training on that point?

A No.

Q Okay. To the -- so is it -- if I understand your testimony correctly, to the extent gang crime specialists were requested to fill out the GIS form or supplementary reform -- supplementary report form based on pertinent information they learned in a homicide

investigation, those GIS forms and supplementary reports should be in the homicide file kept in the Detective Division; correct?

MS. ROSEN: Can you repeat the question? (Inaudible).

Q Yeah. In other words, you've indicated that these reports, supplementary reports or GIS forms that get filled out by gang specialists, if they related to a homicide investigation, they were supposed to get over to the Detective Division through the supervisory staff. You with me so far?

A Yes.

Q Okay. And when they got to the Detective Division, the place where they would go is the investigative file; correct?

A Correct. Yes.

Q Would they go in the permanent retention or record division file as well? Or would they just be in the investigative file?

A They would be in the investigative file.

Q Okay. All right. So when looking at the -- ultimately, if you wanted to see or get a copy of the -- any GIS forms or supplement reports filled out by gang specialists in a homicide case, the place to look is the investigative file; correct?

MS. ROSEN: Object to the form.
A Yes.
Q Okay. Let me just see here. Yeah. Hold on. Let me -- can you go Foster 261?
A 261?
Q 261, yes.
A Okay.
Q Can you tell me what this form is? The identification -- it's identified as a notification worksheet.
A Yeah, this is -- I've seen this before. It's just basically an internal document notification form that kind of describes the crime that they're working on. So if you look at the top, it's got an incident, there's a UCR code and then victim, offender. It's just kind of a -- it's just kind of a, an internal document on, on what what's going on with a particular case.
Q Okay. And then if you go to Foster 120.
A 120?
Q Yeah, 120.
A Okay.
Q I can't really make out what's at the top of this document. It kind of looks like it's like a document related to a tip or something like that. But I wanted to just -- maybe let me just ask the question.

Foster 120, can you tell me what this document is?
A So I -- believe it or not, I've seen this before. It's been a long time. I looked at it when I was prepping. I think it's like anonymous. It's like -- like we were talking about earlier, like a phone tip card or something that would come in, somebody providing street source information. And this is kind of a card that you would fill out to, try to garner as much information as you could. I haven't seen one of these in a long time, but I think that's what this is.
Q Okay. So basically this is a form that was available to gang specialists to gather information from people providing tips; Is that correct?
A Yeah. It would've been probably more authored by somebody answering the phone, but yes.
Q Okay. Somebody within the gang unit?
A (Inaudible) it did -- it did exist, obviously.
Q Okay. And so this was a form that could also be used by people in the gang unit accepting information from street sources, for example; correct?
A Correct.
Q Okay. Closer to the end here. Would you agree with me? You've had a chance to review this training document before there's no training contained within Exhibit 5 regarding Brady obligations; correct?

A Regarding what?
Q Brady obligations.
A No.
Q So when you say no; is that correct?
A That's correct. Yes. You're correct. Yes.
Q All right. One second. All right. Let's see here. Okay. I'm taking a look at -- this is a Pages 101 to 102. Actually, let's look at 100 to 102.
A Okay.
Q And on 100 to 102 --
MS. ROSEN: Can you make it look bigger?
Q Yeah. Yeah. Sorry. I'm starting at the bottom here. It documents various types of files that were kept within the gang unit. You see that the -- it starts with the major case file?
A Yes.
Q Okay. So what are examples of -- were homicide investigations the kind of things that may be part of a major case file?
A No.
Q Okay. That was typically related to narcotics training; correct?
A Yeah. I think if you go into this, it talks about major case files being, you know, going after the hierarchy of gangs and long-term gang-related

investigations.
Q Okay. So it -- so major case files were a type of file that was kept within gang units; correct?
A Correct.
Q And then there's something called a minor case file that was also kept within the gang units; correct?
A Correct.
Q Okay. And was that similar, just different types of obviously less serious criminal investigations, but similar type of information that was being kept in those files?
A Yeah. I mean, this -- these would be shorter-term investigations, not utilizing the kind of resources that a major case file would be. And one of the distinctions that they make with the major case files that usually involves a federal agency where the minor case file does not.
Q Okay. And then the next type of file list is a gang file. Do you see that?
A Yes.
Q And what type of information was kept in the gang files?
A Well, the only -- I'm just going on what I'm reading the same as you are. It's just information about gangs. And I think with the -- maybe the more

important aspect there is, you know, everybody's familiar with the Latin Kings or the Gangster Disciples, obviously that would be a big thick gang file. But there's a lot of smaller gangs that this probably become more in play because there's far less in intelligence. So somebody may say, you know, the Insane Fish and I've never heard of them. And they could go to this and get some relevant background where you probably wouldn't need it as far as some of the bigger, more well-known gangs.

Q Okay. And, but basically the gang -- there was a gang file for each gang that was kept; correct?

A Correct.

Q And then the information in that gang file would basically be information about gang intelligence and arrests and other type of information that gang specialists had been gathering as to each of those gangs; correct?

A Correct.

Q Would the gang books that were kept, would they be kept as part of the gang files?

A The gang books were separate from the gang -- from the gang file.

Q Okay. In terms of the gang files, to the extent gang specialists participated investigations into

specific members of gangs with regard to anything from guns to drugs, would those -- would information that they were learning in the course of those investigations go into the gang file?

MS. ROSEN: Can you repeat the question?

A Yeah.

Q Yes. And maybe a better question is, when gang crime specialists, for example, participated in an investigation related to drugs or guns associated with a particular gang, they may fill out ROI. They may fill out GIS forms or sup reports; correct?

A Correct.

Q Okay. Would those sup reports or GIS reports go in the gang files?

A Yeah.

MS. ROSEN: Object to the form.

Q Assuming they weren't related to a minor case or a major case; correct?

MS. ROSEN: Object to the form.

A Correct.

Q Okay. And so then the -- so if the GIS report or the sup report concerned an investigative steps that were taken in an investigation related to Spanish Cobras, that would go in the Spanish Cobras gang file. Do -- am I understanding that correctly?

MS. ROSEN: Object to the form.

A That is also my understanding. Yes.

Q Okay. And then other than in the gang files - - we'll strike that. And then there's another file called the violent crime file. Do you see that on the next page?

A We on 112?

Q Yes. Top of 102.

A Okay. I'm on it. Yep.

Q Yep. And so that -- and so what type of information was kept in the violent crime files?

A I believe that's shootings and other acts of violence committed by certain gangs or one or a particular gang.

Q So would that also be organized by gang?

A I don't know.

Q Okay. In terms -- to the extent there were gang crime specialists that participated in violent crime investigations involving gangs. Would those GIS reports and supp reports go in the violent crime file?

MS. ROSEN: Objection. Form.

A Again, I don't know. I would suspect that they did, but I don't know. And I apologize.

Q Your understanding is that they did, but you're not certain of that?

A That's correct.

Q Okay. And in terms of the ROIs and -- strike that. In terms of the violent crime files, I think you -- just correct me if I'm wrong. Did you indicate that your understanding is that those were kept by gang?

A That's my understanding, but I don't know that definitively.

Q Okay. And then each of these sets of files, were they all kept in the gang crimes offices?

A Yes.

Q Okay. And so we talked earlier about the -- in the instances when gang crime specialists created GIS reports or sup reports based on their participation in a homicide investigation. We said those reports were expected to get over to the Detective Division through the supervisory staff; correct?

A Correct.

Q Okay. And in addition, a copy would stay in the gang unit; correct?

A I would suspect so. The -- the originals usually stay in the unit.

Q Yeah.

A But I've never seen any policy, or anything written down, but that's generally how the police department works. Yes.

Q Okay. And in other words, usually what goes to the Detective Division would've been a copy of a report, not an original?
A Correct.
Q Okay. And then the original would stay in the gang unit; correct?
A Correct.
Q Okay. And where that occurred in homicide investigations, would those documents go -- those document reports go in gang files or violent crime files or something else?
MS. ROSEN: Object to the form.
A I don't know where they would've been placed because homicides were treated and still are treated differently, and their documentation is treated differently. And as you know, we keep our homicide files separate than other crimes. So what the policy was, or if there was a policy, as far as what gangs did with their homicide-related reports, there was no policy. And -- and I haven't been able to learn what, if anything, was how that was, you know -- how they maintained custody of it.
Q Are you aware of any other repositories where those reports would go other than the violent crime file or gang file?

A The only other repository that I can think of would be, you know, the records division and that's -- that's the only thing that I can -- I can think that would -- that would have anything documentation-wise.
Q Okay. Any other place you can think of that those would've gone?
A No.
Q Okay. And if I understand correctly, the gang unit ultimately was disbanded and their documents -- when the gang unit was disbanded, they were at Maxwell Street; correct?
A No, when they were disbanded, they were at Homewood Square.
Q Okay. My apologies. When the gang unit was disbanded, those various violent crimes files, gang files, and whatever other files were kept within the gang unit. Where did those go?
MS. ROSEN: I'm going to object to the form. Compound because you're mixing files. Compound.
A Oh, I'm sorry. I can only speculate. I have no idea.
Q Do you have any knowledge about where those files are?
MS. ROSEN: I'm sorry. One more objection. Beyond the scope of 30(b)(6), though. It's because

you're talking about after 1998.
BY MR. SWAMINATHAN:
Q Okay. Last question on that topic. Do you have any knowledge about where those files are today?
A If I did, I'd come work for you. No, I have no idea.
Q This training -- this whole package, Exhibit 5. I lost my train of thought. Never mind. Let's see. The -- what policy, if any existed with regard to the process for ensuring that information contained in any of the gang files related to an -- to a homicide investigation was getting to the subpoena service unit?
A So as you know, the subpoena service unit, I'm not sure there was any mechanism in place for the gang files to get to the subpoena service unit. Obviously, somebody would subpoena a file and the subpoena unit would -- would -- would see there's a gang nexus and they would get whatever relevant or whatever available reports from gangs during that time. I'm sorry.
MS. ROSEN: Belated. Sorry. Belated small objection, as to get to the subpoena service unit, as if somebody simply sent documents on request.
Q Did -- are you aware of any policy that set forth requirements about how gang -- how investigative

information in the gang unit would get to the subpoena unit?
A No.
MS. ROSEN: Objection, form.
Q Are you aware of any directives or other written guidelines instructing gang units on how to get information to the subpoena unit related to a homicide investigation?
MS. ROSEN: Objection, form.
A No.
Q Are you aware of any guidance or written instructions to the subpoena unit about gathering information from the gang unit related to homicide investigation?
A No.
Q Are you aware of any training given to anyone in the gang unit, to ensure that documents in their files were getting to the subpoena service unit related to homicide investigations?
A No, I'm not.
Q Are you aware of any training for folks in the subpoena service unit, to ensure that documents in the gang files related to homicide investigations were getting to the subpoena unit? Your answer didn't come through?

A No, I'm sorry. No.
Q Okay. And were there any clerks -- strike that. Was there anybody who worked in the gang unit in the period from '86 to 1998 who was sort of a designated person whose job it was to respond to subpoenas?
A All I can tell you is it was civilian staff assigned to gangs. Presumably one would've had some kind of subpoena responsibilities, but in the documents that are reviewed, there was clerk one, two and three, you know, depending, I guess, on their seniority or responsibility. So as to which clerk would've had those responsibilities, I don't know. Obviously, there was support staff assigned to gangs.
Q Would it be fair to say that in the -- you agree with me that in the Detective Division, there were actual detectives who were assigned to respond to subpoenas; correct?
A Yes. The homicide unit, each homicide unit in every area has a -- has a detective winding down his career that is responsible for building and maintaining files and also fulfilling subpoena requests.
Q Okay. Was there any sworn employee in the gang unit who had that same responsibility in the period from '86 to '98?
A From the documents that I reviewed there was

not.
Q Okay. All right. Are you aware of any checklists or other docu -- strike that. Are you aware of any practice that existed within the gang units in the period from '86 to '98 to ensure that information contained in the gang files, was getting to the subpoena unit in related to homicide investigation?
MS. ROSEN: Objection, form. Foundation.
A No.
Q Okay. Last question for you in Exhibit 5. The very end of Exhibit 5, 272. Foster 272 is where I'm starting.
A Okay. Yes.
Q This is essentially a section from 272 through the end.
A Yes.
Q See here. Yeah. It talks about mainframe computer access. Do you see that?
A I do.
Q And it talks about various types of information that could be accessed through the mainframe computer. Do you see that?
A I do, yes.
Q Okay. And then for -- according to this document, basically information -- you could put in the

name of an individual and get information about that person and their gang affiliation; correct?
A Correct. I believe this is commonly known as a gang database.
Q Okay. And were there photos kept in the gang database?
A No, I truly don't know. I don't believe that this system had the capability or the -- yeah, the computer capability to store photographs.
Q Were there -- were gang contact cards -- what do they call? Gang arrest identification cards or contact cards contained within the mainframe computer?
MS. ROSEN: Objection, form.
A My answer to that would be, this is kind of a very rudimentary computer system that had just very basic information. There was no scanned documents. I don't even think that was invented yet. It was just basically a name. It was like, you know, looking at hell 6,000.
MR. SWAMINATHAN: All right, let me see if I have anything else. I think I'm done. You know what? I'm so bored of my own questions. I'm done.
MS. ROSEN: You're done asking questions?
MR. SWAMINATHAN: I'm done asking questions.
CROSS EXAMINATION

BY MS. ROSEN:
Q I have -- I actually have just a clarification question that I want to ask. With respect to Exhibit 5, which is the pre-service gang specialist training. Mr. Rails [sic], you were asked whether or not this was the training that was provided from 1986 through 1998. Do you recall those questions?
A I do.
Q Okay. And we've already talked about how in 1993, the same crime specialist division or unit was moved over to Organized Crime; correct?
A Yes.
Q So to the extent that the -- any of the information contained in the training materials is specific to Organized Crime, does that mean that information would not have been trained to gang crime specialists before 1993?
A Correct.
MS. ROSEN: That's all I have.
REDIRECT EXAMINATION
BY MR. SWAMINATHAN:
Q Okay. And to the information about -- just to make her understand. Information, we talked, for example, with the major crime file and the minor crime file, do you recall that?

A Yes.
Q That would be -- was that -- is that information that would be specific to Organized Crime?
A Yes.
Q Okay. So that -- those files, are you saying, wouldn't have existed prior -- before gang crimes moved over to the Organized Crime; is that right?
A Correct.
Q Okay. The gang file and the violent crimes file, those were not specific to Organized Crime; correct?
A Correct.
MR. SWAMINATHAN: Okay. I have nothing else.
MS. ROSEN: Anybody else?
MR. ENGQUIST: Nothing for me.
MS. MCGRATH: Nothing for me
MR. SWAMINATHAN: Lieutenant. Sorry. Let me -- anyone else?
COURT REPORTER: No.
MR. SWAMINATHAN: All right. Lieutenant, thank you very much for your time.
THE WITNESS: Thank you.
MS. ROSEN: We reserve signature.
COURT REPORTER: Reserve. All right. And Anand, how would you like your copy?

MR. SWAMINATHAN: No copy for now. Thank you.
COURT REPORTER: Okay. Eileen?
MS. ROSEN: No, not now. If he -- if plan for orders, then we want a copy.
COURT REPORTER: Okay. And if they do order, how would you like your copy?
MS. ROSEN: However we normally get it. I don't know, electronically.
COURT REPORTER: Okay. Megan, how about you?
MS. MCGRATH: Nothing right now. Thank you.
COURT REPORTER: All right. Let me get us off the record.
(DEPOSITION CONCLUDED AT 6:42 P.M.)

CERTIFICATE OF REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

SYDNEY LITTLE,
COURT REPORTER/NOTARY
COMMISSION EXPIRES: 03/18/2026
SUBMITTED ON: 07/29/2022

**Exhibits**

**Exhibit 1_ Foster** 53:25 54:3,10

**Exhibit 2_ Foster** 54:25 55:2,6

**Exhibit 3_ Foster** 82:11, 15 84:12 85:10, 15 86:5,7 113:14 119:16

**Exhibit 4_ Foster** 158:21, 22 159:2 160:18 161:2 162:9 203:5 255:4 277:22 278:19 279:8 281:5,15,22 282:14

**Exhibit 5_ Foster** 179:16, 17,19,21 318:1 323:13,14 335:25 344:8 347:10,11 349:3

**Exhibit 6_ Foster** 199:11, 14 200:19 280:12

**Exhibit 7_ Foster** 201:2,9, 18 215:8 216:16 242:14, 17 277:23 302:21 303:2 314:8,9,16,22

**Exhibit 8_ Foster** 201:21, 22 202:1,14,17 216:3 242:15 243:7,19,23

**0**

**06-02** 201:24

**1**

**1** 28:24 29:3,10, 18,19,22 30:3, 8,17,20,25 31:22 32:24 33:14 34:4 41:10 42:6,23 46:14 53:25 54:3,10 159:25 199:12 200:19 282:18 283:15

**10** 60:6,7 138:14 162:20 163:1,2,8,17,23 164:3 165:13 166:1 256:4

**100** 246:23 247:1,10,13,19 248:9 249:17 336:8,10

**101** 336:8

**102** 336:8,10 340:8

**105** 180:5

**107** 180:5,18 185:9 186:19 189:8,13,16

**10:10** 12:8

**10:48** 46:4

**10:56** 46:10

**10th** 17:19 18:6,8

**11** 297:10,11

**112** 340:7

**113** 323:13

**114** 325:20,23

**119** 190:8,21, 25

**11:23** 69:10

**11:30** 69:16

**11:44** 81:7

**11:48** 81:13

**120** 334:18,19, 20 335:1

**12:42** 125:5

**13** 59:4

**13-page** 55:3

**17** 200:6

**177** 184:1

**18** 12:12,13,15

**180** 191:4

**188** 326:24

**19** 12:16,17 50:5 183:16 277:25

**1980** 243:1

**1983** 200:6

**1986** 55:15 72:17,21 73:1,6 80:11 84:5 87:23 99:4 101:7 153:19 243:2,24 279:16 280:9 281:8 282:15 283:22 285:4 294:21 295:1 298:9,15 301:8 302:20,23 303:8 307:17 315:6 318:12, 17 349:6

**1987** 302:23

**1988** 215:15,19 216:11,18,21 217:4 243:1,3 277:25 278:23 280:11,21 281:11,18 282:5 315:22

**1990** 35:18,20 298:9

**1991** 17:8

**1993** 18:3 81:21,23 82:5 84:5,11,16 87:17,23 91:25 93:6 103:25 104:2,6,10,11, 15,20 105:11 106:8 107:4 113:23 149:24 301:8 328:1 349:10,17

**1995** 18:3 182:1,6,15,21 183:1 318:6

**1996** 23:23 81:21 92:19 93:12 111:13, 18 112:3,8 159:10 243:1 278:20,23,24 279:6,9,21 281:6,11,18 282:5

**1998** 25:15 32:9 55:15 72:18,21 73:1,6 79:15 80:11 91:25 93:22 98:24 99:4 101:7 105:20 106:15 107:2,7, 16 108:19 109:9 112:14, 24 113:8 120:11,19,22 121:8 122:2 150:9 151:22 152:5,15,23 153:2,9,19 155:1,7,14,21 156:3,9,18 158:11 170:2 183:16 239:7, 11,18 240:15 241:1 243:2,4, 5,20,24 244:5, 23 245:4 246:22 277:25 279:11,17 280:9 281:8 282:15 283:22 285:5 286:10, 23 294:21 295:1,18 298:15 302:20 303:8 304:19 307:17 309:8, 16 310:1 312:4, 11 315:6,18 318:12,17 327:8,13,16 344:1 346:4 349:6

**1999** 17:3 28:21

**1:19** 125:11

**1A** 54:18 55:13

**1B** 56:4,7

**1C** 41:12,15 56:19

**1D** 56:23

**1E** 57:3

**1F** 57:6

**1J** 41:2,6,8 54:19 57:11 69:19,23 83:18

**1K** 41:2,6,8 57:15 148:4

**2**

**2** 19:25 25:12 49:10 50:1,18 54:25 55:2,6 158:24 199:12 200:19 256:8 257:6,12,17

**20** 12:19

**20-30** 66:18

**2000** 31:25 32:1,11,16 35:20

**2000s** 28:21

**2011** 216:8 217:24,25

**2013** 17:3 29:24,25

**2014** 49:19,23

**2019** 50:11,22

**2022** 12:8 46:9 69:15 81:12 125:10 162:5 242:10 277:19 314:1

**205** 184:1

**22** 12:7 25:23

**22nd** 17:21 18:1,10,14,18, 24 19:10,21 21:8 24:19,25 25:5,20 26:1

**235** 329:13,14, 15

**236** 329:11,13

**237** 329:10

**23rd** 182:6

**24** 215:15 216:11,21 217:4 243:1,3

**2441** 12:16

**251** 183:22 184:12

**26** 217:24,25 236:24

**261** 334:4,5,6

**272** 347:11,14

**276** 82:11

**279** 179:21

**28** 183:24

**284** 82:12

**29** 46:9 69:15 81:12 125:10 162:5 242:10 277:19 314:1

**29th** 12:7

**2:02** 161:25

**2:09** 162:6

**2A** 57:19

**2B** 57:24

**2C** 58:2

**2D** 58:7

**2E** 58:10

**2F** 58:15

**2G** 58:17

**2K** 58:21

**2L** 58:25

**3**

**3** 25:23 82:11, 15 84:12 85:10, 15 86:5,7 113:14 119:16 158:20 287:12

**3(b)** 117:20 119:1

**3-4** 201:7

**30** 12:6 38:17 185:7,8 269:22

**30(b)(6)** 12:10 32:8,11 33:13, 15,19,21 34:9 37:13,21 40:13 43:19 44:18 45:3,5,7,13 46:17,18 53:15 54:5,14 55:4 78:20 91:2,16 92:5,8,15 93:8, 16 94:21 98:19 109:25 111:1 158:22 187:15, 23 188:9,16 269:9 286:14 295:22 302:12 343:25

**3029** 12:12

**31** 209:8,21

**311** 141:8

**3335** 12:13

**33rd** 180:12

**35** 162:11

**36** 329:12

**3:47** 242:5

**4**

**4** 26:23 27:3 158:22 159:2 160:18 161:2 162:9 190:13 203:5 255:4 277:22 278:19 279:8 281:5,15, 22 282:14 287:24 288:3 299:6 300:13 302:14

**40** 161:6 255:12,20 279:2 281:22, 23

**41** 296:15

**4156** 12:19

**42** 162:12,16

**44** 297:24 298:1

**45** 190:17

**4:09** 242:11

**4:52** 277:14

**4:58** 277:20

**4th** 17:22,24 25:6,7,11,14,24 26:2,7

**5**

**5** 15:21 16:6,11 50:21,23 179:16,17,19, 21 243:7 275:12 318:1 323:13,14 335:25 344:8 347:10,11 349:3

**5-7** 201:24

**55** 275:8

**56** 15:8

**57** 159:13

**5:00** 303:22

**5:44** 313:21

**5:53** 314:2

**6**

**6** 15:6 18:3 25:23 182:1 199:11,14 200:19 275:12 280:12 289:20 290:3 292:8 294:14 310:13

**6,000** 348:19

**6-7** 51:13

**60606** 12:7

**6508** 12:17

**67** 159:25

**6:07** 314:5

**6:42** 351:13

**7**

**7** 84:16 201:2,9, 18 215:8 216:16 242:14, 17 243:7 275:12 277:23 302:21 303:2 314:8,9,16,22

**74** 158:22

**75** 179:21

**7951** 12:15

**8**

**8** 158:22 201:21,22 202:1,14,17 216:3 242:15 243:7,19,23 275:12 296:17

**8-** 43:18

**80s** 149:23,24

**83-5** 201:4,5 280:11

**86** 78:18 79:4,8, 15,22 80:1,5 81:17 83:19 85:1,13 87:25 88:9 89:8,13,24 90:6,10,18,23 91:13 92:1,13 93:22 94:1 95:1 97:16,20,23 98:24 99:13,16 100:2,7,23 101:4 103:23 104:20 105:2,4 106:12,15 107:4,6,16 108:19 109:8 112:14,24 113:8 120:10, 19,22 121:8 122:2 137:10 150:9,13 151:22 152:5, 15,19,21,23 153:2,9 155:1, 7,14,18,21 156:3,9,18 158:11 168:3 170:2,7 181:23 182:13 183:7, 16 193:10 224:8 238:19 239:6,11,18 240:14,25 241:6,11 244:5, 22 245:4 246:21 249:21 286:9,23 295:18 304:14, 19 309:8,16 310:1,18,25 312:4,10 315:17,22 327:7,13,15 346:4,24 347:5

**88** 217:6 282:8, 11

**88-18** 201:5 215:8,9 217:7,9 242:17 277:24 280:6,11

**9**

**9** 180:11,12,18 185:9 275:12 313:13

**9-year** 43:18

**90** 79:22 312:11

**90s** 21:15,21 22:23 23:15,22 24:16 150:5

**91** 18:5 35:19

**92** 18:12 25:22

**93** 18:5,11 87:25 88:9 89:8,13,24 90:23 91:13 92:1,13 103:9 104:7 105:2,4, 19 107:2 119:18

**93-01** 82:13 86:7

**94** 18:20 24:20 25:20

**95** 18:20 24:20 25:17,20,23 26:2

**96** 24:11 25:18 26:4 93:1 112:12 119:18 159:15 282:8

**98** 24:20 25:18 26:7 78:18 79:4,9 80:1,5 81:17 83:19 85:2,13 90:6, 10,18 94:1 95:1 97:16,20,23 99:13,16 100:2, 7,23 101:4 103:23 109:8 137:11 150:13 155:18 168:4 170:7 181:24 182:13 183:7 193:10 224:8 238:19 241:6, 11 249:21 304:15 310:18, 25 346:24 347:5

**99** 25:15,18 26:7

**A**

**a.m.** 12:8 46:10 69:16 81:13

**ability** 51:21 70:20 116:4 219:4 266:22

**abreast** 263:5, 13,22 264:10 266:2

**absolutely** 144:14 173:10 214:13 225:6 226:4

**abused** 282:24 283:3 284:20 285:25 286:25 287:2,10

**abusing** 286:10

**academy** 17:19 18:7 94:23

**accepting** 335:19

**access** 347:18

**accessed** 347:21

**accuracy** 250:14 272:22

**accurate** 70:24 96:21 116:5,8 127:22 130:15 132:2 143:23 178:2 213:18 222:10,16 225:24 226:8 271:21 273:3 283:12 285:18 301:23 328:21

**acknowledging** 137:5

**act** 141:22

**activity** 19:12 26:12 33:9

**acts** 340:12

**actual** 54:17 165:22 346:16

**ad** 89:16,20

**add** 301:18

**addition** 71:4 243:13 278:7 341:18

**additional** 44:6 96:12,22 97:7 134:15 135:6,11 138:4 139:8,21 140:5 173:4 174:15 180:19 192:11 197:5 237:9 253:25 291:10 292:10,22 293:22 312:19 313:14

**additionally** 243:11

**address** 39:12 307:25 308:3

**addressed** 37:19 40:3 85:7 153:22

**adequate** 177:25

**admissible** 234:8

**admitted** 179:1,13

**admonishment** 315:7,13

**admonishments** 193:5,7

**adult** 301:15 302:3

**advance** 316:25

**advantage** 229:17

**adversarial** 174:12

**affiant** 117:13

**affiliated** 171:14

**affiliation** 171:21 181:3 348:2

**affirm** 14:19

**aftermath** 136:7

**afternoon** 303:22

**afterward** 173:13

**age** 308:14

**agency** 337:16

**agent** 112:20

**aggravated** 33:7

**aggressive** 19:5 20:22

**agree** 38:5 80:16 84:21 89:23 90:16 97:17 98:24 99:3 117:7 135:18 138:17 144:1,4,9 154:18 157:24 161:1 164:2 167:6 168:2 170:1,6,17 182:21 194:5 200:11 262:6 268:4,24 269:2, 3 272:10 275:13 280:16 288:18 305:20, 21 310:17 335:23 346:15

**Agreed** 162:24,25

**agreement** 37:19

**ahead** 13:12 55:25 65:2 89:19 91:5,8,17 98:20 109:24 113:5 117:3,15, 16 130:2,3 141:2,3 143:9 147:17 185:25 186:1 219:13, 21 221:3,14 241:4 252:2 270:1 271:1 276:5,20 287:7 300:7 302:9 324:10

**aid** 282:20

**album** 164:9 181:3

**albums** 163:5, 11,12,15,18 164:16

**alive** 317:19,20

**All-relevant** 143:21

**all-suspect** 278:11,15

**alley** 97:13

**allocation** 326:9

**allowed** 38:16 176:12,16 178:18 289:23 292:13

**allowing** 326:9

**alluded** 270:9

**alluding** 257:23

**ambiguity** 61:25

**ambiguous** 74:13 235:1 251:18

**Amended** 54:4 55:4

**amount** 37:17 66:17 95:8,11 97:7 172:9 250:8,12

**analysis** 185:1,21 186:22

**analytical** 323:21 325:21, 25 326:7,21

**Anand** 12:25 103:7 118:15 350:25

**and-so** 135:8 140:20

**and/or** 79:11

254:9,15

**anonymity** 117:9,15,17 119:4

**anonymous** 69:20 75:2,6 95:20 116:19, 24 117:5 128:17 132:13, 21 133:8,9,13 134:3,6,18 135:4 137:7 138:2 139:2,20 140:2,6,11,15, 19 141:10,13, 19,22,24 142:3, 6,14,15,18,19, 23 143:14,16, 20,24 144:16, 23 145:24 146:1,8,10,18, 19 147:5 335:4

**anonymously** 132:6 133:19, 25 138:18

**answering** 17:14 52:2 141:8 153:21 335:15

**answers** 33:12,18 52:12 75:12 187:14

**anticipated** 75:4

**anybody's** 326:17

**apologies** 196:16 343:14

**apologize** 28:9,11 77:13 121:25 340:23

**apparent** 270:11

**appearance** 12:22 13:10 175:1

**appearing** 13:15

**appears** 160:24 167:17 271:6

**applicable** 69:22 102:5 103:4,6 212:25 216:16 280:10 303:19

**applied** 72:18, 22 73:2,7 79:9 80:7 82:2 83:25 84:7 85:16 86:6 87:10,24 89:9, 14 90:25 91:12 93:20,24 100:15 101:5, 12 103:19 107:1 110:13, 20 113:20,22 119:17 120:6,9 121:13 122:2,3 199:2,6 201:15 202:14,21 215:11 216:13 218:20 226:11 277:24 280:11 285:6 332:13

**applies** 84:22 92:17 114:2 119:7 129:17 149:16 226:6 301:20 306:22 307:3

**apply** 77:16,25 78:4,9 84:12,24 85:10,20 86:8 91:3 113:20 119:23 125:23 163:8,23 167:2 200:20,23 201:18 202:17 216:14 243:23

**approach** 35:11

**appropriateness** 123:11

**approval** 227:11

**approve** 317:12

**approved** 331:20

**approximate** 66:16

**approximately** 16:16 18:2,11, 12 19:9 23:14, 21 24:10,20 25:15 26:4 28:1,19 29:17 50:13 51:13 60:2,4,8 61:1 197:17 281:22

**approximation** 66:12

**April** 217:24,25

**area** 15:21 16:6,11 19:21, 23,25 25:11,12 26:22,23 27:3 28:23,24 29:3, 10,18,19,22 30:3,8,17,20,25 31:22 32:24 33:14 34:4 36:8 42:6,23 46:14 49:8,10,25 50:1,17,18,21, 23 178:11 232:20 346:19

**areas** 109:16, 21 110:3,4,8, 18,21 141:5

**argue** 130:14 237:8 248:20, 23 269:11

**argument** 269:13

**Ariel** 12:12

**array** 130:12, 17,22 131:12, 17 132:3 136:23 145:23 146:7,17,20 147:6,15,21 157:21 173:12, 19 174:4,21 194:17 195:25 197:10,22 198:1,6 208:16, 23 213:16 220:20 221:3,8, 10 228:8 229:6, 11,14 249:23 254:9,14,16 258:1,13 261:11 263:4,8 265:1 267:25 268:2,7,15 269:14,17,20 270:6,18,19 272:6 273:13, 18,25 274:8,19 275:3,12,15 287:14,24 288:21 289:3, 13 290:25 291:4,19 292:3, 9,16,20 293:7, 11,16,24 294:3, 6 295:10,20,24 306:8,10,13,18

**array's** 284:13

**arrays** 154:15, 18,19 157:19 176:24 196:18 197:12 198:11, 22 199:2 200:13,19,20 201:12,16 202:15 203:10 205:14 207:15 214:11,22 215:12 226:1 239:3,8,12 242:21 243:13, 17 251:23 256:1,2,6 273:6,24 278:14,15 283:5 288:12, 17 291:10,17, 22 292:10,22 293:3,14,23 295:2 296:2 306:19

**arrest** 126:18 128:6,8,10 130:8 134:8 135:14,19 137:10 173:9 179:10 180:24 181:1,17 183:17 184:11, 17,22,24 185:6, 11,13,14,15,22 186:2,7,21 187:2 189:4,9, 11,12,15,21 190:6 191:1,8 220:8 221:13 225:5,9 254:2 272:1 282:24 287:3 291:1,4,9 295:16 297:17, 20 348:11

**arrested** 179:8 185:3,23 229:21 276:2 297:14

**arrestee** 191:12 312:12, 15

**arresting** 126:5 127:11

**arrests** 183:5, 13 191:6 338:16

**arrived** 36:8 124:22 252:15

**art** 213:15

**articulated** 49:3

**aspect** 265:3 338:1

**aspects** 286:3

**assaulting** 19:16

**assess** 139:9, 22 247:21

**asset** 86:10

**assigned** 15:21 16:3 26:22 28:23 29:4 32:2 36:22 48:18 49:13 110:17 150:14 323:25 346:7, 13,16

**assignment** 15:20 48:17

**assignments** 19:2

**assist** 30:23,24 99:5 101:25 168:2 169:10 304:18,21 305:6 319:12

**assistance** 103:1 104:22 105:1,7,14,21 106:17 107:18 108:21 111:8, 11,19 119:25 150:12 168:6

**assisted** 99:8, 10 100:13,18, 24 102:17 105:11 320:1

**assisting** 101:4,12,17 109:15 123:2 305:3 308:7 319:15,19 320:10 324:25 329:18,23

**assume** 52:21 66:12 149:23 189:23 329:20

**assumed** 110:4

**assuming** 61:20 232:18 339:17

**assumption** 250:18

**attach** 264:12

**attached** 182:5

**Attachment** 190:12

**attending** 12:23 13:19,22

**attentive** 239:14

**attorney** 308:8

**attorney's** 173:17 209:23 210:1,18 211:11 245:18

**attorney-client** 69:1

**attorneys** 59:10

**audit** 179:5

**authentic** 271:21 273:3 284:16

**authenticity** 283:7

**authored** 335:14

**authority** 176:22

**authorize** 227:15

**automatically** 137:18 138:11

**availability** 233:10

**avenue** 179:11

**avenues** 157:11

**avoid** 225:16 271:7,9,12,14

**aware** 21:18 24:3 48:6,7,8, 10 60:1 72:20, 25 73:5 74:7 76:19 77:12,15, 24 78:2,3,8,13 79:13 80:17 81:1,15 84:9 85:23 86:4 87:16,22 89:12 92:11 93:4,10, 11 97:4 98:1,13 101:14,20 103:3 104:15 105:9,17 108:15,22 109:3,12 111:18 112:2,5, 6,9,13,19 113:7 122:5,6 127:1 141:18 145:11 148:10 152:20 153:3,5 154:4, 5,6,16 155:4,9 158:3 175:18 178:17 185:24 186:2 193:2 199:3 202:21, 24 203:4 214:20 227:9, 13 246:4,7 267:14 278:20 279:19 281:9 287:8 293:25 296:7,13 304:11 307:11 332:17,18 342:23 344:24 345:5,11,16,21 347:2,3

**B**

**B6** 269:22

**back** 17:24 45:25 46:6,25 48:18 49:13 50:6,10,11,14 69:12 77:9 80:9 81:9 82:7 94:13 99:16 108:12 124:13 125:7 132:21 136:24 137:3 147:16, 18 148:15,16 149:11 154:17 162:2 173:22 175:7 183:23, 25 185:7,8 189:24 190:1,3 191:20 216:23 218:8,12,16 223:17 232:7, 20 236:21 240:20 242:7 244:20 250:22 270:22 271:10 277:16 281:5, 22 290:9 296:19,20 297:1,4,8 313:23 317:22

**background** 17:12 38:16 45:9 51:11,19 338:8

**bad** 199:20 252:18

**bank** 96:3

**bar** 145:7,9

**Barber** 59:23

**based** 26:24 27:1 28:25 29:1 33:20 37:1,23 61:20 103:1,13 115:9 124:9 126:6 127:2,11 128:15 129:7 137:22 140:9 142:5,14 144:20 145:1, 23 146:4,7,17 147:6 148:15, 20 179:7 181:17 183:11 187:20 194:6 237:19 257:11 276:24 283:21 291:13,15 298:10 325:5 332:24 341:13

**basic** 348:16

**basically** 20:19 73:24 95:2 160:12 167:15,18 178:14 179:6 181:14 191:5 205:5 214:9 228:13 259:5, 19 266:11 280:4,10 324:22 326:21 327:17 332:1 334:12 335:11 338:11,15 347:25 348:18

**basis** 43:8 44:13,21 97:11 109:22 110:18 123:11 126:10, 22 127:20 128:12 130:22 131:15 134:11 135:22 136:3 137:14 138:6 146:23 147:2, 12 148:2 177:9 204:9 205:23 207:20 208:22 221:18 225:13 230:2 232:18 235:17 238:2 257:21 258:11 259:13 261:22 262:4 266:16 267:20 271:3 291:15 312:5 326:8,23

**Bates** 158:22 162:12 180:8 184:5 190:20 255:13 278:25

**bathroom** 69:6

**batteries** 33:7

**beat** 191:10,24 251:19

**beefs** 171:25

**began** 84:12

**begin** 14:24 17:4

**beginning** 49:23 53:19 82:3 159:9 202:8 258:6

**begins** 256:9

**behalf** 13:14, 16,20 54:13 56:6,18 57:2, 10,23 58:6,14, 20 83:7

**behest** 319:24

**being's** 235:23

**belated** 250:17 344:21

**belief** 191:12 286:6

**believed** 52:3

**believes** 275:21

**belong** 176:3

**beneficial** 139:25 232:19 234:7

**bias** 43:7,21 44:9 45:9,16, 17,18 46:21 222:2 289:9,11

**big** 297:3 338:3

**bigger** 54:1 113:17 118:18 161:8 184:19 336:11 338:9

**bill** 125:15

**binding** 44:17 45:6 55:20,25 56:6,10,18,22 57:1,5,9,14,19, 22 58:1,5,9,13, 19,24 59:4

**bit** 30:6 34:19 87:5 95:12 106:20 142:2 155:21 165:6 172:21 203:8 253:3 292:24

**black-and-white** 174:22, 24

**blind** 298:5,9

**blood** 224:14

**Blow** 199:19

**bodies** 197:7

**book** 40:1,2 64:3 148:6,11, 17,18 149:7 150:21,23 151:7,21,23 152:6 154:9,18 156:11,16 157:2,20,25 162:23,24 163:2,3,8,23 164:10,12,21, 22 165:2,11,22 166:4,17 167:1, 2,5,7,8,13,14, 18 169:5,6,19, 25 170:21 172:4,10,23 173:3,5 175:6, 9,16,20 176:13, 17,24 177:5,12 178:15 192:21 193:3,17 194:1, 7,16,18,22 195:7,20,24 198:5,8,9,10,14 199:23 200:24 202:22,25 265:7,9,13,15, 19

**booking** 308:14

**books** 40:10 63:17,19,23 124:14 148:3,8, 12,14,20,22,23, 25 149:1,3,4, 11,12,14,18,22, 23 150:2,9,12, 18 151:1,11,14 152:17,25 153:8,17 155:1, 7,11,15,24 156:4,9 163:6, 14,18,22 164:5, 13,16 165:9 166:9,13,21 167:11,23,24 168:1,2,6,8,11, 13,14,16,19,21, 23,25 169:2,3, 10,14 170:13, 15 172:14,18 175:20,25 176:2,7,10 177:3,19,21,22 178:4,8,18,23 179:6 180:20, 21 181:17 182:19,25 183:5,11 188:21 192:4, 11,16,17 193:1, 3,6 194:4,10,25 195:1,15 198:10 199:6,8, 10 201:12,13, 19 202:18 242:21,22 265:7,14 338:20,22

**bored** 348:22

**bottom** 180:11, 13 187:17,20 189:20 217:11, 25 323:16 336:13

**bound** 99:22, 24 100:6 240:11

**box** 185:22

**boxes** 185:2

**boy** 234:5

**boyfriend** 133:2 204:22

**Brady** 335:25 336:2

**breadth** 68:25

**break** 45:23 46:1 52:23,24 69:6 81:4 134:24 142:2 218:4 241:16, 18 242:3 248:7 267:9 277:5,9 311:5,6,8 312:10 313:19

**briefly** 50:14 148:4 218:18

**bring** 46:25 160:6 209:25 219:5 292:4 297:12,19 320:23 321:10

**bringing** 214:2 221:15

**broad** 90:9 117:18 126:13 128:25 136:2 206:2 213:23 221:22 274:13

**broader** 88:16 98:16

**broke** 30:6 65:16 83:15 97:19 111:24 172:21 268:25

**brought** 139:4 184:6 199:21 268:13

**Brown** 13:7

**brush** 126:13 128:25 136:2 206:3

**buckets** 244:7

**Bug** 147:22

**Bugs** 147:24

**build** 106:13

**building** 178:3 346:20

**Buoto** 12:15 54:7

**Bureau** 24:2 79:5,8 82:4 84:6 86:16 87:9 90:23 103:20 104:8 327:9 330:2

**burglaries** 33:8

**burglars** 148:18

**burglary** 148:18

**busy** 29:19

**but--** 188:25

**buys** 27:7

**by-case** 135:22 147:12 262:4

**C**

**call** 91:18 132:6,22 133:9, 18 134:12 135:24 138:17 139:20 140:25 141:5 142:4,7, 14,16,23 143:14,16 159:19 184:24 200:1 204:17 330:10 348:11

**called** 70:12 136:16 140:11 149:7 168:23 185:1 186:20, 21 197:9 266:9 337:5 340:5

**caller** 75:6 134:6 137:7 139:2 140:6,11, 15,19 141:13, 14,23,24 143:20,24 144:16,24 145:24 146:1,8, 10,18,19 147:5

**callers** 133:9, 14 136:10,11

**calling** 86:12 133:2 139:14 147:22 180:21

**calls** 19:5 69:20 75:7 129:4 134:3 135:2,3,4,16,22 137:7,19 138:2 140:2,15,19 141:10,20 142:18 147:19 188:6,7 237:18

**capability** 348:8,9

**capacity** 51:15

**caption** 13:5 55:3

**captions** 13:2 54:6

**captures** 302:21

**car** 75:18 211:25 222:7,8, 11 223:17,18

**card** 125:1 180:24 184:11, 12,24 185:11, 16 186:3,7,10, 21 187:2 188:14 189:11, 13,16,20,22,23, 24 190:1,6 191:1,5,9 335:6,7

**cards** 181:18 183:17,18 184:18 185:15 189:5,9 191:23 192:3,14

348:10,11,12

**care** 69:4 103:10 277:6

**career** 17:10, 13 43:18 49:1 346:20

**careful** 103:16

**carefully** 53:4 74:24 117:23

**Carney** 59:23

**carry** 251:16

**cars** 97:13 251:20

**case** 37:20 45:14,15 47:18 48:12 55:3 66:25 122:23 129:15,17 133:13 134:4, 10,14 137:16 174:3,8 185:20 207:3 221:17 232:18 233:10 243:23 320:6 333:24 334:17 336:15,19,24 337:2,5,14,15, 17 339:17,18

**case-** 135:22 147:11 262:3

**case-by-** 232:17

**case-by-case** 97:11 123:11 126:9,22 127:20 128:12 131:14 134:11 136:3 137:14 138:6 146:23 147:2 148:2 177:8 204:9 205:23 207:20 208:22 221:17 225:13 235:17 238:2 257:20 258:11 259:13 261:22 266:16 271:3 312:5

**case-specific** 230:2 232:24

**case-to-case** 267:19 291:15

**cases** 13:1,4, 15,17,21 47:13 48:2 53:18 54:6 69:22 97:18,21 102:2 129:2,17, 25 138:23 147:2,12 170:7 176:18 177:12 178:8 232:5 233:5 252:7 261:19 263:18 264:19 285:19 292:24 293:14 304:15 306:10, 25 307:2

**categories** 71:19,20 74:5,7 88:20,21 316:17

**category** 75:5, 10

**caught** 236:25

**caveat** 87:11

**ceiling** 317:18

**central** 308:14

**certainty** 249:5 250:10

**cetera** 148:23

**chain** 331:14, 16

**chance** 85:5,8 125:13 188:18 335:23

**change** 21:15 23:3,25 65:3 131:6 175:1 249:11

**changed** 209:14 327:16 328:1

**characteristics** 287:15

**characterize** 72:4 134:19

**characterized** 164:9

**characterizing** 256:22 286:17

**charges** 173:13

**charging** 173:12,17

**check** 185:2

**checklists** 347:3

**Chicago** 12:7 13:4,14,15,19, 22 15:19 17:4 53:14 54:5,14 55:5 56:7,19 57:2,10,23 58:6,14,20 68:17,21 70:3, 5,9 72:9 76:10 83:13 86:1 94:23 99:24 100:5 112:21 117:8 133:16 147:24 148:9 149:19 153:13 155:5 158:23 165:25 166:24 170:4 203:21 207:3 209:13, 18 210:4,16,22 211:3 218:21 220:17 268:4 318:10 327:3

**Chicago's** 43:25

**child** 129:4 147:19

**choice** 107:13

**chooses** 328:11

**chronology** 273:16 274:3 293:9

**CI** 76:1,16 88:19,20 114:6, 7

**circumstance** 76:15 252:4 258:10 259:20 268:22 272:16 281:1

**circumstances** 76:14 91:6 102:24 128:14 138:9,12,16,22, 24,25 139:1,18 204:10,13,21 206:5 211:17 212:18,22 213:19 214:4, 16,20 218:20 233:15 235:14, 20 236:3,7,14, 18,19 237:7,19, 24 252:12 254:25 257:21, 25 258:15,22 259:2,21 262:9 267:21 271:4 272:15 274:12 279:25 280:25 291:16 297:25 298:1,5 302:24 306:11 311:24 312:20 313:15 328:3

**CIS** 85:15 86:20 87:15,21 88:11 89:11,15, 25 90:3,7,14, 18,22 93:5,12 114:22

**citizen** 75:16

**city** 13:3,14 19:22 43:24 44:17 48:10 53:13 54:5,13 55:5,21 56:6,19 57:2,10,23 58:6,14,20 59:18 70:22 83:7,13 97:14 110:14,18 147:24 158:23 170:4 218:21 318:10

**City's** 43:13 55:14 59:9

**civilian** 346:6

**claim** 182:9

**clarification** 61:18 76:13 88:13 103:8 244:2 349:2

**clarified** 88:25

**clarify** 61:24 68:24 85:6 107:3 168:15 189:2

**clarifying** 82:8

**clarity** 148:1

**clean** 224:13

**clear** 33:11 48:24 61:22 74:14 76:3 82:8 85:8 103:11 112:25 150:3 154:6 155:20 186:16 193:16 247:16 250:25 268:3 274:16 282:2

**clearer** 219:1

**clerk** 346:9,11

**clerks** 346:2

**click** 13:23

**client** 45:22

**close** 232:22 277:6

**closely** 263:19 264:4

**Closer** 335:22

**closing** 285:19

**cloth** 208:24

**clothes** 209:10

**clothing** 171:8, 14 208:25 209:2,3,6,9,14, 15,17 210:3,15, 20,21,25 211:3, 7

**Cobra** 274:24

**Cobras** 275:4 339:24

**code** 329:21 334:15

**collaborative** 105:25

**colleague** 13:7

**collect** 95:9 183:17

**collected** 116:14 179:8

**collecting** 185:5

**collection** 179:7

**collects** 232:10

**color** 171:8 316:21

**combat** 326:10

**comfortable** 73:17

**command** 20:24 21:5 284:18 285:8, 21

**commander** 16:9,11 21:7 123:9 124:9 324:14 332:5

**commanders** 284:7,19 285:8, 16 286:7,9,24

**commanding** 16:6 124:8 332:5

**comment** 117:18

**commented** 247:12

**comments** 238:5 312:11 328:3

**commit** 205:16 212:2

**committed** 147:23 171:18 211:21 224:12 275:22 285:2 340:13

**common** 120:2 170:7,18 211:2 232:25 233:4 257:25 293:14 295:8,17,19 301:4 312:2 321:2,20 328:25

**commonly** 72:1 177:9 327:5 348:3

**communicate** 70:21 102:21 320:24 328:19, 23

**communicated** 102:20,22

**communication** 105:25

**comparatively** 21:19

**compensation** 75:20 77:2

**competent** 188:9

**complaint** 47:4

**completed** 52:3 194:1

**completely** 20:10 23:23 50:13 76:3 136:7 274:16 290:5

**components** 248:8

**compound** 87:4 343:19

**computer** 347:18,22 348:9,12,15

**computer-generated** 174:22,23

**concealed** 117:23 118:3

**conceive** 214:25

**concept** 70:3 225:21

**concepts** 20:4

**concern** 187:8 189:23 290:16

**concerned** 293:6 339:22

**concerns** 55:14

**CONCLUDED** 351:13

**conditions** 53:8

**conduct** 96:5 121:17 122:11 138:3 142:4,13 173:19 175:20 176:12,16 177:5 200:9 202:21 204:2,7 207:3,14 208:19 212:8, 14 213:10 215:3 218:21 219:8 220:10, 18,20 221:14 224:22 225:10 228:6,7,8 229:4 231:15 242:20 243:12,17 247:20 248:2, 11 251:20 252:7 253:25 257:17 258:15 265:15 266:22, 24 268:7 273:13 274:7 283:24 284:3 291:9,10,11,21 292:21 293:22 298:10 300:24 303:4,12 304:14,25 306:9,12,19 318:21 324:5

**conducted** 46:8 69:14 81:11 97:8 115:8 125:9 142:23,24 162:4 173:5 175:21 176:23 178:4,11,16 192:21 193:13, 15,19 194:15 212:19,22 226:20 227:8, 10 230:24 233:6,22 234:3 235:4 239:7,22 242:9 251:11, 25 252:1,21 254:25 258:24 265:19 277:18 279:9 298:15, 19 301:6 303:7 304:9 305:16 307:7,22 313:25 317:8, 13 322:3

**conducting** 37:3 121:3 145:18 167:13 177:12 193:17 214:11,21 222:1 227:12 232:14 239:25 251:4,7 252:14 258:8 267:23 273:6,24 288:17 292:10 300:11 305:9 307:1 308:4

**confer** 45:21

**conference** 46:8 69:14 81:11 125:9 162:4 242:9 277:18 313:25

**confidence** 238:11 239:15 240:16 246:18 247:5 250:10 313:1,3,8,9,16

**confident** 114:22 238:24 247:1

**confidential** 27:9 28:11 40:1,10,20 63:5,8,11 69:20,21,25 70:6,13,14,16, 18 71:2,5,11, 13,16,21 72:5, 14,19 73:3,19, 22,23 74:6,25 76:8,20,23 77:5,16,25 78:5,10,15 79:11,16,19,20, 23 80:6,12,24 81:18 82:3 83:8,12,18 84:7,22,23 85:16,19,25 86:25 88:2,6, 14,19,21 91:14 92:3,13 97:24 98:2,5,9,22 113:9 114:3,7 115:2,6,21 116:3,12,18 117:7 118:1 119:8,14,17,24 125:19 126:14

**confidentially** 145:25

**confine** 78:21 98:17

**confined** 118:5

**confines** 155:23

**confining** 124:3

**confirm** 175:8 223:2 257:3

**confirmation** 205:19

**confirming** 128:21 205:6

**conflict** 325:15

**confront** 174:11

**confused** 35:24 81:20 104:14

**confusing** 195:12 280:7

289:17

**conjunction** 183:12

**connections** 38:19

**conscious** 105:24

**consent** 177:20

**considered** 27:12,18,19 154:19 210:3, 16 211:8,11 245:6 246:11, 22

**consist** 278:6

**consistent** 279:10 281:17 295:5 318:15 326:23

**consisting** 159:12 197:17

**conspiracies** 132:25

**conspiracy-type** 22:15

**constitutes** 269:23

**constraint** 219:14,15

**construed** 249:10

**contact** 75:13 183:18 184:11, 22 185:1,16,20, 21 186:22 189:20 348:10, 12

**contained** 282:3,13 304:10 314:15 318:14,20 326:16 335:24 344:11 347:6 348:12 349:14

**content** 145:1 327:25

**context** 38:1 73:16 162:22

**contrary** 268:24,25

**control** 89:22

**controlling** 118:12

**convened** 12:9

**convenience** 178:21

**convenient** 311:6

**conversation** 106:22 107:7 108:5,11 148:19 220:1 248:25 321:9 322:17,18

**Cook** 210:18

**Cool** 184:7

**cooperate** 70:4

**cooperating** 71:6,21 72:3, 10,12,15,23 73:8,10,11 74:13,17 82:13 85:14 88:14 114:1,5,11,16, 19 115:9 117:22

**coordinated** 326:9

**copied** 175:17

**copy** 118:15, 16,18,21 160:3, 12 161:13,18, 20 162:9 180:2 199:20 242:14 333:22 341:18 342:2 350:25 351:1,4,6

**corner** 183:25

**correct** 15:10 16:5,10 18:16 22:24 24:15,17 26:8,9 31:12, 16,24 32:3,23 34:22 36:16,18 47:5,12 49:7,21 50:8,12 51:1,2 53:15,16,20,21 55:10,11,22 56:8,20,21,24, 25 57:3,4,7,8, 12,13,16,17,20, 21,24,25 58:3, 4,7,8,11,12,15, 16,17,22,23 59:1,2,4,5 60:10,11 66:20, 21 73:12 74:10 75:8 79:24 80:2 82:4 84:8,9,13, 14,16,17,25 85:3,4,11,12, 17,21,22 86:22 88:11 93:2,22, 23 100:4,10,11, 16,20,21 101:9 102:10,11,14 105:22 106:24, 25 107:20,24 108:2,6 110:15 112:1 113:6,10, 11,20,21,23,24 114:3,4,8,9,19, 20,24,25 115:3, 4,10,23 116:10, 15,19,24 119:20,22 121:10 122:9 126:2 127:11 128:11,22 129:22 131:21 134:1,23 135:19 136:11 137:1,2 138:5, 20 139:23 140:7,13 143:25 144:18, 24 145:6,15 150:9,10 151:8, 9,12,15,24 153:19,20 154:20,21,23, 24 155:2,3,7,8, 11,12,15,24 156:1,4,19,20, 24 157:8,16 158:2,6 159:1, 3,6,7,10,11,15, 16 160:16 161:4 163:3,20, 24 164:1,6,14, 23,25 165:4,17, 19,23,24 166:1, 2,5,7,10,22 167:15,20,22, 24,25 168:13, 14,25 169:7,8, 11,16,21 170:4, 5,11 171:19,23, 24 172:2,3,5, 10,11,16,25 173:5 176:14 177:14 178:5, 11,17,20 179:9, 24 180:22,23 181:8,9,12,13, 18,21,24 182:6, 7 183:7,14,18, 19 184:18,24 185:17 186:11 191:6,7,13,14, 25 192:1,11,12, 16,17,18 193:20,21 194:7,12,23,24 195:1,2 196:21, 22,24 197:10, 11,19 198:2,3, 6,12,19,22 199:13 200:3,6, 7,9,13,16,17, 21,24,25 201:8, 10,13,14,16,17, 19,20,25 202:2, 12,13,15,16,18, 19 203:2,3,5,6, 25 205:11,12, 16,17 207:15, 16,19 208:8,9, 13 209:19,22 210:19,22,23, 25 211:1,4,5,9, 15,16 212:10, 11,16 213:5,6, 13 214:12,17, 18,22 215:12, 13 216:5,6 217:2,10 219:18,19 221:5,8 222:21 223:6,7,24 225:5 226:9,10, 12,13 229:14, 16 230:10 231:16 232:3,4, 6,16 234:14 238:21,22,25 239:1,4,9,10, 15,16,18,19,23 240:7,10,17,19 242:22,23 243:2,4,5,9,10, 13,14,17,18,20, 21,24,25 244:7, 8,12,13,17,25 245:2 246:20 247:2,3,6,7,10, 11 248:13,14 250:1,2 251:2, 8,9,13,14 252:8,9 253:17 254:18,20,21 255:1 256:1,5, 6,7,19 257:4,5, 7,8,14,15,19 258:11 259:7 260:12,13,21, 22 262:5,14,23, 24 263:14,18, 24 264:16,22, 23 265:2,5,7, 16,17,23 266:3, 5 267:13,14 268:8,9,10 272:3,4,8,9 276:3,14,15,18 278:1,2,12,13, 16,17 279:6,7, 17,18 280:6,10, 12,13 282:6,9, 16,17 283:14 285:20 287:16, 17,21,22 288:1, 2,7,8,22 290:19,21,22 291:2 292:4,5 294:23,24 295:3,4 298:11, 16,17 299:7,8, 17,24 300:4,12, 25 301:2 302:6, 25 303:1,4,9,10 305:19 306:6,7, 16,19,20,23,24 307:3,4,14,15, 19,20,22,23,25 308:1,4,5,9,10, 15,16,21,22 309:1,2,5,6,9, 10 310:9,18,19, 21,25 311:3,4,

14,15,18 312:13,14,16, 21,22 313:4,11, 12,16,17 314:11,12 315:2,3,8,9,14, 15 316:14,16, 21,22,25 317:1, 5,6,9,10,13,15 318:3,7,8,12, 13,18 319:13, 14,17,18 320:11,12,16, 17 321:20 322:7,8,12,13 323:22,23 324:6,7,8 327:4,10,11,19 328:7,8,13,20 329:6,7,19 330:4,14,21,22 331:9,10,18 332:2,9,10 333:3,15,16,25 335:13,20,21, 25 336:4,5,22 337:3,4,6,7 338:12,13,18, 19 339:11,12, 18,20 341:1,4, 16,17,19 342:4, 6,7 343:11 346:17 348:2,3 349:11,18 350:8,11,12

**correctly** 74:4 84:4 105:18 138:1 166:19 209:17 210:2 225:3 231:18, 24 246:24 257:1 284:21 286:12 327:7, 14 332:22 339:25 343:8

**corroborate** 96:8,13

**corroborating** 136:11

**corroboration** 97:7 136:9

**corroborative** 96:25

**coughs** 137:17 185:3

**could've** 18:12 26:4 219:1 241:22,23

**counsel** 12:24 14:23 59:12 61:13 62:2,5,8, 14,18,24 68:15 312:12

**count** 209:13

**counted** 210:6

**counterproductive** 324:24

**countless** 224:16

**County** 210:18

**couple** 26:1 40:9 41:25 51:11,19 53:2 60:14 74:18 125:20 136:14 147:24 266:7 277:6 320:22

**court** 12:3,4,5, 20 14:1,5,10, 14,17,23 42:18 46:3,6,19 47:1 51:22 52:12 53:19 69:9,12 81:6,9 107:18 125:4,7 161:24 162:2 234:8 242:4,7 253:2,4 277:13,16 282:25 287:4 288:24 313:20, 23 314:5 330:24 331:2 350:19,24 351:2,5,9,11

**Court's** 211:19

**cover** 94:2 195:18 196:5 216:4 256:21 261:12

**covered** 38:6 41:14 81:24 260:16 261:14

**covers** 94:3 200:8 303:17

**CPD** 49:1 141:15 142:16, 17,22 164:11 206:20

**create** 101:24 102:16,25 171:11 272:6, 12 275:3 316:19 322:23

**created** 102:10 122:7,15 123:1 148:20 178:24 183:11 184:23 188:22 194:6 329:23 330:6 341:12

**creating** 181:17 195:6 251:1 327:15

**credibility** 70:10 115:5,13, 22 134:19,21 137:24

**credible** 74:20

**crime** 15:22 16:22,23 19:16 20:22 22:8 23:7,12,13,19 24:2,5 27:21,23 37:15 57:3,6, 11,15,19 58:2, 7,10,21 59:1 64:23 73:8 75:24 77:11,17 78:1,11,21 79:1,4,5,8,10, 14,23 80:1,5, 11,24 81:16,21, 23,25 82:1,4,12 83:13,19 84:1, 2,5,6,11 85:2 86:3,10,13,15, 17,19,25 87:7, 10,13,17,18,20, 24 88:1,10 89:9,10,16,24 90:6,17,24 92:2,12 93:5, 11,20,25 94:10 96:10,16 97:2, 12 98:24 99:4, 7,13 100:3,8, 12,17 101:2,17, 21,25 102:6,25 103:8,19,20 104:8,16 105:19 106:11, 16,23 107:8,10, 12,17,20,23 108:4,10,19,24 111:19 112:3 113:23 119:12 121:22 122:4,8, 14,15,20 123:1, 7,24 138:13 148:23 149:1,3 161:3 169:4 170:19 171:9, 17,19 194:9 205:16 211:20 212:9 213:13, 22 215:4 224:12 227:6, 22 228:14 231:8 239:25 275:22 285:2 318:11,16,21, 24 319:1,9,16, 20 320:7,9 321:5,15,23 322:3,10 323:5, 17 327:9,21 330:2,12 332:22 334:13 339:8 340:5,11, 18,19,20 341:3, 12 342:10,24 349:10,11,15, 16,24 350:3,7, 10

**crime's** 178:19

**crimes** 15:24 16:1,2 17:2 19:6,11 26:12 29:6,8,11,23 30:4,9,23 38:11,20,22 56:8,20,23 58:15 73:3 84:12 91:20 100:23 149:17 188:10 193:20 196:21 317:23 319:12,25 341:9 342:17 343:15 350:6,9

**criminal** 19:11 26:12 33:8 144:6,12 282:19 288:24 308:8 337:9

**criteria** 77:3 86:21

**critical** 212:6 263:20

**cross** 45:5 348:25

**cross-** 44:1

**cross-examination** 44:6

**CRS** 47:9,13, 20,21 48:5,10 49:1

**cultivate** 120:12,20

**cultivating** 120:23,25 121:3

**current** 16:11 217:24,25

**custodial** 128:3,5,10 130:9 200:2

**custodian** 178:19

**custodians** 168:10,13 175:25 176:9

**custody** 130:17 213:12, 15 220:21 266:20,24 267:13,22 303:17,18,20, 24 304:2,3 316:6 342:22

**custody's** 304:6

**cut** 15:7 33:17 59:14 131:5 141:4 143:10

153:4 253:3,7

**cutoff** 212:14

**cuts** 224:13

**D**

**daily** 323:21

**dark** 274:18

**database** 180:25 185:12 348:4,6

**date** 200:5 215:14 216:10, 18,20,25 217:1, 13 296:20 297:1 307:18

**dated** 92:19 182:6 204:23

**dates** 50:14

**Dave** 42:9

**day** 12:7 13:8 60:17 148:15 204:24 205:5 216:19 259:16, 18 263:11

**day-to-** 263:10

**days** 40:9 266:18

**de** 319:7

**deal** 125:3 188:10

**debit** 125:1

**decide** 47:1 228:22 236:18

**decided** 141:21 142:4 146:6,16 147:5 262:4

**decides** 145:13

**deciding** 108:17

**decision** 105:24 229:10 233:17 235:23 236:11,12 237:9 262:7,8 291:12

**decisions** 235:23 236:15

**deemed** 124:9 127:21 143:14 332:6

**deems** 124:1

**defend** 43:24

**defendant** 13:21 144:6

**defendants** 13:17 144:13

**defending** 115:7

**defense** 308:8

**defined** 96:25

**definition** 143:4

**definitively** 341:7

**delegate** 265:16

**delegated** 176:21 193:14 265:21 306:15, 17

**deliberately** 73:14 289:15

**Demetrius** 12:18

**dep** 38:17

**department** 15:19 17:5,17 18:5 25:4 28:17 34:1 68:22 70:3,5,9 71:1 72:2,10 74:8 76:11 78:17,24 86:2 94:23 99:24 100:4,5 109:17 110:9 112:21 116:21 117:9,10 133:9, 17 148:9 149:19 153:13 158:23 163:11, 18 165:10 166:24 173:15 188:2,5 195:18 203:21 209:12, 13,18 210:4,17, 22 211:4,10 212:13 232:10 233:1 245:18 268:4 326:10 327:3 341:25

**department's** 74:21 224:2

**depending** 43:8 44:7 126:10 204:9 259:21 321:3 329:2,7 346:10

**depends** 138:21,22 146:13 232:21

**depo's** 46:24

**deponents** 45:13

**deposed** 51:12

**deposition** 12:9 15:13 20:6 38:25 45:18 46:7 52:7,16 53:20 54:5,22 55:4 59:8 61:16 62:25 65:21,23, 25 66:2 67:6,7, 10,12,14,18 68:1,9,14,19 69:13 81:10 82:18 111:2 125:8 148:5 159:1 162:3 179:24 187:15 199:13 201:4,8, 25 242:8 277:17 278:1 279:12 313:24 351:13

**depositions** 62:10 65:15,17, 20 66:8,17,22 67:2 68:7 178:7

**describe** 35:9

**describes** 334:13

**describing** 205:9 258:2 321:14

**description** 275:1,5,10,23

**deserve** 15:14

**designated** 53:13 55:9,20 112:21 279:14 281:7 318:9 319:5 346:4

**detail** 15:20 126:11 128:16 131:21 158:19

**detailed** 127:22 128:20 130:19 131:9

**details** 53:3 109:7 128:22 134:13,16 135:6,11 237:23

**detain** 220:8, 22 227:22 297:20

**detained** 213:17,21 214:3,17 219:4 228:5,17,18,19, 22 229:3,17,20

**detaining** 219:25

**detect** 258:14

**detective** 16:18,21,22,25 17:2 19:23 28:18,20,25 29:4,23 30:4, 17,20 31:1,2,4, 7,9,13,15,18, 20,22 32:2,25 34:2,5,13 35:2, 6,13,17,20 36:1,3,6,14 37:10,17 38:4, 7,10,22 39:20, 23 41:21 42:5, 6,23 46:14 48:16 49:13,23, 24 75:24 85:10, 18 86:14 97:3 98:21 99:9,14, 21,23 100:9,14, 20 102:3,20 105:22 106:1,5, 23 107:8 123:5 124:1 130:21 131:11 134:16 135:19 136:21 137:9,15 138:17 139:1 140:18 141:6, 12,21 142:4,13, 19,22 143:14 144:22,24 145:6,13,15,17, 22 146:6,9,15, 16 147:3 150:14 156:24 157:5,6,14 159:4 160:13, 25 174:2,12 176:4 177:4 178:11 187:9 193:19 194:2 203:1 211:9 212:7 223:14 224:17,24 228:15,20 229:14 231:23 233:16 234:2 235:4,18 236:8, 11,13,15 237:3, 8,23 238:2,4,8 251:2,7,11,12 253:1,20 255:8, 21 261:1,16,25 262:4,7,16,20, 22 263:16 265:4,8,20,21 268:13 271:17 274:7,22 275:21 278:20 279:4 281:16 284:24 286:2 288:14 289:4, 14 291:12 293:3,18 304:23 305:2,9, 12 306:12,14, 17 311:25 315:18 316:7 319:24 320:25

321:1,8,11,25
322:5 323:17,
22 324:1
328:11,12,19,
23 330:5,8
331:18 332:16
333:2,10,13
341:15 342:2
346:15,19

**detective's**
107:13 137:20
229:9 235:22
237:12 271:25
328:10

**detectives**
16:4 29:3 30:12
32:18,20,22
33:3 34:20,21
35:14,22 36:1
41:14 42:5 43:4
45:12 50:8 51:5
56:19 57:11,16
58:3,21,25
64:19 72:19,23
78:5,21 83:14,
19 85:17,21
94:9 96:10,15
97:6,17,20,24
98:3,5,8,13
107:20 108:5,
10 112:6,12,14,
23 113:8,20
120:8,10,12,16,
19,23 121:1,9,
13,21 122:2,9,
18,22 123:4,12
125:24,25
126:4,16 127:9,
15 128:1 130:4,
10 131:10
133:18,19,24
134:4,5 135:12
138:1,18 139:7,
20 140:16
143:18 144:11,
18 145:21
149:16,17
153:7,16 155:5,
10,14 158:5
159:20 160:19,
23 164:3,11,17,
21 166:9,16,21
168:2,5,16,19
169:4,9,13,18,
23 170:7,12,20

171:3 175:19
176:1,6,7,12,
17,21,23 177:4,
13,20 193:12
194:9,14,21
196:20 202:25
206:20 207:3,
12 208:6,10
210:24 213:7,9
214:1,9,14
215:1 220:10,
12 221:25
223:23 224:20
225:3,7,14,22
226:15,17,18,
23 227:10,20
228:4,5,13,18
229:2,16,21
230:9 232:1
233:12,21
236:2 237:17,
25 238:5,10,23
239:7,11,12
240:11,21
241:1,7,12,21
246:25 247:4,
13,20 248:11,
16 249:12,17
250:3,7,12
252:7,15
253:15,19
257:17 258:6,
14,21,22 259:9
261:9,23
262:14,25
263:12,21
264:1,4,7
265:13,14
266:1,10
267:11 268:5
271:21 272:19
273:2,5,12,13,
24 278:23
279:21 281:10,
17 282:5,15,21
283:2,8,10,16,
23 284:7 285:6,
10 288:5,10,19
289:1,13 290:2
292:7,21
293:22 294:2,
20,25 295:19,
25 296:18
298:8,14
299:15,23
300:2,10,22

301:1,4 305:12,
16 307:1,3,17,
22 308:4,11
309:3 311:12,
20 312:3,6,8,11
314:9,14,21,24
315:6,23
316:12,18
317:7,11
318:11 319:8
320:24 322:12,
16 324:25
325:2 330:10
331:9,23 332:1
346:16

**detectives'**
167:11 285:5

**determination**
97:5 144:17
145:5,14 197:7
229:12 262:12,
18 332:7

**determinations** 237:12

**determine**
123:11 135:13
146:23,25
173:16 275:16
299:3

**determined**
95:6 140:16
142:20 210:9
262:16,17

**dictated** 89:25

**difference**
193:18 199:1
280:2,19

**differences**
22:10 278:21
279:19,23
280:5 302:24

**differently**
252:24 342:15,
16

**difficult**
294:15,21

**direct** 14:25
40:6 206:24

**direction**

132:10 133:20
208:6 263:20
306:12

**directives**
80:23 81:16
87:1,12,19
345:5

**directly** 98:3
141:14 320:24

**disagree** 43:4

**disbanded**
23:4 24:7,8
149:25 150:4,6
343:9,10,12,15

**Disciples**
338:2

**discretion**
328:10

**discuss** 46:23

**discussed**
64:11 215:4
242:18

**discussing**
63:9,24

**discussion**
211:7

**disorganized**
89:21

**displayed**
54:15 176:2

**dispute** 84:18

**disseminate**
124:10 324:14

**dissemination**
123:21

**distinct** 113:2

**distinction**
71:14 198:8

**distinctions**
337:15

**distinguish**
154:14

**distinguishes**
74:19

**distinguishing**
73:21

**distracted**
121:24

**distraction**
124:24

**district** 12:20
17:20,21,22
18:1,6,8,11,15,
18,24 19:10,21
21:8 24:19,25
25:5,6,8,11,14,
21,24 26:1,2,7,
22 48:19,21
49:5,8 50:15,16
191:19

**districts** 22:1
326:3,9,22

**division** 12:21
15:23 19:23
21:9,11,17
22:22 23:2,6,18
27:21,23 29:5
31:4 32:3 34:13
36:14 37:18
38:4,7,10,22
39:20,23 41:21
42:6 48:16,18
49:14,23 81:25
82:12 85:10
99:9,14,22,23
100:9,15,20
104:18,21
105:5 109:6
113:23 123:5
124:1 156:24
159:4 160:13
178:11 183:15
187:9 203:1
211:9 255:9,21
263:17 265:4,8
278:20 279:5
281:16 284:24
286:2 316:7
321:3 323:17,
18,22 324:1
327:22,23
329:2,6 330:8,
21 331:18
332:16 333:3,
10,14,18
341:15 342:2
343:2 346:15

349:10

**divisions** 285:23

**docu** 347:3

**document** 53:24 54:2,3 55:2,3 82:11, 17,20,21 83:2, 24 86:23 87:13 103:12 104:22 105:1,6 106:24 107:9,14,23,25 108:11,17,18, 20,23 109:9 113:25 114:6, 23 115:3,15 116:3 121:20, 21 123:17,19, 25 140:13 142:15,21,25 143:16,19 144:11,23 145:3,4,25 146:9,18 147:4, 13 151:10,11 153:6,7,8,12, 14,16 154:4,6, 7,8,13 155:5,6, 11,15,24 156:14,18 157:10,11,15, 22 158:8,13,17, 18,21,25 159:12,24 160:2 161:2 164:4,10,12,21 165:15,22 166:9,16 179:23 180:12 181:6,8 183:10 184:1 187:1,18, 21 188:5,19 189:4,19 190:17 191:4 194:21,25 199:12 200:1 201:3,7,11,22, 24 202:3,11 212:21 223:3 230:6,9,13 231:4 233:22, 24 234:2,7,9, 14,19,22 235:3, 19 236:1,3,8,9, 12,17,19 237:23,25 238:5,10,23 239:13 240:5, 15,22 241:20 242:16 245:17 246:17 249:19, 25 251:4 261:17,23 279:2,3 286:22 287:5,12 296:8 303:6,14 304:10 306:21 307:18,21,24 308:2,12,19 311:13 312:11 314:9,14,21 318:2,15 321:9 323:2,6,10 325:2 327:18 328:24 330:13, 17 331:6 332:11 334:12, 16,23,24 335:1, 24 342:10 347:25

**document-heavy** 238:9

**documentation** 64:6,12,16,18, 22 70:25 78:4, 10 79:10 95:3 101:23 109:14 110:23 111:10 116:22 122:7 123:2 141:19 182:17 194:6 230:4,5 237:15 240:9 241:19 245:14 246:9 250:24 251:1 260:18,19 307:8 308:23 314:25 322:23 327:14 329:5 342:15

**documentation-wise** 343:4

**documented** 107:19 109:18 116:14 140:7,8, 21 141:16,25 142:6 143:21 150:20,24 151:15,24 152:6,7,8,11,17 156:4,23 157:3, 4,6,7,13 158:1 165:3 193:25 194:15,18 230:17,25 231:1,14 235:12 239:8, 12 241:21 244:11,16 245:3,7,10,22 246:3,6,12,13, 15 251:12 260:3,24 261:5, 9,19 262:3,10, 11 303:8,13 307:10,13 309:9,13,17 310:3,6,7,14,24 311:1 312:21 313:3,9,10 321:3 322:18

**documenting** 111:14 116:7 151:18,19 152:24 163:22 167:1 237:22 250:4 279:24 280:25 309:23, 24 313:14 324:23 325:12 327:24 330:2

**documents** 60:18,21 61:14 68:8,11 82:25 85:24 87:19 105:13 110:7 116:23 117:1 122:17 160:19 178:7 182:5,17 188:3 318:1 323:14 325:18 336:13 342:9 343:9 344:23 345:17,22 346:8,25 348:16

**dog** 75:17

**domestic-** 129:9

**drive** 12:6 229:10

**driven** 209:22 233:15 235:23

**driver** 168:7

**drivers** 19:19

**driving** 236:14 237:7

**drug** 27:7

**drugs** 339:2,9

**dubious** 209:15

**duties** 263:5

**dynamic** 138:8 225:12

**E**

**earlier** 22:2 184:15 203:2 244:3 256:4 259:15 265:12 270:9 271:25 279:4 280:12 283:9 306:9 313:8 324:12 328:15 335:5 341:11

**early** 20:16 21:15,20 22:23 23:15,22 24:16 25:15 28:21 35:16,19 49:19 150:5

**earth** 293:7

**easier** 120:18 160:4 161:18

**easily** 66:15

**Eastern** 12:21

**easy** 289:5

**educational** 329:22

**effect** 128:8 195:21 217:4, 22 243:20 307:17 327:24

**effective** 84:15,19 200:5 215:14 216:10 217:1

**effectively** 322:3

**efforts** 146:9 207:12 222:15 316:12

**Eileen** 13:3 40:4 56:13 80:10 88:24 160:11 242:3 244:2 329:11 351:2

**either/or** 105:24

**elderly** 293:5

**electronically** 351:8

**element** 212:5, 6 234:21 238:14 265:10

**elicit** 139:19

**emotional** 139:14,17 305:24

**employee** 346:22

**encompass** 106:3

**encompassed** 19:24

**end** 133:1 153:4 172:21 225:1 279:12 283:11 285:2 335:22 347:11, 15

**ended** 24:4 245:10

**enforcement** 27:6,14 51:16 75:13

**engage** 225:15,23

**engaging** 207:12

**Engquist** 13:12,16 277:4, 10,12 350:15

**ensure** 187:5 223:5 225:9 283:25 284:25 285:17,24,25 286:4 287:18, 24 288:6 305:14 345:17, 22 347:5

**ensuring** 225:8 316:4 332:12 344:10

**enter** 94:22

**entered** 180:25 185:12

**entire** 85:1 106:12 119:2 279:3 318:11 327:13

**entirety** 83:9 279:16

**entitled** 43:25 45:10 55:4 200:2 201:23 323:16

**equivalent** 104:4

**Eric** 37:19

**erodes** 283:7

**error** 131:6

**errors** 283:18

**essentially** 97:6 159:13 160:18 169:6 205:9 212:9,13 233:11 235:18, 19 244:5 254:24 262:3 266:21 275:24 276:1 282:4 284:17 307:21 308:17 315:1 329:15 332:7 347:14

**establish** 127:14 128:7, 15 137:23 220:4 254:12

**established** 32:10 90:3,7, 16,17 92:6,16 93:19 113:19 127:2 157:20 158:8,17 193:24 302:21

**et al** 12:11,13, 14,17,18

**ET's** 232:21,22

**ETS** 232:9

**event** 130:9 325:13

**eventually** 29:12 331:23

**everybody's** 273:21 274:4, 19 338:1

**evidence** 195:6 210:8 229:20 232:5, 10,13 311:16

**evidentiary** 145:8,14 210:4, 10 262:17,19

**ex-boyfriend** 204:22

**exact** 24:9 165:21 299:1

**examination** 14:25 44:2 348:25 349:20

**examples** 75:9 224:16 312:23 336:17

**exception** 13:18 256:3 302:23

**exceptions** 137:5

**exchange** 140:3

**excluding** 325:10

**exclusively** 16:24 87:7,9 119:7 127:2 191:7 193:9

**exculpatory** 144:5,12,17

**excuse** 16:7 93:23 98:23 126:11 127:19 137:17 146:4 185:3

**exhibit** 53:25 54:3,10,25 55:2,6 82:11,15 84:12 85:10,15 86:5,7 113:14 119:16 158:21 159:2 160:18 161:2 162:9 179:16,17,19, 21 199:11,14 200:19 201:2,9, 18,21,22 202:1, 14,17 203:5 215:8 216:3,16 242:14,15,17 243:6,7,19,23 255:4 277:22, 23 278:19 279:8 280:12 281:5,15,22 282:14 302:21 303:2 314:8,9, 16,22 318:1 323:13,14 335:25 344:8 347:10,11 349:3

**exigent** 138:12,16 139:1 214:25

**exist** 74:7 335:17

**existed** 122:17 227:7 280:6 285:10 344:9 347:4 350:6

**existence** 112:22 142:6 150:2

**existing** 93:4

**exists** 70:2

**expect** 141:24 296:1

**expectation** 138:3 164:20 165:25 166:15 175:6,16 192:13,14 207:14,17 220:9 224:19 231:13 235:11 236:2,9 238:5, 7,10 240:5 241:12,19 249:12 250:25 251:10 254:1 263:21 265:25 320:19

**expected** 96:11,15,16 101:24 104:16 125:24,25 126:4 127:10, 15 128:1 130:4, 10 138:19 139:7 140:7,20 141:24 142:5, 25 143:15,18 144:11 145:25 146:9,18 147:3, 13 151:15 164:12,17 181:16 234:19, 22 235:3 240:22 241:8 249:6 341:15

**experience** 33:23,25 34:24 38:23 43:6 68:18 187:12 224:6 227:2,3 229:9 231:3 253:22 257:11 283:22 284:5 285:4,21 295:6, 8,17 312:2 325:6,8,11

**experienced** 35:14 271:17 293:3,17

**experiences** 33:14,21 34:1

**explain** 37:24 290:1

**expound** 292:23

**expressly** 216:7 306:15, 17

**extends** 32:9

**extensively** 288:10

**extent** 13:10 47:8 92:8 109:17 139:22 163:17 165:1 211:6 213:1 214:12 227:24 239:21 240:2, 13 252:10 262:22 296:5 331:5 332:22 338:25 340:17 349:13

**external** 235:23

**extra** 222:6

**extraordinary** 214:16 252:4, 11 279:25 280:25

**extreme** 45:16

**eyewitnesses** 234:20

**F**

**F-O-S-T-E-R** 14:9 15:4

**face** 174:17 205:18 222:9, 12 224:14 293:6

**face-to-face** 174:25

**faces** 257:13

**facet** 35:12

**facets** 35:12

**fact** 14:11 34:24 127:24 134:21 158:8 165:11 174:21 185:19,20 188:4 211:6 213:18 224:1 231:14 246:14 256:8 263:7 270:9 276:25 279:4 290:20 299:3

**factor** 134:2 229:25 230:1 273:16

**factors** 233:18 235:24 291:13

**facts** 128:13 325:18

**failing** 154:11

**fair** 30:4,9 34:20 39:24 45:3 52:9,13, 18,19,21,22,25 53:1 63:3 73:25 74:15 78:16 80:4,12 86:6 89:14 90:1,19, 25 95:4 100:15, 22 102:17 107:11 111:17, 20 122:11 127:9 133:8 135:14,15 136:24 138:14, 15 139:10 170:14,16 171:15 172:15, 20 177:6 205:19 206:4 249:14 258:5, 10 259:6 264:11,12 269:20 283:19, 20,21 284:21 286:22 288:7,9, 14 289:12 292:10 301:3 321:25 346:14

**fairly** 207:6

**fairness** 317:12

**fall** 71:20 75:5, 10

**false** 67:8,12, 16,20 272:3 285:14

**familial** 206:10

**familiar** 170:19 188:1 205:10, 18 206:7 209:5 257:2,13 326:20 338:2

**familiarity** 206:18

**fashion** 251:5

**fast** 237:5 310:11

**father** 129:5

**fault** 121:25

**feasible** 218:20

**federal** 22:14 337:16

**feel** 83:11 188:12

**feeling** 283:4

**feels** 238:3

**field** 178:19 200:2

**fight** 40:16

**figure** 44:1 218:7

**figured** 218:2

**file** 333:2,15, 18,19,20,25 336:15,19 337:3,6,14,17, 18,19 338:3,12, 14,23 339:4,24 340:4,5,20 342:24,25 344:17 349:24, 25 350:9,10

**files** 85:15 336:13,24 337:2,11,15,22 338:21,24 339:14 340:3, 11 341:3,8 342:10,17 343:15,16,19, 23 344:4,11,16 345:18,23 346:21 347:6 350:5

**Files(ci)** 82:14

**fill** 103:22 104:17 105:7, 20 108:24 109:5 184:17 191:6,9,11 329:17 331:5, 12 332:23 335:8 339:10

**filled** 106:12 191:16,24 328:5 332:14 333:8,23

**filler** 244:10 276:12 309:9, 12,15 310:2,5, 7,23

**fillers** 197:5, 18,21 198:1 208:15 272:7 274:14 276:11 287:15,20 288:6,12,16,17, 20 289:2 299:1 301:15 302:4 305:1,6 309:1 316:9,13,19

**filling** 105:5 330:20

**final** 125:20

**finally** 59:3 312:18

**find** 39:23 47:25 185:8 188:13 196:12 202:4 218:2 227:15 242:2 285:1 293:9 321:7

**finds** 321:17

**fine** 41:16 43:14 44:24 46:2 78:22 182:24

**finger** 138:2,18 140:19 196:2 259:22

**finish** 51:23 52:4,9

**Fish** 338:6

**fit** 103:12 106:11 275:9, 23

**fits** 74:14 188:16

**fix** 14:2

**flashlight** 222:9

**flip** 174:9 292:25

**Floor** 12:6

**fluid** 140:3 232:23 235:24 237:7,16

**fluidity** 237:19

**focus** 120:17, 18 156:10 218:17 241:11 304:6 319:6

**focused** 19:6, 11 26:12 33:24 37:13 87:7,8 155:19 256:4,6

**folks** 345:21

**follow** 87:2,14, 21 99:14 100:9, 20 164:17 196:1 229:22 282:24 287:3 301:4

**follow-** 142:23

**follow-up** 44:7 137:21 138:4, 19,22 139:2,19, 21,25 142:5,13, 24 247:21 248:2,5,12,17 249:9,13 302:10 324:5

**follow-ups** 115:8

**foremost** 39:17

**forensic** 231:9 232:8,13 241:25 311:17

**forfeiture** 86:10

**form** 21:22 22:11,18 35:23 36:17,19 55:23 71:23 72:8,24 74:9,16 76:2,9, 18 78:7,12,19 80:15 87:3 89:17 90:2,12, 20 91:1,15 92:4 93:14 97:9 105:16 106:19 108:7 115:11 116:25 118:4 120:13,24 126:7,20 127:4, 12,18 128:4 130:24 131:13 132:11 134:9 135:20 137:12 139:11 140:14, 22 141:17 142:1,9 143:3 144:7,19,25 145:16 146:2, 11,21 147:7,17 148:13 149:9 151:25 152:1 153:10,18 154:3 155:16, 25 156:5 157:1 163:4,25 164:7, 15,24 165:18 166:6,12,20 167:3,10,16,21 169:22 170:23 171:5 172:6 173:14 174:18 177:7,15,24 178:6 181:25 182:22 184:25

186:6,24 195:8 204:4 205:21 206:23 213:14, 24 218:24 224:23 225:18 226:22 227:25 228:10 229:7, 15 233:7,13 235:21 239:20, 24 240:8,18 244:18 245:1 247:15 248:19 250:19 252:13, 18,23 254:6 255:2 267:18 269:6 271:15 273:8 274:9 276:4 282:7 284:22 289:7, 16 295:21 296:3,11 299:18 300:5 314:17 315:20 316:1 317:14 324:9 327:2,16, 17,25 329:5,18 330:4,18 331:11,19 332:3,23,24 334:1,8,12 335:11,18 339:16,19 340:1,21 342:12 343:18 345:4,9 347:8 348:13

**formal** 71:12 111:10

**forms** 34:21 327:20 330:1, 14 331:6 332:13 333:1,7, 23 339:11

**forthcoming** 264:1

**forward** 23:5 70:4 123:8 125:16 218:15 332:6

**Foster** 12:10 14:6,8,12,15,17 15:4,15 46:7 54:9 69:13 81:10,15 125:8 129:6 135:23 158:22 161:6 162:3,12,16 179:21 180:5, 18 183:22 184:12 185:9 186:19 189:8, 13,16 190:8,25 199:12 200:19 201:7,24 204:24 205:2,3, 7 242:8,13 243:7 255:12, 20 277:17 281:23 298:1 313:24 323:13 326:24 329:9 334:4,18 335:1 347:11

**Foster's** 44:3

**Fosters** 134:14

**found** 67:8,11, 15,19 74:20 142:24 320:25

**foundation** 34:20 38:12 45:5 89:18 90:2,12 91:1,3 92:15 117:1 166:20 167:10, 16 182:22 239:24 240:8, 18 250:19 272:25 300:5 324:9 331:19 347:8

**four-page** 54:3

**fourth** 48:19,20 49:4,8 135:24

**frame** 20:14,15 36:24 51:8 63:8,13,23 64:1 90:4 99:11,21 103:13 141:19 148:16 150:1 177:17 181:19, 23 197:13 230:20 232:7 238:13 252:17 264:13 277:25 311:23 313:4 329:3

**frankly** 188:15

**fresh** 221:11

**Frito-lay** 19:18

**front** 162:9 189:24 190:1,3 290:8 296:25 297:4

**frowned** 260:15

**fulfilling** 346:21

**full** 167:19

**fully** 298:21

**function** 20:19,21 31:7 119:21 306:3

**functions** 19:2 24:4 32:22

**future** 174:13 254:3

**G**

**G-O-L-U-B-I-A-K** 42:19

**gain** 148:1

**game** 39:24 45:3 77:22,23

**gang** 20:2,7,8, 11,12,13,18,20 21:1,2,10,16, 20,24 22:3,5 24:1,15,22 25:1 26:15,18 28:2,5 30:19,23,24 31:2,6,11,14, 16,19,23 32:2, 17,25 33:2 37:15 38:11,20, 22 40:1,2,10 51:6,7 55:22 56:8,20,23 57:3,6,11,15, 19,24 58:2,7, 10,15,21,25 61:7,10 62:9,12 63:16,19,23 64:3,8,10,15,23 68:7 73:3,8 75:24 77:11,17 78:1,11,21 79:4,9,10,14,22 80:1,5,11,24 81:16,20 82:2 83:13,19 84:1, 5,12 85:2 86:10,13,15,19, 25 87:7,13,17, 20,24 88:1,10 89:9,10,15,24 90:6,17 91:20 92:2,12,19 93:1,5,11,20,25 94:10 96:10,15 97:2 98:24 99:4,7,13,20 100:2,8,12,17, 22,23 101:2,7, 17,21,25 102:6, 8,9,10,16,25 103:8,19 104:4, 16 105:19,25 106:11,16,22 107:8,10,12,15, 17,19,22 108:3, 10,19,24,25 109:5,9,15 110:10,12,14, 16,19,20,23 111:8,9,18 112:3 113:22 118:1 119:18, 24 121:21 122:3,8,13,14, 15,20,23 123:1, 7,9,10,21,24 124:14 148:3,6, 8,12,20,22 149:1,3,4,14, 17,18,22,23 150:2,9,12,15, 16,17,18,21,23 151:1,4,7,21,23 152:6,17,24 153:8,16,17 154:9,18 155:1, 5,7,11,14,15,24 156:3,9,11,16 157:2,3,7,13, 20,25 161:3 162:23 163:2,6, 8,18,23 166:4, 9,13,17,21 167:2,5,6,7,11, 13,24 168:1,2, 6,7,12,14,19, 21,23,24 169:1, 3,5,7,10,14,16, 19,21,24,25 170:8,13,14,20 171:4,11,14,15, 21,23 172:2,4, 10,13,14,18,20, 23,25 173:3,5 174:7 175:5,9, 16,19,20,21,24, 25 176:2,3,4,6, 7,8,13,16,24 177:2,3,5,11, 12,16,19,21,22 178:4,8,10,15, 18,23 179:1,2, 6,7,9,14,22 180:21,24,25 181:3,8,11,16, 17 182:10,16, 19,20,25 183:5, 11,12,15,17 184:11,17,24 185:11,12,14 186:2,4,7,11,20 187:2,12 188:10,21 189:4,8,11,12, 15,21 190:6,10, 16 191:1,2,5,8, 9,11,13,16,17, 19,20,25 192:2, 4,10,16,17,21 193:1,3,6,13, 14,15,17,19 194:1,2,4,6,9, 10,16 195:7,15, 20,24 196:21 198:5,8,10,14 199:10 200:24 201:12,19 202:18 236:22 239:22,23,25 240:2,12,13 242:21 265:7,9, 10,12,14,15,16, 18,19,20,22 266:3 292:24 293:13 304:13, 17 305:2,5,8, 18,22,25 306:4, 9,15,18 308:6, 11 317:23

318:3,11,16,21, 23 319:1,9,11, 16,20,25 320:6, 19 321:5,15,22 322:3,9,20,22 323:1,5,20,25 324:4,6 325:1, 21,25 326:5,6, 7,10,13,16,22 327:3,14 328:3, 5,10,11,16,18, 22 329:17,25 330:12 331:5, 12,14,17,20 332:2,8,14,22 333:8,23 335:12,16,19 336:14 337:3,6, 19,22 338:3,11, 12,14,15,16,20, 21,22,23,24,25 339:4,8,10,14, 24 340:3,14,15, 18 341:5,9,12, 19 342:6,10,25 343:8,10,14,15, 17 344:11,15, 18,25 345:1,6, 13,17,23 346:3, 23 347:4,6 348:2,4,5,10,11 349:4,16 350:6, 9

**gang's** 157:7 171:17

**gang-** 324:15

**gang-related** 170:3 336:25

**gang-specific** 151:2 169:2

**gangs** 23:4 81:20 132:9 148:21 172:1 179:2 274:25 275:3,23 320:3, 4 321:17 326:2, 8 327:7,9 332:6 336:25 337:25 338:4,10,18 339:1 340:13, 19 342:18 344:20 346:7, 13

**Gangster** 274:24 338:2

**Gangsters** 275:4,9

**garner** 335:8

**gather** 192:10 335:12

**gathered** 325:25

**gathering** 22:6,7,9 183:4 338:17 345:12

**gauged** 132:15,18,20

**gave** 66:6 177:13 223:16 240:22 270:5 276:9 314:10

**gender** 275:9

**general** 60:23 61:1 62:10,13, 16,22 63:3,7, 10,15,18,22 64:2,5,17,21 65:6,10 68:6 74:5 99:25 100:3,6 120:16 137:7,8 149:18 187:8 195:17, 22 196:5 199:4 201:4 212:25 215:9,22 226:2, 3 240:10 241:23 242:19 267:3 269:1 277:24 304:1 306:22

**generalities** 129:12

**generally** 37:22 43:14 50:10 113:3 150:11 176:23 177:8 207:21 208:22 220:12 258:12 305:11 341:24

**generate** 122:20 283:5

329:23

**generated** 326:23

**gentleman** 96:3

**Geraldo** 12:16

**germane** 148:19

**get all** 165:6

**GI** 102:24

**girl** 204:21

**girlfriend** 133:2

**GIS** 102:4,6,8, 13,15,19,25 103:4,11,18,22 104:4,6,10,12 105:15,20 106:7 108:25 109:5 321:4 327:5,6,16,20 329:2,18 330:1, 4,14,18 331:6, 11 332:13,23 333:1,7,23 339:11,13,21 340:19 341:12

**give** 14:20 66:16 74:22 95:23 118:14, 15,18 136:13 161:20 172:19 180:3 188:18 212:1 241:1,8, 12 298:24 301:23 315:7, 12,18

**giving** 136:5 326:8

**goal** 224:24 225:3 226:7 248:4 271:25 285:1,3

**Golubiak** 42:10,17

**Gomez** 12:12 54:6

**good** 73:21 121:1 123:6 130:18 132:24 173:8 207:1 254:7 299:11 300:18,23 301:7

**government** 22:15

**grab** 125:14

**graduated** 110:17

**grand** 174:6

**great** 174:1 254:5 277:10

**Griffin** 42:13

**group** 20:25 180:14,19 181:16 182:20, 23 193:13 237:1 256:14 258:3

**groups** 38:23 74:14 86:1 216:14

**growing** 326:10

**guess** 44:20 46:18 66:10 69:4 72:6 80:20 118:5 128:19 129:13 135:1 136:24 139:12 140:15,24 171:7 190:2 193:16 203:20 214:6,24 216:15 248:20 251:3 273:19 275:15 293:17 299:21 303:16 320:21 321:12 346:10

**Guevara** 12:11,13,14,15, 17,18 13:18,21

**Guevara's** 45:15

**guidance** 87:13,20 243:12,17 296:7,14 300:2 304:8 316:3 345:11

**guide** 240:11

**guidelines** 80:22 87:12,19 345:6

**guns** 339:2,9

**guy** 133:5 211:24 222:10 237:4,13 259:16 275:2

**guys** 37:4 40:9 124:17 148:16 160:3 218:5

**H**

**hair** 316:21

**half** 159:21 165:7 330:24 331:2

**half-masked** 298:21

**hand** 14:18 275:6

**handcuffed** 316:9,10 317:3, 5

**Handcuffing** 229:24

**handcuffs** 229:19,25 230:2 236:5,6

**handful** 197:18

**handle** 237:18

**hang** 139:5

**hangs** 135:17 139:6

**happen** 98:1 132:5 172:17 177:10 289:4 320:15,22

**happened** 32:10 136:14 175:23 232:1 251:24 322:15

**happening** 121:5 210:10

**happily** 122:1

**happy** 35:4 46:23

**hard** 118:14, 15,18,20 137:17 139:14 160:3,11 161:13,18,20 162:8

**head** 52:11 241:24 303:22

**health** 132:24

**hear** 196:10

**heard** 20:6 75:15 101:8 134:6,7 135:2, 17 137:8 139:3 149:6,7 203:22 204:20 244:19 338:7

**heavily** 238:1

**height** 222:11 308:14 316:20

**held** 25:3 31:23 49:12 211:19

**hell** 348:19

**helpful** 138:23

**helping** 70:1

**helps** 149:3

**hey** 75:15,17 106:1 134:6 135:2 139:3 227:21 274:22 300:21,23 320:8 321:18

**Hickey** 66:8,23 67:3,7

**Hickey's** 65:21

**hierarchy** 336:25

**High** 20:22

**highest** 252:19,22

**hired** 17:6

**historically** 116:8 173:18

**history** 47:4 53:3

**ho** 321:22

**hoc** 89:16,20

**hold** 14:1 41:3 55:1 94:12 180:9 237:2 258:18 329:11 334:3

**holding** 275:6

**Homewood** 27:2 343:13

**homicide** 15:21,24 16:1, 2,4,7,17,21 30:12,17,20,25 31:24 32:22 33:1 34:13,20, 21 35:14,17,20, 21 49:24 50:8, 21,23 51:5 55:16 91:3 92:17 97:18,21 98:16,17,21 99:5,8,10 100:13,19,24 101:4,13,16,18, 22 102:1,17 103:1 104:23 105:1,7,9,12, 14,21 106:17 107:19,24 108:6,21 109:1, 11,15 110:24 111:8,11,16,20 112:7,15,23 119:25 120:6, 11,16,18,19 121:22 122:9, 16,21,24 123:2 124:4 129:14 134:5 150:12, 15 155:22 156:10 168:3 169:11 176:17 177:4,12,18,20 231:9 232:2,5, 15 233:5 251:15,19 252:7 263:11, 12,18,24 264:19 265:3 268:4 285:5,6, 9,23 304:15,19 306:10,14,20, 25 307:2,3 318:20,25 319:1,3,4,5,6,7, 8,11,12,15,19 320:10,16,20 321:19,24 322:4 324:25 325:10,17 328:17 329:18, 22,24 330:3,13, 18 331:7,9,13 332:15,25 333:2,9,24 336:18 341:14 342:8,16 344:12 345:7, 13,19,23 346:18 347:7

**homicide-related** 342:19

**homicides** 16:15,24 29:13, 18 30:5,10,13 33:6 92:7 170:3 263:19 324:8, 17 342:14

**hone** 170:13,21 172:24

**honestly** 131:24

**hope** 172:14

**hour** 211:20 212:11,13 213:12,21 214:3,17 215:4 219:17,20 224:3 227:5,14, 17,22 228:5 229:3 231:15 330:24 331:2

**hours** 60:6,7 66:13,18

**Howard** 16:13

**human** 129:24

**hundreds** 30:5,10 48:3

**hurt** 237:10

**husband** 129:3 147:18

**husbands** 129:8

**hypothetical** 118:5 126:8 137:13 140:23 146:3,12 147:8 204:5 221:22 228:11 274:10 275:20 276:5

**I**

**ID** 165:9 244:12 245:5,8,10,17, 25 257:14 282:16 291:24 296:20 312:25

**idea** 114:6 125:22 198:5 207:1 219:7 287:13 288:10, 15 290:24 299:11 300:18, 23 301:7 324:4 343:21 344:6

**ideal** 208:16

**ideally** 197:21 227:23 274:14 278:6

**ident** 246:9

**identification** 37:15 39:21,25 41:11 54:10 55:6 82:15 150:19 151:16, 20 156:11,25 157:10,15,23, 25 158:24 159:2,5 160:14, 20 161:7,10 162:24 164:8, 13,22 165:23 166:4,18 167:7, 8,14 172:18,23 173:3,4,5 174:4,5,7,10,15 175:8,15 178:2 179:17 193:18 194:1,21 195:7 196:17 197:8, 15 199:14 201:9 202:1 203:13 204:12, 15,18 205:4,13 206:22 207:5, 18 208:17 209:14 210:6, 16 211:12 212:24 213:3 220:9 221:11 222:10,15 225:4,10,17 226:2,6,8,9,11 230:7,14 231:6, 19 232:19 238:15,17,18, 20,21 239:14, 15,21 240:4,6, 7,14,17 244:15, 16,23,24 245:3, 6,7,9,11,13,16, 19,20 246:15, 19,22 247:20, 23 248:3,6,10, 18,22,23 249:6, 7,8,17 250:5,9, 10,13,15 253:24 254:3,9 255:1,7,20 256:18 257:7, 18 258:7,9,16, 23,24 259:5,10, 11 260:11,15, 20,24 261:5,8, 19,20 262:2,3 263:9 264:9,10, 19,22,25 266:1, 8,11 268:6 269:14,18,23 270:7,19 271:18 272:3, 21 276:14,17, 24 278:22 279:15,20 281:10,16 282:24 283:17,

24 284:2,4,8, 15,20 285:23 286:3,11,25 287:2,10 289:22 290:25 291:3,8,14,20, 25 292:7,9,12, 18,20 293:2,5, 15,18,24 294:3, 7,8 295:9,10,14 296:10 297:22 299:15 305:15 310:9 313:2 334:9 348:11

**identifications** 154:9 156:8 161:11 163:22 164:4 167:1,2 174:20 194:4,7 207:11 211:8, 14 225:25 238:24,25 239:9 240:16 244:4,6 245:22, 23 246:3,6,10 247:2,8 249:20 250:1 254:13 255:23 256:5 263:1,22,23 271:22 273:3 282:2 283:12, 13 284:12 285:14,17,18 294:23 295:2, 20 296:1,6

**identified** 39:21 53:19 68:8 85:15 88:22 114:17 116:12 135:1 151:5,23 152:6 156:16 157:16 158:14 221:23 244:10 268:16 270:18 271:23 273:17 274:4, 12,17 275:25 290:12 309:4,8, 12,15 310:7,13, 21,24 314:22 334:9

**identifies** 54:6, 8,12 114:10 115:19 209:10 276:13 290:7 312:23

**identify** 13:9 42:21 46:13 112:22 151:7 165:20 196:3 207:12 245:24 246:2 264:3 308:18 309:4

**identifying** 71:15 95:15 127:23 136:8 164:5 290:9,15 296:19

**identities** 43:12 117:22 118:2 129:18 308:20

**identity** 70:19 114:23 116:13

**Iglesias** 12:16 54:7

**Illinois** 12:7,21

**imagine** 91:19 158:9

**immediately** 228:16 232:2

**impeachment** 325:3

**Imperial** 274:24 275:4,9

**implicit** 289:9, 11

**importance** 288:11

**important** 38:11 51:22 115:7 116:2 136:4 140:13 231:5 234:21 283:24 288:15 338:1

**impossible** 297:18

**improper** 297:22

**in-person** 203:24

**inaccurate** 67:8,12,16,20 143:25 144:2,4 284:11

**inappropriate** 208:18

**Inaudible** 309:23 333:5 335:17

**incident** 323:21 334:14

**incidents** 324:6,16

**include** 27:7,9 146:16 163:18 192:10,15 261:17 287:14 308:6 324:8

**included** 127:25 260:25

**includes** 324:16

**including** 21:2 147:14 226:12 319:3 324:16

**incomplete** 118:4 126:7 137:12 140:22 146:2,11 147:7 204:4 228:10 274:9 276:4

**incorporate** 106:6 122:22

**incorporated** 31:3 330:8

**Incorrect** 163:5 245:2

**increase** 134:18

**increases** 134:20

**inculpatory** 144:17

**incumbent** 264:3

**independently** 289:22

**indicating** 247:18 296:8 301:19

**indication** 212:1 249:4 250:9,14

**indications** 316:5

**indicia** 131:10, 20 146:19 147:4,13

**individual** 13:17 21:3 48:11 71:6 72:3,10,13,15 73:10 74:13,17 82:13 85:15 88:14 112:21 114:6 135:10 172:19,20 261:25 348:1

**individuals** 38:14 67:3 70:4 71:22 72:23 73:8,11 86:2 114:1,12,16,19 115:10 116:11, 14 117:22 129:18 151:12

**influence** 249:10,14

**inform** 68:21 118:1 125:25 262:25 264:7

**informal** 36:10

**informally** 75:15,23

**informant** 69:25 70:7,13, 14,16,18 71:11, 12 72:6,12,15 73:19,23,24 74:25 76:8,21, 23 77:5,7 85:19 88:14,19,21 98:2,22 114:7 116:16

**informants** 27:10 28:12 40:1,3,10,20 63:5,8,11 69:20 70:5 71:2,5,16, 21 72:19 73:3 74:6 77:16 78:1,5,11,15 79:11,16,20,23 80:6,12,24 81:18 82:3 83:8,12,18 84:8,23 85:16, 25 86:25 88:2,7 91:14 92:3,13 97:25 98:6,9 113:10 114:3 115:2,6,21 116:3,12,18 117:8 118:2 119:8,14,17,24 125:19 126:15

**information** 33:20 47:15,25 67:7,11,15 70:8,24 74:3, 22,23,25 75:3, 14,21,23 77:2 92:18 94:4,6,23 95:3,5,9,11,13, 15,21,22,23 96:13,20 97:1, 8,17,21,24 98:2,25 101:3, 22 102:2 103:13 105:22 106:2,16,24 107:9,14,17,23 108:5,12,16,20 109:1,10,14,18 110:22 111:14 112:18 114:24 115:6,9 116:5,8 117:6 118:2 121:2,9,10,13, 15,21 122:3,8, 13 123:4,12,16, 24 124:11 126:1,5,6,10,17 127:2,10,11,16, 20,24 128:2,14, 17,18,21 129:3, 20 130:4,11,16, 20 131:9,23 132:2,9,14,16,

20 133:13,24, 25 134:5,22 135:12,19,25 136:6,25 137:15 138:4, 19 139:8,9,13, 15,21,22 140:3, 5,6,10,12,13, 17,20 141:11, 12,22,23 142:12,14,21, 25 143:15,19, 21,22,23 144:2, 3,5,12,16,20, 21,23 145:1,14, 21,23 146:1,5, 7,10,14,15,17, 24 147:4,6,21, 25 157:4 158:16 159:14 171:8,9 180:24 181:17 183:4, 17,18 184:12, 24 185:4,5,11, 15 186:3 187:2 189:5,9,13,16, 22 191:1,15,19, 22 202:24 221:13 230:25 233:23 242:2 248:9 260:8 261:16 262:9, 17 264:1 273:20 274:22 275:1 276:6,8 279:8 282:3,13 294:13 304:9 308:12,19 312:19 313:14 320:9,14,20 321:1,6,8,18,23 322:4,6,17,24 323:2,6,7 325:25 326:15 328:17,19,22 329:17 330:3, 13,18 331:7,8, 13 332:25 335:7,9,12,19 337:10,21,24 338:14,15,16 339:2 340:11 344:10 345:1,7, 13 347:5,21,25 348:1,16 349:14,16,22, 23 350:3

**informed** 265:22

**inherent** 224:18

**inherently** 223:24

**initial** 292:20 293:15,23 322:14

**initially** 42:9

**inordinate** 37:17 38:18

**Insane** 338:6

**inside** 236:5

**instance** 122:19 129:3 252:11

**instances** 127:1 170:12 172:4 204:11 232:1 245:15 328:10 329:4 341:12

**instruct** 38:2 39:9 44:20 46:15 47:3 49:2

**instructed** 108:3,23 109:4 238:23 293:21 294:1 316:18

**instructing** 45:20 47:10 345:6

**instruction** 155:10 202:25 208:6 242:19 315:7

**instructions** 80:23 81:16 86:24 87:1,11 192:25 240:22 241:2,8,13 314:10 315:18 345:12

**instructs** 153:7

**integral** 263:16

**integrity** 284:4 286:4 305:14

**intelligence** 22:6,8 86:11 180:14 181:15 182:20,23 186:4,11 190:10,16 191:2,16,25 192:2 338:5,15

**intend** 289:4

**intending** 73:14 289:6,10

**intention** 267:23

**interact** 28:2,5 30:19

**interaction** 21:24 24:22

**interactions** 24:15 25:1 26:15,18 30:22

**interesting** 120:15

**interim** 31:19

**internal** 334:12,16

**Internet** 47:25

**interpret** 116:4 119:3 257:12 324:15,19,22

**interpretation** 163:20 324:24 325:5

**interpreted** 310:20

**interpreting** 256:20 302:5 324:21

**interrogate** 319:2,9,17

**interrogated** 318:24

**interrogation** 65:11 128:3,5, 10 276:2

**interrogations** 55:16 200:2 318:22

**interrupt** 302:17,18 330:25

**interview** 319:20 322:4, 14,21,23 323:3, 8

**interviewing** 179:12 320:1

**interviews** 55:16 65:11

**invading** 69:1

**invaluable** 282:20

**invented** 348:17

**inventoried** 175:17 290:10, 20

**inventory** 195:6

**invest** 111:9

**investigated** 30:5,9

**investigating** 29:9,12,18 30:13 177:20 212:3

**investigation** 92:17 94:24 95:4 96:5 101:13,23 102:8,9 103:2 105:14,21 107:19,24 108:6,21 109:2, 11 111:16 121:17,23 122:11,16,21, 24 123:3,10,21 127:17 129:15 138:8 145:18, 20 150:15 169:11 175:25 180:25 181:11 185:12 191:20 209:25 232:2 233:16 235:25 236:14,18 237:7 263:6,20, 24 265:3 286:2, 4 306:20 320:16,20 321:20,24 322:5 324:23 325:1,17 327:2, 4 328:12,18,20 329:19,24 330:4,14,18 331:8,13,21 332:15 333:1,9 339:9,23 341:14 344:12 345:8,14 347:7

**investigations** 22:14,16 30:25 31:24 32:22 33:1 37:3 55:17 88:5,6,8 90:21 91:9 99:1,5,8, 10 100:13,19, 24 101:4,18 102:1,17 104:23 105:1,8, 10,12 106:18 109:16 110:24 111:11,20 112:8,16 119:15,25 120:6,11 121:2 132:5 150:13 155:22 156:10 168:3 177:18 232:15 251:15, 19 263:12,13 268:5 304:19 318:21,25 319:1,3,4,5,6,7, 8,11,12,16,20 320:1,11 324:5 325:10 328:4,6 336:18 337:1,9, 13 338:25 339:3 340:19 342:9 345:19, 23

**investigative** 228:23 282:20 333:15,19,20,

25 339:22 344:25

**investigator** 75:25 232:13

**investigators** 115:8 231:10 232:8 311:17

**investigatory** 96:6,23

**involved** 22:13 75:18 119:15 136:17 172:15 176:5 235:24 240:3 253:21 257:19 262:4, 22

**involvement** 131:16 169:15 170:8 171:4,22 172:1

**involves** 297:25 337:16

**involving** 205:9 206:7 235:14 298:5 340:19

**IR** 197:14 308:14

**irregular** 253:13

**issue** 34:9 37:14 38:8 43:3,6 46:20 48:25 82:9 83:18 95:10 153:22 189:2 216:25 218:17 274:5 293:9 303:24

**issues** 43:7 51:19 95:17 182:11 257:24

**J**

**J-O-H-N** 14:8 15:4

**Jacque** 45:14

**jail** 293:20

**James** 45:11

**January** 50:5 84:16 182:6 318:6

**Jessica** 13:13

**job** 31:7,12 35:1,6 346:5

**Joel** 16:13

**John** 12:10 14:8,12 15:4,16 42:13 46:7 54:8 69:13 81:10 125:8 129:6 131:25 134:14 135:23 162:3 204:24 205:2,3, 6 242:8 277:17 313:24

**Johnson** 12:18 54:7

**join** 18:17

**joined** 17:17 25:20 29:3,7 42:6 82:3 84:1, 6,10 86:14,16 87:9,18 90:23 103:20 104:7 113:23

**joining** 13:8

**Josh** 13:12,16

**judgment** 237:18

**July** 216:8 318:6

**June** 12:8 46:9 69:15 81:12 125:10 147:22, 24 162:5 242:10 277:19 314:1

**jury** 174:6

**justify** 257:24

**juvenile** 299:7, 16 300:12 301:6,13,15,21 302:1,3,5,14, 15,16

**juvenile's** 301:17

**juveniles** 300:25

**K**

**keeping** 17:15 267:4

**Kennedy** 131:25

**Kentuckiana** 12:5

**kill** 129:8,24 133:3

**killed** 129:5 135:23 136:15

**killing** 147:18

**kills** 129:4 204:22 236:25

**kind** 24:22 75:9 87:12 97:11 128:6 131:16 135:3 147:12 177:19 179:4,5 195:4 206:18 219:25 221:21 226:6 231:25 234:25 235:24 242:24 258:2, 11 263:9 265:10 269:16 271:16 275:12 280:1,2 287:20 305:24 325:24 329:16 334:13, 16,23 335:7 336:18 337:13 346:8 348:14

**kinds** 29:8 95:17

**King** 236:25

**King's** 236:24

**Kings** 237:1 338:2

**knowing** 14:4 206:14

**knowledge** 38:13 257:9 281:19 320:2 343:22 344:4

**L**

**lack** 246:18 249:5 313:1,2

**laid** 223:3

**language** 287:4

**late** 17:3 23:22 28:21

**Latin** 236:24,25 237:1 338:2

**Latino** 274:23 275:2

**Latinos** 275:5

**law** 51:16 75:13 299:10,17 300:1,4,17

**lay** 34:19 38:12

**layers** 174:10 271:18 293:1,4, 18

**laying** 45:5

**lead** 96:22 126:24 132:10 133:19 171:15, 18,22 172:1,19 186:23 284:14, 15 287:25

**leafed** 190:8

**leafing** 160:1

**learn** 228:21 328:22 342:20

**learned** 35:1,5 106:16 107:10, 17,24 108:6,20 109:1,15 126:1 259:1 321:23 322:4,17,24 323:3,6,7 330:3,13 331:7 332:25

**learning** 95:3 322:6 339:3

**learns** 321:6 328:16

**leave** 87:6 98:16 178:18

**left** 25:23 125:18 183:25 193:4 331:2

**lesson** 160:13, 18 255:22 279:5

**letter** 182:6

**level** 94:8 126:11 128:16 158:19 173:16 174:4,5,7 238:11 239:15 240:16 250:9 252:19,22 313:9

**levels** 75:20 132:13,20 145:19 205:23 313:16

**liaison** 324:1 326:22

**lieu** 214:21 219:8 220:11 221:15 292:22

**lieutenant** 12:10 14:5,11, 14,17 15:10,14, 19 16:4,15 21:7 46:7 50:3,7,12, 20 51:4 54:8 69:13 81:10,15 88:22 125:8,13 162:3 242:8,13 255:17 277:17 313:24 350:17, 20

**lieutenants** 91:22 284:7,19 285:9,16 286:7, 9,24

**light** 236:4,5

**lighting** 177:25

**likes** 271:18

**likewise** 52:2, 20

**limit** 222:2,25 223:14,15

**limitations** 178:15

**limited** 33:13, 20 112:11 118:10 223:18 253:21 273:20 280:5 302:23

**limits** 228:16

**lineup** 63:1 130:7 154:18 173:13,20 174:5 195:25 197:3,4,24 198:1 200:3 201:6,15,23 203:11 208:25 209:2,3,9,15 210:11 213:3 216:3 218:21, 22 219:2,6,8, 18,22,23 220:10,14 221:3,8 228:9 229:6,14 242:18 243:8 254:10,15,17 261:11 265:1 266:12,13,18, 19,22,24 267:1, 3,7,12,17,23 268:8,15 269:5, 12,19 270:8,11 271:19 272:7, 13,14 277:2 278:5,6,8,11 280:10 288:6 292:4,22 294:4, 7 295:12,15 298:23 300:24 301:9,12 302:2, 6 303:25 304:7, 8,14,18,22,24, 25 305:6,9 307:1,19,22,25 308:3,4,13,21 309:5,8,12,16, 17 310:2,14,24 311:14 312:12, 20,25 314:25 315:1,3,8,13, 19,25 316:6,25 317:4,13

**lineups** 130:5 154:15,22 157:19 196:18, 24,25 198:19 199:2 200:9,16, 20 201:12 202:3,12,15 205:14 207:15 209:6,17 210:3, 15,22,25 211:3, 7 214:11,22 215:11 216:5 239:3,7,13,25 242:20,21 243:13 251:23 270:9 273:6 276:3 278:10 291:11 293:4 298:10,15 299:7 300:12 301:6 302:15, 20 303:4,7,13 305:12,17 307:2,7,9 309:18,19,20 311:18,20 312:3 314:11 316:13 317:9

**linger** 237:13

**list** 127:25 165:8 329:21 337:18

**listed** 13:2,5,18 84:11 180:11 183:24 287:24

**listen** 53:4

**lists** 54:18 55:8

**litigate** 48:25

**live** 70:20 95:15 173:13 196:24,25 197:3,4,7 198:18 211:13, 18 212:8,14,18, 22 213:4,10,20 214:4,11,14,21 215:3 218:17, 22 219:9,18,21 220:11,18 221:3,8,14,24 222:1 223:5,11, 23 224:9,21 226:12,16,20 227:5,7,10,12, 23 228:6,7,9 229:4,5,6,13,14 230:5,9,13,17, 23 231:1,15,19, 20,25 232:14 233:2,6,22,24 234:3,15,20,23 235:12 238:6, 12 239:2,3,7,13 240:20,23 241:2,9,13,19, 20 242:20 243:13 250:22, 24 251:1,16,20 252:20 253:2,8, 19,24,25 254:20 264:25 265:1 266:22, 24 267:12,17, 23 269:5,18 273:6 276:2 277:2 291:11 292:4,22 294:4, 7 302:20 303:4, 7,13,25 304:6, 8,14,18 307:7,9 316:6

**located** 12:6

**location** 12:23 151:7 156:19 157:16 158:14 166:18 194:22 234:10,14 235:11,15 307:18

**lodge** 32:6,7 98:14

**logs** 13:10 323:21

**long** 16:14 18:22 22:13 25:13 27:25 29:22 36:9 48:20 60:2,4,13 66:7 189:17 220:22,23 249:20,22,23, 25 250:4 264:12 305:25 335:3,10

**long-term** 336:25

**longer** 22:14 36:15,25 76:6 293:6

**looked** 46:20 174:21 185:16 189:19 199:7 200:12 201:3 203:2 213:2 215:10,21 242:15,17 243:9 269:14 270:6 280:12 335:3

**loose** 256:9,13 257:3,8 258:2

**losing** 294:16

**lost** 25:20 89:3 242:24 288:25 344:8

**lot** 95:23 102:2 131:23 139:18 140:1 141:9 170:3 234:24 236:4 338:4

**lucky** 172:22

**lunch** 124:15, 16,19 125:2,14

**luxury** 120:1

**M**

**machine** 149:11

**made** 28:18,20 31:2,18 36:1 97:6 136:25 145:6 151:16, 20 164:8,13 175:3 194:4 230:7,8 231:6 235:9 237:8 238:6,11,17 244:15,23 248:3,4 262:13 269:14 270:6 285:18 291:14 312:12 332:8

**mainframe** 347:17,21 348:12

**maintain** 290:6

**maintained** 182:19 342:22

**maintaining** 346:20

**maintenance** 180:20

**major** 323:21 336:15,19,24 337:2,14,15 339:18 349:24

**make** 17:11,15 28:25 33:18 44:11,23 48:23 52:8 61:18 66:19 74:11 82:7 85:8 95:17 101:8 103:10 113:17 118:17 120:17 123:12 124:10 135:19 147:20 148:24 161:8 184:17, 19 187:19 196:4,14 197:7, 8,15 198:7,8,15 211:22 218:25 222:15 236:11 237:17 244:19 248:6 249:20, 25 250:4,8,13 283:6 291:13 294:15,22 295:2,9,14 309:25 316:12 330:10 331:17 334:22 336:11 337:15 349:23

**makes** 116:1 124:18 145:15 163:17 262:7, 18

**making** 43:20 93:8 127:16 128:2 131:15

182:15 191:6,8 233:17 235:22 305:3

**manual** 111:13 123:7 279:5

**March** 200:6

**margin** 294:17

**marginally** 43:16

**margins** 294:14

**mark** 53:24 201:21

**marked** 54:3, 10,25 55:2,6 82:11,15 158:21 159:2 179:17 185:9 199:14 201:9, 22 202:1 242:16 318:2

**marking** 185:22

**masked** 298:5, 16,21

**match** 275:5 287:15

**material** 61:6, 10 66:14 83:6 199:7,9

**materials** 61:4, 8,19,25 62:1,4, 7,20 64:11 110:11,13 149:22 188:14 256:12 349:14

**matter** 12:10 94:24 108:16 128:24 131:7 145:9 149:18 151:17,21 155:13 158:4 167:6 181:14 186:18 194:14 197:24 207:2, 24 208:5,10,14 223:3,8 224:8 233:9 239:17 248:15 260:14, 18,23 261:18, 21 267:10,15 274:3,6,11 295:19 297:5,9 302:13 314:13, 20,23

**matters** 302:13

**Maxwell** 343:10

**Mcgrath** 13:20 14:16 350:16 351:10

**meaning** 71:11 91:21

**means** 121:4 225:1 297:11 306:22

**meant** 247:14 282:8

**mechanism** 124:8 330:7 331:22 344:15

**media** 133:4

**medical** 53:3,8

**medications** 53:5

**meet** 59:11

**meeting** 59:25 62:2,14 123:19

**meetings** 59:20 60:5,10, 13,16,19,22 61:13,15 68:15 82:21,25

**Megan** 13:20 351:9

**member** 100:5 169:20 191:12

**members** 151:4 169:7 179:1 183:17 273:25 275:3, 22 339:1

**memorize** 208:3

**memorized** 187:4

**memory's** 154:11

**mental** 132:24

**mention** 166:13 199:9

**mentioned** 149:22 211:13

**merit** 29:1

**met** 59:9,18 86:20

**methods** 94:5

**Metro** 19:17

**mid** 21:21

**mid-1990s** 20:16

**middle** 189:25

**million** 259:14

**mind** 118:14,15 180:3 249:11 276:20 344:8

**minor** 97:13 337:5,16 339:17 349:24

**minute** 39:22 40:11 161:20

**minutes** 38:17 46:21 69:7 81:4 124:24 266:18 277:12

**mischaracterizes** 186:13 233:14 300:6

**misidentifications** 285:14

**misnomer** 203:10

**misremembering** 255:5

**missed** 80:9 165:6 265:6

**missing** 163:6

**mission** 22:7

**misspoke** 150:8

**misstatement** 131:4

**mistake** 175:3

**mistaken** 154:16

**mistakenly** 52:3

**misunderstood** 210:14

**mitigate** 223:20 224:4,9, 17,21 226:15, 19 272:2

**mitigating** 229:21,25 272:12

**mitigation** 227:1

**mixing** 343:19

**MO** 148:15,23 149:3

**modern** 215:25

**moment** 54:17 126:15 192:20 215:7 218:17 304:12

**monitor** 285:22 286:2

**monitored** 263:19 264:4 265:4

**monitoring** 145:20 265:9

**month** 36:11, 14,22

**months** 18:19 29:20 48:22 136:14 179:3

**moot** 269:16

**morphing** 76:20

**mother** 129:5

**motion** 288:24

**move** 44:23 45:24 48:13,23 54:16 69:3,5 196:7 218:15 266:6 287:12 289:19 300:10 302:19

**moved** 23:13, 17 26:1 48:16 50:23 249:18 349:11 350:6

**moving** 39:3 45:18

**muddy** 71:10

**mug** 149:7,11 163:14

**multi-page** 40:12

**multifaceted** 35:10

**multiple** 38:4 67:2 136:5,10 137:1 253:11, 15 271:18 291:16 293:1 325:12

**multitude** 33:5 96:17 233:18 293:10

**mumbling** 196:11

**murder** 97:15 129:9 136:18 147:23 236:23

**murderer** 132:1

**murders** 29:21 228:16 236:23

**mush** 73:14

**N**

**name's** 117:12

**names** 34:6 71:19 148:9

**narcotics** 26:21,23 27:4, 6,14,15,20,21 28:13 336:21

**nature** 20:23 70:11,21 126:10 127:20 128:7,16 223:13 231:8

**necessarily** 19:7 63:6 89:22 102:18 104:24 120:5 128:23 129:1 144:1,9 145:4 184:21 185:4,5,19 205:22 221:19 223:25 236:15 262:15 271:19 276:21 283:12 305:21 323:11 325:15

**needed** 102:21 144:23 176:7

**negative** 151:19 230:14, 18 238:20 239:9 240:6 244:4 261:20 262:2 263:1,3, 8,9,23 264:8, 22,25 265:23 276:14 309:19, 20

**negligent** 136:22

**negotiated** 40:12

**news** 133:3

**nexus** 150:15 169:24 171:11 191:9,11 236:21 344:18

**nickname** 95:14

**nods** 52:11

**noise** 317:17

**non-** 154:8 272:11 278:6 310:8

**non-attorneys** 59:24

**non-identification** 156:3 244:11 245:8 249:7

**non-identifications** 152:16,24 153:8,16 155:6, 15,19,24 246:11,14

**non-ids** 155:11

**non-verbal** 52:12

**normal** 263:4

**Northern** 12:20

**notate** 156:14

**note** 209:12

**noted** 165:11

**notes** 322:21

**notice** 32:8,11 33:13,15 37:13, 22 39:22 40:8, 13,19 43:19 44:18 46:17,18 54:4,18,21 55:4 60:23 69:19 91:16 92:8,16 93:9,16 94:21 98:19 110:1 111:1 148:5 155:23 188:16, 20 269:9,22 286:14 295:22

**notification** 334:9,12

**November** 17:8 279:6,21

**nuanced** 207:7 279:24

**nuclear** 237:6

**number** 12:12, 13,14,16,17,19 34:12 38:7 115:17 164:10, 12,13,22 165:1, 22 190:13,20 194:18,19,22 197:25 255:11 256:4 278:7,25 290:7 291:13 300:13 311:13

**numbered** 151:2

**numbers** 156:21 308:15

**numeral** 114:14

**numerically** 151:5

**O**

**oath** 186:17

**object** 21:22 22:11,18 28:10 35:23 71:23 72:8,24 74:9,16 76:2,9,18 78:7, 12,19 80:8,15 87:3 89:17 90:2,12,20 91:1,15 92:4 93:14 97:9 105:16 108:7 116:25 120:13, 24 126:7,20 127:4,12,18 128:4 130:24 131:13 132:11 134:9 135:20 137:12 139:11 140:14,22 141:17 142:1 144:7,19,25 145:16 146:2, 11 147:7 148:13 149:9 151:25 153:10, 18 155:25 156:5 157:1 163:4,25 164:7 165:18 166:6, 12,20 167:3,10, 16,21 169:22 170:23 171:5 173:14 174:18 177:7,15,24 178:6 182:22 184:25 187:3 195:8 204:4 205:21 206:23 213:14,24 218:24 224:23 225:18 226:22 227:25 228:10 229:7,15 233:7, 13 234:11 235:21 239:20, 24 244:18 247:15 252:13 254:6 255:2 269:6 273:8 276:4 282:7 284:22 286:13 289:7,16 294:10 295:21 299:18 314:17 315:20 317:14 324:9 331:19 332:3 334:1 339:16,19 340:1 342:12 343:18

**objecting** 55:23

**objection** 32:7 42:7 44:12,19, 23 56:9,13 77:19 92:14 93:7,15 94:20 98:15,18 106:19 109:25 110:25 111:5 115:11 118:4 142:9 143:3 146:21 147:17 152:1 154:3 155:16 164:15, 24 172:6 181:25 185:18 186:12 233:25 240:8,18 241:3 245:1 248:19 250:17 252:23 267:18 269:21 270:20,24 271:15 272:24 274:9 296:3,11 300:5 315:11 316:1 340:21 343:24 344:22 345:4,9 347:8 348:13

**obligation** 121:20

**obligations** 335:25 336:2

**observed** 205:15

**obtain** 247:5 271:21 273:2

**obtained** 101:21 115:9 127:3 140:6 146:8 183:12 263:23 289:22 292:12 294:2

**obvious** 211:12 258:25

**occasion** 188:3,4 299:5

**occasions** 70:24 102:16

**occur** 247:9 254:3

**occurred** 171:9,17 233:2 252:11 312:20, 24 320:18 325:19 342:8

**occurring** 227:6

**occurs** 76:15 264:25

**offender** 19:16 127:23 129:25 130:1 132:1 134:15 203:14 207:23 209:11 211:21 220:3 222:7,10 228:17 231:11 232:20 236:24 256:23 276:25 295:16 298:24 301:14,15 334:15

**offender's**

211:24

**offenders** 220:21 282:19 298:6,16

**offense** 209:11 212:2 329:21

**offering** 187:13 222:23

**office** 13:19,22 173:17 176:11 209:23 210:1, 19 211:11 245:18

**officer** 13:17 16:6 18:14 20:7 25:9 27:13,18, 19,21 37:8 42:4 51:16 124:9 141:7 191:24 193:20 252:19, 22 299:10,11 300:11,24 301:5,9,11,16 302:2 328:11 331:5 332:5

**officer's** 300:3

**officers** 19:4 20:2,12,20 21:1,5,11,17 22:3 26:15 28:3 30:23 37:8 43:15 49:6 56:8,20 68:17 75:13 117:21 166:1 191:10 222:6 228:19 234:22,25 251:16,17,19 252:14 299:23 306:23 316:24 319:12 320:1

**offices** 259:19 341:9

**on-scene** 203:13,24 211:14

**on-the-job** 34:22,25 35:4, 11 36:17 38:9 43:3 112:9

253:22 259:2,8

**one-** 36:21

**one-hour** 221:1,6 229:18

**online** 12:4

**Oops** 161:11

**operating** 155:22 181:12 184:16 326:2

**opine** 269:9,22

**opining** 270:23

**opinion** 271:20

**opportunity** 83:5 223:18,19 228:6 229:4 235:20 236:4,7, 20 237:22,24

**opposed** 77:7 222:13 233:16

**option** 220:2

**orally** 102:3,22 105:22 328:18, 23 330:7

**order** 40:6 81:25 82:1,13 83:6 86:7 119:22 146:25 199:4 201:4,24 208:3 212:25 215:9,20,21,22, 23,25 216:3,17 222:2 223:4,10 242:19 243:8 261:14 267:3 271:9,13 277:24 280:5,8 283:25 285:24 293:19 303:15, 17,21 304:1 306:22 316:8 351:5

**orders** 60:24 61:1,2 62:10, 13,16,17,23 63:4,7,10,11, 15,16,18,19,22 64:2,5,6,17,18, 21,22 65:7,10,

11 68:6 99:9, 15,23,25 100:4, 6,10,14 195:17, 22 196:5 215:10 240:10 261:11 279:22, 25 280:3 351:4

**ordinance** 97:14

**organized** 23:7,12,13,18 24:2,5 27:21,23 79:1,5,8 81:21, 23,25 82:1,4,12 84:1,6,10 86:3, 16 87:10,18 90:23 103:20 104:8 113:23 119:12 169:2 323:17 327:9, 21 330:2 340:15 349:11, 15 350:3,7,10

**original** 77:9 269:17 342:3,5

**originals** 341:20

**overseeing** 15:22 16:4 50:7 51:4

**overstating** 46:22

**overview** 326:2,6,8,13,23

**overviews** 326:16

**P**

**p.m.** 125:11 162:6 242:11 277:14,20 314:2 351:13

**package** 344:7

**packet** 159:13 183:24 186:25 188:13 282:14

**pages** 48:3 120:2 159:13,

25 164:5 165:2, 10 166:17 175:10 184:1 190:9,16,17 192:22 195:1 201:6 336:7

**paging** 120:2

**paid** 70:8 71:17 72:13 73:24 74:3,19 76:22, 24 77:2 78:15

**paint** 126:12 128:25 136:2 206:2

**painted** 271:19

**pan** 133:14

**paperwork** 37:2

**paragraph** 39:23 40:21,25 162:20 163:1,2, 8,17,23 164:3 165:13 166:1 186:3,11 191:2 203:5 256:8 257:6,12,17 282:18 283:15 287:12,24 288:3 289:20 290:3,24 292:8 294:14 296:17 297:10,11 299:6 300:6,13 302:14 307:13 310:13 313:13 314:15,22 316:11 324:11 326:6

**paragraphs** 40:13 288:4

**parallel** 324:23

**parameters** 275:9

**paraphrase** 55:13

**Pardon** 152:22 173:24

**parent** 308:9

**part** 13:8 29:11 48:11 79:5,8 99:21 115:15 136:4 192:16 255:21 287:14 289:12 320:10 336:19 338:21

**partially** 262:6

**participated** 157:14 240:14 322:6 338:25 339:8 340:18

**participating** 31:24 308:13, 20,24

**participation** 341:13

**parties** 14:10

**partner** 35:17 37:6 251:12

**partnered** 36:1 37:4 44:4

**partners** 30:16 34:4 35:18 36:22 37:21,25 42:22 43:2,17 44:3 46:13

**passed** 331:9

**past** 75:14 95:15 150:5

**path** 141:11

**paths** 141:9

**patient** 184:4

**patrol** 18:14 19:5 20:22 21:5,8,9,11,17 22:21 23:1,5, 11,12,18 24:4 25:9 27:18 48:18,20 49:4,5 50:10,11,14 104:18,21 105:5 109:6 251:17,19 252:1 321:3 327:22,23 329:1,6 330:20

**patrolmen** 251:25

**pattern** 19:16, 18

**pause** 17:25 82:20 304:12

**pay** 125:2

**pending** 12:19 52:25 208:16

**people** 34:15 36:25 37:1 44:4 70:1 71:20 75:10 94:3 129:19,23 132:6,22,23 133:18 135:6,8 136:5 137:1 139:13 169:6 179:8,10,12 197:21 237:9 253:11 273:25 275:21,24,25 291:16 296:25 297:1 303:19, 24 304:3 308:20,24 320:3 321:16 325:12 335:13, 19

**people's** 174:25

**percent** 246:23 247:1,10,13,19 248:10 249:17

**Perfect** 124:25

**perform** 35:1,6

**performance** 166:4 210:21, 25 221:24 240:3 263:11

**performing** 32:21 167:7 211:3 306:5

**performs** 263:17

**period** 17:1 18:1 21:14,20 24:18 26:14,17 31:21 32:1,9,15 35:18,19 36:4, 7,9,22 37:9 55:15 72:17,21 73:1,6 78:18 79:4,7,15,22 80:1,5,10 81:17 83:19 84:5 85:1,13 87:9, 23,25 88:9 89:8,13 90:6,9, 18,22 91:13,24 92:1,13 93:22 94:1,25 97:16, 20,23 98:24 99:4,12,13 100:2,7,23 101:3 103:11, 23 104:20 105:2,4 106:9, 12,15 107:2,4, 6,16 108:18 109:8 112:14, 24 113:8 119:18 120:10, 19,22 121:8 122:2 137:10 150:9,13 151:22 152:5, 15,19,21,23 153:2,9 154:25 155:7,13,18,19 156:2,9,18 158:11 168:3, 17,22 170:2,6, 18 181:23 182:13 183:6, 16 193:10 215:17 216:16 224:8 238:19 239:5,6,11 240:7,25 241:6 243:23 244:5, 10,22 245:4 246:21,25 247:4 249:21, 25 277:24 278:11,16,23 279:12,16 280:9 281:8,11, 18 282:5,15 283:22 285:4 286:9,23 294:21,25 295:18 298:9, 14 302:20,22 303:8 304:14, 19 307:17 309:7,11,16 310:1,18,20,25 311:16 312:4, 10 313:10 315:5,17,22 318:12,16 327:8,13,15 346:4,23 347:5

**periods** 19:10 26:11

**peripheral** 303:16,21

**peripherally** 102:1

**permanent** 333:17

**permissible** 165:10 220:17 252:17 259:20 267:23 268:13

**permission** 177:13 248:1

**permitted** 205:20 206:6, 20 211:18 213:20 247:14, 20,25 251:16, 20 257:4 259:10 266:10, 25 267:16 270:15

**permitting** 260:11

**perpetrator** 132:8 169:20 170:20 171:13

**person** 76:16 95:21 96:6 114:23 116:7 127:23 128:20 130:21 131:12 132:15 134:8, 17 136:15,22 138:5,20 139:8 141:6,7 170:14 174:16 175:4, 13 196:3 212:2 213:11 224:10, 11,25 225:5 227:21 229:20 235:3 238:17 246:14 248:5 251:1,3,7 257:4 259:17,22 267:25 268:14 269:19 270:17 271:22 274:23 276:13 284:1 285:2 287:25 289:23 291:14, 19 292:12 293:19 294:8 295:11 296:18 297:13 304:5 307:25 308:3, 12 309:8 310:5, 6,13,23 311:14 316:6 320:23 332:8 346:5 348:2

**person's** 70:19 137:23 309:4

**personal** 43:11 325:8

**personally** 325:6

**personnel** 85:11 323:24

**persons** 130:6 182:15 234:19 266:24 303:16 304:2,23

**perspective** 38:16 76:14 256:25 257:1

**perspectives** 325:13,14

**persuade** 46:24

**pertaining** 63:23

**pertinent** 107:17,23 108:20,25 320:20 321:19, 23 322:17,24 323:2,6 330:17 331:7 332:14, 25

**phase** 31:19

**phone** 134:3, 12 135:18,24 138:14,17 139:7 140:2,15, 25 141:5,6,7,8, 10,19 142:3,6, 14,15,18,20,23 143:14,16 335:5,15

**phones** 75:3

**photo** 63:16 130:12,17,22 131:12,17 132:3 136:23 145:23 146:7, 17,20 147:6,15, 21 148:11,14, 22,25 149:3,12 151:3,8 154:9, 14,17,19,22 157:16,18,20 158:14 161:11 162:22,24 163:3,5,11,12, 14,18,22 164:4, 6,9,13,16,22 165:2,11 167:1, 8,14,23 168:16, 21 173:12,19 174:4,21 175:7, 16 176:24 180:20 181:1,2, 3 185:13,15 192:15 194:17, 22 195:25 196:18 197:10, 12,13,22 198:1, 5,6,9,10,11,13, 22 199:2,6,8 200:12,13,15, 19,20,24 201:12,16,19 202:4,7,8,12, 15,18,22,25 203:8,10,15 204:3,14,20 205:14 206:6 207:4,15 208:1, 16,23 213:16 214:11,22 215:12 216:5 220:20 221:2,7,

10 223:12 226:1 228:8 229:6,11,13,23 230:21 234:5, 10 237:3 239:3, 7,12 242:21 243:12,17 249:23 251:23, 25 254:9,14,16, 22,23,25 255:23 256:1,2, 5,6,10,13,14, 18,22 257:3,18 258:1,3,9,13 261:3,7,11,14 263:3,4,8 265:1,7,9 266:7,8,12,25 267:24,25 268:1,2,7,15 269:4,14,17,20 270:6,18,19 272:6 273:6,13, 18,24,25 274:7, 19 275:3,12,14 278:14,15 282:2 283:5,17, 24 284:8,13,20 287:14,19,24 288:12,17,21 289:3,13,20 290:17,25 291:3,10,16,19, 21 292:3,9,10, 15,20,22 293:3, 7,11,14,15,16, 22,24 294:3,6 295:2,10,20,24 296:2,19,20 297:13 306:8,9, 12,18,19

**photograph** 151:4 174:22, 24 175:14 203:18 204:11, 17 205:1 207:22 220:19 231:11,20 233:20 241:25 261:2 267:7 270:8 296:25 297:4,15,18 311:17,20 312:1,3

**photographing** 309:18,20 311:14

**photographs** 175:10 179:1, 11,13,15 192:7 197:14 258:4 260:8 282:19 287:10 290:6,8, 10,11 312:7 348:9

**photoing** 309:25

**photos** 151:10 165:9 166:16 167:19,20 169:6 178:24 179:7 183:12 192:3,10,24 197:17 203:20 204:8 205:20 206:21 207:19 208:1,7,11,19 232:16 233:1,5 234:12 257:9 259:25 260:2,6 261:12 267:11, 16 270:17 272:20 275:13 287:13,19,20 289:23 290:18, 20 292:13 294:23 348:5

**phrase** 117:1 189:16 299:1

**physical** 287:15

**picked** 37:2

**picture** 156:15, 21 194:19 196:2 232:23 272:13 290:9, 12

**pictures** 175:12 178:1 275:7,8,14,16, 17,19,20

**piece** 145:13

**place** 23:15 136:9 188:6,7 215:18,21,24 233:24 234:10 243:1,3 296:20 302:22 321:10 331:22 333:14, 24 343:5 344:15

**plaintiff** 13:1 14:13

**Plaintiff's** 12:24

**plaintiffs** 13:7

**plan** 160:13,18 255:22 279:5 351:3

**play** 123:14 262:10 301:9 305:5 338:5

**plays** 262:8

**point** 13:10 16:18 20:16,17, 19 21:16,25 22:20 23:2,3, 17,25 26:13 27:13 31:17 32:13,16 37:3 43:20 52:24 61:18 63:7 67:23 68:2,12 75:22 76:5 80:25 88:12 99:12 100:8 119:12 121:18 122:12 132:7 136:19 142:5 143:22 156:6 212:24 218:4 230:20,21 235:10 248:3 264:17,20 265:24 269:16 290:10 293:12 297:14 298:22 301:10 303:15 321:22 322:2, 10 328:1 330:11 332:19

**pointing** 138:2 171:15 192:9 257:22

**points** 51:11 96:2 138:18 140:19

**Polaroid** 297:20

**Polaroids** 179:1

**police** 15:19 17:5,17,19 68:17,21 69:22 70:3,5,9 71:1 72:1,9,10 74:21 76:10 78:17,24 86:2 94:23 96:18 99:24 100:4,5 109:17 110:8 112:21 116:9,21 117:8, 21 129:4,21 130:7 132:10, 22 133:9,16 141:7 148:9 149:19 153:13 155:5 158:24 165:25 166:24 173:15 178:3,9 188:1,5 195:17 203:21 207:3 209:12,13,18 210:4,17,22 211:3,10,25 212:13 219:6 220:19 221:15 222:7 223:17 224:2,12 228:19 232:10 234:25 237:2 245:18 252:14 268:4 306:23 316:24 327:3 341:24

**policies** 37:16, 18 43:25 55:14 64:18 72:18,22 73:2,7 77:10, 15,24 78:3,9,25 79:9 80:6,13 84:7 90:1,24 95:10 96:24 100:20 101:5, 11 120:9 122:16 123:3 125:23 141:15 187:10 192:20 193:25 196:4 213:2 215:7 217:5 280:10, 16,17,21 281:4 284:25 285:6, 10,13,24 307:6, 9

**policy** 76:11, 13,19 77:6 78:18 80:17,25 83:25 84:11,15, 22 85:2,10,14, 20,23,24 86:5, 14,16,21,23 87:10,13,24 89:9,14 91:11 93:20 94:8 98:4 101:10 107:22 108:3,14,15,18, 23 109:3,4,8,12 113:13,19 114:2,10,17,21 115:1,10,20 116:13,17 117:4,19,20 118:9 119:1,2, 7,16,23 121:12, 16,20 122:1,6, 10 123:13,16 141:18 142:16, 17 145:9,11 152:9,16 153:6, 14,22 154:4,7, 12,23,25 155:4 156:11 157:18 158:1 181:15 182:4,5 192:24 193:2,23 194:3 195:12,13,23 197:20 198:13, 16,17,18,21,23 199:2,6,8 200:8,12,15,19, 23 201:15,18 202:11,14,17, 21 206:20,24 207:8,24 210:21 212:7, 18,21 215:14, 18 218:19 219:7,10 220:13,15,18 222:23 223:3, 12 224:2 230:16,19 231:2 234:5

235:7,16
242:20,25
243:3,9,11,12,
16,19,22 246:1,
2 247:25
248:11 249:15,
19 251:21,23,
24 253:10
260:6,9,10,18,
19 261:10
267:2,10
268:18 272:18
273:12,15,22,
23 274:2,13
278:4,12,16,17
280:21,22
293:21,25
294:1,5 297:6,9
302:21 303:3,
13 304:8,10
306:2,21 307:2,
10,12,14,16
308:25 309:3
310:17 311:4,
12 314:8 316:2,
3,11,12,18,23
317:2 323:1,10
332:11,17
341:23 342:17,
18,20 344:9,24

**policy-** 314:19

**policy-wise**
234:16

**poorly** 258:2

**populate** 192:4

**populated**
178:24

**population**
192:17

**position** 16:14
25:3,7,14 26:6,
20 27:22,25
28:16 34:2
44:15 49:11
50:2,19,25 51:6
266:23

**positive** 23:24
156:8,10,25
157:15,24,25
164:4,22
166:18 172:17,
23 173:2

175:15 194:21
195:7 210:16
211:8,11 225:4
226:8 230:14,
18 231:19
238:15,20
239:8 240:6
244:3,16,24
245:13,19
247:22 253:23
254:13 261:4,8
263:22 264:8,
22,25 265:22
268:5 270:19
276:17 283:11,
12 290:25
291:8 292:7,8,
18 293:15,23
294:2,22
295:20,24
296:1,6

**possession**
176:10

**possibility**
133:22 171:20
231:7 286:10

**possibly**
293:19

**post-1993**
106:7

**post-2000**
99:17

**potential** 43:7
45:9 131:18
206:18 273:14
274:1 299:1

**potentially**
133:6 142:15
175:2 210:12
247:18 249:13
325:4

**powerful**
136:25

**practical**
227:14 290:16

**practice** 76:11
78:17 79:18
80:18,19,22
91:11 94:4,7,8,
18,19,22,25

105:19 106:14,
15,21,22 107:3,
7 108:9,14
109:13 117:25
120:11,23
121:10 139:21
145:10,11,12
151:24 152:24
153:25 155:13,
23 158:5,10,12,
13,17 167:7
170:1 194:14,
20 195:3,4,5
207:2 208:5
209:18 211:2
219:7,17,21
220:18,25
223:8,9 224:8
232:25 233:3,4,
9 234:17
239:18 246:8,
17 248:15
249:3,16,24
252:6 253:14,
24 254:8
260:14,16,23
261:18,21
263:10 264:9,
17 267:15
268:24 269:1
270:16 271:7,
12,20 274:6
291:7 295:19
296:23,24
301:4 312:3
314:20,23
315:12 347:4

**practices**
34:14 37:16,18
38:14 43:25
55:15 64:6
79:1,14 80:7,13
87:2,14,20
88:1,10 89:10,
15 90:1,24
91:12 93:24
95:2,10 96:25
101:5,11
109:14,16
110:8,22
183:15 187:10
193:20,22
195:14 223:9
225:15,20,22
226:14 230:4

270:16

**pre-** 68:6 92:18
106:7 258:25
318:2

**pre-1993** 91:11

**pre-detective**
36:12

**pre-service**
61:7,10 62:9
64:8,10,14,15
110:10,12,16
159:19 160:24
179:22 181:7
182:18 253:20
255:9 259:3,4
260:7 349:4

**pre-services**
92:25

**prefer** 118:19
143:5

**preferable**
221:2

**preference**
229:5,9 312:8

**premise**
272:25

**preparation**
60:3 61:15
62:25 68:9,14,
19 82:17
158:25 179:23
199:13 201:3,8,
25

**prepare** 59:7
104:5

**prepared**
83:11,20 174:3
187:11 314:24

**preparing**
174:12

**prepping**
335:4

**presence**
61:21 62:17,24
300:3 321:8,25

**present** 59:17,
18,20,25 176:2

234:23 252:20
253:1 299:11
300:11,24
301:5 308:3,8,9

**presentation**
166:14

**president**
132:3

**presume**
179:4

**pretty** 275:1

**prevent** 53:5,9

**previous**
23:10 162:21,
22

**previously**
16:17 49:3
81:22 160:3
242:17 259:24
267:25 268:16
318:2

**primarily**
37:13 193:12

**primary** 34:25
35:5,8,12
119:10,21
286:5

**printed** 190:3
199:20

**prior** 23:10
24:24 33:18
82:21 87:17
93:6,12 104:15
111:18 112:3,8
165:9 182:17,
20 270:8
278:23 279:21
280:6 297:17
350:6

**prisoners**
303:18

**privilege** 69:2

**probable**
127:1,14 128:7,
15 172:9 219:5,
25 220:4,7
221:20 254:2,
12 291:1,4

292:2

**probe** 44:1,8

**problem** 91:4 130:18 326:11

**procedure** 157:14 160:14 167:6,8,14,15 177:6 184:16 193:17 194:1, 16 195:24 198:5,6 200:6 203:9 204:16 218:21 226:6,7 227:8 240:4,14 242:19 243:8 258:16,23 261:11 265:19, 22 266:1 269:19,24 272:21,23 284:2 287:9,14 288:21 306:5, 18

**procedure's** 304:9

**procedures** 37:15 39:21,25 40:1,2 63:1 64:3 65:12 154:9,10,19 158:24 159:5 160:20 161:7, 10 162:24 163:3,8,24 166:5 172:24 173:4 174:15 175:2,20 176:13,17 177:12 178:4, 10,15 181:12 192:21 193:13, 16 196:1,17,18 200:3,24 201:6, 23 202:22 203:1 205:13 206:6 207:7,14 212:25 213:3,4 216:4 218:23 222:3 225:10, 17 226:2,12 239:21 242:15 254:3,18 255:21 256:18 257:18 258:9 259:10 260:11, 20,24 261:19 262:2 264:11, 19 265:7,13,15 266:3,9,11 272:7 278:22 279:16,20 281:10,16 282:16 283:11, 17,24 284:8,20 285:23 286:3, 11,25 289:13 295:20 299:16 303:25 304:7, 14,18 306:10

**proceed** 321:1

**proceeding** 174:12 263:14

**PROCEEDINGS** 12:1

**process** 78:16 167:13,17 183:4,6 285:22 288:11 332:1, 12 344:10

**processes** 187:10 285:25

**produce** 47:18,21

**produced** 47:13 48:4,10 323:22 326:7

**productions** 48:11

**program** 64:14 159:5 323:21 324:1 325:21 326:1,7,21

**progress** 19:5 138:13 145:20 241:23

**prohibit** 218:22

**prohibited** 195:14,19 204:2 208:7,12 256:19 267:10 272:18 273:23 278:12

**prohibiting** 260:10

**prohibition** 207:25 208:4 278:15

**prohibitions** 315:17,23

**promise** 250:23

**promoted** 29:25 50:3,7,9

**promotion** 29:1

**proper** 285:17 287:9

**properly** 150:20,24 283:19 284:12 287:1

**property** 16:2

**prosecute** 224:25

**protect** 284:4 301:16 302:3

**proved** 140:12

**proves** 143:23, 24

**provide** 45:6 53:14 55:20 56:6,18,22 57:1,5,9,14,18, 22 58:1,5,9,13, 19,24 59:3 83:6 94:6 116:5 129:19 132:9 134:13 135:6, 10 288:4 318:9 326:1

**provided** 70:23 75:19 87:13,19 94:24 95:16 96:14 102:2 107:14 111:7 114:17 115:6 126:17 128:20 130:15, 19 131:9 134:21 140:12 141:22 142:14 143:24 144:16, 23 145:23 146:10,17 159:8,9,15,18, 20 161:3 182:10,13,15 191:16 193:5 195:13 202:25 221:25 249:4 278:22 279:11, 21 281:6,9,12 282:4,15 290:2 299:15,22 300:2,25 318:5, 16 328:2 331:13 349:6

**providing** 68:22 75:23 77:2 94:3 95:22 98:2 106:2 114:23 116:8 134:17 136:6, 20 137:1 195:4 273:20 335:6, 13

**prudent** 121:11 138:7 207:9 221:9

**public** 134:13

**publicly** 47:15, 21 134:22

**pull** 41:11 53:12 54:1,24 59:6 82:9 120:7 160:4,11 202:7 216:20 218:11 244:1 255:4 281:5 317:25 323:12

**pulling** 192:19

**purpose** 147:21 150:21 176:22 267:8 268:21

**purposes** 73:19 74:21 103:25 104:1 116:22 150:19 173:8,11 204:12 256:24 329:15,22

**pursuant** 116:17 151:24 164:11 299:14 307:12,16

**put** 130:16,21 131:11,17 132:2 136:22 145:22 146:6 147:5 169:5 196:2 216:23 219:6 225:21 242:14 244:6 264:6 275:16, 17,20 280:4 289:2 293:19 347:25

**putting** 63:25 126:14 130:5, 11 138:16 146:20 183:5 292:6 304:5 330:9

## Q

**qualifiers** 87:7

**quality** 132:13 209:24

**quashed** 288:25

**question** 20:25 28:10 34:10 35:3 38:15 42:20 43:9,13, 15 44:11,15,22, 24 45:16,19 46:16 47:17,18 48:1 51:24 52:2,8,9,15,17, 20,21,25 53:4 55:24 56:1 61:20,24 69:1, 24 75:4 77:10, 14,20 80:9 82:7 85:6 87:4 89:4, 6 90:14 92:9 94:13 98:15 101:9 105:3 107:1 112:13 115:16 120:15, 18 122:25

123:6 125:24 126:13 129:23 130:14 131:6,7 137:6,21 139:19 140:24 160:7,10 167:12 171:2 173:8 174:1 183:2 189:7 195:11 198:17 199:1 204:21 206:4 212:20 213:23 216:1, 13 219:1 229:1 240:1 241:17 244:20 248:21 250:18 254:5,7 270:3 271:11 272:25 275:15, 18,19,20 279:3 281:6 288:13 294:17 296:12, 13 300:8,9 302:4,10 307:8 313:5 328:4 331:24,25 333:4 334:25 339:5,7 344:3 347:10 349:3

**question-and-answer** 51:20

**questioned** 45:8,17

**questioning** 44:6 138:4 247:21 301:10

**questions** 17:15 33:16,23 34:13 38:17,18, 21,24 39:1,2,4 41:24,25 42:2 44:2,5,14,16 45:11 47:4,9 51:20,21,23 53:2,6,9 87:8 125:21 138:14, 22 139:2,25 155:20 193:11 226:18 248:5, 12 249:9,13 266:7 311:8 312:9 348:22, 23,24 349:7

**quick** 69:6 81:4 227:19 237:3 277:4,5

**quicker** 190:19

**quickly** 17:9 19:20 37:2 218:19 228:21 237:13

**quoted** 122:11

**R**

**race** 308:14

**racketeering** 22:15

**Rails** 349:5

**raise** 14:18

**ran** 224:12

**range** 133:1

**ranging** 171:8

**rank** 311:13

**rare** 17:14 122:19 188:3 232:1 299:4

**re-ask** 94:14 131:7 143:9,10, 13 155:17 234:13 240:1 247:17 294:16 310:1

**re-form** 35:3

**re-paraphrase** 56:4

**read** 66:14,20 80:8 83:9 94:13 113:15 123:20, 23 163:8 178:7 186:4 193:3 209:7 244:20 271:10 310:12 311:23 324:10

**reading** 67:24 68:2 110:2 120:1 208:4 301:22 313:6 337:24

**ready** 125:16

**real** 44:5 95:14 136:13 174:25 197:5 259:17 263:7

**reason** 74:11, 12 84:18 95:20 169:15,19 172:13 215:23 291:21,23 305:18

**reasons** 49:3 114:11,18,22 115:2,19,20 133:23 211:12 258:12 293:10

**reassure** 117:21

**recall** 22:20 25:2 30:21 42:14 63:2 66:25 67:21,25 68:4,10 252:10 280:2,24 349:7, 25

**receive** 43:4 132:14 145:21 171:9

**received** 111:15 121:9, 21 122:3,8 135:24 140:25 142:23 143:14, 19 145:2 146:1, 15 147:5 164:18 181:2 320:19

**receiving** 74:23 121:2,13 122:13 132:15 146:24

**receptive** 121:1

**recognize** 133:4 167:20 172:15

**recognized** 70:23

**recollect** 19:20 22:1 24:22 26:13,19 28:7 60:25 66:4 67:17

**recollection** 19:15 28:22 31:12 32:19 33:6 82:5 226:23 312:6

**record** 12:3 14:7 15:3 42:17 46:4,5,6 48:24 69:10,11,12 81:6,8,9 94:5, 23 95:5 125:5, 6,7 161:22,25 162:1,2 184:22 185:1,21 186:22 190:18 218:8 242:4,6,7 253:3 277:13, 15,16 313:21, 22,23 314:4 333:18 351:12

**Recorded** 54:4

**records** 47:22 343:2

**red** 75:18

**REDIRECT** 349:20

**reduce** 222:20 223:10 225:23 272:2,22

**refer** 15:14,15 70:17

**reference** 116:1 163:17 180:21 181:11 182:24 188:2, 14 200:15 203:1,24 213:4 302:14

**referenced** 41:13 93:13 184:15 186:10, 19 191:2 324:11

**references** 114:5 189:4,8 200:12,16 201:11 202:3,4, 11 203:23 312:15 324:4 325:24

**referencing** 183:10 203:19

**referred** 15:23 27:17 32:17 76:6 186:3 204:15 211:14

**referring** 20:14 83:25 88:20 148:6 181:23 185:17 189:5, 10 196:25 303:24 313:15 323:25

**refers** 70:13 73:23,24 185:14 325:20

**reflects** 282:4, 14

**reform** 332:24

**refuse** 44:13

**regard** 41:21 53:14 55:21 56:7 78:14 79:15 80:21 81:17 83:17 85:2,14 87:14 88:1 89:11 91:13 93:5,18, 21 95:1,3 106:16 110:6 112:3,15,23 113:9 114:1 119:19 120:8, 10 122:14 149:15 156:8 168:1 182:11 196:20 242:20 243:12 246:8,9 253:19 254:22 278:10,14 279:15 281:10 287:11 294:5 302:24 303:12 339:1 344:10

**register** 47:4 86:20 114:22 115:2

**registered** 70:7,14,16,17, 18,22 71:2,4, 12,16,18,21 72:5,12,13,19 73:3,23 74:5 75:25 76:1,7, 16,21,23 77:4, 7,16,25 78:4,10 79:11,16 82:2 84:23 88:15 97:24 98:5,8 113:9 114:7,11, 18 116:12,16, 18 117:5,8 119:8,17,24 126:14

**registering** 115:21

**registration** 78:14,16

**regular** 209:18

**regularly** 133:10

**relate** 38:8,10

**related** 39:19 43:19 55:15 63:4,12,16 64:2,6,18,22 65:11 69:19 79:1,10 80:23 85:25 92:14 101:22 104:17 105:14,20 109:10 111:10, 19 113:2 122:15 123:2 129:9 155:1 159:5,14 160:13 186:4 196:18 250:19 260:20 324:6, 16 333:8 334:24 336:21 339:9,17,23 344:11 345:7, 13,18,23 347:7

**relates** 64:1 92:7

**relating** 325:18

**relationship** 305:23 320:3

**relationships** 206:11 321:16

**relevance** 37:12,20,25 42:7,24 44:12, 24 45:2 144:20 145:5 303:23

**relevancy** 140:9 144:21 145:7 146:5,14, 24

**relevant** 20:5 32:11 34:8 37:22,23 38:15, 21 43:2,5,6,12, 16 44:1 46:17 95:7 127:21 140:9,17 142:12,20 143:1,5,6,8,15, 22 144:2 145:2, 3,7 238:3 260:4 261:16 262:9, 13,15,16 277:25 328:24 338:8 344:19

**reliability** 95:16 115:3 116:1,3 121:14 131:10,20 139:9,22 146:19 147:4, 14 174:16,20 250:14 272:22 294:4

**reliable** 130:20 142:25 143:1,2, 5,11 225:25

**relied** 101:2

**reluctance** 224:4

**rely** 100:25 320:2

**relying** 110:22 325:9

**remember** 24:21 28:9 32:24 40:5 65:8 68:12 77:14 208:4 279:23 294:14

**remind** 50:4

**remotely** 13:15,19,22

**removed** 175:10 230:3

**removing** 229:19,24

**repairing** 97:13

**repeat** 30:6 77:20 94:13 97:19 105:3 108:8 121:25 152:3 167:12 212:20 258:18, 20 333:4 339:5

**repeated** 135:25

**rephrase** 52:18 214:23 328:14

**report** 16:9,12 21:1,4 22:21 23:6 64:7,9,12, 14,19,22 102:4, 7,8,13,15,16, 19,21 103:1,4, 6,18,19 104:3, 4,16 105:2,15, 20 106:3,4,6,7, 11 107:20 108:25 109:6 122:20,24 156:24 157:6,8 165:4,8,12,16 179:4,5 230:7 235:9 237:21 241:22,23,25 261:1,17 315:4 321:4 327:2,23 328:4,12,13,20, 25 329:2,6 330:20 331:12, 14,20 332:24 339:21,22 342:3

**reported** 21:3, 6,7

**reporter** 12:3,5 14:1,5,10,14, 17,23 42:18 46:3,6 51:22 52:13 53:19 69:9,12 81:6,9 125:4,7 161:24 162:2 242:4,7 253:2,4 277:13, 16 313:20,23 314:5 330:24 331:2 350:19, 24 351:2,5,9,11

**Reporters** 12:6

**reporting** 21:16 24:1 103:25 104:1,2

**reports** 69:22 96:18 102:9,10 103:22 104:6, 10,12,19,22,23 105:5 110:2 122:15 123:8, 22,25 157:9 315:1 321:4 324:15 328:5 331:6 332:13 333:1,7,23 339:11,13 340:20 341:13, 14 342:10,19, 24 344:20

**repositories** 342:23

**repository** 343:1

**representative** 153:13

**representing** 12:5

**request** 192:3, 15 209:23 344:23

**requested** 181:1 185:13 331:5 332:23

**requesting** 185:15

**requests** 346:21

**require** 102:21 128:9 156:12 166:8 316:12

**required** 88:15 97:1 99:14 100:9,19 102:19,25 103:3 104:5,22, 25 105:6,13 107:22 108:4 109:9 121:14 152:8,11,16 154:8 155:11 157:15 158:1, 18 166:25 193:8 198:1 230:5,9,12,13, 17,24,25 233:21,23 234:2,9,14 241:1,7 246:1 252:20 260:2 261:5,9 262:25 276:23 297:5 299:10,17,23, 25 300:4,17 303:12 307:10, 13,18,21,24 308:2,11,24 309:4 310:2,14 311:13 312:10, 21 313:10 314:9,14 317:7 321:9 323:1 327:18 332:15

**requirement** 153:15 156:17 157:18,21 227:4,11 234:4 235:2,7 245:15, 21 252:25 263:2 264:7 308:24 309:17 314:18 315:6 322:16,20,22

**requirements** 64:13 104:3 122:7 156:14 172:8 227:7 234:16 260:19 280:15 303:3,7, 11 307:6

344:25

**requires** 141:19 155:5

**requiring** 64:12 308:18

**rescinded** 215:20,24 216:8

**rescinding** 201:5

**rescinds** 217:6,7,8

**reserve** 350:23,24

**resource** 169:25

**resources** 326:10 337:13

**respect** 15:13 37:14,21 39:18 56:9 93:15 98:15 349:3

**respond** 19:5 39:14 228:15, 21 346:5,16

**responded** 232:11

**responding** 228:19

**response** 44:15,25

**responses** 136:8

**responsibilities** 325:21 346:8, 12

**responsibility** 180:19 346:11, 23

**responsible** 346:20

**rest** 83:16 161:22

**restraints** 316:5

**restrictions** 195:23 221:23 253:8

**result** 226:7 261:4 283:18 285:13 287:9 289:3

**resulted** 230:14 262:2

**results** 264:10, 18 265:22 266:2

**retain** 117:9

**retained** 71:1

**retention** 333:17

**review** 60:18, 21 61:2,4,6,14 62:1,4,7,12,13, 16 63:3,10,15 64:2,5,16,17 65:10,20 66:23 67:2 82:21,24 83:6 85:5,8 110:7 111:2 149:21 335:23

**reviewed** 61:11,21 62:12, 23 64:11 65:14, 17 67:6,10,14, 18,22 68:1,6,9 82:17,19 110:2, 13,20 112:18 123:7,18 154:12 158:25 160:3 179:23 199:12 201:7, 25 203:5 279:22 346:9, 25

**reviewing** 62:1 66:7,17 82:24

**reviews** 323:21

**Reyes** 40:5

**Reyes/ solache** 41:15

**Reynaldo** 12:11,12,14,15, 17,18 13:18,21

**RFC** 82:11

**Ricardo** 12:13

**righty** 54:24

**risk** 272:3 286:20

**risks** 224:21 284:8,10,11 286:10,18

**rivalries** 171:25

**robbed** 19:19 96:3

**robber** 299:1

**robberies** 29:11

**robbers** 148:17

**robbery** 96:19 148:17 298:23

**Robert** 12:15

**rode** 36:5

**Rodriguez** 12:14 54:7

**ROI** 339:10

**ROIS** 332:12 341:2

**role** 21:20 27:3 110:24 177:16 262:8,10 263:16 286:1 301:9,11 305:5, 25 320:10

**roles** 27:16 34:1 286:5

**roll** 159:19

**Roman** 114:14

**room** 160:6 161:22 304:24 305:8,18

**Rosen** 13:3 21:22 22:11,18 32:6 33:11 34:8 35:23 37:11 39:7,11,14,17 40:2,6,11,16, 21,24 41:3,7,9, 16,19,23 42:7, 24 43:10 45:1, 21 46:2,15 47:5,12,17,24 48:7,13 49:2,17 55:23 56:9,15 59:18 61:17 68:24 69:8 71:23 72:8,24 74:9,16 76:2,9, 18 77:19 78:7, 12,19,24 80:8, 15 81:3 83:15 87:3 88:12 89:1,3,17 90:2, 9,12,20 91:1,6, 15 92:4,14 93:7,14 94:12, 16,20 97:9,19 98:14 99:16 103:7,16 105:16 106:19 108:7 109:24 110:25 111:5 112:25 113:15 115:11 116:25 118:4,14 120:13,24 124:3,6,19,22, 24 126:7,20 127:4,12,18 128:4 130:24 131:13 132:11 134:9 135:20 137:12 139:11 140:14,22 141:17 142:1,9 143:1,3 144:7, 19,25 145:16 146:2,11,21 147:7,17 148:13 149:9 151:25 152:4,7, 12 153:10,18, 21,25 155:16, 25 156:5 157:1 160:5 161:8,13, 15,19 162:13 163:4,25 164:7, 15,24 165:18 166:6,12,20 167:3,10,16,21 169:22 170:23 171:5 172:6 173:14 174:18 177:7,15,24 178:6 179:20 180:2,8 181:19, 25 182:22 184:5,19,25 185:18 186:12 187:3,22,25 188:23,25 190:20 195:8 196:9,13 199:16,19 204:4 205:21 206:23 213:14, 24 216:23 217:6,10,13,17, 20 218:1,6,10, 13,24 224:23 225:18 226:22 227:25 228:10 229:7,15 233:7, 13,25 234:11 235:21 239:20, 24 240:8,18 241:3,16 244:18 245:1 247:15 248:19 250:17 252:13, 22 254:6 255:2, 6,10,14 258:19 267:18 268:1, 25 269:6,8,21 270:2,20,22 271:10,15 272:24 273:8 274:9 276:4,20 282:7,11 284:22 286:13 287:2 289:7,16 294:10 295:21 296:3,11 299:18 300:5 302:9 309:22 311:5,10 314:3, 6,17 315:11,20 316:1 317:14, 17,20 324:9 331:19 332:3 333:4 334:1 336:11 339:5, 16,19 340:1,21 342:12 343:18, 24 344:21 345:4,9 347:8 348:13,23

349:1,19 350:14,23 351:3,7

**rudimentary** 348:15

**rule** 52:24 54:5 55:4 137:6

**run** 176:1 263:2 273:9 305:12

**running** 224:14

**Ruth** 13:7

**S**

**S06-02** 243:8

**safety** 230:1 301:17

**scanned** 348:16

**scenario** 77:3, 4 96:19 126:23 127:7,8 129:10 130:21 205:8 207:18 208:20 210:12 214:25 258:8,17,24 260:15 266:23 268:12 269:11 270:4 273:19 274:21 276:10, 11,16,24 292:2, 17,19 295:13, 17 321:15,20 329:1

**scenarios** 126:16 129:16 206:7 207:5 215:2 255:1 256:25 257:7, 14,19 259:6,9, 11 292:6,21 293:12

**scene** 129:21 214:3 220:9 227:23 228:20 232:2,6,11,14, 21 233:1,5,20 237:4 251:15, 17 254:1

**school** 118:20

**scope** 32:8 33:12,19 42:8 46:16 78:20 91:2,16 92:5,7, 15 93:8,15 94:20 98:19 109:25 110:25 269:8,21 286:14,16 295:22 343:25

**score** 29:1,2

**scrapes** 224:13

**screaming** 139:16

**screen** 40:19 53:22 113:13 162:13 201:2 242:25 279:1

**screw-up** 217:13

**scroll** 217:10 218:1

**scrutinized** 174:3 325:16

**seam** 189:25

**search** 47:25 115:7,13,22 116:23 117:6, 11,12 118:6,10 119:4,8,13,19 120:3

**seasoned** 35:21,25 36:5

**seat** 223:17

**sec** 258:18

**secondhand** 141:15

**section** 16:23 23:19 26:21 33:24 86:10,11 91:20 102:8,9 114:13,14 115:25 117:20 118:9,21 123:10,21 161:6,10,11 176:4 180:25 181:2,11,16 182:20 185:12 191:20,25 192:2 255:20, 22,25 256:3,5,9 257:16 278:3 282:1,18 298:2 323:16,20,25 325:9 327:4 331:14,17,21 332:2,8 347:14

**section's** 180:20

**seeking** 117:6 173:13

**select** 288:1,20

**selected** 151:12 156:19 164:6 175:5 267:24 310:2,5

**selecting** 288:6,12,16,17

**send** 125:15

**senior** 75:16 332:8

**seniority** 346:10

**sense** 95:18 124:18 261:13 297:23

**sentence** 178:12 278:4 299:9

**separate** 106:6 136:16 175:2 189:25 199:5 338:22 342:17

**separated** 16:1 267:4

**separately** 289:21

**September** 215:15 216:11, 21 217:4 243:1, 3

**sergeant** 21:3 30:1 48:16,17 49:20,23 51:4

**sergeants** 16:5 21:4 91:21 284:7,19 285:9, 17 286:7,8,15, 23

**series** 53:18

**serve** 267:8 306:2

**served** 18:14 27:15 33:5

**serves** 263:17 268:21

**service** 36:13 68:7 92:19 259:1 318:3 344:13,14,16, 22 345:18,22

**services** 110:19

**session** 51:20

**set** 54:17 76:14 85:24 86:21 87:1 88:10 89:10,25 90:1, 24 91:12 93:24 94:7,18 121:12, 20 123:3 138:9 145:9 188:16 192:20,24,25 193:23,25 195:13,23 197:16 212:18, 21 230:16 260:19 270:15 271:4 290:11, 18 292:14 307:6,9,13 325:17 332:12 344:24

**sets** 303:2,6 341:8

**setting** 86:24

**sex** 308:13

**share** 40:18 53:22 105:21 162:13 201:2

**shared** 109:19 123:25 191:19, 22,25

**shares** 320:14

**sharing** 108:16 318:1

**shift** 103:9

**shifts** 103:9

**shining** 222:8

**shooter** 136:17

**shooting** 171:4

**shootings** 228:17 340:12

**shoots** 236:25

**short** 18:19 82:19 212:9 311:5

**shorten** 155:20

**shorter-** 337:12

**shorthand** 102:12

**shortly** 48:19

**shot** 274:18

**should've** 235:8

**show** 54:16,25 131:17 158:21 165:10 169:14 170:15,20 172:10,13 192:22,23 204:3,7 205:1 206:21 207:21 208:19 252:14 259:21 266:25 267:6,16,24 268:15 270:16 272:13,20 275:8 290:6 291:16 292:3 293:2,3,4,7,11, 14 297:21

**show-** 203:15 212:14 219:22 221:3 223:12

224:21 227:10, 23 228:13 231:2 232:14 240:20 241:19 250:23 251:1 254:23

**show-up** 203:8,11,12,13, 20 204:20 211:24 212:19 214:15 215:3 219:2,9 220:6, 11,13,16,18,22 221:14,18,24 223:1,5,21 224:3,5 227:5, 7,12 228:6,7 229:4,11,13,18 231:1,4,5,15, 19,20 233:6,24 234:3,8,10,12, 15,20,23 235:4, 12 237:4 238:6, 12 240:23 241:2,9,13 251:4,7,11,13, 22 252:14,20 253:2,9,12,16, 24 254:8,13,19, 20 256:22 265:1 266:8

**show-ups** 203:23 211:13, 18 212:8,22 213:10,20 214:4,21 218:17,22 219:15 222:1 223:11,23 224:9 226:12, 16,20,25 229:5, 24 230:5,10,13, 17,22,23 231:25 233:2, 22 234:5,24 239:2 241:20 250:25 251:16, 20,24,25 252:7 253:10,19,21, 25 254:22,25 256:6,18 257:18

**showed** 60:23 83:24 165:16

261:1

**showing** 53:24 54:2 55:1 82:10 159:21 177:19 186:6 192:25 195:15,18,20 201:22 205:19 207:18 242:16 243:6 257:3 260:6 266:11 267:11 273:17 275:7

**shown** 150:23 151:11,14,23 164:5 165:2 166:9,16,17 172:5 176:24 177:3,21,22 184:12 193:3 194:25 195:1 197:14,18 203:18 204:14 208:1,7,11 256:10,13 258:3 260:1,2 261:3,7 269:4 270:7,8 287:13, 19 289:21 290:21 291:19

**shows** 213:5

**sic** 329:12 349:5

**side** 19:22 294:18 296:15 304:25

**Sierra** 12:11 54:6

**sign** 175:11 290:8 296:19, 24 297:8 332:4

**signature** 290:12 297:3,7 350:23

**signed** 70:7 175:6

**similar** 167:17 272:8 280:17 281:2,19 288:20 316:13, 20 337:8,10

**similarly** 330:19

**simplify** 87:4 149:1

**simply** 45:4 76:6 134:23 135:16 137:8 169:5 344:23

**single** 203:18, 25 204:3,7,11, 14,17 205:19 206:6,21 207:4, 19,22 208:1,7, 11,19 253:23 256:17,21 259:11,22,25 260:1,6,8 261:2,3,7,12,13 263:4,8 265:1 266:11,25 267:6,11,16 268:1,16 269:3 270:8,17

**single-** 258:8

**single-photo** 256:18 257:18 258:16,23 259:10 260:11, 20,24 261:18 262:1 266:8,10

**sir** 15:2,5,7,10 17:5 22:24 26:9,25 33:24 34:19 39:6 42:4 48:15,25 51:9, 11 54:9,11,14 55:5,17 59:8 65:16 69:18 82:14,16 84:14 102:14 114:9, 12,13 117:23, 24 148:7 153:5 158:24 162:9 166:22 179:24 181:5 186:17 189:7 190:23 240:1 243:18, 25 255:3,18,23, 24 257:15 273:10 292:5 293:25 294:12 298:3 302:16 303:5,10 306:7,

24 307:15 316:16 318:3

**sit** 65:8,9 127:6 138:13 305:3

**sitting** 186:9 190:5 202:20 211:25 222:8, 13 237:20

**situation** 132:24 225:12 237:16,20

**six-foot-tall** 274:23 275:5

**skin** 316:21

**Skip** 206:17 259:23

**slight** 302:24

**slightly** 137:6

**slow** 165:5

**slower** 147:9

**small** 344:21

**smaller** 165:1 338:4

**smell** 298:10

**snippet** 133:3

**so-** 135:7 140:19

**so-and-** 134:6

**so-and-so** 133:5 134:7,23 135:3,11,17 137:8,19 138:18 139:3 141:13

**so-called** 70:13

**social** 133:4

**Solache/reye's** 37:20

**solemnly** 14:18

**solid** 172:19

**somebody's** 77:1 206:15

220:2 222:12

**sort** 36:4,5 37:9 71:19 73:23 76:5 95:17 138:1 158:16 190:8 346:4

**sought** 175:19

**sound** 317:20

**sounds** 61:19 213:8,9 289:8 317:19

**source** 71:13 72:5,14 74:2,22 75:2 76:7,17,20 77:8 95:6,9 96:11 97:2,8 101:9,12 109:10 117:5 126:17 127:3 128:17 130:15 131:1,8,15 132:7 134:18 335:7

**sources** 44:9 45:18 69:21 71:15,17,22 72:23 73:9,11, 16,20,24 74:6 75:6,10,11,19 77:11 78:5,11 79:12,19,21 80:2 84:24 85:3,21 86:1 88:6,19 93:19, 21,25 94:2,6 95:2,19,20,24 97:18,21 98:25 100:25 101:3, 19,22 112:4,7, 15,24 113:1 114:3 120:8,12, 20,23 121:9,14, 15,18 125:20, 21 126:1,5,15 127:10,16 128:2 129:16 130:5,11 131:23 132:13 335:20

**South** 12:6

**southwest** 19:22

**Spanish** 274:24 275:4 339:23,24

**spared** 237:9

**speak** 32:24 68:13,17 129:12 154:14 174:19,20 198:14 320:14 322:11,15

**speaking** 26:4 37:22 159:23 174:8 176:23 177:8 207:21 208:22 221:21 224:3 230:21 238:13 258:13 270:4

**speaks** 188:2 198:13,18,21 199:8 321:6

**spec** 102:6

**special** 24:4 60:24 61:2 62:10,13,17,23 63:4,7,11,16, 18,22 64:2,6, 18,21 65:7,11 68:6 82:12 86:7 99:9,14,23 100:9,14 109:6 201:23 215:22, 23 216:3 243:8 297:25 298:1,5 302:24 316:8

**specialist** 21:20 26:18 32:25 37:15 51:6 56:24 58:2 61:7 75:24 82:2 85:3 89:25 93:11 97:2 99:13 101:8 102:25 105:19 106:1,23 107:8, 10,12,15,20 122:13,20,23 150:16 157:3,7, 13 176:13 177:2,5,16 179:23 191:5,8, 17 193:14,15

194:2 239:25 265:11,16,20 305:2,18,22,25 306:15,18 318:3 321:5,15, 23 322:3,21,22 325:1 328:16, 22 331:12 332:14 349:4, 10

**specialists** 20:2,8 21:25 22:3,5 24:1,15, 23 25:1 28:5 30:19,24 31:3, 6,11,14,16,20, 23 32:2,18 33:2 51:7 55:22 57:3,7,11,15, 20,24 58:7,10, 21 59:1 64:15, 23 73:4,8 77:11,17 78:1, 11,22 79:5,10, 15,23 80:2,5, 11,24 81:17,20 83:13,20 84:1, 5,12 86:13,15, 19,25 87:8,14, 18,20,25 88:1, 11 89:9,11,16 90:7,18 92:2,12 93:5,21,25 94:11 96:10,16 98:25 99:4,7,20 100:3,8,12,18, 23 101:2,17,21, 25 102:10,16 103:19 104:4, 16 106:11,16 107:17,23 108:4,10,19,24 109:5,9,15 110:14,16,21, 23 111:8,9,19 112:3 113:22 118:1 119:18, 24 121:22 122:4,8,15 123:1,8,24 153:17 155:6, 14 161:3 168:6, 7,12,21,24 169:2 175:21, 24 176:4,8,16

177:11 179:8 181:8 182:11, 16,25 184:17 194:9 196:21 239:22,23 240:2,12,13 265:14 304:13, 17 305:5,8 306:4,9 308:7 318:16,21,24 319:2,9,16,20 320:7,19 322:10 323:2,5 324:5 327:15 328:3,5,18 329:17,25 330:12 332:23 333:8,24 335:12 338:17, 25 339:8 340:18 341:12 349:17

**specific** 36:23 48:1 92:11 122:12 123:19 130:15 148:19, 21 151:7 153:21,22,25 156:15,21 157:18 158:16 166:25 176:22 179:2 194:10, 19 212:23 223:4 233:10 261:10 267:5 275:1 339:1 349:15 350:3, 10

**specifically** 38:8 41:13 55:21,24 56:7 80:21 90:11 113:1,25 117:21 121:18 162:19 177:13 188:13,21 193:14 213:4 317:2 325:10

**specifics** 111:15 126:25 221:17

**speculate** 91:18 167:4 343:20

**spell** 15:2 42:17

**spelled** 267:6

**spend** 60:3,4 66:7

**spending** 37:16

**spent** 18:4 66:17,19

**spoke** 291:24

**Spratte** 45:12 66:8 67:3,15 68:2 149:22

**Spratte's** 65:25 111:2

**spread** 197:10 202:7,8

**spreads** 154:20,22 162:23 197:12, 13 198:12 200:13,16 202:5,12 216:5 289:20

**Square** 27:2 343:13

**staff** 284:6,19 285:8,21 333:10 341:16 346:6,13

**stamp** 255:13

**stamped** 158:22 162:12 184:5

**stand** 211:25 305:4

**standard** 181:11 184:15

**standing** 56:13 184:15 197:4 235:13

**star** 311:13

**start** 20:11 29:17 55:13 69:23,24 70:1 76:13 140:20

149:15,17 180:4 196:23 237:5 260:5 275:11 317:25

**started** 29:11 124:4 215:19 270:23

**starting** 12:24 20:16 149:14 200:18 336:12 347:12

**starts** 94:22 336:15

**state** 12:22 14:6 15:2 139:14 173:17 209:23 210:1, 18 211:10 245:18

**statement** 246:18 247:5, 18

**statements** 115:22 238:11, 24 239:14 240:16 248:12 313:8,15

**States** 12:19

**station** 129:5 130:7 132:22 178:3 219:6 221:15 254:4 268:14

**statistically** 129:7

**statistics** 295:23

**stay** 341:18,21 342:5

**step** 51:23 96:23 141:12 222:6 229:21

**steps** 96:10,12, 25 224:20 226:19 228:23 247:13 271:24 272:2 285:22 287:18,23 288:5 339:22

**stick** 20:15 129:24

**stipulate** 14:11

**stipulates** 14:13,16

**stop** 17:14 32:12 96:6 292:9

**stopped** 32:17

**store** 348:9

**stranger** 206:22 207:5, 11,13,17 208:20 255:1 257:7,14,19 258:7,16 259:5, 11,15,19 260:15

**strangers** 208:12

**street** 26:2 69:21 71:12,13, 15,17,22 72:5, 14,23 73:9,11, 16,19,24 74:2, 6,21 75:2,5,10, 11,19 76:7,17 77:8,11 78:5,11 79:11,21 80:2 84:24 85:3,21 86:1 88:19 93:19,21,25 94:2,6 95:1,6,9, 19,20,24 96:11 97:2,8,18,21 98:25 100:25 101:3,9,12,18, 22 109:10 112:4,7,15,23 113:1 114:3 120:8,12,20,23 121:9,14,15,18 125:19,21 126:1,5,15,17 127:3,10,16 128:2,17 129:16 130:5, 11,15 131:1,8, 15,23 132:13 134:18 178:3,5, 9,22 179:12 322:1 326:2,8 335:7,20 343:11

**street-level** 27:5,6

**streets** 320:8

**strictest** 261:13

**strike** 20:25 24:12 30:15,23, 24 34:3 42:4 51:10,18 60:3 62:12 64:17 65:6 71:5 80:21 82:20 86:6,15 91:25 94:10 101:16 102:23 106:13 109:6 111:9 114:1,16 120:9 121:19 125:23 133:17 145:22 146:15 149:15 177:22 193:23 195:5, 11,13 213:8 226:16,17 233:23 238:4 241:7 244:9,14 252:24 258:21 260:1,16 286:8 292:18 308:18 312:24 314:13 318:20 319:8 322:21 340:4 341:2 346:2 347:3

**stronger** 254:14

**stronghold** 236:24

**structure** 20:24

**stuff** 112:17 206:10

**style** 238:2,8

**subject** 44:6, 18 82:13 99:8 100:3 108:14 129:15 131:7 137:10 148:3 181:1 200:3,18 201:6 250:22 273:18 288:24 317:23

**subjected** 276:2

**subjecting** 128:3,10 277:1

**subjective** 271:17

**subjects** 47:10 65:7 187:12 317:4

**submit** 105:13

**submitted** 328:6

**submitting** 326:3

**subpoena** 344:12,14,16, 17,22 345:1,7, 12,18,22,24 346:8,21 347:6

**subpoenas** 346:5,17

**subsequent** 36:20 200:12 237:15,20 248:24 254:8, 13 269:18 291:21 292:3 294:4,7

**subsequently** 268:7 291:11

**substance** 280:1

**substantively** 280:20

**subtopics** 55:9

**suddenly** 100:14 134:7, 10

**sufficient** 83:5 126:18 135:13, 18 137:9 173:6, 7,8,11,16 206:1 219:5 221:13 292:2

**sufficiently** 131:9

**suggested** 248:9

**suggestibility** 222:2 223:10 225:24

**suggesting** 300:22

**suggestion** 222:20 225:16 271:14 272:12 289:3

**suggestions** 222:24

**suggestive** 175:13 196:4 211:22 222:17 223:5,13,24 253:13 254:14, 17 283:5,6,25 284:3,14 287:25 289:5, 14,15 290:19

**suggestivenes s** 222:25 223:21 224:5,9,18,21 226:16,20 227:1 271:9

**suggests** 274:23

**Sullivan** 66:8 67:3,11

**Sullivan's** 65:23

**super** 317:11

**supervising** 49:5,22 285:9

**supervision** 145:19

**supervisor** 123:9 124:1 145:6 227:12, 15 253:1 262:19,23 263:3,16 264:3 265:4,8 286:1,5 317:12 332:4

**supervisor's** 263:5

**supervisors** 91:19 94:9,10 263:1,13,22 264:2,8,10,18 265:11 266:2 283:23 284:24 285:5 287:8 317:8 328:7 332:2

**supervisory** 284:6 333:10 341:16

**supp** 329:2 340:20

**supplement** 333:23

**supplemental** 54:4 104:19,21 105:5 106:4,7 235:9 241:22 261:1,17 321:4 327:23 328:24

**supplementar y** 108:25 109:6 156:24 165:3,8, 12,16 315:1,3 328:13 329:6 330:20 331:6, 11 332:13,24 333:1,7

**support** 115:22 119:19 135:7 177:17 305:24 346:13

**supports** 115:13

**suppose** 157:3 221:20 248:2 272:16 273:15 303:18 305:11

**supposed** 95:24 118:13 141:15 156:23 164:21 165:3 192:21,23 196:10 316:24 333:9

**suppress** 22:8

**suppression** 20:22

**Supreme** 211:19

**surmise** 187:19 301:13

**surmising** 187:17

**sus** 195:15 305:9

**suspect** 127:17,25 135:14 158:8, 17 169:15,19 170:10,22 171:3 172:13, 19,25 197:4,17, 20 203:25 204:3 205:10, 15 206:7,19 207:13 208:15 213:12 214:10, 17 221:13 222:21 223:16 235:12 244:14, 15,24 257:2,10 260:1 266:25 267:16 268:6,8, 16 269:4,18,19 271:8,13 272:8, 14,20 273:7,14, 19,21 274:4,8, 15,19,25 275:23 278:5 287:16 288:1 291:1,9 294:9 298:25 301:21 302:2,16 305:1, 3,7 308:25 310:21 312:15 316:4,9,14,20, 24 317:3 340:22 341:20

**suspect's** 220:19 235:14 256:9,13 258:2 287:19 296:19

**suspected** 170:8

**suspects** 151:4 206:21 207:4,19 208:7, 12,19 260:6 274:1 275:24 278:7 282:20 288:20 302:15, 16 304:3 317:4 318:22,24 319:2,9,17

**suspects'** 257:8

**sustained** 49:1

**Swaminathan** 12:25 13:1,6 14:13 15:1 33:22 34:11,17 38:3 39:5,9,12, 16,25 40:4,8, 15,18,23 41:1, 5,8,10,17,20,24 42:3,11 43:1,22 45:4 46:1,11 47:2,6,14,20 48:6,9,14 56:3, 12,16 61:23 69:3,17 78:23 79:2 81:5,14 88:17,24 89:2, 5,7 90:5,10,13, 15 91:5,7 92:21 94:14,17 99:19 100:1 103:15, 17 110:5 113:4 118:7,13,17,23 124:5,12,21,23, 25 125:3,12 143:2,7 152:10, 14 153:23 154:1 160:8 161:9,17,21 162:7 181:20 184:7,9,20 186:15 187:7, 23 188:20,24 189:1,3 190:21, 24 196:7,11,15 199:18,22,25 217:8,12,16,18, 21 218:3,7,11, 14 242:12 250:21 255:8, 12,15 269:25 270:25 273:4 277:8,11,21 282:9,12 286:19 287:6 311:7,11 314:7 317:21 331:1,3 344:2 348:20, 24 349:21 350:13,17,20 351:1

**SWARMINATHAN** 32:14

**swear** 14:19

**sworn** 346:22

**Sydney** 12:3 46:8 69:14 81:11 125:9 162:4 242:9 277:18 313:25

**synonymously** 73:11

**synoptic** 179:4

**system** 348:8, 15

**T**

**table** 38:5 41:20

**TAC** 17:21 20:17 21:2 25:10,13,14,21, 25 27:18

**tactical** 18:17, 23 19:3,4,9 20:2,7,11,12, 18,20 21:1,6, 10,16 22:3 24:14,19,25 25:4 26:7,10,15 27:13 28:2

**taint** 223:10 225:16,24 269:5,10,23 270:24 271:9, 14 272:13,22

**tainted** 222:16 223:6 269:13 270:10,11

**tainting** 222:20

**taints** 269:18

**taking** 51:22 53:4 96:11 118:6 136:9 274:18 301:25 326:24 336:7

**talk** 34:18 131:22 132:25 137:4 236:22 267:4 289:10 302:19 304:13 320:7,23

**talked** 125:22 148:4 169:1 184:16 198:4 215:10 216:4 218:18,19 250:24 254:23 256:4 279:4 283:9 292:23 306:8 313:7 327:8 341:11 349:9,23

**talking** 21:14 22:23 24:16 32:10 39:19 40:7,14 51:25 75:1 88:13 92:6,17,23 93:1 97:12 99:11,17 112:12 113:1 125:19 129:15 137:17 149:20 159:24 162:23 163:2 168:17 177:17 205:2,6 226:1,2,3 232:8 255:25 257:6, 13 258:7 266:17 270:15 283:16 289:8 290:13,24 297:15 300:13 306:5 321:15 335:5 344:1

**talks** 161:6,10, 12 162:22 163:22 188:5,6 298:4 299:6 313:13 336:23 347:17,20

**tall** 275:1,2

**tangent** 77:15, 18,21 81:24 228:24

**task** 193:14 306:15

**tasked** 27:6

**tasks** 31:20 33:5

**taught** 208:15

**teaching** 289:12

**team** 17:21 18:17,23 19:3,9 20:18 21:2 24:14,19,25 25:5,10,13,14, 21,25 26:7,11, 23 27:5,13,15, 16,18

**teams** 20:18

**technician** 12:4 232:13

**technicians** 232:6 311:17

**telephonically** 131:24 132:23

**telling** 220:3

**tentative** 238:24 240:15 244:15,23 245:3,5,7,10, 15,17,19,21,22, 25 246:2,3,6, 10,15,22 247:8, 22 249:7 291:20,24 292:19 295:2, 10 296:9

**term** 22:14 69:25 70:12,17 72:6,11 73:16, 21 88:7 148:6, 11 149:6,7 163:13 203:20 204:20 209:5 213:15 337:13

**termed** 277:2

**terminology** 69:24 70:2 186:22 196:23 203:8

**terms** 20:7 21:16 24:1 69:21 71:9 72:1 88:18 95:8 109:13 111:7 144:15 167:5 193:16,18,20, 22,24 194:13, 15 195:3,5,14, 23 199:1 204:15 212:14 215:1 227:7 230:4 236:1,16 237:21 280:15, 20 281:3 288:6 303:12 316:19 338:24 340:17 341:2,3

**territory** 171:18

**test** 29:1,2 70:10

**testified** 45:13, 14 90:5 271:24

**testify** 43:24 55:9 83:11,20 187:9,12 196:20 279:14

**testifying** 54:13,18 68:19 327:12

**testimony** 14:19 44:17 45:6 46:18 53:14 55:20 56:6,18,23 57:2,6,10,15, 19,23 58:2,6, 10,14,20,25 59:4 68:22 83:7 98:11 131:8,19 186:13 233:14 293:13,17 318:10 328:16 332:22

**that'd** 210:8 277:10

**theme** 120:3

**themself** 247:9

**theory** 275:8

**there'd** 106:22 107:7

**There'll** 52:7

**there're** 38:3 42:1

**thick** 338:3

**thing** 20:8 71:6 99:18 123:23 129:22 138:7 163:13 186:21 187:4 188:6 203:15 207:9 208:25 209:4 223:20 231:25 271:5 272:11 280:1,23 288:3 297:3 298:22 301:12,13 343:3

**things** 20:23 34:18 70:1,10, 21 71:9 74:18 75:5,6 128:16 132:4 171:11 176:25 179:14 198:9,11 222:19,24 223:4,22 224:7, 15 231:13 250:18 272:2,5 277:6 308:6 320:22 322:9 336:18

**thinking** 302:1

**third-party** 131:16

**Thomas** 12:11

**thought** 121:4 169:23 196:13 265:12 268:23 309:25 344:8

**thoughtful** 288:16

**thousand** 147:24

**thousands** 48:3

**throw** 259:14

**thrown** 282:25 287:3

**thrust** 119:11

**tighten** 95:12 106:20

**time** 12:8 17:1, 16,25 18:1,19 19:8,10 20:1,7, 13,14,15,17,19 23:2 24:13,18, 24 26:11,14,17, 19 27:17 29:7, 19 30:16,20 31:22 32:1,9 34:4 35:13,18, 19 36:4,24 37:17 42:22 44:22 46:4,9,13 51:3,7,25 56:5 62:5 63:8,12,23 64:1 66:4,17,19 67:21 69:10,15 79:4,7 81:7,12 82:19 83:3 90:4 99:11,20 103:11,13 106:5 119:12 125:5,10 136:13 141:18 148:16 149:21 150:1,8 161:25 162:5 168:17 173:22 174:14, 23,25 177:17 181:19,23 185:16 189:17 191:6,18 193:7 197:5,13 209:11 210:10, 11 212:5,9 215:17 216:15 219:14 220:16, 24 222:5 226:25 230:20 231:5 232:7 233:24 234:3,5, 7 238:13,19 239:5,18 240:7, 25 241:6 242:5, 10 244:5,10 246:25 247:4 250:8,13 252:17 253:9, 12,16 263:7 264:8,13 266:15 277:14, 19,25 278:11, 16 279:12 281:7 286:23 296:8,20 297:1, 14 302:22 307:18 309:7, 11 311:16,23 313:4,10,21 314:1,3 316:8 327:8,9 329:2 330:1 335:3,10 344:20 350:21

**time-specific** 266:17

**timeline** 92:23

**times** 17:14 51:11 52:7,16 59:9,11,15 102:23 177:11 209:7 271:8,13

**tip** 142:20 334:24 335:5

**tips** 335:13

**title** 31:8,15,16, 23 82:12 179:22

**titled** 54:4 158:23 180:14

**today** 12:5,7 13:8 38:5 39:19 46:9 53:6,10,15 54:22 55:21 56:7,18,23 57:2,6,10,15, 19,23 58:2,6, 20,25 59:4 65:8 68:19,23 69:15 81:12 82:22,25 83:3,8,13,21 96:1 98:12 123:19 125:10 162:5 174:8 186:9 202:20 242:10 277:19 314:1 344:4

**today's** 38:25 59:7 68:9,14,19 82:18 159:1 179:24 199:13 201:3,8,25

**told** 299:16 315:23

**tool** 283:17

**top** 162:20 183:24 185:2 199:16 217:7 241:24 303:22 334:14,22 340:8

**topic** 39:2 40:19,20 41:1,2 42:1,21 43:9 55:13,21 56:4, 7,19,23 57:3,6, 11,15,19,24 58:2,7,10,14, 17,21,25 59:4 69:19,23 83:7, 12,17,20 124:14,15,17 148:4 149:16 153:14 187:13 344:3

**topics** 37:18 38:4,6,7,8,10, 21,24 39:18,24 41:13,18 45:7 53:15 54:12,17, 18 55:8,12 62:22 68:18,23 196:19 318:11

**total** 60:3,4,9

**touch** 298:10

**touches** 64:9, 14 256:2

**touching** 119:14

**trad** 129:8

**tradition** 29:10

**traditional** 174:9

**traditionally** 173:18

**train** 160:19 294:16 344:8

**trained** 17:19 18:8 36:25 37:4 38:14 39:6 42:5,9 86:14, 15,20 100:18 120:20 164:3 208:11,18 210:24 213:7, 10 214:1,10,14, 19 215:2 223:23 224:1 225:3,7,14,22 226:15,18,24 227:2,20 229:2, 4,22 246:25 247:5 250:3,7, 12 258:6,14,22, 25 259:9 272:19 273:2,5 283:8,10,16 288:10,15,19 289:1 292:8 294:20,25 298:8,14,18 300:10 314:14 323:5,9,11 329:25 330:2, 12,15,19 349:16

**training** 17:20 34:21,22,25 35:5,11 36:7,9, 13,18 37:9 38:9,11,13,22, 23 42:25 43:3, 7,11,13,15,18 61:4,6,7,8,10, 19 62:9 64:8, 11,14 68:7 92:1,11,19,25 93:1,4,12,13 101:15,16 110:10,12,20 111:7,10,13,14, 18,21 112:2,6, 13,22 113:2,8 156:2,7 159:5, 8,9,14,19,20,22 160:1,13,22,25 161:2,5 163:16, 21 164:11,18 165:4,15 166:1, 3,8,14,25 181:8,14 182:5, 10,12,15,18 194:5,8 199:7,9 203:2 208:10, 14 212:12 215:1 219:7,17 220:18,25 221:25 226:5 228:7 229:23 231:7 239:17 246:5 253:18, 20 255:9,21 256:12,17,24 257:1,16,22 259:2,4 260:17 278:20,21 279:5,9,11,15, 20 281:3,6,9, 11,15,17 282:3, 4,13,14 283:2 287:13 288:4 289:12 290:2 294:6 295:25 296:5 299:14, 22 300:21,23, 25 301:5 318:3, 5,10,14,15,19 323:14 329:16, 21 330:16,17 332:18 335:24 336:22 344:7 345:16,21 349:4,6,14

**trainings** 160:1

**trajectory** 29:10,14

**treat** 15:13 135:13

**treated** 249:6,8 304:4,6 342:14, 15

**treatment** 303:18 304:2

**trial** 43:23,24 44:10 45:10 174:4 210:9,13 293:1 325:3

**trials** 45:14

**tricky** 130:13

**trier** 299:3

**true** 58:17 132:4 133:14, 15 140:12 167:23 197:25 239:2,3,22 240:4 264:21, 24 265:6 290:23 292:7 298:10

**truth** 14:20,21 225:9 272:1 283:18 285:1

**turn** 124:14 148:3 193:4 317:22

**turned** 32:25

**turns** 321:19

**twisted** 152:1

**type** 34:9 88:4, 8,13 89:21 90:21 96:9,10 102:15 104:3, 16 105:2,6 106:11 129:21 148:23 173:2 186:2 195:6 230:7 240:3 241:20 315:7 337:3,10,18,21 338:16 340:10

**types** 19:6,11 105:13 115:7 147:1,2 204:13 206:5 222:18 259:9 289:2 336:13 337:9 347:20

**typical** 76:17 129:14 134:4,9 252:6 275:11 291:7 296:23, 24

**typically** 95:19 173:3 205:14 251:7 275:14 291:1 301:5 314:21 336:21

**U**

**UCR** 334:15

**uh-huhs** 52:11

**ultimate** 224:24 285:1

**ultimately** 44:10 96:24 102:3 115:5 134:20 141:21 143:23 144:22 145:13 183:9 191:24 224:19 229:12 258:5 262:12 265:15 286:6,8 287:23 289:1 300:21 331:8 333:22 343:9

**unavailable** 311:25

**uncertainty** 249:5 313:1

**unclear** 153:11 155:17 170:24 214:8 286:17 299:19,21 315:21 321:12

**uncontaminated** 225:11

**underlying** 320:16

**undermines** 288:21 294:3,7

**understand** 20:4 38:12 43:10,11,17,20 44:14,19 45:2 47:24 52:15,17 53:6,9,13,17 55:19 56:5,17, 22 57:1,5,9,14, 18,22 58:1,5,9, 13,19,24 59:3 69:24 70:2,6 74:4,12 84:4 105:18 108:12 128:20 131:8, 19 136:12 137:25 166:19 178:25 182:4 185:14 187:1 188:23 198:15 209:17 210:2 225:2 231:18, 24 237:16 243:15 246:24 247:14 257:1, 12 266:4 268:17 273:23 285:10,12 286:10,24 297:11 327:7, 13 328:16 330:9 332:21 343:8 349:23

**understanding** 17:12 33:25 34:15 79:25 80:3 109:22 148:25 151:1 160:12,17 166:23 174:14 175:9,23 182:9, 12,14 183:3 189:21 193:12 279:10 281:14 284:18 286:15 339:25 340:2, 24 341:5,6

**understands** 305:25

**understood** 32:15 52:21 66:20 80:20 181:15 237:11 283:23 284:6

**unduly** 283:5 284:3,14

**uniform** 80:6, 13

**unique** 138:9 259:2

**unit** 26:24 27:1 28:3,6,12,13 29:8 86:3,10 176:11 191:16, 20 335:16,19 336:14 341:19, 21 342:6 343:9, 10,14,17

344:13,14,16, 17,22 345:1,2, 7,12,13,17,18, 22,24 346:3,18, 23 347:7 349:10

**United** 12:19

**units** 337:3,6 345:6 347:4

**unnecessary** 109:7

**unrealistic** 228:13

**unreliability** 134:2

**unreliable** 134:1

**unsuggestive** 225:11

**unsure** 72:6

**unusual** 252:5 258:10 267:20 269:2 271:4,6 272:17,18 281:1 292:6 312:19 313:14

**up-to-date** 326:8

**update** 264:18

**updated** 179:3

**ups** 224:22 227:11 231:3 232:15 240:21 241:20 254:24

**utilize** 169:24

**utilizing** 337:13

**utterances** 139:17

**V**

**vacuum** 145:18

**valuable** 133:6,7 210:12 299:2

**variables** 259:14

**variety** 39:18 94:3,5

**vast** 132:25

**vehicle** 222:13, 21 224:10 235:13 237:14

**vehicles** 178:9

**verify** 96:18

**version** 180:9 183:21 184:5 255:13

**versions** 148:14

**versus** 12:11, 12,14,15,16,18 193:19 229:5 244:4 247:22

**vet** 74:23 96:6, 11 121:10,14 125:24 126:1,4 127:10,13,15 128:1,9 129:3 130:4,10 135:12 146:9 147:20 148:1

**vetted** 74:25 95:21,25

**vetting** 128:21 133:24

**victim** 171:21 256:13 294:15 334:15

**victims** 289:21 294:22 295:1 296:9 298:5,9

**video** 12:4 46:8 54:4 69:14 81:11 125:9 133:3 162:4 242:9 277:18 313:25

**videoconference** 12:9

**view** 43:16 45:15 64:21 169:18 223:19 253:8,15 267:1 268:14 271:8, 13 289:23 292:13 315:13, 24

**viewed** 165:9 170:19 193:6 197:5 223:16 241:2,9 307:25 315:19

**viewing** 156:16 203:24 234:20 235:20 236:3,7,19 237:22,24 238:6 240:23 269:12 295:1 302:6 304:24 315:8 316:25

**viewings** 207:4

**violating** 97:14

**violation** 206:25 207:8 268:18 274:3 306:2

**violence** 340:13

**violent** 15:22, 23 16:1,2,22,23 17:2 29:6,7,11, 22 30:3,8 340:5,11,18,20 341:3 342:10, 24 343:15 350:9

**visible** 222:13

**voice** 298:23

**voluntarily** 130:7

**volunteered** 247:9,17 248:8

**W**

**Wacker** 12:6

**wait** 39:11 40:11,21,22 83:15 219:22 220:10,14 221:2,7 228:8 229:13 268:1

**waited** 219:24

**waiting** 220:1 229:6

**walk** 17:9,12 96:1 304:24

**walking** 75:16

**walks** 96:2

**wallet** 298:24

**wanted** 17:11 45:16 98:9 106:6 107:13 196:3,14 312:7 330:6 333:22 334:25

**war** 237:6

**warrant** 117:6, 13

**warranted** 146:20 147:14

**warrants** 115:7,14,23 116:23 117:11 118:6,10 119:5, 9,13,19 120:3

**wasting** 44:22

**waters** 71:10

**ways** 34:25 35:5 96:17 171:3 179:15 183:11 192:11 224:4 225:8 277:1 283:3

**wearing** 171:13 209:11

**weekly** 326:7, 13,16

**weeks** 60:14 205:25

**weigh** 233:18 273:16

**weight** 222:11 308:14 316:20

**weird** 317:17

**well-known** 338:9

**whichever** 118:18 157:12

**whoa** 39:7,8

**whoever's** 74:23

**whole-** 103:12

**wide** 78:25 94:3

**wife** 129:4 147:18

**winding** 346:19

**window** 220:16,24 221:1,7,19 222:5 226:25 229:18 234:6 305:1,4

**Winstrom** 37:19 66:9 67:4,19

**Winstrom's** 66:2

**wise** 237:8 314:19

**withdraw** 98:18

**withstood** 70:10

**witness'** 33:13,20 48:5

**witness's** 38:13

**witnesses** 45:10 113:2 150:18,23 166:10 170:18 172:5,10 177:22,23 178:5 193:1,6 195:16 204:8

205:14,20 206:21 207:4 208:11,20 238:6 240:23 241:1,8 247:1,6 249:4,20,25 250:4,8 253:8, 15 254:1 260:2 267:4,11 289:21 292:25 294:22 295:1,9 296:9 299:16 300:12 301:6 302:14 305:13 313:16 314:11 316:23 319:21 320:2

**wives** 129:8

**women** 19:17 136:16,20

**word** 35:7 55:25 79:20 121:1 202:8 213:15 247:25 248:1 286:21

**worded** 258:2 290:5

**wording** 248:21

**words** 31:8 73:22 116:6,21 132:8 133:8 136:8 144:4 151:6 163:21 165:15 167:18 172:12 191:10 192:22 197:2 216:14 219:3 225:2 228:2 233:11 235:13 239:6 243:22 246:17 249:3 254:16 256:17 264:14 271:16 273:11 283:8 289:5 292:1 306:14 321:14 333:6 342:1

**work** 20:1 22:14 25:1 28:11 30:12,15 35:14,15,21 38:20 51:5 70:4 104:17 121:4 123:2 179:9 206:15 227:16 259:16,18,23 263:11 276:23 344:5

**worked** 16:24 19:17 24:12,24 28:6 29:12 30:3,17,20,25 34:4,15 35:25 37:9 42:22 48:15 51:4 346:3

**working** 19:8 24:13,19 28:3 29:21 33:6,7 36:20 110:14 334:13

**works** 15:16 341:25

**worksheet** 334:10

**would've** 18:8 21:6,7 25:17 26:23 50:24 80:25 81:24 87:24 99:24 102:3 107:12, 13 110:17 122:22 130:8 175:11,12 176:5,23 177:19 191:22, 24 192:3 194:17,18 197:13 228:18 232:8,11 234:17 235:8,9, 16,17 240:11 249:18 253:21 259:1 260:25 297:18 301:11 327:21 330:6,7 335:14 342:2, 13 343:6 346:7, 11

**write** 52:13 328:4,11,20

**writing** 64:7,9, 12,15,19,22 237:21 290:17 328:13

**written** 153:7 154:7 155:10 187:18 189:13 326:1,5,6 341:24 345:6, 11

**wrong** 67:23 133:19 140:1 160:15 187:25 286:21 341:4

**Y**

**year** 18:7,9 24:9 28:1,19 179:3 182:4 321:3 329:7

**year-and-a-half** 18:9

**years** 15:25 16:16 18:5 19:1,9 25:4 26:1 35:16,21 174:13 204:23, 24 205:4 206:16 209:8, 21 293:1

**young** 292:25

**younger** 293:8

**youth** 299:10, 11,23 300:3,11, 23 301:5,9,11, 16 302:2 323:17

**Z**

**Zehner** 13:11, 13,14,25

**Zoom** 14:2

# Exhibit 42

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GERALDO IGLESIAS,

Plaintiff,

*v.*

REYNALDO GUEVARA, ERNEST HALVORSEN, STEVE GAWRYS, ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO,

Defendants.

Case No. 19 C 6508

**DEFENDANT CITY OF CHICAGO'S SUPPLEMENTAL ANSWERS AND OBJECTIONS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES TO DEFENDANT CITY OF CHICAGO**

Defendant City of Chicago, by its undersigned attorneys, in its first supplemental response to Plaintiff's Third Set of Interrogatories to Defendant City of Chicago, states the following:

1. In 1993, did the Chicago Police Department use any files, lists, databases, or any other Documents to store information about confidential informants? If your answer is anything other than an unequivocal "no," identify all such files, lists, databases, or other Documents; the individuals with access to them; the information stored therein; and every other place they been stored from the time of the Roman Investigation through today, including where and in what form they exist today.

**RESPONSE:** The City objects to this interrogatory as it is overly broad and vague as to "any files, lists, databases, or any other Documents to store information about confidential informants" and to the term "confidential informants." The City also objects that this interrogatory is not limited in scope and is therefore not proportional to the needs of this case. The City further objects that this interrogatory is overly broad, unduly burdensome, and not limited in time or scope to the extent it seeks that the City identify all "individuals with access to [any files, lists, databases or other Documents]" over a 27-year period; "the information stored therein" over a 27-year period;

"every other place they [files, lists, databases or other Documents] [sic] been stored from the time of the Roman Investigation through today, including where and in what form they exist today." Subject to and without waiving these objections, no. Investigation continues.

2. In 1993, were there any Chicago Police Department policies, practices, customs, training, or other requirements related to the use of confidential informants by Chicago Police Department personnel (including detectives and gang crimes officers)? If your answer is anything other than an unequivocal "no," identify all such policies, practices, customs, training, or other requirements; any information to be created or recorded; how or where it was to be stored or maintained; and every place such information has been stored from the time of the Roman Investigation through today, including where and in what form it exists today.

**RESPONSE:** The City objects to this interrogatory as it is overly broad and vague as to "policies, practices, customs, training or other requirements" and "the use of confidential informants by Chicago Police Department personnel" and to the term "confidential informants." The City further objects that this request is vague, overly broad and not proportional to the needs of the case: "identify all such policies, practices, customs, training or other requirements" and "any information to be created or recorded" and "how or where it was to be stored or maintained." Finally, the City objects that this interrogatory is not limited in time or scope and is therefore not proportional to the needs of this case to the extent it seeks information over a 27-year period. Subject to and without waiving these objections, the City answers that it has not located any documents responsive to this request (as the City understands it). In further response, pursuant to the parties' Rule 37 discussions and without waiving any objections, the City refers Plaintiff to Special Orders 93-01 and 86-04 from the Organized Crime Division of CPD, as well as Detective Division Standard Operating Procedures from 1992 (collectively RFC-Iglesias 276-494). Investigation continues.

Dated: March 31, 2021

Respectfully submitted,

CELIA MEZA

Acting Corporation Counsel for the City of Chicago

By: /s/ *Eileen E. Rosen*
Special Assistant Corporation Counsel for the City of Chicago

Eileen E. Rosen
Catherine M. Barber
Austin G. Rahe
Theresa Berousek Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000
erosen@rfclaw.com

**CERTIFICATE OF SERVICE**

I certify that I served a copy of Defendant City of Chicago's Supplemental Responses and Objections to Plaintiff's Third Request for Production to all counsel of record by electronic mail on March 31, 2021.

/s/ *Kara Hutson*
Paralegal

# Exhibit 43

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GERALDO IGLESIAS | ) | |
| | ) | Case No. 19 CV 06508 |
| Plaintiff, | ) | |
| | ) | Hon. Virginia M. Kendall |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, JOANN HALVORSEN as SPECIAL REPRESENTATIVE for ERNEST, HALVORSEN, STEVE GAWRYS, ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO, | ) | |
| Defendants. | ) | |

**DEFENDANT ROBERT BIEBEL'S ANSWERS TO PLAINTIFF'S**
**<u>SECOND SET OF INTERROGATORIES</u>**

Defendant Robert Biebel, by his attorneys, The Sotos Law Firm, P.C., responds to Plaintiff 's First Set of Interrogatories as follows:

**Objections to Definitions and Instructions**

Defendant Biebel incorporates his objections to Plaintiff's definitions and instructions as set forth in his Response to Plaintiff's First Set of Interrogatories.

**<u>INTERROGATORIES</u>**

1. Do You know who is the confidential informant referenced in RFC-Iglesias 000011? If your answer is anything other than an unequivocal "no," Identify the following:

   a. The name, address, telephone number, or any other identifying information you know of for that informant.

   b. When and how you learned information about who the informant was, including who was present at the time you learned the information.

   c. Any past dealings or interactions you had with informant.

d. Any payments, benefits or other incentives that were offered or provided to the informant.

e. The name of each Defendant and non-Defendant Person, that you are aware of, who had knowledge of the informant's name or other identifying information on June 21, 1993.

f. The name of each Defendant and non-Defendant Person, that you are aware of, who acquired knowledge of the informant's name or other identifying information after June 21. 1993.

If this interrogatory is answers by incorporating Documents, please provide the identities of any additional Persons who are not listed in the Documents that you reference; in the event that you fail to do so, Plaintiff will assume the witnesses and the substance of their testimony is strictly limited to what is contained in the Documents that you reference

**ANSWER: Defendant Biebel objects to this interrogatory as vague and ambiguous as to "know who is." Defendant Biebel further objects that this interrogatory is compound and violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts. Defendant Biebel further objects that this interrogatory lacks a relevant time frame. Subject to and without waiving these objections, Defendant Biebel states that he does not know the name or nickname of the confidential informant referenced in RFC-Iglesias 000011.**

Dated: September 28, 2020

Respectfully submitted,

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

James G. Sotos
Josh M. Engquist
David A. Brueggen
Jeffrey R. Kivetz
Carson W. Canonie
Special Assistant Corporation Counsel
The Sotos Law Firm, P.C.
141 W. Jackson Blvd., Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
jengquist@jsotoslaw.com

## PROOF OF SERVICE

I, Joseph M. Engquist, an attorney, certify that a copy of the attached **Defendant Robert Biebel's Answers to Plaintiff's Second Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on September 28, 2020.

***Attorneys for Plaintiff***
Jonathan I. Loevy
Anand Swaminathan
Arthur R. Loevy
Joshua A. Tepfer
Rachel E. Brady
Sean Star
Steve E. Art
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60606
(312)243-5900
jon@loevy.com
anand@loevy.com
arthur@loevy.com
josh@loevy.com
brady@loevy.com
sean@loevy.com
steve@loevy.com

***Attorneys for Reynaldo Guevara***
Thomas M. Leinenweber
Michael J. Schalka
Kevin Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com
mjs@ilesq.com
kevin@ilesq.com

***Attorneys for City of Chicago***
Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, IL 60654
(312)474-1000
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

**ATTESTATION**

I, Robert Biebel, affirm under penalty of perjury pursuant to 28 U.S.C. §1746 that the answers made in the foregoing document are true and correct to the best of my knowledge and belief.

Date: 9/22/2020

ROBERT BIEBEL

# Exhibit 44

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GERALDO IGLESIAS,<br><br>Plaintiff,<br><br>*v.*<br><br>REYNALDO GUEVARA, ERNEST HALVORSEN, STEVE GAWRYS, ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO,<br><br>Defendants. | ) | Case No. 19 C 6508 |

**DEFENDANT CITY OF CHICAGO'S**
**ANSWERS AND OBJECTIONS TO PLAINTIFF'S**
**SECOND SET OF INTERROGATORIES TO DEFENDANT CITY OF CHICAGO**

Defendant City of Chicago, by its undersigned attorneys, in response to Plaintiff's Second Set of Interrogatories to Defendant City of Chicago, states the following:

1. Do You know who is the confidential informant referenced in RFC-Iglesias 000011? If your answer is anything other than an unequivocal "no," Identify the following:

a. The name, address, telephone number, or any other identifying information you know of for the informant.

b. When and how you learned information about who the informant was, including who was present at the time you learned the information.

c. Any past dealings or interactions you had with the informant.

d. Any payments, benefits or other incentives that were offered or provided to the informant.

e. The name of each Defendant and non-Defendant Person, that you are aware of, who had knowledge of the informant's name or other identifying information on June 21, 1993.

f. The name of each Defendant and non-Defendant Person, that you are aware of, who acquired knowledge of the informant's name or other identifying information after June 21, 1993.

If this Interrogatory is answered by incorporating Documents, please provide the identities of any additional Persons who are not listed in the Documents that you reference; in the event that you fail to do so, Plaintiff will assume the witnesses and the substance of their testimony is strictly limited to what is contained in the Documents that you reference.

**RESPONSE:** The City objects that this interrogatory seeks attorney-client and/or work product privileged information ("When and how your learned information about who the informant was, including who was present at the time you learned the information."). The City also objects that this interrogatory is not limited in time or scope and is therefore not proportional to the needs of this case ("Any past dealings or interactions you had with the informant."). The City also objects to Plaintiff's "assumptions" to the extent they do not comport with the Federal Rules of Civil Procedure or any other rules of this Court. Without waiving these objections, the City is presently unaware of the identity of the "confidential informant" referenced in RFC-Iglesias 11. Investigation continues.

Dated: September 28, 2020

Respectfully submitted,

MARK A FLESSNER

Corporation Counsel for the City of Chicago

By: /s/ *Eileen E. Rosen*
One of its attorneys

Eileen E. Rosen
Catherine M. Barber
Theresa Berousek Carney
Special Assistant Corporation Counsel
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000
erosen@rfclaw.com

**CERTIFICATE OF SERVICE**

I certify that I served a copy of Defendant City of Chicago's Responses and Objections to Plaintiff's Second Request for Production on counsel of record by electronic mail to all counsel of record on September 28, 2020.

___*/s/ Kara Hutson*____
Paralegal

# Exhibit 45

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GERALDO IGLESIAS )
) Case No. 19 CV 06508
Plaintiff, )
) Hon. Virginia M. Kendall
)
vs. )
) Magistrate Maria Valdez
)
REYNALDO GUEVARA, JOANN HALVORSEN )
as SPECIAL REPRESENTATIVE for ERNEST, )
HALVORSEN, STEVE GAWRYS, ANTHONY )
RICCIO, ROBERT BIEBEL, and the CITY OF )
CHICAGO, )
Defendants. )

**DEFENDANT STEVE GAWRYS'S ANSWERS TO PLAINTIFF'S**
**SECOND SET OF INTERROGATORIES**

Defendant Steve Gawrys, by his attorneys, The Sotos Law Firm, P.C., responds to Plaintiff 's Second Set of Interrogatories as follows:

**Objections to Definitions and Instructions**

Defendant Gawrys incorporates his objections to Plaintiff's definitions and instructions as set forth in his Response to Plaintiff's First Set of Interrogatories.

**INTERROGATORIES**

1. Do You know who is the confidential informant referenced in RFC-Iglesias 000011? If your answer is anything other than an unequivocal "no," Identify the following:

a. The name, address, telephone number, or any other identifying information you know of for that informant.

b. When and how you learned information about who the informant was, including who was present at the time you learned the information.

    c. Any past dealings or interactions you had with informant.

d. Any payments, benefits or other incentives that were offered or provided to the informant.

e. The name of each Defendant and non-Defendant Person, that you are aware of, who had knowledge of the informant's name or other identifying information on June 21, 1993.

f. The name of each Defendant and non-Defendant Person, that you are aware of, who acquired knowledge of the informant's name or other identifying information after June 21. 1993.

If this interrogatory is answers by incorporating Documents, please provide the identities of any additional Persons who are not listed in the Documents that you reference; in the event that you fail to do so, Plaintiff will assume the witnesses and the substance of their testimony is strictly limited to what is contained in the Documents that you reference

**ANSWER: Defendant Gawrys objects to this interrogatory as vague and ambiguous as to "know who is." Defendant Gawrys further objects that this interrogatory is compound and violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts. Defendant Gawrys further objects that this interrogatory lacks a relevant time frame. Subject to and without waiving these objections, Defendant Gawrys states that he does not know the name or nickname of the confidential informant referenced in RFC-Iglesias 000011.**

Dated: September 28, 2020

Respectfully submitted,

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

James G. Sotos
Josh M. Engquist
David A. Brueggen
Jeffrey R. Kivetz
Carson W. Canonie

Special Assistant Corporation Counsel
The Sotos Law Firm, P.C.
141 W. Jackson Blvd., Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
jengquist@jsotoslaw.com

**PROOF OF SERVICE**

I, Joseph M. Engquist, an attorney, certify that a copy of the attached **Defendant Steve Gawrys's Answers to Plaintiff's Second Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on September 28, 2020.

***Attorneys for Plaintiff***
Russell Ainsworth
Athrur R. Lovey
D. Samuel Heppell
Jonathan I. Loevy
Ruth Z. Brown
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60606
(312)243-5900
russell@loevy.com
Arthur@loevy.com
sam@loevy.com
jon@loevy.com
ruth@loevy.com

***Attorneys for Reynaldo Guevara***
Thomas M. Leinenweber
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 200
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com

***Attorneys for City of Chicago***
Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, IL 60654
(312)474-1000
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

***Attorneys for Defendant Kevin Hughes and and Cook County***
Ryan J. Gillespie
Edward M. Brener
Cook County State's Attorney's Office
50 W. Washington, #500
Chicago, IL 60602
(312)603-5440
ryan.gillespie@cookcountyil.gov
edward.brener@cookcoutnyil.gov

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

**ATTESTATION**

I, Steve Gawrys, affirm under penalty of perjury pursuant to 28 U.S.C. §1746 that the answers made in the foregoing document are true and correct to the best of my knowledge and belief.

Date: __9-21-2020

STEVE GAWRYS

# Exhibit 46

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GERALDO IGLESIAS | ) | |
| | ) | Case No. 19 CV 06508 |
| Plaintiff, | ) | |
| | ) | Hon. Virginia M. Kendall |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, JOANN HALVORSEN as SPECIAL REPRESENTATIVE for ERNEST, HALVORSEN, STEVE GAWRYS, ANTHONY RICCIO, ROBERT BIEBEL, and the CITY OF CHICAGO, | ) | |
| Defendants. | ) | |

**DEFENDANT JOANN HALVORSEN, as SPECIAL REPRESENATIVE FOR THE ESTATE OF ERNEST HALVORSEN'S, ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Defendant JoAnn Halvorsen as Special Representative for Ernest Halvorsen, by her attorneys, The Sotos Law Firm, P.C., responds to Plaintiff 's Second Set of Interrogatories as follows:

**Objections to Definitions and Instructions**

Defendant JoAnn Halvorsen incorporates her objections to Plaintiff's definitions and instructions as set forth in his Response to Plaintiff's First Set of Interrogatories.

**INTERROGATORIES**

1. Do You know who is the confidential informant referenced in RFC-Iglesias 000011? If your answer is anything other than an unequivocal "no," Identify the following:

a. The name, address, telephone number, or any other identifying information you know of for that informant.

b. When and how you learned information about who the informant was, including who was present at the time you learned the information.

c. Any past dealings or interactions you had with informant.

d. Any payments, benefits or other incentives that were offered or provided to the informant.

e. The name of each Defendant and non-Defendant Person, that you are aware of, who had knowledge of the informant's name or other identifying information on June 21, 1993.

f. The name of each Defendant and non-Defendant Person, that you are aware of, who acquired knowledge of the informant's name or other identifying information after June 21. 1993.

If this interrogatory is answers by incorporating Documents, please provide the identities of any additional Persons who are not listed in the Documents that you reference; in the event that you fail to do so, Plaintiff will assume the witnesses and the substance of their testimony is strictly limited to what is contained in the Documents that you reference

**ANSWER: Defendant JoAnn Halvorsen objects to this interrogatory as vague and ambiguous as to "know who is." Defendant JoAnn Halvorsen further objects that this interrogatory is compound and violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts. Defendant JoAnn Halvorsen further objects that this interrogatory lacks a relevant time frame.**

Dated: September 28, 2020

Respectfully submitted,

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

James G. Sotos
Josh M. Engquist
David A. Brueggen

Jeffrey R. Kivetz
Carson W. Canonie
Special Assistant Corporation Counsel
The Sotos Law Firm, P.C.
141 W. Jackson Blvd., Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
jengquist@jsotoslaw.com

**PROOF OF SERVICE**

I, Joseph M. Engquist, an attorney, certify that a copy of the attached **Defendant JoAnn Halvorsen as Special Administrator for the Estate of Ernest Halvorsen's Answers to Plaintiff's Second Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on September 28, 2020.

***Attorneys for Plaintiff***
Russell Ainsworth
Athrur R. Lovey
D. Samuel Heppell
Jonathan I. Loevy
Ruth Z. Brown
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60606
(312)243-5900
russell@loevy.com
Arthur@loevy.com
sam@loevy.com
jon@loevy.com
ruth@loevy.com

***Attorneys for Reynaldo Guevara***
Thomas M. Leinenweber
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 200
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com

***Attorneys for City of Chicago***
Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, IL 60654
(312)474-1000
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

***Attorneys for Defendant Kevin Hughes and and Cook County***
Ryan J. Gillespie
Edward M. Brener
Cook County State's Attorney's Office
50 W. Washington, #500
Chicago, IL 60602
(312)603-5440
ryan.gillespie@cookcountyil.gov
edward.brener@cookcoutnyil.gov

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

# Exhibit 47

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CASE NO. 1:20-CV-4156 |
| | ) | |
| REYNALDO GUEVARA, ERNEST HALVORSEN, DARRYL DALEY, WILLIAM ERICKSON, JOHN HEALY AND THE CITY OF CHICAGO, | ) | |
| | ) | |
| DEFENDANTS | ) | |

*****************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST HALVORSEN, STEVE GAWRYS, A. RICCIO, J. SANTOPADRE, ROBERT RUTHERFORD, K. MCDONALD, JOSE ZUNIGA, ASSAF, ROBERT BIEBEL AND THE CITY OF CHICAGO, | ) | CASE NO. 1:19-cv-6508 |
| | ) | |
| Defendants. | ) | |

*******************************************************

ORAL & VIDEOTAPED DEPOSITION OF
REYNALDO GUEVARA
APRIL 20, 2022

*******************************************************

**D. Johnson vs. R. Guevara, et al. (AND)**
**G. Iglesias vs. R. Guevara, et al.**

**Reynaldo Guevara**
**April 20, 2022**

2

ORAL & VIDEOTAPED DEPOSITION OF REYNALDO GUEVARA, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the above referenced date, from 10:01 a.m. CST to 1:59 p.m., before Rosa E. Davila, CSR, in and for the State of Texas, reported by machine shorthand at 8000 IH-10 West, Suite 600, San Antonio, Texas pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record herein.

3

APPEARANCE

FOR THE PLAINTIFF:

MS. RACHEL BRADY
MR. STEVEN ART
LOEVY & LOEVY
311 NORTH ABERDEEN
3RD FLOOR
CHICAGO, ILLINOIS 60607
(312) 243-5900
brady@loevy.com

FOR THE DEFENDANT REYNALDO GUEVARA, ET AL:

MR. TOM LEINENWEBER
MS. MEGAN K. MCGRATH
LEINENWEBER BARONI & DAFFADA, LLC
120 N. LASALLE
SUITE 2000
CHICAGO, ILLINOIS 60602
(866) 786-3705
(800) 896-2193 FAX
Thomas@ilesq.com
mkm@ilesq.com

FOR THE DEFENDANT OFFICERS:

MR. DANIEL J. McGINNIS
THE SOTOS LAW FIRM, P.C.
141 W. JACKSON BLVD.
SUITE 1240A
CHICAGO, ILLINOIS 60604
(630) 735-3307
(630) 773-0980 FAX
dmcginnis@jsotoslaw.com

FOR THE DEFENDANT CITY OF CHICAGO:

MR. AUSTIN RAHE
ROCK FUSCO & CONNELLY, LLC
321 N. CLARK STREET
CHICAGO, ILLINOIS 60654
(312) 494-1000
(312) 494-1001 FAX
Arahe@rfclaw.com

4

APPEARANCES CONTINUED

ALSO PRESENT:

MR. REYNALDO GUEVARA
THE WITNESS;

MR. MARIO KOOLE,
THE VIDEOGRAPHER;

MS. ROSA E. DAVILA,
CERTIFIED SHORTHAND REPORTER.

5

INDEX

| REYNALDO GUEVARA | PAGE |
|---|---|
| Appearances .................................... | 3 |
| Examination By Ms. Brady ........................ | 7 |
| Witness Signature Page .......................... | 260 |
| Reporter's Certification ........................ | 261 |

EXHIBITS

| NO. | DESCRIPTION | PAGE REFERRED |
|---|---|---|
| Exhibit 1 | RFC Johnson 36 ...................... | 34 |
| Exhibit 2 | RFC Johnson 34 ...................... | 35 |
| Exhibit 3 | RFC Johnson 76 five-page document ... | 73 |
| Exhibit 4 | RFC Johnson 22 two-page document .... | 76 |
| Exhibit 5 | RFC Johnson 643 two-page document ... | 86 |
| Iglesias Exhibit 1 | RFC Iglesias 59 19-page document .... | 186 |
| Iglesias Exhibit 2 | RFC Iglesias 90 four-page document .. | 194 |
| Iglesias Exhibit 3 | RFC Iglesias 19 three-page document . | 218 |

Quotation marks are used for clarity and do not necessarily reflect a direct quote

**2 (Pages 2 to 5)**

**Koole Court Reporters of Texas**
**(210) 558-3129 Fax** **myreportingfirm@gmail.com** **210-558-9484**

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

6

THE VIDEOGRAPHER: This marks the start of the deposition of Reynaldo Guevara. Today's date is April 20th, 2022. We are going on the record at 10:01.

THE REPORTER: My name is Rose Davila, Certified Shorthand Reporter No. 3516. I am present with the witness and reporting the deposition by stenographic means from San Antonio, Texas.

Will Counsel on Zoom please state their appearance, location and if anyone else is present in the room with them for the record, starting with Plaintiff's counsel.

MS. BRADY: Yes. Are we on the record now?

THE REPORTER: Yes.

MS. BRADY: Has the witness been sworn in?

THE REPORTER: No, not yet. But I wanted to get the appearances on Zoom.

MS. BRADY: Okay. My name is Rachel Brady, and I represent the plaintiff in this case. And I don't think we discussed this beforehand, but we're going to be starting with the Johnson versus Guevara case.

Oh, I'm appearing remotely via Zoom

7

from Chicago.

MR. ART: I'm Steve Art, and I represent the plaintiffs in these cases as well. Appearing via Zoom from Chicago.

MR. McGINNIS: Dan McGinnis representing the Defendant Officers except Ray Guevara, appearing from Chicago. And no one is in the room with me.

MR. RAHE: This is Austin Rahe appearing on behalf of the defendant City of Chicago via Zoom from the Chicago land area. No one's in the room with me.

MS. MCGRATH: Megan McGrath appearing via Zoom for witness Ray Guevara. No one's in the room with me.

MR. LEINENWEBER: Good morning. Tom Leinenweber appearing on behalf of the defendant Ray Guevara who sits to my right.

REYNALDO GUEVARA

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. BRADY:

Q. Mr. Guevara, could you please state your name for the record.

**A. Reynaldo Guevara.**

8

Q. How old are you today?

**A. 78 years old.**

Q. Were you working as a Chicago police officer in June of 1991?

**A. Yes, I was.**

Q. And during the investigation of Edwin Fred's murder and Raul Ortiz's attempted murder in June of 1991, isn't it true that you intentionally and knowingly framed Demetrius Johnson?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: On advice of my counsel, I choose to take the Fifth.

Q. (BY MS. BRADY) Okay. And when you say "advice of counsel," are you intentionally injecting into this case what your attorneys have told you about the reasons that you shouldn't testify?

MR. LEINENWEBER: Objection, form.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So it's our position that this opens the door to what Mr. Guevara's lawyers have told him. And when you say "by advice of counsel," which lawyers are you referring to?

MR. LEINENWEBER: Objection.

THE WITNESS: Take the Fifth.

9

Q. (BY MS. BRADY) You're refusing to answer the question about which lawyers have told you to invoke your Fifth Amendment rights?

**A. Take the Fifth.**

Q. And did your lawyers advise you that if you testify about your actions in Demetrius Johnson's case, you would be subjecting yourself to criminal prosecution?

MR. LEINENWEBER: Objection, attorney-client.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Did they tell you that you could be charged for lying under oath?

MR. LEINENWEBER: Objection, attorney-client privilege.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And are you declining to answer that question on the grounds that a truthful answer would expose privileged attorney-client communication?

MR. LEINENWEBER: Objection to form.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And did your attorney tell you that you could be prosecuted for framing 20 men for crimes that they did not commit?

3 (Pages 6 to 9)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

10

MR. LEINENWEBER: Objection.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You're refusing to answer questions about the Edwin Fred and Raul Ortiz murder invest -- murder and attempted murder investigation because you fear that a truthful answer will subject you to criminal prosecution; is that right?
**A. Take the Fifth.**
Q. And you understand that you're permitted to assert the Fifth Amendment only if a truthful answer would implicate you in a crime, don't you?
MR. LEINENWEBER: Objection.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you have a reasonable fear that if you answered my questions about the Fred murder and Ortiz attempted murder investigation and Demetrius Johnson's case that you could be prosecuted for a crime?
MR. LEINENWEBER: Objection, form, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you intend to answer all of my questions by asserting your Fifth Amendment rights?
**A. Take the Fifth.**
Q. What crime do you fear that you could be

11

prosecuted for in connection with truthful testimony here today?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution by state authorities or federal authorities?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for perjury?
MR. LEINENWEBER: Objection, form.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for perjury for lies you told in the past under oath?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for perjury for lies that you would tell in this case or lies that you told in other cases --
MR. LEINENWEBER: Objection --
Q. (BY MS. BRADY) -- or at other times under oath?

12

MR. LEINENWEBER: Sorry, Rachel. Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for obstruction of justice?
MS. BRADY: Objection, form, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for a RICO violation?
MR. LEINENWEBER: Objection, form, calls for speculation, legal conclusion.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for bribery?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take -- take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for fraud?
MR. LEINENWEBER: I'm sorry, Rachel. Could you repeat that. I didn't hear the question.
MS. BRADY: Sure.
Q. (BY MS. BRADY) Do you fear prosecution for fraud?

13

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for assault?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for battery?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you fear prosecution for violation of federal civil rights criminal laws?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
MS. BRADY: And can we agree that every time the witness says "I take the Fifth" that -- or invokes his right to remain silent he's asserting his Fifth Amendment right against self -- self-incrimination?
MR. LEINENWEBER: Yes. Thank you.
MS. BRADY: I'm also having a little

4 (Pages 10 to 13)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

14

bit of trouble hearing complete responses. I don't know if it's -- I don't know what's happening on the video. But since we're using the Zoom recording, a lot of the witness's answers are getting clipped.

So he's saying "I take the Fifth," and it comes in only when he says Fifth. I'm sorry. I just want to make sure that we're getting a clean video.

THE VIDEOGRAPHER: We are. The vid -- the video is just fine. I'm using my actual camera equipment.

MS. BRADY: Okay.

MR. LEINENWEBER: If you can then, Ray, just keep your voice up. You can say "I plead the Fifth" like --

THE WITNESS: Okay.

MR. LEINENWEBER: -- like you wanted to, but just keep -- enunciate, I guess.

Q. (BY MS. BRADY) Okay. So let's turn back to Demetrius Johnson's case then. Isn't it true that you intentionally violated Demetrius Johnson's constitutional rights during your investigation of the Fred murder and Ortiz attempted murder?

MR. LEINENWEBER: Objection, form and foundation.

15

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And in June of 1991, you were working as a detective in Area 5, correct?

**A. I plead the Fifth.**

Q. On the case that Demetrius Johnson served decades in prison for, you and Halvorsen were the ones who solved that case, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Let's talk about how you and your partner Halvorsen solved the Fred murder and Ortiz attempted murders. Do you recall three eyewitnesses to the crime, Ricardo Burgos, Rosa Burgos and Elba -- Elba Burgos?

**A. I plead the Fifth.**

Q. You knew that those eyewitnesses had not gotten a good look at the shooter and could not make an identification, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) But you still got them to pick Demetrius Johnson during identification procedures, didn't you?

16

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you told them that Demetrius Johnson was your suspect, and you pointed out his picture to them and told them to pick it, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you conducted photo identification procedures with those three individuals that you knew to be suggestive, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And in addition to that, you conducted live lineups with those three witnesses where you told them who to pick out of the lineup, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And isn't it true that you knew all those identifications of Demetrius Johnson

17

were false all along?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And isn't it the case that you also suppressed evidence showing that Demetrius Johnson was innocent?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Sir, you agree that a lineup was conducted on the night of the crime, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And Demetrius Johnson was not a participant in that lineup, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Bryan Johns was the suspect in that lineup, wasn't he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

5 (Pages 14 to 17)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

18

Q. (BY MS. BRADY) And a man named Aby Gonzalez was an eyewitness who viewed the lineup on the night of the crime, right?
MR. LEINENWEBER: Objection, form and foundation. Misstates the evidence.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And Aby Gonzalez was there during the shooting, and he saw the entire thing, didn't he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you concealed the fact that Aby Gonzalez viewed the lineup on the night of the crime and that he selected Bryan Johns, correct?
MR. LEINENWEBER: Objection, form and foundation, misstates what the -- what Gonzalez said.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you concealed evidence that other witnesses also viewed a lineup on the night of the crime and selected Bryan Johns, correct?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And one of the ways you

19

concealed this critical evidence from Demetrius Johnson is that you created a false lineup report claiming that Aby Gonzalez and the other eyewitnesses did not select Bryan Johns from the lineup, right?
MR. LEINENWEBER: Objection, form and foundation, misstates the evidence.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And in addition to creating a false lineup report, you hid the real lineup report written by another detective which stated that Aby Gonzalez had selected Bryan Johns, right?
MR. LEINENWEBER: Objection, form and foundation, and misstates the evidence.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) You buried that real lineup report so that it would never be seen by the prosecutors and the criminal defense, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) You also concealed evidence about your investigation into Bryan Johns, correct?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.

20

Q. (BY MS. BRADY) You concealed evidence of your investigation into another person named Robert Weeks, correct?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I Plead the Fifth.
Q. (BY MS. BRADY) And isn't it true that you repeatedly lied under oath during Demetrius Johnson's criminal proceedings?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Do you have any remorse that Demetrius Johnson spent half his life in prison for something that he didn't do?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you're refusing to answer all the questions I just asked you because you fear that a truthful answer would subject you to criminal prosecution, isn't that right?
MR. LEINENWEBER: Objection to form and foundation.
THE WITNESS: I plead the Fifth.

21

Q. (BY MS. BRADY) All right. So let's talk about the Fred and Ortiz shooting and your investigation in more detail. Do you remember Edwin Fred -- Fred and Raul Ortiz being shot around the North Avenue, Western Avenue and Claremont area on the northwest -- northwest side of Chicago?
**A. I plead the Fifth.**
Q. The shooting occurred on June 12th, 1991 at approximately 70 -- 7:45 p.m., isn't that correct?
**A. I plead the Fifth.**
Q. Edwin Fred and Raul Ortiz were standing on the street near 2333 West North Avenue when they were shot, right?
**A. I plead the Fifth.**
Q. Edwin Fred died from gunshot wounds, right?
**A. I plead the Fifth.**
Q. Raul Ortiz survived but sustained gunshot wounds in his arms and back, right?
**A. I plead the Fifth.**
Q. And there were numerous eyewitnesses, weren't there?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) You responded to the scene and

6 (Pages 18 to 21)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

22

spoke with numerous witnesses, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) At least six witnesses including Aby Gonzalez, Fina Montana -- Montanez, Angel Cordova, his father Victor Cordova, Forrest Garnett and Jewell Stanley told you they saw the shooter, didn't they?

MR. LEINENWEBER: Objection, form and foundation and misstates the evidence.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) There were two witnesses who told you they did not see the shooter, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Raul Ortiz told you he did not see who shot him, didn't he?

MR. LEINENWEBER: Objection, form.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And Rosa Burgos told you she did not see the shooter, didn't she?

MR. LEINENWEBER: Objection, form and foundation.

23

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) There was no physical evidence connecting anyone to the crime, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) There was no weapon recovered, isn't that true?

**A. Plead the Fifth.**

Q. And there was no video?

**A. Plead the Fifth.**

Q. So you had several witnesses who were able to make an identification, but you did not use any of them to solve this case, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Instead, you relied on three other witnesses named Ricardo Burgos, Elba Burgos and Rosa Burgos to solve this case, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And none of those individuals got a good look at the person who committed the crime,

24

did they?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Ricardo Burgos did not see the shooter shoot at Fred and Ortiz, did he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Ricardo Burgos was the pas -- in the passenger seat of a moving car headed in the opposite direction of the shooting, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) He heard gunshots and went back to the shooting, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And all he saw was the back of a man running away, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

25

Q. (BY MS. BRADY) He did not see the face of the person who was running away, did he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) He did not see this person who was running away holding a gun, did he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And for all Mr. Burgos knew, the person he saw running away was running away to avoid the shooting, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And Mr. Burgos didn't provide police with any description of the shooter, did he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) That's because he couldn't provide a description, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

7 (Pages 22 to 25)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

26

THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Elba Burgos also did not see the shooter, did she?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Elba was sitting on her porch on Claremont Avenue when the shooting -- shooting occurred, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) She heard gunshots and had to stand up and look toward North Avenue, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And Elba saw a large crowd of people about 25 feet away, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And for all Mrs. Burgos knew, the person she saw running was just trying to get -- avoid getting shot, right?

27

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And Elba Burgos did not provide police with any description of the shooter when she first spoke to police, did she?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) That's because she could not provide a description, correct?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Rosa Burgos also did not get a good look at the shooter, did she?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Rosa Burgos was walking downstairs in her apartment building with Raul Ortiz in front of her when she saw Raul get shot, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.

28

Q. (BY MS. BRADY) Raul was between her and the shooter, wasn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Then the shooter pointed a gun at her, and she ran upstairs to avoid getting shot, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So she was running away from the shooter, wasn't she?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And she never had a chance to stop and take a good look at the shooter, did she?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And so she did not provide police with any description of the shooter when she initially spoke to police, did she?
MR. LEINENWEBER: Objection, form,

29

foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that's because she could not provide a description, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So all of these factors meant that it was impossible for Ricardo, Elba or Rosa to make an identification of the shooter, isn't that right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And they all told you that they did not think they could identify the shooter, didn't they?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Ricardo told you that he could not give a good description of the shooter and that he could not identify him, right?
MR. LEINENWEBER: Objection, form, foundation.

8 (Pages 26 to 29)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

30

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Elba told you that she could not give a good description of the shooter and that she could not identify him, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And Rosa told you that she could not give a good description of the shooter and that she could not identify him, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Are you aware that Ricardo Burgos has submitted an affidavit stating that he did not see the shooter and could not identify the shooter?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) How do you explain getting identifications from those people when they could not provide any descriptions of the shooter?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.

31

Q. (BY MS. BRADY) So changing topics, I want to ask you about the police investigation of the Fred murder. So you were not the first officer to respond to the scene of the crime, correct?
**A. I plead the Fifth.**
Q. And neither was your partner Halvorsen, right?
**A. Plead the Fifth.**
Q. Several other officers including M. Hernandez and L. Johnson were first at the scene, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And they conducted an initial canvass?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And Officer Daley also responded to the call about the shooting, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And he, in fact, heard on the radio broadcast that "Little D" or Bryan Johns was one

32

of the shooters and drove to the area of Talman and Wabansia to look for Johns, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And, sure enough, Daley found Johns not far from the shooting, didn't he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And when Daley found Johns, he was with two Latino men, Elliot Berverena and Jose Medina, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And they had all exited a black sedan, correct?
MR. LEINENWEBER: Objection, form, foundation.
MR. LEINENWEBER: I plead the Fifth.
Q. (BY MS. BRADY) Daley looked inside the van and saw a chrome-plated semiautomatic handgun, and he arrested the three men, didn't he?
MR. LEINENWEBER: Objection, form,

33

foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) When you got the assignment for the Fred and Ortiz shooting, you talked to the responding officers about their canvass, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you read their reports, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you talked to Daley, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you read his report?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) I'm going to put up an exhibit now.
MR. LEINENWEBER: Do you see that?

9 (Pages 30 to 33)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

34

Is it big enough? Can you see it?

THE WITNESS: I can see it, but I can't read it.

Q. (BY MS. BRADY) All right. Showing you what's been marked as Exhibit 1.

(Exhibit 1 referred to.)

MR. LEINENWEBER: Excuse me. Rachel, can you make it a little bit larger, if you can, please.

MS. BRADY: Yes. For the record, this is a two-page document beginning at Bates label RFC Johnson 36.

MR. LEINENWEBER: Thank you.

Q. (BY MS. BRADY) I'll scroll down so you can see the next page as well. Showing you this general offense case report, which has been marked as Exhibit 1, which -- which was made by the beat officer who responded to the scene. You would have reviewed this federal offense case report when you picked up the case, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you would have learned right away that Aby Gonzalez, Fina Montanez and Jules

35

Stanley had seen the shooter, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And that Aby Gonzalez said he was standing with Fred and Ortiz when they got shot, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And that was just minutes after the shooting occurred, wasn't it?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) I'm going to show you another exhibit, which we'll call Exhibit 2.

(Exhibit 2 referred to.)

Q. (BY MS. BRADY) This is a one-page document Bates labeled RFC Johnson 34.

MR. LEINENWEBER: Could you make that -- thank you.

Q. (BY MS. BRADY) So this Exhibit 2 is Daley's supplementary report. And you would have reviewed this information with Officer Daley, correct?

36

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So you learned that police had a lead that Johns was the shooter, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And that Johns was in custody, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So even though you had a lead that Johns had committed the shooting, you didn't pursue that lead, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Even though Johns was in custody, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Why did you not pursue Bryan

37

Johns as a suspect?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Why did you let him go?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Did you know Bryan Johns?

**A. Plead the Fifth.**

Q. Was Bryan Johns cooperating with you on other investigations?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Were you conspiring with Bryan Johns as part of a criminal enterprise?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Why did you not pursue Elliott Berverena as a suspect?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

10 (Pages 34 to 37)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

38

Q. (BY MS. BRADY) Why didn't you put Berverena in a lineup?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Berverena was already in custody, wasn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Did you know Berverena?
**A. I plead the Fifth.**
Q. Was Berverena cooperating with you on other investigations?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Were you conspiring with Berverena as part of a criminal enterprise?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Why did you not pursue Jose Medina -- Medina as a suspect?
MR. LEINENWEBER: Objection, form and

39

foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Why did you let him go?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Did you know Jose Medina?
**A. I plead the Fifth.**
Q. Was Jose Medina cooperating you -- with you on other investigations?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Were you conspiring with Jose Medina as part of a criminal enterprise?
MR. LEINENWEBER: Objection to form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Why didn't you or your partner, Halvorsen, pursue Robert Weeks as a suspect?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Why did you let him go?
MR. LEINENWEBER: Objection, form,

40

foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Did you know Robert Weeks?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Was Robert Weeks cooperating with you on other investigations?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Were you conspiring with Robert Weeks as part of a criminal enterprise?
MR. LEINENWEBER: Objection to form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you and Halvorsen decided that Demetrius Johnson was the perpetrator, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And then you made evidence to fit that theory, isn't that right?
MR. LEINENWEBER: Objection, form and foundation.

41

THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) All right. So let's talk about who was in charge of this investigation. So once you joined the investigation, you were the lead detective, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And Halvorsen worked with you every step of the way to solve the crime, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Halvorsen would take the reports, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you helped him write the reports, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) William Erickson and Darryl Daley worked on the investigation as well, didn't they?

11 (Pages 38 to 41)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

42

MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you reported everything that was going on in the investigation to your superiors, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you were required to get approval for all of your reports, weren't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And John Healy was one of your supervisors during this investigation, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And in addition to sharing information with your supervisors like John Healy, you also shared all information with the rest of the investigative team, didn't you?
MR. LEINENWEBER: Objection, form, foundation.

43

THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you ensured that the investigative team was sharing all information with you, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) So Bryan Johns stood in a lineup the night of the shooting, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And six people viewed the Johns lineup, didn't they?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And Aby Gonzalez identified Johns, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) Aby Gonzalez knew Johns, right?
MR. LEINENWEBER: Objection, form,

44

foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And so Gonzalez was not identifying a stranger. He was identifying someone he knew from the neighborhood. Right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you agree that a witness identification of someone he knows and has seen before is more reliable than an identification of a stranger, right?
MR. LEINENWEBER: Objection, form.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And, indeed, Aby Gonzalez told you he was certain that Bryan Johns was the shooter, didn't he?
MR. LEINENWEBER: Objection, form, foundation, assumes a fact not in evidence.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you concealed Aby Gonzalez's identification of Johns for decades, didn't you?
MR. LEINENWEBER: Objection, form, foundation.

45

THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) In fact, at least three people who viewed that lineup identified Johns as the shooter, didn't they?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you told them that they got the wrong person, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
MR. RAHE: Sorry. Sorry. Can I interrupt. Tom, can you speak up because we're not hearing your objections.
MR. LEINENWEBER: Yeah. No problem.
MR. RAHE: Thanks.
Q. (BY MS. BRADY) And you concealed the facts that three people -- that you told three people that they got the wrong person. You concealed that for decades, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you released Bryan Johns,

12 (Pages 42 to 45)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

46

correct?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) You worked with Maj -- in gang crimes, didn't you?

MR. LEINENWEBER: Object --

THE REPORTER: You worked with who? I'm sorry?

MS. BRADY: Miedzianowski.

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you continued to work with him as a detective, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And Miedzianowski was convicted of participating in a massive criminal enterprise working with various gang leaders to buy and sell drugs, wasn't he?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

47

Q. (BY MS. BRADY) And you were part of Miedzianowski's criminal enterprise, weren't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

MR. RAHE: Tom, we're still not hearing you.

MS. BRADY: Tom, do you need to adjust anything?

MR. LEINENWEBER: No. Just I'll try and talk louder. Sorry. I mumble a lot.

Q. (BY MS. BRADY) Is Fred Rock lying when he said you worked with Miedzianowski?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Is John Levancia (phonetic) lying when he says you worked with Miedzianowski?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And so as part of this criminal enterprise, you would protect gang members that were working with you; is that right?

MR. LEINENWEBER: Objection, form,

48

foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you and Miedzianowski would frame innocent people of murders in order to protect the gang members that were part of that enterprise, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And that's exactly what you did in this case isn't it?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you protected Bryan Johns because he was working with you and Miedzianowski, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And so to protect him, you framed an innocent man named Demetrius Johnson, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

49

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Please explain why you would released Bryan Johns without any meaningful investigation?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And please explain why you released Bryan Johns after he had been identified in a lineup by Aby Gonzalez who was right next to the victims when they were shot?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) You protected Elliott Berverena because he was working with you and Miedzianowski, too, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) So to protect him, you framed an innocent man named Demetrius Johnson, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

13 (Pages 46 to 49)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

50

Q. (BY MS. BRADY) Would you please explain why you did not put Berverena in a lineup the night he was arrested with Johns with a gun in his car near the shooting?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) You also protected Jose Medina because he was working with you and Miedzianowski, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And so to protect him, you framed an innocent man named Demetrius Johnson, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Please explain why you released Jose Medina without any meaningful investigation?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

51

Q. (BY MS. BRADY) And please explain why you released Jose Medina when he was with Johns near the shooting?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) You also protected Robert Weeks because he was working with you and Miedzianowski, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And so to protect him, you framed an innocent man named Demetrius Johnson, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Please explain why you did not meaningfully investigate Robert Weeks?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So despite at least three identifications of Johns as the shooter, you went after Demetrius Johnson, right?

52

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you decided to pin the Fred murder on Demetrius, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) Demetrius Johnson was just 15 years old at that time, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And you had absolutely no leads pointing to Demetrius Johnson, did you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And when you decided to pin the murder on Demetrius, you had no leads that suggested he had anything to do with the crime, did you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

53

Q. (BY MS. BRADY) And to this day you've never developed a single lead that points to Demetrius Johnson other than the evidence that you falsified, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) All right. Let's talk about how your investigation of the Fred case unfolded after you decided that Demetrius Johnson was your suspect. So on June 21st, 1991 you found Ricardo Burgos who was driving in a car away in the opposite direction of the shooting when it occurred, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: I plead the Fifth.

Q. (BY MS. BRADY) And Ricardo Burgos could not make an identification, could he?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) But you showed Ricardo Burgos the photo array anyway, right?

MR. LEINENWEBER: Objection, form, foundation.

14 (Pages 50 to 53)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

54

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And he didn't pick anyone out of the array, did he?
MR. LEINENWEBER: Objection, form, foundation.
MR. LEINENWEBER: Plead the Fifth.
Q. (BY MS. BRADY) And that's because he did not get a good enough look at the shooter to be able to identify anyone, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And then a month after the shooting on July 11th, 1991, you found Elba Burgos who lived in the area of the shooting and you showed her a photo array as well, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) This photo array that you showed Elba Burgos included Demetrius Johnson's brother, Darrel Johnson, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.

55

Q. (BY MS. BRADY) And you had no leads pointing to Darrell Johnson either, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So -- and Elba didn't select Darrell Johnson out of the photo array, did she?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you made up a story that she said the person was younger, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And Elba never said that, did she?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) But you used that lie to focus on Demetrius Johnson, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.

56

Q. (BY MS. BRADY) And on July 15th, 1991 you went back to Elba's house and showed -- showed her a photo of Demetrius Johnson, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And what you showed Elba was not a proper photo array, was it?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) A photo array is supposed to contain a suspect and then at least five photos of people who look similar but are not suspects, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that's how you were trained to conduct a photo array, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You were trained that you should not just show up with a single photo and ask a witness to identify the person in the photo, right?

57

MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You knew that an identification procedure like that was improper, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that an identification procedure like that was inherently unreliable, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that's what you did in this case, isn't it?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You showed Elba a single photo with just three people in it, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And Demetrius was in the

15 (Pages 54 to 57)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

58

middle of two other people in that photo, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) He was shorter and younger than the other two people, wasn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You told Elba Burgos to pick Demetrius, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you did not include in your report the fact that you had manipulated Elba Burgos into picking Demetrius Johnson, did you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You knew that the photo identification procedure used with Elba Burgos was inappropriate, right?
MR. LEINENWEBER: Objection, form, foundation.

59

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew that identification procedures were suggestive?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And the part of your report about Elba Burgos identifying Demetrius Johnson from a photograph is intentionally false, isn't it?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) All right. So let's talk about how you conducted the photo arrays in this case. Do you agree with me that it is improper to do a photo identification procedure when a witness tells you that they did not see the perpetrator?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Do you agree with me that photo arrays have to be fair?
**A. Plead the Fifth.**
Q. Do you agree with me that you're supposed to select photos that look like the suspects?

60

**A. Plead the Fifth.**
Q. Do you agree with me that all of the photos in an array should look like the suspect?
**A. Plead the Fifth.**
Q. Because that would make a witness more likely to select the person or people who match the description of a suspect, right?
MR. LEINENWEBER: Objection to form.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that would be unfair, correct?
**A. Plead the Fifth.**
Q. And you would agree that it's highly improper to tell a witness that a photo array contains a person that the police suspect committed the crime, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Because that will make a witness more likely to select whoever looks most like the person they saw even if it's not the person they actually saw, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.

61

Q. (BY MS. BRADY) And it's very suggestive to tell a witness that one of the people in the photo book or photo array was already locked up, isn't it?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it's improper to hint to someone who you think the shooter was, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it's improper to tell a witness that they selected your suspect or not, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) But if you're trying to manipulate a witness rather than get a genuine identification, then that's a good way to get them to go along with your story, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Because if you tell them they selected your suspect, then they become more confident

16 (Pages 58 to 61)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

62

in their selection, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And they try to remember the person they selected from the photos, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it's even worse if you actually tell the person who to pick from that photo array, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Because if you tell the person who to pick, then they haven't actually made an identification at all, have they?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Is it proper when you conduct a photo array to point out a photo or hold a photo separate from the rest of the photos in the array?
MR. LEINENWEBER: Objection, form,

63

foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) All experienced officers know that you have to promptly record the results of a photo array, isn't that right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And if you get an identification, then you write a report that shift, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you preserve the photos that you showed the witness, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And, in fact, you make sure their inventory is kept as evidence, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And if you get an incorrect

64

identification, you have to write a report about that, too, don't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you have to be sure that the report gets turned over to the prosecutor, don't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And in your reporting, isn't it true it's critical to record exactly how the identification procedure took place?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And do you agree with me that once Elba Bur -- Burgos had seen Demetrius Johnson's picture and you had told her that Demetrius Johnson was the shooter, Elba Burgos could simply identify Demetrius Johnson in a lineup and at trial based on that picture?
MR. LEINENWEBER: Objection, form and foundation.

65

THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) You intentionally suppressed the true circumstances of the photo identification procedures that you used with Elba Burgos, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You intentionally suppressed how you got her identification?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So let's talk a little bit about how lineups -- live lineups are supposed to be performed. Do you agree with me that you're supposed to select fillers that look like the suspect?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And do you agree with me that you're not supposed to suggest to the eyewitness who's viewing the lineup that your suspect is in the lineup?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.

17 (Pages 62 to 65)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

66

Q. (BY MS. BRADY) And you're certainly not supposed to point out to a witness who they should select from a lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Nor are you allowed to confirm to a witness whether he has selected the correct person out of the lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) When you conduct a lineup, you're not supposed to do anything to suggest which of the people standing in the lineup is the suspect, isn't that right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Isn't it true that you knew that showing someone a photograph of your suspect before they view a live lineup was highly improper?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.

67

Q. (BY MS. BRADY) Because you knew that if you show a person a photo and suggest to them that the person in the photo is the one who committed the crime then any identification in the lineup is worthless, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You were an experienced officer by June of 1991, right?
**A. Plead the Fifth.**
Q. You'd been a gang crimes officer for a long time?
**A. Plead the Fifth.**
Q. And then you were a detective?
**A. Plead the Fifth.**
Q. And you interviewed lots of witnesses?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You investigated dozens and dozens of homicides, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.

68

Q. (BY MS. BRADY) You've shown a lot of photos and lineups to witnesses, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you knew how to steer witnesses to your suspect without the witness even realizing it, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You knew how to manipulate witnesses without them realizing it was happening, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You created a lineup where only the suspect was the person who matched the description and you knew that that was a way of steering the witness without them realizing it, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You told witness that the

69

shooter was in the lineup?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you kept a photo on hand while others were on the table, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And you reminded witnesses of the description of the perpetrator while they were viewing the lineups, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) These were all ways to manipulate witnesses without them realizing it, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) All right. Let's talk about how you conduct a live lineup. So in your career, you developed a number of ways to rig lineup procedures so that eyewitnesses would pick your suspect, did you not?

18 (Pages 66 to 69)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

70

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) For instance, you would bring your suspects into the lineup room after all the fillers were in the room so that the eyewitness could see who the suspect was, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) You would make sure that the suspect was different than the fillers so that it was obvious to the person viewing the lineup which participant was your suspect, correct?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And sometimes you would make your suspect stand up twice during the procedure when everyone else stood up only once, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And sometimes you would tell the witnesses beforehand what order the fillers and

71

suspect would be standing in the lineup, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And if a witness in one of your lineups picked someone you didn't want them to, you definitely would not make a record of that identification procedure, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And sometimes you would just tell people to pick your suspect out of lineups, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) You would say "pick that guy" and then tell them exactly who to pick, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) These are the very techniques that you used in Demetrius Johnson's case, right?

MR. LEINENWEBER: Objection, form, foundation.

72

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Demetrius Johnson was arrested on July 22nd, 1991, right?

**A. Plead the Fifth.**

Q. And at that point there was no legitimate evidence against him, was there?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Because the only evidence against him at that point was Elba's identification from a photo array where you told her who to pick out of the suggestive array you showed her, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) You knew that there was no evidence against Demetrius Johnson at the time he was arrested. So you sought to manufacture an in-person identification, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Going to put up what we'll call Exhibit 3.

73

(Exhibit 3 referred to.)

MR. RAHE: While we're doing this, I just want to say that I still cannot hear Tom's objections. And I don't think it's you, Tom. I think it's a microphone issue.

MR. LEINENWEBER: Yeah, it's -- it's going through -- it's going through a phone line here. So I -- I've moved a little bit closer, and I'll try and be louder. But it's -- it's on the videotape in any event.

MS. BRADY: I'm not having a problem hearing him.

MR. RAHE: Oh, you're not?

MS. BRADY: I'm not.

MS. MCGRATH: I'm -- I'm also having a problem hearing, and I'm having like a delay on the witness as well.

MR. McGINNIS: Same for -- for me, both the witness and Tom. I get the very end of what they're saying, not the beginning.

MS. MCGRATH: Yeah.

MS. BRADY: Does anybody want to take some time and try to address this issue, or -- or can we carry on knowing that this is being video recorded and the court reporter is there in person?

19 (Pages 70 to 73)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

74

MR. LEINENWEBER: I'm fine continuing. I'll try and speak louder.
MS. BRADY: Okay. Any objection from the other defense counsel?
MR. RAHE: We'll just -- we'll just keep going. I'm not really sure what we could even do about it. But, you know, I just don't want to delete Tom for seven hours, you know. Let's -- let's keep going and maybe we can address it at the first break.
MR. LEINENWEBER: There we go. That should work.
MS. BRADY: All right. So I'm putting up what we'll call Exhibit 3. This is a three -- I'm sorry, five-page document beginning at RFC Johnson 76.
MR. LEINENWEBER: Can you see it?
THE WITNESS: Can --
MR. LEINENWEBER: Can you make it a little bit bigger, Rachel, please. Thank you.
MS. BRADY: Yes. And I'll just flip -- flip through the pages here real quick so you can see it.
Q. (BY MS. BRADY) All right. So turning back to this document, your report states that at 8:30 p.m. on July 22nd, 1991, you showed Elba Burgos a live lineup.

75

Do you see that?
**A. Plead the Fifth.**
Q. This was over a month after the shooting, right?
**A. Plead the Fifth.**
Q. This is the same day Demetrius Johnson was arrested, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Demetrius Johnson asked for a lawyer to be present at this lineup, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) But you did not allow him to have a lawyer present, did you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Demetrius was just 15 years old when you arrested him, right?
**A. Plead the Fifth.**
Q. And he requested that a parent be present, didn't he?

76

MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you didn't allow that either, did you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) I'm going to put up what we'll call Exhibit 4.
(Exhibit 4 referred to.)
Q. (BY MS. BRADY) This is a two-page document beginning at RFC Johnson 22.
I'll zoom in here for you, Tom.
MR. LEINENWEBER: Thank you.
Q. (BY MS. BRADY) So this is a lineup report that you and Halvorsen wrote and signed relating to that same lineup, right?
**A. Plead the Fifth.**
Q. And according to the report, Halvorsen was present for this lineup, wasn't he?
**A. Plead the Fifth.**
Q. And it says that Elba Burgos selected Demetrius Johnson, right?
**A. Plead the Fifth.**

77

Q. Demetrius Johnson was the shortest and the youngest looking person in the lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Demetrius Johnson was the only person in the lineup whose photo Elba Burgos had already seen, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And Halverson was present at this lineup, wasn't he?
**A. I plead the Fifth.**
Q. And the only reason Elba Burgos picked Demetrius Johnson out of the lineup was because you told her to, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew her identification was unreliable because she had not seen the shooter, right?
MR. LEINENWEBER: Objection, form and foundation.

20 (Pages 74 to 77)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew that this identification was false, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you sought to manufacture even more evidence against Demetrius Johnson, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you wanted to cover all your bases with other witnesses, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you got Ricardo Burgos and Rosa Burgos to view a lineup, too, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So continuing to look at this Exhibit 4, which is the lineup report that you and Halvorsen wrote and signed, it says that Ricardo Burgos selected Demetrius Johnson, doesn't it?

**A. Plead the Fifth.**
Q. But Burgos -- strike that. Halvorsen was present at this lineup, right?
**A. Plead the Fifth.**
Q. And Demetrius Johnson was the shortest and youngest looking person in the lineup, wasn't he?
MR. LEINENWEBER: Objection, asked and answered, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) The only reason Ricardo Burgos selected Demetrius Johnson out of the lineup was because you told him to, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) But Ricardo Burgos had never even seen a gun when he was driving by, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And because he barely saw anything during the shooting, he never gave a description, did he?
MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And he looked at a prior set of photos you showed him and did not identify anyone, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Yet when he viewed the live lineup you conducted, he was suddenly able to pick out your suspect, wasn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) But he couldn't possibly have picked out your suspect without your help, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And so you told him who to pick, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you already manipulated the lineup itself to steer him towards Demetrius

Johnson, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew his identification was unreliable because he had not seen the shooter, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew that this lineup identification was false, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And taking a look at this same exhibit, this lineup report, this lineup report says that Rosa Burgos also selected Demetrius Johnson out of the lineup, right?
MR. LEINENWEBER: Plead the Fifth.
Q. (BY MS. BRADY) And this was the same lineup that you had showed the previous two witnesses, right?
**A. Plead the Fifth.**
Q. And Halvorsen was still there, right?
**A. Plead the Fifth.**

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

82

Q. And Demetrius Johnson was still the shortest and youngest looking person in the lineup, right?
MR. LEINENWEBER: Objection, form, foundation, asked and answered.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And the only reason Rosa Burgos picked Demetrius Johnson out of the lineup was because you told her to, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew her identification was unreliable because she barely saw the shooter at all, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) I mean, you agree that her only chance to see the shooter was in the split second that he pointed his gun at her and she turned to run away, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Yet when Rosa viewed the live

83

lineup you conducted, she was suddenly able to pick out your suspect, wasn't she?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) But she could not have possibly picked out your suspect without your help, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you told her who to pick, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you'd already manipulated the lineup to steer her towards Demetrius, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew her identification was unreliable because she told you she couldn't make an identification, right?
MR. LEINENWEBER: Objection, form and

84

foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) And so you knew this lineup identification was false as well, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) You never had Aby Gonzalez come view a lineup with Demetrius Johnson in it, did you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) That's because you knew he had already identified Bryan Johns as the shooter, right?
MR. LEINENWEBER: Objection, form, foundation, assumes a fact not in evidence.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you knew that Aby Gonzalez was certain that Johns was the shooter, weren't you?
MR. LEINENWEBER: Objection, form, foundation, assumes a fact not in evidence.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And so you knew that Aby Gonzalez would not pick Demetrius Johnson out of the

85

lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you don't dispute that Aby Gonzalez got a good view of the shooter, do you?
**A. Plead the Fifth.**
Q. That out of anyone at the scene defendant -- I'm sorry. Strike that.
That out of anyone at the scene the detective spoke to, no one got a better view of the shooter than Gonzalez, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that's why he was one of the people that went in to do a lineup that first day, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: I plead the Fifth.
Q. (BY MS. BRADY) So what explanation do you have for why Aby Gonzalez did not view a lineup with Demetrius Johnson in it?
MR. LEINENWEBER: Objection, form and

22 (Pages 82 to 85)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

86

foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Okay. Going to put up what we'll call Exhibit 5.
(Exhibit 5 referred to.)
Q. (BY MS. BRADY) For the record, this is a two-page document beginning at Bates Johnson 643. Do you see this?
MR. LEINENWEBER: Could you make it a little bigger, please. Thank you.
Q. (BY MS. BRADY) I'll flip through. So this is a lineup report written and signed by Detective Erickson showing that Aby Gonzalez picked Johns out of the lineup the night of the shooting. Do you see that?
**A. Plead the Fifth.**
Q. And you buried this report, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You fabricated a different report of a lineup that same night, and that report was false, correct?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.

87

Q. (BY MS. BRADY) The lineup report you fabricated falsely stated that Aby Gonzalez had not picked out Johns from the lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) A lineup report you fabricated falsely stated that no one picked out Johns in the lineup that occurred on the night of the shooting, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You intentionally fabricated that false lineup report, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you intentionally buried the real report, Exhibit 5, where the real perpetrator was identified, correct?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Do you have any explanation

88

for why Detective Erickson wrote a report stating that Gonzalez identified Johns but you wrote a report claiming the opposite?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You agree that Erickson conducted this lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you agree that Erickson is an honest cop, right?
**A. Plead the Fifth.**
Q. Do you believe that Erickson wrote a false report?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Which report is true: Yours or Erickson?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) In July of 1991 you spoke to

89

assistant states attorney Bob Buckley about charging Demetrius Johnson for the Fred murder, correct?
**A. Plead the Fifth.**
Q. And that was based on the photo array and lineup identification by Elba Burgos, Ricardo and Rosa, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it was based on your word about what had happened during those identifications, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) It was based on your word that those identifications were done by the book, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) In other words, you informed ASA Buckley that the identification procedures were all done properly, right?
MR. LEINENWEBER: Objection, form, foundation.

23 (Pages 86 to 89)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

90

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that you had not manipulated those procedures in any way, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) That was all a lie, wasn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And ASA Buckley's charging decision was also based on your representation that Bryan Johns had been cleared as a suspect after no one identified him, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And that was a lie also, wasn't it?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you lied to ASA Buckley because you wanted to get false murder charges approved against Demetrius Johnson, didn't you?

91

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) After you got the three false lineup identifications, you summed up your investigation in the closing report, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) I'm going to put up an exhibit. All right. This closing report, which is Exhibit 3 that we looked at before, this was the only report that you and Halvorsen did to summarize what you'd done during this investigation, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And this report is filled with false statements that you had fabricated, isn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) This report includes your false story about Elba Burgos positively identifying Demetrius Johnson out of a three-person photo, right?

92

MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it includes your false story about Elba Burgos identifying Demetrius Johnson out of a lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it includes your false story about Ricardo Burgos identifying Demetrius Johnson out of an in-person lineup, doesn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And it includes your false story about Rosa Burgos identifying Demetrius Johnson out of an in-person lineup, doesn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Sar --
THE REPORTER: I'm sorry. Rachel, can you start that question again.
Q. (BY MS. BRADY) Yes. Sergeant Healy signed

93

off on your and Halverson's closing report on July 24th, 1991, didn't he?
MR. LEINENWEBER: Plead the Fifth.
Q. (BY MS. BRADY) By that point Demetrius Johnson had already been charged, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You provided Healy all of the information about your investigation before he signed off on this report, didn't he?
**A. Plead the Fifth.**
Q. You let him know everything you had learned from every witness, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you provided him with all of the reports and notes from this case, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Did he ever follow up with any questions, or did he just sign the report?
**A. Plead the Fifth.**

24 (Pages 90 to 93)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

94

Q. So to be clear, you never wrote any report that included any of the information you learned during the investigation that showed Demetrius Johnson was not the perpetrator, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) There were reports showing that Demetrius Johnson was not the perpetrator, weren't there?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And one of the those reports was the Erickson report of the lineup the night of the shooting where Aby Gonzalez ID'd Johns, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you saw that report, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you hid that report,

95

didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) In fact, no report showing that Demetrius Johnson was innocent ever made it into the file, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And as the lead investor -- lead investigator in the case, you had control over the CPD's investigative file, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And none of the notes that were created during the investigation made it to the file either, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) The detectives took notes, didn't they?

MR. LEINENWEBER: Objection, form and

96

foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) You took notes, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) You agree with me that notes were key to being able to accurately document your investigation, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Because it's hard to keep track of what everyone says, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you were working on many other cases at the same time, too, right?

**A. Plead the Fifth.**

Q. You interviewed lots of people in this case, right?

**A. Plead the Fifth.**

Q. Do you claim to have a perfect memory?

MR. LEINENWEBER: Objection, form,

97

foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Do you claim that although other detectives needed to take notes to write accurate reports that you did not?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So in order to write a report accurately, of course you needed to take notes, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) There are not any notes in this file in this case, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Why not?

MR. LEINENWEBER: Objection, form.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) It's because you buried your notes, right?

MR. LEINENWEBER: Objection, form and foundation.

25 (Pages 94 to 97)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

98

THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) Your notes would have confirmed that the people you used to get the identifications -- Rosa, Elba and Ricardo -- could not make any identifications, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And so you destroyed those notes, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) All right. And without any of the documents showing that Demetrius Johnson was innocent, state prosecutors and Demetrius Johnson's criminal defense attorneys could not learn everything you knew about the investigation, could they?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You did not talk to prosecutors about the exculpatory evidence you were suppressing, did you?
MR. LEINENWEBER: Objection, form,

99

foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You didn't do that even when you received a subpoena for all your files, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you didn't tell the prosecutors that you had fabricated the identifications, did you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you withheld this information even though you were the chief witness for the prosecution, isn't that right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So based on the investigation you had done, Demetrius Johnson went on trial for the murder of Fred and the attempted murder of Ortiz, correct?
**A. Plead the Fifth.**
MR. LEINENWEBER: Objection, form,

100

foundation. Sorry.
Q. (BY MS. BRADY) And you're refusing to answer all the questions that I just asked you because you fear that truthful answers would subject you to criminal prosecution, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So this is the last subject about this case. Let's turn to Demetrius Johnson's criminal proceeding. The first step -- step in the process, after prosecutors approved charges, was that Demetrius Johnson was indicted by a Grand Jury, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you testified at Demetrius Johnson's Grand Jury proceeding, didn't you?
**A. Plead the Fifth.**
Q. You were the main witness at the Grand Jury that indicted Demetrius Johnson, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And you provided the same

101

false story to the Grand Jury that you had included in your own closing report, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And Demetrius Johnson went to trial about a year and a half after your investigation, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) And after all that time, you needed to remind the witnesses what their stories should be, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) So you helped prepare the witnesses for trial, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Plead the Fifth.
Q. (BY MS. BRADY) You wanted to make sure those witnesses told the story you wanted them to tell, didn't you?

26 (Pages 98 to 101)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

102

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) One of those witnesses was Elba Burgos, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) She told you she did not want to testify, didn't she?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) In fact, Elba was in Puerto Rico and had to be brought back to the United States to testify, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And another witness who didn't want to testify was Ricardo Burgos, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And that's because he was not

103

sure about his identification anymore, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you forced him to testify at Demetrius Johnson's trial, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) Then you did the same thing with Rosa Burgos, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) She told you she did not want to testify at Demetrius Johnson's trial, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And that's because she wasn't sure about her identification, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you forced her as well to

104

testify at Demetrius Johnson's trial, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And you yourself testified to help put Demetrius Johnson away, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So then Ricardo Burgos took the stand and told a false story about his identification, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And Rosa Burgos took the stand and told a false story about her identification, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And Elba Burgos testified at trial and told a false story about her identification too, right?

MR. LEINENWEBER: Objection, form, foundation.

105

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) She says she picked Demetrius Johnson out of a three-person photo, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And she said she picked Demetrius Johnson out of the lineup, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And the only reason she made those identifications was because you told her to, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) And when you took the stand as a witness against Demetrius Johnson, you lied throughout your testimony, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So let's talk about some of the lies that you told at Demetrius Johnson's criminal

27 (Pages 102 to 105)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

106

trial. First of all, you falsely testified that you did not interview Rosa Burgos on the night of the shooting, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) But you did interview Rosa Burgos, who was a witness to the shooting, and at the police station the night of the shooting, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you also falsely testified that Aby Gonzalez did not view a lineup on the night of the shooting, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you knew Aby had viewed a lineup and picked out Bryan Johns, didn't you?

MR. LEINENWEBER: Objection, form, foundation, assumes fact not in evidence.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you also falsely testified that you took a photo array to Elba Burgos's house and

107

she said a photo of Darrell Johnson looked like the shooter but the shooter was younger, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So she never said that, did she?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You also falsely testified that you went back to Elba's house with a three-person photo and she picked out Demetrius Johnson from the photo, correct?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But that didn't happen, did it?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you falsely testified that Elba Burgos, Ricardo Burgos and Rosa Burgos picked Demetrius Johnson out of a lineup without any influence

108

by you, didn't you?

MR. LEINENWEBER: Objection -- objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You got up on the stand and took an oath to tell the truth, didn't you?

**A. Take the Fifth.**

Q. And the judge believed what you were saying, didn't he?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you were lying the whole time, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So based on your testimony, Demetrius Johnson went to prison for decades for something he did not do, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you're refusing to answer all the questions I just asked you because you fear

109

that a truthful answer will subject you to criminal prosecution, right?

MR. LEINENWEBER: Objection, form and foundation, asked and answered.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Please tell me every step you took to investigate the shooting of Edwin Fred and Raul Ortiz.

**A. Take the Fifth.**

Q. You framed Mr. Johnson pursuant to an official policy or practice whereby the Chicago Police Department put dozens of innocent people in -- in prison for crimes they did not commit, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced eyewitnesses to falsely implicate innocent criminal suspects, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

MR. RAHE: Also -- also objection to

28 (Pages 106 to 109)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

110

speculation.
Q. (BY MS. BRADY) Was there an answer?
**A. Take the Fifth.**
Q. You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced eyewitnesses to provide false identifications, didn't you?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago -- Chicago Police Department manipulated and coerced witness testimony, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department fabricated false evidence including false police reports, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.

111

Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department fabricated false evidence by purposefully feeding information to witnesses, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department kept secret files that contained exculpatory evidence that would never be shared with criminal defendants or state prosecutors, didn't you?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department kept street files that contained exculpatory evidence that would never be shared with criminal defendants or state prosecutors, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

112

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You maintained a street file for the Fred homicide that contained exculpatory evidence that was never shared with Mr. Johnson --
MR. LEINENWEBER: Objection --
Q. (BY MS. BRADY) -- defense or the prosecution, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department destroyed evidence suggesting that criminal suspects in defense cases were, in fact, not guilty, correct?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department concealed material exculpatory evidence from suspects, criminal defendants, their lawyers and state prosecutors including materials that could be used to impeach state witnesses, right?

113

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department lied in criminal trials about investigations they had been involved in, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department lied, covered up misconduct committed by their colleagues pursuant to a code of silence, correct?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy or practice whereby members of the Chicago Police Department were never disciplined for misconduct which created an environment of lawlessness, correct?
MR. LEINENWEBER: Objection, form,

29 (Pages 110 to 113)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

114

foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Johnson pursuant to an official policy and practice whereby the lack of discipline imposed by the department encouraged detectives like yourself to violate suspects' constitutional rights with impunity, right?
MR. LEINENWEBER: Objection, calls for speculation, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) More than three dozen times during the course of your employment with the Chicago Police Department you framed innocent people for crimes they did not commit, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You engaged in this misconduct repeatedly because you knew you would never be disciplined from anybody, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And the knowledge that you would not face any consequences for misconduct

115

motivated you to frame Mr. Johnson, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And, in fact, you were never disciplined for framing anybody for a crime during the course of your entire employment with the Chicago Police Department, isn't that right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) In fact, you received a merit promotion to detective, didn't you?
**A. Take the Fifth.**
Q. Your misconduct in the Fred and Ortiz shooting investigation violated Mr. Johnson's constitutional right to due process, right?
MR. LEINENWEBER: Objection, form, foundation, calls for legal conclusion.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You violated Mr. Johnson's constitutional right to due process as part of a conspiracy with Halvorsen, right?
MR. LEINENWEBER: Objection, form and foundation, calls for legal conclusion.

116

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You violated Mr. Johnson's constitutional right to due process as part of a conspiracy with Halvorsen and other Chicago Police Department officers, right?
MR. LEINENWEBER: Objection, calls for -- calls for legal conclusion, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Your conspiracy with Halvorsen to violate Mr. Johnson's constitutional rights also included defendant William -- defendant William Erickson, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And your conspiracy with Halvorsen to violate Mr. Con -- Johnson's constitutional rights also included defendant Sergeant John Healy, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And your conspiracy with Halvorsen to violate Mr. Johnson's constitutional rights also included defendant Officer Darryl Daley,

117

right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Your misconduct in the Fred and Ortiz shooting investigation violated Mr. Johnson's constitutional rights protected by the Fourth Amendment, right?
MR. LEINENWEBER: Objection, form, foundation, calls for legal conclusion.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you violated Mr. Johnson's constitutional right protected by the Fourth Amendment by causing him to be detained without probable cause, right?
MR. LEINENWEBER: Objection, form, foundation, calls for legal conclusion.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You violated Mr. Johnson's constitutional rights protected by the Fourth Amendment by causing him to be detained without probable cause in conspiracy with other defendants, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.

30 (Pages 114 to 117)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

118

Q. (BY MS. BRADY) You conspired with Halvorsen and other defendants to reach an agreement to frame Mr. Johnson before there was probable cause to believe that he had had anything to do with the Fred murder, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You caused Mr. Johnson to be prosecuted for murder and made sure that the prosecution would see it through to his wrongful conviction despite knowing that there was no probable cause to suspect Mr. Johnson had been involved in the Fred and Ortiz shootings, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You knew your fellow officers were committing acts of misconduct and violating Mr. Johnson's constitutional rights during the Fred and Ortiz investigations, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Despite knowing that your

119

fellow officers were violating Mr. Johnson's constitutional rights during the Fred and Ortiz shooting investigation, you did nothing to stop the misconduct, did you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you're refusing to answer all of those questions that I just asked because you fear that truthful answers would subject you to criminal prosecution, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you admit now that Mr. Johnson is innocent of the Fred murder and the Ortiz attempted murder?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you have any basis whatsoever to believe that Mr. Johnson had anything to do with the Fred murder or Ortiz attempted murder?
MR. LEINENWEBER: Objection, form, foundation.

120

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) If you have any basis whatsoever to believe that Mr. Johnson had anything to do with the Fred or Ortiz shooting, please tell me now.
MR. LEINENWEBER: Objection, form.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You intentionally and knowingly framed Demetrius Johnson for murdering Edwin Fred and attempted to murder Raul Ortiz, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knowingly fabricated false evidence to cause Demetrius Johnson's prosecution and conviction, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you suppressed evidence that would have shown Demetrius Johnson was innocent, didn't you?
MR. LEINENWEBER: Objection form, foundation.
MR. LEINENWEBER: Take the Fifth.
Q. (BY MS. BRADY) Do you have any remorse at all

121

for your actions?
MR. LEINENWEBER: Objection, form.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) No matter what questions I ask you about the Fred and Ortiz shooting investigation, you are going to invoke your Fifth Amendment right to remain silent, right?
MR. LEINENWEBER: Objection, asked and answered.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you are going to assert your Fifth Amendment right to remain silent at trial, right?
**A. Take the Fifth.**
Q. I don't have any more questions about the Johnson case, but I do have some questions about a couple of other cases. Do people want to take a break now, or should we keep going?
MR. LEINENWEBER: Can we take like five minutes, Rachel.
MS. BRADY: That sounds good. Take five minutes.
THE VIDEOGRAPHER: Time off record is 11:33.
(Break taken.)

31 (Pages 118 to 121)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

122

THE VIDEOGRAPHER: We are now back on the record at 11:44.

Q. (BY MS. BRADY) Sir, do you know someone named Gamalier Rivera?

**A. Plead the Fifth.**

Q. You fabricated evidence to ensure that Gamalier Rivera was convicted of the shooting of Jesus Ramos on April 22, 1996, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You decided that you wanted to put the case on Gamalier Rivera, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And one of the ways you did this is by manipulating the identification of Richardini Lopez, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You showed a gang book to Richardini Lopez just days after the shooting that you knew included Rivera's photo, right?

123

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Lopez told you that he could not identify the shooter but picked out five or six photos that he told you looked like the shooter, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then you conducted a photo array and included a photo of Gamalier Rivera and steered Lopez towards Rivera's photo, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You told Richardini Lopez that you knew it was Rivera who had committed the crime, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you withheld all of these facts from prosecutors and defense attorneys including that Lopez was shown a gang book at all, didn't you?

MR. LEINENWEBER: Objection, form and

124

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you did not include any of this information in any of the police reports in this case, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: The Fifth.

Q. (BY MS. BRADY) Instead, all you documented was the June 10th, 1996 lineup with Mr. Lopez, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you fabricated those reports as well, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You also testified falsely at Rivera's trial when you spoke about the circumstances of the lineup procedures, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Specifically, you falsely

125

testified that none of the eyewitnesses in -- interacted during the course of the lineup procedures at the station on June 10th, 1996, correct?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But the truth is Richardini Lopez, Maria Diaz and Antonio Diaz were all in the same room prior to the lineup, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew that all of them said they did not know who had committed the shooting and could not make an accurate identification, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew that all of them were merely there to make an identification based on a photograph of Rivera that you had showed them and told them was the shooter, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

32 (Pages 122 to 125)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

126

Q. (BY MS. BRADY) You fabricated your clear -- close report in this investigation in another way as well, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Namely, you falsely documented in your report that when you spoke to Gamalier Rivera on June 17, 1996 he told you that he never left his house from January 10th through May of 1996, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And this was false as Gamalier Rivera never told you that, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Rather, Gamalier Rivera told you specifically that he was home on the evening of the shooting on April 22nd, 1996 with Elizabeth Bustos, Madelyn Bustos and Orlando Bustos, didn't he?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

127

Q. (BY MS. BRADY) And you knew that Elizabeth Bustos, Madelyn Bustos and Orlando Bustos corroborated Rivera's alibi, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You falsified your police report to say that Gamalier Rivera told you he never left his house for four months because you knew such a statement was outlandish, right?

MR. LEINENWEBER: Object -- objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And so by documenting this outlandish statement, you knew that when or if Gamalier Rivera tried to present his alibi in court you could impeach him with this claimed and fabricated outlandish statement, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew this would have the effect of not allowing Rivera to present an alibi at his trial at all, correct?

MR. LEINENWEBER: Objection, form and

128

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You fabricated the reports in these statements -- strike that.

You fabricated the reports of these statements so that you could ensure that Rivera was successfully framed and convicted, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You know the brothers Juan and Rosendo Hernandez?

**A. Take the Fifth.**

Q. You knew Juan Hernandez as Poochie?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You conspired with Joseph Miedzianowski to frame Juan and Rosendo Hernandez, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew that Joe Miedzianowski wanted to frame Juan Hernandez for

129

murder, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew that because Miedzianowski told you that he believed Juan Hernandez stole drugs from an individual named Francisco Figueroa and Juan Mercier (phonetic) who supplied Miedzianowski with drugs, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You were present when Miedzianowski told Fred Rock that, quote, we are going to get Poochie, quote, shortly before Juan Hernandez's false arrest for the murder of Jorge Gonzalez, weren't you?

MR. LEINENWEBER: For -- excuse me. Sorry. Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew when Miedzianowski said that to Fred Rock that this meant you were going to participate with Miedzianowski to frame Juan Hernandez for a murder he did not commit, right?

MR. LEINENWEBER: Objection, form.

33 (Pages 126 to 129)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

130

Sorry. I'm sorry, Rachel. Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you were present for other conversations between Miedzianowski and Fred Rock where Miedzianowski said he was going to, quote, frame "Poochie," right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) You were present for other conversations between Miedzianowski and Fred Rock where Miedzianowski said, quote, I have to get this guy, quote, in reference to Juan Hernandez, weren't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you did, in fact, participate in framing Juan and his brother Rosendo Hernandez for the murder of Jorge Gonzalez, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) One of the ways you did that is by manipulating witness identifications, right?

131

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You manipulated the photo arrays and lineups of Daniel Violante, Juan Carlos Cruz Nancy Gonzalez, Jose Martin Gonzalez and Jesus Gonzalez to ensure that they identify Rosendo and Juan Hernandez, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Another way you framed the Hernandez brothers is by fabricating police reports regarding the statements that each man supposedly said in custody, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Upon his arrest, Rosendo Hernandez told you that he was at the Kraft bowling alley at the time of the June 27, 1997 murder which occurred at 11:00 p.m., right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

132

Q. (BY MS. BRADY) Rosendo told you that he was with Luis Torres, Carlos Moises Lopez and Jennifer Kingston, among others at the bowling alley that day, didn't he?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew that each of these witnesses and others could corroborate Rosendo's alibi, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Rosendo told you that he specifically remembered that night because it was the night before the infamous Mike Tyson, Evander Holyfield heavyweight fight where Tyson bit Holyfield's ear and Rosendo was making wagers with his friends that night about the boxing match the following night, didn't he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Rosendo also told you specifically that he stayed until the bowling alley kicked out minors, which was 11:30 p.m., right?

133

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) However, in your police report you purposefully falsely documented that Rosendo Hernandez told you that he left the bowling alley prior to 11:00 p.m. that night, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you did that because you knew the crime occurred at 11:00 p.m. So you wanted to show that Rosendo had no alibi for the murder, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew this was false and you fabricated the police report in an effort to frame Rosendo Hernandez, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You did something similar to Juan Hernandez as well, right?

MR. LEINENWEBER: Objection, form and

34 (Pages 130 to 133)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

134

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Juan Hernandez told you on the night of the murder he was hanging out at a pizza restaurant owned by Rosa Solis and her daughter Sofia at 3268 West Origin Avenue, which was 4.5 miles from the crime scene, didn't he?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Juan Hernandez told you he was there from 10:30 p.m. until 1:00 a.m. the next morning, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Juan Hernandez told you that he remembered it clearly because he was preparing decorations for the cotillion the following night, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew that both Rosa and Sofia Solis corroborated Juan's alibi, didn't you?

135

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you fabricated a police report and committed perjury at Juan's trial to contradict Juan's alibi, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You lied and said that Juan told you he never left his house on the night of the shooting, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You then went further and claimed that you spoke to Juan's parents who undermined Juan's claim that he never left the house that night, didn't you?

MR. LEINENWEBER: Objection, form -- I'm sorry. I'm sorry. Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But all of that was a lie. Juan never told you he never left the house on the night of the murder and you never spoke to Juan's

136

parents, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You fabricated the police report and committed perjury at Juan's trial in an attempt to undermine his alibi and ensure Juan was wrongfully convicted, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) The Gamalier Rivera case and the Hernandez brothers case is not the only time you've ever fabricated police reports and committed perjury in an attempt to manipulate and undermine an individual's truthful alibi, correct?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Fabricating false statements for arrestees and their alibi witnesses is part of your pattern of ensuring you successfully frame the individuals you choose to arrest, isn't it?

MR. LEINENWEBER: Objection, form and foundation.

137

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) In 1995 you did the same thing to Thomas Sierra and his alibi witness Luz Montalvo, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You falsely documented their statements, too, at the police station in an attempt to ensure they could not present a truthful alibi at trial, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) In 1991 you did the same thing to Demetrius Johnson, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You falsely documented Johnson's statements, too, at the police station in an attempt to ensure he could not present a truthful alibi at trial, right?

MR. LEINENWEBER: Objection, form and foundation.

35 (Pages 134 to 137)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

138

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) In 1993 you did the same thing to Robert Buoto, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You falsely documented the statement of Buoto to you at the police station in an attempt to ensure he could not present his truthful alibi that he was with witnesses Tania Astefan and Helen Kandah at the time of the murder at the shoot, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You conspired with Ernest Halvorsen to frame Marilyn Mulero for a double murder of Jimmy Cruz and Hector Reyes, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You conspired with Ernest Halvorsen to fabricate evidence that Mulero shot Jimmy Cruz even though you new Jacqueline Montanez killed both Cruz and Reyes --

139

MR. LEINENWEBER: Objection -- I'm sorry. Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You coerced Ivette Rodriguez to falsely claim that Marilyn Mulero knowingly participated in the murders, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You coerced Rodriguez to falsely claim that Mulero told her prior to the shooting that they planned to kill rival (indiscernible) members, didn't you?

MR. LEINENWEBER: Objection, form and --

THE REPORTER: That they planned to kill who?

MS. BRADY: Rival gang members.

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And in exchange for Rodriguez's false testimony against Mulero, you ensured she received favorable treatment in her own case, correct?

140

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Prior to Mulero's interrogation, you took her and Montanez to Latin King gang members to tell them that they were responsible for the murders of their friend, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You did that to put fear into Mulero and Montanez so that they would confess to the murders knowing that if they were released they could be killed, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You then used threats to get Mulero to falsely confess to a plan of committing the double murder, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you used threats to get Mulero to falsely confess to actually shooting Cruz,

141

didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Mulero that she would get the death penalty and never see her kids again unless she admitted to shooting Cruz, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Later you conspired with Halvorsen to get Joan Roberts, also known as JoAnn Santiago to falsely claim that Mulero solicited Roberts to kill Montanez while they were at Cook County jail, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And in exchange for Roberts's false statement, you ensured that she received favorable treatment on her own charges, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

36 (Pages 138 to 141)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

142

Q. (BY MS. BRADY) Did you frame Jayson Aguiar for the July 29th, 1990 shooting murder of Rosalio Franco?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you conspire with Ernest Halvorsen and Steve Gawrys to frame Jayson Aguiar?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You knew that Jayson Aguiar did not shoot Rosalio Franco, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You fabricated evidence, including falsifying police reports, as part of the Franco homicide investigation, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) During the Hernandez homicide investigation, you withheld exculpatory evidence from prosecutors as well as the criminal defendants and

143

their attorneys, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) During the Franco homicide investigation, you attempted to manipulate and coerce witnesses, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You claimed to have interviewed an informant on August 20th, 1990 who tipped you off that Jayson Aguiar had committed the crime, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But that informant was made up, wasn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You never actually spoke to an informant who pointed the finger at Jayson Aguiar, did you?

144

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) As part of the Hernandez homicide investigation, you and Halvorsen got Aguiar to sign a false statement implicating himself in the crime, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You were able to get Aguiar to sign a false statement implicating himself in the crime through the use of physical abuse, threats and promises, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you and Halvorsen physically abuse Jayson Aguiar?
MR. LEINENWEBER: Can we -- can we stop --
THE WITNESS: Take the Fifth.
MR. LEINENWEBER: -- for one second, Rachel. The battery is running low on this computer -- on the computer that --

145

MS. BRADY: Yeah. Sure. Let's -- let's take a couple minutes.
THE VIDEOGRAPHER: Time off record is 12:02.
(Break taken.)
THE VIDEOGRAPHER: We are now back on the record at 12:03.
Q. (BY MS. BRADY) Did you and Halvorsen physically abuse Jayson Aguiar?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) As part of the Hernandez homicide investigation, you and Halvorsen coerced other witnesses into giving false statements implicating Aguiar in the crime, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) For example, you and Halvorsen coerced a witness named Ernie into giving false statements implicating Aguiar in the crime, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.

37 (Pages 142 to 145)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

146

Q. (BY MS. BRADY) You coerced Ernie into falsely implicating Aguiar through the use of physical abuse, threats and promises, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And is it true that you and Halvorsen caused Jayson Aguiar, a man you knew was innocent, to be charged and convicted of a crime that he did not commit?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you frame Louis Robinson for the shooting of Kelly Velez that occurred in June 1996?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Is it true that you conspired with Ernest Halvorsen to frame Louis Robinson?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You knew that Louis Robinson

147

did not shoot Velez, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Is it true that you fabricated evidence including falsifying police reports as part of the Velez homicide investigation?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Is it true that during the Velez homicide investigation you withheld exculpatory evidence from prosecutors as well as the criminal defendants and their attorneys?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Right after the shooting, the only description the witness could provide of the shooter was that he was a male and Hispanic, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And when detectives initially interviewed Oscar Betancourt, the only description he

148

could provide of the shooter was that he was a dark complected Hispanic in his early 20s, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So in the case with no meaningful leads, you decided to frame Louis Robinson, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Louis Robinson did not match the limited description provided by eyewitnesses, did he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knew that Oscar Betancourt did not get a good enough view of the shooter to be able to make an identification, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so you manipulated and coerced Oscar Betancourt to falsely identify Louis

149

Robinson, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you and Detective Ernest Halvorsen coerce Oscar Betancourt into falsely identifying Louis Robinson from a photo array?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Oscar Betancourt could not identify anyone from the photo array you showed him, could he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you told him to pick the photo of Louis Robinson, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you and Detective Halvorsen coerce Oscar Betancourt into falsely identifying Louis Robinson from a live lineup?
MR. LEINENWEBER: Objection, form and

38 (Pages 146 to 149)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

150

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Oscar Betancourt could not identify anyone in the live lineup you showed him as being the shooter, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you told him to pick Louis Robinson, the same person you told him to pick from the photo array, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You got Betancourt to agree to make the false identification you wanted through the use of threats and promises, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You and Halvorsen falsely documented what Louis Robinson told you about his whereabouts -- whereabouts on the night of the shooting in order to destroy his alibi, right?
MR. LEINENWEBER: Objection, form and

151

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And by falsely documenting what Robinson told you, you undermined Robinson's credibility and further implicated him in a crime you knew he did not commit, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You and Halvorsen also falsified a statement from Lloyd Barnes in order to undermine Robinson's alibi, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You and Halvorsen also falsified a statement from Linda Moran in order to undermine Robinson's alibi, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you and Halvorsen cause Louis Robinson, a man you knew was innocent, to be charged and convicted of a crime that he did not commit?

152

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Okay. That was all the questions on other cases I have. So now I'm going to turn to the Iglesias case.
THE REPORTER: Turn to the what case?
MS. BRADY: Do you folks want to take another break, or should we just dive right in?
MR. LEINENWEBER: I think we can go right in. Iglesias.
MS. BRADY: All right. So I'm basically starting over as though this were a new deposition. So I'm going to start from the beginning.
MR. LEINENWEBER: Okay.
Q. (BY MS. BRADY) Mr. Guevara, could you please state your name for the record.
**A. Reynaldo Guevara.**
Q. How old are you today?
**A. 78 years old.**
Q. Were you working as a Chicago police officer in 1993?
**A. Take the Fifth.**
Q. And did you investigate the shooting of Monica Roman in June 1993?

153

**A. Take the Fifth.**
Q. Did you intentionally and knowingly frame Geraldo Iglesias for the murder of Monica Roman?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you fabricate evidence in order to frame Geraldo Iglesias for that crime?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you suppress evidence of Mr. Iglesias's innocence in order to frame him for that crime?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And did you work hand in hand with your partner, Ernest Halvorsen, to frame Mr. Iglesias for Ms. Roman's death?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you framed Geraldo Iglesias for the crime even though there was not a

39 (Pages 150 to 153)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

154

shred of evidence pointing to him, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) There was no physical evidence that ever connected Geraldo Iglesias to the Roman shooting, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And no weapon was ever recovered or traced to Geraldo Iglesias in any way, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) There were no fingerprints or DNA or any other forensic evidence of any kind connecting Geraldo Iglesias to the crime, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you framed him anyway, right?

MR. LEINENWEBER: Objection, form,

155

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you're refusing to answer all the questions that I just asked because you fear that a truthful answer will subject you to criminal prosecution, isn't that right?

**A. Take the Fifth.**

MS. BRADY: And as we did in the previous case, can we stipulate with counsel that when the witness says "take the Fifth," that he's asserting his Fifth Amendment right against self-incrimination?

MR. LEINENWEBER: Yes. Thank you, Rachel.

Q. (BY MS. BRADY) All right. So let's talk about the Monica Roman murder and your investigation in more detail. Do you remember Monica Roman being shot in the Humboldt Park neighborhood in June of 1993?

**A. Take the Fifth.**

Q. The crime occurred on June 7, 1993 at approximately 3:56 p.m., right?

**A. Take the Fifth.**

Q. Ms. Roman was in the front passenger seat of a car that was traveling northbound on Sawyer, right?

**A. Take the Fifth.**

Q. And she was shot from behind by someone

156

standing on the street, right?

**A. Take the Fifth.**

Q. Ms. Roman had no gang affiliation, did she?

**A. Take the Fifth.**

Q. And Ms. Roman was killed, right?

**A. Take the Fifth.**

Q. And there were four other people in the same car as Ms. Roman, right?

**A. Take the Fifth.**

Q. And you knew none of them got a good look at the shooter, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And that's because they were driving away north away from the shooter who was to the south of the car, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And the shooter ran south after the shooting with his back to the car that was traveling north, right?

MR. LEINENWEBER: Objection, form and foundation.

157

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And so you knew that when each of those witnesses were initially interviewed by police they could not provide a description of the shooter, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew there were not any other witnesses at the scene who got a good view of the shooter that would allow them to make an identification, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So in order to close the case, you had to manufacture evidence, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: The take the Fifth.

Q. (BY MS. BRADY) And so you manipulated two witnesses, one named Hugo Rodriguez and the other named Rosendo Ochoa, correct?

MR. LEINENWEBER: Objection, form and foundation.

40 (Pages 154 to 157)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

158

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you manipulated Rodriguez and Ochoa into falsely identifying Geraldo Iglesias in photo lineups and live lineups, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) The problem was that Rodriguez and Ochoa did not get a good look at the person who committed the shooting, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) In fact, from where they were, it would have been almost impossible for them to identify the shooter, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you still managed to get them to identify your chosen suspect, Geraldo Iglesias, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.

159

Q. (BY MS. BRADY) And you did that by telling Hugo Rodriguez and Rosendo Ochoa who to pick, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you did that by showing them photos designed to steer them to pick your suspect, Geraldo Iglesias, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) In fact, that was your tried and true method of getting witnesses to identify the person you had decided was the suspect, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) In fact, this was not the only time you manipulated a witness to get them to pick the person you wanted from a photo array or lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You manipulated eyewitness ident -- identification procedures in dozens of other

160

cases too, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) As an example, that's what you did in Ricardo Rodriguez's case in 1995 where you used suggestive identification practices by showing witnesses a single photo and telling witnesses that the perpetrator's photo was in the array in order to get eyewitnesses Oralia Martinez and Rodolfo Zaragoza to falsely identify Ricardo Rodriguez, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) The car that Monica Roman was in was traveling north away from the shooter, who was to the south, when the shooter started firing, right?
**A. Take the Fifth.**
Q. And when the shooting occurred, the car was nearly at the stop sign at Sawyer and Palmer, right?
**A. Take the Fifth.**
Q. And the shooter was farther south behind the vehicle, right?
**A. Take the Fifth.**
Q. And after firing five shots, the shooter

161

immediately turned around and ran south during -- down Sawyer and then west into the alley, right?
**A. Take the Fifth.**
Q. So, in other words, the shooter ran away to the south while the car continued north, right?
**A. Take the Fifth.**
Q. Meaning that once the shots were fired, the shooter had his back to the people in the car, right?
**A. Take the Fifth.**
Q. And, in addition to that, the shooter was wearing a black hoodie, right?
**A. Take the Fifth.**
Q. And the hood was up during the shooting and when he ran away, which obscured his face, right?
**A. Take the Fifth.**
Q. So with that backup, let's talk about the witnesses. Hugo Rodriguez was sitting in the rear middle seat of the car with Ms. Roman, right?
**A. Take the Fifth.**
Q. Hugo Rodriguez never actually saw the shooter shoot at the car, did he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) When the shooting started,

41 (Pages 158 to 161)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

162

Hugo Rodriguez ducks down in the well between the rear seat of the car and the front seats, right?
**A. Take the Fifth.**
Q. He was trying to avoid getting shot, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And when the shots were fired, the driver of Ms. Roman's car sped up to get away, right?
**A. Take the Fifth.**
Q. And so the first time Hugo Rodriguez would have had any opportunity to see the shooter was when he poked his head up after the shooting had stopped and looked behind him, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But at that point he was looking back from a car that was speeding away from the shooter, wasn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And by then the shooter was

163

running away in the opposite direction and so the shooter had his back to Hugo Rodriguez, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And the rear window Rodriguez had to look back through had horizontal blinds in it which further obstructed his view of the shooter, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And, in fact, when Rodriguez was first interviewed by police, that's exactly what he told them, that all he could say was that after the shooting he saw an offender in all black run into the alley, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) In other words, he saw the shooter's back running away from him, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.

164

Q. (BY MS. BRADY) And all he could say he saw was the shooter wearing all black, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So put some way, Rodriguez could not possibly have seen the shooter's face in order to make an identification, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But you, nevertheless, fabricated an identification for Rodriguez in order to frame Geraldo Iglesias, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Okay. So now, let's talk about Rosendo Ochoa. Ochoa was looking out the second story window at 2135 North -- North Sawyer when he saw the shooting, right?
**A. Take the Fifth.**
Q. And the shooter was to the north across the street and across an alley, right?
MR. LEINENWEBER: Objection, form,

165

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) That means Ochoa was 120 to 160 feet away from the shooter, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And the shooter was standing next to a tree that further obstructed Ochoa's view, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And when Ochoa spoke to police right after the shooting, he told them the shooter was wearing a hood, didn't he?
**A. Take the Fifth.**
Q. So when he spoke to police after the shooting, Ochoa described the shooter as 17 to 19 years old, 5 foot 5 inches, 135 to 140 pounds and clean shaven, isn't that right?
**A. Take the Fifth.**
Q. And according to Ochoa, the shooter had a light complexion, didn't he?
**A. Take the Fifth.**

42 (Pages 162 to 165)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

166

Q. Ochoa thought the shooter was basically white, didn't he?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew that none of that matched up with Geraldo Iglesias's description, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Iglesias was around 5-10 or 5-11, medium to dark complected with facial hair, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you, nevertheless, used Ochoa to pin the case on Iglesias, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And Ochoa had never seen the shooter before, had he?

MR. LEINENWEBER: Objection, form and foundation.

167

THE WITNESS: Plead the Fifth.

Q. (BY MS. BRADY) So you knew that Ochoa was looking at a stranger from 120 to 160 feet away with an obstructed view, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And so you knew that Ochoa would never be able to identify the shooter, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Because you agree that people who are 120 to 160 feet away cannot make out detailed facial features that would allow them to identify a stranger, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew that back in 1995, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you, nevertheless,

168

fabricated an identification from Ochoa in order to frame Geraldo Iglesias, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So all those factors meant that it was impossible for Rodriguez and Ochoa to make identifications of the shooter, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And they both told you that they could not identify the shooter, didn't they?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Ochoa told you that he could not identify the shooter, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And Rodriguez told you he could not identify the shooter, right?

MR. LEINENWEBER: Objection, form and foundation.

169

THE WITNESS: Take The Fifth.

Q. (BY MS. BRADY) So how do you explain getting identifications from two men who have such obstructed and impossible views of the shooter?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) The answer is that you manipulated them into identifying your suspect, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you're refusing to answer the questions I just asked on that topic because you fear that a truthful answer will subject you to criminal prosecution, right?

MR. LEINENWEBER: Objection -- objection, form.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You understand that you're permitted to assert the Fifth Amendment only if the truthful answer will implicate you in a crime, right?

MR. LEINENWEBER: Objection.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you have a reasonable

43 (Pages 166 to 169)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

170

fear, do you not, that if you answer my questions about the Roman murder and the Geraldo Iglesias's case that you could be prosecuted for a crime?

**A. Take the Fifth.**

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And that, in fact -- and that, in fact, you would be prosecuted for a crime, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you intend to answer all my questions by asserting your Fifth amendment right?

MR. LEINENWEBER: Take the Fifth.

Q. (BY MS. BRADY) What crime do you fear that you will be prosecuted for in connection with your testimony here today?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution by state authorities or federal authorities?

MR. LEINENWEBER: Objection, form, foundation.

171

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for perjury for lies that you told in the past under oath?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Or do you fear prosecution for perjury for lies that you would tell in this case under oath during this deposition?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for obstruction of justice?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for RICO violations?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for bribery?

MR. LEINENWEBER: Objection, form,

172

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for fraud?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for assault?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take The Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for battery?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you fear prosecution for violation of federal civil rights criminal laws?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) All right. So I'm going to turn back now to the initial investigation to the Roman murder. You were not involved in investigating the

173

Roman shooting until June 21st, 1993, right, which was two weeks after the crime?

**A. Take the Fifth.**

Q. And you were not at the crime scene, right?

**A. Take the Fifth.**

Q. And that it was your partner, Halvorsen, right?

**A. Take the Fifth.**

Q. So when you first got involved in the investigation, you read all the police reports that had already been generated at that point in time, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you talked to all the other officers that had investigated already, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And when you reviewed the report and talked to the officers, you saw that there were other witnesses who were actually in much better positions to be able to identify the shooter, right?

MR. LEINENWEBER: Objection, form and foundation.

44 (Pages 170 to 173)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

174

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) For instance, Arnell Moore was on the sidewalk on the same side as the shooter, and the shooter ran right past Arnell Moore after the shooting, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And David Chmelieski saw the shooter run right past his window, didn't he?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And Efrian Torres knew who the shooter was, didn't he?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And none of them could identify the shooter, could they?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So how do you explain how eyewitnesses like Moore and Chmelieski, who were on the

175

street within yards of the shooter, were not able to get a good enough look to identify him but Rodriguez and Ochoa did from so far away?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And police showed photos to Arnell Moore and Chmelieski, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You showed them gang books full of photos, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And, in fact, you talked to Arnell Moore since he might have information about the shooter, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And he told you he didn't see the shooter's face, right?

MR. LEINENWEBER: Objection, form,

176

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you and Halvorsen took him to the station twice and showed him photo books, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And the first time you showed him a book of photos containing Geraldo Iglesias's picture, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you tried to get him to identify Geraldo Iglesias, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But he refused, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then the second time you took him to the station you showed him another book of

177

photos, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And that book also contained Geraldo Iglesias's photo, didn't it?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you tried to get Moore to pick Geraldo Iglesias's photo that time, too, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And he refused again, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You also talked to David Chmelieski, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You went to his house late at

45 (Pages 174 to 177)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

178

night and picked him up and took him to Area 5, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) He told you he hadn't seen the shooter's face, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But you showed him a photo album containing Geraldo Iglesias's photo anyway, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you tried to pressure him to pick Geraldo Iglesias's picture, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) He wouldn't do it, would he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) He told you he had not seen

179

the shooter's face, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You talked to Efrian Torres several times as well, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you were aware that he knew who the shooter was, weren't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you showed him books containing Geraldo Iglesias's picture, and he did not select Geraldo Iglesias as the shooter, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And then he looked at Geraldo Iglesias in a live lineup and he did not identify him there as the shooter either, right?
MR. LEINENWEBER: Objection, form, foundation.

180

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you ultimately could not manipulate any of those three witnesses into helping you frame Geraldo Iglesias, could you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But you were able to get Ochoa and Rodriguez to go along. Why is that?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So they had just seen a friend of theirs killed. So they were emotionally vulnerable, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But Ochoa and Rodriguez were both members of the Latin Kings and the Imperial Gangsters were their rival. So they would not care if they helped out -- helped lock up someone from a rival gang, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

181

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And on top of that, Rodriguez and Ochoa both had pending criminal issues, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you used that to pressure them, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you're refusing to all the questions -- to answer all the questions that I just asked you on that topic because you fear that a truthful answer will subject you to criminal prosecution, right?
MR. LEINENWEBER: Form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you showed gang books to multiple witnesses in this case, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You showed gang books to Hugo Rodriguez at least twice, didn't you?

46 (Pages 178 to 181)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

182

MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You showed gang books to Efrian Torres, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you showed gang books to Arnell Moore and David Chmelieski, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And the gang books that were shown to the witnesses were gang books containing photos of members of the Imperial Gangster street gang, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And that was because that Imperial Gangsters was the gang that controlled the territory where the shooting occurred, right?
MR. LEINENWEBER: Objection, form, foundation.

183

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And that was the gang that was suspected in the shooting, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And Geraldo Iglesias was affiliated with the Imperial Gangsters, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so his photo would have been in the gang books showed to Moore, Chmelieski, Torres and Rodriguez, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But neither Moore nor Chmelieski, who were just yards away from the shooter, identified Geraldo Iglesias out of the gang book, did they?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And they did not identify

184

anyone else either, did they?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And neither did Efrian Torres, right, and he knew the shooter, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And neither did Hugo Rodriguez, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And all those negative identifications weren't good for your case. So you concealed the fact that gang books had ever been shown to any of the witnesses, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You hid the fact that witnesses had seen photos, including photos of Geraldo Iglesias, but could not identify him, right?
MR. LEINENWEBER: Objection, form,

185

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You agree that if gang books are shown to eyewitnesses, that must be documented under Chicago Police Department policy and training, right?
**A. Take the Fifth.**
Q. And you deliberately did not do that in this case, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Because if you did, it would have undermined your efforts to frame Geraldo Iglesias, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you review the handwritten notes and general progress reports generated during the initial investigation?
**A. Take the Fifth.**
Q. I'm going to put up what we'll call Exhibit 1 --
Actually, wait. This will be -- can

47 (Pages 182 to 185)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

186

we go off the record for a sec.
MR. LEINENWEBER: Sure.
THE VIDEOGRAPHER: Time off record is 12:34.
(Break taken.)
THE VIDEOGRAPHER: We are now back on the record at 1 -- 12:35 -- 35.
Q. (BY MS. BRADY) So let's take a look at what we're calling Exhibit Iglesias 1.
(Iglesias Exhibit 1 referred to.)
Q. (BY MS. BRADY) This is a 19-page document beginning at RFC Iglesias 59.
MR. LEINENWEBER: Could you make it a little bigger, please, Rachel.
See?
THE WITNESS: I can see it, but...
MR. LEINENWEBER: It's on a --
Q. (BY MS. BRADY) So this is a bundle on all of the handwritten notes and GPRs that we have in this case. And I want to direct your attention to the GPR that's on page RFC Iglesias 69. Take a look at the page. This handwritten report documents an interview with eyewitness Rosendo Ochoa, right?
**A. Take the Fifth.**
Q. And you looked at this report before you

187

began your investigation, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Do you see where it says that Ochoa said the vehicle dropped off Mercelles Cordero, stopped in the alley, then Mercelles picked up her niece and was going out to show people in the car the baby and that Rosendo was looking out the window?
**A. Take the Fifth.**
Q. And so you knew, based on this report, that Ochoa was looking at his friend and the baby out the window, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And then here on page RFC Iglesias 72 it describes the interview with Hugo Rodriguez, and it says Rodriguez was in the middle rear seat and after the shooting, he saw the offender in all black run into the alley. Do you see that?
**A. Take the Fifth.**
Q. That's all the information he provided, right?
MR. LEINENWEBER: Objection, form,

188

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So based on this report, you knew Rodriguez had not gotten any kind of look at the shooter's face, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And flipping up to page RFC 59, you can see that this documents an interview with Sarah Torres and it says her son came home from the boys club and knows the shooter. You see that?
**A. Take the Fifth.**
Q. And so if Sarah Torres's son knew the shooter, you'd want him to look at a lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And if he did not identify Geraldo Iglesias in a lineup, you agree that would be exculpatory, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But it's exculpatory only if

189

it was documented somewhere that her son knew who the shooter was, isn't that right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you had an obligation to ensure that all exculpatory material was turned over to prosecutor, didn't you?
**A. Take the Fifth.**
Q. And you made sure this report did not get turned over to the prosecution, isn't that right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And that's because Sarah Torres's son Efrian did view a lineup containing Iglesias and did not identify him, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) All right. So you picked up the existing police reports and started working on the case in June 21st, 1993, correct?
**A. Take the Fifth.**
Q. And the original investigators -- Santopadre,

48 (Pages 186 to 189)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

190

Shock and Bogati -- were experienced investigators at the time, weren't they?
**A. Take the Fifth.**
Q. There was no need for you and Halvorsen to get involved in the case, was there?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But you got yourself assigned to the case anyway, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And at that point there were no leads, were there?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Were there any suspects at all?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) None of the eyewitnesses have been able to identify anyone out of any of the photos

191

they were shown, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so you knew that unless there was some big break, the case was going to go unsolved, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You liked closing cases, didn't you?
**A. Take the Fifth.**
Q. You had a real knack for closing cases, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And when you made arrests and closed cases, you would then go to court, right?
**A. Take the Fifth.**
Q. And you were granted permission to work overtime on cases that you were going to close, right?
MR. LEINENWEBER: Objection, form, foundation.

192

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you even got overtime when you went to court to testify on a case you had solved, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you needed the money back then, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You were borrowing money from your sergeant, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so this opportunity fell into your lap, didn't it?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so, according to you, you happened to get a call from a confidential informant on June 21st, 1993 who told you that the person who

193

committed the crime was named Snake, right?
**A. Take the Fifth.**
Q. And then the next thing that happened is you got a photo of Iglesias and then within 72 hours you had closed the case, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) There was no confidential informant that implicated Geraldo Iglesias, was there?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And there is not one place where you ever wrote down who this supposed confidential informant was, is there?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) That supposed confidential informant never testified or signed a statement or anything else, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.

49 (Pages 190 to 193)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

194

Q. (BY MS. BRADY) And the reason there's no documentation anywhere about the confidential informant is because you made it up, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You made it up in order to frame Geraldo Iglesias for a crime you knew he did not commit, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) In fact, you wrote a report about this fake confidential informant, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Let's take a look at an exhibit we'll call Iglesias 2.

(Iglesias Exhibit 2 referred to.)

Q. (BY MS. BRADY) So for the record, this is a four-page document beginning at Bates RFC Iglesias 90. This is clear close report. I'll flip through the pages so you can take a look. So please take a look at this first paragraph here on the second page of this

195

document.

It says you and Halvorsen wrote that on 21 June '93 the reporting detectives were contacted by a confidential informant who was a member of the Imperial Gangsters street gang. This informant stated that many members of the gang were talking about, quote, Snake, quote, killing a girl in a car on Sawyer and Palmer. The informant cannot elaborate any further.

This was a lie, wasn't it?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You never got a call from a confidential informant saying that a member of the IG gang were talking about Snake killing a girl in a car at Sawyer and Palmer, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you successfully made up fake informant tips in other cases in order to make it look like you had a reason to pursue your chosen victim for crimes they didn't commit, right?

MR. LEINENWEBER: Objection, form,

196

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you knew this was a successful strategy, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you made up this fake tip about Snake as well, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You made up the tip about Snake so it would look like you had a reason to pursue Geraldo Iglesias, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You made up the tip about Snake so your investigation would seem legitimate, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Sir, why did you decide to

197

frame Geraldo Iglesias?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew that Geraldo Iglesias did not fit the profile of someone who would commit such a senseless crime, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And at the time of the crime, did you know that he was taking GED classes?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Did you know that he was living with his girlfriend and they were raising their baby son together?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Did you know that he was working in a gang intervention program at the YMCA to keep kids away from gangs?

MR. LEINENWEBER: Objection, form,

50 (Pages 194 to 197)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

198

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Did you know those things when you decided to pin this murder on Geraldo Iglesias?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You worked with Joseph Miedzianowski in gang crimes, correct?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You continued to work with him as a detective?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Miedzianowski was convicted of participating in a massive criminal enterprise of working with various gang leaders to buy and sell drugs, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You were part of

199

Miedzianowski's criminal enterprise, weren't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Is Fred Rock lying when he says you worked with Miedzianowski?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Is John Alencio lying when he says you worked with Miedzianowski?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so as part of this criminal enterprise, you would protect gang members that were working with you and Miedzianowski, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you and Miedzianowski would frame innocent people of murders in order to protect the gang members that were part of that enterprise, right?
MR. LEINENWEBER: Objection, form and

200

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Is that what happened in this case?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So in any event, once you decided you were going to frame Geraldo Iglesias, you created evidence to fit your theory, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So let's talk about who was in charge of the investigation. Once you joined the investigation into the Roman shooting, you were the lead detective on the case, weren't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And Halvorsen worked with you every step of the way to solve the crime, didn't he?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.

201

Q. (BY MS. BRADY) He was the one who typed up all the reports, right?
**A. Take the Fifth.**
Q. And you helped him write the reports, didn't you?
**A. Take the Fifth.**
Q. And Steve Gawrys and Anthony Riccio worked on the investigation as well, didn't they?
**A. Take the Fifth.**
Q. And you reported everything that was going on in the investigation to your superiors, correct?
**A. Take the Fifth.**
Q. Your superiors were required to approve all of your reports, weren't they?
**A. Take the Fifth.**
Q. And Robert Biebel was the superior who supervised you on this case, wasn't he?
**A. Take the Fifth.**
Q. So in addition to sharing information with Robert Biebel, you also shared all the information with the rest of the investigative team, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you ensured that the

51 (Pages 198 to 201)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

202

investigative team was sharing all the information they had gathered with you, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So turning back to the report that we labeled Exhibit Iglesias 2, it includes the false story about the confidential informant. And then your -- the second highlighted paragraph on page 2, it says that you and Halvorsen interviewed Rosendo Ochoa, and it says that he stated he got a good look at the shooter's face and would be able to identify him if he saw him, that he was shown a photo spread consisting of eight Polaroids and that he identified Geraldo Iglesias as the person who killed Monica Roman.

That's completely made up, isn't it?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew Ochoa had not gotten a good look at the shooter's face, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And he told you that, didn't he?

203

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Yet you and Halvorsen showed him a photo array anyway, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then you used all of the tried and true tricks in your bag to get him to pick your suspect Geraldo Iglesias, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) For instance, you and Halvorsen told him the perpetrator was in the set of photos, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you and Halvorsen had experience putting together lineup photos using photos that you knew would help steer witnesses to pick the person you wanted them to, right?

204

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you and Halvorsen put together the photo array in this case using photos that you knew would help steer witnesses to pick Geraldo Iglesias, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You had access to hundreds or thousands of photos that you could have used to create a fair photo array, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But instead, you created a photo array in which only Geraldo Iglesias matched the initial descriptions given by the witnesses, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And during the photo procedure you and Halvorsen suggested to Ochoa who he should pick out of the photo array, right?

205

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you and Halvorsen did not include any of the things that you did to get Ochoa to select Geraldo Iglesias's photo, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then based only on this fake manipulated photo array procedure, Geraldo Iglesias was arrested, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So at the time Geraldo Iglesias was arrested, there was no legitimate evidence implicating him in a crime, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) All right. So once Geraldo Iglesias was in custody, you had him stand in a lineup to be viewed by Rosendo Ochoa, right?

MR. LEINENWEBER: Objection, form and

52 (Pages 202 to 205)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

206

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you had just shown Ochoa a photo of Geraldo Iglesias, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you told Ochoa to pick out of the lineup the person whose photo he had just seen, isn't that right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But because he had just seen a photo of Geraldo, the lineup didn't meaning anything at all, did it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) By the time you had pointed out Geraldo Iglesias's photo to Ochoa, you knew he would identify Iglesias in a lineup, too, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.

207

Q. (BY MS. BRADY) That was the entire plan from the beginning, wasn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you're refusing to answer all the questions I just asked you about Ochoa because you fear that a truthful answer would subject you to criminal prosecution, right?
MR. LEINENWEBER: Objection, calls for legal conclusion.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So let's talk a little bit about how photo procedures are supposed to be performed. So do you agree with me that you're supposed to select fillers that look like the suspect?
**A. Take the Fifth.**
Q. And you agree with me that you're not supposed to suggest to eyewitnesses viewing photo or lineup procedures that your suspect is there, right?
**A. Take the Fifth.**
Q. And you're certainly not supposed to point out to a witness who they should select, right?
MR. LEINENWEBER: Take the Fifth.
Q. (BY MS. BRADY) Nor are you allowed to confirm

208

whether a witness has selected the correct person, right?
**A. Take the Fifth.**
Q. And when you're conducting an identification procedure, you're not supposed to do anything to suggest which of the people on display is the suspect, right?
**A. Take the Fifth.**
Q. And you knew that showing someone a photograph of your suspect, separate and apart from an identification procedure, was highly improper, right?
**A. Take the Fifth.**
Q. Even you show a photo to an eyewitness and then suggest to them that that's the person who you think committed the crime, that any identification procedure after that is completely worthless, right?
**A. Take the Fifth.**
Q. You were an experienced officer by June of 1993, right?
**A. Take the Fifth.**
Q. You've been a gang crimes officer for a long time before that, right?
**A. Take the Fifth.**
Q. And then you were a detective?
**A. Take the Fifth.**

209

Q. And you'd interviewed a lot of witnesses, right?
**A. Take the Fifth.**
Q. You investigated many homicides?
**A. Take the Fifth.**
Q. You had shown lots of photos and lineups to witnesses, right?
**A. Take the Fifth.**
Q. And you knew how to steer witnesses to pick your suspects, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You knew how to create lineups and photo arrays where your suspect was the only person who matched the description given by the eyewitnesses, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you also sometimes told witnesses that your suspect was in the identification photos or lineup, right?
MR. LEINENWEBER: Objection, form and foundation.

53 (Pages 206 to 209)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

210

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So after you performed the fake lineup with Ochoa, you and Halvorsen interviewed Geraldo Iglesias, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And Geraldo Iglesias repeatedly denied any involvement in the shooting, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And when you asked him if he had an alibi for where he had been two weeks earlier, he told you that he didn't remember exactly what he was doing at 3:56 on June 7, but he told you that he would typically be at -- having gone to GED classes in the morning and then working in gang intervention at the YMCA in the afternoon, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Taking a look again at Exhibit 2, you wrote: "He admitted that he hangs out

211

in the area of the boys club at the corner of Sawyer and Palmer. He stated that he gets home from school at 1400 hours. After he gets home, his daily activity consisted of hanging out on the street with his friends who are members of the Imperial Gangsters." But that wasn't true, was it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You and Halvorsen just made that up out of whole cloth, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Geraldo Iglesias never told you that his daily activity consisted of hanging out on the street with his Imperial Gangster friends, did he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And Geraldo Iglesias never told you that he hung out in the area of the boys club, did he?
MR. LEINENWEBER: Objection, form and foundation.

212

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So take a look at the next paragraph here where it says you and Halvorsen then contacted felony review and assistant states attorney Mike Latz came to Area 5?
MR. LEINENWEBER: Could you make it a little bigger, Rachel, please.
MS. BRADY: What's that?
MR. LEINENWEBER: I'm sorry. Could you make it a little bigger.
MS. BRADY: Yes.
MR. LEINENWEBER: Thank you.
Q. (BY MS. BRADY) So you told Assistant States Attorney Latz that Ochoa had identified Geraldo Iglesias out of a photo array and lineup, right?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You didn't tell States Attorney Latz that Ochoa told you he didn't get a good look at the shooter's face, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You didn't tell Mike Latz that

213

you told Ochoa who to pick out of the photo array in the lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You led Mike Latz to believe that Ochoa's identifications were legitimate, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But they were not legitimate identifications, were they?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) All right. So then at the bottom of this page your report also falsely states that Hugo Rodriguez stated he'd be able to identify the person who shot Monica Roman. You see that?
**A. Take the Fifth.**
Q. That's a lie, isn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.

54 (Pages 210 to 213)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

214

Q. (BY MS. BRADY) Because you and Halvorsen had shown Rodriguez photos of Mr. Iglesias several times and he had not selected Mr. Iglesias, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you never wrote that down, did you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you never told ASA Latz about it, did you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Yet, you translated this conversation with Rodriguez and then falsely reported that Rodriguez said he would be able to identify the shooter, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And then here at the top of page 4 your report also falsely says that you and Latz

215

showed Hugo Rodriguez the same photo array that you showed Ochoa. That's a lie, isn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Latz was not there for the photo array, was he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But you and Halvorsen did do the photo array procedure with Rodriguez, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Even though you had no reason to because he couldn't see the shooter's face, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you had no reason to because you had Geraldo Iglesias in custody already and you could have just done a live lineup, right?
MR. LEINENWEBER: Objection, form and foundation.

216

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Why didn't you just do a live lineup?
**A. Take the Fifth.**
Q. Is it because you wanted to be able to point out Geraldo Iglesias's photo to Rodriguez first?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so you showed Rodriguez photos because you wanted to make sure he would make your identification, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knew the state's attorney was in the building and you weren't sure if he was going to come to the lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And in case he did come to the lineup, you wanted to make sure Rodriguez knew who to pick, right?
MR. LEINENWEBER: Objection, form and

217

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you showed Rodriguez the photo right beforehand, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And then you took Rodriguez to do a live lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And then all Rodriguez had to do was pick the person that you had just shown him in a photo, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so when you reported that Rodriguez identified Geraldo Iglesias out of the lineup, that was a lie, wasn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you're refusing to answer

55 (Pages 214 to 217)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

218

all the questions I just asked about this closing report because your -- you feel that a truthful answer would subject you to criminal prosecution, right?

MR. LEINENWEBER: Objection, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you had Efrian Torres come view the lineup too, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take -- take the Fifth.

Q. (BY MS. BRADY) I'm going to show you what we'll call Exhibit Iglesias 3.

(Iglesias Exhibit 3 referred to.)

Q. (BY MS. BRADY) For the record, this is a three-page document beginning at Bates RFC Iglesias 19. I'll flip through the pages so you can take a look. So this lineup report shows that you, Halvorsen and Riccio showed Efrian Torres the lineup that Mr. Iglesias was standing in, right?

**A. Take the Fifth.**

Q. And you knew that Efrian Torres knew who the shooter was, right?

MR. LEINENWEBER: Objection, form and foundation.

219

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Yet Efrian Torres did not identify Iglesias out of the lineup, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Now, this was highly exculpatory, wasn't it?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But you hid the significance of Torres's non-ID by concealing the fact that Torres knew the shooter, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You never told Latz that Torres knew who the shooter was, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You just made it seem as though that Torres did not make an ID simply because he hadn't seen the shooter's -- shooter's face well enough

220

to make an ID, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then going back to your closing report, Biebel signed off on yours and Halvorsen's closing report on June 25th, 1993, right?

**A. Plead the Fifth.**

Q. And by that point charges had already been approved against Geraldo Iglesias, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you provided Biebel with all the information about your investigation before he signed the report, didn't you?

**A. Take the Fifth.**

Q. You let him know everything you learned from every witness, didn't you?

**A. Take the Fifth.**

Q. And you provided him with all the reports and notes from the case, didn't you?

**A. Take the Fifth.**

Q. And did he ever follow up with questions, or did he just sign the report?

221

**A. Take the Fifth.**

Q. So to be clear, you never wrote any report that included any of the information you learned during the investigation that showed Geraldo Iglesias was not the perpetrator, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You never wrote any report that identified the suggestive tactics you employed to get Ochoa and Rodriguez to identify Geraldo Iglesias, did you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But there were reports suggesting that Geraldo Iglesias was not the perpetrator, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you saw that report, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

56 (Pages 218 to 221)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

222

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knew the reports were exculpatory, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But none of those reports ever made it into the file, did they?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And as the lead investigator in the case, you had control over the Chicago Police Department's investigative file, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So without the exculpatory documents, the state prosecutor and Geraldo's criminal defense attorney -- attorneys could not learn what you knew about the investigation, could they?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You didn't talk to prosecutors

223

about the exculpatory evidence you were suppressing, did you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you didn't do that even when you received a subpoena for all your files, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You didn't tell the prosecutors that you had fabricated the eyewitness identifications, did you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And based on the information you provided to the prosecutors about what you say happened during the investigation, Geraldo Iglesias went on trial for murder, correct?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take -- take the Fifth.
Q. (BY MS. BRADY) But you wanted to generate a little bit of extra evidence against Geraldo Iglesias,

224

didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so you eventually learned that Geraldo Iglesias would be in lockup with Francisco Vicente on June 25th, 1993, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you used Vicente in other cases to falsely implicate people you wanted to frame for murder, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You successfully coerced Vicente into falsely implicating Robert Buoto, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you successfully coerced Vicente into falsely implicating Jose Montanez, Armando Serrano and Jorge Pacheco, right?
MR. LEINENWEBER: Objection, form and

225

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you Halvorsen had beaten him up in order to secure his false statements against other people, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And so you knew you could use Vicente to falsely implicate Geraldo Iglesias in the Roman murder as well, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you and your partner, Halvorsen, agreed to use Vicente to falsely implicate Geraldo Iglesias in the Roman murder, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you and Halvorsen agreed to use Vicente to falsely implicate Geraldo Iglesias either by incentivising him or coercing him to carry out your plan, right?
MR. LEINENWEBER: Objection, form and

57 (Pages 222 to 225)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

226

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you and Halvorsen met with Vicente and fed him details about the Roman murder, didn't you?
MR. LEINENWEBER: Objection, form, foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knew Vicente was afraid of you, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) He told you he remembered the threats you made against him in other cases, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knew he knew that you'd abused him in other instances, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You knew Vicente was susceptible to you and Halvorsen, didn't you?

227

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you told Vicente that you wanted him to claim that Geraldo Iglesias confessed that he had shot someone at Spaulding and Palmer, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you told Vicente that you wanted him to mistakenly say that the shooting involved a Latin Eagle instead of a Latin King, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You knew that there was no way -- would mistake a Latin King for a Latin Eagle, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you wanted him to make that mistake about Latin Kings for Latin Eagle so his false statement would seem more realistic, isn't that right?

228

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And at the time you told Vicente that you wanted him to claim that Geraldo Iglesias confessed to him, you knew that Geraldo Iglesias had had nothing to do with the Roman shooting, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And when you told Vicente that you wanted him to claim that Geraldo Iglesias confessed to him, you knew that Geraldo Iglesias had not, in fact, confessed to Vicente, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) In fact, Vicente told you and Halvorsen that he knew nothing about the murder of Monica Roman, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And Vicente told you and

229

Halvorsen that he knew nothing about Mr. Iglesias having anything to do with the murder of Monica Roman, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) But nevertheless, you and Halvorsen fed facts to Vicente about the Roman murder, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that Geraldo Iglesias hung out at the boys club on Palmer, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that he and Geraldo Iglesias hung out together outside the boys club, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you knew that Vicente and

58 (Pages 226 to 229)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

230

Geraldo Iglesias were in the bullpen together on June 25th, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you and Halvorsen told Vicente that the murder occurred on Spaulding and Palmer, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you told him to say Spaulding instead of Sawyer to make his story seem more believable, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You told him to say Spaulding instead of Sawyer to make it seem like he had heard the information from the neighborhood, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Or that he had heard the information from Geraldo Iglesias, right?

231

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that Geraldo Iglesias told him he was standing at the corner of Spaulding and Palmer when a car full of Latin Eagles pulled up by the corner of the alley, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that Snake told him that before the car pulled up to the alley Snake and his brothers were disrespecting the Latin King gang by showing gang signs, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you and Halvorsen told Vicente to say that Snake told him that a bitch jumped out of the car and ran into the alley -- I'm sorry, ran into the building by the alley, right?

MR. LEINENWEBER: Objection, form and foundation.

232

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that Snake told him that one of the Imperial Gangster brothers got a gap and gave it to Snake, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that Snake told him that the girl who jumped out of the car was back at the car talking to another girl, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you and Halvorsen told Vicente to say that Snake told him that he then started shooting at the car, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Vicente to say that Snake told him that he, quote, shot the bitch in the head, quote, and then ran, right?

MR. LEINENWEBER: Objection, form and

233

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen told Vicente not to tell anyone that you had threatened him into making a false statement, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) But that wasn't true, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You, in fact, had threatened Vicente to make that false statement, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen held these threats over Vicente's head until he testified at Geraldo Iglesias' criminal trial, isn't that right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So Geraldo Iglesias went to trial about a year and a half after your investigation,

59 (Pages 230 to 233)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.
Reynaldo Guevara April 20, 2022

234

didn't he?
A. **Take the Fifth.**
Q. And after all that time, you needed to remind witnesses what their stories should be, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) So you helped prepare the witnesses for trial, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You wanted to make sure those witnesses told the right story as you wanted it told, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And those witnesses included Vicente, Ochoa and Rodriguez, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And, of course, Hugo Rodriguez took the stand and told a false story about his

235

identifications, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) He testified that he picked Geraldo Iglesias out of a lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And he testified about those things because you met with him several times before trial to make sure that he would give that testimony, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you kept the pressure on him so he would give the testimony that you wanted him to give, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Even though you knew it wasn't true, right?
MR. LEINENWEBER: Objection, form and

236

foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And by the time Rodriguez testified at trial, you had sufficiently pressured him into agreeing to testify that he had identified Geraldo Iglesias, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And he didn't get a good look at the shooter. So he didn't even know that his gang book identification was wrong, did he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Rosendo Ochoa also testified at the trial and told a false story about the identification, too, didn't he?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) He said he picked Geraldo Iglesias out of a photo array, right?
A. **Take the Fifth.**
Q. And he said he picked Geraldo Iglesias out of

237

the live lineup, right?
A. **Take the Fifth.**
Q. But the only reason he made those identifications was because you made him, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Because he hadn't seen the shooter's face at all, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Ochoa's identification was impossible, wasn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you also testified at Geraldo Iglesias's trial and provided a false testimony about the investigation, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You falsely testified that you got a call from a confidential informant who implicated

60 (Pages 234 to 237)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

238

Geraldo Iglesias in the Roman shooting, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you falsely testified that you did not indicate to Rosendo Ochoa who to pick out of the photo array or lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you falsely testified that you did not suggest to Hugo Rodriguez who to pick out of the lineup, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you falsely testified that Geraldo Iglesias told you that he was, quote, hanging around with his friends, quote, on the street around 4:00 p.m. on the day Ms. Roman was shot, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Geraldo Iglesias never told you that, did he?

239

MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) That's flat out contradicted by your own closing report, isn't it?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You made it up at trial, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You got up on the stand, took an oath to tell the truth, and then just told lies, didn't you?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And the judge believed what you were saying, right?
MR. LEINENWEBER: Objection, calls for speculation, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And you were lying the whole

240

time, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) And based on your false testimony and fabricated identifications, Geraldo Iglesias went to prison for decades for something that he didn't do, right?
MR. LEINENWEBER: Objection, form and foundation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You have any regrets about that?
MR. LEINENWEBER: Objection.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) Can you tell me every step that you took to investigate the Monica Roman homicide?
**A. Take the Fifth.**
Q. You framed Mr. Iglesias pursuant to an official policy or practice whereby the Chicago Police Department put dozens of individuals -- innocent individuals in prison for crimes they did not commit, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

241

THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced eyewitnesses to falsely implicate criminal suspects, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: The fifth.
Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced eyewitnesses to provide false identifications, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced witness testimony, right?
MR. LEINENWEBER: Objection, form, foundation, calls for speculation.
THE WITNESS: Take the Fifth.
Q. (BY MS. BRADY) You framed Mr. Iglesias

61 (Pages 238 to 241)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

242

pursuant to an official policy or practice whereby members of the Chicago Police Department fabricated false evidence, including false police reports, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department fabricated false evidence by purposefully feeding information to witnesses, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department kept secret files that contained exculpatory evidence that would never be shared with criminal defendants or state prosecutors, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby

243

members of the Chicago Police Department kept street files that contained exculpatory evidence that would never be shared with criminal defendants or state prosecutors, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You maintained a street file for the Roman homicide that contained exculpatory evidence that was never shared with Mr. Iglesias's defense or the prosecution, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department destroyed evidence suggesting that suspects in criminal defense cases were, in fact, not guilty, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department concealed

244

material, exculpatory evidence from suspects, criminal defendants, their lawyers and state prosecutors including materials that could be used to impeach state witnesses, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department lied in criminal trails -- trials about investigations they've been involved in, didn't you?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby members of the Chicago Police Department lied and covered up misconduct committed by their colleagues pursuant to a code of silence, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby

245

members of the Chicago Police Department were never disciplined for misconduct creating an environment of lawlessness, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You framed Mr. Iglesias pursuant to an official policy or practice whereby the lack of discipline imposed by the department encouraged detectives like yourself to violate suspects' constitutional rights with impunity, right?

MR. LEINENWEBER: Objection, form, foundation, calls for speculation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) More than three dozen times during the course of your employment with the Chicago Police Department, you framed innocent people for crimes they did not commit, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you engaged in this conduct repeatedly because you knew you would never be disciplined from anybody, right?

MR. LEINENWEBER: Objection, form,

62 (Pages 242 to 245)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

246

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And the knowledge that you would not face any consequences for misconduct motivated you to frame Geraldo Iglesias, didn't it?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You were never disciplined for framing anybody for a crime during the course of your entire employment with the Chicago Police Department, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Are you currently receiving a pension?

**A. Take the Fifth.**

Q. Your misconduct in the Roman investigation violated Mr. Iglesias's constitutional rights to due process, didn't it?

MR. LEINENWEBER: Objection, form, foundation, calls for legal conclusion.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you violated

247

Mr. Iglesias's constitutional rights to due process as part of a conspiracy with Halvorsen, Robert Biebel, Steve Gawrys and Anthony Riccio, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Your misconduct in the Roman investigation violated Mr. Iglesias's constitutional rights protected by the Fourth Amendment, right?

MR. LEINENWEBER: Objection, form, foundation, calls for a legal conclusion.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You violated Mr. Iglesias's Fourth Amendment rights by causing him to be detained without probable cause, right?

MR. LEINENWEBER: Objection, form, foundation, calls for legal conclusion.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) There was no probable cause to arrest Geraldo Iglesias, was there?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You violated Mr. Iglesias's Fourth Amendment right by causing him to be detained

248

without probable cause in conspiracy with the other defendants, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen and the other defendants reached an agreement to frame Mr. Iglesias before there was probable cause to believe that he had anything to do with the Roman murder, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) So you caused Mr. Iglesias to be prosecuted for murder and made sure that the prosecution was seen through all the way to conviction despite your knowledge that there was no probable cause to suspect that Mr. Iglesias had been involved in the Roman shooting, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew that your fellow officers were committing acts of misconduct and violating Mr. Iglesias's constitutional rights during

249

the Roman investigation, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And despite knowing that your fellow officers were violating Mr. Iglesias's constitutional rights during the Roman investigation, you did nothing to stop the misconduct, did you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Is it your position in this litigation that Mr. Iglesias is guilty of the Roman murder?

**A. Take the Fifth.**

Q. Do you have any basis whatsoever to believe that Mr. Iglesias had anything to do with the Roman murder?

**A. Take the Fifth.**

Q. If you have any basis whatsoever to believe that Mr. Iglesias had anything to do with the Roman murder, please tell me what it is now.

**A. Take the Fifth.**

Q. So you intentionally and knowingly framed Geraldo Iglesias for the murder of Monica Roman, didn't

63 (Pages 246 to 249)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

250

you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knowingly fabricated false evidence to cause Geraldo Iglesias's wrongful prosecution and conviction, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you intentionally suppressed evidence that would have showed Geraldo Iglesias was innocent, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Do you have any remorse at all for your actions?

MR. LEINENWEBER: Objection.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) No matter what questions I ask you about Mr. Iglesias or the Roman investigation, you're going to say that you invoke your Fifth Amendment right to remain silent, right?

**A. Take the Fifth.**

251

Q. And are you going to assert your Fifth Amendment right to remain silent at trial?

**A. Take the Fifth.**

Q. All right. I'm done with my Iglesias' questions. Can we take a bit of a break?

MR. LEINENWEBER: How long do you need?

THE VIDEOGRAPHER: Time off record is 1:30.

(Break taken.)

THE VIDEOGRAPHER: We're now back on the record at 1:48.

MS. BRADY: All right. Sorry. Do we have Dan and Megan and Austin?

MR. McGINNIS: Yeah.

MS. McGRATH: Yes.

Q. (BY MS. BRADY) All right. Mr. Guevara, isn't it true that you framed Carlos Andino for the 1994 murder of Mark Devoeke (phonetic) on April 11, 1994?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You showed Theresa Rios a photo of Carlos Andino to persuade her to identify Andino as the person who ran past the laundromat

252

meet -- immediately after the shooting, didn't you?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And it's true that there were at least three young kids who had witnessed the shooting of Mr. Doeveke, right?

MR. LEINENWEBER: Objection, form and foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And at least two of those kids reported that the shooter had a teardrop tattoo on his face, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you knew Carlos Andino did not have a teardrop tattoo on his face, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You concealed from the defendant that the children had described the shooter as having a teardrop tattoo, didn't you?

MR. LEINENWEBER: Objection, form,

253

foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then you went to the children's home on August 18th, 1994 and told them you had caught the shooter, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then you told them the shooter was in custody and they just had to pick him out of a lineup, didn't you?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And then you and your partner indicated to the children who they should pick out of the lineup, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You and Halvorsen actually showed the children a photo of Andino and falsely told them that Mr. Andino was the shooter, right?

MR. LEINENWEBER: Objection, form, foundation.

64 (Pages 250 to 253)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

254

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you influenced those kids so they would pick Andino from the lineup, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And Rick Beuke represented Mr. Andino at trial, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And neither you or Beuke told Mr. Andino that Beuke was representing you in connection with an unrelated family car matter at the same time Beuke was rep -- representing Andino; is that right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And during the investigation into the murder of Rosalio Franco, you withheld exculpatory evidence from prosecutors as well as the criminal defendants and their attorneys, right?

MR. LEINENWEBER: Objection, form, foundation.

255

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) As part of the investigation into the homicide of Rosalio Franco, you and Halvorsen got Jayson Aguiar to sign a false statement implicating himself in the crime, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And as part of the Franco homicide investigation, you and Halvorsen coerced others witnesses into giving false statements implicating Aguiar in the crime, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Give me just one minute. All right. Thanks for your patience.

Is it true that you coerced Andy Montanez into falsely implicating Manuel Suastegui in the murder of Daniel Matias?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) Is it true that you induced false testimony from Ignacio Salgado to implicate

256

Suastegui in the murder of Daniel Matias?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) At the time of your investigation into the murder of Daniel Matias, Ignacio Salgado had a range of pending charges against him in connection with Operation Mongoose, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you helped negotiate a deal with Salgado where in exchange for leniency in his own criminal matters Salgado would testify against Suastegui, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You knew Salgado's testimony was entirely false, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) You did not reveal to prosecutors or criminal defense attorneys that

257

Salgado's testimony was false, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

Q. (BY MS. BRADY) And you did not reveal to prosecutors and criminal defense attorneys that you had promised Salgado that you would help him with his own criminal exposure in exchange for his testimony, right?

MR. LEINENWEBER: Objection, form, foundation.

THE WITNESS: Take the Fifth.

MS. BRADY: Okay. I think that I'm done. Give me just one minute --

MR. LEINENWEBER: No problem.

MS. BRADY: -- if you wouldn't mind. Thanks.

MR. LEINENWEBER: No problem.

(Break taken at 1:57 to 1:59 p.m.)

MS. BRADY: I do not have any further questions.

MR. LEINENWEBER: Okay.

MS. BRADY: Thank you.

MR. LEINENWEBER: Thanks, Rachel. Anyone else, any questions?

All right. We'll reserve. Thank

65 (Pages 254 to 257)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND) G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara April 20, 2022

258

you, Rachel. I appreciate it.

MS. BRADY: Thanks everybody.

THE REPORTER: Hold on. Before we leave -- I'm sorry. Before we leave, do you want signature for the witness?

MR. LEINENWEBER: Yeah. We'll -- we'll reserve.

THE REPORTER: Okay. And Does anybody need a copy of the transcript and/or the video? Mr. McGinnis?

MR. McGINNIS: Not at this time.

THE REPORTER: Ms. McGrath?

MS. MCGRATH: Not at this time.

THE REPORTER: Mr. Raye?

MR. RAHE: No, thank you.

THE VIDEOGRAPHER: Time off record 1:59.

259

CHANGES AND SIGNATURE

WITNESS NAME: REYNALDO GUEVARA

DATE OF DEPOSITION: APRIL 20, 2022

PAGE/LINE CHANGE REASON

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

_____________________________________________

260

I, REYNALDO GUEVARA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________

REYNALDO GUEVARA

THE STATE OF __________)

COUNTY OF _____________)

Before me, _______________, on this day personally appeared REYNALDO GUEVARA, known to me (or proved to me under oath or through ________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ____________________, 2022.

_______________________

NOTARY PUBLIC IN AND FOR

THE STATE OF _______________

My commission expires:_______

____ No Changes Made _____ Amendment Sheet(s) Attached

261

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEMETRIUS JOHNSON, )
)
PLAINTIFF, )
)
VS. ) CASE NO. 1:20-CV-4156
)
REYNALDO GUEVARA, ERNEST )
HALVORSEN, DARRYL DALEY, )
WILLIAM ERICKSON, JOHN HEALY )
AND THE CITY OF CHICAGO, )
)
DEFENDANTS )

*****************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERALDO IGLESIAS )
)
Plaintiff, )
)
VS. )
)
)
REYNALDO GUEVARA, ERNEST ) CASE NO. 1:19-cv-6508
HALVORSEN, STEVE GAWRYS, )
A. RICCIO, J. SANTOPADRE, )
ROBERT RUTHERFORD, K. )
MCDONALD, JOSE ZUNIGA, )
ASSAF, ROBERT BIEBEL AND )
THE CITY OF CHICAGO, )
)
Defendants. )

*******************************************************

REPORTER'S CERTIFICATION OF THE
ORAL & VIDEOTAPED DEPOSITION OF
REYNALDO GUEVARA
APRIL 20, 2022

*******************************************************

66 (Pages 258 to 261)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

D. Johnson vs. R. Guevara, et al. (AND)
G. Iglesias vs. R. Guevara, et al.

Reynaldo Guevara
April 20, 2022

262

I, Rosa E. Davila, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, REYNALDO GUEVARA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to ____________________;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__x___ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

263

Certified to by me this, the 5th day of May, 2022.

Rosa E. Davila, CSR No. 3516
Expiration Date: 7/31/22
Koole Court Reporters of Texas
Firm Registration No. 413
8000 IH-10 West, Suite 600
San Antonio, Texas 78230
(210) 558-9484

67 (Pages 262 to 263)

Koole Court Reporters of Texas
(210) 558-3129 Fax myreportingfirm@gmail.com 210-558-9484

# Exhibit 48



pd
Planet Depos
We Make It Happen™

# Transcript of Ernest Halvorsen

**Date:** April 20, 2018
**Case:** Montanez -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**EP IGLESIAS Sub Resp 001519**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

JOSE MONTANEZ, )
Plaintiff, )
-vs- ) No. 17 CV 4560
REYNALDO GUEVARA, et al., )
Defendants. )
---------------------------
ARMANDO SERRANO, )
Plaintiff, )
-vs- ) No. 17 CV 2869
REYNALDO GUEVARA, et al., )
Defendants. )

Deposition of ERNEST HALVORSEN
Chicago, Illinois
Friday, April 20, 2018
10:14 A.M.

Job No: 182444
Pages: 1 - 420
Reported By: Aneesha L. Williams, CSR

Deposition of ERNEST HALVORSEN, held at the offices of:

LOEVY & LOEVY
311 North Aberdeen Street,
3rd Floor
Chicago, Illinois 60607
(312) 243-5900

Pursuant to notice before Aneesha L. Williams, Certified Shorthand Reporter and Notary Public, to and for the State of Illinois.

APPEARANCES:

ON BEHALF OF THE PLAINTIFF, JOSE MONTANEZ:
MS. JENNIFER BONJEAN
BONJEAN LAW GROUP, PLLC
1000 Dean Street, Suite 422
Brooklyn, New York 11238
(718) 875-1850

ON BEHALF OF THE PLAINTIFF, ARMANDO SERRANO:
MS. ELIZABETH MAZUR
LOEVY & LOEVY LLC
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
MR. JEFFREY N. GIVEN
THE SOTOS LAW FIRM, P.C.
550 East Devon Street, Suite 150
Itasca, Illinois 60143
(630) 735-3300

APPEARANCES:

ON BEHALF OF THE DEFENDANT, ANDT:
MS. TAMMY WENDT
HERBERT LAW FIRM
206 South Jefferson Street,
Suite 100
Chicago, Illinois 60661
(312) 655-7660

ON BEHALF OF THE DEFENDANT, MATTHEW COGHLAN:
MS. KRISTINA KATZ CERCONE
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601
(312) 782-3939

ON BEHALF OF THE DEFENDANT, COOK COUNTY and JOHN DILLON:
MR. MICHAEL P. GORMAN
ASSISTANT STATE'S ATTORNEY
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4366

APPEARANCES:

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

MS. CATHERINE M. BARBER
ROCK FUSCO & CONNELLY, LLC
321 North Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000

ALSO PRESENT: Rick Hasberg, Videographer

INDEX

WITNESSERNEST HALVORSEN PAGE
EXAMINATION
BY MS. BONJEAN ............................ 8
BY MS. MAZUR ............................ 282
BY MS. BONJEAN .......................... 330

EXHIBITS

DEPOSITION EXHIBIT MARKED FOR ID
Guevara No. 1
Log of Criminal History Records .......... 56
Guevara No. 2
Log of Criminal History Records .......... 58
Guevara No. 3
Supplemental Report ..................... 164
Halvorsen No. 1
Transcript of 07/01/93 .................. 195
Halvorsen No. 2
Transcript of Record Appeal ............. 206
Guevara No. 7
Affidavit of Francisco Vicente .......... 246
Halvorsen No. 3
Supplementary Report .................... 337
Halvorsen No. 4
Area 5 Supplemental Report .............. 370

THE VIDEOGRAPHER: This is the video deposition of Ernest Halvorsen taken by Loevy & Loevy in the matter of Montanez v. Guevara, et al., case number 17 CV 4560; and Serrano vs. Guevara, et al., case number 17 CV 2869, held at Loevy & Loevy, 311 North Aberdeen Street, Chicago, Illinois.

Today is April 20th, 2018. The time is 10:14. The court reporter is Aneesha Williams, Planet Depos, and the videographer is Rick Hasberg.

The counsel will now introduce themselves, and the court reporter is free to administer the oath.

MS. BONJEAN: Good morning. My name is Jennifer Bonjean. That's B-O-N-J-E-A-N. I represent Armando Serrano. I will be taking this deposition today along with Loevy & Loevy. My law firm is the Bonjean Law Group.

MS. MAZUR: My name is Elizabeth Mazur, and I'm here for Loevy & Loevy representing Jose -- plaintiff, Jose Montanez.

MR. GORMAN: Assistant State's Attorney Michael Gorman on behalf of John Dillon and

Cook County.

MS. CERCONE: Kristina Cercone on behalf of Matthew Coghlan.

MS. BARBER: Catherine Barber for Defendant, City of Chicago:

MR. GIVEN: Jeff Given on behalf of the individual defendant officers and Mr. Halvorsen at the dep today.

MS. WENDT: Tammy Wendt for the ANDT from the Herbert Law Firm on behalf of Mr. Halvorsen.

(Witness sworn.)

ERNEST HALVORSEN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. BONJEAN:

Q. Good morning, Mr. Halvorsen. My name is Jennifer Bonjean, and I represent the Plaintiff, Armando Serrano, in this matter, and I'm going to begin by questioning you here today.

Do you understand that?

**A. Yes.**
Q. Okay. Sir, can you please state your full name for the record?
**A. Ernest Halvorsen.**
Q. And, sir, are you a Chicago police officer?
**A. I was.**
Q. And when did you become a Chicago police officer?
**A. 23 October 1972.**
Q. And when did you retire from the Chicago Police Department?
**A. 16 April 2010.**
Q. And, sir, how long were you a Chicago police officer, if you could do the math for me?
**A. A little less than 38 years.**
Q. And at what rank did you retire from the Chicago Police Department?
MR. GIVEN: Objection; form. You can answer.
THE WITNESS: Detective.
BY MS. BONJEAN:
Q. And, sir, did you at some point in

your career investigate the murder of Rodrigo Vargas?
**A. Yes.**
Q. Okay.
MR. GIVEN: Go ahead.
MS. BONJEAN: You want to take a second?
MR. GIVEN: Sure.
MS. BONJEAN: Okay.
MR. GIVEN: This will literally take about 30 seconds.
MS. BONJEAN: Okay.
MS. CERCONE: Can we agree that one objection is joined by all? That one objection is joined by all.
MR. GIVEN: It's okay with me.
MS. BONJEAN: I'm okay with it.
MS. MAZUR: That's fine.
MR. GIVEN: Can you ask him that question again, please?
MS. BONJEAN: Sure.
BY MS. BONJEAN:
Q. Mr. Halvorsen, at some point in your career, did you investigate the murder of Rodrigo Vargas?

**A. The Fifth Amendment protects the innocent, as well as the guilty. On advice of counsel, I choose to exercise my constitutional right to remain silent.**
Q. Okay. Tell me everything you did to investigate the Vargas murder.
**A. Oh, my God. I forgot it already.**
**On advice of counsel, I assert my Fifth Amendment.**
Q. Tell me every person that you interviewed during the course of your investigation of the Vargas murder.
**A. On advice of counsel, I assert my Fifth Amendment.**
Q. Identify every document that was contained in the Vargas investigative file when you last saw it.
**A. On advice of counsel, I assert my Fifth Amendment.**
Q. Identify all reports that you authored or affixed your signature to that were produced in the investigation of the Vargas murder.
**A. On the advice of counsel, I assert**

**my Fifth Amendment.**
Q. Tell me all steps you took to determine that Mr. Serrano, Mr. Montanez, and Mr. Pacheco were guilty of the murder of Rodrigo Vargas.
**A. On advice of counsel, I assert my Fifth Amendment.**
Q. Your misconduct in the Vargas investigations violated Mr. Montanez, Mr. Serrano, and Mr. Pacheco's constitutional rights to due process; isn't that true?
MR. GIVEN: Objection; form. You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, you violated Mr. Montanez, Mr. Serrano, and Mr. Pacheco's constitutional rights to due process as part of a conspiracy with your partner, Detective Guevara, your supervisor, Sergeant Mingy, and Assistant State's Attorneys Coghlan and Dillon.
MS. CERCONE: Object to form.
MR. GIVEN: Objection; form.

EP IGLESIAS Sub Resp 001522

13

THE WITNESS: On advice of counsel, I assert my Fifth Amendment.
BY MS. BONJEAN:
Q. Your misconduct in the Vargas investigation violated Montanez, Serrano, and Pacheco's constitutional rights protected by the Fourth Amendment; isn't that correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. You violated Mr. Montanez, Serrano and Pacheco's constitutional rights protected by the Fourth Amendment as part of a conspiracy with Guevara, Mingy, Coghlan, and Dillon.
MS. CERCONE: Objection; form.
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true, sir, that you conspired with your partner, Detective Guevara, Sergeant Mingy, Assistant State's

14

Attorneys Coghlan and Dillon reaching an agreement to frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco for the murder of Rodrigo Vargas?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, sir, isn't it true that you conspired with Mr. Guevara, Sergeant Mingy, Coghlan and Dillon to frame Montanez, Serrano, and Pacheco before any of those offi- -- strike that.
Isn't true that you conspired with Detective Guevara, Sergeant Mingy, Assistant State's Attorneys Coghlan and Dillon to frame Mr. Montanez, Serrano, and Pacheco before Montanez, Serrano, and Pacheco were arrested or charged with the murder of Rodrigo Vargas?
MS. CERCONE: Objection --
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

15

BY MS. BONJEAN:
Q. In fact, you, sir, knew that your fellow officers, specifically Detective Guevara and Sergeant Mingy, were committing acts of misconduct that violated the constitutional rights of Montanez, Serrano, and Pacheco, and you did nothing to stop that misconduct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment.
BY MS. BONJEAN:
Q. Indeed, sir, isn't it true that you caused Mr. Montanez, Mr. Serrano, and Mr. Pacheco to be prosecuted for murder and ensured that the prosecution was seen through to their wrongful convictions --
MR. GIVEN: Objection.
BY MS. BONJEAN:
Q. -- despite knowing that there was no probable cause to arrest them?
MR. GIVEN: Objection; form, calls for a legal conclusion.
THE WITNESS: On the advice of counsel,

16

I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, sir, you had no probable cause to believe that Mr. Montanez, Mr. Serrano, or Mr. Pacheco were involved in any way in the Rodrigo Vargas's murder?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you intentionally framed Jose Montanez for the murder that he did not commit, that of Rodrigo Vargas?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you intentionally framed Armando Serrano for the murder of Rodrigo Vargas, a murder that he did not commit?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you intentionally framed Jordan Pacheco for the murder of Rodrigo Vargas, a murder he did not commit?

MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And as a result of your misconduct and the misconduct of your fellow Chicago police officers, Jose Montanez and Armando Serrano were convicted of Rodrigo Vargas's murder?
MR. GIVEN: Objection; form, legal conclusion, calls for speculation.
You can answer.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And from February 1993 till July 1993, isn't it true that you conspired with other officers to falsely charge Mr. Montanez, Serrano, and Pacheco for the murder of Rodrigo Vargas?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And to be clear, sir, you were

assigned to investigate the murder of Rodrigo Vargas along with your partner, Detective Reynaldo Guevara, correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And your supervisor on the Vargas case was Sergeant Edward Mingy?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that the three of you consulted regularly and shared all information about the progress of the Vargas investigation?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You discussed all aspects of the investigation with your partner, Detective Guevara, along with your supervisor, Sergeant Mingy; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And you knew when you started the investigation into the murder of Rodrigo Vargas that neither Montanez nor Serrano nor

Pacheco were involved in the shooting?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. You knew that there was absolutely no physical evidence indicating that Montanez, Serrano, and Pacheco had any connection to the murder, correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And instead you decided to frame Montanez, Serrano, and Pacheco by fabricating false evidence; isn't that correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. Specifically, Francisco Vicente told you and Detective Guevara that he had no knowledge about the murder of Rodrigo Vargas; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You had absolutely no reason to believe that Francisco Vicente possessed any

information or knowledge about the Rodrigo Vargas murder; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And, in fact, Vicente told you and Detective Guevara that he had no information to suggest that either Serrano, Montanez, nor Pacheco were involved in any way with the murder of Rodrigo Vargas?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that Vicente actually told you that Guevara -- strike that.
Isn't it true that Vicente told you and Detective Guevara that Mr. Montanez, Mr. Serrano, and Mr. Pacheco were actually and factually innocent of the murder of Rodrigo Vargas?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And despite Vicente's

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 702 of 1206 PageID #:66507

representations to you, you and your fellow officer, Detective Guevara, told Mr. Vicente facts about the Vargas murder; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And, in fact, your purpose and the purpose of your partner, Detective Guevara, was to feed information to Vicente so that he could reiterate it back to you and you could pretend that there was information to suggest that Serrano, Montanez, and Pacheco were responsible for the murder?
MR. GIVEN: Objection; form, foundation, speculation.
You can answer.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, in fact, you actually used psychological and physical coercion against Vicente to falsely implicate Montanez, Serrano, and Pacheco?
**A. On advice of counsel, I assert the**

**Fifth Amendment.**
Q. You, Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Dillon and Coghlan all conspired jointly to frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco for the Vargas murder?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you, along with Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Dillon and Coghlan all conspired to jointly frame Mr. Montanez, Serrano, and Pacheco for the Vargas murder, specifically, by coercing Francisco Vicente and Timothy Rankins to falsely implicate them in that crime?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, sir, isn't it true that you committed perjury by testifying

falsely at Mr. Montanez, Mr. Serrano, and Mr. Pacheco's criminal trials?
MR. GIVEN: Objection; form, calls for a legal conclusion.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, in fact, you knowingly gave false testimony at the criminal trials of Mr. Montanez, Serrano, and Pacheco knowing that your false testimony would lead to their wrongful convictions?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice on counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And from February 5th, 1993 and to the present day you have concealed your misconduct and the misconduct of your fellow officers; isn't that right?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. Now, specifically, with regard to

the Vargas investigation, sir, isn't it true that Rodrigo Vargas was murdered in the early morning hours of February 5th, 1993?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. And you learned at some point that Mr. Vargas was murdered inside his van outside of his home; isn't that correct?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. And you were assigned to investigate the Vargas murder a couple days after it occurred; isn't that correct?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. And you, along with your partner, Detective Guevara, spoke with the victim's wife, a woman by the name of Wilda Vargas, shortly after you were assigned to investigate the case, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

EP IGLESIAS Sub Resp 001525

BY MS. BONJEAN:
Q. In fact, Wilda Vargas was a Spanish-speaking woman who communicated primarily through Detective Guevara, who was also Spanish-speaking, correct?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. But as was your routine with Detective Guevara, he always communicated to you what any witness or victim may have said if they were speaking in the Spanish language; is that right?
MR. GIVEN: Objection; form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And during the month of February 1993, isn't it true that Detective Guevara and yourself frequently communicated with Ms. Vargas?
MR. GIVEN: Objection; form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:
Q. And isn't it true that Detective Guevara had somewhat of a cozy relationship with Wilda Vargas?
MR. GIVEN: Objection; form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, Detective Guevara told you that he had tried to initiate or was initiating a romantic relationship with Wilda Vargas; isn't that right?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. Now, during this period of time in which you and Detective Guevara interviewed Ms. Vargas in February of 1993, isn't it true that Ms. Vargas told you about what actions she and Rodrigo Vargas, her husband, took on the day leading up to his murder?
MR. GIVEN: Objection; form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:
Q. And, in fact, isn't it true that you and Detective Guevara asked Ms. Vargas to tell you specifically everything she did and everything Rodrigo Vargas did in the 24 hours prior to his murder?
MR. GIVEN: Form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you and Detective Guevara told Wilda Vargas no detail was too small, you wanted to hear every step they took in the 24 hours prior to his murder?
MR. GIVEN: Form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that she provided you with information about what transpired during her day and in the 24 hours prior to Mr. Vargas's murder?
MR. GIVEN: Form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that Wilda Vargas recounted to you that the night before the murder of her husband, she and Rodrigo had been to the bank where he had obtained some cash related to his business dealings?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that Wilda Vargas told you and Detective Guevara that after stopping at the bank, they stopped at a gas station?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And Ms. Vargas relayed to you that she recalled a minor incident at that gas station where Mr. Vargas, her husband, had honked at a tan car that contained three Latino men; isn't that correct?
MR. GIVEN: Form.

29

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that this incident at the gas station was something that you learned almost immediately after being assigned to the case after interviewing Wilda Vargas?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you and Detective Guevara failed to investigate any legitimate leads into the murder of Rodrigo Vargas?
MR. GIVEN: Objection; form, foundation.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, actually investigating that case was just far too much work, wasn't it?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

30

BY MS. BONJEAN:
Q. In fact, you and Detective Guevara had an unspoken understanding, that the way you cleared cases was to frame Latino men in the Humboldt Park the area, correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And it didn't matter much to you or Detective Guevara which Latino men you framed because they were all sort of the same in your book; isn't that right?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And as a result, after learning of the murder of Rodrigo Vargas and speaking with Wilda Vargas, you decided that you wanted to frame three Latino men for the murder of Rodrigo Vargas rather than legitimately investigate the case, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

31

BY MS. BONJEAN:
Q. What exactly did you do to investigate the case once you were assigned to the case in February of 1993?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And did you prepare any general progress reports whatsoever that memorialized your investigation of the Vargas murder after your assignment?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. What police reports did you author or prepare that memorialized the steps you took to legitimately investigate the case and the murder of Rodrigo Vargas?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, sir, it's true, isn't it, that you did not investigate any lead into the Vargas murder between February and June of 1993?

32

**A. On advice of counsel, I assert the Fifth Amendment.**
Q. At this moment, Detective Halvorsen -- or Mr. Halvorsen, I'd like to discuss with you the murder of Salvador Ruvalcaba and your introduction to Francisco Vicente.
MR. GIVEN: Objection to the extent that's not a question.
MS. BONJEAN: Well, just for the benefit of yourself and others, I was --
MR. GIVEN: I understand.
MS. BONJEAN: -- going to let you know where I was headed.
MR. GIVEN: I was making my record.
BY MS. BONJEAN:
Q. Mr. Halvorsen, isn't it true that on May 14th, 1993, you investigated the murder of Salvador Ruvalcaba?
**A. On the advice of counsel, I assert my Fifth Amendment.**
Q. And as part of the Ruvalcaba investigation, you decided to falsely target Robert Buto for that murder, even though you

knew he was innocent; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. Isn't it true that you improperly influenced Carl Richmond, Ray Lozada, and Frank Escobar to falsely implicate Buto for the Ruvalcaba murder?
MR. GIVEN: Objection; form, foundation, compound.
MS. BONJEAN: Okay. And Ruvalcaba, by the way, is R-U-V-A-L-C-A-B-A.
BY MS. BONJEAN:
Q. Isn't it true that on May 14th, 1993, you were informed by Assistant State's Attorney Kevin Hughes that his supervisor, Assistant State's Attorney Sally Gray, would not agree to lodge charges against Mr. Buto?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Notwithstanding the fact that a supervisor in the Assistant State's Attorney office declined to lodge any charges against

Mr. Buto, you and along with Detective Guevara decided you wanted to falsely charge Buto with the murder?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And as a result of your agreement with Detective Guevara to frame Mr. Buto for the murder of Ruvalcaba, you decided to use a man named Francisco Vicente, who was already in the lock-up at Area 5; isn't that correct?
MR. GIVEN: Objection; form, foundation, compound.
THE WITNESS: On advice of counsel, i assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, in fact, it was a common tactic of yours and Detective Guevara to use individuals who were already in police custody as witnesses in your cases in order to frame suspects for murders, correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. In fact, you couldn't even bother to go get people off the streets to be

witnesses in the cases where you wanted to frame people. You sometimes just took them right out of the lock-up; isn't that righted?
MR. GIVEN: Objection; form, foundation, harassing, oppressive. You can answer.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Mr. Halvorsen, you discovered on May 14th, 1993, that Robert Buto was talking to a man named Francisco Vicente, who was in the lock-up at Area 5; isn't that correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And you and Detective Guevara decided you wanted to use Vicente to falsely implicate Buto in the Ruvalcaba murder; isn't that correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you instructed the lock-up keepers to bring

Mr. Vicente to you on May 14th, 1993?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And Mr. Vicente came up from the lock-up, he sat and had a conversation with you and Detective Guevara; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You already knew at that point that Mr. Vicente had four felony charges pending against him; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. In fact, isn't it true that you knew that Mr. Vicente had been charged with a simple robbery and three separate armed robberies; isn't that correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And you told Mr. Vicente that he was looking at a sentence that would amount to natural life in prison if he was found guilty of those armed robberies; isn't that right?

**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You also knew that Francisco Vicente was a heroin addict; isn't that correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And on May 14th, 1993, you knew that Mr. Vicente was actually actively going through heroin withdrawal while he was in police custody at Grand and Central?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You had some passing familiarity with the symptoms people suffered when they went through heroin withdrawal and knew that he was in very vulnerable state; isn't that correct?
MR. GIVEN: Instead of asking you to re-read it, I will work off memory and object as to form.
MS. BONJEAN: Okay.
MR. GIVEN: You can answer.
THE WITNESS: On advice of counsel, I

assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you brought Mr. Vicente candy bars in order to help him with his withdrawal symptoms?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you had some understanding that candy would actually help with those withdrawal symptoms and used that as a means to manipulate Mr. Vicente?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you frequently played the role of good cop in interviewing witnesses while Detective Guevara played the role of bad cop?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, isn't it true that you frequently employed the tactic where Detective Guevara would physically abuse

witnesses or suspects in custody, and then after that physical abuse, you would come in and try to use kinder methods to gain their cooperation?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true that you told Francisco Vicente on May 14th, 1993 that you wanted his help in framing Robert Buto for the Ruvalcaba murder?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You and Detective Guevara asked Vicente about Buto's gang affiliation; isn't that correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And you asked Mr. Vicente about his gang affiliation in hopes that you might be able to use that information and use him to frame Buto for the Ruvalcaba murder?
**A. On advice of counsel, I assert the**

**Fifth Amendment.**
Q. You hoped that Vicente would be willing to frame an opposing gang member for a murder, and that's why you asked for his gang affiliation; isn't that right?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment.
BY MS. BONJEAN:
Q. And Francisco Vicente -- strike that.
Isn't it true that you told Francisco Vicente to say that Buto confessed to the shooting -- the shooting of someone near Roosevelt High School; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment.**
Q. And you told Vicente that, "We can -- "We can make this hard for you or we can make this easy for you," or words to that effect; isn't that correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that Francisco

Vicente initially told you that he would not falsely implicate Robert Buto in the murder of Ruvalcaba -- Ruvalcaba's murder?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you and Detective Guevara told Francisco Vicente that you would help him with his pending armed robbery charges if he assisted you in framing Buto for the Ruvalcaba murder?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And, specifically, isn't it true that you and Detective Guevara told Francisco Vicente that you could get him a deal, a deal of leniency in his armed robbery cases, if he only agreed to frame Robert Buto for the murder of Ruvalcaba?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And you were present when Detective Guevara expressly told Vicente that he would

come to court and speak on Vicente's behalf if Vicente lied and said that Buto confessed to him?

**A. On behalf --**

MR. GIVEN: On advice.

THE WITNESS: I forgot. On behalf of counsel, I assert my Fifth Amendment.

MR. GIVEN: For the record, he means "on advice of counsel."

THE WITNESS: Advice, yes. I'm sorry.

MS. BONJEAN: That's okay.

BY MS. BONJEAN:

Q. Isn't it true that despite those representations by Detective Guevara and yourself, Vicente still refused to falsely implicate Robert Buto?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that Vicente told you and Detective Guevara he didn't really trust you to get a deal for him; isn't that correct?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And at that point Detective Guevara then began to use physical violence against Francisco Vicente to gain his cooperation; isn't that right?

MR. GIVEN: Objection; form and foundation, calls for speculation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Mr. Halvorsen, it's true that you saw Detective Guevara strike Vicente in the back of the head multiple times; isn't that right?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that you saw Detective Guevara strike Mr. Vicente with a rolled up -- like a small, rolled up telephone book?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that Detective Guevara actually walked around with a small telephone book rolled up -- he often had that

on his person?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you heard that -- you heard Detective Guevara call Vicente a stupid son of a bitch?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you observed Detective Guevara hit Vicente in the back of the head multiple times with this skinny phone book?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. Did you and Detective Guevara discuss specifically how you would get Vicente to falsely implicate Buto?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that the reason that Detective Guevara would use a phone book

to strike witnesses because it wouldn't leave visible marks?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, it was well known amongst the Area 5 Chicago police detectives, including yourself, that the use of a phone book in beating suspects was a good tool because it didn't leave marks that could be later detected or used to corroborate claims of abuse?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true, sir, that you had the opportunity to stop Detective Guevara from hitting Vicente?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that rather than

stop Detective Guevara from hitting Vicente, you permitted Guevara to do so in your presence and knowing that it was going on outside of your presence?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true that at a certain point during this interrogation of Francisco Vicente, you left the room so that Detective Guevara could be alone with Mr. Vicente?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you heard Detective Guevara striking Vicente while you were outside of the room?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. Eventually, sir, after physical abuse by Detective Guevara and promises of benefits and leniency, Francisco Vicente eventually agreed to cooperate with framing Mr. Buto?

MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true that Vicente only agreed to frame Buto after you promised help on his pending criminal charges and after he was physically abused by Detective Guevara?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And it's true, sir, isn't it, that you and Detective Guevara told Francisco Vicente that he could not tell anyone about the tactics that you and Detective Guevara used to gain his cooperation in the frame-up of Robert Buto?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you told

Francisco Vicente that you would make sure that he received the minimum sentence for his string of armed robberies and robberies in exchange for his cooperation with framing Robert Buto?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true that one of the tactics that you and Detective Guevara had discussed is that you were going to put Vicente in line-ups, and that would be used as an explanation for why he was absent from the lock-up?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that the motive for doing this was so that Vicente could tell Buto that the reason he had been pulled out of the lock-up was to be placed in line-ups?
MR. GIVEN: Form.

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 709 of 1206 PageID #:66514

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you and Guevara told Vicente to tell Buto that he was being placed in line-ups as a false explanation for why Vicente was being removed and returned to the lock-up?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you and Detective Guevara told Vicente to get Buto to talk to him as much as possible so that it would be plausible that he would confess to Vicente in the lock-up?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you reminded Francisco Vicente that if he told anyone about what had transpired, that he would be

labeled a rat, a snitch, a stoolie, and that he would be in physical danger if that information was revealed to the streets?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you and Detective Guevara coached Vicente on what he should tell the Assistant State's Attorney who would take the false statement implicating Robert Buto in the Ruvalcaba murder?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. Isn't it true that you practiced with Frankie Vicente what false statement he would provide to the Assistant State's Attorney when she came to take the statement that was going to be used to frame Robert Buto?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:
Q. Now, at some point isn't it true that you decided that you could get more use out of Francisco Vicente as a witness in other murder investigations that had not been cleared?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you and Detective Guevara and your supervisor, Sergeant Mingy, along with State's Attorneys Coghlan and Dillon, decided that you would frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco for the Vargas murder with the help of Frankie Vicente?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Now, as part of your plan, along with Detective Guevara, to frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco

for the murder of Rodrigo Vargas, isn't it true that you and Detective Guevara decided to gather the criminal history reports for Montanez, Serrano, and Pacheco in May of 1993?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. In May of 1993, you had absolutely no reason to believe that Mr. Montanez, Mr. Serrano, and Mr. Pacheco had any involvement in the murder of Rodrigo Vargas?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And notwithstanding the fact that there was no evidence whatsoever to suggest their involvement in Vargas's murder, you along Detective Guevara, decided that you would frame those three individuals for this murder, correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. But before you could frame an individual for a murder that had happened many months earlier, it was important to make

EP IGLESIAS Sub Resp 001532

sure that they weren't in custody at the time of the murder; isn't that right?
MR. GIVEN: Objection, form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, Detective Guevara and yourself was kind of sloppy at times, and at times you actually tried to frame people who were in custody; isn't that right?
MR. GIVEN: Objection; form, harassing oppressive.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Well, isn't it true that you actually tried to frame Efrain Cruz and Francisco Veras for the murders of the Wiley brothers, but you had to let them go because they were actually in police custody at the time of the murders?
MR. GIVEN: Hold on a second. Objection; form, foundation, also object to the fact that Efrain -- that the Wiley

brothers' murders is the subject of a different lawsuit that's currently pending; and I object to the use of this deposition to ask questions about another lawsuit.
You can answer.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that at one point Detective Guevara and yourself attempted to frame George Laureano for a murder that he did not commit but --
MR. GIVEN: Objection; form, foundation.
I'm sorry. Were you done?
MS. BONJEAN: Sort of. Go ahead. You can answer.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And on one occasion, you learned that George Laureano actually had an airtight alibi, as he was visiting someone else in the Illinois Department of Corrections, and you couldn't frame him for that murder, correct?

MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. So by 1993, you realized that you probably should check the criminal histories of the defendants you -- strike that.
By 1993, you knew that you had to check the criminal history of an individual who you wanted to frame for a murder to make sure that they weren't in custody at the time of the murder; isn't that right?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. So I am going to hand you what has been previously marked as, I believe, Montanez 1.
MR. GIVEN: Why don't we call it Guevara 1.
MS. BONJEAN: It was just 1, right?
MR. GIVEN: Well --

MS. BONJEAN: Yeah, we'll call it Guevara 1. That's fine.
MR. GIVEN: Well, only because it was used in the Guevara dep, and things will get really --
MS. BONJEAN: I just don't remember what it was called in the Guevara dep.
MR. GIVEN: I wrote it as Guevara No. 1.
MS. BONJEAN: Okay. Fine.
MR. GIVEN: Is what I wrote it as.
But I think if you identify it for the record with its Bates stamp, then we'll be good.
MS. BONJEAN: Sure. Okay.
BY MS. BONJEAN:
Q. I'm going to hand you what's been previously marked Exhibit 1 or Guevara 1, we'll call it. It has a Bates stamp RFC-Serrano/Montanez 000222.
I'm going to have you look at what's been marked Guevara 1, and if you could look specifically at the line that is four up from the bottom. Isn't it true, sir, that on May 20th, 1993, a person named

Detective Reynaldo Guevara requested the criminal records for the individual with the IR number 736499?
MR. GIVEN: Objection; form, foundation, and competence.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And you knew that Detective Guevara was going to obtain the criminal arrest history for the person with IR number 736499 to ensure that he was not in custody on that day and, therefore, would not have an alibi for the murder of Rodrigo Vargas?
MR. GIVEN: Form; foundation and competence.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that Jose Montanez, one of the plaintiffs in this matter, has an IR number that is 736499?
**A. On advice of counsel, I assert the Fifth Amendment.**

Q. I'm going to hand you now what has been previously marked Guevara 2. It has a Bates stamp that is RFC-Serrano/Montanez 000226.
Mr. Halvorsen, I'm handing you what's been marked Guevara 2. I'd like you to look at the entry on this log of criminal history records, four up from the bottom.
Sir, do you see that on May 24th, 1993 Detective Reynaldo Guevara requested the criminal history of an individual with the IR number 874175?
MR. GIVEN: Objection; form, foundation, and competence.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true that these documents that you've looked at, Exhibits 1 and 2, are logs of criminal history records that were issued during the date that is reflected on the log?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I

assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And on May 24th, 1993, Detective Guevara requested the criminal history of Armando Serrano, whose IR number is reflected up the upper right-hand corner of this exhibit, 874175?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true, sir, that you also -- strike that.
Isn't it true that Detective Guevara also requested the history -- criminal history of Jordan Pacheco in May of 19- -- May of 1993?
MR. GIVEN: Same objections.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you, Guevara, and Mingy decided to gather the

criminal histories of Montanez, Serrano, and Pacheco in May of 1993 before there was any suggestion that those three men had any involvement whatsoever in the murder of Rodrigo Vargas?
**A. On the advice counsel, I assert the Fifth Amendment.**
Q. Isn't it true, sir, that you and Detective Guevara and Sergeant Mingy decided to gather the criminal history reports for Montanez, Serrano, and Pacheco in May of 1993 so that you could ensure that none of the men were in custody on February 5th, 1993, which would provide an alibi for the Vargas murder?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you, along with Detective Guevara and Sergeant Mingy, decided to gather the criminal history reports for Montanez, Serrano, and Pacheco in May of 1993 all as part of a plan to frame those three men for the murder of Rodrigo

Vargas?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. After you determined, along with Detective Guevara, that neither Mr. Montanez, Mr. Serrano, and Mr. Pacheco were, in fact, in custody at the time of Rodrigo Vargas's on February 5th, 1993, you took additional efforts to advance your plan to frame those three individuals for his murder; isn't that right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And one of the methods that you and Detective Guevara used in order to execute a plan to frame an individual was to take facts that you knew to be true about the case so that you could incorporate them later on to give credibility to fabricated evidence; isn't that right?

MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. So just as by way of example in this particular case, you took information that was provided by Wilda Vargas that you knew to be true -- that you knew to be true that occurred on the day before the murder, and you used those facts in order to develop a narrative that would be used to frame Montanez, Serrano, and Pacheco for the murders of Rodrigo Vargas?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, you decided that a good motive for this murder of Rodrigo Vargas would be a robbery gone bad; is that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. You and Detective Guevara and Sergeant Mingy decided that you would use a

robbery gone bad motive despite the fact that there was no evidence whatsoever that anything was taken from the victim?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And as part of your plan to contrive a motive for the murder of Vargas, you used information that had been provided to you by Wilda Vargas, namely, that the day before Mr. Vargas's murder, he had gone to the bank and obtained some money?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. In fact, sir, isn't it true that you used the information that Ms. Vargas provided you about this incident -- episode at the gas station as a basis to create a motive for the murder of Rodrigo Vargas?
MR. GIVEN: Objection; form, asked and answered.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:
Q. And you and Detective Guevara had done this numerous times in the past, where you would learn innocuous but truthful information from the victims or witnesses that you would then incorporate into fabricated evidence to give it the appearance of credibility?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Now, Mr. Halvorsen, on June 2nd, 1993, you brought Francisco Vicente to the Cook County State's Attorney's office gang crimes unit to meet with Defendants Dillon and Coghlan, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, actually, you arranged for Mr. Vicente to come to the Cook County State's Attorney's office gang crimes unit to

meet with Defendants Dillon and Coghlan on June 2nd, 1993?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. In fact, you and Detective Guevara spoke specifically with Assistant State's Attorneys Dillon and Coghlan about the plan to bring Vicente to the gang crimes unit at the Cook County State's Attorney office, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, in fact, Assistant State's Attorneys Dillon and Coghlan actually made the arrangements for Mr. Vicente to come from the Cook County Jail where he was being housed in general population over to the Cook County State's Attorney's offices, right?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I

assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And the plan that you had entered into with Detective Guevara and Assistant State's Attorneys Cogh -- Assistant State's Attorneys Dillon and Coghlan is that you wanted Vicente to invent a story that Buto's lawyer had tried to offer him money not to testify against Buto; isn't that correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, in fact, Buto's lawyer had met with Francisco Vicente in the Cook County jail, and you learned of that, right?
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And you were concerned, weren't you, that Francisco Vicente was going to come clean and tell someone about your misconduct and the misconduct your fellow officers, Detective Guevara and Sergeant Mingy,

correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And that concern prompted you to let Assistant State's Attorneys Coghlan and Dillon know about this -- about the fact that Vicente had met with Buto's lawyer, right?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And together the four of you decided how you were going to discredit Vicente -- strike that -- discredit Buto's lawyer by falsely claiming that Vicente -- that he had tried to offer Vicente money to change his testimony?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And, in fact, you know that Buto's

lawyer never tried to offer Vicente money not to testify against Buto; isn't that right?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And after Francisco Vicente was brought over to the gang crimes unit of the Assistant State's Attorney offices, you, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan met with him; isn't that right?
MS. CERCONE: Object to form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And while Francisco Vicente was in the gang crimes unit at the Cook County State's Attorney on June 2nd, 1993, you showed Mr. Vicente crime scene photos of the Vargas homicide; isn't that right?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. You knew that Francisco Vicente had no information about the Vargas murder, but you decided, nonetheless, to show him

photographs of the murder; isn't that correct?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. And you showed Mr. Vicente photographs of the murder of Rodrigo Vargas in the presence of fellow officers Detective Reynaldo Guevara and Assistant State's Attorneys Coghlan and Dillon; isn't that correct?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that the purpose in showing Vicente the Vargas crime scene photos was to make it appear as if he had firsthand knowledge of the murder, even though you knew that he knew nothing about the murder?

MR. GIVEN: Form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. By giving Francisco Vicente the photographs of the crime scene photos, you gave him information about that murder that he could then utilize in this fabricated statement; is that right?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And by utilizing actual information that might be truthful or accurate, it gave the appearance that the other aspects of Francisco Vicente's statements were truthful and accurate; isn't that right?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true, Mr. Halvorsen, that you, along with Detective Guevara and Assistant State's Attorneys Dillon and Coghlan, knew that Mr. Vicente did not witness the Vargas homicide?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that Frankie Vicente never even mentioned the Vargas homicide until you first raised it with him?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. And it's also true, sir, that you knew that neither Mr. Montanez, Mr. Serrano, or Mr. Pacheco had anything to do with the Vargas murder when you raised questions about that murder with Francisco Vicente?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that while you were showing Vicente photographs of the Vargas crime scene, Detective Guevara told him in sum and substance, "You're an IG. This is what we want you to do"?

**A. On advice of counsel, I assert Fifth Amendment.**

Q. And isn't it true that you and Detective Guevara fed information to Mr. Vicente, including the fact that the victim was shot inside a van, and that the murder was part of a robbery?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you fed information to Mr. Vicente so that that information could be used to fabricate a story that would falsely implicate Montanez, Serrano, and Pacheco?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you told Vicente while you were feeding him facts about the Vargas murder and showing him crime seen photos, that this was the way of telling him that the word on the street was that Pistol Pete, Armando, and Jordan had committed the murder?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that by telling Vicente that the word on the street was that Pacheco, Serrano, and Montanez were the offenders of the Vargas murder, that you wanted him to implicate them in that murder?
**A. On the advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you, Defendants Guevara and Assistant State's Attorneys Coghlan and Dillon essentially brainstormed a factual narrative that you would then -- that you then fed to Frankie Vicente?
MR. GIVEN: Form.
MS. CERCONE: Object to form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And you, Defendant Guevara, and Assistant State's Attorneys Coghlan and Dillon were all feeding Vicente facts about

the Vicente (sic) murder in the gang crimes unit at the State's Attorney office on June 2nd, 1993?
MS. CERCONE: Object to form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Isn't it true that you had the opportunity to stop your fellow defendants from feeding facts to Vicente; isn't that right?
MS. CERCONE: Object to form.
THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. And isn't it true that you had the opportunity to stop Defendants Guevara and Assistant State's Attorneys Coghlan and Dillon from feeding facts to Vicente that you knew were going to be used to frame Montanez, Serrano, and Pacheco for the murder of Rodrigo Vargas?
MS. CERCONE: Object to form.
THE WITNESS: On the advice of counsel,

I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. Now, isn't it true that Detective Guevara and yourself and Assistant State's Attorneys Coghlan and Dillon first wanted Vicente to claim that he was an eyewitness to the murder?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert the Fifth Amendment.
BY MS. BONJEAN:
Q. You initially told Vicente that you wanted him to falsely claim that he witnessed the murder when he drove the car Montanez, Serrano, Pacheco were supposedly using as the getaway car, correct?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And you wanted Vicente to essentially agree to make himself the getaway driver, even though you knew that he had neither witnessed the murder, had acted as a getaway driver, or had any information about the Vargas murder?

**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that you wanted Vicente to claim that he had witnessed Montanez, Serrano, and Pacheco commit the Vargas murder because you wanted to frame Montanez, Serrano, and Pacheco for that crime?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that Frankie Vicente refused to say that he was actually present for the Vargas murder?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. Isn't it true that Frankie Vicente told you all that he didn't really trust you, that you might now turn around and charge him with the crime if he admitted he was present?
**A. On advice of counsel, I assert the Fifth Amendment.**
Q. And isn't it true that Detective Guevara and yourself tried to reassure Frankie Vicente that he would not be charged

with the crime if he admitted that he was present for the Vargas murder?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you were present when Assistant State's Attorneys Coghlan and Dillon reassured Mr. Vicente that they would make sure he was not charged with the Vargas murder if he admitted that he had witnessed it?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And despite those reassurances, isn't it true that Frankie Vicente still refused to falsely claim that he was present when Rodrigo Vargas was murdered?

MS. CERCONE: Object to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. During these conversations that you

had with Frankie Vicente with Detective Guevara and Assistant State's Attorneys Dillon and Coghlan also present, isn't it true that it was represented to him that he would be moved to the witness head- -- witness quarters, otherwise known as "the Q" for his protection if he agreed to act as a witness in the Vargas murder?

MR. GIVEN: Form.

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you, along Detective Guevara and Assistant State's Attorneys Dillon Coghlan, tried to convince Vicente to falsely claim that after the Vargas murder he met up with Montanez, Serrano, and Pacheco, and they gave him the murder weapon?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. You knew this also to be a false narrative but offered it as a compromise to Frankie Vicente so that he could avoid saying he was actually present at the time of Vargas's murder; isn't that right?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that Frankie Vicente insisted that he would not make himself involved in the actual crime in any way, shape, or form?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that Frankie Vicente told you and Detective Guevara, along with Assistant State's Attorneys Coghlan and Dillon, that he would not falsely state that he was given the murder weapon?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that during the

meeting with Frankie Vicente in the gang crimes unit of the Cook County State's Attorney office, you and Detective Guevara either pushed him in the head or poked him in the head during the course of that interrogation?

MR. GIVEN: Form and foundation.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And that while you were trying to get Vicente to tell false stories that you were feeding him, you were also actually poking him in the head and telling him, "You need to do this," or words to that effect?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that every time you or Detective Guevara used force against Frankie Vicente, there was no justification for that use of force?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that when you

used force against Frankie Vicente and when Detective Guevara used force against Frankie Vicente while feeding him false information, your purpose was to coerce Vicente to falsely implicate Montanez, Serrano, and Pacheco?

MR. GIVEN: Form and foundation.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that finally after Vicente refused to go along with these stories that had been proposed by yourself and Detective Guevara and Assistant State's Attorneys Coghlan and Dillon, you offered a third fabricated story that you wanted Vicente to regurgitate?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you told Frankie Vicente that you wanted him to falsely claim that Montanez, Serrano, and Pacheco had confessed to him after the murder?

**A. On advice of counsel, I assert the Fifth Amendment.**

MS. BONJEAN: At any point, sir, you want to take a break, please let me know, and we can do that.

MR. GIVEN: Thanks. It's been about an hour. Are you okay?

THE WITNESS: I can take a little break.

MS. BONJEAN: Sure. No problem.

MR. GIVEN: By the way, just for everybody, I don't think we'll be taking like an extended lunch break today.

MS. BONJEAN: Yeah, that's fine.

THE VIDEOGRAPHER: Off the record at 11:22.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, 11:36.

BY MS. BONJEAN:

Q. Mr. Halvorsen, isn't it true that on June 2nd, 1993, while in the offices of the gang crimes unit of the Cook County State's Attorney office, you, along with Detective Guevara and Assistant State's Attorneys Dillon and Coghlan, contrived a story that you then fed to Francisco Vicente?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Eventually, when Frankie Vicente decided that he would give a statement in which he falsely claimed Montanez, Serrano, and Pacheco confessed to him, isn't it true that you, along with Guevara, Dillon, and Coghlan, fabricated a detailed narrative that you wanted Mr. Vicente to repeat?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you told Vicente to claim that he was at Harding, H-A-R-D-I-N-G, and Altgeld on the morning of February 5th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Vicente that you wanted him to falsely claim that while he was at Harding and Altgeld, Montanez, Serrano, and Pacheco told him that they had seen Vargas at a gas station the night before?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Frankie Vicente that you wanted him to falsely claim that Montanez, Serrano, and Pacheco told him that after seeing Vargas at the gas station, they decided that he would be a good target to rob?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you and Detective Guevara obtained the information about the gas station previously from Wilda Vargas?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You and Detective Guevara knew already as of June 2nd, 1993, that Wilda

EP IGLESIAS Sub Resp 001540

Vargas had, in fact, been at a gas station prior -- on the night prior to her husband's murder; is that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You also knew as of June 2nd, 1993, from your conversations and Detective Guevara's conversations with Wild Vargas, that there had been some type of minor incident at that gas station where Rodrigo Vargas had beeped the horn at three Latino men in a tan car, correct?
MR. GIVEN: Objection, form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And it is those facts you and Detective Guevara decided to utilize in your construction of a fabricated story to give credibility to that fabricated story?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. And in so doing, you told Vicente to falsely claim that Montanez, Serrano, and Pacheco reported to him that they didn't rob Mr. Vargas on that night because he had his wife and kids with him at the time, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told Vicente to falsely claim that Montanez, Serrano, and Pacheco told Vicente that they waited by his house until 5:00 a.m., correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And the reason that you fed that fact to Mr. Vicente is because you knew that Mr. Vargas had been murdered in the early morning hours of February 5th, 1993, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it further true that you told Vicente to falsely claim that Montanez, Serrano, and Pacheco told Vicente that they tried to rob the victim but "Mondo fucked up"

and that they had to kill the guy?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you told Vicente to falsely state that had Montanez, Serrano, and Pacheco had a gun with them when they were relaying this information to him?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, further, isn't it true that you told Vicente to say that the gun was a nine millimeter gun?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told Vicente to say that the gun was a nine millimeter gun because you already knew that nine millimeter bullet casings had been found at the crime scene?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, again, this was part of your methodology in framing individuals, by using facts that you knew already to be true and

incorporating them into fabricated statements of witnesses so that those statements would have the appearance of veracity and credibility?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, sir, isn't it true that you told Vicente to falsely claim that he saw the gun when he got into the car with Montanez, Serrano, and Pacheco, and that they drove to a pawn shop to sell some jewelry that Montanez, Serrano, and Pacheco had supposedly stolen that day when they unsuccessfully attempted to rob Mr. Vargas?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that it was part of your methodology, along with that of Detective Guevara, to incorporate unique facts into fabricated statements, again, to

give the appearance that those statements had veracity and credibility?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you told Vicente to say that Montanez, Serrano, and Pacheco went to a pawn shop because they needed money to feed their heroin addiction; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Mr. Halvorsen, you did also tell Vicente to falsely claim that Montanez told him that damage to his car had occurred while he was driving away from the Vargas murder scene and crashed into a parked car; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you already knew that Mr. Montanez's car had some damage to it; isn't that right?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And, in fact, sir, isn't it true that you knew who Mr. Montanez was and you knew what type of car he drove, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And part of your plan to frame Mr. Montanez and Mr. Serrano and Mr. Pacheco was, again, to derive information that you knew to be true and then utilize that information as part of a -- the fabricated statement that was fed to Mr. Vicente, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that none of -- nothing of which you told Mr. Vicente was, in fact, true?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, you knew, along with -- strike that. You knew, Detective Guevara knew, and Assistant State's Attorneys Coghlan and Dillon knew that Vicente had never met with Montanez, Serrano, and Pacheco on

February 5th, 1993, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you and the other defendants in this case knew that Montanez, Serrano, and Pacheco had not confessed to Vicente, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you, along with your fellow defendants knew that Montanez, Serrano, and Pacheco had nothing to do with the murder of Rodrigo Vargas?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did you know who actually committed the murder of Rodrigo Vargas?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. Did you and Detective Guevara protect the guilty person who was responsible for the Vargas murder?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Was the murder of Rodrigo Vargas related to any drug activity of which neither you, Detective Guevara, or Joseph Majinowski were benefitting financially?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did you protect the true murderer of Rodrigo Vargas and frame innocent people so that you could protect a drug operation that you were benefitting from financially?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Now, in order to get Vicente to go along with the story that you and your fellow

defendants fabricated and fed to him, isn't it true that Vicente was told by yourself and others that he would not be charged in connection with the felony -- with the -- with the murder of Rodrigo Vargas?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you and Detective Guevara told Mr. Vicente that he had already committed to being a snitch in the Robert Buto case and he may as well go all the way?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told him that he was already going to be labeled a snitch and a rat, so he may as well get as much benefit out of that arrangement as he could?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And part of that agreement with

Vicente is that so long as he continued to help and you and Detective Guevara and the Assistant State's Attorneys Dillon and Coghlan on murder cases, that he would get certain benefits throughout his stay in the Cook County jail?
MS. CERCONE: Object to form.
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that for the whole process of feeding Vicente the story about Montanez, Serrano, and Pacheco confessing to him, Defendants Guevara and Assistant State's Attorneys Coghlan and Dillon were also present?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it also true that you and Detective Guevara spoke with Sergeant Mingy about how you had decided to utilize Frankie

Vicente in the frame-up of Montanez, Serrano, and Pacheco?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that while you were coercing Vicente to fabricate a false story against plaintiffs, Defendants Coghlan and Dillon were either directly in the room with you or had positioned themselves right outside the room where they would have been able to hear everything that was being said and done?
MS. CERCONE: Form.
MR. GIVEN: Form. Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it further true that Frankie Vicente confessed to you that he was back on heroin again on June 2nd, 1993 when you were fabricating a statement that you wanted him to falsely repeat?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And isn't it true that the way in which you fed a false narrative to Frankie Vicente was to say, "Didn't you say that Mr. Montanez told you this?"
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you fed Mr. Vicente the false narrative by giving him "didn't you say" statements?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And then after you would give him "didn't you say" statements, he would agree that he had said those things to you, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

EP IGLESIAS Sub Resp 001543

97

BY MS. BONJEAN:
Q. And while you were giving Mr. Vicente the "didn't you say" statements and he was agreeing that he had made those statements, Assistant State's Attorneys Coghlan and Dillon were writing down the statement?
MS. CERCONE: Object to form.
MR. GIVEN: And just so I can stop saying it, to the extent that you continue to use the phrase, "didn't you say statements" I'll just have a standing objection to that as to form. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that neither Assistant State's Attorney Dillon nor Coghlan told you or Detective Guevara to stop coaching Mr. Vicente?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

98

BY MS. BONJEAN:
Q. Now, after the June 2nd, 1993 meeting in the Cook County State's Attorney office gang crime unit, isn't it true that Assistant State's Attorney Coghlan and Dillon arranged for Mr. Vincent to be placed in the witness quarters or otherwise known as "the Q"?
MS. CERCONE: Object to form.
MR. GIVEN: Foundation and competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And while Mr. Vicente was housed in the Q, isn't it true that you and Detective Guevara arranged for him to get between $200 -- 200 and $300 in cash at various points to ensure his continued cooperation in the scheme to frame the plaintiffs in this case?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Detective Guevara arranged for Mr. Vicente to

99

also get drugs and alcohol while he was in the Q in order to ensure his continued cooperation in the scheme to frame the plaintiffs?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Assistant State's Attorneys Coghlan and Dillon would call you on occasion to express concern that Vicente wanted to back out of being a witness against Buto and the plaintiffs in this case?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And after Assistant State's Attorneys Coghlan and Dillon would call and express their concern, isn't it true that you and Detective Guevara would go have a talk with Frankie Vicente to ensure that he would maintain his cooperation in the scheme to frame, not only Robert Buto, but the plaintiffs in this case?
MS. CERCONE: Object to form.

100

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you and Detective Guevara decided that you would use Frankie Vicente in, yet, a third murder as a snitch witness?
MR. GIVEN: Objection; form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Sir, isn't it true that you, Detective Guevara, along with Assistant State's Attorneys Coghlan and Dillon, decided that you would use or wanted to use Frankie Vicente in the murder case against a defendant by the name Geraldo Iglesias?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that even after the June 2nd, 1993 meeting in the gang crimes unit, Mr. Vicente was frequently brought up

to the Cook County State's Attorney gang crimes unit so he could memorize and work on his statements against three different -- well, strike that -- five different defendants in criminal murder investi- -- criminal murder cases?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Assistant State's Attorneys Dillon and Coghlan and yourself came up with a theory that you wanted Mr. Vicente to, again, claim that Iglesias had confessed to murder in his presence and in the bullpen?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Detective Guevara showed Frankie Vicente a photograph of Geraldo Iglesias, who went by the

nickname Snake, so that he could identify Mr. Iglesias?

MR. GIVEN: Hold on just a second. I'm going to repeat and just have a standing objection to -- for the same reasons that I mentioned earlier regarding questions about another case that's not related to the underlying case in this lawsuit.

MS. BONJEAN: Okay.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Detective Guevara showed Frankie Vicente a photograph of Geraldo Iglesias because Vicente didn't know what Iglesias looked like? He had never met him, correct?

MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Detective Guevara and yourself fed information to Frankie Vicente about the murder for which

Iglesias had been charged?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you and Detective Guevara and the Assistant State's Attorneys discussed the fact that it would be suspicious that Frankie Vicente would have been a witness to five different defendants confessing to him?

MS. CERCONE: Object to form.

MR. GIVEN: Foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And even as of June 2nd, 1993, wasn't it true that the four of you, the four defendants in this case, discussed the fact that it was not ideal that Frankie Vicente would be sort of a key witness in -- in this -- in the murder prosecution against Serrano, Montanez, and Pacheco, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, the goal was to actually get a different witness who would implicate Serrano, Montanez, and Pacheco in the case; isn't that right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, the four of you, being yourself, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon, recognized that one witness who claimed to have heard a statement by the defendants would not actually satisfy the State's burden of proof?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And also wasn't it true that one of the reasons that you relied on -- strike that. Another reason that you fabricated a statement that was attributed to Frankie

Vicente was so that you could create probable cause in order to make an arrest in the case?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. We'll get back to that in a second.
After June 2nd, 200- -- strike that. After June 2nd, 1993, isn't it true that you and Detective Guevara decided that you would continue to manipulate the victim in this case, Wilda Vargas, to persuade her that Serrano, Montanez, and Pacheco had murdered her husband, Rodrigo Vargas?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, part of your plan, along with Detective Guevara and Assistant State's Attorneys Coghlan and Dillon, was to manipulate Vargas in a way so that her statements would corroborate Vicente's story?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Isn't it true that you, Guevara, Mena, Dillon and Coghlan decided that you would manipulate her in a way that she would falsely implicate Montanez's car as the car she saw in the gas station the night before the murder?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you and Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Dillon and Coghlan decided to manipulate Wilda Vargas to get her to falsely implicate Montanez and Serrano as the men she saw at the gas station the night before her husband's murder?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that on June 6, 1993, a few days after this meeting on June

2nd, you and Detective Guevara picked up Wilda Vargas at her home and brought her to a location where Mr. Montanez's car was parked?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. The purpose in bringing Wilda Vargas to view Mr. Montanez's car parked on the street was to get her to identify the car as the car that she saw at the gas station the night before her husband's murder; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Wilda Vargas viewed the car and told you and Detective Guevara that it looked kind of like the car that she had seen at the gas station?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Wilda Vargas told you and Detective Guevara that she could not say whether it was the same car, but that it had a similar color?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And isn't it true that and you and Detective Guevara then falsely told Ms. Vargas that evidence found at the crime scene matched forensic evidence from Montanez's car?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And to put a fine point on it, isn't it true that you pointed out on Mr. Montanez's car what appeared to be a bullet hole in the side of the car?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you told Ms. Vargas that evidence taken from that bullet hole on Montanez's car matched firearms evidence that was recovered from the scene of her husband's murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and

Detective Guevara falsely told Ms. Vargas that the evidence taken from the bullet hole on Montanez's car matched ballistic evidence at the crime scene in order to convince her that that was the car she had seen at the gas station?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, isn't it true that it was a fabricated statement that was made up from whole cloth that there was any firearms evidence that matched Mr. Montanez's car collected from the crime scene?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Wilda -- Wilda Vargas never told you that the car that was parked on the street that you brought her to see was the same car that she had seen at the gas station?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, you did not drive Wilda around the neighborhood so that she might be

able to legitimately try to identify a car that she had seen at the gas station the night before the murder, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you didn't put together any type of array or photograph array of different types of cars to see if she could identify which one looked like the car she had seen at the gas station, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And when you authored a police report in which you claim that you and Guevara drove Wilda Vargas around the neighborhood of the 3900 block of West Dickens, that was, in fact, a false statement, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you and Detective Guevara brought Ms. Vargas directly to Montanez's car and told her that was the car that had been used in her husband's murder,

right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you -- And neither you nor Detective Guevara had any basis whatsoever to believe that Mr. Montanez's car had any involvement in the murder of Rodrigo Vargas, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you and Detective Guevara had no basis to believe whatsoever that Mr. Montanez's car had been at a gas station on the night before the murder of Rodrigo Vargas, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You had prior knowledge that Mr. Montanez's car had some damage to the fender, and you used those facts in order to manipulate Ms. Vargas into believing that that was the car that she had seen at the gas station, right?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. Now, I'm going to have you look at what has been previously marked as Guevara Exhibit 3. It's a collection of documents from RFC-Serrano/Montanez 1 through 148.

MR. GIVEN: The original for him, right?

MS. BONJEAN: Yes.

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm handing you what has been previously marked as Exhibit 3, which purports to be the complete investigative file for the Rodrigo Vargas murder. It is Bates stamped RFC-Serrano/Montanez 1 through 148. I'd ask please, sir, that you turn your attention, if you would, to the Bates stamp 96, which is towards the end of the document.

MR. GIVEN: And let me just state -- Go ahead. You can point it out to him.

MS. BONJEAN: Okay. You can make your...

MR. GIVEN: I'll just state for the record and tell the witness, Mr. Halvorsen, pay attention to me when Ms. Bonjean is

getting you to the page. When you are directed to a document, you should feel free to review the document to the extent necessary -- to the extent you feel necessary in order to understand and answer the question; and that will apply as we go through the rest of the day.
BY MS. BONJEAN:
Q. Now, Mr. Halvorsen, I'd like to draw your attention to the supplemental police report that begins at the Bates stamp 96 and goes through 99 and that bears your signature at the bottom of Page 96.
Do you see that, sir?
**A. Yes.**
MR. GIVEN: Okay. That's fine. Go ahead.
BY MS. BONJEAN:
Q. Sir, at the page -- At the bottom of Page 96, is that your signature underneath the typewritten entry that says "Detective E. Halvorsen, Star No. 20692"?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, do you see next to that entry another officer's name that reflects "Detective R. Guevara, Star No. 20861 that has his signature or purported signature beneath it? Do you see that, sir?
MR. GIVEN: Objection; form and compound: You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Sir, isn't it true that frequently you -- strike that.
Isn't it true almost -- almost always you were responsible for authoring police reports on cases where you and Detective Guevara worked together?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, isn't it true that you had previously said that you both -- you and Detective Guevara had different skill sets in your policing abilities?

MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Detective Guevara was someone who had a lot of knowledge about the streets and, specifically, about the gangs in Humboldt Park?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you viewed yourself as someone who had skills in writing police reports? You were sort of the brains behind the operation, right?
MR. GIVEN: Form. Sorry, Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, Detective Guevara was not much of a writer, was he?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. In fact, isn't it true that Detective Guevara didn't really write competent police reports?
MR. GIVEN: Form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And that usually when you were investigating a case with Detective Guevara, you would be the responsible party for authoring the police reports, and he would be the more hands-on officer in the field, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And that was the case when this supplemental report that has been marked already and is before you was prepared, right?
MR. GIVEN: Form. And with that, I don't mean to do a speaking objection; but

when you say "that was the case," I'm not sure what you're referring to.
MS. BONJEAN: Sure. I'll -- I'll -- I will rephrase.
BY MS. BONJEAN:
Q. Sir, isn't it true that the supplemental report that's before you that has the Bates stamp 96 through 99 as part of Exhibit 3 is a supplemental report that you, in fact, authored?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And even though the report has Detective Guevara's name on it as well, you actually typed his name in there and signed his name, didn't you?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, you frequently signed Detective Guevara's name to police reports; isn't that correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Now, this police report indicates, sir, that it was submitted on June 2nd, 1993; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, that is untrue, isn't it? This police report was not submitted on June 2nd, 1993, was it?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, if you look at Page 99, the last page of the supplemental report, the narrative contains facts that occurred on June 6th, 1993; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you would agree, sir, that June 6th, 1993 actually comes after June 2nd, 1993 chronologically?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Now, in this police report that you authored, sir, isn't it true that you

memorialized the meeting that occurred with Frankie Vicente on June 2nd, 1993 at the gang crimes unit of the Cook County State's Attorney's office?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you did not name Frankie Vicente by name in the supplemental police report but identified him as a circumstantial witness; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you claim in your police report that you did so for his safety so that he could remain anonymous since he was giving information about a crime? But that was, in fact, the reason why you called him a confidential witness -- a circumstantial witness, is it?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Isn't it true that because Frankie Vicente was already being used in the Robert Buto case, it was your hope that you would be able to find a better witness than Frankie Vicente to use in the frame-up of the plaintiffs in this matter, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. But this served as a basis that -- strike that.
But isn't it true that you, nonetheless, reported the meeting with Frankie Vicente in the gang crimes unit so that you could use Frankie Vicente, if necessary, as witness at trial against the plaintiffs?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, now, I'd ask you to look at Page 97 of the second, I guess, full paragraph that begins with "He is a member of

121

Imperial Gangsters street gang."

Sir, isn't it true that you wrote in this report on Friday, the -- Friday, February 5th, 1993, "He was hanging out by a dope spot at Hamlin and Altgeld. Between 8:30 and 9:00, a car arrived at this location. He recognized the driver of the car as being Pistol Pete. Also in the car were Jordan and Mondo. He recognized all three of these guys, as they were also members of the Imperial Gangsters."

Do you see that statement, sir, that you drafted in this report?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that when you authored this report, you knew that Mr. Vicente had not been hanging out at a dope spot on Hamlin and Altgeld on February 5th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, when you authored this report, sir, you knew that it was untrue

122

that Mr. Vicente had recognized the driver of the car as Pistol Pete and that Jordan and Mondo were in the car; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, you knew these were false statements that had been fed to Frankie Vicente on June 2nd, 1993, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And these false statements you then took and placed in a police report representing that Mr. Vicente had made these statements when, in fact, he had merely repeated a story that you had fed to him, along with Detective Guevara and Assistant State's Attorneys Coghlan and Dillon?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, isn't it true that you also falsely reported in this supplemental police report that Vicente told you and

123

Detective Guevara that the plaintiffs in this matter, Mr. Montanez, Mr. Serrano, and Mr. Pacheco were riding a tan-colored Buick Regal, and that he recognized -- that he recognized as being Pistol Pete's car, that Jordan and Mondo got out of the car, and that Pistol Pete sat in the car playing around with a bag of dope?

Isn't it true that that is a statement, sir, that was falsely -- It was contrived falsely by yourself, Detective Guevara, Assistant's State's Attorneys Dillon and Coghlan?

Ms. CERCONE: Object to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you included this false statement in your police report that you authored sometime after June 6th, 1993?

MR. GIVEN: Form; foundation.

THE WITNESS: On advice of counsel, I

124

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true, sir, that you also included a false statement in this police report that Vicente told you the following: "The three of them were talking about a robbery that they had just done that had gone bad and that Pistol Pete had stated that Mondo fucked up and that he had went at the guy wrong and he would -- he would've never did what he did if Mondo had not fucked up and that Jordan stood around laughing at Pistol Pete yelling at Mondo."

Isn't it true, sir, that that, too, was a false statement that you included in the supplemental police report?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Frankie Vicente never told you these statements that we have just read, that the three of them were talking about a robbery that they had

done that had gone bad, and that Pistol Pete had stated that Mondo fucked up and he went at the guy wrong?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true, sir, that the entire narrative that is contained on Page 97, if you could take a look there, was a false narrative that you attributed to Frankie Vicente?
MR. GIVEN: Objection; form.
Just Page 97 or --
MS. BONJEAN: Yeah, just stop there. Yes.
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that there is no statement on Page 97 through 98 in which Vicente admits -- strike that. Just stay on 97 so you don't have to keep looking back and

forth. Let me start over.
Sir, isn't it true that every statement that is contained on 97 that -- in which Vicente alleges that Mr. Serrano, Mr. Montanez, or Mr. Pacheco made admissions regarding their involvement in the Vargas murder is, in fact, false?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And the narrative that is contained on Page 97 is a narrative that -- a false narrative that was fed to Frankie Vicente by yourself, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan; isn't that right?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And the false narrative that is contained on Page 97 of this exhibit is a false narrative that you then incorporated into this supplemental report, correct?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And at no point did you put in the supplemental report any information about how the narrative had been fed to Frankie Vicente by yourself, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan?
MS. CERCONE: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true, sir, that you never reported in this supplemental report or any other that Frankie Vicente had no knowledge about the murder of Rodrigo Vargas and was merely regurgitating a story that had been fed to him by yourself and your fellow defendants?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that if you turn the page, sir, on Page 98 of Exhibit 3, you authored statements alleged -- allegedly made

by Frankie Vicente during the meeting that occurred on June 2nd, 1993, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, again, the statements that are contained on Page 98 of Exhibit 3 are also false statements that were attributed to Frankie Vicente, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Frankie Vicente did not make any of these statements contained in this police report, both on Page 97 and 98, that you report as being truthful reflections of what he told you on June 2nd?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, this entire statement that has been attributed to Frankie Vicente in the supplemental police report that you

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 729 of 1206 PageID #:66534

authored was actually contrived by yourself, Detective Guevara, Assistant State's Attorneys Dillon and Coghlan and falsely attributed to Frankie Vicente, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And when you wrote this police report, you knew that Frankie Vicente had not been present at any point when the plaintiffs confessed their involvement in the murder of Rodrigo Vargas, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You also included in this police report at the bottom of Page 98 a statement by Wilda Vargas; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And this statement that is attributed to Wilda Vargas is pertaining to the gas station episode; isn't that correct?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And when I say "the gas station episode," I'm talking about the gas station incident on February 4th, 1993 where Ms. Vargas had reported that she had gone to the gas station with her husband after they had gone to the bank, and that they had got into like a beeping -- beeping cars at each other incident there with three Latino men in a tan car?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And although, sir, you included this statement of Wilda Vargas in this June 2nd, 1993 police report, you had information about the gas station episode almost immediately after you were assigned to the case on February 1993; isn't that right?
**A. On advice --**
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, you and Detective Guevara

certainly interviewed the victim shortly after you were assigned to the case in February of 1993; and you, in fact, interviewed her about the 24-hour period preceding her husband's murder; isn't that right?
MR. GIVEN: Objection. You said victim.
MS. BONJEAN: Okay. Let me start over. I'm doing a lot of work here.
MR. GIVEN: All you have to do is read it off the page.
MS. BONJEAN: No, I'm not -- I actually --
MR. GIVEN: You have a script right over there. I see it.
MS. BONJEAN: Well, keep up. We're talking about timing here.
MR. GIVEN: Go ahead. Anyway, I don't think anybody interviewed the victim was my -- the point, so...
MS. BONJEAN: Yeah, that's a good point. Thank you. I don't think I would have caught that.

BY MS. BONJEAN:
Q. Anyway, Mr. Halvorsen, isn't it true that you and Detective Guevara were able to obtain information about the gas station incident that occurred on February 4th, 1993 when you interviewed the victim's wife in this case in February of 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, you had that information that you did not report, but you had it from having -- you did not report in any GPR, right?
MR. GIVEN: Objection; form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. After you had put into motion your plan to frame Mr. Serrano, Mr. Montanez, and Mr. Pacheco, you utilized that information to give credibility to Frankie Vicente's fabricated story, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I

EP IGLESIAS Sub Resp 001552

133

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, sir, you also report in this June 2nd, 1993 supplemental report that Detective Guevara showed Ms. Vargas a photo array consisting of eight identification photos in that she identified Mr. Montanez, Mr. Serrano, and Mr. Pacheco as those individuals she saw at the gas station on February 4th of 1993, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. But that, too, was a false statement that you included in your supplemental report, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, at no point did you or Detective Guevara show Ms. Vargas a photo array consisting of eight photographs, did

134

you or did he?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Rather, you and Detective Guevara told Ms. Vargas that you had determined who the individuals at the gas station were, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, isn't it true, sir, that you and Detective Guevara actually showed Ms. Vargas three Polaroid photographs of the plaintiffs in this case?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And rather than ask Ms. Vargas to actually make an identification of the individuals she saw at the gas station, you told her who was at the gas station and identified Mr. Serrano, Montanez, and Pacheco as those three Latino men in the tan car?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, sir, isn't it true also that

135

you falsely reported in your supplemental report that you had Ms. Vargas drive around the neighborhood of the 3900 block of West Dickens on June 6th, 1993 to see if she could recognize the car from the gas station?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, sir, you reported in this police report that she positively identified a 1984 Buick Regal belonging to Jose Montanez as the car that followed her from the gas station, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. When, in fact, sir, you and Detective Guevara actually brought Ms. Vargas to Mr. Montanez's car and told her that that was the car that had been at the gas station, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You further falsely told Ms. Vargas

136

that that was the car that had been connected to her husband's murder on February 5th of 1993, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And the statements that you included in this supplemental report regarding Ms. Vargas identifying the car without your prompting were false statements, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You certainly didn't report in your supplemental report that you had drove Ms. Vargas to look at Jose Montanez's car, correct?
**A. On advice of --**
MR. GIVEN: Form. Sorry, form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, this supplemental

EP IGLESIAS Sub Resp 001553

report that you authored is devoid of any information that you -- that Ms. Vargas was unable to identify the tan car as the car she saw at the gas station, right?

**A. Form.**

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you failed to report in this police report that you falsely told Ms. Vargas that the damage to Mr. Montanez's car and the bullet hole was somehow connected to firearms evidence that was found at the murder scene, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you took all of these actions in order to execute the plan to frame Mr. Serrano, Mr. Montanez, and Mr. Pacheco for the murder of Rodrigo Vargas, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You also prepared this police report with the state- -- with these statements in order to justify an arrest of Armando Serrano, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, isn't it true, sir, that you and Detective Guevara arranged for Mr. Serrano to be arrested on June 8th of 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Serrano was brought to Grand and Central on June 8th, 1993 in connection with the murder of Rodrigo Vargas, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you and Detective Guevara discussed that you wanted to bring Mr. Serrano in for questioning in

hopes that he would make an inculpatory statement against himself, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Or, alternatively, you wanted to bring Mr. Serrano in in hopes that he might point the finger at another party, maybe Mr. Montanez or Mr. Pacheco, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, you wanted to fabricate more evidence in order to frame these three individuals, the plaintiffs in this case, because you didn't want to rely solely on Frankie Vicente's statements, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You didn't want to use Vicente as the key witness in the murder prosecution of Rodrigo Vargas because he was already being used in another murder case, correct?

MR. GIVEN: Form; foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that it was highly suspicious that one snitch witness would be used in three separate murder cases? And you knew that that would be looked at as scams by the Court, correct?

MR. GIVEN: Form; foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that there was absolutely no probable cause to believe that Mr. Serrano had been involved in the murder of Rodrigo Vargas when you arranged for him to be arrested on June 8th, 1993, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. The only evidence against Mr. Serrano that existed at the time that he

was arrested on June 8th, 1993 was evidence that you fabricated and fed to Mr. Vicente and reported in your June 2nd, 1993 report, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, the only basis for the arrest of Mr. Serrano on June 8th, 1993 was false and fabricated evidence that had been developed by yourself, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, after Mr. Serrano was brought to Grand and Central on February 8th of 199- -- strike that.

After Mr. Serrano was brought to Grand and Central on June 8th of 1993, he was interrogated for a period of about 24 hours; isn't that right?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. And you and Detective Guevara did as you often did and played tag team in the interrogation of Mr. Serrano, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And as was your routine, you played the good cop while Ray played the bad cop, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And the way this played out on June 8th of 1993 is that Detective Guevara would come in the interrogation room and physically abuse Mr. Serrano; isn't that correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, isn't it true, sir, that Mr. Guevara slapped plaintiff repeatedly and accused him of killing Rodrigo Vargas while he was held in this interrogation for a 24-hour period?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, isn't it true that you either witnessed Detective Guevara slapping plaintiff in the face or heard Detective Guevara slapping plaintiff repeatedly during the course of the 24-hour period?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And after Detective Guevara would physically abuse Plaintiff Serrano by slapping him, he would sometimes leave the room and let you come in and do your good cop thing, right?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, sir, you did come in and question Mr. Serrano on a number of occasions during this 24-hour period to try to gain his cooperation in -- in the case by using less aggressive methods, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you told Plaintiff Serrano that if he just admitted his involvement, you could -- you could -- you could help him get leniency in the case?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Plaintiff Serrano that you already knew that he and Montanez and Pacheco did it, and if he just pointed the finger at Montanez and Pacheco, you would make sure that he got a benefit or a deal for his involvement in the murder of Vargas?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. And then after your friendlier methods were unsuccessful in obtaining cooperation form Mr. Serrano, isn't it true that Detective Guevara would return to the interrogation room would where he would, again, use physical force to extract a statement from Mr. Serrano?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But isn't it true, sir, that during that 24-hour period, your method -- your methods and Detective Guevara's methods didn't work, did they?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You and Detective Guevara couldn't get Mr. Serrano to confess, could you?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that neither you or Detective Guevara could even get Mr. Serrano to implicate third parties in the murder of Rodrigo Vargas, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. But, sir, isn't it true that you had probable cause to arrest Mr. Serrano?

MR. GIVEN: Object. Go ahead.

MS. BONJEAN: Let me start over. Let me strike that.

BY MS. BONJEAN:

Q. Isn't it true that you had prepared a report that reflected that you had probable cause to arrest Mr. Serrano?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you and Detective Guevara were already relying on false statements by Vicente and could have used that information to arrest Mr. Serrano, right?

MR. GIVEN: Objection; form, incomplete hypothetical, calls for speculation.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Well, the point is, sir, that you didn't actually arrest or charge Mr. Serrano on February 8th, 1993; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Despite claiming that you had a witness who had heard Mr. Serrano confess to the crime and had a witness who identified Mr. Serrano at the gas station, you did not, in fact, charge Mr. Serrano with the murder of Rodrigo Vargas on February 8th, 1993, correct?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you released Mr. Serrano on February 9th, 1993, correct?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. And you released Mr. Serrano on February 9th, 1993 because you knew Vicente's statements were going to be problems -- be a problem in the future, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You wanted to develop more false evidence in order to successfully frame Mr. Serrano, Mr. Montanez, and Mr. Pacheco in the murder of Rodrigo Vargas, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you had hoped that Mr. Serrano might provide some statements, either implicating himself or implicating others that could be used, but that plan did not work out, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. So you were forced to release Mr. Serrano on February -- on June 9th, 1993, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, at that point, sir, you decided that you would cultivate another witness to act as a witness in the Vargas murder, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did you prepare any police reports regarding your arrest and interrogation of Mr. Serrano on February 8th of 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Did you prepare any GPRs that reflected that Mr. Serrano had not made any statements implicating himself or others in

the murder of Rodrigo Vargas?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And did you ensure that any of those police reports or GPRs were tendered to Mr. Serrano's attorneys after he was charged with the murder of Rodrigo Vargas?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, isn't it true, Mr. Halvorsen, that on June 11th of 1993, a person by the name of Timothy Rankins was brought into Area 5, otherwise known as Grand and Central?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you, along with Detective Guevara and your supervisor, Sergeant Mingy, decided that you would cultivate Mr. Rankins as a witness in the murder of Rodrigo Vargas?
MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You were concerned, sir, isn't it true, that Vicente wouldn't be able to tell a credible story implicating Montanez, Serrano, and Pacheco in the Vargas homicide?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and Detective Guevara spoke with your supervisor, Sergeant Mingy, along with Assistant State's Attorneys Dillon and Coghlan about the need to get another witness to corroborate Vicente's testimony against Montanez, Serrano, and Pacheco?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you talked to Defendants Mingy, Dillon, and Coghlan about the need to get another witness to play the role that you initially wanted Vicente to plea -- play, that is, as an eyewitness to the Vargas murder who would falsely claim to

have seen Montanez, Serrano, and Pacheco commit that murder?
MS. CERCONE: Object to form.
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. How exactly, sir, did you come into contact with Timothy Rankins on June 11th of 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true actually that Mr. Rankins was brought into Area 5 by Sergeant Mingy and yourself?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and Defendant Serrano -- I'm sorry. Strike that. You, Defendant Guevara, and Defendant Mingy told Rankins that Montanez, Serrano, and Pacheco had testified against his brother in another case?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And you told Mr. Rankins that the plaintiffs in this matter had testified against his brother in order to get him to cooperate in falsely implicating the plaintiffs in the murder of Rodrigo Vargas, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and Detective Guevara and Sergeant Mingy all agreed that you would either coerce or entice Mr. Rankins, whatever it took, to falsely implicate Montanez, Serrano, and Pacheco in the Vargas murder?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that in your presence, Defendant Mingy told Rankins that the reason he wanted to frame Montanez, Serrano, and Pacheco is because he couldn't catch them on a case, but he knew that they

were selling drugs?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you evenly -- you evenly tried to get Rankins to falsely implicate two brothers by the name of Rico and Marlo in a separate murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And in attempting to get Mr. Rankins to implicate this -- these people, Rico and Marlo in this other murder, you also told Rankins that they had testified against his brother in another case, correct crick?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you also told Rankins that if he did you this favor and falsely implicated the plaintiffs in the murder of Rodrigo Vargas, you could get his robbery charge dismissed?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Rankins that you needed him to testify that he actually saw the Plaintiffs Serrano, Montanez, and Pacheco murder Rodrigo Vargas?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that when Mr. Rankins initially declined to assist you, you also told him that you may just frame him for the murder of Rodrigo Vargas?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and Detective Guevara were present in an interview room when Detective Guevara kicked Mr. Rankins out of a chair that he was seated in while his hands were cuffed behind him?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you were also present when Detective Guevara and Sergeant Mingy kicked Mr. Rankins in the stomach and the back while he was in custody at Grand and Central?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you observed Detective Guevara place a phonebook on Rankins's head and strike the phonebook with a flashlight while he was in custody at Grand and Central?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, isn't it true that that was a method that Detective Guevara had used frequently when he was using physical coercion against suspects, that is, using a phonebook that he would then hit with a flashlight?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that in your experience that when an officer hits a suspect with a flashlight while using a phonebook as a barrier, that avoids leaving marks on the body of the person that's being

beaten?
MR. GIVEN: Form, foundation, competence, and speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that while you were making promises, as well as threats of violence against Mr. Rankins, Guevara and Mingy were also present?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And at no point during the interrogation of Mr. Rankins did you tell Mr. Detective to stop beating him; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And the reason that you told Rankins that you could help him with his robbery case and also separately threatened to charge him with the murder was because you wanted to coerce him into fabricating a story that implicated Montanez, Serrano, and

Pacheco in the Vargas murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, eventually you were successful in getting Mr. Rankins to provide a false statement that implicated Mr. Montanez, Mr. Serrano, and Mr. Pacheco in the Vargas murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, you had Mr. Rankins in custody for almost 24 hours, isn't that right, while you helped him prepare a false statement that he was going to give to an Assistant State's Attorney, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you told Rankins to falsely tell the State's Attorney that Stripes and Barrel Belly pulled up in a car and said they wanted him to do a drug deal with them?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you told Rankins to falsely say the people would want him on a drug deal because he's a fast runner?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told Rankins to falsely say that he was at a park, and then Stripes, Barrel Belly, and Joker said, "Let's do this," and then they drove to Springfield and Cortland?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told Rankins to falsely say that Joker, Barrel Belly, and Stripes got out of the car while he stayed inside of the car to wait?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told Rankins to falsely say that Joker, Barrel Belly, and Stripes got on either side of the gate and that Stripes said, "Do him, do him,"

and Barrel Belly said, "Go ahead," and that Joker supposedly opened fire with a nine millimeter gun?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you told Rankins to falsely say that Stripes told him that if he talked about the murder, they would do the same thing to him?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you provided Rankins with photographs of Montanez, Serrano, and Pacheco so that he could know who they were and what they looked like?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you, Detective Guevara, and Sergeant Mingy fed information to Rankins despite knowing that Rankins had no personal knowledge about the Vargas murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you, Guevara, and Mingy fed information to Rankins despite the fact that you knew that neither Mr. Montanez, Mr. Serrano, nor Mr. Pacheco were involved in any way in the Vargas murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, I'm going to have you look at Exhibit 3, please again, if you would. I'm going to have you look at Page 81. I'll give it to you.

Sir, Pages 81 through 85 purports to be a statement of Timothy Rankins taken on June 11th, 1993 at 11:35 p.m.

Do you see that statement in front of you, sir?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. According to this handwritten statement, also present was ASA John King and yourself, Detective Ernest Halvorsen; isn't

that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true, sir, that the statement contained in this handwritten statement at 81 through 85 contains a false narrative that you and Detective Guevara and Sergeant Mingy fed to Timothy Rankins?

MR. GIVEN: Form. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, isn't it true that the statements contained in this handwritten statement in which Rankins claims to have been present for the murder of Rodrigo Vargas and witnessed Montanez, Serrano, and Pacheco participate in the murder of Rodrigo Vargas was false in its entirety?

**A. On advice of counsel, I assert my Fifth Amendment rights it.**

Q. And that Mr. -- Mr. Rankins didn't write out this statement; isn't that fair to say?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, this was a statement that was attributed to him by yourself, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And through physical coercion and promises of leniency, you successfully obtained cooperation from Timothy Rankins, in that he signed this statement, even though its contents were completely false?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, isn't it true that you did not tell the Assistant State's Attorney John King that Mr. Rankins never made any statements to you regarding his knowledge about the murder of Rodrigo Vargas?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you did not tell Assistant State's Attorney John King

that you, Detective Guevara, and Sergeant Mingy had contrived a false narrative that you persuaded Timothy Rankins to adopt through physical coercion and promises of leniency?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you lied in your supplemental police report about the circumstances of your first meeting with Rankins to make it appear that Rankins was voluntarily truthfully implicating Montanez, Serrano, and Pacheco?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. I'm going to have you, sir, look at Page 68 through 72. I'm having you look at Page 68 through 72 of Exhibit 3 or Guevara 3 that purports to be a supplemental police report prepared on June 14th, 1993.

Do you see that, sir?

**A. On advice of counsel, I assert my**

165

**Fifth Amendment rights.**
Q. And this is a said report that you authored, and it bears your signature at the bottom of Page 68, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, again, sir, it also bears the signature of Detective Reynaldo Guevara, who was your partner in the investigation of the Vargas murder, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But, in fact, it's true, sir, that Mr. Guevara didn't actually sign this supplemental report? You signed his name at the bottom there, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And in this report that you authored, you indicated, sir, that Sergeant Mingy interviewed Timothy Rankins regarding his knowledge about an unrelated shooting involving a woman by the name of Monica Roman, right?

166

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you also reported, sir, that during this interview, Mr. Rankins revealed to Sergeant Mingy that he was a witness to the Vargas murder on February 5th of 1993, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But, sir, Mr. Rankins never told Sergeant Mingy he was a witness to the Vargas murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Rather, you and Sergeant Mingy and Detective Guevara decided that since you had Mr. Rankins in custody on an offense, that you would be able to use him as a witness in the Vargas murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And in this report that you prepared, you summarized the statement that Timothy Rankins purportedly made to yourself

167

and later to Assistant State's Attorney King, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And apart from any background information about Mr. Rankins, the statements that are contained in this supplemental report in which Mr. Rankins purportedly admitted to being a witness to the murder of Rodrigo Vargas are false; isn't that correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that the statements that you included in this supplemental report regarding -- strike that. Let me start over.
You fabricated the statements in this report, sir, and then attributed those statements to Mr. Rankins, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

168

BY MS. BONJEAN:
Q. You knew that Mr. Rankins had no knowledge about the murder of Rodrigo Vargas when you authored this report and included false statements in this report, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You knew there was no reason to believe that Mr. Serrano, Mr. Montanez, and Mr. Pacheco had any involvement in the Rodrigo Vargas murder when you authored this report and included false statements purportedly made by Timothy Rankins, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You knew that Timothy Rankins had not witnessed the murder of Rodrigo Vargas, nor had he seen Montanez, Serrano, and Pacheco on February 4th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You also falsely reported that

Timothy Rankins was shown a photo array consisting of eight Polaroid color photos, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You also -- You falsely reported that Timothy Rankins identified Mr. Serrano as the person known to him as Joker, identified Jorge Pacheco as the person known to him as Stripes, and identified Jose Montanez as the person known to him as Barrel Belly, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, isn't it true that you and Detective Guevara merely showed Mr. Rankins Polaroid photos of the plaintiffs in the case when you fed the story to him that you wanted him to repeat for the Assistant State's Attorney?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Sir, isn't it true that you knew that Rankins did not know Sergeant Mingy before his arrest on June 10th, 1993?

MR. GIVEN: Form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And it's true, sir, that you wrote the supplementary report that Rankins -- that you wrote in your supplemental report that Rankins did, in fact, know Sergeant Mingy prior to his arrest in June of 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you lied in your supplementary report that Rankins knew Defendant Mingy prior to June of 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you did so so it would be more plausible -- well, strike that.

Isn't it true that you falsely

claimed that Rankins knew Defendant Mingy to try to come up with a false story for why you were discussing the Vargas murder with Rankins in the first place?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And after you coerced Rankins into telling the story to ASA King, you also brought Rankins to later see Defendant Coghlan, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that in your presence Rankins told Assistant State's Attorney Coghlan that he was beaten by the police in an effort to get him to implicate Montanez, Serrano, and Pacheco?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true, sir, that you also brought Mr. Rankins to the crime scene where Mr. Vargas had been murdered so that he

could more credibly tell the false story that you had fabricated and fed to him?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you coerced Mr. Rankins into falsely implicating Mr. Montanez, Serrano, and Pacheco, along with Mr. Mingy and Detective Guevara because you wanted to frame the plaintiffs for the murder of Rodrigo Vargas?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, the supplemental report that you authored, purportedly on June 14th, 1993, which is in Exhibit 3, Bates stamp No. 68 through 72, contains false and fabricated statements that were never made by Timothy Rankins, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you did not include in your report at any point that you had used any type of misconduct to obtain these false statements from Timothy Rankins, right?

173

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you did not report that you had used misconduct -- strike that.
You did not report that Detective Guevara had used any physical abuse or other forms of misconduct to secure these false statements from Mr. Rankins, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, yet, you, Detective Guevara, and Sergeant Mingy all knew that Mr. Rankins's story about having witnessed the murder of Rodrigo Vargas was false in its entirety, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Now, sir, after securing this false and fabricated statement from Mr. Rankins, you and Detective Guevara went and arrested Mr. Serrano a second time, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, you and Detective Guevara

174

went to Mr. Serrano's house yourself and arrested Mr. Serrano at his home, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you did this on June 11th, 1993 after securing the false statement from Timothy Rankins, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that either you or Detective Guevara told Mr. Serrano in sum and substance, "This time you're not going home"?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: Jennifer?
MS. BONJEAN: Yes.
MR. GIVEN: Whenever you get to a natural stopping --
MS. BONJEAN: Yeah, it's good.
MR. GIVEN: Okay. Why don't we just take a short break. It's been an hour and a half.
MS. BONJEAN: Yeah, sure.

175

THE VIDEOGRAPHER: Off the record at 1:05.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record, 1:19.
BY MS. BONJEAN:
Q. Mr. Halvorsen, isn't it true that you, Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Coghlan and Dillon jointly discussed getting Wilda Vargas to falsely identify Montanez and Serrano as the men she had seen at the gas station?
MS. CERCONE: Object to form.
MR. GIVEN: Asked and answered, I think. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you, Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Coghlan and Dillon jointly discussed getting Wilda Vargas to falsely identify Montanez and Serrano from a live lineup as the men she had seen at the gas

176

station?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, you and Detective Guevara, Sergeant Mingy, and Coghlan and Dillon jointly discussed getting Wilda Vargas to falsely identify Montanez and Serrano as the men she had seen at the gas station in order to bolster your shaky case against them?
MR. GIVEN: Objection; form.
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Wilda Vargas was unable to describe any of the three men that she had seen at the gas station in any way prior to June 11th of 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that she told you

previously that she had paid very little attention to the men, and that had she doubted she could identify them, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you, Detective Guevara, and Sergeant Mingy conduct an impermissibly suggestive lineup that contained Armando Serrano and was viewed by Wilda on July -- I'm sorry, on June 11th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it rue that you and Detective Guevara suggested to Wilda Vargas that she should select Mr. Serrano from that lineup on June 11th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Wilda Vargas was unable to actually make an independent identification of Mr. Serrano as the person she saw at the gas station on June 11th, 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara made comments to Wilda Vargas that suggested that she should select Mr. Serrano from that lineup -- that she should select Mr. Serrano from that lineup and identify him as one of the individuals she saw at the gas station the day before her husband's murder?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara actually told Ms. Vargas that you had individuals in custody who were responsible for her husband's murder prior to her viewing the lineup on June 11th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, specifically, you and Detective Guevara told Wilda Vargas that you

had Mr. Serrano in custody, and that you had information that he was, in fact, the person responsible for her husband's murder prior to her viewing the lineup on June 11th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you, Guevara, and Mingy conduct an impermissibly suggestive lineup that contained Jose Montanez and was viewed by Wilda on July 9th of 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you and Guevara suggest to Wilda Vargas that she should select Mr. Montanez from this live lineup on July 9th of 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And did you and Guevara tell Wilda Vargas who to pick out of that lineup that contained Mr. Montanez on July 9th of 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that Wilda

Vargas was unable to independently identify Mr. Montanez from a lineup on July 9th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true Wilda Vargas told you that she could not identify the people from the gas station because she did not pay close attention to them when she saw them on February 4th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And did you and Guevara and Sergeant Mingy falsely claim that Wilda Vargas had identified Mr. Montanez from the lineup on July 9th of 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, isn't it true that you, Detective Guevara, and Sergeant Mingy falsely claimed that Wilda had identified Mr. Serrano from a live lineup on June 11th, of 1993? Yes, June 11th, 1993.

**A. On advice of counsel, I assert my Fifth Amendment rights.**

181

Q. Did you and Detective Guevara make comments to Wilda Vargas during the lineup on July 9th of 1993 that suggested to her that she should pick out Mr. Montanez as one of the individuals she saw at the gas station?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And did you and Guevara tell Wilda Vargas that you had someone in custody for the Vargas murder before the lineup that she viewed on July 9th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Specifically, you and Detective Guevara told Wilda Vargas that you had Mr. Montanez in custody for the Vargas murder prior to her viewing the lineup on July 9th, 1993, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you falsely told Ms. Vargas prior to her viewing the lineup on July 9th, 1993 that you had developed evidence showing that Jose Montanez was the person or one of

182

the people responsible for her husband's murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you appeared before Judge Spitzer to get arrest warrants for Jose Montanez and Jorge Pacheco?
MR. GIVEN: Objection; foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you lied to Judge Spitzer about the evidence against Jose Montanez and Jorge Pacheco?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you lied to Judge Spitzer about the evidence against Jose Montanez and Jorge Pacheco so that you would be able to obtain an arrest warrant for them, even though you knew there was no probable cause to justify their arrest?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

183

Q. And is it true, sir, that you lied to Judge Spitzer about the evidence against Jose Montanez and Jorge Pacheco so that you would be able to obtain arrest warrants for them because you knew that Judge Spitzer would not approve the arrest warrants without your lie?
MR. GIVEN: Objection. Never mind. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you and Detective Guevara lied to Assistant State's Attorneys to get them to approve charges against Montanez, Serrano, and Pacheco?
**A. On the advice of --**
MR. GIVEN: Object; foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. I'd like to have you look, sir, at Pages 54 through 55 of Exhibit 3. I will get you there. Actually, 53 through -- Did I say

184

that, 53 through 55?
MR. GIVEN: You said 54.
MS. BONJEAN: It's actually 53.
BY MS. BONJEAN:
Q. Mr. Halvorsen, I'm having you look at what's been previously identified as Guevara 3, Bates stamp 53 through 59. This purports to be a supplemental report authored by yourself on July 3rd, 1993, isn't it?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, again, sir, your signature is affixed at the bottom of 53, along with your partner, Detective Reynaldo Guevara, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And this is a supplemental report that you authored yourself, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And although Ray Guevara's signature appears at the bottom, it is, in fact, your signature, or it is your handwriting purporting to be Ray Guevara's

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 743 of 1206 PageID #:66548

signature, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And according to the supplemental report that you prepared, sir, you and Detective Guevara brought Timothy Rankins to testify before the Cook County Grand Jury, correct? And that's on Page 54, if you would like to see that.
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that prior to bringing Timothy Rankins before the Grand Jury, you had him review the statement -- the handwritten statement that you had previously coerced him into signing and adopting, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, you practiced with Timothy Rankins about what his testimony would be before the Grand Jury, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you knew that Timothy Rankins was going to testify consistent with his handwritten statement that you had fabricated and fed to him prior to him adopting it, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You further knew that the statements that Timothy Rankins was going to give under oath at the Grand Jury implicating Montanez, Serrano, and Pacheco in the murder of Rodrigo Vargas were, in fact, false, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you had secured Mr. Rankins's cooperation in not only giving the false handwritten statement but also testifying falsely before the Grand Jury through threats of physical violence, actual use of physical violence, and also promises of leniency, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, you knew that Timothy Rankins had no personal knowledge about the murder of Rodrigo Vargas, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you knew that Timothy Rankins's statement before the Grand Jury and his testimony under oath claiming to have been a witness to the Vargas murder were false?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you also knew that Timothy Rankins had no knowledge whatsoever to believe that Montanez, Serrano, and Pacheco were involved in the murder of Rodrigo Vargas, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you also knew that the statements that -- strike that -- that the statements and testimony that Mr. Rankins gave before the Grand Jury, in which he

implicated Montanez, Serrano, and Pacheco in the murder of Rodrigo Vargas were false in their entirety, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You, nonetheless, secured the false testimony from Mr. Rankins so that indictments would be issued charging Mr. Pacheco, Mr. Serrano, and Mr. Montanez with the murder of Rodrigo Vargas?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And after having secured Timothy Rankins's false Grand Jury testimony and prior handwritten statement, you and Detective Guevara decided also that you would memorialize Francisco Vicente's false narrative in a handwritten statement, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, on June 28th of 1993, isn't it true, sir, that you and Detective

EP IGLESIAS Sub Resp 001566

Guevara and Assistant State's Attorneys Dillon and Coghlan, again, arranged for Francisco Vicente to be transferred from the Cook County jail to the gang prosecution unit at the Cook County State's Attorney office?
MS. CERCONE: Object to form.
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And it was at that point on June 28th of 1993, you and the other defendants in this case decided that the fabricated story that you all had contrived on June 2nd, 1993 would be memorialized in a handwritten statement that you would have Mr. Vicente sign and adopt, correct?
MS. CERCONE: Objection to form.
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, Mr. Vicente gave a statement on June 28th, 1993 at 2 o'clock.

Also present was yourself and an Assistant State's Attorney by the name of Solita Pandit, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, Assistant State's Attorneys Coghlan and Dillon declined to be present for the taking of this formal statement of Vicente because -- because they wanted to distance themselves from this fabricated statement that would then be used to wrongfully convict the plaintiffs, correct?
MS. CERCONE: Object to form.
MR. GIVEN: Form, foundation, competence, and speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, the Assistant State's Attorney Solita Pandit that was brought in to take the statement of Mr. Vicente on June 28th, 1993 was unaware of the -- strike that.

Let me ask it this way: Do you know whether Assistant State's Attorney Solita Pandit was aware -- was aware of the meeting that took place in those offices on June 2nd, 1993 during which you, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon fabricated a false statement for Francisco Vicente that he ultimately adopted?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, you did not tell Assistant State's Attorney Pandit, did you, that you, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon had manufactured the false story on June 2nd, 1993 that was ultimately memorialized in this handwritten statement by Francisco Vicente on June 28th, 1993?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. And your supplemental report also does not contain any information -- strike that. Your supplemental report dated July 3rd of 1993 contains no information revealing that the statement that Francisco Vicente signed on June 28th, 1993 was actually the product of a prior meeting on June 2nd, 1993 where you, Defendants Guevara, Coghlan, and Dillon had manufactured this statement?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you knew that the facts of the Vargas murder were similar to the shooting investigated in RD number T, as in Tom, 018247?
MR. GIVEN: Form and foundation.
I'm sorry. What was the RD number?
MS. BONJEAN: T, as in Tom, 018247.
MR. GIVEN: Go ahead.
THE WITNESS: On advice of counsel, I

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, isn't it true that you knew evidence from RD number T018247 would be important evidence for Montanez, Serrano, and Pacheco at their murder trial?
MR. GIVEN: Form and foundation, speculation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, there was a shooting investigated that bore the RD number T018247 that would have been of particular interest to Montanez, Serrano, and Pacheco's attorneys, as it bore many similarities to the Vargas shooting, correct?
MR. GIVEN: Same objection.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you removed from the file the RD number -- strike that.
Isn't it true that you removed from

the file police reports associated with RD T018247 before it was available to be subpoenaed by either the State or the defense?
MR. GIVEN: Objection; form and foundation.
When you say "removed from the file," you mean this file?
MS. BONJEAN: Yeah, I'll ask it -- strike that. Let me start over so we can...
BY MS. BONJEAN:
Q. Isn't it true that you removed police reports and information related to RD T018247 from the Vargas investigative file before that file was available to be subpoenaed by either the State or the defense?
MR. GIVEN: Objection; form, foundation, competence, and speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you removed

the file or the police reports associated with file RD number T018247 from the Vargas investigative file because it was available -- because if it was available to be subpoenaed, you knew it would be helpful to Montanez, Serrano, and Pacheco's defense?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
MS. BONJEAN: Can you mark this, please, as -- How do you want to do this?
MR. GIVEN: Well, so this is where the rubber hits the road. We had talked the last time about trying to do continuous numbers and pointed out that usually doesn't work very well. So we either designate this as Halvorsen 1 or --
MS. BONJEAN: I think Halvorsen makes sense.
MR. GIVEN: I do too.
(Halvorsen Deposition Exhibit No. 1 was marked for identification.)
BY MS. BONJEAN:
Q. Mr. Halvorsen, I'm going to hand

you what I marked as Halvorsen 1 for identification purposes -- I'm sorry. I'm going to hand you what I've marked as Halvorsen 1.
MR. GIVEN: Which I will try to give you a trick question and tell you to identify it by Bates stamp for the record, but you would not be able to do that.
MS. BONJEAN: No, I wouldn't. And I know it's been produced, but I honestly don't have an explanation because the fine people here at Loevy & Loevy made the copies for me, and I don't -- So I apologize, but this is -- I will represent for the record that this is a transcript of Grand Jury testimony in the matter of People versus Armando Serrano, Grand Jury number 336, and Criminal Indictment number 93 CR 15871, and this exhibit itself is four pages, although it's double-sided, okay.
MR. GIVEN: I think that will identify it sufficiently.
MS. BONJEAN: Good.

BY MS. BONJEAN:
Q. Mr. Halvorsen, isn't it true that you gave testimony at the Grand Jury or before the Grand Jury in connection with the criminal prosecution of Mr. Serrano and all the plaintiffs in this matter?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, sir, you gave testimony on July 1st of 1993 before the Grand Jury; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, sir, Page 3 up in the right-hand corner, you'll see you were asked a question by an Assistant State's Attorney by the name of Daniel Gallivan (phonetic), a question, "Did your investigation show that the defendant, Armando Serrano, was also present at that time?"
Do you see that?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. I'm going to back up so we have

some context as well, okay.
Prior to that, the Assistant State's Attorney asked you, "Did your investigation show that Rodrigo Vargas was in the area of 1838 North Springfield at approximately 5:30 a.m. on February 5th of 1993?" And you answered, "That's correct," correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You further testified in response to the question, "Did your investigation show that the Defendant Armando Serrano was also present at that time?" You answered, "That's correct."
Isn't that true, Mr. Halvorsen?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But, sir, that testimony was knowingly false, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Your expression did not show that Defendant Armando Serrano was present at

1838 North Springfield at 5:30 a.m. on February 5th of 1993; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, you did not actually conduct an investigation that showed that Mr. Serrano was present at the crime scene at 1838 North Springfield on February 5th of 1993, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Rather, you along with your defendant -- strike that.
Rather, you along with Defendants Guevara and Assistant State's Attorneys Dillon and Coghlan fabricated and fed false stories to Mr. Vicente and Mr. Rankins that suggested that Mr. Serrano and his co-defendants were present at the murder scene on the morning of February 5th of 1993, right?
MR. GIVEN: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. And that you knowingly gave false testimony before the Grand Jury to secure an indictment against Mr. Serrano for the murder of Rodrigo Vargas, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You were also asked the following questions by the Assistant State's Attorney: "Did your investigation show that Defendant Armando Serrano was armed with a handgun?" You answered, "That's correct."
You were also asked the question, "What did your investigation show as to the type of handgun he was armed with at that time?" Your answer, "A 9 millimeter semi-automatic pistol."
Do you remember being asked those questions and giving those answers, sir?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that testimony that you provided before the Grand Jury was knowingly false testimony, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Your investigation did not show that Armando Serrano was armed with handgun, specifically, a nine millimeter gun on the morning of February 5th of 1993 at 1838 North Springfield Avenue; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, that fact or those facts were actually fabricated by yourself, Detective Guevara, Assistant State's Attorneys Coghlan and -- Coghlan and Dillon, and fed to your witnesses, Mr. Vicente and Mr. Rankins, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You were also asked, "What did your investigation show occurred at approximately 5:30 a.m. at 1838 North Springfield?" And you responded, Answer: "Rodrigo Vargas just walked out of his house going to work at

approximately 5:30. As he walked out the front gate, he was stopped by three persons, one of the persons being Armando Serrano. They attempted to take money and a car radio that he had in his hand. He was able to run and get in his van, which was parked across the street. He closed that van door and locked it. Armando Serrano ran up to the van, shot through the window hitting Rodrigo Vargas five times and killing Rodrigo Vargas."

You provided that testimony before the Grand Jury on July 1st of 1993, correct?

**A. On advice of counsel, I assert my Fifth Amendment right.**

Q. And that testimony was knowingly false testimony, wasn't it, Mr. Halvorsen?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. That testimony came from evidence that you, Detective Guevara, Assistant State's Attorneys Dillon and Coghlan fabricated and fed to your witnesses, Frankie Vicente and Timothy Rankins, right?

**A. On advice --**

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you knew that Mr. Serrano was nowhere near 1838 North Springfield on the morning of February 5th, 1993, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You also knew that neither Mr. Montanez or Mr. Pacheco were with Mr. Serrano at 1838 North Springfield on the morning of February 5th of 1993; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you knew that neither Mr. Vicente nor Mr. Rankins had any personal knowledge about Mr. Montanez, Pacheco, or Serrano being at the crime scene located at 1838 North Springfield on the morning of February 5th of 1993, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you gave this false testimony before the Grand Jury for the purpose of securing an indictment against Mr. Serrano, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And securing an indictment against Mr. Serrano was just one of the steps that you took in order to frame him for the murder of Rodrigo Vargas and cause his wrongful conviction, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you were asked at the end of your examination on Page 5, Question: "Did you learn the facts to which you testified today through police records, interviews of witnesses, and statements?" And you said, "That is correct."

Isn't that right, Mr. Halvorsen?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. But isn't it true that the facts that you testified to that you learned through police records were police reports you fabricated?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And the fact that you testified too that you learned through the interviews of witnesses were actually statements by witnesses who you had coerced into regurgitating false stories that you gave and provided to them?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In addition to providing false testimony before the Grand Jury, you provided false testimony at the trial of Mr. Pacheco, Mr. Montanez, and Mr. Serrano?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MS. BONJEAN: I ask that we mark that as Halvorsen 2.

(Halvorsen Deposition Exhibit No. 2 was marked for identification.)

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm going to hand you what's been marked as Halvorsen 2 and bears a caption of "People of the State of Illinois versus Jose Montanez." I will represent that it bears Bates stamps JRL04985 through JRL05100, 5100, okay.

Mr. Halvorsen, did you provide testimony at the trial -- bench trial of Mr. Serrano, Mr. Montanez, and Mr. Pacheco?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true prior to giving testimony at their bench trials, you sat down with Assistant State's Attorney Coghlan to discuss your testimony?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you, along with Assistant State's Attorney Coghlan discussed how you would testify falsely about the circumstances under which Franco -- Frankie Vicente and

Mr. Rankins made statements implicating Pacheco, Montanez, and Serrano in the murder of Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, I'm going to have you look at page -- I'll use the page numbers that are at the very bottom of the page and the center of the page. We'll start with Page 80.

Assistant State's Attorney Defendant Coghlan asked you about the meeting that you had on June 2nd of 1993 at the Cook County State's Attorney gang prosecution unit on the 13th floor, and you admitted, sir, that you were present for that meeting, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, Mr. Coghlan asked you who else was present besides yourself and Mr. Vicente, and you answered, "Just the two of us"; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that testimony was knowingly false testimony, wasn't it, sir?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, it wasn't just you and Vicente who was present for this meeting. It was also Detective Guevara and Assistant State's Attorneys Coghlan and Dillon, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Assistant State's Attorney Coghlan told you that you needed to lie about who was present for this meeting because it would reflect poorly on him and Assistant State's Attorney Dillon if it was known to the judge that they were present for a meeting with Vicente prior to Mr. Serrano or Mr. Montanez or Mr. Pacheco's arrest?

MS. CERCONE: Object to form.

MR. GIVEN: Foundation, competence, and speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Assistant State's Attorney Coghlan told you, "Hey, you can't say I was there at this meeting. You understand that Ernie, right?"
MR. GIVEN: Object to form.
BY MS. BONJEAN:
Q. Or something to that effect?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you agreed to lie in front of the judge when you stated that it was just you and Frankie Vicente in the gang crimes unit of the prosecutors's office, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, you falsely testified that you had alone brought Mr. Vicente up to

the gang prosecution office to talk to him about the case, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you falsely stated that you brought him up because he was involved in another one of your investigations, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And while it was true that he had been coerced into implicating Robert Buto in the murder of Ruvalcaba, he was not involved in any legitimate investigation of yours, correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, sir, you testified that Frankie Vicente indicated to you that he had information regarding the Vargas murder during this meeting that took place on June 2nd, 1993 in the prosecutor's office, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, again, sir, that was false testimony because Mr. Vicente never told you he had information regarding the Vargas murder, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, it was you, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan who told Vicente that you wanted him to implicate Montanez, Serrano, and Pacheco in the Vargas murder, right?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, you told -- You testified -- You testified before Judge Bolan that you had heard of rumors on the street that a guy by the name of Pistol Pete was involved in the murder of Rodrigo Vargas, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that Assistant State's Attorney Coghlan told you to testify to that knowing full well that it would be objectionable evidence?
MS. CERCONE: Object to form, foundation.
MR. GIVEN: Competence and speculation, calls for a legal conclusion.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Well, by 1993, sir, you were a pretty seasoned detective, and you knew something called -- you knew something about the rule of hearsay, right?
MR. GIVEN: Form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you knew, generally speaking, that you couldn't get in front of a jury or any trier of fact and say, "Oh, I heard rumors on the street that someone did it," correct?

MR. GIVEN: Form, foundation, competence, speculation, incomplete hypothetical.
You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, certainly, the former Cook County State's Attorney, Matthew Coghlan, now the esteemed Judge Coghlan told you, "I'm not going to be able to ask you about rumors you heard on the street legitimately. So I need you to just blurt it out so the judge can hear it," right?
MR. GIVEN: So --
MS. CERCONE: Objection to form, foundation, harassing.
MR. GIVEN: Objection. I adopt what she says.
MS. BONJEAN: Okay.
MR. GIVEN: You've been doing a great job so far.
MS. BONJEAN: Jeff?
MR. GIVEN: Go ahead.

MS. BONJEAN: It makes my day when you compliment me. I really -- I really don't know what I would do without your affirmations. Thank you.
MR. GIVEN: You're welcome. I would think of it more as a backhanded compliment myself, but...
MS. BONJEAN: Yes, and your backhanded compliments mean the world to me. What would I do?
THE WITNESS: I don't really care.
MS. BONJEAN: Anyway.
MR. GIVEN: Is there a question to be answered here.
MS. BONJEAN: There will be.
Are you going to answer it?
MR. GIVEN: He's waiting for a question. He's answered every question you've asked, so let's just continue.
BY MS. BONJEAN:
Q. Now, after Assistant State's Attorney Coghlan told you that he wanted you to blurt out in testimony that you had heard rumors on the street that a guy named Pistol

Pete was involved in the crime, you agreed to do that, right?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And Assistant State's Attorney Coghlan questioned you or asked you, "So did you ask Francisco Vicente regarding Pistol Pete?" And you answered that you did do that, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you testified that you did that because you knew Francisco Vicente when he was arrested, and he was arrested with a second offender who had a nickname of Pistol Pete, and "I was curious whether or not Francisco might be able to assist me in the investigation of the murder of Rodrigo Vargas," right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that testimony, sir, was

knowingly false testimony, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that was knowingly false testimony that you prepped the Assistant State's Attorney Matthew Coghlan prior to you taking the stand, wasn't it?
MS. CERCONE: Object to form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, isn't it true that you never asked Vicente whether he would be able to assist you in the investigation of Vargas? Rather, you told Vicente what you wanted him to say regarding the Vargas murder, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You testified, sir, on Page 83 that Francisco Vicente gave you a lengthy

statement about what he knew about the murder of Rodrigo Vargas, and that he had supplied you with the three nicknames Pistol Pete, Mondo, and Jordan, and that you checked the nicknames in your file and saw that Pistol Pete was Jose Montanez and Armando Serrano was Mondo and that Jordan was George or Jorge Pacheco, and that you had dealt with those persons in past investigations, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, sir, that testimony was false testimony, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that was false testimony that you practiced with Assistant State's Attorney Matt Coghlan before you took the stand and testified under oath, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, isn't it true that

Francisco Vicente never gave you any type of statement about the murder of Rodrigo Vargas? Rather, you gave him a statement to repeat about the murder of Rodrigo Vargas, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Vicente didn't give you the names Pistol Pete, Mondo, and Jordan. Rather. You, Detective Guevara, Assistant State's Attorneys Dillon and Coghlan provided those names to Francisco Vicente and coerced him into repeating or regurgitating those names in the form of a false statement that was later used against the plaintiffs in this case, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that after you got those names -- strike that.

You falsely testified before you

received these names of Pistol Pete, Mondo, and Jordan, that you hooked up with Jose Montanez, Armando Serrano, and Jorge Pacheco, that you went and you obtained three black-and-white Chicago Police Department photos of them, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you testified that you apparently left 26th Street and went over back to Area 5, and you brought -- got those photos, and then you brought them back to the building so you could show them to Frankie Vicente, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Halvorsen, that was knowingly false testimony; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You never went back to Grand and Central to obtain these three photographs because you already you had them with you when you interviewed Mr. Vicente at the gang crimes unit on June 2nd of 1995 -- 1993, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, you showed Mr. Vicente the photographs of Serrano, Montanez, and Pacheco almost from the start of your interview on June 2nd of 1993 at the gang crimes unit, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Further, sir, you testified that Mr. Vicente identified the photographs of Serrano, Montanez, and Pacheco as individuals that he recognized, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you testified that you went to work at 3 o'clock that day and then you informed your partner, Detective Guevara, of

the statement that you had gotten from Frankie Vicente, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that was false testimony -- also false testimony that was prepared and practiced with Assistant State's Attorney Matt Coghlan prior to you taking the stand and testifying, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, Detective Guevara was present at the gang crimes unit on June 2nd of 1993; isn't that right?

**A. On advice of counsel --**

MR. GIVEN: Objection; form. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that Detective Guevara then immediately got on the telephone and called the wife of Mr. Vargas, Wilda

Vargas, and questioned her on the telephone, and that after you questioned -- he questioned Ms. Vargas on the phone, that you and Detective Guevara then drove to Ms. Vargas's home with these three black-and-white photographs, along with a filler photograph to show Ms. Vargas a photo array, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, that also was false testimony that you provided to the judge in this case, Judge Bolan (phonetic), with the preparation and practicing -- with preparation by Assistant State's Attorney Matt Coghlan prior to taking the stand, right?

MS. CERCONE: Objection to form.

THE WITNESS: On advice -- On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you never brought a photo array to Ms. Vargas to view, correct?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. Rather, you provided three photographs to Ms. Vargas and told her that those were the individuals responsible for her husband's murder, and that they were the individuals who had been at the gas station the night before his murder, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You provided that information, that false information, to Ms. Vargas because you wanted to manipulate her into believing that she had seen those -- the offenders of her husband's murder at the gas station prior to his murder on February 5th of 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that that same day you drove to the gas station at Central Park and North Avenue with Ms. Vargas, and

Ms. Vargas explained in Spanish to Detective Guevara the events that had taken place at the gas station the day before her husband's murder.

Do you remember testifying to that?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. That testimony was false as well, testimony that was prepared with the assistance of the Assistant State's Attorney Matt Coghlan prior to you taking the stand, correct?

MS. CERCONE: Object to form.

MR. GIVEN: Compound.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon had determined that it was important that you testify in a manner that would lead the trier of fact to believe that Wilda Vargas provided the gas station information after Mr. Vicente had provided that

information, correct?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. It was important, according to yourself, Detective Guevara, and the Assistant State's Attorneys that the trier of fact be misled into believing that Ms. Vargas provided this information after Vicente because otherwise -- strike that.
It was important to you, Detective Guevara, Assistant State's Attorneys Coghlan and Dillon that the trier of fact be misled into believing that Vargas provided this information after Vicente so as to leave the trier of fact with the impression that Vicente was aware of independent information that nobody would have known but someone -- but Ms. Vargas or Mr. Vargas?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. And that Mr. Vicente could have only gotten that information from the offenders at the gas station, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But in reality, you and Detective Guevara had learned from Ms. Vargas very early on in the investigation that she had been at the gas station prior to her husband's murder, and you used that information with Vicente, again, to give the false impression that there was some veracity to his statement, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, you also testified that on June 6th, 1993, you and Detective Guevara drove over to the 3900 block of West Dickens and saw a beige-colored 1984 Buick Regal four-door that had damage to the left front fender, and there was a bullet hole in the

trunk, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You testified that you went and got Wilda Vargas, and you and Detective Guevara went and got Wilda Vargas and that Guevara instructed Ms. Vargas in Spanish that you are going to drive down some streets, and if she saw the car that she saw at the gas station that day before her husband was killed, that she was to point it out; is that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you also testified that you drove down a number of streets eventually driving down the 3900 block of Dickens, and she spontaneously pointed to a car that you had previously determined belonged to Jose Montanez, correct?
MR. GIVEN: Objection; misstates the document that you're purporting to read from.
Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Well, you testified that you drove down a number of streets, eventually driving down the 3900 block of Dickens, "And I saw her" -- that being Wilda Vargas -- "indicate to Detective Guevara that she was pointing to the car that we had previously looked at."
You gave that testimony, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But that, too, was false testimony; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. That was false testimony that you prepared with Assistant State's Attorney Matt Coghlan prior to taking the bench, correct? Prior to taking the stand, correct?
MS. CERCONE: Object to form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, you never took Wilda Vargas along different blocks and have her

identify or try to identify the car from the gas station, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Rather, you took Wilda Vargas exactly to Jose Montanez's car, you told her it was the car of the offenders, and that forensic evidence connected the car to the crime scene; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You falsely told Ms. Vargas this information in an attempt to manipulate her testimony and persuade her, coerce her, or trick her into identifying the car as the car that she saw at the gas station on February 4th of 1993, right?

MR. GIVEN: Objection; form, asked and answered.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you, Detective Guevara, and Assistant State's Attorney Matthew Coghlan

and Assistant State's Attorney Dillon, along with your supervisor, Sergeant Mingy, were fully aware that you had taken Ms. Vargas directly to Ms. Montanez's car and suggested and manipulated her into believing that that was the car that he saw at the gas station on February 4th, 1993, correct?

MR. GIVEN: Object to form.

THE WITNESS: On advice of --

MR. GIVEN: Foundation. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, you testified that on June 11th of 1993 you received a call from Sergeant Mingy in which he reported to you that he had Timothy Rankins in custody and that he was an eyewitness to the murder of Mr. Vargas; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Now, prior to you taking the stand and giving testimony in this criminal prosecution, you discussed with Assistant

State's Attorney Matt Coghlan that Timothy Rankins was not going to be an available witness at this -- at the trial, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you knew that Mr. Rankins was MIA or sort of missing in action at the time of the criminal prosecution of Serrano, Pacheco, and Montanez, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And as a result, you knew, along with Detective Guevara and the Assistant State's Attorney that Rankins wasn't going to come in and testify falsely that he had seen Serrano, Montanez, and Pacheco murder Rodrigo Vargas, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But that didn't stop Assistant State's Attorney Matthew Coghlan from wanting to get that evidence in before the trier of fact, correct?

MS. CERCONE: Object to form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, prior to you taking the stand, Assistant State's Attorney Matt Coghlan practiced with you how you could testify about the statement that Rankins made to you in order to get that information in front of the judge, even though it was inadmissible?

MS. CERCONE: Object to form.

MR. GIVEN: And foundation, competence, and speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that you went along

your partner, Detective Guevara, to Area 5 located at 5555 West Grand Avenue at approximately 2 o'clock in the afternoon to interview Timothy Rankins.

This would have been, I believe, on June 11th, 1993, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You testified that you and Detective Guevara placed Rankins in a car and drove to the corner of North Avenue and Springfield and -- isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And then Assistant State's Attorney Matt Coghlan asked you the question, "And what happened next?" And you answered, "I told Timothy Rankins I wanted to believe what he was telling me, but he was going to have to prove to me" -- before you were interrupted by an objection.

Do you remember giving that testimony?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. And that was an answer that you had to practice with Assistant State's Attorney Matt Coghlan in order to try to get this inadmissible, incompetent evidence before the trier of fact, right?

MS. CERCONE: Object to form, foundation.

MR. GIVEN: Competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Judge Bolan, who apparently didn't know the rules of evidence any better than Assistant State's Attorney Matt Coghlan, allowed you to testify about statements that were made to you by Mr. Rankins, right?

MS. CERCONE: Object to form.

MR. GIVEN: Object to form.

MS. CERCONE: Move to strike.

MR. GIVEN: Yes. That's a fairly outrageous comment, but par for the course.

Go ahead.

MS. BONJEAN: Why? Are you protecting

Judge Bolan, or are you protecting your client?

MR. GIVEN: I'm not protecting anybody. I'm making objections. If you want to make obnoxious comments like that, go right ahead.

MS. BONJEAN: What's obnoxious is the transcript, what happened here. That's obnoxious, 23 years go by with someone wrongfully convicted.

MR. GIVEN: You know, we're not here to hear your speeches.

MS. BONJEAN: You're the one speaking, Mr. Given. What don't you zip it? Zip it.

MR. GIVEN: Why don't you ask a question --

MS. BONJEAN: Why don't you zip it, and then I'll ask a question.

MR. GIVEN: That's why we're here.

MS. BONJEAN: Zip it, and I'll ask a question.

MR. GIVEN: I don't even know what you mean by "zip it." What a ridiculous statement. Why don't you be professional?

MS. BONJEAN: Why don't you be

professional?

MR. GIVEN: And ask your question.

MS. BONJEAN: Why don't you be professional?

MR. GIVEN: I am.

MS. BONJEAN: It doesn't sound like it. I will move along if you close your mouth.

MR. GIVEN: Close your mouth? You want to put that on the video so we can all see your act?

MS. BONJEAN: Are you finished?

MR. GIVEN: I am. Are you? Are you going to ask a question?

MS. BONJEAN: I'm waiting for you to be quiet.

MR. GIVEN: Go right ahead.

BY MS. BONJEAN:

Q. Okay. Now, you answered that question after some back and forth, that you were at the corner of North Avenue and Springfield, and you told Timothy Rankins, "I wanted to believe the information he was providing me, but he's going to have to demonstrate to me that he actually had

evidence of this. I told him that I was going to drive north on Springfield, and he was going to have to show me that he knew exactly where this crime took place."

After a question, "What happened next?" You answered, "I then started driving slowly on Springfield from North Avenue. As he drove past 1838 North Springfield, Rankins pointed to a house and a fence. I recognized this house and fence as being the home of the victim, Rodrigo Vargas."

You testified, "We returned him, T. Rankins, to my office at Area 5 Violent Crimes, and we went out looking for the first defendant, Armando Serrano."

Do you remember giving that testimony?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that testimony, sir, was false in its entirety, wasn't it?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, that testimony that

you provided was testimony that you practiced with Assistant State's Attorney Matthew Coghlan prior to taking the stand; is that correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Rankins never pointed out to you where the murder of Rodrigo Vargas took place, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Instead, you told Mr. Rankins where the murder of Rodrigo Vargas took place, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you fed the entire statement to Timothy Rankins that you later then claimed was the basis for believing that Montanez, Serrano, and Pacheco were responsible for the murder of Rodrigo Vargas, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you gave this false testimony at the trial of Mr. Montanez, Mr. Pacheco, and Mr. Serrano in part because you wanted to secure a wrongful conviction against Mr. Montanez, Serrano, and Pacheco, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, if the trier of fact, Judge Bolan, believed that there was a witness out there who had identified Mr. Serrano, Mr. Montanez, and Mr. Pacheco as the offender -- offenders of Rodrigo Vargas, it would assist the State in meeting its burden -- burden of proof, correct?

MR. GIVEN: Objection; form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you, Detective Guevara, and Assistant State's Attorney Coghlan and Dillon knew that the case that you had against Serrano, Montanez, and Pacheco was a very shaky case, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, the case against Mr. Serrano, Pacheco, and Montanez hinged entirely on Francisco Vicente's testimony regarding what he heard them admit to, right?

MR. GIVEN: Form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you no longer had an eyewitness to this crime, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. So with the assistance and preparation of Assistant State's Attorney Matthew Coghlan, you testified before the trier of fact to testimony that Rankins had implicated Serrano in this case, correct?
MS. CERCONE: Objection; form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You testified further, sir, if you want to look at Page 95, that you put together a lineup on June 11th of 1993 that you had viewed by Timothy Rankins and Wilda Vargas, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true, sir, that Mr. Rankins never looked at a live lineup

that contained the plaintiffs in this matter, correct?
**A. On advice of counsel --**
MR. GIVEN: Form. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And Wilda Vargas, when she viewed the lineup, indicated to you and Detective Guevara that she did not have a recollection of who the individuals were at the gas station, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you testified that she viewed the lineup and made identification of -- an identification of Armando Serrano as one of the people at the gas station, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that was false testimony, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And on July 9th of 1993 -- strike that.
You testified about the lineup that was conducted on July 9th of 1993, and that would be at Page 97, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You also had Wilda Vargas view that lineup that contained Jose Montanez, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, again, Wilda Vargas told you that she could not identify any of the individuals who were at the gas station because she had not gotten a good look at them, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And notwithstanding the fact that she had told you that, you instructed or directed her to pick out Jose Montanez as one of the individuals who was at the gas station, correct?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And when you testified that she identified Jose Montanez from that lineup, that was false testimony, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that was false testimony that you practiced with Assistant State's Attorney Matthew Coghlan prior to taking the stand, correct?
MS. CERCONE: Object to form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And the false testimony that you provided at the trial of Mr. Serrano and Mr. Montanez and Mr. Pacheco was used to secure wrongful convictions against the plaintiffs, correct?
MR. GIVEN: Objection; form, foundation, competence, speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. After you testified falsely at the trial of Mr. Serrano and Mr. Montanez and Mr. Pacheco, Mr. Serrano and Mr. Montanez were convicted of the murder of Rodrigo Vargas, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you never told the judge that your testimony was a bald-faced lie, did you?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you never told anyone, even after the wrongful conviction of Mr. Montanez and Mr. Serrano that the testimony you provided at their trial was false, did you?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Do you have any regret for testifying falsely against Mr. Montanez, Mr. Serrano, and Mr. Pacheco and causing their 23-year wrongful convictions?

MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. I'm going to have you look at what's previously marked as Guevara 7.
Mr. Halvorsen, handing you what's been marked as Guevara 7, which is an affidavit of Francisco Vicente. It was executed on May 26th of 2004.
Have you ever seen this affidavit before, sir?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. I want to draw your attention to provision 4 or No. 4 of this affidavit, in which Francisco Vicente affirms that his testimony was false in all respect. While attributing his acquaintance with each of the of defendants, he did not see any of them on February 5th, 1993. At no point then or thereafter did Serrano, Pacheco, or Montanez speak to him -- speak to Vicente about the murder or any knowledge they may have had

concerning the death of Rodrigo Vargas.
Do you see that, sir?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, Francisco Vicente's statement that he made on May 26th, 2004 is in fact, truthful testimony; isn't that right? Or a truthful statement?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And he went on to say that his false testimony was given as a result of threats, intimidation, and physical abuse by Detective Reynaldo Guevara, and this began during the time period that he was incarcerated at Cook County jail following his arrest for armed robbery. Do you see that?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, sir, you were aware and knew

that Mr. Vicente had suffered intimidation and physical abuse by Detective Reynaldo Guevara, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. I'd like you to actually take a look at this affidavit. If you can, just take the opportunity to read it at your convenience and identify for me any statement in this affidavit that you know to be false by Francisco Vicente.
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true, Mr. Halvorsen, at some point prior to Mr. Vicente's own sentencing hearing that in his armed robbery cases, that he realized that he was not actually going to get that six-year minimum deal that he had been promised by you and Detective Guevara?
MR. GIVEN: Form, foundation, competence, speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. At some point Francisco Vicente learned that he was not eligible for the minimum a of six -- a six-year sentence because one of his rob -- well, three of his armed robberies were committed while he was on bond for another robbery, correct?
MR. GIVEN: Same objection.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And he was angry at you and Detective Guevara and the Assistant State's Attorney because a six-year sentence was an illegal sentence? He wasn't going to be able to get it, and that the mandatory minimum sentence was actually nine years, right?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that he was angry that he was now going to have to do a nine-year sentence, and he told you as much,

correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And he felt that he had been double crossed by you and Detective Guevara and the Assistant State's Attorneys when he learned that the mandatory minimum sentence that he would have to serve for his four robbery cases was actually nine years and not six years, correct?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that you, Detective Guevara and Assistant State's Attorneys Dillon and Coghlan decided that you would try to make it up to him by getting him pretrial custody time to which he wasn't entitled?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. In fact, you knew that at Frankie Vicente's sentencing hearing on September 23rd, 1996 Assistant State's Attorney Dillon stood up before Judge Surrea (phonetic) on that sentencing proceeding or at that sentencing proceeding, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, Assistant State's Attorney John Dillon drafted the sentencing order that was presented to Judge Surrea to be signed that reflected the pretrial custody time to which Mr. Vicente was entitled, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And between May 14th, 1993, the date of Mr. Vicente's arrest, and the date of his sentencing hearing on September 23rd, 1996, he was actually entitled to 1,132 days of pretrial custody; isn't that correct?

MR. GIVEN: Objection; form, foundation, competence, speculation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And notwithstanding the fact that he was only entitled to 1,132 days of pretrial custody credit, Assistant State's Attorney John Dillon wrote in the proposed sentencing order that he had spent 1,476 days in custody pretrial, correct?
MR. GIVEN: Form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And taking into account day-for-day credit, Assistant State's Attorney John Dillon essentially gave Mr. Vicente an extra two years of good time, correct?
MR. GIVEN: Form, foundation, speculation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

253

BY MS. BONJEAN:
Q. And Assistant State's Attorney Dillon gave Mr. Vicente over 300 days of additional pretrial custody time in order to make up for the fact that they had forgotten that he couldn't get a six-year sentence but was going to have to take a nine-year sentence because of the bond-on-bond crime that he had committed?
MR. GIVEN: Same objection.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, Mr. Vicente served about three-and-a-half years of real time on that nine-year sentence; isn't that correct?
MR. GIVEN: Same objections.
THE WITNESS: On advice.
MR. GIVEN: Hold on.
Form and foundation. Yeah, same objections. Competence and foundation and speculation as well.
Go ahead.
THE WITNESS: On advice of counsel, I

254

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true, Mr. Halvorsen, that Mr. Vicente was back on the streets approximately a month after he pled guilty on September 23rd of 1996?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that within a few months, you actually arrested him again for an armed robbery for which he ended up doing 20 years in prison?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Mr. Halvorsen, you framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby the Chicago Police Department put dozens of innocent individuals in prison for crimes they did not commit, correct?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

255

BY MS. BONJEAN:
Q. You framed Montanez, Serrano and Pacheco pursuant to an official policy or practice whereby members of Chicago Police Department manipulated and coerced eyewitness -- eyewitnesses to obtain false photo and in-person identifications; isn't that right?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced witness testimony, correct?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago

256

Police Department fabricated false evidence, including false police reports?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department fabricated false evidence, including false police reports?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department kept clandestine files that contained exculpatory evidence that would never be shared with the criminal defendants or State prosecutors; isn't that right?
MS. CERCONE: Objection; form.

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 761 of 1206 PageID #:66566

MR. GIVEN: Foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department destroyed evidence suggesting that suspects and criminal defendants were, in fact, not guilty, correct?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department concealed material exculpatory evidence from suspects, criminal defendants, their lawyers, and State prosecutors, including materials that could be used to impeach State witnesses; isn't that right?

MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Mr. Montanez, Mr. Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department lied in criminal trials about investigations they had been involved in?
MS. CERCONE: Objection; form.
BY MS. BONJEAN:
Q. Correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department lied and covered up misconduct committed by their colleagues pursuant to a code of silence, correct?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department were never disciplined for this type of misconduct creating an environment of lawlessness; isn't that right?
MS. CERCONE: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You used unconstitutionally coercive tactics, including excessive force, you manipulated eyewitnesses and eyewitness identifications, and you framed innocent individuals for crimes they did not commit more than three dozen times during the course of your employment with the Chicago Police Department; isn't that right?
MR. GIVEN: Form; foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Sir, you engaged in this misconduct repeatedly because you knew you would never be disciplined for this misconduct, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, you were never disciplined for framing people for crimes they did not commit, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, instead, you received a merit promotion to detective; isn't that right?
MS. CERCONE: Objection.
MR. GIVEN: Form.
MS. BARBER: Join.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Mr. Halvorsen, you understand that you alone and not your lawyers control your Fifth Amendment rights, don't you?

EP IGLESIAS Sub Resp 001584

MR. GIVEN: Object to form. You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Sir, why have you asserted your Fifth Amendment right not to incriminate yourself in this deposition?
MR. GIVEN: Objection; calls for attorney client priv- -- Calls for matters that are covered by the attorney-client privilege, and I would instruct him not to answer that question to the extent that it covers attorney-client privilege.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you intend to assert the Fifth to all questions asked at this deposition?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Has it been and is it your

intention to assert the Fifth Amendment to all questions asked to you about the Vargas murder investigation?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Has it been and is it your intention to assert the Fifth Amendment to all questions asked to you about any murder investigation in which you participated?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Has it been and is it your intention to assert the Fifth Amendment to all questions asked about you regarding any witness that you have interviewed, interacted with, or any suspect whom you've interrogated through the course of your career?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Do you intend to assert the Fifth Amendment to all questions asked about your employment with the Chicago Police Department?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Are there any subjects that you can identify as you sit here today on which you are willing to give binding testimony?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Has it been your intention and is it your intention to assert your Fifth Amendment rights to any and all questions?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Mr. Halvorsen, in order to assert

your Fifth Amendment right not incriminate yourself, sir, you do understand that you might -- you must have a reasonable fear of future prosecution based on that testimony that you might otherwise give today, correct?
MR. GIVEN: Form, and I object to you giving legal advice to my client.
You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Mr. Halvorsen, what crime do you fear that you might be prosecuted for in connection with your testimony here today?
MR. GIVEN: Objection; form. And to the extent that an answer would implicate attorney-client privilege, I would instruct him not to answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution by state authorities or federal authorities?
MR. GIVEN: Same objections.

You can answer.
THE WITNESS: On advice of counsel, I assert -- I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for perjury?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for lies you have told in the past under oath or for lies you intend to tell in this case under oath?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for lying under oath?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Do you fear prosecution for obstruction of justice?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for any RICO violations?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for any Hobbs Act violations?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for bribery?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Do you fear prosecution for fraud?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for mail fraud?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for assault or battery?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you fear prosecution for violation of federal civil rights criminal laws?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. When in this litigation did you determine that you would assert your Fifth Amendment right not to incriminate yourself?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Why did you determine that you should assert your Fifth Amendment right not to incriminate yourself in this case?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that it is because you committed the constitutional violations that Montanez and Serrano allege in their complaints?
MR. GIVEN: I'm sorry. Could you read that?
BY MS. BONJEAN:
Q. Isn't it true that you are asserting your Fifth Amendment right not to

269

incriminate yourself here today because you did, in fact, commit the constitutional violations that Montanez and Serrano allege in their complaints?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Are you asserting your Fifth Amendment rights in this case in order to deprive plaintiffs of discovery in this case?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you intend to assert your Fifth Amendment right not to incriminate yourself in this case if you are called upon to testify at trial?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Is it your decision to assert your

270

Fifth Amendment right not to incriminate yourself your own choice -- Is it your decision -- Is your decision to assert your Fifth Amendment right not to incriminate yourself your own choice or an instruction given to you by your lawyer?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You do realize, sir, that if at some later point you wish to give testimony under oath at trial or at any other proceeding, that the plaintiffs will object if you do not give testimony here today?

MR. GIVEN: Are you done?

MS. BONJEAN: Yes.

MR. GIVEN: Same objections, plus speculation. I don't know how he can imagine knowing what plaintiffs intend to do, but same objections.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

271

BY MS. BONJEAN:

Q. Well, sir, you do realize that if at a later point you indicate that you wish to give testimony in a proceeding and seek to blame prior attorneys for having given you the advice to plead your Fifth Amendment right, the plaintiffs will, in fact, object and move to bar your testimony if you do not provide testimony here today regarding the advice you were provided by your counsel?

Do you understand that?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did you rely on all -- Did you rely on the advice of your counsel in your decision to assert your Fifth Amendment rights?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, I'm going to, again,

272

instruct you that if you refuse to answer questions about the legal advice that you relied upon, we will move to bar you from later claiming that you relied upon advice of counsel as an explanation for your statements here today.

Do you understand that?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. What lawyers did you speak to about asserting your Fifth Amendment right not to incriminate yourself?

MS. BONJEAN: You can answer.

THE WITNESS: Jeff Given and Dan Herbert.

BY MS. BONJEAN:

Q. Did you speak with Mr. Soto?

**A. What's his first name?**

Q. James.

**A. I think I did.**

Q. What about Ms. Golden?

**A. I don't remember.**

273

Q. Mr. Grille (phonetic)?
**A. I don't remember.**
Q. Do you remember speaking to any other members of the Sotos law firm aside from Mr. Sotos and Mr. Given?
MR. GIVEN: About?
BY MS. BONJEAN:
Q. About the advice that you were -- Well, about asserting your Fifth Amendment right not to incriminate yourself?
**A. No.**
Q. Did you speak with any attorney outside of the Sotos law firm aside from Mr. Herbert about asserting your Fifth Amendment right not to incriminate yourself?
**A. No.**
Q. Did you speak with any attorney from the law firm of Rock & Fusco or Rock Fusco?
**A. No.**
Q. Did you speak with Ms. Eileen Rosen from Rock Fusco regarding your assertion of your Fifth Amendment right here today?
**A. No.**

274

MR. GIVEN: Don't look at me.
THE WITNESS: I don't know. Are these Fifth Amendment questions? I don't know.
MR. GIVEN: I will tell when it's a Fifth Amendment question again.
THE WITNESS: Okay.
BY MS. BONJEAN:
Q. Did you speak with any attorney from the Chicago law department?
**A. No.**
Q. Did you speak with any attorney from the Cook County State's Attorneys office?
**A. No.**
Q. Did you speak with any attorney associated with the Fraternal Order of Police?
MR. GIVEN: With regard to his Fifth Amendment?
MS. BONJEAN: With regard to anything.
THE WITNESS: I believe Dan Herbert is the FOP lawyer.
BY MS. BONJEAN:
Q. Okay. Aside from Dan Herbert, did you speak with any other attorneys with the Fraternal Order of Police?

275

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. What other attorneys have represented you in the past two years?
**A. None.**
MS. BONJEAN: Give me one second.
BY MS. BONJEAN:
Q. The lawyer that you identified regarding advice around the Fifth Amendment issue, what advice did those lawyers give to you that you assert as part of your advice of counsel defense?
MR. GIVEN: Same objections as before. That calls for attorney-client privilege. To the extent that your answer would implicate attorney-client privilege, I will instruct you not to answer. If it doesn't, you can answer otherwise.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You are not asserting your advice of counsel defense in this case, correct?

276

MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. What advice did your lawyers give you that you assert as part of your advice of counsel defense?
MR. GIVEN: Same objections, assumes a fact not in evidence. You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did your attorneys give you advice about whether your conduct in connection with plaintiffs or the Vargas investigation violated the constitution?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did they give you advice about whether your conduct in connection with plaintiffs or the Vargas investigation

violated state law?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Or did they simply just give you advice generally about asserting Fifth Amendment rights in this case?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Are you prepared to answer in any way, shape, or form why your attorneys told you that you should assert your rights -- your Fifth Amendment rights in this case?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did any lawyer give you any advice at all relating to any of your interactions with Montanez, Serrano, and Pacheco prior to this lawsuit?

MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did any lawyer give you any advice at all during the course of the Vargas investigation?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. When you testified at plaintiffs' criminal trial, did any lawyer there give you any advice about whether to testify?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And apart from Assistant State's Attorney Matt Coghlan, did any attorney give you advice at plaintiffs' criminal trial about how to testify?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Have you received any other advice at any point in time from any attorney or legal authority about the investigation of the Vargas murder or Montanez, Serrano, and

Pacheco?
MR. GIVEN: Object to the extent that you're asking about attorney-client privilege. I would instruct him not to answer to the extent an answer would implicate that. Otherwise, you can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you were contacted by the attorneys at Sidley & Austin in December of 2013, who sought to interview you about your investigation in the Serrano and Montanez case, along with other cases?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You agreed to meet with the attorneys from Sidley & Austin, specifically, Daniel Greenfield and Fred Stewart; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And during that meeting, you continued to provide false statements to

Mr. Greenfield and Mr. Stewart to cover up your misconduct and that of your fellow officers; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, you continued to lie about the investigation because you hoped to protect the wrongful convictions of Mr. Serrano and Mr. Montanez, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You falsely told Mr. Greenfield and Mr. Stewart that Vicente admitted on May 14th, 1993 that he had been with the guy who did the Vargas murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you continued to provide false statements claiming that Vicente had told you that Mr. Serrano and Mr. Montanez had admitted to their involvement in the Vargas murder, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. At no point did you tell the attorneys for Sidley & Austin that you had framed Mr. Serrano and Mr. Montanez, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, you did not tell the attorneys from Sidley & Austin that you and Detective Guevara had helped fabricate statements from Francisco Vicente and Timothy Rankins that were later used to convict Serrano and Montanez for the murder of Rodrigo Vargas, did you?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MS. BONJEAN: Give me a second.
MR. GIVEN: Do you got a whole new line --
MS. BONJEAN: Yeah.
MR. GIVEN: Why don't we take a break?
MS. BONJEAN: Okay.
THE VIDEOGRAPHER: Off the record, 2:57.
(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, 3:08.
MS. MAZUR: As I introduced myself this morning, I am Elizabeth Mazur. I'm just going to go ahead and ask some questions today.

EXAMINATION

BY MS. MAZUR:
Q. First, did you frame Thomas Sierra for the May 23rd, 1995 murder of Noel Andahar in Logan Square?
MR. GIVEN: Objection; form and foundation. Also, I object to you asking questions -- using this deposition to ask questions about other cases. I don't think that's proper. And to the extent that -- I'm not going to instruct him not to answer; but to the extent you're using this deposition to ask questions about other cases, I may well object in those cases to further depositions of this witness in those.
I'll just keep that as a standing objection.
MS. MAZUR: Sure.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. During the first day that you joined the Andahar investigation on May 24, 1995, you developed no evidence to suggest that Sierra was involved in the crime, correct?
MR. GIVEN: Same objection.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Did you fabricate a story about having seen Sierra in a Buick Park Avenue three days before the Andahar murder in an effort to connect Sierra to the crime?
MR. GIVEN: I'm sorry. Maybe I -- I may have made this clear or I may have said it, but I just don't remember. Standing objections to all these questions.
MS. MAZUR: Sure.
MR. GIVEN: Apart from any specific objection that I may raise, but the one I made earlier will be standing.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. You showed eyewitness Albert Rodriguez a live lineup containing Sierra on May 30th, 1995, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. During that lineup, you showed Rodriguez who he should pick from the lineup, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Before the lineup, you showed Rodriguez a photo array that contained Sierra's photo, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: Liz, can you keep your voice up a little?
MS. MAZUR: Oh, sure. Sorry.
MR. GIVEN: We might be able to hear you like this, but you're talking down in your laptop.

MS. MAZUR: Okay, can you read back my last question? I'm sorry.
(The question was read as requested.)
BY MS. MAZUR:
Q. During that photo array, you told Rodriguez to identify Sierra's photo, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You told Rodriguez that Sierra was probably the shooter during that photo array, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Before the lineup, Rodriguez had informed you that he could not identify the shooter, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Before the photo array, Rodriguez had informed you that he could not identify the shooter, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Before the identification procedure, you told Rodriguez that you believed that you had "got the person" and "knew the person who did the shooting," correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You showed eyewitness Jose Melendez a live lineup containing Sierra on May 30th, 1995, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. During that lineup up, you showed Melendez who he should pick from the lineup, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Before the lineup, you showed Melendez a photo array that contained Sierra's photo, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. During that photo array, you told Melendez to identify Sierra's photo, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You pointed to a picture of Sierra in the photo array, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you told Melendez that you "had reason to believe that this was the guy" while pointing at the photo, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Before the lineup, Melendez had informed you that he could not identify the shooter, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Before the photo array, Melendez had informed you that he could not identify the shooter, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You showed Jose Melendez a Buick Park Avenue in the parking lot of Area 5 on May 30th, 1995, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you asked him to identify it as the car the shooter had been driving on the night of the murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Melendez told you it was not the car that the shooter had been driving on the night of the murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But you wrote a report falsely stating that Melendez had identified the car as the shooter's vehicle, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You wrote a false report on Melendez's purported identification of Sierra, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You wrote a false report on Rodriguez's purported identification of

Sierra, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You provided false testimony at Sierra's trial, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And at the time of Sierra's trial, eyewitness Melendez was represented by Richard Boyke, correct?
MR. GIVEN: Objection; foundation and competence.
You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. And you had conversations about Melendez's testimony at Sierra's trial, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. And you asked Boyke to prevent

Melendez from testifying at Sierra's trial?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you framed Geraldo Iglesias for the shooting death of Monica Roman on the night of June 7th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: And also -- I'm late in the game on this one. Same standing objection with regard to the other cases that we've mentioned.
BY MS. MAZUR:
Q. Isn't it true that you conspired with other Chicago police officers to frame Geraldo Iglesias for the shooting death of Monica Roman on the night of June 7th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you knew Geraldo Iglesias did not shoot Monica Roman while you were investigating the Roman shooting?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you fabricated evidence, including falsifying police reports, as part of the Roman homicide investigation in June of 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that during the Roman homicide investigation, you withheld exculpatory evidence from prosecutors, criminal defendants, and their attorneys?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that during the Roman homicide investigation in June 1993, you coerced witnesses in order to obtain manipulated and false photographic and live lineup identification of Geraldo Iglesias?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you never received a call on June 21st, 1993 or any other date from any confidential informant

claiming that Geraldo Iglesias was involved in the shooting of Monica Roman?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and your partner, Reynaldo Guevara, routinely fabricated claims that an anonymous informant provided the name of a suspect when, in fact, no such anonymous informant ever existed?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Ernest Halvorsen -- Wait, sorry.
Isn't it true that Rosendo Ochoa could not make an identification of the shooter, and so you told him to pick Geraldo Iglesias in June 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Rosendo Ochoa told you that he could hot identify the shooter from the photo array on June 22nd,

1993 or from the live lineup on June 23rd, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did Rosendo Ochoa initially select someone other than Mr. Iglesias from the photo array on June 22nd, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did Rosendo Ochoa initially select someone other Mr. Iglesias from the lineup on June 23rd, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you make any comment to Rosendo Ochoa to improperly influence his decision on who to pick from the photo array you showed him on June 22nd, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you make comments to Rosendo Ochoa to improperly influence his decision on who to pick from the lineup you showed him on June 23rd, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you used threats and incentives related to Rosendo Ochoa's own legal problems to coerce him into falsely identifying and testifying against Geraldo Iglesias in June 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Reynaldo Guevara coerced an eyewitness named Hugo Rodriguez into falsely identifying Geraldo Iglesias from a photo array and from a live lineup on June 24th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Hugo Rodriguez could not make an identification of the shooter, and so you told him to pick Geraldo Iglesias on June 24th, 1993?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. Isn't it true that Hugo Rodriguez told you that he could not identify the shooter from the photo array or the live lineup on June 24th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did Hugo Rodriguez initially select someone other than Mr. Iglesias from the photo array on June 24th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did Hugo Rodriguez initially select someone other Mr. Iglesias from the lineup on June 24th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you make comments to Hugo Rodriguez to improperly influence his decision on whom to pick from the photo array you showed him on June 24th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you make comments to Hugo

Rodrigo to improperly influence his decision on whom to pick from the lineup you showed him on June 24th, 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you used threats and incentives related to Hugo Rodriguez's own legal problems to coerce him into falsely identifying and testifying against Geraldo Iglesias in June 1993?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that on June 25th, 1993 or July 1st, 1993, you convinced Francisco Vicente to make up a false story that Geraldo Iglesias confessed to him about shooting Monica Roman?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you used threats and incentives related to Francisco Vicente's own legal problems to pressure him into falsely identifying and testifying against Geraldo Iglesias in the summer of 1993?

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 771 of 1206 PageID #:66576

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that at the trial of Geraldo Iglesias for the murder of Monica Roman, you gave false testimony, including regarding your investigation of the crime and manipulation of witnesses?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that your partner, Detective Guevara, told you that he was going to lie at Iglesias's trial about whether Iglesias's claims -- about where Iglesias claimed to be at the time of the murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MS. MAZUR: Hold on a second. Can we go off the record for just one second?
THE VIDEOGRAPHER: Off the record, 3:23.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record, 3:23.
MS. MAZUR: I'm about to ask a question that contains a name that I'm not sure how to

pronounce. So maybe I'll spell it for the court reporter first and go from there.
The name is -- I think it's Jaime Alvarez, J-A-I-M-E, Alvarez, A-L-V-A-R-E-Z.
BY MS. MAZUR:
Q. Isn't it true that you were assigned to investigate the murder of Jaime Alvarez in June 1995 alongside your partner, Detective Guevara?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that when you questioned Michael Ybarra -- I'll spell it, Y-B-A-R-R-A -- on July 2nd, 1995 regarding the Alvarez murder, he told you that he did not see who had shot him and Alvarez?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: Can I interrupt for a second?
Is Ybarra -- Is he the suspect in this? Here is why I'm asking: Are you moving -- I'm assuming that you are now asking about a different --

MS. MAZUR: Yes, yes.
MR. GIVEN: -- case.
So I will reassert my same --
MS. MAZUR: Sure.
MR. GIVEN: -- standing objections that I had previously. I don't know if this is a --
MS. MAZUR: It's a different one, yes.
MR. GIVEN: Is it a civil lawsuit, a case that is intended to be a civil lawsuit or is, in fact, a criminal case that's in some form of post conviction? But I'd object to using this deposition for any or all of those situations.
MS. MAZUR: Noted. And I -- I also don't know, but I imagine Russell does. So that's fair.
MR. GIVEN: Do you know, Jennifer?
MS. BONJEAN: What's that?
MR. GIVEN: Is Ybarra the suspect?
MS. BONJEAN: No, I think Edwin Davilla.
MS. MAZUR: It's the Edwin Davilla case.
MR. GIVEN: Got it. Thanks.
MS. BONJEAN: The witness is Ybarra.

MS. MAZUR: Did we get an answer on the last one?
MR. GIVEN: If we did, I can guess what it would be, what it was. You can answer again.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that when you questioned Michael Ybarra on July 2nd, 1995 regarding the Alvarez murder, he could not tell you anything about the shooter, either a description or even if he had been in the car that Ybarra had been chasing or not?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that when you questioned Ivara (phonetic) Valasco, V-A-L-A-S-C-O, on July 9th, 1995 regarding the Alvarez murder, he told you that did he not see who had killed Alvarez?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that when you

questioned Ivara Valasco on July 9th, 1995 regarding the Alvarez murder, he could not tell you anything about the shooter, either a description or even if he had been in the car that Ybarra had been chasing?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that no one provided any information whatsoever to suggest that Mr. Davilla had anything to do with the Alvarez murder before you showed Mr. Davilla's photograph to Ybarra and Valasco?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MR. GIVEN: You know, by the way, let me just -- Before you go on to your next question, that question reminds me that I would like to add to my standing objections. Both retroactively and moving forward, in addition to everything I've already said, the fact that you're asking about these without any documentation showing the witness, I think, creates a foundation problem that is

more than the usual foundation objection.

So with that said, I'll add that to the standing objections and then let you go on.

BY MS. MAZUR:

Q. Isn't it true that the people you spoke with on July 9th, 1995 said nothing about Mr. Davilla having anything to do with the Alvarez murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that the children -- I'm sorry. Isn't it true that the people you spoke with on July 9th, 1995 said nothing about Mr. Davilla having anything to do with any criminal activity whatsoever?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you did not have probable cause to suspect Mr. Davilla in the Alvarez murder or any other crime in July of 1995?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Ybarra did not voluntarily identify Mr. Davilla from a photo array as the shooter in the Alvarez case?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. An isn't it true that Valasco did not voluntarily identify Mr. Davilla from a photo array as the shooter in the Alvarez case?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you showed Mr. Davilla's photograph to Ybarra and Valasco because you were trying to frame Mr. Davilla for the Alvarez murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew Davilla had nothing to do with the Alvarez murder while you were investigating it?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you lied in your July 11th, 1995 general progress report in

which you claim that Ybarra and Valasco identified Mr. Davilla from a photo array?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Valasco and Ybarra who to select from the photo array you showed them in July of 1995?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you help construct the lineup that Ybarra and Valasco viewed in July 1995?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you instruct Mr. Davilla to turn around during his lineup to expose his gang tattoo on his back?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Did you instruct only Mr. Davilla to turn around during his lineup in order to expose his gang tattoo on his back?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

BY MS. MAZUR:
Q. Did you instruct only Mr. Davilla to turn around during his lineup so that Ybarra and Valasco would falsely implicate him in the Alvarez murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you conspired with Guevara, Detective Garz (phonetic), and Bill Johnson to frame Mr. Davilla for the Alvarez murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Moving on to another area regarding David Colon. Maybe I'll pose the question.
MR. GIVEN: Is David Colon the suspect?
MS. MAZUR: Yes. He's the accused -- the wrongly convicted, I should say.
BY MS. MAZUR:
Q. Okay. So the first question is: Isn't it true you were assigned to investigate the murder --
MR. GIVEN: I'm sorry. I have the same standing objections.

MS. MAZUR: Do you want me to just do the question first, and you can -- .
MS. BONJEAN: What is the value of standing objections to always repeat --
MR. GIVEN: So that I don't have to say it to every single question. Do you not understand the concept of a standing objection?
MS. BONJEAN: A standing objection is a standing objection. I understood it the first time you said it.
MR. GIVEN: Well, then -- I'm sorry. I didn't mean to interrupt your question. I just have a -- I don't need your question. I will have a standing objection to presumably all of your questions about Mr. Colon.
BY MS. MAZUR:
Q. Isn't it true that you were assigned to investigate the murder of Michael Velez, V-E-L-E-Z, in 1992?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you had no reason to suspect David Colon, C-O-L-O-N, in

the murder of Michael Velez?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Efrain, E-F-R-A-I-N, Sanchez, told you that he could not see the shooter's face because the shooter never looked up at him?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that when you brought Julio Sanchez to view photos and a lineup as part of the Velez homicide investigation on September 8th, 1993, Julio was obviously intoxicated?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that in 1992 you knew a gang member nicknamed "Mallo," M-A-L-L-O, who was not David Colon, committed the Velez murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you improperly influenced Julio Sanchez to pick David Colon

out of a photo array?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you improperly influenced Efrain Sanchez to pick David Colon out of a photo array?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you told Efrain Sanchez to pick David Colon out of a lineup on September 8th, 1992?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you told Efrain Sanchez to pick David Colon out of a lineup on September 8th by telling him to pick No. 5 from that lineup?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you told Julio Sanchez to pick David Colon out of a lineup?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you told Julio

Sanchez to pick David Colon out of a lineup on September 8th, 1992 by telling him to pick the person in spot No. 5?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you showed Julio Sanchez a single photo of David Colon before Julio viewed a lineup?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you showed Julio Sanchez a single photo of David Colon before Julio viewed a lineup and told Julio to pick the person depicted in the photo from the lineup?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Julio Sanchez to pick the same person he selected from the photo array from the lineup he was about to view on September 8th, 1992?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Julio Sanchez

told you that he did not know who the shooter was and did not get a good look at him?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you conspired with Defendant Guevara to falsely charge David Colon with murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you falsified police reports in Navella's (phonetic) homicide investigation to make it appear that David Colon was guilty?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you withheld documents establishing David Colon's innocence in the Navella murder, such that the documents would not be available to either the State's Attorney or Mr. Colon or his attorneys?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you framed David

Colon for murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Moving on to a different matter. I guess -- I think the suspect here is Manuel Rivera.

Isn't it true that you assisted in the investigation of the murder of Marlon, M-A-R-L-O-N, Wade, in October 1989?

MR. GIVEN: And for the record, I will repeat my standing objections to questions about Rivera.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that all available information about the Wade murder stated that the perpetrator was a member of the Latin Eagles gang?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew in 1989 Manuel Rivera had nothing to do with the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that the Latin Eagles and the Spanish Cobras were involved in a gang war in September and October 1989?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that the Latin Eagles and the Spanish Cobras were involved a gang war in September and October 1989 arising, in part, from the murder of Little Rook, R-O-O-K, in September 1989?

MR. GIVEN: Objection; competence, speculation. You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that Detective Guevara had told you that he had used Sal, S-A-L, Ortiz to help frame Juan and Henry Johnson for the murder of Little Rook?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Detective

313

Guevara knew Sal Ortiz in October 1989?
MR. GIVEN: Objection; competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that Detective Guevara admitted to you that he lied at Manuel Rivera's trial when he claimed not to know who Sal Ortiz was?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you, Defendant Guevara, Detective Villardita, V-I-L-L-A-R-D-I-T-A, and Steve Garz conspired to frame Manuel Rivera for the Wade murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Detective Guevara told you during the Wade homicide investigation that he fabricated his account that an anonymous informant implicated Manuel Rivera in the Wade murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

314

Q. Isn't it true that you never had any legitimate reason to suspect Manuel Rivera in the Wade murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you improperly influenced Loretta, Helean, H-E-L-E-A-N, into falsely implicating Mr. Rivera in the Wade murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you conspired with Detective Guevara, Detective Villardita, Steven Garz -- and Steven Garz to improperly influence Loretta Helean into falsely implicating Mr. Rivera in the Wade murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Defendant Guevara, Detective Villardita, and Steven Garz conspired to get Virgilio, V-I-R-G-I-L-I-O, Muniz, M-U-N-I-Z, to falsely implicate Manuel Rivera in the Wade murder?
**A. On advice of counsel, I assert my**

315

**Fifth Amendment rights.**
Q. Isn't it true that Detective Guevara in your presence showed Virgilio Muniz a photo of Manuel Rivera and told him to falsely implicate Manuel Rivera in the murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Defendant Guevara in your presence told Virgilio Muniz that if he did not implicate Manuel Rivera in the Wade murder, then Guevara would charge Muniz with the Wade murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Tran, T-R-A-N, Brown told you that he could not identify the shooter in the Wade homicide because he ducked when the shots were being fired, and he did not see the shooter?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you improperly influenced Tran Brown to falsely implicate

316

Manuel Rivera in the Wade homicide?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you conspired with Detective Guevara, Detective Villardita, and Steve Garz to get Tran Brown to falsely implicate Manuel Rivera in the Wade homicide?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that no one ever said a member of the Spanish Cobras committed the Wade homicide?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you knew that Loretta Helean, Tran Brown, and Virgilio Muniz's identification of Manuel Rivera were fabricated?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Moving on again. The subjects of the next line of questioning are Rosendo Hernandez and Juan Hernandez, R-O-S-E-N-D-O H-E-R-N-A-N-D-E-Z, and Juan, J-U-A-N.

MR. GIVEN: Thank you. And I will assert, again, for the record, my standing objections to using this deposition for Mr. Hernandez, and Mr. Hernandez who, I believe, just recently filed a post conviction proceeding. So I object specifically to this deposition being used to get evidence for that case.
MS. MAZUR: Okay.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Rosendo Hernandez and Juan Hernandez for the murder of -- I believe, it's Jorge, J-O-R-G-E, Gonzalez in June 1997?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Detective Guevara intentionally placed Rosendo and Juan Hernandez in unduly suggestive lineups?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and

Detective Guevara intentionally placed Rosendo and Juan Hernandez in unduly suggestive lineups by having them be the only one in the lineup with booking numbers on their hands?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. There is one more area -- two more; but the next one, I believe, the suspect is Jacqueline Montanez.
MR. GIVEN: Jacqueline?
MS. MAZUR: Yes, J-A-C-Q-U-E-L-I-N-E.
MR. GIVEN: Montanez?
MS. MAZUR: Yes, M-O-N-T-A-N-E-Z.
MR. GIVEN: Thank you.
Same standing objections.
BY MS. MAZUR:
Q. Isn't it true that on May 13th, 1992, you and Detective Guevara conspired to frame Jacqueline Montanez for murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that on May 13th, 1992, you and Detective Guevara conspired to

coerce Jacqueline Montanez to provide a false confession?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you knew that Jacqueline Montanez was a juvenile when you interrogated her in 1992?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you knew that Jacqueline Montanez, a juvenile, would be more susceptible to coercion during her interrogation?
MR. GIVEN: Objection; form, foundation competence, speculation, assumes facts not in evidence.
Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. And isn't it true that you interrogated Jacqueline Montanez without a youth officer present so that you could coerce her to falsely confess?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
MS. MAZUR: My last page is titled, "A Bunch of Randoms."
MR. GIVEN: Is that the suspect or the victim?
MS. MAZUR: Vomit from Russell's brain, but we'll run through this and take a break.
MR. GIVEN: Great.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Charles Ellison, E-L-L-I-S-O-N, for a crime he did not commit?
MR. GIVEN: Same standing objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Daniel Rodrigo for a crime he did not commit?
MR. GIVEN: Same standing objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Santos Flores, S-A-N-T-O-S F-L-O-R-E-S, for a crime he did not commit?
MR. GIVEN: Same standing objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Angel Diaz, A-N-G-E-L D-I-A-Z for a crime he did not commit?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to from Freddie Santiago, S-A-N-T-I-A-G-O, for a crime he did not commit?
MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Reynaldo Munoz for a crime he did not commit?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true that you and Detective Guevara conspired to frame Adolfo Frias, A-D-O-L-F-O F-R-I-A-S, for a crime he did not commit?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Isn't it true you and Detective Guevara conspired to frame Alfredo A-L-F-R-E-D-O, Gonzalez, G-O-N-Z-A-L-E-Z, for a crime he did not commit?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I

assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. And isn't it true that you and Detective Guevara conspired to frame Carlos Andino, A-N-D-I-N-O, for a crime he did not commit?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. And isn't it true that you and Detective Guevara conspired to frame Angel Gaya, A-N-G-E-L G-A-Y-A, for a crime he did not commit?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
MS. MAZUR: Let me just confer about this last section, and then I'll probably hand it back over to --
MR. GIVEN: Can we just stay on the record, rather than go off and on?
MS. MAZUR: That's fine. I'm going to talk to her outside.

I've got one last area. Counsel did ask some questions about Robert Buto earlier, but they were more general, and these are a few more specific things that she did not ask.
MR. GIVEN: If there's anything objectionable, guess what? I'll object.
MS. MAZUR: Got it.
BY MS. MAZUR:
Q. So a name that I will use in the first question, which I'll just spell now is Salvador, S-A-L-V-A-D-O-R, Ruvalcaba, R-U-V-A-L-C-A-B-A.
Isn't it true that the man who shot Salvador Ruvalcaba on May 14th, 1993 was described by all of the witnesses as having a ponytail?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that Robert Buto, B-U-T-O, did not have a ponytail on May 14th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew that Robert Buto had nothing to do with the Ruvalcaba murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you wanted to frame Robert Buto for the Ruvalcaba murder despite his innocence?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that on May 14th, 1993, you allowed Frankie Escobar, Ray Lozada, Jacob Lozada, and Carl Richmond to see Robert Buto in the police station in handcuffs before these witnesses viewed a lineup?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you knew it was improper to allow witnesses to see a suspect in the police station in handcuffs before the witnesses viewed a lineup?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that on May 14th, 1993, you allowed Carl Richmond to see Mr. Buto in handcuffs in the bathroom before Richmond viewed a lineup on that day?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you allowed Frankie Escobar, Ray Lozada, Jacob Lozada, and Carl Richmond to view a Polaroid photograph of Mr. Buto before these witnesses viewed a lineup on May 14th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that your partner. Reynaldo Guevara told Frank Escobar, Ray Lozada, Jacob Lozada, and Carl Richmond to pick Mr. Buto out of a lineup on May 14th, 1993?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Detective Guevara intentionally placed Mr. Buto in a lineup where the suspect was described as wearing a hooded shirt, and he

was the only person in the lineup wearing a hooded shirt?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Detective Guevara knew that placing Mr. Buto into a lineup in which he was the only person wearing a hooded shirt was impermissibly unfair because the witnesses did see the shooter's face and were trying to identify the suspect based on his clothing?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Detective Guevara placed Mr. Buto in an impermissibly suggestive lineup because you wanted Michael and Margaret Fleming to falsely identify Mr. Buto?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. Did you make comments to Margaret and Michael Fleming to unfairly get them to

falsely identify Mr. Buto from a lineup?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Tell me everything you did to investigate the Ruvalcaba murder.
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. MAZUR:
Q. You and Defendant Guevara harassed Carl Richmond in an effort to get him to falsely implicate Mr. Buto at trial, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You and Detective Guevara told Richmond that if he did not implicate Mr. Buto, you would place false criminal charges against Richmond, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you knew that Ray Lozada and Carl Richmond were lying when they implicated Mr. Buto?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. Isn't it true that you fabricated evidence in your police reports in the Ruvalcaba homicide investigation in order to make it appear that witnesses had voluntarily and accurately implicated Mr. Buto in that homicide?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you withheld exculpatory and material evidence from your police reports in the Ruvalcaba homicide investigation in order to withhold the truth about how the witnesses came to implicate Mr. Buto in the Ruvalcaba murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Defendant Guevara and Defendant Mingy worked jointly to frame Mr. Buto for the Ruvalcaba murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MS. MAZUR: That's all I've got.

MR. GIVEN: By the way, I didn't say it at the beginning, but I will say it at end. I have the same standing objections to all those questions about Mr. Buto.
MS. BONJEAN: No one needs a break, right?
MR. GIVEN: No.
MS. BONJEAN: If you need one -- Does the deponent need one?
MR. GIVEN: You all right?
THE WITNESS: Yes.
FURTHER EXAMINATION
BY MS. BONJEAN:
Q. Mr. Halvorsen, when did you first meet Detective Guevara?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. When did you actually become partners with Detective Guevara?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. I want to draw your attention to, I'll say, the late 1980s, maybe 1988, approximately.

Were you aware that Mr. Guevara had a relationship with Richard Boyke that involved Mr. Boyke paying Detective Guevara to allow certain people to buy their way out of trouble in the late '80s?
**A. On advice --**
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You knew Richard Boyke from the Assistant State's Attorney office from the mid '80s, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Did you have an arrangement with Mr. Boyke as well where he would pay you to let people out of trouble?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Detective Guevara routinely would allow gang members to

buy their way out of trouble with either drugs, guns, or money?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. There were a number of occasions where you observed firsthand Detective Guevara accepting either guns, drugs, or money in exchange for letting gang members out of trouble for various things, such as gang activity or drug selling, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Did you also have an arrangement with gang members on the streets of Humboldt Park, that you allowed people to buy their way out trouble if they gave you guns, drugs, or money?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Did you participate in the arrest of Abraham Omar for a murder that occurred on a CTA bus sometime in the late 1980s?
MR. GIVEN: Same standing objections with regard to questions about Mr. Omar.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. While Mr. Omar was in custody, were you present when a witness to that murder identified Mr. Omar from a lineup as the person who had committed the -- strike that -- the murder on the CTA bus?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that at a later point Detective Guevara arranged for Mr. Omar to be released from custody after Mr. Omar obtained representation from Richard Boyke?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Did you receive any of the $20,000 that Mr. Omar paid Mr. Boyke that secured his release from custody after he was identified as being the person responsible for committing a murder on a CTA bus in the late 1980s?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, Mr. Guevara and Mr. Boyke were close friends, weren't they?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Did Mr. Boyke represent you in any of your personal legal matters over the coerce of your career?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And with respect to the murder that occurred on the CTA bus, isn't it true that after Boyke secured release of Abraham Omar, you and Detective Guevara conspired to frame another individual for that murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, you and Detective Guevara determined that you would frame George Laureano for the murder that occurred on the CTA bus; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You knew that George Laureano was innocent of that crime, but you had actually -- because Detective Guevara had actually released the real offender, you needed to close the case, and you decided to do so by framing George Laureano, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. But you were unable to frame George

Laureano for that because he had an alibi for the time that the murder happened, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, his alibi involved him being at the Illinois Department of Corrections at the institution called the Vienna facility, and that was about Seventh hours away from the City of Chicago, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. So who did you and Detective Guevara actually end up framing for the CTA bus murder in the late 1980s?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. How many times did you and Detective Guevara allow a person who was actually guilty to buy their way out of trouble?

MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, in 1985, you were assigned to investigate the murder of Ivan Mena, weren't you?
MR. GIVEN: Could you spell that one for me?
MS. BONJEAN: Yeah. It's I-V-A-N M-E-N-A.
MR. GIVEN: Thank you.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
MS. BONJEAN: I'm going to actually mark this as Halvorsen 3.
(Halvorsen Deposition Exhibit No. 3 was marked for identification.)
MR. GIVEN: I'm going to assert my standing objections to questions involving this case and maybe Reynaldo Munoz. Is he the suspect?
MS. BONJEAN: Yes. He's the wrongfully convicted.

MR. GIVEN: Same standing objections. Go ahead.
MS. BARBER: This one doesn't have a Bates stamp, right, or am I missing it?
MS. BONJEAN: No. No, it does not have a Bates stamp.
MR. GIVEN: Has this been produced?
MS. BONJEAN: I believe it has been produced, but don't hold me to that. But since you had objected earlier to him not any being given any paper to look at, I thought it was better to --
MR. GIVEN: Well, I'll just have the object- -- I'm not going to instruct him to not answer based on the fact that it doesn't have Bates stamps; but if you could -- If it hasn't been produced --
MS. BONJEAN: Sure.
MR. GIVEN: -- if you could produce it with Bates stamps after the deposition, that would be appropriate.
MS. BONJEAN: Absolutely.
BY MS. BONJEAN:
Q. Mr. Halvorsen, I'm handing you what has been marked as Halvorsen 3. I represent that that's a supplemental police report that bears your signature at the bottom of that, Detective E. Halvorsen, Star 6036.

That is you, correct, sir?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, this was a case that you were assigned to with Detective Dickinson, Star No. 4588, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And the supervisor on this case was Sergeant Epplen, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true, sir, that you framed Reynaldo Munoz for the murder of Ivan Mena and the attempted murder of Beubea (phonetic) Bobby Garcia that occurred on September 8th, 1985?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, sir, you were not originally assigned to investigate the murder of Ivan Mena that occurred on September 8th, 1985; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, the investigation was carried out originally by a number detectives who were unable to close the case because they could not identify who was responsible for the murder of Ivan Mena and the attempt murder of Mr. Garcia, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Sergeant Epplen decided that he would then assign you, Detective Halvorsen, and Detective Dickinson, to investigate this case several weeks later; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And now isn't it true that you knew Reynaldo Munoz as someone who was a member of the so-called Unknown street gang who went by the name of Scooby prior to September 27th, 1985?

MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you, along with Detective Dickinson and Sergeant Epplen, determined that you would frame Mr. Munoz for the murder of Mena since the previous detectives were unable to identify who was responsible for that shooting, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, on September 26th, 1989, you contacted the complainant, one of the complainants, the living complainant, Beubea Garcia, and told him to come to Area 5 or Grand and Central to identify the person who shot him, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you knew that prior to September 26th, 1985 that Mr. Garcia was unable to describe the individual who had shot at him and killed his -- killed his

friend, Ivan Mena, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you knew that Mr. Garcia had told detectives from Area 5 that he could not make an identification of the offender because he did not get a look at the offender who had shot at him and killed his friend, Ivan Mena, on September 8th, 1985?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And notwithstanding the fact that Mr. Garcia had consistently indicated to detectives at Area 5 that he was unable to describe the shooter you, nonetheless, directed that he be brought into Area 5 so that you could persuade him, manipulate him to make an identification of Reynaldo Munoz as the shooter in the murder of Ivan Mena, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. And on September 26th, 1985, Mr. Munoz was arrested and brought into Area 5, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you interviewed Mr. Garcia when he came into Area 5, and he told you that he didn't get a good look at the person who was responsible for the shooting, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you persuaded Mr. Garcia that you had learned from the streets that Reynaldo Munoz was the person who committed the shooting on September 8th, 1985 that resulted in the death of his friend -- in the death of Garcia's friend, Ivan Mena, right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, Mr. Garcia told you

that he knew who Mr. Munoz was from the streets, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Mr. Garcia also told you that he had seen Mr. Munoz earlier on the night of the murder at a party where he had actually -- he and Ivan Mena had broken up a fight between Mr. Munoz and another individual, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Mr. Beubea Garcia told you expressly that he had no reason to believe that Mr. Munoz had anything to do with the shooting that occurred on September 8th, 1985 that resulted in the murder of Ivan Mena; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, yet, you told Mr. Garcia that you had developed evidence that Mr. Munoz was responsible, and you just needed Mr. Garcia to pick him out of a lineup; isn't that

right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, you did construct a lineup in which Mr. Munoz was one of the participants in the line up, and you had Mr. Mena -- strike that -- Mr. Garcia view that lineup up; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Mr. Garcia viewed that lineup up and told you that he had no reason to believe that Munoz had shot and murdered his friend, Ivan Mena, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you, nonetheless, directed him to identify Mr. Munoz as the culprit, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you reassured -- you reassured Mr. Garcia that you had the right guy, and that it was, in fact, Reynaldo Munoz; isn't

that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Mr. Garcia, whose good friend had been murdered and he, himself, shot, agreed to cooperate with you because he believed you when you told him falsely that you had evidence that Munoz was the responsible party; isn't that right?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, after that identification was purportedly made, you prepared a police report that is now part of -- is Halvorsen 3 that you're now presently looking at; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you wrote in this police report that reporting detective contacted Beubea Garcia, who stated that he was able to

identify the person who shot him and Mena; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, that statement that you have -- that you authored and is contained in this supplemental report was a false statement because Mr. Garcia never stated that he could identify who shot him and Mena, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You also reported that Garcia told you that he kept the information about Munoz having committed the murder because he was fearful that Scooby, otherwise known as Reynaldo Munoz, and his friends who killed Garcia? You recorded that here, didn't you?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that statement was a false statement because Mr. Garcia never told you that he was afraid to identify Munoz as the offender; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You fabricated the statement that Mr. Garcia was afraid of Mr. Munoz in order to justify and explain plausibly why Mr. Garcia never previously identified Mr. Munoz as the offender; isn't that right?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. What specifically did you tell Bobby Garcia to persuade him to identify Reynaldo Munoz as the shooter?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you and Detective Dickinson together jointly determined that you would close this case by framing 16-year-old Reynaldo Munoz because he was a known gang banger on the streets?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you framed Mr. Munoz

specifically by coercing and/or manipulating the only witness to the crime, Bobby Beubea Garcia, into falsely identifying Mr. Munoz as the shooter?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, sir, after you secured a fabricated identification of Mr. Munoz, you cleared this case; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But on October 4th, 1989, a witness by the name of Hermeno or Hermino Molina, a male, aged approximately 46 years old, who work at the grocery store as a butcher, came into Area 5 to report that he had actually seen the shooting and that Mr. Munoz was not the culprit?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. I'm going to have you look at -- It's going to be Page 5 of this report. I'll

give you a chance to look at it.
MR. GIVEN: I'm sorry. Page...
MS. BONJEAN: Page 5.
MR. GIVEN: I'm sorry. I'm not tracking it. Sorry, I've got --
MS. BONJEAN: You just have to count to five starting on the fifth page --
MR. GIVEN: Oh, as opposed to looking at the document that has page numbers on them?
MS. BONJEAN: It's two different reports, two different reports. This is the page right here. You can rip them apart, if you'd like.
BY MS. BONJEAN:
Q. I'm going to show you what is a supplemental report that is dated October 14th, 1985 that bears your signature at the end. Do you see that, sir?
And this is a supplemental report that you actually prepared, authored, and then signed; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And this reflected an interview

that you conducted with a witness by the name of Hermena Molina; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
MR. GIVEN: You know what? He's trying to listen to your question and look at the document at the same time.
MS. BONJEAN: If you want to take your time, look at the document. Whenever you're...
THE WITNESS: Okay.
BY MS. BONJEAN:
Q. Isn't it true that Mr. Molina told you that he knew who the victim was and that he had seen the shooting on September 8th, 1985?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Mr. Molina told you that a boy by the name of Shorty from the neighborhood did the murder and that it wasn't Scooby, otherwise known by his legal as Reynaldo Munoz?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And isn't it true that Mr. Molina told you that he recognized Shorty out on the street when the shooting occurred, and that it was not Scooby?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true that you immediately disregarded Mr. Molina's statement to you because you had committed yourself to framing Mr. Munoz for the murder of Ivan Mena?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, you didn't go out and try to find Shorty to determine whether he had an alibi at the time of the shooting, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. What efforts did you take to identify who Shorty was in order to determine whether he may have had some involvement in the murder of Ivan Mena?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Did you and Detective Dickinson together jointly agree that you would make no efforts to follow up on the statement that Mr. Molina provided because you were committed to framing Mr. Munoz for the murder of Ivan Mena?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. How many juveniles did you frame during the late 1980s and 1990s for crimes they did not commit?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You knew that Mr. Munoz was merely 16 years old when you framed him for the murder of Ivan Mena; isn't that right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you and Detective Dickinson, after being assigned to the case for less

than 24 hours, were able to solve this crime where your follow detectives were unable to solve the crime; isn't that correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. What special powers did you have that allowed you to determine that Mr. Munoz was responsible for the murder of Ivan Mena?
MR. GIVEN: Form, harassment, oppressive.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Prior to bringing Mr. Beubea Garcia in to view a lineup with Mr. Munoz in it, what information did you have that led you to believe that Mr. Munoz was responsible for the shooting death of Mr. Mena?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. So you knew that a woman by the name of Sonia Blevin had witnessed the

shooting that occurred on September 8th, 1985 at 4218 West Potomac, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you didn't contact Sonia Blevin to determine whether or not she could identify Reynaldo Munoz as the person who had committed the shooting, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Or did you contact Ms. Blevin, and she told you that it wasn't Mr. Munoz?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Sir, did you not have Mr. -- strike that. Did you avoid having Ms. Blevin look at the lineup that contained Mr. Munoz because you knew Mr. Munoz was not responsible for this murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you knew Sonia Blevin would not be able to identify Mr. Munoz as the shooter of Ivan Mena and Bobby Garcia because he was,

in fact, innocent of that crime, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you and Detective Reynaldo Guevara conspired together to frame Daniel Rodriguez for the murder of Jose Hernandez, otherwise known as Gernito, that occurred on March 17th, 1991?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and Detective Guevara knew that Daniel Rodriguez had an alibi for the time that Mr. Hernandez had been murdered, and you disregarded that alibi because you wanted to frame Mr. Rodriguez for Gernito's murder?
MR. GIVEN: At this point I'll reassert my standing objections to this line of questioning about Mr. Rodriguez. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Isn't it true on May 11th, 1991, you and Detective Guevara pulled Daniel Rodriguez over in his car near the College of Bryn Mawr?
**A. On the advice of counsel, I assert my Fifth Amendment rights.**
Q. Perhaps you remember this: Mr. Rodriguez was wearing a Bart Simpson T-shirt when you arrested -- Hold on -- when you arrested him. Do you remember that?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that when you arrested had Mr. Rodriguez, you said to him, "Guess what, Bart Simpson? You won."
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Daniel Rodriguez responded by saying, "Won what?"
**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you responded to Daniel Rodriguez by saying, "You got Gernito's murder"?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Isn't it true, sir, that that's routinely how you and Detective Guevara closed cases during the 1990s in the Humboldt Park area?
MR. GIVEN: Objection; form, foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You randomly decided which gang bangers you were going to frame for murders that occurred in Humbolt Park; isn't that correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You had no reason to believe that Daniel Rodriguez was actually responsible for the murder of Gernito; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You, nonetheless, decided, along with Detective Guevara, that you were going to frame Daniel Rodriguez for Gernito's murder?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You and Detective Guevara also decided you were going to frame George Laureano for Gernito's murder, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You had been unsuccessful at framing George Laureano for the murder from the CTA bus, so it was sort of his time to get framed, right?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. But George Laureano did what smart people on the West Side in the Humboldt Park

did when they got charged with a murder involving Detective Guevara; isn't that true?
MR. GIVEN: Objection, form, foundation, and possible to even answer that. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Well, isn't it true that George Laureano went out and hired Rick Boyke to be his counsel for the murder involving Gernito?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Detective Guevara -- strike that. And Detective Guevara told you that George Laureano paid him $20,000 to beat the case, the case involving Gernito?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And this $20,000 was above and beyond whatever the fee was that he was

paying Mr. Boyke, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that the case was assigned to Mr. Boyke's good friend, Judge Reyna?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that George Laureano beat that case in a bench trial before Judge Reyna?
MR. GIVEN: Same objections.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Do you know how much money Detective Guevara paid Judge Reyna in order to beat the case?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Or were Judge Reyna and Rick Boyke

such good friends that he didn't actually need to pay Judge Reyna money in order to beat the case?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In any event, Daniel Rodriguez was wasn't fortunate enough to beat his case because he didn't have Rick Boyke as an attorney; isn't that correct?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that Daniel Rodriguez was convicted based on a confession that you and Detective Guevara had coerced from him?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Isn't it true that you and Detective Guevara also framed an individual by the name of Tony Gonzalez for the murder of Hector Rivera and the attempt murders of two individuals by the name of Luis Marrero and Illuminata Nieves?
MR. GIVEN: I'll reassert my standing objection to this line of questioning for reasons previously stated.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, you were aware that -- strike that. You and Detective Guevara were assigned to the murder of Hector Rivera that occurred at 2647 West Crystal in the Humbolt Park area of Chicago, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. I'm sorry. I'm going to strike that. I actually got the address wrong. Let's start over.
You and Detective Guevara were

assigned to investigate a murder that occurred at 1215 North Washtenaw in Chicago, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. The date of this murder was July 24th, 1998 --
THE COURT REPORTER: I'm sorry, Counsel. Hold on.
MS. BONJEAN: Sure.
BY MS. BONJEAN:
Q. And when you were assigned to the case, you read the general offense case report, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You knew that there was a young teenage girl by the name of Yesenia Rodriguez who had witnessed the murder of Hector Rivera and the attempt murders of Luis Marrero and Illimunata Nieves, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you and

365

Detective Guevara read the police report that reflected an interview with Ms. Rodriguez immediately after the shooting or shortly after the shooting?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And within hours of the shooting, Yesenia Rodriguez reported that although she had witnessed the shooting, she was unable to describe the shooter because his face was concealed by a black T-shirt that was wrapped around his face; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And despite having read that report, you and Detective Guevara decided to go speak with Yesenia Rodriguez to determine whether or not you might be able to use her to frame another person in Humboldt Park, right?
MR. GIVEN: Objection; form, foundation, oppressive. You can answer.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

366

BY MS. BONJEAN:
Q. And Yesenia Rodriguez was a young girl, a crime victim, and a Spanish-speaking young woman, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you and Detective Guevara had been highly successful at manipulating statements and identifications from young people, particularly, young women who were Spanish speakers and were victims of crimes; isn't that correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Detective Guevara and yourself brought Ms. Rodriguez to Grand and Central to look through a book that contained mugshots of Spanish Cobras?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You and Detective Guevara decided you were going to frame a Spanish Cobra for

367

the murder of Hector Rivera, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You didn't care much which Spanish Cobra it was because eventually your goal, along with Detective Guevara's goal, was to make sure all Spanish Cobras were incarcerated; isn't that correct?
MR. GIVEN: Objection; form, foundation oppressive, and go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that Yesenia Rodriguez told Detective Guevara that she could not see the shooter because his face was concealed by a black T-shirt that was wrapped around everything but his eyes?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Detective Guevara and yourself told Ms. Rodriguez just to look through the Spanish Cobras book and see if she could recognize anybody in the

368

book?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And the young girl did as she was told and started looking through the Spanish Cobra book for anyone that she might be able to identify; isn't that correct?
MR. GIVEN: Objection; form, foundation, and competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true Ms. Rodriguez told you and Detective Guevara that she recognized Tony Gonzalez from somewhere on the street?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. Yesenia Rodriguez never told you or Detective Guevara that Tony Gonzalez was the person that she saw commit the shooting at 1215 North Washtenaw; isn't that right?
**A. On advice of counsel, I assert my**

EP IGLESIAS Sub Resp 001611

**Fifth Amendment rights.**
Q. She only identified someone she recognized, as was the instruction that was given to her by you and Detective Guevara, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And she also never told you that the offender made any gang announcements during the murder, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But you and Detective Guevara decided to fabricate a statement in which Yesenia Rodriguez purportedly said that the shooter had said, "Jiver killer," right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Yesenia Rodriguez never told you that the offender who shot at Luis Marrero in the alley of 1215 North Washtenaw said, "Jiver killer," correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And after you asked Ms. Rodriguez to identify someone from the Spanish Cobra book that she recognized, you prepared a police report on July 27th, 1998; isn't that correct?
MR. GIVEN: Objection; form.
(Halvorsen Deposition Exhibit No. 4 was marked for identification.)
MS. BARBER: I'm just noting for the record this one does not appear to be Bates stamped either.
MS. BONJEAN: I'll represent that if it has not been produced, I will make sure it is, but I believe it was. I could be wrong.
BY MS. BONJEAN:
Q. Mr. Halvorsen, I'm handing you what's been marked as Halvorsen 4. This is a supplemental report that bears your signature at the bottom, along with Detective Guevara. And this is also a supplemental police report that you prepared or authored; isn't that correct?

MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And if you'll look at the second page of this police report, there is a summary of a statement by Yesenia Rodriguez that was purportedly made on July, I guess, 27th, 1998 or -- strike that. On July 25th, 1998, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And this would have been the day after the shooting, in which you conducted this interview of Ms. Rodriguez and showed her photos of Spanish Cobra gang members, right?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And on Page 3 of this police report, you reported --
MR. GIVEN: Just to be clear, when you say Page 3, you mean the page that's marked Page 3 and not where I actually count the pages?
MS. BONJEAN: They're the same this time.
MR. GIVEN: Not on mine. I actually have blank pages.
MS. BONJEAN: I didn't do the copying. I don't know what happened.
MR. GIVEN: Okay. I just want to be clear since the last time you said a page, and it was not marked the right way, and you told me I was wrong for not counting the number of pages rather than looking at the page numbers.
MS. BONJEAN: I didn't tell you you were wrong. I was trying to clarify for you.
MR. GIVEN: Well, I'm just trying to clarify as well.
MS. BONJEAN: That's fine.
MR. GIVEN: Page 3 that says Page 3?
MS. BONJEAN: That's 3. I didn't realize your copy had a blank page.

BY MS. BONJEAN:
Q. Now that we're on the same page -- no punt intended -- I'll have you look, sir, at the top of that Page 3.
You reported that Ms. Rodriguez told you that the offender was male, white Hispanic, age 18 through 22, 5'7 to 5'10, thin build, medium complexion; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, Ms. Rodriguez never told you that the offender was a male, white Hispanic, age 18 to 22, 5'7 to 5'10 in build, medium complexion, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. In fact, she told you -- the first responding detectives, that the offender was a dark Hispanic -- a dark-skinned Hispanic, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You attributed a false statement to

her that matched a photograph of Tony Gonzalez that was contained in the Spanish Cobra mug book, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You also falsely reported that Ms. Rodriguez told you that the offender had a white T-shirt on his head that did not cover his face and that she got a good look at the offender's face but had never seen him before?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, that statement was false too. Ms. Rodriguez never told you that the offender had a white T-shirt on his head that did not cover his face, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. She also never told you that she

got a good look at the offender's face, rather, she told you that she did not get a good look at the offender's face because his face was concealed by a black T-shirt; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But you and Detective Guevara jointly decided that you would attribute false statements to Ms. Rodriguez, and you included those false statements in this supplemental report that you authored on July 28th, 1998?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And then after interviewing Ms. Rodriguez, you took the photo of Tony Gonzalez, and you brought it to Mr. Marrero, who was convalescing in a hospital, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you told Mr. Marrero that you had identified or determined who the shooter was and showed him

a photograph of Tony Gonzalez?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you put together a so-called photo array, in which Mr. Gonzalez stood out by virtue of the fact that the background of his photograph was white, and he had a placard in front of him, whereas, the other individuals in the photo array had a black background with no placard?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you show Luis Marrero this photo array -- this suggestive photo array, so that he could identify Mr. Gonzalez as the shooter?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you tricked and manipulated Luis Marrero into believing that Tony Gonzalez was the person who shot him and

377

killed his friend, Hector Rivera, as you had done in the past in a number of cases, correct?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Isn't it true that you and Detective Guevara gave false testimony at Mr. Gonzalez's trial in order to secure his wrongful conviction?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You never told the State or Mr. Rodriguez's -- strike that.
You never told the State, who was prosecuting Hector Rivera's murder or the defense attorneys who were representing Tony Gonzalez that you and Detective Guevara had showed Ms. Rodriguez a book of Spanish Cobras and told her just to identify anyone she recognized from that book, correct?
MR. GIVEN: Form.

378

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You did not tell the State prosecutors or the defense attorneys for Mr. Gonzalez that you and Detective Guevara had fabricated Ms. Rodriguez's statement, that she actually did get a good look at the offender?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that you never told the State prosecutors or the defense attorney for Tony Gonzalez that Luis Marrero who he should identify from this suggested photo array?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, you knew that Luis Marrero was highly intoxicated at the time of the shooting, right?
**A. On advice of counsel, I assert my**

379

**Fifth Amendment rights.**
Q. You further knew Luis Marrero said he could not make an identification because his back was turned when the shooting occurred, it was dark, and in an alley and he was intoxicated, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But after you and Detective Guevara interviewed Mr. Rivera, you were able to persuade him that he should identify Tony Gonzalez as the offender, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. What exactly did you say to Luis Marrero to get him to identify Tony Gonzalez as the shooter when Luis Marrero had no idea and had not seen the person who shot him and his friend, Hector Rivera?
MR. GIVEN: Sorry. Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

380

BY MS. BONJEAN:
Q. Why did you and Detective Guevara frame Tony Gonzalez for the murder of Hector Rivera?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, Tony Gonzalez wasn't even a Spanish Cobra; isn't that correct? Not one that you were familiar with, right?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
MR. GIVEN: Do you want to take a break?
MS. BONJEAN: Yes.
THE VIDEOGRAPHER: Off the record at 4:45.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record, 4:53.
BY MS. BONJEAN:
Q. Mr. Halvorsen, isn't it true that

you framed Jose Juan Masonette, Jr. (phonetic) for the murders of a Kevin and Torrence Wiley that occurred on May 24th, 1990?

MR. GIVEN: Same standing objections as I've previously stated with regard to questions about this case, this Masonette case.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you framed Alfredo Gonzalez for the murders of Kevin and Torrence Wiley that occurred on May 24th, 1990?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you framed Jose -- strike that. Isn't it true that you framed co-defendant, Justino Cruz and Christopher Goosens, for the murders of Kevin and Torrence Wiley that occurred on May 24th, 1990?

MR. GIVEN: And just for the record,

same standing objections with regard to Mr. Gonzalez Cruzen?

MS. BONJEAN: Cruz.

MR. GIVEN: Justino Cruz and --

MS. BONJEAN: And Christopher Goosens.

MR. GIVEN: Goosens, whatever. Okay.

MS. BONJEAN: G-O-O-S-E-N-S.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true, sir, that you you conspired with your fellow officers, Detective Pawlnisky (phonetic), Detective Montias (phonetic), Detective Guevara, and Sergeants Mingy and Epplen to frame both Jose Masonette, Alfredo Gonzalez, Justino Cruz, and Christopher Goosens for the murders of Kevin and Torrence Wiley that occurred on May 24th, 1990.

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you also conspired with Assistant State's Attorney DeFranco in order to secure fabricated

statements from Jose Juan Masonette and Alfred Gonzalez that would later be used against them to secure their wrongful convictions?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You were aware that Mr. Masonette was arrested on July 3rd of 1990 in connection with an unrelated -- with an unrelated murder; isn't that correct? Strike that. That's not accurate. My apologies.

Isn't it true you that you were aware that on July 3rd of 1990 Mr. Masonette was arrested in connection with an unrelated shooting that occurred in Humboldt Park?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you were aware that Roland Pawlniski had arrested Mr. Masonette for the shooting that occurred on July 3rd, 1990; and while Mr. Masonette was in custody at Area 5, he was questioned about any knowledge he had

about the Wiley brothers murders, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that on July 3rd, 1990, Mr. Masonette told Sergeant Mingy and Detective Montia that he had no knowledge about the Wiley brothers murders that occurred on North Avenue, murders that occurred on, let's see, May 20th -- No, I'm sorry -- May 25th of 1990, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Now, originally, Detective Guevara and yourself decided that you were going to -- strike that.

You and Detective Guevara, Sergeant Mingy, and Sergeant Epplen determined that you were going to frame Latin Kings for the murder that occurred on North Avenue of Torrence and Kevin Wiley, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you and your fellow officers determined to frame Latin Kings because North

Avenue at that location was King territory, correct?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, initially, you had conspired with Detective Guevara and your fellow officers to frame two individuals who were Latin Kings by the name of Efrain Cruz and Francisco Vera, correct?
**A. On advice --**
MR. GIVEN: Objection; form. I'm sorry. Go ahead.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, you arrested -- you and your fellow officer arrested Mr. Vera and Mr. Cruz, Efrain Cruz, and brought them to Grand and Central for questioning about the Wiley brothers murders?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. You ultimately had to release Mr. Vera and Mr. Cruz from custody because it was determined that they were actually in police custody on the early morning hours of May 25th, 1990 when with the murders occurred, correct?
MR. GIVEN: Objection, form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. So shortly after that, Detective Guevara told you he wanted to frame Jose Masonette for the murders of the Wiley brothers, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you were aware, sir, weren't you, that Mr. Masonette had been paying protection money to Detective Guevara up until around May 20th of 1990?
**A. On advice --**
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, isn't it true, sir, that Detective Guevara told you that Masonette had stopped make protection payments to him because he was angry at him related to the frame-up of another friend whose name is Santiago Sanchez?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. So isn't it true that on August 22nd, 1990 you learned from Detective Pawlniski and your fellow officers that Mr. Masonette had made bond on the attempted murder case that he had been previously arrested for on July 3rd?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And you learned that Detective Pawlnisky had arrested Mr. Masonette at 26th and California outside of Room 101 and had brought him to Grand and Central in the morning, correct, of August 22nd, 1990?
**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**
Q. And you and Detective Guevara was starting your shift on the evening -- or the early evening of August 22nd, 1990; isn't that correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that after coming to Grand and Central, you and Detective Guevara discussed the fact that Detective Guevara was going to interrogate Mr. Masonette in order to get him to falsely confess to the murders of the Wiley brothers, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And over the course of approximately 13 hours, sir, isn't it true that Detective Guevara intermittently would -- strike that.
Over the course of the next 13 hours, Detective Guevara used physical abuse to extract an inculpatory statement from Mr. Masonette?
MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And by -- I mean, over the course of 13 hours -- it wasn't necessarily 13 hours straight, but Mr. Guevara would come in and out of the interrogation room and intermittently beat Mr. Masonette about his body, genitals, and head with a telephone book and a flashlight, correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You did nothing to stop Mr. Guevara from physically abusing Mr. Masonette in order to secure an inculpatory statement that you would later use against him in order to secure his wrongful conviction, correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. After approximately 13 hours of

intermittent beatings, isn't it true that Detective Guevara told you that Masonette was ready to "cooperate"?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And by "cooperate," Detective Guevara that meant he was ready to repeat a false narrative or a false story that implicated himself and others, including Alfredo Gonzalez and Justino Cruz, in the murders of Torrence and Kevin Wiley?
MR. GIVEN: Form, foundation competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And as a result, you and Detective Guevara contacted Assistant State's Attorney Frankie DeFranco and told him to come to Area 5 so that he could take a statement from Mr. Masonette that had been secured through physical abuse by Detective Guevara?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that Assistant's

State's Attorney DeFranco came to Area 5, and together with Detective Guevara and yourself and Detective Montia, you agreed to contrive a story that involved Mr. Masonette implicating himself as the driver of the car that was involved in the murders of Kevin and Torrence Wiley, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And Detective Guevara had persuaded Mr. Masonette to falsely allege that Alfred Gonzalez was the shooter of Torrence and Kevin Wiley, correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And at approximately August 23rd, 1990 at 9:28 a.m., you are aware, sir, that Mr. Masonette falsely confessed to the Wiley brothers murders that occurred on May 20th, 1990, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true, sir, that Mr. Masonette also falsely implicated Alfred Gonzalez in the crime?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Specifically, isn't it true, sir, that Mr. Masonette falsely told the Assistant State's Attorney, as well as Detective Montia that Alfredo Gonzalez had asked him to hide a nine millimeter pistol at his home located at 1320 North Homan?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And isn't it true that Masonette falsely stated that Alfred Gonzalez came to his home between 11:30 p.m. and 12 o'clock a.m. on May 24th, 1990 with two other Latin

Kings by the name of Christopher Hernandez, who went by the nickname Fro and Tino, whose real name was Justino Cruz; and that they came to Mr. Masonette's home, again, at that hour just before May 25th, 1990?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Mr. Masonette falsely told the detective and the Assistant State's Attorney that Alfred Gonzalez, Fro, and Tino had told him that they got two guys on Drake and North Avenue waiting for some dope, and that Masonette falsely stated that he drove to Drake and North Avenue with Alfred Gonzalez, Fro, and Tino?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true, sir, that Mr. Masonette falsely told you and other detectives, as well as Assistant State's

Attorney DeFranco that Alfred Gonzalez was in the passenger seat with a gun and that Fro and Tino were in the back; and that when they got to the area that Masonette waited in the car while Alfred Gonzalez, Fro, and Tino approached the two black men on North Avenue, and that he could hear them talking?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true, sir, you knew Mr. Masonette falsely claimed that he heard five or six shots and then saw the two men on the ground and Alfred Gonzalez pointing the nine millimeter gun at them?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew that Mr. Masonette's statement that he made, both to Detective Guevara and later to Assistant State's Attorney DeFranco and Detective Montia, was

in its entirety false, and that Mr. Masonette had no involvement in the murder of the Wiley brothers, nor did his co-defendants, Alfredo Gonzalez, Christopher Goosens, and Justino Cruz, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. After Mr. Gonzalez -- strike that. After Mr. -- strike that one more time.

And isn't it true also that you, Detective Guevara, and Detective Montia jointly decided to manipulate or coerce Mr. Masonette's girlfriend into making a statement that implicated Alfred Gonzalez and Jose Masonette and Justino Cruz in the murders of the Wiley brothers?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, on August 23rd, 1990 at 2 o'clock p.m., Jose Masonette's girlfriend, Rosa Bellow provided a handwritten statement in which she falsely stated that Gonzalez,

Fro, and Tino came to her house that she shared with Mr. Masonette and retrieved a nine millimeter weapon at roughly 11:30 p.m. on May 24th, 1990, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, Detective Guevara and yourself threatened Ms. Bellow by telling her that if she did not cooperate and state what you wanted her to state, that you would arrange to have her children taken away by DCFS, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, Ms. Bellow spent approximately 24 hours at the police station and eventually agreed to sign a statement that had been written out by an Assistant State's Attorney and a detective that prepared it, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you and Detective Guevara, as well as the Assistant State's Attorney knew

397

that the statement that Ms. Bellow had signed was false, and that she only signed that statement out of fear of losing custody of her children?
MR. GIVEN: Form, foundation, and competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Now, isn't it true, sir, that after Mr. Masonette was charged with the murder -- murders of the Wiley brothers, you and Detective Guevara and your supervising sergeant realized that there was no probable cause to justify the arrest of Mr. Masonette in the first place?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And as a result, you authored a police report that contained false statements attributing false oral statements to Mr. Masonette to justify his arrest, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**

398

Q. With the collaboration of the other detectives in the case, including Guevara, Montia, Sergeant Mingy, as well as Assistant State's Attorney DeFranco, you put your report writing skills to work and began drafting supplemental police reports that had a number of false and fabricated statements in it that served to justify plaintiff's unlawful arrest, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. Specifically, you included a statement in this police report that you authored claiming that Mr. Masonette made inculpatory statements to Defendants Mingy and Montia on July 15th, 1990 when he was in custody for the murder that occurred on July 3rd, 1390 -- for the attempt murder that occurred on July 3rd of 1990, correct?
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

399

BY MS. BONJEAN:
Q. Isn't it true that you had reason to believe that Mr. Masonette had made any statements acknowledging knowledge about the murders of the Wiley Brothers on July 15th, 1990?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And notwithstanding the fact that you had no factual basis to believe that Mr. Masonette had ever made any statements implicating himself or any others or suggesting that he had any knowledge about the Wiley brothers murders, you falsely reported in the supplemental report prepared on August 24th, 1990 that Mr. Masonette had told Mingy and Montia that he did have knowledge of the murders?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You also falsely reported that Mr. Masonette told Montia and Mingy on August 1st, 1990 that he was involved in the murders of the Wiley brothers, correct?

400

**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. You claimed that Mr. Masonette made an oral statement to Mingy and Montia in Cook County jail on August 1st, 1990 in which he claimed to have some involvement in the murders of the Wiley brothers, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that oral statement that is contained in the August 24th, 1990 supplemental police report is a false statement that you authored, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, those oral statements that were attributed to Mr. Masonette were later used in the criminal trial that resulted in his conviction for the murders of the Wiley brothers and natural life sentence, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, in fact, the statement that

was coerced by Rosa Bella -- Bellow, was later used to force Ms. Bellow to testify at the criminal trial of Alfred Gonzalez; isn't that correct?

MR. GIVEN: Form, foundation, and competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew that Mr. Masonette and Mr. Alfredo Gonzalez, Mr. Cruz, and Mr. Goosens had nothing to do with the Wiley brothers murders; isn't that fair?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. But you and Detective Guevara decided that you would frame those four individuals for those murders, and Detective Guevara, specifically, was eager to frame Mr. Masonette for the murders?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MS. BONJEAN: I'm going to move on to the last --

MR. GIVEN: Okay. Let me just say that just for the record, that all of those questions that you just asked about the Masonette case appear to be re-reading paragraphs from the complaint and then asking isn't it true or not, that's perfectly fine in order to do that; but I just wanted to state for the record, yet, again, that I will object to re-deposing this witness in the Masonette case because you've just deposed him in this case on those very same issues.

MS. BONJEAN: Okay. I don't know -- Unless you the ability to read my notes, I can assure you that this is not the complaint. There are portions of the complaint that were incorporated in my notes to remind me of dates and times, but this is not Mr. Masonette's complaint. In fact, I referenced it in a number of different cases in here.

MR. GIVEN: Well, fair enough. We'll have this fight in front of the judge on another day.

So who are we moving on to now?

MS. BONJEAN: And for the record, I have in no way exhausted my questioning of Halvorsen. It wouldn't be possible within the time period, so --

MR. GIVEN: Oh, it would certainly be possible. You would choose not to do it. It's certainly possible.

MS. BONJEAN: Well, when you spend two decades framing people, it's kind of hard to get to everybody.

MR. GIVEN: That statement is, of course, highly oppressive and would be cause, in fact, for me to cancel this dep at this point; but I'm not going to do that. Why don't you move on to the next set of questions.

MS. BONJEAN: Well, for the record, to be clear, these questions are being asked because there's certainly an argument that plaintiff could make at a later date that certain evidence pursuant to Federal Rules of Evidence 404(b) would be admissible at a trial; and that is the area that we're exploring because it would lead potentially

to discoverable evidence, and it's not overly burdensome since we have Mr. Halvorsen here.

MR. GIVEN: Well, we're here to answer your questions today. So you and I can have this discussion another time.

MS. BONJEAN: Okay.

MR. GIVEN: You want to get going, and he wants to get going.

BY MS. BONJEAN:

Q. Isn't it true you, along with Detective Guevara, and Officer Mark O'Shefsky (phonetic) framed Roberto Almodovar, A-L-M-O-D-O-V-A-R, and William Negron for the murders of Amy Merkez (phonetic), George Rodriguez, and the attempt murders of Jacqueline Grande and Conetti Sayez (phonetic).

MR. GIVEN: Same standing objections with regard to this line of questioning about Mr. Almodovar and Negron that I've previously stated.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:
Q. Isn't it true, sir, that you and Detective Guevara were assigned to the murders -- were assigned to investigate the murders of George Rodriguez and Amy Merkez that occurred on the early morning hours of September 1st, 1994?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And, sir, you were aware that Rodriguez and Merkez were outside a building located at 3920 West Cortland Street, along with Mr. Sayez and Ms. Grande in the early morning of September 1st, 1994 when a blue car pulled up and started shooting at the group of young people standing outside or hanging outside on a stoop in front of this apartment building, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And isn't it true that this blue car, which was described as a blue Oldsmobile, contained three individuals, but that none of the living witnesses were able

to give any description of who was in that -- any description of the offenders in the vehicle?
MR. GIVEN: Objection; form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. In fact, you were aware that Jacqueline Grande told a police officer, Detective Gembowski (phonetic), that the assailants were three male Hispanics, that the driver was tall and thin, dark hair, light complexion, that the front passenger had a thin, long face with a light complexion, black jacket, red hat, and that the back -- the back seat passenger was skinny, dark hair, medium complexion, clean-looking, all teens and early 20s, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And that was the extent of the description that Ms. Grande was able to

provide to the detective on September 1st of 1994, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Conelli Sayez was interviewed at the police station after the shooting and could only describe the offenders as three male Latinos in this blue car, correct?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And despite the fact that those were the only descriptions that were provided by the witnesses/victims of the crime, you and Detective Guevara determined that you would close the case by framing individuals who were members of the Insane Dragon gang, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You were aware that the Insane

Dragons or you thought you were aware that the Insane Dragons were in some type of gang war with the gang to which Mr. Rodriguez and Mr. Sayez belonged, and, thus, made sense to frame an individual from the Insane Dragons under the theory that the victims' gang, the Maniac Latin Disciples were retaliating -- strike that. Let me start over.
You theorized that the Maniac Latin Disciples, the victims' gang, and the Insane Dragons were at war with one another and, therefore, the shooting on Cortland was actually in retaliation for the murder of an Insane Dragon that had taken place actually about the seven blocks away, correct?
MR. GIVEN: Form.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And you and Detective Guevara decided to consult with Mark O'Shefsky about which Insane Dragons you should frame for this murder because Mr. O'Shefsky had a particular -- a knowledge and disdain for the

409

Insane Dragons, correct?
**A. On advice of counsel, I assert the Fifth Amendment right.**
Q. In fact, Mark O'Shefsky told you and Detective Guevara that he had a particular Insane Dragon that he wanted to frame, and that was Robert Almodovar, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. But because Mr. Almodovar had not been arrested previously for any serious crimes, there were no photographs at Grand and Central of Mr. Almodovar, and, therefore, Detective O'Shefsky told you and Guevara that he would get a Polaroid photo of Mr. Almodovar, right?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And Mr. O'Shefsky and his partner actually did a pretextual arrest of Mr. Almodovar while he was at his cousin's house and brought him in to Area 5 for the sole purpose of taking a Polaroid photo of

410

him that would later be used to show the individuals in this case, correct?
MR. GIVEN: Form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, you and Detective Guevara also asked O'Shefsky to provide a photo of another Insane Dragon who you could frame for the murders that occurred on Cortland, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And with no factual basis whatsoever, O'Shefsky gave you a picture of William Negron and identified him as an "associate of Mr. Almodovar," right?
MR. GIVEN: Objection; form, foundation, competence.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. You and Detective Guevara had no

411

factual basis to believe that Robert Almodovar or William Negron were involved in the murders of George Rodriguez or Amy Merkez, correct?
**A. On advice of counsel, I assert my Fifth Amendment rights.**
Q. And notwithstanding the fact there was no factual basis to believe that Mr. Almodovar or Mr. Negron were involved in those murders. Detective Guevara took those Polaroid photos and brought them to the victim, the living victim, Jacqueline Grande, for her to view, correct?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And Detective Guevara told Jacqueline Grande, who had just been released from the hospital, that Robert Almodovar and William Negron were the persons responsible for shooting her and killing her best friend?
MR. GIVEN: Objection; form.
THE WITNESS: On advice of counsel, I

412

assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And, in fact, Detective Guevara, manipulated this young girl, who was traumatized by having been a crime victim and watching her two friends murdered, that he was confident that Almodovar and Negron were responsible and that she should look at the photos and carefully -- and that he was confident that she would be able to identify them as the people who committed the murder on Cortland street -- murders?
MR. GIVEN: Form and foundation.
THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.
BY MS. BONJEAN:
Q. And through manipulation and persuasion, Detective Guevara was able to get Ms. Grande to agree that Mr. Almodovar and Mr. Negron were in that blue Oldsmobile that shot at her and her friends in the early morning hours of September 1st, 1994, correct?
MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, relatedly, Detective Guevara was able to use Ms. Grande and these photographs just to persuade Mr. Sayez also to agree that Almodovar and Negron were in that blue Oldsmobile that shot and killed their friends in the early morning hours of September 1st of 1994?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Detective Guevara told Ms. Grande and Mr. Sayez that he was going to take them to look at a live lineup that contained Mr. Almodovar and Mr. Negron at Grand and Central, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And he had Ms. Grande and Mr. Sayez

look at a live lineup that contained Mr. Almodovar and Mr. Negron after having showed both of those witnesses Polaroid photos of Mr. Almodovar and Mr. Negron, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Detective Guevara told you, did he not, that he advised Sayez and Grande not to mention that he had shown them the Polaroid photos prior to them viewing the live lineup?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Sayez and Ms. Grande did, in fact, view a live lineup in which they identified Mr. Almodovar and Mr. Negron as two of the offenders from the shooting on September 1st, 1994?

**A. On advice of counsel, I assert my**

**Fifth Amendment rights.**

Q. And isn't it true that it was a result of Detective Guevara's misconduct that -- strike that.

Isn't it true that as a result of your misconduct, Detective Guevara's misconduct, and Detective O'Shefsky's misconduct that Ms. Grande and Mr. Sayez made false identifications of Mr. Almodovar and Mr. Negron.

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And those false identifications were later repeated in court when Mr. Almodovar and Mr. Negron were criminally prosecuted for the murders of George Rodriguez and Amy Merkez?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And a result of those fabricated identifications that you, Detective Guevara,

Mark O'Shefsky, and your supervising sergeant, Epplen, secured from Mr. Sayez and Ms. Grande, isn't it true that Mr. Almodovar and Mr. Negron were wrongfully convicted of the murders of George Rodriguez and Amy Merkez?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you never told any State prosecutors or attorneys for Mr. Almodovar or Mr. Negron that Detective and Guevara and yourself had utilized improper identification methods in order to secure false identifications from Mr. Sayez and Ms. Grande?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

MS. BONJEAN: I have nothing further.

MR. GORMAN: Nothing from me.

MS. BARBER: I have nothing.

MS. CERCONE: I have no questions.

MR. GIVEN: Nothing from me. We'll reserve signature.

THE VIDEOGRAPHER: This concludes the video deposition of Mr. Halvorsen, 5:30.

(The deposition proceedings were concluded at 5:30 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, Ernest Halvorsen, being first duly sworn, on oath say that I am the deponent in the aforesaid transcript of my deposition taken April 20, 2018, consisting of pages 1 through 415, whatever inclusive, taken at the aforesaid time and place and that the foregoing is a true and correct transcript of my testimony so given.

_________ Corrections have been submitted

_________ No corrections have been submitted

_____________________________

Ernest Halvorsen, Deponent

SUBSCRIBED AND SWORN TO before me this ____ day of _______________, A.D., 2018.

__________________

Notary Public

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Aneesha L. Williams, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, do hereby certify that on the 20th day of April, A.D., 2018, the deposition of witness, ERNEST HALVORSEN, called by the Plaintiff, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, ERNEST HALVORSEN, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was not waived by agreement.

Pursuant to Rule 207(a) of the Rules of

the Supreme Court of Illinois, if deponent fails to read and sign this deposition transcript within 30 days or make other arrangements for reading and signing thereof, this deposition transcript may be used as fully as though signed, and the instant certificate will then evidence such failure to read and sign this deposition transcript as the reason for signature being waived .

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature as a Certified Shorthand Reporter, in and for Cook County, Illinois on this 8th day of May, 2018.

Aneesha L. Williams,
Certified Shorthand Reporter
License No. 084-004443

**A**

**a-d-o-l-f-o**
322:13
**a-l-f-r-e-d-o**
322:21
**a-l-m-o-d-o-v-a-r**
404:13
**a-l-v-a-r-e-z**
298:4
**a-n-d-i-n-o**
323:5
**a-n-g-e-l**
321:12, 323:13
**aberdeen**
2:5, 3:13, 7:7
**abilities**
114:24
**ability**
402:13
**able**
39:22, 95:11, 110:1, 120:5, 132:3, 151:5, 166:18, 182:20, 183:4, 196:8, 202:5, 213:11, 215:20, 216:15, 249:15, 284:22, 346:24, 354:1, 355:23, 365:18, 368:8, 379:10, 405:24, 406:24, 412:10, 412:18, 413:5
**above**
360:23
**abraham**
333:3, 335:3
**absent**
48:14
**absolutely**
19:6, 19:23, 52:8, 140:15, 338:22
**abuse**
38:24, 39:2, 45:14, 46:21, 142:19, 143:17, 173:6, 247:16, 248:2, 388:21, 390:21
**abused**
47:9
**abusing**
389:16
**accepting**
332:10
**according**
161:22, 185:4, 225:6
**account**
252:16, 313:20
**accurate**
70:10, 70:13, 383:13, 419:18
**accurately**
329:6
**accused**
143:4, 305:17
**acknowledging**
399:4
**acknowledgment**
418:1
**acquaintance**
246:19
**across**
202:6
**act**
78:7, 149:11, 236:10, 266:15
**acted**
75:22
**action**
231:9
**actions**
26:18, 137:18
**actively**
37:9
**activity**
92:10, 302:16, 332:13
**acts**
15:5
**actual**
70:9, 79:11, 186:22
**actually**
20:15, 20:19, 21:20, 29:19, 37:9, 38:9, 43:23, 53:9, 53:17, 53:20, 54:21, 64:22, 65:18, 76:12, 79:5, 80:13, 91:22, 104:3, 104:15, 117:15, 118:19, 129:1, 131:13, 134:11, 134:17, 135:18, 147:6, 152:13, 155:3, 165:14, 177:20, 178:17, 183:24, 184:3, 192:8, 199:5, 201:11, 205:11, 236:24, 248:6, 248:18, 249:17, 250:9, 251:23, 254:10, 330:18, 335:16, 335:17, 336:15, 336:23, 337:15, 344:8, 349:18, 350:20, 358:23, 362:1, 363:22, 372:2, 372:6, 378:8, 386:4, 408:13, 408:14, 409:21
**add**
301:19, 302:2
**addict**
37:4
**addiction**
89:10
**addition**
205:17, 301:21
**additional**
61:10, 253:4
**address**
363:22
**administer**
7:14
**admissible**
403:22
**admissions**
126:5
**admit**
240:14
**admits**
125:23
**admitted**
76:19, 77:1, 77:9, 144:12, 167:9, 207:16, 280:13, 280:21, 313:7
**adolfo**
322:12
**adopt**
164:3, 189:17, 213:18
**adopted**
191:9
**adopting**
185:17, 186:4
**advance**
61:11
**advised**
414:11
**affidavit**
6:20, 246:9, 246:11, 246:16, 248:7, 248:10
**affiliation**
39:16, 39:21, 40:5
**affirmations**
214:4
**affirms**
246:17
**affixed**
11:21, 184:13
**aforesaid**
418:5, 418:8
**afraid**
347:23, 348:4
**after**
24:13, 24:19, 28:14, 29:6, 29:7, 30:16,

31:9, 39:2, 46:20, 47:7, 47:8, 61:6, 68:5, 78:17, 81:11, 82:1, 84:12, 96:17, 98:2, 99:16, 100:22, 105:8, 105:9, 106:24, 118:19, 123:21, 130:6, 130:17, 131:2, 132:18, 141:17, 141:20, 143:16, 145:2, 150:6, 171:9, 173:18, 174:6, 188:15, 214:21, 218:22, 222:2, 224:24, 225:10, 225:16, 236:19, 237:5, 245:2, 245:16, 254:5, 333:19, 334:4, 335:3, 338:20, 346:15, 349:9, 353:24, 365:3, 365:4, 370:3, 371:14, 375:16, 379:9, 386:12, 388:8, 389:24, 395:8, 395:9, 397:10, 407:6, 414:2

**afternoon**
233:3

**again**
10:19, 87:22, 88:24, 90:9, 95:21, 101:15, 128:5, 145:7, 161:12, 165:7, 184:12, 189:2, 211:3, 226:12, 243:12, 254:10, 271:24, 274:5, 300:5, 316:21, 317:2, 393:4, 402:8

**against**
21:21, 33:17, 33:24, 36:11, 43:2, 66:9, 68:2, 80:19, 81:1, 81:2, 95:7, 99:11, 100:16, 101:3, 103:20, 120:18, 139:2, 140:23, 151:15, 152:22, 153:4, 154:14, 156:13, 157:9, 176:11, 182:13, 182:18, 183:2, 183:16, 200:4, 204:5, 204:9, 218:16, 239:8, 240:5, 240:11, 244:19, 245:22, 294:6, 296:9, 296:23, 328:18, 383:3, 389:18

**age**
373:7, 373:14

**aged**
349:16

**aggressive**
144:6

**agree**
10:12, 33:17, 75:20, 96:18, 118:18, 353:4, 412:19, 413:7

**agreed**
41:17, 46:23, 47:7, 78:7, 153:12, 209:15, 215:1, 279:17, 346:6, 391:3, 396:17

**agreeing**
97:4

**agreement**
14:2, 34:6, 93:24, 419:23

**ahead**
10:5, 54:15, 97:13, 112:19, 113:17, 131:18, 146:9, 160:1, 162:9, 175:15, 183:9, 192:23, 213:24, 221:18, 227:22, 230:10, 234:23, 235:5, 236:16, 242:4, 253:23, 282:5, 319:17, 338:2, 356:21, 360:4, 367:10, 385:15

**airtight**
54:21

**al**
1:7, 1:13, 7:4, 7:5

**albert**
284:4

**alcohol**
99:1

**alfred**
383:2, 391:13, 392:4, 392:22, 393:12, 393:17, 394:1, 394:5, 394:15, 395:14, 401:3

**alfredo**
322:20, 381:13, 382:16, 390:10, 392:14, 395:3, 401:11

**alibi**
54:22, 57:13, 60:14, 336:1, 336:5, 352:18, 356:15, 356:17

**all**
10:13, 10:14, 11:20, 12:2, 18:11, 18:16, 22:4, 22:14, 30:10, 60:23, 73:24, 76:17, 93:14, 121:9, 131:10, 137:18, 153:11, 173:12, 189:14, 197:5, 236:9, 246:18, 261:19, 262:2, 262:10, 262:18, 263:3, 263:19, 271:16, 277:22, 278:6, 283:20, 299:13, 306:16, 311:16, 324:16, 329:24, 330:3, 330:10, 367:7, 402:2, 406:19

**allege**
268:18, 269:3, 391:13

**alleged**
127:24

**allegedly**
127:24

**alleges**
126:4

**alley**
369:23, 379:5

**allow**
325:20, 331:4, 331:24, 336:22

**allowed**
234:16, 325:12, 326:2, 326:7, 332:18, 354:9

**almodovar**
404:12, 404:20, 409:7, 409:11, 409:14, 409:17, 409:22, 410:18, 411:2, 411:9, 411:20, 412:7, 412:19, 413:7, 413:18, 414:2, 414:4, 414:21, 415:9, 415:18, 416:3, 416:11

**almost**
29:6, 114:13, 130:17, 158:12, 220:11

**alone**
46:12, 209:24,

260:23
**along**
7:18, 18:2, 18:18, 22:11, 24:16, 34:1, 51:13, 51:22, 52:17, 60:19, 61:6, 70:20, 78:14, 79:16, 81:12, 82:24, 83:12, 88:22, 90:20, 91:14, 92:24, 100:13, 105:18, 122:16, 150:19, 151:12, 172:7, 184:13, 199:12, 199:14, 206:21, 222:6, 228:24, 230:1, 231:16, 232:24, 236:7, 279:14, 341:5, 359:3, 367:6, 370:21, 404:10, 405:12
**alongside**
298:8
**already**
11:7, 34:9, 34:18, 36:9, 84:24, 87:17, 87:24, 89:21, 93:12, 93:18, 116:21, 120:3, 139:22, 144:18, 146:19, 220:3, 301:21
**also**
5:10, 25:5, 37:3, 53:23, 59:14, 59:16, 71:9, 78:3, 79:2, 80:13, 85:6, 89:13, 94:17, 94:22, 99:1, 104:21, 121:8, 121:10, 122:23, 124:3, 128:6, 129:16, 133:3, 134:24, 138:2, 154:13, 154:18, 155:9, 155:20, 157:10, 157:21, 161:23, 165:7, 166:3, 168:24, 169:6, 171:10, 171:23, 186:20, 186:23, 187:14, 187:21, 188:18, 190:1, 192:2, 197:19, 198:13, 200:8, 200:13, 201:20, 203:12, 208:9, 221:6, 222:11, 226:19, 227:14, 243:8, 282:13, 290:9, 299:15, 332:16, 344:5, 347:13, 359:9, 363:3, 369:10, 370:22, 374:8, 374:24, 382:22, 392:4, 395:10, 399:21, 410:9, 413:6
**alternatively**
139:5
**altgeld**
83:21, 84:3, 121:5, 121:19
**although**
130:13, 184:21, 196:19, 365:8
**alvarez**
298:4, 298:8, 298:15, 298:16, 300:11, 300:20, 300:21, 301:2, 301:11, 302:9, 302:21, 303:3, 303:8, 303:15, 303:19, 305:5, 305:11
**always**
25:9, 114:14, 306:4
**amongst**
45:8
**amount**
36:21
**amy**
404:14, 405:5, 411:3, 415:20, 416:5
**andahar**
282:10, 283:5, 283:15
**andino**
323:5
**andt**
4:3, 8:9
**aneesha**
1:24, 2:11, 7:9, 419:4, 420:21
**angel**
321:11, 323:12
**angry**
249:12, 249:22, 387:6
**announcements**
369:11
**anonymous**
119:16, 292:7, 292:9, 313:21
**another**
54:4, 102:7, 104:23, 114:2, 139:7, 139:23, 149:10, 151:14, 151:21, 152:23, 154:14, 210:7, 249:7, 305:14, 335:5, 344:9, 365:19, 387:7, 402:23, 404:5, 408:11, 410:10
**answer**
9:21, 12:13, 17:13, 21:16, 35:5, 37:23, 54:5, 54:16, 113:5, 114:7, 147:1, 200:16, 201:23, 213:4, 214:16, 234:2, 261:2, 261:13, 264:8, 264:16, 264:18, 265:1, 270:22, 272:1, 272:15, 275:17, 275:19, 275:20, 276:10, 277:13, 279:5, 279:6, 282:17, 289:13, 300:1, 300:4, 312:14, 338:15, 360:4, 365:22, 404:3, 404:22
**answered**
63:22, 175:14, 198:7, 198:14, 200:12, 207:23, 214:14, 214:18, 215:10, 229:19, 233:17, 236:18, 237:6
**answers**
200:19, 419:19
**any**
14:12, 16:6, 19:8, 19:24, 20:8, 25:10, 29:12, 31:7, 31:22, 33:24, 52:10, 60:2, 60:3, 75:23, 79:11, 82:4, 92:10, 109:11, 110:7, 111:5, 111:6, 127:3, 127:13, 128:14, 129:11, 132:13, 137:1, 149:17, 149:22, 149:23, 150:4, 161:7, 163:18, 167:5, 168:10, 172:22, 173:6, 176:19, 176:20, 192:3, 203:20, 210:13, 212:22, 218:1,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 805 of 1206 PageID #:66610

234:14, 243:13, 245:21, 246:20, 246:24, 248:9, 262:10, 262:18, 262:20, 263:10, 263:19, 266:8, 266:14, 270:13, 273:3, 273:12, 273:17, 274:8, 274:11, 274:15, 275:1, 277:13, 277:21, 277:22, 278:5, 278:11, 278:12, 278:16, 278:21, 278:22, 283:22, 291:23, 291:24, 293:15, 299:13, 301:9, 301:23, 302:16, 302:21, 314:2, 334:2, 334:20, 338:10, 338:11, 362:9, 369:11, 383:24, 399:3, 399:11, 399:12, 399:13, 406:1, 406:2, 409:12, 416:10, 420:11

**anybody**
131:19, 235:3, 367:24

**anyone**
47:16, 49:23, 245:15, 368:8, 377:22

**anything**
63:3, 71:11, 274:20, 300:12, 301:3, 301:10, 302:8, 302:15, 324:6, 344:15

**anyway**
131:18, 132:2, 214:12

**apart**
167:5, 278:15, 283:22, 350:12

**apartment**
405:18

**apologies**
383:13

**apologize**
196:13

**apparently**
219:12, 234:13

**appeal**
6:18

**appear**
69:17, 164:13, 310:12, 329:5, 370:12, 402:4

**appearance**
64:7, 70:11, 88:3, 89:1

**appearances**
3:1, 4:1, 5:1

**appeared**
108:11, 182:5

**appears**
184:22

**apply**
113:6

**approached**
394:6

**appropriate**
338:21

**approve**
183:6, 183:15

**approximately**
198:6, 201:21, 202:1, 233:3, 254:5, 330:24, 349:16, 388:17, 389:24, 391:20, 396:16

**april**
1:18, 7:8, 9:13, 418:6, 419:7

**area**
6:24, 30:5, 34:10, 35:12, 45:9, 150:16, 152:14, 198:5, 219:13, 233:1, 237:13, 287:23, 305:14, 318:8, 324:1, 341:16, 342:5, 342:14, 342:16, 343:4, 343:8, 349:18, 358:9, 363:18, 383:23, 390:18, 391:1, 394:4, 403:23, 409:23

**argument**
403:19

**arising**
312:10

**armando**
1:10, 3:10, 7:17, 8:21, 16:16, 17:8, 59:5, 72:22, 138:5, 177:8, 196:16, 197:19, 198:13, 198:24, 200:11, 201:4, 202:3, 202:8, 217:6, 219:3, 237:15, 242:17

**armed**
36:16, 36:23, 41:8, 41:16, 48:3, 200:11, 200:15, 201:4, 247:20, 248:16, 249:6, 254:10

**around**
43:23, 76:18, 109:24, 110:15, 123:7, 124:12, 135:2, 275:11, 304:15, 304:20, 305:3, 365:12, 367:18, 386:21

**arrange**
396:11

**arranged**
64:22, 98:6, 98:16, 98:24, 138:9, 140:17, 189:2, 333:18

**arrangement**
93:20, 331:16, 332:16

**arrangements**
65:19, 420:4

**array**
110:7, 110:8, 133:6, 133:24, 169:1, 222:8, 222:23, 284:15, 285:5, 285:11, 285:20, 286:19, 286:23, 287:4, 287:17, 292:24, 293:7, 293:17, 294:16, 295:4, 295:10, 295:20, 303:3, 303:8, 304:2, 304:6, 308:1, 308:6, 309:20, 376:5, 376:10, 376:17, 378:16

**arrest**
15:21, 57:10, 105:2, 138:4, 141:8, 146:8, 146:15, 146:21, 147:6, 149:18, 170:4, 170:14, 182:6, 182:20, 182:22, 183:4, 183:6, 208:23, 247:20, 251:21, 333:2, 397:15, 397:22, 398:9, 409:21

**arrested**
14:19, 138:10, 140:18, 141:1, 173:20, 174:2, 215:16, 215:17, 254:10, 343:3, 357:10, 357:11, 357:17, 383:10, 383:16, 383:21, 385:19, 385:20, 387:16, 387:20, 409:12

**arrived**
121:6

EP IGLESIAS Sub Resp 001628

**asa**
161:23, 171:10
**aside**
273:4, 273:13, 274:24
**ask**
10:18, 54:4, 112:14, 120:22, 134:16, 191:1, 194:9, 205:23, 213:11, 215:9, 235:14, 235:17, 235:19, 236:2, 236:13, 282:5, 282:14, 282:19, 297:23, 324:2, 324:5
**asked**
27:3, 39:15, 39:20, 40:4, 63:21, 175:14, 197:15, 198:3, 200:8, 200:13, 200:18, 201:20, 204:18, 207:13, 207:21, 214:18, 215:8, 216:14, 229:18, 233:16, 261:19, 262:2, 262:10, 262:18, 263:3, 288:3, 289:24, 370:3, 392:14, 402:3, 403:18, 410:9, 419:19
**asking**
37:19, 279:3, 282:13, 298:22, 298:24, 301:22, 402:5
**aspects**
18:16, 70:11
**assailants**
406:12
**assault**
267:13
**asserted**
261:6
**asserting**
268:24, 269:9, 272:13, 273:9, 273:14, 275:24, 277:7
**assertion**
273:22
**assign**
340:15
**assigned**
18:1, 24:11, 24:19, 29:7, 31:3, 130:17, 131:2, 298:7, 305:21, 306:19, 337:5, 339:9, 340:1, 353:24, 361:5, 363:16, 364:1, 364:12, 405:3, 405:4
**assignment**
31:10
**assist**
155:8, 215:20, 216:15, 239:19
**assistance**
224:10, 241:2
**assistant's**
123:12, 390:24
**assisted**
41:9, 311:7
**associate**
410:18
**associated**
194:1, 195:1, 274:16
**assumes**
276:9, 319:15
**assuming**
298:23
**assure**
402:14
**attempt**
229:13, 340:10, 363:5, 364:20, 398:20, 404:15
**attempted**
54:10, 88:16, 202:4, 339:19, 387:14
**attempting**
154:10
**attention**
112:15, 112:24, 113:10, 177:2, 180:8, 246:15, 330:22
**attorney**
4:21, 7:23, 33:15, 33:16, 33:23, 50:10, 50:19, 65:11, 68:7, 68:17, 74:2, 80:3, 82:24, 97:18, 98:3, 98:5, 101:1, 158:15, 158:21, 163:17, 163:24, 167:1, 169:20, 171:17, 189:5, 190:2, 190:21, 191:2, 191:15, 197:16, 198:3, 200:9, 206:17, 206:22, 207:12, 207:15, 208:16, 208:20, 209:6, 212:2, 213:9, 214:22, 215:7, 216:6, 217:17, 221:7, 222:15, 224:10, 228:16, 229:24, 230:1, 231:1, 231:18, 232:3, 232:12, 233:15, 234:3, 234:15, 238:2, 240:3, 241:3, 244:8, 249:14, 251:5, 251:11, 252:9, 252:17, 253:2, 261:10, 273:12, 273:17, 274:8, 274:11, 274:15, 278:16, 278:22, 310:20, 331:12, 362:12, 378:14, 382:23, 390:17, 391:1, 392:13, 393:12, 394:1, 394:24, 396:19, 396:24, 398:4
**attorney's**
64:15, 64:24, 65:22, 119:4
**attorney-client**
261:11, 261:14, 264:17, 275:16, 275:18, 279:3
**attorneys**
12:22, 14:1, 14:16, 22:3, 22:13, 51:13, 65:9, 65:18, 66:5, 66:6, 67:7, 68:9, 69:9, 70:21, 73:13, 73:23, 74:18, 75:5, 77:6, 78:2, 78:16, 79:17, 81:15, 83:2, 90:22, 94:3, 94:16, 97:5, 99:8, 99:17, 100:14, 101:13, 103:6, 104:12, 105:19, 106:14, 122:17, 123:12, 126:14, 127:6, 129:3, 141:11, 150:6, 151:13, 175:9, 175:21, 183:15, 189:1, 190:7, 191:6, 191:17, 193:16, 199:15, 201:13, 202:22, 208:10, 211:10, 218:12, 224:19, 225:8, 225:13, 250:6, 250:17, 271:5, 274:12, 275:1,

275:5, 276:14, 277:14, 279:11, 279:18, 281:4, 281:9, 291:10, 310:21, 377:19, 378:5, 416:10
**attribute**
375:9
**attributed**
104:24, 125:11, 128:7, 128:23, 129:4, 129:22, 163:4, 167:19, 373:24, 400:17
**attributing**
246:19, 397:21
**august**
387:12, 387:23, 388:4, 391:20, 395:21, 399:16, 399:23, 400:5, 400:11
**austin**
279:11, 279:18, 281:4, 281:9
**author**
31:13
**authored**
11:21, 110:13, 117:10, 118:24, 121:17, 121:23, 123:21, 127:24, 129:1, 137:1, 165:3, 165:20, 168:4, 168:11, 172:14, 184:8, 184:18, 347:6, 350:20, 370:23, 375:12, 397:19, 398:16, 400:13
**authoring**
114:14, 116:12
**authorities**
264:23
**authority**
278:23
**available**
194:2, 194:16, 195:4, 231:2, 310:19, 311:16
**avenue**
201:7, 223:24, 233:2, 233:11, 236:20, 237:7, 283:14, 287:23, 384:8, 384:19, 385:1, 393:14, 393:16, 394:6
**avoid**
79:4, 355:16
**avoids**
156:23
**aware**
191:3, 225:18, 230:3, 247:24, 331:1, 363:14, 383:9, 383:15, 383:20, 386:18, 391:21, 405:10, 406:9, 407:24, 408:1
**away**
89:16, 336:9, 396:11, 408:15

**B**

**b**
403:22
**b-o-n-j-e-a-n**
7:16
**b-u-t-o**
324:21
**back**
21:10, 43:12, 44:13, 82:18, 95:21, 99:10, 105:7, 125:24, 155:23, 175:4, 197:24, 219:13, 219:14, 220:1, 236:19, 254:4, 282:1, 285:1, 297:21, 304:16, 304:21, 323:20, 379:4, 380:21, 394:3, 406:17
**background**
167:5, 376:7, 376:10
**backhanded**
214:6, 214:8
**bad**
38:17, 62:20, 63:1, 124:8, 125:1, 142:10
**bag**
123:8
**bald-faced**
245:12
**ballistic**
109:3
**banger**
348:21
**bangers**
358:15
**bank**
28:7, 28:15, 63:13, 130:7
**bar**
271:8, 272:3
**barber**
5:4, 8:4, 260:18, 338:3, 370:11, 416:21
**barrel**
158:22, 159:10, 159:16, 159:22, 160:1, 169:12
**barrier**
156:23
**bars**
38:4
**bart**
357:9, 357:18
**based**
264:4, 327:11, 338:15, 362:19
**basis**
63:19, 111:5, 111:12, 120:12, 141:7, 238:21, 399:10, 410:15, 411:1, 411:8
**bates**
56:12, 56:18, 58:3, 112:13, 112:16, 113:11, 117:8, 172:15, 184:7, 196:7, 206:8, 338:4, 338:6, 338:16, 338:20, 370:12
**bathroom**
326:3
**battery**
267:14
**bears**
113:12, 165:3, 165:7, 206:6, 206:8, 339:3, 350:17, 370:20
**beat**
360:19, 361:13, 361:21, 362:3, 362:10, 389:8
**beaten**
157:1, 171:17
**beating**
45:11, 157:15
**beatings**
390:1
**because**
30:10, 45:1, 45:12, 53:19, 56:3, 76:6, 86:5, 86:16, 87:17, 89:9, 102:15, 120:2, 139:14, 139:22, 148:3, 153:23, 157:22, 159:5, 172:8, 180:7, 183:5, 190:9, 195:3, 195:4, 196:11, 208:18, 210:6, 211:4, 215:15, 220:3, 223:13, 225:11, 239:7, 243:15, 249:5, 249:14, 253:8, 260:3, 268:17, 269:1, 280:7, 303:14,

307:6, 315:18, 327:9, 327:16, 335:16, 336:1, 340:8, 342:7, 346:6, 347:8, 347:15, 347:22, 348:20, 352:10, 353:6, 355:18, 355:24, 356:17, 362:11, 365:10, 367:5, 367:16, 375:3, 379:3, 384:24, 386:3, 387:6, 402:10, 403:19, 403:24, 408:23, 409:11

**become**
9:8, 330:18

**been**
8:14, 28:7, 36:15, 48:22, 51:5, 55:19, 56:16, 56:21, 58:2, 58:6, 63:10, 81:13, 82:7, 85:1, 85:9, 86:17, 87:18, 95:10, 103:1, 103:8, 110:24, 111:13, 112:3, 112:10, 116:20, 121:18, 122:7, 127:4, 127:16, 128:23, 129:11, 135:20, 136:1, 140:16, 141:9, 162:16, 171:24, 174:22, 184:6, 187:10, 193:14, 196:10, 206:5, 210:11, 213:21, 223:6, 226:10, 233:5, 246:8, 248:19, 250:4, 258:10, 261:24, 262:8, 262:16, 263:17, 280:14, 288:4, 288:9, 300:13, 300:14, 301:4, 301:5, 338:7, 338:8, 338:17, 339:1, 346:5, 356:16, 359:14, 366:8, 370:15, 370:19, 371:13, 386:19, 387:15, 390:20, 396:18, 409:12, 411:19, 412:5, 418:11, 418:12

**beeped**
85:11

**beeping**
130:8

**before**
2:11, 14:12, 14:18, 28:5, 52:22, 60:2, 62:9, 63:12, 84:6, 106:6, 106:18, 107:10, 110:3, 111:14, 116:21, 117:7, 170:4, 178:10, 181:10, 182:6, 185:7, 185:13, 185:22, 186:21, 187:9, 187:24, 194:2, 194:16, 197:4, 197:10, 200:3, 200:23, 202:12, 204:4, 205:18, 211:19, 217:18, 218:24, 223:7, 224:3, 227:10, 232:4, 233:20, 234:5, 241:4, 246:12, 251:5, 275:15, 283:15, 284:14, 285:15, 285:20, 286:1, 286:18, 287:12, 287:17, 301:11, 301:17, 309:7, 309:12, 325:15, 325:21, 326:3, 326:10, 361:14, 374:13, 393:5, 418:20, 419:9

**began**
43:2, 247:17, 398:5

**begin**
8:22

**beginning**
330:2

**begins**
113:11, 120:24

**behalf**
3:3, 3:10, 3:17, 4:3, 4:11, 4:18, 5:3, 7:24, 8:2, 8:6, 8:10, 42:1, 42:4, 42:6

**behind**
115:14, 155:17

**beige-colored**
226:22

**being**
29:7, 49:6, 49:7, 65:20, 93:12, 95:11, 99:10, 104:11, 120:3, 121:8, 123:5, 128:16, 139:22, 156:24, 167:9, 200:18, 202:3, 203:22, 228:5, 237:10, 315:19, 317:7, 334:5, 336:6, 338:11, 353:24, 403:18, 418:3, 420:9

**believe**
16:4, 19:24, 52:9, 55:19, 111:6, 111:12, 140:15, 168:9, 187:16, 224:22, 233:5, 233:18, 236:22, 274:21, 287:8, 317:5, 317:14, 318:9, 338:8, 344:14, 345:13, 354:19, 358:22, 370:16, 399:3, 399:10, 411:1, 411:8

**believed**
239:15, 286:3, 346:7

**believing**
111:21, 223:14, 225:9, 225:15, 230:5, 238:21, 376:23

**bella**
401:1

**bellow**
395:23, 396:8, 396:15, 397:1, 401:1, 401:2

**belly**
158:22, 159:10, 159:17, 159:23, 160:1, 169:12

**belonged**
227:18, 408:4

**belonging**
135:12

**bench**
206:11, 206:16, 228:17, 361:13

**beneath**
114:5

**benefit**
32:10, 93:20, 144:22

**benefits**
46:22, 94:5

**benefitting**
92:12, 92:20

**besides**
207:22

**best**
411:22

**better**
120:5, 234:14, 338:12

**between**
31:23, 98:16, 121:5, 251:20, 344:9, 392:23
**beubea**
339:19, 341:16, 344:13, 346:23, 349:2, 354:16
**beyond**
360:24
**bill**
305:10
**binding**
263:12
**bitch**
44:9
**black**
365:11, 367:17, 375:4, 376:10, 394:6, 406:16
**black-and-white**
219:5, 222:6
**blame**
271:5
**blank**
372:7, 372:23
**blevin**
354:24, 355:5, 355:11, 355:16, 355:22
**block**
110:16, 135:3, 226:21, 227:16, 228:4
**blocks**
228:24, 408:15
**blue**
405:14, 405:21, 405:22, 407:8, 412:20, 413:8
**blurt**
213:13, 214:23
**bobby**
339:20, 348:13, 349:2, 355:24
**body**
156:24, 389:9
**bolan**
211:19, 222:13, 234:13, 235:1, 239:15
**bolster**
176:11
**bond**
249:7, 387:14
**bond-on-bond**
253:8
**book**
30:11, 43:19, 43:24, 44:15, 44:24, 45:11, 366:19, 367:23, 368:1, 368:8, 370:5, 374:3, 377:21, 377:23, 389:10
**booking**
318:4
**bore**
193:13, 193:16
**both**
114:22, 128:15, 301:20, 382:15, 394:22, 414:3
**bother**
34:23
**bottom**
56:23, 58:8, 113:13, 113:19, 129:17, 165:4, 165:16, 184:13, 184:22, 207:10, 339:3, 370:21
**boy**
351:20
**boyke**
289:10, 289:24, 331:2, 331:3, 331:11, 331:17, 333:20, 334:3, 334:14, 334:20, 335:3, 360:9, 361:1, 361:24, 362:11
**boyke's**
361:5
**brain**
320:7
**brains**
115:14
**brainstormed**
73:14
**break**
82:5, 82:9, 82:13, 174:22, 281:21, 320:8, 330:5, 380:16
**bribery**
266:21
**bring**
35:24, 65:10, 138:24, 139:6
**bringing**
107:6, 185:13, 354:16
**broken**
344:8
**brooklyn**
3:7
**brother**
152:22, 153:4, 154:14
**brothers**
53:19, 54:1, 154:6, 384:1, 384:7, 385:23, 386:15, 388:13, 391:23, 395:3, 395:16, 397:12, 399:5, 399:14, 399:24, 400:7, 400:20, 401:13
**brought**
38:3, 64:14, 68:6, 100:24, 107:2, 109:18, 110:22, 135:18, 138:17, 141:17, 141:20, 150:15, 152:14, 171:11, 171:23, 185:6, 190:21, 209:24, 210:6, 219:13, 219:14, 222:22, 307:11, 342:16, 343:3, 366:18, 375:18, 385:21, 387:22, 409:23, 411:11
**brown**
315:17, 315:24, 316:6, 316:16
**bryn**
357:5
**buick**
123:3, 135:12, 226:22, 283:14, 287:22
**build**
373:8, 373:14
**building**
219:15, 405:11, 405:18
**bullet**
87:18, 108:12, 108:19, 109:2, 137:13, 226:24
**bullpen**
101:17
**bunch**
320:4
**burden**
104:16, 239:20
**burdensome**
404:2
**bus**
333:4, 333:14, 334:6, 335:2, 335:11, 336:16, 359:16
**business**
28:8
**butcher**
349:17
**buto**
32:24, 33:6, 33:17, 34:1, 34:3, 34:7, 35:10, 35:17, 39:11, 39:23, 40:13, 41:2, 41:10, 41:17, 42:2, 42:16, 44:20, 46:24,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 810 of 1206 PageID #:66615

47:7, 47:19, 48:5, 48:22, 49:5, 49:14, 50:12, 50:21, 66:9, 68:2, 93:13, 99:11, 99:22, 120:4, 210:11, 324:2, 324:20, 325:2, 325:7, 325:14, 326:3, 326:10, 326:17, 326:23, 327:6, 327:15, 327:18, 328:1, 328:12, 328:17, 328:23, 329:6, 329:15, 329:20, 330:4
**buto's**
39:16, 66:7, 66:14, 67:9, 67:16, 67:24
**buy**
331:4, 332:1, 332:18, 336:23

**C**

**c-o-l-o-n**
306:24
**california**
387:21
**call**
44:8, 55:21, 56:1, 56:18, 99:9, 99:17, 230:15, 291:23
**called**
8:14, 56:7, 119:19, 212:14, 221:24, 269:18, 336:7, 419:9
**calls**
15:22, 17:12, 23:3, 43:6, 146:24, 212:8, 261:9, 261:10, 275:16
**came**
36:4, 50:19, 101:14, 202:20, 329:14, 343:8, 349:17, 391:1, 392:22, 393:4, 396:1
**can**
9:2, 9:20, 10:12, 10:18, 12:12, 17:13, 21:16, 35:5, 37:23, 40:19, 40:20, 54:5, 54:16, 82:6, 82:9, 97:9, 112:19, 112:20, 114:7, 147:1, 194:11, 195:10, 213:4, 213:13, 236:9, 248:7, 261:1, 263:10, 264:8, 265:1, 270:19, 270:22, 272:15, 275:19, 276:10, 279:6, 284:19, 285:1, 289:13, 297:17, 298:19, 300:3, 300:4, 306:2, 312:14, 323:21, 350:12, 365:22, 402:14, 404:4, 404:22
**can't**
209:7
**cancel**
403:13
**candy**
38:4, 38:9
**caption**
206:6
**car**
28:22, 75:14, 75:16, 85:12, 88:11, 89:15, 89:17, 89:22, 90:4, 106:5, 107:3, 107:7, 107:8, 107:9, 107:15, 107:16, 107:22, 108:6, 108:11, 108:12, 108:19, 109:3, 109:5, 109:12, 109:17, 109:19, 110:1, 110:10, 110:23, 111:6, 111:13, 111:19, 111:22, 121:6, 121:8, 122:2, 122:3, 123:5, 123:6, 123:7, 130:10, 134:21, 135:5, 135:13, 135:19, 135:20, 136:1, 136:8, 136:17, 137:3, 137:13, 158:23, 159:17, 159:18, 202:4, 227:9, 227:17, 228:7, 229:1, 229:6, 229:7, 229:8, 229:15, 230:4, 230:6, 233:10, 288:4, 288:9, 288:14, 300:13, 301:4, 357:4, 391:5, 394:5, 405:15, 405:22, 407:8
**care**
214:11, 367:4
**career**
10:1, 10:23, 262:21, 334:22
**carefully**
412:9
**carl**
33:5, 325:13, 326:2, 326:9, 326:16, 328:11, 328:22
**carlos**
323:4
**carried**
340:7
**cars**
110:8, 130:8
**case**
7:4, 7:5, 18:7, 24:20, 29:7, 29:20, 30:21, 31:3, 31:4, 31:15, 61:21, 62:6, 91:7, 93:13, 98:20, 99:11, 99:23, 100:16, 102:7, 102:8, 103:17, 104:5, 105:2, 105:12, 116:10, 116:19, 117:1, 120:4, 130:18, 131:2, 132:7, 134:13, 139:13, 139:23, 144:5, 144:14, 152:23, 153:24, 154:14, 157:21, 169:18, 176:11, 189:13, 210:2, 218:17, 222:13, 240:4, 240:6, 240:11, 241:6, 265:13, 268:11, 269:10, 269:11, 269:18, 276:1, 277:8, 277:16, 279:14, 299:2, 299:10, 299:11, 299:22, 303:3, 303:9, 317:8, 335:18, 337:21, 339:8, 339:13, 340:8, 340:17, 348:19, 349:11, 353:24, 360:19, 361:4, 361:13, 361:21, 362:3, 362:10, 364:13, 381:7, 381:8, 387:15, 398:2, 402:4, 402:10, 402:11, 407:17, 410:2,

EP IGLESIAS Sub Resp 001633

420:11
**cases**
30:4, 34:19, 35:1, 41:16, 94:4, 101:6, 114:15, 140:6, 248:17, 250:9, 279:14, 282:15, 282:19, 282:20, 290:11, 358:8, 377:2, 402:19
**cash**
28:8, 98:17
**casings**
87:18
**catch**
153:24
**catherine**
5:4, 8:4
**caught**
131:22
**cause**
15:21, 16:4, 105:2, 140:15, 146:8, 146:15, 182:22, 204:12, 302:20, 397:15, 403:12
**caused**
15:14
**causing**
245:23
**center**
4:22, 207:10
**central**
37:11, 138:17, 141:18, 141:21, 150:16, 155:24, 156:7, 220:2, 223:23, 341:17, 366:19, 385:22, 387:22, 388:9, 409:14, 413:19
**certain**
46:9, 94:5, 331:4, 403:21
**certainly**
131:1, 136:15, 213:8, 403:5, 403:7, 403:19
**certificate**
420:7
**certified**
2:12, 419:4, 420:14, 420:22
**certify**
419:6, 419:17
**chair**
155:16
**chance**
350:1
**change**
67:19
**charge**
17:19, 34:2, 76:18, 147:6, 147:14, 154:22, 157:22, 310:6, 315:12
**charged**
14:19, 36:15, 76:24, 77:8, 93:3, 103:1, 150:6, 360:1, 397:11
**charges**
33:17, 33:24, 36:10, 41:9, 47:8, 183:15, 328:18
**charging**
188:8
**charles**
320:12
**chasing**
300:14, 301:5
**check**
55:7, 55:10
**checked**
217:4
**chicago**
1:17, 2:7, 3:14, 4:8, 4:15, 4:23, 5:3, 5:7, 7:7, 8:5, 9:5, 9:8, 9:12, 9:15, 9:19, 17:7, 45:9, 219:5, 254:18, 255:4, 255:15, 255:24, 256:10, 256:19, 257:8, 257:18, 258:8, 258:19, 259:6, 259:20, 263:4, 274:9, 290:15, 336:9, 363:18, 364:2
**children**
302:12, 396:11, 397:4
**choice**
270:2, 270:5
**choose**
11:3, 403:6
**christopher**
381:21, 382:5, 382:17, 393:1, 395:4
**chronologically**
118:20
**circumstances**
164:12, 206:23
**circumstantial**
119:10, 119:20
**city**
5:3, 8:5, 336:9
**civil**
267:20, 299:9, 299:10
**claim**
75:6, 75:13, 76:4, 77:17, 78:17, 81:23, 83:20, 84:2, 84:11, 86:3, 86:10, 86:22, 88:10, 89:14, 101:15, 110:14, 119:14, 151:24, 180:13, 304:1
**claimed**
83:10, 104:14, 171:1, 180:20, 238:21, 297:14, 313:8, 394:13, 400:3, 400:6
**claiming**
67:17, 147:10, 187:10, 272:4, 280:19, 292:1, 398:16
**claims**
45:13, 162:15, 292:7, 297:13
**clandestine**
256:20
**clarify**
372:17, 372:19
**clark**
5:6
**clean**
66:22
**clean-looking**
406:19
**clear**
17:24, 283:18, 371:24, 372:11, 403:18
**cleared**
30:4, 51:6, 349:11
**client**
235:2, 261:10, 264:7
**close**
180:8, 236:7, 236:8, 334:14, 335:18, 340:8, 348:19, 407:17
**closed**
202:7, 358:8
**cloth**
109:11
**clothing**
327:11
**co-defendant**
381:20
**co-defendants**
199:19, 395:3
**coached**
50:9
**coaching**
97:20

**cobra**
366:24, 367:5, 368:8, 370:4, 371:16, 374:3, 380:10
**cobras**
312:4, 312:9, 316:11, 366:20, 367:7, 367:23, 377:21
**code**
258:21
**coerce**
81:4, 153:12, 157:23, 229:14, 294:5, 296:8, 319:1, 319:24, 334:22, 395:12
**coerced**
171:9, 172:6, 185:16, 205:12, 210:11, 218:13, 255:5, 255:16, 291:15, 294:13, 362:20, 401:1
**coercing**
22:16, 95:6, 349:1
**coercion**
21:21, 156:13, 163:7, 164:4, 319:12
**coercive**
259:15
**cogh**
66:5
**collaboration**
398:1
**colleagues**
258:21
**collected**
109:13
**collection**
112:4
**college**
357:4
**colon**
305:15, 305:16, 306:16, 306:24, 307:19, 307:24, 308:5, 308:10, 308:15, 308:21, 309:1, 309:7, 309:12, 310:7, 310:13, 310:20, 311:1
**colon's**
310:17
**color**
107:23, 169:2
**come**
39:2, 42:1, 64:23, 65:19, 66:21, 142:18, 143:19, 144:2, 152:8, 171:2, 231:19, 341:16, 389:6, 390:18
**comes**
118:19
**coming**
388:8
**comment**
234:22, 293:15
**comments**
178:5, 181:2, 235:5, 293:21, 295:18, 295:24, 327:23
**commit**
16:11, 16:18, 16:24, 54:12, 76:5, 152:2, 254:20, 259:18, 260:11, 269:2, 320:14, 320:21, 321:5, 321:13, 321:23, 322:6, 322:14, 322:22, 323:6, 323:14, 353:13, 368:22
**committed**
22:24, 72:23, 91:22, 93:12, 249:6, 253:9, 258:20, 268:17, 307:19, 316:11, 333:13, 343:16, 347:15, 352:10, 353:7, 355:8, 412:11
**committing**
15:4, 334:6
**common**
34:16
**communicated**
25:3, 25:9, 25:19
**competence**
44:3, 45:4, 47:2, 57:5, 57:16, 58:14, 59:9, 70:15, 95:15, 98:10, 140:10, 150:9, 157:3, 170:6, 190:16, 193:8, 194:20, 209:1, 212:7, 213:2, 232:19, 234:9, 239:22, 244:22, 248:22, 252:2, 252:21, 253:21, 257:1, 289:12, 312:13, 313:2, 319:15, 332:4, 333:22, 334:9, 334:16, 346:11, 360:12, 361:8, 362:5, 362:14, 362:22, 368:11, 377:5, 380:13, 390:12, 397:6, 401:6, 410:4, 410:20, 415:12
**competent**
116:4
**complainant**
341:14, 341:15
**complainants**
341:15
**complaint**
402:5, 402:15, 402:16, 402:18
**complaints**
268:19, 269:4
**complete**
112:11, 419:18
**completely**
163:11
**complexion**
373:8, 373:15, 406:14, 406:16, 406:18
**compliment**
214:2, 214:6
**compliments**
214:9
**compound**
33:9, 34:12, 114:7, 224:14
**compromise**
79:3
**computer-aided**
419:11
**concealed**
23:19, 257:19, 365:11, 367:17, 375:4
**concept**
306:7
**concern**
67:6, 99:9, 99:18
**concerned**
66:20, 151:4
**concerning**
247:1
**concluded**
417:4
**concludes**
417:1
**conclusion**
15:23, 17:12, 23:4, 212:8
**conduct**
177:7, 179:7, 199:6, 276:15, 276:23
**conducted**
243:4, 351:1, 371:14

**conelli**
407:5
**conetti**
404:16
**confer**
323:18
**confess**
49:16, 145:22, 147:11, 319:24, 388:12
**confessed**
40:13, 42:2, 82:1, 83:11, 91:9, 95:20, 101:16, 129:12, 296:16, 391:22
**confessing**
94:15, 103:9
**confession**
319:2, 362:19
**confident**
412:7, 412:10
**confidential**
119:19, 291:24
**connect**
283:16
**connected**
136:1, 137:13, 229:8
**connection**
19:9, 93:4, 138:18, 197:4, 264:14, 276:15, 276:23, 383:11, 383:16
**connelly**
5:5
**consistent**
186:2
**consistently**
342:13
**consisting**
133:6, 133:24, 169:2, 418:6
**conspiracy**
12:19, 13:15
**conspired**
13:23, 14:10, 14:14, 17:18, 22:4, 22:14, 290:14, 305:8, 310:5, 313:14, 314:12, 314:21, 316:4, 317:12, 318:19, 318:24, 320:12, 320:20, 321:3, 321:11, 321:21, 322:5, 322:12, 322:20, 323:4, 323:12, 335:4, 356:7, 382:12, 382:23, 385:9
**constitution**
276:17
**constitutional**
11:4, 12:10, 12:18, 13:6, 13:13, 15:6, 268:17, 269:2
**construct**
304:10, 345:4
**construction**
85:19
**consult**
408:21
**consulted**
18:11
**contact**
152:9, 355:5, 355:11
**contacted**
279:11, 341:14, 346:23, 390:17
**contain**
192:3
**contained**
11:16, 28:22, 125:9, 126:3, 126:10, 126:21, 128:6, 128:15, 162:5, 162:14, 167:7, 177:8, 179:9, 179:21, 242:1, 243:9, 256:20, 284:15, 286:19, 347:7, 355:17, 366:20, 374:2, 397:20, 400:11, 405:23, 413:18, 414:1
**containing**
284:5, 286:9
**contains**
118:14, 162:6, 172:16, 192:5, 297:24
**contents**
163:11
**context**
198:1
**continue**
97:10, 105:11, 214:19
**continued**
94:1, 98:18, 99:2, 279:24, 280:6, 280:18
**continuous**
195:14
**contrive**
63:9, 391:3
**contrived**
83:2, 123:11, 129:1, 164:2, 189:14
**control**
260:23
**convalescing**
375:19
**convenience**
248:9
**conversation**
36:5
**conversations**
77:24, 85:7, 85:8, 289:17
**convict**
190:12, 281:12
**convicted**
17:9, 235:9, 245:5, 305:18, 337:24, 362:19, 416:4
**conviction**
204:13, 239:8, 245:16, 299:12, 317:6, 377:12, 389:19, 400:19
**convictions**
15:17, 23:12, 244:19, 245:24, 280:8, 383:4
**convince**
78:16, 109:4
**convinced**
296:14
**cook**
4:18, 8:1, 64:15, 64:23, 65:11, 65:20, 65:21, 66:15, 68:16, 80:2, 82:23, 94:6, 98:3, 101:1, 119:3, 185:7, 189:4, 189:5, 207:14, 213:8, 247:19, 274:12, 400:4, 419:3, 419:6, 420:15
**cooperate**
46:23, 153:5, 346:6, 390:3, 390:6, 396:9
**cooperation**
39:4, 43:3, 47:18, 48:4, 98:18, 99:3, 99:21, 144:5, 145:4, 163:9, 186:19
**cop**
38:15, 38:17, 142:10, 143:19
**copies**
196:12
**copy**
372:23
**copying**
372:8
**corner**
59:6, 197:15,

233:11, 236:20
**corrections**
54:23, 336:7, 418:11, 418:12
**corroborate**
45:13, 105:21, 151:14
**cortland**
159:12, 405:12, 408:12, 410:12, 412:12
**could**
9:15, 21:10, 41:15, 45:12, 46:12, 47:16, 48:21, 51:3, 52:22, 56:22, 60:12, 61:22, 70:5, 72:10, 79:4, 92:19, 93:21, 101:2, 102:1, 105:1, 107:21, 110:9, 119:16, 120:17, 125:10, 135:4, 144:13, 144:14, 145:22, 146:2, 146:20, 148:19, 154:21, 157:20, 160:16, 172:1, 177:3, 180:6, 219:15, 226:2, 232:13, 243:13, 257:22, 268:20, 285:16, 285:21, 287:13, 287:18, 292:17, 292:23, 294:21, 295:3, 300:11, 301:2, 307:5, 315:17, 319:23, 337:8, 338:16, 338:19, 340:9, 342:5, 342:17, 347:9, 355:6, 367:16, 367:24, 370:16, 376:18, 379:3, 390:19, 394:7, 403:20, 407:7, 410:10
**couldn't**
34:23, 54:24, 145:21, 153:23, 212:21, 253:6
**count**
350:6, 372:2
**counting**
372:13
**county**
4:18, 8:1, 64:15, 64:23, 65:11, 65:20, 65:22, 66:15, 68:16, 80:2, 82:23, 94:6, 98:3, 101:1, 119:3, 185:7, 189:4, 189:5, 207:15, 213:9, 247:19, 274:12, 400:5, 419:3, 419:5, 420:15
**couple**
24:12
**course**
11:11, 80:5, 143:13, 234:22, 259:19, 262:21, 278:6, 388:16, 388:20, 389:4, 403:12
**court**
1:1, 7:9, 7:13, 42:1, 140:8, 298:2, 364:8, 415:17, 420:1
**cousin's**
409:22
**cover**
280:1, 374:11, 374:21
**covered**
258:20, 261:11
**covers**
261:14
**cozy**
26:3
**cr**
196:18
**crashed**
89:17
**create**
63:19, 105:1
**creates**
301:24
**creating**
259:8
**credibility**
61:23, 64:8, 85:20, 88:4, 89:2, 132:21
**credible**
151:6
**credibly**
172:1
**credit**
252:8, 252:17
**crick**
154:15
**crime**
22:18, 68:18, 69:16, 70:3, 71:20, 72:19, 76:8, 76:19, 77:1, 79:11, 87:19, 98:4, 108:4, 109:4, 109:13, 119:18, 147:12, 171:23, 199:7, 203:22, 215:1, 229:9, 237:4, 240:20, 253:8, 264:12, 283:7, 283:16, 297:6, 302:21, 320:13, 320:21, 321:4, 321:12, 321:22, 322:6, 322:13, 322:22, 323:5, 323:13, 335:15, 349:2, 354:1, 354:3, 356:1, 366:3, 392:5, 407:15, 412:5
**crimes**
64:16, 64:24, 65:10, 68:6, 68:16, 74:1, 80:2, 82:23, 100:23, 101:2, 119:3, 120:16, 209:17, 220:5, 220:12, 221:15, 237:14, 254:19, 259:18, 260:10, 353:12, 366:11, 409:13
**criminal**
6:10, 6:12, 23:2, 23:9, 47:8, 52:3, 55:7, 55:10, 57:2, 57:10, 58:7, 58:11, 58:20, 59:4, 59:17, 60:1, 60:10, 60:21, 101:5, 101:6, 196:17, 197:5, 230:23, 231:10, 256:22, 257:10, 257:20, 258:9, 267:20, 278:11, 278:17, 291:10, 299:11, 302:16, 328:17, 400:18, 401:3
**criminally**
415:18
**crossed**
250:5
**cruz**
53:17, 381:20, 382:3, 382:4, 382:16, 385:11, 385:21, 386:3, 390:10, 393:3, 395:5, 395:15, 401:11
**cruzen**
382:2
**crystal**
363:17

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 815 of 1206 PageID #:66620

**csr**
1:24
**cta**
333:4, 333:14, 334:6, 335:2, 335:11, 336:15, 359:16
**cuffed**
155:17
**culprit**
345:18, 349:20
**cultivate**
149:10, 150:22
**curious**
215:19
**currently**
54:2
**custody**
34:19, 37:11, 39:1, 53:1, 53:10, 53:20, 55:12, 57:12, 60:13, 61:9, 155:23, 156:6, 158:12, 166:17, 178:18, 179:1, 181:9, 181:16, 230:17, 250:19, 251:13, 251:24, 252:8, 252:11, 253:4, 333:10, 333:19, 334:4, 383:23, 386:3, 386:5, 397:3, 398:19
**cv**
1:6, 1:12, 7:4, 7:6

D

**d-i-a-z**
321:12
**daley**
4:22
**damage**
89:15, 89:22, 111:19, 137:12, 226:23
**dan**
272:16, 274:21, 274:24
**danger**
50:2
**daniel**
197:17, 279:19, 320:20, 356:8, 356:14, 357:3, 357:21, 358:2, 358:23, 359:5, 362:9, 362:18
**dark**
373:20, 379:5, 406:13, 406:18
**dark-skinned**
373:20
**date**
58:21, 251:21, 291:24, 364:6, 403:20
**dated**
192:4, 350:16
**dates**
402:17
**david**
305:15, 305:16, 306:24, 307:19, 307:24, 308:5, 308:10, 308:15, 308:21, 309:1, 309:7, 309:12, 310:7, 310:13, 310:17, 310:24
**davilla**
299:21, 299:22, 301:10, 302:8, 302:15, 302:20, 303:2, 303:7, 303:15, 303:18, 304:2, 304:14, 304:19, 305:2, 305:10
**davilla's**
301:12, 303:13
**day**
4:13, 23:19, 26:20, 27:22, 57:13, 62:9, 63:11, 88:15, 113:7, 178:10, 214:1, 220:23, 223:22, 224:3, 227:10, 283:4, 326:4, 371:13, 402:23, 418:20, 419:7, 420:15
**day-for-day**
252:16
**days**
24:12, 106:24, 251:23, 252:7, 252:10, 253:3, 283:15, 420:3
**dcfs**
396:12
**deal**
41:15, 42:21, 144:22, 158:24, 159:5, 248:19
**dealings**
28:8
**dealt**
217:8
**dean**
3:6
**death**
247:1, 290:5, 290:16, 343:18, 354:20
**decades**
403:9
**december**
279:12
**decided**
19:12, 30:18, 32:23, 34:2, 34:8, 35:16, 51:3, 51:14, 52:2, 52:17, 59:24, 60:9, 60:21, 62:18, 62:24, 67:15, 68:24, 83:9, 84:13, 85:18, 94:24, 100:5, 100:14, 105:10, 106:3, 106:15, 149:10, 150:21, 166:16, 188:18, 189:13, 250:17, 335:18, 340:14, 358:14, 359:3, 359:10, 365:16, 366:23, 369:16, 375:9, 384:14, 395:12, 401:17, 408:21
**decision**
269:24, 270:3, 271:18, 293:16, 293:22, 295:20, 296:1
**declined**
33:24, 155:8, 190:7
**defendant**
3:17, 4:3, 4:11, 4:18, 5:3, 8:5, 8:7, 73:22, 100:17, 152:19, 152:20, 153:21, 170:18, 171:1, 171:11, 197:19, 198:13, 198:24, 199:13, 200:10, 207:13, 237:15, 310:6, 313:12, 314:20, 315:9, 328:10, 329:19
**defendants**
1:8, 1:14, 55:8, 64:16, 65:1, 73:12, 74:9, 74:17, 91:7, 91:15, 93:1, 94:15, 95:7, 101:5, 103:8, 103:17, 104:15, 127:17, 151:20, 189:13, 192:9, 199:14, 246:20, 256:22, 257:10, 257:21,

EP IGLESIAS Sub Resp 001638

291:10, 398:17
**defense**
194:4, 194:18, 195:6, 275:14, 276:1, 276:8, 377:19, 378:5, 378:13
**defranco**
382:24, 390:18, 391:1, 394:1, 394:24, 398:4
**demonstrate**
236:24
**dep**
8:8, 56:4, 56:7, 403:13
**department**
9:12, 9:19, 54:23, 219:5, 254:18, 255:5, 255:16, 256:1, 256:10, 256:19, 257:8, 257:19, 258:8, 258:19, 259:6, 259:21, 263:5, 274:9, 336:6
**depicted**
309:14
**deponent**
330:9, 418:1, 418:5, 418:17, 420:1
**depos**
7:10
**deposed**
402:10
**deposition**
1:16, 2:1, 6:8, 7:2, 7:18, 54:3, 195:21, 206:1, 261:8, 261:19, 282:14, 282:18, 299:13, 317:3, 317:7, 337:17, 338:20, 370:9, 417:2, 417:3, 418:6, 419:8, 420:2, 420:5, 420:8
**depositions**
282:20
**deprive**
269:11
**derive**
90:9
**describe**
176:19, 341:23, 342:15, 365:10, 407:7
**described**
324:16, 326:24, 405:22
**description**
300:13, 301:4, 406:1, 406:2, 406:24
**descriptions**
407:14
**designate**
195:16
**despite**
15:20, 20:24, 42:13, 63:1, 77:15, 147:10, 160:22, 161:5, 325:8, 365:15, 407:13
**destroyed**
257:8
**detail**
27:12
**detailed**
83:13
**detected**
45:13
**detectives**
45:9, 340:7, 341:8, 342:5, 342:14, 354:2, 373:19, 393:24, 398:2
**determine**
12:3, 268:3, 268:9, 352:17, 352:22, 354:9, 355:6, 365:17
**determined**
61:6, 134:5, 224:20, 227:18, 335:9, 341:6, 348:19, 375:24, 384:17, 384:24, 386:4, 407:16
**develop**
62:10, 148:10
**developed**
141:10, 181:23, 283:6, 344:22
**devoid**
137:1
**devon**
3:20
**diaz**
321:12
**dickens**
110:17, 135:4, 226:21, 227:16, 228:4
**dickinson**
339:10, 340:16, 341:6, 348:18, 353:3, 353:23
**didn't**
30:8, 42:20, 45:12, 76:17, 86:4, 96:4, 96:12, 96:18, 97:3, 97:11, 102:15, 110:6, 116:3, 117:16, 136:15, 139:14, 139:20, 145:16, 147:6, 162:22, 165:14, 218:9, 232:2, 234:14, 306:13, 330:1, 343:9, 347:18, 352:16, 355:5, 362:1, 362:11, 367:4, 372:8, 372:16, 372:22
**different**
54:2, 101:3, 101:4, 103:8, 104:3, 110:8, 114:23, 228:24, 298:24, 299:8, 311:4, 350:10, 350:11, 402:19
**dillon**
4:19, 7:24, 12:22, 13:16, 14:1, 14:11, 14:16, 22:3, 22:13, 51:14, 64:16, 65:1, 65:9, 65:18, 66:6, 67:8, 68:9, 69:9, 70:21, 73:13, 73:24, 74:19, 75:5, 77:7, 78:3, 78:16, 79:18, 81:15, 83:2, 83:12, 90:23, 94:3, 94:17, 95:8, 97:6, 97:18, 98:5, 99:8, 99:17, 100:14, 101:13, 104:13, 105:19, 106:3, 106:14, 122:17, 123:12, 126:14, 127:6, 129:3, 141:11, 151:13, 151:20, 175:10, 175:21, 176:8, 189:2, 190:7, 191:7, 191:17, 192:10, 199:16, 201:13, 202:22, 208:10, 208:20, 211:11, 218:12, 224:20, 225:14, 230:1, 240:4, 250:17, 251:5, 251:11, 252:9, 252:18, 253:3
**directed**
113:2, 243:21,

342:16, 345:17
**directly**
95:8, 110:22, 230:4
**disciples**
408:7, 408:10
**disciplined**
259:7, 260:4, 260:9
**discoverable**
404:1
**discovered**
35:9
**discovery**
269:11
**discredit**
67:15, 67:16
**discuss**
32:5, 44:19, 206:18
**discussed**
18:16, 48:12, 103:6, 103:17, 138:23, 175:10, 175:22, 176:8, 206:22, 230:24, 388:9
**discussing**
171:3
**discussion**
404:5
**disdain**
408:24
**dismissed**
154:22
**disregarded**
352:9, 356:16
**distance**
190:10
**district**
1:1, 1:2
**document**
11:15, 112:17, 113:2, 113:3, 227:21, 350:9, 351:7, 351:9
**documentation**
301:23
**documents**
58:18, 112:4, 310:17, 310:19
**does**
192:3, 299:16, 330:8, 338:5, 370:12
**doesn't**
195:15, 236:6, 275:19, 338:3, 338:15
**doing**
48:21, 86:2, 131:9, 213:21, 254:11
**don't**
55:21, 56:6, 82:12, 116:24, 125:24, 131:18, 131:22, 174:21, 196:10, 196:13, 214:2, 214:11, 235:13, 235:14, 235:16, 235:21, 235:23, 235:24, 236:3, 260:24, 270:19, 272:24, 273:2, 274:1, 274:2, 274:3, 281:21, 282:15, 283:19, 299:6, 299:16, 306:5, 306:14, 338:9, 372:9, 402:12, 403:15
**done**
54:14, 64:3, 95:12, 124:7, 125:1, 270:16, 377:2
**door**
202:7
**dope**
121:5, 121:19, 123:8, 393:15
**double**
250:4
**double-sided**
196:20
**doubted**
177:3
**down**
97:6, 206:16, 227:8, 227:15, 227:16, 228:3, 228:4, 284:23
**dozen**
259:19
**dozens**
254:18
**drafted**
121:13, 251:11
**drafting**
398:6
**dragon**
407:18, 408:14, 409:6, 410:10
**dragons**
408:1, 408:2, 408:5, 408:11, 408:22, 409:1
**drake**
393:14, 393:16
**draw**
113:10, 246:15, 330:22
**drive**
4:14, 109:23, 135:2, 227:8, 237:2
**driver**
75:21, 75:23, 121:7, 122:1, 391:5, 406:13
**driving**
89:16, 227:16, 228:3, 237:6, 288:4, 288:9
**drove**
75:14, 88:12, 90:4, 110:15, 136:16, 159:11, 222:4, 223:23, 226:21, 227:15, 228:2, 233:11, 237:8, 393:16
**drug**
92:10, 92:19, 158:23, 159:5, 332:13
**drugs**
99:1, 154:1, 332:2, 332:10, 332:19
**ducked**
315:19
**due**
12:11, 12:19
**duly**
8:15, 418:4, 419:14
**during**
11:11, 25:17, 26:15, 27:22, 46:10, 58:21, 77:24, 79:24, 80:5, 128:1, 143:12, 144:4, 145:13, 157:13, 166:4, 181:2, 191:5, 210:22, 247:18, 259:19, 278:6, 279:23, 283:4, 284:9, 285:5, 285:11, 286:13, 286:23, 291:7, 291:13, 304:15, 304:20, 305:3, 313:19, 319:12, 353:12, 358:8, 369:12

**E**

**e-f-r-a-i-n**
307:5
**e-l-l-i-s-o-n**
320:13
**each**
130:8, 246:19
**eager**
401:19
**eagles**
311:19, 312:3, 312:8
**earlier**
52:24, 102:6,

283:24, 324:3, 338:10, 344:6
**early**
24:2, 86:17, 226:9, 386:5, 388:4, 405:6, 405:13, 406:19, 412:21, 413:9
**east**
3:20
**easy**
40:20
**edward**
18:7
**edwin**
299:21, 299:22
**effect**
40:21, 80:15, 209:12
**effort**
171:18, 283:16, 328:11
**efforts**
61:11, 352:21, 353:5
**efrain**
53:17, 53:24, 307:4, 308:5, 308:9, 308:14, 385:11, 385:21
**eight**
133:6, 133:24, 169:2
**eileen**
273:21
**either**
20:7, 80:4, 95:8, 143:10, 148:17, 153:12, 159:23, 174:10, 194:3, 194:17, 195:16, 300:12, 301:3, 310:20, 332:1, 332:10, 370:13
**eligible**
249:3
**elizabeth**
3:11, 7:20, 282:4
**ellison**
320:13
**else**
54:22, 207:22
**employed**
38:23
**employment**
259:20, 263:4
**end**
112:17, 204:18, 330:2, 336:15, 350:18
**ended**
254:11
**engaged**
260:2
**enough**
362:10, 402:21
**ensure**
57:12, 60:12, 98:18, 99:2, 99:20, 150:4
**ensured**
15:16
**entered**
66:3
**entice**
153:12
**entire**
125:8, 128:22, 238:19
**entirely**
240:13
**entirety**
162:19, 173:15, 188:3, 237:21, 395:1
**entitled**
250:20, 251:14, 251:23, 252:7
**entry**
58:7, 113:21, 114:2
**environment**
259:8
**episode**
63:18, 129:23, 130:3, 130:16
**epplen**
339:14, 340:14, 341:6, 382:15, 384:17, 416:2
**ernest**
1:16, 2:1, 7:2, 8:13, 9:4, 161:24, 292:15, 418:3, 418:17, 419:8, 419:13
**ernie**
209:8
**escobar**
33:6, 325:12, 326:8, 326:15
**essentially**
73:13, 75:20, 252:18
**establishing**
310:17
**esteemed**
213:10
**et**
1:7, 1:13, 7:4, 7:5
**even**
32:24, 34:23, 69:18, 71:5, 75:21, 100:22, 103:15, 117:13, 146:2, 163:10, 182:21, 232:16, 235:21, 245:15, 300:13, 301:4, 360:4, 380:9
**evening**
388:3, 388:4
**evenly**
154:5
**event**
362:9
**events**
224:2
**eventually**
46:20, 46:23, 83:8, 158:4, 227:15, 228:3, 367:5, 396:17
**ever**
246:11, 292:9, 316:10, 399:11
**every**
11:10, 11:15, 27:13, 80:18, 126:2, 214:18, 306:6
**everybody**
82:12, 403:10
**everything**
11:5, 27:4, 27:5, 95:11, 301:21, 328:4, 367:18
**evidence**
19:7, 19:14, 52:15, 61:23, 63:2, 64:7, 108:4, 108:5, 108:18, 108:20, 109:2, 109:3, 109:12, 137:14, 139:12, 140:23, 141:1, 141:9, 148:11, 181:23, 182:13, 182:18, 183:2, 193:4, 193:5, 202:20, 212:4, 229:8, 232:4, 234:5, 234:14, 237:1, 256:1, 256:11, 256:21, 257:9, 257:20, 276:10, 283:6, 291:2, 291:9, 317:8, 319:16, 329:3, 329:11, 344:22, 346:8, 403:21, 403:22, 404:1, 420:7
**exactly**
31:2, 152:8, 229:6, 237:4, 379:17
**examination**
6:3, 8:17,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 819 of 1206 PageID #:66624

204:19, 282:7, 330:12
**examined** 8:15, 419:16
**example** 62:5
**excessive** 259:15
**exchange** 48:4, 332:11
**exculpatory** 256:20, 257:20, 291:9, 329:11
**execute** 61:19, 137:19
**executed** 246:10
**exercise** 11:3
**exhausted** 403:2
**exhibit** 6:8, 56:17, 59:7, 112:4, 112:10, 117:9, 126:21, 127:23, 128:6, 161:12, 164:20, 172:15, 183:23, 195:21, 196:19, 206:1, 337:17, 370:9
**exhibits** 58:19
**existed** 140:24, 292:9
**experience** 156:21
**explain** 348:5
**explained** 224:1
**explanation** 48:14, 49:7, 196:11, 272:5
**exploring** 403:24
**expose** 304:15, 304:21
**express** 99:9, 99:18
**expression** 198:23
**expressly** 41:24, 344:14
**extended** 82:13
**extent** 32:8, 97:10, 113:3, 113:4, 261:13, 264:16, 275:17, 279:2, 279:5, 282:16, 282:18, 406:23
**extra** 252:18
**extract** 145:7, 388:22
**eyes** 367:18
**eyewitness** 75:6, 151:23, 230:18, 240:19, 255:6, 259:16, 284:4, 286:8, 289:9, 294:14
**eyewitnesses** 255:6, 259:16

**F**

**f-l-o-r-e-s** 321:4
**f-r-i-a-s** 322:13
**fabricate** 72:10, 95:6, 139:11, 281:10, 283:13, 369:16
**fabricated** 61:23, 64:7, 70:5, 81:16, 83:13, 85:19, 85:20, 88:1, 88:24, 90:11, 93:1, 104:23, 109:10, 132:22, 141:2, 141:9, 167:18, 172:2, 172:17, 173:19, 186:3, 189:14, 190:11, 191:7, 199:16, 201:11, 202:23, 205:6, 256:1, 256:10, 291:1, 292:7, 313:20, 316:18, 329:2, 348:3, 349:10, 378:7, 382:24, 398:7, 415:23
**fabricating** 19:13, 95:22, 157:23
**face** 143:11, 307:6, 327:10, 365:10, 365:12, 367:16, 374:11, 374:12, 374:21, 375:1, 375:3, 375:4, 406:15
**facility** 336:8
**facts** 21:3, 61:20, 62:10, 72:18, 73:24, 74:10, 74:19, 85:17, 87:24, 88:24, 111:20, 118:14, 192:17, 201:10, 204:20, 205:3, 319:15
**factual** 73:14, 399:10, 410:15, 411:1, 411:8
**factually** 20:20
**failed** 29:12, 137:10
**fails** 420:2
**failure** 420:7
**fair** 162:23, 299:17, 401:13, 402:21
**fairly** 234:21
**falsified** 310:10
**falsifying** 291:2
**familiar** 380:11
**familiarity** 37:14
**far** 29:20, 213:22
**fast** 159:5
**favor** 154:19
**fear** 264:3, 264:13, 264:22, 265:5, 265:11, 265:19, 266:2, 266:8, 266:14, 266:20, 267:2, 267:7, 267:13, 267:19, 397:3
**fearful** 347:16
**february** 17:17, 23:18, 24:3, 25:17, 26:17, 31:4, 31:23, 60:13, 61:10, 83:22, 86:18, 91:1, 121:4, 121:20, 130:4, 130:18, 131:3, 132:5, 132:7, 133:10, 136:2, 141:18, 147:7, 147:15, 147:23, 148:3, 149:3, 149:19, 166:6, 168:21, 180:9, 198:6, 199:2, 199:8,

EP IGLESIAS Sub Resp 001642

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 820 of 1206 PageID #:66625

199:20, 201:6, 203:8, 203:15, 203:24, 223:17, 229:16, 230:7, 246:21
**fed**
72:2, 72:8, 73:15, 83:3, 86:15, 90:12, 93:1, 96:3, 96:10, 102:23, 122:7, 122:15, 126:12, 127:4, 127:16, 141:2, 160:21, 161:4, 162:8, 169:18, 172:2, 186:4, 199:16, 201:14, 202:23, 238:19
**federal**
264:23, 267:20, 403:21
**fee**
360:24
**feed**
21:9, 89:9
**feeding**
72:18, 73:24, 74:10, 74:19, 80:13, 81:3, 94:13
**feel**
113:2, 113:4
**fellow**
15:3, 17:7, 21:1, 23:20, 66:23, 69:7, 74:9, 91:14, 92:24, 127:16, 280:2, 382:12, 384:23, 385:10, 385:20, 387:13
**felony**
36:10, 93:4
**felt**
250:4
**fence**
237:9, 237:10
**fender**
111:20, 226:24
**few**
106:24, 254:9, 324:4
**field**
116:13
**fight**
344:9, 402:22
**file**
11:16, 112:12, 193:23, 194:1, 194:8, 194:15, 194:16, 195:1, 195:2, 195:3, 217:5
**filed**
317:5
**files**
256:20
**filler**
222:7
**finally**
81:11
**financially**
92:12, 92:20
**find**
120:5, 352:17
**fine**
10:17, 56:2, 56:9, 82:14, 108:9, 113:16, 196:11, 323:23, 372:20, 402:6
**finger**
139:7, 144:20
**finished**
236:11
**fire**
160:2
**firearms**
108:20, 109:11, 137:14
**fired**
315:19
**firm**
3:19, 4:5, 7:19, 8:10, 273:4, 273:13, 273:18
**first**
8:14, 71:6, 75:5, 164:12, 171:4, 237:14, 272:20, 282:9, 283:4, 298:2, 305:20, 306:2, 306:11, 324:11, 330:14, 373:18, 397:16, 418:3, 419:14
**firsthand**
69:18, 332:9
**five**
101:4, 103:8, 202:10, 350:7, 394:14
**flashlight**
156:6, 156:15, 156:22, 389:10
**fleming**
327:17, 327:24
**floor**
2:6, 3:13, 207:16
**flores**
321:4
**follow**
353:5, 354:2
**followed**
135:13
**following**
124:5, 200:8, 247:19
**follows**
8:16
**fop**
274:22
**force**
80:19, 80:21, 81:1, 81:2, 145:7, 259:15, 401:2
**forced**
149:2
**foregoing**
418:9, 419:17
**forensic**
108:5, 229:8
**forgot**
11:7, 42:6
**forgotten**
253:5
**formal**
190:8
**former**
213:8
**forms**
173:7
**forth**
126:1, 236:19
**fortunate**
362:10
**forward**
301:20
**found**
36:22, 87:18, 108:4, 137:14
**four**
36:10, 56:23, 58:8, 67:14, 103:16, 104:10, 196:19, 250:8, 401:17
**four-door**
226:23
**fourth**
13:7, 13:14
**frame**
14:2, 14:11, 14:17, 19:12, 22:4, 22:14, 30:4, 30:19, 34:7, 34:20, 35:2, 39:23, 40:3, 41:17, 47:7, 50:20, 51:15, 51:23, 52:18, 52:22, 53:9, 53:17, 54:11, 54:24, 55:11, 60:23, 61:11, 61:20, 62:11, 74:20, 76:6, 90:7,

EP IGLESIAS Sub Resp 001643

92:18, 98:19, 99:3, 99:22, 132:19, 137:19, 139:12, 148:11, 153:22, 155:9, 172:9, 204:11, 282:9, 290:15, 303:14, 305:10, 312:20, 313:15, 317:12, 318:20, 320:12, 320:20, 321:3, 321:11, 322:5, 322:12, 322:20, 323:4, 323:12, 325:7, 329:20, 335:4, 335:9, 335:24, 341:7, 353:11, 356:8, 356:17, 358:15, 359:5, 359:10, 365:19, 366:24, 380:3, 382:15, 384:18, 384:24, 385:10, 386:13, 401:17, 401:19, 408:5, 408:22, 409:7, 410:11
**frame-up**
47:18, 95:1, 120:6, 387:7
**framed**
16:10, 16:16, 16:22, 30:9, 254:15, 255:2, 255:13, 255:22, 256:7, 256:16, 257:5, 257:16, 258:5, 258:16, 259:3, 259:17, 281:5, 290:4, 310:24, 339:18, 348:24, 353:19, 359:17, 363:3, 381:1, 381:12, 381:18, 381:20, 404:12
**framing**
39:11, 41:9, 46:23, 48:4, 87:23, 260:10, 335:19, 336:15, 348:20, 352:10, 353:7, 359:15, 403:9, 407:17
**francisco**
6:20, 19:17, 19:24, 22:17, 32:6, 34:9, 35:11, 37:3, 39:10, 40:10, 40:13, 40:24, 41:7, 41:14, 43:3, 46:10, 46:22, 47:15, 48:1, 49:23, 51:4, 53:18, 64:14, 66:15, 66:21, 68:5, 68:15, 68:22, 70:2, 70:12, 71:13, 83:3, 188:19, 189:3, 191:8, 191:20, 192:6, 215:9, 215:16, 215:19, 216:24, 218:1, 218:13, 240:13, 246:9, 246:17, 247:5, 248:11, 249:2, 281:11, 296:15, 296:21, 385:12
**franco**
206:24
**frank**
33:6, 326:15
**frankie**
50:17, 51:17, 71:4, 73:15, 76:11, 76:16, 76:24, 77:16, 78:1, 79:4, 79:9, 79:15, 80:1, 80:20, 81:1, 81:3, 81:22, 83:8, 84:10, 94:24, 95:20, 96:3, 99:20, 100:6, 100:15, 101:23, 102:14, 102:24, 103:7, 103:18, 104:24, 119:2, 119:8, 120:2, 120:5, 120:16, 120:17, 122:7, 124:21, 125:11, 126:12, 127:4, 127:13, 128:1, 128:8, 128:13, 128:23, 129:4, 129:10, 132:21, 139:15, 202:23, 206:24, 209:17, 210:20, 219:15, 221:2, 251:2, 325:12, 326:8, 390:18
**fraternal**
274:16, 275:2
**fraud**
267:2, 267:8
**fred**
279:19
**freddie**
321:21
**free**
7:13, 113:2
**frequently**
25:19, 38:15, 38:23, 100:24, 114:11, 117:19, 156:12
**frias**
322:13
**friday**
1:18, 121:3
**friend**
342:1, 342:8, 343:18, 343:19, 345:14, 346:4, 361:5, 377:1, 379:21, 387:7, 411:22
**friendlier**
145:2
**friends**
334:14, 347:17, 362:1, 412:6, 412:21, 413:9
**fro**
393:2, 393:12, 393:17, 394:2, 394:5, 396:1
**front**
161:18, 202:2, 209:15, 212:21, 226:23, 232:16, 376:8, 402:22, 405:17, 406:14
**fucked**
86:24, 124:9, 124:11, 125:2
**full**
9:3, 120:23, 212:3
**fully**
230:3, 420:6
**further**
86:21, 87:10, 95:19, 135:24, 186:8, 198:11, 220:16, 241:12, 282:20, 330:12, 379:2, 416:19, 419:17
**fusco**
5:5, 273:18, 273:19, 273:22
**future**
148:5, 264:4

**G**

**g-a-y-a**
323:13
**g-o-n-z-a-l-e-z**
322:21
**g-o-o-s-e-n-s**
382:7
**gain**
39:3, 43:3, 47:18, 144:5

**gallivan**
197:17
**game**
290:10
**gang**
39:16, 39:21, 40:3, 40:5, 64:15, 64:24, 65:10, 68:6, 68:16, 74:1, 80:1, 82:23, 98:4, 100:23, 101:1, 119:2, 120:16, 121:1, 189:4, 207:15, 209:17, 210:1, 220:4, 220:12, 221:15, 304:16, 304:21, 307:18, 311:19, 312:5, 312:9, 331:24, 332:11, 332:13, 332:17, 340:22, 348:21, 358:14, 369:11, 371:16, 407:18, 408:2, 408:3, 408:6, 408:10
**gangs**
115:8
**gangsters**
121:1, 121:11
**garcia**
339:20, 340:11, 341:16, 341:22, 342:4, 342:13, 343:7, 343:14, 343:24, 344:5, 344:13, 344:21, 344:23, 345:7, 345:11, 345:23, 346:4, 346:24, 347:8, 347:13, 347:18, 347:22, 348:4, 348:6, 348:13, 349:3, 354:16, 355:24
**garcia's**
343:19
**garz**
305:9, 313:14, 314:14, 314:21, 316:6
**gas**
28:15, 28:20, 29:5, 63:19, 84:5, 84:13, 84:19, 85:1, 85:10, 106:6, 106:17, 107:9, 107:17, 109:6, 109:20, 110:2, 110:10, 111:13, 111:22, 129:23, 130:2, 130:3, 130:6, 130:16, 132:4, 133:9, 134:6, 134:18, 134:19, 135:5, 135:13, 135:20, 137:4, 147:13, 175:12, 175:24, 176:10, 176:20, 177:22, 178:10, 180:7, 181:5, 223:6, 223:16, 223:23, 224:3, 224:23, 226:4, 226:10, 227:9, 229:2, 229:16, 230:6, 242:11, 242:18, 243:14, 243:22
**gate**
159:24, 202:2
**gather**
52:3, 59:24, 60:10, 60:21
**gave**
23:8, 70:4, 70:10, 78:19, 187:24, 189:23, 197:3, 197:9, 200:2, 204:3, 205:13, 216:24, 218:1, 218:3, 228:8, 239:5, 252:18, 253:3, 297:5, 332:19, 377:10, 410:16
**gaya**
323:13
**gembowski**
406:11
**general**
31:7, 65:21, 303:24, 324:3, 364:13
**generally**
212:20, 277:7
**genitals**
389:9
**george**
54:11, 54:21, 217:7, 335:10, 335:14, 335:19, 335:24, 359:10, 359:15, 359:23, 360:8, 360:18, 361:12, 404:14, 405:5, 411:3, 415:19, 416:5
**geraldo**
100:17, 101:24, 102:15, 290:5, 290:16, 290:20, 291:17, 292:1, 292:18, 294:6, 294:15, 294:22, 296:9, 296:16, 296:24, 297:4
**gernito**
356:9, 358:24, 360:10, 360:20
**gernito's**
356:18, 358:3, 359:5, 359:11
**get**
34:24, 41:15, 42:21, 44:19, 49:14, 51:3, 56:4, 80:12, 92:23, 93:19, 94:4, 98:16, 99:1, 104:3, 105:7, 106:16, 107:8, 144:14, 145:22, 146:2, 151:14, 151:21, 153:4, 154:5, 154:10, 154:21, 171:18, 174:18, 182:6, 183:15, 183:23, 202:6, 212:21, 232:4, 232:15, 234:4, 248:18, 249:16, 253:6, 300:1, 310:2, 314:21, 316:6, 317:8, 327:24, 328:11, 342:7, 343:9, 359:17, 375:2, 378:8, 379:18, 388:11, 403:10, 404:7, 404:8, 409:16, 412:18
**getaway**
75:16, 75:20, 75:23
**getting**
113:1, 158:5, 175:10, 175:22, 176:8, 250:18
**girl**
364:18, 366:3, 368:6, 412:4
**girlfriend**
395:13, 395:22
**give**
61:23, 64:7, 83:9, 85:19, 89:1, 96:17, 132:21, 158:14, 161:14, 186:10, 196:5, 218:9, 226:12, 263:12, 264:5, 270:12, 270:15, 271:4, 275:8, 275:12, 276:6, 276:14, 276:22, 277:6, 277:21, 278:5,

278:11, 278:16, 281:17, 350:1, 406:1
**giving**
70:2, 96:11, 97:2, 119:17, 186:19, 200:19, 206:15, 230:23, 233:22, 237:16, 264:7
**go**
10:5, 34:24, 53:19, 54:15, 81:12, 92:23, 93:13, 97:13, 99:19, 112:18, 113:6, 113:16, 131:18, 146:9, 160:1, 162:9, 175:15, 183:8, 192:23, 213:24, 221:18, 227:22, 230:10, 234:23, 235:5, 235:8, 236:16, 242:4, 253:23, 282:5, 297:17, 298:2, 301:17, 302:3, 319:17, 323:22, 338:2, 352:16, 356:21, 360:4, 365:17, 367:10, 385:15
**goal**
104:2, 367:5, 367:6
**god**
11:7
**goes**
113:12
**going**
8:22, 32:13, 37:9, 46:3, 48:12, 50:20, 55:18, 56:16, 56:20, 57:10, 58:1, 66:21, 67:15, 74:20, 93:18, 102:4, 112:2, 148:4, 158:14, 161:11, 161:13, 164:18, 174:12, 186:2, 186:9, 195:24, 196:3, 197:24, 201:24, 206:4, 207:8, 213:11, 214:16, 227:8, 231:2, 231:18, 233:19, 236:13, 236:23, 237:2, 237:3, 246:5, 248:18, 249:15, 249:23, 253:7, 271:24, 282:5, 282:17, 297:11, 323:23, 337:15, 337:19, 338:14, 349:23, 349:24, 350:15, 358:15, 359:4, 359:10, 363:21, 366:24, 384:14, 384:18, 388:10, 401:23, 403:14, 404:7, 404:8, 413:16
**golden**
272:23
**gone**
62:20, 63:1, 63:12, 124:7, 125:1, 130:5, 130:7
**gonzalez**
317:15, 322:21, 363:4, 368:17, 368:21, 374:2, 375:18, 376:1, 376:6, 376:18, 376:24, 377:20, 378:6, 378:14, 379:12, 379:18, 380:3, 380:9, 381:13, 382:2, 382:16, 383:2, 390:10, 391:14, 392:5, 392:14, 392:22, 393:12, 393:17, 394:1, 394:5, 394:15, 395:4, 395:8, 395:14, 395:24, 401:3, 401:11
**gonzalez's**
377:11
**good**
7:15, 8:19, 38:15, 45:11, 56:13, 62:18, 84:14, 131:21, 142:10, 143:19, 174:20, 196:23, 243:15, 252:19, 310:2, 343:9, 346:4, 361:5, 362:1, 374:11, 375:1, 375:3, 378:8
**goosens**
381:21, 382:5, 382:6, 382:17, 395:4, 401:12
**gorman**
4:20, 7:23, 7:24, 416:20
**got**
88:11, 123:6, 130:7, 144:21, 159:17, 159:23, 218:22, 219:13, 221:23, 227:4, 227:6, 281:18, 286:3, 299:23, 324:1, 324:8, 329:24, 350:5, 358:3, 360:1, 363:22, 374:11, 375:1, 393:13, 394:4
**gotten**
221:1, 226:3, 243:15
**gpr**
132:13
**gprs**
149:22, 150:5
**grand**
37:11, 138:17, 141:18, 141:21, 150:16, 155:23, 156:6, 185:7, 185:13, 185:22, 186:10, 186:21, 187:9, 187:24, 188:16, 196:15, 196:17, 197:3, 197:4, 197:11, 200:3, 200:23, 202:13, 204:4, 205:18, 220:1, 233:2, 341:17, 366:19, 385:22, 387:22, 388:8, 409:13, 413:19
**grande**
404:16, 405:13, 406:10, 406:24, 411:12, 411:19, 412:19, 413:5, 413:16, 413:24, 414:11, 414:20, 415:8, 416:3, 416:15
**gray**
33:16
**great**
213:21, 320:9
**greenfield**
279:19, 280:1, 280:12
**grille**
273:1
**grocery**
349:17
**ground**
394:15
**group**
3:5, 7:19, 405:16
**guess**
120:23, 300:3, 311:5, 324:7,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 824 of 1206 PageID #:66629

357:18, 371:8
**guevara's**
85:8, 117:14, 117:20, 145:15, 184:21, 184:24, 367:6, 415:3, 415:6
**guilty**
11:2, 12:4, 36:23, 92:3, 254:5, 257:11, 310:13, 336:23
**gun**
87:6, 87:11, 87:12, 87:16, 87:17, 88:11, 160:3, 201:5, 394:2, 394:16
**guns**
332:2, 332:10, 332:19
**guy**
87:1, 124:10, 125:3, 211:20, 214:24, 280:14, 287:8, 345:23
**guys**
121:10, 393:13

**H**

**h-a-r-d-i-n-g**
83:21
**h-e-l-e-a-n**
314:7
**h-e-r-n-a-n-d-e-z**
316:24
**hair**
406:13, 406:18
**half**
174:23
**halvorsen**
1:16, 2:1, 6:2, 6:15, 6:17, 6:21, 6:23, 7:2, 8:8, 8:11, 8:13, 8:19, 9:4, 10:22, 32:4, 32:17, 35:9, 43:10, 58:5, 64:13, 70:19, 82:21, 89:13, 112:9, 112:23, 113:9, 113:22, 132:2, 150:13, 161:24, 175:7, 184:5, 195:17, 195:18, 195:21, 195:24, 196:1, 196:4, 197:2, 198:16, 202:17, 204:24, 205:24, 206:1, 206:4, 206:5, 206:10, 219:21, 246:7, 248:14, 254:3, 254:15, 260:22, 263:24, 264:12, 292:15, 330:14, 337:16, 337:17, 338:24, 339:1, 339:4, 340:15, 346:18, 370:9, 370:18, 370:19, 380:24, 403:3, 404:2, 417:2, 418:3, 418:17, 419:8, 419:13
**hamlin**
121:5, 121:19
**hand**
55:18, 56:16, 58:1, 195:24, 196:3, 202:5, 206:4, 323:20
**handcuffs**
325:15, 325:21, 326:3
**handgun**
200:11, 200:15, 201:4
**handing**
58:5, 112:9, 246:7, 338:24, 370:18
**hands**
155:17, 318:5
**hands-on**
116:13
**handwriting**
184:24
**handwritten**
161:22, 162:5, 162:14, 185:15, 186:3, 186:20, 188:17, 188:20, 189:16, 191:19, 395:23
**hanging**
121:4, 121:18, 405:17
**happened**
52:23, 233:17, 235:7, 237:5, 336:2, 372:9
**harassed**
328:10
**harassing**
35:5, 53:11, 213:17
**harassment**
354:11
**hard**
40:19, 403:9
**harding**
83:20, 84:3
**has**
55:18, 56:18, 57:22, 58:1, 58:2, 112:3, 112:10, 114:4, 116:20, 117:8, 117:13, 128:23, 261:24, 262:8, 262:16, 263:17, 338:7, 338:8, 339:1, 350:9, 370:15
**hasberg**
5:10, 7:11
**hasn't**
338:17
**hat**
406:16
**have**
23:19, 25:10, 56:20, 57:13, 88:3, 95:10, 97:12, 99:19, 102:4, 103:7, 104:14, 112:2, 124:23, 125:24, 131:10, 131:14, 131:22, 146:20, 152:1, 161:11, 161:13, 162:15, 164:18, 183:22, 187:10, 189:16, 193:14, 196:11, 197:24, 207:8, 225:19, 226:2, 228:24, 233:5, 233:19, 236:23, 237:3, 242:10, 245:21, 246:5, 246:11, 246:24, 249:23, 250:8, 253:7, 261:6, 262:19, 264:3, 265:12, 275:5, 278:21, 283:18, 302:19, 305:23, 306:5, 306:14, 306:15, 324:21, 330:3, 331:16, 332:16, 338:3, 338:5, 338:13, 338:16, 347:6, 349:23, 350:6, 352:23, 354:8, 354:18, 355:15, 362:11, 371:13, 372:7, 373:3, 396:11, 399:17, 400:6, 402:22, 403:1, 404:2, 404:4, 416:19, 416:21, 416:22, 418:11, 418:12
**having**
8:14, 132:12, 164:19, 173:13, 184:5, 188:15, 271:5, 283:14,

EP IGLESIAS Sub Resp 001647

302:8, 302:15, 318:3, 324:16, 347:15, 355:16, 365:15, 412:5, 414:2
**he's**
159:5, 214:17, 214:18, 236:23, 305:17, 337:23, 351:5
**head**
43:12, 44:14, 78:5, 80:4, 80:5, 80:14, 156:5, 374:10, 374:20, 389:9
**headed**
32:14
**hear**
27:13, 95:11, 213:14, 235:11, 284:22, 394:7
**heard**
44:7, 44:8, 46:15, 104:14, 143:11, 147:11, 211:20, 212:22, 213:12, 214:23, 240:14, 394:13
**hearing**
248:16, 251:3, 251:22
**hearsay**
212:15
**hector**
363:5, 363:16, 364:19, 367:1, 377:1, 377:18, 379:21, 380:3
**held**
2:1, 7:6, 143:5
**helean**
314:7, 314:15, 316:16
**help**
38:4, 38:9, 39:11, 41:8, 47:7, 51:17, 94:2, 144:14, 157:20, 304:10, 312:20
**helped**
158:13, 281:10
**helpful**
195:5
**henry**
312:20
**her**
26:19, 27:22, 28:6, 28:21, 85:2, 105:12, 105:14, 105:20, 106:4, 106:16, 106:18, 107:2, 107:8, 107:10, 108:21, 109:4, 109:18, 110:23, 110:24, 130:6, 131:4, 131:5, 134:19, 135:13, 135:19, 136:2, 178:10, 178:19, 178:20, 179:3, 179:4, 181:3, 181:17, 181:22, 182:1, 222:1, 223:3, 223:5, 223:14, 223:15, 224:3, 226:10, 227:10, 228:5, 228:24, 229:6, 229:13, 229:14, 229:15, 230:5, 243:21, 319:7, 319:12, 319:24, 323:24, 365:18, 369:4, 371:16, 374:1, 377:22, 396:1, 396:8, 396:10, 396:11, 397:4, 411:13, 411:22, 412:6, 412:21
**herbert**
4:5, 8:10, 272:17, 273:14, 274:21, 274:24
**here**
7:21, 8:23, 131:9, 131:17, 196:12, 214:14, 235:7, 235:10, 235:18, 263:11, 264:14, 269:1, 270:15, 271:9, 272:6, 273:23, 298:22, 311:5, 347:18, 350:12, 402:20, 404:2, 404:3
**hereby**
419:6
**herein**
8:14
**hereinabove**
419:21
**hermena**
351:2
**hermeno**
349:15
**hermino**
349:15
**hernandez**
316:23, 317:4, 317:13, 317:20, 318:2, 356:9, 356:15, 393:1
**heroin**
37:4, 37:10, 37:16, 89:10, 95:21
**hey**
209:7
**hide**
392:14
**high**
40:15
**highly**
140:5, 366:8, 378:22, 403:12
**himself**
75:20, 79:11, 139:2, 148:18, 149:24, 346:5, 390:9, 391:5, 399:12
**hinged**
240:12
**hired**
360:9
**hispanic**
373:7, 373:14, 373:20
**hispanics**
406:12
**histories**
55:7, 60:1
**history**
6:10, 6:12, 52:3, 55:10, 57:11, 58:8, 58:11, 58:20, 59:4, 59:16, 59:17, 60:10, 60:21
**hit**
44:13, 156:14
**hits**
156:21, 195:13
**hitting**
45:21, 46:1, 202:9
**hobbs**
266:15
**hold**
53:22, 102:3, 253:19, 297:17, 338:9, 357:10, 364:9
**hole**
108:12, 108:19, 109:2, 137:13, 226:24
**homan**
392:16
**home**
24:8, 107:2, 174:2, 174:13, 222:5, 237:10, 392:15, 392:23, 393:4
**homicide**
68:19, 70:23,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 826 of 1206 PageID #:66631

71:6, 151:7, 291:3, 291:8, 291:14, 307:12, 310:12, 313:19, 315:18, 316:1, 316:7, 316:12, 329:4, 329:7, 329:12
**honestly**
196:10
**honked**
28:22
**hooded**
326:24, 327:2, 327:8
**hooked**
219:2
**hope**
120:4
**hoped**
40:2, 148:16, 280:7
**hopes**
39:21, 139:1, 139:6
**horn**
85:11
**hospital**
375:19, 411:20
**hot**
292:23
**hour**
82:8, 131:4, 143:6, 143:13, 144:4, 145:14, 174:22, 393:5
**hours**
24:3, 27:5, 27:14, 27:22, 86:18, 141:22, 158:12, 336:9, 354:1, 365:7, 386:5, 388:17, 388:21, 389:5, 389:24, 396:16, 405:6, 412:22, 413:9
**house**
86:12, 174:1, 201:24, 237:9, 237:10, 396:1, 409:23
**housed**
65:21, 98:14
**how**
9:14, 44:19, 67:15, 94:24, 127:3, 152:8, 195:11, 206:22, 232:13, 270:19, 278:18, 297:24, 329:14, 336:21, 353:11, 358:7, 361:19
**hughes**
33:15
**hugo**
294:14, 294:20, 295:2, 295:8, 295:13, 295:18, 295:24, 296:7
**humboldt**
30:5, 115:8, 332:17, 358:8, 359:24, 365:19, 383:17
**humbolt**
358:16, 363:17
**husband**
26:19, 28:6, 28:21, 105:14, 130:6, 227:10
**husband's**
85:2, 106:18, 107:10, 108:21, 110:24, 131:5, 136:2, 178:11, 178:19, 179:3, 182:1, 223:5, 223:16, 224:3, 226:11
**hypothetical**
146:24, 213:3

**I**

**i'll**
97:12, 112:22, 117:3, 161:14, 194:9, 207:9, 235:17, 235:19, 282:22, 298:1, 298:13, 302:2, 305:15, 323:19, 324:7, 324:11, 330:23, 338:13, 349:24, 356:19, 363:8, 370:14, 373:3
**i've**
196:3, 301:21, 324:1, 329:24, 350:5, 381:6, 404:20
**i-v-a-n**
337:10
**id**
6:8
**idea**
379:19
**ideal**
103:18
**identification**
133:7, 134:17, 177:21, 195:22, 196:2, 206:2, 242:16, 242:17, 286:1, 288:19, 288:24, 291:17, 292:17, 294:21, 316:17, 337:18, 342:6, 342:18, 346:16, 349:10, 370:10, 379:3, 416:13
**identifications**
255:7, 259:17, 366:9, 415:9, 415:16, 415:24, 416:14
**identified**
119:9, 133:7, 134:20, 135:11, 147:12, 169:7, 169:9, 169:10, 180:14, 180:20, 184:6, 220:17, 239:16, 244:3, 275:10, 288:14, 304:2, 333:12, 334:4, 348:6, 369:2, 375:23, 410:17, 414:21
**identify**
11:15, 11:20, 56:11, 102:1, 107:8, 110:1, 110:9, 137:3, 175:11, 175:23, 176:9, 177:3, 178:9, 180:1, 180:6, 196:6, 196:21, 229:1, 243:13, 248:9, 263:11, 285:6, 285:16, 285:21, 286:24, 287:13, 287:18, 288:3, 292:23, 295:3, 303:2, 303:7, 315:17, 327:10, 327:18, 328:1, 340:9, 341:9, 341:17, 345:18, 347:1, 347:9, 347:23, 348:13, 352:22, 355:7, 355:23, 368:9, 370:4, 376:18, 377:22, 378:15, 379:11, 379:18, 412:10
**identifying**
136:8, 229:15, 294:6, 294:15, 296:9, 296:23, 349:3
**ig**
71:21
**iglesias**
100:17, 101:16, 101:24, 102:2, 102:15, 102:16, 103:1, 290:5,

EP IGLESIAS Sub Resp 001649

290:16, 290:21, 291:17, 292:1, 292:19, 293:6, 293:11, 294:7, 294:15, 294:23, 295:9, 295:14, 296:10, 296:16, 296:24, 297:4, 297:13
**iglesias's**
297:12, 297:13
**illegal**
249:15
**illimunata**
364:21
**illinois**
1:2, 1:17, 2:7, 2:14, 3:14, 3:21, 4:8, 4:15, 4:23, 5:7, 7:7, 54:23, 206:7, 336:6, 419:1, 419:6, 420:1, 420:15
**illuminata**
363:7
**imagine**
270:19, 299:16
**immediately**
29:6, 130:17, 221:23, 352:8, 365:3
**impeach**
257:23
**imperial**
121:1, 121:11
**impermissibly**
177:7, 179:8, 327:8, 327:16
**implicate**
21:22, 22:18, 33:6, 35:17, 41:2, 42:16, 44:20, 72:11, 73:8, 81:5, 104:4, 106:5, 106:16, 146:3, 153:14, 154:6, 154:11, 171:18, 211:12, 264:16, 275:17, 279:6, 305:4, 314:23, 315:5, 315:11, 315:24, 316:7, 328:12, 328:16, 329:14
**implicated**
154:20, 157:24, 158:6, 188:1, 241:6, 313:21, 328:23, 329:6, 390:9, 392:4, 395:14
**implicating**
50:12, 148:18, 149:24, 151:6, 153:5, 164:14, 172:6, 186:10, 207:1, 210:11, 314:8, 314:16, 391:5, 399:12
**important**
52:24, 193:5, 224:20, 225:6, 225:12
**impression**
225:17, 226:13
**improper**
325:20, 416:13
**improperly**
33:4, 293:16, 293:22, 295:19, 296:1, 307:23, 308:4, 314:6, 314:14, 315:23
**in-person**
255:7
**inadmissible**
232:17, 234:5
**incarcerated**
247:19, 367:8
**incentives**
294:4, 296:7, 296:21
**incident**
28:20, 29:5, 63:18, 85:10, 130:4, 130:9, 132:5
**include**
172:21
**included**
123:19, 124:4, 124:15, 129:16, 130:13, 133:16, 136:7, 167:16, 168:4, 168:12, 375:11, 398:14
**including**
45:10, 72:3, 256:2, 256:11, 257:22, 259:15, 291:2, 297:5, 390:9, 398:2
**inclusive**
418:7
**incompetent**
234:5
**incomplete**
146:23, 213:2
**incorporate**
61:22, 64:6, 88:23
**incorporated**
126:22, 402:16
**incorporating**
88:1
**incriminate**
261:7, 264:1, 268:4, 268:11, 269:1, 269:17, 270:1, 270:4, 272:14, 273:10, 273:15
**inculpatory**
139:1, 388:22, 389:17, 398:17
**indeed**
15:13
**independent**
177:20, 225:18
**independently**
180:1
**indicate**
228:5, 271:3
**indicated**
165:20, 210:20, 242:9, 342:13
**indicates**
118:2
**indicating**
19:7
**indictment**
196:18, 200:4, 204:5, 204:9
**indictments**
188:8
**individual**
8:7, 52:23, 55:10, 57:2, 58:11, 61:20, 335:5, 341:23, 344:10, 363:3, 408:5
**individuals**
34:18, 52:18, 61:12, 87:23, 133:9, 134:6, 134:18, 139:13, 178:9, 178:18, 181:5, 220:18, 223:4, 223:6, 242:11, 243:14, 243:22, 254:19, 259:18, 363:6, 376:9, 385:10, 401:18, 405:23, 407:17, 410:2
**influence**
293:16, 293:22, 295:19, 296:1, 314:15
**influenced**
33:5, 307:24, 308:5, 314:7, 315:24
**informant**
291:24, 292:7, 292:9, 313:21
**information**
18:12, 20:1, 20:6, 21:9, 21:11, 27:21,

39:22, 50:3, 62:6, 63:10, 63:17, 64:5, 68:23, 70:4, 70:9, 72:2, 72:9, 72:10, 75:23, 81:4, 84:18, 87:7, 90:9, 90:10, 102:23, 119:17, 127:3, 130:16, 132:4, 132:11, 132:20, 137:2, 146:21, 160:22, 161:4, 167:6, 179:2, 192:3, 192:5, 194:14, 210:21, 211:5, 223:12, 223:13, 224:23, 225:1, 225:10, 225:16, 225:18, 226:3, 226:12, 229:13, 232:15, 236:22, 301:9, 311:17, 347:14, 354:18
**informed**
33:14, 220:24, 285:16, 285:21, 287:13, 287:18
**initially**
41:1, 75:12, 151:22, 155:8, 293:5, 293:10, 295:8, 295:13, 385:8
**initiate**
26:10
**initiating**
26:11
**innocence**
310:18, 325:8
**innocent**
11:2, 20:20, 33:1, 92:18, 254:19, 259:17, 335:15, 356:1
**innocuous**
64:4
**insane**
407:18, 407:24, 408:2, 408:5, 408:10, 408:14, 408:22, 409:1, 409:6, 410:10
**inside**
24:7, 72:4, 159:18
**insisted**
79:10
**instant**
420:6
**instead**
19:12, 37:19, 238:14, 260:14
**institution**
336:7
**instruct**
261:12, 264:17, 272:1, 275:18, 279:4, 282:17, 304:14, 304:19, 305:2, 338:14
**instructed**
35:24, 227:7, 243:20
**instruction**
270:5, 369:3
**intend**
261:18, 263:2, 265:13, 269:16, 270:20
**intended**
299:10, 373:3
**intention**
262:1, 262:9, 262:17, 263:17, 263:18
**intentionally**
16:10, 16:16, 16:22, 317:19, 318:1, 326:22
**interacted**
262:19
**interactions**
277:22
**interest**
193:14
**interested**
420:10
**intermittent**
390:1
**intermittently**
388:18, 389:8
**interrogate**
388:11
**interrogated**
141:22, 262:20, 319:7, 319:22
**interrogation**
46:10, 80:6, 142:4, 142:18, 143:5, 145:6, 149:18, 157:14, 319:13, 389:7
**interrogatories**
419:16
**interrupt**
298:19, 306:13
**interrupted**
233:21
**interview**
155:15, 166:4, 220:11, 233:4, 279:12, 350:24, 365:2, 371:15
**interviewed**
11:11, 26:16, 131:1, 131:4, 131:19, 132:6, 165:21, 220:4, 262:19, 343:7, 379:10, 407:5
**interviewing**
29:7, 38:16, 375:16
**interviews**
204:21, 205:10
**intimidation**
247:16, 248:1
**into**
18:23, 29:13, 31:22, 64:6, 66:4, 88:1, 88:11, 88:24, 89:17, 111:21, 126:23, 130:8, 132:18, 150:15, 152:8, 152:14, 157:23, 171:9, 172:6, 185:16, 205:12, 210:11, 218:14, 223:14, 225:9, 225:15, 229:15, 230:5, 252:16, 294:5, 294:14, 296:8, 296:22, 314:7, 314:15, 327:7, 342:16, 343:3, 343:8, 349:3, 349:18, 376:23, 395:13
**intoxicated**
307:14, 378:22, 379:6
**introduce**
7:12
**introduced**
282:3
**introduction**
32:6
**invent**
66:7
**investi**
101:5
**investigate**
10:1, 10:23, 11:6, 18:1, 24:12, 24:20, 29:12, 30:21, 31:3, 31:15, 31:22, 298:7, 305:22, 306:19, 328:5, 337:6, 340:1, 340:16, 364:1, 405:4
**investigated**
32:18, 192:18, 193:13
**investigating**
29:19, 116:10, 290:22, 303:20
**investigation**
11:12, 11:22,

13:5, 18:13, 18:17, 18:23, 24:1, 31:9, 32:23, 165:9, 197:18, 198:4, 198:12, 199:6, 200:10, 200:14, 201:3, 201:21, 210:13, 215:20, 216:15, 226:9, 262:3, 262:11, 276:16, 276:24, 278:7, 278:23, 279:13, 280:7, 283:5, 291:4, 291:8, 291:14, 297:6, 307:13, 310:12, 311:8, 313:20, 329:4, 329:13, 340:6
**investigations** 12:9, 51:5, 210:7, 217:9, 258:9
**investigative** 11:16, 112:12, 194:15, 195:3
**involved** 16:5, 19:1, 20:8, 79:11, 140:16, 161:7, 187:17, 210:6, 210:12, 211:21, 215:1, 258:10, 283:7, 292:1, 312:4, 312:9, 331:3, 336:5, 391:4, 391:6, 399:23, 411:2, 411:9
**involvement** 52:11, 52:16, 60:4, 111:7, 126:6, 129:12, 144:13, 144:22, 168:10, 280:21, 352:23, 395:2, 400:6
**involving** 165:23, 337:20, 360:2, 360:10, 360:20
**ir** 57:3, 57:11, 57:22, 58:12, 59:5
**issue** 275:12
**issued** 58:21, 188:8
**issues** 402:11
**it's** 10:15, 31:21, 43:10, 47:14, 71:9, 82:7, 112:4, 165:13, 170:10, 174:20, 174:22, 184:3, 196:10, 196:19, 274:4, 298:3, 299:8, 299:22, 317:14, 337:10, 349:24, 350:10, 403:7, 403:9, 404:1
**itasca** 3:21
**its** 56:12, 162:19, 163:11, 173:14, 237:21, 239:19, 395:1
**itself** 196:19
**ivan** 337:6, 339:18, 340:2, 340:10, 342:1, 342:9, 342:19, 343:19, 344:8, 344:17, 345:14, 352:11, 352:24, 353:8, 353:20, 354:10, 355:24
**ivara** 300:18, 301:1

**J**

**j-a-c-q-u-e-l-i--n-e** 318:12
**j-a-i-m-e** 298:4
**j-o-r-g-e** 317:14
**j-u-a-n** 316:24
**jacket** 406:16
**jacob** 325:13, 326:8, 326:16
**jacqueline** 318:10, 318:11, 318:20, 319:1, 319:6, 319:11, 319:22, 404:16, 406:10, 411:12, 411:19
**jail** 65:20, 66:16, 94:6, 189:4, 247:19, 400:5
**jaime** 298:3, 298:7
**james** 272:21
**jeff** 8:6, 213:23, 272:16
**jefferson** 4:6
**jeffrey** 3:18
**jennifer** 3:4, 7:16, 8:20, 174:16, 299:18
**jewelry** 88:13
**jiver** 369:18, 369:24
**job** 1:22, 213:22
**john** 4:19, 7:24, 161:23, 163:17, 163:24, 251:11, 252:9, 252:17
**johnson** 305:10, 312:21
**join** 260:18
**joined** 10:13, 10:14, 283:5
**jointly** 22:4, 22:14, 175:10, 175:21, 176:8, 329:20, 348:18, 353:4, 375:9, 395:12
**joker** 159:10, 159:16, 159:22, 160:2, 169:8
**jones** 4:13
**jordan** 16:22, 59:17, 72:22, 121:9, 122:2, 123:6, 124:12, 217:4, 217:7, 218:10, 219:2
**jorge** 169:9, 182:7, 182:14, 182:19, 183:3, 217:7, 219:3, 317:14
**jose** 1:4, 3:3, 7:22, 16:10, 17:8, 57:20, 135:12, 136:17, 169:10, 179:9, 181:24, 182:7, 182:13, 182:18, 183:3, 206:7, 217:6, 219:2, 227:18, 229:6, 243:9, 243:21, 244:3,

286:8, 287:22, 356:9, 381:1, 381:19, 382:15, 383:1, 386:13, 395:15, 395:22
**joseph**
92:11
**jr**
381:1
**jrl**
206:8, 206:9
**juan**
312:20, 316:23, 316:24, 317:13, 317:20, 318:2, 381:1, 383:1
**judge**
182:6, 182:13, 182:18, 183:2, 183:5, 208:20, 209:16, 211:19, 213:10, 213:13, 222:12, 222:13, 232:16, 234:13, 235:1, 239:15, 245:11, 251:5, 251:12, 361:5, 361:14, 361:20, 361:24, 362:2, 402:22
**julio**
307:11, 307:13, 307:24, 308:20, 308:24, 309:6, 309:8, 309:11, 309:13, 309:18, 309:24
**july**
17:18, 177:9, 179:10, 179:16, 179:21, 180:2, 180:15, 181:3, 181:11, 181:17, 181:22, 184:9, 192:5, 197:10, 202:13, 243:1, 243:4, 296:14, 298:14, 300:10, 300:19, 301:1, 302:7, 302:14, 302:21, 303:24, 304:7, 304:11, 364:7, 370:6, 371:8, 371:9, 375:13, 383:10, 383:15, 383:22, 384:4, 387:16, 398:18, 398:20, 398:21, 399:5
**june**
31:23, 64:13, 65:2, 68:17, 74:3, 82:22, 84:24, 85:6, 95:21, 98:2, 100:23, 103:15, 105:8, 105:9, 106:23, 106:24, 118:3, 118:9, 118:15, 118:19, 118:20, 119:2, 122:8, 123:21, 128:2, 128:17, 130:15, 133:4, 135:4, 138:10, 138:17, 140:18, 141:1, 141:3, 141:8, 141:21, 142:17, 149:3, 150:14, 152:9, 161:17, 164:22, 170:4, 170:14, 170:19, 172:15, 174:5, 176:21, 177:10, 177:16, 177:22, 178:20, 179:4, 180:21, 180:22, 188:23, 189:12, 189:15, 189:24, 190:23, 191:5, 191:18, 191:20, 192:7, 192:9, 207:14, 210:23, 220:5, 220:12, 221:15, 226:20, 230:14, 233:6, 241:14, 290:6, 290:17, 291:4, 291:14, 291:23, 292:19, 292:24, 293:1, 293:7, 293:12, 293:18, 293:24, 294:7, 294:16, 294:23, 295:5, 295:10, 295:15, 295:21, 296:3, 296:10, 296:13, 298:8, 317:15
**jury**
185:7, 185:14, 185:22, 186:10, 186:21, 187:9, 187:24, 188:16, 196:15, 196:17, 197:3, 197:4, 197:11, 200:3, 200:23, 202:13, 204:4, 205:18, 212:21
**just**
29:20, 32:10, 35:2, 55:23, 56:6, 62:5, 82:11, 97:9, 97:12, 102:3, 102:4, 112:18, 112:22, 124:7, 124:23, 125:14, 125:15, 125:23, 144:12, 144:20, 155:9, 174:21, 201:23, 204:10, 207:23, 208:7, 209:16, 213:13, 214:19, 248:7, 277:6, 282:4, 282:22, 283:19, 297:18, 301:17, 306:1, 306:14, 317:5, 323:18, 323:21, 324:11, 338:13, 344:23, 350:6, 367:22, 370:11, 371:24, 372:10, 372:18, 377:22, 381:24, 393:5, 402:1, 402:2, 402:3, 402:7, 402:10, 411:19, 413:6
**justice**
266:3
**justification**
80:20
**justify**
138:4, 182:22, 348:5, 397:15, 397:22, 398:8
**justino**
381:20, 382:4, 382:16, 390:10, 393:3, 395:4, 395:15
**juvenile**
319:6, 319:11
**juveniles**
353:11

**K**

**katz**
4:12
**keep**
125:24, 131:16, 282:22, 284:19
**keepers**
35:24
**kept**
256:19, 347:14
**kevin**
33:15, 381:2, 381:13, 381:21, 382:18, 384:20, 390:11, 391:6, 391:15
**key**
103:19, 139:21
**kicked**
155:15, 155:22
**kids**
86:6
**kill**
87:1

**killed**
227:10, 300:21, 341:24, 342:8, 347:17, 377:1, 413:8
**killer**
369:18, 369:24
**killing**
143:4, 202:10, 411:22
**kin**
420:11
**kind**
53:8, 107:16, 403:9
**kinder**
39:3
**king**
161:23, 163:18, 163:24, 167:1, 171:10, 385:1
**kings**
384:18, 384:24, 385:11, 393:1
**know**
32:13, 67:8, 67:24, 82:5, 91:22, 102:16, 160:16, 170:3, 170:13, 191:2, 196:10, 214:3, 234:14, 235:10, 235:21, 248:10, 270:19, 274:2, 274:3, 299:6, 299:16, 299:18, 301:16, 310:1, 313:9, 351:5, 361:19, 372:9, 402:12
**knowing**
15:20, 23:10, 46:3, 160:22, 212:3, 270:20
**knowingly**
23:8, 198:20, 200:2, 200:24, 202:16, 208:3, 216:1, 216:4, 219:21
**knowledge**
19:19, 20:1, 69:18, 111:18, 115:7, 127:14, 160:23, 163:19, 165:22, 168:3, 187:4, 187:15, 203:21, 246:24, 383:24, 384:6, 399:4, 399:13, 399:18, 408:24
**known**
45:8, 78:6, 98:7, 150:16, 169:8, 169:9, 169:11, 208:20, 225:19, 347:16, 348:21, 351:22, 356:9
**kristina**
4:12, 8:2

**L**

**labeled**
50:1, 93:18
**language**
25:12
**laptop**
284:24
**last**
11:17, 118:13, 195:13, 285:2, 300:2, 320:3, 323:19, 324:1, 372:11, 401:24
**late**
290:9, 330:23, 331:5, 333:4, 334:6, 336:16, 353:12
**later**
45:13, 61:22, 167:1, 171:11, 218:16, 238:20, 270:12, 271:3, 272:4, 281:12, 333:17, 340:17, 383:2, 389:18, 394:23, 400:18, 401:2, 403:20, 410:1, 415:17
**latin**
311:18, 312:3, 312:8, 384:18, 384:24, 385:11, 392:24, 408:7, 408:9
**latino**
28:23, 30:4, 30:9, 30:19, 85:11, 130:9, 134:21
**latinos**
407:8
**laughing**
124:12
**laureano**
54:11, 54:21, 335:10, 335:14, 335:19, 336:1, 359:11, 359:15, 359:23, 360:9, 360:18, 361:13
**law**
3:5, 3:19, 4:5, 7:19, 8:10, 273:4, 273:13, 273:18, 274:9, 277:1
**lawlessness**
259:8
**laws**
267:21
**lawsuit**
54:2, 54:4, 102:8, 277:24, 299:9, 299:10
**lawyer**
66:8, 66:14, 67:9, 67:17, 68:1, 270:6, 274:22, 275:10, 277:21, 278:5, 278:11
**lawyers**
257:21, 260:23, 272:12, 275:12, 276:6
**lead**
23:11, 31:22, 224:21, 403:24
**leading**
26:20
**leads**
29:13
**learn**
64:4, 204:20
**learned**
24:6, 29:6, 54:20, 66:16, 205:4, 205:10, 226:8, 249:3, 250:6, 343:14, 387:12, 387:19
**learning**
30:16
**leave**
45:1, 45:12, 143:18, 225:16
**leaving**
156:23
**led**
354:18
**left**
46:11, 219:12, 226:23
**legal**
15:23, 17:11, 23:4, 212:8, 264:7, 272:2, 278:23, 294:5, 296:8, 296:22, 334:21, 351:23
**legitimate**
29:13, 210:13, 314:2
**legitimately**
30:21, 31:15, 110:1, 213:12
**lengthy**
216:24
**leniency**
41:16, 46:22,

144:14, 163:8, 164:5, 186:23
**less**
9:17, 144:6, 353:24
**let**
32:13, 53:19, 67:7, 82:5, 112:18, 126:1, 131:8, 143:19, 146:10, 167:17, 191:1, 194:10, 301:16, 302:3, 323:18, 331:18, 402:1, 408:8
**let's**
159:11, 214:19, 363:23, 384:9
**letting**
332:11
**license**
420:23
**lie**
183:7, 208:17, 209:15, 245:12, 280:6, 297:12
**lied**
42:2, 164:10, 170:17, 182:12, 182:17, 183:1, 183:14, 258:8, 258:19, 303:23, 313:7
**lies**
265:11, 265:13
**life**
36:22, 400:20
**light**
406:14, 406:15
**like**
32:4, 43:18, 58:6, 82:12, 102:16, 107:16, 110:9, 113:9, 130:8, 160:17, 183:22, 185:9, 235:5, 236:6, 248:6, 284:23, 301:19, 350:13
**line**
56:22, 281:19, 316:22, 345:6, 356:20, 363:9, 404:19
**line-ups**
48:13, 48:23, 49:6
**lineup**
175:24, 177:8, 177:16, 178:7, 178:8, 178:20, 179:4, 179:8, 179:15, 179:20, 180:2, 180:15, 180:21, 181:2, 181:10, 181:17, 181:22, 241:14, 241:24, 242:9, 242:16, 243:3, 243:9, 244:3, 284:5, 284:9, 284:10, 284:14, 285:15, 286:9, 286:13, 286:14, 286:18, 287:12, 291:17, 293:1, 293:11, 293:23, 294:16, 295:5, 295:14, 296:2, 304:10, 304:15, 304:20, 305:3, 307:12, 308:10, 308:15, 308:17, 308:21, 309:1, 309:8, 309:13, 309:15, 309:20, 318:4, 325:16, 325:22, 326:4, 326:11, 326:17, 326:23, 327:1, 327:7, 327:16, 328:1, 333:12, 344:24, 345:5, 345:8, 345:12, 354:17, 355:17, 413:17, 414:1, 414:14, 414:20
**lineups**
317:21, 318:3
**listen**
351:6
**literally**
10:9
**litigation**
268:2
**little**
9:17, 82:9, 177:1, 284:20, 312:11, 312:21
**live**
175:23, 179:15, 180:21, 241:24, 284:5, 286:9, 291:16, 293:1, 294:16, 295:4, 413:17, 414:1, 414:14, 414:20
**living**
341:15, 405:24, 411:12
**liz**
284:19
**llc**
3:12, 5:5
**located**
203:22, 233:2, 392:15, 405:12
**location**
107:3, 121:7, 385:1
**lock-up**
34:10, 35:3, 35:12, 35:24, 36:5, 48:15, 48:23, 49:8, 49:17
**locked**
202:8
**lodge**
33:17, 33:24
**loevy**
2:4, 3:12, 7:3, 7:6, 7:18, 7:19, 7:21, 196:12
**log**
6:10, 6:12, 58:7, 58:22
**logan**
282:11
**logs**
58:20
**long**
9:14, 94:1, 406:15
**longer**
240:19
**look**
56:20, 56:22, 58:7, 112:2, 118:12, 120:22, 125:10, 136:17, 161:12, 161:13, 164:18, 164:19, 183:22, 184:5, 207:8, 241:13, 243:15, 246:5, 248:7, 274:1, 310:2, 338:11, 342:7, 343:9, 349:23, 350:1, 351:6, 351:9, 355:16, 366:19, 367:23, 371:5, 373:3, 374:11, 375:1, 375:3, 378:8, 412:8, 413:17, 414:1
**looked**
58:19, 102:16, 107:16, 110:9, 140:7, 160:17, 228:7, 241:24, 307:7
**looking**
36:21, 125:24, 237:14, 346:19, 350:8, 368:7, 372:14
**loretta**
314:7, 314:15, 316:16
**losing**
397:3

**lot**
115:6, 131:9, 287:23
**lozada**
33:5, 325:13, 326:8, 326:16, 328:22
**luis**
363:6, 364:20, 369:22, 376:16, 376:23, 378:14, 378:21, 379:2, 379:17, 379:19
**lunch**
82:13
**lying**
265:19, 328:22

**M**

**m-a-l-l-o**
307:18
**m-a-r-l-o-n**
311:9
**m-e-n-a**
337:11
**m-o-n-t-a-n-e-z**
318:14
**m-u-n-i-z**
314:22
**made**
65:18, 97:4, 109:10, 122:13, 126:5, 127:24, 149:23, 163:18, 166:24, 168:13, 172:17, 178:5, 196:12, 207:1, 232:14, 234:17, 242:16, 247:6, 283:18, 283:24, 346:16, 369:11, 371:8, 387:14, 394:22, 398:16, 399:3, 399:11, 400:3, 408:4, 415:8, 419:19
**mail**
267:7
**maintain**
99:21
**majinowski**
92:11
**make**
40:19, 40:20, 48:1, 52:24, 55:11, 69:17, 75:20, 77:8, 79:10, 105:2, 112:20, 128:14, 134:17, 139:1, 144:21, 164:13, 177:20, 181:1, 235:4, 250:18, 253:5, 292:17, 293:15, 293:21, 294:21, 295:18, 295:24, 296:15, 310:12, 327:23, 329:5, 342:6, 342:18, 353:4, 367:7, 370:15, 379:3, 387:5, 403:20, 420:3
**makes**
195:18, 214:1
**making**
32:15, 157:8, 235:4, 395:13
**male**
349:16, 373:6, 373:13, 406:12, 407:8
**mallo**
307:18
**man**
34:9, 35:11, 324:14
**mandatory**
249:16, 250:7
**maniac**
408:7, 408:9
**manipulate**
38:11, 105:11, 105:20, 106:4, 106:15, 111:21, 223:14, 229:13, 342:17, 395:12
**manipulated**
230:5, 255:5, 255:16, 259:16, 291:16, 376:22, 412:4
**manipulating**
349:1, 366:8
**manipulation**
297:7, 412:17
**manner**
224:21
**manuel**
311:5, 311:23, 313:8, 313:15, 313:21, 314:2, 314:23, 315:4, 315:5, 315:11, 316:1, 316:7, 316:17
**manufactured**
191:17, 192:10
**many**
52:24, 193:16, 336:21, 353:11
**march**
356:10
**margaret**
327:17, 327:23
**mark**
195:10, 205:23, 337:15, 404:11, 408:21, 409:4, 416:1
**marked**
6:8, 55:19, 56:17, 56:21, 58:2, 58:6, 112:3, 112:10, 116:20, 195:22, 196:1, 196:3, 206:2, 206:5, 246:6, 246:8, 337:18, 339:1, 370:10, 370:19, 372:1, 372:12
**marks**
45:2, 45:12, 156:24
**marlo**
154:7, 154:12
**marlon**
311:8
**marrero**
363:6, 364:20, 369:23, 375:18, 375:23, 376:16, 376:23, 378:14, 378:22, 379:2, 379:18, 379:19
**masonette**
381:1, 381:7, 382:16, 383:1, 383:9, 383:15, 383:21, 383:23, 384:5, 386:14, 386:19, 387:5, 387:14, 387:20, 388:11, 388:23, 389:8, 389:16, 390:2, 390:20, 391:4, 391:13, 391:22, 392:4, 392:12, 392:21, 393:10, 393:15, 393:23, 394:4, 394:13, 395:1, 395:15, 396:2, 397:11, 397:15, 397:22, 398:16, 399:3, 399:11, 399:16, 399:22, 400:3, 400:17, 401:10, 401:20, 402:4, 402:10
**masonette's**
393:4, 394:21, 395:13, 395:22, 402:18
**matched**
108:5, 108:19, 109:3, 109:12, 374:1
**material**
257:19, 329:11
**materials**
257:22

EP IGLESIAS Sub Resp 001656

**math**
9:16
**matt**
217:18, 221:8, 222:16, 224:11, 228:16, 231:1, 232:12, 233:16, 234:4, 234:15, 278:16
**matter**
7:3, 8:21, 30:8, 57:22, 120:7, 123:2, 153:3, 196:16, 197:6, 242:1, 311:4
**matters**
261:10, 334:21
**matthew**
4:11, 8:3, 213:9, 216:6, 229:24, 232:3, 238:2, 241:4, 244:9
**mawr**
357:5
**may**
25:10, 32:18, 33:13, 35:10, 36:1, 37:8, 39:10, 52:4, 52:8, 56:24, 58:9, 59:3, 59:17, 59:18, 60:2, 60:11, 60:23, 93:13, 93:19, 155:9, 246:10, 246:24, 247:6, 251:20, 280:14, 282:10, 282:19, 283:5, 283:17, 283:18, 283:23, 284:6, 286:9, 287:24, 318:18, 318:23, 324:15, 324:21, 325:11, 326:1, 326:11, 326:17, 352:23, 357:2, 381:3, 381:14, 381:22, 382:18, 384:9, 384:10, 386:6, 386:21, 391:23, 392:24, 393:5, 396:4, 420:5, 420:16
**maybe**
139:7, 283:17, 298:1, 305:15, 330:23, 337:21
**mazur**
3:11, 6:5, 7:20, 10:17, 282:3, 282:4, 282:8, 282:24, 283:3, 283:12, 283:21, 284:3, 284:21, 285:1, 285:4, 289:16, 289:23, 290:13, 291:21, 292:13, 294:11, 297:17, 297:23, 298:5, 299:1, 299:4, 299:8, 299:15, 299:22, 300:1, 300:8, 302:5, 305:1, 305:17, 305:19, 306:1, 306:17, 311:15, 312:17, 313:5, 317:9, 317:10, 318:12, 318:14, 318:17, 319:20, 320:3, 320:7, 320:10, 320:18, 321:1, 321:9, 321:19, 322:3, 322:10, 322:18, 323:2, 323:10, 323:18, 323:23, 324:8, 324:9, 327:22, 328:9, 329:24
**mean**
116:24, 194:8, 214:9, 235:22, 306:13, 372:1, 389:4
**means**
38:11, 42:8
**meant**
390:7
**medium**
373:8, 373:15, 406:18
**meet**
64:16, 65:1, 279:17, 330:15
**meeting**
80:1, 98:3, 100:23, 106:24, 119:1, 120:15, 128:1, 164:12, 191:4, 192:8, 207:13, 207:17, 208:8, 208:18, 208:21, 209:8, 210:22, 239:19, 279:23
**melendez**
286:8, 286:14, 286:19, 286:24, 287:7, 287:12, 287:17, 287:22, 288:8, 288:14, 289:9, 290:1
**melendez's**
288:19, 289:18
**member**
40:3, 120:24, 307:18, 311:18, 316:11, 340:21
**members**
121:11, 255:4, 255:15, 255:24, 256:9, 256:18, 257:7, 257:18, 258:7, 258:18, 259:5, 273:4, 331:24, 332:11, 332:17, 371:16, 407:18
**memorialize**
188:19
**memorialized**
31:8, 31:14, 119:1, 189:15, 191:19
**memorize**
101:2
**memory**
37:20
**men**
28:23, 30:4, 30:9, 30:19, 60:3, 60:12, 60:24, 85:12, 106:17, 130:9, 134:21, 175:12, 175:24, 176:10, 176:19, 177:2, 394:6, 394:14
**mena**
106:3, 337:6, 339:19, 340:2, 340:10, 341:8, 342:1, 342:9, 342:19, 343:19, 344:8, 344:17, 345:7, 345:14, 347:1, 347:10, 352:11, 352:24, 353:8, 353:20, 354:10, 354:20, 355:24
**mention**
414:12
**mentioned**
71:5, 102:6, 290:12
**merely**
122:14, 127:15, 169:16, 353:18
**merit**
260:14
**merkez**
404:14, 405:5, 405:11, 411:4, 415:20, 416:6
**met**
66:14, 67:9, 68:9, 78:18,

90:23, 102:17
**method**
145:14, 156:11
**methodology**
87:23, 88:22
**methods**
39:3, 61:18, 144:6, 145:3, 145:15, 416:13
**mia**
231:9
**michael**
4:20, 7:24, 298:13, 300:10, 306:19, 307:1, 327:17, 327:24
**mid**
331:13
**might**
39:21, 70:10, 76:18, 109:24, 139:6, 148:17, 215:19, 264:3, 264:5, 264:13, 284:22, 365:18, 368:8
**millimeter**
87:12, 87:17, 87:18, 160:3, 200:16, 201:5, 392:15, 394:16, 396:3
**mind**
183:8
**mine**
372:6
**mingy**
12:21, 13:15, 13:24, 14:11, 14:15, 15:4, 18:7, 18:19, 22:3, 22:12, 51:13, 59:24, 60:9, 60:20, 62:24, 66:24, 94:23, 106:13, 150:21, 151:12, 151:20, 152:15, 152:21, 153:11, 153:21, 155:22, 157:10, 160:21, 161:4, 162:8, 164:2, 165:21, 166:5, 166:11, 166:15, 170:3, 170:14, 170:18, 171:1, 172:8, 173:12, 175:8, 175:20, 176:7, 177:7, 179:7, 180:13, 180:19, 230:2, 230:16, 329:19, 382:15, 384:5, 384:17, 398:3, 398:17, 399:17, 399:22, 400:4
**minimum**
48:2, 248:18, 249:4, 249:16, 250:7
**minor**
28:20, 85:9
**misconduct**
12:8, 13:4, 15:5, 15:8, 17:6, 17:7, 23:20, 66:22, 66:23, 172:23, 173:4, 173:7, 258:20, 259:7, 260:2, 260:4, 280:2, 415:3, 415:6, 415:7, 415:8
**misled**
225:9, 225:14
**missing**
231:9, 338:4
**misstates**
227:20
**molina**
349:15, 351:2, 351:13, 351:19, 352:2, 353:6
**molina's**
352:9
**moment**
32:3
**mondo**
86:24, 121:9, 122:3, 123:6, 124:9, 124:11, 124:13, 125:2, 217:4, 217:7, 218:10, 219:1
**money**
63:13, 66:8, 67:18, 68:1, 89:9, 202:4, 332:2, 332:11, 332:20, 361:19, 362:2, 386:20
**monica**
165:23, 290:6, 290:17, 290:21, 292:2, 296:17, 297:4
**montanez's**
89:22, 106:5, 107:3, 107:7, 108:6, 108:11, 108:19, 109:3, 109:12, 110:23, 111:6, 111:13, 111:19, 135:19, 136:17, 137:12, 229:6, 230:4
**month**
25:17, 254:5
**months**
52:24, 254:9
**montia**
384:6, 391:3, 392:13, 394:24, 395:11, 398:3, 398:18, 399:17, 399:22, 400:4
**montias**
382:14
**more**
51:3, 116:13, 139:12, 148:10, 170:22, 172:1, 214:6, 259:19, 302:1, 318:8, 319:12, 324:3, 324:4, 395:9
**morning**
7:15, 8:19, 24:3, 83:21, 86:18, 199:20, 201:6, 203:8, 203:15, 203:23, 282:4, 386:5, 387:23, 405:6, 405:14, 412:22, 413:9
**motion**
132:18
**motive**
48:20, 62:19, 63:1, 63:9, 63:20
**mouth**
236:7, 236:8
**move**
234:20, 236:7, 271:8, 272:3, 401:23, 403:15
**moved**
78:5
**moving**
298:23, 301:20, 305:14, 311:4, 316:21, 402:24
**much**
29:20, 30:8, 49:15, 93:20, 115:21, 249:24, 361:19, 367:4
**mug**
374:3
**mugshots**
366:20
**multiple**
43:12, 44:14
**muniz**
314:22, 315:4, 315:10, 315:13
**muniz's**
316:17
**munoz**
322:6, 337:21,

339:18, 340:21, 341:7, 342:18, 343:3, 343:15, 344:1, 344:6, 344:9, 344:15, 344:22, 345:5, 345:13, 345:18, 345:24, 346:8, 347:14, 347:17, 347:23, 348:4, 348:7, 348:14, 348:20, 348:24, 349:3, 349:10, 349:19, 351:23, 352:11, 353:7, 353:18, 354:9, 354:17, 354:19, 355:7, 355:12, 355:17, 355:18, 355:23
**murdered**
24:2, 24:7, 77:18, 86:17, 105:14, 171:24, 345:14, 346:5, 356:16, 412:6
**murderer**
92:17
**murders**
34:20, 53:18, 53:21, 54:1, 62:13, 358:15, 363:5, 364:20, 381:2, 381:13, 381:21, 382:17, 384:1, 384:7, 384:8, 385:23, 386:6, 386:14, 388:12, 390:11, 391:6, 391:23, 395:16, 397:12, 399:5, 399:14, 399:18, 399:24, 400:7, 400:19, 401:13, 401:18, 401:20, 404:14, 404:15, 405:4, 405:5, 410:11, 411:3, 411:10, 412:12, 415:19, 416:5
**must**
264:3
**myself**
214:7, 282:3

**N**

**name**
7:15, 7:20, 8:20, 9:3, 24:18, 100:17, 114:2, 117:14, 117:15, 117:16, 117:20, 119:8, 150:15, 154:6, 165:15, 165:23, 190:2, 197:17, 211:21, 272:20, 292:8, 297:24, 298:3, 324:10, 340:23, 349:15, 351:1, 351:20, 354:24, 363:4, 363:6, 364:18, 385:11, 387:8, 393:1, 393:3
**named**
34:9, 35:11, 56:24, 214:24, 294:14
**namely**
63:11
**names**
218:10, 218:13, 218:15, 218:23, 219:1
**narrative**
62:11, 73:14, 79:3, 83:13, 96:3, 96:11, 118:14, 125:9, 125:11, 126:10, 126:11, 126:12, 126:20, 126:22, 127:4, 162:7, 164:2, 188:20, 390:8
**natural**
36:22, 174:19, 400:20
**navella**
310:18
**navella's**
310:11
**nd**
292:24, 293:7, 293:18, 387:12, 387:23, 388:4
**near**
40:15, 203:7, 357:4
**necessarily**
389:5
**necessary**
113:4, 120:18
**need**
80:15, 151:13, 151:21, 213:12, 306:14, 330:8, 330:9, 362:2
**needed**
89:9, 155:2, 208:17, 335:18, 344:23
**needs**
330:5
**negron**
404:13, 404:20, 410:17, 411:2, 411:9, 411:21, 412:7, 412:20, 413:7, 413:18, 414:2, 414:4, 414:22, 415:10, 415:18, 416:4, 416:11
**neighborhood**
109:24, 110:16, 135:3, 351:21
**neither**
18:24, 61:7, 71:10, 75:22, 92:10, 97:17, 111:4, 146:1, 161:5, 203:12, 203:19
**never**
68:1, 71:5, 90:23, 102:16, 109:17, 124:10, 124:22, 127:12, 163:18, 166:10, 172:17, 183:8, 211:4, 216:14, 218:1, 220:1, 222:22, 228:23, 238:9, 241:24, 245:11, 245:15, 256:21, 259:6, 260:3, 260:9, 291:22, 307:7, 314:1, 347:8, 347:22, 348:6, 368:20, 369:10, 369:21, 373:12, 374:12, 374:19, 374:24, 377:15, 377:17, 378:12, 416:9
**new**
3:7, 281:18
**next**
114:1, 233:17, 237:6, 301:17, 316:22, 318:9, 388:20, 403:15
**nickname**
102:1, 215:18, 393:2
**nicknamed**
307:18
**nicknames**
217:3, 217:5
**nieves**
363:7, 364:21
**night**
28:5, 84:6, 85:2, 86:5, 106:6, 106:18, 107:10, 110:3, 111:14, 223:7, 288:5, 288:10,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 837 of 1206 PageID #:66642

290:6, 290:17, 344:6
**nine**
87:12, 87:16, 87:18, 160:2, 201:5, 249:17, 250:9, 392:15, 394:16, 396:3
**nine-year**
249:24, 253:7, 253:16
**nobody**
225:19
**noel**
282:10
**none**
60:12, 90:15, 275:7, 405:24
**nonetheless**
68:24, 120:15, 188:6, 342:15, 345:17, 359:3
**nor**
18:24, 20:7, 97:18, 111:4, 161:6, 168:20, 203:20, 395:3, 420:11
**north**
2:5, 3:13, 5:6, 7:6, 198:5, 199:1, 199:8, 201:6, 201:22, 203:7, 203:14, 203:23, 223:24, 233:11, 236:20, 237:2, 237:7, 237:8, 364:2, 368:23, 369:23, 384:8, 384:19, 384:24, 392:16, 393:14, 393:16, 394:6
**northern**
1:2
**notary**
2:13, 418:24
**noted**
299:15
**notes**
402:13, 402:16
**nothing**
15:7, 69:19, 90:16, 91:16, 302:7, 302:14, 303:19, 311:23, 325:2, 389:15, 401:12, 416:19, 416:20, 416:21, 416:23, 419:15
**notice**
2:11
**noting**
370:11
**notwithstanding**
33:22, 52:14, 243:19, 252:6, 342:12, 399:9, 411:7
**now**
7:12, 23:24, 26:15, 51:2, 51:22, 58:1, 64:13, 75:3, 76:18, 92:23, 98:2, 112:2, 113:9, 118:2, 118:23, 120:22, 141:17, 150:13, 173:18, 207:8, 211:18, 213:9, 214:21, 226:19, 230:14, 230:22, 236:18, 249:23, 298:23, 324:11, 337:5, 340:20, 346:17, 346:18, 349:9, 363:14, 373:2, 384:13, 397:10, 402:24
**nowhere**
203:7
**number**
7:4, 7:5, 57:3, 57:11, 57:22, 58:12, 59:5, 144:3, 192:18, 192:21, 193:4, 193:13, 193:23, 195:2, 196:17, 196:18, 227:15, 228:3, 332:8, 340:7, 372:14, 377:2, 398:7, 402:19
**numbers**
195:14, 207:9, 318:4, 350:9, 372:15
**numerous**
64:3

O

**o'clock**
189:24, 220:23, 233:3, 392:23, 395:22
**o'shefsky**
404:11, 408:21, 408:23, 409:4, 409:15, 409:20, 410:9, 410:16, 416:1
**o'shefsky's**
415:7
**oath**
7:14, 186:10, 187:10, 217:19, 265:12, 265:14, 265:20, 270:13, 418:4
**objected**
338:10
**objectionable**
212:4, 324:7
**objections**
45:15, 47:10, 59:19, 195:7, 235:4, 249:18, 250:11, 253:17, 253:21, 264:24, 265:7, 265:15, 265:21, 266:4, 266:10, 266:16, 266:22, 267:3, 267:9, 267:15, 267:22, 268:5, 268:12, 269:5, 269:12, 269:20, 270:7, 270:18, 270:21, 271:12, 271:20, 272:8, 275:15, 276:9, 276:18, 277:2, 277:9, 277:17, 278:1, 283:20, 299:5, 301:19, 302:3, 305:24, 306:4, 311:11, 317:3, 318:16, 320:15, 320:22, 321:6, 321:16, 321:24, 322:7, 322:15, 322:23, 323:7, 323:15, 330:3, 333:5, 337:20, 338:1, 356:20, 361:15, 381:5, 382:1, 404:18
**obnoxious**
235:5, 235:6, 235:8
**observed**
44:12, 156:3, 332:9
**obstruction**
266:3
**obtain**
57:10, 132:4, 172:23, 182:20, 183:4, 220:2, 255:6, 291:15
**obtained**
28:7, 63:13, 84:18, 163:9, 219:4, 333:20
**obtaining**
145:3
**obviously**
307:14
**occasion**
54:20, 99:9

EP IGLESIAS Sub Resp 001660

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 838 of 1206 PageID #:66643

**occasions**
144:4, 332:8
**occurred**
24:13, 62:9, 89:15, 118:14, 119:1, 128:2, 132:5, 201:21, 333:3, 335:2, 335:10, 339:20, 340:2, 344:16, 352:4, 355:1, 356:10, 358:16, 363:17, 364:2, 379:5, 381:3, 381:14, 381:22, 382:18, 383:17, 383:22, 384:8, 384:9, 384:19, 386:7, 391:23, 398:19, 398:21, 405:6, 410:11
**ochoa**
292:16, 292:22, 293:5, 293:10, 293:16, 293:22
**ochoa's**
294:4
**october**
9:10, 311:9, 312:5, 312:10, 313:1, 349:14, 350:17
**off**
34:24, 37:20, 82:15, 131:11, 175:1, 281:23, 297:18, 297:19, 323:22, 380:18
**offender**
215:17, 239:18, 335:17, 342:6, 342:7, 347:24, 348:7, 369:11, 369:22, 373:6, 373:13, 373:19, 374:9, 374:20, 378:9, 379:12
**offender's**
374:12, 375:1, 375:3
**offenders**
73:7, 223:15, 226:4, 229:7, 239:18, 406:2, 407:7, 414:22
**offense**
166:17, 364:13
**offer**
66:8, 67:18, 68:1
**offered**
79:3, 81:15
**offi**
14:13
**office**
33:24, 64:15, 64:24, 65:11, 74:2, 80:3, 82:24, 98:4, 119:4, 189:5, 209:18, 210:1, 210:23, 237:13, 274:13, 331:12
**officer**
9:6, 9:9, 9:15, 21:2, 116:13, 156:21, 319:23, 385:20, 404:11, 406:10
**officer's**
114:2
**officers**
8:7, 15:3, 17:8, 17:19, 23:21, 66:23, 69:7, 280:3, 290:15, 382:12, 384:23, 385:10, 387:13
**offices**
2:2, 65:22, 68:7, 82:22, 191:4
**official**
254:17, 255:3, 255:14, 255:23, 256:8, 256:18, 257:7, 257:17, 258:7, 258:18, 259:5, 420:13
**often**
43:24, 142:3
**oh**
11:7, 212:22, 284:21, 350:8, 403:5
**okay**
9:2, 10:4, 10:8, 10:11, 10:15, 10:16, 11:5, 33:10, 37:22, 42:11, 56:9, 56:14, 82:8, 102:9, 112:20, 113:16, 131:8, 174:21, 196:20, 198:1, 206:9, 213:20, 236:18, 274:6, 274:24, 281:22, 285:1, 305:20, 317:9, 351:11, 372:10, 382:6, 402:1, 402:12, 404:6
**old**
349:16, 353:19
**oldsmobile**
405:23, 412:20, 413:8
**omar**
333:3, 333:6, 333:10, 333:12, 333:18, 333:19, 334:3, 335:3
**once**
31:3
**one**
10:12, 10:13, 48:10, 54:9, 54:20, 57:21, 61:18, 104:13, 104:21, 110:9, 140:5, 178:9, 181:4, 181:24, 202:3, 204:10, 210:7, 235:12, 242:17, 243:21, 249:5, 275:8, 283:23, 290:10, 297:18, 299:8, 300:2, 301:8, 316:10, 318:4, 318:8, 318:9, 324:1, 330:5, 330:8, 330:9, 337:8, 338:3, 341:14, 345:5, 370:12, 380:10, 395:9, 408:11
**only**
41:17, 47:6, 56:3, 99:22, 140:23, 141:7, 186:19, 226:3, 252:7, 304:19, 305:2, 318:3, 327:1, 327:7, 349:2, 369:2, 397:2, 407:7, 407:14
**opened**
160:2
**operation**
92:19, 115:15
**opportunity**
45:20, 74:9, 74:17, 248:8
**opposed**
350:8
**opposing**
40:3
**oppressive**
35:5, 53:12, 354:12, 365:22, 367:10, 403:12
**oral**
397:21, 400:4, 400:10, 400:16, 419:16
**order**
34:19, 38:4, 61:19, 62:10,

EP IGLESIAS Sub Resp 001661

92:23, 99:2, 105:2, 109:4, 111:20, 113:5, 137:19, 138:4, 139:12, 148:11, 153:4, 176:11, 204:11, 232:15, 234:4, 251:12, 252:10, 253:4, 263:24, 269:10, 274:16, 275:2, 291:15, 304:20, 329:4, 329:13, 348:4, 352:22, 361:20, 362:2, 377:11, 382:24, 388:11, 389:17, 389:18, 402:7, 416:13
**original**
112:6
**originally**
340:1, 340:7, 384:13
**ortiz**
312:20, 313:1, 313:9
**other**
17:19, 51:5, 70:11, 91:7, 127:13, 130:9, 154:12, 173:6, 189:12, 270:13, 273:4, 275:1, 275:5, 278:21, 279:14, 282:15, 282:19, 290:11, 290:15, 291:24, 293:6, 293:11, 295:9, 295:14, 302:21, 376:9, 392:24, 393:23, 398:1, 420:3
**others**
32:11, 93:3, 148:18, 149:24, 390:9, 399:12
**otherwise**
78:6, 98:7, 150:16, 225:11, 264:5, 275:20, 279:6, 347:16, 351:22, 356:9
**out**
35:3, 48:22, 51:4, 93:20, 99:10, 108:10, 112:19, 121:4, 121:18, 123:6, 142:16, 148:20, 155:16, 159:17, 162:23, 179:20, 181:4, 195:15, 201:24, 202:1, 213:13, 214:23, 227:11, 237:14, 238:10, 239:16, 243:21, 308:1, 308:6, 308:10, 308:15, 308:21, 309:1, 326:17, 331:4, 331:18, 332:1, 332:12, 332:19, 336:23, 340:7, 344:24, 352:3, 352:16, 360:9, 376:6, 389:7, 396:18, 397:3
**outrageous**
234:22
**outside**
24:8, 46:4, 46:17, 95:10, 273:13, 323:24, 387:21, 405:11, 405:16, 405:17
**over**
65:21, 68:6, 126:1, 131:8, 131:14, 146:10, 167:17, 194:10, 219:12, 226:21, 253:3, 323:20, 334:21, 357:4, 363:23, 388:16, 388:20, 389:4, 408:8
**overly**
404:1
**own**
248:15, 270:2, 270:5, 294:4, 296:8, 296:22

**P**

**pacheco's**
12:10, 12:18, 13:6, 13:13, 23:2, 193:15, 195:6, 208:23
**page**
6:2, 113:1, 113:13, 113:19, 113:20, 118:12, 118:13, 120:23, 125:9, 125:14, 125:22, 126:11, 126:21, 127:23, 128:6, 128:15, 129:17, 131:11, 161:13, 164:19, 164:20, 165:4, 185:8, 197:14, 204:19, 207:9, 207:10, 207:11, 216:23, 241:13, 243:5, 320:3, 349:24, 350:2, 350:3, 350:7, 350:9, 350:12, 371:6, 371:22, 372:1, 372:2, 372:11, 372:15, 372:21, 372:23, 373:2, 373:4
**pages**
1:23, 161:15, 183:23, 196:19, 372:3, 372:7, 372:14, 418:7
**paid**
177:1, 334:3, 360:18, 361:20
**pandit**
190:3, 190:21, 191:3, 191:15
**paper**
338:11
**par**
234:22
**paragraph**
120:24
**paragraphs**
402:5
**park**
30:5, 115:9, 159:9, 223:23, 283:14, 287:23, 332:18, 358:9, 358:16, 359:24, 363:18, 365:19, 383:17
**parked**
89:17, 107:3, 107:7, 109:18, 202:6
**parking**
287:23
**part**
12:19, 13:14, 32:22, 51:22, 60:23, 63:8, 72:5, 87:22, 88:21, 90:7, 90:11, 93:24, 105:17, 117:8, 239:7, 275:13, 276:7, 291:3, 307:12, 312:11, 346:17
**participants**
345:6
**participate**
162:18, 333:2
**participated**
262:11
**particular**
62:6, 193:14, 408:24, 409:6
**particularly**
366:10
**parties**
146:3, 420:12

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 840 of 1206 PageID #:66645

**partner**
12:20, 13:23, 18:2, 18:17, 21:8, 24:16, 165:9, 184:14, 220:24, 233:1, 292:6, 297:10, 298:8, 326:14, 409:20
**partners**
330:19
**party**
116:11, 139:7, 344:7, 346:9
**passenger**
394:2, 406:14, 406:17
**passing**
37:14
**past**
64:3, 217:9, 237:8, 265:12, 275:6, 377:2
**pawlniski**
383:21, 387:13
**pawlnisky**
382:13, 387:20
**pawn**
88:13, 89:8
**pay**
112:24, 180:7, 331:17, 362:2
**paying**
331:3, 361:1, 386:19
**payments**
387:6
**pending**
36:10, 41:8, 47:8, 54:2
**people**
34:24, 35:2, 37:15, 53:9, 92:18, 154:12, 159:4, 180:6, 182:1, 196:11, 196:16, 206:6, 242:18, 260:10, 302:6, 302:13, 331:4, 331:18, 332:18, 359:24, 366:10, 403:9, 405:16, 412:11
**perfectly**
402:6
**perhaps**
357:8
**period**
26:15, 131:4, 141:22, 143:6, 143:13, 144:4, 145:14, 247:18, 403:4
**perjury**
22:24, 265:6
**permitted**
46:2
**perpetrator**
311:18
**person**
11:10, 44:1, 56:24, 57:11, 92:3, 150:14, 156:24, 169:8, 169:9, 169:11, 177:21, 179:2, 181:24, 286:3, 286:4, 309:3, 309:14, 309:19, 327:1, 327:7, 333:13, 334:5, 336:22, 341:17, 343:9, 343:16, 347:1, 355:7, 365:19, 368:22, 376:24, 379:20
**personal**
160:23, 187:4, 203:20, 334:21
**persons**
202:2, 202:3, 217:9, 411:21
**persuade**
105:12, 229:14, 342:17, 348:13, 379:11, 413:6
**persuaded**
164:3, 343:14, 391:12
**persuasion**
412:18
**pertaining**
129:22
**pete**
72:22, 121:8, 122:2, 123:7, 124:8, 124:13, 125:1, 211:21, 215:1, 215:10, 215:18, 217:3, 217:6, 218:10, 219:1
**pete's**
123:5
**phone**
44:15, 44:24, 45:10, 222:3
**phonebook**
156:4, 156:5, 156:14, 156:23
**phonetic**
197:17, 222:13, 251:6, 273:1, 300:18, 305:9, 310:11, 339:20, 381:2, 382:13, 382:14, 404:12, 404:14, 404:17, 406:11
**photo**
133:6, 133:23, 169:1, 222:7, 222:23, 255:7, 284:15, 284:16, 285:5, 285:6, 285:11, 285:20, 286:19, 286:20, 286:23, 286:24, 287:4, 287:9, 287:17, 292:24, 293:7, 293:17, 294:15, 295:4, 295:10, 295:20, 303:2, 303:8, 304:2, 304:6, 308:1, 308:6, 309:7, 309:12, 309:14, 309:20, 315:4, 375:17, 376:5, 376:9, 376:17, 378:16, 409:16, 409:24, 410:10
**photograph**
101:23, 102:14, 110:7, 222:7, 301:12, 303:13, 326:10, 374:1, 376:1, 376:7
**photographic**
291:16
**photographs**
69:1, 69:6, 70:3, 71:19, 133:24, 134:12, 160:15, 220:2, 220:10, 220:17, 222:6, 223:3, 409:13, 413:6
**photos**
68:18, 69:17, 70:3, 72:20, 133:7, 169:2, 169:17, 219:6, 219:14, 307:11, 371:16, 411:11, 412:9, 414:4, 414:13
**phrase**
97:11
**physical**
19:7, 21:21, 39:2, 43:2, 46:20, 50:2, 145:7, 156:12, 163:7, 164:4, 173:6, 186:22, 247:16, 248:2, 388:21, 390:21
**physically**
38:24, 47:9, 142:19, 143:17,

EP IGLESIAS Sub Resp 001663

389:16
**pick**
179:20, 181:4, 243:21, 284:10, 286:14, 292:18, 293:17, 293:23, 294:22, 295:20, 296:2, 307:24, 308:5, 308:10, 308:15, 308:16, 308:21, 309:1, 309:2, 309:13, 309:19, 326:17, 344:24
**picked**
107:1
**picture**
287:3, 410:16
**pistol**
72:22, 121:8, 122:2, 123:5, 123:7, 124:8, 124:13, 125:1, 200:17, 211:21, 214:24, 215:9, 215:18, 217:3, 217:5, 218:10, 219:1, 392:15
**placard**
376:8, 376:10
**place**
156:4, 171:4, 191:4, 210:22, 224:2, 237:4, 238:11, 238:15, 328:17, 397:16, 408:14, 418:8, 419:20
**placed**
48:23, 49:6, 98:6, 122:12, 233:10, 317:19, 318:1, 326:22, 327:15
**placing**
327:6
**plaintiff**
1:5, 1:11, 3:3, 3:10, 7:22, 8:21, 143:3, 143:11, 143:12, 143:17, 144:12, 144:18, 403:20, 419:9
**plaintiff's**
398:8
**plaintiffs**
57:21, 95:7, 98:19, 99:4, 99:11, 99:23, 120:7, 120:19, 123:1, 129:11, 134:13, 139:13, 153:3, 153:6, 154:20, 155:3, 169:17, 172:9, 190:12, 197:6, 218:16, 242:1, 244:20, 269:11, 270:14, 270:20, 271:7, 276:16, 276:24, 278:10, 278:17
**plan**
51:22, 60:23, 61:11, 61:20, 63:8, 65:9, 66:3, 90:7, 105:17, 132:19, 137:19, 148:19
**planet**
7:10
**plausible**
49:16, 170:23
**plausibly**
348:5
**play**
151:21, 151:23
**played**
38:15, 38:17, 142:3, 142:9, 142:10, 142:16
**playing**
123:7
**plea**
151:23
**plead**
271:6
**please**
9:2, 10:19, 82:5, 112:15, 161:12, 195:10
**pled**
254:5
**pllc**
3:5
**plus**
270:18
**point**
9:24, 10:22, 24:6, 36:9, 43:1, 46:10, 51:2, 54:9, 82:4, 108:9, 112:19, 127:2, 129:11, 131:20, 131:21, 133:22, 139:7, 147:5, 149:9, 157:13, 172:22, 189:11, 227:11, 246:21, 248:15, 249:2, 270:12, 271:3, 278:22, 281:3, 333:18, 356:19, 403:14
**pointed**
108:10, 144:20, 195:15, 227:17, 237:9, 238:10, 287:3
**pointing**
228:6, 287:9, 394:15
**points**
98:18
**poked**
80:4
**poking**
80:14
**polaroid**
134:12, 169:2, 169:17, 326:9, 409:16, 409:24, 411:11, 414:3, 414:13
**police**
9:5, 9:9, 9:12, 9:15, 9:19, 17:8, 31:13, 34:18, 37:11, 45:9, 53:20, 110:13, 113:11, 114:15, 115:13, 116:4, 116:12, 117:20, 118:2, 118:8, 118:23, 119:9, 119:15, 122:12, 122:24, 123:20, 124:4, 124:16, 128:15, 128:24, 129:9, 129:16, 130:15, 135:11, 137:11, 138:2, 149:17, 150:5, 164:11, 164:21, 171:18, 194:1, 194:14, 195:1, 204:21, 205:5, 219:5, 254:18, 255:4, 255:16, 256:1, 256:2, 256:10, 256:11, 256:19, 257:8, 257:19, 258:8, 258:19, 259:6, 259:20, 263:4, 274:17, 275:2, 290:15, 291:2, 310:11, 325:14, 325:21, 329:3, 329:12, 339:2, 346:17, 346:22, 365:1, 370:6, 370:22, 371:6, 371:22, 386:5, 396:16, 397:20, 398:6, 398:15, 400:12, 406:10, 407:6
**policing**
114:24

**policy**
254:17, 255:3, 255:14, 255:23, 256:9, 256:18, 257:7, 257:17, 258:7, 258:18, 259:5
**ponytail**
324:17, 324:21
**poorly**
208:19
**population**
65:21
**portions**
402:15
**pose**
305:15
**positioned**
95:9
**positively**
135:11
**possessed**
19:24
**possible**
49:15, 360:4, 403:3, 403:6, 403:7
**post**
299:12, 317:5
**potentially**
403:24
**potomac**
355:2
**powers**
354:8
**practice**
234:3, 254:17, 255:4, 255:15, 255:24, 256:9, 256:18, 257:7, 257:18, 258:7, 258:18, 259:5
**practiced**
50:16, 185:20, 217:17, 221:7, 232:13, 238:1, 244:8
**practicing**
222:14
**preceding**
131:5
**preparation**
222:14, 222:15, 241:3
**prepare**
31:7, 31:14, 149:17, 149:22, 158:13
**prepared**
116:21, 138:2, 146:13, 164:22, 166:23, 185:5, 221:6, 224:9, 228:16, 277:13, 346:17, 350:20, 370:5, 370:23, 396:20, 399:15
**prepped**
216:5
**presence**
46:3, 46:4, 69:7, 101:17, 153:21, 171:16, 315:3, 315:10
**present**
5:10, 23:19, 41:23, 76:13, 76:19, 77:2, 77:6, 77:17, 78:3, 79:5, 94:17, 129:11, 155:14, 155:21, 157:10, 161:23, 162:16, 190:1, 190:8, 197:20, 198:14, 198:24, 199:7, 199:19, 207:17, 207:22, 208:8, 208:18, 208:21, 221:15, 319:23, 333:11
**presented**
251:12
**presently**
346:19
**pressure**
296:22
**presumably**
306:15
**pretend**
21:11
**pretextual**
409:21
**pretrial**
250:19, 251:13, 251:24, 252:8, 252:11, 253:4
**pretty**
212:13
**prevent**
289:24
**previous**
341:8
**previously**
55:19, 56:17, 58:2, 84:19, 112:3, 112:10, 114:22, 177:1, 184:6, 185:16, 227:18, 228:7, 246:6, 299:6, 348:6, 363:10, 381:6, 387:15, 404:20, 409:12
**primarily**
25:4
**prior**
27:6, 27:14, 27:22, 85:2, 111:18, 170:14, 170:19, 176:21, 178:19, 179:3, 181:17, 181:22, 185:12, 186:4, 188:17, 192:8, 198:2, 206:15, 208:22, 216:6, 221:8, 222:16, 223:16, 224:11, 226:10, 228:17, 228:18, 230:22, 232:11, 238:3, 244:9, 248:15, 271:5, 277:23, 340:23, 341:21, 354:16, 414:13
**prison**
36:22, 254:12, 254:19
**priv**
261:10
**privilege**
261:12, 261:14, 264:17, 275:16, 275:18, 279:4
**probable**
15:21, 16:3, 105:1, 140:15, 146:8, 146:14, 182:21, 302:20, 397:14
**probably**
55:7, 285:11, 323:19
**problem**
82:10, 148:5, 301:24
**problems**
148:4, 294:5, 296:8, 296:22
**procedure**
286:2
**proceeding**
251:6, 251:7, 270:14, 271:4, 317:6
**proceedings**
417:3
**process**
12:11, 12:19, 94:13
**produce**
338:19
**produced**
11:22, 196:10, 338:7, 338:9, 338:17, 370:15
**product**
192:8
**professional**
235:23, 236:1, 236:4
**progress**
18:12, 31:8,

303:24
**promised**
47:7, 248:19
**promises**
46:21, 157:8, 163:8, 164:4, 186:23
**promotion**
260:15
**prompted**
67:6
**prompting**
136:9
**pronounce**
298:1
**proof**
104:16, 239:20
**proper**
282:16
**proposed**
81:13, 252:9
**prosecuted**
15:15, 264:13, 415:19
**prosecuting**
377:18
**prosecution**
15:16, 103:20, 139:21, 189:4, 197:5, 207:15, 210:1, 230:24, 231:10, 264:4, 264:22, 265:5, 265:11, 265:19, 266:2, 266:8, 266:14, 266:20, 267:2, 267:7, 267:13, 267:19
**prosecutor's**
210:23
**prosecutors**
256:22, 257:22, 291:9, 378:5, 378:13, 416:10
**prosecutors's**
209:18
**protect**
92:3, 92:17, 92:19, 280:8
**protected**
13:6, 13:13
**protecting**
234:24, 235:1, 235:3
**protection**
78:7, 386:20, 387:5
**protects**
11:1
**prove**
233:20
**provide**
50:18, 60:14, 148:17, 158:5, 206:10, 271:9, 279:24, 280:18, 319:1, 407:1, 410:9
**provided**
27:20, 62:7, 63:10, 63:18, 160:14, 200:23, 202:12, 205:14, 205:18, 218:12, 222:12, 223:2, 223:12, 224:23, 224:24, 225:10, 225:15, 238:1, 244:17, 245:18, 271:10, 289:4, 292:8, 301:8, 353:6, 395:23, 407:14
**providing**
205:17, 236:23
**provision**
246:16
**psychological**
21:21
**public**
2:13, 418:24
**pulled**
48:22, 158:22, 357:3, 405:15
**punt**
373:3
**purported**
114:4, 288:19, 288:24
**purportedly**
166:24, 167:8, 168:13, 172:14, 346:16, 369:17, 371:8
**purporting**
184:24, 227:21
**purports**
112:11, 161:15, 164:21, 184:8
**purpose**
21:7, 21:8, 69:15, 81:4, 107:6, 204:4, 409:24
**purposes**
196:2
**pursuant**
2:11, 254:16, 255:3, 255:14, 255:23, 256:8, 256:17, 257:6, 257:17, 258:6, 258:17, 258:21, 259:4, 403:21, 419:24
**pushed**
80:4
**put**
48:12, 108:9, 110:6, 127:2, 132:18, 236:9, 241:13, 254:18, 376:4, 398:4

**Q**

**quarters**
78:6, 98:7
**question**
10:19, 32:9, 113:6, 144:3, 196:6, 197:16, 197:18, 198:12, 200:13, 204:19, 214:13, 214:17, 214:18, 233:16, 235:15, 235:17, 235:20, 236:2, 236:13, 236:19, 237:5, 261:13, 274:5, 285:2, 285:3, 297:23, 301:18, 305:15, 305:20, 306:2, 306:6, 306:13, 306:14, 324:11, 351:6
**questioned**
215:8, 222:1, 222:2, 222:3, 298:13, 300:10, 300:18, 301:1, 383:24
**questioning**
8:22, 138:24, 316:22, 356:21, 363:9, 385:22, 403:2, 404:19
**questions**
54:4, 71:12, 102:6, 200:9, 200:19, 261:19, 262:2, 262:10, 262:18, 263:3, 263:19, 272:2, 274:3, 282:5, 282:14, 282:15, 282:19, 283:20, 306:16, 311:11, 324:2, 330:4, 333:6, 337:20, 381:7, 402:3, 403:16, 403:18, 404:4, 416:22, 419:19
**quiet**
236:15

**R**

**r-o-o-k**
312:12
**r-o-s-e-n-d-o**
316:23

**r-u-v-a-l-c-a-b-a**
33:11, 324:13
**radio**
202:4
**raise**
283:23
**raised**
71:6, 71:12
**ran**
202:8
**randomly**
358:14
**randoms**
320:4
**rank**
9:18
**rankins's**
156:5, 173:13, 186:18, 187:8, 188:16
**rat**
50:1, 93:19
**rather**
30:20, 45:24, 134:4, 134:16, 166:15, 199:12, 199:14, 216:16, 218:3, 218:11, 223:2, 229:5, 323:22, 372:14, 375:2
**ray**
33:5, 142:10, 184:21, 184:24, 325:12, 326:8, 326:15, 328:22
**rd**
192:18, 192:21, 193:4, 193:13, 193:23, 194:2, 194:15, 195:2, 251:4, 251:22, 254:6, 282:10, 293:1, 293:12, 293:24, 391:20, 395:21
**re-deposing**
402:9
**re-read**
37:20
**re-reading**
402:4
**reaching**
14:1
**read**
124:23, 131:10, 227:21, 248:8, 268:20, 285:1, 285:3, 364:13, 365:1, 365:15, 402:13, 420:2, 420:8
**reading**
420:4
**ready**
390:3, 390:7
**real**
253:15, 335:17, 393:3
**reality**
226:7
**realize**
270:11, 271:2, 372:23
**realized**
55:6, 248:17, 397:14
**really**
42:20, 56:5, 76:17, 116:3, 214:2, 214:11
**reason**
19:23, 44:23, 48:22, 52:9, 86:15, 104:23, 119:18, 153:22, 157:19, 168:8, 287:8, 306:24, 314:2, 344:14, 345:13, 358:22, 399:2, 420:9
**reasonable**
264:3
**reasons**
102:5, 104:22, 363:10
**reassert**
299:3, 356:19, 363:8
**reassurances**
77:15
**reassure**
76:23
**reassured**
77:7, 345:22
**recalled**
28:20
**receive**
334:2
**received**
48:2, 219:1, 230:15, 260:14, 278:21, 291:23
**recently**
317:5
**recess**
82:17, 175:3, 281:24, 297:20, 380:20
**recognize**
135:5, 367:24
**recognized**
104:13, 121:7, 121:9, 122:1, 123:4, 123:5, 220:19, 237:9, 352:3, 368:16, 369:3, 370:5, 377:23
**recollection**
242:10
**record**
6:18, 9:3, 32:15, 42:8, 56:12, 82:15, 82:18, 112:23, 175:1, 175:4, 196:7, 196:14, 281:23, 282:1, 297:18, 297:19, 297:21, 311:10, 317:2, 323:22, 370:12, 380:18, 380:21, 381:24, 402:2, 402:8, 403:1, 403:17, 419:18
**recorded**
347:18
**records**
6:10, 6:12, 57:2, 58:8, 58:20, 204:21, 205:5
**recounted**
28:5
**recovered**
108:20
**red**
406:16
**reduced**
419:11
**referenced**
402:19
**referred**
419:21
**referring**
117:2
**reflect**
208:19
**reflected**
58:21, 59:5, 146:14, 149:23, 251:13, 350:24, 365:2
**reflections**
128:17
**reflects**
114:2
**refuse**
272:1
**refused**
42:15, 76:12, 77:17, 81:12
**regal**
123:4, 135:12, 226:22
**regard**
23:24, 274:18, 274:20, 290:11, 333:6, 381:6, 382:1, 404:19

**regarding**
102:6, 126:6, 136:8, 149:18, 163:19, 165:21, 167:17, 210:21, 211:5, 215:9, 216:17, 240:14, 262:18, 271:9, 273:22, 275:11, 297:6, 298:14, 300:11, 300:19, 301:2, 305:14
**regret**
245:21
**regularly**
18:11
**regurgitate**
81:17
**regurgitating**
127:15, 205:13, 218:14
**reiterate**
21:10
**related**
28:8, 92:10, 102:7, 194:14, 294:4, 296:7, 296:21, 387:7
**relatedly**
413:4
**relating**
277:22
**relationship**
26:3, 26:11, 331:2
**relayed**
28:19
**relaying**
87:7
**release**
149:2, 334:4, 335:3, 386:2
**released**
147:22, 148:2, 333:19, 335:17, 411:19
**relied**
104:22, 272:3, 272:4
**rely**
139:14, 271:16
**relying**
146:19
**remain**
11:4, 119:16
**remember**
56:6, 200:18, 224:5, 233:22, 237:16, 272:24, 273:2, 273:3, 283:19, 357:8, 357:11
**remind**
402:17
**reminded**
49:22
**reminds**
301:18
**removed**
49:7, 193:22, 193:24, 194:7, 194:13, 194:24
**repeat**
83:14, 95:23, 102:4, 169:19, 218:3, 306:4, 311:11, 390:7
**repeated**
122:15, 415:17
**repeatedly**
143:3, 143:12, 260:3
**repeating**
218:14
**rephrase**
117:4
**report**
6:14, 6:22, 6:24, 110:14, 113:11, 116:20, 117:7, 117:9, 117:13, 118:2, 118:8, 118:13, 118:23, 119:9, 119:15, 121:3, 121:13, 121:17, 121:24, 122:12, 122:24, 123:20, 124:5, 124:16, 126:23, 127:3, 127:12, 128:15, 128:16, 128:24, 129:10, 129:17, 130:15, 132:11, 132:12, 133:3, 133:4, 133:17, 135:2, 135:11, 136:7, 136:15, 136:16, 137:1, 137:10, 137:11, 138:3, 141:3, 146:14, 164:11, 164:22, 165:2, 165:15, 165:19, 166:22, 167:8, 167:16, 167:19, 168:4, 168:5, 168:12, 170:11, 170:12, 170:18, 172:14, 172:22, 173:3, 173:5, 184:8, 184:17, 185:5, 192:2, 192:4, 288:13, 288:18, 288:23, 303:24, 339:2, 346:17, 346:22, 347:7, 349:18, 349:24, 350:16, 350:19, 364:14, 365:1, 365:16, 370:6, 370:20, 370:22, 371:6, 371:23, 375:12, 397:20, 398:5, 398:15, 399:15, 400:12
**reported**
1:24, 86:4, 120:15, 122:23, 127:12, 130:5, 135:1, 135:10, 141:3, 166:3, 168:24, 169:6, 230:16, 347:13, 365:8, 371:23, 373:5, 374:8, 399:15, 399:21, 419:10
**reporter**
2:12, 7:9, 7:13, 298:2, 364:8, 419:5, 420:14, 420:22
**reporting**
346:23
**reports**
11:20, 31:8, 31:13, 52:3, 60:10, 60:22, 114:15, 115:13, 116:4, 116:12, 117:20, 149:17, 150:5, 194:1, 194:14, 195:1, 205:5, 256:2, 256:11, 291:3, 310:11, 329:3, 329:12, 350:11, 398:6
**represent**
7:17, 8:20, 196:14, 206:8, 334:20, 339:1, 370:14
**representation**
333:20
**representations**
21:1, 42:14
**represented**
78:4, 275:6, 289:9
**representing**
7:21, 122:13, 377:19
**requested**
57:1, 58:10, 59:4, 59:16, 285:3
**reserve**
416:24
**respect**
246:18, 335:1

**responded**
201:23, 357:22, 358:2
**responding**
373:19
**response**
198:11
**responsible**
21:13, 92:3, 114:14, 116:11, 178:19, 179:3, 182:1, 223:4, 238:23, 334:5, 340:9, 341:9, 343:10, 344:23, 346:9, 354:10, 354:19, 355:19, 358:23, 411:21, 412:8
**rest**
113:7
**result**
17:6, 30:16, 34:6, 231:16, 247:15, 390:16, 397:19, 415:3, 415:5, 415:23
**resulted**
343:17, 344:17, 400:19
**retaliating**
408:7
**retaliation**
408:13
**retire**
9:11, 9:18
**retrieved**
396:2
**retroactively**
301:20
**return**
145:5
**returned**
49:8, 237:12
**revealed**
50:3, 166:4
**revealing**
192:6
**review**
113:3, 185:14
**reyna**
361:6, 361:14, 361:20, 361:24, 362:2
**reynaldo**
1:7, 1:13, 3:17, 18:3, 57:1, 58:10, 69:8, 165:8, 184:14, 247:17, 248:2, 292:6, 294:13, 322:5, 326:15, 337:21, 339:18, 340:21, 342:18, 343:15, 345:24, 347:17, 348:14, 348:20, 351:23, 355:7, 356:7
**rfc-serrano**
56:19, 58:3, 112:5, 112:14
**richard**
4:22, 289:10, 331:2, 331:11, 333:20
**richmond**
33:5, 325:13, 326:2, 326:4, 326:9, 326:16, 328:11, 328:16, 328:18, 328:22
**rick**
5:10, 7:11, 360:9, 361:24, 362:11
**rico**
154:7, 154:12, 266:9
**ridiculous**
235:22
**riding**
123:3
**right-hand**
59:6, 197:15
**righted**
35:3
**rip**
350:12
**rivera**
311:6, 311:12, 311:23, 313:15, 313:22, 314:3, 314:8, 314:16, 314:23, 315:4, 315:5, 315:11, 316:1, 316:7, 316:17, 363:5, 363:16, 364:19, 367:1, 377:1, 379:10, 379:21, 380:4
**rivera's**
313:8, 377:18
**road**
195:13
**rob**
84:14, 86:4, 86:24, 88:16, 249:5
**robberies**
36:17, 36:23, 48:3, 249:6
**robbery**
36:16, 41:9, 41:16, 62:20, 63:1, 72:5, 124:7, 124:24, 154:22, 157:21, 247:20, 248:16, 249:7, 250:8, 254:11
**robert**
32:24, 35:10, 39:11, 41:2, 41:17, 42:16, 47:19, 48:5, 50:12, 50:20, 93:13, 99:22, 120:3, 210:11, 324:2, 324:20, 325:2, 325:7, 325:14, 409:7, 411:1, 411:20
**roberto**
404:12
**rock**
5:5, 273:18, 273:22
**rodrigo**
10:1, 10:24, 12:5, 14:3, 14:20, 16:6, 16:12, 16:17, 16:23, 17:9, 17:21, 18:1, 18:23, 19:19, 20:1, 20:9, 20:21, 24:2, 26:19, 27:5, 28:6, 29:13, 30:17, 30:20, 31:16, 52:1, 52:11, 57:14, 60:5, 60:24, 61:9, 62:13, 62:19, 63:20, 69:6, 74:22, 77:18, 85:10, 91:17, 91:23, 92:9, 92:18, 93:5, 105:14, 111:7, 111:15, 112:12, 127:14, 129:13, 137:21, 138:18, 139:22, 140:17, 143:4, 146:4, 147:15, 148:13, 150:1, 150:7, 150:23, 153:6, 154:21, 155:4, 155:10, 162:16, 162:18, 163:20, 167:10, 168:3, 168:11, 168:19, 172:10, 173:14, 186:12, 187:5, 187:17, 188:2, 188:10, 198:4, 200:5, 201:23, 202:9, 202:10, 204:12, 211:22, 215:21, 217:2, 218:2,

218:4, 231:20, 237:11, 238:11, 238:15, 238:23, 239:18, 245:5, 247:1, 281:14, 296:1, 320:21
**rodriguez**
284:5, 284:10, 284:15, 285:6, 285:10, 285:15, 285:20, 286:2, 294:14, 294:20, 295:2, 295:8, 295:13, 295:19, 356:8, 356:14, 356:18, 356:21, 357:4, 357:9, 357:17, 357:22, 358:2, 358:23, 359:5, 362:9, 362:18, 364:18, 365:2, 365:8, 365:17, 366:2, 366:18, 367:15, 367:22, 368:15, 368:20, 369:17, 369:21, 370:3, 371:7, 371:15, 373:5, 373:12, 374:9, 374:19, 375:10, 375:17, 377:21, 404:15, 405:5, 405:11, 408:3, 411:3, 415:20, 416:5
**rodriguez's**
288:24, 296:7, 377:16, 378:7
**roland**
383:20
**role**
38:15, 38:17, 151:22
**rolled**
43:18, 43:24
**roman**
165:24, 290:6, 290:17, 290:21, 290:22, 291:3, 291:7, 291:13, 292:2, 296:17, 297:5
**romantic**
26:11
**rook**
312:11, 312:21
**room**
46:11, 46:17, 95:8, 95:10, 142:18, 143:19, 145:6, 155:15, 387:21, 389:7
**roosevelt**
40:15
**rosa**
395:23, 401:1
**rosen**
273:21
**rosendo**
292:16, 292:22, 293:5, 293:10, 293:15, 293:21, 294:4, 316:22, 317:12, 317:20, 318:2
**roughly**
396:3
**routine**
25:8, 142:9
**routinely**
292:6, 331:24, 358:7
**rubber**
195:13
**rue**
177:13
**rule**
212:15, 419:24
**rules**
234:14, 403:21, 419:24
**rumors**
211:20, 212:23, 213:11, 214:24
**run**
202:5, 320:8
**runner**
159:5
**russell**
299:16
**russell's**
320:7
**ruvalcaba**
32:6, 32:19, 32:22, 33:7, 33:10, 34:8, 35:17, 39:12, 39:23, 41:3, 41:10, 41:18, 50:12, 210:12, 324:12, 324:15, 325:3, 325:7, 328:5, 329:4, 329:12, 329:15, 329:20
**ruvalcaba's**
41:3

S

**s**
331:5, 331:13
**s-a-l**
312:20
**s-a-l-v-a-d-o-r**
324:12
**s-a-n-t-i-a-g-o**
321:22
**s-a-n-t-o-s**
321:4
**safety**
119:16
**said**
25:10, 42:2, 95:11, 96:19, 114:22, 131:7, 158:23, 159:11, 159:24, 160:1, 165:2, 184:2, 204:22, 283:18, 301:21, 302:2, 302:7, 302:14, 306:11, 316:10, 357:17, 369:17, 369:18, 369:24, 372:11, 379:2, 419:13, 419:20
**sal**
312:19, 313:1, 313:9
**sally**
33:16
**salvador**
32:5, 32:19, 324:12, 324:15
**same**
30:10, 45:15, 47:10, 59:19, 102:5, 107:22, 109:19, 160:11, 193:18, 195:7, 223:22, 249:8, 249:18, 250:11, 253:10, 253:17, 253:20, 264:24, 265:7, 265:15, 265:21, 266:4, 266:10, 266:16, 266:22, 267:3, 267:9, 267:15, 267:22, 268:5, 268:12, 269:5, 269:12, 269:20, 270:7, 270:18, 270:21, 271:12, 271:20, 272:8, 275:15, 276:9, 276:18, 277:2, 277:9, 277:17, 278:1, 283:9, 290:10, 299:3, 305:23, 309:19, 318:16, 320:15, 320:22, 321:6, 321:16, 321:24, 322:7, 322:15, 322:23, 323:7, 323:15, 330:3, 333:5, 338:1, 351:7, 361:15, 372:4, 373:2, 381:5, 382:1, 402:11, 404:18

**sanchez**
307:5, 307:11, 307:24, 308:5, 308:10, 308:15, 308:21, 309:1, 309:7, 309:12, 309:19, 309:24, 387:8
**santiago**
321:22, 387:8
**santos**
321:3
**sat**
36:5, 123:7, 206:16
**satisfy**
104:15
**saw**
11:17, 43:11, 43:16, 88:10, 106:6, 106:17, 107:9, 133:9, 134:18, 137:4, 155:3, 177:22, 178:10, 180:8, 181:5, 217:5, 226:22, 227:9, 228:4, 229:16, 230:6, 368:22, 394:14
**say**
40:13, 76:12, 87:11, 87:16, 89:7, 96:4, 96:12, 96:18, 97:3, 97:11, 107:22, 117:1, 130:2, 159:4, 159:9, 159:16, 159:22, 160:9, 162:24, 183:24, 194:7, 209:7, 212:22, 216:17, 247:14, 305:18, 306:5, 330:1, 330:2, 330:23, 372:1, 379:17, 402:1, 418:4
**sayez**
404:16, 405:13, 407:5, 408:4, 413:6, 413:16, 413:24, 414:11, 414:19, 415:8, 416:2, 416:14
**saying**
79:4, 97:10, 357:22, 358:2
**says**
113:21, 213:19, 372:21
**scams**
140:8
**scene**
68:18, 69:16, 70:3, 71:20, 87:19, 89:17, 108:5, 108:21, 109:4, 109:13, 137:15, 171:23, 199:7, 199:20, 203:22, 229:9
**scheme**
98:19, 99:3, 99:21
**school**
40:15
**scooby**
340:23, 347:16, 351:22, 352:5
**script**
131:14
**seasoned**
212:13
**seat**
394:2, 406:17
**seated**
155:16
**second**
10:6, 53:22, 102:3, 105:7, 120:23, 173:21, 215:17, 275:8, 281:17, 297:17, 297:18, 298:20, 371:5
**seconds**
10:10
**section**
323:19
**secure**
173:7, 200:3, 239:8, 244:19, 377:11, 382:24, 383:3, 389:17, 389:19, 416:14
**secured**
186:18, 188:6, 188:15, 334:3, 335:3, 349:9, 390:20, 416:2
**securing**
173:18, 174:6, 204:5, 204:9
**see**
58:9, 109:19, 110:8, 113:14, 114:1, 114:5, 121:12, 131:15, 135:4, 161:18, 164:23, 171:11, 185:9, 197:15, 197:21, 236:9, 246:20, 247:2, 247:20, 298:16, 300:21, 307:6, 315:20, 325:14, 325:20, 326:2, 327:9, 350:18, 367:16, 367:24, 384:9
**seeing**
84:12
**seek**
271:4
**seen**
15:16, 72:20, 84:5, 107:17, 109:5, 109:19, 110:2, 110:10, 111:22, 152:1, 168:20, 175:12, 175:24, 176:10, 176:20, 223:15, 231:19, 246:11, 283:14, 344:6, 349:19, 351:15, 374:12, 379:20
**select**
177:15, 178:6, 178:8, 179:14, 293:5, 293:10, 295:8, 295:13, 304:6
**selected**
309:19
**sell**
88:13
**selling**
154:1, 332:13
**semi-automatic**
200:17
**sense**
195:19, 408:4
**sentence**
36:21, 48:2, 249:4, 249:14, 249:15, 249:17, 249:24, 250:7, 253:6, 253:8, 253:16, 400:20
**sentencing**
248:16, 251:3, 251:6, 251:7, 251:11, 251:22, 252:10
**separate**
36:16, 140:6, 154:7
**separately**
157:21
**september**
251:4, 251:22, 254:6, 307:13, 308:11, 308:16, 309:2, 309:21, 312:5, 312:10, 312:12, 339:21, 340:2, 340:23, 341:13, 341:22, 342:9, 343:2, 343:17, 344:16,

351:15, 355:1, 405:7, 405:14, 407:1, 412:22, 413:10, 414:23
**sergeant**
12:21, 13:24, 14:10, 14:15, 15:4, 18:7, 18:18, 22:2, 22:12, 51:13, 60:9, 60:20, 62:24, 66:24, 94:23, 106:13, 150:21, 151:12, 152:15, 153:11, 155:21, 160:21, 162:8, 164:1, 165:20, 166:5, 166:11, 166:15, 170:3, 170:13, 173:12, 175:8, 175:20, 176:7, 177:7, 180:13, 180:19, 230:2, 230:16, 339:14, 340:14, 341:6, 384:5, 384:16, 384:17, 397:14, 398:3, 416:2
**sergeants**
382:15
**serious**
409:12
**serrano's**
150:6, 174:1
**serve**
250:8
**served**
120:12, 253:14, 398:8
**set**
403:15
**sets**
114:24
**seven**
408:15
**seventh**
336:8
**several**
340:17
**shaky**
176:11, 240:6
**shape**
79:12, 277:14
**shared**
18:11, 256:21, 396:2
**she**
26:19, 27:4, 27:20, 28:6, 28:20, 50:19, 106:4, 106:6, 106:17, 107:9, 107:17, 107:21, 109:5, 109:19, 109:24, 110:2, 110:9, 110:10, 111:22, 130:5, 133:7, 133:9, 134:18, 135:4, 135:11, 137:3, 175:12, 175:24, 176:10, 176:20, 176:24, 177:1, 177:2, 177:3, 177:15, 177:22, 178:6, 178:7, 178:10, 179:14, 180:6, 180:7, 180:8, 181:4, 181:5, 181:10, 213:18, 223:15, 226:9, 227:8, 227:9, 227:11, 227:17, 228:6, 229:16, 242:8, 242:10, 242:15, 243:13, 243:15, 243:20, 244:2, 324:4, 355:6, 355:12, 365:8, 365:9, 367:15, 367:24, 368:6, 368:8, 368:16, 368:22, 369:2, 369:10, 370:5, 373:18, 374:11, 374:24, 375:2, 377:22, 378:8, 395:24, 396:1, 396:9, 397:2, 412:8, 412:10
**shift**
388:3
**shirt**
326:24, 327:2, 327:8
**shoot**
290:21
**shooter**
285:11, 285:17, 285:22, 287:14, 287:19, 288:4, 288:9, 292:18, 292:24, 294:22, 295:4, 300:12, 301:3, 303:3, 303:8, 307:7, 310:1, 315:18, 315:20, 342:15, 342:19, 348:14, 349:4, 355:23, 365:10, 367:16, 369:18, 375:24, 376:19, 379:19, 391:14
**shooter's**
288:15, 307:6, 327:10
**shooting**
19:1, 40:14, 165:22, 192:18, 193:12, 193:17, 286:4, 290:5, 290:16, 290:22, 292:2, 296:17, 341:10, 343:10, 343:16, 344:16, 349:19, 351:15, 352:4, 352:18, 354:20, 355:1, 355:8, 365:3, 365:4, 365:7, 365:9, 368:22, 371:14, 378:23, 379:4, 383:17, 383:22, 405:15, 407:6, 408:12, 411:22, 414:23
**shop**
88:13, 89:9
**short**
174:22
**shorthand**
2:12, 419:5, 420:14, 420:22
**shortly**
24:19, 131:1, 365:3, 386:12
**shorty**
351:20, 352:3, 352:17, 352:22
**shot**
72:4, 202:9, 298:16, 324:14, 341:18, 341:24, 342:8, 345:13, 346:5, 347:1, 347:9, 369:22, 376:24, 379:20, 412:21, 413:8
**shots**
315:19, 394:14
**should**
50:10, 55:7, 113:2, 177:15, 178:6, 178:8, 179:14, 181:4, 268:10, 277:15, 284:10, 286:14, 305:18, 378:15, 379:11, 408:22, 412:8
**show**
68:24, 133:23, 197:18, 198:4, 198:12, 198:23, 200:10, 200:14, 201:3, 201:21, 219:15, 222:7, 237:3, 350:15, 376:16, 410:1

**showed**
68:18, 69:5, 101:23, 102:14, 133:5, 134:12, 169:16, 199:6, 220:9, 284:4, 284:9, 284:14, 286:8, 286:13, 286:18, 287:22, 293:17, 293:23, 295:21, 296:2, 301:11, 303:12, 304:7, 309:6, 309:11, 315:3, 371:15, 375:24, 377:21, 414:3
**showing**
69:16, 71:19, 72:19, 181:23, 301:23
**shown**
169:1, 414:12
**sic**
74:1
**side**
108:12, 159:23, 359:24
**sidley**
279:11, 279:18, 281:4, 281:9
**sierra**
282:9, 283:7, 283:14, 283:16, 284:5, 285:10, 286:9, 287:3, 288:20, 289:1
**sierra's**
284:16, 285:6, 286:20, 286:24, 289:5, 289:8, 289:18, 290:1
**sign**
165:14, 189:17, 396:17, 420:2, 420:8
**signature**
11:21, 113:13, 113:20, 114:4, 165:3, 165:8, 184:12, 184:22, 184:23, 185:1, 339:3, 350:17, 370:20, 416:24, 419:22, 420:9, 420:13
**signature-emhzk**
420:18
**signed**
117:15, 117:19, 163:10, 165:15, 192:7, 251:13, 350:21, 397:1, 397:2, 420:6
**signing**
185:16, 420:4
**silence**
258:21
**silent**
11:4
**similar**
107:23, 192:17
**similarities**
193:16
**simple**
36:16
**simply**
277:6
**simpson**
357:9, 357:18
**since**
119:17, 166:16, 338:10, 341:8, 372:11, 404:2
**single**
306:6, 309:7, 309:12
**sit**
263:11
**situations**
299:14
**six**
249:4, 250:9, 394:14
**six-year**
248:18, 249:4, 249:14, 253:6
**skill**
114:23
**skills**
115:13, 398:5
**skinny**
44:14, 406:18
**slapped**
143:3
**slapping**
143:10, 143:12, 143:18
**sloppy**
53:8
**slowly**
237:7
**small**
27:13, 43:18, 43:23
**smart**
359:23
**snake**
102:1
**snitch**
50:1, 93:12, 93:19, 100:7, 140:5
**so-called**
340:22, 376:5
**sole**
409:24
**solely**
139:14
**solita**
190:2, 190:21, 191:3
**solve**
354:1, 354:3
**some**
9:24, 10:22, 24:6, 28:7, 37:14, 38:8, 51:2, 63:13, 85:9, 88:13, 89:22, 111:19, 148:17, 198:1, 226:13, 227:8, 236:19, 248:15, 249:2, 270:12, 282:5, 299:12, 324:2, 352:23, 393:14, 400:6, 408:2
**somehow**
137:13
**someone**
40:14, 54:22, 66:22, 115:6, 115:12, 181:9, 212:23, 225:19, 235:8, 293:6, 293:11, 295:9, 295:14, 340:21, 369:2, 370:4
**something**
29:5, 209:12, 212:14
**sometime**
123:21, 333:4
**sometimes**
35:2, 143:18
**somewhat**
26:3
**somewhere**
368:17
**son**
44:9
**sonia**
354:24, 355:5, 355:22
**sorry**
42:10, 54:14, 115:16, 136:20, 152:19, 177:10, 192:21, 196:2, 268:20, 283:17, 284:21, 285:2, 292:15, 302:13, 305:23, 306:12, 350:2, 350:4, 350:5, 363:21, 364:8, 379:22, 384:10, 385:14
**sort**
30:10, 54:15, 103:19, 115:14, 231:9, 359:16

**soto**
272:19
**sotos**
3:19, 273:4, 273:5, 273:13
**sought**
279:12
**sound**
236:6
**south**
4:6
**spanish**
25:11, 224:1, 227:7, 312:4, 312:9, 316:11, 366:11, 366:20, 366:24, 367:4, 367:7, 367:23, 368:7, 370:4, 371:16, 374:2, 377:21, 380:10
**spanish-speaking**
25:3, 25:5, 366:3
**speak**
42:1, 246:23, 272:12, 272:19, 273:12, 273:17, 273:21, 274:8, 274:11, 274:15, 275:1, 365:17
**speakers**
366:11
**speaking**
25:11, 30:17, 116:24, 212:20, 235:12, 273:3
**special**
354:8
**specific**
283:22, 324:4
**specifically**
15:3, 19:17, 22:16, 23:24, 27:4, 41:13, 44:19, 56:22, 65:8, 115:8, 178:23, 181:14, 201:5, 279:18, 317:7, 348:12, 349:1, 392:11, 398:14, 401:19
**speculation**
17:12, 21:15, 43:6, 140:10, 146:24, 157:3, 170:6, 190:16, 193:8, 194:20, 209:2, 212:7, 213:2, 232:20, 234:9, 239:22, 244:22, 248:22, 252:2, 252:21, 253:22, 270:19, 312:14, 319:15
**speeches**
235:11
**spell**
298:1, 298:13, 324:11, 337:8
**spend**
403:8
**spent**
252:10, 396:15
**spitzer**
182:6, 182:13, 182:18, 183:2, 183:5
**spoke**
24:17, 65:8, 94:23, 151:11, 302:7, 302:14
**spontaneously**
227:17
**spot**
121:5, 121:19, 309:3
**springfield**
159:12, 198:5, 199:1, 199:8, 201:7, 201:22, 203:8, 203:14, 203:23, 233:12, 236:21, 237:2, 237:7, 237:8
**square**
282:11
**ss**
419:2
**st**
291:23
**stamp**
56:12, 56:18, 58:3, 112:16, 113:11, 117:8, 172:16, 184:7, 196:7, 338:4, 338:6
**stamped**
112:13, 370:13
**stamps**
206:8, 338:16, 338:20
**stand**
216:7, 217:18, 221:8, 222:16, 224:11, 228:18, 230:22, 232:12, 238:3, 244:9
**standing**
97:12, 102:4, 282:22, 283:19, 283:24, 290:10, 299:5, 301:19, 302:3, 305:24, 306:4, 306:7, 306:9, 306:10, 306:15, 311:11, 317:2, 318:16, 320:15, 320:22, 321:6, 330:3, 333:5, 337:20, 338:1, 356:20, 363:8, 381:5, 382:1, 404:18, 405:16
**star**
113:22, 114:3, 339:4, 339:10
**start**
126:1, 131:8, 146:10, 167:17, 194:10, 207:11, 220:11, 363:23, 408:8
**started**
18:22, 237:6, 368:7, 405:15
**starting**
350:7, 388:3
**state**
2:13, 9:2, 37:17, 79:18, 87:5, 112:18, 112:22, 138:3, 194:3, 194:17, 206:6, 239:19, 256:22, 257:21, 257:23, 264:22, 277:1, 377:15, 377:17, 378:4, 378:13, 396:9, 396:10, 402:8, 416:10, 419:1, 419:6
**stated**
124:8, 125:2, 209:16, 210:5, 311:17, 346:24, 347:9, 363:10, 381:6, 392:22, 393:15, 395:24, 404:21
**statement**
50:11, 50:17, 50:19, 70:6, 83:9, 90:11, 95:22, 97:7, 104:14, 104:24, 109:10, 110:18, 121:12, 123:10, 123:20, 124:4, 124:15, 125:22, 126:3, 128:22, 129:17, 129:21, 130:14, 133:16, 139:2, 145:8, 158:6, 158:14, 161:16, 161:18, 161:23, 162:5, 162:6, 162:15, 162:23, 163:3, 163:10, 166:23,

173:19, 174:6, 185:14, 185:15, 186:3, 186:20, 187:9, 188:17, 188:20, 189:16, 189:24, 190:9, 190:11, 190:22, 191:8, 191:20, 192:6, 192:11, 217:1, 218:2, 218:3, 218:15, 221:1, 226:14, 232:14, 235:23, 238:20, 247:6, 247:8, 248:9, 347:5, 347:8, 347:21, 347:22, 348:3, 352:9, 353:5, 369:16, 371:7, 373:24, 374:18, 378:7, 388:22, 389:17, 390:19, 394:22, 395:14, 395:23, 396:17, 397:1, 397:3, 398:15, 400:4, 400:10, 400:13, 400:24, 403:11

**statements**
70:12, 88:1, 88:2, 88:24, 89:1, 96:12, 96:18, 97:3, 97:5, 97:11, 101:3, 105:21, 122:7, 122:11, 122:14, 124:22, 127:24, 128:5, 128:7, 128:14, 136:6, 136:9, 138:4, 139:15, 146:20, 148:4, 148:17, 149:24, 162:14, 163:19, 167:6, 167:15, 167:18, 167:20, 168:5, 168:12, 172:17, 172:24, 173:8, 186:9, 187:22, 187:23, 204:22, 205:11, 207:1, 234:16, 272:5, 279:24, 280:19, 281:11, 366:9, 375:10, 375:11, 383:1, 397:20, 397:21, 398:7, 398:17, 399:4, 399:11, 400:16

**states**
1:1

**stating**
288:14

**station**
28:16, 28:21, 29:5, 63:19, 84:5, 84:13, 84:19, 85:1, 85:10, 106:6, 106:17, 107:9, 107:17, 109:6, 109:20, 110:2, 110:10, 111:14, 111:23, 129:23, 130:2, 130:3, 130:6, 130:16, 132:4, 133:9, 134:6, 134:18, 134:19, 135:5, 135:14, 135:20, 137:4, 147:13, 175:12, 176:1, 176:10, 176:20, 177:22, 178:10, 180:7, 181:5, 223:6, 223:16, 223:23, 224:3, 224:23, 226:4, 226:10, 227:9, 229:2, 229:16, 230:6, 242:12, 242:18, 243:14, 243:23, 325:14, 325:21, 396:16, 407:6

**stay**
94:5, 125:23, 323:21

**stayed**
159:18

**stenographically**
419:10

**step**
27:13

**steps**
12:2, 31:14, 204:10

**steve**
313:14, 316:6

**steven**
314:14, 314:21

**stewart**
279:19, 280:1, 280:13

**still**
42:15, 77:16

**stolen**
88:15

**stomach**
155:22

**stood**
124:12, 251:5, 376:6

**stoolie**
50:1

**stoop**
405:17

**stop**
15:7, 45:20, 46:1, 74:9, 74:17, 97:9, 97:19, 125:15, 157:15, 232:2, 389:15

**stopped**
28:15, 202:2, 387:5

**stopping**
28:15, 174:19

**store**
349:17

**stories**
80:12, 81:13, 199:17, 205:13

**story**
66:7, 72:11, 81:16, 83:3, 85:19, 85:20, 92:24, 94:13, 95:6, 105:21, 122:15, 127:15, 132:22, 151:6, 157:23, 169:18, 171:2, 171:10, 172:1, 173:13, 189:14, 191:18, 283:13, 296:15, 390:8, 391:4

**straight**
389:6

**street**
2:5, 3:6, 3:13, 3:20, 4:6, 5:6, 7:7, 72:21, 73:5, 107:8, 109:18, 121:1, 202:7, 211:20, 212:23, 213:12, 214:24, 219:12, 340:22, 352:4, 368:17, 405:12, 412:12

**streets**
34:24, 50:3, 115:7, 227:8, 227:15, 228:3, 254:4, 332:17, 343:15, 344:2, 348:21

**strike**
14:13, 20:15, 40:10, 43:11, 43:17, 45:1, 55:8, 59:14, 67:16, 90:21, 101:4, 104:22, 105:8, 114:12, 120:13, 125:23, 141:19, 146:11, 152:19, 156:5, 167:17, 170:23,

173:4, 187:22, 190:23, 192:3, 193:23, 194:10, 199:13, 218:23, 225:11, 234:20, 243:1, 333:13, 345:7, 355:15, 360:17, 363:14, 363:21, 371:9, 377:16, 381:19, 383:12, 384:15, 388:19, 395:8, 395:9, 408:8, 415:4
**striking**
46:16
**string**
48:3
**stripes**
158:22, 159:10, 159:17, 159:23, 159:24, 160:9, 169:10
**stupid**
44:9
**subject**
54:1
**subjects**
263:10, 316:21
**submitted**
118:3, 118:8, 418:11, 418:12
**subpoenaed**
194:3, 194:17, 195:5
**subscribed**
418:19
**substance**
71:21, 174:12
**successful**
158:5, 366:8
**successfully**
148:11, 163:8
**such**
292:9, 310:18, 332:12, 362:1, 420:7
**suffered**
37:15, 248:1
**sufficiently**
196:22
**suggest**
20:7, 21:11, 52:15, 179:13, 283:6, 301:9
**suggested**
177:14, 178:6, 181:3, 199:18, 230:4, 378:15
**suggesting**
257:9, 399:13
**suggestion**
60:3
**suggestive**
177:8, 179:8, 317:21, 318:3, 327:16, 376:17
**suite**
3:6, 3:20, 4:7, 5:6
**sum**
71:21, 174:11
**summarized**
166:23
**summary**
371:7
**summer**
296:24
**supervising**
397:13, 416:1
**supervisor**
12:21, 18:6, 18:18, 33:15, 33:23, 51:12, 150:20, 151:11, 230:2, 339:13
**supplemental**
6:14, 6:24, 113:10, 116:20, 117:7, 117:9, 118:13, 119:9, 122:23, 124:16, 126:23, 127:3, 127:12, 128:24, 133:4, 133:17, 135:1, 136:7, 136:16, 136:24, 164:11, 164:21, 165:15, 167:7, 167:16, 170:12, 172:13, 184:8, 184:17, 185:4, 192:2, 192:4, 339:2, 347:7, 350:16, 350:19, 370:20, 370:22, 375:12, 398:6, 399:15, 400:12
**supplementary**
6:22, 170:11, 170:17
**supplied**
217:2
**supposedly**
75:15, 88:14, 160:2
**supreme**
420:1
**sure**
10:7, 10:20, 48:1, 53:1, 55:12, 56:14, 77:8, 82:10, 117:2, 117:3, 144:21, 174:24, 282:24, 283:21, 284:21, 297:24, 299:4, 338:18, 364:10, 367:7, 370:15
**surrea**
251:5, 251:12
**susceptible**
319:12
**suspect**
156:22, 262:20, 292:8, 298:21, 299:20, 302:20, 305:16, 306:24, 311:5, 314:2, 318:9, 320:5, 325:20, 326:23, 327:11, 337:22
**suspects**
34:20, 39:1, 45:11, 156:13, 257:9, 257:20
**suspicious**
103:7, 140:5
**sworn**
8:12, 8:15, 418:4, 418:19, 419:14
**symptoms**
37:15, 38:5, 38:10

**T**

**t-r-a-n**
315:16
**t-shirt**
357:10, 365:11, 367:17, 374:10, 374:20, 375:4
**tactic**
34:17, 38:23
**tactics**
47:17, 48:11, 259:15
**tag**
142:3
**take**
10:6, 10:9, 50:11, 50:19, 61:20, 82:5, 82:9, 125:10, 174:22, 190:22, 202:4, 248:6, 248:8, 253:7, 281:21, 320:8, 351:8, 352:21, 380:16, 390:19, 413:17
**taken**
7:2, 63:3, 82:17, 108:18, 109:2, 161:16, 175:3, 224:2, 230:3, 281:24, 297:20, 380:20, 396:11, 408:14, 418:6, 418:8, 419:9

**taking**
7:17, 82:12, 190:8, 216:7, 221:8, 222:16, 224:11, 228:17, 228:18, 230:22, 232:11, 238:3, 244:9, 252:16, 409:24
**talk**
49:15, 99:19, 210:1, 323:24
**talked**
151:19, 160:10, 195:13
**talking**
35:10, 124:6, 124:24, 130:3, 131:17, 284:23, 394:7
**tall**
406:13
**tammy**
4:4, 8:9
**tan**
28:22, 85:12, 130:10, 134:21, 137:3
**tan-colored**
123:3
**target**
32:23, 84:14
**tattoo**
304:16, 304:21
**team**
142:3
**teenage**
364:18
**teens**
406:19
**telephone**
43:19, 43:24, 221:23, 222:1, 389:9
**tell**
11:5, 11:10, 12:2, 27:4, 47:16, 48:21, 49:5, 50:10, 66:22, 80:12, 89:13, 112:23, 151:5, 157:14, 158:21, 163:17, 163:24, 172:1, 179:19, 181:8, 191:14, 196:6, 265:13, 274:4, 281:3, 281:8, 300:12, 301:3, 328:4, 348:12, 372:16, 378:4, 419:14
**telling**
72:20, 73:4, 80:14, 171:10, 233:19, 308:16, 309:2, 396:8
**tendered**
150:5
**territory**
385:1
**testified**
8:15, 152:22, 153:3, 154:13, 198:11, 204:20, 205:4, 205:9, 209:23, 210:19, 211:18, 211:19, 215:15, 216:23, 217:19, 218:22, 218:24, 219:11, 220:16, 220:22, 221:22, 223:22, 226:19, 227:4, 227:14, 228:2, 230:14, 232:24, 233:9, 237:12, 241:4, 241:12, 242:15, 243:3, 244:2, 245:2, 278:10
**testify**
66:9, 68:2, 155:2, 185:7, 186:2, 206:23, 212:2, 224:21, 231:19, 232:14, 234:16, 269:19, 278:12, 278:18, 401:2
**testifying**
22:24, 186:20, 221:9, 224:5, 245:22, 290:1, 294:6, 296:9, 296:23
**testimony**
23:9, 23:11, 67:19, 151:15, 185:21, 187:10, 187:23, 188:7, 188:16, 196:15, 197:3, 197:10, 198:19, 200:3, 200:22, 200:24, 202:12, 202:16, 202:17, 202:20, 204:3, 205:18, 205:19, 206:11, 206:16, 206:18, 208:3, 208:4, 211:4, 214:23, 215:24, 216:1, 216:5, 217:12, 217:13, 217:16, 219:22, 221:5, 221:6, 222:12, 224:8, 224:9, 228:8, 228:11, 228:15, 229:14, 230:23, 233:23, 237:17, 237:20, 237:24, 238:1, 239:5, 240:13, 241:5, 242:21, 244:4, 244:7, 244:16, 245:12, 245:17, 246:18, 247:7, 247:15, 255:17, 263:12, 264:4, 264:14, 270:12, 270:15, 271:4, 271:8, 271:9, 289:4, 289:18, 297:5, 377:10, 418:10
**th**
7:8, 32:18, 33:13, 35:10, 36:1, 37:8, 39:10, 56:24, 58:9, 59:3, 150:14, 152:9, 161:17, 164:22, 170:4, 172:15, 174:5, 176:21, 177:10, 177:16, 177:22, 178:20, 179:4, 180:21, 180:22, 188:23, 189:12, 189:24, 190:23, 191:20, 192:7, 207:16, 219:12, 230:15, 233:6, 241:14, 246:10, 247:6, 251:20, 280:14, 284:6, 286:9, 287:24, 294:16, 294:23, 295:5, 295:10, 295:15, 295:21, 296:3, 296:13, 303:24, 318:18, 318:23, 324:15, 324:21, 325:11, 326:1, 326:11, 326:17, 340:23, 341:13, 341:22, 343:2, 350:17, 356:10, 357:2, 364:7, 370:6, 371:9, 375:13, 381:3, 381:14, 381:22, 382:19, 384:9, 384:10, 386:6, 386:21, 387:20, 391:23, 392:24, 393:5, 396:4, 398:18, 399:5, 399:16, 400:11, 419:7

**than**
9:17, 30:20, 45:24, 120:5, 134:16, 234:15, 259:19, 293:6, 295:9, 302:1, 323:22, 354:1, 372:14
**thank**
131:22, 214:4, 317:1, 318:15, 337:12
**thanks**
82:7, 299:23
**that's**
7:16, 10:17, 32:9, 40:4, 42:11, 54:2, 56:2, 82:14, 102:7, 113:16, 117:7, 131:21, 156:24, 185:8, 198:7, 198:14, 200:12, 234:21, 235:7, 235:18, 282:16, 299:11, 299:17, 323:23, 329:24, 339:2, 358:6, 372:1, 372:20, 372:22, 383:13, 402:6
**their**
15:17, 23:11, 39:3, 52:16, 89:9, 99:18, 126:6, 129:12, 182:22, 188:3, 193:6, 206:16, 245:18, 245:24, 257:21, 258:20, 268:19, 269:4, 280:21, 291:10, 318:5, 331:4, 332:1, 332:18, 336:23, 383:3, 413:9
**them**
15:21, 22:18, 35:2, 53:19, 61:22, 73:8, 87:6, 88:1, 124:6, 124:23, 153:24, 158:24, 176:12, 177:3, 180:8, 182:20, 183:5, 183:15, 205:14, 219:6, 219:14, 219:15, 220:3, 240:14, 243:16, 246:20, 304:7, 318:3, 327:24, 350:9, 350:12, 383:3, 385:21, 394:7, 394:16, 411:11, 412:11, 413:17, 414:12, 414:13
**themselves**
7:13, 95:9, 190:10
**then**
39:1, 43:2, 56:12, 64:6, 70:5, 73:15, 83:3, 90:10, 96:17, 108:3, 122:11, 126:22, 145:2, 156:14, 159:10, 159:11, 167:19, 190:11, 219:14, 220:23, 221:23, 222:4, 233:15, 235:17, 237:6, 238:21, 246:21, 302:3, 306:12, 315:12, 323:19, 340:15, 350:21, 375:16, 394:14, 402:5, 419:16, 420:7
**theorized**
408:9
**theory**
101:14, 408:6
**there**
15:20, 19:6, 21:11, 52:15, 60:2, 63:2, 80:20, 85:9, 109:11, 117:15, 125:10, 125:15, 125:21, 130:9, 131:15, 140:14, 165:16, 168:8, 182:21, 183:24, 193:12, 209:7, 214:13, 214:15, 226:13, 226:24, 239:15, 239:16, 263:10, 278:11, 298:2, 318:8, 332:8, 364:17, 371:6, 397:14, 402:15, 409:13, 411:7
**there's**
324:6, 403:19
**thereafter**
246:22, 419:10
**therefore**
57:13, 408:12, 409:14
**thereof**
420:4
**these**
58:18, 77:24, 81:12, 121:10, 122:6, 122:11, 122:13, 124:22, 128:14, 137:18, 138:3, 139:12, 154:11, 172:23, 173:7, 219:1, 220:2, 222:5, 274:2, 283:20, 301:22, 324:4, 325:15, 326:10, 403:18, 413:5
**they**
25:11, 27:14, 28:15, 30:10, 37:15, 53:1, 53:20, 55:12, 77:8, 78:19, 84:5, 84:13, 86:4, 86:11, 86:23, 87:1, 87:6, 88:12, 88:15, 89:9, 95:10, 121:10, 124:7, 124:24, 130:6, 130:7, 145:16, 153:24, 154:13, 158:23, 159:11, 160:10, 160:17, 190:9, 202:4, 208:21, 223:5, 246:24, 253:5, 254:20, 258:9, 259:18, 260:10, 276:22, 277:6, 324:3, 328:23, 332:19, 334:14, 340:9, 353:13, 360:1, 386:4, 393:3, 393:13, 394:3, 414:21
**they're**
372:4
**thin**
373:8, 406:13, 406:15
**thing**
143:20, 160:11
**things**
56:4, 96:19, 324:4, 332:12
**think**
56:11, 82:12, 131:19, 131:22, 175:14, 195:18, 196:21, 214:6, 272:22, 282:15, 298:3, 299:21, 301:24, 311:5
**third**
81:16, 100:6, 146:3
**thomas**
282:9
**those**
14:12, 36:23,

Case: 1:19-cv-06508 Document #: 277-4 Filed: 03/26/24 Page 856 of 1206 PageID #:66661

38:10, 42:13, 52:18, 60:3, 60:24, 61:11, 62:10, 77:15, 85:17, 88:2, 89:1, 96:19, 97:4, 111:20, 133:9, 134:21, 150:5, 167:19, 191:4, 200:18, 200:19, 201:10, 217:8, 218:13, 218:14, 218:23, 219:13, 223:4, 223:15, 275:12, 282:20, 282:21, 299:14, 330:4, 375:11, 400:16, 401:17, 401:18, 402:2, 402:11, 407:13, 411:10, 414:3, 415:16, 415:23

**though**
32:24, 69:19, 75:21, 117:13, 163:10, 182:21, 232:16, 420:6

**thought**
338:11, 408:1

**threatened**
157:21, 396:8

**threats**
157:8, 186:21, 247:16, 294:3, 296:6, 296:20

**three**
18:10, 28:22, 30:19, 36:16, 52:18, 60:3, 60:24, 61:12, 85:11, 101:3, 121:10, 124:6, 124:23, 130:9, 134:12, 134:21, 139:12, 140:6, 176:19, 202:2, 217:3, 219:4, 220:2, 222:5, 223:2, 249:5, 259:19, 283:15, 405:23, 406:12, 407:7

**three-and-a-half**
253:15

**through**
15:16, 25:4, 37:10, 37:16, 112:5, 112:14, 113:7, 113:12, 117:8, 125:22, 161:15, 162:6, 163:7, 164:4, 164:19, 164:20, 172:16, 183:23, 183:24, 184:1, 184:7, 186:21, 202:9, 204:21, 205:5, 205:10, 206:9, 262:21, 320:8, 366:19, 367:23, 368:7, 373:7, 390:20, 412:17, 418:7, 419:11

**throughout**
94:5

**thus**
408:4

**till**
17:17

**time**
7:9, 26:15, 53:1, 53:21, 55:12, 61:9, 79:5, 80:18, 86:6, 140:24, 173:21, 174:12, 195:14, 197:20, 198:14, 200:16, 231:10, 247:18, 250:19, 251:14, 252:19, 253:4, 253:15, 278:22, 289:8, 297:14, 306:11, 336:2, 351:7, 351:9, 352:18, 356:15, 359:16, 372:5, 372:11, 378:22, 395:9, 403:4, 404:5, 418:8, 419:20

**times**
43:12, 44:14, 53:8, 53:9, 64:3, 202:10, 259:19, 336:21, 402:17

**timing**
131:17

**timothy**
22:17, 150:15, 152:9, 161:16, 162:8, 163:9, 164:3, 165:21, 166:24, 168:13, 168:18, 169:1, 169:7, 172:18, 172:24, 174:7, 185:6, 185:13, 185:21, 186:1, 186:9, 187:3, 187:8, 187:14, 188:15, 202:24, 230:17, 231:1, 233:4, 233:18, 236:21, 238:20, 241:15, 281:11

**tino**
393:2, 393:13, 393:17, 394:3, 394:5, 396:1

**titled**
320:3

**today**
7:8, 7:18, 8:8, 8:23, 82:13, 204:21, 263:11, 264:5, 264:14, 269:1, 270:15, 271:9, 272:6, 273:23, 282:6, 404:4

**together**
67:14, 110:7, 114:16, 241:14, 348:18, 353:4, 356:7, 376:5, 391:2

**tom**
192:19, 192:22

**tony**
363:4, 368:17, 368:21, 374:1, 375:17, 376:1, 376:23, 377:19, 378:14, 379:11, 379:18, 380:3, 380:9

**too**
27:13, 29:20, 124:14, 133:15, 195:20, 205:9, 228:11, 374:19

**took**
12:2, 26:19, 27:14, 31:15, 35:2, 61:10, 62:6, 122:12, 137:18, 153:13, 191:4, 204:11, 210:22, 217:18, 228:23, 229:5, 237:4, 238:11, 238:15, 375:17, 411:10

**tool**
45:11

**top**
373:4

**torrence**
381:3, 381:14, 381:22, 382:18, 384:20, 390:11, 391:7, 391:14

**towards**
112:17

**tracking**
350:4

**tran**
315:16, 315:24,

EP IGLESIAS Sub Resp 001679

316:6, 316:16
**transcript**
6:16, 6:18, 196:15, 235:7, 418:5, 418:10, 420:3, 420:5, 420:8
**transcription**
419:12
**transferred**
189:3
**transpired**
27:21, 49:24
**traumatized**
412:5
**trial**
120:18, 193:6, 205:19, 206:11, 231:3, 239:6, 244:17, 245:3, 245:18, 269:19, 270:13, 278:11, 278:17, 289:5, 289:8, 289:18, 290:1, 297:3, 297:12, 313:8, 328:12, 361:13, 377:11, 400:18, 401:3, 403:23
**trials**
23:2, 23:9, 206:16, 258:9
**trick**
196:6, 229:15
**tricked**
376:22
**tried**
26:10, 53:9, 53:17, 66:8, 67:18, 68:1, 76:23, 78:16, 86:24, 154:5
**trier**
212:22, 224:22, 225:8, 225:14, 225:17, 232:4, 234:6, 239:14, 241:5
**trouble**
331:5, 331:18, 332:1, 332:12, 332:19, 336:24
**trunk**
227:1
**trust**
42:20, 76:17
**truth**
329:13, 419:14, 419:15
**truthful**
64:4, 70:10, 70:12, 128:16, 247:7, 247:8
**truthfully**
164:14
**try**
39:3, 110:1, 144:4, 171:2, 196:5, 229:1, 234:4, 250:18, 352:16
**trying**
80:11, 195:14, 303:14, 327:10, 351:5, 372:17, 372:18
**turn**
76:18, 112:15, 127:22, 304:15, 304:20, 305:3
**turned**
379:4
**two**
154:6, 207:23, 252:19, 275:6, 318:8, 350:10, 350:11, 363:6, 385:10, 392:24, 393:13, 394:6, 394:14, 403:8, 412:6, 414:22
**type**
85:9, 90:4, 110:7, 172:23, 200:15, 218:1, 259:7, 408:2
**typed**
117:15
**types**
110:8
**typewriting**
419:11
**typewritten**
113:21

**U**

**ultimately**
191:9, 191:19, 386:2
**unable**
137:3, 176:19, 177:20, 180:1, 335:24, 340:8, 341:9, 341:23, 342:14, 354:2, 365:9
**unaware**
190:23
**unconstitutional-ly**
259:14
**under**
186:10, 187:10, 206:24, 217:19, 265:12, 265:13, 265:20, 270:13, 408:6
**underlying**
102:8
**underneath**
113:20
**undersigned**
420:10
**understand**
8:24, 32:12, 113:5, 209:8, 260:22, 264:2, 271:11, 272:7, 306:7
**understanding**
30:3, 38:9
**understood**
306:10
**unduly**
317:20, 318:2
**unfair**
327:9
**unfairly**
327:24
**unique**
88:23
**unit**
64:16, 64:24, 65:10, 68:6, 68:16, 74:2, 80:2, 82:23, 98:4, 100:24, 101:2, 119:3, 120:16, 189:4, 207:15, 209:18, 220:5, 220:12, 221:15
**united**
1:1
**unknown**
340:22
**unlawful**
398:9
**unless**
402:13
**unrelated**
165:22, 383:11, 383:12, 383:16
**unspoken**
30:3
**unsuccessful**
145:3, 359:14
**unsuccessfully**
88:15
**until**
71:6, 86:12, 386:21
**untrue**
118:7, 121:24
**upon**
269:18, 272:3, 272:4, 419:16
**upper**
59:6
**us"**
207:24
**use**
34:8, 34:17,

35:16, 39:3, 39:22, 43:2, 44:24, 45:10, 51:3, 54:3, 62:24, 80:21, 97:11, 100:5, 100:15, 120:6, 120:17, 139:20, 145:7, 166:18, 186:22, 207:9, 324:10, 365:18, 389:18, 413:5
**used**
21:20, 38:10, 45:13, 47:18, 48:13, 50:20, 56:4, 61:19, 62:10, 62:11, 63:10, 63:17, 72:10, 74:20, 80:19, 81:1, 81:2, 110:24, 111:20, 120:3, 139:23, 140:6, 146:20, 148:19, 156:12, 172:22, 173:4, 173:6, 190:11, 218:16, 226:11, 244:18, 257:23, 259:14, 281:12, 294:3, 296:6, 296:20, 312:19, 317:7, 383:2, 388:21, 400:18, 401:2, 410:1, 420:5
**using**
75:15, 87:23, 144:6, 156:12, 156:13, 156:22, 282:14, 282:18, 299:13, 317:3
**usual**
302:1
**usually**
116:9, 195:15
**utilize**
70:5, 85:18, 90:10, 94:24
**utilized**
132:20, 416:12
**utilizing**
70:9

**V**

**v-a-l-a-s-c-o**
300:19
**v-e-l-e-z**
306:20
**v-i-l-l-a-r-d-i--t-a**
313:14
**v-i-r-g-i-l-i-o**
314:22
**valasco**
300:18, 301:1, 301:13, 303:6, 303:14, 304:1, 304:5, 304:11, 305:4
**value**
306:3
**van**
24:7, 72:4, 202:6, 202:7, 202:9
**vargas's**
16:6, 17:9, 27:23, 52:16, 61:9, 63:12, 79:6, 222:5
**various**
98:17, 332:12
**vehicle**
288:15, 406:3
**velez**
306:20, 307:1, 307:12, 307:19
**vera**
385:12, 385:20, 386:3
**veracity**
88:3, 89:2, 226:13
**veras**
53:18
**versus**
196:16, 206:7
**very**
37:17, 177:1, 195:16, 207:10, 226:8, 240:6, 402:11
**vicente's**
20:24, 42:1, 70:12, 105:21, 132:21, 139:15, 148:3, 151:15, 188:19, 240:13, 247:5, 248:15, 251:3, 251:21, 296:21
**victim**
25:10, 63:3, 72:4, 86:24, 105:11, 131:1, 131:7, 131:19, 237:11, 320:6, 351:14, 366:3, 411:12, 412:5
**victim's**
24:17, 132:6
**victims**
64:5, 366:11, 407:15, 408:6, 408:10
**video**
7:1, 236:9, 417:2
**videographer**
5:10, 7:1, 7:10, 82:15, 82:18, 175:1, 175:4, 281:23, 282:1, 297:19, 297:21, 380:18, 380:21, 417:1
**vienna**
336:8
**view**
107:7, 222:23, 243:8, 307:11, 309:21, 326:9, 345:7, 354:17, 411:13, 414:20
**viewed**
107:15, 115:12, 177:9, 179:9, 181:11, 241:15, 242:8, 242:15, 304:11, 309:8, 309:13, 325:15, 325:22, 326:4, 326:11, 345:12
**viewing**
178:20, 179:4, 181:17, 181:22, 414:13
**villardita**
313:13, 314:13, 314:20, 316:5
**vincent**
98:6
**violated**
12:9, 12:17, 13:5, 13:12, 15:5, 276:17, 277:1
**violation**
267:20
**violations**
266:9, 266:15, 268:18, 269:3
**violence**
43:2, 157:9, 186:22, 186:23
**violent**
237:13
**virgilio**
314:21, 315:3, 315:10, 316:16
**virtue**
376:6
**visible**
45:2
**visiting**
54:22
**voice**
284:19
**voluntarily**
164:14, 303:2, 303:7, 329:5

**vomit**
320:7
**vs**
1:6, 1:12, 7:5
**vulnerable**
37:17

**W**

**wacker**
4:14
**wade**
311:9, 311:17, 311:23, 313:15, 313:19, 313:22, 314:3, 314:8, 314:16, 314:23, 315:12, 315:13, 315:18, 316:1, 316:7, 316:12
**wait**
159:18, 292:15
**waited**
86:12, 394:4
**waiting**
214:17, 236:14, 393:14
**waived**
419:23, 420:9
**walked**
43:23, 201:24, 202:1
**want**
10:6, 71:22, 82:5, 139:14, 139:20, 159:4, 195:11, 235:4, 236:8, 241:13, 246:15, 306:1, 330:22, 351:8, 372:10, 380:16, 404:7
**wanted**
27:13, 30:19, 34:2, 35:1, 35:16, 39:11, 55:11, 66:7, 73:8, 75:5, 75:13, 75:19, 76:3, 76:6, 81:16, 81:23, 83:14, 84:2, 84:10, 95:23, 99:10, 100:15, 101:15, 138:23, 139:5, 139:11, 148:10, 151:22, 153:22, 157:23, 158:23, 169:19, 172:9, 190:10, 211:12, 214:22, 216:17, 223:14, 233:18, 236:22, 239:7, 325:6, 327:17, 356:17, 386:13, 396:10, 402:7, 409:6
**wanting**
232:3
**wants**
404:8
**war**
312:5, 312:10, 408:3, 408:11
**warrant**
182:20
**warrants**
182:6, 183:4, 183:6
**washtenaw**
364:2, 368:23, 369:23
**wasn't**
29:20, 103:16, 104:21, 202:17, 208:4, 208:7, 216:7, 231:18, 237:21, 249:15, 250:19, 351:22, 355:12, 362:10, 380:9, 389:5
**watching**
412:6
**way**
16:6, 20:8, 30:3, 33:11, 62:5, 72:20, 79:12, 82:11, 93:14, 96:2, 105:20, 106:4, 142:16, 161:7, 176:21, 191:1, 277:14, 301:16, 330:1, 331:4, 332:1, 332:19, 336:23, 372:12, 403:2
**we'll**
56:1, 56:12, 56:18, 82:12, 105:7, 207:11, 320:8, 402:21, 416:23
**we're**
131:16, 235:10, 235:18, 373:2, 403:23, 404:3
**we've**
290:11
**weapon**
78:20, 79:19, 396:3
**wearing**
326:24, 327:1, 327:8, 357:9
**weeks**
340:17
**welcome**
214:5
**well**
11:2, 32:10, 45:8, 53:16, 55:24, 56:3, 93:13, 93:19, 101:4, 117:14, 131:16, 147:5, 157:8, 170:23, 195:12, 195:16, 198:1, 212:3, 212:12, 224:8, 228:2, 249:5, 253:22, 271:2, 273:9, 282:19, 306:12, 331:17, 338:13, 360:8, 372:18, 372:19, 392:13, 393:24, 396:24, 398:3, 402:21, 403:8, 403:17, 404:3
**wendt**
4:4, 8:9
**went**
37:16, 89:8, 101:24, 124:9, 125:2, 173:20, 174:1, 219:4, 219:12, 220:1, 220:22, 227:4, 227:6, 232:24, 237:14, 247:14, 340:22, 360:9, 393:2
**weren't**
53:1, 55:12, 66:20, 334:14, 337:6, 386:18
**west**
4:14, 110:16, 135:3, 226:21, 233:2, 355:2, 359:24, 363:17, 405:12
**what**
9:18, 25:10, 26:18, 27:21, 31:2, 31:13, 49:24, 50:9, 50:17, 55:18, 56:6, 56:10, 58:1, 71:22, 90:4, 102:16, 108:11, 112:3, 112:9, 117:2, 124:11, 128:17, 160:17, 185:21, 192:21, 196:1, 196:3, 200:14, 201:20, 213:18, 214:3, 214:9, 216:16, 217:1, 233:17, 233:18, 235:7, 235:13,

235:21, 235:22, 237:5, 240:14, 264:12, 270:20, 272:12, 272:23, 275:5, 275:12, 276:6, 300:3, 300:4, 306:3, 324:7, 338:24, 348:12, 350:15, 351:5, 352:21, 354:8, 354:18, 357:18, 357:22, 359:23, 372:9, 379:17, 396:9

**what's**
56:16, 56:21, 58:6, 184:6, 206:5, 235:6, 246:6, 246:7, 272:20, 299:19, 370:19

**whatever**
153:13, 360:24, 382:6, 418:7

**whatsoever**
31:8, 52:15, 60:4, 63:2, 111:5, 111:12, 187:15, 301:9, 302:16, 410:16

**when**
9:8, 9:11, 11:17, 18:22, 37:15, 41:23, 50:19, 71:12, 75:14, 77:6, 77:18, 80:24, 81:1, 83:8, 87:6, 88:11, 88:15, 95:21, 110:13, 112:24, 113:1, 116:9, 116:19, 117:1, 121:16, 121:23, 122:14, 129:9, 129:11, 130:2, 132:6, 135:17, 140:17, 155:7, 155:15, 155:21, 156:12, 156:21, 168:4, 168:11, 169:18, 180:8, 194:7, 209:16, 214:1, 215:16, 220:4, 242:8, 244:2, 250:6, 268:2, 274:4, 278:10, 292:8, 298:12, 300:9, 300:17, 300:24, 307:10, 313:8, 315:19, 319:6, 328:22, 330:14, 330:18, 333:11, 343:7, 346:7, 352:4, 353:19, 357:10, 357:16, 360:1, 364:12, 371:24, 379:4, 379:19, 386:6, 394:3, 398:18, 403:8, 405:14, 415:17

**whenever**
174:18, 351:9

**where**
28:7, 28:21, 32:14, 35:1, 38:23, 64:3, 65:20, 85:10, 95:10, 107:3, 114:15, 130:4, 145:6, 171:24, 192:9, 195:12, 237:4, 238:10, 238:14, 297:13, 326:23, 331:17, 332:9, 344:7, 354:2, 372:2

**whereas**
376:9

**whereby**
254:17, 255:4, 255:15, 255:24, 256:9, 256:18, 257:7, 257:18, 258:7, 258:18, 259:5

**whether**
107:22, 191:2, 215:19, 216:14, 276:15, 276:23, 278:12, 297:12, 352:17, 352:23, 355:6, 365:18

**which**
26:16, 30:9, 60:13, 83:10, 90:16, 92:10, 96:3, 102:24, 110:9, 110:14, 112:11, 112:16, 125:22, 126:4, 162:15, 167:8, 172:15, 187:24, 191:5, 196:5, 202:6, 204:20, 206:24, 230:16, 246:8, 246:17, 250:19, 251:14, 254:11, 262:11, 263:11, 304:1, 324:11, 327:7, 345:5, 358:14, 367:4, 369:16, 371:14, 376:5, 395:24, 400:5, 405:22, 408:3, 408:22, 414:21

**while**
37:10, 38:16, 46:16, 68:15, 71:18, 72:18, 80:11, 81:3, 82:22, 84:3, 89:15, 95:5, 97:2, 98:14, 99:1, 142:10, 143:4, 155:17, 155:23, 156:6, 156:22, 157:7, 158:13, 159:17, 210:10, 246:18, 249:6, 287:9, 290:21, 303:20, 333:10, 383:23, 394:5, 409:22

**white**
373:6, 373:13, 374:10, 374:20, 376:8

**who**
25:3, 25:4, 34:9, 34:18, 35:11, 50:11, 53:9, 55:11, 90:3, 91:22, 92:3, 101:24, 104:3, 104:13, 115:6, 115:13, 134:5, 134:19, 147:11, 147:12, 151:24, 160:17, 165:8, 178:18, 179:20, 205:12, 207:21, 208:8, 208:17, 211:11, 215:17, 223:6, 234:13, 239:16, 242:11, 243:14, 243:22, 279:12, 280:15, 284:10, 286:4, 286:14, 293:17, 293:23, 298:16, 300:21, 304:6, 307:19, 310:1, 313:9, 317:4, 324:14, 333:13, 336:14, 336:22, 340:8, 340:9, 340:21, 340:22, 341:9, 341:18, 341:23, 342:8, 343:9, 343:16, 344:1, 346:24, 347:1, 347:9, 347:17, 349:16, 351:14, 352:22, 355:7, 364:19, 366:10, 369:22, 375:19, 375:24, 376:24,

377:17, 377:19, 378:15, 379:20, 385:10, 393:2, 402:24, 406:1, 407:18, 410:10, 411:19, 412:4, 412:11
**whole**
94:13, 109:11, 281:18, 419:14
**whom**
262:20, 295:20, 296:2
**whose**
59:5, 346:4, 387:8, 393:2
**why**
40:4, 48:14, 49:7, 55:21, 119:18, 171:2, 174:21, 234:24, 235:14, 235:16, 235:18, 235:23, 235:24, 236:3, 261:6, 268:9, 277:14, 281:21, 298:22, 348:5, 380:2, 403:14
**wife**
24:18, 86:6, 132:6, 221:24
**wild**
85:8
**wilda**
24:18, 25:2, 26:4, 26:11, 27:12, 28:4, 28:13, 29:8, 30:18, 62:7, 63:11, 84:19, 84:24, 105:12, 106:15, 107:2, 107:6, 107:14, 107:20, 109:16, 109:23, 110:15, 129:18, 129:22, 130:14, 175:10, 175:22, 176:8, 176:18, 177:9, 177:14, 177:19, 178:5, 178:24, 179:10, 179:14, 179:19, 179:24, 180:5, 180:13, 180:20, 181:2, 181:8, 181:15, 221:24, 224:22, 227:5, 227:6, 228:5, 228:23, 229:5, 241:15, 242:8, 243:8, 243:12
**wiley**
53:18, 53:24, 381:3, 381:14, 381:22, 382:18, 384:1, 384:7, 384:20, 385:23, 386:14, 388:13, 390:11, 391:7, 391:15, 391:22, 395:2, 395:16, 397:12, 399:5, 399:14, 399:24, 400:7, 400:20, 401:12
**will**
7:12, 7:17, 10:9, 37:20, 56:4, 113:6, 117:4, 183:23, 196:5, 196:14, 196:21, 206:7, 214:15, 236:7, 270:14, 271:7, 272:3, 274:4, 275:18, 283:24, 299:3, 306:15, 311:10, 317:1, 324:10, 330:2, 370:15, 402:8, 420:7
**william**
404:13, 410:17, 411:2, 411:21
**williams**
1:24, 2:12, 7:10, 419:4, 420:21
**willing**
40:3, 263:12
**window**
202:9
**wish**
270:12, 271:3
**withdrawal**
37:10, 37:16, 38:5, 38:10
**withheld**
291:8, 310:16, 329:10
**withhold**
329:13
**within**
254:9, 365:7, 403:3, 420:3, 420:11
**without**
136:9, 183:6, 214:3, 301:22, 319:22
**witnessed**
75:13, 75:22, 76:4, 77:10, 143:10, 162:17, 168:19, 173:13, 354:24, 364:19, 365:9
**witnessernest**
6:2
**witnesses**
34:19, 35:1, 38:16, 39:1, 45:1, 64:5, 88:2, 201:14, 202:23, 204:22, 205:11, 205:12, 257:23, 291:15, 297:7, 324:16, 325:15, 325:20, 325:22, 326:10, 327:9, 329:5, 329:14, 405:24, 407:15, 414:3
**woman**
24:18, 25:3, 165:23, 354:23, 366:4
**women**
366:10
**won**
357:18, 357:22
**word**
72:21, 73:5
**words**
40:20, 80:15
**work**
29:20, 37:20, 101:2, 131:9, 145:16, 148:20, 195:15, 201:24, 220:23, 349:17, 398:5
**worked**
114:16, 329:19
**world**
214:9
**would've**
124:10
**wouldn't**
45:1, 151:5, 196:9, 403:3
**wrapped**
365:11, 367:18
**write**
116:3, 162:23
**writer**
115:21
**writing**
97:6, 115:13, 398:5
**written**
396:18
**wrong**
124:10, 125:3, 363:22, 370:16, 372:13, 372:17
**wrongful**
15:17, 23:12, 204:12, 239:8, 244:19, 245:16, 245:24, 280:8, 377:12, 383:3, 389:19

**wrongfully**
190:12, 235:9, 337:23, 416:4
**wrongly**
305:18
**wrote**
56:8, 56:10, 121:2, 129:9, 170:10, 170:12, 252:9, 288:13, 288:18, 288:23, 346:22

**Y**

**y-b-a-r-r-a**
298:14
**ybarra**
298:13, 298:21, 299:20, 299:24, 300:10, 300:14, 301:5, 301:12, 303:1, 303:13, 304:1, 304:6, 304:11, 305:4
**yeah**
56:1, 82:14, 125:15, 131:21, 174:20, 174:24, 194:9, 253:20, 281:20, 337:10
**year**
245:24
**year-old**
348:20
**years**
9:17, 235:8, 249:17, 250:9, 250:10, 252:19, 253:15, 254:11, 275:6, 349:16, 353:19
**yelling**
124:13
**yes**
9:1, 10:3, 42:10, 112:7, 113:15, 125:16, 174:17, 180:22, 214:8, 234:21, 270:17, 299:1, 299:8, 305:17, 318:12, 318:14, 330:11, 337:23, 380:17
**yesenia**
364:18, 365:8, 365:17, 366:2, 367:14, 368:20, 369:17, 369:21, 371:7
**yet**
100:6, 173:11, 344:21, 402:8
**york**
3:7
**you'd**
350:13
**you'll**
197:15, 371:5
**you're**
71:21, 117:2, 174:12, 214:5, 227:21, 235:12, 279:3, 282:18, 284:23, 301:22, 346:18, 351:10
**you've**
58:19, 213:21, 214:18, 262:20, 402:10
**young**
364:17, 366:2, 366:4, 366:9, 366:10, 368:6, 405:16, 412:4
**yours**
34:17, 210:13
**yourself**
25:19, 32:11, 42:15, 45:10, 53:8, 54:10, 75:4, 76:23, 81:13, 93:2, 101:14, 102:23, 104:11, 115:12, 123:11, 126:13, 127:5, 127:16, 129:1, 141:10, 152:15, 161:24, 163:4, 166:24, 174:1, 184:9, 184:18, 190:1, 201:11, 207:22, 225:7, 261:8, 264:2, 268:4, 268:11, 269:1, 269:17, 270:2, 270:5, 272:14, 273:10, 273:15, 352:10, 366:18, 367:22, 384:14, 391:2, 396:8, 416:12
**youth**
319:23

**Z**

**zip**
235:13, 235:16, 235:19, 235:22

**$**

**$20,000**
334:2, 360:19, 360:23
**$200**
98:17
**$300**
98:17

**0**

**00**
86:12, 121:6
**000222**
56:19
**000226**
58:4
**004443**
420:23
**01**
6:16
**018247**
192:19, 192:22, 193:4, 193:13, 194:2, 194:15, 195:2
**04985**
206:8
**05**
175:2
**05100**
206:9
**07**
6:16
**08**
282:2
**084**
420:23

**1**

**1**
175:2, 175:5
**1,132**
251:23, 252:7
**1,476**
252:10
**10**
1:19, 7:9, 170:4, 373:7, 373:14
**100**
4:7
**1000**
3:6, 5:8
**101**
387:21
**11**
82:16, 82:19, 150:14, 152:9, 161:17, 174:5, 176:21, 177:10, 177:16, 177:22, 178:20, 179:4, 180:21, 180:22, 230:15, 233:6, 241:14, 303:24, 357:2, 392:23, 396:3
**11238**
3:7
**12**
392:23

**1215**
364:2, 368:23, 369:23
**13**
207:16, 318:18, 318:23, 388:17, 388:20, 389:5, 389:24
**1320**
392:16
**1390**
398:20
**14**
1:19, 7:9, 32:18, 33:13, 35:10, 36:1, 37:8, 39:10, 164:22, 172:15, 251:20, 280:14, 324:15, 324:21, 325:11, 326:1, 326:11, 326:17, 350:17
**148**
112:5, 112:14
**15**
398:18, 399:5
**150**
3:20
**15871**
196:18
**16**
9:13, 348:20, 353:19
**164**
6:14
**17**
1:6, 1:12, 7:4, 7:6, 356:10
**18**
1:18, 7:8, 373:7, 373:14, 418:6, 419:7
**182444**
1:22
**1838**
198:5, 199:1, 199:8, 201:6, 201:22, 203:7, 203:14, 203:23, 237:8
**1850**
3:8
**19**
59:18, 175:5
**195**
6:16
**1972**
9:10
**1980**
330:23, 333:4, 334:7, 336:16, 353:12
**1984**
135:12, 226:22
**1985**
337:5, 339:21, 340:3, 340:24, 341:22, 342:9, 343:2, 343:17, 344:16, 350:17, 351:16, 355:1
**1988**
330:23
**1989**
311:9, 311:22, 312:5, 312:10, 312:12, 313:1, 341:14, 349:14
**199**
141:19
**1990**
353:12, 358:8, 381:4, 381:15, 381:23, 382:19, 383:10, 383:15, 383:22, 384:4, 384:10, 386:6, 386:21, 387:12, 387:23, 388:4, 391:21, 391:24, 392:24, 393:5, 395:21, 396:4, 398:18, 398:21, 399:6, 399:16, 399:23, 400:5, 400:11
**1991**
356:10, 357:2
**1992**
306:20, 307:17, 308:11, 309:2, 309:21, 318:19, 318:24, 319:7
**1994**
405:7, 405:14, 407:2, 412:22, 413:10, 414:23
**1995**
220:5, 282:10, 283:6, 284:6, 286:10, 287:24, 298:8, 298:14, 300:10, 300:19, 301:1, 302:7, 302:14, 302:22, 303:24, 304:7, 304:11
**1996**
251:4, 251:23, 254:6
**1997**
317:15
**1998**
364:7, 370:6, 371:9, 371:10, 375:13
**1st**
197:10, 202:13, 296:14, 399:23, 400:5, 405:7, 405:14, 407:1, 412:22, 413:10, 414:23

**2**

**2**
281:23
**20**
1:18, 7:8, 56:24, 254:11, 384:9, 386:21, 391:23, 406:19, 418:6, 419:7
**200**
98:17, 105:8
**2004**
246:10, 247:6
**2010**
9:13
**2013**
279:12
**2018**
1:18, 7:8, 418:6, 418:21, 419:7, 420:16
**206**
4:6, 6:18
**20692**
113:22
**207**
419:24
**20861**
114:3
**21**
291:23
**22**
82:16, 292:24, 293:7, 293:18, 373:7, 373:14, 387:12, 387:23, 388:4
**2200**
5:6
**23**
9:10, 235:8, 245:24, 251:4, 251:22, 254:6, 282:10, 293:1, 293:12, 293:24, 297:19, 297:22, 391:20, 395:21
**24**
27:5, 27:14, 27:22, 58:9, 59:3, 131:4, 141:22, 143:6, 143:13, 144:4, 145:14, 158:12, 283:5, 294:16, 294:23, 295:5, 295:10, 295:15,

295:21, 296:3, 354:1, 364:7, 381:3, 381:14, 381:22, 382:19, 392:24, 396:4, 396:16, 399:16, 400:11
**243**
2:8, 3:15
**246**
6:20
**25**
296:13, 371:9, 384:10, 386:6, 393:5
**26**
219:12, 246:10, 247:6, 341:13, 341:22, 343:2, 387:20
**2647**
363:17
**27**
340:23, 370:6, 371:9
**28**
188:23, 189:12, 189:24, 190:23, 191:20, 192:7, 375:13, 391:21
**282**
6:5
**2869**
1:12, 7:6
**2nd**
64:13, 65:2, 68:17, 74:3, 82:22, 84:24, 85:6, 95:21, 98:2, 100:23, 103:15, 105:8, 105:9, 107:1, 118:3, 118:9, 118:20, 119:2, 122:8, 128:2, 128:17, 130:15, 133:4, 141:3, 189:15, 191:5, 191:18, 192:9, 207:14, 210:23, 220:5, 220:12, 221:15, 298:14, 300:10

**3**

**3**
282:2, 297:19, 297:22
**30**
10:10, 121:6, 198:6, 199:1, 201:22, 202:1, 284:6, 286:9, 287:24, 392:23, 396:3, 417:2, 417:4, 420:3
**300**
253:3
**311**
2:5, 3:13, 7:6
**312**
2:8, 3:15, 4:9, 4:16, 4:24, 5:8
**321**
5:6
**330**
6:6
**3300**
3:22
**336**
196:17
**337**
6:22
**35**
161:17
**36**
82:19
**370**
6:24
**38**
9:17
**3900**
110:16, 135:3, 226:21, 227:16, 228:4
**3920**
405:12
**3939**
4:16
**3rd**
2:6, 3:13, 184:9, 192:5, 383:10, 383:15, 383:22, 384:4, 387:16, 398:20, 398:21

**4**

**4**
380:19, 380:22
**404**
403:22
**415**
418:7
**420**
1:23
**4218**
355:2
**422**
3:6
**4366**
4:24
**45**
380:19
**4560**
1:6, 7:4
**4588**
339:10
**46**
349:16
**494**
5:8
**4th**
130:4, 132:5, 133:10, 168:21, 180:9, 229:17, 230:7, 349:14

**5**

**5**
34:10, 35:12, 86:12, 198:6, 199:1, 201:22, 202:1, 373:7, 373:14, 417:2, 417:4
**5'7**
373:7, 373:14
**500**
4:22
**5100**
206:9
**53**
183:24, 184:1, 184:3, 184:7, 184:13, 380:22
**54**
183:23, 184:2, 185:8
**55**
183:23, 184:1
**550**
3:20
**5555**
233:2
**56**
6:10
**57**
281:23
**58**
6:12
**59**
184:7
**5900**
2:8, 3:15
**5th**
23:18, 24:3, 60:13, 61:10, 83:22, 86:18, 91:1, 121:4, 121:20, 136:2, 166:6, 198:6, 199:2, 199:8, 199:20, 201:6, 203:8, 203:15, 203:24, 223:17, 246:21

**6**

**60143**
3:21
**603**
4:24

**6036**
339:4
**60601**
4:15
**60602**
4:23
**60607**
2:7, 3:14
**60654**
5:7
**60661**
4:8
**630**
3:22
**655**
4:9
**68**
164:19, 164:20, 165:4, 172:16
**6th**
118:15, 118:19, 123:21, 135:4, 226:20

7

**718**
3:8
**72**
164:19, 164:20, 172:16
**735**
3:22
**736499**
57:3, 57:11, 57:22
**7660**
4:9
**77**
4:14
**782**
4:16
**7th**
290:6, 290:17

8

**8**
121:6
**80**
207:11, 331:5, 331:13
**81**
161:14, 161:15, 162:6
**83**
216:23
**85**
161:15, 162:6
**874175**
58:12, 59:7
**875**
3:8
**8th**
138:10, 138:17, 140:18, 141:1, 141:8, 141:18, 141:21, 142:17, 147:7, 147:15, 149:19, 307:13, 308:11, 308:16, 309:2, 309:21, 339:21, 340:2, 342:9, 343:17, 344:16, 351:15, 355:1, 420:15

9

**9**
121:6, 391:21
**93**
6:16, 59:18, 196:18
**95**
241:13
**96**
112:16, 113:12, 113:13, 113:20, 117:8
**97**
120:23, 125:9, 125:14, 125:22, 125:24, 126:3, 126:11, 126:21, 128:16, 243:5
**98**
125:22, 127:23, 128:6, 128:16, 129:17
**99**
113:12, 117:8, 118:13
**9th**
147:23, 148:3, 149:3, 179:10, 179:16, 179:21, 180:2, 180:15, 181:3, 181:11, 181:17, 181:22, 243:1, 243:4, 300:19, 301:1, 302:7, 302:14

# Exhibit 49

CITY OF CHICAGO / DEPARTMENT OF POLICE / 11?? South State Street
IDENTIFICATION SECTION C. go, Illinois 60605

I.R. NO. 764637

CRIMINAL HISTORY OF IGLESIAS, Geraldo M/WH

DATE 18 Jan 86

DATE OF BIRTH 24 Jul 68

ISSUED ON INQUIRY JUN 22 1993 BY NAME CHECK ONLY

I.R. NO. 764637 | FBI NO. | I.S.B. NO.

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE / DISPOSITION |
|---|---|---|
| Geraldo IGLESIAS 1509 W. Hamlin 24 Jul 68 | 7509247 | -17 Jan 86, Off. Alm. GCU-N (25), Mob Action 29 Jan 86 Mob Action (38-25-1) SOL Judge Wilens Doc# 86105505 |
| Gerardo IGLESIAS 3817 W. Lyndale 24 July 68 | 7549428 | -28 Mar 86, Off. Martin 014th Dist., PCS 29 Mar 86 Poss Cont. Subst. (56½-1402) FNPC Judge Hogan Doc# 861142564 |
| Gerald IGLESIAS 3718 W. Lyndale 24 Jul 68 | 7599073 | -17 Jun 86, Off. Sherman, GCU-N (014th) Theft. 19 Sept 86 Theft Auto Access. (38-16-1al) PGFG 1yr Cout Superv. Judge Morse Doc# 86162910 |
| Gerardo INGLESIAS 3718 W. Lyndale 24 Jul 68 | 7625338 | -27 Jul 86, Off. Machain 14th. Dist, State Disord. 22 Oct 86 State Disorderly (38-26-1al) MS/SOl Judge Bolan Doc# 86228466 |
| Geraldo IGLESDA 3715 W. Belden 24 Jul 68 | 7770595 | -20 Mar 87, Off. Mallon G.C.U. North C.T.T.L. 6 May 87,CTTL(38-21-3)BF/SOL,Judge Wilens(doc#87-160684) |
| Geraldo IGLESIA 3715 W Belden 24 Jul 68 | 8142785 | -28 Oct 88 OFf Moriarty 14th Dist. Mob action jr 22 Nov. 88, Mob Action, (38-25-1a2), MS/SOL, JDg. Chrones, (doc.#88273207) |
| Geraldo IGLESIAS 3715 W. Belden 24 Jul. 1968 | 8215 741 | -17 Feb. 89, Off. Crawford, 014th District. CTTL 16 Mar 89, Crim. Trespass (38-21.3A) SOL, Judge Chrones, (Doc# 89125368) |
| Geraldo IGLESIA 3715 W. Belden 24 July 68 tb | 8273088 | -8 May 89, Kwasinski 14th Dist., State DC 20 Jun 89, Disorderly Conduct (38-26-1al) PG/FG 1 yr. sup. Judge Spitzer, (doc# 89166490) |
| Geraldo IGLESIA 3715 W Belden 24 July 68 | 8329109 | - 19 July 89, off Machain, 14th Dist Dis. Conduct 22 Nov 89, Dis. Conduct (38-26-1al), SOL, Judge Spitzer, Doc#89247727 (Ambak)ke |
| Geraldo IGLESIA 3715 W. Belden 24 July 68, | 8334440 | -26 July 89, Off. Wojick, 14th Dist. Poss. Cann. -cd 21 Aug 89, Poss. of Cannabis (56½-704), MS NOLLE, Judge Erickson, DOC#89266860 |
| Gerardo C. IGLESIAS 3715 W. Belden 24 Jul 68 | 8464535 jlw | -21 Jan 90, Off. Frang, 014, CTTL 16 Feb 90, CTTL (38-21-3), MS/SOL, Judge Divane, Doc#90180366 (Ambak)ke |
| Gerardo IGLESIAS 3715 W. Belden 24 July 68, | 8482801 cd | -16 Feb. 90, Off. Wojcik, 14th (25th) Dist. Armed Robbery 20 FEB 90, ARMED RØBBERY(38-18-2), FNPC, JUDGE MCBRIDE, DOC#90197410 (AMBAK)CU |

cp

CPD-31.903 (REV. 10/75)

*CONFIDENTIAL —Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).*

CITY OF . ıCAGO / DEPARTMENT OF POLICE / 1121 S. .n State Street
IDENTIFICATION SECTION Chicago, Illinois 60605

CRIMINAL HISTORY OF IGLESIAS, Geraldo M/WH

DATE 18 Jan 86

DATE OF BIRTH 24 Jul 68

I.R. NO. 764637 | FBI NO. | S.I.D. NO.

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DISTRICT / CHARGE / DISPOSITION |
|---|---|---|
| Geraldo IGLESIAS<br>3715 N. Belden<br>24 Jul 68 | 8583048 | - 28 Jun 90, OFf. Williams 25th Dist Agg Assault<br>20-Jul-90,Agg. Assault,(38-12-2(a)(1)),MS/SOL,<br>Disorderly Conduct,(193-1(a),MCNS,Judge Kowalski,<br>Doc#90322845, GRAY/ah |
| Gerardo C. IGLESIAS<br>3715 W. Belden<br>24 Jul 68 | 8752953<br>dc | -02 Feb 91, Off. Ruiz, Dist. 016, Battery<br>18 Mar 91, Batt(38-12-3a)PG/FG 1yrprob.JudgeAmirar<br>Doc#91210952 Graycu |
| Geraldo IGLESIAS<br>2137 W. Austin<br>24 July 68, | 8849252<br>cd | -6 June 91, Off. Avila, 14th Dist. Poss. Cannabis<br>26 Jul 91, Poss. of Cann. (56½-704d) FNPC Judge Bastone Doc<br>91124486 GRAY rp |
| Gerrardo C. IGLESIAS<br>3715 W. Belden<br>24 Jun 68 | 9194559<br>ls | -16 Aug 92, Off. Rose, Dist. 14, State D/C<br>14 Dec 92, Disord. Cond.(38-26-1a1), MS/SOL, Judge Spitzer,<br>Doc#92383421, TEMPFLEET CB |
| Gerado IGELESIAS<br>3715 W. Belden<br>24 Aug 68 | 9295437<br>dc | -02 Jan 93, Off. Finn, Dist. 025, Poss Cont Sub<br>**15 Mar 93 INFO (93CR-5350) Pcs** |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

ISSUED ON INQUIRY
JUN 22 1993
BY NAME CHECK ONLY

CPD-31.903 (REV. 7/88)

*CONFIDENTIAL - Further dissemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).*

# Exhibit 50

REPRINT

| NAME (LAST—FIRST—MIDDLE) | C.B. NO. | FINGERPRINT CLASS. |
|---|---|---|
| MONTANEZ, JOSE E. | 7319347 | 1 5/1 0 24 I00 / 1 23 |
| ALIAS | DATE OF BIRTH | REF. |
| | 25AUG67 | |

| ARRESTEE'S HOME ADDRESS | SEX | RACE |
|---|---|---|
| 2206 N. AVERS | M | WH |

| DRIVERS LICENSE NO. | WEIGHT | HEIGHT | EYES | HAIR |
|---|---|---|---|---|
| — | 210 | 6-2 | BRN | BLK |

| DATE OF ARREST | REASON ARRESTED | DIST. OF DET. | ARRESTED BY | UNIT |
|---|---|---|---|---|
| 26MAR85 | Crim. Dam To Prop. | 025 | SANDERS | 025 |

| PRINTED BY | STAR/EMP. NO. | TIME | ARRESTEE'S SIGNATURE |
|---|---|---|---|
| M Horan | 2403 | 0420 | X |

I.R. NO. 736499

1. RIGHT THUMB | 2. RIGHT INDEX | 3. RIGHT MIDDLE | 4. RIGHT RING | 5. RIGHT LITTLE

6. LEFT THUMB | 7. LEFT INDEX | 8. LEFT MIDDLE | 9. LEFT RING | 10. LEFT LITTLE

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | L. THUMB | R. THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

FOR IDENTIFICATION SECTION USE — DO NOT WRITE BELOW THIS LINE

| DATE | PHOTO |
|---|---|
| 27JUN85 | |
| 22JUN89 | |
| 2MAR90 | |
| 7Jan93 | |

NCIC F.P.C. D O P I 1 4 P O P O D I C O 1 7 1 9 1 6

F.B.I. NO. 730 931 DA7

I.S.B. NO. 08101881

C.P.D. REF. NO.

CROSS FILE F.P. CLASS

RECHECKED BY

CPD-31.811 (Rev. 3/83)

PHYSICAL DESCRIPTION/FINGERPRINT RECORD/ CHICAGO POLICE

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION Chicago, Illinois 60605

I.R. NO. 736499

CRIMINAL HISTORY OF MONTANEZ, Jose E. M/WH

DATE 27 March 1985

DATE OF BIRTH 25 Aug 1967 736499 RECORD REVISED 30 Sep 88

| I.R. NO. 736499 | | FBI NO. 730 931 DA7 | I.S.B. NO. 08/0188 |
|---|---|---|---|

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE / DISPOSITION |
|---|---|---|
| Jose E. MONTANEZ<br>2206 No. Avers<br>25 Aug 1967 | 7319347 | -26 Mar 85. Off. Sanders, 25th Dist, Criminal Damage to Prop<br>22 Apr 85. CDTP(38-21-1a) SOL Judge O'Brien(dkt 85-125941) |
| Jose MONTANEZ<br>2206 Avers<br>23 Aug 67 | 7367185 | - 5 June 85, Off., Noon, GCU-N (025th Dist.,) Dam toProp<br>2 Aug 85, CDTP (38-21-1a1) SOL, Judge Wilens (Doc No. 85195347) |
| Jose MONTANEZ<br>2206 N.Avers<br>23 Aug. 67 | 7443016 | -24 Sept. 85, Off. Brennan GCU/N (25th Dist) Att. Robbery<br>14 Nov 85. S. Battery(38-12-3a) SOL Judge Bolan(85276576)dk |
| Jose E MONTANEZ<br>2206 Avers<br>23 Aug 67 | 7482760 | -27 Nov 85, Off Depke, GSU-N, 025th Dist., Assault<br>10 Dec 85 Simple Assault (38-12-1), MS/SOL, Judge Wilens, Doc# 85 273803 |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug. 1967 | 7773 017 | -24 Mar. 87, Off. Whalen, Gang Crime Unit North, (25) Dist. Agg. Assault<br>9 April 87, Agg Assault (38-12-2a) PGFG 1yr ct. Supv. Judge Wilens (Doc# 87148117) |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 7848147 | -22 Jul 87, Off. Schalk, A5VC, (25th) Dist., Robbery vmd<br>26 Aug 87, INFO#87-CR11121, Robbery<br>20 Nov 87, Robbery(87CR-11121)PG 4 YRS. PROBATION, $360 Fine, Judge Maloney |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 7892228 | -27 Sept 87, Off Kobaft 025th Dist., PCS<br>22 Oct 87, Poss.Cont.Sub.(56½-1402)Poss.Cann. (56½-704c)FNPC, Judge Bastone (doc#87247483) |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 8019379 | -01 May 88, Off. Muskerin, 025, Agg Assault<br>16 May 88, Agg Assault(38-12-2a1), SOL, Judge Chrones, Doc#88160875 |
| Jose MONTANEZ<br>1815 N. Harding<br>23 Aug 67 | 8123475<br>(WRW) | -30 Sep 88, Off. Whalen, PH/N(025), Robbery |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug. 67, | 8175963 | -18 Dec. 88, Off. Wojcik, 25th Dist. Poss. Marij. -cd-<br>27 Feb. 89, Poss of Cann, (56½-704a), BFW, Judge Brady, Doc# 88356942 |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug 67 tb | 8193970 | -17 Jan 89, Off. Ramierz 14th Dist., PCS<br>30 Mar 89, Poss. of Cannabis (56½-704a) BF/SOL, Judge Chrones, (Doc# 89102019) |
| Jose MONTANEZ<br>1850 N. Harding<br>23 Aug. 67, | 8203427 | -29 jan. 89, Off. Petrizzi, 25th Dist. ID Check -cd- |

*CONFIDENTIAL —Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).*

CPD-31.903 (REV. 10/78) ES



WANTED

BY Halvorsen 20692

UNIT 652 JUL 06 1993

CHARGE 1st Deg. Murder - X 054183

W.R. / I.R. REGISTER NO. CX 017756

CANCELLED

STOP NO. 93-637

DATE 9 JUL 93 BY C. Collins #4070

CITY OF CHICAGO / **DEPARTMENT OF POLICE** / 1121 South State Street
IDENTIFICATION SECTION Chicago, Illinois 60605

CRIMINAL HISTORY OF MONTANEZ, Jose E. M/WH

DATE 27 Mar 85

DATE OF BIRTH 25 Aug 67

| I.R. NO. | FBI NO. | I.S.B. NO. |
|---|---|---|
| 736499 | 730 931 DA7 | 08101881 |

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE / DISPOSITION |
|---|---|---|
| Jose E. MONTANEZ 1815 N. Harding 23 Aug 67 | 8270739 jlw | -05 May 89, Off. Wojcik, 025, Poss Cannabis 20 Jun 89, POSS CANN WRT, PG/FG 2 days tcs, Judge Branch 23-2 |
| Jose MONTANEZ 1815 N Harding 23 Aug 67 | 8376833 | - 16 Sept 89, Off Babich, 25th Dist Agg Battery 11 Oct 89, Agg. Battery, (38-12-4-A), FNPC, Judge Locallo (89MC1-301710) 11 Oct 89, Agg. batt. (38-12-4), FNPC, Judge LOcallo Doc#, (Ambak) em |
| Joseph MARTINEZ 1815 Harding 23 Aug. 67 pa | 8429905 | 28 Nov. 89, Off. Rowan. Gangs/N (25th) CTTL 16 Jan 90, CTTL(38-21-3), BF/SOL, JUDGE DIVANE, DOC#89283295 (AMBAK) CU |
| Joe Montanez 1850 Handing 23 Aug 67 | 8492563 th | -2 Mar 90, Off. Alvean 25th Dist., Tres. Land 4 Apr 90, CTTV (38-21-2), BF NOLLE, Judge Kowalski DOC#90220365 ambak eh |
| Jose MONTINEZ 1913 N. Kildare 23 Aug 67 lm | 8572247 | -15 Jun 90, Off. Williams, 25th, S/Batt 31 July 90,G.J. IND. #90CR-16801,First Degree Murder (3cts) |
| Jose E. MONTANEZ 1813 N. Kildare 23 Aug 67 lm | 8573492 | -17 Jun 90, Off. Munoz, Gangs No., (25), Murder 31 July 90,G.J. IND. #90CR-16801,First Degree Murder (2cts)Att First Degree Murder 4 Oct 91, First Deg. Mur., Att. First Deg. Mur.,(90CR-16801) |
| | | FINDING NOT GUILTY, Judge Savage |
| Jose E. MONTZNEZ 1913 N. Kildare 23 Sep 67 | 9109723 md | -30 Apr 92, Off. Santiago, Dist. 025, CTTV 14 May 92, CTTV (38-21-2)SOL,Judge Spitzer,Doc#92243639 TEMPFLEET YP |
| Jose E. MONTANEZ 3822 W. North Ave 23 Aug 67 | 9124415 ls | -20 May 92, Off. Maniates, Dist. 25, D/C 24 Jun 92, D/C(38-26-1al), BFSOL, Judge Spitzer, doc 92287538, TEMPFLEET tj |
| Jose MARTINEZ 1913 N Kildare 23 Aug 67 | 9184253 cc | - 04 Aug 92,Off. Antpl, Dist.025., Robbery 28Aug92, Robb(38-18-1a)MS/NOLLE PROS Judge Linn Doc#92326727 TEMPFLEET CU |
| Jose MONTANEZ 1915 N Kildare 23 Aug 67 | 9231402 cc | - 03 Oct 92, Off. Healy, Dist.025., Robbery, Armed Att 28 Oct 92 Armed Robbery(38-8-4) NOLLE Judge Linn Doc# 92333644 TEMPFLEET si |
| Jose E. MONTANEZ 1913 N. Kildare 23 Aug 67 | 9278434 gd | -07 Dec 92, Off. Kroll, Dist. 025, Retail Theft 30 Dec 92 Theft (38-16-a3a) BFW Judge Smith Doc3 92376018 |

*CONFIDENTIAL —Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed. (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).*

CPD-31.903 (REV. 10/75)

#3

CITY OF CHICAGO / **DEPARTMENT OF POLICE** / 1121 South State Street
IDENTIFICATION SECTION Chicago, Illinois 60605

CRIMINAL HISTORY OF MONTANEZ, Jose E. M/WH

DATE 27 Mar 85

DATE OF BIRTH 25 Aug 67

I.R. NO. 736499 | FBI NO. 730 931 DA7 | S.I.D. NO. 08101881

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DISTRICT / CHARGE / DISPOSITION |
|---|---|---|
| Jose E. MONTANEZ<br>1913 N. Kildare<br>23 Aug 67 | 9298361<br>ce | -07 Jan 93, Off. Martinez, Dist. 025., Theft Wrt<br>4 Feb 93,Theft(38-16-1a1)Bf/SOL,Judge Smith,Doc#<br>92-0376018,TEMPFLEET TMC |
| Jose MARTINEZ<br>1913 N. Kildare Ave<br>23 Aug 67 | 9358645<br>gd | -29 Mar 93, Off. Lezimis, Dist. 025, No FOID Card<br>17 May 93, No FOID (38-83-2), BFW, Judge Br. 50-2, |
| Jose E MONTANEZ<br>1913 N Kildare<br>23 Sep 67 | 9394261<br>cc | - 17 May 93, Off. Van, Dist.025., BFW NO FOID<br>25 May 93 NO FOI D(38-83-2a) SOL Judge Smith Tempfleet si |
| Jose E. MONTANEZ<br>1815 N. Harding<br>23 Aug. 67 | 9419641<br>cd | -20 June 93, Off. Williams, 25th Dist. Att. Robbery<br>4 Aug 93, G.J. Ind#93CR-16723, Att. Robbery, Agg. Battery<br>On Public Way |
| **Jose MONTANEZ**<br>**3940 W. Dickens**<br>**23 Aug. 67** | **9434099**<br>**cd** | **-9 July 93, Off. Pena, 25th Dist. Homicide Murder Wrt.**<br>19 Aug 93, GJ IND (93CR-18173) 1st Deg Mur 3 cts, Att Arm<br>Rob |
| | See CB#<br>9419641 | 07 Mar 95,Att Robbery, Agg Batt On Pub Wy, (93CR-16723),PG,4yrs IDOC, JUdge Bolan |
| | See CB#<br>9430499 | 03 Mar 95, First Degree Maruder 3Cts, Att(Armed Robbery), (93CR-18173), FG,45yrs IDOC, Defendant Also Received 10yrs IDOC For Att Armed Robbery To Run Consec, Judge Bolan |
| | | |
| | | |
| | | |
| | | |
| | | |

CPD 31.903 (REV. 7/88)

*CONFIDENTIAL - Further dissemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed (U.S. Dept. of Justice Rules & Regulations S.S. 20.33).*

LOG OF CRIMINAL HISTORY RECORDS ISSUED
Identification Section/CHICAGO POLICE EPARTMENT

I. R. #736499

| DATE | NAME OF PERSON REQUESTING RECORD | AGENCY OR C. P. D. UNIT | Complete Record | CPD & ISB Data Only | CPD Conviction Data Only | ISSUED BY |
|---|---|---|---|---|---|---|
| 4-20-87 | Fallon 5351 | 760-N | ✓ | | | [illegible] |
| 5 Jun 87 | Howlett 14281 | 162 | ✓ | | | [illegible] |
| JAN 19 1988 | Hughes A | CCAPD | ✓ | | | [illegible] |
| JUN 1 1988 | RILEY AS | CC APD | ✓ | | | [illegible] |
| NOV 16 1988 | D Hughes R | CCAPD | ✓ | | | [illegible] |
| APR 10 [illegible] | Riley L | C C APP | ✓ | | | [illegible] |
| Jun 22 9 | Poulosk 6803 | 652 | ✓ | | | [illegible] |
| OCT 22 1991 | TERM | CC APD | — | | | [illegible] |
| OCT 03 1992 | Det Holec 20694 | 652 | — | | | [illegible] |
| 20 May 93 | Det. R. Guevara 20861 | C.P.D | ✓ | | | [illegible] |
| 24 May 93 | Det. R. Guevara #20861 | 652 | | | ✓ | [illegible] |
| 22 July 93 | | SUBPOENAS | ✓ | | | BRIGGS |
| 10-28-94 | [illegible] PSI | [illegible] | ✓ | | | [illegible] |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CPD-31.915 (Rev. 1/78)

# Exhibit 51

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's appropriate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT

CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME: 5 Feb. 1993 0532

1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT: Homicide/First Degree Murder
I-UCR OFF. CODE: 0110
2. ADDRESS OF ORIG. INCIDENT/OFFENSE: 1838 N. Springfield — X 1 VERIFIED ☐ 2 CORRECTED
3. BEAT OF OCCUR.: 2533

5. VICTIM'S NAME AS SHOWN ON CASE REPORT: VARGAS, Rodrigo
CORRECT: X 1 YES ☐ 2 NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27.
6. FIRE RELATED: ☐ 1 YES X 2 NO
7. BEAT ASSIGNED: 5535

8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: Vehicle/Non Commerical
LOCATION CODE: 259
9. NO. OF VICTIMS: 1
10. NO. OF OFFENDERS: (3)

CIRCUMSTANCES 11. X VERIFIED ☐ UPDATE TO — 12. OBJECT/WEAPON CODE NOS. — 13. FIREARM FEATURES CODE NO. — 14. POINT/ENTRY CODE NO. — 15. POINT/EXIT CODE NO. — 16. BURGLAR ALARM CODE NOS. — 17. SAFE BURGLARY METHOD CODE NO. — 18. IF RESIDENCE WHERE WERE OCCUP. CODE NO.

19. PROPERTY — DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED. FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.
☐ VERIFIED ☐ UPDATE TO
1 MONEY ☐ T $ ☐ R — 2 JEWELRY ☐ T $ ☐ R — 3 FURS ☐ T $ ☐ R — 4 CLOTHING ☐ T $ ☐ R — 7 OFFICE EQUIPMENT ☐ T $ ☐ R — 8 TV, RADIO, STEREO ☐ T $ ☐ R
9 HOUSEHOLD GOODS ☐ T $ ☐ R — 0 CONSUM. GOODS ☐ T $ ☐ R — (-) FIREARMS ☐ T $ ☐ R — & NARC./DANGEROUS DRUGS ☐ T $ ☐ R — 5 OTHER ☐ T $ ☐ R — 6 NONE ☐ T ☐ R

VICTIMS UPDATE ONLY

| | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

OFFENDERS UPDATE ONLY

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

31. C.B. NO. — I.R. NO., Y.D. NO. OR J.D.A. NO. — OFFENDER REL. CODE — C.B. NO. — I.R. NO., Y.D. NO. OR J.D.A. NO. — OFFENDER REL. CODE — 32. NO. ARRESTED — ARREST. UNIT NO.
OFF 1 — OFF. 2

33. OFF'S. VEHICLE ☐ USED ☐ STOLEN — YEAR — MAKE — BODY STYLE — COLOR — V.I.N. — STATE LICENSE NO. — STATE

34. SERIAL NOS. OR IDENTIFICATION NOS. X 1 DNA ☐ 2 VERIFIED ☐ 3 CORRECTED — LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA): DNA — REV. CODE — 51. METHOD CODE — 52. METHOD ASSIGNED: X FIELD ☐ 3 SUMMARY — UNIT NO.: 652 — 53. STATUS: X PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED

STATUS CONT'D. ☐ 3 CLRD. CLOSED ☐ 4 CLRD. OPEN ☐ 5 EXC. CLRD. CLOSED ☐ 6 EXC. CLRD. OPEN ☐ 7 CLSD. NON-CRIM.
54. IF CASE CLEARED, HOW CLEARED: ☐ 1 ARREST & PROSEC. ☐ 2 DIRECTED TO JUV. CRT. ☐ 3 COMPL. RFUSD. TO PROSECUTE ☐ 4 COMMUNITY ADJUSTMENT ☐ 5 OTHER EXCEPT. ☐ ADULT ☐ JUV.

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

WANTED FOR QUESTIONING: SERRANO, Armando M/WH/Age 20, DOB [redacted] 72, 4615 W. Altgeld, 5-06, 150 lbs. Hair black, Eyes Brown, Build medium, Complexion medium, Known member of the Imperial Gangsters Street Gang IR# 874175

PACHECO, Jorge M/WH/Age 22, DOB [redacted] 71, 2332½ N. Spualding, 5-11, 175 lbs. Hair black Eyes brown, Build slender, Complexion medium. IR# 863600

35. R.D. NO. X-054183

90. EXTRA COPIES REQUIRED (NO. & RECIPIENT)
91. DATE THIS REPORT SUBMITTED: 2 June 1993 — TIME 2300
92. SUPERVISOR APPROVING (PRINT NAME) — STAR NO.
93. REPORTING OFFICER (PRINT NAME): Det. E. HALVORSEN — STAR NO. 20692
94. REPORTING OFFICER (PRINT NAME): Det. R. GUEVARA — STAR NO. 20861
SIGNATURE: [signature] — SIGNATURE: [signature] — SIGNATURE
95. DATE APPROVED (DAY–MO.–YR.) — TIME

CPD-11.411-B (Rev. 8/85) *MUST BE COMPLETED IN ALL CASES

DETECTIVE DIVISION
AREA FIVE VIOLENT CRIMES

2 JUNE 1993
RD# X-054183

HOMICIDE/FIRST DEGREE MURDER
VICTIM: VARGAS, Rodrigo

WANTED FOR QUESTIONING: MONTANEZ, Jose M/WH/Age 25, DOB [redacted] 67, 1913 N. Kildare, 6-03, 240 lbs. Hair black, Eyes brown, Known member of the Imperial Gangsters Street Gang, IR# 736499

On 2 June 93, the R/Dets. had a meeting with a circumstantial witness who for his own safety must remain anonymous at this time. This witness provided the following information.

He is a member of the Imperial Gangsters Street Gang. On Friday 5 Feb. 93, he was hanging out by a dope spot at Hamlin and Altgeld. Between 0830-0900 hrs. a car arrived at this location. He recognized the driver of the car as being "PISTOL PETE". Also in the car were "JORDAN", and "MONDO". He recognized all three of these guys as they were also members of the Imperial Gangsters. They were riding in a Tan colored Buick Regal, that he recognized as being "PISTOL PETE'S" car. "JORDAN" and "MONDO", got out of the car. "PISTOL PETE", sat in the car playing around with a bag of dope. The three of them were talking about a robbery they had just done, that had gone bad. "PISTOL PETE" stated, "MONDO fucked up, he went at that guy wrong, we would never did what we did if MONDO never fucked up". "JORDAN" stood around laughing as "PISTOL PETE" yelled at "MONDO". The witness asked "PISTOL PETE" what he was talking about. "PISTOL PETE" stated, "We shot a stud, we hurt that stud bad". "PISTOL PETE" told "MONDO", "Man you better think about it, if we had got caught up". "PISTOL PETE" told the witness that the day before the three of them had spotted a victim with lots of money. "PISTOL PETE" was getting change for a dollar when the victim walked in and showed a lot of money. "PISTOL PETE" and the other two guys decided to rob this victim and followed him home. At the last minute they held off sticking this guy up because he was with his lady and some kids. They knew this guy would be a sweet victim so they laid out for him. The witness saw "PISTOL PETE" take a large frame, 9mm semi-automatic pistol from under the dashboard of the car and put the gun in one of the heating ducts in the dashboard. "PISTOL PETE" stated that they did not get money from the victim they popped, and needed to get some money to buy dope, (Heroin). "PISTOL PETE" stated that they robbed some kid on the street with his school bags. "MONDO" stated that he took the school ring off the victims finger. "PISTOL PETE" stated he took this victims three neck chains, and his bracelet. The witness, got into "PISTOL PETE'S" car, along with "JORDAN" and "MONDO". They all drove to a place called, "Gold Busters", located at Diversey and Harding. They went there to sell the jewelry to get money to buy heroin. They got to "Gold Busters" around 0930 hrs. and found the store not yet open. They drove back to Hamlin and Altgeld.

Around 1000 hrs. they all drove back to "Gold Busters". "MONDO" and "PISTOL PETE" went into the store and sold the jewelry. They all then went looking to buy heroin at a different dope spot at Springfiled and Thomas. They finally drove back to Hamlin and Altgeld where the witness left them.

Two days later the witness was at Hirsch and Lemoyne. "PISTOL PETE" drove up in the same car he previously had. The witness noticed new damage to the left front fender, and asked "PISTOL PETE" what happened to his car. "PISTOL PETE" stated that after they popped the victim, he was driving his car and smashed into a parked car as they drove off. The witness asked "PISTOL PETE", what went wrong. "PISTOL PETE" stated that the victim who was a Mexican came out carrying a car radio. "MONDO" was supposed to grab the victim around the neck, so they could go into the victims pockets. "MONDO" got greedy when he saw the radio and, instead of grabbing the victim he went for the radio. The victim started fighting, and got shot. "PISTOL PETE" and "MONDO" jumped back into the car.

The R/Dets. were familiar with the Imperial Gangsters Street Gang and had photos of "PISTOL PETE", "JORDAN" and "MONDO". The witness was shown these photos and identified Jose MONTANEZ, IR #736499 as being "PISTOL PETE", George PACHECO, IR# 863500 as being "JORDAN" and Armando SERRANO IR# 874175 as being "MONDO".

On 2 June 93, Det. R. GUEVARA interviewed Wilda VARGAS, the victims wife. She provided the following information.

VARGAS, Wilda - in summary stated the following. On Thurs. 4 Feb. 93, she, her husband and children went to the bank. On the way home they stopped at the gas station at North Ave. and Central Park. A tan car pulled up and parked directly in front of them in the gas station. She could see that there were three M/WH'S in the car. Her husband went into the station to make a purchase. The driver of this car walked into the station behind her husband. Her husband had a roll of money, about $350.00. She looked at the man next to her husband. She also looked at the man who was seated in the front passenger seat of this tan car. She could not see the man in the back seat clearly. Her husband got back into their car, and they had to back out to get around the tan car. She watched the driver of the tan car, get back into his car. The people in the tan car began to follow them, all the way back to her house on Springfield.

HOMICIDE/FIRST DEGREE MURDER
VICTIM: VARGAS, Rodrigo

On 2 June 93, Det. R. GUEVARA showed Wilda VARGAS a photo array, that consisted of (8), CPD B&W Identification Photos. Wilda VARGAS identified Jose MONTANEZ, "PISTOL PETE", as the person who followed her husband into the gas station. She also identified Armando SERRANO, "MONDO", as the person she saw seated in the front passenger seat of the tan car that followed them. These photos were inventoried for evidence.

Det. R/Dets. gained information that Jose MONTANEZ was staying with a girlfriend in the 3900 block of W. DICKENS. The R/Dets. checked this block and observed a tan colored, 1984, 4Dr. Buick Regal, VIN# 1G4AM69A1EH587157. This car had damage to the left front fender. This car also had a bullet hole in the trunk and in the left passenger door. There were no license plates displayed on this car. The VIN# number was checked and this car was found to be registered to Jose MONTANEZ, 2516 N. McVicker. Jose MONTANEZ, is "PISTOL PETE".

Det. R. GUEVARA drove Wilda VARGAS around the neighborhood of the 3900 block of West Dickens. Wilda VARGAS was asked if she recognized the car that had followed her the day before her husband was killed. She positively identified the 1984, 4Dr. Buick Regal of Jose MONTANEZ, as the car that followed her from the gas station.

On 6 June. 93, the R/Dets. took photos of this 1984 Buick Regal.

Det. E. HALVORSEN #20692
Det. R. GUEVARA #20861

# Exhibit 52

CITY OF CHICAGO, DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION
Chicago, Illinois 60605

CRIMINAL HISTORY OF RIOS, Jose M/WH

DATE 29 July 1981

DATE OF BIRTH 30 April [redacted]

I.R. NO. 614010 | FBI NO 970150 AA5 | I.S.B. NO. 2423829

| NAME & ADDRESS | C.B. NO. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE / DISPOSITION |
|---|---|---|
| Jose RIOS<br>3449 W. North<br>30 April [redacted] | 6187986 | -28 Jul 81. Off. Rogers, 14th Dist, Disorderly Conduct. |
| Jacques RIV'RA<br>3335 W. Beach<br>30 Apr [redacted] | 6776065 | - 27 Feb 83 Off Chavez 14 dist Robbery<br>28 Feb 83, S/A Robb., (38-18-1a), Poss Stl Veh., (95½-4-103a),<br>FPC,TRANSFER TO CHIEF JUDGE, Judge Sodini<br>14 Mar. 83, INFO#83-2690, Robbery, Theft, Poss Stolen Veh. |
| Jack RIVERA<br>3335 W Beach<br>30 Apr [redacted] | 6851273 | - 02 Jun 83 Off Gruber Summer Mobile Force (14) UUW<br>24 June 83, UUW Gun (38-24-1a4) Fail Exib Reg. (MCC) Fail Poss. I.D. (38-83-2a) BFW, Judge Laurie (Docket No. 83235069) |
| | SEE CB<br>6776065 | 28 June 83. Robbery(83-2690) Nolle Prosse, Theft, Poss Stln Mtr Veh, PG/FG, 2yrs PROBATION, Judge Hall. |
| | SEE CB#<br>6857273 | -20 Aug 83, UUW (38-24-1a10) Fail to Exhibit Reg (MCC) Fail Poss ID Card (38-83-2a) SOL, Judge Macellaio (Docket No. 8323 5049) |
| Jaques RIVERA<br>4032 W. Division<br>30 Apr [redacted] | 7355806 | -20 May 85, Off. Fnuelly GCU-North (014th) Poss. Cocaine<br>17 Jul 85, Poss Cocaine, (56½-1402), No FOID Card., (38-83-2), SOL, Judge Kowalski, (Dk#85-1172594) |
| Jacques RIVERA<br>4032 W. Division<br>30 Apr [redacted] | 7849197 | -23 Jul 87, Off. Clark, 14th Dist., Batt. vmd<br>10 Aug 87, Battery(38-12-3) SOL Judge Chrones<br>(Doc# 8718 1956) |
| Jacques RIVERS<br>4448 W. Cortez<br>30 Apr. [redacted], | 8034413 | -24 May 88, Off. RRamirez, 14th dist. Poss. Cann. |

ISSUED ON INQUIRY
AUG 27 1988
BY NAME CHECK ONLY

Wron 00055

CONFIDENTIAL -Further dessemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued it must be destroyed. (U.S. Dept. of Justice Rules & Regulations

PLAINTIFF'S TRIAL EXHIBIT 4
PAGE 1 OF 1

# Exhibit 53

# SUPPLEMENTARY REPORT

CHICAGO POLICE

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE – TIME (DAY MO. YR.): 27 Aug 88 1545

1. INCIDENT/OFFENSE CLASSIFICATION LAST PREVIOUS REPORT: Murder/Homicide

1. UCR OFF. CODE: 0110

2. ADDRESS OF ORIG. INCIDENT/OFFENSE (☐1 VERIFIED ☐2 CORRECTED): 3320 W. Cortland

CORRECT: ☒1 YES ☐2 NO

3. BEAT OF OCCUR.: 1422

5. VICTIM'S/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT: VALENTIN, Felix

6. FIRE RELATED: ☐1 YES ☒2 NO

7. BEAT ASSIGNED: 4627

8. VICTIM'S/SUBJECT'S ADDRESS: 1458 N. Campbell

9. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED: Alley

LOCATION CODE: 092

10. PROPERTY — DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED. FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO | PROPERTY INVENTORY NO(S). |
|---|---|---|---|---|---|---|
| ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | |
| **9 HOUSEHOLD GOODS** | **0 CONSUM. GOODS** | **(-) FIREARMS** | **& NARC./DANGEROUS DRUGS** | **5 OTHER** | **6 NONE** | |
| ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T ☐R | |

OFFENDERS

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 12. HOME ADDRESS | 13. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1 RIVERA, Jacquez | 4231 W. Division | M 4 23 | 5-9 | 160 | Br | Br | Med |
| 2 | | | | | | | |

| 14. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 15. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 8112-639 | 614010 | 24 | OFF. 2 | | | | |

| 16. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

PERMANENT RETENTION FILE

80. NARRATIVE

VICTIM: VALENTIN, Felix; M/WH/16; 1458 N. Campbell 3 rd. flr. Deceased, former member of the Campbell Boys/014

DATE, TIME, LOC. OF INC: 27 Aug 88; 1545 hrs.; 3320 W. Cortland, Alley

DATE, TIME, LOC. OF ARREST: 15 Sep 88; 1930 hrs.; 5555 W. Grand, A/5 VC

OFFENDER: RIVERA, Jacquez; M/WH/23; 30 Apr [redacted]; 5-9, 160; AKA. RIOS, Jose; 4231 W. Division 3rd. flr. nickname, ACE; member of Latin Kings/014

CHARGES: Murder 1st. Degree; 38-9-1a

COURT DATE & BRANCH: 16 Sep 88; 66-2

INVESTIGATION: Reporting officers along with other Gang Crime Specialists were investigating an Aggravated Battery in which the victim was shot ten times. GCSp. Noon, Guzman, Sparks, and Zacharias located a witness on 29 Aug 88. This witness was brought into Gang Crimes North to view gang photo books. On that date witness positively identified the photo of Jose RIOS from book 16-D, page 40

☒ CONTINUED OTHER SIDE

17. RD NO.: K-371955

90. EXTRA COPIES REQUIRED (NO. & RECIPIENT):

91. DATE THIS REPORT SUBMITTED (DAY MO. YR.): 16 Sep 88 — TIME: 0030

92. SUPERVISOR APPROVING (PRINT NAME): Sgt. Mingey — STAR NO.: 1731 — SIGNATURE: [signature]

93. REPORTING OFFICER (PRINT NAME): GCSp. S. Gawrys — STAR NO.: 16899 — SIGNATURE: S. Gawrys

94. REPORTING OFFICER (PRINT NAME): GCSp. R. Guevara — STAR NO.: 16345 — SIGNATURE: R. Guevara

95. DATE APPROVED (DAY-MO.-YR.): 16 Sep 88 — TIME: 0030

CPD-11.411-A (REV. 8/85)

*MUST BE COMPLETED IN ALL CASES

Hickey 00017

19

CONTINUATION OF NARRATIVE

INVESTIGATION CON'T: photo D, Latin King gang book. Numerous attempts were made to interview the victim at Cook County Hospital, on 10 Sep 88 r/i's were able to have victim view gang photo book were then an idetification was made of Jose RIOS as the person that shot victim.

On 15 Sep 88, reporting officers located Jose RIOS, AKA. RIVERA,Jacquez on the street and he was asked to accompany r/o's to A/5 VC to stand in a line-up for Murder. Subject agreed and he was read his Miranda warnings.

Once in A/5 VC Jose RIOS was placed in a line-up and he was positively identified as the person that shot the victim Felix VALENTIN on 27 Aug 88. Review by A.S.A. Rosner with witness, charges of 1st. Degree Murder were approved.

Orlando LOPEZ, witness, was shown photos of Jose RODRIQUEZ and Felipe NIEVES and he stated to r/i's that these two individuals were not involved in this incident.

PERMANENT RETENTION FILE

R.D. NO. K-371955

16 SEP 1988 15 59

HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE. SUPERVISOR'S SIGNATURE | STAR NO. | DATE (DAY-MO.-YEAR)

Hickey 00018

20

# Exhibit 54

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT (DAY MONTH YEAR) | DATE OF THIS REPORT (DAY MONTH YEAR WATCH) |
|---|---|
| | |

| OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| | | |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

RODRIGUEZ, HUGO. M/WH/16.
5916 N. PAULINA 2ND 27 APR 77.
SENN H.S. 2ND YEAR. NO GANG,
- unemployed -

FATHER - 3113 W. AINSLE 2ND.
RODRIGUEZ, FORTUNATO. NO. PH.
mother in MEXICO.

- middle REAR Seat.
- AFTER SHOOTING SAW off in
- ALL BLK -
- Run into Alley -
- HEARD 5 SHOTS.

R.D. NO.

| EPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE–STAR NO. | DAY–MO.–YR. TIME |
|---|---|---|
| | | |

PD-23.122 (Rev. 2/83)

# Exhibit 55

YALE

Eatt X-250303
People v. GERALDO IGLESIAS
Indictment No. 93-15199
People's Exhibit No. I-F

People v. GERALDO IGLESIAS
Indictment No. 93-15199
People's Exhibit No. I-A

People v. GERALDO IGLESIAS
Indictment No. 93-15199
People's Exhibit No. I B

Eatt X-250303
People v. GERALDO IGLESIAS
Indictment No. 93-15199
People's Exhibit No. I E

# Exhibit 56

A. These are the photographs that we took on the 7th of June from the 2100 block area; 2148 North Sawyer.

Q. And these photographs that you identified as being the photographs of the scene, do these photographs truly and accurately represent the scene as you found it on June 7th, 1993?

A. Yes, sir.

MR. STUDENROTH: Nothing further.

MR. DeLEON: I have no question of this witness. Thank you.

THE COURT: Thank you, sir. You may step down.

(witness excused.)

THE COURT: Call your next witness.

MR. STUDENROTH: Detective Guevera.

D E T. R E N A L D O G U E V E R A,

called as a witness by the State's Attorney herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

By: Mr. Studenroth

Q. Sir, could you please introduce yourself to the ladies and gentlemen of the jury?
A. Det. Renaldo Guevera, G-u-e-v-e-r-a. My star number is 20861. I am assigned to the Chicago Police Department, Violent Crimes Unit.
Q. What part of the City do you work?
A. I work the north side of the City of Chicago.
Q. Would that be at Area 5 located at Grand and Central?
A. That is correct.
Q. How long have you been a Chicago police Officer?
A. I have been a Chicago Police Officer approximately 22 years.
Q. How long have you been a Violent Crimes detective?
A. Approximately five years.
Q. Prior to becoming a Violent Crimes detective what did you do within the Chicago Police Department?
A. I was a Gang Crimes Specialist for 15 years.

Q. Could you please describe what a Gang Crimes Specialist does?

A. A Gang Crimes Specialist, their main function is to gather intelligence on all gangs within the area that he works in and investigate gang crimes.

Q. Were you a Gang Crimes Specialist in the same area of the northwest side of the city?

A. Yes, I was.

Q. And as of -- As a Gang Crimes Specialist did you deal with all types of gangs and their locations within that area of the City?

A. Yes, I did.

Q. And were you familiar with the colors and the gang signs and gang slogans that were used by each and every gang in your area?

A. Yes, I am.

Q. And did you have an opportunity to, during your years as a Gang Crimes Specialist, to make arrests of gang members?

A. Yes. Many times.

Q. Approximately how many times did you make arrests for the crime, where the crime was gang related?

A. Thousands of times.

Q. As your duties as a Violent Crimes detective what do you do?

A. As a detective my primary function is to investigate any violent crimes such as robbery, armed robbery, rape, criminal sexual assault, murders, and aggravated batteries.

Q. In June of 1993 did you have an opportunity to investigate the murder of Monica Roman that occurred on June 7th at approximately the 2100 block of North Sawyer?

A. Yes, I did.

Q. Approximately what -- Did you get involved in the investigation on approximately June 21st?

A. That is correct.

Q. Now prior to June 21st had there been other detectives assigned to that investigation?

A. Yes, there were.

Q. And when you got involved in the investigation had there been any leads or any possible suspects up to that point in time?

A. No, there hasn't been any.

Q. When you were working on June 21st what happened with regards to your investigation?

A. While I was in the office I received a phone call from a confidential informant.

Q. Could you please explain to the ladies and gentlemen of the jury what a confidential informant is?

A. Confidential informant is a person that I have dealt with in the past, has given me information about crimes.

Q. After you had the conversation with the confidential informant what is the first thing you did, Detective?

A. After I had that conversation with him I went looking for a photograph of Snake, also known as Geraldo Iglesias.

Q. Do you see the person in court today of the photograph that you were looking for?

A. Yes, I do.

Q. Could you please identify that person by pointing out an article of clothing he is wearing?

A. The gentleman over there with the white shirt on.

MR. STUDENROTH: Indicating the in-court identification of the defendant, your Honor, Geraldo Iglesias, sir.

THE COURT: So reflect.

BY MR. STUDENROTH:

Q. What was your purpose in getting a photograph of the defendant?

A. To conduct a photo array, putting his photograph with numerous other Hispanic or male/white individuals and then conduct a photo array pertaining to the crime.

Q. Did you in fact on the following day, June 22nd, conduct a photo array with Rosendo Ochoa?

A. Yes, I did.

Q. Did you go to his house with your partner to do that?

A. Yes.

Q. Who were you working with that day?

A. Ernest Halverson.

Q. When you met with Roscendo Ochoa did you conduct a photo array?

A. Yes, I did.

Q. Could you please explain to the ladies and gentlemen of the jury how you did that?

A. I had in my possession eight Polaroid color photos, including the one of the suspect, and I laid them down and asked the witness if he sees anybody

in those photographs that he seen the night of the shooting.

Q. Did you indicate to Rosendo Ochoa which photograph to select?

A. No, I did not.

Q. Did he in fact select one?

A. Yes, he did.

Q. Whose photograph did he pick out?

A. He picked the photo of Snake, also known as Geraldo Iglesias.

Q. Detective, I am showing you what has been marked as People's Exhibit, Group Exhibit 7, A through H.

Those are the photographs that you showed Rosendo on June 22, 1993?

A. Yes, they are.

Q. Could you please put your name on the back of the photograph Rosendo Ochoa picked out?

A. (indicating.)

MR. STUDENROTH: Indicating his signature on the back lower portion of the photograph, your Honor.

THE COURT: Record will reflect that.

Which photograph?

MR. STUDENROTH: Exhibit 7D.

THE COURT: Record will reflect that.

BY MR. STUDENROTH:

Q. When he selected this photograph did he say anything about that person?

A. Yes, he did.

Q. What did he say?

A. He said "this is the person that I saw shoot Monica Roman on that day and killed her."

Q. After Rosendo Ochoa told you that what did you and your partners do?

A. At that point we began looking for Snake.

Q. What part of the City did you go looking for him?

A. Looked for him in the immediate area where the Imperial Gangsters, who he is a member of, hang around at.

Q. And you knew that through your experience as a Gang Crimes Specialist, I take it?

A. Yes, I did.

Q. And specifically what area of the City did you go to?

A. The area that goes 3200 west to 3400 west; approximately 2000 north to approximately 2400 north, which would be -- on the south end would be

Armitage, on the north end would be Fullerton, on the west end would be Kimball, on the east end would be Kedzie.

Q. Were you able to find Geraldo Iglesias on that day?

A. Not on that day; no.

Q. The following day, June 23rd, did you come to work and continue looking for Geraldo Iglesias?

A. Yes, I did.

Q. In the evening hours, approximately 6:00 P.M., were you able to locate him?

A. Yes, I did.

Q. Who was with you when you found him?

A. At the time it was my partner, Ernest Halverson, with me.

Q. And where did you see the defendant?

A. Approximately in the 2100 block of Spaulding with numerous other individuals.

Q. When you saw the defendant with these other people what did you and your partner do?

A. I immediately asked for a back-up car.

Q. Did a back-up car arrive?

A. Yes.

Q. Would that have been two additional

detectives from Area 5?

A. Yes; Det. Reccio (ph. sp.) and Det. Steven Garz (ph. sp.).

Q. When the back-up detectives arrived did you at that time exit your car and place the defendant under arrest?

A. Yes, I did.

Q. After placing him under arrest did you transport him to Area 5 located at Grand and Central?

A. Yes, I did.

Q. That evening at approximately 8:00 P.M. did you do anything with the defendant?

A. Yes, I did.

Q. What did you do?

A. I put him in a lineup.

Q. And could you please describe for the ladies and gentlemen of the jury what a lineup is and how you conducted it?

A. A lineup is numerous individuals including the suspects are placed into a room, which is viewed through a one-way mirror from another room by the witnesses.

Q. Did you give Geraldo Iglesias an

opportunity to select his position in the lineup?

A. Yes, I did.

Q. And did Rosendo Ochoa come to the police station and view that lineup?

A. Yes, he did.

Q. And when he viewed that lineup did he identify anyone?

A. Yes, he did.

Q. And when he viewed that lineup and identified someone were you with him when he identified that person?

A. Yes, I was.

Q. Was there any hesitancy at the time when he made the identification on behalf of Rosendo Ochoa?

A. No, no hesitancy. He went right to him.

Q. And did you or your partners indicate to him who to pick out of the lineup?

A. No, I did not.

Q. Showing you what has been previously marked People's Exhibit No. 8 for Identification.

Do you recognize that photograph?

A. Yes. This is a photograph of the lineup that Ochoa viewed.

Q. What person did Roscendo Ochoa select out

of that lineup?

A. He picked a person in the No. 5 spot.

Q. Would that be the 5 spot, going from left to right?

A. Correct.

Q. Could you please put a circle around that person's face that he identified?

A. (indicating.)

MR. STUDENROTH: Indicating for the record a circle, your Honor, around the person in the 5th position from left to right.

THE COURT: Record so reflect.

BY MR. STUDENROTH:

Q. Showing you this photograph that has been previously marked, I believe, 23.

Is that a photograph of the person he identified?

A. Yes, it is.

Q. And that is the same person you identified in court as Rosendo or Geraldo Iglesias, sir?

A. Yes, it is.

Q. Later on that evening going into the morning hours of June 24th, did you continue your investigation?

A. Yes, I did.

Q. And what did you do at that time?

A. At that point Hugo Rodriguez and I believe two other people came into the office, into the Area, and I conducted a photo array with him.

Q. So Hugo Rodriguez was not present at the police station at the time Rosendo Ochoa viewed the lineup; is that correct?

A. No, he was not.

Q. Obviously he was not present when Rosendo Ochoa viewed the photo array; is that correct?

A. No, he was not.

Q. When Hugo Rodriguez arrived at the police station and viewed the photo array who did he pick out?

A. The same photograph Ochoa picked out.

Q. That would be a photograph of the defendant, Geraldo Iglesias?

A. That is correct.

Q. Did you conduct the photo array with Hugo Rodriguez in the same manner that you did with Rosendo Ochoa?

A. Yes, I did.

Q. Did you then in the early morning hours of

June 24th conduct a lineup with Hugo Rodriguez at Area 5?

A. Yes, I did.

Q. And by the way when you conducted a photo array with Hugo was anyone else present besides you and Mr. Rodriguez?

A. Yes.

Q. Who was that?

A. Assistant State's Attorney Latz (ph. sp.).

Q. Latz?

A. Yes.

Q. He was present during the time Hugo selected the photograph?

A. Yes, he was.

Q. When the lineup was run approximately 1:25 in the morning did you conduct that lineup the same way you did it with Rosendo Ochoa?

A. Yes. Same way; different people.

Q. Did you give the defendant, Geraldo Iglesias, an opportunity to select his position in that lineup?

A. Yes, I did.

Q. And how many people were in that lineup with -- the one that Hugo Rodriguez viewed?

A. I believe there were six people in that particular lineup.

Q. When Hugo Rodriguez viewed the lineup was there any hesitancy in the person he selected?

A. No.

Q. When he selected the person what did he tell you about him?

A. He said that is the person that he saw shoot and kill Monica Roman.

Q. And did you suggest to him which person to pick out of the lineup?

A. No, I did not.

Q. I am showing you what has been marked People's Exhibit No. 20 for Identification.

Do you recognize that photograph?

A. Yes, I do.

This is a lineup photograph of the second lineup that was conducted in the early morning hours of June 24.

Q. And could you please circle the person on that photograph that Hugo Rodriguez identified?

A. (indicating.)

MR. STUDENROTH: Indicating for the record, your Honor, the individual on the far right side of the

photograph.

THE COURT: Record will so reflect.

BY MR. STUDENROTH:

Q. And People's Exhibit No. 21, what is that a photograph of?

A. This is a photograph of the same individual by himself.

Q. And does these two photographs truly and accurately depict the lineup and the person he selected on the early morning hours of June 24th?

A. Yes, it does.

Q. Detective, after the witnesses viewed the lineup was the defendant charged with the murder of Monica Roman?

A. Yes, he was.

MR. STUDENROTH: May I have a minute, Judge?

THE COURT: Yes.

BY MR. STUDENROTH:

Q. Detective, during your investigation did you learn that obviously the shooter or the suspect was a member of the Imperial Gangsters?

A. Yes.

Q. Did you learn that the victim, Monica Roman, was in a car driven with some Latin Kings?

A. Yes, I did.

Q. Did you also learn that prior to the shooting the suspect shouted out the words "King love?"

A. Yes, I did.

Q. Could you please explain to the ladies and gentlemen of the jury why an Imperial Gangster would yell out "King love" to a carload of Latin Kings?

A. Purpose of them doing that is whether -- to find out whether the persons that are in the car are affiliated with the same gang or members of the opposite gangs.

Q. That is a term that is commonly referred to as false flagging?

A. That is correct.

MR. STUDENROTH: Nothing further, Judge.

THE COURT: Cross?

CROSS EXAMINATION

By: Mr. DeLeon

Q. Det. Guevera, you were not an eye witness; is that right?

A. That is correct, I was not.

Q. You from your own knowledge, of your personal vision didn't see who shot Monica Roman; is that right?

A. That is correct, I didn't.

Q. You don't know then from your personal knowledge, from your vision, that it was this man that yelled "King love?"

A. That is correct, I don't.

Q. You are depending on what two witnesses, Hugo Rodriguez and Ochoa -- Rosendo Ochoa, told you; is that right?

A. That is correct.

Q. In other words they pick a man, it is your job to go and arrest them; right?

A. That is correct.

Q. That is what you did; right?

A. Yes, sir.

Q. When you went to arrest him you found him, you say, on the street; right?

A. That is correct.

Q. 2100 block of Spaulding; right?

A. That is correct.

Q. There is a Boy's Club not far from there?

A. Block-and-a-half away; yes.

Q. Block-and-a-half away.

And do you know if Mr. Iglesias, sir, works at that Boy's Club?

A. No, I do not.

Q. Have you seen Mr. Iglesias by that Boy's Club?

A. Many times I have.

Q. How many times have you seen him by the Boy's Club to the best of your estimate?

A. I couldn't give you an exact figure but I have seen him many times.

Q. When you saw him you said you called for backup before you made the arrest; is that right?

A. That is correct, I did.

Q. That is a precautionary measure; isn't that?

A. Yes, correct.

Q. At no time when you made the arrest of Mr. Iglesias did he resist you?

A. No, he did not.

Q. At no time did he run away from you?

A. No, he did not.

Q. At no time did he fight with you?

A. No, he did not.

Q. He just went with you voluntarily when you took him; right?

A. Right.

Q. Now you looked at People's Exhibit No. 21 just a few minutes ago; did you not?

A. Yes, I did.

Q. And this is a picture depicting Geraldo Iglesias.

That is a lineup photo; is that correct?

A. That is correct.

Q. In that picture there is a height bar or a tape on the wall to determine the height of individuals; isn't there?

A. Yes, it is.

Q. And in fact he is placed right up against that height bar apparently in that picture; is that right?

A. That is correct.

Q. And what is the height as best you can see from that picture of Mr. Iglesias?

A. Approximately five-eleven.

Q. And this is the bar that you normally use in the station to determine a person's height?

A. That is correct.

MR. DeLEON: Thank you.

REDIRECT EXAMINATION

By: Mr. Studenroth

Q. Detective, you indicated that defendant didn't run or resist when you placed him under arrest; is that correct?

A. That is correct.

Q. How many officers were there when you placed him under arrest?

A. Four detectives.

Q. Did he have an opportunity to run or resist?

A. I don't think so.

Q. And Mr. DeLeon asked you that the reason you placed him under arrest was just because two eyewitnesses picked him out of a lineup in the photographs.

However, there was additional reasons why; isn't that correct?

A. Oh, yes.

Q. Some of the reasons was based on the

description that these witnesses gave?

MR. DeLEON: Objection to that, your Honor.

MR. STUDENROTH: Judge, I believe he opened the door.

MR. DeLEON: I don't believe that is any opening of the door.

I didn't ask about descriptions.

MR. STUDENROTH: He asked him why he placed him under arrest.

THE COURT: I believe the door is opened.

Overruled.

BY MR. STUDENROTH:

Q. And didn't you learn, Detective, that Rosendo Ochoa gave a description of the offender that did the shooting; isn't that correct?

A. Yes, he did.

Q. And didn't you learn that Rosendo Ochoa told the police officers and the detectives that the person that did the shooting was a male/white Hispanic?

A. Yes.

Q. And that he was between the ages of 17 and 19 years of age?

A. Yes, that is correct.

Q. And he was approximately between five-five and five-seven?

A. That is correct.

Q. He was between 135 and 140 pounds?

A. Correct.

Q. That he was clean shaven?

A. Yes.

Q. And he was wearing a black hooded sweatshirt and black pants; is that correct?

A. That is correct.

Q. And based upon that description that those witnesses gave you a male/white Hispanic fit the description of the defendant; didn't it?

A. That is correct.

MR. STUDENROTH: Nothing further, Judge.

THE COURT: Mr. DeLeon?

MR. DeLEON: If I may have a second, your Honor?

THE COURT: All right.

RECROSS EXAMINATION

By: Mr. DeLeon

Q. You say that a description that was given to you fit this young man here; is that right?

A. Fits the description of a male/white Hispanic.

Q. Light complexion?

A. Light complexion.

Q. You wrote out an arrest sheet on this case -- you and your partner Halverson?

A. I believe we did; yes.

Q. I show you a copy and ask you if this is your arrest sheet?

A. Yes, it is.

Q. Would you tell us what you and Off. Halverson put down for his complexion?

A. Medium complexion.

Q. Medium complex.

You didn't put down light; did you?

A. No, I did not.

MR. DeLEON: I have no other questions.

Thank you, Officer.

THE COURT: Anything else?

MR. STUDENROTH: Nothing, Judge.

THE COURT: Thank you, sir.

You may step down.

(witness excused.)

THE COURT: Counsel approach.

# Exhibit 57

SUPREME COURT OF THE STATE OF ILLINOIS
COOK COUNTY, CRIMINAL TERM
--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF ILLINOIS

-against-

GERALDO IGLESIAS, Case No. 93 CR 15199

Defendant.
--------------------------------------------------------------------X

**EXPERT REPORT OF NANCY FRANKLIN PHD**

Nancy Franklin, being duly sworn, deposes and says:

1. I am over 18 years of age, of sound mind and otherwise competent to make this Affidavit. The evidence set out in this Affidavit is based on my personal knowledge.

2. I am an Associate Professor in the Psychology Department at Stony Brook University, Stony Brook, NY.

3. I have a Ph.D. in Psychology from Stanford University (1989), and my areas of specialization are cognition and memory (which includes, among other subjects, eyewitness identification and false memory). I have taught both graduate and undergraduate courses in cognition and human memory and have conducted research at Stony Brook University since 1989. My research has been funded by the National Science Foundation and the National Patient Safety Foundation.

4. I am an active member of the American Psychology-Law Society, the Association for Psychological Science, the Society for Applied Research in Memory and Cognition, and the Psychonomic Society, and I present my work regularly to the research community. I am well-

acquainted with current findings in the field of human memory generally and the fields of eyewitness memory and identification specifically. My CV is attached as Exhibit A.

5. I have consulted as a memory and identification expert in more than 400 criminal cases in New York, Massachusetts, Pennsylvania, Connecticut, Ohio, Washington, D.C., Maryland, South Carolina, Missouri, Arkansas, Oklahoma, Michigan, Illinois, Texas, and California, since 2008. I have testified in more than 60 of these cases.

6. I have been asked to write an affidavit concerning eyewitness evidence provided by Rosendo Ochoa and Hugo Rodriguez, who both made identifications of Geraldo Iglesias following the murder of Monica Roman. In forming my opinions, I reviewed documents totaling approximately 360 pages, including original police reports; photos of the crime scene, of Mr. Iglesias, of a five-person lineup and of a six-person lineup; testimony of eyewitnesses Rosendo Ochoa, Hugo Rodriguez, and Daniel Sanchez; testimony of responding officer Jose Zuniga; and testimony of Detective Reynaldo Guevara.

**Overview of Affidavit**

7. Geraldo Iglesias was convicted in 1994 following identifications and trial testimony by two eyewitnesses, Rosendo Ochoa and Hugo Rodriguez, both of whom had viewed the shooter under nonoptimal perceptual conditions and both of whom had provided descriptions of the shooter that substantially mismatched the physical characteristics of Iglesias. According to Detective Reynaldo Guevara, Geraldo Iglesias became a suspect when a confidential informant told Det. Guevara that Iglesias had committed the murder.

8. A large body of psychological research has identified several factors that impair eyewitness memory and increase the risk of both false memories and incorrect identifications. This affidavit describes factors of the *Iglesias* case that are known to affect memory in these ways, as follows:

a. Inherent incompleteness and unreliability of memory
b. Inherent difficulty in identifying strangers
c. Exposure duration
d. Bias to overestimate event duration
e. Viewing distance
f. Stress
g. Weapon focus effect
h. Delay from incident to identification
i. Characteristics of the description
j. Post-event suggestion
k. ID administrator's knowledge of who the suspect is (*non-blind procedures*)
l. Impact of positive feedback on memory and confidence
m. Multiple exposures to suspect (*Mugshot exposure effect*)
n. Commitment effect
o. Probative value of non-identifications
p. In-court identifications as unreliable and prejudicial
q. Relationship between confidence and accuracy

9. In discussing the above topics, I am relying on peer-reviewed research and am articulating the general consensus among experts in the field regarding these findings. Much of the research demonstrating these effects have emerged from controlled laboratory experiments. Where data from real-world crimes have also been examined, the patterns of findings parallel those found in the laboratory. Indeed, several researchers have argued that error rates observed in the laboratory underestimate those associated with real-world crimes (e.g., Deffenbacher, Bornstein, Penrod, & McGorty, 2004; Ihlebaek, Love, Eilertsen, & Magnussen, 2003; Lindsay & Harvie, 1988; Murray & Wells, 1982) because, for example, the level of stress that can be achieved in the lab is likely much lower than that experienced by many witnesses to crimes.

**Human Memory Is Inherently Vulnerable and Follows Sharp Losses With Time**

10. More than 100 years of research shows that human memory does not behave like an electronic recording device. Instead, it is generally incomplete and subject to error (Bartlett, 1932; Carmichael, Hogan, & Walter, 1932; Loftus & Palmer, 1974). Forgetting begins to set in immediately, with the sharpest losses occurring in the period just after exposure (Ebbinghaus, 1885/1913). When people later remember events, they retrieve whatever details were originally encoded and remain in storage, along with additional details encountered through their own inferences and additional experiences, or from other people. From this, they reconstruct a memory that they typically experience to be a complete and accurate accounting (Payne, Toglia, & Anastasi, 1994). This method of *reconstruction* is a fundamental characteristic of human memory, and it creates opportunities for memory errors. Several contributors to these errors will be discussed in this affidavit.

11. **Inherent Difficulty In Identifying Strangers.** Memory has been studied for a large variety of content types (objects, scenes, language, etc.), and recognition for unfamiliar faces is among the poorest, as detailed below. Consistent with this, approximately three-quarters of exonerations to date had stranger eyewitness identification as a basis for the original conviction (National Research Council, 2014). Eyewitness misidentification appears to be the single greatest contributor to wrongful convictions (e.g., West & Meterko, 2016).

12. Under optimal circumstances (e.g., with good lighting, no threat, extended viewing, and short delay to test), correct identifications in laboratory experiments are typically between 50% and 70%, with false identifications typically 20%-25% (e.g., Shapiro & Penrod, 1986). Similar rates of Hits and False IDs have been demonstrated in real-world criminal identification procedures as well, with IDs of the police suspect treated for these purposes as Hits (Wright & McDaid, 1996). Several researchers have extended this work to perceptual matching tasks that do not require memory, and they have found that false identifications are quite persistent and involve flawed perceptual as well as flawed memory processes (Bruce, Henderson, Greenwood, Hancock, Burton, & Miller, 1999; Bruce, Henderson, Newman, & Burton, 2001; Burton, Miller, Bruce, Hancock, & Henderson, 2001; Henderson, Bruce, & Burton, 2001; Megreya & Burton, 2006, 2007).

13. For example, participants in Megreya, White, and Burton (2011) viewed a face at the top of a computer screen and a set of faces below it. An example from their study is presented here:



14. Participants were instructed that a different photo of the person at the top of the screen, taken the same day, may be presented among the 10 options below him. Their task was to either indicate which was the matching face or indicate that no match was present. In fact, there is no match present in the example above. About one-third of responses to target-absent trials such as the one shown here led to mistaken IDs, demonstrating that poor stranger identification arises from fundamental shortcomings in perception even before any additional complications of memory and distortion are introduced.

15. The increased risk of false identifications appears to arise in part from a bias to choose rather than to indicate that no match is present, both in the laboratory (Wells, 1984) and in real-world criminal ID procedures (Behrman & Davey, 2001). Witnesses tend to make relative comparisons and identify the candidate who they judge to be the best match to whatever they remember about the perpetrator (Leippe, Eisenstadt, & Rauch, 2008).

16. These findings are counterintuitive for the average juror (Schmechel, O'Toole, Easterly, & Loftus, 2006), but are consistent with what we know about adaptive pressures in the evolution of face recognition (Dunbar, 1992). Until quite recently, humans lived in small kin-based groups and had rare contact with members of other groups. When they did see strangers, there likely was little need to later remember specific individuals. Creating a detailed, stable representation of another person's face is particularly costly in cognitive resources. In the absence of adaptive pressures toward committing the nuances of new faces to memory, these functions have remained slow and unreliable.

17. These findings demonstrating the unreliability of stranger identification are relevant to the *Iglesias* case because neither Rosendo Ochoa (trial pp. R-51-R52) nor Hugo Rodriguez (trial p. U-18) recognized the shooter as familiar.

## Encoding Conditions

18. *Encoding* refers to the initial stage of introducing information into memory. Several factors associated with crimes can increase the risk of poor encoding, and thus they increase the risks of incomplete memory and of susceptibility to later systematic distortion.

19. **Exposure Duration**. Stranger identification is poor under a broad range of circumstances, including the straightforward perceptual matching task demonstrated above. Beyond this, performance is further impaired if initial exposure to the face had been brief (Bornstein, Deffenbacher, Penrod, & McGorty, 2012; Shapiro & Penrod, 1986). Mistaken identification rates as high as 80-90% have been observed with exposures of about 10 seconds, and they remain high (mistaken IDs of 25-50%) with exposures of 45 seconds (Memon, Hope, & Bull, 2003; Shapiro & Penrod, 1986). That is, brief exposure creates the risk not just of failing to identify the culprit accurately when he is included in the lineup; it also substantially increases the risk of incorrect identification of an innocent suspect. According to Bornstein et al.'s (2012) meta-analysis[1] of the research to date, much larger increases in exposure time beyond the 30-second range are typically necessary in order to produce clear benefits to identification accuracy.

20. **Bias To Overestimate Event Duration**. People tend to overestimate duration of an event, by as much as a factor of 2 or 3 (e.g., Cutler, Penrod, & Martens, 1987). The risk of this error increases when the event is stressful, unexpected, and/or uncontrollable (see also Buckhout, Fox, & Rabinowitz, 1989; Campbell & Bryant, 2006; Cutler et al., 1987; Loftus, Schooler, Boone, & Kline, 1987; Morewedge, Kassam, Hsee, Caruso, 2009), and is particularly high if the event had lasted less than 2 minutes (Roy & Christenfeld, 2008).

21. With regard to the *Iglesias* case, both eyewitnesses' opportunities to view the perpetrator's face were substantially limited. Hugo Rodriguez did not witness the shooting itself (trial p. U-33), and he ducked down in the car when he heard shots. He then looked up and glimpsed the shooter out of the rear passenger window (trial p. U-10). He ducked down again and then looked up again at the shooter's face as the car he was in accelerated and fled the scene (p. U-12). Rodriguez estimated his exposure to the shooter as "not even ten seconds." This was from a moving car and included time when the shooter was running away with his back turned.

22. Rosendo Ochoa, who testified that he viewed the shooter from an elevated window about 40 yards away, testified at trial (p. R-39) that "Almost immediately he took out a gun and started shooting towards the car where Monica was." Ochoa testified that after shooting five times (p. R-40, R-66), the perpetrator "stood there for about 15-20 seconds, staring at the car." After that, the perpetrator turned and ran with his back to Ochoa (p. R-96). So at best,

---

[1] In a meta-analysis, the data from multiple experiments are aggregated and subjected to a sophisticated statistical analysis in order to assess the existence and strength of the factor of interest. For example, Bornstein et al.'s (2012) meta-analysis included 33 studies published between 1970 and 2006.

Ochoa's view of the shooter appears to have lasted only a matter of seconds, under other poor perceptual conditions, and with some uncertainty about whether or for what proportion of these seconds the perpetrator's full face was available for viewing.

23. These witnesses' duration estimates by themselves indicate that both had only a brief exposure to the perpetrator's face, which is known to produce poor encoding and a high risk of subsequent incorrect identification. Given that the research demonstrates a significant likelihood that both these estimates may also have been inflated, the risk of false identification increases still further.

24. **Viewing Distance.** The quality of optical information reaching the visual system declines sharply as a function of viewing distance (Loftus, 2010; Loftus & Harley, 2005). Given the level of detail necessary to make an accurate identification, initial viewing distances that substantially exceed the ideal position of about 6 ft. away can be detrimental to identification performance (Lampinen, Erickson, Moore, & Hittson, 2014).

25. Rosendo Ochoa estimated that the incident occurred up to 40 yards from his position (trial pp. 38-39), a distance associated with correct ID rates of only about 53% and is associated with false ID rates of about 34% under daytime lighting conditions and 10 seconds of unobstructed free viewing outdoors on a sidewalk (Lampinen et al., 2014). Performance under conditions such as these demonstrate poor perception of fine-grained detail, particularly for internal facial features (e.g., eyes, mouth, nose), which are necessary to form a stable, detailed memory representation of a unique face.

26. **Stress.** Faces viewed under stressful circumstances produce a predictable pattern of errors: increased false identifications as well as reduced correct identifications (e.g., Deffenbacher et al., 2004). In a meta-analysis combining data from 27 different studies conducted in multiple laboratories, using a variety of stress-induction techniques and a variety of methods for testing face memory, Deffenbacher et al. found stressed witnesses to later make misidentifications in target-absent lineups 34% of the time on average and correct identifications in target-present lineups 39% of the time on average. Thus, memory for strangers' faces that had been viewed while under stress is significantly poorer than the already modest performance under ideal circumstances, and an identification made for a face that had been encountered under stress is essentially as likely to be incorrect as correct.

27. Stress inductions in laboratory settings are limited, both by ethical restrictions and by practical limitations, in their ability to produce believable threats in the lab. Methodologies have included anticipated inoculations (Peters, 1988), staged crimes in the witness' presence (Ihlebaek et al., 2003), and depictions of violent crime on video (Ihlebaek et al., 2003), all demonstrating that stressful events impair memory. It is remarkable that performance suffers even under these limitations. But data from highly stressful military training exercises demonstrate that such patterns of impairment remain and are even exacerbated under higher levels of stress. Military personnel who had undergone an intense 40-minute interrogation training exercise in a well-lit room are about twice as likely one day after their release to make a false identification of their interrogator and/or a guard as they are to make a correct ID (Morgan, Hazlett, Doran, Garrett, Hoyt, Thomas, Baranoski, & Southwick, 2004).

Similarly, Kuehn (1974) found that for a randomly selected set of cases in Seattle, WA, victims of relatively less violent crimes (e.g., robbery) produced more detailed descriptions of their attackers than did victims of more violent, and arguably more stressful, crimes (e.g., rape and assault).

28. Hugo Rodriguez witnessed the murder of a friend in the front seat of a car in which he was a passenger, and his view of the shooter occurred largely while he was ducked down to protect himself as his car fled the scene. Rosendo Ochoa observed a man with a gun and heard multiple shots. Such circumstances would be expected to induce stress and to thus increase the risk of incorrect identifications.

29. **Weapon Focus Effect**. Two meta-analyses have shown that the presence of a weapon impairs memory for a stranger's face, both with regard to descriptions and identifications (Fawcett, Russell, Peace, & Christie, 2011; Steblay, 1992). Weapons capture attention, drawing cognitive processing away from the perpetrator's face, even if the witness' eyes are not directly pointed at the weapon. This is consistent with the argument that humans are adapted to monitoring specific threats when confronted with a dangerous situation, since that will optimize the likelihood of survival. Deployment of cognitive resources toward the specific threat and away from face processing would be expected to impair memory for the face, and indeed it does (Fawcett et al., 2011). One outcome of this redirection of cognitive resources is increased risk of subsequent false identifications (Carlson & Carlson, 2012).

30. Weapon focus effects have been demonstrated under a variety of situations and with a variety of threatening objects, including guns (see Fawcett et al., 2011, for a review). The effect holds for real-world criminal cases as well as for lab-based ones (Fawcett et al., 2011).

31. A typical outcome in weapon-present incidents is that victims tend to focus on the weapon and can therefore provide descriptions involving the weapon (Hinkle & Malawista, 1987), as seems to be the case for both witnesses in the *Iglesias* case. Rosendo Ochoa testified that he saw the gun come out of the shooter's clothes and that he saw the shooter hold it with a straight arm (trial p. R-39). Hugo Rodriguez did not notice the perpetrator before the shooting, but he testified that during at least one of his two brief glimpses, he noticed the shooter putting something into his waistband (trial p. U-12).

## Post-Event Factors

32. **Delay.** Memory decays with time, and losses are sharpest immediately following the event (Ebbinghaus, 1885/1913). For example, Deffenbacher, Bornstein, McGorty, & Penrod's (2008) meta-analysis of data from 53 studies found memory to degrade by 15-20% within just the first two hours following an event. Although the rate of loss is steepest immediately after an event, memory continues to fade with time.

33. Detective Guevara was not involved in the *Iglesias* case until June 21, 1993, two weeks after the shooting, and Geraldo Iglesias was not a suspect until after Guevara became involved (trial p. U-85). The eyewitnesses' first identification procedure involving Iglesias was 15

days after the shooting for Rosendo Ochoa and 17 days after the shooting for Hugo Rodriguez.

34. **Characteristics of the Description.** It is important to obtain a witness' description of a perpetrator as soon as possible after an incident, both to preserve as much information as possible before details are forgotten and to protect against post-event influences on memory (Jack, Zydervelt, Zajac, 2014). Details that were absent from the initial description but that emerged in later witness reports, as well as details reported later that directly contradict early descriptions by the same witness, carry the risk of having been intruded, for example, through suggestion or leading questions presented by another person. Indeed, vulnerability to post-event influences increases with the passage of time (Schwartz & Wright, 2012).

35. Hugo Rodriguez and Rosendo Ochoa each gave a description of the perpetrator to police who had arrived on the scene shortly after the shooting (e.g., trial pp. U-102-103, R-45, R-51, R-79). According to the research, we would expect these initial descriptions to be more reliable than those provided by the same witnesses later. Both Rodriguez's and Ochoa's initial descriptions were in substantial agreement with each other and substantially *mis*matched Geraldo Iglesias with regard to several details, including the unalterable features of age, height, and skin tone.

36. For example, according to Officer Zuniga, Hugo Rodriguez provided him at the scene with the following description of the shooter (trial p. U-66): 145 lbs, 5'7", light-completed, about 18 years old. Zuniga confirmed Rodriguez's report of the perpetrator's light complexion later in his testimony (p. U-68), indicating that Rodriguez told him "several times" that the shooter had a light complexion (p. U-71).

37. During his own testimony, Rodriguez characterized the shooter's skin as follows:

- "more or less white" (trial p. U-17)
- "white completed" (p. U-48)
- "light completed" (p. U-54)
- "I said that he looked white." (p. U-57)

Rodriguez further acknowledged at trial that the defendant, Geraldo Iglesias, was not white completed (p. U-49).

38. Ochoa's original description of the shooter to police similarly referred to a White Hispanic (e.g., trial U-102), who was light-completed (trial p. R-56).

39. Based upon Ochoa's and Rodriguez's descriptions, police initially sought a suspect who was light-skinned, 17-19 years old, 5'5"-5'7" in height, and weighing 135-140 pounds (e.g., Wanted profile developed on June 7, 1993, p. 2).

40. Geraldo Iglesias, in contrast, was 24 years old (substantially older than the wanted suspect) and 5'11" (substantially taller) (trial p. U-100). Further, according to the eyewitness

testimony cited above, as well as Detective Guevara's testimony and original police paperwork (trial p. U-104), Iglesias' skin tone was "medium" or darker.

44. If an eyewitness identifies someone who possesses features contradicting that witness' original description, the witness is by definition unreliable. Notably, both Ochoa and Rodriguez identified a suspect possessing features contrary to their descriptions. Particularly given that some of these features (e.g., age and height) cannot be readily altered or disguised, this contradiction is a clear indicator of the unreliability of both identifications.

45. With regard to inconsistencies involving features that could in principle be disguised or changed, including hair length, facial hair, notching in eyebrows, and jewelry, witness reliability is again called into question. For example, in the *Iglesias* case, both Ochoa and Rodriguez testified in court that Iglesias's appearance during the lineup procedure differed with regard to several features from that of the shooter. Namely, the shooter and defendant differed with regard to hair length and with regard to presence of a moustache, a beard, eyebrow notching, and earrings (trial pp. U-31-32, U-46, R-49-51).

46. It would be highly unlikely that witnesses would be able to correctly identify a stranger they had viewed briefly and who had undergone such extensive changes to his appearance. Indeed, the research shows that stranger identification suffers substantially with as minor a change as adding or removing glasses (Kramer & Ritchie, 2016). Similarly, identification suffers when witnesses attempt to match two photos of the same face that had been taken just a few months apart, with the normal variations in appearance that accompany the passage of this rather brief length of time. Thus, if the original eyewitness descriptions in the Iglesias case were accurate, the research findings cast serious doubt on the witnesses' ability to identify a perpetrator who had undergone the sorts of physical changes that would have been involved in this case. If, on the other hand, the witnesses' original descriptions were incorrect with regard to the above details, then the witnesses are again, by definition, unreliable.

47. **Post-Event Suggestion.** It is typical for witnesses to unwittingly incorporate post-event information to which they are exposed into their memory of the original incident (Payne et al., 1994; Wright, Memon, Skagerberg, & Gabbert, 2009). Memory contamination can stem from a wide range of sources, including investigators (Loftus & Palmer, 1974; Payne et al., 1994). Even information embedded in questions can lead to distortion or incorporation of new detail. For example, witnesses to a traffic accident who are asked about the speed of the two cars in a question that describes them as having "smashed" (as opposed to "bumped") into each other report higher speed estimates and are more inclined to report memory for broken glass that had not been present (Loftus & Palmer, 1974). Leading questions such as these can substantially distort memory through the inclusion of a single suggestive word ("smashed" vs. "bumped"), without the witness' awareness (Greathouse & Kovera, 2009).

No deliberate attempt to influence is necessary on the interviewer's part. On the contrary, these effects can be extremely difficult to avoid or detect.

48.     Vulnerability to post-event misinformation increases for memories that had not been well encoded at the time of the incident, leaving more gaps to be filled by details that are encountered after the fact. For example, military personnel who had experienced an event under high stress (which impairs encoding of details) show greater vulnerability to post-event suggestion about event details than do those who had experienced the event under lower stress (Morgan, Southwick, Steffian, Hazlett, & Loftus, 2013).

49.     With each retrieval of a memory, new interpretations and embellishments may be incorporated into and reconsolidated with it (Dudai, 2006). Any ability to later differentiate original from subsequently added detail can thus be lost.

50.  The eyewitnesses in *Iglesias* may have been influenced by various types of post-event suggestion. For example, following his exposure to the suspect during the investigation, Ochoa's report of the shooter's skin tone changed in the direction of Iglesias':
-"I said that the person was about my color or a little bit darker." (trial p. R-69).
- "Dark" (trial p. R-71)
- Q: Didn't you say, "He looked white, but he was Latino, not as dark as me?"
  A: No. (trial p. R-93)

51.  That is, once he had been exposed to the police suspect, Geraldo Iglesias, Ochoa's description of the shooter's skin tone systematically shifted away from the light complexion that Ochoa (and independently, Rodriguez) had originally provided. Instead, Ochoa settled on a description that better matched Iglesias' darker color. Consistent with post-event memory distortion phenomena, Ochoa would neither be expected to doubt this revised memory nor to recognize any such change to his original report.

52.  Other elements of Ochoa's testimony raise concerns that his memory may have been vulnerable to embellishment based on post-event suggestion. Although he had claimed to both hear the shooter say something about a gang (trial p. R-39) and to see him throw gang signs (trial p. R-39), Ochoa conceded during his testimony that he actually did not perceive either. If he had come to believe that the shooter was affiliated with a gang, he may have incorporated details into memory that were consistent with those beliefs. Similarly, had he been aware that gang affiliation and prior criminal history were associated with personal adornments like eyebrow notching, he may have been biased to select a photo array member or lineup member who possessed such a feature, which Ochoa testified he had observed during the identification procedure (trial p. R-50).

53.  Best practices can be put into place to minimize such suggestive influences. Researchers recommend that distinctive features, and particularly those that could strongly bias an

eyewitness toward the suspect, be either replicated across all lineup members or be masked (e.g., by putting a covering over all lineup members' eyebrows) (Carlson, 2011; Colloff, Wade, & Strange, 2016; Zarkadi, Wade, & Stewart, 2009). Such measures were not taken in Iglesias' ID procedures.

54. **ID Administrator's Knowledge Of Who The Suspect Is (*Non-Blind Procedures*).** Experimenter effects have been long known in medicine. Best practices thus dictate that where possible, a test administrator be "blind" to the hypothesis or experimental condition, in order to avoid unintended forms of influence (Rosenthal, 1976). In his analysis of 161 DNA-based exonerations, Brandon Garrett (2011) found 78% of these cases to involve police contamination of eyewitness identifications. In the lab, several studies have demonstrated a remarkable number of ways that people playing the role of ID administrators can verbally and/or non-verbally steer witnesses toward the suspect (Clark, Brower, Rosenthal, Hicks, & Moreland, 2013), even if they have been instructed to avoid doing so and even without being aware of doing so (e.g., Greathouse & Kovera, 2009). Under these circumstances, non-blind administrators produce two to three times the number of innocent suspect IDs by eyewitnesses as occur spontaneously (Alberts, Duncan, Wallace, & Penrod, 2008; Greathouse & Kovera, 2009). Without adherence to best practices and a double-blind identification procedure, an ID of the suspect carries the risk of having been produced through deliberate or inadvertent witness steering.

55. None of the identification procedures involving Geraldo Iglesias were administered blind. Detective Guevara administered all such procedures, and he as the investigating detective had already developed Iglesias as the suspect in Monica Roman's murder.

56. **Impact Of Positive Feedback On Memory And Confidence**. Both verbal indications ("Good, you identified the suspect") and nonverbal indications (e.g., head nods) that the witness has selected the police suspect produce a broad and powerful set of effects (Wells & Bradfield, 1998; Gurney, Vekaria, & Howlett, 2014). In particular, positive feedback increases the likelihood that the witnesses will identify the suspect in later ID procedures (Leippe et al., 2008; Wells & Bradfield, 1998). It also increases the witness' confidence in their identification (e.g., Garrioch & Brimacombe, 2004; Semmler, Brewer, & Wells, 2004; Wells & Bradfield, 1998), as well as producing robust effects on witness' ratings of the quality of the observation conditions, the degree to which they they had paid attention to the perpetrator, and the speed with which they have identified the suspect (Douglass & Steblay, 2006; Wells & Bradfield, 1998; Wells & Quinlivan, 2009). Feedback effects have been demonstrated with witnesses to real crimes (Wright & Skagerberg, 2007), and they arise with even relatively subtle comments such as, "Thank you. You have been a really great witness" (Dysart, Lawson, & Rainey, 2012).

57. This can present particular risk downstream, in the courtroom, as jurors' perception of eyewitness confidence is one of the strongest predictors of their decisions regarding guilt or innocence (Wells, Lindsay, & Ferguson, 1979). Observers' ratings of credibility of witnesses who had actually made incorrect identifications increase if those witnesses had received positive feedback about their ID (Douglass, Neuschatz, Imrich, & Wilkinson, 2010). That is, not only does positive feedback increase witness confidence, but that confidence is

perceptible to observers, who then find the witness to be more reliable regardless of actual accuracy.

58. I am not aware of any recordings of interviews with Ochoa or Rodriguez, or of any recordings of their identification procedures. Certainly, positive feedback during those events could have profoundly impacted both witnesses' memory.

59. I am, however, aware of at least one instance of positive feedback provided by the prosecutor to Rosendo Ochoa prior to trial, and this feedback would be expected to have produced damaging effects of the type described above (p. R-88):

Q: And when we talked to you, you were in fact very descriptive as to the actual events of the shooting, is that correct?

A: Yes.

Q: And in fact, myself in front of Mr. DeLeon commented to you as to how well you could remember the shooting, is that correct?

A: Yes.

60. The body of research cited above consistently demonstrates that positive feedback of this sort is one of the most distorting influences on memory, with eyewitness evidence being consistently altered, not randomly, but toward the apparent reliability of the witness. Such methods are laden with risk.

61. **Multiple Exposures to the Suspect (*Mugshot Exposure Effect*).** Research has demonstrated that memory can often be based simply on a feeling of familiarity with no further access to specific details about prior exposures (Deffenbacher, Bornstein, & Penrod, 2006; Johnson, Hashtroudi, & Lindsay, 1993; Mandler, 1980). Face recognition is frequently based on such a sense of familiarity, and innocent suspects can be falsely identified as perpetrators because of it. A witness may view someone whose face "rings a bell" and may, misattributing the source of that familiarity, positively but mistakenly identify that person as the perpetrator. This error occurs because prior exposure leads to greater ease of processing on later viewings than would be expected if the face were entirely new. Thus, the witness may be correctly detecting some degree of familiarity but may be misplacing the basis of that familiarity.

62. When the familiarity stems from exposure to the suspect's likeness during the course of the investigation (e.g., through photos), we refer to it as *mugshot exposure effect*. A meta-analysis of 19 independent tests of mugshot exposure effects found that prior exposure to an innocent suspect more than doubles the risk of later mistaking him as the perpetrator (Deffenbacher et al., 2006), and it increases confidence in those false IDs (Steblay, Tix, & Benson, 2013). The degree of risk associated with repeated exposure increases with the number of exposures (Deffenbacher et al., 2006; Longmore, Liu, & Young., 2008).

63. Furthermore, exposure effects interact with other factors, exacerbating impairments. For example, when these identification conditions follow a particularly stressful incident, the false identification rate is nearly 6 times as high as it is when no interpolated identification task had occurred (Morgan et al., 2013).

64. If the witness had identified the innocent target on first viewing him, additional *commitment effects* increase the likelihood of a subsequent identification of that innocent suspect still further (Deffenbacher, Bornstein, & Penrod, 2006; Gorenstein & Ellsworth, 1980).

65. In-court identifications are subject to these same principles of exposure and commitment, in addition to other factors that seriously challenge the reliability of an in-court ID (e.g., substantial delay; highly suggestive showup procedure (discussed below).

66. The above findings with regard to both exposure effects and commitment effects apply to the *Iglesias* case. Hugo Rodriguez identified Iglesias from a photo array on June 24 1993 (trial pp. U-18-19). About an hour and a half later on the same day (trial p. U-52), Detective Guevara presented Rodriguez with 6-person lineup, where Rodriguez again identified Iglesias (p. U-93). He was subsequently asked to make four in-court identifications of Iglesias at trial, discussed below.

67. Rosendo Ochoa identified Iglesias in an 8-photo array administered by Det. Guevera at Ochoa's home on June 22, 1993 (trial p. U-86; R-46). Guevara presented Ochoa with a 5-person lineup the next day, and Ochoa again selected Iglesias (p. U-91). Finally, Ochoa was asked to make an in-court identification at trial.

68. **In-Court Identifications As Unreliable And Prejudicial**. An identification procedure itself can be suggestive. For example, eyewitness identification researchers (e.g., Steblay, Dysart, Fulero, & Lindsay, 2003; Wetmore, Neuschatz, Gronlund, Wooten, Goodsell, & Carlson, 2015), the Supreme Court (Stovall v. Denno, 1967; United States v. Wade, 1967), and state courts (Bradley v. State, 1980, Commonwealth v. Carter, 1979) have concluded that showup ID procedures are inherently suggestive. Consistent with this, showups have been repeatedly found to increase the risk of false identifications of innocent suspects (see meta-analysis by Steblay et al., 2003). An in-court identification procedure, during which the witness is invited to point out the perpetrator from among those present in the courtroom, constitutes a particularly suggestive version of a showup. Eyewitness memory researchers commonly consider such a procedure to be highly theatrical but of very low diagnostic value, given the suggestive nature of the procedure and often the history of prior exposures to the defendant's likeness during the course of the investigation and trial preparation. Nevertheless, a confident identification made in court an eyewitness is high compelling to jurors.

69. Rosendo Ochoa identified Geraldo Iglesias at trial (trial p. R-38). Similarly, Hugo Rodriguez was asked by the prosecutor to make in-court identifications of Monica Roman's shooter on four separate occasions (p. U-11, U-19, U-27, and U-30).

70. **Confidence-Accuracy Relationship and Confidence Malleability.** The relationship between witness confidence and identification accuracy is poor under a broad range of circumstances that are typical of crimes and the investigations that follow (Bothwell, Deffenbacher, & Brigham, 1987). Despite the fact that forgetting increases with time, so does witness confidence for memory of specific details. This happens for understandable reasons. Repeatedly thinking about or answering questions about an event not only can alter the content of a memory, but it also tends to increase memory strength and vividness, leading to

strong subjective experience of authenticity even for incorrect details (Arkes, Hackett, & Boehm, 1989; Begg, Anas, & Farinacci, 1992; Hastie, Landsman, & Loftus, 1978; Pezdek, Sperry, & Owens, 2007; Shaw, 1996; Wells, Ferguson, & Lindsay, 1981). The divergence of memory accuracy and witness confidence serves to lower the correlation between the two over time, thereby reducing the value of witness confidence for assessing witness reliability. Certainty for details that have been altered or incorporated into memory after the incident tends to be as high as is certainty for details stemming from the original incident (e.g., Payne et al., 1994).

71. Members of the research community have recently noted that very high confidence can reflect a high likelihood of identification accuracy under a very narrow set of circumstances in which suggestive influences are absent (Wixted & Wells, 2017). Such circumstances do not characterize the *Iglesias* case.

72. On the contrary, several elements associated with the *Iglesias* case are known to artificially inflate witness confidence. These include the brevity of both witnesses' exposure to the shooter during the incident (Bothwell et al., 1987), stress experienced by both eyewitnesses during the crime (Morgan et al., 2004; Steblay, Dysart, Fulero, & Lindsay, 2001), and multiple instances of exposure to Geraldo Iglesias during the investigation (Steblay et al., 2013).

73. To the extent that witnesses Ochoa and Rodriguez expressed confidence in their testimony (e.g., trial p. U-30), any or all of the above may have served to inflate their certainty, which would then increase their perceived credibility in the eyes of the finders of fact. This poses particular risk, as jurors' perception of eyewitness confidence is one of the strongest predictors of their decisions regarding guilt or innocence (Wells et al, 1979). That is, not only do the above factors tend to increase witness confidence, but that confidence is perceptible to observers, who then find the witness more reliable regardless of his or her actual accuracy.

74. It is not unusual for memory of the circumstances of viewing to similarly undergo distortion toward more favorable viewing circumstances (Wells & Bradfield, 1998). There is evidence for this in the *Iglesias* case. For example, Hugo Rodriguez stated at trial (p. U-19), "I would never forget his face". Such a subjective experience is actually highly predictable by the time an eyewitness testifies in court, following exposures to the suspect and to various instances of positive feedback. In his analysis of police records and court transcripts associated with the first 250 DNA based exoneration cases, Garrett (2011) found that well over half of eyewitnesses who identified innocent suspects in court expressed certainty while doing so. When pressed, these witnesses may concede that they did not remember prominent features of the perpetrator. (In Iglesias, for example, after expressing certainty in court and claiming that he would never forget the shooter's face, Hugo Rodriguez was unable to say whether the shooter had had kinky hair, p. U-46).

75. **Probative Value of Non-Identifications.** Far from being of no value to the judicial process, non-identifications by eyewitnesses carry probative value. Wixted & Wells (2017) demonstrated in their landmark paper that the likelihood of innocence given a non-identification is substantial.

76. On June 24, 1993, Detective Guevara and Assistant State's Attorney Latz administered identification procedures for eyewitnesses David Chmieleski and Efrain Torres, which indicates that they had reason to believe that both eyewitnesses had had a sufficient opportunity to view the shooter's face and were in a position to identify him if he were present in the lineup. Both of these witnesses made non-identifications in lineups that included Geraldo Iglesias (Chicago Police Supplementary Form, dated 6/24/93, 21:00, p. 4). Each of these non-identifications independently constitutes evidence in favor of Iglesias' innocence.

## Conclusion

77. Given the number of factors associated with *Iglesias* that are known to reduce the reliability of eyewitness identification and memory, this case presents high risk that identifications of Geraldo Iglesias by eyewitnesses Rosendo Ochoa and Hugo Rodriguez were unreliable.

Nancy Franklin, Ph.D.

STATE OF NEW YORK )
COUNTY OF SUFFOLK ss. :
)

Sworn to me and subscribed in my presence this 24 day of July, 2018 by Nancy Franklin.

Notary Public

Suzanne Cheung
Notary Public, State of New York
No: 01CH6014858
Qualified in Suffolk County
Commission Expires 10/19/2018

Commission Expires: 10/19/2018

## References

Alberts, W., Penrod, S., Wallace, B. & Duncan, J. (July, 2008). Steering witnesses in an identification procedure. Paper presented at the Annual Meeting of the European Association of Psychology and Law, Maastrict, the Netherlands.

Bartlett, F. C. (1932). *Remembering*. Cambridge: Cambridge University Press.

Behrman, B. W., & Davey, S. L. (2001). Eyewitness identification in actual criminal cases: An archival analysis. *Law and Human Behavior, 25*(5), 475-491.

Bornstein, B. H., Deffenbacher, K. A., Penrod, S. D., & McGorty, E. K. (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime, and Law, 18*(5), 473-490.

Bothwell, R. K., Deffenbacher, K. A., & Brigham, J. C. (1987). Correlation of eyewitness accuracy and confidence: Optimality hypothesis revisited. *Journal of Applied Psychology, 72(4)*, 691-695.

*Bradley v. State*, 152 Ga. App. 902 (1980).

Bruce, V. (1988). *Recognising faces*. London: Lawrence Erlbaum Associates.

Bruce, V., Henderson, Z., Greenwood, K., Hancock, P. J. B., & Burton, A. M., & Miller, P. (1999). Verification of face identities from images captured on video. *Journal of Experimental Psychology: Applied, 5*, 339-360.

Bruce, V., Henderson, Z., Newman, C., & Burton, A. M. (2001). Matching identities of familiar and unfamiliar faces caught on CCTV images. Journal of Experimental Psychology: Applied, 7, 207-218.

Burton, A. M., Miller, P., Bruce, V., Hancock, P. J. B., & Henderson, Z. (2001). Human and automatic face recognition: A comparison across image format. *Vision Research, 41*, 3185-3195.

Buckhout, R., Fox, P., & Rabinowitz, M. (1989). Estimating the duration of an earthquake: Some shaky field observations. *Bulletin of the Psychonomic Society, 27(4)*, 375-378.

Campbell, L. A., & Bryant, R. A. (2007). How time flies: A study of novice skydivers. *Behaviour Research and Therapy, 45*(6), 1389-1392.

Carlson, C. A. (2011). Influence of a perpetrator's distinctive facial feature on eyewitness identification from simultaneous versus sequential lineups. *Applied Psychology in Criminal Justice, 7(2)*, 77-92.

Carlson, C. A., & Carlson, M. A. (2012). A distinctiveness-driven reversal of the weapon focus effect. *Applied Psychology in Criminal Justice, 8(1)*, 36-53.

Carmichael, L., Hogan, H. P., & Walter, A. A. (1932). An experimental study of the effect of language on the reproductions of visually perceived forms. *Journal of Experimental Psychology, 15*, 73-86.

Clark, S. E., Brower, G. L., Rosenthal, R., Hicks, J. M., & Moreland, M. B. (2013). Lineup administrator influences on eyewitness identification and eyewitness confidence. *Journal of Applied Research in Memory and Cognition, 2*, 158-165.

Colloff, M. F., Wade, K. A., & Strange, D. (2016). Unfair lineups make witnesses more likely to confuse innocent and guilty suspects. *Psychological Science, 27(9)*, 1227-129.

*Commonwealth v. Carter*, 271 Pa. Super. 508 (1979).

Cutler, B. L., Penrod, S. D., & Martens, T. K. (1987). Reliability of eyewitness identification:

The role of system and estimator variables. *Law and Human Behavior, 11(3),* 233-258.

Deffenbacher, K. A., Bornstein, B. H., McGorty, E. K., & Penrod, S. D. (2008). Forgetting the once-seen face: estimating the strength of an eyewitness's memory representation. *Journal of Experimental Psychology: Applied, 14*(2), 139-150.

Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

Deffenbacher, K. A., Bornstein, B. H., Penrod, S. D., & McGorty, E. K. (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human behavior, 28*(6), 687-706.

Doss, M. K., Picart, J. K., & Gallo, D. A. (2018). The dark side of context: Context reinstatement can distort memory. *Psychological Science, 29*(4), 1-12.

Douglass, A. B., Neuschatz, J. S., Imrich, J. F., & Wilkinson, M. (2010). Does post-identification feedback affect evaluations of eyewitness testimony and identification procedures? *Law and Human Behavior, 34*(4), 282-294.

Douglass, A. B., & Steblay, N. (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20,* 859-869.

Dudai, Y. (2006). Reconsolidation: The advantage of being refocused. *Current Opinion in Neurobiology,* 16(2), 174–178.

Dunbar, R. I. M. (1992). Neocortex size as a constraint on group size in primates". *Journal of Human Evolution 22*(6), 469–984

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the postidentification feedback effect. *Law and Human Behavior, 36*(4), 312-319.

Ebbinghaus, H. (1885/1913). *Forgetting: A contribution to experimental psychology.* New York: Teachers College, Columbia University.

Eisen, M., Cedré, G. C., Williams, T. Q., & Jones, J. M. (In Press). Does anyone else look familiar? Influencing identification decisions by asking witnesses to reexamine the lineup. *Law and Human Behavior.*

Fawcett, J., Russell, E. J., Peace, K. A., & Christie, J. (2013). Of guns and geese: A meta-analytic review of the 'weapon focus' literature. *Psychology, Crime, and Law, 19*(1), 35-66.

Garrett, B. (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge: Harvard.

Garrioch, L., & Brimacombe, C. A. E. (2001). Lineup administrators' expectations: Their impact on eyewitness confidence. *Law and Human Behavior, 25*(3), 299-315.

Greathouse, S. M., & Kovera, M. B. (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70-82.

Gurney, D. J., Vekaria, K. N., & Howlett, N. (2013). A nod in the wrong direction: Does non verbal feedback affect eyewitness confidence in interviews? *Psychiatry, Psychology, and the Law, 21*(2), 241-250.

Henderson, Z., Bruce, V., & Burton, A. M. (2001). Matching the faces of robbers captured on video. *Applied Cognitive Psychology, 15,* 445-464.

Hinkle, D. P. & Malawista, D. (July, 1987). Sudden fear and witness reliability, *Law and Order,* 52-56.

Ihlebaek, C., Love, T., Eilertsen, D. E., & Magnussen, S. (2003). Memory for a staged criminal event witnessed live and on video. *Memory, 11,* 319-327.

Jack, F., Zydervelt, S., & Zajac, R. (2014). Are co-witnesses special? Comparing the influence of co-witness and interviewer misinformation on eyewitness reports. *Memory, 22(3)*, 243-255.

Johnson, M. K., Hashtroudi, H., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*(1), 3-28.

Kuehn, L. L. (1974). Looking down a gun barrel: Person perception and violent crime. *Perceptual and Motor Skills, 39*, 1159-1164.

Lampinen, J. M., Erickson, W. B., Moore, K. N., & Hittson, A. (2014). Effects of distance on face recognition: Implications for eyewitness identification. *Psychonomic Bulletin & Review, 21*, 1489-1494.

Lampinen, J. M., Roush, A., Erickson, W. B., Moore, K. N., & Race, B. (2015). The effects of simulated distance on recognition of same race and other race faces. *Visual Cognition, 23*(6), 678-698.

Leippe, M. R., Eisenstadt, D., & Rauch, S. M. (2008). Cueing confidence in eyewitness identifications: Influence of biased lineup instructions and pre-identification memory feedback under varying lineup conditions. *Law and Human Behavior, 33*, 194-212.

Lindsay, R. C. L., & Harvie, V. L. (1988). Hits, false alarms, correct and mistaken identifications: The effects of method of data collection on facial memory. (1988). *Practical Aspects of Memory: Current Research and Issues, 1*, 47-52.

Loftus, E. F., & Palmer, J. C. (1974). Reconstruction of automobile destruction: An example of the interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior, 13*, 585-589.

Loftus, E. F., Schooler, J. W. Boone, S. M., & Kline, D. (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1*, 3-13.

Loftus, G. R. (2010). What can a perception-memory expert tell a jury? *Psychonomic Bulletin & Review, 17*, 143-148.

Loftus, G. R., & Harley, E. R. (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12*, 43-65.

Longmore, C. A., Liu, C. H., & Young, A. W. (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34*, 77-100.

Mandler, G. (1980). Recognizing: The judgment of previous occurrence. *Psychological Review, 87*(3), 252-271.

Megreya, A. M., & Burton, M. (2006). Recognising faces seen alone or with others: When two heads are worse than one. *Applied Cognitive Psychology, 20*, 957-972.

Megreya, A. M., & Burton, M, (2007). Hits and false positives in face matching: A familiarity based dissociation. *Perception & Psychophysics, 69*, 1175-1184.

Megreya, A. M., White, D., & Burton, M. (2011). The other-race effect does not rely on memory: Evidence from a matching task. *Quarterly Journal of Experimental Psychology, 64*(8), 1473-1483.

Memon, A., Hope, L, & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94*, 339-354.

Morewedge, C. K., Kassam, K. S., Hsee, C. K., & Caruso, E. M. (2009). Duration sensitivity depends on stimulus familiarity, 138, 177-186.

Morgan, C. A., III, Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., Baranoski, M., & Southwick, S. M. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry, 27*, 265-279.

Morgan, C. A., III, Southwick, S., Steffian, G., Hazlett, G. A., & Loftus, E. F. (2013). Misinformation can influence memory for recently experienced, highly stressful events. *International Journal of Law and Psychiatry, 36,* 11-17.

Murray, D., M., & Wells, G. L. (1982). Does knowledge that a crime was staged affect eyewitness performance? *Journal of Applied Social Psychology, 12*(1), 42-53.

Narby, D. J., Cutler, B. L., & Penrod, S. (1996). The effects of witness, target, and situational factors on eyewitness identifications. In S. Sporer, R. Malpass, and G. Köhnken (Eds)., *Psychological issues in eyewitness identification.* Hillsdale, New Jersey: Erlbaum. pp. 23 52.

National Research Council of the National Academies. (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, D.C.: National Academies Press.

O'Donnell, C., & Bruce, V. (2001). Familiarisation with faces selectivity enhances sensitivity to changes made to the eyes. *Perception, 30,* 755-764.

Patterson, K. E., & Baddeley, A. D. (1977). When face recognition fails. *Journal of Experimental Psychology: Learning, Memory, & Cognition, 3(4)*, 406-417.

Payne, D. G., Toglia, M. P., & Anastasia, J. S. (1994). Recognition performance level and the magnitude of the misinformation effect in eyewitness memory. *Psychonomic Bulletin & Review, 1*, 376–382.

Peters, D. P. (1988). Eyewitness memory in a natural setting. In M. M. Gruneberg, P. E. Morris, & R. N. Sykes (Eds.), *Practical aspects of memory: Current research and issues: Vol. 1. Memory in everyday life* (pp. 89-94). Chichester, UK: Wiley.

Rosenthal, R. (1976). *Experimenter effects in behavioral research.* New York: John Wiley.

Roy, M. M., & Christenfeld, N. J. S. (2008). Effect of task length on remembered and predicted duration. *Psychonomic Bulletin & Review, 15*(1), 202-207.

Schmechel, R. S., O'Toole, T. P., Easterly, C., & Loftus, E. F. (2006). Beyond the ken? Testing jurors' understanding of eyewitness reliability evidence. *Jurimetrics, 46,* 177-214.

Schwartz, S. L., & Wright, D. B. (2012). Memory conformity for new and old items with immediate and delayed testing. *Applied Cognitive Psychology, 26*, 508-515.

Semmler, C., Brewer, N., & Wells, G. L. (2004). Effects of postidentification feedback on eyewitness identification and nonidentification confidence. *Journal of Applied Psychology, 89*(2), 334-236.

Shapiro, P. N., & Penrod, S. D. (1986). Meta-analysis of face identification studies. Psychological Bulletin, 100, 139-156.

Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior, 16,* 413-424.

Steblay, N. M., Dysart, J., Fulero, S., & Lindsay, R. C. L. (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27*(5), 523–540.

Steblay, N. K., Tix, R. W., & Benson, S. L. (2013). Double-exposure: The effects of repeated identification lineups on eyewitness accuracy. *Applied Cognitive Psychology, 27,* 644-654.

*Stovall v. Denno*, (1967). 388 U.S. 293.

*United States v. Wade*, 388 U.S. 218 (1967).

Weber, N., Brewer, N., Wells, G. L., Semmler, C., & Keast, A. (2004). Eyewitness identification accuracy and response latency: The unruly 10-12-second rule. *Journal of Experimental Psychology: Applied, 10,* 139-147.

Wells, G. L. (1984). The psychology of lineup identifications. *Journal of Applied Social*

*Psychology, 14*, 89-103.

Wells, G. L., & Bradfield, A. L. (1998). "Good, you identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

Wells., G. L., & Lindsay, R. C. L., & Ferguson, T. J. (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology, 64*(4), 440-448.

Wells, G. L., & Quinlivan, D. S. (2009). Suggestive eyewitness identification procedures and the Supreme Court's reliability test in light of eyewitness science: 30 years later. *Law and Human Behavior, 33*, 1-24.

West, E., & Meterko, V. (2016). Innocence project: DNA exoneration, 1989-2014: Review of data and findings from the first 25 years. *Albany Law Review, 79*(3), 717-795.

Wetmore, S. A., Neuschatz, J. S., Gronlund , S. D., Wooten, A., Goodsell, C. A., & Carlson, C. A. (2015). Effect of retention interval on showup and lineup performance. *Journal of Applied Research in Memory and Cognition, 4*, 8-14.

Wixted, J. T., & Wells, G. L. (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science In The Public Interest, 18*(1), 10-65.

Wright, D. B., & McDaid, A. T. (1996). Comparing system and estimator variables using data from real line-ups. *Applied Cognitive Psychology, 10*, 75-84.

Wright, D. B., Memon, A., Skagerberg, E. M., & Gabbert, F. (2009). When witnesses talk. *Current Directions in Psychological Science, 18*(3), 174-178.

Wright, D. B., & Skagerberg, E. M. (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18*, 172-178.

Wright, D. B., & Sladden, B. (2003). An own gender bias and the importance of hair in face recognition. *Acta Psychologica*, 114, 101-114.

Zarkadi, T., Wade, K. A., & Stewart, N. (2009). Creating fair lineups for suspects with distinctive features. *Psychological Science, 20*(12), 1448-1453.

# Exhibit 58

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **Geraldo Iglesias,**<br><br>Plaintiff,<br><br>v.<br><br>**Reynaldo Guevara et al.,**<br><br>Defendants. | No. 19 C 6508<br><br>Hon. Franklin U. Valderrama, District Judge<br><br>Hon. Maria Valdez, Magistrate Judge |

**DECLARATION OF JENNIFER DYSART**

I, Jennifer Dysart, hereby declare as follows:

1. I have been retained by Plaintiff in this matter to give expert opinion testimony.
2. Attached to this declaration as Exhibit A is a true and accurate copy of my report disclosed in this case, which contains opinions that I offer in this case, as well as attachments incorporated as part of that report. The report and its attachments are true and accurate to the best of my knowledge and belief.
3. My qualifications for rendering expert opinions in this case are summarized in my report and in my CV, which is attached to this declaration as Exhibit B. My CV is true and accurate as of the date of my report.
4. If called to testify in this case, I would provide testimony consistent with my report and its attachments (Exhibit A) and my CV (Exhibit B).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  March 25, 2024

Dr. Jennifer Dysart

# Exhibit A

**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
***Geraldo Iglesias v. Reynaldo Guevara, et al.***
**(Case No. 1:19-cv-06508)**

**Report Date: October 19, 2022**

**I. Overview and Credentials of Dr. Dysart**

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. In September 2022, I was contacted by attorneys representing Mr. Geraldo Iglesias and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the 1994 conviction of Mr. Iglesias for the shooting death of Ms. Monica Roman on June 7, 1993. I am being compensated for expert services in this case at a rate of $350/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 80 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in the Conviction Review Unit in the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

***Presentations:*** I have given more than 175 presentations on eyewitness identification before professional psychological organizations and at conferences attended by judges, lawyers, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

***Curriculum Vitae:*** My complete academic curriculum vitae is attached to this report as Appendix B.

**II. Materials Reviewed in this Case**

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with available relevant materials related to the identification of their client, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the following materials, plus other materials cited in this report:

1. First Amended Complaint
2. Crime scene photographs (June 1993)
3. Crime scene photographs current (Iglesias 3092-3104)
4. GOCR Report by Officer Zuniga (6/7/93)
5. General Progress Report (Ochoa; hand written, nd)
6. General Progress Report (Rodriguez; hand written, nd)
7. General Progress Repots (hand written, all, nd)
8. Supplementary Report (6/7/93)
9. 7 Polaroid photographs (aka photo array with numbers 1-7)
10. Lineup Supplementary Report for Ochoa (6/23/93)
11. Lineup photographs for Ochoa (6/23/93)
12. Lineup Supplementary Report for Rodriguez, Torres & Chmieleski (dated 6/23/93)
13. Lineup photographs for Rodriguez, Torres & Chmieleski (6/24/93)
14. Supplementary Report (6/24/93)
15. Permanent Retention File (generally 6/93)
16. Rosendo Ochoa statement to attorney DeLeon (nd, between 10/5/94 and 12/14/94)
17. Trial Exhibits (12/14/94)
18. Rosendo Ochoa trial transcript (12/14/94)
19. Hugo Rodriguez trial transcript (12/15/94)
20. Daniel Sanchez trial transcript (12/14/94)
21. Reynaldo Guevara trial transcript (12/15/94, 12/16/94)
22. Jose Zuniga trial transcript (12/15/94)
23. Nancy Franklin expert report (7/24/18)
24. Arnell Moore declaration (10/21/20)
25. Efrain Miranda declaration (2/27/21)
26. David Chmieleski declaration (2/24/21)
27. John Santopadre deposition transcript (5/10/21)
28. Jerome Bogucki deposition transcript (5/12/21)
29. Ray Schalk deposition transcript (5/18/21)
30. Hugo Rodriguez Declaration (7/12/21)
31. Hugo Rodriguez deposition transcript and Exhibits (9/9/21)
32. Robert Biebel deposition transcript (10/29/21)
33. Steve Gawrys deposition transcript (10/27/21)
34. Mike Latz deposition transcript (1/18/22)
35. Photo Array Fairness Assessment by Dr. Nancy Franklin (1/27/22)
36. Daniel Sanchez deposition transcript (2/21/22)
37. Rosendo Ochoa Affidavit (3/2/22)
38. Reynaldo Guevara deposition transcript (4/20/22)
39. Anthony Riccio deposition transcript (5/18/22)
40. Second Supplementary Responses to Det. Halvorsen’s First Set of Interr. (5/20/22)
41. Rosendo Ochoa deposition transcript (7/28/22)
42. ASA Latz Felony Review Jacket
43. Iglesias amended post-conviction petition, supplement, and exhibits (3/20/18)

44. Iglesias petition for certificate of innocence (6/6/19)
45. Order granting certificate of innocence (6/8/22)
46. Weather summary from June 1993
47. Google Map aerial images of N. Sawyer area with distances
48. Expert report of Nancy Steblay

If other materials related to eyewitness identification are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

**III. Overview of Case & Summary of Opinions**

**Important dates:**

June 7, 1993: According to the police report, 16 year old Monica Roman was in the front passenger seat of a car, driving around with her friends around 4:00pm. She was shot while in the vehicle around 2148 North Sawyer by a male standing behind a tree. After the shooting, the shooter ran in the opposite direction of the vehicle (south) and down an alley. Several witnesses, including Daniel Sanchez, Hugo Rodriguez, and Jesus Gonzalez, were interviewed by scene officers. The shooter was described as being 5'7"-5'9" tall wearing all black clothing including a black hoodie with the hood up. According to the supplementary report dated June 7, 1993, Rosendo Ochoa was documented as having described the shooter as male, white Hispanic, 17-19 years old, 5'5"-5'6", 135-140 lbs., and clean shaven.

June 7, 1993: Arnell Moore was interviewed by detectives. He said he observed a M/WH, 20-25, 5'7"-5'8" with a light beard and mustache wearing a dark colored hoody and dark pants walk past him traveling north on Sawyer, and then run past him going south on Sawyer toward the alley. David Chmieleski was interviewed and said he observed a person in black clothing run southbound past his window. Efrain Torres was interviewed by detectives and said that about ten minutes before the shooting, he noticed about five "I.G." gang members standing in front of the Boys Club at the N/E corner of Sawyer and Palmer. He stated that he remembered two of the five people were wearing black "hoodies". Torres said that one of the individuals was a M/WH that he had seen in the neighborhood previously. He stated that one wore a 3/4 length black starter coat and pink baggy pants along with a black "hoody". The other person wearing a black "hoody" was a M/B and wore a short black jacket and black pants.

June 21, 1993: Det. Guevara testified that he became involved in the investigation on this day. He allegedly received a CI tip from an Imperial Gangster that "Snake", Geraldo Iglesias, was the shooter. Mr. Iglesias was an Imperial Gangster at the time.

June 22, 1993: Mr. Ochoa is shown an 8-person photo array and selected Mr. Iglesias.

June 23, 1993: Mr. Iglesias was arrested. A lineup was conducted at 8:00pm with Mr. Ochoa and he selected Mr. Iglesias again. Mr. Ochoa was interviewed by ASA Latz. Arnell Moore was interviewed by ASA Latz and says he did not get a good look at the face of the shooter and would not be able to make an identification.

June 24, 1993: 12:30am, Hugo Rodriguez was shown same photo array that had been viewed by Mr. Ochoa and he allegedly selected Mr. Iglesias from the photo array (while Mr. Iglesias was in custody). At 1:25am, Hugo Rodriguez, Efrian Torres and David Chmieleski viewed a 6-person lineup containing Mr. Iglesias. Mr. Rodriguez selected Mr. Iglesias as the shooter. Neither Torres

nor Chmieleski chose anyone from the lineup. Chmieleski further informed ASA Latz that he never saw the face of the offender. Case was cleared by arrest.

October 5, 1994: Interview with Mr. Ochoa by ASA.

December 14, 1994: Trial began.

December 19, 1994: Conviction.

January 17, 2019: Conviction vacated with no objection from the State.

June 8, 2022: Iglesias awarded Certificate of Innocence.

**Summary of Witnesses:**

1. **Rosendo Ochoa.** Is the cousin of another witness Mercy Cordero and a member of the Latin Kings gang. He lived in a 2nd story apartment at 2135 North Sawyer and made his observations from the window(s) of his apartment. He saw a male wearing a black hooded sweatshirt with the hood up across the street by the apartment building before the shooting began. When the vehicle carrying the victim came to a stop sign at Palmer, the shooter walked out from next to the tree and started shooting. The shooter then ran south on Sawyer and west into the alley. He provided the description that was used in the "Wanted" section of the police report.

    - WANTED: Hispanic male, 17-19 years old, 5'5"-5'7" tall, 135-140 lbs., clean shaven, wearing black hooded sweatshirt and black pants.

    Detective Santopadre, who interviewed Mr. Ochoa on the day of the shooting, testified at his deposition that it was his practice to ask witnesses if they thought they could identify the perpetrator, and that he would memorialize if a witness said he thought he could make an identification. He also testified that, based on his notes, Mr. Ochoa must have told him that he could not identify the shooter. (Depo. P. 178-181.)

    In a 6/24/93 Supplementary police report, it is noted that on June 22, 1993 Mr. Ochoa said in a re-interview with Detectives Halvorsen and Guevara that he got a good look at the shooter's face and would be able to identify him.[1] On June 22, 1993, Mr. Ochoa was shown a photo array with 8 color Polaroid photos and, according to the police report, selected a picture of Mr. Iglesias as the shooter. He then viewed a 5-person live lineup at 8:00pm the following day and again selected Mr. Iglesias.

    In a Memorandum of Interview on October 5, 1994, Mr. Ochoa told ASA Studenroth that the shooter was light skinned Hispanic that looked White but was Hispanic. The end of the memo concludes with "Witness was very descriptive as to the events and ASA commented on his excellent memory of events as they occurred."

    At trial, Mr. Ochoa testified that the shooter was standing between 20 and 40 yards away from where he was located on the 2nd floor of his building (TT R-38) and he could see the face of the shooter from this vantage point. (TT R-39)

[1] This information was not listed in the police report containing the notes from the original interview with Mr. Ochoa. However, it is noted in the original report that other witnesses did *not* see the shooter's face.

Mr. Ochoa's account of his observations became more detailed at trial than in any of the police reports I have received. For example, at trial, Mr. Ochoa testified that after shooting, the shooter stood there staring at the car for 15-20 seconds.[2] (TT. R-40). He then testified that after the shooter turned around, he put his hood up and started running toward the alley. (TT. R-40).

Mr. Ochoa made a positive identification of Mr. Iglesias at trial. In his 2021 deposition, Mr. Ochoa testified that he remains certain that Mr. Iglesias is the shooter.

2. **Hugo Rodriguez**. Was a passenger in the rear (middle seat) of the vehicle that was shot at. Mr. Rodriguez testified at trial that he was member of the Latin Kings gang.[3] It is unclear from the report if the vehicle witnesses were interviewed together because the report indicates that the three passengers gave a similar account as the driver, Jesus Gonzalez (see below).[4] Mr. Rodriguez saw the offender – wearing all black with a black hood worn up – run into the alley after the shooting. He was looking through the rear window of the car that was driving away from the shooter. The rear window had a set of horizontal window blinds. He provided the following description to Officer Zuniga:

    - Hispanic male, 18 years old, 5'07", 145 lbs., black hair and light complexion, wearing black clothing with black hood over his head. Shooter allegedly said "King love" before shooting approximately 5 times.

    Mr. Rodriguez was also interviewed by Detective Santopadre, who took handwritten notes of his interview. During that interview, he described the following: "after shooting saw off[ender] in… all Blk… run into alley." Two weeks later on June 23, 1993, Mr. Rodriguez was re-interviewed with Mr. Sanchez and Mr. Coronell. None of the three witnesses spoke English well and Det. Guevara acted as interpreter during the interview that was being conducted by ASA Latz. At this interview, according to the police report, Mr. Rodriguez said that he would be able to identify the shooter.[5]

    At trial, Mr. Rodriguez testified that he saw the shooter through the rear passenger window after the shooting and after he ducked down.[6] (TT U-10) He also testified that the shooter was in front of their car on the opposite side of the street when the shooting started (TT U-11) which is inconsistent with Mr. Ochoa's testimony that the car was shot at when it approached the stop sign. In addition, Mr. Rodriguez, for the first documented time, says that the shooter put the hood up *after* the shooting. (TT. U-13) He also testified that he saw the shooter run into the alley. (TT. U-13)

    In a July 12, 2021 affidavit, Mr. Rodriguez stated that he saw a man to his left standing near a tree before the shooting began. He then heard gunshots and ducked down to take cover. He then peeked his head out of the rear window and saw a man wearing all black.[7] He got a good look at the man's face. He believes that he correctly identified Mr. Iglesias as the shooter.

---

[2] Mr. Rodriguez testified in his 2021 deposition that the shooter started running as soon as the shooting stopped. (P.77)

[3] In his 2021 deposition he testified that he lied at trial and was never was a gang member. (P. 174)

[4] In his 2021 deposition, Mr. Rodriguez testified that the police interviewed the vehicle witnesses together at the gas station (P. 114) but separately at the police station. (P. 30)

[5] In his 2021 deposition, Mr. Rodriguez testified that the other witnesses in the vehicle, Gonzalez, Coronell, Sanchez, told him they did *not* see the shooter. (P. 121)

[6] He also testified that the rear window was down however crime scene photographs of the vehicle show the rear window only half way down.

[7] The back window of the vehicle had curtains/blinds that Mr. Rodriguez looked through to see the shooter running away. (Depo P.106)

In his September 2021 deposition, Mr. Rodriguez said the witnesses in the vehicle were looking east, saying goodbye to Ms. Cordro when the shooting began (the shooter was to their west). He testified that he saw the shooter after he ducked, as the car was speeding north. (P. 74) For the first time, Mr. Rodriguez described seeing mug books with lots and lots of photos of "gang bangers" including Imperial Gangsters the day after the shooting. (P. 128) He also testified that other witnesses also were shown the books. (P. 132) There is no documentation of mug book viewing by any witness in the police reports I have received. Mr. Rodriguez testified that his memory for the events (related to the shooting) are just as good in 2021 as they were in 1993 and 1994. (Depo. P. 190) He continues to believe that he selected the right person as the shooter.

3. **Jesus Gonzalez**. Driver of vehicle. As he was driving away from the alley near Ms. Cordero's home, someone began firing at the car. He ducked and sped away. When he realized Ms. Roman had been shot, he went to a gas station and called the police and an ambulance. He stated "he never saw the offender" and does not know why they were shot at.

4. **Daniel Sanchez**. Passenger in rear of car, behind the driver. No indication in the police report that he saw the shooter (or saw him run into the alley).

5. **Jose Coronell**. Passenger in rear of car, behind passenger seat. He saw the offender run into the alley after the shooting.

6. **Mercy Cordero.** Friend of victim who was in the car with the victim and other witness prior to the shooting. She dropped off by her house at 2135 N. Sawyer and was near the vehicle when the shooting started. She heard the shots and saw someone dressed in all black running west into the alley (of W. Palmer). She only saw the individual's back and did not see if he had a gun.

7. **Arnell Moore.** Bus driver. Was interviewed on June 7, 1993. He said he observed a M/WH, 20-25, 5'7"-5'8" with a light beard and mustache wearing a dark colored hoody and dark pants walk past him travelling north on Sawyer, and then run past him going south on Sawyer toward the alley. He was interviewed again on June 23, 1993 or very early on June 24, 1993 (the police report does not specify whether the interview was before or after midnight). He said at that time that he did not get a good look at the shooter's face and would not be able to make an identification. According to his affidavit, Mr. Moore was shown photo books twice at the police station and did not identify anyone.

8. **Sarah Torres**. Lived at 2148 N. Sawyer, 3rd floor. She heard the shots and saw a skinny male dressed all in black with a black hood. She did not see the face nor a gun. According to a handwritten note, Ms. Torres also told scene detectives that her "son came from the boys club knows shooter."

9. **Efrian Torres.** Lived at 2148 N. Sawyer, 3rd floor. He heard shots and looked out the window but saw nothing. He knew (at his first interview) that his mother Sarah had seen a male with a black hooded sweatshirt run southbound. About 10 minutes before the shooting, he saw around five Imperial Gangster gang members on the N/E corner of Sawyer and Palmer. Two of the males had black hoodies. One was M/H (with pink baggy pants) and the other was M/B (with black pants). According to his affidavit, Mr. Torres says he viewed a thick book filled with lots of pictures at his home, and he told police he did not see the shooting or the shooter.

   Although Mr. Torres did not witness the shooting, he was brought to the police station to view a lineup containing Mr. Iglesias at 1:30am on June 24, 1993. He was asked if he recognized anyone in the lineup, and he did not select anyone.

10. **Rosie Cruz.** Witness on the street. Perhaps interviewed together with Maira Nieves. She saw the person with the black hoody shoot and run southbound. She did not see the shooter's face.

11. **Maira Nieves.** Perhaps interviewed together with Cruz. Saw a person with a black hoody shoot and run southbound. She did not see the shooter's face.

12. **David Chmieleski.** Was interviewed the night of the shooting and said he observed a person in black clothing run southbound past his window. According to his affidavit, he saw only the side of the shooter as he was running past and did not see his face. He was taken to the police station and shown a photo album. He told them that he could not identify anyone because he did not see the shooter's face. He also stated that while he was viewing the live lineup, he felt some pressure to pick someone, but he never did.

**IV. Basis for Opinions in This Case**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selection of Mr. Iglesias as the shooter who killed Monica Roman, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables"). It is critical to understand the impact of both system and estimator variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made.

The distinction between estimator and system variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading international expert in eyewitness identification research. Over the past 40+ years, a substantial amount of research on both estimator and system variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[8] In 2015, the law in Illinois regarding eyewitness identification procedures was amended and this law is consistent with best practices described in this report.[9]

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Iglesias by Mr. Ochoa and Mr. Rodriguez include:

**Estimator Variables:**

1) Effects of Limited Opportunity to Observe at the Time of the Event
    a) Exposure Time
    b) Distance
    c) Weapon-focus Effect
    d) Disguise

---

[8] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification

[9] IL ST CH 725 § 5/107A-0.1

2) Stress/Arousal
3) Prior Familiarity

**System Variables:**

1) Post-event contamination
2) Description "Accuracy"
3) Mug book Searching
4) Photo array/Lineup Bias
5) Pre-identification Warnings/Instructions
6) Non-blind Lineup Administration
7) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
8) Witness Confidence
9) Post-identification Feedback
10) Non-identifications of the Suspect

**V. General Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[10] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[11] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer is commonly none the wiser when perception differs from the "ground truth" of the external world—it appears that accurate eyewitness identification may be difficult to achieve.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through *contamination*, especially when the witness' memory is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed

[10] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[11] Ibid.

to post-event information, it is extremely difficult to ascertain the full impact of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face/characteristics and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[12] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[13] The 2020 White Paper[14] maintains the original four best practice recommendations from 1998[15] and adds five new best practice recommendations for the collection and preservation of eyewitness evidence.[16] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations as well as the law in Illinois.[17]

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently numbers as **375.**[18] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[19] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 cases where there was an erroneous eyewitness identification of the innocent defendant, 36% included mistaken identifications from *more* than one eyewitness, such as in this case. In fact, some of the DNA cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In these exoneration cases, there is no evidence that witnesses were

[12] In this report, the terms "lineup" and "photo array" will be used interchangeably except when discussing the specific procedures utilized in this case.

[13] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603–647.

[14] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[15] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.

[16] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.

[17] IL ST CH 725 § 5/107A-0.1

[18] The figure of 375 has not been updated on the Innocence Project website for some time and therefore this figure is an underestimate of the number of DNA exonerations in the United States. Visit www.innocenceproject.org for information and statistics on DNA exoneration cases nationally.

[19] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. Evidence demonstrates it is common for eyewitnesses to genuinely believe they are identifying the correct person yet can still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[20] In the 2020 White Paper mentioned above, Dr. Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[21] The authors examined 11 published articles with data from over 6,500 witnesses in actual cases. The results show that nearly one quarter of witnesses who view a photo array or lineup in actual cases choose an innocent filler. Of those who "identify"[22] a person from a photo array or lineup, more than one third (36.8%) choose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 36.8%, as these data do not include erroneous selections of innocent suspects (it only includes filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" are incorrect. While false identifications of innocent fillers almost invariably do not send those fillers to prison, these choices still constitute identification errors and provide valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

## VI. Proposed Testimony

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all examples found in the materials will be repeated in this report.

### Estimator Variables

### 1. Effects of Limited Opportunity to Observe at the Time of the Event

---

[20] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[21] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[22] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug book, photo array or lineup procedure).

Common sense might suggest that even a brief opportunity to view a perpetrator's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the opportunity a witness has to view a perpetrator's face significantly impacts the witness' later ability to identify that person. Generally, when the opportunity to see a person's face is limited (due to short time, presence of a weapon, distance, disguise, etc.), the result will be a weak or poor memory for that individual. What is critical with respect to reliability is the amount of time that a witness has to view a person's face ***at the time of the event***.

**a) Exposure Time.**

At trial, Mr. Ochoa testified that from the time the vehicle carrying the victim started to move from the alley until the time the shooting began was "not even a minute". (TT. R-65) When Mr. Ochoa testified at a deposition in 2022, he was asked whether he saw the face of the shooter when he was looking out the window. He responded (Depo. P. 31):

> *When he was walking back and forth exactly, I see him, but not exactly. Not exactly, like, because he don't – he don't was facing to me. So I see him walking. I could see parts of his face but not exactly his whole face when he was back and forth; because he don't look up, was looking, like, at the front.*

Mr. Ochoa then testified that he saw the shooter's face only after the shooting and up to that point only saw his body (Depo. P. 35) or the profile of the shooter's face but that he was basing his identification on seeing the shooter *after* the shots were fired (when the shooter's hood was up). (P. 116-7) He saw the shooter's face between one and 10 seconds. (e.g., Depo. P. 226)[23]

Mr. Rodriguez testified at trial that he saw the shooter through the rear passenger window after the shooting and after he ducked down the first time. (TT U-10) However, if Mr. Ochoa's accounts of where the vehicle was (approaching stop sign) and where the shooter was (by the tree) when the shooting began are accurate, it is unclear how Mr. Rodriguez would have been able to look out the rear passenger window – without turning his head (TT. U-10) – to see the shooter. Mr. Rodriguez's alleged second opportunity to see the shooter was after the shooting when the car had accelerated away when he looked through the back window. (TT U-12-13) In his 2021 deposition, Mr. Rodriguez testified that he was looking out the back window to see the shooter (Depo P.17) and he saw his face for a few seconds (P. 18) while the car was speeding north. (P. 77) He also testified that the shooter was behind the vehicle when the shooting started (P. 93) which implies that he would have to look behind him to see the shooter. Importantly, Mr. Rodriguez testified that the back window of the vehicle had blinds that he had to look through to see the shooter running away. (Depo P.106) These blinds also are depicted in the crime scene photographs which show that they run the entire length of the rear window where Mr. Rodriguez allegedly saw the shooter's face.

[23] Researchers have investigated people's retrospective estimates of the amount of time that an interaction or event took place. The general findings show that estimates often differ from the actual amount of time, with the error often in the direction of overestimating.[23] Sometimes the estimate of time is profoundly exaggerated. In one study, participants saw a 30-second simulated bank robbery on videotape.[23] Two days later they were asked some questions about the tape, including how long it lasted. The average estimate of duration was 152 seconds – more than 5 times the actual length. Very few people estimated a duration that was equal to or less than the true value of 30 seconds. Although it was rare, some people produced inordinately long estimates of over 900 seconds. In other words, these individuals remembered a 30-second bank robbery tape as having lasted over 15 minutes. Thus, it is possible that witness testimony about the duration of their observations will be skewed such that triers of fact hear testimony that the witness had a longer opportunity to view the perpetrator than is in fact true.

In research on the effects of exposure duration – the amount of time one has to view or encode something – on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy in their 1986 meta-analysis on this topic.[24] That is, shorter exposure time generally correlates to less accurate identifications. In the time since this comprehensive review was published, an updated meta-analysis[25] and other research[26] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

For example, in one study by Memon, Hope and Bull, mock witnesses viewed a video of a realistic crime that lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and seven seconds (with the perpetrator's face in view for 12s).[27] Witnesses were then tested with a perpetrator-present or perpetrator-absent photo array 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections in perpetrator-absent arrays increased substantially when exposure time increased. (Note, however, that mistaken identifications in perpetrator-absent arrays remained relatively high regardless of the exposure time.)

*Performance of Young Adults (ages 17-25) in the 12s and 45s Exposure Conditions with Perpetrator-Present and Perpetrator-Absent Photo Arrays (**Errors** are bolded)*

| | **12 Seconds Exposure** | | | **45 Seconds Exposure** | | |
|---|---|---|---|---|---|---|
| | Hits | False Alarm | No Choice | Hits | False Alarm | No Choice |
| Perpetrator-Present Array | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Perpetrator-Absent Array | NA | **90%** | 10% | NA | **41%** | 59% |

The results of the Memon et al. study above show that in circumstances where witnesses viewed the perpetrator's face for 45 seconds, 41% of witness made a mistake and misidentified an innocent person from a photo array in which the actual perpetrator was not shown. When the exposure time was reduced to 12 seconds, the false identification of innocent people increased to 90%. Given the descriptions of the shooting provided by Mr. Ochoa and Mr. Rodriguez in this case, it is unlikely that their ability to see the face of the shooter was even 12 seconds as in the Memon et al. study. Both witnesses gave estimates between one and ten seconds as their opportunity to view the shooter's face.[28]

---

[24] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

[25] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[26] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[27] Memon, A., Hope, L., & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354.

[28] It should be noted here that there were additional estimator variable issues at play including distance (Ochoa) and obstructions (Rodriguez) that were not present in the Memon et al. study described above.

**b) Distance.**

Mr. Ochoa testified at trial that he was between 20 and 40 yards from where the shooter was and it was not more than 40 yards. (TT. R-64) He also testified that nothing was blocking his view of the shooter from his position at the second story window. (TT. R-66) In his 2022 deposition, he testified that the shooter's face was "very clear" from his vantage point at least 100 feet away. (P. 119-20) When he was asked if it is possible that the distance was 160 feet, Mr. Ochoa was not sure because he had not measured the distance but he felt that he would still be able to make an identification of a stranger at 160 feet.[29] (P. 121-2) In the materials reviewed, a Google Map screenshot shows the distance between Mr. Ochoa's residence and the location that he described seeing the shooter (near the tree) to be approximately 160 feet. A second screenshot shows the distance between his residence and the corner by the alley to be approximately 109 feet.

[29] Research has also found that individuals tend to overestimate distance but especially so when distances are great. For example, Lindsay, et al. (2008). How variations in distance affect eyewitness reports and identification accuracy. *Law & Human Behavior*, 32, 525–535.



Research conducted on the issue of distance has shown that distance can significantly impact a person's ability to view the details of another person's face.[30] In his "distance-as-filtering hypothesis", Dr. Geoff Loftus explains that as a face is viewed at further and further distances, there is less ability to detect the details of the face because facial details become coarser and coarser. As way of example, the image below from Loftus' research recreates the loss of detail when one view's a face from 20 feet (6.7 yards; left) to 100 feet (33.3 yards; right). This would render Ochoa's ability to view the shooter at the 109 foot distance (notwithstanding that the shooter had his hood up and was not looking toward Ochoa's window), or the 160 foot distance, extremely unlikely.

[30] Loftus & Harley (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12,* 43-65; Harley, Carlsen & Loftus (2004). The 'saw-it-all-along' effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory and Cognition, 30,* 960-968; Lampinen, Erickson, Moore, & Hittson (2014). Effects of distance on face recognition: Implications for eyewitness identification. *Psychonomic Bulletin & Review, 21,* 1489–1494.

In other research, scientists tested eyewitnesses on their ability to recognize a stranger's face from a range of distances.[31] Participants viewed faces from distances between 10 and 130 feet and were then immediately asked to make an identification from a six-person lineup. The results showed that the proportion of correct responses to errors was too great at distances over 49 feet for an identification to be considered probative. Accordingly, the authors recommended a 50 foot distance cutoff point as a useful "rule of thumb" for courts when assessing reliability. A replication of this study using photos of famous people led to a similar conclusion.[32] Other researchers[33] have also found significant impairments in identification accuracy when the distance between a witness and the target increases but do not recommend a particular cutoff point, as did Wagenaar and van der Schrier. A recent study found that at a distance of 65 feet between an observer and a target individual, the rate of false identification from a target-absent lineup was 65% and the rate of correct identification of the target was only 15%.[34] The implication of the scientific research is that distances between more than 100 feet and as much as 160 feet, as shown above, make it extraordinarily difficult to encode the details of a person's face, which is required in order to make an accurate identification decision. Further, researchers have also found that the confidence-accuracy relationship (discussed in more detail later in this report) is significantly weakened when the distance between the witness and the perpetrator is over 66 feet,[35] as was the case with Mr. Ochoa, who was significantly more distant than 66 feet.

**c) Weapon-focus Effect.**

From my review, I do not recall witnesses being asked by police to describe the gun that was used in the shooting or to comment on whether they specifically saw the gun. Mr. Rodriguez testified at trial that he saw the shooter try to hide something in his waist (presumably a gun; P. U-12) but did not describe a gun. Mr. Ochoa testified at trial regarding where the shooter got the gun from (his clothes) and how the shooter was holding the gun (P. R-39) but there was no description of the gun.[36] According to the handwritten notes of ASA Latz, when he interviewed Mr. Ochoa, Mr. Ochoa told him that he had seen a black .22-.25 pistol. In summary, it appears that both of these witnesses looked at the gun or toward the gun for a period of time during their observations.

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect." As the witness focuses on the weapon, their ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was first reviewed in a meta-analysis published by Steblay in 1992. The weapon focus effect was statistically significant and demonstrated an impairment of identification accuracy when a weapon was present during the event/crime. A more recent meta-analysis confirms the

---

[31] Wagenaar & van der Schrier (1996). Face recognition as a function of distance and illumination: A practival tool for use in the courtroom. *Psychology, Crime & Law, 2,* 321-332.
[32] De Jong, Wagenaar, Wolters, & Verstijnen (2005). Familiar face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crime & law, 11,* 87-97.
[33] Lindsay, Semmler, Weber, Brewer, & Lindsay (2008). How variations in distance affect eyewitness reports and identification accuracy. *Law and Human Behavior, 32,* 526-535.
[34] Lockamyeir, Carlson, Jones, Carlson & Weatherford (2020). The effect of viewing distance on empirical discriminability and the confidence–accuracy relationship for eyewitness identification. *Applied Cognitive Psychology, 34,* 1047-1060.
[35] Ibid.
[36] In my opinion, it was unexpected that both Mr. Ochoa and Mr. Rodriguez commented on Mr. Iglesias' earrings being different than that worn by the shooter but neither witness described the weapon.

findings of the Steblay 1992 report.[37] In summary, although it can certainly be true that a witness pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited. In addition, viewing a weapon can also cause a witness to become afraid, which also can decrease the quality of a witness' memory (see below).

**d) Disguise.**

Another factor that can reduce a witness' ability to observe is the presence of disguise (e.g., hat, mask, sunglasses) worn by a perpetrator during the commission of a crime.

In their initial statements to police on June 7, 1993, Mr. Ochoa and Mr. Rodriguez said that the shooter had a hood on. There is no description in the police reports suggesting that the shooter ever took his hood down or off. At trial, however, Mr. Ochoa testified that the shooter did not cover his head with the hoodie until after the shooting had stopped and the shooter turned to run toward the alley. (TT. R-65) Interestingly, Mr. Rodriguez also told police that the shooter had the hood up during the shooting but testified at trial that the hood was put up after the shots were fired. (TT. U-46) In his 2022 deposition, Mr. Rodriguez reverted back to his original statement and testified that the shooter's hood was up when he saw his face and that he was still able to see his hair. (P. 81) Mr. Ochoa maintained in his 2021 deposition that the shooter put his hood up after the shooting and then he ran to the alley. (P. 136) Other witnesses who were interviewed after the shooting described the shooter as wearing a hoodie, including Sarah Torres, Rosie Cruz and Maira Nieves.

With respect to "obstructions" limiting a witness' opportunity to see a perpetrator clearly, research indicates that when a perpetrator is merely wearing a hat it can significantly reduce later identification accuracy.[38] Thus, the presence of a hood likely had a negative impact on the witnesses' abilities to see the shooter clearly and subsequently make a positive identification of his face.

**2. Stress/Arousal**

Witnessing a shooting turned murder is undoubtedly a stressful experience for any witness. For Mr. Rodriguez in particular, he was inside the vehicle while it was being shot at. He ducked for cover immediately after hearing the shots.

In research related to the effects of stress and arousal on eyewitness performance, Deffenbacher and colleagues published a meta-analysis in 2004.[39] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for

---

[37] Fawcett, Russell, Peace, & Christie (2013). Of guns and geese: A meta-analytic review of the "weapon focus" literature. *Psychology, Crime & Law, 19*, 35–66.
[38] E.g., Cutler & Penrod (1988). Improving the reliability of eyewitness identification: Lineup construction and presentation. *Journal of Applied Psychology, 73*, 281–290; Mansour, Beaudry, Bertrand, Kalmet, Melsom, & Lindsay (2020). Impact of disguise on identification decisions and confidence with simultaneous and sequential lineups. *Law and Human Behavior, 36*, 513–26.
[39] Deffenbacher , Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28*, 687–706.

eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion – such as running – can cause increases in arousal which result in impaired eyewitness identification abilities.[40] In summary, high levels of stress and arousal, which the witnesses in this case undoubtedly experienced, have been demonstrated to significantly reduce the reliability of eyewitness identifications.

**3) Prior Familiarity.**

Although Mr. Torres did not see the shooting/shooter, there is evidence that Mr. Torres may have been familiar with the shooter prior to June 7, 1993. This information is based on a note that Mr. Torres' mother, Sarah Torres, gave law enforcement where she informed that her son knew the shooter. When Mr. Torres was interviewed by police on June 7, 1993, he told them that he did not see the shooter himself but saw people nearby about 10 minutes before the shooting. He gave descriptions of two of these individuals, at least one of which he was familiar with. One person was a Hispanic male wearing a black hoodie and pink pants. The other person was a black male wearing a black hoodie and black pants. The clothing description of the black male matched the clothing description of the shooter but no witnesses described the shooter as being a black male.

Although Mr. Torres did not see the face of the shooter, he was brought to the police station to view a live lineup containing Mr. Iglesias at 1:30am on June 24, 1993. It is not clear from the record why Mr. Torres was asked to view the lineup. If he was asked to view the lineup because he saw a known Hispanic male in a hoodie approximately 10 minutes before the shooting, his rejection of Mr. Iglesias from the lineup should have been extremely important to investigators. It would have meant that a witness who was familiar with the suspect – Mr. Iglesias – was telling them that he was *not* the person he viewed.

Further, Mr. Iglesias testified at his own trial that he was familiar with one of the eyewitnesses – Hugo Rodriguez – who identified him as the shooter. He knew this person on the street as "Gato" and had seen him a few times cruising around in the neighborhood. (TT. V-92, 100-1) Of course it is possible that Mr. Iglesias was familiar with Mr. Rodriguez prior to June 7, 1993 but the same was not true for Mr. Rodriguez. However, if the two men were familiar with each other prior to June 7, 1993 and Mr. Rodriguez did not indicate to police that the shooter was familiar to him, it could be because he did not get a sufficient look at the shooter in the couple of seconds he had to view him after the shooting suddenly began, or because Mr. Iglesias was not the person he saw do the shooting.

The relevance here is that it is accurate to say that we are more likely to correctly recognize people that we are familiar with or people that we "know" than we are to recognize a stranger.[41] And although familiarity can range from a single previous observation/encounter to a family member or close friend, we are less likely to make mistakes as familiarity increases. In this case, the rejection of Mr. Iglesias by Mr. Torres is relevant if police believed that Mr. Torres was a relevant eyewitness in the investigation.

In summary, with respect to estimator variables, there is evidence that both witnesses who selected Mr. Iglesias had a limited opportunity to see the face of the shooter (due to distance, short time, the raised hoodie, and the presence of weapon). In addition, Mr. Rodriguez testified about being shot at, hearing the gun shots and ducking for his life. Together, these estimator variables likely created a scenario where it

[40] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

[41] For a review of this research, see Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law,* 25, 128-146.

would have been difficult for any witness to have a strong memory for the perpetrator. As will be discussed below, there are significant concerns regarding eyewitness reliability in identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed.

**System Variables Relevant to the Current Case**

The police reports and other documentation in this case reveal that several system variables employed in this case, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Iglesias as the shooter.

**1. Post-event Contamination**

In his early statements to police, Mr. Ochoa described the shooter as a light skinned Hispanic male, 17-19 years old, 5’5”-5’7” tall, 135-140 lbs., clean shaven, wearing black hooded sweatshirt and black pants. In 1993, Mr. Iglesias was a medium-skinned Hispanic male, 24 years old and 5’11” tall.

For the most part at trial and again in his 2022 deposition, Mr. Ochoa changed all of the features from his initial description of the shooter that did not match Mr. Iglesias’s features in 1993 to match Mr. Iglesias’ features. Specifically, he testified in 2022 that the shooter was “tall”, taller than Mr. Ochoa who is 5’5”-5’6”. He also testified in 2022 that the shooter’s skin color was brown like his (Depo P. 32) and was between 20 and 30 years old. (P. 33) Further, he testified in 2022 that Mr. Iglesias is an Imperial Gangster (Depo. P. 58), information he only could have learned after the shooting. And he testified in 2022 that he learned from the police that there were five people in the car. (P. 100) The changes in description and knowledge not previously known (before the shooting) are examples of post-event contamination.

Other instances where post-event contamination could have occurred in this case are when Mr. Rodriguez Mr. Sanchez and Mr. Gonzalez were interviewed together at the scene by Officer Zuniga (P. 114-5, 119) and again at the police station, perhaps on several occasions. In addition, Mr. Rodriguez and other “vehicle witnesses” were transported to the precinct in the same car where they talked about what they had seen. (P. 120).

In addition, there is evidence that Mr. Torres and his mother communicated about what they had witnessed as Ms. Torres told police that her son had seen the shooter, and Mr. Torres said his mother had seen the shooter in a black hoody.

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[42] There are many sources of post-event memory contamination that can affect a witness’s memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses (aka *co-witness contamination*), law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person’s memory and identification accuracy, Zajac and Henderson[43] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed

[42] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[43] Zajac & Henderson (2009). Don't it make my brown eyes blue: Co-witness misinformation about a target's appearance can impair target-absent line-up performance. *Memory, 17*, 266-278.

was another participant in the study (i.e., a co-witness). Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

In summary, the concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event. In many actual cases, the full scope and impact of post-event contamination is unknown which is why it is so important to obtain a detailed, recorded interview with a witness. In this case, the extent of the contamination is unclear but the record indicates there were multiple opportunities for all of the witnesses to have learned information about the perpetrators from others.

**2. Description "Accuracy"**

Mr. Ochoa gave police the following description of the shooter that was used in the "Wanted" section of a Supplementary report:

- White Hispanic male, 17-19 years old, 5'5"-5'7" tall, 135-140 lbs., clean shaven, wearing black hooded sweatshirt and black pants.

Officer Zuniga testified at trial that he received a description of the shooter from Mr. Rodriguez. This description was included in a report authored by Zuniga on 6/7/93:

- Hispanic male, 18 years old, 5'07", 145 lbs., black hair and light complexion, wearing black clothing with black hood over head. Shooter allegedly said "King love" before shooting approximately 5 times.

At trial, Mr. Rodriguez testified that the shooter had light skin, "more or less white" and was clean shaven. (TT. U-17) When Mr. Iglesias' defense attorney, Mr. DeLeon, asked Mr. Rodriguez at trial if Mr. Iglesias was white complected, he responded no. (TT. U-49) Mr. Rodriguez also testified that the shooter was not as tall as 5'10" or 5'11" (TT. U-47) which is Mr. Iglesias' height.

At trial in December 1994, 18 months after the shooting, Mr. Ochoa and Mr. Rodriguez both gave the exact same description as to how Mr. Iglesias looked different at the June 1993 lineups than the shooter did on June 7, 1993. Mr. Ochoa (TT. R-49-50) and Mr. Rodriguez (TT. U-31) testified that Mr. Iglesias' hair was different (shorter) in the lineup than the shooter's hair although there is no record in the police report that either witness saw or described the length of the shooter's hair. In addition, Mr. Ochoa and Mr. Rodriguez testified that Mr. Iglesias' eyebrows at the lineup were different than the shooter's,[44] that Mr. Iglesias had facial hair at the lineup (and photo array) and the shooter did not, and both witnesses said the earrings worn by Mr. Iglesias in the lineup were different than what the shooter was wearing on June 7. Finally, although Mr. Ochoa had told ASA Studenroth before the trial that the shooter was light skinned - looked White but was Hispanic - he testified at trial that the shooter was "dark", like his color. (TT. R-71)

---

[44] Both witnesses testified at trial that Mr. Iglesias had partially shaved eyebrows and the shooter did not.

With respect to research on witness description accuracy, in Professor Garrett's (2011)[45] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[46]

In my opinion, the lack of detail in the various witness' initial descriptions of the shooter should have been a red flag for investigators that these witnesses did not have a strong memory for the shooter and would therefore would not likely be reliable eyewitnesses in the investigation.

**3. Mug book Searching**

In his 2021 deposition, Mr. Rodriguez testified that he viewed mug books with lots of photos of "gang bangers" on the day after the shooting. (P. 128) In the police reports I received, there was no documentation of mug book viewing by any witness. In his 2021 deposition, Officer Santopadre testified that in 1993, the most up-to-date and thorough gang books (sorted by gang) would be with the gang crimes unit and minor gang books were kept in the detective area. (P. 141-3) Santopadre also testified in 2021 that he would have expected that mug books would be shown in a case – such as this one – where the witness said they saw the perpetrator and the case was suspected to be gang related. (P. 146) It is not known which books Mr. Rodriguez viewed and whether Mr. Iglesias' photograph was included in those books, but given that he was a member of the Imperial Gangsters, he very well may have been in the Imperial Gangsters photo book. If Mr. Iglesias' photograph was in those books, there are additional concerns related to the ultimate selection of Mr. Iglesias from the photo array (and lineup). Specifically, if Mr. Iglesias' photograph was viewed by witnesses in the mug books and rejected (i.e., not selected), any subsequent viewing of Mr. Iglesias would be contaminated by the mug book procedure. Further, viewing Mr. Iglesias' photograph and not selecting it is indicative of innocence.[47]

Mug book searching is a technique that is sometimes used by law enforcement when they do not have a particular suspect in an investigation. In a mug book searching procedure, a witness is asked to look through a (large) number of arrest photographs in the hopes that 1) the perpetrator has been arrested before, 2) his photograph is among the photos the witness is shown, and 3) the witness will recognize the perpetrator in the photographs. Therefore, many factors need to be in place in order for a witness to be able to successfully make a correct identification of the actual perpetrator and *not* make an inaccurate identification of an innocent person. The literature on mug book searching suggests that witnesses often make multiple selections from mug book searches regardless if the actual perpetrator is present.[48]

---

[45] Garrett (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[46] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[47] E.g., Clark, Howell, & Davey (2008). Regularities in eyewitness identification. *Law and Human Behavior, 32,* 187-218.

[48] E.g., Blunt, & McAllister (2009). Mug shot exposure effects: Does size matter? *Law and Human Behavior, 33,* 175-182; Dysart, Lindsay, Hammond, & Dupuis (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284; Goodsell, Gronlund, & Neuschatz (2015). Investigating mug shot commitment. *Psychology, Crime & Law, 21,* 219-233

There are several concerns with the mug book searching procedure. First, the task is akin to a large *all-suspect* lineup in that any person a witness chooses could potentially become a suspect in the investigation. As discussed above in *Section V*: *Eyewitness Error Rates in Actual Cases*, nearly one quarter of witnesses who view a 6-person lineup end up choosing an innocent person, so we know that witnesses make identification errors with regularity. Second, the mug book task is rarely the only identification procedure that a witness is asked to view. That is, if a witness views mug books, it is likely that the witness will be tested again either with a photo array or a live lineup, as was done in this case with Mr. Rodriguez (if his deposition testimony is accurate). Conducting a second (third, etc.) procedure with the same individual is extremely problematic and will be discussed in more detail below in the section on *Repeated Identification Procedures*. But it is worth a quick note here to say that repeated viewings from mug books can have at least two negative effects on an eyewitness: unconscious transference and commitment. Although the Department of Justice 1999 Eyewitness Guide[49] included a best practices section on mug book searching, researchers continue to have concerns with the use of this procedure because of the effects described herein.

**4. Photo array/Lineup Bias**

At trial, Det. Guevara testified that he wanted a photograph of Mr. Iglesias so that he could create a photo array and show it to witnesses. He testified that to conduct the photo array, he would put Mr. Iglesias' photograph in with "numerous other Hispanic or male/white individuals" and then conduct the array. (TT. U-86) From a reliability perspective, this is an inappropriate way to select fillers as filler should match the race/ethnicity of the suspect.

An examination of the photo array that was shown to Mr. Ochoa and Mr. Rodriguez demonstrates Det. Guevara's lack of emphasis on race/ethnicity/skin tone when selecting fillers. Although these witnesses had told detectives that the shooter was a light skinned Hispanic male, Mr. Iglesias in real life did not match that description. However, the Polaroid photo of Mr. Iglesias used in the array depicts him as a light skinned Hispanic. What is most concerning about the array is that very few fillers look like light skinned Hispanic males and the individual in position 2 looks as though he might be Caucasian. Therefore, based on the description of a light skinned Hispanic male being the shooter, it is my opinion that this photo array does not depict seven light skinned males and therefore Mr. Iglesias stands out in the procedure.

After conducting my own review and forming my own opinions regarding the photo array shown to Mr. Ochoa and Mr. Rodriguez, I then reviewed a "Photo Array Fairness Assessment" authored by Dr. Nancy Franklin in January 2022. The assessment conducted by Dr. Franklin is, in my opinion, typical of assessments of this type where the fairness or bias of an array is evaluated mathematically by a researcher or expert witness. The conclusions drawn by Dr. Franklin are consistent with my own observations and opinions. In summary, her report shows that when mock witnesses were shown the array used in the investigation of Mr. Iglesias, mock witnesses choose Mr. Iglesias' photograph as matching the witnesses' descriptions at a higher rate than any other lineup member. This assessment demonstrates that Mr. Iglesias' photograph stood out from the fillers, where some fillers were completely implausible alternatives, and thus the array was biased against him.

With respect to the two live lineups that were created and conducted in this case, it is unclear why two separate lineups - with nine different fillers in total - were conducted when the witnesses viewed the lineups only hours apart. Regardless, the main concern with the lineup is that it was preceded by the photo array procedure described above. For Mr. Rodriguez, the photo array procedure was conducted approximately

---

[49] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement* . United States Department of Justice, Office of Justice Programs.

one hour before the live lineup. Thus, the carryover influence from the photo array to the lineup cannot be understated (see section 7 below on *Repeated Identification Procedures*). In addition to Mr. Iglesias being the only photo array member being repeated in a lineup, several of the lineup members do not match the description that witnesses provided with respect to age, skin tone, and height. These features are obvious even though the lineup members were seated during the procedure.

With respect to the selection of lineup fillers, a properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers who are known to law enforcement to be innocent of the crime. When it comes to filler selection, there are many choices law enforcement need to make when deciding who to put in a lineup including how many fillers should be used, and how similar should they be to the suspect and/or the description the witness provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, especially the suspect.[50]

When it comes to how similar the fillers should be to the suspect, researchers have some preference to use a rule where all of the features included in the witness' description of the perpetrator should be matched[51] (e.g., gender, age, race, height, weight) and all fillers should be plausible alternatives for the suspect based on how the suspect looks – but fillers should not be clones.[52] When some of the lineup members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen. In this case, it is not clear what criteria were used to select the lineup fillers. What is clear from viewing the lineup is that most fillers do not match the overall description provided by the witnesses in this case.

In summary, with respect to the lineup in this case, there was a very strong likelihood that the witnesses would select Mr. Iglesias from the procedure based on the photo array that preceded it (by one day or one hour, depending on the witness). After being selected from a suggestive identification procedure (photo array) the results from any subsequent procedure are relatively meaningless. That is the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy.

What is interesting to note here is that none of the witnesses who viewed the live lineup without previously viewing the photo array – according to the police file – selected Mr. Iglesias as the shooter, including a witness who allegedly said he knew the shooter. In other words, only the witnesses who viewed the suggestive photo array picked Mr. Iglesias from the lineup.

---

[50] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

[51] For example, see Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[52] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

**5. Pre-identification Warnings/Instructions**

When asked at trial what detectives said to him before showing him the photographs on June 22, 1993, Mr. Ochoa responded "if I could recognize any one of those persons, that if it had been a guy who had shot at the car where Monica was." (TT R-46). This testimony is consistent with Det. Guevara's trial testimony. (TT. U-86-7) The following day, Mr. Ochoa viewed a live lineup with Mr. Iglesias. Prior to viewing that lineup, detectives again asked Mr. Ochoa "if he could recognize any of them." (TT. R-48) He also said the detective told me that "in between those five people I could recognize the person that had shot at Monica Roman." (TT R-48). In his 2022 deposition, Mr. Ochoa was consistent that detectives asked him after showing the photo array "do you recognize the person?" (P. 97)

At trial, Mr. Rodriguez was asked what the police had said to him before showing him photographs just after midnight on June 24, 1993. He responded: "that if I recognize anyone." (TT. U-19) In his 2021 deposition, Mr. Rodriguez testified that he was asked before the lineup if he was able to identify someone in the lineup that he had seen in the pictures (approximately 1 hour earlier). (P. 136) Mr. Rodriguez also testified that he was shown "6 pictures of the gang members" (P.31) It is unclear how he became aware that any or all of the photo array members were gang members but this information most likely originated from law enforcement.

Simply failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection and leads to an increase in identification errors. Instead, eyewitnesses should be told *explicitly* that the perpetrator might not be in the photo array or lineup and that they should not feel compelled to make a selection. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual perpetrator might not be present.[53] Being told that the suspect is in the lineup, as Mr. Ochoa was, can also have a steering effect toward the suspect.[54] Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[55] This law enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case

[53] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25*, 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[54] The scientific literature shows that the issue with suggestive instructions is that it causes witnesses to lower their decision criterion and be more likely to choose someone from the procedure. By itself, biased instructions do not necessarily steer witnesses to a particular lineup member. However, the combination of a lineup that is biased against the suspect and biased instructions would tend to increase the selection of the suspect.

[55] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array. Consistent with these recommendations, the 2015 Illinois law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

**6. Non-blind Lineup Administration**

In this case, the detectives who conducted the identification procedures were aware the Mr. Iglesias was the suspect in the procedure. In addition, Mr. Rodriguez testified that it was the same police officers who showed him the photo array at 12:30am on June 24, 1993 that conducted the lineup at 1:30am on June 24, 1993. (TT. U-29) Consistent with my experience, neither witness who selected Mr. Iglesias from the identification procedures testified that the detectives influenced their decision or outright told them who to select.

Contemporary police guidelines (e.g., IACP, 2006) and the law in approximately half of the United States for conducting identification procedures,[56] indicates that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[57] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[58] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[59] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 9% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in

[56] The 2015 eyewitness identification bill passed in Illinois requires double-blind or blinded administration of identification procedures.
[57] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1*, 765–791.
[58] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.
[59] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 36% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether they administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced. The researchers also asked administrators if they had influenced the witness during the lineup procedure. The results demonstrated that neither participants nor administrators believed that they had been influenced or did any influencing, respectively. The researchers concluded:

> *It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the line of administration procedure to judge the reliability of the identification. If witnesses are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)*

In summary, though double-blind administration was not the norm in the United States in 1993, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Iglesias from the identification procedures. In cases where law enforcement have "steered" a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability.

**7. Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

According to the police reports, Mr. Rodriguez was shown an 8-person photo array containing Mr. Iglesias as the suspect at approximately 12:30am on June 24, 1993. At this point in the investigation, Mr. Iglesias had already been selected by Mr. Ochoa from both a photo array and a lineup[60] and Mr. Iglesias was in police custody. In fact, approximately one hour after Mr. Rodriguez was shown the 8-person photo array, he and two other witnesses – Efrian Torres and David Chmieleski – were shown a live lineup containing Mr. Iglesias. This was approximately 1:30am. In my professional experience, I do not recall ever encountering a case where multiple witnesses were brought to the police station in the middle of the night to view identification procedures when the suspect was already in custody and had already been identified by another witness.[61]

---

[60] In Mr. Ochoa's deposition, he recalled seeing two lineups but he was not sure if he picked Mr. Iglesias from first lineup or the second. (P. 71) He also testified that he was shown a photo array two days after the shooting. Without documentation of this procedure, it is not possible to know how it may have impacted his selection of Mr. Iglesias.

[61] Further, what makes this procedure even more unusual is that the police report states "Witnesses TORRES and CHEMIELESKI viewed the line-up but were unable to make an identification because they never saw the face of the offender." It is unclear why two witnesses would be brought to the police station in the middle of the night to view a lineup if they had not seen the shooter's face.

In addition, in his 2021 deposition, Mr. Rodriguez testified that he was shown a photograph of Mr. Iglesias by the detective after the lineup and before his trial testimony. (P. 148) Mr. Rodriguez testified that this was done to remind him of who he selected as the shooter.[62]

Given the repeated identification procedures in this case, the concepts of unconscious transference and commitment are relevant. Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[63]

Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[64] this is known as "commitment."[65] Thus, it is quite possible that Mr. Iglesias was selected by witnesses at the live lineup merely because they had previously viewed and selected him from the photo array.

Results from a second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure. It is for this reason that psychologists view in-court identifications as mere theater and not actual independent tests of a witness's memory or ability to identify perpetrators.[66] In each succeeding procedure, witnesses can become increasingly more committed to their identifications and

---

[62] Mr. Rodriguez also testified in his deposition that he went to the police station four separate times during the investigation (e.g., P. 146, 149). The police reports I have received only document two times that Mr. Rodriguez went to the police station (June 7 and June 24, 1993).

[63] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[64] For a review, see Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289.

[65] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior, 30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

[66] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

increasingly certain of their accuracy. In fact, there are examples from post-conviction DNA exoneration cases where, after a witness had incorrectly selected an innocent suspect, they continued to identify the innocent suspect even when presented with the actual perpetrator responsible for the crime.[67]

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific finds and best practice recommendations:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383–84 (1968).

In this case, the two "identifying" witnesses were presented with repeated identification procedures with Mr. Iglesias as the suspect. The results from repeated identification procedures with the same suspect are not independently informative with respect to witness accuracy. That is, viewing an earlier procedure with the same suspect taints the result of any subsequent procedure.

**8. Witness Confidence**

There are no contemporaneous notes in the police file regarding Mr. Ochoa's and Mr. Rodriguez's levels of certainty from the photo array (or live lineup) that Mr. Iglesias was the shooter. At trial, Mr. Ochoa was not asked on direct about his level of certainty that Mr. Iglesias was the shooter but he was asked on re-direct if there was any doubt in his mind when he saw the photo array and the lineup that Mr. Iglesias was the shooter. At trial, he responded that there was no doubt. (TT. R-91-92) In his 2022 deposition, Mr. Ochoa continued to report that he had been sure at the time of his selection from the photo array and lineup (e.g. P.74) and continues to be confident today that he selected the right person. (P.74) In fact, he testified that there is no information that would cause him to be less certain in his identification. (Depo P. 254)

---

[67] The wrongful convictions of John Jerome White and Ronald Cotton are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times*, June 8, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole). See also: https://www.youtube.com/watch?v=u-SBTRLoPuo and https://www.youtube.com/watch?v=I4V6aoYuDcg

At trial, Mr. Rodriguez was asked whether he selected Mr. Iglesias from the photographs immediately and he responded yes and that he was sure of his selection. (TT. U-19) When he was asked about the speed of his identification and confidence in his lineup selection (one hour after the photo array procedure), he testified that he made the decision quickly and was certain. (TT. U-30) Mr. Rodriguez's 2021 deposition testimony is relatively consistent with his trial testimony regarding the certainty and speed (P. 33) and remains confident that he selected the correct person. (P. 47)

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[68] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[69]

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors. For example, researchers have recently found that the confidence accuracy relationship is significantly weakened when the distance between the witness and the perpetrator is over 66 feet.

Expressions of confidence at trial, however, are relatively meaningless[70] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[71]

It is worth mentioning that Hugo Rodriguez testified that he met with Detective Guevara four times in the months leading up to Mr. Iglesias's trial, and Guevara showed him a photo to remind him who he had selected. (Depo P. 146-48.) This procedure by itself likely would have artificially inflated Rodriguez's confidence at trial, and perhaps even his confidence in his accuracy that exists today.

---

[68] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[69] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[70] Ibid.

[71] E.g., Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1989; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979.

**9. Post-identification Feedback**

In his 2022 deposition, Mr. Ochoa was asked whether the person he picked out from the photo array is now known to him as Geraldo Iglesias, to which he responded yes. (Depo P. 64) He was then asked several questions related to his confidence at the time of the photo array. In his responses, Mr. Ochoa essentially said that he was confident that he picked out the right person (P. 64) and there is no information that would cause him to be less certain in his identification. (P. 254) He also testified that after Mr. Iglesias was convicted, it confirmed for Mr. Ochoa that he had selected the right person. (P. 258)

In his 2021 deposition, Mr. Rodriguez was asked what detectives said to him after he selected Mr. Iglesias from the lineup (P. 138):

Q. Did the detective tell you that you had selected their suspect and they were going to charge somebody?
A. Yes, correct.
Q. And did the detective thank you for helping them catch somebody for the crime?
A. Correct.

Mr. Rodriguez was also asked what happened after he selected Mr. Iglesias from the lineup (P. 139):

Q. And so after you had made the identification from the lineup, what happened next?
A. No, they separated them so the one who killed – the one, the murderer, they took him to the jail. Said they were going to take him to jail.

Mr. Rodriguez testified in his deposition that he went to the police station four times before trial and met with the Spanish speaking detective. When he was asked why he kept going to the police station and whether the detective was helping him get ready for trial, Mr. Rodriguez responded (P. 149):

A. Just to make sure that there were no mistakes; to make sure that everything was correct; to make sure that I knew what I had to say.

In a Memorandum of Interview with Rosendo Ochoa on October 5, 1994, attorney DeLeon concluded the memo with the following information: "Witness was very descriptive as to the events and ASA [Studenroth] commented on his excellent memory of events as they occurred."

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[72] Even stronger and broader effects of confidence malleability have been shown to emerge

[72] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal*, *19,* 1–8.

when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as *post-identification feedback*.[73]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect/defendant or that they have been a really good witness.[74] In the first research on the post-identification feedback phenomenon, Gary Wells and Amy Bradfield[75] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[76]

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[77] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Dean was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Dean was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Dean was innocent and was not the man who had raped her in 1994.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[78]

**10. Non-Identifications of the Suspect**

There were several witnesses who viewed identification procedures containing Mr. Iglesias as the suspect who did not identify him as the shooter. Mr. Torres, who may have known the shooter, viewed the live

---

[73] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[74] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

[75] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[76] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

[77] Charman, et al., 2010; Festinger, 1956; Festinger & Carlsmith, 1959.

[78] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect. *Applied Cognitive Psychology, 20,* 859–869.

lineup on June 24, 1993 and made no selection. Mr. Chmieleski viewed the same lineup as Mr. Torres and did not identify Mr. Iglesias.[79]

Research shows that an eyewitness's non-identification of a suspect is a reliable indicator of the suspect's innocence. In a 2008 meta-analysis of 94 eyewitness identification experiments by Clark, Howell, and Davey,[80] eyewitnesses gave non-identification responses far more often in target-absent lineups (.52 probability) than in target-present lineups (.33 probability). Therefore, the fact that several witnesses did not identify Mr. Iglesias as the shooter is important information with respect to the likelihood that he is the shooter.

**VII. Summary of Opinions regarding Detective Guevara Cases**

I have been retained as an expert witness and submitted an eyewitness identification expert report or testified in several other cases where Detective Guevara is/was a Defendant. These include:

*Jacques Rivera v. Reynaldo Guevara, et al.,* Case No. 1:12 CV 04428 (April 25, 2017 deposition)
*Jose Montanez v. Reynaldo Guevara, et al.,* Case No. 17-cv-4560 (March 4, 2020 deposition)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020 deposition)
*Thomas Sierra v. Reynaldo Guevara, et al.,* Case No. 1:18-cv-03029 (September 16, 2022 report)
*Robert Bouto v. Reynaldo Guevara, et al.*, Case No. 1:19-cv-02441 (October 7, 2022 report)

These reports are attached as Appendix C.

For the current report, I was asked to comment on any similarities between Mr. Iglesias's case and the other Det. Guevara cases (above) with respect to estimator and system variables.

With respect to estimator variables, all of the cases had a series of uncontrollable factors that tend to reduce the strength of a witness' memory and consequently their ability to be an accurate witness.

It seems that a common theme in the Guevara cases I have reviewed to date is to manipulate witnesses who had poor opportunities to view the perpetrator, often telling witnesses that the perpetrator has been caught before conducting the lineup or telling them they got the right guy after their selection. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in both cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator.

With respect to system variables or the choices made by law enforcement during the collection of eyewitness evidence, there is a great deal of consistency between the five cases:

1) Viewing of photographs (which include the suspect) before a lineup
2) Filler bias and, in many cases, the use of multiple suspects in the same identification procedure
3) Pre-identification instruction bias
4) Use of non-blind rather than a double-blind lineup;
5) Post-identification feedback and its effects on bolstering witness confidence, etc.

[79] According to his affidavit, Mr. Moore viewed photo books on two occasions and did not select anyone. If Mr. Iglesias' photograph was in those photo books, this would be another instance of a non-identification of the suspect.
[80] Clark, Howell, & Davey (2008). Regularities in eyewitness identification. *Law and Human Behavior, 32*, 187-218.

6) Repeated identification procedures, unconscious transference and commitment

In summary, a comparison of the six cases reveals many similarities in the facts of each case, now revealed in post-conviction litigation discovery.

**VIII. Summary of Opinions in This Case**

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability including, short exposure, distance, weapon-focus, disguise, stress, post-event contamination, mug book searching, photo array and lineup bias, no pre-identification warning, non-blind lineup administration, repeated identification procedure and the effects of feedback on witness confidence.

For Mr. Ochoa, the distance from which he made his observations from the 2nd story window of his home, combined with other estimator variables, including distance, exposure time, stress, disguise, and weapon focus effect, in combination with the limited description he provided soon after the shooting, lead me to conclude that it would have it extremely unlikely that he could have formed a strong enough memory to be able to reliably recognize the face of a stranger. For Mr. Rodriguez, the few seconds that he had to observe the shooter through the blinds of the rear window of the speeding vehicle, combined with other estimator variables, including distance, exposure time, stress, weapon focus effect, and disguise, in combination with the limited description he provided soon after the shooting, lead me to conclude that it would have it extremely unlikely that he could have formed a strong enough memory to be able to reliably recognize the face of a stranger.

Given these factors, but particularly the poor opportunity for witnesses to view the perpetrator's face in addition to the various suggestive identification procedures that were utilized in this case, it is not difficult to arrive at a reasonable explanation as to how several witnesses came to select Mr. Iglesias from a photo array, a lineup and again at trial. The combination of a weak memory for the shooter based on a limited opportunity to view coupled with suggestive identification procedures easily accounts for the selections of Mr. Iglesias in this case.

**IX. Supplemental Materials**

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 19, 2022.

Jennifer Dysart

Jennifer Dysart, PhD

## Appendix A

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (as of October 19, 2022)**

**California:**

*Andrew Wilson v. City of Los Angeles, et al.*, Case No. 2:18-cv-05775 (April 29, 2020)

*Maurice Caldwell v. City and County of San Francisco and Kitt Crenshaw*, Case No. 12-cv-1892 EDL (December 21, 2020)

*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.*, Case No. 2:20-cv-10559-PA-KS (April 19, 2022)

**Florida:**

*State of Florida v. Michael Keetley,* Case No. 10-18429 (February 19, 2020)

**Illinois:**

*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020)

*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020)

**Kansas:**

*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al., Case No. 2:18-cv-02545-KHV-KGG* (September 23, 2021)

**Louisiana:**

*Robert Jones v. Leon Cannizzaro, Jr., et al.*, Case No. 2:18-cv-00503 (December 15, 2019)

**Maryland:**

*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.*, Case No. 1:19-cv-00384-ELH (September 14, 2021)

**Massachusetts**

*Angel Echavarria v. J. Michael Roach, et al.*, Case No. 1:16-cv-11118 (August 5, 2020)

**Missouri:**

*Lamont Campbell v. State of Missouri*, Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**

*Richard Rosario v. City of New York, et al.*, Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)

**Ohio:**

*Roger Dean Gillispie v. The City of Miami Township, et al.*, Case No. 3:13-cv-416 (August 27, 2019)

# Appendix B

## Academic Curriculum Vitae of Jennifer E. Dysart

# JENNIFER E. DYSART

## Curriculum Vitae

University Address:
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street, 10th Floor
New York, NY 10019

*Email:* jdysart@jjay.cuny.edu
*Phone:* 212.484.1160

## Academic Work Experience

2006 – present — Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY

2016 – 2019 — Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY

2013 – 2016 — Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY

2011 – 2012 — Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY

2008 – 2010 — Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY

2006 – 2008 — Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice

2003 – 2006 — Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT

2005 — Adjunct Professor, Quinnipiac University, Hamden, CT

## Education

PhD — 2004, Queen's University, Kingston, Ontario (Social Psychology)
*Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy

MA — 1999, Queen's University (Brain, Behavior and Cognitive Science)

BA — 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology)

**Peer-Reviewed Journal Publications**

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5*, 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19,* 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7*, 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17*, 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27*, 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior*, *25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior*, *25,* 459-473.

## Books

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

## Book Chapters

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92). Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

**Other Publications**

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.,

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13). Thousand Oaks, CA: Sage.

**Peer-Reviewed Conference Presentations**

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability*. Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2022, March). Assessing Credibility and Reliability: Perception, Memory and Eyewitnesses Identification. Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, NY, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, Ontario, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, Newfoundland, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Ontario, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, Newfoundland, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, Quebec, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, Saskatchewan, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, Prince Edward Island, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

**Invited Bar Association Presentations**

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

## Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, Newfoundland, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, Nova Scotia, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, Saskatchewan, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor/Conviction Review Presentations

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited Presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit’s Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, “A new legal architecture: Litigating eyewitness identification cases in the 21st Century”, New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

## Invited Law School and University Presentations

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the “Protecting the Innocent: Louisiana’s Reform of Eyewitness Identification” conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled “Faculty Perceptions: Eyewitnesses, Juries, and Consequences.” John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

## Invited Non-Profit Presentations

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

## Supervision of Doctoral Students at John Jay College of Criminal Justice

2010 John DeCarlo (Criminal Justice Doctoral Student)
Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011 Victoria Lawson (Forensic Psychology Doctoral Student)
Topic: Eyewitness Identification

2006-2009 Anna Rainey (Forensic Psychology Doctoral Student)
Topics: Showups; Cross-race identification

2006-2009 Brian Wallace (Forensic Psychology Doctoral Student)
Topics: Alibi believability; Mug shot searching.

## Supervision of Masters Theses at John Jay College of Criminal Justice

2018 – 2020 Elena Christofi
Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019 Samantha Kosziollek
Topic: 911 Dispatchers

2016 – 2018 Marisa Jaross
Topic: Composite sketches

2016 – 2017 Brittany Kassis
Topic: 911 Dispatchers

2011 – 2012 Tamara Andrade
Topic: Composite creation in cross-race identifications

2010 – 2011 Jennifer Savion
Topic: Composite creation in cross-race identifications

2009 – 2010 Lindsey Butera
Topic: Eye-tracking and lineup accuracy with biased lineups
Yinglee Wong
Topic: Cross-race description accuracy of hair/hairstyles
Nancy Yang
Topic: Eye-tracking and weapon focus effect

2008 – 2009 Alexander Buijsrogge
Topic: Cross-race composite creation of famous faces
Kristin Chong
Topic: Stranger alibis and identification accuracy
Victoria Lawson
Topic: Cross-race showup and lineup accuracy

Jessica Owens
Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008   Sarah Kopelovich
Topic: Cross-race and Accent effects on identification accuracy
Jason Mandelbaum
Topic: Cross-race effects in mug shot searching

## Supervision of Master's Theses at Southern Connecticut State University

2005          Lisbeth Fugal
Topic: Post-identification feedback
Anna Rainey
Topic: Cross-race identification and "contact" with other groups

2004          Sandra Soucie
Topic: CSI Effect

## Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University

2005          Daniel Csuka
Topic: Multiple Independent Identification Accuracy

## Awards and Scholarships

2017          PSC CUNY research grant ($3,500)

2008          John Jay College Research Assistance Program Grant ($1,000)

2005          Connecticut State University Research Grant ($4,400)

2005          Junior Faculty Research Fellowship, Southern Connecticut State University
(9 credits teaching release time for Fall 2005)

2003-2005     Social Sciences and Humanities Research Council of Canada (SSHRC)
Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined)

2002          American Psychological Foundation/Council of Graduate Departments of
Psychology (APF/COGDOP) Graduate research scholarship ($1,500)

2002          American Psychology-Law Society Grants-in-Aid award ($650)

2001-2003     Social Sciences and Humanities Research Council of Canada (SSHRC)

Doctoral Award ($17,900 annually)

2000-2001 Ontario Graduate Scholarship ($15,000)

1999-2000 Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900)

1998-1999 Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300)

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**

- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**

- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**

- Introduction to Psychology (undergraduate course)

## University Committee Service

2016 – 2019 Graduate Studies Council, John Jay College of Criminal Justice

2013 – 2016 College Council Member, John Jay College of Criminal Justice

2013 – 2016 Faculty Senate Member, John Jay College of Criminal Justice

2013 – 2014 College Council Executive Committee Member, John Jay College of Criminal Justice

| | |
|---|---|
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |

| | |
|---|---|
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2006 – present | Consultant, eyewitness identification expert |
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

**Reviewing (past and current)**

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

**Professional Affiliations**

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

# Appendix C

## Previous Expert Reports of Jennifer E. Dysart

**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
***Robert Bouto v. Reynaldo Guevara, et al.***
**(Case No. 1:19-cv-02441)**

**Report Date: October 7, 2022**

## I. Overview and Credentials of Dr. Dysart

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. In July 2022, I was contacted by attorneys representing Mr. Robert Bouto and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the wrongful conviction of Mr. Bouto for the 1993 murder of Salvador Ruvalcaba. In 2018, 25 years after his arrest, the Circuit Court of Cook County vacated Mr. Bouto's conviction and all charges against him were dismissed. In May 2019, Mr. Bouto was granted a Certificate of Innocence in this case. I am being compensated for expert services in this case at a rate of $350/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 80 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in the Conviction Review Unit in the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

***Presentations:*** I have given more than 175 presentations on eyewitness identification before professional psychological organizations and at conferences attended by judges, lawyers, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

***Curriculum Vitae:*** My complete academic curriculum vitae is attached to this report as Appendix B.

## II. Materials Reviewed in this Case

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with available relevant materials related to the identification of their client, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the following materials, plus other materials cited in this report:

1. 3rd Amended Complaint (filed 11/11/20)
2. Alan Pergande trial transcript
3. Alan Pergande deposition transcript (4/27/21)
4. Arafat Issa trial transcript
5. Bouto Arrest Report
6. Carl Richmond affidavit (6/7/08)
7. Carl Richmond trial transcript
8. Carl Richmond Report of Proceedings transcript (1/24/19)
9. Carl Richmond deposition transcript (2/1/21)
10. Certificate of Innocence Order (3/27/19)
11. Cleared Closed Report (5/16/93)
12. Closing Arguments (trial transcript)
13. Color photographs of Lineup (5/14/93)
14. Color photograph of Robert Bouto (5/14/93)
15. Crime Scene Processing Report 526 (5/14/93)
16. Crime Scene Processing Report 730 (5/14/93)
17. Crime Scene Processing Report (5/15/93)
18. David Press trial transcript
19. General Offense Case Report (5/14/93)
20. Halvorsen Progress Report (5/14/93)
21. Lassar Memo (3/15/15)
22. Margaret Fleming trial transcript
23. Michael Fleming trial transcript
24. Michael Fleming deposition transcript (12/2/20)
25. Opening Statements (trial transcript)
26. Rey Lozada trial transcript
27. Rey Lozada affidavit (2016)
28. Rey Lozada deposition transcript (5/17/21)
29. Supplementary Report (5/15/93)
30. Supplementary Report (5/16/93)
31. Supplementary Report on Lineup (5/16/93)
32. Supplementary Report (6/8/93)
33. Supplementary Report on Showup (9/27/94)
34. Motion to Quash testimony (5/3/95)

If other materials related to eyewitness identification are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

**III. Overview of Case & Summary of Opinions**

**Important dates:**

May 14, 1993, 3:05pm. Shooting and murder of Salvador Ruvalcaba.

May 14, 1993, 4:00pm. Mr. Bouto is arrested and provides an alibi.

May 14, 1993, unknown time: Showup identification with Mr. Bouto takes place at the scene of the shooting. Mr. Bouto and his clothing are identified by several witnesses.

May 14, 1993, 7:00pm: Lineup. Viewed by 6 witnesses: Carl Richmond, Frank Escobar, Jacobo Losada, Rey Losada, Michael Fleming, and Margaret Fleming. According to the police report, all 6 witnesses either identified Mr. Bouto or identified his clothing as that being worn by the shooter.[1]

July 29, 1996: Trial begins. Mr. Richmond, Rey Lozada, Margaret Fleming, Michael Fleming and Officer Pergande testify. Mr. Richmond and Rey Lozada identify Mr. Bouto as the shooter and Margaret and Michael Fleming identify Mr. Bouto as the person in the lineup who's clothing matched the shooter's clothing. The defense calls two alibi witnesses, Tania Astefan and Helen Kandah, and Mr. Bouto's barber Mr. Issa. Mr. Bouto is convicted and sentenced to 45 years imprisonment.

April 30, 2018: Conviction is vacated.

June 25, 2018: Charges are dismissed.

January 24, 2019: Hearing (Mr. Richmond testified)

March 27, 2019: Certificate of Innocence granted

**Summary of "Identifying" Witnesses**

1) **Carl Richmond** (age 19, Spanish Cobra). Friend of victim, near him when he was shot. From police report, identified Mr. Bouto as the shooter from the lineup. At trial, he made a positive in court identification of Mr. Bouto as the shooter. (TT P. 101)

   In a 2008 affidavit and in his 2014 interview with investigators, Mr. Richmond provided information that he was pressured by Det. Guevara to be involved in the case and that if he did not agree, Mr. Richmond believed that he would be implicated in an unsolved murder by Det. Guevara. In his 2019 testimony, he was asked why he identified Mr. Bouto as the shooter at trial and he responded that he wanted to keep Det. Guevara off his back. (P. 30)

   In 2019 (P. 36-37) and 2021 (P. 78), Mr. Richmond testified that he was sorry for identifying Mr. Bouto as the shooter and has regretted doing so for many years.

[1] In a 2014 interview with investigators, Margaret Fleming indicated that Mr. Bouto was wearing different clothing at the lineup than during the shooting. This appears to be the only reference by any witness suggesting that the shooter's clothing was changed from the shooting (approximately 3pm) to the lineup (7pm). This is also inconsistent with her trial testimony and the police file which both indicate that Ms. Fleming selected Mr. Bouto from the lineup based on the clothing.

2) **Rey Lozada** (age 15, Spanish Cobra). Friend of victim, near him when he was shot. According to his trial testimony, he never saw the shooter before 5/14/93.[2] According to a 9/27/94 Supplemental Report, Rey viewed a showup identification procedure at the scene of the crime within an hour of the shooting and identified Mr. Bouto as the shooter.[3] From a 5/16/93 police report, Rey Lozada also identified Mr. Bouto as the shooter from the lineup at approximately 7:00pm on the day of the shooting. If these reports are accurate, Rey would have viewed Mr. Bouto in two identification procedures – within hours of each other – where Mr. Bouto was the only person wearing clothing similar to that described by the witnesses. Further, it is possible that Rey viewed photos of Mr. Bouto at the police station before viewing the live lineup. (Depo P. 48-9) At trial, for what appears to be the first time, Rey described the shooter and two or three other people running towards him (and his group) before the shooting began. (TT P. 32) During trial, he identified Mr. Bouto as the shooter. (TT P. 39)

In 2016 Rey Lozada signed an affidavit saying that he identified Mr. Bouto at the showup because Mr. Richmond was acting angry about the death of their friend and indicated that the shooter was Mr. Bouto. According to his deposition testimony, Lozada went along with Mr. Richmond (and other witnesses, P. 47) and selected Mr. Bouto. He testified in his 2020 deposition that he does not know who shot his friend Mr. Ruvalcaba (Depo P. 21) because he never saw the shooter's face. (Depo P. 45)

3) **Margaret Fleming** (age 39, lived near shooting). From the police report, it appears that she and her son Michael were interviewed together. They reported seeing the shooter across the street and they saw him fire his gun 4-5 times. They did not see his face but described him wearing a hooded pull over shirt with the hood pulled tight. From the police report, she allegedly identified the clothing worn by Mr. Bouto in the lineup as the clothing worn by the shooter. She testified at trial that she heard shots, ran down from her second story apartment to the street where she stood 3.5 feet from the shooter. (P. 151) She also testified that she did not see the person shoot and the entire event was very fast. (P. 160)

4) **Michael Fleming** (age 15, lived near shooting). From the police report, he was interviewed with his mother, Margaret. He did not see the face of the shooter, only the clothing. After the shooting, he saw the shooter go into an alley and give a gun to a female with blonde hair. The female then gave the gun back to the shooter, who left the scene. At the lineup, Michael identified the clothing worn by Mr. Bouto as being the clothing worn by the shooter. At trial, he identified Mr. Bouto as being the person who he selected from the lineup. In his 2020 deposition, Mr. Fleming repeated the assertion that "we" selected Mr. Bouto from the lineup because of the clothing he was wearing.

5) **Frank Escobar** (age 18, Spanish Cobra). Friend of victim, with him when he was shot. From the police report, he allegedly saw a person he knows (Mario) hand a gun to the shooter. After his friend was shot, he ran to get away from the shooting. From the police report, identified Mr. Bouto as the shooter from the lineup. Mr. Escobar was killed in September 1993.

6) **Jacobo Lozada** (age 17, Spanish Cobra). Friend of victim, near him when he was shot. From the police report, identified the clothing worn by Mr. Bouto in the lineup as the clothing worn by the shooter. Mr. Lozada was shot and killed in July 1994.

---

[2] In a 2014 interview with Rey Lozada, investigators learned that he allegedly saw the shooter on a bicycle prior to the shooting. There is no mention of this description in the police file and Mr. Richmond did not recall (in 2014) the shooter having been on a bicycle. Therefore it is unclear whether this is an accurate recollection by Mr. Lozada.

[3] It should be noted that there was no contemporaneous reporting by police in the police file regarding the showup procedure. The first reference to the showup in the police file appears to be a single Supplementary Report 16 months after the shooting.

**Other Non-Identifying Witnesses:**

7) Melissa Melendez
8) Ida Rodriguez
9) Patricia Fleming
10) Christopher Fleming
11) Melissa Costello

**Overall Opinions**

My overall opinion in this case is that law enforcement repeatedly provided witnesses with multiple opportunities for co-witness contamination which very likely influenced their statements, identifications and subsequent testimony. Law enforcement also engaged in several unnecessarily suggestive identification procedures with multiple witnesses who were vulnerable to influence due to their limited memory for the perpetrator. Further, the ages and gang affiliation status of several witnesses would have made them more susceptible to influence due to threats and coercion.

My opinions are supported by the fact that both Mr. Richmond and Rey Lozada have testified that they did not see the face of the shooter and only selected Mr. Bouto because of external influences. Although Mr. Richmond reported in 2014 that he believed Mr. Bouto is guilty of the murder of Mr. Ruvalcaba, in a 2019 proceeding, Mr. Richmond testified that the primary reason he continued to say Mr. Bouto was the shooter (in 2014) was because he was afraid (of Det. Guevara among other things). He also testified in 2019 and 2021 that he did not know if Mr. Bouto was the shooter because he did not see the shooter's face. (P. 12) Although Mr. Lozada also told investigators in 2014 that Mr. Bouto was the shooter, Mr. Lozada has also recently testified (2020) that he did not see the shooter's face and does not know if Mr. Bouto is the shooter. (Depo P. 45)

**IV. Basis for Opinions in This Case**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selections of Mr. Bouto as the shooter, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables"). It is critical to understand the impact of both system and estimator variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made.

The distinction between estimator and system variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading international expert in eyewitness identification research. Over the past 40+ years, a substantial amount of research on both estimator and system variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[4] In 2015, the law in Illinois

[4] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification

regarding eyewitness identification procedures was amended and this law is consistent with best practices described in this report.[5]

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Bouto include:

**Estimator Variables:**
1) Effects of Limited Opportunity to Observe at the Time of the Event
   a) Exposure Time & Estimates
   b) Distance
   c) Weapon-focus Effect
   d) Disguise
   e) Prior familiarity
2) Stress/Arousal

**System Variables:**
1) Co-witness Contamination
2) Description "Accuracy"
3) Show-up Bias
4) Lineup Bias
5) Pre-identification Warnings/Instructions
6) Non-blind Lineup Administration
7) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
8) Witness Confidence
9) Post-identification Feedback

## V. General Background on Eyewitness Research

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[6] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[7] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer*

---

[5] IL ST CH 725 § 5/107A-0.1
[6] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.
[7] Ibid.

*is commonly none the wiser when perception differs from the "ground truth" of the external world—it appears that accurate eyewitness identification may be difficult to achieve.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through *contamination*, especially when the witness' memory is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impacts of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face/characteristics and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[8] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[9] The 2020 White Paper[10] maintains the original four best practice recommendations from 1998[11] and adds five new best practice recommendations for the collection and preservation of eyewitness evidence.[12] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently

---

[8] In this report, the terms "lineup" and "photo array" will be used interchangeably except when discussing the specific procedures utilized in this case.

[9] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603–647.

[10] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[11] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.

[12] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.

numbers as **375.**[13] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[14] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 cases where there was an erroneous eyewitness identification of the innocent defendant, 36% included mistaken identifications from *more* than one eyewitness, such as in this case. In fact, some of the DNA cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In these exoneration cases, there is no evidence that witnesses were anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. Evidence demonstrates it is common for eyewitnesses to genuinely believe they are identifying the correct person yet can still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[15] In the 2020 White Paper mentioned above, Dr. Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[16] The researchers note that there have been 11 published articles on the subject with data from over 6,500 witnesses in actual cases. The results show that nearly one quarter of witnesses who view a photo array or lineup in actual cases choose an innocent filler. Of those who "identify"[17] a person from a photo array or lineup, more than one third (36.8%) choose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 36.8%, as these data do not include erroneous selections of innocent suspects (it only includes filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" are incorrect. While false identifications of innocent fillers almost invariably do not send those fillers to prison, these choices still constitute identification errors and provide valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

---

[13] The figure of 375 has not been updated on the Innocence Project website for over one year and therefore this figure is outdated. Visit www.innocenceproject.org for information and statistics on DNA exoneration cases nationally.

[14] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[15] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[16] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[17] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

## VI. Proposed Testimony

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all examples found in the materials will be repeated in this report.

### Estimator Variables

### 1. Effects of Limited Opportunity to Observe at the Time of the Event

Common sense might suggest that even a brief opportunity to view a perpetrator's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the amount of time a witness views a perpetrator's face significantly impacts the witness's later ability to identify that person. Generally, when the opportunity to see a person's face is limited (due to short time, presence of a weapon, distance, disguise, etc.), the result will be a weak or poor memory for that individual.

#### a) Exposure Time & Estimates.

According to the police file, neither Margaret Fleming nor Michael Fleming ever saw the shooter's face. They were able to describe his shirt as a dark short-sleeved hooded sweat shirt with the hood pulled up, tight around the shooter's face.

According to the police report, prior to the shooting, Mr. Richmond and Rey Lozada were walking towards the victim when they turned around and allegedly saw the shooter pull out a gun and shoot toward them and the victim. They hit the ground and saw the victim get shot and fall to the ground.

Mr. Richmond testified at a proceeding in 2019 that he glanced up, saw the shooter and then started ducking and running away. (P. 8) Mr. Richmond also testified in 2019 that he did not see the shooter's face and that he told Det. Guevara this information at the police station before the lineup.[18] (P. 19) In his 2021 deposition, Rey Lozada could not say whether the shooter was Mr. Bouto because he never saw the shooter's face. (Depo P. 45).

In research on the effects of exposure duration – the amount of time one has to view or encode something - on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy in their 1986 meta-analysis on this topic.[19] That is, shorter exposure time generally correlates to less accurate identifications. In the time since this comprehensive review was published, an

---

[18] Mr. Richmond also testified in 2019 that Det. Guevara told him that he was going to get involved in the investigation even though Mr. Richmond didn't see the shooter's face and did not want to get involved. (P. 19)

[19] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

updated meta-analysis[20] and other research[21] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

For example, in one study by Memon, Hope and Bull, mock witnesses viewed a video of a realistic crime that lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and seven seconds (with the perpetrator's face in view for 12s).[22] Witnesses were then tested with a perpetrator-present or perpetrator-absent photo array 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections in perpetrator-absent arrays increased substantially when exposure time increased. (Note, however, that mistaken identifications in perpetrator-absent arrays remained relatively high regardless of the exposure time.)

*Performance of Young Adults (ages 17-25) in the 12s and 45s Exposure Conditions with Perpetrator-Present and Perpetrator-Absent Photo Arrays (**Errors** are bolded)*

| | **12 Seconds Exposure** | | | **45 Seconds Exposure** | | |
|---|---|---|---|---|---|---|
| | Hits | False Alarm | Non-Choice | Hits | False Alarm | Non-Choice |
| Perp-Present Array | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Perp-Absent Array | NA | **90%** | 10% | NA | **41%** | 59% |

The results of the Memon et al. study above show that in circumstances where witnesses viewed the perpetrator's face for 45 seconds, 41% of witness made a mistake and misidentified an innocent person from a photo array in which the actual perpetrator was not shown. When the exposure time was reduced to 12 seconds, the false identification of innocent people increased to 90%. Given the descriptions of the shooting provided by witnesses in this case, it seems unlikely that their ability to see the face of the shooter was even 12 seconds.

**Time Estimation.** In his 2021 deposition, Rey Lozada could not say whether the shooter was Mr. Bouto because he never saw the shooter's face. (Depo P. 45). He indicated that he took a few steps when the shooting started, hit the ground and stayed looking down until the gun shots stopped. When he looked back toward the shooter, the shooter was running and he could only see the back of his head. (Depo P. 31). At trial, however, Mr. Lozada testified that it took about a minute for the shooter to "run up and shoot the gun and turn around and run away". (TT P. 38) He later added that he looked down for about 10 seconds and looked at the shooter for about 50 seconds. (TT P. 67)

---

[20] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[21] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[22] Memon, A., Hope, L., & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354.

Although no eyewitness expert can determine which of the versions provided by Mr. Lozada is accurate or closer to the truth, given the descriptions of the shooting by other witnesses, it seems unlikely that the shooting took one minute to complete.

Researchers have investigated people's retrospective estimates of the amount of time that an interaction or event took place. The general findings show that estimates often differ from the actual amount of time, with the error often in the direction of overestimating.[23] Sometimes the estimate of time is profoundly exaggerated. In one study, participants saw a 30-second simulated bank robbery on videotape.[24] Two days later they were asked some questions about the tape, including how long it lasted. The average estimate of duration was 152 seconds – more than 5 times the actual length. Very few people estimated a duration that was equal to or less than the true value of 30 seconds. Although it was rare, some people produced inordinately long estimates of over 900 seconds. In other words, these individuals remembered a 30-second bank robbery tape as having lasted over 15 minutes. Thus, it is possible that witness testimony about the duration of their observations will be skewed such that triers of fact hear testimony that the witness had a longer opportunity to view the perpetrator than is in fact true.

**b) Distance.**

There was trial testimony from Mr. David Press, an investigator who took measurements at the crime scene from various locations described by various witnesses in this case. From these measurements, the distance between 3353 W. Sunnyside Avenue - where the shooter was standing according to Margaret and Michael Fleming and where the shell casings were found - and 3415 W. Sunnyside Avenue - where the victim's body was located and near where witnesses Carl Richmond, Frank Escobar, Rey Lozada, and Jacobo Lozada were prior to the shooting - is 245 feet.

At trial, Rey Lozada testified that he was 15-20 feet from the shooter when the shooting started. (TT. 37) However, in a 2014 interview with investigators, Mr. Lozada said that he was 30-40 yards from the shooter. Regardless of the exact distance, based on the overall description of the events from various witnesses, it appears that distance is a relevant estimator variable.

Research conducted on this topic has shown that distance can significantly impact a person's ability to view the details of another person's face.[25] In his "distance-as-filtering hypothesis", Dr. Geoff Loftus explains that as a face is viewed at further and further distances, there is less ability to detect the details of the face because facial details become coarser and coarser. As way of example, the image below from Loftus' research recreates the loss of detail when one view's a face from 20 feet (6.7 yards; left) to 100 feet (33.3 yards; right).

---

[23] For example, see: Attard & Bindermann (2014). Establishing the duration of crimes: An individual differences and eye-tracking investigation into time estimation. *Applied Cognitive Psychology, 2,* 215–225; Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1*, 3–13; Yarmey, & Yarmey (1997). Eyewitness recall and duration estimates in field settings. *Journal of Applied Social Psychology, 27,* 330–344.
[24] Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1,* 3-13.
[25] Loftus & Harley (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12,* 43-65; Harley, Carlsen & Loftus (2004). The 'saw-it-all-along' effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory and Cognition, 30,* 960-968.



In other research, scientists tested eyewitnesses on their ability to recognize a stranger's face from a range of distances.[26] Participants viewed faces from distances between 10 feet and 131 feet and were then immediately asked to make an identification from a six-person lineup. The results showed that the proportion of correct responses to errors was too great at distances over 49 feet for an identification to be considered probative. Accordingly, the authors recommended a 50 foot distance cutoff point as a useful "rule of thumb" for courts when assessing reliability. A replication of this study using photos of famous people led to a similar conclusion.[27] Other researchers,[28] however, have found significant impairments in identification accuracy as distance between witness and the target increases but do not recommend a particular cutoff point, as did Wagenaar and van der Schrier. The implication of the scientific research is that distances over 100 feet, as shown above, make it extremely difficult to encode the details of a person's face, which is required in order to make accurate identification decisions.

**c) Weapon-focus Effect.**

Although there does not seem to be any description of a weapon provided by witnesses in the police file, at trial Rey Lozada (P. 33), Mr. Richmond (P. 100), Margaret Fleming (P. 150), and Michael Fleming (P. 166) all described seeing a black/dark gun held by the shooter. Mr. Lozada also testified that he saw the shooter put the gun back in his pants after the shooting and run in the opposite direction. (P. 35)

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect." As the witness focuses on the weapon, their ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was first reviewed in a meta-analysis published by Steblay in 1992. The weapon focus effect was statistically significant and demonstrated an impairment of identification accuracy when a weapon was present during the event/crime. A more recent meta-analysis confirms the findings of the Steblay 1992 report.[29] In summary, although it can certainly be true that a witness pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited. In

---

[26] Wagenaar & van der Schrier (1996). Face recognition as a function of distance and illumination: A practival tool for use in the courtroom. *Psychology, Crime & Law, 2,* 321-332.

[27] De Jong, Wagenaar, Wolters, & Verstijnen (2005). Familiar face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crime & law, 11,* 87-97.

[28] Lindsay, Semmler, Weber, Brewer, & Lindsay (2008). How variations in distance affect eyewitness reports and identification accuracy. *Law and Human Behavior, 32,* 526-535.

[29] Fawcett, Russell, Peace, & Christie (2013). Of guns and geese: A meta-analytic review of the "weapon focus" literature. *Psychology, Crime & Law, 19,* 35–66.

addition, viewing a weapon can also cause a witness to become afraid, which also can decrease the quality of a witness' memory (see below).

**d) Disguise.**

Another factor that can reduce a witness' ability to observe is the presence of disguise (e.g., hat, mask, sunglasses) worn by a perpetrator during the commission of a crime.

In this case, Mr. Richmond testified in 2019 that the shooter was wearing a hoodie and the hood was up so he couldn't really see who it was. (P. 10) This testimony is consistent with Rey Lozada's deposition testimony where he indicated that the shooter's hood was pulled tight (P. 27) and the initial reports and trial testimony of Margaret Fleming and Michael Fleming that they could not see the shooter's face because he was wearing a hood.

With respect to "obstructions" limiting a witness' opportunity to see a perpetrator clearly, research indicates that when a perpetrator is merely wearing a hat it can significantly reduce later identification accuracy.[30] Thus, the presence of the hood, pulled tight around the shooter's face, likely had a negative impact on the witnesses' abilities to see the shooter clearly and subsequently make a positive identification of his face.

**e) Prior Familiarity.**

Rey Lozada testified at trial that he had never seen Mr. Bouto before and didn't know him. (TT. 61) In his 2021 deposition, however, he testified that he had seen Mr. Bouto before the shooting but had never met him. (P. 41) In is his 2021 testimony, he cannot say whether the shooter was Mr. Bouto because he never saw the shooter's face. (P. 45)

At the scene of the shooting, Mr. Richmond gave the police only a physical description of the shooter and there is no mention in any police report of any prior familiarity between Mr. Richmond and the shooter or that Mr. Richmond had knowledge of the shooter's street name. The same is true of other witnesses at the scene including Rey Lozada and Frank Escobar.

Mr. Richmond has subsequently told investigators (in 2014) and testified in court (2019) that he knew that Mr. Bouto's street name was Sadam and that he and Mr. Bouto had had an altercation at a police station prior to May 14, 1993.[31] On the other side, Mr. Bouto also has given a statement that he was familiar with Mr. Richmond, Rey Lozada and Mr. Escobar before May 14, 1993 because of gang-related activity.

In some cases, an eyewitness will inform police that the perpetrator they viewed was not a stranger. In other words, they have seen them in the past before the crime. Familiarity can range from a single previous observation/encounter to a family member or close friend. Although identification errors of familiar people are less likely to occur, the research on non-stranger or "familiar-other" identifications shows that even these identification circumstances are not without error.[32] For example, there have been multiple field

[30] E.g., Cutler & Penrod (1988). Improving the reliability of eyewitness identification: Lineup construction and presentation. *Journal of Applied Psychology, 73,* 281–290; Mansour, Beaudry, Bertrand, Kalmet, Melsom, & Lindsay (2020). Impact of disguise on identification decisions and confidence with simultaneous and sequential lineups. *Law and Human Behavior, 36,* 513–26.
[31] It should be noted here that in 2019 (and again in 2021), Mr. Richmond testified that he did not see the shooter's face and does not know if Mr. Bouto is the person who shot and killed his friend. (P. 12)
[32] For a review of this research, see Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

studies (with actual witnesses in real cases) examining the rate of suspect and filler identifications in stranger and *non-stranger* cases. On average, the rate of suspect identifications in these studies is 41% in stranger cases and 90% in non-stranger cases. Of particular interest, however, is the rate of misidentification of known-innocent fillers in the identification procedure. If a witness and perpetrator were previously known to each other, one might expect that the eyewitness would not make a mistake and choose and innocent lineup member. However, on average, 5% of non-stranger real-world cases have filler identifications. It is important to note that there is a range of familiarity – from "minimal" to "extensive" – that impacts the likelihood of identification error.

This pattern of results from field studies is consistent with a laboratory study conducted by Dr. Steblay and colleagues[33] where they found that 9% of witnesses in non-stranger situations made a filler identification. In a 2019 summary of the non-stranger literature,[34] Dr. Vallano and colleagues provide the following warning (P.133):

> Yet familiar identifications are not infallible. First, an eyewitness who states that they know who the perpetrator is does not necessarily mean that the familiar person she identified is the perpetrator. Second, familiar identifications are not all created equal. Familiar identifications involving *minimal prior exposure* to the perpetrator may operate similarly to stranger identifications, with similarly high error rates. (emphasis added)

**2. Stress/Arousal**

Mr. Richmond has testified that he was afraid when he heard the shots and ran, as did other witnesses, when the shooting began. (2019 P. 9) Rey Lozada has also testified that he was scared during the shooting (TT P. 58) and in shock that the shooting happened. (Depo P. 33) Mr. Fleming testified in his 2020 deposition the he was also afraid when the shooting started. (P. 88)

In research related to stress and arousal, Deffenbacher and colleagues published a meta-analysis on the effects of stress/arousal on eyewitness performance.[35] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion – such as running – can cause increases in arousal which result in impaired eyewitness identification abilities.[36] In summary, high levels of stress and arousal, which the witnesses in this case unquestionably experienced, have been demonstrated to significantly reduce the reliability of eyewitness identifications.

---

[33] Steblay, Dietrich, Ryan, Raczynski & James (2011). Sequential lineup laps and eyewitness accuracy. *Law and Human Behavior, 35,* 262–274.

[34] Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

[35] Deffenbacher , Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.

[36] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

In summary, with respect to estimator variables, there is evidence that all of the witnesses in this case had only a short period of time to see the face of the shooter if they were able to see the shooter's face at all (due to the raised hoodie). In addition, witnesses testified about being shot at, hearing the gun shots and ducking for their lives. Together, these estimator variables likely created a scenario where it would have been difficult for any witness to have a strong memory for the perpetrator. As will be discussed below, there are significant concerns regarding eyewitness reliability in identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed.

**System Variables Relevant to the Current Case**

The police reports and other documentation in this case reveal that several system variables employed in this case, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Bouto as the shooter.

**1. Co-witness Contamination**

Witnesses at the scene of the shooting were not separated by law enforcement. In fact, it appears that witnesses at the scene even viewed a "showup" identification procedure while they were together. According to Rey Lozada, he saw Mr. Richmond become upset at the scene and indicate that the shooter was Mr. Bouto, whom Mr. Richmond knew by the street name of Sadam. (Depo P.40)[37] Mr. Lozada then testified that he went along with whatever Mr. Richmond said. (Depo P. 43)[38] He also testified that "we all jumped in the squad car" and went to Area 5 Precinct. (Depo P. 39) This is consistent with Mr. Richmond's 2019 testimony that he, Mr. Lozada and Mr. Escobar were in the same police car on the way to the precinct. (P. 15) On the way to the precinct, the witnesses talked about the shooting with each other and the police. (Lozada Depo P. 160) When he was asked during his deposition about his memory for providing a witness description, Mr. Lozada said (P. 45):

> *If I did, I just followed whatever my brother and Frank was saying, I guess, because they were right next – when they interviewed, they interviewed us together, so whatever they said, I guess I agreed with.*

According to a 2014 investigator interview with Rey Lozada, he recalled that when police brought Mr. Bouto back to the crime scene in a police car (for the showup) that Mr. Richmond approached the car and said that this is the shooter. Therefore, other witnesses at the scene, including Lozada and Mr. Escobar, were able to hear Mr. Richmond's "identification" of Mr. Bouto as the shooter.

Rey Lozada testified in his 2021 deposition that he and others were interviewed together about the shooter's description saying, "he didn't ask me. He just asked the group. It was us three and then they said what they said, and I just agreed." (P. 149)

Other examples of co-witness contamination were described in separate 2014 interviews given by Rey Lozada and Mr. Richmond. Specifically, although there was no documentation in the police file of any photo identification procedures being conducted with witnesses in this case, Mr. Lozada provided investigators with information related to photo identification procedures that were conducted at the police station with four witnesses together in a room. The photographs were passed around between Rey Lozada,

[37] In Mr. Richmond's 2021 deposition testimony, he testified that he only learned Mr. Bouto's street name (Sadam) from people in the neighborhood after Mr. Bouto had been arrested. (P. 25)

[38] At trial, Mr. Richmond testified that the witnesses at the scene were separated and were asked one at a time if they recognized any of the guys in the showup procedure. (P. 105) This testimony is inconsistent with Mr. Lozada's testimony that he was able to hear what other witnesses were saying.

Jacobo Lozada, Mr. Richmond and Mr. Escobar. According to Mr. Richmond in 2014, the witnesses were together listening to what the police were saying rather than being interviewed separately about the shooting.

It also appears that Margaret and Michael Fleming also were interviewed together. In the 5/16/93 Supplementary Report, there is a combined summary of their statements followed by additional detailed statements made by Michael Fleming regarding the actions of the shooter and a young female in the alley (which Margaret Fleming did not see).

If the witnesses had been separated at the scene, in the police car and at the police station it would not have been possible for Rey Lozada to simply follow what Mr. Richmond or other witnesses were saying with respect to Mr. Bouto being the shooter.

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[39] There are many sources of post-event memory contamination that can affect a witness's memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses, law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Zajac and Henderson[40] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed was another participant in the study (i.e., a co-witness). Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

In summary, the concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event. In many actual cases, the full scope and impact of post-event contamination is unknown which is why obtaining a detailed, recorded interview with a witness is so important. In this case, the extent of the contamination is unclear but the record indicates there were multiple opportunities for all of the witnesses to have learned information about the perpetrators from others.

**2. Description "Accuracy"**

***Ponytail***. At the Motion to Quash Arrest hearing (P. 5-6), Det. Pergande testified that he approached Mr. Bouto on the street because he matched the description that he had been given by witnesses on the scene:

> *Male White Hispanic, about 16-17 years old, 5'7", 140 lbs, wearing a blue hoody with black ¾ length shorts, black hair with shaved sides and the hair on top pulled back into a tail, small ponytail.*

---

[39] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[40] Zajac & Henderson (2009). Don't it make my brown eyes blue: Co-witness misinformation about a target's appearance can impair target-absent line-up performance. *Memory, 17,* 266-278.

Melissa Melendez was a witness to the shooting and was interviewed on 5/14/93 at the scene. She described the shooter as a Hispanic male, 16 years old, 5'5", 120 lbs, wearing a black t-shirt, black ¾ baggy pants, white high tops, hair shaved with a ponytail. Other witnesses also described a ponytail.[41]

The reason this feature is particularly important is because Mr. Bouto did not have a ponytail on 5/14/93. Mr. Bouto's hairdresser, Mr. Arafat Issa, testified at trial that Mr. Bouto never had a ponytail during the time around the shooting. (Bouto 006951) Mr. Bouto did not have a ponytail in the photograph of the live lineup but a ponytail is visible on some of the lineup fillers. Further, there is no description of Mr. Bouto having a ponytail in the arrest report or Supplementary Report (5/16/93) which described his hair as "hair black worn short". [42] Yet Det. Pergande testified at the Motion to Quash Arrest hearing that Mr. Bouto did have a "small tail". (P. 6)

***Facial hair.*** According to Det. Halvorsen's notes, on 5/14/93 Michael Fleming described the offender as "clean shaven". Later, he would testify that he never saw the face of the shooter and did not know if he had facial hair. When he was arrested withing an hour of the shooting, Mr. Bouto had a mustache and "soul patch" below his bottom lip.

With respect to research on witness description accuracy, in Professor Garrett's (2011)[43] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[44]

The lack of detail in the various witness' descriptions of the shooter should have been a red flag for investigators that these witnesses did not have a strong memory for the shooter and would therefore would not likely be reliable eyewitnesses in the investigation.

**3. Showup**

There is no contemporaneous documentation in the police file about a showup identification procedure being conducted at the scene in this case.[45] The first and only reference of a showup in the police file appears to be a 9/27/94 Supplemental Report (Bouto 021022):

> *R/O's toured area and located the offender. Wit Lasada, Jacob ID'd the offender's clothing and Ray ID's the offender's face.*

---

[41] Rey Lozada testified at trial that he did not see a ponytail. (TT. 61)

[42] In addition, the two jailhouse informants involved in this case (Vicente and Maldonado) described the P.R. Stone (Bouto) as having no ponytail.

[43] Garrett (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[44] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[45] It also is possible that a police station showup occurred in this case. According to an affidavit and 2021 testimony of Rey Lozada, while he and his friends "were standing by the desks in the open area, we could see Bouto sitting in a room with the door open. The door was not fully open, but it was cracked enough where we could see him" (Depo P.36)

In the state's opening remarks at trial, however, the witnesses who viewed the showup identification procedure and its outcome were described differently than in the Supplemental Report. According to the prosecutor's opening statement (P. 16):

> *And a few minutes later they found Robert Bouto and brought him back to the scene with some other people. And individually at the scene within thirty to forty five minutes after the shooting they showed the Defendant and he was identified by Rey Lozada and **Carl Richmond** (emphasis added) as the shooter.*[46]

However, in Bouto's arrest report prepared by Det. Pergande, the following is noted:

> *History and Investigation: Above subject [Mr. Bouto] taken into custody at address of arrest in that he fit the description of the wanted person in connection with the homicide that occurred at 3415 W. Sunnyside. Subject transported into A5/VC where he was positively IDs by several witnesses via a line-up as being the person who shot Ruvalcaba, Salvador (fatally).*

In other words, Det. Pergande failed to mention or document the on the scene showup procedure. Despite the lack of documentation pertaining to the showup procedure in the police file, there was mention of an identification procedure conducted at the crime scene in the prosecutor's arguments at the Motion to Quash Arrest hearing (P. 22):

> *The officer [Pergande] exercised good police action in detaining this individual and bringing him back to the scene for purposes of either excluding him or for purposes of continuing to search for the person that was responsible for the death of Salvador Ruvalcaba.*

The prosecutor's statement appears to be describing an identification procedure that was conducted at the scene, similar to what various witnesses have now described.

At trial, Rey Lozada testified that he "looked at five people standing in front of a car, the police car." (TT. 39) and this is when he made his identification of the shooter. But in 2021, he described that he was not alone when the showup took place and that other witnesses were next to him. He was next to Mr. Richmond when Mr. Richmond said "that was him", and Mr. Lozada just adopted what Mr. Richmond was saying. (Depo P. 153)

In a 2014 interview, Mr. Richmond told investigators that Det. Guevara did not make the showup identification procedure at the scene fair to Mr. Bouto because the police were bringing random guys which did not have mustaches and did not look like him. Rey Lozado also told the same investigators about the showup and recalled that another suspect in the procedure was an overweight white boy that did not look anything like Mr. Bouto.

In summary, it appears that a multiple-suspect showup procedure occurred at the scene within an hour of the shooting. There is no contemporaneous police documentation regarding the procedure and it is therefore unclear which witnesses viewed the showup, how/where it was conducted, what instructions were given to witnesses before the procedure, and which individuals (suspects) were shown in the procedure. What is

---

[46] In his 2021 deposition, Mr. Richmond testified about the showup procedure and indicated that other witnesses also were shown the (6 or 7) individuals. It appears that none of those witnesses were brought to the precinct for the lineup. (P. 27) It is unclear to me who these other witnesses were due to a lack of documentation in the police file regarding the showup procedure. Mr. Richmond testified in 2021 that he did not point anyone out in the showup procedure although this testimony is inconsistent with other evidence in this case.

known is that three other individuals who allegedly were near Mr. Bouto when he was detained were brought to the precinct for interviews and to stand in the lineup: William Lupo, Luis Oquendo, and Cesar Matias. There is no documentation regarding any identification of these individuals from the lineup or showup.

In addition, there is some evidence that a second highly suggestive showup identification procedure may have occurred at the police station prior to the live lineup. According to Rey Lozada, Mr. Bouto was handcuffed in a room close to where he and his friends were gathered and the door was ajar so that the witnesses could see him. (Depo P. 49) This is consistent with Mr. Richmond's 2019 testimony that he passed by a room at the police station before the lineup and saw Mr. Bouto handcuffed, sitting in a chair. (P. 19) According to Mr. Richmond in 2019, Det. Guevara showed him a single Polaroid of Mr. Bouto at the precinct prior to the lineup and he told Mr. Richmond "that's who I was going to point out" or Det. Guevara would make things difficult for him.[47] (P. 18-19)

Showup identification procedures are suggestive by their nature and are dangerous because there is no particular way for law enforcement to know when an eyewitness has made an error and identified an innocent person from a show-up because, unlike lineups, there are no known-innocent fillers.[48] A meta-analysis comparing witness performance in show-ups to six-person photo arrays indicates that mistaken identifications are significantly more likely with show-ups.[49]

In addition, the Revised 2020 AP-LS White Paper recommends that showups be avoided altogether unless deemed absolutely necessary. This recommendation is consistent with the 1992 IACP model policy on eyewitness identification which states that showups should be avoided whenever possible.[50]

 When showups are used, safeguards should be used to reduce suggestion, such as eliminating inferences of police custody.[51] Showups that occur with a suspect in handcuffs or in the back of a police cruiser may lead to an increased rate of identification not because of recognition, but because of witness deduction ("Gee, this must be the perpetrator if the police have him in custody.").

---

[47] Mr. Richmond also testified in 2019 that it looked like the Polaroid photograph of Mr. Bouto had been taken in the room where he saw him handcuffed. (P. 19)

[48] As stated elsewhere in this report, this is why it is critical to have only one suspect per lineup so that law enforcement can better ascertain whether a witness has a reliable memory.

[49] Steblay, Dysart, Fulero, & Lindsay (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

[50] This 1992 model policy also recommends that only one witness at a time view the showup, that words uttered by police suggesting that the suspect is the perpetrator be "scrupulously avoided", that a suspect is only presented to a witness one time for the purposes of identification, that the suspect is not made to wear clothing similar to that described by the witnesses, and that the suspect not be handcuffed during the showup. From my review of materials in this case, it appears that all of the procedures listed above were utilized in this investigation. IACP (1992). *Model Policy: Showups, photographic identifications and lineups.* Another publication from IACP in 1993, "Showups, Lineups and Photographic Identification: Concepts and Issues Paper", was designed to accompany the 1992 model policy. The 1993 paper underscored the concerns with using showup identification procedures and informed readers that they should be avoided when possible due to their inherent suggestiveness.

[51] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

In summary, the showup procedure described by witnesses in this case substantially increased the likelihood that they would make an identification error, especially given the clothing bias involved in the showup procedure.

***Clothing Bias at Showup (and Lineup).*** In 2012, Rey Lozada testified that he felt certain about his selection of Mr. Bouto from the lineup "because of the hoodie. He still had the hoodie on." (Depo P. 166) In fact, Mr. Lozada had, only a few hours earlier, selected Mr. Bouto from the showup where he was wearing the same hoodie.[52]

The data with regard to clothing bias and show-up identifications is clear (Dysart, Lindsay, & Dupuis, 2004; Yarmey et al., 1996). When an innocent suspect who looks similar to the perpetrator is presented to a witness wearing clothing that matches with witness' description, there is a significant increase in false identifications of that innocent suspect. For example, Dysart et al. (2004) presented witnesses with suspects in various clothing biased showups. When an innocent (similar looking) suspect was presented wearing similar clothing to that worn by the target (perpetrator), he was falsely identified by 37% of witnesses. When the same innocent suspect was presented in clothes that were completely different from that worn by the target, he was falsely identified by 0% of witnesses. In the current case, the clothing worn by Mr. Bouto in the showup (and lineup) was consistent with the witness descriptions and he was the only person in these procedures wearing similar clothing to that worn by the shooter. The result is a set of suggestive or biased identification procedures that made Mr. Bouto stand out.

**4. Lineup Bias**

In my opinion, the live lineup shown to the six witnesses within 4 hours of the shooting was biased against Mr. Bouto. Foremost, Mr. Bouto the only lineup member wearing clothing that matches the description of the shooter's clothing. This is extremely important for all of the witnesses but two witnesses in particular. Margaret Fleming and Michael Fleming allegedly only selected Mr. Bouto from the lineup because his clothing matched the clothing worn by the shooter. Neither witness saw the shooter's face.

When it comes to filler selection, there are many choices law enforcement need to make when deciding who to put in a lineup including how many fillers should be used, and how similar should they be to the suspect and/or the description the witness provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, especially the suspect.[53] In this case, the lineup fails on this principle because Mr. Bouto is the only lineup member wearing clothing similar to that described by the various witnesses. It is important to keep in mind that, if clothing was part of the witness' original description, either all or none of the lineup members should match this aspect of the description otherwise the lineup will be biased toward the suspect.[54]

---

[52] Two other witnesses, Margaret Fleming and Michael Fleming, allegedly only selected Mr. Bouto from the lineup because of his clothing, as neither witness saw the face of the shooter.

[53] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement.* United States Department of Justice, Office of Justice Programs; Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[54] E.g., Lindsay, Wallbridge, & Drennan (1987). Do the clothes make the man? An exploration of the effect of lineup attire on eyewitness identification. *Canadian Journal of Behavioural Science, 19,* 463-478.

**Multiple suspect lineup:** From the police report dated May 14, 1993:

> *"They also had other subjects that were behind the offender at the time of the shooting. R/d then asked tactical unit beat 1763b to bring all suspects into Area Five Violent Crimes for further investigation and a line-up."* Then,
>
> *"R/Dets. Interviewed William Lupo, Luis Oquendo and Cesar Matias. R/Dets. Informed them that they were identified by witnesses, as standing behind the offender at the time of the shooting. All three denied being there."*

With respect to the selection of lineup fillers, a properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers who are known to law enforcement to be innocent of the crime. From the materials I reviewed, I did not see any lineup documentation that, in my experience, is typically created when a lineup is conducted. Therefore, it is unclear which witnesses allegedly identified Mr. Lupo, Mr. Oquendo and Mr. Matias as being behind the shooter, or when they did so. (Bouto 021016) It also is unclear how many individuals the various witnesses selected from the lineup. For example, did any single witness identify 4 out of 8 lineup members? It is also unclear if any of these individuals were identified as the individual who handed the shooter the gun (named Mario).

**Filler similarity.** When it comes to how similar the fillers should be to the suspect, researchers have some preference to use a rule where all of the features included in the witness' description of the perpetrator should be matched[55] (e.g., gender, age, height, weight, etc.) and all fillers should be plausible alternatives for the suspect based on how the suspect looks – but fillers should not be clones.[56] When some of the lineup members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen. In this case, it is not clear what criteria were used to select the lineup fillers. What is clear from viewing the lineup is that most fillers do not match the overall description provided by the witnesses in this case. Some of the lineup members appear much taller or shorter than Mr. Bouto's height (and the height described by witnesses). The build of several of the fillers is different than that described by the witnesses and also Mr. Bouto's build. Although the arrest report indicates that Mr. Bouto has a "dark" complexion, several of the fillers are light complected.

**Photo array procedure:** According to a 2014 interview with investigators and his 2021 deposition, Rey Lozada recalled viewing photos with other witnesses at the police station prior to viewing the live lineup containing Mr. Bouto. The photographs included a Polaroid of Mr. Bouto and approximately 6 other photos.

According to Mr. Lozada, prior to viewing the lineup, various police officers saw these witnesses looking at photographs on a desk and did nothing to stop these witnesses from looking at photographs. (Rey Lozada Depo P. 48-50)

From the materials I reviewed, there is no documentation regarding this alleged photo procedure. However, if this procedure occurred, as Mr. Lozada has described, it would be considered a highly suggestive identification procedure. First, several witnesses were together, viewing photographs and making

[55] For example, see Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[56] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

comments regarding the individuals including Mr. Bouto. Second, these witnesses had already allegedly selected Mr. Bouto from the showup procedure. Third, they were at the police station waiting to view a live lineup. Therefore, at that point in the investigation, there would have been no reason related to eyewitness reliability for witnesses to be viewing photographs that included a photograph of Mr. Bouto.

In summary, with respect to the lineup in this case, if the procedures happened the way that some witnesses have testified - in addition to the suggestive construction of the lineup itself - there was a very strong likelihood that the witnesses would select Mr. Bouto from the procedure. After being selected from an unnecessarily suggestive procedure (here, a showup), the results from any subsequent procedure are relatively meaningless. That is the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy.

**5. Pre-identification Warnings/Instructions**

For the showup identification procedure, there is no documentation at all in the police file prior to a September 27, 1994 memo regarding the procedure. At trial, Rey Lozada testified that he was asked "if I can identify someone" from the shooting. He looked at five people standing in front of the police car and said he recognized the shooter. (TT. 34) It appears that he was not specifically informed that the shooter may or may not be present. In fact, in 2019, Mr. Richmond testified that he was told by police on the scene that "they had three guys in a car and they believed that the shooter was one of them. And I was – that's who I was told to point out, basically". (P. 13) Mr. Richmond went on to describe the *pre-lineup* instruction bias provided by Det. Guevara (P. 25-26):

> *Rey Guevara pulled me out of the room, showed me a picture of Mr. Bouto handcuffed in an empty room and told me that that's who I was going – that that's who he is. He had the shooter. He was like coaching us saying that it's him. And I told him – I saw – you know, I was stressing to him I didn't want to get involved. And he just abundantly made it clear to me, before he brought me back in the room with the other two witnesses, that I was gonna point out Mr. Bouto or he was gonna make life miserable for me.*[57]

With respect to the lineup identification procedure, Mr. Richmond provided information to investigators in 2014 (and in an affidavit in 2008) that Det. Guevara told him, Rey Lozada and Mr. Escobar that they had the shooter and that Mr. Bouto would be standing in position 3 in the lineup. In 2019, Mr. Richmond recalled that Det. Guevara told him who to point out. (P. 21) However, in 2014, Rey Lozada told investigators that Mr. Guevara did not tell them which person to select. Therefore, there are conflicting accounts on this issue.

Simply failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection and leads to an increase in identification errors. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array or lineup and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[58]

---

[57] In his 2021 deposition, Rey Lozada testified that Det. Guevara told him "We got the motherfucker" or "We're going to get him". (P. 56)

[58] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased

Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[59] This law enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array. Consistent with these recommendations, the 2015 Illinois law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

In summary, based on the testimony of Mr. Lozada and Mr. Richmond, there is evidence of strong pre-identification bias in this case. If the suggestive procedures occurred the way in which both witnesses have recounted, it would have significantly increased the likelihood that the witnesses would have chosen Mr. Bouto from the lineup. This is especially true given the poor encoding conditions and other estimator variable factors described above. The extended period of time that Mr. Richmond took to make his selection of Mr. Bouto from the live lineup further supports the above conclusion.

**6. Non-blind Lineup Administration**

All of the identification procedures reportedly conducted in this case were done by Defendant detectives who developed Mr. Bouto as a shooting suspect and therefore were aware that Mr. Bouto was a suspect in the procedures. In fact, Mr. Richmond testified in a 2019 proceeding about why he selected Plaintiff from the lineup (P. 26):

> Q. And why did you point out Robert Bouto at that lineup?
> A. I was pointing – I was told to by Rey Guevara.

In this case, none of the identification procedures were audio or video recorded. If they had been recorded, it would have allowed observers or listeners to evaluate the interactions to determine whether any suggestion - explicit or subtle - had been given during the arrays or lineup.

Contemporary police guidelines (e.g., IACP, 2006) and the law in approximately half of the United States for conducting identification procedures,[60] indicates that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is

---

lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[59] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

[60] The 2015 eyewitness identification bill passed in Illinois requires double-blind or blinded administration of identification procedures.

the suspect can lead them to say things that focus the eyewitness on the suspect.[61] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[62] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[63] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 9% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 36% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether they administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced. The researchers also asked administrators if they had influenced the witness during the lineup procedure. The results demonstrated that neither participants nor administrators believed that they had been influenced or did any influencing, respectively. The researchers concluded:

> *It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the line of administration procedure to judge the reliability of the identification. If witnesses are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)*

---

[61] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[62] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[63] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

In summary, though double-blind administration was not the norm in the United States in 1993, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Bouto from the showup and lineup. In cases, such as this one, where law enforcement have "steered" a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability.

**7. Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

Mr. Bouto was presented to witnesses in this case for the purposes of identification at least 3 but perhaps as many as 4 times: showup, photos at police station, lineup, and trial. It should be noted that the police record in 1993 did not document the showup procedure nor the photo procedure that was described by Rey Lozada in his 2016 affidavit and again in his 2021 deposition.

Given the repeated identification procedures in this case, the concepts of unconscious transference and commitment are relevant to this case. Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[64]

Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[65] this is known as "commitment."[66] Thus, it is quite possible that Mr. Bouto was selected by Mr. Lozada and Mr. Richmond at the live lineup merely because they had previously viewed and selected him from the showup (and possibly photos). Rey Lozada has testified that he and other witnesses viewed photographs - including a photograph of Mr. Bouto – together at the police station after the showup and prior to the lineup (while Mr. Bouto was in custody). If this photo procedure did occur, it is not clear from the record why it was conducted. There is no scientific explanation related to witness reliability that can explain why photographs of Mr. Bouto would have been displayed to witnesses at that point in the

---

[64] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[65] For a review, see Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289.

[66] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

investigation. In my professional experience, I have never before encountered a case where law enforcement conducted a showup and received a "positive identification" and then conducted a photo array followed by a live lineup. Furthermore, all of these identification procedures were conducted within 4 hours of each other.

Results from a second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure. It is for this reason that psychologists view in-court identifications as mere theater and not actual independent tests of a witness's memory or ability to identify perpetrators.[67] In each succeeding procedure, witnesses can become increasingly more committed to their identifications and increasingly certain of their accuracy. In fact, there are examples from post-conviction DNA exoneration cases where, after a witness had incorrectly selected an innocent suspect, they continued to identify the innocent suspect even when presented with the actual perpetrator responsible for the crime.[68]

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific finds and best practice recommendations:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383–84 (1968).

---

[67] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

[68] The wrongful convictions of John Jerome White and Ronald Cotton are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times*, June 8, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole). See also: https://www.youtube.com/watch?v=u-SBTRLoPuo and https://www.youtube.com/watch?v=I4V6aoYuDcg

In this case, witnesses were presented with repeated identification procedures with Mr. Bouto as the suspect within several hours of each other. The results from repeated identification procedures with the same suspect are not independently informative with respect to witness accuracy. That is, viewing an earlier procedure with the same suspect taints the result of any subsequent procedure.

**8. Witness Confidence**

In the materials I reviewed, there does not appear to be any contemporaneous recording of the witnesses' levels of confidence in their selection of Mr. Bouto (or his clothing) from the showup or live lineup.

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[69] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[70]

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors. For example, researchers have recently found that the confidence accuracy relationship is significantly weakened when the distance between the witness and the perpetrator is over 66 feet.[71]

Expressions of confidence at trial, however, are relatively meaningless[72] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[73]

**9. Post-identification Feedback**

---

[69] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[70] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[71] The facts of this case suggest that several witnesses viewed the perpetrator from a distance greater than 66 feet. See Lockamyeir, Carlson, Jones, Carlson & Weatherford (2020). The effect of viewing distance on empirical discriminability and the confidence–accuracy relationship for eyewitness identification. *Applied Cognitive Psychology, 34,* 1047-1060.

[72] See footnote 69 (E.g., Leippe, 1980…)

[73] E.g., Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1989; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979.

According to a 2014 interview with investigators, Rey Lozada recalled a photo array procedure that he and other witnesses participated in together before viewing the live lineup. During this procedure, a few of the witnesses selected the wrong person and were told that they made the wrong decision (by police or other witnesses). The witnesses then selected someone else.

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[74] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as *post-identification feedback*.[75]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect /defendant or that they have been a really good witness.[76] In the first research on the post-identification feedback phenomenon, Gary Wells and Amy Bradfield[77] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[78]

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[79] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Dean was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Dean was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Dean was innocent and was not the man who had raped her in 1994.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make

[74] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.
[75] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.
[76] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.
[77] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.
[78] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.
[79] Charman, et al., 2010; Festinger, 1956; Festinger & Carlsmith, 1959.

them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[80] In this case, it is remarkable that given the many suggestive elements of the identification procedure that Mr. Melendez continued to assert at trial (and at his deposition) that he did not see the shooter's face and did not (independently) identify Mr. Sierra as the shooter. Mr. Rodriguez, however, selected Mr. Sierra three times from various suggestive procedures. These selections

**VII. Summary of Opinions regarding Detective Guevara Cases**

I have been retained as an expert witness and submitted an eyewitness identification expert report or testified in several other cases where Detective Guevara is/was a Defendant. These include:

*Jacques Rivera v. Reynaldo Guevara, et al.,* Case No. 1:12 CV 04428 (April 25, 2017 deposition)
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020 deposition)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020 deposition)
*Thomas Sierra v. Reynaldo Guevara, et al.*, Case No. 1:18-cv-03029 (September 16, 2022 report)

For the current report, I was asked to comment on any similarities between Mr. Bouto's case and the other Det. Guevara cases (above) with respect to estimator and system variables.

With respect to estimator variables, all of the cases had a series of uncontrollable factors that tend to reduce the strength of a witness' memory and consequently their ability to be an accurate witness.

It seems that a common theme in the Guevara cases I have reviewed to date is to manipulate witnesses who had poor opportunities to view the perpetrator, often telling witnesses that the perpetrator has been caught before conducting the lineup. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in both cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator.

With respect to system variables or the choices made by law enforcement during the collection of eyewitness evidence, there is a great deal of consistency between the five cases:

1) Viewing of photographs (which include the suspect) before a lineup
2) Filler bias and use of multiple suspects in the same array
3) Pre-identification instruction bias
4) Use of non-blind rather than a double-blind lineup;
5) Post-identification feedback and its effects on bolstering witness confidence, etc.
6) Repeated identification procedures, unconscious transference and commitment

In summary, a comparison of the five cases reveals many similarities in the facts of each case, now revealed in post-conviction litigation discovery.

---

[80] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect. *Applied Cognitive Psychology, 20,* 859–869.

**VIII. Summary of Opinions in This Case**

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability. Several of the witnesses were shot at and ducked for cover. They were afraid. Other witnesses heard shots and saw the shooter but did not see his face. The initial descriptions of the shooter were vague and did not include any description of the facial features. Mr. Lozada has testified about looking at suggestive photos with other witnesses prior to the lineup. In these photos, the suspect (Mr. Bouto) was the only person wearing clothing similar to the description provided by the witnesses. Further, witnesses were told by police that they had the shooter before the showup and lineup. Given these factors, it is not difficult to arrive at a reasonable explanation as to how several witnesses came to select Mr. Bouto or his clothing from the lineup.. The combination of a weak memory for the shooter coupled with suggestive identification procedures easily accounts for the selections of Mr. Bouto who has been granted a Certificate of Innocence in this matter.

**IX. Supplemental Materials**

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 7, 2022.

Jennifer Dysart
______________________________
Jennifer Dysart, PhD

## Appendix A

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (as of October 6, 2022)**

**California:**
*Andrew Wilson v. City of Los Angeles, et al.*, Case No. 2:18-cv-05775 (April 29, 2020)
*Maurice Caldwell v. City and County of San Francisco and Kitt Crenshaw,* Case No. 12-cv-1892 EDL (December 21, 2020)
*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.,* Case No. 2:20-cv-10559-PA-KS (April 19, 2022)

**Florida:**
*State of Florida v. Michael Keetley,* Case No. 10-18429 (February 19, 2020)

**Illinois:**
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020)

**Kansas:**
*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al., Case No. 2:18-cv-02545-KHV-KGG* (September 23, 2021)

**Louisiana:**
*Robert Jones v. Leon Cannizzaro, Jr., et al.*, Case No. 2:18-cv-00503 (December 15, 2019)

**Maryland:**
*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.,* Case No. 1:19-cv-00384-ELH (September 14, 2021)

**Massachusetts**
*Angel Echavarria v. J. Michael Roach, et al.,* Case No. 1:16-cv-11118 (August 5, 2020)

**Missouri:**
*Lamont Campbell v. State of Missouri,* Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)

**Ohio:**
*Roger Dean Gillispie v. The City of Miami Township, et al.,* Case No. 3:13-cv-416 (August 27, 2019)

# Appendix B

## Academic Curriculum Vitae of Jennifer E. Dysart

**JENNIFER E. DYSART**

**Curriculum Vitae**

University Address:
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street, 10th Floor
New York, NY 10019

*Email:* jdysart@jjay.cuny.edu
*Phone:* 212.484.1160

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology)<br>*Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

**Peer-Reviewed Journal Publications**

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

**Books**

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

**Book Chapters**

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92). Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

## Other Publications

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.,

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13). Thousand Oaks, CA: Sage.

**Peer-Reviewed Conference Presentations**

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San

Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at

the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

**Invited Judicial Presentations**

Dysart, J. E. (2022, March). Assessing Credibility and Reliability: Perception, Memory and Eyewitnesses Identification. Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, NY, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, Ontario, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, Newfoundland, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Ontario, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts

Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, Newfoundland, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, Quebec, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, Saskatchewan, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, Prince Edward Island, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

**Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences**

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, Newfoundland, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, Nova Scotia, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, Saskatchewan, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor/Conviction Review Presentations

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited Presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking

a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

## Invited Law School and University Presentations

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited speaker at the Florida State Attorney's Office (Conviction Review). Meeting via Zoom.

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public

Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

## Invited Non-Profit Presentations

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

## Supervision of Doctoral Students at John Jay College of Criminal Justice

2010 John DeCarlo (Criminal Justice Doctoral Student)
Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011 Victoria Lawson (Forensic Psychology Doctoral Student)
Topic: Eyewitness Identification

2006-2009 Anna Rainey (Forensic Psychology Doctoral Student)
Topics: Showups; Cross-race identification

2006-2009 Brian Wallace (Forensic Psychology Doctoral Student)
Topics: Alibi believability; Mug shot searching.

**Supervision of Masters Theses at John Jay College of Criminal Justice**

2018 – 2020 Elena Christofi
Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019 Samantha Kosziollek
Topic: 911 Dispatchers

2016 – 2018 Marisa Jaross
Topic: Composite sketches

2016 – 2017 Brittany Kassis
Topic: 911 Dispatchers

2011 – 2012 Tamara Andrade
Topic: Composite creation in cross-race identifications

2010 – 2011 Jennifer Savion
Topic: Composite creation in cross-race identifications

2009 – 2010 Lindsey Butera
Topic: Eye-tracking and lineup accuracy with biased lineups
Yinglee Wong
Topic: Cross-race description accuracy of hair/hairstyles
Nancy Yang
Topic: Eye-tracking and weapon focus effect

2008 – 2009 Alexander Buijsrogge
Topic: Cross-race composite creation of famous faces
Kristin Chong
Topic: Stranger alibis and identification accuracy
Victoria Lawson
Topic: Cross-race showup and lineup accuracy
Jessica Owens
Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008 Sarah Kopelovich
Topic: Cross-race and Accent effects on identification accuracy
Jason Mandelbaum
Topic: Cross-race effects in mug shot searching

## Supervision of Master's Theses at Southern Connecticut State University

2005  Lisbeth Fugal
     Topic: Post-identification feedback
    Anna Rainey
     Topic: Cross-race identification and "contact" with other groups

2004  Sandra Soucie
     Topic: CSI Effect

## Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University

2005  Daniel Csuka
     Topic: Multiple Independent Identification Accuracy

## Awards and Scholarships

2017  PSC CUNY research grant ($3,500)

2008  John Jay College Research Assistance Program Grant ($1,000)

2005  Connecticut State University Research Grant ($4,400)

2005  Junior Faculty Research Fellowship, Southern Connecticut State University
    (9 credits teaching release time for Fall 2005)

2003-2005 Social Sciences and Humanities Research Council of Canada (SSHRC)
    Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined)

2002  American Psychological Foundation/Council of Graduate Departments of
    Psychology (APF/COGDOP) Graduate research scholarship ($1,500)

2002  American Psychology-Law Society Grants-in-Aid award ($650)

2001-2003 Social Sciences and Humanities Research Council of Canada (SSHRC)
    Doctoral Award ($17,900 annually)

2000-2001 Ontario Graduate Scholarship ($15,000)

1999-2000 Natural Sciences and Engineering Research Council of Canada (NSERC)
    PGS-B scholarship ($18,900)

1998-1999 Natural Sciences and Engineering Research Council of Canada (NSERC)
    PGS-A scholarship ($17,300)

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**

- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**

- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**

- Introduction to Psychology (undergraduate course)

## University Committee Service

2016 – 2019 Graduate Studies Council, John Jay College of Criminal Justice

2013 – 2016 College Council Member, John Jay College of Criminal Justice

2013 – 2016 Faculty Senate Member, John Jay College of Criminal Justice

2013 – 2014 College Council Executive Committee Member, John Jay College of Criminal Justice

2010 – 2012 College Council Executive Committee Member, John Jay College of Criminal Justice

2010 – 2012 College Council Member, John Jay College of Criminal Justice

2010 – 2012 Faculty Senate Executive Committee Member, John Jay College of Criminal Justice

2010 – 2012 Faculty Senate Member, John Jay College of Criminal Justice

| | |
|---|---|
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2006 – present | Consultant, eyewitness identification expert |

| | |
|---|---|
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

**Reviewing (past and current)**

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

**Professional Affiliations**

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**

***Jose Montanez v. Reynaldo Guevara, et al.,* (Case No. 17-cv-4560);**
***Armando Serrano v. Reynaldo Guevara, et al.,* (Case No. 17-cv-2869)**

**Report Date: December 3, 2019**

## I. Overview and Credentials of Dr. Dysart

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. In June 2019, I was contacted and ultimately retained by attorneys representing Mr. Jose Montanez and Mr. Armando Serrano to review materials in the above referenced cases and provide my opinions regarding the eyewitness identification evidence relating to the conviction of Mr. Montanez and Mr. Serrano for the murder of Mr. Rodrigo Vargas on February 5, 1993 in Chicago, Illinois. Both Mr. Montanez and Mr. Serrano's convictions have been overturned and they were issued Certificates of Innocence in November 2016 for the murder of Mr. Vargas. I am being compensated for expert services in this case at a rate of $325/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have been admitted as an eyewitness expert approximately 65 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in the Conviction Review Unit in the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 5th Edition" published by LexisNexis (6th Edition forthcoming).

***Presentations:*** I have given more than 160 presentations on eyewitness identification before professional psychological organizations and at conferences attended by judges, lawyers, police officers, investigators,

law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

***Curriculum Vitae:*** My complete curriculum vitae is attached to this report as Appendix B.

**II. Materials Reviewed in this Case**

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with all available relevant materials related to the identification of their client, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), testimony of all police officer(s) involved in collecting the eyewitness evidence, and any other documentation that is relevant to the eyewitness identification at hand. In this case, I was provided with the following materials:

1. General Offense Case Report
2. Various Crime Scene Photographs
3. Supplemental Report (dated 06/02/93)
4. Timothy Rankins Arrest Report (6/10/93)
5. Intake Photos
6. Supplemental Report (dated 06/11/93)
7. Supplemental Report (dated 06/14/93)
8. Supplemental Report (dated 07/10/93)
9. Timothy Rankins Photo Array
10. Armando Serrano Lineup Photos (06/11/93)
11. Jose Montanez Lineup Photos (07/09/93)
12. Det. Ernest Halvorsen Trial Testimony
13. Det. Reynaldo Guevara Trial Testimony
14. Wilda Vargas Trial Testimony
15. Trial Court Statements
16. Wilda Vargas affidavit in English (5/23/06)
17. Jose Montanez Certificate of Innocence (11/02/16)
18. Armando Serrano Certificate of Innocence (11/02/16)
19. Private Investigator Lynn Bagley Report (03/12/19)
20. Det. Ernest Halvorsen Deposition #1[1] (04/02/18)
21. Det. Ernest Halvorsen Deposition #2 (02/06/19)
22. Det. Guevara Deposition[2] (04/10/18)
23. Wilda Vargas Deposition (12/12/18)
24. Timothy Rankins Deposition (01/13/19)

**III. Brief Summary of Case Facts**

At approximately 5:30am on February 5, 1993, Mr. Rodrigo Vargas was shot and subsequently died inside his van that was parked near his home at 1838 N. Springfield in Chicago, Illinois. For the first four months after the crime, it was believed that there were no direct witnesses to the shooting. The victim's widow, Mrs. Wilda Vargas, was interviewed the day her husband was killed. According to the police report generated, during this interview, it appears that Mrs. Vargas did not describe any events related to

[1] Det. Halvorsen responded to virtually every substantive question in this deposition by asserting his Fifth Amendment rights.
[2] Det. Guevara responded to virtually every substantive question in this deposition by asserting his Fifth Amendment rights.

their stopping for gas the evening before her husband was killed. According to police reports, four months later, on June 2, 1993, Mrs. Vargas relayed information about the gas station stop to Det. Reynaldo Guevara who was investigating the case. It appears that Mrs. Vargas spoke exclusively with Det. Guevara because she did not speak English but was able to speak in Spanish with Det. Guevara. Det. Ernest Halvorsen, also assigned to this case, did not speak Spanish. During the June 2, 1993 interview, according to the police report, Mrs. Vargas recalled a large tan car parked in front of their van and that the driver got out of the vehicle and went inside the gas station. She also recalled that the tan car was blocking their van and her husband honked so that the car would move.

Mrs. Vargas recalls viewing at least 2 mug-books and selecting two individuals from those books. She also recalls being told that the individuals she selected from the books had robbed people. Mrs. Vargas then viewed an 8-person black and white photo array that contained three suspects – Mr. Montanez, Mr. Serrano and Mr. Pacheco – and five fillers. Mrs. Vargas selected Mr. Montanez and Mr. Serrano from the photo array as being the driver and passenger of the tan car she had viewed at the gas station four months earlier.

On June 11, 1993, Mrs. Vargas viewed a 5-person live lineup wherein Mr. Serrano was the suspect. She recalls that the lineup members were standing. She again selected Mr. Serrano as the passenger of the tan vehicle. On July 9, 1993, Mrs. Vargas viewed a 5-person live lineup wherein Mr. Montanez was the suspect. She recalls that the lineup members were standing in the second lineup procedure as well. She again selected Mr. Montanez as the driver of the tan car from the gas station on February 4, 1993.

At the criminal bench trial in 1994 where Mr. Montanez, Mr. Serrano and Mr. Pacheco were tried as co-defendants, Mrs. Vargas testified but had difficulty identifying the defendants who were asked to stand during her in-court identification procedure. Mr. Montanez and Mr. Serrano were convicted at trial. Mr. Pacheco was acquitted.

On June 2, 1993, Mr. Timothy Rankins was arrested on robbery charges unrelated to the death of Mr. Vargas. During an interview with detective Defendants, Defendants alleged in their reports that Mr. Rankins told them he was a witness to Mr. Vargas' murder four months earlier. According to police reports in June 1993, Mr. Rankins allegedly provided detective Defendants with the nicknames of Mr. Montanez, Mr. Serrano and Mr. Pacheco. Mr. Rankins then allegedly identified Mr. Montanez, Mr. Serrano and Mr. Pacheco from photographs. Mr. Rankins also allegedly identified Mr. Serrano from the June 11, 1993 live lineup but was not asked to view a lineup with Mr. Montanez at any time. Mr. Rankins testified in front of the grand jury in a manner that was consistent with his signed statement.

Several months later, Mr. Rankins allegedly recanted his grand jury testimony when he told a prosecutor that he had been physically assaulted by detective Defendants and coerced into making his statement and the identifications of Mr. Montanez, Mr. Serrano and Mr. Pacheco. He allegedly told the prosecutor that he did not witness the murder of Mr. Vargas on February 5, 1993. Mr. Rankins then fled Chicago and did not testify at the criminal trial.

In March 2019, Mr. Rankins was deposed in this case. In his deposition, Mr. Rankins steadfastly maintained his recantation that he allegedly provided prior to his grand jury testimony. Mr. Rankins strongly asserts that he did not witness the murder of Mr. Vargas and was coerced into signing a false statement and identifications of Mr. Montanez, Mr. Serrano and Mr. Pacheco.

In 2016, the convictions of Mr. Montanez and Mr. Serrano were overturned and they were issued certificates of innocence.

**IV. Basis for Opinions in This Case**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the identifications of Mr. Montanez and Mr. Serrano, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables"). It is critical to understand the impact of both system and estimator variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made. These evaluations should be made by law enforcement and prosecutors during their investigation of the case, defense attorneys, judges and ultimately juries.

The distinction between estimator and system variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading international expert in eyewitness identification research. Over the past 40+ years, a substantial amount of research on both estimator and system variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

Based on my review of the above materials, the estimator and system variables relevant to the identification of Mr. Montanez and Mr. Serrano by Mrs. Vargas include:

1) Effects of Limited Opportunity to Observe
2) Delay
3) Description "Accuracy"
4) Mug-book Searching
5) Post-event Contamination
6) Lineup Bias
7) Pre-identification Warnings/Instructions
8) Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator
9) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
10) Decision Speed
11) Witness Confidence
12) Post-identification Feedback
13) Object Identification (vehicle)

Further, if Mr. Rankins' post-grand jury and 2019 recantations are found to be incredible and a determination made that he was in fact an eyewitness in this case on February 5, 1993, there are additional factors not listed above that would be relevant to his observations:

14) Effects of Distance
15) Effects of Poor Illumination

**V. General Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[3] In fact, the National Research Council Report on eyewitness identification titled "Identify the Culprit: Assessing Eyewitness Identification"[4] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> Perception does not reflect the sensory world passively, as camera film detects patterns of light.

Most theoretical analyses of the memory process divide it into three major stages. First, a witness perceives an event and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. The National Research Council report reminds us that (P.57-58):

> The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer is commonly none the wiser when perception differs from the "ground truth" of the external world—it appears that accurate eyewitness identification may be difficult to achieve.

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. In particular, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through *contamination*. Contamination of a witness' memory can come from many sources including information learned from or about other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impacts of this contamination on a witness' recollection of events and people.

Numerous factors at each stage affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face/characteristics and length of the retention interval. As it relates to law enforcement, research has shown that the procedures and practices police use during the third (retrieval) stage of the memory process can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect the accuracy of an identification include the use and content of pre-lineup/photo array[5] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness after their identification decision.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this

---

[3] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[4] Ibid.

[5] The terms "lineup" and "photo array" are used interchangeably in this report, unless noted otherwise.

database currently numbers as **367.**[6] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[7] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 cases where there was an erroneous eyewitness identification of the innocent defendant, 36% included mistaken identifications from *more* than one eyewitness. In fact, some of the cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. Further, some 31 DNA exonerations involved the misidentification of an individual that was previously known to the witness. In other words, not all mistaken identifications are of strangers.

In addition to the DNA exoneration cases, there are other sources for statistics relating to wrongful convictions and errors in eyewitness identification decisions in actual criminal cases. For example, the National Registry of Exonerations[8] has accumulated data on both DNA and non-DNA exonerations in the United States and has found that eyewitness errors were involved in 715 of the 2,509 DNA and non-DNA cases combined (28%).[9]

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[10] In a 2019 update of the 1998 AP-LS White Paper on eyewitness identification,[11] Dr. Wells and colleagues have summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[12] The researchers note that there have been 11 published articles on the subject with data from over 6,500 witnesses in actual cases. The results show that nearly one quarter of eyewitnesses who view a photo array or lineup choose

---

[6] Visit www.innocenceproject.org for updated information and statistics on DNA exoneration cases nationally.

[7] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[8] The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (visited November 3, 2019).

[9] There are multiple reasons why the DNA and non-DNA rates of mistaken identification differ, including that the majority of DNA cases include sexual assaults and homicides, two crimes that often rely on eyewitness evidence.

[10] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the actual truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[11] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647.

[12] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2019, Feb 4 Draft). *Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence.* Downloaded from: https://ap-ls.wildapricot.org/resources/Documents/Feb42019 EWwhitepaper.pdf

an innocent filler. Of those who "identify"[13] a person from a photo array or lineup, more than one third (36.8%) "identify" an innocent filler as the perpetrator. Further, the overall error rate must be higher than one third, as these data do not include the erroneous identifications of innocent suspects (it only includes filler selections). In summary, identification decisions in actual cases show that errors are common and that over one third of all positive "identifications" are incorrect. While false identifications of innocent fillers do not necessarily send the filler to jail, these choices still constitute identification errors and provide valuable information about the reliability of witnesses and the reliability of lineup procedures generally.

**VI. Proposed Testimony**

I have identified the following eyewitness factors as being relevant to the facts of the current case involving the selection of Mr. Montanez and Mr. Serrano by Mrs. Vargas. Following the discussion of factors related to Mrs. Vargas, I will address a second alleged witness, Mr. Rankins.

**1. Effects of Limited Opportunity to Observe**

Common sense might suggest that even a brief opportunity to view a stranger's face allows us to form a mental snapshot of that person, but research shows that the amount of time that a witness views a person's face significantly impacts the witness's ability to subsequently identify that person. However, even when a witness is in the perpetrator's physical presence for an extended period of time, errors can still be made.[14] With respect to the effects of exposure length on eyewitness accuracy, Peter Shapiro and Steven Penrod found a systematic relationship between exposure time and identification accuracy in a 1986 meta-analysis.[15] Since this study, an updated meta-analysis[16] and other research[17] have replicated the positive correlation between the amount of exposure to a person's face and identification accuracy.

In addition, researchers have found that a person's retrospective estimate of the amount of time that an interaction or event took place may differ from the actual amount of time, with the error often in the direction of overestimating the amount of time.[18] Sometimes the estimate of time is profoundly

---

[13] Witnesses who "identify" an innocent lineup filler are obviously not making this decision because they actually recognize the filler from the crime. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person) and a mere choosing behavior (selecting someone from a lineup procedure).

[14] *National Research Council* (n 3).

[15] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

[16] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[17] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[18] For example, see: Attard & Bindermann (2014). Establishing the duration of crimes: An individual differences and eye-tracking investigation into time estimation. *Applied Cognitive Psychology, 2,* 215–225; Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration

exaggerated. In one study, participants saw a 30-second simulated bank robbery on videotape.[19] Two days later they were asked some questions about the tape, including how long it lasted. The average estimate of duration was 152 seconds – more than 5 times the actual length. Very few people estimated a duration that was equal to or less than the true value of 30 seconds. Although it was rare, some people produced inordinately long estimates of over 900 seconds. In other words, these individuals remembered a 30-second bank robbery tape as having lasted over 15 minutes. Thus, it is possible that triers of fact will believe, through witness testimony, that the witness had a longer opportunity to view the perpetrator than is in fact true.

Although it appears that Mrs. Vargas was not specifically asked during her interviews with law enforcement or during her testimony to describe the length of time she observed two of the men in the tan car at the gas station, her observations could not have been longer than what it would have taken for her husband to pay for gas and pump gas.[20] Mrs. Vargas also testified that she had her youngest child on her lap during the stop at the gas station and they had another young child in the van as well. (TT P12, DT P44-45) Thus, it is likely that she would have been focused, for some period of time during the gas station stop, on her two children. In addition, at the time of her observations of the individuals in the tan car, Mrs. Vargas had no particular reason to pay close attention or remember them (which she described in her 2006 affidavit). In fact, it appears that she did not link the gas station stop to the murder of her husband until several months later as the first reporting of her gas station observations was on June 2, 1993.

**2. Delay**

It is a generally accepted principle amongst memory and eyewitness researchers that memory decreases relatively quickly after an event and then continues to decrease with the passage of time. This relationship is known as the "forgetting curve". Researchers have examined delays of up to 11 months and found significant impairments on accuracy at this time period.[21] One of the earliest eyewitness studies to investigate long periods of delay was a study conducted by Egan and colleagues.[22] After a delay of 2 days, 21 days, or 56 days, participants were asked to make an identification of two targets that they had viewed during a live exposure. The researchers found no significant decrease in correct identifications of the target over the delay; however, the rate of false alarms of innocent people increased from 2 days (48% errors) to 21 days (62% errors) to 56 days (93% errors). Additional research conducted over the past three decades has confirmed the deleterious effects of delay on identification accuracy and in particular the misidentification of innocent suspects.[23] Further, individuals with weak or poor memories of an individual

---

by males and females. *Applied Cognitive Psychology, 1*, 3–13; Yarmey, & Yarmey (1997). Eyewitness recall and duration estimates in field settings. *Journal of Applied Social Psychology, 27,* 330–344.

[19] Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1,* 3-13.

[20] I have not seen any testimony related to how many gallons of gas Mr. Vargas paid for and pumped. Thus, it is not clear how long he would have been pumping gas. Mrs. Vargas testified that Mr. Vargas was inside the gas station for approximately 10 minutes before coming back out to pump gas because other people were paying (DT P45). However, she also testified that there were only 3 other cars at the gas station at that time. In summary, Mrs. Vargas' testimony relating her observations at the gas station are inconsistent and it would be difficult to draw conclusions regarding a specific length of time.

[21] Shepherd, J. (1983). Identification after long delays. In B. R. C. S.M.A. Lloyd-Bostock (Ed.), *Evaluating witness evidence* (pp. 173-187). New York: Wiley.

[22] Egan, Pittner, & Goldstein (1977). Eyewitness identification: Photographs vs. live models. *Law and Human Behavior, 1,* 199-206.

[23] E.g., See Deffenbacher, Bornstein, McGorty, & Penrod (2008). Forgetting the once-seen face:

are much more likely to be influenced by suggestive procedures (e.g., non-blind administration, filler bias, post-identification feedback).

From the police reports I have received and reviewed, it appears that the first documented interview Det. Guevara had with Mrs. Vargas where the gas station "interaction" was mentioned was on June 2, 1993, four months after her initial gas station observations. In her deposition testimony, Mrs. Vargas recalls that she spoke with Det. Guevara soon after her husband's murder and told him about the gas station interaction. Yet, there appear to be no records of this disclosure in the police files I have received. Only in June, four months later, is there any reference to the gas station in the police reports and thus it is not clear whether Mrs. Vargas provided the gas station information for the first time in February or June 1993 (DT P102). There are two implications for this inconsistency. First, there could be missing information in the police reports that would further raise concerns about other information that may have been withheld or not documented pertaining to this investigation. Second, there could have been a significant delay in her recounting the details of the gas station interaction.

Mrs. Vargas admitted that she did not link the gas station event with the death of her husband (DT P101) and thus she had no particular reason to remember the individuals she allegedly saw on February 4, 1993. A delay of four months in reporting an event would likely have resulted in a significant loss of information. Further, the first time Mrs. Vargas was shown photographs related to the gas station incident was on June 2, 1993, four months after her observations. This delay likely resulted in a weak memory for the individuals, increasing her susceptibility to influence and contamination.

As stated above, memory fades with the passage of time and thus some of Mrs. Vargas' recollections during her 2018 deposition, 25 years after her husband's murder, are likely going to be different or altered than recollections she had closer in time to her observations. As examples, her statements and testimony differed significantly with respect to the following:

1) The location of the second person she could see in the tan car (front passenger seat vs. back seat);
2) Whether the driver even got out of the tan car at the gas station on February 4, 1993;[24]
3) Whether the tan car moved out of their way at the gas station, resulting in her husband either driving out or having to back out of his spot;
4) Whether her husband or the tan car squealed their tires when leaving the gas station;
5) Whether the tan car followed them home.[25]

---

Estimating the strength of an eyewitness's memory representation. *Journal of Experimental Psychology: Applied, 14,* 139-150; Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

[24] This change in testimony is particularly relevant because the Supplemental Report in June 1993 indicated that the driver went into the store behind her husband and Mrs. Vargas looked at this man who was next to her husband. Presumably, this would be when the driver would have seen that her husband had a lot of cash on him. However, during her trial testimony, Mrs. Vargas stated that the driver went into the store after her husband was already seated in the van. (TT P20) And in her deposition testimony, she stated that the driver never left the vehicle. (DT P50)

[25] In her June 1993 statement to police, Mrs. Vargas told detectives that the tan car followed them home. But Mrs. Vargas testifed at trial that she didn't know if the car from the gas station followed them home because they did not look up at the time on their way home. (TT P55) In her 2018 deposition, she testified that the tan car followed them all the way home. (DT P50)

It is important to note that although a significant delay in time does typically affect one's ability to make accurate identification decisions, it appears that Mrs. Vargas had difficulty making identification decisions when there was virtually no delay. At trial, Mrs. Vargas repeatedly confused the defendants with one another. When shown a photograph of the Serrano live lineup she viewed on June 11, 1993, Mrs. Vargas selected Mr. Serrano from the photograph as the person she had picked. When she was asked if she saw that person in court, she selected Mr. Pacheco. In other words, after looking at the photograph of Mr. Serrano and then lifting her head to see if she could see that same person in court, she was unable to connect the photograph of Mr. Serrano to Mr. Serrano in person (DT P178):

> Q. So, you couldn't tell Armando Serrano apart from Jorge Pacheco; correct?
> A. Correct.

Further, at trial she identified Mr. Serrano as the driver, then, moments later, she changed her testimony and chose Mr. Montanez as the driver. This is particularly concerning given that the three defendants all were standing when these "identifications" took place (TT P18) and Mr. Serrano is 5'6" tall whereas Mr. Montanez is 6'3" tall.[26] Mrs. Vargas confused the two men who were standing at the time. Her explanation at trial for her confusion was that Mr. Montanez had gained weight (TT P19):

> THE COURT: All right, now she has indicated a different person Mr. Montanez.
> THE WITNESS: He's heavier now.

In summary, it is relatively clear that Mrs. Vargas had a poor memory of the gas station individuals. When asked specifically about this during her deposition testimony, the following exchange took place (DT P179):

> Q. And you practiced with the prosecutor about which photograph was which Defendant, right?
> A. Yes.
> Q. But you still had trouble at trial telling the Defendants apart from each other, right?
> A. Because the -- the prosecutor was only asking the questions.
> Q. He wasn't telling you what the answers were; right?
> A. No.
> Q. So, when you had to answer the questions on your own without help from anyone, you had a hard time telling -- determining which Defendant was which, right?
> A. Yes.

The effects of a 4-month delay on this witness' memory and ability to make accurate identifications in this case are of concern and should have been a concern for investigators in 1993.

**3. Description "Accuracy"**

With respect to research on witness description accuracy, in Professor Garrett's (2011)[27] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification.

Garrett's finding is consistent with scientific research showing a correlation between the presence of

---

[26] From the Supplemental Report, Mr. Montanez was 6'3" tall and weighed 240 lbs, Mr. Serrano was 5'6" tall and weighed 150 lbs, and Mr. Pacheco was 5'11" tall and weighed 175 lbs.

[27] *Garrett* (n 7)

incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[28]

Of note in this case is that there appears to be *no* description of the driver or passenger that was recorded by Det. Guevara in his Supplemental Report that described his first interview with Mrs. Vargas regarding the gas station on June 2, 1993. Therefore, either Det. Guevara failed to record this information Mrs. Vargas provided or he did not ask for this information. In my experience, it is extremely unusual that detectives would not ask a witness for – even a basic – description of potential suspects in a homicide investigation. In fact, Det. Halvorsen testified during his February 2019 deposition that he would ask witnesses to provide a description of the person they saw, including descriptions of sex, age, height, weight, skin color, any distinguishing marks, clothing, and facial hair. (DT P71) At trial, the entirety of Mrs. Vargas' description of the driver was tall Hispanic. (TT P17) She was not asked to provide any description of the passenger during trial.

In her 2018 deposition, Mrs. Vargas gave a description of the two men that she was able to see in the gas station on February 4, 1993: They were Hispanic men, one was tall (driver) and the taller one may have been losing his hair. The other (passenger) wore hair that was "kind of long" and he was a dark-skinned Hispanic. (DT P47) Unfortunately, it is not possible to know whether her 2018 description was a result of having been exposed to the Plaintiffs in this case on multiple occasions, as there is no "contemporaneous" (i.e., June 1993) description to which it can be compared. However, assuming that her 2018 description – that is notably vague – is consistent with her recollections in June 1993, it raises specific concerns with regard to filler bias in the live lineups (see *Section 6: Lineup Bias*).

Ultimately, Mrs. Vargas selected Mr. Serrano as the passenger from mug-books, a photo array and the live lineup but not from the in-court identification procedure at trial. What is notable here is that Mr. Serrano is not dark-skinned (see Supplemental Police Report describing his skin tone as well as photographs) and thus her 2018 description of the passenger does not match Mr. Serrano. In fact at trial, Mrs. Vargas initially selected Mr. Serrano, who is 5'6" in height, as the tall driver. She then changed her testimony and selected Mr. Montanez, the tallest of the three defendants. (TT P18)

**4. Mug-book Searching**

Mug-book searching is a technique that is sometimes used by law enforcement when they do not yet have a suspect(s) in their investigation. In a mug-book searching procedure, a witness is asked to look through a (large) number of arrest photographs in the hopes that 1) the perpetrator has been arrested before, 2) the perpetrator's photograph is among the photos the witness is shown, and 3) the witness will recognize the perpetrator in the photographs. Therefore, many factors need to be in place in order for a witness to be able to successfully make a correct identification of the actual perpetrator and *not* make an inaccurate identification of an innocent person. The literature on mug-book searching suggests that witnesses often make multiple selections from mug-book searches regardless if the actual perpetrator is present.[29]

---

[28] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[29] E.g., Blunt, & McAllister (2009). Mug shot exposure effects: Does size matter? *Law and Human Behavior, 33,* 175-182; Dysart, Lindsay, Hammond, & Dupuis (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284; Goodsell, Gronlund, & Neuschatz (2015). Investigating mug shot commitment. *Psychology, Crime & Law, 21,* 219-233

There are several concerns with the mug-book searching procedure. First, the task is akin to a large *all-suspect* lineup in that any person a witness chooses could potentially become a suspect in the investigation. As discussed above in *Section V*: *Eyewitness Error Rates in Actual Cases*, nearly one quarter of witnesses who view a 6-person lineup end up choosing an innocent person, so we know that witnesses make identification errors with regularity. Second, the mug-book searching task is rarely the only identification procedure that a witness views. That is, if the witness selects someone from mug-books, it is likely that the witness will be tested again either with a photo array or a live lineup, as was done in this case. Conducting a second procedure with the same suspect is extremely problematic and will be discussed in more detail below in the section on *Repeated Identification Procedures.* But it is worth a quick note here to say that repeated viewings from mug-books can have at least two negative effects on an eyewitness: unconscious transference and commitment. Although the DOJ Guide[30] includes a best practices section on mug-book searching, researchers continue to have concerns with the use of this procedure because of the effects described herein.

In the Supplemental Reports I have received, there is no mention of Mrs. Vargas viewing mug-books, let alone selecting two suspects from these mug-books as she testified in her 2018 deposition. The first description of any identification procedure conducted with Mrs. Vargas in a police report was in a June 1993 Supplemental Report that described how she was shown an 8-person, 3-suspect, black and white photo array from which she allegedly chose Mr. Montanez and Mr. Serrano (Mr. Pacheco was also included (TT P7) but not selected). It appears from other records, however, that Plaintiffs already were potential suspects in this case before Mrs. Vargas was shown any photographs and thus it is unclear why a mug-book searching procedure would have been used at all.

In her 2018 deposition, Mrs. Vargas recalled, with some detail, the process of viewing mug books and was able to describe how the books appeared. From these mug-books, she testified that she selected both the driver and the front passenger (DT P56-57). It is unclear to me why there is no mention of her viewing mug-books nor any mention of her selecting two people from this procedure in any of the police reports I have received and reviewed. If Mrs. Vargas did indeed select Plaintiffs from the mug books (there is no record documenting whom she selected), the effects of viewing and selecting Mr. Montanez and Mr. Serrano from these books on subsequent identification outcomes is described in *Repeated Identification Procedures* below.

**5. Post-event Contamination**

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[31] There are many sources of post-event memory contamination that can affect a witness's memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses, law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Rachel Zajac and Nicola Henderson[32] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that

[30] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). Eyewitness evidence: A guide for law enforcement . United States Department of Justice, Office of Justice Programs. [Hereafter: DOJ Guide].
[31] *National Research Council* (n 3)
[32] Ibid.

the participants believed was another participant in the study. Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

The concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event. In this case, the full scope of post-event contamination with Mrs. Vargas is unknown however because she was presented with repeated identification procedures with the same suspects and told that the suspects were "bad" people who committed robberies, these opportunities, at a minimum, constitute post-event contamination that could have affected her memory for the events she witnessed on February 4, 1993. In addition, Mrs. Vargas was given feedback about her identification of Mr. Montanez's car which also could have contaminated her memory and subsequent testimony.

**6. Lineup Bias**

With respect to the selection of lineup members, a properly constructed lineup includes only **one suspect** (who might or might not be the actual perpetrator) and a minimum of five fillers who are known to law enforcement to be innocent of the crime under investigation. According to scientific psychological research and the United States Department of Justice, it is critical to have only one suspect in each lineup so that law enforcement can assess whether a particular eyewitness is reliable. When an eyewitness makes a false identification of a lineup filler, law enforcement will know that that witness is unreliable.[33]

There are many choices law enforcement need to make when deciding which fillers to select for a lineup including how many should be used, and how similar should they be to the suspect and/or the description the witness provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, especially the suspect.[34]

When it comes to how similar the fillers should be to the suspect, researchers have some preference to use a rule where all of the features included in the witness' description of the perpetrator should be matched[35] (e.g., gender, age, height, weight, etc.) and all fillers should be plausible alternatives for the suspect based on how the suspect looks – but fillers should not be clones.[36] When some of the lineup members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen. Other factors to consider in creating fair lineups is the clothing worn by the suspect – and in particular whether it matches the clothing described by the witness – and whether the backgrounds and images in photographs are of similar size and quality.[37]

[33] An alternative explanation as to why a witness would make a false identification of an innocent filler is that there is a coincidental resemblance between the filler and the actual perpetrator of the crime.

[34] For example, see *National Research Council* (n 3); *Wells, et al.* (n 12); *DOJ Guide* (n 30)

[35] For example, see *Wells et al.* (n 12); Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[36] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

[37] *Wells et al.* (n 12)

If a lineup is supposed to have 6 members, all 6 members should be plausible. These, of course, are subjective decisions and thus law enforcement training on how to fairly select fillers for photos and live lineups is highly recommended.[38] In fact, "Train All Law Enforcement Officers in Eyewitness Identification" is the first of 11 recommendations in the National Research Council Report on eyewitness identification.[39]

In this case, the 8-person black and white photo array that Mrs. Vargas allegedly viewed on June 2, 1993 included three suspects: Mr. Montanez, Mr. Serrano and Mr. Pacheco. Therefore, this photo array procedure violated the recommendation of "one suspect per lineup". Det. Halvorsen testified in his February 2019 deposition that he was familiar with the concept of using 5 fillers in a lineup for every suspect but also testified that this means you could have two suspects and 10 fillers in one identification procedure (DT P72, 74-75). In my experience as an eyewitness expert, I have never before heard a detective describe this kind of procedure as being acceptable, where two different suspects and 10 fillers could be included in a single lineup procedure. Det. Halvorsen also testified that if he had 3 suspects that they would conduct three separate procedures (DT P75) and that he would not conduct a photo array with 3 suspects and 5 fillers (DT P83-84). Yet this is exactly what was done in this case. Despite these responses, when asked whether he thought the photo array used in this case – with 3 suspects and 5 fillers – was fair, he initially responded "back in 1993, yes." (DT P148) Yet later in the same deposition, Det. Halvorsen agreed that was improper and appeared to be wrong. (DT P274)

According to a Supplemental Report, Mrs. Vargas allegedly selected both Plaintiffs from this single 8-person black and white array. Further, it is unclear to me why Det. Guevara and Det. Halvorsen chose to show Mrs. Vargas black and white images, as color photographs of Plaintiffs were in their possession at that time. Because Mrs. Vargas had described different skin tones of the driver and passenger, it would have been helpful for her to view photos that were in color.

Further, although repeated identification procedures with the same suspect and witness are not recommended (see *Section 9* below), Mrs. Vargas viewed at least three identification procedures with the same suspects – Mr. Montanez and Mr. Serrano – prior to trial: the mug-shot searching procedure, the 8-person multiple suspect photo array, and two live lineups. In both live lineups, there are additional biases that could have affected Mrs. Vargas' selection of Plaintiffs in this case. Although Det. Guevara did not obtain a detailed description from Mrs. Vargas of the two people she saw at the gas station 4 months earlier,[40] Mrs. Vargas did ultimately give extremely vague descriptions of two of the Hispanic individuals she was able to see in the tan car:

---

[38] Of note, Det. Halvorsen testified during his February 6, 2019 deposition that he does not remember if he was trained in how to conduct photo arrays. (DT P72)

[39] *National Research Council* (n 3).

[40] At Det. Halvorsen's February 2019 deposition, the following was revealed about obtaining a description of the two men from Mrs. Vargas (DT P354-355):

Q. Don't you want to know how she would describe them before you show her the photo array?
A. No.
Q. Don't you want to test her ability to identify the perpetrators to see if she is describing people who match the description of your suspects?
A. No.
Q. You didn't want to know that?
A. She was -- it's a simple as this. She was shown photos. Either she identifies people or she doesn't. I wasn't testing her mental abilities.

1) Passenger: shorter, long hair, dark skinned
2) Driver: tall, big, thinning hair

The first live lineup Mrs. Vargas viewed was on June 11, 1993. This lineup contained Mr. Serrano as a suspect (position #1) and he was alleged to be the passenger in the tan car in the gas station on February 4, 1993. In this lineup, several of the four fillers[41] can easily be eliminated as not matching the (vague) description provided by Mrs. Vargas. For example, only one other lineup member (#3) could be considered to have dark skin and thus lineup members 2, 4 and 5, who are are light-skinned Hispanics, are easily eliminated. Although the photographs of the Serrano and Montanez live lineups show the lineup members sitting, Mrs. Vargas testified in her deposition that the lineup members were standing (DT P192) and thus any differences in height would have been more apparent than what is depicted in the photographs where they are seated.[42] This is a concern with Mr. Serrano's live lineup because Mrs. Vargas said the passenger was shorter and Mr. Serrano is the shortest person in the lineup: he is at least 5" shorter than the next tallest lineup member (from the Lineup Report):

Serrano: **5'6"**, 150lbs, 22 yo
Filler 2: **6'1"**, 150lbs, 28 yo
Filler 3: **5'11"**, 143lbs, 21 yo
Filler 4: **5'11"**, 145lbs, 20 yo
Filler 5: **6'**, 180lbs, 28 yo

In fact, Det. Halvorsen testified in his February 2019 deposition that he never would have conducted a lineup where a 5'6" suspect was standing next to a bunch of 6' tall fillers and would not do this because it would be "unfair". (DT P83)

The second live lineup Mrs. Vargas viewed was on July 9, 1993. This lineup contained Mr. Montanez as a suspect (position #4) and he was alleged to be the driver of the tan car at the gas station on February 4, 1993.[43] As with the Serrano lineup, many of the lineup fillers can easily be eliminated based on the fact that they do not match the (vague) description provided by Mrs. Vargas: Hispanic, tall, big, thinning hair.[44] In her deposition testimony, Mrs. Vargas also stated that the two men she saw in the tan car at the gas station were wearing dark jackets. An examination of Mr. Montanez's lineup shows that he is the *only* lineup member wearing a jacket (which also happens to have "Jose" written on it)[45] and this jacket is dark in color, as described by Mrs. Vargas in her deposition (DT P106). In addition, Mr. Montanez is the only

[41] Four fillers were used for both the Serrano and Montanez live lineups despite deposition testimony from Det. Halvorsen in February 2019 that he knew in 1993 that the Supreme Court recommended using 5 fillers for live (DT P79) and photo lineups.
[42] Her recollection is consistent with Det. Halvorsen's February 2019 deposition testimony where he stated that lineup members were sometimes seated and sometimes standing. (DT P79).
[43] Unlike Mr. Serrano's lineup sheet, Mr. Montanez's lineup sheet did not include the height or weight information for any of the lineup fillers.
[44] At her deposition, Mrs. Vargas stated that the driver did not get out of the car at the gas station (DT P50). This is a major change from her previous reporting and testimony. She also testified at the deposition that the passenger did not get out of the car either (DT P 50). This is particularly interesting because she did describe the heights of these two individuals, despite testimony from Det. Halvorsen in February 2019 that you cannot tell a person's height when they are seated. (DT P81)
[45] In my professional experience, I have never seen a lineup where the suspect is wearing clothing with his name printed on it. Here, the jacket could easily have been removed, as Mr. Montanez was wearing a shirt underneath. Additionally, I have never seen a lineup where only one member (here a filler) is not wearing a shirt and all other lineup members are wearing clothing on their upper body.

lineup member who has thinning hair. Therefore, fillers 1, 2, 3, and 5 easily can be eliminated from this procedure, leaving only one plausible choice in the lineup – Mr. Montanez.

There was no attempt made to select fillers who were similar to each suspect in appearance or similar to the witness' description because, according to Det. Guevara's trial testimony, the 8-person 3-suspect array was assembled before he had even spoken with Mrs. Vargas regarding her observations the night before her husband was killed (TT P8) and at trial he did not recall asking her to provide physical descriptions before showing her the photo array. (TT P24) Det. Halvorsen testified during his February 2019 deposition that he would ask witnesses to provide a description of the person they saw, including descriptions of sex, age, height, weight, skin color, any distinguishing marks, clothing, and facial hair (DT P71). Further, if a witness was not able to describe the person they saw, he would document that as well (DT P71). Despite these statements, there were no detailed documented descriptions from Mrs. Vargas in June 1993.

**7. Pre-identification Warnings/Instructions**

Failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the photo array (or that their task merely is to find the perpetrator among the set) encourages witnesses to make a selection from the array. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[46] Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with. Further, witnesses should also be told that the person administering the photo array does not know which person is the suspect in the case (i.e., that the photo array is double-blind).

In 1992, prior to the events related to this case, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[47] These best practices also recommend among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array.

In the materials I reviewed, there is no indication that Mrs. Vargas was given any pre-identification warnings prior to viewing the mugbooks, the photo array or the live lineups that the actual perpetrator *may or may not be present* or that the investigation would continue if she did not choose anyone. This is consistent with Det. Halvorsen's February 2019 deposition testimony where he did not recall ever giving a witness the latter instruction. (DT P78) In fact, based on her testimony, it appears Mrs. Vargas was led

---

[46] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions*,* in Cutler (Ed.), *Reform of eyewitness identification procedures* (65–86). American Psychological Association.
[47] *DOJ Guide* (n 30).

to believe that the people from the gas station *were* in the group of photos. For example, at the mug-book searching task (DT P107-8):

Q. Can you tell us what Guevara said to you before you started looking at the books?

A. He asked me that -- he told me that he was going to show me the books to see if I recognize the people that I had seen at the gas station, and when you recognize them, you tell me which ones were the ones you saw.

Q. Did you -- did he tell you what the books contained?

A. He gave me the books to see if I could recognize the people -- recognize the people that were in the books, because the people that were in these books were people that had done something bad.

Q. Did Guevara tell you that the people from the gas station might not be in the books?

A. No, he did not say anything about that.

In his trial testimony, Det. Guevara testified about what he said to Mrs. Vargas before showing her the 8-person 3-suspect array (TT P8):

Q. After the conversation with he r what did you do with the photo array?

A. I took the photo array and placed them in front of her on the table and asked her to look through the photo array to see if she see anybody in that photo array she saw the night before the murder went down.

At the live lineup (DT P76):

Q. He told you to -- he told you to pick out the person that was -- that was at -- in the tan-colored car at the gas station incident on February 3rd, 1993; is that correct?

A. Yes.

Later in her deposition, Mrs. Vargas indicated what Det. Guevara had said to her before she viewed the live lineup (DT P189):

Q. What did Guevara tell you when he told you that he -- that you were going to be asked to view a lineup?

A. I had never been, you know, in that before. Yes, he took me in a room and he told me, you know, we're going to show you the people that -- you know, to see if any of those are the ones you saw in the pictures.

Not only did Mrs. Vargas receive leading pre-identification instructions for the Car identification instruction bias, referring to Guevara (DT P233):

Q. Okay. So, he told you he thought the offender lived in the area?

A. Well, that happens in the area. He says a lot of bad things happen there. It was a bad neighborhood.

Q. And so, he -- he told you that he thought that it was likely that the car was in that area?

A. Probably.

**8. Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator**

Contemporary guidelines (e.g., IACP, 2006), and in some states the law, for conducting identification procedures states that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. We need not assume that a lineup administrator's influence is conscious or deliberate in order to see the value of the "double-blind" procedure. In other words, the influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful

and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[48] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[49] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[50] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 9% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 36% of witnesses chose the innocent suspect.

In this case, Det. Guevara knew that Mr. Montanez and Mr. Serrano were suspects when he conducted the 8-person, 3-suspect black and white photo array with Mrs. Vargas on June 2, 1993. In addition, Det. Guevara and Det. Halvorsen knew that Mr. Montanez and Mr. Serrano were suspects when they conducted the live lineups in June and July 1993. Thus, these identification procedures were conducted with non-blind administrators who could have – intentionally or unintentionally – influenced the results of the procedures. In this case, it is my understanding that the identification procedures were not recorded and thus it is not possible to determine with exact certainty whether any influence – conscious or unconscious – occurred during the identification procedures. However, if double-blind administration had been used in this case, it would have eliminated the possibility of the administering detective(s) having influenced Mrs. Vargas to identify Mr. Montanez and Mr. Serrano.

**9. Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

The concepts of unconscious transference and commitment are relevant to the facts of this case due to the repeated identification procedures conducted with Mrs. Vargas.

---

48 See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

49 Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

50 Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing mugshot photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[51]

If an individual has been identified in one identification procedure, that person is considerably more likely to be identified in a subsequent procedure regardless of whether or not they are the actual perpetrator;[52] this is known as "commitment."[53] Thus, it is possible that Mr. Montanez and Mr. Serrano were identified from the photo array, the live lineup and in court[54] merely because they were previously identified from the mug-books, if indeed Mrs. Vargas selected them from the mug books. According to her 2018 deposition testimony, Mrs. Vargas saw folders with pictures (presumably the photo array) on the same day that she saw the mugbooks. (DT P226) There are other instances in wrongful conviction cases when a victim was ultimately presented with the actual perpetrator who was responsible for the crime and the victim rejected the guilty person, maintaining their incorrect identification (and commitment) of an innocent person.[55]

---

[51] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[52] For a review, see Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289.

[53] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

[54] The inconsistent in-court identifications of the defendants are discussed in other sections of this report.

[55] The wrongful convictions of Ronald Cotton and John Jerome White are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times*, June 8, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole).

It is also important to consider Mrs. Vargas' testimony about what she was trying to do when she viewed the Serrano live lineup (DT P189):

Q. What did Guevara tell you when he told you that he -- that you were going to be asked to view a lineup?
A. I had never been, you know, in that before. Yes, he took me in a room and he told me, you know, we're going to show you the people that -- you know, to see if any of those are the ones you saw in the pictures.

Mrs. Vargas also used the same strategy for the Montanez live lineup (DT P199). This is detailed in her testimony (DT P191):

Q. When you viewed the lineup, were you trying to pick out the person who was in the photograph that you had seen either the day before or two days before in the book?
A. Yes.

She describes this again in her deposition (DT P195):

Q. And -- and what had you said before Guevara asked you if you were sure?
A. Because the day before I had seen the folders with the pictures.
Q. And so you were matching up the person you saw in the photos to the person you saw in the lineup?
A. Correct.

In summary, through her testimony, Mrs. Vargas confirmed that when she was viewing the live lineups with Mr. Serrano and Mr. Montanez she was merely trying to select the people she had chosen from the photographs. Finally, it should be noted that psychologists view in-court identifications – which are very likely to have been preceded by out-of-court identification, as was the case here – as mere theatre and not as independent tests of a witness's memory or ability to identify perpetrators.[56]

**10. Decision Speed**

When a witness makes a quick identification decision from a fair, unbiased double-blind procedure, the speed with which the witness makes their identification is useful information. That is, "quick" identifications from "fair" procedures are more likely to be accurate. With respect to what constitutes a quick identification decision, early research suggested that identifications made within approximately 10 seconds are quite likely to be accurate.[57] Additional research suggests that the time might be extended somewhat[58] but decisions that take longer than this are less likely being made using recognition – instead they are more likely to be made due to comparisons between the lineup members. In other words, slower decisions are more likely to reflect witnesses who are trying to figure out whom to select. But when suggestive identification procedures are used, the speed of the identification no longer becomes a reliable

---

[56] See *Steblay & Dysart* (n 52).
[57] E.g., Dunning, & Perretta (2002). Automaticity and eyewitness accuracy: A 10- to 12-second rule for distinguishing accurate from inaccurate positive identifications. *Journal of Applied Psychology, 87,* 951-962; Sauerland, & Sporer (2009). Fast and confident: Postdicting eyewitness identification accuracy in a field study. *Journal of Experimental Psychology: Applied, 15,* 46–62
[58] E.g., Weber, Brewer, Wells, Semmler, & Keast (2004). Eyewitness identification accuracy and response latency: The unruly 10-12-second rule. *Journal of Experimental Psychology: Applied, 10(3),* 139-147.

indicator of accuracy because biased procedures have been shown to influence decision speed.[59] Identifications that take longer than a minute are more likely than not to be wrong.

Despite the likelihood of biased procedures influencing the speed of Mrs. Vargas' identification decision from the live lineups (see above *Section 6: Lineup Bias*), Mrs. Vargas recalled during her 2018 deposition that it took her five to seven minutes to make her selections of both Mr. Serrano (DT P193) and Mr. Montanez (DT P198) from the live lineups. It should be noted here that this would have been (presumably) the third identification procedure Mrs. Vargas saw that contained Mr. Serrano and Mr. Montanez. Det. Guevara, however, testified at trial that Mrs. Vargas was not hesitant when she made her identifications of Plaintiffs from the live lineup. (TT P13)

**11. Witness Confidence & Post-identification Feedback**

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[60] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory.[61]

But this relationship can be significantly affected by pre- and post-identification factors. Expressions of confidence *at trial*, however, are relatively **meaningless**[62] because confidence is *malleable*, easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[63]

It should be noted here that there is no record in the materials I reviewed that Mrs. Vargas was asked to provide a confidence statement after she selected Mr. Montanez and Mr. Serrano from the mug-book searching procedure or any subsequent identification procedure. There are no references to witness confidence in the police reports I have received. Consistent with this lack of reporting and Det. Halvorsen's February 2019 deposition testimony that he would *sometimes* ask witnesses about their

---

[59] Key, Wetmore, Neuschatz, Gronlund, Cash & Lane (2017). Line-up fairness affects postdictor validity and 'don't know' responses. *Applied Cognitive Psychology, 31,* 59-68.

[60] See, *Wells et al* (n 12); Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[61] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[62] Ibid.

[63] See Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1989; Leippe, Manion, & Romanczyk, 1991; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979; Wells & Murray, 1984

confidence (DT P78), when Mrs. Vargas was questioned at her 2018 deposition about the Serrano live lineup, she indicated that no one asked her about her level of confidence (DT P193):

Q. And after you made your identification, did anyone ask you how confident you were in your identification before telling you whether you picked the suspect or not?
A. No.
Q. And I take it you didn't tell anyone how confident you were?
A. No.

Similarly, according to Mrs. Vargas, no one asked her about her confidence in her decision from the Montanez live lineup on July 11, 1993. (DT P199) Consequently, any statement of confidence she may have given after she made her selections and received post-identification feedback (see following paragraphs) cannot be relied upon as a reliable indicator of accuracy.

**Post-identification Feedback**

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that confidence is easily changed. Confidence malleability is the tendency for an eyewitness to become more (or possibly less) confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[64] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as *post-identification feedback*.

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate. In the first research on this phenomenon, Gary Wells and Amy Bradfield[65] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[66]

In the current case, Mrs. Vargas received post-identification feedback several times, after different identification procedures. For example, she received feedback from Det. Guevara after she allegedly selected Mr. Montanez and Mr. Serrano from the mug-book searching task and the photo array. In her deposition, she testified that she was told the people she had selected had done bad things (DT P108):

Q. Could you tell from looking at the cover of the books or anything inside the books whether the books were members of a particular gang?
A. No, I didn't know anything. I asked him actually, yeah, I asked these people that I had selected, what they had done, and they said that they had done bad things on the street.

And again (DT P109):

---

[64] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.
[65] *Wells & Bradfield* (n 59).
[66] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

Q. And so when you -- you identified that person, what did Guevara or anyone else say at the time that you made that identification?
A. They said that they had robbed somebody in another place, and that they were gang bangers. I don't know what gang.

And again (DT P114):

Q. Did you ask Guevara what that person had done?
A. Yes.
Q. And what did Guevara say?
A. That these persons were in a group with the other people, robbing people.

And again (DT P180-181):

Q. Who was it who told you that the people that you picked out were the ones who killed your husband?
A. The detectives.
Q. Which detectives?
A. Detective Jack and Detective Guevara

In sum, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[67] One of the most effective methods of reducing feedback effects is to eliminate police suggestion/ communications by having an officer who does not know the identity of the suspect conduct the identification procedure (i.e., use a double-blind administrator). This safeguard was not used in this case.

**12. Object Identification (vehicle)**

Although the vast majority of research in the field of eyewitness identification has been conducted using human faces, research on voice and object identification has been conducted by eyewitness researchers for decades. For example, researchers have conducted studies on witness accuracy in identifying voices,[68] body shape and clothing,[69] shoes,[70] shopping bags,[71] as well as vehicles.[72]

---

[67] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect. *Applied Cognitive Psychology, 20,* 859–869.

[68] E.g., Saslove, & Yarmey (1980). Long-term auditory memory: Speaker identification. *Journal of Applied Psychology, 65,* 111-116; Orchard, & Yarmey (1995). The effects of whispers, voice-sample duration, and voice distinctiveness on criminal speaker identification. *Applied Cognitive Psychology, 9(3), 249-260;* Mullennix, Ross, Smith, Kuykendall, Conard, & Barb (2011). Typicality effects on memory for voice: Implications for earwitness testimony. *Applied Cognitive Psychology, 25(1)*, 29-34.

[69] Pryke, Lindsay, Dysart, & Dupuis (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84; Lindsay, Wallbridge, & Drennan (1987). Do the clothes make the man? An exploration of the effect of lineup attire on eyewitness identification accuracy. *Canadian Journal of Behavioural Science, 19, Special Issue: Forensic Psychology,* 463-478; Pozzulo, Dempsey, & Gascoigne (2009). Eyewitness accuracy when making multiple identifications using the elimination line-up. *Psychiatry, Psychology and Law, 16(Suppl 1),* S101-S111).

[70] *Pozzulo et al.* (n 69)

It is my professional opinion, an opinion shared by other eyewitness researchers, that the *principles* that have been tested on the best practices in face lineup identification procedures (e.g., pre-lineup instructions, suspect does not stand out, fillers match the witness's description) are relevant to the identification of non-facial stimuli including voices and inanimate objects (e.g., vehicles). Consistent with this belief is the fact that in the non-facial identification lineup research, the "fillers" typically are selected based on the description and similarity to the target (e.g., car, shirt). This is consistent with how face lineup fillers are selected – based on a similarity to description and appearance.

On June 6, 1993, Mrs. Vargas participated in a car identification procedure where she was driven around and finally taken down the street where Mr. Montanez's car was parked. Det. Guevara was aware that Mr. Montanez's car, which was similar to Mrs. Vargas' description of the tan vehicle she saw at the gas station on February 4, 1993, was at this location. Mrs. Vargas allegedly selected Mr. Montanez's car as the one she saw at the gas station and that may have followed them home the night before her husband was killed.[73] In this car lineup procedure, there is evidence of filler bias (DT P235):

    Q. The -- you testified earlier that you looked at -- you saw five cars before?

    A. Yes.

    Q. And how did -- how were you certain that those were not the cars that were involved?

    A. Because the other ones were different. They were smaller, they were Toyotas. You know, they were smaller, they were little ones. They were older cars. There were different cars, and there were -- some were little trucks.

    Q. So, he showed you some trucks?

    A. Yes, yes, little trucks.

    Q. And they were different colors maybe?

    A. They were all different colors.

    Q. And he showed you some very small cars?

    A. Smaller.

    Q. Okay. And none of those fit the -- fit the description; right?

    A. No.

In addition to filler bias, Mrs. Vargas was given post-identification feedback about her car selection. After Mrs. Vargas told detectives to stop because she saw a tan vehicle and said that it looked like the vehicle she saw at the gas station (4 months earlier), they got out to look more closely at the car. This is when Mrs. Vargas saw that the front of the car was damaged (whereas she did not see damage on the tan car on February 4, 1993) and that there was a bullet hole in the car (that she did not see on February 4, 1993). In her deposition, she first recalled receiving feedback about the bullet hole (DT P65-66):

    Q. Did they tell you that the bullet hole that was in the car that you saw when you were driving around with the officers matched the bullet that killed your husband?

    A. That it looked like it.

    Q. That it looked like it?

    A. Yes.

---

[71] Sauerland, & Sporer (2008). The application of multiple lineups in a field study. *Psychology, Crime & Law, 14,* 549-564.

[72] Allison, Overman, Braun, Campbell, & Price (2014). Recognition and recall of vehicles and manufacturer symbols: Implications for eyewitness vehicle identifications. *Applied Psychology in Criminal Justice, 10,* 83-97; Smith, Mackovichova, Jalava, & Pozzulo (in press). High-similarity forensic-object lineups are superior to forensic-object showups. *Journal of Applied Research in Memory and Cognition.*

[73] As stated earlier, there is inconsistent testimony as to whether the tan car did follow them home.

She then recalled receiving feedback about the damage to the front of the vehicle (DT P121-122):

Q. Did Guevara tell you that the car in Exhibit No. 5 had damage to its front because of the -- as a result of the murder of your husband?
A. Yes.
Q. What did Guevara tell you about how the car pictured in Exhibit 5 got the damage to its front?
A. That they were -- probably when they were running away, that they hit something.

In summary, not only did Det. Guevara provide post-identification feedback to Mrs. Vargas after she chose Mr. Montanez and Mr. Serrano from the mug-books and live lineup, he provided feedback to her after she chose Mr. Montanez's car as well. This type of feedback has been shown to cause changes in witness' recollections of the event and certainly could have contaminated her memory for the events of February 4, 1993.

**SECOND WITNESS: Mr. Timothy Rankins**

If Mr. Rankins' police statement and grand jury testimony are to be believed, then he was an eyewitness to the murder of Mr. Vargas and he may have been familiar with Plaintiffs in this case prior to February 5, 1993. For the purposes of this report, the following paragraphs and Sections 13 and 14 are relevant to this case only if Mr. Rankins was in fact an eyewitness in this case. If it is determined that he was not a witness and his recantation is reliable, then these factors are not relevant to this case.

If he was an eyewitness in this case, Mr. Rankins, like Mrs. Vargas, would have experienced a four-month delay between the alleged witnessed events and his first interview with law enforcement in June 1993. Thus, the variable "delay" discussed in Section 1 above also would be relevant to Mr. Rankins. In my review of the police reports, I did not see any notes related to perpetrator descriptions Mr. Rankins provided and thus the variable "description accuracy" discussed in Section 3 above also would be relevant to Mr. Rankins in particular because he used different nicknames for the individuals than detectives were familiar with (see following paragraph). Therefore, if detectives had asked for descriptions of these individuals that Mr. Rankins was allegedly familiar with, they could have used this information to verify his statement.

After being interviewed by Det. Halvorsen and Det. Guevara, Mr. Rankins was driven past the victim's home allegedly so he could identify for the detectives the location of the shooting. Therefore, the variable "post-event contamination" discussed in Section 5 above also could be relevant to Mr. Rankins. Detectives in this case showed Mr. Rankins a color photo (Polaroid) array that contained 3 suspects. Therefore, the variable "lineup bias" discussed in Section 6 above also would be relevant to Mr. Rankins. I also saw no evidence that Mr. Rankins was given any pre-identification instructions and thus the variable "pre-identification warnings/instructions" discussed in Section 7 above also would be relevant to Mr. Rankins. Further, the lineup procedure was non-blind and thus the "use of a non-blind lineup administrator rather than a double-blind administrator" discussed in Section 8 above also would be relevant to Mr. Rankins. There is no record of how quickly Mr. Rankins allegedly made his identification decisions and there is no record of how confident he was in his identification decisions. Mr. Rankins allegedly identified both Plaintiffs as well as Mr. Pacheco but, according to Det. Halvorsen, Mr. Rankins used "*the wrong*" nicknames (DT P343):

> When he looked at the photos of these three individuals, I told him, I says, you're giving me all the wrong nicknames. And I told him, I says, those aren't the names I know these guys by. Then he corrected himself.

This is a clear example of post-identification feedback that could have contaminated Mr. Rankins' statement and grand jury testimony.

Det. Halvorsen testified at trial that Mr. Rankins also viewed the June 11, 1993 live lineup with Mr. Serrano (TT P96) and selected him as one of the perpetrators. Thus, the variable "repeated identification procedures" discussed in Section 9 above also would be relevant to Mr. Rankins. In addition to these factors, there are other factors relevant to Mr. Rankins that were not relevant to Mrs. Vargas' observations that will be discussed next.

**13. Effects of Distance**

Mr. Rankins signed a police statement wherein he provided a description of his location from where he was allegedly able to see the murder of Mr. Vargas at 1838 N. Springfield at approximately 5:30am on February 5, 1993. In the statement, Mr. Rankins stated that the van he was in was parked on the corner of Springfield and Cortland. It is from this location where he allegedly made his observations. According to measurements taken by investigator Lynn Bagley in February 2019, the distance of Mr. Rankins' observations would have been at a distance between 209 and 247 feet.[74] It is my opinion that an investigation of the crime scene would have made it obvious that a witness would not have been able to see what Mr. Rankins claimed to have seen, including the type of radio being held by the victim, or that the victim was grasping the handle to the van door. In addition to distance, it is important to note that the shooting took place around 5:30am when it was still dark outside (see below). These two factors together would have made it extremely unlikely that Mr. Rankins could have seen what he alleged in his statement.

Research conducted by Geoffrey Loftus and colleagues has shown that distance can significantly impact a person's ability to view details at a distance.[75] In his "distance-as-filtering hypothesis", Loftus explains that as things are viewed at further and further distances, there is less ability to see the details because the image becomes coarser and coarser. By way of example, the image below from Loftus' research recreates the loss of detail when one view's a face from 20 feet (left) to 100 feet (right).

20 feet
100 feet

[74] Mr. Rankins did not specify which corner of Springfield and Cortland the van was parked and thus the measurements from all 4 corners were provided by investigator Bagley.

[75] Loftus & Harley (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12,* 43-65; Harley, Carlsen & Loftus (2004). The 'saw-it-all-along' effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory and Cognition, 30,* 960-968.

In other research related to the ability to identify faces, Willem Wagenaar and Juliette van der Schrier tested witnesses on their ability to recognize a person's face from a range of distances.[76] The results showed that the proportion of correct responses to errors was too great at distances over 49 feet (15m) for an identification to be considered probative. Accordingly, the authors recommended a 15-meter distance cutoff point as a useful "rule of thumb" for courts when assessing reliability. A replication of this study using photos of famous people led to a similar conclusion.[77] Recent research suggests that the effects of distance on accuracy may be even greater in situations where the race of the witness and subject are different,[78] which is relevant in this case because Mr. Rankins is African-American and all of the people he was allegedly viewing are Hispanic.

**14. Effects of Poor Illumination**

If Mr. Rankins' signed statement to police and his Grand Jury testimony are to be believed, he would have made his observations at approximately 5:30am in Chicago on February 5, 1993. At that time of day, it is dark outside. In addition, the photographs I reviewed of the victim's van in relation to the street and sidewalk show no streetlights in close proximity to the van.

Mr. Rankins' statements to police and trial testimony regarding his observations are inconsistent with how vision works. To better understand, it is important to have a basic idea of how visual information gets into the brain.[79] The answer lies in a network of millions of nerve cells. Of particular importance to the visual system are two types of receptor cells in the eye called *rods* and *cones*. Rods and cones absorb information that is eventually transmitted to the brain, telling us what we "see". Critically, rods and cones have different functions. Rods are related to *nighttime* or low-lighting visual conditions – such as the conditions Mr. Rankins would have experienced if he was a witness in this case – and cones are related to daytime or good-lighting conditions. Cones are the primary mechanism for color vision and this is why we see little color by moonlight because there is not enough light to stimulate the cones. We can see shades of light and dark at night because moonlight is intense enough to stimulate the rods. Rods, however, provide a much less sharp image than do cones. That is why objects and people lit by moonlight, although visible, may appear coarse and ill-defined.[80] Therefore, it is extremely unlikely that if Mr. Rankins was present at the street corner, as he testified, that he would be able to perceive the actions and objects that he alleged in his statements and testimony.

**VII. Conclusion**

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be.

---

[76] Wagenaar & van der Schrier (1996). Face recognition as a function of distance and illumination: A practival tool for use in the courtroom. *Psychology, Crime & Law, 2,* 321-332.
[77] De Jong, Wagenaar, Wolters, & Verstijnen (2005). Familiar face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crime & law, 11,* 87-97.
[78] Lampinen, Roush, Erickson, Moore, & Race (2015). The effects of simulated distance on recognition of same race and other race faces. Visual Cognition, 23, 678-698.
[79] For a detailed review of this process, see *National Research Council* (n 3).
[80] Loftus, Doyle, Dysart, & Newirth (forthcoming). Eyewitness testimony: Civil and criminal (6th Edition). LexisNexis.

In this case, there are several estimator and system variable factors that have been shown to negatively affect witness accuracy. These factors include: a limited opportunity to see the individuals alleged to be the perpetrators due to time and distance, the effects of a 4-month delay before any of the relevant events were reported, the lack of description provided by witnesses before identification procedures were conducted, mug-book searching, post-event contamination, lineup filler bias and multiple-suspect procedures, the use of non-blind identification procedures with no pre-lineup warnings that the actual perpetrator may or may not be there, commitment related to repeated identification procedures with the same suspects, Mr. Montanez and Mr. Serrano, and post-identification feedback for both the person lineups and the car identification procedure. In summary, the combination of all of these factors significantly decreased the likelihood that an accurate identification was made by the witnesses in this case. As demonstrated in the DNA exoneration cases described above, the presence of multiple witnesses in a case – who all make the same selection from a photo array – does not conclusively demonstrate that the witnesses were accurate.

**VIII. Supplemental Materials**

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

If called to testify, I would swear to the truth of these facts.

Jennifer Dysart
______________________________
Jennifer Dysart, PhD

## Appendix A

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (dated December 1, 2019)**

**California:**
*George Souliotes,* PC 4900 Claim (May 4, 2016)

**Florida:**
*State of Florida v. Michael Keetley,* Case No. 10-18429 (September 26, 2016)

**Illinois:**
*Jacques Rivera v. Reynaldo Guevera, et al.,* Case No. 1:12-cv-04428 (April 25, 2017)

**Louisiana:**
*Darrin Hill, et al., v. City of New Orleans, et al.,* Case No. 2:13-cv-02463 (December 5, 2016)

**New York:**
*State of New York v. David Everette,* Ind. No. 1383-09 (November 5 & 6, 2015, December 9, 10 & 14, 2015)
*State of New York v. Corey Dunton*, Ind. No. 5068-2013 (January 10 & 11, 2017)
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019)

**Ohio:**
*Dewey Jones v. City of Akron, Ohio, et al.,* Case No. 5:14-cv-02618 (November 16, 2017)
*Roger Dean Gillispie v. The City of Miami Township, et al.,* Case No. 3:13-cv-416 (August 27, 2019)

**Appendix B**

**Academic Curriculum Vitae of Jennifer E. Dysart**

December 2019

**JENNIFER E. DYSART**

**Curriculum Vitae**

University Address:
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street, 10th Floor
New York, NY 10019

*Email:* jdysart@jjay.cuny.edu
*Phone:* 212.484.1160

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology)<br>*Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

**Peer-Reviewed Journal Publications**

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

**Books**

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (forthcoming). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

**Book Chapters**

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92). Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

**Other Publications**

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13). Thousand Oaks, CA: Sage.

**Peer-Reviewed Conference Presentations**

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster to be presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster to be presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention,

Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces

Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, NY, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, Ontario, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, Newfoundland, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Ontario, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, Newfoundland, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, Quebec,

Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, Saskatchewan, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, Prince Edward Island, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program titled "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

**Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences**

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues*' panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, Newfoundland, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, Nova Scotia, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, Saskatchewan, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor Presentations

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

## Invited Law School and University Presentations

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference,

Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

**Invited Non-Profit Presentations**

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

**Supervision of Doctoral Students at John Jay College of Criminal Justice**

2010 John DeCarlo (Criminal Justice Doctoral Student)
Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011 Victoria Lawson (Forensic Psychology Doctoral Student)
Topic: Eyewitness Identification

2006-2009 Anna Rainey (Forensic Psychology Doctoral Student)
Topics: Showups; Cross-race identification

2006-2009 Brian Wallace (Forensic Psychology Doctoral Student)
Topics: Alibi believability; Mug shot searching.

**Supervision of Masters Theses at John Jay College of Criminal Justice**

2018 – present Elena Christofi
Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019 Samantha Kosziollek
Topic: 911 Dispatchers

2016 – 2018 Marisa Jaross
Topic: Composite sketches

2016 – 2017 Brittany Kassis
Topic: 911 Dispatchers

2011 – 2012 Tamara Andrade
Topic: Composite creation in cross-race identifications

2010 – 2011 Jennifer Savion
Topic: Composite creation in cross-race identifications

2009 – 2010 Lindsey Butera
Topic: Eye-tracking and lineup accuracy with biased lineups

Yinglee Wong
Topic: Cross-race description accuracy of hair/hairstyles
Nancy Yang
Topic: Eye-tracking and weapon focus effect

2008 – 2009 Alexander Buijsrogge
Topic: Cross-race composite creation of famous faces
Kristin Chong
Topic: Stranger alibis and identification accuracy
Victoria Lawson
Topic: Cross-race showup and lineup accuracy
Jessica Owens
Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008 Sarah Kopelovich
Topic: Cross-race and Accent effects on identification accuracy
Jason Mandelbaum
Topic: Cross-race effects in mug shot searching

**Supervision of Master's Theses at Southern Connecticut State University**

2005 Lisbeth Fugal
Topic: Post-identification feedback
Anna Rainey
Topic: Cross-race identification and "contact" with other groups

2004 Sandra Soucie
Topic: CSI Effect

**Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University**

2005 Daniel Csuka
Topic: Multiple Independent Identification Accuracy

**Awards and Scholarships**

2017 PSC CUNY research grant ($3,500)

2008 John Jay College Research Assistance Program Grant ($1,000)

2005 Connecticut State University Research Grant ($4,400)

| | |
|---|---|
| 2005 | Junior Faculty Research Fellowship, Southern Connecticut State University (9 credits teaching release time for Fall 2005) |
| 2003-2005 | Social Sciences and Humanities Research Council of Canada (SSHRC) Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined) |
| 2002 | American Psychological Foundation/Council of Graduate Departments of Psychology (APF/COGDOP) Graduate research scholarship ($1,500) |
| 2002 | American Psychology-Law Society Grants-in-Aid award ($650) |
| 2001-2003 | Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually) |
| 2000-2001 | Ontario Graduate Scholarship ($15,000) |
| 1999-2000 | Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900) |
| 1998-1999 | Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300) |

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**

- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**

- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**

- Introduction to Psychology (undergraduate course)

## University Committee Service

| | |
|---|---|
| 2016 – 2019 | Graduate Studies Council, John Jay College of Criminal Justice |
| 2013 – 2016 | College Council Member, John Jay College of Criminal Justice |
| 2013 – 2016 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2013 – 2014 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |

| | |
|---|---|
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – present | Research Advisory Board Member, Innocence Project, New York, NY |
| 2006 – present | Consultant, eyewitness identification expert |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |

| | |
|---|---|
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

## Reviewing (past and current)

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

## Professional Affiliations

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

# Appendix B

## Mock Witness Experiment Materials

Witness Task

September 4, 2018

Please indicate the photograph number that best matches the witness' description provided on the Powerpoint slide by placing an "X" in the corresponding line below.

________ Photograph #2

________ Photograph #3

________ Photograph #4

________ Photograph #5

________ Photograph #6

# Thank you for your time

Your responses to this exercise may be used in an actual wrongful conviction case. Please be as honest as possible.

All responses will be anonymous.

# Instructions

- On the next slide, you will be provided with a witness' description of a perpetrator in an actual case.
- You will also be shown 5 color photographs that were used in the criminal investigation.
  - Note photo #1 is missing from this array.
- Please read the description and then select the person from the photographs that you believe best matches the witness' description.
- Record your answer on the sheet provided.

Black male, approximately 6 feet tall, wearing a dark jacket, ball cap & jeans
#1
#2
#3
#4
#5
#6

# Thank you for your time.

If you have any questions, please contact Dr. Jennifer Dysart at jdysart@jjay.cuny.edu

**Eyewitness Identification Expert Report Prepared by Dr. Jennifer Dysart for attorney Russell Ainsworth in Jacques Rivera v. Reynaldo Guevara, et al. (Case No. 1:12 CV 04428)**

**Report Date: December 21, 2016**

## I. Credentials of Dr. Jennifer Dysart

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to this appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University (Canada), a Master's degree in Psychology from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University (Canada).

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony:*** I have been admitted as an eyewitness expert approximately 60 times in various pre-trial hearings, trials, and post-conviction hearings in California, Connecticut, Delaware, Florida, Illinois, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a jury trial in Federal court in New Jersey. I have never been not qualified as an Eyewitness Identification expert in court.

***Publications:*** I am an author or co-author of over a dozen eyewitness publications including original research articles published in peer reviewed scientific journals and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 5th Edition" published by LexisNexis.

***Presentations:*** I have given more than 100 presentations on eyewitness research before professional psychological organizations and at conferences attended by lawyers, judges, police officers and investigators concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

## II. Materials Reviewed

1. Color photographs of apartment building and surrounding area
2. Color photographs of 6 people involved in Aug 31/Sep 1 identification procedure (polaroid pictures)
3. Color photographs of the live lineup, side and front views of lineup members
4. Color photograph of Jacques Rivera

5. Certificate of Innocence Opinion
6. Handwritten interview notes with Orlando Lopez
7. Felony Minute Sheet
8. Supplementary Report: Interview with Orlando Lopez
9. Supplementary Report: Gang photo books ID
10. Arrest Report for Jacques Rivera 8-30-88
11. Supplementary Report: Unable to locate Lopez
12. Release of Person in Custody form
13. Arrest Report for Jacques Rivera 9-15-88
14. Supplementary Report: Investigation cleared by arrest
15. Document titled "All Arrest Reports"
16. 1990 Trial testimony of Orlando Lopez
17. 2011 Post-conviction testimony of Orlando Lopez
18. 2013 Deposition testimony of Orlando Lopez
19. 1990 Trial testimony of Reynaldo Guevara
20. 2013 Deposition testimony of Reynaldo Guevara
21. 1990 Trial testimony of Craig Letrich
22. 2011 Post-conviction testimony of Gillian McLaughlin
23. Selected pages of 2013 Deposition testimony of Gillian McLaughlin (5-24-13)
24. Selected pages of 2013 Deposition testimony of John Leonard (5-29-13, 12-20-13)
25. Jacques Rivera v. Reynaldo Guevera, et al. Complaint
26. Police reports Wron 0001-64

**III. Basis for testimony in the present case.**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to Jacques Rivera v. Reynaldo Guevara, et al., I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables").

The distinction between system and estimator variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading expert on eyewitness identification research. Over the past 35 years, a substantial amount of research on both system and estimator variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

Independently, system and estimator variables have been shown to influence the likelihood of an accurate identification decision. That is, even when best practices are used by law enforcement, eyewitness errors are not necessarily eliminated. This is because estimator variables - the circumstances surrounding the crime and the witness' ability to perceive – also influence accuracy.

The estimator and system variables relevant to this case include:

**Estimator Variables:**
1. Effects of brief/limited exposure on eyewitness accuracy;
2. Effects of weapon presence;
3. Effects of stress/arousal;
4. Eyewitness description accuracy;
5. Effects of witness age on accuracy;

**System Variables:**
6. Mug-shot searching;
7. Filler bias;
8. Pre-identification instruction bias;
9. Use of non-blind simultaneous lineup rather than a double-blind sequential lineup;
10. Witness confidence and accuracy;
11. The post-identification feedback effect;
12. Repeated identification procedures and Commitment effects; and
13. Non-identifications of the suspect;

**IV. Brief Summary of Relevant Facts**

Based on my review of the materials listed above, I summarize the facts relevant to the eyewitness evidence in the above referenced case:

On August 27, 1988, Mr. Felix Valentin was shot multiple times - by a single shooter - and later died as a result of his injuries. There was one witness to the shooting, 12-year old Orlando Lopez. On the day of the shooting, Lopez provided a description of the shooter to law enforcement and this description included his belief that the shooter was a member of the Latin Kings. Lopez was asked to look through “mug-books” of Latin King gang members to see if he recognized anyone and Lopez selected a photograph of the Plaintiff, Jacques Rivera, believing at the time that the photograph resembled the shooter. According to Lopez, he subsequently was asked to view a live lineup that contained Plaintiff and Jose Rodriguez – another suspect in the case who had been identified by the victim who, on the day of the shooting, was asked to view Imperial Gangster gang mug-books in the hospital. Lopez has testified that, from the live lineup, he selected the person he believed was the shooter, whom he claimed was Plaintiff Jacques Rivera. I note, however, that Jacques Rivera was released from custody following a line-up in which he stood. At a time following this identification procedure, Lopez saw a man in his neighborhood whom he believed was the shooter, who was not Jacques Rivera. After this sighting, Lopez was asked to view another lineup containing Plaintiff and he identified Plaintiff. Lopez testified (in 2011) that he told law enforcement at this second lineup that he had seen the actual shooter in his neighborhood, who was not Jacques Rivera, but law enforcement told him not to worry and continued with their case with Plaintiff as their suspect. Lopez testified at Plaintiff’s bench trial in 1990 and again identified Plaintiff at trial despite his testimony post-conviction that he knew Plaintiff was not the shooter when he testified in 1990.

## V. Background on Eyewitness Research

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex (see review and report on eyewitness identification by NAS, 2014). Most theoretical analyses of the memory process divide it into three major stages. First, an event is perceived by a witness and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. Psychologists who conduct research in this area try to identify and study the important factors that play a role in each of the three stages.

Numerous factors at each stage affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: lighting conditions, duration of an event, stress/fear, and length of the retention interval. As it relates to law enforcement, research has shown that the procedures and practices police use during the third (retrieval) stage of the memory process can influence the reliability of an eyewitness identification and the witness' subsequent testimony. Examples of police procedures that can affect the accuracy of an identification include pre-lineup/photoarray[1] instructions, type of lineup/photoarray administered (simultaneous or sequential), whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness after their identification decision.

### 1. Research Methodologies Used in Eyewitness Research

In general, eyewitness identification researchers employ several techniques to come to the scientific conclusions that will be discussed in this report. The three most common research techniques are laboratory research, archival research and meta-analyses.

The most common form of eyewitness identification research is experimental laboratory research. The primary reason for conducting experimental research is that it gives researchers the ability to make cause and effect statements, such as "Y happened *because* of X." For example, a well-conducted experiment can tell us that using a specific identification procedure will cause an improvement in identification accuracy.

Archival research involves the examination of existing records or data from actual cases. This type of research is important for understanding how witnesses in actual cases behave. For example, archival studies have demonstrated that approximately 20% of witnesses in real cases who are shown a lineup select a lineup filler or stand-in, rather than the real perpetrator. Thus, these records show us that nearly one in five eyewitnesses makes an identification error by selecting a known innocent person. These results are consistent with results from laboratory studies, which have found very similar rates of erroneous filler selection. The study of DNA exonerations in the United States, discussed below, is an example of archival research.

A third research technique that psychologists and other researchers employ is the meta-analysis. Generally, a meta-analysis is a statistical summary of research that has already been conducted, as opposed to the collection of new data with participants in a new experiment. Although the

[1] The terms "lineup" and "photoarray" are used interchangeably in this report.

specific procedures employed by researchers in one meta-analysis may differ from those used in another meta-analysis, there are common elements to all meta-analyses. A benefit of using the meta-analysis technique is that it informs the researcher about eyewitness performance over the course of a large number of studies, from many researchers and from different laboratories (and perhaps from many different countries around the world).

**2. Eyewitness Error Rates in Actual Cases**

I begin by noting, briefly, some important facts about eyewitness errors. According to the Innocence Project, there have been mistaken eyewitness identifications in close to **75% of DNA exonerations** – which currently number **347**. *See* www.innocenceproject.org.

Brandon L. Garrett (2011), a law professor at the University of Virginia, systematically examined the first 250 DNA exoneration cases in the United States and found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases. In a quarter of all wrongful convictions studied, eyewitness testimony was the only direct evidence against the defendant. Further, in the 190 cases where there was an erroneous eyewitness identification of the defendant, 36% included mistaken identification from more than one eyewitness. In fact, some of the cases had as many as five eyewitnesses who mistakenly testified that the defendant was the perpetrator.

**3. Eyewitness Error Rates in Archival Studies**

Archival studies also show that eyewitness identifications can be unreliable. Researchers have begun to analyze records of actual eyewitness identifications and attempted identifications. Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct, but it is possible to determine error rates as reflected in the false identification of non-suspect fillers. Ruth Horry and colleagues discuss additional concerns about archival studies in a recent paper in 2014.[2]

A properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers (who are known to be innocent). According to scientific psychological research and the National Institute of Justice, it is critical to have only one suspect in each lineup so that law enforcement can assess whether a particular eyewitness is reliable. When an eyewitness identifies a lineup filler, police will know that that witness is unreliable. If all of the lineup members were potential suspects, it would be impossible for police to determine if an eyewitness has recognized the perpetrator or merely is guessing – as any identification would be categorized as a "positive ID". This is particularly important when one considers the findings from field studies with real witnesses presented below. While false identifications of innocent fillers do not necessarily send innocent people to jail, these still constitute identification errors and provide useful information about the accuracy of eyewitness identifications and the reliability of lineup procedures.

[2] Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94-108.

In a 2006 paper, Drs. Gary Wells, Amina Memon and Steven Penrod summarized the findings of four studies of actual eyewitnesses to serious crimes:

- Wright and McDaid (1996) analyzed 1,561 lineup outcomes in London and found filler-identification rates of 19.9%.
- These data are similar to the 21% filler identification rate reported by Slater (1994) in a study of 843 lineups conducted by the Metropolitan Police in London.
- Behrman and Davey (2001) reported that 24% of identifications from live lineups in Sacramento, California, were identifications of fillers.
- Valentine, Pickering, and Darling (2003) analyzed 119 lineups in the greater London area and found that 21.6% of the eyewitnesses identified fillers.

Wells, et al., underscored that these archival results are "a very important complement to the experimental studies of eyewitnesses" because they find filler identification results that are quite consistent with rates obtained in experiments (e.g., Ebbeson & Flowe, n.d.; Steblay, Dysart, Fulero, & Lindsay, 2001), and they address a common criticism of experiments—namely, that participant witnesses in experiments are not as cautious as actual crime witnesses are, because the consequences of a mistaken identification in an experiment are not serious,

**VI. Proposed Testimony in Current Case**

The following eyewitness factors have been identified as being relevant to the facts of the current case involving the identification of Mr. Rivera by Orlando Lopez:

1. Effects of brief/limited exposure on eyewitness accuracy;
2. Effects of weapon presence;
3. Effects of stress/arousal;
4. Eyewitness description accuracy;
5. Effects of witness age on accuracy;
6. Mug-shot searching;
7. Filler bias;
8. Pre-identification instruction bias;
9. Use of non-blind simultaneous lineup rather than a double-blind sequential lineup;
10. Witness confidence and accuracy;
11. The post-identification feedback effect;
12. Repeated identification procedures and Commitment effects; and
13. Non-identifications of the suspect;

**1. Effects of brief/limited exposure on eyewitness accuracy**

In 1990, Orlando Lopez indicated that he saw the shooter's face briefly after the shooting was finished and the shooter was going back to the "getaway" car. It appears that this exposure was limited and that, before this, during the actual shooting, Lopez was only able to see the shooter

from behind. Lopez also testified at Rivera's bench trial that he believed the shooter was someone he had previously seen playing baseball at a specific park in the neighborhood. Plaintiff has testified that he did not play baseball at that park.

Common sense might suggest that even a brief opportunity to view someone allows us to form a mental snapshot of someone, but research shows that the amount of time that a witness views a perpetrator is positively associated with the witness's ability to subsequently identify him. Further, what is critical with respect to accuracy is the witness' opportunity to see the perpetrator(s) *at the time of the event*.

In their 1986 meta-analysis, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy. Since this meta-analysis, others (e.g., Bornstein, Deffenbacher, Penrod, McGorty, & Kiernan, 2012; Memon, Hope & Bull, 2003) have replicated the positive correlation between exposure time and identification accuracy.

The Memon, Hope and Bull (2003) study involved showing witnesses a video of a realistic crime which lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and seven seconds (with the perpetrator's face in view for 12s). Witnesses' abilities to recognized the perpetrator were tested with target-present and target-absent arrays 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections in target-absent arrays increased substantially when exposure time increased. (Note, however, that mistaken identifications in target-absent arrays remained relatively high regardless of the exposure time.)

*Accuracy of Young Adults (ages 17-25) in the 12s and 45s Exposure Groups with Target-Present an Target-Absent Lineups*

| | **12 Seconds Exposure** | | | **45 Seconds Exposure** | | |
|---|---|---|---|---|---|---|
| | Hits | False Alarm | Non-Choice | Hits | False Alarm | Non-Choice |
| Target Present | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Target Absent | N/A | **90%** | 10% | N/A | **41%** | 59% |

*Note.* Identification **Errors** are bolded

The results of the Memon et al. study above show that in circumstances where young adults viewed the perpetrator's face for 45 seconds, approximately 40% of all witness made a mistake and misidentified an innocent person from a lineup in which the actual perpetrator was not shown. When the exposure time was reduced to 12 seconds, the false identification of innocent people increased to 90%. Further, the ability of witnesses to correctly identify the actual perpetrator when he was shown dropped by 66% when the exposure time was reduced from 45 seconds to 12 seconds.

Moreover, it should be underscored that many factors that have been shown to decrease eyewitness identification performance were not present in the Memon et al. study (for example, stress). In essence, other than the short exposure, the other witnessing conditions in this study were relatively ideal in terms of making a correct identification decision.

**2. Weapon focus effect**

Orlando Lopez indicated that he saw a gun in the shooter's hand during the shooting and therefore spent some (unknown) amount of time looking at the weapon.

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect". As the witness focuses on the weapon, his ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was reviewed in a meta-analysis published by Steblay in 1992. The review included 19 studies with a total sample of 2082 participants. The weapon focus effect was statistically significant and demonstrated impairment of identification accuracy. A recent meta-analysis confirms the findings of the Steblay 1992 report (Fawcett et al., 2012). In summary, although it can certainly be true that a victim pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person wielding the weapon and reduces eyewitness accuracy, especially when the opportunity to see the perpetrator is short or limited, for example due to concealment of the face or a short amount of exposure to the perpetrator.

**3. The effects of stress/arousal on memory**

Being a witness to a shooting and murder is commonly considered to be a stressful or arousing experience. In addition, Orlando Lopez testified that he ran (to the store and back) when he saw the shooting, potentially causing further increases in arousal.

In their research, Deffenbacher, Bornstein, Penrod, and McGorty (2005) published a meta-analysis on the effects of stress/arousal on eyewitness performance. This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities. Researchers have also found that physical exertion, such as running, can cause increases in arousal and result in impaired identification abilities (Hope, Lewinski, Dixon, Blocksidge, Gabbert, 2012).

**4. Eyewitness description accuracy**

Orlando Lopez initially provided law enforcement with a brief description of the shooter. Assuming the description of the shooter that appears at the police report numbered Wron 0053 is

from Orlando Lopez, Lopez reported that the shooter was "18 yo, Kings, has seen before, black jacket, dark pants, gym shoes." Initially, there was no mention of hairstyle, in particular no mention of a ponytail or long hair worn by the shooter. At a later point in time, Lopez added that the shooter had blonde hair on top and darker hair at the back, however this added detail was after he had been shown mugbooks and selected a photograph of Plaintiff. Therefore, it is possible that the hair length feature provided by Lopez was merely consistent with the photograph he chose. There is no evidence that Plaintiff had blond hair – either on the top or back – in 1988 or any time near the shooting.

In Garrett's (2011) study of the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. This finding is consistent with scientific research showing that there is a correlation between the presence of incorrect descriptors and inaccurate identifications in that as the number of incorrect descriptors of a suspect increases, identification accuracy decreases (Meissner et al., 2008).

**5. Effects of witness age on accuracy**

At the time of the shooting and the identification of Plaintiff, the lone eyewitness, Orlando Lopez, was 12 years old.

An extensive literature review on child witnesses is beyond the scope of this report however it should be noted that it is well documented and widely accepted in the field of psychology that child witnesses, including 12 year olds, are more susceptible to suggestion and influence than are adult witnesses resulting in young witnesses being, overall, less reliable than adult witnesses (e.g., Poole, Brubacher, & Dickinson, 2015; Pozzulo, 2007). Therefore, caution should have been taken with Lopez during the investigation to make certain that no unnecessary influence had taken place. Further, there appeared to be little appreciation of the fact that Lopez was a child and should have been treated differently than a typical adult witness. For example, detectives contacted Lopez's mother at 11:00pm on August 30th, 1988 asking if Lopez could come to the police station to view a live lineup. This late hour should be unusual for any witness, let alone a 12 year old child.

**6. Mug-shot searching**

Orlando Lopez told detectives that he believed the shooter was a Latin King. Subsequently, police officers reported that, on August 29, 1988, they showed at least 2 "gang books" to Lopez. These books contained arrest photographs of individuals who were associated with the Latin Kings. According to the police officers, Plaintiff's photograph was included in these books and Lopez selected a photograph of Plaintiff and indicated that he looked like the shooter. Near the same time, detectives had spoken with the victim at the hospital who indicated that he believed the shooter was affiliated with the Imperial Gangsters gang. Detectives subsequently brought Imperial Gangsters mugbooks to the hospital for the victim to view and, from the materials I reviewed, it appears that the victim identified Jose Rodriguez (as the shooter) and Felipe Nieves (as the getaway driver) from the Imperial Gangsters mugbooks.

Mugbook searching is a technique that is sometimes used by law enforcement when they do not have a particular suspect in an investigation. The literature on mugshot searching, however, indicates that it is a very risky procedure because mugbooks are, in effect, large lineups in which all individuals are potential suspects. As described above, identification procedures should contain one suspect so that law enforcement can gauge whether or not a witness is reliable or merely guessing when they make a selection. The literature also shows that there are negative effects of viewing mugbooks in that it can cause commitment and unconscious transference effects (described in more detail in section 12 below; see Deffenbacher, et al., 2006).

**7. Filler bias**

Orlando Lopez provided a description of the shooter to law enforcement (see section 4 above). Of note for the lineup(s) he viewed, at some point Lopez described the shooter as having long hair in the back that could be in a ponytail. A review of the color photo of the live lineup that was shown to Lopez on September 15, 1988 shows that only 2 of the 5 individuals had long hair in the back that could reasonably be put in a ponytail. Therefore, only 2 of the 5 fillers matched the witness' description. Further, a review of the Polaroid pictures of the lineup members that were assemble for the Aug 31/Sep 1 lineup also show, in my opinion, only 2 fillers with hair long enough that it could reasonably be styled in a ponytail.

The scientific research on filler selection and filler bias shows this factor has a significant impact on the reliability of the identification outcome. Researchers use the term "functional size" (Lindsay & Wells, 1980) to refer to the number of viable lineup members, or the number of lineup members who plausibly match the eyewitness's description of the crime perpetrator. Having other lineup members who resemble the perpetrator in physical appearance and the witness' description affects suggestion by protecting the suspect from the eyewitness's tendency to make relative judgment comparison and merely choosing the person who most closely resembles their description. For example, if an eyewitness had a poor memory for the crime perpetrator but remembered some general characteristics, such as the perpetrator's hair, then having other lineup members with similar hair safeguards the suspect from identification by deduction. The quality and the number of fillers in an array clearly influence the fairness of the array--as reflected in the tendency for witnesses to make identifications, particularly false identifications.

It appears that these best practices for selecting fillers, including choosing fillers who match the witness' description, was not followed in this case. The deposition testimony of John Leonard seems to explain how this could have occurred. During the deposition of John Leonard (Deposition, 5-17-13), he was asked how the officers who went out to select the fillers (for the Aug 31/Sep 1 lineup they were putting together) knew what physical description they were looking for. Leonard's response was "I guess they know. I didn't tell them what to get." (Line 3, Page 96).

In addition, there appear to be two suspects - Jacques Rivera and Jose Rodriguez - in the first lineup procedure that law enforcement attempted to show Mr. Valentin while he was in the hospital. It is possible that Lopez also viewed the members of the lineup at a live procedure. In

fact, Gillian McLaughlin testified in 2013 that it would have been the proper procedure – to put two suspects in one lineup – if you had two suspects that had previously been identified. She went on further to testify that she believes "all possible suspects should have been in that lineup" (p.103 of 2013 transcripts). Having two suspects in a single procedure, as discussed in section V.3. above, is a serious departure from best practices and should never be done.

**8. Pre-identification instruction bias**

There is no evidence in the materials I reviewed that Orlando Lopez was informed, prior to viewing the mug-books or lineups, that the actual perpetrator "may or may not be present" in the procedures. In fact, he testified at Plaintiff's trial that the purpose of going to see the lineup was "to pick out who did it" (Line 20, page 24).

Informing the witness that the police have a suspect or failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the photo array (or that their task merely is to find the perpetrator among the set) encourages witnesses to make a selection from the array. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array and that they should not feel compelled to make an identification. This pre-lineup instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present. Further, witnesses should also be told that the person administering the photo array does not know which person is the suspect in the case (i.e., that the photo array is double-blind).

In 1999, the National Institute of Justice (DOJ) issued a report entitled *Eyewitness Evidence: A Guide for Law Enforcement* that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence. These best practices recommend among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array.

The instruction bias research was reviewed by Steblay in a 1997 meta-analysis in which she cumulated the results of 22 different experimental studies of the effects of biased instructions involving nearly 2600 witness-participants. She found that biased instructions were particularly harmful in target-absent lineups in which witness accuracy declined from 60% (unbiased lineups) to 35% (biased lineups). Strikingly, the magnitude of the biasing effect was just as large when witnesses were simply not given a "don't know" or "not present" option as it was when instructions also included some pressure to make a selection.

**9. Use of non-blind simultaneous lineup rather than a double-blind sequential lineup**

The detectives who conducted the simultaneous lineups in this case were aware that Plaintiff was the suspect – or one of the suspects - in the simultaneous procedure. In addition, it is clear from my review of the materials that the detectives who attempted to conduct a photo lineup with Mr.

Valentin in the hospital were familiar with and sometimes used sequential lineups, as they attempted to show Mr. Valentin a sequential (non-blind) lineup while he lay in his hospital bed.

More than twenty-five years of research indicates that sequential lineups – when compared to simultaneous lineups – can cut the rate of false identifications of innocent people in half. In simultaneous lineups (live and photographic), the suspect and fillers are presented at the same time and the eyewitness identifies which (if any) is the perpetrator. Scientific research demonstrates that sequential lineups, in which a witness views the suspect and fillers one at a time and makes a judgment about each face as it is presented, results in fewer mistaken identifications compared to simultaneous procedures. The dominant explanation for this difference is that witnesses who view simultaneous lineups are more likely to engage in a relative judgment process and choose the lineup member who most closely resembles their memory for the perpetrator. Witnesses who view the images one-at-a-time are less able to engage in this relative or comparison process and therefore are more likely to make an identification based on their memory, rather than a combination of their memory and choosing the person who is the best answer of those presented.

In 2001, Steblay, Dysart, Fulero, and Lindsay published a simultaneous/sequential meta-analysis examining 30 comparisons of sequential and simultaneous procedures involving the responses from over 4,000 research participants. The results showed that witnesses were nearly half as likely to make a false identification from a target-absent sequential array (28% mistaken identifications) than from simultaneous arrays (51% mistaken identifications). In 2011, Steblay, Dysart and Wells updated the 2001 meta-analysis and looked at 70 comparisons and the responses from over 10,000 participants. The pattern of findings in 2011 was almost identical to those reported in 2001.

A recent field study on eyewitness identification procedures using real witnesses and real identification decisions in ongoing criminal investigations (Wells, Steblay, & Dysart, 2011) also found that sequential lineups produce fewer mistaken identifications than simultaneous lineups. It should be noted that all of the lineups conducted in this study were done in a double-blind manner, where the administering officer does not know which lineup member is the suspect and which the fillers (see section on non-blind lineup administration). The study also found that double-blind sequential lineups (compared to double-blind simultaneous lineups) as administered by police departments across the country resulted in the same number of suspect identifications (27.3% for sequential and 25.5% for simultaneous) and fewer known-innocent filler identifications (12.2% for sequential and 18.1% for simultaneous). Thus, the results of the laboratory research were replicated in real criminal investigations.

One of the results from the field study was that witnesses in these real criminal cases who made positive identifications ("yes, that is the person I saw commit the crime") from a simultaneous photoarray made an identification error and chose a lineup filler 42% of the time. That is, 4 out of every 10 positive identifications that were obtained from double-blind simultaneous lineups were mistaken identifications of innocent people (see Figure below). Even with the double-blind sequential procedure, 3 of every 10 identifications were of an innocent filler. Thus, even when the best identification procedures are used, identification procedures are not entirely eliminated

and witnesses can still be unreliable (most likely due to the effects of estimators on eyewitness accuracy).

Contemporary guidelines (e.g., IACP), and in some states (e.g., CT, NC, TX) the law, for conducting identification procedures states that the police officer conducting the proceedings should not know who the suspect is—this completely eliminates the possibility that the officer can influence the witness to pick the suspect. We need not assume that a lineup administrator's influence is conscious or deliberate in order to see the value of the "double-blind" procedure. In other words, the influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect. We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person (Luus & Wells, 1994; Wells & Bradfield, 1998).

In this particular case, I have not been provided with a video recording of the identification procedures and thus it is not possible to determine with exact certainty whether any influence – conscious or unconscious - occurred during the identifications. However, if double-blind administration had been used in this case, it would have eliminated the possibility of the administering detective having influenced the witness – again, either consciously or unconsciously – to identify Plaintiff.

**10. Witness confidence and accuracy**

In the materials I reviewed in preparation of this report, I found no contemporaneous recording of Orlando Lopez's level of confidence in his selection of Plaintiff from the mug-books or from the non-blind simultaneous lineup.

Decades of research now show that there is a moderate relationship between the accuracy of an eyewitness' positive identification and his confidence in that identification, and that this relationship can be significantly affected by pre- and post-identification factors.

Unfortunately, the problems relating to witness confidence in the accuracy of their identifications and the actual accuracy of those identifications are manifold. Some of these problems relate to jurors' reliance on witness confidence as a guide to witness accuracy and some relate to the tenuous association between confidence and accuracy at trial. In addition witness confidence can be strongly influenced by suggestive procedures and post-identification factors such as repeated questioning, briefings in anticipation of cross examination, and feedback to the witness. The most useful expression of confidence is one made at the time the *initial unbiased/non-suggestive* identification procedure. Research demonstrates that jurors have difficulty reliably differentiating accurate from inaccurate eyewitnesses, and are not adequately sensitive to aspects of witnessing and identification conditions that affect witness performance.

Another important consideration in the area of confidence is *confidence malleability*, which refers to the tendency for an eyewitness to become more (or less) confident in his or her identification as a function of events that occur after the identification decision. Confidence malleability is particularly important because actors in the legal system can contaminate the confidence of an eyewitness in ways that can make an eyewitness's in-court expression of confidence a meaningless indicator of the eyewitness's memory. An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the culprit are the same person. An eyewitness's belief that the identified person is the culprit can arise out of pure memory judgments, i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit (Leippe, 1980; Wells, Ferguson, & Lindsay, 1981). But, significantly, an eyewitness may believe that the identified person is the culprit for reasons other than the eyewitness's memory (Leippe, 1980; Wells, Ferguson, & Lindsay, 1981; Luus & Wells, 1994; Wells & Bradfield, 1998). For example Hastie, Landsman, & Loftus (1978), in an early demonstration of confidence malleability, found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports (see also Shaw, 1996; Shaw & McClure, 1996; Turtle & Yuille, 1994).

Similarly, Wells, Ferguson, and Lindsay (1981) demonstrated they could increase witness confidence simply by briefing witnesses about the types of questions they might encounter in an upcoming cross-examination. When cross-examined, the briefed witnesses (who were no more accurate than the un-briefed witnesses) were significantly more confident about their identifications (than were un-briefed witnesses) and were believed more often by the jurors. Unfortunately, the briefing effect occurred among inaccurate eyewitnesses, whose levels of confidence rose dramatically, whereas confidence levels among accurate witnesses were unchanged.

**11. Post-identification feedback effect and confidence**

Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). In this case, Lopez testified in his deposition that officers told him that he had done his job and that everything was going to be okay.

In their research, Wells and Bradfield (1998) found that eyewitnesses who received confirming feedback ("Good, you identified the suspect") were not only much more confident than the witnesses with no feedback and witnesses with disconfirming feedback - the confirming feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times in research labs and also with real witnesses in real ongoing criminal investigations (Wright & Skagerberg, 2007). The most effective method of eliminating police suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure (i.e., a double-blind administrator; Kovera & Greathouse, 2009).

One of the explanations that have been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance (Charman, et al., 2010; Festinger, 1956; Festinger & Carlsmith, 1959). In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Dean was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Dean was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Dean was innocent and was not the man who had raped her in 1994.

**12. Repeated identification procedures and Commitment effects**

Orlando Lopez viewed and selected Plaintiff's photograph from one of the gang mugbooks that he was shown by law enforcement. He contends he was then presented with two live lineups in which Plaintiff was present and Lopez again chose Plaintiff from the lineup. After the lineup identification, Lopez was shown photographs of Jose Rodriguez and Felipe Nieves and Lopez indicated that he did not recognize those two men. It should be noted that this identification procedure – showing two individual photographs of additional suspects – occurred after Lopez had already identified Plaintiff.

If an individual has been identified in one identification procedure, he is considerably more likely to be identified in a subsequent procedure regardless of whether or not he is the actual perpetrator (Behrman & Vayder, 1994; Brigham & Cairns, 1988; Deffenbacher et al., 2006; Dysart, Lindsay, Hammond, & Dupuis, 2001; Gorenstein & Ellsworth, 1980; Haw et al., 2007; Steblay & Dysart, 2016); this is known as "commitment". Identification of an individual from a

mugshot (Brigham & Cairns, 1988; Deffenbacher et al., 2006; Dysart et al., 2001; Gorenstein & Ellsworth, 1980), as well as from a showup (Behrman & Vayder, 1994; Godfrey & Clark, 2010; Haw et al., 2007), has been found to increase the probability that witnesses will make a positive identification of the individual selected from a subsequent lineup. Thus, the question remains as to whether Orlando Lopez identified Plaintiff from the lineup because he had selected Plaintiff's photograph from the mug-book search, in addition to other potential influences. Further, any in-court identification made by Lopez also could have been a result of commitment rather than recognition of Plaintiff. In fact, Lopez's post-conviction and deposition testimony confirms that he did not identify Plaintiff at trial because he had recognized him from the shooting.

**13. Non-identifications of the suspect**

In this case, it remains disputed whether Lopez viewed one or two live lineups containing Plaintiff. If Lopez did view a lineup containing Plaintiff on Aug 31/Sep 1, 1988, evidence would support the conclusion that he did not positively identify Plaintiff because Plaintiff, according to his testimony and police records, was released by law enforcement following the identification procedure. In my experience, if Plaintiff had been identified by Lopez at this lineup, he would not have been released.

Lopez's failure to identify Plaintiff at this lineup is indicative of Plaintiff's innocence. Research shows that an eyewitness's non-identification of a suspect is a reliable indicator of the suspect's innocence. In a 2007 meta-analysis of 94 eyewitness identification experiments by Clark, Howell, and Davey, eyewitnesses gave non-identification responses far more often in target-absent lineups (.52 probability) than in target-present lineups (.33 probability). Thus, Lopez's failure to identify Plaintiff in this first live lineup a few days after the shooting should have been an important factor to consider in the investigation.

## VII. Summary

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness' memory, the reliability of the identification and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be.

In this particular case, there exist several factors that have been shown to affect witness accuracy: the brief opportunity the witness - a 12 year old child - had to see the perpetrator, the fact that a weapon was used and viewed by the witness, the effects of stress/arousal, the use of mugbooks in trying to locate a suspect, the selection of lineup fillers that did not match the witness' description of the shooter, a non-blind simultaneous lineup with no pre-lineup warning that the actual perpetrator may or may not be there, the possibility of commitment effects for the identification of Plaintiff from the mugbooks to the lineup. In summary, the combination all these factors significantly decreased the likelihood that an accurate identification could have been made by the lone witness, who happened to be a child, in this case.

**VIII. Supplemental Reports**

If additional materials are received in reference to this case, I reserve the right to supplement this report in the future.

If called to testify, I would swear to the truth of these facts.

Jennifer Dysart

Jennifer Dysart, PhD

**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
***Thomas Sierra v. Reynaldo Guevara, et al.***
**(Case No. 1:18-cv-03029)**

**Report Date: September 16, 2022**

**I. Overview and Credentials of Dr. Dysart**

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. In July 2022, I was contacted by attorneys representing Mr. Thomas Sierra and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the wrongful conviction of Mr. Sierra for the murder of Mr. Noel Andujar in May 1995. case. In January 2018, 22 years after his conviction, the Cook County State's Attorney moved to vacate Mr. Sierra's conviction and all charges against him were dropped. In February 2022, Mr. Sierra was granted a Certificate of Innocence in this case. I am being compensated for expert services in this case at a rate of $350/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 80 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in the Conviction Review Unit in the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

***Presentations:*** I have given more than 175 presentations on eyewitness identification before professional psychological organizations and at conferences attended by judges, lawyers, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

***Curriculum Vitae:*** My complete academic curriculum vitae is attached to this report as Appendix B.

**II. Materials Reviewed in this Case**

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with available relevant materials related to the identification of their client, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the following materials, plus other materials cited in this report:

1. Amended Complaint (4/29/20)
2. First Night - Scene Report (5/23/1995)
3. First Night - Area Five Report (5/24/1995)
4. Montanez Rap Sheet (05/25/1995)
5. Sierra Rap Sheet (05/25/1995)
6. Alberto Rodriguez Statement (05/30/1995)
7. Arrest Report (05/30/1995)
8. Closing Report (05/30/1995)
9. Investigative File Inventory (05/30/1995)
10. Jose Melendez Statement (05/30/1995)
11. Lineup Report (05/30/1995)
12. Lucy Montaldo Statement (05/30/1995)
13. Arrest Report (05/31/1995)
14. Hector Montanez Statement (05/31/1995)
15. Sierra PD File (Sierra 005462-5940)
16. Photo Array Photographs
17. Photo of Black Car in Parking Lot
18. Lineup Photo 1, 2 & 3
19. Photo Array
20. Scene Photo at Night 1, 2, 3, & 4
21. Arrest Report (01/06/1995)
22. Area File
23. Permanent Retention File
24. Photographs (RFC-Sierra 000036-100)
25. Scene Photos
26. Alberto Rodriguez Pretrial Hearing (08/20/1996)
27. Alberto Rodriguez Criminal Trial Testimony (02/06/1997)
28. Jose Melendez Criminal Trial Testimony (02/06/1997)
29. Reynaldo Guevara Criminal Trial Testimony (02/07/1997)
30. Rodriguez Cook County State's Attorney Investigative Report (11/15/2018)
31. Alberto Rodriguez Deposition (Juan Johnson Civil Case, 01/09/2009)
32. Jose Melendez Deposition (Jacques Rivera Civil Case, 06/30/2014)
33. Sierra Criminal Trial Allocution via Letter (nd)
34. Jose E. Melendez affidavit (3/28/2010)
35. First Supplemental Post-Conviction Petition (08/01/2017)
36. Second Supplemental Post-Conviction Petition (09/20/2017)
37. Third Supplemental Post-Conviction Petition
38. Dysart Report in Jacques Rivera v. Reynaldo Guevara (12/21/2016)
39. Map of Scene
40. Dismissal Order (01/09/2018)

41. Thomas Sierra Transcript (02/10/2022)
42. Certificate of Innocence (2/10/2022)
43. Sierra Court of Claims Order (8/16/2022)
44. Motion to compel deposition of Alberto Rodriguez
45. Litigation to compel deposition of Alberto Rodriguez
46. August 19, 2021 Letter to Alberto Rodriguez
47. Letter from Alberto Rodriguez
48. Communication from BOP Attorney JD Crook Attaching Rodriguez Letter
49. Returned Envelope from Alberto Rodriguez
50. Jose Melendez Deposition and Exhibits
51. Thomas Sierra Deposition and Exhibits
52. Hector Montanez Deposition and Exhibits
53. George Figueroa Deposition and Exhibits
54. John McMurray Deposition and Exhibits
55. Ron Malczyk Deposition and Exhibits
56. Kenneth Trempe Deposition and Exhibits
57. Anthony Wojcik Deposition and Exhibits
58. Reynaldo Guevara Deposition and Exhibits
59. Alternate photo array containing Mr. Sierra

If other materials related to eyewitness identification are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

## III. Overview of Case & Summary of Opinions

**Important dates:**
May 23, 1995: shooting and murder of Noel Andujar. Scene interview of Mr. Melendez and Mr. Rodriguez.
May 23-24, 1995: detective interviews with Mr. Melendez and Mr. Rodriguez; mugbook procedure.
May 25, 1995: reported photo array with Mr. Sierra viewed by Mr. Rodriguez.
May 30, 1995: reported photo array with Mr. Sierra viewed by Mr. Melendez at 5:30pm; reported live lineup containing Mr. Sierra at 6:00pm; reported car identification procedure with a Buick.
August 1996: Preliminary Hearing.
February 1997: Sierra criminal trial.
January 2018: Conviction overturned & charges dropped.
February 2022: Certificate of Innocence.

**Witness Summaries:**
1) Jose Melendez – driver of car with victim
2) Alberto Rodriguez – passenger in car with victim

Mr. Rodriguez testified that he and Mr. Melendez had smoked marijuana before and while driving around on May 23, 1995 at approximately 10pm. According to Mr. Rodriguez, the amount smoked somewhat impaired their cognitive abilities. (Depo. JR-JJ 053831).

According to the witness statements and testimony, they were driving around when they came across a Buick with three individuals inside. The encounter occurred just east of the monument and roundabout depicted in the map of the Logan Square neighborhood in Chicago. Ultimately, the passenger in the Buick showed gang signs to the witnesses and then opened his door and began shooting at their car.

Shortly after the shooting, the witnesses described the car with the shooter as a dark blue or black Park Avenue Buick with spoke custom rims and tinted windows (either light, according to Mr. Rodriguez or dark, according to Mr. Melendez). The only description of the shooter and other passengers in the shooter's car that Mr. Melendez and Mr. Rodriguez could provide was two Hispanic males and one Black male. Later, the description would become slightly more detailed but remained vague.

According to the police file, Mr. Sierra became a suspect because of a connection to the car reportedly used in the shooting, and a photo array was constructed containing his photograph. A photograph of the alleged owner of the shooter's vehicle, Mr. Hector Montanez, was also reportedly included in this 6-person photo array. On May 25, 1995, this array was shown to Mr. Rodriguez.[1] Mr. Rodriguez has testified that he was told before viewing the array that the police thought they had caught the right guy. In his preliminary hearing testimony, he was asked about how long he viewed the photos before making a selection (A11):

Q. Okay. And how long did it take for you to look through those pictures?
A. Five, ten minutes.
Q. Okay. After those five or ten minutes that you looked through those pictures did you select one of the photographs?
A. Yes.

Five days later on May 30, 1995, Mr. Melendez was shown the same photo array. Mr. Melendez has testified that the detective conducting the procedure was holding Mr. Sierra's photograph in his hand and told Mr. Melendez that they had caught the guy. Mr. Melendez said yes to Mr. Sierra's photograph. Later, Mr. Melendez would testify that he did not see the shooter's face and only said yes to Mr. Sierra's photograph because he was told to pick that photo and was upset and angry that his friend had been killed.

Also on May 30, 1995, Mr. Sierra was arrested and a live lineup was conducted. According to the police file, both Mr. Rodriguez and Mr. Melendez viewed the lineup and selected Mr. Sierra. Mr. Melendez, however, contests this account and insists that he has never viewed a live lineup.

Also on May 30, 1995, Defendants also conducted an (object) identification procedure wherein, according to the police report, both witnesses were asked to walk through a parking lot and tell Defendants if they saw the car that was carrying the shooter on May 23, 1995. According to a police report and handwritten statements, both witnesses identified a Buick.[2] But in his 2009 deposition testimony, Mr. Rodriguez testified that he told law enforcement that it was not the correct vehicle because the windows were not tinted. (Depo. JR-JJ 053867)[3]

---

[1] In his 2009 deposition, Mr. Rodriguez testified about when the various identification procedures took place (JR-JJ 053880): Q. So after the night when you attended the lineup or did the photographs or looked at the vehicles, you think all that happened on the same day, correct? A. Yes.

[2] This vehicle was being driven by a man named Jose E. Melendez (not the witness, who is Jose M. Melendez) when it was stopped on May 30, 1995. This Buick had been owned by Hector Montanez.

[3] Mr. Rodriguez was asked: Do you remember where you talked to the officers, or excuse me, the detectives in the police station? Answer: Well, when I got to the station, he asked me if I -- if I can identify the vehicle. He says it's somewhere in the parking lot. And we were walking around looking for the vehicle. And I said the only vehicle I see that looks like it, I pointed to a vehicle which was a Park Avenue 98. I know it was a four-door vehicle, like a dark blue, same hubcaps, a spoke hubcap. But I told him there is one thing that's different on the vehicle than the one that had shot at us. And he said what's different. I said, well, it don't have any tinted windows. And he said this is the car. I said, looks just like the car other than the tinted windows. And, umm --

In his testimony in this case, Mr. Melendez also denies making a positive identification of the Buick in the parking lot saying the windows were not tinted and the rims were factory, not custom. In addition, there is evidence that one car in the parking lot, the Buick, may have been pointed out to the witnesses.

As of the date of this report, Mr. Rodriguez has refused to attend a deposition in this case. He has stated that he intends to assert his Fifth Amendment right not to incriminate himself in response to questions about his role in the investigation of the shooting and the prosecution of Thomas Sierra. If Mr. Rodriguez's deposition in this matter does proceed, I reserve the right to modify or add to this report as I deem necessary based on his testimony.

**IV. Basis for Opinions in This Case**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selection of Mr. Sierra as the shooter, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables"). It is critical to understand the impact of both system and estimator variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made.

The distinction between estimator and system variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading international expert in eyewitness identification research. Over the past 40+ years, a substantial amount of research on both estimator and system variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[4] In 2015, the law in Illinois regarding eyewitness identification procedures was amended and this law is consistent with best practices described in this report.[5]

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Sierra include:

**Estimator Variables:**

1) Effects of Limited Opportunity to Observe at the Time of the Event
    a. Short Exposure Time
    b. Lighting
2) Stress/Arousal
3) Description "Accuracy"

**System Variables:**

1) Photo Array and Lineup Bias
2) Pre-identification Warnings/Instructions

[4] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification

[5] IL ST CH 725 § 5/107A-0.1

3) Non-blind Lineup Administration
4) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
5) Witness Confidence
6) Post-identification Feedback

**V. General Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[6] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[7] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer is commonly none the wiser when perception differs from the "ground truth" of the external world—it appears that accurate eyewitness identification may be difficult to achieve.*

Consistent with the conclusions of the National Research Council above, the History section of the Nassau County Police Department 1977 Bulletin on Identification Procedures (page 1) states:

> *The main human problem with eyewitness identification is that there is a basic weakness with human observation and interpretation of events. Different people see the same event sometimes quite differently. Further, a recent victim of a crime, anxious to apprehend the assailant, may be in a frame of mind making him or her susceptible to suggestion. Such suggestion may inadvertently come from the police, the circumstances or his or her physical or mental state.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through *contamination*, especially when the witness' memory is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impacts of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face/characteristics and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage can influence the

---

[6] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[7] Ibid.

reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[8] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[9] The 2020 White Paper[10] maintains the original four best practice recommendations from 1998[11] and adds five new best practice recommendations for the collection and preservation of eyewitness evidence.[12] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently numbers as **375.**[13] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[14] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 cases where there was an erroneous eyewitness identification of the innocent defendant, 36% included mistaken identifications from *more* than one eyewitness. In fact, some of the cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In these DNA exoneration cases, there is no evidence that witnesses were anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. Evidence demonstrates it is common for eyewitnesses to genuinely believe they are identifying the correct person yet can still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual

---

[8] The terms "lineup" and "photo array" are used interchangeably in this report, unless noted otherwise.
[9] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647.
[10] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.
[11] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.
[12] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.
[13] The figure of 375 has not been updated on the Innocence Project website for over one year and therefore this figure is outdated. Visit www.innocenceproject.org for information and statistics on DNA exoneration cases nationally.
[14] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

eyewitness identifications and attempted identifications from police files.[15] In the 2020 White Paper mentioned above, Dr. Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[16] The researchers note that there have been 11 published articles on the subject with data from over 6,500 witnesses in actual cases. The results show that nearly one quarter of witnesses who view a photo array or lineup in actual cases choose an innocent filler. Of those who "identify"[17] a person from a photo array or lineup, more than one third (36.8%) choose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 36.8%, as these data do not include erroneous selections of innocent suspects (it only includes filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" are incorrect. While false identifications of innocent fillers almost invariably do not send those fillers to prison, these choices still constitute identification errors and provide valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

**VI. Proposed Testimony**

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all examples found in the materials will be repeated in this report.

**Estimator Variables**

**1. Effects of Limited Opportunity to Observe at the Time of the Event**

a) *Exposure Time.* Based on my review of the materials in this case, it is my opinion that both witnesses had a limited opportunity to view the shooter's face. In fact, Mr. Melendez, who was in the driver's seat and closest to the shooter, testified at trial that he told Defendants before viewing any identification procedures that he did not see the person who shot. (e.g., TT. E207, E240) Mr. Melendez testified at trial that his opportunity to see the shooter was as Mr. Melendez was turning his vehicle and the shooter

---

[15] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[16] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[17] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

flashed some gang signs at him. (TT. E169-70) Mr. Melendez also testified at trial that the car had dark tinted windows (TT. E190), which would have further reduced both witness' ability to clearly see people inside the shooter's car and partially explains why Mr. Melendez indicated he did not see the shooter.

In an early interview with law enforcement, both Mr. Melendez and Mr. Rodriguez described their limited abilities to clearly see the occupants of the car containing the shooter. For example, they only viewed the individuals while they were in the car (with tinted windows rolled up), often while the car was moving, at night. In addition, the witnesses testified that the shooter opened the passenger door and was firing through the open door and thus there would have been additional obstructions limiting their view. Further, as soon as the shooting started, the occupants of the victim's car all ducked down. According to Mr. Rodriguez (Johnson v. Guevara Deposition, P.38):

> Q. What did he do when the shooting started?
> A. Well, when the shooting started, I ducked down. I wasn't sure how close they were to our vehicle. I heard many shots hit the vehicle. It was like non-stop, the shooting.

When asked whether he saw where the other car went when the shooting stopped, Mr. Rodriguez responded (Depo. JR-JJ 053845):

> A. No. I was basically on the bottom of the front seat taking cover.

Describing his view in his 2009 deposition, Mr. Rodriguez recalled telling police officers that "when the car was stopped, I got a pretty all right glance of the individual." (Depo. JR-JJ 053858); this is not description of an excellent or clear view of the shooter.

Common sense might suggest that even a brief opportunity to view a perpetrator's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the amount of time a witness views a perpetrator's face significantly impacts the witness's later ability to identify that person. Generally, when the opportunity to see a person's face is limited (due to short time, presence of a weapon, disguise, etc.), the result will be a weak or poor memory for that individual. Specifically, when a witness is looking at other objects or features (e.g., shooter making gang signs) other than the person's face, it limits their ability to encode details.

In research on the effects of exposure duration – the amount of time one has to view or encode something - on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy in their 1986 meta-analysis on this topic.[18] That is, shorter exposure time generally correlates to less accurate identifications.[19] In the time since this comprehensive review was published, an updated meta-analysis[20] and other research[21] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

---

[18] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.
[19] Det. Abbondandelo testified in his 2020 deposition that he agrees with this general principle. (P. 20)
[20] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.
[21] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull

For example, in one study by Memon, Hope and Bull, mock witnesses viewed a video of a realistic crime that lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and seven seconds (with the perpetrator's face in view for 12s).[22] Witnesses were then tested with a perpetrator-present or perpetrator-absent photo array 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections in perpetrator-absent arrays increased substantially when exposure time increased. (Note, however, that mistaken identifications in perpetrator-absent arrays remained relatively high regardless of the exposure time.)

*Performance of Young Adults (ages 17-25) in the 12s and 45s Exposure Conditions with Perpetrator-Present and Perpetrator-Absent Photo Arrays (**Errors** are bolded)*

| | **12 Seconds Exposure** | | | **45 Seconds Exposure** | | |
|---|---|---|---|---|---|---|
| | Hits | False Alarm | Non-Choice | Hits | False Alarm | Non-Choice |
| Perp-Present Array | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Perp-Absent Array | NA | **90%** | 10% | NA | **41%** | 59% |

The results of the Memon et al. study above show that in circumstances where witnesses viewed the perpetrator's face for 45 seconds, 41% of witness made a mistake and misidentified an innocent person from a photo array in which the actual perpetrator was not shown. When the exposure time was reduced to 12 seconds, the false identification of innocent people increased to 90%. Given the descriptions of the shooting provided by both witnesses, it seems unlikely that their ability to see the face of the shooter was even 12 seconds. Further, the shooter's face was always viewed through the tinted window making their observation of the shooter's face even more difficult.

b) *Lighting.* The shooting took place around 10:30pm on May 23, 1995. It was dark outside and street lamps lit the scene, depicted in scene photos. The shooting occurred between two moving vehicles on the street. The car containing the shooter had tinted windows that were rolled up. Mr. Melendez testified at trial that the shooter's car had dark tinted windows (TT. E168, E238) and that he did not see much because of the tinted windows. (TT. E238) Mr. Rodriguez recalled that the windows had a light tint. According to Mr. Rodriguez (Depo. JR-JJ 053838):

Q. Okay. I'm going to ask you to describe each one for me. Let's start with the passenger . Can you give me a description of the passenger ?
A. Not too good of a description because of the tinted window. I couldn't tell if he had a mustache or not. Umm, I know they were Hispanic.

Given the description of the tinted windows and time of night when the shooting took place, an understanding of how lighting conditions can affect perception is important here. First, it is informative

(2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[22] Memon, A., Hope, L., & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354.

to have a basic understanding of how visual information gets into the brain.[23] The answer lies in a network of millions of nerve cells. Of particular importance to the visual system are two types of receptor cells in the eye called *rods* and *cones*. Rods and cones absorb information that is eventually transmitted to the brain, telling us what we "see". Critically, rods and cones have different functions. Rods are related to *nighttime* or low-lighting visual conditions – such as the conditions both witnesses would have experienced – and cones are related to daytime or good-lighting conditions. Cones are the primary mechanism for color vision and this is why we see little color by moonlight because there is not enough light to stimulate the cones. We can see shades of light and dark at night because moonlight is intense enough to stimulate the rods. Rods, however, provide a much less sharp image than do cones. That is why objects and people lit by moonlight, although visible, may appear coarse and ill-defined.[24] In this case, the poor lighting conditions could only have served to reduce their ability to see clearly and in detail.

**2. Stress/Arousal**

Being the victim of a drive by shooting undoubtedly caused the two witnesses to experience high levels of stress/fear/arousal. Both witnesses immediately ducked down when the shots began. In his 2009 deposition, Mr. Rodriguez described his state of mind when the shooting started as shock, freaked out. (Depo. JR-JJ 053845) A few minutes later when he discovered his friend had been shot in the head, he was also in a state of shock. (Depo. JR-JJ 053847)

In research related to stress and arousal, Deffenbacher and colleagues published a meta-analysis on the effects of stress/arousal on eyewitness performance.[25] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion can cause increases in arousal that result in impaired identification abilities.[26] In summary, high levels of stress and arousal, which the witnesses in this case unquestionably experienced, have been demonstrated to significantly reduce the reliability of eyewitness identifications.

**3. Description "Accuracy"**

Within minutes of the shooting, Mr. Melendez and Mr. Rodriguez were interviewed by police and could only describe the shooter as a Latino male; they could not provide other details of his appearance. (TT. E133-4) For example, during his preliminary hearing testimony, Mr. Rodriguez was asked about his ability to describe the perpetrator (A22):

---

[23] For a detailed review of this process, see *National Research Council* (n 3).

[24] Loftus, Doyle, Dysart, & Newirth (2020). Eyewitness testimony: Civil and criminal (6th Edition). LexisNexis.

[25] Deffenbacher , Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.

[26] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

Q. Okay. But my question is regarding the description of the person that did the shooting, did the officer ask you whether you could describe him any further other than just an Hispanic guy?
A. Yes.
Q. And you were not able to do that?
A. No.

Consistent with this testimony, the police documentation regarding the witnesses descriptions shows that the shooter's and driver's age, height, weight, eye color, hair color, complexion and other marks/scars were UNKNOWN. Officer Trempe, the individual who wrote the report regarding the witness' descriptions, testified in a 2020 deposition that he tries to get as detailed description of the perpetrators as possible when interviewing a witness. (Depo. 41-2, 52) With respect to the shooter's actions, the witnesses saw the shooter make the Spanish Cobra gang sign before the shooting began.

On May 24, 1995, a supplementary report describes all three occupants of the car containing the shooter. It is unclear from the written report which witness(es) provided these additional details.

**Shooter:** Hispanic male, 18-22, lighter complexion, black hair pushed back, wearing white hoodie

**Driver:** Hispanic male, 20-25, darker complexion, fade type haircut

**Rear passenger:** Black male, 23-27, dark complexion

In my professional experience, the description of the shooter provided by the witnesses in this case was extremely vague. Initially, the description included two features: Hispanic and male. Later, a few additional details were provided but it is not clear by whom. For example, one report indicates that Mr. Rodriguez gave information that was essentially the same as Mr. Melendez. But it is unknown what details were and were not the same and who provided what additional information.

With respect to Mr. Sierra's physical description in 1995, he was a Hispanic male, 18 years old, 5'11", 160lbs, brown eyes, black hair and medium complexion. Generally speaking, his appearance is similar to the (vague) description provided by the witnesses. Countless young Hispanic males would have similarly fit the witnesses' description of the shooter.

With respect to one inconsistency in their description of the shooter when compared to Mr. Sierra, in 1995, Mr. Sierra was not and had never been a Spanish Cobra. According to police documents in this case, Mr. Sierra was a member of the Imperial Gangsters. His May 30, 1995 arrest report indicates a gang affiliation of Imperial Gangsters.[27]

With respect to research on witness description accuracy, in Professor Garrett's (2011)[28] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications

[27] It should be noted that there was testimony by the witnesses that gang members sometimes show the sign of other gangs to throw off the recipient gang
[28] Garrett (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[29]

One reasonable explanation as to why the description was so limited initially is that the shooter was seated in a car and viewed through tinted windows during the entire incident. In other words, the description could have been vague because of a limited opportunity for the witnesses to see the shooter clearly. In my professional experience, the initial descriptions provided by Mr. Melendez and Mr. Rodriguez – that included only 2 features – were the shortest (least detailed) descriptions I have encountered. These descriptions were far below the norm. The lack of description detail and the witness' inability to provide additional information when asked should have been a red flag for investigators that these witnesses did not have a strong memory for the shooter and would therefore would not likely be reliable eyewitnesses in the investigation.

In summary, with respect to estimator variables, there is evidence that Mr. Melendez and Mr. Rodriguez had only a short period of time to see the face of the shooter through a tinted car window at night. In addition, they testified about being shot at, hearing the gun shots and ducking for their lives. Together, these estimator variables likely created a scenario where it would have been difficult for either witness to have a strong memory for the perpetrator. As will be discussed below, there are significant concerns regarding eyewitness reliability in stranger identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed.

**System Variables Relevant to the Current Case**

The police reports in this case document several identification procedures utilized in this case that, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Sierra.[30] In addition, prior to conducting any identification procedures with Mr. Sierra as a suspect, Mr. Rodriguez was asked to view mug-books containing photographs of Spanish Cobra gang members. Presumably Mr. Rodriguez was shown Spanish Cobra gang books because the shooter had flashed a Spanish Cobra gang sign to him and Mr. Melendez. According to the record, Mr. Rodriguez did not select anyone from these gang books.

**1. Photo Array and Lineup Bias**

---

[29] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[30] It is my professional practice to ask attorneys how a criminal defendant became a suspect in the investigation. This line of inquiry is consistent with the 2020 White Paper recommendations on eyewitness procedures. In this case, it is my understanding from the police file that Mr. Sierra was developed as a suspect by Det. Guevara based on the description of the shooter's car (Buick) that Det. Guevara linked to Mr. Sierra through an alleged observation of Mr. Sierra in a Buick several days before the shooting. Both witnesses in this case have testified that the Buick Det. Guevara showed them in the parking lot "identification procedure" was not the car used in the shooting. This testimony is inconsistent with the police file which indicates both witnesses positively identified the Buick in the parking lot.

***Photo Array.***[31] In my opinion, the photo array shown to Mr. Rodriguez on May 25, 1995[32] and Mr. Melendez on May 30, 1995 was biased against Mr. Sierra. Foremost, Mr. Melendez testified at trial (TT. E209) and again at his 2019 deposition in this case (P.42) that Det. Guevara held only Mr. Sierra's photograph in his hand during the photo array procedure. If true, this alone would have made the identification procedure unnecessarily suggestive and extremely biased against Mr. Sierra. The importance of conducting a non-suggestive array is discussed in more detail below in the section on *Non-blind Lineup Administration*. But generally speaking, steering a witness toward an individual, especially the suspect, increases the likelihood that the witness will select that individual from the procedure, regardless of guilt/innocence. In addition, Mr. Rodriguez testified about suggestive pre-identification instructions being given to him before viewing the photo array. This issue is addressed in more detail below in the section on *Pre-identification Warnings/Instructions.*

Both witnesses described the shooter as being as young as 18. It is very unlikely that some fillers in the photo array could possibly be 18 years old. For example, the arrest photo of #1 (J. Sepulueda) was taken in 1987, over 7 years before the shooting in this case. Photo #2 (M. Ruiz) was taken in 1988, over 6 years before this case. In this photograph, Mr. Ruiz appears much older than 18.

Further, both witnesses told law enforcement that the shooter as wearing a light (white or gray) hoodie. They also testified to this at trial (Rodriguez, TT. E102; Melendez, TT. E196) In the photo array, Mr. Sierra is the *only* person shown wearing a light (gray) hoodie.

Despite the suggestive construction of the photo array, Mr. Rodriguez testified at a pretrial hearing that he looked at the photographs for 5-10 minutes before picking one. (Hearing A11) This decision time is also described in his deposition testimony (P.65).[33]

***Live lineup.*** In my opinion, the live lineup shown to Mr. Rodriguez and Mr. Melendez[34] also was biased against Mr. Sierra. Foremost, Mr. Sierra is the only lineup member who was repeated from the

[31] In my review of the materials, I saw a second group of 6 photos, perhaps a photo array, containing mostly the same fillers as in the documented photo array. This second group has two photographs of Mr. Sierra. It does not contain a picture of Hector Montanez. From my review, I have found no documentation regarding the purpose of these photographs nor any documentation as to how or if this second group of photographs was used. In addition, I have found no documentation that these photographs were made part of the homicide files at any point. If these photos were used in the investigation, it would be extremely valuable information to have. For example, if this group was shown as a photo array, the array would have been biased against Mr. Sierra because he is the only person who is in the group two times. This would have been extremely suggestive.

[32] There is inconsistent information in this case regarding the location of Mr. Rodriguez's photo array. The police file indicates it was shown at his home however in his deposition Mr. Rodriguez did not recall if a photo array procedure took place at his home but recalled seeing an array at the police station.

[33] When a witness makes a quick identification decision from a fair, unbiased double-blind procedure, the speed in which the witness makes their identification is useful information. That is, quick identifications from "good" procedures are more likely to be accurate. With respect to what constitutes a "quick" identification decision, early research suggested that identifications made with 10-12 seconds are quite likely to be accurate. Additional research suggests that the time might be extended somewhat but decisions that take much longer than this are less likely being made based on recognition – instead they are more likely to be made due to comparisons between the lineup members. In other words, slower decisions are more likely to reflect witnesses who have a weak memory for the perpetrator.

[34] Mr. Melendez asserted several times at trial (TT E212-3, E232) and again in his 2019 deposition that he never viewed a live lineup. Despite this testimony, there are references to Mr. Melendez (and Mr. Rodriguez, separately) viewing a lineup in the police file.

photo array. Further, three of the lineup members (3, 4, & 6) had facial hair that was not described by either witness and all three appear older than the 18 year old range provided by the witnesses. Lineup member #1 is 26 years old and, based on appearance, it is difficult to tell that lineup member #5 is Hispanic. For all these reasons, Mr. Sierra stands out from the lineup fillers.

With respect to the selection of lineup fillers, a properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator)[35] and a minimum of five fillers who are known to law enforcement to be innocent of the crime. When it comes to filler selection, there are many choices law enforcement need to make when deciding who to put in a lineup including how many fillers should be used, and how similar should they be to the suspect and/or the description the witness provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, especially the suspect.[36] In this case, both the photo array and lineup fail on this principle.

When it comes to how similar the fillers should be to the suspect, researchers have some preference to use a rule where all of the features included in the witness' description of the perpetrator should be matched[37] (e.g., gender, age, height, weight, etc.) and all fillers should be plausible alternatives for the suspect based on how the suspect looks – but fillers should not be clones.[38] When some of the lineup members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen.

In summary, with respect to the photo array in this case, if the procedures happened the way that Mr. Melendez and Mr. Rodriguez have testified - in addition to the suggestive construction of the array itself - there was a very strong likelihood that the witnesses would select Mr. Sierra from the procedure. After being selected from an unnecessarily suggestive photo array, the results from any subsequent procedure are relatively meaningless. That is the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy.

**2. Pre-identification Warnings/Instructions**

Mr. Melendez testified at trial – and in his deposition testimony – that Det. Guevara pointed out Mr. Sierra's photograph in the array and told Mr. Melendez to pick him because Det. Guevara had reason to believe it was the right guy. (TT E231) Both at the preliminary hearing (PH A10-11) and at trial (TT. E139), Mr. Rodriguez was asked whether the detective told him *before* he was shown the photo array that they probably got the guy. At the preliminary hearing, he was asked:

---

[35] The photo array contains a picture of Mr. Hector Montanez, another potential suspect (as the driver) in this case. It is unclear whether witnesses were informed that more than one perpetrator could be in the photo array.

[36] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

[37] For example, see Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[38] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

Q. Didn't you tell me a few minutes ago that prior to showing the pictures the officer – the officer that showed you the pictures told you that he thought he had the person?
A. Yeah. He asked me -- he said they probably got the guy. But he didn't say that he does. He said he's probably the guy in these pictures.
Q. So the officer did tell you that probably the guy that did the shooting was in those pictures?
A. Yes.
Q. And after he said that to you, what did he do? Gave you the pictures?
A. Yes.

At trial, Mr. Rodriguez testified consistently on this issue (TT. E139):

Q. And when this detective—just before the detective showed you the photographs, he told you that they probably got the guy, didn't he?
A. Yes.
Q. And after that detective told you that they probably got the guy, he showed you—he gave you those six photographs?
A. Yes.

Again in his 2009 deposition, Mr. Rodriguez testified that law enforcement told him that they might have the people who did the shooting in custody (Depo. JR-JJ 053859) but he could not recall in 2009 if this information came before or after the photo array. (Depo. JR-JJ 053877) If this information was given *before* the photo array, it could have influenced the selection of Mr. Sierra. If this information was given *after* the selection of Mr. Sierra, it would be a form of *Post-identification Feedback* (see section 6 below).[39]

Failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the suspect is in the identification procedures encourages witnesses to make a selection from the array. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array or lineup and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[40] Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[41] This law enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case

[39] Mr. Rodriguez testified at his deposition in 2009 that no lineup member was pointed out to him during his viewing of the array. (P. 91)
[40] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.
[41] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array. Consistent with these recommendations, the 2015 Illinois law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

In summary, based on the testimony of Mr. Melendez and Mr. Rodriguez, there is evidence of strong pre-identification bias in this case. If the suggestive procedures occurred the way in which both witnesses have recounted, it would have significantly increased the likelihood that the witnesses would have chosen (Mr. Sierra) from the array. This is especially true given the poor encoding conditions and other estimator variable factors described above. The extended period of time that Mr. Rodriguez took to make his selection of Mr. Sierra from the photo array further supports the above conclusion.

**3. Non-blind Lineup Administration**

Both identification procedures reportedly conducted in this case with Mr. Melendez and Mr. Rodriguez were done by detectives who developed Mr. Sierra as a suspect and therefore were aware that Mr. Sierra was a suspect in the procedure.[42] In fact, at trial, Mr. Melendez testified that he picked out a photograph from the array that Det. Guevara held in his hand and told him to pick (TT. E207, E208) and that Det. Guevara said he had reason to believe that he (Sierra) was the one that did the shooting. (TT E210) At trial (TT E209) and again in his 2019 deposition (P.42), Mr. Melendez testified that Det. Guevara held Mr. Sierra's photograph in his hand during the photo array procedure. In this case, neither the photo array procedures nor the live line-up were audio or video recorded. If they had been recorded, it would have allowed observers or listeners to evaluate the interactions to determine whether any suggestion - explicit or subtle - had been given during the arrays or lineup.

Contemporary police guidelines (e.g., IACP, 2006) and the law in approximately half of the United States for conducting identification procedures,[43] indicates that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[44] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[45] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

[42] As noted above, a photograph of Hector Montanez was also included in this array. Hector Montanez owned the Buick that Det. Guevara alleges was positively identified by Mr. Rodriguez and Mr. Melendez as the shooter's car and thus was a reasonable suspect in this investigation. Both witnesses, however, deny making a positive identification of the Buick.

[43] The 2015 eyewitness identification bill passed in Illinois requires double-blind or blinded administration of identification procedures.

[44] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[45] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[46] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 9% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 36% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether they administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced. The researchers also asked administrators if they had influenced the witness during the lineup procedure. The results demonstrated that neither participants nor administrators believed that they had been influenced or did any influencing, respectively. The researchers concluded:

> *It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the line of administration procedure to judge the reliability of the identification. If witnesses are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)*

In summary, though double-blind administration was not the norm in the United States in 1995, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Sierra from the photo arrays and lineup. In cases, such as this one, where law enforcement have "steered" a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability.

**4. Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

Mr. Sierra was presented to witnesses in this case for the purposes of identification at least 3 times: photo array, lineup, and trial. According to police documents and the trial transcript, Mr. Rodriguez selected Mr. Sierra as the shooter from all three procedures. With respect to Mr. Melendez, although there are documents in the police file referring to Mr. Melendez's viewing of the live lineup on May 30, 1995, Mr. Melendez consistently testified at trial (TT E212-3, E232) and at his 2019 deposition (P. 50-1) that he did *never* viewed a live lineup in this case. Mr. Melendez testified at trial that Mr. Sierra – sitting in court – was the

---

[46] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

same person he had identified (at Det. Guevara's direction, TT. E209) from the photo array[47] (TT. E236) but he did not identify Mr. Sierra as the person who shot his friend, Mr. Andujar. (TT. E197)

Given the repeated identification procedures in this case, the concepts of unconscious transference and commitment are relevant to this case. Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing mugshot photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[48]

Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[49] this is known as "commitment."[50] Thus, it is quite possible that Mr. Sierra was selected by Mr. Rodriguez and Mr. Melendez[51] at the live lineup merely because they had previously viewed and selected him from the photo array. For reasons not clear from the record, it appears that Mr. Melendez was shown the photo array procedure while Mr. Sierra was in custody and within a short period of time of Mr. Melendez viewing the live lineup (if he viewed the live lineup). In my professional experience, I have never before encountered a case where law enforcement conducted a photo array under similar circumstances (suspect in custody, positive photo array identification already secured from another witness). I can think of no reason - related to reliability - supported by scientific research to explain why Defendants would have shown Mr. Melendez a photo array on May 30, 1995.

Results from a second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure. It is for this reason that psychologists view in-court identifications as mere

[47] He did not testify that Mr. Sierra was in fact the shooter.

[48] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[49] For a review, see Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289.

[50] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

[51] Note, Mr. Melendez testified at the criminal trial and again in his 2019 deposition that he did not view a live lineup. This testimony is inconsistent with the police file.

theater and not actual independent tests of a witness's memory or ability to identify perpetrators.[52] In each succeeding procedure, witnesses can become increasingly more committed to their identifications and increasingly certain of their accuracy. In fact, there are examples from post-conviction DNA exoneration cases where, after a witness had incorrectly selected an innocent suspect, they continued to identify the innocent suspect even when presented with the actual perpetrator responsible for the crime.[53]

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific finds and best practice recommendations:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383–84 (1968).

In this case, witnesses were presented with repeated identification procedures with Mr. Sierra as the suspect. The results from repeated identification procedures with the same suspect are not independently informative with respect to witness accuracy. That is, viewing an earlier procedure with the same suspect taints the result of any subsequent procedure.

**5. Witness Confidence**

In the materials I reviewed, there did not appear to be any contemporaneous recording of the witnesses' levels of confidence in their selection of Mr. Sierra from the photo array or live lineup. It should also be noted here, however, that Mr. Melendez has repeatedly testified that he did not identify Mr. Sierra as the

---

[52] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

[53] The wrongful convictions of John Jerome White and Ronald Cotton are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times*, June 8, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole). See also: https://www.youtube.com/watch?v=u-SBTRLoPuo and https://www.youtube.com/watch?v=I4V6aoYuDcg

shooter but selected him from the photo array at the suggestion/direction of Det. Guevara. Mr. Rodriguez did testify, however, that it took him 5-10 minutes to make his selection from the photo array, an indication of a lack of confidence in his identification.[54] In addition, when Mr. Rodriguez testified in a 2009 deposition, he testified that he was only "pretty sure" about his in-court selection of Mr. Sierra at trial. (Depo. JR-JJ 053879)

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[55] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[56]

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors. Expressions of confidence at trial, however, are relatively meaningless[57] because confidence is *malleable*, and easily affected by external sources.[58] The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[59]

**6. Post-identification Feedback**

In a hand-written statement allegedly attributed to Mr. Melendez on May 30, 1995, the following statement is written:

> *Jose Melendez states that he picked out the man he saw shooting at him and his car on May 23, 1995 and that that man was later identified as Thomas Sierra.*

---

[54] Although the length of time that a witness takes to make an identification is not a direct measure of confidence, witnesses who make quick identification decisions (from a first and fair identification procedures) are more likely to be accurate and confident.

[55] See, Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[56] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[57] Ibid. This would also be true of an interview (several decades) after trial testimony.

[58] In his 2009 deposition, Mr. Rodriguez testified that he was "pretty sure" that the person he selected from the photo array was the shooter. (Depo. JR-JJ 053879)

[59] See Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1989; Leippe, Manion, & Romanczyk, 1991; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979; Wells & Murray, 1984

Therefore, by May 30, 1995, post-identification information regarding the identity of the person he allegedly identified as the shooter had been given. It should also be noted here, as it is elsewhere, that Mr. Melendez has testified several times that he did not identify Mr. Sierra from the photo array as being the shooter. He has testified that Det. Guevara was holding Mr. Sierra's photograph and told him that he was the shooter. This information could be classified as (pre- and) post-identification feedback.

Another example of post-identification feedback was given after the two witnesses reportedly selected a Buick from the parking lot "identification" procedure on May 30, 1995. In 2009, Mr. Rodriguez recalled that a detective told them that the Buick in the lot was the right car (Depo 61) even though Mr. Rodriguez had told detectives that the windows weren't the same because they didn't have any tint. Moreover, Mr. Melendez testified that he told detectives that the car was not the one used in the shooter. Despite this, detectives reported that both witnesses confirmed that the car had been used in the shooting, and the testimony at trial reflected the detectives' report.

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[60] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as *post-identification feedback*.[61]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect /defendant or that they have been a really good witness.[62] In the first research on the post-identification feedback phenomenon, Gary Wells and Amy Bradfield[63] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[64]

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[65] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive

---

[60] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.

[61] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[62] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

[63] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[64] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

[65] Charman, et al., 2010; Festinger, 1956; Festinger & Carlsmith, 1959.

dissonance is the DNA exoneration case of Dean Cage from Illinois. After Dean was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Dean was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Dean was innocent and was not the man who had raped her in 1994.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[66] In this case, it is remarkable that given the many suggestive elements of the identification procedure that Mr. Melendez continued to assert at trial (and at his deposition) that he did not see the shooter's face and did not (independently) identify Mr. Sierra as the shooter. Mr. Rodriguez, however, selected Mr. Sierra three times from various suggestive procedures. These selections

**VII. Summary of Opinions regarding Detective Guevara**

In December 2016, I submitted an eyewitness identification expert report in Jacques Rivera v. Guevara et al. (attached as Appendix C) For the current report, I was asked to comment on any similarities between Mr. Rivera's and Mr. Sierra's cases with respect to the estimator and system variables.

With respect to estimator variables, both cases had a series of uncontrollable factors that tend to reduce the strength of a witness' memory and consequently their ability to be an accurate witness. Both the Rivera and Sierra cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in both cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator.

With respect to system variables or the choices made by law enforcement during the collection of eyewitness evidence, there is a great deal of consistency between the two cases. In my opinion, both cases involve the following system variables:

1) Mug-shot searching
2) Filler bias and use of multiple suspects in the same array
3) Pre-identification instruction bias
4) Use of non-blind rather than a double-blind lineup;
5) Post-identification feedback and its effects on bolstering witness confidence, etc.
6) Repeated identification procedures, unconscious transference and commitment

In summary, a comparison of the two cases reveals many similarities in the facts of each case, now revealed in post-conviction litigation discovery.

**VIII. Summary of Opinions in This Case**

---

[66] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect. *Applied Cognitive Psychology, 20,* 859–869.

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability. The witnesses viewed three individuals at night in a car through tinted windows. The car was often moving. The witnesses were then shot at and ducked for cover while (Mr. Melendez was) trying to get away from the shooter's vehicle as quickly as possible. They were afraid. Their initial description of the three individuals included only race and sex. Later descriptions also were vague. Mr. Melendez has testified about being shown a suggestive photo array procedure where only the suspect's photograph was held by the detective, the suspect is the only person in the array wearing clothing similar to the (vague) description provided by the witnesses, and the witnesses were told that the police believed they had the shooter. Given these factors, it is not difficult to arrive at a reasonable explanation as to how both witnesses came to select Mr. Sierra from the photo array (and subsequent procedures, depending on the witness). Given all the factors and circumstances discussed above, the photo array and lineup identifications of Mr. Rodriguez and Mr. Melendez are very likely unreliable, as it is highly unlikely that they could each, independently and without influence, make accurate identifications of the perpetrator. The combination of a weak memory for the shooter coupled with suggestive identification procedures easily accounts for the selection of Mr. Sierra who has been granted a Certificate of Innocence in this matter.

**IX. Supplemental Materials**

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 16, 2022.

Jennifer Dysart
____________________________________
Jennifer Dysart, PhD

## Appendix A

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (as of September 16, 2022)**

**California:**
*Andrew Wilson v. City of Los Angeles, et al.*, Case No. 2:18-cv-05775 (April 29, 2020)
*Maurice Caldwell v. City and County of San Francisco and Kitt Crenshaw,* Case No. 12-cv-1892 EDL (December 21, 2020)
*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.,* Case No. 2:20-cv-10559-PA-KS (April 19, 2022)

**Florida:**
*State of Florida v. Michael Keetley,* Case No. 10-18429 (February 19, 2020)

**Illinois:**
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020)

**Kansas:**
*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al., Case No. 2:18-cv-02545-KHV-KGG* (September 23, 2021)

**Louisiana:**
*Robert Jones v. Leon Cannizzaro, Jr., et al.*, Case No. 2:18-cv-00503 (December 15, 2019)

**Maryland:**
*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.,* Case No. 1:19-cv-00384-ELH (September 14, 2021)

**Massachusetts**
*Angel Echavarria v. J. Michael Roach, et al.,* Case No. 1:16-cv-11118 (August 5, 2020)

**Missouri:**
*Lamont Campbell v. State of Missouri,* Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)

**Ohio:**
*Roger Dean Gillispie v. The City of Miami Township, et al.,* Case No. 3:13-cv-416 (August 27, 2019)

**Appendix B**

**Academic Curriculum Vitae of Jennifer E. Dysart**

**JENNIFER E. DYSART**

**Curriculum Vitae**

---

University Address:
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street, 10th Floor
New York, NY 10019

*Email:* jdysart@jjay.cuny.edu
*Phone:* 212.484.1160

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology)<br>*Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

**Peer-Reviewed Journal Publications**

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

**Books**

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

**Book Chapters**

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92). Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

## Other Publications

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.,

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13). Thousand Oaks, CA: Sage.

## Peer-Reviewed Conference Presentations

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San

Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at

the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2022, March). Assessing Credibility and Reliability: Perception, Memory and Eyewitnesses Identification. Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, NY, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, Ontario, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, Newfoundland, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Ontario, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts

Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, Newfoundland, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, Quebec, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, Saskatchewan, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, Prince Edward Island, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

## Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, Newfoundland, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, Nova Scotia, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, Saskatchewan, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor/Conviction Review Presentations

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited Presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, “Changing Times – Changing Strategies: Striking

a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

## Invited Law School and University Presentations

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited speaker at the Florida State Attorney's Office (Conviction Review). Meeting via Zoom.

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public

Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

## Invited Non-Profit Presentations

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

## Supervision of Doctoral Students at John Jay College of Criminal Justice

2010 John DeCarlo (Criminal Justice Doctoral Student)
Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011 Victoria Lawson (Forensic Psychology Doctoral Student)
Topic: Eyewitness Identification

2006-2009 Anna Rainey (Forensic Psychology Doctoral Student)
Topics: Showups; Cross-race identification

2006-2009 Brian Wallace (Forensic Psychology Doctoral Student)
Topics: Alibi believability; Mug shot searching.

## Supervision of Masters Theses at John Jay College of Criminal Justice

2018 – 2020 Elena Christofi
Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019 Samantha Kosziollek
Topic: 911 Dispatchers

2016 – 2018 Marisa Jaross
Topic: Composite sketches

2016 – 2017 Brittany Kassis
Topic: 911 Dispatchers

2011 – 2012 Tamara Andrade
Topic: Composite creation in cross-race identifications

2010 – 2011 Jennifer Savion
Topic: Composite creation in cross-race identifications

2009 – 2010 Lindsey Butera
Topic: Eye-tracking and lineup accuracy with biased lineups
Yinglee Wong
Topic: Cross-race description accuracy of hair/hairstyles
Nancy Yang
Topic: Eye-tracking and weapon focus effect

2008 – 2009 Alexander Buijsrogge
Topic: Cross-race composite creation of famous faces
Kristin Chong
Topic: Stranger alibis and identification accuracy
Victoria Lawson
Topic: Cross-race showup and lineup accuracy
Jessica Owens
Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008 Sarah Kopelovich
Topic: Cross-race and Accent effects on identification accuracy
Jason Mandelbaum
Topic: Cross-race effects in mug shot searching

**Supervision of Master's Theses at Southern Connecticut State University**

2005 Lisbeth Fugal
Topic: Post-identification feedback
Anna Rainey
Topic: Cross-race identification and "contact" with other groups

2004 Sandra Soucie
Topic: CSI Effect

**Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University**

2005 Daniel Csuka
Topic: Multiple Independent Identification Accuracy

**Awards and Scholarships**

2017 PSC CUNY research grant ($3,500)

2008 John Jay College Research Assistance Program Grant ($1,000)

2005 Connecticut State University Research Grant ($4,400)

2005 Junior Faculty Research Fellowship, Southern Connecticut State University (9 credits teaching release time for Fall 2005)

2003-2005 Social Sciences and Humanities Research Council of Canada (SSHRC) Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined)

2002 American Psychological Foundation/Council of Graduate Departments of Psychology (APF/COGDOP) Graduate research scholarship ($1,500)

2002 American Psychology-Law Society Grants-in-Aid award ($650)

2001-2003 Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually)

2000-2001 Ontario Graduate Scholarship ($15,000)

1999-2000 Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900)

1998-1999 Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300)

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**

- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**

- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**

- Introduction to Psychology (undergraduate course)

## University Committee Service

2016 – 2019 Graduate Studies Council, John Jay College of Criminal Justice

2013 – 2016 College Council Member, John Jay College of Criminal Justice

2013 – 2016 Faculty Senate Member, John Jay College of Criminal Justice

2013 – 2014 College Council Executive Committee Member, John Jay College of Criminal Justice

2010 – 2012 College Council Executive Committee Member, John Jay College of Criminal Justice

2010 – 2012 College Council Member, John Jay College of Criminal Justice

2010 – 2012 Faculty Senate Executive Committee Member, John Jay College of Criminal Justice

2010 – 2012 Faculty Senate Member, John Jay College of Criminal Justice

| | |
|---|---|
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2006 – present | Consultant, eyewitness identification expert |

| | |
|---|---|
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

**Reviewing (past and current)**

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

**Professional Affiliations**

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

# Attachment C

**Eyewitness Identification Expert Report Prepared by Dr. Jennifer Dysart for attorney Russell Ainsworth in Jacques Rivera v. Reynaldo Guevara, et al. (Case No. 1:12 CV 04428)**

**Report Date: December 21, 2016**

## I. Credentials of Dr. Jennifer Dysart

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to this appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University (Canada), a Master's degree in Psychology from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University (Canada).

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony:*** I have been admitted as an eyewitness expert approximately 60 times in various pre-trial hearings, trials, and post-conviction hearings in California, Connecticut, Delaware, Florida, Illinois, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a jury trial in Federal court in New Jersey. I have never been not qualified as an Eyewitness Identification expert in court.

***Publications:*** I am an author or co-author of over a dozen eyewitness publications including original research articles published in peer reviewed scientific journals and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 5th Edition" published by LexisNexis.

***Presentations:*** I have given more than 100 presentations on eyewitness research before professional psychological organizations and at conferences attended by lawyers, judges, police officers and investigators concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

## II. Materials Reviewed

1. Color photographs of apartment building and surrounding area
2. Color photographs of 6 people involved in Aug 31/Sep 1 identification procedure (polaroid pictures)
3. Color photographs of the live lineup, side and front views of lineup members
4. Color photograph of Jacques Rivera

5. Certificate of Innocence Opinion
6. Handwritten interview notes with Orlando Lopez
7. Felony Minute Sheet
8. Supplementary Report: Interview with Orlando Lopez
9. Supplementary Report: Gang photo books ID
10. Arrest Report for Jacques Rivera 8-30-88
11. Supplementary Report: Unable to locate Lopez
12. Release of Person in Custody form
13. Arrest Report for Jacques Rivera 9-15-88
14. Supplementary Report: Investigation cleared by arrest
15. Document titled "All Arrest Reports"
16. 1990 Trial testimony of Orlando Lopez
17. 2011 Post-conviction testimony of Orlando Lopez
18. 2013 Deposition testimony of Orlando Lopez
19. 1990 Trial testimony of Reynaldo Guevara
20. 2013 Deposition testimony of Reynaldo Guevara
21. 1990 Trial testimony of Craig Letrich
22. 2011 Post-conviction testimony of Gillian McLaughlin
23. Selected pages of 2013 Deposition testimony of Gillian McLaughlin (5-24-13)
24. Selected pages of 2013 Deposition testimony of John Leonard (5-29-13, 12-20-13)
25. Jacques Rivera v. Reynaldo Guevera, et al. Complaint
26. Police reports Wron 0001-64

**III. Basis for testimony in the present case.**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to Jacques Rivera v. Reynaldo Guevara, et al., I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables").

The distinction between system and estimator variables was developed in 1978 by Dr. Gary Wells, a Distinguished Professor of Psychology and leading expert on eyewitness identification research. Over the past 35 years, a substantial amount of research on both system and estimator variables has been conducted and published in peer-reviewed scientific journals, books, law reviews, and other sources.

Independently, system and estimator variables have been shown to influence the likelihood of an accurate identification decision. That is, even when best practices are used by law enforcement, eyewitness errors are not necessarily eliminated. This is because estimator variables - the circumstances surrounding the crime and the witness' ability to perceive – also influence accuracy.

The estimator and system variables relevant to this case include:

**Estimator Variables:**
1. Effects of brief/limited exposure on eyewitness accuracy;
2. Effects of weapon presence;
3. Effects of stress/arousal;
4. Eyewitness description accuracy;
5. Effects of witness age on accuracy;

**System Variables:**
6. Mug-shot searching;
7. Filler bias;
8. Pre-identification instruction bias;
9. Use of non-blind simultaneous lineup rather than a double-blind sequential lineup;
10. Witness confidence and accuracy;
11. The post-identification feedback effect;
12. Repeated identification procedures and Commitment effects; and
13. Non-identifications of the suspect;

## IV. Brief Summary of Relevant Facts

Based on my review of the materials listed above, I summarize the facts relevant to the eyewitness evidence in the above referenced case:

On August 27, 1988, Mr. Felix Valentin was shot multiple times - by a single shooter - and later died as a result of his injuries. There was one witness to the shooting, 12-year old Orlando Lopez. On the day of the shooting, Lopez provided a description of the shooter to law enforcement and this description included his belief that the shooter was a member of the Latin Kings. Lopez was asked to look through "mug-books" of Latin King gang members to see if he recognized anyone and Lopez selected a photograph of the Plaintiff, Jacques Rivera, believing at the time that the photograph resembled the shooter. According to Lopez, he subsequently was asked to view a live lineup that contained Plaintiff and Jose Rodriguez – another suspect in the case who had been identified by the victim who, on the day of the shooting, was asked to view Imperial Gangster gang mug-books in the hospital. Lopez has testified that, from the live lineup, he selected the person he believed was the shooter, whom he claimed was Plaintiff Jacques Rivera. I note, however, that Jacques Rivera was released from custody following a line-up in which he stood. At a time following this identification procedure, Lopez saw a man in his neighborhood whom he believed was the shooter, who was not Jacques Rivera. After this sighting, Lopez was asked to view another lineup containing Plaintiff and he identified Plaintiff. Lopez testified (in 2011) that he told law enforcement at this second lineup that he had seen the actual shooter in his neighborhood, who was not Jacques Rivera, but law enforcement told him not to worry and continued with their case with Plaintiff as their suspect. Lopez testified at Plaintiff's bench trial in 1990 and again identified Plaintiff at trial despite his testimony post-conviction that he knew Plaintiff was not the shooter when he testified in 1990.

## V. Background on Eyewitness Research

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex (see review and report on eyewitness identification by NAS, 2014). Most theoretical analyses of the memory process divide it into three major stages. First, an event is perceived by a witness and information is entered into the memory system. Next, some time passes before a witness tries to remember the event. Finally, the witness tries to retrieve the stored information. Psychologists who conduct research in this area try to identify and study the important factors that play a role in each of the three stages.

Numerous factors at each stage affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: lighting conditions, duration of an event, stress/fear, and length of the retention interval. As it relates to law enforcement, research has shown that the procedures and practices police use during the third (retrieval) stage of the memory process can influence the reliability of an eyewitness identification and the witness' subsequent testimony. Examples of police procedures that can affect the accuracy of an identification include pre-lineup/photoarray[1] instructions, type of lineup/photoarray administered (simultaneous or sequential), whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness after their identification decision.

### 1. Research Methodologies Used in Eyewitness Research

In general, eyewitness identification researchers employ several techniques to come to the scientific conclusions that will be discussed in this report. The three most common research techniques are laboratory research, archival research and meta-analyses.

The most common form of eyewitness identification research is experimental laboratory research. The primary reason for conducting experimental research is that it gives researchers the ability to make cause and effect statements, such as "Y happened *because* of X." For example, a well-conducted experiment can tell us that using a specific identification procedure will cause an improvement in identification accuracy.

Archival research involves the examination of existing records or data from actual cases. This type of research is important for understanding how witnesses in actual cases behave. For example, archival studies have demonstrated that approximately 20% of witnesses in real cases who are shown a lineup select a lineup filler or stand-in, rather than the real perpetrator. Thus, these records show us that nearly one in five eyewitnesses makes an identification error by selecting a known innocent person. These results are consistent with results from laboratory studies, which have found very similar rates of erroneous filler selection. The study of DNA exonerations in the United States, discussed below, is an example of archival research.

A third research technique that psychologists and other researchers employ is the meta-analysis. Generally, a meta-analysis is a statistical summary of research that has already been conducted, as opposed to the collection of new data with participants in a new experiment. Although the

[1] The terms "lineup" and "photoarray" are used interchangeably in this report.

specific procedures employed by researchers in one meta-analysis may differ from those used in another meta-analysis, there are common elements to all meta-analyses. A benefit of using the meta-analysis technique is that it informs the researcher about eyewitness performance over the course of a large number of studies, from many researchers and from different laboratories (and perhaps from many different countries around the world).

**2. Eyewitness Error Rates in Actual Cases**

I begin by noting, briefly, some important facts about eyewitness errors. According to the Innocence Project, there have been mistaken eyewitness identifications in close to **75% of DNA exonerations** – which currently number **347**. *See* www.innocenceproject.org.

Brandon L. Garrett (2011), a law professor at the University of Virginia, systematically examined the first 250 DNA exoneration cases in the United States and found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases. In a quarter of all wrongful convictions studied, eyewitness testimony was the only direct evidence against the defendant. Further, in the 190 cases where there was an erroneous eyewitness identification of the defendant, 36% included mistaken identification from more than one eyewitness. In fact, some of the cases had as many as five eyewitnesses who mistakenly testified that the defendant was the perpetrator.

**3. Eyewitness Error Rates in Archival Studies**

Archival studies also show that eyewitness identifications can be unreliable. Researchers have begun to analyze records of actual eyewitness identifications and attempted identifications. Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct, but it is possible to determine error rates as reflected in the false identification of non-suspect fillers. Ruth Horry and colleagues discuss additional concerns about archival studies in a recent paper in 2014.[2]

A properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers (who are known to be innocent). According to scientific psychological research and the National Institute of Justice, it is critical to have only one suspect in each lineup so that law enforcement can assess whether a particular eyewitness is reliable. When an eyewitness identifies a lineup filler, police will know that that witness is unreliable. If all of the lineup members were potential suspects, it would be impossible for police to determine if an eyewitness has recognized the perpetrator or merely is guessing – as any identification would be categorized as a "positive ID". This is particularly important when one considers the findings from field studies with real witnesses presented below. While false identifications of innocent fillers do not necessarily send innocent people to jail, these still constitute identification errors and provide useful information about the accuracy of eyewitness identifications and the reliability of lineup procedures.

[2] Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94-108.

In a 2006 paper, Drs. Gary Wells, Amina Memon and Steven Penrod summarized the findings of four studies of actual eyewitnesses to serious crimes:

- Wright and McDaid (1996) analyzed 1,561 lineup outcomes in London and found filler-identification rates of 19.9%.
- These data are similar to the 21% filler identification rate reported by Slater (1994) in a study of 843 lineups conducted by the Metropolitan Police in London.
- Behrman and Davey (2001) reported that 24% of identifications from live lineups in Sacramento, California, were identifications of fillers.
- Valentine, Pickering, and Darling (2003) analyzed 119 lineups in the greater London area and found that 21.6% of the eyewitnesses identified fillers.

Wells, et al., underscored that these archival results are "a very important complement to the experimental studies of eyewitnesses" because they find filler identification results that are quite consistent with rates obtained in experiments (e.g., Ebbeson & Flowe, n.d.; Steblay, Dysart, Fulero, & Lindsay, 2001), and they address a common criticism of experiments— namely, that participant witnesses in experiments are not as cautious as actual crime witnesses are, because the consequences of a mistaken identification in an experiment are not serious,

**VI. Proposed Testimony in Current Case**

The following eyewitness factors have been identified as being relevant to the facts of the current case involving the identification of Mr. Rivera by Orlando Lopez:

1. Effects of brief/limited exposure on eyewitness accuracy;
2. Effects of weapon presence;
3. Effects of stress/arousal;
4. Eyewitness description accuracy;
5. Effects of witness age on accuracy;
6. Mug-shot searching;
7. Filler bias;
8. Pre-identification instruction bias;
9. Use of non-blind simultaneous lineup rather than a double-blind sequential lineup;
10. Witness confidence and accuracy;
11. The post-identification feedback effect;
12. Repeated identification procedures and Commitment effects; and
13. Non-identifications of the suspect;

**1. Effects of brief/limited exposure on eyewitness accuracy**

In 1990, Orlando Lopez indicated that he saw the shooter's face briefly after the shooting was finished and the shooter was going back to the "getaway" car. It appears that this exposure was limited and that, before this, during the actual shooting, Lopez was only able to see the shooter

from behind. Lopez also testified at Rivera's bench trial that he believed the shooter was someone he had previously seen playing baseball at a specific park in the neighborhood. Plaintiff has testified that he did not play baseball at that park.

Common sense might suggest that even a brief opportunity to view someone allows us to form a mental snapshot of someone, but research shows that the amount of time that a witness views a perpetrator is positively associated with the witness's ability to subsequently identify him. Further, what is critical with respect to accuracy is the witness' opportunity to see the perpetrator(s) *at the time of the event*.

In their 1986 meta-analysis, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy. Since this meta-analysis, others (e.g., Bornstein, Deffenbacher, Penrod, McGorty, & Kiernan, 2012; Memon, Hope & Bull, 2003) have replicated the positive correlation between exposure time and identification accuracy.

The Memon, Hope and Bull (2003) study involved showing witnesses a video of a realistic crime which lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and seven seconds (with the perpetrator's face in view for 12s). Witnesses' abilities to recognized the perpetrator were tested with target-present and target-absent arrays 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections in target-absent arrays increased substantially when exposure time increased. (Note, however, that mistaken identifications in target-absent arrays remained relatively high regardless of the exposure time.)

*Accuracy of Young Adults (ages 17-25) in the 12s and 45s Exposure Groups with Target-Present an Target-Absent Lineups*

| | **12 Seconds Exposure** | | | **45 Seconds Exposure** | | |
|---|---|---|---|---|---|---|
| | Hits | False Alarm | Non-Choice | Hits | False Alarm | Non-Choice |
| Target Present | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Target Absent | N/A | **90%** | 10% | N/A | **41%** | 59% |

*Note.* Identification **Errors** are bolded

The results of the Memon et al. study above show that in circumstances where young adults viewed the perpetrator's face for 45 seconds, approximately 40% of all witness made a mistake and misidentified an innocent person from a lineup in which the actual perpetrator was not shown. When the exposure time was reduced to 12 seconds, the false identification of innocent people increased to 90%. Further, the ability of witnesses to correctly identify the actual perpetrator when he was shown dropped by 66% when the exposure time was reduced from 45 seconds to 12 seconds.

Moreover, it should be underscored that many factors that have been shown to decrease eyewitness identification performance were not present in the Memon et al. study (for example, stress). In essence, other than the short exposure, the other witnessing conditions in this study were relatively ideal in terms of making a correct identification decision.

**2. Weapon focus effect**

Orlando Lopez indicated that he saw a gun in the shooter's hand during the shooting and therefore spent some (unknown) amount of time looking at the weapon.

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect". As the witness focuses on the weapon, his ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was reviewed in a meta-analysis published by Steblay in 1992. The review included 19 studies with a total sample of 2082 participants. The weapon focus effect was statistically significant and demonstrated impairment of identification accuracy. A recent meta-analysis confirms the findings of the Steblay 1992 report (Fawcett et al., 2012). In summary, although it can certainly be true that a victim pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person wielding the weapon and reduces eyewitness accuracy, especially when the opportunity to see the perpetrator is short or limited, for example due to concealment of the face or a short amount of exposure to the perpetrator.

**3. The effects of stress/arousal on memory**

Being a witness to a shooting and murder is commonly considered to be a stressful or arousing experience. In addition, Orlando Lopez testified that he ran (to the store and back) when he saw the shooting, potentially causing further increases in arousal.

In their research, Deffenbacher, Bornstein, Penrod, and McGorty (2005) published a meta-analysis on the effects of stress/arousal on eyewitness performance. This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates. Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities. Researchers have also found that physical exertion, such as running, can cause increases in arousal and result in impaired identification abilities (Hope, Lewinski, Dixon, Blocksidge, Gabbert, 2012).

**4. Eyewitness description accuracy**

Orlando Lopez initially provided law enforcement with a brief description of the shooter. Assuming the description of the shooter that appears at the police report numbered Wron 0053 is

from Orlando Lopez, Lopez reported that the shooter was "18 yo, Kings, has seen before, black jacket, dark pants, gym shoes." Initially, there was no mention of hairstyle, in particular no mention of a ponytail or long hair worn by the shooter. At a later point in time, Lopez added that the shooter had blonde hair on top and darker hair at the back, however this added detail was after he had been shown mugbooks and selected a photograph of Plaintiff. Therefore, it is possible that the hair length feature provided by Lopez was merely consistent with the photograph he chose. There is no evidence that Plaintiff had blond hair – either on the top or back – in 1988 or any time near the shooting.

In Garrett's (2011) study of the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. This finding is consistent with scientific research showing that there is a correlation between the presence of incorrect descriptors and inaccurate identifications in that as the number of incorrect descriptors of a suspect increases, identification accuracy decreases (Meissner et al., 2008).

**5. Effects of witness age on accuracy**

At the time of the shooting and the identification of Plaintiff, the lone eyewitness, Orlando Lopez, was 12 years old.

An extensive literature review on child witnesses is beyond the scope of this report however it should be noted that it is well documented and widely accepted in the field of psychology that child witnesses, including 12 year olds, are more susceptible to suggestion and influence than are adult witnesses resulting in young witnesses being, overall, less reliable than adult witnesses (e.g., Poole, Brubacher, & Dickinson, 2015; Pozzulo, 2007). Therefore, caution should have been taken with Lopez during the investigation to make certain that no unnecessary influence had taken place. Further, there appeared to be little appreciation of the fact that Lopez was a child and should have been treated differently than a typical adult witness. For example, detectives contacted Lopez's mother at 11:00pm on August 30th, 1988 asking if Lopez could come to the police station to view a live lineup. This late hour should be unusual for any witness, let alone a 12 year old child.

**6. Mug-shot searching**

Orlando Lopez told detectives that he believed the shooter was a Latin King. Subsequently, police officers reported that, on August 29, 1988, they showed at least 2 "gang books" to Lopez. These books contained arrest photographs of individuals who were associated with the Latin Kings. According to the police officers, Plaintiff's photograph was included in these books and Lopez selected a photograph of Plaintiff and indicated that he looked like the shooter. Near the same time, detectives had spoken with the victim at the hospital who indicated that he believed the shooter was affiliated with the Imperial Gangsters gang. Detectives subsequently brought Imperial Gangsters mugbooks to the hospital for the victim to view and, from the materials I reviewed, it appears that the victim identified Jose Rodriguez (as the shooter) and Felipe Nieves (as the getaway driver) from the Imperial Gangsters mugbooks.

Mugbook searching is a technique that is sometimes used by law enforcement when they do not have a particular suspect in an investigation. The literature on mugshot searching, however, indicates that it is a very risky procedure because mugbooks are, in effect, large lineups in which all individuals are potential suspects. As described above, identification procedures should contain one suspect so that law enforcement can gauge whether or not a witness is reliable or merely guessing when they make a selection. The literature also shows that there are negative effects of viewing mugbooks in that it can cause commitment and unconscious transference effects (described in more detail in section 12 below; see Deffenbacher, et al., 2006).

**7. Filler bias**

Orlando Lopez provided a description of the shooter to law enforcement (see section 4 above). Of note for the lineup(s) he viewed, at some point Lopez described the shooter as having long hair in the back that could be in a ponytail. A review of the color photo of the live lineup that was shown to Lopez on September 15, 1988 shows that only 2 of the 5 individuals had long hair in the back that could reasonably be put in a ponytail. Therefore, only 2 of the 5 fillers matched the witness' description. Further, a review of the Polaroid pictures of the lineup members that were assemble for the Aug 31/Sep 1 lineup also show, in my opinion, only 2 fillers with hair long enough that it could reasonably be styled in a ponytail.

The scientific research on filler selection and filler bias shows this factor has a significant impact on the reliability of the identification outcome. Researchers use the term "functional size" (Lindsay & Wells, 1980) to refer to the number of viable lineup members, or the number of lineup members who plausibly match the eyewitness's description of the crime perpetrator. Having other lineup members who resemble the perpetrator in physical appearance and the witness' description affects suggestion by protecting the suspect from the eyewitness's tendency to make relative judgment comparison and merely choosing the person who most closely resembles their description. For example, if an eyewitness had a poor memory for the crime perpetrator but remembered some general characteristics, such as the perpetrator's hair, then having other lineup members with similar hair safeguards the suspect from identification by deduction. The quality and the number of fillers in an array clearly influence the fairness of the array--as reflected in the tendency for witnesses to make identifications, particularly false identifications.

It appears that these best practices for selecting fillers, including choosing fillers who match the witness' description, was not followed in this case. The deposition testimony of John Leonard seems to explain how this could have occurred. During the deposition of John Leonard (Deposition, 5-17-13), he was asked how the officers who went out to select the fillers (for the Aug 31/Sep 1 lineup they were putting together) knew what physical description they were looking for. Leonard's response was "I guess they know. I didn't tell them what to get." (Line 3, Page 96).

In addition, there appear to be two suspects - Jacques Rivera and Jose Rodriguez - in the first lineup procedure that law enforcement attempted to show Mr. Valentin while he was in the hospital. It is possible that Lopez also viewed the members of the lineup at a live procedure. In

fact, Gillian McLaughlin testified in 2013 that it would have been the proper procedure – to put two suspects in one lineup – if you had two suspects that had previously been identified. She went on further to testify that she believes "all possible suspects should have been in that lineup" (p.103 of 2013 transcripts). Having two suspects in a single procedure, as discussed in section V.3. above, is a serious departure from best practices and should never be done.

**8. Pre-identification instruction bias**

There is no evidence in the materials I reviewed that Orlando Lopez was informed, prior to viewing the mug-books or lineups, that the actual perpetrator "may or may not be present" in the procedures. In fact, he testified at Plaintiff's trial that the purpose of going to see the lineup was "to pick out who did it" (Line 20, page 24).

Informing the witness that the police have a suspect or failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the photo array (or that their task merely is to find the perpetrator among the set) encourages witnesses to make a selection from the array. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array and that they should not feel compelled to make an identification. This pre-lineup instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present. Further, witnesses should also be told that the person administering the photo array does not know which person is the suspect in the case (i.e., that the photo array is double-blind).

In 1999, the National Institute of Justice (DOJ) issued a report entitled *Eyewitness Evidence: A Guide for Law Enforcement* that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence. These best practices recommend among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array.

The instruction bias research was reviewed by Steblay in a 1997 meta-analysis in which she cumulated the results of 22 different experimental studies of the effects of biased instructions involving nearly 2600 witness-participants. She found that biased instructions were particularly harmful in target-absent lineups in which witness accuracy declined from 60% (unbiased lineups) to 35% (biased lineups). Strikingly, the magnitude of the biasing effect was just as large when witnesses were simply not given a "don't know" or "not present" option as it was when instructions also included some pressure to make a selection.

**9. Use of non-blind simultaneous lineup rather than a double-blind sequential lineup**

The detectives who conducted the simultaneous lineups in this case were aware that Plaintiff was the suspect – or one of the suspects - in the simultaneous procedure. In addition, it is clear from my review of the materials that the detectives who attempted to conduct a photo lineup with Mr.

Valentin in the hospital were familiar with and sometimes used sequential lineups, as they attempted to show Mr. Valentin a sequential (non-blind) lineup while he lay in his hospital bed.

More than twenty-five years of research indicates that sequential lineups – when compared to simultaneous lineups – can cut the rate of false identifications of innocent people in half. In simultaneous lineups (live and photographic), the suspect and fillers are presented at the same time and the eyewitness identifies which (if any) is the perpetrator. Scientific research demonstrates that sequential lineups, in which a witness views the suspect and fillers one at a time and makes a judgment about each face as it is presented, results in fewer mistaken identifications compared to simultaneous procedures. The dominant explanation for this difference is that witnesses who view simultaneous lineups are more likely to engage in a relative judgment process and choose the lineup member who most closely resembles their memory for the perpetrator. Witnesses who view the images one-at-a-time are less able to engage in this relative or comparison process and therefore are more likely to make an identification based on their memory, rather than a combination of their memory and choosing the person who is the best answer of those presented.

In 2001, Steblay, Dysart, Fulero, and Lindsay published a simultaneous/sequential meta-analysis examining 30 comparisons of sequential and simultaneous procedures involving the responses from over 4,000 research participants. The results showed that witnesses were nearly half as likely to make a false identification from a target-absent sequential array (28% mistaken identifications) than from simultaneous arrays (51% mistaken identifications). In 2011, Steblay, Dysart and Wells updated the 2001 meta-analysis and looked at 70 comparisons and the responses from over 10,000 participants. The pattern of findings in 2011 was almost identical to those reported in 2001.

A recent field study on eyewitness identification procedures using real witnesses and real identification decisions in ongoing criminal investigations (Wells, Steblay, & Dysart, 2011) also found that sequential lineups produce fewer mistaken identifications than simultaneous lineups. It should be noted that all of the lineups conducted in this study were done in a double-blind manner, where the administering officer does not know which lineup member is the suspect and which the fillers (see section on non-blind lineup administration). The study also found that double-blind sequential lineups (compared to double-blind simultaneous lineups) as administered by police departments across the country resulted in the same number of suspect identifications (27.3% for sequential and 25.5% for simultaneous) and fewer known-innocent filler identifications (12.2% for sequential and 18.1% for simultaneous). Thus, the results of the laboratory research were replicated in real criminal investigations.

One of the results from the field study was that witnesses in these real criminal cases who made positive identifications ("yes, that is the person I saw commit the crime") from a simultaneous photoarray made an identification error and chose a lineup filler 42% of the time. That is, 4 out of every 10 positive identifications that were obtained from double-blind simultaneous lineups were mistaken identifications of innocent people (see Figure below). Even with the double-blind sequential procedure, 3 of every 10 identifications were of an innocent filler. Thus, even when the best identification procedures are used, identification procedures are not entirely eliminated

and witnesses can still be unreliable (most likely due to the effects of estimators on eyewitness accuracy).



Contemporary guidelines (e.g., IACP), and in some states (e.g., CT, NC, TX) the law, for conducting identification procedures states that the police officer conducting the proceedings should not know who the suspect is—this completely eliminates the possibility that the officer can influence the witness to pick the suspect. We need not assume that a lineup administrator's influence is conscious or deliberate in order to see the value of the "double-blind" procedure. In other words, the influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect. We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person (Luus & Wells, 1994; Wells & Bradfield, 1998).

In this particular case, I have not been provided with a video recording of the identification procedures and thus it is not possible to determine with exact certainty whether any influence – conscious or unconscious - occurred during the identifications. However, if double-blind administration had been used in this case, it would have eliminated the possibility of the administering detective having influenced the witness – again, either consciously or unconsciously – to identify Plaintiff.

PLAINTIFF 12-21-2016 RULE 26 DISCLOSURE 013

**10. Witness confidence and accuracy**

In the materials I reviewed in preparation of this report, I found no contemporaneous recording of Orlando Lopez's level of confidence in his selection of Plaintiff from the mug-books or from the non-blind simultaneous lineup.

Decades of research now show that there is a moderate relationship between the accuracy of an eyewitness' positive identification and his confidence in that identification, and that this relationship can be significantly affected by pre- and post-identification factors.

Unfortunately, the problems relating to witness confidence in the accuracy of their identifications and the actual accuracy of those identifications are manifold. Some of these problems relate to jurors' reliance on witness confidence as a guide to witness accuracy and some relate to the tenuous association between confidence and accuracy at trial. In addition witness confidence can be strongly influenced by suggestive procedures and post-identification factors such as repeated questioning, briefings in anticipation of cross examination, and feedback to the witness. The most useful expression of confidence is one made at the time the *initial unbiased/non-suggestive* identification procedure. Research demonstrates that jurors have difficulty reliably differentiating accurate from inaccurate eyewitnesses, and are not adequately sensitive to aspects of witnessing and identification conditions that affect witness performance.

Another important consideration in the area of confidence is *confidence malleability*, which refers to the tendency for an eyewitness to become more (or less) confident in his or her identification as a function of events that occur after the identification decision. Confidence malleability is particularly important because actors in the legal system can contaminate the confidence of an eyewitness in ways that can make an eyewitness's in-court expression of confidence a meaningless indicator of the eyewitness's memory. An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the culprit are the same person. An eyewitness's belief that the identified person is the culprit can arise out of pure memory judgments, i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit (Leippe, 1980; Wells, Ferguson, & Lindsay, 1981). But, significantly, an eyewitness may believe that the identified person is the culprit for reasons other than the eyewitness's memory (Leippe, 1980; Wells, Ferguson, & Lindsay, 1981; Luus & Wells, 1994; Wells & Bradfield, 1998). For example Hastie, Landsman, & Loftus (1978), in an early demonstration of confidence malleability, found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports (see also Shaw, 1996; Shaw & McClure, 1996; Turtle & Yuille, 1994).

Similarly, Wells, Ferguson, and Lindsay (1981) demonstrated they could increase witness confidence simply by briefing witnesses about the types of questions they might encounter in an upcoming cross-examination. When cross-examined, the briefed witnesses (who were no more accurate than the un-briefed witnesses) were significantly more confident about their identifications (than were un-briefed witnesses) and were believed more often by the jurors. Unfortunately, the briefing effect occurred among inaccurate eyewitnesses, whose levels of confidence rose dramatically, whereas confidence levels among accurate witnesses were unchanged.

**11. Post-identification feedback effect and confidence**

Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). In this case, Lopez testified in his deposition that officers told him that he had done his job and that everything was going to be okay.

In their research, Wells and Bradfield (1998) found that eyewitnesses who received confirming feedback ("Good, you identified the suspect") were not only much more confident than the witnesses with no feedback and witnesses with disconfirming feedback - the confirming feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times in research labs and also with real witnesses in real ongoing criminal investigations (Wright & Skagerberg, 2007). The most effective method of eliminating police suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure (i.e., a double-blind administrator; Kovera & Greathouse, 2009).

One of the explanations that have been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance (Charman, et al., 2010; Festinger, 1956; Festinger & Carlsmith, 1959). In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Dean was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Dean was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Dean was innocent and was not the man who had raped her in 1994.

**12. Repeated identification procedures and Commitment effects**

Orlando Lopez viewed and selected Plaintiff's photograph from one of the gang mugbooks that he was shown by law enforcement. He contends he was then presented with two live lineups in which Plaintiff was present and Lopez again chose Plaintiff from the lineup. After the lineup identification, Lopez was shown photographs of Jose Rodriguez and Felipe Nieves and Lopez indicated that he did not recognize those two men. It should be noted that this identification procedure – showing two individual photographs of additional suspects – occurred after Lopez had already identified Plaintiff.

If an individual has been identified in one identification procedure, he is considerably more likely to be identified in a subsequent procedure regardless of whether or not he is the actual perpetrator (Behrman & Vayder, 1994; Brigham & Cairns, 1988; Deffenbacher et al., 2006; Dysart, Lindsay, Hammond, & Dupuis, 2001; Gorenstein & Ellsworth, 1980; Haw et al., 2007; Steblay & Dysart, 2016); this is known as "commitment". Identification of an individual from a

mugshot (Brigham & Cairns, 1988; Deffenbacher et al., 2006; Dysart et al., 2001; Gorenstein & Ellsworth, 1980), as well as from a showup (Behrman & Vayder, 1994; Godfrey & Clark, 2010; Haw et al., 2007), has been found to increase the probability that witnesses will make a positive identification of the individual selected from a subsequent lineup. Thus, the question remains as to whether Orlando Lopez identified Plaintiff from the lineup because he had selected Plaintiff's photograph from the mug-book search, in addition to other potential influences. Further, any in-court identification made by Lopez also could have been a result of commitment rather than recognition of Plaintiff. In fact, Lopez's post-conviction and deposition testimony confirms that he did not identify Plaintiff at trial because he had recognized him from the shooting.

**13. Non-identifications of the suspect**

In this case, it remains disputed whether Lopez viewed one or two live lineups containing Plaintiff. If Lopez did view a lineup containing Plaintiff on Aug 31/Sep 1, 1988, evidence would support the conclusion that he did not positively identify Plaintiff because Plaintiff, according to his testimony and police records, was released by law enforcement following the identification procedure. In my experience, if Plaintiff had been identified by Lopez at this lineup, he would not have been released.

Lopez's failure to identify Plaintiff at this lineup is indicative of Plaintiff's innocence. Research shows that an eyewitness's non-identification of a suspect is a reliable indicator of the suspect's innocence. In a 2007 meta-analysis of 94 eyewitness identification experiments by Clark, Howell, and Davey, eyewitnesses gave non-identification responses far more often in target-absent lineups (.52 probability) than in target-present lineups (.33 probability). Thus, Lopez's failure to identify Plaintiff in this first live lineup a few days after the shooting should have been an important factor to consider in the investigation.

**VII. Summary**

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness' memory, the reliability of the identification and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be.

In this particular case, there exist several factors that have been shown to affect witness accuracy: the brief opportunity the witness - a 12 year old child - had to see the perpetrator, the fact that a weapon was used and viewed by the witness, the effects of stress/arousal, the use of mugbooks in trying to locate a suspect, the selection of lineup fillers that did not match the witness' description of the shooter, a non-blind simultaneous lineup with no pre-lineup warning that the actual perpetrator may or may not be there, the possibility of commitment effects for the identification of Plaintiff from the mugbooks to the lineup. In summary, the combination all these factors significantly decreased the likelihood that an accurate identification could have been made by the lone witness, who happened to be a child, in this case.

**VIII. Supplemental Reports**

If additional materials are received in reference to this case, I reserve the right to supplement this report in the future.

If called to testify, I would swear to the truth of these facts.

Jennifer Dysart
______________________________
Jennifer Dysart, PhD

# Exhibit 59

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT (DAY MONTH YEAR) | DATE OF THIS REPORT (DAY MONTH YEAR WATCH) |
|---|---|
| | |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| | | |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

OCHOA, ROSENDO M/WH/23 [illegible] MAR 70
2135 N. SAWYER 2ND PH: 772-0991
~~SSN.~~ unemployed. CLAIMS NO GANG, NO NICKNAME
offender standing AT 2148 N. SAWYER AT Time of SHOOTING
- ABout 1610-1615 -
- INSIDE -
- VEH: DROPPED off MARCELLES CORDER[illegible]
STOPPES IN ALLEY, 2135 N. SAWYER. 2ND
- MARCELLES PICKED UP HER NICE 1½ YR. & WAS going out To SHow People in CAR the BA[illegible]
- ROSENDO WAS LOOKING out WINDOW C[illegible]
& SAW 1-M/ P.R. / 17-19 5'5 135-14[illegible]
STANDING ON STREET WEARING BLK HOODED SWEATSHIRT - + BLK PANTS. - CLEAN SHAVEN.
- MARCELLES - BEGAN TO TAKE BABY INSID[E]
- CAR STARTED TO Pull AWAY.
- NORTH Bound,
- off HIDES BEHIND TREE &
FIRES 5 SHOTS AT VEH. (3+2)
- off then Runs S. To ALLEY &
WEST IN ALLEY.
- HEARD CAR TIRES SQUEELING IN
[illegible]

R.D. NO.

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY MO. YR. TIME |
|---|---|---|
| | | |

CPD-23.122 (Rev. 2/83)

# Exhibit 60

2148
2148
THE SAWYER

# Exhibit 61

## MEMORANDUM OF INTERVIEW OF ROSENDO OCHOA

Rosendo Ochoa a/k/a Geraldo Najera interviewed by Attorney De Leon in the presence of ASA Studenroth and Transportation D.O.C. Off. M. Patte and R Gib's, on October 5, 1994 at Room 602, Jury Chambers (Judge Suria's courtroom) witness Ochoa (Najera stated that he is in Galesburg Correctional Center for V.O.P. and a drug case.) Judge Hibbler gave him four years.

In summary he said: I was in my house looking out the second floor window. I saw the car Monica was in go North on Sawyer. It is a one-way north. I seen one guy behind a tree shoot at the car. No gang signs were exchanged, but the guy said something I could not hear. No-one in the car gave gang signs. I was about 2 houses down and across the street. The person who shot was a male hispanic, black pants, black hooded sweatshirt, hoodup, his skin color was lighter than mine. He looked white but he was Latino, not as dark as me. (The witness pointed to the ASA David Studenroth, white like this pointing his finger at ASA's hand) but not a white guy he was hispanic.) He again was asked if he was white the witness said, no he was definitely hispanic but light skin, not as dark as me. (indicating the witness Ochoa himself.) Witness was very descriptive as to the events and ASA commented on his excellent memory of events as they occurred.

Respectfully submitted,

John R. De Leon

EXHIBIT
13
Ochoa 7/28/2022

Ex 13