## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
| | ) | No. 19 C 6508 |
| *Plaintiff*, | ) | |
| | ) | Hon. Franklin U. Valderrama, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

## PLAINTIFF GERALDO IGLESIAS'S CONSOLIDATED RESPONSE
## IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

## TABLE OF CONTENTS

**Page**

I.     IGLESIAS IS INNOCENT OF THE ROMAN MURDER ............................................3

II.    ROMAN IS SHOT IN A CAR ON THE STREET IN LOGAN SQUARE.............................................................................................................3

III.   DEFENDANTS HAD NO LEADS .................................................................3

IV.   OCHOA AND RODRIGUEZ DID NOT SEE AND COULD NOT IDENTIFY THE PERPETRATOR .........................................................4

V.     DEFENDANTS DECIDE ON IGLESIAS AS THEIR SUSPECT WITHOUT EVIDENCE AND FABRICATE A TIP FROM A CONFIDENTIAL INFORMANT ...................................................................5

VI.   DEFENDANTS FRAME IGLESIAS IN TWO DAYS IN JUNE 1993 ........................6

VII.   THE DEFENDANTS FABRICATE AN INCRIMINATING STATEMENT FROM VICENTE USING FORCE, THREATS, AND PROMISES, AND THEN SUPPRESS WHAT THEY HAVE DONE ........................8

VIII.   THE DEFENDANTS SUPPRESS KEY EVIDENCE THROUGHOUT THE PROSECUTION OF IGLESIAS .......................................................9

IX.   IGLESIAS IS CONVICTED AT TRIAL .....................................................11

X.     THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED IGLESIAS'S WRONGFUL CONVICTION.................................................12

XI.   IGLESIAS FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED.................................................................................13

XII.   DEFENDANTS REFUSE TO TESTIFY IN THIS CIVIL CASE ............................13

XIII.   VICENTE COMES CLEAN ....................................................................14

I.     DEFENDANTS CONCEDE AND DO NOT CHALLENGE THAT MANY OF IGLESIAS'S CLAIMS REQUIRE A TRIAL .....................................15

II.    SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE .................................................18

III.   SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA AND HALVORSEN IN LIGHT OF THEIR INVOCATION OF THE FIFTH AMENDMENT.................................................................................20

     A. Guevara and Halvorsen Cannot Meet Their Initial Burden of Production At Summary Judgment .......................................................21

     B. Guevara and Halvorsen Cannot Meet Their Burden of Persuasion At Summary Judgment .......................................................23

C. Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law ........................................................................................24

D. Guevara and Halvorsen Cannot Assert Their Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record ...........................................................................26

IV. SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS ................................................................27

A. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence ........................................................................................29

1. Riccio, Gawrys, and Biebel Fabricated Evidence ...........................32

2. Ochoa's and Rodriguez's Identifications Were Fabricated ............36

3. Defendants' Fabrication of the Confidential Informant Tip Was Used to Deprive Iglesias of His Liberty ...............................39

B. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence ........................................................................................43

1. Defendants Suppressed Their Own Fabrications ..............................45

   (a) Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong .....................46

   (b) *Gauger*'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case.........................47

   (c) Defendants' Suppressions of Their Fabrications Were Material to Iglesias's Criminal Prosecution..............................50

2. Defendants Suppressed Exculpatory and Impeachment Evidence Independent of Their Fabrications .....................................51

   (a) Defendants Suppressed That Both Eyewitnesses Told Police that They Did Not See and Could Not Identify the Shooter ........................................................................................51

   (b) Defendants Suppressed That Iglesias Was Their Suspect Before There Was Any Evidence Implicating Him, and They Suppressed A Document Showing They Had Picked Him As A Suspect First ......................................52

   (c) Defendants Suppressed Their Interactions with Vicente ...........53

   (d) Defendants Suppressed Their Interactions with Ochoa ............55

   (e) Defendants Suppressed Their Own Pattern of Misconduct..................................................................................56

3. Defendants' Arguments About Other Suppressed Exculpatory and Impeachment Evidence Lack Merit.....................57

        (a) Defendants Suppressed A Note Documenting That A Witness Knew the Shooter ................................................................ 58

        (b) Defendants Suppressed Documentary Evidence That They Believed Spanish Cobras Had Committed the Crime ........................................................................................ 62

        (c) Defendants Suppressed Arnell Moore's Non-Identification of Iglesias ................................................................. 63

        (d) Defendants Suppressed Their Interactions with Rodriguez ............................................................................... 65

        (a) Defendants Suppressed Exculpatory Police Documents .......................... 68

C. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Iglesias's Criminal Trial ........................................................... 70

    1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983 .............................................................................. 70

        (a) The Seventh Circuit Recognizes This Type of § 1983 Claim .............................................................................. 70

        (b) *Vega* Does Not Affect This Type of § 1983 Claim ................................. 71

    2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Iglesias's Criminal Case and Violated His Right to Due Process ........................................... 74

        (a) The Identification Procedures Were Unduly Suggestive .......................... 74

        (a) Ochoa's and Rodriguez's Identifications Were Not Reliable .............................................................................. 78

        (b) The Identifications Tainted Iglesias's Criminal Proceedings ............................................................................. 81

    3. Whether or Not Iglesias's Attorneys Objected to the Admission of the Identifications At the Criminal Trial Has Zero Bearing on This Theory ................................................. 84

    4. Defendants Are Not Entitled To Summary Judgment Merely Because They Disclaim Intent ................................................. 87

    5. Defendants Are Not Entitled To Qualified Immunity on This Theory ........................................................................................ 89

D. A Jury Must Decide Iglesias's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims ........................... 91

E. A Jury Must Decide the Failure-To-Intervene Claims ........................... 95

F. A Jury Must Decide Iglesias's State-Law Claim of Intentional Infliction of Emotional Distress ........................................................... 97

G. A Jury Must Decide the Section 1983 Conspiracy Claims ............................... 97

H. A Jury Must Decide the State Law Negligence Claim ...................... 101

V. SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO ........................................................................................... 103

A. The City Misstates the Legal Framework Governing *Monell* Claims .............................................................................................. 106

B. The City Does Not Move for Summary Judgment On A Number of Iglesias's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What .................................................................................. 107

C. The City Is Precluded from Relitigating Its Official Policy of Evidence Suppression ....................................................................... 110

D. The City Does Not and Cannot Challenge Iglesias's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression .............................................. 111

E. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression .................................. 112

    1. The City's False Premise Regarding Expert Evidence ................. 112

    2. The City Invokes the Wrong Legal Standard for Widespread Practice Claims ........................................................................... 112

    3. The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous ............................. 114

    4. Non-Expert Evidence Establishing the City's Evidence Suppression Practice ................................................................... 115

    5. Expert Evidence Demonstrating the City's Evidence Suppression Practice ................................................................... 120

    6. The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit .................................... 122

        (a) The City's Causation-Related Arguments Lack Merit .......... 122

        (b) The City's Arguments Challenging Mr. Tiderington Lack Merit ........................................................................ 124

F. A Jury Must Decide the *Monell* Theory Regarding the City's Failure to Train, Supervise, and Discipline Its Police Officers .......... 128

    1. Non-Expert and Expert Evidence Supports the Failure to Train, Supervise, and Discipline Theory ................................... 129

    2. The City's Arguments for Summary Judgment on the Failure to Train, Supervise, and Discipline *Monell* Theory Lack Merit ............................................................................................ 143

      (a) The City's Reiterated Arguments Regarding Mr. Finnell and Ms. Meza Lack Merit and Do Not Justify Summary Judgment ...................................................................143

      (b) The City's Argument About Burge Evidence Lacks Merit.......................................................................145

      (c) The City's Argument About Lawsuits Against Officers Lacks Merit .................................................146

      (d) The City's Argument About Complaint Register Files Lacks Merit .................................................147

G. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures ....................................149

  1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications...........................................150

  2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications ..........................................153

  3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit ...................................158

H. The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit...........................................................161

  1. The City's Liability Does Not Necessarily Depend on Individual Liability .........................................................161

  2. The City's Causation Argument Is Meritless................................163

I. The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment ..........................................................164

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adickes v. S.H. Kress & Co.,*
   398 U.S. 144 (1970)................................................................................*18*

*Alexander v. City of South Bend,*
   433 F.3d 550 (2006)......................................................................... *passim*

*Alexander v. United States,*
   721 F.3d 418 (7th Cir. 2013) .............................................................92

*Anderson v. City of Rockford,*
   932 F.3d 494 (7th Cir. 2019) .......................................................41, 55

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...............................................................................15

*Armstrong v. Daily,*
   786 F.3d 529 (7th Cir. 2015) .....................................................65, 101

*Avery v. City of Milwaukee,*
   847 F.3d 433 (7th Cir. 2017) ......................................................... *passim*

*Banks v. Dretke,*
   540 U.S. 668 (2004)...........................................................................59, 69

*Baxter v. Palmigiano,*
   425 U.S. 308 (1976)...........................................................................23, 24

*Beam v. IPCO Corp.,*
   838 F.2d 242 (7th Cir. 1988) ..............................................................115

*Beaman v. Freesmeyer,*
   183 N.E.3d 767 (Ill. 2021)..................................................................92

*Belangen v. Schreiber,*
   407 F.3d 34 (2d Cir. 2005) ...................................................................23

*Bell v. City of Milwaukee,*
   746 F.2d 1205 (7th Cir. 1984) ......................................................98, 100

*Blackmon v. City of Chicago,*
   No. 19 CV 767, 2023 WL 7160639 (N.D. Ill. Oct. 31, 2023) .....................71, 73, 75

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                  **Page(s)**

*Blasius v. Angel Auto., Inc.,*
839 F.3d 639 (7th Cir. 2016) ........................................................................124

*Bolden v. Pesavento,*
623 F. Supp. 3d 897 (N.D. Ill. 2022) ..............................................................71

*Bonds v. City of Chicago,*
No. 16-CV-5112, 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018)....................162

*Boss v. Pierce,*
263 F.3d 734 (7th Cir. 2001) ....................................................................60, 61

*Briscoe v. LaHue,*
460 U.S. 325 (1983)........................................................................................90

*Brown v. Mississippi,*
297 U.S. 278 (1936)........................................................................................72

*Bryant v. Whalen,*
759 F.Supp. 410 (N.D. Ill. 1991) ...................................................................93

*Buckley v. Fitzsimmons,*
509 U.S. 259 (1993)........................................................................................41

*Byrd v. Brishke,*
466 F.2d 6 (7th Cir. 1972) ..............................................................................96

*Cage v. City of Chicago,*
No. 9 C 3078, 2010 WL 3613981 (N.D. Ill. Sept. 8, 2010)...........................162

*Calhoun v. Ramsey,*
408 F.3d 375 (7th Cir. 2005) ........................................................................107

*Camm v. Faith,*
937 F.3d 1096 (7th Cir. 2019) .................................................................19, 49

*Canton v. Harris,*
489 U.S. 378 (1989)...............................................................................108, 128

*Carmichael v. Village of Palatine,*
605 F.3d 451 (7th Cir. 2010) .........................................................................17

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                 **Page(s)**

*Cartwright v. City of Chicago,*
    450 Fed. App'x 539 (7th Cir. 2011) .......................................................95

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...........................................................................17

*Chavez v. Martinez,*
    538 U.S. 760 (2003) .....................................................................72, 73

*Chelios v. Heavener,*
    520 F.3d 678 (7th Cir. 2008) ...............................................................95

*City of Chicago v. Reliable Truck Parts Co., Inc.,*
    822 F.Supp. 1288 (N.D. Ill. 1993) ........................................................24

*City of Los Angeles v. Heller,*
    475 U.S. 706 (1986) .........................................................................162

*Coleman v. City of Peoria,*
    925 F.3d 336 (7th Cir. 2019) .........................................................70, 86

*Collier v. City of Chicago,*
    2015 WL 50814408, (N.D. Ill. Aug. 26, 2015) .......................................93

*Costello v. Grundon,*
    651 F.3d 614 (7th Cir. 2011) .................................................17, 39, 109

*Crivens v. Roth,*
    172 F.3d 991 (7th Cir. 1999) ...............................................................61

*Currie v. Chhabra,*
    728 F.3d 626 (7th Cir. 2013) ...............................................................95

*Daniel v. Cook County,*
    833 F.3d 728 (7th Cir. 2016) .......................................................113, 123

*Davis v. Carter,*
    452 F.3d 686 (7th Cir. 2006) ..................................................106, 109, 114

*Dixon v. Cook County,*
    819 F.3d 343 (7th Cir. 2016) .............................................................113

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                  **Page(s)**

*Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
593 F.3d 507 (7th Cir. 2010) ............................................................102

*Dominguez v. Hendley,*
545 F.3d 585 (7th Cir. 2008) ..............................................................43

*Donald v. Outlaw,*
No. 2:17-CV-32-TLS, 2023 WL 2346270 (N.D. Ind. Mar. 3, 2023) ....................71

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,*
285 F.3d 609 (7th Cir. 2002) ............................................................144

*Engel v. Buchan,*
710 F.3d 698, 699 (7th Cir. 2013)........................................................46

*Escobedo v. Ram Shirdi,*
No. 10 C 6598, 2013 WL 1787819 (N.D. Ill. Apr. 25, 2013)...........................164

*Estate of Moreland v. Dieter,*
395 F.3d 747 (7th Cir. 2005) ............................................................114

*Evans v. City of Chicago,*
2010 WL 3075651 (N.D. Ill. Aug. 5, 2010) ..............................................162

*Evans v. City of Chicago,*
2006 WL 463041 (N.D. Ill. Jan. 6, 2006) ................................................109

*Evans v. Katalinic,*
445 F.3d 953 (7th Cir.2006) ..............................................................84

*Ezell v. City of Chicago,*
No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) ..........................49, 71

*Fields v. Chicago,*
981 F.3d 534 (7th Cir. 2020) ............................................................114

*Fields v. Chicago,*
No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017)
*affirmed*, 981 F.3d 534 (7th Cir. 2020).......................................103, 110, 113, 114

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                     **Page(s)**

*Fields v. City of Chicago,*
2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ..............................................................68

*Fields v. Wharrie,*
672 F.3d 505 (7th Cir. 2012) .........................................................................44, 45

*Fields v. Wharrie,*
740 F.3d 1107 (7th Cir. 2014) ............................................................................30

*Fox v. Hayes,*
600 F.3d 819 (7th Cir. 2010) .........................................................................94, 97

*Fox v. Peters,*
2011 WL 6378826 (N.D. Ill. 2011) ...................................................................109

*Franks v. Delaware,*
438 U.S. 154 (1978).............................................................................................92

*Garcia v. City of Chicago,*
No. 01 C 8945, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003) .............................142

*Gauger v. Hendle,*
349 F.3d 354 (7th Cir. 2003) .................................................................48, 49, 50

*Geinosky v. City of Chicago,*
675 F.3d 743 (7th Cir. 2012) .............................................................................100

*Gerstein v. Pugh,*
420 U.S. 103 (1975).............................................................................................91

*Giglio v. United States,*
405 U.S. 150 (1972).................................................................................43, 44, 45, 67

*Glisson v. Ind. Dep't of Corrections,*
849 F.3d 372 (2017).......................................................................106, 107, 108, 113

*Godinez v. City of Chicago,*
No. 16-CV-07344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) .................163, 164

*Goudy v. Cummings,*
922 F.3d 834 (7th Cir. 2019) .........................................................................18, 19

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                   **Page(s)**

*Gray v. City of Chicago,*
No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) ....................................................75

*Graystone Nash, Inc.,*
25 F.3d 187 (3d Cir. 1994)........................................................................................................24

*Hampton v. City of Chicago,*
2017 WL 2985743 (N.D. Ill. July 13, 2017)......................................................60, 61, 73, 74, 75

*Hampton v. Hanrahan,*
600 F.2d 600 (7th Cir. 1979) ....................................................................................................98

*Harris v. City of Chicago,*
No. 20-CV-4521, 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020)................................................101

*Henry v. Ramos,*
1997 WL 610781 (N.D. Ill. Sept. 28, 1997) .............................................................................97

*Hensley v. Carey,*
818 F.2d 646 (7th Cir. 1987) .......................................................................................72, 73, 90

*Hill v. City of Chicago,*
No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) ....................................................84

*Holland v. City of Chicago,*
 643 F.3d 248 (7th Cir. 2011) ....................................................................................................43

*Hollins v. City of Milwaukee,*
574 F.3d 822 (7th Cir. 2009) ..................................................................................................128

*Holloway v. City of Milwaukee,*
43 F.4th 760 (7th Cir. 2022) .......................................................................................70, 71, 80

*Hope v. Pelzer,*
536 U.S. 730 (2002)...................................................................................................................95

*Hudson v. City of Chicago,*
No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019)............................................164

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                          **Page(s)**

*Hurt v. Wise,*
   880 F.3d 831 (7th Cir. 2018) ...................................................................................41

*J&J Sports Productions, Inc. v. Resendiz,*
   2009 WL 1953154 (N.D. Ill. July 2, 2009)...............................................................89

*J.K.J. v. Polk County,*
   960 F.3d 367 (7th Cir. 2020) ...................................................... 106, 158, 160, 161

*Jackson v. Marion County,*
   66 F.3d 151 (7th Cir. 1995) ...................................................................................102

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
   973 N.E.2d 880 (Ill. 2012)...................................................................................102

*Jenkins v. Bartlett,*
   487 F.3d 482 (7th Cir. 2007) .............................................................106, 108, 128

*Jimenez v. City of Chicago,*
   830 F. Supp. 2d 432 (N.D. Ill. 2011) .........................................59, 60, 67, 69, 70

*Johnson v. City of Chicago,*
   No. 05 C 6545, 2009 WL 1657547 (N.D. Ill. June 9, 2009) .................................142

*Jones v. City of Chicago,*
   856 F.2d 985 (7th Cir. 1988) ........................................................................ *passim*

*Kailin v. Gurnee,*
   77 F.4th 476 (7th Cir. 2023) ...................................................................................91

*Kindle v. City of Harvey,*
   No. 00 C 6886, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002).................................143

*King v. Kramer,*
   680 F.3d 1013 (7th Cir. 2012) ...............................................................................107

*Kluppelberg v. Burge, No. 13 C 3963,*
   Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017)............................................................67, 121

*Kyles v. Whitley,*
   514 U.S. 419 (1995)...................................................................................................43

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                 **Page(s)**

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse*,
    991 F.2d 1249 (7th Cir. 1993) ................................................................88

*LaPorta v. City of Chicago*,
    277 F. Supp. 3d 969 (N.D. Ill. 2017) ..........................................124, 163

*LaSalle Bank Lake View v. Seguban*,
    54 F.3d 387 (7th Cir. 1995) ...................................................................23

*Lawson v. Veruchi*,
    637 F.3d 699 (7th Cir. 2011) .................................................................92

*Lewis v. City of Chicago*,
    914 F.3d 472 (7th Cir. 2019) .................................................................46

*LiButti v. United States*,
    178 F.3d 114 (2d Cir. 1999)...................................................................23

*Liggins v. City of Chicago*,
    2021 WL 2894167 (N.D. Ill. July 9, 2021)..........................................101

*Logan v. Caterpillar*,
    246 F.3d 912 (7th Cir. 2011) .................................................................91

*Logan v. City of Chicago*,
    891 F. Supp. 2d 897 (N.D. Ill. 2012) .....................................................24

*Lopez v. City of Chicago*,
    464 F.3d 711 (7th Cir. 2006) .................................................................97

*Lyons v. Johnson*,
    415 F.2d 540 (9th Cir. 1969) .................................................................25

*Malley v. Briggs*
    475 U.S. 335 (1986)...............................................................................94

*Manson v. Brathwaite*,
    432 U.S. 98 (1977)..........................................................................72, 90

*Manuel v. Joliet*,
    580 U.S. 357 (2017).................................................................................91

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                 **Page(s)**

*Marcinczyk v. Plewa,*
  No. 09 C 1997, 2012 WL 1429448 (N.D. Ill. Apr. 25, 2012).......................142, 144

*Martinez v. Cook County,*
  No. 11 C 1794, 2011 WL 4686438 (N.D. Ill. Oct. 4, 2011) ...................................162

*Maxwell v. City of Indianapolis,*
  998 F.2d 431 (7th Cir. 1993) ...........................................................................93, 94

*Maxwell v. Gilmore,*
  37 F. Supp. 2d 1078 (N.D. Ill. 1999) ....................................................................145

*McCottrell v. White,*
  933 F.3d 651 (7th Cir. 2019) .................................................................................89

*McDonough v. Smith,*
  139 S. Ct. 2149 (2019)...........................................................................................41

*Monell v. Department of Social Services,*
  436 U.S. 658 (1978).......................................................................................*passim*

*Moore v. City of Chicago,*
  2011 WL 1231318 (N.D. Ill. 2011) .........................................................................97

*Moore v. Pennsylvania Dep't of Corrections,*
  457 F. App'x 170 (3d Cir. 2012) ..............................................................................

*Mwangangi v. Nielsen,*
  48 F.4th 816 (7th Cir. 2022) ..................................................................................96

*Nanda v. Bd. of Trustees of Univ. of Illinois,*
  219 F. Supp. 2d 911 (N.D. Ill. 2001) ....................................................................71

*Napue v. Illinois,*
  360 U.S. 264 (1959)...............................................................................................43

*National Acceptance v. Bathalter,*
  705 F.2d 924 (7th Cir. 1983) ................................................................................25

*Neil v. Biggers,*
  409 U.S. 188 (1972)........................................................................................78, 90

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                 **Page(s)**

*Nelson v. LaCrosse Cty,*
    301 F.3d 820 (7th Cir. 2002) ............................................................109

*Newsome v. McCabe,*
    256 F.3d 747 (7th Cir. 2001) .............................................................43

*Newsome v. McCabe,*
    319 F.3d 301 (7th Cir. 2003) ...................................................44, 45, 55

*Obrycka v. City of Chicago,*
    2012 WL 601810 (N.D. Ill. Feb. 23, 2012) .........................................142

*Ocean Tomo, LLC v. Barney,*
    133 F. Supp. 3d 1107 (N.D. Ill. 2015) .................................................59

*Olson v. Tyler,*
    771 F.2d 277 (7th Cir. 1985) .............................................................92

*Otto v. Variable Annuity Life Ins. Co.,*
    134 F.3d 841 (7th Cir. 1998) ...................................................91, 92, 96

*Padilla v. City of Chicago,*
    2009 WL 4891943(N.D. Ill. Dec. 14, 2009) .......................................147

*Padilla v. City of Chicago,*
    2013 WL 1208567 (N.D. Ill. Mar. 26, 2013) .........................................92

*Palmer v. City of Chicago,*
    82 C 2349 (N.D. Ill.) .............................................................. *passim*

*Patrick v. City of Chicago,*
    974 F.3d 824 (7th Cir. 2020) .............................................................40

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986).......................................................................106

*Pennington v. Flora Cmty. Unit Sch. Dist. No. 35,*
    2023 WL 348320 (S.D. Ill. Jan. 20, 2023)..........................................102

*Petty v. City of Chicago,*
    754 F.3d 416 (7th Cir. 2014) .......................................................29, 30

# TABLE OF AUTHORITIES (cont.)

**Cases**                                               **Page(s)**

*P.H. Glatfelter Co. v. Voith*,
784 F.2d 770 (7th Cir. 1986) ................................................88

*Pickett v. Dart*,
2014 WL919673 (N.D. Ill. Mar. 10, 2014)......................................162

*Proffitt v. Ridgway*,
279 F.3d 503 (7th Cir. 2002) ................................................98

*Purghoraishi v. Flying J, Inc.*,
449 F.3d 751 (7th Cir. 2006) ................................................38

*Reeves v. Jewel Food Stores*,
759 F.3d 698 (7th Cir. 2014) ................................................102

*Rehberg v. Paulk*,
566 U.S. 356 (2012).........................................................42

*Reyes v. Nurse*,
38 F.4th 636 (7th Cir. 2022) ................................................70

*Rivera v. Guevara*,
319 F. Supp. 3d 1004 (N.D. Ill. 2018) .....................................103, 154

*Rivera v. Guevara*,
No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019)......................103

*Robinson v. City of Harvey*,
No. 99 C 3696, 2001 WL 138901 (N.D. Ill. Feb. 16, 2001)........................143

*Roe-Midgett v. CC Services*,
512 F.3d 865 (7th Cir. 2008) ................................................145

*S.E.C. v. Colello*,
139 F.3d 674 (9th Cir. 1998) ................................................22

*Sanders v. City of Chicago Heights*,
No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) .........................80, 90

*Saunders-El v. Rohde*,
778 F.3d 556 (7th Cir. 2015) ................................................47

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                              **Page(s)**

*Savory v. Cannon*,
   947 F.3d 409 (7th Cir. 2020) ...............................................................71

*Serrano v. Guevara*,
   No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020)................................42

*Sherrod v. Berry*,
   827 F.2d 195 (7th Cir 1987) ............................................................... 147

*Simmons v. United States*,
   390 U.S. 377, 382-83 (1968) .........................................................75, 89

*Smith v. Burge*,
   222 F. Supp. 3d 669 (N.D. Ill. 2016) ....................................................49

*Smith v. Cain*,
   132 S. Ct. 627 (2012)......................................................................43

*Smith v. City of Chicago*,
   143 F. Supp. 3d 741 (N.D. Ill. 2015) ..................................................146

*Smith v. Ne. Illinois Univ.*,
   388 F.3d 559 (7th Cir. 2004) ............................................................32

*Sornberger v. City of Knoxville*,
   434 F.3d 1006 (7th Cir. 2006) .........................................................84

*Standard Ins. Co. v. VanLanduit*,
   551 F. Supp. 3d 854 (N.D. Ill. 2021) ..................................................88

*Steidl v. Fermon*,
   494 F.3d 623 (7th Cir. 2007) ............................................................34

*Steidl v. Gramley*,
   151 F.3d 739 (7th Cir. 1998) ..........................................................108

*Sterk v. Redbox Automated Retail, LLC*,
   770 F.3d 6187 (7th Cir. 2014) ..........................................................21

*Stevenson v. City of Chicago*,
   No. 17 CV 4839, 2018 WL 1784142 (N.D. Ill. Apr. 13, 2018)....................102, 103

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                    **Page(s)**

*Stinson v. Gauger,*
    868 F.3d 516 (7th Cir. 2017) *(en banc)* ........................................................ 41, 46

*Stovall v. Denno,*
    388 U.S. 293 (1967)........................................................................................72

*Streckenbach v. Vandensen,*
    868 F.3d 594 (7th Cir. 2017) ......................................................................110

*Strickler v. Greene,*
    527 U.S. 263 (1999)..................................................................................66, 67

*Sublett v. John Wiley & Sons, Inc.,*
    463 F.3d 731 (7th Cir. 2006) .......................................................17, 38, 109

*Swanigan v. Chicago,*
    775 F.3d 953 (7th Cir. 2015) ......................................................................162

*Swanigan v. City of Chicago,*
    881 F.3d 577 (7th Cir. 2018) ........................................................................ 73

*Taylor v. City of Chicago,*
    2021 WL 4401528 (N.D. Ill. Sept. 27, 2021) ...........................................42

*Thomas v. Cook County,*
    604 F.3d 293 (7th Cir. 2010) ......................................................................114

*Thompson v. Boggs,*
    33 F.3d 847 (7th Cir. 1994) ........................................................................109

*Thompson v. City of Chicago,*
    472 F.3d 444 (7th Cir. 2006) ......................................................................126

*Thompson v. City of Chicago,*
    722 F.3d 963 (7th Cir. 2013) ........................................................................57

*Thompson v. City of Chicago,*
    2009 WL 674353 (N.D. Ill. Mar. 12, 2009).............................................24

*Thompson v. Clark,*
    596 U.S. 36 (2022).........................................................................................91

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                 **Page(s)**

*Titran v. Ackman*,
   893 F.2d 145 (7th Cir. 1990) ..................................................................17, 109

*Tolan v. Cotton*,
    572 U.S. 650 (2014)................................................................... *passim*

*United States v. $39,000.00 in U.S. Currency*,
   951 F.3d 740 (6th Cir. 2020) ..........................................................................25

*United States v. 4003-4005 5th Ave.*,
   55 F.3d 78 (2d Cir. 1995)................................................................................24

*United States v. Agurs*,
   427 U.S. 97 (1976)...........................................................................................44

*United States v. Bagley*,
   473 U.S. 667 (1985).......................................................................45, 55, 56

*United States v. Certain Real Prop. & Premises*,
   55 F.3d 78 (2d Cir. 1995)................................................................................22

*United States v. Holm*,
   326 F.3d 872 (7th Cir. 2003) ..........................................................................18

*United States v. Jackson*,
   546 F.3d 801 (7th Cir. 2008) ..........................................................................99

*United States v. Morris*,
   80 F.3d 1151 (7th Cir. 1996) ..........................................................................61

*United States v. Rylander*,
   460 U.S. 752 (1983).........................................................................................22

*United States v. Taylor*,
   975 F.2d 402 (7th Cir. 1992) ..........................................................................22

*United States v. Wade*,
   388 U.S. 218 (1967).......................................................................................150

*Vega v. Tekoh*,
   597 U.S. 134 (2022)....................................................................70, 71, 72, 73, 74

xx

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                               **Page(s)**

*Velez v. City of Chicago,*
No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023) ...................... 103, 104, 142

*Vodak v. City of Chicago,*
639 F.3d 738 (7th Cir. 2011) ....................................................................................... 107, 108

*Washington v. Boudreau,*
No. 16-CV-01893, 2022 WL 4599708, (N.D. Ill. Sept. 30, 2022) .................................. *passim*

*Wearry v. Cain,*
577 U.S. 385 (2016) ...................................................................................................... 43, 44, 54, 56

*Wehrs v. Wells,*
688 F.3d 886 (7th Cir.2012) ............................................................................................... 59

*Wells v. Coker,*
2014 WL 716518 (C.D. Ill. Feb. 25, 2014) ...................................................................... 162

*Whren v. United States,*
517 U.S. 806 (1996) .............................................................................................................. 95

*Whitlock v. Brueggemann,*
682 F.3d 567 (7th Cir. 2012) ........................................................................................... 29, 40

*Williams v. City of Chicago,*
733 F.3d 749 (7th Cir. 2013) ............................................................................................... 92

*Williams v. Florida,*
399 U.S. 78 (1970) ................................................................................................................ 22

*Wilson v. City of Chicago,*
707 F. Supp. 379 (N.D. Ill. 1989) ..................................................................................... 99

*Woodward v. Corr. Med. Servs,*
368 F.3d 917 (7th Cir. 2004) ............................................................................................. 163

*Yang v. Hardin,*
37 F.3d 282 (7th Cir. 1994) ................................................................................................. 96

*Ziglar v. Abbasi,*
137 S. Ct. 1843 (2017) ....................................................................................................... 100

**TABLE OF AUTHORITIES (cont.)**

**Cases** **Page(s)**

**Other Authorities**

10A Wright & Miller, Federal Practice & Procedure §2727 ...........................................18, 21, 112

## INTRODUCTION

Geraldo Iglesias was wrongly convicted of the 1993 shooting murder of Monica Roman based on a fabricated tip from a confidential informant that Defendants invented, two false identifications Defendants fabricated from two supposed eyewitnesses to the crime, who said from the start they could not identify the shooter, and manufactured statements from a jailhouse informant, who has since testified that Defendants used physical abuse to force him to implicate Iglesias. No real evidence of any kind ever implicated Iglesias. To ensure his conviction, throughout Iglesias's criminal proceedings, Defendants suppressed evidence that would have shown Iglesias was innocent and that Defendants had framed him.

Starting at age 24, Iglesias served nearly two decades in prison for a crime he did not commit. Throughout, he maintained his innocence and fought to clear his name. In 2019, based on the revelation that false evidence had been used to obtain his conviction, the Cook County State's Attorney's Office moved to vacate Iglesias's conviction, a state court vacated the conviction, and state prosecutors dropped all charges against him. In 2022, the State of Illinois granted Iglesias a Certificate of Innocence. There is no dispute that Iglesias is innocent, and Defendants do not contest that fact at summary judgment.

In 2019, Iglesias brought this § 1983 lawsuit to hold the Defendants accountable for violating his constitutional rights and causing his wrongful conviction. Iglesias's conviction is one of more than 44 obtained by notorious Chicago Police detective Reynaldo Guevara, his partner Ernest Halvorsen, and their colleagues at the Chicago Police Department's Area Five Detective Division, whose misconduct has spawned dozens of civil rights cases in this District. But these Defendant Officers are not solely to blame. Iglesias's ordeal was also caused by the City of Chicago's official policies, which caused the suppression of evidence in homicide investigations,

permitted the fabrication of identifications using suggestive identification procedures, and encouraged untrained police officers to engage in misconduct with impunity.

None of the Defendants is entitled to summary judgment on any of Iglesias's claims. The motions filed by Guevara and Halvorsen are frivolous, considering both have asserted their Fifth Amendment right not to incriminate themselves in response to all questions about their misconduct at issue in this case. For its part, the City moves for summary judgment on *Monell* theories that it has already lost repeatedly at trial and is therefore precluded from re-litigating here, and it cannot create a genuine dispute of fact on others, as Iglesias has explained in his cross-motion for partial summary judgment. Dkts. 244, 248. The Defendants' remaining arguments lack merit and are made in the face of overwhelming evidence that the Defendant Officers and the City violated Iglesias's rights protected by the U.S. Constitution and Illinois law, and so summary judgment is inappropriate on those claims. This Court should deny Defendants' motions.

## SUMMARY OF DISPUTED MATERIAL FACTS

Defendants' motions depend on a factual account that impermissibly construes the evidence for the moving Defendants and improperly draws inferences for them. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Iglesias has prepared an extensive account of the facts relevant to summary judgment in his Local Rule 56.1 statements.[1] Given space constraints, the number of Defendants' arguments, and the vast record, Iglesias summarizes the material disputes here, rather than repeating all of the facts. Additional facts are discussed below within the argument sections. Properly viewing the record in Iglesias's favor, the following facts cannot be disputed.

---

[1] Iglesias's affirmative statement of facts in support of this response is cited as "PSOF ¶" (Dkt. 277), his response to the City's statement of facts as "RSOF-City ¶" (Dkt. 275), and his response to the Officer Defendants' statement of facts as "RSOF-Officers ¶" (Dkt. 276). The Defendant Officers' brief (Dkt. 247) is cited "OB," the City's (Dkt. 253) "CB," and Guevara's (Dkt. 264) "GB."

## I.     IGLESIAS IS INNOCENT OF THE ROMAN MURDER

Iglesias is innocent of the Roman shooting. PSOF ¶¶1-3, 6-12. He had nothing to do with the crime. No evidence connects him to the crime. He has always maintained his innocence. The State of Illinois has certified that he is innocent. PSOF ¶¶1-12.

## II.    ROMAN IS SHOT IN A CAR ON THE STREET IN LOGAN SQUARE

On June 7, 1993, Monica Roman was sitting in the front passenger seat in a car driving northbound on Sawyer toward Palmer, in the Logan Square neighborhood of Chicago, along with a driver and three rear passengers. PSOF ¶¶13-15, 17-18. As they were nearing the stop sign at Palmer, a gunman was standing on the sidewalk on the west side of the street, wearing all black with a hood up over his head, south of the intersection and near the entrance to the apartment building at 2148 N. Sawyer. PSOF ¶¶19-20, 48, 120, 121, 236. He began firing at the vehicle. PSOF ¶¶21. The shooter was behind the car to the south. PSOF ¶¶18-21. The bullets entered the vehicle on the rear driver's side next to the rear window, and they traveled through the vehicle hitting Monica Roman in the front passenger seat. PSOF ¶¶21, 25.

When the vehicle's driver heard the shots, he sped away going north on Sawyer across Palmer. PSOF ¶¶20, 22, 24. The shooter fled in the opposite direction, running south to an alley just south of the building at 2148 N. Sawyer, and then turning right (westbound) in the alley to escape. PSOF ¶¶23, 44, 50, 74-76, 130-31.

## III.   DEFENDANTS HAD NO LEADS

The responding detectives interviewed all of the witnesses who had been in the car with Roman—Jesus Gonzalez, Daniel Sanchez, Jose Coronell, and Hugo Rodriguez—and all of the witnesses at the scene. All of the individuals in the car either did not see the shooter at all, or only saw the shooter from behind as he was running away in the opposite direction. PSOF ¶¶26-33, 70-

3

87. All of the other witnesses at the scene who were anywhere near the shooter—even those who were on the street as the shooter ran by them or near them—did not get a good look at the shooter and could not make an identification. PSOF ¶¶29-37, 39, 41-51, 117-32.

## IV. OCHOA AND RODRIGUEZ DID NOT SEE AND COULD NOT IDENTIFY THE PERPETRATOR

Rosendo Ochoa and Hugo Rodriguez, who were also at the scene of the crime, did not get a good look at the shooter and could not make an identification either. PSOF ¶¶26-27, 29-33, 70-81-117-32, 164-71. Many circumstances of the shooting made it impossible for Ochoa and Rodriguez to be able to see the shooter, let alone make an identification. Among them: (a) the shooter was wearing a hood over his head, (b) the shooting lasted only a few seconds before the shooter fled through an alley, (c) the shooter was not someone they were familiar with but rather a stranger, and (d) more than two weeks passed from the time of the shooting to the time either of them was asked to make an identification. PSOF ¶¶23, 33, 44, 50, 75-77, 89, 120, 130-32, 135, 147, 166, 168, 170, 236.

In addition, both Ochoa and Rodriguez were not in a position to be able to see the shooter's face, and they had extremely obstructed views of the shooter. In Rodriguez's case:

- He was in the car with Roman traveling north, while the shooter was behind him to the south, PSOF ¶¶33, 70-71;
- He immediately ducked when the shooting started, PSOF ¶¶72;
- By the time he looked up and out of the rear window, the car he was in was at the intersection of Sawyer and Palmer, while the shooter was almost to the alley to the south, a considerable distance away, running in the opposite direction so only his back was visible, PSOF ¶¶74-76; and
- There were blinds in the rear window of the car that obstructed any view out that window, PSOF ¶¶80.

In Ochoa's case:

- He was in the window at 2135 N. Sawyer, more than 150 feet away from the shooter, PSOF ¶¶117-19, 127, 166.
- The shooter was hiding behind a tree, PSOF ¶¶19, 21, 121, 123-25;

4

- There were numerous obstructions to Ochoa's view, including a tree near his window and the tree the shooter was hiding behind that slanted out into street, PSOF ¶¶19, 21, 121, 123-25, 166;
- He was looking out his window up the street, at an angle, PSOF ¶¶118-19, 126, 166; and
- He never got a direct view of the shooter, who was never facing toward him. PSOF ¶¶123-25, 129-30.

At the scene right after the shooting, and in the interview of Rodriguez by detectives at the station just a couple hours later, he could not provide any description of the shooter to responding officers who interviewed him thoroughly. All he could say was that the shooter was wearing all black, without any physical description of the shooter at all. PSOF ¶¶27-33, 82-86.

Ochoa could only provide a vague physical description of the shooter. PSOF ¶¶34, 133-38. He said the shooter was a male white Hispanic, with light complexion, 17-19 years old, 5'5" to 5'7", 135-140 pounds. Ochoa could not provide a description of any distinguishing features. PSOF ¶135.

Iglesias did not fit Ochoa's description at all. At the time of the shooting, he was 24 years old, 5'10", with medium complexion. At the time, he also had two distinct features: large hoop earrings and shaved eyebrows, neither of which Ochoa mentioned at all. PSOF ¶¶38-39, 137.

Critically, unbeknownst to Iglesias, Ochoa and Rodriguez each told Detective Santopadre, the responding detective who interviewed them on the day of the shooting, that they could not identify the perpetrator. PSOF ¶¶85-86, 96, 137-38. That information was hidden until this civil case. PSOF ¶¶ 85-86, 96, 106, 137-138, 210-211.

## V.    DEFENDANTS DECIDE ON IGLESIAS AS THEIR SUSPECT WITHOUT EVIDENCE AND FABRICATE A TIP FROM A CONFIDENTIAL INFORMANT

Without any leads, the investigation went dead. No witnesses could identify the perpetrator. Defendants had no avenues to pursue. Between June 8 and June 23, other than a cause-of-death

report, there were no police reports submitted in the case—for a period of more than two weeks. PSOF ¶¶29-33, 52, 57, 89, 179, 288.

Then, Guevara, Halvorsen, Riccio, and Gawrys got involved in the case. Defendants decided that Iglesias was their suspect without any evidence. They pulled Iglesias's rap sheet on June 22, 1993, as shown by the "issued on inquiry" date stamp appearing on it, before there was any evidence implicating him in the crime. PSOF ¶¶63-64. That rap sheet was never turned over to prosecutors or to Iglesias and his attorneys, until this civil case. PSOF ¶65.

Then, to make their suspicion of Iglesias appear legitimate, Halvorsen, Guevara, Gawrys, and Riccio made up a tip from a confidential informant, writing a report saying that a confidential informant had told them that Iglesias was the perpetrator. PSOF ¶184. But there is no contemporaneous documentation of that tip, and none of the Defendants will swear under oath that they received that tip or know who the informant was. PSOF ¶¶57-60. Rather, Defendants Guevara and Halvorsen pleaded the Fifth when asked if they simply made it up. PSOF ¶¶61-62.

## VI. DEFENDANTS FRAME IGLESIAS IN TWO DAYS IN JUNE 1993

On June 23 and June 24, 1993, Defendants fabricated all of the evidence implicating Iglesias in the murder, closed the case, and had him charged with murder. PSOF ¶¶53-60, 115-116, 139-143, 179-190, 212, 279. Over the course of those two days, (a) they fabricated a claim that Ochoa had identified Iglesias from a photo array at his home on June 22, 1993, to justify arresting Iglesias, when no such identification procedure had occurred; (b) then, they showed Ochoa and Rodriguez photo arrays at Area Five on June 23, in which they had them to identify Iglesias, even though they had each said they could not make an identification; and (c) they used those identifications of Iglesias's photos to get Ochoa and Rodriguez to identify Iglesias in a live lineup that same night. PSOF ¶¶67-108; 114-158.

6

The fact that Iglesias was not involved in and has been certified innocent of the Roman murder, PSOF ¶¶ ¶¶1-12; that the Defendants decided Iglesias was their suspect first, without any evidence to implicate him, PSOF ¶¶57-60, 184; that none of the witnesses interviewed by the responding officers and detectives could provide any details about the shooter or indicated that they could make an identification, PSOF ¶¶ 82-96, 133-138; that Ochoa and Rodriguez could not describe the shooter and on the day of the shooting both told Detective Santopadre that they could not identify the perpetrator, PSOF ¶¶70-96, 117-138; and that Guevara and Halvorsen have asserted the Fifth Amendment when asked if they fabricated the identifications, PSOF ¶¶109-113, 157-162, has an important consequence at the summary-judgment stage of this case: This Court must draw the inference from these facts alone that any identifications that Ochoa or Rodriguez made of Iglesias were false and fabricated by Defendants. Put differently, with the facts construed for Iglesias, Defendants identified an innocent person as their suspect, and then got two witnesses who had not seen the perpetrator to both identify that same innocent person. Construing the evidence for Iglesias and drawing inferences in his favor, there is no explanation at summary judgment other than that Defendants fabricated these identifications.

The identifications of Iglesias obtained from Ochoa and Rodriguez were false. PSOF ¶¶70-96, 117-138, 181-186, 188-190. They were the result of improperly suggestive identification procedures. PSOF ¶¶99-105, 108, 176-178; see Argument IV(C) *infra* (discussing the suggestive identification procedures in detail). Defendants did not document the true circumstances of these identification procedures, reporting instead that the two witnesses independently selected Iglesias without suggestion. PSOF ¶¶89, 106, 114-116, 140, 149-151, 154-156, 181-190.

To wrap the case up, Defendants Guevara, Halvorsen, Riccio, Gawrys, and Biebel fabricated a closing report that included an entirely false account of how they "solved" the crime.

PSOF ¶¶54, 67-68, 114-115, 183-190, 279, 289, 292, 297. That report included the false story about a confidential informant who implicated Iglesias, and the false claim—contrary to what was reported to the responding detectives—that Ochoa and Rodriguez now claimed two weeks after the crime that they could identify the shooter. PSOF ¶¶184-186, 188-190. The Defendants then included in the closing report and two lineup reports the false claim that Ochoa and Rodriguez identified Iglesias from photo arrays and live lineups. PSOF ¶¶181-182, 185-186, 189-190.

## VII.   THE DEFENDANTS FABRICATE AN INCRIMINATING STATEMENT FROM VICENTE USING FORCE, THREATS, AND PROMISES, AND THEN SUPPRESS WHAT THEY HAVE DONE

Based on only their fabricated evidence, Iglesias was charged, detained, and prosecuted for Roman's murder. PSOF ¶¶267-278. Given the weak case against Iglesias, Defendants needed more evidence. So, they invented that evidence.

About a month after Iglesias had been charged, Guevara and Halvorsen forced a jailhouse informant named Francisco Vicente to adopt a story that Guevara and Halvorsen had fabricated. The false story was that, while Vicente had been in Cook County Jail, he ran into Iglesias, who confessed to shooting Monica Roman. This story was made up by Guevara and Halvorsen. Vicente had no such interaction with Iglesias. Guevara and Halvorsen forced Vicente to provide the statement by physically abusing him, threatening him, and making him promises, none of which were disclosed. PSOF ¶¶192-198.

This was not the first case in which Guevara and Halvorsen cemented their case against an innocent suspect by forcing Vicente to tell a false story that the suspect had confessed to Vicente. In other cases, using the same physical abuse, threats, and promises, Guevara and Halvorsen forced Vicente to falsely claim that four other innocent men—Jose Montanez, Armando Serrano, Angel Pacheco, and Robert Bouto—had each confessed to him about other crimes in which Guevara and

8

Halvorsen were the investigating detectives. PSOF ¶99. As in Iglesias's case, this information was concealed during the prosecutions of Montanez, Serrano, Pacheco, and Bouto, and all were wrongfully convicted. PSOF ¶¶199, 202, 204, 207, 208.

When Defendants Guevara and Halvorsen were asked under oath if they fabricated Vicente's statements implicating all of these men, they invoked their Fifth Amendment right against self-incrimination. PSOF ¶¶201-204. The City of Chicago conducted an investigation into allegations of misconduct against Defendant Guevara, and concluded as part of that investigation that Vicente's statements implicating Iglesias and all four other men were false and fabricated. PSOF ¶¶207-209.

## VIII. THE DEFENDANTS SUPPRESS KEY EVIDENCE THROUGHOUT THE PROSECUTION OF IGLESIAS

Throughout the criminal proceedings, Defendants suppressed that they had fabricated the evidence just discussed, including a false confidential informant tip, the photo array from June 22, that Ochoa's and Rodriguez's identifications were fabricated, and that Vicente's statement was made up by Guevara and Halvorsen. PSOF ¶¶251-277. In addition, they suppressed many other items of exculpatory and impeachment information they had uncovered during their investigation.

Defendants suppressed that they had decided on Iglesias as a suspect first, before there was any evidence at all. They concealed in their file a rap sheet with a date stamp, showing that they had selected Iglesias as their suspect first, and then fabricated evidence to implicate him second. PSOF ¶¶63-65.

In addition, Defendants suppressed that eyewitnesses Ochoa and Rodriguez each told responding detectives that they could not identify the perpetrator. PSOF ¶¶70-86, 117-138. They suppressed that Ochoa and Rodriguez said that Iglesias looked different than the person who had committed the shooting. PSOF ¶¶104-106, 150-151. They suppressed the circumstances of the

9

identification procedures that they conducted with Ochoa and Rodriguez. PSOF ¶¶67-69, 104, 106, 114-116, 151, 154-156, 181-183, 185-186, 188-190.

Moreover, Defendants suppressed that they conducted multiple photo identification procedures with Rodriguez before his purported identifications of Iglesias on June 23. Rodriguez was shown photos multiple times over the first few days after the June 7 crime, including a book of photos of members of the Imperial Gangsters, in which Iglesias would have appeared, but Rodriguez did not identify anyone. PSOF ¶¶89-91, 96, 173, 210, 229-233.

The Defendants also suppressed a report reflecting that, early on in the Roman investigation, witnesses at the scene had told them that the perpetrator was a member of the Spanish Cobras, a gang with which Iglesias had no affiliation. PSOF ¶¶94, 214-221. Defendants buried this information in the file for another homicide investigation, but they omitted the report entirely from the Roman homicide investigation file. PSOF ¶¶218-221.

Defendants suppressed that Efrain Torres, a witness who lived at 2148 N. Sawyer (where the shooter was standing), had come from the Boy's Club at the nearby corner close in time to the shooting and knew the shooter. PSOF ¶¶222-225. This information, contained in handwritten notes in the Roman homicide file, but not disclosed to the prosecution or defense, was critical because Torres later viewed a lineup during the investigation, in which Iglesias was the suspect, and Torres did not select him. PSOF ¶¶226-228.

Defendants suppressed that they conducted numerous identification procedures with other scene witnesses, all of whom had far better viewing opportunities than Ochoa or Rodriguez. Scene witnesses Arnell Moore, David Chmieleski, Efrain Torres and Daniel Sanchez were all shown books of photos to see if they could make an identification, but none of them could. In the case of Arnell Moore, one of the times he was brought to Area Five view photos was on June 23, by which

10

time Iglesias was the suspect. PSOF ¶¶234-245. He had the best viewing opportunity of anyone—he was standing at 2148 N. Sawyer, same as the shooter, who walked past him twice—but did not identify Iglesias. PSOF ¶¶43-45.

Finally, Defendants suppressed that they had obtained a story about an incriminating jailhouse confession from Vicente by using force, threats, and promises, all of which were undisclosed. PSOF ¶¶192-198, 213.

Much of this exculpatory and impeachment evidence was documented in reports and notes, which Defendants included in their investigative file, but which they did not turn over to prosecutors or to Iglesias and his criminal defense lawyers. PSOF ¶¶210-266. All of the Defendants shared information about the investigation with the small team in which they worked. PSOF ¶¶279-283. All of the Defendants had access to and reviewed the investigative file. PSOF ¶¶279-284. None of them ensured that the exculpatory information was disclosed. PSOF ¶¶210-213, 226, 245, 247, 250, 259, 262, 264.

## IX.    IGLESIAS IS CONVICTED AT TRIAL

At Iglesias's criminal trial, the fabricated evidence discussed above was introduced against Iglesias and was the sole basis for his conviction. PSOF ¶¶269-278. Guevara testified about the fabricated confidential informant tip that he said made Iglesias the suspect. PSOF ¶275. Guevara falsely testified that Iglesias told him he was near Palmer and Sawyer when the shooting occurred. PSOF ¶276. And Guevara, Rodriguez, and Ochoa all testified about the fabricated identifications Defendants procured from them. PSOF ¶¶269-274. In addition, Vicente testified about the fabricated confession that Iglesias purportedly made to him in Cook County Jail. PSOF ¶277. Based on these fabrications, Iglesias was convicted of murder. PSOF ¶278.

## X.  THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED IGLESIAS'S WRONGFUL CONVICTION

The suppression of evidence during Iglesias's case was the result of the official policies of the City of Chicago, which caused the widespread suppression of evidence in homicide cases, including Iglesias's. PSOF ¶¶301-355, 358, 361-371, 376-377, 379-389, 513-526, 546-550. Moreover, the City's official policies let officers fabricate witness identifications using unduly suggestive identification techniques, which caused unreliable identifications to be used and to taint criminal proceedings like Iglesias's criminal case. PSOF ¶¶392-415, 424, 431, 441, 457-461, 462-471, 510-512, 527-545, 546-550.

Finally, the City's official policies permitted police to conduct investigations untrained and without any oversight or discipline. PSOF ¶¶457-461, 474-511, 513-545. The City's policy of failing to train, supervise, and discipline its police officers led to historic corruption and police misconduct across the Chicago Police Department in the years leading up to the Roman investigation, including at the Area Five Detective Division on the northwest side of Chicago. PSOF ¶¶451-461, 474-511, 513-545, 546-550. Because of this environment of lawlessness, officers like Guevara and Halvorsen were free to fabricate evidence, manipulate witnesses, suppress investigative information, and to frame innocent individuals for crimes they had not committed with complete impunity. PSOF ¶¶498-512, 513-526, 534-545, 546-550. A code of silence in the Chicago Police Department prevented anyone from blowing the whistle on their misconduct. PSOF ¶¶465, 501.

As a result, Guevara framed at least 44 innocent individuals for murder. In the past 15 years, at least 44 murder convictions engineered by Guevara have been overturned by Illinois courts, and Guevara has been widely recognized as a blight on the criminal legal system. PSOF ¶¶ 344-355, 503-512, 546-550. Guevara was able to use his police powers to dismantle families and

12

an entire community because the City did nothing to ensure its police officers conducted themselves according to law.

## XI.     IGLESIAS FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED

Defendants' misconduct caused Iglesias to be wrongfully convicted in the prime of his life. He spent nearly two decades incarcerated for something he had not done. During his decades of wrongful incarceration, Iglesias always maintained his innocence as he fought for his freedom. PSOF ¶¶1-6.

In 2018, based on proof that Defendants had introduced false evidence in his criminal case, Iglesias's post-conviction petition was granted and his conviction was set aside. PSOF ¶¶7-8. The Cook County State's Attorney dropped all charges against him. PSOF ¶9. In 2022, following a full hearing, a state court granted Iglesias a Certificate of Innocence. PSOF ¶¶10-12.

## XII.    DEFENDANTS REFUSE TO TESTIFY IN THIS CIVIL CASE

The only evidence that implicated Iglesias in Roman's murder and that caused his wrongful prosecution and conviction was fabricated by Defendants. PSOF ¶¶53-60, 63-64, 67-69, 88-108, 114-116, 139-143, 147-156, 176-177, 181-190, 192-198, 200, 210-213, 279. At Iglesias's criminal trial, Guevara testified consistent with that false story, helping to put Iglesias behind bars. PSOF ¶¶266, 271-276.

But today, Guevara and his partner Halvorsen do not stand by their story. PSOF ¶¶61-62, 109-113, 157-162, 191, 201-20. They both have asserted their Fifth Amendment right against self-incrimination in response to every question about every material disputed fact discussed above. PSOF ¶¶61-62, 109-113, 157-162, 191, 201-204.

## XIII.   VICENTE COMES CLEAN

Vicente has now come forward to reveal the truth about his fabricated statements used against Iglesias, as well as those used against the other four men who he claimed had confessed to him to crimes. Vicente has testified that the statements were all false, they were all manufactured by Guevara and Halvorsen, and that he was forced to give those statements because of physical abuse, threats, and promises from Guevara and Halvorsen. Vicente has testified to this misconduct consistently, across multiple depositions and sworn statements in recent years. PSOF ¶¶196-200.

## ARGUMENT

This is not a summary judgment case. The record properly construed unambiguously supports the conclusion that Defendants fabricated all of the evidence used to arrest, charge, prosecute, and to convict Iglesias of Roman's murder, that Defendants hid from prosecutors and from Iglesias and his attorneys a large volume of exculpatory and impeachment evidence that would have halted Iglesias's prosecution and shown his innocence, and that Defendants conducted suggestive identification procedures and fabricated identifications that fatally tainted Iglesias's criminal case. A similar volume of evidence supports Iglesias's claim that this misconduct occurred because of the official policies of the City of Chicago. All material facts are disputed, and Defendants' legal arguments lack merit. This Court should deny Defendants' motions.

Though Defendants ignore the legal standard throughout their motions, this Court must examine the evidence in the light most favorable to Iglesias and draw all inferences in his favor. *Tolan*, 572 U.S. at 656-57. Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Iglesias's claims such that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This brief proceeds in five parts. First, it outlines those claims and theories not challenged by Defendants, on which there will be a trial. Second, it explains that Seventh Circuit law holds that this Court need not parse sub-theories of liability and items of evidence at summary judgment in a case like this one, where it is clear the case will proceed to trial on a fair trial claim against the Defendants. Third, it describes the reasons summary judgment is categorically unavailable to Guevara and Halvorsen, given their assertion of their Fifth Amendment rights. Fourth, it sets out why the Defendant Officers' legal arguments must be rejected and outlines the hotly disputed facts that preclude summary judgment for the Defendant Officers. And fifth, it explains why the City is precluded from re-litigating *Monell* claims the City has lost in recent trials, why Iglesias is entitled to summary judgment on the theory that the City's express policies were deficient to stop the suppression of evidence in homicide cases, and why genuine disputes of fact preclude summary judgment on the remainder of Iglesias's *Monell* claims.

## I. DEFENDANTS CONCEDE AND DO NOT CHALLENGE THAT MANY OF IGLESIAS'S CLAIMS REQUIRE A TRIAL

It is first important to note that Defendants concede a trial is necessary on certain theories of liability, and they do not move for summary judgment on other theories. In particular, Defendant Officers expressly concede the following:

- Guevara and Halvorsen both concede they cannot obtain summary judgment on Iglesias's theory that they knowingly fabricated Vicente's statement incriminating Iglesias, OB-8; GB-2;
- Because they concede they are not entitled to summary judgment on the Vicente theory, Guevara and Halvorsen also necessarily concede that they are not entitled to summary judgment on Iglesias's theories that they suppressed material exculpatory and impeachment evidence regarding their interactions with Vicente, see Argument IV(B)(2)(c) *infra*;

15

- Moreover, this concession also means that Guevara and Halvorsen also necessarily concede that they are not entitled to summary judgment on Iglesias's theories that they failed to intervene to prevent the violation of Iglesias's rights, see Argument IV(E) *infra*, that they conspired to violate his rights, see Argument IV(G) *infra*, and that they intentionally inflicted emotional distress, see Argument IV(F) *infra*, and Guevara and Halvorsen do not make any argument for summary judgment on those claims and theories in their briefs.

In addition, Defendant Officers do not include any argument in their motions regarding the

following material disputes of fact:

- No Defendant challenges that a jury must decide whether Defendants fabricated a false statement attributed to Iglesias stating that he hung out in the area of the crime, PSOF ¶187;
- No Defendant challenges that a jury must decide whether Defendants fabricated entirely that Ochoa identified Iglesias from a photo array at his house on June 22, 1993, when in fact no photo array occurred on that date, PSOF ¶¶139-146;
- No Defendant challenges that a jury must decide whether Defendants fabricated a false closing report, which summarized the evidence they had fabricated to implicate Iglesias a photo identification procedure had taken place on June 22 and June 23, 1993, PSOF ¶¶183-191;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence that Ochoa and Rodriguez each informed Defendant Officers that they had not seen the shooter and could not identify him, PSOF ¶¶133-138 (Ochoa); ¶¶83-87 (Rodriguez);
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence that Iglesias was their suspect before there was any evidence implicating him, and that they suppressed a rap sheet in their file establishing that was the case, PSOF ¶¶63-66;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence regarding Guevara and Halvorsen's suppression of their interactions with Vicente, PSOF ¶¶192-209;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence relating to their interactions with Ochoa, PSOF ¶¶114-116, 133-138, 147-162, 211;
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence that Rodriguez told Defendants during the identification procedures that Iglesias looked different in various ways from the perpetrator, PSOF ¶104; and
- No Defendant challenges that a jury must decide whether Defendants suppressed exculpatory and impeachment evidence relating to their own pattern of misconduct, PSOF ¶¶503-512, 546-549.

In addition, the City of Chicago does not move for summary judgment on multiple of

Iglesias's *Monell* theories, as outlined at the start of Argument V(B) *infra*.

16

Because Defendants do not move for summary judgment on a number of Iglesias's theories that they violated his right to a fair trial, they are not entitled to summary judgment. Defendants *each* bear the burden of showing that there is no evidence on which a reasonable jury could find for Iglesias on *any* of his claims against *each* of them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331-32 (1986). The fact that Defendants have not moved for summary judgment on many theories supporting Iglesias's claims, means that those uncontested theories must be tried, and that Defendants are not entitled to judgment on any claim. *Id.* at 332 ("Plainly, a conclusory assertion that the nonmoving party has no evidence in insufficient….[A] part who moves from summary judgment . . . must affirmatively show the absence of evidence in the record."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"); see also *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006). Any arguments Defendants might have made for summary judgment on the above theories are now forfeited, and it will be too late for Defendants to raise them in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply).

Independent of these concessions and forfeitures, Guevara does not develop an argument that *he* is entitled to summary judgment at all. Instead, Guevara has filed a boilerplate motion to "join" the other Defendants' motions for summary judgment, which is devoid of substance or record citations. Dkt. 264. The problem for Guevara, among other things, is that the other Defendants do not make *any* argument that he is entitled to summary judgment. See Dkt. 247.

17

Guevara has failed to satisfy his burden of production at summary judgment, and his motion should be denied without the need for a response. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. In addition, his argument is too cursory to justify relief. *United States v. Holm*, 326 F.3d 872 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived).

Moreover, by conceding that a trial is needed on several fabrication theories discussed above, and then "joining" a motion filed by other Defendants without additional discussion, Guevara necessarily concedes that a trial is necessary on all other claims that arise from those he concedes must be tried. For example, Guevara concedes he cannot obtain summary judgment on the fabrication theory that he fabricated Vicente's statement incriminating Iglesias. That also means he cannot obtain summary judgment on the related suppression theory that he hid the evidence that he used physical abuse to force Vicente to adopt the fabricated statement, which could have been used to impeach Vicente and Guevara, among other witnesses. The same logic applies regarding Guevara's liability on nearly every theory at issue. This Court should deny Guevara's motion summarily.

## II. SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE

Defendants' decision to concede and not to contest Iglesias's theories set out above has an additional consequence. The Seventh Circuit has directed that courts at summary judgment should not weed through sub-theories and parse items of evidence giving rise to a fair trial due process claim, so long as it has been established that there is a material dispute of fact about whether a Defendant contributed to violating a plaintiff's right to a fair trial. See *Goudy v. Cummings*, 922

F.3d 834, 844 (7th Cir. 2019) (holding that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); see also *Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) ("It's worth noting that while the parties sometimes refer to three '*Brady* claims,' it's more accurate to say that [the plaintiff] has a single *Brady* claim alleging the suppression of three baskets of evidence."); *Goudy*, 922 F.3d at 838 (stating that "[i]t is important to clarify that although the parties occasionally refer to [the plaintiff's] '*Brady* claims' or 'identification procedure claim,' his allegations do not give rise to separate *claims* under section 1983. [The plaintiff] has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights"); *id.* (holding that "all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.").

As a result, once this Court decides Iglesias has shown a genuine dispute of fact on any of his due process theories, it can move forward with a trial on Iglesias's fair trial claim without exploring every argument made by Defendants in their motion, and it can deny summary judgment on that basis. Most prominently, while there is plainly no reason for the Court to labor over whether Guevara or Halvorsen is entitled to summary judgment relating to any particular sub-theory or item of evidence, given their concessions and forfeitures, the same is true of all of the Defendants. This Court need not parse every due process theory addressed in Defendants' motion and below to conclude that a trial against each Defendant is necessary and to deny summary judgment. This Court should simply deny the motions and proceed to trial.

III.   **SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA AND HALVORSEN IN LIGHT OF THEIR INVOCATION OF THE FIFTH AMENDMENT**

Guevara's and Halvorsen's motions are frivolous for another reason. They cannot obtain summary judgment given their assertion of their Fifth Amendment right to remain silent in response to questions about the material facts at issue. This Court should independently deny their summary judgment motions based solely on their assertion of this privilege.

Guevara asserted his Fifth Amendment right not to incriminate himself in response to hundreds of questions about his specific misconduct during the Roman investigation and Iglesias's arrest, prosecution, and conviction, including every one of the specific disputed material facts at issue in this case (*e.g.*, the confidential informant tip, the Ochoa and Rodriguez identifications, the Vicente statement, etc.). PSOF ¶¶ 61, 109-113, 157-160, 191, 201-202. For his part, Halvorsen also asserted his Fifth Amendment right not to incriminate himself in response to dozens of deposition questions about his misconduct in the Roman investigation and Iglesias's wrongful prosecution. PSOF ¶¶ 62, 112-113, 161-162, 191, 203-204 .[2] The two pleaded the Fifth in response to questions about making Iglesias a suspect, fabricating a confidential informant tip, fabricating identification procedures and identifications, concealing their knowledge that Ochoa and Rodriguez had not seen the perpetrator of the crime, fabricating a false statement they forced Vicente to provide, fabricating police reports about this false evidence, suppressing their misconduct, and testifying falsely at trial. ¶¶61-62, 109-113, 157-162, 191, 201-204.

Because Guevara and Halvorsen exercised their right to remain silent in response to every question regarding disputed material facts, they cannot seek summary judgment. They cannot meet their initial burden of production, and they cannot meet their ultimate burden of persuasion, at this

---

[2] In a civil deposition in another matter, he did not deny his misconduct in this case. PSOF ¶203. Instead, he confirmed that Vicente's story about Iglesias's confession was made up. PSOF ¶¶205-206.

stage of the case. It is critical that this Court send a clear message that police officers cannot assert their Fifth Amendment right to avoid self-incrimination in civil cases, refuse to participate in discovery, and then ask the Court to take the issue of their liability away from a jury before trial.

### A. Guevara and Halvorsen Cannot Meet Their Initial Burden of Production At Summary Judgment

At summary judgment, the moving party bears the initial burden of establishing the absence of genuine disputes of material fact for trial. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727, at 455-56 (3d ed. 1998) ("The movant is held to a stringent standard."). That initial burden is satisfied either when the moving party affirmatively produces evidence negating an essential element of the non-moving party's claim, or when the movant establishes that the record demonstrates the non-moving party will be unable to meet its burden at trial. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or merely by asserting that the nonmovant lacks evidence to support its claim." 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727.1, at 455-56 (4th ed. 2016). If the moving party neither offers evidence to negate an element of the nonmovant's claim, nor points to evidence establishing that the nonmovant cannot satisfy its trial burden, then the moving party fails to satisfy its initial burden, the burden does not shift to the non-moving party, and summary judgment must be denied, even without a responsive brief. *Adickes*, 398 U.S. at 160 ("Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits."); *Sterk*, 770 F.3d at 627.

A moving party who asserts their Fifth Amendment right to remain silent in response to questions about every material fact cannot satisfy the initial burden of production at summary judgment, because that party can neither point to evidence negating an essential element of the

21

claim nor establish that proof will be lacking on material facts at trial. The Seventh Circuit has emphasized that an assertion of the Fifth Amendment does not "relieve a litigant in civil litigation of the need to establish elements on which he bears a burden of production or persuasion." *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992); see also *United States v. Rylander*, 460 U.S. 752, 758 (1983) ("But while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production."). "A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence. . . . If this be seen as a 'price' on the assertion of the privilege, so be it." *Taylor*, 975 F.2d at 404; see also *Williams v. Florida*, 399 U.S. 78, 83-84, (1970) (explaining that forcing a litigant to choose "between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination"). And "the claim of privilege will not prevent an adverse finding even at summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *United States v. Certain Real Prop. & Premises*, 55 F.3d 78, 83 (2d Cir. 1995).

While there may be cases in which a party asserts the Fifth Amendment on a peripheral issue unimportant to the material facts at summary judgment, here Guevara and Halvorsen, the two principal Defendants, asserted the privilege as to all material aspects of their illegal conduct in this case. "[A] district court has discretion in its response to a party's invocation of the Fifth," *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998), and it is a sound exercise of that discretion in this situation to hold that the party invoking the Fifth Amendment cannot satisfy its burden of production at summary judgment.

**B.    Guevara and Halvorsen Cannot Meet Their Burden of Persuasion at Summary Judgment**

Even assuming Guevara and Halvorsen could meet their burden of production, they certainly cannot satisfy their burden of persuasion at this stage: They must show that no material fact is disputed. *Celotex*, 477 U.S. at 323. The Supreme Court holds that jurors must be expressly instructed that they can draw adverse inferences against a party asserting the Fifth Amendment in civil litigation. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995); see also *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader"). As Rule 56 requires, a court at summary judgment must draw an inference like this one in favor of the non-moving party, here Iglesias, and against the movants, Guevara and Halvorsen. *Tolan*, 572 U.S. at 656-57.

Accordingly, where a Defendant asserts his Fifth Amendment rights to avoid answering questions about material facts, then moves for summary judgment, the Court must draw an inference against that Defendant on those material facts. *Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (noting that while a jury may decide whether to draw an inference from the assertion of privilege, the court is "required at summary judgment to draw all reasonable inferences in favor of the non-moving party"); see also *Seguban*, 54 F.3d at 390 (holding that this inference based on an assertion of the privilege may be drawn against even the *non*-moving party at summary judgment). Applied to this case, this Court must draw the adverse inference at summary judgment against Guevara and Halvorsen on those material facts where they have asserted their Fifth Amendment rights, and so Guevara and Halvorsen cannot satisfy their burden of showing there are no disputes of material fact at this stage.

23

The prospect of losing a claim on the merits in the future because of an assertion of the Fifth Amendment is certainly not the type of cost of invoking the privilege that is prohibited—in fact, this prospect of losing on the merits is considered a wholly permissible consequence of asserting the privilege in non-criminal cases. *E.g.*, *Kimm v. Rosenberg*, 363 U.S. 405, 408 (1960) (*per curiam*) (imposing adverse immigration consequences where burden could not be met under a federal statute because of an assertion of the privilege); *Baxter*, 425 U.S. at 318-20 (declining to extend the *Griffin* rule to civil cases and expressly permitting inferences against the asserting party in a civil action); *Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("The principle that the invocation of the privilege may be too 'costly' does not mean that it must be 'costless.'"). A party who invokes the privilege deprives the opponent of an essential source of information, obstructs discovery and proceedings, and hinders the search for truth. *Seguban*, 54 F.3d at 390 n.4; *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2d Cir. 1995). Moreover, a party cannot use the privilege as a shield to avoid self-incrimination and then as a sword to obtain a litigation advantage. *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F. Supp. 1288, 1293 (N.D. Ill. 1993). Iglesias is not asking at this stage for entry of judgment in his favor based on Guevara's and Halvorsen's assertion of privilege. On the contrary, he contends only that those Defendants cannot themselves ask for judgment before trial after asserting their Fifth Amendment rights. This Court should deny Guevara's and Halvorsen's motions because of their assertions of the Fifth Amendment.

### C. Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law

Based on a misunderstanding of the law, some district courts have required an examination of additional evidence before denying summary judgment to a moving party who has asserted the Fifth Amendment privilege. See *Rivera*, 319 F. Supp. 3d at 1039-40; *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *Thompson v. City of Chicago*, 2009 WL 674353, at *3

24

(N.D. Ill. Mar. 12, 2009). These courts have held that there must be "some evidence" in the record apart from the moving party's assertion of the Fifth Amendment to deny the motion for summary judgment. These cases are incorrectly decided and depart from established law.

In some situations, courts have said that judgment should not be entered on the pleadings against a party merely because that party asserts the Fifth Amendment privilege. *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983). In other cases, courts have refused to grant summary judgment to a *moving* party merely because the *non-moving party* asserted the Fifth Amendment. *Seguban*, 54 F.3d at 391. Unfortunately, District courts have read these cases incorrectly to say that summary judgment cannot be *denied* based on the *moving* party's assertion of the Fifth Amendment. *Rivera*, 319 F. Supp. 3d at 1039-40. But the cases cited do not support such a proposition, and there is nothing in the law that would justify such a logical leap.

Consider the question this way: Suppose there were a blanket rule that judgment cannot be entered against a party merely because that party has asserted the Fifth Amendment privilege.[3] That rule would not justify the conclusion that a summary judgment motion filed by a party asserting the privilege cannot be denied on that basis. Entering a judgment *against a party* who asserts the Fifth is much different than denying a motion for summary judgment *filed by a party* who asserts the Fifth. The former situation imposes a high cost for asserting the Fifth Amendment and ends the litigation; the latter merely requires the party asserting the Fifth to face a trial.

District courts have cited *Seguban*, 54 F.3d at 391, in support of the incorrect "more evidence" rule. But that case undermines rather than supports this rule. There, a motion for

---

[3] And the rule is not so simple in the case law. In some circumstances parties *are* granted judgment merely because the opposing party has asserted their Fifth Amendment rights. *Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir. 1969) (holding that a plaintiff who asserted the Fifth could not sustain a burden of proof and that judgment for the defendants was appropriate); see also *United States v. $39,000.00 in U.S. Currency*, 951 F.3d 740, 742 (6th Cir. 2020).

summary judgment was denied on the logic that the *non-moving party's* assertion of privilege could not justify a grant of judgment to the moving party, without consideration of other evidence. That situation is doubly different than this case: First, here the *moving* party is asking for summary judgment *and* asserting the Fifth. Second, the consequence for the moving party here of asserting the privilege is not a judgment in the nonmovant's favor, but instead is the mere denial of the moving party's motion. Courts who have held that summary judgment cannot be denied based on an assertion of the Fifth Amendment privilege alone get the law wrong.

### D. Guevara and Halvorsen Cannot Assert Their Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record

Regardless, even if the erroneous "some evidence" standard were applied here, requiring Iglesias to point to evidence beyond Guevara's and Halvorsen's assertion of the Fifth to defeat summary judgment, their motion for summary judgment remains frivolous. There is ample additional evidence. Indeed, when one considers the record evidence below in the light most favorable to Iglesias and the misconduct it establishes, along with Guevara and Halvorsen's assertion of their Fifth Amendment rights when asked about that same misconduct, plainly Guevara and Halvorsen are not entitled to summary judgment.

\* \* \*

The discussion above illustrates many independent reasons that it makes little sense for Defendants to have filed summary judgment motions in this case. Parties do not have an absolute right to move for summary judgment in every case, and the Federal Rules establish a preference for speedy resolution of claims. It is a waste of this Court's and the parties' time and resources to litigate hundreds of pages of summary judgment motions in a case where summary judgment is plainly not warranted and a trial is sure to occur.

## IV. SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS

Examining the record in the light most favorable to Iglesias and drawing inferences in his favor, this Court should deny summary judgment on all claims and theories on which Defendants have moved. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' purely legal arguments lack merit and contradict deeply established Supreme Court and Seventh Circuit cases.

Defendants move for summary judgment on portions of Iglesias's due process fair trial claim. But the evidence in the record supports Iglesias's due process claim on each of three, independent theories of liability—fabrication of evidence, suppression of evidence, and fabricated identifications using suggestive identification procedures.

On fabrication, Defendants do not discuss much of the fabricated evidence they used to implicate Iglesias and none of Defendants makes a complete argument that he is entitled to summary judgment. Instead, their arguments are limited: Riccio, Gawrys, and Biebel argue they did not fabricate the confidential informant tip, Ochoa's and Rodriguez's identifications, or Vicente's statements; all Defendants contend Ochoa's and Rodriguez's identifications were not fabricated; and all assert they are not liable for fabricating the confidential informant tip because the tip was not admitted as evidence at Iglesias's criminal trial. This Court could accept each of Defendants' arguments (which it should not do, for the reasons discussed below), and still no Defendant would be entitled to summary judgment on this due process theory. Nonetheless, Defendants' limited arguments fail in the face of disputed facts and they get the law completely wrong.

On suppression, Defendants do not address many items of key evidence they suppressed, including that Ochoa and Rodriguez each said they could not identify the shooter; that Iglesias was

a suspect before there was evidence and the rap sheet that proved as much; Guevara's and Halvorsen's interactions with Vicente; and their interactions with Ochoa. By forfeiting any challenge on those issues, Defendants cannot obtain summary judgment on Iglesias's suppression theory. Moreover, when Defendants do discuss the evidence they suppressed, they ignore disputed facts. In addition, they assert the law permitted them to suppress their fabrications of evidence with impunity, a position contrary to Supreme Court and Seventh Circuit precedents. They argue that various items of evidence they suppressed were not suppressed, which is disputed. And they argue Iglesias's attorney should have discovered the evidence they were hiding by exercising more diligence, a view that is disputed and is incompatible with controlling law.

With respect to Iglesias's unduly suggestive identification theory, Defendants incorrectly argue—contrary to Seventh Circuit precedents—that such a claim is not cognizable under § 1983. In addition, they contend there is no evidence they used suggestive identification procedures with Ochoa or Rodriguez. But even accepting some of the *Defendants'* own version of the facts, they are liable for intentionally using improper identification techniques, resulting in false identifications of Iglesias, which tainted Iglesias's criminal trial. The law prohibiting Defendants' illegal tactics was clearly established long before 1993.

Finally, Defendants' other arguments on Iglesias's Fourth Amendment legal seizure claim, Illinois malicious prosecution claim, federal failure-to-intervene claim, federal and state conspiracy claims, and Illinois negligence claims lack merit and depend on reviewing the factual record in the light most favorable to Defendants, which this Court cannot do at this stage. So, too, for the interspersed arguments from Riccio, Gawrys, and Biebel that they were not involved in the misconduct at issue (which begs the question why the other Defendant Officers have moved for

summary judgment as all). Iglesias's claims must go to trial against the Defendant Officers on all theories.

### A.    A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from the due process theory based on suppression of evidence, which is discussed below. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014).

There are multiple fabrication theories, each of which would independently justify denying summary judgment:

1.    Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated a tip from a confidential informant to provide the reason that Iglesias was a suspect in the crime, knowing that no such tip had ever occurred, PSOF ¶¶56-60;

2.    Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated a statement attributed to Iglesias that he "hangs out" in the area of Sawyer and Palmer with members of the Imperial Gangsters, which Iglesias never provided to these Defendants, PSOF ¶187;

3.    Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated entirely that a photo identification procedure had taken place on Ochoa identified Iglesias in a photo array at Ochoa's house on June 22, 1993, when no photo array occurred on that date, PSOF ¶¶114, 139-146;

4.    Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated Ochoa's identification of Iglesias in photo array and a live lineup procedure on June 23, 1993, when Ochoa told them he could not identify the shooter, PSOF ¶¶114, 139-146, 147-151, 154-156;

5.    Defendants Guevara, Halvorsen, Riccio, Gawrys and Biebel fabricated entirely that Rodriguez identified Iglesias in a photo array and then a live lineup procedure on June 23,

1993, when Rodriguez told them he could not identify the shooter, PSOF ¶¶67-69, 70-108, 182, 229-233, 294;

6. Defendants Guevara and Halvorsen, in conspiracy with the other Defendants, fabricated a false story that the forced Vicente to adopt, using physical force, in which Vicente said that Iglesias had made incriminating statements to him, when Defendants had knowingly manufactured that false story, PSOF ¶¶192-198;

7. Defendants Guevara, Halvorsen, Riccio, Gawrys, and Biebel fabricated a closing report for their investigation, which included a summary of the evidence that they had fabricated implicating Iglesias, PSOF ¶¶183-190, 279-280, 289-294, 297

8. Defendants Guevara, Halvorsen, Riccio, and Biebel, in conspiracy with Gawrys, fabricated two lineup reports claiming that Ochoa and Rodriguez both positively identified Iglesias from lineups independently and without police manipulation, PSOF ¶¶67-69, 106, 114-116, 181-182, 289-291; and

9. Defendants Guevara, Halvorsen, Riccio, Gawrys, and Biebel fabricated a claim that more than two weeks after the crime Ochoa and Rodriguez told them that they got a good look at the shooter and could make an identification, PSOF ¶¶114, 185.

Where a due process violation concerns witness statements, the Seventh Circuit has been careful to distinguish between coerced evidence and fabricated evidence. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423).

Contrary to Defendants' suggestion, OB-10-11, all of the fabrication theories in the case concern the creation of evidence that Defendants knew was false, and not an assertion that Defendants coerced truthful testimony. The facts construed in the light most favorable to Iglesias demonstrate that the Defendants Officers created a fake confidential informant tip in order to implicate Iglesias before there was evidence; fabricated identifications that they knew were false from witnesses who had not seen the perpetrators and had made clear that they had not seen the

30

perpetrators; and manufactured a statement for a jailhouse informant to incriminate Iglesias, which was invented out of whole cloth and which the informant was forced to adopt because of Guevara and Halvorsen's physical abuse of him. Any conclusion that these were coercions of truthful evidence necessarily would require construing facts for the Defendants, at minimum, which is inappropriate at this stage.

Importantly, Defendants do not challenge much of Iglesias's due process fabrication theory. Defendant Officers other than Guevara and Halvorsen argue that they were not involved in the fabrications of the confidential informant tip, Ochoa's and Rodriguez's identifications, or Vicente's incriminating statement (items 1, 4, 5, and 6, above). OB-8-10. All Defendants Officers argue that Ochoa's and Rodriguez's identifications were not fabricated (items 4 and 5, above). OB-10-11. All assert that they cannot be liable for fabricating a fake tip from a confidential informant first implicating Iglesias because, in their view, it was not used to deprive Iglesias of his liberty (item 1, above). OB-11-12. Guevara and Halvorsen both concede that they cannot move for summary judgment on the theory that they fabricated Vicente's statement (item 6, above). OB-8; GB-2.[4]

Apart from arguing that Ochoa's and Rodriguez's identifications were not fabricated and that the confidential informant tip was not used, none of Defendant Officers contest that the other items of evidence above were fabricated or deny that they were used to deprive Iglesias of his

---

[4] This concession necessarily concedes that Guevara and Halvorsen are not entitled to summary judgment on other claims and theories as well, including Iglesias's theories that Guevara and Halvorsen suppressed material exculpatory and impeachment evidence regarding their interactions with Vicente, see Argument IV(B)(2)(c) *infra*, that they failed to intervene to prevent the violation of Iglesias's rights, see Argument IV(E) *infra*, that they conspired to violate his rights, see Argument IV(G) *infra*, and that they intentionally inflicted emotional distress, see Argument IV(F) *infra*. Because Guevara and Halvorsen concede the Vicente fabrication theory, they necessarily concede these claims and theories as well.

liberty (items 2, 3, 7, 8, and 0, above). See OB-8-12. Any such argument is now forfeited. *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 569 (7th Cir. 2004).

The end result is that Guevara and Halvorsen concede they are not entitled to summary judgment on this theory, and no Defendant makes a complete argument for summary judgment. As discussed, Seventh Circuit precedents dictate that this Court need not address fabrication sub-theories in a situation where the due process claim will be tried. See Argument II *supra*.

### 1. Riccio, Gawrys, and Biebel Fabricated Evidence

Riccio, Gawrys, and Biebel argue that they did not fabricate the confidential informant tip, Ochoa's and Rodriguez's identifications, or Vicente's statements, because they were not present for any interactions with any of those individuals. OB-7-10. Iglesias agrees that they were not involved in fabricating Vicente's statements. But these Defendants are not entitled to summary judgment on Iglesias's fabrication theory.

Riccio, Gawrys, and Biebel argue that they were not involved in fabricating the confidential informant tip or the Ochoa and Rodriguez identifications, but their arguments interspersed throughout their brief are broader than that—they contend that they had minimal involvement in the Roman investigation, such that they are entitled to summary judgment on many different claims. See OB-12, 18, 32 (suggestive identification theory); OB-36, 39-40 (evidence suppression theories); OB-43 (malicious prosecution and detention without probable cause); OB-46 (failure to intervene); OB-49 (conspiracy); OB-40 (intentional infliction of emotional distress). Those arguments go well beyond construing the facts in their own favor. In making them, Defendants ask the Court to disbelieve facts in the record and instead to accept their self-serving statements to the contrary. These Defendants were each intimately involved in the misconduct at issue, and none of them is entitled to summary judgment.

Defendants argue that Biebel was simply a supervisor who signed reports and did not conduct the investigation. *E.g.*, OB-36. There are a number of problems with this argument. First, supervisors who approve police reports are not passive rubber stampers who sign whatever crosses their desks—they are in fact leaders of the team, responsible for oversight of investigative tasks and verification of results. PSOF ¶¶283, 286-287 They are kept fully abreast of the homicide investigation as it proceeds, including the results of any positive or negative lineup identification procedures, witness interviews and other developments. PSOF ¶283. Indeed, tracking the day-to-day progress of the investigation was one of their integral roles. PSOF ¶283; see generally PSOF ¶¶285-291. The record supports the conclusion at summary judgment that Biebel was involved in misconduct that occurred in the investigation he oversaw.

Biebel oversaw the Defendants' investigation throughout as their direct supervisor. PSOF ¶¶285-291. He approved the initial reports on June 7 and June 8, the day of the crime and day after, which included the interviews in which Ochoa and Rodriguez had told the reporting detectives they could not make an identification, and which omitted the unsuccessful photo identification procedures conducted with Hugo Rodriguez and others. PSOF ¶288. He approved the false June 24, 1993 closing report of Halvorsen, Guevara, Riccio, and Gawrys, which documented the panoply of fabricated evidence used to implicate Iglesias, including the entirely made-up confidential informant and June 22 photo array, as well as the fabricated photo array and lineup identifications of Ochoa and Rodriguez, and a fabricated statement from Iglesias in which he purportedly admitting to hanging out near the scene. PSOF ¶¶289-291.

Biebel acknowledged that as a supervisor, he remained involved and informed of what was going on during the investigation, and he took steps to understand what had occurred during the investigation to ensure reports were accurate. PSOF ¶¶283, 285-287. Accordingly, Plaintiff is

entitled to the inference that Biebel learned about the fabrication and suppression that had occurred during the course of the investigation, and nevertheless approved reports that he knew were fabricated, and that concealed exculpatory and impeaching evidence.[5]

Finally, the arguments of Riccio, Gawrys, and Biebel ignore substantial disputes of fact. For example, they argue they were not present for or involved in identification procedures with Ochoa and Rodriguez. OB-8-10, 18-19. That is an unsustainable view of the record. Consider that Riccio and Gawrys are listed as reporting detectives on the closing report, and Biebel is listed as the supervising and approving officer, on the closing report and lineup reports that document so much of the fabricated evidence. PSOF ¶¶279-280, 289-294, 297. Riccio and Gawrys were involved in preparing that report, and thus the numerous fabrications contained within it. PSOF ¶¶292, 297. Riccio and Gawrys are also listed as arresting detectives on the arrest report for Iglesias and were involved in arresting him and bringing him to Area 5 on June 23 without any probable cause for his arrest. PSOF ¶¶295, 298. For these Defendants to claim in the face of this evidence that they are entitled to a view of the facts where they were uninvolved in the very things that they themselves reported being involved in does not pass the straight face test.

But there is even more evidence they were involved in the fabrications in this case. With respect to the confidential informant tip, the closing report on which they are both identified as

---

[5] Defendants contend that Biebel cannot be liable merely for his supervisory role. OB-46. Supervisors are liable under § 1983 "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). As discussed above, the summary judgment record supports the conclusion that Biebel directly participated in violating Iglesias's rights, and so reference to supervisory liability is not necessary. Nonetheless, the record would also permit a reasonable jury to conclude that the constitutional violations Iglesias suffered were caused by the deliberate indifference of Biebel. He was the direct supervisor of the other Defendant Officers, had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. PSOF ¶¶283, 285-291; RSOF-Officers ¶¶44, 101. His participation as a supervisor was essential to the scheme. *Id.* He is liable on that basis as well. To the extent Defendants wish to contest these facts, they must do so at trial.

reporting detectives states that the "Reporting Detectives were contacted by a confidential informant" who implicated Iglesias. PSOF ¶¶56, 184, 292, 297.

The same is true of the Ochoa and Rodriguez identifications. Riccio admits that he is the one who wrote the fabricated lineup reports falsely claiming that Ochoa and Rodriguez had positively identified Iglesias, and he signed Guevara and Halvorsen's names to the report. Biebel then reviewed it and approved it. PSOF ¶¶293-294, 289-291.

These actions—working with Guevara and Halvorsen to fabricate the initial lead against Iglesias, working with them to draft the closing report full of fabrications, signing their names to fabricated lineup reports, and in Biebel's case overseeing and signing off on all of these fabrications—are all evidence that Riccio, Gawrys, and Biebel conspired with Guevara and Halvorsen to file charges and prosecute Iglesias for a crime he had not committed.

Of course, in addition to this evidence, under oath Guevara and Halvorsen did not deny that they were involved in the fabrication of the confidential informant tip, the Ochoa and Rodriguez identifications, and Vicente's statement. Instead, they pleaded the Fifth about their involvement in those fabrications. PSOF ¶¶61-62, 109-113, 157-162, 201-204.

In light of this record evidence, Riccio, Gawrys, and Biebel cannot assert at summary judgment that they were uninvolved as a factual matter in fabricating the confidential informant tip and Ochoa's and Rodriguez's identifications. They had knowledge of this false evidence. They reported it. They reached an agreement to prosecute Iglesias based on it—the identifications were a central part of their conspiracy to frame Iglesias. A trial is required against Riccio, Gawrys, and Biebel on the fabrication of these items of evidence. And again, once the Court makes the determination that these Defendants will proceed to trial on the due process claim, it need not address every other sub-theory and item of evidence. See Argument II *supra*.

### 2. Ochoa's and Rodriguez's Identifications Were Fabricated

Defendants next contend that there is no evidence that Ochoa's and Rodriguez's identifications of Iglesias were fabricated. OB-10-11. In this argument, Defendants do not argue that they were uninvolved in the identifications, but they instead contend that Ochoa's and Rodriguez's identifications of Iglesias were accurate. *Id.*

Defendants do not faithfully apply Rule 56. Defendants' arguments simply cherry pick one piece of evidence they think supports them and draw inferences from that evidence in their own favor, disregarding ample record evidence that creates genuine disputes of fact. Properly construing the record for Iglesias and drawing inferences for him, as this Court must, neither Ochoa nor Rodriguez could have made an identification given the circumstances of the shooting: he shooter had his hood up over his head; the incident lasted just seconds; the perpetrator was a stranger to both witnesses; the shooter was hiding behind a tree; Ochoa was more than 150 feet away, looking out a second floor window, at an angle up the street, with an obstructed view; Rodriguez ducked right away when the shooting began and then looked back through the rear window of a car with blinds on it, for a considerable distance, only able to see the back of the shooter as he was running away in the opposite direction of the speeding car. PSOF ¶¶19, 21, 23, 26-27, 29-33, 44, 50, 70-81, 89, 117-132, 135, 164-171, 236. As a result, neither Ochoa nor Rodriguez could provide a description of the perpetrator. Rodriguez could only tell the reporting detectives that the shooter was wearing all black. Ochoa could provide only a limited description, consistent with the long distance from which he saw the shooter, which did not include any distinguishing features. PSOF ¶¶82-86, 133-38. The limited description he could provide—age, height and complexion—did not match Iglesias at all. PSOF ¶137. Importantly, each of the two witnesses independently told responding detectives that they would not be able to identify the

36

perpetrator. PSOF ¶¶27, 84-86, 138. Throughout the criminal proceedings, Defendants suppressed that the eyewitnesses had told them they could not make an identification. PSOF ¶¶271-274. And they suppressed evidence that Rodriguez had been shown multiple, earlier identification procedures in which he did not make an identification, including at least one of Imperial Gangsters in which Iglesias would have been included. PSOF ¶¶90-96, 210, 229-233.

Meanwhile, Iglesias is innocent, as this Court must infer at summary judgment based on the evidence. PSOF ¶¶2-12. That means, as a factual matter, that he was not the perpetrator who was present at the scene. PSOF ¶¶2-12. Nonetheless, Defendants somehow got two different witnesses independently to identify their chosen suspect Iglesias. PSOF ¶¶67-69, 114-116, 269-270. In other words, both witnesses picked the same innocent person who Defendants had decided in advance to frame for the Roman murder. PSOF ¶¶55-66.

Moreover, when asked if they fabricated identifications from Ochoa and Rodriguez that they knew were false, Guevara and Halvorsen took the Fifth. PSOF ¶¶109-113, 157-162. Based on these facts alone, Iglesias is entitled to the inference at summary judgment that Defendants fabricated Ochoa's and Rodriguez's identification of Iglesias to frame him and knew that those identifications were false.

But there is much more. There is record evidence that Defendant Officers fabricated a statement attributed to Iglesias that he claimed to hang out near the area of the shooting. PSOF ¶187. They fabricated that Ochoa had identified Iglesias during a photo identification procedure at Ochoa's house on June 22, even though no such event occurred. PSOF ¶¶139-146. They fabricated false police reports documenting their false evidence. PSOF ¶¶181-191. And they manufactured witness testimony for trial. PSOF ¶¶269-270, 274, 277. This unchallenged evidence that Defendants knowingly fabricated evidence separate from Ochoa's and Rodriguez's identifications

firmly supports the inference at this stage that they did the same thing with Ochoa's and Rodriguez's identifications.

Moreover, it is undisputed—and unchallenged at summary judgment—that Defendants fabricated a jailhouse confession incriminating Iglesias and forced Vicente to adopt that story. PSOF ¶¶192-209. The blatant fabrication of a jailhouse confession to the crime amply supports the proper view of the evidence at this stage that Defendants fabricated Ochoa's and Rodriguez's identifications of Iglesias. Put differently, if Defendants had obtained legitimate identifications of Iglesias, they would have had no need to make up a confession; and the fact that they were willing to invent a confession supports the inference that they fabricated other incriminating evidence.

Moreover, Defendants do not address as a factual matter anywhere in their motion Iglesias's contention that they selected him as a suspect and pulled his rap sheet before any evidence existed (facts that they suppressed), and then made up a story about a confidential informant tip in order to have a false reason to suspect Iglesias. PSOF ¶¶ 63-65, 211, 55-62, 210. (The Defendants simply argue that this fabricated tip did not violate Iglesias's due process rights, which is addressed below. See Argument IV(A)(3) *infra*.) This false story about how Iglesias became a suspect and Defendants' subsequent fabrication of Ochoa's and Rodriguez's identifications are intimately related—the latter fabrication is the execution of a plan that began with the former fabrication. PSOF ¶¶55-62, 67-113, 114-162. Defendants cannot hope for summary judgment on Iglesias's fabrication claims having failed to even address the fabricated origin of their scheme. *Sublett*, 463 F.3d at 736 ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Purghoraishi v. Flying J*, 449 F.3d 751, 765 (7th Cir. 2006) (same). It will obviously be too late

for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

Again, Guevara took the Fifth when asked if Ochoa's and Rodriguez's identifications were fabricated, PSOF ¶¶109-111, 157-160, Halvorsen did the same, PSOF ¶¶112-113, 161-162, and Ochoa and Rodriguez themselves admit that they identified differences between the shooter and Iglesias, PSOF ¶¶106, 150. Drawing the necessary inferences for Iglesias from this testimony and Defendants' refusals to testify, combined with the other evidence above, Defendants cannot win the argument at summary judgment that Ochoa's and Rodriguez's identifications were legitimate and that they had no knowledge that they were unreliable. Such a view requires turning the summary judgment standard on its head. This Court should reject Defendants' argument that they are entitled to a judgment as a matter of law that Ochoa's and Rodriguez's identifications were not fabricated.

### 3. Defendants' Fabrication of the Confidential Informant Tip Was Used to Deprive Iglesias of His Liberty

Defendant Officers' final argument for summary judgment on Iglesias's fabrication due process theory is that they cannot be held liable because one item of evidence they fabricated—the fake confidential informant tip—was not admitted as evidence as Iglesias's criminal trial. OB-11-12. The two-paragraph argument is too cursory to justify summary judgment, *Smith*, 388 F.3d at 569, and it is wrong on the law and the facts. However, before turning to that argument, it is important to observe that Defendants do not argue that the other items fabricated evidence above had no impact on Iglesias's criminal trial. OB-11-12. Those fabrications were used in Iglesias's criminal case to deprive him of his liberty, and they are alone enough for each of the Defendant Officers to be held liable on Iglesias's fabrication due process theory, without the need to resolve the question of whether the confidential informant tip alone violated Iglesias's due process rights.

39

Again, the Court should not address sub-theories and items of evidence one by one once it is already clear there will be a trial on due process claims. See Argument II *supra*.

On the law, Defendants' position that they cannot be liable for fabrication of evidence unless the particular item of evidence fabricated is admitted as evidence at the criminal trial, OB-11-12, fundamentally misunderstands Seventh Circuit law governing fabrication due process claims. An officer who fabricates evidence violates due process if their fabrication causes *any* deprivation of liberty. This is true whatever form the initial fabricated evidence takes (*e.g.*, a false report, a manufactured statement, a fabricated identification, invented physical evidence, or planned testimony, etc.), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (*e.g.*, issuance of a warrant, filing of charges, an indictment, a conviction, etc.), and however the evidence comes to impact the criminal proceedings (*e.g.*, introduced as an exhibit, offered as testimony, or used to preclude other evidence from being used in the criminal case).

The question is simply whether the fabrication caused a deprivation of liberty. As the Seventh Circuit put it in *Whitlock v. Brueggemann*, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (emphasis added). The cases unanimously hold that due process is violated when fabricated evidence causes a liberty deprivation at any stage of the criminal proceedings, even when the initial fabrication is not admitted in its original form in those proceedings. See, *e.g.*, *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony);

40

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Avery v. City of Milwaukee*, 847 F.3d 433, 441-42 (7th Cir. 2017) (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (*en banc*) (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).[6]

Fabricated evidence violates due process when it is admitted as evidence, when it comes in at trial through the testimony of police or witnesses, where it used to affect the outcome of the criminal case, or where it "furthered the prosecution" in any other way. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018).[7] Accordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial in its original form.

On the facts, there are material disputes of fact about whether the confidential informant tip was used to deprive Iglesias of his liberty during the criminal proceedings. A trial is required

---

[6] In addition, the Supreme Court implicitly rejected Defendants' myopic view of a fabricated evidence claim in both *Buckley v. Fitzsimmons*, which approved a fabrication claim where physical evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial. 509 U.S. 259, 262-64 (1993), and more recently in *McDonough v. Smith*, where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony. 139 S. Ct. 2149, 2154 (2019).

[7] Defendants cite *Avery*, OB-11-12, but that case supports Iglesias's position: the Seventh Circuit there recognized that evidence often comes in at trial through oral testimony, and it rejected the proposition that witness testimonial immunity renders a state actor not liable for a pre-trial act of fabrication. 847 F.3d at 441. In so holding, *Avery* recognizes that the pre-trial act of fabrication still may violate due process rights if the fabricated evidence affects the criminal proceedings later in some other form.

to resolve these disputes. *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30, 2022) (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary). Defendants contend that the tip was not used in the criminal case, but that is plainly false: Defendant Guevara testified at the criminal trial about having received the tip from a confidential informant, based on which he then included Iglesias's photo in the photo array shown to Ochoa and Rodriguez. PSOF ¶275. This is enough to demonstrate that the tip violated Iglesias's due process rights. *Taylor v. City of Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the contents of the fabricated report certainly were.").[8]

Moreover, the Defendants' false confidential informant tip led to an arrest and detention without any probable cause, and it was used to get murder charges approved. PSOF ¶¶55-62, 268. A jury must consider the claim that Defendants' pre-trial fabrication of a fake confidential informant tip violated Iglesias's due process rights when that fabrication was used against Iglesias during his criminal proceedings.[9]

---

[8] Defendants rightly do not raise any argument for testimonial immunity in their summary judgment briefs. Testimonial immunity does not extend to pre-trial acts of fabrication that are then presented by way of testimony at trial. *Rehberg*, 566 U.S. at 370 n.1; *Avery*, 847 F.3d at 441-42 (an officer cannot immunize himself simply by testifying about his false evidence at trial and noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter."). Accordingly, Defendants may not be found liable simply for testifying, but they are liable for fabricating evidence before criminal proceedings that was later introduced through his testimony during criminal proceedings.

[9] Defendants cite *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *17 (N.D. Ill. June 4, 2020), claiming that it supports the view that reference to a non-testifying witness due not violate due process. OB-12. *Serrano* says nothing of the sort. In that case, the court found that a false witness statement was *not* used substantively at trial, and so the plaintiff could not show that it had an effect on his prosecution. *Serrano*, 2020 WL 3000284, at *17. Here, the fake tip was used in the criminal case as the entire explanation of why Iglesias became a suspect in the Roman murder, PSOF ¶¶55-56, and any dispute about causation must be reserved for the jury, *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).

* * *

All of Defendants' fabricated evidence outlined above was used to deprive Iglesias of his liberty. Indeed, all of the evidence that ever implicated Iglesias in the Roman shooting was created by the Defendants. To the extent that the Defendants disagree, it is because there are genuine disputes of fact. Summary judgment on Iglesias's fabrication theories should be denied.

### B. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence

This Court should also deny summary judgment on Iglesias's evidence suppression due process theories. *Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); see also *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court holds that "[e]vidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); see also *Kyles*, 514 U.S. at 434.

The question whether suppressed evidence was material must be answered considering all of the suppressed evidence together in the aggregate, and not by assessing evidence piece by piece. *Wearry*, 577 U.S. at 394. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

A group of Defendants who each suppress different items of evidence that are collectively material are each liable for the resulting due process violation, even if one may have an argument that the item of evidence they suppressed was not alone material. *Goudy*, 922 F.3d at 843 ("[A]ll defendants who can be shown to have suppressed evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.") (internal quotations and citations omitted).

Importantly, it is firmly established that evidence that would impeach a key witness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

The case against Iglesias could not have been thinner. There was no evidence implicating him other than the fabricated evidence discussed above. Any one of the pieces of exculpatory evidence suppressed by Defendants would have undermined confidence in his prosecution and

conviction. Any piece of it would have impeached key witnesses at trial—the eyewitnesses and the Defendant Officers. When the suppressed evidence is considered collectively, there is no chance any Defendant is entitled to summary judgment on the suppression claim.

### 1. Defendants Suppressed Their Own Fabrications

The Defendant Officers suppressed that they had fabricated the false evidence discussed in the previous section. Specifically, Defendants did not disclose to state prosecutors, to Iglesias, or to his criminal defense attorneys that they had fabricated a confidential informant tip to first implicate Iglesias in the crime, a purported statement from Iglesias that he hung out by the crime scene, the June 22 photo array supposedly at Ochoa's house, Ochoa's and Rodriguez's photo array and live lineup identifications of Iglesias, a jailhouse confession from Iglesias attributed to Vicente, and police reports falsely documenting the investigation. See Argument IV(A) *supra*.

Had the Defendants disclosed that they had fabricated this evidence incriminating Iglesias, it would have immediately halted the criminal prosecution and conclusively shown Iglesias's innocence. The suppression of the fact that items of incriminating evidence were invented by police is precisely the sort of impeachment evidence that is material as a matter of law, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been used to cross-examine literally every state's witness at trial, including Rodriguez, Ochoa, and Guevara, in a manner that would have left the state without any evidence to prosecute or convict. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05. Defendants' suppression of their own fabrications is enough for Iglesias's suppression claims to survive summary judgment, without the need for the Court to consider other suppression theories. See Argument II *supra*.

**(a) Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong**

Defendants incorrectly assert that facts giving rise to a due process fabrication claim cannot also give rise to a due process suppression claim. OB-41-43. This made-up legal rule has no support in the law and Defendants cite none. Contrary to Defendants' position, the Seventh Circuit has recognized in many cases that the same facts may give rise to both a fabrication claim and a suppression claim. The *en banc* Seventh Circuit in *Stinson* endorsed due process claims brought against defendants who violated due process by "(1) fabricating the principal evidence of [the plaintiff]'s guilt (the opinions that his detention matched the bite marks on [the victim]), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence." 868 F.3d at 524-25. Similarly, *Avery* explained that a claim regarding fabricated informant statements used in a criminal case gave rise not only to a fabrication due process theory but also a *Brady* theory because, although the plaintiff "knew that the informants' statements were false, . . . he did *not* know about the pressure tactics and inducements the detectives used to obtain them. . . . In other words, he did not have the evidence that could help him *prove* that the informants' statements were false." 847 F.3d at 443-44. In *Engel v. Buchan*, the Court recognized a *Bivens* claim where "[the plaintiff] claim[ed] that [the defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*." 710 F.3d 698, 699 (7th Cir. 2013). And in *Lewis v. City of Chicago*, the court said expressly that when fabricated evidence causes a conviction, it gives rise to liability for a due process violation for fabrication of evidence, and that "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady* . . . , if government officials suppressed evidence of the fabrication." 914 F.3d 472, 480 (7th Cir. 2019).

46

Consider how illogical Defendants' proposed rule would be. According to Defendants, a police officer could beat a witness until he agreed to provide a false manufactured statement implicating a criminal defendant, as Defendants did with Vicente here, PSOF ¶¶192-209, and though the fabricated statement might violate the criminal defendant's due process rights, the police officer is under no *Brady* obligation to disclose that he beat the witness. Or an officer could plant a criminal defendant's blood on an item of physical evidence found at the scene to connect the defendant falsely to a crime, violating due process, but the state would face no obligation under *Brady* to disclose that the item of evidence contained no blood at the time it was collected from the scene. Or an officer could even fabricate that he himself was a witness to a crime and saw the defendant do it, and provide that testimony on the stand at trial, without any due process obligation to disclose that he was off of work and out of the country on the day of the crime. The suggestion that such suppressions do not violate the Constitution is patently absurd. The *Brady* case line is not a hyper-technical system of disclosure rules. Instead, the Supreme Court has for decades made clear that *Brady* imposes an affirmative duty on the government "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and then to disclose all of that exculpatory and impeachment evidence, even if it has not been requested, if the evidence considered collectively had a reasonable probability of impacting the criminal case. *Kyles*, 514 U.S. at 432-38. This Court should reject Defendants' novel new legal rule.

### (b) *Gauger*'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case

Because the argument Defendants make has sown some confusion in cases decided by courts in this Circuit, it is worth explaining a bit more why the cases Defendants rely upon do not apply in the context presented by Iglesias's case. In support of their argument, Defendants cite to *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), part of the line of Seventh Circuit cases

47

that started with *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), which hold that police are not required under *Brady* to disclose the true circumstances of an interrogation of a criminal defendant that results in a false confession because, according to these cases, the criminal defendant was present for and knows the true circumstances of the interrogation and false confession. The logic of these decisions is that police are not required to turn over evidence already known to the criminal defendant because that evidence has not been "suppressed" within the meaning of *Brady*.

This is not a false confession case, and the Seventh Circuit has emphasized that *Gauger*'s logic does not extend to the type of evidence suppression claims presented here. In *Avery*, the Court held that *Gauger*'s rule does not apply where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess. 847 F.3d at 443-44. There, the Court confronted the situation where police fabricated witness statements to implicate a plaintiff at his criminal trial, causing his wrongful conviction. *Id.* Though the plaintiff all along knew those statements were false, given their very nature, the Court held that *Gauger* did not apply, and that the police had an obligation to disclose and could not remain silent about how they had manufactured the false witness statements and the tactics they had used to get the witnesses to adopt them. *Avery*, 847 F.3d at 443-44. Put simply, where the police know of evidence that the criminal defendant does not, including evidence that might impeach a third-party witness or police officer who testifies falsely, that evidence must be turned over and *Gauger* does not apply, even though the criminal well knows that the evidence used against him is false. *Avery*, 847 F.3d at 443-44.

Applying this rule, courts have limited *Gauger* to the context of cases where police interrogate and coerce a confession from a criminal defendant, and the criminal defendant then

contends that the police should have disclosed the circumstances of the interrogation and false confession, *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *22 (N.D. Ill. Jan. 24, 2024), and they have not applied the same rule in cases, like this one, where police have suppressed the true circumstances of their own conduct and their interactions with third-party witnesses who inculpate the suspect, *Smith v. Burge*, 222 F. Supp. 3d 669, 680 (N.D. Ill. 2016) ("Courts in this district have concluded that similar allegations state a *Brady* claim based on events that transpired outside of the interrogation room.").

The *Gauger* rule has no application to any of the claims or theories in this case. Consider Vicente's false statement. Iglesias obviously knew that statement was false because he had never confessed to Vicente. But he did not have what he needed to impeach the Defendants' false story attributed to Vicente because Defendants suppressed that evidence. This is precisely what happened in *Avery*, where the criminal defendant knew that the witnesses' statements were false, and the police suppressed information about how they had obtained those false statements, which the defendant could have used to impeach the witnesses at trial. 847 F.3d at 443-44. Moreover, the Seventh Circuit held recently in *Camm* that a police officer's lie about evidence in an investigation is itself actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt." 937 F.3d at 1110.

Given these cases, there is no argument that Defendants can escape liability on *Brady* claim merely because Iglesias knew the evidence they had fabricated was false. The *Gauger* rule should

not be overread in a way that eliminates the meritorious *Brady* claims in this case in advance of trial. This Court should reject the application of the *Gauger* rule in this case, as *Avery* instructs.

### (c) Defendants' Suppressions of Their Fabrications Were Material to Iglesias's Criminal Prosecution

A jury must decide whether Defendants are liable for suppressing the material exculpatory and impeachment information relating to their fabrications of false evidence. The record construed for Iglesias would permit a reasonable person to decide that Defendants are liable for suppressing that no confidential informant tip was ever received, which would have impeached Defendants' entire account of the reason that Iglesias was suspected. PSOF ¶¶55-62. Or that Iglesias never said he hung out near the crime scene, which would have exonerated Iglesias and impeached the police account. PSOF ¶187. Or that no photo identification procedure took place on June 22, when according to Defendants' account of the investigation, Ochoa made his first identification of Iglesias, which would have impeached Ochoa's and Rodriguez's identifications and Defendants' own testimony in the criminal case. PSOF ¶¶139-146. Or that Ochoa's and Rodriguez's identifications of Iglesias were fabricated, which would have halted the criminal case. PSOF ¶¶67-113, 114-162. Or that the Vicente statement was manufactured using physical above, threats, and promises, which would have impeached one of the central state's witnesses against Iglesias, and which would have fatally undermined Guevara's credibility in all aspects of his testimony. PSOF ¶¶192-209. The list of ways that disclosing Defendants' fabrications would have been exculpatory and impeaching goes on and on.

The disclosure of any one piece of this evidence would have been material to Iglesias's criminal case, within the meaning of *Brady*, and collectively this evidence was certainly material. *Goudy*, 922 F.3d at 843. Just as none of Defendants is entitled to summary judgment on Iglesias's

fabrication theories, none is entitled to summary judgment on his suppression theories, without the need for further analysis.

### 2. Defendants Suppressed Exculpatory and Impeachment Evidence Independent of Their Fabrications

But Iglesias's suppression of evidence theory is not based solely on the suppression of Defendants' fabrications, because Defendants suppressed other material exculpatory and impeachment evidence as well. Notably, unlike the fabrication claims, the Defendants do not argue that they were uninvolved in particular suppressions of evidence. Nor could they, given that Iglesias is entitled to the inference at this stage, based on the short time frame in which the evidence against Iglesias was developed (two days) and the small investigating team (four detectives and one sergeant), that Defendants each knew of the exculpatory and impeachment evidence that the team had uncovered. PSOF ¶¶53-54, 282. In fact, Defendants do not even discuss the evidence suppression theories outlined in this section.

### (a) Defendants Suppressed That Both Eyewitnesses Told Police that They Did Not See and Could Not Identify the Shooter

Defendants suppressed that both Ochoa and Rodriguez independently informed them that they had not seen the shooter and could not identify him. Defendants do not discuss this *Brady* theory at all in their summary judgment motion, OB-34-41, and thus have forfeited any argument on it, *Smith*, 388 F.3d at 569.

Documentary evidence and testimony from the initially assigned detectives themselves proves that both Ochoa and Rodriguez got little to no view of the shooter and each independently told detectives that they could not make an identification. PSOF ¶¶70-87, 117-138. That information was not provided to prosecutors, to Iglesias, or to his attorneys. PSOF ¶¶210-212

Defendants have no evidence in the record that would allow them to respond to this suppression of critical evidence.

A reasonable jury could conclude based on this evidence that Defendants knew that both Ochoa and Rodriguez could not identify the perpetrator. It is hard to conceive of more powerful impeachment evidence in a case that turned on identifications from two eyewitnesses than testimony that both told the police they could not identify the perpetrator. Defendants cannot dispute these facts at this stage. This suppressed evidence was, without question, material. *Jones*, 856 F.2d 985 (affirming a due process verdict in a case with nearly the same fact pattern); *Whitlock*, 682 F.3d at 574 (affirming denial of summary judgment in similar circumstances).

### (b) Defendants Suppressed That Iglesias Was Their Suspect Before There Was Any Evidence Implicating Him, and They Suppressed a Document Showing They Had Picked Him As A Suspect First

Defendants also suppressed the fact that Iglesias was their suspect before any witness identified him or any evidence implicated him. This is another profound suppression in this case. Again, Defendants do not discuss this *Brady* theory at all in their summary judgment motion, OB-34-41, and thus have forfeited the issue, *Smith*, 388 F.3d at 569.

Defendants had no evidence at all implicating Iglesias at any point following the crime or initial investigation. PSOF ¶55. In fact, the case went cold for weeks. PSOF ¶55. On June 22, Defendants decided that Iglesias was their suspect, they pulled his rap sheet, and they fabricated a confidential informant tip to provide a false basis to suspect him of the crime. PSOF ¶¶54-65. Only after this did Defendants obtain any other evidence purportedly implicating Iglesias. PSOF ¶¶52, 64, 139-146.

The rap sheet was produced by another division of the Chicago Police Department with an "Issued on Inquiry" date stamp of June 22, and the Defendants put the rap sheet in their file. PSOF

¶¶63-65. Meanwhile, Defendants fabricated a June 22 photo array at Ochoa's home, when in fact Ochoa only viewed a photo array at Area Five on June 23. PSOF ¶¶139-146. In other words, the rap sheet was produced one day before Ochoa and Rodriguez made their supposed identifications of Iglesias. PSOF ¶¶67-69, 114-116, 181-182. Iglesias is fully entitled to the inference at this stage of the case that this sequence of events demonstrates that Defendants decided he was a suspect first and created evidence to implicate him second. That inference is strengthened by the fact that the rap sheet itself was hidden in the investigation and was never turned over to prosecutors, Iglesias, or his defense attorneys. PSOF ¶¶63-65.

This is not the only Guevara case in which Guevara and others decided on a suspect first, pulled that suspect's rap sheet, and then suppressed the rap sheet showing what they had done. In fact, it is quite a common and disturbing pattern for these Defendants. PSOF ¶¶63-66. In the cases of Jacques Rivera and Jose Montanez, both resulting in exonerations, Defendant Guevara and other Area 5 detectives requested their rap sheets before any witness had provided evidence making them a suspect. PSOF ¶66.

If Iglesias could have told the criminal court that Defendants had chosen him as their suspect before any evidence existed, it would have exonerated him immediately, and it would have impeached the state's entire case. Particularly so if Defendants had disclosed that they had done this in multiple cases.

### (c) Defendants Suppressed Their Interactions with Vicente

A jury could also find Guevara and Halvorsen independently liable on the theory that they suppressed their abuse of and interactions with Vicente in connection with their fabrication of his false statement implicating Iglesias. As discussed, these Defendants have conceded that they are

not entitled to summary judgment on this theory, see Argument I *supra*, and there is no discussion of the theory in their motion, OB-34-41, which would forfeit the issue, *Smith*, 388 F.3d at 569.

Guevara and Halvorsen physically abused Vicente until he adopted a false statement that Iglesias had confessed to him in jail. PSOF ¶¶192-197. They decided to use Vicente to fabricate a confession from Iglesias, just as they had done in two other cases in which they wrongfully convicted four other men. PSOF ¶¶199, 549(j). So, they orchestrated an interaction in the Cook County Jail between Vicente and Iglesias, having already decided that Vicente would falsely claim that Iglesias confessed to him in that conversation. PSOF ¶¶192-198. In fact, Iglesias told Vicente he was being charged with something he did not do. PSOF ¶195. But Vicente went along with the confession story fabricated by Guevara and Halvorsen, because Guevara and Halvorsen physically abused him, threatened to continue abusing him, and promised him leniency and benefits if he told their false story. PSOF ¶¶192-198.

The evidence Defendants possessed about their interactions with Vicente was both exculpatory because it exonerated Iglesias, and it could have been used to impeach Vicente, as well as Guevara, and all of the evidence and testimony about Iglesias's guilt in the criminal case. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by eyewitness that he could not see a perpetrator's face that contradicted that eyewitness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous eyewitness statement, in which he described the shooter as someone who was "about 5'4" or 5'5", 140 to 150 pounds, medium build" was material and exculpatory, where defendant was 6 feet tall and thin because "[i]f cross-examined on this

description, [the witness] would have had trouble explaining how he could have described [the defendant] . . . as a man more than half a foot shorter with a medium build"); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material).

Moreover, if Defendants had disclosed this information, Iglesias would have been exonerated without a trial—he could have called on Vicente to testify that he had never confessed to the Roman killing, that the Defendants' story of Iglesias confessing was made up, and that Vicente only said otherwise because Defendants had forced him through illegal physical abuse and coercion to accept their false statement. *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) ("Due process entitled the plaintiffs to learn before their trial" that witness's statement "was the product of police coercion or fabrication"); *Avery*, 847 F.3d at 439 (due process rights are implicated by "a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain" witness testimony); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (affirming judgment where police officers were held liable "under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger [plaintiff]").

### (d) Defendants Suppressed Their Interactions with Ochoa

Defendants also suppressed all of their interactions with Ochoa leading to his supposed identification of Iglesias. In addition to suppressing that he told them that he could not identify the shooter and the fact that there was no June 22 photo array, Defendant Officers suppressed that Ochoa informed them during the identification procedures on June 23 that there were a number of differences between what Iglesias looked like and what the shooter looked like. PSOF ¶¶150-151. A jury could find Defendants liable on this suppression theory as well.

The evidence Defendants possessed about their interactions with Ochoa (and Rodriguez, discussed below) was both exculpatory because it exonerated Iglesias, and it could have been used to impeach both Ochoa and Rodriguez, as well as Guevara, and evidence and testimony about Iglesias's guilt in the criminal case. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by eyewitness that he could not see a perpetrator's face that contradicted that eyewitness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous eyewitness statement, in which he described the shooter as someone who was "about 5'4" or 5'5", 140 to 150 pounds, medium build" was material and exculpatory, where defendant was 6 feet tall and thin because "[i]f cross-examined on this description, [the witness] would have had trouble explaining how he could have described [the defendant] . . . as a man more than half a foot shorter with a medium build"); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material).

Though Defendants discuss the suppression of information relating to Rodriguez in their motion, OB-39-41, which is discussed below, see Argument IV(B)(3)(d) *infra*, they do not make an argument about the suppression of their interactions with Ochoa, see OB-39-41, and they forfeit that issue as well, *Smith*, 388 F.3d at 569.

### (e) Defendants Suppressed Their Own Pattern of Misconduct

Last but not least, as described below in great detail, by the time of Iglesias's criminal trial Guevara had been involved in a number of cases where they fabricated and suppressed evidence, coerced false statements from witnesses and suspects, obtained false identifications using

suggestive procedures, and wrote false police reports. See Argument V(F) *infra*. Defendants did not disclose any of this pattern of extreme police misconduct by the officers who investigated Iglesias to prosecutors or defense attorneys. The suppression of this other misconduct, which could have been used to impeach Guevara and others on the stand, is also violation of *Brady*. *Thompson v. City of Chicago*, 722 F.3d 963, 972 (7th Cir. 2013). As with all of the suppression theories just discussed, Defendants do not address this theory in their motion, OB-34-41, forfeiting the issue, *Smith*, 388 F.3d at 569.

\* \* \*

Each of the suppression theories above are not addressed by Defendants Officers in their motions for summary judgment. Accordingly, Defendant Officers have not met their burden of production or persuasion to show that summary judgment is warranted on these theories. Once the Court has concluded that these theories will go to trial, it can deny summary judgment and move on, without addressing Defendants arguments about particular items of evidence they suppressed.

### 3. Defendants' Arguments About Other Suppressed Exculpatory and Impeachment Evidence Lack Merit

With respect to the suppressed items of evidence Defendants discuss in their motion, see OB-34-35 (listing seven items), Defendants' arguments for summary judgment depend on a version of the facts skewed in their own favor and legal arguments that are contrary to law, OB-34-41. This Court should reject Defendants' arguments.[10]

---

[10] On page 37 of their motion, Defendant Officers make arguments about the suppression of "the handwritten note of Iglesias's own school schedule" and "the tow report." OB-37. Iglesias is not pursuing a *Brady* theory based on these two items, and the Court need not address them.

### (a) Defendants Suppressed a Note Documenting That a Witness Knew the Shooter

Defendants suppressed a handwritten note in their investigative files that documented that an individual named Sarah Torres, who lived in the apartment building in front of which the shooter stood when he committed the crime, told investigators that her son, Efrain Torres, "came from boys club" and "knows shooter." PSOF ¶224. The note was never disclosed to prosecutors, Iglesias, or his attorneys. PSOF ¶¶227-228. Defendant Officers later showed Efrain Torres a live lineup that included Iglesias, and they reported that Torres had not made any identification. PSOF ¶182. Defendants contended that Torres's non-identification of Iglesias was inconsequential because, in their view, he had not seen the shooter's face. PSOF ¶182. But all the while Defendants suppressed a note that documented that Torres knew who the shooter was. And knowing who the shooter was, Torres did not identify Iglesias. PSOF ¶¶182, 224. This suppressed item of evidence would have allowed Iglesias to call Torres to demonstrate that Iglesias was not the shooter, and it would have worked in tandem with the reported non-identification to exculpate Iglesias, and it would have impeached the Defendants' account of their investigation.

In their motion, Defendants assert that the note does not clearly say that the Torres "knows shooter," and they contend that it instead says that he "knows shorti," OB-35, an implausible reading of the note (the note has two o's following the h), which impermissibly construes the facts against Iglesias. In addition, they contend that there is "no material difference" between the suppressed note, which says Torres "knows shooter," and a disclosed police report that says Torres "saw the offender." OB-35-36. This is an untenable position—there is a world of difference between a witness who knows who the perpetrator is and one who reports having seen the perpetrator. In the former circumstance the witness has personal knowledge of the identity of the perpetrator, and in the latter he does not. Particularly so when the witness viewed Iglesias and did

58

not identify him, and the fact that the witness knows the shooter means the non-identification of Iglesias means Iglesias did not do it.

Next, Defendants assert that Iglesias and his attorneys could have learned themselves what Efrain Torres knew. As a preliminary matter, Defendants' arguments are fatally undeveloped, and this Court should be strict in not even entertaining these undeveloped arguments. *Wehrs v. Wells*, 688 F.3d 886, 891 n. 2 (7th Cir.2012).[11] In addition, Defendants' contention would be a *defense* at trial, and Defendants in their cursory arguments are far from meeting the heavy burden of establishing that all elements of the defenses are established by unrebutted evidence. *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1114 (N.D. Ill. 2015). On the merits, Defendants did the opposite of disclose the exculpatory Torres note—they wrote false reports to ensure that it did not come to light that Torres knew the shooter—and a Defendant who actively suppresses evidence cannot later claim it was discoverable through the exercise of reasonable diligence. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that there is no requirement that a Defendant find materials that state actors are deliberately hiding: "A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process").

Even if that were not the case, disputes of fact would preclude summary judgment. As in *Jimenez*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d at 446. Iglesias's attorney, John DeLeon, took ample steps to learn everything he could about the information detectives had developed during their investigation, including any

---

[11] It is an extreme burden responding to a summary judgment motion where moving parties make hundreds of assertions in single sentences, without any analysis, and the nonmoving party has to expend multiple paragraphs responding to each. Iglesias has done his best in this response to address all of Defendants contentions as efficiently as possible. But Defendants should not be permitted to create this amount of work for the Court and parties with bald assertions.

exculpatory or impeachment evidence. PSOF ¶¶259, 261-262. He filed discovery requests and issued multiple subpoenas to get all of the investigative information available in the police files related to the Roman investigation, and he expected and trusted that all such information was being disclosed to him. PSOF ¶¶259-262. He issued additional supplemental discovery, and he made attempts to talk to a number of witnesses, some of which were successful and some of which were not. PSOF ¶¶259-263. But the idea that he should have divined that Efrain Torres may have actually known the shooter, even though that information is assiduously omitted from the police reports regarding Efrain Torres and his mother, and even though the handwritten note stating that information was not disclosed, is simply wrong both factually and legally. PSOF ¶¶222-228.

Fundamentally, Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.* Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness." *Hampton v. Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017). As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a

tenable legal rule if courts determined that stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. And as Judge Dow observed in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

More generally, the Seventh Circuit has said that the reasonable-diligence doctrine does not extend to information *in the heads of witnesses* the same way that it does to information in accessible documents. *Boss* observes that "[i]n the typical reasonable diligence case, the question is whether defense counsel had access to the documents containing the *Brady* material, through an open file policy," and not "whether defense counsel had access to *Brady* material contained in a witness's head." 263 F.3d at 741. The Court continued: "In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a witness's head. . . . Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document." *Id.* (citation omitted).

At the same time, the Court has concluded that information may be deemed unavailable if the defense has less of an opportunity to obtain it, *e.g.*, *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (focusing on whether "defendants had been given the same opportunity as the

government to discover the identified documents"); or where there is evidence that a witness would have lied about it, *e.g.*, *Crivens v. Roth*, 172 F.3d 991, 996-97 (7th Cir. 1999) (holding that evidence in a prosecution witness's head not discoverable through the exercise of reasonable diligence where there was evidence that the witness would have lied about that evidence). Here there is no support in the record for a conclusion that Iglesias's attorney could have discovered from Efrain Torres that he knew the shooter, particularly given Defendants' active efforts to suppress that fact.

Finally, all Defendant Officers except Guevara contend that there is no evidence they saw or knew about this note. OB-36. To the extent Riccio, Gawrys, and Biebel rehash their arguments that they were uninvolved in the case, Iglesias incorporates his response above. See Argument IV(A)(1) *supra*. Moreover, this self-serving view of the facts cannot be sustained at summary judgment. The note was in these Defendants' investigative file for the Roman homicide—the same file containing all of the reports that Defendants wrote, signed, and approved. PSOF ¶¶183, 222, 279-283. Case updates were shared on a daily basis with the supervising sergeant Biebel. PSOF ¶¶282-283, 286. Iglesias is entitled to the inference that the investigating officers knew the evidence in their own file.

### (b) Defendants Suppressed Documentary Evidence That They Believed Spanish Cobras Had Committed the Crime

Defendant Officers also suppressed that, in the separate Vargas homicide investigation, which occurred around the same time, they had received information indicating that in the days immediately after the Roman homicide they had learned information indicating that the perpetrator was a member of the Spanish Cobras, and they found the lead credible enough to follow up about with a witness in the Vargas investigation. PSOF ¶¶214-217. Guevara and Halvorsen wrote a report documenting this information, but they placed it in the Vargas homicide file, and they

excluded it from the Roman homicide file. PSOF ¶218. It was never turned over to the prosecutors or the defense. PSOF ¶¶220-221.

This information was material to the Roman investigation because Defendant Officers claimed all along that the shooting had been committed by an Imperial Gangster, and they used that information to tie Iglesias to the crime, contending that he was affiliated with the Imperial Gangsters. PSOF ¶¶56, 90, 94, 184. If Iglesias could have shown that there had been evidence developed in the days immediately after the shooting that witnesses had indicated the shooter was a Spanish Cobra, and that the Defendants themselves believed that the crime may have been committed by Spanish Cobras, a gang with which Iglesias was not affiliated, it would have impeached the police theory of the investigation and it would have exculpated Iglesias.

Defendants do not provide any argument about why they are entitled to summary judgment on this theory, except to say that Iglesias cannot demonstrate that he did not possess the report. OB-38. But it is Defendants' burden to point to record evidence that establishes that there is no dispute of fact about whether this Vargas report was disclosed. In this context, that would mean evidence that Defendants had disclosed the document. They point to nothing of the sort, and they cannot obtain summary judgment by mere assertion. Regardless, as discussed below, the document was not disclosed. See Argument IV(B)(3)(d) *infra*.

### (c) Defendants Suppressed Arnell Moore's Non-Identification of Iglesias

Defendants also suppressed witness Arnell Moore's non-identification of Iglesias shortly after the crime. Moore is the witness who got the best look at the shooter, seeing him twice in the course of the crime, and providing a detailed description. PSOF ¶¶43-44, 236. Shortly after the crime, investigating officers showed Moore photobooks to see if he could identify the shooter. PSOF ¶¶236-238. Iglesias is entitled to the inference that he was in the photobooks shown to

Moore, given that Moore viewed the photobooks at Area Five, and he is only documented to have been at Area Five on June 23; on that day, the only suspect, and the only person's photo being used in photo identification procedures as a suspect, was Iglesias. PSOF ¶¶236-238. But Moore did not select Iglesias's photograph from the book. That the best eyewitness failed to select Iglesias's photo is exculpatory evidence that should have been disclosed. Instead, Defendants deliberately suppressed it, omitting from their closing report that this identification procedure had occurred, and instead falsely stating the opposite: that Moore had told them he did not get a good look at the shooter and could not make an identification, and indicating that as a result he was not shown any photo array or lineup. PSOF ¶¶188, 240, 244.

Defendants contend that they were not involved in the photobook procedures. OB-40. Again, to the extent this restates arguments Iglesias has disposed of already, he incorporates that response. See Argument V(A)(1) *supra*. Moreover, Guevara, Halvorsen, Riccio, and Gawrys were all involved in arresting Iglesias on June 23, and were at Area Five participating in various aspects of the many other fabrications discussed above, and all participated in writing the closing report that deliberately concealed that Moore had been shown photos that day at Area Five. PSOF ¶¶143, 183-190, 236-238. Again, the investigative team was small, police officers testified that they would have readily shared information about the investigation with one another, and Sergeant Biebel had them share case updates at their daily roll calls. PSOF ¶¶279-286.

Defendants also assert that because the results of the photobook procedures "may not" have been documented, Iglesias has no way to show that the information withheld was exculpatory. OB-40-41. This cynical and self-serving argument should be rejected. At this stage of the case Defendants are not entitled to the inference in their favor that notes and reports they made during the course of their investigation that no longer exist had no exculpatory or impeachment value.

64

Moreover, Iglesias need not demonstrate that Defendant Officers recorded the results of the photobook procedures at all—he just needs to show that they suppressed exculpatory investigative information that they learned about, written or not. Defendants position that they can avoid a trial on whether they suppressed exculpatory evidence because there is no documentation of the evidence they suppressed "strains *Brady* to the point of absurdity." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) ("*Brady* would mean nothing if, . . . a prosecutor could comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense."). Defendants' arguments regarding Moore's photobook non-identification should be rejected.

### (d) Defendants Suppressed Their Interactions with Rodriguez

Last but not least, Defendants suppressed their interactions with Hugo Rodriguez. When Rodriguez supposedly identified Iglesias, he told Defendants that Iglesias looked different from the shooter in important ways, but this information was suppressed and omitted from the closing report. PSOF ¶¶104, 106, 210, 212.

Also suppressed was the fact that Guevara showed Rodriguez a photo to remind him what Iglesias looked like in advance of his trial testimony. PSOF ¶¶230-233. So was the fact that Guevara practiced Rodriguez's testimony with him in advance of trial. PSOF ¶¶230-233. So was the fact that Rodriguez had viewed photobooks on multiple occasions before his purported identification of Iglesias on June 23. PSOF ¶229.

Defendants contend again that no documents were created from those meetings with Rodriguez, and so there is no evidence of what exculpatory or impeaching evidence was suppressed, OB-39, an argument this Court should reject for the same reasons discussed in the last subsection above, see Argument IV(B)(3)(c) *supra*.

Defendants also contend that this information was not necessarily material exculpatory or impeachment evidence, because all Defendants were doing is preparing Rodriguez to testify truthfully. OB-39. This argument again impermissibly draws inferences for the moving party. This argument ignores most of the suppressions related to their interactions with Rodriguez. On the suppression of the meetings before trial again, the Defendants again impermissibly draw inferences for themselves. Rodriguez made an in-court identification of Iglesias, but what was not known to Iglesias and his counsel was that Guevara had shown Rodriguez Iglesias's photo and was meeting with Rodriguez repeatedly to help him rehearse his story and make that identification. This raises serious questions about why, if Rodriguez had actually seen the shooter at all, he would have needed such coaching. In other words, all of this evidence would have buttressed Iglesias's defense, and impeached Rodriguez's identifications.

Last, Defendants again argument that Iglesias and his lawyers could have discovered all of the information that Rodriguez knew. OB-41. As discussed above, this position misunderstands the reasonable diligence doctrine, and for the same reason that Iglesias and his lawyers could not have discovered the documents Defendants were suppressing or the exculpatory evidence regarding Moore, they could not have discovered the suppressed Rodriguez. Iglesias incorporates those arguments again here. See Argument IV(B)(3)(c) *supra*. Where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22

Moreover, Defendants' position the chance to learn what Rodriguez knew is also inconsistent with the Supreme Court's *Brady* line of cases. The Court in *Strickler v. Greene*, 527

U.S. 263 (1999), imposed a duty on the state to disclose material exculpatory or impeachment evidence, even when there has been no request for that evidence by the accused. Included in that is evidence that would impeach witnesses known by the state. *Giglio*, 405 U.S. 150. For these constitutional rules to have effect, any understanding of reasonable diligence along the lines of the one that Defendants advance in this case must be rejected. Defendants had an obligation under *Brady*, *Giglio*, and *Strickler* to disclose evidence about Rodriguez even without an effort on the part of Iglesias and his attorneys to obtain that evidence. That constitutional obligation is in irreconcilable tension with Defendants' proposed legal rule that they were not required to turn over suppressed evidence about their interactions with a witness because there was some remote chance that Iglesias and his attorneys could have discovered it. As Judge Kennelly put it in *Jimenez*, adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio* . . . , a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445; *accord Kluppelberg v. Burge*, No. 13 C 3963, Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) (rejecting reasonable diligence defense and concluding that "defense counsel's diligence is irrelevant if the suppressed information was material").

Finally, there is a heated dispute of fact about whether Iglesias and his attorneys could have learned what Rodriguez knew. Iglesias's attorney issued numerous subpoenas and discovery requests to learn exactly this type of information, but it was not disclosed. PSOF ¶¶259-266. While Defendants' reasonable diligence argument for summary judgment is contradicted by law, it is also precluded by factual disputes. Given the blatant *Brady* violations outlined above, Defendants'

only possible defense is to deny they occurred. That defense must be mounted at trial and not in a motion at this stage.

### (a) Defendants Suppressed Exculpatory Police Documents

The summary judgment record also supports Iglesias's claim that Defendants violated his right to due process by suppressing investigative documents generated during the course of the Roman investigation. *Jones*, 856 F.2d 985 (noting that suppression of exculpatory evidence in clandestine police files violates due process); see also *Fields v. City of Chicago*, 2014 WL 477394, at *6-7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment on a similar claims). As discussed, they suppressed documents showing they picked Iglesias first, that the eyewitnesses could not make an identification, that Efrain Torres knew the shooter, and that their leads pointed to the Spanish Cobras. PSOF ¶¶63-65, 214-221, 222-228.

Defendant Officers mildly suggest Iglesias cannot succeed on a document suppression claim because he cannot show that documents ever existed, he cannot show he did not receive them, and he cannot show that his criminal defense attorney could not have discovered the documents. OB-38-39. But Defendants are not entitled at this stage to these inferences in their favor that notes and reports they made during the course of their investigation were not suppressed.

The opposite is true. Construing the record for Iglesias, it is obvious that notes and documents that Defendants created during the investigation were not turned over. PSOF ¶¶210-245. The Vargas report was not even maintained in the Roman investigative files, and it was discovered during the litigation of this case in other police files. PSOF ¶¶214-221. With respect to the documents that were included in Roman investigative files obtained during discovery in this case, those documents were not in the Cook County State's Attorney's file (to whom the police would have disclosed the documents had they been disclosed); the documents and the information

in them were not referenced at the criminal trial at all (which they would have been if they had been turned over); Iglesias's lawyer said he had no knowledge of the exculpatory information contained in the document; police officers took the Fifth when asked if they turned over documents to the prosecutor and criminal defense; and Defendant Officers took affirmative steps of fabricate evidence that contradicted the suppressed documents. PSOF ¶¶53-54, 67-162, 179-191, 210-213, 246-257, 265-266. Drawing inferences for Iglesias, the documents in question were not disclosed.

Defendants assert that perhaps the documents were turned over to Iglesias's criminal defense attorney and were part of a defense case file that has not been discovered in this civil case, or that Iglesias's defense attorney might have obtained some of the document by subpoena. OB-38-39. Those arguments depend on untenable inferences or raw assumptions drawn for the Defendants, which is inappropriate at this stage. *Tolan*, 572 U.S. at 656. Moreover, to the extent that Defendants are suggesting that Iglesias's attorneys should have discovered this information by working, that, too, is in dispute. Iglesias's attorney made efforts to discover all of the evidence in the case, and he was rebuffed. PSOF ¶¶258-266. As a result, Iglesias's attorney's effort cannot be the basis for summary judgment, *Jimenez*, 830 F. Supp. 2d at 446 ("What was available through reasonable diligence . . . is very much in dispute.").

Again, where police officers take steps, as here, to actively suppress evidence by fabricating a false account, they cannot later contend that the evidence was disclosed or should have been discovered. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process"). Police officers who lie to perpetuate the suppression of evidence are liable under *Brady* solely on that basis as well. *Camm*, 937 F.3d at 1110 (holding that a *Brady* claim may be based on "exposing the lie" of a police officer, which would have "eroded the jury's

69

trust in both the prosecutor and the lead case investigator"). These disputes of fact preclude summary judgment on Defendants' theory that they did not suppress exculpatory documents. *Jimenez*, 830 F. Supp. 2d at 443-44.

### C. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Iglesias's Criminal Trial

#### 1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983

Defendants argue that, following the Supreme Court's decision in *Vega v. Tekoh*, 597 U.S. 134, 141 (2022), § 1983 does not render a state actor liable for using unduly suggestive identification procedures to obtain a false identification that taints a criminal case. OB-13-18. Defendants are wrong on the merits, but this Court should reject the argument before even reaching the merits, because it is not within this Court's prerogative to overrule Seventh Circuit precedents.

#### (a) The Seventh Circuit Recognizes This Type of § 1983 Claim

The Seventh Circuit held in *Alexander v. City of South Bend* that while "[t]he Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality," it does "guarantee the right to a fair trial . . . and that right is violated if unduly suggestive identification techniques are allowed to taint the trial," and so state actors are liable under § 1983 if they use identification techniques that make a criminal trial unfair. 433 F.3d 550, 555. Since then, the Seventh Circuit has recognized that this theory of § 1983 lability is viable repeatedly and recently. *Holloway v. City of Milwaukee*, 43 F.4th 760, 766 (7th Cir. 2022); *Coleman v. City of Peoria*, 925 F.3d 336, 347 (7th Cir. 2019); see also *Reyes v. Nurse*, 38 F.4th 636, 644 (7th Cir. 2022) (recognizing the same in the federal habeas context). In *Holloway*, the Seventh Circuit considered whether and what effect *Vega* might have on this line of cases, but it "conclude[d] that [the question] need not be resolved" and went on to address the suggestive

70

identification § 1983 claim on the merits. 43 F.4th at 766-67. Accordingly, the Seventh Circuit currently recognizes this theory of § 1983 liability, having applied it in a recent case, and it will consider whether *Vega* affects it at an appropriate time.

Since *Holloway*, five district courts in this Circuit have considered Defendants' argument that *Vega* eliminated § 1983 suggestive identification claims, and all but one have followed Seventh Circuit precedent and have rejected the argument.[12] This Court is bound to follow existing precedent of the Seventh Circuit and cannot overrule it. *E.g.*, *Savory v. Cannon*, 947 F.3d 409, 421 (7th Cir. 2020) (en banc); *Nanda v. Bd. of Trustees of Univ. of Illinois*, 219 F. Supp. 2d 911, 914 (N.D. Ill. 2001). Defendants have preserved an argument, which they can present to the court of appeals at an appropriate time, and this Court should reject Defendants invitation to overrule Circuit precedents, without reaching the merits of Defendants' argument.

### (b) *Vega* Does Not Affect This Type of § 1983 Claim

On the merits, Defendants are wrong that *Vega* changes anything. In fact, quite contrary to Defendants' argument, the logic of *Vega* is *already applied* to § 1983 due process claims asserting that a police officer's improper identification techniques resulted in an unreliable identification

---

[12] In *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 908-09 (N.D. Ill. 2022), Judge Seeger rejected a Rule 50 challenge to a $25 million verdict on the theory. In *Donald v. Outlaw*, No. 2:17-CV-32-TLS, 2023 WL 2346270, at *11-12 (N.D. Ind. Mar. 3, 2023), Judge Springman rejected the argument and denied summary judgment. In *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *14 & n.19 (N.D. Ill. Oct. 31, 2023), Judge Jenkins also recognized consistent with Seventh Circuit precedent that a § 1983 claim for improper identification procedures is viable when those procedures affected the criminal trial. Similarly, the court in *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *22-23 (N.D. Ill. Sept. 30, 2022), denied summary judgment on this theory (except as to two defendants, who were granted qualified immunity).

Only *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *23-24 (N.D. Ill. Jan. 24, 2024) (Ellis, J.), concluded that such an unduly suggestive identification claim is not viable under § 1983, without much legal analysis at all, and without considering whether it was within that court's power to overrule Seventh Circuit precedents. Indeed, in that case, the parties hardly briefed the issue: the defendants presented the argument that the district court should rely on *Vega* to overrule Seventh Circuit precedents in four sentences of their motion, 18 C 1049, Dkt. 462 at 33; the issue was not discussed in response, except to say that multiple courts recognize the claim as viable, 18 C 1049, Dkt. 475 at 29; and there was a limited discussion in reply, 18 C 1049, Dkt. 505 at 29-30.

that is used in and taints a criminal case. In both instances, a police officer's violation of a prophylactic rule does not by itself violate the Constitution and is not actionable under § 1983, but where illegally obtained evidence is actually used in and taints a criminal case, there is a violation of core Constitution rights, and a corresponding claim under § 1983.

*Vega* holds that there is no § 1983 claim for a mere violation of *Miranda*'s prophylactic rules. 597 U.S. at 150. The Court reasoned that *Miranda* prophylactic rules exist to guard against Fifth Amendment violations in criminal cases. *Id.* at 149. But a police officer's violation of those rules does not automatically violate the Fifth Amendment. *Id.* at 149-50. As a result, the violation of *Miranda*'s prophylactic rules is not necessarily a violation of the Fifth Amendment actionable under § 1983. *Id.* However, the Court was careful to say that "[i]f a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be different," *id.* at 141, and it said that because a long line of Supreme Court cases recognizes that statements that are illegally compelled by police interrogations and then are used in a criminal case violate the Fifth Amendment, *Brown v. Mississippi*, 297 U.S. 278 (1936), and are actionable under § 1983, *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003). As the Court emphasized throughout its opinion in *Vega*, it was not breaking any new ground. 597 U.S. at 142. Just as the Court has long held that compulsive questioning without *use of the resulting confession in the criminal case* does not violate the Fifth Amendment and is not actionable under § 1983, *Chavez*, 538 U.S. at 767, a mere violation of *Miranda*'s prophylactic rules without more does not violate the Fifth Amendment and is not actionable under § 1983, *Vega*, 597 U.S. at 149-50.

Precisely the same framework already applies to unduly suggestive identification claims. As the Seventh Circuit explained in *Hensley v. Carey*, "The rule [from *Stovall v. Denno*, 388 U.S. 293 (1967), and *Manson v. Brathwaite*, 432 U.S. 98 (1977)] against admission of evidence from

unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983." *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987). As was the case in *Vega* for violations of *Miranda*'s prophylactic rules, a violation of the prophylactic rules prohibiting unnecessarily suggestive identification procedures does not by itself violate due process, and is not by itself actionable under § 1983. *Alexander*, 433 F.3d at 555. Instead, the plaintiff must show "how the flaws [in the defendants'] identification techniques made his trial unfair." *Id.*; see also *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (holding that there is no § 1983 claim regarding suggestive identification procedures if the identifications are never used in the criminal case). If the plaintiff can show that improper identification procedures resulted in an unreliable identification that tainted the criminal proceedings, then a violation of due process is established, and that violation is actionable under § 1983. *Blackmon*, No. 19 CV 767, 2023 WL 7160639, at *14; *Hampton*, 2017 WL 2985743, at *23.

*Vega*'s logic governing Fifth Amendment § 1983 claims is identical to the law that governs due process suggestive identification § 1983 claims. In *Vega* and *Chavez*, a violation of a prophylactic rule or the use of coercive interrogation techniques alone is not actionable under § 1983, but the use of an illegally obtained confession in the criminal case, in violation of the core Fifth Amendment right against self-incrimination, is actionable under § 1983. In the context of suggestive identification procedures, the use of improper identification procedures is not alone actionable under § 1983, but an unreliable identification obtained from such procedures that is used in and taints the criminal case, in violation of the core due process right to a fair trial, is actionable under § 1983. Because the law governing § 1983 suggestive identification claims is

already in harmony with *Vega*, this Court should reject Defendants argument that *Vega* eliminates this type of § 1983 claim.[13]

### 2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Iglesias's Criminal Case and Violated His Right to Due Process

Disputed facts preclude summary judgment on Iglesias's claim that Defendants used improper identification techniques to obtain false identifications that were introduced in and tainted Iglesias's criminal case. "A plaintiff with this kind of [section 1983] claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial." *Alexander*, 433 F.3d at 555-56. The assessment of whether identification procedures were so unduly suggestive that they gave rise to a misidentification turns on two questions, assessed considering the totality of circumstances: (1) whether the procedures were unnecessarily suggestive; and (2) whether there is evidence that the identifications were nonetheless reliable. *Hampton*, 2017 WL 2985743, at *23 (citing *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014)). If the identification techniques were unduly suggestive, the question is whether they rendered the criminal proceeding unfair. *Id.* (citing *Alexander*, 433 F.3d at 555). Each of these questions must be resolved in Iglesias's favor at summary judgment.

### (a) The Identification Procedures Were Unduly Suggestive

As discussed above, the identifications of Ochoa and Rodriguez were fabricated: Neither Ochoa nor Rodriguez could have possibly seen the perpetrator's face well enough to make an

---

[13] Interestingly, although Defendants go on for seven pages discussing *Vega* and Seventh Circuit law, they do not actually say anything different than what Iglesias has said above. OB-13-18. Instead, they contend that violations of prophylactic rules alone do not give rise to § 1983 claims, which is apparent from the case law, but then they make no argument whatsoever about whether the introduction of a tainted identification in the criminal case is actionable as a due process claim. See OB-16-18. Instead, they fudge the end of the argument, note that Judge Ellis deemed these § 1983 not viable, and skip right to an argument about what Iglesias can show factually. OB-17-18.

identification. They told responding detectives they could not make an identification in their initial interviews on the night of the shooting. Iglesias is an innocent man and was not present at the scene. Defendants selected Iglesias as their suspect before there was any evidence, and they suppressed that they had done so. Then they fabricated a June 22 photo array identification at Ochoa's home that never happened. Both Ochoa and Rodriguez told Defendants that Iglesias looked different than the perpetrator. Yet despite all of this, Defendants got both Ochoa and Rodriguez each to identify the same innocent person who Defendants had selected as their suspect. See Argument IV(A)(2) *supra*. The only way this could have happened is if Defendants fabricated the identifications, telling Ochoa and Rodriguez who to pick. When Guevara and Halvorsen were asked if they did exactly that, they pleaded their Fifth Amendment right not to incriminate themselves. *Id.*

This extreme misconduct is far more than enough at summary judgment to establish that the identification procedures were improperly suggestive. *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (denying summary judgment where the police defendants convinced a witness to select a particular photo); see also *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *17 (N.D. Ill. Oct. 31, 2023) (holding that evidence that Defendants intended to obtain an identification of a suspect relevant to dispute of fact about whether the identification procedures were unduly suggestive); *Hampton*, 2017 WL 2985743, at *23 (denying summary judgment where the officer suggested who the witness should pick). Indeed, on this view of the facts, Defendants did all the things (and more) that the Supreme Court said in 1968 would make an identification procedure unduly suggestive in *Simmons v. United States*, 390 U.S. 377, 382-83 (1968).

Even pretending that this misconduct was not in the record—so, construing some of the facts in *Defendants' favor*, just for purposes of this argument—there would still be sufficient evidence to show that the identification procedures Defendants used were unduly suggestive.

For one, Defendants do not challenge any of the opinions of Iglesias's expert in eyewitness identifications, Dr. Dysart, who points to nearly a dozen factors suggesting Ochoa and Rodriguez's identifications were unreliable at best, and fabricated at worst. PSOF ¶¶163-178. Ultimately Dr. Dysart opined that it would have been "extremely unlikely that [either Rodriguez or Ochoa] could have formed a strong enough memory to be able to reliably recognize the face of a stranger," and that the "combination of a weak memory for the shooter based on a limited opportunity to view coupled with suggestive identification procedures easily accounts for the selections of Mr. Iglesias in this case." PSOF ¶178.

For instance, analyzing these identifications and applying eyewitness expert science, Dr. Dysart opined that the conditions under which Ochoa and Rodriguez viewed the shooting— including the obstructions like trees and window blinds, short duration, and huge distance— combined with their virtually nonexistent descriptions of the shooter (that, incidentally, did not match Iglesias), severely limited their abilities to make an accurate identification. PSOF ¶¶163-171. How then did both of these people both pick Iglesias out of the photo array? Dr. Dysart and another expert in eyewitness identification and memory, Dr. Nancy Frankly, both opine that the photo array was biased against Iglesias, because Iglesias stood out from the fillers, some of whom were "completely implausible alternatives." PSOF ¶¶174-175. The fact that neither Rodriguez nor Ochoa were told that the perpetrator may or may not be in the photo array was suggestive, and the fact that the lineup administrators knew who the suspect was also suggestive. PSOF ¶172. Dr. Dysart further opines that if Rodriguez viewed Iglesias's photo in a photo book and rejected

Iglesias, as the record suggests he did, "any subsequent viewing of Mr. Iglesias would be contaminated by the mug book procedure." PSOF ¶¶90, 172.

After being pointed out in an unduly suggestive photo array, the results from any subsequent procedure are relatively meaningless. PSOF ¶176, 264. That is, the bias from the first suggestive procedure renders the outcomes of the subsequent lineup procedures' irrelevant for the purposes of determining witness accuracy. PSOF ¶176. After these identification procedures, the risk of unconscious transference and commitment—the phenomena where witnesses believe that the suspect's face is familiar from the crime, but it has merely been encoded as the result of repeated identification procedures—was high, explaining Rodriguez's and Ochoa's view that they had selected the right person. PSOF ¶¶176-177. Accordingly, the totality of circumstances reveals a robust dispute about whether the identification procedures used with Ochoa and Rodriguez were unduly suggestive, even setting aside the evidence that Defendants fabricated the identifications out of whole cloth. PSOF ¶¶97-110, 147-162, 172-178.

Defendants argue that Ochoa and Rodriguez each viewed separate, legitimate photo arrays that were not suggestive, and that they did not do anything to elicit a selection of Iglesias from those photo arrays. OB-24. That is an account that impermissibly takes the facts in Defendants' own favor and draws untenable inferences. *Tolan*, 572 U.S. at 656. For the reasons just discussed, Defendants are not entitled to the inference that their identification procedures were legitimate; instead, Iglesias is entitled to the inference that the identifications were fabricated. And again, even ignoring the circumstantial evidence of direct fabrication, the remains a hot factual dispute about whether the photo identification procedures were unduly suggestive, given Iglesias's unrebutted expert evidence that that Ochoa and Rodriguez did not get a good enough look at the shooter to make an identification; that their initial descriptions were thin and did not match Iglesias; that at

least Rodriguez had seen Iglesias in a photo book before the photo lineup; that they were not given neutral pre-identification instructions; that the photo array itself was biased against Iglesias; and that the witness's expression of confidence were meaningless. PSOF ¶¶163-175.[14]

### (a) Ochoa's and Rodriguez's Identifications Were Not Reliable

Defendants argue that Ochoa's and Rodriguez's identifications were sufficiently reliable that they could not have tainted Iglesias's criminal proceedings. OB-24-29. This argument depends on a self-serving and slanted view of the facts, and it should be rejected.

Ochoa's and Rodriguez's identifications were undeniably unreliable. Most importantly, the record viewed in Iglesias's favor shows that Ochoa and Rodriguez identified Iglesias as the shooter even though Iglesias had nothing to do with the crime and was not at the scene, and even though neither Ochoa nor Rodriguez saw the shooter. PSOF ¶¶2-12, 70-81, 117-132. Ochoa and Rodriguez picked an innocent person, and so of course the identification of Iglesias cannot be said to be reliable. PSOF ¶¶2-12. This factor of the suggestive identification analysis is meant to assess whether the suggestiveness of the identification procedure created a substantial likelihood of *misidentification*. *Neil v. Biggers*, 409 U.S. 188, 198-201 (1972). In a case where the record reflects an *actual misidentification* of an innocent person, it is established that the identification was not reliable.

Nonetheless, even applying the *Biggers* factors—the opportunity of the witness to view the criminal during the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation,

---

[14] With respect to the live lineup, Defendants argue that there was no established police procedure prohibiting a photo array being used directly before a live lineup. OB-22. For purposes of this analysis, that is beside the point. The question is whether showing Iglesias to both witnesses in a photo array directly prior to a live lineup rendered the latter lineup meaningless as an identification procedure, and construing the record for Iglesias at this stage, the answer must be "yes."

and the length of time between the crime and the confrontation, 409 U.S. at 199-200—there is ample evidence to support the view that the identifications were not reliable. The reported initial description from Rodriguez was that the shooter was wearing all black, running into an alley (in the opposite direction), and so he could provide no description of the person at all. PSOF ¶¶33, 82-84. Ochoa's description of the perpetrator, also without any reference to any distinguishing features—and omitting Iglesias's unique eyebrows and earrings—was not only vague, but in addition the limited details he could provide such as complexion, age and height did not match Iglesias. PSOF ¶¶33. The initial descriptions are strong evidence that Ochoa and Rodriguez could not identify the perpetrator at all, let alone accurately identify Iglesias. PSOF ¶¶171, 173. Indeed, the witnesses told the police they could not identify the shooter. PSOF ¶¶82-86, 133-138.

In addition to the poor descriptions environmental circumstances confirm the identifications were unreliable, all of which are discussed at length above—*e.g.*, the shooter wore a hood up, the witnesses had views obstructed by blinds or trees, the incident lasted seconds and there was a limited viewing opportunity, both witnesses viewed from a great distance, the shooter ran, Rodriguez drove away and ducked). See Argument IV(A)(2) *supra*; see also Statement IV *supra*.

Moreover, Iglesias's expert, Dr. Dysart, explains how these variables reduce the risk of accurate identifications, according to established, peer-reviewed eyewitness science. She opines that Ochoa and Rodriguez viewed the perpetrator for such little time that the risk of false identification of an innocent person in identification procedures increased to 90%. PSOF ¶165. That already high risk of inaccurate identification was increased by the well documented reduction in eyewitness accuracy caused by distance, obstructed viewing caused by the perpetrator's hood, weapon focus, and stress and arousal. PSOF ¶¶163-171. Dr. Dysart opines that "[t]ogether, these

estimator variables [environmental circumstances] likely created a scenario where it would have been difficult for either witness to have a strong memory for the perpetrator. . . . [T]here are significant concerns regarding eyewitness reliability in stranger identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed." PSOF ¶171.

No evidence in the record suggests Ochoa's or Rodriguez's identifications of Iglesias were reliable. *Washington*, 2022 WL 4599708, at *23 (holding that a witness's identifications of the plaintiffs at night from a distance was enough to create a genuine dispute of fact about whether the identification was reliable and procedures were suggestive); *Bolden*, 623 F. Supp. 3d at 915-19 (affirming jury verdict as supported by sufficient evidence when unreliability of the identification was supported by nearly the same factors present here). *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *9 (N.D. Ill. May 17, 2016) (noting that limited opportunity to view the crime, a lack of detail, and misidentification of the wrong person created a dispute of fact for trial).

In response to these arguments, Defendants argue at some length that the witnesses had a great opportunity to view the perpetrator, gave good descriptions to the police that were similar to Iglesias, and made identifications in which they were confident. OB-24-26. That is a factual account they will have to present to a jury—there is no part of it that is not disputed and directly contradicted by the facts set out above—it is not a determination that the Court can credit at this stage, consistent with Rule 56. *Tolan*, 572 U.S. at 656. There are many examples of how Defendants' account is slanted drastically in their favor, but consider that they argue that the descriptions of the witnesses were "sufficiently similar to Iglesias's physical appearance." OB-26. Not only did the witnesses provide no distinguishing details in their description, but the one generic

description that was provided was dissimilar to Iglesias, as the witnesses later told police. See Argument IV(A)(2) supra. Or consider that Defendants stress that "there were two identifications—by witnesses who did not know each other or speak to each other and witnessed from different locations . . . ." OB-26. At this stage, the fact that two unrelated witnesses identified the same innocent person that Defendants had chosen as their suspect is a fact that supports Iglesias's account that the identifications were fabricated. See Argument IV(A) supra.

Moreover, Defendants' contention about witness certainty is one the Seventh Circuit has discounted at summary judgment, saying it is "too much of a leap at the summary-judgment stage" to decide as a matter of law that a witness identification was reliable where the witness confidently identified a suspect and testified that the identification was not influenced, given the problems of unconscious transference. *Holloway*, 43 F.4th at 766-67; *see also* PSOF ¶¶266-267. Even accepting Defendants' view of witness confidence, it would not entitle Defendants to summary judgment.

### (b) The Identifications Tainted Iglesias's Criminal Proceedings

The final factor necessary to support this due process theory is whether the unduly suggestive and inaccurate identifications rendered Iglesias's criminal case unfair. Based on this record, the question must be answered in the affirmative.

Under Seventh Circuit case law, whether unduly suggestive identifications made criminal proceedings unfair is answered by reference to the following questions: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any

objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Alexander*, 433 F.3d at 555.

At trial, Ochoa, Rodriguez, and Guevara implicated Iglesias as the perpetrator from the stand, explaining in detail the identifications of Iglesias that were obtained by Defendants' suggestive identification procedures before trial. PSOF ¶¶269-276. Rodriguez and Ochoa both testified about photo identifications of Iglesias and subsequent live lineup identifications. PSOF ¶¶269-270. Guevara testified about the photo identifications and live lineup identifications of Ochoa and Rodriguez. PSOF ¶¶271-273. The photo array used with both was introduced as evidence, as was a photograph of the live lineup. PSOF ¶274. Ochoa, Rodriguez and Guevara all placed markings on the trial exhibits of the photo array and live lineups in front of the jury. PSOF ¶274.

Though DeLeon attempted to cross examine these witnesses, Defendants' suppression of the true circumstances of these identification procedures—of the fact that Ochoa and Rodriguez had previously admitted to detectives that they could not identify the shooter, that some of the procedures did not happen at all, that Iglesias was a suspect before any identification, that the confidential informant tip was made up, and that Defendants told Ochoa and Rodriguez who to pick from the photo array, and then fabricated police reports as to all of this (at the same time suppressing the truth)—rendered cross examination effectively impossible. *See, e.g.*, PSOF ¶¶179-191, 258-266.

The identifications were used to convict Iglesias at trial. Indeed, no other evidence—apart from Defendants' own fabricated evidence—even implied Iglesias was guilty. The record shows conclusively that the unduly suggestive false identifications made Iglesias's trial unfair. *Donald*,

2023 WL 2346270, at *11 (deciding in nearly identical circumstances that material disputes of fact required a jury to determine whether identifications tainted a criminal trial).

The Defendants devote much of their argument to contention that the criminal jury "had ample information to determine for itself whether the identifications were suggestive." OB-27-29. This is an outlandish argument at summary judgment in this case, considering the strong evidence of fabricated and suppressed evidence discussed above. See Arguments IV(A) and IV(B) *supra*. Defendants seem to be arguing that they fabricated and suppressed evidence to frame an innocent person, bilked the criminal justice system by not revealing anything that they had done, but now should escape liability because the criminal jury had everything it needed to consider whether the identifications were reliable. This argument should be rejected summarily.

But even if this Court entertains the argument and evaluates the identifications in a vacuum, there are ample disputes of fact about whether the jury in Iglesias's criminal case had the information it needed about the suggestive identification procedure to decide whether the identifications were accurate. Iglesias and his attorney were unaware of the circumstances of Defendants' interactions with Rodriguez that cast doubt on Rodriguez's purported identification of Iglesias, including, critically, the fact that Rodriguez had told the detectives who initially interviewed him that he could not make an identification. They were also unaware that Rodriguez was shown multiple photo and lineup procedures in the first few days after the shooting—including those that would have contained Iglesias's photo—and did not make an identification; that Rodriguez told them Iglesias looked different from the shooter; and that Roriguez was told during the lineup to select the person he had identified from the photo array he saw less than an hour earlier. PSOF ¶¶82-87, 90-96, 101-106, 150-151, 210. Nor were they aware of Defendants' interactions with Ochoa that undermined Ochoa's purported identification of Iglesias, including,

again critically, the fact that Ochoa had told the detectives who initially interviewed him that he could not make an identification. But also, they were unaware that Ochoa did not in fact view a photo array at home on June 22; that he was shown a photo array only after Defendants had already pulled Iglesias's rap sheet and made him a suspect; that he told detectives the shooter looked different from Iglesias, and that he told detectives that Iglesias looked different than the shooter. PSOF 133-138, 139-146, 147-162, 211. This is ample evidence upon which a jury in this case could find that the jury in Iglesias's case was not properly informed.

### 3. Whether or Not Iglesias's Attorneys Objected to the Admission of the Identifications at the Criminal Trial Has Zero Bearing on This Theory

Defendants next argue that Iglesias cannot pursue this § 1983 theory because his attorneys did not file a motion to suppress the identifications during the criminal proceedings. OB-30-31. This argument suffers a number of flaws, each of which is an independent reason to reject it. First, Defendants do not point to any case that supports their proposed legal rule that a motion to suppress in the criminal case is a prerequisite to a § 1983 claim challenging a tainted identification. They do not because no such case exists.

Second, it makes sense that such a case does not exist. Even where a motion to suppress is filed and *denied* in the criminal case, that denial has no impact on whether a § 1983 claim can proceed. The Seventh Circuit in *Sornberger* held that a decision denying a suppression motion in a criminal case has zero effect in later § 1983 litigation after the criminal conviction has been set aside. *Sornberger v. Knoxville*, 434 F.3d 1006, 1021-23 (7th Cir. 2006); see also *Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir.2006) (estoppel argument based on state-court decision "absurd" when there is no extant criminal judgment against the plaintiff); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) (collecting cases and concluding that state court denial of motion to suppress did not prevent civil rights plaintiff from re-litigating the

legality of his confession). If a state court decision *denying* a motion to suppress as without basis has no effect on a later § 1983 case, then the *absence* of any litigation on such a motion to suppress obviously cannot bar a § 1983 action.

Third, Defendants' argument ignores the practical realities of litigating criminal cases. An attorney's decision not to file a motion to suppress in a criminal case can be influenced by a wide array of strategic considerations—*e.g.*, a bad trial judge, the chances that a motion to suppress will adversely impact other litigation on evidentiary issues prior to trial, or the view that an eyewitness will be more effectively cross-examined at trial without testifying first in a preliminary hearing. There are many reasons not to file a pre-trial motion to suppress that have nothing to do with the veracity of an identification.

Fourth, another strategic reason not to file a motion to suppress in the criminal case is the fact that, at the time of the criminal case, the criminal defendant might lack the evidence to effectively challenge the identification. That, of course, is the case here. Had Iglesias known that the eyewitnesses had not seen the shooter and told police they could not make an identification, for example, he could have filed quite a successful motion to suppress. But Defendants hid that evidence. In effect, Defendants are arguing that because they hid the evidence that they had framed Iglesias and manufactured identifications, he could not file a motion to suppress in the criminal case, and because he could not do that, they cannot be liable for manufacturing the identifications. That circular argument is nothing more than an attempt to contest Iglesias's facts at summary judgment.

Fifth, Iglesias's counsel De Leon did try to undermine and challenge Ochoa and Rodriguez's identifications of Iglesias during the criminal trial. He vigorously cross-examined both Ochoa and Rodriguez, over dozens of pages of transcripts, trying to demonstrate that they

could not have possibly seen the shooter well enough to make an identification, that their identifications were mistaken because Iglesias did not fit the initial descriptions, and that they were not telling the truth about what they saw and about their interactions with police. PSOF ¶266. He pressed on these arguments in his lengthy closing argument. *Id*. But he was ultimately unsuccessful, because what he lacked was the investigative information that would have allowed him to effectively confront the witnesses and prove his points, because Defendants had concealed it all. PSOF ¶¶258-266.

Finally, Defendants cite passages from *Alexander*, 433 F.3d at 556 and *Coleman v. City of Peoria*, 925 F.3d 336, 347-48 (7th Cir. 2019), to suggest that their invented motion-to-suppress rule is grounded in case law. OB-30-31. But neither of those cases even suggests that a motion-to-suppress in the criminal case is a prerequisite to a § 1983 claim.

*Coleman* is nothing like this case. There, the Seventh Circuit found that police officers used no improper identification procedures at all. *Id.* at 347-48. The witness had seen the suspect's fact for three minutes during the incident in question, and the witness recognized the suspect because they had lived in the same place for years. *Id.* During the happenstance meeting at the police station, the witness recognized the suspect, who was in a hallway, and pointed him out as the perpetrator. *Id.* Based on those facts, the Court determined that the witness's identifications did not clearly taint the suspect's trial. *Id.* at 349. The witness knew the perpetrator and had an independent basis to make an accurate identification, and that was what undermined the plaintiff's claim. Discussing the criminal trial court's denial of a motion to suppress the identification, the Seventh Circuit said that the denial of such a motion did not alone give rise to § 1983 liability. *Id.* at 347. That is nearly the opposite of a holding that a motion to suppress is required to assert a § 1983 claim.

In *Alexander*, the plaintiff lost the claim because he did not put any evidence in the record relating to his criminal case or the manner in which the identification affected that case. 433 F.3d at 556 ("[The plaintiff] has not made any effort to describe how the police identification procedures tainted his trial."). the Seventh Circuit said, "Without the trial record we cannot determine whether such a motion, had it been made, would or should have been granted. . . . Alexander's is a sympathetic case, but we cannot connect the dots for him. That he must do on his own." 433 F.3d at 556. The absence of a record doomed the claim, and the Seventh Circuit recognized that a properly assembled record, like the one here, might demonstrate that a hypothetical motion to suppress would have been granted had it been filed in the criminal case. *Id.* The core of Iglesias's claim is that he lacked information during the criminal case that he needed to effectively defend himself. Unlike Alexander, Iglesias has put together a record in this case that establishes that if he had possessed the evidence earlier and had filed a motion to suppress, it would have been granted. This Court should reject Defendants' argument regarding the lack of a motion to suppress.

### 4. Defendants Are Not Entitled to Summary Judgment Merely Because They Disclaim Intent

Defendants' next assert incorrectly that there is no dispute of fact about whether they possessed the requisite mental state to be held liable for conducting the suggestive identification procedures that resulted in their tainted identifications being used at Iglesias's criminal trial. OB-31-32. In this argument, Defendants merely reiterate their view that Riccio, Gawrys, and Biebel were not involved in procuring the identifications, and they assert in a single sentence that there is no evidence Halvorsen knew the identification procedures were suggestive. OB-32. Guevara does not make any independent argument.

Iglesias had already explained how Riccio, Gawrys, and Biebel participated in obtaining Ochoa's and Rodriguez's fabricated identifications. See Argument IV(A)(1) *supra*. Moreover,

Halvorsen's argument is so perfunctory that it is forfeited. *Smith*, 388 F.3d at 569. Even if it were not, Halvorsen cannot possibly take the Fifth about whether he knowingly obtained false identifications of Iglesias, and then argue that he is entitled to summary judgment because he has established that there is no genuine dispute of fact about whether he had the necessary intent. It is highly problematic for a party's lawyers to argue for judgment by disclaiming that the party acted with intent when the party has exercised his right to remain silent. See Argument III *supra*.

Moreover, the Seventh Circuit long has reminded that "[d]ue to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse*, 991 F.2d 1249, 1258 (7th Cir. 1993); see also *P.H. Glatfelter Co. v. Voith*, 784 F.2d 770, 774 (7th Cir. 1986) (noting that, "as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication and that resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible") (internal quotation marks and citations omitted). "There is especially good reason to follow the general rule where, as here, evaluating whether a party had an actual intent to deceive requires credibility determinations." *Standard Ins. Co. v. VanLanduit*, 551 F. Supp. 3d 854, 868 (N.D. Ill. 2021) (internal quotation marks omitted).

In this case, the record is replete with evidence from which a reasonable jury could draw the inference that Defendant Officers had the intent to obtain a fabricated identification using unduly suggestive procedures. Officers involve in those procedures have taken the Fifth. Defendants decided on Iglesias as their suspect without evidence. Multiple pieces of evidence independent of the identifications were fabricated. Defendants suppressed information undermining their eyewitnesses, including statements from those witnesses that they could not

make an identification, throughout the case, and still more exculpatory and impeachment evidence was suppressed on other subjects. Some Defendants testified falsely at trial. Police reports were falsified. The list of circumstantial evidence of intent goes on and on. Based on much less evidence the Seventh Circuit decided that "[a] jury would not be compelled to find that the officers acted with that intent, but it could so find." *McCottrell v. White*, 933 F.3d 651, 670–71 (7th Cir. 2019). This Court should reject Defendants' intent argument.

### 5. Defendants Are Not Entitled to Qualified Immunity on This Theory

Finally, Defendants contend they are entitled to qualified immunity on this theory. OB-32-33.[15] Defendants argue only that the law was not clearly established in 1993 that they could not use a photo array prior to a live lineup or that they could not use poor quality fillers. OB-33. That qualified immunity argument depends on a view of the facts where Defendants did not violate Iglesias's rights at all, but as discussed already material disputes of fact foreclose such an argument.[16]

To the extent Defendants are actually arguing that the law governing Iglesias's identification theory was not clearly established in 1993 and 1994, that is plainly incorrect. The illegality of the Defendants' conduct was established long before the events at issue in this case. In 1968, the Supreme Court announced that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968). Moreover, it has

---

[15] Defendants do not argue they are entitled to qualified immunity on any of Iglesias's other due process theories, and so they have now forfeited any argument for immunity on those claims. *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009).

[16] In fact, this whole section of Defendants' brief really repeats factual arguments addressed above about whether Defendants violated Iglesias rights, OB-33, but now Defendants have dressed them up as arguments about the contours of clearly established law.

For example, Defendants argue that the law was not clearly established that they could not say "the probably got the guy" before an identification procedure, OB-49, which is not an argument about the state of clearly established law, but instead is an argument that they did not engage in suggestive identification procedures in the first place.

been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint the criminal proceedings violates due process. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *see also Neil v. Biggers*, 409 U.S. 188 (1972). It was clear in the Seventh Circuit that police officers could be held liable for this misconduct at latest in 1987, nearly a decade before Iglesias's prosecution. *Hensley*, 818 F.2d at 648-50; see also *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *10 (N.D. Ill. May 17, 2016) (holding that it was clearly established in 1993 that police officers violated a criminal defendant's due process rights by conducting impermissibly suggestive identification procedures). Defendants are not entitled to qualified immunity on Iglesias's due process identification theory.[17]

### 6. Defendants' Remaining Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit

Defendants' remaining arguments for summary judgment on this due process theory have been addressed already. First, Defendants argue that Riccio, Gawrys, and Biebel were uninvolved in the identification procedures. OB-18-19. Iglesias has addressed already how that is an untenable reading of the record, particularly so if the record is construed for Iglesias, and Iglesias incorporates that argument here. Argument IV(A)(1) supra. The evidence that these Defendants were involved is substantial. PSOF ¶279-299.

Second, to the extent that Defendants incorporate an argument in their discussion of the identification procedures about their lack of intent, see OB-20, that argument is addressed directly above, see Argument IV(C)(4) supra.

---

[17] Iglesias preserves the argument that qualified immunity does not apply to § 1983 claims. The Supreme Court's qualified-immunity precedent derives from the premise that there is "no evidence that Congress intended to abrogate the traditional common law" immunities in §1983 actions. *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983). But that premise is wrong. Section 1983 as originally enacted in 1871 contained express language abrogating state common-law immunities. That text was mistakenly omitted during codification, and the Supreme Court has never addressed it.

At the end of the day, the Defendants' account of their identification procedures is based on Defendants' own view of the facts, depends on piles of inferences in their favor, and the resolution of credibility issues. "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied . . . . A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. . . . These credibility disputes are for fact finders to resolve." *Kailin v. Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023).

### D. A Jury Must Decide Iglesias's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims

Iglesias also brings a § 1983 claim for illegal detention without probable cause, as well as a state-law claim for malicious prosecution. Defendant Officers treat these as though they were a single claim, OB-43-45, but they are not. The Supreme Court held in *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and *Thompson v. Clark*, 596 U.S. 36, 42 (2022), that it has long recognized a Fourth Amendment claim for illegal seizure pursuant to legal process where the detention is without probable cause. That claim, like all other Fourth Amendment claims, requires proof of a (1) a seizure, (2) without probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975). By contrast, an Illinois malicious prosecution claim requires proof of (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2011).

Defendants Riccio, Gawrys, and Biebel repeat the argument that they were not involved in the identification procedures. OB-43. This argument should be rejected for the reasons discussed above. See Argument IV(A)(1) *supra*.[18]

---

[18] There is a hint of an argument in this section that these Defendants did not cause Iglesias's wrongful prosecution and conviction. The argument is too cursory to be preserved, *Otto v. Variable Annuity*

On both claims, Defendants contend that there is no genuine dispute about whether there was probable cause to suspect that Iglesias killed Roman. OB-44-45. Defendants assert that they believed at the time that Ochoa and Rodriguez accurately identified Iglesias, and they cite cases that say that probable cause can be based on eyewitness identifications. *Id.* Again, Defendants' argument is founded on utterly disputed facts and inapplicable case law.

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). It is firmly established that knowingly fabricated evidence and false statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the

---

*Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments), but it is also wrong on the law and facts. The Seventh Circuit holds, "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision," as Defendants did here. *Jones*, 856 F.2d at 994. As a matter of Illinois law, liability extends to all persons who played a significant role in causing the prosecution of plaintiff. *Beaman v. Freesmeyer*, 183 N.E.3d 767, 782 (Ill. 2021). Police who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (police who engage in misconduct cannot blame others involved in the prosecution).

    Defendants' contention that they did not cause Iglesias's criminal proceedings and their implication that a prosecutor exercised independent judgment in bringing the case cannot be reconciled with the record either. As discussed at length, the Defendant Officers fabricated false evidence and hid evidence from prosecutors. PSOF ¶¶55–62, 67-162, 192-209, 214-257. They manufactured identifications and false witness accounts to be used in Iglesias's criminal case. PSOF ¶¶67-162, 192-209. They concealed from both the felony review prosecutor (Latz) and trial prosecutor (Studenroth) the fabrications they had used to build a case against Iglesias, because those prosecutors would have disclosed all of that information if they had learned about it. PSOF ¶¶246-257. Guevara testified consistent with their false statements at trial. PSOF ¶¶271-274. The record construed in Iglesias's favor shows direct influence by Defendants over the decision to prosecute.

probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F. Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length already, there is a huge difference of opinion about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Iglesias had killed Roman. Viewed in Iglesias's favor, the record demonstrates that Defendants wholly fabricated all the evidence against Iglesias, including the made-up tip that supposedly implicated him, each of Ochoa's and Rodriguez's identifications, and statements they attributed to Vicente. See Argument IV(A) *supra*. There is similarly strong evidence that Defendants hid evidence demonstrating that Iglesias was innocent and that they had no reason to suspect him. See *id.* In other words, there is nothing that the Defendants can point to that establishes probable cause independent of their own misconduct.

Putting a finer point on it, Defendants state that probable cause for Iglesias's should be measured at the time of the filing of charges. OB-44. Assuming that is true, Defendants submitted a sworn arrest report at the time that legal process was initiated in Iglesias's criminal case, which had a field in which they were to record the evidence establishing probable cause of the murder

charge. PSOF ¶¶146, 267. That field states: "Geraldo IGELESIAS was identified in a line-up, as the person who on 7 June 93, at 2148 N. Sawyer, shot Monica ROMAN in the head with a handgun, killing Monica ROMAN." PSOF ¶146. The identified evidence was fabricated, viewing the facts in Iglesias's favor. See Argument IV(A) *supra*. No other evidence was identified. Indeed, when Iglesias was arrested on the afternoon of June 23, the only two items of evidence that even arguably existed were the confidential informant tip and the purported June 22 photo array at Ochoa's home, but both were entirely made up. PSOF ¶¶55-62, 139-146. A jury must decide whether there was probable cause to suspect Iglesias of the Roman murder.

Finally, Defendants argue that they are entitled to qualified immunity on Iglesias's federal claim, asserting that they had so-called "arguable probable cause" to charge Iglesias based on Ochoa's and Rodriguez's identifications. OB-45. Arguable probable cause does not add any protection for Defendant Officers at this stage of the case. The Seventh Circuit holds that, in evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); *see also id.* ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which is another way of asking whether they had probable cause to think they had probable cause."). Indeed, the Supreme Court held unambiguously in *Malley v. Briggs* that an officer is not entitled to qualified immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. 335, 345 (1986). The probable cause and arguable probable cause standards are objective, based on the facts known to the officer. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). The

94

officer's subjective state of mind is irrelevant to this analysis. *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

Just as a jury must decide whether Defendant Officers had probable cause to suspect Iglesias, it must decide whether a reasonable officer would have believed that there was probable cause, to the extent there is any difference. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (jury must make probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them"). The Seventh Circuit has reversed grants of summary judgment where defendants did not establish conclusively that there was no fact issue on probable cause. *Cartwright v. City of Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011). Moreover, a claim of qualified immunity can be defeated even if the precise conduct in question had not previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739-741 (2002) ("[O]fficials can still be on notice that their conduct violates established law . . . in novel factual circumstances."); see also *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving fundamentally similar or materially similar facts"). Finally, qualified immunity does not protect officers "who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (citation omitted). Defendant Officers are not entitled to qualified immunity on this claim.

### E.     A Jury Must Decide the Failure-To-Intervene Claims

Riccio, Gawrys and Biebel argue for summary judgment on Iglesias's failure-to-intervene claim. OB-46-48. First, they argue again that they were not involved in the misconduct at issue. OB-47. To the extent that argument incorporates the arguments they have made above, Iglesias incorporates his response. See Argument IV(A)(1) *supra*. To the extent they take the position that they had no opportunity to intervene to prevent the violation of Iglesias's rights, their one-

paragraph argument is not developed in a way that permits a response and is therefore forfeited. *Smith*, 388 F.3d at 569; see also *Otto*, 134 F.3d at 854. It also lacks merit. "Whether a bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact[.]" *Mwangangi*, 48 F.4th at 832. The discussion of Iglesias's due process claims above demonstrates that a reasonable jury could find that each of these Defendants had the opportunity to intervene to prevent the fabrication and suppression of evidence that caused Iglesias's decades-long wrongful incarceration. See Argument IV *supra*. Indeed, Defendants had decades to so intervene while Iglesias was languishing in prison and did not. These Defendants' arguments otherwise are plainly dependent on the Court drawing inferences—and many untenable inferences—in their favor, an approach the Court cannot take at this stage.

Second, these Defendants argue that Iglesias's failure-to-intervene claims fail because they are entitled to summary judgment on all of Iglesias's other constitutional claims. OB-48. This Court should reject this argument because Defendants do not move for summary judgment on all of Iglesias's other constitutional claims, and regardless material disputes of fact require a trial on those claims. Argument I *supra*.

Finally, they argue that such a claim is not viable under § 1983, a position they admit is incompatible with Seventh Circuit law. OB-48. As the Seventh Circuit reaffirmed in the very case Defendants cite for the proposition that a failure-to-intervene claim is not viable, defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Summary judgment is not appropriate on this claim.

**F.     A Jury Must Decide Iglesias's State-Law Claim of Intentional Infliction of Emotional Distress**

In a single paragraph, Riccio, Gawrys, and Biebel assert that Iglesias's state-law claim of intentional infliction of emotional distress fails because they were not involved in the misconduct at issue. OB-50-51. For the reasons discussed already, these Defendants committed misconduct in the course of the Roman investigation. See Argument IV(A)(1) *supra*. As a result, Iglesias spent decades in prison. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Iglesias's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for these Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

**G.     A Jury Must Decide the Section 1983 Conspiracy Claims**

Riccio, Gawrys, and Biebel argue for summary judgment on Iglesias's federal and state conspiracy claims in a single section. OB-49-50. First, on both federal and state claims, these Defendants assert that Iglesias's conspiracy claims are derivative of his due process claims and unsupported by evidence. OB-49. To the extent that argument is based on a purported deficiency in Iglesias's due process claims, that argument is rebutted by the discussion above of the reasons that the due process claims survive. See Argument IV(A)-(C) *supra*. Moreover, Defendants' bald assertion that there is no evidence of conspiracy is insufficient to shift the summary judgment burden. *Carmichael*, 605 F.3d at 460 ("The defendants, the moving party on the summary

judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."). Regardless, there is ample evidence supporting Iglesias's conspiracy claims.

To prove a section 1983 or civil conspiracy, Iglesias must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. "To be liable as a conspirator you must be a voluntary participant in a common venture," the Seventh Circuit has explained, "although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

There is ample evidence on which a jury could infer an agreement between the Defendant Officers, and Iglesias's conspiracy claims against each of them should proceed to trial. The facts viewed in Iglesias's favor show Defendants all worked together on the Roman homicide investigation, deciding that Iglesias was a suspect before he was ever identified, and working from there to fabricate evidence implicating him in the crime, even though there was no evidence to speak of otherwise. PSOF ¶¶63-66, 279-299. Where evidence contradicted Defendants' official version, it was hidden from sight. PSOF ¶¶214-245. As discussed, Defendant Biebel had the

Defendants provide updates on the investigation at each roll call, all of the Defendant were involved in preparing the closing report full of fabrications, they all participated in Iglesias's arrest without probable cause, and they worked together signing each other's names to police reports. PSOF ¶¶ 63-66, 279-299; RSOF-Officers ¶¶ 26, 30, 44, 100. By the end of June 23, 1993, each of the Defendant Officers had engaged in a scheme to fabricate evidence to frame Iglesias for a crime they had no evidence he committed. *Id.*; *see Jones*, 856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The conspiracy continued after Iglesias was charged, with the Vicente fabrications and the efforts to prepare Rodriguez to identify Iglesias at trial, but its object and scope remained the same. *See United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance in the scheme," and a "participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of the conspiracy[.]"). Throughout, Defendants conspired with Vicente, Ochoa, and Rodriguez to provide false statements and evidence in Iglesias's criminal case. PSOF ¶¶ 67-113, 114-162, 192-200, 277.

The Seventh Circuit has warned that "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621; *Wilson v. City of Chicago*, 707 F. Supp. 379, 386 (N.D. Ill. 1989) ("Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide."); *Washington*, 2022 WL 4599708, at *23 (denying officers summary judgment on conspiracy claim there was a material dispute of fact as to whether they fabricated or withheld evidence). The summary

99

judgment record reveals a genuine dispute of fact about whether each of the Defendants reached an agreement with the others, and a reasonable jury could find for Iglesias on his conspiracy claims.

Second, Defendant Officers argue they are entitled to qualified immunity on Iglesias's § 1983 conspiracy claims because, in their view, it is unclear in 1993 whether officers working for the same police department could be liable for participating in a conspiracy. This argument follows from the incorrect contention that the law is unclear about whether the so-called intra-corporate conspiracy doctrine bars Iglesias's conspiracy claims against the Defendant Officers. OB-50. The argument is wrong on a number of levels. For starters, the Supreme Court and Seventh Circuit long before the Roman case held that § 1983 conspiracy claims can be pursued against members of a single law enforcement agency. See *Adickes*, 398 U.S. at 152; *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (conspiracy among supervisory officers within the Chicago Police Department); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253-61 (7th Cir. 1984) (upholding punitive damages for conspiracy among members of the Milwaukee Police Department).

In addition, neither the Supreme Court nor the Seventh Circuit has ever applied the intra-corporate conspiracy doctrine to §1983 claims, and cases applying that doctrine in other contexts but not to §1983 claims do not unsettle established law. Moreover, the intra-corporate conspiracy doctrine has no place in § 1983 cases. The doctrine arose in the antitrust context and provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). It arose because the presumption for a conspiracy among agents of a single corporate entity is that

100

the actions of employees are attributed to the corporate principal. But for § 1983 claims that presumption cannot apply because *Monell* holds that actions of municipal employees can never be imputed to their municipal employer. So, applying the doctrine to §1983 claims does not make sense. This is why "district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." *Liggins v. City of Chicago*, 2021 WL 2894167, at *5-*6 (N.D. Ill. July 9, 2021).

Moreover, qualified immunity considers whether state actors were on notice that their *conduct* was unlawful according to established law, which it was, not whether prior cases gave notice of a *defense* to a civil claim. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."). Accordingly, "[r]ecent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified immunity on behalf of defendant officers." *Harris v. City of Chicago*, No. 20-CV-4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020).

Lastly, the intra-corporate conspiracy doctrine applies to conspiracy wholly among members of a single entity, and here Iglesias's conspiracy claims include an agreement between Defendants and private individuals, including Vicente, and so the intra-corporate conspiracy doctrine would not apply in this case, even if there were some argument for its application more generally.

## H.    A Jury Must Decide the State Law Negligence Claim

In their final argument, Defendant Officers assert in a paragraph that Iglesias's Illinois negligence claim that they breached a duty to him and acted willfully and wantonly in so doing

101

must be dismissed because, Defendants say, there is no separate tort of willful and wanton misconduct in Illinois. OB-51. "This argument is a non-starter," courts in this Circuit have recognized, "While there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as 'either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare.'" *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320, at *4 (S.D. Ill. Jan. 20, 2023) (quoting *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012)); see also *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). Similarly, the Seventh Circuit has held: "Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach. A willful and wanton claim has the additional requirement that the breach be not merely negligent, but with conscious disregard for the welfare of the plaintiff." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) (internal quotations and citations omitted). Iglesias's claim has been recognized by the Illinois Supreme Court and the Seventh Circuit, and Defendant Officers' argument to the contrary should be rejected. Particularly so given that federal pleading rules only require Iglesias to plead facts in his complaint, not legal theories. *Reeves v. Jewel Food Stores*, 759 F.3d 698, 701 (7th Cir. 2014).[19]

Defendants do not argue that Iglesias has failed to create a genuine dispute of fact on any element of this claim. Nonetheless, to succeed on this claim at trial, Iglesias must show that the

---

[19] Iglesias pleaded the claim this way initially because Illinois law might provide a defense to public employees who act with negligence, requiring a heightened showing of "willful and wanton conduct." 745 ILCS 10/2-202.

Officer Defendants owed him duty of care, breached this duty, that this breach caused Iglesias's injuries, and that Defendants either deliberately intended to harm Iglesias or consciously disregarded his welfare. *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). For all of the reasons set out above, there are genuine disputes of fact on all of these elements as to each Defendant. See Argument IV(A)-(C) *supra*.

## V.     SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO

Though the City purports to move for summary judgment on all claims, it does not come close to making a showing that justifies that relief. The City moves for summary judgment on *Monell* claims whose theories are supported by evidence that multiple courts in this District have already determined survive summary judgment, on which federal juries have already found the City liable, after which multiple judges have denied the City's post-trial motions, and the Seventh Circuit in one case has affirmed. *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), *Rivera v. Guevara*, No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067 (N.D. Ill. 2018); *Washington*, 2022 WL 4599708, at *17. Like in those cases, the City fails to establish its entitlement to summary judgment on those same claims here.

Moreover, although Iglesias's *Monell* claims are supported by extensive evidence separate from and alongside expert reports and testimony, the City's arguments for summary judgment depend nearly entirely on challenges to the experts that Iglesias has disclosed. Not only do those arguments ignore the separate supporting Iglesias's *Monell* claims, but the same types of challenges have already been rejected already by other courts in this District, which have held that juries may consider nearly the exact expert opinions the City seeks to exclude here. *E.g.*, *Fields v. Chicago*, 2017 WL 4553411, at *5; *Rivera*, 2019 WL 13249674, at *3; *Velez v. City of Chicago,*

103

No. 1:18-CV-08144, 2023 WL 6388231, at *24 (N.D. Ill. Sept. 30, 2023); *Washington*, 2022 WL 4599708, at *11.

Indeed, Iglesias's experts do better than what has been deemed admissible in past cases, and their examinations of the City's policies and practices are among the most comprehensive and careful analyses ever produced regarding the Chicago Police Department. The City asks this Court to depart from these sound past court opinions and robust evidence and instead grant the City judgment in advance of trial. This Court should decline that invitation.

The Court should deny the City's motion for summary judgment for at least seven reasons. First, the City does not move for summary judgment on all *Monell* theories against it. Second, as discussed in Iglesias's partial motion for summary judgment, Dkt. 248 at 3-18, the City is precluded from re-litigating Iglesias's *Monell* claim that the City had an official policy of evidence suppression. Third, also discussed in Iglesias's motion, Dkt. 248 at 18-25, the City has no evidence to contest that City policymakers, who were on notice of the need for policies governing the recording and disclosure of investigative materials in homicide cases, promulgated facially deficient written policies, leading to the suppression of evidence.

Fourth, there is ample evidence, even ignoring expert opinions entirely, that would permit a reasonable jury to conclude that the City knew of and was indifferent to a widespread practice of suppressing evidence, which risked *Brady* violations in criminal cases. The central premise of the City's entire motion is that Iglesias's *Monell* claims are based entirely on the reports of Iglesias's retained experts, which is not true. Because the City raises challenges in its brief solely to Iglesias's experts (and only partial challenges to those experts' opinions), it effectively does not challenge the large record of evidence supporting Iglesias's *Monell* claims.

104

Fifth, the parties hotly dispute whether the City failed to train, supervise, and discipline its officers, and promoted a code of silence in the Chicago Police Department, risking violations of citizens' constitutional rights, including in the City's failure to training, supervise, and discipline Guevara, who is responsible for the wrongful convictions of at least 44 individuals.

Sixth, material disputes of fact preclude summary judgment on the City's widespread practice of fabricating witness identifications using unnecessarily suggestive and improperly documented identification procedures in homicide cases, which risked that unreliable identifications would be used in criminal cases.

Seventh, the City's arguments regarding the admissibility of the expert opinions are without merit and do not entitle the City to summary judgment on any theory. Iglesias responds to the City's *Daubert* motions separately, see Dkt. 268 (Mr. Tiderington); Dkt. 269 (Mr. Finnell); Dkt. 271 (Dr. Steblay), and he incorporates those responses here. Many of the City's arguments in its summary judgment motion are copied from its *Daubert* motions.

Throughout its summary judgment motion, the City impermissibly ignores evidence, construes the record in the light favorable to the City, and draws inferences in its favor. When the record is properly construed for Iglesias and inferences are drawn in his favor, it is obvious the City's official policies and customs caused innocent civilians to be framed in homicide investigations where evidence was manufactured and suppressed, witness identifications were fabricated using suggestive identification procedures, and police officers worked untrained and never disciplined, leaving them to violate the rights of countless individuals. The City is responsible for violating Iglesias's rights, and it should not be permitted to sit on the sidelines at trial.

A.    **The City Misstates the Legal Framework Governing *Monell* Claims**

The City ignores recent Seventh Circuit cases discussing *Monell* liability and provides an incomplete outline of the legal standard governing § 1983 claims against municipalities. CB-3-4 (stating incorrectly that there are three potential avenues to municipal liability).

The *en banc* Seventh Circuit has held recently that municipalities are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of a plaintiff's constitutional rights was caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision not to adopt or to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020) (*en banc*) (holding a jury correctly found a municipality liable for gaps in a jail sexual assault policy when decisionmakers knew of the risk of sexual assault of detainees); *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372, 379-81 (2017) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); (2) a widespread custom or practice that pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Board of Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger*, 434 F.3d at 1029-30.

"The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation," the Seventh Circuit has explained. *Glisson*, 849 F.3d at 379. "It does not matter if the policy was

106

duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Id.*

## B. The City Does Not Move for Summary Judgment On A Number of Iglesias's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What

The City's motion inexplicably asserts that Iglesias is only pursuing three *Monell* theories, and the City goes on to address only three widespread practice theories regarding evidence suppression, identification procedures, and failure to discipline police officers. CB-1-5 (describing theories); CB-8 (Part II, addressing widespread practice regarding eyewitness identifications); CB-17 (Part III, addressing widespread practice of evidence suppression); CB-37 (Part IV, addressing widespread failure to discipline). The City makes no argument about any other *Monell* theory.

The City thus ignores *Monell* theories at issue in the case. In addition to the theories discussed by the City, Iglesias pursues the following theories, which the City has not addressed:

- The Chicago Police Department's express written policies governing the creation, maintenance, and production of investigative information were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in homicide cases, including in this case. PSOF ¶¶300-355, 358, 361-365, 367-371, 373-391, 408;[20] *see Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability). Iglesias has moved for summary judgment on this theory. Dkt. 248 at 18-25.
- The City's final policymakers, who were on notice of the problem of systemic suppression of investigative materials, chose not to adopt needed policies to ensure transmission of police investigative information in homicide cases, and in so doing made a decision that caused suppression of exculpatory materials in Iglesias's case. PSOF ¶¶300-339, 341-355; *see Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional rights); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or

---

[20] Among other things, the City's express policies authorized individual police investigators to subjectively determine what investigative materials to maintain and turn over; they mandated a system of parallel investigative files in homicide investigations; they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system; they did not cover gang crimes officers or other non-detective investigators; and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas. PSOF ¶¶300, 315-16, 322, 325-330, 334, 336, 339-340.

constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (final policymaker who is aware of a systematic lapse in policy and who fails to correct it renders municipality liable). Iglesias has moved for summary judgment on this theory as well. Dkt. 248 at 18-25.

- The City failed to adequately train, supervise, and discipline its police officers regarding documentation of investigative information, maintenance of investigative files, production of investigative materials to the criminal justice system, and the documentation of their investigations, PSOF ¶¶300, 355, 387, 514-527;[21] *e.g.*, *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact").[22]

- The Chicago Police Department's express written policies governing the conduct and documentation of identification procedures were deficient (or non-existent) and caused the fabrication of false identifications, suggestive identification procedures, and inaccurate or non-documentation of eyewitness identification procedures. PSOF ¶¶300, 398-415, 528-547, 550; *e.g.*, *Glisson*, 849 F.3d at 379-80; *Calhoun*, 408 F.3d at 379-80.[23]

- The City's final policymakers, who were on notice of the problem of false identifications, suggestive identification procedures, and inaccurate documentation of eyewitness identification procedures, chose not to adopt needed policies to ensure that accurate identification procedures were conducted and fairly reported at the time of the Roman investigation. PSOF ¶¶300, 392-415, 431, 441, 444-45; *see also e.g.*, *Vodak*, 639 F.3d at 747-48; *King*, 680 F.3d at 1021; *Steidl*, 151 F.3d at 741.

- The City is liable for its failure to adequately train, supervise, and discipline its officers to properly conduct identification procedures and to accurately record the results of those identification procedures, PSOF ¶¶300, 355, 402–415, 528-546, 547; *see also, e.g.*, *Canton*, 489 U.S. at 390; *Jenkins*, 487 F.3d at 492.

- The City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence used in criminal cases, and the City failed to train, supervise, and discipline officers who fabricated evidence, which resulted in violations of due process and numerous wrongful convictions. PSOF ¶¶300, 350-53, 431-432, 441, 444, 451-461, 462-471, 474-483, 485-513, 536-546, 547-551; *e.g.*, *Jackson v.*

---

[21] The City had no policies governing supervision of investigative file production; it did not audit its written policies governing the production of investigative materials, which were promulgated after *Jones* and *Palmer*; and it did not provide training on those policies, PSOF ¶¶300, 316, 321, 322, 325-330, 355, 387, 515-527; *Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed).

[22] The City moves for summary judgment on Iglesias's *Monell* theory that the City failed to discipline police officers accused of misconduct generally, but it does not address the separate theories that the City did not provide adequate training, supervision, or discipline on particular subjects relating to homicide investigations.

[23] With respect to its official policies governing eyewitness identification procedures, the City moves on Iglesias's widespread practice theory, CB-8-17, but it does not address his express policy/gap in policy theory, his theory regarding actions of final policymakers, or his theory that the City failed to train, supervise, or discipline on this subject.

*Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at *13 (N.D. Ill. Jan. 6, 2006).

The fact that the City has not moved for summary judgment on these *Monell* theories means they must be tried. *Carmichael*, 605 F.3d at 460 ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority . . . defendants sought summary judgment on all claims against all parties."); *Sublett*, 463 F.3d at 736 ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Titran*, 893 F.2d at 148 ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Any argument the City might have made regarding these theories are now forfeited, *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994); *Fox v. Peters*, 2011 WL 6378826, at *8 (N.D. Ill. 2011), and it will be too late for the City to raise arguments for the first time in reply, *Costello*, 651 F.3d at 635; *Nelson v. LaCrosse Cty*, 301 F.3d 820, 836 (7th Cir. 2002).

To the extent the City states at the start of its motion that Iglesias is not pursuing the above *Monell* theories, *e.g.*, CB-4 ("Plaintiff does not identify any express unconstitutional policy and is not claiming that he was directly injured by a person with final policymaking authority."), or implies that the City was not on notice of these theories, CB-1-2 (discussing allegations in Iglesias's complaint), those contentions are without merit. First, these theories have been litigated exhaustively in this case, and Iglesias has explained them in detail in response to discovery

requests. PSOF ¶300.[24] Second, they are discussed at length in the parties' expert reports. PSOF ¶¶356-371, 416-445, 472-512.

Third, the City recently has faced multiple trials and cases involving these *Monell* claims, including in Guevara cases, in which it has briefed the theories and evidence just discussed, including *Fields*, No. 10 C 1168, Dkt. 1184 (response to post-trial motion) at 12-25 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 735 (response to post-trial motion) at 78-118 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 321 (response to summary judgment) at 50-53 (explaining each of these theories). The City cannot attempt to obtain summary judgment without addressing *Monell* theories that Iglesias pursues merely by mischaracterizing the nature of Iglesias's claims, and this Court should reject the City's attempt to do so. As the court decided in *Rivera*, 319 F. Supp. 3d at 1056-59, a trial is necessary on these *Monell* theories that the City does not challenge.[25] Given the City's forfeiture, Iglesias does not address these theories further in this response.

## C. The City Is Precluded from Relitigating Its Official Policy of Evidence Suppression

As Iglesias explains in detail in his cross-motion for partial summary judgment, this Court should grant summary judgment to Iglesias because the City is precluded from relitigating Iglesias's *Monell* theory that the City had an official policy of suppressing exculpatory evidence.

---

[24] To the extent that the City cites Iglesias's complaint in its motion, CB-1-2, the Court should disregard those citations. Not only were the claims explored in richer detail in discovery, as discussed, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017) ("Complaints need not plead law or spell out theories of liability.").

[25] Remarkably, in its summary judgment brief in *Rivera*, filed seven years ago, the City made the same argument that Rivera there had not pursued the *Monell* theories that Iglesias sets out above, and Iglesias there responded, as Iglesias does here, that he had pursued those theories in discovery. No. 12 C 4428, Dkt. 321 at 50-53. The Court then ruled that those theories were in play at trial in *Rivera*. 319 F. Supp. 3d at 1056-59. For the City to suggest seven years later that it is still not on notice of these theories in these closely related cases is incredible.

Dkt. 248 at 3-18. Because Iglesias's argument for summary judgment is fully developed in Iglesias's cross-motion, he does not repeat the argument here, but he expressly incorporates the argument. *Id.* Iglesias's statement of facts filed in response to the City's motion for summary judgment includes the same relevant material facts that are included in his statement of facts in support of Iglesias's cross-motion for summary judgment, to comply with Local Rule 56.1(b). PSOF ¶¶300-391.

### D. The City Does Not and Cannot Challenge Iglesias's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression

In addition, as Iglesias also discusses in his cross-motion, the City cannot raise any material dispute of fact that its final policymakers put in place express policies that were facially deficient to stop the suppression of evidence in homicide investigations. Dkt. 248 at 18-25. Again, Iglesias does not repeat the argument justifying the grant of summary judgment to Iglesias on that theory here, but he expressly incorporates the argument. *Id.* Iglesias's statement of facts filed in response to the City's motion for summary judgment includes the same relevant material facts. PSOF ¶¶300-391.

Moreover, as discussed above, the City does not move for summary judgment on Iglesias's express policy and final policymaker *Monell* theories, because it has no evidence permitting it to do so, and thus the City has forfeited any argument for summary judgment on those theories. *See* Argument V(B) *supra*. Accordingly, when this Court disposes of the City's summary judgment motion, there is no need for this Court to address the theory that the City's final policymakers put in place express policies that were facially deficient to stop the suppression of exculpatory evidence in homicide investigations.

### E.     A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression

Turning to the arguments the City has preserved, the City contends it is entitled to summary judgment on Iglesias's theory that the Chicago Police Department had a widespread practice of suppressing evidence in homicide investigations. CB-17-37. The City has no hope of summary judgment on this theory.

#### 1.   The City's False Premise Regarding Expert Evidence

A few preliminary points are important. First, the City's entire summary judgment motion starts from the premise that Iglesias's *Monell* claims depend "entirely upon his expert witness disclosures." CB-1; CB-24-26. As a result, the City discusses only Iglesias's experts' opinions relating to the *Monell* theories that the City addresses.[26] In so doing, the City simply ignores the huge volume of evidence supporting Iglesias's *Monell* theories that are unrelated to expert testimony. The City's litigation decision to ignore evidence means it cannot meet its burden to show that there are no genuine disputes of material fact in the record. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. A party cannot assert that a claim is based entirely on a single item of evidence, ignore all other record evidence, and ask a court to grant it summary judgment by attacking the single item of evidence it has identified.

#### 2.   The City Invokes the Wrong Legal Standard for Widespread Practice Claims

Second, it is important to clarify what sort of pattern must be shown in order to succeed on a *Monell* widespread practice theory. The City wrongly suggests in various places throughout its motion and in its *Daubert* briefing that Iglesias must present evidence of a pattern of repeating

---

[26] As discussed below, the City challenges only a small portion of Iglesias's experts' opinions in its motion, and so even if its false premise were correct, the City would not be entitled to summary judgment.

*constitutional violations* to succeed on this *Monell* theory. The Seventh Circuit rejected exactly this argument when it affirmed the verdict against the City on the evidence-suppression widespread practice theory in *Fields* saying, "We have rejected that narrow interpretation of *Monell* liability." 981 F.3d at 562. The *en banc* court of appeals in *Glisson* reiterated the long-standing rule that a *Monell* plaintiff need only show a repeated pattern of *behavior* that provides notice of a *risk of harm*, and not a repeated pattern of *actual harms* to others, to establish a widespread practice. 849 F.3d at 381-82.

Accordingly, to proceed with a widespread practice theory, Iglesias need only establish a repeated pattern of behavior that provided notice of a risk of harm to which the City did not respond, and not a pattern of constitutional violations. *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]"). So, for example, Iglesias can show a repeating pattern of evidence suppression in homicide cases that provided notice of the risk that exculpatory or impeachment evidence would be suppressed in criminal cases, and he need not show a repeating pattern of *Brady* due process violations. Or he may show a repeating pattern of fabricating identifications using suggestive identification procedures in homicide cases, which provided notice of the risk that unreliable identifications would taint criminal proceedings. Or he may show a repeating pattern of failing to train, supervise, and discipline police officers, which gave notice of the risk that officers would violate the rights of civilians. Ample Seventh Circuit precedent confirms that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated *behavior* (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734 (7th Cir. 2016) (emphasis added); *see also Dixon v. Cook County*, 819 F.3d 343, 348-49

(7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting the same argument the City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."). Iglesias proffers record evidence to establish each of these widespread practices.

In addition, the summary judgment record *also* includes evidence of repeating constitutional violations caused by the City's widespread practices of evidence suppression, fabricating identifications with suggestive procedures, and failing to train, supervise, and discipline officers. PSOF ¶¶344-354, 371, 373-391, 451-461, 474, 547-550. So, even applying the City's incorrect legal standard, summary judgment would be inappropriate.

### 3. The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous

Third, before diving into the record evidence that precludes summary judgment, it is worth reiterating that the City lost the *Monell* theory regarding its widespread practice of evidence suppression at trial in *Fields* and *Rivera*; the City's post-trial motions were denied; and the Seventh Circuit expressly found in affirming the *Fields* verdict that (1) the City's widespread practice of evidence suppression was well established, (2) City policymakers were on notice of the practice, and (3) there was sufficient evidence to support a verdict against the City on this theory. *Fields*, 981 F.3d at 563. For the City to argue after such rulings that there is insufficient evidence for a trial on the same theory is meritless. Worse yet, the City does not even reference the Seventh Circuit's *Fields* decision in its motion for summary judgment, which is at odds with the City's

114

duty of candor to this Court. *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988). Even if the City were not precluded from relitigating its policy of evidence suppression, *see* Argument V(C) *supra*, these past verdicts affirmed by the Seventh Circuit make its argument for summary judgment frivolous.

### 4. Non-Expert Evidence Establishing the City's Evidence Suppression Practice

Setting aside Iglesias's expert opinions for the moment, there is a huge volume of evidence in the record supporting Iglesias's claim that the City had a widespread practice of evidence suppression, including:

- Starting in at least 1982, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.) (see also *Jones*, 856 F.3d at 996), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of investigative materials and violations of due process, PSOF ¶¶301-304, 307-309, 312; *see also Fields*, 981 F.3d at 563 (concluding that *Palmer* and *Jones* establish the City was aware that the failure to ensure production of evidence in police investigations "presented a constitutional problem");[27]
- James Hickey, the City's designated Rule 30(b)(6) witness on this topic, testified, among other things, that (a) in light of *Palmer* and *Jones*, City policymakers knew that they had an evidence suppression problem, (b) he reviewed evidence disclosure practices across the department prior to 1983 and determined that the problem was citywide, (c) the problem

---

[27] The City engages in a long, largely revisionist history regarding the *Jones* and *Palmer* litigation and the policies it promulgated in response. CB-18-23. This discussion is largely irrelevant to the fact disputes at summary judgment. Particularly so given that the Seventh Circuit has already concluded in *Fields* that *Jones* and *Palmer* provided the City notice of a widespread practice that risked constitutional harm, and that its practice of evidence suppression continued after that time. 981 F.3d at 563. Moreover, the City's discussion plainly does not construe the facts in the light most favorable to Iglesias, which is required at this stage.

To the extent, however, that the City is suggesting that the *Jones* and *Palmer* cases are themselves ultimately not evidence of a widespread practice of evidence suppression, that is not correct. *Jones* involved the suppression of critical exculpatory information and resulted in a large damages verdict approved by the Seventh Circuit. 856 F.2d 985. *Palmer* caused numerous City policymakers to take notice of a widespread problem of evidence suppression, *according to the testimony of those City policymakers themselves*, PSOF ¶¶301, 307-312, and the City's pronouncement that none of the *Palmer* files revealed exculpatory information is undermined by the fact that those files were never analyzed in a systematic fashion, PSOF ¶304. As the Seventh Circuit noted in *Jones*, the *Palmer* litigation was resolved "without a formal ruling on the lawfulness of the practice," thought the Court in *Jones* concluded that the record supported that the practice was in place and that "[t]he City sensibly does not attempt to defend such behavior in this court." *Jones*, 856 F.3d at 995-96.

stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead written in memos and notes that were not disclosed and were eventually destroyed, PSOF ¶¶305-309;

- City officials were aware of substantial resistance within the Police Department to any change in policies requiring disclosure of information or the practice of keeping parallel, "personal" files not available to the criminal justice system, and they were aware of the risk of wrongful prosecutions and convictions if the evidence suppression problem was not solved, PSOF ¶¶310-312;

- Detective Division Special Orders 83-1 (effective February 3, 1983), 83-2 (effective May 2, 1983), and 86-3 (effective May 29, 1986) were put in place in response to the problem and required that detectives keep notes and memoranda on a new official form called a "General Progress Report" and preserve them in a new "Investigative File" kept in the Detective Area. PSOF ¶¶319-320, 323-324, 326-27. But the written policies had facial deficiencies, including: (1) they left to the discretion of detectives what information to record in the Chicago Police Department's official files, based on detectives' own subjective determinations, PSOF ¶¶322, 325, 328-330, 338; (2) the policies did not include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files," PSOF ¶¶322, 325, 328-330, 334, 336, 339; (3) they allowed for the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be gathered from all of those locations, PSOF ¶¶322, 325, 328-329, 335-336; (4) they failed to cover gang crimes officers and other non-detective investigators participating in homicide investigations, meaning there was no change in rules when it came to investigative information gathered by these individuals, PSOF ¶¶ 322, 325, 328-329, 337, 525; (5) they did nothing to ensure that the Chicago Police Department subpoena service unit (charged with responding to subpoenas from the criminal justice system for investigative information), the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, PSOF ¶¶322, 325, 328-330, 334-336, 339;

- Judge Shadur in *Palmer* identified many of these specific problems in the paragraph above as problems in need of a solution, PSOF ¶¶318, 322, and despite those findings, City policymakers decided to leave these particular gaps in Chicago Police Department written policies, PSOF ¶¶331-341;

- City policymakers and designees in charge of this policy-making concede that the Special Orders the City implemented did not address Judge Shadur's concerns, including the continued use of parallel files, the lack of any guidance as to what constituted relevant information that needed to be documented, the lack of any guidance to the subpoena service unit about what to gather in response to document requests from prosecutors and criminal defendants, and most fundamentally the lack of any directive to produce all investigative information contained in police investigative files, and they conceded that the policies they

promulgated were insufficient to overcome a problem as entrenched as the Chicago Police Department's evidence suppression policy. PSOF ¶¶335-341, 519-525;

- The City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies. PSOF ¶331-333, 387, 514-515, 518-520, 523-526;

- The City acknowledges that its continued system of having multiple parallel files instead of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations, PSOF ¶336;

- The Defendant officers in this case testified almost uniformly that they had no knowledge of the requirements of the post-*Palmer* Special Orders, received no training on the Special Orders or on the obligation to preserve notes or disclose exculpatory information, and continued to keep unofficial, personal notes that they destroyed, PSOF ¶355;

- The Chicago Police Department suppressed evidence in the case of Nathson Fields, who was convicted of the 1984 double murder and eventually re-tried and acquitted in 2009, a case in which civil discovery revealed a street file—sitting among hundreds of other files in a file cabinet at Area Central—of over a hundred pages of handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Fields was innocent, PSOF ¶344-348;

- Ample evidence from the 2016 *Fields* trial, in which a jury found that the failure to disclose evidence to Fields was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Fields compensatory damages of $22 million, including (a) dozens of other street files in the Area Central basement, including the cases of Jon Fulton, Timothy Malone, and James Crockett, (b) the testimony of Defendant officers in that case about the continued use of informal notes and memoranda and a lack of training on the new Special Orders, and (c) the testimony of the City's defense experts, supporting the conclusion that the street files practice continued, PSOF ¶¶348, 374-377;

- The Chicago Police Department suppressed evidence in the case of James Kluppelberg, who was convicted for a 1984 fire that killed six people and later exonerated, a case in which civil discovery in 2014 revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda, including a memo between detectives about an alternate suspect who was intoxicated at the time and had started a fire in a building nearby just hours before the fire for which Kluppelberg was convicted, PSOF ¶349;

- The Chicago Police Department suppressed evidence in the case of Jacques Rivera, another Guevara case, including an August 27 GPR containing the critical first memorialization of the sole eyewitness's account that put the witness further away from the scene of the crime than police reports documented; an August 27 GPR regarding the same witness that contradicted Defendants' story about an identification procedure that happened on that date; Guevara falsely claimed that the shooting victim had identified Rivera as the shooter before he died, but suppressed that the victim was in a medically induced coma at the supposed time of the identification. PSOF ¶¶350-353. The City's Rule 30(b)(6) designee Hickey admitted that all of these documents should have been disclosed. PSOF ¶350.

- Ample evidence from the 2018 *Rivera* trial, in which a jury found that the failure to disclose evidence to Mr. Rivera was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Rivera compensatory damages of $17 million, supported that the City had a pattern and practice of evidence suppression. For instance:

117

o Rivera's expert, Michael Brasfield, testified that the City's written policies were plainly deficient because they retained the decentralized record-keeping system that perpetuated the system of multiple, unofficial parallel files that were at the heart of the *Jones* and *Palmer* litigation, did not cover gang crimes units and other investigators involved in homicide investigations, did not define what investigative information had to be documented in reports, and did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and produced in response to criminal court subpoenas. PSOF ¶352, 381-382;

o Brasfield conducted an analysis of 435 CPD Area Five homicide files for the years 1985 to 1991, and his analysis of the data revealed that, in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to the criminal justice system. A full 100% of the files contained evidence of failures to follow the post-*Palmer* policies. PSOF ¶383;

o Defendants' expert, Bernard Murray, chose not to conduct his own corresponding review to see if the practices changed after the new policies were enacted, and so Brasfield's testimony on these issues was unrebutted. PSOF ¶383;

o Brasfield also testified that his review of the City's permanent retention files revealed that the problems identified in *Jones* and *Palmer* persisted, as the CPD permanent retention files he reviewed only told the single branch of the story that let from crime to charged suspect, in effect excluding alternate suspects, different witnesses, and other types of materials a criminal defendant would need to build a defense. Defendants' expert, Bernard Murray, failed to rebut this testimony. PSOF ¶384;

o Brasfield also compared investigative files to their corresponding criminal defense files and determined that materials from the investigative file were missing from more than 90% of the defense files, and 74% were missing police notes, the sort of crucial material that had been the subject of *Jones* and *Palmer*. Only 8% included the inventories that were supposed to be disclosed to defense attorneys under the new policies. Brasfield and Murray testified about multiple cases—*e.g.*, Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland—in which the withheld materials were the type of important investigative material that by all accounts should have been turned over, and that a jury could deem material. Murray conceded that material missing from criminal defense attorney files was also missing from the prosecutor files, including many of the specific examples above of highly exculpatory material missing from criminal defense files. PSOF ¶385;

o Brasfield's testimony also revealed that Gang Crimes officers were fully involved in homicide investigations, as they were in the Valentin investigation. Gang Crimes officers should have been subject to the rules governing detectives with regard to documenting investigative steps and ensuring that such material was produced to the criminal justice system. But Gang Crimes officers were

118

permitted to keep their own personal notes in their own set of parallel files. They were exempt from these rules despite the City designee Hickey's recommendation in the early 1980s that gang crimes be included in the new Special Orders. PSOF ¶386;

- o The City's own witness, James Hickey, confirmed in his trial testimony that the CPD was fully aware of its evidence suppression problem, yet did not implement any policy or formal training to ensure disclosure. He confirmed that there was no auditing of detectives following Special Orders, either. PSOF ¶387; and

- o Finally, there was testimony that, as a result of the practice of evidence suppression, Rivera and his criminal attorney never received a number of important documents from the investigative file during the criminal proceedings, although the police department was responsible for ensuring their production. PSOF ¶388.

- After Special Order 86-3 there was no further change in City policy of evidence suppression before the time that Iglesias was wrongly convicted of the Roman murder in 1994. PSOF ¶329, 331, 340-342.

- The City has admitted that its relevant policies were the same from 1983 all the way into the 2000s, PSOF ¶341.

- Consistent with the above, the City of Chicago's own Inspector General issued a report in 2020 finding that the Chicago Police Department's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations remained inadequate, stating, "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." PSOF ¶ 340.

- The Inspector General issued a follow-up report in 2021, following an inquiry into the status of corrective actions taken by the City of Chicago in response to its 2020 recommendations. In that report, the Inspector General concluded that "CPD has yet to implement most of the improvements to which it committed. Specifically, CPD has yet to conduct a comprehensive staffing and resource analysis, develop and implement standard operating procedures for the management and production of records, or develop necessary trainings." In particular, it found that the CPD "cannot ensure that it identifies and produces all relevant records in its possession as required." Without making these improvements, the Inspector General's follow-up report concluded that "Not having made these improvements, CPD is now—just as it was when OIG published its 2020 report— unable to ensure that it can meet legal and constitutional *obligations* which are at the core of its function as a law enforcement agency. This is an area of very serious risk for CPD and for the City." PSOF ¶340.

Accordingly, even if this Court ignores the evidence relating to Iglesias's retained experts, the summary judgment record establishes disputes of material fact that preclude summary judgment for the City on Iglesias's *Monell* theory that the City had a widespread practice of

119

evidence suppression. As a result, the Court need not even address the City's arguments or the City's *Daubert* motions on this theory to deny the City's summary judgment motion.

### 5. Expert Evidence Demonstrating the City's Evidence Suppression Practice

Expert opinion evidence also supports Iglesias's widespread evidence suppression theory. At trial, Iglesias will present Mr. Tiderington's expert testimony in support of this *Monell* theory,[28] including but not limited to opinions that:

- The City's written policies did not solve the evidence suppression problem because they: (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to document in police files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation, PSOF ¶358;
- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, PSOF ¶358, 359-371;
- Mr. Tiderington's analysis and findings from the review of 475 homicide files from Area Five for the period 1991-1995 (the five-year period leading up to and through Iglesias's wrongful prosecution), and 344 Area Five investigative files from 1995-1998 revealed that approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files he reviewed contained handwritten notes not taken on general progress reports. Tiderington's analysis found many examples where the information on handwritten notes not transferred to official reports was "potentially exculpatory," including handwritten notes containing cryptic notations on a page without any context: a name, phone number, address, etc., where the relevance of the information and its potential inculpatory or exculpatory value is lost without being transcribed into an official report. Relatedly, Tiderington found no handwritten notes or GPRs in the entire investigative file from Guevara or Halvorsen, the lead detectives in this case. In his decades of experience, he was "not aware of a single homicide investigation in which the lead detectives took no notes." PSOF ¶361;

---

[28] As discussed in Iglesias's response to the City's motion to exclude Mr. Tiderington's opinions, Mr. Tiderington is a police practices expert with more than 40 years of experience in law enforcement, including experience as a Police Chief for more than 20 years. Mr. Tiderington has trained more than 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. Further, in two decades of experience as Police Chief, Tiderington reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. PSOF ¶¶356-357.

- Mr. Tiderington's review of these investigative files revealed that approximately 10% (1991-1995) and approximately 28% (1995-1998) of the files he reviewed contained to-from memos not on official police forms, despite the Special Order's requirements and the City's knowledge of this deficiency, PSOF ¶¶362;

- Mr. Tiderington's review of these investigative files revealed that 24% (1991-1995) and 17% (1995-1998) of total investigative files contained no inventory sheet, which the Special Orders required as a means to ensure disclosure, PSOF ¶¶363;

- Mr. Tiderington's subsequent review of corresponding permanent retention files during both of these time periods routinely lacked an inventory sheet as required by policy, and his comparison of the investigative files and corresponding criminal defense files for the years 1995-1998 demonstrated that important investigative materials were regularly withheld from criminal defendants, as nearly all of the criminal defense files were missing documents contained in the corresponding Chicago Police Department homicide files, PSOF ¶¶364-368;

- Mr. Tiderington's review of opinions regarding police practices expert Michael Brasfield's analysis in *Fields* of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas One, Two, Three, and Four. PSOF ¶¶360, 369, 346-47;

- Mr. Tiderington's review of opinions regarding Mr. Brasfield's findings in *Fields* that comparison of the Chicago Police Department homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives were to take notes), and 36% were missing inventories. PSOF ¶¶347, 369;

- Mr. Tiderington's review of opinions regarding Mr. Brasfield's unrebutted analysis in *Rivera* of 435 Chicago Police Department homicide files from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. PSOF ¶¶360, 359, 382-383;

- Mr. Tiderington's review of the police homicide files from *Kluppelberg,* as well as the report of Mr. Brasfield in *Kluppelberg* appended to Mr. Tiderington's report, in which Brasfield found that, of the investigative files produced to him (from 1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity, including that there was a widespread practice of disregarding the use of Major Crime Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) Material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete inventories or no indication that inventories were sent to Records Divisions. PSOF ¶360, 370;

- These assessments of the City's homicide files demonstrate that the evidence suppression practice as it existed prior to the 1980s Special Orders continued unabated. PSOF ¶¶358-371; and
- Mr. Tiderington also identified specific examples of files where investigative materials contained in the City's homicide files were missing from the criminal defense files, were potentially exculpatory information of significant investigative value, and should have been disclosed under standard police procedures, including:; (1) RD # 687989 (Defendant Kim Mathis); (2) RD #Z475236 (Defendant Ardell Clemons); (3) RD #B442532 (Defendant Oscar Soto); (4) RD #A403252 (Defendant Guy Rainey); and (5) RD #P272087 (Defendant Demetrius Johnson). For each of the eight cases, Tiderington reviewed corresponding State's Attorney's Office files. In each, the police documents were withheld, were of potential exculpatory value, and were not given to prosecutors, PSOF ¶ 367.

All of the record evidence above amply supports Iglesias's *Monell* theory that the City was indifferent to a widespread practice of suppressing evidence in the relevant time frame, and summary judgment should be denied.

### 6. The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit

The City's arguments for summary judgment on this theory lack merit. First, the City argues that Iglesias cannot show that its widespread practice of evidence suppression caused the suppression of evidence that occurred in Iglesias's criminal case. CB-24-26. Second, the City contends that Iglesias's *Monell* theory is based entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a practice of suppressing exculpatory evidence, largely repeating the arguments the City makes in its *Daubert* motion. CB-25-37. Neither argument has merit.

### (a) The City's Causation-Related Arguments Lack Merit

The City's first argument is difficult to follow. To the extent the City is suggesting Iglesias has not shown a genuine dispute that material exculpatory or impeachment evidence was suppressed in Iglesias's criminal case, that argument fails for the same reasons the Defendant

Officers' arguments for summary judgment on the evidence suppression theories failed. *See* Argument IV(B) *supra*.

To the extent the City is arguing it did not have a widespread practice of suppressing the *particular kinds* of evidence in the *particular way* they were suppressed in Iglesias's criminal case, that argument depends on construing facts and inferences for the City, which is not permissible. Moreover, the argument understands Seventh Circuit case law governing widespread practice claims too narrowly, and it also construes Iglesias's theory too narrowly.

Iglesias's theory is that the Chicago Police Department had a widespread practice of suppressing evidence. Naturally, in any given homicide case, the types of evidence suppressed, and the mechanisms of evidence suppression, may vary.[29] Regardless of how any one suppression of evidence occurred, that evidence was suppressed across homicide cases establishes an actionable widespread practice. In other words, *Monell* liability does not require Iglesias to show a widespread practice of suppressing the particular types of evidence that were ultimately suppressed in his case in the precise way they were suppressed in his case. Instead, the Seventh Circuit has been clear that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734; *see also King*, 680 F.3d

---

[29] A variety of overlapping mechanisms caused the suppression of investigative information in Chicago homicide cases including: detectives were permitted to decide subjectively what evidence was documented in reports and in official files; there were no policies requiring the disclosure of evidence, governing what had to be kept in official files, or dictating how to respond to requests for investigative files; there were no policies governing non-detectives; there was a decentralized file system, which allowed for parallel files; the written policies that did exist were not followed; notes were not retained or included in files; and officers intentionally did not turn over to the criminal justice system material evidence they learned during their investigations. Different combinations of these mechanisms caused the suppression of different items of evidence in different homicide investigations during the relevant time period. The fact that there were different mechanisms of suppression does not dilute that the City had a widespread practice of suppressing evidence in homicide investigations.

at 1020-21 (widespread practice of delaying medical care through different mechanisms sufficient to proceed on *Monell* claim where plaintiff was denied needed medication). Iglesias has made such a showing.

To the extent the City is arguing that Iglesias cannot show that its widespread practice of evidence suppression caused the suppression of evidence in his particular case, that causation question must be resolved by a jury. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017); *see also Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (holding that at summary judgment "a plaintiff need only produce evidence sufficient to *potentially* persuade *any* reasonable jury"). If the jury believes that the evidence above establishes that the City had a widespread practice of evidence suppression in homicide cases, it could easily decide that the practice caused the suppression of evidence in Iglesias's case.

### (b) The City's Arguments Challenging Mr. Tiderington Lack Merit

The City next argues that Iglesias's widespread practice evidence suppression theory depends entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a widespread practice. CB-26-37. The argument suffers a number of flaws, each of which represents an independently sufficient reason to reject it.

First, the City is simply wrong that the only thing supporting this *Monell* theory is expert opinion evidence. The City ignores the volume of evidence, outlined above, that has nothing to do with Mr. Tiderington and that by itself is sufficient to create genuine disputes of material fact for trial. *See* Argument V(E)(4) *supra*. Iglesias has pointed to hundreds of pages of documents, policies, testimony from Rule 30(b)(6) witnesses, prior litigation of the same theory in federal

cases, testimony from Defendant Officers, suppressions of exculpatory evidence in other homicide cases (including Guevara cases), and more. This evidence alone justifies denying summary judgment, without any need for the Court to adjudicate Iglesias's reliance on expert testimony. This Court should so find, which will eliminate the need for the Court to weigh in on Defendants' *Daubert* motion regarding Mr. Tiderington at this stage.

Second, even supposing Mr. Tiderington's report was the only evidence supporting this theory, the City's challenges to his opinions and methodology lack merit. CB-26-37. In its summary judgment motion, the City repeats arguments it makes in its *Daubert* motion. *Compare* CB-26-37, *with* Dkt. 252 at 9-12, 16-24. For the same reasons this Court should reject the City's motion to limit Mr. Tiderington's testimony, set forth in Iglesias's response to that motion, Dkt. 268, this Court should reject the City's repeated arguments regarding Mr. Tiderington in its summary judgment motions. As set forth in Iglesias's response to the City's *Daubert* motion, Mr. Tiderington's *Monell* opinions are laid out in detail over 38 pages of his report. They are amply supported by his review of thousands of pages of police files, policies, deposition testimony, and other records. The City does not challenge Mr. Tiderington's qualifications. Nor does it provide any meaningful methodological attack on his opinions. In particular, as discussed in detail in Igleisas's *Daubert* response, Mr. Tiderington analyzes the deficiencies in the CPD's policies, Dkt. 268 at 3-6, 13-17, 21-22; he appropriately relied on data provided by Iglesias's counsel, which was mechanically coded based on objective criteria and properly spot-checked; and he conducted a robust analysis based on that data that consumed many hours, *id.* at 19-30, 34-36; his analysis is not statistical in nature but instead applies police expertise to observable data, *id.* at 22-27; his analysis does not require intimate familiarity with each different homicide file, *id.* at 27-31; and

he has amply supported his opinions that the Chicago Police Department had a practice of failing to document information learned during homicide investigations, *id.* at 13-19, 36-39.[30]

Moreover, the City argues in its motion for summary judgment, as it did in its *Daubert* motion, that Mr. Tiderington's opinions are not reliable because he compared what was in Area Five homicide files to the materials contained in criminal defense files for the same cases, rather than to materials contained in the Cook County State's Attorney's files. CB-32-35. Iglesias has provided a response to that argument in his response to the *Daubert* motion. Dkt. 268 at 31-34. There are several problems with the City's argument. First, the City is simply raising a fact dispute about whether investigative information in the Area Five files was disclosed to prosecutors and criminal defendants, which is inappropriate at this stage of the case. To the extent the City believes that it has evidence that investigative information was disclosed to prosecutors, it can present that evidence, and it may defeat the theory at trial on that basis. But that does not mean that the absence of investigative information in the files of criminal defendants is irrelevant, such that Mr. Tiderington's opinions based on the file comparison can be disregarded. If the Area Five files contained investigative information that the criminal defendants did not receive, that is certainly probative of the City's widespread practice of evidence suppression. The parties' factual dispute is for a jury to resolve.

Second, the City's argument is entirely hypothetical. The City has not developed any evidence—and it points the Court to no evidence—that supports the conclusion that the State's

---

[30] The City also cites cases that generally stand for the proposition that an officer's violation of police policy is not always relevant to showing that the officer committed a constitutional violation in a particular case. CB-30 (citing *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006)). Those cases have no application here. Iglesias is not arguing that an officer's violation of policy shows that his constitutional rights were violated. Instead, he will prove at trial that the Chicago Police Department's failure to implement its own policies in a way that would have stopped a widespread practice of evidence suppression, and the continued persistence of that widespread practice, caused the violation of Iglesias's constitutional rights. That is the proof that *Monell* requires.

126

Attorney's files contained any of the investigative information that Mr. Tiderington found in Area Five files but not in criminal defense files. The City cannot hypothesize that perhaps information was turned over without proof, and the City has not developed any of that proof. In other words, the City's factual dispute, which is already inappropriate, is based on raw supposition without evidence, which is doubly inappropriate. Moreover, the City's expert examined a small number of State's Attorney's files and conceded that documents identified as missing from criminal defense files were also missing from those prosecutor files, *see* PSOF ¶385, corroborating Iglesias's evidence.

Third, nowhere in its brief or *Daubert* motion does the City address the fact that the same opinions, based on the same analysis, of the same types of documents (only for a slightly later time period), were admitted in two prior wrongful conviction cases against the City, *Fields* and *Rivera.* In those two cases, Judge Kennelly and Judge Gottschall, respectively, rejected the same arguments the City makes here and permitted police practices experts to offer these same opinions, juries returned verdicts against the City based on this evidence, and in *Fields* the Seventh Circuit affirmed. In those cases, the City's arguments about file comparisons and every other challenge raised to Mr. Tiderington were left for the juries to consider. The City offers no reason why this Court should not follow suit.

Finally, it is important to note that the City does not even challenge all of Mr. Tiderington's opinions. Many of his opinions would survive even if this Court granted the City's *Daubert* motion entirely. Dkt. 252 at 4, 9-11, 16-19, 20-21, 23-24 (identifying limited portions of Tiderington's opinions implicated by City's arguments)*; see also* Dkt. 268 at 3, 19-22. Accordingly, this Court need not resolve all of the City's challenges to Mr. Tiderington's opinions to deny summary judgment.

### F.    A Jury Must Decide the *Monell* Theory Regarding the City's Failure to Train, Supervise, and Discipline Its Police Officers

A jury must also decide Iglesias's *Monell* theory that the City is liable for failing to train, supervise, and discipline its police officers. CB-37-50. The City asserts again that this opinion is based "entirely on his disclosed disciplinary practices experts, Anthony Finnell, Timothy Knight, and Miroslava" CB-38, which again is not correct. As explained below, there is ample record evidence that would permit a reasonable jury to decide that the City failed to train, supervise, and discipline its officers on a City-wide basis, condoned a code of silence that prevented police misconduct from coming to light, and failed to supervise or discipline bad actors, resulting in repeated police misconduct on the part of officers like Guevara, who violated the rights of countless individuals and caused dozens of wrongful convictions for murder.

A failure to train, supervise, or discipline officers provides a basis for municipal liability when the failure amounts to deliberate indifference to the citizens whom the officers encounter. *Harris*, 489 U.S. at 388 (1989); *Hollins v. City of Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Deliberate indifference exists if the "need for more or different" training, supervision, or discipline was "obvious." *Harris*, 489 U.S. at 390. Proof "can take the form of []() failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger*, 434 F.3d at 1029-30.

Taking a step back, it is stunning that the City would allow officers like Guevara, Burge, and others to commit brutal misconduct in the Chicago Police Department for decades, without taking any corrective action, and then years later claim an entitlement to summary judgment on the theory that it adequately trained, supervised, and disciplined officers during the time period in which these—and other officers—operated with impunity. The City should not be able to escape

128

accountability for some of the worst police misconduct in U.S. history, which was perpetuated because City policymakers turned a blind eye to its officers, causing the violation of Iglesias's constitutional rights. A jury must resolve this claim.

### 1. Non-Expert and Expert Evidence Supports the Failure to Train, Supervise, and Discipline Theory

Ample evidence supports denying summary judgment on this theory. Iglesias sets out all of that evidence below, but this Court could easily deny summary judgment based on just a few of these items of evidence. Indeed, Judge Kness recently took that approach when denying summary judgment to the City on this theory in a similar case. *Washington*, 2022 WL 4599708, at *16-17 (listing eight items of evidence).

The theory that the City failed to train, supervise, and discipline its police officers is supported by the following record evidence:

- Defendants' misconduct in this case, including their fabrication of witness statements and false evidence, and their failure to disclose evidence to prosecutors, Iglesias, or his attorneys, PSOF ¶¶24-40, 42, 43, 54-72, 86-133, 135-156, 159-70, 195, 199-227, 248.
- The City has a long history of failing to discipline police officers in response to notice of serious misconduct, starting at latest in the Burge era, which predates Iglesias's wrongful conviction:
  - Starting in 1972 and continuing until 1991, Jon Burge and others who worked for him tortured individuals and fabricated evidence in police investigations, PSOF ¶451;
  - Superintendent Brzeczek admitted during the Special Prosecutor's investigation that he was aware of that misconduct as early as 1982, PSOF ¶452;
  - In 1990, the Goldston Report found that command-level Chicago police employees were aware of Burge's and others' sustained police misconduct, identifying 26 OPS and IAD investigations and 50 victims of police misconduct, PSOF ¶¶456-457;
  - It is undisputed that the City did not discipline officers involved in the beatings and torture outlined in this report, PSOF ¶¶457, 459, 460;
  - The City did not even fire Burge until 1993, long after the City was aware of his misconduct, and more than a decade after Burge tortured Andrew Wilson, PSOF ¶459;
  - No other officers were fired for the dozens of cases of alleged torture during the Burge era, and only two others received any form of discipline, PSOF ¶¶460;

- o The City no longer disputes that Burge and others committed egregious acts of misconduct between 1972 and 1991, PSOF ¶¶453, 454;
- Unsurprisingly, given the lack of accountability, police misconduct continued without pause in homicide cases following the Burge era:
    - o In 1987, the Illinois Appellate Court reversed the conviction of Melvin Jones for murder based on evidence that officers had fabricated an eyewitness identification against him. PSOF ¶462;
    - o In 1988, the Seventh Circuit upheld a jury verdict in favor of George Jones, who was convicted after CPD detectives suppressed the victim's initial failure to identify him as the suspect and conducted a repeat photo identification procedure which was disclosed without indication that it had been performed before; CPD subsequently disciplined the police whistleblower who brought the misconduct to light, but declined to discipline any of the detectives involved in the investigation, PSOF ¶463;
    - o In 1989, James Newsome, who had been wrongly convicted of murder, obtained a court order requiring the CPD to run unidentified fingerprints from the murder scene through its fingerprint identification system, and CPD officers hid the results for five years—until in 1994, they revealed that the fingerprints matched another man convicted of murder. This led to the overturning of Newsome's conviction in 1994, and Newsome was subsequently granted a pardon based on innocence in 1995, PSOF ¶464;
    - o In 1993, CPD's head of Internal Affairs Richard Risley learned of serious allegations of criminal misconduct (including hiding evidence related to a homicide) and, instead of pursuing discipline, directly communicated with Miedzianowski about the allegations against him and provided him copies of witness statements and other reports that Miedzianowski was not authorized to have, PSOF ¶465;
    - o In 1993 and 1994, Chicago police officers obtained several purported identifications of Vincent Goldstein as the robber of four grocery stores and arrested him; those identifications were proven false after Mr. Goldstein's alibi was established by his employer and another man confessed, PSOF ¶466;
    - o CPD sergeants, lieutenants, and commanders of detectives widely understood that false identifications could result if photo identification procedures weren't conducted properly, and understood that photo identification procedures could be abused if they were not done correctly, PSOF ¶¶392, 398;
    - o From 1986-1998, the Chicago Police Department conducted no audits into the City's witness identification procedures or practices or patterns of misconduct involving such procedures, PSOF ¶470; and
    - o The City's police officers engaged in a pattern of fabricating evidence starting at minimum in the early 1980s and continuing through the time of Iglesias's conviction, PSOF ¶471.
- The evidence that the City failed to train, supervise and discipline its officers is also evidence in the City's complaint register files (CR files):
    - o Iglesias's experts Finnell and Meza analyzed all of the allegations made in 323 CR files produced by the City, which are all of the CR files relating to detectives

130

assigned to Area Five in the time period between 1989 and 1993, PSOF ¶¶472-475, 478;

- o Those CR files contained 2,020 instances of allegations of police misconduct, PSOF ¶¶478;
- o They found that 56% of allegations (1,129 out of 2,020) concerned misconduct similar to that in this case—i.e., fabricated statements or evidence, false arrest, improper inventory procedures, planted evidence, threats, verbal abuse, coerced confessions, and excessive force, PSOF ¶¶478;
- o The sustained rate for citizen complaints in Chicago was well below the national average, compared to other departments, and reflected a "deeply flawed system of investigation and disciplining serious police misconduct, particularly forms of police misconduct that cause wrongful convictions," PSOF ¶¶488;
- o The sustained rate for complaints of fabrication was 6.5% after investigation; 0% for false arrest; and 2.1% for excessive force, PSOF ¶¶479;
- o Only 1.1% of the total allegations originating from outside of the Chicago Police Department (21 out of 1,867 allegations) were sustained, much less than other large American municipalities, PSOF ¶¶476, 487;
- o The small number of complaints that were sustained in the entire dataset of 2,020 allegations (only 1.6%) disproportionally reflected misconduct relating to procedural misconduct (e.g., inattention to duty, rule violations, improper inventory procedure) or domestic violence, as opposed to abuses against community members while on duty (e.g., fabricated statements, threats, excessive force, false arrest, warrantless search, verbal abuse), PSOF ¶¶486;
- o Of the 1,129 allegations concerning the types of misconduct at issue in this case (*e.g.*, fabricated statements, false arrest, coerced confessions, threats, excessive force, improper inventory, and other misconduct), the Chicago Police Department sustained just 23 after investigation and 10 after final review, PSOF ¶¶480; and
- o Even where allegations were sustained, officers did not face meaningful discipline, PSOF ¶¶474, 477, 481, 505, 508, 509, 510.
- Based on this evidence, Mr. Finnell and Ms. Meza reached various conclusions, including:
  - o Mr. Finnell opines that the City's police officers engaged in a pattern of fabricating evidence starting at minimum in the early 1980s and continuing through the time of Iglesias's conviction, PSOF ¶¶471;
  - o He opines that the City had a de facto policy of failing to investigate officers accused of misconduct, and to supervise or discipline officers found to have committed misconduct, PSOF ¶¶474;
  - o He opines that the City's mechanisms and rules for investigating misconduct were not consistent with accepted practices as of 1993, PSOF ¶¶474, 487, 490-93, including for the following reasons:
    - ▪ General order 93-1 did not permit the investigation of anonymous complaints that were not criminal in nature, PSOF ¶¶490;
    - ▪ Officers were not interviewed during investigations, PSOF ¶¶491;

- There was no mechanism to respond to officers with a high number of complaints (10.7% of officers were responsible for 41.4% of allegations of misconduct), PSOF ¶¶493-494; and
  - The Chicago Police Department's process for reviewing discipline delayed accountability, PSOF ¶¶492.
  o He opines that the City of Chicago condoned a code of silence in its police department, where officers were permitted to lie without repercussion, PSOF ¶¶501, 465; and
  o He opines that the City of Chicago encouraged abuses of power by failing to supervise and discipline officers, PSOF ¶¶502.
- Iglesias has also identified CR files from the Defendants Officers' own disciplinary history in which it was alleged that misconduct similar to this case occurred, and to which the City did not respond:
  o Guevara, Halvorsen, Gawrys, Riccio, and Biebel were alleged to have engaged in numerous acts of misconduct that mirror those alleged by Iglesias and that demonstrated a risk that they would violated constitutional rights and cause wrongful convictions, PSOF ¶¶498-500, 503-512;
  o Guevara and Riccio were outliers among their colleagues at Area Five. Defendant Guevara received 30 CRs over his career, Defendant Halvorsen received 9 CRs over his career, Defendant Gawrys received 3 CRs over his career, Defendant Riccio received 16 CRs over his career, and Defendant Biebel received 6 CRs over his career, for a total of 64 CRs across all five officers, PSOF ¶¶494, 495, 503;
  o The 30 citizen complaints against Defendant Guevara involved misconduct including false reports, false arrest, warrantless searches, verbal and physical abuse/excessive force, and fabrication of evidence. In response to those 30 complaints, Guevara was disciplined just three times. Many of the complaints did not result in meaningful investigation. And in two of the three instances where the CRs resulted in a sustained finding, Guevara only received one-day and two-day suspensions. In the third occasion, his discipline was a 20-day suspension, which was imposed only because the complaint was made by a supervisor in the CPD. Further, in all three of the sustained findings, Guevara investigators concluded based on their investigations that Guevara had lied to them. However, Guevara received only (1) modest discipline for one sustained Rule 14 violation against him (CR # 152902) and (2) no Rule 14 violations at all in the other disciplinary investigations where it was found that he demonstrably lied. (e.g. CR #s 223928, 251502), PSOF ¶¶503-506, 510, 547-48;
  o Out of 9 CRs against Defendant Halvorsen, none were ever sustained against him, PSOF ¶¶503, 507;
  o Out of 3 CRs against Defendant Gawrys, none were sustained,, PSOF ¶¶503, 508;
  o Out of 16 CRs against Defendant Riccio, only one CR contained two sustained allegations against him, which resulted in a three-day suspension, PSOF ¶¶503, 509

- o Defendants Guevara and Halvorsen received multiple CRs containing similarly themed allegations and patterns throughout their careers, and Guevara and Halvorsen were sued many times based on similarly themed allegations and patterns, including many allegations of fabricating evidence and abusing people, yet none of their supervisors acted as if they noticed a pattern or showed concern for such behavior, PSOF ¶510;

- o Mr. Finnell and Ms. Meza opine that Guevara took advantage of the broken disciplinary system at the Chicago Police Department, PSOF ¶504;

- o Mr. Finnell and Ms. Meza further opine that the City's delayed disciplinary practices meant that the Defendants had no reason to fear that they would ever be disciplined for misconduct, PSOF ¶511.

- Mr. Finnell and Ms. Meza opine that the City's promulgation of a culture of impunity is reflected also in civil lawsuits filed against the Defendants for misconduct like that at issue here. At the time of their report, at least 17 civil rights cases had been filed against Defendants Guevara, Halvorsen, Gawrys, Riccio, and Biebel. At least nine had resulted in verdicts and settlements.. PSOF ¶¶512 Since then, at least eleven other lawsuits have been filed against Defendants Guevara, Halvorsen, Gawrys, Riccio, and Biebel. PSOF ¶¶512.

- The City also disregarded Guevara's own pattern of staggering misconduct, which demonstrates that Guevara is the single worst perpetrator of police misconduct in the history of the Chicago Police Department in terms of framing innocent people, even when compared to Jon Burge.

  Between 1982 and 1998, the City had notice of the pattern of illegal misconduct of Guevara, who physically assaulted, threatened, and/or coerced witnesses, suspects, victims, and defendants, primarily in the process of obtaining false statements. Between 1982 and 1998, Guevara physically assaulted, threatened, and/or coerced individuals, primarily in the process of obtaining false statements, including Annie Turner, Almarie Lloyd, Leshurn Hunt, Graciela Flores, Daniel Pena, Victor Vera, Virgilio Muniz, Virgilio Calderon Muniz (unrelated to the Virgilio Muniz previously referenced), Wilfredo Rosario, David Rivera, Daniel Rodriguez, David Velazquez, Efrain and Ulio Sanchez, Jacqueline Montanez, Eliezar Cruzado, Adolfo Frias-Munoz, Adrian Duta, Santos Flores, Evelyn Diaz, Luis Figueroa, Gloria Ortiz Bordoy, Rodolfo Zaragoza, Maria Rivera, Robert Ruiz, Voytek Dembski, Rosauro Mejia, Adriana Mejia, and Francisco Vicente, and in every case there is no evidence that he received *any* discipline for his misconduct. PSOF ¶¶546, 547, 549.

- In the few instances where allegations of misconduct were sustained, Guevara received disproportionately little—and clearly not meaningful—discipline for his misconduct:

  - o In 1986, Guevara beat Rafael Garcia by grabbing him by the shirt and throwing him against a bar; handcuffing him and striking him in the face several times; throwing him to the floor and kicking him; and throwing him against the wall and hitting him in the head. After the incident was reported, Guevara then denied striking Garcia and throwing him onto the floor, into the wall, and handcuffing him to the wall. The City's disciplinary body found that Guevara had indeed lied about the incident and had given false information to investigators. For that behavior, Guevara was only suspended for two days, PSOF ¶¶546(f);

133

- o Also in 1986, Guevara called Melvin Warren a "n***** dog" and beat him, and the City's disciplinary body initially sustained Warren's allegations and recommended five-day suspension, only to later overturn the suspension and impose a reduced punishment of a reprimand for calling a citizen "n*****." PSOF ¶¶546(h);
- o In 1996, Defendant Guevara was accused of physically striking his stepdaughter in the face. Defendant Guevara again denied all allegations. Although the Command Channel Review and IAD concurred in a sustained finding and recommended three-day discipline in February 1996, Defendant Guevara only served a one-day suspension, and no Rule 14 violation was added despite finding that Guevara provided false information. PSOF ¶¶548(a);
- o Further, in 1999, Defendant Guevara stated "fuck you" to Sergeant David Oravetz; engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant Oravetz in the chest; and failed to comply with a direct order to leave the district station—all when observed by several on-duty members of CPD. Throughout the OPS investigation, Guevara still denied all allegations against him despite the presence of others and the statements supporting the allegations. The allegations were sustained. Yet, even after the disciplinary history described above and the allegations at hand, a Police Commander still recommended reducing his recommended 30-day suspension by ten days, "considering the circumstances and his complementary and disciplinary history." In 2000, Guevara's discipline was reduced to 20 days, and he was compensated for 10 days of back pay for the suspension he had already served. No Rule 14 violation was added or sustained, despite Guevara making false statements during the investigation. PSOF ¶¶548(b).
- In spite of these sustained incidents of flagrant misconduct, the City made no effort to meaningfully discipline or terminate Guevara in light of this repeated misconduct, despite notice of it. PSOF ¶¶546-549.
- In yet other instances involving subsequent litigation and ultimately resulting in wrongful convictions, there is still no evidence that Guevara was disciplined for his egregious misconduct towards wrongfully convicted individuals, witnesses, and suspects:
  - o In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin, and falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. As a result of this misconduct, Rivera was convicted. In 2011, Rivera filed a post-conviction petition based on actual innocence and received an evidentiary hearing. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's

134

civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey. PSOF ¶¶549(a).

o In 1989, Guevara framed Juan Johnson for murder by showing Sam Perez a photo of Johnson before an identification procedure and by telling Perez that he wanted Johnson to take the blame for the murder. . Johnson filed his post-conviction petition in 1996, and appealed its denial in 2001—and in May 2002, the appellate court reversed the denial, vacated his convictions, and remanded for a new trial. At his new trial, Johnson was acquitted by a jury. He sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. (See Ex. 81, Jury Verdict in Johnson v. Guevara, 05 C 1042). Guevara took the Fifth in regard to all allegations regarding Juan Johnson. PSOF ¶549(b);

o Johnny Flores was wrongfully convicted of a 1989 murder that he did not commit, a conviction attributable to the misconduct of Defendant Guevara, who fabricated an identification to inculpate Mr. Flores. In 2022, the State asked the Court to vacate his convictions and subsequently dismissed all charges against him. Flores now seeks justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. PSOF ¶549(c);

o In 1989, Jaime Rios was wrongfully arrested, charged, and convicted for a murder that he did not commit—a conviction that was ultimately dismissed after evidence was presented showing that a witness had been threatened by Defendant Guevara into implicating Rios. In 2022, the Cook County State's Attorney's Office agreed to dismiss his conviction; within days, he had obtained a certificate of innocence; and he has now filed a federal lawsuit against Guevara and the City of Chicago. PSOF ¶549(d);

o In approximately 1990, former Chicago police detective Bill Dorsch was present when Detective Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license plate of the shooter's car. While the first juvenile was viewing a photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. (See Ex. 82, Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873 at JR-L 076819, JR-L 076824-48). Mr. Dorsch then directed Guevara to leave the room and had the other juvenile view the same photo array—that juvenile was unable to make any identification. (Id.) Subsequently, Dorsch spoke to the two juveniles without Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was the shooter. (Id.) Dorsch's supervisors in the CPD knew about Guevara's misconduct in that case, but instead of disciplining Guevara, instead Guevara was promoted. (*Id.* at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32). Guevara has taken the Fifth in regard to all allegations regarding Bill Dorsch's accusations. PSOF ¶546(m);

o In 1990, Defendant Guevara repeatedly beat Jose Maysonet until he confessed to a double homicide that rested solely on that coerced confession. In 2016, Maysonet's double murder conviction was vacated and he was granted a new

trial. Over a year later, the Cook County State's Attorney dropped charges against Jose after five retired Chicago police officers, including Defendants Guevara, Halvorsen, and Mingey, invoked their fifth amendment right and refused to testify. Another victim of this same string of misconduct as Maysonet, Alfredo Gonzalez's conviction for the same homicide was vacated in 2022, and both Maysonet and Gonzalez have filed lawsuits against the City of Chicago and Guevara seeking justice for their wrongful convictions. PSOF ¶549(e);

o   In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos. Johnson was granted a certificate of innocence and has filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(f);

o   In 1991, David Lugo was just 20 years old when he was framed for murder by Defendant Guevara and his fellow officers. In 2022, his conviction was vacated. He has since filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(g);

o   Marilyn Mulero was wrongfully convicted of a 1992 double murder based on evidence fabricated by notoriously corrupt Chicago Police Defendants Guevara and Halvorsen. Marilyn was pressured to enter a guilty plea without a trial and was sentenced to death. In 2022, all charges against her were dropped. She has also filed suit against Defendants Guevara and Halvorsen. PSOF ¶549(h);

o   Madeline Mendoza was arrested in 1992, and convicted in 1993, for a crime she did not commit, based on false statements obtained by Defendants Guevara and Halvorsen. In 2023, the prosecution agreed to vacate Mendoza's conviction and the case was dismissed. PSOF ¶549(i);

o   In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano and Jose Montanez. In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez, causing Rankins to testify falsely against the men in the Grand Jury. In 2004, Jose Montanez filed a post-conviction petition based on the recantation affidavit of the State's key witness Vicente, who provided a detailed statement describing how his false testimony was given as a result of threats, intimidation and physical abuse by Det. Reynaldo Guevara. Likewise, in 2005, Armando Serrano filed a post-conviction petition alleging actual innocence based on Vicente's affidavit and multitudes of other affidavits, transcripts, OPS complaints, and other supporting documentation, revealing that Guevara had engaged in a pattern and practice of coercing evidence through the use of threats, intimidation, lies, and physical abuse. The City of Chicago then determined that Montanez and Serrano were wrongfully convicted. In 2016, both men were exonerated and received

certificates of innocence. Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. Montanez and Serrano's lawsuit against, *inter alia*, Defendants Guevara, Halvorsen, and the City of Chicago was settled for $20.5 million after Defendants' motion for summary judgment was denied as to the plaintiffs' claims of fabricated evidence, pretrial detention, malicious prosecution, federal and state-law conspiracy, Brady claims, IIED, and failure to intervene. PSOF ¶549(j);

o  In 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the line-up, allowed them to view photographs Mr. Bouto and confer with one another before the line-up, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than not innocent. Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. PSOF ¶549(k);

o  In 1993, Jose Cruz was arrested and ultimately wrongly convicted of a murder, based on fabricated and coerced statements caused by Defendant Guevara and other officers. In 2022, the prosecution agreed to vacate and dismiss his conviction. In 2023, he obtained a certificate of innocence, and filed a lawsuit against the City of Chicago, Defendant Guevara, and others for his wrongful conviction. PSOF ¶549(m);

o  In 1994, Guevara framed Roberto Almodovar and William Negron. In that case, Guevara framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a lineup without any influence by Guevara. Almodovar, and his co-defendant Negron, have both since been exonerated. Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron, PSOF ¶549(n);

o  Nelson Gonzalez was framed with a 1994 murder, resulting from a fabricated identification conducted by Defendant Guevara. In 2022, Gonzalez's convictions were vacated and the case dismissed, and in 2023, he was granted a certificate of innocence. He has also filed suit against Defendant Guevara, among others involved in his wrongful conviction. PSOF ¶549(o);

o  In 1994, Defendants Guevara and Halvorsen, among other officers, manufactured false identifications that resulted in the wrongful arrest and conviction of Carlos Andino. In 2021, Andino filed for post-conviction relief, and in 2022, the Cook County State's attorney's office agreed to vacate Andino's conviction. In 2023, he was awarded a certificate of innocence, and filed suit against Guevara and other officers to seek compensation for his wrongful conviction. PSOF ¶549(p);

o  In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote fabricated reports falsely saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting. The

state finally dismissed charges against Mr. Sierra in 2019, and Mr. Sierra was granted a Certificate of Innocence in 2022. He spent over 22 years in prison due to Guevara's misconduct and is suing the City of Chicago and defendant officers, including Defendant Guevara, due to that misconduct. PSOF ¶549(l);

o In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter. PSOF ¶549(q);

o In 1996, Gamalier Rivera was wrongfully arrested and convicted for murder resulting from fabricated confessions caused by Defendant Guevara and other officers. After years of seeking post-conviction relief, the state dismissed charges against him, and he was granted a certificate of innocence in 2022. As the Court stated, "No amount of money can make up for the lost time, the trauma of being wrongfully imprisoned, and the egregious experience of being wrongfully accused" as a victim of Defendant Guevara's misconduct. Rivera has filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(r);

o Louis Robinson was wrongfully convicted of a 1996 drive-by shooting that killed Kelly Velez, based on coercive identification and fabricated evidence caused by Defendant Guevara. In 2023, his post-conviction petition was granted following an evidentiary hearing, and the State dismissed all charges. PSOF ¶549(s);

o Juan and Rosendo Hernandez were wrongfully convicted of the 1997 shooting of Jorge Gonzalez and collectively spent decades for a crime they did not commit due to the misconduct of Defendant Guevara and other officers, including the disgraced Joseph Miedzianowski, and Halvorsen. In 2022, their convictions were vacated, and they received certificates of innocence in 2023. They have filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(t);

o In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not done so, PSOF ¶546(bb);

o In 1998, Guevara repeatedly beat Gabriel Solache into giving a false confession, causing Solache to sustain permanent hearing loss. In the same investigation, Guevara repeatedly threatened and beat Arturo Reyes to coerce Reyes into falsely implicating himself. The City subsequently determined that Solache and Reyes were abused during their interrogations and that their convictions should not stand. Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes, PSOF ¶354;

o John Martinez was wrongfully convicted of a 1998 homicide due to falsified evidence, including fabricated identifications and coercive interrogations, caused by Defendant Guevara and other officers. In 2023, Martinez's conviction was vacated, and less than a month later, his case was dismissed. In 2024, two others involved in this case – Thomas Kelly and Jose Tinajero – also

had their wrongful convictions resulting from the same homicide dismissed based on Guevara's misconduct. Martinez has filed a lawsuit against the City of Chicago and Defendant Guevara, seeking justice for his wrongful conviction. PSOF ¶549(u);

o   In 1999, David Gecht and Richard Kwil were both wrongfully convicted of a murder due to Defendants Guevara and Halvorsen's misconduct. During a single night, Defendants Guevara, Halvorsen, and other officers subjected both Gecht and Kwil to torturous investigations, breaking their wills and coercing them into signing false confessions. They also obtained a false confession from Ruben Hernandez, falsely implicating all three in the crime. In 2022, Gecht and Kwil's charges were dismissed, and both were granted certificates of innocence. The charges against Hernandez were also dismissed, and all three have pending lawsuits against Defendants Guevara and Halvorsen, among other officers, and the City of Chicago.  PSOF ¶549(v);

o   Eruby Abrego and Jeremiah Cain were wrongly convicted of the 1999 murder of Jose Garcia and aggravated battery of Julio Lugo, despite having nothing to do with the murder, due to the false identifications, falsified confessions obtained through torture, and other evidence manufactured by Defendants Guevara, Halvorsen, and others. In 2022, their wrongful convictions were vacated and the charges were dismissed. Both now seek justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. PSOF ¶549(w);

o   On February 29, 2024, seven men – Jayson Aguiar, who served 20 years, David Kruger, who served 14 years, Juan Molina, who served 12.5 years, Edwin Ortiz, who served 25 years, Oscar Soto, who served 3 years, Victor Vera, who served 19 years, and Tyrece Williams, who served 20 years–filed petitions seeking to reverse their decades-old convictions tied to disgraced former Chicago Police Detective Reynaldo Guevara. The men—who have completed their sentences and are out of custody—all claim their innocence. PSOF ¶549(x);

o   Plaintiff's retained expert Jennifer Dysart opined on the similarities between the cases she has reviewed involving Detective Guevara, which include Rivera, Montanez v. Guevara, et al., Case No. 17-cv-4560, Armando Serrano v. Guevara, et al., Case No. 17-cv-2869, Sierra, Bouto, and Iglesias. She stated that "It seems that a common theme in the Guevara cases I have reviewed  is [for Guevara to] manipulate witnesses who had poor opportunities to view the perpetrator. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in these cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator." PSOF ¶549(y).

●   Finally, in 2001, the FBI authored a 302 report detailing the criminal activity of CPD Officer Joseph Miedzianowski and Guevara in the 1980s and 1990s. The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble," and he would take bribes to alter the results of lineups. The FBI report also states that Guevara would receive cash in exchange for the dismissal of murder cases he

139

investigated. The report contained no indication that Guevara was questioned or that the IAD tried to find the people mentioned as having cases that were fixed by Guevara. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302 report. PSOF ¶¶548(c).

- That same year, in 2001, a perjury investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Defendants Guevara and Halvorsen gave false testimony in 17 homicide cases ranging from 1984 to 1997, and requested that the State's Attorney's office also investigate the matter to determine possible misconduct on the part of the detectives. The CPD Internal Affairs Division interviewed Delgado, who related that the 17 defendants convicted primarily on the false testimonies of Guevara and Halvorsen stated that "we're tired of busting you on petty crime and we're gonna get you. We'll bust you for murder." Delgado stated that in at least one case it was impossible for Guevara to obtain a detailed statement from the defendant due to Guevara's poor Spanish. Yet the State's Attorney's office closed its separate investigation without providing a report on the complaint, and without reviewing 3 of the 17 cases. However, based on the closure of the case by the State's Attorney's office (without actually seeing that report) and the alleged "fruitless" attempts to contact witnesses regarding the complaint, the CPD closed the case with a finding of "Not Sustained" in 2002. PSOF ¶548(d).

- Indeed, over the two decades the City was continually on notice of Guevara's misconduct as a result of citizen complaints, the perjury investigation, and the FBI's 302 report, the City did nothing to address Guevara's misconduct, even given the City's knowledge that individuals were still wrongfully incarcerated because of Guevara's misconduct, as was obvious from the steady stream of post-conviction innocence petitions filed and granted by victims of Guevara's misconduct. PSOF ¶546-549.

- It was not until 2013 that the City first investigated Guevara, hiring Sidley Austin to conduct a review of a portion of his cases, which found that Guevara had engaged in investigative misconduct including through improper identification procedures, falsifying reports, and physical abuse during interrogations. PSOF ¶550.

- Guevara's invocation of the Fifth Amendment in response to all questions about the City's failure to discipline him after he repeatedly violated individuals' constitutional rights provides additional support for the conclusion that City policymakers were on notice of and indifferent to Guevara's pattern of framing innocent individuals. Indeed, Detective Guevara has refused to testify about his interactions with many individuals, including Anna Flores, Graciela Flores, David Velazquez, Efrain Sanchez, Julio Sanchez, Adolfo Frias Munoz, Jose Melendez, Gabriel Solache, Arturo Reyes, Virgilio Muniz, Luis Figueroa, Angel Diaz, Wilfredo Rosario, Xavier Arcos, Gloria Ortiz Bordoy, Robert Ruiz, Leshurn Hunt, Adrian Duta, Voytek Dembski, Daniel Pena, Annie Turner, Juan Johnson, Francisco Vicente, Timothy Rankins, Jose Montanez, Armando Serrano, Robert Bouto, Roberto Almodovar, William Negron, Jacques Rivera, Orlando Lopez, Armando Serrano, Timothy Rankins, Robert Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Carl Richmond, Rey Lozada, Rosendo Ochoa, Hugo Rodriguez, Jacqueline Grande, Angel Diaz, Luis Figueroa, Sam Perez, Salvador Ortiz, David Colon, Luis Serrano, Evelyn Diaz, Freddy and Concepcion, Aurelio Martinez, Gamalier Rivera, Antonio Diaz, Richardini Lopez, Maria Diaz, Antonio McDowell,

Marilyn Mulero, David Gecht, Richard Kwil, Colleen Miller, Ruben Hernandez, Eruby Abrego, Ramon Torrez, Isidro Quinonez, Julio Lugo, Bernard Turner, Melvin Warren, Rafael Garcia, Jossie Martinez, Semara Johnson, Juan and Rosendo Hernandez, Edgar Perez, Johnny Flores, Edwin Davila, Alfredo Gonzalez, Jorge Pacheco, Alberto Rodriguez, Carl Richmond, Demetrius Johnson, Thomas Sierra, and Iglesias. PSOF ¶547, 549.

- Moreover, there is ample record evidence that the City failed to train, supervise and discipline its officers on a wide variety of particular topics important to investigations, including:

  - o Iglesias's expert testimony that the City's homicide files reflect a widespread practice of evidence suppression, fabricated and false identifications, and other departure from policies, showing a lack of training, PSOF ¶¶358-371, 424, 431-441, 444-45, 470-71, 474-502, 517, 526-545;

  - o The City's 30(b)(6) representatives testified that there was no punishment for non-compliance with Special Orders; no auditing or surveying of the implementation of the policies, including no auditing to ensure that documents were produced in response to subpoenas; and that he had no personal knowledge of any training provided to commanders or supervisors to conduct such audits, PSOF ¶¶513, 514, 519-525;

  - o The City's 30(b)(6) representative Winstrom testified that only a three-hour training took place after the initial S.O. 83-1, and that no other training like that occurred throughout the development of the Special Orders; PSOF ¶516, 518;

  - o The City's 30(b)(6) representative Foster testified that detectives were not trained that there were any prohibitions on what they could say to a witness before a lineup procedure or a gang book showing, PSOF ¶532;

  - o Foster testified that no training on identifications or their assistance in homicide investigations was provided to gang crime specialists, despite their involvement in the investigations and identification procedures; PSOF ¶527, 532;

  - o Foster stated that the only training provided to detectives only trained on documenting positive identifications. PSOF ¶533;

  - o Foster agreed that a gang specialist could interview a witness and learn information pertinent to the homicide investigation outside the presence of any detective, and there was no requirement that the specialist had to document that interview. Even if the gang specialist did document pertinent information the specialist acquired, there was no policy requiring that information to get to the Detective Division, or training on the issue. PSOF ¶414.

This evidence is far more than sufficient for a jury to conclude that the City failed to train, supervise, and discipline its officers, condoned a code of silence, and in so doing was deliberately indifferent to the risk that its officers would commit the types of misconduct at issue in this case. The City had notice of rampant misconduct starting with Burge, was indifferent to that misconduct in its non-response, and then continued to permit police officers to commit misconduct with

impunity, as shown in the analysis of Chicago's disciplinary files and the repeated misconduct identified above, including Guevara specifically, through and long past the time of Iglesias's wrongful conviction. This failure on the City's part created an environment of lawlessness where repeat bad actors in the Chicago Police Department could violate the rights of citizens, fabricate evidence, coerce witnesses, testify falsely, suppress evidence, and frame innocent individuals for crimes. A reasonable jury could find that the City's broken system encouraged Defendants to repeatedly commit misconduct, and in the case of Guevara and Halvorsen to manufacture the wrongful convictions of dozens of individuals. Despite this misconduct, the City had no meaningful response.

The evidence set out above dramatically exceeds what many courts have decided requires a trial on this particular *Monell* theory. See, *e.g.*, *Sornberger*, 434 F.3d at 1030 (reversing grant of summary judgment to municipality based on evidence that municipality "had a policy of coercing confessions out of female suspects by threatening to have DCFS take away their children," which included experts' report that reviewed other complaints that it had been deliberately indifferent to coercive threats); *Washington*, 2022 WL 4599708, at *16-17.[31]

---

[31] See also, *e.g.*, *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *25 (N.D. Ill. Sept. 30, 2023) ("A reasonable jury could find a widespread failure to investigate and to discipline caused the Chicago Officers to believe that their alleged misconduct would not be discovered and that, even if discovered, they would not face any effective disciplinary action resulting from such misconduct.") (cleaned up); *Obrycka v. City of Chicago*, 2012 WL 601810, at *8 (N.D. Ill. Feb. 23, 2012) (denying summary judgment on "code of silence" claim where plaintiff submitted police practices expert that opined a "code of silence" existed and a statistical expert report "showing that the Chicago Police Department has statistically significantly lower rates than the national average of sustained rates for police misconduct complaints"); *Marcinczyk v. Plewa*, No. 09 C 1997, 2012 WL 1429448, at *3 (N.D. Ill. Apr. 25, 2012) (denying summary judgment where plaintiff's evidence of City's failure to investigate and discipline officers accused of misconduct included "documentary evidence indicating that only a minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline"); *Johnson v. City of Chicago*, No. 05 C 6545, 2009 WL 1657547, at *10 (N.D. Ill. June 9, 2009) (denying summary judgment where plaintiff had evidence that City only paid lip service to known problem of failing to investigate and discipline rogue officers); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621, at *6-7 (N.D. Ill.

### 2. The City's Arguments for Summary Judgment on the Failure to Train, Supervise, and Discipline *Monell* Theory Lack Merit

#### (a) The City's Reiterated Arguments Regarding Mr. Finnell and Ms. Meza Lack Merit and Do Not Justify Summary Judgment

The City contends that summary judgment should be granted on this theory because of a smattering of challenges that the City mounts to Iglesias's expert, Mr. Finnell and Ms. Meza. CB-38-50. Again, the City's argument starts from the false premise that the failure to train, supervise, and discipline *Monell* theory is based solely on expert opinions, which is not the case, as demonstrated by the record evidence above unrelated to Mr. Finnell's opinions. The City's criticisms of Mr. Finnell are meritless, and they are also not an argument for summary judgment.

Next, the City also uses its summary judgment motion to regurgitate arguments to exclude Mr. Finnell and Ms. Meza that the City has made in its *Daubert* motion. Dkt. 250. The City's criticisms of Mr. Finnell's methodology and opinions on pages 38-41 (arguments regarding methodology of review of CR files), and pages 41-44 (discussing opinions based on CR files) of its motion, CB-38-44, are addressed fully in Iglesias's response to the City's motion to exclude

---

Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse by its officers where plaintiff had expert testimony on the City's investigations of officers accused of misconduct, testimony from IAD investigator, as well as statistics on the sustain rates of investigations of misconduct from 1999 through 2001, concluding that "[a] reasonable jury could infer that the City knew about and acquiesced in a widespread custom tolerating the tacit use of excessive force by its police officers over a substantial period of time."); *Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, at *4 (N.D. Ill. Feb. 15, 2002) (denying summary judgment on failure to discipline claim were "[p]laintiff's evidence consists of approximately thirty-five City of Harvey files where private citizens filed excessive force complaints and no corrective action was ever taken on any of them. No formal hearings were ever held on these complaints nor is there evidence of any type of independent investigation on the part of the City of Harvey. Some of the complaints lodged against the Harvey police officers involve similar types of brutality, and no evidence of notes being put in officer's personnel files is present."); *Robinson v. City of Harvey*, No. 99 C 3696, 2001 WL 138901, at *7 (N.D. Ill. Feb. 16, 2001) (denying summary judgment where evidence included complaints of officers' use of excessive force were frequently unreviewed and undocumented as well as an expert report that found that the municipality had systemic deficiencies in its administrative investigations of use of force and citizen complaints).

Mr. Finnell and Ms. Meza.[32] Dkt. 269 at 10-11, 13-32, 33-35. As discussed there, courts in this District have found Mr. Finnell's exact opinions criticized by the City here and similar expert opinions to be helpful to juries in cases concerning widespread practices of failing to discipline Chicago police officers. *Velez*, 2023 WL 6388231, at *24 (finding Mr. Finnell's opinions helpful to the jury and relevant to the claim based on failing to investigate and discipline police misconduct); *Washington*, 2022 WL 4599708 at *11 (concluding Plaintiff presented sufficient evidence for *Monell* claim based on expert opinion on deficiencies of investigations and discipline); *Marcinczyk*, 2012 WL 1429448, at *3-4 (concluding plaintiff presented sufficient evidence for Monell claim, including evidence indicating that "minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline"). Likewise, as discussed in Iglesias's response to the City's motion to exclude these experts, Mr. Finnell's reliance on Ms. Meza's statistical analysis is not grounds to bar Mr. Finnell's opinions; it is expected and appropriate for experts in technical fields to rely on other experts' conclusions, *see Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002), and *Washington*, 2022 WL 4599708, at *11 ("[T]here is nothing objectionable about an expert relying on the work of a colleague."), and Defendants cite no case law to support their unsubstantiated position that Ms. Meza is not qualified, particularly in the face of Ms. Meza's substantial experience in both statistics and police accountability that proves the City wrong.

Moreover, the City's arguments that Mr. Finnell's opinions do not establish a widespread practice depend entirely on disputing the correctness of Mr. Finnell's opinions and ignoring all of

---

[32] As discussed in Iglesias's Response to the City's *Daubert* Motion to exclude Mr. Finnell, Dr. Knight, and Ms. Meza, Iglesias has withdrawn Dr. Knight as an expert. *See* Dkt. 269 at 11-12.

144

the other record evidence set out above. Whether Mr. Finnell's opinions add evidence supporting a widespread practice, like any other dispute of fact, must be saved for trial.

### (b) The City's Argument About Burge Evidence Lacks Merit

The City asserts in a single paragraph that the evidence discussed above relating to Burge and his colleagues' pattern of misconduct and the City's lack of any response to that pattern is irrelevant to this *Monell* theory, suggesting that those things happened too early in time to be relevant. CB-44-45. A paragraph without factual or legal analysis is insufficient to wish away the Burge scandal. *Roe-Midgett v. CC Services*, 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped arguments are forfeited).

Much like *Jones* and *Palmer* in the context of evidence suppression, the Burge evidence demonstrates that City policymakers had direct notice of the problem of systemic abuses of constitutional rights occurring at the hands of officers in the Chicago Police Department, investigated that problem, and received notice in the 1990 Goldston Report that the problem was widespread, that command-level officers knew of it, and that specific corrective action was essential. *Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) (noting in 1999 that by then Burge's misconduct was an established pattern and practice); *Fields*, 981 F.3d at 562 (notice can be established in various ways, such as through proof of a prior pattern of similar constitutional violations).

In addition to being relevant to notice, the Burge evidence demonstrates the City's indifference to police misconduct. In response to the notice of Burge's misconduct, the City did nothing. It did not meaningfully investigate any of the cases of misconduct, including those identified in the 1990 Goldstone Report, or discipline the officers involved, and it took no steps to implement new policies or remedial measures. In fact, it was not until 1993—more than a decade

after Burge's torture of suspects began, three years after the Goldston report, and two years before Iglesias's ordeal, that Burge was finally fired. In the preceding decade, at a time when Chicago Police Department command staff knew of Burge's misconduct, Burge was *promoted* to Commander. The ultimate firing of Burge was inconsequential, given that it was untimely and came after his promotion and celebration within the department, and it was the only step the City took. The City did not conduct any other investigation, implement policy changes, or impose discipline. The City's utter indifference to the most extremely abusive police misconduct in the ranks of the Chicago Police Department is highly probative of the City's indifference here. *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 753 (N.D. Ill. 2015) ("Proof of deliberate indifference in the context of a failure to train case 'can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers.'"); PSOF ¶¶451-461.

The City's indifference toward Burge helped to establish the widespread practice of lax or non-existent discipline that continued in full force through the time of Iglesias's wrongful prosecution and conviction. Indeed, had the City responded to Burge, perhaps there would have been no Guevara. It is understandable that the City wishes to ignore the Burge scandal. However, it is highly relevant to Iglesias's claim that the City's failure to train, supervise, and discipline officers spawned egregious patterns of police misconduct, like Guevara's, which caused the violations of Iglesias's rights. PSOF ¶¶451-461, 474-512, 546-549.

### (c) The City's Argument About Lawsuits Against Officers Lacks Merit

The City also asserts that evidence of lawsuits against Chicago police officers is not relevant to Iglesias's *Monell* claims because some lawsuits were filed after Iglesias's wrongful conviction. CB-49-50. To the extent the City is making the narrow argument that lawsuits filed

146

after Iglesias's wrongful conviction did not provide the City *notice* of the misconduct at issue in those lawsuits before Iglesias's wrongful conviction, Iglesias agrees. But even excluding those lawsuits post-dating 1994, there is a tremendous amount of evidence that the City had notice of the problems created by failing to train, supervise, and discipline officers prior to Iglesias's ordeal.

Regardless, putting notice to one side, all of the lawsuits discussed above concerning police misconduct and the City's response to them are highly relevant to the City's practices and its indifference. The Seventh Circuit has held that incidents postdating a particular case are probative of the policies and practices that were in place at the time of the case, and they are evidence of City policymakers' deliberate indifference. *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir 1987) ("[S]ubsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy[.]"); *see also Padilla v. City of Chicago*, 2009 WL 4891943 at *7 (N.D. Ill. Dec. 14, 2009).[33]

### (d) The City's Argument About Complaint Register Files Lacks Merit

Finally, the City argues that the Defendants' CR files themselves, and Mr. Finnell's and Ms. Meza's opinions about them, are not evidence supporting a widespread practice of failure to train, supervise, discipline. CB-46-50. First, the City's argument that Mr. Finnell did not appropriately analyze which CR files should have resulted in sustained findings, CB-29-30, is

---

[33] Similarly, the City argues that a U.S. Department of Justice report documenting the Chicago Police Department's failure to investigate, supervise, and discipline officers who use excessive force is irrelevant to the *Monell* issues in this case because it post-dates the events at issue here. CB-45-46. Again, Iglesias agrees that the report post-dates the events at issue, but as discussed, this post-incident evidence is probative of the lack of disciplinary policies and indifference on the part of the City when it comes to training, supervising, and disciplining its police officers. The fact that the City's indifference, which was deeply entrenched at absolute latest at the start of the 1990s (being generous to the City), continues well into the 21st Century highlights the probative value of this evidence: The City has never cared about proper discipline of police officers, and its indifference continues today. Regardless, the Court need not resolve a question about the admissibility of a single Department of Justice Report at this stage, because the denial of summary judgment to the City in no way turns on that report.

addressed fully in Iglesias's response to the City's motion to exclude Mr. Finnell, Dkt. 269 at 18-20, 23-30, 32-35 (Parts II(B), III(A), III(C), and IV).[34] The same is true of the City's argument challenging the fact that Guevara and Riccio were outliers. See CB-13, 31-32; Dkt. 269 at 30-32, 33-35 (Parts III(C) and IV).

Second, the City arbitrarily limits the Defendants' CR files (saying that Guevara had only five, for example, when he had 30 in total) in an attempt to suggest that those CR files do not support Iglesias's claim that the City failed to discipline officers. CB-47-48. The City's limitation and skewed view of the evidence is again inappropriate at summary judgment. The City will have to make arguments about what the Defendants' citizen complaints and the City's investigation of them show or do not show at trial.

Moreover, the City is wrong about what Defendants' CRs show. Guevara and Riccio received many more complaints than the average officer—Guevara had 30 CRs during his career, and Riccio had 16. PSOF ¶503. All Defendants were accused of fabricating evidence and abusing citizens multiple times. PSOF ¶503, 498-500, 503-510. They were never meaningfully disciplined for these accusations. PSOF ¶¶504-510. Critically, a small proportion (10.7%) of all accused officers in the Chicago Police Department were responsible for 41.4% of the allegations of misconduct in the files reviewed by Finnell, and Defendants Guevara and Riccio—due to the high number of allegations against them—fell into the category of statistical outliers. PSOF ¶494, 495.

Finally, the City makes the nonsensical assertion that focusing too much on a particular officer's pattern of misconduct transforms the City's liability into *respondeat superior* liability.

---

[34] The City cites to *Rivera* in support of this argument, CB-47, but in *Rivera* summary judgment was granted on this theory precisely because there was no expert like Mr. Finnell or Ms. Meza to opine about the City's failure to investigate and respond to complaints across the Chicago Police Department. 319 F. Supp. 3d at 1069-70.

CB-49-50. It does no such thing. *Respondeat superior* would make the City vicariously liable for a particular tort that Guevara, for example, had committed. The argument here is different: Guevara engaged in a pattern of misconduct because the City had no functional disciplinary system and he could act with impunity. That is not *respondeat superior* liability.

In conjunction with all of the record evidence above, a showing that a particular Defendant repeatedly committed misconduct and received complaints without investigation by the City or consequences "*does* present sufficient evidence of *Monell* liability based on a failure to investigate and a failure to discipline specific officers." *Velez*, 2023 WL 6388231, at *24. Again, the Defendants' CR file evidence is just part of the evidence in support of Iglesias's failure to train, supervise, and discipline theory.

G. **A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures**

Material disputes of fact also preclude summary judgment on Iglesias's theory that the City was indifferent to a widespread practice of Chicago police officers fabricating witness identifications using suggestive identification procedures. In the nine-year period before and after the Roman investigation, an examination of 2,786 identification procedures performed at Area Five between 1989 to 1998 demonstrates that Chicago police officers obtained identifications of their suspects in a staggering and unprecedented 75% of identification procedures that they performed, and identifications of innocent fillers essentially never. These rates represent a dramatic and statistically significant departure from other jurisdictions, and they can only be explained by Chicago police suggestion during identification procedures. In addition, Iglesias has amassed evidence of dozens of individual cases in which Chicago police fabricated identifications for use in criminal proceedings using suggestive tactics. Moreover, City policymakers

149

promulgated deficient written policies, provided no training on proper identification procedures, took no steps to assess whether police identification procedures resulted in false identifications, and never disciplined officers who fabricated identifications. The City was indifferent to this widespread practice of fabricating identifications and the risk it presented that false identifications would taint criminal proceedings, in violation of due process.

### 1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Again, contrary to the City's suggestion, this theory is not based solely on expert testimony. Iglesias offers evidence that long before the 1993 Roman investigation it was common knowledge in law enforcement that a large portion of wrongful convictions were caused by improper eyewitness identification procedures. PSOF ¶¶392-398.[35] The City's Rule 30(b)(6) witness confirmed that the City had notice of model policies that cautioned law enforcement of the risk posed by suggestive identification procedures. PSOF ¶398.

---

[35] Since 1967, the International Association of Chiefs of Police Law Enforcement Policy Center (IACP) has provided training material for law enforcement about the failures in eyewitness identification, writing that "[e]ye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts" – including the Supreme Court that same year in *United States v. Wade*, 388 U.S. 218 (1967). PSOF ¶¶ 392, 397. By at least 1992, the IACP was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. PSOF ¶¶393-97. As the IACP papers in 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors." PSOF ¶393. The papers explained the primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion. PSOF ¶394. The 1993 White Paper accompanying the 1992 Model Policy quoted from the Supreme Court's 1967 decision in *United States v. Wade*, stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined." PSOF ¶397. Thus, long before 1993, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such procedures were being conducted in appropriate cases, and in the appropriate ways. PSOF ¶¶393-397.

Despite this notice, in 1993 and 1994 the City had no written policies whatsoever governing photo identification procedures. PSOF ¶¶402. With respect to live lineups, the City's written policy in effect required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing lineup, all comments of counsel for arrestee, and any additional information or unusual circumstance occurring during the lineup. PSOF ¶¶399, 403. The policy does not on its face explain what record must be made when suspects are *not* identified in a lineup. PSOF ¶¶405-06.[36] Nor does the policy on its face require reporting of what police conducting lineups said to witnesses or vice versa, or any other circumstances of the identification (other than what an officer considers relevant or unusual in their own discretion). PSOF ¶¶403, 408, 529, 532. Documentation of exculpatory or impeachment information arising from identification procedures was not required by the policy. PSOF ¶408. The policies did not explain what was required before a supervisor approved a lineup report. PSOF ¶407. There was no training to fill these gaps in policy. PSOF ¶¶528-531.

In 1993 and 1994, there was no policy at all governing photo identification procedures. PSOF ¶402. No written policy required a report of photo identification procedures or required specific documentation about such a procedure. PSOF ¶402. No policy or training provided instruction on identifications made as part of gang book procedures—although both detectives and gang specialists used gang books during homicide investigations—and gang specialists were not provided any training relative to their participation in homicide investigations in general. PSOF ¶¶531, 532. No policy prohibited showing a single photo of a suspect or suggesting to a witness

---

[36] The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were not documented, and that filler identifications were documented as negative identifications. PSOF ¶406.

who the suspect was during a photo array, or showing the witness a photo of the suspect prior to a live lineup, or repeating identification procedures with the same witnesses and suspects, or providing confirming statements about a suspect before or after an identification procedure. PSOF ¶¶408-410. The only training manuals the City has produced on identification procedures come from 1996, three years after the Roman investigation. PSOF ¶528.

Moreover, the City had the ability to audit the conduct and accuracy of identification procedures, but it did not actually conduct any audits of these identification procedures from at least 1986 to 1998, including the year of Mr. Iglesias's wrongful conviction. It did not track misconduct during identification procedures in any way. It did not ensure that it received notice or took steps to learn of situations where motions to suppress identifications generated by the Chicago Police Department were granted. PSOF ¶¶534-543.

In this absence of policy, training, supervision, and review, Chicago police officers fabricated identifications using suggestive identification procedures that were not properly documented. There is ample evidence in the record that the practice of fabricating identifications using suggestive techniques persisted citywide at the relevant time period.

Iglesias has identified multiple instances in which Guevara or his colleagues procured wrongful convictions and false charges using fabricated identifications, including but not limited to cases involving Robert Brown, Vincent Goldstein, James Newsome, Donald Reynolds, Billy Wardel, Reynaldo Munoz, Virgilio Calderon Muniz, Victor Vera, Xavier Arcos, Wilfredo Rosario, Daniel Rodriguez, David Velazquez, David Lugo (Colon), Santos Flores, Gloria Ortiz Bordoy, Edwin Davila, Luis Serrano, Evlyn Diaz, Angel Diaz, Luis Figueroa, Ricardo Rodriguez, Rodolfo Zaragoza, Angel Gaya, Maria Rivera, Freddy and Concepcion Santiago, Robert Ruiz, Ariel Gomez, Ruth Antonetty, Jaime Rios, Demetrius Johnson, Robert Bouto, Roberto Almodovar,

Thomas Sierra, Jose Melendez, William Negron, Nelson Gonzalez, Carlos Anindo, Gamalier Rivera, Louis Robinson, John Martinez, Eruby Abrego, Jeremiah Cain, Jacques Rivera, Orlando Lopez, Felix Valentin, Juan Johnson, Samuel Perez, Johnny Flores, Marilyn Mulero, Francisco Vicente, Armando Serrano, Jorge Pacheco, Jose Montanez, Juan and Rosendo Hernandez, and Iglesias. PSOF ¶¶546, 548, 549.

## 2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Iglesias also presents compelling expert evidence in support of this widespread practice theory. First, Iglesias's expert Mr. Finnell provides evidence of cases in which identifications were fabricated, including those of James Newsome, George Jones, Melvin Jones, John Willis, Donald Reynolds, Billy Wardell, Robert Brown, Vincent Goldstein, and the murder of Ruben Gonzalez (which, as Finnell notes, is directly intertwined with the investigation that led to Plaintiff's wrongful conviction). PSOF ¶¶462-468, 471. Moreover, the City never introduced accountability systems that would identify and correct incorrect or improper eyewitness identifications and manipulation of witnesses. PSOF ¶¶470, 527-545. In fact, the City's total failure to identify and correct such misconduct in the 1989-1993 complaints of Area Five police misconduct reviewed by Mr. Finnell "indicates that the City's disciplinary system did not provide any meaningful deterrent against misconduct by police officers who sought to fabricate and manipulate live lineup or photo array identifications." PSOF ¶544.

Second, Iglesias's expert Dr. Nancy Steblay provides extremely strong evidence of the City's widespread practice of fabricating identifications using suggestive identification procedures. Dr. Steblay is a leading expert on eyewitness identification.[37] In this case (and other

---

[37] Dr. Nancy Steblay is an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. She

Guevara cases), Dr. Steblay conducted an exhaustive analysis of data obtained from 2,786 identification procedures (including live lineups and photo arrays) reported in Area Five homicide files produced by the City from the period of 1989 to 1998. PSOF ¶¶418-419; Dkt. 271 at 6. Each lineup was coded using objective criteria to reflect information about each lineup including: the number of witnesses participating, the number of suspects, whether multiple suspects were included, the number of fillers, the total number of individuals in the lineup or array, whether the witnesses were previously familiar with the perpetrator, the total number of possible positive identifications (the number of witnesses viewing the lineup multiplied by the number of suspects), and the number of reported positive, negative, and filler identifications in each procedure.[38] PSOF ¶¶ 419-420.

The data were assembled in a spreadsheet, which contains many tens of thousands of coded variables, across nearly 2,800 lineup procedures. PSOF ¶419. Dr. Steblay participated in the design of the data summary, ensured that the variables were objective and clearly defined, and verified the data.[39] The data was shared with all parties, and Defendants have not identified any

---

has authored over 45 publications, which involve a quantitative method called meta-analysis as well as the analysis of empirical data from the lab and from real witnesses to crime in the field. She has served on the editorial boards of four major scientific journals that publish research on eyewitness identification. PSOF ¶¶416-417.

[38] The task of coding these data based on police reports "borders on the mechanical." *Rivera v. Guevara*, 319 F. Supp. 3d at 1067. Reading a police report and transferring to a spreadsheet what the report says about the criteria just mentioned does not call for any subjective decision making, as Dr. Steblay explains. PSOF ¶421.

[39] Dr. Steblay ensured that the coding team "was using objective and clear definitions for the coding variable." The coding was undertaken by at least two independent coders, who compared their work to catch discrepancies. The coding process did not call for any subject decision making. Dr. Steblay also conducted a robust reliability check, verifying approximately 200 lineups, randomly selected from the court-ordered homicide files produced in this case. She agreed with the coders in 98% of the instances, "strong interrater agreement" that gave her confidence in the quality of the underlying data. PSOF ¶¶420, 421.

154

error in any of the data coded.[40] PSOF ¶423. Indeed, Defendants' expert responding to Dr. Steblay concedes that he does not challenge the data on which Dr. Steblay relies and has not identified any error in that data. PSOF ¶423.

Dr. Steblay observed that between 1989 and 1998, witnesses participating in Chicago procedures picked the police officer's suspect a whopping 75% of the time, made no identification 25% of the time, and selected a filler less than 1% of the time (in only nine instances in the entire dataset). PSOF ¶424. Moreover, 23% of identification procedures included multiple suspects, and 20% concerned a repeat identification procedure with the same suspect and witness. PSOF ¶424. In 74% of identification procedures, the witness did not know the perpetrator prior to the crime, and in 26% the perpetrator was familiar to the witness. PSOF ¶424.

In addition to making these observations, Dr. Steblay compared the results of Chicago identification procedures to 11 major peer-reviewed field studies which report lineup outcome data for live and photo identification procedures conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. PSOF ¶425. The 11 field studies report the frequencies of lineup outcomes— suspect/positive identifications, filler identifications, and non-identifications—for a total of 6,734 field lineups. PSOF ¶427. The aggregated field studies revealed that witnesses selected a suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time.[41] PSOF ¶428.

---

[40] In Defendants' *Daubert* motion, Defendants make much of what they assert are errors in the coded data. Dkt. 251. As Iglesias explains in his response, the asserted errors reflect the ongoing quality control measures between Dr. Steblay's analysis in the earlier *Sierra* case—another Guevara case—and her analysis in this case, and regardless are so few in number compared with the total set of coded data that they would have no effect on Dr. Steblay's analysis. Dkt. 271.

[41] The outcomes of each study are collected in Table 1 of Dr. Steblay's report. PSOF ¶425.

Dr. Steblay then compared the Chicago comparison subset of data to the field studies.[42] PSOF ¶¶429-431. She observed that while in the field studies revealed witnesses selected suspects 40.8% of the time, in the Chicago comparison subset, suspects were identified in 70% of lineups. PSOF ¶431. In field studies, witnesses identified no one 35.5% of the time, while in Chicago there was no identification in 30% of cases. PSOF ¶431. And in the field studies, witnesses picked a filler 23.7% of the time, while in Chicago that occurred not even *once*. PSOF ¶431. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was statistically significant, and that there was less than a 1 in 100,000 chance that the difference could be explained by chance.[43] PSOF ¶432.

Dr. Steblay then analyzed why Chicago has a dramatically higher suspect identification rate and lower filler identification rate than other jurisdictions. Her analysis shows that the only explanation is that suspect identifications are fabricated using suggestive identification procedures. PSOF ¶¶434-441. Dr. Steblay identified all possible explanations for the elevated suspect identification rate in Chicago: (a) familiar perpetrator identifications (where the witness knows the

---

[42] To compare the Chicago data to the field data, Dr. Steblay had to make the two datasets as similar as possible. She determined the field data did not have lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, or lineups with repeated procedures. This determination was "favorable to the defense case" as the presence of unreported multiple-suspect lineups, familiar-suspect identifications, or repeated identifications would potentially inflate suspect ID rates. PSOF ¶427. Therefore, for the comparison, Dr. Steblay screened out from the Chicago data lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, and lineups that were repeated procedures with the same witness viewing the same suspect. In addition, removing these lineups from the Chicago data eliminated lineups more likely to obtain a suspect identification, reducing the suspect identification rate, and therefore giving the City the benefit of the doubt. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, single-suspect lineups. PSOF ¶¶427, 429, 430.

[43] These conclusions are consistent with Steblay's findings in other cases, as the *Iglesias* report includes the data provided and used in those other cases and analyzes all lineups conducted at Area Five between 1989 and 1998. She notes in her *Iglesias* report that the Chicago suspect identification rate was consistent across all of the cases for which she had datasets. Indeed, she concluded that the Chicago suspect identification rate as found in *all* of those cases is statistically significantly higher than the aggregate field studies. PSOF ¶¶ 444, 445.

suspect); (b) multiple suspect lineups, including those with too few fillers; (c) repeated identification procedures with the same suspect and witness, and instances in which police show the witness the suspect, in a photo or show-up, prior to the line-up; (d) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly; (e) a failure to report filler identifications; and (f) biased lineup constructions where the suspect stands out. PSOF ¶434.

Dr. Steblay eliminated explanations (a), (b) and (c) from the Chicago data that she compared to the field studies, as discussed above, *supra* at 158 n.42, and so those could not be the explanation for Chicago's significantly higher suspect identification rate. PSOF ¶435. Explanation (e)—that the City does not report filler identifications—is denied by the City and would violate its policies, and so that explanation can be eliminated.[44] That leaves fabrication of identifications using the improper techniques identified in explanations (d) and (f)—steering and suggestion to witnesses and presenting lineups where the suspect stands out—as the only explanation for Chicago's radically high suspect identification rate. PSOF ¶436.

In sum, the Chicago Police Department's identification procedures between 1989 and 1998 resulted in suspect identifications approximately 75% of the time overall, and 70% of the time in Dr. Steblay's comparison dataset (and almost never filler identifications). PSOF ¶424, 431. This is a remarkably significant departure from the results of identification procedures everywhere else. PSOF ¶¶ 428, 431-433, 441. The only possible explanation for the rate is that Chicago police

---

[44] The theory here is that a total failure to record filler identifications *might* elevate the suspect identification rate because the set of filler identifications that one would expect to exist based on field studies is simply absent from the Chicago data. However, the City has contended that its police officers recorded filler identifications as non-identifications. PSOF ¶406. That fact is disputed, both by the City's own Rule 30(b)(6) witness and by Dr. Steblay. PSOF ¶406, Dkt. 271 at 38 n.6.Moreover, recording filler identifications as non-identifications would itself present a risk of constitutional violations. *Rivera*, 319 F. Supp. 3d at 1067. Regardless, accepting the City's position for purposes of summary judgment only, not recording filler identifications is not the explanation for Chicago's elevated suspect identification rate.

systematically fabricated identifications using overtly and covertly suggestive procedures. This comprehensive analysis of all of the lineups conducted in all homicide investigations at Area Five in the relevant time period is confirmed by Iglesias's evidence of dozens of cases in which Guevara and others fabricated identifications for use in criminal proceedings. PSOF ¶¶546, 548, 549. Moreover, these fabricated identifications using suggestive techniques all occurred against the backdrop of City policymakers having notice of a serious risk of false identifications in identification procedures, but responding with deficient policies, training, and supervision on the subject of identification procedures. PSOF ¶¶398, 400, 404-415, 527-545. The jury in this case should hear that a careful analysis of Chicago's homicide files reveals that eyewitnesses in Chicago nearly always pick the police officer's suspect and never select an innocent filler, contrary to eyewitness science and eyewitness behavior everywhere else.

Iglesias has offered far more than enough evidence to establish the City's widespread practice of fabricating identifications using suggestive identification procedures. That widespread practice presented the acute risk that fabricated identifications would be used in and would taint criminal proceedings, in violation of due process. "A city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *J.K.J.*, 960 F.3d at 378 (cleaned up). And Iglesias presents evidence that, in fact, that risk came to pass, not only in his case, but also in many other homicide cases that were prosecuted based on fabricated identifications.

### 3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit

The City's remaining arguments for summary judgment on this theory lack merit. First, the City incorporates the Defendant Officers' argument that § 1983 claims regarding suggestive

identification procedures are not cognizable, CB-9-10, which the Court should reject for the reasons discussed already, *see* Argument IV(C)(1)(b) *supra*.

Second, the City contends that its policies and training governing identification procedures were sufficient to stop fabricated identifications. CB-10-11. But that is a theory that depends on rejecting the evidence set out above in favor of a reading of the City's limited policies and training materials that draws unreasonable inferences for the City, which the Court cannot do. *Tolan*, 572 U.S. at 656. Moreover, the City's argument that its policies were sufficient to stop fabricated identifications obtained in suggestive identification procedures runs headfirst into the evidence that those fabricated identifications occurred routinely across all cases, a finding that the City does not meaningfully challenge in this case.

Third, the City again deploys the argument that only expert opinions support this theory, CB-11, which again ignores the other record evidence discussed above. Then, the City goes on to attack Dr. Steblay's expert opinions in summary terms, contending that they do not establish a widespread practice, rely on data prepared by Iglesias's attorneys, and do not identify particular cases in which identifications were fabricated. CB-11-12. These arguments are addressed in rich detail in Iglesias's response to the City's *Daubert* motion to exclude Dr. Steblay, which Iglesias incorporates here. Dkt. 271 at 11-23, 23-31, 33-44.

Fourth, in a long passage the City takes issue with Dr. Steblay's discussion of the possible mechanisms that could cause the City's remarkably high suspect identification rate and absence of filler identifications. CB-13-16. To the extent that the City is challenging the reliability of Dr. Steblay's opinions, Iglesias has responded to these arguments in his *Daubert* response. Dkt. 271 at 11-23. Otherwise, the City is merely disagreeing in its summary judgment motion with conclusions that Dr. Steblay has reached, which is nothing more than an effort to contest the facts

at summary judgment, which the City cannot do as the moving party.[45] The City's assertions about the relevance of Dr. Steblay's opinions sets out what appears to be a weak cross-examination of Dr. Steblay for trial. Indeed, the whole section highlights disputes of fact, and there is no argument that the City has thereby established an *absence* of genuine disputes of material fact about whether Dr. Steblay's opinions support Iglesias's widespread practice theory.

Fifth, the City asserts in two paragraphs that Iglesias cannot proceed on this *Monell* theory because his evidence does not create a genuine dispute of material fact about whether the City was on notice and indifferent. CB-16. Not so. A persistent widespread pattern of behavior risking constitutional harm *is itself* notice to the municipality, *e.g.*, *J.K.J.*, 960 F.3d at 383, and the City's Rule 30(b)(6) witness admitted the City was on notice that if proper policies were not followed, it could result in false identifications or misidentifications, and that unduly suggestive identification procedures presented a risk of unreliability and the "abuse" of these processes. PSOF ¶¶398, 400. Yet the City did nothing to institute policies for photographic lineups, gang books, or photo books before Iglesias's prosecution, and did nothing at all to account for situations where identification

---

[45] The City's discussion misstates and mischaracterizes Dr. Steblay's opinions in every respect: The City complains that an expert presenting "possible explanations" for a phenomenon does not create a dispute of fact, CB-13, which is both an inaccurate statement of what experts do and a misapprehension of Dr. Steblay's analysis, which identifies *all* possible explanations for the City's high suspect identification rate, and then explains why some of them cannot explain the high rate. The City also asserts that Iglesias cannot contend that factors such as familiar perpetrators, multiple suspect identifications, and repeated identification procedures with the same suspect and witness caused the City's high identification rate because Dr. Steblay excluded those factors from the lineup dataset. CB-13-14. But Iglesias *agrees* that they were excluded, and the City does not seem to recognize that the exclusion of all of those lineups from the dataset reduced the City's suspect identification rate by only a couple of percentage points, and also eliminated the more benign explanations that the City might have offered to explain the data. In addition, the City says that Dr. Steblay cannot account for whether Chicago lineups were conducted by non-blind administrators, CB-14, leaving out that its policies never called for blind administration of lineups, PSOF ¶404, and leaving out that this factual dispute has no bearing on Dr. Steblay's testimony or conclusions. Finally, the City asserts that some of Dr. Steblay's proffered explanations for the high suspect identification rate are irrelevant to the case—for example the contention that Chicago did not record filler identifications. CB-15-16. As discussed above, Iglesias accepts for purposes of summary judgment that this is not the explanation for the City's high suspect identification rate, but that has no effect on his widespread practice theory.

procedures went wrong, or to address its high rate of suspect identifications, at any time, from long before Iglesias's prosecution to long after his conviction. PSOF ¶¶402-415, 527-545. That is enough to create a dispute of fact about the City's indifference. *J.K.J.*, 960 F.3d at 383.

Finally, the City asserts that Iglesias cannot proceed with a failure to train argument relating to this theory. CB-17. But the City's earliest training manuals produced in this case on the subject of identification procedures are from 1996, PSOF ¶528, which is three years *after* the investigation at issue in this case. The City may contend that it trained its officers before that, but the proof presents a dispute of fact for trial.

At the end of the day, all of the evidence in the record firmly supports Iglesias's *Monell* theory that the City had a widespread practice of fabricating identifications using suggestive identification techniques. Disputes of fact preclude summary judgment for the City.

## H. The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit

None of the City's more general arguments for summary judgment have merit, and so Iglesias addresses them only briefly. The City argues that it cannot be liable under *Monell* if summary judgment is granted to the Defendant Officers on Iglesias's constitutional claims. CB-6-8. It also argues that there is no dispute of fact about whether the City's official policies caused the violations of Iglesias's constitutional rights. OB-50-52. Both arguments fail.

### 1. The City's Liability Does Not Necessarily Depend on Individual Liability

The Court can disregard the argument that the City is not liable if no Defendant Officer is liable because the Defendant Officers do not move for summary judgment on all of Iglesias's constitutional claims, and they are not entitled to summary judgment on any claim, for the reasons explained above. See Argument IV *supra*. Accordingly, this Court need not decide at this stage whether the City's liability depends on a finding of Defendant Officer liability.

Still, the City is incorrect that it cannot be liable unless a Defendant Officer is found liable. The Seventh Circuit's rule, set forth in *Thomas*, is that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." 604 F.3d at 305 (emphases in original); see also *Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). Numerous judges in this district have applied this rule that a municipal policy can cause a constitutional deprivation even if a jury finds the individual officers not liable. See *Bonds v. City of Chicago*, 16-cv-5112, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL919673 (N.D. Ill. Mar. 10, 2014); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Martinez v. Cook County*, No. 11 C 1794, 2011 WL 4686438, at *1; *Cage v. City of Chicago*, 9 C 3078, 2010 WL 3613981, at *1; *Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010).

In the case of a theory of municipal liability that depends entirely on a particular officer's act of misconduct—e.g., a municipal policy of using excessive force where there was no excessive force used by any officer, as in *City of Los Angeles v. Heller*, 475 U.S. 706 (1986)—a *Monell* claim will fail if an individual defendant did not violate the Constitution. But that is not the case here. For example, a jury might find that the City's official policy of evidence suppression caused investigative information not to reach prosecutors, Iglesias, and his attorneys—particularly given the game of hot potato that the Defendant Officers play about who fabricated and suppressed what evidence. In that case, a verdict against the City but for the Defendant Officers would not be inconsistent as a matter of law. The City argues that this theory depends on a finding of individual

162

liability, CB-8, but that argument assumes facts in the Defendants' favor, which is not permissible. This Court should reject the City's argument that its liability depends on the Defendant Officers.

### 2. The City's Causation Argument Is Meritless

The City's causation argument also fails. A municipality's official policy "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up). In a case like this, where a plaintiff has put forth evidence of municipal action (or inaction) and deliberate indifference—here in the form of express policies and gaps in policies, widespread practices, actions of final policymakers, and failures to train, supervise, and discipline—the question whether municipal policies and practices caused the plaintiff's constitutional injuries must be resolved by a jury, like most other causation questions. See, *e.g.*, *Thomas*, 604 F.3d at 303 (holding that the jury must make a factual determination about whether the evidence establishes that a widespread practice caused the alleged constitutional harm); *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

In this case, there is no distance between the risks of harm presented by the City's official policies and practices—evidence suppression, fabricated identifications, and untrained and unsupervised police officers—and the particular constitutional injuries that Iglesias suffered. A reasonable jury could conclude that the City's policies caused the violations of Iglesias's constitutional rights, as many other courts have concluded in analogous circumstances. See, *e.g.*, *Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *6 (N.D. Ill. Oct. 30, 2019) ("Plaintiff has pointed to a variety of evidence, in the form of the DOJ and PATF Reports, public officials' statements, expert testimony, other lawsuits, and evidence about CPD training and

accountability that create a genuine issue of fact about the causal link between Godinez's death and CPD practices and the City's *Monell* liability. That is enough to survive summary judgment."); see also *Washington*, 2022 WL 4599708, at *18; *Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260, at *7 (N.D. Ill. Mar. 11, 2019); *Thomas*, 604 F.3d at 303; *Woodward*, 368 F.3d at 927; *LaPorta*, 277 F. Supp. 3d at 991.The City's arguments to the contrary, like the Defendant Officers arguments throughout their motion, "reflect[] a kind of self-hypnosis that no lawyer can afforded to practice in the summary judgment context— a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant[.]" *Escobedo v. Ram Shirdi*, No. 10 C 6598, 2013 WL 1787819, at *4 (N.D. Ill. Apr. 25, 2013). This Court should reject the City's arguments that depend on viewing the facts in the City's own favor.

## I.    The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment

Finally, the City asserts that it is entitled to judgment on Iglesias's *respondeat superior* and indemnification claims, arguing these claims are derivative of others. Iglesias's underlying claims survive, and so, too, should these derivative claims.

## CONCLUSION

Construing the record in the light most favorable to Iglesias and drawing inferences in his favor, none of Defendants is entitled to summary judgment on any of the theories on which they have moved for summary judgment. Iglesias is entitled to a trial against the City and the Defendant Officers on all of his claims, except on those against the City on which Iglesias is entitled to summary judgment. For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**GERALDO IGLESIAS**

By: /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Wallace Hilke
Meg Gould
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

## <u>CERTIFICATE OF SERVICE</u>

I, Steve Art, an attorney, hereby certify that, on March 26, 2024, I filed the foregoing PLAINTIFF'S GERALDO IGLESIAS'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
Wallace Hilke
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com