# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GERALDO IGLESIAS,

      Plaintiff,

    v.

REYNALDO GUEVARA, *et al.*,

      Defendants.

No. 19-cv-06508

Judge Franklin U. Valderrama

## MEMORANDUM OPINION AND ORDER

Plaintiff Geraldo Iglesias (Iglesias) was convicted of murder and incarcerated for 17 years before his conviction was vacated and the charges dropped by the Cook County State's Attorney's Office. Iglesias sued the City of Chicago (the City) and Chicago Police Department (CPD) Officers Reynaldo Guevara (Guevara), Ernest Halvorsen (Halvorsen),[1] Steve Gawrys (Gawrys), Anthony Riccio (Riccio), and Robert Biebel (collectively, Defendants) under 42 U.S.C § 1983 and state law. R. 67, Am. Compl.[2] Before the Court is Defendants' motion for partial summary judgment.[3] R. 239, Mot. Summ. J. For the reasons that follow, Defendants' motion is granted in part and denied in part.

---

[1]Defendant Officer Ernest Halvorsen is deceased. His wife, JoAnn Halvorsen, has been substituted as a Defendant and Special Representative for Ernest Halvorsen. R. 56.

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and, where necessary, a page or paragraph citation.

[3]Guevara has filed a separate motion for summary judgment joining several of Defendants' arguments. R. 264. For efficiency purposes, the Court does not analyze Guevara's motion separately. All rulings apply to Defendants' motion and Guevara's motion.

## Background

### I. Local Rule 56

Before delving into the factual background, the Court must address Iglesias's alleged disregard of Local Rule 56, which governs summary judgment briefing in the Northern District of Illinois. When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acq. Co., LLC v. AIP Prods. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1)). The L.R. 56.1 Statement must cite specific pages or paragraphs of the documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)).

Under Local Rule 56.1(b) and (e), the nonmovant must counter with a response to the separate statement of facts, and either admit each fact, or, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015); *see also Daniels v. Janca*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019). The Seventh Circuit has recognized time and again that "district judges are entitled to insist on strict compliance with local rules

2

designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

Defendants argue that Iglesias violates Local Rule 56 and the Court's standing orders throughout his Response to Defendants' Statement of Facts and his own Statement of Facts, asking the Court to deem certain facts admitted as a result. R. 306, Reply, at 3–6. Defendants are correct in that Iglesias "routinely violates" Local Rule 56 by "argu[ing] his case and inject[ing] additional facts . . . that do not materially controvert or respond directly to the corresponding facts or supporting record citations." *Id*. at 3. Take, for example, Iglesias's response to the proposed fact that a certain eyewitness made an in-court identification of Iglesias at his criminal trial. R. 276, Pl. Resp. DSOF ¶ 65. Iglesias does not dispute the fact that this eyewitness made an in-court identification, nor could he. *Id*. Instead, Iglesias disputes "the substance" of the in-court identification, arguing that the "identification was the product of steering" and thus "meaningless." *Id*. This is but one of numerous examples of Iglesias's improper responses. And Iglesias's own Statement of Facts fares no better, as he persistently injects improper characterizations and argument throughout the filing. *See generally*, R. 277, PSOF. Like Defendants, the Court does not believe this is "just shoddy work," as Iglesias is represented by experienced counsel. To be frank, Iglesias's counsel knows better.

Local Rule 56 is intended to streamline the summary judgment process and "assists the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with

3

admissible evidence." *Bordelon*, 233 F.3d at 527 (cleaned up).[4] Iglesias's Response to Defendants' Statement of Facts and his own Statement of Facts fell short of this goal. "District judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo*, 662 F.3d at 886–87. Failure to abide by local rules can have serious implications, such as deeming facts admitted or striking non-compliant fact statement. *See Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000).

However, given the sheer volume of the facts presented, the Court will not engage in a lengthy analysis of Iglesias's countless violations and the consequences thereof. The Court is able to determine when facts are truly in dispute and will note those instances as necessary. This determination, however, should not be mistaken for acceptance of counsel's flagrant violations of Local Rule 56. The Court does not appreciate being made "to wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon,* 233 F.3d at 529. The violations of this rule have forced the Court to expend unnecessary time and resources in resolving this motion. Regrettably, this is not an isolated occurrence, as such violations are a recurring problem in this District. *Aponte v. Ill. Workers' Comp. Comm'n*, 2025 WL 3098078, at *2 (N.D. Ill. Nov. 6, 2025) (collecting cases).

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## II.    Factual Background

The following facts are set forth favorably to Iglesias, the non-movant, as the record and Local Rule 56 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Iglesias's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up). This background section details all material undisputed facts and notes where facts are disputed, to the extent they are supported by evidence.

### A.    The Shooting

On June 7, 1993, shortly before 4:00 p.m., Jesus Gonzalez drove Hugo Rodriguez (Rodrgiuez), Daniel Sanchez (Sanchez), Jose Coronel (Coronel), Monica Roman (Roman), and Merci Cordero (Cordero) to Cordero's apartment, where she lived with her cousin, Rosendo Ochoa (Ochoa), at 2135 N. Sawyer Ave. R. 249, DSOF, ¶ 8. Roman was in the front seat, while Rodriguez, Sanchez, and Coronel were in the back seat. *Id*. ¶ 10. After dropping Cordero off, Gonzalez drove north on Sawyer Ave. towards Palmer Street. *Id*. As the car approached the stop sign at the Sawyer Ave./Palmer Street intersection, an individual dressed in black pants and a black hooded sweatshirt (with the hood up) stood to the south of the car, on the west side of Sawyer Ave., and fired multiple shots at the car.[5] *Id*.; *see also* PSOF, ¶ 19. After the shooting, the car sped north on Sawyer Ave. while the shooter ran south on

---

[5]Whether the shooter yelled "King Love" prior to firing the shots is in dispute. Pl. Resp. DSOF, ¶ 10.

5

Sawyer Ave. and turned west into an alley. *Id.* ¶ 12. Shortly after speeding away, the occupants of the car realized that Roman had been shot in the head. *Id.* Roman died the next day. *Id.* ¶ 21.

Non-defendant CPD officers arrived at the scene and spoke to Gonzalez, Rodriguez, and Sanchez. DSOF ¶ 13; PSOF ¶ 19. Rodriguez initially told the responding officers only that the shooter was wearing all black, but later at the police station, described the shooter as a male white Hispanic dressed in black clothing with a black hood over his head, 18 years old, 5'7", 145 pounds, with black hair. Pl. Resp. DSOF, ¶ 13.[6] *Id.* Non-defendant officers also interviewed Ochoa, who described the shooter as a "male White Hispanic, 17–19 years old, 5'5" to 5'7", 135–140 pounds, clean shaven, and wearing a black hoodie and black pants." *Id.* ¶ 34.

Officers also spoke to Arnell Moore (Moore), a bus driver who was dropping off a boy on Sawyer Ave. when the shooting occurred. PSOF ¶ 43. Moore stated that he observed "[male white Hispanic] 20-25 [years old], 5'7" [to] 5'8" with a light beard and mustache wearing a dark colored hoody and dark pants walk past him traveling north." DSOF ¶ 23. Police also spoke to an individual named Sarah Torres (Torres), who "heard gunshots and looked out the window of her apartment, also at 2148 N. Sawyer, and "observed someone 5'9", skinny, wearing all black including a black hood, run southbound." PSOF ¶ 48. Torres did not see the shooter's face. *Id.* During

---

[6]Defendants assert that Rodriguez gave a detailed description at the scene. DSOF ¶ 13. However, Rodriguez testified at Iglesias's trial that he provided a detailed description only after arriving at the police station. PSOF, Ex. 2, at 16:6-19. Iglesias, for his part, contends that "there are no documents reflecting that [Rodriguez] provided any additional description of the shooter once he was at [the police station]." Pl. Resp. DSOF, ¶ 13.

discovery, a handwritten note was found in investigative files that indicated Torres told police that her son, Efrain Torres, 'came from the boys club' and 'knows shooter.'" *Id*. ¶ 224. Defendants, however, dispute that the note says "shooter," contending it says "shorti." DSOF ¶ 119. Police interviewed Efrain Torres (Efrain), who stated that he heard gunshots, but did not see the shooter. *Id*. ¶ 20. Efrain also indicated that ten minutes before the shooting, he saw five members of the Imperial Gangsters standing at the northeast corner of Sawyer Ave. and Palmer Street. *Id*. Iglesias admits that at the time, he was affiliated with the Imperial Gangsters. PSOF ¶ 94.

In the few days after the shooting, unknown officers showed eyewitnesses, including Rodriguez and Moore, photobooks containing pictures of known gang members, including members of the Imperial Gangsters. DSOF ¶ 114; PSOF ¶¶ 90, 237. Neither witness made an identification. DSOF ¶ 114. It is disputed whether Iglesias's photo was included in these viewings. R. 299, Defs.' Resp. PSOF, ¶ 94. No further suspects were developed. *Id*. ¶ 52.

### B. The Investigation

At this point, the parties' versions of events diverge significantly. According to Defendants, on June 21, 1993, two weeks after the shooting, Guevara and Halvorsen became involved in the case after a confidential informant (CI) told Guevara that an individual known as "Snake" shot Roman. DSOF ¶ 26. Because "Snake" was Iglesias's nickname, Guevara and Halvorsen pulled Iglesias's rap sheet the next day, on June 22, 1993. *Id*. ¶ 27. That same day, Guevara and Halvorsen interviewed Ochoa at his home and reported that, after being shown an 8-person photo array, Ochoa identified

Iglesias as the shooter. *Id.* ¶ 28. On June 23, 1993, Guevara and Halvorsen, along with Gawrys and Riccio, arrested Iglesias. *Id.* ¶ 30. Later that day, Guevara and Halvorsen took Ochoa to the station and showed him a 5-person live lineup. *Id.* ¶¶ 31, 33. Ochoa again identified Iglesias as the shooter. *Id.* ¶ 30.

Defendants next assert that after Ochoa's identification, Guevara and Halvorsen interviewed Iglesias, who admitted that he was a "gang member who hung out at the Boys Club at Palmer and Sawyer[.]" DSOF ¶ 34. Guevara and Halvorsen contacted Assistant State's Attorney Mike Latz (ASA Latz), who after speaking to Ochoa, brought further witnesses in, including Rodriguez. *Id.* ¶ 35. On June 24, 1993, Rodriguez was shown the same 8-person photo array that Ochoa had viewed and identified Iglesias as the shooter. *Id.* ¶ 36. Rodriguez then viewed a 6-person live lineup and again identified Iglesias as the shooter. *Id.* ¶ 37. No other witness made an identification. *Id.* ASA Latz, Guevara, and Halvorsen interviewed Iglesias, who again admitted that he hung around the area of the shooting, but denied involvement. *Id.* ¶ 41. Eventually, Iglesias was charged with Roman's murder. *Id.* ¶ 42.

Iglesias hotly contests the above. From Iglesias's perspective, the investigation played out in the following manner: Guevara and Halvorsen—without any evidence— decided that Iglesias was their suspect and pulled his rap sheet. R. 278, Resp., at 7. Guevara and Halvorsen then fabricated a CI tip to get assigned to the investigation and target Iglesias. Pl. Resp. DSOF ¶ 26; PSOF, Exh. 22, Guevara Dep. at 192:23– 193:9. Next, Guevara and Halvorsen fabricated the fact that they showed Ochoa an 8-person photo array at his home on June 22, 1993. Pl. Resp. DSOF ¶ 27 (citing PSOF,

8

Exh. 5, Ochoa Dep. (stating that he was never shown a photo array at his home). According to Iglesias, Guevara and Halvorsen fabricated this fact to manufacture probable cause to arrest him, which they did on June 23, 1993. PSOF ¶ 143.

Only then, Iglesias posits, did Guevara and Halvorsen contact Ochoa and bring him to the police station for an interview and identification procedures. PSOF ¶ 148. Iglesias does not contest that Ochoa was shown a photo array and a live lineup but contends his identifications were (1) made under the direction of Guevara and Halvorsen or (2) made pursuant to unduly suggestive procedures. *Id*. ¶¶ 149–162. Iglesias maintains the same for Rodriguez's identifications. *Id*. ¶¶ 88–113. Iglesias further submits that Defendants composed lineup reports falsely stating that Ochoa and Rodriguez identified Iglesias as the shooter, and that Defendants wrote a Closing Report that falsely documented the investigation into Iglesias. *Id*. ¶¶ 181–191. Biebel signed all three reports. *Id*. ¶¶ 181–183.

### C. The Confession

On July 16, 1993, one month after Iglesias's arrest, Francisco Vicente, another detainee, submitted a handwritten statement alleging that Iglesias confessed to the shooting on June 25, 1993. DSOF ¶ 48; PSOF ¶ 192. However, Vicente has since testified that Guevara and Halvorsen had threatened him into making this statement, and that his statement was false. DSOF ¶ 111; PSOF ¶¶ 197, 200.

### D. The Trial

Iglesias's jury trial began on December 14, 1994. DSOF ¶ 58. Among others, Ochoa, Rodriguez, Guevara, and Vicente testified. DSOF ¶¶ 62, 78, 91, 94.

### 1. Ochoa's Testimony

Ochoa testified that just before the shooting, he saw Iglesias dressed in all black standing across the street. DSOF ¶ 63. He further testified that he could see Iglesias's face and watched him start shooting. *Id*. Ochoa then identified Iglesias in open court. *Id*. ¶ 64. Ochoa also testified that he identified Iglesias in an 8-person photo array on June 22, 1993, and denied that police told him who to choose. *Id*. ¶ 67. According to Ochoa, he went to the police station the following evening, June 23, 1993, where he viewed a 5-person lineup. *Id*. ¶ 69. Again, Ochoa indicated that he identified Iglesias and denied that police told him who to choose. *Id*.

### 2. Rodriguez's Testimony

Rodriguez testified that on June 7, 1993, he was sitting in the back middle seat of the car that carried Roman. He testified that after dropping Cordero off, someone yelled "King love" and started shooting at the car. DSOF ¶ 78. Rodriguez testified that he looked through the car's side window and saw the shooter. *Id*. He then made an in-court identification of Iglesias. *Id*. ¶ 79. Rodriguez further testified that on June 24, 1993, he viewed an 8-person photo array at the police station and identified Iglesias, denying that police told him who to select.. *Id*. ¶ 83. Last, Rodriguez testified that shortly after viewing the photo array, he viewed a 6-person lineup and identified Iglesias. *Id*. ¶ 85. Rodriguez again denied that police told him who to choose. *Id*.

### 3. Guevara's Testimony

Guevara testified that he and Halvorsen became involved in the investigation after receiving a phone call from a CI, after which he "went looking for a photograph

of" Iglesias.[7] DSOF ¶ 91. Guevara then testified that on June 22, 1993, he went to Ochoa's home with Halvorsen, where Ochoa viewed an 8-person photo array and identified Iglesias. *Id*. ¶ 92. According to Guevara, he and Halvorsen, along with Gawrys and Riccio as backup, arrested Iglesias. *Id*. ¶ 93. After the arrest, Guevara testified that he brought Iglesias back to the police station, where he was placed in a lineup and identified by Ochoa. *Id*. Guevara further testified that Rodriguez came to the police station, that he conducted a photo array with Rodriguez, and that Rodriguez identified Iglesias. *Id*. ¶ 94. Last, Guevara testified that he conducted a live lineup with Rodriguez, where Rodriguez again selected Iglesias. *Id*.

### 4.    Vicente Testimony

Vicente testified that, while in the Cook County Jail bullpen, Iglesias confessed to killing Roman. DSOF ¶ 96. Specifically, he testified that Iglesias said "he was standing on the corner with a few of the brothers on Spaulding and Palmer and as they were standing on the corner[,] a car drove by" with Latin Kings. *Id*. According to Vicente, Iglesias stated he made gang signs towards the car, told someone to get a gun, approached the car, and "shot the bitch in the head." *Id*.

The jury found Iglesias guilty of first-degree murder, and he was sentenced to 35 years in prison. DSOF ¶ 104.

### E.    Appeal and Post-Conviction Proceedings

Iglesias filed a direct appeal, which was denied in March 1995. DSOF ¶ 105. Iglesias then spent 17 years in prison before being paroled. *Id*. ¶ 106. In March 2018,

---

[7]As explained *infra* at 19–20, the trial court barred any reference to the substance of the CI's tip, and mention of the tip was only admissible to demonstrate the course of the investigation.

he filed an Amended Petition for Post-Conviction Relief, which the Cook County State's Attorney's Office did not oppose. *Id.* ¶ 107. In January 2019, Iglesias's conviction was vacated and the charges against him dismissed. *Id.* Iglesias subsequently received a certificate of innocence from the State of Illinois. PSOF ¶ 10.

### F. Civil Case

Iglesias filed this lawsuit soon after and asserts 11 counts. The first four counts are brought under 42 U.S.C. § 1983: violation of his due process right to a fair trial under the Fourteenth Amendment (Count I); unlawful detention under the Fourth and Fourteenth Amendments (Count II); failure to intervene (Count III); and conspiracy to violate his constitutional rights (Count IV). Iglesias also asserts a municipal liability claim against the City under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), alleging that he was wrongly convicted due to the City's deficient policies and practices (Count V). Last, Iglesias asserts five state law claims: malicious prosecution (Count VI); intentional infliction of emotional distress (Count VII); willful and wanton conduct (Count VIII); civil conspiracy (Count IX); and claims against the City for *respondeat superior* (Count X) and indemnification (Count XI).

Defendants now move for partial summary judgment.[8] The fully briefed motion is before the Court.

### Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[8]Defendants concede there is a genuine dispute of material fact as to Guevara and Halvorsen's fabrication of Vicente's testimony.

matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

### I.     Preliminary Issues

The Court must address two preliminary issues that, according to Iglesias, allow the Court to summarily deny summary judgment (1) on Iglesias's fair trial claim and (2) in favor of Guevara and Halvorsen on all claims.

#### A.     Evaluating Evidence in a Fair Trial Claim

In Count I, Iglesias sets forth three primary theories as to how Defendants violated his constitutional right to a fair trial: the fabrication of evidence, the

13

procurement of eyewitness identifications through unduly suggestive techniques, and the deliberate suppression of exculpatory evidence. Am. Compl. ¶¶ 143–152. Each theory comes with its own set of allegations and with discovery complete, Iglesias has identified baskets of evidence in support of each theory. For example, Iglesias argues that Defendants fabricated (1) a CI tip; (2) eyewitness identifications; (3) incriminating "jailhouse" testimony; and (4) police reports documenting this evidence.

Normally, the Court would address each basket of evidence, evaluating whether there are any material disputes of fact that would preclude summary judgment as to a particular basket. For example, the Court would first determine whether there were genuine disputes of fact as to the fabrication of the CI tip, moving next to eyewitness identifications, and so on. However, Iglesias argues that the Court should abandon this seemingly routine approach, asserting that "[t]he Seventh Circuit has directed that courts at summary judgment should not weed through sub-theories and parse items of evidence giving rise to a fair trial due process claim[.]" Resp. at 18. In other words, Iglesias boldly proclaims that "once this Court decides Iglesias has shown a genuine dispute of fact on *any* of his due process theories, it can move forward with a trial on Iglesias's fair trial claim without exploring every argument made by Defendants in their motion, and it can deny summary judgment on that basis." *Id*. at 19 (emphasis added).

In support of this argument, Iglesias cites *Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019) and *Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019). As Defendants correctly point out, neither support his argument as the Seventh Circuit, in both

*Goudy* and *Camm*, addressed each of the plaintiffs' fair trial theories, accepting some and rejecting others. *See Goudy*, 922 F.3d at 838–42 (evaluating two baskets of *Brady* evidence); *Camm*, 937 F.3d at 1110–12 (evaluating three baskets of *Brady* evidence); *Moran v. Calumet City*, 54 F.4th 483, 493–99 (7th Cir. 2022) (evaluating five baskets of *Brady* evidence).

"Courts routinely and appropriately assess sub-theories of fabrication and suppression claims to determine which sub-theories are adequately factually supported to advance to trial." *Johnson v. Guevara*, 2025 WL 903813, at *17 (N.D. Ill. Mar. 24, 2025). "While the Court must assess all allegedly suppressed evidence together to determine if the suppressed evidence deprived a plaintiff of a fair trial, that does not mean that once [Iglesias] establishes that one defendant may have violated his right to a fair trial based on one theory of liability, that his claims as to all defendants on any theory of fair trial liability can advance to trial.". *Id*. In the absence of binding precedent, the Court declines Iglesias's invitation to engage in the novel analysis he proposes and proceeds to evaluate separately the baskets of allegedly fabricated or suppressed evidence.

## B. Guevara and Halvorsen's Invocation of the Fifth Amendment

Iglesias argues next that, on all counts, the Court should summarily deny summary judgment to Guevara and Halvorsen "given their assertion of their Fifth Amendment right to remain silent in response to questions about the material facts at issue." Resp. at 20. Iglesias reasons that a defendant who invokes his right to remain silent in a civil case deprives the plaintiff of an important source of proof. *Id*.

15

at 21–22. Iglesias acknowledges that courts in this circuit have long held that "to create a fact issue for trial, a party resisting summary judgment cannot rely exclusively on the moving party's invocation of the Fifth Amendment privilege." *Id.* at 25 (citing *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1039 (N.D. Ill. 2018) (collecting cases). Remarkably, Iglesias argues that these rulings have been based on "a misunderstanding of the law." *Id.* at 24. Yet, he does not cite *any* authority endorsing his position. In the absence of any binding authority to the contrary, the Court finds the reasoning of *Rivera* persuasive and declines to deny Guevara and Halvorsen summary judgment based on their Fifth Amendment invocation alone.

## II.    Count I: Iglesias's Due Process Fabrication Claim

In Count I, Iglesias alleges that his right to a fair trial was violated because Defendants fabricated evidence and used that evidence against him at trial. Am. Compl. ¶ 145. Iglesias presents three fabrication contentions:[9] (1) Defendants fabricated a CI tip; (2) Defendants fabricated Ochoa and Rodriguez's identifications; and (3) Guevara and Halvorsen fabricated Vicente's testimony. The Court first addresses Vicente's testimony.

### A.    Vicente Testimony

Recall that Vicente, a fellow detainee at the Cook County Jail, submitted a handwritten statement alleging that Iglesias confessed to the shooting on June 25, 1993 and testified to that effect at Iglesias's trial. DSOF ¶ 48; PSOF ¶ 192. However,

---

[9]For the reasons described *infra* at 43–51, the Court only considers those contentions timely disclosed during discovery.

16

Vicente has since recanted, testifying that Guevara and Halvorsen coerced him into making a false statement. DSOF ¶ 111; PSOF ¶¶ 197, 200.

Given that Vicente has recanted his statement and testimony regarding Iglesias's confession, both Guevara and Halvorsen concede that summary judgment must be denied on this issue. R. 247, Memo. Summ. J. at 7–8. Guevara and Halvorsen further admit that this concession precludes summary judgment in their favor on the following claims: suppression of their interactions with Vicente (Count I); failure to intervene (Count III); conspiracy to deprive Iglesias of his constitutional rights (Count IV); and intentional infliction of emotional distress (Count VII). *See* Reply at 17 n.7. Accordingly, Guevara and Halvorsen must proceed to trial on these claims.

### B.    Gawrys, Riccio, and Biebel

Before evaluating further alleged fabrications, the Court must address the Defendants' persistent argument that there is no evidence Riccio, Gawrys, or Biebel were involved in any of the alleged misconduct and thus are entitled to summary judgment.[10] *See* Memo. Summ. J. at 8–10, 18–19, 43–44, 46–51.

"Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018). The Court agrees with Iglesias that there is a question of fact as to Gawrys, Riccio, and Biebel's involvement. First, it is undisputed that Riccio and Gawrys, along with Guevara and Halvorsen,

---

[10]The parties agree that Riccio, Gawrys, and Biebel were not involved in the alleged fabrication of Vicente's testimony. Resp. at 32.

are listed as arresting detectives on Iglesias's arrest report. Resp. at 34. Second, with respect to Riccio, it is undisputed that he was involved in conducting the live lineups for Ochoa and Rodriguez and wrote the reports documenting the identifications. *Id*. Third, and most important, is the Closing Report, which documented and summarized all the steps taken in the Iglesias investigation. *See* PSOF, Exh. 1, Closing Report. It is undisputed that Riccio and Gawrys are listed as "Reporting Officers" in the Closing Report, and that Biebel signed the Closing Report as the supervising and approving officer. *Id*. at 1.

With respect to Riccio and Gawrys, Defendants argue the Closing Report does not preclude summary judgment because Riccio provided deposition testimony that he and Gawrys were not involved in the investigation. That is, Riccio testified that only Guevara and Halvorsen investigated Iglesias. While Riccio explains the appearance of his and Gawrys' names, the Court cannot ignore the Closing Report. The Court cannot weigh conflicting evidence or make credibility determinations at the summary judgment stage, meaning that the Court cannot, as Defendants suggest, find Riccio's deposition testimony more credible than the Closing Report. *Omnicare*, 629 F.3d at 704. Those tasks are reserved for the jury. *Id*. at 704–705. As such, when viewing the evidence in the light most favorable to Iglesias, the Court finds there is a question of fact as to the extent of Riccio and Gawrys' participation in the alleged misconduct within the investigation and will not grant them summary judgment based on their alleged non-involvement alone.

The same goes for Biebel. A supervisor is "deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001). While Defendants argue that Biebel had no personal involvement in the investigation, they do not dispute the fact that, as a supervisor, he "remained involved and informed of what was going on during the investigation" and "took steps to understand what had occurred during the investigation to ensure reports were accurate." Resp. at 33; *see also* Defs.' Resp. PSOF, ¶ 283, 285–87. Considering this fact along with his approval of the Closing Report, the Court finds that at minimum, there is a dispute of material fact as to the extent of Biebel's knowledge of the alleged misconduct within the investigation. Accordingly, the Court will not grant Biebel summary judgment on the basis of his alleged non-involvement alone.

### C. Confidential Informant Tip

Iglesias maintains that Defendants violated his right to a fair trial by fabricating a tip from a CI that implicated him in the shooting. Defendants argue they are entitled to summary judgment on this issue because this allegedly fabricated evidence "was not used at Iglesias's criminal trial." Memo. Summ. J. at 11. Defendants first note that the trial court barred testimony regarding the substance of the tip and admitted the tip so that the course of the investigation may be demonstrated. *Id*. at 12. To that effect, Guevara testified that he "received a phone call from a [CI]" and afterward, he "went looking for a photograph" of Iglesias. *Id*. From Defendants' perspective, "the information from the CI was not introduced at

trial," defeating Iglesias's allegation. *Id.* Iglesias, on the other hand, argues that a particular item of allegedly fabricated evidence need not be used specifically at trial for a due process fabrication claim to survive. Resp. at 40.

The Fourteenth Amendment forbids states from depriving any person of liberty "without due process of law." U.S. Const. amend XIV. "The guarantee of liberty includes protection from fabricated evidence." *Zambrano v. City of Joliet*, 2024 WL 532175, at &19 (N.D. Ill. February 9, 2024). The Seventh Circuit has "recently clarified the contours of constitutional claims based on allegations of evidence fabrication." *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020). "A claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause. If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial." *Id.* (cleaned up) (citing *Lewis v. City of Chicago*, 914 F.3d 472, 476–79 (7th Cir. 2019)). As Iglesias claims that Defendants' fabrication of evidence violated his right to a fair trial, he must demonstrate that the fabricated evidence was *used* at his trial to secure a conviction.

The Court agrees with Iglesias that a question of fact exists as to whether the CI tip was indeed used against him at trial. It is undisputed that Guevara testified that he received a tip and then went looking for Iglesias's picture to include in a photo array. True, Guevara did not recite exactly what the CI told him. But the inference to be drawn from Guevara's testimony is obvious, and thus the Court cannot say—as a matter of law—that the CI tip was not used against Iglesias at trial.

Given that Defendants' assert no other arguments as to the CI tip, the Court denies Defendants' motion for summary judgment on this issue.

### D. Ochoa and Rodriguez Identifications and Testimony

Iglesias contends that Defendants fabricated both Ochoa and Rodriguez's identifications. To support his claim, Iglesias "needs to present sufficient evidence to suggest that each defendant knowingly fabricated evidence that is false." *Johnson*, 2025 WL 903813, *18.

Defendants argue that Iglesias cannot prove they fabricated Ochoa and Rodriguez's identifications because "[t]o this day, neither Ochoa nor Rodriguez have ever recanted their identifications of Iglesias, and both testified in their depositions that they provided truthful testimony at Iglesias's criminal trial." Memo. Summ. J. at 10–11. Defendants also note that both Ochoa and Rodriguez "testified that they were not told who to identify" and were not "threatened to make an identification[.]" *Id*. These facts, according to Defendants, "vitiates any contention that any Defendant *knowingly* manufactured *false* testimony." *Id*. at 10 (emphasis in original).

Iglesias, of course, disagrees, arguing that when viewing the evidence in the light most favorable to him, the Court must conclude that Defendants fabricated Ochoa and Rodriguez's identifications. Resp. at 36–39. Iglesias points to (1) the unreliability of the identifications; (2) Iglesias's innocence; (3) Guevara and Halvorsen's invocation of the Fifth Amendment; and (4) separate instances in which Defendants allegedly fabricated evidence during the investigation. *Id*. Notably, Iglesias never meaningfully engages with the fact that both Ochoa and Rodriguez

21

have remained steadfast in their identifications and have consistently denied that any Defendant told them to identify Iglesias.

The Court finds that Defendants have the better of the argument. Simply put, none of the "evidence" Iglesias puts forth is sufficient to contradict Ochoa and Rodriguez's repeated affirmations of their identifications and testimony. First, Iglesias's attacks on the credibility of Ochoa and Rodriguez's identifications and subsequent testimony does not move the needle in his favor, as such arguments do not give rise to an inference of fabrication. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346–47, 349 (7th Cir. 2019) (arguments related to the credibility or reliability of evidence do not support the conclusion that officers knew the evidence was false); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014) ("testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."); *Johnson*, 2025 WL 903813, \*19 ("expert testimony regarding the circumstances of the identifications rendering them unreliable cannot establish fabrication, without more"). Second, Iglesias's certificate of innocence also does little to advance his claim, as "a wrongful conviction is not, by itself, evidence of a tapestry of wrongdoing." *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 729 (N.D. Ill. 2016). Third, although it is undisputed that Guevara and Halvorsen invoked the Fifth Amendment with respect to this issue, Iglesias must still present additional evidence that Defendants fabricated Ochoa and Rodriguez's identifications and testimony. Last, although Iglesias points to other alleged

instances of fabrication—all of which are heavily disputed—none of these instances speak to whether Defendants fabricated the evidence at issue *here*.

At bottom, Iglesias has presented no evidence to meaningfully counter Ochoa and Rodriguez's consistent testimony that Defendants never told them to identify Iglesias and never told them to provide false testimony at trial. Accordingly, the Court grants summary judgment on Iglesias's contention that Defendants fabricated Ochoa and Rodriguez's identifications and testimony. *See Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 740 (N.D. Ill. 2016) (granting summary judgment where witnesses "universally stated that the Defendants did not provide them with what to say or force them to make statements at trial that they knew to be untrue"); *see also Thorpe v. Duve*, 2022 WL 332804, at *3 (2d Cir. Feb. 4, 2022) (no evidence of fabricated testimony where witness "never recanted or claimed that she lied in her interview, before the grand jury, or at trial"); *Velez v. City of Chicago*, 2023 WL 6388231, at *9 (N.D. Ill. Sept. 30, 2023) (denying summary judgment where an eyewitness later (1) refuted the officer's version of events re: his initial photo identification; (2) admitted to lying at plaintiff's trial regarding the circumstances of his initial photo identification; (3) testified that, during an in-person lineup, he was unable to make an identification until the officer pointed him towards the individual he had identified in the photo); *Johnson*, 2025 WL 903813, at *19 (denying summary judgment where an eyewitness testified to making a photo identification in June 1991 when the undisputed evidence demonstrated that police did not obtain a photo of the suspect until July 1991).

### III. Count I: Iglesias's Due Process Unduly Suggestive Identification Claim

As an alternative to his fabrication theory, Iglesias asserts, under Section 1983, that Defendants violated his right to due process by engaging in unduly suggestive identification procedures that then tainted his criminal trial. Resp. at 70. Defendants, among other reasons, argue they are entitled to qualified immunity. The Court agrees.

"The doctrine of qualified immunity balances dueling interests—allowing officials to perform their duties reasonably without fear of liability on the one hand and affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices on the other." *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021) (cleaned up). It "shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*)).

"The purpose of qualified immunity is to protect all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (cleaned up). It is an affirmative defense, but once a defendant properly raises the defense, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019).

To defeat a defense of qualified immunity, Iglesias must establish that (1) Defendants' conduct violated a constitutional right, and (2) the violated right was clearly established at the time of the alleged misconduct. *Lewis v. Downey*, 581 F.3d

24

467, 478 (7th Cir. 2009). Iglesias can show that a right is clearly established in at least two ways: "(1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (cleaned up). There need not be a case exactly on point for a right to be clearly established, but "existing precedent must place the lawfulness of the particular arrest beyond debate." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (cleaned up); *see also Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). Still, the right must have been clearly established "in a particularized sense, rather than at a high level of generality." *Id*. Put another way, "the official must have [had] fair warning that his conduct [was] unconstitutional." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (cleaned up).

A qualified immunity defense may also be defeated at the summary judgment stage on account of material factual disputes. *DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998). Namely, when "the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity." *Id*. Indeed, it is improper to grant qualified immunity if there are disputes of material facts surrounding the alleged unlawful conduct. *Alicea*, 815 F.3d at 292.

Recently, in *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025), the Seventh Circuit addressed whether officers are entitled to qualified immunity in relation to unduly suggestive identification claims. In *Blackmon*, two eyewitnesses identified Blackmon as the assailant in a murder after viewing a photo array and an in-person

25

lineup. 132 F.4th at 524. These witnesses also identified Blackmon at trial. *Id*. Although Blackmon was convicted of murder, his conviction was eventually vacated and the State declined to retry him. *Id*. Blackmon then sued the investigating officers, bringing, among other claims, a Section 1983 claim contending the officers obtained identifications through unconstitutionally suggestive procedures. *Id*. The officers moved for summary judgment on qualified immunity grounds. *Id*.

The Seventh Circuit found that the officers were entitled to qualified immunity, because "[b]efore 2002 neither this circuit, nor any other, had held that an officer could be liable for employing suggestive identification procedures." *Blackmon*, 132 F.4th at 526 ("Blackmon has not cited, and we have not found, any appellate decision holding police officers liable in damages when judges allowed prosecutors to introduce suggestive identifications into evidence at trial. The absence of a clearly established right entitles the defendants in this case to qualified immunity."). As the events in this case occurred in 1993 and 1994, the Court must find that Defendants are entitled to qualified immunity. *See Johnson*, 2025 WL 903813, *24 (officers entitled to qualified immunity where plaintiff's unduly suggestive identification claim arose from events in 1991). Accordingly, the Court grants summary judgment in favor of Defendants on Iglesias's unduly suggestive identification claim.

## IV.    Count I: Brady Claims

As part of his due process claim, Iglesias also asserts that Defendants suppressed several pieces of exculpatory and material evidence. "The suppression of material, exculpatory evidence in a criminal case violates due process." *Moran*, 54

F.4th at 492. The duty to disclose exculpatory evidence "extends to police officers, insofar as they must turn over potentially exculpatory evidence . . . to the prosecution." *Holloway v. City of Milwaukee*, 43 F.4th 760, 767–68 (7th Cir. 2022). To prevail on his suppression claim, Iglesias must prove that "(1) the nondisclosed evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice." *Moran*, 54 F.4th at 492 (cleaned up); *see also Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022).

Defendants identify multiple pieces of evidence Iglesias claims was suppressed and argue they are entitled to summary judgment on each.[11] The Court addresses each in turn.

### A.     Handwritten Note about Sarah Torres

Iglesias contends that Defendants suppressed a handwritten note in their investigative files that indicated Sarah Torres, who lived in the apartment building in front of which the shooter stood when he committed the crime, told investigators that her son, Efrain Torres, 'came from boys club' and 'knows shooter.'" Resp. at 58. More specifically, this note lists Sarah Torres's contact information next to the statement: "[s]on [Efrain Torres] came from the boys club knows" followed by a word that Iglesias believes to be "shooter," but Defendants believe to be "shorti." Memo. Summ. J. at 35.

---

[11]Again, for the reasons described *infra* at 43–51, the Court only considers those contentions timely disclosed during discovery. Additionally, Defendants present arguments regarding the suppression of "the handwritten note of Iglesias's own school schedule" and "the tow report." Memo. Summ. J. at 37. However, Iglesias "is not pursuing a Brady theory based on these two items," so the Court need not address them. Resp. at 57 n.10.

Defendants first argue that, even assuming the note said "shooter," it was not materially different from information Iglesias possessed, which was a General Offense Case Report noting Sarah Torres's contact information and stating that "her son related that he saw the offender come out of the Boys Club at Sawyer and Palmer." Memo. Summ. J. at 35–36. Iglesias counters that "there is a world of difference between a witness who knows who the perpetrator is and one who reports having seen the perpetrator." Resp. at 58. The Court agrees and finds that it cannot, as a matter of law, conclude there is no material difference between an indication that Efrain Torres knew the shooter as opposed to having simply seen the shooter.

Second, Defendants cursorily maintain that Iglesias "cannot show the information was suppressed because with reasonable diligence, [his counsel] could have learned whatever Efrain knew." Memo. Summ. J. at 36. However, Defendants do not identify what steps Iglesias's trial counsel took with respect to Efrain Torres. In other words, they provide no basis for this Court to evaluate, let alone find, whether the information in the note could have been discovered with reasonable diligence as a matter of law. As Iglesias argues, the perfunctory nature of Defendants' argument here results in waiver. *See* Resp. at 59 (characterizing Defendants' arguments as "fatally underdeveloped"); *Lewis v. Mills*, 677 F.3d 324, 332 (7th Cir. 2012) ("Unsupported and underdeveloped arguments are waived.") (cleaned up); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010).

Last, Defendants argue that Iglesias has failed to produce evidence that Gawrys, Riccio, Halvorsen, and Biebel had knowledge of this note. Memo. Summ. J.

28

at 36. In response, Iglesias maintains that "[t]he note was in these Defendants'
investigative file for the Roman homicide—the same file containing all of the reports
that Defendants wrote, signed, and approved." Resp. at 62. The Court agrees with
Iglesias and finds that, due to the note's presence in the investigative file, there is a
genuine dispute of fact as to Defendants' knowledge.

### B.     Evidence that Defendants Believed the Spanish Cobras Committed the Shooting

When investigating a separate homicide—the homicide of Rodrigo Vargas—
Guevara and Halvorsen created a Supplemental Report ("the Vargas Report") in
which they wrote that "[p]reliminary information in the Roman shooting indicated
that the offenders may have been Spanish Cobras Street Gang." Memo. Summ. J. at
38. The Vargas Report thus contradicts the theory that led to the arrest of Iglesias—
that Roman was killed by the Imperial Gangsters, with whom Iglesias was affiliated.
Iglesias claims that, in violation of *Brady*, the exculpatory Vargas Report was never
turned over to the prosecution or the defense.

Iglesias bases his theory of non-disclosure on the (undisputed) fact that the
Vargas Report was not contained in the Cook County State's Attorney's (CCSAO) file
for the Iglesias prosecution that was produced during discovery. Memo. Summ. J. at
38. But according to Defendants, there is no way of knowing whether "the CCSAO
file that was produced to the parties here contained all the documentation that was
in the file thirty years ago during the underlying Monica Roman investigation." *Id*.
This uncertainty, Defendants insist, entitles them to summary judgment here. The
Court disagrees.

29

True, no one may know for sure which documents were contained in the original CCSAO file. Perhaps the Vargas Report was indeed contained in the file. Or perhaps, as Defendants suggest, Iglesias's trial counsel obtained the Vargas Report via subpoena. But for the Court to indulge such theories would require viewing facts and drawing inferences in the light most favorable to Defendants. The Court must do the opposite; that is, it must view the facts and draw reasonable inferences in the light most favorable to Iglesias. And when doing so, the undisputed absence of the Vargas Report from the CCSAO file leads to a reasonable inference that Defendants failed to disclose the report to the prosecution and Iglesias's trial counsel.

## C. Guevara's Meetings with Rodriguez

Iglesias asserts that Defendants failed to disclose documentation of four meetings between Guevara and Rodriguez in the lead-up to Iglesias's criminal trial. Resp. at 65.[12] While Defendants do not dispute whether these meetings occurred, they argue that Iglesias has failed to demonstrate that the content of these meetings were favorable to him. Memo. Summ. J. at 39. Iglesias disagrees, stating Rodriguez testified that, in relation to his upcoming trial testimony, Rodriguez met with Guevara "to make sure that there were no mistakes," "that everything was correct," and "to make sure that I knew what I had to say." PSOF, Exh. 19 at 149:18-20. Further, Rodriguez testified that Guevara showed him a photo of Iglesias in preparation for his trial testimony. *Id.* at 147:22–148:6. The Court finds that

---

[12]Iglesias does not challenge Defendants' contention that there is no evidence that Gawrys, Riccio, Halvorsen, or Biebel were involved in or knew of these meetings. Accordingly, this suppression allegation only proceeds against Guevara.

Rodriguez's testimony allows Iglesias to survive summary judgment here. Given Rodriguez's testimony, the Court cannot say as a matter of law that evidence of these meetings would not have been favorable to Iglesias at trial.

### D.    Rodriguez's Photobook Viewings

Iglesias contends that Defendants suppressed the fact that, in the first few days after the shooting, Rodriguez was shown photos of Imperial Gangsters (the Gangbook) and failed to identify anyone as the shooter. Resp. at 66. Defendants make several arguments against this allegation. None are persuasive.

First, Defendants' argument that there can be no *Brady* violation if a plaintiff fails to prove an event was documented is a nonstarter. Memo. Summ. J. at 40–41. Defendants cite *Hill v. City of Chicago*, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009) but (1) *Hill* did not involve the suppression of a non-identification and (2) does not stand for the striking proposition that officers may avoid trial on *Brady* allegations if they simply chose not to document potential exculpatory evidence.

Second, Defendants argue that Iglesias cannot prove suppression because his trial counsel had interviewed Rodriguez and "had the ability to ask him about all of the facts surrounding his identification, including whether he looked at photobooks." Memo. Summ. J. at 41. The Court disagrees. "[I]f the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez v. City*

*of Chicago*, 830 F. Supp. 2d at 432, 444 (N.D. Ill. 2011). Whether Rodriguez, if asked, would have disclosed his non-identification to counsel, is a question for the jury.

Third, the Court finds there is a genuine dispute of fact as to whether Defendants had knowledge of Rodriguez's viewings of the Gangbook. Although these alleged viewings took place before Defendants were officially involved in the investigation, the Court agrees with Iglesias that there is a genuine dispute of fact as to whether Rodriguez's non-identifications were communicated to Defendants. Prior to the alleged CI tip that resulted in Guevara and Halvorsen's assignment to this case, Detective Jerome Bogucki (Bogucki) worked on the investigation as an assisting detective. PSOF, Exh. 27, Bogucki Dep. at 70:21-24. Bogucki testified that, when detectives were assigned to a case, "the practice that [he] experienced when [he was] the assigned detective [was] that [his] colleagues would share information that they learned with [him]." *Id.* at 74:2-7. He also could not recall *any* instance in a homicide investigation in which other officers or detectives failed to share information they had learned with the assigned detective. *Id.* at 74:13-21. Thus, as Iglesias posits, it is reasonable to infer that, when assigned to the case, Guevara and Halvorsen were informed that Rodriguez failed to identify any Imperial Gangsters as the shooter, among other things. And, as for the reasons explained *supra* at 17–19, it is reasonable to infer that Riccio, Gawrys, and Biebel had knowledge of this information as well.

Last, the Court finds that Rodriguez's failed identification would have been favorable and material. Defendants' only argument against materiality is that Iglesias has not come forth with definite proof that his photo was among those that

Rodriguez viewed. Memo. Summ. J. at 41. However, it is undisputed that Iglesias was a known affiliate of the Imperial Gangsters, Iglesias had been previously arrested, and CPD had Iglesias's photo. Def. Resp. PSOF ¶ 94. Accordingly, the Court agrees with Iglesias that, when viewing the evidence in the light most favorable to him, it is reasonable to infer that his picture was included in the Gangbook.

### E. Arnell Moore's Photobook Viewings

Iglesias also submits that Defendants suppressed the fact that Moore was shown photos in the Gangbook and failed to identify anyone as the shooter. Resp. at 63–65. Defendants argue they did not suppress Moore's non-identification because the prosecution was aware of this non-identification. The Court agrees.

"A police officer's *Brady* obligation extends only insofar as they must turn over potentially exculpatory evidence . . . to the prosecution," and "a plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it." *Moran*, 54 F.4th at 492. The record demonstrates that Moore informed ASA Latz that, because the shooter was wearing a hood, he would not be able to identify the shooter. Reply at 68. Thus, the prosecution knew that, despite being a witness to the shooting, Moore could not make an identification. The fact that Moore allegedly failed to identify Iglesias after seeing his photo is of little consequence, as Moore unambiguously indicated his inability to identify *anyone*. Accordingly, the Court grants summary judgment as to this contention.

### F. Suppression of Fabrications

Iglesias argues that Defendants suppressed their own fabrications of evidence by not disclosing these fabrications. Iglesias's argument was recently addressed in a factually similar case, *Johnson*, 2025 WL 903813, at *27:

> *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution. *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015). While defendants do not violate *Brady* by failing to disclose the fact of their fabrication, defendants do violate *Brady* by failing to disclose any evidence of the fabrication. *See, e.g., Bouto v. Guevara*, 2024 WL 4346561, at *7 (N.D. Ill. Sept. 30, 2024); *Smith v. Burge*, 222 F. Supp. 3d 669, 680–81 (N.D. Ill. 2016). For example, defendants must disclose notes documenting their fabrication, reports documenting exculpatory witness statements, and implements of coercing witnesses into giving fabricated statements. *See Bouto*, 2024 WL 4346561, at *7. Based on this authority, Johnson has no colorable *Brady* claim to the extent that he asserts that the Individual Defendants should have affirmatively disclosed their fabrications. *See Myvett v. Heerdt*, No. 12 C 09464, 2015 WL 12745087, at *6 (N.D. Ill. May 28, 2015).

(cleaned up). The only allegation of fabrication at issue concerns the CI tip.[13] And like *Johnson*, Iglesias's argument is that Defendants should have affirmatively disclosed this fabrication. The Court finds the reasoning in *Johnson* and related cases persuasive, and grants summary judgment in favor of Defendants as to the alleged suppression of their fabrications.

## V. Counts II and VI: Unlawful Detention and Malicious Prosecution

In Counts II and VI, Iglesias brings claims for unlawful detention under Section 1983 and malicious prosecution in violation of Illinois state law.

---

[13]Again, Guevara and Halvorsen concede they are not entitled to summary judgment as to the suppression of their interactions with Vicente.

To prove an unlawful detention claim, a plaintiff must demonstrate that the defendant "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez v. Guevara*, 2024 WL 4299046, at *10 (N.D. Ill. Sept. 26, 2024) (citing *Manuel v. City of Joliet*, 580 U.S. 357, 364–65 (2017) (unlawful pretrial detention requires a seizure without probable cause)). As for malicious prosecution, Illinois law requires a plaintiff to prove "(1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018). "The existence of probable cause for each offense charged is a complete defense to an action for malicious prosecution." *Id.* (citing *Howard v. Firmand*, 880 N.E.2d 1139, 1142 (Ill. 2007)).

Defendants argue that the existence of probable cause to arrest and charge Iglesias as the shooter is fatal to his unlawful detention and malicious prosecution claims. Specifically, Defendants maintain that Ochoa and Rodriguez's identifications "were more than enough to establish probable cause." Memo. Summ. J. at 45. The Court agrees.

In challenging the existence of probable cause, Iglesias relies solely on his argument that Defendants fabricated the identifications of Ochoa and Rodriguez. However, the Court has found that Iglesias has failed to put forth any evidence creating a material issue of fact as to whether Defendants fabricated these

identifications. "An eyewitness identification, even if questionable, sufficed to give the Individual Defendants probable cause to arrest" Iglesias." *Johnson*, 2025 WL 903813, at *31 (citing *Coleman*, 925 F.3d at 351). Here, Ochoa and Rodriguez identified Iglesias as the shooter and have consistently maintained they were never instructed, pressured, or coerced into making their identifications. Iglesias has produced no evidence to the contrary. Accordingly, there existed probable cause to arrest and charge Iglesias and the Court grants summary judgment in favor of Defendants on Counts II and VI.

## VI.    Count III: Failure to Intervene

In Count III, Iglesias claims that Defendants failed "to intervene and prevent the violation of his constitutional rights despite having had the duty and the opportunity to do so." Memo. Summ. J. at 47 (cleaned up).

"The failure to intervene doctrine imposes liability on an officer when the officer does not intervene to prevent other officers from infringing the constitutional rights of citizens." *Johnson v. Kurut*, 2023 WL 2402964, at *6 n.7 (N.D. Ill. Mar. 8, 2023). "An officer may be liable if that officer had reason to know that a citizen was unjustifiably arrested, or that any constitutional violation was committed by an officer; and if that officer had a realistic opportunity to intervene to prevent the harm from occurring." *Id.* (citing *Chavez*, 251 F.3d at 652). "In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]" *Neita v. City of Chicago*, 148 F.4th 916, 938 (7th Cir. 2025) (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)).

Defendants maintain they are entitled to summary judgment on three bases: (1) Riccio, Gawrys, and Biebel were not personally involved in any of the alleged misconduct and thus had "no opportunity to intervene;" (2) there is "no failure to intervene liability without an underlying constitutional tort;" and (3) failure to intervene "is not cognizable as a federal tort because it violates Section 1983's prohibition against vicarious liability." *Id*. at 47–48. These arguments may be addressed in short order. First, for the reasons listed *supra* at 17–19, there is an issue of fact as to whether Riccio, Gawrys, and Biebel knew of and were involved in the alleged misconduct. These reasons also serve to create an issue of fact here, as they allow for two reasonable inferences: (1) Riccio, Gawrys, and Biebel, at minimum, knew of Guevara and Halvorsen's constitutional violations and (2) Riccio, Gawrys, and Biebel had a realistic opportunity to prevent those constitutional violations. Second, the Court has found that Iglesias may proceed to trial on certain aspects of his due process fabrication and suppression claims, so there are indeed constitutional violations underlying Iglesias's claim. Last, Defendants acknowledge that, pursuant to Seventh Circuit precedent, failure to intervene is a cognizable tort, and only raise an argument to the contrary "for the express purpose of preserving it for appeal[.]" Memo. Summ. J. at 48 (citing *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)). Accordingly, the Court denies summary judgment on Count III.[14]

---

[14]Because both parties agree that only Guevara and Halvorsen were involved in allegedly fabricating Vicente's testimony, Riccio, Gawrys, and Biebel may not be held liable for failure to intervene with regards to that alleged constitutional violation.

## VII. Counts IV and IX: Section 1983 Conspiracy and State Law Conspiracy

In Count IV, Iglesias asserts that Defendants are liable under Section 1983 for conspiring to deprive him of his constitutional rights. In Count IX, Iglesias asserts Defendants are liable under Illinois state law for conspiring to maliciously prosecute and intentionally inflict emotional distress upon him.

To prove conspiracy liability under Section 1983, a plaintiff must demonstrate that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Pena v. Ortiz*, 521 F. Supp. 3d 747, 751 (N.D. Ill. 2021) (citing *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). "A civil conspiracy claim under Illinois law has similar elements, requiring allegations of "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Id*. (citing *Fritz v. Johnston*, 807 N.E.2d 461 (Ill. 2004)).

Defendants first argue that, as a threshold issue, Iglesias's conspiracy claims fail because his federal constitutional and state law malicious prosecution claims fail. Memo. Summ. J. at 49. With respect to Iglesias's Section 1983 conspiracy claim, it is true that "conspiracy is not an independent basis of liability in § 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). However, the Court has found that certain aspects of Iglesias's constitutional claims may proceed, and thus Defendants are not entitled to summary judgment on the basis that his constitutional claims fail.

38

As for Iglesias's state law conspiracy claim, Defendants correctly argue that if Iglesias "fails to state independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails." *Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 950 (N.D. Ill. 2014). And it is true that the Court has granted summary judgment to Defendants on Iglesias's state law malicious prosecution claim. However, for reasons explained *infra* at 41–42, the Court denies summary judgment to Defendants on Iglesias's claim for intentional infliction of emotional distress. And because Iglesias's intentional infliction of emotional distress claim constitutes an independent cause of action underlying his conspiracy allegations, the Court may not enter summary judgment simply because his malicious prosecution claim is not proceeding to trial.

Defendants next argue that "Iglesias has no evidence of a conspiratorial agreement amongst Riccio, Gawrys, or Biebel." Memo. Summ. J. at 49. For the reasons stated *supra* at 17–19, there exists a question of fact as to the existence of an agreement among Defendants.

Last, Defendants argue they are entitled to qualified immunity on Iglesias's claims. Memo. Summ. J. at 50. Recall that in assessing qualified immunity, a court "must ask two questions: '(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1060 (7th Cir. 2018). The unlawfulness of the defendants' actions is clearly established if, "at the time of the officer's conduct,

the law was sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Wesby*, 583 U.S. at 63.

Specifically, Defendants argue they are entitled to qualified immunity because the law is unsettled as to whether the intracorporate conspiracy doctrine applies to Section 1983 claims. Memo. Summ. J. at 50.

"The intracorporate conspiracy doctrine, derived from corporate and antitrust settings, provides that employees of the same corporate entity cannot be liable under a conspiracy theory if the employees act within the scope of their employment." *Smith v. City of Chicago*, 785 F.Supp.3d 356, 397 (N.D. Ill. 2025) (cleaned up). This doctrine "was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory." *Id.* (cleaned up). While Defendants are correct in that the Seventh Circuit has yet to address whether this doctrine applies to Section 1983 claims, *id.*, the Court need not weigh in on the debate as it finds that, even if the doctrine applies, it does not apply to the circumstances here. Critically, "[t]he doctrine applies only when the agents of a corporation or government entity act within the scope of their employment in joint pursuit of the entity's lawful business." *Harris v. City of Chicago*, 2020 WL 7059445, *11 (N.D. Ill. Dec. 2, 2020), As the *Harris* court explained, "[i]n cases of police misconduct, the doctrine is inapplicable if the alleged misconduct is not the product of routine police department decision-making." *Id.*

Defendants' argument was recently addressed and rejected in *Johnson*, 2025 WL 903813, at *33. In *Johnson*, the defendant officers argued they were entitled to

40

summary judgment because "it was not clearly established that officers working at the same municipality could be liable for a conspiracy because it is unsettled whether the intracorporate conspiracy doctrine applies to § 1983 claims." *Id.* Echoing *Harris*, the court found that even if the doctrine applied, it did not apply to the plaintiff's claims against the defendants because the plaintiff maintained the defendants "acted unlawfully through their individual actions to deprive him of his civil rights[.]" *Id.* That is, the court found that the defendants' conduct was "not the product of routine police department decision-making because CPD could not have lawfully planned to violate individual's rights." *Id.* (cleaned up). The Court finds *Johnson*'s reasoning persuasive and adopts it here. Accordingly, the Court finds that qualified immunity does not shield Defendants from Iglesias's conspiracy claims.

All in all, the Court finds that (1) Count IV may proceed and (2) Count IX may proceed, but only to the extent that it is based upon Defendants' conspiracy to intentionally inflict emotional distress upon Iglesias.

## VIII. Count VII: Intentional Infliction of Emotional Distress

In Count VII, Iglesias alleges that Defendants are liable for intentional infliction of emotional distress (IIED).

"To prevail on an intentional infliction of emotional distress claim under Illinois law, a claimant must prove three elements:" (1) "the conduct in question was truly extreme and outrageous;" (2) "the actor intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would have caused such distress;" and (3) "the conduct in fact caused severe emotional

distress." *Sun v. Xu*, 99 F.4th 1007, 1013 (7th Cir. 2024) (citing *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016)).

In just a few sentences, Defendants argue that Iglesias cannot prevail on his IIED claim as to Riccio, Gawrys, and Biebel because he cannot demonstrate evidence of their involvement. Memo. Summ. J. at 51. The Court has repeatedly rejected this argument and does so again. Next, Defendants submit that Iglesias "cannot demonstrate the 'extreme and outrageous' conduct necessary to support his IIED claim" because his constitutional claims fail. As has been explained, the Court has found that Iglesias has viable constitutional claims that may proceed to trial.

Accordingly, the Court denies summary judgment on Count VII.

## IX.     Count VIII: Willful and Wanton Conduct

In Count VIII, Iglesias asserts that "Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, [Iglesias's] rights." Am. Compl. ¶ 196. Defendants argue that this claim must fail, as "there is no separate and independent tort of willful and wanton misconduct." Memo. Summ. J. at 51 (cleaned up). The Court disagrees.

As Iglesias correctly points out, "[w]hile there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." Resp. at 102 (quoting *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320, at *4 (S.D. Ill. Jan. 20, 2023)). Thus, the

Court recognizes Iglesias's willful and wanton conduct claim as one for aggravated negligence, wherein Iglesias must prove: (1) "the existence of a duty;" (2) "breach of that duty;" (3) "an injury proximately resulting from the breach;" and (4) "that the breach be not merely negligent, but with conscious disregard for the welfare of the plaintiff." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010).

In their opening brief, Defendants argue solely that the Court may not recognize a willful and wanton conduct claim and wait until their Reply to challenge Iglesias's satisfaction of the foregoing elements. Reply at 82–83. "An argument made for the first time in a reply brief is waived," and thus the Court does not address Defendants arguments made in reply. *Eberhardt v. Walsh*, 122 F.4th 681, 687 n.4 (7th Cir. 2024).

Accordingly, the Court denies summary judgment on Count VIII.

## X. Exclusion of Iglesias's Newly Asserted Fabrication and Suppression Contentions

There remains one last, but critical issue for the Court to resolve. Defendants argue that Iglesias's Response to their motion for partial summary judgment relies on information he failed to timely disclose in violation of Federal Rule of Civil Procedure 26, and insists that information be excluded pursuant to Federal Rule of Civil Procedure 37. Iglesias, for his part, never moved to file a sur-response, and thus has made no attempt to counter Defendants' argument. For the reasons that follow, the Court agrees with Defendants.

### A.    Background

On June 2, 2020, Defendants issued interrogatories asking Iglesias "to identify the records he alleges were fabricated, falsified, or withheld, and to describe how those records support [his] allegations." R. 161, Defs.' Mot. Compel, at 2. Specifically, Defendants issued the following interrogatories:

> **Interrogatory No. 6**: With regard to the allegation in Count I of your Complaint that the Defendants "manufactured evidence and solicited false evidence- including false identifications, false witness statements, and false witness testimony" relating to your prosecution for the Roman homicide, for each of the following named Defendant Officers please state with particularity what testimony the Defendant Officer falsified during the investigation of, or during any of the underlying criminal proceedings relating to the Monica Roman homicide: a) Ernest Halvorsen; b) Steve Gawrys; c) Anthony Riccio; d) Robert Biebel and e) Reynaldo Guevara.

> **Interrogatory No. 8**: With regard to the allegation in Count I of your Complaint that the Defendants "fabricated police reports" relating to the investigation of the Roman homicide, identify which reports you allege were fabricated and identify the information you allege was fabricated.

> **Interrogatory No. 10**: Are you aware of any documents that were not produced or tendered to prosecutors or defense counsel during any of the underlying criminal proceedings relating to the Roman homicide? If so, please identify and state with particularity the documents you claim were not so produced or tendered, including but not limited to, their date, author recipient, and subject matter, and if you have possession of the document, produce a copy pursuant to Fed. R. Civ. P. 34, or identify it by Bates number if previously produced.

DSOF, Exh. 54, at 13, 21, 28–29; *see also* R. 174, Judge Valdez Order, at 2.

In response, Iglesias "generally restate[d] the allegations in the complaint, namely that the individual [D]efendants solicited false testimony from informant, manipulated eyewitness identifications, or ratified the misconduct of others." Judge Valdez Order, at 2. After exchanging deficiency letters and amended responses, the

44

parties reached an impasse as to the sufficiency of Iglesias's interrogatory responses, and Defendants moved to compel more complete responses to Interrogatory Nos. 6, 8, and 10. *Id*.

Magistrate Judge Valdez found that Iglesias's answers "generally describing the complaint's allegations or his theory of liability in broad strokes" were deficient. Judge Valdez Order at 5–6. In granting Defendants motion to compel, Judge Valdez ordered Iglesias to respond to Interrogatory Nos. 6, 8, and 10, stating that if Iglesias "lacks specific evidence, he may say so, and if "the evidence is primarily circumstantial, as [Iglesias] asserts in his response brief, he may list it." *Id*. at 5.

On May 20, 2022, Iglesias provided his amended responses. DSOF, Exh. 54. With respect to Interrogatory No. 6, Iglesias identified the Ochoa and Rodriguez's testimony regarding their identifications of Iglesias, and Vicente's testimony regarding Iglesias's confession. *Id*. at 13–20. For Interrogatory No. 8, Iglesias identified: the photo and live lineup identifications of Ochoa and Rodriguez and any related reports, Vicente's statement and any related reports, and the CI tip and any related reports. *Id*. at 21–28. And for Interrogatory No. 10, Iglesias identified: the handwritten notes re: Sarah and Efrain Torres; notes related to Iglesias's school schedule; documentation related to the Gangbook viewings of certain witnesses, including Moore and Rodriguez; documentation related to Guevara's four meetings with Rodriguez, and documentation regarding Defendants' investigative misconduct. *Id*. at 28–29. For each Interrogatory, Iglesias "reserve[d] the right to supplement or modify this answer as new information comes to light." *Id*. at 20, 28, 29. According to

45

Defendants, and as far as the Court is aware, Iglesias never supplemented his responses to Interrogatory Nos. 6, 8, and 10 or further identified any testimony or evidence he maintains Defendants fabricated or suppressed. Reply at 17.

### B.    Legal Standard

In our adversarial system, parties pursue discovery consistent with their respective theories of the case. *Ezell v. City of Chicago*, 2013 WL 657659, at *15–16 (N.D. Ill. Feb. 22, 2013). Federal Rule of Civil Procedure 26(e) provides that a party that has made an initial disclosure under Rule 26(a) has a duty to "supplement or correct its disclosure or response . . . in a timely manner if the party learns . . . the disclosure is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26 (e)(1). Thus, Iglesias was under an obligation to supplement his interrogatory responses if he "learn[ed] in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), that party is not allowed to use the information or witness to supply evidence on a motion, at a hearing, or at trial, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Exclusion of such evidence is not discretionary;" rather, exclusion "is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Wexler v. Chubb Nat'l Ins. Co.*, 2025 WL 1725149, at *1 (N.D. Ill. June 20, 2025) (cleaned up) (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)).

46

"Determining whether a failure to disclose had a substantial justification or is harmless is within the Court's broad discretion." *Id*.; *see also David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) ("A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose."). However, the Seventh Circuit has indicated that "the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857.

### C.    Analysis

Defendants first contend that Iglesias has untimely disclosed four new baskets of allegedly fabricated evidence: (1) Ochoa's identification of Iglesias from a photo array at Ochoa's house on June 22, 1993; (2) Iglesias's statement that he "hangs out" near Sawyer and Palmer with Imperial Gangsters; (3) two lineup reports claiming Ochoa and Rodriguez positively identified Iglesias in lineups independently and without manipulation; and (4) a false Closing Report that summarized allegedly fabricated evidence. Reply at 19. After careful review of Iglesias's interrogatory responses, the Court finds that Defendants were sufficiently on notice of Iglesias's allegations that the lineup reports and the Closing Report were fabricated. *See* DSOF, Exh. 54 at 21 The first two baskets of evidence, however, are another matter. The Court finds that Iglesias's interrogatory responses did not include his allegations that

47

Defendants fabricated Ochoa's June 22, 1993 identification and Iglesias's statement that he "hangs out" near the crime scene. Thus, Iglesias first disclosed the information supporting these allegations at summary judgment.

Defendants next assert that Iglesias has untimely disclosed five new baskets of allegedly suppressed information: (1) Defendants' procurement of Iglesias's criminal history sheet on June 22, 1993; (2) Ochoa and Rodriguez's alleged remarks to Defendants that Iglesias looked different on June 23, 1993 (date of lineup) than on June 6, 1993 (date of shooting); (3) Moore's non-identification of Iglesias; (4) Ochoa and Rodriguez's alleged statements to Defendant that they did not see the shooter and could not identify him; (5) Defendants' pattern of misconduct in prior cases; and (6) Defendants' misconduct during the Iglesias investigation. Reply at 18.

The Court finds that Iglesias's interrogatory responses sufficiently placed Defendants on notice of the allegation that they suppressed Moore's non-identification of Iglesias and their own misconduct during the investigation. DSOF, Exh. 54, at 29. However, the Court finds that Iglesias's interrogatory responses did not include his allegations that Defendants suppressed their procurement of Iglesias's criminal history sheet, Ochoa and Rodriguez's remarks to Defendants that Iglesias looked different on the day of the live lineup, Ochoa and Rodriguez's statements that they did not see the shooter and could not identify him, and Defendants' pattern of misconduct in prior cases. Again, Iglesias first disclosed the information supporting these allegations at summary judgment.

Defendants argue that Iglesias's late disclosure is neither substantially justified nor harmless. The Court agrees.

With respect to substantial justification, Iglesias was under a legal obligation to continuously supplement discovery pursuant to Rule 26(e). Judge Valdez then put Iglesias on notice of his need to supplement his interrogatory answers with specific pieces of evidence or testimony that he claimed were fabricated or suppressed. However, in violation of Rule 26(e) and Judge Valdez's Order, Iglesias waited until summary judgment to disclose his new contentions. Notably, Iglesias did not explain or attempt to explain his delay. In its broad discretion, the Court finds that Iglesias's late disclosure is not substantially justified.

As for whether Iglesias's non-disclosure was harmful, Defendants' citation to the Seventh Circuit's decision in *Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) is instructive. In *Moran*, the plaintiff answered an interrogatory asking him to "[s]tate the factual basis for the allegation" that the defendants "deliberately with[held] exculpatory evidence." *Moran*, 54 F.4th at 497. At summary judgment, the plaintiff attempted to raise two *Brady* contentions that were not identified in his interrogatory answer. *Id*. The plaintiff argued "that any Rule 26(e) violation was harmless because the allegations in question were part of a single *Brady* suppression claim, not a freestanding claim, so they did not prejudice or surprise the defendants." *Id*. The Seventh Circuit rejected that argument, stating that "Rule 37(c)(1) refers to information, not claims," and that "it would prejudice the defendants if they had to contend with allegations at summary judgment that [the plaintiff] did not disclose

49

during discovery." *Id.* Ultimately, the Seventh Circuit ruled that Rule 37(c)(1) precluded the plaintiff from raising his two new suppression contentions. *Id.*

Like *Moran*, the Court finds Iglesias's failure to supplement was not harmless. Iglesias's failure to supplement his interrogatory answers prevented Defendants from addressing his newly asserted contentions in discovery, "e.g., asking specific questions during depositions of scene witnesses, his defense attorney [], or prosecutors, or issuing follow-up interrogatory requests[.]" Memo. Summ. J. at 20. Further, Defendants were unable to address these new contentions in their opening brief and were forced to address them for the first time in their reply. It also bears repeating that Iglesias has made no attempt to respond to Defendants' argument. It is not the Court's "responsibility to research and construct" Iglesias's arguments. *Gross*, 619 F.3d at 704.

In short, there is nothing before the Court to suggest that Iglesias's failure to supplement is substantially justified or harmless. Accordingly, the Court has no choice but to exclude his newly asserted fabrication and suppression contentions is mandatory. *Wexler*, 2025 WL 1725149, at *6; *Musser*, 356 F.3d at 758; *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012).

## Conclusion

For the reasons set forth above, the Court grants in part and denies in part Defendants' motion for partial summary judgment. R. 239. The Court grants summary judgment as to Iglesias's contentions that Defendants (1) fabricated Ochoa and Rodriguez's identifications, (2) obtained Ochoa and Rodriguez's identifications

through unduly suggestive lineup procedures; and (3) suppressed their fabrications of evidence. The Court also grants summary judgment on Iglesias's claims for unlawful detention (Count II) and malicious prosecution (Count VI). Defendants' motion is denied in all other respects.

Date: November 13, 2025

_____
United States District Judge
Franklin U. Valderrama