IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERALDO IGLESIAS,

      Plaintiff,

      v.

REYNALDO GUEVARA, *et al.*,

      Defendants.

No. 19-cv-06508

Judge Franklin U. Valderrama

## ORDER

Plaintiff Geraldo Iglesias (Iglesias) was convicted of murder and incarcerated for 17 years before his conviction was vacated and the charges dropped by the Cook County State's Attorney's Office. Iglesias sued the City of Chicago (the City) and several Chicago Police Department (CPD) officers involved in his arrest and conviction (Defendant Officers)[1] under 42 U.S.C § 1983 and state law. R. 67, Am. Compl.[2] Before the Court is the City's motion for summary judgment. R. 241, Mot. Summ. J. For the reasons that follow, the City's motion granted in part and denied in part.

## Background

The Court assumes familiarity with the facts of this case as previously set forth in the Court's November 13, 2025 Memorandum Opinion and Order, as well as

---

[1]Defendant Officer Ernest Halvorsen is deceased. His wife, JoAnn Halvorsen, has been substituted as a Defendant and Special Representative for Ernest Halvorsen. R. 56.

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and, where necessary, a page or paragraph citation.

familiarity with the rulings (both procedural and substantive) therein. *See* R.337, 11/13/2025 Opinion. Accordingly, the Court only sets forth those facts necessary to resolve the City's motion, which it does so favorably to Iglesias, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Iglesias's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up);[3] *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed, to the extent disputed facts are supported by evidence.

In 1993–94, Iglesias was arrested, prosecuted, and convicted of the murder of Monica Roman. Am. Compl. ¶¶ 1, 117. Iglesias then spent 17 years behind bars before his conviction was vacated and all charges against him were dropped in January 2019. *Id.* ¶ 141.

Iglesias sued Defendant Officers under 42 U.S.C § 1983 and related state law alleging that he was wrongfully convicted and incarcerated. Am. Compl. Pertinent here, Iglesias also brings a municipal liability claim against the City under *Monell v.*

---

[3]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

*Dep't of Soc. Servs.,* 436 U.S. 658 (1978) (*Monell*) (Count V), alleging that his injuries "were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago." Am. Compl. ¶ 174. Specifically, Iglesias asserts he was injured by the City's policies and practices related to the fabrication of evidence; unduly suggestive identification procedures; evidence suppression; and the supervision and discipline of police officers.[4] *See* Am. Compl. ¶¶ 173–184. Iglesias also brings claims against the City for *respondeat superior* (Count X) and indemnification (Count XI).

The City moves for summary judgment on each of Iglesias's *Monell* theories of liability, as well as his claims for *respondeat superior* and indemnification. The fully briefed motion is before the Court.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

---

[4]Iglesias contends that the City has waived argument on a number of Iglesias's *Monell* theories. R. 278, Resp., at 107–109. However, the Court finds that the City's arguments fairly encapsulate all of Iglesias's theories.

3

If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

### I.     *Monell* (Count V)

Iglesias seeks to hold the City liable under *Monell* for the alleged misconduct of Defendant Officers during the investigation and prosecution related to the murder of Monica Roman. To establish *Monell* liability, a plaintiff must first demonstrate that he suffered a constitutional injury. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Once such an injury is demonstrated, "a local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Fields v. City of Chicago*, 981 F.3d 534, 562 (7th Cir. 2020) (cleaned up). For liability to attach, a plaintiff must prove that the municipality "had notice that its programs

4

would cause constitutional violations" and failed to take corrective action. *Id.*; *see also J.K.J. v. Polk Cty.*, 960 F.3d 367, 380 (7th Cir. 2020)(en banc). "That notice can be established in various ways, such as through proof of a prior pattern of similar constitutional violations, or through a demonstration that the need for governmental action is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to act constitutes deliberate indifference even in the absence of similar prior constitutional violations." *Id.* At bottom, "[t]he critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017); *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35–36 (2010).

Iglesias alleges that Defendant Officers' actions were taken pursuant to the City's deficient policies concerning photographic and live lineup identification procedures; the writing of investigative notes and police reports; the maintenance of investigative files and the disclosure of those files in criminal proceedings; and the training, supervision, and discipline of CPD officers. Am. Compl. ¶ 175. Further, Iglesias alleges five widespread practices of the City: the fabrication of evidence; the use of unduly suggestive lineup procedures; the suppression of exculpatory evidence; a failure to supervise and discipline CPD officers in response to complaints of misconduct; and fostering a "code of silence." *Id.* ¶¶ 177–180.

A.     **Underlying Constitutional Violations**

The City first argues that to the extent the Court grants Defendant Officers' corresponding motion for summary judgment, the Court should also grant the City's motion on Iglesias's *Monell* claim. Without an underlying constitutional violation by the Defendant Officers, the City reasons, Iglesias cannot proceed with a *Monell* claim on the same basis, as doing so would create an inconsistent verdict.  Memo. Summ. J. at 7 *(citing Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010)). The City, however, acknowledges that a municipality can be held liable under *Monell,* even when that liability is not dependent on its officers. *Id* But here, the City argues, where the alleged constitutional violations relate to the fabrication of evidence and the suppression of evidence, Defendant Officer liability is required. *Id*. (collecting cases). Iglesias disagrees, arguing that the alleged constitutional violations do not depend on Defendant Officers' actions. R. 278, Resp., at 162 (arguing a jury could find the City liable for evidence suppression due solely to its official policies and without any officers shouldering individual liability for that suppression). Iglesias cites no authority supporting this argument. The Court agrees with the City.

The City cites several cases that have held that, where the alleged constitutional violations are the fabrication of evidence and the suppression of exculpatory evidence, a finding of officer liability is a prerequisite to *Monell* liability. Memo. Summ. J. at 7–8 (citing *Mitchell v. City of Chicago*, No. 18-cv-7357, Dkt. 86 at 4 (N.D. Ill. Sept. 18, 2019) (*Monell* liability for fabrication of confession and coercion

6

of statements requires officer liability); *Andersen v. City of Chicago*, 2016 WL 7240765, at \*3–4 (N.D. Ill. Dec. 14, 2016) (*Monell* liability for evidence suppression requires officer liability); *Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1081 (N.D. Ill. 2018) (same); *Bouto v. Guevara*, 2021 WL 5415151, at \*4 (N.D. Ill. Nov. 19, 2021) ("the *Monell* violation alleged would likely first require a finding that the individual [d]efendants committed a *Brady* violation"). The Court finds the reasoning of the cases persuasive. In the absence of any binding authority to the contrary, the Court finds that any harm caused by the City's policies and practices related to evidence fabrication and suppression can only arise through officer actions. In short, any finding of municipal liability here is dependent on the liability of Defendant Officers.

### B. Fabrication of Evidence and Unduly Suggestive Identification Procedures

Iglesias alleges that CPD had a widespread practice of fabricating evidence, including eyewitness identifications, statements and testimony of witnesses, and evidence implicating criminal defendants in criminal conduct. Am. Compl. ¶¶ 178–179. Additionally, Iglesias alleges that CPD had a widespread practice of obtaining identifications through unduly suggestive identification procedures. *Id.* ¶ 178.

As explained in the Court's November 13, 2025 Memorandum Opinion and Order, Iglesias timely presented three baskets of evidence alleged to have been fabricated in his case: (1) eyewitness identifications; (2) a confidential informant tip; and (3) a statement and corresponding testimony, provided by Iglesias's fellow pretrial detainee, that Iglesias confessed to Roman's murder. 11/13/2025 Opinion at

16. Additionally, Iglesias asserted that he presented evidence supporting his allegation that the eyewitness identifications were procured through unduly suggestive identification procedures. *Id.* at 24. While the Court granted summary judgment in favor of Defendant Officers as to the fabrication of identifications and the procurement of identifications through unduly suggestive procedures, it denied summary judgment as to the fabrication of the confidential informant tip and Iglesias's "jailhouse" confession. *Id.* at 19–26.

Given the Court's ruling that Defendant Officer liability is a prerequisite to municipal liability here, it must grant summary judgment in favor of the City to the extent that Iglesias's widespread practice theories are related to the fabrication of eyewitness identifications and unduly suggestive identification procedures. However, the City makes no argument that Iglesias has failed to set forth evidence related to the alleged widespread CPD practices of fabricating evidence *beyond* identifications, such as false witness statements, false witness testimony, and evidence—such as a confidential informant tip—that falsely implicates individuals such as Iglesias in criminal conduct. Accordingly, the Court must find that the City has waived any argument that it is entitled to summary judgment on the theory that CPD's widespread practice of fabricating evidence—excluding identifications—caused Iglesias's constitutional injuries. *Lewis v. Mills*, 677 F.3d 324, 332 (7th Cir. 2012); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010).

### C. Suppression of Evidence

In Count V, Iglesias first alleges that the City's express, facially deficient policies for the "writing of police reports and taking of investigative notes" and the "maintenance of investigative files and disclosure of those files in criminal proceedings" caused Iglesias's constitutional injuries. Am. Compl. ¶ 175. Iglesias further alleges that the City was on notice and deliberately indifferent to CPD's widespread practices of failing to "record investigative information in police reports," "maintain proper investigative files," and "disclose investigative materials to prosecutors and criminal defendants." *Id.* ¶ 179. The Court addresses each in turn.

#### 1. The City's Policies

As an initial matter, although the City does not explicitly argue that it is entitled to summary judgment on the issue of deficient policies, it explains its written policies in a seeming effort to demonstrate their facial sufficiency. *See* Memo. Summ. J. at 21–23. Iglesias maintains that the City's express written policies were insufficient to stem the suppression of investigative materials and other evidence in CPD homicide investigations. Resp. at 115–119.

To the extent that the City argues that no reasonable jury could find its written policies deficient or that those policies caused a constitutional violation, the Court rejects that argument as other courts in this District have done previously. *See Fields v. City of Chicago*, 2014 WL 477394, at *11 (N.D. Ill. Feb. 6, 2014) (concluding that a reasonable jury could find that the City's written policies failed to stop practices leading to evidence suppression); *Johnson v. Guevara*, 2025 WL 903813, at *36 (N.D.

9

Ill. Mar. 24, 2025) (explaining that "[t]he enforcement of the [City's] policies as written could violate a constitutional right because an officer fully complying with these policies still could refrain from providing the investigative file to the prosecution, even if it contained exculpatory evidence."). Accordingly, whether the City's written policies caused Iglesias's injury is a question for the jury.

### 2. Widespread Practice

Iglesias asserts that CPD has a widespread practice of evidence suppression and as such, the City is liable for this widespread practice. Am. Compl. ¶ 179. The City argues that Iglesias has failed to put forth any evidence demonstrating the existence of this alleged widespread practice. Memo. Summ. J. at 24.

To prevail on a widespread practice theory, Iglesias must prove three elements: (1) a widespread pattern or practice, (2) deliberate indifference, and (3) causation. *Velez v. City of Chicago*, 2023 WL 6388231, at *23 (N.D. Ill. Sept. 30, 2023). "A plaintiff can satisfy his burden to show a widespread custom or practice with evidence that shows a series of bad acts or evidence from which the factfinder could infer that the municipality was bound to have noticed the issue." *Johnson*, 2025 WL 903813, at *36. There are no bright-line rules defining how frequently conduct must occur to impose *Monell* liability, except it must be more than one instance or even three. *Thomas*, 604 F.3d at 303; *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) ("Isolated" acts committed by non-policymaking officials generally do not amount to a "custom" which "implies a habitual practice or a course of action that characteristically is repeated under like circumstances.") (cleaned up).

10

In support of this argument, the City focuses solely on Iglesias's expert, Thomas Tiderington (Tiderington), contending he fails to "establish a policy and practice of maintaining and concealing exculpatory evidence," and characterizing his opinions as "thin" and reliant on speculation. Memo. Summ. J. at 25. Here, the City rehashes the same arguments advanced in its *Daubert* motion that sought to bar Tiderington's opinions and testimony from this case. R. 252. That is, the City argues Tiderington's methodology is flawed and his opinions unreliable. The Court has rejected these arguments and need not address them again. *See* R. 328, 03/31/2025 Order. While the City's issues with Tiderington's analysis and opinions are fodder for cross-examination, they do not undermine the disputes of fact he generates, which the Court recites below.

Tiderington reviewed "475 homicide files from Area Five for the period 1991-1995 (the five-year period leading up to and through Iglesias's wrongful prosecution), and 344 Area Five investigative files from 1995-1998[.]" Resp. at 120. Tiderington also reviewed permanent retention files and criminal defense files corresponding to those time periods. *Id*. at 120–121. Upon reviewing these materials, Tiderington made several findings that could lead a jury to find the existence of widespread evidence suppression. His review of investigative files revealed that: 24% (1991-1995) and 17% (1995-1998) of total investigative files contained no inventory sheet, which City policy required "as a means to ensure disclosure;" approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files contained [potentially exculpatory] handwritten notes" that were not transferred to official reports; and 10%

11

(1991-1995) and approximately 28% (1995-1998) contained "to-from" memos not on official police forms, contrary to City policy. *Id.* at 120–121. Tiderington's review of permanent retention files revealed that, "during both of these time periods," the files "routinely lacked an inventory sheet as required by [City] policy." *Id.* at 121. Last, Tiderington's "comparison of the investigative files and corresponding criminal defense files for the years 1995-1998 demonstrated that important investigative materials were regularly withheld from criminal defendants, as nearly all of the criminal defense files were missing documents contained in the corresponding [CPD] homicide files." *Id.* Ultimately, Tiderington provided two opinions:

(1)     CPD's documentation and disclosure policies were contrary to accepted police practice and lacked the appropriate safeguards to ensure the disclosure of *Brady* material to prosecutors and criminal defendants; and

(2)     CPD had a widespread practice of failing to disclose investigative information.

Viewing the evidence in the light most favorable to Iglesias, the Court finds he has presented sufficient evidence creating a genuine dispute of fact as to whether CPD had a widespread practice of evidence suppression.[5] *See Johnson,* 2025 WL 903813, at \*37 (Tiderington's findings sufficient for a reasonable jury to find that "the City had a widespread practice of evidence suppression in the CPD" and "that the City should have noticed the issue"); *Washington v. Boudreau,* 2022 WL 4599708, at \*16–18 (N.D. Ill. Sept. 30, 2022) (finding similar expert evidence sufficient to preclude summary judgment on plaintiff's widespread evidence suppression theory).

---

[5]While Iglesias argues that a host of non-expert evidence also precludes summary judgment, the Court finds Tiderington's findings alone to be sufficient.

12

**D.     Failure to Supervise and Discipline Officers and "Code of Silence"**

Iglesias also argues that the City is liable for the aforementioned widespread practices because it "failed to supervise[] and discipline its officers on a City-wide basis . . . resulting in repeated police misconduct" and "condoned a code of silence that prevented police misconduct from coming to light.[]" Resp. at 128.

For starters, the City makes no argument as to why it is entitled to summary judgment on Iglesias's "code of silence" claim, focusing instead solely on Iglesias's failure to discipline theory. Accordingly, the City has waived any argument related to the alleged "code of silence." *Lewis*, 677 F.3d at 332 ("Unsupported and underdeveloped arguments are waived.") (cleaned up); *Gross*, 619 F.3d at 704.

Regarding its alleged failure to supervise and discipline its officers, the City argues that Iglesias has not set forth any evidence showing "the City had a widespread practice of failing to discipline its officers or that its disciplinary system was otherwise deficient." Memo. Summ. J. at 38. Again, the City takes aim at Iglesias's experts—here, Anthony Finnell (Finnell) and Miroslava Meza (Meza). Among other things, Finnell reviewed over 300 complaint registers[6] (CRs) from 1989-1993 containing over 2,000 allegations of police misconduct, and Meza, a statistician, analyzed the relevant data distilled from the CR files. *See* R. 336, 08/13/2025 Order, at 2. From this analysis, Finnell proffered two global opinions:

(1)     The Chicago Police Department and the Defendant City of Chicago engaged in a widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices.

---

[6]Complaint registers are files that documented misconduct allegations and investigations into certain CPD officers.

(2)     The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses.

*Id*. at 3.

As it did for Tiderington, the City regurgitates the arguments made in its *Daubert* motion that sought to bar Finnell and Meza's opinions and testimony from this case, which the Court denied in full. R. 250, Mot. to Bar; 08/13/2025 Order. The Court has already rejected these arguments and need not address them again. The Court finds that, through Finnell and Meza,[7] Iglesias has presented ample evidence that could lead a jury to impose *Monell* liability for the City's failure to supervise and discipline its officers.

Through Finnell and Meza, Iglesias has presented evidence that Defendant Officers received 64 CR's over their careers. Resp. at 132. Defendant Guevara alone received 30 CR's involving "misconduct including false reports, false arrest, warrantless searches, verbal and physical abuse/excessive force, and fabrication of evidence." *Id*. However, Guevara was disciplined just three times, receiving a one-day suspension, a two-day suspension, and a twenty-day suspension. *Id*. Defendants Halvorsen and Gawrys were never disciplined, and Defendant Riccio, despite receiving 16 CR's, was disciplined just once, receiving a three-day suspension. *Id*. Further, Finnell and Meza found that out of the 1,129 relevant allegations of police misconduct between 1989-1993, CPD "sustained just 23 after investigation and 10 after final review." *Id*. Finnell found this sustained rate to be "well below the national

---

[7]Iglesias again argues that a host of non-expert evidence also precludes summary judgment here. The Court finds Finnell and Meza's findings alone to be sufficient.

14

average, compared to other departments, and reflected a deeply flawed system of investigation and disciplining serious police misconduct, particularly forms of police misconduct that cause wrongful convictions." *Id.* (cleaned up). Last, Finnell opined that that " [e]ven where allegations were sustained, officers did not face meaningful discipline." *Id.*

This is just some of the evidence Iglesias has put forth that could lead a jury to find *Monell* liability here. Indeed, courts in this district have routinely found such evidence sufficient to preclude summary judgment on a *Monell* claim. *See e.g., Velez*, 2023 WL 6388231, at \*25 (finding that Finnell's identical analysis of CR's from 1996-2001 precluded summary judgment on failure to supervise and discipline theory); *Washington*, 2022 WL 4599708, at \*16–17 (expert opinion on deficiencies of investigations and discipline precluded summary judgment); *Marcinczyk v. Plewa*, 2012 WL 1429448, at \*3–4 (N.D. Ill. Apr. 25, 2012) (summary judgment precluded where evidence indicated that "minuscule percentage of civil rights complaints [were] found to be meritorious after investigations and that officers who [had] complaints lodged successfully against them [were] subject to only minimal discipline").

### E.    Causation

The last arrow in the City's quiver is that Iglesias has failed to produce sufficient evidence on the issue of causation.[8] Memo. Summ. J. at 50.

---

[8]To the extent that the City argues that Iglesias has failed to put forth any evidence showing deliberate indifference, it appears the City predicates this argument upon the Court finding no evidence demonstrating any of the alleged widespread practices. Memo. Summ. J. at 50–52. This argument fails, as the Court has found Iglesias adduced sufficient evidence in this regard.

To be held liable under *Monell*, the City's policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. Of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up); *see Est. of Novack ex rel. Turbin v. Cnty. Of Wood*, 226 F.3d 525, 530 (7th Cir. 2000). Surviving summary judgment on the issue of causation is not an exacting task—"as long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury," *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017); *Velez*, 2023 WL 6388231, at *25; *Washington*, 2022 WL 4599708, at *16.

Regarding Iglesias's *Monell* claim based on CPD's widespread practice of evidence suppression, the City simply posits that, because Iglesias has not set forth any evidence demonstrating this widespread practice, he has failed to show causation. Memo. Summ. J. at 50. Given the Court has found that Iglesias presented sufficient evidence of CPD's widespread practice of evidence suppression, this argument fails.

As for Iglesias's failure to supervise and discipline *Monell* claim, the City argues that Iglesias has not shown that "City policymakers were aware of, and acquiesced in, a pattern of constitutional violations, which is required to hold a municipality liable for failure to train." *Id.* at 51 (cleaned up). Iglesias counters, pointing to the 1990 Goldston Report, which "found that command-level Chicago police employees were aware of . . . sustained police misconduct[.]" Resp. at 129. Through this report, argues Iglesias, City policymakers "had direct notice of the

16

problem of systemic abuses of constitutional rights occurring at the hands of officers in the [CPD]," knew the "problem was widespread, that command-level officers knew of it, and that specific corrective action was essential." Resp. at 145. Iglesias argues further that the City took no disciplinary action in light of this report. *Id.* at 146. The Court agrees with Iglesias that this is sufficient to create a genuine issue of fact as to whether City policymakers had notice of the need to supervise and discipline officers, and whether they were deliberately indifferent to that need. Accordingly, a jury must determine the extent of the causal link between Iglesias's injuries and the City's failure to supervise and discipline its officers.

All in all, the Court finds that Iglesias has presented sufficient evidence that CPD's widespread practices were the moving force behind his constitutional injuries. That is, based on all of the evidence discussed herein, the Court finds that a reasonable jury could find a direct causal link between the alleged misconduct of the Defendant Officers and CPD's widespread practices of fabricating evidence, suppressing evidence, and failing to supervise and discipline officers. *See Velez*, 2023 WL 6388231, at *25; *Washington*, 2022 WL 4599708, at *16.

## II. *Respondeat Superior* (Count X) and Indemnification (Count XI)

Claims for *respondeat superior* and indemnification are derivative liability claims that survive only to the extent Iglesias's claims against Defendant Officers survive. *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). Further, they do not apply to claims arising under Section 1983. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Accordingly, the Court grants summary judgment on Counts

17

X and XI to the extent they are based on Iglesias's state law claim for malicious prosecution. *See* 11/13/2025 Opinion. (granting summary judgment in favor of Defendant Officers on Iglesias's state law malicious prosecution claim). However, the Court denies summary judgment on Counts X and XI to the extent they are based on Iglesias's state law claims for conspiracy, intentional infliction of emotional distress, and willful and wanton conduct. *Id.* (denying summary judgment on all of Iglesias's remaining state law claims).

## Conclusion

For the reasons set forth above, the Court grants in part and denies in part the City's motion for summary judgment. R. 241.

Date: November 26, 2025

United States District Judge
Franklin U. Valderrama

18